**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>  v.<br><br>INTERNET RESEARCH AGENCY LLC, *et al.*,<br><br>  Defendants. | Criminal Action No. 18-00032 (DLF) |

**DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S
MOTION TO DISMISS THE INDICTMENT BASED ON THE SPECIAL COUNSEL'S
UNLAWFUL APPOINTMENT AND LACK OF AUTHORITY TO INDICT CONCORD**

Pursuant to Rule 12(b)(1) of the Federal Rules of Criminal Procedure, Defendant Concord Management and Consulting LLC ("Concord") moves to dismiss the Indictment, ECF No. 1, in its entirety.  As set forth more fully in the accompanying memorandum of points and authorities, the Indictment should be dismissed for three independent reasons:

(1)  The appointment of Robert S. Mueller III (the "Special Counsel") violates the Appointments Clause, U.S. Const. art. II, § 2, cl. 2;

(2)  The regulations governing the Special Counsel, 28 C.F.R. pt. 600, are unlawful and violate core separation-of-powers principles; and

(3)  Even if the regulations are valid and binding, the order appointing the Special Counsel is inconsistent with the regulations and does not authorize a prosecution against Concord.

In accordance with Local Criminal Rule 47(c), a proposed order granting the relief requested is attached as Exhibit F.

Dated: June 25, 2018                              Respectfully submitted,

                                                  CONCORD MANAGEMENT
                                                  AND CONSULTING LLC


                                   By:   /s/ Eric A. Dubelier
                                         Eric A. Dubelier (D.C. Bar No. 419412)
                                         Katherine J. Seikaly (D.C. Bar No. 498641)
                                         REED SMITH LLP
                                         1301 K Street, N.W.
                                         Suite 1000 – East Tower
                                         Washington, D.C. 20005-3373
                                         202.414.9200 (phone)
                                         202.414.9299 (fax)
                                         edubelier@reedsmith.com
                                         kseikaly@reedsmith.com

                                         James C. Martin[*]
                                         Colin E. Wrabley[*]
                                         REED SMITH LLP
                                         225 Fifth Avenue
                                         Pittsburgh, PA 15222-2716
                                         412.288.3131 (phone)
                                         412.288.3063 (fax)
                                         jcmartin@reedsmith.com
                                         cwrabley@reedsmith.com

                                         [*] *Motion for Admission Pro Hac Vice Pending*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>INTERNET RESEARCH AGENCY LLC, *et al.*,<br><br>Defendants. | Criminal Action No. 18-00032 (DLF) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S
MOTION TO DISMISS THE INDICTMENT BASED ON THE SPECIAL COUNSEL'S
UNLAWFUL APPOINTMENT AND LACK OF AUTHORITY TO INDICT CONCORD**

Eric A. Dubelier (D.C. Bar No. 419412)
Katherine J. Seikaly (D.C. Bar No. 498641)
REED SMITH LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005-3373
202.414.9200 (phone)
202.414.9299 (fax)
edubelier@reedsmith.com
kseikaly@reedsmith.com

James C. Martin[*]
Colin E. Wrabley[*]
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222-2716
412.288.3131 (phone)
412.288.3063 (fax)
jcmartin@reedsmith.com
cwrabley@reedsmith.com

*Counsel for Defendant Concord
Management and Consulting LLC*

[*] *Motion for Admission Pro Hac Vice Pending*

## <u>TABLE OF CONTENTS</u>

Page

I.    PRELIMINARY STATEMENT ...................................................................................... 1

II.   FACTUAL BACKGROUND.......................................................................................... 2

III.  LEGAL STANDARDS ................................................................................................. 6

IV.   ARGUMENT................................................................................................................. 6

   A.   The Concord Indictment should be dismissed because the Special
        Counsel's appointment violates the Constitution's Appointments Clause............. 6

        1.   If the Special Counsel is an inferior officer, he was unlawfully
             appointed by the Deputy Attorney General without authorization
             from Congress. ...................................................................................... 7

             a.   The Special Counsel is an "Officer" who must be
                  properly appointed. ........................................................................ 8

             b.   Congress has not enacted a statute that clearly gives
                  the Attorney General or Deputy Attorney General the
                  power to appoint a private attorney as an "Officer." .................... 10

        2.   Alternatively, the Special Counsel is a principal officer required to
             be—but who was not—appointed by the President and confirmed
             by the Senate. ....................................................................................... 26

   B.   The Concord Indictment should be dismissed because the Special Counsel
        Regulations are unlawful and invalid and, consequently, the Special
        Counsel position violates core separation-of-powers principles. ........................ 40

   C.   The Concord Indictment should be dismissed because even if the Special
        Counsel Regulations are valid and binding, the Appointment Order is
        inconsistent with them and does not authorize a prosecution against
        Concord................................................................................................................. 44

V.    CONCLUSION............................................................................................................. 50

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Abourezk v. Reagan*,
    785 F.2d 1043 (D.C. Cir. 1986) ................................................................. 5

*Adams Fruit Co. v. Barrett*,
    494 U.S. 638 (1990) ....................................................................... 43

*Airlines for Am. v. Transp. Sec. Admin.*,
    780 F.3d 409 (D.C. Cir. 2015) ............................................................... 23

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
    --- F. Supp. 3d ---, No. 1:16-cv-02394-DLF, 2018 WL 1542049
    (D.D.C. Mar. 29, 2018) .............................................................. 16, 18

*Ass'n of Am. R.Rs. v. Dep't of Transp.*,
    821 F.3d 19 (D.C. Cir. 2016) ............................................................ 29, 41

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
    785 F.3d 710 (D.C. Cir. 2015) ............................................................... 32

*Barrett v. United States*,
    423 U.S. 212 (1976) ....................................................................... 17

*Bond v. United States*,
    134 S. Ct. 2077 (2014) .................................................................... 12

*Buckley v. Valeo*,
    424 U.S. 1 (1976) .......................................................................... 8

*Burnap v. United States*,
    252 U.S. 512 (1920) ....................................................................... 10

*Cent. United Life Ins. Co. v. Burwell*,
    827 F.3d 70 (D.C. Cir. 2016) ............................................................... 11

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ....................................................................... 41

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ....................................................................... 16

---

[*]     Authorities upon which we chiefly rely are marked with asterisks.

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004)................................................................... 26

*Cyan v. Beaver Cnty. Employees Retirement Fund*,
138 S. Ct. 1061 (2018)............................................................. 33

*Dean v. United States*,
556 U.S. 568 (2009).......................................................... 16, 17

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
135 S. Ct. 1225 (2015)......................................................... 30, 48

\* *Edmond v. United States*,
520 U.S. 651 (1997)......................................................... *passim*

*Erie Blvd. Hydropower, LP v. FERC*,
878 F.3d 258 (D.C. Cir. 2017)................................................ 44

*Estes v. U.S. Dep't of Treasury*,
219 F. Supp. 3d 17 (D.D.C. 2016)......................................... 30

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)................................................................ 41

*Fed. Maritime Comm'n v. Seatrain Lines, Inc.*,
411 U.S. 726 (1973)................................................................ 20

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)................................................................ 12

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010)......................................................... *passim*

*Freytag v. Comm'r of Internal Revenue*,
501 U.S. 868 (1991)...................................................... 7, 12, 30, 48

*FTC v. Guignon*,
390 F.2d 323 (8th Cir. 1968) ................................................. 22

*FTC v. Ruberoid Co.*,
343 U.S. 470 (1952)................................................................ 41

*Go-Bart Importing Co. v. United States*,
282 U.S. 344 (1931)................................................................. 8

*Gonzales v. Oregon*,
546 U.S. 243 (2006)................................................................ 41

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004)..............................................................................27

*Henson v. Santander Consumer USA Inc.,*
    137 S. Ct. 1718 (2017)........................................................................32

*In re Grand Jury Subpoena, Judith Miller,*
    438 F.3d 1141 (D.C. Cir. 2006)...........................................................47

*In re Olson,*
    818 F.2d 34 (D.C. Cir. 1987)...............................................................20

*In re Sealed Case,*
    829 F.2d 50 (D.C. Cir. 1987)...............................................23, 24, 25

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
    684 F.3d 1332 (D.C. Cir. 2012)....................................................*passim*

*Jimenez v. Quarterman,*
    555 U.S. 113 (2009)............................................................................17

*King Mfg. Co. v. Augusta,*
    277 U.S. 100 (1928)............................................................................21

*Kucana v. Holder,*
    558 U.S. 233 (2010)............................................................................12

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986)............................................................................11

*Lopez v. Davis,*
    531 U.S. 230 (2001)............................................................................32

*Loving v. IRS,*
    742 F.3d 1013 (D.C. Cir. 2014)...........................................................15

*Lucia v. SEC,*
    --- S. Ct. ---, No. 17-130, 2018 WL 3057893 (U.S. June 21, 2018)....................8, 16

*Mach Mining, LLC v. EEOC,*
    135 S. Ct. 1645 (2015)........................................................................48

*Marshall v. Gibson's Prods., Inc.,*
    584 F.2d 668 (5th Cir. 1978) ...............................................................22

*Miles v. Apex Marine Corp.,*
    498 U.S. 19 (1990)..............................................................................21

*Morrison v. Olson*,
  487 U.S. 654 (1988) ................................................................................................... *passim*

*Morton v. Ruiz*,
  415 U.S. 199 (1974) ........................................................................................................... 48

*Myers v. United States*,
  272 U.S. 52 (1926) .............................................................................................................. 9

*Nguyen v. United States*,
  539 U.S. 69 (2003) ............................................................................................................ 43

*NLRB v. SW Gen., Inc.*,
  137 S. Ct. 929 (2017) ............................................................................................. 26, 27, 43

*Pereira v. Sessions*,
  --- S. Ct. ---, No. 17-459, 2018 WL 3058276 (U.S. June 21, 2018) ........................................ 31

*Ryder v. United States*,
  515 U.S. 177 (1995) ....................................................................................................... 6, 36

*SAS Inst., Inc. v. Iancu*,
  138 S. Ct. 1348 (2018) ...................................................................................................... 32

*Smith v. City of Jackson*,
  544 U.S. 228 (2005) .......................................................................................................... 23

*St. Louis, I. M. & S. Ry. Co. v. United States*,
  251 U.S. 198 (1920) .......................................................................................................... 21

*Sutherland v. Int'l Ins. Co. of N.Y.*,
  43 F.2d 969 (2d Cir. 1930) .................................................................................................. 9

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) .......................................................................................................... 44

*United States ex rel. Totten v. Bombardier Corp.*,
  380 F.3d 488 (D.C. Cir. 2004) ............................................................................................ 16

*United States v. Ballestas*,
  795 F.3d 138 (D.C. Cir. 2015) .............................................................................................. 6

*United States v. California*,
  332 U.S. 19 (1947) ............................................................................................................ 11

*United States v. Giangola*,
  No. 1:07-cr-00706-JB, 2008 WL 3992138 (D.N.M. May 12, 2008) ........................................... 9

*United States v. Hercules, Inc.*,
   961 F.2d 796 (8th Cir. 1992) ................................................................. 11

*United States v. Int'l Union of Operating Eng'rs, Local 701*,
   638 F.2d 1161 (9th Cir 1979) ............................................................... 11

*United States v. Manafort*,
   No. 1:17-cr-00201-ABJ, 2018 WL 2223656 (D.D.C. May 15, 2018) ................. 48

*United States v. Menasche*,
   348 U.S. 528 (1955) ............................................................................ 17

*United States v. Nixon*,
   418 U.S. 683 (1974) .......................................................... 23, 24, 25, 44

*United States v. Park*,
   297 F. Supp. 3d 170 (D.D.C. 2018) ......................................................... 6

*United States v. Providence Journal Co.*,
   485 U.S. 693 (1988) ....................................................................... 36, 43

*United States v. Rosenthal*,
   121 F. 862 (C.C.S.D.N.Y. 1903) ............................................................ 42

*United States v. San Jacinto Tin Co.*,
   125 U.S. 273 (1888) ....................................................................... 9, 11

*United States v. Sheffield*,
   832 F.3d 296 (D.C. Cir. 2016) .............................................................. 26

*United States v. Wilson*,
   503 U.S. 329 (1992) ............................................................................ 16

*Wisc. Cent. Ltd. v. United States*,
   --- S. Ct. ---, No. 17-530, 2018 WL 3058014 (U.S. June 21, 2018) ................ 18

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ............................................................................ 31

## CONSTITUTION

U.S. Const. art. I, § 7, cl. 2 ................................................................... 21

U.S. Const. art. I, § 8 ........................................................................... 16

U.S. Const. art. I, § 8, cl. 18 ................................................................. 21

* U.S. Const. art. II, § 2, cl. 2 (Appointments Clause) .............................. *passim*

## STATUTES

17 U.S.C. § 801(a) ........................................................................................... 10

18 U.S.C. § 371 ........................................................................................... 37, 38

18 U.S.C. § 1001 ............................................................................................... 38

28 U.S.C. § 509 ........................................................................................... *passim*

28 U.S.C. § 510 ........................................................................................... *passim*

28 U.S.C. § 515 ........................................................................................... *passim*

28 U.S.C. § 515(a) ....................................................................................... *passim*

28 U.S.C. § 516 ..................................................................................... 11, 22, 24

28 U.S.C. § 519 ......................................................................................... 11, 22

28 U.S.C. § 533 ............................................................................................... 24

28 U.S.C. § 542(a) ........................................................................................... 17

28 U.S.C. § 543(a) ....................................................................................... 17, 19

28 U.S.C. § 591 ............................................................................................... 21

28 U.S.C. § 592 ............................................................................................... 21

28 U.S.C. § 593 ............................................................................................... 21

52 U.S.C. § 30109(d) ........................................................................................ 38

Act of Aug. 2, 1861,
    ch. 37, 12 Stat. 285 .................................................................................... 19

Act of Aug. 5, 1909,
    ch. 6, 36 Stat. 11 ....................................................................................... 19

Act of June 30, 1906,
    ch. 3935, 34 Stat. 816 .................................................................... 14, 15, 19, 42

Act of June 30, 1926,
    ch. 712, 44 Stat. pt. I, 1 ............................................................................. 14, 15

Act of Sept. 6, 1966,
     Pub. L. No. 89-554, 80 Stat. 378 ........................................................................... 15

Act to Establish the Department of Justice,
     ch. 150, 16 Stat. 162 (1870) ................................................................................ 11

Foreign Affairs Act of 1789,
     ch. 4, 1 Stat. 28 .................................................................................................. 34

H.J. Res. 160,
     68th Cong., ch. 42, 43 Stat. 16 (1924) ................................................................ 20

Judiciary Act of 1789,
     ch. 20, 1 Stat. 73 ................................................................................................ 11

S.J. Res. 54,
     68th Cong., ch. 16, 43 Stat. 5 (1924) .................................................................. 20

## SUPERSEDED STATUTES

5 U.S.C. § 310 (1926) ................................................................................................. 15

5 U.S.C. § 310 (1964) ................................................................................................. 15

## REGULATIONS

28 C.F.R. § 600.1 ........................................................................................... 4, 45, 46

28 C.F.R. § 600.3 ..................................................................................................... 4

28 C.F.R. § 600.4 ..................................................................................................... 3

28 C.F.R. § 600.6 ........................................................................................... 8, 31, 34

28 C.F.R. § 600.7(a) ........................................................................................... 34, 35

28 C.F.R. § 600.7(b) ............................................................................... 31, 32, 33, 34

28 C.F.R. § 600.7(d) ............................................................................................... 35

28 C.F.R. § 600.8(b) ............................................................................................... 34

28 C.F.R. § 600.10 ......................................................................................... 3, 47, 48

## RULES

Fed. R. Crim. P. 12(b)(1) .......................................................................................... 6

Final Rule, 52 Fed. Reg. 7270 (Mar. 10, 1987) ......................................................... 24

Final Rule, 64 Fed. Reg. 37,038 (July 9, 1999) ........................................................... 43

# OTHER AUTHORITIES

Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747 (1999) ............................... 27

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of
    Legal Texts* (2012) ................................................................................................ 18, 19

*Appointment of Assistant Appraisers at New York*,
    15 Op. Att'y Gen. 449 (1878) ....................................................................................... 12

Black's Law Dictionary (1st ed. 1891) ....................................................................... 18

Black's Law Dictionary (2d ed. 1910) ........................................................................ 18

Bryan A. Garner et al., *The Law of Judicial Precedent* (2016) .................................... 26

Dep't of Justice Order No. 3915-2017 (May 17, 2017) ....................................... *passim*

Dep't of Justice, *Federal Prosecution of Election Offenses* (8th ed. 2017) ................. 37

Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* (1890) ......... 8

Francis Rawle, *Bouvier's Law Dictionary* (8th ed. 1914) ........................................... 18

James B. Comey, Dir., Fed. Bureau of Investigation, Statement Before the House
    Permanent Select Committee on Intelligence (Mar. 20, 2017) .............................. 3, 45

Kenneth Gormley, *An Original Model of the Independent Counsel Statute*,
    97 Mich. L. Rev. 601 (1998) ................................................................................. 40, 41

Press Release, Dep't of Justice,
    Attorney General Sessions Statement on Recusal (Mar. 2, 2017) ............................ 46

Press Release, Dep't of Justice, Appointment of Special Counsel (May 17, 2017) ....... 3

Statement of Prof. Akhil Reed Amar, *Special Counsels and the Separation of Powers:
    Hearing on S. 1735 & S. 1741 Before the S. Judiciary Comm.*, 115th Cong. (2017) ............. 38

*The Attorney General's Role as Chief Litigator for the United States*,
    6 Op. O.L.C. 47 (1982) ...................................................................................... 11, 22

*The Federalist No. 51* (James Madison) (Barnes & Noble ed., 2006) ......................... 40

Tim Hains, *Rosenstein: "No Allegation in This Indictment That Any American Had Any
    Knowledge" of Russian Election Influence Operation*, RealClearPolitics (Feb. 16, 2018) ..... 46

*United States Attorneys—Suggested Appointment Power of the Attorney General—Constitutional Law (Article II, § 2, cl. 2)*, 2 Op. O.L.C. 58 (1978) ........................................... 9

Walter A. Shumaker & George Foster Longsdorf, *The Cyclopedic Dictionary of Law* (1901) ... 18

*Webster's New International Dictionary* (2d ed. 1934) ............................................................... 19

William Blackstone, *Commentaries on the Laws of England* (3d ed. 1768) ................................. 8

## I.      PRELIMINARY STATEMENT

This case is brought by a former private attorney—Robert S. Mueller III (the "Special Counsel")—who claims that he has discretion to exercise the Federal Government's exclusive and plenary prosecutorial powers pursuant to an appointment order issued by the Deputy Attorney General that is not authorized by the express terms of any statute and contravenes fundamental constitutional principles.  This deeply flawed delegation of these vast prosecutorial powers accordingly should be declared unlawful and the Indictment, ECF No. 1, should be dismissed with respect to Defendant Concord Management and Consulting LLC ("Concord").

*First*, the Appointments Clause of Article II, § 2 of the United States Constitution requires that all "Officers of the United States" be appointed by the President and confirmed by the Senate, though "inferior Officers" may be appointed by the "Head[]" of a "Department[]"— in this case, the Attorney General—if Congress "by Law vest[s]" a department head with the authority to do so.  The Special Counsel is either a principal officer or an inferior officer.  Regardless, his appointment is unconstitutional because he was not appointed by the President and confirmed by the Senate as required for a principal officer, and there was no statutory authorization ("by Law") allowing the Deputy Attorney General to appoint the Special Counsel as an inferior officer and confer on him the Attorney General's exclusive and plenary prosecutorial authority.  Since the requirements of the Appointments Clause are not met, the Indictment must be dismissed.

*Second*, to the extent the Special Counsel attempts to rely on regulations issued by the Attorney General in 1999—and the Special Counsel has argued elsewhere that the regulations are non-binding guidelines not enforceable in court—that fails because they are unlawful and cannot fill the critical voids left by statute.  The Attorney General lacked authority to issue those

regulations and they cannot, in any event, confer any power on the Attorney General that only Congress can provide him.

*Third*, the Deputy Attorney General's appointment order does not and cannot act as a proxy for an unconstitutional delegation of the Federal Government's prosecutorial powers. Apart from its lack of statutory authorization, the extension of the appointment order to Concord goes beyond the order's terms and the Attorney General's 1999 regulations that purportedly govern it. The Indictment should be dismissed for both these reasons as well.

Given the context surrounding this proceeding and the anticipated response from the Special Counsel, it is important to emphasize what Concord's motion is not. It does not suggest or imply that a private attorney can never be appointed to prosecute (or help a United States Attorney prosecute) an action on behalf of the Federal Government. That concededly can be done with a constitutionally valid appointment or express congressional authorization, neither of which is present here. But under this Nation's established constitutional framework, without a proper appointment and express congressional authorization, neither the Attorney General nor his subordinates have the inherent authority to empower a private attorney to investigate and prosecute *anyone*, regardless of citizenship, when he or she deems it is expedient to do so under jurisdictional ground rules that he or she alone sets down. Here, the Deputy Attorney General and the Special Counsel are attempting to exercise authority neither the Constitution nor Congress has conferred, and this Court should dismiss the Indictment to restore the checks and balances the Constitution demands.

## II.   FACTUAL BACKGROUND

The authority to investigate and indict in this case purportedly rests with the Special Counsel by virtue of a one-page appointment order signed by Deputy Attorney General Rod J. Rosenstein on May 17, 2017. *See* Ex. A: Dep't of Justice Order No. 3915-2017 ("Appointment

Order" or "Order"). The Order appoints Robert S. Mueller III, a private attorney, to serve as Special Counsel. *Id.* ¶ (a); *see also* Ex. B: Press Release, Dep't of Justice, Appointment of Special Counsel (May 17, 2017) (listing Mr. Mueller as a "former" Department of Justice official). The basis for the appointment, according to the Order, arises from a previous investigation conducted by the Federal Bureau of Investigation ("FBI"). Ex. A ¶ (b). As a result of that investigation, the Special Counsel is, in turn, directed to investigate any links or coordination between the Russian government and individuals associated with the 2016 presidential campaign of Donald J. Trump. *Id.* ¶ (b)(i). The Order says nothing about which, if any, federal criminal statutes could have been violated by any such links; nor does it indicate why any purported violations are apparent. According to the Order, the Special Counsel's appointment nevertheless is authorized by 28 U.S.C. §§ 509, 510, and 515, *see* Ex. A (introductory paragraph), and the regulations set forth in 28 C.F.R. §§ 600.4 to 600.10 (the "Special Counsel Regulations" or "Regulations"), which are deemed "applicable" to the Special Counsel as appointed, Ex. A ¶ (d).

As for the FBI investigation that forms the basis for the Order, it was "confirmed" by then-FBI Director James B. Comey's testimony "before the House Permanent Select Committee on Intelligence on March 20, 2017." *Id.* ¶ (b). There, Director Comey described the FBI's investigation as one involving "counter-intelligence." *See* Ex. C: James B. Comey, Dir., Fed. Bureau of Investigation, Statement Before the House Permanent Select Committee on Intelligence (Mar. 20, 2017). Neither the statutes cited in the Order, nor the identified Special Counsel Regulations, however, authorize a counter-intelligence investigation. The statutes make no such reference and the Regulations specify that there are grounds for appointment of a special counsel only when the Attorney General—"or in cases in which the Attorney General is recused,

the Acting Attorney General"—determines that a "criminal investigation . . . is warranted."  28

C.F.R. § 600.1.  Neither determination is set forth anywhere in the Order.  The Order's more

specific jurisdictional statement instead discloses only a need to investigate "any links or

coordination between the Russian government and individuals associated with the campaign of

President Donald Trump" and to further investigate "any matters that arose or may arise directly

from the investigation."  Ex. A ¶ (b)(i), (ii).

In short, the Order contains no express statement that the Deputy Attorney General,

acting for the recused Attorney General, had determined that a criminal investigation was

warranted or why; provides no explanation as to how the Special Counsel had been invested with

the authority to pursue the counter-intelligence investigation referenced in Director Comey's

testimony; fails to say what the *criminal* predicate might be for the investigation if there was one;

and does not indicate why it was that the Attorney General had a conflict of interest—but his

Deputy does not[2]—with respect to the particularized aspects of the investigation actually being

pursued—all as required by §§ 600.1 to 600.3 of the Special Counsel Regulations.

In public court filings, the Special Counsel has made it clear that he believes the Order

gives him the unfettered authority to investigate any Russian interference with the 2016

presidential election or the candidates in it, without regard to the narrower grant of jurisdiction

specifically conferred by the Order or the applicable "regulatory guidelines."  *See* Gov't Resp. to

Def. Concord Mgmt. & Consulting LLC's Mot. for *In Camera* Review of Grand Jury Materials

---

[2]     The Deputy Attorney General likely is a fact witness in the Special Counsel's investigation
of alleged obstruction of justice in connection with President Trump's termination of former FBI
Director Comey.  *See, e.g.*, Ex. D: Letter from Donald J. Trump, U.S. Pres., to James B. Comey,
Dir., Fed. Bureau of Investigation (May 9, 2017) (stating that the President's termination
decision was based on a written recommendation made by the Deputy Attorney General, a copy
of which was attached to the President's letter).

at 2 n.1, ECF No. 20 (citing title of Order, without reference to Order's substance, and asserting Indictment thus falls "within the express scope of the Special Counsel's jurisdiction"); Gov't Resp. in Opp'n to Def.'s Mot. to Dismiss at 6, *United States v. Manafort*, No. 1:17-cr-00201-ABJ (D.D.C. Apr. 2, 2018), ECF No. 244 (claiming that the Regulations "simply provide a helpful framework that the Attorney General may use in establishing the Special Counsel's role").

In that regard, the Indictment necessarily is a product of the Special Counsel's expansive view of his authority. It does not allege that Concord is part of the Russian government. *See* Indictment ¶ 11 (alleging that Concord has "various Russian government contracts"). Nor does it indicate that Concord had any links to, or coordination with, President Trump's 2016 campaign. *See id.* ¶¶ 6, 45, 54(c), 55(a), 74–79 (making allegations involving "unwitting" individuals involved in President Trump's campaign). Rather, the authorization for the Indictment purportedly rests on paragraph (b)(ii) of the Appointment Order, which the Special Counsel construes to provide him with jurisdiction to prosecute any conduct involving any Russian, whether individual or corporation, that "arose . . . directly from" the above-described investigation.[3]

---

[3]     As he has done in the pending cases he has filed against Paul J. Manafort Jr., the Special Counsel may also attempt to rely on an August 2017 memorandum ("Memorandum") issued by the Deputy Attorney General, which apparently purports to expand the Special Counsel's jurisdiction. The fundamental problem with the Memorandum is that it remains largely secret and appears to be an after-the-fact justification to bolster an unlawful appointment order. For present purposes, the most Concord can say is that the redacted public version of the Memorandum provides no support for the Indictment here. And if the Special Counsel does rely on the Memorandum to support his jurisdiction here, Concord, consistent with its due process rights, should be permitted to view it and contest the Special Counsel's assertion. *See Abourezk v. Reagan*, 785 F.2d 1043, 1060–61 (D.C. Cir. 1986) ("It is a hallmark of our adversary system that we safeguard party access to the evidence tendered in support of a requested court judgment. The openness of judicial proceedings serves to preserve both the appearance and the reality of (continued)

## III.    LEGAL STANDARDS

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."   Fed. R. Crim. P. 12(b)(1).   Challenges to the constitutionality of the appointment of the Special Counsel and to his statutory authority to bring the Indictment likewise may be asserted in a Rule 12(b) motion.   *See United States v. Park*, 297 F. Supp. 3d 170, 174 (D.D.C. 2018).   "When considering a motion to dismiss an indictment, a court assumes the truth of [the indictment's] factual allegations."   *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015) (citation omitted).

## IV.    ARGUMENT

The record here shows that the Special Counsel, formerly a private citizen, is purporting to exercise—without a proper appointment, any express statutory authorization, or, according to him, any binding jurisdictional constraints—the Attorney General's plenary and exclusive prosecutorial powers.   In so doing, the Special Counsel is acting unlawfully—indeed unconstitutionally—under an Appointment Order that does not and cannot confer the prosecutorial authority he claims to possess.   The Indictment accordingly should be dismissed.

### A.    The Concord Indictment should be dismissed because the Special Counsel's appointment violates the Constitution's Appointments Clause.

The Appointments Clause of Article II of the Constitution sets forth a "bulwark against one branch aggrandizing its power at the expense of another branch" and preserves "the Constitution's structural integrity by preventing the diffusion of the appointment power."   *Ryder v. United States*, 515 U.S. 177, 182 (1995).   "The 'manipulation of official appointments' had

---

fairness in the adjudications of United States courts.   It is therefore the firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte*, *in camera* submissions.").

long been one of the American revolutionary generation's greatest grievances against executive power." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991) (citation omitted). The Framers therefore chose to "limit[] the appointment power" so as to "ensure that those who wielded it were accountable to political force and the will of the people." *Id.* at 884.

To achieve that goal, the Appointments Clause provides mechanisms for appointing principal and inferior "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. So-called "principal" officers must be appointed by the President "by and with the Advice and Consent of the Senate." *Id.* That method of appointment likewise is the default manner of appointing all "Officers"—whether principal or not—though Congress "may" override that default rule and "by Law vest the Appointment of such inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

Here, whether the Special Counsel is deemed a principal or inferior officer, his appointment by the Deputy Attorney General violates the strict requirements of the Appointments Clause because the Special Counsel was neither appointed by the President and confirmed by the Senate, nor was he appointed pursuant to authority vested by the express terms of a congressional enactment.

### 1. If the Special Counsel is an inferior officer, he was unlawfully appointed by the Deputy Attorney General without authorization from Congress.

The Special Counsel was not appointed by the President or confirmed by the Senate, so his appointment necessarily violates the Appointments Clause if he is, as is demonstrated below, a principal officer. But at a minimum, the Special Counsel is an "inferior Officer[]" and thus could only have been appointed by an official with power specifically conferred by Congress. The Deputy Attorney General did not have clear and specific statutory authorization to appoint the Special Counsel, however, and his appointment accordingly is unconstitutional.

a.      **The Special Counsel is an "Officer" who must be properly appointed.**

As the Supreme Court has held, an "Officer" governed by the Appointments Clause is an official "exercising significant authority pursuant to the laws of the United States[.]" *Buckley v. Valeo*, 424 U.S. 1, 125–26 (1976).  The term "embrace[s] all appointed officials exercising responsibility" under federal law, *id.* at 131, though not "lesser functionaries in the Government's workforce," *Lucia v. SEC*, --- S. Ct. ---, No. 17-130, 2018 WL 3057893, at *5 (U.S. June 21, 2018) (internal quotation marks and citation omitted).  "Officer" had an expansive definition at the time of the Founding, *see, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England* 339 (3d ed. 1768) (noting that an "officer" includes "sheriffs; coroners; justices of the peace; constables; surveyors of highways"), and the Supreme Court has found many even minor federal officials qualify as "Officers" whose appointment is, in turn, subject to the strictures of the Appointments Clause, *see, e.g.*, *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 352–54 (1931) (district-court commissioners); *see also* Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 1, at 1–2 (1890) ("A public office is the right, authority and duty, created and conferred by law, by which for a given period . . . an individual is invested with some portion of the sovereign functions of the government[.]").

Consistent with these authorities, there is no colorable claim that the Special Counsel is a mere federal employee—some "lesser functionar[y]"—and not an "Officer" falling within the Appointments Clause.  This is especially true if, as the Special Counsel has argued, the Special Counsel Regulations are not binding on him.  Absent those Regulations, there is nothing constraining his power and jurisdiction at all and, *a fortiori*, he is an "Officer."

The Regulations do nothing to change that.  The Special Counsel's role, as conceived by the Regulations, certainly is analogous to a United States Attorney, *see* 28 C.F.R. § 600.6

(Special Counsel has "the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney"), and it is beyond peradventure that United States Attorneys are "Officers," *see Myers v. United States*, 272 U.S. 52, 159 (1926) (noting that United States Attorneys are "officers"); *United States Attorneys—Suggested Appointment Power of the Attorney General—Constitutional Law (Article II, § 2, cl. 2)*, 2 Op. O.L.C. 58, 59 (1978) (same).

If more were needed, it should be noted that the Special Counsel's powers are much broader than those of a United States Attorney. United States Attorneys are both geographically restricted and subject to the Attorney General's plenary power to direct and supervise their litigation. *See United States v. San Jacinto Tin Co.*, 125 U.S. 273, 278–79 (1888); *Sutherland v. Int'l Ins. Co. of N.Y.*, 43 F.2d 969, 970 (2d Cir. 1930) (L. Hand, J.) (noting that Attorney General has power to "displace [United States] attorneys in their own suits, dismiss or compromise them, [or] institute those they decline to press"). They also must obtain the Attorney General's approval before taking a laundry list of steps or actions, and consult with Department officials before taking numerous others. *See United States v. Giangola*, No. 1:07-cr-00706-JB, 2008 WL 3992138, at *9–10 (D.N.M. May 12, 2008). Compare those constraints with the Special Counsel, who has nationwide jurisdiction, wide latitude to operate free from the Attorney General's oversight, and the authority to make final binding prosecutorial decisions without prior approval from anyone in the Department of Justice. *Infra* at 29–35. Simply put, the Special Counsel indisputably is an "Officer" whose appointment must comply with the Appointments Clause.

**b.**      **Congress has not enacted a statute that clearly gives the Attorney General or Deputy Attorney General the power to appoint a private attorney as an "Officer."**

An inferior officer's appointment passes constitutional scrutiny only if Congress specifically authorized it under the so-called "Excepting Clause" within the Appointments Clause. *See* Art. II, § 2, cl. 2 ("Officers" are appointed by the President with the advice and consent of the Senate, "but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments").[4]   Therefore, the Special Counsel's appointment requires express and specific statutory authorization and, absent that, his appointment is unconstitutional.

Thus, in *Burnap v. United States*, 252 U.S. 512 (1920), when the Supreme Court considered an appropriations statute enumerating various positions and their salaries, the Court held that the statute did not "by Law vest" any power to appoint a person to that position in anyone, noting that there was "no statute which provides specifically by whom the [purported officer] shall be appointed." *Id.* at 516–17.  More recently, the Court likewise required a statute that clearly and specifically provided the authority to appoint the officer whose status is under scrutiny. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 661 (1988) (Ethics in Government Act— authorizing Special Division court to "appoint an appropriate" independent counsel); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1335 (D.C. Cir. 2012) (17 U.S.C. § 801(a)—providing that the "Librarian of Congress shall appoint 3 full-time Copyright Royalty Judges").

---

[4]      The "obvious purpose" of the Excepting Clause was "administrative convenience[.]" *Edmond v. United States*, 520 U.S. 651, 660 (1997).

In this context in particular—where the Deputy Attorney General has appointed a Special Counsel—a clear and unambiguous statute from Congress allowing such an appointment and conferring the Attorney General's power is a prerequisite.  "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016) ("[A]gencies may act only when and how Congress lets them.").  That is no less true of the Department of Justice and the Attorney General, each given life by Congress.  *See* Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93; Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870); *San Jacinto Tin Co.*, 125 U.S. at 278–80.

In turn, the Attorney General is duty-bound, by statute, to conduct and supervise all litigation to which the United States is a party, and these powers belong exclusively to that office.  *See* 28 U.S.C. §§ 516, 519; *United States v. Int'l Union of Operating Eng'rs, Local 701*, 638 F.2d 1161, 1162 (9th Cir 1979) ("[C]onduct [of] federal criminal litigation . . . is an executive function within the exclusive prerogative of the Attorney General.") (internal quotation marks and citation omitted).  Accordingly, the law is settled that the Attorney General cannot appoint a private attorney as special counsel and give the special counsel the Attorney General's prosecutorial power "without a clear and unambiguous directive from Congress" allowing it. *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992) (citing *United States v. California*, 332 U.S. 19, 27 (1947)); *The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47, 56 (1982) ("[T]he 'otherwise authorized by law'" exception in "§§ 516 and 519 has been narrowly construed" to encompass only "statutes" that speak "explicitly").

Separately this clear and unambiguous statement rule is required here because Congress's exercise of its power under the Excepting Clause—whose "obvious purpose" was merely "administrative convenience[,]" *Edmond*, 520 U.S. at 660—alters the "default manner of appointment for inferior officers": Presidential appointment and Senate confirmation. *Id.* The exception thereby effects a waiver of the constitutionally prescribed advice-and-consent default rule. *See Freytag*, 501 U.S. at 882 (explaining that the "principle of separation of powers is embedded in the Appointments Clause"); *cf. Bond v. United States*, 134 S. Ct. 2077, 2088–90 (2014) (noting that structural constitutional safeguards function as "background principles of construction").

This clear and unambiguous statement principle, as applied to the exception to the Appointments Clause's default rule, is consistent with the treatment of similar statutory waivers that purport to disrupt separation-of-powers boundaries specifically laid down by the Constitution. *See, e.g.*, *Kucana v. Holder*, 558 U.S. 233, 237 (2010) (strictly construing statute purporting to deprive courts of jurisdiction to review Attorney General's actions where "[s]eparation-of-powers concerns . . . caution us against reading legislation, absent clear statement, to place in executive hands authority to remove cases from the Judiciary's domain"); *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) ("requir[ing] an express statement by Congress" subjecting President's conduct of statutory duties to review "[o]ut of respect for the separation of powers"); *Appointment of Assistant Appraisers at New York*, 15 Op. Att'y Gen. 449, 450 (1878) (concluding that Congress did not displace Appointments Clause's default rule of appointment "[w]here there is no express enactment to the contrary").

As an inferior officer, therefore, the Special Counsel's appointment by the Attorney General or his Deputy must be clearly and unambiguously authorized by a statute giving the

Special Counsel the prosecutorial role he has assumed.  But there is no such clear statement in any of the statutes referred to in the Appointment Order—28 U.S.C. §§ 509, 510, or 515—that conceivably meets the controlling legal standard.

To start with, § 509 states only that "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General," save for certain limited exceptions.  28 U.S.C. § 509.  On its face, § 509 does not provide an independent grant of authority to appoint private counsel to investigate and pursue criminal charges on behalf of the United States.

Section 510 is essentially the converse of § 509, providing only that the "Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."  28 U.S.C. § 510.  But like § 509, § 510 does not mention the term "appoint" or provide the Attorney General any power to appoint private attorneys as special counsels.  And while § 510 permits the Attorney General to allow "any" of his "function[s]" to be performed, he can only authorize an "officer, employee, or agency of the Department of Justice" to perform them—§ 510 gives the Attorney General no power to appoint a private attorney as a special counsel and then delegate power to him.

Turning lastly to § 515, only subsection (a) is relevant to this Appointments Clause inquiry, and in its current form it provides:

> The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General *under law*, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.

28 U.S.C. § 515(a) (emphases added).   Section 515(a), by its terms, authorizes only three categories of individuals to conduct proceedings in the name of the United States: (1) the Attorney General; (2) "any other officer of the Department of Justice"; or (3) "any attorney specially appointed by the Attorney General *under law*." (Emphases added).

The Special Counsel was an attorney in private practice at the time of his appointment. Therefore, he was not the Attorney General, nor was he an "officer of the Department of Justice."   And, the Special Counsel does not fall within the third § 515(a) category either.   He is not "any attorney specially appointed by the Attorney General under law" because there is no "law"—that is, a *statute* separate from § 515(a)—that specifically authorizes the appointment of a private individual to perform the lead prosecutorial role in bringing this case.   Any argument to the contrary fails to accord the statute its plain meaning and abrogates the need for a clear and specific statement of authority as required under the Appointments Clause.

Section 515(a) originated from the Act of June 30, 1906, ch. 3935, 34 Stat. 816 ("1906 Act").   The 1906 Act states that the

> Attorney-General [sic] or any officer of the Department of Justice, or any attorney or counselor specially appointed by the Attorney-General [sic] *under any provision of law*, may, when thereunto specifically directed by the Attorney-General [sic], conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which district attorneys [the precursor to today's United States Attorneys] now are or hereafter may be by law authorized to conduct, whether or not he or they be residents of the district in which such proceeding is brought.

(Emphases added.)

The United States Code did not exist at the time of the 1906 Act's adoption.   It was not until 1926 that the language of the 1906 Act was codified at 5 U.S.C. § 310 by an Act of Congress creating the first edition of the United States Code.   *See* Act of June 30, 1926, ch. 712, § 2, 44 Stat. pt. I, 46.   While the authors of the first edition of the United States Code saw fit to

- 14 -

delete the hyphen in "Attorney-General," the original codified version of the 1906 Act retained the "under any provision of law" language.  *See* 5 U.S.C. § 310 (1926) ("The Attorney General or any officer of the Department of Justice, or any attorney or counselor specially appointed by the Attorney General ***under any provision of law***, may, when thereto specifically directed by the Attorney General, conduct any kind of legal proceeding . . . .") (emphases added).  Moreover, Congress expressly stated that nothing in the first edition of the United States Code was to be "construed as repealing or amending any . . . law" in effect as of December 7, 1925, which included the 1906 Act.  Act of June 30, 1926 § 2(a), 44 Stat. pt. I at 1.

The original codified version of the 1906 Act remained undisturbed for almost four decades.  *See* 5 U.S.C. § 310 (1964) (using language identical to 1926 edition).  In 1966, however, Congress moved the content of what had been 5 U.S.C. § 310 to its current location at 28 U.S.C. § 515(a).  *See* Act of Sept. 6, 1966, Pub. L. No. 89-554, § 4(c), 80 Stat. 378, 613 ("1966 Act").  In doing so, the 1966 Act used the streamlined "under law" formulation now found in § 515(a) instead of the longer "under any provision of law" version used by the 1906 Act.  *Id.*  Congress specified, however, that the "legislative purpose" of any changes was merely to "restate" existing law "without substantive change."  *Id.* § 7(a), 80 Stat. at 631.  Therefore, § 515(a)'s use of the phrase "under law" has the same meaning as the phrase "under any provision of law" at the time of the 1906 Act.  *See, e.g.*, *Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) (addressing similar instance where the language of a statute as first enacted in 1884 informed the meaning of the codified version where, as here, Congress specified that the codification was intended to be made "without substantive change"); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, --- F. Supp. 3d ---, No. 1:16-cv-02394-DLF, 2018 WL 1542049, at *16

(D.D.C. Mar. 29, 2018) (Friedrich, J.) (finding statutory term "rural district" retained its 1934 meaning even though other portions of statute had been amended since then).

For a private-attorney appointment under § 515(a) to be congressionally authorized, therefore, he or she must be an "attorney specially appointed by the Attorney General under [any provision of] law."  To give each of the terms in the statute independent meaning, "under any provision of law" or "under law" must be a reference to a statute, other than § 515(a) itself by which Congress provided for a private attorney's appointment as a special counsel with the expansive powers claimed here.

"[L]aw" necessarily means "statute"—and ***not*** a mere "regulation"[5]—because, under the Appointments Clause, any power the Attorney General would have to appoint an "Officer" such as the Special Counsel could only come from Congress, and Congress makes "law" through legislation.  *See Clinton v. City of New York*, 524 U.S. 417, 437 (1998) (Congress makes "law" through the enactment of legislation pursuant to its Article I, § 8 powers); *Lucia*, 2018 WL 3057893, at *10 (Thomas, J., concurring) ("by Law" in Appointments Clause means "by statute").  In addition, § 515(a) uses both the past tense and the passive voice—"specially appointed by the Attorney General"—which further demonstrates that Congress contemplated attorneys already "specially appointed" under some other statute when it wrote § 515(a). "'Congress' use of a verb tense is significant in construing statutes.'"  *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 493 (D.C. Cir. 2004) (Roberts, J.) (quoting *United States v. Wilson*, 503 U.S. 329, 333 (1992)); *see also Dean v. United States*, 556 U.S. 568, 572 (2009) (focusing on statute's "use of the passive voice" in determining meaning).  Congress uses

---

[5]    As noted (*infra* at 47–48), the Special Counsel seemingly does not consider the Special Counsel Regulations to be "law" since he claims they are neither binding nor enforceable in court.

the past tense to "denot[e] an act that has been completed[,]" *Barrett v. United States*, 423 U.S. 212, 216 (1976), while its use of the passive voice conveys that "*whether* something happened"—here, a "special[] appoint[ment]" of an attorney—"*not how* or why it happened—[is what] matters," *Dean*, 556 U.S. at 572 (emphases added).  Contrast that with the present-tense, active-voice conferral of appointment power by Congress as reflected, for example, in 28 U.S.C. §§ 542(a) ("Attorney General may appoint one or more assistant United States attorneys") and 543(a) ("Attorney General may appoint [special] attorneys to assist United States attorneys"), and in numerous other appointment power-conferring statutes.  *Infra* at 19–21.

This plain-text construction is, of course, the preferred one and must be followed.  *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("[W]hen the statutory language is plain, we must enforce it according to its terms").  Well-recognized principles of statutory construction also reinforce that § 515(a) requires the authorization to appoint a private attorney as a special counsel to come from another statute apart from § 515(a) itself.

*First*, the surplusage canon supports the conclusion that "under any provision of law" or "under law" means a legislative enactment other than § 515(a).  *See United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute . . . rather than to emasculate an entire section[.]") (internal quotation marks and citation omitted).  If § 515(a) provides standalone authorization for the special appointment of a private attorney by the Attorney General, then the "under any provision of law" or "under law" language is meaningless.  There would be no need to require a special appointment "under any provision of law" if § 515(a) independently provides such authority—had it intended the latter, Congress could simply have said "any attorney specifically appointed under this section."

*Second*, dictionaries of the era support the conclusion that "under any provision of law" or "under law" means a separate legislative enactment.  *See Wisc. Cent. Ltd. v. United States*, --- S. Ct. ---, No. 17-530, 2018 WL 3058014, at *2 (U.S. June 21, 2018) (explaining that "our job is to interpret the words [of a statute] consistent with their ordinary meaning . . . at the time Congress enacted the statute," and looking to contemporary dictionary definitions of statutory term) (internal quotation marks and citation omitted); *Am. Bankers Ass'n*, 2018 WL 1542049, at *8 ("To discern contemporaneous meaning, courts look first to contemporaneous dictionaries.").

For example, a leading law dictionary at the time defined a "law" as, among other things, a "rule or enactment promulgated by the legislative authority of a state."   Black's Law Dictionary 691 (1st ed. 1891).  "According to usage in the United States," the same dictionary explained, "the term 'law' is used in contradistinction to [a constitution] to denote a statute or enactment of the legislative body."  *Id.*; *accord* Black's Law Dictionary 700 (2d ed. 1910) ("'Law' is a solemn expression of legislative will.").  Other legal dictionaries of the era define "law" in similar terms.  *See, e.g.*, Walter A. Shumaker & George Foster Longsdorf, *The Cyclopedic Dictionary of Law* 533 (1901) (defining "law" to include a "rule of civil conduct prescribed by the supreme power in a state," as well as "a statute; a rule prescribed by the legislative power"); 2 Francis Rawle, *Bouvier's Law Dictionary* 1876 (8th ed. 1914) (defining "law" to include a "rule of civil conduct prescribed by the supreme power in a state," as well as a "rule or enactment promulgated by the legislative authority of a state"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 419 (2012) ("Dictionaries

tend to lag behind linguistic realities . . . .  If you are seeking to ascertain the meaning of a term in an 1819 statute, it is generally quite permissible to consult an 1828 dictionary.").[6]

*Third*, congressional practice—both at the time § 515(a) was enacted and thereafter—further supports the conclusion that "under any provision of law" or "under law" means a legislative enactment other than § 515(a).  To put it simply—since the time of § 515(a)'s enactment in 1906, and despite § 515(a)'s existence, Congress repeatedly has enacted statutes that clearly and expressly confer authority to appoint special or independent counsels.  If Congress believed § 515(a) itself conferred that authority, it would have had no need to pass additional ones that did.

Three years after the 1906 Act that first enacted the predecessor to § 515(a), Congress passed legislation of the very type envisioned by what is now § 515(a).  The Act of August 5, 1909, ch. 6, 36 Stat. 11, authorized the Attorney General to, "whenever in his opinion the public interest requires it, employ and retain, in the name of the United States, such special attorneys and counselors at law in the conduct of customs cases as he may think necessary . . . ."  *Id.* § 28, 36 Stat. at 108.  The enactment of such legislative language was by no means groundbreaking. In 1861, for example, Congress enacted a similar statute empowering the Attorney General, "whenever in his opinion the public interest may require it, to employ and retain (in the name of the United States) such attorneys and counsellors-at-law [sic] as he may think necessary to assist the district-attorneys . . . ."  Act of Aug. 2, 1861, ch. 37, § 2, 12 Stat. 285, 285.  That statute, as amended, exists to this day.  *See* 28 U.S.C. § 543(a) (providing that the Attorney General "may

---

[6]    As for the word "provision," an often-cited English language dictionary of the era defines the word "provision" as including "[t]hat which is stipulated in advance," such as "the statute has many *provisions.*"  *Webster's New International Dictionary* 1995 (2d ed. 1934); *see also* Scalia & Garner, *Reading Law* 422 (citing the foregoing dictionary as a trustworthy source for meanings during 1901 to 1950).

appoint attorneys to assist United States attorneys when the public interest so requires"). This contemporary legislative activity is strong evidence that § 515(a) does not itself confer any appointment power. *See Fed. Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 736 (1973) (looking to "Congress' . . . contemporaneous and related statutes").

Later-enacted statutes further reinforce the point. At the height of the 1920s' Teapot Dome scandal, Congress enacted legislation that expressly authorized the President to "appoint, by and with the advice and consent of the Senate, special counsel who shall have charge and control of the prosecution of such litigation [related to the oil leases giving rise to the scandal], anything in the statutes touching the powers of the Attorney General of the Department of Justice to the contrary notwithstanding." S.J. Res. 54, 68th Cong., ch. 16, 43 Stat. 5, 6 (1924). Congress later enacted legislation appropriating funds for that very purpose, specifying that "[a]ny counsel employed by the President under the authority of this resolution shall be appointed by, and with the advice and consent of the Senate and shall have full power and authority to carry on said proceedings, *any law* to the contrary notwithstanding." H.J. Res. 160, 68th Cong., ch. 42, 43 Stat. 16 (1924) (emphasis added). The contrast between these provisions and § 515(a) is clear.

There is more. After Watergate came the Ethics in Government Act of 1978, as subsequently renewed by Congress until 1999. By the late 1970s, the "need" for specific statutory appointment authorization had "been demonstrated several times [during the twentieth] century[,]" *In re Olson*, 818 F.2d 34, 39–42 (D.C. Cir. 1987)—from Teapot Dome, to government corruption during President Truman's administration, to Watergate itself—despite the fact that § 515(a) was, and had been all that time, on the books. Yet, like the enactments during the Teapot Dome scandal, and in stark contrast to § 515(a), the Ethics in Government Act contained a present-tense, active-voice provision that specifically conveyed power to the

Attorney General and a Special Division court to appoint an independent counsel.  *See* 28 U.S.C. §§ 591–593.

When it legislates, Congress is presumed to know "existing law," *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (citation omitted)—including, of course, the statutes it enacted, *see St. Louis, I. M. & S. Ry. Co. v. United States*, 251 U.S. 198, 207 (1920) ("Congress must be presumed to have known of its former legislation . . . and to have passed the new laws in view of the provisions of the legislation already enacted.").  Thus presumed to have known of § 515(a) since its enactment in 1906, then, why did Congress proceed to pass multiple and express special/independent counsel appointment-authorization statutes in 1909; in the 1920s during the Teapot Dome scandal; and from the late 1970s through the late 1990s in the Ethics in Government Act and subsequent renewals?  The only explanation is that Congress, consistent with the plain language of § 515(a), believed those separate appointment-authorization statutes were necessary because § 515(a) did not itself confer that significant power.

*Fourth*, judicial opinions of the era support the conclusion that "under any provision of law" or "under law" means a separate legislative enactment.  *See, e.g.*, *King Mfg. Co. v. Augusta*, 277 U.S. 100, 103 (1928) ("The Constitution of the United States does not use the term 'statute,' but it does employ the term 'law,' often regarded as an equivalent, to describe an exertion of legislative power."); *see also* U.S. Const. art. I, § 7, cl. 2 (providing that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, *before it become a Law*, be presented to the President") (emphasis added); *id.* art. I, § 8, cl. 18 (providing that Congress shall have power "[t]o make *all Laws* which shall be necessary and proper for carrying into Execution the foregoing Powers") (emphasis added).

*Fifth*, and finally, the conclusion that § 515(a)'s "under any provision of law" or "under law" means a separate legislative enactment also is supported by the fact that courts have construed similar language ("by law") in neighboring provisions—§§ 516 and 519—to mean a legislative enactment, and the Department of Justice agrees.  Section 516 provides that, "[e]xcept as otherwise authorized **by law**," the conduct of litigation involving the United States is "reserved to officers of the Department of Justice, under the direction of the Attorney General." (Emphases added.)  Similarly, § 519 provides that, "[e]xcept as otherwise authorized **by law**, the Attorney General shall supervise all litigation to which the United States" is a party.  (Emphases added.)   Courts of appeals have interpreted "by law" in these two provisions to mean a statute. *See, e.g.*, *Marshall v. Gibson's Prods., Inc.*, 584 F.2d 668, 676 n.11 (5th Cir. 1978) (holding that "in the absence of an express congressional directive to the contrary, [the Attorney General] is vested with plenary power over all litigation to which the United States or one of its agencies is a party"); *FTC v. Guignon*, 390 F.2d 323, 324–25 (8th Cir. 1968) (holding that there must be "specific authorization" in a statute to proceed without the Attorney General).

Following these same precedents, the Department of Justice has explained that "[i]n order to come within the 'as otherwise authorized by law' exception to the Attorney General's authority articulated in [§§] 516 and 519, it is necessary that ***Congress use language*** authorizing agencies to employ outside counsel. . . ."  *The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. at 56–57 (emphases added); *see also id.* at 56 ("'otherwise authorized by law' language [in §§ 516 and 519] has been narrowly construed to permit litigation by agencies *only when statutes* explicitly provide for such authority") (citing cases; emphasis added).  Given the parallel between these provisions and § 515(a)—and the views of the courts and the Department of Justice on the proper construction of neighboring §§ 516 and 519—

"under any provision of law" or "under law" in § 515(a) should be read the same way: to require a separate statute authorizing the appointment.  *See Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."); *Airlines for Am. v. Transp. Sec. Admin.*, 780 F.3d 409, 411–12 (D.C. Cir. 2015) (rejecting interpretation that would require court "to believe that Congress intended different meanings for a nearly identical phrase as used in two neighboring provisions").

Properly construed, §§ 509, 510, and 515 plainly fail to provide the clear authorization demanded by the Appointments Clause for the appointment of an inferior officer like the Special Counsel.  While that should end the analysis, the Special Counsel likely will point to two decisions to try to defend the statutory validity of his unlawful appointment: (1) *United States v. Nixon*, 418 U.S. 683 (1974); and (2) *In re Sealed Case*, 829 F.2d 50 (D.C. Cir. 1987).  Neither case is on point for the Appointments Clause argument Concord advances here.

In *Nixon*, the Supreme Court was asked to address President Richard Nixon's claim of executive privilege in response to a grand jury subpoena seeking certain audio recordings related to the Watergate burglary and issued by the special counsel, Leon Jaworski, an attorney in private practice when he was appointed by Acting Attorney General Robert Bork.  Acting Attorney General Bork made that appointment pursuant to a regulation he promulgated, which also granted Mr. Jaworski plenary authority to conduct the investigation and expressly granted him the power to contest assertions of privilege.  *See Nixon*, 418 U.S. at 694–95.  In the course of resolving the executive-privilege claim, the Court made the following observation regarding the regulation:

> Under the authority of Art. II, § 2, Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government.  28

U.S.C. § 516.  It has also vested in him the power to appoint subordinate officers to assist him in the discharge of his duties.  28 U.S.C. §§ 509, 510, 515, 533.  Acting pursuant to those statutes, the Attorney General has delegated the authority to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure.  ***The regulation*** gives the Special Prosecutor explicit power to contest the invocation of executive privilege in the process of seeking evidence deemed relevant to the performance of these specially delegated duties.

418 U.S. at 694–95 (emphases added) (footnote omitted).  Ultimately, the Court found that "[s]o long as this regulation remains in force the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and it enforce it."  *Id.* at 696.  That said, the authority of Acting Attorney General Bork to make the special-counsel appointment was not in dispute in *Nixon*, the regulation in *Nixon* was specific to that matter, and no issue was raised about the construction of any of the cited statutes in relation to the requirements set forth in the Appointments Clause or the accepted judicial construction of those requirements.

*Sealed Case* lacks relevance here for the same reason.  In that case, Lawrence Walsh, then an attorney in private practice, was appointed by a special division of the D.C. Circuit to serve as an independent counsel under the Ethics in Government Act.  Mr. Walsh was tasked with investigating whether Lieutenant Colonel Oliver North had committed crimes related to selling arms to Iran and diverting related proceeds.  After Lt. Col. North filed suit challenging the constitutionality of the independent-counsel provisions of the Ethics in Government Act, Attorney General Edwin Meese promulgated a specific regulation similar to that promulgated prior to the *Nixon* decision that established an "Office of Independent Counsel: Iran/Contra[,]" citing, among other things, §§ 509, 510, and 515.  *See Sealed Case*, 829 F.2d at 52; Final Rule, 52 Fed. Reg. 7270 (Mar. 10, 1987).  Mr. Walsh, who was already serving as an independent counsel under the Ethics in Government Act, accepted a parallel appointment under the new

regulation.  *Sealed Case*, 829 F.2d at 53.  The grand jury then issued a subpoena to Lt. Col. North, with which he refused to comply.  *Id.*  After being held in contempt by the district court and obtaining a remand by the D.C. Circuit to address his arguments challenging, among other things, the validity of Mr. Walsh's parallel appointment under the regulation, the district court once again ruled against Lt. Col. North.  *See id.* at 53–54.

The D.C. Circuit affirmed.  Without any analysis, the court concluded "that the Attorney General possessed the statutory authority to create the Office of Independent Counsel: Iran/Contra and to convey to it the 'investigative and prosecutorial functions and powers' described in [the regulation]."  *Id.* at 55 (citing §§ 509, 510, and 515).  The court then observed in a footnote that "[t]ogether, these provisions vest in the Attorney General the 'investigative and prosecutorial functions and powers' described in the regulation, . . . and authorize him to delegate such functions and powers to others within the Department of Justice."  *Id.* at 55 n.29. Again, however, *Sealed Case*, like *Nixon*, cannot be divorced from its unique facts as they relate to the court's references to §§ 509, 510, and 515 in considering the appointment of Mr. Walsh. And, like *Nixon*, *Sealed Case* did not purport to resolve whether Mr. Walsh's appointment in fact complied with the express requirements in the Appointments Clause.

Here, in contrast, the Appointments Clause statutory-construction issue is squarely raised and calls for this Court to consider whether the precise language of §§ 509, 510 and 515(a) properly can be read to authorize the Special Counsel's appointment.  Cases are not authority for propositions not specifically addressed, considered, or analyzed, and *Nixon* and *Sealed Case* most certainly did not decide what the Appointments Clause requires in this context, nor did either court need to do so in order to resolve the actual dispute before it.  Thus, neither case can be considered dispositive and this Court is free to make its own determination on the

constitutionality of the Special Counsel's appointment under the Appointments Clause. *See United States v. Sheffield*, 832 F.3d 296, 308 n.3 (D.C. Cir. 2016) ("'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'") (quoting *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (internal citation omitted)); Bryan A. Garner et al., *The Law of Judicial Precedent* 44 (2016) (cases are only "precedent" for "legal questions actually presented to and decided by the court").

### 2. Alternatively, the Special Counsel is a principal officer required to be—but who was not—appointed by the President and confirmed by the Senate.

The "inferior Officer" analysis is dispositive, but the Special Counsel's appointment also fails under the Appointments Clause on an additional and independent ground: as a matter of fact and law, he is a principal officer within the meaning of the Appointments Clause and therefore was required to be appointed by the President and confirmed by the Senate. That did not happen and the Indictment must be dismissed for this reason, too.

Three precedents are important for determining whether the Special Counsel is a principal officer under the Appointments Clause: (1) *Edmond*, 520 U.S. 651; (2) *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010); and (3) *Intercollegiate*, 684 F.3d 1332. A fourth—*Morrison*, 487 U.S. 654—has been supplanted by *Edmond*, but to the extent it adds further functional considerations to the principal-officer inquiry, the outcome is the same on this record.[7]

---

[7]  The *Edmond* Court pointed out that "*Morrison* did not purport to set forth a definitive test for whether an office is 'inferior' under the Appointments Clause[,]" 520 U.S. at 661, and Justice Thomas recently expressed a similar view in *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 947 n.2 (2017) (Thomas, J., concurring) ("Although we did not explicitly overrule *Morrison* in *Edmond*, it is difficult to see how *Morrison*'s nebulous approach survived our opinion in *Edmond*.").
(continued)

In *Edmond*, the Supreme Court considered whether civilian administrative law judges on the Coast Guard Court of Criminal Appeals were principal or inferior officers.  Observing that the Court's "cases have not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes[,]" the Court found that the principal distinguishing feature is that "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."  520 U.S. at 663.  The Court of Criminal Appeals judges, the Supreme Court held, were inferior officers under this standard because they were subject both to the Judge Advocate General's extensive "administrative oversight"—including, notably, his power to remove them "without cause"—and the Court of Appeals for the Armed Forces' review of "every" one of their rulings.  *Id.* at 664–65.  Thus, the Court found to be "significant" the fact that the Court of Criminal Appeals judges had "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers."  *Id.* at 665.

More recently, in *Free Enterprise Fund*, 561 U.S. 477, the Supreme Court considered whether members of the Public Company Accounting Oversight Board were principal or inferior officers.  The Court noted the Securities and Exchange Commission's ("SEC") "oversight authority" over the Board.  *Id.* at 511.  And it concluded that because the SEC was "properly viewed, under the Constitution, as possessing the power to remove Board members at will[,]"

---

*Edmond* "conforms" with the original "understanding of the Appointments Clause" as expressed by the first Congress in 1789.  520 U.S. at 663; *see also SW Gen.*, 137 S. Ct. at 947 n.2 (Thomas, J., concurring) (noting same).  And since *Edmond* also "postdates" and "clarifies" *Morrison*, *Edmond* is the "most apposite precedent" here.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 522–23 (2004); *see also* Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 810, 811 (1999) (explaining that *Morrison* provided "a doctrinal test good for one day only" and that in *Edmond* the Supreme Court "apparently abandoned [that] *ad hoc* test").

"under *Edmond* the Board members are inferior officers whose appointment Congress may permissibly vest in a 'Hea[d] of Departmen[t].'"  *Id.* at 510.

Applying *Edmond* and *Free Enterprise Fund*, the D.C. Circuit in *Intercollegiate* found that administrative Copyright Royalty Board judges were principal officers.  The court of appeals began by noting that the Supreme Court in *Edmond* "emphasized three factors: (1) the judges were subject to the substantial supervision and oversight of the Judge Advocate General (who in turn was subordinate to the Secretary of Transportation) . . . ; (2) the judges were removable by the Judge Advocate General without cause . . . ; and (3) another executive branch entity, the Court of Appeals for the Armed Forces, had the power to reverse the judges' decisions so that they had 'no power to render a final decision on behalf of the United States unless permitted to do so by other Executive Officers.'"  *Intercollegiate*, 684 F.3d at 1338 (quoting *Edmond*, 520 U.S. at 664–65) (citations omitted).

On the first factor, the court acknowledged that the copyright judges were "supervised in some respects by the Librarian [of Congress] and by the Register of Copyrights"—the Librarian issued ethical rules, exercised oversight over copyright judges' procedural regulations, and had power to assign copyright judges additional duties, while the Register had "authority to interpret the copyright laws and provide written opinions to the [copyright judges] on 'novel material question[s]' of law" that copyright judges "must abide by" and "reviews and corrects any legal errors in the [copyright judges'] determinations."  *Id.* at 1338–39.  These were "non-trivial limit[s] on the [copyright judges'] discretion," the court of appeals noted, "and the Librarian may well be able to influence the nature of the Register's interventions."  *Id.* at 1339.  Nevertheless, the "supervision and oversight" factor—in light of the removability and final-decision factors— fell "short of . . . render[ing] the [copyright judges] inferior officers" given the "broad discretion"

with regard to setting the rates and terms for copyright royalties. *Id.* at 1338–39. That is because copyright judges could only be removed "for misconduct or neglect of duty"—particularly significant under *Edmond*. *Id.* at 1339–40. And the copyright judges' rate determinations were "not reversible or correctable by any other officer or entity within the executive branch" or "subject to reversal or change only when challenged in an Article III court." *Id.* at 1340.

Consistent with *Edmond*, *Free Enterprise Fund*, and *Intercollegiate*, three overarching criteria dictate whether an officer is a principal or inferior one: first, whether an officer is "directed and supervised" by persons "appointed by Presidential nomination with the advice and consent of the Senate"; second, whether an officer can make a "final decision on behalf of the United States" without prior permission from "other Executive Officers"; and third, whether the officer is removable at will. Applying the three criteria here, the Special Counsel is no less a principal officer than the copyright judges in *Intercollegiate*.

**Direction and supervision.** In looking at the degree of the Special Counsel's autonomy, the inquiry focuses on whether there is meaningful direction and supervision provided by the Deputy Attorney General—not practically, but objectively under existing law.[8] *See Edmond*, 520 U.S. at 664–65 (looking to Uniform Code of Military Justice provisions outlining superior officers' power to supervise and oversee); *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 821 F.3d 19, 39 (D.C. Cir. 2016) (consulting Passenger Rail Investment and Improvement Act in determining agency's power to direct appointed arbitrator); *Intercollegiate*, 684 F.3d at 1338–39 (looking to Copyright Act provisions setting forth supervisory authority of Librarian of Congress and

---

[8]   As noted elsewhere, Concord maintains that the Special Counsel Regulations are constitutionally invalid and in excess of the Attorney General's authority. *Infra* at 40–43. But the Regulations are the only objective source providing authority for the Deputy Attorney General to direct and supervise the Special Counsel. They therefore are considered in the analysis here.

Register of Copyrights over copyright judges).   This focus follows from the fact that "Appointments Clause challenges are properly structural, not procedural." *Estes v. U.S. Dep't of Treasury*, 219 F. Supp. 3d 17, 38 (D.D.C. 2016).   Thus, "[i]n evaluating such challenges, reviewing courts do not evaluate the degree of supervision or reversal authority actually exercised by superiors regarding the particular agency decision at issue, but rather the extent to which relevant statutes or regulations provide for such oversight as a structural matter." *Id.*

With that objective focus in mind, there is no statute that gives the Attorney General the power to supervise a private attorney appointed as a special counsel.  That includes 28 U.S.C. §§ 509, 510, and 515, the three provisions that purportedly support the appointment here.

As for the Special Counsel Regulations, as noted, the Special Counsel has challenged the binding nature of the Regulations in the *Manafort* litigation, asserting that they "simply provide a helpful framework for the Attorney General to use in establishing the Special Counsel's role[,]" *supra* at 4–5 (citation omitted), and rejecting the claim that any violation of the Regulations can be remedied by the federal courts, *id.*; *see also infra* at 40.  Were the Special Counsel right about this, there would be ***no*** objective legal basis for direction and supervision of the Special Counsel: only such direction and supervision, if any, that the Deputy Attorney General elects, at his sole discretion—unreviewable by the Judiciary—to exercise.

But this "just trust me, complete deference to the Deputy Attorney General" rule is no way to ensure that the critical separation-of-power limits the Appointments Clause establishes— which protect both "individual" rights, *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 135 S. Ct. 1225, 1233 (2015) (citation omitted), as well as the "structural interests . . . of the entire Republic[,]" *Freytag*, 501 U.S. at 878—are heeded.  *See Morrison*, 487 U.S. at 727 (Scalia, J., dissenting) (rejecting a "[t]rust us" approach to interpreting and enforcing separation of powers because "the

Constitution gives . . . the people . . . more protection than that").  It is the Judiciary's province to police constitutional boundaries, *see Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 197 (2012), and, specifically, to ensure that an agency's exercise of "substantive . . . powers . . . accord[s] with constitutional separation-of-powers principles," *Pereira v. Sessions*, --- S. Ct. ---, No. 17-459, 2018 WL 3058276, at *14 (U.S. June 21, 2018) (Kennedy, J., concurring).  And, at a minimum, taking the Special Counsel's view of the Regulations at face value, there is no objective legal basis for the Deputy Attorney General's—or anyone else's—direction and supervision over the Special Counsel.

To the extent the Special Counsel Regulations do apply and are binding, the conclusion is the same.  While the Regulations purport to address the Attorney General's role with respect to a special counsel, *see* 28 C.F.R. § 600.7(b), they also make clear that any supervision is *de minimis* at most and not nearly enough to turn this Special Counsel into an inferior officer.  Indeed, the Regulations give the Special Counsel very wide latitude subject to no meaningful, substantive oversight or supervision by the Attorney (or Deputy Attorney) General:

- ***First***, the Special Counsel has discretion whether "to inform or consult with the Attorney General or others within the Department about the conduct of his or her duties and responsibilities"—he is not required to do so (§ 600.6);

- ***Second***, the "Special Counsel shall ***not*** be subject to the day-to-day supervision of any official of the Department" of Justice (§ 600.7(b)) (emphases added); and

- ***Third***, although § 600.7(b) goes on to provide for some involvement by the Attorney General in a Special Counsel's investigation, that involvement (i) is ***purely discretionary***—"the Attorney General *may* request that the Special Counsel provide an explanation for any investigative or prosecutorial step"; (ii) is ***highly deferential to the Special Counsel***—it only triggers further possible action if steps are found to be "so inappropriate or unwarranted under established Departmental practices that it should not be pursued[,]" giving "great weight to the views of the Special Counsel" in that determination; and (iii) does not authorize the Attorney General to revoke, rescind, or change in any way any "step" taken by the Special Counsel—if the Attorney General finds the "so inappropriate or unwarranted" standard met, he must "notify Congress[,]" nothing more (§ 600.7(b)) (emphasis added).

- 31 -

In other pending litigation, the Special Counsel has described § 600.7(b) as permitting the Attorney General to "countermand the [Special Counsel's investigative or prosecutorial] step if it is sufficiently 'inappropriate or unwarranted under established Departmental practices[.]'" Gov't Resp. in Opp'n to Mot. to Dismiss at 7, *United States v. Manafort*, No. 1:17-cr-00201-ABJ (D.D.C. Apr. 2, 2018) (citing § 600.7(b)).  But that is a unilateral interpretation by the Special Counsel himself, and in fact, not at all what the regulation says.  Rather, the regulation strings together a series of permissive terms—"may review"; "may . . . conclude"; and "should not be pursued" (twice); one mandatory directive—"will give great weight to the views of the Special Counsel"; and a single mandatory remedy—"shall notify Congress. . . ."  *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 718 (D.C. Cir. 2015) ("Should"—unlike "shall"—is "'precatory, not mandatory.''") (citation omitted); *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) ("'shall' generally imposes a nondiscretionary duty") (citation omitted).  And the use of "may," "should," "will," and "shall" in this same section—and in the very same and neighboring sentences—confirms that they are intended to have different and independent meanings.  *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017) ("[W]e presume differences in language" in same statutory provision to "convey differences in meaning") (citation omitted); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (noting "Congress' use of the permissive 'may' in [one section of statute] contrasts with the legislators' use of a mandatory 'shall' in the very same section").

In short, § 600.7(b), by its terms, plainly does not authorize the Deputy Attorney General to countermand steps taken by the Special Counsel.  The authority to "request" an "explanation" from the Special Counsel and "conclude that the action . . . should not be pursued" neither expresses nor implies any remedial action or self-executing measure.  It describes, instead, an

advisory function—to (i) "review" the Special Counsel's "explanation" of a "step"; (ii) reach a "conclu[sion]" that, in the Attorney General's view, the action "should not" (not, "shall not") "be pursued"; and (iii) to "notify Congress." This straightforward construction follows, too, from the parallel use of "conclude that [an action] should not be pursued" in § 600.7(b), the second of which leads to the remedy—"shall notify Congress." Concluding that an action "should not be pursued" is just that—a conclusion, not a remedial act of "countermand[ing]" what the Special Counsel plans to do (or already has done).

Had the drafters of the Regulations intended to confer such a broad "countermand[ing]" power, they would not have used the precatory phrase "may . . . conclude that the action . . . should not be pursued" and then tied it to a mandatory duty to "notify Congress." Rather, they could instead have written, "if the Attorney General concludes that the proposed action by a Special Counsel should not be pursued, the Attorney General is authorized to countermand it and order that it cease immediately." Or the regulation could have said that the special counsel could be removed based on a disagreement with the Attorney General. And given the significance in this context of the Attorney General's authority over the Special Counsel, the drafters would not have hidden that "elephant" of supposed countermanding authority in the "mousehole" of the limited, precatory language the drafters are presumed to have intentionally chosen. *Cyan v. Beaver Cnty. Employees Retirement Fund*, 138 S. Ct. 1061, 1071–72 (2018).

A final note on "direction and supervision": it is of no moment in analyzing "supervision and oversight" that the Attorney General and Deputy Attorney General formally outrank the Special Counsel. *See Edmond*, 520 U.S. at 662–63 (finding it "not enough that other officers may be identified who formally maintain a higher rank"); *id.* at 667 (Souter, J., concurring) ("Having a superior officer is necessary for inferior officer status, but not sufficient to establish

it."); *Morrison*, 487 U.S. at 722 (Scalia, J., dissenting) ("Even an officer who is subordinate to a department head can be a principal officer.").  The Appointments Clause's express definition of principal officers confirms as much, specifically listing "Ambassadors, other public Ministers and Consuls" as principal officers even though such officials were at the Founding—as they are now—supervised and directed by a superior executive official: the Secretary of State.  *See* Foreign Affairs Act of 1789, ch. 4, § 1, 1 Stat. 28, 28–29 (Secretary shall "perform and execute such duties . . . relative to correspondences, commissions or instructions to or with public ministers or consuls").  Here, for all the above reasons, the "direction and supervision" criterion plainly supports the conclusion that the Special Counsel is a principal officer.

**Power to make final decisions without prior Executive approval.**  This criterion likewise strongly supports the Special Counsel's principal-officer status because—even assuming the Special Counsel Regulations apply and are binding—the Special Counsel can make final decisions on behalf of the United States without first obtaining permission from the Deputy Attorney General.  Certainly, without the Regulations there is nothing to stop the Special Counsel from making final decisions without first asking the Deputy Attorney General for permission.  With the Regulations, again, the story is the same.

In several instances, the Regulations require the Special Counsel to "consult" with Department of Justice officials and inform—or exercise his discretion whether to inform—the Attorney General of "events" that occur in the course of his investigation.  *See* 28 C.F.R. §§ 600.6, 600.7(a), 600.8(b).  They also indicate that the Special Counsel should provide an "explanation" of any "step" in his investigation if asked by the Attorney General to do so.  *Id*. § 600.7(b).  And they direct that the Special Counsel—like any other Department of Justice official—must generally comply with Department rules, regulations, and procedures.  *Id*.

- 34 -

§ 600.7(a).  Yet the Regulations nowhere require the Special Counsel to obtain the approval or permission of the Attorney General before making final decisions about who to investigate, indict, and prosecute.  And while, as noted, the Attorney General might "conclude" that a decision made by the Special Counsel is "so inappropriate or unwarranted . . . that it should not be pursued"—and must notify Congress if he so concludes—he has no authority under the Regulations to reverse or countermand the Special Counsel's decision.

**Removal.**  Finally, the fact that the Special Counsel is not removable at will by a superior officer in the Executive Branch further reinforces that the Special Counsel is a principal officer. In the absence of the Regulations, there is no provision for the removal of the Special Counsel at all, much less removal for no cause.  And here again, applying the Regulations leads to the same result.  Section 600.7(d) provides that the Attorney General can remove the Special Counsel only for "misconduct, dereliction of duty, incapacity, conflict of interest, or for other good case, including violation of Departmental policies."   Looking at the same heightened standard in *Intercollegiate*, the D.C. Circuit held that the removability factor "support[ed] a finding that the [copyright judges] are principal officers" because, as here, the copyright judges could be removed by a superior officer "only for misconduct or neglect of duty."  684 F.3d at 1339-40; *compare Edmond*, 520 U.S. at 664 (finding Coast Guard judges were inferior officers where they could be removed ***without*** cause); *Free Enter. Fund*, 561 U.S. at 510 (holding that members of Public Company Accounting Oversight Board were inferior officers because SEC had the power to remove Board members at will).

Accordingly, under the relevant inquiry as set forth in *Edmond*, the Special Counsel is a principal officer who was not appointed in conformity with the procedures required by the Appointments Clause.  He therefore lacks "the authority to represent the United States," and the

Court "must dismiss . . . for want of jurisdiction." *United States v. Providence Journal Co.*, 485 U.S. 693, 699 (1988); *see also Ryder*, 515 U.S. at 180, 188 (holding that judges appointed in violation of the Appointments Clause lacked authority to hear case and reversing judgment).

**Morrison v. Olson.**   While the reasoning of *Morrison* should not be viewed as controlling, the factorial analysis the Supreme Court applied there does not change the outcome here.   In that case, the Court considered whether Alexia Morrison, an independent counsel appointed under the now-expired Ethics in Government Act, was an inferior officer.   In undertaking its analysis, the Court observed that Ms. Morrison could be removed by the Attorney General "only for good cause[,]" but the Court "clearly did not hold that such a restriction on removal was generally consistent with the status of inferior officer." *Intercollegiate*, 684 F.3d at 1340.   "Instead, as *Edmond* explains, *Morrison* relied heavily on the Court's view that the independent counsel also 'performed only limited duties, that her jurisdiction was narrow, and that her tenure was limited [to performance of a 'single task'].'" *Id.* (quoting *Edmond*, 520 U.S. at 661) (bracketed text supplied by *Intercollegiate*).   As for those three criteria—duties, jurisdiction, and tenure—the differences between *Morrison* and this case are clear and material.

**First**, Ms. Morrison's duties were narrowly restricted by statute to investigating and prosecuting "certain federal crimes" by specific categories of persons. *Morrison*, 487 U.S. at 671.   In fact, the Attorney General, through the "Special Division" court charged with appointing independent counsel, limited the inquiry to looking at then Assistant Attorney General Theodore Olson and testimony he gave to Congress on a particular date. *Id.* at 666–67.   And these duties did not "include any authority to formulate policy for the Government or the Executive Branch, nor [did] it give [Ms. Morrison] any administrative duties outside of those necessary to operate her office." *Id.* at 671–72.

- 36 -

Here, by contrast, the Special Counsel's investigation is not limited—by statute or regulation—to particular alleged crimes or to specific categories of alleged perpetrators, nor is court oversight provided, as was the case in *Morrison*—indeed, according to the Special Counsel, the Regulations themselves cannot even be enforced in court. *Supra* at 4–5. And, even assuming the Regulations apply and are binding, the Special Counsel's investigation not only can extend (and has) to officials at the highest levels of the Federal Government—including the President himself—it also can extend to private persons for conduct having nothing to do with alleged Russian government links to President Trump's campaign. *See* Hr'g Tr. 4:5–14, *United States v. Manafort*, No. 1:18-cr-00083 (E.D. Va. May 4, 2018) (statement of Judge Ellis: "These allegations of bank fraud, of false income tax returns, of failure to register or report rather, failure to file reports of foreign bank accounts, and bank fraud, these go back to 2005, 2007, and so forth. Clearly, this investigation of Mr. Manafort's bank loans and so forth antedated the appointment of any special prosecutor and, therefore, must've been underway in the Department of Justice for some considerable period before the letter of appointment, which is dated the 17th of May in 2017.").

Moreover, the Special Counsel has—and has exercised—"authority to formulate policy." He has brought a case here against foreign nationals for funding alleged electioneering activity on a theory of defrauding the Federal Election Commission ("FEC") that has never been brought before in any reported case. He has also ignored Department of Justice guidance requiring willfulness for a charge under 18 U.S.C. § 371 of conspiracy to violate election laws based on alleged interference with the FEC.[9] *See* Def. Concord Mgmt. & Consulting LLC's Mot. for *In*

---

[9]     *See* Dep't of Justice, *Federal Prosecution of Election Offenses* 163 (8th ed. 2017) (stating that "the proof must also show that the defendant intended to disrupt and impede the lawful (continued)

*Camera* Review of Grand Jury Materials at 5–6, ECF No. 11 (demonstrating Special Counsel's departure from Department guidance and indicting this case solely on the basis of a knowing—as opposed to a willful—violation).

Given all this, there can be little doubt that the Special Counsel's investigation is "vastly wider and more consequential for the republic than was Alexia Morrison's."  Statement of Prof. Akhil Reed Amar at 7, *Special Counsels and the Separation of Powers: Hearing on S. 1735 & S. 1741 Before the S. Judiciary Comm.*, 115th Cong. (2017) ("Prof. Amar Statement"), *available at* https://www.judiciary.senate.gov/imo/media/doc/09-26-17%20Amar%20Testimony.pdf.

**Second**, Ms. Morrison's role was "limited in jurisdiction" because the controlling statute "itself [was] restricted in applicability to certain federal officials suspected of certain serious federal crimes" and the independent counsel could "only act within the scope of the jurisdiction that has been granted."  *Morrison*, 487 U.S. at 672.  Indeed, Ms. Morrison's "investigation was focused on only one person, who was out of government at the time: Ted Olson."  Prof. Amar Statement at 6.  In fact, the supervising "Special Division" court there determined that it had no authority to overrule the Attorney General's refusal to permit Ms. Morrison to investigate two additional Department of Justice officials.  *Morrison*, 487 U.S. at 668.  Additionally, before Ms. Morrison was appointed, and as required by the Ethics in Government Act, the Attorney General had conducted his own criminal investigation and only then did he, and the Special Division court, conclude that further investigation by Ms. Morrison was necessary.  Here, however, the Special Counsel's jurisdiction is far from "limited" and is not "restricted in applicability to

---

functioning of the FEC.  Indeed the crux of a Section 371 FECA case is an intent on the part of the defendant to thwart the FEC.  That is a higher factual burden than is required under 18 U.S.C. § 1001, and is arguably a greater factual burden than is required by Section 30109(d)," the substantive FECA violation).

certain federal officials suspected of certain serious federal crimes."   Nor, apparently, is it predicated on any preliminary investigation by the Attorney General or a determination by the Attorney General that an appointment of a Special Counsel was warranted in the first place.

*Third*, Ms. Morrison's tenure was limited—even though there was "concededly no time limit on the appointment of a particular counsel[,] the office of independent counsel is 'temporary' in the sense that an independent counsel is appointed essentially to accomplish a single task, and when that task is over the office is terminated. . . ."   *Morrison*, 487 U.S. at 672. The Court continued: "Unlike other prosecutors, [Ms. Morrison] has no ongoing responsibilities that extend beyond the accomplishment of the mission that she was appointed for and authorized by the Special Division to undertake."   *Id.*   The Special Counsel's charge here is not limited to "accomplish[ing] a single task" after which his "office is terminated."   Rather, his jurisdiction, as he perceives it, is far-reaching and could involve countless lines of investigation, many of which—like this very one involving Concord—are far afield from the Russian government and links to President Trump's 2016 campaign.   And there is no end provided for in any statute or regulation—the investigation will apparently continue until the Special Counsel himself declares that he is finished.   Here, even if *Morrison* is made a part of the analysis, the outcome is the same: the Special Counsel is a principal officer without a valid appointment and the Indictment therefore should be dismissed.[10]

---

[10]   Needless to say, if the Special Counsel Regulations do not apply or are not binding on the Special Counsel, he incontrovertibly is—in that unchecked and unfettered capacity—a principal officer under *Morrison*.

**B.    The Concord Indictment should be dismissed because the Special Counsel Regulations are unlawful and invalid and, consequently, the Special Counsel position violates core separation-of-powers principles.**

Apart from the constitutional invalidity of the Special Counsel's appointment, the absence of any valid and binding regulations constraining his discretion renders his position, in effect, a fourth branch of government incompatible with fundamental separation-of-powers principles.

To begin with, the Special Counsel has taken the position in court filings that the Special Counsel Regulations are not binding and cannot be enforced in court. If that is correct, then there is no limitation at all on the scope of an investigation and prosecution the Deputy Attorney General can delegate to a special counsel to pursue. And the byproduct is a powerful prosecutor, unguided, unconstrained, unfettered, and, indeed, foreign to this Nation's three-branch constitutional order. *See The Federalist No. 51*, at 288 (James Madison) (Barnes & Noble ed., 2006) (explaining that the need for separation of powers was driven in part by the reality that human beings are no angels).

This is precisely what then-Professor Kenneth Gormley, among the foremost scholars in the United States on independent counsel appointments and the issues they engender, warned about in his seminal article on the topic. *See* Kenneth Gormley, *An Original Model of the Independent Counsel Statute*, 97 Mich. L. Rev. 601 (1998). He wrote the article just as Congress was debating whether it should reauthorize the Ethics in Government Act and the appointment of private counsel to investigate and prosecute where the Executive Branch had a potential conflict of interest. As he noted, Congress had put stock in the jurisdictional limitations the Ethics in Government Act imposed: "Both proponents and opponents of the law understood that if such a statute gave the special prosecutor *too* much power to roam—beyond carefully delineated jurisdictional borders—the statute would be patently unconstitutional. Congress's final piece of

legislation, which created a temporary (rather than permanent) special prosecutor and issued that prosecutor a passport identifying his or her precise jurisdiction, was meant to avoid that dangerous precipice." *Id.* at 630.

Professor Gormley went on to observe that: "[I]f the independent counsel could dictate the terms of his or her own jurisdiction, this would create separation of powers problems of mammoth proportions, because Congress would be creating a free-floating satellite branch of government unaccountable to any other, a cardinal sin under our tripartite constitutional system." *Id.* at 661; *see also Ass'n of Am. R.Rs.*, 821 F.3d at 30–31 (reasoning that the "'auxiliary precautions' against 'ambition' that were built into our Constitution—bicameralism, presentment, judicial independence and life tenure, etc.—were designed for a government of three branches, not four"); *cf. FTC v. Ruberoid Co.*, 343 U.S. 470, 487–88 (1952) (Jackson, J., dissenting) (noting that agencies had "become a veritable fourth branch of the Government, which has deranged our three-branch legal theories").  This, however, is what we now have—a Special Counsel with expansive powers and jurisdiction who claims he is not subject to the only check on those powers and jurisdiction: the Special Counsel Regulations.

But even if the Regulations are binding and judicially enforceable, they are unlawful and invalid and thus provide no check on the Special Counsel's expansive jurisdiction.  It is fundamental that regulations can only validly "be promulgated pursuant to authority Congress has delegated" to an agency or department.  *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) (citation omitted); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) (agency's power to regulate "must always be grounded in a valid grant of authority from Congress").  And when an agency exceeds that delegated authority, it acts "ultra vires" and its regulations should be invalidated.  *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (agencies'

"power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, . . . what they do is ultra vires").

Congressional intent is the touchstone for determining an agency's power to issue regulations. For example, it is difficult to imagine that over 100 years ago when Congress enacted what would become § 515(a), it intended that statute to be a wellspring of authority for the Department of Justice to issue the blanket, non-case-specific Special Counsel Regulations that delegate core Attorney General powers and duties to a private attorney in a role of special counsel absent any other legislative enactment—which Regulations the Special Counsel later would deem non-binding and not enforceable in court. Indeed, at that time, the Attorney General—and the Department of Justice—had limited powers. *See, e.g.*, *United States v. Rosenthal*, 121 F. 862, 865–69 (C.C.S.D.N.Y. 1903) (describing statutory limits in effect shortly before the 1906 Act). And, as noted above, when private lawyers were retained by the Department as "special attorneys," Congress routinely provided specific grants of authority— despite the existence of § 515(a). *Supra* at 19–21. Given this, it is no surprise that there is not a shred of evidence of congressional intent at the time of §§ 509, 510, and 515(a)'s enactment authorizing the Attorney General to issue the broad Special Counsel Regulations that the Special Counsel could violate without any judicial recourse.

Moreover, as noted (*supra* at 20–21), Congress thought appointment authority was required when it passed the Ethics in Government Act in 1978. And when Congress abandoned the Ethics in Government Act in 1999—driven chiefly by concerns over the degree of unchecked prosecutorial power independent counsels had come to exercise—surely Congress could not have intended that the Attorney General thereafter could create the same concept of an independent or "special" counsel purely through regulation, without any new statutory

appointment authorization from Congress to do so.  Yet in the immediate wake of Congress's refusal to re-enact that unchecked independent counsel, the Attorney General did just that, promulgating the Special Counsel Regulations which—particularly since, according to the Special Counsel, they are not even binding—have created that very same unfettered independent counsel, but one that is even more unchecked.  *See* Final Rule, 64 Fed. Reg. 37,038 (July 9, 1999).

In this light, there can be no credible argument that Congress delegated authority to the Attorney General to issue non-judicially enforceable regulations replacing the statute Congress allowed to expire.  And certainly, the Attorney General cannot "bootstrap[] [him]self into an area in which [he] has no jurisdiction. . . ."  *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990) (citation omitted).  This kind of circular logic—that the Attorney General could give himself power that only a statute can provide by issuing the Special Counsel Regulations, and then use those same regulations to empower a special counsel who was never authorized by Congress— effectively nullifies any actual delegation of authority by Congress to the Attorney General as unnecessary.

In the end, there is no valid source for the Special Counsel's claimed un-cabined federal prosecutorial authority—none can be found in the Constitution, none has been provided by Congress, and none can exist in the Regulations.  This Court accordingly should find that the Special Counsel lacks the power to indict and prosecute Concord and dismiss the Indictment. *See SW Gen., Inc.*, 137 S. Ct. at 943–44 (affirming vacatur of agency order where appointment violated statute); *Nguyen v. United States*, 539 U.S. 69, 78–83 (2003) (similar where lower court's composition violated statute); *Providence Journal Co.*, 485 U.S. at 699 (similar).

**C.**     **The Concord Indictment should be dismissed because even if the Special Counsel Regulations are valid and binding, the Appointment Order is inconsistent with them and does not authorize a prosecution against Concord.**

Finally, the Appointment Order cannot be invoked to override what the Constitution and statutes plainly do not authorize and, even on its own terms, the Order does not authorize the indictment or prosecution of Concord.

To begin with, the Appointment Order does not support the Indictment—whether the Special Counsel Regulations are valid and binding, or, as the Special Counsel insists, they are not. In the absence of valid and binding Regulations, the Special Counsel is unfettered and unsupervised, and the Appointment Order certainly is no cure for that. It purports to define the jurisdiction of the Special Counsel. But without the Regulations to back it up, the Order has no teeth—there is, quite simply, no mechanism to enforce it and ensure the Special Counsel does not stray beyond its bounds. This, then, is no mere "independent counsel" under the now-defunct Ethics in Government Act. It is, instead, a private lawyer clothed with the Attorney General's exclusive and plenary prosecutorial authority who—unlike the Attorney General (or Deputy Attorney General) himself—is subject to no one's control. Although critically deficient in many respects, the Regulations provided at least some semblance of restraint. In their absence, the Indictment against Concord surely cannot stand.

If, however, and contrary to the Special Counsel's on-the-record claims, the Special Counsel Regulations are indeed binding on him,[11] the Appointment Order still does not support

---

[11]     If the Regulations are not invalid, there is good reason to think the Regulations do bind the Special Counsel. *See, e.g.*, *Nixon*, 418 U.S. at 695 (holding that Department of Justice regulations are binding); *Erie Blvd. Hydropower, LP v. FERC*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("[A]n agency is bound by its own regulations.") (quotation marks omitted); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266 (1954) (agencies and their department heads cannot "sidestep" their own regulations at their whim).

- 44 -

the Indictment because the Order fails to comply with the clear mandate of the Regulations. Three threshold prerequisites must be met under the Regulations before the appointment of a Special Counsel can even be contemplated:

- There must be a determination that "criminal investigation of" an individual or entity "is warranted";

- There must be a determination that "investigation or prosecution of that person or matter by a United States Attorney's Office or litigating Division of the Department of Justice would present a conflict of interest for the Department or other extraordinary circumstances"; and

- There must be a determination that "under the circumstances, it would be in the public interest to appoint an outside Special Counsel to assume responsibility for the matter."

28 C.F.R. § 600.1.   But the Special Counsel's indictment and prosecution of Concord impermissibly deviates from the Regulations because the Appointment Order fails to establish the need for a criminal investigation of Concord, a conflict of interest as to Concord, or extraordinary circumstances as to Concord.

*First*, the Order provides no indication that there was a need for a criminal investigation into Concord as required by § 600.1.   At the time of the Special Counsel's appointment, there was no criminal investigation taking place.   The testimony provided by then-FBI Director Comey referred to in the Order confirmed the existence only of a ***counter-intelligence*** investigation into the Russian government's alleged efforts to interfere with the 2016 presidential election—an investigation beyond the scope of the Regulations that no United States Attorney could, by law, undertake.   *See* Ex. C: James B. Comey, Statement Before the House Permanent Select Committee on Intelligence (Mar. 20, 2017).   And the Deputy Attorney General has given no indication that the investigation that led to the indictment of Concord was a criminal one, subject to referral to the Special Counsel under § 600.1.

*Second*, there was no stated conflict of interest or extraordinary circumstance in the Appointment Order supporting a criminal investigation into Concord as required by § 600.1. That stands to reason because Attorney General Sessions already had recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."   Ex. E: Press Release, Dep't of Justice, Attorney General Sessions Statement on Recusal (Mar. 2, 2017).  This, in turn, eliminated any apparent conflict at the time. Nor does the Appointment Order point to any conflict or extraordinary circumstance necessitating the Special Counsel's investigation into Concord, a private entity that, as the Deputy Attorney General confirmed in his press conference, had no links to President Trump's presidential campaign. *See* Tim Hains, *Rosenstein: "No Allegation in This Indictment That Any American Had Any Knowledge" of Russian Election Influence Operation*, RealClearPolitics (Feb. 16, 2018).

*Third*, the Regulations do not allow for the Appointment Order's general, open-ended grant of jurisdiction to investigate "any matters that arose or may arise directly from" the FBI's counter-intelligence investigation.  The Regulations authorize the Attorney General to confer two forms of jurisdiction on the Special Counsel: (i) a "matter" as to which the Attorney General provides a "specific factual statement"; and (ii) "federal crimes" committed in the course of investigating a specifically defined "matter."   Neither category, no matter how broadly construed, can fit the Order's expansive "any matter that arose or may arise directly from" jurisdiction, which obviously sweeps far beyond "federal crimes" that obstruct or interfere with the investigation, and lacks any publicly disclosed "specific factual statement" confining it.

The Appointment Order expressly omits these particular regulatory requirements from its terms, but they are the most pivotal because they purport to define the circumstances under

which a special counsel can be appointed in the first place.  Given "the vast power and the immense discretion that are placed in the hands of a prosecutor with respect to the objects of his investigation[,]" a claim that these specific Regulations have no role to play only magnifies the apparent usurpation of authority that is occurring in this case—a Special Counsel who is a "mini-Executive" who "operat[es] in an area where so little is law and so much is discretion. . . ." *Morrison*, 487 U.S. at 732 (Scalia, J., dissenting).  And this is all the more problematic here, where the Special Counsel, "immune to political control and lacking a docket of other cases, face[s intense] pressure to justify [his] appointment[] by bagging [some] prey." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1176 (D.C. Cir. 2006) (Tatel, J., concurring) (citing *Morrison*, 487 U.S. at 727–28 (Scalia, J., dissenting)).

In the *Manafort* action, the Special Counsel nevertheless contended that § 600.10—which provides that the Regulations "are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law or equity, by any person or entity, in any matter, civil, criminal, or administrative"—mandated that they could not be relied on by a defendant in challenging an indictment.[12]  If this is right, the effect on the issues raised in this case and Concord's motion to dismiss is clear and significant, as discussed above.

There is, however, good reason to believe the Special Counsel's view is wrong.  If, as noted (*supra* at 40), the Regulations cannot be enforced to hold the Special Counsel to their terms, the consequence would be a delegation of unfettered and unregulated prosecutorial power—exactly what Attorney General Reno claimed the Regulations would prevent when they were issued in 1999.  Indeed, by attempting to set the parameters of this new "special counsel"

---

[12]    *See* Gov't Resp. in Opp'n to Def.'s Mot. to Dismiss at 29–30, *United States v. Manafort*, No. 1:17-cr-00201-ABJ (D.D.C. Apr. 2, 2018), ECF No. 244.

position so that it did not become some impermissible fourth branch of government beyond the

reach and control of the three branches, the Regulations aim to preserve the structural separation-

of-powers principles that form the bedrock of the American constitutional system.  In so doing,

the Regulations do more than protect the "structural interests . . . of the entire Republic[,]"

*Freytag*, 501 U.S. at 878, they protect the rights of "individual[s]" as well,  *Ass'n of Am. R.Rs.*,

135 S. Ct. at 1233 (citation omitted).  So while the Attorney General, through § 600.10, says the

Regulations do not "create any rights" that are enforceable in court, that is simply incompatible

with their core purpose.  "Where the rights of individuals are affected, it is incumbent upon

agencies to follow their own procedures[,]" *Morton v. Ruiz*, 415 U.S. 199, 235 (1974), and they

are subject to judicial review—they cannot be left to "police [their] own conduct," *Mach Mining,*

*LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (citation omitted).[13]

Wholly apart from the Appointment Order's defects, the effort to indict Concord goes

beyond the Appointment Order's own terms as well.  There are no allegations in the Indictment

regarding: (i) the Russian government; (ii) President Trump's campaign;[14] (iii) links and/or

coordination between Concord and the Russian government or President Trump's campaign; or

(iv) obstruction or interference by Concord with the Special Counsel's investigation.  Nor is

---

[13]   At the Special Counsel's urging, in *United States v. Manafort*, No. 1:17-cr-00201-ABJ, 2018 WL 2223656, at \*12–14 (D.D.C. May 15, 2018), Judge Jackson relied on § 600.10 and found that the Regulations were not enforceable by a private party in a court of law, even when the regulations are relied on for the sole purpose of evaluating the Special Counsel's conduct. Respectfully, Judge Jackson erred in departing from the controlling precedents discussed above and in failing to recognize the essential role the Regulations play—in the absence of congressional action—in ensuring the Special Counsel's investigation is subject to at least some constraints, however minimal.  That being said, Concord notes that Mr. Manafort did not present Judge Jackson with the Appointments Clause and statutory arguments contained herein, nor has he presented those arguments in the Eastern District of Virginia.

[14]   The Indictment contains only allegations involving "unwitting" individuals involved in President Trump's campaign.  *See* Indictment ¶¶ 6, 45, 54(c), 55(a), 74–79, ECF No. 1.

there any indication that the investigation of Concord arose ***directly*** from the counter-intelligence investigation into alleged Russian government interference with the 2016 presidential election. Indeed, supposed Russian social media involvement in the alleged Russian government interference that was the target of the investigation was publicly known long before—and thus could not have arisen directly from—the Special Counsel's investigation.

Surely, Concord cannot be indicted under an order that does not purport to reach it and the Indictment should be dismissed on this ground, too.

[*Remainder of Page Intentionally Blank*]

## V.     CONCLUSION

The Indictment of Concord is unconstitutional and should be dismissed.

Dated: June 25, 2018

Respectfully submitted,

CONCORD MANAGEMENT
AND CONSULTING LLC

By: /s/ Eric A. Dubelier
    Eric A. Dubelier (D.C. Bar No. 419412)
    Katherine J. Seikaly (D.C. Bar No. 498641)
    REED SMITH LLP
    1301 K Street, N.W.
    Suite 1000 – East Tower
    Washington, D.C. 20005-3373
    202.414.9200 (phone)
    202.414.9299 (fax)
    edubelier@reedsmith.com
    kseikaly@reedsmith.com

    James C. Martin[*]
    Colin E. Wrabley[*]
    REED SMITH LLP
    225 Fifth Avenue
    Pittsburgh, PA 15222-2716
    412.288.3131 (phone)
    412.288.3063 (fax)
    jcmartin@reedsmith.com
    cwrabley@reedsmith.com

    [*] *Motion for Admission Pro Hac Vice Pending*

**EXHIBIT A:**
**Dep't of Justice Order No. 3915-2017 (May 17, 2017)**


**Defendant Concord Management and Consulting LLC's**
**Motion to Dismiss the Indictment Based on the Special Counsel's**
**Unlawful Appointment and Lack of Authority to Indict Concord,**
***United States v. Internet Research Agency LLC,***
**Criminal Action No. 18-00032 (DLF)**



Office of the Deputy Attorney General
Washington, D.C. 20530

ORDER NO. 3915-2017

APPOINTMENT OF SPECIAL COUNSEL
TO INVESTIGATE RUSSIAN INTERFERENCE WITH THE
2016 PRESIDENTIAL ELECTION AND RELATED MATTERS

By virtue of the authority vested in me as Acting Attorney General, including 28 U.S.C. §§ 509, 510, and 515, in order to discharge my responsibility to provide supervision and management of the Department of Justice, and to ensure a full and thorough investigation of the Russian government's efforts to interfere in the 2016 presidential election, I hereby order as follows:

(a)     Robert S. Mueller III is appointed to serve as Special Counsel for the United States Department of Justice.

(b)     The Special Counsel is authorized to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including:

    (i)     any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and

    (ii)     any matters that arose or may arise directly from the investigation; and

    (iii)     any other matters within the scope of 28 C.F.R. § 600.4(a).

(c)     If the Special Counsel believes it is necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters.

(d)     Sections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel.

_____5/17/17_____
Date

Rod J. Rosenstein
Acting Attorney General

**EXHIBIT B:**
**Press Release, Dep't of Justice, Appointment of Special Counsel (May 17, 2017)**


**Defendant Concord Management and Consulting LLC's**
**Motion to Dismiss the Indictment Based on the Special Counsel's**
**Unlawful Appointment and Lack of Authority to Indict Concord,**
*United States v. Internet Research Agency LLC,*
**Criminal Action No. 18-00032 (DLF)**

# JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                        Wednesday, May 17, 2017

## Appointment of Special Counsel

Deputy Attorney General Rod J. Rosenstein today announced the appointment of former Department of Justice official and FBI Director Robert S. Mueller III to serve as Special Counsel to oversee the previously-confirmed FBI investigation of Russian government efforts to influence the 2016 presidential election and related matters.

"In my capacity as acting Attorney General, I determined that it is in the public interest for me to exercise my authority and appoint a Special Counsel to assume responsibility for this matter," said Deputy Attorney General Rosenstein. "My decision is not a finding that crimes have been committed or that any prosecution is warranted. I have made no such determination. What I have determined is that based upon the unique circumstances, the public interest requires me to place this investigation under the authority of a person who exercises a degree of independence from the normal chain of command."

Deputy Attorney General Rosenstein added, "Each year, the career professionals of the U.S. Department of Justice conduct tens of thousands of criminal investigations and handle countless other matters without regard to partisan political considerations. I have great confidence in the independence and integrity of our people and our processes. Considering the unique circumstances of this matter, however, I determined that a Special Counsel is necessary in order for the American people to have full confidence in the outcome. Our nation is grounded on the rule of law, and the public must be assured that government officials administer the law fairly. Special Counsel Mueller will have all appropriate resources to conduct a thorough and complete investigation, and I am confident that he will follow the facts, apply the law and reach a just result."

Special Counsel Mueller has agreed to resign from his private law firm in order to avoid any conflicts of interest with firm clients or attorneys.

A copy of the order is attached.

**Attachment(s):**
Download Order 3915-2017 (Special Counsel)

**Component(s):**
Office of the Deputy Attorney General

**Press Release Number:**
17-541

*Updated May 17, 2017*

**EXHIBIT C:**
**James B. Comey, Dir., Fed. Bureau of Investigation, Statement Before**
**the House Permanent Select Committee on Intelligence (Mar. 20, 2017)**

**Defendant Concord Management and Consulting LLC's**
**Motion to Dismiss the Indictment Based on the Special Counsel's**
**Unlawful Appointment and Lack of Authority to Indict Concord,**
***United States v. Internet Research Agency LLC*,**
**Criminal Action No. 18-00032 (DLF)**

**James B. Comey**

Director
Federal Bureau of Investigation

Statement Before the House Permanent Select Committee on Intelligence (HPSCI)
Washington, D.C.
*March 20, 2017*

# HPSCI Hearing Titled Russian Active Measures Investigation

Mr. Chairman, Ranking Member Schiff, members of the committee, thank you for including me in today's hearing. I'm honored to be here representing the people of the FBI.

I hope we have shown you through our actions and our words how much we at the FBI value your oversight of our work and how much we respect your responsibility to investigate those things that are important to the American people. Thank you for showing that both are being taken very seriously.

As you know, our practice is not to confirm the existence of ongoing investigations, especially those investigations that involve classified matters, but in unusual circumstances where it is in the public interest, it may be appropriate to do so as Justice Department policies recognize. This is one of those circumstances.

I have been authorized by the Department of Justice to confirm that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any

coordination between the campaign and Russia's efforts. As with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed.

Because it is an open, ongoing investigation and is classified, I cannot say more about what we are doing and whose conduct we are examining. At the request of congressional leaders, we have taken the extraordinary step in coordination with the Department of Justice of briefing this Congress' leaders, including the leaders of this committee, in a classified setting in detail about the investigation, but I can't go into those details here.

I know that is extremely frustrating to some folks. But it is the way it has to be for reasons that I hope you and the American people can understand. The FBI is very careful in how we handle information about our cases and about the people we are investigating. We are also very careful about the way we handle information that may be of interest to our foreign adversaries. Both of those interests are at issue in a counterintelligence investigation. Please don't draw any conclusions from the fact that I may not be able to comment on certain topics. I know speculating is part of human nature, but it really isn't fair to draw conclusions simply because I say that I can't comment.

Some folks may want to make comparisons to past instances where the Department of Justice and the FBI have spoken about the details of some investigations, but please keep in mind that those involved the details of completed investigations. Our ability to share details with the Congress and the American people is limited when those investigations are still open, which I hope makes sense. We need to protect people's privacy. We need to make sure we don't give other people clues as to where we're going. We need to make sure that we don't give information to our foreign adversaries about what we know or don't know. We just cannot do our work well or fairly if we start talking about it while we're doing it. So we will try very, very hard to avoid that, as we always do.

This work is very complex and there is no way for me to give you a timetable as to when it will be done. We approach this work in an open-minded, independent way and our expert investigators will conclude that work as quickly as they can, but they will always do it well no matter how long that takes. I can promise you,

we will follow the facts wherever they lead. And I want to underscore something my friend Mike Rogers said—leaks of classified information are serious, serious federal crimes for a reason. They should be investigated and, where possible, prosecuted in a way that reflects that seriousness so that people understand it simply cannot be tolerated.

And I look forward to taking your questions.

**EXHIBIT D:**
**Letter from Donald J. Trump, U.S. Pres., to**
**James B. Comey, Dir., Fed. Bureau of Investigation (May 9, 2017)**


**Defendant Concord Management and Consulting LLC's**
**Motion to Dismiss the Indictment Based on the Special Counsel's**
**Unlawful Appointment and Lack of Authority to Indict Concord,**
***United States v. Internet Research Agency LLC*,**
**Criminal Action No. 18-00032 (DLF)**



**THE WHITE HOUSE**

WASHINGTON

May 9, 2017

Dear Director Comey:

I have received the attached letters from the Attorney General and Deputy Attorney General of the United States recommending your dismissal as the Director of the Federal Bureau of Investigation. I have accepted their recommendation and you are hereby terminated and removed from office, effective immediately.

While I greatly appreciate you informing me, on three separate occasions, that I am not under investigation, I nevertheless concur with the judgment of the Department of Justice that you are not able to effectively lead the Bureau.

It is essential that we find new leadership for the FBI that restores public trust and confidence in its vital law enforcement mission.

I wish you the best of luck in your future endeavors.

Donald J. Trump



# Office of the Attorney General
## Washington, D. C. 20530

May 9, 2017

President Donald J. Trump
The White House
Washington, DC  20500

Dear Mr. President:

 As Attorney General, I am committed to a high level of discipline, integrity, and the rule of law to the Department of Justice—an institution that I deeply respect.  Based on my evaluation, and for the reasons expressed by the Deputy Attorney General in the attached memorandum, I have concluded that a fresh start is needed at the leadership of the FBI.  It is essential that this Department of Justice clearly reaffirm its commitment to longstanding principles that ensure the integrity and fairness of federal investigations and prosecutions.  The Director of the FBI must be someone who follows faithfully the rules and principles of the Department of Justice and who sets the right example for our law enforcement officials and others in the Department.  Therefore, I must recommend that you remove Director James B. Comey, Jr. and identify an experienced and qualified individual to lead the great men and women of the FBI.

Sincerely

Jeff Sessions
Attorney General

JS:ph
Attachment

**U. S. Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General                    *Washington, D.C. 20530*

May 9, 2017

MEMORANDUM FOR THE ATTORNEY GENERAL

FROM:                        ROD J. ROSENSTEIN
                             DEPUTY ATTORNEY GENERAL

SUBJECT:                     RESTORING PUBLIC CONFIDENCE IN THE FBI

The Federal Bureau of Investigation has long been regarded as our nation's premier federal investigative agency. Over the past year, however, the FBI's reputation and credibility have suffered substantial damage, and it has affected the entire Department of Justice. That is deeply troubling to many Department employees and veterans, legislators and citizens.

The current FBI Director is an articulate and persuasive speaker about leadership and the immutable principles of the Department of Justice. He deserves our appreciation for his public service. As you and I have discussed, however, I cannot defend the Director's handling of the conclusion of the investigation of Secretary Clinton's emails, and I do not understand his refusal to accept the nearly universal judgment that he was mistaken. Almost everyone agrees that the Director made serious mistakes; it is one of the few issues that unites people of diverse perspectives.

The Director was wrong to usurp the Attorney General's authority on July 5, 2016, and announce his conclusion that the case should be closed without prosecution. It is not the function of the Director to make such an announcement. At most, the Director should have said the FBI had completed its investigation and presented its findings to federal prosecutors. The Director now defends his decision by asserting that he believed Attorney General Loretta Lynch had a conflict. But the FBI Director is never empowered to supplant federal prosecutors and assume command of the Justice Department. There is a well-established process for other officials to step in when a conflict requires the recusal of the Attorney General. On July 5, however, the Director announced his own conclusions about the nation's most sensitive criminal investigation, without the authorization of duly appointed Justice Department leaders.

Compounding the error, the Director ignored another longstanding principle: we do not hold press conferences to release derogatory information about the subject of a declined criminal investigation. Derogatory information sometimes is disclosed in the course of criminal investigations and prosecutions, but we never release it gratuitously. The Director laid out his version of the facts for the news media as if it were a closing argument, but without a trial. It is a textbook example of what federal prosecutors and agents are taught not to do.

In response to skeptical questions at a congressional hearing, the Director defended his remarks by saying that his "goal was to say what is true. What did we do, what did we find, what do we think about it." But the goal of a federal criminal investigation is not to announce our thoughts at a press conference. The goal is to determine whether there is sufficient evidence to justify a federal criminal prosecution, then allow a federal prosecutor who exercises authority delegated by the Attorney General to make a prosecutorial decision, and then – if prosecution is warranted – let the judge and jury determine the facts. We sometimes release information about closed investigations in appropriate ways, but the FBI does not do it sua sponte.

Concerning his letter to the Congress on October 28, 2016, the Director cast his decision as a choice between whether he would "speak" about the FBI's decision to investigate the newly-discovered email messages or "conceal" it. "Conceal" is a loaded term that misstates the issue. When federal agents and prosecutors quietly open a criminal investigation, we are not concealing anything; we are simply following the longstanding policy that we refrain from publicizing non-public information. In that context, silence is not concealment.

My perspective on these issues is shared by former Attorneys General and Deputy Attorneys General from different eras and both political parties. Judge Laurence Silberman, who served as Deputy Attorney General under President Ford, wrote that "it is not the bureau's responsibility to opine on whether a matter should be prosecuted." Silberman believes that the Director's "performance was so inappropriate for an FBI director that [he] doubt[s] the bureau will ever completely recover." Jamie Gorelick, Deputy Attorney General under President Clinton, joined with Larry Thompson, Deputy Attorney General under President George W. Bush, to opine that the Director had "chosen personally to restrike the balance between transparency and fairness, departing from the department's traditions." They concluded that the Director violated his obligation to "preserve, protect and defend" the traditions of the Department and the FBI.

Former Attorney General Michael Mukasey, who served under President George W. Bush, observed that the Director "stepped way outside his job in disclosing the recommendation in that fashion" because the FBI director "doesn't make that decision." Alberto Gonzales, who also served as Attorney General under President George W. Bush, called the decision "an error in judgment." Eric Holder, who served as Deputy Attorney General under President Clinton and Attorney General under President Obama, said that the Director's decision "was incorrect. It violated long-standing Justice Department policies and traditions. And it ran counter to guidance that I put in place four years ago laying out the proper way to conduct investigations during an election season." Holder concluded that the Director "broke with these fundamental principles" and "negatively affected public trust in both the Justice Department and the FBI."

Former Deputy Attorneys General Gorelick and Thompson described the unusual events as "real-time, raw-take transparency taken to its illogical limit, a kind of reality TV of federal criminal investigation," that is "antithetical to the interests of justice."

Donald Ayer, who served as Deputy Attorney General under President George H.W. Bush, along with other former Justice Department officials, was "astonished and perplexed" by the decision to "break[] with longstanding practices followed by officials of both parties during

Memorandum for the Attorney General                                          Page 3
Subject: Restoring Public Confidence in the Federal Bureau of Investigation

past elections." Ayer's letter noted, "Perhaps most troubling … is the precedent set by this departure from the Department's widely-respected, non-partisan traditions."

We should reject the departure and return to the traditions.

Although the President has the power to remove an FBI director, the decision should not be taken lightly. I agree with the nearly unanimous opinions of former Department officials. The way the Director handled the conclusion of the email investigation was wrong. As a result, the FBI is unlikely to regain public and congressional trust until it has a Director who understands the gravity of the mistakes and pledges never to repeat them. Having refused to admit his errors, the Director cannot be expected to implement the necessary corrective actions.

THE WHITE HOUSE
Office of the Press Secretary

FOR IMMEDIATE RELEASE
May 9, 2017

### Statement from the Press Secretary

Today, President Donald J. Trump informed FBI Director James Comey that he has been terminated and removed from office.  President Trump acted based on the clear recommendations of both Deputy Attorney General Rod Rosenstein and Attorney General Jeff Sessions.

"The FBI is one of our Nation's most cherished and respected institutions and today will mark a new beginning for our crown jewel of law enforcement," said President Trump.

A search for a new permanent FBI Director will begin immediately.

### ###

**EXHIBIT E:**
**Press Release, Dep't of Justice,**
**Attorney General Sessions Statement on Recusal (Mar. 2, 2017)**


**Defendant Concord Management and Consulting LLC's**
**Motion to Dismiss the Indictment Based on the Special Counsel's**
**Unlawful Appointment and Lack of Authority to Indict Concord,**
*United States v. Internet Research Agency LLC*,
**Criminal Action No. 18-00032 (DLF)**

## JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                        Thursday, March 2, 2017

## Attorney General Sessions Statement on Recusal

Attorney General Jeff Sessions today issued the following statement:

"During the course of the confirmation proceedings on my nomination to be Attorney General, I advised the Senate Judiciary Committee that '[i]f a specific matter arose where I believed my impartiality might reasonably be questioned, I would consult with Department ethics officials regarding the most appropriate way to proceed.'

"During the course of the last several weeks, I have met with the relevant senior career Department officials to discuss whether I should recuse myself from any matters arising from the campaigns for President of the United States.

"Having concluded those meetings today, I have decided to recuse myself from any existing or future investigations of any matters related in any way to the campaigns for President of the United States.

"I have taken no actions regarding any such matters, to the extent they exist.

"This announcement should not be interpreted as confirmation of the existence of any investigation or suggestive of the scope of any such investigation.

"Consistent with the succession order for the Department of Justice, Acting Deputy Attorney General and U.S. Attorney for the Eastern District of Virginia Dana Boente shall act as and perform the functions of the Attorney General with respect to any matters from which I have recused myself to the extent they exist."

---

**Component(s):**
Office of the Attorney General

**Press Release Number:**
17-237

*Updated March 2, 2017*

**EXHIBIT F:**
**Proposed Order**


**Defendant Concord Management and Consulting LLC's**
**Motion to Dismiss the Indictment Based on the Special Counsel's**
**Unlawful Appointment and Lack of Authority to Indict Concord,**
*United States v. Internet Research Agency LLC*,
**Criminal Action No. 18-00032 (DLF)**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 18-00032 (DLF) |
| INTERNET RESEARCH AGENCY LLC, *et al.*, | |
| Defendants. | |

## <u>ORDER</u>

With the Court having considered Defendant Concord Management and Consulting LLC's Motion to Dismiss the Indictment Based on the Special Counsel's Unlawful Appointment and Lack of Authority to Indict Concord, it is hereby

**ORDERED** that the motion is **GRANTED**; and it is

**FURTHER ORDERED** that the Indictment, ECF No. 1, is dismissed as to Defendant Concord Management and Consulting LLC.

_____
DABNEY L. FRIEDRICH
United States District Judge

Date:

PERSONS TO BE SERVED WITH ORDER:

Michael R. Dreeben
Jeannie S. Rhee
L. Rush Atkinson
Ryan K. Dickey
Heather N. Alpino
U.S. DEPARTMENT OF JUSTICE
Special Counsel's Office
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Jonathan I. Kravis
Deborah A. Curtis
Kathryn L. Rakoczy
U.S. DEPARTMENT OF JUSTICE
U.S. Attorney's Office
  for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

*Counsel for United States of America*

Eric A. Dubelier
Katherine J. Seikaly
REED SMITH LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005-3373

James C. Martin
Colin E. Wrabley
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222-2716

*Counsel for Defendant Concord
Management and Consulting LLC*