```
 1              BEFORE THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,         .
                                        .  Case Number 18-CR-32
 4              Plaintiff,              .
                                        .
 5         vs.                          .
                                        .  Washington, D.C.
 6    CONCORD MANAGEMENT AND            .  Jun 15, 2018
      CONSULTING LLC,                   .  10:03 a.m.
 7                                      .
                Defendant.              .
 8    - - - - - - - - - - - - - - - -

 9                   TRANSCRIPT OF STATUS HEARING
              BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                 UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12    For the Government:              JEANNIE S. RHEE, AUSA
                                       MICHAEL R. DREEBEN, AUSA
13                                     L. RUSH ATKINSON, AUSA
                                       RYAN K. DICKEY, AUSA
14                                     U.S. Department of Justice
                                       Special Counsel's Office
15                                     950 Pennsylvania Avenue N.W.
                                       Washington, D.C. 20530
16                                     202-616-0900

17    For the Defendant Concord
      Management and Consulting LLC:   ERIC A. DUBELIER, ESQ.
18                                     KATHERINE J. SEIKALY, ESQ.
                                       Reed Smith LLP
19                                     1301 K Street N.W.
                                       Suite 1000, East Tower
20                                     Washington, D.C. 20005
                                       202-414-9291
21
      Official Court Reporter:         SARA A. WICK, RPR, CRR
22                                     U.S. Courthouse, Room 4704-B
                                       333 Constitution Avenue N.W.
23                                     Washington, D.C. 20001
                                       202-354-3284
24
      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription.
```

```
 1                      P R O C E E D I N G S
 2          (Call to order of the court.)
 3               THE COURTROOM DEPUTY:  Your Honor, this is Criminal
 4      Case Number 18-32, the United States of America versus Concord
 5      Management and Consulting LLC.
 6          Will counsel, please, approach the podium and identify
 7      yourselves for the record, as well as any additional parties at
 8      your table.
 9               MS. RHEE:  Good morning, your Honor.  Jeannie Rhee for
10      the United States, along with Rush Atkinson and Ryan Dickey, and
11      today for purposes of the hearing on the motions that have been
12      briefed, Michael Dreeben.
13               THE COURT:  Good morning.
14               MR. DUBELIER:  Good morning, your Honor.  Eric
15      Dubelier and Katherine Seikaly for the defendant.
16               THE COURT:  Good morning.  So I set this hearing to
17      discuss any ongoing discovery issues and to hear argument on
18      Concord's motion for an in-camera inspection of the instructions
19      provided to the grand jury.  I also intend to set future hearing
20      dates on the pretrial motions that Defendant Concord has
21      identified to date.
22          It's unfortunate that, after all this time, the parties
23      have been unable to make more progress on discovery.  I'm
24      disappointed it took the parties nearly four weeks to let me
25      know they didn't have an agreement on the protective order.
```

1    Defendant Concord was arraigned on May 9th, and here we are more

2    than five weeks later, and discovery still hasn't started in

3    this case.  That's a concern to the Court, and I want to focus

4    time on the discovery issues.

5        But first, Mr. Dubelier, let me ask you some questions

6    about your motion for an in-camera inspection of the grand jury

7    instructions.

8                MR. DUBELIER:  Of course, your Honor.

9                THE COURT:  I've read your briefs.  I'm familiar with

10   your points.  What I want to know is, why aren't you bringing

11   this as a challenge to the motion to dismiss the indictment?

12               MR. DUBELIER:  Ultimately, we do intend to file a

13   motion to dismiss the indictment, your Honor.  And I think the

14   issue is, what we tried to do and the way we framed it this way

15   is that the jury instruction itself is critical to the motion to

16   dismiss the indictment.  I actually think it's less critical

17   than it was when we originally filed the motion -- when we

18   originally filed to ask for the grand jury instruction, because

19   I think the government has conceded that they didn't give a

20   willfulness instruction to the grand jury.

21       So then I think the question becomes, your Honor, well, if

22   we already know that, why do we need to see the instruction?

23   But I actually don't think that's the fair question.  I think

24   the fairer question is, if we already know that, why don't they

25   just let you look at the instruction?

1        Because I think, your Honor, what's critical here is this

2    issue is only -- you're seeing a preview to this issue that

3    ultimately is going to have to be decided later, not only in a

4    motion to dismiss but what the appropriate jury instruction is

5    that is going to have to go to the jury, if we get that far.

6        THE COURT:  Understood.  But what if I determine that

7    the government's right and that willfulness is not an essential

8    element?  Why do I need to get into the grand jury at all?  If

9    they win on that, why is that not the end of the matter?  Why do

10   I breach the secrecy of the grand jury to determine whether they

11   were instructed on an element that is not even required, if

12   they're right?

13       Now, if they're wrong, at that point maybe you renew your

14   motion, but at this point why should I breach the secrecy of the

15   grand jury without knowing the answer to that question?  You've

16   asked me not to decide that question today; correct?

17       MR. DUBELIER:  That's correct, your Honor, because the

18   question hasn't been fully briefed, candidly, by either side.

19       THE COURT:  Understood.  But I'm not inclined to

20   decide this unless and until I determine that willfulness is an

21   essential element of the defense, because otherwise it's an

22   unnecessary exercise.

23       MR. DUBELIER:  Well, I agree with that, your Honor,

24   with these few caveats here.  They have now conceded they did

25   not instruct as to willfulness.  So it's no secret anymore what

1    instruction was given to the grand jury.

2          THE COURT:  But are they even required to give

3    instructions like I would give to the jury if there's a trial in

4    this case?  Is the prosecutor required to go through the

5    instructions, or can they simply read the statute?

6          MR. DUBELIER:  That's a great question, your Honor.

7    The law is not clear on that.  However, what the law is clear

8    on, if they do give an instruction, it has to be correct.

9          THE COURT:  At this point we have no evidence they

10   even gave an instruction.  So what sort of particularized

11   showing have you made to enable me to breach the secrecy of the

12   grand jury?

13        If you win on the argument with respect to willfulness,

14   then I think at that point maybe you renew the motion.  But at

15   this point I see no need to breach the secrecy of the grand jury

16   to get into this until I've determined that you are right on the

17   law.

18        At this point we don't even know that they were instructed.

19   It's not like the cases where it's clear that the government

20   gave the wrong instruction.  Here, we don't even know that they

21   gave any instruction whatsoever.

22          MR. DUBELIER:  Your Honor, the only -- I'm not

23   disagreeing with anything you're saying, and I'm not going to

24   argue against what you're saying.  The point, however, here is,

25   this case is different from any other criminal case.  It's

1    different.  This charge has never been brought before against

2    anybody.

3          THE COURT:  Conspiracy to defraud has been brought

4    many times.  You've attached some in your pleadings.

5          MR. DUBELIER:  Never conspiracy to defraud for an

6    electioneering communication, never.  We can find no case ever

7    where that was ever brought.

8          THE COURT:  Conspiracy to defraud the FEC has never

9    been bought?

10          MR. DUBELIER:  FEC, for an electioneering

11   communication.  There are conspiracy to defraud cases involving

12   the FEC with respect to contributions.  This is different.  This

13   is an electioneering communication.

14       It would seem to me it would be inconceivable to the Court

15   that they didn't give an instruction to the grand jury with

16   respect to this charge.  The charge has never been brought

17   before.  It's been brought against a foreign company with no

18   presence in the United States.

19       And if they didn't instruct the grand jury that they had to

20   find that the company had knowledge of what they were prohibited

21   from doing and did it, then they've indicted -- they've violated

22   our Fifth Amendment right.  They've indicted a case without

23   having put sufficient law before the grand jury for them to

24   return an indictment.

25       And remember, your Honor, here we're not asking for any of

```
 1       the transcripts.  We're not asking for the evidence that was put
 2       in.
 3                   THE COURT:  I know.  You're asking for me to look in
 4       camera, and I appreciate that that's a limited request.
 5            However, there is -- breaching the secrecy of the grand
 6       jury, it's not an easy thing to do.  And I don't think you've
 7       made a showing at this point, without even winning on the
 8       argument that willfulness is an essential element, that I need
 9       to go there.
10                   MR. DUBELIER:  Your Honor, I understand your position.
11       I respectfully disagree with you, but I understand the position
12       you're arguing.  And if we have to renew this at a later time
13       and we will tee it up with respect to the motion to dismiss, we
14       will do that as well.
15                   THE COURT:  Okay.  Thank you, Mr. Dubelier.
16                   MR. DUBELIER:  Thank you very much, your Honor.  I
17       appreciate it.
18                   THE COURT:  Mr. Dreeben?
19                   MR. DREEBEN:  Good morning, your Honor.
20                   THE COURT:  Good morning.  Let me ask you, I know
21       we're not getting into the merits today and deciding the
22       ultimate issue.  But I'm curious, with respect to the conspiracy
23       to defraud the FEC and the conspiracy to defraud the DOJ with
24       respect to the Foreign Agents Registration Act, what is the
25       government's position on what ultimately the government must
```

1    prove to the jury?

2            MR. DREEBEN:  So the government's position on that,

3    your Honor, is that we need to prove a conspiracy to defraud the

4    United States.  We do not need to prove a criminal violation of

5    the underlying statute, and the elements of the underlying

6    statutes that your Honor has referred to are not an ingredient

7    in the case.

8        It's well-established in D.C. Circuit law, in the

9    *Kanchanalak* campaign finance case that Judge Friedman handled

10   that the elements of a conspiracy to defraud the United States

11   are formation of a conspiracy, the intent to obstruct, impede,

12   or interfere with functions of the government through deceit and

13   an overt act.  Those are the elements that we need to establish.

14       It's a different crime because it's not saying that they

15   necessarily were required to file with the FEC or that they were

16   required to register with the Department of Justice.  What it is

17   saying is that the deception interfered with the regulatory

18   functions of those agencies to make the determination one way or

19   the other.

20           THE COURT:  But don't you have to show, on some level,

21   maybe not a knowledge of the particular legal provisions that

22   underlie the FECA and the FARA allegations, the specific

23   statutory provisions, while they may not need to know that,

24   don't they have to, on some level, in having an intent to

25   defraud, have some knowledge that they are doing something

1    wrong?

2              MR. DREEBEN:  Well, the wrongfulness of the act

3    consists of using deception to impair the government's

4    functions.  They do have to have a purpose.  It doesn't have to

5    be the major purpose or the exclusive purpose of deceiving the

6    government to impede its functions.  It could range all the way

7    up to they know that they're violating the law, but it could

8    also be that we know that the government has a regulatory

9    apparatus that exists to root out foreign influence on the

10   United States's processes, political processes without adequate

11   disclosure.  And thwarting that process through deceptive acts

12   is a way of impeding the regulatory functions of the United

13   States.

14             THE COURT:  Do they have to have some knowledge of how

15   that regulatory apparatus works to do that?

16             MR. DREEBEN:  Very little, I think.  What they need to

17   have is an intent to impair the regulatory apparatus.  They need

18   to know that there is in the United States, on some level,

19   regulation that's designed to prevent foreign influence from

20   operating in a covert, undisclosed manner that can thwart the

21   political system.  There's a ban on foreign involvement in

22   federal elections.  It has specific details.  There's a

23   requirement under the Foreign Agents Registration Act to make

24   disclosure before acting in certain specified political ways in

25   the United States.

1      I don't think the defendants here have to know the details

2  of how that works.  What they have to know is that it exists,

3  it's out there.  If they were unmasked as Russian agents posing

4  as Americans intervening in the political system, their entire

5  project would have failed.  They needed to fly under the radar

6  screen.

7      We've alleged that they engaged in a variety of deceptive

8  acts, ranging from lying on visa applications, to using proxy

9  servers in the United States to make their activities appear as

10 if they were going on here, to posing as U.S. citizens, real

11 U.S. persons in interacting with campaigns.  All of those means

12 of deception were both aimed at the political sphere and aimed

13 at avoiding regulatory oversight by the United States

14 government.

15          THE COURT:  Okay.  Mr. Dreeben, is your position here

16 inconsistent with the DOJ Policy Memorandum on Election Crimes

17 that suggests that the government needs to prove that the

18 defendant was aware that his or her conduct was unlawful?

19          MR. DREEBEN:  To the extent that that document, which

20 I think is a little cryptic and ambiguous, is read that way, and

21 I agree that it's susceptible to that reading, that's not the

22 litigating position of the United States.  We've taken the

23 position in briefs in opposition in the United States Supreme

24 Court and in litigating cases around the country that the

25 elements of a conspiracy to defraud are what I said.

I think that that manual, it gestures towards the idea that
you both need to show the elements of a campaign finance
violation and an intent to interfere with the government.  To
the extent that it's read that way, it isn't the position of the
United States.  The position of the United States is what we
have said explicitly to the Supreme Court, to the First Circuit
in a brief that was signed by the Assistant Attorney General for
the Criminal Division in 2016.

Willfulness is not an element of a 371 violation.  There
are not cases that describe it as an element of a 371 violation.
There's a legion of cases that describe the elements as I have
and have specifically said you don't need to have an underlying
illegality in a conspiracy to defraud.  The wrongful conduct is
deceiving the United States to thwart its regulatory objectives.

So if I were writing the election manual, I think I would
write it a little bit differently, but I don't think it ever
comes out and says willfulness is an element.  It's a
description of, perhaps, an overly cautious approach to
litigating these cases.  It's not the position that the
government takes in its legal filings.

THE COURT:  If there comes a time to instruct the jury
on this, is the instruction with respect to the objects that
involve the DOJ and the FEC in any way different than that that
involves the State Department?

MR. DREEBEN:  I don't think that it is, because in

each case it's not a question of whether the defendant was

violating the substantive offense.  We could have charged a

conspiracy to violate specific substantive statutes.  We chose

to indict a conspiracy to defraud the United States that has

multiple objectives and multiple means, all of which consist in

deception.

So I would not suggest that the Court deviate from the

standard jury instructions that focus on the elements of

defrauding the United States as opposed to getting into the

elements of the underlying crime.  That is one of the reasons

why conspiracy to defraud the United States differs from the

underlying offenses.

And again, Judge Friedman's opinion in *Kanchanalak* goes

into this in some detail.  When the D.C. Circuit has recited the

elements of a conspiracy to defraud in the *Treadwell* and *Davis*

cases that we've cited, it doesn't say anything about underlying

offenses.  Willfulness is not an express element of Section 371.

I think my friend would have the burden of persuading the Court

that there should be an implied element only as applied to

certain kinds of activities in 371.  That doesn't appear on the

face of the statute.  That's a very disfavored way to read

criminal provisions as fluctuating in their meaning depending on

the underlying conduct and reading elements in that aren't on

the face of the statute.

The one point that I would like to respond to, if I may,

1    your Honor, is my opponent's suggestion that we've conceded what

2    we said to the grand jury.  We have not conceded anything about

3    what we did in front of the grand jury.  I agree with your Honor

4    that piercing grand jury secrecy requires a particularized need

5    and overcoming the presumption of regularity about grand jury

6    proceedings.  And it is something of a slippery slope to say

7    let's get into the grand jury proceedings, let's just start with

8    an in-camera review of jury instructions.

9        The grand jury instructions, even if -- assuming there were

10   some error in the grand jury instructions, it doesn't justify

11   dismissal of the indictment unless it's prejudicial, and that

12   would inevitably lead to the question of was there an injurious

13   influence on the grand jury proceedings which, by analogy to the

14   way a jury instruction error is analyzed for harmlessness at the

15   petit jury stage, you would have to look at the evidence and say

16   would any reasonable grand jury, given the evidence, have

17   returned the indictment notwithstanding any potential error in

18   the prosecutor's description of the offense.  And that really

19   opens up the entire grand jury proceeding.

20       So it's fine for Concord to say hey, we're just asking for

21   a very modest step here, but that modest step has no legal

22   significance unless you are prepared to go further and really

23   open up the grand jury proceedings to review.

24       And I agree with your Honor on sequencing.  The cases that

25   have typically denied motions for inspection of grand jury

1   instructions have said look, the indictment is valid on its

2   face.  The defendant has a burden of coming forward with some

3   evidence to overcome the presumption of regularity.  That's

4   usually pretty hard to do.  Occasionally, it has been done.

5       Here, I don't think there's anything.  It's just a reliance

6   on a legal theory.  And if your Honor decides the legal theory

7   in our favor, then I think it erases their claim.

8           THE COURT:  And if I decide in their favor, do you

9   think at that point they have a basis for me to look at the

10  grand jury --

11          MR. DREEBEN:  What we would have to persuade your

12  Honor at that point is, if you concluded that willfulness or

13  knowledge of illegality is an element, we would have to then go

14  back to the indictment and point to provisions from which it

15  could be inferred that the jury found that.  It doesn't say

16  willfulness expressly.  That's clear.  And if we lost that

17  battle, you would dismiss the indictment, and there would be no

18  need to look at the grand jury minutes.

19      So I don't really get their argument at this stage.

20  They've said that they're going to make a motion to dismiss on

21  the merits.  They haven't fully briefed it.  They're not asking

22  your Honor to decide it.  We're ready to brief it when the time

23  comes.  If your Honor resolves it one way or the other, I think

24  that it will moot out the need to consider this motion.

25          THE COURT:  Okay.  Thank you, Mr. Dreeben.

1        Mr. Dubelier, briefly?

2            MR. DUBELIER:  Briefly, your Honor.  Well, I guess if

3  anyone thought for a second there wasn't anything unusual about

4  this case, it's the first time in my career that I've seen the

5  Deputy Solicitor General of the United States down here with us

6  common folk in district court.

7        He doesn't understand why we sequenced the motion the way

8  we did.  We sequenced it because --

9            THE COURT:  I don't understand it either.

10           MR. DUBELIER:  Well, look, your Honor, we tried to do

11  it in the least intrusive way, and that is, we could have filed

12  a motion to dismiss and a motion to inspect the minutes, the

13  grand jury minutes at the same time.  We didn't do that.  We

14  tried to do it in the least intrusive way.

15       And now the Deputy Solicitor General of the United States

16  has gotten up and said to your Honor, Well, yeah, we understand

17  what the election law manual says, and the Department of Justice

18  wrote it, but we, the special counsel, disagree with it.

19           THE COURT:  It's kind of ambiguous.  It's hard to tell

20  what that manual means.

21       But Mr. Dubelier, the fact is, he says if you win on

22  willfulness, the indictment's dismissed, and ultimately, that's

23  what you want.  So let's wait, and let's head towards that.

24           MR. DUBELIER:  Good point, your Honor.  Two very quick

25  points I want to make.

1    First, I think counsel is ignoring *Bluman versus the FEC*

2    and Judge Cavanaugh's concurring opinion in that case, which is

3    absolutely consistent with the election law manual at DOJ, and

4    we cited Judge Cavanaugh's language.  So I think that's

5    important.

6    Let me also say, your Honor, that again what the special

7    counsel continues to do every time we appear before the Court is

8    make general statements about the defendants in this case,

9    ascribing conduct to us that we are not accused of doing.  There

10   is no one at Concord who has been accused of being fraudulently

11   involved in a visa application or something like that, and they

12   just come up and repeat over and over again the defendants have

13   done things.  We're not accused of doing that.

14   THE COURT:  The indictment alleges that Concord spent

15   significant funds on behalf of Internet Research Agency and paid

16   individual defendants' wages.  Concord also recommended

17   personnel to Internet Research Agency and oversaw its

18   activities.  This was a part of a larger interference operation

19   called "Project Lakhta."  The indictment is vague about what

20   Project Lakhta involved, but its monthly budget exceeded $1.25

21   million.

22   MR. DUBELIER:  Well, you're going to be surprised when

23   we actually show you what Project Lakhta is about.

24   THE COURT:  I look forward to that evidence.  But I

25   think the indictment does allege involvement by Concord here.

1   But it is a great argument to make to the jury.

2            MR. DUBELIER:  Okay, your Honor.  I'm not going to

3   waste any more of your time, because I know I am losing on this

4   one.  We will be back with this eventually.

5            THE COURT:  Mr. Dubelier, I'm going to deny your

6   motion without prejudice to bring it in later in the case.

7            MR. DUBELIER:  Thank you, your Honor.  Fair enough.

8            THE COURT:  All right.  So let's turn to the

9   government's motion for a protective order under Rule 16.  You

10  can have a seat, Mr. Dubelier.

11           MR. DUBELIER:  Thank you, your Honor.

12           THE COURT:  Again, I've read the parties' briefs.  I

13  understand the parties' positions.  I think some of the points

14  on both sides have merit.  I have a couple of questions for each

15  of you here today.  I also want to share some preliminary

16  thoughts that I have on the parties' proposed protective orders.

17       I'm not going to hear argument on the motion today, because

18  it appears to me that there's significant areas of common

19  ground, and it makes sense to have the parties confer again

20  after I share my preliminary views, before, if necessary, having

21  a hearing or having me simply draft a protective order on my

22  own.

23       First, let me say that, at this early stage of discovery,

24  it appears that the government has demonstrated good cause for

25  the protection of some of the discovery it seeks to provide to

1    Defendant Concord.  As outlined in the government's motion and

2    as further supported by the government's ex parte submission, it

3    is clear that the discovery in this case contains sensitive,

4    though not classified, information that is relevant to ongoing

5    national security investigations.  Among other things, the

6    sensitive discovery material contains information about

7    investigative techniques and cooperating witnesses.

8         Additionally, it includes a significant amount of personal

9    identifying information relating to victims of identity theft

10   and other individuals who are not conspirators in this case.

11        The Court must balance these national security and

12   individual privacy concerns against the defendant's Sixth

13   Amendment right to the effective assistance of counsel and its

14   due process right to prepare and present a full defense at

15   trial.

16        Weighing these competing interests, it seems to me that

17   some discovery should be limited.  In particular, it seems

18   reasonable for defense counsel to seek permission of the Court

19   before disclosing sensitive discovery materials to foreign

20   nationals.  It also seems reasonable to have a firewall counsel

21   play a role in that process.  However, that counsel would need

22   to be separate from the prosecution team and, I am inclined to

23   say, separate from the Special Counsel's Office.

24        Additionally, as to access to nonsensitive discovery

25   materials, it does not seem reasonable to me to limit access to

1    a co-defendant in this case who allegedly controlled Defendant

2    Concord LLC.

3         And Mr. Dubelier, on this point, I have a couple of

4    questions for you.  In your brief, you argue that Concord should

5    not be ordered to prevent its officers and employees from

6    viewing discovery, and you indicate that Mr. Prigozhin is one of

7    Concord's officers.

8         How many other officers does Concord have?

9              MR. DUBELIER:  I don't have the answer to that

10   question, your Honor.

11             THE COURT:  Okay.  You've made the assertion that he's

12   just one of officers, plural, and it would be helpful for me, in

13   assessing the strength of your argument, to know the answer to

14   that question.

15             MR. DUBELIER:  I will get the answer, your Honor.

16             THE COURT:  And the same with respect to employees.

17   It's hard to determine how essential it is that Concord have the

18   help of Mr. Prigozhin.  I'm not saying I'm ruling that I'm not

19   going to allow him to have it.  It does seem to me a material

20   fact that I should have in determining his role.

21             MR. DUBELIER:  Your Honor, if I may, the complexity

22   here, of course, is we've had to argue this whole thing in the

23   abstract, because we don't even know what the evidence is.  And

24   we're not privy to the ex parte submission that the Court --

25   that was made to the Court, even though that submission is not

1    classified.

2         THE COURT:  Mr. Dubelier, just to make you feel a

3    little better about that, the government has outlined in its

4    public motion all of the bases for that information, and what

5    was supplied to me ex parte are just the details that back up

6    the assertions in terms of national security investigations,

7    cooperating witnesses, et cetera.  So it's the particulars

8    behind their argument that's fully briefed.

9         MR. DUBELIER:  I understand.  But again, your Honor,

10   the complexity for me is simply this:  If I can't see the

11   evidence, I don't know who I need to share it with.  And the

12   case law in this addresses this exact point for this reason:

13   There may be evidence that gets produced that purely relates to

14   legal issues that we have to argue before the Court where I

15   wouldn't necessarily share that with any client, not because

16   they were prohibited from seeing it but there's simply no reason

17   to share it with them.

18        THE COURT:  Understood.  My goal here is to get

19   discovery started.  You have nothing, and you were arraigned

20   five weeks earlier.  We need to get discovery rolling.

21        MR. DUBELIER:  Yep.

22        THE COURT:  I think over time this protective order

23   could change.  I'm just trying to get discovery off the ground

24   here, and I want to have a mechanism by which you can come, once

25   you get this discovery and you see it -- exactly the point

1    you're making.  Once you see it, you can come to the Court and

2    say look, I need to show this to this individual.

3        But at the outset, without you having that discovery,

4    without me having that information, we can't make those

5    determinations.  And I think the government's made enough of a

6    good cause showing here to at least start with a protective

7    order that has a mechanism for firewall counsel, just as a

8    start.

9            MR. DUBELIER:  Well, your Honor, I will say that, in

10   the negotiations we had with the special counsel, we had

11   conceded to them, because we were looking for a middle ground,

12   that they could designate a certain category of information as

13   sensitive as opposed to not sensitive.

14       But then where the real complexity came in here is, if the

15   Court will recall, they've already told us that -- they talk in

16   gigabytes or terabytes.  I think it's like 10 million pages of

17   stuff.  And when we went back to them and said look, to the

18   extent you want to characterize stuff as sensitive that we can't

19   put on a computer that's connected to the Internet, we can't

20   take it outside the United States, are we dealing with a

21   relatively small amount of stuff here?  And they said no, it's

22   half of what we're going to give you.

23           THE COURT:  I'm going to explore with them the volume

24   of the discovery, because I think you're at a great disadvantage

25   there.  So we are going to get to that.

1          MR. DUBELIER:  And the other thing is, your Honor, and

2     I think this is very important, I would ask the Court to look at

3     this carefully.  This personal identifying information stuff, I

4     don't want it.  I don't want the responsibility for having it.

5          THE COURT:  I hear you, but there's certainly

6     precedent in other cases, in large-volume cases for this

7     procedure to be used.  Again, this is another area I'm going to

8     explore with the government.  But I hear your concerns there.  I

9     think they're valid concerns.

10         Yet, the fact is, we're dealing with a large volume of

11    discovery.  And the government's kind of in a Catch-22, because

12    if they hold back on some of this stuff and there's some nugget

13    somewhere in there that they might not even know about that you

14    can use to your advantage at trial, then they've committed a

15    violation of *Brady*.

16         So it's a tough balance to strike here.  But what I'm

17    saying to you is, I have some questions for the government, and

18    then I think it's worth -- I think there's enough areas of

19    common ground for you all to sit down and try again.  I will

20    walk through what I envision the process being if you're unable

21    to agree.  But I think it's worth another step, because I think

22    that there are areas of common ground, and I think -- I would

23    much prefer that you all work out an agreement than I write one,

24    and I think both sides should prefer that, too, because you have

25    more input that way.

1    MR. DUBELIER:  Your Honor, I agree with you, again

2  with a caveat.  That is, we're certainly willing to sit down and

3  talk to them again and see if we can work this out with the

4  guidance that the Court has provided.

5    But if the Court -- I would ask the Court to focus on a

6  very important issue here.  They ultimately have to make

7  representations to us about is there exculpatory material, is

8  there *Brady* material, is there material that's helpful to the

9  defense.

10    Now, on the one hand, they say, we can't go through all

11  this discovery because it's so voluminous and pull out all the

12  PII that's irrelevant.  But at the same time, how are they going

13  to make a representation to your Honor that they've supplied us

14  with exculpatory information, if they haven't even been through

15  the material?

16    It's their problem.  We're just the victim of what they've

17  created here, this monster amount of data that they haven't even

18  fully analyzed because it's so large --

19    THE COURT:  Mr. Dubelier --

20    MR. DUBELIER:  -- and they want to just dump it on us.

21    THE COURT:  -- this problem exists in all these

22  high-volume cases involving electronic data.  It existed 15

23  years ago in the *Shaw* case with primarily paper data.  There was

24  a warehouse of documents.  The government tried to go through

25  each paper.  The problem now is exponentially bigger.

1      So this is not unique to this case.  This is a struggle in

2   courtrooms across the country, and we've got to balance

3   competing interests.

4      And I would like to hear from Mr. Dreeben or Ms. Rhee about

5   some of the particulars of the issues, some of which I share

6   with you, regarding how they're going to better help Concord

7   sift through this.

8            MR. DUBELIER:  Thank you, your Honor.

9            THE COURT:  All right.  Ms. Rhee, once we have a

10   protective order in place, is the government in a position to

11   provide to defense counsel a smaller select group of documents

12   that the government will use in its case-in-chief or views as

13   more relevant and certainly *Brady* and Rule 16?  Are we in a

14   position to give them a narrower set of documents, in addition

15   to the terabytes?

16            MS. RHEE:  Yes, your Honor.

17            THE COURT:  How far along are you on that?  Will that

18   be immediate?

19            MS. RHEE:  Near immediate.

20            THE COURT:  Okay.  All right.  Moving forward with the

21   protective order, if I approve the designation of a firewall

22   counsel, you need to provide me with more than one option.  My

23   suggestion would be, there are attorneys in the National

24   Security Division of the Department of Justice and the U.S.

25   Attorney's Office National Security Division who are capable,

1    qualified, able to perform this function that could get up to

2    speed on the national security implications of this

3    investigation.

4              MS. RHEE:  We are entirely in agreement, your Honor.

5    We never contemplated firewall counsel being within the

6    office --

7              THE COURT:  All right.

8              MS. RHEE:  -- of the Special Counsel's Office.

9              THE COURT:  Okay.  With respect to the personal

10   identifying information, your briefs say hundreds of pages.  Is

11   there not a way to search those Social Security numbers, dates

12   of birth electronically and try to redact some of these?

13             MS. RHEE:  Your Honor, given the way in which the

14   production came in and the different types of media, I think

15   this is really analogous to the case that we cited to you,

16   *United States versus Bundy* from 2016, because we are talking

17   about terabytes' worth of data, of digital information and

18   multimedia.  And of course, the government went through it for

19   purposes of investigation.

20        But really, what defense counsel is now asking the

21   government to do is engage in a rereview for purposes of

22   redaction of PII, and that is clearly going to substantially

23   delay production as defense counsel requests, because to do that

24   and to put the screening mechanisms in place to run filters

25   across the different kinds of media for PII information is going

1    to require the government to get a vendor and to load up that

2    kind of data in all of its different formats in order to run

3    those screens.

4            THE COURT:  What about with respect to the smaller

5    group of documents that you will provide to Concord?  It sounds

6    like almost immediately, as soon as the protective order is

7    entered, within days; correct?  That's what you've suggested?

8        It can be rolling.  I understand over time the government

9    may identify additional documents.  But you have a critical mass

10   of hot documents, if you will.

11           MS. RHEE:  Correct, your Honor.

12           THE COURT:  With respect to those, are you able to

13   redact those?

14           MS. RHEE:  We may be able to do a manual redaction.

15   Well, certainly, we can do a manual redaction.  And off the top

16   of my head, I think that those materials do not contain as much

17   PII.  But nevertheless, that is still --

18           THE COURT:  I would ask that you do that, because that

19   will, I think, aid the defense.

20       Is there any reason why today -- as an interim measure

21   before we figure out whether you're going to agree to a

22   protective order or I'm going to have to impose one, is there

23   any reason why immediately I should not enter an order giving

24   Reed Smith and attorneys, paralegals access at least at this

25   point to nonsensitive information, not to be shared with anyone

1    but just for them to start reviewing this?

2        MS. RHEE:  We couldn't agree more, your Honor.  And

3    when you actually look at the government's proposal, we are just

4    trying to get discovery going, and that for us, what we want to

5    do is, in light of the equities here, make sure that there's an

6    incremental approach, which is the reason why it isn't a bar,

7    per se, on any foreign nationals, and it isn't even a bar, per

8    se, on any other individual, but rather, to the extent that

9    defense counsel then comes forward about need, that it be done

10   to you with the existence of firewall counsel.

11      But certainly, your Honor, if the Court were to enter a

12   protective order as step 1 in order to get discovery underway

13   for it to go to the offices of Reed Smith on the nonsensitive

14   side, we are happy to proceed.

15       THE COURT:  What about the sensitive side?

16       MS. RHEE:  Even on the sensitive side, if the Court

17   were to order that, for the sensitive information, that it be

18   maintained in a secure location at the U.S. offices of Reed

19   Smith off-line.

20       THE COURT:  As an interim measure?

21       MS. RHEE:  As an interim measure, that they proceed as

22   the government had outlined.  We are happy to commence discovery

23   on the sensitive information as well.

24       THE COURT:  I will hear from Mr. Dubelier, but I don't

25   see any reason not to do that.  If the defense at this point can

1    even identify pretrial motions it needs to file, it seems to me

2    we need to get discovery going, and as an interim measure, I

3    would like to do that.

4        So Mr. Dubelier, any reason why that shouldn't happen

5    today?

6        MR. DUBELIER:  No, your Honor.  I think we're getting

7    real close.  I have to go back to my client for approval, as you

8    would imagine.  But I actually -- I will tell you, in the first

9    instance from listening to the Court, if I can communicate with

10   the Court ex parte on the issue of disclosure of sensitive

11   information to the client and there's a non-special counsel

12   firewall from DOJ that cannot communicate substantively with

13   them, I don't object to that in the first instance.

14       Now, when I say "in the first instance," then I think we

15   will ultimately have to decide, do you want me coming in here

16   every day when we find a new document saying can I show this to

17   them, can I show this to them.

18       THE COURT:  At some point I may need a special master

19   to handle all of this, or this will be a full-time job.

20       MR. DUBELIER:  One point to the question you've asked.

21   I'm sorry to interrupt, your Honor.  I didn't mean to do that.

22   Here's my only hesitation.  They have told us -- and I

23   appreciate the fact that they disclosed this to us.  When they

24   took the nonsensitive and the sensitive information, it crashed

25   the computer system of the Department of Justice.  It crashed

the computer system of the special counsel.  And so that's the

voluminous amount of material we are talking about here that

they have warned me, if you put this onto your system at Reed

Smith, you're crashed.

THE COURT:  What about some portion of that?  I don't

want to crash your system, but it seems like you should want to

avail yourself of whatever discovery you can get now, even if

it's only for you, your attorneys, and paralegals.

MR. DUBELIER:  Absolutely.  The only problematic thing

for me is putting it into a system that has to be off-line,

because we have to buy hardware.  So if we don't have that

problem yet, and that is, if we can put the discovery on a

system that's online, let them give us the nonsensitive stuff

first.  We can have that now.

THE COURT:  Okay.  All these logistics, you are going

to have to work out.  Let me say, by close of business today, I

would like a joint protective order as an interim measure

proposing the release of nonsensitive and/or sensitive

information to Reed Smith.

Regardless of what your client says here, the fact is, you

will have access by the close of business today to discovery,

and if you don't want to avail yourself of it, that's your

choice.  But it seems to me you ought to get together and come

up with a mechanism by close of business that you can access

that if you want.

1        MR. DUBELIER:  Your Honor, I think we can do it in the

2    next 15 minutes.

3        THE COURT:  Great; great.

4        MR. DUBELIER:  Thank you.

5        THE COURT:  Terrific.  Thank you, Mr. Dubelier.

6    So here's what I'm going to do.  I'm going to wait for your

7    joint protective order in the next 15 minutes, and I'm going to

8    give you --

9        MR. DUBELIER:  I didn't say --

10       THE COURT:  All right.  I will give you an hour.  And

11   then I will give you 10 days to submit a joint protective order

12   as to everything.  If you're unable to agree on all provisions

13   of that joint protective order, you should clearly delineate the

14   areas of agreement and the areas of disagreement.  If there are

15   areas of disagreement, you may file at the same time a brief of

16   no more than 10 pages supporting your position.  If I find it

17   necessary, I will hold a hearing.  If not, I will enter a

18   protective order.

19   We've just got to get discovery going.  This is too long

20   without it.

21   So finally, let's talk about a schedule to consider the

22   defendant's identified pretrial motions.  Have you all had a

23   chance to confer?  Do you have some dates that you would like to

24   propose?

25       MS. RHEE:  Yes, your Honor.  We have conferred, and

1    here are the parties' proposals as requested by the Court.  For

2    the second pretrial motion that the defense counsel has

3    identified that it intends to file to dismiss, the parties are

4    offering up September 26th, 27th, 28th, or after October 8th.

5            THE COURT:  So September 26th, 27th --

6            MS. RHEE:  Or 28th.

7            THE COURT:  Do you have times on those dates?  I'm

8    inclined to do the 28th.

9            MS. RHEE:  I think the parties are available at all of

10   the times at this point.

11           THE COURT:  Let's do 10:00 a.m. on September 28th for

12   the defendant's second anticipated pretrial motion, which is a

13   motion to dismiss the indictment.  Correct?  Is that right?

14           MS. RHEE:  Correct.

15           THE COURT:  All right.  Done.  Third motion?

16           MS. RHEE:  The third motion, similarly, the parties

17   are offering the 26th, the 27th, the 28th, or any time after

18   October 8th.

19           THE COURT:  I'm sorry.  Say that again.

20           MS. RHEE:  The 26th, the 27th, the 28th of September.

21           THE COURT:  So we can handle two on one day is what

22   you're proposing?

23           MS. RHEE:  Correct.  At least as we understand the

24   Court's order, the third pretrial motion will have concluded its

25   briefing on September 18th.

1          THE COURT:  Yes.  So let's address both of those

2   motions on September 28th at 10:00 a.m.

3       And then the final pretrial motion, the due process

4   challenge to the grand jury instructions, if the defense is

5   going to file that, do you have a proposed date for that

6   hearing?

7          MS. RHEE:  After October 8th, your Honor.  Given that

8   it's so far out into the future, the parties are free.

9          THE COURT:  Okay.  Why don't we do this:  Why don't we

10  set that date later.

11         MS. RHEE:  On the 28th, perhaps, your Honor?

12         THE COURT:  Yes, or if we end up needing a hearing,

13  which I hope we don't, between now and the 28th, we can do it

14  then.  Otherwise, I will set that on the 28th.

15         MS. RHEE:  Great.

16         THE COURT:  We also have another pretrial hearing

17  already set, correct, on August 1?

18         MS. RHEE:  Correct, your Honor, and that is the

19  defense anticipates filing on June 25th a motion challenging the

20  authority of the Special Counsel's Office.

21         THE COURT:  So on that date, we will set the fourth

22  motions hearing.  All right?  Anything else?

23         MS. RHEE:  Not from the government, your Honor.

24         MR. DUBELIER:  Not from the defense, your Honor.

25  Thank you.

1          THE COURT:   Thank you.

2        (Proceedings adjourned at 10:43 a.m.)

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5

6            CERTIFICATE OF OFFICIAL COURT REPORTER

7

8          I, Sara A. Wick, certify that the foregoing is a

9    correct transcript from the record of proceedings in the

10    above-entitled matter.

11

12

13

14    /s/ Sara A. Wick_____        June 15, 2018_____

15    SIGNATURE OF COURT REPORTER        DATE

16

17

18

19

20

21

22

23

24

25