# EXHIBIT H:

**Indictment from *United States v. Kanchanalak*, Criminal Action No. 98-00241-PLF (D.D.C.)**

**Defendant Concord Management and Consulting LLC's
Motion to Dismiss the Indictment
*United States v. Internet Research Agency LLC, et al.,*
Criminal Action No. 18-00032-DLF**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on December 8, 1995

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.: 98-0241 PLF |
| | : | |
| v. | : | VIOLATIONS: |
| | : | 18 U.S.C. § 371 (Conspiracy); |
| PORNPIMOL "PAULINE" | : | 18 U.S.C. § 1001 (False |
| KANCHANALAK (aka PORNPIMOL | : | Statements); 2 U.S.C. §§ 441b, |
| PARICHATTKUL) and DUANGNET | : | 441e & 437g(d)(1)(A) (Corporate |
| "GEORGIE" KRONENBERG | : | and Foreign National |
| | : | Contributions, in Criminal |
| | : | Violation of the Federal |
| FRIEDMAN, J. PLF | : | Election Campaign Act); 18 |
| | : | U.S.C. § 2(b) (Causing an Act |
| | : | to Be Done) |

**B**

**FILED IN OPEN COURT**

SUPERSEDING INDICTMENT

NOV 13 1998

The Grand Jury charges:

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

COUNT ONE

CONSPIRACY TO IMPAIR AND IMPEDE THE LAWFUL FUNCTION OF THE
FEDERAL ELECTION COMMISSION

### Introductory Allegations

1. Between on or about August 30, 1993, and on or about
December 31, 1996, Ban Chang International (USA), Inc. ("BCI USA")
was a corporation organized under the laws of the Cayman Islands
with offices located in the Washington Harbour office complex, 3000
and 3050 K Street, N.W., Washington, D.C. BCI USA was affiliated
with Ban Chang International (Thailand), Ltd. ("BCI Thailand"), a
corporation organized under the laws of the Kingdom of Thailand.

2. Defendant PORNPIMOL "PAULINE" KANCHANALAK (aka PORNPIMOL
PARICHATTKUL) was a director, 30 percent shareholder, and President



19

of BCI USA.

3.   Defendant DUANGNET KRONENBERG was the Secretary of BCI USA.  Defendant KRONENBERG also held herself out to the public as the Vice President of Operations of BCI USA.  Defendant KRONENBERG is the sister of Chupong Kanchanalak (also known as Jeb Kanchanalak), who is married to defendant PAULINE KANCHANALAK. Thus, defendant DUANGNET KRONENBERG is the sister-in-law of defendant PAULINE KANCHANALAK.

4.   Praitun Kanchanalak, an unindicted coconspirator with respect to the conspiracy charged in this Count, is the mother of defendant DUANGNET KRONENBERG and the mother-in-law of defendant PAULINE KANCHANALAK.  At all times material to this Count, Praitun Kanchanalak was not a shareholder, officer, director, employee or creditor of BCI USA or of any entity affiliated with BCI USA, nor did Praitun Kanchanalak perform any consulting or other services for BCI USA or for any entity affiliated with BCI USA.

5.   Jeb Kanchanalak, an unindicted coconspirator with respect to the conspiracy charged in this Count, was a director, 20 percent shareholder, and Vice President of BCI USA, and was the Managing Director and/or President of BCI Thailand.

6.   Between on or about November 16, 1993, and continuing through at least July 1, 1996, AEGIS Capital Management Limited ("AEGIS") was a corporation organized under the laws of Hong Kong with offices located in the Washington Harbour office complex, 3050 K Street, N.W., Washington, D.C. Defendant PAULINE KANCHANALAK was one of two "Directors" of AEGIS.  AEGIS's other Director was

2

Supharb Parichattkul, defendant PAULINE KANCHANALAK's mother. Defendant DUANGNET KRONENBERG was the Secretary of AEGIS.

7.   At all times material to this Count, defendant DUANGNET KRONENBERG and Praitun Kanchanalak were lawfully admitted for permanent residence in the United States. At all times material to this Count, defendant PAULINE KANCHANALAK, Jeb Kanchanalak, and Supharb Parichattkul were neither citizens nor lawful permanent residents of the United States.

8.   Pairoj Piempongsant was a director and 30 percent shareholder of BCI USA, and was a director of BCI Thailand.

9.   At all times material to this Count, it was prohibited under the provisions of the Federal Election Campaign Act ("FECA"):

> (a)  for any person to contribute more than $1,000.00 to the campaign of a candidate for federal office for the candidate's primary election;
>
> (b)  for any person to contribute more than $1,000.00 to the campaign of a candidate for federal office for the candidate's general election;
>
> (c)  for any person to make a contribution in the name of another person for the purpose of influencing any election for federal office;
>
> (d)  for any corporation to make a contribution for the purpose of influencing any election for federal office; and
>
> (e)  for any corporation organized under the laws of a foreign nation, or for any individual not a

citizen of the United States and not lawfully
admitted for permanent residence in the United States, to
make a contribution for the purpose of influencing any
election for federal office.

10.   At all times material to this Count, the Federal Election
Commission ("FEC") was an agency of the United States government,
headquartered in Washington, D.C., and was responsible for
enforcing the reporting requirements of the FECA, and for
directing, investigating, and instituting civil enforcement actions
with respect to violations of the FECA, including the provisions
referred to in paragraph 9 of this Count.   The FEC also was
responsible for providing accurate information to the public about
the amounts and sources of certain federal political contributions
and non-federal political donations.

11.   At all times material to this Count, under the provisions
of the FECA, the responsible officials of "political committees,"
as that term is defined in the FECA, 2 U.S.C. § 431(4), were
required to file periodic reports with the FEC listing the
contributions received by such committees.   In each report, the
responsible official was required to state the following for all
contributions that were made by a person who contributed more than
$200 during the calendar year:

(a)   the identity of the contributor;

(b)   the date of the contribution; and

(c)   the amount of the contribution.

12.   The following entities were "political committees" within

the meaning of the FECA and therefore were required to submit periodic reports to the FEC concerning certain contributions they received in connection with elections for federal office:

    (a)  Democratic National Committee ("DNC")

    (b)  Democratic Senatorial Campaign Committee ("DSCC")

    (c)  Wayne Owens for Senate Committee

    (d)  Democratic State Central Committee of California - Federal

    (e)  Marjorie Margolies-Mezvinsky for Congress

    (f)  Friends of Marjorie Margolies-Mezvinsky

    (g)  Gephardt in Congress Committee

    (h)  Kennedy for Senate Committee

    (i)  Friends of John Glenn

    (j)  Friends of Jane Harman

    (k)  Clinton/Gore '96 Primary Committee

    (l)  Coopersmith for Congress

13. At all times material to this Count, the DNC was a "national committee" within the meaning of the FECA, 2 U.S.C. § 431(14), and thus also was required, pursuant to 11 C.F.R. § 104.8(e), to report information to the FEC concerning certain donations to its non-federal account. In particular, the DNC was required to state the following for all donations that were made by a person who donated more than $200 during a calendar year to the DNC's non-federal account:

    (a)  the identity of the donor;

    (b)  the date of the donation; and

    (c)  the amount of the donation.

14.   In or about 1988, the DNC established the Trustee Program
for major supporters of the Democratic Party.   At all times
material to this Count, in order to be a "Trustee" of the DNC, an
individual was required either to contribute and/or donate
$50,000.00 to the DNC or to raise $100,000.00 in contributions
and/or donations for the DNC in a calendar year.   At all times
material to this Count, in order to be a "Managing Trustee" of the
DNC, an individual was required either to contribute and/or donate
$100,000.00 to the DNC or to raise $200,000.00 in contributions
and/or donations for the DNC in a calendar year.

15.   In or about May 1994, defendant PAULINE KANCHANALAK
achieved the status of DNC Trustee.   In or about October 1994,
defendant PAULINE KANCHANALAK achieved the status of DNC Managing
Trustee.

### The Conspiracy

16.   Beginning in or about September 1992, and continuing
through in or about November 1996, in the District of Columbia and
elsewhere, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG,
and others known and unknown to the grand jury, combined,
conspired, and agreed with each other to defraud the United States
by impairing, impeding, and defeating the lawful functions and
duties of the FEC.

### Purpose of the Conspiracy

17.   The purpose of the conspiracy was for defendants PAULINE
KANCHANALAK, DUANGNET KRONENBERG, and others known and unknown to
the grand jury to use funds from BCI USA, AEGIS, BCI Thailand,

6

PAULINE KANCHANALAK, Jeb Kanchanalak, and other corporations and/or "foreign nationals," as that term is defined in the FECA, 2 U.S.C. § 441e(b), to make at least $392,000 in prohibited contributions and other political donations to the DNC and other political committees, without being detected by the FEC or the public.

18.  It was the further purpose of the conspiracy for defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG to gain favor with the DNC by making substantial contributions and donations to the DNC and other Democratic political committees, using funds that belonged to undisclosed corporations and/or foreign nationals, and thereby to gain access to President Clinton and members of his Administration for defendants KANCHANALAK and KRONENBERG and for their clients, which defendants believed would help their business ventures.

### Manner and Means of the Conspiracy

19.  It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG used funds from BCI USA, AEGIS, BCI Thailand, PAULINE KANCHANALAK, Jeb Kanchanalak, Supharb Parichattkul, and other foreign nationals to make prohibited campaign contributions, as well as donations to the non-federal account of the DNC, and concealed the true sources of these contributions and donations by making such contributions and donations with checks drawn on bank accounts held in the names of DUANGNET KRONENBERG and Praitun Kanchanalak.

20.  It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused checks to be written on

BCI USA's bank account at Riggs National Bank ("Riggs") payable to DUANGNET KRONENBERG, Praitun Kanchanalak, and "P. Kanchanalak," and caused those checks to be deposited into bank accounts held in the names of DUANGNET KRONENBERG and Praitun Kanchanalak.

21.   It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused checks to be written on AEGIS's bank account at Riggs payable to DUANGNET KRONENBERG and "P. Kanchanalak," and caused those checks to be deposited into bank accounts held in the names of DUANGNET KRONENBERG and Praitun Kanchanalak.

22.   It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused funds from BCI USA and AEGIS which were deposited into accounts held in the names of DUANGNET KRONENBERG and Praitun Kanchanalak to be contributed and/or donated to various political committees located in the United States.

23.   It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG prepared and submitted false or deceptive statements to political committees in order to conceal the true sources of the contributions and/or donations made to such committees.

24.   It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused political committees to receive contribution and donation checks drawn on Praitun Kanchanalak's bank account which were imprinted and signed "P. Kanchanalak," thereby causing several such political committees to

8

believe that the contributions and donations were being made from an account held by defendant PAULINE KANCHANALAK.

25.  It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG concealed their unlawful activities from the FEC and the public by causing political committees to submit false reports to the FEC.

### Overt Acts

26.  In furtherance of the conspiracy, and to accomplish its objects, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG, and others known and unknown to the grand jury, committed the following overt acts in the District of Columbia and elsewhere:

A.  **$16,750.00 in Foreign National Contributions Made in the Name of Praitun Kanchanalak in 1992**

(1)  Between on or about September 25, 1992, and on or about October 20, 1992, defendant PAULINE KANCHANALAK caused the following contributions to be made in the name of Praitun Kanchanalak:

| Date of Check | Recipient | Amount |
|---|---|---|
| 9/25/92 | DNC | $11,000.00 |
| 10/5/92 | Wayne Owens for Senate Committee | $    500.00 |
| 10/20/92 | Democratic State Central Committee of California - Federal | $ 5,000.00 |
| 10/20/92 | DSCC | $    250.00 |
| | Total | $ 16,750.00 |

(2)  Between on or about September 25, 1992, and on or about October 20, 1992, defendant PAULINE KANCHANALAK provided Praitun Kanchanalak with $16,750.00 in funds drawn on defendant

PAULINE KANCHANALAK's personal accounts at Bank-Fund Staff Federal Credit Union ("BFSFCU") and First American Bank of Virginia ("First American") for the purpose of funding the contributions listed in subparagraph (1).

(3)  On or about March 4, 1993, Praitun Kanchanalak signed a "contributor information form" sent to her by the DSCC in order for the DSCC to be able to comply with federal contribution reporting requirements.

B.  $4,000.00 in Conduit/Foreign National Contributions Made in Connection with 1993 Fundraiser for Representative Marjorie Margolies-Mezvinsky

(4)  In or about August 1993, defendant PAULINE KANCHANALAK agreed to be one of four host committee members for a fundraising breakfast to be held in September 1993 to benefit the reelection campaign of Representative Marjorie Margolies-Mezvinsky of Pennsylvania.  Defendant DUANGNET KRONENBERG was on the organizing committee for this fundraiser.

(5)  On or about August 10, 1993, defendant PAULINE KANCHANALAK wrote a $4,000.00 check made payable to defendant DUANGNET KRONENBERG drawn on Supharb Parichattkul's Merrill Lynch cash management account.

(6)  On or about August 10, 1993, defendant DUANGNET KRONENBERG wrote a $2,000.00 check made payable to Praitun Kanchanalak.

(7)  On or about August 10, 1993, defendant DUANGNET KRONENBERG wrote a $2,000.00 check made payable to "MMM for Congress."

(8)  On or about August 10, 1993, Praitun Kanchanalak wrote a $2,000.00 check made payable to "MMM for Congress."

(9)  On or about August 10, 1993, in connection with the upcoming fundraising breakfast for Representative Margolies-Mezvinsky, defendant PAULINE KANCHANALAK provided the two contribution checks described in subparagraphs (7) and (8) to a member of Representative Margolies-Mezvinsky's campaign staff.

(10)  On or about September 22, 1993, PAULINE KANCHANALAK, DUANGNET KRONENBERG, and Praitun Kanchanalak attended the fundraising breakfast for Representative Margolies-Mezvinsky that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG had helped to organize.  Also in attendance at this event were Vice President Albert Gore, Jr. and Representative Margolies-Mezvinsky.

C.   1994 Contributions and Donations

(11)  In or about February 1994, BCI USA and BCI Thailand budgeted $135,000.00 for political contributions and/or donations and other politically related payments in the United States for calendar year 1994.  One of the budgeted items was $100,000.00 to the DNC to pay for "Renewal of DNC Trusteeship."

(12)  Between on or about March 17, 1994, and on or about October 14, 1994, approximately $121,250.00 in contributions and/or donations were made by way of checks drawn on accounts held in the name of DUANGNET KRONENBERG and Praitun Kanchanalak, using funds that were provided to DUANGNET KRONENBERG and Praitun Kanchanalak by BCI USA.

11

Contributions and Donations Made with Checks Drawn on
Praitun Kanchanalak's Account at First Virginia

(13) Between on or about March 17, 1994, and on or about
October 14, 1994, the following contributions and donations were
made by way of checks drawn on Praitun Kanchanalak's account at
First Virginia Bank ("First Virginia") using BCI USA funds that had
been deposited into Praitun Kanchanalak's First Virginia account
via DUANGNET KRONENBERG's personal account at First Union National
Bank ("First Union"):

| Date of Check | Recipient | Amount |
|---|---|---|
| 3/17/94 | DNC | $15,000.00 |
| 3/22/94 | Gephardt in Congress | $ 1,500.00 |
| 4/18/94 | DNC | $15,000.00 |
| 5/3/94 | Friends of Marjorie Margolies-<br>Mezvinsky (primary) | $ 1,000.00 |
| 5/3/94 | Friends of Marjorie Margolies-<br>Mezvinsky (general) | $ 1,000.00 |
| 5/19/94 | Kennedy for Senate | $ 1,000.00 |
| 10/14/94 | DNC | $32,500.00 |
| | Total | $67,000.00 |

(14) Defendant DUANGNET KRONENBERG signed the BCI USA
checks which were used to fund the contributions and donations
listed in subparagraph (13).

(15) The checks used to make the contributions and
donations listed in subparagraph (13) were imprinted and signed "P.
Kanchanalak," in order to cause the recipient political committees
to believe that the funds were coming from an account held by
PAULINE KANCHANALAK.

12

(16) On or about April 18, 1994, DUANGNET KRONENBERG conveyed the April 18, 1994, $15,000.00 check listed in subparagraph (13) to a DNC fundraiser located in Washington, D.C., with an accompanying memorandum which stated:

> Enclosed please find a check for $15,000.00 payable to DNC (non-federal) as part of Ms. Kanchanalak's contribution to the DNC Trustee Program. As earlier discussed with you, the remaining $20,000.00 will be payable at the end of May 1994 which will conclude the total contribution of $50,000.
>
> Please also mail me the Federal Election Commission Report Form.

Contributions and Donations Made with Checks Drawn on
DUANGNET KRONENBERG's Account at First Union

(17) Between on or about May 25, 1994, and on or about October 6, 1994, the following contributions and donations were made by way of checks drawn on DUANGNET KRONENBERG's account at First Union, using BCI USA funds that were provided to DUANGNET KRONENBERG for the purpose of making such contributions and donations:

| Date of Check | Recipient | Amount |
|---|---|---|
| 5/25/94 | Friends of John Glenn | $ 1,000.00 |
| 5/26/94 | DNC | $20,000.00 |
| 6/7/94 | DNC | $15,000.00 |
| 9/20/94 | Friends of Jane Harman | $    500.00 |
| | Total | $36,500.00 |

(18) Defendant DUANGNET KRONENBERG signed the BCI USA checks which were used to fund the contributions and donations listed in subparagraph (17).

(19) The May 26, 1994, $20,000.00 contribution to the DNC

13

listed in subparagraph (17) was made as the final payment toward PAULINE KANCHANALAK's 1994 DNC Trustee dues.

(20) On or about May 25, 1994, defendant DUANGNET KRONENBERG provided Friends of John Glenn with information about herself on a form which noted that the requested information was "required by the Federal Election Commission."

(21) On or about May 27, 1994, BCI USA issued a check to defendant DUANGNET KRONENBERG in the amount of $2,628.40. The memo line of this check read: "May 15-30 + expenses." This BCI USA check constituted KRONENBERG's BCI USA paycheck for the period May 15, 1994, through May 30, 1994, plus reimbursement of "expenses" in the amount of $1,128.40. $1,000.00 of these "expenses" included the $1,000.00 contribution to Friends of John Glenn listed in subparagraph (17).

(22) On or about September 22, 1994, BCI USA issued a $2,000.00 check to DUANGNET KRONENBERG. The memo line of this check read "Sept: 1-15 & consulting." This BCI USA check constituted KRONENBERG's BCI USA paycheck for the period September 1, 1994, through September 15, 1994, plus reimbursement of the $500.00 contribution to the Friends of Jane Harman that Kronenberg had made approximately two days earlier.

(23) In or about September 1994, defendant PAULINE KANCHANALAK pledged to donate $50,000.00 as co-chair of the Second Annual Issues Conference of the Women's Leadership Forum ("WLF"), which was to be held in Washington, D.C. in early October 1994. The WLF was a donor council within the DNC's Finance division.

(24) The $32,500.00 donation to the DNC listed in subparagraph (13) was made by the defendants to partially fulfill PAULINE KANCHANALAK's $50,000.00 pledge in connection with the WLF conference.

D.   $1,000.00 Contribution to Clinton/Gore '96

(25) In or about June 1995, PAULINE KANCHANALAK, having been asked to make a contribution to the Clinton/Gore '96 Primary Committee, requested that DUANGNET KRONENBERG "handle" the making of such a contribution for her.  Writing partially in English and partially in Thai, PAULINE KANCHANALAK faxed KRONENBERG: "When you fill out the info regarding the donation ..., be very careful. Don't take for granted."  Elsewhere on the same document, PAULINE KANCHANALAK instructed KRONENBERG partially in English and partially in Thai: "Use the name P. Kanchanalak and mom's SS# and add.  You don't need to fill out the work address or occupation."

(26) On or about June 12, 1995, DUANGNET KRONENBERG wrote a $1,000.00 check made payable to "P. Kanchanalak."

(27) On or about June 14, 1995, the $1,000.00 check described in the preceding subparagraph was deposited into Praitun Kanchanalak's account at First Virginia.

(28) On or about June 14, 1995, BCI USA issued a $1,000.00 check to DUANGNET KRONENBERG.  This check, which was signed by defendant KRONENBERG, contained a handwritten notation in the memo line referring to "Clinton/Gore '96."

(29) On or about June 16, 1995, a $1,000.00 check was made out to Clinton/Gore '96 on Praitun Kanchanalak's First

15

Virginia account.    This  check  was  imprinted  and  signed  "P.
Kanchanalak"  and  contained  a  handwritten  notation  of  Praitun
Kanchanalak's Social Security Number.

    E.   <u>1996 Contributions and Donations</u>

      (30) In   or   about   January   1996,   defendant   PAULINE
KANCHANALAK joined the DNC's Finance Board of Directors, pledging
to contribute/donate or raise at least $350,000.00 for the DNC.

> $25,000.00 in Contributions and Donations
> in Connection with the February 19, 1996,
> <u>DNC Dinner at the Hay-Adams Hotel</u>

      (31) On or about February 19, 1996, defendants PAULINE
KANCHANALAK and DUANGNET KRONENBERG attended a DNC fundraising
dinner at the Hay-Adams Hotel in Washington, D.C.  The suggested
ticket price per person for this event was a $12,500.00 payment to
the DNC.

      (32) On or about February 21, 1996, defendants PAULINE
KANCHANALAK and DUANGNET KRONENBERG caused BCI USA to receive a
wire  transfer  deposit  of  $14,985.00  into  its  Riggs  account
($15,000.00 minus $15.00 for the wire transfer fee).  These funds
were wired through Siam City Bank by an individual affiliated with
Jeb Kanchanalak.

      (33) On or about February 21, 1996, BCI USA issued a
$15,000.00 check drawn on its Riggs account made payable to Praitun
Kanchanalak.  This check, which was signed by defendant DUANGNET
KRONENBERG, contained a notation in the memo line of "consulting
fee."

      (34) On or about February 26, 1996, a $10,000.00 check

was made out to the DNC on Praitun Kanchanalak's account at First Virginia, containing a typed entry of "dinner 2/19" on the memo line.  This check was imprinted and signed "P. Kanchanalak."

(35) On or about February 26, 1996, defendant DUANGNET KRONENBERG wrote a $5,000.00 check to the DNC in connection with the Hay-Adams dinner.

(36) On or about March 4, 1996, defendant DUANGNET KRONENBERG deposited $4,877.65 into her First Union account by way of checks provided to her by BCI USA and Praitun Kanchanalak.

(37) On or about March 6, 1996, having caused $15,000.00 to be contributed to the DNC in connection with the Hay-Adams dinner, out of the $25,000.00 that represented the full price of two tickets to that event, defendant PAULINE KANCHANALAK sent a memorandum to Pairoj Piempongsant with a copy to Jeb Kanchanalak, which said in a post-script:  "The DNC calls me everyday.  Please help!"

(38) On or about March 8, 1996, defendant DUANGNET KRONENBERG wrote a $5,000.00 check made payable to the DNC.

(39) On or about March 11, 1996, defendant PAULINE KANCHANALAK caused BCI USA to receive a wire transfer deposit of $9,985.00 into its Riggs account ($10,000.00 minus a wire transfer fee of $15.00) from a Thai corporation affiliated with BCI USA. Prior to this deposit, BCI USA's account at Riggs had a balance of $926.78.

(40) On or about March 13, 1996, BCI USA issued a $5,000.00 check drawn on its Riggs account to defendant DUANGNET

17

KRONENBERG.  This check, which was signed by defendant KRONENBERG, contained a notation in the memo line of: "consulting fee."

(41) On or about March 14, 1996, defendant DUANGNET KRONENBERG wrote a $5,000.00 check made payable to the DNC.

(42) On or about March 15, 1996, BCI USA issued a $5,000.00 check drawn on its Riggs account to defendant DUANGNET KRONENBERG. This check, which was signed by defendant KRONENBERG, contained a notation in the memo line of: "consulting fee."

### $10,000.00 in Donations to the DNC in May 1996

(43) On or about May 15, 1996, BCI USA issued two sequential checks to Praitun Kanchanalak and DUANGNET KRONENBERG, respectively, each in the amount of $5,000.00.  Both of these checks were signed by defendant DUANGNET KRONENBERG.  The memo line of the check to Praitun Kanchanalak read: "consulting."

(44) On or about May 23, 1996, a $5,000.00 check was made payable to the DNC on Praitun Kanchanalak's account at First Virginia.  This check was imprinted and signed "P. Kanchanalak."

(45) On or about May 23, 1996, defendant DUANGNET KRONENBERG wrote a $5,000.00 check made payable to the DNC.

### $185,000.00 in Donations to the DNC in June 1996

(46) On or about June 7, 1996, Jeb Kanchanalak wired $100,000.00 into defendant DUANGNET KRONENBERG's First Union account.  After a series of transactions between defendant DUANGNET KRONENBERG and defendant PAULINE KANCHANALAK between on or about June 7, 1996, and on or about June 20, 1996, defendant KRONENBERG retained a net sum of $85,000.00 out of the $100,000.00 wire

18

transfer into her First Union account from Jeb Kanchanalak on or about June 7, 1996.

(47) On or about June 7, 1996, Jeb Kanchanalak wired $100,000.00 into Praitun Kanchanalak's First Virginia account. After a series of transfers between Praitun Kanchanalak and PAULINE KANCHANALAK between on or about June 13, 1996, and on or about July 1, 1996, Praitun Kanchanalak retained a net sum of $77,500.00 out of the $100,000.00 wire transfer into her First Virginia account from Jeb Kanchanalak on or about June 7, 1996. (The remaining $22,500.00 of this wire transfer was passed through PAULINE KANCHANALAK's BFSFCU account to DUANGNET KRONENBERG, as described below in subparagraph (53).)

(48) On or about June 13, 1996, Jeb Kanchanalak wired $275,510.00 into AEGIS's Riggs account. The wire transfer confirmation sheet for this deposit into AEGIS's account described the purpose of the transfer as "professional service fees." Prior to this infusion of funds, AEGIS's Riggs account had a balance of $500.59.

(49) On or about June 17, 1996, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused AEGIS to issue three sequential checks drawn on its Riggs account made out to "P. Kanchanalak" in the amounts of $75,000.00, $75,000.00, and $50,000.00, respectively. Defendant DUANGNET KRONENBERG signed all three of these AEGIS checks.

(50) On or about June 17, 1996, the three AEGIS checks made out to "P. Kanchanalak" described in subparagraph (49) were

19

deposited into Praitun Kanchanalak's First Virginia account, which, combined with the $77,500.00 left in that account from the $100,000.00 wire transfer from Jeb Kanchanalak on or about June 7, 1996, amounted to $277,500.00 in deposits into Praitun Kanchanalak's First Virginia account that were traceable back to wire transfers from Jeb Kanchanalak in or about June 1996.

(51) On or about June 18, 1996, defendant PAULINE KANCHANALAK and three individuals affiliated with the C.P. Group, a Thai corporation, attended a "coffee" at the White House hosted by President Clinton.    Others in attendance at this coffee included, among others, John Huang and Donald Fowler of the DNC. The Chairman of the C.P. Group, Mr. Dhanin, spoke for the majority of the event, discussing primarily economic and political issues relating to the relationship between the United States and the People's Republic of China.

(52) On or about June 20, 1996, AEGIS issued a $75,000.00 check drawn on its Riggs account made payable to DUANGNET KRONENBERG, which was signed by defendant KRONENBERG.

(53) On or about June 24, 1996, defendant DUANGNET KRONENBERG deposited into her First Union account the $75,000.00 AEGIS check described in the preceding subparagraph, simultaneously depositing a $22,500.00 check made payable to defendant KRONENBERG drawn on defendant PAULINE KANCHANALAK's BFSFCU account, dated June 21, 1996.   When combined with the $85,000.00 left in defendant KRONENBERG's First Union account from the $100,000.00 wire transfer from Jeb Kanchanalak on or about June 7, 1996, as of June 24, 1996,

a net total of approximately $182,500.00 in deposits into defendant KRONENBERG's account were traceable to wire transfers from Jeb Kanchanalak in or about June 1996.

(54) Several checks, including a $50,000.00 donation to the DNC, were written on defendant DUANGNET KRONENBERG's First Union account, as follows:

| Date of Check | Recipient | Amount |
|---|---|---|
| 6/13/96 | California Democratic Party | $30,000.00 |
| 6/15/96 | Florida Democratic Party | $25,000.00 |
| 6/18/96 | DNC | $50,000.00 |
| 6/18/96 | Illinois Democratic Party | $30,000.00 |
| 6/21/96 | Ohio Democratic Party | $20,000.00 |
| 6/25/96 | Pennsylvania Democratic Party | $25,000.00 |
| | Total | $180,000.00 |

(55) Several checks, including two donations to the DNC totalling $135,000.00, were written on Praitun Kanchanalak's First Virginia account, as follows:

| Date of Check | Recipient | Amount |
|---|---|---|
| 6/19/96 | DNC | $85,000.00 |
| 6/24/96 | DNC | $50,000.00 |
| 6/25/96 | California Democratic Party | $24,500.00 |
| 6/27/96 | Florida Democratic Party | $35,000.00 |
| 6/29/96 | Ohio Democratic Party | $33,000.00 |
| 7/5/96 | Illinois Democratic Party | $25,000.00 |
| 7/5/96 | Pennsylvania Democratic Party | $25,000.00 |
| | Total | $277,500.00 |

21

Contributions and Donations to the DNC
and Coopersmith for Congress

(56) On or about August 18, 1996, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG traveled from Washington, D.C., to New York City, staying overnight at the Waldorf-Astoria Hotel. On or about August 18, 1996, the DNC held a fundraising event at the Waldorf-Astoria Hotel in New York City in celebration of President Clinton's fiftieth birthday.

(57) On or about August 19, 1996, BCI USA issued a $20,000.00 check to defendant DUANGNET KRONENBERG. Defendant KRONENBERG signed this $20,000.00 BCI USA check made out to herself.

(58) On or about August 22, 1996, defendant DUANGNET KRONENBERG wrote a $20,000.00 check made payable to Praitun Kanchanalak.

(59) On or about August 26, 1996, the $20,000.00 check described in the preceding subparagraph was deposited into Praitun Kanchanalak's First Virginia account.

(60) On or about August 26, 1996, a $1,000.00 check was written on Praitun Kanchanalak's First Virginia account made payable to Coopersmith for Congress. This check was imprinted and signed "P. Kanchanalak." At the time of this contribution, Jeffrey Coopersmith was seeking election to the U.S. House of Representatives from a congressional district located in the State of Washington.

(61) On or about August 26, 1996, a $1,000.00 check was written on defendant DUANGNET KRONENBERG's First Union account made

22

payable to Coopersmith for Congress.

(62) On or about September 10, 1996, BCI USA issued a $21,000.00 check made payable to "P. Kanchanalak." Defendant KRONENBERG signed this check.

(63) On or about September 11, 1996, the $21,000.00 BCI USA check described in the preceding subparagraph was deposited into Praitun Kanchanalak's First Virginia account.

(64) On or about September 11, 1996, defendant DUANGNET KRONENBERG wrote a memorandum to defendant PAULINE KANCHANALAK, which read, in relevant part:

> I transferred 21K into P. Kanchanalak's acct. The acct now has a total of 40K (1K was written to Jeff Coopersmith). I will give John Huang 40K from this acct for B-Day on Friday, Sept 13 afterwhich the acct bal will be 0.

(65) On or about September 13, 1996, a $40,000.00 check was written on Praitun Kanchanalak's First Virginia account made payable to the DNC. This check was imprinted and signed "P. Kanchanalak."

(66) On or about September 13, 1996, defendant DUANGNET KRONENBERG gave John Huang the $40,000.00 check described in subparagraph (65).

(**Conspiracy**, in violation of 18 U.S.C. § 371).

COUNTS TWO THROUGH FOURTEEN

CAUSING FALSE STATEMENTS IN MATTERS WITHIN THE JURISDICTION
OF THE FEDERAL ELECTION COMMISSION

1.      The grand jury realleges paragraphs 1 through 26 of Count One, above, as though fully stated herein.

2.      On or about the dates indicated below, in the District of Columbia, in matters within the jurisdiction of the FEC, an agency of the United States, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG knowingly and willfully caused the submission of material false statements to the FEC, in that defendants caused the responsible officials of the following political committees to file reports with the FEC that listed the following individuals as having provided funds to such political committees on the following dates, in the following amounts, when, as defendants then and there well knew, the named individuals were not the actual sources of those funds:

24

| Count | Political Committee Making Report | Date of Report | Person Identified in Report as Having Provided Funds | Amount Reported | Date of Contrib. or Donation Reported |
|---|---|---|---|---|---|
| 2 | Friends of Marjorie Margolies-Mezvinsky | 12/31/93 | Praitun Kanchanalak<br>Praitun Kanchanalak<br>Duangnet Kronenberg<br>Duangnet Kronenberg | $1,000 (primary)<br>$1,000 (general)<br>$1,000 (primary)<br>$1,000 (general/debt) | 8/13/93<br>8/13/93<br>8/13/93<br>8/13/93 |
| 3 | Gephardt in Congress Committee | 4/13/94 | P. Kanchanalak<br>P. Kanchanalak | $1,000 (primary)<br>$500 (general) | 3/29/94<br>3/29/94 |
| 4 | DNC | 4/15/94 | Pauline Kanchanalak | $15,000 | 3/21/94 |
| 5 | DNC | 7/15/94 | Pauline Kanchanalak<br>Duangnet Kronenberg<br>Duangnet Kronenberg | $15,000<br>$20,000<br>$15,000 | 4/22/94<br>5/27/94<br>6/13/94 |
| 6 | Friends of John Glenn | 7/15/94 | Duangnet Kronenberg | $1,000 (primary) | 6/6/94 |
| 7 | Friends of Marjorie Margolies-Mezvinsky | 7/19/94 | Pauline Kanchanalak<br>Pauline Kanchanalak | $1,000 (primary)<br>$1,000 (general) | 5/4/94<br>5/4/94 |
| 8 | Kennedy for Senate Committee | 7/15/94 | P. Kanchanalak | $1,000 (primary) | 6/19/94 |
| 9 | DNC | 12/8/94 | Pauline Kanchanalak | $32,500 | 10/20/94 |
| 10 | Clinton/Gore '96 Primary Committee | 10/14/95 | P. Kanchanalak | $1,000 (primary) | 6/22/95 |
| 11 | DNC | 4/15/96 | Pauline Kanchanalak<br>Duangnet Kronenberg<br>Duangnet Kronenberg<br>Duangnet Kronenberg | $10,000<br>$5,000<br>$5,000<br>$5,000 | 2/29/96<br>2/29/96<br>3/11/96<br>3/15/96 |

| 12 | DNC | 7/15/96 | Pauline Kanchanalak<br>Duangnet Kronenberg<br>Pauline Kanchanalak<br>Duangnet Kronenberg | $5,000<br>$5,000<br>$85,000<br>$50,000 | 6/6/96<br>6/6/96<br>6/19/96<br>6/19/96 |
| 13 | Coopersmith for Congress | 9/5/96 | P. Kanchanalak<br>Duangnet Kronenberg | $1,000 (primary)<br>$1,000 (primary) | 8/28/96<br>8/28/96 |
| 14 | DNC | 10/15/96 | Pauline Kanchanalak<br>P. Kanchanalak | $50,000<br>$40,000 | 7/10/96<br>9/25/96 |

(**Causing False Statements in Matters Within the Jurisdiction of the Federal Election Commission,** each count in violation of 18 U.S.C. §§ 1001 and 2(b)).

COUNTS FIFTEEN AND SIXTEEN

CONSENTING TO CONTRIBUTIONS BY A CORPORATION

1.   The grand jury realleges paragraphs 1 through 26 of Count One, above, as though fully stated herein.

2.   On or about the following dates, in the District of Columbia and elsewhere, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG knowingly and willfully committed a violation of a provision of the FECA which involved the making, receiving, or reporting of a contribution aggregating $2,000 or more during a calendar year; to wit, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG, both of whom were officers of BCI USA, consented to the following contributions by BCI USA, which were passed through bank accounts held in the name of DUANGNET KRONENBERG and/or Praitun Kanchanalak at First Union and First Virginia, respectively:

| Count | Political Committee | Account Used to Make Contribution | Amount of Contrib. | Date of Contrib. Check |
|-------|---------------------|-----------------------------------|--------------------|------------------------|
| 15 | DNC (federal account) | Praitun Kanchanalak | $10,000 | 2/26/96 |
| 16 | DNC (federal account) | Duangnet Kronenberg | $5,000 | 2/26/96 |

(**Consenting to Contributions by a Corporation**, each count in violation of 2 U.S.C. §§ 441b and 437g(d)(1)(A)).

COUNT SEVENTEEN

CAUSING CONTRIBUTION BY A FOREIGN NATIONAL

1.   The grand jury realleges paragraphs 1 through 26 of Count One, above, as though fully stated herein.

2.   On or about August 26, 1996, in the District of Columbia and elsewhere, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG knowingly and willfully caused a violation of a provision of the FECA which involved the making, receiving, or reporting of a contribution aggregating $2,000.00 or more during a calendar year; to wit, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused an aggregate contribution of $2,000.00 to be made to Coopersmith for Congress in connection with the primary election, using funds that belonged to foreign nationals, and which were passed through bank accounts held in the name of DUANGNET KRONENBERG and Praitun Kanchanalak at First Union and First Virginia, respectively, in the form of two $1,000.00 checks.

**(Causing Contribution by a Foreign National,** in violation of 2 U.S.C. §§ 441e and 437g(d)(1)(A), and 18 U.S.C. § 2(b)).

28

COUNT EIGHTEEN

CONSPIRACY TO OBSTRUCT THE DUE ADMINISTRATION OF JUSTICE
AND TO OBSTRUCT A CONGRESSIONAL INVESTIGATION

**Introductory Allegations**

1.    The grand jury realleges paragraphs 1 through 26 of Count One, above, as though fully stated herein.

2.    In or about 1994, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG assisted in the formation of the U.S.-Thailand Business Council ("USTBC"), a non-profit entity established to facilitate trade between the United States and Thailand.  From the time of its inception, through the dissolution of BCI USA, the USTBC and BCI USA shared office space.

3.    At all times material to this Count, a federal grand jury in the District of Columbia was investigating various allegations relating to the campaign financing practices, including allegations relating to political contributions purportedly made by PAULINE KANCHANALAK, DUANGNET KRONENBERG, Praitun Kanchanalak, or "P. Kanchanalak."

4.    At all times material to this Count, a Committee or Committees of the United States Senate or the United States House of Representatives were conducting an investigation or investigations of political contributions which had been made in the names of PAULINE KANCHANALAK, Praitun Kanchanalak, DUANGNET KRONENBERG, and "P. Kanchanalak," or such an investigation or investigations were reasonably foreseeable.

### The Conspiracy

5.   Beginning in or about December 1996, and continuing through in or about March 1997, in the District of Columbia and elsewhere, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG, and others known and unknown to the grand jury, combined, conspired, and agreed with each other --

(1) corruptly to obstruct the due administration of justice, that is, a federal grand jury investigation, in violation of 18 U.S.C. § 1503; and

(2) corruptly to obstruct the due administration of the law under which an inquiry is being conducted, that is, a congressional investigation, in violation of 18 U.S.C. § 1505.

### Purpose of The Conspiracy

6.   The purpose of the conspiracy was for defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG, to obstruct, impair, and impede ongoing or imminent federal grand jury and congressional investigations into their activities and into the activities of other individuals and entities with which they were associated.

### Manner and Means of the Conspiracy

7.   It was a part of the conspiracy that defendant DUANGNET KRONENBERG caused an attorney, who had performed legal work for BCI USA and defendants, to collect and remove relevant BCI USA records from BCI USA's offices.

8.   It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG subsequently retrieved the BCI USA records referred to in paragraph 7 from the attorney outside

his office.

9.   It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG took steps to dissolve BCI USA and to send relevant BCI USA records to Thailand.

10.   It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused relevant BCI USA records to be transported from BCI USA's offices to a self-storage facility they had rented in the name of a nanny who was employed by a family member.

11.   It was a part of the conspiracy that defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG hired an individual to erase the hard drives of computers located in BCI USA's offices and in DUANGNET KRONENBERG's home.

### Overt Acts

12.   In furtherance of the conspiracy, and to accomplish its objects, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG, and others known and unknown to the grand jury, committed the following overt acts in the District of Columbia and elsewhere:

A.   Removal of BCI USA Records by Attorney

(1)   On or between December 2, 1996, and December 11, 1996, defendant DUANGNET KRONENBERG caused an attorney who was then representing PAULINE KANCHANALAK to review files at BCI USA's offices over the course of two days.

(2)   At the end of his review of records at BCI USA, the attorney removed several boxes of records from BCI USA's office and placed them in defendant DUANGNET KRONENBERG's car.

31

(3)  Defendant KRONENBERG and the attorney then used KRONENBERG's car to transport the records the attorney had removed from BCI USA's office to the attorney's office in Washington, D.C., whereupon the attorney removed the boxes of records from KRONENBERG's car and took them to his office.  On or about December 19, 1996, KANCHANALAK and KRONENBERG retrieved these records from the attorney outside his office.

B.   <u>Dissolution of BCI USA</u>

(4)  Shortly before Christmas 1996, defendant PAULINE KANCHANALAK informed the staff of BCI USA and others working in the same office suite that BCI USA would be dissolved, effective immediately.

(5)  In or about late December 1996, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG participated in plans to organize a new company which would move into BCI USA's office as of January 1, 1997, and which would continue working on BCI USA's projects.  This resulted in the formation of Global Investments, Inc. ("Global"), a corporation organized under the laws of the District of Columbia, in or about January 1997.

(6)  On or about January 20, 1997, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused the Office of the Registrar General of the Cayman Islands to issue notification that on March 27, 1997, BCI USA would be struck from the Companies Register of the Cayman Islands and thereupon dissolved.

C.   <u>Collection of Other BCI USA Records</u>

(7)  Shortly after PAULINE KANCHANALAK announced her

32

plans to dissolve BCI USA, DUANGNET KRONENBERG told a member of BCI USA's staff to review and pack all of BCI USA's inactive project files into boxes, which the staffer did with the help of KRONENBERG.

(8)   In or about late December 1996, at the direction of DUANGNET KRONENBERG, the BCI USA staffer described in subparagraph (7) contacted an accountant who had performed services for BCI USA, and instructed the accountant to send any original BCI USA documents in his or his firm's possession to Jeb Kanchanalak in Thailand.

(9)   On or about December 31, 1996, the accountant sent original BCI USA records that were in his firm's files to Jeb Kanchanalak at BCI Thailand in Bangkok.

D.   Rental of Storage Unit in Name of Thai National

(10) On or about December 17, 1996, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused a Thai national working as a nanny for a family member to accompany KRONENBERG to a self-storage facility, and to rent a storage unit.

(11) Defendant DUANGNET KRONENBERG caused the Thai national referred to in subparagraph (10) to sign and initial a rental form at the self-storage facility that the Thai national could not read because it was written in English.

(12) Defendant DUANGNET KRONENBERG completed most of the rental form at the self-storage facility, providing KRONENBERG's own address, telephone number, and Social Security Number under the Thai national's name, and writing the Thai national's address under

33

KRONENBERG's name.

(13) After the rental form had been completed and the Thai national was given a key to the storage unit, defendant DUANGNET KRONENBERG immediately took possession of the key to the storage unit from the Thai national.

(14) Defendant DUANGNET KRONENBERG subsequently informed the Thai national that KRONENBERG had given the key to the storage unit to PAULINE KANCHANALAK.

E.   Moving of BCI USA Records to Storage Unit

(15) On or about December 24, 1996, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused two handymen to come to BCI USA's offices to move boxes.  While the movers waited, PAULINE KANCHANALAK and DUANGNET KRONENBERG filled boxes with papers and files.  KRONENBERG labeled the boxes.

(16) Later on that same day, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused the handymen to load the back of a pick-up truck with boxes containing files from BCI USA's office suite.  The boxes removed from BCI USA's offices at that time included seven or eight boxes that a BCI USA staffer had packed with BCI USA records, as described in subparagraph (7).

(17) After the movers' truck had been loaded with boxes, defendant PAULINE KANCHANALAK drove to the self-storage facility described in subparagraph (10), followed by the movers.

(18) Defendant PAULINE KANCHANALAK used a code to let both vehicles into the self-storage facility, and then used a key to open a storage unit.

34

(19) Defendant PAULINE KANCHANALAK caused the movers to remove the boxes they had transported from their truck into the storage unit, filling the unit almost to the ceiling.

(20) After the movers finished moving the boxes into the storage unit, defendant PAULINE KANCHANALAK gave one of the men a BCI USA check signed by DUANGNET KRONENBERG, dated December 24, 1996, for $200, and told the movers something to the effect that "you didn't move these boxes here" or "don't tell anyone you moved these boxes here."

(21) Within two days of moving these boxes, one of the movers went to BCI USA's offices to extort additional money from PAULINE KANCHANALAK. PAULINE KANCHANALAK gave the mover approximately $40 and then called the other mover to complain about his colleague's conduct.

F.   Erasure of Computer Hard Drives

(22) On or about January 10, 1997, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused an individual with expertise in computer engineering to erase professionally the hard drives of two computers located in BCI USA's offices.

(23) Within a few days of the erasure of the hard drives of the computers located in BCI USA's offices, defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused the same individual referred to in subparagraph (22) to erase the hard drive of a computer located at defendant KRONENBERG's home.

(24) Defendants PAULINE KANCHANALAK and DUANGNET KRONENBERG caused BCI USA to pay $500.00 to the individual who

erased the hard drives of the three computers referred to in subparagraphs (22) and (23).

(25) In or about late December 1996, defendant PAULINE KANCHANALAK told a BCI USA staffer that one reason for erasing the hard drives of BCI USA's computers was that "someone had told [KANCHANALAK] that she need[ed] to stay one step ahead in case something ever happened, in case someone ever came to the office and seized the assets, froze the assets. . . . Or they took the computers away or they seized them or something to that effect."

G.   Discarding of Records Responsive to Grand Jury Subpoena

(26) On or about February 24, 1997, defendant DUANGNET KRONENBERG received notice that a federal grand jury in the District of Columbia was seeking to subpoena her to appear before the grand jury and to produce certain relevant records to the grand jury, when her father-in-law handed her a federal grand jury subpoena that an agent of the Federal Bureau of Investigation had attempted to serve on defendant KRONENBERG earlier that day.

(27) Between on or about February 25, 1997, and on or about March 7, 1997, defendant KRONENBERG mutilated and/or discarded documents that she knew were responsive to the federal grand jury subpoena described in the preceding subparagraph.

(**Conspiracy**, in violation of 18 U.S.C. § 371).

A TRUE BILL:

_____
FOREPERSON

_____
WILMA A. LEWIS
United States Attorney for
  for the District of Columbia

_____
JONATHAN BIRAN
DEBRA HERZOG
Trial Attorneys
Campaign Financing Task Force
Criminal Division
U.S. Department of Justice
1001 G Street, N.W.
Suite 310
Washington, D.C.  20001
(202) 307-0655

Date:  November 13, 1998

37