```
 1              BEFORE THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF COLUMBIA

 3

 4   UNITED STATES OF AMERICA,      .
                                    .  Case Number 18-CR-32
 5           Plaintiff,             .
                                    .
 6       vs.                        .
                                    .  Washington, D.C.
 7   CONCORD MANAGEMENT AND         .  August 3, 2018
     CONSULTING LLC,                .  10:01 a.m.
 8                                  .
             Defendant.             .
 9   - - - - - - - - - - - - - - - -

10                   TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE DABNEY L. FRIEDRICH
11                   UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Government:         JEANNIE S. RHEE, AUSA
                                 MICHAEL R. DREEBEN, AUSA
14                               U.S. Department of Justice
                                 Special Counsel's Office
15                               950 Pennsylvania Avenue N.W.
                                 Washington, D.C. 20530
16                               202-616-0900

17                               JONATHAN I. KRAVIS, AUSA
                                 U.S. Attorney's Office for the
18                                   District of Columbia
                                 555 Fourth Street N.W.
19                               Washington, D.C. 20530
                                 202-252-6886

20

21   For the Defendant Concord
     Management and Consulting LLC:  ERIC A. DUBELIER, ESQ.
                                     Reed Smith LLP
22                                   1301 K Street N.W.
                                     Suite 1000, East Tower
23                                   Washington, D.C. 20005
                                     202-414-9291

24

25                   -- continued --
```

1    APPEARANCES (CONTINUED):

2                                    KATHERINE J. SEIKALY, ESQ.
                                     Reed Smith LLP
3                                    7900 Tysons One Place, Suite 500
                                     McLean, Virginia 22102
4                                    202-414-2919

5                                    JAMES C. MARTIN, ESQ.
                                     COLIN E. WRABLEY, ESQ.
6                                    Reed Smith LLP
                                     225 Fifth Avenue
7                                    Pittsburgh, Pennsylvania 15222
                                     412-288-3546

8

9
     Official Court Reporter:        SARA A. WICK, RPR, CRR
10                                   U.S. Courthouse, Room 4704-B
                                     333 Constitution Avenue N.W.
11                                   Washington, D.C. 20001
                                     202-354-3284

12


13   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(Call to order of the court.)

THE COURTROOM DEPUTY:  Your Honor, this is Criminal Action 18-32, *the United States of America versus Concord Management and Consulting LLC.*

Counsel, please approach the podium and identify yourselves for the record, as well as any additional parties at your table.

MS. RHEE:  Good morning, your Honor.  Jeannie Rhee on behalf of the United States.  I am joined by Michael Dreeben and Adam Jed.  And also joining us at counsel's table is Jonathan Kravis of the D.C. U.S. Attorney's Office, who has entered an appearance in this case.

THE COURT:  Good morning.

MR. DUBELIER:  Good morning, Your Honor.  Eric Dubelier, Katherine Seikaly, James Martin, and Colin Wrabley for Concord.  Mr. Martin will be arguing the motion, and then if the Court has any other issues you would like to address after that argument, I would be happy to handle that.

THE COURT:  Thank you, Mr. Dubelier.  Good morning.

MR. DUBELIER:  Thank you.

THE COURT:  All right.  This is a hearing to hear argument on Concord's motion to dismiss the indictment based on the Special Counsel's unlawful appointment.

Before I hear argument on the motion, I would like to address two housekeeping matters.  The first is, I will grant

1    Defendant Concord's unopposed motion to modify the briefing

2    schedule.  Accordingly, the deadline to file Concord's third

3    anticipated pretrial motion is extended to August 31st, 2018.

4    The government's opposition will be due September 21st.  And

5    Concord's reply will be due on October 5th.

6         Also before the Court is the government's request to

7    approve firewall counsel.  I just received this Wednesday

8    evening through ECF, and I haven't had a chance, with my trial

9    this week, to focus on it, but I will do so promptly.

10        For the argument, will Mr. Dreeben be arguing for the

11   Special Counsel?

12             MR. DREEBEN:  Yes, your Honor.

13             THE COURT:  I would like to start with the issue of

14   whether Congress has by law vested the authority to appoint a

15   Special Counsel and a department head, in this case the DAG, as

16   acting Attorney General, and I would like to hear from you first

17   on this issue, Mr. Dreeben.

18             MR. DREEBEN:  Sure.  Good morning, Your Honor.

19             THE COURT:  Good morning.  So which specific provision

20   does the Special Counsel believe authorizes the appointment

21   here?

22             MR. DREEBEN:  The appointment of the Special Counsel

23   is authorized by at least two provisions:  Section 515(b) of

24   Title 28, which authorizes specially retained attorneys to be

25   commissioned by the Attorney General.  It is a source of

authority.  It traces back to the original 1870 act that created

the Department of Justice and, for the first time, vested the

Attorney General with the authority to appoint assistance to

him.  And the second source of authority is 28 U.S.C. 533,

Section 1, which authorizes the Attorney General to appoint

officials to detect and prosecute crime.

THE COURT:  Okay.  Let's start with 515 first.  Does

that statutory provision really address what -- who are

specially appointed or specially retained?  Doesn't it talk

about what they can do?  They can take an oath, exercise certain

powers, but neither section appears to give the AG the authority

to appoint the Special Counsel.

MR. DREEBEN:  I think that, read in context,

Section 515(b) does.  Its antecedents, as I mentioned, trace

back to the original 1870 act that created the Department of

Justice.  Before that time, the Attorney General did not have

any authority to appoint officials to assist him, and he was

restricted to appointing officials to assist the District

Attorneys, which are now United States Attorneys.

Congress wanted the Department of Justice to have its own

litigation capacity, and the structure of the statute reflects

that the Attorney General's authority to make appointments comes

from that statute.  There is no other statute that would have

allowed the Attorney General to do that.  So Section 515(b)'s

antecedents would have had no function whatsoever.  And on the

presumption both that Congress was attempting to accomplish
something and that no language is superfluous, the antecedents
of 515 were understood to produce that result.

And the statutory history reinforces that, because it was
accepted widely by lower courts that the Attorney General had
this authority, and that was recognized by the Supreme Court in
a case called *Crosswaite*.  It was called into question in a 1904
decision of a district court in New York, which readily
acknowledged that the Attorney General had the authority to
appoint attorneys to participate in cases in districts, but
because the antecedents to Section 515(b) only refer to trials,
the District Court said he cannot appoint attorneys who will
represent the United States in grand jury proceedings.

Two other district courts disagreed, and Congress got into
the act with the enactment of what is now Section 515(a), which
specifically authorizes the participation of Attorney
General-appointed lawyers in grand jury proceedings, as well as
all other proceedings.  And the history of that statute reflects
that Congress well understood that the Attorney General had the
authority to appoint attorneys, and he wanted to clarify that
they had plenary authority to represent the United States in
grand jury proceedings as well.

THE COURT:  Okay.  So you agree 515 alone doesn't
confer the authority?

MR. DREEBEN:  No, I think 515(b) does confer the

1    authority.

2              THE COURT:  Even though the statute -- why wouldn't it

3    just say "specially appointed under this section" as opposed to

4    "under any provision of law"?  Why would that language be in

5    there if the statute itself conferred the authority?

6              MR. DREEBEN:  Sorry, your Honor.  Are we talking about

7    515(a) now or 515(b)?

8              THE COURT:  That's 515(a).

9              MR. DREEBEN:  Correct.  What Concord argued in its

10   initial brief is that 515(a) doesn't confer any authority; you

11   have to look outside it to some other provision of law.

12             THE COURT:  And you're saying 515(b) gets them there?

13             MR. DREEBEN:  Yes.

14             THE COURT:  Even though it doesn't specifically

15   identify the AG in citing that authority?

16             MR. DREEBEN:  It says -- it authorizes today, under

17   the authority of the Department of Justice, separate statutes --

18   I believe Section 509 vests all functions of all officials of

19   the Department of Justice in the Attorney General.  So the

20   Attorney General is the head of the Department who acts on

21   behalf of the Department of Justice.

22        And when Congress was creating the Department of Justice,

23   it intended the Attorney General to be the organizing official

24   who would take these actions.  And the other steps that Section

25   515(b) refers to, commissioning and taking the oath, only makes

1    sense if you presuppose that there is somebody who could be

2    appointed to this position.

3         THE COURT:  Or that there's another statute that gives

4    the authority.

5         MR. DREEBEN:  Except that historically, there was no

6    other statute.  This was the statute -- 515(a) and 515(b) are

7    today joined, but their origins are separate.  515(a) derives

8    from the law that overruled *United States versus Rosenthal*, and

9    I think Congress enacted it in 1906.  515(b) originates from the

10   original 1870 act that created the Department of Justice.

11       We quoted the revised statute's version of it in our brief.

12   Concord, in its reply brief, quotes the original version that

13   was Section 17 of the act that created the Department of

14   Justice.  And it's clear that when you look at these provisions

15   structurally, that it was intended to give the Attorney General

16   that authority.  The Supreme Court recognized it in *Crosswaite*.

17   Congress effectively endorsed it when it enacted the progenitor

18   to 515(a) that clarified that, contrary to the *Rosenthal* Court's

19   view, Attorney General-appointed attorneys should be able to

20   conduct grand jury proceedings.

21       And I actually don't think that, in its reply brief,

22   Concord contests that 515(b) gives appointment authority.

23   Concord's current argument -- they can speak for themselves, of

24   course, but it appears to be that 515(b)'s antecedents did,

25   indeed, confer appointment authority, but only to a point what

1    they regard as employees, not officers.  The line between the

2    two of them is roughly that an officer has to be performing

3    duties that are not isolated and intermittent and has to

4    exercise significant authority on behalf of the United States.

5         Concord seems to be acknowledging that there is the

6    authority to retain people that was conferred upon the Attorney

7    General as a result of the predecessor to Section 515(b), but

8    they claim that because it doesn't use the word "officer,"

9    whereas other provisions of the Department of Justice creation

10   act do, 515(b) can't be used to appoint somebody who has the

11   authority of the Special Counsel.  That's at least the way I

12   understand their argument.

13        THE COURT:  What about the Payne-Aldrich Tariff Act of

14   1909?  That Act would have been unnecessary if 515(b) does what

15   you say it does.

16        MR. DREEBEN:  The Act as a whole did far more than

17   just confer appointment authority.  It created a Court of

18   Customs, and it provided for a specific section of the

19   Department of Justice to be created, and it authorized staffing

20   of it with a particularized number of attorneys.  And it did go

21   on to talk about appointment authority.  It's a logical unitary

22   provision that covered court creation, section of the DOJ

23   creation, and appointment authority.

24        It's true that the -- in our view, the Department would

25   have had the authority to hire people without that additional

1    authority, but it didn't reflect a congressional determination

2    that the attorneys had none.  It was simply a very specialized

3    provision to a specialized problem.

4        And again, I think what is more telling is Congress's

5    reaction in amending the statute to overrule the *Rosenthal*

6    decision by saying yes, attorney general-appointed lawyers can

7    go into grand juries -- if that provision didn't have any

8    effect, if the predecessor to 515 had nothing to operate on,

9    then Congress would have passed an entirely meaningless and

10   useless statute.

11       And as a presumption of statutory construction, it is

12   assumed -- I think the Court said so in *INS versus Stone* -- that

13   an amendment has substantive meaning.  It's presumed to have

14   substantive meaning.  And here, when it's analyzed against the

15   backdrop of the way that 515(b) came into existence, its

16   acknowledged use, the fact that the Supreme Court commented on

17   it as of course allowing the Attorney General to appoint

18   lawyers, the fact that it wasn't questioned that the Attorney

19   General could do that until *Rosenthal* came along and said he can

20   do it but not for purposes of grand juries, and Congress said

21   well, actually, we want him to be able to do it for grand

22   juries, too, I think that sequence of events is a far more

23   powerful historical structural indication that indeed Section

24   515(b) is a source of authority.

25       And I'm not speaking as the only one who thinks that.  The

1    Supreme Court of the United States in *United States versus Nixon*

2    considered whether the Watergate special prosecutor was properly

3    appointed.  And it necessarily did that because it had to decide

4    whether the special prosecutor had the authority to represent

5    the sovereign interests of the United States as against a

6    presidential assertion of executive privilege.  And it needed to

7    have adversary proceedings that were enforceable in a court as

8    opposed to simply an intra-executive branch dispute in order to

9    reach the merits.

10    And in concluding that the special prosecutor that was

11    appointed by the Attorney General had been properly delegated

12    authority, the Court said he was properly appointed, and it

13    cited Sections 515 and 533 as sources of authority for that.

14    THE COURT:  So you don't think you need 533 here?

15    MR. DREEBEN:  No.  I think that the Court could

16    entirely rely on Section 515.  Section 533 is very explicit

17    statutory language that gives the Attorney General the authority

18    to appoint officials to investigate and prosecute crime.  It's

19    housed in the section of the statute now that addresses the FBI,

20    but it doesn't --

21    THE COURT:  Does that matter?

22    MR. DREEBEN:  No, I don't think it does.

23    THE COURT:  How come?

24    MR. DREEBEN:  Because the Supreme Court has said that

25    section headings and titles cannot qualify or restrict plain and

1    unequivocal language of a statute; they can only be used to

2    resolve ambiguities.  Because Concord raised this argument for

3    the first time in its reply brief, we didn't address it in our

4    brief, but the case that I would cite to the Court for that

5    proposition is *Florida Department of Revenue versus Piccadilly*

6    *Cafeteria*, 544 U.S. 33, at jump cite page 47.  It's a 2008

7    decision.

8            THE COURT:  All right.  What about the *Yates* case that

9    involved the fish and the document destruction statute of the

10   Sarbanes-Oxley?

11           MR. DREEBEN:  Yes.

12           THE COURT:  Didn't placement there matter?

13           MR. DREEBEN:  The Court concluded, for reasons that

14   mystified the government at the time, that the word "tangible"

15   was ambiguous in the context of that statute.  And we don't

16   dispute that in a case of true ambiguity, the Supreme Court has

17   said time and again that you can look to other indicia of

18   meaning to attempt to discern what the sense of a statute is,

19   but only if there is ambiguity.

20        So the dichotomy is between statutes that are ambiguous and

21   statutes that have clearer language.  We think that 533 falls on

22   the clearer language side, and therefore, the title cannot

23   qualify its substantive scope.

24           THE COURT:  It's not so much the title; it's where

25   it's placed.

1          MR. DREEBEN:  True.  And the Court said -- and the

2     *Piccadilly* case refers to both section headings and titles.  So

3     what those are are extrinsic indications of meaning that can be

4     used when the language on its face doesn't get you there.

5          THE COURT:  Okay.  Other than *Nixon*, can you cite any

6     other case that says 533 vests the IG with authority to appoint

7     inferior officers?

8          MR. DREEBEN:  Other than a Supreme Court case that

9     addressed an analogous special prosecutor to us, I think I

10    can't, but I don't think that the Court needs additional

11    authority beyond the Supreme Court.  Part of the reason for that

12    is that the issue has not arisen all that -- on that many

13    occasions.  So other courts, to my knowledge, have not addressed

14    it and rejected it or addressed it and, you know, conferred

15    authority on us under 533.

16         As I'm sure your Honor is aware, a district court in this

17    district recently did rely on Section 533.

18         THE COURT:  Yes, I am aware, and now I understand why

19    you wanted to continue this hearing.  All right.

20         What about the fact that that's not listed in the

21    appointment order 533 or the regulations here?

22         MR. DREEBEN:  I don't think that that is a relevant

23    feature.  The appointment order says, "By virtue of the

24    authority vested in me as Attorney General, including," and then

25    it cites several statutory provisions.  But the ultimate

question for the Court is whether the Attorney General had the

authority to make the appointment that he did, and the

appointment order didn't have to cite anything.

The Nixon Watergate appointment order, which was done in

the form of a regulation, actually doesn't cite any statutory

authority, and the Supreme Court nonetheless analyzed it by

asking, what authority does the Attorney General have, what

authority did he deploy?  And it relied on Sections 515 and 533

in upholding the validity of the appointment and the delegation

of authority.

THE COURT:  For purposes of 533, did it matter that

Mr. Mueller was a private attorney outside DOJ when he was

appointed?

MR. DREEBEN:  No.  I don't think it matters for

Section 515(b) either.  In order to be appointed as a government

official, all of us start out in the private world, and then

we're incorporated into the government by virtue of an

appointment.  Once we are appointed, we exercise the authority

of the United States as agents for the United States.

So a lot of Concord's arguments seem to treat the Special

Counsel as if he is a private attorney, somehow mystically

clothed with governmental authority but he still retains his

private character.  That's just not an accurate understanding of

how governmental appointments work.

The Special Counsel is operating as an officer in the

1    Department of Justice, subject to the supervision of the acting

2    Attorney General, and within the hierarchy of the Department of

3    Justice, and he's deploying on behalf of the United States the

4    sovereign power of the United States, like any U.S. Attorney

5    would.

6            THE COURT:  All right.  So the Special Counsel is

7    relying on 515(b), 533?

8            MR. DREEBEN:  Yes.

9            THE COURT:  What about 509, 510, and 301?  Are these

10   relevant?

11           MR. DREEBEN:  They are relevant.  Section 509 and 510

12   vest all functions of the Department in the acting Attorney

13   General -- the Attorney General, but now we have an acting one

14   because of the recusal.  For purposes of these matters,

15   Section 510 permits delegation of any power that the Attorney

16   General has to other officials in the Department.

17       So those explain how a Special Counsel can be created and

18   what the supervisory relationship is between the Special Counsel

19   and the Attorney General.  But the appointment authority itself

20   is conferred by Sections 515(b), 533 -- we have cited to the

21   Court cases that involve the housekeeping statute, 5 U.S.C. 301,

22   and that have regarded it as a source of appointment authority.

23   It's not necessary that the Court address or analyze those in

24   order to uphold this appointment, in the government's view.

25           THE COURT:  But is it your position here that these

statutes 509, 510, 301, they authorize the AG to appoint all inferior officers?

MR. DREEBEN:  Yes.

THE COURT:  It is?

MR. DREEBEN:  Yes.

THE COURT:  Does that make sense with the statutory schemes, though?  There's all these specific statutes that apply to, you know, the DAG, U.S. Attorneys, et cetera.  Does it make any sense to read these statutes that broadly?

MR. DREEBEN:  I think that there is some logic to the idea that when Congress provides a specific reticulated system of appointments, then the generalized powers in the housekeeping statute might not be properly viewed as augmenting that or contradicting it.  And that is an argument accepted by the Court of Appeals for the Armed Forces.  It was rejected by two other circuits that considered Department of Transportation appointments.

In the government's view, the stronger arguments here are 515 and 533.  They do have the backing of the Supreme Court opinion.  And although we would offer the other authority to the Court as a supplementary source of authority, it's not necessary that the Court agree that it exists.

THE COURT:  So you disagree with the *Jansen* decision?

MR. DREEBEN:  Yeah, I think that *Jansen* may also be distinguishable based upon the particularized features of the

1    Department of Defense and its statutory arrangements of

2    appointments and the detail into which they go, and I'm

3    confident that the government would say that a decision in favor

4    of us here under 5 U.S.C. 301 wouldn't conflict with *Jansen*

5    because of the distinguishable statutory schemes.

6        But the general thrust of that opinion is more in line with

7    what your Honor said, and I think that that is a legitimate

8    point of debate.

9        THE COURT:  Thank you, Mr. Dreeben.

10   Mr. Martin, if you could address the statutory arguments.

11       MR. DREEBEN:  Thank you, your Honor.

12       MR. MARTIN:  Thank you, your Honor.  James Martin.

13   May it please the Court.  With the Court's indulgence on

14   that, I would like to start with 509 and work my way through.

15       THE COURT:  It sounds like they're kind of sort of

16   conceding that that's not the main source here.

17       MR. MARTIN:  Well, I think that's important only in

18   the sense that what's in front of the Court is, as counsel

19   suggested, a carefully reticulated statutory scheme where the

20   statutes provide for specific things, none of which, I should

21   say, by their plain terms authorizes the appointment that we

22   have in this case.

23       THE COURT:  So why don't you focus on 515 and -- it

24   sounds like 515 and 533.

25       MR. MARTIN:  All right.  I will start with 515.  With,

1    again, the Court's indulgence, I will take it in alphabetical

2    order, (a) and then (b).

3        We don't think there's any genuine dispute about the

4    construction of 515(a) or (b) at all, and I would caution the

5    Court that in counsel's argument this morning, there was a lot

6    of history.  There was a lot of analysis.  There was a lot of

7    atextual construction aimed at saying now we should construe

8    these statutes this way.

9        We would prefer, and we know that the Court understands,

10   that you start with the language in the statutes themselves.

11   And on that, in terms of the context that we offered, the plain

12   language meaning that we offered with respect to the "under law"

13   language in 515(a), there's really no rebuttal on that.  The

14   original language that was used in the section makes it clear

15   that you should be looking for another statute.  The reticulated

16   statutory scheme always says, "Unless authorized by law, the

17   power retained by the Attorney General is exclusive."  This

18   section lines up very clearly with that.  And the other

19   provisions make it clear that this "under law" language should

20   be given independent meaning to get to the same place.

21       We've also pointed to the surplusage canon.  You can't just

22   delete this language.  We've demonstrated that again, as a

23   matter of history, that plain language construction makes sense.

24   It seems to me, in that context, we don't have to drift over to

25   anything other than what the statute says.

1      We do get the one past participle construction piece from

2  Special Counsel in his briefing, but even there, your Honor, as

3  the Supreme Court has said, a past participle in the past tense

4  is still in the past tense.  And what that means is that this

5  lawyer that's referred to in Section (a) had to already be

6  appointed under law.

7      Now, apart from this faulty grammatical, what we get is

8  next the focus on 515(b), which becomes the elephant in the room

9  in the opposition brief and which we have dealt with

10  specifically in our reply brief.  But let's unpack that the same

11  way.  Let's take the plain language of the statute as the

12  starting point, not the history that relates to *Rosenthal* or

13  anything else.  There, the statute plainly doesn't provide

14  appointment authority in it.

15      The word "appointment," it refers to a lawyer who is

16  already specially retained -- lining up again with (a), that in

17  the past tense, that means there should be another statute.

18  Then we get to the word "commissioned."  It's also in the past

19  tense.  Special Counsel converts the word "commissioned"

20  to "commission" to try to give it some active feel.  But even

21  then, under the definition he provides, "commission" refers to a

22  named or appointed official, meaning again that this authority

23  has to come from elsewhere.

24      Then we get down to the history, which is really, as far as

25  Special Counsel is concerned, the thing that drives the whole

analysis.  Let's just start with the proposition that history can't supply what the plain language does not, and history can't edit the statute in a way that would achieve the ends that Special Counsel wants.

Now, on that history, as we have developed in our brief, there is a very specific distinction between officers and employees preserved in this statutory scheme from the beginning. The *Crosswaite* case, for example, that was cited is aimed at employees, and all of this was about funding and getting them paid.  It wasn't about authority.

By the same token, there is nothing in this history related to *Rosenthal* or otherwise that would substantiate that we can make a leap of faith from the 1870 act forward, which preserved this distinction and gives us the current language, to the notion that this is the omnibus authority to provide for the appointment of private counsel in the context of an appointment to carry out the prosecutorial function of the United States.

In fact, the 1870 act and moving forward maintains this distinction between officers on the one hand, special employees on the other, and 515(b) is not getting at the appointment of officers of the United States.

*Rosenthal* is directly relevant to this inquiry, but not in the way that Special Counsel suggests.  *Rosenthal* is confirmation of the argument that you need a statute, because in that case, there wasn't authorization for the specially employed

attorney to conduct grand jury proceedings, and therefore, you had to find the statute.  The rest of the statutory provision, starting with 509 and working ultimately up to 533, eventually diffused that authority and provided for it, but it didn't and wasn't residing in 515(b).

Now let me turn to 533.  533 most assuredly makes its way into the *Nixon* opinion in a single sentence or two combined sentences.  And I think everyone concedes there is no analysis of the history of that section, what it means for the appointment of the Special Counsel in that case, an issue that was not disputed.  The authority of the Special Counsel was conceded by all parties.  The Supreme Court addressed it, as I said, only in passing, only in a couple of sentences.  It was not a holding.  It was not an analysis.

And once the concession was made, the Court had an adversary proceeding before it.  It did not need to make that holding in order to litigate the question of executive privilege, and there's nothing in the Court's opinion that directly suggests that as a matter of the construction of 533 in particular or any of the other sections.

533, as was acknowledged, didn't make its way into the appointment order here either.  And I think as our reply brief points out, and somewhat tellingly, 533 has never been used in any court opinion with analysis facing the arguments about the language of the statute that are now in front of this court,

1    even though it's been on the books for 97 years, to accomplish

2    the result that we are talking about in this case.

3        And if it was enough -- if it was enough, just like 515(b),

4    it would be hard to explain the rest of these statutory

5    provisions which are so careful about the delegation of this

6    prosecutorial function in the cases which require a specific

7    appointment to accomplish that.

8           THE COURT:  What do you say about Chief Judge Howell's

9    point in her opinion about DOJ trial attorneys that don't have a

10   specific statutory appointment?  Where do they fall?  Where does

11   the authority come for them?

12          MR. MARTIN:  So if an attorney is within the

13   Department of Justice, we've already separated the analysis from

14   this case.

15        Now, I should point out, with respect to Judge Howell's

16   opinion, we've had that for less than 24 hours.

17          THE COURT:  Me, too.

18          MR. MARTIN:  We have no briefing context for how those

19   arguments came about.  And if that's going to become, you know,

20   a linchpin of what's going on here, we would --

21          THE COURT:  It's not a linchpin at all.  It's

22   persuasive authority for this court.  But it is an interesting

23   question.

24          MR. MARTIN:  It's only interesting in the sense that

25   we're past the issue that's presented here as it relates to 533.

1  When somebody is within the Department of Justice, as even the

2  *Sealed* case acknowledged, that makes critical difference in the

3  analysis.  And then once you've got the appointment authority,

4  you can move to whatever U.S. Attorneys might do with that.  But

5  that line between appointment and delegation or status is

6  critical.  That's what *Edmond* says.  That's what *Jansen* says.

7  What we don't have in 533 is the appointment piece.

8      THE COURT:  All right.  I find your statutory

9  arguments compelling.  The problem is, we have this precedent.

10  We have *Nixon*.  We have *In re: Sealed*.  You say they're dicta.

11  Have you looked at the briefs in the *In re: Sealed* case?  It

12  seems to me that the language was at least a necessary step in

13  the Court's reasoning.  Have you looked at that?

14      MR. MARTIN:  So yes to that, and then let me again

15  take a step back.  Judge Edwards's opinion that we cited makes

16  it, I think, clear on how authority works when we're giving a

17  *stare decisis* effect.  What you need for that is for the issue

18  to be presented, addressed, and analyzed on materially similar

19  facts.

20      But we can't get there with *Nixon*.  We've got two

21  conclusory sentences in a bare citation to the statute.  It is

22  not a holding --

23      THE COURT:  But even if it's just dicta with *Nixon*,

24  don't I, as a district court judge, have to follow that?

25      MR. MARTIN:  Not --

1          THE COURT:  The Circuit's made clear that --

2          MR. MARTIN:  What you can take out of that is, 533 was

3     cited in *Nixon*.  You can't go any further with it than that,

4     because we don't know what statute in that litany the Court felt

5     was important, and that is the issue that is on your --

6          THE COURT:  But why would it list 533 if it didn't

7     think it was important?

8          MR. MARTIN:  Well, apparently, because somebody

9     offered that section up in the case as a source of authority,

10    which then it was not disputed that the authority existed.  So

11    we don't know why.  That's exactly the point.  Now that issue is

12    stage center, without the notion that *Nixon* is controlling,

13    because of the absence of the analysis.  So *Nixon* --

14         THE COURT:  But me, as a District Court, I should draw

15    that conclusion?  Fine, maybe the D.C. Circuit, maybe the

16    Supreme Court, but for me to do that?

17         MR. MARTIN:  Well, be brave.  No -- so I come back to

18    the precedential value or *stare decisis* value of the case.  It

19    is not even, as phrased in the case, dicta, because dicta

20    usually carries some analysis with it.

21         THE COURT:  But the cite's there.  It has to mean

22    something.

23         MR. MARTIN:  Well, it means only that a nondisputed

24    issue in the case had four statutes attached to it, and the

25    Court moved beyond it.

THE COURT:  All right.  What about *In re: Sealed*, because that binds me, too?

MR. MARTIN:  I think the *In re: Sealed* case actually helps us to a considerable degree, when you unpack the case carefully, as we did in the briefing that we provided.  In *Sealed* case, what I get out of the briefing is that this appointment issue was, again, not disputed in the way that we've presented it.  So we are in a vacuum as to what the Court was looking at.

But I think what's really important about *Sealed* case is the opinion itself was much more careful in dealing with the appointment authority than the lack of dispute in the underlying briefing.

The Court was reticent, we know, to say that the sections we're talking about provided the express authority to have the kind of appointment that we have in this case.  It relied on the notion that the lawyer was within the Department of Justice as the linchpin of making the accommodation in the statutory construction that it did.  And every single citation that it makes to the section pivots on that.

So what we have in *Sealed* case that is helpful to this court is, you need another statute.  You can't just have it on the AG's authority alone.  And second, if you're trying to get the AG's authority from the sections we're talking about, we don't see it.

THE COURT:  Well, there were dual appointments in that case.

MR. MARTIN:  There were.

THE COURT:  But the holding didn't hinge on that.

MR. MARTIN:  So the analysis of the private appointment, which was independent of the statute, hinged very carefully and expressly on the notion that Walsh was considered to be -- and this is the Court's words -- "within the Department of Justice."  That is a material difference in this case at the time the appointment was made.  And the circumstances of Walsh's appointment, of course, also carried with it that that prior appointment had been under the Independent Counsel Statute, with all the ramifications that went with that.

The Court then said, when we get down to these sections, if we were just talking about those sections alone, it wouldn't accommodate this appointment.  But the fact that he was within the Department of Justice did it.

So I think *Sealed* case, in the sense that, first of all, the Court approached the issue very carefully.  It didn't say we have *Nixon*, we're home.  In fact, it said, as we have suggested, *Nixon* simply presumed this to be the case.

So the D.C. Circuit took an independent look at it without saying that there was dicta in *Nixon* that could be somehow precedential, approached it very carefully, as we have indicated, and then tellingly said that the statutory scheme did

1    not go as far as the argument that's in front of the Court.

2              THE COURT:  So here, if the DAG had brought Mueller

3    first into the Department of Justice and then appointed him,

4    would that make a difference?

5              MR. MARTIN:  I think it would make a difference.  It

6    would be, then, an additional piece of the analysis, because

7    somebody within the Department of Justice has -- there's more

8    ability to define or create their authority and provide for a

9    delegation when you're in that situation.  It's the appointing

10   authority, of course, that is the critical issue here.

11       Now, on 301, which is the last one, it just can't get there

12   from here --

13             THE COURT:  I agree with you.  All right.  Thank you,

14   Mr. Martin.

15             MR. MARTIN:  Thank you.

16             THE COURT:  Mr. Dreeben, I will give you a chance to

17   respond to the arguments about *Nixon* and *In re: Sealed* before we

18   move to the second issue.

19             MR. DREEBEN:  I think focusing on *Nixon* is really the

20   most relevant piece, your Honor, because in that case, the

21   question was, did the Department of Justice, acting through the

22   special prosecutor, have a live dispute with the President.  And

23   to get there, the Court had to decide that there were statutes

24   that authorized the Attorney General to represent the sovereign

25   interests of the United States in litigation.  That's one side

1    of the case.  And he had, then, appointed and delegated his

2    authorities to a special prosecutor, who could go to court to

3    enforce the subpoena.

4        And the language that the Court used was first to describe

5    the appointing authority.  Under the authority of Article II of

6    the Constitution, Congress vested in the Attorney General the

7    power to represent the United States in criminal cases.  And

8    then the critical sentence is, "It has also vested in him the

9    power to appoint subordinate officers to assist him in the

10   discharge of his duties."

11       That's not dictum.  That's how you get from power of the

12   Attorney General, power of the special prosecutor, live dispute

13   between the special prosecutor and the President.

14       It's true that it wasn't contested, but I think the reason

15   that it wasn't contested is that these authorities have been

16   long understood and are clear on their face to authorize the

17   Attorney General to take this action.  We provided in our brief

18   a long history of examples of the use of the Attorney General of

19   these statutory authorities to make appointments.  It would be

20   striking, I think, if it escaped everybody's notice that he

21   couldn't do this but he was nonetheless doing it.

22       Congress has never acted in that way.  It has actually

23   funded special prosecutors and independent counsels.  We are

24   today funded under authorities that provide for the Attorney

25   General to make appointments that cover special counsels.  So I

1    think that *Nixon* is actually governing.

2        Now, on *Sealed* case, my friend's distinction of it actually

3    contradicts the central holding of the case.  The central

4    holding of *Sealed* case is that it was unnecessary to decide the

5    constitutionality of the Independent Counsel Act because a

6    coequal parallel appointment under distinct statutory authority

7    permitted the Attorney General to have an independent counsel

8    who was vested with all the same powers.

9        And in none of that analysis was it critical to the Court

10   to say okay, there was already somebody in the Department of

11   Justice under this constitutionally challenged law, which we

12   haven't adjudicated, but because he was nominally in the

13   Department of Justice, the Attorney General could lateral him

14   over to the status of AG-appointed independent counsel, and that

15   would somehow be a distinguishing feature.

16       That contradicts the central point that the Court was

17   trying to make.  It didn't have to decide whether the

18   independent counsel statute provided a constitutionally valid

19   pathway to bring somebody in to the Department of Justice,

20   because the Attorney General had provided this parallel backup

21   authority under Section 515 and the other statutes that

22   permitted him to delegate authority.

23       So I don't think that that *Sealed* case can be treated as a

24   distinguishable authority in the manner that my friend suggests.

25       And I also think it's critical to note that in both of

1    these cases, as well as in Watergate, you start with somebody

2    who is outside the government.  They get an appointment.  And

3    that's when they become a governmental official.  They don't

4    remain a private official who somehow is exercising headless,

5    branchless, unsupervised activity on behalf of the United

6    States.

7        We are in the Department of Justice.  The Special Counsel

8    is an appointee of the Department of Justice, so is his staff.

9        THE COURT:  All right.  Let's move on to question 2,

10   whether or not the Special Counsel is a principal or inferior

11   officer and your arguments in your brief about the regulations

12   and how they provide for supervision by the DAG.

13       MR. DREEBEN:  Yes.

14       THE COURT:  I want first to address the regulations as

15   they are without your argument that you can rescind or amend

16   them at any time.  So let's stick to the regs.  Because you do

17   agree, as long as they're in effect, they're binding and have

18   the force of law; correct?

19       MR. DREEBEN:  Yes.  Not enforceable in courts, because

20   they're like the U.S. Attorneys' Manual and other regulations.

21       THE COURT:  We will get there.

22       MR. DREEBEN:  Okay.

23       THE COURT:  But in terms of the regulations and the

24   supervision element --

25       MR. DREEBEN:  Yes.

1        THE COURT:  -- you talk about the regulations state

2   that the Special Counsel must comply with DOJ rules,

3   regulations, procedures, practices, and policies.

4      Tell me, what policies is the Special Counsel subject to?

5   Is this the U.S. Attorneys' Manual?  Is it public integrity

6   manuals?  What applies here?  What should I be looking at?  What

7   does the Special Counsel understand the policies to be?

8        MR. DREEBEN:  We put ourselves in the same position as

9   a U.S. Attorney.

10       THE COURT:  Do U.S. Attorney's Offices follow the

11  Public Integrity Section guidelines?

12       MR. DREEBEN:  It depends what we're talking about.  If

13  we're talking about the 371 issue, I don't think that manual

14  states the Department of Justice has litigating authority.  I

15  think when I was before you last time, I noted that the charging

16  practices of the Criminal Division, as reflected in a brief that

17  was filed in the First Circuit, show that we do not regard

18  Section 371 as imposing an atextual willfulness requirement.

19       THE COURT:  I understand.  But can a brief in

20  litigation, can that counter an on-the-books policy of DOJ?

21       MR. DREEBEN:  I think a signed brief by the Criminal

22  Division of the Department represents the Department's

23  litigating position.  The Solicitor General also took that

24  position in a brief-in-opposition in the Supreme Court, and I do

25  regard the Solicitor General's determinations of what the law is

1    in a criminal case as superseding an advisory policy manual

2    issued by the Criminal Division.

3              THE COURT:  So the policy manual, is it still in

4    effect?  Does that not change over time when the Department's

5    litigating position changes?  It seems like you want to give

6    correct advice to your employees.

7              MR. DREEBEN:  Yes, it should, and I'm confident that

8    the Criminal Division will, now that this issue has come into

9    focus, revise and correct the guidance manual, which --

10             THE COURT:  But has not done so yet?

11             MR. DREEBEN:  The wheels of justice sometimes turn

12   slowly.

13             THE COURT:  When was this brief filed?

14             MR. DREEBEN:  Which brief, your Honor?

15             THE COURT:  The one that you are relying on for the

16   official position.

17             MR. DREEBEN:  I think it was either 2016 or 2017.

18   It's a pretty recent brief.  So I can supply it to the Court via

19   a citation, if you wish.  You're going to hear that issue in the

20   371 case.

21             THE COURT:  I know.

22             MR. DREEBEN:  Just to back up, though, we do regard

23   ourselves as living within Department of Justice policy.  The

24   regulations call for us to consult with the relevant components

25   about the meaning and interpretation of policy.  I do that

1    regularly.

2              THE COURT:  But what are these policies?  Is it the

3    U.S. Attorney's Office Manual?

4              MR. DREEBEN:  Yes.

5              THE COURT:  What does this mean?  What kind of

6    standard is it for Mr. Mueller or anyone else?

7              MR. DREEBEN:  I think that there may be -- there's an

8    element here of clarity, in the sense that U.S. Attorneys -- the

9    U.S. Attorneys' Manual does exist to supply U.S. Attorneys with

10   policy.  There are other ways in which the Attorney General can

11   communicate policies.  The Attorney General will from time to

12   time issue memoranda that did govern charging practices.  The

13   Criminal Division may do the same.

14        But to back up and try to answer your question with a

15   comprehensive definition of what are all sources of DOJ

16   policies, I'm not sure anyone has ever done that, and I think

17   that they may emanate from different sources.  But it's

18   precisely because there may be lack of clarity about that that

19   we are encouraged, authorized, and required to consult with

20   relevant Department officials to ascertain what their

21   understanding of policies are, and we are bound by them.

22             THE COURT:  But to the extent these policies exist in

23   these various different forms, can you represent to me that the

24   Special Counsel is following them?

25             MR. DREEBEN:  Yes.

1          THE COURT:  So the regulations also require the

2     Special Counsel to notify the DAG of events in the course of the

3     investigation in conformity with Departmental guidelines with

4     respect to urgent reports.

5          MR. DREEBEN:  Yes.

6          THE COURT:  And these urgent reports include "major

7     developments in significant investigation and litigation."

8       What counts as a major development?

9          MR. DREEBEN:  Well, an indictment, an arrest of a

10     significant suspect, I believe, are given as the examples.

11          THE COURT:  A plea agreement?

12          MR. DREEBEN:  Sorry?

13          THE COURT:  Plea agreement, sentencing

14     recommendations, are those major developments?

15          MR. DREEBEN:  They can be.  I think there's an element

16     of judgment, and I think one prong of the urgent report

17     requirement talks about when an issue may get national press

18     attention so that the Department is apprised of it.  We have

19     been working with the Acting Attorney General to ascertain what

20     sorts of developments need to be reported.  We have regular

21     meetings and consultations so that he is aware of our conduct.

22          THE COURT:  Do these notifications occur before the

23     Special Counsel takes an action?  The regulation doesn't make

24     clear they must be before.  It just says give notice, urgent

25     reports.  Can these reports come after a Special Counsel has

1   made a --

2           MR. DREEBEN:  With a major event like an indictment,

3   it's going to be before.  I won't say that every investigative

4   step that might conceivably fall within an urgent report has

5   been the subject of advanced consultation with the Acting

6   Attorney General, because that would -- I'm not in a position to

7   make that broad of a representation, but we do have ongoing

8   regular consultations in which the Acting Attorney General is

9   apprised of the investigative steps that we're taking in the

10  course of the investigation.

11      And an additional section of the regulations permits the

12  Acting Attorney General to request the Special Counsel to

13  provide an explanation for any investigative step that we take,

14  whether before or after.  And if he concludes that it is so

15  unwarranted or inappropriate under established departmental

16  practice, it should not be pursued.

17          THE COURT:  Okay.  Let me stop you there.

18          MR. DREEBEN:  Okay.

19          THE COURT:  I just want to make sure I understand.

20  You can't represent that the Special Counsel is, in fact,

21  notifying the DAG of all such major developments?

22          MR. DREEBEN:  No, we definitely are complying with all

23  obligations to represent.  I think, your Honor --

24          THE COURT:  Before, before the decision is made?

25          MR. DREEBEN:  If we're required to, we are.  The

1    reason why I'm being a little hesitant to make a unequivocal

2    assertion is not because we're not complying with our

3    notification and advice functions.  It's because I don't have

4    sitting in front of me the definition of what is covered by an

5    urgent report, and there may be some room for debate about what

6    exactly is in, what exactly is out.

7            THE COURT:  But at least as to the major ones that you

8    feel comfortable representing, can you represent that --

9            MR. DREEBEN:  Yes.

10           THE COURT:  -- they're occurring before the action?

11           MR. DREEBEN:  Yes.

12           THE COURT:  Okay.

13           MR. DREEBEN:  And I would also, your Honor -- we are

14   on the regulations.  I realize we're not just talking about the

15   statutes.  But the regulations are what bind us.  If we stepped

16   out of line -- and I'm not suggesting that we have ever stepped

17   out of line.  But if we stepped out of line, it wouldn't alter

18   the scope of supervisory authority of the Acting Attorney

19   General.  It just may mean that a slip occurred in the

20   administration of a reg.

21           THE COURT:  But the reg itself, as I read it, doesn't

22   require the notification before.  That's why I'm asking these

23   questions.

24           MR. DREEBEN:  Yes.  In practice, the combination of

25   the Acting Attorney General's desire for understanding of what

1    we are doing so that he is in a position to exercise his

2    supervisory responsibility and our understanding in

3    administration of the urgent reports requirement, means that

4    major, important steps in our investigation are the subject of

5    consultation before they occur.

6          THE COURT:  Okay.  So after the DAG is notified of a

7    potential decision, or even after the Special Counsel makes a

8    decision, your position is that the DAG can revoke, countermand

9    the decision made?

10          MR. DREEBEN:  Yes.

11          THE COURT:  Because the regulations don't say that

12    explicitly.

13          MR. DREEBEN:  They say it should not be pursued.

14          THE COURT:  But it's really narrow.  It says, "May,

15    after review, conclude that the action is so inappropriate or

16    unwarranted under established authority or departmental

17    practices that it should not be pursued, and in conducting that

18    review, the Attorney General will give great weight to the views

19    of the Special Counsel."

20          MR. DREEBEN:  Yes.

21          THE COURT:  So one, a lot of deference; and two, it's

22    not just any action the DAG disagrees with.  It has to be so

23    inappropriate or unwarranted under established departmental

24    practices.

25          MR. DREEBEN:  That's right.

1          THE COURT:  So you could have a really big, big

2     decision --

3          MR. DREEBEN:  Yes.

4          THE COURT:  -- where the DAG and the Special Counsel

5     disagree just a little bit, but a really huge, significant

6     decision, and under the regulation, it seems the Special Counsel

7     prevails.

8          MR. DREEBEN:  The regulation is written to assure a

9     degree of independence to the Special Counsel in structuring the

10    investigation on a day-to-day basis.  It also provides for the

11    termination or removal of the Special Counsel for good cause,

12    violation of departmental policies.

13         THE COURT:  Right.  But what if the Special Counsel is

14    following all the regulations and policies of the Department, so

15    there's no good cause basis for removal here?

16         MR. DREEBEN:  I mean, I don't know that that's right.

17    "Good cause" is a flexible term if this channeled into a

18    constitutional concern about the Special Counsel, and I think,

19    for reasons that I would hope we get a chance to discuss, I

20    don't think that it would.  But if there were a concern that the

21    removal authority were not sufficiently protective of the Acting

22    Attorney General's supervision to satisfy constitutional

23    standards, it should be interpreted in a way that would satisfy

24    those standards.

25         On its face and when it's been -- when similar terms have

1    been interpreted by the Supreme Court or Justices of the Supreme

2    Court in separate opinions, they have fairly generously tended

3    towards the view that a superior executive branch official

4    should have sufficient latitude to supervise inferior ones.

5         This is a provision embedded in a regulation, not designed

6    for Court interpretation, designed for managing an internal

7    executive branch process so as to provide confidence to the

8    community that an independent actor has reviewed and analyzed

9    situations that call for the appointment of a Special Counsel,

10   while retaining the ultimate authority and responsibility in the

11   Attorney General.  So they strike a balance.

12        And I think that if there were a Special Counsel that were

13   acting out of bounds and skating too close to the edge when the

14   Attorney General wasn't sure whether the countermanding

15   provision applied but he was distressed by what was happening, I

16   think there would be removal authority.

17             THE COURT:  But hypothetically, let's say the Special

18   Counsel is not acting out of bounds at all, and in fact, the

19   Special Counsel is following every DOJ policy or regulations,

20   general practices.  And yet the Deputy Attorney General, for

21   good reasons, thinks a major decision should be decided

22   differently.  Say, for example, a major decision by the Special

23   Counsel is going to interfere with an ongoing investigation in

24   another case being handled in San Diego, or there's a resource

25   issue or there's a foreign policy issue, there's some major

reason why the Deputy Attorney General may disagree with the Special Counsel's decision.  And yet the Special Counsel is acting within the law, within the bounds.

Does the Deputy Attorney General have the ability to countermand or revoke that decision in that circumstance?  It doesn't seem like he has the power to remove them for cause in that situation.

MR. DREEBEN:  I think you would have both.  Your Honor posited a situation in which a particular investigative step or prosecution would cause a major foreign policy concern or a serious misallocation of resources.  I'm not sure why those things wouldn't be so inappropriate or unwarranted, under established departmental policy or practice, to justify countermanding, and nor do I understand why the good cause authority would not kick in.

These regulations, after all, were designed to strike a balance and provide confidence to the public for an internal departmental supervisory practice.  They're not meant to be provisions that would prevent the Department from actually carrying out legitimate functions or being hamstrung by a rogue Special Counsel if the --

THE COURT:  I'm not saying rogue.  I'm just saying when there are legitimate disagreements and they're close calls --

MR. DREEBEN:  Yes.

1     THE COURT:  -- who makes the call here?  It seems to

2  me, under this reg, the Special Counsel does, the way it's

3  written.  Again, another issue is, it doesn't say "shall."  It

4  says "should."  I'm looking at the reg.

5     MR. DREEBEN:  Yes.

6     THE COURT:  I realize you've got this great trump card

7  and that you can revoke all the regulations.  But just looking

8  at the reg, and you concede it's binding and has a force of law,

9  I'm just trying to understand, in those close calls on important

10  decisions, who has the final call?  Under the reg, as drafted,

11  it seems like the Special Counsel does.

12     MR. DREEBEN:  Within the scope of what the regulation

13  actually says, which is to provide a day-to-day structuring of

14  the investigation according to the Special Counsel, it does

15  provide that latitude.  It is, in that respect, I think, not

16  very different other than it's formalized, from the way that the

17  Department typically operates with U.S. Attorney's Offices.

18  U.S. Attorneys have very vast investigative and prosecutorial

19  freedom, in some ways vaster than the Special Counsel, to go

20  about conducting the investigations and prosecutions in their

21  district.

22     When disagreements arise, they're typically worked out

23  within Justice with a fairly heavy degree of deference to the

24  line prosecutors.  That's formalized in the regulations, but

25  it's not done in a way that eliminates the Attorney General's

1    authority to exercise the degree of supervision and direction

2    that's required by the appointments clause.

3           THE COURT:  Are there regs, by the way, that analyze

4    that relationship you've just described?  Because if there are,

5    I would be surprised if it talks about "so inappropriate" or "so

6    unwarranted."

7           MR. DREEBEN:  There aren't regulations that -- I was

8    describing, based upon my experience at the Department of

9    Justice, how the U.S. Attorney's Offices relate to the

10   Department on important issues.  There's a fair amount of

11   deference that's given to them.

12          THE COURT:  All right.  And so for that reason, I

13   shouldn't draw too much from the fact that "should" is used here

14   and "shall" is used throughout the entire Special Counsel

15   regulation but not in that provision?  It's twice in the very

16   same subprovision and seven times in the same provision.  Isn't

17   that variation meaningful here?

18          MR. DREEBEN:  No, I don't think that it is.  If you

19   look -- again, these are regulations that were promulgated to

20   govern internal processes within the Department of Justice.  So

21   it makes sense to interpret them against the backdrop of the

22   reason why they were promulgated and the purpose for which they

23   were adopted, as well as structurally other provisions that

24   relate to them.

25          THE COURT:  Do these track prior -- do they track

1    prior regulations that were put into effect for other special

2    counsels?

3           MR. DREEBEN:  These are general -- Part 600 are a

4    general set of regulations that the Department adopted when

5    Congress allowed the Independent Counsel Act to sunset.  It was

6    felt that there should be some mechanism, in particular

7    sensitive investigations, when the Department thought that the

8    usual chain of command could lead to public lack of confidence

9    in the integrity of the outcome, and it was beneficial to bring

10   in someone who had a degree of independence.

11       The experience with the Independent Counsel Act, even

12   though it had been upheld by the Supreme Court in *Morrison*, led

13   many observers to believe that independent counsels had too much

14   independence, that the fact that they were subject to

15   interbranch appointments by the courts led to an insufficient

16   degree of control by the President and through the Attorney

17   General over Special Counsel activities, and therefore, an

18   internal set of regulations was adopted that was designed to

19   kind of strike a balance in a fairly difficult situation:  How

20   do you have a prosecutor within the Department of Justice who is

21   not viewed as so beholden to the administration and the Attorney

22   General that the public would doubt that his work is

23   independent, while at the same time maintaining the

24   constitutionally mandated chain of command, President, head of a

25   Department being the Attorney General, and statutes that vest

1    the Attorney General with all the investigative authorities that

2    we're now exercising?

3        These regulations were the result of that compromise.  They

4    lean very heavily, compared to the Independent Counsel Statute,

5    towards authority by the Attorney General to supervise the

6    activities of the independent counsel.  He appoints them.  He

7    sets the scope of the jurisdiction.  Expansions of the

8    jurisdiction are at the mercy of the Acting Attorney General.

9        This is all in contrast to how the independent counsel

10   statute, which put the appointment authority with a fairly low

11   trigger, in a special division of the D.C. Circuit, and allowed

12   the Circuit to define the mandate that the independent counsel

13   exercised, and then virtually -- it limited supervisory control

14   over the independent counsel in the Department of Justice much

15   more severely than these regulations do.

16       Notwithstanding all that, the Supreme Court, in *Morrison*

17   *versus Olson*, held that the independent counsel there was a

18   inferior officer and had been validly appointed within the

19   meaning of the appointments clause.

20       So if you compared that benchmark against what's going on

21   under the regulations, even if your Honor's description and

22   understanding of the way that the regulations are written is

23   100 percent correct and the independent counsel may have a zone

24   of discretion where the Acting Attorney General has decided to

25   withhold direct supervision, it's far less of a degree of

1    independence than existed under the Independent Counsel Statute,

2    and it doesn't divest the Special Counsel of the character of

3    being an inferior officer.

4        If we back up to precedent, the *Edmond* case, which is the

5    case that the Court most recently spent some time articulating

6    the inferior officer criteria, it talks about there being

7    direction and supervision at some level of the officer who is

8    asserted to be inferior.  And in that case, the JAG had

9    administrative authority over the Coast Guard Court of Criminal

10   Appeals, and the substantive decisions of the Coast Guard Court

11   of Criminal Appeals were reviewable by the Court of Appeals for

12   the Armed Forces, but under a very narrow standard and not in

13   the plenary sense of every decision went up and every decision

14   that the Coast Guard Court of Criminal Appeals made was subject

15   to plenary review.  That wasn't the case.

16       In fact, there's a high degree of deference that's given to

17   factfinding and law application by the CAAF vis a vis the

18   Service Courts of Appeals.  The Supreme Court had no difficulty

19   saying there was an adequate amount of supervision.

20       So even if -- and I don't think it's entirely the way

21   things are in administrative practice.  But even if you viewed

22   the Attorney General as a sort of reviewing authority and the

23   Special Counsel as having a zone of discretion that was

24   immutable, that would still be consistent with the test in

25   *Edmond* for finding that there was adequate direction or

1    supervision to render the Special Counsel an inferior officer

2    under the meaning of the Constitution.

3            THE COURT:  All right.  So I just want to make sure

4    I'm clear on this.  It's your position that good cause would

5    exist if the Special Counsel did not follow an order from the

6    Deputy Attorney General?

7            MR. DREEBEN:  Yes.

8            THE COURT:  And if the good cause provision were to

9    render this unconstitutional, what would be the remedy?  Would

10   it be to strike the good cause provision?

11           MR. DREEBEN:  Well, hypothetically, I think that is

12   the way that the Court, the Supreme Court and the Court of

13   Appeals, have remedied other difficulties that they have found

14   with good cause provisions.  But if I can go back to the

15   antecedent question of whether the good cause removal provision

16   would be a problem, I don't think that it is.

17       When you actually look at *Edmond*, what *Edmond* talks about

18   is two things that define whether there is an inferior officer.

19   He has to have a relationship with a principal officer who is

20   presidentially appointed/Senate-confirmed, and there has to be

21   direction and supervision.  And the inferior officer does not

22   have authority to make binding decisions on behalf of the United

23   States without the opportunity for executive branch review by a

24   higher official.

25       So it doesn't actually talk about removal under any

1    standard as being an indispensable criteria.  What removal does

2    is provide a tool for direction and supervision, and that has to

3    be true because the Supreme Court has recognized time and again

4    that good cause protection for inferior officers is

5    constitutional.  It did that in a 19th century case called

6    *Perkins* -- at least I think it's 19th century.  *Perkins* was

7    cited both by the majority in *Morrison* and by Justice Scalia's

8    dissent as being a perfectly valid constitutional rule for an

9    inferior officer.

10        *Morrison* itself involved officers who were protected by

11   good cause, the independent counsel, and *Freytag versus*

12   *Commissioner*, which also involved officers that the Supreme

13   Court said unequivocally were inferior officers, the special

14   trial judges there were protected by good cause removal

15   features.  Otherwise, you would have to have sort of a plenary

16   system of at-will termination all the way down through the

17   federal system, at least until you reach the employee level.

18        That has never been what the Supreme Court has said.  It

19   requires an adequate tool for direction and supervision, and the

20   good cause removal provision that's in the regulations is

21   certainly that, even if it is not equivalent to at-will

22   termination.

23        To answer your question, yes, striking it would be the

24   appropriate result if the Court found that there was no way to

25   interpret it that was constitutional.  But if the Court thought

1    that it was a critical piece of the analysis, it should apply

2    both constitutional doubt as well as a deference to the Attorney

3    General who wants an adequate supervisory mechanism over the

4    Special Counsel and should conclude that it does not convert the

5    Special Counsel into a principal officer.

6        THE COURT:  What about the pardon power?  Does that

7    add anything to the analysis here in terms of the finality of

8    the Special Counsel's decisions?

9        MR. DREEBEN:  I am struggling to connect that to the

10   issue that we've analyzed on principal and inferior officers.

11   If the Court could help me understand the question.

12       THE COURT:  To what extent does -- could you make the

13   argument that the Special Counsel has the final decision here,

14   if you think that the regulations don't give enough supervision

15   by the Attorney General?  And if one were to conclude that, does

16   the pardon power have any relevance here whatsoever?

17       MR. DREEBEN:  I'm not sure that I'm prepared to go

18   there on that as a supervisory mechanism.  The pardon power is

19   available to the President to be exercised for reasons apart

20   from supervising ongoing prosecutions in court, and even

21   individuals who are pardoned might still be called as witnesses

22   in investigations.  So it doesn't seem to me that they're

23   coextensive powers.

24       Again, stepping back from the specific question about how

25   the regulations operate, we do think they do nothing to divest

1    the Attorney General of adequate supervisory authority to

2    maintain the status of the Special Counsel as an inferior

3    officer.  If your Honor wishes to hear our views on it, we do

4    think that because these are internal housekeeping regulations,

5    the acting Attorney General could revoke his appointment of the

6    Special Counsel if he wished, convert him either to a different

7    kind of official in the Department of Justice or simply revoke

8    the regulations altogether.  And that kind of a backup

9    supervisory mechanism would establish that, ultimately, the

10   Attorney General really can't give away the authority that's

11   vested in him by statute.

12       We do regard the regulations as providing a framework that

13   guides our relationship with the Acting Attorney General, so

14   long as they're extant.  But the same was true in *Nixon*, and the

15   Court was very careful to say that so long as the regulations

16   are extant, they have the force and effect of law.  In theory,

17   they could be revoked by the Attorney General.

18           THE COURT:  And I want to get there.  I just want to

19   hear from Mr. Martin first on revocability.

20           MR. DREEBEN:  Certainly.  Thank you.

21           MR. MARTIN:  Thank you, your Honor.  I'm not quite

22   sure where to start.

23           THE COURT:  So I'm interested in your interpretation

24   of the regulation and whether it has adequate -- the Special

25   Counsel is adequately supervised, has final decisionmaking

1    authority, and is removable.

2             MR. MARTIN:  So I think our view on the regulations is

3    that they fall short of what would be necessary to take Special

4    Counsel into the inferior officer category, and rather, they are

5    demonstrative of the fact that he's a principal officer under

6    the analysis in the *Intercollegiate* case or in *Edmond*.

7         But before I unpack that, what happened this morning in

8    order to bring these regulations to bear was like the statutory

9    construction issue.  We went off an objective analysis of what

10   the regulations actually say and were told that this

11   experiential supervision is an effective substitute.

12        Our position on that would be that you can't drift over

13   there in making the constitutional analysis that is in front of

14   the Court.

15             THE COURT:  Do I have to give deference to their

16   interpretation, to the extent the regulations aren't clear?

17             MR. MARTIN:  No, not on the issue of, first of all,

18   the authority to issue the regulations in the first instance,

19   and second, the constitutional questions are for this Court.

20   And that is the first point that I wanted to make.  If Special

21   Counsel has the unregulated authority without the benefit of any

22   supervision check or balance and it's only the Attorney General

23   who, operating on his or her own, can make it up as they go

24   along -- this is our separation of powers argument -- that that

25   is more authority than the framers intended to give the

1    executive branch in this setting, and I think that confirms it.

2         The second thing is that constitutional analysis, where

3    you're dealing with the kind of limitations and checks and

4    balances on government power that we are talking about, is not a

5    trust-me environment.  The Supreme Court has made that clear.

6    None of the canons of construction that defend the

7    constitutionality of statutes that are on the fringes deal with

8    the idea that you can make it up as you go along and continually

9    fend off constitutional challenges with this kind of

10   manipulation.

11        The constitutional boundaries in the appointments clause

12   and the separation of powers, in fact, are designed to stop

13   that.  And you have to look, as the cases that deal with this

14   principal officer analysis point out, at objective factors that

15   are in place that actually govern what the principal or inferior

16   officer might do.

17             THE COURT:  So why aren't these regulations enough?

18   Why aren't they sufficient?

19             MR. MARTIN:  So I will just make one point, starting

20   at the top, and that is that the analysis here, we think -- and

21   I think the government agrees -- at least starts with, we would

22   say stops with the three factors that are emphasized in

23   *Intercollegiate*.  And that's final, binding decisionmaking

24   authority, supervision of the work, and finally, removability.

25        So taking those in order, I think the summation of these

1    regulations as to the Attorney General's authority is, the

2    Special Counsel has to consult with the Attorney General, but

3    pretty much it all stops there.

4            THE COURT:  No, no.  To be fair, it's more than that.

5            MR. MARTIN:  Well, to be fair, the consultations take

6    place.  The explanations take place.  But the final

7    decisionmaking authority at the end of the day on the first

8    factor rests firmly with the Special Counsel.  The power to

9    investigate, who to investigate, the terms of the investigation,

10   the sovereign power to enforce the criminal law here is

11   expansively given to Special Counsel, and that's not disputed.

12           THE COURT:  So you disagree with Mr. Dreeben that the

13   Deputy Attorney General can countermand the decision made by the

14   Special Counsel here under these regulations?

15           MR. MARTIN:  Yes, I disagree with that, based on the

16   express language in the regulations themselves.  There is no

17   regulation that gives the Deputy Attorney General that

18   authority.  When it comes down to it, if there is disagreement

19   under the express language in the regulations, there is

20   consultation, and then there is go to Congress.  That's it.

21   That's the objective universe we're dealing with.  And this is

22   why I come back to these constitutional commands that overlay

23   this.  If that gets to change, then we are living in a world

24   that even this Court can't navigate.

25       Now, the point I will add to that is, you can't take, on

this decisionmaking authority, too much refuge in the notion

that this is analogous to what U.S. Attorneys do.  First, we

know that the decisionmaking authority here is broader.  There

are less checks on it, and it's certainly --

THE COURT:  In what way than a U.S. Attorney?

MR. MARTIN:  A U.S. Attorney, in the decisionmaking

they actually undertake in cases, there is direct supervision of

the work.

THE COURT:  By whom?  They're pretty independent, U.S.

Attorneys.  Who is reviewing the decisions on indictments, for

example?

MR. MARTIN:  I don't want to trap myself here.  To the

extent that there is great independence in the U.S. Attorneys,

we would argue that they, too, are principal officers, a

question that the D.C. Circuit has not addressed, nor has the

U.S. Supreme Court.  This plenary authority to prosecute is a

powerful tool.  It is significant decisionmaking authority.  The

difference that I wanted to emphasize is the U.S. Attorneys

undertaking that plenary role are subject to the appointments

clause in the principal officer category.  They have to be

appointed by the President, approved by the Senate.  We're not

operating in that environment now, and that's the reason we need

more rigorous scrutiny on this particular piece of it.

Now, when you step back and look at the actual final

decisionmaking authority for these important prosecutorial steps

one by one under these regulations, they rest with the Special

Counsel.  And that's by design.  And there's great deference

given to it, and that's the bottom line.  And we know this is a

significant power.  It is authority nationwide in scope.  It

allows for the definition of what will be prosecuted, who will

be prosecuted, and in that sense, the comparison to

*Intercollegiate* is meaningful.  The authority that rests with

the Special Counsel here is, we submit and we've argued, in

excess of the decisionmaking authority that ultimately rested

with the judges in *Intercollegiate*.

Now, turning to supervision, which is the next prong, it's

supervision of the work -- not supervision writ large but of the

work.  And yes, *Intercollegiate* and *Edmond* say at some level.

But that isn't some watered-down de minimis standard that means

nothing.  We are dealing with a constitutional limitation, and

that constitutional limitation is intended to protect against

the diffusion of the appointment power where it should not go.

So when we look at the supervision here, what do we have?

Again, looking at the regulations, they require the Special

Counsel to provide information in reports.  They give some

control over the budget.  They require the Special Counsel to

notify the Attorney General of significant events.  But none of

that equates with supervision and direction of work.  The

discretion in the investigation still lies with the Special

Counsel.  The ability to terminate the investigation also

doesn't say anything about the discretion as it's being
exercised.

The one provision we get back to is 600.7(b).  That's the
only one where the prosecutorial steps are involved.  And the
plain text of that again doesn't require a countermanding kind
of thing.  It doesn't even suggest that.  If things should not
be pursued, you go to Congress.

So on the second factor, where we end up is, again, with a
largely unsupervised, maybe completely unsupervised individual
exercising extraordinary power who is not analogous to the
attorney that was in the *Morrison* case, as our briefing has
demonstrated, in terms of the grant of decisionmaking authority
and the extent of the unsupervised activity.

Without that grant of authority specifically, you can't get
to our; right?  Because clear regulations don't provide a basis
for interpretation.  The Court has pointed out the linguistic
problems with the argument extending it.  In addition to that,
our is not the source of modification or removal or change in
terms.  And that is, in fact, what is going on here.  And then,
as I said, when it comes down to constitutional matters, our is
not a source, of course, to undermine what the Constitution
would otherwise require.

On the removability point, we can't make good cause removal
go away, at least for purposes of the initial analysis.  It's in
there.  And that, of course, is treated by *Intercollegiate* as

1    something that confirms a principal officer status for the

2    reasons that the case lays out and are intuitive.  It is not a

3    dispositive issue at the end of the day.  The principal officer,

4    if they are operating with final decisionmaking authority and

5    with unbridled discretion and really not supervision at some

6    level, that is -- that goes to the actual work, the

7    decisionmaking.  Then we can still get to the principal officer

8    analysis.  But for purposes of the regs themselves, the good

9    cause removal provision works in favor of principal officer

10   status, as *Intercollegiate* suggests.

11        Now, there has been this argument about well, we will just

12   make it all go away, the regulations could be withdrawn, and

13   after all, that reservoir of power is out there.  That argument

14   was raised in Judge Howell's opinion as well.  And again, if

15   that is going to be in the mix here, we would love the

16   opportunity to say something specific about it in writing.

17            THE COURT:  What is in the mix is this issue that the

18   government raised, I think, in a footnote.  That is very much

19   before the Court, and I want to hear your argument on that, and

20   Mr. Dreeben as well.

21        Aren't your arguments on the regulation academic if, in

22   fact, the Attorney General can revoke the regs at any time or

23   modify them?

24            MR. MARTIN:  Right.

25            THE COURT:  So is it all academic?

1          MR. MARTIN:  So it's not academic for separation of

2     powers.  Start there.  If the Attorney General has this

3     unbridled authority, we submit that the *Freytag* and *Light* cases

4     in our separation of powers argument demonstrate that this is

5     the time for the Court to independently step in and be

6     concerned.

7          But for purposes of the appointments clause analysis, your

8     Honor, we would submit that this argument proves too much, and

9     it would, in fact, nullify the appointments clause, because what

10    you would have is a situation where the Court would undertake

11    the analysis, conclude that somebody was a principal officer

12    based on their decisionmaking authority and the discretion that

13    they exercised, and then say, well, none of that matters,

14    because maybe or hypothetically this termination power over the

15    regulations, et cetera, could exist.

16         If the appointments clause operates in that hypothetical

17    environment, then the principal officer analysis that the cases

18    have labored over would be a lot more truncated and a lot

19    shorter.  So why isn't that in there?  And that's because the

20    appointments clause has to operate in the present.  There is no

21    concept of harmless error hanging over this.  If I'm a victim of

22    a bad appointment that is not authorized by the Constitution and

23    that's the action in the case that happened, then

24    hypothetically, the fact that that might not have happened if

25    there had been no regulations or if I had been terminated under

some power that wasn't exercised, you cannot take away the Constitution.  I get that protection under the law.

The appointments clause applies to existing objective sources of law that govern an officer's removal, not some hypothetical future circumstance.  So no one has equated that theoretical situation with a termination mechanism that's relevant in the analysis.

Again, that would cut across all agencies.  It would be an incredible state of affairs for the law to operate in, because in theory, the head of all the departments may, indeed, have this power at the end of the day to act in the hypothetical, but we are operating in the concrete.

I would submit that that's the same problem with simply striking the good cause provision.  First of all, the government has not suggested that that's a remedy to the appointments clause violation here.  It's not in their briefing.  And second, it still wouldn't rob the appointment in this particular case of its unconstitutionality.  It might fix something downstream in the future for another analysis, but in the here and now, Concord should still be entitled to make this argument.

THE COURT:  Okay.  What about if the Attorney General were to revoke the regulations?  Could that be challenged in court?

MR. MARTIN:  Well, that's a good question.  I don't know, because the way the Attorney General views his authority

1    is that no one can challenge his regulations.  They operate on

2    him as a matter of law as long as he wants them to.  I'm not

3    sure where you would get standing to do that, but if they were

4    revoked and that became important in a case, then it could be

5    litigated in terms of what its effect is.  But that is, again,

6    very much in the hypothetical.

7            THE COURT:  Okay.  All right.  Thank you, Mr. Martin.

8        Mr. Dreeben, do you want to address the --

9            MR. DREEBEN:  Revocation?

10           THE COURT:  -- revocation?

11           MR. DREEBEN:  Yes, your Honor.  Can I make three brief

12   points in response to him?

13           THE COURT:  Sure.

14           MR. DREEBEN:  The first is, Concord's theory seems to

15   be that the Attorney General has to basically be supervising

16   every single move that the Special Counsel makes in order for

17   the Special Counsel to be an inferior officer.  I think that

18   overlooks the fact that the line between employees and officers

19   is that officers exercise significant authority pursuant to the

20   laws of the United States.  Employees don't.

21       If Concord's theory of supervision were correct, it would

22   mean that the Special Counsel would have to be an employee,

23   subject to really day-to-day control of the Attorney General, to

24   not slip over the line into principal officer status.  I think

25   that just ignores that officers do have significant authority

inherent in them.  And then the line that exists between inferior officers and principal officers, they would erase that line, I think, if the Court adopted that test.

The second point is that -- and this does go to the revocation of the regulations.  They analogize it to a situation where Congress could repeal a statute.  It's not analogous to a situation where Congress could repeal a statute, where an official of the executive branch has authority today, in the here and now, under a statute that is so limited in a way that converts a nominally inferior officer into a principal one.  The executive branch is operating under an unconstitutional arrangement at that time if the individual hasn't been appointed by the President and confirmed by the Senate.

What we are talking about here is an executive branch official, the Attorney General, who is already armed with statutory powers to delegate his authorities to a subordinate prosecutor.  All the functions of that prosecutor are vested in the Attorney General.  That's 509 and 510.  Those statutes exist today.  The regulations are subordinate to the statutes.  They do not add any power and they cannot take any power away from the Attorney General.

So I agree with Concord's formulation that you need to look at objective existing sources of law, but where I disagree with Concord is they write out of the picture the statutes that have vested in the Attorney General certain functions.  He hasn't

spiraled them off and given them to somebody outside his

control.  He has appointed somebody who is within his control.

And then the regulatory framework was adopted under

provisions that make clear that it was for the organization and

management of the Department.  They didn't have to go through

notice and comment.  They didn't go through notice and comment.

They're not substantive rules that are governing the primary

conduct of citizens out in the world.  They're something that

helps the Department of Justice fulfill the mission that's

conferred upon it by statute.

And if the Attorney General concluded that those

regulations, like any policy of the Department that's not

mandated by a statute or the Constitution, interfered with his

accomplishment of his statutorily defined mission, he can

supersede those regulations, he can revoke the regulations, he

can modify the regulations.  None of that requires any notice

and comment.

THE COURT:  So does that power effectively make the

Special Counsel an at-will officer?

MR. DREEBEN:  For constitutional purposes, I think

that it would, because the Special Counsel is aware today that

we're operating under a framework of regulations that, so long

as they are in force, are -- have the force of law, and they

govern the relationship, and the country can be confident that

the Special Counsel has the degree of independence that the

1    regulations describe.  But if the Attorney General concluded

2    that they were interfering with or were contrary to the

3    obligations that he has under the statutes that define the

4    Department of Justice's mission, they could be revoked.  We know

5    that.  We know that today.

6        So in effect, the real-world constellation of statutes and

7    laws that applies to the Special Counsel consists at the highest

8    and most binding level of the statutes that define the Attorney

9    General's obligations and powers and authorize him to delegate

10   them to a subordinate official.  He's done that.  It's done

11   within the framework of a set of regulations which serve, I

12   think, an extremely useful purpose in the Department, fulfilling

13   its mission of conducting an independent, thorough investigation

14   in which the public can have confidence in its integrity.  But

15   they're all done in a subordinate fashion to the statutes.  The

16   regulations cannot supersede the statutes.

17       THE COURT:  So tomorrow, the Attorney General could

18   revoke the regulation and put in effect a new one that required

19   a much greater amount of supervision than the current one does?

20       MR. DREEBEN:  He could do that this afternoon.  I hope

21   that he does not.

22       I think that there is a reason why the balance was struck

23   in these regulations, and there would be consequences that are

24   nonlegal to superseding the authority of the Special Counsel.

25   That's, in part, the way that the balance was struck in these

1    regulations.  The reporting to Congress, if a Special Counsel is

2    terminated, was designed to be a check of transparency upon an

3    unwarranted or inadvisable move to interfere with an official

4    who has been formally tasked with conducting a reasonably

5    independent investigation within the existing structures of the

6    Department of Justice.  But those consequences are basically

7    political and public confidence checks, not legal checks on the

8    authority of the Attorney General.

9        I don't think the Attorney General has the power to divest

10    himself of responsibilities that are reposed in him by statute.

11    That's what Congress did.  It created an office in the

12    Department of Justice.  It assigned all the functions in the

13    Department of Justice to be vested in that official.  He can't

14    give that away, but he can come up with internal structures that

15    are designed to limit him, so long as they are in force in a way

16    so as to promote public confidence.

17            THE COURT:  Mr. Dreeben, do you want to respond in any

18    other way to the separation of powers argument or the third

19    argument that Concord makes about the appointment being

20    inconsistent with the regs?

21            MR. DREEBEN:  Well, I think their separation of powers

22    argument is really derivative of their other arguments, and it's

23    founded on the idea that the Special Counsel is somehow some

24    headless fourth branch operating with autonomy and in blissful

25    independence of the Department of Justice, both legally and

1    practically, and I think practically may well be relevant to the

2    Court's understanding of how the regulatory framework is

3    designed to proceed.  That's just not so.  We are within the

4    Department of Justice, very much so.

5        So I don't think the separation of powers argument adds

6    anything to their appointments clause arguments, and it does

7    have to be assessed against the backdrop of *Morrison*, which is

8    still a binding decision of the Supreme Court in which the Court

9    considered a far more threatening arrangement to the separation

10   of powers, in which Congress had transferred appointment

11   authority out of the executive branch and had very severely

12   limited the ability of the Attorney General to supervise the

13   independence of counsel's activities.

14       And the Court held that it didn't impermissibly undermine

15   the authority of the President to ensure the faithful execution

16   of the laws and was, therefore, not a separation of powers

17   problem.  If that is true, we are far less of a threat to the

18   separation of powers.  We're all within the executive branch.

19   Even if *Morrison* were reconsidered, I still think we are exactly

20   what proponents of a unitary executive would argue for, a

21   prosecutor that's appointed by and subordinate to the Attorney

22   General.

23           THE COURT:  On the *Morrison* point, doesn't the Special

24   Counsel have much broader duties and powers than the one in

25   *Morrison*?

1          MR. DREEBEN:  Alexa Morrison herself was appointed to

2     investigate a pretty discrete area, and I would agree that the

3     Special Counsel's mandate in this context covers more issues and

4     more personalities.

5          But the way the Supreme Court analyzed it was not by

6     reference to the specific assignment that Alexa Morrison had

7     been given by the Special Division, but by the statutory

8     authorization of powers.  If you go back and look at the

9     independent counsel statute, it was designed to cover sensitive

10    investigations involving the highest officials in government up

11    to the President, and the independent counsel had the authority

12    to prosecute any class A violation of criminal law and, I think,

13    some misdemeanors in certain circumstances as well.

14         So the breadth of the statutory authorization was very

15    significant.  The Court, nonetheless, concluded that it's

16    discrete in that it's a single-focus mission that's assigned to

17    a prosecutor who will have a reasonably determinable end date,

18    and therefore, it's not like another mini Attorney General or a

19    U.S. Attorney that is set up in the field.

20         I'd add, on the U.S. Attorney point that the Supreme Court

21    actually has commented, in the *Myers* decision, that U.S.

22    Attorneys are inferior officers.  So it's not quite true that

23    the courts have not grappled with that, and I think --

24              THE COURT:  It is pre-*Edmond*; right?

25              MR. DREEBEN:  Yes, it is pre-*Edmond*, but I think it

was in the context of, perhaps, the most ambitious decision of
the Court on the need for presidential control of executive
officers, principal executive officers who don't fall into the
categories that *Humphreys Executor* and *Morrison* later dealt
with.

So I think it's good law.  The circuits that have looked at
it have said the same thing.  Even if you ran it through
straight *Edmond*, the Attorney General supervisory authority over
U.S. Attorneys is not in practice exercised on a day-to-day
basis, as it couldn't possibly be, given 92 U.S. Attorneys and
one Attorney General.  But statutorily, he has direct
supervisory authority over them.

And going back to that 1870 act that we talked about
earlier, that was one of the purposes of it.  The Attorney
General previously had had the responsibility to represent the
United States in the Supreme Court, and the District Attorneys
were out there enforcing law in the hinterlands.  And in 1870,
Congress said, we actually want a unified system of
administration of federal justice, and the District Attorneys
are now subject to supervision and accountability to the
Attorney General.  It's been that way ever since.

And the accountability constitutes direction and
supervision.  To some extent under *Edmond*, the power to issue a
final decision on behalf of the United States and a U.S.
Attorney, in practice, yes.  As a matter of legal structure, no,

1    because the Attorney General can countermand what they do.

2    That's enough, I think, to put them in the inferior officer

3    category.  If a U.S. Attorney is in an inferior officer

4    category, I think surely the Special Counsel is as well.

5            THE COURT:  So what about the appointment order here

6    and their argument that it's inconsistent with the regulations?

7            MR. DREEBEN:  First of all, we don't think that

8    there's any justiciable question there, because the regulations

9    themselves state that they don't create any rights that are

10   enforceable in any civil, criminal, or administrative action.

11   That's consistent with the way that the Court of Appeals for

12   this district, as well as Courts of Appeals across the country,

13   have treated internal departmental rules that weren't intended

14   to be binding.

15       I think this Circuit has authority in the Judith Miller

16   case dealing with the media subpoena regulation, which has a

17   similar disclaimer of rights creation.  And the Court said,

18   consistent with the Supreme Court's decision in *United States*

19   *versus Caceres*, that as long as it's not required by the

20   Constitution or statute, a regulation that governs internal

21   processes of a department or agency need not be enforced by a

22   court.

23       The U.S. Attorneys' Manual is not enforced by courts.  So

24   if their argument is relying on hey, the appointment order

25   somehow strays beyond the regulation, our response is, the

regulation doesn't create a source of rights for you.  It

created a vehicle for the Attorney General to appoint and manage

a Special Counsel and to convey to the public, I've done

something that provides a degree of independence so that you,

the public, should be reassured this investigation will be done

in the right way.

So I don't think there are any rights that are created

under the regulations to say the appointment order is

inconsistent with it.  And I don't think that they have much of

an argument that's relevant here, even if you give it the

greatest degree of credence possible, that would affect them.

The core of this order was an appointment of a Special

Counsel to investigate the Russian government's efforts to

interfere with the 2016 Presidential election and any links

and/or coordination with persons associated with the campaign of

President Trump.  So the starting point for this core area of

the investigation was the Russian government's effort to

interfere with our election.  The interference activity on

behalf of the Internet Research Agency, which Concord is alleged

in the indictment to have supported financially and in a

position to supervise, is interference activity that causes

great concern.  And our core mission required us to ask the

question, is it associated with the Russian government?  To what

degree is it supported or coordinated with other Russian

government interference activities?  So that falls within our

1    investigatory mandate.  And then paragraph D of the appointment

2    order says we have authority to prosecute things that emerge or

3    arise from our investigation.

4        So we investigate the matter to determine its connection to

5    the Russian government and its effect on the -- whether it

6    violated United States law in interfering with the election, and

7    that gives us the authority to prosecute the crimes that are

8    alleged in the indictment.

9        So even if the Court were to turn to the merits, the

10   appointment order itself is not inconsistent with the

11   regulations in any respect.  In the *Manafort* case, there was a

12   challenge to a paragraph that's really not at issue here that

13   allowed the Special Counsel to investigate matters that arose

14   from or may directly arise from the investigation.  And there

15   was a claim that that was too nebulous to be consistent with the

16   requirement that the Acting Attorney General provide the Special

17   Counsel with a factual statement that defines the jurisdiction.

18       But here, we have been provided amply with a central

19   mission that is backed by reference to the investigation that

20   FBI Director Comey confirmed in March 20th, 2017, testimony that

21   the FBI was investigating Russian interference and connections

22   to the Trump campaign and whether any crimes were committed, and

23   the order references that.  And there have been ongoing

24   consultations between Special Counsel and the Acting Attorney

25   General to define exactly what that jurisdiction is.

1          So even if the Court were to go on to reach the merits, I

2     don't think that this is a difficult case in being within the

3     core of the Special Counsel's jurisdiction.

4               THE COURT:  Thank you, Mr. Dreeben.

5               MR. DREEBEN:  Thank you.

6               THE COURT:  Mr. Martin, anything you want to add to

7     issue number 2 or 3?

8               MR. MARTIN:  Just quickly, your Honor, and thank you.

9          We are talking about a structural defect under the

10    Constitution here, as reflected in the appointments clause and

11    the separation of powers principles that we've cited.

12         The authority that has been accreted to the Attorney

13    General in this argument is inexplicable in light of history, in

14    light of the statutory scheme, in light of all the angst over

15    the Independent Counsel Statute, because according to the

16    argument this morning all of that is irrelevant because the

17    Attorney General has this authority and he has regulations that

18    matter or they don't matter, depending on the expediency of his

19    argument.

20         The Constitution can't be amended.  The appointments clause

21    says what it says.  Its requirements as implemented by the case

22    law are constraints on the government.  This Court should

23    enforce them, for the reasons that we have indicated.

24         Down to the regulations.  In our last argument

25    specifically, I did not hear a response that addressed the very

1    discrete areas where we said there was a lack of compliance with

2    these now meaningless regulations that apparently were support

3    for the appointment order but aren't support that are now

4    unnecessary.  I'm not quite sure what it is.

5        But those arguments stand on their own footing,

6    notwithstanding the speech that was made concerning the scope of

7    the investigation or otherwise.

8                THE COURT:  Thank you, Mr. Martin.

9                MR. DUBELIER:  Your Honor, may I raise a procedural

10   issue?

11               THE COURT:  Sure.

12               MR. DUBELIER:  Your Honor, we have an unusual

13   circumstance here that I've never seen before, and I'm pretty

14   old.  We brought this issue before the Court a number of weeks

15   ago, and the Court gave us an enormous amount of time to plead

16   and arrange for this argument.  And obviously, the Court read

17   and spent an enormous amount of time with our pleadings.

18       In the meantime, another litigant before this court, a guy

19   named Miller, challenged the grand jury subpoena that was issued

20   by the Special Counsel and, in doing that, filed a pleading

21   before a separate judge of this court incorporating by reference

22   our pleadings that were pending before your Honor.

23       Even though that far exceeded the page limitation that that

24   litigant would have been allowed, the other judge of this court,

25   Judge Howell, allowed that to occur and then basically ruled on

1    our motion in secret, without us ever having the opportunity to

2    appear and argue before her, also without ever having the

3    opportunity for you or us to see the pleadings that were filed

4    in that case.  We haven't seen what the Special Counsel argued

5    in that case.  We haven't seen what Miller argued.

6        And the irony of this all being done in secret, your Honor,

7    is troubling to me as well, because both Miller and his lawyer

8    stated publicly they were going to challenge the subpoena.  And

9    as we all know, as a practical matter, the only reason you have

10   grand jury litigation under seal is to protect the witness, so

11   the witness's identity is not known if they get a grand jury

12   subpoena and you don't want some negative association to attach

13   to that.

14       So further, what we have then is Judge Howell taking our

15   pleading in a case where we can't appear and we can't argue and

16   we don't know what the parties have argued, because we haven't

17   seen the pleadings, and then ruling on it three days ago, in

18   secret.

19       I don't believe in coincidence.  I never have.  So our

20   hearing was originally scheduled for Wednesday of this week.

21   The Special Counsel asked that that be extended to today.  So

22   basically, they set up a situation where two days before we have

23   a hearing here, they get the order from Judge Howell.  They have

24   it Tuesday night.  We don't get it until less than 24 hours ago,

25   and I know your Honor doesn't get it until less than 24 hours

1    ago as well.

2              THE COURT:  Same situation, yes.

3              MR. DUBELIER:  What I am saying, your Honor, is, I

4    believe this weighs heavily in favor of supplemental briefing

5    here.  And that is, what I would request is 30 days to file

6    supplemental briefing on the issues that were argued and

7    whatever was addressed in Judge Howell's opinion.

8         I would ask that those be -- again, your Honor, I know

9    you're -- I would ask that we be able to do that for this

10   reason:  We should have the ability to see the pleadings that

11   were filed in that case, and I believe this Court has the

12   authority to order the Special Counsel to go to Judge Howell

13   and argue that those pleadings be unsealed and the oral argument be

14   unsealed.

15        And we should have the ability -- even though the opinion

16   is not binding on you and you said it's not, we should have the

17   ability to go into where we believe Judge Howell is wrong -- and

18   we do; we believe the opinion is wrong.  And we should have the

19   ability to come before the Court and tell you why that opinion

20   is wrong.

21        And your Honor --

22             THE COURT:  What if I say I'm not going to consider

23   the opinion at all?  Does that remedy the issue?

24             MR. DUBELIER:  The difficulty with that, your Honor,

25   is -- let me state it in this way, because I think it's the

1    fairest way to state it:  If you say you're not going to

2    consider it, I have to trust you that you're not going to

3    consider it, and I do trust you if you say that.

4         The complexity, though, is the opinion is out there.  It's

5    publicly available for anybody to read.  And candidly, I'm

6    dealing with -- and this is not your problem; it's my problem.

7    But I just want to tell you in reality what the problem is.  I

8    have a Russian client who doesn't speak English and doesn't

9    understand U.S. law.  And when they see the sequencing of what

10   happened in the last three days, that's really darn hard to

11   explain to somebody.  It's hard to explain to an American person

12   how this could happen, where a judge of another -- in another

13   courtroom in this court would take a pleading that we have filed

14   and is pending before your Honor and rule on it, secretly, and

15   then dump the opinion on us the day before we have oral argument

16   before your Honor.

17        Now, look, it is absolutely apparent to me that whatever is

18   in that Howell opinion means nothing to you, because that's

19   evidenced by the questions you've asked us today.  But again,

20   your Honor, let me say this:  If you are making that

21   representation that you're not going to consider the opinion, I

22   take you at your word, and I would never question that word.

23   But I will say, the opinion is out there publicly.  There are

24   issues and holdings in that opinion that are fundamentally

25   wrong.  And I think the complexity here, your Honor, is to the

1   extent you say you're not going to rely on it, well, if there

2   are parts of that opinion that are wrong and we can

3   demonstratively prove to you that they're wrong, wouldn't you

4   rather have that information than not have it?

5        And I'm saying this, your Honor, in the context of, we have

6   other pleadings pending before you.  We don't have a trial date

7   yet.  I'm not trying to create more work for you.  But I do feel

8   like, you know -- limit us to 20 pages --

9             THE COURT:  20 pages?

10            MR. DUBELIER:  -- or 10, 15 pages.

11            THE COURT:  Five, five.

12            MR. DUBELIER:  It took Judge Howell 93 pages to

13   explain something.  I've had many judges of this court tell me,

14   Mr. Dubelier, if you need 93 pages, I know you've got a serious

15   problem here.  Okay?  So we have this giant opinion.  I don't

16   know whether it's cut and pasted from their pleadings.  And so

17   your Honor, even if you give us five pages, if you give us time

18   to digest that opinion, respond to it -- and I do believe also,

19   and I'm orally moving and I'm happy to supplement it in

20   writing -- I think you have the authority to order the Special

21   Counsel to move that the pleadings and argument that occurred

22   before Judge Howell be unsealed.  They're a party to that.  I

23   can't go do that, but they can do it.

24            THE COURT:  All right.  I will let the Special Counsel

25   be heard on this.  Thank you, Mr. Dubelier.

1          MR. DUBELIER:  Thank you, your Honor.

2          MR. DREEBEN:  Thank you, your Honor.

3     First, I want to clear up one thing that had come up in the

4     first part of the argument.  I asked for an extension of the

5     argument date totally independent of any other proceedings.

6          THE COURT:  You didn't know that a decision would be

7     rendered this week?

8          MR. DREEBEN:  No, no.  When I asked for that, it was

9     when I realized that they had obtained authority to file a

10    30-page reply brief two days before the hearing.

11         THE COURT:  You're a great appellate advocate,

12    Mr. Dreeben.  Two days isn't enough?

13         MR. DREEBEN:  No.  I was coming off another experience

14    where a little bit more time seemed advisable.  We asked them,

15    and they consented, and it was -- that was my reason.

16         THE COURT:  Let's move on to the substance of his

17    argument.  What is your response?

18         MR. DREEBEN:  I will have discussions with the parties

19    and the Court about unsealing what can be unsealed from what is

20    otherwise a sealed grand jury proceeding.  So to the extent

21    Mr. Dubelier is interested in pleadings, to the extent that they

22    can be made public, consistent with Rule 6(e) and Chief Judge

23    Howell's analysis, they will be.

24         THE COURT:  Don't those pleadings have to go before

25    her and not me?

1        MR. DREEBEN:  Yes.  That's a grand jury matter that is

2    pending before her.  It's governed by separate rules of criminal

3    procedure.

4        THE COURT:  Well, we can't talk about it, but anything

5    more you can say at this point?

6        MR. DREEBEN:  I think that problem will resolve

7    itself.

8        THE COURT:  Expeditiously?

9        MR. DREEBEN:  Yes.  Everything in the grand jury

10   happens expeditiously because of the imperative need for speed

11   in a grand jury proceeding.  That was not within the

12   government's control, and I could make a separate submission to

13   you in-camera on that issue, if the Court desires.

14       As far as the content of what's going on here, all of the

15   statutes and the opinions that are at issue in Chief Judge

16   Howell's opinion, *Morrison*, *Edmond*, they're all thoroughly

17   briefed here.  If the Court thinks it would assist the Court in

18   receiving supplemental briefings --

19       THE COURT:  I don't think it would assist me at all.

20   I have plenty of briefing here.  However, Mr. Dubelier does have

21   a point here.  He hasn't seen the briefs in this.  And yet I'm

22   reluctant to delay my ruling in this case.

23       MR. DREEBEN:  I think the briefing in the sealed

24   matter isn't going to change anything.  But it will be

25   presumably expeditiously unsealed, for the same reason that it

1    was possible to unseal the bulk of Chief Judge Howell's orders.

2    It doesn't actually reveal matters that occurred before the

3    grand jury.  It's just legal argument.  I don't think they're

4    going to find a lot of new material there.

5        The government's position on this is, basically, we are at

6    the disposal of the Court.  We're not going to object if the

7    Court wants to receive additional briefing, although we would

8    hope --

9            THE COURT:  I really don't want additional briefing.

10            MR. DREEBEN:  We're not asking for it.

11            THE COURT:  He's asking for it; I'm not asking for it.

12            MR. DREEBEN:  And we're not taking a position on it

13    one way or another, because it just doesn't seem to be a matter

14    for us to address.  But we will advise the Court and

15    Mr. Dubelier as soon as any unsealing of pleadings or argument

16    occurs.

17            THE COURT:  If that is in the works, I would encourage

18    the Special Counsel to encourage prompt release so that it

19    doesn't delay these proceedings.

20            MR. DREEBEN:  We're on the same page, your Honor, and

21    we will do that.

22            THE COURT:  All right.  Mr. Dubelier?

23            MR. DUBELIER:  One more procedural issue, your Honor.

24    You mentioned you hadn't gotten to the firewall counsel issue.

25            THE COURT:  Yes.

1          MR. DUBELIER:  I understand that, because you were in

2     trial.  I want to make sure you understand the sequencing there

3     and where I pause on this as well.  And that is, we asked the

4     Special Counsel in the beginning of the week who the firewall

5     counsel was.  They told us they had already submitted that

6     information to you.

7          THE COURT:  Yeah, and let me explain that.  There was

8     a snafu with the ECF filing system.  So they did, in fact, try

9     to submit it.  And I don't know whether the problem was on the

10    Court's end or in space, but it was not received by the Court

11    until Wednesday evening.  So that's -- they did provide it much

12    earlier in the week.

13         MR. DUBELIER:  That answers my question, your Honor.

14    So I appreciate that clarification.

15       One other issue, though, is, I don't understand what their

16    authority is to do that in secret.

17         THE COURT:  Does Special Counsel want to be heard on

18    this?

19         MR. KRAVIS:  Good morning, your Honor.  Jonathan

20    Kravis for the United States.

21         THE COURT:  Good morning, Mr. Kravis.

22         MR. KRAVIS:  As the Court is aware, the government did

23    file, along with the firewall counsel letter, a motion to make

24    that filing ex parte and under seal.  The motion that we

25    filed -- that the government filed with the Court sets forth the

1     basis for the government's belief that an ex parte sealed filing

2     was appropriate in that matter.

3          The only thing I would add to that is that I believe that

4     from the Court's comments on the litigation over the protective

5     order at the last status hearing, and in the Court's order

6     granting the government's motion for the protective order, the

7     Court had not contemplated that defense counsel would play a

8     role in the selection of the firewall counsel him or herself.

9          THE COURT:  I don't contemplate that at all.  However,

10    I don't know exactly what Mr. Dubelier is seeking here.  I think

11    you're to recommend someone to me for my consideration.

12         Mr. Dubelier?

13         MR. DUBELIER:  Your Honor, exactly.  So why is that a

14    secret?  That's what I'm trying to understand here, why they

15    have the ability to come to you and say, here's the

16    recommendation and it's a secret, we don't want them to know who

17    we have recommended, we don't want them to know why --

18         THE COURT:  Here's what I am going to do,

19    Mr. Dubelier:  I'm going to give you until Monday to file

20    something making your argument on this.  I'm going to give the

21    government until Wednesday to respond, and I will make a

22    decision at that point on whether this is open to you.

23         MR. DUBELIER:  Fair enough.

24         THE COURT:  But realize, this is a delay in you

25    getting the firewall counsel, too, but if you're okay with that,

1     I'm okay with giving you a chance to make your argument and

2     giving the Special Counsel an opportunity to respond before I

3     make a decision.

4               MR. DUBELIER:  Thank you, your Honor.  What we will

5     do, your Honor, if it's all right, we will go back and speak

6     with our client and speak internally.  We may decide we're not

7     going to file anything on this.

8               THE COURT:  Okay.  Jointly let the Court know that

9     you're not going to --

10              MR. DUBELIER:  Absolutely.

11              THE COURT:  -- so I don't delay making a decision on

12    this.

13              MR. DUBELIER:  Yes, your Honor.

14              MR. KRAVIS:  Finally, I just wanted to flag, if the

15    defense does end up filing something on this and if the Court

16    does rule that the selection of firewall counsel should not

17    proceed ex parte, the government will request to withdraw the

18    materials that have been filed ex parte under seal, for the

19    reasons set forth in the motion that accompanied them.

20              THE COURT:  Okay.  Withdraw the particular materials

21    you've submitted?

22              MR. KRAVIS:  Correct.

23              THE COURT:  But not a recommendation; you would do it

24    in a different form?

25              MR. KRAVIS:  Correct.

1          THE COURT:  Understood.  Anything else?

2          MR. DUBELIER:  No, your Honor.  Thank you very much.

3          THE COURT:  Ms. Rhee?

4          MS. RHEE:  Your Honor, just for clarification of the

5    record, though, I just want to make clear that Mr. Kravis and

6    colleagues at the U.S. Attorney's Office are not a part of the

7    Special Counsel's Office, but for purposes of this proceeding

8    and this case, given the scope, for example, of the discovery

9    obligation and proceeding with the litigation as it goes

10   forward, they have made appearances and are appearing at this

11   proceeding under the auspices of the U.S. Attorney's Office in

12   the District of Columbia.

13         THE COURT:  Okay.  Thank you for that clarification.

14   Thank you very much.

15         (Proceedings adjourned at 12:02 p.m.)

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.




/s/ Sara A. Wick                    August 3, 2018

SIGNATURE OF COURT REPORTER         DATE