**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

CONCORD MANAGEMENT &
CONSULTING LLC,

*Defendant.*

Criminal Action No. 18-cr-0032-2 (DLF)

<u>**MEMORANDUM OPINION**</u>*

 Concord Management and Consulting LLC moves to dismiss the indictment on the ground that Special Counsel Robert Mueller was appointed unlawfully by Acting Attorney General Rod Rosenstein.  Dkt. 36.  The Court will deny Concord's motion.  The Special Counsel's appointment complies with the Constitution's Appointments Clause because (1) the Special Counsel is an "inferior Officer"; and (2) Congress "by Law vest[ed]" the Acting Attorney General with the power to make the appointment.  U.S. Const. art. II, § 2, cl. 2.

 First, the Special Counsel is an inferior officer because he is directed and supervised by the Acting Attorney General.  Although the Special Counsel regulations may not permit the Acting Attorney General to countermand certain decisions made by the Special Counsel, the Special Counsel remains subject to the Acting Attorney General's plenary supervision: the Acting Attorney General has the discretionary power to rescind or revise the regulations; moreover, the Acting Attorney General effectively has the power to remove the Special Counsel at will, either via the regulations or by rescinding or revising the regulations.  Second, Congress vested the Acting Attorney General with the power to appoint the Special Counsel.  Even though no statute explicitly authorizes the Acting Attorney General to make the appointment, Supreme

---

\*  This memorandum opinion includes corrections of clerical errors.

Court and D.C. Circuit precedent make clear that the Acting Attorney General has the necessary statutory authority.

Concord's secondary arguments also fail. The appointment does not violate core separation-of-powers principles. Nor has the Special Counsel exceeded his authority under the appointment order by investigating and prosecuting Concord. Accordingly, and for the reasons stated below, the Court will deny Concord's motion to dismiss the indictment.

## I. BACKGROUND

### A.      The Office of the Special Counsel

During the Watergate era, special prosecutors were appointed through executive-branch regulations. In 1978, Congress enacted the Ethics in Government Act, which allowed for the appointment of a special prosecutor later renamed the "independent counsel." *See* Pub. L. No. 95-521, § 601(a) (1978); *see also* Ethics in Government Act Amendments of 1982, Pub. L. No. 97-409, § 2 (1983). Under the Act, if the Attorney General determined that certain investigations or prosecutions were warranted, the Attorney General applied to a special three-judge court, which then selected and appointed an independent counsel. Pub. L. No. 95-521, § 601(a). In the face of a constitutional challenge, the independent counsel provisions of the Ethics in Government Act were upheld in *Morrison v. Olson*, 487 U.S. 654 (1988). The provisions expired in 1999, and Congress declined to renew them. Then-Attorney General Janet Reno testified before the Senate, "The Independent Counsel Act is structurally flawed and . . . those flaws cannot be corrected within our constitutional framework. . . . [T]he independent counsel is vested with the full gamut of prosecutorial powers, but with little of its accountability. He has not been confirmed by the Senate . . . . Accountability is no small matter. It goes to the very heart of our constitutional scheme." The Future of the Independent Counsel Act: Hearing Before

the S. Comm. on Governmental Affairs, 106th Cong. (March 17, 1999) (statement of Janet Reno, Att'y Gen. of the United States).

As the independent counsel provisions of the Ethics in Government Act expired in 1999, the Attorney General promulgated the Office of the Special Counsel regulations to "replace" the Act.  *See* Office of Special Counsel, 64 Fed. Reg. 37,038, 37,038 (July 9, 1999) (published at 28 C.F.R. §§ 600.1–600.10).  Under the regulations, the Attorney General "appoint[s] a Special Counsel when he or she determines that criminal investigation of a person or matter is warranted and—

> (a) That investigation or prosecution of that person or matter by a United States Attorney's Office or litigating Division of the Department of Justice would present a conflict of interest for the Department or other extraordinary circumstances; and
>
> (b) That under the circumstances, it would be in the public interest to appoint an outside Special Counsel to assume responsibility for the matter."

*Id.*  The regulations govern the Special Counsel's jurisdiction, powers, and duties.  They "seek to strike a balance between independence and accountability in certain sensitive investigations."  *Id.* According to the regulations' preamble, the Special Counsel is "free to structure the investigation as he or she wishes and to exercise independent prosecutorial discretion to decide whether charges should be brought, within the context of the established procedures of the Department." *Id.*  "Nevertheless, it is intended that ultimate responsibility for the matter and how it is handled continue[s] to rest with the Attorney General (or the Acting Attorney General if the Attorney General is personally recused in the matter)."  *Id.*

### B.      Appointment of Special Counsel Robert Mueller

On April 26, 2017, Rod Rosenstein was sworn in as the Deputy Attorney General.  Dep't of Justice, Meet the Deputy Attorney General (last visited August 13, 2018), https://www.justice

.gov/dag/staff-profile/meet-deputy-attorney-general.  As a result, he became the Acting Attorney

General for matters from which the Attorney General was recused, *see* 28 U.S.C. § 508; 28

C.F.R. § 0.15(a), which included "existing or future investigations of any matters related in any

way to the campaigns for President of the United States," Dep't of Justice, Office of Public

Affairs, Attorney General Sessions Statement on Recusal (Mar. 2, 2017), Dkt. 36-5.  On May 17,

2017, Rosenstein appointed a Special Counsel.  His appointment order states: "By virtue of the

authority vested in me as Acting Attorney General, including 28 U.S.C. §§ 509, 510, and

515, . . . Robert S. Mueller III is appointed to serve as Special Counsel for the U.S. Department

of Justice."  Dep't of Justice, Office of the Deputy Attorney General, Order No. 3915-2017,

Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential

Election and Related Matters ("Appointment Order") (May 17, 2017), Dkt. 36-1.  Per the

appointment order, the Special Counsel is "authorized to conduct the investigation confirmed by

then-FBI Director James B. Comey in testimony before the House Permanent Select Committee

on Intelligence on March 20, 2017, including:

> (i)   any links and/or coordination between the Russian government and
>        individuals associated with the campaign of President Donald Trump; and
>
> (ii)  any matters that arose or may arise directly from the investigation; and
>
> (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)."

*Id.* ¶ (b).[1]  And "[i]f the Special Counsel believes it is necessary and appropriate, the Special

Counsel is authorized to prosecute federal crimes arising from the investigation of these

---

[1] Then-FBI Director James Comey testified on March 20, 2017 before the U.S. House of
Representatives Permanent Select Committee on Intelligence that he "ha[d] been authorized by
the Department of Justice to confirm that the FBI, as part of our counterintelligence mission, is
investigating the Russian government's efforts to interfere in the 2016 presidential election, and
that includes investigating the nature of any links between individuals associated with the Trump

matters." *Id.* ¶ (c).  Finally, the appointment order stated that 28 C.F.R. §§ 600.4 through 600.10 "are applicable to the Special Counsel."  *Id.* ¶ (d).

### C.   *United States v. Internet Research Agency, et al.*

Nine months later, on February 16, 2018, the grand jury returned an eight-count indictment against thirteen individuals and three corporate entities: Internet Research Agency LLC, Concord Management and Consulting LLC, and Concord Catering.  Indictment ¶¶ 10–24, Dkt. 1.  Under 18 U.S.C. § 371, the indictment charges that the defendants conspired to defraud the United States by impeding the lawful functions of the Federal Election Commission, the Department of Justice, and the Department of State.  *Id.* ¶ 9.  Also, under 18 U.S.C. §§ 1343 and 1344, the indictment charges that the Internet Research Agency and two individual defendants conspired to commit wire and bank fraud.  *Id.* ¶ 87.  And under 18 U.S.C. § 1028A, the indictment charges that the Internet Research Agency and four individual defendants committed aggravated identity theft.  *Id.* ¶ 97.

On the day the grand jury returned the indictment, the magistrate issued summonses for the defendants to appear on March 20.  The Special Counsel was unable to effectuate service, so the magistrate continued the initial appearance and arraignment until May 9.  *See* Minute Order of Mar. 19, 2018.  In the interim, defense counsel entered an appearance on April 11 for Concord Management and Consulting LLC.  Dkt. 2; Dkt. 3.  On May 4, the Special Counsel moved to continue the initial appearance and arraignment scheduled for May 9 until the Court resolved whether Concord had been properly served.  Dkt. 7 at 1, 3–5.  The Special Counsel also

---

campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts."  James B. Comey, Statement Before the House Permanent Select Comm. on Intelligence (Mar. 20, 2017), Dkt. 36-3.

requested that the Court set a schedule for the parties to brief service-related issues by June 15. Dkt. 7 at 1, 5; Dkt. 7-5.  Concord, however, responded that it intended to voluntarily appear through counsel consistent with Rule 43(b) of the Federal Rules of Criminal Procedure and it intended to plead not guilty.  Dkt. 8 at 2.  The Court therefore denied the Special Counsel's motion.  Minute Order of May 5, 2018.  At the ensuing initial appearance and arraignment on May 9, defense counsel stated that Concord was not properly served under Rule 4, but nonetheless, Concord authorized defense counsel to enter a voluntary appearance, subject Concord to the Court's jurisdiction, and plead not guilty, which defense counsel did.  Dkt. 9 at 4–5, 9.

One week later, at a status conference on May 16, the Court directed the parties to confer regarding a protective order and a briefing schedule for pretrial motions.  Dkt. 18 at 5, 7–8. Because the parties did not reach agreement on a protective order, discovery was delayed.  At a hearing on June 15, the Court ordered the parties to propose a joint interim protective order that same day, Dkt. 41 at 29, which the Court then issued, Dkt. 30.  After further briefing, *see* Dkt. 37; Dkt. 39; Dkt. 40, the Court issued a more comprehensive protective order and later approved a firewall counsel to facilitate discovery, *see* Dkt. 42-1; Minute Entry of Aug. 6, 2018.

Contemporaneously, on June 25, Concord filed a motion to dismiss the indictment "based on the Special Counsel's unlawful appointment and lack of authority."  Dkt. 36 at 1.  Concord's motion argues that (1) the appointment of the Special Counsel violates the Appointments Clause of the Constitution; (2) the regulations governing the Special Counsel violate core separation-of-powers principles; and (3) even if the regulations are valid and binding, the order appointing the Special Counsel is inconsistent with the regulations and does not authorize the prosecution of Concord.  *Id.*

6

**D.      Related Cases**

Three recent opinions address similar issues.  In May and June 2018, respectively, Judge

Berman-Jackson and Judge Ellis resolved motions to dismiss filed by defendant Paul Manafort.

Manafort argued that the Special Counsel's appointment is invalid because it conflicts with the

Special Counsel regulations and, even if the appointment is valid, the Special Counsel exceeded

his authority by prosecuting the particular charges against Manafort.  *See United States v.*

*Manafort*, No. 17-cr-0201, 2018 WL 2223656, at *1 (D.D.C. May 15, 2018); *United States v.*

*Manafort*, No. 18-cr-0083, 2018 WL 3126380, at *1 (E.D. Va. June 26, 2018).  Judge Berman-

Jackson and Judge Ellis denied the motions.  *Manafort*, 2018 WL 2223656, at *18; *Manafort*,

2018 WL 3126380, at *8, *14.  Judge Ellis also noted that Manafort did not argue that the

appointment of the Special Counsel violates the Appointments Clause and the parties did not

dispute the issue, but he observed that "such an objection would likely fail."  *Manafort*, 2018

WL 3126380, at *3 n.5, *12.

On July 31, Chief Judge Howell resolved a motion to quash filed by a witness ordered to

appear before the grand jury.  The witness argued that the appointment of the Special Counsel

violates the Appointments Clause, and the witness "adopt[ed] and incorporate[d] by reference

th[e] same arguments" advanced by Concord.  Redacted Mem. Op., *In re Grand Jury*

*Investigation*, No. 18-gj-0034, 2018 WL 3688461, at *10 (D.D.C. July 31, 2018) (alterations in

original) (quoting Witness's Second Motion to Quash).  Chief Judge Howell concluded that "the

Special Counsel's power falls well within the boundaries the Constitution permits," and she

denied the motion to quash.  *Id.* at *2, *42.  Chief Judge Howell also granted the Special

Counsel's motion to unseal the redacted opinion.  *See* Mem. & Order at 1, 7, *In re Grand Jury*

*Investigation*, No. 18-gj-0034 (D.D.C. Aug. 2, 2018) (Dkt. 26); *see also* Order, *In re Grand Jury*

*Investigation*, No. 18-gj-0034 (D.D.C. Aug. 8, 2018) (Dkt. 32) (unsealing the docket and certain filings).

On August 3, this Court held a hearing on Concord's motion to dismiss, which the Court now resolves.

## II.  LEGAL STANDARDS

Under Rule 12(b)(1) of the Federal Rules of Criminal Procedure, a party "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  Relevant here, a defendant may raise a "defect in the indictment" by challenging the constitutionality of the Special Counsel's appointment and his authority to bring an indictment.  Fed. R. Crim. P. 12(b)(3); *see also United States v. Park*, 297 F. Supp. 3d 170, 174 (D.D.C. 2018).  "When considering a motion to dismiss an indictment, a court assumes the truth of [the indictment's] factual allegations."  *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).

## III.  THE APPOINTMENTS CLAUSE

The Appointments Clause states:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.  The clause "is more than a matter of etiquette or protocol; it is among the significant structural safeguards of the constitutional scheme."  *Edmond v. United States*, 520 U.S. 651, 659 (1997) (internal quotation marks omitted).  The clause prescribes the manner of appointment for "Officers of the United States."  In contrast to "mere employees,"

officers are persons who "exercis[e] significant authority pursuant to the laws of the United States." *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)).[2]

By default under the Appointments Clause, officers are nominated by the President and confirmed by the Senate. The President's nomination power "prevents congressional encroachment upon the Executive and Judicial Branches," and confirmation by the Senate "serves . . . to curb Executive abuses of the appointment power." *Edmond*, 520 U.S. at 659. "By requiring the joint participation of the President and the Senate, the Appointments Clause was designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one." *Id.* at 660. But for "inferior Officers," unlike principal officers, Congress may deviate from the default: it "may by Law vest" their appointments in the President alone, courts, or "Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The purpose of this provision is "administrative convenience," but "that convenience was deemed to outweigh the benefits of the more cumbersome procedure only with respect to the appointment of 'inferior Officers.'" *Edmond*, 520 U.S. at 660. "These limitations on the appointment power 'ensure that those who wield it are accountable to political force and the will of the people.'" *Ass'n of Am. Railroads v. Dep't of Transp.*, 821 F.3d 19, 36 (D.C. Cir. 2016) (alterations omitted) (quoting *Freytag v. CIR*, 501 U.S. 868, 884 (1991)).

Concord argues that the appointment of the Special Counsel violates the Appointments Clause in two ways. First, the Special Counsel is not an inferior officer. *See* Concord Mem. at 39–52, Dkt. 36. Second, even if the Special Counsel is an inferior officer, Congress has not "by Law vested" his appointment in the Acting Attorney General. *See id.* at 20–39.

---

[2] The Special Counsel does not dispute that he is an "Officer of the United States." Opp'n at 20, Dkt. 47.

A. **The Special Counsel as an "inferior Officer"**

Consistent with the Appointments Clause, the Acting Attorney General may not appoint a Special Counsel outside of the nomination-and-confirmation process unless the Special Counsel is an "inferior Officer." U.S. Const. art. II, § 2, cl. 2. "Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President." *Edmond*, 520 U.S. at 662. That is, "[w]hether one is an 'inferior' officer depends on whether he has a superior." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 510 (2010) (quoting *Edmond*, 520 U.S. at 662). "It is not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude." *Edmond*, 520 U.S. at 662–63; *see also id.* at 662 (observing that the exercise of significant authority "marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in *Buckley*, the line between officer and nonofficer"). Rather, "'inferior officers are officers whose work is directed and supervised at some level' by other officers appointed by the President with the Senate's consent." *PCAOB*, 561 U.S. at 510 (quoting *Edmond*, 520 U.S. at 663).

For evaluating direction and supervision, *Edmond* "emphasized three factors": whether an officer is (1) "subject to the substantial supervision and oversight of" another executive officer who is a principal officer or is "subordinate" to a principal officer, (2) subject to "revers[al]" by "another executive branch entity" so that the officer has "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive Officers," and (3) "removable . . . without cause." *Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1338 (D.C. Cir. 2012) (citing *Edmond*, 520 U.S. at 664–65). Of these factors, the third—the removal power—is likely "the most important to a Court's

determination of principal-inferior status." *In re Grand Jury Investigation*, 2018 WL 3688461, at *12; *see PCAOB*, 561 U.S. at 501 (noting that the power to appoint and control executive officers is "perhaps *the* key means" for protecting the constitutional prerogatives of the executive branch, and stating that "[t]he power to remove officers at will and without cause is a powerful tool for control of an inferior"); *Edmond*, 520 U.S. at 661–62.

Statutes and regulations provide the framework for evaluating the direction and supervision of the Special Counsel. *See Estes v. Dep't of the Treasury*, 219 F. Supp. 3d 17, 38 (D.D.C. 2016) ("Appointments Clause challenges are properly structural."). The Special Counsel regulations matter because they have the "force of law" so long as "extant." *Nixon v. United States*, 418 U.S. 683, 695 (1974). Thus they bind the Department of Justice and the Acting Attorney General. *Id.* ("So long as this regulation remains in force the Executive Branch is bound by it . . . ."); *Accardi v. Shaughnessy*, 347 U.S. 260, 266–68 (1954) (holding that when the Attorney General delegated discretionary powers via regulations, he denied himself the authority to exercise the delegated powers as long as the regulations remained operative, even though the original authority was his and he could reassert it by amending the regulations); *Erie Blvd. Hydropower v. FERC*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("It is axiomatic that an agency is bound by its own regulations." (alteration omitted)). The Special Counsel's principal argument is that, despite the constraints imposed by the regulations, the Acting Attorney General retains control of the Special Counsel. Therefore, the Court does not begin its analysis by "looking solely to statutes." *In re Grand Jury Investigation*, 2018 WL 3688461, at *13. Instead, the Court first examines the Acting Attorney General's ability to direct and supervise the Special Counsel under the presently binding statutes and regulations. Next, the Court evaluates (if necessary) whether the analysis is affected by the regulations' potential for revocation or

revision.  For if the Acting Attorney General is able to "rescind the regulations at will," the regulations—no matter how constraining they purport to be—"do not meaningfully restrict" the Acting Attorney General's plenary supervisory power.  *Id.* at *14.

       1.       Direction and Supervision of the Special Counsel

The relevant statutes give the Acting Attorney General "virtually plenary authority" to direct and supervise a Special Counsel.  *Id.* at *15; *see, e.g.*, 28 U.S.C. §§ 509, 516, 519.  That authority, however, is circumscribed by the Special Counsel regulations in several ways.

       a.       Supervision, Oversight, and Final Decisionmaking Power

As to the first and second factors emphasized by *Edmond*, the Acting Attorney General establishes the parameters of the Special Counsel's investigation at its outset, and Department of Justice policies frame the investigation as it proceeds.  The investigation only comes into existence by the action of the Acting Attorney General, 28 C.F.R. § 600.1, and the Acting Attorney General defines the scope of the Special Counsel's "jurisdiction," *id.* § 600.4(a).  The Special Counsel may request "additional jurisdiction," but only the Acting Attorney General can grant the request.  *Id.* § 600.4(b).  Also, throughout the investigation, the Special Counsel "shall consult with appropriate offices within the Department for guidance with respect to established practices, policies and procedures."  *Id.* § 600.7(a).  This consultation requirement affords the Acting Attorney General the opportunity to exert his supervisory powers, which will be discussed further below.

In addition to consulting with the appropriate offices, the Office of the Special Counsel must adhere to the Department of Justice's ethical standards, and the Special Counsel "shall comply with" the Department of the Justice's "rules, regulations, procedures, practices and policies."  *Id.* § 600.7(a), (c).  One governing policy is the U.S. Attorneys' Manual, but other

than that, it is unclear what "procedures, practices and policies" shape the Special Counsel's

actions.[3]  Further complicating things, the Special Counsel represents that certain policies do not

bind it.  Specifically, the Criminal Division's Public Integrity Section published a manual in late

2017 that "addresses how the Department handles all federal election offenses . . . .."; the manual

indicates that § 371 conspiracies based on violations of the Federal Election Campaign Act must

prove "willfulness," but the Special Counsel relies on a different policy—the Department's

"litigating position" embodied in Supreme Court and First Circuit briefs filed in 2016 or 2017—

to establish that the Special Counsel need not have charged willfulness in this case.  *See* Dep't of

Justice, Federal Prosecution of Election Offenses at 1, 163 (8th ed. Dec. 2017); Indictment ¶ 9;

Hr'g Tr. at 31–32; *see also United States v. Morosco*, 822 F.3d 1 (1st Cir. 2016).  Without more

certainty about the governing policies, it is difficult to draw strong conclusions about how

§ 600.7(a) contributes to the Acting Attorney General's supervisory ability.

Also, the Special Counsel must provide information about his actions to the Acting

Attorney General.  This matters because, without information upon which to act, the Acting

Attorney General would be unequipped to direct and supervise the Special Counsel.  The Special

Counsel "shall notify" the Acting Attorney General "of events in the course of the investigation

in conformity with the Departmental guidelines with respect to Urgent reports," 28 C.F.R.

§ 600.8(b), which are "major developments in significant investigations and litigation," "law

---

[3] *See* Hr'g Tr. at 33 (Special Counsel: "[T]he U.S. Attorneys' Manual does exist to supply U.S. Attorneys with policy.  There are other ways in which the Attorney General can communicate policies.  The Attorney General will from time to time issue memoranda that . . . govern charging practices.  The Criminal Division may do the same.  But to back up and try to answer your question with a comprehensive definition of what are all sources of DOJ policies, I'm not sure anyone has ever done that, and I think that they may emanate from different sources.  But it's precisely because there may be lack of clarity about that that we are encouraged, authorized, and required to consult with relevant Department officials to ascertain what their understanding of policies are, and we are bound by them.").

enforcement emergencies," and "events affecting the Department that are likely to generate national media or Congressional attention," USAM §§ 1-13.100.  Such major developments "*may* include" the initiation of investigations, filing of criminal charges, arrests, pleas, trials, verdicts, settlements, and sentencings, but the Special Counsel regulations and Department of Justice policies do not appear to *require* notification of all such developments.  USAM § 1-13.120 (emphasis added); *see also* Hr'g Tr. at 34 (The Court: "Plea agreement[s], sentencing recommendations, are those major developments?"  Special Counsel: "They can be. I think there's an element of judgment . . . .  We have been working with the Acting Attorney General to ascertain what sorts of developments need to be reported.  We have regular meetings and consultations so that he is aware of our conduct.").  Even so, the Acting Attorney General "may request that the Special Counsel provide an explanation for *any* investigative or prosecutorial step."  28 C.F.R. § 600.7(b) (emphasis added).  Therefore, the Acting Attorney General has access to as much information as he requests to direct and supervise an investigation.

Information-sharing alone, however, does not guarantee adequate supervision.  The Acting Attorney General must also retain the authority to direct the Special Counsel and countermand certain decisions.  *See Intercollegiate Broad. Sys.*, 684 F.3d at 1338 (inferior officer must be subject to "substantial supervision and oversight" and "revers[al]" by "another executive branch entity" (citing *Edmond*, 520 U.S. at 664–65)).

Does the Acting Attorney General possess the power to supervise and reverse the Special Counsel?  The key regulatory provision reads:

> The Special Counsel shall not be subject to the day-to-day supervision of any official of the Department.  However, the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued.  In conducting that review, the Attorney General will give great weight

> to the views of the Special Counsel. If the Attorney General concludes that a proposed action by a Special Counsel should not be pursued, the Attorney General shall notify Congress as specified in § 600.9(a)(3).

28 C.F.R. § 600.7(b). Thus, the Acting Attorney General has the power to "conclude"—after giving "great weight to the views of the Special Counsel"—that an action "is so inappropriate or unwarranted under established Departmental practices that it *should* not be pursued." *Id.* (emphasis added). But the power to come to this conclusion is not always the power to mandate or countermand the Special Counsel's actions, for a number of reasons.

First, "should" is generally "precatory, not mandatory." *Ass'n of Flight Attendants v. Huerta*, 785 F.3d 710, 718 (D.C. Cir. 2015); *see also Jolly v. Listerman*, 672 F.2d 935, 945 (D.C. Cir. 1982) ("The use of the word 'should' . . . detracts significantly from any claim that this guideline is more than merely precatory."); *Military Toxics Project v. EPA*, 146 F.3d 948, 958 (D.C. Cir. 1998); *Judd v. Billington*, 863 F.2d 103, 106 (D.C. Cir. 1988). Although the use of "should" instead of "shall" is not "automatically determinative," *Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977), it is particularly striking here because "shall" is used twice in the very same sub-provision, seven times in the same provision, and throughout the Special Counsel regulations, *see* 28 C.F.R. §§ 600.3, 600.4, 600.6, 600.7; *see also Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."). And the same sub-provision requires that, if the Acting Attorney General concludes that a proposed action should not be pursued," certain actions must follow—in particular, the Acting Attorney General "shall notify Congress." 28 C.F.R. § 600.7(b). Pointedly missing is any requirement that the Special Counsel "shall" comply with

the conclusion.  *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017)

("[W]e presume differences in language . . . convey differences in meaning.").

    Further context does not turn "should" into a mandatory term.  The Special Counsel

argues that "should" is sufficiently ambiguous that its meaning ought to be ascertained from the

"the context of the regulation" and the Attorney General's "intent," such as is embodied in the

regulations' background section.  *See* Opp'n at 44, Dkt. 47.  The background section states that

"the intent of the regulations is to ensure that ultimate responsibility" for how a Special Counsel

investigation "is handled will continue to rest with the Attorney General."  64 Fed. Reg. at

37,038.  But the background section also makes very strong statements about the Special

Counsel's independence.  For example, the immediately preceding sentence says the Special

Counsel "would be free to structure the investigation as he or she wishes and to exercise

independent prosecutorial discretion to decide whether charges should be brought."  *Id.*  The

background therefore cuts both ways, providing little reason to think that "should" means

"shall."  *See St. Francis Med. Ctr. v. Azar*, 894 F.3d 290, 297 (D.C. Cir. 2018) ("Because the

regulation itself is clear, we need not evaluate these mixed signals from the preamble, which

itself lacks the force and effect of law.").

    Regardless, even crediting the Special Counsel's argument that "should" can be read as a

mandatory "shall," some Special Counsel decisions remain insulated from review or

countermand under § 600.7(b).  At most, the Acting Attorney General is able to countermand

actions that—after giving "great weight to the views of the Special Counsel—are "so

inappropriate or unwarranted under established Departmental practices."  28 C.F.R. § 600.7(b).

As noted, it is unclear from the provision what "established Departmental practices" shape the

Special Counsel's actions.  And troublingly, the importance of the decision and the Acting

Attorney General's desired course of action are not considerations specified in the text.  The provision prevents the Acting Attorney General from countermanding a decision with which he disagrees, no matter how vehemently, so long as the decision does not rise to the level of "so inappropriate or unwarranted under established Departmental practices."  *Id.*  As a result, the Special Counsel regulations prevent the Acting Attorney General from directing a course of action based on legitimate reasons other than established Departmental practices.  Such legitimate reasons might include, for example, resource limitations, Department-wide strategy and policy considerations, and the exercise of prosecutorial discretion.

The Special Counsel represents that, under Departmental practices and policies, the Acting Attorney General gets the last say on certain major or serious decisions, even if the decisions are otherwise within the bounds of the Special Counsel's discretion.[4]  If so, that

---

[4] At the motion hearing, the Court asked:

> [H]ypothetically, let's say the Special Counsel is not acting out of bounds at all, and in fact, the Special Counsel is following every DOJ policy or regulation[], general practices.  And yet the Deputy Attorney General, for good reasons, thinks a major decision should be decide[d] differently.  Say, for example, a major decision by the Special Counsel is going to interfere with an ongoing investigation in another case being handled in San Diego, or there's a resource issue, or there's a foreign policy issue, there's some major reason why the Deputy Attorney General may disagree with the Special Counsel's decision.  And yet the Special Counsel is acting within the law, within the bounds.  Does the Deputy Attorney General have the ability to countermand or revoke that decision in that circumstance?

The Special Counsel responded:

> I think you would have both.  Your Honor posited a situation in which a particular investigative step or prosecution would cause a major foreign policy concern or a serious misallocation of resources.  I'm not sure why those things wouldn't be so inappropriate or unwarranted, under established departmental policy or practice, to justify countermanding, and nor do I understand why the good cause authority would not kick in.

Hr'g Tr. at 39–40.

enhances the Acting Attorney General's ability to countermand under § 600.7(b), but it is unclear how much.  *See* Hr'g Tr. at 33; *see also supra* note 3.  At the very least, some Special Counsel decisions remain insulated from review or countermand.

b.      Removal

Turning to the third and likely most important *Edmond* factor, the Special Counsel argues that his removability subjects him to the direction and supervision of the Acting Attorney General.  *See* Opp'n at 45–47.  If available to the Acting Attorney General, "[t]he power to remove officers at will and without cause is a powerful tool for control of an inferior."  *PCAOB*, 561 U.S. at 501.  Here, "[t]he Special Counsel may be disciplined or removed from office only by the personal action of the Attorney General," and "[t]he Attorney General may remove a Special Counsel for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies."  28 C.F.R. § 600.7(d).

These grounds for removal may impose only a minimal restriction on the Acting Attorney General because "misconduct," "dereliction of duty," and especially "other good cause" are susceptible to broad readings.  They might permit removal, for example, if the Special Counsel refused to follow an order from the Acting Attorney General, even if the order involved decisions that would otherwise be within the scope of the Special Counsel's discretion.  *See Bowsher v. Synar*, 478 U.S. 714, 729 (1986) (emphasizing, in the context of a statute that limited Congress's removal power, that "neglect of duty," "malfeasance," and "inefficiency" are "very broad and, as interpreted by Congress, could sustain removal . . . for any number of actual or perceived transgressions of the legislative will").[5]

---

[5] *See also* Geoffrey P. Miller, *Independent Agencies*, 1986 Sup. Ct. Rev. 41, 86–87 (arguing that "malfeasance," "neglect of duty," or "good cause" may exist when an officer refuses to follow an

"Good cause" in particular is an "open-textured expression" that defies easy definition. John F. Manning, *The Independent Counsel Statute: Reading "Good Cause" in Light of Article II*, 83 Minn. L. Rev. 1285, 1298–99 (1999). Interpreting the removal provision at issue here, Chief Judge Howell concluded that "'other good cause' seems at a minimum to encompass . . . and indeed to reach farther" than "inefficiency," defined by reference to Judge Griffith's concurrence in *PHH Corp. v. CFPB*, 881 F.3d 75, 134 (D.C. Cir. 2018). *See In re Grand Jury Investigation*, 2018 WL 3688461, at *19 n.19. In *PHH*, Judge Griffith examined late nineteenth and early twentieth century indicia of meaning to interpret "inefficiency" as an officer's "fail[ure] to produce or accomplish the agency's ends, as understood or dictated by the President operating within the parameters set by Congress." 881 F.3d at 134 (Griffith, J., concurring). If "other good cause" in the 1999 Special Counsel regulations tracks or "reaches[es] farther" than this interpretation of "inefficiency," then the removal provision imposes only minimal restrictions on the Acting Attorney General. *In re Grand Jury Investigation*, 2018 WL 3688461, at *19 n.19.

Indeed, the Office of the Special Counsel understands "good cause" in just this way. At the motion hearing, the Special Counsel represented, without limitation, that "good cause" would exist if the Special Counsel did not follow any order from the Acting Attorney General. *See* Hr'g Tr. at 46 (The Court: "It's your position that good cause would exist if the Special Counsel did not follow an order from the Deputy Attorney General?" Special Counsel: "Yes.").

---

executive directive to take an action within the scope of the officer's discretion, so long as the executive directive is legally valid); Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1, 111 (1994) ("[T]he words 'good cause' and 'inefficiency, neglect of duty, or malfeasance in office' might even allow discharge of [officers] who have frequently or on important occasions acted in ways inconsistent with the [superior's] wishes with respect to what is required by sound policy.").

Supporting this understanding, the removal provision specifies that "good cause" "includ[es] violation of Departmental policies," and the Special Counsel understands such policies to include that the Acting Attorney General gets the last say on certain decisions.  28 C.F.R. § 600.7(d); *see supra* note 4 and accompanying text.  If the Special Counsel is correct that "good cause" essentially includes "failure to accept supervision," then the for-cause removal provision imposes only a minimal restriction on the Acting Attorney General's power to remove the Special Counsel, and the Appointments Clause problem dissipates.  *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting).

There is reason to think, however, that the Special Counsel regulations afford the Special Counsel more substantial protection against removal, and thus risk rendering him a principal officer.  In *Intercollegiate*, for example, a similar removal standard "for misconduct or neglect of duty" "support[ed] a finding that [the officers at issue] are principal officers."  684 F.3d at 1339–40; *see also Edmond*, 520 U.S. at 664–665 (concluding that the officers at issue were inferior officers in part because they were removable "without cause").  And in general, for-cause removal standards are often understood to provide some degree of independence and protection beyond mere failure to accept supervision.  *See, e.g.*, *PCAOB*, 561 U.S. at 502–03; *PHH Corp.*, 881 F.3d at 77–78 (majority opinion); *id* at 191 n.16 (Kavanaugh, J., dissenting).  The Special Counsel regulations themselves suggest the same.  As discussed above, the regulations—at most—only require the Special Counsel to follow the Acting Attorney General's countermand orders for actions deemed "so inappropriate or unwarranted under established Departmental practices."  28 C.F.R. § 600.7(b); *see supra* Section III.A.1.a.  With regard to actions that do not rise to that level, the regulations do not clearly require the Special Counsel to follow orders, so it is difficult to see how "good cause" would arise from the Special Counsel's refusal to follow

orders.  Under such circumstances, the Special Counsel could rightly resist removal on the ground that he was proceeding in full compliance with the regulations, while the Acting Attorney General would not have a similarly steady leg to stand.  After all, the Acting Attorney General would be seeking to remove the Special Counsel for not following orders that the Special Counsel was under no duty to follow.

In the event that the for-cause removal standard in the Special Counsel regulations confers substantial protection against removal, the Appointments Clause problem re-emerges. The Special Counsel argues that for-cause removal does not make him a principal officer because "when [C]ongress . . . vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest."  Opp'n at 46 (quoting *United States v. Perkins*, 116 U.S. 483, 485 (1886)).  The cases cited by the Special Counsel, however, do not persuade the Court.  It is unlikely that the broad and dated language of *Perkins* survived *Edmond*, which demands that inferior officers be subordinate to superiors and does not contemplate allowing unremovable officers if "for the public interest."  116 U.S. at 485; 520 U.S. at 662–63.  Also, *Perkins* involved a low-ranking naval cadet who was likely well-supervised by the military chain of command, irrespective of any limits on his removal, and the cadet sought only damages, not reinstatement or other protection from removal.  *See* 116 U.S. at 483–84.  The Special Counsel also invokes *Morrison v. Olson* to demonstrate that he is an inferior officer.  There, the Supreme Court found the independent counsel to be an inferior officer even though she was removable only for good cause.  487 U.S. at 663, 672–73.  *Morrison*, however, "relied heavily" on factors other than removal, as discussed below.  *Intercollegiate Broad. Sys.*, 684 F.3d at 1340.  Thus, "while the presence of a 'good cause' restriction in *Morrison* did not prevent a finding of inferior officer

status, [*Morrison*] clearly did not hold that such a restriction on removal was generally consistent with the status of inferior officer." *Id.* Therefore, the Special Counsel's for-cause removal protection, if substantial, "supports a finding" that the Special Counsel is a principal officer. *Id.* at 1339.

* * *

In sum, the regulations as written may prevent the Acting Attorney General from countermanding certain actions taken by the Special Counsel. Even so, if the Special Counsel—as he contends—is only minimally protected from removal, then the Special Counsel remains subject to significant direction and supervision by the Acting Attorney General and is thus an inferior officer.

On the other hand, if the for-cause removal provision affords the Special Counsel substantial protection from removal, then in certain circumstances the Acting Attorney General might be unable to countermand the Special Counsel *and* unable to remove the Special Counsel. If such constraints bind the Acting Attorney General against his wishes, the Special Counsel is not truly inferior.

2.      Rescission or Revision of the Special Counsel Regulations

Regardless whether the Special Counsel regulations enable the Acting Attorney General to direct and supervise the Special Counsel, the regulations do not bind the Acting Attorney General against his wishes. Rather, the regulations persist only so long as the Acting Attorney General allows them to remain in effect. As in *Sealed Case*, "[s]ubject to generally applicable procedural requirements," the Department of Justice "may rescind this regulation at any time, thereby abolishing the Office of [Special] Counsel." *In re Sealed Case*, 829 F.2d 50, 56 (D.C. Cir. 1987); *see also Nixon*, 418 U.S. at 696 (noting that "the regulation defining the Special

Prosecutor's authority" binds the executive branch so long as it "remains in force," but "it is theoretically possible for the Attorney General to amend or revoke the regulation defining the Special Prosecutor's authority"); *Morrison*, 487 U.S. at 721 (Scalia, J., dissenting) ("[T]he President or the Attorney General could have removed [the Watergate special prosecutor] at any time, if by no other means than amending or revoking the regulation defining his authority.").

The regulations' revocability is "[t]he crucial difference" between the Special Counsel regulations and a statute that seeks to bind the executive branch from without, and it is this difference that ensures the Special Counsel is an inferior officer. *In re Sealed Case*, 829 F.2d at 56. That is, to the extent that the regulations threaten to impair the Acting Attorney General's ability to direct and supervise the Special Counsel, the Department of Justice may simply rescind or revise the regulations at any time. This ability to rescind or revise the regulations as needed means that the Special Counsel is subject to the Acting Attorney General's plenary supervision. It also makes the Special Counsel effectively removable at will: if the for-cause provision stands in the way, the Acting Attorney General need only rescind or revise the regulation in order to remove the Special Counsel. *See id.* at 65 (Williams, J., concurring) (explaining that special prosecutor Lawrence Walsh was an inferior officer due to the "the Attorney General's complete legal freedom to dispose of [him] by revocation of the Regulations"); *In re Grand Jury Investigation*, 2018 WL 3688461, at *14 ("If the regulations ever prevented the Attorney General from countermanding a Special Counsel's action or firing a Special Counsel who disobeyed directives, the Attorney General could rescind the regulations immediately and direct or fire the Special Counsel as he wished.").[6]

---

[6] *See also* Akhil Reed Amar, Testimony Before the S. Comm. on the Judiciary (Sept. 26, 2017) ("At present, a special counsel such as Robert Mueller is inferior (and thus constitutionally

The D.C. Circuit added one caveat in *Sealed Case*.  The decision to rescind the Special

Counsel regulations would be "[s]ubject to generally applicable procedural requirements."  *In re*

*Sealed Case*, 829 F.2d at 56.  Conceivably, procedural rulemaking requirements—such as notice-

and-comment or the 30-day delay rule—could impose burdens such that the executive branch

would not truly be free to rescind the regulations at will.  *See* 5 U.S.C. § 553.  Such

requirements, however, do not apply to "matter[s] relating to agency management or personnel,"

*id.* § 553(a)(2); notice-and-comment is not required for "rules of agency organization, procedure,

or practice," *id.* § 553(b)(A); and the 30-day delay rule does not apply to "interpretative rules and

statements of policy" or when the agency finds "good cause," *id.* § 553(d).  Indeed, when

promulgated in 1999, the Special Counsel regulations relied on these exceptions to avoid the

usual procedural requirements.  *See* 64 Fed. Reg. at 37,041.  A decision to rescind or revise the

Special Counsel regulations likewise fits comfortably within the exceptions, so procedural

requirements would not hamper the decision.

In addition, the Acting Attorney General retains a free hand to rescind the regulations

because such a decision likely would be unreviewable.  Under the Administrative Procedure Act,

judicial review is not available for actions "committed to agency discretion by law."  5 U.S.C.

§ 701(a)(2).  Under this standard, "review is not to be had if the statute is drawn so that a court

---

kosher) precisely because he can be fired at will."); William K. Kelley, *The Constitutional Dilemma of Litigation Under the Independent Counsel System*, 83 Minn. L. Rev. 1197, 1228 n.142 (1999) (During the events leading up to *Nixon*, "no source of law prohibited the President from demanding that his Attorney General repeal the regulations guaranteeing Jaworski independence and tenure, and then having him fired.  President Nixon could have accomplished that (assuming the presence of a willing Attorney General) literally in a moment."); Akhil Reed Amar, *Nixon's Shadow*, 83 Minn. L. Rev. 1405, 1407 (1999) (In *Nixon*, the Supreme Court "conceded that the Nixon Administration was free simply to rescind the regulation unilaterally— and then, Nixon could tell Jaworski what to do or where to go.").

would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985).  Thus, in determining whether a particular action is "committed to agency discretion by law," courts ask whether "statutes are drawn in such broad terms that in a given case there is no law to apply."  *Id.*; *see also Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002) ("[T]he 'no law to apply' formula has come to refer to the search for substantive legal criteria against which an agency's conduct can be seriously evaluated.").  Here, "[t]he sources of authority invoked by the Attorney General speak in the broadest imaginable terms," so "the search for any 'law to apply' is singularly unproductive."  *In re Sealed Case*, 829 F.2d at 64 (Williams, J., concurring); *see, e.g.*, 28 U.S.C. §§ 509, 510, 516; 5 U.S.C. § 301; *see also Manafort*, 2018 WL 2223656, at *10–14 (explaining that the Special Counsel regulations "do not create judicially enforceable rights").  Therefore, the Administrative Procedure Act would not provide for judicial review of a decision to rescind or revise the regulations, and in the absence of any other viable claim, the decision would be unreviewable.[7]

In the absence of procedural requirements or judicial review to hamstring his discretion, the Acting Attorney General retains the power to rescind or revise the Special Counsel regulations at will, and any purported limits on the power to remove or countermand persist only with the acquiescence of the Acting Attorney General.  As a result, the Special Counsel is

---

[7] *Nader v. Bork*, 366 F. Supp. 104 (D.D.C. 1973), reached the opposite conclusion, but under unique facts.  The district court reviewed and found arbitrary and capricious the decision by then-Acting Attorney General Robert Bork to rescind the regulations creating the Office of Watergate Special Prosecutor helmed by Archibald Cox.  *Id.* at 105–107, 109.  But Bork fired Cox while the regulations were in force (and without claiming that Cox met the regulations' standard for removal).  *Id.* at 107.  Then, three days later, Bork rescinded the regulations, purportedly retroactively.  *Id.*  In contrast, the analysis above contemplates the rescission or revision of the regulations while the Special Counsel is in office, not after firing the Special Counsel in violation of the regulations.

effectively removable at will, subject to the Acting Attorney General's plenary supervision, and thus an inferior officer.

        3.    *Morrison v. Olson*

Even if the Special Counsel is an inferior officer under *Edmond*, Concord argues in the alternative that the Special Counsel remains a principal officer under *Morrison v. Olson*. *See* Concord Mem. at 49–52. Although *Morrison* has been called into doubt by seemingly all quarters,[8] there is no need to consider *Morrison*'s continuing vitality because the result is no different under *Morrison*.

*Morrison* did not set forth a definitive test for differentiating between inferior and principal officers, but it identified four relevant factors: whether the officer is (1) "subject to removal by a higher Executive Branch official," (2) "empowered . . . to perform only certain, limited duties," (3) "limited in jurisdiction," and (4) "limited in tenure." 487 U.S. at 671–72. Of these factors, only the jurisdictional inquiry arguably weighs against inferiority here. Independent Counsel Alexia Morrison's "office" was "limited in jurisdiction" because the Ethics in Government Act was "restricted in applicability to certain federal officials suspected of certain

---

[8] *See, e.g.*, *PCAOB*, 561 U.S. at 510–511 (resolving an Appointments Clause challenge under *Edmond* without discussing or citing *Morrison*); *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 947 n.2 (2017) (Thomas, J., concurring) ("Although we did not explicitly overrule *Morrison* in *Edmond*, it is difficult to see how *Morrison*'s nebulous approach survived our opinion in *Edmond*."); Stanford Lawyer, Views from the Bench (May 30, 2015) (quoting Justice Kagan describing Scalia's *Morrison* dissent as "one of the greatest dissents ever written and every year it gets better"), https://law.stanford.edu/stanford-lawyer/articles/justice-kagan-and-judges-srinivasan-and-kethledge-offer-views-from-the-bench; Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 810, 811 (1999) (arguing that *Morrison* provided "a doctrinal test good for one day only" and that in *Edmond* the Supreme Court "apparently abandoned *Morrison*'s ad hoc test"); Adrian Vermeule, Morrison v. Olson *Is Bad Law*, Lawfare (June 9, 2017) ("*Morrison* is probably no longer good law. Indeed, the best understanding is that it has long since become anticanonical."); Linda Greenhouse, N.Y. Times (Sept. 1, 2016) (stating that, in his *Morrison* dissent, Justice Scalia's "words were prescient, his analysis airtight").

serious federal crimes" and because "an independent counsel can only act within the scope of the jurisdiction that has been granted" by the appointing authority. *Id.* at 672. That jurisdictional grant was quite narrow: Morrison was directed to investigate "whether the testimony of [Assistant Attorney General Theodore] Olson and his revision of such testimony on March 10, 1983 [before a House Subcommittee] violated either 18 U.S.C. § 1505 or § 1001, or any other provision of federal law," and she "ha[d] jurisdiction to investigate [and prosecute] any other allegation of evidence of violation of any Federal criminal law by Theodore Olson developed during investigations, by the Independent Counsel, referred to above, and connected with or arising out of that investigation . . . ." *Id.* at 667 (quoting Special Division Order of April 23, 1986). In contrast, the Special Counsel possesses a broad jurisdiction to investigate "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump" and "any matters that arose directly from the investigation." Appointment Order ¶ (b). The Special Counsel may also "prosecute federal crimes arising from the investigation of these matters." *Id.* ¶ (c). This jurisdictional framework is arguably broader than Morrison's, which cuts against inferiority.

The other three factors, however, point in the opposite direction. Like the Independent Counsel, the Special Counsel is "empowered . . . to perform only certain, limited duties," in the sense that his "role is restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes." *Morrison*, 487 U.S. at 671; *see also In re Grand Jury Investigation*, 2018 WL 3688461, at *22–24. Also, the Special Counsel is "limited in tenure." *Morrison*, 487 U.S. at 672. *Morrison* did not view this factor as requiring a time limit, but rather considered an officer's tenure limited if the officer "is appointed essentially to accomplish a single task, and when that task is over the office is terminated," which describes the Special Counsel's tenure.

*Id.*  Finally, the Special Counsel is far more removable than the Independent Counsel was.  The

Independent Counsel was removable "only for good cause," which the Supreme Court did not

define but understood to afford some degree of protection.  *Id.* at 663, 692–693.  The Special

Counsel, as discussed above, is effectively removable at will.  *See supra* Section III.A.2.  Under

*Morrison*, therefore, the Special Counsel is an inferior officer.  *See Libby*, 429 F. Supp. 2d at 45

(concluding based on *Morrison* that special prosecutor Patrick Fitzgerald was an inferior officer).

### B.     The Statutory Authority to Appoint the Special Counsel

Qualifying as an inferior officer, however, is not enough to satisfy the Appointments

Clause.  Congress must also "by Law vest" the authority to appoint the inferior officer in a

"Head of Department"—here, the Acting Attorney General.  U.S. Const. art. II, § 2, cl. 2.  The

Special Counsel contends that multiple statutory provisions establish the Acting Attorney

General's appointment authority, and the Special Counsel primarily relies on 28 U.S.C. § 533(1)

and 28 U.S.C. § 515(b).  *See* Opp'n at 24–35; Hr'g Tr. at 4–5.  Concord argues that no provision

gets the job done.  Concord Mem. at 20–39.  On a blank slate, this might be a difficult question

because the statutory provisions "do not explicitly authorize" the Acting Attorney General to

appoint a Special Counsel.  *In re Sealed Case*, 829 F.2d at 55.  Even so, Supreme Court and D.C.

Circuit precedent foreclose Concord's argument.

### 1.     28 U.S.C. § 533(1)

The text of § 533(1) offers the most promising hook for the Acting Attorney General's

authority to appoint a Special Counsel.  It states: "The Attorney General may appoint officials—

(1) to detect and prosecute crimes against the United States."  28 U.S.C. § 533(1).  Concord,

however, raises strong arguments that § 533 does not confer the authority at issue here.  First, the

provision refers to "officials," not "officers."  Although the two words share the same root and

overlapping definitions, *see In re Grand Jury Investigation*, 2018 WL 3688461, at *31, they are

not necessarily synonyms.  An "official" is someone "invested with an office," but "esp. a

subordinate one."  Webster's Seventh New Collegiate Dictionary (1963); *see also* Webster's

Second New International Dictionary (1934) ("esp. one having subordinate . . . powers").  This

definition may connote the subservience and lesser authority associated with a mere employee,

functionary, or agent.  In contrast, an "officer" holds the more substantial responsibility of an

"office of trust, authority, or command," not simply that of an "office."  Webster's Seventh New

Collegiate Dictionary (1963).  Also, in the specific context of appointments by department heads,

"officer" is a distinct and well-established legal term.  *See FAA v. Cooper*, 566 U.S. 284, 292

(2012) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a [legal]

term of art, it presumably knows and adopts the cluster of ideas that were attached to each

borrowed word in the body of learning from which it was taken.").  When vesting appointment

authority in department heads, other provisions specifically confer the power to appoint

"officers," not "officials."  *See, e.g.*, 7 U.S.C. § 610(a) (Agriculture Secretary "may appoint such

officers and employees, . . . and such experts, as are necessary to execute the functions vested in

him"); 20 U.S.C. § 3461(a) (Education Secretary "is authorized to appoint and fix the

compensation of such officers and employees, including attorneys, as may be necessary to carry

out the functions of the Secretary and the Department"); 42 U.S.C. § 913 (HHS Secretary "is

authorized to appoint and fix the compensation of such officers and employees"); 49 U.S.C.

§ 323(a) (Transportation Secretary "may appoint and fix the pay of officers and employees of the

Department of Transportation").  These provisions show that, had Congress meant to confer

"officer"-appointing power via § 533 or any other provision, "it easily could have done so."

*Baker Botts LLP v. ASARCO LLC*, 135 S. Ct. 2158, 2166 (2015).  As written, § 533 appears to confer something different: "official"-appointing power.[9]

In addition, the use of "officials" in § 533 is notable because provisions in the same chapter refer to "officers," *see* 28 U.S.C. § 535(a), (b) ("Government officers and employees"), as do provisions in adjacent chapters, *see* 28 U.S.C. § 509 (vesting the functions of "officers of the Department of Justice" and the functions of "agencies and employees of the Department of Justice" in the Attorney General"); 28 U.S.C. § 516 (reserving the conduct of federal litigation to "officers of the Department of Justice"); 28 U.S.C. § 519 ("[T]he Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party."); *see also* 28 U.S.C. §§ 515(a), 517, 518(b), 528, 529(a)(1), 530D(a)(1), 547(3).  Reading "official" as synonymous with "officer" therefore risks running afoul of the "usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."  *United States v. Monzel*, 641 F.3d 528, 533 (D.C. Cir. 2011) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 170 (2012) ("[A] material variation in terms suggests a variation in meaning.").

Further context also supports a circumscribed reading of § 533.  Section 533(1) is located alongside three other provisions authorizing the appointment of FBI-centric officials.  *See* 28

---

[9] The Special Counsel counters that the Supreme Court in *Edmond* located the power to appoint inferior officers in a statute that spoke much more generally than § 533.  *See* Opp'n at 26.  The statute at issue in *Edmond*, however, underscores § 533's deficiencies.  There, the Supreme Court held that a broad "default statute" gave the Secretary of Transportation appointment power.  *Edmond*, 520 U.S. at 656, 658.  But the statute, unlike § 533, specifically referred to officer appointments: "The Secretary of Transportation may appoint and fix the pay of officers and employees of the Department of Transportation and may prescribe their duties and powers." *Id.* (quoting 49 U.S.C. § 323(a)).  The Acting Attorney General does not have a comparable provision at his disposal for making officer appointments.

U.S.C. § 533(2), (3), (4) (authorizing the appointment of officials to assist in protecting the President and the Attorney General and conduct investigations).  And § 533 is within the chapter of the U.S. code devoted to the FBI, not the chapter that houses the Attorney General's other appointment authorities.  *Compare* 28 U.S.C. ch. 33 (chapter on the "Federal Bureau of Investigation" and housing § 533), *with* 28 U.S.C. ch. 35 (chapter on "United States Attorneys" and housing the Attorney General's authorizations to appoint assistant U.S. attorneys under § 542(a), "special attorneys" to assist U.S. attorneys under § 543(a), and interim U.S. attorneys under § 546(a)).  To be sure, as the Special Counsel points out, contextual indicators like statutory placement and section headings "cannot substitute for the operative text of the statute." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008); *see also* Hr'g Tr. at 11–13.  But as discussed above, the operative text of § 533 raises questions about whether its conferral of "official"-appointing power extends to officers.  As a result, acknowledging § 533's placement does not threaten to "limit the plain meaning of the text," and the placement thus remains "informative."  *Piccadilly*, 554 U.S. at 47 (internal quotation marks omitted); *see also Yates v. United States*, 135 S. Ct. 1074, 1083 (2015) (plurality opinion) (interpreting a statutory phrase in part based on its statutory placement).  Section 533's placement suggests interpreting the provision within the narrower context of its surrounding provisions governing the FBI and its investigations, not as a broad grant of authority for the Attorney General to appoint inferior officers generally and a Special Counsel in particular.[10]

---

[10] Indeed, that is how § 533 has been in read in the few cases to discuss appointments under it. Two cases, for example, state that § 533 empowers the Attorney General to appoint officials for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  *See United States v. Hasan*, 846 F. Supp. 2d 541, 546 n.7 (E.D. Va. 2012), *aff'd*, 718 F.3d 338 (4th Cir. 2013); *United States v. Fortuna*, No. 12-cr-0636, 2013 WL 1737215, at *2 n.8 (D.N.J. Apr. 22, 2013); *see also In re*

2.      28 U.S.C. § 515(b)

Likewise, § 515(b) does not explicitly authorize the Acting Attorney General to appoint a

Special Counsel.  In total, § 515 states:

> (a) The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.

> (b) Each attorney specially retained under authority of the Department of Justice shall be commissioned as special assistant to the Attorney General or special attorney, and shall take the oath required by law.  Foreign counsel employed in special cases are not required to take the oath. The Attorney General shall fix the annual salary of a special assistant or special attorney.

28 U.S.C. § 515.  On its face, § 515 does not explicitly empower the Acting Attorney General to

appoint or retain anyone.  Instead, § 515(a) empowers "any attorney specially appointed by the

Attorney General under law" to do certain things—namely, conduct legal proceedings.  *Id.*

§ 515(a).  And § 515(b) imposes a requirement that "[e]ach attorney specially retained under

authority of the Department of Justice shall be commissioned" and "shall take the oath."  *Id.*

§ 515(b).  But neither appears to vest the Acting Attorney General with the power to appoint or

retain such attorneys.

This reading is supported by the statute's verb tenses.  *See U.S. ex rel. Totten v.

Bombardier Corp.*, 380 F.3d 488, 493 (D.C. Cir. 2004) ("Congress' use of a verb tense is

significant in construing statutes." (internal quotation marks omitted)).  "Specially appointed"

and "specially retained" are past participles that modify "attorney."  A past participle can

_____

*Grand Jury Investigation*, 2018 WL 3688461, at *31.  An ATF agent, however, is a far cry from a Special Counsel.

"indicat[e] past or completed action," *Piccadilly*, 554 U.S. at 47, or as the Special Counsel notes, it can "describe the present state of a thing," *Henson v. Santander Consumer USA*, 137 S. Ct. 1718, 1722 (2017).  Section 515 thus refers either to attorneys who were already appointed or retained in the past, or it refers to attorneys who are presently appointed or retained.  Regardless whether § 515 refers to past or present conditions, it does not appear to convey the power to bring those conditions about.  Indeed, § 515 contrasts sharply with the numerous other statutes that *do* confer the power to appoint in a straightforward manner.  *See, e.g.*, 28 U.S.C. § 543(a) ("The Attorney General may appoint attorneys to assist United States attorneys."); *id.* § 542(a) ("The Attorney General may appoint one or more assistant United States attorneys."); *id.* § 546(a) ("[T]he Attorney General may appoint a United States attorney for the district in which the office of United States attorney is vacant."); 7 U.S.C. § 610(a) (department head "may appoint . . . officers and employees"); 49 U.S.C. § 323(a) (same); 20 U.S.C. § 3461(a) (department head "is authorized to appoint . . . officers and employees"); 42 U.S.C. § 913 (same).

Furthermore, § 515 refers to attorneys who are specially appointed by the Attorney General "under law" and specially retained "under Authority of the Department of Justice." These clauses become surplusage if § 515 provides standalone appointment power, for in that case the statute could have referred to attorneys "specially appointed under this section" or simply attorneys "specially appointed."  To avoid rendering theses clauses in § 515 superfluous, Concord counsels that they should be read to require some other law or authority—outside of § 515—to authorize the Acting Attorney General to make the special appointment.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotation marks omitted)).

3.       5 U.S.C. § 301 and 28 U.S.C. §§ 509 and 510

As additional sources of appointment authority, the Special Counsel points to three other statutory provisions that are no more explicit: §§ 509, 510, and 301.  Section 509 vests in the Attorney General the "functions of other officers of the Department" and the "functions of agencies and employees of the Department of Justice," while § 510 permits the Attorney General to "authoriz[e] the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."  28 U.S.C. §§ 509, 510.  But the Attorney General's general power to delegate duties to an existing officer is not the same as the power to appoint the officer in the first place.

Under the even broader § 301—the "housekeeping statute"—department heads "may prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business."  5 U.S.C. § 301.  This power to "keep house," however, is not the same as the power to "build the house" by appointing officers.  Otherwise, § 301 would threaten to swallow up the statutory appointment schemes enacted for various agencies, including the Department of Justice.  *See, e.g.*, 28 U.S.C. §§ 542(a), 543(a), 546(a); *see United States v. Janssen*, 73 M.J. 221, 225 (C.A.A.F. 2014) (explaining that relying on § 301 for appointment power "makes no sense in the face of the statutory structure that Congress has enacted for the Department of Defense," particularly because Congress would not "go to the trouble of enshrining [inferior officer] positions in statute and providing for their appointment" if § 301 got the same job done).  In sum, the individual provisions relied upon by the Special Counsel "do not explicitly authorize" the Acting Attorney General to appoint him.  *In re Sealed Case*, 829 F.2d at 55.

4.      *Nixon* and *Sealed Case*

Even though the statutes "do not explicitly authorize" the Acting Attorney General to

appoint the Special Counsel, *Nixon* and *Sealed Case* establish that the statutory provisions

"accommodate the delegation at issue." *In re Sealed Case*, 829 F.2d at 55.  Both cases involved

similar officers: special prosecutors appointed via Department of Justice regulations.  In both, the

Supreme Court and the D.C. Circuit stated that Congress empowered the Attorney General to

appoint the officers, albeit without analyzing specifically how any individual provision or

combination of provisions accomplished this.  Discussing Leon Jaworski's appointment in

*Nixon*, the Supreme Court explained:

> Congress has vested in the Attorney General the power to conduct the criminal
> litigation of the United States Government.  28 U.S.C. § 516.  It has also vested in
> him the power to appoint subordinate officers to assist him in the discharge of his
> duties.  28 U.S.C. §§ 509, 510, 515, 533. Acting pursuant to those statutes, the
> Attorney General has delegated the authority to represent the United States in
> these particular matters to a Special Prosecutor with unique authority and tenure.

*Nixon*, 418 U.S. at 694.  Similarly, *Sealed Case* addressed Lawrence Walsh's appointment under

Department of Justice regulations to investigate the Iran/Contra affair, particularly then-

Lieutenant Colonel Oliver North and any associates.  *See In re Sealed Case*, 829 F.2d at 51–54.

Noting that *Nixon* "presupposed the validity" of an "indistinguishable" regulation appointing a

special prosecutor, the D.C. Circuit stated:

> We have no difficulty concluding that the Attorney General possessed the
> statutory authority to create the Office of Independent Counsel: Iran/Contra and to
> convey to it the "investigative and prosecutorial functions and powers" described
> in 28 C.F.R. § 600.1(a) of the regulation.  The statutory provisions relied upon by
> the Attorney General in promulgating the regulation are 5 U.S.C. § 301 and 28
> U.S.C. §§ 509, 510, and 515.  While these provisions do not explicitly authorize
> the Attorney General to create an Office of Independent Counsel virtually free of
> ongoing supervision, we read them as accommodating the delegation at issue
> here.

*Id.* at 55 (footnotes omitted).

Concord dismisses these statements as mere dicta on an issue that was not presented to, nor analyzed by, the higher courts.  But these statements are not dicta.  They are necessary steps toward the higher courts' ultimate conclusions, so they are authoritative here.  Bryan A. Garner et al., *Law of Judicial Precedent* 51 (2016) ("The distinction between holding and a dictum doesn't depend on whether the point was argued by counsel and deliberately considered by the court, but instead on whether the solution of the particular point was more or less necessary to determining the issues involved in the case."); *In re Grand Jury Investigation*, 2018 WL 3688461, at *31 (quoting *Six Cos. of Cal. v. Joint Highway Dist. No. 13 of Cal.*, 311 U.S. 180, 187 (1940), as recognizing that a court's "statement of the ground of its decision" is not "a mere dictum").

Moreover, in *Sealed Case*, Oliver North and Lawrence Walsh *did* present the issue to the D.C. Circuit, at least at a high level of generality.  *See* Appellant's Br. at 1, *In re Sealed Case*, No. 87-5247 (D.C. Cir. July 21, 1987) (available on microfiche at the D.C. Circuit library) (summarizing one of the appeal issues as "[w]hether the Attorney General had legal authority to delegate the powers that he purported to convey in the regulation"); *id.* at 12–13 ("The Attorney General has no authority, particularly under any of the statutory provisions on which he purports to rely in promulgating this regulation, to limit th[e] constitutionally protected removal power." (citing 5 U.S.C. § 301 and 28 U.S.C. §§ 509, 510, and 515)); Appellee's Br. at 1, 26, *In re Sealed Case*, No. 87-5247 (D.C. Cir. July 27, 1987) (available on microfiche at the D.C. Circuit library) (responding that "the Attorney General had the legal authority to issue his Independent Counsel regulation pursuant to 5 U.S.C. § 301 and 28 U.S.C. §§ 509, 510, and 515" and "[t]he statutory authority of the Attorney General to appoint a special prosecutor was squarely upheld by the United States Supreme Court in *United States v. Nixon*").

Finally, even if the statements were dicta, they would still carry significant weight.  *See Winslow v. FERC*, 587 F.3d 1133, 1135 (D.C. Cir. 2009) ("[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative."); Garner et al., *Law of Judicial Precedent* 70 ("All federal courts place significant weight on the dicta of the U.S. Supreme Court.").

As a result, *Nixon* and *Sealed Case* resolve the issue.  "The statutory provisions relied upon by the [Acting] Attorney General in promulgating the regulations . . . do not explicitly authorize the [Acting] Attorney General to create an Office of [Special] Counsel," but they "accommodat[e] the delegation at issue here."  *In re Sealed Case*, 829 F.2d at 55.  That is, Congress "vested in [the Acting Attorney General] the power to appoint subordinate officers to assist him in the discharge of his duties," including "a Special Prosecutor with unique authority and tenure" such as the Special Counsel.  *Nixon*, 418 U.S. at 694.

## IV.  THE SEPARATION OF POWERS

Next, Concord briefly contends that the Special Counsel position violates core separation-of-powers principles in two ways.  The arguments resemble Concord's Appointments Clause challenge, just at a higher level of generality, and they fail for much the same reasons.

Concord first argues that if the Special Counsel regulations are not binding on the Special Counsel, then "there is no limitation at all on the scope of an investigation and prosecution," and "the byproduct is a powerful prosecutor, unguided, unconstrained, unfettered, and, indeed, foreign to this Nation's three-branch constitutional order."  Concord Mem. at 53.  To the contrary, in the absence of the regulations, the Special Counsel would be subject to the Acting Attorney General's plenary control by statute.  *See* 28 U.S.C. §§ 509, 516; *In re Grand Jury*

*Investigation*, 2018 WL 3688461, at *15.  Because executive power would remain wholly within the executive branch, no separation-of-powers problem would arise.

Second, Concord argues that Congress did not authorize the Attorney General to promulgate the Special Counsel regulations, which are thus "ultra vires" and lead to an "un-cabined federal prosecutorial authority."  Concord Mem. at 54, 56 (first quote from *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)).  The Attorney General, however, has ample authority to issue regulations that govern the Department of Justice.  *See* 5 U.S.C. § 301 (A department head "may prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business."); *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979) (Section 301 is a "grant of authority to the agency to regulate its own affairs.").  And far from "un-cabined," the Special Counsel is an inferior officer, supervised and directed by the Acting Attorney General.  *See supra* Section III.A.  This case does not present an encroachment by one branch against another.  Executive power, particularly the core executive power of prosecution, remains vested exclusively in the executive and subject to the executive's control.  *See* Art. II, § 1, cl. 1.  As constituted, the Special Counsel position does not violate core separation-of-powers principles.

## V.  THE APPOINTMENT ORDER

Finally, Concord argues that the Special Counsel's appointment order violates the Special Counsel regulations and the appointment order does not authorize the prosecution of Concord.  *See* Concord Mem. at 57–62.

### A.      Consistency with the Special Counsel Regulations

The appointment order, according to Concord, violates § 600.1 and § 600.4 of the Special Counsel regulations.  *See* Concord Mem. at 58–59.  Concord's challenge fails at the outset,

however, because the Special Counsel regulations do not create judicially enforceable rights.  As Judge Berman-Jackson and Judge Ellis explained at length, "the Special Counsel Regulations are internal 'rules of agency organization, procedure, or practice,' and not substantive rules that affect the rights and obligations of individuals outside the Department."  *Manafort*, 2018 WL 2223656, at *12 (quoting *Chrysler Corp.*, 441 U.S. at 301); *accord Manafort*, 2018 WL 3126380, at *11–14.  (Indeed, that is why the Acting Attorney General may rescind or revise the regulations at will.  *See supra* Section III.A.3.)  Because "internal agency regulations that were not required by the Constitution or a statute are not enforceable by the defendant in a criminal prosecution," the Special Counsel regulations "do not afford defendant grounds to move to dismiss the indictment."  *Manafort*, 2018 WL 2223656, at *12, *14 (citing *United States v. Caceres*, 440 U.S. 741, 749–54 (1979) and *United States v. Weisz*, 718 F.2d 413, 435 n.137 (D.C. Cir. 1983)); *accord Manafort*, 2018 WL 3126380, at *14.

Even if Concord could bring a challenge, the appointment order does not violate the Special Counsel regulations.  According to Concord, the Special Counsel appointment order violates § 600.1 because the appointment order does not establish the need for a criminal investigation of Concord, a conflict of interest as to Concord, or extraordinary circumstances as to Concord.  *See* Concord Mem. at 58.  But § 600.1 is not defendant-specific.  Rather, it permits the Acting Attorney General to appoint a Special Counsel upon a determination that a "criminal investigation of a . . . *matter* is warranted," an "investigation or prosecution of that . . . *matter* by a United States Attorney's Office or litigating Division of the Department of Justice would present a conflict of interest for the Department or other extraordinary circumstances," and "it would be in the public interest to appoint an outside Special Counsel to assume responsibility for

the *matter*." 28 C.F.R. § 600.1 (emphasis added).  Therefore, the appointment order's omission

of defendant-specific determinations does not conflict with § 600.1.

The appointment order is also consistent with § 600.4, which states:

> The jurisdiction of a Special Counsel shall be established by the Attorney
> General.  The Special Counsel will be provided with a specific factual statement
> of the matter to be investigated.  The jurisdiction of a Special Counsel shall also
> include the authority to investigate and prosecute federal crimes committed in the
> course of, and with intent to interfere with, the Special Counsel's investigation . . .

28 C.F.R. § 600.4.  Concord argues that the appointment order violates § 600.4 by giving the

Special Counsel jurisdiction to investigate "any matters that arose or may arise directly from" the

FBI's counter-intelligence investigation.  *See* Concord Mem. at 59; Appointment Order ¶ (b)(ii).

As explained by Judge Berman-Jackson, however, § 600.4 does not impose a limit on the Acting

Attorney General's power to delegate authority to the Special Counsel "as he sees fit."

*Manafort*, 2018 WL 2223656, at *15; *see also Manafort*, 2018 WL 3126380, at *9–11.

Therefore, the appointment order is on solid ground when it confers jurisdiction over "matters

that arose or may arise directly from" the investigation.

**B.      Authority to Prosecute Concord**

Concord also contends that the Special Counsel exceeded his authority under the

appointment order by investigating and prosecuting Concord.  Concord Mem. at 61–62.  The

appointment order authorizes the Special Counsel "to conduct the investigation confirmed by

then-FBI Director James B. Comey," *i.e.*, the investigation of "the Russian government's efforts

to interfere in the 2016 presidential election."  Appointment Order (introduction); *see also supra*

note 1.  And the authorized investigation "includ[es] any links and/or coordination between the

Russian government and individuals associated with the campaign of President Donald Trump"

and "any matters that arose or may arise directly from the investigation."  Appointment Order ¶ (b)(i), (ii).

Concord faults the indictment for lacking allegations regarding the Russian government, President Trump's campaign, links or coordination between Concord and the Russian government or President Trump's campaign, or interference by Concord with the Special Counsel's investigation.  *See* Concord Mem. at 61.  The appointment order, however, does not limit the Special Counsel to investigating individuals and entities that are part of the Russian government.  Rather, the Special Counsel may investigate the Russian government's interference "efforts," which involved non-governmental third parties.  *See* Opp'n at 57 (citing Intelligence Community Assessment, Assessing Russian Activities and Intentions in Recent U.S. Elections at 2 (Jan. 6, 2017)).  Concord's alleged actions are therefore within the scope of the Special Counsel's investigation.  Because the investigation of Concord was authorized, so was the prosecution.  *See* Appointment Order ¶ (c) (authorizing the Special Counsel "to prosecute federal crimes arising from the investigation"); *Manafort*, 2018 WL 3126380, at *8.  Therefore, by investigating and prosecuting Concord, the Special Counsel did not exceed his authority.

## CONCLUSION

For the foregoing reasons, the Court denies Concord's Motion to Dismiss the Indictment Based on the Special Counsel's Appointment and Authority.  Dkt. 36.  A separate order consistent with this decision accompanies this memorandum opinion.


DABNEY L. FRIEDRICH
United States District Judge

Date: August 13, 2018