**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

INTERNET RESEARCH AGENCY LLC, *et al*.,

       Defendants.

CRIMINAL NUMBER:

1:18-cr-00032-DLF

**DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S MOTION FOR
DISCOVERY REGARDING SELECTIVE PROSECUTION**

Defendant Concord Management and Consulting LLC ("Defendant" or "Concord"), by and through undersigned counsel, respectfully submits this motion and memorandum of points of law and authorities seeking discovery on the issue of selective prosecution.  Undersigned counsel has been unable to identify any reported case previously brought by the U.S. Department of Justice ("DOJ") alleging a § 371 conspiracy to defraud that is entirely dependent on an allegation of deceptive use of social media in a presidential election by non-governmental foreign nationals.[1]   Unless the Court accepts that no other private foreign nationals other than the Defendants in this case ever engaged in any such activity, this fact alone establishes a *prima facie* case of selective prosecution.  But the Court need not simply accept this obvious truth because publicly available reporting has shown that efforts by foreign individuals and groups to influence the 2016 presidential election are not limited solely to Russian nationals, but may include—at the least—Ukrainian, Middle Eastern, and British nationals.  Further, public

---

[1] Undersigned counsel has also been unable to identify any reported case where any defendant was charged with a § 371 conspiracy to defraud based on social media activity potentially covered by the Foreign Agents Registration Act, or visa fraud where a person obtained a tourist visa and then allegedly engaged in electioneering activity.  Whether any such cases exist is empirical, and such data is only in the possession of the government.  Surely no burden is involved because to produce the data involves only counting to zero.

reporting also indicates that foreign nationals—including Chinese, Canadian and Indian entities and individuals—made unlawful campaign contributions in connection with the 2016 presidential election.  But those matters have generated no criminal charges.

The Deputy Attorney General's appointment of the Special Counsel limited his investigative and indictment authority to contacts with Russians.  That only Russian individuals and entities now face criminal liability for substantially similar alleged conduct strongly suggests that the government has selectively prosecuted Russian individuals and entities for ***being Russian***—an action that would warrant dismissal of the Indictment.  The identification and prosecution of only Russians is particularly nefarious here because it coincided with massive political and public pressure on the Special Counsel to confirm a narrative generated by the Clinton campaign that the Russians had ensured the election of President Trump.  Because the publicly-available information at this stage strongly suggests that other instances of attempted foreign national influence have occurred, Concord seeks an order directing the government to provide discovery so that Concord may develop the factual record necessary to assert a full-throated selective-prosecution claim.

## I.     Introduction

The one-count conspiracy charge against Concord in this case is unprecedented.  Never before has any foreign national been indicted in the United States for alleged activity originating solely outside the United States relating to free speech in the form of communications and advertisements predominantly on social media concerning a U.S. presidential election.  By their very nature, social media platforms have no national borders—nor are they bound by those that do exist—thus, it is easy for any person wherever located to express views that may be read in any country that allows access to the social media platform.  Based on that fact alone, it defies common sense to think that Russian nationals were the only foreign individuals or entities to

have allegedly engaged in speech activities aimed at influencing other social media users in the United States with respect to the 2016 election. Yet here, the Order of the Deputy Attorney General limited the Special Counsel to investigation and prosecution only of "***Russian***" activity related to the 2016 presidential election campaign, and only "***links and/or coordination . . . with the campaign of President Donald Trump.***" Exhibit A, Deputy Attorney General Order No. 3915-2017, dated May 17, 2017 (emphasis added) available at https://www.justice.gov/opa/press-release/file/967231/download.

With that Order, the Deputy Attorney General predetermined that nationals of no other country would be investigated or prosecuted by the Special Counsel for supporting any other candidate. This action by the Deputy Attorney General, and the subsequent Indictment against Defendants here, is the purest form of selective prosecution, that is, Russian nationals such as Concord were singled out by the Deputy Attorney General for investigation and indictment by the Special Counsel for being Russian, even though: (1) nationals of other countries that allegedly engaged in similar conduct were not investigated or prosecuted by the Special Counsel or the DOJ, and (2) foreign nationals supporting candidates other than President Trump were not investigated or prosecuted by the Special Counsel or the DOJ.

Accordingly, Defendant requests that the Court order the government to produce information that will corroborate or refute Concord's claim of selective prosecution, including but not limited to any information regarding (1) what, if any, investigative or prosecutorial actions were taken regarding reported efforts by Ukrainian, Middle Eastern, and British individuals and organizations to influence the 2016 presidential election while attempting to avoid detection and scrutiny of their activities; (2) what, if any, investigative or prosecutorial actions were taken regarding reported campaign contributions by foreign nationals in the 2016

presidential campaign while attempting to avoid detection and scrutiny of their activities; and (3) other instances of alleged influence in the 2016 presidential election by any other foreign national, whether in support of President Trump, Hillary Clinton, or some other candidate. Such information is relevant to any potential selective prosecution motion because evidence of the types of influence at issue, whether successful or not, and any prosecutorial response by the government cannot be definitively determined based upon publicly-available sources. Thus, the only evidence to determine whether the DOJ and the Special Counsel have unconstitutionally singled out Russian nationals for prosecution is in the possession of the government.

## II.     Law

The Deputy Attorney General's and Special Counsel's discretion is subject to constitutional limitations including the equal protection component of the Fifth Amendment's Due Process Clause, which prohibits prosecutorial decisions based on race, religion, or other arbitrary classifications, including the exercise of protected constitutional rights. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *Wayte v. United States*, 470 U.S. 598, 608 (1985). Federal courts have long "recognized that it is unconstitutional to administer the law 'with an evil eye and an unequal hand so as practically to make unjust and illegal discrimination between persons in similar circumstances . . . ." *United States v. Napper*, 574 F. Supp. 1521, 1523 (D.D.C. 1983) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886)).

To obtain discovery on a selective-prosecution claim, a defendant must put forth "some evidence tending to show the existence of the essential elements of a selective prosecution claim." *Armstrong*, 517 U.S. at 468-70. These elements are: (1) that the defendant was singled out for prosecution from others similarly situated, and (2) that the prosecution was motivated by a discriminatory purpose. *See United States v. Palfrey*, 499 F. Supp. 2d 34, 39 (D.D.C. 2007). To make out such a claim sufficient to warrant discovery, the defendant must provide something

more than mere speculation or personal conclusions based on anecdotal evidence, but the standard "***necessarily is lower than the 'clear evidence' standard*** required for dismissal of the indictment." *United States v. Hsia*, 24 F. Supp. 2d 33, 49 (D.D.C. 1998), *reversed in part and appeal dismissed*, 176 F.3d 517 (D.C. Cir. 1999) (citing *Armstrong*, 517 U.S. at 470) (emphasis added).

With respect to the first prong, "[a] similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *United States v. Khanu*, 664 F. Supp. 2d 28, 32 (D.D.C. 2009) (internal quotation marks omitted); *see also Armstrong*, 517 U.S. at 469. With respect to the second prong, "[d]iscriminatory purpose implies more than intent as awareness of consequences. It implies that the decision maker selected or affirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610 (internal quotations omitted).

A party seeking discovery on a selective prosecution claim is not required to produce direct evidence of intent. *See United States v. Washington*, 705 F.2d 489, 494-95 (D.C. Cir. 1983) (recognizing that the district court had ordered discovery on discriminatory intent based on indirect evidence of statistics regarding "how many passport frauds were detected since 1975, how many detected frauds were prosecuted and how many frauds detected or prosecuted involved [a particular group]" and was thus uniquely in the government's possession)*; see also Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997) (noting that indirect evidence of bias or discriminatory motive may be sufficient in civil case alleging selective prosecution by Internal Revenue Service applying the same test for selective prosecution as that

used in criminal cases and noting that application of civil, as opposed to criminal, discovery rules did not affect the outcome of the case).

"If discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim" of selective prosecution. *Armstrong*, 517 U.S. at 468. This may include information demonstrating how many instances of the crime were detected, how many were prosecuted and how many involved individuals or entities of the defendant's nationality. *Washington*, 705 F.2d at 494-95. Concord can meet the threshold and is entitled to discovery.

### III.   Argument

The reason for the Special Counsel's targeted investigation and prosecution of Russians is obvious: the Order appointing the Special Counsel is limited to "the Russian government's efforts to interfere in the 2016 presidential election," and "links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump." Ex. A. The Appointment Order is dated May 17, 2017. As set forth below, much of the public reporting regarding efforts by other foreign nationals to interfere with the 2016 election came to light in late 2016 and early 2017.[2] Nevertheless, the Deputy Attorney General chose to limit the

---

[2] Efforts to influence are not limited to Russian actors—as the Special Counsel's investigation would suggest—nor have they abated since the 2016 election. Recent reporting in the Washington Post reveals that Facebook detected a wide-ranging effort by Iran, dating to 2011, to use the social media platform as part of a "sprawling disinformation operation" aimed at hundreds of thousands of people worldwide, including in the United States. Craig Timberg, Elizabeth Dwoskin, Tony Romm, Ellen Nakashima, *Sprawling Iranian influence operation globalizes tech's war on disinformation*, The Washington Post (August 21, 2018), https://www.washingtonpost.com/technology/2018/08/21/russian-iran-created-facebook-pages-groups-accounts-mislead-users-around-world-company-says/?utm_term=.e492d2847100. In response to this revelation, Senator Mark Warner of Virginia commented: "I've been saying for months that there's no way the problem of social media manipulation is limited to a single troll farm in St. Petersburg, and that fact is now beyond a doubt." *Id.* The ongoing nature of this problem and its acknowledged multinational scope further underscore the need for discovery to

Special Counsel's appointment to focus solely on activities by Russians in support of President Trump, despite the existing reports regarding these other efforts to interfere on behalf of multiple presidential candidates including Donald Trump, Hillary Clinton, and Bernie Sanders.

Widely-reported news stories have brought to light various attempts by foreign nationals to influence the 2016 presidential election through both traditional media and social media platforms, and, according to some reports, in a manner designed to avoid scrutiny by United States agencies and even to cause United States agencies (including the Special Counsel's Office) to take actions intended to have an effect on the political system of the United States. Those efforts provide the basis for a "colorable claim" that the Special Counsel has selectively pursued only individuals and entities of Russian nationality who allegedly supported the campaign of President Trump, while overlooking activities by other foreign nationals, either because they were not Russian or because they supported the campaign of another candidate. Based upon the number of reported stories—and the fact that many attempts to exert influence on social media or contribute to campaigns do not occur in the open—it is reasonable to conclude that the government is aware of other such attempts involving non-Russians but has not acted to prosecute them.

In *Armstrong*, the Supreme Court ruled that a defendant's evidence of discriminatory effect was insufficient to support a selective prosecution claim where it did not identify similarly situated offenders—individuals of a different race who could have been prosecuted but were not. 517 U.S. at 470. Here, to the contrary, publicly available information makes clear that foreign individuals and entities from several nations engaged in concerted activity, including social media postings disparaging a presidential candidate, intended to interfere in the 2016 presidential

determine what other foreign actors may have engaged in conduct that is substantially similar to what Concord is accused of, and have escaped criminal prosecution.

election, but were not prosecuted for that conduct. But these actors are not Russian, and as such, no charges have been brought against them. Indeed, they are "outside the protected class [and have] committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *Khanu*, 664 F. Supp. 2d at 32 (internal quotation marks omitted). If—as discovery will make clear—that is indeed the case, then information about these and other efforts to influence the 2016 election will be highly relevant to a subsequent selective prosecution claim and potential dismissal of the Indictment against Concord.

### A. Non-Russian individuals attempted to influence the 2016 election

#### 1. Ukrainian officials took actions seeking to benefit Hillary Clinton

Public reporting demonstrates that during the 2016 presidential election Ukrainian government officials and a Ukrainian-American operative supported the campaign of candidate Hillary Clinton and sought to damage the campaign of then-candidate Trump. *See, e.g.*, Kenneth P. Vogel and David Stern, *Ukrainian Efforts to Sabotage Trump Backfire*, Politico (Jan. 11, 2017), https://www.politico.com/story/2017/01/ukraine-sabotage-trump-backfire-233446; Roman Olearchyk, *Ukraine's Leaders Campaign Against 'Pro-Putin' Trump*, Financial Times (Aug. 28, 2016), https://www.ft.com/content/c98078d0-6ae7-11e6-a0b1-d87a9fea034f.

These efforts to influence and interfere with the presidential election allegedly included social media postings critical of candidate Trump. For example, in July 2016 former Ukrainian Prime Minister Arseny Yatseniuk posted on Facebook that Trump "challenged the very values of the free world." *Id*. That same month Arsen Avako, a Ukrainian government minister, posted messages on Facebook and Twitter calling Trump "an even bigger danger to the US than terrorism" and "dangerous for Ukraine and the US." Vogel and Stern, *supra.*

Ukrainian officials were also allegedly responsible for the dissemination of documents implicating Paul Manafort, who at the time was the chairman of the Trump campaign, in alleged wrongdoing involving the prior Ukrainian administration. *Id*. These documents included a handwritten list of alleged payments to Manafort—the so-called "black ledger" passed to the Ukrainian National Anti-Corruption Bureau by Viktor Trepak, a former Ukrainian security official, which became publicly known in August 2016. *See Statement regarding P. Manafort's Appearance on the Party of Regions Black Ledger*, website of the National Anti-Corruption Bureau of Ukraine (Aug. 18, 2016), https://nabu.gov.ua/en/novyny/statement-regarding-pmanaforts-appearance-party-regions-black-ledger. In June 2017, *Bloomberg News* reported that Ukrainian prosecutors had been unable to authenticate the "black ledger." *See, e.g.,* Volodymyr Verbyany, *Ukraine Says There's No Evidence of Illicit Payments to Manafort,* Bloomberg News (June 27, 2017), https://www.bloomberg.com/news/articles/2017-06-27/ukraine-says-there-s-no-evidence-of-illicit-payments-to-manafort. While these disclosures became the subject of the Special Counsel's investigation and eventual prosecution of Mr. Manafort, there has been no prosecution related to Ukrainian interference in the presidential election, and no public disclosure of the results of any efforts by the Special Counsel or other investigators to authenticate the so-called "black ledger" or determine whether this or any other documents were falsified by Ukrainian nationals to influence the 2016 presidential election.

### 2. A Middle Eastern envoy to the Trump campaign offered a proposal for an online manipulation campaign

A second reported instance of alleged foreign influence in the 2016 election relates to an August 2016 meeting between Donald Trump Jr. and an envoy purportedly representing Saudi Arabia's Crown Prince, Mohammad bin Salman, along with Abu Dhabi's Crown Prince Mohammed bin Zayed Al Nahyan of the United Arab Emirates. *See* Mark Mazzetti, Ronen

Bergman, David D. Kirkpatrick, *Trump Jr. and Other Aides Met With Gulf Emissary Offering Help to Win Election*, N.Y. Times (May 19, 2018), https://www.nytimes.com/2018/05/19/us/politics/trump-jr-saudi-uae-nader-prince-zamel.html.   The meeting also allegedly included George Nader, a Lebanese-American businessman, Joel Zamel, an Israeli specialist in social media manipulation, and Eric Prince, the founder of the private military contractor formerly known as Blackwater.   Zamel's company, called Psy-Group, allegedly offered a proposal for an online manipulation program designed to help elect candidate Trump by using thousands of fake accounts to promote him on Facebook.   Emily Stewart, *Donald Trump Jr. and Trump Aides Were Reportedly Open to Foreign Help in 2016 Election Beyond Russia*, Vox (May 19, 2018), https://www.vox.com/policy-and-politics/2018/5/19/17372344/donald-trump-jr-saudi-arabia-russia-meeting.   The Times article suggested that the reported meeting was "the first indication that countries other than Russia may have offered assistance to the Trump campaign in the months before the presidential election"—but no charges have been brought.[3]

> 3. **Christopher Steele engaged in a campaign to create media coverage negative to then-candidate Trump and to use unverified, and possibly false information to influence federal agencies to open and conduct investigations damaging to Trump**

A third reported instance of attempted interference in the 2016 election involved Christopher Steele—a British national, private investigator and former alleged MI6 intelligence agent who worked on-and-off as a confidential human source for the FBI.   Reporting reveals that Steele, while working for an English legal entity, worked with U.S. and foreign nationals to

---

[3] *The New York Times* article reports without attribution that the interactions between Mr. Nader, Mr. Zamel, and the Trump campaign "are a focus of the investigation" by the Special Counsel. If this is indeed the case, it further supports Concord's argument that the Special Counsel was focused only on allegations of interference in support of President Trump.  On the other hand, if this reporting is incorrect, it would support the argument that the Special Counsel focused solely on Russian nationals.  Either way, Concord is entitled to discovery on this issue.

influence U.S. public opinion and influence the outcome of the 2016 presidential election by acting as an anonymous source for media articles disseminating information Steele had compiled, allegedly based on his own investigation of then-candidate Trump, which Steele later admitted was unverified.  *See* Howard Blum, *How Ex-Spy Christopher Steele Compiled His Explosive Trump-Russia Dossier*, Vanity Fair (Apr. 2017), https://www.vanityfair.com/news/2017/03/how-the-explosive-russian-dossier-was-compiled-christopher-steele;     Rowan Scarborough, *Ex-Spy Admits Anti-Trump Dossier Unverified, Blames Buzzfeed for Publishing*, The Washington Times (Apr. 25, 2017), https://www.washingtontimes.com/news/2017/apr/25/christopher-steele-admits-dossier-charge-unverifie/.   Steele's actions were clearly aimed at discrediting and disparaging Donald Trump and, ultimately, to benefit the other presidential candidates in order to influence the outcome of the election.

Steele also reportedly interacted with U.S. federal officials in an effort to disseminate a dossier of Trump opposition research, reportedly including officials of the DOJ, the Federal Bureau of Investigation, the Department of State, the Central Intelligence Agency, and the staff of members of Congress.  *See, e.g.*, Jane Mayer, *Christopher Steele, the Man Behind the Trump Dossier*,     The     New     Yorker     (Mar.     12,     2018), https://www.newyorker.com/magazine/2018/03/12/christopher-steele-the-man-behind-the-trump-dossier.  In a January 4, 2018 letter sent to Deputy Attorney General Rosenstein and FBI Director Wray, Senator Charles Grassley, Chairman of the Senate Judiciary Committee, and Senator Lindsey Graham, Chairman of the Subcommittee on Crime and Terrorism, referred Mr. Steele "for investigation of potential violations of 18 U.S.C. § 1001," and stated that Steele told at least one Justice Department official that he "was 'desperate' to see that Mr. Trump was not elected president."  *See* Charles E. Grassley and Lindsey O. Graham, letter to Rod J. Rosenstein,

Deputy Attorney General, U.S. Department of Justice, and Christopher A. Wray, Director, Federal Bureau of Investigation (Jan. 4, 2018), https://www.judiciary.senate.gov/imo/media/doc/2018-02-06%20CEG%20LG%20to%20DOJ%20FBI%20(Unclassified%20Steele%20Referral).pdf (emphasis omitted).

According to later reporting, DOJ documents show that Steele was in contact with a top DOJ official both before and after the 2016 election; and both before and after Steele was formally notified that due to violations of FBI policy, he was forbidden from supplying information to the FBI. *See, e.g.*, Kimberley A. Strassel, *What Was Bruce Ohr Doing?*, The Wall Street Journal (Aug. 16, 2018), https://www.wsj.com/articles/what-was-bruce-ohr-doing-1534462447. Reportedly, text messages from Steele archived by the DOJ show that in late 2017, Steele was attempting to convey information to the FBI and the Special Counsel's Office indirectly, outside of official channels. *Id.*

But no charges have been filed against Steele, and no information has been made public about the government's efforts to authenticate the "Trump-Russia Dossier" that Steele disseminated before and after the 2016 presidential election. *See, e.g.,* Josh Gerstein, *Judge: Trump's Release of Dossier Memos Opens Door to Disclosures from FBI*, Politico (Aug. 16, 2018), https://www.politico.com/blogs/under-the-radar/2018/08/16/trump-dossier-fbi-disclosures-782237. Underscoring the need for discovery in this case, the FBI and other U.S. agencies have resisted multiple Freedom of Information Act requests seeking information about the U.S. government's dealings with Christopher Steele. *Id.*

**B.**     **Non-Russian foreign nationals made illegal contributions to support presidential campaigns in 2016**

**1.**     **Chinese Nationals Made Campaign Contributions to Support Jeb Bush**

In addition to the public evidence of non-Russian foreign nationals' efforts to influence the 2016 presidential election, reporting has also shown that other foreign nationals unlawfully contributed to 2016 presidential campaigns which is far more egregious.  For example, two Chinese citizens residing in Singapore used their U.S. corporation, American Pacific International Capital, Inc., to illegally contribute $1,300,000 to Jeb Bush's political action committee Right to Rise USA.  *See,* Jon Schwarz and Lee Fang, *The Citizens United Playbook: How a Top GOP Lawyer Guided a Chinese-Owned Company Into U.S. Presidential Politics*, The Intercept (Aug. 3, 2016), https://theintercept.com/2016/08/03/gop-lawyer-chinese-owned-company-us-presidential-politics/.  These allegations form the basis of a complaint filed with the Federal Election Commission in August 2016.  Ex. B, Complaint, *Campaign Legal Center, et al. v. Gordon Tang, et al.*, MUR No. __ (Federal Election Commission Aug. 10, 2016), available at http://www.campaignlegalcenter.org/sites/default/files/APIC%20Right%20to%20Rise%20complaint%208_10_16.pdf.[4]  Despite these public allegations of campaign finance violations against Chinese nationals in support of the presidential campaign of a candidate other than President Trump, there has been no prosecution by the DOJ of this matter.

---

[4] The complaint filed with the FEC in this matter does not appear on the FEC's Enforcement Query System (http://eqs.fec.gov/eqs/searcheqs), indicating that the matter is still pending before the FEC and has not been closed.  *See* Guidebook for Complainants and Respondents on the FEC Enforcement Process, Federal Election Commission, May 2012 at 7 (https://www.fec.gov/em/respondent_guide.pdf) ("Until the matter is closed, the Commission is required by law to keep its actions regarding the [Matter Under Review] confidential.").

### 2.    Australian Nationals Made Contributions to Support Bernie Sanders

The FEC also investigated and closed a matter involving alleged illegal campaign contributions by members of the Australian Labor Party in support of 2016 presidential candidate Bernie Sanders.  Ex. C, Complaint against the Australian Labor Party and Bernie 2016, the campaign committee of Bernie Sanders.  The complaint alleged that the Australian Labor party made payments for travel expenses and daily stipends for seven "delegates" from Australia who were placed within and provided campaign services to the Bernie 2016 campaign committee.  *Id.*  Ultimately, in 2018, the Australian Labor Party entered into a Conciliation Agreement with the FEC in which it agreed to pay a civil penalty and cease and desist violating FECA.  Ex. D, Conciliation Agreement.  There was no criminal prosecution related to these allegations by the DOJ or the Special Counsel's Office.

The fact that there has been no apparent interest by the DOJ or Special Counsel in investigating or prosecuting these allegations of violations of federal campaign laws against Chinese and Australian nationals in support of candidates other than Donald Trump further supports Concord's suspicion that the government is singularly focused on conduct by Russians in support of President Trump.

### C.    The Deputy Attorney General explicitly authorized a selective prosecution targeting Russian nationals

Although direct evidence of discriminatory purpose is exceedingly rare, it is present here, signed by the Deputy Attorney General.  The Appointment Order makes clear that the Special Counsel was not authorized to investigate election interference by just any foreign national, only Russians.  And not any and all election interference by Russians, but only that in support of the Trump campaign.  This is not simply general evidence of government profiling; rather, it is a mandate by the decision makers at the highest levels of the DOJ to focus solely on a select group

of individuals and not others.[5]   *Contra Khanu*, 664 F. Supp. 2d at 34 (finding insufficient evidence of discriminatory purpose in public reporting of government profiling of Muslims because it did not apply to the prosecutors responsible for defendant's case).

The Special Counsel has acknowledged in briefing that it adhered to the Appointment Order's singular focus on Russian individuals and entities.  For example, even though the Appointment Order specifically references "the Russian government's efforts to interfere in the 2016 presidential election," the Special Counsel has argued that this "would inevitably cover organized, Russia-based social-media campaigns."  Government's Opposition to Defendant's Motion to Dismiss at 46 (ECF No. 47).  The Special Counsel concedes that he did not have "open-ended authority" to investigate interference with the 2016 presidential election, but that "the central investigative mission specifically assigned by the Acting Attorney General," was "organized social-media active measures that were emanating from Russia and funded by an individual and companies with close ties to the Russian government."  *Id*. 49.  The only difference between that directive and the conduct discussed above, of course, is the country of origin.  Such distinctions are inappropriate, and are a sufficient basis to direct the government to provide discovery

## IV.    Conclusion

In this unprecedented criminal prosecution, where individuals and entities of a particular nationality were singled out for investigation and prosecution, Concord respectfully requests discovery from the government which might corroborate or refute its claim of selective prosecution.  The Appointment Order purporting to authorize the Special Counsel's investigation

---

[5] The pinpoint demographic and ideological targeting of the Special Counsel's mandate is ironically reminiscent of a quotation attributed to Lavrenty Beria, the chief of Joseph Stalin's secret police: "Show me the man, and I'll find you the crime."

is clear on its face that any such investigation would be limited to persons of Russian nationality who supported President Trump.  Public reporting indicates that non-Russian foreign nationals engaged in similar conduct that amounts to election interference and deceptive interference with the functions of federal agencies, in support of other candidates, but have not been subject to investigation or prosecution.

Dated:   August 31, 2018

Respectfully submitted,

CONCORD MANAGEMENT AND
CONSULTING LLC

By Counsel

/s/*Eric A. Dubelier*
Eric A. Dubelier
Katherine Seikaly
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
202-414-9200 (phone)
202-414-9299 (fax)
edubelier@reedsmith.com
kseikaly@reedsmith.com

James C. Martin*
Colin E. Wrabley*
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222-2716
412-288-3131 (phone)
412-288-3063 (fax)
jcmartin@reedsmith.com
cwrabley@reedsmith.com

*Admitted Pro Hac Vice*

# EXHIBIT A:

**Office of the Attorney General Order No. 3915-2017 Appointing Special Counsel Robert S. Mueller III. (May 17, 2017)**

**Defendant Concord Management and Consulting LLC's Motion for Discovery Regarding Selective Prosecution**
***United States v. Internet Research Agency LLC, et al.,***
**Criminal Action No. 18-00032-DLF**



Office of the Deputy Attorney General
Washington, D.C. 20530

ORDER NO. 3915-2017

APPOINTMENT OF SPECIAL COUNSEL
TO INVESTIGATE RUSSIAN INTERFERENCE WITH THE
2016 PRESIDENTIAL ELECTION AND RELATED MATTERS

By virtue of the authority vested in me as Acting Attorney General, including 28 U.S.C. §§ 509, 510, and 515, in order to discharge my responsibility to provide supervision and management of the Department of Justice, and to ensure a full and thorough investigation of the Russian government's efforts to interfere in the 2016 presidential election, I hereby order as follows:

(a)     Robert S. Mueller III is appointed to serve as Special Counsel for the United States Department of Justice.

(b)     The Special Counsel is authorized to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including:

   (i)     any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and

   (ii)    any matters that arose or may arise directly from the investigation; and

   (iii)   any other matters within the scope of 28 C.F.R. § 600.4(a).

(c)     If the Special Counsel believes it is necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters.

(d)     Sections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel.

_____5/17/17_____
Date

Rod J. Rosenstein
Acting Attorney General

# EXHIBIT B:

**Complaint, *Campaign Legal Center, et al. v. Gordon Tang, et al.*
(Federal Election Commission Aug. 10, 2016)**


**Defendant Concord Management and Consulting LLC's
Motion for Discovery Regarding Selective Prosecution
*United States v. Internet Research Agency LLC, et al.,*
Criminal Action No. 18-00032-DLF**

**BEFORE THE FEDERAL ELECTION COMMISSION**



CAMPAIGN LEGAL CENTER
1411 K Street, NW, Suite 1400
Washington, DC 20005
(202) 736-2200

J. GERALD HEBERT
1411 K Street, NW, Suite 1400
Washington, DC 20005
(202) 736-2200

     v.                                MUR No. _____

GORDON TANG
5 Thomas Mellon Cir, Suite 305
San Francisco, CA 94134

HUAIDAN CHEN
5 Thomas Mellon Cir, Suite 305
San Francisco, CA 94134

AMERICAN PACIFIC INTERNATIONAL CAPITAL, INC.
5 Thomas Mellon Cir, Suite 305
San Francisco, CA 94134

WILSON CHEN
5 Thomas Mellon Cir, Suite 305
San Francisco, CA 94134

### <u>COMPLAINT</u>

1.    This complaint is filed pursuant to 52 U.S.C. § 30109(a)(1) and is based on information

     and belief that Gordon Tang and Huaidan Chen have violated the prohibition on foreign

     nationals making contributions in connection with a federal election, that American

     Pacific International Capital, Inc. ("APIC") has violated the prohibition on providing

     substantial assistance in making such contributions, and that Wilson Chen has violated

     the prohibition on soliciting and providing substantial assistance in making such

1

contributions, in violation of the Federal Election Campaign Act ("FECA"), 52 U.S.C.

§ 30101, *et seq*.

2.      Specifically, based on published reports, complainants have reason to believe that

Gordon Tang and Huaidan Chen violated FECA's ban on any foreign national directly or

indirectly making a contribution in connection with a Federal election, 52 U.S.C.

§ 30121(a)(1)(A), by participating in the decision to direct $1.3 million in contributions

from APIC to Right to Rise USA (ID: COO571372), a super PAC supporting the

presidential candidacy of Jeb Bush. Additionally, based on published reports,

complainants have reason to believe that APIC violated the prohibition on providing

substantial assistance in the making of a foreign national contribution, 11 C.F.R.

§ 110.20(h), by allowing Tang and Huaidan Chen to participate in the decision to make

the contribution to Right to Rise USA. Finally, based on published reports, complainants

have reason to believe that Wilson Chen violated the prohibition on any person soliciting

a contribution from a foreign national, 52 U.S.C. § 30121(a)(2), and the prohibition on

providing substantial assistance in the making of a contribution from a foreign national,

11 C.F.R. § 110.20(h), by proposing that Tang, Huaidan Chen and APIC make the

contribution to Right to Rise USA.

3.      As a foreign-owned U.S. corporation, APIC is only permitted to make contributions if the

decision-making process is entirely controlled by U.S. citizens. 11 C.F.R. § 110.20(i),

AO 2000-17. Accordingly, Right to Rise USA's reports disclosing $1.3 million in

contributions from APIC caused complainant and the public to believe that the

contributions were not directly or indirectly made by a foreign national. By allowing

foreign nationals to direct APIC's contribution to Right to Rise USA, APIC failed to

2

disclose the nature of the contribution, misleading the public and complainants about the true sources of Right to Rise USA's financial support. APIC's failure deprived the public and complainant Hebert of the facts necessary to give proper weight to Right to Rise USA's messages, to evaluate those federal candidates it supported and to cast an informed vote.

4. "If the Commission, upon receiving a complaint … has reason to believe that a person has committed, or is about to commit, a violation of [the FECA] … [t]he Commission shall make an investigation of such alleged violation …." 52 U.S.C. § 30109(a)(2) (emphasis added); *see also* 11 C.F.R. § 111.4(a).

## FACTS

5. American Pacific International Capital, Inc. is "a California corporation owned by Gordon Tang and Huaidan Chen, a married couple who are citizens of China and permanent residents of Singapore."[1] According to *The Intercept*:

> The couple are the majority shareholders of SingHaiyi, a publicly traded Singapore-based corporation with a market value of about $250 million … According to a 2016 corporate filing by APIC, it is wholly owned by another corporation, 'Jag Pacific Ltd.,' which appears to be incorporated in the Bahamas. But whatever Jag Pacific's provenance, a 2012 SingHaiyi corporate circular states that APIC was ultimately '100 percent owned' by Tang and Chen. SingHaiyi's 2014 annual report also says that APIC was owned by the couple, and its 2016 report states APIC is 'controlled' by them.[2]

---

[1]     Jon Schwarz and Lee Fang, *The Citizens United Playbook: How a Top GOP Lawyer Guided a Chinese-Owned Company Into U.S. Presidential Politics*, THE INTERCEPT, Aug. 3, 2016, https://theintercept.com/2016/08/03/gop-lawyer-chinese-owned-company-us-presidential-politics/.

[2]     *Id.*

SingHaiyi's 2016 annual report also states that "APIC is an entity controlled by the controlling shareholders of the Company, Mr Gordon Tang and Mrs. Celine Tang a.k.a. Huaidan Chen]."[3]

6.     According to APIC's website, its board members include Chairman/President Gordon Tang, Vice President Jinshan Mao, Neil Bush, Wilson Chen and Huaidan Chen.[4] According to *The Intercept*, Tang and Huaidan Chen are foreign nationals, and Neil Bush and Wilson Chen are U.S. citizens.[5] Wilson Chen is Huaidan Chen's brother and Tang's brother-in-law.[6]

7.     Right to Rise USA is an single-candidate super PAC that was established to promote Jeb Bush's presidential campaign.[7]

8.     On March 26, 2015, APIC made a $1,000,000 contribution to Right to Rise USA, and on June 29, 2015, APIC contributed an additional $300,000.[8]

9.     On August 3, 2016, *The Intercept* reported that in interviews, "both Wilson Chen and Gordon Tang made statements that suggest Tang may have violated the relevant FEC regulations" barring foreign nationals from directly or indirectly participating in the decision-making process:

> According to Chen, 'I proposed to make a donation to the Republican Party and then let the board of directors approve it before sending the donation.' APIC's board includes Chen himself and Neil Bush, both U.S. citizens, but also Chinese citizens Tang and Huaidan Chen.

---

[3]     SingHaiyi Group Ltd. Annual Report 2016 at 54, *available at* http://infopub.sgx.com/FileOpen/SingHaiyi_Group_Ltd_Annual_Report_FY2016.ashx?App=Announcement&FileID=412563.

[4]     *See* APIC website, http://www.apicincus.com/ (last accessed Aug. 4, 2016).

[5]     Schwarz and Fang, *supra* note 1.

[6]     *Id.*

[7]     *See* Alex Isenstadt, *Jeb Bush's $100M May*, POLITICO, May 8, 2015, http://www.politico.com/story/2015/05/jeb-bush-right-to-rise-super-pac-campaign-117753.

[8]     *See* Right to Rise USA 2015 Mid-Year Report of Receipts and Disbursements, Schedule A (filed Jul. 31, 2015) at 1253, *available at* http://docquery.fec.gov/cgi-bin/fecimg?_201507319000471819+1252.

For Tang's part, when asked why APIC made the donation to Right to Rise USA, he responded: "Wilson said to donate, so I did, I don't really mind."[9]

10. *The Intercept* article also stated, "[w]hen asked whether Gordon Tang was unhappy with the donation to Rise to Rise USA given Jeb Bush's quick defeat, Chen said no: It was simply about helping a friend."[10]

11. Additionally, the article noted that "APIC, which was initially incorporated in Oregon, made contributions between 2010 and 2014 to state and local Oregon politicians, mostly Democrats, totaling about $25,000. The earlier donations include $9,500 given to John Kitzhaber, a Democrat who was elected governor of Oregon in 2010 and 2014 and resigned last year in an unrelated ethics scandal. 'You know the politicians,' said Wilson Chen about the company's history of donations. 'They always ask for help.'"[11]

## SUMMARY OF THE LAW

12. Federal law prohibits a foreign national from directly or indirectly making a contribution in connection with a Federal, State, or local election, 52 U.S.C. § 30121(a)(1), and prohibits any other person from soliciting a foreign national to make such a contribution, *id.* § 30121(a)(2), or from knowingly providing substantial assistance in the solicitation, making, acceptance or receipt of such a contribution, 11 C.F.R. § 110.20(h)(1).

13. "Contribution" is defined as "any gift … of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i).

---

[9]     Schwarz and Fang, *supra* note 1.
[10]    *Id.*
[11]    *Id.*; *see also* Oregon Secretary of State, "Campaign Finance Transactions,"
https://secure.sos.state.or.us/orestar/gotoPublicTransactionSearch.do (search "Contributor/Payee Information").

14.    "Foreign national" is defined as (1) a "foreign principal," such as a foreign corporation,[12]

and (2) "an individual who is not a citizen of the United States or a national of the United

States." 52 U.S.C. § 30121(b)(1-2).

15.    The Commission has promulgated regulations at 11 C.F.R. § 110.20 implementing the

statutory foreign national contribution ban. Those regulations provide that "a foreign

national shall not, directly or indirectly, make a contribution or a donation of money or

other thing of value, or expressly or impliedly promise to make a contribution or a

donation, in connection with any Federal, State, or local election," *id.* § 110.20(b), and

that "a foreign national shall not, directly or indirectly, make any expenditure,

independent expenditure, or disbursement in connection with any Federal, State, or local

election," *id.* § 110.20(f).

16.    Commission regulations additionally provide that:

> A foreign national shall not direct, dictate, control, or directly or indirectly
> participate in the decision-making process of any person, such as a corporation …
> with regard to such person's Federal or non-Federal election-related activities,
> such as decisions concerning the making of contributions, donations,
> expenditures, or disbursements in connection with elections for any Federal,
> State, or local office ...

*Id.* § 110.20(i).

17.    A corporation owned by foreign nationals or that is a subsidiary of a foreign corporation

is not itself a foreign national if it is both organized under the laws of a U.S. state and has

its principal place of business in the United States. 52 U.S.C. § 30121(b)(1); 22 U.S.C.

§ 611(b)(2). However, the Commission has advised that such a corporation may only

make contributions, expenditures or disbursements in connection with federal elections if

---

[12]    The statute cross-references the definition of "foreign principal" at 22 U.S.C. § 611(b), which defines "foreign principal" to include "a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country." 22 U.S.C. § 611(b)(3).

the decision-making process is entirely controlled by U.S. citizens. AO 2000-17

(Extendicare Health Services, Inc.); AO 2006-15 (TransCanada). In Advisory Opinion

2000-17, the Commission advised that, when a subsidiary's board includes foreign

nationals, the subsidiary must establish a Special Committee comprised solely of U.S.

citizens or permanent residents if it wishes to make contributions in connection with

elections. AO 2000-17.[13] Additionally, the Commission has advised that any

contributions made by a subsidiary under these conditions must be wholly derived from

earnings generated by the subsidiary's U.S. operations and not subsidized by the foreign

parent corporation. AO 1992-16; AO 2006-15.

18.   Commission regulations additionally provide that "[n]o person shall knowingly solicit,

accept, or receive from a foreign national any contribution or donation" to a political

committee or political party or in connection with U.S. elections. 11 C.F.R. § 110.20(g).

A "solicitation" is defined as "an oral or written communication that, construed as

reasonably understood in the context in which it is made, contains a clear message

asking, requesting, or recommending that another person make a contribution." *Id.*

§ 300.2(m).[14]

19.   Commission regulations also provide that "[n]o person shall knowingly provide

substantial assistance in the solicitation, making, acceptance or receipt of a contribution

or donation" prohibited under this section. *Id.* § 110.20(h)(1). "Substantial assistance"

refers to "active involvement" in the solicitation, making, receipt or acceptance of a

---

[13]     A board that includes foreign nationals may make a general decision to create a segregated fund or PAC and set a "not to exceed" budget, but all further decisions must be made by the Special Committee comprised of U.S. citizens or nationals. AO 2000-17.
[14]     The "solicit" definition at 11 C.F.R. § 300.2(m) is the relevant definition for section 110.20. *See* 11 C.F.R. § 110.20(a)(6).

foreign national contribution "with an intent to facilitate successful completion of the transaction." 67 Fed. Reg. 69945-6 (Nov. 19, 2002).

20.   A solicitation or the provision of substantial assistance under 11 C.F.R. § 110.20 is made "knowingly" if a person "has actual knowledge that the source of the funds solicited, accepted, or received is a foreign national," *id.* § 110.20(a)(4)(i), or is "aware of facts that would lead a reasonable person to conclude that there is a substantial probability that the source of the funds solicited, accepted or received is a foreign national," *id.* § 110.20(a)(4)(ii).

## CAUSES OF ACTION

### GORDON TANG AND HUAIDAN CHEN HAVE VIOLATED THE BAN ON FOREIGN NATIONALS MAKING CONTRIBUTIONS IN U.S. ELECTIONS

21.   Federal law prohibits a foreign national from directly or indirectly making a contribution in connection with a Federal, State, or local election, 52 U.S.C. § 30121(a)(1), or from directing, dictating, controlling, or directly or indirectly participating in the decision-making process of making such a contribution. 11 C.F.R. § 110.20(i).

22.   If a foreign national is on the board of a U.S. corporation, he or she will violate the foreign national contribution ban by directly or indirectly participating in decisions concerning the corporation's contributions. *Id. See also* AO 2000-17. When a corporation's board includes foreign nationals, it must establish a Special Committee comprised solely of U.S. citizens to control all decisions related to the making of contributions in connection with federal elections. AO 2000-17.

23.   Based on published reports, there is reason to believe that Gordon Tang and Huaidan Chen violated the ban on foreign nationals directly or indirectly making a contribution in connection with a federal election.

8

24.     Tang and Huaidan Chen are foreign nationals as that term is defined in 52 U.S.C.

        § 30121(b) and 11 C.F.R. § 110.20(a)(3).

25.     APIC is a California-based corporation "100 percent owned by" and "controlled by"

        Tang and Huaidan Chen.[15] Tang is the Chairman and President of APIC's board and

        Huaidan Chen is an APIC board member.

26.     APIC made $1.3 million in contributions to the federal political committee Right to Rise

        USA in 2015.

27.     According to news reports, Tang and Huaidan Chen approved APIC's contribution to

        Right to Rise USA in their respective capacity as APIC board chair and an APIC board

        member. Wilson Chen, who is also on the APIC board, told *The Intercept*, "I proposed to

        make a donation to the Republican Party and then let the board of directors approve it

        before sending the donation."[16] Tang has personally taken responsibility for APIC's

        decision to make the Right to Rise USA contribution, telling *The Intercept*: "Wilson

        [Chen] said to donate, so I did, I don't really mind."[17]

28.     Therefore, based on published reports, there is reason to believe that Tang and Huaidan

        Chen, both foreign nationals, directed, dictated, controlled, and/or directly or indirectly

        participated in the decision-making process of making contributions to Right to Rise

        USA, in violation of the prohibition on a foreign national directly or indirectly making a

        contribution in connection with a Federal, State or local election, 52 U.S.C.

        § 30121(a)(1).

---

[15]     Schwarz and Fang, *supra* note 1; SingHaiyi Annual Report 2016.
[16]     Schwarz and Fang, *supra* note 1.
[17]     *Id.*

## APIC HAS VIOLATED THE BAN ON PROVIDING SUBSTANTIAL ASSISTANCE TO FOREIGN NATIONALS MAKING CONTRIBUTIONS

29. Commission regulations prohibit a person from knowingly providing substantial assistance in the making of a foreign national contribution, donation, expenditure or disbursement. 11 C.F.R. § 110.20(h)(1). "Substantial assistance" refers to "active involvement…with an intent to facilitate successful completion of the transaction." 67 Fed. Reg. 69945-6. The provision of substantial assistance is made "knowingly" if a person "has actual knowledge that the source of the funds solicited, accepted, or received is a foreign national." *Id.* § 110.20(a)(4)(i).

30. If the U.S. subsidiary of a foreign corporation has a board of directors that includes foreign nationals, it must take affirmative steps to guarantee that those foreign nationals cannot directly or indirectly participate in the decision-making process concerning the subsidiary's contributions. Specifically, when a subsidiary's board includes foreign nationals, it must establish a Special Committee comprised solely of U.S. citizens to control all decisions related to the subsidiary making contributions in connection with federal elections. AO 2000-17.

31. APIC is "100 percent owned by" and "controlled by" Tang and Huaidan Chen, both of whom are foreign nationals and members of APIC's board, so APIC and the other members of its Board had actual knowledge that Tang and Huaidan Chen are foreign nationals.

32. Despite the requirement that only U.S. citizens or nationals make decisions concerning a subsidiary's contributions, APIC's $1.3 million contribution to Right to Rise USA was approved by Tang in his capacity as the Chairman/President and by Huaidan Chen in her capacity as a board member.

33.   Because APIC and its board were actively involved in allowing Tang and Huaidan

Chen—both foreign nationals—to directly participate in the decision-making process

concerning APIC's contributions to Right to Rise PAC, with the intent of facilitating

those contributions, APIC knowingly provided substantial assistance to foreign nationals

in making contributions in connection with a federal election, in violation of 11 C.F.R.

§ 110.20(h)(1).

### WILSON CHEN HAS KNOWINGLY AND ILLEGALLY SOLICITED, AND PROVIDED SUBSTANTIAL ASSISTANCE IN THE MAKING OF, CONTRIBUTIONS FROM FOREIGN NATIONALS

34.   Federal law and Commission regulations prohibit a person from soliciting contributions

from a foreign national, 52 U.S.C. § 30121(a)(2), 11 C.F.R. § 110.20(g), and from

knowingly providing substantial assistance in the making of a foreign national

contribution, donation, expenditure or disbursement, 11 C.F.R. § 110.20(h)(1).

35.   Commission regulations define a "solicitation" as "asking, requesting, or recommending

that another person make a contribution." 11 C.F.R. § 300.2(m).

36.   A solicitation or the provision of substantial assistance is made "knowingly" if a person

"has actual knowledge that the source of the funds solicited, accepted, or received is a

foreign national." *Id.* § 110.20(a)(4)(i).

37.   Based on published reports, there is reason to believe that Wilson Chen, a U.S. citizen,

has violated the prohibition on soliciting contributions from foreign nationals and the

prohibition on knowingly providing substantial assistance in the making of a foreign

national contribution.

38.     Wilson Chen had actual knowledge that Tang and Huaidan Chen were foreign nationals.

Tang is his brother-in-law and Huaidan Chen is his sister.[18]

39.     Wilson Chen admitted that he solicited APIC, a corporation "100 percent owned by"

foreign nationals Tang and Huaidan Chen, to contribute to Right to Rise USA, and

asked for approval for the contribution from APIC's five-person board of directors,

which was chaired by foreign national Tang and included foreign national Huaidan

Chen.

40.     Wilson Chen told *The Intercept*: "I proposed to make a donation to the Republican

Party and then let the board of directors approve it before sending the donation." [19]

Wilson Chen later described the contribution as attributable to Tang, with *The Intercept*

reporting: "When asked whether Gordon Tang was unhappy with the donation to Rise

to Rise USA given Jeb Bush's quick defeat, Chen said no: It was simply about helping

a friend."[20] And Tang has personally taken responsibility for APIC's decision to make

the Right to Rise USA contribution, telling *The Intercept*: "Wilson [Chen] said to

donate, so I did, I don't really mind."[21]

41.     Therefore, by soliciting foreign national members of APIC's board to make a decision

to contribute to Right to Rise PAC, Wilson Chen violated the ban on a person soliciting

contributions from a foreign national. 52 U.S.C. § 30121(a)(2); 11 C.F.R. § 110.20(g).

Additionally, by proposing that foreign national members of APIC's board approve the

contribution, Wilson Chen was actively involved in the making of a foreign national

contribution with the intent of facilitating the completion of the transaction, in violation

---

[18]     *Id.*
[19]     *Id.*
[20]     *Id.*
[21]     *Id.*

of the ban on knowingly providing substantial assistance to a foreign national in making a

contribution in connection with a federal election, 11 C.F.R. § 110.20(h)(1).

### PRAYER FOR RELIEF

42.   Wherefore, the Commission should find reason to believe that Gordon Tang, Huaidan

Chen, APIC and Wilson Chen have violated 52 U.S.C. § 30101, *et seq*., including 52

U.S.C. § 30121, and conduct an immediate investigation under 52 U.S.C. § 30109(a)(2).

Further, the Commission should determine and impose appropriate sanctions for any and

all violations, should enjoin the respondents from any and all violations in the future, and

should impose such additional remedies as are necessary and appropriate to ensure

compliance with the FECA.

August 10, 2016

Respectfully submitted,

*J. Gerald Hebert*

Campaign Legal Center, by
J. Gerald Hebert
1411 K Street, NW, Suite 1400
Washington, DC 20005
(202) 736-2200

*J. Gerald Hebert*

J. Gerald Hebert
1411 K Street, NW, Suite 1400
Washington, DC 20005
(202) 736-2200

Lawrence M. Noble
Brendan M. Fischer
The Campaign Legal Center
1411 K Street, NW, Suite 1400
Washington, DC 20005

Counsel to the Campaign Legal Center

## VERIFICATION

The complainants listed below hereby verify that the statements made in the attached

Complaint are, upon their information and belief, true.

Sworn pursuant to 18 U.S.C. § 1001.

**For Complainant Campaign Legal Center**

J. Gerald Hebert

Sworn to and subscribed before me this 10 day of August 2016.

Notary Public

**For Complainant J. Gerald Hebert**

J. Gerald Hebert

Sworn to and subscribed before me this 10 day of August 2016.

Notary Public

14

# EXHIBIT C:
**Complaint Against the Australian Labor Party and Bernie 2016
(March 15, 2016)**

**Defendant Concord Management and Consulting LLC's
Motion for Discovery Regarding Selective Prosecution
*United States v. Internet Research Agency LLC, et al.,*
Criminal Action No. 18-00032-DLF**

RECEIVED
FEDERAL ELECTION
William L. O'Brien COMMISSION

State Representative
Hillsborough (NH) District 5 2016 APR -4 AM 6: 59

P.O. Box 154

Mont Vernon, NH 03057-0154
OFFICE OF GENERAL
COUNSEL

March 15, 2016

MUR # 7035

Federal Election Commission
Office of the General Counsel
999 E Street N.W.
Washington, DC 20463

**Re: Complaint against the Australian Labor Party and Bernie 2016**

Dear Commissioners,

This letter constitutes a formal complaint filed under 52 U.S.C. § 30109(a)(1) of the Federal Election Campaign Act ("FECA"). In compliance with regulations, this complaint is filed by this original and three copies.

Based on information and belief as set forth below, the Australian Labor Party, a foreign political party espousing democrat socialist policies,[1] which also has international goals such as, in effect, seeking the dissolution of national borders to promote open immigration,[2] has violated the FECA and the regulations of the Federal Election Commission (the "Commission") that prohibit foreign contributions. *See* 52 U.S.C. § 30121(a)(1). Furthermore, by information and belief and as set forth below, the organizational campaign to elect Sen. Bernard Sanders as president, which organization is known as "Bernie 2016"[3] and which has registered with the Commission,[4] has violated the FECA and the Commission's regulations on accepting or receiving prohibited foreign contributions. *See* 52 U.S.C. § 30121(a)(2).

In response to these violations, I request that the Commission conduct an immediate investigation, make relevant findings, and impose appropriate sanctions, fines and remedial

---

[1] Australian Labor Party National Platform, page 202,
https://cdn.australianlabor.com.au/documents/ALP_National_Platform.pdf (accessed March 14, 2016).

[2] *Id.* at page 143, *et seq.*

[3] https://go.berniesanders.com/page/content/splash (accessed March 14, 2016).

[4]http://www.fec.gov/fecviewer/CandidateCommitteeDetail.do?candidateCommitteeId=C005771 30&tabIndex=1

1

measures to prohibit and preclude the further foreign financing of Bernie 2016 and to preclude other campaigns from allowing foreign participation in the selection of our president.

It is crucial that this requested investigation and the needed intervention by the Commission proceed with all immediate attention and reach a conclusion with all due deliberation in accordance with the schedule anticipated by the Commission's regulations. This foreign intervention into the presidential selection process may have had, and certainly will come to have, an extremely prejudicial effect on the democratic selection of the next president and, as time proceeds, this effect may well become irreparable. Indeed, the effect of this illegal reliance on foreign resources on the first-in-the-national presidential primary in New Hampshire is now beyond repair, but should not be beyond sanctions.

## I.   Paid Foreign Campaign Work in New Hampshire

### A. *Factual Background*

On February 25, 2016, a report from Project Veritas Action Fund featured several recorded conversations with people campaigning with Bernie 2016—the principal campaign committee for presidential candidate Bernie Sanders—prior to the New Hampshire primary. *See Australian Labor Party Assisting Democratic US Campaigns in Violation of Campaign Finance Laws*, YouTube, Feb. 25, 2016, https://www.youtube.com/watch?v=p7kPtWAzvU4 (hereinafter "Video"). These recordings featured foreign nationals—specifically, foreign nationals from Australia—stealing political yard signs and disclosing that they had replaced Hillary Clinton campaign literature with Sanders literature. *Id.* After a review of the footage, it appears these individuals were not volunteers.[5]

According to Australian citizen Rebecca Doyle, the Australian Labor Party ("ALP") provided support for their campaign work: "they pay for our flights, they pay for the cost of accommodation, which is just the staff house, and then we also get sixty dollars stipend a day." *Id.* at 04:56. According to another Australian national working on the Bernie 2016 campaign, Ben Kremer: "I couldn't afford to be here if [ALP] didn't pay for it." *Id.* at 07:00. Yet another – a third – Australian campaign worker, Sandeep Sarath, claimed the ALP "paid for our tickets." *Id.* at 07:30. The ALP also provided a "food allowance." *Id.* at 08:36.

Sarath also commented that three out of four of the New Hampshire "volunteers" were "full-time employees" of the Australian Labor Party. *Id.* at 11:30.

---

[5] Under the FECA and this Commission's interpretation of it, uncompensated volunteer services are not deemed contributions to a campaign. 11 C.F.R. § 100.74. However, compensated "volunteer" services are considered contributions. *See* Advisory Opinions 1981-51 (FEC Jan. 29, 1982); 1987-25 (FEC Sept. 17, 1987).

According to Kremer, Australian foreign nationals were also deployed to Nevada, New Hampshire, Iowa, South Carolina, and one other state. *Id.* at 06:48.

The candor, indeed, the brazen nature, of the disclosures of these violations did not end with statements by those Australian citizens paid by a foreign political party to work on the Sanders presidential campaign. Rich Pelletier, National Field Director for Bernie 2016,[6] confirmed their presence in New Hampshire, Nevada and Iowa. *Id.* at 10:00.

### B. *The Australian Labor Party and Bernie 2016 Violated FECA by Making, Accepting or Receiving Prohibited Foreign Contributions*

The ban on foreign contributions under FECA is broad and unequivocal:

> It shall be unlawful for—
> (1) a foreign national, *directly or indirectly*, to make--
> (A) a contribution or donation of money *or other thing of value* . . . in
> connection with a Federal, State, or local election;
> ***
> (2) a person to solicit, *accept*, or *receive* a contribution or donation described in
> subparagraph (A) . . . of paragraph (1) from a foreign national.

52 U.S.C. § 30121(a) (emphasis added). This ban was recently upheld even for foreign nationals financing the barest independent expenditure, which is typically afforded greater First Amendment protection than contributions. *See Bluman v. FEC*, 800 F.Supp.2d 281 (D.C. Cir. 2011) (upholding the ban against foreign expenditures under a strict scrutiny analysis), *aff'd*, 132 S.Ct. 1087 (2012).

The definition of "contribution" is also broad:

> (8)(A) The term "contribution" includes--
> (i) any gift, subscription, loan, advance, or deposit of money or anything of
> value made by any person for the purpose of influencing any election for
> Federal office; or
> (ii) the payment by any person *of compensation for the personal services of
> another person which are rendered to a political committee without charge
> for any purpose.*

52 U.S.C. § 30101(8)(A) (emphasis added). The Commission's regulations further provide that "[t]he payment for the personal services of another person if those services are rendered without charge to a political committee for any purpose, except for legal and accounting services . . . is a contribution." 11 C.F.R. § 100.54. FECA also includes an extensive list of exceptions to the term. *See* 52 U.S.C. § 30101(8)(B).

---

[6] *See* http://www.p2016.org/sanders/sandersorg.html (accessed March 14, 2016).

The Australian individuals in question are foreign nationals for purposes of FECA. They are not citizens of the United States or nationals of the United States, and not lawfully admitted for permanent residence. *See* 52 U.S.C. § 30121(b). The Australian Labor Party is, without doubt, a foreign national for all purposes under FECA as well. The money expended by ALP for travel to New Hampshire, housing in New Hampshire, and food in New Hampshire for the purpose of "volunteering" for Bernie 2016 are all prohibited contributions under FECA—in kind contributions of services and goods in connection with the 2016 presidential election. Bernie 2016 has accepted—or at least received—these contributions. All of this is in blatant contravention of the relevant and well-known FECA prohibition on foreign contributions.

The ALP's actions do not meet any exceptions to the term "contribution" described in 52 U.S.C. § 30101(8)(B). Assuming the ALP worked with someone else to provide housing, this use of real or personal property likely exceeded $1,000 in value. *See* 52 U.S.C. § 30101(8)(B)(ii); 11 C.F.R. § 100.75. Assuming the ALP qualifies for making unreimbursed payments for travel expenses, the cumulative value of plane tickets in this situation likely exceeded $1,000 in value for a single candidate in this election. 52 U.S.C.§ 30101(8)(B)(iv); 11 C.F.R. § 100.79. It is likely that by paying for the plane ticket for even *one* Australian "volunteer" ALP violated the contribution ban even under this exception, as the cost of plane tickets from Australia to the United States easily exceed $1,000 in cost.[7]

Finally, most disturbingly, Sandeep Sarath noted that three of four Australian "volunteers" for Bernie 2016 in New Hampshire were paid staff of the Australian Labor Party. One must wonder, given the enlightened sensibilities of the ALP, whether these staffers were utilizing vacation or earned leave time to "volunteer" for Bernie 2016, or if in fact, their contributions were made pursuant to their employer's expectations or perhaps dictates. *See* 11 C.F.R. § 100.54(c).

All of the facts recited are troubling in two ways.

First, Bernie 2016 appears to have coordinated an illegal scheme to accept illegal foreign national contributions. Agents of Bernie 2016 picked up the foreign nationals at the Manchester airport and gave them responsibilities in the campaign's field offices. *See* Video at 04:20. Moreover, with the frequent and unabashed public discussion of their reimbursement scheme by the ALP workers throughout the video, it is difficult to imagine Bernie 2016 was without knowledge of this financial arrangement. It cannot be argued with any credibility that the responsible officials of the camping receiving these illegal foreign contributions were any less aware of their illicit origination than was a stranger who the foreign nationals so candidly made their disclosures.

---

[7] For example, a flight leaving Sydney for New York on March 15, 2016 and returning on March 29, 2016 has an economy fare of (US)$4508.95.  See

https://www.orbitz.com/Details?action=UnifiedDetailsWidget@showDetails&rfrr=&c=02a0f332 -c8ee-4dae-ad62-009844861087&udpDisplayMode=normal (accessed on March 14, 2016).

4

Second, it appears that the ALP engaged in prohibited foreign intervention, perhaps in furtherance of its international goals of eliminating national borders, in a United States federal election by knowingly sending into the United States compensated agents who themselves were foreign nationals to promote the Bernie 2016 presidential campaign. The ALP then compounded this violation by then paying the expenses of those foreign agents while they worked on this U.S. presidential campaign.

Project Veritas Action's report shows nothing less than a concerted effort by the ALP to financially influence the 2016 presidential election. The evidence easily indicates more than $10,000 of in-kind contributions to Bernie 2016 in New Hampshire alone, and hints that similar financial outlays were made by ALP in several other state primaries. By all reasonable accounts and calculations, Bernie 2016 is responsible for accepting—or at least receiving—tens of thousands of dollars in foreign in-kind contributions. And the ALP is responsible for prohibited intervention in a federal election.

I ask that the Commission conduct an investigation into these allegations, declare the respondents to have violated the FECA and FEC regulations, refer criminal violations to the Department of Justice, and impose sanctions appropriate for these violations.

Sincerely,

Rep. William L. O'Brien

Sworn and subscribed to before me, a notary public, by the said William L. O'Brien on March 15, 2016.

Notary Public

My commission expires:

Amanda M Boissonneault
Notary Public, State of New Hampshire
My Commission Expires Oct. 21, 2020

5

# EXHIBIT D:

**Conciliation Agreement,** *In the Matter of Bernie 2016 and Susan Jackson in Her Official Capacity as Treasurer*
**(March 15, 2016)**

**Defendant Concord Management and Consulting LLC's
Motion for Discovery Regarding Selective Prosecution**
*United States v. Internet Research Agency LLC, et al.,*
**Criminal Action No. 18-00032-DLF**

## BEFORE THE FEDERAL ELECTION COMMISSION

In the Matter of     )
          )  MUR   7035
Bernie 2016 and Susan Jackson in her )
 official capacity as treasurer   )

## CONCILIATION AGREEMENT

This matter was generated by a complaint filed with the Federal Election Commission

("Commission").  The Commission found reason to believe that Bernie 2016 and Susan Jackson

in her official capacity as treasurer ("Committee" or "Respondent") violated 52 U.S.C.

§ 30121(a)(2).

NOW, THEREFORE, the Commission and the Respondent, having participated in

informal methods of conciliation, prior to a finding of probable cause to believe, do hereby agree

as follows:

I.  The Commission has jurisdiction over the Respondent and the subject matter of this

proceeding, and this agreement has the effect of an agreement entered pursuant to 52 U.S.C.

§ 30109(a)(4)(A)(i).

II.  Respondent has had a reasonable opportunity to demonstrate that no action should be

taken in this matter.

III.  Respondent enters voluntarily into this agreement with the Commission.

IV.  The pertinent facts in this matter are as follows:

1.  Bernie 2016 ("Committee") is the principal campaign committee of 2016

Presidential candidate Bernie Sanders.  Susan Jackson is the treasurer of the Committee.

2.  The Australian Labor Party ("ALP") is a political party in Australia.

MUR 7035
Bernie 2016 *et al.*
Conciliation Agreement
Page 2

3.      In November 2015, ALP asked the Committee to allow Australian delegates to be placed as volunteers with the Committee.  The Committee agreed and proceeded to make arrangements for the arrivals of delegates to various campaign offices of the Committee.

4.      The Committee treated the ALP delegates no differently from any other campaign out-of-town volunteers and was aware that they were receiving a stipend from ALP.

5.      ALP delegates engaged in hands-on activity typical of volunteers while placed with the Committee, including encouraging voter attendance at campaign events, recruiting volunteers, canvassing with volunteers, and planning events.  These activities indicate that the delegates provided campaign services to the Committee.  Information in the Commission's possession indicates that ALP paid a total of $16,140 for the delegates' flights and $8,282 for their daily stipends.

6.      The Federal Election Campaign Act of 1971, as amended ("Act"), prohibits any foreign national from making "a contribution or donation of money or other thing of value" in connection with a federal, state, or local election.  52 U.S.C. § 30121(a)(1)(A); 11 C.F.R. § 110.20(b).  A "foreign national" means a foreign principal, which includes a "foreign political party."  52 U.S.C. § 30121(b)(1), referencing 22 U.S.C. § 611(b)(1).  A "contribution" includes "the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose."  52 U.S.C. § 30101(8)(A)(ii); 11 C.F.R. § 100.54.  A "contribution" does not include "the value of services provided without compensation by any individual who volunteers on behalf of a candidate or political committee."  52 U.S.C. § 30101(8)(B)(i); 11 C.F.R. § 100.74.  The Act and Commission regulations also prohibit persons from knowingly accepting or receiving a contribution from a

foreign national.  52 U.S.C. § 30121(a)(2); 11 C.F.R. § 110.20(g).  The costs of travel taken at the direction of the candidate or staff or authorized or requested by the candidate or staff are contributions.  *Buckley v. Valeo*, 424 U.S. 1, 37, 38 (1976).

7.      Respondent contends that the Committee and its staffers did not request that the ALP send the delegates and did not request that the ALP pay for the delegates' airfare or stipends.  Respondent further contends that although some Committee staffers were aware that the ALP delegates received a stipend from the ALP, these Committee staffers mistakenly believed that the services performed by the ALP delegates constituted exempt volunteer activity.

V.   Solely for the purpose of settling this matter expeditiously and to avoid the expense of litigation, and without admitting liability, Respondent agrees not to further contest the Commission's finding that Respondent accepted a $24,422 prohibited in-kind foreign national contribution in violation of 52 U.S.C. § 30121(a)(2).

VI.      Respondent will do the following:

1.      Respondent will pay a civil penalty to the Federal Election Commission in the amount of Fourteen Thousand, Five Hundred dollars ($14,500), pursuant to 52 U.S.C. § 30109(a)(5)(A).

2.      Respondent will cease and desist from violating 52 U.S.C. § 30121(a)(2).

VII.  The Commission, on request of anyone filing a complaint under 52 U.S.C. § 30109(a)(1) concerning the matters at issue herein or on its own motion, may review compliance with this agreement.  If the Commission believes that this agreement or any requirement thereof has been violated, it may institute a civil action for relief in the United States District Court for the District of Columbia.

MUR 7035
Bernie 2016 *et al.*
Conciliation Agreement
Page 4

VIII.  This agreement shall become effective as of the date that all parties hereto have executed same and the Commission has approved the entire agreement.

IX.  Respondent shall have no more than 30 days from the date this agreement becomes effective to comply with and implement the requirements contained in this agreement and to so notify the Commission.

X.  This Conciliation Agreement constitutes the entire agreement between the parties on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by either party or by agents of either party, that is not contained in this written agreement shall be enforceable.

FOR THE COMMISSION:

Lisa J. Stevenson
Acting General Counsel

BY:  _____        _____
     Kathleen Guith                          2-14-18
     Associate General Counsel               Date
        for Enforcement

FOR THE RESPONDENT:

     _____        _____
     Brad C. Deutsch                         1/19/2018
     Counsel for Respondent                  Date

# EXHIBIT E:
### Proposed Order

**Defendant Concord Management and Consulting LLC's
Motion for Discovery Regarding Selective Prosecution,
*United States v. Internet Research Agency LLC, et al.,*
Criminal Action No. 18-00032-DLF**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 18-00032 (DLF) |
| INTERNET RESEARCH AGENCY LLC, *et al.*, | |
| Defendants. | |

## ORDER

With the Court having considered Defendant Concord Management and Consulting LLC's Motion for Discovery Regarding Selective Prosecution, it is hereby

**ORDERED** that the motion is **GRANTED**; and it is

**FURTHER ORDERED** that the government produce all information that will corroborate or refute Concord's claim of selective prosecution.


_____
DABNEY L. FRIEDRICH
United States District Judge

Date:

PERSONS TO BE SERVED WITH ORDER:

Michael R. Dreeben
Jeannie S. Rhee
L. Rush Atkinson
Ryan K. Dickey
Heather N. Alpino
U.S. DEPARTMENT OF JUSTICE
Special Counsel's Office
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Jonathan I. Kravis
Deborah A. Curtis
Kathryn L. Rakoczy
U.S. DEPARTMENT OF JUSTICE
U.S. Attorney's Office
  for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

*Counsel for United States of America*

Eric A. Dubelier
Katherine J. Seikaly
REED SMITH LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005-3373

James C. Martin
Colin E. Wrabley
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222-2716

*Counsel for Defendant Concord
Management and Consulting LLC*