UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **INTERNET RESEARCH AGENCY, ET AL.,** | **Crim. No. 18-cr-32 (DLF)** |
| **Defendants.** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
FOR DISCOVERY ON CLAIM OF SELECTIVE PROSECUTION**

The United States of America respectfully opposes defendant Concord Management and Consulting, LLC's motion requesting discovery on a claim of selective prosecution. Dkt. No. 61. Concord's motion fails to meet the rigorous standard for overcoming the presumption of regularity that attaches to prosecutorial decision-making, and therefore Concord is not entitled to discovery on a claim of selective prosecution.

**STATEMENT**

On January 6, 2017, the U.S. Intelligence Community ("USIC") released an assessment entitled "Assessing Russian Activities and Intentions in Recent US Elections." *See* https://www.dni.gov/files/documents/ICA_2017_01.pdf (the "ICA"). Among other things, the USIC assessed that "Russian efforts to influence the 2016 US presidential election represent the most recent expression of Moscow's longstanding desire to undermine the US-led liberal democratic order, but these activities demonstrated a significant escalation in directness, level of activity, and scope of effort compared to previous operations." ICA ii. "Russia, like its Soviet predecessor," the ICA continued, "has a history of conducting covert influence campaigns

focused on US presidential elections that have used intelligence officers and agents and press placements to disparage candidates perceived as hostile to the Kremlin." *Id.*

On March 20, 2017, then-FBI Director James B. Comey testified before the House Permanent Select Committee on Intelligence about the FBI's investigation into Russian interference with the 2016 presidential election. In open session, Comey stated:

> I have been authorized by the Department of Justice to confirm that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts.

Statement of FBI Director James B. Comey, H. Perm. Select Comm. on Intelligence, *Hearing on Russian Active Measures Investigation* (Mar. 20, 2017) ("Comey Testimony"), *available at* https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation. Comey added that "[a]s with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed." *Id.*

On May 17, 2017, Acting Attorney General Rod J. Rosenstein issued an order appointing Robert S. Mueller, III, as Special Counsel "to investigate Russian interference with the 2016 presidential election and related matters." Office of the Deputy Att'y Gen., Order No. 3915-2017, *Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters*, May 17, 2017 ("Appointment Order") (capitalization omitted). "The Special Counsel," the Order stated, "is authorized to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017," including:

> (i)   any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and

(ii)      any matters that arose or may arise directly from the investigation; and

(iii)     any other matters within the scope of 28 C.F.R. § 600.4(a).

*Id.* ¶ (b).  "If the Special Counsel believes it is necessary and appropriate," the Order provided, "the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters."  *Id.* ¶ (c).

On February 16, 2018, a grand jury returned an eight-count Indictment in this case against thirteen Russian individuals and three Russian corporations.  The Indictment alleges that the defendants engaged in a multi-year conspiracy, operating out of Russia, to defraud the United States by impairing, obstructing, and defeating the lawful functions of the government, through fraud and deceit, for the purpose of interfering with the U.S. political and electoral processes. Dkt. No. 1, ¶¶ 1–7.  The conspiracy included a Russian organization, defendant Internet Research Agency LLC (the "Organization"), that conducted what it called "information warfare" against the United States to spread "distrust towards the candidates" in the 2016 election and "the political system in general."  *Id.* ¶ 10.  The Indictment further alleges that defendant Yevgeniy Viktorovich Prigozhin approved, supported, and funded the Organization's operations through other entities that he directly controls, particularly defendant Concord Management and a second entity, defendant Concord Catering.  *Id.* ¶¶ 3, 11-12.  Concord "was the Organization's primary source of funding for its interference operations."  *Id.* ¶ 11.  Concord also "controlled funding, recommended personnel, and oversaw the Organization's activities through reporting and interaction with Organization management."  *Id.*

According to the indictment, to carry out their interference activities without detection of their Russian affiliation, the defendants "knowingly and intentionally" conspired to obstruct the lawful functions of the Federal Election Commission, the Department of Justice, and the

Department of State.  Dkt. No.1, ¶¶ 7, 9.   The Indictment further details that the defendants used

a host of deceptive means to impede these entities' functions, including surreptitious intelligence

gathering in the United States by foreign agents, influence operations conducted through false

online personas, and fraudulent visa applications for entry to the United States.  *Id.*  ¶¶ 10–11.

## ARGUMENT

## CONCORD IS NOT ENTITLED TO DISCOVERY ON A CLAIM OF SELECTIVE PROSECUTION

As the Supreme Court has explained, a "presumption of regularity" supports the

Executive Branch's prosecutorial decisions, and "in the absence of clear evidence to the

contrary, courts presume that" Executive Branch officials "have properly discharged their

official duties."  *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v.

Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).   Several factors support the presumption

of regularity that attaches to prosecutorial decisions.  First, the presumption "rests in part on an

assessment of the relative competence of prosecutors and courts."  *Id.* at 465.  "Such factors as

the strength of the case, the prosecution's general deterrence value, the Government's

enforcement priorities, and the case's relationship to the Government's overall enforcement plan

are not readily susceptible to the kind of analysis the courts are competent to undertake."  *Id.*

(quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).  Second, deference to Executive

Branch prosecutorial decision-making "also stems from a concern not to unnecessarily impair the

performance of a core executive constitutional function."  *Id.*   For these reasons, "[p]rosecutors

have broad discretion to enforce the law, and their decisions are presumed to be proper absent

clear evidence to the contrary."  *United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017),

*cert. denied*, 138 S. Ct. 1990 (2018).  To overcome that presumption, a defendant must present

"clear evidence" that a decision to prosecute was "based on 'an unjustifiable standard such as

race, religion, or other arbitrary classification.'" *Armstrong*, 517 U.S. at 464-65 (citations omitted).

The standard for obtaining discovery on a selective prosecution claim is "correspondingly rigorous," as such discovery "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy." *Armstrong*, 517 U.S. at 468; *see also United States v. Bass*, 536 U.S. 862, 864 (2002) (per curiam) (summarily reversing unfounded selective-prosecution discovery order which itself "threaten[ed] the performance of a core executive constitutional function") (internal quotation marks and citation omitted).  Under that standard, the defendant must put forward "some evidence tending to show the existence of the essential elements of the defense." *Armstrong*, 517 U.S. at 468 (citation omitted).  Accordingly, a defendant is not entitled to discovery on a claim of selective prosecution absent a "colorable showing" that (1) the defendant was "singled out for prosecution from among others similarly situated" and (2) "the prosecution is improperly motivated, *i.e.*, based on an arbitrary classification." *United States v. Blackley*, 986 F. Supp. 616, 617-18 (D.D.C. 1997).  "The District of Columbia Circuit requires that this colorable showing be made with respect to both prongs of the test." *Id.* (citing *Attorney General of the United States v. Irish People, Inc.*, 684 F.2d 928, 947 (D.C. Cir. 1982)); *accord Bass*, 536 U.S. at 863 ("[A] defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent.")

### A. Concord Has Not Made a Colorable Showing That It Was Singled Out for Prosecution from Others Similarly Situated

To prevail on the first prong, Concord must show "that there exist persons who *engaged in similar conduct* and were not prosecuted." *Blackley*, 986 F. Supp. at 618 (emphasis in original).  A person has "engaged in similar conduct" and therefore is "similarly situated" for

purposes of a selective prosecution claim "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000) (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)).  Or, as the Eleventh Circuit has concluded, a person is "similarly situated" for selective prosecution purposes if he "engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant." *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000).

Concord has failed to make such a showing.  In its motion, Concord claims to have identified three "[n]on-Russian individuals" who "attempted to influence the 2016 election" and two "[n]on-Russian foreign nationals" who "made illegal contributions to support presidential campaigns in 2016."  Dkt. No. 61, at 8-14.  Those five examples from a single election cycle do not come close to the "colorable showing" of being singled out for prosecution required to obtain discovery on a selective prosecution claim because they do not involve "similar conduct" to that charged in the indictment.

As described above, the indictment alleges a multi-year conspiracy to defraud the United States through a variety of deceptive acts that had, as one purpose, deceiving the United States government and thereby obstructing its lawful functions to address foreign activity in the United States.  The scale, multifaceted means, and actual conduct of the conspiracy are detailed in the indictment.

None of Concord's examples remotely compares to this systematic, deceptive effort to interfere in our democracy.  First, Concord points to Ukrainian officials who posted social media messages about the 2016 presidential election.  Dkt. No. 61, at 8.  But those officials posted messages using their real identities, whereas the indictment alleges that Concord and its co-conspirators used social media messages and groups that "falsely claimed to be controlled by U.S. activists when, in fact, they were controlled by Defendants."  Dkt. No. 1, ¶ 4; *see also id.* ¶ 5 ("Defendants also procured and used computer infrastructure…to hide the Russian origin of their activities and to avoid detection by U.S. regulators and law enforcement."); *id.* ¶ 6 ("Defendants also staged political rallies inside the United States, and while posing as U.S. grassroots entities and U.S. persons, and without revealing their Russian identities and [Internet Research Agency] affiliation, solicited and compensated real U.S. persons to promote or disparage candidates."); *cf. Blackley*, 986 F. Supp. at 618 (conduct alleged in indictment "is relevant to a determination as to whether there are others who are similarly situated to [the defendant] and have not been indicted").  Deception is an essential element of a conspiracy to defraud the United States.  *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).  Therefore, the fact that the defendants, unlike the Ukrainian officials, are alleged to have engaged in deception in their social-media postings by concealing their foreign identities means that the two groups have not "engaged in similar conduct" for selective prosecution purposes.

Next, Concord cites news reports about an offer by a company to use fake Facebook accounts to promote a 2016 presidential candidate.  Dkt. No. 61, at 9-10.  But an offer does not amount to "similar conduct" to the conduct charged in the indictment.  The defendants here are alleged not to have offered, but to have actually engaged, in the deceptive use of social media for the purpose of impairing the lawful functions of the United States government.

Concord also mentions an individual who allegedly "worked with U.S. and foreign nationals to influence U.S. public opinion and influence the outcome of the 2016 presidential election by acting as an anonymous source for media articles."  Dkt. No. 61, at 10-11.  But acting as an anonymous source for media articles is not similar to conducting "'information warfare against the United States of America' through fictitious U.S. personas on social media platforms and other Internet-based media" with a purpose of impairing the lawful functions of the United States government, as the indictment in this case alleges.  Dkt. No. 1, ¶¶ 10c, 28.  Indeed, Concord does not even attempt to suggest how this individual's conduct would implicate the lawful functions of any government agency.

Finally, Concord cites news reports and Federal Election Commission filings regarding two instances of foreign nationals allegedly making unlawful campaign contributions.  Dkt. No. 61, at 13-14.  But one of the two examples cited by Concord involved a good-faith mistake about the scope of exemptions for volunteer activity.  *See* Dkt. No. 61, Exh. D, at ¶ 7.  A good-faith mistake about the scope of an exception does not establish deception, which is an essential element of the crime with which Concord is charged.  A single FEC complaint that has not yet resulted in a criminal prosecution falls far short of the colorable showing that the defendant was singled out for prosecution required to obtain discovery on a claim of selective prosecution.

In short, Concord has not met its burden to show that similarly situated entities committed similar misconduct but were not prosecuted.  The absence of any showing of a "discriminatory effect" alone justifies denying Concord's motion for intrusive discovery.  *Bass*, 536 U.S. at 863; *see United States v. Lewis*, 517 F.3d 20, 29 (1st Cir. 2008) (because "the defendant has failed to make the threshold showing required under the first prong of the test; he has failed to adduce some evidence that the prosecution manifested a discriminatory effect," his

"discovery motion founders, and further consideration of the evidence pertaining to discriminatory intent would serve no useful purpose").

### B. Concord Has Not Made a Colorable Showing That The Prosecution Is Improperly Motivated

With respect to the second prong, Concord has similarly failed to present any evidence that "the prosecution is improperly motivated."  Concord's only attempt to make this showing is to argue that the order appointing the Special Counsel amounts to "direct evidence of discriminatory purpose."  Dkt. No. 61, at 14.  That argument is without merit.  The Appointment Order authorized the Special Counsel to conduct an investigation into "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump."  The Order was issued approximately four-and-one-half months after the USIC had publicly assessed that Russian interference in the 2016 presidential election "demonstrated a significant escalation in directness, level of activity, and scope of effort compared to previous operations," ICA ii, and had warned that "Moscow will apply lessons learned from its campaign aimed at the US presidential election to future influence efforts in the United States and worldwide, including against US allies and their election processes," ICA 5, and two months after then-FBI Director James Comey testified before the House Permanent Select Committee on Intelligence "that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election."

Viewed in this context, the Appointment Order does not show improper motivation. Defining the scope of a criminal investigation with reference to the documented activities of a particular foreign government that engaged in a broad and unparalleled attack on the U.S. presidential election and that is potentially behind or associated with major patterns of criminal conduct does not amount to improper prosecutorial motivation based on a protected

characteristic.  And given the foreign-relations backdrop of Appointment Order, judicial review and discovery would raise heightened concerns about disclosure of "foreign-intelligence products and techniques."  *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 491 (1999) (holding, as a general matter, than an alien cannot claim unconstitutional selective enforcement as a defense to deportation); *see also id.* (explaining that "[t]he Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat . . . and even if it did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy").

Still less does the Appointment Order suggest an improper discriminatory motive against a particular defendant who was prosecuted as a result of the investigation the government conducted.  The Appointment Order does not, as the defendant suggests, state that only individuals of a particular nationality are to be investigated or prosecuted.  Rather, the Order authorizes the Special Counsel "to prosecute federal crimes arising from" his investigation regardless of the nationality of the defendant, and the Special Counsel's investigation has in fact resulted in the prosecution of multiple individuals who are not Russian.  *See, e.g.*, *United States v. Manafort*, 2018 WL 3126380, at *8 (E.D. Va. June 26, 2018) (noting that the structure of the Appointment Order differentiates between the Special Counsel's investigatory jurisdiction and prosecutorial authority); *see also* Mem. Op., Dkt. No. 58, at 41 ("Because the investigation of Concord was authorized, so was the prosecution.").

Moreover, the Appointment Order does not purport to define the entire scope of the federal government's efforts to investigate and prosecute interference with the work of the Federal Election Commission, the Justice Department, and the State Department.  Rather, the Order references a single criminal investigation that was referred to a Special Counsel

"[c]onsidering the unique circumstances of [the] matter." DOJ, *Appointment of Special Counsel* (May 17, 2017), *available at* https://www.justice.gov/opa/pr/appointment-special-counsel. Neither the Appointment Order nor any other Justice Department document purports to limit the Executive Branch's exercise of prosecutorial discretion in this area to Russian nationals or to Russia-based activity.

### C. The Government's Overall Record of Prosecutions in Election-Related Cases Further Refuses Concord's Claim

Finally, while Concord's failure to carry its burden to show either a discriminatory effect or a discriminatory intent in the instant prosecution requires that its discovery motion be denied, an additional important flaw in its motion bears mention. Concord's effort to carry its burden exclusively focuses on conduct during the 2016 presidential election. But as the federal courts have recognized, "the relevant inquiry is the history of prosecutions over a reasonable period of time." *United States v. Bourgeois*, 964 F.2d 935, 941 (9th Cir. 1992). Expanding the scope of the inquiry beyond the last election cycle shows that the federal government regularly prosecutes non-Russian defendants engaged in deception connected to participation in the electoral process. *See, e.g.*, *United States v. Benton*, 890 F.3d 697 (8th Cir. 2018) (affirming convictions of non-Russian defendants charged with causing false statements to Federal Election Commission in connection with 2012 election); *United States v. Whittemore*, 776 F.3d 1074 (9th Cir. 2015) (affirming conviction of non-Russian defendant charged with causing false statements to the Federal Election Commission and related election crimes in connection with 2010 election); *United States v. Smukler*, 2018 WL 3649555 (E.D. Pa. Aug. 1, 2018) (denying pretrial motion to dismiss of non-Russian defendant charged with causing false statements to Federal Election Commission and related election crimes in connection with 2012 and 2014 elections); Third Superseding Indict., *United States v. Matsura*, No. 14-CR-388 (S.D. Cal. 2016) (charging non-

Russian foreign nationals with making unlawful campaign contributions and related offenses);
Indict., *United States v. Danielczyk*, No. 11-CR-85 (E.D. Va. 2011) (charging non-Russian
defendant with creating false documents, causing false statements to the Federal Election
Commission, and related election-law offenses).  Indeed, in this jurisdiction and elsewhere, non-
Russian defendants have been charged with the very crime that Concord is accused of
committing—conspiracy to defraud the United States by impairing the lawful functions of the
Federal Election Commission.  *See, e.g.*, *United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999);
*United States v. Braddock*, 2013 WL 4441531 (D. Conn. Aug. 14, 2013); Indict., *United States v.
Fieger*, No. 07-20414 (E.D. Mich. 2008); *United States v. Kanchanalak*, 41 F. Supp. 2d 1
(D.D.C. 1999), *rev'd on other grounds*, 192 F.3d 1037 (D.C. Cir. 1999); *United States v. Trie*, 23
F. Supp. 2d 55 (D.D.C. 1998).

These cases establish that the Executive Branch regularly prosecutes non-Russians
engaged in election interference.  While Concord bears the burden to justify its request for
discovery and while Concord's failure to make a colorable showing that it was singled out for
prosecution among others similarly situated based on an impermissible motive requires the
denial of its motion, *e.g.*, *United States v. Hsia*, 24 F. Supp. 2d 33, 52 (D.D.C. 1998), *rev'd on
other grounds*, 176 F.3d 517 (D.C. Cir. 1999); *Blackley*, 986 F. Supp. at 620, the record of
prosecutions over time refutes any suggestion of improper conduct by the United States.

\* \* \* \* \*

Because Concord has failed to carry its burden, it is not entitled to discovery on its claim
of selective prosecution and its discovery motion should be denied.

Respectfully submitted,

ROBERT S. MUELLER, III                                 JESSIE K. LIU
Special Counsel                                        United States Attorney

By: /s/_____          By: /s/_____
Michael R. Dreeben                                  Jonathan Kravis
Jeannie S. Rhee                                        Deborah Curtis
Adam C. Jed                                             Kathryn Rakoczy
950 Pennsylvania Avenue NW               555 Fourth Street NW
Washington, D.C. 20530                         Washington, D.C. 20530
Telephone: (202) 616-0800                     Telephone: (202) 252-6886

JOHN C. DEMERS
Assistant Attorney General for National Security

By: /s/_____
Heather N. Alpino
U.S. Department of Justice
National Security Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Telephone: (202) 514-2000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing opposition to be served by electronic means, through the Court's CM/ECF system, upon counsel for Concord, Eric Dubelier and other counsel, on this 21st day of September, 2018.

_____/s/_____
Jonathan Kravis