## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC | |
| Defendant. | |

## DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S MOTION FOR APPROVAL TO DISCLOSE DISCOVERY PURSUANT TO PROTECTIVE ORDER

Pursuant to the Protective Order entered in *United States v. Internet Research Agency, et al*, 1:18-cr-00032 (DLF), Dkt. No. 42-1, Defendant Concord Management and Consulting LLC ("Defendant" or "Concord"), by and through undersigned counsel, respectfully submits this motion for approval to disclose documents identified by the Special Counsel as "sensitive" to Concord's officers and employees for purpose of preparing for trial.  In support of this motion, Concord states as follows:

## I.      INTRODUCTION

In this first-of-its-kind prosecution of a make-believe crime, the Office of Special Counsel maintains that it can unilaterally—and for secret reasons disclosed only to the Court— categorize millions of pages of non-classified documents as "sensitive," and prohibit defense counsel from sharing this information with Defendant Concord for purposes of preparing for trial.  This, apparently only because the Defendant and its officers and employees are Russian as opposed to American.  The Special Counsel's unique argument appears rooted in the maxim, "Happy the short-sighted who see no further than what they can touch."[1]   Specifically, the short-

---

[1] Maillart, Ella K., *The Cruel Way* (1947).

term political value of a conviction far outweighs a reversal by a higher court years from now. This tactic, though rare, is not new. *See Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) (unanimous reversal of conviction three years after the hysteria over the failure of Enron; which was three years too late for the survival of Arthur Andersen). Here, the Special Counsel ignores the obvious fact that "any consultation with counsel is rendered meaningless unless the defendants and their attorneys have an opportunity to review the evidence." *United States v. Medina*, 628 F. Supp. 2d 52, 54 (D.D.C. 2009).

Discovery is a fundamental right accorded to all defendants in all criminal cases. There is no "Russian Exception" to this right, which belongs to the defendant, not to defense counsel. It is not the burden of a defendant to convince the court it is entitled to view discovery, rather it is the burden of the Special Counsel to comply with Rule 16. *See United States v. Mejia*, 448 F.3d 436, 444 (D.C. Cir. 2006). Despite this fact, in the eight months since Concord voluntarily appeared to defend itself the Court has prohibited defense counsel from sharing or discussing with the Defendant unilaterally-designated "sensitive" discovery produced by the Office of Special Counsel. The Special Counsel has explicitly acknowledged that none of the discovery is classified. Moreover, the allegedly "sensitive" discovery appears to have been collected exclusively through the use of criminal subpoenas, search warrants, and orders issued pursuant to 18 U.S.C. § 2703, as opposed to any classified collection method. The Court has permitted the Special Counsel to support his position with disfavored *ex parte* submissions that are impossible to respond to because defense counsel has no idea of their contents. *See United States v. Rezaq*, 899 F. Supp. 697, 706-07 (D.D.C. 1995).

Since the entry of the Protective Order, the Special Counsel has produced nearly 4 million documents, 3.2 million of which it has designated as "sensitive." The Special Counsel

has not explained to defense counsel the reason for the designation of any particular document or category of documents, nor has he explained why—with non-classified material—defense counsel should not have access to his secret communications with the Court. The position of the Court and the Special Counsel creates an insuperable obstacle to defense counsel preparing for trial.[2]

## II.   LAW & ARGUMENT

### A.   Rule 16 applies equally to corporate defendants.

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation omitted). Indeed, "[i]t has long been established that Federal Rule of Criminal Procedure 16 was 'designed to provide to a criminal defendant, in the interests of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case.'" *United States v. Daum*, 847 F. Supp. 2d 18, 20 (D.D.C. 2012) (quoting *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989)).

With respect to documents and objects, Rule 16 does not distinguish between individual and organizational defendants; both are equally entitled to discovery. *See* Fed. R. Crim. P. 16(a)(1)(E). In cases involving corporate defendants, discovery is even more important because "[a]n organization has no self-knowledge of its own conduct, since it acts through its agents, and must be afforded an opportunity to learn what of its employees' conduct is being used against it at trial." *United States v. Maury,* 695 F.3d 227, 248 (3rd Cir. 2012). As to discovery of

---

[2] Concord initially requested authorization from the Court pursuant to the Protective Order to disclose a small number of specifically identified allegedly sensitive documents to particular Russian individuals, but to date the Court had not required the Firewall Counsel to respond to that request in writing. As such, Concord respectfully requests authorization to share all discovery with its individual officers and employees, so that it can confer with counsel and effectively participate in its defense.

statements, "[i]t is only by learning what statements can be attributed to it as an organization that a corporate defendant can defend itself at trial." *Id*. at 248-49 (citing Fed. R. Crim. P. 16(a)(1)(C) advisory committee's notes to 1994 Amendments).

Moreover, "[w]here the defendant objects to the government's proposed method of conducting discovery . . . the burden of showing good cause lies squarely on the government." *United States v. Johnson*, 314 F. Supp. 3d 248, 253 (D.D.C. 2018). Even a broad protective order does not give the government *carte blanche* to impose unnecessary limitations on discovery available to a criminal defendant. *See id*. at 252-53. This Court has recognized that although so-called "umbrella" protective orders "may be entered 'without a particularized showing to support the claim for protection,'" in those situations courts still "require a particularized showing [of good cause by the government] 'wherever a claim under [the umbrella] order is challenged." *Id.* (citations omitted) (second alteration in original).

Undersigned counsel has been unable to identify a single reported case where a corporate defendant was prohibited from viewing discovery, or where a Court or the prosecutor inserted themselves into the decision about which corporate representatives could view discovery. There is simply no good faith showing available to the Special Counsel, whether made in public or again in secret to the Court, that would result in any outcome other than the absolute inability of defense counsel to prepare for trial. Any attempt to persist in this novel and never-before-utilized method of prosecution would be fatal for the following reasons:

***First***, the government's desire—untethered to any statute or case law—to limit discovery to co-defendants who have appeared in Court cannot overcome Concord's constitutional rights as a present defendant. Corporate defendants enjoy the same discovery and disclosure requirements as individual defendants. *See* Fed. R. Crim. P. 16 advisory committee's note to 1994

Amendments.   Moreover, disclosure is critical for Concord to prepare for trial because "[c]orporations may be held liable for specific intent offenses [like conspiracy] based on the 'knowledge and intent' of their employees."  *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) (quoting *N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481, 495 (1909)).  The Court has already noted that Concord's specific intent will be an issue at trial, Nov. 15, 2018 Mem. Op. at 15, 25, Dkt. 74, and Concord must be able to view and consider the discovery materials in order to evaluate and rebut any such evidence at trial.   The fact that the Indictment alleges that co-defendants may have had the ability to bind Concord makes it essential that defense counsel be able to disclose and discuss discovery with Concord. *See* Fed. R. Crim. P. 16 advisory committee's note to 1994 Amendments ("Because an organizational defendant may not know what its officers or agents have said or done in regard to a charged offense, it is important that it have access to statements made by persons whose statements or actions could be binding on the defendant.")

For example, the Indictment alleges that Concord controlled funding for the Internet Research Agency.   Dkt. 1 at ¶ 11.   Assuming the allegedly sensitive discovery contains documents allegedly generated by Concord on this issue, then how can undersigned counsel possibly prepare to defend against this allegation without discussing these documents with Concord?

**Second**, co-defendant Mr. Prigozhin is the only person directly affiliated with Concord identified in the Indictment.  As such, Concord cannot be expected to make informed decisions regarding its defense or meaningfully confer with its counsel unless it—and specifically Mr. Prigozhin—understands the evidence the Special Counsel intends to use against it at trial. *Maury*, 695 F.3d at 248 (recognizing that "[a]n organization has no self-knowledge of its own

conduct, since it acts through its agents, and must be afforded an opportunity to learn what of its employees' conduct is being used against it at trial").  Such decision-making is fundamental to how a defendant navigates criminal proceedings.  As the Third Circuit recognized in *Maury*, "[p]re-trial discovery allows an individual defendant the opportunity to seek suppression of these statements before they are introduced into evidence at trial, and to evaluate the weight of such direct evidence against him in deciding whether to take a plea or face trial."  *Id*. at 252. Moreover, "the same limitations and driving principles which control in the individual context transfer, through incorporation, to the discovery rights afforded to organizational defendants under Rule 16(a)(1)(C)."  *Id*. at 53.

   ***Third***, Concord's officers and employees possess a critical first-hand understanding of its own business activities, and their input and insight about both is necessary for Concord to adequately prepare a defense.  *See Philip Morris USA*, 566 F.3d at 1118 ("Because a corporation only acts and wills by virtue of its employees, the proscribed corporate intent depends on the wrongful intent of specific employees.").  It is axiomatic that "an essential component to the Sixth Amendment right to counsel is that a defendant be allowed to assist and participate meaningfully in his own defense."  *United States v. Darden*, No. 3:17-cr-00124, 2017 WL 3700340, at *2 (M.D. Tenn. Aug. 28, 2017).  This Court has recognized that "any consultation with counsel is rendered meaningless unless the defendants and their attorneys have an opportunity to review the evidence."  *Medina*, 628 F. Supp. 2d at 54.  Information from Concord's officers and employees will help it understand the actions allegedly undertaken and statements allegedly made by those individuals and whether they were within the scope of their employment by Concord.  *See United States v. Sun-Diamond Growers of Cal.*, 964 F. Supp. 486, 490 (D.D.C. 1997) ("the acts of a corporation are the acts of its employees acting within the

scope of their employment" (citing *United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987))).   Put another way, Concord (as a legal entity) has no memory or understanding of its actions independent of those of its officers and employees.  Input from those individuals is necessary for Concord to respond to the charge against it.

**Fourth**, the documents that the government appears to contend are statements of Concord under Fed. R. Civ. P. 16(C)(i) and (ii) are primarily in Russian.  While defense counsel has engaged translators to begin its review of the discovery materials, the only way to get fully accurate translations and prepare for trial is to speak to the individuals who allegedly wrote the documents.  *See United States v. Archbold-Manner*, 577 F. Supp. 2d 291, 292-93 (D.D.C. 2008) (noting the need for translations of voluminous foreign language discovery in ruling relating to Speedy Trial Act).  This is particularly true with respect to Russian, which is highly dissimilar to English and literal translations of words often result in lost meaning or context.  *See, e.g.,* https://www.state.gov/m/fsi/sls/c78549.htm (Department of State's Foreign Service Institute School of Language Studies identifying Russian as a Category III Language "with significant linguistic and/or cultural differences from English").   Again, by way of example, certain allegedly sensitive documents contain the Russian word "шеф."  This word can be translated into the English words "chief," "boss" or "chef"—a distinction that is critically important since international media often refers to Mr. Prigozhin as "Putin's Chef."

Given these facts, it is inconceivable how Concord can be afforded its Constitutional right to "a meaningful opportunity to present a complete defense," *Crane*, 476 U.S. at 690, without defense counsel being able to disclose and discuss the government's evidence with its own officers and employees who allegedly took actions on Concord's behalf.  Any continuing Protective Order must be balanced against Concord's fundamental constitutional right to a fair

opportunity to present its defense.  *See United States v. Lindh*, 198 F. Supp. 2d 739, 744 (E.D. Va. 2002) (in ruling on protective order recognizing need to balance national security interests with defendant's right to prepare and present a full defense at trial and that courts should ensure the protection is no broader than necessary).  Here, there can be no question that the balance tips in Concord's favor, particularly now that potentially dispositive motions have been resolved and the case is being prepared for trial.  *Id.* at 744 (approving proposed protective order but noting that at the time of trial the balance struck in favor of restricting disclosure of unclassified protected information may shift in favor of disclosure); *see also* Jun. 15, 2018 Hrg. Tr. at 20:22-23 ("I think over time this protective order could change.").

## B.    The Protective Order is Overly Broad

As defense counsel has repeatedly addressed with the Court, the government has grossly over-designated documents as "sensitive."  Based upon what has been disclosed to date, this allegedly "sensitive" discovery includes a massive amount of irrelevant data ranging from promotional emails for airlines to personal correspondence, even including personal naked selfie photographs.  Despite the fact that much of this allegedly sensitive material is irrelevant to the charges against Concord, the Special Counsel's over-designation creates a massive problem for defense counsel in trying to identify what is relevant and/or exculpatory.  That is, currently only the defense team and a small number of court-approved translators have access to this data to be able to sift through, identify, and isolate the documents that are actually material to the defense. To date, the Defendant has been prohibited from assisting in any manner and, further, defense counsel is prohibited from discussing or even alluding to any relevant information that has been identified.  This equates to the burden of preparing for trial without any ability to discuss the evidence with the client who is to be put on trial.  This has never happened before in reported case law because the notion is too ludicrous to contemplate.

The only cases that undersigned counsel has been able to find where a defendant was prohibited from viewing non-classified discovery were those involving specific threats to the safety of witnesses/informants, or factually dissimilar cases where the discovery involved the object of the crime, *i.e.* child pornography. *See, e.g., United States v. Hill*, 322 F. Supp. 2d 1081, 1093 (C.D. Cal. 2004) (protective order stating that "Defendant himself shall not be permitted to access or view any graphic image file containing actual or alleged child pornography . . ."); *United States v. Morris*, No. 17-cr-107, 2018 WL 3546198, at *2 (D. Minn. July 24, 2018) (in a case involving charges of sex trafficking the protective order initially prevented defendant from reviewing any discovery identified as "Protected Material" because threats had been made to victims and their families; but this restriction was later relaxed to allow defendant to assist in trial preparation). Nor has undersigned counsel been able to identify a single case in which a court dictated which employees or officers of a corporate defendant were allowed to view protected discovery.

Moreover, the case law that does exist supports Concord's position that the government cannot simply hide behind a broad Protective Order in an effort to block access to discovery materials necessary for the defendant to prepare for trial. *See, e.g., Johnson* 314 F. Supp. 3d at 253-56 (rejecting the government's effort to preclude defense counsel from showing a defendant un-redacted body-camera footage, and ultimately requiring the government to redact that footage so defendant could view and use it to prepare his defense); *United States v. Carriles*, 654 F. Supp. 2d 557, 562, 570 (W.D. Tex. 2009) (rejecting the government's proposed protective order related to sensitive but unclassified discovery which would have prevented defendant from disseminating any sensitive discovery material to prospective witnesses without first obtaining court approval, and instead allowing defendant to disclose materials necessary for trial

preparation after obtaining a memorandum of understanding related to the protective order); *Darden*, 2017 WL 3700340, at *3 (rejecting the government's proposed protective order that prohibited the defendants from reviewing discovery materials unless in the presence of counsel and adopting a less restrictive protective order which specified precisely which discovery materials defense counsel could review with the defendants but could not provide or leave with the defendants). These cases illustrate the importance of the competing interests at stake, while still recognizing that the government cannot simply seek a broad protective order without making the requisite good cause showing.

> **1.    The Protective Order's Restrictions Place No Burden on the Government.**

It is the government—not Concord—that bears the burden of showing good cause for the restriction it seeks. *Johnson*, 314 F.Supp. 3d at 251. And that burden is not satisfied by merely dumping millions of pages of discovery on Concord and then secretly whispering to the Court about why the discovery cannot be shared with the Defendant. *See id.* at 253 ("Rather, Johnson argues—correctly—that the government has not explained why its attorneys are any less capable of reviewing the [discovery materials] and redacting sensitive information than is Johnson's attorney."). "Protective orders are the exception, not the rule, and appropriate reasons must be given for their entry." *United States v. Stone*, No. 10-20123, 2012 WL 137746, at *3 (E.D. Mich. Jan. 18, 2012). Other courts to have addressed similar issues agree that protective orders should be more limited at the trial preparation stage. *See Morris*, 2018 WL 3546198, at *2 (recognizing that "this case is shifting from the pretrial discovery stage to trial preparation. Defendants need to be able to participate more thoroughly in the review of discovery and the formulation of their defense at trial"); *Lindh*, 198 F. Supp. 2d at 744.

While Concord has undertaken the onerous task and enormous cost of complying with the Protective Order, the discovery process up to this point has imposed literally no burden on the government.  The government has not been required to explain publicly or confidentially to defense counsel the basis of its designation of any discovery as sensitive, nor has it been asked to re-evaluate that designation at any time.  The government has not been not required to ensure in any way that it has designated the discovery appropriately.  As a result, the Special Counsel has simply made a blanket designation of data related to hundreds of individuals and accounts, none of which on its face implicates any national security or law enforcement secrets—imposing significant burden on Concord—without consequence.

For example, in the briefing relating to entry of the Protective Order, the Special Counsel argued to the Court that the presence of personal identifying information ("PII") constitutes good cause for the restrictions on discovery.  Government's Mot. For a Protective Order Under Federal Rule of Criminal Procedure 16(d)(1) at 9-10, Dkt. 24.  Notably, however, this is not among the categories of information included in the definition of "sensitive" in Paragraph 10 of the Protective Order.  As such, it is not clear whether the presence of PII is a basis on which the government has designated materials as sensitive or whether the government believes the other restrictions in the Protective Order are sufficient to protect this information.  In any event, undersigned counsel has made clear that it does not want or need access to specific PII, such as social security numbers, dates of birth, addresses, or financial account numbers, unless it is relevant to the defense of the case, the Special Counsel intends to use it in its case-in-chief at trial, or the information was obtained from or belongs to Concord.  *See* June 15, 2016 Hr'g Tr. at 22:1-4; Concord's Opposition to the Special Counsel's Motion for a Protective Order at 8, Dkt. 27.

But rather than impose on the government the burden of identifying the materials that actually contain PII, so that the specific documents or information can be redacted or restricted, the Special Counsel has used the Protective Order to designate the entirety of various data productions to completely restrict Concord's ability to view the vast majority of discovery regardless of whether specific documents contain PII. *See Johnson*, 314 F. Supp. 3d at 255 (nothing the default approach under Rule 16 is that "it is the government's obligation—not defense counsel's—to review the information in the government's possession and to determine what information, if any, should be withheld"). Further, because the Special Counsel has provided no clear definition of what constitutes "sensitive" discovery, there is no way for defense counsel to challenge or contest any specific designation thereunder. But the law is clear that the government "may not circumvent its responsibilities by seeking a blanket protective order from this Court or by indiscriminately invoking ['sensitive' material]." *United States v. O'Keefe*, No. 06-0249, 2007 WL 1239207, at *2 (D.D.C. Apr. 27, 2007).

Relatedly, the government itself has described some of the "sensitive" discovery in great detail in public filings, yet has made no effort to subsequently re-categorize those very same documents as no longer sensitive. For example, in an affidavit in support of a criminal complaint filed under seal on September 28, 2018 in the Eastern District of Virginia and unsealed on October 19, 2018, an FBI Special Agent described "detailed financial documents that tracked itemized Project Lakhta expenses" allegedly transmitted between an employee of Concord and an employee of its co-defendant, Internet Research Agency. *See* Ex. A, Criminal Compl., *United States v. Elena Khusyaynova*, 1:18-mj-464 (E.D. Va.) (filed Sept. 28, 2018; unsealed Oct. 19, 2018) ("the Holt Affidavit"). The Holt Affidavit goes on to state that "[b]etween at least January 2016 and July 2018, these documents were updated and provided to Concord on approximately a

12

monthly basis," and provides "illustrative examples" of these documents, including identifying the individual who sent the document (the defendant identified in the complaint); describing the date on which the documents were allegedly sent and the approximate dollar value contained in the document; and even quoting from the documents. *Id*. ¶ 21. To the extent that these very same documents are among those designated by the Special Counsel as "sensitive," it is impossible to understand why they cannot be shared with Concord in order to defend itself against criminal charges in this case.

2.    **Discovery in this case should not be withheld on the basis of either an ongoing investigation or sensitive investigatory techniques.**

Because much of the proceedings related to the Protective Order have been undertaken *ex parte*, (*see infra* Section II.C), Concord is not privy to any basis on which the government obtained the Protective Order, nor does it know the basis by which the government seeks to prevent the disclosure requested herein. Nevertheless, the Special Counsel has publicly invoked—in the Protective Order itself and its briefing—both an "ongoing investigation" and "sensitive investigatory techniques" as grounds for preventing disclosure, neither of which should apply here.

Undersigned counsel must assume for now that the "ongoing investigation" referred to in the Protective Order is related to the criminal complaint recently unsealed in the Eastern District of Virginia. Ex. A. Because this complaint is now unsealed, and the ongoing investigation has been publicly revealed, there is no further need to protect this investigation from disclosure.

With respect to "sensitive investigatory techniques," the discovery produced to date comes from legal process issued to various companies, including email providers, internet service providers, financial institutions, and other sources. *See* Government's Mot. For a Protective Order Under Federal Rule of Criminal Procedure 16(d)(1) at 2, Dkt. 24. But any

person anywhere in the world connected to the Internet already knows that law enforcement agencies can and do gather evidence from these types of companies through legal process in criminal matters, and specifically what can be gathered through those various processes is widely known and is not in need of protection.  For example, Google explains in detail on its website precisely what information it will disclose in response to legal process in the form of a subpoena, court order, or search warrant.  *See* https://support.google.com/transparencyreport/answer/7381738?hl=en.  Google specifically publicizes that in response to a subpoena for Gmail data, it can be compelled to disclose subscriber registration information (e.g., name, account creation information, associated email addresses, phone number), and sign-in IP addresses and associated time stamps.  *Id*.  In response to a court order for Gmail data, Google may provide "non-content information (such as non-content email header information)" and in response to a search warrant Google can be compelled to produce email content, in addition to the data produced in response to a subpoena or court order.  *Id*.  Facebook publishes similar information, explaining that in response to a subpoena, it may disclose "basic subscriber records," which may include name, length of service, credit card information, email addresses, and recent login/logout IP addresses. *See* https://www.facebook.com/safety/groups/law/guidelines/.   In response to a court order, Facebook may disclose message headers and IP addresses, as well as basic subscriber records. *Id*.  In response to a search warrant, Facebook may disclose stored contents of the account, including messages, photos, videos, timeline posts, and location information.  *Id*.

Twitter, Apple, Microsoft, Yahoo!, Instagram, and WhatsApp, all publish similarly detailed information about the types of data available to law enforcement through subpoenas, court orders, and search warrants.  *See* https://help.twitter.com/en/rules-and-policies/twitter-law-enforcement-support (explanation from Twitter that obtaining non-public information requires

valid legal process like a subpoena, court order, or other legal process and that requests for the contents of communications require a valid search warrant or equivalent); https://www.apple.com/privacy/government-information-requests/ (explanation from Apple, Inc. of what government and law enforcement agencies can obtain through legal process); https://www.microsoft.com/en-us/corporate-responsibility/lerr (explanation from Microsoft that a subpoena is required for non-content data, and a warrant or court order is required for content data); https://r.search.yahoo.com/_ylt=A0geK.OJvA5cPPUAkCJXNyoA;_ylu=_X3oDMTEya DM4Z2dkBGNvbG8DYmYxBHBvcwMxBHZ0aWQDQjQ4NTNfMQRzZWMc3I-/RV=2/ RE=1544498442/RO=10/RU=https%3a%2f%2fwww.eff.org%2ffiles%2ffilenode%2fsocial_net work%2fyahoo_sn_leg-doj.pdf/RK=2/RS=sXU4pB1SMj3WwjZBx3ltlU4S6v_w- (explanation from Yahoo of precisely what data may be disclosed in response to a subpoena, 2703(d) order, or Search Warrant); https://faq.whatsapp.com/en/android/26000050/?category=5245250 (explanation from WhatsApp detailing what information is available through various forms of legal process); https://help.instagram.com/494561080557017 (explanation from Instagram describing the information it will disclose in response to subpoenas, search warrants, and court orders). Financial institutions and internet service providers also openly describe what information is available to law enforcement through various legal process. *See, e.g.,* https://www.paypal.com/us/webapps/mpp/law-enforcement (explanation from PayPal describing the type of data it collects and when that data is made available to law enforcement as required by law); https://www.verizon.com/about/portal/transparency-report/faqs/ (explanation from Verizon of the types of information it is required to disclose when properly requested by law enforcement or court order).

Thus, if it is the so-called "manner of collection" of the discovery that the Special Counsel seeks to protect—that is, the fact that law enforcement agencies can collect a certain type of data—that fact is widely known and does not justify the burdens the Protective Order imposes on Concord's right to present a defense.[3]

### C.     The Government Should Not Be Permitted to Proceed *Ex Parte*.

When the government is given an opportunity to make its case for preventing Concord from viewing the "sensitive" discovery at this stage of proceedings, it should not be permitted to do so *ex parte*.   "This [C]ourt generally disfavors *ex parte* proceedings involving the government," and has acknowledged that such "communications between a district court and the prosecution in a criminal case are greatly discouraged, and should only be permitted in the rarest of circumstances." *Rezaq*, 899 F. Supp. at 707 (requiring government to file motions for leave to make *ex parte* submissions, to serve those motions on the defendant, and to litigate them in an adversarial hearing); *see also United States v. George*, 786 F. Supp. 11, 16 (D.D.C. 1991) ("*Ex parte* proceedings are generally disfavored, even when the federal rules expressly permit them."). The Advisory Committee's notes for Rule 16 explain that the language regarding *ex parte* communications is permissive, not mandatory. Fed. R. Crim. P. 16 advisory committee's note to 1975 Amendments. "Thus, if a party requests a protective or modifying order and asks to

---

[3] To the extent that the government argues that limiting access to discovery will ensure the safety of witnesses, there is no valid basis for such argument.  Specifically, even in cases where there is such a risk (and undersigned counsel knows of no such risk here), there must be more than "broad allegations of harm, unsubstantiated by specific examples or articulated reasoning." *Johnson*, 314 F. Supp. 3d at 251.  In those instances, courts are still willing to allow a defendant to review the evidence, subject to certain parameters. *See, e.g., id.*, at 254 (requiring government redaction of discovery materials); *Darden*, 2017 WL 3700340, at *3 (adopting less-restrictive measure to ensure witness safety).  If the government has a legitimate concern about witness safety, the burden is on it to specifically articulate the concern, identify precisely the documents that would lead to the identification of a witness, and redact that information or propose an alternative means of restricting disclosure.

make its showing ex parte, the court has two separate determinations to make.  First, it must determine whether an ex parte proceeding is appropriate, bearing in mind that ex parte proceedings are disfavored and not to be encouraged. . . . Second, it must determine whether a protective or modifying order shall issue."  *Id*.  As an example, the Advisory Committee explained that "[a]n ex parte proceeding would seem to be appropriate if any adversary proceeding would defeat the purpose of the protective or modifying order.  For example, the identity of a witness would be disclosed and the purpose of the protective order is to conceal that witness' identity."  *Id*.  Here, an adversary proceeding would not defeat the purpose of the Protective Order because any proceeding could be conducted in a sealed filing that is disclosed to undersigned counsel, thus ensuring that appropriate counter-arguments can be made to the Court, while not being litigated on the public docket.

In the context of classified information—which is not at issue in this case—the Court has identified three limited exceptions to the rule disfavoring *ex parte* proceedings, but has noted that they are "'both few and tightly contained.'"  *Libby*, 429 F. Supp. 2d at 21 (quoting *Abourezk v. Reagan*, 785 F.2d 1043, 1060 (D.C. Cir. 1986)).  First, "the 'inspection of materials by a judge isolated in chambers may occur when a party seeks to *prevent use* of the materials in the litigation;'" second, "when the government has properly invoked, for example, the state secrets privilege," it must demonstrate "'compelling national security concerns,'" and must disclose "'as much of the material as it could divulge without compromising the privilege'" before *in camera* review; and third, "*ex parte* proceedings are permitted when a statute expressly provides for such proceedings."  *Id.* (quoting *Abourezk*, 785 F.2d at 1061) (emphasis in original).

None of the exceptions articulated in *Libby* apply in this case.  The first exception is not present here because the Special Counsel has already produced the information to defense

counsel pursuant to Fed. R. Crim. P. 16. The second exception also does not apply because unlike *Libby*, the Special Counsel has not asserted the state secrets privilege and there is no classified information in the discovery. *See* Government's Submission Related to a Permanent Protective Order Under Federal Rule of Criminal Procedure 16(d)(1) at 2, Dkt. 40 (recognizing the discovery is not classified). With respect to the third exception, no statute allowing *ex parte* proceedings is implicated in this case.

### D. The Protective Order's Restrictions If Left in Place Would Render Concord's Representation Ineffective as a Matter of Law.

As a final matter, preventing Concord's officers and employees from viewing the purportedly "sensitive" discovery material will effectively deprive Concord of its constitutionally-guaranteed right to effective assistance of counsel. To be effective, counsel must be able to investigate the allegations against the defendant—a process that will be all but meaningless here if defense counsel cannot even discuss the discovery with the Defendant's officers and employees, much less disclose the information. Courts have recognized that counsel's failure to conduct an adequate investigation amounts to ineffective assistance. *See, e.g., Strickland v. Washington*, 466 U.S. 668, 691 (1984) (recognizing that "counsel has a duty to make reasonable investigations . . . "); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (recognizing deficiencies in counsel's investigation); *United States v. Mohammed*, 863 F.3d 885, 890 (D.C. Cir. 2017) (finding counsel's performance deficient on the basis of a "complete failure to investigate" (internal quotation marks omitted)). No reasonable investigation of the allegations against Concord can take place if counsel is prohibited from reviewing and discussing the discovery with Concord.

### III.     Conclusion

Should the Court grant approval of the requests contained herein, undersigned counsel will take necessary steps to protect the discovery from unauthorized disclosure.   Undersigned counsel is submitting under seal as Exhibit B hereto a specific proposal for how the discovery is to be shared with the Defendant.

A proposed order is submitted herewith.

Dated:   December 20, 2018

Respectfully submitted,

CONCORD MANAGEMENT AND
CONSULTING LLC

By Counsel

 /s/*Eric A. Dubelier*
Eric A. Dubelier
Katherine Seikaly
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
202-414-9200 (phone)
202-414-9299 (fax)
edubelier@reedsmith.com
kseikaly@reedsmith.com

# Exhibit A

AO 91 (Rev. 11/11)  Criminal Complaint

UNDER SEAL

UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

FILED

SEP 2 8 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  1:18-MJ-464 |
| | ) | |
| | ) | |
| ELENA ALEKSEEVNA KHUSYAYNOVA | ) | |
| | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___the year 2014 until the present___ in the county of ___Alexandria___ in the ___Eastern___ District of ___Virginia___ , the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 371 | Conspiracy to defraud the United States |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

Reviewed by AUSA/SAUSA:

AUSA Jay Prabhu; SAUSA Alex Iftimie

_Complainant's signature_

David Holt, Special Agent, FBI

_Printed name and title_

Sworn to before me and signed in my presence.

Date:  28 Sep 18

City and state:  ___Alexandria, Virginia___

/s/

Ivan D. Davis
United States Magistrate Judge



IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:18-MJ-464 |
| | ) | |
| ELENA ALEKSEEVNA KHUSYAYNOVA, | ) | 18 U.S.C. § 371 |
| | ) | (Conspiracy) |
| Defendant. | ) | |
| | ) | **UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, David Holt, being duly sworn under oath, do hereby depose and state:

### INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been so employed since August 2008.  I am presently assigned to the Washington Field Office

where I am responsible for investigations of foreign influence operations and other national

security matters with a cyber nexus.  I have also conducted national security investigations of

foreign intelligence services and the targeting of critical U.S. infrastructure.  As a Special Agent,

I have received specialized training and instruction in the field of national security investigations

and am authorized to investigate violation of laws of the United States and to execute warrants

issued under the authority of the United States.

2.      I am submitting this affidavit in support of a criminal complaint and arrest

warrant charging the defendant, ELENA ALEKSEEVNA KHUSYAYNOVA, with Conspiracy

to defraud the United States, in violation of Title 18, United States Code, Section 371.

3.      The statements contained in this Affidavit are based on my experience and

background as a criminal investigator, on information provided to me by other members of the

FBI and other law enforcement officers, court records and documents, business records, interviews, publicly available information, and my review of physical and documentary evidence. I have personally participated in the investigation of the offense set forth below and, as a result of my participation and review of evidence gathered in the case, I am familiar with the facts and circumstances of this investigation. Since this Affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included every fact resulting from the investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe the above-named defendant has violated Title 18, United States Code, Section 371, as set forth herein.

## RELEVANT STATUTES AND BACKGROUND

4.      Title 18, United States Code, Section 371, makes it a federal crime if "two or more persons conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy."

5.      The United States of America, through its departments and agencies, regulates the activities of foreign individuals and entities in and affecting the United States in order to prevent, disclose, and counteract improper foreign influence on U.S. elections and on the U.S. political system. U.S. law bans foreign nationals from making certain expenditures or providing things of value for the purpose of influencing federal elections. U.S. law also bars agents of any foreign entity from engaging in political activities within the United States without first registering with the Attorney General. Various federal agencies, including the U.S. Department of Justice and the Federal Election Commission, are charged with enforcing these laws.

6.      The U.S. Department of Justice administers the Foreign Agent Registration Act ("FARA"), Title 22, United States Code, Section 611 *et seq*. FARA establishes a registration, reporting, and disclosure regime for agents of foreign principals (which includes foreign non-government individuals and entities) so that the U.S. government and the people of the United States are informed of the source of information and the identity of persons attempting to influence U.S. public opinion, policy, and law. FARA requires, among other things, that persons subject to its requirements submit periodic registration statements containing truthful information about their activities and the income earned from them. Disclosure of the required information allows the federal government and the American people to evaluate the statements and activities of such persons in light of their function as foreign agents.

7.      The Federal Election Commission is a federal agency that administers the Federal Election Campaign Act ("FECA"). Among other things, FECA prohibits foreign nationals from making "a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election." 52 U.S.C. § 30121(a)(1)(A). FECA also requires that individuals or entities who make certain independent expenditures in federal elections report those expenditures to the Federal Election Commission. The reporting requirements permit the Federal Election Commission to fulfill its statutory duties of providing the American public with accurate data about the financial activities of individuals and entities supporting federal candidates, and enforcing FECA's limits and prohibitions, including the ban on foreign expenditures.

## STATEMENT OF PROBABLE CAUSE

I.     **Project Lakhta and Efforts to Interfere with U.S. Political System**

8.     Since at least 2014, known and unknown individuals, operating as part of a

broader Russian effort known as "Project Lakhta," have engaged in political and electoral

interference operations targeting populations within the Russian Federation and in various other

countries, including, but not limited to, the United States, members of the European Union, and

Ukraine.  Since at least May 2014, Project Lakhta's stated goal in the United States was to

spread distrust towards candidates for political office and the political system in general.

9.     Beginning in or around mid-2014 and continuing to the present, Project Lakhta

obscured its conduct by operating through a number of Russian entities, including Internet

Research Agency LLC ("IRA"), Internet Research LLC, MediaSintez LLC, GlavSet LLC,

MixInfo LLC, Azimut LLC, NovInfo LLC, Nevskiy News LLC (a/k/a "NevNov"), Economy

Today LLC, National News LLC, Federal News Agency LLC (a/k/a "FAN"), and International

News Agency LLC (a/k/a "MAN").  These entities employed hundreds of individuals in support

of Project Lakhta's operations with an annual global budget of millions of U.S. dollars.  Only

some of Project Lakhta's activities were directed at the United States.

10.     Concord Management and Consulting LLC and Concord Catering (collectively

"Concord") are related Russian entities with various Russian government contracts.  Concord

was the primary source of funding for Project Lakhta operations.  Concord controlled funding,

recommended personnel, and oversaw Project Lakhta activities through reporting and interaction

with the management of the various Project Lakhta entities.

11.     Yevgeniy Viktorovich Prigozhin is a Russian oligarch who is closely identified

with Russian President Vladimir Putin.  Prigozhin began his career in the food and restaurant

business and is sometimes referred to as "Putin's Chef." Prigozhin controls Concord, which has

been paid by the Russian government to feed school children and the military. Concord and

Prigozhin spent significant funds to further the Project Lakhta operations.

12.     On February 16, 2018, a grand jury in the District of Columbia returned an

indictment charging thirteen Russian nationals and three Russian companies, including

Prigozhin, the IRA, and Concord, with committing federal crimes while seeking to interfere with

U.S. elections and political processes, including the 2016 presidential election. Indictment,

*United States v. Internet Research Agency, et al.*, 1:18-CR-32 (DLF) (D.D.C. Feb. 16, 2018).

Based on my training and experience, the factual allegations in that indictment provide further

probable cause to believe that the above-named defendant has violated Title 18, United States

Code, Section 371. That indictment is attached hereto and incorporated by reference.

## II.     ELENA ALEKSEEVNA KHUSYAYNOVA

13.     Defendant ELENA ALEKSEEVNA KHUSYAYNOVA is a resident of St.

Petersburg, Russia. Since at least 2014, the defendant has been employed by various entities

within Project Lakhta, including the IRA, GlavSet, and the Federal News Agency. Since

approximately April 2014, she has acted as the Chief Accountant in Project Lakhta's finance

department. As detailed further herein, KHUSYAYNOVA oversaw all aspects of Project Lakhta

financing. She managed the budgeting and payment of expenses associated with social media

operations, web content, advertising campaigns, infrastructure, salaries, travel, office rent,

furniture, and supplies, and the registration of legal entities used to further Project Lakhta

activities.

14.     There is probable cause to believe that, from at least 2014 to the present,

KHUSYAYNOVA conspired with persons known and unknown to defraud the United States by

impairing, obstructing, and defeating the lawful functions of the U.S. Department of Justice and Federal Election Commission in administering federal requirements for disclosure of foreign involvement in certain domestic activities, in violation of Title 18, United States Code, Section 371. Among the persons with whom KHUSYAYNOVA conspired are known and unknown employees and associates of Concord and Project Lakhta entities. The Conspiracy had as its objects impairing, obstructing, and defeating the lawful governmental functions of the United States by dishonest means in order to enable Project Lakhta actors to interfere with U.S. political and electoral processes, including the 2018 U.S. elections.

### III.    Manner and Means of the Conspiracy

15.    The Conspiracy has a strategic goal, which continues to this day, to sow division and discord in the U.S. political system, including by creating social and political polarization, undermining faith in democratic institutions, and influencing U.S. elections, including the upcoming 2018 midterm election. The Conspiracy has sought to conduct what it called internally "information warfare against the United States of America"[1] through fictitious U.S. personas on social media platforms and other Internet-based media.

16.    Members of the Conspiracy, posing as U.S. persons, operated fictitious social media personas, pages, and groups designed to attract U.S. audiences and to address divisive U.S. political and social issues or advocate for the election or electoral defeat of particular candidates. These personas, groups, and pages falsely claimed to be controlled by U.S. activists when, in fact, they were controlled by members of the Conspiracy. Over time, these accounts

---

[1] Throughout this affidavit, statements by members of the Conspiracy are translated or quoted exactly as they appear in the source text, including any spelling, grammatical, or factual errors.

became the Conspiracy's primary means to reach significant numbers of Americans for purposes of interfering with the U.S. political system.

17.     Members of the Conspiracy made various expenditures to carry out those activities, including buying social media analytics products and services, as well as advertisements on social media, in some instances through third-party intermediaries. Members of the Conspiracy also staged and promoted political rallies inside the United States, and while posing as U.S. grassroots entities and U.S. persons, and without revealing their Russian identities and Project Lakhta affiliation, promoted or disparaged candidates and campaigns and organized rallies and counter-protests around particular socially divisive issues.

### A. *KHUSYAYNOVA's Role in Project Lakhta*

18.     To effectively manage such a large-scale operation, the Conspiracy was headed by a management group and organized into departments, including a design and graphics department, an analysts department, a search-engine optimization ("SEO") department, an information-technology ("IT") department, and a finance department.

19.     Between April 2014 and the present, KHUSYAYNOVA, as the Chief Accountant in Project Lakhta's finance department, managed the financing of substantially all aspects of Project operations, which included media and influence activities directed at the United States, the European Union, and Ukraine, as well as the Russian Federation. In that role, she oversaw the budgets of various Project Lakhta entities, including the IRA, MediaSintez LLC, GlavSet LLC, MixInfo LLC, Azimut LLC, NovInfo LLC, Nevskiy News LLC, Economy Today LLC, National News LLC, Federal News Agency LLC, and International News Agency LLC. KHUSYAYNOVA participated in the preparation and submission of hundreds of financial vouchers, budgets, and payment requests for the various Project Lakhta entities, often putting all

company names on the same paperwork and identifying them as part of Project Lakhta. KHUSYAYNOVA maintained Project Lakhta monthly budgets and submitted associated requests for funds to the central finance offices of Concord, which were responsible for disbursing money to Project Lakhta entities.

20.     To conceal the nature of Project Lakhta activities, since at least January 2016 the Conspiracy labeled the funds paid by Concord to Project Lakhta as payments related to software support and development. Moreover, since at least January 2016, Concord distributed funds to Project Lakhta through approximately fourteen bank accounts held in the names of Concord affiliates, including Glavnaya Liniya LLC, Merkuriy LLC, Obshchepit LLC, Potentsial LLC, RSP LLC, ASP LLC, MTTs LLC, Kompleksservis LLC, SPb Kulinariya LLC, Almira LLC, Pishchevik LLC, Galant LLC, Rayteks LLC, and Standart LLC. The Conspiracy described payments from these Concord entities to Project Lakhta as being in furtherance of a series of vague contracts that obscured or falsely stated the true intended use of the funds. At various times, such payments were described as being for "providing services to collect and process materials," "providing services in developing an exporting module for results," and "providing services for developing a statistical processing module" (preliminary translation of Russian text).

21.     At the same time, KHUSYAYNOVA kept detailed financial documents that tracked itemized Project Lakhta expenses, including efforts to promote the illegal objects of the Conspiracy in the United States. For example, the financial documents included itemized budgets that included IT expenses, social media marketing expenses, and expenses for activities in the United States and the European Union, including expenditures for activists and advertisements on social media platforms. KHUSYAYNOVA also issued and kept track of requests to Concord for funds to cover those expenses. Between at least January 2016 and July

2018, these documents were updated and provided to Concord on approximately a monthly basis. The following illustrative examples demonstrate KHUSYAYNOVA's meticulous record-keeping and management of Project Lakhta funds:

    a.   In or around January 2017, KHUSYAYNOVA compiled and submitted to Concord a planned itemized budget for February 2017 for Project Lakhta totaling approximately 60 million Russian rubles (approximately $1 million U.S. dollars).[2] This budget also contained a backward-looking accounting of actual expenses for calendar year 2016, which totaled approximately 720 million Russian rubles (approximately $12 million U.S. dollars). In addition to administrative expenses, such as office rent, utility payments, and garbage disposal, the budget identified IT expenses, such as "registration of domain names" and the purchase of "proxy servers;" and social media marketing expenses, such as expenses for "purchasing posts for social networks," "[a]dvertisement on Facebook," "[a]dvertisement on VKontakte," "[a]dvertisement on Instagram," "[p]romoting news postings on social networks," and social media optimization software (such as Twidium and Novapress) (preliminary translation of Russian text). The budgets also contained a section on "USA, EU" activities, which included itemized expenditures for "Instagram," "Facebook advertisement," and "Activists" (preliminary translation of Russian text). Moreover, the budgets identified expenditures for "bloggers" and "developing accounts" on Twitter, and for the development and promotion of online videos (preliminary translation of Russian text).

---

[2] For the purpose of this affidavit, the approximate U.S. dollar values are based on an approximate currency conversion rate of 60 Russian rubles to 1 U.S. dollar.

b.  To cover the February 2017 expenses, KHUSYAYNOVA requested funds from Concord in two parts.  KHUSYAYNOVA requested approximately 25 million Russian rubles on or about February 16, 2017, and approximately 35 million Russian rubles on March 6, 2017.

c.  In or around January 2018, KHUSYAYNOVA compiled and submitted to Concord a planned itemized budget for February 2018 totaling approximately 100 million Russian rubles (approximately $1.7 million U.S. dollars).  This budget also contained a backward-looking accounting of actual expenses for calendar year 2017, which totaled approximately 733 million Russian rubles (approximately $12.2 million U.S. dollars).  The budget contained, among other things, all of the categories of itemized expenditures identified in subparagraph a, above.

d.  To cover substantial portions of the February 2018 expenses, KHUSYAYNOVA requested funds from Concord in at least six parts.  KHUSYAYNOVA requested approximately 20 million Russian rubles on or about February 7, 2018, approximately 10 million Russian rubles on or about February 7, 2018, approximately 15 million Russian rubles on or about February 16, 2018, approximately 3 million Russian rubles on or about February 21, 2018, approximately 5 million Russian rubles on or about February 28, 2018, and approximately 31 million Russian rubles on or about March 6, 2018.

e.  In or around March 2018, KHUSYAYNOVA compiled and submitted to Concord a monthly budget for April 2018 for Project Lakhta that exceeded 107 million

Russian rubles (over $1.75 million U.S. dollars).  The budget contained, among other things, all of the itemized expenditures identified in subparagraph a, above.

f.  To cover substantial portions of the April 2018 expenses, KHUSYAYNOVA requested funds from Concord in at least two parts.  KHUSYAYNOVA requested approximately 32 million Russian rubles on or about April 6, 2018, and approximately 21 million Russian rubles on or about May 8, 2018.

g.  In or around April 2018, KHUSYAYNOVA compiled and submitted to Concord a monthly budget for May 2018 for Project Lakhta that exceeded 111 million Russian rubles (over $1.86 million U.S. dollars).  The budget contained, among other things, all of the categories of itemized expenditures identified in subparagraph a, above.

h.  To cover substantial portions of the May 2018 expenses, she requested funds from Concord in at least three parts.  She requested approximately 5 million Russian rubles on or about May 8, 2018, approximately 31 million Russian rubles on or about May 10, 2018, and approximately 35 million Russian rubles on or about June 9, 2018.

i.  On or about June 1, 2018, KHUSYAYNOVA compiled and submitted to Concord a monthly budget for June 2018 for Project Lakhta that exceeded 114 million Russian rubles (over $1.9 million U.S. dollars).  The budget contained, among other things, all of the categories of itemized expenditures identified in subparagraph a, above.

j.  To cover substantial portions of the June 2018 expenses, KHUSYAYNOVA requested funds from Concord in three parts.  KHUSYAYNOVA requested

approximately 29 million Russian rubles on or about June 1, 2018, approximately

29 million Russian rubles on or about June 4, 2018, and approximately 36 million

Russian rubles on July 10, 2018.

22.     Between in or around January 2016 and in or around June 2018, Project Lakhta's

proposed operating budget totaled more than 2 billion Russian rubles (over $35 million U.S.

dollars).  Just between in or around January 2018 and in or around June 2018, Project Lakhta's

proposed operating budget totaled more than 650 million Russian rubles (over $10 million U.S.

dollars).

23.     KHUSYAYNOVA also monitored the Project Lakhta budget to ensure that

expected payments from Concord were received.  For example, on or about November 15, 2017,

KHUSYAYNOVA contacted Concord to inform them that she had not received a payment from

Almira LLC for certain Project Lakhta companies, and that she was urgently waiting for the

payment.  Similarly, on or about April 11, 2018, KHUSYAYNOVA confirmed to Concord that

she had received payment for a portion of the March 2018 budget for Project Lakhta but was

waiting for the remaining payment.  On or about April 12, 2018, a Concord employee informed

KHUSYAYNOVA that the remaining payment would be forthcoming.

24.     Starting at least in or around 2015, the Conspiracy began to purchase

advertisements on online social media sites to promote events and social media groups it

controlled.  These expenditures were included in the budgets that KHUSYAYNOVA submitted

to Concord.  For example, between approximately January 2018 and June 2018,

KHUSYAYNOVA compiled and submitted to Concord expenditures of over 3.7 million Russian

rubles (over $60,000 U.S. dollars) for advertisements on Facebook and over 385,000 Russian

rubles (over $6,000 U.S. dollars) for advertisements on Instagram.  Over that same timeframe,

the budget also included expenditures of over 1,100,000 Russian rubles (over $18,000 U.S. dollars) for "bloggers" and "[d]eveloping accounts" on Twitter (preliminary translation of Russian text). Additionally, the budget included expenditures for "[r]enting software for social networks," including payments for services to manage Twitter posts and generate additional followers (preliminary translation of Russian text).

### B. Targeted Messaging to Sow Social and Political Discord

25. Between in or around December 2016 and in or around May 2018, as part of the Conspiracy's effort to sow discord in the U.S. political system, members of the Conspiracy used social media and other internet platforms to inflame passions on a wide variety of topics, including immigration, gun control and the Second Amendment, the Confederate flag, race relations, LGBT issues, the Women's March, and the NFL national anthem debate. Members of the Conspiracy took advantage of specific events in the United States to anchor their themes, including the shootings of church members in Charleston, South Carolina, and concert attendees in Las Vegas, Nevada; the Charlottesville "Unite the Right" rally and associated violence; police shootings of African-American men; as well as the personnel and policy decisions of the current U.S. administration.

26. Members of the Conspiracy were directed to create "political intensity through supporting radical groups, users dissatisfied with [the] social and economic situation and oppositional social movements." The Conspiracy also sought, in the words of one member of the Conspiracy, to "effectively aggravate the conflict between minorities and the rest of the population."

27. The Conspirators' activities did not exclusively adopt one ideological viewpoint; they wrote on topics from varied and sometimes opposing perspectives. Members of the

Conspiracy also developed strategies and guidance to target audiences with conservative and

liberal viewpoints, as well as particular social groups.  For example, a member of the Conspiracy

advised in or around October 2017 that "if you write posts in a liberal group, . . . you must not

use Breitbart titles.  On the contrary, if you write posts in a conservative group, do not use

Washington Post or BuzzFeed's titles."  Using the example of individuals of color who are also

members of the lesbian, gay, bisexual, and transgender ("LGBT") community, the member of the

Conspiracy offered the following guidance on how to target the group:

> Colored LGBT are less sophisticated than white; therefore, complicated
> phrases and messages do not work. Be careful dealing with racial content.
> Just like ordinary Blacks, Latinos, and Native Americans, colored LGBT
> people are very sensitive towards #whiteprivilege and they react to posts
> and pictures that favor white people. . . . Unlike with conservatives,
> infographics works well among LGBT and their liberal allies, and it does
> work very well. However, the content must be simple to understand
> consisting of short text in large font and a colorful picture.  (Preliminary
> translation of Russian text.)

Members of the Conspiracy also sought to target the timing of their posts to attract the widest

possible viewership.  The same member of the Conspiracy referenced above offered the

following guidance on how to overcome the time difference between Russia and the United

States:

> Posting can be problematic due to time difference, but if you make your
> re-posts in the morning St. Petersburg time, it works well with liberals –
> LGBT groups are often active at night. Also, the conservative can view
> your re-post when they wake up in the morning if you post it before you
> leave in the evening St. Petersburg time. (Preliminary translation of
> Russian text.)

28.    Members of the Conspiracy also developed detailed analysis of timely news

articles and guidance for how to describe the articles in social media posts in order to promote

the objectives of the Conspiracy.  For example, in or around early August 2017, one or more

members of the Conspiracy working under the guise of the Facebook group "Secured Borders"

analyzed a large quantity of U.S. news articles, summarized the substance of the articles, and

outlined ways for the conspiracy to promote them. Specifically, one or more members of the

Conspiracy described each article and categorized its theme, provided a strategic response with a

particular focus on how to target U.S. audiences, and then noted approval to use the strategic

response. The strategic response was referred to as "Tasking Specifics," which appeared to

include an assignment to certain members of the Conspiracy to disseminate the message on

social media platforms.

   a.  Citing an online news article titled "McCain Says Thinking a Wall Will Stop

       Illegal Immigration is 'Crazy,'" from on or about August 5, 2017, a member of

       the Conspiracy directed that the article be messaged in the following way:

> Brand McCain as an old geezer who has lost it and who long ago
> belonged in a home for the elderly. Emphasize that John McCain's
> pathological hatred towards Donald Trump and towards all his
> initiatives crosses all reasonable borders and limits. State that
> dishonorable scoundrels, such as McCain, immediately aim to
> destroy all the conservative voters' hopes as soon as Trump tries to
> fulfill his election promises and tries to protect the American
> interests. (Preliminary translation of Russian text.)

   b.  Citing an online news article titled "Paul Ryan Opposes Trump's Immigration

       Cuts, Wants Struggling American Workers to Stay Poor," from on or about

       August 5, 2017, a member of the Conspiracy directed that the article be messaged

       in the following way:

> Brand Paul Ryan a complete and absolute nobody incapable of any
> decisiveness. Emphasize that while serving as Speaker, this two-
> faced loudmouth has not accomplished anything good for America
> or for American citizens. State that the only way to get rid of Ryan
> from Congress, provided he wins in the 2018 primaries, is to vote
> in favor of Randy Brice, an American veteran and an iron worker
> and a Democrat. (Preliminary translation of Russian text.)

c.  Citing an online news article titled "11 California Counties Might have More

Registered Voters Than Eligible," from on or about August 6, 2017, a member of

the Conspiracy directed that the article be messaged in the following way:

> In the California voter registration rolls, there are more registrants
> than there are residents.  This is the time for American
> conservatives to sound the alarm before the elections turn the
> Constitution into a mockery and a celebration of lawlessness.
> Emphasize that previous falsifications during the U.S. elections
> used to be perceived as a myth; today they became a reality with a
> threatening force and are perceived accordingly.  Emphasize that
> all illegal voters must be kept away from the ballot boxes at
> distances "beyond artillery firing range."  There is an urgent need
> to introduce voter IDs for all the states, above all in the blue
> (liberal and undecided) states.  Remind that the majority of the
> "blue states" have no VOTER IDs, which suggests that large-scale
> falsifications are bound to be happening there.  State in the end that
> the Democrats in the coming election will surely attempt to falsify
> the results.  (Preliminary translation of Russian text.)

d.  Citing an online news article titled "Savage: Civil War if Trump Taken Down,"

from on or about August 6, 2017, a member of the Conspiracy directed that the

article be messaged in the following way:

> Forcefully support Michael Savage's point of view with
> competence and honesty.  Savage made it clear that any attempt to
> remove Trump is a direct path to a civil war in the United States.
> Name those who oppose the president and those who impede his
> efforts to implement his pre-election promises.  Focus on the fact
> that the Anti-Trump Republicans: a) drag their feet with regard to
> financing the construction of the border wall; b) are not lowering
> taxes; c) slander Trump and harm his reputation (bring up
> McCain); d) do not want to cancel Obamacare; e) are not in a hurry
> to adopt laws that oppose the refugees coming from Middle
> Eastern countries entering this country.  Summarize that in case
> Republicans will not stop acting as traitors, they will bring upon
> themselves forces of civil retribution during the 2018
> elections.  (Preliminary translation of Russian text.)

e.  Citing an online news article titled "Trump: No Welfare To Migrants For Grants

For First 5 Years" from on or about August 6, 2017, a member of the Conspiracy

directed that the article be messaged in the following way:

> Fully support Donald Trump and express the hope that this time
> around Congress will be forced to act as the president says it
> should. Emphasize that if Congress continues to act like the
> Colonial British government did before the War of Independence,
> this will call for another revolution. Summarize that Trump once
> again proved that he stands for protecting the interests of the
> United States of America. (Preliminary translation of Russian
> text.)

f.  Citing an online news article titled "The 8 Dirtiest Scandals of Robert Mueller No

One Is Talking About," from on or about August 7, 2017, a member of the

Conspiracy directed that the article be messaged in the following way:

> Special prosecutor Mueller is a puppet of the establishment. List
> scandals that took place when Mueller headed the FBI. Direct
> attention to the listed examples. State the following: It is a fact
> that the Special Prosecutor who leads the investigation against
> Trump represents the establishment: a politician with proven
> connections to the U.S. Democratic Party who says things that
> should either remove him from his position or disband the entire
> investigation commission. Summarize with a statement that
> Mueller is a very dependent and highly politicized figure;
> therefore, there will be no honest and open results from the
> investigation. Emphasize that the work of this commission is
> damaging to the country and is aimed to declare impeachment of
> Trump. Emphasize that it cannot be allowed, no matter what.
> (Preliminary translation of Russian text.)

g.  Citing an online news article titled "CNN's Pro-Jeb! Republican: Trump White

House Like a 'Brothel,'" from on or about August 7, 2017, a member of the

Conspiracy directed that the article be messaged in the following way:

> CNN commentator "RINO" likened the Trump administration to a
> "brothel." Mass News Media Criticism! Accuse CNN of yet
> another lie. State that during past elections, namely, this
> mainstream media, which supported Hillary Clinton's candidacy

for U. S. President almost 100%, disseminated fake news, insulting statements, and lies about Donald Trump and his supporters. This continues now. This is precisely why such news sources as the New York Times, Washington Post, CNN, CBS, Time, and Huffington Post must not be taken seriously, for they are the main propaganda channels that are screwing with the heads of American citizens. Remind readers that each of the above-mentioned media resources supported Hillary Clinton and received funds from her election fund. They produced fake social study research results at polls predicting a Clinton win with a 10-15% lead over Trump and tried hard to insult and discredit Trump. Summarize with a statement that CNN long ago lost its reputation as a trusted source and that its reputation is still declining. (Preliminary translation of Russian text.)

h.  Citing an online news article titled "Pro-Amnesty Sen. Marco Rubio: Trump's Immigration Bill Will Not Pass the Senate," from on or about August 7, 2017, a member of the Conspiracy directed that the article be messaged in the following way:

VERY IMPORTANT! We expose Marco Rubio as a fake conservative who is a traitor to Republican values and who in his soul despises the American Constitution and civil liberties. Remind that Rubio is the protégé of the preposterous Jeb Bush, who is a disgrace to the conservative movement. State that victims of violence committed by illegals and the relatives of the victims hate Marco Rubio completely and wholeheartedly. In other words, Rubio is a liberal who penetrated the Republican Party for the purpose undermining it from the inside. Summarize in a statement that voting for Rubio during the Senate elections is practically the same as voting for Hillary Clinton. (Preliminary translation of Russian text.)

i.  Citing an online news article titled "Sanctuary City Objects to Arrest of Accused Illegal Alien Child Molester," from on or about August 7, 2017, a member of the Conspiracy directed that the article be messaged in the following way:

Characterize the position of Californian sanctuary cities along with the position of the entire California administration as absolutely and completely treacherous and disgusting. Stress that protecting an illegal rapist who raped an American child is the peak of

wickedness and hypocrisy.  Summarize in a statement that
"sanctuary city" politicians should surrender their American
citizenship, for they behave as true enemies of the United States of
America.  (Preliminary translation of Russian text.)

j.   Citing an online news article titled "Maryland City Mulling Over Idea to Let

Illegal Immigrants Vote" from on or about August 7, 2017, a member of the

Conspiracy directed that the article be messaged in the following way:

Stress that the leadership in sanctuary cities has lost all connection
with reality and is trying to provide criminals who illegally crossed
the U.S. borders with voting rights that are available only to the
citizens of the United States.  Summarize in a statement that the
leaders of sanctuary cities are people without conscience and
without any respect for the American Constitution.  (Preliminary
translation of Russian text.)

k.   Citing an online news article titled "Dobbs Slams McConnell, Says It's Time to

'Ditch Mitch,'" from on or about August 8, 2017, a member of the Conspiracy

directed that the article be messaged in the following way:

It's time for Mitch McConnell (leader of the Senate Republicans)
to retire. Show solid support for the news anchor.  Emphasize that
McConnell exhausted himself as a politician.  State that Mitch
McConnell, like many other Republican senators, behaves as a
renegade and a vile liberal.  McConnell has done nothing to fulfill
Trump's and other Republicans' election promises.  Remind that
McConnell is a friend of Joe Biden, who has no political
principles.  Emphasize that boycotting the conservative agenda is
the most inadequate and treacherous behavior possible in the given
situation. Summarize in a statement that people did not vote for the
Republicans in 2014 and in 2016 so that today they would do the
same things that Democrats usually busy themselves
with.  (Preliminary translation of Russian text.)

## C.   Use of Specific U.S. Fake Personas

29.     Since at least in or around 2015, the Conspiracy used social media platforms to

create thousands of social media and email accounts that appeared to be operated by U.S.

persons and used them to create and amplify divisive social and political content targeting a U.S.

audience. These accounts were also used to advocate for the election or electoral defeat of particular candidates in the 2016 and 2018 U.S. elections, to post derogatory information about a number of candidates, and, on occasion, to promote political donations against particular candidates.

30. In or around May 2015, the Conspiracy created a Facebook account registered under the false U.S. persona "Helen Christopherson." On her Facebook page, "Helen Christopherson" purported to be a resident of New York City and identified her hometown as Charleston, South Carolina. Between in or around March 2016 and in or around July 2017, while concealing its true identity, location, and purpose, the Conspiracy used the false U.S. persona "Helen Christopherson" to contact individuals and groups in the United States to promote protests, rallies, and marches, including by funding advertising, flyers, and rally supplies. Specific examples of this account's activities, as well as the activities of other accounts described in this subsection, are contained in the Overt Acts section below.

31. In or around June 2015, the Conspiracy created a Facebook account registered under the false U.S. persona "Bertha Malone." On her Facebook page, "Bertha Malone" purported to be a resident of New York City, identified her hometown as New York City, and stated that she had attended a university in New York City. In or around January 2016, the Conspiracy used the "Bertha Malone" Facebook account to create a Facebook page for a group called "Stop A.I.," which is an abbreviation for "Stop All Invaders." Between in or around December 2016 and in or around August 2017, while concealing its true identity, location, and purpose, the Conspiracy used the "Bertha Malone" Facebook account to create over 400 posts on Facebook containing inflammatory political and social content focused primarily on immigration and Islam. Between on or about July 17, 2017, and on or about July 23, 2017, alone, the content

on the "Stop A.I." Facebook page reached approximately 1,385,795 individuals and approximately 130,851 individuals purposefully engaged with the Facebook page. In total, by on or about July 23, 2017, the Facebook page received approximately 194,221 total page likes.

32.     The Conspiracy also used the "Bertha Malone" Facebook account, while concealing its true identity, location, and purpose, to solicit at least one person presumed to be located in the United States to assist with Project Lakhta's social media activities in or around July 2017, such as by posting and managing content on the "Stop A.I." Facebook page. Moreover, the Conspiracy used the "Stop A.I." Facebook page to accept money from individuals to post ads and other content on the Facebook group's page.

33.     In or around June 2016, the Conspiracy created a Twitter account that went by various names, including "@UsaUsafortrump," "@USAForDTrump," "@TrumpWithUSA," "@TrumpMov," "@POTUSADJT," "@imdeplorable201," "@swampdrainer659," "@maga2017trump," and "@TXCowboysRawk." Most recently, the Twitter account went by the name "@CovfefeNationUS." Between in or around November 2017 and in or around December 2017, while concealing its true identity, location, and purpose, the Conspiracy used the Twitter account "@CovfefeNationUS" to post or repost over 23,000 messages.

34.     In or around September 2016, the Conspiracy created a Facebook account registered under the false U.S. persona "Rachell Edison" and an associated Facebook page for a group called "Defend the 2nd." Between in or around December 2016 and in or around May 2017, while concealing its true identity, location, and purpose, the Conspiracy used the "Rachell Edison" Facebook account to create over 700 posts on Facebook containing inflammatory political and social content primarily focused on gun control and the Second Amendment.

35.     In or around March 2017, the Conspiracy created the Twitter account "@wokeluisa" registered under the false U.S. persona "Luisa Haynes." Between in or around March 2017 and in or around March 2018, while concealing its true identity, location, and purpose, the Conspiracy used the Twitter account "@wokeluisa" to post over 2,000 Tweets on topics such as the 2018 midterm election, the disenfranchisement of African-American voters, the NFL national anthem debate, the current U.S. administration, and the U.S. President's family. By in or around March 2018, the Twitter account amassed over 55,000 followers.

36.     In or around September 2017, the Conspiracy created several Twitter accounts that it used to create and amplify content that would resonate with either liberal or conservative audiences. For example, on or about September 4, 2017, one or more members of the Conspiracy created the Twitter accounts "@JohnCopper16," "@Amconvoice," and "@TheTrainGuy13." Members of the Conspiracy used these accounts to post messages on controversial social and political topics using a perspective that they believed would resonate with a conservative audience in the United States. Similarly, one or more members of the Conspiracy created the Twitter account "@KaniJJackson" on or about September 5, 2017, and the Twitter account "@JemiSHaaaZzz" on or about September 6, 2017, and used these accounts to post on many of the same controversial social and political topics from a perspective that they believed would resonate with a liberal audience in the United States. Between in or around September 2017 and in or around May 2018, while concealing its true identity, location, and purpose, the Conspiracy used these Twitter accounts to post thousands of Tweets, on topics including, but not limited to, the 2018 midterm election, gun rights, the net neutrality debate, negotiations with North Korea, and the personnel and policy decisions of the current U.S. administration. In some cases, these accounts attracted significant numbers of followers. For

example, by in or around May 2018, the Twitter account "@KaniJJackson" had amassed over 33,000 followers.

## IV.  Overt Acts

37.     Between in or around December 2016 and in or around May 2018, in the Eastern District of Virginia and elsewhere, while concealing its true identity, location, and purpose, the Conspiracy committed the following overt acts involving U.S. social media platforms in furtherance of the Conspiracy and to effect its illegal objects:

38.     On or about December 5, 2016, a member of the Conspiracy used the "Rachell Edison" Facebook account to post the following image on Facebook, accompanied by the comment "Whatever happens, blacks are innocent. Whatever happens, it's all guns and cops. Whatever happens, it's all racists and homophobes.  MainStream Media...":



39.    On or about April 28, 2017, a member of the Conspiracy used the "Rachell Edison" Facebook account to post the following image on Facebook:



**NRA DETERMINED TO TURN MAJOR ELECTION WINS INTO PERMANENT GUN RIGHTS FOR AMERICANS**

Chris W. Cox, executive director of the NRA Institute for Legislative Action

The image was accompanied by the following comment advocating political activities:

> Gun rights backers need to make sure that election victories translate into action on Capitol Hill and expanded support in the states, the National Rifle Association's legislative chief said Thursday, a day ahead of President Trump's speech at the NRA's annual convention. And he is absolutely right. Now it is the time for us to demand our rights. With current, administration it is possible to defend our right to bear arms. I think next 4 years will be great for all Americans, and for gun lovers especially! But we must stand for our rights! And in the end, I believe, we will win!

40.    On or about July 1, 2017, a member of the Conspiracy used the "Helen Christopherson" Facebook account to contact the Facebook accounts for three real U.S. organizations (hereinafter U.S. Organizations 1, 2, and 3) to inquire about collaborating with

these groups on an anti-President Trump "flash mob" at the White House, which was already being organized by the groups for July 4, 2017. The organizers had described the event as "inviting resistance activists, show tune lovers, and karaoke fans to come join us on Independence Day, sing a song of freedom, and demand Trump's impeachment."

41.    On or about July 2, 2017, a member of the Conspiracy used the "Helen Christopherson" Facebook account to contact U.S. Organization 1 and a U.S. person affiliated with the organization, U.S. Person 1, and inform them that "I got some cash on my Facebook ad account so we can promote it for 2 days," adding "I got like $80 on my ad account so we can reach like 10000 people in DC or so. That would be Massive!"

42.     On or about July 2, 2017, a member of the Conspiracy used the "Helen Christopherson" Facebook account to send U.S. Organization 1 a proposal to purchase advertising targeting individuals within 30 miles of Washington, DC, including significant portions of the Eastern District of Virginia, as depicted below:



The proposed advertisements had an estimated reach of 29,000 to 58,000 individuals. Subsequently, U.S. Organization 1 agreed to make the "Helen Christopherson" Facebook account a co-organizer of the event on Facebook.

43.     On or about July 4, 2017, a member of the Conspiracy used the "Bertha Malone"

Facebook account to engage in the following conversation with U.S. Person 2 about U.S. Person

2 assisting with posting content and managing the "Stop A.I." Facebook page, which members of

the Conspiracy controlled:

> Malone:     Hey girl! How u doin? still got free time on ya hands?
> So...remember u wanted to help me with that page i'm workng
> on? It's a little bit unorthodox, but nwm that. Content is not of
> my choosing. So what tell ya? Help a sister out?
>
> U.S. Person 2:  Hi! Let me think bout 4 a sec.
> what's the name of the page again?
>
> Malone:     https://www.facebook.com/StopAllInvaders/
>
> ...
>
> Malone:     Nothin muh, [U.S. Person 2]. Just general scannin, answer
> subcribers now and then and mb post something (i'll be sending
> content to u directly)
>
> Malone:     nwm the posts lol
>
> Malone:     just business
>
> Malone:     makes ratinging for clients, that's what i know.
>
> Malone:     ratings*
>
> Malone:     u know how rednecks are
>
> Malone:     so here's the deal. I give u admin rights, u check the page when
> i'm not around and basically do some stuff i tell u to :D
>
> ...
>
> U.S. Person 2:  You know I can't let my sis down
>
> U.S. Person 2:  so I'm in
>
> ...
>
> U.S. Person 2:  but please tell me I'm not going to jail for this
>
> ...
>
> Malone:  jeez why would u
>
> Malone:  just page lol
>
> Malone:  i'll vouch fou 4 mb u get some money out that even
>
> ...
>
> U.S. Person 2:  i trust you

44.     On or about July 28, 2017, a member of the Conspiracy used the "Bertha Malone"

Facebook account to post the following image on Facebook:



The image was accompanied by the following comment:

> Instead this stupid witch hunt on Trump, media should investigate this
> traitor and his plane to Islamize our country. If you are true enemy of
> America, take a good look at Barack Hussein Obama and Muslim
> government officials appointed by him.

45.     On or about July 31, 2017, a member of the Conspiracy used the "Bertha Malone" Facebook account to post the following image on Facebook, with the comment "Stop separating families! Deport them all, including their anchor babies! And spend saved money on Americans who really need it, for example our homeless Vets":



46.     On or about July 31, 2017, a member of the Conspiracy used the "Bertha Malone" Facebook account to post the following image on Facebook, with the comment "Feel the difference!":



47.     On or about August 1, 2017, a member of the Conspiracy used the "Bertha

Malone" Facebook account to post the following image on Facebook, with the comment "Damn

right! And we all know which cult we need to kick out of America…":



The post generated approximately 104 comments between on or around August 1, 2017, and on

or around August 2, 2017.

48.     On or about December 10, 2017, a member of the Conspiracy used the Twitter

account "@CovfefeNationUS" to repost a Tweet encouraging readers to donate to a political

action committee aiming to unseat Democratic Senators and Representatives in the 2018

midterm election:

> Tell us who you want to defeat! Donate $1.00 to defeat @daveloebsack
> Donate $2.00 to defeat @SenatorBaldwin Donate $3.00 to defeat
> @clairecmc Donate $4.00 to defeat @NancyPelosi Donate $5.00 to defeat
> @RepMaxineWaters Donate $6.00 to defeat @SenWarren

The Tweet included a link to the donation website of a political action committee.

49.     On or about December 12, 2017, a member of the Conspiracy used the Twitter

account "@KaniJJackson" to post a Tweet about the 2017 special election in Alabama:

> Dear Alabama,  You have a choice today.  Doug Jones put the KKK in
> prison for murdering 4 young black girls.  Roy Moore wants to sleep with
> your teenage daughters.  This isn't hard. #AlabamaSenate

50.     On or about December 12, 2017, a member of the Conspiracy used the Twitter

account "@JohnCopper16" to post a Tweet about the 2017 special election in Alabama:

> People living in Alabama have different values than people living in NYC.
> They will vote for someone who represents them, for someone who they
> can trust. Not you. Dear Alabama, vote for Roy Moore.

51.     On or about December 16, 2017, a member of the Conspiracy used the Twitter

account "@KaniJJackson" to post a Tweet about the Special Counsel's Office's investigation:

> If Trump fires Robert Mueller, we have to take to the streets in protest.
> Our democracy is at stake.

52.     On or about December 17, 2017, a member of the Conspiracy used the Twitter

account "@Amconvoice" to repost a Tweet about the Special Counsel's Office's investigation:

> Liberals : If Trump fire/removes Mueller, we will take to the
> streets/protest. (DNC must have sent that talking point out today.
> Everyone using same line) Why would Trump need to remove/fire
> Mueller. Mueller is doing fine job destroying himself. Keep the implosion
> coming Mueller.

53.     On or about January 19, 2018, a member of the Conspiracy used the Twitter

account "@KaniJJackson" to post a Tweet about the government shutdown of 2018:

> Who ended DACA? Who put off funding CHIP for 4 months? Who
> rejected a deal to restore DACA?   It's not #SchumerShutdown. It's
> #GOPShutdown.

54.     On or about January 20, 2018, a member of the Conspiracy used the Twitter

account "@JohnCopper16" to repost a Tweet about the government shutdown of 2018:

> Anyone who believes that President Trump is responsible for the
> #shutdown2018 is either an outright liar or horribly ignorant.
> #SchumerShutdown for illegals. #DemocratShutdown  #DemocratLosers
> #DemocratsDefundMilitary  #AlternativeFacts

55.     On or about January 26, 2018, a member of the Conspiracy used the Twitter

account "@JemiSHaaaZzz" to repost a Tweet about a Senate vote on reproductive health issues,

referencing the telephone number of the U.S. Capitol switchboard:

> Republicans have scheduled a vote Monday on legislation that would
> ban some women's health care choices
>
> We can't turn back the clock on women's reproductive health. Call your
> Senators now and tell them to vote NO: (202) 224-3121.

56.     On or about February 8, 2018, a member of the Conspiracy used the Twitter

account "@Amconvoice" to post a Tweet about the 2018 U.S. midterm election:

> The only way the Democrats can win 101 GOP seats is to cheat like they
> always do with illegals & dead voters.

57.   On or about February 15, 2018, a member of the Conspiracy used the Twitter account "@KaniJJackson" to post a Tweet about the Parkland, Florida, school shooting and the 2018 U.S. midterm election:

> Reminder: the same GOP that is offering thoughts and prayers today are the same ones that voted to allow loosening gun laws for the mentally ill last February.   If you're outraged today, VOTE THEM OUT IN 2018. #guncontrol #Parkland

58.   On or about February 16, 2018, a member of the Conspiracy used the Twitter account "@JemiSHaaaZzz" to repost a Tweet about the Special Counsel's Office's indictment of Russian companies and nationals who sought to interfere with U.S. elections and political processes:

> Dear @realDonaldTrump: The DOJ indicted 13 Russian nationals at the Internet Research Agency for violating federal criminal law to help your campaign and hurt other campaigns.   Still think this Russia thing is a hoax and a witch hunt? Because a lot of witches just got indicted.

59.   On or about February 16, 2018, a member of the Conspiracy used the Twitter account "@JohnCopper16" to post two Tweets about the Special Counsel's Office's indictment:

> Russians indicted today: 13 Illegal immigrants crossing Mexican border indicted today: 0  Anyway, I hope that all those Internet Research Agency f*ckers will be sent to gitmo.

> We didn't vote for Trump because of a couple of hashtags shilled by the Russians. We voted for Trump because he convinced us to vote for Trump.  And we are ready to vote for Trump again in 2020!

60.   On or about February 19, 2018, a member of the Conspiracy used the Twitter account "@KaniJJackson" to post a Tweet about the 2018 midterm election:

> Midterms are in 261 days, use this time to:  - Promote your candidate on social media - Volunteer for a campaign - Donate to a campaign - Register to vote  - Help others to register to vote - Spread the word  We have only 261 days to guarantee survival of democracy. Get to work!

61.     On or about February 27, 2018, a member of the Conspiracy used the Twitter

account "@JohnCopper16" to post the following Tweet about the 2018 midterm election:

> Dem 2018 platform: - We want women raped by the jihadists - We want
> children killed - We want higher gas prices  - We want more illegal aliens
> - We want more Mexican drugs  And they are wondering why
> @realDonaldTrump became the President...

62.     On or about March 9, 2018, a member of the Conspiracy used the Twitter account

"@JohnCopper16" to post the following two Tweets about the summit between President Trump

and North Korean President Kim Jong Un:

> WOW! Donald Trump is going to meet Kim Jong Un to discuss
> denuclearization of North Korea, If Trump gets North Korea to
> denuclearize its game over for the Democrats! That would be
> monumental!

> RETWEET if you think that Donald Trump deserves a Nobel Peace Prize
> for resolving the North Korean crisis!

63.     On or about March 9, 2018, a member of the Conspiracy used the Twitter account

"@KaniJJackson" to post the following two Tweets about the summit between President Trump

and North Korean President Kim Jong Un:

> Trump says he will meet with Kim Jong Un in May. But he might not
> even be president by then. Mueller is coming!

> The same people who criticized Barack Obama for signing the Iran
> Nuclear deal are already praising Trump for his promise to meet with Kim
> Jong Un and talk about denuclearization.

64.     On or about March 14, 2018, a member of the Conspiracy used the Twitter

account "@wokeluisa" to post several Tweets regarding the Pennsylvania special election on

March 13, 2018, for a House of Representatives seat:

> Enthusiastically watching #PA18 turn blue

> Lamb up by only 703 votes... EVERY. VOTE. COUNTS. #PA18

We need to flip about 20 seats to regain control of the House! 19 after tonight!  #PA18

Tonight's results are a message regardless of the outcome: D voters are motivated! Blue Wave coming! #PA18

65.     On or about March 14, 2018, a member of the Conspiracy used the Twitter account "@TheTrainGuy13" to repost a Tweet about voter fraud:





66.     On or about March 18, 2018, a member of the Conspiracy used the Twitter account "@wokeluisa" to post the following Tweet about election fraud:

> Fun fact: the last time a new Republican president was elected without electoral fraud was in 1988

67.     On or about March 18, 2018, a member of the Conspiracy used the Twitter account "@wokeluisa" to repost the following Tweet:

> Just a reminder that: - Majority black Flint, Michigan still has drinking water that will give you brain damage if consumed. - Republicans are still trying to keep black people from voting. - A terrorist has been targeting black families for assasination in Austin, Texas.

68.     On or about March 19, 2018, a member of the Conspiracy used the Twitter account "@wokeluisa" to post the following Tweets about an explosion in Austin, Texas:

> Trump will tweet NOTHING about yet another explosion in Austin b/c all of the victims have been black and hispanic. Mark my words

> Another explosion in southwest Austin, Texas! Why these bombings ain't a bigger story? Oh yes... all of the victims have been Black and Hispanic #AustinBombings

69.     On or about March 19, 2018, a member of the Conspiracy used the Twitter account "@wokeluisa" to post the following Tweet about the 2018 midterm election:

> Make sure to pre-register to vote if you are 16 y.o. or older. Don't just sit back, do something about everything that's going on because November 6, 2018 is the date that 33 senate seats, 435 seats in the House of Representatives and 36 governorships will be up for re-election.

70.     On or about March 22, 2018, a member of the Conspiracy used the Twitter account "@johncopper16" to post the following Tweet about the 2018 midterm election:

> Just a friendly reminder to get involved in the 2018 Midterms. They are motivated They hate you They hate your morals They hate your 1A and 2A rights They hate the Police They hate the Military They hate YOUR President

71.     On or about May 17, 2018, a member of the Conspiracy used the Twitter account

"@KaniJJackson" to repost two Tweets about a U.S. Senate vote on Net Neutrality:

> Ted Cruz voted to repeal #NetNeutrality. Let's save it and repeal him instead.

> Here's the list of GOP senators who broke party lines and  voted to save #NetNeutrality:  Susan Collins John N Kennedy Lisa Murkowski  Thank you!

## CONCLUSION

72.     Based on the foregoing, and on my training, experience, and participation in this

and other investigations, I submit there is probable cause to believe that, from at least 2014 to the

present, ELENA ALEKSEEVNA KHUSYAYNOVA has violated Title 18, United States Code,

Section 371.


_____
David Holt
Special Agent
Federal Bureau of Investigation

Reviewed by:

Jay V. Prabhu
Chief, Cybercrime Unit
Assistant U.S. Attorney

Alex Iftimie
Special Assistant U.S. Attorney


Sworn to before me this _28_ th day
of September, 2018


_____ /s/_____
Ivan D. Davis
**United States Magistrate Judge**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC | |
| Defendant. | |

## PROPOSED ORDER

Upon consideration of Defendant Concord Management and Consulting LLC's Motion for Approval to Disclose Discovery Pursuant to Protective Order and any opposition thereto, it is hereby

ORDERED that the motion is GRANTED,

IT IS FURTHER ORDERED that the officers and employees of Concord Management and Consulting LLC are approved to view Sensitive material in this matter in the manner set forth in Exhibit B to the motion.

_____
Date

_____
DABNEY L. FRIEDRICH
United States District Judge