# EXHIBIT 1



**U.S. Department of Justice**

National Security Division

---

*Counterintelligence and Export Control Section*                    *Washington, D.C. 20530*

January 15, 2019

**By FedEx and Electronic Mail**
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036

Re:    Ukraine Matter

To: Skadden, Arps, Slate, Meagher & Flom LLP

The United States Department of Justice, National Security Division ("NSD") and Skadden, Arps, Slate, Meagher & Flom LLP (the "Law Firm") enter into this Settlement Agreement.  The Law Firm agrees to certain terms and obligations of the agreement set forth herein.

The Attorney General of the United States of America, including the Department of Justice ("DOJ") and all agencies thereof, (collectively, the "Attorney General") has determined that the Law Firm, through certain of its current and former partners, acted as an agent of the Government of Ukraine ("GoU" or "Ukraine") within the meaning of the Foreign Agents Registration Act ("FARA" or the "Act"), 22 U.S.C. § 611 *et seq.*, by contributing to a GoU public relations campaign directed at U.S. media without registering with DOJ as required by the Act.

The Law Firm agrees on certain facts, which are set forth in the Appendix to this Settlement Agreement (the "Appendix").  The Law Firm agrees that it had an obligation to register with DOJ as required by FARA.

The Law Firm also agrees that, as described in the Appendix, from in or about December 2012 through in or about February 2014, the Law Firm received a series of inquiries from DOJ's FARA Registration Unit ("FARA Unit") about the Law Firm's work on behalf of the GoU. In concluding that the Law Firm was not obligated to register under FARA, the FARA Unit relied to its detriment on false and misleading oral and written statements made by a former Partner of the Law Firm on the Law Firm's behalf regarding the nature of its activities on behalf of the GoU.

The Attorney General expects that any organization, including a law firm or other professional service organization, that provides information in response to a government inquiry shall utilize formal policies and procedures to assess when independent diligence should be

undertaken in responding to such inquiries to ensure that the information provided is reliable, accurate, and complete.

The Law Firm has already taken substantial steps to comply with the terms herein, and the Attorney General agrees that so long as the Law Firm continues to comply with the terms herein, the Attorney General will not undertake any action against the Law Firm relating to any of the conduct described in the Statement of Facts set forth in the Appendix hereto.

The Attorney General finds that the Law Firm has cooperated extensively with the Attorney General in its investigation, including with the Special Counsel's Office and the National Security Division of DOJ in relation to these matters; and in so doing, the Law Firm has undertaken affirmative steps to enhance its internal procedures and processes. The Attorney General also recognizes that the Law Firm has been constructively engaged with the FARA Unit regarding registration under FARA, has indicated its willingness to register voluntarily under FARA, and has agreed to do so as part of this resolution. The Law Firm's cooperation and other voluntary actions have facilitated the resolution of this matter.

The Law Firm agrees to register with DOJ as required by FARA in connection with the Law Firm's work for GoU; make payment to the United States Treasury of $4,657,568.91, representing all monies from all sources that the Law Firm was paid for its work and incurred expenses for GoU; undertake continuing cooperation with all Attorney General inquiries relating to the Law Firm's work for GoU; and continue to undertake a review of its compliance policies and procedures to ensure that there are formal robust procedures and protocols for responding to inquiries concerning the Law Firm's conduct from any federal government entity and ensuring FARA compliance as to the Law Firm's engagements.

In connection with its voluntary cooperation with the DOJ and as a final resolution of this matter, the Attorney General and the Law Firm agree as follows:

1.      The Law Firm agrees to register within ten (10) business days of the execution of this Agreement with the Attorney General under FARA for the Law Firm's activities as set forth in the Appendix and to comply with FARA in any other matter in which it acts as the agent of a foreign principal and engages in conduct requiring registration under FARA.

2.      The Law Firm agrees that the Appendix, hereto, accurately describes the Law Firm's conduct with respect to the events described therein. The Law Firm agrees to comprehensively reflect the events set forth in the Appendix in its FARA filing consistent with FARA registration requirements.

3.      The Law Firm agrees not to take any action or to make or permit to be made on its behalf any public statement denying any fact in the Appendix or creating the impression that the Appendix is without factual basis.

4.      With respect to any United States judicial proceeding or investigation concerning the subject matter of this Agreement and its Appendix, the Law Firm agrees (i) to continue to produce, without service of a notice or subpoena, any and all non-privileged documents and

other information reasonably requested by DOJ; (ii) to accept service by mail or facsimile transmission of notices or subpoenas issued by DOJ for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by DOJ; (iii) to appoint the undersigned as agent to receive service of such notices and subpoenas; (iv) with respect to such notices and subpoenas, to waive the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules, provided that DOJ reimburses the Law Firm's travel, lodging, and subsistence expenses at the then-prevailing Federal Government per diem rates; and (v) to consent to personal jurisdiction over the Law Firm in any United States District Court for purposes of enforcing any such subpoena.

5.      The Law Firm agrees to continue to use its best efforts to make available for interviews or testimony, as requested by the Attorney General, present or former partners, employees, agents, and consultants, in any and all matters concerning any act within the scope of or related to the conduct described in this Agreement and its Appendix. This obligation includes, but is not limited to, sworn testimony before federal grand juries or federal trials, as well as interviews with domestic law enforcement and regulatory authorities.

6.      The Law Firm agrees to continue to undertake a review of its policies and procedures for responding to information requests from the federal government that concern the conduct of the Law Firm and the Law Firm's agents, employees, attorneys, and all persons in active concert or participation with them. Within 180 days of the entry of this Agreement, the Law Firm shall submit a written report to DOJ that sets forth such policies and procedures then in effect. The Law Firm shall certify that such policies and procedures have been fully implemented as of the date of the submission of the written report. The report shall address, at minimum, the Law Firm's formal procedures for when independent diligence should be undertaken in responding to such inquiries to ensure that the information provided is reliable, accurate and complete.

7.      The Law Firm agrees to continue to undertake a review of its policies and procedures designed to ensure the Law Firm's compliance with FARA. The Law Firm shall continue to engage, at its own expense, outside counsel to advise in a professionally independent and objective fashion on the development of enhanced policies and procedures to ensure compliance with FARA. The Law Firm shall, within 180 days of the entry of this Agreement, submit a written report to DOJ that sets forth such policies and procedures regarding FARA compliance then in effect. The Law Firm shall certify to DOJ that such policies and procedures have been fully implemented as of the date of the submission of the written report. The report shall address, at minimum, the Law Firm's policies and procedures related to:

     a.  Client intake procedures to identify the direct or indirect involvement of a foreign principal and/or activities that may trigger potential FARA registration obligations;

     b.  Promoting firm-wide awareness of FARA compliance, including FARA-compliance training and messaging to appropriate personnel;

3

   c. Establishing guidance concerning conduct or activities that may trigger potential FARA registration obligations in the form of a firm-wide policy on representing foreign principals, which provides information on:

      i. The FARA statute in order to assist attorneys and personnel in identifying, tracking, and ongoing monitoring of client relationships and matters that present possible FARA registration obligations;

      ii. Approval processes for engagements and matters that present possible FARA registration obligations;

      iii. Review mechanisms to evaluate potential FARA registration obligations at the time of client intake or during the delivery of professional services on behalf of the Firm's clients; and

      iv. Required procedures for responding to inquiries from the FARA Unit.

   d. Promotion of firm-wide awareness of FARA compliance, including by distributing the Law Firm's FARA policy and conducting FARA-compliance training and continued messaging to appropriate personnel.

8.    The Law Firm agrees to make payment of $4,657,568.91 (the "Settlement Amount"), which represents all funds received by the Law Firm from any source in connection with the Law Firm's work for the GoU that the Law Firm has not previously returned to the GoU. The Law Firm shall pay the Settlement Amount to the United States Treasury within ten (10) business days of the signing of this Settlement Agreement. The Law Firm further agrees that it will not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Settlement Amount.

9.    The Attorney General agrees that so long as the Law Firm continues to comply with the terms herein, the Attorney General will not undertake any action against the Law Firm concerning any act within the scope of or related to the conduct described in this Agreement and its Appendix. The Attorney General agrees that its exclusive redress for any breach of this Agreement will be through an injunction, civil enforcement action or other available civil remedy. The Law Firm acknowledges that no promise or representation has been made by the Attorney General with regard to any civil or criminal liability that may have arisen or may arise from the facts underlying this action for the Law Firm's current or former partners, agents, employees, attorneys, or other persons who worked in active concert or participation with them.

10.    The Law Firm agrees that, in order to ensure that the Attorney General may enforce this Agreement in the event of a breach, including by seeking an injunction against the Law Firm and other appropriate civil relief (including to ensure compliance with the terms herein), the Law Firm agrees that, for a period of two (2) years from the execution of this Agreement, it will not assert any defense based upon any applicable statute of limitations with respect to the Attorney General asserting any civil claim in law or equity for the Law Firm's

failure to file a timely registration statement as required by FARA for the work described in the Appendix.

Sincerely,

JAY I. BRATT
Chief, Counterintelligence and Export
Control Section (CES)
National Security Division
United States Department of Justice

Date:  January 15, 2019                    BY: _____

Jason B.A. McCullough
Trial Attorney
National Security Division

**AGREED AND CONSENTED TO:**

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

Date:  January 15, 2019                    BY: _____

Eric J. Friedman
Executive Partner

5

**APPENDIX**

## STATUTORY BACKGROUND

1.     The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, was enacted in 1938.  It is a disclosure statute that requires persons acting as agents of foreign principals, as those terms are defined by the statute, to register with the Attorney General and to make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts, and disbursements in support of those activities.  Disclosure of the required information facilitates evaluation by the Federal Government and the American people of the statements and activities of such persons in light of their function as foreign agents.  The FARA Unit of DOJ's National Security Division is primarily responsible for the administration and enforcement of FARA.

2.     Relevant provisions of FARA include, in substance and in part, the following:

a.     Any person who acts as an "agent of a foreign principal" is required to file, within ten days of becoming an agent of a foreign principal, a registration statement with the Attorney General containing the information specified in the statute.  22 U.S.C. § 612(a).

b.     A foreign agent's registration obligation "continue[s] from day to day, and termination of such status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal." Id.

c.     The term "agent of a foreign principal" is defined under FARA, in pertinent part, as:

> any person   who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised,        directed,        controlled,

financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person (i) engages within the United States in political activities  for or in the interests of such foreign principal; [or] (ii) acts within the United States as a public relations counsel, publicity agent, [or] information-service employee . . . for or in the interests of such foreign principal.  Id. § 611(c)(1)(i) & (ii).

3.   Registration under FARA requires disclosure from an agent of, principally, (1) information related to the compensation an agent receives for its work on behalf of a foreign principal, (2) the identity of the source of that compensation, (3) written and oral agreements with the foreign principal, and (4) a full description of "the nature and method of performance of [its] agreement or understanding" with the foreign principal.

## THE ENGAGEMENT AND THE REPORT

4.   In or about the spring of 2012, the Government of Ukraine ("GoU" or "Ukraine"), through its Ministry of Justice (the "MOJ"), and with Paul Manafort's assistance, retained Skadden, Arps, Slate, Meagher & Flom LLP (the "Law Firm") to, among other things, prepare a report (the "Report") on the evidence and procedures used during the 2011 prosecution and trial of former Prime Minister Yulia Tymoshenko and to address various questions regarding its fairness.[1]  Several Law Firm partners and associates worked on the Report, which was led by a Washington, D.C., based partner ("Partner 1").[2]

5.   On or about February 20, 2012, Partner-1 emailed Manafort a preliminary engagement letter between the Law

---

[1] DOJ has represented to the Law Firm that the GoU has waived any applicable privilege with respect to information contained herein.  The Law Firm has represented to the DOJ that the facts herein are not derived from any Law Firm client confidential information.

[2] Partner-1 has not been associated with the Law Firm since April 13, 2018.

2

Firm and the GoU, dated February 20, 2012 (the "February 20, 2012 Preliminary Engagement Letter"), which proposed a trip to Ukraine by Partner-1 and another Washington, D.C. based partner ("Partner-2") for meetings with government decision-makers and other parties so that the Law Firm could assess whether it would undertake the matter.  The February 20, 2012 Preliminary Engagement Letter stated, among other things, that a third party "ha[d] agreed to pay the fees, charges and disbursements incurred in connection with the Preliminary Engagement," and that "[a]n initial retainer [would] be paid to the Firm at the outset of the Engagement in the amount of $150,000." On or about March 1, 2012, Manafort replied to Partner-1's email, indicating that the letter would be signed that day and asking for wire transfer instructions, as well as dates when Partner-1 and other attorneys could travel to Kiev for meetings with GoU representatives.

6.   In or about early April 2012, Partner-1 traveled to Kiev and met with, among others, a Ukrainian businessperson who was associated with the funding of the Law Firm's work for the GoU ("Business Person-1"); Partner-2 did not go on this trip.  On or about April 5, 2012, after having met with the GoU and Business Person-1, Partner-1 indicated to Manafort that the Law Firm was prepared to start on the project as soon as Business Person-1 made the first payment.  On or about April 12, 2012, Partner-1 and Manafort exchanged an email in which Partner-1 confirmed that "the deal" was that the Law Firm would be advanced $4 million for the project against which it would charge its customary fees and actual expenses incurred.  The Law Firm was told that Business Person-1 would have no role beyond providing funding in connection with the Report.

7.   Soon thereafter, the GoU retained the Law Firm to, among other things, prepare the Report.  An engagement letter dated April 10, 2012 (the "April 10, 2012 Engagement Letter")characterized the scope of the engagement as "serving as a rule of law consultant to the Ministry [of Justice] and advising the Ministry on a variety of rule of law issues, including those that may arise before the

European Court for Human Rights."[3]  The April 10, 2012 Engagement Letter also stated that the Law Firm "is willing to take on this project with the clear understanding that [the Law Firm] will have access to all relevant materials and information that [the Law Firm] deems necessary to do its job, and that [the Law Firm] will be free to reach its own conclusions based on its own independent work."  The April 10, 2012 Engagement Letter provided that the Law Firm's "fees will be based on the time that [the Law Firm's] lawyers spend on the Engagement . . . charged at [the Law Firm's] normal hourly rates . . . against a retainer that has been paid in advance."  In addition, Partner-1 wrote in an email in April 2012 that "the powers that be in NYC . . . insist – and I agree – that we should include a provision in the retainer agreement that '[the Law Firm] is not being retained to engage – and will not engage – in political activities as defined by the Foreign Agents Registration Act (FARA).'"  A nearly identical provision was included in the April 10, 2012 Engagement Letter.

8.    The April 10, 2012 Engagement Letter incorporated by reference a contract between the MOJ and the Law Firm, which was dated April 10, 2012 (the "April 10, 2012 Contract").  The April 10, 2012 Contract provided that the Law Firm would be compensated by the government for its work on the Report at a rate of 100 Ukrainian hryvnias per hour with total hours not to exceed 950 hours, which yielded a total price of 95,000 Ukrainian hryvnias, or approximately $12,000. In addition to those terms of payment, as discussed herein, the Law Firm understood that its work was to be largely funded by Business Person-1.

9.    In parallel with the preparation of the Report, in or about the spring of 2012, at the request of the GoU, certain of the Law Firm attorneys who worked on behalf of the GoU to examine the 2011 prosecution of Tymoshenko (the "Tymoshenko Case") and prepare the Report (the "Report Team") also began to advise the GoU about rule of law procedures in connection with a second criminal case against Tymoshenko in which the GoU had charged Tymoshenko with embezzlement and tax evasion ("Project 2" and together

---

[3] The April 10, 2012 Engagement Letter was not countersigned by the GoU.



4

with the Report and other projects, the "Ukraine
Engagement").  Several months later, Partner-1 noted in an
email to certain attorneys on the Report Team on or about
August 30, 2012:  "I am concerned that [the Law Firm's]
activity in Project 2 might surface before the report comes
out, and that would do enormous damage to the credibility
of [the Report]."  In response, a Law Firm attorney replied
that this activity had been planned "before the beginning
of [Tymoshenko's second trial] and on dates [that] might
post date publication of the [Report]."  Partner-1
responded that: "You are right that everything would be
better, I think, if [the Report] could be released and
absorbed and discussed before [Project 2] truly got
underway . . . I am extremely concer[n]ed that information
about [the Law Firm's] involvement in [Project 2] has come
to the attention of Tymoshenko's lawyer, and that he will
use it to discredit the report at some point.  We have our
explanations and defenses, e.g., as rule of law
consultants, we are assisting and advising [Ukraine] on how
to manage the second trial with an eye toward guaranteeing
due processs [sic] of law and meeting Western standards."

    10.  During 2012, the Report Team worked on behalf of
the GoU to examine the Tymoshenko Case and prepare the
Report.  As part of the process of generating the Report,
attorneys on the Report Team shared draft versions of the
Report with representatives of the GoU, including certain
members of the Ukraine prosecutor general's office as well
as Manafort and persons working with him.  Drafts of the
Report, its Executive Summary, or both were provided to
representatives of the GoU on or about July 27, August 1,
August 23, September 12, and in late September 2012.  The
GoU provided comments to the Report Team concerning the
content and conclusions of the Report, both directly and
through Manafort and his associates.  The Report Team
incorporated some comments from the GoU and Manafort into
the Report.  In many instances, these comments were factual
contentions that the Law Firm attributed to the GoU and
noted where such contentions were disputed, including by
Tymoshenko. There were also comments that the Report Team
did not incorporate into the Report.

    11.  The Report Team did not provide Tymoshenko with
drafts of the Report; however, the Report Team did

interview Tymoshenko and obtain information and advocacy
from her counsel regarding, among other things, specific
contested issues addressed in the Report and requested
materials from them, including on or about June 19, June
27, June 29, August 16, August 23, September 10, and
September 24, 2012.  For example, on or about August 16,
August 23, and September 10, 2012, the Law Firm sent emails
to Tymoshenko's counsel seeking information regarding
Tymoshenko's claim that, between May 24 and July 4, 2011,
she attended meetings with the prosecutor's office
regarding other crimes, which interfered with her ability
to prepare for trial.  In particular, on or about September
10, 2012, Partner-1 emailed Tymoshenko's counsel and asked
that Tymoshenko supply "evidentiary support for Mrs.
Tymoshenko's claim that between May 24 and July 4, 2011,
Mrs. Tyhmoshenko [sic] was summoned for interviews and
meetings with OPG investigators virtually every day."
Partner-1 stated, "[i]f we do not hear from you soon on
this topic, we will assume that nothing is forthcoming."
Tymoshenko's counsel did not provide this information.  In
other instances, Tymoshenko or her counsel did provide
input to the Report Team, and Tymoshenko and her counsel's
perspective on the relevant facts was attributed to them
explicitly throughout the Report.

        12.  On or about September 26, 2012, the Report Team
attempted to deliver the final Report to the GoU, and the
GoU refused to accept delivery. Subsequently, the GoU
proposed additional changes to the Report, many of which
were rejected by the Report Team. Specifically:

            a.    On or about September 28, 2012, an associate
of Manafort emailed a Law Firm associate who worked on the
Report ("Associate-1") with proposed changes from the GoU.
The attached two-page document began with an introduction
that read, in part, "[h]aving reviewed the content of the
fourth version of the [Report] . . . we urge you to further
analyze the materials and pay attention to the following
facts, which we consider to be necessary mentioned in the
narrative part and in the summaries of the project.
(Conclusion)."  When Associate-1 forwarded the comments to
the Report Team, Partner-1 responded, "We are done. The
final draft should be delivered asap if not earlier!"

b.   On or about October 8, 2012, Manafort emailed Partner-1 and attached a one-and-a-half page letter that outlined "technical" and "substantive" issues with the Report based on "a fact review [] done . . . by MoJ on the Report."  Partner-1 responded and stated that the Law Firm would not be making further changes to the Report.

c.   On or about October 16, 2012, Partner-1 emailed Manafort regarding the delivery of the final Report and the GoU's refusal to accept delivery.  That same day, Partner-1 expressed to Associate-1, "Honestly, I am quite angry about this.  I don't think we can go ahead and deliver it without a green light from Manafort.  But I am 24 hours away from sending a letter to the Ministry of Justice telling them that we have completed our work for them and, as they have known since September 15, we await instructions as to where to deliver the final report."  On or about October 18, 2012, Manafort responded and, among other things, explained that the MoJ had "several issues in the [] Report that relate to preparation for the [European Court of Human Rights] case" and was "looking for documents to be entered in the addendum, not in the body of the Report" because it was "important to them for purposes of the [European Court of Human Rights] case and defending the case."

d.   On or about November 19, 2012, Partner-1 emailed Manafort to explain to Manafort how five final issues that Manafort had raised had been resolved. Partner-1 refused to accommodate two of the GoU's comments, one on the basis that it was not supported by the trial transcript.  Of the three issues that were addressed on two pages of the Report, one was providing additional information about a document to which the Report already cited where Partner-1 agreed to "make more specific reference to the fact that the defense counsel introduced this letter and advanced that legal defense" and that "the court did not accept that legal analysis because it represented only a preliminary legal opinion;" one was including a reference and citation to a letter "on the same topic;" and the last was making "reference to the [prosecutor's] theory that [Tymoshenko] entered into [an] agreement to resolve her outstanding criminal charges in Russia [where] she was in fact charged with bribing the

Russian Ministry of Defense.  But we will also note that the trial judge did not adopt that theory of the case when it came to her motives."  The Report Team did not move any document to the appendix of the Report.

       e.  On or about November 20, 2012, Partner-1 emailed Manafort that the Law Firm had responded to the GoU's comments, referring back to Partner-1's email of the day before and stating that the "tweaks have been made, and the final [R]eport is ready for delivery."

       f.  On or about November 30, 2012, Associate-1 emailed Manafort, with copy to Partner-1, to let Manafort know that the final Report had been delivered to representatives of the GoU.

    13.  The GoU officially released the Report to the public on the MOJ's website on December 13, 2012 at 3 a.m. (EST).  Because no registration under FARA was made then, *see infra* ¶ 61, the Law Firm did not disclose at that time, among other things:  the amount of money received by the Law Firm for preparing the Report and that a third party (Business Person-1) was associated with the funding of the Report.

    14.  On or about November 26, 2012, *i.e.*, approximately two and a half weeks before the Report was released, Manafort emailed Partner-1 to ask about a memorandum that Manafort and Partner-1 had discussed regarding (as described by Manafort) Partner-1's "assessment of the strengths and weaknesses of [Partner-1's] findings, especially as relates to the [European Court of Human Rights]."  On or about the same day, Partner-1 created a Memorandum to File (the "November 26, 2012 Memorandum"), which discussed "the strengths and weaknesses of Tymoshenko's case in the European Court of Human Rights; and . . . [Partner-1's] experience in the criminal justice system of Ukraine." Partner-1 included the following statement in the document: "This memorandum is not to be treated as a document approved or issued by the law firm. This is my work-product and mine alone."  In assessing the strengths of Tymoshenko's appeal, Partner-1 wrote, in part, that:

8

> [d]espite the fact that [Tymoshenko] did not
> present evidence in the trial to establish
> that her case was a selective prosecution, a
> reviewing court might find that her course of
> conduct as Prime Minister — even if you take
> the prosecutor's case at face value — did not
> represent an abuse of powers as prime
> minister.  Two reasons for this: (1) Many
> prime ministers have in the past directly
> negotiated the natural gas deals with the
> Russians.  Her decision to order [to execute
> the deal] would be seen by many as a
> technicality. (2) The true limits on the scope
> of her authority . . . were uncertain and
> there was some confusion even among legal
> experts about this point.  Some Western courts
> might find that such confusion or uncertainty
> or ambiguity as to the precise limits of her
> authority would preclude a criminal
> prosecution/conviction of this nature.

Partner-1 also wrote:

> The evidence of criminal intent — i.e.,
> that she actually intended to commit a
> crime — is virtually non-existent.

The Report, which stated that it "express[ed] no view about
those facts which [the parties] contested," did not reflect
all of the observations set out in Partner-1's November 26,
2012 Memorandum.

15.  The November 26, 2012 Memorandum also assessed
the "Weaknesses of the [A]ppeal" and provided an assessment
of the system of criminal justice in Ukraine that included
recommendations for, among other things, better training
for prosecutors and judges, along with the use of juries,
the latter of which was addressed in the Report.  Partner-
1's assessment of the criminal justice system in Ukraine
included the statement that "the owners of the system know
that the system is in trouble, are working to change it,
and are serious about reform."  Among Partner-1's
observations of "weaknesses," Partner-1 noted Tymoshenko's
"own conduct" and "attitude toward the process" during
trial (both of which were discussed in the Report) and

wrote that Tymoshenko's "failure adequately to explain why
she did what she did is significant" and that the evidence
of Tymoshenko's "disregard of normal procedures, of the
lack of coordination and cooperation with other leaders of
government, of cloaking her own actions in secrecy" was
"compelling." Partner-1 also wrote, "[e]vidence of
[Tymoshenko's] deceit – particularly with respect to the
[then-President of Naftogaz] – is powerful." The Report
did not include these observations. The Report states that
assessing "whether the facts found by the Court establish
Tymoshenko's guilt" was an issue of Ukrainian law "beyond
the scope of [the Report Team's] assignment and beyond
[its] expertise" and that the Law Firm was "not in a
position to evaluate whether the High Council has misused
its authority, or whether the threat of discipline and
dismissal had an effect on Judge Kireyev in this case."

## FARA'S REGISTRATION REQUIREMENTS

16. On multiple occasions prior to the Report's
public release, Partner-1 and certain other partners
involved in preparing the Report sought and received
analyses and advice from other Law Firm attorneys regarding
the potential applicability of FARA to the Law Firm's work
for the GoU. In particular, they received advice from
other attorneys at the Law Firm that engaging in public
relations-related conduct on behalf of the GoU would
require that the Law Firm register as a "foreign agent"
under FARA. Among other things:

a. In response to an initial request in
February 2012, a U.S.-based Law Firm associate sent an
email to Partner-1 and Partner-2 attaching the FARA statute
and quoting, among other provisions of FARA, the definition
of "agent of a foreign principal."

b. On or about April 16, 2012, Associate-1
emailed other attorneys on the Report Team concerning "FARA
issues." Associate-1 noted that he/she was "mindful that the
clients view one of the aims of both [the Report] and
[Project] 2 as improved PR on the issue of Ukraine's conduct
in relation to Yulia Tymoshenko and her trial." Later that
day, Partner-2 asked if Partner-1 wanted Partner-2 to
contact a particular Law Firm partner, the Law Firm's

10

"resident FARA guru" (*i.e.*, Partner-3, who was not involved
in the underlying Ukraine Engagement), regarding FARA.
Partner-1 responded, in part: "I don't really care who you
ask but we need an answer from someone who we can rely on
with a straight face."

       c.   On or about April 17, 2012, Partner-2
emailed a U.S.-based Law Firm associate who worked on the
Report, informing the associate that Partner-3 had been
contacted.  Partner-2 explained: "[w]e want to be sure to
structure our representation of Ukraine so that we are not
foreign agents," and that "one issue that has come up . . .
is retention of a PR firm, which presumably would reach out
to western press, including both US and European press (and
also our own efforts)." After speaking with Partner-3, the
associate explained that Partner-3 had advised, among other
things, that "if we were to perform public relations work
aimed at the US, if our London lawyers were to do so, or if
we were to subcontract with a PR firm to do so, then we
would be obligated to register under FARA. (If the
Ukrainian Government were to hire the PR firm directly,
then FARA would not come into play for us.)"  After
receiving this advice, Partner-2 emailed Partner-1 that the
Ukraine Engagement "should not include PR advice," and that
"somebody else can hire the PR team and manage that"
because the Law Firm was "in this as lawyers, not spin
doctors."  Partner-1 responded, "Good advice".

       d.   On or about June 21, 2012, Partner-2
received "a brief summary updating" the February 2012
research on the FARA statute.  Among other things, the Law
Firm associate tasked with the project explained, as had
been relayed in February 2012, that "representation of a
foreign principal's interests *within* the United States
would require registration" (emphasis in original).

### UKRAINE'S PUBLIC RELATIONS EFFORTS SURROUNDING THE RELEASE OF THE REPORT

    17.   In or about the spring of 2012, certain Law Firm
attorneys worked with Manafort to identify a public
relations firm to assist the GoU with developing and
implementing a public relations strategy centered on the
Report.  On or about April 30, 2012, Partner-1 sent an

email to Manafort identifying four entities that the GoU could consider engaging to perform such public relations work, including a PR Firm with offices in Europe and the U.S.  On or about May 10, 2012, Partner-1 emailed Manafort stating, in part, that engagement of the PR Firm would be "critical . . . for distributing and circulating and briefing throughout Europe when our report is completed." Ultimately, the GoU selected and retained the PR Firm.

18.   Certain Law Firm attorneys on the Report Team and representatives of the PR Firm exchanged emails concerning the potential applicability of FARA to the PR Firm's work on behalf of the GoU.  For example, on or about May 29, 2012, Partner-1 and a Manhattan-based senior executive at the PR Firm ("PR Firm Senior Executive-1") exchanged emails that concerned the FARA statute.  Partner-1 informed PR Senior Executive-1 that the Law Firm could not engage the PR Firm as a subcontractor, stating that "we cannot run close to the FARA line and if we were seen as hiring and directing [PR Firm] we would be doing much more than just lawyering." PR Firm Senior Executive-1 informed Partner-1 that "[a]s relates to FARA, we are taking the position at this time, that our work in Europe . . . does not require us to file under FARA," but that "[i]f at a future date our brief is expanded and requires US headquartered personnel and activities we will then take appropriate steps."

19.   During the spring and summer of 2012, certain attorneys on the Report Team communicated via email, telephone, and in-person meetings in Ukraine with Manafort, Manafort-associate Rick Gates ("Gates"), and members of the PR Firm, including a U.K.-based Senior Managing Director ("PR Firm Senior MD-1"), in connection with the work that the Law Firm and the PR Firm each were performing on behalf of the GoU.  As the Law Firm drafted the Report, the PR Firm created a public relations strategy to accompany the release of the Report, which included, among other things, outreach to U.S. media and politicians.

20.   On or about July 14, 2012, the PR Firm sent a document titled "Communication Strategy" to Gates outlining a public relations strategy for the release of the Report ("PR Strategy Document-1"), which Gates forwarded to Associate-1 at the Law Firm.  PR Strategy Document-1

12

characterized the anticipated "publication of the [Law
Firm] Report" as a "key event[ ] that provide[s] an
opportunity for Ukraine to challenge the international
(European/US) perception that it is mounting selective
political prosecutions that do not comply with
international standards." PR Strategy Document-1 outlined a
multi-faceted public relations strategy for the release of
the Report that included "media outreach with selected
journalists – briefing in general terms about the report"
and "[r]elease of abstract of report to selected and agreed
journalists." PR Strategy Document-1 indicated that
prerelease briefing would include briefings in the United
States.

21.    On or about August 7, 2012, Associate-1 sent an
email to Partner-1, copying other members of the Report
team, and communicated that Associate-1 had spoken with PR
Firm Senior MD-1 about the PR Firm's media plan for the
release of the report.  Associate-1 conveyed that PR Firm
Senior MD-1 wanted to speak with Partner-1 and Associate-1
"assume[d]" that one of the issues was when PR Firm Senior
MD-1 would receive a copy of the Report.

22.    On or about August 28, 2012, Gates made available
to Associate-1 a set of public relations strategy documents
reflecting the global media rollout strategy for the
Report.  Associate-1 forwarded the documents to a member of
the Law Firm's public relationship group ("Law Firm PR
Employee-1").  Law Firm PR Employee-1 forwarded the
documents to Partner-2, who then sent the documents to
Partner-1 and suggested that they discuss.  One of the
documents introduced the strategy as follows:  "[t]he
public release of the report prepared by [the Law Firm]
will provide a major opportunity for the Government [of
Ukraine] to re-set the agenda and demand a fresh appraisal
of its position regarding the trial and conviction of Yulia
Tymoshenko." The document went on to state that the Law
Firm "cannot proactively lead in communications, given
their restrictions by FARA registration and disclosure."
Another of the documents in the public relations strategy
documents set forth a list of media and government
personnel around the world — including in the United States
— to be contacted in connection with the release of the
Report, which included approximately 20 members of the U.S.

Congress. Another document in the set was a spreadsheet titled "Master Control Grid" ("Master Control Grid-1"), which set forth a step-by-step plan for the execution of the GoU public relations strategy in the days leading up to and following the public release of the Report.  The plan reflected in Master Control Grid-1 included that, on the day before the GoU released the Report to the public, Partner-1 and the PR Firm would engage in "[m]edia briefings."

    23.  On or about August 30, 2012, Associate-1 emailed Partner-1, Partner-2, and a Law Firm associate, asking "[d]oes anyone have any objections to showing [the PR Firm] a copy of the report now" in order to "give [the PR Firm] as much time as possible to digest and prepare" for its release.  Partner-1 responded to that group that he was already "talking directly to [PR Firm Senior MD-1] about giving them [the PR Firm] early access to the report" and that Associate-1 should not "jump the gun quite yet."

    24.  On or about September 2, 2012, Manafort communicated PR Firm Senior MD-1's reaction to the draft to Partner-1.  Manafort wrote that it was PR Firm Senior MD-1's opinion that, in substance and in part:

> the media will see this report as a vindication of [Tymoshenko's] position and the international community will come down hard on UKRAINE. I have attached [PR Firm Senior MD1's] comments. While you and I know that the details of the report are more favorable, the conclusions will drive the perceptions.

In an email to Associate-1 on or about September 3, 2012, Partner-1 asked if Associate-1 was aware of how PR Firm Senior MD-1 had obtained a draft of the Report.  Associate-1 responded, "I don't know what [PR Firm Senior MD-1] has said or what he has been quoting.  I would imagine he has had sight of a copy from one of the persons outside [the Law Firm]. . . ."

    25.  On or about September 10, 2012, after Partner-1 had delivered a "final draft" to Manafort, Partner-1

14

emailed Manafort, stating:  "[I] would like to find our
[sic] what the communications strategy is - no rush."

26.   On or about September 13, 2012, Manafort sent an
email to Partner-1, stating: "I have attached [PR Firm's]
proposed plan for release next week.  It envisions a
leaking of the document on Monday.  This is not yet
approved by the GOVERNMENT.  I wanted to get this document
to you to bring your thinking into the process." Attached
to Manafort's email to Partner-1 was a document ("PR
Strategy Document-2"), titled "SA Report - Media Plan,"
which contained a further updated version of the public
relations strategy for the release of the Report.   PR
Strategy Document-2 began by stating:

> The public release of the report prepared by
> [the Law Firm] will provide an opportunity for
> the independent endorsement of the Government
> message that the trial of Yulia Tymoshenko []
> was not politically motivated and that her
> conviction was based on the evidence before
> the court.

> The REPORT does provide ample justification,
> based on the record, of the legitimacy of the
> process and conviction.  These findings will
> be the foundation for our strategy.  It is
> important that all parties on the GOVERNMENT
> side be linked and co-ordinated.  The handling
> of the initial release is critical to our
> ability to define the REPORT and its findings.

27.   PR Strategy Document-2 set forth a proposed
"RELEASE PLAN," which included that "[i]n order to ensure
the Government message that [the Law Firm] has found no
evidence of political motivation is conveyed at the outset
of release," the Report would be "leak[ed]" to a particular
journalist ("Journalist-2") at a major U.S. media outlet
("Publication 2") "after the Ukrainian media has closed
down" on the night before the Report's public release.   PR
Strategy Document-2 further indicated that:  a principal
("Lobbyist-2") at a certain U.S.-based lobbying firm also
working with Manafort and Gates for the GoU ("Lobbying
Firm-2") would "engage[ ]" Journalist-2 for a

"prebriefing"; Journalist-2 would be "given an off-the record briefing call with [Partner-1]"; and Journalist-2 would be told that he/she had until a certain time to release an "exclusive" in advance of the Report's public release.  PR Strategy Document-2 explained that the purpose of this advance briefing of a select U.S.-based journalist was to "effectively set the agenda for subsequent coverage" of the Report.

28.  FARA requires an agent of a foreign principal to register within ten days of agreeing to become an agent and before performing any activities for the foreign principal. 22 U.S.C. § 612(a).

## THE PUBLICATION AND DISSEMINATION OF THE REPORT IN THE U.S.

29.  On or about September 23, 2012, PR Firm Senior MD-1 sent an email to Partner-1, Associate-1, Manafort, Gates, and a Ukraine-based associate of Manafort and Gates regarding a meeting that was to take place later that day (the "NYC Meeting").  The email read, in relevant part: "I've been asked to send you an agenda and a draft communications pack for consideration at [the] meeting. I look forward to discussing these with you then. . . Please bear in mind that the MFA/OPG/MoJ briefing packs are covered off by a review of [the] Message Master and [the] Master Q and A. It's worth a quick read of the media plan."  The attached "Message Master" contained proposed media messaging and talking points regarding the content and conclusions of the Report.  The documents circulated by PR Firm Senior MD-1 also included an updated version of the Master Control Grid referenced above ("Master Control Grid-2"), which contained an entry — which was the only highlighted item in the document — indicating that on the day before the public release of the Report, "[Partner-1]/[the Law Firm]" would participate in the "[e]ngagement with [Publication-2]."  The public relations strategy was thereafter modified such that the select U.S. based journalist to receive an advance briefing would be Journalist-1 at Publication-1 instead of Journalist-2 at Publication-2.  Communications at the time of the outreach, such as those described herein, *infra*, at ¶¶ 32, 34 - 37, reflect that Partner-1 had a prior relationship with Journalist-1.

30.  In advance of the NYC Meeting, on or about
September 21, 2012, Associate-1 sent an email to PR Firm
Senior MD-1, copying Partner-1, attaching a copy of the
Report and stating, in part, that "[a]s you know, [the
Report] is not yet in circulation, so please do not
circulate it or show it to anyone (even in [the PR Firm])."

31.  On or about September 24, 2012, Partner-1 emailed
Manafort that the Report Team would have to "reverse
direction on the issue of [Law Firm] lawyers being used to
background journalists about the [R]eport," explaining that
"[o]ur objective here is to remain true to the mission
which is to do a professional job and to prepare an
independent report that has maximum integrity."   Manafort
asked whether Partner-1 could answer questions if
journalists were first directed to the Law Firm's
communications professionals.   Partner-1 responded that the
Report Team could answer questions "run through" the
communications professionals.

32.  During the week following the NYC Meeting, on or
about October 2, 2012, Partner-1 sent an email to
Journalist-1, asking:  "Would you take a call from
[Lobbyist-2] about a report that we ([the Law Firm], that
is) wrote about the Tymoshenko case?" Later that day,
Journalist-1 replied to Partner-1, stating that "[Lobbyist-
2] knows me" and providing Journalist-1's contact
information.   Partner-1 then forwarded Journalist-1's
contact information to Lobbyist-2, stating "[t]his is
[Journalist-1] contact info." Partner-1 also sent an email
to Journalist-1, copying Lobbyist-2, connecting Journalist-
1 and Lobbyist-2 by email.   Partner-1 also directed his
assistant to have a "hard copy of Ukraine report hand
delivered this afternoon to [Lobbyist-2] at [his/her]
office."

33.  The GoU did not officially release the Report on
its website until December 13, 2012 at approximately 3 a.m.
(EST).   During the week prior to the official public
release, on or about December 5, 2012, Associate-1 received
an email at Associate-1's personal email address from PR
Firm Senior MD-1 attaching a set of public relations
strategy documents that had been updated.   The PR document
set included an updated version of the Master Control Grid

("Master Control Grid-3"), which set forth a day-by-day public relations plan for the period surrounding the release of the Report.  The public relations plan laid out in Master Control Grid-3 included the following steps to be taken on Wednesday, December 12, 2012, *i.e.*, the day before the public release of the Report:

| Time (in UKR) | Action Unit Responsible | Action |
|---|---|---|
| . . . | . . . | . . . |
| 1300 | [PR Firm]/[Partner-1] | The report will be given to [Journalist-1] of [Publication-1] who will have an exclusive on the material for 24 hours |
| 1900 | [Partner-1] | [Partner-1] will give an on-record[ ] interview with [Publication-1]<br><br>[Journalist-1] will write an article to be placed in [Publication-1] that will be released Thursday morning (midnight) |
| 0700 | | [PUBLICATION-1] ARTICLE RELEASED |

    34.  On December 10, 2012, PR Firm Senior MD-1 emailed Journalist-1 and stated that he was "working with [Partner-1] of [the Law Firm] (who I understand you know well) and his client, [the MoJ]," and PR Firm Senior MD-1 asked whether Journalist-1 would be interested in "receiving the report and a briefing with [Partner-1] on an exclusive basis in the States." Journalist-1 responded to PR Firm Senior MD-1 that he had heard about the report a month or more before but had never received a copy.  PR Firm Senior MD-1 forwarded this exchange to Partner-1.

18

35.  On December 11, 2012, after receiving PR Firm Senior MD-1's email, Partner-1 emailed Journalist-1.  In Partner-1's email, he stated:  "I just learned that the Ukrainians intend to release our report about the Tymoshenko case on Thursday – finally – and that the Ukrainians have determined that you should be given first look at it. . . . [I]f you are interested, I would be happy to get you a copy (all 186 pages of it) and even happier to talk to you about it."

36.  Shortly after sending the email to Journalist-1, Partner-1 reported on his action by forwarding the email to PR Firm Senior MD-1.  PR Firm Senior MD-1 responded, in part, that:  "If you don't hear back from [Journalist-1] by 1500, it might be best to speak to your [Publication-3] contact as time is short." Partner-1 replied:  "We are on it."  PR Firm Senior MD-1 thanked Partner-1 for the response and noted that representatives of the GoU were "pressing me for reassurance here so any update would be very welcome.  I hope the chat goes well."

37.  On the afternoon of December 11, 2012, Journalist-1 replied to Partner-1's email and suggested they talk "today." Journalist-1 wrote that it "will be good to catch up" and also explained that:  "It was a bit hard for me to discuss with our foreign desk editors until I have a sense of what the report says, and when your associates called last month, or maybe earlier, they were promising to bring a copy over within a day or two.  When they disappeared I didn't know what to make of it." Journalist-1 similarly responded to PR Firm Senior MD-1's email, stating:  "I'm a little confused by this:  didn't we all discuss this a month or more ago? It was supposed to arrive then, and suddenly everyone went silent."

38.  About an hour after receiving Journalist-1's response, Partner-1 sent an email to Journalist-1 attaching a copy of the Report and informing Journalist-1 that

Partner-1 would also "hand-deliver a hard copy of this report to your home tonight."[4]

39.  Also on December 11, 2012, Partner-1 sent an email to Partner-2 with the Subject "[Journalist-1] conversation" that indicated that Partner-1 had spoken to Journalist-1.  Several minutes later, Partner-2 replied: "What did [Journalist-1] think of the Tymoshenko report?" Partner-1 and Partner-2 then agreed to meet in Partner-2's office.

40.  Also on December 11, 2012, after speaking with Journalist-1, Partner-1 again emailed PR Firm Senior MD-1. Partner-1 explained that Journalist-1 had received the Report by email and wrote:  "I am hand delivering a hard copy to [Journalist-1's] home this evening on my way home. [Journalist-1] will tell us tomorrow if [Journalist-1] wants to use it.  [Journalist-1] will check with [Journalist-1's] deputy foreign editor." PR Firm Senior MD-1 replied to Partner-1, copying Gates, stating that "[w]e are both keeping our fingers crossed for [Journalist-1] and thank you for your efforts here, especially hand delivering the report." PR Firm Senior MD-1 further stated that, depending on the time of Journalist-1's meeting with Publication-1's deputy foreign editor, "it would leave us little time to take the report to your [Partner-1's] contact at [Publication-3] or to [Journalist-2] if [Publication-1] decided not to go with this."  PR Firm Senior MD-1 asked Partner-1:  "Did you get a view of how keen [Journalist-1] was to run this and [Journalist-1's] confidence in getting to print, based on your conversation [with Journalist-1]?  Rick [Gates] is wondering whether we should wait until [Journalist-1] reports back before engaging with [Publication-2] etc.  What are your thoughts?" Partner-1 responded to PR Firm Senior MD-1, stating:  "We told [Journalist-1] that it was [Journalist-1's] if [Journalist-1] wanted to use it.  [Journalist-1] agreed to get back to us with an answer tomorrow.  Tomorrow is not too late for [Journalist-2] or for [Publication-3]."

---

[4] Later that night, Partner-1 emailed Journalist-1, informing Journalist-1 that Partner-1 would be "dropping off hard copy" to Journalist-1 "in 5 minutes."

41.   On the morning of the following day, December 12, 2012, Journalist-1 emailed Partner-1, indicating that Journalist-1 was having difficulty opening the electronic copy of the Report sent by Partner-1 the previous day. Partner-1 replied:  "Working on it." Shortly thereafter, a Law Firm associate emailed Journalist-1, copying Partner-1, attaching another electronic copy of the Report "[o]n behalf of [Partner-1]." Later that day, Partner-1 received an email from his assistant, who informed Partner-1 that Journalist-1 had "received it with no problem."

42.   Later that day, on December 12, 2012 (i.e., the day before the public release of the Report), Journalist-1 emailed Partner-1, stating: "[w]e've read it and are ready to talk" and that a colleague in Moscow ("Journalist-1B") was going to take the lead.  In his email, Journalist-1 noted "one issue" flagged by Journalist-1B was that "there's rumor/dispute in Ukraine about how and how much [the Law Firm] got paid."  Shortly thereafter, Journalist-1B emailed Partner-1 with a list of six multi-part questions and suggested a conference call among Journalist-1, Journalist-1B, and Partner-1.  The first question on the list related to how much the Law Firm was paid and whether anyone other than the government paid for the Law Firm's work.  Another question posed by Journalist-1B was whether the Law Firm would have any role in the proceedings at the European Court of Human Rights related to Tymoshenko.

43.   After speaking with Publication-1, Partner-1 sent an email to Journalist-1 consisting of a quote that the Report did not conclude whether the Ukrainian government's prosecution of Tymoshenko was politically motivated:  "We leave to others the question whether this prosecution was politically motivated.  We say nothing about that.  Our assignment was to look at the evidence in the record and determine whether the trial was fair."  Partner-1 then forwarded that email to Partner-2 explaining that Journalist-1 wanted a quote on "selective prosecution vs. politically-motivated prosecution."

44.   At approximately 5:38 p.m. (EST) on December 12, 2012, Partner-1 emailed Journalist-1, informing Journalist-

21

1 that "[t]he report will become public at 3 a.m. our time
tomorrow morning."[5]

45.  On December 12, 2012, and prior to the public
release of the Report the following day, Publication-1
published an article (the "Article") on the Report authored
by Journalist-1 and Journalist-1B.  Among other things, the
Article stated that the Law Firm had concluded that
"important legal rights of [Tymoshenko] were violated
during her trial," "[b]ut over all, the lawyers . . .
seemed to side heavily with the government of President
Viktor F. Yanukovich," as "[t]hey concluded that Ms.
Tymoshenko's conviction was supported by the evidence
presented at trial, and they found no evidence in the trial
record to support her main contention: that her prosecution
was a politically motivated effort by Mr. Yanukovich, her
archrival, to sideline her and cripple Ukraine's main
opposition party." The Article quoted Partner-1:  "We leave
to others the question whether this prosecution was
politically motivated.  We say nothing about that.  Our
assignment was to look at the evidence in the record and
determine whether the trial was fair."

46.  The final version of the Report, in substance and
among other things, stated that while the Law Firm "do[es]
not opine about whether the [Tymoshenko] prosecution was
politically motivated or driven by an improper political
objective," the Law Firm concluded that "based on our
review of the record, we do not believe that Tymoshenko has
provided specific evidence of political motivation that
would be sufficient to overturn her conviction under
American standards." The Report also states that: "the
court's decisions not to permit [Tymoshenko] to call
certain witnesses and to allow important witnesses to
testify while Tymoshenko was unrepresented by counsel would
constitute violations of due process in Western courts";
the court's decision not to allow certain defense witnesses
resulted in "Tymoshenko's ability to present a defense in
her trial appear[ing] to have been compromised to a degree

---

[5] As set forth above, PR-Strategy Document-2 stated that "we propose to
leak" an advance copy of the Report to a journalist and that "[t]he
journalist will be told that he has until [a specified time] to release
his exclusive" in advance of the Report's public release.



that is troubling under Western standards of due process
and the rule of law"; and Tymoshenko's continued detention
beyond the end of trial until the date of her sentencing
was "improper" and that her incarceration during trial
"raises concerns about whether she was inappropriately
deprived of her liberty prior to her conviction."

## THE RESPONSE TO THE FARA UNIT'S DECEMBER 18, 2012 INQUIRY AND REQUEST FOR INFORMATION

47.    On or about December 18, 2012, following the
public release of the Report and the appearance of media
coverage regarding the Report, the FARA Unit sent a letter
to the Law Firm advising that the Law Firm's work for the
GoU may require registration pursuant to FARA.  The FARA
Unit requested that the Law Firm provide information
addressing four topics, including, "(3) a description of
the activities the firm has engaged in or the services it
has rendered to the Ministry of Justice of the Government
of Ukraine." ("Question 3"); and "(4) a copy of the
existing or proposed written agreement, if any, or a full
description of the terms and conditions of each existing or
proposed oral agreement, if any, the firm may have with the
Ministry of Justice of the Government of Ukraine"
("Question 4").  The other two questions related generally
to the Law Firm's structure.

48.    On or about December 21, 2012, Partner-4, who was
not involved in the underlying Ukraine Engagement, emailed
the FARA Unit's letter to Partner-1 and Partner-2.
Partner-4 noted that the Law Firm had received the FARA
Unit's letter and that Partner-4 would be "available to
discuss and review" the Law Firm's response to the FARA
Unit, although he was "not familiar with the obligations
under FARA."  Partner-2 replied, stating that Partner-2 and
Partner-1 would "provide the information on the
representation" for the Law Firm's response (i.e.,
Questions 3 and 4) and would "follow up" regarding next
steps.

49.    Partner-1 and Partner-2 drafted the Law Firm's
response to the FARA Unit's Questions 3 and 4 seeking
information about the Law Firm's work for the GoU.  Over
the course of the ensuing weeks, Partner-1 and Partner-2

23

continued to refine the response to the FARA Unit, with
general input from Partner-4, who relied on Partner-1 and
Partner-2 for their knowledge of the underlying facts and
FARA.

50.   On or about February 6, 2013, Partner-1 responded
to the FARA Unit's inquiry of December 18, 2012 (the
"February 6, 2013 Letter").   The February 6, 2013 Letter
included the following in response to the FARA Unit's
request for "[a] description of the activities the Firm has
engaged in or the services it has rendered to the Ministry
of Justice of the Government of Ukraine":

> In April 2012, the Ministry of Justice for the
> Government of Ukraine asked the Firm to serve as
> consultant [sic] on rule of law issues and to provide
> advice about the question of Ukraine's criminal
> justice system as viewed through the prism of western
> standards of due process, and, in particular, to
> advise the Ministry about rule-of-law issues that
> might arise before the European Court for Human
> Rights.   A major focus of the assignment was to
> conduct an independent inquiry into the facts and
> circumstances surrounding the prosecution, trial,
> conviction and sentencing of [Tymoshenko] and to write
> a report on the Firm's findings in light of western
> standards of due process.   The Firm insisted on
> complete independence and total access to relevant
> individuals and evidence in connection with our work.
> As an explicit component of our assignment from the
> very beginning, the Law Firm's work was conditioned on
> the understanding with the client that the Firm would
> not provide any services that would be covered by the
> Foreign Agent [sic] Registration Act ("FARA") or would
> require registration under FARA.   The Firm completed
> its investigative work in September 2012, and
> delivered its report to the Ministry in December 2012.

51.   Neither the response to Question 3 nor any other
part of the February 6, 2013 Letter signed by Partner-1
made any reference to Partner-1's interactions with
lobbying or public relations firms working for the GoU,
contact between Partner-1 and the media in connection with
the Report, the GoU's public relations campaign associated

with the Report, or that the GoU's public relations plan
included Partner-1 contacting and providing the Report to a
U.S. media publication in advance of its public release.

52.   In response to Question 4, the February 6, 2013
Letter attached, among other things, the April 10, 2012
Contract, which reflected that the Law Firm would be paid
the approximately $12,000 by the GoU.  The February 6, 2013
Letter further stated that "there was an oral agreement
with a private citizen of Ukraine in which that individual
agreed to contribute funds to help pay for the work," but
declined to identify the private citizen (i.e., Business
Person-1).  The February 6, 2013 Letter noted that "there
have been discussions with the Government of Ukraine about
the possibility of [the Law Firm] receiving additional
compensation."  The letter did not include any reference to
the February 20, 2012 Preliminary Engagement Letter, which
provided for an initial retainer of $150,000 from a third
party.

### THE RESPONSE TO THE FARA UNIT'S APRIL 9, 2013
### REQUEST FOR ADDITIONAL INFORMATION

53.   On or about April 9, 2013, the FARA Unit sent a
letter addressed to Partner-1, seeking "additional
information to determine whether your firm is obligated to
register under [FARA]."  The FARA Unit's letter asked,
among other things, "To whom, if anyone, did your firm
release or distribute the report and when?" and "Did you or
anyone in your firm have any media interviews or comments
to the media, public, or government officials about the
report and the findings of your firm?"

54.   The FARA Unit's letter also requested information
about the Law Firm's compensation for the Ukraine
Engagement.  The FARA Unit noted that the April 10, 2012
Contract that had been attached to the Law Firm's February
6, 2013 Letter stated that the "time spent on this contract
by [the Law Firm] is not to exceed 950 hours, and the fee
for [the Law Firm]'s work will be 95,000 Ukrainian
hryvnias."  The FARA Unit stated:  "This is equivalent to
$11,675.02 U.S. dollars.  It is unclear to us from the
contract and supporting documentation how much additional
money [the Law Firm] charged the Ukrainian Government to

perform this work." The FARA Unit's letter also asked for the identity of the "private citizen" associated with the funding of the Report, "the amount of money paid by the private citizen to [the Law Firm]," and "any other sources of money for the Tymoshenko work."

55.   During April and May 2013, Partner-1 and Partner-2 prepared a response to the FARA Unit's April 9 Letter. On or about May 29, 2018, the FARA Unit's letter and a proposed response were sent to and reviewed by other partners at the Law Firm.  Relying on the factual representations set forth in the proposed response, these other partners suggested only "minor changes," along with a direction that the proposed response be sent to the client for review prior to its submission to the FARA Unit.

56.   On or about June 3, 2013, Partner-1 submitted a final version of the above-discussed letter, signed by Partner-1, to the FARA Unit in response to its April 9 Letter (the "June 3, 2013 Letter").  The FARA Unit relied to its detriment on false and misleading statements in this letter that were similar in a number of respects to the February 6, 2013 Letter, including as to when Partner-1 made the Report available to Journalist-1 and for what purpose.  As a result, the FARA Unit was deprived of the complete information that the FARA Unit expected to receive in response to its inquiry.  The following facts, among others, were not fully reflected in the June 3, 2013 Letter:

        a.   On December 12, 2012, Publication-1 released an article regarding the content of the Report. Publication-1's article stated that the Report would be "publicly released" the next day.  Partner-1 provided the Report to Publication-1 prior to its official public release with the knowledge of certain other members of the Report Team.  Several attorneys on the Report Team received copies of one or more public relations strategy documents generated by the PR Firm, Manafort, and Gates (such as, for example PR Strategy Document-2), which set forth that a U.S. newspaper would receive an advance copy of the Report and briefing from Partner-1 in order to "effectively set the agenda for subsequent coverage." In addition, Master Control Grid-3, which was received by Law Firm Associate-1

from PR Firm Senior MD-1 on or about December 6, 2012, listed as an "[a]ction" that the Report would "be given to [Journalist-1] of [Publication-1] who will have an exclusive on the material for 24 hours." Master Control Grid-3 assigned this task to "[PR Firm/Partner-1]." Master Control Grid-3 also listed as an "[a]ction" that Partner-1 was to provide an on-the-record interview with Publication-1 prior to the release of the Report.

b.   Partner-1 exchanged a series of emails with Journalist-1 on December 11, 2012. Partner-1 also exchanged a series of emails with Journalist-1 in early October 2012 about Journalist-1 speaking with Lobbyist-2 regarding the Report and provided an advance copy of the Report to Lobbyist-2.

c.   Partner-1 and Partner-2's email exchange on December 11, 2012, indicated that Partner-1 had already communicated with Journalist-1 about the Report on that day, not "December 12-13, 2012" as stated in the June 3, 2013 Letter. In the course of the preparation of the June 3, 2013 Letter, on or about May 20, 2013, Partner-2 revised the dates set forth in a version of the draft letter to reflect that Partner-1 had provided the Report to Journalist-1 at Publication-1 on "December 11-12, 2012." Prior to submitting the June 3, 2013 Letter to the FARA Unit, when asked to take "one last look" at the letter, Partner-2's short email reply to Partner-1 noted a typo and stated "I assume you're sure about the dates we provide."

57.   In response to a question as to whether anyone in the firm had "any media interviews or comments to the media, public, or government officials about the report and the findings of [the] firm," the June 3, 2013 Letter stated that "[Partner-1] provided brief clarifying statements about the report" to Journalist-1 of Publication-1 and two other publications, and explained that "[o]ne purpose of the statements was to correct misinformation that the media had received – and was reporting – from the Ministry of Justice and from the Tymoshenko legal team in Ukraine."

58.   The June 3, 2013 Letter also stated that the Law Firm "completed the [R]eport and provided the final draft of the [R]eport to the [GoU] in September 2012." As

27

described herein, *supra*, at ¶ 12, the Report Team sought to deliver what it considered to be the final report in September 2012 but then made certain limited changes to two pages of the Report in November 2012 in response to comments from Manafort and the GoU, and Partner-1 emailed Manafort on or about November 20, 2012, to inform Manafort that the final Report was ready for delivery.

59.   The June 3, 2013 Letter also stated that "to supplement" the previous response about agreements with the GoU, Partner-1 had attached "a signed copy . . . of our initial agreement with Ukraine and the copy of a more recent agreement . . . reflecting Ukraine's undertaking with respect to final payment." Partner-1 attached an engagement letter, dated April 5, 2012, which had actually been executed in March 2013, along with a contract, dated March 11, 2013, both of which are introduced more fully herein, *infra*, at ¶¶ 80 - 81.

60.   With respect to the FARA Unit's inquiry regarding the Law Firm's compensation, the June 3, 2013 Letter explicitly declined to provide the identity of Business Person-1, stating, in part, that "[w]e do not believe that we engaged in conduct requiring us to register under FARA, and, respectfully, we therefore do not believe that you are entitled to such information," and "[a]s to this individual's 'connection to our work,' other than providing financial assistance to help fund the project, this individual had no connection to the project whatsoever, either professionally or personally, and to our knowledge was not involved in any way with the work that we did." As such, the June 3, 2013 Letter's response to the FARA Unit's inquiry regarding the Law Firm's compensation did not disclose, among other things, that the Law Firm had received payments of $4 million from an offshore account, see *infra* ¶ 70, as of June 3, 2013 to cover its fees and expenses in connection with the engagement on behalf of the GoU. The June 3, 2013 Letter attached the March 11, 2013 Contract "reflecting Ukraine's undertaking with respect to final payment," which, as discussed herein, *infra*, served to increase the price of the contract to 10,200,000 Ukrainian hryvnias (i.e., over 1 million USD) from 95,000 Ukrainian hryvnias under the April 10, 2012 Contract.

61. Registration under FARA would have required the Law Firm to disclose, among other things, accurate and complete information related to the compensation that it received for preparing the Report on behalf of the GoU, and the identity of Business Person-1. In addition, registration under FARA would have required the Law Firm to file or otherwise disclose its written and oral agreements with the GoU and "[d]escribe fully the nature and method of performance of [its] agreement or understanding" with the GoU (e.g., the engagement letter with a clarification of the actual amount billed and a full description of all efforts to publicize the Report as part of a public relations campaign to change U.S. public opinion concerning the Tymoshenko trial). See Exhibit B to Registration Statement Pursuant to Foreign Agents Registration Act of 1938, as amended (OMB No. 1124-0004) at Question 7.

## THE RESPONSE TO THE FARA UNIT'S SEPTEMBER 5, 2013 DETERMINATION LETTER

62. On or about September 5, 2013, the FARA Unit sent a letter addressed to Partner-1, advising that the FARA Unit had determined that, as a result of the dissemination of the Report to the media and communications with the media regarding the Report, the Law Firm must register pursuant to FARA as an agent of the GoU. Partner-1 forwarded the FARA Unit's letter to Partner-4, copying another Law Firm partner and stating: "DOJ has concluded that we should register under FARA. I am looking at what options are available, if any."[6]  Partner-4 forwarded Partner-1's email to another Manhattan-based partner, who responded to Partner-4, stating, in substance and in part, "next week let's discuss impact on registering."  Partner-4 responded, "[w]ill put it on the list for next week."

63. On or about September 19, 2013, Partner-1 sent an email to Partner-4 with the Subject "FARA" that began "Just for the record" and then made false and misleading statements. Partner-1's email stated the following:

---

[6] Partner-2 left the Law Firm on June 28, 2013 and returned to the Law Firm on January 1, 2015.



i.   [The Law Firm] did not 'disseminate the report to news media.' Three media outlets who were not able to obtain a copy of the report from the Ministry in Kiev, contacted us and asked us to provide them with a copy. The report was a public document.

ii.  At no time did [Law Firm] attorneys 'contact the media.' Quite to the contrary, we were approached by the media – asked for interviews, asked for background commentary, etc. – and we did not respond. The only time we responded was to correct misinformation.

iii. To the best of my recollection, our statements to the press were not about Ukraine. They were to correct misinformation. The statements were about our report and about us.

64.   On or about the following day, September 20, 2013, Partner-1 emailed Partner-4 and a Law Firm associate a draft response to the FARA Unit prepared by Partner-1, which draft response was forwarded by Partner-4 to another Law Firm partner. Partner-1's draft response included false and misleading statements. Partner-1's draft response stated as follows:

[W]e told you that the firm provided a copy of the report to a reporter from [Publication-1] [and two other publications]. Ukrainian authorities had released the report to the general public much earlier in that day, but these three outlets – for some reason – had not been able to obtain copies of the report. They approached the firm, asked us if we could provide them with a copy, and so we did so. The law firm did not "disseminate" this report. . . . The firm did not send this report to media outlets or journalists. . . . To my knowledge, no one in this law firm initiated any contacts with the media. It is simply wrong to say that [the Law Firm] took "actions [to] contact the media." . .

. As I told you in my letter of June 3,[] 2013, I did communicate briefly with two print-media journalists. Even with them, I took no action to contact them. They initiated the contact. As to the substance and the reason for my communications with these three journalists, my contact with them was for the sole purpose of defending my law firm and correcting misinformation.

65. The draft response was not submitted to the FARA Unit. Instead, the Law Firm requested an in person meeting with the FARA Unit, so that Partner-1 could directly address questions from the FARA Unit. Law Firm records show that Partner-1 edited the draft response on September 24, 2013, and then accessed the document on September 26, October 4, and October 9, 2013 (i.e., the day of the meeting with the FARA Unit). Throughout this period, the document contained the statements set forth in the paragraph above.

66. On or about October 9, 2013, members of the FARA Unit met with Partner-1, in Washington, D.C. (the "October 9, 2013 Meeting"). Also in attendance were Partner-3, who was included for his FARA expertise and prior dealings with the FARA Unit, and Partner-4, both of whom relied on Partner-1 for his knowledge of the underlying facts. At the meeting, Partner-1 conveyed information generally consistent with that contained in the draft response that he had emailed internally on September 20, 2013. As a result, the FARA Unit relied upon information that was false and misleading in making its decision. The FARA Unit asked the Law Firm to submit a letter following the October 9, 2013 Meeting.

67. On or about October 11, 2013, the requested letter was submitted to the FARA Unit. It was dated October 10, 2013, and was signed and principally prepared by Partner-1 ("the October 10, 2013 Letter"). The October 10, 2013 Letter stated, among other things, that the Law Firm distributed copies of the Report to certain U.S. media outlets including Publication-1 only "in response to requests from the media." As set forth above, Partner-1 contacted Publication-1 prior to the official public

31

release of the Report, offered to and did provide an
advance copy of the Report to Publication-1, and discussed
the Report with Publication-1.  Partner-1 also provided an
advance copy of the Report to Lobbyist-2 in October 2012
and emailed Journalist-1 to ask if he would "take a call
from [Lobbyist-2] about a report that we ([the Law Firm],
that is) wrote about the Tymoshenko case?".  Journalist-1
responded, "[s]ure. [Lobbyist-2] knows me . . . ."
Partner-1 then connected Journalist-1 and Lobbyist-2 by
email. As a result, the FARA Unit relied to its detriment
upon statements made by Partner-1 on the Law Firm's behalf
that were false and misleading in making its decision.

68.   On or about January 16, 2014, the FARA Unit sent
a letter to Partner-1, advising that, "based upon the
information you brought to our attention[, the Law Firm]
has no present obligation to register under FARA."

69.   On or about February 27, 2014, Partner-1, at
Partner-4's direction, called the FARA Unit to inquire if
Partner-1 could reach out to Publication-1 without
implicating FARA. The FARA Unit called back Partner-1 and,
on this call, as reflected in a memorandum to file drafted
by Partner-1 on the same date as the call, Partner-1
expressed a "desire to respond to [a Publication-1] article
and to correct misinformation in the article. . . ."
According to the memo, Partner-1 told the FARA Unit that
there were "serious inaccuracies in the [Publication-1]
article - much like the ones that caused us to talk to
journalists when the report was first published in December
2012 - and we wanted to correct the record."  Specifically,
Partner-1 set out "two areas of concern . . .: (1) The
journalists want to report that [the Law Firm] made a
finding of fact that there was no political motivation in
Tymoshenko's prosecution.  No such thing happened, and we
want to explain it.  (2) The journalists want to say that
[the Report] was 'sympathetic' to the government of
Ukraine.  We want to say that the [R]eport concluded that
there were serious violations of Tymoshenko's rights during
the trial. . . ."  Partner-1 asked if the FARA Unit could
"give us comfort hat [sic] by answering these questions and
making these corrections and addressing these concerns,
FARA will not see us as being s [sic] agents of a foreign
government."  Partner-1 told the FARA Unit that the Law

32

Firm "had stopped working for Ukraine well over a year
ago[, and the Law Firm was] not taking instruction from
anyone in Ukraine."  The FARA Unit advised that "[t]here
would be no need for us to register under FARA."

### THE LAW FIRM RECEIVED APPROXIMATELY $4.7 MILLION IN CONNECTION WITH ITS WORK ON THE UKRAINE ENGAGEMENT

70.   In or about the spring and summer of 2012, as the
Law Firm worked on the Ukraine Engagement for the GoU, the
Law Firm received payments totaling $4 million from an
entity called Black Sea View Limited, which had a bank
account at the Bank of Cyprus in the Republic of Cyprus.
The Law Firm understood this money to be from Business
Person-1.  These monies were applied over time from the Law
Firm's escrow account to the fees and expenses incurred in
connection with the Law Firm's work on the Ukraine
Engagement.  Specifically:

a.   On or about April 19, 2012, $2 million was
wired from Black Sea View Limited to the Law Firm.

b.   On or about June 7, 2012, $1 million was
wired from Black Sea View Limited to the Law Firm.

c.   On or about July 16, 2012, $1 million was
wired from Black Sea View Limited to the Law Firm.

71.   On or about August 9, 2012, Law Firm PR Employee-
1" circulated an editorial titled "[Law Firm] Stink" that
had been published in the Kyiv Post on or about the same
day.  The editorial noted that the GoU's relationship with
the Law Firm was "highly suspicious" and stated that the
GoU claimed that the Law Firm "works for a mere $12,000"
and that none of the Law Firm's expenses are paid by the
government.  The editorial stated that the public did not
know who was paying the Law Firm and, accordingly, that
"the public may never know of conflicts of interest, or
worse things, that may lurk behind [the] arrangement."
Partner-2 forwarded the article to Partner-1 and wrote, in
substance and in part, "[w]e really need to get them to
disclose the funding."  Partner-1 responded, in substance
and in part, that he had already told Manafort that he "has
got to get [Business Person-1] out whether voluntarily or

non voluntarily." Partner-2 responded, in substance and in part, that the issue was "about to explode, including in the American press" and that it was better to "get ahead of it now while we still have a bit of a chance." In an email exchange with members of the Law Firm's public relations group that same day, one member of the group noted that the Law Firm's "fees in most of our client engagements are not publically available" unless the client advises otherwise. Partner-1 agreed, writing that "[i]f the government [of Ukraine] wants the third party to step forward that would be up to the government to make happen."

72.  On or about August 10, 2012, Partner-2 wrote an email to Partner-1 and stated, in substance and in part, "[y]ou were mentioning the Ukraine payment situation last night and then our connection broke up. I really think we need to get it out there as soon as we can. (I know you agree). If we don't, it's self-defeating for [Business Person-1] and the government. Will put us in a very deep hole in the western press. We still have a bit of a window now and we should take it."

73.  On or about August 10, 2012, and August 13, 2012, Partner-1 exchanged emails with Manafort to make arrangements to speak on August 10, 2012 and August 13, 2012, respectively. On or about August 14, 2012, Manafort emailed Partner-1 that "Kyiv wants to move ASAP and is pressing me for an answer." Partner-1 responded and posed the question, "[n]o one promised [Business Person-1] anonymity did they?" Manafort responded, "I don't know, but I do know that is what he is saying he wants now."

74.  On or about August 15, 2012, in an email to Partner-1, Manafort suggested a discussion of "what [a certain GoU representative] proposes before putting anything in writing." In the same email thread, on or about August 16, 2012, Manafort emailed Partner-1, asking: "Is the number $1,300,000 good for official submission?" Partner-1 responded: "My thought is $250,000 per month which is either $1.25 million or $1.5 million." Manafort replied: "Ok I will tell them 1.250."

75.  A few days later, on or about August 20, 2012, Manafort emailed Partner-1, asking Partner-1 to, among other

things, send an invoice for "$1,250,000 for services rendered." On or about August 22, 2012, Partner-1 emailed a letter to Manafort, addressed to the MOJ and signed by Partner-1 on the Law Firm's letterhead stating, among other things: "You have asked me to provide you with an invoice setting forth the outstanding payments due from the Government of Ukraine for services rendered in connection with [the Ukraine Engagement]. For services rendered during the months of April, May, June, July and August, there is an outstanding balance due of $250,000 per month for a total of $1.25 million." Neither the MOJ nor any other entity or individual made any payment pursuant to this invoice.

76. On or about August 22, 2012, Manafort responded to Partner-1's email and attached a draft letter, which he asked Partner-1 to date July 18, 2012 and to email back to Manafort because that would "finish what [he] need[ed] for administrative purposes." A letter to MoJ, dated July 16, 2012 and signed by Partner-1, in part reads similarly to the draft letter attached to Manafort's email and includes the following statement:

> Due to the complexity of the case, conducting an examination that would comply with §2 of the contract will require specialists of a higher class and greater training than was originally planned when the initial contract was concluded. In addition, because of the volume of materials that need to be inspected, carrying out the assignment will require many more working hours than was first contemplated in the contract.
>
> . . .
>
> [The Law Firm] respectfully submits that it is not able to perform the above task upon the terms set in the contract of April 10, 2012, and recommends that an additional contract settling the aforementioned issues should be concluded.

Metadata from the letter dated July 16, 2012, indicated that the document was created and printed on August 23, 2012, and that the author was Partner-1. Neither the MOJ

35

nor any other entity or individual made any payment
pursuant to this document at that time.

77.  On or about November 20, 2012, Partner-1 wrote to
Manafort that: "We have more than exhausted the retainer
[from Business Person-1]. We are owed another $75,000 in
time and expenses. . . . Can we expect or hope for payment
from MOJ at some point?"

78.  On or about December 26, 2012, Manafort emailed
Partner-1 and wrote that he had attached three documents
that "relate to the MoJ/[Law Firm] contract."  Manafort
explained that the MoJ needed some basic information from
the Law Firm "for the official record."  One of the
attached documents was a one-page letter from a Deputy
Minister at the MoJ to Partner-1, dated August 28, 2012,
which stated that the MoJ had considered Partner-1's letter
of August 22, 2012, "concerning increase of the volume of
work related to the expert examination as to compliance
with the [Report on the Tymoshenko case] and respective
increase of the contract price" and had approved the
increase of the contract price.

79.  On or about February 15, 2013, a representative
of the MoJ emailed Partner-1 with copy to Manafort,
Associate-1, and others.  The email discussed an increase
in the amount of the April 10, 2012 Contract (i.e., 95,000
Ukrainian hryvnias) and cited as basis for the increase an
explanation consistent with that set forth in the letter
from Partner-1, dated July 16, 2012, and discussed herein,
*supra*, at ¶ 76.

80.  On or about February 25, 2013, Associate-1
emailed Partner-1 and attached a draft Law Firm engagement
letter that "we discussed."  Associate-1 wrote that the
draft letter needed to be "dated on a date in April on
which [Partner-1 was] in Ukraine."  Partner-1 forwarded the
draft to his assistant and asked her to "print out a new
draft of the old retainer letter and put a date on it from
April 2012 when I was in Ukraine."  After confirming the
date of April 5, 2012 with Partner-1, Partner-1's assistant
provided a draft to Associate-1 on or about March 7, 2013.
The executed letter, signed by Partner-1, was backdated to
April 5, 2012 (the "April 5, 2012 Engagement Letter").  The

April 5, 2012 Engagement Letter changed the description of
the scope of the engagement to read: "The Engagement
involves conducting an inquiry and writing an independent
report on the evidence and procedures used during the
prosecution and trial of former Prime Minister Yulia
Tymoshenko, applying Western standards of due process and
rule of law."  It did not reference advising the Ministry
on "a variety of rule of law issues, including those that
may arise before the European Court for Human Rights"
(i.e., Tymoshenko's appeal).  On or about March 14, 2013,
Associate-1 emailed Partner-1 and Partner-2 and attached
the April 5, 2012 Engagement Letter and a contract for
services dated March 11, 2013 (the "March 11, 2013
Contract"), which both bore signatures from Partner-1 and
an MOJ official.  The March 11, 2013 contract reflected an
increase of the total price to be paid by the MoJ to the
Law Firm under the contract to 10,200,000 Ukrainian
hryvnias (i.e., over 1 million USD).  The initial April 10,
2012 Contract reflected a price of 95,000 Ukrainian
hryvnias.

    81.  On or about March 25, 2013, Partner-1 emailed
Manafort regarding the "final bill to Ukraine."  Partner-1
explained that the final bill would reflect the Law Firm's
"fees and expenses for the time frame July 2012 through
March 2013."  Partner-1 also stated that "[y]ou should know
– and Ukraine should also know – that we are taking pains
NOT to double charge for time and expenses that others have
already paid for" and that Partner-1 "anticipate[d] that,
once Ukraine pays our invoice, [the Law Firm] will be
making reimbursement to those who contributed to our fees
and expenses in the past."

    82.  In or about April 2013, after the monies received
from Black Sea View had been fully applied to the Law
Firm's fees and expenses for its GoU work and additional
monies were owed to the Law Firm, the Law Firm sent an
invoice to the MOJ stating, in substance and in part, that
the amount due for services rendered from August 2012 to
March 2013 with respect to the Report was 8,595,523.65
Ukrainian hryvnias.  On or about June 6, 2013, the MOJ paid
that invoice by wiring $1,075,381.41, the approximate USD
equivalent of 8,595,523.65 Ukrainian hryvnias, to the Law
Firm's escrow account.  Approximately $450,000 was applied

to satisfy amounts owed to the Law Firm for its fees and expenses per invoices outstanding. On or about June 14, 2017, the Law Firm subsequently returned $567,812.50 to the MOJ that had been maintained in the Law Firm's client escrow account, which represented GoU funds in excess of the fees and disbursements for the Ukraine Engagement.

83.   The Law Firm received payments totaling $5,225,381.41 in connection with its work on behalf of the GoU.  With the return of the unused funds maintained in the Law Firm's escrow account, the total amount paid to the Law Firm for its fees and expenses was $4,657,568.91.

38

