IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CONCORD MANAGEMENT AND CONSULTING LLC<br><br>Defendant. | CRIMINAL NUMBER:<br><br>1:18-cr-00032-2-DLF |

**DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S
MOTION FOR SHOW CAUSE ORDER**

Defendant Concord Management and Consulting LLC ("Defendant" or "Concord"), by and through undersigned counsel, respectfully submits this motion ("Motion") seeking an order to show cause why Attorney General William Barr ("AG Barr") and Special Counsel Robert S. Mueller III ("SC Mueller") should not be held in contempt for violating United States District Court for the District of Columbia Local Criminal Rule 57.7, by releasing prohibited information and opinions regarding the guilt of the accused and the evidence in the above-captioned pending criminal case thus interfering with Concord's right to a fair trial and further prejudicing the due administration of justice. In support thereof, undersigned counsel respectfully states as follows:

**The Undisputable Facts**

The facts giving rise to this Motion are simple. The above-captioned matter is a pending criminal case wherein Concord voluntarily appeared and entered a plea of not guilty. Tr. Initial Hr'g & Arraignment 9:24, May 9, 2018, ECF No. 9. As such, Local Criminal Rule 57.7 applies to this case. In March 2019, SC Mueller provided AG Barr with a 448-page report entitled "Report On The Investigation Into Russian Interference In The 2016 Presidential Election," (the "Report") which contains a detailed description of the alleged activity described in the

1

Indictment in this case, a detailed examination of the alleged evidence, and additional allegations regarding Concord and its alleged co-conspirators that are not included in the Indictment in this case. *See* Report 14-16, 19, 21-27, 31, 34-35, *available at* www.justice.gov/storage/report.pdf.

SC Mueller knew that the Report would be made public in whole or in part. *See, e.g.,* Ex. A, *Hr'g on the Nomination of William P. Barr to U.S. Att'y Gen. Before the Senate Judiciary Comm,* 116th Cong. (Jan. 15, 2019). ("[A]s I said in my statement I am going to make as much information available as I can consistent with the rules and regulations that are part of the special counsel regulations."). According to AG Barr, SC Mueller effectively had the last word over what material would be redacted from the Report. AG Barr testified on April 10, 2019 in a Senate subcommittee hearing that "[t]he people who are making . . . red[a]ctions . . . are the department working with the special counsel office lawyers" and in response to a question as to whether AG Barr overruled SC Mueller or his team on any redaction question, AG Barr responded that he had not. Ex. B, *Hr'g on Justice Dep't Fiscal 2020 Budget Request Before the Senate Appropriations Comm. on Commerce, Justice and Science*, 116th Cong. (Apr. 10, 2019).

On April 18, 2019, AG Barr made public statements about the above-captioned case and released a redacted version of the Report to the general public.[1] *See* Ex. C, U.S. Dep't of Justice, Att'y Gen. William P. Barr Delivers Remarks on the Release of the Report on the Investigation into Russian Interference in the 2016 Presidential Election (April 18, 2019), *available at* https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-release-report-investigation-russian; Ex. D, Tr. of AG Barr Press Conference (Apr. 18, 2019), *available at* https://www.politico.com/story/2019/04/18/transcript-barr-press-conference-1280949.  AG

---

[1] There is not a single redaction obviously related to LCrR 57.7. Instead, the AG and the SC used the release of the Report as a sword to prejudice Concord, and a shield to hide discovery from Concord. *See generally* redactions for "Investigative Technique" and "Harm to Ongoing Matter."

Barr stated, among other things, that (1) the activity charged in the Indictment was sponsored by the Russian Government[2] and (2) the Defendants had in fact committed the acts alleged in the Indictment. *See* Exs. C, D. Specifically, AG Barr stated in relevant part:

- "As the Special Counsel's report makes clear, the Russian government sought to interfere in our election. But thanks to the Special Counsel's thorough investigation, we now know that the Russian operatives *who perpetrated these schemes* did not have the cooperation of President Trump or the Trump campaign . . . ." Ex. C (emphasis added).

- "The Special Counsel's report outlines two main efforts *by the Russian government* to influence the 2016 election . . . ." Ex. C (emphasis added).

- "But the Special Counsel found no evidence that any Americans . . . conspired or coordinated with the Russian government or the IRA in carrying out this *illegal scheme*." Ex. C (emphasis added).

- "Put another way, the Special Counsel found no 'collusion' by any Americans in the IRA's *illegal activity*." Ex. C (emphasis added).

- "[T]he Special Counsel confirmed that the Russian government's sponsored efforts *to illegally interfere* with the 2016 presidential election but did not find that the Trump campaign or other Americans colluded in *those schemes*." Ex. C (emphasis added).

The un-redacted portions of the Report contain similar statements. *See, e.g.,* Report 1 ("The Russian government interfered in the 2016 presidential election in sweeping and systematic fashion."); Report 4 ("Prigozhin is widely reported to have ties to Russian President Vladimir Putin"); Report 14 ("The first form of Russian election influence came principally from

---

[2] No such allegation is contained in the Indictment. Further, AG Barr's statements and the Report also imply that the allegations contained in the Indictment are connected to those contained in the Special Counsel's indictment in *United States v. Netyksho*, No. 1:18-cr-00215-ABJ (D.D.C.), the so-called "GRU Indictment." *See, e.g.,* Ex. C (stating that the Report "outlines two main efforts by the Russian government to influence the 2016 election" and then identifying "efforts by the Internet Research Agency" and "efforts by Russian military officials associated with the GRU"); Report 5 ("The social media campaign and the GRU hacking operations coincided with a series of contacts between Trump Campaign officials and individuals with ties to the Russian government."); Report 9 ("The Office determined that Russia's two principal interference operations in the 2016 U.S. presidential election—the social media campaign and the hacking-and-dumping operations—violated U.S. criminal law."). There is no allegation in either the Indictment in this case or the GRU Indictment that the conduct was connected.

the Internet Research Agency, LLC (IRA), a Russian organization funded by Yevgeniy Viktorovich Prigozhin and companies he controlled, including Concord Management and Consulting LLC and Concord Catering . . . .  The IRA conducted social media operations targeted at large U.S. audiences with the goal of sowing discord in the U.S. political system."); Report 35 ("the investigation *established* that Russia interfered in the 2016 presidential election through the 'active measures' social media campaign carried out by the IRA, an organization funded by Prigozhin and companies that he controlled.") (emphasis added).[3]

Beginning immediately on April 18, 2019, and continuing through the present date, the statements of AG Barr and the conclusions of SC Mueller contained in the Report have been disseminated in the mainstream press and social media innumerable times.  A sampling of such is as follows:

- "In the report, Mueller's team provided some new details to bolster [] its conclusions about Russian activities on social media, particularly those focused on two Russian organizations that carried out most of the interference campaign."  *5 New Details In Mueller's Report About Russian Election Interference,* PBS News Hour (Apr. 18, 2019), www.pbs.org/newshour/world/5-new-details-in-muellers-report-about-russian-election-interference.

- "The redacted Special Counsel report released this morning confirms that the Russian government, through various proxies, carried out a multi-pronged campaign against the United States before, during, and after the 2016 election. That campaign involved three distinct elements: 1. A social media influence and infiltration operation led by the Internet Research Agency (IRA); 2. A cyber hacking operation carried out by the Russian military intelligence (GRU); and 3. An infiltration operation of the Trump campaign. The report describes in stunning detail the inner workings of the full Russian operation.  To date, the report is the most comprehensive account (in addition to the previously released indictment [sic] of IRA and GRU operatives) of how the Russian operation evolved over time, how successful it was in targeting and duping Americans, and the Kremlin's

---

[3] The Report is explicit as to the manner in which it used the word "established."  "[W]hen substantial, credible evidence enabled the Office to reach a conclusion with confidence, the report states that the investigation established that certain actions or events occurred."  Report 2. As such, when the Report uses the word "established," it is publicly expressing an opinion as to the Defendant's guilt, the merits of the case, and the evidence in the case, in direct contravention of Local Criminal Rule 57.7(b)(3)(vi).

motivation." Alina Polyakova, *What The Mueller Report Tells Us About Russian Influence Operations*, Brookings (Apr. 18, 2019), www.brookings.edu/blog/order-from-chaos/2019/04/18/what-the-mueller-report-tells-us-about-russian-influence-operations/.

- "This part right at the start of the report stands out to me still like it is written in light in the night sky. The Internet Research Agency, IRA, carried out the earliest Russian interference operations identified by the investigation. A social media campaign designed to provoke and amplify political and social discord in the United States. The IRA used social media accounts and interest groups to sow discord in the U.S. political system for what it termed information warfare." *The Rachel Maddow Show,* (MSNBC broadcast Apr. 18, 2019), www.msnbc.com/transcripts/rachel-maddow-show/2019-04-18.

- "The special counsel's office concluded that the Putin-linked IRA conspired to change the course of U.S. elections through social media campaigns and that Russia believed it would prosper with Trump in the White House." Kelcee Griffis, *Social Media Seen As Fake-News Conduit in Mueller Report,* Law 360 (Apr. 19, 2019), www.law360.com/articles/1151430/social-media-seen-as-fake-news-conduit-in-mueller-report.

- "In his final report, special counsel Robert Mueller found 'dozens of U.S. rallies organized by the IRA,' indicating that the troll farm spearheading Russian meddling had more unwitting proxies in the U.S. than prosecutors originally let on." Adam Rawnsley, Kevin Poulsen, *Russian Trolls Had More Boots on the Ground Than We Knew,* The Daily Beast (Apr. 19, 2019), www.thedailybeast.com/mueller-report-russian-trolls-had-more-boots-on-the-ground-than-we-knew.

- "The report, released to the public on Thursday, concluded that the IRA 'conducted social media operations,' including using social platforms to organize and promote political rallies, often drawing hundreds of participants." Deanna Paul, *Russians Used a Photo of his Father as Pro-Trump Propaganda. He Saw it in the Mueller Report,* The Washington Post (Apr. 22, 2019), www.washingtonpost.com/history/2019/04/22/russians-used-photo-his-father-pro-trump-propaganda-he-saw-it-mueller-report/.

- "Internal IRA documents 'referred to support for the Trump Campaign and opposition to candidate Clinton,' according to the report." Sean Sullivan, *Mueller Report: Russian Interference Sought to Boost Bernie Sanders in 2016,* Washington Post, Apr. 19, 2019, at A29, *available at* www.washingtonpost.com/graphics/2019/politics/read-the-mueller-report/?utm_term=.4a2153a7b411.

- "Two operations lay at the heart of Russia's unprecedented interference, Mueller found: a social media campaign 'designed to provoke and amplify political and social discord in the United States' . . . ." Shane Harris, Ellen Nakashima, Craig Timberg, *Through Email Leaks and Propaganda, Russians Sought to Damage Clinton,* The Washington Post (Apr. 19, 2019), www.washingtonpost.com/politics/through-email-leaks-and-propaganda-

russians-sought-to-elect-trump-mueller-finds/2019/04/18/109ddf74-571b-11e9-814f-e2f46684196e_story.html.

- "The Mueller report documents Russian trolls with tens of thousands of followers on Twitter and Facebook.  And it offers repeated instances of their social media messages being touted in the news media and by top Trump campaign officials, including the president, who as recently as September 2017 responded to a 'We Love You, Mr. President' tweet from @10_GOP, a Russian controlled account."  Greg Jaffe, Craig Timberg, *In the 2020 Landscape: 2016 Russian Interference,* The Washington Post, Apr. 20, 2019, at A14, *available at* www.washingtonpost.com/politics/russian-interference-in-2016-sets-landscape-for-2020-presidential-campaign/2019/04/19/089dacde-6231-11e9-9ff2-abc984dc9eec_story.html.

- "As many of us are aware by now, the attacks were carried out by trolls working for the Putin-linked Russian Internet Research Agency (IRA) in St. Petersburg, along with the Russian GRU itself."  Bob Cesca, *Look Again: The Mueller Report Spells It Out; Putin's Russian Hack Delivered America To Donald Trump,* Salon.com (Apr. 23, 2019), www.salon.com/2019/04/23/putins-russian-hack-delivered-2016-election-for-donald-trump-the-mueller-report-spells-it-out/.

- "The special counsel report, Barr explained, features two sections related to Russian interference: one dealing with the Kremlin-backed Internet Research Agency (IRA), which worked to disseminate political disinformation on social media, and another addressing the hacking of internal Democratic National Committee (DNC) emails by Russian intelligence." Jack Crowe, *Barr: Mueller Found 'No Evidence of Any Collusion" Between Trump Campaign and Russia*, The National Review (Apr. 18, 2019), www.nationalreview.com/news/barr-mueller-found-no-evidence-of-any-collusion-between-trump-campaign-and-russia/.

- "Conducted by the Internet Research Agency (IRA), a Russian government-backed social media troll farm, the extent and reach of the operations is astounding. Collectively, the report says, 'The IRA's social media accounts reached 10s of millions of US persons.' It also controlled Facebook groups such as 'United Muslims of America,' that had 300,000 followers when it was shut down in 2017." David Marcus, *The Bombshell in the Mueller Report Is Russia's Social Media Campaign*, The Federalist (Apr. 18, 2019), https://thefederalist.com/2019/04/18/the-bombshell-in-the-mueller-report-is-russias-social-media-campaign/.

- "Internet trolls hired by the Russian government used social media to persuade gullible Americans to do things like walk around New York City dressed as Santa Claus with a Trump mask on."  Tess Owen, *How Russian Trolls Screwed with America, According to the Mueller Report*, Vice (Apr. 18, 2019), https://news.vice.com/en_us/article/j5wqd3/how-russian-trolls-screwed-with-america-according-to-the-mueller-report.

- "The report details both Moscow's social media influence campaign and Russian intelligence officials' systemic effort to hack and dump documents stolen from Democratic officials. Together, the report paints a detailed narrative of Russian election interference and the sweeping and elaborate effort to discredit Hillary Clinton and elect Trump to the presidency in 2016." Jane C. Timm, *Mueller Report: Russians Charged With Disrupting 2016 Election Sought Help, Retweets From Team Trump*, NBC News (Apr. 18, 2019), www.nbcnews.com/politics/donald-trump/mueller-report-russians-meddling-2016-election-sought-help-retweets-team-n996051.

- "God… Mueller established connections between Mifsud and the IRA *and* the GRU." Ex. E, Seth Abramson (@SethAbramson), Twitter (Apr. 18, 2019, 4:52 PM), https://twitter.com/SethAbramson/status/1118965679342985216.

- "The first ad the IRA bought was on April 19, 2016, on the Instagram account 'Tea Party News,' asking people to upload photos with the hashtag #KidsForTrump." Ex. F, Alfred Ng (@alfredwkng), Twitter (April 18, 2019, 12:25 PM).

- "Mueller report, page 23: Internal IRA memos show that by early 2016 the goal of Russia's secret social media operation was to support Trump *and* Sanders: 'Main idea: Use any opportunity to criticize Hillary and the rest (except Sanders and Trump – we support them)." Ex. G, David Corn (@DavidCornDC]), Twitter (Apr. 18, 2019, 5:43 PM).

The practical effect of the broadside by AG Barr and SC Mueller on Concord was to advise the world (including potential jurors) that the allegations in the Indictment are true and that the Defendants in this case were operating as part of a Russian-government led interference campaign expressly linked to the allegations in *United States v. Netyksho et al*. This despite the fact that the Indictment contains no such allegation. Moreover, the statements of AG Barr and the Report authored by SC Mueller are devoid of the demonstrably provable fact that of the nearly four million documents produced in discovery to date there is not a single document to indicate that the Defendants were aware of the Federal Election Campaign Act or the Foreign Agents Registration Act.[4]

---

[4] In response to Concord's request for exculpatory material, on April 12, 2019, AUSA Kravis conceded this fact by stating in writing, "With respect to your email dated March 12, 2019, the government is not aware of any exculpatory evidence. As Concord has noted in its filings, including its motion to dismiss for failure to state an offense under 18 USC 371, the absence of

Contrast AG Barr's statements and the Report with the statement of Deputy Attorney General Rosenstein at the time of the Indictment wherein Rosenstein specifically and properly framed the Indictment as mere allegations and further said nothing about the Russian government allegedly directing the conduct.  *Compare supra* 2-3, *with* Ex. I, Tim Haines, *Rosenstein: "No Allegation in This Indictment That Any American Had Any Knowledge" of Russian Election Influence Operation*, RealClearPolitics (Feb. 16, 2018) (stating that the "defendants *allegedly* conducted . . ." certain activities and "*[a]ccording to the allegations* in the indictment . . .") (emphasis added).

There is no small irony in the fact that for a year the government has successfully kept over 3.5 million pages of discovery in the case from Concord while at the same time determined it was appropriate to broadcast its unilateral and biased version of the evidence in the case to the public at large.  Moreover, SC Mueller could have kept the details of this pending criminal case from his Report but chose not to do so presumably to increase the negative impact of the portions of the Report relating to alleged obstruction by the President of the United States.  But Local Criminal Rule 57.7 creates no exception to permit AG Barr and SC Mueller to do what they have done.

**Local Criminal Rule 57.7**

Local Criminal Rule 57.7(b) is unambiguous with respect to extrajudicial statements by attorneys in criminal cases.  "It is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation

---

certain information from the target accounts (such as information reflecting an awareness of the requirements of the Federal Election Campaign Act or the Foreign Agents Registration Act) could be viewed as exculpatory."  Ex. H, Email from Johnathan Kravis, to Katherine J. Seikaly (Apr. 12, 2019, 9:56 AM EST).

with which the lawyer or the law firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." Local Crim. R. 57.7(b)(1). Further, from the time of the filing of an indictment in any criminal matter until the commencement of a trial, a lawyer associated with the prosecution "shall not release or authorize the release of any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication, relating to that matter and concerning:" ([i]) the character or reputation of the accused; . . . (iv) the identity, testimony, or credibility of prospective witnesses; and (vi) any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case. Local Crim. R. 57.7(3).

**Ancillary Legal Prohibitions on Extrajudicial Statements**

The prohibition on extrajudicial statements by prosecutors is not limited to the Court's Local Criminal Rules but are also incorporated into the Department of Justice's own Manual and governing regulations. For example, the Justice Manual, which applies to all DOJ personnel, makes clear that a news release issued before a finding of guilt should state that the charge is merely an accusation and the defendant is presumed innocent until proven guilty, and that DOJ personnel shall not make any statement or disclose any information that could have a substantial likelihood of materially prejudicing an adjudicative proceeding. Justice Manual §§ 1-7.500, 1-7.600. More particularly, the Justice Manual echoes this Court's Local Rules by specifying certain types of information that prosecutors should refrain from disclosing, including (i) observations about the defendant's character, (ii) statements concerning the identity, testimony, or credibility of prospective witnesses; (iii) statements concerning anticipated evidence or argument in the case; (iv) any opinion as to the defendant's guilt. *Id*. 1-7.610. The Manual notes that there are circumstances in which media contact may be appropriate after indictment but

before conviction, but provides that in those situations "communications with the media should be limited to the information contained in publicly available material, such as an indictment or other public pleadings." *Id.* 1-7.700. These requirements are also included in the regulations setting forth DOJ's statements of policy. *See, e.g.,* 28 C.F.R. § 50.2(b)(3) (providing that "[d]isclosures should include only incontrovertible, factual matters, and should not include subjective determinations").

In addition to the above authority, the Rules of Professional Conduct for the District of Columbia Bar create similar obligations to refrain from making prejudicial extrajudicial statements. Rule 3.6 states that a "lawyer engaged in a case being tried by a judge or jury should not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of mass public communication and will create a serious and imminent threat of material prejudice to the proceeding." Rule 3.8 places further restrictions on prosecutors, in part based on their "responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Comments to D.C. Rule of Professional Conduct 3.8. "The prosecutor in a criminal case shall not . . . (f) Except for statements which are necessary to inform the public of the nature and extent of the prosecutor's action and which serve a legitimate law enforcement purpose, make extrajudicial comments which serve to heighten condemnation of the accused." D.C. Rule of Professional Conduct 3.8. "Indeed, because of the power and visibility of a prosecutor, the prosecutor's compliance with these Rules, and recognition of the need to refrain even from some actions technically allowed to other lawyers under the Rules, may, in certain instances, be of special importance." Comments to D.C. Rule of Professional Conduct 3.8. Thus, when an

extrajudicial comment by a prosecutor serves to heighten public condemnation of the accused "even if the ultimate trial is not prejudiced, the accused may be subjected to unfair and unnecessary condemnation before the trial takes place. Accordingly, a prosecutor should use special care to avoid publicity, such as through televised press conferences, which would unnecessarily heighten condemnation of the accused." *Id.*

### The Court's Power to Punish Contempt of its Authority

This Court has the power to punish by fine or imprisonment, or both, at its discretion, contempt of its authority, including "disobedience or resistance to its lawful writ, process, order, rule, decree or command." 18 U.S.C. § 401(3). "A contempt proceeding is either civil or criminal by virtue of its 'character and purpose.'" *Cobell v. Norton*, 334 F.3d 1128, 1145 (D.C. Cir. 2003). Criminal contempt is used to punish intentional misconduct of a contemnor and vindicate the authority of the court following a transgression rather than to compel future compliance. *See id*. at 1145 (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827–28 (1994)). The Supreme Court has acknowledged that in the case of criminal contempt, "the contemnor cannot avoid or abbreviate [the punishment] through later compliance." *Bagwell*, 512 U.S. at 829. Accordingly, parties are held in criminal contempt for willful conduct that has already occurred and that cannot be remedied.

By definition, criminal contempt is a willful disregard or disobedience of a public authority and a federal court has the power to punish by criminal contempt any such disobedience "when the evidence shows an intentional violation of the court's rules or orders, or conduct which constitutes reckless disregard for the court's rules or orders." *Yohannes v. Republic Gardens*, 217 F. Supp. 2d 91, 94 (D.D.C. 2002) (hearing on an order to show cause as to whether an attorney should not be held in contempt for violating the court's Local Rules and

11

orders to appear at two hearings). Willfulness "may be inferred if a lawyer's conduct discloses a reckless disregard for his professional duty." *In re Holloway*, 995 F.2d 1080, 1082 (D.C. Cir. 1993) (quoting *In re Farquhar*, 492 F.2d 561, 564 (D.C. Cir. 1973)).

Federal Rule of Criminal Procedure 42(a)(1) provides that defendants in a criminal contempt proceeding must be given notice of the essential facts forming the basis of the criminal contempt charge, which includes an order to show cause that states the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. Here a prima facie case has been made, and as such it is the burden of AG Barr and SC Mueller to come forward with evidence in whatever form the Court requires to rebut the inferences drawn from the above-referenced media coverage of information released in violation of Local Criminal Rule 57.7. *See In Re Sealed Case*, 151 F.3d 1059, 1075 (D.C. Cir. 1998).

Lawyers have been punished with criminal contempt for doing a lot less than what AG Barr and SC Mueller did here. *See In re Morrissey*, 168 F.3d 134 (4th Cir. 1999) (holding defense counsel in contempt in a drug case for making statements to the media about potential government witnesses and the unfairness of the prosecution).[5]

Concord has set forth above a prima facie case that AG Barr and SC Mueller released information in violation of Local Criminal Rule 57.7. As such, Concord respectfully requests that the Court issue an order pursuant to Rule 42(a) that AG Barr and SC Mueller appear and show cause why they should not be found to be in contempt.

---

[5] In *Morrissey*, the contempt motion was handled by then AUSA, later FBI Director, James Comey.

Dated: April 25, 2019

Respectfully submitted,

CONCORD MANAGEMENT AND
CONSULTING LLC

By Counsel

/s/*Eric A. Dubelier*
Eric A. Dubelier
Katherine Seikaly
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
202-414-9200 (phone)
202-414-9299 (fax)
edubelier@reedsmith.com
kseikaly@reedsmith.com