# Exhibit A

CQ Congressional Transcripts

Jan. 15, 2019

Jan. 15, 2019 Revised Final

# Senate Judiciary Committee Holds Hearing on Nomination of William P. Barr to be U.S. Attorney General

## LIST OF PANEL MEMBERS AND WITNESSES

GRAHAM:

Thank you all. You're not going to get a good shot of me. So thank you all. So happy new year. New Congress, and we'll see how this goes. I recognize Senator Grassley.

GRASSLEY:

Okay. I do this with a point of personal privilege, Mr. Chairman, and I appreciate that courtesy of you and the members. This is the first meeting of the Senate Judiciary Committee in this 116th Congress. It's also the first time that we convened while my friend, Lindsey Graham, holds the gavel and will proceed to be chairman. So I'd like to congratulate the new chairman, thank him for his leadership and say that I look forward to working with you and other members of this committee as we seek to address some of our nation's most pressing problems. I have every confidence that you will steer our 200-year-old committee in the right direction.

GRAHAM:

Well, thank you. I really appreciate that. In my view, nobody looks over 100. So we're actually--

(LAUGHTER)

We're aging well as a committee. The bottom line is how do you get this job? Your colleagues have to vote for you. Thank you. You have to get reelected and outlive the person to your

right. So I've been able to do that, and I look forward to working with Senator Feinstein who is--I have a lot of affection and fondness for. She, to me, represents a seriousness that the body needs and a--and a demeanor that I think we should all aspire to. To the new colleagues, Senator Hawley, Blackburn and Ernst, thank you for being part of this committee. To Senator Blackburn and Ernst, thank you for making history, I think, on our side.

As to the hopes and dreams for this committee, to get as much done as possible and to fight when we have to over things that matter to the public and show diff--two different views of an issue that's important, but do it as respectfully as possible. Sentencing reform. Criminal justice reform was a very big deal, and this committee delivered for the country. Senator Durbin, I want to thank you very, very much for working with Senator Lee and Senator Grassley and Senator Booker. That's a big deal that's going to change lives, I think, in a positive way.

So this committee has within it the ability to do big things long overdue. I know Senator Blackburn wants to do something on social media. Senator Klobuchar has got some ideas about how to make sure if you put an ad up on social media you have to stand by it. We're all worried about social media platforms being hijacked by terrorists and bad actors throughout the international world. We're worried about privacy. Do you really know what you're signing up for when you get on one of these platforms? I'd like this committee working with commerce to see if we can find some way to tame the Wild West.

Intellectual property, Senator Tillis and Senator Coons have some ideas that I look forward to--to hearing about. Senator Sasse wants to make sure that we act ethically. You've got a package of ethic re--ethic reforms, and I look forward to working with you there. On this side, I know there are a lot of ideas that I'm sure that if we sat down and talked we could embrace, and I look forward to solving as many problems as we can and having a contest over ideas that really matter to the American people.

Senator Hatch, thank you for coming. In terms of my chairmanship, if I can do what you and Senator Grassley were able to do during your time, I will have done the committee a good

service. Senator Grassley, thank you very much. Last year was tough, but I think you and Senator Feinstein did the best you could in the environment in which we live. The times in which we live are very difficult times. I don't see them getting better overnight, but I do see them getting better if we all want them to.

So about me. I want us to do better, and I'll be as measured as possible. The immigration Lindsey will show up, but the other guy is there, too.

(LAUGHTER)

And I don't like him any more than you do. So the bottom line is we're starting off with something that would be good for the country. We have a vacancy for the attorney general spot. We have a chance to fill that vacancy. Mr. Barr , as--you can't hold a job. When you look at what he's done in his life, it's incredible. So I want to thank the president for nominating somebody who is worthy of the job, who will understand on day one what the job is about and can right the ship over there. I think we all have concerns. I know Senator Whitehouse is passionate about cybersecurity and fort cyber and all of these other ideas that Sheldon has been pushing. It's just a matter of time before we hit and hit hard if somebody doesn't step up to the plate with some solutions.

But a little bit about the nominee. He's been attorney general before from '91 to '93 by voice vote. Those were the days. Deputy attorney general from '90 to '91, unanimous consent, without a recorded vote. Assistant Attorney General Office of Legal Counsel, voice vote. That's pretty amazing. I think you're going to have an actual vote this time. Academically gifted, George Washington Law School, Columbia University undergraduate. Outside of DOJ he was the general counsel, legislative counsel for the CIA. That's how he met Bush 41. He's been a law clerk. He's worked in private practice. I'm not going to bore the committee with all the things he's done. He's been the senior vice president and general counsel of GTE. He's lived a consequential life--general counsel for Verizon.

You've lived a life that, I think, has been honorable, and noteworthy and accomplished, and I want to thank you for being willing to take this task on. We've got a lot of problems at the Department of Justice. I think morale is low, and we need to change that. So I look forward

to this hearing. You will be challenged. You should be challenged. The memo, there will be a lot of talk about it, as there should be. But I just want to let you know, Mr. Barr, that we appreciate you stepping up at a time when the country needs somebody of your background and your temperament to be in charge of the rule of law.

GRAHAM:

And with that I will turn it over to my colleague, Senator Feinstein.

FEINSTEIN:

Thanks very much, Mr. Chairman and I want you to know I really look forward to working with you.

GRAHAM:

Me, too.

FEINSTEIN:

And I think we can work productively together. And Senator Grassley I want to thank you for the time we worked together. It really was a pleasure and I had an opportunity to get to know you as the fine person that you are. So thank you very much.

I want to say just one word or two or three about women. Twenty five years ago there were no women on this committee. I'll never forget watching the Anita Hill hearing on a television in the London airport with a lot of people gathered around.

So I went over to take a look and I saw and I saw this all-male Judiciary Committee and it took all of these years but here we are and I want to particularly welcome Senator Ernst and Senator Blackburn. I think it's extraordinarily important that this committee be representative of our society at large and we are growing that way. And so thank you very much for being here.

I'd also like to welcome Bill Barr and his family. I know you're proud to be here and you served as attorney general before from '91 to '93 and I think we all have great respect for your commitment to public service.

When we met your previous tenure marked a very diff--we talked about a very different time for our country and today we find ourselves in a unique time with a different administration and different challenges. And now perhaps more than ever before the country needs someone who will uphold the rule of law, depend the independence--defend the independence of the Justice Department and truly understand their job is to serve as the people's lawyer, not the president's lawyer.

Top of mind for all of us is the ongoing Mueller investigation. Importantly, the attorney general must be willing to resist political pressure and be committed to protecting this investigation. I'm pleased that in our private meeting as well as in your written statement submitted to the committee you stated that it's vitally important and this is a quote that the special counsel be allowed to complete his investigation end quote and that quote the public and Congress be informed of the results of the special counsel's work end quote.

However, there are at least two aspects of Mr. Mueller's investigation. First, Russian interference in the United States election and whether any U.S. persons were involved in that interference and second, possible obstruction of justice. It's the second component that you have written on and just five months before you were nominated, I spent the weekend on your 19-page legal memo to Deputy Attorney General Rod Rosenstein criticizing Mueller's investigation specifically the investigation into potential obstruction of justice.

In the memo you conclude I be--think that press--Special Counsel Mueller is quote grossly irresponsible for pursuing an obstruction case against the President and pursuing the obstruction inquiry is fatally misconceived. So I hope we can straighten that out in this hearing.

But your memo also shows a large sweeping view of presidential authority, and a determined effort I thought to undermine Bob Mueller even though you state you have been friends and are in the dark about many of the facts of the investigation. So it does raise

questions about the willingness to reach conclusions before knowing the facts and whether you prejudge the Mueller investigation and I hope you'll make that clear today.

It also raises a number of serious questions about your views on executive authority and whether the president is in fact above the law. For example, you wrote the president and I quote alone is the executive branch. As such he is the sole repository of all executive powers conferred by the Constitution. Thus the full measure of law enforcement authority is placed in the president's hands and no limit is placed on the kinds of cases subject to his control and supervision. This is in your memo on page 10 and I will ask you about it.

This analysis included cases involving potential misconduct where you concluded and I quote the president may exercise his supervisory authority over cases dealing with his own interests and the president transgresses no legal limitation when he does so. That's on page 12. In fact, you went so far as to conclude that quote the framers' plan contemplates that the president's law enforcement powers extends to all matters including those in which he has a personal stake.

You also wrote the Constitution itself places no limit on the president's authority to act on matters which concern him or his own conduct, page 10.

Later you conceded that certain supervisory actions such as the firing of Director Comey may be unlawful obstruction however this too is qualified. You argue that such a case--in such a case obstruction of justice occurs only if first, a prosecutor proves that the president for his aides colluded with Russia.

Specifically, you conclude and I quote the issue of obstruction only becomes ripe after the alleged conclus--collusion by the president or his campaign is established first end quote. So that some of the things I hope to ask you about.

And in conclusion, let me just say that some of your past statements on the role of attorney general and presidential power are concerning. For instance, you have said in the past that the attorney general is the president's lawyer.

In November 2017, you made comments suggesting it would be permissible for the president to direct the Justice Department to open an investigation into his political opponents. And this is notable in light of President Trump's repeated calls for the investigation of Hillary Clinton and others who disagree with him.

I believe it's important that the next attorney general be able to strongly resist pressure whether from the administration or Congress to conduct investigations for political purposes. You must have the integrity, the strength and the fortitude to tell the president no regardless of the consequences. In short, he must be willing to defend the independence of the Justice Department.

So my questions will be do you have that strength and commitment to be independent of the White House pressures you will undoubtedly face? Will you protect the integrity of the Justice Department above all else? Thank you very much, Mr. Chairman.

GRAHAM:
Thank you, Senator Feinstein.

GRAHAM:
Senator Hatch. Welcome back. We truly miss you. you are a great chairman and a incredible member of this body and you're very welcomed to share your thoughts about Mr. Barr with us today.

HATCH:
Well, thank you so much, Mr. Chairman, Ranking Member Feinstein as well, and members of the committee. It is my distinct pleasure to be here today to introduce William Barr, the president's nominee to be attorney general of the United States. I have known and worked with Bill closely over the years and am glad to call him a friend.

Bill has had a distinguished career in public service and in the private sector. He started his career at the Central Intelligence Agency. While there, he went to law school part time at George Washington University. Following graduation, he was selected for a prestigious clerkship with the federal judge on the DC Circuit before heading to private practice. Later, he served in the Reagan White House and the Office of Policy Development.

Following another stent in private practice, Bill began his distinguished career at the Department of Justice under President George H.W. Bush. Bill served as the assistant attorney general for the Office of Legal Counsel, then as deputy attorney general, and then finally as attorney general of the United States. As attorney general, Bill oversaw a number of sensitive criminal investigations, including the investigation into the Pan Am Flight 103 bombing. He prioritized fighting violent crime and became known as the law and order attorney general.

Throughout his time at the Justice Department, Bill earned a reputation as a fierce advocate for the rule of law, as a principled and independent decision-maker, and as a lawyer's lawyer. He has shown his commitment to the Constitution time and time again while serving our country. That is why he has been confirmed by the Senate unanimously three times. After completing his service at the DOJ, Bill returned to the private sector working at--at law firms and as counsel for some of America's largest companies. I could do--I could go on at length in describing Bill's distinguished career.

There is no question, none whatsoever, that Bill is well qualified to serve as attorney general. He has held this position before and won high praise during his tenure for his fairness, his tenacity, and his work ethic. So instead of droning on about Bill's resume, I want to tell you about what Bill identifies as the most important achievement of his private service as attorney general, at least I believe this is what he believes. I believe his answer tells you much about how he will approach the job and who he is.

When asked what his most important accomplishment was as attorney general, Bill does not point to one of his many policy successes, he doesn't talk about his role in setting antitrust merger guidelines, he doesn't say it was his role leading the DOJ's response to the savings

and loans crisis. No, for him it was something more, it was something more tangible, it was Talladega.

Three days after Bill was named acting attorney general by President Bush, 121 prisoners noted and seized control of the Talladega Federal Correctional Institution in Alabama. This was a very serious matter and they took 10 hostages. Planning at the DOJ began immediately for how best to resolve the situation and secure the safe release of the hostages. In such a situation, some would have sought political cover. Not Bill. He was in charge. He knew the response was his decision to make, his response ability. He maintained his focus on the safety of the men and women held hostage by the prisoners.

The standoff lasted 10 days. Then, on Bill's order, FBI agents stormed the prison. Three minutes later it was over. The hostages were safe, the mission was well planned and executed, the federal agent--the federal agents did not even have to fire a single shot. Bill's decision-making and judgment help saved lives.

When President Bush nominated Bill to be attorney general in 1991, I noted why he had been selected. He was not a member of President Bush's political or personal inner circle. He was not a part of the president's brain trust. He was not a politician or former politician who--who brought political clout to the position from prior elections or prior elections-- elected office. Bill Barr was a lawyer's lawyer. Talent, merit, and performance. Those were the reasons President Bush selected him to be the attorney general at that time.

That statement holds true today. Bill Barr, in my opinion, is an outstanding choice for attorney general. His vast experience, renowned judgment, and reputation as an ardent defender of the rule of law make him a nominee that the American people, the president, and this Senate should all be proud of. So I feel very honored to be here today to speak in his favor and I hope that his nomination will be approved expeditiously. Thank you, Mr. Chairman.

GRAHAM:

Thanks, Senator Hatch. I'd like to note at the outset that the rules of the Senate prohibit outbursts, clapping, or demonstration of any kind. This includes blocking the view of people around you. Please be mindful of these rules as we conduct this hearing. I will ask that capital please to remove anyone who violates the rules of this committee.

GRAHAM:

Raise your right hand, please. Do you affirm that the testimony you are about to give to this committee will be the truth, the whole truth, and nothing but the truth, so help you God?

BARR:

I do.

GRAHAM:

The floor is yours.

BARR:

Before I begin, Mr. Chairman, could I introduce my family?

GRAHAM:

Absolutely.

BARR:

My wife of 46 years, Christine, a retired librarian. My daughter, Margaret, who we call Meg. She was an assistant United States attorney in the District of Columbia but now has moved up to Capitol Hill and works for Senator Braun. My middle daughter, Patricia, who's also an attorney, and she has been counsel to the House Agriculture Committee for how long now, 10? Eleven years. And my daughter Mary, who is a long-time federal prosecutor and is currently the coordinator for opioid enforcement in the Office of the Deputy Attorney

General. Mary's husband, Mike, who is also an attorney at the Department of Justice in the national security division. And their son, Mary and Mike's son, Liam, who will someday be in the Department of Justice.

(LAUGHTER)

Patricia's husband, Pelham, who is a founding partner of a consulting firm, and Meg's husband, Tyler, who is also an Assistant United States Attorney in the Eastern District of Virginia. Did I leave anyone out?

GRAHAM:

Think about medical school, Liam.

(LAUGHTER)

Somebody needs to make money in the family.

BARR:

When Meg was starting at Notre Dame, I told her to--I wanted a doctor in the family and I made her take organic chem. Needless to say, she's now a lawyer.

So, good morning, Mr. Chairman, Ranking Member Feinstein, and members of the committee. It's a privilege to come before you today, and I'm honored that President Trump has nominated me for the position of attorney general.

I regret that I come before this committee at a time when much of our government is shut down. And my thoughts are with the dedicated men and women of the Department of Justice and other federal workers, many of whom continue to perform their critical jobs.

As you know, if the Senate confirms me, this would be my second time I would have the honor of holding this office. During the four years I served under President George H.W. Bush, he nominated me for three successive positions in the department, the assistant attorney general for the Office of Legal Counsel, the deputy attorney general, and finally the attorney general, and this committee unanimously approved me for each of those offices.

Twenty-seven years ago at my confirmation hearing, I explained that the Office of Attorney General is not like any other cabinet post. It is unique and has a critical role to play under our constitutional system. I said then the attorney general has a very special obligation, unique obligations. He holds in trust the fair and impartial administration of justice. It is the attorney general's responsibility to enforce the law evenhandedly and with integrity.

The attorney general must ensure that the administration of justice, the enforcement of the law, is above and away from politics. Nothing could be more destructive of our system of government, of the rule of law, or the Department of Justice as an institution, than any toleration of political interference with the enforcement of the law. I believe this as strongly today as I did 27 years ago, indeed more strongly.

We live in time when the country is deeply divided. In the current environment, the American people have to know that there are places in the government where the rule of law, not politics, holds sway, and where they will be treated fairly based solely on the facts and the even-handed application of the law. The Department of Justice must be that place.

I did not pursue this position. And when my name was first raised, I was reluctant to be considered and indeed proposed a number of alternative candidates. I'm 68 years old, partially retired, and nearing the end of a long legal career. My wife and I were looking forward to a peaceful and cherished time with our daughters and grandchildren. And I've had this job before.

But ultimately, I agreed to serve because I believe strongly in public service. I revere the law. I love the Department of Justice and the dedicated professionals who serve there. And I believe that I can do a good job leading the department in these times. If confirmed, I will serve with the same independence I did in 1991.

At that time, when President George Bush chose me, he sought no promises and asked only that his attorney general act with professionalism and integrity. Likewise, President Trump has sought no assurances, promises, or commitments from me of any kind, either express or implied, and I have not given him any, other than that I would run the department with professionalism and integrity.

As attorney general, my allegiance will be to the rule of law, the Constitution, and the American people. That is how it should be. That is how it must be. And if you confirm me, that is how it will be.

Now let me address a few matters I know are on the minds of some of the members of this committee. First, I believe it is vitally important that the special counsel be allowed to complete his investigation. I have known Bob Mueller for 30 years. We worked closely together throughout my previous tenure at the Department of Justice.

We've been friends since, and I have the utmost respect for Bob and his distinguished record of public service. And when he was named special counsel, I said that his selection was good news and that, knowing him, I had confidence he would handle the matter properly.

And I still have that confidence today. Given his public actions to date, I expect that the special counsel is well along in his investigation. At the same time, the president has been steadfast that he was not involved in any collusion with Russian attempts to interfere in the election.

I believe it is in the best interest of everyone, the president, Congress, and the American people, that this matter be resolved by allowing the special counsel to complete his work. The country needs a credible resolution of these issues.

And if confirmed, I will not permit partisan politics, personal interests, or any other improper consideration to interfere with this or any other investigation. I will follow the special counsel regulations scrupulously and in good faith. And on my watch, Bob will be allowed to finish his work.

Second, I also believe it is very important that the public and Congress be informed of the results of the special counsel's work. My goal will be to provide as much transparency as I can consistent with the law. I can assure you that, where judgments are to be made, I will make those judgments based solely on the law and I will not let personal, political, or other improper interests influence my decision.

Third, I would like to briefly address the memorandum that I wrote last June. I wrote the memo as a former attorney general who has often weighed in on legal issues of public importance, and I distributed it broadly so that other lawyers would have the benefit of my views. My memo was narrow, explaining my thinking on a specific obstruction of justice theory under a single statute that I thought, based on media reports, the special counsel might be considering.

The memo did not address or in any other way question the special counsel's core investigation into Russian efforts to interfere in the election, nor did it address other potential obstruction of justice theories or argue, that some have wrongly suggested, that a president can never obstruct justice. I wrote it myself on my own initiative, without any assistance, and based solely on public information.

I would like to comment very briefly on my priorities if confirmed as attorney general. First, we must continue the progress we've made on violent crime while at the same time recognizing the changes that have occurred since I last served as attorney general. The recently passed First Step Act, which I intend to diligently implement if confirmed, recognizes the progress we have made over the past three decades in fighting violent crime. As attorney general, I will ensure that we will continue our efforts to combat violent crime.

In the past, I was focused on predatory violence, but today I am also concerned about another kind of violence. We can only survive and thrive as a nation if we are mutually tolerant of each other's differences, whether they be differences based on race, ethnicity, religion, sexual orientation or political thinking and yet, we see some people violently attacking others simply because of their differences. We must have zero tolerance for such crimes, and I will make this a priority as attorney general if confirmed.

Next, the department will continue to prioritize enforcing and improving our immigration laws. As a nation, we have the most liberal and expansive immigration laws in the world. Legal immigration has historically been a huge benefit to this country. However, as we open our front door and try to admit people in an orderly way, we cannot allow others to flout our legal system by crashing in through the back doors. In order to ensure that our immigration

system works properly, we must secure our nation's borders and we must ensure that our laws allow us to process, hold, and remove those who unlawfully enter.

Finally, in a democracy like ours, the right to vote is paramount. In a period of great political division, one of the foundations of our nation is our enduring commitment to the peaceful transition of power through elections. If confirmed, I will ensure that the full might of our resources are brought to bear against foreign persons who unlawfully interfere in our elections. Fostering confidence in the outcome of elections also means ensuring that the right to vote is fully protected, as well as ensuring the integrity of elections.

Let me conclude by making the point that over the long run, the course of justice in this country has more to do with the character of the Department of Justice as an enduring institution than with the tenure of any particular attorney general. Above all else, if confirmed I will work diligently to protect the professionalism and integrity of the department as an institution, and I will strive to leave it and the nation a stronger and better place.

Thank you very much for your time today, and I look forward to answering your questions.


GRAHAM:

Thank you, Mr. Barr. We'll try to break around 11:30, I think, to get a quick bite and break up the day for you. But one thing I want to tell you is that I support the idea that politicians, no matter what party, should not interfere with criminal investigations. That makes imminent sense to me. Once you go down that road, then the rule of law collapses. But there's another side to this equation, if I may say, a two-way street. What about those in charge of enforcing the law? What about those with the power to bring charges against American citizens, including people up here? I remember Senator Stevens' case in Alaska. So we should always be on guard about the politician interfering in a investigation, but we should also have oversight of how the department works, and those with this tremendous power use that power. Are you familiar with the January 11 New York Times article about FBI open inquiry into whether Trump was secretly working on behalf of Russians?

BARR:

Yes, Mr. Chairman.

GRAHAM:

Would you promise me and this committee to look into this and tell us whether or not, in the appropriate way, a counterintelligence investigation was opened up by somebody at the FBI/Department of Justice against President Trump?

BARR:

Yes, Mr. Chairman, I think there are a number of investigations, as I understand it, going on in the department.

GRAHAM:

Have you ever heard of such a thing in all the time you've been associated with the Department of Justice?

BARR:

I have never heard of that.

GRAHAM:

Are there rules about how you can do counterintelligence investigations?

BARR:

I believe there are, Mr. Chairman.

GRAHAM:

So if you want to open up one against the president, are there any checks and balances?

:

Not outside the FBI.

GRAHAM:

Okay, well we need to look at that. In terms of people who are actually enforcing the law, don't we want to make sure they don't have an agenda?

BARR:

That's right, Mr. Chairman.

GRAHAM:

Do you know a Lisa Page or Peter Strzok?

BARR:

I've heard their names.

GRAHAM:

But do you know them personally?

BARR:

No, I don't.

GRAHAM:

This is a message, August 8, 2016, a text message. Trump's not ever going to become president, right? Right. Strzok responded, no, no, he's not. We'll stop him. Strzok was in charge of the Clinton email investigation. Ms. Page worked in the Department of Justice. August 15, 2016, I want to believe the path you threw out for consideration in Andy's office that there is no way he gets elected, but I'm afraid we can't take that risk. It's like an

insurance policy in the unlikely event you die before 40. March 4, 2016, Page to Strzok, God, Trump is a loathsome human being. October 20, 2016, Trump is an f-ing idiot, is unable to provide a coherent answer. To all those who enforce the law you can have any opinion of us that you like, but you're supposed to do your job without an agenda. Do you promise me, as attorney general, if you get this job, to look in to see what happened in 2016?

BARR:

Yes, Mr. Chairman.

GRAHAM:

How do these statements sit with you?

BARR:

I was shocked when I saw them.

GRAHAM:

Okay. Please get to the bottom of it. I promise you we will protect the investigation, but we're relying upon you to clean this place up. FISA warrants. Are you familiar with the FISA warrant?

BARR:

Yes, Mr. Chairman.

GRAHAM:

Okay. During the process of obtaining a warrant is there a certification made by the Department of Justice to the court that the information being provided is reliable?

BARR:

Yes, sir.

GRAHAM:

Are you familiar with Bruce Ohr?

BARR:

No, I'm not.

GRAHAM:

Bruce Ohr was associate deputy attorney general for organized crime and drug enforcement. His wife worked at Fusion GPS. Are you familiar with Fusion GPS?

BARR:

I've--yes, I've read about that.

GRAHAM:

Fusion GPS, Mr. Barr, was hired by the Democratic National Committee and the Clinton campaign to do opposition research against candidate Trump, and maybe other candidates, but we now know that they hired, Fusion GPS, Michael Steele, who is a former British agent, to do opposition research and produce the famous dossier. Are you aware that Mr. Ohr's wife worked for that organization?

BARR:

I've read that.

GRAHAM:

Does that bother you, if he had anything to do with the case?

BARR:

Yes.

GRAHAM:

Are you aware that on numerous occasions he met with Mr. Steele while his wife worked with Fusion GPS?

BARR:

I've read that.

GRAHAM:

Okay. The warrant certification against Carter Page, on four different occasions certifies that the dossier, which was the main source of the warrant, was reliable. Would you look in to see whether or not that was an accurate statement and hold people accountable if it was not?

BARR:

Yes, Mr. Chairman.

GRAHAM:

Mueller. You say you've known Mueller a long time. Would you say you have a close relationship with Mr. Mueller?

BARR:

I would say we were good friends.

GRAHAM:

Would you say that you understand him to be a fair-minded person?

BARR:

Absolutely.

GRAHAM:

Do you trust him to be fair to the president and the country as a whole?

BARR:

Yes.

GRAHAM:

When his report comes to you, will you share it with us as much as possible?

BARR:

Consistent with the regulations and the law, yes.

GRAHAM:

Do you believe Mr. Mueller would be involved in a witch-hunt against anybody?

BARR:

I don't--I don't believe Mr. Mueller would--would be involved in a witch-hunt.

GRAHAM:

What are the circumstances that would allow a special counsel to be appointed, generally speaking?

BARR:

Well, I appointed three, Mr. Chairman, as special counsel. And generally, when something comes up, an issue comes up that needs to be investigated, and there are good reasons to have it investigated by a special counsel outside the normal chain at the department, someone usually of public stature that can provide additional assurance of nonpartisanship.

GRAHAM:

Do you believe that Attorney General Sessions had a conflict because he worked on the Trump campaign?

BARR:

I'm not sure of all the facts, but I--I think he probably did the right thing recusing himself.

GRAHAM:

I agree. I think he did the right thing to recuse himself. Do you know Rod Rosenstein?

BARR:

Yes, I do.

GRAHAM:

What's your opinion of him?

BARR:

I have a very high opinion of Rod Rosenstein and his service in the department.

GRAHAM:

Okay. Why did you write the memo?

BARR:

I wrote the memo because starting, I think, in June of 2017, there were many news reports-- and I had no facts, and none of us really outside the department have facts--but I read a lot of news reports suggesting that there were a number of potential obstruction theories that were being contemplated, or at least explored. One theory, in particular, that appeared to be under consideration under a specific statute concerned me because I thought it would

involve stretching the statute beyond what was intended, and it would do it in a way that would have serious adverse consequences for all agencies that are involved in the administration of justice, especially the Department of Justice. And I thought it would have a chilling effect going forward over time. And my memo is very clear that is the concern that was driving me. The impact, not the particular case, but its impact of a rule over time. And I wanted to make sure that before anyone went down this path, if that was in fact being considered, that the full implications of the theory were carefully thought out. So I wanted my views to get in front of the people who would be involved and the various lawyers who would be involved in those discussions.

So I first raised these concerns verbally with Rod Rosenstein when I had lunch with him early in 2008, and he did not respond and was sphinx-like in his reaction, but I expounded on my concerns. And then I later attempted to provide a written analysis as follow up. Now I initially thought of an op-ed, and because of the material it wasn't working out, and I talked to his staff, and I said you know I want to follow up and send something to Rod in writing, but is he a one-pager kind of guy, or, you know, how much will he read? And the guy said, he--he's like you. He doesn't mind waiting into a dense legal (INAUDIBLE)--

GRAHAM:

Don't you think President Trump is a one-pager kind of guy?

BARR:

Excuse me?

GRAHAM:

President Trump is a one-pager kind of guy?

BARR:

I suspect he is.

GRAHAM:

Okay, just remember that. Go ahead.

BARR:

Yeah.

(LAUGHTER)

And so I provided the memo to Rod, and I provided it, distributed it freely among the other lawyers that I thought would be interested in it. And I think it was entirely proper. It's very common for me and for other former senior officials to weigh in on matters that they think may be ill-advised and may have ramifications down the road. For example, just a few months before that, I had weighed in repeatedly to complain about the idea of prosecuting Senator Menendez. I think I made three calls. I think it was two to Sessions, to AG Sessions, and one to Rosenstein.

Now, I didn't know Senator Menendez. I don't represent Senator Menendez. No one was paying me to do it. And in fact, I don't support Senator Menendez politically. But I carefully watched this case. My friend, Abbe Lowell, was his defense counsel, and it was very much like a line of cases that I had been concerned about when I was AG. And so I was watching it, and I thought the prosecution was based on a fallacious theory that would have bad long-term consequences. And so I freely weighed in at the department, and I did so because I care about the rule of law.

And I want to say one final thing on the rule of law because it picks up on something you said, Mr. Chairman. What is the rule of law? We all use that term. In the area of enforcement, I think the rule of law is that when you apply a rule to A, it has to be the same rule and approach you apply to B, C, D, and E and so forth. And that seems, to me, to suggest two corollaries for an attorney general. The first, that's why we don't like political interference. Political interference means that the rule being applied to A isn't the rule you're applying to every--it's special treatment because someone is in there exerting

political influence. The corollary to that--and this is what you're driving at, Mr. Chairman--is that when you apply a rule--when a prosecutor is applying a rule to A, you've got to be careful that it's not torqued specially for that case in a way that couldn't be applied down the road, or if it is applied will create problems down the road. And I think the attorneys general's job is both.

It is both to protect against interference, but it's also to provide oversight to make sure that in each individual case the same rule that would be applied broadly is being applied to the individual.


GRAHAM:
(OFF-MIC)


FEINSTEIN:
Thank you, Mr. Chairman. Six quick yes or no questions. Will you commit to no interference with the scope of the special counsel's investigation?


BARR:
I--I will--the scope of the special counsel's investigation--


FEINSTEIN:
By not limiting--


BARR:
--is--is set by his charter and--and by the regulations and I will ensure that those are maintained.


FEINSTEIN:

Will you commit to providing Mr. Mueller with the resources, funds and time needed to complete his investigation?

BARR:

Yes.

FEINSTEIN:

Will you commit to ensuring that Special Counsel Mueller is not terminated without good cause consistent with department regulations?

BARR:

Absolutely. If Special Counsel Mueller makes any request for instance--instance about the scope of his investigation or resources for his investigation will you commit to notifying Congress if you deny that request?

BARR:

I think--I think the regulations require notification of Congress if there is a disagreement.

FEINSTEIN:

Thank you. And I have two questions from the chairman of the House Judiciary Committee. Will you commit to making in the report Mueller produces at the conclusion of his investigation available to Congress and to the public?

BARR:

As I--as I said in my statement I am going to make as much information available as I can consistent with the rules and regulations that are part of the special counsel regulations.

FEINSTEIN:

Will you commit to making any report on the obstruction of justice public?

BARR:

I--that's the same answer. Yes.

FEINSTEIN:

Thank you. In your June 2, 2018, memo about obstruction of justice to the Mueller investigation you repeatedly referred to Mueller's quote sweeping and all-encompassing interpretation of section 1512 which is the st--a statute on obstruction. How do you know what Mueller's interpretation of 1512 is?

BARR:

Well, as I said I was--I was speculating. I freely said at the beginning I was writing in the dark and we're all in the dark. Every lawyer, every talking head, everyone who thinks about or talks about it doesn't have the facts.

FEINSTEIN:

So I spent my Saturday reading that memorandum--

BARR:

--Yeah.

FEINSTEIN:

So are you saying this is all your speculation? It's a big memo.

BARR:

Well, it--it was informed to the extent that I I thought that that was one of the theories being considered. And I don't know how seriously whether it was being considered or how seriously it was being considered. But I, as a shorthand way in the memo of referring to what I was speculating might be the theory I referred to it as Mueller's theory rather than go in every time I mention it say well, this is speculative.

FEINSTEIN:

But do you know what Mueller's interpretation of 1512 is?

BARR:

No, I don't know what Mueller's interpretation. But and just one point, senator, I think you said in your opening statement I said he was grossly irresponsible. I think I said if something happens it would be grossly irresponsible. I was not calling Mueller grossly irresponsible.

FEINSTEIN:

I understand. Thank you.

BARR:

Okay.

FEINSTEIN:

I appreciate that. Has anyone given you nonpublic information about Mueller's investigation?

BARR:

I don't--I don't recall getting in the confidential information about the investigation.

FEINSTEIN:

Your 2018 mem--in it you stated and I quote the framers' plan contemplates that the president's law enforcement powers extend to all matters including those in which he had a personal stake end quote. Please explain what you base this conclusion on.

BARR:

Y--yes. Here's the Department of Justice right here and within the Department of Justice, enforcement decisions are being made. The president is over here and I think of it as there are two categories of potential communications.

One would be on a case that the president wants to communicate about that he has no personal interest in, no political interest in. Let's say the president is concerned about Chinese stealing trade secrets and say I want you to go after this company that's being--you know that may be stealing trade secrets. That's perfectly appropriate for him to do, to communicate that.

But whether it's bona fide or not the Department of Justice's obligation and the attorney general's obligation is not to take any action unless we reach--we, the Department of Justice and the attorney general, reach their own independent conclusion that it is justified under the law and regardless of the instruction and that's my quote that everyone is saying I am I'm siccing (SP)--it's okay for the president to direct things. All I said was it's not per se improper for the president to call on the department for doing something especially if he has no personal or political interest in it.

The other category of cases and let's pick an easy bad example would be if a member of the president's family or a business associate or something was under investigation and he tries to intervene. He--he's the chief law enforcement officer and you could say well, he has the power but that would be a breach of his obligation under the Constitution to faithfully execute the laws.

So in my opinion if he attempts--if a president attempts to intervene in a matter that he has a stake in to--to protect himself that should first be looked at as a breach of his constitutional duties whether it also violates a statute depending on what statute comes into play and what all of the facts are.


FEINSTEIN:
Including the emoluments clause of the Constitution?

BARR:

I--well, I think there's a dispute as to what the emoluments clause relates to. I--I have not personally research the emoluments clause. I--I can't even tell you what it says at this point. My--off the top of my head I would have said well, emoluments are essentially a stipend attached to some office but I don't know if that's correct or not. But I'm sure it's--I think it's being litigated right now.

FEINSTEIN:

I'm going to--I don't know why there--so I'm going to try and find out. We'll come back another day--

BARR:

Okay.

FEINSTEIN:

--and maybe discuss it. Your memo stated a fatal flaw in Mueller's interpretation of 1512(c)(2), is that while the findings obstruction solely as acting corruptly. Mueller offers no definition of what corruptly means. My understanding is that there's nothing in the public record that sheds light on his definition of obstruction. Do you know what his definition is?

BARR:

I--I don't know what his definition is. I--I read a book where people were asking whether someone I think--I don't know if it was accurate but whether someone the president was acting with corrupt intent and--and what I say in my memo is actually people don't understand what the word corruptly means in that statute.

It's an adverb and it's not meant to mean with a state of mind. It's actually meant the way in which the influence or obstruction is committed. That's its adverbial function in the statute and what it means is using it in the 19th century sense. It meant to influence in a way that

changes something that's good and fit to something that's bad and unfit namely the corruption of evidence or the corruption of a decision maker. That's what the word corruptly means because once you dissociate it from that it really means very hard to dis--discern what it means. It means bad. What does bad mean?

FEINSTEIN:

Let me go on because my time is so limited. You argue that the--and I quote the Constitution's plenary grant of those powers to the president also extends to the unitary character of the executive branch itself. Specifically, you argue and this is a quote while Mueller's immediate target is the president's exercise of his discretionary powers, his obstruction theory reaches all exercises of prosecutorial discretion by the president's subordinates from the attorney general down to the most junior line prosecutor end quote.

So if the president orders the attorney general to halt a criminal investigation for personal reasons would that be prohibited under your theory?

BARR:

Prohibited by what?

FEINSTEIN:

By--

BARR:

The Constitution?

FEINSTEIN:

The Constitution.

BARR:

I think it would be--I think it would be a breach of the president's duties to faithfully execute the law. It would be an abuse of power. Whether it would violate a statute depends on all of the facts and what statute I would--someone would cite me to. But I certainly think it would be an abuse of his power. And--and let me just say that the position--

FEINSTEIN:

Would that be the same thing if an attorney general fired U.S. attorneys for political reasons?

BARR:

No, because U.S. attorneys are political appointments.

FEINSTEIN:

According to news reports President Trump interviewed you and asked you to be part of the legal team defending him in the Mueller investigation twice, first, in the spring of '17 when the investigation was just beginning and again earlier this year. Is that correct?

BARR:

No--no. He--he, I had one conversation with him that related to the--his private representation and I--I can describe that for you. That was--that was in June 2017. That's the only time I met him before I talked to him about the job of attorney general which obviously is not the same as representing him.

FEINSTEIN:

Have you discussed the Mueller investigation with the president or anyone else in the White House?

BARR:

I discussed the Mueller investigation but not--not in not in any particular substance. I can go through my conversations with you if--if you want.

FEINSTEIN:

Well, not--not at this time but I may come back to you--

BARR:

Okay.

FEINSTEIN:

--and ask you about that. I don't want to take any more time. Thank you, Mr. Chairman.

GRAHAM:

Senator Grassley.

GRASSLEY:

Before I asked my first question, and I don't want you to respond to this, I just want you to know what my interest is in the transparency of the Mueller report, when we spend $35, I don't know whether it's $25 million or $35 million, the taxpayers, that's billions of dollars, the taxpayers ought to know what their money was spent for. So if you've got some reservations of the of some part of it not being public, I hope that that's related to traditional things that--of the public's business that shouldn't be public, like national security, as an example, not being made public. But beyond that, the only way I know for the taxpayers to hold anybody that spends the taxpayer's money responsibly is through transparency because that brings accountability.

My first question in, as you would expect from our conversation in my office, '86 Reagan signed the False Claims Act. I worked hard to get that passed, especially provisions empowering whistleblowers to help government identify fraud. More than a decade ago,

you said the qui tam provisions in the False Claims Act were, your words, an abomination and were unconstitutional. You said you, in your words, wanted to attack the law but the Supreme Court upheld the law's constitutionality.

Prosecutors from both sides of the aisle have praised the law as the most effective tool government has to detect and actually recover public money lost to fraud since 1986. The law that was fast in 1986 brought in $56 billion into the federal treasury. Most of that is because patriotic whistleblowers found the fraud and brought the case to the attention of the government. Is the False Claims Act unconstitutional?

BARR:

No, senator. It's been upheld by the Supreme Court.

GRASSLEY:

Do you consider the False Claims Act to be an abomination?

BARR:

No, I don't.

GRASSLEY:

Does the False Claims Act benefit the taxpayer, specifically its provisions to empower and protect whistleblowers?

BARR:

Yes, senator.

GRASSLEY:

If confirmed, do you commit to not take any action to undermine the False Claims Act? Further, if confirmed, will you continue (INAUDIBLE) Justice Department staff and funding levels to properly support and prosecute False Claims Act cases?

BARR:

Yes. I will diligently enforce the False Claims Act.


GRASSLEY:

Now, with all those positive answers, you think I'd be done, wouldn't you, with that? But let me go on.

(LAUGHTER)

Now, just to show you that there is some forces out there that I'm suspicious about within the Department of Justice, we have a new department of justice and guidance document out last year known as the Granston memo, provides a long list of reasons that the department can use the dismiss False Claims Act cases. Some of them pretty darn vague, such as preserving, these--these are their words, preserving government resources. Just think of all the mischief those three words can bring.

Of course, the government can dismiss, obviously, meritless cases. I don't argue with that. But even when the department declines to participate in False Claims Act cases, the taxpayer can, in many cases, still recover financially. So it's important to allow whistleblowers to pursue cases even when the department is unable to be involved. Under what circumstances can or should the Justice Department move to dismiss false claims cases?


BARR:

Senator, I haven't reviewed that memorandum, so I'm not familiar with the thinking of the people in this--I think it's the civil division that did that. But if I'm confirmed, I will review it and I am--I would be glad to come and sit down with you and discuss it and if there are areas you're concerned about, I'd be glad to work with you on that.


GRASSLEY:

Unless you find that my presumption is wrong, that there's reasons to be suspicious, I hope you'll take into consideration my feeling about how, in various suspicious ways, people that are faceless bureaucrats can undermine this effort. In circumstances where the government doesn't intervene in false claims cases, if confirmed, will you commit to ensuring the department doesn't unnecessarily dismiss false act cases?

BARR:

Yes, senator. I will--I will enforce the law in good faith.

GRASSLEY:

Okay. Now, got an act that the Justice Department just talk, and I can't, obviously, expect you to respond specifically to their act, but I use it as an example of their un-cooperation with Department of Congressional Oversight. This uncooperative behavior needs to change. On December 10 last year, the department confirmed a briefing for your staff regarding Assets Forfeiture Fund. And to do that, last week, January 8, on January 7, Department of Justice office of legal, or legislative affairs, informed our staff that they will no longer provide the briefing because they consider the matter closed as a result of the change in chairmanship and because you released a public memo, because I released a public memo, on the Marshall service study, or investigation. It's important to gain your commitment on how you would handle this as an example.

Let me explain how ridiculous it is to get somebody in this administration saying that they don't have to answer if you are chairman of the committee. We went through this in January, the first month this president this was in office when he said, or he put out a memo, we aren't going to answer any oversight except for chairman of the committee. So you're going to write off 500 members of Congress not doing oversight.

So we told him all about this and the coast constitutional cases on this, we got them up, they wrote a memo again two months later that said that they were going to respond to all the stuff. Now you've got people in the bowels of the bureaucracy that are--they're still saying if

you want to chairman, you ain't going to get an answer to anything. How ridiculous. It's our constitutional response ability.

So then I laid out, I'll give you an example. I sent the Justice Department a classified letter regarding information acquired from the Justice Department Inspector General report on the Clinton investigation. The department ought to answer for what the attorney inspector general has found, but I haven't heard to heat people, not a peep, on that yet. On December 10, the Justice Department, well, I'm repeating here, so the question is do you understand that if you are confirmed, you have an obligation to ensure the Justice Department and, particularly, the FBI as a problem, respond to congressional inquiry, and to do it in a timely manner?

BARR:
Absolutely, senator.

GRASSLEY:
Do you understand that this obligation applies regardless of whether you're a member of Congress or a committee chairman?

BARR:
Yes, senator. You know, you and Senator Leahy, I think, are the only members of the committee now who are were here 27 years ago when I was first confirmed. But I think you will recall that we were able to--we were able to establish very cooperative and productive relationships with all the members and try to respond to their questions and deal with their concerns and work with them on projects they are interested in and that will be the same approach that I will bring to the job if you confirm me.

GRASSLEY:
Okay. Then let me be specific on my last question on oversight. You remember when you are in my office, I gave you as I gave Attorney General Sessions, as I gave Holder a long list of

things that the department has not answered. And one of these was an October 17, 2018 letter. And--and I'd like to have your response to answering that letter and respond all outstanding and future oversight requests in a timely manner.

And then remember, I said all you cabinet people come up here to tell us yes when we ask you if you're going to answer our stuff. I said maybe you better say maybe. So if you want to save maybe now and be really honest, say maybe. Otherwise I hope you'll answer that October 17 letter once we get you voted into office.

BARR :
Yes, senator.

GRASSLEY:
Throughout your career, you've expressed concerns with congressional attempts to enact criminal justice reform and, at times, advocated for stricter mandatory minimum sentences. And '92, under your direction, the DOJ published a report entitled The Case For More Incarceration. This report declared that the problem with our criminal justice system was that we were incarcerating too few criminals.

More recently, in 2015, you signed a letter opposing the Sentencing Reform and Corrections Act of 2015. This letter states quite clearly your opposition to sentencing reform, particularly the lessening of mandatory minimum sentence as any sort of retroactivity. The First Step Act was signed by President Trump. As attorney general, it will be your job to implement the legislation even though you've opposed criminal justice reform in the past. Will you commit to fully implementing the First Step Act?

BARR :
Yes, Senator. But I--I--you know, in 1992 when I was attorney general, the violent crime rates were the highest in American history. The sentences were externally short, typically, in--in many states the time served for--for rape was three years, for murder, time served five to seven years. It was--the system had broken down and I think, through a series of

administrations, Reagan, Bush, and Clinton, the laws were changed and we targeted violent, chronic violent offenders, especially those using guns, and I think the reason the crime rate is much lower today is because of those policies.

So I don't think comparing the policies that were in effect in 1992 to the situation now is--is really fair. And I think, and I've said, that right now we have greater regularity in sentencing, there's broader recognition that chronic violent offenders should be incarcerated for significant periods of time to get them off the streets, and I think the time was right to take stock and make changes to our penal system based on current experience. So I have no problem with the approach of reforming the sentencing structure, and I will faithfully enforce that law.


GRASSLEY:
Don't take it personally if I raise my voice to you. I'm not mad at you.

(LAUGHTER)


GRAHAM:
If I were you, I'd answer his letters just as (INAUDIBLE)--

(LAUGHTER)

--a tip that may help you through your job, if you get it. I'll take the time away from my second round. I'm very curious about the conversations you had about personal representation being attorney general. You mentioned it to Senator Feinstein. Can you just kind of give us a summary of what you were talking about?


BARR:
Yeah, so in June of 2017, middle of June, Ambassador David Friedman, who is the U.S. ambassador to Israel, who I didn't know--I knew that he was a top-tier lawyer in New York and apparently a friend of the president's. He reached out to me, and we talked one evening, and he said that he--well, my understanding was he was--he was interested in finding

lawyers that could augment the defense team. And failing that, he wanted to identify Washington lawyers who had exper--you know, broad experience that--whose perspective might be useful to the president's. And he asked me a number of questions like, you know, what have you said about the president publicly, do you have any conflicts, and so forth. And I told him that I didn't think I could take this on, that I had just taken on a big corporate client that was very important to me and I expected a lot of work. And I said at my point in life I really didn't want to take on this burden and that I actually preferred the freedom to not have any representation of an individual but just say what I thought about anything without having to worry about that.

And I said that I--my wife and I were sort of looking forward to a bit of respite and I didn't want to stick my head into that meat grinder. He asked me if I would nonetheless meet, you know, just briefly go over the next day to meet with the president. And I said sure, I'll go and meet with the president, and he brought me over and was squeezing me in. It looked to me like it was before the morning staff meeting because people were grouping by the door to get in, and I went in. And he was there, the ambassador was there, sat through the meeting. It was a very brief meeting where essentially the president wanted to know--he said oh, you know Bob Mueller. How well do you know Bob Mueller? And I told him how well I knew Bob Mueller and our--and how, you know, the Barrs and Muellers were good friends and would be good friends when this is all over, and so forth. And he was interested in that, wanted to know, you know, what I thought about Mueller's integrity and so forth and so on. And I said Bob is a--is a straight shooter and should be dealt with as such. And he said something to the effect like, so are you envisioning some role here? And I said, you know, actually, Mr. President, right now is--I couldn't do it. You know, I just--my personal and my professional obligations are such that I'm unable to do it. So he asked me for my phone number. I gave it to him, and I never heard from him again until--

GRAHAM:
Well, I tried that once.

(LAUGHTER)

GRAHAM:

You did better than (INAUDIBLE).

BARR:

Well, I didn't hear--hear from him until, you know, later, but about something different, which was the attorney general position.

GRAHAM:

(OFF-MIC)

LEAHY:

Thank you. Mr. Barr, good to see you again w--As you mentioned Senator Grassley and I were here at your hearing a number of years ago. Let me go back even before that.

46 years ago I wasn't on the Senate. I was state's attorney in Vermont and I watched with a great deal of interest the Elliot Richardson hearings; he had been nominated to be attorney general amidst of Watergate. He made several commitments to the committee including appointing a special prosecutor and he promised to protect his independence. And I as one who had total independence as elected prosecutor in Vermont, I thought how important it was to have that same independence at the national level.

And Mr. Richardson said it was necessary to create the maximum possible degree of public confidence in the integrity of the process. I've never forgotten that.

I think the integrity of our institutions is just as much at risk today. President Trump has made it clear he views the Justice Department as an extension of his political power. He's called on it to target his opponents. He obsesses over the Russian investigation which looms over his presidency, may define it. He attacks the special counsel almost daily. He fired both the previous FBI director and attorney general for not handling the investigation as he pleased.

That tells me the rule of law can no longer be taken for granted. So if confirmed the president is going to expect you to do his bidding. I can almost guarantee you he will cross the line at some point. That's why the commitments you make here today just like those I watched Elliot Richardson make years ago matter greatly.

So will you commit if confirmed to both seeking and following the advice of the Department's career ethics officials on whether you must recuse from the special counsel's investigation?

BARR:

I--I will seek the advice of the career ethics personnel but under the regulations, I make the decision as the head of the agency as to my own recusal. So I--I certainly would consult with them and at the end of the day, I would make a decision in good faith based on the laws and the facts that are evident at that time.

LEAHY:

Same thing if you are talking about a conflict of interest?

BARR:

Well, no. Some conflicts as you know are--are mandatory.

LEAHY:

I'm thinking of what Attorney General Sessions when asked a similar question he said he will seek and follow the advice, seek and follow the advice of the Department of Justice's designated ethics officials. So let me ask you maybe in a different way.

I know you promise to not interfere with the special counsel. Are there any circumstances that would cause you to terminate the investigation or any component of it or significantly restrict its funding?

BARR:

Under the--under the regulations, Bob Mueller could only be terminated for good cause and I--frankly it's unimaginable to me that Bob would ever do anything that gave rise to good cause. But in theory if--if something happened that was good cause for me it would actually take more than that. It would have to be pretty grave and the public interest would essentially have to compel it because I believe right now the overarching public interest is to allow him to finish.

LEAHY:

I--I would agree with that but I also think over the past 18 months you have rather harshly prejudged the investigation in some of your writings.

BARR:

Well I--I, you know, I--I don't see that at all, senator. When you strip away a lot of the rhetoric the two things that have been thrown up as me sort of being antagonistic to the investigation are two things.

One, a very mild comment I made that gee, I wish the team had been more balanced. I wasn't criticizing Mueller. I believe that prosecutors and I think he would agree, they can handle the case professionally whatever their politics are. They--you know, a good prosecutor can leave their politics at the door and go in and do the job and I think that's what Justice Department prosecutors do in general.

LEAHY:

But you also are very critical--

BARR:

But--

LEAHY:

--of the Russian probe and I mean I can't think of anything that would--in your memo for example that would jump about more for this president because of his commitment to it. I ask that because some have said on both sides of the aisle that it looked like a job applica-- application and so that's what I want you to refer to.

BARR:

Well, you know that's ludicrous. If I wanted the job and was going after the job there are many more direct ways of me bringing myself to the president's attention than writing an 18-page legal memorandum--

LEAHY:

Or--or criticize--

BARR:

--sending it to the Department of Justice and routing it to other--

LEAHY:

But also publicly criticizing the Russian probe.

BARR:

How have I criticized the Russian po--probe?

LEAHY:

You don't have any criticism of the Russian probe?

BARR:

Not at all. I think I--I believe the Russians interfered or attempted to interfere with the election and I think we have to get to the bottom of it.

LEAHY:

So you would be in favor of releasing the investigative report when it's completed?

BARR:

As I've said I'm in favor of as much transparency as there can be consistent with the rules and the law.

LEAHY:

Do you see a case where the president could claim executive privilege and say that parts of the report could not be released?

BARR:

Well, I don't have a clue as to what would be in the report. The report could end up being you know, not very big. I don't know what's going to be in the report. In theory if--if there was executive privilege material to which an executive privilege claim could be made it might ca--you know someone might raise a claim of executive privilege.

LEAHY:

That would be pretty difficult following U.S. versus Nixon when the Supreme Court unanimously rejected President Nixon's claims of executive privilege over the Watergate tapes. But I--I ask because the presidents attorney, Mr. Giuliani, said the president should be able to correct the Mueller report before any public release.

So, in other words, he could take his investigative report, put his own spin on it and correct it before it's released. Do you commit that would not happen if you are attorney general?

BARR:

That will not happen.

LEAHY:

Thank you. You had--when you're AG, I remember this well because I was here in the Senate at the time you encouraged President George H. W. Bush to pardon all six individuals who were targeted Iran-Contra. The independent prosecutor investigating the matter labeled that a cover-up.

Now you and I talked about this in my office and I appreciate you coming by. I found the conversation the two of us had to be well worthwhile. Do you believe a president could lawfully issue a pardon in exchange for the recipient's promise to not incriminate him?

BARR:

No, that would be a crime.

LEAHY:

Thank you. In 1990 you argue that Congress appropriation power is not an independent source of congressional power to control the allocation of government resources. Only three committees in the Senate have a vice chairman, appropriations one of them. Obviously, as vice chairman I kind of looked at that.

You claim if a president finds no appropriated funds within a given category, he may use funds from another category as long as both categories are in his constitutional purview. Now this is vice chairman of Appropriations Committee don't be surprised I disagree.

Congress has power of the purse Article 1 Section 9. I believe Constitution is one of the fundamental and foundational checks and balances on the Executive Branch. So do you believe the president can ignore Congress appropriations allocations, conditions and restrictions in law, just ignore them and take the money and--

BARR:

Not--not as a general proposition. But I do--that--that was a--

LEAHY:

A general prop--

BARR:

I actually thought that was a good law review article. I gave it as a speech and it was really a thought piece and what I was really saying was and I say right up front that the more I thought about the appropriations power, the more confused I got and I was just laying out a--a potential template which is this. People frequently say you know the power to spend money on this division or this missile system is part of the power of the purse and what I was actually saying was you know actually what right--what the power being exercise there is the substantive power that the Congress has to raise armies and--and it's not--it doesn't come from the power of--

LEAHY:

It also has specific appropriations on agriculture or on (INAUDIBLE). I mean, for example, could a president just build a wall along our southern border because he wanted to and just take the money whether appropriated or not? What about eminent domain?

BARR:

What about eminent domain?

LEAHY:

Well, if you're going to build a wall you've got to take a whole lot of land away from landowners--

BARR:

No.

LEAHY:

--in Texas and elsewhere.

BARR:

Well, you know, you'd have to show me what statute is being invoked and also what appropriations is being used. I--I can't answer that in the abstract.

LEAHY:

So you're saying the president though can have the power to go into money even if the Congress has appropriated it for a different purpose?

BARR:

No, I--I didn't say that. But some appro--

LEAHY:

Do you mean that?

BARR:

No, I don't mean that. I'm saying that you know there are monies that the president may have power to shift because of statutory authority.

LEAHY:

But that would have been because Congress gave him that authority.

BARR:

Right.

LEAHY:

Not because he has it automatically.

BARR:

I'm-- I'm not taking that position because I said my--my law review, it was published as a law review article and it was a thought piece exploring what limits there might be to the appropriations power and what--where--where Congress's power comes from in certain areas.

LEAHY:

Thank you. Thank you, Mr. Chairman.

GRAHAM:

Just a follow up on that, real quick, and I won't take this against Senator Cornyn. Did the Article 2 powers, the inherent authority of the commander-in-chief, give him the ability to take appropriated dollars from the Department of Defense and build a wall?

BARR:

I can't an--without looking at the statute, I really couldn't answer that.

GRAHAM:

I'm not talking about a statute. I'm talking about the inherent authority of the president as commander-in-chief.

BARR:

That's the kind of question I would go OLC to answer.

GRAHAM:

Okay. Get back with us on that. Senator Cornyn.

CORNYN:

Well, Mr. Chairman, let me congratulate you on your election as chairman of the Judiciary Committee and tell you we look forward to working with you and supporting this committee's efforts. Thank you for convening today's hearing. And I want to express my profound and sincere thanks to the nominee, Mr. Barr, for agreeing to serve a second time as attorney general. I noted in your statement you said it was 27 years ago that you sat in this chair and went through your first confirmation hearing. And to me, that says a lot about your character and your commitment to the rule of law that you would be willing to go through this process again and serve, once again, as the chief law enforcement officer of the--of the country. Thank you for doing that.

BARR:

Thank you, senator.

CORNYN:

Thank you to--thank you to your family, as well. To me, the attorney general is one of the most challenging cabinet offices to hold because, as you point out in your opening statement, you are committed to the rule of law and enforcing the laws of the land, but you are also a political appointee of a president. If you are serving another cabinet position, certainly you're committed to implementing the president's agenda or the agenda of an administration, but as attorney general that is not an unequivocal commitment because there may be some things that the administration wants you to do that you cannot do consistent with the rule of law, correct?

BARR:

That's right, senator. One of the reasons I ultimately decided that I would accept this position, if it was offered to me, was because I was--I feel that I'm in a position to be independent. You know, over the years a lot of people have--some politicians have called me up saying, you know, I'm thinking of going for the attorney general position in this

administration and so forth, and I say you're crazy because if you view yourself as having a political future down the road, don't take the job because if you take this job, you have to be ready, you know, for--to make decisions and spend all your political capital and have no future because you have to do--you have to have that freedom of action. And--and I feel I'm in a position in life where I can do the right thing and not really care about the consequences in the sense that I don't--I can truly be independent.

CORNYN:

Mr. Barr, thinking back about the run up to the 2016 election where the nominee of both political parties for president of the United States ended up being investigated by the FBI, can you think of any precedent in American history where that's occurred that you know of?

BARR:

No, I can't, senator.

CORNYN:

And thinking back to James Comey's press conference of July 7, 2016, where he took the step of talking about the evidence against Mrs. Clinton, talking about the legal standard that would apply as to whether she might or might not be indicted for committing a crime under the Espionage Act, have you ever seen a situation where an FBI director would usurp the authority of the Department of Justice to make that charging decision, and hold a press conference, and talk about all of the derogatory information that the investigation had gleaned against a potential defendant, and then say now we're--we're not going to--no reasonable prosecutor would indict her? Have you ever seen anything like that happen before?

BARR:

No, I've never seen that, and I thought it was a little bit--more than a little bit--it was weird at the time, but my initial reaction to it was I think Attorney General Lynch had said something--you know, she was under pressure to recuse herself, I think because of the so-

called tarmac meeting, and I think she said something like she was going to defer to the FBI.
So my initial reaction to that whole thing was, well, she must have agreed, or it must have
been the plan that he was going to make the decision and go out and announce his decision,
but--

CORNYN:

Under the normal rules, if the attorney general has a conflict of interest--

BARR:

It would go to the deputy.

CORNYN:

It would go to the deputy.

BARR:

Correct.

CORNYN:

Not to the FBI director to make that decision, correct?

BARR:

Right. So that's why I thought it was very strange, but I think later it became clearer, to the
extent there is anything clear about it, that I don't think Attorney General Lynch had
essentially delegated that authority to the director. And I think Jim Comey is a, as I've said,
is an extremely gifted man who has served the country with distinction in many roles. But I
thought that to the extent he actually announced a decision was wrong. And the other thing
is, if you're not going to indict someone, then you don't stand up there and unload negative
information about the person. That's not the way the Department of Justice does business.

CORNYN:

I was shocked when Mr. Comey later wrote a letter saying that based on the discovery of Clinton emails on the Weiner laptop that they were reopening the investigation that he get already announced closed. And then finally, just days before the general election, November 6, 2016, said we didn't find anything in the--on the laptop that would change my conclusions based on the press conference of July 6. Did you likewise find that to be an extraordinary--I would use the word bizarre--but certainly unprecedented event?

BARR:

Yeah, the whole sequence, though, was very herky-jerky and bizarre. But at that time I was a little over contrarian in that I basically took the position that once he did what he did in July and said the thing was over and then found out it wasn't over, he, you know, he had no choice but to correct the record. So I said that he had no choice but to do what he did. But it sort of shows you what happens when you start disregarding the normal procedures and established practice, is that you sort of dig yourself a deeper and deeper hole.

CORNYN:

Why is it that the Department of Justice rules, which also apply to the FBI, make it clear that our chief law enforcement agencies in this country should not get tangled up in election politics? Are there policies in place that try to insulate the investigations and the decisions of the Department of Justice and FBI from getting involved in elections?

BARR:

Yes, senator, there are.

CORNYN:

And why--why is that?

BARR:

Well, obviously because the incumbent party has their hands on the le--among other reasons, they have their hands on the levers of the law enforcement apparatus of the country, and you don't want it used against the opposing political party.

CORNYN:

And that's what happened when the counterintelligence investigation of the Trump campaign began in late July and continued on through--well, presumably to Director Comey's firing and beyond.

BARR:

Well, I'm not in a position to, you know, make a judgment about it because I don't know what the predicate was for it. I--I--I think I said, you know, it's strange to have a counterintelligence investigation of a president, but I'm not-- you know, I just don't know what the predicate is, and if I'm confirmed, I assume I'll find out.

CORNYN:

Rod Rosenstein's memo recommending the termination of James Comey as FBI director was dated May 9, 2017. It's entitled, "Restoring Public Confidence in the FBI." I take it you've read the memo, and do you agree with its conclusion?

BARR:

I completely agree with Rod Rosenstein. And I thought the important point he made, from my standpoint, was not the particular usurpation that occurred, but it was, as I think he says, that Director Comey just didn't recognize that that was a mistake. And--and so it was going to potentially be a continuing problem that his appreciation of his role, vis-a-vis the attorney general.

CORNYN:

As I said, the title of the memo is, "Restoring Public Confidence in the FBI." Do you agree that restoration of public confidence in the FBI and Department of Justice as a political or nonpolitical law enforcement organization is important--

BARR:
It's critical.

CORNYN:
--and needed?

BARR:
It's critical, and that's one of the reasons I'm sitting here. I'd like to help with that process.

CORNYN:
Well, Mr. Barr, I think you're uniquely qualified to do that, and I wish you Godspeed.

BARR:
Thank you, senator.

CORNYN:
It couldn't be more important. Thank you.

BARR:
Thank you.

DURBIN:
Mr. Barr, we've never had a chance to meet, but I welcome you to this committee.

BARR:

Thank you.

DURBIN:

You seem like a rational person. I'd like to ask you a question. When you consider what Jeff Sessions went through as the attorney general for President Donald Trump, where he was subjected to unrelenting criticism, primarily because, as a matter of conscience, he decided he had a conflict of interest and should remove himself from any decisions by the special counsel concerning the Russia investigation, when you consider that this president has lashed out on a personal basis against federal judges who ruled against his administration, when you consider the criticism which he has leveled at the chief law enforcement investigative agency of the Department of Justice, the FBI, as well as our intelligence agencies, when you see the exit lanes glutted of those leaving the White House at every single level, why do you want this job?

BARR:

Well, because I love the department, I love--and--and all its components, including the FBI. I think they are critical institutions that are essential to preserving the rule of law, which is the--the heartbeat of this country. And I'd like to think that--that there was bipartisan consensus when I was last in this position that I acted with--with independence and professionalism and integrity and I had very strong and productive relationships across the aisle, which--which were important, I think, to trying to get some things done. And I feel that I'm in a position in life where I can provide the leadership necessary to protect the independence and the reputation of the department and serve in this administration.

DURBIN:

A number of my colleagues on both sides have asked, and I bet you will hear more, questions along the line of what would be your breaking point, when would you pick up and leave? When is your Jim Mattis moment when the president has asked you to do something that you think is inconsistent with your oath? Doesn't that give you some pause as you embark on this journey?

BARR:

It might give me pause if I was 45 or 50 years old, but it doesn't be pause right now because I--I had--I had very good life, I have a very good life, I love it, but I also want to help in this circumstance and I am not going to do anything that I think is wrong and I will not be bullied into doing anything I think is wrong by anybody, whether it be editorial boards or Congress or the president. I'm going to do what I think is right.

DURBIN:

You have a very nice family behind you.

BARR:

Thank you.

DURBIN:

I'm glad you introduced them.

BARR:

Thank you, senator.

DURBIN:

And I don't want to give your grandson any career advice. He's received quite a bit this morning already, but he ought to consider, at least for some balance, being a public defender.

(LAUGHTER)

One of the things that you alluded to as a major issue of concern is immigration. I'm glad you said it. Our government is set shut down now over the issues of border security and immigration, and the attorney general plays a central role, which many people don't know as they look at the Department of Homeland Security for most of the action on the issue of

immigration. I was surprised at the exit interview by General Kelly when he said, and I'm paraphrasing, that Attorney General Sessions was responsible for the zero-tolerance policy that was announced in mid-2018 and that it was because of that policy, that was one of the reasons why he was being asked to leave. That's the first I'd ever heard. Are you familiar with the zero-tolerance policy?

BARR:
Generally, senator, yes.

DURBIN:
I can tell you that he was an effort to take escorted children, infants, toddlers, and children, and forcibly remove them from their parents at the border. This policy by our government separated up to 2,800 of those children and put them into the system, the same system as unaccompanied children. The results were horrible. I saw them firsthand. And you have alluded in your opening statement to stopping people from crashing through the border, breaking and flouting the laws. Those young children, for the most part, were being brought to this country by their parents to seek asylum. You can present yourself at America's border and seek asylum legally, can you not?

BARR:
Yes, senator. You can.

DURBIN:
So separating those children from their parents in an effort, as Attorney General Sessions explained, to get tough with families presenting themselves at the border, was a policy decision on his part. Do you agree with that policy decision?

BARR:

Well, I'm not sure I know all the details because one of the disadvantages I have is I'm not in the department and--and--and don't really have the same backing I did in terms of information that I had last time. But my understanding is that DHS makes the decision as to who they're going to apprehend and hold. Now, you can claim asylum, but that doesn't mean you can waltz into the country freely.

DURBIN:
No, of course not.

BARR:
Okay. And you have to be processed. And my understanding is a majority of people do not qualify for asylum. But DHS makes the decision who to hold and--and charge with a crime of illegal entry and then they refer it to the Department of Justice. And I believe the department's policy when they say--when the department says a zero tolerance, they're saying whatever DHS refers to us in the way of illegal entry prosecutions, we'll prosecute. Now--now what is being done, because I think the administration is has change the policy, is DHS is not referring for prosecution family units that would lead to the separation of children from the family unit.

DURBIN:
It is true that the president and the administration abandoned the policy after there was a public reaction to the separation of these children. I'm concerned, I want to go back to your University of Virginia Miller Center speech, which is--

BARR:
It's a gem, isn't it?

(LAUGHTER)

DURBIN:

It's a classic. And it goes back many years, but you described your previous tenure as the attorney general and you said, "After being appointed, I quickly developed some initiatives on the immigration issue that would create more border patrols, change immigration rules, streamline processing. It would furthermore put the Bush campaign ahead of the Democrats on the immigration issue, which I saw as extremely important in 1992. I felt that a strong policy on immigration was necessary for the president to carry California, a key state and the election." That's a pretty revealing statement about a political agenda.

BARR:

Yeah, and there's nothing wrong with that because as--as I've said, you know, the attorney--and--and I've spoken on this a number of times, there's sort of three roles the attorney general plays. One is the enforcer of the law, and that, the role of the attorney general, is to keep the enforcement process sacrosanct from political influence.

The second one is as legal advisor. And that is in the Judiciary Act of 1789, legal advisor to the president and the cabinet. And there I say the attorney general's role is to provide, you know, unvarnished, straight from the shoulder legal advice as to what the attorney general believes is the right answer under the law. And then the third role is the policy role, which is law enforcement policy, which includes immigration policy, and there you are a political subordinate of the president. And it's okay to--to propose policies that are politically advantageous.

DURBIN:
Well--

BARR:

--But I have to say that, you know, that was casual conversation. The point was I was pursuing a strong immigration policy even when I was deputy long before, you know, the election was on the horizon. And in traveling around the country, visiting the border, paying

a lot of visits to California, I saw how important the issue was and I thought the administration had to be more responsive to it. And yes, there was a political benefit to it.

DURBIN:

I just have a short time left. The chairman, our new chairman, congratulations, Graham, noted 10 years of work by a number of us on this committee on a bipartisan basis to deal with criminal sentencing and prison reform, and the First Step Act signed by the president around Christmas, I think, is a significant departure. I learned, as many have, that the approach, the get tough approach that we imposed with 100 to 1 sentencing disparity between crack and powder didn't work, did not work.

The number of drugs being sold on the street increased. The price of the drugs went down. The people being incarcerated went up dramatically and we learned the hard way that was not the way to deal with the issue, and now we're trying to clean up 10 years later or more, 25 years later from the 100 to 1 disparity.

I voted the one the wrong way on 100 to 1. Now I know, in retrospect. You've made some hardline statements about this issue in criminal sentencing in the past and many of us believe, on a bipartisan basis, we've got to look at this anew and not repeat these mistakes again. So I would like to hear your assurance that you are--you have learned as I have that there's a better way, could be a more effective way, and that, as attorney general, you will help us implement the First Step Act and design the second step.

BARR:

Absolutely, senator. From my perspective, the very draconian penalties on crack were put into place initially because when the crack epidemic first hit it was like nuclear weapons going off in the inner city. And--and as I think you'll recall, a lot of the community leaders at that time were saying you've got to, you know, this is killing us. You have to do something.

So the initial reaction of draconian penalties was actually, you know, trying to--trying to help those communities. And over time and now, the same leaders are saying to us this has

been devastating. You know, generation after generation of--of our people are being incarcerated--have been incarcerated and lost their lives because of this and--and--and you have to change the policy. And--and--and I think that that is--we should listen to the same people we were listening to before.

I--I supported generally strong penalties on drugs because, not just crack, because I felt the money involved was so high that, you know, you needed something to counteract that. I also said repeatedly over the years of the drug war that I felt that the head of the snake is outside the country and the place to fight this aggressively is at the source more than on the street corner. And I used to say we could, you know, stack of generation after generation of people in prison and it'll still keep on coming.

And so I always felt that--and--and I support a adjustment to these sentences and the safety valve and so forth. To me, the corollary is we have to really start thinking and using all our national forms of power in--in the sense of our diplomacy and our--and our, you know, economic leverage and so forth to get better results overseas. So for example, now, fentanyl is sort of the new crack, fentanyl and fentanyl analogues are sort of the new crack and they're coming in from China. So--

DURBIN:
--Across the Mexican border.

BARR:
Correct.

DURBIN:
At ports of entry, 90 percent.

BARR:
Mm-hmm. So that's a long-winded answer to your question, which is I understand that things have changed since 1992. I--I, you know, I held on a little bit longer to keeping strong

sentences, maybe, than others. Part of that was I wasn't involved in the business anymore. I wasn't at Justice Department looking at up reports and studies learning about different things in the country. I was, you know, arguing with the FCC about telecommunications rules. So--

GRAHAM:
--Mr. Barr?

BARR:
Yes?

GRAHAM:
That was a great answer and it was long-winded.

BARR:
Okay.

(LAUGHTER)

GRAHAM:
Senator Lee.

LEE:
Mr. Barr--

GRAHAM:
--After this, we'll break till 12:15 for lunch and kind of a break.

LEE:

Mr. Barr, thank you very much for your willingness to spend time with us today and your willingness to be considered for this important position yet again.

BARR:

Thank you.

LEE:

Great to have your family here. And I can't help but comment. A lot of people have talked about Liam today, probably more than any of his other friends or classmates, people of his age cohort. People are thinking about what he might do for a living.

(LAUGHTER)

Unlike some of my colleagues who have suggested medicine, I want to just sort of suggest what I've suggested to my three children, which is that I'm not going to push them into any career choice, which in our family means that you can be any kind of lawyer you want.

(LAUGHTER)

Just keep that in mind with Liam. I'd like to talk to you first about civil asset forfeiture. As you know, civil forfeiture and criminal forfeiture are two very different things, two very different species of government taking someone's asset. With criminal forfeiture, of course, the government's ability to take something away is predicated upon a conviction of a crime. With civil asset forfeiture that happens even in the absence of a conviction. There are some serious questions, of course, regarding the legality and the constitutionality of civil asset forfeiture, and Justice Thomas, for example, has questioned whether some of these practices are constitutional. I was encouraged to note that in your testimony in 1991 you identified this as an issue when you testified before this committee. You criticized what you described as the speed trap mentality of forfeiture. Your point was that, quote, agencies should not feel that just because they seize money they are going to get the money, close quote.

Now since 1991, I've seen our government, our law enforcement agencies, actually move more toward this sort of speed trap mentality rather than away from it, as many of us would have preferred. Too often, law enforcement agencies have too strong an incentive to use civil asset forfeiture in a way that lines their own coffers outside of the relevant appropriations process. So let me just ask you the question, do you--do you think that the speed trap mentality is a problem? And if so, is that something that you'll work to address within the Department of Justice if you're confirmed?

BARR:

Yes, I think constant vigilance is necessary because, you know, there are incentives there that should be of concern in--in--in administering the law. And I understand that there are some horr--you know, people who are concerned about it, have some horror stories. The people at the Justice Department have been trying to clamp down. I think Attorney General Sessions put out some guidelines that were supposed to address that. I haven't gotten into it myself. I plan to get into it and see exactly, you know, what the horror stories are, where the problems and potential abuses are, and also how--whether Attorney General Sessions' guidelines are providing sufficient protection.

At the same time, you know, I think it is a valuable tool in law enforcement, and the state and local law enforcement officer--are partners. It's very important to them. So I want to make sure we strike the right balance, and once I have a chance to review it, I'd be glad to come up and talk to you about that.

LEE:

Thank you. I appreciate that. I understand that it's a tool that many consider valuable, and-- but a tool that can be considered valuable for some of those same reasons. Something that's considered valuable to the government can, in many instances, jeopardize an individual right that is protected under the Constitution. We've got to be careful of that. You refer to the partnership that sometimes takes place between state and federal authorities. This is sometimes where we see it abused. In the case of a procedure known as equitable sharing,

where sometimes state law might prohibit the use of civil asset forfeiture under certain circumstances, and in those circumstances those state law enforcement agencies might work with federal law enforcement for the specific purpose of evading state law that would otherwise prohibit that. So I hope that's something you'll look into, as well.

BARR:
Yes.

LEE:
Let's talk about antitrust for a minute. Along with Senator Klobuchar I chair the Antitrust Subcommittee, and as I'm sure you're aware, there are a growing number of people who take the position, who embrace the viewpoint that we should use antitrust law to address a whole host of social and economic harms to, among other things, to ensure that company's respect the First Amendment, or to prevent large companies from becoming too big, or to shape labor markets, or to conform industries to a particular aesthetic, or achieve some other broadly-defined social interest. I'd like to know what your view on--is on this. Are you a believer in the sort of big is bad mentality, or do you gravitate more toward the idea that our antitrust laws are there to protect consumers and should focus on consumer welfare and prices that consumers face?

BARR:
Yes, I mean generally that's where I stand, which is the purpose of the antitrust laws, obviously, is to protect competition. And the competition--it is competition that ultimately redounds to consumer benefits. At the same time, I'm sort of interested in stepping back and reassessing, or learning more about how the antitrust division has been functioning and what their priorities are. I don't think big is necessarily bad, but I think a lot of people wonder how such huge behemoths that now exist in Silicon Valley have taken shape under the nose of the antitrust enforcers. And they're--you know, you can win that place in the market--in the marketplace without violating the antitrust laws. But I--I want to find out more about that dynamic.

LEE:

Right. Yeah, and in some circumstances a company that becomes too big ends up behaving in a way and exerting market dominance in a way that impairs consumer welfare anti-competitively. In other circumstances consolidation can bring about lower prices and increased competition. I assume you wouldn't disagree with either of those statements.

BARR:

No, senator.

LEE:

As you know, and as several of my colleagues have mentioned, President Trump signed into law the First Step Act about a month ago. This is legislation that I applaud and legislation that I have been working on in one way or another for eight years, and was pleased to team up with Senator Grassley, Senator Durbin, Senator Booker and others to work on that over the course of many years. As you know, the attorney general has an important role under the First Step Act in appointing members to something called the Independent Review Commission. That Independent Review Commission will make recommendations concerning which offenders might be eligible for earned credits under this legislation and which programs will be approved. When we drafted this legislation there were some members who were concerned that whoever was the attorney general at the time of this law's passage and implementation might be able to undermine the effectiveness of this law by appointing members who didn't agree with or believe in the objectives of the bill. So will you commit to me, Mr. Barr, that you will appoint people to that Independent Review Commission who are honest brokers to decide which offenders should be eligible and which programs should be eligible to participate?

BARR:

Yes, senator.

LEE:

Thank you. Are you familiar with the Ashcroft-Sessions policy, namely the policy requiring prosecutors to charge the most significant, readily approvable offense?

BARR:

Yes, senator.

LEE:

Tell me how that should best be balanced out with the discretion of a prosecutor, most frequently, of course, with the discretion of a local U.S. attorney's office?

BARR:

Well, I was going to say I think the best way of balancing it out is to have a supervisor who is able to approve departures from that policy based on the specific circumstances, and there are countless different, you know, permutations of facts that might justify a departure from it. So I think it's best handled by supervisory people. But I also think it has to be looked at centrally. I'm not saying that each case has to be approved centrally, but there has to be some monitoring of what's going on because, as you know, one of the things that led to the sentencing guidelines was, you know, just difference--big differences in the way the laws were being applied and enforced around the country. And I think we need to try to strive for as much uniformity as we can.

LEE:

But you intend to continue that policy?

BARR:

Yes.

LEE:

And--

BARR:

Unless someone tells me a good reason not to.

LEE:

If I'm understanding you correctly, you're saying that if you do follow it, you will defer to the judgment of the office in question in the case of determining when to not charge the most serious, readily approvable offense?

BARR:

No, I mean I won't defer to my subor--I mean, I'm not going to say yeah, I will defer to my subordinates. I mean usually you do defer to your subordinates, but there might be a case I disagree with, and I'll assert myself on it.

LEE:

Okay. I see my time has expired. Thank you, sir.

GRAHAM:

Thanks, Senator Lee. We'll take a recess to 12:15 and start with Senator Whitehouse when we come back.

GRAHAM:

The hearing will come to order and I recognize Senator Whitehouse. Thank you, Mr. BARR.

WHITEHOUSE:

Thank you, chairman. This is my first chance at a committee hearing to congratulate you on taking the gavel here. We worked well together when you were Chairman of the Crime and

Terrorism Subcommittee and I hope that that will continue here. Mr. Barr , welcome. Did you make it a condition of taking this job that Rod Rosenstein had to go?

BARR :

No.

WHITEHOUSE:

Just to be clear so we are not bandying words here, did you request or signal or otherwise communicate in any way that you wanted Rod Rosenstein to go?

BARR :

No. The president said that the decision on--on the deputy was mine. Any--anything I wanted to do on the deputy was mine.

WHITEHOUSE:

So we will find no William Barr fingerprints on Rosenstein's departure?

BARR :

No. I--Rod and I have been talking, you know, about his plans. He told me that he viewed it as a two-year stent and would like to use, if I'm confirmed, my coming in as an occasion to leave. But we talked about the need for a transition and I asked him if he would stay for a while and he said he would. And--and--and so as of right now, I would say there's no--he has no concrete plans, I have no concrete plans in terms of his departure. We're going to sort of play--

WHITEHOUSE:

--And you were not going to--

BARR :

--It by ear and make see what makes sense.

WHITEHOUSE:

And you have not undertaken to run him out in any way?

BARR:

Absolutely not.

WHITEHOUSE:

That leaves an opening at the DAG position whenever you work this out. Can you tell us, since attorneys general are very often defined by the immediate appointments around them at chief of staff, DAG, criminal chief, what are the characteristics and qualifications that you will seek as you fill, particularly that position, but all three that I mentioned?

BARR:

I'm sorry, the deputy and what was the other one?

WHITEHOUSE:

Deputy chief of staff and criminal chief.

BARR:

There is already a criminal chief.

WHITEHOUSE:

I know, yeah. There's always already a deputy attorney general, but he's leaving.

BARR:

Well, for a deputy, I'd like someone who's a really good manager and who has had good management experience running government programs and I want a first-rate lawyer and

someone I--whose judgment I feel comfortable in.

WHITEHOUSE:

Experience in the department?

BARR:

Not necessarily, but--but--but experience in government at--at a high level.

WHITEHOUSE:

When we met, I gave you a letter that you've seen just so none of these questions would be a surprise, so I hope it is no surprise to you that I'm going through some of them. If you're confirmed, what will be the department's rule regarding communications between White House and Department of Justice officials regarding criminal and investigative matters? Who at DOJ will be allowed to have those conversations with the White House and who at the White House will you entertain those conversations from a DOJ?

BARR:

So I, you know, I've looked through the existing regime and by instinct is to keep it, maybe even tighten it up a little bit more. I--I remember when George W. Bush's administration was coming and my advice was start tight and then, as you realize who has judgment and so forth, you--you can go back to a--

WHITEHOUSE:

--They went the other way and it was a bad day for Attorney General Gonzales in the hearing room when that was brought to his attention. What is your understanding right now of who at the Department of Justice is authorized to have communications with the White House regarding investigations?

BARR:

Well, it depends--it depends what it is, but on--on criminal matters, I would just have the AG and the deputy.

WHITEHOUSE:

And what you think the rule is now in the department?

BARR:

I think that's what it is.

WHITEHOUSE:

Okay. So if the reports are true that, as chief of staff, Mr. Whitaker was involved in conversations with the White House about bringing criminal investigations against the president's political enemies, that would not be consistent with your understanding of that policy?

BARR:

Well, it would depend upon, you know, what--what his understanding is with the attorney general, I mean the--

WHITEHOUSE:

--Well the attorney general was recused, so it's hard to step into the shoes of a recused attorney general on that matter, right?

BARR:

Well, I don't know what the communications were related to. I'm not really sure what you're talking about.

WHITEHOUSE:

Okay, well I hope you'll become sure when you get there because there is a fair amount of, I think, questionable behavior that have gone on that does not reflect well on the department that I hope will get your attention. I also asked you about the special counsel investigation and to give us a clear exposition of how that memo came to be, who you talk to, when, who was involved in it, there were number of questions in that letter that at this point you have not answered.

You have, I gathered, told the chairman the names of some dozen or so people whom you contacted. As I understand it, once the memo was written, but it's not clear, do you have any objection to answering the questions that I wrote as questions for the record so that the committee can understand who you worked with, who you talked with about this idea, who you work with in preparing the memo, who helped you with things like citations, the people at your level don't often do yourselves, and where it was circulated and vetted and what edits were made and so forth?

BARR:

No, I have no objection to that.

WHITEHOUSE:

Great.

BARR:

But I--

WHITEHOUSE:

--We'll let that keep--

BARR:

--Just to--just to be clear, no one else may write the memo and I know how to do legal citation, which I do.

WHITEHOUSE:

Yeah, well a lot of people know how but that doesn't mean they always do it.


BARR:

I do it. I did.


WHITEHOUSE:

Okay.


BARR:

Okay.


WHITEHOUSE:

You might want to get out of that habit.

(LAUGHTER)

You may have other things to look at.


BARR:

I'd like to have some fun in life.


WHITEHOUSE:

In--if you think citations are fun, you're going to--

(LAUGHTER)

You're not going to have the problem some other nominees have had. My letter to you also asked about the Bork order that set out a series of protections for the then independent counsel operation. Do you have any objection to any of those rules or principles applying and should see those rules and principles, which I gave to you then, as being more or less

adopted into the statement that you made earlier about your protection of the Mueller investigation from political interference?

BARR:

You know, I looked at them. I--I think the current regime is--is what I'm happy with. In other words, I wouldn't--I wouldn't change the current rule that we are--those rules were put in place at the end of the Clinton administration and--and sort of, I think, reflects the back on back experience of the Reagan-Bush years and in the Clinton years and then sort of Justice Department's thinking under the Clinton administration as to how to balance all the equities. And I think it's working well. So that's--that's--

WHITEHOUSE:

--Well anything that you would disagree with in the so-called work rules, I'd ask you to explain that in a--in a QFR.

BARR:

In a follow-up?

WHITEHOUSE:

In a follow-up.

BARR:

Okay. Okay.

WHITEHOUSE:

Also in my letter to you, I expressed my concern that Mr. Whitaker was paid $1.2 million through what I consider to be a front group that has very little reality to it and that the funding that came to that front group to pay him the million dollars came through another entity that is essentially an identity laundering operation that has no independent business

operation. And result of all of this is that somebody out there arranged to get over $1 million to Mr. Whitaker and we have no idea who that somebody is. And as I mentioned to you in our conversation, I don't see how the department can do a proper recusal and conflict analysis for somebody when the player who delivered the million dollars is still hidden behind the curtain. Is that something that you will help us fix?

BARR:

Well first, you know, I--I don't think there was anything wrong done for at least--

WHITEHOUSE:

--Well, we don't know that yet because we don't know with the facts are.

BARR:

Yeah, well I'm just saying just the facts that you said, you know, doesn't necessarily mean there was anything wrong done. What you're saying is that if the ultimate financial backers are behind some entity and the current ethics laws require only the reporting of the entity, you're not really sure where the--the money is coming from. And that, you know I--I think that that raises a very interesting point that I think I would like to review with the ethics people and experts and even OGE to talk about that because I--the more I thought about it, the more I thought that the trick is going to be deciding what kind of entities and how far back you go because that can be said of a lot of different kinds of entities.

WHITEHOUSE:

Yeah.

BARR:

And--and--

WHITEHOUSE:

--I would submit to you that--

BARR:

--Sometimes you have first--

WHITEHOUSE:

--If the department's money laundering folks looked at this operation, they would see it as almost amateurish and simple and something quite easy to penetrate and it would be quite easy, simply, to ask Mr. Whitaker what he knew, to ask whoever is at fact if it even has any existence with Whitaker's departure what they knew, and to ask donor's trust to cough up the identity of the donor and then you can do your homework. And if they refused to do that, nothing guarantees anybody a job at the highest levels of government who's not willing to provide those disclosures.

BARR:

Well as I said, you know, one of my first considerations always is where do you--where do you draw the line, and also what are the implications for other kinds of entities because, you know, they're membership groups and first amendment interests and you don't want to disclose memberships and whose--

WHITEHOUSE:

--Yeah, and my point was I think if your money laundering folks took a look at that, they'd be able to help show that this is something that looks a little bit different than that. My time has expired. And I'll see you on the second round. Thank you.

GRASSLEY:

Senator Sasse.

GRAHAM:

I believe Senator Ernst is filling in for Senator Cruz next.


UNKNOWN:

Thank you, chairman.


UNKNOWN:

Okay with me.


ERNST:

Thank you. Mr. Barr, I want to commend you for stepping forward. Thank you very much. And I want to say thank you to your family, as well, for being so supportive in this endeavor. I'm really pleased to have all of you here. So thank you for doing that. Mr. Barr, later this month I do plan on reintroducing Sarah's Law, which is a bill that would require the detention of illegal aliens who have been charged with a crime that resulted in the death or serious injury, bodily injury, of another person. Now that sounds pretty common sense, but I'll give you a little background. This bill is named after Sarah Root. She was a resident of Council Bluffs, Iowa, and Sarah was killed by an illegal alien who was driving drunk. And that alien had a blood alcohol content of more than three times the legal limit, yet he was allowed to post bond and has not been seen since. It's important to me that Congress act to close these loopholes in our immigration system and do better to enforce the laws that are already

existing on the books. And I know that Attorney General Sessions, he had a real passion for this. And he had a strong record of trying to make sure that we're correcting wrongs in the system. How do you, as attorney general, plan on making sure that we are restoring the rule of law in our immigration system?


BARR:

Well, first that sounds like a very commonsensical bill--

ERNST:

Thank you.

BARR:

--and something that I would certainly be inclined to support. I think one of our major problems, as the president says, is that the immigration laws just have to be changed and to provide sensible and commonsense ways of processing immigration and claims of asylum. Right now--this goes--this goes all the way--this goes back 27 years. We were facing exactly the same kind of problem, maybe on a smaller scale. But Congress has to--where people are abusing the asylum system, coming in, they're being coached as to what to say, and then once they come in we don't have the facilities to keep them, and they're released into the population. And this was a big abuse, as I say, 27 years ago, and it's getting--and it's gotten worse. So we need to change the laws to stop that kind of abuse and enable us to run a lawful immigration system where we process people into the country who are entitled to come into the country, and we keep out those that are flouting our laws. And it's long overdue. And the president

is right that until--until we're able to do that, we're just not going to be able to get control over illegal immigration. And it creates a lot of unsafe conditions for many people.

ERNST:

Absolutely. And I appreciate your thoughts on that. This is a very important issue. I think all of us understand that immigration is so vital to our country, but it has to be done in the right manner. And for those that are causing bodily injury and death to those here in the United States, we want to make sure that they are brought to justice. And in this case, that illegal undocumented was not brought to justice. And I feel a lot of empathy for that family.

I'll move into another situation that's really important to Iowans. According to the U.S. Department of Health and Human Services, after drug dealing, human trafficking is tied with arms dealing as the second-largest criminal industry in the world. And it generates

about $32 billion each year. The Department of Justice has said that 83 percent of sex trafficking victims identified in the United States are U.S. citizens with the average age of a victim being between 12 and 14 years, 12 and 14 years. Since 2007 there have been over 300 cases of human trafficking in Iowa alone, and Iowa is a very rural state. 300 cases, that's very concerning to my constituents back home. What do you see as the main contributor to human trafficking here in the United States? And then how can the DOJ impact, and combat and prevent those heinous crimes?

BARR:

This is a--this is an area that, frankly, wasn't very much on the radar scope of the Department of Justice when I was last there. I know it's--and it's an abhorrent area of criminality, and I know the department and Attorney General Sessions have been focused on and have put in place various programs and entities within the department to focus on it and work with state and local law enforcement on it. I'm not sure what the major contributor to it is. It's an area that I'm going to have to study when I get into the department and see what are the factors contributing to it.

ERNST:

Okay. I appreciate that. And as I mentioned in my question, as well, drugs and drug trafficking, that is also a very, very big industry. And in fiscal year 2017, 65 percent of drug-related prison sentences in Iowa were related to methamphetamine. We talk a lot about the opioid crisis, but in Iowa it still is meth. In 2016 Iowa reported over 1500 founded child abuse reports relating to methamphetamine being found in the child's body. According to the DEA, most of the meth available in the United States is being produced in Mexico and smuggled across our southern border. How do you see the situation at our southern border contributing to the prevalence of controlled substance use here in the United States?

BARR:

Well, it's been pointed out earlier, it is the major avenue by which drugs come into the country. Heroin, fentanyl, all the serious drugs are coming across that border. And again, I

feel it is a critical part of border security that we need to have barriers on the border. We need a barrier system on the border to get control over the border. And I think obviously there are some places that more of the traffic comes over than others, but unless you have a system across the border, you're not going to be able to deal with it because you'll just displace it. If you build a barrier in one place, you'll just displace it to another. So we need a barrier system across the border to--part of that is illegal immigration, but a big part of it also is preventing the influx of drugs.

ERNST:

Absolutely. And you stated earlier that really the head of the snake lies outside of the United States. Is there a way that DOJ can be working with additional ideas, methodology with other departments that you might think would help?

BARR:

Yes, you know this is an area, again, because I'm out of the government I don't know how it's functioning, how the drug war is being coordinated, but I think justice can play a big role in pushing for partners like the State Department, Defense Department, the intelligence agencies and so forth, to--to help deal with this. It's not, to me, not just a law enforcement problem; it's a national security problem.

ERNST:

And you mentioned, as well, the situation on the border where we do need barriers in place to control the influx of, whether it's drugs, human trafficking, gun trafficking, so forth. Do you believe that sanctuary cities play a role in harboring some of those activities?

BARR:

Yes, I do. I think there are a number of sort of--you know, of factors that have a hydraulic affect in that they pull people into the United States, or induce them to make, you know, take the hazards of coming into the United States, coming up hundreds of miles through Mexico and so forth. And things like sanctuary cities where they feel that they'll be able to

come up and hide and be protected is one of those factors that I think is irresponsible because it attracts the illegal aliens coming in. And obviously, I think that the main problem with sanctuary cities is that they're not giving us information about criminals that they have in their custody. This is not chasing after, you know, families or anything like that. This is going after criminals who the state, local law enforcement have in custody, and not allowing us to take custody of them and get them out of the country. That's the problem with sanctuary cities.

ERNST:

Correct, which could be the situation with Edwin Mejia who killed Sarah Root. So we would love to see that young man brought to justice. Thank you very much for your time.

GRAHAM:

Thank you. Just follow up on that with Senator Klobuchar. Don't count this against her time.

GRAHAM:

So you are saying that you want access to people who have committed crimes or accused of committing crimes outside of a status violation? Is that what--

BARR:

That--that's right, senator.

GRAHAM:

Senator Klobuchar.

KLOBUCHAR:

Thank you. Thank you, Mr. Barr. I take it as a positive that your grandson has gotten out a pen, a pen and a pad of paper to take notes during my questions.

(LAUGHTER)

I also impressed by your daughters in that they all chose to go into public service but as you know employees at the Justice Department now are either furloughed or they are working without pay and I've talked to a number of them at home and it's an outrage. Very briefly what do you have to say to them?

BARR:
I--I would--I would like to see a deal reached whereby Congress recognizes that it's imperative to have border security and that part of that border security as a common-sense matter needs barriers.

KLOBUCHAR:
And you are aware that in the comprehensive Senate immigration bill that we passed there was literally billions of dollars for border security back in 2013?

BARR:
I'm generally aware of that.

KLOBUCHAR:
And that also we had an agreement earlier last year which would allow the dreamers to stay legally that also had money for border security?

BARR:
The point is we need money right now for border security--

KLOBUCHAR:
Yes, but we have--

BARR:

--including a--including a barriers and walls and slats and other things. Anything that makes sense in--in different areas of the border.

KLOBUCHAR:

Okay, in different areas. That's a good point. So President George H.W. Bush said back in 1980 that he didn't want to see six and eight-year-old kids being made to feel that they are living outside the law and you were his attorney general. He also said that immigration is not just a link to America's past but it's a bridge to America's future. Do you agree with those statements?

BARR:

Yes, I think--I think as I said I think legal immigration has--we have a great system potential. I think it needs reforming but legal immigration has been good for the United States. It's been great for the country.

KLOBUCHAR:

And that's why we were trying to work on that comprehensive reform. I want to just briefly turn to FBI leadership.

The president has made statements accusing the FBI of making politically-motivated decisions, many of us up here and in the Senate have confidence in Director Wray and the leadership at the FBI and believe they can do their jobs without politics getting in the way. Do you agree with that?

BARR:

I'm--I'm looking if I'm confirmed I'm looking forward to getting to know Chris Wray. From what I know I think very highly of him.

KLOBUCHAR:

Okay, thank you. In the memo from back in June the one comment that Senator Grassley made, he talked about how much the Mueller investigation was costing and actually did a little googling here and there was a CNBC report that it actually could bring in more money than it costs because of the wealthy people being prosecuted, that Manafort's assets could be well over $40 million. I don't know if that includes that ostrich jacket. But do you think that's possible based on your experience with white-collar crime?

BARR:

I--I don't know enough about it.

KLOBUCHAR:

Okay. The--in your memo you talked about the--the Comey decision and you talk about obstruction of justice and you already went over that which I appreciate. You wrote on page 1 that a president persuading a person to commit perjury would be obstruction. Is that right?

BARR:

That--y--yes.

KLOBUCHAR:

Okay.

BARR:

Any--any, well any person who persuades another yeah.

KLOBUCHAR:

You also said that a president or any person convincing a witness to change testimony would be obstruction. Is that right?

BARR:

Yes.

KLOBUCHAR:

Okay. And on page 2 you said that a president deliberately impairing the integrity or availability of evidence would be an instruction. Is that correct?

BARR:

Yes.

KLOBUCHAR:

Okay. And so what if a president told a witness not to cooperate with an investigation or hinted at a pardon?

BARR:

You know I--I'd have to know the specific--I'd have to know the specific facts.

KLOBUCHAR:

Okay, and you wrote on page 1 that if a president knowingly destroys or alters evidence that would be obstruction.

BARR:

Yes.

KLOBUCHAR:

Okay. So what if a president drafted a misleading statement to conceal the purpose of a meeting. Would that be obstruction?

BARR:

Again, you, I'd--I'd have to know, I'd have to know the specifics.

KLOBUCHAR:

All right. You would seek the advice of career ethic--ethics officials in the Department of Justice for any recusal and I appreciate that. And you said in--in the past that you commended Attorney General Sessions for following the advice of those ethics lawyers but you didn't commit today to following that advice. Is that right?

BARR:

No, I did--I didn't, I didn't commend him for following the advice as the agency had--he makes his--he is the one responsible for making the recusal decision. I don't know why he said--locked himself into following the advice that's an advocation of his own responsibility.

KLOBUCHAR:

So what did you think about what Acting Attorney General Whitaker did when he rejected the Justice Department ethics advice to recuse himself out of an abundance of caution?

BARR:

I--I haven't seen the advice he got and I don't know the specific facts but--but abundance of caus--caution suggests that it could have gone either way.

KLOBUCHAR:

You have committed to recuse yourself from matters involving the law firm where you currently work. Are you aware of any of your firm's clients who are in any way connected to the special counsel's investigation?

BARR:

I--I'm not--I'm not aware. You know I--I tell you the truth I am of counsel there and I have one client which I'm representing and I don't pay very much attention to what else is going on.

KLOBUCHAR:

Okay, you can also supplement (INAUDIBLE).


BARR:

Yeah, I--I'll supplement I'll supplement my answer.


KLOBUCHAR:

No problem. Will you commit to make public all of the report's conclusions, the Mueller report, even if some of the evidence supporting those conclusions can't be made public?


BARR:

You know that certainly is my goal and intent. It's hard for me to conceive of a conclusion that would you know run afoul of the regs as currently written but that's certainly my intent.


KLOBUCHAR:

Secure elections, you and I have a talk about that in my office. Do you think back-up paper ballots are a good idea? This is a bill that Senator Lankford and I have introduced and with the Senator Graham and Senator Harris?


BARR:

Yeah, I--I don't know what's a good idea, what's a bad idea right now because I haven't gotten into this area. But--


KLOBUCHAR:

I'll just tell you back up paper ballots is a good idea.


BARR:

Okay.

KLOBUCHAR:

And we can talk about it later as well--


BARR:

Yeah.


KLOBUCHAR:

--audits. Along the lines of voting state election officials in North Carolina as you know contacted the Justice Department about the integrity of their elections. The Justice Department may have failed to take action in a timely manner. What steps would you take to make sure these failures don't occur again?


BARR:

Not specifically with respect to North Carolina you're talking generally?


KLOBUCHAR:

Um-hmm.


BARR:

Yeah. Well, as I say I want to make one of my priorities the integrity of elections and so this is not an area I have been involved with deeply before and when I get to the department if I'm confirmed I'm going to start working with the people and fi--making sure that those kind of things don't--


KLOBUCHAR:

And part of this, of course, is also how voting rights and our concern about some of the changes in department policy and I hope you will seriously look at that because the last thing we should be doing is suppressing voting and that is what we have been seeing under this current administration.

My dad was a reporter so I grew up knowing the importance of a free press. We obviously have the tragic case of a journalist who worked right here at the Washington Post, Jamal Khashoggi, and it's a particular concern. So want to ask you something I asked Attorney General Sessions. If you are confirmed will the Justice Department jail reporters for doing their jobs?

BARR:
I think that you know I know there are guidelines in place and I--I can conceive of situations where you know as a--as a last resort and--and where a news organization has run through a red flag or something like that, knows that they are putting out stuff that will hurt the country there might be a sit--there could be a situation where--where someone would be held in contempt. But--

KLOBUCHAR:
Attorney General Sessions had said he was going to look at chan--potentially changing those rules at one point. So I'd like you to maybe respond in writing to this because that was very concerning.

And last, when you and I were in my office we talked about your work with Time Warner, with this major merger on appeal from the Justice Department and I just wanted you to commit today to what you committed to me in the office that you would recuse yourself from any matters regarding that appeal.

BARR:
Absolutely.

KLOBUCHAR:
Okay. And as you know you were on the board of Time Warner at the time and you signed a sworn affidavit questioning whether the Justice Department's decision to block the merger was politically motivated given and this is from the affidavit the president's prior public

animus towards the merger. Are you talking here about his view on CNN? What did you mean by prior public animus?

BARR:

I'm sorry. Could you--could you repeat that?

KLOBUCHAR:

Sure. You were on the Board of Time Warner and you signed a sworn affidavit questioning whether the Justice Department's decision to block the merger was politically motivated given the president's prior public animus toward the merger. And so what did you mean by that?

BARR:

I--I mean the affidavit speaks for itself in that at that meeting I was concerned that the antitrust division was not engaging with some of our arguments and I got concerned that they weren't taking the merits as seriously as I had hoped they would. But I have, you know I have no--I'm not sure why they acted the way they did.

KLOBUCHAR:

Okay. Very good. And I'll ask you more on antitrust policy-wise in the second round but and I appreciated the discussion we had on that. It's very important. Thank you very much.

BARR:

Yep.

GRAHAM:

Thank you. Senator Hawley did a good thing by allowing Senator Ernst to go because she-- no good deed goes unpunished around here but you do have a credit with the--with the Chairman so I appreciate that. Senator Cruz, you are next.

CRUZ:

Thank you, Mr. Chairman. And thank you, Senator Hawley, as well and welcome to the committee. Welcome to all the new members of the committee and congratulations, Mr. Chairman. We're looking forward to the Lindsey Graham chairmanship judiciary and I'm sure, if--

GRAHAM:

--They'll make a movie about it I'm sure.

CRUZ:

I am certain whatever else happens, it will not be boring. Welcome, Mr. Barr. Congratulations on your nomination yet again, and--and let me say thank you. You and I have visited before about this but--but the past two years have been a difficult time at the Department of Justice and--and you and I and many on this committee hold the Justice Department in very high esteem, indeed I would even say revere the department and its century long tradition of enforcing the law without regard to party and without regard to partisanship. And--and I commend you for your willingness to go back--go back and serve once again. I think that is a good step for the department and on a good step for strengthening the department.

You know, I would note 27 years ago when you did this previously, when you were last nominated to be attorney general, and I think you may have been about Liam's age at the time, it was a different time. Then Chairman of the Judiciary Committee, Joe Biden. said at the time that he found you to be "Honest" and that you, "Understand and are committed to the dual responsibility of the office of the attorney general." Chairman Biden also said that, "This commitment to the public interest above all else is a critical attribute in an attorney general, and I will vote to confirm Mr. Barr."

Senator Ted Kennedy likewise noted your dedication to public service. Senator Fritz Hollings said, "Mr. Barr has a distinguished academic background and impressive experience in private sector as well as in public service. Most important Bill Barr is a known quantity. He has done a truly outstanding job as deputy attorney general for the last year and a half, during which time he has worked with many of us in this body earning our respect for his professionalism and competence." And Senator Cole said that, "Your willingness to discuss the issues is a refreshing change in the confirmation process and it would be wise of future nominees to follow Mr. Barr 's example."

At that hearing you are confirmed by this committee unanimously, as you had been twice previously for senior appointments to the Department of Justice. Now, we all recognize that was a different time. I think, given the environment we are in now, few you expect this committee vote to be unanimous, but I would hope those voices from democrats who are respected by members of this committee will be heard today as well.

One of the questions you were asked, if I might paraphrase, was why on earth would you take this job. And your answer, if I recall correctly, concerned your commitment both to the--to the department, and the rule of law. Would you tell this committee in--in--in your judgment why the rule of law matters? Why--why is that important?

BARR :
Well, you know the--as--as our framers said in the Federalist Papers, "The art of--of setting up a government is to have a government that's strong enough to perform the functions that a government has to perform while, at the same time, not being so strong that it can oppress its own people. And the rule of law ensures that, precisely, that the government does not oppress its own people.

And when people are accused of wrongdoing, our system essentially gives them the benefit of the doubt and--and gives them rights to bring them up essentially to the same level as a government. And the process we go through is there to ensure that justice is not arbitrary, but it's done according to a set of rules and the basic protection that we have is that the rule

that applies to one applies to all. That, at the end of the day, is what keeps us all free. That is the protection of individual freedom."

And to me, the rule of law is exactly that, that we don't allow special rules to go into effect for a particular individual. A rule has to be universalized. Anything we do against A has to be universalized across everyone who's similarly situated. That's our basic protection. And to me, that's with the rule of law is.

CRUZ:

So I don't want to see a Republican Department of Justice or Democratic Department of Justice. I don't want to see a Republican FBI or a Democratic FBI. What we should see, what the American people have a right to see and a right to expect is a Department of Justice that is committed to and faithful to the Constitution and the laws regardless of political party, and--and a corollary to that is, a department that is willing to hold anyone who commits criminal conduct accountable, regardless of that individual's political party or whatever partisan interest there might be. Would--would you agree with that? Characterization?

BARR:

Yes, senator. Yes, senator.

CRUZ:

I would note as well during the previous administration there was concern by many, including me on this committee, that the previous administration, and in particular the IRS, had targeted individual citizens and citizen groups for exercising their First Amendment rights and--and had abused its power in doing so. The current Justice Department--I--I've been dissatisfied with their--the degree of scrutiny they have--they have given to that potential abuse of--of power, and I'm going to ask you going forward if you are confirmed, to examine that conduct and ensure that if--if laws were broken that individuals are held accountable.

Let me shift to a different topic. One of the most important safeguards of our liberties is the Bill of Rights. And the Attorney General has a unique responsibility defending the Constitution. Can you share for this committee in your view the importance of free speech, of the protections that the First Amendment provides to Americans to speak and even to speak on--on unpopular or politically disfavored topics?

BARR:

I--I think free speech is at the--at the core of our system because we believe in the democratic process and power shifting through the processes of voting by an--an informed electorate. And free speech is foundational to the ability to have a democratic process. The framers, I think, believed that the dialectic, the clashing of ideas in the public marketplace is the way to arrive at the truth. And that is one function.

Another function of free speech is that it's the substitute for other means of settling differences. In some ways it's a safety valve. People are allowed to speak their mind and persuade their neighbors of their position. And I think that--that performs a very important function in keeping the peace within a community. And if speeches speech is suppressed, it can lead to the building up of pressures within society that sometimes can be explosive.

CRUZ:

How about your views on--on religious liberty and--and would you share your thoughts on the importance of the religious liberty protections in the First Amendment in terms of protecting our--our diverse and pluralistic society?

BARR:

Yes. I--I, you know, to--I think--I think the framers believe that the--our system, they said that our system only works if the people are in a position to control themselves. Our--our government is an--is an experiment in how much freedom we can allow the people without tearing ourselves apart, and they believe fewer laws, more self-control and they believe that part of that self-control, and I know there are many people here who disagree in--in, not

here, but in our society, who disagree, but they believe part of that self-control ultimately came from religious values. And I think it's important underpinning of our system that we permit--I believe in the separation of church and state, but I--I am sometimes concerned that we not use governmental power to suppress the freedoms of traditional religious communities in our country.

CRUZ:
Final question. The Department of Justice is charged with defending the United States, but that doesn't mean that the Department of Justice always must argue for maximum federal power. There are important restraints on federal power, whether civil liberties protections in a criminal context, whether the takings clause, or whether the 10th Amendment in federalism. Can--can you briefly share your thoughts on--on the appropriate balance of respecting limitations on federal power?

BARR:
There--well, as you--as you say, the Constitution has many different forms of restraint on-- on federal power. Part of it is, in fact, the separation of powers within the federal government, part of it is the balance between the federal--the federalist system that we have and--and the central government and respecting the rights of the states and local communities, and part of it is the Bill of Rights that, on certain topics, constrains the rule role of the federal government. And those are all important checks on federal power.

And you know, I am concerned about our country becoming just a unitary state that we try to govern centrally 350 million people. I think a lot of our current tensions in society are because we are turning our back on the federalist model. There are certain things that have to be protected by the federal government. There's no ifs, ands, or buts about that. But the more we can decentralize decision making, the more we can allow people a real diversity in the country of approaches to things, I think we'll have less of an explosive situation.

CRUZ:

I very much agree. Thank you, Mr. Barr .

GRAHAM:

The freedom of speech has to be balanced by the freedom to question. Senator Coons.

COONS:

Congratulations, Chairman Graham. Look forward to working with you in this Congress. And thank you, Mr. Barr , and to you and your family for their service to our country through federal law enforcement and the Department of Justice. You just faced some questioning from Senator Cruz about your own confirmation hearing back in 1991, and I'd like to take us back to a previous confirmation hearing, which was at a more similar time to today than 1991, 1973. Senator Leahy asked you about the confirmation of Elliot Richardson, President Nixon's nominee to be attorney general. That confirmation took place in the context of a similarly divided period in American history where there was great concern over the, at that point, ongoing Watergate investigation. And Elliot Richardson reassured the country by making some important commitments during his confirmation hearing before this committee. Then Senator Strom Thurmond asked Richardson if he wanted a special prosecutor who would, and I quote, shield no one

and prosecute this case regardless of who was affected in any way, shape or form. Richardson responded, exactly. Do you want special counsel Mueller to shield no one and prosecute the case regardless of who is affected?

BARR :

I want--I want Special Counsel Mueller to discharge his responsibilities as a federal prosecutor, and exercise the judgment that he's expected to exercise under the rules and finish his job.

COONS:

Senator Kennedy followed up by asking Richardson if the special prosecutor would have the complete authority and responsibility for determining whom he prosecuted and at what location. Richardson said simply, yes. Would you give a similar answer?

BARR:

No, I would give the answer that's in the current regulations, which is that the special counsel has, you know, broad discretion, but the acting attorney general in this case, Rod Rosenstein, can ask him about major decisions. And if they disagree on a major decision, and if after giving great weight to the special counsel's position the acting attorney general felt that it was so unwarranted under established policies that it should not be followed, then that would be reported to this committee. I--you know, I've--I've--

COONS:

Please forgive me. I've only got--I've got seven minutes left.

BARR:

Okay.

COONS:

I have a number of other questions. Let me just make sure I understand you. senators asked Elliot Richardson what he would do if he disagreed with the special prosecutor. Richardson testified to the committee the special prosecutor's judgment would prevail. That's not what you're saying. You're saying--

BARR:

That's not---that's not--

COONS:

--if you have a difference of opinion with Special Counsel Mueller, you won't necessarily back his decision; you might overrule it.

BARR:

Under the regulations there is--there is the possibility of that, but this committee would not, you know, would be aware of it. You know, a lot of water has gone under the dam since--

COONS:
Yes.

BARR:

--since Elliot Richardson. And a lot of different administrations on both parties have experimented with special counsel arrangements.

COONS:
Well, let me (INAUDIBLE)--

BARR:

And the existing rules, I think, reflect the experience of both Republican and Democratic administrations and strike the right balance. They are put together in the Clinton administration after Ken Starr's investigation.

COONS:

That's right. So the current regulations on the books right now prevent the attorney general from firing without cause the special counsel. They require misconduct, dereliction of duty, incapacity, conflict. Will you follow that standard?

BARR:

Of course.

COONS:

What if the president asked you to rescind or change those special counsel regulations?

BARR:

I think those special counsel regulations should stay in place for the duration of this investigation, and we can do a postmortem then, but I--I have no reason to think they're not working.

COONS:

So most famously, when directed by President Nixon to fire the special counsel, the prosecutor investigating Watergate, Richardson refused and resigned instead, as we all well know. If the president directed you to change those regulations and then fire Mueller, or simply directly fired Mueller, would you follow Richardson's example and resign instead?

BARR:

Assuming there was no good cause?

COONS:

Assuming no good cause.

BARR:

Yeah, I would not carry out that instruction.

COONS:

Let me bring us forward to your 1991 hearing in front of this committee. You explained at the time how you would handle the BCCI case, and ironically Robert Mueller, the same individual, was at that point the head of the criminal division, and you testified that you had directed Mueller to spare no resources, use whatever resources are necessary and pursue the

investigation as aggressively as possible and follow the evidence anywhere and everywhere it leads. Would you give similar direction to Robert Mueller today?

BARR:

I don't think he needs that direction. I think that's what he's doing.

COONS:

You also said at that hearing that Robert Mueller and that investigation had full cooperation, full support and carte blanche. Could he expect a similar level of support from you as attorney general?

BARR:

Yeah, he will--as I said, I'm going to carry out those regulations, and I want him to finish this investigation.

COONS:

I think we all do. And I am encouraged by things you've said about this and just want to make sure we've had as clear a conversation as we can. Attorney General Richardson also testified the relationship between the president and the Justice Department should be arm's-length. You've said similar things about the importance of shielding the department from political influence. Can you make a similar commitment to us to maintain an arm's-length relationship between the Justice Department and the president regarding the special counsel investigation and other investigations?

BARR:

Well, remember I said there are like three different functions, generally, that the attorney general performs. I think on the enforcement side, especially where matters are of either personal or political interest to people at the White House, then there would be an arm's--

there has to be an arm's-length relationship. The White House counsel can play a constructive role in that as well. So--

COONS:

Let me ask, if the president asked for information that could well be used to interfere with the special counsel investigation, to misdirect or curtail it in some way, would you give it to him?

BARR:

No, I think--I mean, there are rules on what kind of information can flow and what kind of communications can go between the White House. And you know, I would follow those. But the basic principle is that the integrity of an investigation has to be protected. There are times where you can share information that wouldn't threaten the integrity of an investigation like, you know, for example, when I was attorney general and we were investigating something that related to president--someone who had a relationship with President Bush--I could just orient them that, you know, there's going to be a story tomorrow that, you know, says this. But in that particular case there was no chance that it would affect the investigation. So sometimes judgment calls are necessary.

COONS:

If you learned that the White House, not directly through you, but through other means, was attempting to interfere with the investigation, would you report that information to the special counsel and to Congress?

BARR:

Well, there are some conclusions in there about interfering, you know, and--and, you know, if I thought something improper was being done, then I would deal with it as attorney general.

COONS:

Last, in that confirmation hearing back in 1973, then Senator Birch Bayh of Indiana asked Richardson, suppose the prosecutor determines it's necessary to get the president's affidavit or to have his testimony personally. Would that be the kind of determination he, the special prosecutor, could make? Richardson said, yes. Will you give a similar answer today that you won't interfere with special counsel Mueller seeking testimony from the president?

BARR:

You know, I think, as I say, the regulations currently provide some avenue if there is some disagreement. I think that in order to overrule Mueller someone would have to de--the attorney general or the acting attorney general would have to determine, after giving Mueller's position great weight, that it was unwa--so unwarranted under established policies that it should not be done. So that's the standard I would apply. But I'm not going to surrender the res--the regulations give some responsibility to the attorney general to have this sort of general superv--not day-to-day supervision, but sort of be there in case something really transcends the established policies. I'm not surrendering that responsibility. I'm not pledging it away.

COONS:

What gives me pause and sort of led me to this line of questioning, Mr. Barr, was that June 2018 memo you sent to the deputy attorney general, in which at one point you state Mueller should not be permitted to demand the president submit to interrogation about alleged obstruction. If the special counsel wants to subpoena the president's testimony to ask questions about obstruction, and you're supervising the investigation, would you rely on that theory to block the subpoena?

BARR:

Well, the question for me would be what's the predicate, you know? And I don't know what the facts are. I don't know what the facts are. And if there was a factual basis for doing it,

and I couldn't say that it was--it violated established policies, then I wouldn't interfere. But I don't know what the facts are.

COONS:

Well, if I might just in closing, Mr. Chairman, we're in this unique situation where you've known Robert Mueller 30 years. You've said you respect and admire his professionalism, his conduct. He's been entrusted by you with significant, complex investigations in the past. There's no reason to imagine, since he is the person who would know the facts, that he wouldn't be acting in an inappropriate way. So it is my hope, even my expectation, that you would trust Robert Mueller to make that decision about whether to compel the president to testify in an appropriate way and that he would not face any interference. Thank you for your testimony today.

BARR:

Thank you.

COONS:

I look forward to the next round.

GRAHAM:

Senator Sasse.

SASSE:

Thank you, Mr. Chairman and congratulations on your new call laying here. Liam, I have career advice. I won't do it on camera. We want to know if you are taking notes for your cousins about career advice though? We'll--we'll ask you later.

General, congratulations on your nomination and con--thanks for your past service. I had planned to ask you for some pledges related to the Mueller investigation in private to me. In

public today I think you've already done that. How should the American people think about what the M--the Mueller investigation is about?

BARR:

I think--I think that there were allegations made of Russian attempts to interfere in the election and there were allegations made that some Americans were in cahoots with the Russians and the word is now being--that's being used is collusion. And as I understand it Mueller is looking into those--those allegations.

SASSE:

You know a lot of the media summary of the investigation starts with people's views and who they voted for in the 2016 presidential election and for those of us who spend a lot of time reading intelligence reports--a handful of us on this committee are about to leave to go to an intelligence briefing-- what Russia is doing to the U.S. is big and broad and not constrained to the 2016 election and increasingly it feels like the American people reduce Russia to just how you thought about the 2016 presidential election.

So since you will have serious supervisory responsibilities over parts of the intelligence community is Putin a friend or a foe and what are his long-term objectives toward the U.S.?

BARR:

Well, I don't hold myself out as a foreign policy expert but I think that he is--I think the Russians are a--are a potent rival of our country and his foreign policy objectives are usually directly contrary to our goals. I think he wants to weaken the American alliances in Europe and he also wants to become a player in the Middle E--more of a player in the Middle East. A lot of his foreign policy objectives are--are at odds with ours.

At the same time, I think the primary rival of the United States is China. I think Russia is half the size it was when we were facing them at the peak of the Cold War. Their economy is long-term prognosis is nowhere near China's. I also feel that part of what Russia is up to is

trying to hold on to Ukraine and (INAUDIBLE) Russia in their orbit. But I'm--I'm concerned that the fixation on Russia not obscure the danger from China.

SASSE:

I want to ask you some China questions as well. I want to ask you about your role on the president's Intelligence Supervisory Board but sticking with Russia for a minute does Hooton have any long-term ideological alignment with the U.S. or does he have other objectives trying to sow discord broadly here?

BARR:

You know I'm not--I'm not a--an expert on this area but I think there are pot--you know I think there may be some potential areas where our interest could be aligned.

SASSE:

But when he interferes here does he have long-term interest in the success of one or another political party or does he have specific interest in sowing chaos and discord to make Americans distrust one another?

And one of the reasons I ask is because I'd love to have you say in public some of what you said to me about at the end of this investigation what happens next. Are you concerned that when the Mueller report is received quite a part--

BARR:

Okay.

SASSE:

--the narrowest pieces you know where I'm headed.

BARR:

So I mean I--I--I think that the basic vulnerability of the United States in the age in which we live the internet age, you know the globalization of information and so forth is the vulnerability of--that we are seeing which is people can create doubt, undercut confidence in our elect--our election process and also torque our public discourse in ways that we find hard to perceive and this has long-term danger for the United States and the survival of a democratic society like ours.

And so I hope that whatever the outcome of the Mueller investigation that we view this as a bigger problem of inter--foreign interference on our elections which is why I said it was one of my priorities and it's not just the Russians, it's other countries as well and we have to focus on that. We have to ensure that we are doing all we can and I'm not sure all of that is defensive either. I mean in terms of law enforcement I think we have to look at all options including sanctions and other options to deter organized efforts to interfere in our elections.

SASSE:

So you have no reason to doubt any aspect of the intelligence community's composite assessment about Russian efforts in the 2016 election?

BARR:

I have no reason to doubt that the Russians attempted to interfere in our election.

SASSE:

And Dan Coats, the National Intelligence director, has testified in public and has said in different media context that Russia is already plotting for the 2020 elections in the U.S. You have no reason to--to doubt that?

BARR:

I haven't s--you know I--I haven't seen those reports. I--I hadn't reviewed the reports about the 2016 but I have no reason to doubt it.

SASSE:

And can you explain what your role is on the president's Intelligence Advisory Board?

BARR:

Yes, I am actually a consultant, I am an advisor on--on sort of legal issues. Obviously, I'm stepping down from that position if I'm confirmed but I've been just advising. I'm not a member of the board. I'm on the CIA's external advisory board and--and you know I have been participating on that as well.

SASSE:

When you talk about the long-term Chinese efforts to also sow different kinds of discord in the U.S. obviously not crossing any fine classified lines here but long-term interests that other countries have in strategic rivalry with the U.S. to use gray space and information will status operations warfare against us how do you see the role of the national security branch and the FBI more broadly fitting into the larger IC and what responsibilities do you see would be on your priority list as you arrive at the department?

BARR:

You know I--I've--I've been out of the department for so long you know I'm not really sure about how that is currently being handled. You know I--I also think that we had our attention focused on terrorism which we can't let up and--but I want to make sure that and I'm sure Chris Wray is on top of this and looking forward to talking to him about it, of making sure that the bureau is playing a central role in--in combating efforts by foreign countries to engage in those kinds of hostile intelligence activities.

SASSE:

You have unpacked a couple of times today the three different roles or functions of the attorney general. Can--could you do that one more time in summary? Then I want to ask you a particular question. What are--what are those three roles as you see them?

BARR:

I see the three rules in 1789 the first to set up the office. The first role was providing advice to the president in the cabinet and representing the United States in cases before the Supreme Court. And I see the three roles as providing advice, sup--being a policy advisor on legal and law enforcement policy issues and the top law enforcement officer enforcing the laws.

SASSE:

And so in no way would the job of protecting the president be a subset of any of those three jobs? The language of protecting the president has been used occasionally in this administration to refer to the way it was conceived of how Eric Holder did his job. Is there any sense in which it's the attorney general's job to protect the president?

BARR:

No, that wasn't included in my--in my description of the role of the attorney general. Obviously as a--in the policy arena the depart--the attorney general is someone who should be sympathetic to the administration and its policy goals.

SASSE:

But there are circumstances where those three roles could come into some internal conflict or you could be asked to do things that don't align with them and there's probably a list that you have. I won't al--ask you to enumerate it here but there's probably a list of issues where you can imagine needing to resign because of what you were asked to do in the space of so-called protecting the president?

BARR:

If I--if I was ever asked to do something that I thought was unlawful and directed to do that I wouldn't do it and I would resign rather than do it but I think that should be true of every officer who serves anywhere in government, whatever branch.

SASSE:

I am at time but I had a series of questions related to some of what Senator Ernst did about Sarah's Law. She and I have jointly been active in that space, the tragic case of the young woman that she was talking about from Council Bluffs was actually--it occurred in Omaha and Edwin Mejia, her killer, is still at large and both the last administration and this administration have not prioritized that enough in--in our understanding and I imagine that Senator Ernst and I will follow up with a letter to you on that as well. Thank you.

GRAHAM:

Senator Blumenthal.

BLUMENTHAL:

Thanks, Mr. Chairman. I congratulate you, and I look forward to working with you and congratulate also the new members of our committee that have joined us. And thank you very much, Mr. Barr, for being here today, for your past record of public service. And I hope I am perhaps the last to make reference to your grandson--

(LAUGHTER)

--by saying that if he makes it through this hearing today he can have any job he wants--

(LAUGHTER)

--in this building. Let me say first that as a former United States attorney I share your allegiance and admiration for the Department of Justice and, equally so, the Federal Bureau of Investigation. And I know that you respect Mr. Wray, the current director, but I think you would agree with me that the FBI is probably one of the best, if not the most professional, accomplished, skilled and dedicated law enforcement agencies in the world. Would you agree?

BARR:

Yes, senator.

BLUMENTHAL:

And I hope that the president agrees with you and perhaps shares that view more publicly in the future. When the FBI begins a counterintelligence investigation, if it is of the president of the United States for working with a foreign adversary, that decision would be subject to multiple levels of review within the FBI, correct?

BARR:

I assume. I don't know what rules were in effect at the time.

BLUMENTHAL:

Well, in your experience there would be?

BARR:

Yes, yes.

BLUMENTHAL:

And you have no reason to think that those rules have changed?

BARR:

I don't know what the practice was. There was--

BLUMENTHAL:

And almost certainly in that kind of extraordinary investigation you would agree with me it would be extraordinary for the FBI to be investigating the president for working with a determined foreign adversary. There probably would be information shared with the deputy attorney general or the attorney general, agree?

BARR:

I would--I would hope so. The reason I'm hesitating is because, you know, some of these texts that we've all read are so weird and beyond my experience with the FBI. I don't know what was going on.

BLUMENTHAL:

Well, these reports are stomach turning in terms of the absolutely stunning and unprecedented kind of investigation that they reflect. You'd agree?

BARR:

You mean the texts are stomach turning?

BLUMENTHAL:

The reports of the investigation of the president.

BARR:

I'm not sure what you're talking about when you say the reports of the investigation.

BLUMENTHAL:

The reports that the FBI opened an investigation of the president for working with a foreign adversary, Russia.

BARR:

And what's stomach turning about that? Which--what is stomach turning, the allegation against the president or the fact that--

BLUMENTHAL:

(INAUDIBLE) that an allegation would be made and be under investigation. Well let me move on. I want to talk about transparency. Would you commit--will you commit to this committee that you will not allow the president or his attorneys to edit or change the special counsel report before it is submitted to Congress or the public?

BARR:

I already said that I would not permit editing of my report, whatever report I--I or whoever is the attorney general makes.

BLUMENTHAL:

And will you commit that you will come to Congress and explain any deletions or changes that are made to that report before it is issued?

BARR:

Okay, so you know there are different reports at work here. Which report are you--there are two different reports.

BLUMENTHAL:

I'm talking about the special counsel report.

BARR:

Okay, well under the current regulations the special counsel report is confidential. (INAUDIBLE) The report that goes public would be a report by the attorney general.

BLUMENTHAL:

Will you commit that you will explain to us any changes or deletions that you make to the special counsel report that's submitted to you in whatever you present to us?

BARR:

I will commit to providing as much information as I can consistent with the regulations. Are you saying, for example, that if information is deleted that would be for like classification purposes I would identify that and things like that?

BLUMENTHAL:

Well, that you will commit to explaining to us what the reasons are for your deleting any information that the special counsel includes that you are preventing us or the public from seeing.

BARR:

You know, that would--that would be my intent. I have to say that the rules--I don't know what kind of report is being prepared. I have no idea, and I have no idea what Acting Attorney General Rosenstein has discussed with Special Counsel Mueller. If I'm confirmed I'm going to go in and see what's being contemplated, and what they've agreed to, and what their interpretation, you know, what game plan they have in mind.

BLUMENTHAL:

Will you permit special counsel--

BARR:

But I'm--but my purpose is to get as much accurate information out as I can consistent with the regulation.

BLUMENTHAL:

Well, the regulations and rules give you extraordinarily broad discretion, and I'm hoping, and I'm asking you to commit, that you will explain to us information that you have taken out of that special counsel report. And I also want to ask you about restrictions on the special counsel. Will you commit that you will allow the special counsel to exercise his judgment on subpoenas that are issued and indictments that he may decide should be brought?

BARR :

As I said, I will carry out my responsibilities under the regulations. Under the regulations the, whoever is attorney general, can only overrule the special counsel if the special counsel does something that is so unwarranted under established practice. I am not going to surrender the response abilities I have. I would--you would not like it if I made some pledge to the president that I was going to exercise my responsibilities in a particular way, and I'm not going to make a pledge to anyone on this committee that I'm going to exercise it in a particular way or surrender it.

BLUMENTHAL:

Will you allow the special counsel to exercise his judgment as to what resources are necessary? Will you meet those needs for resources?

BARR :

That would be my expectation. I think, you know, I mean if you believe the media they're sort of starting to reduce their resources. So I wouldn't expect that would be a problem.

BLUMENTHAL:

Will you allow the special counsel to exercise his judgment as to what the scope should be? The president has talked about red lines around finances. Will you allow the special counsel to exercise his judgment about what the scope should be, even if the president says that there should be red lines?

BARR :

I think the scope of the investigation is determined by his charter from the acting attorney general. And if he wants to go beyond that charter, I assume he would come back and talk to whoever the attorney general is about that.

BLUMENTHAL:

Will you impose any restrictions on other prosecutors who are also investigating the president? As you're well aware, in the Southern District of New York the president has been named, in effect, as an unindicted co-conspirator. The Eastern District of Virginia has an investigation that's relevant to the president. Will you impose any restrictions on those prosecutors?

BARR:

The office of attorney general is in charge of the pros--with the exception of the special counsel who has special rules applicable to him--is in charge of the work of the Department of Justice. I'm (INAUDIBLE)--

BLUMENTHAL:

--but you have a responsibility to allow prosecutors to enforce the law.

BARR:

I have the responsibility to use my judgment and discretion that are inherent in the office of attorney general to supervise, and I'm not going to go around saying well this U.S. attorney or that U.S. attorney I'm going to defer to. And--and--and (INAUDIBLE) I'm not--

BLUMENTHAL:

You referred earlier to the possibility of firing--

BARR:

Excuse me?

BLUMENTHAL:

--a United States attorney. Would you allow the president to fire a United States attorney and thereby stop an investigation?

BARR:

I would not stand by and allow a U.S. attorney to be fired for the purpose of stopping an investigation. But the president can fire a U.S. attorney. They're a presidential appointment.

BLUMENTHAL:

But the president should have a cause beyond simply stopping an investigation for firing a United States attorney, even if he or she is (INAUDIBLE).

BARR:

Well, as I said, I would not stand by and allow, you know, an investigation to be stopped if I thought it was a lawful investigation. I wouldn't stand by for that. But the president is free to fire his, you know, officials that he's appointed, and--

BLUMENTHAL:

I want to ask a different--a question, a question on a different topic. You said that--and I'm quoting you--I believe Roe v. Wade should be overruled. You said that in 1991. Do you still believe it?

BARR:

I said in 1991 that I thought as an original matter it had been wrongly decided, and that was, what, within 18 years of its decision? Now it's been 46 years, and the department has stopped, under Republican administration, stopped as a routine matter asking that it be overruled, and I don't see that being turned--you know, I don't see that being resumed.

BLUMENTHAL:

Would you defend Roe v. Wade if it were challenged?

BARR:

What I defend Roe v. Wade? I mean, usually the way these--this would come up would be a state regulation of some sort and whether it's permissible under Roe v. Wade, and I would hope that the AG would make whatever arguments are necessary to address that. I think the justices have--the recent ones have made clear that they consider Roe v. Wade an established precedent. It's been on the books 46 years.

BLUMENTHAL:
And you would enforce the Clinic Access Protection Act?

BARR:
Absolutely.

BLUMENTHAL:
Thank you, Mr. Chairman.

HAWLEY:
Thank you, Mr. Chairman. Mr. Barr, congratulations on your nomination. Thank you for being here. You were eminently qualified for this position when you were confirmed unanimously by this committee 27 years ago and you are eminently qualified today. It's a pleasure to have you here. I wanted to start where Senator Blumenthal started as well with the reports about the FBI counterintelligence investigation launched against the president, which I also find to be stomach turning, though perhaps, for different reasons.

The New York Times report indicates that the FBI began the probe in part because they were concerned about the president's foreign policy stances, comments he made during the 2016 campaign about foreign policy, and the Republican Party's official position on the Ukraine. In your expense with the FBI, is it strange to have a counterintelligence investigation begun because members of that bureau disagree with the foreign policy stances of a candidate for president or a president of the United States?

BARR:

Yes.


HAWLEY:

Yet, the Supreme Court has been unequivocal that the president and our system of government, the president possesses, and I'm going to quote now, "The plenary and exclusive power as the sole organ of the federal government in the field of international relations, a power which does not require, as its basis--as a basis for its exercise, an act of Congress." That's the very famous Curtiss-Wright case. To your knowledge, is that still good law?


BARR:

Yes.


HAWLEY:

And you think that was rightly decided?


BARR:

Yes.


HAWLEY:

Let me ask you this, would it concern you, as attorney general, if FBI agents were making decisions about when and how to launch an investigation of an elected official if it was in order to avoid being supervised or directed by their agency leadership? Would that be concerning to you?


BARR:

Yes.

HAWLEY:

As--as is, I might just add, reported by the New York Times. Let me--let me switch gears and ask you about another topic that you mentioned a little bit earlier in the field when we were talking generally about antitrusts. This is something you talk about things that have changed in the 27 years since you were last here. One of the things that has changed is the extraordinary concentration of power in our economy in the hands of a few corporations, no more so than in Silicon Valley, which you referenced earlier today. And I just want to ask you a little bit about that.

Big tech companies like, for instance, Google and Facebook, who have drawn much attention of late, pose significant challenges, not just for competition, but also for the larger issues of privacy and the free flow of ideas. The Justice Department has recently deferred to the FTC across this range of issues. And while I'm hopeful that Chairman Simons will right the course here, the FTC has perhaps too often allowed these companies in my view to violate privacy and maybe antitrust laws without meaningful consequences. Here's my question, what role do you think the Justice Department has working with the FTC or independently to address anticompetitive conduct, potential bias, and privacy violations by these big tech companies?

BARR:

Well, obviously competition is of central concern to the antitrust division and--and you know, there are, I guess, concourse (SP) dots that had been reached between the FTC and-- and the antitrust division as to who has primary jurisdiction in different areas. But I would like to weigh into some of these issues. I'd like to have the antitrust support that effort to get more involved in reviewing the situation from a competition standpoint. I also am interested in the issue of privacy and the question of who owns this data and, you know, it's not an area that I've studied closely or become an expert in, but I--I think it's important for the department to get more involved in these questions.

HAWLEY:

Just on the subject of ownership of data, as you know, Facebook is currently subject to a 2011 consent decree as part of which it did agreed not to release or share or sell personal user information without the knowledge and consent of its users. Facebook's CEO, Mark Zuckerberg, has adamantly insisted under oath, as recently of as April 10 of 2018, that on Facebook, "Users have complete control," those are his words, "Over everything that they share."

However, as I'm sure you're aware, recent media reports have indicated that Facebook, in fact, routinely has shared user information without user's consent or even knowledge. Now, the Justice Department has the and forward authority to enforce the terms of the 2011 consent decree and potentially to prosecute any violation. Will you consider doing so?

BARR:

Well, because that is something that I might have to get involved with and supervise if I'm confirmed, I'd rather not, you know, make any comments about it right now.

HAWLEY:

Let me ask you this, these same technology companies also control the flow of information, or at least influence it, the flow of information to consumers to an unprecedented degree. I mean, you have to go way back in American history to find any analog, back to the paper trust, to--to find an analog of a group, a small group of companies that control the information and influence the news and its flow to Americans to an extent--to the extent that these companies do.

And there is growing evidence that these companies have leveraged their considerable market power, if not monopoly status, to disfavor certain ideological viewpoints, particularly conservative and libertarian viewpoints. Do you think the Department of Justice has authority under the antitrust laws were consumer protection laws or other laws to address bias by dominant online platforms?

BARR:

I would just say generally, you know, I wouldn't think it would, you know, I'd have to think long and hard before I said that it was really the stuff of an antitrust matter. On the other hand, it could involve issues of disclosure and--and other--and other--implicate other laws like that.

HAWLEY:

Is there any point, do you think, at which political bias could require a response? And I'm thinking, for example, Harvard Law Professor Jonathan Zittrain has written how Google or Facebook, for example, could manipulate their algorithms to significantly swing voter turnout to favor a candidate of their choice. Would that sort of conduct require a response from the department?

BARR:

I have to think about that. I--I I'm not sure. You know, I'd like to know more about the--the phenomena and what laws could be indicated by it.

HAWLEY:

Let me ask you this, the Justice Department's case against AT&T-Time Warner, focused on how the merged company would control or could control the distribution of information to discriminate against rival content. And I understand that you, of course, are recusing yourself from--from that matter, but generally speaking, generally speaking, do you see similar concerns regarding how dominant Silicon Valley firms could use their market power and social media or search to discriminate against rival products or services or viewpoints?

BARR:

Yeah. And--and making clear that what I'm saying now has no application to, you know, the transaction that we just talked about and talking about the other companies, yes.

HAWLEY:

Let me ask you a more broadly about the question of the antitrust and mergers and you--you gestured towards this earlier in your testimony, I'm increasingly worried that the department is--is not enforcing visit vigorously the antitrust statutes in many of the sectors of the economy, not just technology. We see, again, as you alluded to, we see growing concentration of power in--in various sectors held by just a few firms. And if you look at recent trends in the department scrutiny of proposed mergers, it's at record lows.

Last year, for instance, the Department of Justice antitrust division scrutinized mergers through second request for information in less than one percent of all eligible cases. That is, I believe, the lowest level of merger scrutiny recorded since the FTC started tracking those statistics back in 1981. And just for comparison purposes, in 1981 that review was five times higher than it was in 2018. My question is do you think that this record low level of merger scrutiny is appropriate and, if you're confirmed as attorney general, what might you do to ensure that the antitrust division faithfully and vigorously enforces the law?

BARR:

Well, I--I--I am for vigorous enforcement of the antitrust laws to preserve competition and, as I said, this is going to be an area I'm going to want to get into and--and--and work with Makan Delrahim on if I'm confirmed. I wouldn't necessarily use, you know, the incidence of merger review as a proxy for failure of competition. At the end of the day, it's competition we're worried about in different markets. But I--I am interested in exploring those, you know, those statistics we were just using.

HAWLEY:

And--and do you think it's fair to say, would you agree that the historic levels of concentration that we are seeing and many parts of the economy, technology in particular, is--is potentially detrimental to competition? I mean it is, potentially and in general, but it--it is something that is worth scrutinizing and being concerned about if one is concerned about free, fair, and open competition.

BARR:

You said the size?


HAWLEY:

Yes. The historic levels of concentration.


BARR:

Yeah, I think what's--the thing I'm concerned about are that the network effects that have now--that are now a work where there so powerful that particular sectors could essentially be subsumed--you know, subsumed into these--into these networks. They're just very powerful network effects because of the size.


HAWLEY:

Yes. I see my time has almost expired. Thank you, Mr. Chairman.


HIRONO:

Thank you, Mr. Chairman. Mr. Chairman, I welcome the arrival of the immigration Lindsey Graham of 2013. The other Lindsey Graham, we shall see, as you yourself have acknowledged. Mr. Barr, I ask these questions, these two questions of every nominee who comes before any of the committees on which I sit, and these are the questions. Since you became a legal adult have you ever made unwanted requests for sexual favors or committed any verbal or physical harassment or assault of a sexual nature?


BARR:

No.


HIRONO:

Have you ever faced discipline or entered into a settlement related to this kind of conduct?

BARR:

No.


HIRONO:

I have a question relating to recusal. You've been asked a number of times. It is very clear that the president does not want an attorney general who will recuse himself from the Mueller investigation. So when he came before us for confirmation in January 2017, Jeff Sessions wrote on his committee questionnaire that he would, quote, seek and follow the advice of the Department of Justice's designated agency ethics official if confronted with a conflict of interest, end quote. And in fact, he did do that. And he was basically pummeled by the president ever since. So Matthew Whitaker has not come before us for the job of attorney general, but we know that when it came time to make a decision about recusal, he didn't want to be the object of Trump's wrath, so he proceeded to listen to and then ignore the advice of the career ethics officials at the DOJ who recommended recusal.

So your answer to Senator Klobuchar makes it clear that you are going to basically follow the Whitaker model. Can you understand why that is not terribly reassuring to us? These are not normal times. This is not 27 years ago. Today the president is Donald Trump, who will do anything to protect himself. He wants you, who has written a manifesto about why the president shouldn't be prosecuted, at least for obstruction of justice, who has met with and consulted with the president's defense attorneys, who has written op-eds defending his firings of Sally Yates and James Comey to be his attorney general. So in this context, just asking us to trust you is not enough. Why won't you simply follow Jeff Sessions' lead and take and follow--the critical portion being follow--the advice of the department's ethics officials?


BARR:

Because the regulations and the responsibilities of the attorney general as the head of the agency vests that responsibility in the attorney general And I am not going to surrender the

responsibilities of the attorney general to get the title. I don't need the title. If you don't--if you don't trust me to--

HIRONO:

Well, you have--excuse me.

BARR:

Yes.

HIRONO:

You have repeated that answer many, many times. However, I think we all acknowledge that Jeff Sessions possibly didn't want to recuse himself, but he did. And so you have it within your power to follow the ethics advice of your own department, and you're telling us you're not going to, so that is the bottom line.

BARR:

No, senator, I think Jeff Sessions recused himself because of a different provision, which was the political conflict provision.

HIRONO:

I think in the context--

BARR:

He played a role in--he played a role in the campaign.

HIRONO:

--of all of the things that--in the context of all of the things that you have done, basically to get the attention of President Trump to nominate you, I would say that there is a political context to what your decision should be also. Let me move on. You have said that you will

allow Mueller to complete his work, although, you know, I do want to ask you very specif--very specifically because you did write that 19-page memo relating to the obstruction of justice issue. Would you allow the Mueller investigation with regard to obstruction of justice to also go forward unimpeded by you?

BARR:

I don't know whether there's an investigation of obstruction of justice.

HIRONO:

Well, definitely obstruction of justice. You read the papers as well as we do, that that is an element of the Mueller investigation. I don't think you can sit here and tell us that you do not think that that is a part of the investigation, but let's say that it is. Having written what you did, would you seek to--to stop that portion of the Mueller investigation, that being the obstruction of justice portion, assuming that that is, in fact, part of the investigation?

BARR:

Okay, but you have to remember my memo was on a very specific statute and a specific theory that I was concerned about.

HIRONO:

I understand that.

BARR:

I have no basis for suspecting at this point that that is in play at all.

HIRONO:

You mean that particular provision? So Mueller--

BARR:

That provision or theory, or theory.

HIRONO:

Well, I did say let's assume that, in fact, obstruction of justice is part of the Mueller investigation.

BARR:

No, when I say theory I mean--what I was addressing was, you know, whether the removal of Comey, in and of itself, would be obstruction.

HIRONO:

Of course it's not in and of itself.

BARR:

Under a particular--under a particular (INAUDIBLE).

HIRONO:

I hate to be interruptive, but you know, I only have four minutes, so thank you very much. We--you were asked about the investigations that are going on in the Southern District of New York, the Eastern District of Virginia, the District of Columbia, and there are various investigations brought by various U.S. attorneys' offices relating to the activities of Donald Trump, his campaign, his inauguration, his foundation, his businesses, his families, his associates. Do you consider these to be lawful investigations because I believe that you responded to Senator Blumenthal that if these are lawful investigations by the U.S. attorneys' offices that you do not see yourself interfering with them.

BARR:

I have no reason to think they're not lawful investigations, whatever they are. I--I'm--you know more--seem to know more than I do about what's under investigation.

HIRONO:

You're--that's reassuring that your wanting to have the Mueller investigation go forward extends to all these other U.S. attorneys' investigations. I believe you also said that the Mueller report will be confidential. It is confidential under the special counsel's, whatever the criteria are. So what I'm hearing you say that in spite of the fact that you want to be transparent, neither Congress nor public will get the Mueller report because that's confidential. So what we will be getting is your report of the Mueller report, subject to applicable laws limiting disclosure. So is that what you're telling us?

BARR:

I don't know what--what--at the end of the day what will be releasable. I don't know what Bob Mueller is writing.

HIRONO:

Well, you said that the Mueller report is confidential pursuant to whatever the regulations are that applies to him, so I'm just trying to get as to what you're going to be transparent about.

BARR:

The--as the rules stand now, people should be aware that the rules, I think, say that the independent, the special counsel will prepare a summary report on any prosecutive or declination decisions and that that shall be confidential and shall be treated as any other declination or prosecutive material within the department. In addition, the attorney general is responsible for notifying and reporting certain information upon the conclusion of the investigation. Now how these are going to fit together and what can be gotten out there, I have to wait and--I would have to wait. I'd want to talk to Rod Rosenstein and see what he has discussed with Mueller and what, you know, what

HIRONO:

But you have testified that you'd like to make as much of the original report--

BARR:

Right. And so what--all I can say right now is--

HIRONO:

--open as possible.

BARR:

Yeah. All I can say right now is my goal and intent is to get as much information out as I can--

HIRONO:

Thank you.

BARR:

--consistent with the regulations.

HIRONO:

So in the minute that I have, I'd just like to go over some of the policies that Jeff Sessions has followed. One is a zero-tolerance policy, which led to the separation of children from their parents. He refused to defend the Affordable Care Act and argued in the Texas lawsuit that key parts of the ACA was unconstitutional. He failed to bring a single lawsuit to enforce a voting rights act to stop voter suppression efforts, and he issued a memo making it harder for the civil rights division to enter into consent decrees to address systemic police misconduct. Do you agree with these policies? Do you intend to continue them?

BARR:

The last one, yes, I agree with that policy. The other ones, I'm not--I'd have to see what the basis was for those decisions.

HIRONO:

So do you think that as to the last one, which has to do with consent decrees that there is a role for the Department of Justice in addressing systemic police misconduct?

BARR:

No, there--

HIRONO:

You don't see much of a role in that?

BARR:

No, that's your character--

HIRONO:

Or you see a more limited role?

BARR:

That's your characterization of it. That's not what I understand the policy to be. Of course the department has a role in pattern and practice violations.

HIRONO:

So the Attorney General Sessions has issued a rule that makes it a lot tougher to enter into these kinds of decrees.

BARR:

Why do you say it's a lot tougher?

HIRONO:

Because it's not just relying on the career attorneys, that now it goes to the deputy AG or whoever--there are more political appointees who are going to get involved in that process, and that makes it much more limited, I would say, in utilization. Thank you, Mr. Chairman.

GRAHAM:

(INAUDIBLE) Hirono. We'll take a 10-minute comfort break and start with Senator Tillis. If my math is right, we've got about an hour left on round one, so 10 minutes be okay, Mr. Barr?

BARR:

Mm-hm.

GRAHAM:

Okay, thank you. Adjourned for 10 minutes.

GRAHAM:

Thank you, Mr. Barr. I think what we have left on our side is Kennedy, Senator Kennedy, Blackburn, and Tillis, and Senator Booker, Senator Harris. Anybody else? I think that's it in round one. So, Senator Kennedy?

KENNEDY:

Thank you, Mr. Chairman. Mr. Barr, do you--do you know of any instance in which anybody has tried to interfere in Mr. Mueller's investigation?

BARR:

No. I mean, I'm not--I'm not in the Department of Justice and I have no--you know, I'm not privy to that information. But I don't know of any.

KENNEDY:

I understand you know Mr. Mueller. Do you?


BARR:

Yes, I do.


KENNEDY:

Is he big enough to take care of himself?


BARR:

He's a Marine.


KENNEDY:

Yeah. If someone had tried to interfere with his investigation, based on your knowledge of Mr. Mueller, would he have something to say about it, including but not limited to in a court of law?


BARR:

Yes, senator.


KENNEDY:

I--I want to try to cut through some of the innuendo here. Did--did President Trump instruct or ask you, once you become attorney general, to fire Mr. Mueller?


BARR:

Absolutely not.


KENNEDY:

Did he ask you to interfere in Mr. Mueller's investigation?

BARR:

Absolutely not.

KENNEDY:

Has anybody in the White House made that suggestion to you?

BARR:

Absolutely not.

KENNEDY:

Has anybody in the Western Hemisphere made that suggestion to you?

BARR:

Absolutely not.

KENNEDY:

Okay.

I want to associate myself--myself with the remarks of Mr. Blumenthal about the FBI being the premier law enforcement agency in the history of the world, in my opinion, and the high esteem--esteem in which we all hold the Department of Justice. But I have a question for you. This counterintelligence investigation that was started by FBI and Justice about-- allegedly about President Trump, how did the New York Times get that information?

BARR:

I don't know, senator.

KENNEDY:

Well, didn't it have to come from the FBI or the Department of Justice?

BARR:

I--I--I just can't say. I don't know how they got it and I don't know whether that's an accurate report.

KENNEDY:

Right. What do you intend to do about the leaks coming out of the FBI and the Department of Justice?

BARR:

The problem of leaks is a difficult--a difficult one to address. I think the first thing is to--is to make it clear that there's an expectation that there are no leaks and punish people through discipline--internal discipline if there are leaks, also keep--you know, exercise more compartmentalization and discipline and--and make the--the institutions that are responsible--if you're talking about the FBI, that their leadership is taking aggressive action to stop the leaks.

KENNEDY:

Okay.

You've had some experience with the enforcement of our immigration laws, is that correct?

BARR:

That's right, senator.

KENNEDY:

Do you believe it is possible to secure a 1,900 mile border without, in part at least, using barriers?

BARR:

No, I don't think it's possible.

KENNEDY:

Okay.

BARR:

When I was--when I was attorney general, we--we had the INS as part of the department. And I remember another part of my kibitzing was trying to persuade George W. Bush's administration not to break that out.

But in those days, I had some studies done and I was trying, within the budget, to put as--as much as we could on--

KENNEDY:

--Um-hmm--

BARR:

--Barriers as we could.

KENNEDY:

Okay. Do you believe that ICE should be abolished, as some of my colleagues do?

BARR:

Certainly not.

KENNEDY:

Okay.

You're Roman Catholic, are you not?

BARR:

Yes, I am.

KENNEDY:

Do you think that disqualifies you from serving in the United States government?

BARR:

I don't think so, no.

KENNEDY:

Okay. Why is that?

BARR:

Why doesn't it disqualify me?

KENNEDY:

Um-hmm. Some of my colleagues think it might.

BARR:

Because you render under Caesar that which is Caesar's and under God that which is God. And I believe in the separation of church and state. And I--if there was something that was against my conscience, I wouldn't--I wouldn't impose it on others. I would resign my office.

KENNEDY:

Yeah. I think it's called freedom of religion--

BARR:

--Yes--

KENNEDY:

--As I recall.

BARR:

That's right.

KENNEDY:

If the--if the federal government threatens to withhold federal money from a university if that university doesn't investigate, prosecute, punish sexual assault in a way prescribed by the federal government, does that make the state university a state actor--or the--the university a state actor?

BARR:

It--it may. I--you know, I would have to look at the case--or the cases. I'm not up to speed on those. But I would think so.

KENNEDY:

Well, if the--if the federal government says to a university, look, if you do not prosecute, investigate, punish allegations of sexual assault in a way that--that the federal government says you must, otherwise we're going to take away your federal money, does--does the accused in one of those sexual assault allegations still have the protection of the Bill of Rights?

BARR:

I--I would hope so.


KENNEDY:

Should he or her?


BARR:

I--you know, I'd have to look and see exactly the state actor law right now. But--but what you're getting at is, you know, the--the--the rules that were forced on universities in handling sexual harassment cases--


KENNEDY:

--Right--


BARR:

--That, you know, I felt did--essentially did away with due process.


KENNEDY:

Yes.


BARR:

And, you know, I think the--the--you know, as a--as a father of three daughters, you know, I take very seriously any question of sexual harassment. It's a serious problem. And the--the word of a--of a victim has to be taken very seriously and it has to be pursued, but we can't do it at the expense of the Bill of Rights or--or basic fairness and due process.


KENNEDY:

Both the accused and the accuser deserve due process, do they not?


BARR:

That's right.

KENNEDY:

Okay.

Tell me what the legal basis is for a universal injunction.

BARR:

I think universal injunctions are--have no--well, let me say that--that they are a--a recent vintage. They really started arising in the '60s. And I--I think that they have lost sight of a limitation on the--on the judicial power of the United States, which is case or controversy. And it--

KENNEDY:

--It's all--it's all based on a DC Circuit--

BARR:

--Right--

KENNEDY:

--case. It--the Wirtz case. Is that right?

BARR:

I forgot the name of the case, but I think the DC Circuit case was the first--the first one. I think that was in the '60s. And people have lost sight of the fact that it's really a question of who gets the relief in a case. And under the case or controversy, it should be limited to the parties.

And, you know, when--earlier you could have a--you could have a court in one jurisdiction decide it, and that would be the rule in that jurisdiction.

KENNEDY:

Um-hmm.

BARR:

But that didn't debar the government from continuing its policies elsewhere. And eventually you'd get differences and they would work their way up to the Supreme Court. So, I think that I'd like to see these universal injunctions challenged.

KENNEDY:

Well, it's not--it's not--I don't know how many federal district court judges we have. Let's say 650, six hundred and fifty. As I understand it, one can enjoin a Congressional statute nationwide even if the other 624 judges disagree.

BARR:

That's right.

KENNEDY:

Right.

BARR:

And not just a statute, senator. I think what's different, the--what we're seeing is the willingness of courts to set aside, you know, even the kinds of exercises of national security power that, you know, 20 years ago would have been unimaginable for a court to challenge. And yet, a district court judge somewhere can enjoin--

KENNEDY:

--Yeah--

BARR:

--Some action that has a bearing on the safety of the nation, and then the judicial process can take years and years to get that up to the Supreme Court.

KENNEDY:

I've just got a few seconds left. As I--as I understand your testimony, general, Mr. Mueller will write a report, submit it to you as attorney general, and you--then you will write a report based on that report and release your report. Is that right?

BARR:

That's essentially it, but I wouldn't--you know, it could easily be that the report is communicated to the department--assuming I was confirmed. That could be a month away. I don't--

KENNEDY:

--Well--well, let me tell you what I'm getting at. I've got six seconds; now four. The American people deserve to know what the Department of Justice has concluded, and they're smart enough to figure it out.

I've said this before. The American people don't read Aristotle every day. They--they're too busy earning a living. But if you give them the facts, they'll figure it out and they'll draw their own conclusions. It doesn't matter who spins 'em. They'll figure it out for themselves.

And I would strongly encourage you to put this all to rest, to--to--to make a report--a final report public and let everybody draw their own conclusions so we can move on. If somebody did something wrong, they should be punished. But if they didn't, let's stop the innuendo and the rumors and the leaking and let's move on.

BARR:

I agree, senator.

And let me say, you know, earlier I misspoke, because the acting attorney general is Matt Whitaker, and I--and I referred to Rod as the acting attorney general. But in fact, the report would go to Matt Whitaker.

KENNEDY:

Thank you, Mr. Chairman.

BOOKER:

Thank you, Mr. Chairman, and I would like to remark Mr. Barr that your family is showing a prestigious level of patience and indefatigable endurance that should be marked for the record. You are a very lucky man.

You know that about 30+ states have legalized medical marijuana or adult use. You are aware of that, correct?

BARR:

Yes, yes. In 2018 Attorney General Jeff Sessions rescinded the Cole Memorandum which provided guidance to U.S. attorneys that the federal marijuana prohibition should not be enforced in states that have legalized marijuana in one way or the other. Do you believe it was the right decision to rescind the coal memorandum?

BARR:

My approach to this would be not to upset settled expectations and the reliance interest that have arisen as a result of the Cole Memorandum and--and investments have been made and so there have been reliance on it so I don't think it's appropriate to upset those interests. However, I think the current situation is untenable and really has to be addressed. It's almost like a backdoor nullification of federal law. To me, it's a binary choice, either we have a federal law that applies to everybody--

BOOKER:

And--and I'm sorry to interrupt you sir, but how--how would you address that?

BARR:

Well--

BOOKER:

Do you think it's appropriate to use federal resources to target marijuana businesses that are in compliance with state laws?

BARR:

No, I--I said that's what I said I'm not going to go after companies that have relied on the Cole Memoranda. We either should have on--a federal law that prohibits marijuana everywhere which I would support myself because I think it's a mistake to back off on marijuana. However, if we want a federal approach if we want states to have their own laws then let's get there and let's get there the right way.

BOOKER:

And if you don't mind, I'm going to just move on it's good to hear at least the first part of what--what you said. During your previous tenure as attorney general, you literally wrote the book on mass incarceration or at least wrote this-this--this report the case for more incarceration. You argue that we as a nation were quote incarcerating too few criminals.

BARR:

In those days.

BOOKER:

And--and that the solution was more incarceration for more people.

BARR:

Excuse me.

BOOKER:

Please, sir.

BARR:

For chronic violent offenders and gun offenders.

BOOKER:

Well, I mean--I mean that's the challenge, sir, and you argued against the bipartisan legislation in 2015 quite strenuously.

BARR:

I did.

BOOKER:

And--and but that's not the--that's not the nature of incarceration in this country. In fiscal year 2016, only 7.7 percent of the federal prison population was convicted of violent crimes. Overwhelmingly what was initiated in those times that led to an 800 percent increase in the federal prison population overwhelmingly that was nonviolent drug offenders set--right now our federal prison population is overwhelmingly nonviolent.

47.5 percent of the federal prison population are in incarcerated for--for drug offenses and I guess hearing your arguments then and hearing your arguments against the bipartisan legislation that we brought out of the committee in 2016--

BARR:

Senator, I think that's wrong what--what you just said. Okay? I think when you have violent gangs in the city killing people, murder and so forth and so on sometimes the most readily

provable charge is their drug trafficking offenses rather than proving culpability of the whole gang for murder.

So you can take out--you can take out a gang on drug offenses and it--you could be taking out a lot of violent offenders. Do you think that the murders in Chicago are--they are related to gangs--

BOOKER:

And again--

BARR:

--including gangs involved in (INAUDIBLE).

BOOKER:

Sir, and again we can--we can get into the data if you'd like and I'd like to get some more pointed questioning but this is the sort of--these are sort of the tropes that make people believe that in inner cities we should have such a profound incarceration rates. And I'd like to ask you specifically about that data because I think it's language like that that makes me kind of concerned and worried.

You said you hadn't reviewed, you said earlier in your testimony you hadn't reviewed criminal justice data about this actual issue of incarceration versus non-incarceration. I just want to know will you commit to commissioning a study on just the con--concerns that we are talking about right now, about the efficacy of reducing mass incarceration and publish those results? Would you be willing to do such a study yourself?

BARR:

Well, as I understand it, I've been told that there's a lot of data to support the First Step Act.

BOOKER:

And--and that First Step Act goes directly towards addressing a lot of the problems we've had in mass incarceration and--and--and so if you are saying that it is necessary to deal with violence in communities by over-incarcerating here's a bipartisan group of senators that's working towards reducing mass incarceration and that's why I think it's very important which I appreciate you saying you didn't know because you hadn't reviewed the data.

I think it's very important that you review the data and understand the implications for the language that you are using which brings up this language of race which is often not said explicitly. But when you talk about Chicago in the way you just did it brings up racial fears or racial concerns. And you stated that if a black and a white this is quoting you directly are changed with the same offense generally, they will get the same treatment in the system and ultimately the same penalty. You previously quoted and I quote you again there's no statistical evidence that--of racism in the criminal justice system, do you still believe that?

BARR:

No, what I said was that I think that's taken out of a broader quote which is the whole criminal just--that whole criminal ice system involves both federal but also state local justice systems and I said there's no doubt that there are places where there's racism still in this system. But I said overall, I thought that as a system it's working. It does not--it's not predicated on--

BOOKER:

So can I press you on that? Overall the system treats blacks and whites fairly from my own experience I've lived in affluent communities, I've gone to the college campuses (INAUDIBLE). There are certain drug laws applied there that's very different than the inner-city community in which I live but let's talk stats, let's not talk our personal experiences.

And so I've sat with many of my colleagues and many conservatives who readily admit what the data shows and so I have a whole bunch of reports which I'll enter into the record from nonpartisan, bipartisan groups, even conservative leaders talking about the rife nature of racial bias within the system. For example, the federal government's own data, the U.S.

Sentencing Commission's research shows that federal prosecutors are more likely to charge blacks with offenses that carry harsh mand--mandatory minimum sentences than similarly situated for whites. The federal government's own data shows that black defendants were subject to three-strike sentencing enhancements and a statistically significantly higher rate which added on average over 10 years to their sentences.

And so with numerous researchers having found funding racial disparities right throughout our system and in the federal system which you will be the chief law enforcement officer of and primarily for drug--overwhelmingly for drug laws. For example I don't know if you are aware or not of the Brookings study that found that blacks are 3.6 times more likely to be arrested for selling drugs despite the fact that whites are actually more likely to sell drugs in the United States of America and blacks are 2.5 times more likely to be arrested for possession of drugs when there is no difference racially in America for the usage and possession of drugs in the United States. I don't know if you--are you familiar with the Brookings study?

BARR:
No, I'm not.

BOOKER:
Okay, so just a follow-up. Will you commit to commissioning a study examining racial disparities and disparate impacts of the policies that you talked about and that--that led to mass incarceration, the policies that you defended when you criticized the bipartisan 2015 sentencing reform legislation? Will you commit to at least as the--as the most important law enforcement officer in the land to studying those well-documented racial disparities and the impacts it has?

BARR:
Of course--of course I'll commit to studying that and I'll have the Bureau of Justice Statistics pull together everything they have and if there's something lacking, I'll--I'll get that and I'm

interested in the state experience. But when I looked at--I think 1992 was a different time, senator. The crime rate had quintupled over the preceding 30 years and it peaked in 1992 and it's been coming down since 1992.

BOOKER:

And--and sir I just want to say I was a young black guy in 1990s. I was a 20 something-year-old and experienced a dramatically different justice system and the treatment that I received--

BARR :

Okay.

BOOKER:

And the data of racial disparities and what it's done to black--because you literally said this about black communities and I know that your heart, I know that your heart was in the right place. You said that hey, I want to help black communities. This is what you're saying the benefits of incarceration would be enjoyed disproportionately by black Americans living in inner cities. You also said that quote a failure to incarcerate hurts black Americans most--

BARR :

And I'll tell you what's--

BOOKER:

And I just want to ask you a yes or no question because I have seconds left. Do you believe now 30, 40 years of mass incarceration targeted disproportionately towards African-Americans, harsher sentences, disproportionately represented in the criminal justice system with American Bar Association talking about once you've been incarcerated for even a low-level drug crime there are 40,000 collateral consequences that impact your life jobs, Pell

Grants, loans from banks. Do you think just yes or no that this system of mass incarceration has disproportionately benefited African-American communities? Yes or no, sir?

BARR:

I think the reduction in crime has over--since 1992 but I think that the--that the heavy drug penalties, especially on crack and other things, have--have harmed the black community, the incarceration rates upon the black community.

BOOKER:

And I would just conclude to--to my chairman and partner thank you, sir, on this because I'm really grateful for this bipartisan group for the Heritage Foundation. I've spoken at the AEI Conference, just found such great partnership. But I worry about the highest law enforcement officer in the land and some of the language I still hear you using that goes against the data and that you're going to be expected to oversee a justice system that you and I both know needs the faith and confidence of communities that has dramatically lost that confidence because of implicit racial bias.

And the DOJ and I'll give you a chance to respond, the DOJ itself has said mandated implicit racial bias training and I hope that's something that you will agree to do but this is the thing I'll conclude on is that we live in--in on a planet Earth where you can tell the most about a nation bike who they incarcerate.

In Turkey they incarcerate journalists. Thank God we don't do that here even though they've been called the enemy of the people. In Russia, they incarcerate political opponents. I'm glad we don't do that even though with chants of lock her up. But you go into the American criminal prisons, sir, and you see the most vulnerable people.

You see over stigmatized mentally ill people clogging our system. You see over stigmatized addicted people clogging our system. You see a system whereas Bryan Stevenson says it treat you better if you are rich and guilty than if you are poor and innocent. And you see

disproportionately overwhelmingly for drug crimes African-Americans and Latinos being incarcerated.

The importance of your job and I'll ask you this last question because you haven't met with me yet, you've given that courtesy to others, would you please meet with me in my office so you and I can have a heart to heart on the urgency, the cancer on the soul of our country's criminal justice system is a disproportionate impact of that system on those vulnerable communities including women, over 80 percent of whom--the women we incarcerate are survivors of sexual trauma? Can you and I sit down and have a longer conversation than these 10 minutes will allow on this issue?

BARR:
I'd--I'd I very much welcome that, senator. You know I--my experience back in 1992 when I--when sort of blood was running on the streets all over the United States my ideas were actually first formed when I went to Trenton and the African-American community there essentially surrounded me and was saying look, we are in our golden years. We are trying to enjoy our golden years and we can't even go outside our house. We have bars on our house and so forth. Please, will you--? These gangs are running roughshod.

So I developed this idea called weed and seed and my attitude was look, let's stop arguing past each other on--let's attack root causes and let's get tough on crime. And I--and I felt that for--for programs to work like afterschool programs and so forth for housing projects to be safe we needed strong enforcement in those communities and we needed those other programs to be brought to bear community by community and it had to be done with the leadership of the community and that was this idea of the partnership and it caught on.

It was very popular and in fact, it was continued by a lot of the U.S. attorneys in the Clinton administration after the Bush administration was out. And it is actually a number of different names has continued. So I'm very conscious of the issues you raise but my goal is to provide safe, was and my motivation was to provide safety in these neighborhoods for the people trying to raise their children and for the older people and so forth.

BOOKER:

And--

BARR:

I think the neighborhoods are--you know, the crime rate has gone down. I make a distinction between the way we treat these chronic violent offenders and the drug penalties. The drug penalties as I said very high and draconian and in some cases that might have been necessary but I supported revisiting the penalty structure.

BOOKER:

And, sir, I-- I'm the only United States senator that lives in an inner-city low-income community. I've had shootings in my neighborhood, a young man killed last year on my block with an assault weapon. I know this urgent need for safety and security and I actually I'm not saying I'm necessarily going to vote for you one way or the other but I believe your intentions are well. But I think that some of the things you said in the past lead me to believe that your policies might be misguided.

In the way that Mike Lee and Cornyn and Graham and Grassley have been incredible partners in changing the American reality I hope that you can be that kind of partner, too, and I hope that you and I can have a good heart to heart conversation trusting that we both want the same end for all communities, safety, and security but a justice system that is fair to all American citizens.

BARR:

I'd welcome that, senator.

BOOKER:

Thank you, sir.

GRAHAM:

Senator Blackburn.


BLACKBURN:

Thank you, Mr. Chairman. And we appreciate your time today, Mr. Barr , and that of your family. I told Liam that Grandpa ought to give him whatever he wants to eat for dinner tonight.

(LAUGHTER)

He has behaved very well and done a great job. Going back to something that Senator Kennedy mentioned on leaks, and you said you would address that by compartmentalization. Talk for just a little bit about your vision for the Department of Justice as you look at implementing first steps, addressing violent crime, dealing with opioids, dealing with online sex trafficking, the antitrust issues, the Mueller investigation, all the things we've talked about, how do you intend to lead that department that is very different from the DOJ that you led previously?


BARR :

In some ways it's different. In some ways it's not so different. But my basic approach to things is to get good lieutenants, good subordinates who--running different parts of the agenda and give them, you know, their marching orders and watch them perform and get involved to the extent I can to make sure that we're pushing the priorities things--things ahead. One of the interesting things about the Department of Justice--it's a little different than many agencies--is one of our--our first priority has to be to enforce all the law. It's not like we can just come into work and say well, we're just going to pay attention to this, so we're not going to enforce all these other laws. We have to cover the waterfront. That's number one. But beyond that, what I tried to do last time, and what I would try to do if you confirm me this time, would be, you know, to make sure that even though we're enforcing

things across the board, we have an understood set of priorities, and we put the effort behind those pri

orities, and we define clearly what we're trying to--what we're trying to achieve.

So for example, in the area of civil rights, when I was attorney general last time, and I had discussed this with Senator Kennedy, I said you know, we're not doing enough on housing discrimination. Housing is very important. It determines where you go to school and all-- you know, the safety and so forth. And I set up a program. We hired testers and stuff like that, and we had a very clear goal and priority for that. And we launched it. And that's what, you know, that's what I plan to bring in area after area, defining what we're trying to accomplish and give the people the tools to get it done, and give them the direction and motivation to get it done.

BLACKBURN:

You've mentioned the Mueller investigation and your relationship with Mr. Mueller having him finish the investigation. If we were to ask him about you, do you think he, his assessment would be that you are a fair and impartial leader, that he can trust--that we can trust to lead the DOJ?

BARR:

I--I--I hope he would say that, but I'm not going to put--I'm not going to put words in his mouth.

BLACKBURN:

Words in his mouth. Yeah. We talked about technology and my interest in that area, and you've had--Mr. Lee and Mr. Hawley have also talked about antitrust and some of the enforcement there. Big Tech, and Silicon Valley, and the power that is harbored there, they are gobbling up a lot of their competitors. You've got Facebook and Google that are claiming to only be platforms for their users. But they are also getting into the content business, and that is why Facebook bought Instagram and WhatsApp and Google bought YouTube and

DeepMind for AI technology. So their tentacles are spreading, and they are moving away from a platform into that content, into artificial intelligence. And their market dominance is causing some problems. And as we discussed, these companies are violating users' privacy. They are recklessly sharing their users' personal data with third parties. This is done without explicit permission. We can't let these companies collude to drive out competitors or to ignore vital data

privacy protections.

And big Tech operated really without regard to the law. And you and I talked a little bit about one of the edge provider CEOs who last spring, when he came before a House committee--he was also here before this committee--there was even reference to how--I discussed how he subjectively manipulated or asked if he subjectively manipulated algorithms, and how there was concern that some of these platforms referencing a statement he had made functioned more like a government than a platform or an information service. So how do you intend to begin this conversation and begin this work addressing the antitrust provisions with Big Tech?

BARR:

Yes, you know, as I mentioned, I'm interested in these issues and would like to have them fully ventilated at the department with the antitrust division and also with, you know, outside experts so I can have a better understanding. I do want to say, however, that I'm going to be recusing myself from AT&T because--

BLACKBURN:

Time Warner, yeah.

BARR:

Yeah, because now Time Warner is part of AT&T.

BLACKBURN:

Right.

BARR:

And I was told that under the rules that will carry over to AT&T. So until I talk to the ethics advisors of the department, I don't want to get too far ahead of my skis and sort of talking about the tech area. But as a general policy matter, I want to get into this area because I think it's on a lot of people's minds and--

BLACKBURN:

Absolutely.

BARR:

--and how the law relates to these, you know, to these developments that we see with these large companies. And I don't mean to cast aspersions on any particular company or executive.

BLACKBURN:

Well, and I think for many of us, if you're looking at a merger and they cannot prove the efficiencies, and they cannot prove that there will be increased competition, then it does raise some questions as to how those would be evaluated. And let me go to one other issue that is developing on this privacy front. It is a data privacy problem that I don't think a lot of people realize, and it is the embedding of hardware and then the geolocation, and sometimes that information is sold. Now it folds into the encryption issue because law enforcement has a very difficult time getting the information from devices and from the services on encryption. But we are now aware that many times bounty hunters will be paid a few hundred dollars, and then they can go in and find the location of that phone. And some of these Android operating systems are specific enough that they do the barometric pressure readings, and they can tell you exactly where in a building that this phone is located. So I would hope th

at you are going to look at the legal procedures that surround this kind of data and this kind of tracking, and the privacy provisions that are going to pertain to consumers as they use these devices.

BARR:

Yes.

BLACKBURN:

That--good. Thank you. Let me move on. Senator Ernst talked a little bit about the online sex trafficking. In Tennessee we have followed this issue so closely because our TBI carried out a--an operation where they apprehended 22 traffickers. 22 men were arrested for sex trafficking. And much of that work and the work I've done in the House on the online sex trafficking, working to shut down Backpage.com and to keep our children and keep women safe from these online traffickers, and you know, we were so pleased that last April the Justice Department seized Backpage and charged seven defendants for facilitating prostitution and sex trafficking crimes. And what we know is that when you shut down a site like Backpage, the big one, then you have a lot of small sites that proliferate. And we know that it is going to really take a lot of effort to arrest this situation so that you're not constantly playing whack-a-mole with these. So I would hope that you will be committed to putting an end to this

kind of violence and online trafficking.

BARR:

Yes, senator. You know, and I know how focused you are on it and the leadership you've provided over the years on it. I don't know that much about the problem and also about what resources are currently being devoted to it in the department, but I would like to come by and--

BLACKBURN:

Great.

BARR:

--talk to you further about it once I get exposed to it, if I'm confirmed.

BLACKBURN:

Thank you. My time has expired. Mr. Chairman, I yield back. Thank you, Mr. Barr.

HARRIS:

Thank you, Mr. Chairman, and congratulations. And to you, congratulations on your nominations and--and thank you for you are not your lifetime of dedication of public service.

BARR:

Thank you.

HARRIS:

In response to a question that Senator Ernst asked, you mentioned that we need barriers across the border to deal with drug trafficking. Are you advocating a wall?

BARR:

Well, I--I think I'm advocating a--a--a system, a barrier system. In some places and--and--and I'd have to find out more about the situation since--since I last visited the border.

HARRIS:

From what you know, do you believe that a wall would address the concern that you have about drug trafficking?

BARR:

Well a wall certainly would, but I--in some quick places it may not be necessary to have, you know, what most people imagine as a wall.

HARRIS:

Are you aware that most of the drugs coming into United States is, in particular through Mexico, are entering through ports of entry?

BARR:

Yes, but they also come elsewhere and so do illegal immigrants crossing the border and basically--

HARRIS:

--But particularly on the subject of drug trafficking, are you aware that most of the drugs that are trafficked into the United States enter through points of entry?

BARR:

Yes.

HARRIS:

Have you recently or ever visited a point of entry--a port of entry for the United States?

BARR:

Not recently. Not recently. I used to spend a lot of time--

HARRIS:

--When was the last time?

[BARR]:

Well, when I was attorney general.

HARRIS:

So a couple of decades ago?

[BARR]:

Almost 30 years.

HARRIS:

Okay, I'd--I'd urge you to visit again if and when you are confirmed. You'll--I think you'll see that a lot has changed over the years. Given status quo on marijuana and the fact that 10 states, including the District of Columbia, have legalized marijuana, and--and given that the status quo is what it is and, as you rightly described, we have federal laws and then there are various states that have different laws, if confirmed, are you intending to use the limited federal resources at your disposal to enforce federal marijuana laws in the states that have legalized marijuana?

[BARR]:

No, I--I--I thought I answered that by saying that--that, you know, to the extent that people are complying with--with the state laws, you know, in distribution and--and production and so forth, we're not going to go after that.

HARRIS:

Okay.

[BARR]:

But, I--I do feel we can't stay in the current situation because I mean, if--you can imagine any kind of situation. Can an existing administration and an attorney general start cutting

deals with states to say well, we're not going to apply the federal law, you know, so some gun law or some other thing and say well, we're not going to apply it in your state.

HARRIS:

I appreciate your point, but--but specifically, and I appreciate you answering the question, you do not intend to use the limited federal resources at your disposal to enforce federal marijuana laws in those states or in the District of Columbia that have legalized marijuana?

BARR:

That's right, but I think--

HARRIS:

--Thank you--

BARR:

--The Congress of the United States, it's incumbent on the Congress to--to regularize--you know, make a decision as to whether we're going to have a federal system or whether it's going to be, you know, a central federal law because--

HARRIS:

--I--I agree with you, (INAUDIBLE)--

BARR:

--This is breeding disrespect for the federal law.

HARRIS:

I agree with you. I--I believe Congress should act. I agree. Earlier today, Senator Leahy asked whether you would follow the recommendation of career Department of Justice ethics officials on whether you should recuse yourself from the Mueller investigation. You

said, "I will seek the advice of the career ethics personnel, but under the regulations, I make the decisions as the head of the agency as to my own recusal."

You also said to Senator Klobuchar that you do not want to, "Abdicate your duty since recusal decision would be yours." So my question is, would it be appropriate to go against the advice of career ethics officials that have recommended recusal, and can you give an example of under what situation or scenario you would go against their recommendation that you recuse yourself?

BARR:
Well there--there--there are different kinds of recusal. Some are mandated, for example, if you have a financial interest, but there are others that are judgment calls.

HARRIS:
Let's imagine it's a judgment call and the judgment by the career ethics officials in the agency are that you recuse yourself.

BARR:
Then--then in--

HARRIS:
--Under what scenario would you not follow their recommendation?

BARR:
If I disagreed with it.

HARRIS:
And what with the basis of that disagreement be?

BARR:

I came to a different judgment.

HARRIS:

On what basis?

BARR:

The facts.

HARRIS:

Such as?

BARR:

Such as whatever facts are relevant to the recusal.

HARRIS:

What you imagine the facts would be that are relevant to the recusal?

BARR:

They could be innumerable. I mean, there are a lot of, you know, for example, there's a rule of necessity, like who else would be handling it, it could be--

HARRIS:

--Do you believe that would be a concern in this situation if you are--if the recommendation is that you recuse yourself from the Mueller investigation, do you believe that would be a concern, that there would be no one left to do the job?

BARR:

No, I'm just saying--well, in some contexts, there very well might be because of, you know, who--who's confirmed for what and--and who's in what position. But apart from that, it's a

judgment call and the attorney general is the person who makes the judgment. And that's what the job entails.

HARRIS:

As a general matter, that's true, but specifically on this issue, what--under what scenario would you imagine that you would not follow the recommendation of the career ethics officials and the Department of Justice to recuse yourself from the Mueller investigation?

BARR:

If I disagreed with them.

HARRIS:

Okay, will move on. Senator Feinstein previously asked you whether you'd put your June 2018 memo--whether you put together that memo based on nonpublic information. Your response was that you, "Did not rely on confidential information." Are you creating a distinction between nonpublic information and confidential information?

BARR:

No.

HARRIS:

Okay. In response to a question from Senator Durbin about harsh sentencing laws, you stated in response to the crack epidemic that community leaders, back when you were attorney general previously, asked for these types of sentencing laws. Now, my understanding is that many of these community leaders at that time, and I was a young prosecutor during those days, knew and said even then that the crack epidemic was a public health crisis and that--that was really the chorus coming from community leaders, not that they wanted drug addicted people to be locked up.

And similarly now, we can find that, in most of the communities afflicted by the opioid crisis, they are similarly, these community leaders, asking that it be addressed for the public health crisis that is. So my question is if and when you are confirmed in this position, would you agree that, when we talk about the opioid crisis, the crisis in terms of methamphetamine addiction or any other controlled substance, that we should also acknowledge the public health ramifications and causes and that there is a role for the chief law enforcement officer of the United States to play in advocating for public health response and not only a lock them up response?

BARR:

Well, I--I think the commission that was chaired by Governor Chris Christie came up with a three-pronged strategy and I think that recognized that part of it was a treatment, an education, recovery, and prevention. But the third prong of it was enforcement and interdiction, and that's the job of the Department of Justice. The Department of Justice can't be all things to all people and--

HARRIS:

--sir, but I would suggest to you that in the intervening almost 30 years since you were last attorney general, that--that--that there is consensus in the United States that when we look at the drug epidemic, whatever the narcotic may be, that there is now an understanding that the war on drugs was an abject failure, that America, frankly, has a crisis of addiction, and that putting the limited resources of our federal government into locking up people who-- who suffer from a public health crisis is probably not the smartest use of taxpayer dollars. So if confirmed, I'd ask that you take a look at the more recent perspective on the drug crisis that is afflicting our country. And I'll move on, today there is $1 billion--

BARR:

--well, excuse me, can I just say something in response to that?

HARRIS:

Sure.

BARR :

Which is I was just making the observation that the job of the Department of Justice is enforcement. I recognize there are a lot of dimensions to the problem, and that's what we have places like HHS. The department can't, you know, can't do the job of everybody.

HARRIS:

Sir, but I would remind you what you said because I agree with it, you said earlier the role of the attorney general, one, is to enforce the rule of law, two is a legal advisor to the president and the cabinet, and three is policy. This is a policy issue, so I urge you to emphasize that role and power that you will have if you're confirmed, and think of it that way.

BARR :

I see, yeah.

HARRIS:

I'd like to talk to you with you about private prisons. There is a billion-dollar private prison industry that profits off of incarcerating people and, frankly, as many as possible. By one estimate, the two largest private prison companies in the United States make a total combined profit of $3.3 billion, that's with a B, dollars a year. In August 2016, the Justice Department issued a report on the Bureau of Prisons, use of private prisons that concluded, "Contract prisons incurred more safety and security incidents per capita than comparable Bureau of Prisons institutions." Given this conclusion that prisons run by for-profit companies have been found to be less safe than government run prisons, if confirmed, will you commit to no longer renew private prison contracts?

BARR :

Whose report was this? BOP?

HARRIS:

This was--yes. From the Justice Department.

BARR:

BOP? Yeah, I'd like to, you know, I would obviously look at that report. Yes.

HARRIS:

Okay, and then--

BARR:

--But I'm not committing--I mean, I'd want to see what the--the report says.

HARRIS:

Sure. And then I'd appreciate a follow-up when you have a chance to read it.

BARR:

Sure.

HARRIS:

Thank you. My time is up.

TILLIS:

Thank you, Mr. Chair. Mr. Barr, thank you for being here. And Liam, your granddaddy's doing good.

Mr. Barr, I want to go back because it's a long time--I think I'm the last person in the first round. So, I think we have to go back and maybe have you restate some things that you said earlier before I get to a few other things that I hope I have time to cover on intellectual property, Americans with Disability Act, and a GAO report back from 2014.

I'm--I do have to ask a question while Senator Kennedy is here 'cause I don't think he covered the full landscape. He asked about anybody in government, anyone in Western Hemisphere, but did you in fact talk to anybody in the Eastern Hemisphere with respect to the Mueller probe?

BARR:

No, I didn't.

TILLIS:

Okay. Thank you. We got that--we got that--

KENNEDY:

--Ask him about the Milky Way.

TILLIS:

We got that closed out.

You know, the--would you go back again and please describe for me the--first off, I think we've all--you've made it very clear, in spite of the fact some people thought that you had coaching and some of the citations in the memo that you wrote, that this was a memo you wrote on your own. Can you explain to me again the--the motivation behind the memo, what precisely you were trying to communicate, just for the record?

BARR:

Yes, senator. So, the public commentary and media commentary was sort of dominated by discussion of obstruction of justice, and everyone was throwing out obstruction theories and so forth. And the statute that relates to obstructing a proceeding that's not yet in being, that is some future proceeding, is 1512.

And my view was--of the particular provision, 1512(c), was that it requires--what it covers is obstruction by means of impairing evidence, that you know some evidence is going to be needed in a future proceeding and you impair it either by making it not available or by corrupting it in some way, altering it, destroying it. That's what I thought the scope of that statute dealt with.

And to my knowledge, the only cases ever brought under it involved the destruction of evidence. Based on public reports, which may be completely wrong, I thought that the--it was being--that--that the special counsel may be trying to interpret the statute to say that any act, not destruction of evidence or anything like--but any act that influences a proceeding is a crime if it's done with a bad intent.

My concern there is that, unlike something like bribery statute or document destruction where you prohibit it, that's a bad act. You don't need to be performing that bad act if you're a government official. But if you say that any act that influences a proceeding is a crime if you have a bad state of mind, that's what the people at Justice Department do every day of the week is influence proceedings. That's what they're there for.

And what I was worried about is the impact on the department and other agencies if you say to someone if you, in--in supervising a case or handling a case, make a decision with a--for a bad intent, it can be a crime. And I thought that that would essentially paralyze the government.

So, just to give an example, you know, Eric Holder made some pardon recommendations during the Clinton administration which were controversial. Incidentally, I supported Eric Holder for his position. But could someone come along then later and say, well, if you did that for a political reason to help Hillary Clinton run in New York, that's a crime, and when he's--when he's exercising his prerogatives, you know, in that situation? And you can just see how that could paralyze government. And that was--

TILLIS:

--Could you--

BARR:

--My concern.

TILLIS:

You also referred to your concerns with the prosecution of Senator Menendez--

BARR:

--Um-hmm--

TILLIS:

--That weave into that same thought process.

BARR:

Yes, because in that case my concern was that they were basically taking activities that were not, you know, wrongful acts in themselves. You know, the political contributions were lawful political contributions. And the--the things with, you know, the travel on his friend's--that was his friend for 25 years. They were taking a trip together.

And you take those kinds of things and then you couple it with official action, and then the prosecutor comes along and says, well, we're going to look into your mind and see what your subjective intent was for performing these two sets of lawful acts, and we're going to say, you know, that you're corrupt.

TILLIS:

Right.

BARR:

So, I just think that gives too much power to the prosecutor. And I think if that kind of--by the way, you know, they've had cases like this for--you know, I mean, they've been



pursuing things like this, and they've had to be slapped down a few times by the Supreme Court on these kinds of aggressive things involving, you know, quid pro quos on the Hill. So, I--

TILLIS:

--Let me--

BARR:

--Yeah--

TILLIS:

--If I can--

BARR:

--Yeah--

TILLIS:

--Thank you. I just thought it was helpful because think you tried to explain a lot of that and you were cut off. So, I thought I'd use some of my time in the first round to ask you that.

Also, I think somebody tried to characterize you as having somehow been opposed to any sort of Russia probe or Russia investigations. Have you ever gone on record as opposing any of the things that we're trying to do to figure out where Russia may have been involved in election tampering?

BARR:

No. And in fact, in the op-ed piece where I said I thought the president was right in firing Comey, I said that the investigation was going forward under the supervision of Rod Rosenstein.

TILLIS:

Yeah. Did you also say more than one time that you felt like the special counsel investigation should reach a conclusion, that--that Special Counsel Mueller shouldn't be--that he should be allowed to draw this to a--a conclusion, that he will submit his report and you're going to do everything that you can to present as much of that information as you can--as you can--

BARR:

--Um-hmm--

TILLIS:

--To the extent that confidential information is not being compromised?

BARR:

Well, to the--yeah, to the extent the regulations permit it. Yeah.

TILLIS:

Did you also say that there is--even a scenario where--you can't imagine a scenario for cause, but even a scenario for cause where you'd have to--you'd have to take under serious consideration before you would remove special counsel?

BARR:

That's right.

TILLIS:

Yeah. Okay.

BARR:

There hasn't been a special counsel removed since Archibald Cox, and that didn't work out very well.


TILLIS:

Didn't work out too well, right.

And so--and again, did you also say that under--in no circumstances have you had a discussion with the president with respect to--I think you said you had a discussion about you had a relationship with Mr. Mueller, but no discussion about the special counsel investigation and your opinions on it with respect to any discussions you've had with the president?


BARR:

Right. That was the first meeting I had with the president, and then in November I met with him about the attorney general job. And there was no discussion of the substance of an--of the investigation. The president didn't ask me my views about any aspect of the investigation and he didn't ask me about what I would do about anything in the investigation.


TILLIS:

Yeah.

With respect to the line of questioning about the states that have legalized marijuana, either for medicinal purposes or recreational purposes, I think what you were trying to say in a very, very respectful way is it's not your job to do our job. Is that right?

That if we ultimately want to provide certainty for these business--you've done a good job in saying that you disagree with the policy of the states but we are where we are, and you would not want to undermine that given that investments have been made, states have moved forward. But at the end of the day, we should stop talking about it here and making it your job. And those members--I don't happen to be one of them--who think that we should take

these federal laws off the books should probably file a bill and try and get it done. Is that a fair assessment of your opinion?

BARR:

That's--that's generally fair, yes. I--

TILLIS:

--Yeah.

BARR:

Yeah.

TILLIS:

Just a few minor things so that we can get to the next round. There was a report by the inspector general in 2014 that had to do with accountability in the Department of Justice. I'm--I don't expect you to be familiar with this report. But there were some very interesting observations there about a lack of follow through on disciplinary action for a number of--I think the subtitle of the report was that DOJ could strengthen procedures for disciplining attorneys.

It's something I would commend to you, and maybe dust off and see if there have been any actions since this report. I didn't get a satisfactory answer when it was contemporary with a nominee from the Obama administration for the position you're seeking, which is one of the reasons why I opposed the nomination.

BARR:

Actually, I--I think very highly of Inspector General Horowitz. And I haven't seen that report, but that issue is one that I plan to take up--

TILLIS:

--Yeah--

BARR :
--With him.

TILLIS:
And then just so that I do finish on time versus pretend I'm going to and go two minutes early--over, one, I want to get your recommendation on intellectual property. I think we have more work to do to give the Department of Justice tools to go after bad actors, which are China, Russia, India, a number of other countries, Brazil, that are stealing our intellectual property.

I also want to talk about what I think is the exploitation of the Americans with Disabilities Act, particularly around website access. The web didn't exist, and now we have attorneys filing a number of frivolous lawsuits; would like to get some feedback on that after you get confirmed.

And finally, I want to make sure that you recognize in the First Step Act that faith-based organizations that have proven to help reduce recidivism are absolutely in play for the First Step Act. And hopefully we can make sure the Department of Justice moves forward with that.

Thank you, Mr. Chair.

BARR :
Thank you, senator.

GRAHAM:
I believe that's the end of the--the first round. Mr. Barr , you're able to go for a little bit longer?

BARR:

Sure.

GRAHAM:

Okay. So, we'll start. We'll do five minutes. As you can tell, I've been pretty liberal with the time, but let's try to honor it the best we can. Senator Grassley?

GRASSLEY:

Where he left off on using--working with faith-based institutions you were very positive about that?

BARR:

Absolutely, senator.

GRASSLEY:

That takes care of my first question. Enforcement of the antitrust laws is extremely important to ensure that markets are fair and participants don't engage in abusive activity harming consumers. If've been particularly active in making sure that the Justice Department of Federal Trade Commission carefully scrutinized mergers as well as looking out for anti-competitive behaviors and predatory practices in certain sectors of the economy and particularly in my state of Iowa, the agricultural industry. But I'm also pursuing things in healthcare.

In particular is because I will be chairman of the Senate Finance Committee, I am interested in making sure back companies in drug and healthcare industries are playing by the rules. Everyone's concerned about the high cost of healthcare and especially the skyrocketing price of prescription drugs. Do you agree that the Justice Department has a very important role in this area?

:

Yes, senator.

GRASSLEY:

And would you commit to making antitrust enforcement a priority?

BARR:

Yes, it has to be a priority.

GRASSLEY:

Okay, thank you.

GRASSLEY:

Now to a favorite issue of mine, whistleblower protection. Whistleblowers, as I told you in my office, are very critical to exposing waste, fraud, and abuse. They're our eyes and ears on the ground. Their courage when they have it and they--most of them do have great courage or they wouldn't come forward to expose government malfeasance, that's how important they are. So I hope I can have you have a favorable view towards the opportunity to listen to whistleblowers, protect them from retaliation and promote a culture that values important contribution from those patriotic people.

BARR:

Absolutely, senator.

GRASSLEY:

Now to the Foreign Agents Registration Act. I hope you understand there have been very few prosecutions under the Foreign Agents Registration Act since 1938 and so that law enforcement I think is good thing obviously even since the Mueller investigation getting a lot more attention now. But we--we had a hearing on it before the committee and I think it

proves that we should see more transparency and more enforcement against bad actors, not less.

Do you agree that the Foreign Agents Registration Act is a critical national security and public accountability tool and if confirmed will you commit to make sure that that act is a top priority?

BARR:
Yes, senator.

GRASSLEY:
Okay. So then getting back to legislation that I think will improve that 1938 Act I introduced the Disclosing Foreign Influence Act to improve transparency, accountability, and enforcement. You haven't probably read that act but I would like to work with you even though it's not in this committee, it's in Foreign Relations Committee. I would like to have you work with us so it's something that we can pass and make sure that this law is more useful than it has been over the last 80 years.

I support the Freedom of Information Act and the public disclosure of government (INAUDIBLE). Transparency yields accountability. You hear me say that all of the time and that's true, no matter who's in the White House.

When I was chairman of the committee, I helped steer FOIA Improvement Act into law which creates a presumption of openness and that presumption of openness is a very important standard. The Justice Department oversees the federal government's compliance with FOIA. So I hope you would agree that FOIA is an important tool for holding government accountable and if confirmed then would you make sure it's a top priority to make FOIA and the faithful and timely implementation of the 2016 amendments a top priority?

BARR:

Yes, we will work hard on that.

GRASSLEY:

Because you know what really happens in the bowels of the bureaucracy, it just takes them forever because maybe something's going to embarrass on them so they don't want it out in the public so you get all sorts of excuses. We've got to do away with those excuses.

One way to make FOIA work better is by reducing the number of requests. This will be my last question. By--one way to make FOIA work better is by reducing the number of requests that have to be made in the first place. That's why I'm a strong advocate for improved proactive disclosure.

If confirmed will you commit to help advocate for more proactive disclosure of gover-- rectors (SP)? Now that's not just by the Justice Department but because your government or your department's top dog in this particular area in the federal government overall?

BARR:

Yes, senator.

GRASSLEY:

Thank you.

GRAHAM:

Senator Feinstein?

FEINSTEIN:

Mr. Barr, I see you have staying power, but I see it runs in the back family, and particularly your grandson. I'd like to send a little care package down to him.

(LAUGHTER)

He deserves a medal.

BARR:

Thank you, senator.

FEINSTEIN:

You're welcome.

BARR:

He doesn't have to share it with the rest of the family.

FEINSTEIN:

In 1994, you said that gun control is a dead end. It won't reduce the level of violent crime in our society. The year you made this comment, I introduced a federal assault weapons ban and the weapon president signed it into law. A 2016 study shows that, compared with the 10-year period before the ban was enacted, the number of gun massacres between '94 and '04 fell by 37 percent and the number of people dying from gun massacres fell by 43 percent.

In addition, between 2004 and 2014, there has been 183 percent increase in massacres and a 239 percent increase in massacre deaths. Do you still believe that prudent controls on weapons won't reduce violent crime? And if so, what is your basis from this conclusion?

BARR:

I think the--the problem of our time is to get an effective system in place that can keep dangerous firearms out of the hands of mentally ill people. That is--should be priority number one and it's going to take some hard work and we need to get on top of the problem, we need to come up with, agree to standards that are prohibitors of people who are mentally ill, we have to put the resources in to get the system built up the way we did many years ago on the--on the felon records and so forth. We--we have to get the system working.

And as I say, it's--it's sort of piecemeal a little bit right now. We need to really get some energy behind it and get it done. And I think we also need to push along the--the ERPOs so that we have these red flag laws to--to supplement the use of the background check to find out if someone has some mental disturbance. This is the single most important thing I think we can do in--in the gun-control area to stop these massacres from happening in the first place.

FEINSTEIN:

Well, thank you. I'd like to work with you in that regard.

BARR:

Yes.

FEINSTEIN:

In August 2002, the Justice Department's Office of Legal Counsel issued opinions authorizing enhanced interrogation methods that included waterboarding and extended sleep deprivation. These opinions were later withdrawn and the Justice Department's Office of Professional Responsibility found that they reflected a lack of, this is a quote, "A lack of thoroughness, objectivity, and candor." In 2015, I worked with Senator McCain to pass legislation making clear that enhanced interrogation techniques are unlawful and limit--and limiting authorized interrogation techniques to those listed in the Army Field Manual. And that is the law today. If confirmed, will you ensure that the Justice Department upholds the law?

BARR:

Yes, senator. I--I think that that was an important change because I think it gave clarity to the law and I support--I will support that.

FEINSTEIN:

Thank you. I'm delighted to hear that. Now, a lot of us have asked about the Mueller report and whether you would probe permit to providing it to Congress. When asked, I thought you said yes, but when I tried to clarify it, I meant the full report including obstruction of justice. You again said yes. Then, when Senator Blumenthal asked you about the Mueller report you seemed to make a distinction and said you were going to provide your own report based on Muller's report but not the report, this is the way we understood it, not the report he submits at the end of the investigation.

This is concerning as there is nothing in the regulations that prevent you from providing Mueller's report to Congress. While the regs refer to a confidential report to be provided to the attorney general, the regs do not state that confidentiality means the report cannot be provided to Congress. So here's the question, will you provide Mueller's, excuse me, Mueller's report to Congress, not your rewrite or a summary?

BARR:

Well, the regs do say that Mueller is supposed to do a summary report of his prosecutive and his declination decisions and that they will be handled as a confidential document, as our internal documents relating to any federal criminal investigation. Now, I'm not sure--and--and then, the AG has some flexibility and discretion in terms of the AG's report.

What I am saying is my objective and goal in the goal is to get as much as I can of the information to Congress and the public. And you know, these are departmental regulations and I'm going to be talking to Rod Rosenstein and Bob Mueller. I'm sure they had discussions about this. There's probably existing thinking and the department as to how to handle this, but all I can say at this stage, because I have no clue as to what's being planned, is that I am going to try to get the information out there consistent with these regulations. And to the extent I have discretion, I--I will exercise that discretion to do that.

FEINSTEIN:

Well, I can only speak for this side, and maybe not all the side, but we really appreciate that. In the degree to which you can get us a prompt report in the fullest possible form would be

really appreciated and I think there has to be a realization to among the administration that this is an issue of real concern to people and to the Congress and we should be able to see the informed information that comes out. So--

BARR:

--I understand--

FEINSTEIN:

--I'm very hopeful.

BARR:

Thank you.

FEINSTEIN:

Thank you. Let me ask this question on enhanced--did my time run out?

GRAHAM:

Yeah, but go ahead.

FEINSTEIN:

On enhanced interrogation. During a 2005 panel discussion, you said the following, I think, about interrogating suspected terrorists. And I quote, "Under the laws of war, absent a treaty, there is nothing wrong with coercive interrogation applying pain, discomfort, and other things to make people talk so long as it doesn't cross the line and involve the gratuitous barbarity involved in torture."

This is a panel discussion civil liberties and security July 18, 2005. Do you believe that torture is ever lawful?

BARR:

No.


FEINSTEIN:

Is waterboarding torture?


BARR:

You know, I--I'd have to look at the legal definition. You're talking about under the--right now is prohibited. So you know, the law has--


FEINSTEIN:

--The technique, yes--


BARR:

--Has definitively dealt with that. I can't even remember what the old law was that defined torture. I'd have to look at that and then, you know, figure out what's involved in that. But it--


FEINSTEIN:

--What--


BARR:

Sorry.


FEINSTEIN:

Keep going. I didn't mean to interrupt.


BARR:

No, it's okay, senator.

FEINSTEIN:

At what point does interrogation cross the line to the, "Gratuitous barbarity involved in torture?" That's your quote.

BARR:

Well, I wasn't using--using that as a legal--the gratuitous barbarity, that's--that's what I was-- I was--I was saying torture is gratuitous barbarity. So I wasn't saying that gratuitous--

FEINSTEIN:

--Oh, well that's helpful then. That's helpful.

BARR:

Yeah.

FEINSTEIN:

And you define waterboarding, you know, one would think these questions would never be necessary. I thought that all my life and then I found I was wrong, and they really are. And I was chairman of intelligence when we did the big torture report and what I found and what I saw was really indicative of reform. So I think for the attorney general, knowing the position is really very important. So maybe you could concisely state your position on torture.

BARR:

I--I don't think we should ever use torture and I think that the clarification that your--was it your legislation of the putting in the Army--

FEINSTEIN:

--It was McCain's bill--

BARR:

--The field--the Field Manual--

FEINSTEIN:

--That's right--

BARR:

--Was an--was important to clarifying where the line is.

FEINSTEIN:

Thank you. Thank you, Mr. Chairman.

GRAHAM:

Senator Cornyn.

CORNYN:

Mr. Barr, I want to talk about guns and I want to talk about China in the five minutes we have together.

Back in 1992, there was some discussion about your position on Congress's role when it talks to banning certain types of semi-automatic weapons, sometimes people call those assault weapons. But in the intervening years, the Supreme Court has now spoken in both the Heller and McDonald case and recognized that the Second Amendment confers an individual fundamental right to bear arms.

Could you sort of bring us up to date from your views in 1992 and how they were affected by Heller and McDonald and what your views now are on the Second Amendment?

BARR:

Sure. I--I think I opposed an assault weapon ban because I felt that that was really sort of the aesthetics of the gun and but, you know, since that time Heller has been decided. Actually, before Heller, I did work at OLC on--on this issue and I personally concluded that the Second Amendment creates a personal amendment right under the Constitution. It's based on the Lockean notion of the right of self-preservation. It's tied to that.

And I was glad that--to see Heller come out and--and vindicate that initial view that I had and so there's no question under Heller that the right to have weapons is--firearms is protected under the Second Amendment and is a personal right. At the same time, there is room for reasonable regulation.

And you know from my standpoint what I would look for is--in assessing a regulation is what's the burden of law-abiding people and is it proportionate to whatever benefit in terms of safety and effectiveness will be conferred? As I said just a moment ago let's get down to the real problem, we are confronting which is keeping these weapons out of the hands of people who are mentally ill. And--and I think all of the rest of this stuff is really a sensually rhetoric until we really get that problem dealt with in terms of--of regulatory approaches.


CORNYN:
Well, as our colleague the senator from Louisiana, Senator Kennedy, likes to say the Bill of Rights is not an a la carte menu and I--I agree with that and I also agree that this is--there are many facets to these mass violence incidents. After the shooting at Sutherland Springs we found out that the background check system, the national instant criminal background check system, was not being used appropriately by the U.S. government, in that case, the Air Force and if it had been this individual who killed 20 people, injured 26 more at a Baptist church right outside of San Antonio would not have been able to legally get his hands on the firearm by lying.

But certainly the mental health issue that you mentioned we've done work there with--


BARR:

Fix NICS.

CORNYN:

In the Fix NICS area. We've also done--done expanded pilot programs on assisted outpatient treatment for people suffering from mental illness recognizing that it is difficult for any family member to control particularly an adult but that providing an opportunity to go to court and get basically a civil order that would require them to comply with their doctor's orders, take their medication and the like. I am thinking of Adam Lanza at the Sandy Hook shooting whose mother did not know how to control him as he was getting more and more ill and only to have him take the very--her very weapon and then kill her and then go murder the innocent children. So--

On China do you agree with me that China represents probably one of the preeminent economic challenges to America because particularly because of their theft of intellectual property and their exploitation of gaps in foreign investment that we've tried to address through improvement of the CFIUS process the committee on foreign investment in the United States? But talk to me a little bit about what you see the challenge of China both economically and from a national security standpoint.

BARR:

Well, the--the Chi--I think I think they are the paramount economic and military rival in the world. I think that they are--they are very formidable because they take the long view. They have been stealing our technology and they have been gradually building up their military power and investing in new technologies.

I--I think from a military standpoint it's very disturbing how much progress they are making largely based on U.S. technology. And I was very please--I really thought that Attorney General Sessions was right on target in setting up his China Initiative in the department to start going after the pirating of American technology and other kinds of illegal activities that Chinese nationals are involved in here in the United States and even abroad.

CORNYN:

Would you--do you share my skepticism that Chinese telecommunications companies like Huawei and ZTE in terms of how that once in the hands or in the networks of unsuspecting countries that that could be used for espionage purposes and theft of intellectual property?

BARR:

Yes, in fact even in my old Verizon days we understood the danger and would not use that kind of the equipment even though it's economically it would be economically attractive. Yeah.

GRAHAM:

Before Senator Leahy I would like to on behalf of Senator Feinstein introduce into the record letters that express opposition or concern from groups like the Leadership Conference on Civil and Human Rights, Planned Parenthood, People for the American Way, National Education Association, Alliance for Justice, NARAL, National Urban League, the National Council of Jewish Women, Center for American Progress and the Human Rights Campaign and a letter from Representative Raul Grijalva. I hope I didn't--I hope I got his name right from Arizona.

In support we have letters from the International Association of Chiefs of Police; letter from the National Fraternal Order of Police; numerous letters signed from 100 former federal law enforcement national security officials including three former attorney generals; and a lot of U.S. attorneys and heads of the CIA, FBI and Department of Homeland Security; a letter from the National Narcotics Officers Association; a letter from the International Union of Public Police Associations; a letter from Major Cities Chiefs Association; a letter from the Association of State Criminal Investigative Agencies. Without objection, I would like to enter all of that into the record.

Senator Leahy.

LEAHY:

Thank you, Mr. Chairman.

Just when you--you just mentioned being at Verizon during the NSA's metadata program relative to the PRISM--PRISM upstream. It required telecom internet providers, you know, to hand over huge amounts of data to the government. And you testified in 2003 that the law is clear that a person has no fourth amendment rights in these records left in the hands of third parties, the third party doctrine.

I actually disagreed with you at that time. And I hope you would now, especially as the Carpenter decision just came down, and written by Chief Justice Roberts, that this is generally requiring the government to get a warrant to obtain geolocation information through cell site location information. Does that change the opinion you had back then?

BARR:

Well, it sounds like it--I haven't read that decision, senator. It--it may modify my views. I'd have to read the decision. I was going on the Miller decision relating to--

LEAHY:

--It actually--

BARR:

--Bank records. But also you mentioned the--you were tying this to the NSA collection, because--and then tying it to my testimony, because, you know--

LEAHY:

--Well, you had said that no--a person has not fourth amendment rights in these records left in the hands of third parties, the third party doctrine.



BARR:

Yeah, that was the--

LEAHY:

--It seems to be undercut by--by Carpenter.

BARR:

Okay. I'm--I'll--I'll take a look at that. But--

LEAHY:

--Well, then would you respond--

BARR:

--I don't want people to have the impression that Verizon was involved in--

LEAHY:

--Would you respond--

BARR:

--Spying--

LEAHY:

--For the record on that question?

BARR:

Yes. Sure. Certainly.

LEAHY:

And you said back in November of 2017 you saw more basis for investigating the Uranium One deal than any supposed collusion between President Trump and Russia and, by not pursuing these matters, the department is abdicating its responsibility. Just about everybody's debunked the Uranium One controversy. I think probably the nail in the coffin was President Trump's biggest supporter, Fox News, debunked it. Did I miss something in here?

BARR:

No. Actually, that--you know, I--you'll notice that there were no quotes around that, and then the next sentence is plural, matters. And my recollection of that is what--I think it was relating to the letter and the appointment of Huber in Utah to look into a number of things.

And the point I was trying to make there was that, whatever the standard is for launching an investigation, it should be dealt with evenhandedly, that whatever that trigger is should be applied to all. I have no knowledge of the--Uranium One. I didn't particularly think that was necessarily something that should be pursued aggressively. I was trying to make the point that there was a lot out there. And I think all that stuff at the time was being looked at by--by Huber. That's my recollection. I may be wrong on that.

LEAHY:

Well, I think the fact that the investigation has been pretty well debunked, we don't have to worry about in the future. But we do have one thing that's happening right now. The Trump shutdown is in its 25th day.

The Justice Department has a hundred and--or has 13,000 FBI agents, 16,000 prison guards, 3,600 U.S. Marshals, 4,300 Drug Enforcement Agents. They're all working without pay. The FBI Agents Association, I realize it's not part of the government, but the association described the effect of the shutdown as a potential national security issue.

So, let me just ask you. In your years of experience at the department, what impact do you believe a long term shutdown has on law enforcement?

BARR:

Well, I think most--most people involved in law enforcement are--I don't know if the--the--the lingo is still the same. They used to be called essential. I think it's been changed to something else. But I think they're on the job, but obviously we'd like to--people would like to see the shutdown ended, and that's why people want to see some kind of compromise.

And, you know, you call it the Trump shutdown, but, I mean, it takes two to tango. And I sort of wonder--

LEAHY:

--Well, I would--

BARR:

--Why can't--

LEAHY:

--Only because he called it that--

BARR:

--Oh--

LEAHY:

--In his meeting--

BARR:

--Okay--

LEAHY:

--In the White House. And I said finally I've got something I could agree with him on, and-- because senator--

BARR:
--Well--

LEAHY:
--Senator Shelby and I had put together appropriations bills that passed almost unanimously in the Senate at a time when it--that would have kept the government open. That's at a time when it's hard to get something unanimous saying the sun would rise in the east, and I--so, I was just agreeing with the president.

But no matter what you call it, isn't it a fact that this does have an effect on law enforcement?

BARR:
Well, not having a wall also has an effect on law enforcement.

LEAHY:
Yeah. Yeah, and not paying our law enforcement people.

We've both had experience in law enforcement, you at the national level, me at the state level. You don't pay our law enforcement people, I think there's an effect. You have some very dedicated people, but you have some very distracted people.

Do you believe the voter ID laws and similar restrictions on voting actually promote democracy by discouraging voters who are not really paying attention to what's going on, going back to a panel discussion you had a few years ago?

BARR:
Yeah. Yeah, what I said there was that, in that panel discusson, there was a lot of people complaining about the lack of--that--that many Americans aren't educating themselves

about the issues and they're passive, and that it was important to--and--and--and the--and also that the voting participation was dropping.

And I--my position was that the underlying problem is the citizen--you know, the--the--the citizen who is not paying attention to public events, not educating themselves about the issues and so forth, and that the nonvoting is a symptom, and I didn't see driving up participation as addressing the primary underlying problem.

That was my point. And I pointed out that when the Constitution was adopted, the turnout was about 33 percent, my understanding. So--and then I said, you know, low participation has been a problem from the very beginning.

But my view is that--that voter turnout shouldn't be artificially driven up without also addressing the issue of an informed citizen rate, which I think is a problem.

LEAHY:

We--we do have voting laws that guard against discrimination, the arbitrary closing of voting booths in a predominantly African American area, for example.

BARR:

Um-hmm.

LEAHY:

Would you have any problem in vigorously enforcing our voting rights laws that are on the books?

BARR:

Of what, vigorously? No, not at all. I--I--I said one of my priorities would--would be that. I think we have to enforce the voting rights. And I wasn't suggesting that voting should be suppressed.

I was just saying that the low turnout is ultimately attributable to sort of the--I--I don't know what the word to use is, but, you know, that the citizenry doesn't seem to be that engaged, you know, in--in the public affairs of the country.

LEAHY:
Well, they are in Vermont.

BARR:
Hmm?

LEAHY:
I say they are in Vermont.

BARR:
Yeah. And what--

LEAHY:
--We have one of the highest turnouts in the country.

BARR:
That's good. Yeah, excellent.

GRAHAM:
Thank you.

LEAHY:
Thank you, Mr. Chairman.

GRAHAM:

Thank you. We're going to have two votes at 4:10. Can you go for a bit longer?


BARR:

Um-hmm.


GRAHAM:

Senator Sasse.


SASSE:

Thank you, chairman. General, I'd like to return to this disturbing topics of human trafficking and sex trafficking. You've answered a few questions here today. I'd like to look at the November 28 Miami Herald investigative series that I know that you followed into the crimes of Jeffrey Epstein and I want to quote from that. Epstein, a wealthy hedge fund manager, "Assembled the large cult-like network of underage girls with the help of young female recruiters to coerce into having sex acts behind the walls of his opulent waterfront mansion as often as three times a day."

The report continues, "He was also suspected of trafficking minor girls, often from overseas, for sex parties at his other homes in Manhattan, New Mexico, and the Caribbean." The Herald series continues, "In 2007, despite ample physical evidence and multiple witnesses corroborating the girl's stories, federal prosecutors and Epstein's lawyers quietly put together a remarkable deal for Epstein, then age 54. He agreed to plead guilty to two felony prostitution charges in state court and in exchange, he and his accomplices received immunity from federal sex trafficking charges that could have sent him to prison for the rest of his life."

"He served 13 months in a private wing of the Palm Beach County stockade. His alleged co-conspirators, who helped schedule his sex sessions, were never prosecuted in the deal, called, again this is the Miami Herald, a federal non-prosecution agreement was sealed so that no one, not even his victims, could know the full scope of Epstein's crimes and who else was involved." The fact that federal prosecutors appear to have crafted this secret

sweetheart deal for a child rapist obviously enrages moms and dads everywhere. On this particular case, will you commit to making sure that there is a full and thorough investigation into the way DOJ handled the Epstein case?

BARR:

Senator, I have to recuse myself from Kirkland & Ellis matters I am told, and I think Kirkland & Ellis was maybe involved in that case. So I need to sort out exactly what--what my role can be, but, you know, I will say that if--if on confirmed, I'll make sure your questions are answered on this case.

SASSE:

Thank you. The deputy attorney general obviously there have been immediate reports about the timing of his potential departure post your confirmation and the DAG, as you all know from your prior history, has a key responsibility in deconflicting different parts of the department. Those of us who've been pressing on this matter have found, in different parts of the department, a lot of anxiety about the way this was handled and yet kind of a hot potato of a bunch of people thinking they're not responsible.

Right now, right Rod Rosenstein has been helping trying to de-conflict some of that, but I'm worried if--with your potential recusal if the DAG also departs it's not clear who's going to actually do conflict this. So I'm grateful for your pledge that the department will be responsive even if not you, personally.

BARR:

That's right, sir.

SASSE:

More broadly than the miscarriage of justice in this particular Florida case, would you agree that justice has nothing to do with the size of your bank account or the number of attorneys you can hire?

BARR:

Yes.

SASSE:

I agree and I think that a whole bunch of Americans wonder about the Department of Justice and how we are trying to prioritize or how we should be prioritizing our responsibility to the victims of sex trafficking who are left afraid and voiceless. In this particular case, many of the women who were clearly victims, trafficked, rape victims, had no awareness of the fact, and I think in violation of federal statute statutes of victim notification that this non-prosecution agreement had been agreed to, and not just that Epstein and his co-conspirators were not indicted, but the rest of the investigatory matters of the department were also suspended. It seems truly bizarre.

I think moms and dads watching this hearing would like to know that you will pledge broadly to attack sex trafficking as a scourge and our society on both the supply side and the demand side as these dirtbags demand this, but on the supply side as organizations clearly perpetrate these crimes. Can you pledge to us that this will be one of your priorities at the department?

BARR:

They can count on it.

SASSE:

Thank you, sir.

GRAHAM:

I want to associate myself with what Senator Sasse said about the Epstein case and the problem in general. And to the extent you can help us figure this out, please.

BARR:

Yes.


GRAHAM:

Senator Durbin.


DURBIN:

Thanks, Mr. Chairman. Mr. Barr, thank you for being with us. Mr. Barr, my colleague, Senator Ernst, ask--ask a question earlier which I'm sure would be asked in virtually every state we represent, what we are doing to stop the flow of narcotics into the United States. She asked about meth I believe in particular but about narcotics coming in from Mexico and your reply was and I quote it is the major avenue of how drugs come into the country.

They come cross that order. I feel it is a critical part of border security and we need barriers on the border. That was your quote.

I'm troubled by that answer and I--I'd like to clarify it because if we're ever going to have a rational conversation about border security there ought to be some basics that we agree on. The DEA which you will supervise if confirmed, in its 2018 report said quote the most common method employed by the Mexican drug cartels involves transporting illicit drugs through U.S. ports of entry and passenger vehicles which concealed compartments are co-mingled with legitimate goods on tractor-trailers. The customs and border protection's own data shows that customs officers at legal ports of entry seize the vast majority of lethal narcotics coming into this country.

In fiscal year 2017, last year we have data, 87 percent of the fentanyl which has been identified as CDC as the most deadly narcotic in America, 87 percent seized in our country coming in through ports of entry, 13 percent ceased outside of ports of entry.

So overwhelmingly when we talk about building new walls and barriers to stop narcotics, we are ignoring the obvious, 80 percent to 90 percent of the drugs are coming in through ports of entry. I mit--I met with the head of customs and border protection. He said the number one thing we can do is to put technology in the ports of entry to scan the vehicles coming through.

Currently, only 17 percent of trucks and cars coming through those ports of entry are being scanned, 17 percent. That means 83 percent of them are just flowing right on through. They are bringing narcotics to Iowa and to Illinois. Building a new concrete wall from sea to shining sea doesn't even address this issue. Technology does.

I want to reach the point where we open the government and have this honest conversation. Would you reconsider your earlier answer as to the fact that we need to build more barriers to stop narcotics from coming into the United States?

BARR:

Well, it wasn't tied just to narcotics. It was tied to overall border security which--

DURBIN:

You said a major avenue for how drugs come into this country. It's not.

BARR:

I said was--was across the b--

DURBIN:

Across the border.

BARR:

Wait a minute. I--I--go ahead.

DURBIN:

The border is the major avenue but your answer was we need barriers on the border.

BARR:

Right, because drug you know we need barriers on the order for border security part of what we are trying to do is cut down on drugs, it's also illegal aliens, it's also people from other countries who may wish to do harm in the United States that are coming in. And barriers are part of the answer and from my experience, the threat is always dynamic.

You put technology at the ports of entry they will shift somewhere else. It's a moving target, always has been and I think we need a system that covers all of the bases.

DURBIN:

I think the reason we cannot reach an agreement with the Trump administration is fundamental to our exchange and it's this. I don't disagree with you, with the--with the notion that barriers from sea to shining sea well at least slow people down. But when it comes to the next marginal dollar to protect kids in Illinois and children in your home state it's ports of entry, it's technology to keep these narcotics out of the United States.

And if we can't really start at the same premise based on reports from the president's own administration, we are never going to reach a point of bipartisan agreement on border security. So I hope, I think we are close to agreeing and maybe it's semantics, I hope not. But I hope that we can agree that if we are going to stop narcotics, technology, and personnel the experts tell us that, it's not a wall and I hope that we can move from there.

The last question I'll ask you in limited time; they asked me about your statements this morning, your testimony and I thought they were good responsive in most part. The one thing I'm stuck on and many are is this report you gave to this administration in June of last year about the investigation of the President.

BARR:

You mean my memo?

DURBIN:

Yes.

BARR:

Memo, yeah.

DURBIN:

And you said in there Mueller should not be permitted to demand that the president submit to interrogation about alleged obstruction. You volunteered that. I'm trying to get around this.

It sounds like it was an effort on your part to ingratiate yourself with an administration which is now nominating you for attorney general. I'll give you one last chance. My time is up. Please respond.

BARR:

Okay. Well, first, what I was saying there was again, based on speculation on my part was that there has to be an adequate predicate and if he was relying on just the firing of Mueller or the statement about Flynn in this specific statute, those two things, I didn't think it was an adequate predicate. I wasn't saying he--he may have other facts, he may have other theories that would support it. I was just pinpointing that.

Number two, I can--

DURBIN:

I think you meant the firing of Comey.

BARR:

I can assure you I was not trying to ingratiate myself with anybody, the furthest thing from my mind was coming back into government I can assure you that. And if I wanted to ingratiate myself or signal things a lot more direct ways of doing it than that.

DURBIN:

I just for the record I think you meant the firing of Mr. Comey, I think you said Mueller earlier.

BARR:

Okay, yeah what did I say? Oh, yeah, the firing of Comey, yeah, yeah.

DURBIN:

Thank you very much.

UNKNOWN:

Just trying to help.

GRAHAM:

Thank you. I'll just take a couple of seconds and see if I can help clarify this because I think it's been a very interesting hearing. So if there was some reason to believe that the president tried to coach somebody not to testify or testify falsely that could be obstruction of justice?

BARR:

Yes, under that--under an obstruction statute, yes.

GRAHAM:

So if there are some evidence that the president tried to conceal evidence that would be obstruction of justice potentially, right?

BARR :

Right.

GRAHAM:

Your--your point is just simply firing somebody which is a personnel decision is problematic for the system.

BARR :

Right, especially if you--what I'm saying is that doesn't fit under that statute.

GRAHAM:

No, I got you.

BARR :

Show me some other statute but that statute, no.

GRAHAM:

Yeah, okay. Who's next?

UNKNOWN:

Senator Hawley.

GRAHAM:

Senator Hawley. Thank you.

HAWLEY:

Thank you, Mr. Chairman. Mr. Barr , switching gears a little bit, yesterday, a district--federal district court judge in Pennsylvania struck down the Trump administration's

religious and moral exemptions to the contraceptive mandate under the Affordable Care Act. As part of this ruling, the district court issued a nationwide injunction to any enforcement or application of these rules.

This is a growing trend. We've seen a lot of this in the last two years. We've seen lots and lots of district courts all across the country in various contexts, in the immigration context, and other, issue nationwide injunctions. And now, of course, for those listening at home, the-- the court--the entire nation is not within the jurisdiction of these courts.

These courts are district courts. They reach a specific geographic area delineated by law, and yet, they're issuing, increasingly commonly, these injunctions that reach the entire country. This is a fairly unusual and fairly recent practice.

In distinction of this, the district court judge in Texas who recently heard a challenge to the Affordable Care Act case did not issue a nationwide injunction, therefore allowing the appeals process to take its normal course. And, of course, the ACA remains in full effect throughout that appeals process because he did not issue a nationwide injunction.

So, my question to you is are you concerned about this growing practice of nationwide injunctions by federal district courts, and what do you think ought to be done about it?

BARR:
Yes, I'm very concerned by it. Earlier I was talking about this and saying that I think it mistakes the limitation on judicial power, which is a case or controversy limitation, and tries to grant relief to people who are not part of the case or controversy that's being decided.

And, as you said, it really started in the sixties, and it's been picking up steam. And the fact of the matter is there are a lot of district court judges--and you can usually find one who-- somewhere in the country who will agree with you. And so, major democratic decisions can be held up by one judge nationwide.

I'm also concerned that there's another trend, which is the willingness of some district court judges to wade into matters of national security, where, in the past, courts would not be

presumed to be--in joining those kinds of things.

And then, the appeals process takes a lot of time. And so, a lot of damage can be done before it gets to the Supreme Court and you get a definitive decision. And meanwhile, everything is stuck.

HAWLEY:

Can you just say more? You're concerned about courts that wade into national security issues where traditionally they have hesitated to do so. Can you just say more about that? What do you have in mind?

BARR:

Like the travel ban.

HAWLEY:

And the concern there is?

BARR:

I mean, if the president takes something based on national security, and one--and--and--and the Constitution vests that kind of judgement for that kind of emergency act or act that he has the authority to perform to protect the country. He's politically accountable for that.

And yet, a judge with a lifetime appointment, sitting somewhere in the country, who doesn't have the access to the information has no political accountability can stop a national security measure, globally, essentially. And it takes a long to get that sorted out. That's really troublesome to me.

HAWLEY:

Yeah. I--I completely agree with you. Let me ask you about another recent case, this one from the Southern District of New York today, in which the district courts ruled that the

attempt to include--the attempt by the Commerce Department to include a citizenship question on the census is not permissible and has stopped the Commerce Department from including that on the 2020 census.

The department has argued, of course--and the Department of Justice is defending this decision--that including a citizenship question, as was done for approximately 100 years, on the census actually helps identify, with greater accuracy, the residents of the country--who is and who is not a citizen, and, of course, helps more accurately apportion and draw Congressional districts and make sure that representation is fair and the Voting Rights Act is fairly enforced. Do you agree with that position?

BARR:

Well, it's being litigated now. So, I really would prefer not to comment on it.

HAWLEY:

Do you anticipate that the Department of Justice will continue its vigorous defense of the position the administration has taken?

BARR:

I think, generally--I have no reason to change that position.

HAWLEY:

Thank you, Mr. Chairman.

GRAHAM:

Senator Whitehouse.

WHITEHOUSE:

Thank you. Mr. Barr, in order to perform its counterintelligence function effectively, what should the Department of Justice and the FBI know about the business relationships and

entanglements of senior officials with foreign interests and governments?

BARR:

Well, usually--you know, I guess, usually investigations are started because there is some act that comes to the attention of the law enforcement agency that suggests someone is being disloyal to the United States--

WHITEHOUSE:

Except for (INAUDIBLE)

BARR:

--and working for a foreign--excuse me?

WHITEHOUSE:

Except where we require disclosures in order to give the law enforcement folks that advantage of knowing in advance when a senior official has a business entanglement with a foreign interest or power.

BARR:

Mm-hm.

WHITEHOUSE:

So what should we know?

BARR:

What official are we talking about?

WHITEHOUSE:

Well, let's start with the president.

BARR:

Are you suggesting the president go through a background investigation by the FBI?

WHITEHOUSE:

No, I'm suggesting that when there's evidence that he has business relationships with foreign interests, then that may be a factual determination that would be of some note to our counterintelligence folks.

BARR:

Well, the financial disclosures that I think are filed by other--I don't even know if members of Congress file financial disclosures, do they?

WHITEHOUSE:
Yeah.

BARR:

They do?

WHITEHOUSE:
So do many officials in the executive branch. (INAUDIBLE)

BARR:

You know, that's for--that's for financial conflict. I don't think that's for counterintelligence purposes.

WHITEHOUSE:
Probably because very few people have business relationships with foreign interests, so it turns up much more often in a conflict (INAUDIBLE).

:

Well, business relationship with a foreign interest is not ordinarily a counterintelligence concern.

WHITEHOUSE:
Unless, of course, you are--

BARR:
Unless the person is a traitor.

WHITEHOUSE:
Or in a position to make decisions that are biased or influenced by those business relationships.

BARR:
Well, that--

WHITEHOUSE:
Counterintelligence and treason are not the same thing, are they?

BARR:
Counterintelligence, you're usually trying to counter the intelligence activities of another country.

WHITEHOUSE:
Correct. And you may want to head off things. You may want to be aware of things. You may want to--there are a whole lot of things short of treason that are the counterintelligence function.

BARR:

Right, including, you know--counterintelligence focuses, usually, on foreign intelligence services and their activities.

WHITEHOUSE:

Trying to (INAUDIBLE) American officials often.

BARR:

I think what we're kind of--I think we're mixing, you know, apples and grapes or whatever here because financial disclosure (INAUDIBLE)--

WHITEHOUSE:

Maybe, or maybe you're just having a hard time answering what ought to be a really easy question, which is that when a senior government official has business relationships with foreign interests and powers, we ought to know about it. That ought to be an easy proposition, and in any other administration it would be.

BARR:

Well, do congressmen go through background investigations to get access to classified information?

WHITEHOUSE:

We--that's a whole separate question, but yes--

BARR:

No, it's exactly the same question.

WHITEHOUSE:

--we do a lot of--we do a lot more reporting than we do (INAUDIBLE).

BARR:

Well, your financial reporting, with all due respect, is not the same as a background investigation. You're elected by the people to hold an office, and you know, you don't get a background investigation to get on the Intelligence Committee.

WHITEHOUSE:

But we do have to do a lot of reporting. Okay, you don't want to answer it. I'll move on. Let's talk about corruptly in obstruction cases. I'm not sure I heard you correctly, so I want to make sure you have the chance to explain, but it sounded like you were saying that the word corruptly, used as you said, adverbially, was a requirement that there be some form of destruction or interference with evidence. I have always read that term, corruptly, in obstruction of justice, to impose an intent requirement, which is also what the criminal resources manual of the Department of Justice says and what I think virtually every appellate court has said. So it worries me if what you are trying to do here is to redefine the obstruction statute by narrowing the intent requirement and using the term corruptly to refer to something very different, which is the actual physical corruption, changing or (INAUDIBLE)--

BARR:

I think I can allay your concerns, yeah.

WHITEHOUSE:

Could you do that, because obviously (INAUDIBLE)?

BARR:

Yeah, because if you read--if you look at the memo, you'll see that my discussion of corruptly is not up in the plain meaning section. We're talking about how you interpret the

statute, and my basic argument as to why the statute covers destruction of evidence, and hiding evidence and stuff like that, is based on the word otherwise, the Supreme Court decisions in Yates and Begay, also the fact that if you actually read it, otherwise, it swallows up all--it becomes a one clause--it wipes out everything else.

WHITEHOUSE:

So if I can just cut to the (INAUDIBLE)--

BARR:

No, so then later on I point out, in my memo, I later point out that that reading is also supported by the understanding of the word corruptly, which the Poindexter case, DC Circuit case, I think had the most intelligent discussion of the word corruptly, which is it does refer to the kind of activity that's necessary, which is perverting a proceeding by corrupting it.

WHITEHOUSE:

So in the event that the Mueller investigation has turned up evidence of obstruction of justice by the president, or people close to him, you would follow the Department of Justice's existing legal guidance with respect to what that word, corruptly, means?

BARR:

My--my interpretation of the statute was not predicated entirely on the word corruptly. I was just pointing out--

WHITEHOUSE:

And it is not your intention to change--

BARR:

No, it's not my intention.

WHITEHOUSE:

--department policy, or department standards, or department definitions, particularly as they may bear on obstruction by the president or people around him?

BARR :

That's right.

WHITEHOUSE:

Thank you.

GRAHAM:

We're about to vote. Let's do one more. You deserve a break. You've done great. When-- Senator Ernst, then we'll take a break, go vote. I'm going to vote and come back, give you about 15 minutes, then we'll just plow through until we're done. Senator Tillis.

TILLIS:

I'll be brief. One question, because people have asked--they've grown gone to the wall. It almost sounds like they're trying to suggest that you believe that the fix for border security is a 2,300-mile physical barrier from the Pacific to the Gulf. Do you believe that's the best way to secure the border?

BARR :

I'm not sure what the current thinking is on this, but when I was looking--

TILLIS:

--Have you ever advocated for a wall or some sort of monolithic structure as the plan for securing the border?

BARR :

No, but I do believe we need to have a system all the way across. When I was looking at this, you know, there were certain areas where, you know, a wall didn't make any sense.

TILLIS:

You've used the word barrier. I don't think a 430-foot wall makes sense on a, for example, 1,000-foot cliff or one that's out in the middle of nowhere. Would--would you agree that, you know, when we get away from this childish everybody saying it's a wall or not, that we are probably, the president's repeatedly said that we need wall structures, we made steel slat structures, we may need to reinforce chain-link fences with all-weather roads, we need aerostat so that we can identify people crossing the border that are otherwise desolate and not very frequently crossed, we need Border Patrol agents and we need technology that interdicts all the illicit drugs at all the legal ports of entry, that those are all elements of a barrier that actually will better prepare us to secure the border, eliminate the poison coming across the border, and perhaps the amount of human trafficking that's coming through the legal ports of entry. Is that a better way to characterize your position on barriers--

BARR :

--Yes--

TILLIS:

--Then either our physical, technological, or otherwise?

BARR :

--Yes.

TILLIS:

Thank you. Also, the--I--I can't leave without going back to you were talking about a--a time when I was in my early 30s, I remember vividly just how dangerous things were getting back

in the early 90s. I was 30 years old in 1990. I remember vividly the news reports and everything that we were trying to do to get ahead of the murderous environment that we were in. I think some people are trying to project or at least maybe I've inferred, maybe incorrectly, but project what you were trying to do or what you are advocating for in the midst of a crisis, which was not mass incarceration of low-level and nonviolent criminals--

BARR:
--Right--

TILLIS:
--Onto your view of, let's say, the First Step Act and what we are trying to do today. If you, hypothetical, maybe you can't answer it, but let's say you were attorney general when we were moving First Step, which I supported, I supported criminal justice reforms in North Carolina when I was speaker the house. Are you fundamentally opposed to what we're trying to do with this First Step Act?

BARR:
No, I--I think some of those things make sense. If I was--if I had been at the table, I probably would have urged a few changes to it. But you know, overall, I don't have a problem with it.

TILLIS:
And you're fully aware the president and folks in the White House are supportive of the act and--

BARR:
Yes, senator.

TILLIS:

So you will do everything you can to help us take that intent, the statutory intent, the things you'll need to do is implement in your--in your role as attorney general, I do believe you're going to be confirmed, to make sure that we get the full positive effect that we'll get out of the First Step Act?

BARR:
That's right, senator. And, you know, there were a number of things being lumped together. My--what I espoused in the 90s when we had the highest crime rates in our history were--was taking the violent--the chronic violent offenders with long criminal history records of predatory violence, and especially the ones that use guns in multiple offenses, and getting them off the streets and into prisons.

TILLIS:
And I think you made the point that in some cases there--there--you were able to more clearly present evidence where they were involved in drug trafficking, but you knew damn well that they were a part of what was murdering these communities and making them very dangerous.

BARR:
Right.

TILLIS:
And the point there was you were using every device possible to get them behind bars and off the street so that you could make those communities safer.

BARR:
Right, but--

TILLIS:

--Including the communities in Trenton, New Jersey.

BARR:

Right. So--so the other thing were, then there are drug penalties and some of the drug penalties, yes, were draconian and they were rational reasons for doing that at the time. And--and sometimes people got drug--and--and we weren't going after people who needed treatment who were, you know, just because they were addicts, we were going after the people who were distributing the drugs.

And you know, in the--in the current circumstance, if--I understand there is data to support what was done in First Step, I understand those changes on--on the drug front. But I--I would not let up on chronic violent offenders because they committed disproportionate amounts of the predation in society.

TILLIS:

I hope you don't because they need to go behind bars for a very, very long time. Thank you.

GRAHAM:

All right, thank you, Mr. Barr. What we'll do, we'll come back with Senator Klobuchar. We're going to take a 15-minute break and hopefully by then both of us can vote and come back and continue and we're just going to plow through till we get done today. So we'll be in recess for 15 minutes.

ERNST:

We will go ahead and reconvene the hearing. I'll recognize Senator Klobuchar.

KLOBUCHAR:

Thank you very much. Thank you, Mr. Barr. Thanks for your grandson for the mint. That was pretty nice.

(LAUGHTER)

In your previous confirmation hearing for attorney general, you stated that the attorney general is the president's lawyer. You have also said that the attorney general's ultimate allegiance must be to the rule of law, so I'm going to characterize that as the people's lawyer.

And there have been times throughout our history, including during Watergate, when the personal interests of the president do not align with the interests of the country. In those critical moments, is the attorney general the people's lawyer or the president's lawyer?

BARR:

Well, it--it--as--the reason he's the--I referred to the attorney general as the president's lawyer is because in 1789 they said that the attorney general is to provide legal advice to the--to the--

KLOBUCHAR:

--Um-hmm--

BARR:

--President--

KLOBUCHAR:

--Yes--

BARR:

--And the cabinet, and that's in their official capacity.

And my view on that is that, like any lawyer, you give the best advice as to your view of the law. But if the president determined that he wanted to do something that you thought was still a reasonable construction of the law, even though you might not have decided that way as an Article III judge, just as you support congressional enactments that are--

KLOBUCHAR:

--Okay--

BARR:

--Reasonable, you do the same for the president.

KLOBUCHAR:

Um-hmm. But how about in a situation like Watergate?

BARR:

So, you know, I--if the president directs an attorney general to do something that is contrary to law, then I think the attorney general has to step down.

KLOBUCHAR:

Okay.

BARR:

It's that simple.

KLOBUCHAR:

Thank you.

Under the special counsel regs, the special counsel must send a second report to Congress documenting any instances where the AG prohibited the special counsel from taking an action. Will you follow those regulations and send the report to Congress?

BARR:

Yes.

KLOBUCHAR:

Thank you.

And then a few just things that I care a lot about. You had a great discussion with Senator Booker about the First Step Act and nonviolent drug crimes. Will you support the use of drug courts? Something--my county, when I was prosecutor, was one of the first to do that in a big way, and now we have federal drug courts. Will you support them for nonviolent offenders?

BARR:

Yeah, I think--I think they're generally a good idea.

KLOBUCHAR:

Okay.

And there's a bill that I have that we're reintroducing on guns and stalking. And it's a pretty narrow bill. It fills a loophole that's called sometimes the boyfriend loophole. I don't know if you know what that is, but it's when someone is not married but they're living together, and then the question is would the gun laws apply.

And we actually had a hearing and a number of the Republican witnesses agreed they should. So, that's part of it, and then the other involves stalking--

BARR:

--Um-hmm--

KLOBUCHAR:

--And whether or not that could also fall under the prohibitions on guns. So, we had the meeting on guns at the White House, and the president said he thought the bill was terrific. I just kind of give--lead you into that.

[BARR]:

Okay.


KLOBUCHAR:

But--


[BARR]:

--It--it's--


KLOBUCHAR:

--And it hasn't passed yet, but I'm just asking you to review it.


[BARR]:

Absolutely.


KLOBUCHAR:

Okay. And I hope we would have your support. It would be nice to get that done.

And then I also have a second bill with Senator Cornyn, the Abby Honold Act. And the bill would expand the use of evidence-based practices in responding to sex assault crimes, and I hope you would look at that as well. And it's part right now of the Senate package on the Violence Against Women Act. And I--my bill aside, I hope that you would support the reauthorization of that bill.


[BARR]:

Um-hmm.


KLOBUCHAR:

You would, of the Violence Against Women Act?

BARR:

Well, I haven't seen it, but I--I--if it's reauthorizing what's in effect now, yes.

KLOBUCHAR:

Okay.

And then I just want to end here with a--a second chance, second go round on a question. I--I decided to leave my antitrust questions for the record--

BARR:

--Okay--

KLOBUCHAR:

--So I can ask this. I asked earlier today this question because I really meant it as an opportunity for you to kind of address your troops and not a gotcha question. So, immigration debates aside, putting aside the differences in this House and in the White House, and we have now thousands and thousands of extraordinary people devoting themselves to a good cause, and that is justice at the Department of Justice and the FBI, including a few of them right behind you in the front row.

And they--many of them right now are either furloughed or they're doing their jobs every single day without pay. And if you get confirmed, you will be their leader. And do you want to say anything to them or about them? And I'd appreciate it if you would.

BARR:

Well, thank you, senator, for giving me the opportunity, because one of the reasons I want to do this, serve as attorney general, is because of the opportunity to work with the outstanding people at the Department of Justice. And I think the country can be very proud of them as they're--of their dedication as they stand their post and continue to perform their mission.

It's a great sacrifice for many of them with the paychecks not coming in. So, I hope this ends soon. But one of the reasons the department is such a important institution to me and a big part of my life is the quality of the people there. And I'm looking forward, hopefully if I'm confirmed, to joining them again.

KLOBUCHAR:

Okay. Thank you very much.

BARR:

Thank you.

ERNST:

Thank you, Senator Klobuchar.

I love the upward mobility on this committee. This is my first committee hearing, and I get to chair. So, thank you. I appreciate it very much.

ERNST:

I'll go ahead with my second--second round of questioning. And there has been a lot of discussion so far about the Mueller investigation, which I do think is--is very appropriate. And as I understand it, the underlying premise of that investigation was to determine if there was collusion by an American entity or person with the Russians during the 2016 election cycle. Is--is that accurate?

BARR:

That's my understanding.

ERNST:

Okay. And we do know that there was Russian meddling in our 2016 election cycle. We do know that. And what can the DOJ do in the future to prevent, whether it's Russia or other

foreign entities, from interfering with our elections process?

BARR:

Yes, well I adverted it to in my opening statement is obviously the department is a law enforcement agency, and so we can use our law enforcement tools. And the special counsel has already brought cases against Russian nationals for--for their activities and the current leadership of the department is following suit and I'd like to build on that experience to sharpen our legal tools to go after Russian nationals, but nationals of any country that are interfering in our elections.

I also think that the--the FBI, as part of the intelligence community, can--can perform, you know, can--can use all of their intelligence tools to--to counteract the--the threat. And as I said in my opening statement, I think we have to look at all our national resources, such as diplomacy, economic sanctions, other kinds of countermeasures, to deter and punish foreign countries that seek to meddle in our elections.

ERNST:

Absolutely. So a whole of government approach--

BARR:

--Yes--

ERNST:

--As we look at those entities. Thank you very much. I was really pleased to hear Senator Klobuchar mention the Violence Against Women Act. We had a discussion about that in my office.

BARR:

Yes.

ERNST:

So thank you. I did serve as a volunteer at an assault care center while I was at Iowa State University just--just a few years ago.

(LAUGHTER)

But the Violence Against Women Act is in desperate need of reauthorization, as Senator Klobuchar said. In 2016 alone, over 1 million services were provided to victims and their families through VAWA programs. In the office on Violence Against Women is actually housed within the DOJ, as you are aware. In fiscal year 2017, my home state of Iowa was awarded $8.7 million from 13 different OVW grant programs.

And these dollars do go towards programs that are in dire need, especially in rural areas like mine. So what I would like to know from you, sir, is how you will work to further this engagement and to address violence against women and families through VAWA or through the--through the office that is located within DOJ.

BARR:
And--and that office is not familiar to me because it didn't exist, obviously, when--when I was there before. So first, I'm going to familiarize myself with the office, its work, its programs, and, you know, strongly support that.

ERNST:
Thank you very much. Domestic violence is--is largely a state crime. How can we better assist between the DOJ and state officials in this area?

BARR:
Again, this is not an area of expertise that I have right now, but I would imagine that technical support and grants are--are probably the most effective means for the federal government to assist.

ERNST:

Okay, very good. Well I appreciate that so much. I've just got a little bit of time left. I do want to go back to the issue that's been brought up many times over about our border security. I as well agree that there are many ways that we can use to secure our border, whether it's through technology, whether it's through a physical barrier, understanding, as has been rightly pointed out, that a number of the interdictions of drugs crossing the border are actually done at those ports of entry. However, I think there are a lot of families that are very concerned about the fentanyl that might be coming across those--those areas that are not watched.

BARR:

Right.

ERNST:

So families that have lost their loved ones, I think it doesn't matter what percentage is coming through port of entry or elsewhere, we want to stop it. So your comments?

BARR:

That's right. That's right, senator. And--and the other thing is that the statistics on the port of entry are where the interdictions, that's the stuff we catch.

ERNST:

Correct.

BARR:

It doesn't necessarily reflect the stuff that's getting across elsewhere that we're not catching.

ERNST:

Absolutely. Thank you very much, Mr. Barr.

GRAHAM:

Senator Hirono.

HIRONO:

Thank you very much. Mr. Barr, you've written and spoken about morality and you're worried about the destruction of--and I'm quoting you--"any kind of moral consensus in society." And you wrote quite extensively on this when you were Attorney General. And you've been described as an institutionalist, someone who cares about the Department of Justice and the government. That's a good thing.

But, you've agreed to work for someone who relentlessly attacks the press, calling them fake news and an enemy of the people. The President criticizes the FBI nonstop. He belittles generals. He calls the Mueller investigation a witch hunt. He believes the claims of Putin over the judgement of our intelligence community, and it's been objectively verified that he lies every single day and changes his mind on a regular basis.

So, are you concerned, having written about morality and consensus in our society? Are you concerned about the way Donald Trump undermines the institutions in our society that help us to maintain a moral consensus?

BARR:

No, Senator. And I'd like to make a point about the witch hunt, which is we have to remember that the President is the one that, you know, has--has denied that there was any collusion and has been steadfast in that. So, presumably, he knows facts, and I don't know facts. I don't think anyone here knows facts.

But, I think it's understandable that, if someone felt they were falsely accused they would feel an investigation is something like a witch hunt, where someone like you or me who doesn't know the facts, you know, might not use that term.

HIRONO:

Well, you--you're certainly coming to his defense. As I said, it's been objectively verified that he lies on a regular basis.

I have a question about immigration. In your written statement, you wrote that, "We must secure our nation's borders, and we must ensure that our laws allow us to process, hold, and remove those who unlawfully enter." And this kind of sounds like Jess Sessions's "Zero Tolerance" policy. I did ask you that before, whether you would continue to go after people who are not coming through our regular checkpoints. Would you go after them for deportation?

BARR:

I thought I said that our "Zero Tolerance" policy is to prosecute people who are referred to the Department by DHS for illegal entry.

HIRONO:

Well, under a "No Tolerance" policy, everyone who comes in not through the checkpoints would be deemed, I would say, subject to prosecution. So--.

BARR:

--No. Anyone who comes in--.

HIRONO:

--No--?

BARR:

--Illegally and is going to be referred to us for a violation of the legal entry statute will be prosecuted. But, DHS is not referring, as I understand it--is not referring families so that there is no more separation.

HIRONO:

Yes. Instead we have a lot of them in family detention facilities. I visited them.

What about the 11 million or so undocumented immigrants in our country? Because you say we have to process, hold, and remove those who unlawfully entered. Now, the 11 million or so undocumented people have unlawfully entered, a number of them because they're just visa overstays there. So, what do you propose to do with these people who have been here in our country for a long time, many of whom work and pay taxes?

BARR:

Well, I think it just highlights the need for some--so Congress to address the whole issue of our immigration laws.

HIRONO:

So, do you support comprehensive immigration reform, an effort that we undertook in the Senate in 2013?

BARR:

I--I support--I support addressing some of the problems that are creating the influx of illegal aliens at this point and also addressing the question of border security.

HIRONO:

Well, what about the 11 million undocumented people who are already here?

BARR:

Well, you know, Congress is the--is able to determine that policy as part of--as part of immigration legislation.

HIRONO:

So, that is the largest group of undocumented people. They are the largest group of people who are here illegally. As you say, you would like to--.

BARR :
--Zero--"Zero Tolerance Policy," as I understand it, has to do with people who are coming in illegally--.

HIRONO:
--Yes, I know that. But, you know that, when I talk about the 11 million people, that they are undocumented. They live in the shadows. Many of them do pay taxes. And so, that is the largest group that--that's here. This is why we worked really hard for comprehensive immigration reform. I hope that you support that kind of effort.

Do you believe birthright citizenship is guaranteed by the 14th amendment?

BARR :
I haven't looked at that issue.

HIRONO:
It says right there in the 14th amendment that anyone born, basically--born in this country is a US citizen. And there are those who think that that should be done away with. Are you one of them?

KENNEDY:
Could you give us a brief answer Mister--?

BARR :
--Yeah, I--as I say, I haven't looked at that issue legally. That's the kind of issue I would ask (INAUDIBLE) to advise me on as to whether it's something that's appropriate for legislation. I don't--I don't even know the answer to that--.

HIRONO:

--It's certainly been interpreted for a long time as saying that people who are born in this country are citizens.


KENNEDY:

I think the chairman would like to finish today, and I think your time's expired.


HIRONO:

Shall I continue, or should I ask for a third round?


KENNEDY:

I'm fine. You can have a third, fourth fifth round. But I'm not chairman.


HIRONO:

I just have a few more. But I can wait.


KENNEDY:

Ok, why don't we do that. Thank you, senator. I think I'm next, Mr. Barr.


KENNEDY:

This--we talked about this earlier. I think we can agree, can we not, that hundreds of thousands, millions of words have been written speculating about what happened at the Department of Justice and the FBI in the 2016 election with respect to the two party nominees. Can we agree on that?


BARR:

Yes.

KENNEDY:

Can we agree that the American people have a right to know what happened at Justice and the FBI?

BARR:

Yes.

KENNEDY:

Okay. Why don't we just declassify all the documents and show them to the American people, and let the American people draw their own conclusions?

BARR:

I'm not in a position to say because I don't have access to the documents, and I don't know what it entails.

KENNEDY:

Well, it entails the truth, does it not?

BARR:

Yes, but presumably if they're classified it--you know, there could be collateral consequences, and I'm not in a position to make that judgment.

KENNEDY:

Well, I mean, is your mind open on that, Mr. Barr, or--

BARR:

I think generally--

KENNEDY:

I don't understand why, properly redacted, those documents have not been shown to the American people. They're smart enough to figure it out.

BARR:

I think ultimately the best policy is to let the light shine. If there have been mistakes made, the best policy is to allow light to shine in and for people to understand what happened. But sometimes, you know, you have to determine when the right time to do that is.

KENNEDY:

I understand. I'm asking that you seriously consider that, and I'm talking about the investigations with respect to Secretary Clinton and President Trump. Clearly the FBI and the Department of Justice--I'm not saying that they--either was imprudent to do so, but we've seen bits and pieces, and there's been a lot of speculation and innuendo, and people have drawn conclusions based on incomplete facts. And it would seem to me that if for no other reason but the integrity of the FBI and the Justice Department, both of which I hold in great esteem, we should redact the portions that would endanger somebody and show the American people the documents. And I wish you would seriously consider that.

BARR:

I will, Senator.

KENNEDY:

And I, having watched you here today, I think you'll--I think you will. I think you'll give it serious consideration.

BARR:

Yes.

KENNEDY:

Let me ask your opinion on something else. About 10 years ago we had a problem with our banking system in America, and we had a lot of bankers who made loans to borrowers when the bankers and the borrowers knew the money was not going to be paid back. That's called fraud, and it's illegal. And then some of those same bankers, and other bankers, took those garbage loans, and they packaged them together, packaged them together into security, and they sold them to investors without telling the investors that the underlying loans were-- were toxic. That's called securities fraud. And I don't know how many billions of dollars of this bad paper was sold, but I know a lot of people in the banking industry got rich doing it. And then--and as a result, the American economy and almost the world economy, almost melted down. Now the Department of Justice prosecuted virtually no one, no banking executives over this. Why? I realize they made the banks pay some money, but I saw banking fraud, and I saw securities fraud. And nobody was prosecuted.

BARR :

I can't answer that, Senator, but I can say that I was in charge of the S&L cleanup after it was over. It was put under me in the deputy's office, and--

KENNEDY:

You folks prosecuted people.

BARR :

We prosecuted a lot of people and very quickly, and we cleaned it up very quickly. My--how many did we get?

UNKNOWN:

Over 900.

BARR :

Over 900 convictions, in very short order.

KENNEDY:

I don't think we had nine this time. I mean, what message does that send to the American people? I mean, I'll tell you what I think the message it sends is that the people at the top can cut corners and get away with it.

BARR:

What I can say, Senator, is I think my experience with the S&L shows that I'm not afraid of going after fraud--

KENNEDY:

I know that.

BARR:

--at the corporate level. And it was one of the most successful, I think, government responses to that kind of whole sector meltdown that there's been. So I'm very proud of the job that was done by the department on that.

KENNEDY:

As--you know, as we say in Louisiana, you were mean as a mama wasp.

(LAUGHTER)

And you did the right thing. But I don't think we did the right thing with the banking meltdown. Senator Coons.


COONS:

Thank you, Senator Kennedy. Thank you, Mr. Barr . You have declined, or I'd say refused, to commit to following the advice of the career ethics officials at DOJ with regards to recusal from the ongoing special counsel investigation. Will you at least commit to notify this committee once you receive the ethics officials' guidance, tell us what it was and explain whether you agreed or disagreed with it?

BARR :

To tell you the truth, Senator, I don't know what the rules are and what the practice is, but you know, off the top of my head I don't think I would have an objection to that.

COONS:

So you'd be comfortable letting us know that you'd received an ethics opinion and either declined to follow--

BARR :

Yeah, but I'm not sure what the practice and the rules are. I generally try to follow the rules.

COONS:

You said earlier in this hearing you have an interest in transparency with regards to the final report of the Mueller investigation. But I didn't hear a concrete commitment about release, and I think this is a very significant investigation, and you've been very forthcoming about wanting to protect it. The DOJ has released information about declination memos, about descriptions of decisions not to prosecute in the past. I'll cite the Michael Brown case, for example. Would you allow Special Counsel Mueller to release information about declamation memos in the Russia investigation as he sees fit?

BARR :

I actually don't think Mueller would do that because it would be contrary to the regulations, but that's one of the reasons I want to talk to Mueller and Rosenstein and figure out, you

know, what the lay of the land is. I'm trying to--

COONS:

But if appropriate under current regulations, you wouldn't have any hesitation about saying prosecutorial decisions should be part of that final report?

BARR:

As I said, I want to get out as much as I can under the regulations.

COONS:

You also--

BARR:

I think it--that's the reason I say it's vitally important. It's related to my feeling that it's really important to, you know, let the chips fall where they may and get the information out.

COONS:

You also said, in response to my first round of questions, that the special counsel regulations shouldn't be rescinded during this investigation. Just to be clear, you would refuse to rescind them if the president asked, even if that meant you'd have to resign?

BARR:

Well, that came up in the context of wanting to change the rules so Mueller could be fired.

COONS:

Right.

BARR:

That--where there was no good cause.

COONS:

No good cause, correct.


BARR:

And I said there, yeah, I would not agree to that.


COONS:

There is another ongoing investigation in the Southern District of New York in which I would argue the president's implicated as individual number one. If the president ordered you to stop the SDNY investigation in which someone identified as individual one is implicated, would you do that?


BARR:

Well, that goes back to an earlier answer, explanation I gave, which is every decision within the department has to be made based on the attorney general's independent conclusion and assessment that it's in accordance with the law. And so I would not stop a bona fide lawful investigation.


COONS:

So if the president sought to fire prosecutors in the Southern District of New York to try and end the investigation into his campaign, would that be a crime? Would that be an unlawful act?


BARR:

Well, I mean that one--usually firing a person doesn't stop the investigation. That's one of the things I have a little bit of trouble accepting. The--you know, but to answ--the basic point is, if someone tried to stop a bona fide lawful investigation to cover up wrongdoing, I would resign.

COONS:

Deputy Attorney General Rosenstein has said publicly your memo had no impact on the special counsel investigation. If you're confirmed and you're supervising the special counsel investigation, would you order the special counsel's office to accept and follow the reasoning in your memo?

BARR:

I would probably talk to Bob, Bob Mueller, about it. You know, if I felt there was a difference of opinion, I would try to--I would try to work it out with Bob Mueller. At the end of the day, unless something violates the established practice of the department, I would have no ability to overrule that.

COONS:

You were attorney general when President Bush pardoned six administration officials charged with crimes arising from the Iran-Contra scandal, and you encouraged the president to issue those pardons. Is it permissible for a president to pardon a member of his administration in order to prevent testimony about illegal acts?

BARR:

Is it permissible under what?

COONS:

Would it strike you--would it strike you as obstruction of justice for him to exercise his presidential pardon power for the purpose of preventing testimony?

BARR:

Yeah, I think that if--if a pardon was a quid pro quo to altering testimony, then that would definitely implicate an obstruction statute.

COONS:

And would it be permissible for the president to pardon family members simply because they're family members?

BARR:

Let me say that--no, I'm sorry. Go ahead.

COONS:

Two last questions, and then we'll be done. Do you think it would be permissible for the president to pardon a family member simply because they are a family member, and where the purpose, the motive is unclear? And do you think it would be permissible for a president to pardon himself?

BARR:

Yeah, so here--the problem is under the Constitution there are powers, but you can abuse a power. So the answer to your question, in my opinion, would be yes, he does have the power to pardon a family member, but he would then have to face the fact that he could be held accountable for abusing his power. Or if it was connected to some act that violates an obstruction statute, it could be obstruction.

COONS:

How would he be held accountable?

BARR:

Well, in the absence of a violation of a statute, which is--as you know, in order to prosecute someone they have to violate a statute--in the absence of that, you know, then he'd be accountable politically.

COONS:

Thank you for your answers today.


GRAHAM:

Senator Blackburn.


BLACKBURN:

Thank you, Mr. Chairman. And Mr. Barr , thank you for your patience and for staying with us today. A couple of questions. We've talked about border security and immigration law and that is something that I want to return to.

I appreciated your comments about going after the problem at the source and I think that is so vitally important when we talk about the immigration issues and we look at what has happened when you are talking about drug traffickers and human traffickers, the gangs that are coming across that southern border and I do think that a barrier is there. But one of the symptoms if you will of an open border policy has been the sanctuary city policy and that pertains to those that are illegally in the country.

And I tell you what, it is just absolutely heartbreaking to me every time I meet with an angel mom and I hear these stories and then after Officer Sing(SP) was murdered, hearing that law enforcement, local law enforcement officer, talk about and talk with specificity about how sanctuary policies emboldened those that were illegally in the country. And when you look at this practice of sanctuary city you know if we don't do something consistent in this realm then what is to say you don't develop sanctuary cities for other--other violations of the law whether it's tax law or environmental protection law or traffickers or any other--?

So talk to me for just a minute about what your connection will be between dealing with the sanctuary cities and then dealing with some of these problems at the source. How do you-- you've talked about compartmentalizing and putting lieutenants in charge. And this is an issue that affects every single community because until we stop some of this, we are going to have every state a border state and every town a border town.

BARR:

So you know I just think of it immigration. You have pull factors and push factors. There's--there are factors down in Latin America that are pushing people up and there are attractions to the United States that are pulling them up.

And one of the--I think a--a pull factor is things like sanctuary cities, the idea that you can come in and not be--and--and get away with flouting our laws and coming in and so I think that's one of the concerns I have about sanctuary cities. The second concern I have is that the sanctuary city problem is a criminal alien problem.

I think a lot of people are under the impression that sanctuary cities are there to protect you know the illegal aliens who are quietly living as productive members of society and paying their taxes as Senator Hirono said. It isn't.

The problem with sanctuary cities is that it is preventing the federal government from taking custody of criminal aliens and it's a deliberate policy to frustrate the apprehension of criminal aliens by the federal government. So I don't think those cities should be getting federal--.

BLACKBURN:

Do you think it would be v--would it be abided with any other violation of U.S. law?

BARR:

No, I don't and there's a legal issue which is the question of--of, what's the word? Commandeering. The states argue that for their law enforcement officers to have custody of a criminal alien to notify the federal government on a timely basis so that they can turn that fugitive essentially over to the federal government that that's commandeering state apparatus under the Printz case and therefore it's--you know the federal government shouldn't have that power. That's--that's the issue and I personally am very skeptical of the commandeering argument.

That was adopted where the federal government passed gun-control legislation and basically, we are ordering the states to set up the whole background check and everything else. The idea here is simply one law enforcement agency notifying another and holding the person until they can be pick--picked up. So I'm skeptical that that's commandeering. But that's the legal issue.

BLACKBURN:

My time is expiring and I know we need to finish this up but I do look forward to talking with you again about China and the intellectual property violations; the way they go in and re-engineer, steal from our innovators and of course the way they are forcing fentanyl and illicit drugs through our ports and through that open porous southern border that we have to secure. Thank you. Yield back.

GRAHAM:

Senator Blumenthal.

BLUMENTHAL:

Thanks, Mr. Chairman. I want to join and thanking you for your patience. I'm hoping that I can get through all my questions on this round. I don't know whether the chairman will exceed to a short third round but let me just try as best I can. On the pardon issue and accountability, you would agree that the president pardoning someone in return for changing his or her testimony would be an abuse of the pardon power and the president should be held accountable?

BARR:

And--well, a quid pro quo to change testimony could potentially be obstruction.

BLUMENTHAL:

Or for not testifying at all would be obstruction of justice. If the special prosecutor or the prosecutor anywhere else came to you with proof beyond a reasonable doubt of that kind of obstruction or any other crime, we're talking proof beyond a reasonable doubt, would you approve an indictment of the president?

BARR:
I--that's the kind of thing I'm not going to--I'm not going to answer off the top of my head. But if we take it out of this context and say if someone--if someone were--if a prosecutor came and--and showed that there was a quid pro quo by which somebody gives something of value to induce a false testimony or--

BLUMENTHAL:
(INAUDIBLE)

BARR:
Yes.

BLUMENTHAL:
And the question is whether the president could be prosecuted while in office. I happen to believe that he could be, even if the trial were postponed until he is out of office, but because the statute of limitations might run for any other number of reasons, a prosecution would be appropriate. Would you agree?

BARR:
Well--but--you know, for 40 years, the position of the executive branch has been you can't indict a sitting president.

BLUMENTHAL:

Well, it's the tradition based on a couple of OLC opinions, but now it is potentially an eminent, indeed immediate possibility, and I'm asking you for your opinion now, if possible, but if not now, perhaps at some point.

BARR:

Are you asking me if I--if I would change that--that policy?

BLUMENTHAL:

I'm asking you what your view is right now.

BARR:

I, you know, I--I actually haven't read those opinions in a long time. But I see no reason to--to change them.

BLUMENTHAL:

Well I'm happy to continue this conversation with more time and another opportunity.

BARR:

Sure.

BLUMENTHAL:

I want to ask you about the Southern District of New York, which I believe is as important as the special prosecutor. As I mentioned earlier in my question before, the president has been named their individual number one as an unindicted co-conspirator. If the president fired the United States attorney, would you support continuing that investigation even under the civil servants, the career prosecutors who would remain, assuming it is a legitimate prosecution?

BARR:

Yeah, and I've--I've tried to say it in a number of different ways, I believe, regardless of who or what outside the department is trying to influence what's going on, every decision within the department relating to enforcement, the attorney general has to determine independently that--that it's a lawful action. And--and if there was a lawful, bona fide investigation that someone was trying to squelch, I wouldn't tolerate that.

BLUMENTHAL:

Putting it very simply, you would protect that investigation against political interference as hopefully you would do to the--

BARR:

--With any investigation in the department.

BLUMENTHAL:

Exactly. Let me move on to something unrelated, if I may. In the early 1990s, thousands of Haitians tried to flee persecution in their own country by coming to the United States by boat. As you remember, you oversaw, I believe, a program that sent thousands of them, some of them were HIV-positive, to Guantanamo Bay. These asylum-seekers were kept at Guantanamo Bay for 18 months area a federal judge in the Eastern District of New York described the living conditions in Guantanamo Bay by saying that asylum-seekers were forced to leave and live in camps, "Surrounded by razor barbed wire," and compelled to, "Tie plastic garbage bags to the sides of the building to keep the rain out."

In an interview in 2001 at the Miller Center, you defended this program. Do you have regrets about it now and I made correct in saying that these asylum-seekers first started coming to the United States, it was your position that they should be kept there indefinitely?

BARR:

I really appreciate the opportunity to address this. So in--in 1991, Aristide was overthrown in Haiti and there was a sort of a mass exodus from Haiti. And up until then, the policy of

the United States has been force, until that time, administrations had forcibly returned Haitian asylum-seekers and so forth without any kind of process.

We--it was a humanitarian problem because a lot of these boats were sinking, it was a 600 mile journey, so the Coast Guard--there are two different issues. One issue is the processing of those who were healthy, and the second issue was the HIV. In a nutshell, the--the processing we started actually giving them abbreviated asylum hearings on--on the ships. Eventually, we moved some of that to Guantanamo and we were admitting to the United States 30 percent, which is the highest it's ever been. I mean, I think before that it was just minuscule.

Later, when the Clinton administration adopted our policies, it went down to 5 percent I am told. But in any event, then it became so overwhelming that we forcibly repatriated the Haitians because we felt that most of them, the conditions were changing, we didn't think that there was a threat in Haiti, and--and we forcibly--we were just overwhelmed, and we forcibly sent them back to Haiti. Meanwhile, HIV was--was an exclusion. You could not admit anyone with HIV, and this was adopted by the Senate and then in the first year of the Clinton administration and the Clinton administration signed a bill that kept it as exclusion, you cannot admit someone with HIV except by case-by-case waiver based on extreme circumstance.

So what we did with the HIV people is we first screened them for asylum because if they couldn't claim asylum, then they wouldn't be admitted, and then we started a case by case review. I started admitting them on a case-by-case basis where--where cases could be made that there was a particular reason for doing it, like pregnant women and people who had not yet developed full-blown.

So I think there was a slowing down of the processing because people felt that the Clinton administration, which at the time was attacking these policies, was going to--was going to be more liberal. And so, people thought will why should we go through this process with Bush when Clinton is right around the corner? Clinton came in, adopted our policies, and

defended them in court, continued forced repatriation, continued the exclusion of HIV. As part of settling the case he brought in three 300--260--

BLUMENTHAL:

--Which didn't necessarily make it right.

BARR:

Well, it was right under the law.

BLUMENTHAL:

Did you favor keeping those Haitians in Guantanamo indefinitely?

BARR:

No.

BLUMENTHAL:

and can I ask you--

BARR:

--We were--I think most of the articles at the time said we recorded sort of in a Catch-22. We were trying to process the HIV people on a case-by-case basis and--and in fact the lawyers who--we, by the way, agree to have lawyers come down and represent these people in the asylum hearings at Guantanamo. And in the book, written by them, they say right out we were making progress. It stopped on the Clinton administration was elected.

So we were in this Catch-22 on the HIV and I had staff members go down there to Guantanamo and the did not report, you know, inhumane conditions or anything like that and--and that is not mentioned, I don't think in the--in the book written by the lawyers who represented them. So it was a max--mass exodus situation and we did the best we could.

BLUMENTHAL:

Would you do it again in exactly the same way if you had to do again?

BARR:

I don't--I mean, I don't know depending on the circumstances and also depending on--on whether we thought this was really a case of persecution.

BLUMENTHAL:

Let me ask you this, would you, again, house asylum-seekers in Guantanamo?

BARR:

Well the Clinton administration did.

BLUMENTHAL:

I'm asking you.

BARR:

In fact, they doubled--they doubled and they started putting other nationalities in there too. Probably not because of the associations of Guantanamo now.

BLUMENTHAL:

Would you segregate asylum-seekers in some other way, then?

BARR:

Well, I think it's always advantageous--given the abuses of the asylums system right now, I would always procure prefer to process asylum-seekers outside the United States.

BLUMENTHAL:

And don't you think we should do a better job with asylum-seekers in this country? In terms of the kinds of facilities that we provide, particularly for women and children and families?

BARR:

Oh absolutely, yes. I--I think we--if we're going to detain families, I--I think those have to be facilities that are safe and appropriate for young children.

BLUMENTHAL:

Thank you, Mr. Chairman.

GRAHAM:

Senator Lee?

LEE:

Thank you very much very much, Mr. Chairman. Thanks again to you, Mr. Barr, for being willing to answer all these questions today. I want to continue on some of the same theme that Mr. Blumenthal raised a moment ago. He raised a couple of questions regarding immigration, regarding our asylum process.

I think it's significant to note here that we have some in our political discourse today who are suggesting that the enforcement of our immigration laws and the enforcement of our border is somehow immoral, that it's somehow wrong. We've had people who--in one of the major political parties, multiple candidates be elected campaigning, among other things, on either eviscerating ICE's power or abolishing the agency all together.

As--as you noted earlier today, you gave a speech back in 1992 in which you were one of the first people I remember using the metaphor of, you know, wanting to make sure that our immigrants come to this country through the front door and not through the back door, or not through a side window or something to that effect.

Can you just sort of describe to us why you think it's important that we draw a clear moral distinction between the enforcement of immigration laws, between legal immigration and illegal immigration? Is this the functional equivalent, in other words, of the premature removal of a do not remove tag on a mattress, or is it something more than that?

BARR:

I think it's something more. I mean, you know, we--we have built a great society here in the United States. And a vast--and I forgot what the statistic is, but a very large majority of the world lives under our poverty level. And for them, even, you know, being poor in the United States would be a step up. And we have a lot to be grateful and thankful for here.

And if it was unrestricted, a lot of people would come here, more than we could possibly accommodate. And people--.

LEE:

--And who would that--who would that harm, first and foremost, if we allowed that to happen? Would it be the wealthy who would most immediately be harmed by that?

BARR:

No, it wouldn't. Yeah.

And so, it just seems obvious that you have to have a system of rationing. You have to have a system that makes determinations who can come in when. And it's--Congress is in charge of that. They can make the laws and determine it. And we--we I think have a very expansive system.

There are people waiting in line for 10, 15--at least there were when I last looked at it, you know, in the Philippines, for example, for over a decade, waiting patiently, law-abiding people who want to come here and have family here and other things like that. And just to allow people to come crashing in, be told that if you say if this, you'll be treated as an asylum

and then you don't have to--you don't have to reappear for your EEA hearing or whatever, it's just an abuse of the system and it's unfair.

I mean, all of us have been standing in lines, long, long lines, and someone just walks up to the front. That's unjust. That's unjust. I also think that, without control, you have unsafe conditions and uncontrolled conditions on the border which create, you know, serious safety problems for everybody on both sides of the border.

So, it creates--uncontrolled access to the country is a national security threat. You know, there are people around the world that are coming into Latin America for the purpose of coming up through the border. So, these are--you know, these are the reasons why I think it's important that we enforce--we have an enforceable system of laws which right now the laws are sorely lacking.


LEE:
Our desire to enforce our border is not unique to us. In fact, our neighbors on the southern side of our border in Mexico themselves have pretty strict laws which they enforce. And our--our neighbors in Mexico, including the officials in the--in the new Lopez Obrador administration, with whom I visited recently, are themselves quite concerned about these uncontrolled waves of migration from Guatemala, from Honduras, from El Salvador.

It occurs to me, and it has occurred to them, that it's important for us to figure out ways to turn off the--the magnets that are bringing these uncontrolled waves in. If you could wave a magic wand, is there anything--any change you would make to current asylum law or policy that you think we ought to consider?


BARR:
I really couldn't say off the top of my head. I--I think--I had some ideas a while back about-- you know, I'm talking decades ago about how we could change it, 'cause this has always been the problem. But I'd--you know, I'd have to see exactly where the abuses are coming in and how we could deal with it.

LEE:

Yeah. Mr. Chairman, I've got one more question. Could I?

GRAHAM:

Sure. Absolutely.

LEE:

With leave of the Chairman, I want to get back very briefly to civil asset forfeiture. I referred briefly at the end of our previous exchange to a process whereby some state law enforcement agencies, seeing that they are prohibited from doing that which they would like to do under state law, will go to a federal law enforcement agency and agree to make the civil asset forfeiture that they want federal such that it's no longer governed by state law.

Sometimes that happens and the Department of Justice will enter into an equitable sharing arrangement with that state where the money is sort of--I don't like to use the word laundered, but it's--it's filtered through the federal system deliberately in an effort to circumvent state law. Would banning this type of equitable sharing in civil asset forfeiture be something that you would be willing to do as attorney general?

BARR:

No, I couldn't say I'm willing to do it now 'cause I don't know enough about it. You know, I come at this, number one, that asset forfeiture is an important tool; number two, that it's important, you know, how--how we work with our state and local partners. But number three, as you could tell from my early statement on this matter, I am sensitive to creating a speed trap problem and also due process issues where amounts are stolen that, for all intents and purposes, it would be too costly for some individuals to go and try to, you know, get back. So, I'm open to looking at whether there are abuses, what kind of abuses occur, and try to redress those.

LEE:

Okay. Thank you. And--and it's--it's my view that, at least in that circumstance where it's prohibited by state law, state law enforcement agencies shouldn't be able to make themselves whole. They shouldn't be able to seek the blessing of government simply by making it federal.

So, I hope you'll consider that, and appreciate your remarks on due process. This really does touch on that, and it's right at the surface of a whole lot of constitutional rights. Thank you very much, sir. Thank you, Mr. Chairman.

GRAHAM:

Senator--Senator Harris. I'm sorry, Booker. I apologize.

BOOKER:

Gosh, give a guy a little power as the chairman and he starts to push you around.

GRAHAM:

I tell you what. He's doing better than I am. I'm getting tired.

BOOKER:

I thought we were friends.

GRAHAM:

(INAUDIBLE) We are friends.

BOOKER:

Grateful, sir. Let me jump right in and you wrote an article where you described how the law was being used and this was your--your opinion and maybe it's changed because this was over a decade ago where you said the breakdown--the breakdown traditional morality by

putting on an equal plane conduct that was pre--previously considered immoral. And you mentioned the homosexual movement is what you described it as one of the movements causing an erosion of morality in America.

I--I can only gather from this the article I'm quoting unless your opinions have changed that you believe that gay bisexual trends--being gay or bisexual, lesbian or transgender is immoral. Do--have your views changed from that?

BARR:
No, but I don't think I said--I think you were paraphrasing there. What did I say about the homosexual move--

BOOKER:
I will put it in the record the--

BARR:
Okay.

BOOKER:
The--the article that you and again I'm quoting your actual language.

BARR:
I'll--I'll tell you my views. If--if--if I had been voting on it at the time my view is that under the law, under the Constitution as I originally conceived it before it was decided by the Supreme Court, marriage was to be regulated by the states and if I were and if it was brought to me, I would have favored marital unions b--single-sex

BOOKER:
I guess I'm more asking do you still believe that homosexuality is a movement or that--that somehow that's immoral behavior?

BARR:

What I was getting at is I think there has to be a live and le--in a pluralistic society like ours there has to be a live and let live attitude and mutual tolerance which has to be a two-way street. And my concern and the rest of the article addresses this is I am perfectly fine with the law as it is for example with gay marriage. It's perfectly fine. But I want accommodation to religion and what I was concerned about--

BOOKER:

But I guess that's not my concern, sir. We live in a country right now where especially LGBTQ youth are disproportionately bullied at school.

BARR:

Yes. Hate crimes.

BOOKER:

Hate crimes, serious hate crimes. Many report missing school because of fear, disproportionately homeless. And I guess what I'm more concerned about is do you believe that laws designed to protect LGBTQ individuals from discrimination contribute to what you described as a breakdown in traditional morality, the laws--

BARR:

No.

BOOKER:

You do not?

BARR:

No.

BOOKER:

Okay. Since--

BARR:

But I'd like to say what I--I also believe there has to be accommodation to--to religious communities.

BOOKER:

You and I both believe in freedom of religion. I guess what I'm talking about again is discrimination and I know you believe I know you believe, I know you believe--you don't need to say for me that you believe that firing somebody simply because they're gay is wrong.

BARR:

Totally wrong.

BOOKER:

I--I understand that you believe that but do you believe the right to not be fired just because of your sexual orientation should be something that should be protected under civil rights law?

BARR:

I'm sorry. Your right not to be fired?

BOOKER:

Sir--

BARR:

In other words are you saying that it should be part of Title VII?

BOOKER:

I'm saying that right now in the United States of America and the majority of our state someone can be fired, they can post their wedding pictures on their Facebook page and be fired the next day just because they are gay.

BARR:

I think that's wrong.

BOOKER:

You think that's wrong?

BARR:

Yes.

BOOKER:

And--and--and so you would believe that efforts by the Department of Justice to protect LGBT kids--kids or--or individuals from harassment from hate crimes in efforts to protect the civil rights of LGBTQ Americans?

BARR:

I support that.

BOOKER:

You support that, okay.

BARR:

That's what I said in the beginning. I--I am very concerned about the increase in hate crime.

BOOKER:

I was really happy about that and said you recognize that violence based on sexual orientation is not acceptable and that you will work to combat that. I was really happy to read that in your written testimony and hear it again.

Will you recognize that then that there's a place for the Department of Justice which is supposed to protect the civil rights of Americans, vulnerable communities, that there's a place for the Department of Justice to protect the civil rights of LGBT Americans by banning discrimination based on sexual orientation or gender identity?

BARR:

If Congress passes such a law. I--I think the litigation going on now in Title VII is what the 1964 Act actually contemplated but personally, I think--

BOOKER:

Please, so I'm sorry you do believe the 1964 Act contemplated protecting individuals from having being discriminated upon by--

BARR:

No, no. I think it was male-female that they were talking about when they said sex in the '64 Act.

BOOKER:

So protecting someone's basic rights to be free from discrimination because of sexual harassment is not something that the Department of Justice should be protecting?

BARR:

No. I'm saying Congress passes the law, the Justice Department enforces the law. I think the '64 Act on its face and this is what's being litigated, what does it cover? I think for like three

or four decades the LGBT community was trying to amend the law.

BOOKER:

But the Obama administration as you know the Justice Department under the Obama administration was working to protect LGBTQ kids from discrimination. Are those practices that you would be--be pursuing as well?

BARR:

I--I don't know what you are referring to. I don't--I'm against discrimination against anyone because of some status, you know, their gender or their--

BOOKER:

I understand really briefly--

BARR:

--sexual orientation or--or whatever.

BOOKER:

Thank you. With the indulgence of the chair just very briefly the Department of Justice reversed the federal government's position in BC versus Perry after arguing that almost 6 years that the Texas voter ID law intentionally discriminated against minorities. Even the Fifth Circuit of Appeal, one of the more conservative circuits, ruled that the Texas law discriminated against minority voters.

You said very strongly that voting, the right to vote is paramount and I'm wondering if confirmed will you bring the Department of Justice back into a--to the mode of defending the right to vote because they've now pulled out of a lot of cases that were--that were affirming people's access for the right to vote?

BARR:

I will vigorously enforce the Voting Rights Act.


BOOKER:

Okay. And then I'll--I'll just say Mr. Chairman, I just want to say to you please I hope we get a chance to talk more. I imagine this is our--our second round and I'm grateful for you today answering my questions. Thank you, sir.


GRAHAM:

Now Senator Harris.


HARRIS:

Thank you. Sir, you were the Attorney General obviously under President George HW Bush and in the Reagan White House a senior policy advisor so I'm going to assume that you are familiar with the Presidential Records Act and my question is in the context of a Washington Post report that the President took possession of an interpreter's notes documenting the President's meeting with the Russian President Putin in 2017 and the question is then is does that violate the Presidential Records Act?


BARR :

Your--your initial assumption I'm afraid was wrong. I--I don't, I'm not familiar with that act.


HARRIS:

You are not familiar at all--?


BARR :

At--at some time I-it's, you know, I--I really don't know what it says.


HARRIS:

You don't know what it says?

BARR:

No.

HARRIS:

Okay.

BARR:

At some time at some point I was--.

HARRIS:

It requires the president to keep documents and not destroy them essentially.

BARR:

At one point I knew what it said but I'm not familiar with it right now.

HARRIS:

Okay. In December a Texas jug--judge struck down the Affordable Care Act. If the decision is upheld the results could include an estimated 17 million Americans losing their health insurance in the first year alone, protections from pre-existing conditions would be eliminated and seniors would pay more for prescription drugs and some adults would no longer be able to stay on their parent's insurance plans until the age of 26.

Attorney General Sessions refused to defend the Affordable Care Act in court. As you know when there is a change of the Attorney General in the Justice Department there is often a change of priorities from the previous AG.

So in the context of also understanding that many lawyers including conservative legal scholars have criticized the Texas decision including Philip Klein of the Washington

Examiner. Would you reverse the Justice Department's position and defend the Affordable Care Act in court?

BARR:

That is a case that I--if I'm confirmed would want--.

HARRIS:

If confirmed.

BARR:

If I'm confirmed I would like to review the department's position on that case.

HARRIS:

Are you open to reconsidering the--the position?

BARR:

Yes.

HARRIS:

The Attorney General Sessions also issued a memo limiting the use of consent decrees. This came up earlier in your hearing and the limitation was on the use of consent decrees between the Justice Department and local governments.

I'm asking then within your first 90 days will you commit to provide--if confirmed, providing this committee with a list of all consent decrees that have been withdrawn since Attorney General Session issued that policy? We'd like some transparency and information about what consent decrees have been withdrawn during the Sessions administration of the Justice Department. Would you commit to doing that?

BARR:

Yes.

HARRIS:

And if confirmed will you commit to providing this committee with a list of any consent decrees that you withdraw during your tenure?

BARR:

Throughout the in--tenure?

HARRIS:

Yes.

BARR:

Yes.

HARRIS:

And if confirmed, within 90 days of your confirmation will you commit to convening civil rights groups to listen to their concerns about this policy and the Department of Justice?

BARR:

I--I will, I'm--I'm very happy to convene that group.

HARRIS:

I'm going to interpret that as a commitment that you will.

BARR:

I'm--I'm not sure of about 90 days. Give me 120.

HARRIS:

Okay. That's fine. That's--that's the agreement then within 120 days. That's terrific. And then the Voting Rights Act you are familiar of course with that I'm going to assume, yes?

BARR:

Yes.

HARRIS:

Okay. And under the act, the record of discriminatory voting practices, those states that have a record of such practices had to obtain federal approval in order to change their voting laws as you know.

BARR:

Yes.

HARRIS:

And then came the 2013 Shelby decision where the court by a 5-4 vote pretty much gutted the act ending the federal preapproval requirement. So within weeks of that ruling, you are probably aware that legislators in North Carolina rushed through a laundry list of voting requirements. A federal appeals court later held those North Carolina laws to be intentionally discriminatory against African-American voters targeting them quote with almost surgical precision.

Do you believe there are currently laws on the books that target African-Americans or have the effect of discouraging African-Americans from voting in our country?

BARR:

Well, it sounds like those laws do.

HARRIS:

Sure.

:

So I'm-

HARRIS:

Do you have any concern about that there may be other laws that have the same effect?

BARR:

I would be concerned if there are other laws and that's why I would vigorously enforce Section 2 of the Voting Rights Act.

HARRIS:

And would you make it then part of your mission to also in spite of the fact that the Voting Rights Act has been gutted to make it your mission to also become aware of any discriminatory laws in any of the states including those that were covered by the Voting Rights Act because of their history of discrimination and use the resources of the Department of Justice to ensure that there is not voter suppression happening in our country?

BARR:

Yes.

HARRIS:

Thank you. My time is up. I appreciate it.

GRAHAM:

It was very efficient. I think that's the end of the two rounds that I promised the committee we would do. Thanks. Senator Hirono, you have a few more questions.

HIRONO:

Yes, thank you very much. And I thank Senator Kennedy, as he was sitting in the chair, to give me permission to go a little bit further. So, I'll be as brief as I can.

Last year, the Justice Department in Zarda v. Altitude Express--it was the second circuit case--argued that Title VII of the filing amicus brief--it argued that Title VII of the Civil Rights Act of '64 did not prohibit discrimination on employment on the basis of sexual orientation.

So, both the second and the seventh circuits have the Department's argument. So, if confirmed, would you appeal the--this decision to the Supreme Court?

BARR:

I thought--I think--I think it is going up to the Supreme Court.

HIRONO:

So, is the--is the DOJ going to continue to argue that Title VII does not protect--?

BARR:

--Well--.

HIRONO:

--Discrimination--employment discrimination?

BARR:

You know, it's pending litigation, and I haven't--you know, I haven't gotten in to review the--the Department's litigation position. But, the matter will be decided by the Supreme Court.

HIRONO:

Well, I take it that--that sounds like a yes to me that the Department will continue to push the argument status then of--.

BARR:

--Well, it's not just the Department's argument. It's been sort of common understanding for almost 40 years--.

HIRONO:

--So, employment discrimination on the basis of sex is something that--that--it would be okay by you if that's something (INAUDIBLE)--.

BARR:

--No, that's not at all what I'm saying. I'm saying the question is the interpretation of a statute back in 1964. I--as I've already said, I personally, as a matter of, you know, my own personal feelings, think that there should be laws that prohibit discrimination against gay people--.

HIRONO:

So, perhaps though, should you be confirmed, that you would review the Department's position on making the argument, continuing to put for the argument that Title VII does not prohibit employment discrimination. Would you review?

BARR:

No, because there's a difference between law and policy. The question in law is what was--what--I will enforce the laws as passed by Congress. I'm not going to amend them. I'm not going to undercut them. I'm not going to try and work my way around them and evade them.

HIRONO:

Well, the DOJ also doesn't have to file an amicus brief either.

Let me move on then. Recently, The New York Times reported that the Department of Health and Human Services wanted to redefine gender for federal anti-discrimination law, such as Title IX--so now, we're talking about Title IX--as being determined by the biological features one has at birth.

So, do you believe that transgender people are protected from discrimination by Title IX?

BARR:

I think that matter is being litigated in the Supreme Court too.

HIRONO:

Do you know what the Justice Department's position is on whether--well, if they're going to go along with what the Department of Health and Human Services wants, then there's--the Justice Department's position is that Title IX does not protect discrimination on the basis of transgender.

BARR:

I do not know what the position is.

HIRONO:

This is probably another one that I would ask you to review.

BARR:

Okay.

HIRONO:

Last questions. You've been asked this already. But, after the Shelby County v. Holder decision, there was some 13 states that passed various kinds of laws that one could--the

argument could be made that they were intended to suppress voters. In fact, some of them were intentionally intended--not just the effect of discriminating against, basically, minority voters.

So, you did say that you would vigorously enforce the Voting Rights Act. So, that's good. The Washington Post reported last week that officials in North Carolina reported strong allegations of election fraud related to absentee ballot tampering to the US DOJ. This--we're talking about election fraud, not voter fraud.

But, the Justice Department did not appear to take any action, and now that Congressional race is still being decided. But, one thing the Department of Justice did manage to do in North Carolina was to request that North Carolina turn over millions of voting records to Immigrations and Customs Enforcement, ICE, apparently as part of a needle in a haystack effort to prosecute voting by non-citizens.

If confirmed, will you continue to put resources into this kind of effort to prosecute voting by non-citizens--which the evidence is very clear that there is not this kind of voter fraud going, in spite of the fact that the President said there was some--I don't know--three million people who were not supposed to vote voting. So, would you continue to expend resources on requiring turning over millions of voter records to be turned over to ICE?

BARR:
Well, I don't know what the predicate--I don't know what the predicate for looking into that is.

HIRONO:
Well, it was to get at voter fraud, which, according to the President, is going on in a massive way, which it is not.

BARR:

Well, yeah. But, the predicate--I don't know what information triggered that review. But, you know, when I go into the Department, I'll be able to discern whether or not that's a bona fide investigation. And, if it is, I'm not going to stop it.

HIRONO:

What is--what if the trigger was that there's massive voter fraud going on--which is not the factual--it's not a factual basis. I would hope that, as--as Attorney General, you would make decisions based on facts, not on some kind of ideological need to go after people. So, that's all I'm asking. I would just ask you to make sure that--.

BARR:

--You're right--.

HIRONO:

--The predicates are based on--.

BARR:

--Facts--.

HIRONO:

--Some factual basis so that we're not wasting short resources to go after fraud that's not even--there are plenty of other things that you could be doing to make sure that the people are able to vote.

BARR:

Right.

HIRONO:

Thank you.

GRAHAM:

Okay, can you make it a few more minutes?


BARR:

Sure.


GRAHAM:

Okay. I know comfort breaks are necessary. So what I'd like to do--Senator Kennedy has one question, right? Senator Blumenthal has a couple. Then we're going to wrap it up. If you had 10 minutes to live you would want to live in this committee.

(LAUGHTER)

Because 10 minutes is a long time. Senator Kennedy.


KENNEDY:

In general I'm still confused about one point. Let's assume that Mr. Mueller, at some point, hopefully soon, writes the report, and that report will be given to you. What happens next under the protocol, rules and regulations at Justice?


BARR:

Well, under the current rules that report is supposed to be confidential and treated as, you know, the prosecution and declination documents in an ordinary crim--any other criminal case. And then the attorney general, as I understand the rules, would report to Congress about the conclusion of the investigation. And I believe there may be discretion there about what the attorney general can put in that report.


KENNEDY:

So you would make a report to Congress--

BARR:

Yes.


KENNEDY:

--based on the report you've received?


BARR:

Yes.


KENNEDY:

Okay, thank you.


GRAHAM:

All right. A couple questions by Senator Blumenthal, and we're going to wrap it up.


BLUMENTHAL:

Thank you for your patience and--


BARR:

(INAUDIBLE)


BLUMENTHAL:

--your perseverance. And I appreciate, let me say, your willingness to come meet with me, and so I'm going to cut short some of my questions. And also I hope that you will come back regularly to the committee. Obviously the chairman is the one who determines when and whether we have witnesses, but the frequency--


GRAHAM:

He comes every 30 years.

(LAUGHTER)

BARR:

27.

BLUMENTHAL:

27. You were asked by Senator Leahy about your statement that the Uranium One deal was more deserving of investigation than collusion with Russia. You answered that you were not specifically referring to the--referencing the Uranium One deal, but just generally referring to matters the U.S. Attorney might be investigating.

BARR:

I--I can't remember the exact context of that. There was a series of questions a reporter was asking, and then the article sort of put them in a sequence that, you know, didn't necessarily show my thoughts.

BLUMENTHAL:

Well, the New York Times just published in a tweet the email that you sent them, and you did reference Uranium One specifically.

BARR:

Okay.

BLUMENTHAL:

I'll ask that it be made part of the record, if--

GRAHAM:

Without objection.

BLUMENTHAL:

And--

BARR:

So what did I say?

BLUMENTHAL:

The tweet from Peter Baker of the New York Times says questions have been raised about what Bill Barr told us for a story in 2017. Here is his full email from then responding to our request for comment. We're grateful he replied and hope this clarifies any confusion. And the email from you says, and I will take the relevant-

BARR:

Yeah.

BLUMENTHAL:

--part of the sentence. Quote, I have long believed that the predicate for investigated the Uranium deal, as well as the foundation, is far stronger than any basis for investigating so-called collusion.

BARR:

What--and came before that?

BLUMENTHAL:

I'll read the full email, with the permission of the chairman.

GRAHAM:

Yes, please.

BLUMENTHAL:

Peter, got your text. There is nothing inherently wrong about a president calling for an investigation, although an investigation shouldn't be launched just because a president wants it. The ultimate question is whether the matter warrants investigation, and I have long believed that the predicate for investigating the Uranium deal, as well as the foundation, is far stronger than any basis for investigating so-called collusion. Likewise, the basis for investigating various national security activities carried out during the election, as Senator Grassley has been attempting to do. To the extent it is not pursuing these matters, the department is abdicating its responsibility. Signed Bill Barr.

BARR:

Right. So the abdicating responsibility, I was actually talking about the national security stuff, and that was my primary concern. I--you know, the Uranium One deal, the sort of pay-for-play thing, I think at that point--I may be wrong on this, but I think it was included in Huber's portfolio to review, suggesting that there was something to look at there. But the point I was really trying to get at was that there was a feeling, I think a strong feeling among many people, that it appeared, at least on the outside, that there were double standards being applied. And I thought it was important that the same standard for investigation be used for all matters. But I have no, you know, specific information about Uranium One that would say that it has not been handled appropriately.

BLUMENTHAL:

Well, that's really my question. What was the factual basis for your saying that the Uranium One deal was more deserving of investigation than Russian collusion, given what you have--

BARR:

I think that--

BLUMENTHAL:

--very articulately described as the potential threat to the national security of the United States from Russian interference in our election.

BARR:

Yeah, I think at that time there was a lot of articles appearing about it. I think maybe Congressman Goodlatte had written a letter about it. So there was smoke around the issue, as there has been smoke around a number of issues that have been investigated. But I was using it really as an example of the kinds of things that were floating around that some people felt had to be looked in as well--looked at as well.

BLUMENTHAL:

So the factual basis was whatever that smoke was?

BARR:

Well, the public information that a lot of opinions are being formed.

BLUMENTHAL:

And how about as to the foundation? What was the basis of your claim that the foundation was more deserving of investigation than Russian collusion?

BARR:

Well, the founda--you know, I didn't necessarily think the foundation was--should be criminally investigated, but I--

BLUMENTHAL:

Well, you did say that in the email.

BARR:

I did, criminally?

BLUMENTHAL:

Well, let me read that part of the sentence again. I have long believed that the predicate for investigating the Uranium deal, as well as the foundation, is far stronger than any basis for investigating so-called collusion. You were referring to the criminal investigation, as I read it.

BARR:

Yeah. Well, the foundation, I always wondered about--it was the kind of thing that I think should have been looked at from a tax standpoint and whether it was complying with the foundation rules the way a corporate foundation is. And I thought there were some things there that, you know, merited some attention. But I wasn't thinking of it in terms of a criminal investigation of the foundation. I'd like to--you know, Attorney General Mukasey said something that I agree with. He said, it would be like a Banana Republic putting political opponents in jail for offenses committed in a political setting. Even if they are criminal offenses, it's a something we just don't do here. And one of my concerns, frankly, is, you know, politics degenerating into, you know, this kind of thing about should we investigate this, investigate that, about political opponents, and that concerns me. So that's why I said--I think, if not that, some other article. I don't subscribe to this lock her up stuff.

BLUMENTHAL:

But a political or public official, even the President of the United States, has to be held accountable. No one is above the law. Wouldn't you agree?

BARR:

Oh, yes, absolutely.

BLUMENTHAL:

And just one more question. You referred earlier in response to a question from Senator Feinstein about the emoluments issue, and I ask this question--in the interest of full

disclosure I will tell you that I am the lead plaintiff in a litigation called Blumenthal, Nadler vs. Trump that raises the issue of emoluments and the payments and benefits that have been going to the President of the United States without the consent of Congress, in violation of the chief anticorruption clause in United States law, the emoluments clause of the United States Constitution, so we claim. You said that your understanding of emoluments was that it was--that it pertained only to stipends.

BARR:

No. Well, first, I--

BLUMENTHAL:

Maybe--

BARR:

I haven't looked at that clause. I've not--you know, I haven't researched it, and I haven't even looked up the word emolument. But all I said is just colloquially, off the top of my head, that's what I always thought the word meant.

BLUMENTHAL:

So you're not necessarily disputing the conclusion of at least one district court, perhaps others, that emoluments relates to payments and benefits much broader than just a stipend? You were speaking only of your colloquial understanding?

BARR:

Yeah, I mean my colloquial understanding is that emoluments doesn't refer to exchange of services and stuff like that, commercial transactions.

BLUMENTHAL:

Which is not necessarily the understanding of the founders and framers of the Constitution.

BARR:

We'll see.

(LAUGHTER)

BLUMENTHAL:

Thank you.

GRAHAM:

Well, that's a good way to end. We'll see. Thank you, Senator Blumenthal.

BLUMENTHAL:

Thank you.

GRAHAM:

Thank you, Mr. Barr. To your family, thank you. You should be proud. This was a very thorough examination of a very important position in our government. If confirmed, you will be the chief protector of the rule of law, and I really appreciate your time, attention and your patience. Any further questions can be submitted for the record by January 21. This hearing is adjourned to re--to be reconvened tomorrow at 9:30. Thank you.

**List of Panel Members and Witnesses**

PANEL MEMBERS:

SEN. LINDSEY GRAHAM (R-S.C.), CHAIRMAN

SEN. CHARLES E. GRASSLEY (R-IOWA)

SEN. JOHN CORNYN (R-TEXAS)

SEN. MIKE LEE (R-UTAH)

SEN. TED CRUZ (R-TEXAS)

SEN. BEN SASSE (R-NEB.)

SEN. JOSHUA D. HAWLEY (R-MO.)

SEN. MICHAEL D. CRAPO (R-IDAHO)

SEN. JONI ERNST (R-IOWA)

SEN. THOM TILLIS (R-N.C.)

SEN. JOHN KENNEDY (R-LA.)

SEN. MARSHA BLACKBURN (R-TENN.)

FORMER SEN. ORRIN G. HATCH (R-UTAH)

SEN. DIANNE FEINSTEIN (D-CALIF.), RANKING MEMBER

SEN. PATRICK J. LEAHY (D-VT.)

SEN. RICHARD J. DURBIN (D-ILL.)

SEN. SHELDON WHITEHOUSE (D-R.I.)

SEN. AMY KLOBUCHAR (D-MINN.)

SEN. CHRIS COONS (D-DEL.)

SEN. RICHARD BLUMENTHAL (D-CONN.)

SEN. MAZIE K. HIRONO (D-HAWAII)

SEN. CORY BOOKER (D-N.J.)

SEN. KAMALA HARRIS (D-CALIF.)

WITNESSES:

U.S. ATTORNEY GENERAL NOMINEE WILLIAM PELHAM BARR

**Testimony & Transcripts**

Complete written testimony for this event Jan. 15, 2019

**About Senate Judiciary**

Staff

Hearing

Transcripts

Testimony

Committee Reports

Associated Bills

Schedules

Markup

Amendments

© 2019 · CQ - Roll Call, Inc · All Rights Reserved.

1625 Eye Street, Suite 200 · Washington, D.C. 20006-4681 · 202-650-6500

About CQ   Help   Privacy Policy   Masthead   Terms & Conditions