# EXHIBIT B

CQ Congressional Transcripts
Apr. 10, 2019

Apr. 10, 2019 Revised Final

# Senate Appropriations Subcommittee on Commerce, Justice and Science Holds Hearing on Justice Department Fiscal 2020 Budget Request

## LIST OF PANEL MEMBERS AND WITNESSES

MORAN:

(OFF-MIC) Justice, Science, and Related Agencies Appropriations Subcommittee hearing (INAUDIBLE) your department, the Department of Justice's, Fiscal Year 2020 budget request. I'm pleased to also welcome Lee Lofthus, Chief Financial Officer, of the department.

I'd like to begin my remarks by thanking the (INAUDIBLE) men and women that work at the Department of Justice. The work they do is vital to protect American lives (INAUDIBLE). I especially want to use this moment (INAUDIBLE) for persevering during our unfortunate recent government shutdown. I'm sorry for the stress that was created, and I hope that we're able to avoid future shutdowns by enacting timely appropriations bills, including Commerce, Justice, Science.

In order to accomplish this and write the Fiscal Year '20 CJS appropriation bill, this committee needs to understand the department's resource needs. The president's FY '20 budget request proposes over $30 billion for the Department of Justice. Because you indicated yesterday you will report to Congress on the Mueller investigation next week, it's my hope that the budget request will remain the major focus of today's hearing. I'm not naive, but I hope that's the case.

I would like to begin, though, by asking you a question about your testimony yesterday. I would like for you to respond during your time in regard to clarifying an issue related to the

Mueller report. When we met before your confirmation, you and I met, I told you I'd like to see the Mueller report released to the public as expeditiously as possible and to the fullest extent possible as allowed by law.

Will you, as I hope, released the redacted version of the actual report special counsel Mueller submitted to you, or did you intend to indicate in your testimony comments yesterday that you will only provide a report of your own findings that are derived from the Mueller report?

Now the focus of this hearing, the president's Fiscal Year '20 budget request. The department's FY '20 request is not based off of the department's FY '19 appropriation, and therefore does not contemplate the increases provided for the government wide 1.9 percent increase included for federal employees. Because the baseline of the FY '20 request is below the department's current appropriation, I encourage you to take time today to discuss any needs that may not be adequately represented in the President's budget proposal that's before us.

In particular, I hope you will discuss the department's resource needs as they relate to the First Step Act. I'm an original cosponsor that legislation, and I'm concerned to learn that the FY 20 request only includes $14 million in additional funds for the implementation of this legislation. That figure is far short of the $75 million that was authorized by Congress.

I do note several program increases for the Department of Justice included in the administration's request is year. These increases reflect the administration's priorities, which include strengthening our national security, combating violent crime, cyber crime, drug trafficking, and opioid epidemic. The request also includes enhancement for immigration enforcement. And another administration priority, under the Executive Office of Immigration Review, EOIR, and the Environment and Natural Resources division, FY '20 request seeks $670 million for immigration related enforcement activities and border security efforts, including 100 additional immigration judges, judge teams, and two new positions at the Environment in Natural Resources Division's Land Acquisition section.

I am--while I understand the importance of those increases, I am discouraged and concerned to learn that the request does not include technology enhancements or improvements for EOIR. Our FY '19 provisions allowed for $25 million for technology improvements to transform EOIR's paper system to an electronic case management system. That electronic management system, though incredibly important, was only forward-looking, so the $25 million that we put in place for the Department of Justice did not include paper files associated with the 861,513 cases that are backlogged at ECAS.

MORAN:

To encourage this practice, our '19 report language directed the department to develop a plan for folding existing cases into the Electronic Case Management System. I hope to learn more about both the status of implementing that plan as well as the department's intentions to incorporate the backlog into the system and if there are additional needs associated with full implementation of electronic records let's discuss those today Mr. Attorney General.

The department's FY '20 request reflects its broad and multifaceted mission of protecting and defending the laws of the United States, the members of the DOJ community, law enforcement community including the FBI, the DEA, the ATF, U.S. Marshall's and the Bureau of Prisons and the people who work there put their minds--lives on the line every day to keep our country and community safe. The department's mission and especially its law enforcement focus is central to Americans' safety and stability.

It is imperative that Congress ensures the department is adequately equipped to affect its mission and I look forward to working with you in that endeavor. I also look forward to learning more of the department's request for resources dedicated to the law enforcement mental wellness initiative which includes peer mentoring, mental health checks and suicide prevention. Unfortunately, a number of indicators now show that for the third straight year police suicide outnumbered lives lost in the line of duty. Much like our veterans and active duty service members law enforcement officers need access to comprehensive programs that address mental wellness, something that many jurisdictions struggled to provide the necessary resources to provide.

I will soon turn to Senator Shaheen but I want to thank you Attorney General **Barr** for your attention and acknowledgment of the committee's request, our questions for the record from the FY '19 budget hearing a year ago as you know the department's responses to these questions were eight months late making it impossible for our committee to consider the department's responses as we crafted our FY '19. After I brought this to your attention, we receive DOJ's responses in very short order.

It is my hope and so I thank you for that, it is my hope that under your leadership the department will continue to respond expeditiously to this year's questions for the record and one of the things I remember from the conversation we had before your confirmation was your commitment to work closely with Congress and this subcommittee in particular to have an open dialogue and a transparent conversation and your answer to those questions on the record will be and continue to be appreciated. I would add an additional thank you which is thank you for your presence here today. This testimony is important and I now recognize the Ranking Member, Senator Shaheen.

SHAHEEN:

Well, thank you, Mr. Chairman. Good morning Attorney General **Barr**. Thank you for appearing before this subcommittee. I share the chairman's view that we want to try and focus mostly on your budget but I have to be again with two concerns that I have about actions that you and the Justice Department have taken. First, I saw your testimony yesterday and I still do have questions on the special counsel's report as I believe this report has serious national security implications. We know that Russia interfered in our election. We know that the special counsel has brought nearly 200 charges against 34 individuals in three companies including six former Trump officials and 26 Russian nationals. I am concerned by recent media reports that those working on the special counsel's team believe your summary to Congress flossed over the severity of the damaging actions of those in the White House including the pres. The American people should be allowed to see the report in its entirety so they can make their own judgments about its content.

I'm also troubled by the department's recent decision to support a District Court decision that would completely invalidate the Affordable Care Act. I have questions for you as to why this decision was made. This recent action by the department will put millions of Americans including 118,000 granite stators that risk of being unable to afford or simply not have access to their current health care coverage. The loss of protections for pre-existing conditions and soaring prescription drug cost for seniors will affect thousands.

And this includes vulnerable Americans like a young boy named Seth from Northfield, New Hampshire. He lives with hemophilia. It is a disease that requires hundreds of thousands of dollars of medication and treatment cost every month. Before the Affordable Care Act Seth's father would have to change jobs because Seth's medical cost were constantly running up against the families annual limits on the dollar value of insurance cover--coverage. Children like Seth, those living with pre-existing conditions stand to lose the most if the Affordable Care Act is wiped out. They can be denied insurance coverage because of their medical condition; insurers would be able to jack up cost and cut off coverage after medical bills reach an arbitrary threshold.

I believe we need to work together, the Republicans and Democrats to improve the health care law, not unravel it. And I hope that we will be able to do that in the coming months and years.

I do acknowledge as I said that you are here today in your role as attorney general to explain the department's Fiscal Year 20 budget request. The complex and often difficult work of the department is vast ranging from national security investigations to operating a national prison system to management of billions in grants to state and local entities. Yet in Fiscal Year 2020 the department has requested nearly 2 percent less funding for its missions than the level provided in the omnibus we passed last month.

The Bureau of prisons is a large part of this reduction, a cut of $188 million below what we just enacted in Fiscal Year '19. It is disconcerting that the department would slash the budget for BOP in light of our direction in Congress to continue hiring particularly so as not to rely on augmentation which is the dangerous practice of using administrative staff light

teachers and counselors as correctional officers including expanding programming for inmates, cutting programming for inmates and facilities across the country including FCI Berlin in my home State of New Hampshire.

It is also troubling that the department seems to have forgotten about meeting the requirements for prisoner reentry as part of the recently passed first step back. There is only $14 million requested with little detail as to how you plan to use that money when $75 million has been authorized for this effort. I was also surprised about drastic reductions and eliminations proposed for Justice Department grant programs including those to help our communities fight opioids. I am deeply concerned that this budget request cuts nearly $100 million in funding that was just provided for justice grant programs to help communities respond to the opioid crisis with the balance of enforcement, treatment and prevention programs.

I'm interested to hear your reasons why your FY '20 budget dramatically reduces this critical funding and even eliminates key programs like cops antiheroine task forces which we provided $32 million to cover and mentoring programs for youth who are directly affected by the toll opioids have had on their families and communities. We funded that at $15 million. We see this very dramatically in New Hampshire whereas I think we discussed previously we have the third-highest overdose death rate in the country.


SHAHEEN:

I understand that there is more demand on these programs than even we in Congress have appropriated so what I don't understand is why we are talking about eliminating them.

In closing I want to echo the appreciation that was expressed by Chairman Moran for the 112 career employees at the Department of Justice. They work very hard to keep Americans safe from crime and terrorism and especially during the government shutdown they worked without any guarantee that they would be paid so I know that I speak for everybody on this committee and thanking them for their service.

I look forward to your testimony today Mr. Attorney General.

MORAN:

Before we turn to the attorney general for his remarks, I would recognize the vice-chairman of the full committee Sen. Leahy for any comments or opening statement he would like to make.

LEAHY:

Thank you, Mr. Chairman, and I--I agree with both you and Senator Shaheen and the 112,000 who kept on working during the shutdown that went on for 35 days. I remember very well the day it ended when four of us met in my office Senator Shelby, myself, Congresswoman Lowey and Congresswoman Granger and we made an agreement on the appropriations and fortunately Republicans and Democrats join with us and passed. The president vetoed the first one because it gave him only $1.6 billion for a wall. The agreement that we agreed to gave $1.3 billion but he accepted that and I thought it was about time we got back to work. Now there are a lot of pressing issues facing the Justice Department, immigration enforcement, combating opioids, violent crime, protecting voting rights. And a lot of these are going to be discussed this morning. There will be another oversight hearings.

I first want to express my appreciation to Robert Mueller and his team for their service to our country in determining exactly what happened during the unprecedented attack on our democracy. We already know from their investigation 37 indictments. They uncovered serious misconduct reaching some of the highest level, even if the presidents involvement did not amount to a provable crime and thankfully so.

The American people and their representatives in Congress now expect to see these special council's work. It is my hope that you are still committed to the greatest possible degree of transparency. As you know classified material can be shared with Congress and is on a constant basis. But there is also precedents for sharing grand jury information as well

especially in high profile investigations of keen public interest. In ongoing investigations and other reason to redirect certain information like all things in life eventually and.

One way or another the vast majority of the special council's report will ultimately become public. I think it attempts to hide swaths of the report from public scrutiny along the way will only fuel suspicions that have been raised by many at the Justice Department which represent the United States as playing the role of President Trump's defense team.

For the integrity of the department and I know you well enough to know that you agree this is a result that must be avoided. Your imprint on the course of justice and rule of law in these moments are going to be scrutinized long after both you and I are gone from the public service. The only way out in my view is transparency. You do have the discretion to release the full report to Congress.

Nothing in the letter of the law stands in your way. So I hope in coming weeks you will work in good faith with Congress to accomplish that. And Mr. Chairman I will have a number of questions on the budget and I appreciate the courtesy of being recognized.


MORAN:
You are welcome, Mr. Vice Chairman. Attorney General **Barr** we are ready for your testimony. Thank you for joining us and anxious to hear what you have to say.


BARR:
Thank you, Chairman Moran. Thank you Chairman Moran and Ranking Member Shaheen and Vice Chair Leahy and members of the subcommittee. I am pleased to be here today to present the president's Fiscal Year 2020 budget for the Department of Justice. I am joined here today by the department's Chief Financial Officer Assistant Attorney General for Administration Lee Lofthus. We are looking forward to discussing how our requested appropriations will help protect the safety and the rights of your constituents.

Rather than read a statement to you let me just say that I am here to talk about the department's $29.2 billion FY 20 budget request. I believe the budget request supports our

priorities. We are seeking $128 million of increases for our violent crime prevention work. We are seeking $291 million enhancements for our drug abuse and opioid efforts. We have $131 million for our national security and cybercrime efforts and I am seeking an additional $72 million for our immigration work. I am proud of the department's accomplishments and our workforce of more than 112,000 men and women and I am looking forward to your support for the resources we need for their important work.

With that I am happy

**BARR:**
--to answer any questions.

**MORAN:**
Attorney general, thank you for your brief statement, and thanks for the opportunity to ask you questions. I would just reiterate to ask for an answer to the question I raised--

**BARR:**
--Sure--

**MORAN:**
--in my opening statement. I was uncertain as to what you are conveying yesterday during your House testimony about whether you will provide a report of the report or a redacted version of the Mueller's--actual Mueller report.

**BARR:**
Yes, it's my intention to provide the latter. As I said in my confirmation hearing, you know, the--the regulation under which we are operating did not contemplate and specifically was meant to avoid these public reports. But I feel I have the discretion in the circumstances to make the report public as long as it's consistent with the law.

And as I said at my hearing, that I was going to try to be as transparent as possible, and that's what I've been working toward. There are four areas--I intend to release the report with redaction's made in four areas, and they were specified in my March 29th letter. The first area is 6 (e) material, because--and I'm talking here, by the way, about the--a report that would be available to the public generally, and then I'll talk a little bit about the report available to committees of Congress.

The report I'm working on now I'd like to make available with redactions that would enable me to make it public generally, and there are four categories; the grand jury material, which by law must be retained in the department absent very specific circumstances which I do not think exist here. The second category is any material identified by the intelligence community that would put at risk intelligence sources and methods.

The third category is information that would impair existing, you know, prosecutions and investigations that are going forward right now, either by affecting the ability of the department to pursue them as effectively as we'd like or being unfair to the individuals who are actually parties to that prosecution.

You will recognize that Special Counsel Mueller did spin off a number of cases which continue in progress on are being handled in the department. And so, we have to make sure that nothing in the report impinges on those ongoing cases. And the final category is information that implicates the privacy or reputational interests of peripheral third parties who were not charged.

Now, the people who are making these reductions and implementing these four categories are the department working with the special counsel office lawyers, and those of the people involved in making the reductions. So, as I mentioned yesterday, we plan to identify very specifically which redactions relate to which category and try to explain why that redaction was made.

I also said yesterday that, when it comes to Congress, once I get this done and the public--everyone has the report, I'm willing to work with the committees. The regulation requires that--it doesn't require, but it has my notification going to be Judiciary Committees. And I

intend to take up with the House and the Senate Judiciary Committees, the chair and the ranking members of each, what other areas, you know, they feel they have a need to have access to the information and see if I can work to accommodate that.

As has been correctly said here, the fact that information is classified does not necessarily--doesn't mean that Congress can't see it. So, I'm willing to work on--on some of these categories. The category I think is the most inflexible under the law right now is the--is the grand jury material. But even there, once the reductions are completed, I intend to sort of read the report and see if there are areas where it affects the intelligibility or, you know, really has an impact on--on the report. And I'm willing to work with the Judiciary Committees to see if there is a workaround that could address any concerns for needs that they have.

MORAN:
General, under the assumption that your answer was of interest to my colleagues, I'm going to continue with another question beyond my time. I want to talk about grant funding that's been delayed due to litigation surrounding sanctuary cities.

BARR:
Um-hmm.

MORAN:
So, in the past, the department has tried to enforce federal immigration law by imposing special conditions or bonus points on recipients of federal grant funding. These conditions restrict grant funding to jurisdictions that certify they are in compliance with federal law, stating that they are not sanctuary cities or states.

That's not something that I'm complaining about in this question. What I'm concerned about is the money that has been held up as a result of that litigation--because of pending litigation in regard to Byrne JAG grant funds. We've had success in that occurring. But unfortunately, that has not been the case in the FY '18 COPS hiring grants.

These solicitations were pulled and applicants are still unable to apply for COPS hiring grants going back to FY '18 awards. Have you reviewed the department's policies? Is there a plan to figure out how that we can--can provide those necessary resources to local law enforcement to retain and higher law enforcement officers?

BARR:
Yes, I think this is a--the problem is really a function of this phenomenon of nationwide injunctions that are imposed by district court judges. And this is actually a fairly recent phenomenon.

The old--the old practice in law was that, if a district court judge issued a decision, the judge could redress the grievances of the parties before the court. But now courts are granting nationwide injunctions. As a result, if a district court in Northern California, which is I think the court that may have been involved here, grant an injunction, they enjoin the grant program nationwide.

Now, one of the reasons we were able to--and Lee can correct me if I'm wrong about this. But one of the reasons we were able to get out the Byrne JAG grants was that there had been a district court in Chicago that had enjoined it nationwide. We went to the 7th Circuit. They required the court to--to reduce its injunction just to its jurisdiction. And when that happened, we were able to get out the Byrne JAG grants.

What's happened with the COPS grants is that it's enjoined by a district--several district court judges. We're arguing if not today, within the next few days in the 7th and 9th Circuit to try to have that addressed so we can get those--those grants out.

But frankly, I think we need to come to grips with this issue of nationwide injunctions, because I think the way the system should do these issues should percolate up through various circuit courts and so forth up to the Supreme Court. And the idea that one district court judge can kill programs nationwide is a serious problem.

MORAN:

Thank you for your answer. If you're successful in finding a path to see that the COPS grants are available, please be prepared as a department to proceed quickly when that--if and when that occurs. And I don't think local law enforcement has been able to even submit a grant application, so it is significantly delayed. And maybe there's a way that those grant applications--I don't know what the injunction covers, but maybe there's a way to submit the grant application even if you can't award a grant until you receive judicial authority to do so.

BARR:

I'll look--I'll look into that.

MORAN:

Thank you. Senator Shaheen?

SHAHEEN:

Thank you, Mr. Chairman. And let me just echo what Senator Moran was saying about the COPS grants, particularly in states like New Hampshire where we have no sanctuary cities. It's very onerous for us to be affected by these rulings.

I want to go back to your comments about the four reasons that you intend to redirect portions of the special counsel's report. The fourth one was information that would unduly infringe on the personal privacy and reputational interests of peripheral third parties. Does that mean that you will redact information to protect the reputational interests of the president?

BARR:

No. I'm talking about people in private life--

SHAHEEN:

--Okay. So--

BARR:

--not--not public officeholders.

SHAHEEN:

Thank you. News just broke today that you have a special team looking into why the FBI opened an investigation into Russian interference in the 2016 elections. I wonder if you can share with this committee who's on that team, why you felt a need to form that kind of a team, and what you intend to be the scope of their investigation.

BARR:

Yeah. I--as I said in my confirmation hearing, I am going to be reviewing both the genesis and the conduct of intelligence activities directed at the Trump campaign during 2016. And a lot has already been--a lot of this has already been investigated, and a substantial portion of it has been investigated and is being investigated by the Office of Inspector General at the department.

But one of the things I want to do is pull together all the information from the various investigations that have gone on, including on the Hill and in the department, and see if there are any remaining questions to be addressed.

SHAHEEN:

And can you share with us why you feel a need to do that?

BARR:

Well, I--you know, for the same--well, for the same reason we're worried about foreign influence in elections. We want to make sure that during ele--I--I think spying on a political campaign is a big deal. It's a big deal. Generation I grew up in, which is the Vietnam War, a period--you know, people were all concerned about spying on anti-war people and so forth by the government. And there were a lot of rules put in place to make sure that there's an

adequate basis before--before our law enforcement agencies get involved in poli--you know, political surveillance. I'm not suggesting that those rules were violated, but I think it's important to look at that. And I'm not just--I'm not talking about the FBI necessarily, but intelligence agencies more broadly.

SHAHEEN:

So, you're not--you're not suggesting, though, that spying occurred.

BARR:

I don't--well, I--I guess you could--I--I think there's--spying did occur. Yes, I think spying did occur.

SHAHEEN:

Well, let me--

BARR:

--But, the question is whether it was predicated--adequately predicated and I'm not suggesting it wasn't adequately predicated, but I need to explore that. I think it's my obligation. Congress is usually very concerned about intelligence agencies and law enforcement agencies staying in their proper lane and I want to make sure that happened. We have a lot of rules about that.

And I want to say that--that I've said I'm reviewing this. I am going--I haven't set up a team yet, but I do have--I have in mind having some colleagues help me pull all this information together and--and let me know whether there's some areas that should be looked at. And I also want to make clear, this is not launching an investigation of the FBI. I--frankly, I'm--to the extent there were--there were any issues at the FBI, I do not view it as a--a--a problem that's endemic to the FBI. I think there was probably a failure among a--a group of leaders there at the upper echelon.

And so, I don't like to hear attacks about the FBI because I think the F--FBI is an outstanding organization and I think, you know, Chris Wray is a great partner for me. I'm--I'm very pleased that he's there as the director. And if it becomes necessary to--to--to look over some former officials' activities, I expect that I'll be relying heavily on Chris and--and work closely with him in looking at that information.

But, that's what I'm doing. I--I feel I have an obligation to make sure that government power is not abused. I mean, I think that's one of the principle roles of the attorney general.

SHAHEEN:

I--I certainly agree. I think we all have an obligation to ensure that government power is not abused. The question I have is what happens when the executive is potentially playing that role and that's where it doesn't seem to me there has been adequate oversight. Thank you, Mr. Chairman.

MORAN:

Senator Collins.

COLLINS:

Thank you, Mr. Chairman. Welcome, Mr. Attorney General. Last June, your predecessor, then Attorney General Sessions, announced that the department would no longer defend the Affordable Care Act's pre-existing conditions provisions because they were inseverable from the ACA's individual mandate. Two weeks ago, your department went much further, deciding that it would not defend any provisions of the ACA. This puts at risk other important provisions in addition to protection for people with pre-existing conditions, such as the Medicaid expansion dependent coverage for young adults up to age 26 and coverage for preventive services.

Now, the individual mandate is a highly regressive penalty and I've longed opposed it and Congress repealed it. But, I disagree strongly with the department's decision not to defend the rest of the ACA. In a letter that I wrote to your predecessor last June and to you on April

1st, I made the point that the individual mandate can be struck down and severed from the ACA while the remainder of the law can stay in place. And this isn't just my opinion. In 2010, the Chief Justice Roberts said in the Free Enterprise Fund case that under the doctrine of severability that generally speaking when confronting a constitutional flaw, we try to limit the solution to the problem severing any problematic portions while leaving the remainder intact.

In 1990, when you were head of the department's Office of Legal Counsel under President George Herbert Walker Bush, you authored an opinion finding that the president could enforce the remainder of the statute after an unconstitutional provision had been severed. I agree wholeheartedly with your 1990 opinion. What led you to take a different approach?

BARR:

Thank you, senator. When--when I visited with you before my confirmation, I promised you that I would personally take a look at this issue and I did. And I studied it carefully and I provided my views robustly within the deliberative process that was going on within the executive branch. As I've said, when--when the attorney general is providing legal advice, I think the first obligation is to provide the advice that you think is the right legal answer and how you would decide the case if you were a judge, which is what was the advice I gave.

But, I also have said that if the other--if the other stakeholders in the Executive Branch and the people involved, the agencies and so forth end up in a different place, as litigator for the United States, its--its attorney general should be able to advance positions that he believes are defensible and reasonable legal positions. Even if they are not positions that the attorney general would adopt if the attorney general was a judge deciding the case. In this situation, the ultimate decision was to support the position of the states, including Texas and the decision of the district court judge.

The rationale for that is that it is a defensible and reasonable legal position given that that was the decision of the district court and the position of four justices on the original NFIB case who--who felt that when--if the mandate goes, the rest of the statute goes. I know there's an additional point there, which is the fact that Congress did take out the penalty

from the--from the mandate. And therefore, should that act be viewed as essentially validating the--the rest of the statute. And those issues were debated. But, at the end of the day, I felt that the position was a defensible position and it was the decision of the executive branch.

COLLINS:

I would just make the final point that Congress had the opportunity to strike other provisions and chose not to.

BARR:

Yes.

COLLINS:

Thank you, Mr. Chairman.

MORAN:

Thank you, Senator Collins. Senator Leahy.

LEAHY:

Thank you. Thank you, Mr. Chairman. Attorney general, thank you for being here. We-- over the decades, we've had a chance to talk at these hearings many times. I--let me go back to the discussion of your March 24th letter and you said the president did not commit obstruction of justice. It--you said that before any reference to Congress. Of course, you have the position that no matter the evidence, you don't believe a president can be indicted while in office. You said the mechanism is through the ballot or--or Congress, not at criminal courts.

Did you have any conversation with the special counsel about why he did not reach a conclusion one way or the other on obstruction?

BARR:

Yes, I did. And he also has a fuller explanation of that in the--in the report that I'll be making available hopefully next week.

LEAHY:

Did he express any expectation or interest in leaving the obstruction decision to Congress?

BARR:

Not that--he--he didn't say that to me, no.

LEAHY:

So, he said the obstruction decision should be up to you?

BARR:

He didn't say that either.

LEAHY:

All right.

BARR:

But, that's generally how the Department of Justice works. Generally, grand juries are to investigate crimes and a prosecutor's role at the end of the day is binary. Are there charges or no charges? Or, is this a crime or not a crime?

LEAHY:

I've had some experience--

BARR:

--I know--

LEAHY:

--In the field.

BARR:

I--I saw you would agree with me. But, let me say that I--I--I don't feel--you know, I--I--I'm looking forward to explaining my decision that--that I briefly outlined in the Mar--March 24th letter. But I don't feel I can do it until the report is out, because I think it's--because the--I think the report contains a lot of the information that would give meaning and content to the discussion. And I really can't do it in the absence of getting it out.

So, I'm anxious to get it out. That's what I've been working toward.

LEAHY:

Well, let me--

BARR:

--And I said I'd come up to the Hill as soon as the capital will have me, which I guess is at the end of the month to testify about that.

LEAHY:

Well, let's sort of follow up on something Senator Moran asked in determining what should be redacted. Have you overruled Mr. Mueller or his team on any redaction question?

BARR:

No.

LEAHY:

One way or the other?

BARR:

No.

LEAHY:

Okay. Have you discussed any specific redactions with the White House?

BARR:

No.

LEAHY:

I was just curious. Before this came out, you were at a--sort of an annual St. Patrick's Day event at the White House with the prime minister of Ireland exchanging shamrocks and so on. You had a long discussion, apparently a very--you both seem very happy with the discussion, you and the president. Were you discussing the report?

BARR:

Was I?

LEAHY:

Yeah.

BARR:

No, it was actually in front of several justices of the Supreme Court and--

LEAHY:

--I understand--

BARR:

--Numerous other dignitaries. I--I wasn't alone with the president.

LEAHY:

Okay. You're sure of that?

BARR:

What?

LEAHY:

So, anybody--anybody thinking they heard you say anything else would be wrong?

BARR:

Right.

LEAHY:

Okay. You've indicated you'd redact grand jury material. But of course, in both the Watergate and the Ken Starr investigations, grand jury secrecy was overcome to allow Congressional access. Have you asked the District Court to release grand jury material to Congress?

BARR:

Did you say--were you citing the Starr investigation?

LEAHY:

And the Watergate, yes.

BARR:

Okay. Well, the Starr--the Starr investigation involved the specific statute that--

LEAHY:

--Rule 6(c)--6(e), rather?


BARR:

No, no. The--the Starr--


LEAHY:

--Yeah--


BARR:

--The statute setting up the independent counsel provided for the report going to Congress and overrode 6(e). So, I don't view the Starr situation as a precedent.


LEAHY:

Well, have you--but more specifically, have you asked the District Court to release grand jury material?


BARR:

No. The law right now is, in the District of Columbia, that the court can only way 6(e) for one of the grounds specified specifically in 6(e). There is no sort of inherent power in the court to do that. And if someone shows me and--and I think make a persuasive argument that it's covered, I'm willing to listen to that. But I don't see it.


LEAHY:

And lastly, on a dollar amount, your budget, we're told from ATF, would result in 300--could lose 370 positions under the President's budget, even though it shows a slight increase because of attrition and everything else. Are you satisfied with ATF, at a time of violent crime and everything else, losing these positions?

BARR:

Are you talking about the 377 positions that Mr. Brandon mentioned?

LEAHY:

I had--I understood 370, but--

BARR:

--Okay--

LEAHY:

--whichever.

BARR:

Yeah, I--I--I--we don't think he--he will lose those positions. There's some complicated accounting here that I'm sort of a little mystified by myself. But, as I understand it, we've been continually investing and increasing the number of ATF agents, and they were worried about bringing on too many agents, in access of funds that were going to be appropriated. And they had sort of--the way they quickly make up for that is to just take a head count rather than make cuts across the board.

We don't think that they are, and I--and Mr. Lofthus here can give you more of an explanation if you want one. But let me just say the ATF--

LEAHY:

--My time is up, but I really would like more, because you can either do his 370 or the administrations 46. Either way, it looks very much like cuts in ATF.

LOFTHUS:

I can add, senator, just to say that ATF does have a 4 percent increase in this budget. And I have spoken with the ATF chief. I think he's a outstanding guy. I've worked closely with him over many years. And I do know that they are concerned about the resources in their budget.

But we have looked at the 4 percent increase. We don't think the 4 percent increase translates into a loss of hundreds of positions. But we're willing to work very closely with ATF and make sure that we can protect their--certainly there agents. And again, any money that ATF receives I think can be put to very good use, and we look forward to working with both ATF and the committee on this--on this one.


LEAHY:

Okay.


MORAN:

Senator Leahy, thank you. We have three vote scheduled at 11:45. My intention is to go until those votes are called, and don't anticipate coming back after that occurs. Senator Kennedy is recognized.


KENNEDY:

Thank you, Mr. Chairman. General, I don't intend to talk much about your budget. I think we both know that Congress will make sure that you are adequately funded.

I want to talk a little bit about the Mueller report. I think it was inevitable that some people were going to be disappointed in--in the result or results that Mr. Mueller reached. You can-- you can only be young once. You can always be immature. There will be some who were so disappointed in the results that they are going to attack the process in bad faith. I would strongly encourage you to--to--to ignore that. Just call them like you see them.


BARR:

Um-hmm.

KENNEDY:

Follow the law.

If you--can we agree that--if you turned over the Mueller report without grand jury material redacted to only members of Congress, can we agree that there is a material risk that the grand jury information would leak?

BARR:

I think so.

KENNEDY:

I mean, that's been known to happen.

BARR:

Yes, occasionally.

KENNEDY:

Yes. And in a sentence or two, why--why that be bad?

BARR:

Well, because we depend on the secrecy of the grand jury for our whole system of justice. And people have to be assured, when they go into the grand jury, that they--that these are going to be confidential sessions. That's how--

KENNEDY:

--I got it. I got it. Can we agree that, if you turned over an un-redacted report to the members of the United States Congress that included material that might impair an existing investigation or investigations, that there is a material risk that that information might leak?

BARR:

Yes, senator, there is a risk.

KENNEDY:

Why is that bad?

BARR:

Well, it--presumably the reason people are interested in--in seeing the report is because they believe it's important for the criminal justice process to work.

KENNEDY:

Yes, sir.

BARR:

Allowing this other information to come that would frustrate, from the prosecutor's standpoint, the system from working in other cases. And from the defendant's standpoint, would be unfair--potentially unfair to the defendant.

KENNEDY:

Let's talk about reputational risk. If you turn over a report--

BARR:

--Excuse me, senator. Can I just add something?

KENNEDY:

Certainly.

BARR:

In some of these cases, there are gag orders from the court prohibiting this information from going out.

KENNEDY:

Okay. If you were to turn--turn over an un-redacted report containing un-redacted information that could--could raise reputational risk, can we agree there is a material risk that that would leak?

BARR:

Yes, senator.

KENNEDY:

Why is that bad?

BARR:

Well, it goes back to the--if someone has not committed a crime, at the end of the day and in this context, if they're not public officeholders, other private citizens, they--they--the government is not in a position to say they did anything wrong. It would be unfair from--just fundamentally unfair to put that information out.

KENNEDY:

Would that be especially the case if someone thought their communication was confidential?

BARR:

Yes.

KENNEDY:

Kind of like Dr. Ford, who thought she was making a confidential communication until some member of the Judiciary Committee or their staffs turned her life upside down and leaks that.

BARR:

I'm--I'm not aware of the circumstances myself, senator.

KENNEDY:

I'm not either. I wish I were.

BARR:

Um-hmm.

KENNEDY:

It was probably the greatest injustice I've seen in the time I've been here.

Let me talk a little bit in the minute I have left, and I'm going to land this plane on time, Mr. Chairman. I know you're taking a look at the genesis of the investigations with respect to the 2016 election. Just quickly, can we agree that the FBI is the premier law enforcement agency in all of human history?

BARR:

Absolutely. And--okay. Yeah.

KENNEDY:

Can--can we agree that we want FBI agents and justice department members to have thought about the world, thought about socioeconomic problems, and thought about how to solve those problems? You don't want a dummy working for the FBI or the Justice Department, correct? But, they're not supposed to act on those political beliefs, are they?

BARR:

No, senator.

KENNEDY:

It--it appears to me--I'm not going to ask you this question--that there were a handful of men and women at the FBI and possibly at the Department of Justice who did act on their political beliefs in 2016. Some of them were for Donald Trump. If you don't believe me, ask Secretary Clinton.

(LAUGHTER)

Some of them were for Secretary Clinton. If you don't believe me, ask President Trump. And that's not right. And we need to stop this from ever happening again. My plane has landed.

(LAUGHTER)

MORAN:

Thank you, Senator Kennedy. Senator Reed.

REED:

Well, thank you very much, Mr. Chairman. Thank you, attorney general. Let me return to your March 24th letter to the Judiciary Committee and along the lines of Senator Leahy. You quote the special prosecutor--excuse me--the Director Mueller with respect to allegations of obstruction of justice. And you say, while this report does not conclude that president committed a crime, it also does not exonerate him. Which raises a question in my mind, did the special counsel find probable cause that a crime had been committed?

BARR:

I'm not going to characterize his report. The report will speak for itself and that's why I want to get it out.

REED:
Well, then let me just follow up.

BARR:
But--but, I think my letter says that he did not find a crime was committed.

REED:
No, I--I understand that. But, it's, I think, important to note that he--you took his language and said I--I did not find a crime, but I can't exonerate the president. That suggests that there's a possibility that probable cause existed for a crime. However, someone, either Director Mueller or yourself, made a determination that the evidence would not be beyond--could not convince a jury beyond a reasonable doubt or that the policy of the department was not to charge the president because the constitutional issue of impeachment. So, this is a--again, I'm trying to understand why not only Director Mueller said this, but you repeated it, that the president was not exonerated from the obstruction of judges--

BARR:
--Because, well--

REED:
--of justice allegations.

BARR:
As I explained yesterday, I--I was trying to state just the bottom line conclusions and not characterize it or try to summarize the report beyond just stating its bottom line

conclusions. And I thought the best way of doing that was taking that language from Bob's--Mueller's report itself.

REED:

Let me sort of turn the question around. If there was no evidence of probable cause, then I would presume he could've said very clearly that there was no crime committed, that he could in fact exonerate the president, as he seems to have done with the allegations of conspiracy between the campaign and Russia.

BARR:

I think that sentence says he didn't find--he--he's not finding that there's a crime and he's not exonerating. I--I am not going--

REED:

--Which puts--puts--

BARR:

--to sit here and try to characterize his reasoning or--or his report. That's why it's important to get the whole report out instead of trying to read these little (INAUDIBLE).

REED:

No, I absolutely--absolutely--

BARR:

--probable cause is a very low standard for determining when you start investigating something. A lot of things have probable cause.

REED:

I understand that, but I think it's important--I--I agree with you completely. It's important to get the whole report out to the American public because there are serious questions that we've just gone back and forth on and your response, I think, is very critical. It's--those questions aren't going to be resolved until the American people see this report. Not sections of it. Not paraphrases of it, but this entire report.

Let me just quickly ask another question, which is do you have any specific evidence that there was anything improper in the counterintelligence investigation by the FBI or anything improper in the way the investigation was carried out by the special counsel with respect to the 2016 election? Do you have any evidence?

BARR:

I'm sorry. That was a compound question.

REED:

Compound question. There was a counterintelligence investigation by the FBI with respect to the 2016 election involving primarily the Trump campaign. There was the investigation by Director Mueller into the 2016 campaign and other issues. Have you any evidence that there was anything improper in those investigations?

BARR:

I have no specific evidence that I would cite right now. I do have questions about it.

REED:

So, this panel you're putting together is--

BARR:

--I'm not putting together a panel.

REED:

So, you--you just have some interest in this. You don't have any evidence.

BARR:

I have concerns about various aspects of it.

REED:

Do you believe that the investigation that Director Mueller undertook was a witch hunt or illegal as has been asserted by the president?

BARR:

As--as I said during my confirmation, it really depends on where you're sitting. If--if you are somebody who's being falsely accused of something, you would tend to view the investigation as a witch hunt.

REED:

Well, you're sitting as the attorney general of the United States with the constitutional responsibility. So, if you could answer in that regard.

BARR:

Well, I'm not going to characterize the--it is what it is, you know?

REED:

But--

BARR:

--Mueller and his team conducted an investigation and are issuing a report. I'll use my own adjectives.

REED:

You can use your own adjectives and those I don't assume include witch hunt or a--or illegal, is that correct? Those would not be in your answer.

**BARR:**

I--I haven't referred to the--

REED:

--Thank you--

**BARR:**

--investigation that way--

REED:

--very much. Thank you, Mr. Chairman.

MORAN:

Senator Murkowski.

MURKOWSKI:

Thank you, Mr. Chairman. Mr. Attorney General, welcome. I want to start my questions with the issue of marijuana. Senator Gardner has--is really taking the lead on this issue over here in the Senate. I have been supportive of his efforts. He's trying to move forward with the STATES Act. I am cosponsoring that. But, when we visited and during your confirmation process, you explained that you believed that the current conflict between federal and state marijuana laws is untenable was--was the words that you described. You also explained that you will not upset settled expectation or the reliance interest that have developed because of the policies from the prior administration. But, you did state that you believe the current situation really has to be addressed.

I--I know and understand that you don't support the wholesale legalization of marijuana. You made it clear that we face a--a binary choice between the federal prohibition and a "Federal approach" to correct the disconnect between federal and state marijuana laws. And so, I think you--you committed to me or--and--and to others that this is something that Congress has to address the right way, which is through legislation. And--and we would agree with that. I think--we think that the STATES Act is--is an approach that does what you have recommended. It adjusts the federal law the right way to create a federal approach to marijuana. I think the president has expressed some support for it.

So, can you share with me, share with the committee where you are on--on this approach that has been outlined in this STATES Act? And whether or not we can--we can work with you on this issue.

BARR:
Yes, senator. The situation that I think is intolerable and which I'm opposed to is the current situation we're in.

MURKOWSKI:
Right.

BARR:
And I would prefer one of two approaches rather than where we are. Personally, I would still favor one uniform federal rule against marijuana. But, if there is not sufficient consensus to obtain that, then I think the way to go is to permit a more federal approach so states can, you know, make their own decisions within the framework of a--of the federal law. And so, we're not just ignoring the enforcement of federal law. Now, I haven't studied specifically the STATES law, but I've just circulated it through the department for comment. I think that's process it's in now.

MURKOWSKI:

Mm-hmm.

BARR:

Once we get those comments, you know, we'll be able to work with you on any concerns about the STATES law. But, I would much rather that approach--the approach taken by the--the--the STATES Act than where we currently are.

MURKOWSKI:

Well, I think you'll--you'll have a--a group of folks over here that would like to work with you, would like to work with the department on that. Let me move to--to VAWA and special domestic violence criminal jurisdiction. In the--in the 2013 reauthorization of VAWA, we recognize tribal special domestic violence criminal jurisdiction that allowed tribes to prosecute non-native domestic violence offenders in tribal courts. And this was for a limited class of--of offenses.

So, just last week, the House passed its reauthorization vehicle that expands this jurisdiction to a broader class of sexual assault and domestic violence offenses, as well as crimes against children and assaults on tribal police officers. The--the vehicle there, the reauthorization vehicle, also allows for a pilot project that is specific to Alaska native villages that have 75 percent or greater native population to exercise this jurisdiction.

I think that all these provisions in the House Bill are a step in the right direction. You and I have had discussion about the issues of just protection in general in outlying areas, very remote parts of my states, where we--we really have--have got to be thinking outside of the box when it comes to how we provide for protection.

And so, allowing for these--these--these limitations based on jurisdiction are really, really hard when you have women and children that are vulnerable. So, I am--I'm hoping that we can continue to work with you on these jurisdictional issues. I'm hopeful that we'll have a chance to bring you up to the state so we can get you out into some of these villages, see how

these tribal courts are functioning and, again, better explore the opportunities to provide for a level of safety.

I do appreciate you including the 5 percent tribal set aside from the Crime Victims Fund. I think that this is gonna make a difference, but if you have--if you can comment in any way on--on this aspect of tribal jurisdiction and what it might mean for domestic violence protection

BARR:

Well, I think Alaska native women, you know, face unacceptably high levels of--of violence in--in very remote areas. And as--I've actually scheduled a trip up to Alaska specifically to visit some of these--

MURKOWSKI:

--Good--

BARR:

--communities. And so, I would approach this with a great deal of sympathy for the need to think outside of the box and to do something that's effective in protecting these--this vulnerable population. And I'm prepared to work with you to try to fashion something that--that will work.

MURKOWSKI:

Well, I appreciate that, and also working on the Murdered Missing Indigenous Women's Initiatives that we're working on.

BARR:

Yes.

MURKOWSKI:

I look forward to that as well too, and welcoming you to the state. Thank you, Mr. Chairman.

MORAN:

Senator Manchin?

MANCHIN:

Thank you very much, Mr. Chairman. Thank you, Mr. Attorney General, for being here and your service. I'm only going to say one thing about the Mueller report. I would just compassionately ask, the more that you can reveal if it doesn't interfere with a criminal investigation or with intelligence that we need to protect, the more you can do, the more healing will happen for our country, I believe. And it would be very, very, very helpful, so I hope you would consider that when you're--when you're releasing your report back to us.

The other thing I wanted to say is on the ACA. I think my friend, Senator Collins, has spoken that we're all concerned. No matter what side of the aisle we're on, we're concerned about the healthcare of America, how we take care of some of the most vulnerable, but also how we prevent the gouging that's going on of some of those in the middle. And we have fixes for that.

If the Fifth Circuit or the Supreme Court is not favorable to your client in the quest to basically have this completely repealed and is successful and upholds, and I think it will--I think the courts will overturn--one of those courts will overturn basically the position that's been taken by the administration.

If that's the case, what process do you have and what procedure? How do you proceed if your client's still not acceptable towards the defeat by the highest court in the land, if it goes there? How do we get back to where we protect the Affordable Care Act so we can repair it and fix it and make sure the American public have access?

BARR:

So, if the--if the position taken by the department just recently in the--

MANCHIN:

--Right--

BARR:

--Fifth Circuit ultimately loses--

MANCHIN:

--hopefully.

BARR:

Ultimately, I said.

(LAUGHTER)

Then the ACA stays in effect. And--

MANCHIN:

--But does that put you in a precarious--I mean, since you had to--you have a client you have to represent. You're representing that client. I--you know, then you have to come back and represent the people of the United States of America, which is that it's still intact. And we're trying to fix it.

I think it's--it's basically harmed us from fixing, the repair that we had for over a year and a half, that could tremendously help this. We haven't been able to move forward because there's always been a chance of repealing it in Texas, now the Fifth Circuit, and on and on. I understand what position--are you going to be in a position to defend the ACA if the highest court in the land does not accept their--

BARR:

--Yeah. Yes, senator. Yes, absolutely.


MANCHIN:

I'm--I'm just very much concerned about that.

West Virginia has been ravaged by the opiate epidemic, and I've supported the special agents in charge of the region and the FBI office in their efforts to catch the largest distributors. It's now well known that a single pharmacy in the West Virginia town of Kermit, a little town of Kermit, less than 400 people, received shipments of roughly 9 million--9 million pain pills in this little town.

It's less well-known that the DEA, Drug Enforcement Agency, explicitly requested Congress to help in amending the existing statute to restore their authority to intercept these illegal shipments. So, my question would be, do you still support amending the immediate suspension order standard from substantial likelihood to probable cause, which gives the DEA the clout to stop these--these horrific shipments into our--our little state and all over this whole America? Have you looked at that, or has it--


BARR:

I haven't looked at it. I was support it. I don't know if the department's taken a position on that, but anything that will strengthen enforcement.


MANCHIN:

We need all your legal eagles there. We really need help here. And we need your support on put it back to probable. And it basically--it was--it's a very contentious change that went into substantial, which basically stopped the DEA cold in its tracks going after and stopping the shipments before they hit the streets.


BARR:

Let--let me look into that. But obviously, I want to have--

MANCHIN:

--It's very, very important.

BARR:

Yeah.

MANCHIN:

It's--it's a--tremendous, harmful to our states.

My final one would be on foreign investment, sir. I am very much concerned about what's going on, and I'm concerned about the attempts of foreign countries to make investments and gain control over certain American critical technologies and industries, whether it's in our financial--the things that we see going on and the investments they are making. And sometimes they have a front for this and we have not engaged it.

So, is there any law enforcement agency or anyone in your department keeping track of the types of actions taken by foreign companies that could be harmful, artificial intelligence, machine learning, on and on and on, that we know what they have been doing through espionage and sabotage?

BARR:

Yes, the--the FBI is in the fore of that effort. This budget seeks enhancements of $18 million to their program of--of watching for this kind of economic espionage and also intelligence, but also another $5 million for monitoring and upgrading our ability to--in the SIFIs process too.

MANCHIN:

We want to work with you on that.

BARR:

Yes.

MANCHIN:

We have tremendous concern and we know what's going on.

The only thing I would say that--just a simple--in West Virginia they understand that if we're not allowed to go into China and Russia and have investments or ownerships or control over any of their--

BARR:

--Right--

MANCHIN:

--critical infrastructure, why in the world do we allow them to come and use a front in order to have control when the government basically is controlling their--

BARR:

--right. This is--this is one of my highest priorities.

MANCHIN:

Thank you.

BARR:

Yeah.

MANCHIN:

It's very, very much a concern. Thank you.

MORAN:

Senator Capito?

CAPITO:

Thank you, Mr. Chairman. Thank you, Mr. Attorney General, for your service. I wanted to ask about the Bureau of Prisons.

During the shutdown, obviously, our correctional officers and--and staff remained on duty. And--but we have--we have Hazelton in West Virginia. We've had several murders at Hazelton. We've had--and I'm sure Senator Manchin has the same thing. We've had complaints from staffing, that there are staffing shortages, that it's not--it's not safe for our correctional officers. They're being asked to perform different duties maybe than what they were originally assigned for.

And in the budget, there's a funding reduction for correctional officers, staffing, and salaries in the budget. Could you help me square with that? And is this a national problem that you're finding--

BARR:

--Yeah--

CAPITO:

--across the BOP?

BARR:

I think this is an area where we--where we have stumbled. And I'll tell you, I've been looking into this because it's been very frustrating to me because I think it's--I have always supported Bureau of Prisons in the past and think it's a great organization. And if were going to have people incarcerated, we have to make sure they're incarcerated under proper conditions.

CAPITO:

Right.


BARR:

We are--the way I look at it, our authorized level is--is good and adequate. It's that we're 4 to 5,000 people short of our authorized level. Now, why has that come about? A part of that overall number may be because of the hiring freeze, but--which I lifted yesterday.


CAPITO:

Oh, good.


BARR:

But the--those slots were really in the regional and headquarters. The shortages out in the-- the prison facilities themselves was not the freeze. I think what it is is, frankly, bureaucracy. And I don't say this in a bad sense, just the--the way these organizations go about bringing in people. They leave much too much of a--of a the time.


CAPITO:

Um-hmm.


BARR:

So, the way it works in the Bureau of Prisons, if a person at this level leaves, then the next person moves up, and they don't start the process of hiring a new person until sort of everyone's taken a new chair.


CAPITO:

Right.

BARR:

And then they go out, and it takes months and months and months to get that person on board. That makes no sense because every year we lose 2,600 of these correctional officers. So, my view is we just have to turn on the spigot--

CAPITO:

--Um-hmm--

BARR:

--and just keep these new entry-level people coming in at a rate where we're going to be able to get up to and maintain our enacted level.

So, I think this is largely a snafu by the department. And that's how I interpret it and that's how I'm approaching it.

CAPITO:

Well, thank you. I mean, I--I would--I'm glad to hear what you said in terms of--

CAPITO:

--more people because the ratios are going up and certain situations can be very dangerous for the officers that are working there. And that discourages people from wanting to stay.

BARR:

Right.

CAPITO:

It's a tough job.

BARR:

It's tough.

CAPITO:

And so, anything we can do to help on that. I'd like to ask you about the opioid crisis. When you came to visit me we talked about this. It's just a scourge on our--on our country, but really in my particular--our particular region. I know that you all--that are increasing the budget in that area, but are there areas that are working better on the disruption part of the drug interdiction that you think we need to put more emphasis on rather than, you know, spread out as far and wide as we are?

BARR:

I really--I really can't say that. I think where we are we're having a lot of success. So, I think it's taking that and reproducing it elsewhere. And, as you know, we have essentially a two-prong strategy. One is to this illicit, you know, the legal drugs that have been over prescribed and--and--and diverted and created this population of--of people who are addicted. And we have to push that down to a smaller--smaller group. And that--you know, I know Senator Manchin mentioned that hot spot. We have--we have a lot of resources now focused on--on doing that. And I think we're gonna be in that sense of major successes in--in--doing this.

And the other is going after the big operations in Mexico.

CAPITO:

Right.

BARR:

And--and then the local distribution. We--we are adding $254 million of HIDTA money to our budget where it will be administered through DEA as well.

CAPITO:

Well, I think when we see the squeeze down on legal prescriptions that are then used illicitly that's when the heroine and the Fentanyl and all of that comes in. and now it's crystal meth that's coming in across the Southern border.

I just want to, as a clarification, as a non-lawyer here, we hear the Mueller report. We hear a cry on Capitol Hill to release the entire report. I just want to reemphasize what you said-- stated to Senator Kennedy for those of us who are non-legal, that would be a very unprecedented and damaging to just put the whole thing out there and unreasonable request. Is that--am I stating that correctly?

BARR:

I don't know if it'd be unprecedented since I'm not really sure what happened in the--in the Watergate situation. I know that the report came out 50 years later I think. But--

CAPITO:

--And from a legal standpoint.

BARR:

It's essentially unprecedented I would say.

CAPITO:

All right, thank you.

MORAN:

Thank you. Mr. Attorney General, you said something in your response to the question of we have this subcommittee--this committee has been encouraging the Department of Justice to lift the BOP hiring freeze for which the department's response has been there is no hiring freeze. And you just announced you have eliminated it yesterday.

BARR:

That's department-wide as well.


MORAN:

Okay.


BARR:

There has been--there has been a hiring freeze since 2017.


MORAN:

We've been encouraging the hiring freeze at BOP for lifted for quite a while.


BARR:

It is. It is lifted.


MORAN:

We're glad to hear that. Senator Van Hollen?


VAN HOLLEN:

Thank you, Mr. Chairman. Mr. Attorney General, I gather from your testimony that if you were a judge you would find against the position the DOJ is taking in the ACA case, is that right?


BARR:

I didn't say that.


VAN HOLLEN:

You said that your recommendation within the administration was a judge would likely conclude against the position. But, you said that as the client of the administration, you are taking this position. Did I misunderstand your testimony?

BARR:

Yes. I would--

VAN HOLLEN:

--I--I--

BARR:

--I was saying--I was talking in general.

VAN HOLLEN:

Yeah. You're assessment within the administration--

BARR:

--Whatever--

VAN HOLLEN:

--as I understood it was that if you were a judge you would--you would not find in favor of the case.

BARR:

--(INAUDIBLE) I said whatever advice I gave the administration--

VAN HOLLEN:

--Yeah.

BARR:

--would have initially been my personal view as to the best--

VAN HOLLEN:

--Right.

BARR:

--legal view.

VAN HOLLEN:

And your personal view, if you were a judge you told them that you would not support the case. Is that the--the administration's position? Isn't that what happened internally?

BARR:

I'm not gonna say what my advice was in the internal deliberation.

VAN HOLLEN:

I think--I think it was clear, Mr. Attorney General, from your testimony. You said that they had a--they still had some basis for going forward. Let me--let me ask you with regard to the Mueller Report in your March 24th letter. You say that Mueller set out evidence on both sides of the question that leaves unresolved what the special council views as, quote, "difficult issues of law and fact concerning whether the president's action and intent could be viewed as obstruction." Do you agree with the assessment of Bob Mueller of that--the evidence is, in fact, presenting difficult issues of law in fact on those matters?

BARR:

I'm--I'm not gonna comment on it until the report is out and everyone has--

VAN HOLLEN:

--Mr. Attorney General, I'm not--but I'm not asking you for what's in the report. You sent a letter to the--to the United States Congress that con--included something which was a principle conclusion, which was not a conclusion reached by the Mueller Report. You indicated that they did not exonerate the president. You did. And so I'm asking you whether you agree with Mueller that there were difficult issues of law in fact in making that assessment?

BARR:

That's not a question I really can answer until I think--

VAN HOLLEN:

--Well, you did--but--but you made--you looked at the report, right, and you looked at the evidence to the report and you made a decision. And you said that the president's not guilty of criminal obstruction of justice. I'm asking you in your review of the report; did you agree with Mueller that there were difficult issues of law in fact?

BARR:

I'm gonna give my reaction and comments, you know, about the report after the--

VAN HOLLEN:

--Well, it would have been--but, you--you put your view of the report out there on this issue of obstruction of justice, right? Nobody asked you to do that.

BARR:

I didn't put my view of the report--

VAN HOLLEN:

--Well, you put your--your assessment on--you made a conclusion on the question of obstruction of justice that was not contained in the Mueller Report. And I'm simply asking you when you looked at the evidence did you agree with Mueller and his team that there were difficult issues of law in fact?

BARR:

As I say, I am going to explain my decision and to the extent that requires any assessment of the Mueller report--

VAN HOLLEN:

--Did--did your decision--

BARR:

--(INAUDIBLE) report is out. I'm not--

VAN HOLLEN:

--did your decision require you to look into the intent of the president of the United States with respect to obstruction of justice?

BARR:

I'm not gonna discuss my decision. I will lay it out after the report is out.

VAN HOLLEN:

Mr. Attorney General, the--the thing is you put this out there. I mean the president went out and tweeted the next day that he was exonerated. That wasn't based on anything in the Mueller report with respect to obstruction of justice, that was based on your assessment. That was on March 24. And now you won't elaborate at all as to how you reached that conclusion because I'm not asking you what's in the Mueller report. I'm asking about your conclusion.

Let me ask you this--


BARR:

--Well, the conclusion--it was the conclusion of a number of people, including me, and I obviously am the attorney general. It was also the conclusion of the Deputy Attorney General Rod Rosenstein.


VAN HOLLEN:

I understand, though, I've read your letters--


BARR:

--(INAUDIBLE) understand, I will discuss that decision after the report is--


VAN HOLLEN:

--did Bob Mueller support your conclusion?


BARR:

I don't know whether Bob Mueller supported my conclusion.


VAN HOLLEN:

So, in your--in your June 2018 memo you indicated a president can commit obstruction of justice in the classic sense of sabotaging the proceedings truth finding functions. Did you see any evidence in this report about whether or not President Trump committed what you call a classic sense of obstruction of justice?


BARR:

I'm not gonna characterize or discuss the contents of the report. The report will be made public--

VAN HOLLEN:

--Again, reaching your--

BARR:

--maybe next week and that I will come up and testify at that point then.

VAN HOLLEN:

Right, but--but the thing about it is, Mr. General, you put your conclusion out there. And now you refuse to talk about any basis of your conclusion. I'm not asking you what's in the report. I'm asking you how you reached your conclusion.

Last question, can you assure us that the key factual evidence relevant to charges of obstruction of justice will be included in the public report?

BARR:

There--could you say it again?

VAN HOLLEN:

Do you assure us that the key factual evidence in the Mueller report related to charges of obstruction of justice will be available in the public report?

BARR:

I believe it will. And that's one of the reasons why I want to review it after the--you know, when the redaction team is done making the redactions to make sure that there's nothing in there that would prevent that.

VAN HOLLEN:

So my--

BARR:

--At the extent--and, by the way, you know, redactions can cut both ways.

VAN HOLLEN:

Can I--can I--my last question relates to the redaction process. My understanding from your House testimony was you're allowing the Mueller team to make the redactions in three of the four areas you mentioned, all of them except for intelligence. Is that--is that a correct understanding of your testimony yesterday? In other words, you're leaving the discretion to them on the three of the four criteria that you've mapped out.

BARR:

I--I have stated what the categories are and the people implementing it are the Justice lawyers with the special counsel of lawyers. They're implanting those categories.

VAN HOLLEN:

And you--you're not gonna overrule this special counsel's judgement with respect to any of those categories, right?

BARR:

I haven't.

VAN HOLLEN:

And you--well, can you tell us you will not?

BARR:

Well, if an issue comes up, you know, i--I don't want to prejudge it. But, it's not my intention. My intention is to allow the team to make the redactions and the people in the department are making those redactions.

MORAN:

Senator Boozman.


BOOZMAN:

Thank you. Thank you, Mr. Chairman. Thank you very much for being here. We appreciate your service. We've really talked about a lot of things that are very important. I want to talk about one that really is sweeping the country it has been mentioned briefly before and that's the opioid epidemic. And not just that we don't have an opio--we have an opioid epidemic, but we have an addiction epidemic. And in Arkansas we are number two in prescribing. Literally, we have 3 million people. We have hundreds of millions of pills prescribed last year. And so, your team, I understand you've ranked that very high or has been--you've kept that ranking. But I'd really like to talk about how we can come up with some innovative new strategies in order to do that. So, if we provide you additional resources do you have any ideas as to anything different that we can do that we are doing now? We are making a dent but 72--72,000 deaths last year. These are--these are statistics sadly, we're spending a lot of money

but I don't know that we're having great success.


BARR:

I do think we're--I do think we're having some--some starting--starting to see some good results. I think the initial suggests that we finally stopped seeing an increase in opioid overdose deaths. It--it seems to be leveling out and we hope--


BOOZMAN:

Part of that is just the--the ability to have the Narcan. In fact, my understanding is that drug dealers are carrying it to keep their clients alive. You know that--so that's part of that. I don't know what the statistic would be if we didn't have that.

BARR:

Right. I also think we are--we are making progress on reducing diversion and over--prescription of the drugs and that we are locking up a lot of healthcare providers and we're bringing a lot of civil actions and--

BOOZMAN:

I applaud you.

BARR:

And we're now applying technology a lot more to detecting places where there's suspicious patterns of over prescription and so forth and attacking them very aggressively. So, on the first leg of the strategy which is to reduce that addicted population from illicit drugs you know, I think we're--we're making some progress.

On the illicit drugs I think it a huge part of this is to address of Mexi--of the traffic coming up from Mexico. Mexico is our drug supplier all kinds of drugs. And the organizat--the organizations in Mexico are very formidable criminal enterprises. And we have to--we have to address that problem to stop the flow of these really deadly drugs and increasingly deadly drugs. The fentanyl mixed in with all other kinds of drugs, so people really don't know what they're taking. We--we have to address we have to stop the flow of Mexico or make a much bigger dent in it. That's one of the reasons that I do think that a wall a barrier system across the Southern border is an important part of that.

BOOZMAN:

Another--another part of that is the mail. And we've got you know, our postal inspectors are doing a good job there's just not a whole lot of them. And in the past it's much better now--but in the past the interoperability hasn't been there. That's much better now than it used to be. But I wish you would look into that in the sense that you know, you mentioned the Southern border I agree with you totally the mail from China you know, is a huge--

BARR:

Right.

BOOZMAN:

--and then also getting the shipments and then distributing them you know, throughout the rest of the country you know from--from someplace serious is a huge problem.

BARR:

Well, the FBI has a great tool--tool we call J-CODE, which is--is starting to get some big successes on internet trafficking of drugs that I think attacking both the dark net and the regular internet and these online and--and policing the mails is a very important part of it and--and we are now applying the technology to get a lot more progress on these online dealers. And on the mail front you know, there are some sensing technologies that are coming along that are very promising in terms of being able to intercept them.

BOOZMAN:

And then finally, one of the tools that we have that I think is one of the most effective are the drug courts. The VA is doing that now. You know, others are doing that--having the ability you know, make somebody stay clean have a job you know, support their families--most of them do--really is a great asset. So, I would hope that you would support that and that's a way that we can I think, really also make a dent is--

BARR:

Yes, I very much support the drug courts the veterans courts and there's $75 million in our budget for those so we will continue to support that.

BOOZMAN:

Thank you. Thank you, Mr. Chairman.

MORAN:

Approximately 15 minutes we have a vote a set of votes of three. Senator Coons is next followed by Senator Graham and Senator Schatz and Senator Feinstein. We will--as I said earlier attempt to--we will conclude shortly after the vote is called. Senator Coons.


COONS:

Thank you, Chairman Moran. Thank you, Attorney General Barr, for your service and for being here and for Mr. Lofthus, I have many questions about the budget but I'm going to first turn to some questions that I think are more urgent and concerning about the special counsel's report. The primary purpose of the special counsel's investigation was both to thoroughly investigate issues around the 2016 election, but also to provide a clear and objective conclusion in a report to the American people. I--I am concerned that over the last three weeks your actions have created some confusion and distrust around the process and look forward to the imminent release of as much of that report as you can to the American people and to congress.

You stated that the redacted portions of the special counsel's report will be color coded and accompanies by explanatory notes to describe the basis for redactions. Will those notes merely indicate which of the four categories was applied or provide some information to congress on the specific justification for redactions? You mentioned you envision a situation where congress under the appropriate safeguards could verify the redaction categories weren't abused--can you tell me something about the safeguards you have in mind?


BARR:

You know I--I--I don't know how-how detailed the description will be. Some of them may just be generic but some of them may be able to provide additional information. So, for example, if there's a gag order in a case that says you know, apart from whatever we feel about impinging on the case there's a gag order that would be implicated by release. I expect that that will be put in.

COONS:

And are those safeguards likely to be worked out with the chair and ranking of judiciary--

BARR:

Right. (INAUDIBLE)

COONS:

--who also just happened to (INAUDIBLE).

BARR:

I'll talk to the safeguard. For example, an easy one in my view is the classified information. I would just want to make sure that was the adequate safeguards and shared with a limited number of people that kind of thing. The thing we would normally do in this situation.

COONS:

I was struck that the district court of the District of Columbia reported recently the grand jury convened by Mueller has not been discharged and is continuing its investigation. Did anyone pressure the special counsel to conclude his investigation and submit his report before it was complete?

BARR:

I didn't.

COONS:

Did anyone else, to your knowledge?

BARR:

Not that I'm aware of.

COONS:

Why--there are press accounts that members of the special counsel's team--his investigators prepared summaries for public release of sections of the report. Why did you summarize the principal conclusions reached by the special counsel and the results of investigation rather than releasing some of these prepared for public release summaries?

BARR:

So, actually Deputy Attorney General Rosenstein and I were expecting a report that would make it very easy for us to determine what had to be taken out and what wasn't. And that's not how the report came to us. So, we--I immediately recognized that there was going to be some significant lag time between our receipt of the report and when we could actually get it out. And decided that I--none--none of it was releasable as I received it because none of it had been vetted for 6(e) material but every--every page on it said--had a warning that it could contain 6(e) material.

COONS:

Every page had a warning and you were certain that the Mueller had not vetted it?

BARR:

It had not been vetted.

COONS:

Their warrant summaries--let me get to two other questions if I could. Forgive me--

BARR:

So, I'm just saying that--that on--I--I felt it was important to just advise the country as to what the bottom-line conclusions were. I was not interested actually even if I had summaries available, which I did not on Sunday that were vetted I wouldn't have put out summaries because I think summaries no matter who is preparing them is going to be

subject to criticism. What people have to remember that generally, the Department of Justice does come out with binary conclusions and so, just stating the bottom line on--on each of those I think was entirely appropriate.

COONS:
Who, if anyone outside the Justice Department has seen portions of all of the special counsel's report? Has anyone in the White House seen any of the report?

BARR:
You know I'm not going to--I'm not going to you know, as I--as I say, I'm landing the plane right now and you know, I've been willing to discuss my--my letters and the process going forward. But the report is going to be out next week and I'm just not going to get into the details of the process until the plane is on the ground.

COONS:
At what point will you allow Congress to know whether or not the White House was given the full report, briefed on the report, shared sections of the report

BARR:
Once I go up to--

COONS:
--It is striking, the president's claim to complete and total exoneration if he didn't either see the report or was briefed on the report.

BARR:
As I said, you know, once the report is out, I'm happy to discuss the process.

COONS:

I very much look forward to that. Given--my last question. Given your unsolicited June 8th letter to the Justice Department regarding obstruction of justice, did you ever consider recusing yourself from making a conclusion about whether a charge of obstruction of justice should have been made?

BARR:

Well, I consulted with the career ethics officials at the department.

COONS:

And they concluded that your memo on that topic did not require your recusal?

BARR:

That is correct.

COONS:

Thank you, Mr. Chairman.

MORAN:

You're welcome. Chairman Graham, the attorney general has been very faithful to his insistence that he not disclose anything of significance until he's in front of your committee.

GRAHAM:

Great, but you cannot possibly surprise that President Trump would claim exoneration without having read anything. So anyway, I hate to talk about appropriations in an Appropriations Committee, but I will.

MORAN:

We will welcome that.

GRAHAM:

Okay. If sequestration goes back into effect and is due--is due to do that, how would it affect the FBI and your ability to defend the nation?

BARR:

Can I turn that over to--

GRAHAM:

--Yeah--

BARR:

--my trusty sidekick here?

GRAHAM:

Yeah.

LOFTHUS:

I can tell you--

GRAHAM:

--Boy, did you pick a winning lottery ticket to be here with him.

BARR:

Throw the hard ones to him.

LOFTHUS:

I can tell you the last time we had full sequestration in 2013, the department had $1.3 billion at risk. People at the FBI, the rest of our law enforcement agencies, the Bureau of

Prisons, all those agencies had their funding impacted, their staffing impacted, people were at risk for furlough, we had to move several hundred million dollars from other accounts into the department into our S&E accounts to keep our people working. Sequestration had a tremendous, tremendous impact on the apartment of justice to, took tremendous work to avoid the detrimental effects of sequestration.

GRAHAM:

I believe if we go back down that road, it would make us less safe?

LOFTHUS:

I believe it would curtail the safety operations of the Department of Justice and its national security operations.

GRAHAM:

Okay, thank you. Mr. Attorney General, I'm--I'm sure you--you share that assessment.

BARR:

Yes.

GRAHAM:

Okay. As to what you're going to do on May 1, we'll save that mostly for May 1, but I am intrigued by the idea of this working group or some group looking at the other side of the ledger. Do you agree with me that every American should be concerned as to whether or not a warrant was obtained against an American citizen with the unverified information?

BARR:

Absolutely. I think, you know, the fourth amendment is one of our most cherished civil liberties.

GRAHAM:

So you think that's an appropriate thing to look at and you will look at it?


BARR:

Yes.


GRAHAM:

Okay. Do you share my concern that if you're going to open up a counterintelligence investigation against a presidential candidate that you have to have a very good reason?


BARR:

Yes, absolutely.


GRAHAM:

And a counterintelligence investigation is designed to protect the target of foreign influence. Is that correct?


BARR:

That is correct.


GRAHAM:

It's not a prosecutorial function, is it?


BARR:

No, unless--unless espionage or some violation of estimation laws is--develops.


GRAHAM:

So would it be odd that the candidate was never really briefed by the Department of Justice that your campaign may be targeted by a foreign entity?

BARR:

That is one of the questions I have is--is I feel normally the campaign would have been advised of this.

GRAHAM:

Okay, and can you think of a good reason right now why they wouldn't have been?

BARR:

I'm interested in--in getting that answer. They had two former U.S. attorneys in, Chris Christie and Rudy Giuliani involved in the campaign and I don't understand why the campaign was not advised.

GRAHAM:

Apparently, when Senator Feinstein had a person on her staff that was supposedly connected to the Chinese government, she was brief. Is that the normal way you do things with a counterintelligence investigation?

BARR:

I--I think--

GRAHAM:

--Well, she was briefed about a staff member that they thought might be connected to the Chinese government and she took action and fired the guy. Is that sort of what you're supposed to be doing?

BARR:

That's what I would, if I were attorney general and that situation came up, I would say yes, brief--brief the target of the foreign espionage activity.

GRAHAM:

Okay, so you are pledging to this committee, and I guess to the country as a whole is to find out what happened with a warrant application to find out about the counterintelligence investigation to make sure that the law was followed and if there was any of the abuse of the law to report with the Congress and the public. Is that accurate?

BARR:

That's accurate. I--I just, you know, want to satisfy myself that there were no abuse of--of law enforcement or intelligence powers.

GRAHAM:

Well I'm glad you're doing that. When it comes to Mr. Mueller, are you talking to him about the 6(e) material?

BARR:

I haven't personally talked to him about the 6(e), but his people are--are working on the 6(e) material.

GRAHAM:

So there's a collaboration between your people and Mueller people about what to take out and what to leave then on the grand jury side?

BARR:

Yes. As it was described to me, people are sitting at the same table.

GRAHAM:

Right. And when it comes down to on growing going criminal investigations, your making sure that prosecutors, they have a say about what's released because it may jeopardize their cases?

BARR:

That's right. The people involved in those cases.

GRAHAM:

And when it comes to classified information, you're talking to an intelligence community to make sure they're okay?

BARR:

Yes.

GRAHAM:

Thank you very much.

MORAN:

Senator-- Senator Schatz.

SCHATZ:

Thank you, Mr. Chairman. Thank you, attorney general, for--for being here. I wanted to give you a chance to rephrase something you said because I think when the attorney general, of the United States uses the word spying, it's rather provocative and, in my view, unnecessarily inflammatory. And I--I know what you're getting at because you have explained yourself in terms of answering Senator Graham's questions and--and the questions of others.

Do you want to rephrase what you are doing? Because I think the word spying could cause everybody in the cable news ecosystem to freak out and I think it's necessary for you to be

precise with your language here. You normally are and I want to give you a chance to be especially precise here.

BARR:

I'm not sure of all the connotations of that word that you're referring to, but you know, unauthorized surveillance, I want to make sure there was no unauthorized surveillance.

SCHATZ:

Okay, thank you.

BARR:

Is that--is that more appropriate in your mind?

SCHATZ:

This is your call. I really did want to give you a chance to--to say it how you wanted to say it and make sure that you didn't misspeak because you--you talk for a long time, you had yesterday, and I want to make sure that you--

BARR:

--I appreciate it--

SCHATZ:

--use the words that you want to use.

BARR:

Yeah.

SCHATZ:

Okay, on the Mueller summaries, on the Mueller team summaries within the report, I get that on every page there was a sort of admonition that this may contain 6(e) material. The question I have relates to your desire to make sure that the whole thing is intelligible. Are these reports going to be, excuse me, are these summaries when the report is released going to be intelligible? I assume there may be some redactions, there may be none, but the basic question I think for the public is are we going to get the gist of this or is it going to be, you know, on January 2015 and then--and then you have to flip 15 pages to find the next text?

BARR:

You will get more than the gist.

SCHATZ:

Thank you. I want to ask you about the Cole Memorandum. In your confirmation hearing, you said I'm not going to go after companies that have relied on the Cole Memorandum. Are you planning on restoring it, are you planning on establishing your--your new guidance? I heard what you said about marijuana generally, but those are public policy questions. Assuming we can't come to an agreement on a new statutory framework, what's the plan for the Department of Justice?

BARR:

I'm going to have to make some difficult choices.

SCHATZ:

Do you care to elaborate?

BARR:

Well, for example, reliance suggests people who have already taken action based on the Cole memorandum. I mean, one open question in my mind is if states continue to pass these

laws are we going to continue to forbear in those new states. I would like to see Congress addressed this issue.

SCHATZ:

Is there any internal guidance regarding these sort of difficult questions?

BARR:

Not--none that I've given.

SCHATZ:

So the Department of Justice is operating without guidance?

BARR:

The--the Department of Justice is operating under my general guidance that I am accepting the Cole Memorandum for now, but I have generally left it up to the U.S. attorneys and each state to determine what the best approach is in that state. I haven't heard any complaints from--from the states that have legalized marijuana.

SCHATZ:

A year ago, Attorney General Sessions said we are moving forward and we will add fairly soon additional suppliers of marijuana under the controlled substance act. I've sent two follow-up letters. Where are we on this?

BARR:

I have been pushing very hard over the last few weeks to get--

BARR:

--that process underway, and I think we're going to move forward on it. I think it's very important to get those--you know, those additional supplier--

SCHATZ:

--Can you assure me that I'm not going to be here a year later asking the same question?

BARR:

Yes.

SCHATZ:

Thank you. On defending the ACA, how often has the Department of Justice declined to defend a federal statute?

BARR:

It--you know, it's happened. I can't give you a number.

SCHATZ:

Is it fair to say it's infrequent?

BARR:

It's infrequent, but it--but it happens. And it happens under different kinds of--you know, the Obama administration refused to defend--

SCHATZ:

--Sure.

BARR:

Yeah.

SCHATZ:

And I think that was the only one. And I think that that's sort of telling, that as policy, you try to make these choices as infrequently as possible. And--

BARR:

--Correct--

SCHATZ:

--under the Obama administration, they refused to defend the Defense of Marriage Act. And under the Trump administration, you're refusing to defend the Affordable Care Act. So, it sort of has to rise to a level of political and public policy importance that supersedes the judgment of a lot of career attorneys. Would you agree with that?

BARR:

Well, I think--I'm not sure whether it's a question of career attorneys or non-career attorneys. I mean, there frequently are disputes among lawyers within an administration, whether they be career or non-career.

SCHATZ:

Thank you.

BARR:

Okay.

MORAN:

Senator Feinstein?

FEINSTEIN:

If I may, Mr. Chairman, on Senator Schatz's question of you, Mr. Attorney General, I'm really surprised by the answer, because the Supreme Court did uphold the law, the ACA. And now the attorney general is saying we will not defend it regardless. It seems to me that that's a problem, that if something is duly passed and upheld as legal, that the attorney general has a duty to defend it.

BARR:

Well, the--the law was originally upheld because the mandate was upheld--

FEINSTEIN:

--The individual mandate--

BARR:

--as a tax. And--and Chief Justice Roberts' opinion said that it would--you know, it can be held--upheld as a tax even though it couldn't otherwise be upheld. So, but for finding it a tax, you would have had five votes against it.

FEINSTEIN:

But that didn't happen.

BARR:

Once the--once the penalty was removed, the--the financial penalty was removed, it could no longer--that provision could no longer be justified as a tax, which means that it would have to fall. So, the mandate fell. The mandate--in my opinion, I don't think it's even a close question, the mandate was unconstitutional because it could no longer be upheld as a tax.

Then the question becomes, if the mandate falls even though there was no penalty attached to it, what's its impact on the rest of the statute? Four of the justices in the NFIB felt that the whole statute had to fall. So, as I said before you arrived, Senator, and you know, at the end of the day, I felt that this was a defensible legal position to take.

FEINSTEIN:

In my experience, which I guess I've been here 26 years, I've never seen this before, that a decision like this would be made by one individual on the basis of what has been a huge decision legislatively and signed by a president based on I'm not sure quite what, despite what you said. So--

BARR:

--Who was the one--who was the one individual, me?

FEINSTEIN:

No, no.

BARR:

Oh, okay.

FEINSTEIN:

No, you misunderstood what--what I said. But it's not--

BARR:

--Okay--

FEINSTEIN:

--it's not important.

BARR:

Right.

FEINSTEIN:

It's--so, you're--you're saying despite the fact that the Supreme Court of the United States upheld what has been a major law, duly passed, duly signed by the president, that you're just not going to defend it.

BARR:

That--that does happen. It happens occasionally in our system. I think the principle over at the Department of Justice is that our--our default position, our preference, is to defend statutes if and if we don't agree with the statutes and even if we think the argument's a weak argument.

For example, last time I was in the Justice Department I thought the flag statute was unconstitutional, but we defend it in the no burning of the flag--

FEINSTEIN:

--Well--

BARR:

--we defended it. We lost because the Justice Department was correct on it.

FEINSTEIN:

But why wouldn't you defend this?

BARR:

Because occasionally, you know, the--the administration determines that it--that another position should be taken.

FEINSTEIN:

Is this determine by the White House?

BARR:

It's determined by the process within the Executive Branch. There are a number of agencies. There are a number of different players even in the White House that get involved in these things.

FEINSTEIN:

Well, I assume you wouldn't take this position unless this is what the president wanted.

BARR:

Well--

FEINSTEIN:

--Because this is--

BARR:

--that would be a safe assumption--

FEINSTEIN:

--This is a mega law. You know, it affects pre-existing conditions. It affects everybody in the United States. It's not--it went through a great deal of hearing and testimony and amendment and passage.

BARR:

Yeah. It was a very controversial law.

FEINSTEIN:

Exactly. But it's a big law--

BARR:

--Right--

FEINSTEIN:

--and it's been operational for a period of time. And people depend on it, millions of people, for their healthcare.

BARR:

Okay.

FEINSTEIN:

And so, all of the sudden along comes--and I--I just--this is just my frame of--way of saying it, somebody and, oh, I'm going to take this whole thing on. And--

BARR:

--Well, there were 20, I think, or more states that were challenging it. I mean it's--there were--there was a lot of opposition to--to it. A lot of states have weighed in. And I think the administration is on the side of those states.

I--as I said yesterday, I think people should sort of take a deep breath. If this is such a wacky position that--that the administration is taking, then there's nothing to fear, right?

FEINSTEIN:

Well--

BARR:

--Then--then, you know, the law will be upheld.

FEINSTEIN:

In 26 years, I've never seen this kind of thing. And--

BARR:

--well--

FEINSTEIN:

--I--

BARR:

--Well, DOHA, I mean, we mentioned that before. I--I know it doesn't--you know, it happens rarely in each administration. But I'd be surprised if not any--you know, most administrations have from time to time declines to--

FEINSTEIN:

--well, maybe--I don't want to take the time. Maybe we can discuss this, because this struck me like lightning, that, you know, one person decided--I assume the president wants you to--made this decision, and everything that was done by way of proper legislative action has been taken, and signature of president. I just don't ever recall anything like this happening in the past quarter of a century.

Thank you, Mr. Chairman.

MORAN:

Thank you, Senator Feinstein. Attorney general, we're about to conclude. I have a follow-up question, so does Senator Shaheen, then we'll wrap up.

I want to go back to something you said in your testimony, that's you've indicated that there is the possibility that unauthorized surveillance, or spying, occurred. And my question is maybe twofold. My question is what is the basis for reaching that conclusion or a belief that something like that occurred? And what are the consequences for those who committed on authorizing--an unauthorized surveillance?

BARR:

Did you say that I said that it occurred?

MORAN:

You indicated I think--I tried to at least reflect on what your quote was, that you thought spying on a political campaign occurred in the course of an intelligence agency's investigation into Russian interference in 2016.

BARR:

Well, I thought the question was did I have any basis for saying that.

MORAN:

And I'm now asking what the basis is or what the facts are that you to that thought.

BARR:

Okay. I felt--I am concerned about it, and I was asked about whether there was any basis for it. And I believe there is a basis for my concern, but I'm not going to discuss the basis.

MORAN:

And what's potential consequences for those who violated the law?

BARR:

Well, it depends what--it depends what the facts ultimately prove to be.

MORAN:

Which would be determined in a prosecution?

BARR:

Possibly. But, you know, there are also kind--there can be a abuses that may not rise to the level of a--of a crime but that, you know, people might think is bad and want to put in rules

or prophylaxis against it.

I mean, I remember when there was a lot of, you know, people upset at the FBI, you know, spying on or surveilling civil rights groups or antiwar groups or nuclear freeze groups and so forth. And as a result of that, there were a lot of safeguards built in. There were also concerns about surveilling reporters, and so safeguards have been put in.

So, it doesn't necessarily have to result in a--in a criminal investigation or a finding of a crime. But, you know, part of my responsibility is to protect the civil liberties of the American people. And I think--I think something that is important is that the law enforcement and intelligence agencies respect the limits on their powers.


MORAN:
I share that view with you, Mr. General, and am of the same generation in which those things occurred and were alleged to have occurred.

Senator Shaheen?


SHAHEEN:
Yes, Mr. Chairman, I remember that too. And I remember when J. Edgar Hoover's FBI survey old student groups as well, having been in one of those student groups that was surveilled.

I want to ask a couple of what I hope will be very short questions. Over the past two years, this subcommittee in Congress has provided record levels of funding for the Office of Violence Against Women. That is true about the recent omnibus as well. We have not yet reauthorized the Violence Against women Act, and I--I want to be reassured that the Justice Department, despite this lapsed authorization, will continue to provide the funding that's been appropriated by Congress.


LOFTHUS:
Absolutely.

BARR:

Yeah.

SHAHEEN:

Thank you.

BARR:

I support the reauthorization of the act.

SHAHEEN:

Yes. Thank you. I hope you will share that with some members of your administration.

BARR:

Well, I haven't seen any specific vehicle for that. But in--in concept, I certainly supported and would like to see it done.

SHAHEEN:

Thank you. The other question I have is that the prior attorney general issued a number of memos and--during his tenure that provided guidelines for everything from sentencing for U.S. attorneys on drug offenses to immigration policy, to even the protective detail for Secretary DeVos. Do you intend to review any of those of us, and should we expect that there might be a different outcome after your review from any of that?

And I have a particular specific question because--that is around the issue of quotas for immigration judges and whether you believe that judges should have--both federal judges and immigration judges should have quotas around the number of cases that they are expected to get through in a period of time.

BARR:

Do you want the specific or the general question answered, both or--

SHAHEEN:

--Both would be nice.

BARR:

Okay. Well, both. I actually--you know, I've been in the job seven weeks, and I haven't put in process a thing of reviewing all the--the stuff. And so, right now it's just a question of something being brought to my attention.

And you know I haven't looked at that particular guidance but I do--you know I understand that it is important to understand our metrics and how productive our--our judges are so we can figure out how to manage the caseloads and certainly I would be not happy with hard and fast quotas. They have--have to have enough give in them that people can take into account the you know the factors that could go into productivity such as the complication of the case and things like that.

SHAHEEN:

Thank you.

LOFTHUS:

Can I add one thing on the protective details?

SHAHEEN:

Yes.

LOFTHUS:

There is $1 billion in this budget for the U.S. Marshals to do a basically feasibility look at providing executive branch wide protective details based on real threat assessments. That is an expertise of the marshals. I think people think highly of the Marshals capabilities in that

area. OMB asked the department to take a look at doing it Executive Branch-wide. It would take resources for the Marshals if they go in that direction but we have been asked to take a look at it and that is what that $1 million in the budget is all about.

SHAHEEN:

Thank you. I appreciate that. Is there--are there--is there a reason to believe that there are more valid threats against members of this administration or in the Executive Branch now than there has been in the past?

LOFTHUS:

That's not something I can--I don't have that information. I don't know the way the question came to us was simply take a group that does judicial and executive protection as their profession, who does real professional threat assessments and looks at this and--and have a group like that take a look at it for the administration.

SHAHEEN:

Thank you.

BARR:

Mr. Chairman could I just add one point of clarification?

MORAN:

Please.

BARR:

That I just want to make it clear looking--thinking back on all of the different colloquy's here that I am not saying that improper surveillance occurred. I am saying that I am concerned about it and looking into it. That is all.

MORAN:

Thank you. I will give you both a chance to clarify anything that you said earlier. I want to highlight--I mention this in my opening statement and other times, other circumstances this would have been a more significant topic of conversation in this hearing but there are a number of request by the Department of Justice related to immigration that are included in the conversations that we will be having as far as the appropriations for the Department of Justice. DOJ has requested $100 million--$110 million increase above the enacted '19 levels to fund 100 new immigration judges and 500 additional positions including 100 attorneys and 100 judicial law clerks.

And in addition to that as you indicated the Marshals service there is a request work $32 million for a federal prisoner detention programs to support housing and transportation, care for federal detainees that are not criminals but are within the immigration system awaiting adjudication. Or following adjudication. And the Office of Solicitor General, the Environmental and Natural Resource Division as well as the Southwest border (INAUDIBLE) law enforcement Violent Crime Reduction Initiative. I wanted to give you a chance if you care to indicate anything about these issues and their importance to the current circumstance, we find ourselves in relate--related to immigration. Mr. general?

BARR:

Yes, I mean absolutely we need those additional resources especially the additional judges to process the backlog. Right now even though our judges are being very productive in deciding these cases the pipeline is actually greater than the product.

MORAN:

There is 800 some thousand cases--

BARR:

(INAUDIBLE) 860,000.

MORAN:

In addition I would highlight for you the importance of electronic records and moving forward with getting the department in this regard out of the paper world and onto computers.

Okay. My opportunity to every witness that appears before my committee is to say and Mr. Attorney General you are always very circumspect so I doubt this applies to you but if there is something you want to amend, alter, correct, if there is something that you failed, we failed to ask you that you want to make certain that we hear we would welcome either you or Mr. Lofthus to do so.

BARR:

Know, I--know. I mean after I--if I review the transcript and see a problem, I will let you know.

MORAN:

I wish it always--I wish it worked that way. Thank you very much for your presence here today. Thank you for the information that you convey to us. Senator Shaheen and I are grateful. If there are no further questions this--is it the afternoon? If there are no further questions this afternoon senators may submit additional questions for the subcommittee's official hearing record. We request that the Department of Justice respond within 30 days. As I indicated we value that--your--your efforts to accomplish that in the past. The subcommittee now stands in recess.

**List of Panel Members and Witnesses**

PANEL MEMBERS:

SEN. JERRY MORAN (R-KAN.), CHAIRMAN

SEN. LAMAR ALEXANDER (R-TENN.)

SEN. LISA MURKOWSKI (R-ALASKA)

SEN. SUSAN COLLINS (R-MAINE)

SEN. LINDSEY GRAHAM (R-S.C.)

SEN. JOHN BOOZMAN (R-ARK.)

SEN. SHELLEY MOORE CAPITO (R-W.VA.)

SEN. JOHN KENNEDY (R-LA.)

SEN. MARCO RUBIO (R-FLA.)

SEN. RICHARD C. SHELBY (R-ALA.), EX-OFFICIO

SEN. JEANNE SHAHEEN (D-N.H.), RANKING MEMBER

SEN. PATRICK J. LEAHY (D-VT.)

SEN. DIANNE FEINSTEIN (D-CALIF.)

SEN. JACK REED (D-R.I.)

SEN. CHRIS COONS (D-DEL.)

SEN. BRIAN SCHATZ (D-HAWAII)

SEN. JOE MANCHIN III (D-W.VA.)

SEN. CHRIS VAN HOLLEN (D-MD.)

SEN. PATRICK J. LEAHY (D-VT.), EX-OFFICIO

WITNESSES:
ATTORNEY GENERAL WILLIAM P. BARR

U.S. DEPARTMENT OF JUSTICE ASSISTANT ATTORNEY GENERAL LEE LOFTHUS

**Testimony & Transcripts**

[Complete written testimony for this event](#) April 10, 2019

**About Senate Appropriations**

[Staff](#)

[Hearing](#)

[Transcripts](#)

[Testimony](#)

[Committee Reports](#)

[Associated Bills](#)

[Schedules](#)

[Markup](#)

[Amendments](#)

© 2019 · CQ - Roll Call, Inc · All Rights Reserved.

1625 Eye Street, Suite 200 · Washington, D.C. 20006-4681 · 202-650-6500

About CQ    Help    Privacy Policy    Masthead    Terms & Conditions