# Exhibit A

CQ Congressional Transcripts
May. 1, 2019

May. 01, 2019 Revised Final

# Senate Judiciary Committee Holds Hearing on Justice Department's Investigation of Russian Interference in 2016 Presidential Election

LIST OF PANEL MEMBERS AND WITNESSES

GRAHAM:

Thank you. The hearing will come to order, and the first order of business is to try to cool the room down. So we'll see if we can do that. But the attorney general will be testifying here in a bit about the Mueller report. And I want to thank him for coming to the committee and giving us an explanation as to the actions he took and why he took them regarding the Mueller report. And here's the good news; here's the Mueller report. You can read it for yourself. It's about 400 and something pages. I can't say I've read it all, but I've read most of it. There is an unredacted version over in the classified section of the Senate, a room where you can go look at the unredacted version, and I did that, and I found it not to change anything in terms of an outcome.

But a bit about the Mueller report. Who is Mueller? For those who may not know--I don't know where you've been, but you may not know--that Bob Mueller has a reputation in this town and throughout the country as being an outstanding lawyer and a man of the law. He was the FBI director. He was the deputy attorney general. He was in charge of the criminal division at the Department of Justice. He was a United States marine, and he has served his country in a variety of circumstances long and well.

For those who took time to read the report, I think it was well written, very thorough. And let me tell you what went into this report. There were 19 lawyers employed, approximately 40 FBI agents, intel analysts, forensic--forensic accountants and other staff, 2800 subpoenas issued, 500 witnesses interviewed, 500 search warrants executed, more than 230 orders

for communication records so they--records could be obtained, 13 requests to foreign governments for evidence, over $25 million spent over two years. We may not agree on much, but I hope we can agree that he had ample resources, took a lot of time and talked to a lot of people. And you can read for yourself what he found. The attorney general will tell us a bit about what his opinion of the report is.

In terms of interacting with the White House, the White House turned over to Mr. Mueller $1.4 million documents and records, never asserted executive privilege one time. Over 20 White House staffers, including eight from the White House Counsel's office, were interviewed voluntarily. Don McGahn, chief counsel for the White House, was interviewed for over 30 hours. Everybody that they wanted to talk to from the Trump campaign on the ground, they were able to talk to. The president submitted himself to written interrogatories.

So to the American people, Mr. Mueller was the right guy to do this job. I always believed that Attorney General Sessions was conflicted out because he was part of the campaign. He was the right guy with ample resources. And the cooperation he needed to find out what happened was given, in my view. But there were two campaigns in 2016, and we'll talk about the second one in a minute.

So what have we learned from this report? After all this time and all this money, Mr. Mueller and his team concluded there was no collusion. I didn't know, like many of you here on the Republican side, we all agreed that Mr. Mueller should be allowed to do his job without interference. I joined with some colleagues on the other side to introduce legislation to protect the special counsel that he could only be removed for cause. He was never removed. He was allowed to do his job. So no collusion, no coordination, no conspiracy between the Trump campaign and the Russian government regarding the 2016 election.

As to obstruction of justice, Mr. Mueller left it to Mr. Barr to decide. After two years and all this time, he said Mr. Barr, you decide. Mr. Barr did. There are a bunch of lawyers on this committee, and I will tell you the following. You have to have specific intent to obstruct justice. If there is no underlying crime, pretty hard to figure out what intent might be if there

was never a crime to begin with. The president never did anything to stop Mueller from doing his job, so I guess the theory goes now, we don't--okay, he didn't collude with the Russians and he didn't specifically do anything to stop Mueller, but attempted obstruction justice of a crime that never occurred I guess is sort of the--the new standard around here. We'll see if that makes any sense. To me it doesn't.

Now there was another campaign. It was the Clinton campaign. What have we learned from this report? The Russians interfered in our election. So can some bipartisanship come out of this? I hope so. I intend to work with my colleagues on the other side to introduce the DETER Act and to introduce legislation to defend the integrity of the voting system. Senator Durbin and I have legislation that would deny anyone admittance into the United States a visa through the immigration system if they were involved in interfering in an American election. Working with Senator Whitehouse and Blumenthal to make sure that if you hack into a state election system, even though it's not tied to their internet, that's a crime. I would like to do more to harden our infrastructure because the Russians did it. It wasn't some 400-pound guy sitting on a bed somewhere. It was the Russians. And they're still doing it. And it could be the Chinese, it could be somebody next, so my takeaway from this report is that we've got a lot of work to do to defend democracy against the Russians and other bad actors. And I promise the committee we will get on with that work, hopefully in a bipartisan fashion.

The other campaign. The other campaign was investigated, not by Mr. Mueller, by people within the Department of Justice. The accusation against the Clinton--Secretary Clinton was that she set a private server up somewhere in her house, and classified information was on it, to avoid the disclosure requirements and the transparency requirements required of being secretary of State. So that was investigated. What do we know? We know that the person in charge of investigating hated Trump's guts. I don't know how Mr. Mueller felt about Trump, but I don't think anybody on our side believes that he had a personal animosity toward the president to the point he couldn't do his job.

This is what Strzok said on February 12, 2016. Now he's in charge of the Clinton email investigation. "Oh he's Trump's abysmal. I keep hoping the charade will end and people will

just dump him." February 12, 2016. Page is the Department of Justice lawyer assigned to this case. March 3, 2016. "God, Trump is a loathsome human being." Strzok, "Oh my God, Trump's an idiot." Page, "He's awful." Strzok, "God, Hillary should win 100 million to nothing." Compare those two people to Mueller. March 16, 2016. "I cannot believe Trump is likely to be an actual serious candidate for president." July 21, 2016. "Trump is a disaster. I have no idea how destabilizing his presidency would be." August 8, 2016, three days before Strzok was made deputy acting--in charge of the counterintelligence division of the FBI, "He's never going to become president, right?" Page to Strzok, "No, no he won't. We'll stop him." These are the people investigating the Clinton email situation and start the counterintelligence investigation of the Trump campaign. Compare them to Mueller.

August 15, 2016. Strzok, "I want to believe the path you threw out for consideration in Andy's (PH) office that there's no way he gets elected, but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40." August 26, 2016. "Just went to the Southern Virginia Wal-Mart. I could smell the Trump support." October 19, 2016, "Trump is a fucking idiot. He's unable to provide a coherent answer." Sorry to the kids out there.

These are the people that made a decision that Clinton didn't do anything wrong and that counterintelligence investigation of the Trump campaign was warranted. We're going to, in a bipartisan way, I hope deal with Russia, but when the Mueller report is put to bed, and it soon will be, this committee is going to look long and hard at how this all started. We're going to look at the FISA warrant process. Did Russia provide Christopher Steele the information about Trump that turned out to be garbage that was used to get a warrant on American system--citizen, and if so, how did the system fail? Was there a real effort between Papadopoulos and anybody in Russia to use the Clinton emails stolen by--stole by the Russians, or was that thought planted in his mind? I don't know, but we're going to look. And I can tell you this. If you change the names, you all would want to look, too. Everything I just said, just substitute Clinton for Trump and see what all these people with cameras would be saying out here about this.

As to cooperation in the Clinton investigation, I told you what the Trump people did. I'll tell you a little bit about what the Clinton people did. There was a protective order for the server issued by the House, and there was a request by the State Department to preserve all the information on the server. Paul Combetta, after having the protective order, used a software program called BleachBit to wipe the email server clean. Has anybody ever heard of Paul Combetta? No. Under protective order from the House to preserve the information under request from the State Department to preserve the information on the server, he used a BleachBit program to wipe it clean. What happened to him? Nothing. 18 devices possessed by Secretary Clinton she used to do business as secretary, how many of them were turned over to the FBI? None. Two of them couldn't be turned over because Judith Caspar (PH) took a hammer and destroyed two of them. What happened to her? Nothing.

So the bottom line is we're about to hear from Mr. Barr the results of a two-year investigation into the Trump campaign, all things Russia, the actions the president took before and after the campaign, $25 million, 40 FBI agents. I appreciate very much what Mr. Mueller did for the country. I have read most of the report. For me, it is over.

GRAHAM:
Senator Feinstein?

FEINSTEIN:
Thank you, Mr. Chairman, and welcome, Attorney General. On March 24th, you sent a letter to Chairman Graham and the ranking member of this committee providing your summary of the principal conclusions set out in Special Counsel Mueller's report. This letter was widely reported as a win for the president and was characterized as confirming there was no conclusion.

Following this letter, the White House put out a statement declaring the special counsel-- and I quote, "The Special Counsel did not find any collusion and did not find any obstruction," and that the report "was a total and complete exoneration" of the president. However, last night the Washington Post reported that Special Counsel Mueller sent you a

letter in late March where he said your letter to Congress failed to "fully capture the context, nature, and substance of his offices work and conclusions," and that he spoke with you about the concern that the letter threatened to undermine the public confidence in the outcome of the investigation. That's in quotes as well.

Then on April 18th, you held a press conference where you announced repeatedly that the Mueller report found no collusion and no evidence of a crime. An hour later, a redacted copy of the Mueller report was provided to the public and the Congress, and we saw why Mueller was concerned. Contrary to the declarations of the total and complete exoneration, the special counsel's report contained substantial evidence of misconduct.

First, Special Counsel Mueller's report confirms that the Russian government implemented a social media campaign to mislead millions of Americans, and that Russian intelligence services hacked into the DNC and the DCCC computers, stole emails and memos, and systematically released them to impact the presidential election. Your March letter stated that there was no evidence that the Trump campaign "conspired or coordinated with Russia." However, the report outlined substantial evidence that the Trump campaign welcomed, encouraged, and expected to benefit electorally from Russia's interference in the election.

The Mueller report also details how time and time again the Trump campaign took steps to gain advantage from Russia's unlawful interference. For example, President Trump's campaign manager, Paul Manafort, past internal campaign polling data, messaging, and strategy updates to Konstantin Kilimnik, a Russian national with ties to Russian intelligence. The Mueller report explains how Paul Manafort briefed Kilimnik in early August 2016 on "the state of the Trump campaign and Manafort's plan to win the election," including the campaigns focus on the battleground states of Michigan, Wisconsin, Pennsylvania, and Minnesota.

Next, the Mueller report documents the Trump campaign's communications regarding Secretary Clinton's and the DNC's stolen emails. Specifically, the report states, "within approximately five hours" of President Trump calling on Russia to find Secretary Clinton's

emails, Russian intelligence agency GRU officers "targeted for the first time Clinton's personal office." The Mueller report also reveals that President Trump repeatedly asked individuals affiliated with his campaign, including Michael Flynn "to find the deleted Clinton emails."

These efforts included suggestions to contact foreign intelligence services, Russian hackers, and individuals on the dark Web. The report confirms that Trump knew of WikiLeaks releases of the stolen emails and received status about--status updates about upcoming releases. While his campaign promoted coverage of the leaks, Donald Trump Junior communicated directly with WikiLeaks and, at its request, publicly tweeted a link to emails stolen from Clinton's campaign manager.

Second, in your March letter to Congress, you concluded "that the evidence is not sufficient to establish that the president committed an obstruction of justice offense." However, Special Counsel Mueller methodically outlines 10 episodes, some continuing multiple actions, by the president to mislead the American people and interfere with the investigations into Russian interference in obstruction. In one example, the president repeatedly called White House Counsel Don McGahn at home and directed him to fire Mueller, saying "Mueller has to go. Call me back when you do it." Then later, the president repeatedly ordered McGahn to release a press statement and write a letter saying the president did not order Mueller fired.

The Mueller report also outlines efforts by President Trump to influence witness testimony and deter cooperation with law enforcement. For example, the president's team communicated to witnesses that pardons would be available if they "stayed on message" and remained "on the team." In one case, the president sent messages through his personal lawyers to Paul Manafort that he would be taken care of and just "sit tight." The president then publicly affirmed this communication by staying--stating that Manafort was "a brave man" for refusing to break.

Similarly, the Mueller report stated the president used inducements in the form of positive messages in an effort to get Michael Cohen not to cooperate and then turned to attacks and

intimidation to deter the provision of information or undermine Cohen's credibility.

Finally, while the March letter to Congress and the April press conference left the impression there were no remaining questions to examine, this report notes several limitations Mueller face while gathering the facts that Congress needed to examine. More than once, the report documents that legal conditions--excuse me, conclusions were not drawn because witnesses refuse to answer questions or failed to recall the events.

In addition, numerous witnesses, including but not limited to Jared Kushner, Sarah Sanders, Rudolph Giuliani, Michael Flynn, Steve Bannon, and John Kelly, all stated they could not recall events. The president himself said more than 30 times that he could not recall or remember enough to be able to answer written questions from the special counsel. The special counsel also recounted that "some associated with the Trump campaign deleted relevant communications or communicated during the relevant period using applications that featured encryption or do not provide for long-term retention of data."

Based on these gaps, the Mueller report concluded "the office cannot rule out the possibility that the unavailable information would have shed additional light on or cast a new light on events described in the report." And contrary to the conclusion that the special counsel's report did not find evidence of communication or coordination between the Trump campaign and Russia, the Mueller report explicitly states "A statement that the investigation did not establish particular facts does not mean there was no evidence of those facts," volume two, page two.

Let me conclude with this. Congress has both the Constitutional duty and the authority to investigate the serious findings contained in the Mueller report. I strongly believe that this committee needs to hear directly from Special Counsel Mueller about his views on the report in his March letter. I also believe Senators should have the opportunity to ask him about these subjects in questions directly.

I have requested this to our chairman, to authorize a hearing with Special Counsel Mueller, and I hope that will happen soon. Thank you, Mr. Chairman.

GRAHAM:

Thank you. Before we receive your testimony, Mr. Barr, we have the letter that Mr. Mueller sent to you on March 27th, 2019. I'll put that in the record now. The floor is yours.

GRAHAM:

I've got to swear you in; sorry. Solemnly--do you solemnly swear the testimony you're about to give this committee is the truth, the whole truth and nothing but the truth, so help you God?

BARR:

Yes.

GRAHAM:

Sorry about that.

BARR:

Thank you, Mr. Chairman and Ranking Member Feinstein, members of the committee. During my confirmation process there were two concerns that dominated, as I think you will all agree. The first was whether I would in any way impede or curtail Special Counsel Mueller's investigation, and the second, whether I would make public his final report. As you see, Bob Mueller was allowed to--to complete his work as he saw fit, and as to the report, even though the applicable regulations require that the report is to be made to the AG and is to remain confidential and not be made public, I told this committee that I intended to exercise whatever discretion I had to make as much of the report available to the public and to congressional leaders as I could, consistent with the law. This has been done.

I arrived at the department on February 14, and shortly thereafter I asked it to be communicated to Bob Mueller's team that in preparing the report we requested that they make it so we could readily identify 6(e) material so we could quickly process the report for--

GRAHAM:

Could you tell the public what 6(e) is?

BARR:

6(e) is Grand Jury material that cannot be made public. It's prohibited by statute. And I wanted that identified so we could redact that material and prepare the report for public release as quickly as we could. When I arrived at the department I found--and was eventually briefed in on the investigation--I found that the deputy attorney general and his principal associate deputy, Ed O'Callaghan, were in regular discussions with the counsel's office, had been, and they communicated this request and had discussions about both the timing of the report and the nature of the report.

On March 5 I met with Bob at the suggestion of the deputy and the principal associate deputy--Bob Mueller, I met with Bob Mueller--to get a readout on what his conclusions would be. On March 25--and at that meeting I asked--I reiterated to Special Counsel Mueller that in order to have the shortest possible time before I was in a position to release the report, I asked that they identify 6(e) material. When I received the report on March 22--and we were hoping to have that easily identified, the 6(e) material, unfortunately it did not come in that form, and it quickly became apparent that it would take about three or four weeks to identify that material and other material that would have to be redacted. So there was necessarily going to be a gap between the receipt of the report and getting the full report out publicly.

The deputy and I identified four categories of information that we believe required redaction, and I think you all know of them, but they were the Grand Jury material, the 6(e) material, information that the intelligence community advised would reveal sensitive sources and methods, information that if revealed at this stage would impinge on the investigation or prosecution of related cases, and information that would unfairly affect the privacy and reputational interests of peripheral third parties. We went about redacting this material in concert with the special counsel's office. We needed their assistance to identify

the 6(e) material, in particular. The redactions were all carried out by DOJ lawyers with special counsel lawyers in consultation with intelligence community.

The report contained a substantial amount of material over which the president could have asserted executive privilege, but the president made the decision not to assert executive privilege and to make public as much of the report as we could subject to the redactions that we thought required. As you see, the report has been lightly redacted. The public version has been estimated to have only 10 percent redactions. Almost--the vast bulk of those reductions relate to--are in Volume 1, which is the volume that deals with collusion and that relates to existing ongoing cases. Volume 2 has only about 2 percent redactions for the public version. So 98 percent of Volume 2 dealing with obstruction is available to the public.

We have made a version of the report available to congressional leaders that only contains redactions of Grand Jury material. For this version, overall redactions are less than 2 percent for the whole report, and for Volume 2 dealing with obstruction, they are less than one tenth of 1 percent. So given the limited nature of redactions, I believe that the public--publicly-released report will allow every American to understand the results of the special counsel's work.

By now everyone is familiar with the special counsel's bottom line conclusions about the Russian attempts to interfere in the election. In Volume 1 the special counsel found that the Russians engaged--engaged in two distinct schemes. First, the Internet Research Agency, a Russian entity with close ties to the Russian government, conducted a disinformation and social media operation to sow discord among Americans. Second, the GRU, Russian military intelligence, hacked into computers and stole emails from individuals affiliated with the Democratic Party and Hillary Clinton's campaign. The special counsel investigated whether anyone affiliated with President Trump's campaign conspired or coordinated with these criminal schemes. They concluded that there was not sufficient evidence to establish that there had been any conspiracy or coordination with the Russian government or the IRA.

As you know, Volume 2 of his report dealt with obstruction, and the special counsel considered whether certain actions of the president could amount to obstruction. He

decided not to reach a conclusion. Instead, the report recounts 10 episodes and discusses potential legal theories for connecting the president's actions to elements of obstruction offenses. Now we first heard that the special counsel's decision not to decide the obstruction issue at meet--at the March 5 meeting when he came over to the department, and we were, frankly, surprised that--that they were not going to reach a decision on obstruction. And we asked them a lot about the reasoning behind this and the basis for this. Special Counsel Mueller stated three times to us in that meeting, in response to our questioning, that he emphatically was not saying that but for the OLC opinion he would have found obstruction. He said that in the future the facts of the case against the president might be such that a special counsel would recommend abandoning the OLC opinion, but this is not such a case. We did not understand exactly why the special counsel was not reaching a decision. And when we pressed him on it, he said that his team was still formulating the explanation.

Once we heard that the special counsel was not reaching a conclusion on obstruction, the deputy and I discussed and agreed that the department had to reach a decision. We had the responsibility to assess the evidence as set forth in the report and to make the judgment. I say this because special counsel was appointed to carry out the investigative and prosecutorial functions of the department and to do it as part of the Department of Justice. The powers he was using, including the power of using the Grand Jury and using compulsory process, exists for that purpose, the function of the Department of Justice in this arena, which is to determine whether or not there has been criminal conduct. It's a binary decision. Is there enough evidence to show a crime, and do we believe a crime has been committed?

We don't conduct criminal investigations just to collect information and put it out to the public. We do so to make a decision. And here we thought there was an additional reason, which is this was a very public investigation, and we had made clear that the results of the investigation were going to be made public, and the deputy and I felt that the evidence developed by the special counsel was not sufficient to establish that the president committed a crime, and therefore it would be irresponsible and unfair for the department to

release a report without stating the department's conclusions and thus leave it hanging as to whether the department considered that there had been criminal conduct.

So the deputy attorney general and I conducted a careful review of the report with our staffs and legal advisors, and while we disagreed with some of the legal theories and felt that many of the episodes discussed in the report would not constitute obstruction as a matter of law, we didn't rest our decision on that. We took each of the 10 episodes, and we assessed them against the analytical framework that had been set forth by the special counsel. And we concluded that the evidence developed during the special counsel's investigation was not sufficient to establish that the president committed an obstruction of justice offense.

BARR:
Let me just talk a little bit about this March 24th letter and--and Bob Mueller's letter I think on the 20, which I received on the 28th.

When the report came in on the 22nd and we saw it was going to take a great deal of time to get it out to the public I made the determination that we had to put out some information about the bottom line. The body politic was in a high state of agitation. There was massive interest in learning what the bottom line results of Bob Mueller's investigation was particularly as to collusion. Former government officials were confident--confidently predicting that the president and members of his family were going to be indicted. There were people suggesting that if it took any time to turn around the report and get it out it would mean that the president was in legal jeopardy. So, I didn't feel that it was in the public interest to allow this to go on for several weeks without saying anything. And so I decided to simply state what the bottom line conclusions were, which is what the department normally does--make a bi--binary determination. Is there a crime or isn't there a crime? We--we prepared the letter for

that purpose to state the bottom line conclusions. We use the language from the report to state those bottom line conclusions. I analogize it to announcing after an extended trial what the verdict of the trial is. Pending release of the full transcript. That's what we were

trying to do--notify the people as to the bottom line conclusion. We were not trying to summarize the 410 page report.

So, we released that I--I offered Bob Mueller the opportunity to review that letter before it went out and he declined. On Thursday morning I received--I received--it was probably received at the department Wednesday night or evening, but on Thursday morning I received a letter from Bob the letter that's just been put into the record. And I called Bob and said you know, what's the issue here? Are you su--and I asked him if he was suggesting that the March 24th letter was inaccurate and he said no, but that the press reporting had been inaccurate. And that the press was reading too much into it and I asked him you know, specifically what his concern was. And he said, that his concern focused on his explanation of why he did not reach a conclusion on obstruction. And he wanted more put out on that issue. He wanted--he argued for putting out summaries of each volume--the executive summaries that had been written by his office. And, if not that then other material that focused on the issue of why he didn't r

each the obstruction question. But he was very clear with me that he was not suggesting that we had misrepresented his report.

I told Bob that I was not interested in putting out summaries and I wasn't going to put out the report piece meal. I wanted to get the whole report out. And, I thought summaries by very definition regardless of who prepared them would be under inclusive and we'd have sort of a series of different debates and public discord over each tranche of information that went out and I wanted to get everything out at once and we should start working on that. And so the following day I put out a letter explaining the process we were following and stressing that the March 24th letter was not a summary of the report but a statement of the principal conclusions and that people would be able to see Bob Mueller's entire thinking when the report was made public. So, I'll end my statement there, Mr. Chairman and glad to take any questions.

GRAHAM:

Thank you very much. As to the actual report itself, was there ever an occasion where you wanted to--something was redacted from the report that Mr. Mueller objected to?

BARR:
I--I wouldn't say objected to. My understanding is the categories were defined by me and--and the deputy. I don't think that--I have no--you know, I don't believe--

GRAHAM:
--Did you work with him to redact the report?

BARR:
Right. Those categories were executed by DOJ lawyers working with his lawyers. I think there were maybe a few judgment calls, very few, as to whether or not something as a prudential matter should be treated as a reputational interest or something. So there may have been some occasions of that. But as--as far as I'm aware--

GRAHAM:
--As I understand it, you did not want to hurt somebody's reputation unless it really affected the outcome. Is that correct?

BARR:
Right.

GRAHAM:
So was there any disagreement about 6 (e) material?

BARR:
Not that I'm aware of.

GRAHAM:

Any disagreement about classified information?


BARR:

Not that I'm aware of.


GRAHAM:

Okay. So the conclusion in your page--four page summary you think accurately reflect his bottom line on collusion. Is that correct?


BARR:

Yes.


GRAHAM:

And you can read it for yourself if you got any doubt. As to obstruction of justice, were you surprised he was going to let you decide?


BARR:

Yes, I was surprised. I--I think the very purpose--the function he was carrying out, the prosecutive and investigative and prosecutive function is performed for the purpose of (INAUDIBLE)


GRAHAM:

--How many people that he actually indict? Do you know?


BARR:

I can't remember off the top of my head.

GRAHAM:

It was a lot.


BARR:

Yeah.


GRAHAM:

So he actually has the ability to indict if he wants to. He's used that power during the investigation. Is that correct?


BARR:

That's correct. And the other thing that was confusing to me is that the investigation carried on for a while as additional episodes were--were looked into, episodes involving the president, and so my question is or was why were those investigative investigated if at the end of the day you aren't going to reach a decision on them?


GRAHAM:

So did you consult Deputy Attorney General Rosenstein about the obstruction matter?


BARR:

Constantly, yeah.


GRAHAM:

So was he in agreement with your decision not to proceed forward?


BARR:

Yes. I'm sorry, the agreement what? Not--

GRAHAM:

--Not to proceed forward with obstruction.

BARR:

Right. Right, right.

GRAHAM:

Okay. So very quickly, give us your reasoning why you think it would be inappropriate to proceed forward on obstruction of justice in this case.

BARR:

Well, generally speaking, an obstruction case typically has two aspects to it. One, there's usually an underlying criminality that--

GRAHAM:

--Let's stop right there.

BARR:

Yeah.

GRAHAM:

Was there an underlying crime here?

BARR:

No.

GRAHAM:

So usually there is?

BARR:

Usually. But it's not--it's not necessary, but the typical--

GRAHAM:

--Right--

BARR:

--sort of the paradigmatic case is there's an underlying crime and then the person implicated or people implicated were concerned about that criminality being discovered take an inherently malignant act as--as the Supreme Court has said to--to obstruct that investigation--

GRAHAM:

--So one of the examples--

BARR:

--such as destroying documents--what--

GRAHAM:

--That people were worried about that he fired Comey to stop the Russian investigation. That's one of the concerns people had. Well, let me tell you a little bit about coming. "I do not have confidence in him, Comey, any longer." That was Chuck Schumer November 2, 2016. "I think he, Comey, should take a hard look at what he has done and I think it would not be a bad thing for the American people if he did step down." Bernie Sanders, January 15, 2017.

"The president ought to fire Comey immediately and he ought to initiate an investigation." That is Congressman Nadler, November 14, 2016. Did you have a problem with the way Comey handled the Clinton email investigation?

BARR:

Yes. I said so at the time.

GRAHAM:

Okay. So given the fact that a lot of people--Comey should be fired, did you find that to be a persuasive act of obstructing justice?

BARR:

No. I--I think even the report at the end of the day came to the conclusion if you--if you read the analysis that--that a reason that loomed large there for his termination was his refusal to tell the public what he was privately telling the president, which was that the president was not under investigation.

GRAHAM:

As to where we go forward, as--as to how we go forward, would you recommend that this committee and every other committee of Congress do our best to harden our infrastructure against future Russian attacks?

BARR:

Absolutely. Yes.

GRAHAM:

Do you think Russia is still up to it?

BARR:

Yes.

GRAHAM:

Do you think other countries may get involved in our elections in 2020?

BARR:

Yes.

GRAHAM:

So you would support an effort by Congress working with administration to harden our electoral infrastructure?

BARR:

Yes.

GRAHAM:

Is that one of the takeaways of the Mueller report?

BARR:

Yes.

GRAHAM:

Do you share my concerns about the FISA warrant process?

BARR:

Yes.

GRAHAM:

Do you share my concerns about the counterintelligence investigation, how it was opened and why it was opened?

BARR:

Yes.

GRAHAM:

Do you share my concerns that the professional--lack of professionalism in the Clinton email investigation is something we should all look at?

BARR:
Yes.

GRAHAM:

Okay. Do you expect to change your mind about the bottom line conclusions of the Mueller report?

BARR:
No.

GRAHAM:
Do you know Bob Mueller?

BARR:
Yes.

GRAHAM:
Do you trust him?

BARR:
Yes.

GRAHAM:

How long have you known him?

BARR:

30 years, roughly

GRAHAM:

Do you think he had the time he needed?

BARR:

Yes.

GRAHAM:

Do you think he had the money he needed?

BARR:

Yes.

GRAHAM:

Do you think he had the resources he needed?

BARR:

Yes.

GRAHAM:

Do you think he did a thorough job?

BARR:

Yes, and I--I think he feels he did a thorough job and--and had adequate evidence to make the calls.

GRAHAM:

Do you think the president's campaign in 2016 was thoroughly looked at in terms of whether or not they colluded with the Russians?

BARR:

Yes.

GRAHAM:

And the answer is no, according to Bob Mueller?

BARR:

That's right.

GRAHAM:

He couldn't decide about obstruction. You did, is that correct?

BARR:

That's right.

GRAHAM:

Do you feel good about your decision?

BARR:

Absolutely.

GRAHAM:

Thank you very much. (OFF-MIC)

FEINSTEIN:

(OFF-MIC) chairman--Mr. Attorney General, the special counsel's report describes how the president directed White House counsel, Don McGahn, to fire Special Counsel Mueller and later told McGahn to write a letter, quote, for our records, end quote, stating that the president had not ordered him to fire Mueller. The report also recounts how the president made repeated efforts to get McGahn to change his story. Knowing that McGahn believed the president's version of events was false, the special counsel found, and I quote, substantial evidence, end quote, that the president tried to change McGahn's account in order to prevent further scrutiny of the president towards the investigation. Special counsel also found that McGahn is a credible witness with no motive to lie or exaggerate given the position he held in the White House. Here's the question. Does existing law prohibit efforts to get a witness to lie to say something the witness believes is false?

BARR:

Yes. Lie to the government, yes.

FEINSTEIN:

And what law is that?

BARR:

Obstruction statutes.

FEINSTEIN:

The obstruction statute. And you don't have it, I guess, before you?

BARR:

I'm not sure which--which one they were referring to here. It was probably 15.12 (c)2 (PH).

FEINSTEIN:

So these things, in effect, constitute obstruction?

BARR:

Well, you're talking in general terms. You're not talking--

FEINSTEIN:

What--I'm talking about specifically--yes, you're correct in a sense that substantial--the special counsel in his report found substantial evidence that the president tried to change McGahn's account in order to prevent--and this is a quote--further scrutiny of the president towards the investigation, end quote. Special counsel also found McGahn is a credible witness with no motive to lie or exaggerate. So what I'm asking you then, is that a credible charge under the obstruction statute?

BARR:

We--we felt that--we felt that that episode the government would not be able to establish obstruction. The--if you go back and you--if you look at the--the episode where McGahn-- the president gave McGahn an obstruction--an instruction--McGahn's version of that is quite clear in each time he gave it, which is that the instruction said go to Rosenstein, raise the issue of conflict of interest, and Mueller has to go because of this conflict of interest. So there's no question that that--that the--whatever instruction was given McGahn had to do with conflict of--Mueller's conflict of interest. Now the president later said that what he meant was that the conflict of interest should be raised with Rosenstein, but the decision should be left with Rosenstein.

On the other end of the spectrum it appears that McGahn felt it was more directive and that the president was essentially saying push Rosenstein to invoke a--a conflict of interest to push Mueller out. Wherever it fell on that spectrum of interest, the New York Times story was very different. The New York Times story said flat out that the president directed the firing of Mueller. He told McGahn, fire Mueller. Now that--there's something very different between firing a special counsel outright, which suggests ending the investigation and

having a special counsel removed for conflict, which suggests that you're going to have another special counsel. So the fact is that even under McGahn's--and then as the report says and recognizes, there is evidence the president truly felt that the Times article was inaccurate and he wanted McGahn to correct it. So we believe that it would be impossible for the government to establish beyond a reasonable doubt that the president understood that he was instructing McGahn

to say something false because it wasn't necessarily false. Moreover, McGahn had, weeks before, already given testimony to the--to the special counsel, and the president was aware of that. And as the report indicates, it could also have been the case that what he--that he was primarily concerned about press reports and making it clear that he never outright directed the firing of Mueller.

So in term--so in terms of the request to ask McGahn to memorialize that fact, we do not think in this case that the government could show corrupt intent beyond a reasonable doubt.

FEINSTEIN:
Just to finish this, but you still have a situation where a president essentially tries to change the lawyer's account in order to prevent further criticism of himself.

BARR:
Well, that's not a crime.

FEINSTEIN:
So you can, in this situation, instruct someone to lie?

BARR:
No, it has to be--well, to be obstruction of justice the lie has to be tied to impairing the evidence in a particular proceeding. McGahn had already given his evidence, and I think--I think it would be plausible that the purpose of McGahn memorializing what the president was asking was to make the record that the president never directed him to fire--and there is

a distinction between saying to someone, go fire him, go fire Mueller, and saying have him removed based on conflict.

FEINSTEIN:

And what would--

BARR:

They have different results.

FEINSTEIN:

What would that conflict be?

BARR:

Well, the difference between them is if you remove someone for a conflict of interest, then there would be another--presumably another person appointed.

FEINSTEIN:

Yeah, but wouldn't you have to have it in this kind of situation an identifiable conflict that made sense, or else doesn't it just become a fabrication?

BARR:

Well, this--now we're going to shift from the issue of writing the memo or somehow putting out a release later on and the issue of the actual direction to McGahn. So the question on the direction to McGahn has a number of different levels to it. And first, as a matter of law, I think the department's position would be that the president can direct the termination or the replacement of a special counsel. And as a matter of law, the obstruction statute does not reach that conduct. Putting that aside, the next question would be, even if it reached the conduct could you here establish corrupt intent beyond a reasonable doubt? What makes this case very interesting is that when you take away the fact that there were no underlying

criminal conduct, and you take away the fact that there was no inherently malign obstructive act, that is the president was carrying out his constitutional duties, the question is what is the impact of taking away the underlying crime?

And it's not--the report suggests that one impact is well, we have to find some other reason why the president would obstruct the investigation. But there's another impact, which is if the president is being falsely accused, which the evidence now suggests that the accusations against him were false--if he--and he knew they were false--and he felt that this investigation was unfair, propelled by his political opponents and was hampering his ability to govern, that is not a corrupt motive for replacing an independent counsel. So that's another--another reason that, you know, we would say that the government would have difficulty proving this beyond a reasonable doubt.

FEINSTEIN:
My time is--thanks.

GRAHAM:
Senator Grassley.

GRASSLEY:
Senator Johnson and I wrote you about text messages between Peter Strzok and Lisa Page that appeared to show the FBI may have tried to use counter intelligence briefings for the Trump transition team as intelligence gathering operations. I hope you will commit to answering the letter in writing but also providing committees the requested briefing. That is my question.

BARR:
Yes, senator.

GRASSLEY:

Have you already task any staff to look into whether spying by the FBI and other agencies on the Trump campaign was properly predicated and can Congress expect a formal report on your findings?

BARR:

Yes, I do have people in the department helping me review the activities over the summer of 2016.

GRASSLEY:

I suppose it depends on which conclusions you come to but is there any reason why Congress wouldn't be briefed on your conclusions?

BARR:

It's a little early for me to commit completely but I envision some kind of a reporting at the end of this.

GRASSLEY:

The Clinton campaign and the Democratic National Committee hired Fusion GPS to do opposition research against candidate Trump. Fusion GPS then hired Christopher Steele former British intelligence officer to compile what we all know is the Steele dossier. That reportedly used Russian government sources for information. The Steele dossier was central to the now debunked collusion narrative.

Now here's the irony. The Mueller report spent millions investigating and found no collusion between Trump campaign and Russia but the Democrats paid for a document created by a foreign national with reported foreign government sources, not Trump but the Democrats. That's the definition of collusion.

Despite the central status of the steel dossier to the collusion narrative the Mueller report failed to analyze whether the dossier was filled with disinformation to mislead U.S. intelligence agencies and the FBI. My question Mueller spent over two years, $30 million

investigating Russian interference in the election. In order for a full accounting of Russian interference attempts show that the special counsel have considered on whether the Steele dossier was part of a Russian disinformation and interference campaign?

BARR:
I--I don't--Special Counselor Mueller has put out his report and I have not yet that anyone go through the full scope of his investigation to determine whether he did address or look at all into those issues. One of the things I am doing in my review is to try to assemble all of the existing information out there about it, not only from Hill investigations and the OIG but also to see what the special counsel looked into. So I really couldn't say what he actually looked into.

GRASSLEY:
But--but you think in other words if you had looked at all of that information right now you are telling me you could have said yes or no to my question?

BARR:
If I had looked at it.

GRASSLEY:
Yeah, and you are going to--you are going to attempt--

BARR:
Yes.

GRASSLEY:
--to find some of this information if it is available?

BARR:

Yes. Yes.

GRASSLEY:

Similarly should and the special counsel have looked into the origins of the FBI's investigation into alleged collusion between the Trump campaign and Russia?

BARR:

The--the origins of that narrative?

GRASSLEY:

Yes.

BARR:

I don't know if he viewed his charter that broadly and I don't know whether he did or not. That is something that I am reviewing and again we will look at whatever this special counsel has developed on that.

GRASSLEY:

In volume 2 of the report the special counsel declined to make a traditional prosecutorial decision. Instead the special counsel laid out 200 or so pages relating to a potential obstruction analysis and then dump that on your desk. In your press conference you said that you ask me special counsel whether he would have made a charging decision or recommended charges on obstruction but for the Office of Legal Counsel's opinion on charging sitting presidents and that the special counsel made clear that was not the case.

So Mr. Barr is that an accurate description in your conversation with the special counsel?

BARR:

Yes, he--he reiterated several times in--in a group meeting that he--he was not saying that but for the OLC opinion he would have found obstruction.

GRASSLEY:

If the special counsel found facts sufficient to constitute obstruction of justice would he have stated that finding?

BARR:

If--if he had found that I think he would state it, yes.

GRASSLEY:

Was it Special Counsel Mueller's responsibility to make a charging recommendation?

BARR:

I think the deputy attorney general and I thought it was. But--but--but not just charging but to--to determine whether or not conduct was criminal. The president would--would be charged--could not be charged as long as he was in office.

GRASSLEY:

Do you agree with the reasons that he offered for not making a decision in volume 2 of his report? And why or why not?

BARR:

I'm not really sure of his reasoning. I--I really could not recapitulate his analysis which is one of the reasons in my March 24 letter I simply stated the fact that he did not reach a conclusion, did--didn't try to put words in his mouth. I think that if he felt that he shouldn't go down the path of making a traditional prosecutive decision then he shouldn't have investigated. That was the time to pull up.

GRASSLEY:

Okay. There have been a number of leaks coming out of the Justice Department/FBI during high profile investigations. The inspector general found that during the department's

investigation of Hillary Clinton for mishandling highly classified information there was a culture of unauthorized media contacts. During the Russia investigation the leaks continued. Leaks undermine the ability of investigators to investigate. Further, leaks to the papers all congresses questions to the department go unanswered is unacceptable. Why-- what are you doing to investigate unauthorized media contacts by the department and FBI officials during the Russia investigation?

BARR:
We have multiple criminal leak investigations underway.

GRASSLEY:
Thank you.

GRAHAM:
Senator Leahy?

LEAHY:
Thank you, attorney general. I'm somewhat troubled by your--your testimony here and in the other body. He appeared before the House appropriations on April 9th. You are asked about media reports and portrayed the special counsel's team as frustrated at your that your March 24 letter didn't adequately portray the report's findings.

When the congressman, I believe this was Congressman Chris, asked if you knew with those members of the special council's team were concerned about, you testified in response "No, I don't." You then said you merely suspected they would have preferred more information was released with the letter. Now we know that, contrary to what you said April 9th that on March 27th, Robert Muller wrote to you expressing very specific concerns that your March 24th letter, remember you were testifying on April 9th, that your March 24th letter failed to capture the, to quote Mr. Mueller, "The context, nature, and substance" of his report.

And I--what really struck me, Mr. Mueller wrote that your letter threatened to undermine a central purpose for which the department appointed the special counsel, ensure full public confidence in the outcome of the investigation. Why did you testify on April 9 that you didn't know the concerns being expressed by Mueller's team when in fact you'd heard those concerns directly from Mr. Mueller two weeks before?

BARR:

Well as I said, I talked directly to--to Bob Mueller about his letter to me and--and specifically asked him what exactly are your concerns. Are you saying that the March 24th letter was misleading or inaccurate or what? He indicated that it was not. He was not saying that and that what he was concerned about--

LEAHY:

--That wasn't my question.

BARR:

Well, I'm--I'm getting to the question, which is the question from Chris was reports have emerged recently, press reports, that members of the special counsel's team are--are frustrated at some level with the limited information included in your March 24th letter and that they don't adequately or accurately portray the report's findings. I don't know what members he's talking about, I don't--and I--and I certainly am not aware of any challenge--

LEAHY:

--But still not my question--

BARR:

--to the accuracy of the findings.

LEAHY:

Mr. Barr, you seem to have learned the filibuster rules even better than senators do. My question was why did you say you were not aware of concerns, when weeks before your testimony Mr. Mueller had expressed concerns to you? I mean, that's a fairly simple--

BARR:

--Well, I answered the question and the question was relating to unidentified members who were expressing frustration over the accuracy relating to findings. I don't know what that refers to at all. I talked directly to Bob Mueller, not members of his team. And even though I didn't know what was being referred to and had--and--and Mueller had never told me that my--that the expression of--of the findings was inaccurate, but I did then volunteer that I thought they were talking about the desire to have more information put out. But it wasn't my purpose to put out more information.

LEAHY:

Mr. Barr your--I feel your answer was purposefully misleading and I think others do too. Let me ask you another one. You said the president is fully cooperating with investigation, but his attorney had told a defendant he'd be taking care of if he didn't cooperate with the investigation. Is there a conflict in that?

BARR:

I'm sorry, could you just repeat that?

LEAHY:

Both Mr. Manafort and Mr. Cohen were told by Trump's personal attorney they be taken care of if they did not cooperate. You said that the president was fully cooperating. Is there a conflict there? Yes or no?

BARR:

No.

LEAHY:

You think it is fully cooperating to instruct a former aide to tell the attorney general to un-recuse himself, shut down the investigation, and declare the president did nothing wrong?

BARR:

I don't think, well obviously, since I didn't find it was obstruction, I felt that the evidence could not support an obstruction.

LEAHY:

I'm asking is that fully cooperating. I'm not asking if that is obstruction. Is that fully cooperating?

BARR:

Yeah, he fully cooperated.

LEAHY:

So by instructing a former aide to tell the attorney general to un-recuse himself, shut down the investigation, and declare the president did nothing wrong, that's fully cooperating?

BARR:

Where is that in the report?

LEAHY:

That is on volume 2 page 5 on June 19, 2017. The president dictated a message for Lewandowski to deliver to Sessions a message that said that Sessions should publicly announce the notwithstanding his recusal from the Russia investigation. The investigation is very unfair to the president and the president has done nothing wrong.

BARR:

Right.

LEAHY:

Is that cooperating?

BARR:

Well firstly, asking sessions to un-recuse himself, I--we do not think is obstruction.

LEAHY:

And to declare the president did nothing wrong? I'm not asking you if it's obstruction. Is it cooperating?

BARR:

Well, I don't--I don't know if that declares the president did nothing wrong, although the president in terms of collusion did nothing wrong. Isn't that correct?

LEAHY:

Collusion is not a crime. It's the obstructing. But is that fully cooperating to--to say that?

BARR:

Well, I don't see any conflict between that and fully cooperating with the investigation.

LEAHY:

The president of course declared many times publicly in tweets and at campaign rallies and all that he would testify. He never did testify, correct?

BARR:

As far as I know.

LEAHY:

I think you know whether he testified or not.

BARR:

As far as I know, he didn't testify.

LEAHY:

And Mr. Mueller found the written answers to be inadequate. Is that correct?

BARR:

I think he wanted additional, but he never sought it.

LEAHY:

And the president never testified.

BARR:

Well, he never--he never pushed it.

LEAHY:

The president never testified. Does the fact that Mr. Mueller found the Trump campaign was receptive to some of the offers of assistance from Russia or the fact that the Trump campaign that never reported any of this to the FBI, does that trouble you?

BARR:

What would the report to the FBI?

LEAHY:

That they were receptive to offers of assistance from Russia.

BARR:

What do you mean by receptive? I think the report says--you know, obviously--

LEAHY:

--Well the report--

BARR:

--obviously they were--they were expecting to benefit from whatever the Russians--

LEAHY:

--page 173. The volume 1 report says in sum, the investigation has established multiple links between Trump campaign officials and individuals tied to the Russian government. Those links included Russian offers of assistance to the campaign, and in some instances the campaign was receptive to the offers, whereas others they were not.

BARR:

Well I00

LEAHY:

--That doesn't bother you at all?

BARR:

Well, I have to--understand exactly what that refers to, what--what communications I referred to.

LEAHY:

Well, you have the report, I just gave you the page from the report and I--I know my time is up. I'm making the chairman nervous.

GRAHAM:

No, just very well done. Senator Cornyn?

CORNYN:

General Barr, the chairman has pointed out that after the Hillary Clinton email investigation there were a number of and Mr. Comey's press conference, I think it was July 5 roughly 2016 there are a number of prominent Democratic members of the Senate who said that Comey should be--should resign or be fired.

I believe you said that you have concluded as a matter of law that the president is the head of the Executive Branch of government has a right to fire Executive Branch employees. Is that correct?

BARR:

That's right.

CORNYN:

In this case the president was relying at least in part on a recommendation by the Deputy Attorney General Rod Rosenstein arising out of Rod Rosenstein's critique of Mr. Comey's conduct in holding that press conference, releasing derogatory information about Sec. Clinton but then announcing that no reasonable prosecutor would bring charges against her. Is that right?

BARR:

That's right.

CORNYN:

You started your career I believe in the intelligence community and then moved on of course to the Department of Justice and thank you for agreeing to serve again as attorney general and help restore the department's reputation as an impartial arbiter of the law and not as a political arm of any administration. I think that's very, very important that you and Director Wray continue your efforts in that regard and I am grateful to you for that.

BARR:
Thank you.

CORNYN:
But I do believe that we need to ask the question why didn't the Obama administration do more as early as 2014 in investigating Russian efforts to prepare to undermine and so dissension in the 2016 election? Mr. Mueller's report does document that the Russian government through the intelligence--through their intelligence agencies and their Internet research or IRA I think it's called begin as early as 2014 began their efforts to do so and we know they met with some success.

Is it any surprise to you based on your experience that the Russians would try to do everything they can to so dissension in American political life including in our elections?

BARR:
No, not at all. I mean I think the--the Internet creates a lot more opportunities to--to have--you know to have that kind of covert effect on American body politics. So it is getting more and more dangerous. But the Russians have been at this for a long time in various different ways.

But the point you made about Bob Mueller's efforts on IRA that is one of the things that struck me about the report. I think it's very impressive work that they did in moving quickly to get into the--to get into the IRA and also the GRU folks and I was thinking to myself if that had been done in 2000--you know starting in the beginning of 2016 we would have been a lot further along.

CORNYN:

For example we have heard a lot about the Steele dossier. Mr. Steele of course is a former British intelligence officer hired by--to do opposition research by the Hillary Clinton campaign on her political adversaries including President Trump or Candidate Trump at that time. How do we know that the Steele dossier is not itself evidence of Russian disinformation campaign knowing what we know now that basically the allegations made therein were secondhand, hearsay or unverified? Can you state with confidence that the Russian--that the Steele dossier was not part of the Russian disinformation campaign?

BARR:

No, I can't state that with confidence and that is one of the areas that I am reviewing. I am concerned about it and--and I don't think it is entirely speculative.

CORNYN:

Well, we know that from published reports that the head of the CIA, Mr. Brennan went to President Obama and brought his concerns about initial indications with Russian involvement in the campaign as early as the late of July--late July 2016 and instead of doing more during the Obama administration to look into that and disrupt and deter Russian activities that threaten the validity and integrity of our campaign in 2016 it appears to me that the Obama administration, Justice Department and FBI decided to place their bets on Hillary Clinton and focus their efforts on investigating the Trump campaign. But as you have pointed out thanks to the general--thanks to the Special Counsel we now have confidence that no Americans colluded with the Russians in their effort to undermine the American people.

We now need to know and I am glad to hear what you are telling us about your inquiries and your research and your investigation. We now need to know what steps the Obama FBI Department of Justice and intelligence community, what steps they took to undermine the political process and put a thumb on the scale in favor of one political candidate over the other and that would be before and after the 2016 election.

What's a defensive briefing that--in a counter intelligence investigation?

BARR:

Well, you could have different kinds of defensive briefings. If--if you learn that somebody is being targeted by hostile intelligence service then one form of a defensive briefing is to go and to alert that person to the risk.

CORNYN:

I think Attorney General Lynch has said that it is routine in counter intelligence investigations. Would you agree with her?

BARR:

Yes.

CORNYN:

Do you know whether a defensive briefing was ever given to the Trump campaign by the FBI based on their counterintelligence investigation? Did they ever tell the President before he was--January 2017 what the Russians were trying to do and advise him to tell people affiliated with his campaign to be on--on their guard and be vigilant about Russian efforts to undermine public confidence in the election?

BARR:

My understanding is that didn't happen.

CORNYN:

That would be--that failure to provide a defensive briefing to the Trump campaign that would be an extraordinary or notable failure. Would you agree?

BARR:

I think under the circumstances one of the things that I can't fathom why--why it did not happen. If you are concerned about interference in the election and you have substantial people involved in the campaign who are former U.S. attorneys, you had three former U.S. attorneys there in the campaign I--I don't know why the bureau would not have gone and--and given a defensive briefing.

CORNYN:
Thank you.

GRAHAM:
Senator Durbin.

DURBIN:
Thanks, Mr. Chairman. Thanks, General Barr. I've been listening carefully to my Republican colleagues on the other side. It appears that they are going to work together and coordinate the so-called lock her up defense. This is really not supposed to be about the Mueller investigation, the Russian involvement in the election, the Trump campaign and so forth; it is really about Hillary Clinton's emails. Finally, we get down to the bottom line. Hillary Clinton's emails, questions have to be asked about Benghazi along the way, what about Travel-gate, Whitewater? There's a lot of material we should be going through today according to their response to this. That is totally unresponsive to the reality of what the American people want to know. They paid a lot of money, $25 million, for this report. I respect Mr. Mueller and believe he came up with a sound report, though I don't agree with all of it. But I find, General Barr, that some of the things that you've engaged in really leave me wondering what you believe your role as attorney general is when it comes to something like this.

Listen to what--since it's put in the record, let me read it. Listen to what you received in a letter on March 27 from Bob Mueller. The summary letter the department sent to Congress and released to the public late in the afternoon March 24 did not fully capture the context,

nature and substance of the office's work and conclusions. We communicated that concern to the department on the morning of March 25. There is no public confusion about critical aspects of the results of our investigation. This threatens to undermine the central purpose for which the department appointed the special counsel, to assure full public confidence in the outcome of the investigations. I cannot imagine that you received that letter on March 24 and could not answer Congressman Crist directly when he asked you whether there were concerns about representations being made on these findings by the people working for Bob Mueller. You said no, I don't know, after you received this letter. What am I missing?

BARR:

Well, as I explained to--as I explained to Senator Leahy, I talked directly to Bob, and Bob told me that he did not have objections to the accuracy--

DURBIN:

Attorneys don't put things in writing unless they're pretty serious about them. There's an old rule in politics. A good politician doesn't write a letter and doesn't throw one away.

BARR:

Okay.

DURBIN:

So I've got to ask you, if he puts it in writing, if his concerns of your representations on March 24, you couldn't recall that when Congressman Crist asked you that question a few days later?

BARR:

No, I'm saying that this was--the--the--the March 24 letter stated that Bob Mueller did not reach a conclusion on obstruction, and it had the language in there about not exonerating the president. My view of events was that there was a lot of criticism of the special counsel

for the ensuing few days, and on Thursday I got this letter. And when I talked to the special counsel about the letter, my understanding was his concern was not the accuracy of the statement of the findings in my letter, but that he wanted more out there to provide additional context to explain his reasoning on why he didn't reach a decision on obstruction.

DURBIN:

I'll just say this, Mr. Barr. If you received a letter from Bob Mueller a few days after your March 24 letter, it was clear he had some genuine concerns about what you had said and done to that point. Can we move to another topic?

BARR:

Yeah, his concern was he wanted more out. And I would analogize it to this. My--you know, after a, you know, months long trial if I wanted to go out and get out to the public what the verdict was pending preparation of the full transcript--and I'm out there saying here's the verdict, and the prosecutor comes up and taps me on the shoulder and says well, the verdict doesn't really fully capture all my work. How about that great, you know, cross-examination I did, or how about that third day of trial where I did that? This doesn't capture everything. My answer to that is I'm not trying to capture everything. I'm just trying to state the verdict.

DURBIN:

No, you just absolutely used the word summarize, though, in your letter.

BARR:

Summarize the principal conclusions.

DURBIN:

Principal conclusions, which most people would view as a summary, but let me move to another topic if I can for a minute. The Office of Legal Counsel's decision as to whether or not you can prosecute a sitting president, you had some pretty strong feelings of that, and

they were reflected in your volunteered memo to the Trump defense team, your 19-page memo.

BARR:

Did I--did I discuss that?

DURBIN:

You certainly discussed whether or not a president should cooperate with an investigation. You said at one point in--in summarizing the findings of Mueller that the White House fully cooperated. We know for a fact, and you've stated already, the president never submitted himself to what was characterized as a vital interview, an actual sit-down interview under oath, not once, and that his questions that were answered, some 30 times his memory failed him. So to say the White House fully cooperated that I think is a general--generous conclusion.

On this Office of Legal Counsel, I would refer you to this volume 2 of the Mueller report. And on page 1 he talks about the whole issue of whether or not he was in any way restricted and what he could conclude because of the opin--or the outstanding Office of Legal Counsel opinion on the liability of a sitting president. You dismissed that in your opening statement and said we asked him two or three times, he said that had nothing to do with it. Well how do you explain on the first page of volume 2 that he says it had a lot to do with it? It's the reason he couldn't reach a binary conclusion on obstruction of justice.

BARR:

Well, no, it was a prudential reason. One of the backdrop factors that he cited as influencing his prudential judgment that he should not reach a decision, which is different than citing the OLC--saying that but for the OLC opinion, I would indict.

DURBIN:

I'm just going to stand by what he has written. And I ask others to read it as well.

The last point I want to make is about Don McGahn. If you read the section here hundred and--pages 113 to 120, on Don McGahn's experience, the president wanted him to state publicly that the New York Times article was untrue, that he had not asked McGahn to fire the special counsel. McGahn refused, and there is some speculation as to whether he risked being dismissed or even resigning over this issue. And for you to suggest that this was some sort of a kabuki dance with Rob Rosenstein, I think the president's intent here was very clear. He wanted this to end. He told Lester Holt, going back to the issue that was raised by the chairman earlier here, the reason to get rid of Comey is because the Russian investigation. I mean, over and over again this president was very explicit, and certainly is very expository in his style. So I don't unders--let me ask you this in conclusion. My time is up. Do you have any objections? Can you think of an objection of why Don McGahn shouldn't come and testify before this

committee about his experience?


BARR:
Yes, I mean I think that he's--he's a close advisor to the president.


DURBIN:
Never.


BARR:
And the president--


DURBIN:
Never exerted executive privilege?


BARR:
Excuse me?

DURBIN:

You may have already waived his--

BARR:

No, we haven't waived the executive privilege.

DURBIN:

Well, at this point do you believe--you're saying Don--what about Bob Mueller? Should he be allowed to testify before this sub--?

BARR:

I've already said publicly I have no objection to him testifying.

DURBIN:

And Don McGahn, should he be allowed to testify?

BARR:

Well, that's a call for the president to make.

DURBIN:

Well, he's a private citizen at this point as I understand it.

BARR:

Well, I assume he'd be testifying about privileged matters.

DURBIN:

Well, I--I would hope that we could get to the bottom of this with actual testimony of witnesses after we've taken another close look to Hillary Clinton's emails. Thank you.

GRAHAM:
Senator Lee?


LEE:

In his classic dissent in Morrison v. Olson, Justice Scalia remarked that nothing is so politically effective as the ability to charge that one's opponent and his associates are not really wrongheaded, naive and ineffective but in all probability crooks and nothing so effectively gives an appearance of validity to such charges as a Justice Department investigation.

That observation has I think been borne out time and time again over the past two years. Time and time again the president's political adversaries have exploited the Mueller probe, it's mere existence to spread baseless innuendo in an effort to undermine the legitimacy of the 2016 election and the effectiveness of this administration.

For example on January 25, 2019, Speaker Nancy Pelosi asked what does Putin have on the president politically, personally or financially? Mr. Attorney General is there any evidence to suggest that Vladimir Putin quote unquote has something on President Trump?


BARR:
None that I am aware of.


LEE:

on February 20, 2019 former FBI Deputy Director Andrew McCabe said on national television to the entire nation that he thinks it's possible that Donald Trump is a Russian agent. Mr. Attorney General, is there any evidence that you are aware of that suggest even remotely that President Trump is a Russian agent?


BARR:
None that I am aware of.

LEE:

Representative Eric Swalwell has repeatedly claimed that Donald Trump quote "acts on Russia's behalf." Attorney General Barr is there anything you are aware of to back that up by way of evidence? The President acts on Russia's behalf?

BARR:

None that I am aware of.

LEE:

So basically, we have heard over and over again on national TV, in committee hearings, on the House and Senate floor and in the media we have heard about the president's alleged collusion with Russia. But what we have heard is baseless as any conspiracy theory that we have seen in politics, any that I can think of. The only difference here is that the purveyors of this conspiracy were in many cases prominent members of the opposition party. That's concerning.

Now from the beginning there were some indications that the Russia investigation was perhaps not always conducted with the absolute impartiality that the American people should expect and have come to hope--to find in existence within the department of justice especially given that the track record of excellence that the U.S. Department of Justice has shown. According to the Mueller report itself the investigation into the Trump campaign began on July 31, 2016 after a foreign government contacted the FBI of about comments made by George (INAUDIBLE). Is that accurate or--or were there other precipitating events that helped lead to this?

BARR:

That is--that is the account that has been given in the past as to how it got going.

LEE:

You have previously said that you think it's possible that the Federal Bureau of Investigation improperly spied on the Trump campaign. I assume that's a reference to the (INAUDIBLE) warrant for Carter Page. Is that what you have in mind or are there other circumstances that you've got in mind there?

BARR:

One of the things I want to look--there are people--many people seem to assume that the only intelligence collection that occurred was a single confidential informant and a (INAUDIBLE) warrant. I would like to find out whether that is in fact true. It strikes me as a fairly anemic effort if that was the counterintelligence effort designed to stop the threat as it's being represented.

LEE:

Was Carter Page under surveillance during his time working for the Trump campaign which was roughly January 2016 to September 2016?

BARR:

I don't know.

LEE:

Was any other Trump campaign official under surveillance during that time. To your knowledge?

BARR:

Well, these are the things that I--I need to look at and I have to say that as I said before the extent that there was any overreach, I believe it was some--a few people in the upper echelons of--of the bureau and perhaps the department. But those people are no longer there and I am working closely with Chris Wray who I think has done a superb job at the bureau and we are working together on trying to reconstruct exactly what went down.

One people should know is that the bureau itself has been a little bit handicapped in looking back because of the pending Mueller investigation and the OIG investigation.

LEE:
As we know the (INAUDIBLE) warrant for Carter Page was based largely on the so-called Steele dossier and in particular on two specific facts about pages trip to Moscow to deliver a speech in July 2016. First, according to the warrant page had a secret meeting with Igor Session(SP) the President of (INAUDIBLE). Does the Mueller report confirmed that page met with Session(SP)?

BARR:
Met with who?

LEE:
With--with Mr. Session (SP), with Igor--

BARR:
I can't--I can't recall. I don't remember that. Let me just say that I want to stay away from getting too deeply into the (INAUDIBLE) issue because that is currently under investigation by the OIG.

LEE:
Understood. Second and more importantly the warrant also says that page met with Igor(SP) in order to discuss what is referred to as (INAUDIBLE) involving Hillary Clinton, against Hillary Clinton. Does the Mueller report confirmed that page met with (INAUDIBLE)?

BARR:
I don't think so.

LEE:

Does it confirm that page discussed (INAUDIBLE) on Hillary Clinton with anyone?

BARR:

Not that I recall.

LEE:

Since the main evidentiary area support for the warrant has been discussed by the Mueller report which is sort of the gold standard of what we are discussing here I am glad that you are looking into it. I would encourage you to look into why the FBI relied on this false information and--and I hope you will share the results. The public obviously has a right to know what happened here. The U.S. Department of Justice, the Federal Bureau of Investigation have a long history and a long history of success that has been based on respect. They deserve to understand that there is not so much power that has been concentrated in that one agency, that the outcome of an investigation can depend on the whims of who might be assigned to it. They have a right not to believe that a particular investigation might be (INAUDIBLE), might not be tarmac, might not be influenced by an improper consideration, politically or otherwise. Thank you, Mr. Attorney General.

GRAHAM:

Senator Whitehouse, I am told we are going to have two votes beginning at 11:45. We will do Senator Whitehouse and why don't we just come back an hour later. We will break--break for an hour and do the votes.

GRAHAM:

Senator Whitehouse.

WHITEHOUSE:

Thank you, chairman. Attorney general, you had a conversation with Chairman Graham earlier this morning, which you described the importance of, to use Chairman Graham's words, hardening our electoral infrastructure against foreign election interference. I ask you, is anonymous election funding in avenue for possible foreign election influence and in interference?

BARR:
Yes.

WHITEHOUSE:
Let's turn to the March 27th letter, which you received and read, March 28, the Mueller letter. Correct?

BARR:
Yes.

WHITEHOUSE:
When did you have the conversation with Bob Mueller about that letter that you referenced?

BARR:
I think it was on the 28th.

WHITEHOUSE:
The same day that you read it. When did you first learn of the New York Times and Washington Post stories that would make the existence of this letter public, the ones that came out last night?

BARR:
I think it could've been yesterday, but I'm not sure.

WHITEHOUSE:

When they contacted you to ask for any comment?


BARR:

They didn't contact me.


WHITEHOUSE:

Contacted DOJ to ask for any comment?


BARR:

I can't actually remember how it came up, but someone mentioned it.


WHITEHOUSE:

So you--at some point, you knew that the Mueller letter was going to become public and that was probably yesterday?


BARR:

I think so.


WHITEHOUSE:

Okay. When did you decide to make that letter available to us and Congress?


BARR:

This morning.


WHITEHOUSE:

Would you concede that you had an opportunity to make this letter public on April 4th when representative Chris asked you a very related question?

BARR:

I don't know what you mean by a related question. It seems to me to be a very different question.

WHITEHOUSE:

I can't even follow that down the road. That, I mean--boy. That's some masterful hairsplitting. The letter references enclosed documents and enclosed materials, right? Are those the same things as what you called the executive summaries that Mueller provided you?

BARR:

With this letter?

WHITEHOUSE:

Yes.

BARR:

Yes.

WHITEHOUSE:

It's all the same document.

BARR:

I'm sorry, what's all the same?

WHITEHOUSE:

When you talk about the executive summaries that Mueller provided you, they are the documents that were the enclosed documents with that letter, which we have not been

provided.

BARR:

I think they were.

WHITEHOUSE:

The--

BARR:

--You have been provided them. They are in the report. The summary is in the report.

WHITEHOUSE:

Is the language of the report in the report? There is nothing else that he provided you, then?

BARR:

I think that's what he provided.

WHITEHOUSE:

Okay. If there is anything else, will you provide it to us if it's different in any form? It's odd to be given a letter without the attachments to it when the attachments are referenced in the letter.

BARR:

I think they--I think they were redacted versions of the--

WHITEHOUSE:

--Can we get that--

BARR:

--executive summaries that are embedded in the report.

WHITEHOUSE:

Can we get that, just to be sure?

BARR:

Sure.

WHITEHOUSE:

Great. Thank you. You agreed that none of that material was either grand jury 6 (e) or presented a risk to intelligence sources and methods or would interfere compromise ongoing investigation--

BARR:

--I think the--

WHITEHOUSE:

--Or affected--were affected by executive privilege?

BARR:

There were reductions made in the executive summaries.

WHITEHOUSE:

The--

BARR:

--But as I said, I'm not--I wasn't interested in putting out summaries.

WHITEHOUSE:

Well, you know--

BARR:

--and frankly--

WHITEHOUSE:

--this is another hairsplitting exercise because Bob Mueller, who I think we all agree is fairly credible, actually described your letter as a summary. So you can say it wasn't a summary, but Mueller said it was a summary and I don't think--

BARR:

--I wasn't--I wasn't interested in summarizing the whole report. As I say, I was stating the bottom-line conclusions of the report.

WHITEHOUSE:

Your letter itself says--

BARR:

--And I--and I--

WHITEHOUSE:

--that it's intended to describe, I quote your words, describe the report.

BARR:

Yeah, describe the report meaning volume 1 (INAUDIBLE)--

WHITEHOUSE:

--When you describe the report in 4 pages and it's a 400 page report, I don't know why you are caviling about whether it's a summary or not.

BARR:

Because I state in the letter that I'm stating the--the principal conclusions. Let me also say that, you know, Bob Mueller is the equivalent of a U.S. attorney. He was exercising the powers of the attorney general subject to the supervision of the attorney general. He's part of the Department of Justice. His work concluded when he sent his report to the attorney general At that point, it was my baby and I was making a decision as to whether or not to make it public and I effectively overrode the regulations, used discretion to lean as far forward as I could to make that public and it was my decision how and when to make it public, not Bob Mueller's.

WHITEHOUSE:

With respect to the OLC opinion that informed Bob Mueller's decision as he describes in the report, do you agree that that is merely an executive opinion and that under our Constitution the decision as to what the law is is made by the Judicial Branch of the United States government?

BARR:

I'm sorry could you--

WHITEHOUSE:

--With respect to the OLC opinion that informed Mueller's decision not to make a recommendation on obstruction as he said in his report, do you concede that that is an executive opinion and that under our constitutional system what the law is gets decided by the Judicial Branch of government?

BARR:

Yes.

WHITEHOUSE:

Is there any way for the OLC's opinion to be tested by the Judicial Branch of government to see if it's correct or not?

BARR:

None that comes to mind.

WHITEHOUSE:

And it could be wrong, could it not?

BARR:

I guess I hypothetically it could be wrong.

WHITEHOUSE:

And certainly there are--

BARR:

--OLC usually gets it right--

WHITEHOUSE:

--Respected legal minds that disagree with that, correct?

BARR:

Excuse me?

WHITEHOUSE:

There are many respected legal commentators and professors and lawyers who disagree with that, correct?

BARR:

It's very hard to find lawyers that agree to any--on--on anything.

WHITEHOUSE:

So the interesting thing to me is that it goes on to say that because of the OLC opinion, we have to give the president an extra benefit of the doubt because he has denied his date in court where he could exonerate himself. That seems like a fallacy to me because if you are the president of the United States, you can either waive or readily override the OLC opinion and say I'm ready to go to trial. I want to exonerate myself, let's go, could you not?

BARR:

How is this relevant to my decisions?

WHITEHOUSE:

It's relevant--

BARR:

--because I--I assume that there was no OLC opinion.

WHITEHOUSE:

Well, we have a report in front of us that says that this influenced the outcome. And in particular, it says that it influenced the outcome because it deprived the president of his ability to have his day in court. And my point to you is that the president could easily have his day in court by simply waving or overwriting this OLC opinion that has no judicial basis. Correct?

BARR:

Well, I don't--I don't think that there was anything to have a day in court on. I don't--I think that the government did not have a prosecutable case.

WHITEHOUSE:

But part--well, Mueller obviously didn't agree because he--

BARR:

--No that's--

WHITEHOUSE:

--left that up to you--

BARR:

--Well that--well--

WHITEHOUSE:

--He said that he could neither confirm nor deny that there was a prosecutable case here. He left that to you. And when he did, he said, and you apparently have agreed that this OLC opinion bears on it and that it would be unfair to the president to put in to the burden of being indicted and not having the ability to be charged and to--

BARR:

--I don't want to characterize how--

WHITEHOUSE:

--exonerate himself--

BARR:

--how Bob's thought process on this.

WHITEHOUSE:

I'm not asking you to characterize it. It's in the--it's in his report. He's put it in writing.

BARR:

I'm not sure what he means I that in the report.

WHITEHOUSE:

With respect to the word--can I have a minute? I just want to nail down, you used the word spying about authorized DOJ investigative activities.

BARR:

You're--are you talking about my testimony--

WHITEHOUSE:

--Yes--

BARR:

--before the House appropriations?

WHITEHOUSE:

Yes.

BARR:

Okay.

WHITEHOUSE:

In the entirety of your previous career in the Department of Justice, including as attorney general, have you ever referred to authorized department investigative activities officially or publicly as spying? I'm not asking for private conversation your comments.

BARR:

I'm not going to abjure the use of the word spying. I think, you know, my first job was in CIA and I don't think the word spying has any pejorative convert connotation at all. To me the question--

WHITEHOUSE:

--but you recognize that--

BARR:

--to me the question is always whether or not it's authorized and adequately predicated, spying. I think spying is a good English word that in fact doesn't have synonyms because it is the broadest word incorporating really all forms of covert intelligence collections. So I'm not going to back off the word spying to--except I will say--

WHITEHOUSE:

--when did you decide--

BARR:

--I'm not suggesting any pejorative and I use it frequently, as do media--

WHITEHOUSE:

--when did you--

BARR:

--as do media.

WHITEHOUSE:

When did you decide to use it? Was it off-the-cuff in the hearing that day or did you go into that hearing intending to use a word spying?

BARR:

It was actually off-the-cuff, to tell you the truth. And when--when--when Senator, the--the senator--I mean, the--the--

WHITEHOUSE:

--congressman, probably.

BARR:

From Schatz, from Hawaii.

UNKNOWN:

Shaheen?

WHITEHOUSE:

Shaheen?

BARR:

No, no.

WHITEHOUSE:

Whoever it was, go ahead.

BARR:

Yeah, when she--when--when he challenged me and said do you want to change your language I was actually thinking, like, what's the issue? I don't consider it a pejorative. But frankly--

WHITEHOUSE:

--and you rather

BARR:

--frankly we went back and looked at present usage and up until all the--the full outrage a couple of weeks ago, it's commonly used in the press to refer to authorized activity, such as refer to the FISA court--

WHITEHOUSE:

--But it is not commonly used by the department.

BARR:

What?

WHITEHOUSE:

It is not commonly used by the department. My time is up.

BARR:

It's commonly used by me.

GRAHAM:

Thank you very much. We'll come back at 10 till 1:00. Thank you.

GRAHAM:

Senator Feinstein I have been told is on the way. And I will just--we will go ahead and start. I think the next questioner is Republican Senator Kennedy.

KENNEDY:

Thank you, Mr. Chairman.

GRAHAM:

Yeah, was there something you wanted to say Mr. Attorney General about one of your statements?

BARR:

Just briefly Mr. Chairman Sen. Cornyn asked me about defensive briefings before and as I said there were different kinds of them and I was referring to the kind where you are told of a specific tar--you are a specific target and I have been told at the break that a lesser kind of briefing, a security briefing that generally discusses you know general threats apparently was given to the campaign in August.

GRAHAM:

Thank you. Sen. Kennedy?

KENNEDY:

Thank you, Mr. Chairman and thanks to my colleagues were letting me go out of order. I promise to be as brief as possible.

Mr--Mr. Chairman thanked--thank you or general, thanks were coming today. Humans have a universal need I think to be--to be listened to, to be understood and to be validated. I think we all share that. I have listened to the Mueller team. I validate them but I want to be sure I understand it. Has Mr. Mueller or his team change their conclusions?

BARR:

Humane during--during the course of the investigation?

KENNEDY:

Know, today. It's clear at least according to press reports--excuse me, general--that at one point the Mueller team was unhappy. I think it had to do with your letter. What matters to me is and I will get to this in a moment. I want to know first has the Mueller team changed its mind on its conclusions.

BARR:

Its conclusions as to what?

KENNEDY:

As to collusion, conspiracy and conspiracy?

BARR:

Not that I am aware of.

KENNEDY:

So the decision not to bring an indictment against the president for collusion conspiracy with Russia has not changed?

BARR:

No, it hasn't.

KENNEDY:

And the conclusion not to bring an indictment against the president for obstruction of justice has not changed?

BARR:

No.

KENNEDY:

Okay. I--I take it from your testimony that the Mueller team was unhappy when you receive the letter from Mr. Mueller.

BARR:

I can't speak to the team as a whole--

KENNEDY:

All right. Mr. Mueller then?

BARR:

When I talked to Bob Mueller, he--he--he indicated he was concerned about the press coverage that had gone on the previous few days and he felt that was to be remedied by putting out more information.

KENNEDY:

Okay. I understood you to say and these are my words, not yours. The first concern that Mr. Mueller had he felt like your letter wasn't nuanced enough.

BARR:

Correct.

KENNEDY:

That problem has been solved, has it not?

BARR:

Well, it was sort of solved by putting out the whole report--

KENNEDY:

Exactly.

BARR:

--which was the--that is why I think this whole thing is--is sort of mind-bending labels are because I made clear from the beginning that I was putting out the report, as much of the report as I could and it was clear it was going to take three weeks or so, maybe four to do that and the question is what is the placeholder and the placeholder in my judgment was a simple statement of what the bottom line conclusions work. And I wasn't going to be in the business of feeding out more and more information as time went on to adjust to what the press was saying.

KENNEDY:

And that is your call as attorney general.

BARR:

Absolutely.

KENNEDY:

Okay. That wouldn't be the call of a U.S. attorney or a special counsel?

BARR:

No, not at all.

KENNEDY:

Okay. Now the second reason I--I mentioned the nuance concern. The second reason that Mr. Mueller was concerned, I don't want to say unhappy because I'm not trying to be pejorative, I say concerned, he was concerned about press coverage.

BARR:

He indicated--yeah--he--he felt that what was an accurate was the press coverage and what they were interpreting the March 24 letter to say.

KENNEDY:

And what were you supposed to do about that?

BARR:

He wanted to put out the full executive summaries that are incorporated in the report and I said to him I wasn't interest--and by the way, those summaries even when he sent them apparently, they actually required later more read action because of the intelligence community. So the fact is we didn't have readily available summaries that have been fully vetted. But I made it clear to him I--I was not in the business of putting out periodic summaries because a summary would start a whole public debate. It's by definition underinclusive and I thought what we should do is focus on getting the full report out as quickly as possible which we did.

KENNEDY:

And that's your call as attorney general?

BARR:

Of course, of course.

KENNEDY:

And the news coverage issue well, none of us can control what the news publishes or prints except the media. But--but to the extent that an argument was made they didn't have the full report that's a moot issue to now isn't it?

BARR:

Yes.

KENNEDY:

Okay. Can you--can you briefly go over with me one more time--I find it curious that the Mueller team spent all of this time investigating obstruction of justice and then reach no conclusion. Tell me again briefly why Mr. Mueller told you he reach no conclusion or he couldn't make up his mind or whatever I'm not trying to put words in your mouth?

BARR:

I really couldn't recapitulated. I--it was unclear to us. We first discussed it on March 5, the deputy was with me, Ed O'Callaghan the principal associate deputy and we didn't really get a clear understanding of the reasoning and the report I'm not sure exactly what the full line of reasoning is and that's one of the reasons I didn't want to try to put words in Bob Mueller's mouth.

KENNEDY:

But he--he did not choose to bring an indictment. We know that much.

BARR:

Right.

KENNEDY:

Regardless of the reason.

BARR:

Right.

KENNEDY:

I am going to repeat quickly in less than one minute what we talked about the last time you were here. This is one person's opinion. As I told you before I think the FBI is the premier law enforcement agency in all of human history and I believe that. I do think there were a handful of people, may be some are still there who decided in 2016 to act on their political beliefs. There were--there were two investigations here. One was an investigation of Donald Trump. There was another investigation of Hillary Clinton. I'd like to know how that one started, too.

And it would seem to me that we all have a duty if--if--if not to the American people to the FBI to find out why these investigations were started, who started them and the evidence on which they were started and I hope you will do that and you will get back to us. And there's another short way home. As well. All you've got to do is release--the president can't--release all of the documents that the FBI and the Justice Department pertaining to the 2016 election. Now you can read tax national security information but just release them instead of us going through all of this spin and innuendo and leaks and rumors let's just let the American people see them. And the final point I will make when you are investigating leaks at the Department of Justice and the FBI, I hope you will include the Mueller team as well. Thank you, Mr. Chairman.

GRAHAM:
Senator Klobuchar?

KLOBUCHAR:
Thank you, Mr. Chairman. Mr. Attorney General, I'm gonna take us out of the weeds here because I think the American people deserve to know what happened in the election for the highest office of the land. And I'll just give my views very quickly and not ask you about these topics. I think your four-page letter was clearly a summary and that's why Director Mueller called it a summary.

I think when Senator Van Hollen and Representative Crist asked you if the special counsel disagreed with you under oath you had to go out of your way not to at least mention the fact that he had sent you this letter, that you didn't mention it. And then, finally, I would say that we must hear from Director Mueller because in response to some of my colleagues' questions you have said that you didn't know what he meant or why he said it. And I believe we need to hear from him.

So, I want to first start with Russia. Special Counsel Mueller's report found that the Russian government interfered in the 2016 presidential election in a sweeping and systematic fashion. Later Director Wray has informed us that 2018 was a dress rehearsal for the big show in 2020. Director Coats, the president's intelligence advisor, has told us that the Russians are getting bolder. Yet, for the last two years Senator Lankford and I, on a bipartisan bill of support from the ranking and the head of the Intelligence Committee have been trying to get the Secure Elections Act passed. This would require backup paper ballots. If anyone gets federal funding for an election, it would require audits and it would require better cooperation. Yet, the White House just as we were on the verge of getting a markup in the Rules Committee, getting it to the floor where I think we would get the vast majority of senators, the White House made calls to stop this. Were you aware of that?

BARR:
No.

KLOBUCHAR:
Okay, well that happened. So, I would like to know from you as our nation's chief law enforcement officer, if you will work with Senator Langford and I to get this bill done because otherwise we are not going to have any clout to get back up paper ballots if something goes wrong in this election.

BARR:

Well, I will--I will work with you to enhance the security of our election. And I'll take a look at--at what you're proposing. I'm not familiar with it.

KLOBUCHAR:

Okay. Well, it is the bipartisan bill. It has Senator Burr and Senator Warner and support from Senator Graham was on the bill. Senator Harris is on the bill. And the leads are Senator Lankford and myself. And it had significant support in the House as well.

The GRU, the Russian military intelligence agency, target the U.S. state and local agencies along with private firms that are responsible for electronic polling and voter registration. The GRU accessed voter information and installed malware on a voting technology company's network. I understand the FBI will brief U.S. Senator Rick Scott and Florida Governor DeSantis on efforts by Russian hackers to gain access to Florida election data. Will you commit to have the FBI provide a briefing to all senators on this?

BARR:

I--just on the Florida situation?

KLOBUCHAR:

On the entire Russia situation.

BARR:

Sure.

KLOBUCHAR:

Including the Florida situation.

BARR:

Sure.

KLOBUCHAR:

Okay, that would be helpful. Again, Senator Lankford and I are trying to get our bill passed. And I think if everyone hears about this it may help.

Also, according to the report, the IRA purchased over 3,500 ads on Facebook to undermine our democracy as the chairman has pointed out, contrary to what we heard from a high ranking official at the White House, this was not just a few Facebook ads. I'm pleased that Chairman Graham has agreed to be the lead republican on the Honest Ads Act that I introduced last year with Senator McCain. And will you help us to try at least to change our election laws so that we can show where the money is coming from and who's paying for these ads so that people have access to these ads?

BARR:

In concept, yes.

KLOBUCHAR:

Okay, very good. Thank you. We need that support. Now, let's go to something I noted in your--in the opening you talked about how the two major concerns at your nomination hearing were about the report and about making the report public. There was a third concern. And it was something I raised. And that was your views on obstruction. I asked you if a president or any person convincing a witness to change testimony would be obstruction of justice and you said yes.

The report found that Michael Cohen's testimony to the House before it, that the president repeatedly implied that Cohen's family members had committed crimes. Do you consider that evidence to be an attempt to convince a witness to change testimony?

BARR:

No. I don't think that that could--could pass muster, those public statements he was making, could pass muster as subornation of perjury.

KLOBUCHAR:

But this is a man in the highest office in the most powerful job in our country. And he is basically, I'm trying to think how someone would react, any of my colleagues here, if the president of the United States is implying getting out there that your family members have committed a crime. So, you don't consider that any attempt to change testimony?

BARR:

Well, you have--you have two different things. You have the question of whether there's--it's an obstructive act and then also whether or not it is a corrupt intent. I don't think general public statements like that have--

KLOBUCHAR:

--Okay.

BARR:

--well, our--we could show that they would have sufficiently probable effect to--to constitute--

KLOBUCHAR:

--Okay, well then let's go to some private statements. The report found that the president's personal counsel told Paul Manafort that he would be, quote, "taken care of". This is in volume two, page 123 to 24. That you don't consider obstruction of justice?

BARR:

No, not standing alone. Both of this comment--on both the same reasons.

KLOBUCHAR:

And I think that is my point here.

BARR:

What?

KLOBUCHAR:

You look at the totality of the evidence, that's what I learned when I was in law school. You look at the totality of the evidence and the pattern here. Look at this, the report found that the president's personal counsel told Michael Cohen that if he stayed on message about the Trump Tower Moscow Project the president had his back, that's volume 2, page 140.

BARR:

Right, but I think that the counsel acknowledged that it's unclear whether he was reflecting the president's statements on that.

KLOBUCHAR:

Okay. The report found that after Manafort was convicted, the president himself called him a brave man for refusing to break.

BARR:

Yeah. And that is not in--and that is not obstruction because the president's statement--the evidence I think what the president's lawyers would say if this were ever actually joined, is that the president's statements about flipping are quite clear and expressed. And--and uniformly the same, which is by flipping he meant succumbing to pressure on unrelated cases to lie and compose in order to get lenient treatment on other cases.

KLOBUCHAR:

Again--

BARR:

--That is not--it's a discouraging flipping in that sense is not obstruction.

KLOBUCHAR:

Okay, well, look at the pattern here. The report found that after Cohen's residence and office were searched by the FBI the president told Cohen to hang in there and stay strong. The report found that after Nation Security Advisor Michael Flynn resigned, the president made public positive comments about him and then when he cooperated, he changed his tune. During your confirmation hearing I asked you whether a president deliberately impairing the integrity or availability of evidence would be obstruction and you responded yes. And this is a different take on Senator Feinstein's question. Would causing McGahn, the White House Counsel, to create a false record when the president asked ordered him to have the--when McGahn told him to deny reports, right, he tells McGahn deny reports, that the president ordered him to have the counsel fired.

If you don't see that as--as obstruction and directing him to change testimony, do you think that would create a false record to impair the integrity of evidence?

BARR:

Well, I said there--there--it fails on--the evidence would not be sufficient to establish any of the three elements there. First, it's--it's not sufficient to show a obstructive act because it is unclear whether the president knew that to be false. In fact, the president's focus on the fact that I never told you to fire McGahn. Did I ever say fire? I never told you to fire McGahn. McGahn's--McGahn--

KLOBUCHAR:

--Yeah, I'm getting at something it's about impairing the integrity of the evidence. I just see it as different. This is--I wanted--

BARR:

--Well, the second thing is note it's hard to establish the nexus to the proceeding because he already had testified to the--to the special counsel. He'd given his evidence. As the report itself says, there is evidence that the president actually thought and believed that the Times

article was wrong, that's evidence on the president's side of the ledger, that he actually thought it was wrong and was asking for its correction.

It is also possible, the report says, that the president's intent was directed at--at the publicity and the press. The government has to prove things beyond a reasonable doubt. And, as the report shows, there's--there's ample evidence on the other side of the ledger that would present--prevent the government from establishing that.

KLOBUCHAR:

Okay, again, I look at the totality of the evidence and when you look at it it is a pattern. And that is different than having one incident. Thank you, Mr. Chairman.

GRAHAM:

Senator Sasse.

SASSE:

Thank you, Mr. Chairman. General Barr, I'd like to go back to--to Russia And your opening statement laid out some of what the GRU had done, what military--German--Russian military intelligence had done in terms of hacking. I'd also like to look at some of the oligarchs and some of the corruption so closely aligned with Putin. Volume 1 pages 129 to 144 our largely about Deripaska. Can you tell us who he is and what his objectives are?

BARR:

I'd rather not get--get into that in this open setting.

SASSE:

Well, I'll at least quote the Department of Treasury, because this is a public document, so Oleg Deripaska is a designated individual. He's--he possesses a Russian diplomatic passport, he regularly claims to represent the Russian government, he's in aluminum and other metals billionaire and he's been investigated by the US government and by other of

our allies for money laundering, he's been accused of threatening the lives of his business rivals, he's been charged with illegal wiretapping, taking part in extortion and racketeering schemes, he's bribed government officials, he's ordered the murder of a businessman, and he has many links to Russian organized crime. So I think we can in an open setting at least agree that he's a bad dude, right?

This is a--this is a bottom feeding scum sucker and he has absolutely no, I'll take your laugh as agreement, he has absolutely no alignment with the interests of the U.S. people and our public. So the--the section of volume 1 deals with nominally Paul Manafort, but it's really about Deripaska. I would like you to help us have an American public 101 understanding of what is and isn't allowed. So Paul Manafort is hired by Deripaska ostensibly for things with related to the Ukraine. They have a bunch of failed business ventures together it looks like over time, but he's on the payroll of a Russian oligarch that has interest completely misaligned with the American government and the American people and with the interests of NATO, and he's on his payroll. Is it permissible for someone to be paid by somebody who's basically an enemy of the United States and then could that individual just volunteer and start to donate their time and talent and expertise to a campaign in the U.S.?

And I mean this--let me interrupt for a second and say one of the things that I think is painfully tragic about a hearing like this, I think the vast majority of the American people are going to tune it out and those that pay attention are going to think the only two takeaways you need to know is a bunch of people were pro Trump before they came and they stayed pro Trump and a bunch of people were anti-Trump before they came and they stayed anti-Trump, and we didn't dig into any of what the report actually says. I think these 448 pages say a whole bunch of really important things about intelligence operations against the United States people and our public and our government and our public trust.

And I think it isn't just about 2016. There are important questions about 2016. Lindsay-- Chairman Graham summarized at the beginning how much money and time was available to the spent special counsel and his team to do their work, so there are a bunch of factual matters about 2016 that matter. But if one of the most important things we take away from this isn't that we are going to be--it needs to be that we are going to be under attack again in

2020 and it isn't just going to be Russia who's pretty dang clunky at this stuff, but it's also overtime likely going to be China who is going to be much more sophisticated about this stuff.

Can you help us understand what is legal and illegal about foreign intelligence services being involved in U.S. elections? And what should American people and the American public and especially American campaign operatives know about what's appropriate and not appropriate to take in the form of help from foreign intelligence agencies?

BARR:

I mean that's a--that's a very broad topic of what is legal and in illegal. I mean, could you refine that a little bit? Are you talking about what kind of--what kind of propaganda, that kind of thing coming into the country?

SASSE:

Could--could you make--

BARR:

--Obviously you can't--you can't put money into a foreign money obviously into a campaign.

SASSE:

Yeah but could you--

BARR:

--You can't--

SASSE:

--could you--take Russia, China, I'm making up a country, decide to come into the United States and look at all the political talent, make it database, by the way, the OPM hack in 2014 tells us the Chinese government is actively involved in creating databases of people

they can potentially use as leverage against American citizens. More than 20 million people are already in the spy recruitment database of the China--of the Communist Party of China. Could they come in and build a database of all campaign operatives in the U.S. and some foreign entity just decide to hire all of them and then say why don't you go and volunteer for this campaign and you go and volunteer for that campaign? Could we have campaign chairman and women running around the U.S.? U.S. citizens who have U.S. campaign talent and experience, paid for by foreign entities just choosing to volunteer on campaigns going forward? Is that legal?

BARR:

If their--if their time is paid for for the purpose of participating in a campaign, I wouldn't think it's legal.

SASSE:

But given how sleazy so much of the city is in a whole bunch of people live on retainers of 15 and 20 and $30,000 a month, is it always obvious what you're paid for versus what you do? So some Russian oligarch just decides to start putting American campaign personnel on retainer payments and say we may need you to lobby for something somewhere in the future?

They've got views about oil pipelines and--and natural gas pipelines into Germany. We just told you on retainer and by the way, the fact that you are a person who likes to work for specific campaigns and certain parties and causes, feel free to go and avocationally (SP) do whatever the heck you want whenever you want. Is that--is that a place we should head? Is that--is that allowed under U.S. law today?

BARR:

Well I mean, it depends on--on the specific circumstances, the nature of the agreement, what the--what the--who the person is representing. Are they representing the interests of a

foreign government? Are they a foreign agent who--are they registered? You know, I mean, we could--it's a slippery area and we could sit here all day and--and without specific--

SASSE:

--I only have seven minutes. I don't--I don't get all day, but you are the chief law enforcement officer of the United States government and I think it would be helpful for us to have a shared understanding as we head toward the 2020 election of what campaign operatives should well understand is beyond the pale. So if--if the Chinese government decides to start hacking into 2020 campaigns, I would hope there's clarity from the Department of Justice about whether or not Democratic campaign--residential campaigns and whether or not the Trump reelection campaign are allowed to say hey, we're interested in this hacked material going forward.

I think we need to have clarity about a question like that and I think somebody who sits not just on judiciary but on the intelligence committee, I think there are a bunch of counterintelligence investigations happening right now in the United States where campaigns don't really understand what the laws are and I think we need a lot more clarity about it. Because I'm nearly at time, let me at least give it to you as a--this version as a precise question.

Under the presidential transitions act, once you have a democratic nominee for president and a Republican nominee for president, one of the things that we do is we start to brief them on in the event that you would become the president elect, you will need to know where we are in different national security issues. Should we be adding to the Presidential Transition Act counterintelligence briefings for campaigns as they become the nominee in a much more detailed way than the--the response you had about the bureau's efforts? When Senator Cornyn asked if defensive briefings were given, should we the Congress be thinking very intentionally about authorizing the ability of the Bureau and in a shared broader IC context but with the bureau or Homeland Security probably being the interface entity, should nominees for the highest office in the land heading into 2020 be receiving regular counterintelligence briefings on the fact that foreign intelligence services are going to

surround people that are likely going to be people of influence and principal officers to the United States government, should they win?

BARR:

Absolutely. I think the--the danger from countries like China, Russia, and so forth is far more insidious than it has been in the past because of nontraditional collectors that they have operating in the United States and I think most people are unaware of how pervasive it is and how--and what the risk level is. And I think it actually should get go far beyond even campaigns where people involved in government have to be educated on this.

SASSE:

Thank you. I'm at time, but I would love to work with you and the broader intelligence community on that more. I think there are a number of members of the (INAUDIBLE), of the Senate Intelligence Committee who know what you're saying particularly about the Chinese government and their attempt to encircle lots of people who are going to have influence in the future. And I think we, not just a whole of government effort but as a whole of society effort have to become much more sophisticated about what foreign intelligence services, and especially the Chinese are plotting for the future.

BARR:

Yeah, if I could just say that you know, the pattern is whenever there is an election, foreign governments and their operatives frequently descend on the people who they think could have a shot at winning and it's--it's common and--and typical--the most typical scenario is that they do try to make contact and so forth. So--

SASSE:

And--and in a digital cyber era, you don't need a bar and a hooker anymore, you can surround people digitally much easier and we know that we are going to be having these kinds of attacks in the future and we need to up our game. Thanks.

GRAHAM:

Minus the bar and the hooker, we'll have hearings about all that stuff.

(LAUGHTER)


GRAHAM:

Senator Coons?


COONS:

Thank you Chairman Graham. Thank you, Attorney General Barr. And I want to follow up on some of that line of questioning from Senator Sasse and Klobuchar.

The special counsel was appointed first to investigate Russia's attack on our 2016 election and potential coordination with the Trump campaign and I'm glad the chairman started this hearing by recognizing we need to focus on that demonstrable assault on our democracy and to protect our elections going forward and I look forward to working with my colleagues whether it's on sanctions bills or it's on the Lankford-Klobuchar Bill but we genuinely need leadership from you Mr. Attorney General and from the White House and our president to make sure that we are doing everything we can to protect our next election.

But frankly we also can't ignore volume 2 of this report which I think details unacceptable conduct by the president and his campaign and that includes trying to fire the special counsel without cause. I appreciated the leadership of Senators Graham and Tillis and Booker and I in a bill to try and protect the special counsel, something I think is still worth doing for future special counsel's. We were told by many of our colleagues there was nothing to worry about because the president wasn't going to fire the special counsel but I was particularly struck by some reports in the second volume that the president attempted to do exactly that.

And I frankly Mr. Attorney General have concerns that your March 24 letter obscured that conduct and as a result work to protect the president for several weeks rather than give the full truth to the American people as I now believe Special Counsel Mueller was urging you to do as reflected in the letter we just received today. Some going to ask you some questions about they report but they bottom line is that I think we need to hear more about the special counsel's work from the special counsel.

According to Special Counsel Mueller's report in June 2017 President Trump called White House Counsel McGahn and directed him to have the special counsel removed and I quote and this is from about page 85, 86 McGahn recalled the President called him at home twice and on both occasions directed him to call Rosenstein and say that Mueller had conflicts and go no longer serve as Special Counsel. There were no credible conflicts. McGahn testified that he had shared that these conflicts were silly, were not real and Chris Christie advised President Trump about the same time there were no substantive basis, no good cause to fire the Special Counsel.

In one call the President said call Rod, tell Ron Mueller has conflicts, can't be the special counsel quote Mueller has to go and I assume he didn't mean go to Cleveland or go to Seattle. He met go, be fired. Call me back when you do it. I think the presidents demands to fire Mueller without cause are alarming and unacceptable. And Mr. Attorney General not one bit of what I just described was in your March 24 letter to this committee was it?

BARR:
No. Because I wasn't (INAUDIBLE)

COONS:
But it was in the summaries that were offered to you by Special Counsel Mueller and his team which you chose not to release. Is that correct?

BARR:

They were--they were--they were in complete form in the final report which I was striving to make public and which I did make public.

COONS:

Which I respect and appreciate but a critical three weeks passed between when you deliver the letter with the focus on the principal conclusions and when we ultimately got the redirected report and what I take from the Mueller letter to you--

BARR:

Why--why were they critical?

COONS:

Well, I think that the volume two summary would have revealed to the general public a whole range of inappropriate actions by the president and his core team. I will go to a second episode that I think is important.

On February 5 of 2018, over a week after the story broke publicly that the president ordered his White House Counsel to fire the special counsel investigating the president The president demanded that McGahn create a false record saying the president never directed McGahn to fire the special counsel. The president wasn't looking for a press statement here. He wasn't looking to correct the record. He wanted a fraudulent record for White House records, a letter that wasn't true. McGahn refused to do it.

Again there's nothing about the president's request to create a false record in your March 24 letter is there?

BARR:

Well, that your characterization of it and I have been through it a couple of times and I--I think it would be difficult for the government to prove that beyond a reasonable doubt. I think--

COONS:

And an important point--

BARR:

I think there is a very plausible alternative explanation but what I was trying to get that was the final report and have one issuance of the complete report. I made it clear in the March 24 letter that Bob Mueller didn't make a decision but that he felt he could not exonerate the President

COONS:

That's right.

BARR:

I wasn't hiding the blow on--on where Mueller was an--and that he was presenting both sides of the issue, all of the evidence but he was not making a call but he felt he couldn't exonerate the president And then I briefly describe the process we went through to make a judgment internal into the Department of Justice. And as I say from the public interest standpoint, I felt there should be only one thing issued, it should be the complete report as complete as it could be.

COONS:

And I know we differ in our conclusions about what that meant but my concern is that that gave President Trump and his folks more than three weeks of an open field to say I was completely exonerated. When had you release the summaries of it the first and second volume, we would have been more motivated than ever based on the first volume to work cooperatively to protect our next election and more concerned than ever about misdeeds, about inappropriate actions by the president and some of his core team as a result of the summary of the second volume? And at the end of the day you have had a number of exchanges with colleagues where you've said I can't tell you why Mueller chose not to

charge. I want to hear that from Bob Mueller. I think we should hear from Special Counsel Mueller.

Let me move on to a point that Senator Sasse was just asking but that I think is worth revisiting about foreign intelligence and the role in our elections. The reason we had this investigation in the first place was George (INAUDIBLE) was told the Russians had dirt on Hillary Clinton. The Russians had a direct contact to Donald Trump Junior and offered to give dirt about his father's opponent. Donald Trump Junior said I love it and invited the campaign chairman and president son-in-law to the campaign chairman to a meeting with the Russians to get it.

BARR:

Who did you say offered it? Who did you say offered it?

COONS:

In the second instance it was Russians made an offer to Donald Trump. I have 30 seconds.

BARR:

Okay.

COONS:

Let me get to a question if I could. Going forward what if a foreign adversary let's now say North Korea offers a presidential candidate dirt on a competitor in 2020. Do you agree with me the campaign should immediately contact the FBI? If a foreign intelligence service--

BARR:

A foreign intelligence service?

COONS:

A representative of a foreign government--

BARR:

-- yes

COONS:

-- Says we have dirt on your opponent--

BARR:

--yes

COONS:

Should they say I love it, let's meet or should--

BARR:

If a foreign intelligence--

COONS:

--they contact the FBI?

BARR:

intelligence service does, yes.

COONS:

Okay. Here's my core concern. The president ordered the White House counsel to have Special Counsel Mueller fired. He fabricated evidence to cover it up and whether or not you can make a criminal charge of this it is unacceptable and everyone who said we didn't have to worry about President Trump firing the special counsel was flat out wrong. The Russians offered the Trump campaign on Hillary Clinton and the Trump campaign never reported that to the FBI. Instead they try to conceal the meeting and misled the American people and

I think we have to work on a bipartisan basis going forward to protect our elections from a repeat of this and we need your leadership and the presidents.

You somehow concluded the president didn't obstruct justice and you announce that you had cleared the president 25 days before the public could read the Mueller report for themselves. I think it's no wonder Special Counsel Mueller thought your four-page letter created public confusion about critical aspects of the results of the investigation and that that threatened to undermine the central purpose for which he was appointed. I think we need to hear from Special Counsel Mueller. I think we need to hear from Don McGahn and I think we need to review how we are going to handle going forward the fact that you are supervising 12 ongoing cases that came out of the Mueller investigation and have been referred. This body has a central role in oversight that I believe we need to exercise given your recent record. Thank you, Mr. Chairman.

GRAHAM:
Senator Hawley?

HAWLEY:
Thank you, Mr. Chairman. General Barr, I commend your candor in calling what happened in 2016 what it is, which is spying on the Trump campaign and spying on the president of the United States. I'd like to talk a little bit more about spying.

Counterintelligence investigations, like the one that we now know the FBI launched against candidate Trump and President Trump, those are designed to thwart spying and sabotage. Is that correct?

BARR:
That's correct.

HAWLEY:

To your knowledge, has the FBI ever launched a counterintelligence investigation of another president that you're aware of?

BARR:
Not to my knowledge.

HAWLEY:
So, it's safe to say that, to your knowledge, this move was completely unprecedented.

BARR:
To my knowledge.

HAWLEY:
Would it be unusual, in your experience and to your knowledge, for FBI agents to hide the existence and results of an investigation--such an investigation from their superiors?

BARR:
Would--did you say would it be typical? Did you--

HAWLEY:
--No, would it be unusual for the--

BARR:
--very unusual.

HAWLEY:
Yes. And in fact, that is--that is indeed what press reports should just happened here. When FBI officials hide investigators--investigations from superiors, is there anybody to hold them accountable? I mean, what--what happened in that instance?

BARR:

There is no accountability.


HAWLEY:

Have you looked into the decision by the FBI to--why have they launched a counterintelligence investigation?


BARR:

I am looking into it, and I have looked into it.


HAWLEY:

And you will--will you commit to--to telling us what you find as the result of your--of your own review and investigation?


BARR:

Well, at the end of the day, when I form conclusions I intend to share it.


HAWLEY:

I'll take that as a yes. Let me ask you about the 25th Amendment, if I might for just a moment. We know that former Acting Director of the FBI Andy McCabe, he's publicly confirmed that he contemplated forcing the president from office using the 25th Amendment. To your knowledge, have FBI officials ever contemplated forcing any other president from office against his will using that provision?


BARR:

Not to my knowledge.


HAWLEY:

The 25th Amendment contemplates the vice president taking over as president when the president is unable to act. Would you agree that that text to contemplates physical ailments like a coma, mental incapacitations, not just political differences of opinion?

BARR:
Yes.

HAWLEY:
Have you ever doubted, since you have been in your current position, whether this president is physically able in a constitutional sense to discharge the duties--his duties as president?

BARR:
No.

HAWLEY:
Would you agree that discussions within the FBI of a forcing the president out of office for political reasons gives the public at best reason to question what the FBI is doing and to fear that there may be abuses of power in that organization?

BARR:
I--I think it gives reason to be concerned about those particular individuals that were involved. I--I don't attribute it to the organization.

HAWLEY:
Speaking of particular individuals who were involved, I have to say I've--I've listened to this testimony all day today. And to me, maybe the most shocking thing I've heard is this. The chairman read it earlier. August 26th, 2016, this is a text message from Peter Strzok, a top counterintelligence investigator who we now know helped launch this counterspy investigation of the president of the United States. Peter Strzok says just went to a Southern

Virginia Walmart. I could smell the Trump support. Smell is capitalized. Just went to a Southern Virginia Walmart. I could smell the Trump support.

In my view, you want to know what's really going on here? You want to know why the counterintelligence investigation really happened? You want to know why we're all really sitting here today? That's why, right there.

It's because an unelected bureaucrat, an unelected official in this government who clearly has open disdain if not outright hatred for Trump voters, like the people of my state, for instance, I could smell the Trump support, then tried to overturn the results of the Democratic election. That's what's really going on here. That's the story. That's why we're here today.

I cannot believe that a top official of this government, with the kind of power that these people had, would try to exercise their own prejudices--and that's what this is, it's open, blatant prejudice--would try to use that in order to overturn a Democratic election. And to my mind, that's the real prices here, and it is a crisis. Because if there's not accountability, if this can go on in the United States of America, well then, my goodness gracious, we don't have a democracy anymore.

So, I appreciate your leadership, Mr. Attorney General. I look forward to hearing the results of your investigation. And I look forward to this committee continuing its constitutional responsibility to find out what is going on here and making sure that the will of the people is vindicated and established. Thank you, Mr. Chairman.


GRAHAM:
Senator Blumenthal?


BLUMENTHAL:
Thank you Mr. Chairman. Thank you, Attorney Barr, for being here today. You have been very adroit and agile in your responses to questions here but I think history will judge you

harshly and maybe a bit unfairly because you seem to have been the designated fall guy for this report.

And I think that conclusion is inescapable in light of the four-page summary and then the press conference you did on the day it was released knowing that you had in hand a letter from the special counsel saying that he felt that you mischaracterized his report. And you were asked by one of my colleagues, Senator Van Hollen whether you know--whether you knew that Bob Mueller supported your conclusion and you said I don't know whether Bob Mueller supported my conclusion. You were asked by Representative Crist--

BARR:
Excuse me, senator that conclusion was not related to my description of the findings in the March 24 letter. That conclusion refers to my conclusion on the obstruction basis. So it's a-- different conclusion. It's a different conclusion.

BLUMENTHAL:
(INAUDIBLE) conclusions that was used by Special Counsel Mueller. And on the obstruction issue at page 8 and 182 of the report I don't know whether you have it in front of you the--the special counsel specifically said at the same time I am quoting if we had confidence after a thorough investigation of the facts that the president clearly did not commit obstruction of justice, we would so state. He said it again at page 182 and yet in your summary and in the press conference that you did you in effect cleared the president on both so-called collusion and--

BARR:
And the difference--the difference is I used the proper standard. That statement you just read is actually a very strange statement for--

BLUMENTHAL:

-- for a prosecutor of the specific obstruction episodes Robert Mueller concluded that there was substantial evidence on for--on the three necessary elements of obstruction--

BARR:
Well, you--you--you are a prosecutor--

BLUMENTHAL:
I have to finish my question.

BARR:
You haven't let me finish my answer.

BLUMENTHAL:
Well, let me just finish the question.

GRAHAM:
We can do both.

BLUMENTHAL:
You ignored in that press conference and in the summary that Robert Mueller found substantial evidence and it's in the report and we have a chart that shows the elements of back crime intent, interference with an ongoing investigation and the obstructive act. So I think that your credibility is undermined within the department and this committee and with the American people and I want to ask you whether on those remaining investigations, the 12 to 14 investigations whether you have had any communication with anyone in the White House.

BARR:
Know.

BLUMENTHAL:

And will you give us an ironclad commitment that you will in no way interfere--

BARR:

I--I'm not sure the laundry list of investigations but I certainly haven't--talked these substance or been directed to do anything on any of the cases.

BLUMENTHAL:

Well, let me give you an opportunity to clarify. Have you had any conversations with anyone in the White House about those ongoing investigations that were spawned or spun off by--

BARR:

I--I don't recall having any substantive discussion on the investigation.

BLUMENTHAL:

Have you had any non-substantive discussion?

BARR:

It's possible that the name of a case was mentioned.

BLUMENTHAL:

And have you provided information about any of those ongoing investigation--any information whatsoever?

BARR:

I don't recall, no.

BLUMENTHAL:



You don't recall?

BARR:

I don't recall providing any.

BLUMENTHAL:

Wouldn't you recall whether you gave information to somebody in the White House about an ongoing criminal investigation in the Southern District of New York or the Eastern District of New York or the Eastern District of Virginia or the Department of Justice?

BARR:

Yeah, I mean I--I just don't recall providing any substantive information about a case.

BLUMENTHAL:

Is there anything that would refresh your recollection?

BARR:

If I probably looked over a list of cases and thought about it. But--but I don't recall--

BLUMENTHAL:

You know what those investigations are. We have discussed them at your confirmation hearing, correct?

BARR:

(INAUDIBLE) I think there's 12 or 18 cases, right?

BLUMENTHAL:

You don't know what those investigations are, Mr.--

BARR:

I do generally but I--I can't remember each (INAUDIBLE).

BLUMENTHAL:

Let me ask you one last time. You can't recall whether you have discuss those cases with anyone in the White House including the president of the United States?

BARR:

My recollection is I have not discussed them.

BLUMENTHAL:

But you don't recall for sure?

BARR:

I--

BLUMENTHAL:

Let me move on.

BARR:

I--I--I can say very surely, I did not discuss the substance of (INAUDIBLE).

BLUMENTHAL:

Will you recuse yourself from those investigations?

BARR:

No.

BLUMENTHAL:

Let me ask you about a couple of quotes from the presidents of the number of my colleagues have raised the Russia investigation and these are from the report untruths recited by the report from the president in December 2016 when President Trump was ask about the intelligence communities conclusion that Russia interfered in our election to boost Trump's chances he said he had quote no idea if it's Russia, China or somebody. It could be somebody sitting in a bed some place.

GRAHAM:

400-pound person.

BLUMENTHAL:

I'm sorry Mr. Chairman?

GRAHAM:

400-pound person sitting on a bed.

BLUMENTHAL:

That isn't what the president said. He referred to it as somebody. He also at Helsinki denied Russian attacks in 2016 on our election, another lie. Two days after President Trump was elected Russian officials told the press that the Russian government had maintained contacts with Trump's quote a median in entourage end quote during the campaign when President Trump was ask about it, he said quote there was no communication between the campaign and any foreign entity during the campaign. That's at page 21 of volume 2. The first quote I gave you was from page 21 of volume 2.

The president initially denied playing in the role in shaping his sons statement to the press about the now infamous June 9 meeting. The Mueller report establish that the president dictated a misleading statement about that meeting through His Communications Director

Hope Hicks. That's at page 101 and 102 of volume 2. After news organizations reported that the president ordered McGahn, Mr. McGahn to have these special counsel remove the president publicly disputed these accounts. The Mueller report establishes that quote substantial evidence supports the conclusion that the president in fact directed McGahn to call Rosenstein to have the special counsel removed. That set volume 2, page 88.

In your view did President Trump on those occasions and others recited in the report lie to the American people?

BARR:

Well, I am not in the business of determining when lies are told to the American people. I am in the business of determining whether a crime has been committed.

BLUMENTHAL:

So he may have lied (INAUDIBLE).

BARR:

But I would like an opportunity to answer some of these questions. Okay? You started--you started by citing this thing in volume 2 about how the report says that they could not be sure that they could clearly say that he did not violate the law. As you know that's not the standard we use in the criminal justice system. It's presumed that someone is innocent and the government has to prove that they clearly violated the law. We are not in the business of exoneration. We are not in the business of proving they didn't violate the (INAUDIBLE).

BLUMENTHAL:

I found that whole (INAUDIBLE) exonerated him in your press conference and in your four-page summary.

BARR:

How did that start? I didn't hear the beginning of the question.

BLUMENTHAL:

You in effect exonerated or cleared the president

BARR:

No, I didn't exonerate. I--I said that we did not believe that there was sufficient evidence to establish an obstruction offense which is the job of the Justice Department and the job of the Justice Department is now over. That determines whether or not there is a crime. The report is now in the hands of the American people. Everyone can decide for themselves. There's an election in 18 months. That's a very democratic process. But we are out of it. We have to stop using the criminal justice process as a political weapon.

BLUMENTHAL:

My time has expired. I apologize Mr. Chairman but I would just say that the four-page letter in the press conference that you did left a clear impression and it's been repeated again and again that you cleared the president

GRAHAM:

Thank--thank you Senator--

GRAHAM:

--Ernest.

ERNST:

Thank you, Mr. Chair. And, thank you, Attorney General Barr, for being here today and visiting with all of us. The special counsel's investigation and--and all of the ripples that came from the 2016 presidential election have really permeated the country. I mean there is great interest in this. And, as I'm touring the 99 counties of Iowa, I am asked about this at

town halls and other interactions with my constituents just as much as any other issue at hand. And I'm sure many of the other senators here have had the same experience.

And I'd like to start today by visiting with you about the actions of Russia during the 2016 presidential election. I think that's where a lot of us would like to see the focus go. We need to focus on what happened in the 2016 election. And then look ahead and make sure we are safeguarding our practices.

So, I think it's natural to think of acts of aggression by a foreign state in terms of bullets, in terms of bombs, that's what we typically thought of as acts of aggression. After all, up until just recent days acts of aggression or warfare has been a symmetrical operation by a foreign adversary. In the past it's been practiced by boots on the ground or various bombing campaigns. But, that's not what we are facing today. And I do believe what we saw from Russia was an act of aggression. Other adversarial foreign states, not just Russia, but I think a number of colleagues have mentioned, China as well, perhaps North Korea, Iran. We could go on and on. Not only do they practice direct hostile military action, just as Russia did in Ukraine with its illegal annexation of Crimea, but as was detailed in the special counsel's report, they seek to influence the elections of our free states through cyber means. And it is an objective fact that Russia attempted to influence our election. We know that, folks. All of us admit to that. We see the evidence that Russia tried to influence our election. The hacks, the disinformation and social media cyber-attacks by Russia were done with the intent to sow discord among the American people.

Russia will show no hesitation. They have not in the past. They won't in the future in using these types of acts of aggression in an attempt to undermine our elections process and our way of life. And it doesn't matter if the attack is coming from the end of a barrel of a gun or the click of a mouse. We have to get to the bottom of it.

And so, General Barr, the past two years we've been talking about this investigation in terms of what happened and now we have the opportunity to decide how to do better. So, the special counsel's Report is the end of the road. I think many have stated that, the end of the road when it comes to the question of the Trump administration's intent, but it is just the

beginning of the conversation on how we counter Russia and other foreign adversaries in their attempts to undermine our republic.

So, if we can talk about that 2016 presidential election, do you see vulnerabilities or weaknesses that existed at--at that time that left us open to foreign aggression, foreign influence in the election system and then how do we move forward through the Department of Justice in making sure we're shoring up some of those avenues of approach of our foreign adversaries?

BARR:

Yes. The FBI, you know, has a very robust program, the Foreign Influence Task Force, which is focused on this problem. And is working to counteract and prepare for the kinds of interference that we have seen. And it's a very dynamic program. I've been briefed on it by--by Chris Wray and I'm very impressed with what they're--what they're up to.

I think that the way I--the way I view this general problem is there has always been efforts by Russia and other hostile countries to influence American elections and public opinion. But, it was more easily detectable and it was sort of a cruder operation in the past. And what we have now is the technology and the democratization of information, the danger is far more insidious. And it enables not only them getting into, effectively, our whole communication system here in the United States. And I'm just--I mean just the way we communicate with each other and into our business systems, our infrastructure. But, it also allows them to do exactly what we've seen, which is because of our robust First Amendment freedoms they're able to come in and pretend they're Americans and effect the dialogue and the social dynamics in the United States in a way that they've never been able to do before.

And it's a huge challenge to deal with it. But, I think the intelligence community is responding to the challenge and the threat. I think--I had this discussion with Bob Mueller on March 5 when he was briefing me on his work and discussing lessons learned. What he has seen in dismantling the threats that he, you know, was able to detect and how we can start using that approach across the board.

ERNST:

So, I see we've accomplished a lot through our federal agencies and through the Department of Justice that are we able to work with different social media giants, other private organizations to help counter some of this? Do you see that they are actually stepping up to this challenge, taking this on and making sure that they are pushing back as well against what they might determine as a--a foreign adversary?

BARR:

Yes, I think the--the private companies are, you know, stepping up their game and being more responsible and addressing it.

ERNST:

I think--

BARR:

--and--

ERNST:

--I think that's important. I'm sorry, go ahead, please--I--I just think it's important that we really focus on why we're here today. And that's because we did see Russian influence in our 2016 presidential election. What we need to make sure, as many of our other colleagues have noted, is that this doesn't happen to us again. And that we are aware. And as a public we are aware of what has been happening not just in our own elections process here in the United States, but to many of our allies around the globe as well and making sure that we adequately pushing back against that and even over matching in making sure that--that we keep that type of influence out of our election cycle.

So, I appreciate your time today. Thank you very much, General Barr.

BARR:

Thank you.


GRAHAM:

Senator Hirano.


HIRONO:

Thank you, Mr. Chairman. Mr. Barr, now the American people know that you are no different from Rudy Giuliani or Kellyanne Conaway or any of the other people who sacrifice their once decent reputation for the grifter and liar who sits in the Oval Office. You once turned down a job offer from Donald Trump to represent him as his private attorney. At your confirmation hearing, you told Sen. Feinstein that, "The job of attorney general is not the same as representing" the president. So you know the difference, but you have chosen to be the president's lawyer and sighed with him over the interest of the American people.

To start with, you should never have been involved in supervising the Robert Mueller investigation. You wrote a 19-page unsolicited memo, which you admit was not based on any facts, attacking the premise of half of the investigation. And you also should have insisted that Deputy Attorney General Rod Rosenstein recuse himself. He wasn't just a witness to some of the president's obstructive behavior, we now know he was in frequent personal contact with the president, a subject of the investigation. You should have left it to a career officials.

Then once the report was delivered by the special counsel, you delayed its release for more than two weeks. You let the president's personal lawyers look at it before you even deigned to let Congress or the public see it. During the time, you substituted your own political judgment for the special councils--counsel's legal conclusions and a four-page letter to Congress and now we know, thanks to a free press, that Mr. Mueller wrote you a letter objecting to your so-called summary.

When you called Mueller to discuss his letter, the reports are that he thought your summary was giving the press, Congress, and the public a misleading impression of his work. He asked you to release the report summaries to correct the miss-impression you created, but she refused. When you finally did decide to release the report over a Congressional recess and on the eve of two major religious holidays, you called a press conference to once again try to clear Donald Trump before anyone had a chance to read the special counsel's report and come to their own conclusions.

But when we read the report, we knew Robert Mueller's concerns were valid and that your version of events was false. You used every advantage of your office to create the impression that the president was cleared of misconduct. You selectively quoted fragments from the special counsel's report, taking some of the most important statements out of context and ignoring the rest. You put the power and authority of the office of the attorney general and the Department of Justice behind a public relations effort to help Donald Trump protect himself.

Finally, you lied to Congress. You told Representative Charlie Crist that you didn't know what objections Mueller's team might have to your March 24 so-called summary. You told Senator Chris Van Hollen that you didn't know if Bob Mueller supported your conclusions, but you knew. You lied, and now we know.

A lot of respected nonpartisan legal experts and elected officials were surprised by your efforts to protect the president. But I wasn't surprised. You did exactly what I thought you do. It's why I voted against your confirmation. I expected you would try to protect the president, and indeed you did.

In 1989--this isn't something you hadn't done before. In 1989 when you refused to show Congress an OLC opinion that led to the arrest of Manuel Noriega. In 1992 when you recommended pardons for the subjects of the Iran-Contra Scandal. And last year when you wrote the 19-page memo telling Donald Trump as president can't be guilty of--of obstruction of justice and then didn't recuse yourself from the matter. From the beginning, you were addressing an audience of one, that person being Donald Trump.

That's why before the bombshell news of yesterday evening, 11 of my Senate colleagues and I called on the Department of Justice inspector general and Office of Inspector Professional Responsibility to investigate the way you have handled the Mueller report. I wanted them to determine whether your actions complied with the departments policies and practices and whether you have demonstrated sufficient impartiality to continue to oversee the 14 other criminal matters that the special counsel referred to in other parts--to other parts of the Department of Justice.

But now, we know more about your deep involvement in trying to cover up for Donald Trump. Being attorney general of the United States is a sacred trust. You have betrayed that trust America deserves better. You should resign. I have some questions for you. Is the White House exerting any influence on your decision whether to allow special counsel Mueller to testify in Congress, and when?

BARR:
No.

HIRONO:
Now, you've been clear today that you don't think that any of the 10 episodes of possible obstruction that the special counsel outlined is a crime. I disagree, but you seem to think that if it's not a crime, then there's no problem. Nothing to see here, nothing to worry about. So with apologies to Adam Schiff, do you think all of the things that President Trump did are okay? Are they what the president of the United States should be doing? For example, do you think it's okay for a president to fire an FBI director to stop him from investigating links between his campaign and Russia? It may not be a crime, but do you think it's okay?

BARR:
Well I think the report is clear that that--

HIRONO:

--No, I'm not talking about the report--

BARR:
--Well, I'm talking about--

HIRONO:
--and its analysis of whether a crime occurred. I'm asking you--

BARR:
--I don't think the evidence--

HIRONO:
--this is not a crime, but do you think it's okay for the president to do what he did to fire the special counsel--

BARR:
--I do think it's okay--

HIRONO:
--To keep him from investigating--

BARR:
--for the president to do what he did and I don't think the evidence supports the proposition--

HIRONO:
--So I guess you think it's okay--

BARR:

--That he did it to stop the investigation.

HIRONO:

Do you think it's okay for a president to ask his White House counsel to lie?

BARR:

Well, I'm willing to talk about what's criminal.

HIRONO:

No, we've already acknowledged that you think it was not a crime. I'm just asking whether you think it's okay. Even if it's not a crime, do you think it's okay for the president to ask his White House counsel to lie?

BARR:

Which event--

HIRONO:

Look, if you're just going to go back to whether or not it's a crime--

BARR:

--No, which event are you talking about--

HIRONO:

--You're telling me that it's--

BARR:

--Which event are you talking about--

HIRONO:

--Okay let me ask you the last question that I have in 17 seconds. Do you think it's okay for a president to offer pardons to people who don't testify against him to threaten the family of someone who does. Is that okay?

BARR:

What--when did he--offer a pardon to someone in order--

HIRONO:

I think you know what I'm talking about. Please.

BARR:

What do you mean--

HIRONO:

--Please, Mr. Attorney General. You know, give us some credit for knowing what the hell is going on around here with you.

GRAHAM:

Not really too this line of questioning.

HIRONO:

So--

GRAHAM:

--We're going to--we're going to--listen, you slandered this man every way you can slander--

BARR:

--Yeah, what I sort of want to know is how did we get--how did we get to this point--

GRAHAM:

--yeah, so--

HIRONO:

--I do not think that I--

BARR:

--How did we get to the point--

HIRONO:

--I am slandering anyone--

GRAHAM:

--All--all I can say is--

BARR:

--How did we--

HIRONO:

--Mr. Chairman, I am done--

GRAHAM:

--7 minutes--

HIRONO:

--Thank you very much--

GRAHAM:

--And you slandered this man from top to bottom. So if you want more of this, you're not going to get it. If you want to ask him questions, you can.


HIRONO:
You certainly have your opinion and I have mine.


BLACKBURN:
Thank you, Mr. Chairman, thank you, General Barr, for being here today. We really appreciate your time.

I--I want to talk with you just a little bit about some of your bottom line conclusions, because I think there is one that we need to kind of circle back to a little bit. And as I've listened to a lot of the conversation here today, one of the things we've not discussed is what seems to be the culture at DOJ and the FBI. And I know there are a lot of good people that work there, and we are grateful for their service.

But every organization has a culture, and--whether it's a corporate culture or a church or schools or--or whatever. And what seems to have happened at the FBI is there is a seedy, cynical, political culture within a group that developed. And these individuals collectively seemed to think that they could work within the power of their jobs and their roles with the federal government. There was an elitism and an arrogance there, and it speaks to a very unhealthy work culture within that agency.

And I will tell you this. When I talk to Tennesseans, they talk a lot about what they want to see with the Department of Justice and the FBI post all of this and a restoration of trust and integrity and accountability. And really, in Tennessee, they'll talk to me about four things. They talk a lot about healthcare, jobs, and the economy. They are going to talk about getting federal judges confirmed and about reining in government and holding it accountable.

And there's been a lot of hysteria. This is something that grew within the ranks of the FBI. What are you doing and what is your plan for rebuilding that trust and integrity so that the

American people can say, when the FBI does its job, when the DOJ does its job, we know that it's a job done right?

BARR:
I don't think there is--there is a--a bad culture in the FBI, and I don't think the problems that manifested themselves during the 2016 election are endemic to the institution. I think the FBI is doing its job. I mean just this recent case out in California where they interdicted this, you know, would be bomber. They're--they do great work around the country every day. And it's a--it--I agree with Senator Kennedy, who said, you know, it's the premier law enforcement institution in the world.

I believe that and I say to the extent there was overreach--I don't want to judge people's motives and come to a conclusion on that. But to the extent there was overreach, what we have to be concerned about is at a--you know, a few people at the top get--getting it into their heads that they know better than the American people and--

BLACKBURN:
--And that is the problem, and that is what we hope that you are--

BARR:
--Yep--

BLACKBURN:
--you're addressing. Let's go back to this because, to repeat--to the report. To produce it, I think that Mr. Mueller assembled what would be called a dream team, 19 all-star lawyers, a Watergate prosecutor, a deputy solicitor general, a fluent Russian speaker who clerked for two Supreme Court Justices, former head of the Enron investigative task force, chief of the Public Corruption Unit in the Manhattan U.S. attorneys office, federal prosecutors who have taken down mob bosses, the Mafia, and ISIS terrorists. Do you consider these lawyers to be the best and the brightest in the field?

BARR:

Not necessarily.


BLACKBURN:

Are they the warriors you would want on your side in the courtroom?


BARR:

I mean, it--you know, there are a lot of great lawyers in the Department of Justice. You know, he assembled a very competent team.


BLACKBURN:

Are they meticulous investigators who will hunt down every witness and every piece of evidence?


BARR:

I--I think they are tenacious investigators.


BLACKBURN:

Are they devoted to finding the truth?


BARR:

Yes.


BLACKBURN:

Are they masters at taking down hardened criminals, foreign and domestic?


BARR:

Yes.

BLACKBURN:

If there were evidence to warrant a recommendation for collusion charges against the president, do you believe that the special counsel team would have found it?

BARR:

Yes.

BLACKBURN:

And if there were evidence to warrant your recommendation for obstruction of justice charges against the president, do you believe the Mueller team would have found it?

BARR:

I--I think that they had an--they canvassed the evidence exhaustively on--they didn't reach a decision on it.

But the question you've just been asking raises a point I wanted to say when Senator Hirono was talking, which is it's--you know, how did we get to the point here where the evidence is now that the president was falsely accused of colluding with the Russians and accused of being treasonous and accused of being a Russian agent. And the evidence now is that was without a basis. And two years of his administration have been dominated by the allegations that have now been proven false. And, you know, to--to listen to some of the rhetoric, you would think that the Mueller report had found the opposite.

BLACKBURN:

And, you know, Mr. Attorney General, I will tell you that is what Tennesseans say. They say how did we get here? How is there this allowance and acceptedness of saying that's okay? Because it's not. And people want to see government held accountable. They want agencies to act with accountability to the American people, and they don't want to ever see this happen again.

It doesn't matter if a candidate is a Democrat or Republican or an independent. They never want to see this happen again, because they know that this was pointed at using the power that they had to try to tilt an election or to achieve a different outcome. And the American people what equal justice, they want respect for the rule of law, and they want fairness from the system.

I have one other question dealing with social media. Tennessee Republican Party had a (INAUDIBLE) GOP account that was set up by the Russians. And, you know, either--I think as we look at social media, either they were willing to turn a blind eye and allow these accounts to go up, because they knew they were being paid in rubles on some of these accounts, and--or there was just negligence.

So, my hope is that, with all the bad actor states, whether it is Russia or Iran or North Korea or China, that you all have a game plan for dealing with these platforms in a way that you're going to rein them in for the 2020 election. I yield back.


GRAHAM:
Thank you. Senator Booker?


BOOKER:
Thank you, Mr. Chairman. Mr. Barr as I take a step back at this I--I just really think we are at a very sobering moment in American history that there is a considerable amount going on when you actually take time and read this whole report that shows that we are sort of at a crossroad and I fear that we are descending into a new normal that is dangerous for our democracy on a number of levels and I fear unfortunately and I hope we have a chance to discuss this that you have not only put your own credibility into question but seem to be giving sanctioned to behavior through the language you used in that press conference you held, the language you used in your summary that--that stimulated Mueller to write such a strong rebuking letter. I--I fear that you are adding normalcy to a point where we should be sounding alarms as opposed to saying that there is nothing to see here.

And so one this 448 page report that has a deep litany of lies and deceit and misconduct, a president of the United States instructing people to lie and be deceitful, evidence of people trying to cover up behavior that on its face is morally wrong whatever the legal standard is. I found it number one by saying that this kind of obstructive conduct was acceptable not only acceptable but your sentence literally saying that the American people should be grateful for it that is the beginning of normalization that I want to explore. But the second thing I want to explore and we will explore this but I want to make my two statements at the top.

One, that's problematic and--and general the second problem I have is that you seem to be excusing a campaign that literally had hundreds of contacts with a foreign adversary that I think there's a conclusion amongst and a bipartisan conclusion that there was a failure to even report those contacts, that we engaged in behaviors that the folks knew that were wrong that they try to actively hide they seem to capitalize--seem to capitalize on this foreign interference. I mean in our country we know it is the legal for a campaign and wrong for a campaign to share polling data with an American super pack but we have here documented a level of coordination with a foreign adversary sharing polling data and--and--and we seem to be and your conduct seems to be trying to normalize that behavior and I think that is why we are in such a serious moment that is the routing the cultures of this democracy and the security of this democracy and so let's just get into some of this specifically.

You said quote we know that the Russian operatives who perpetrated these schemes did not have the cooperation of President Trump or the Trump campaign. That is something that all Americans can and should be grateful to have confirmed. The things I just mentioned a willingness to meet with Russian operatives in order to capitalize on information I don't think that's something that should be grateful. I--I find your choice of words alarming. I think it calls into question your objectivity when you look at the actual context of the report. And so should the American people really be grateful that a candidate for president sought to benefit from material and information that was stolen by a foreign power in an effort to influence an election?

BARR:

I am not sure what you mean by seek to benefit. There--there is no indication that they engaged in either the conspiracy to act or that they engaged in any action with respect to the dissemination that was criminal.

BOOKER:

Well, again, sir you are using the word conspiracy which is a legal term. In that press conference you use President Trump's words obstruction over and over again--

BARR:

Obstruction is a legal term.

BOOKER:

Well--well, sir, you pulled into his words and I am asking you specifically I am sorry coalition was the word I was looking for. You use the words no collusion over and over again and you said the American people should be great that the president sought to benefit from material information but you know they did seek to benefit from that material. Donald Trump Junior in his own email seem to celebrate that he might have access to information from a foreign adversary. Is that correct? Is that something the American people should be (INAUDIBLE) for?

BARR:

Apparently according to the report he was--apparently, he was interested in seeing what this Russian woman had in the way of quote dirt.

BOOKER:

And--and did not report it as I think everybody who's in politics knows it's something you should do. Should the American people be grateful in the face of our attack on our democracy by foreign adversary that the president of the United States made several

documented attempts to thwart an investigation into the links between his campaigns and Russia? You use that word grateful again that the American people should be grateful. Is that something we should be grateful for?

BARR:

I'm not sure what--what you are talking about.

BOOKER:

Well, sir, I am talking about the attempts that this president made that Mueller pointed to at least 10 attempts to thwart an investigation into the links between his campaign and Russia. Should we be grateful for those 10 well documented attempts by Mueller?

BARR:

Are you talking about the obstruction part of the report? (INAUDIBLE)

BOOKER:

I am talking about the second volume but--but let me continue. Should the American people be grateful that the Trump had more than 215 documented contacts between Russian linked operatives and then lied about them and tried to hide them? Is that something the American people should be grateful for, any precedent, this one or any down the road?

BARR:

As I--as mentioned earlier during a campaign foreign governments make and foreign citizens frequently make a lot of attempts to contact different campaigns. If we were right now to go and look at for example Hillary Clinton's campaign during the same timeframe--

BOOKER:

Sir, sir, I--

BARR:

--timeframe then--then you would see a lot of foreign governments--the Chinese trying to establish (INAUDIBLE).

BOOKER:

And that's I guess what I'm trying to say to you, sir, is that we right now have a new normal in our country. We have a document that shows over 200 attempt--connections between a--a presidential campaign and a foreign adversary sharing information that would be legal if you did it with a super pack, we know that.

BARR:

What information was shared?

BOOKER:

Polling data was shared, sir. It's in the report. I can send you the page.

BARR:

With who?

BOOKER:

And--and I guess my point is is that your willingness to seem to brush over this and use words like the American people should be grateful of what's in this report nobody should be grateful. Concerted efforts for deception, for misleading, inappropriate action after inappropriate action that--that is clear. And then on top of that at a time that we all recognize that we had a foreign power trying to undermine our election you the chief law enforcement officer not only undermines your own credibility as an independent actor when there is ongoing investigation still using the word--presidents own words having it criticized by Mueller himself but--but the challenge we now have is that we are going into an

area where you seem to not even be willing to be in the least bit critical--in your summarizations. I--I believe that calls into your credibility and again my time is up.

GRAHAM:
Senator Tillis?

TILLIS:
Thank you, Mr. Chairman. General Barr, thank you for being here. On the--in the last sentence on page 1 of your four page memo it states that the special counsel issued more than 2,800 subpoenas, executed nearly 500 search warrants, obtained more than 230 orders for communication records, issued almost 50 orders authorizing the use of pen registers, made 13 requests to foreign governments for evidence, and interviewed approximately 500 people. That seems like a pretty extensive investigation. It took about 22 months, right?

BARR:
Right.

TILLIS:
And it was summarized in about a little over 400-page document, volume two was just under 200 pages, as I recall. I've read volume two word for word and I've read most of volume one. The new normal that seems to be created here is even after all of this investigation and you haven't found any conduct worthy of indictment that you can just bounce back for political reasons and indict somebody. That's a rhetorical statement or question, not a statement.

Now, we go back to the other part that I find interesting here. The New York Times already issued a headline that says Mueller pushed and lettered for Barr to release the reports summary. So, now the--the narrative because I've had a lot of people in the press coming

out and the narrative is well, doesn't this undermine the--the attorney general because Mueller wanted the executive summaries issued? Now, I'm gonna go back to what you said in your opening statement. You said that, I believe, using your words, the body politic was--that it was unrestful. You've gotten the report. You didn't get the (INAUDIBLE) information. You had to do the redacting. You knew that that was gonna take time. It would have been helpful if you'd gotten that when the report was transmitted to you. It took however long it took.

You issued the summary. You used the analogy of--of announcing the verdict and waiting for the transcript. Did you ever at any point say you know what I really want to do is issue this letter and then let the news media play with it for three or four weeks and then we'll get the redacted version out? Did that ever cross your mind?

BARR:
No, we were pushing--

TILLIS:
--To get it done as soon as possible.

BARR:
--to get the report out as soon as possible.

TILLIS:
And at any point in time when the president had the opportunity to issue their own advice on redactions or--or assert executive privilege over the course of the weeks that you were doing the review of the report, did you ever get advice from the president or from anybody in the White House to assert executive privilege or to redact any portion of the document?

BARR:
No.

TILLIS:

None. And so, the narrative between the letter and the redaction process was we're gonna get a report that's 80 percent redacted. Now, would you give me the--the numbers again on the version that's available to the leadership of Congress, the numbers again, I think you said one-tenth of one per--the--we're skipping over volume one and we're spending time on volume two.

BARR:

Yes.

TILLIS:

Did I hear you say that the legislative leaders have access to all but one-tenth of one percent of the entire report?

BARR:

Approximately, yes.

TILLIS:

So, guys, you can go out and spin this any way you want to, but the data is there. There was no underlying crime and there was insufficient evidence to indict the president on obstruction of justice. You said something else that's interesting to me. In the report about the we found no evidence that was sufficient to indict. But, then they went on to say nor can we exonerate him. When is the special counsel in the business of exonerating a subject of an investigation?

BARR:

They're not.

TILLIS:

They're not. So, why would somebody put something like that in the report?


BARR:

I don't know.


TILLIS:

And--and so, what it--it would follow if that's uncommon that you would not have actually included that in the summary before the full context of the report could be produced. Is that a fair statement?


BARR:

That's a fair statement. But, I did put in the sentence about not--I did put in the sentence about not exoneration.


TILLIS:

Yeah. I think that--that--the thing that frustrates me, number one, I should have started by saying this, the vast majority of people in the Department of Justice and the FBI are extraordinary people. The chairman is right. Starting with Strzok and Page and everybody else leading up before the investigation, I hope they're being investigated. I have--I have a question for you. The scope of the OIG, where does--do you understand or do you know what the scope of that report will be? Will it be purely on this investigation or would it extend also to other acts that may have in some way influenced this investigation?


BARR:

Well, I--I don't want to be too specific. I talked to Mike Horowitz a few weeks ago about it. And it's focused on the FISA, the basis for the FISA and the handling of the FISA applications. But, by necessity it looks back a little bit earlier than that. The people I have helping me with my review will be working very closely with Mr. Horowitz.

TILLIS:

Now, I wanna go back again because we have other people talking and I'm sure it's gonna come up again. I'm clear in this report there was no underlying crime? Is that correct? That--

BARR:

--Yes--

TILLIS:

--and there was--

BARR:

--That's the conclusion of the--

TILLIS:

--and there was insufficient evidence or insufficient evidence to assert that the president obstructed justice. And a lot of that evidence was in the public eye because we talked about tweets and public statements, a number of other things that we're trying to use to assert as evidence for obstruction of justice. It seems odd to me that people on this committee that pound and pound over and over again that you're innocent and proven--until proven guilty with the extent of this report, with the number of resources, nearly $30 million, when the facts don't lead to the outcome that you wanted, the one that the marketing department wanted, to use this as a political tool for the next 20 months, it seems odd to me that we'd go down the--of the path of--of saying that well, in spite of all the work, we're gonna indict him anyway. And if we can't indict him we're gonna impugn your integrity and call you a liar. I find that behavior on this committee despicable. Thank you.

GRAHAM:

Senator Harris?

HARRIS:

Thank you, Mr. Chairman. Attorney General Barr has the president or anyone at the White House ever ask or suggested that you open an investigation of anyone?

BARR:

I--I wouldn't--

HARRIS:

Yes or no?

BARR:

Could you repeat that question?

HARRIS:

I will repeat it. Has the president or anyone at the White House ever ask or suggested that you open an investigation of anyone? Yes or no please, sir?

BARR:

The president or anybody else?

HARRIS:

Seems you would remember something like that and be able to tell us.

BARR:

Yeah, but I--I'm trying to grapple with the word suggest. I mean there have been discussions of--of matters out there that they have not asked me to open an investigation but--

HARRIS:

Perhaps they have suggested?

BARR:

No, I wouldn't say suggest--

HARRIS:

Hinted?

BARR:

(INAUDIBLE)

HARRIS:

Inferred? You don't know? Okay. In your March 24 summary you wrote that quote after reviewing special counsel's final report--

BARR:

I will say that no one--

HARRIS:

Sir, I am asking a question. In your March 24 summary you wrote that quote after reviewing the special counsel's final report Deputy Attorney General Rosenstein and I have concluded that the evidence is not sufficient to establish that the president committed an obstruction of justice defense. Now the special counsel's investigation produced a great deal of evidence. I am led to believe it included witnesses notes and emails, witnesses congressional testimony, witnesses interviews which were summarized in the FBI 302(SP) forms, former FBI Director Comey's memos in the presidents public statements.

My question is in reaching your conclusion did you personally review all of the underlying evidence?

BARR:

No, we took and accepted--we accepted--

HARRIS:

Mr. Rosenstein?

BARR:

No, we accepted the statements in the report as the factual record. We did not go underneath it to see whether or not they were accurately accepted as accurate. And made our--made our--

HARRIS:

Accepted the report as the evidence?

BARR:

Yes.

HARRIS:

You did not question or look at the underlying evidence that supports the conclusions in the report?

BARR:

No.

HARRIS:

Did Mr. Rosenstein review the evidence that underlies and supports the conclusions in the report to your knowledge?

BARR:

Not to my knowledge. We accepted the statements in the report--and characterization of the--

HARRIS:

Did anyone in your--

BARR:

--evidence as true.

HARRIS:

Did anyone in your executive office review the evidence supporting the report?

BARR:

No.

HARRIS:

No. Yet you represented to the American public that the evidence was not quote sufficient to support an obstruction of justice offense?

BARR:

The evidence--the evidence presented in the report. This is not--this is not a mysterious process and the department of justice we have (INAUDIBLE) memos and declination memos every day coming up and we don't go and look at the underlying evidence (INAUDIBLE).

HARRIS:

Sir, would you support--

BARR:

--we take the characterization of the evidence as true.

HARRIS:

As the attorney general of the United States you run the United States Department of Justice. If then in a U.S. attorney's office around the country the head of that office when being asked to make a critical decision about in this case the person who holds the highest office in the land and whether or not that person committed a crime would you accept them recommending a charging decision to you if they had not reviewed the evidence?

BARR:

Well, that's a question for Bob Mueller. He is the U.S. attorney; he is the one who presents the report.

HARRIS:

But it was you who made the charging decision, sir. You made the decision not to charge the president

BARR:

No, in a process memo and in a declination memo.

HARRIS:

You said it was your baby. What did you mean by that?

BARR:

It was my baby to let--to decide whether or not to disclose it to the public.

HARRIS:

And whose decision was it--who have the power to make the decision about whether or not the evidence was sufficient to make a determination of whether there had been an obstruction of justice?

BARR:

Prosecution memos go up to the supervisor, in this case it was the attorney general and the deputy attorney general who--to decide on the final decision and that is based on the memo as presented by the U.S. attorney's office.

HARRIS:

I think you have made it clear that you have not looked at the evidence. We can move on.

BARR:

I have seen a lot of prosecution--I have seen a lot of (INAUDIBLE).

HARRIS:

You have made it clear sir that you have not looked at the evidence and we can move on. Will you agree to consult career DOJ ethics officials about whether your recusal from the 14 investigations that have been discussed by my colleagues is necessary?

BARR:

I don't see any basis for it. I already consulted with them and--and--

HARRIS:

You have consulted with them about the 14 other investigations?

BARR:

About the Mueller case.

HARRIS:

Have you consulted with the career DOJ ethics officials about the appropriateness of you being involved work recusing yourself from the 14 other investigations that have been referred out?

BARR:

On what basis?

HARRIS:

Conflict of interest, clear conflict of interest.

BARR:

What's my conflict? What's my conflict of interest?

HARRIS:

I think the American public guessing quite well that you are biased in this situation and you have not been objective and that would arguably be a conflict of interest.

BARR:

You know I haven't been the only decision-maker here. Now let's take the Deputy Attorney General Ron Rosenstein who was approved by the Senate 94-6 with a specific discussion on the floor that he would be responsible for supervising the Russian investigation.

HARRIS:

I'm glad you brought up that.

BARR:

And he has 30 years' experience and we had a number of senior prosecutors in the department involved in this process, both career and noncareer--

HARRIS:
Yes, I--I have read the process, sir.

BARR:
Who have all agreed on the (INAUDIBLE).

HARRIS:
Sir, I have another question and I'm glad you brought the subject up because I have a question about that. Earlier today in response to Senator Graham you said quote that you consulted with Rosenstein constantly unquote with respect to the special counsel's investigation and report but Deputy Attorney General Rosenstein is also a key witness in the firing of FBI director Comey. Did you consult--

BARR:
Well, that's (INAUDIBLE)

HARRIS:
--with the--I am not finished. Did you consult with DOJ ethics officials before you enlisted Rod Rosenstein to participate in a charging decision for an investigation the subject of which he is also a witness?

BARR:
My understanding was that he had been cleared already to participate in it (INAUDIBLE)

HARRIS:
So you had consulted with them and they cleared it?

BARR:

No, I think they cleared it when he--when he took over the investigation.

HARRIS:

Did you consult--

BARR:

That's my understanding.

HARRIS:

You don't know whether he's been cleared of a conflict of interest?

BARR:

He would it be participating if there was a conflict.

HARRIS:

So you are saying that it did not need to be reviewed by the career ethics officials in your office?

BARR:

I believe--I believe it was reviewed and I would also point out--

HARRIS:

And what was the finding?

BARR:

--this seems to be a bit of a flip-flop because when the president supporters were challenging Rosenstein--

HARRIS:

Sir, the flip-flop I think in this case is that you are not answering the question directly. Did the ethics officials in your office in the Department of Justice review the appropriateness of Rod Rosenstein being a part of making a charging decision on an investigation which he is also a witness in?

BARR:

Yeah, so as I said my understanding was, he had been cleared and he had been cleared before I arrived by (INAUDIBLE)

HARRIS:

In making a decision on the Mueller report?

BARR:

Yes.

HARRIS:

And--and the findings of whether or not the case would be charged on obstruction of justice? He had been cleared on that.

BARR:

He--he was the acting attorney general on the Mueller investigation.

HARRIS:

Had he been cleared--

BARR:

He had been--I--I -

HARRIS:

--by your side a decision--

BARR:

I am informed--I am informed that before I arrived, he had been cleared by the ethics officials.

HARRIS:

Of what?

BARR:

Serving as acting attorney general in the Mueller case.

HARRIS:

How about making a charging decision on obstruction of justice, that is the underlying--

BARR:

That is what the acting--

HARRIS:

--offenses which include him as a witness?

BARR:

That's what the acting attorney general's job is.

HARRIS:

To be a witness and to make the decision about being a prosecutor?

BARR:

Well, no, but to make charging decisions.


HARRIS:

I have nothing else. My time has run out.


GRAHAM:

Thank you.


GRAHAM:

Senator, let's see we have Senator Cruz. I'd like to do short second rounds. I've got to go to another hearing at 2:40. We're going to take four votes, but to my colleagues on the other side I would like to do a very short second round and wrap it up. Oh, I'm sorry Senator-- Senator Crapo. I apologize.


CRAPO:

All right, thank you. Attorney General Barr, I know you have gone through almost everything that could have been asked so far today and I'm going to go over a few things that you already talked about. But I appreciate your willingness to get into it with me.

First off, I want to talk about the letter of March 27th that's been talked about a lot from Mr. Mueller. First, could you tell me who released that letter to the public?


BARR:

Released it to whom?


CRAPO:

Yes. I mean, how did it get released? Was that a decision that you made to release that letter?

BARR:

I think the department provided it this morning.

CRAPO:

Excuse me, I mean to the Washington Post. How did the Washington Post get the letter?

BARR:

I don't know.

CRAPO:

That's what I thought. So, well, let' stalk about the letter for-for a moment. You indicated that--

BARR:

I assume the Washington Post got it from the Department of Justice.

CRAPO:

Yeah, well, I think we need to find out. But we can get into that later. If--if you're not aware then let's move onto other aspects of the--of the issue. You indicated that you did not feel you needed to release as much as Mr. Mueller thought you needed to release at the outset. You gave a summary of the conclusions and he apparently wanted to see a--the summaries of each section that he had put together released. Correct?

BARR:

Yes.

CRAPO:

Could you go over again, the reason why you--you responded to him when he asked you to release portions of the report before you released it in its entirety?

BARR:

Yes, this was on a conversation on Thursday. I got his letter. And, I said that I didn't want to put out it was already several days after we had received the report and I had put out the four page letter on Sunday. And I said I don't--I don't want to put out summaries of the report that would trigger all kinds of frenzy about what was said in the summaries and then when the more information comes out it would recalibrate to that. And I said I just want to put it at one time everything together. And I told him that was--that was the game plan.

CRAPO:

All right, and I just think it's important to point that out again because there's been a lot of speaking about--about the letter and what--what it was that was being requested and what your response to that was.

BARR:

Right.

CRAPO:

I think it was important to help that get out again and get clarified. The reason I asked who released the letter is because there have been a lot of releases of documents from the FBI that were basically leaks and I was just curious as to whether that letter was a leak. I'm not asking you that to--

BARR:

I think--I don't like people jump me if I'm wrong on this, but I think the fact of the--I mean the information about Mueller's concerns were leaked and I think some news organizations were starting to ask about that.

CRAPO:

So, then the letter--

BARR:

And in that context I think the letter was provided. Is that accurate?

CRAPO:

So, there were leaks at least about the concerns and the conversations that you had had.

BARR:

Yes.

CRAPO:

That gets back to the broader question of leaks that--that I want to get into now. And you've had a number of people--senators that asked you about the perceived bias of the FBI. I--I heard you responses earlier that you believe the culture at the FBI is strong and solid and I agree with that. I do believe however, that it's been pretty clearly shown in a number of different ways that there are some individuals at the FBI at high levels who in the past few years have not been holding up the standards of the FBI that the American people expect of them. I'm--I'm sure you're familiar with the report of the DOJ's Inspector General Michael Horowitz where he looked at bias in the FBI. And, in fact, he found it. And he indicated in a hearing in this room before us that he did in fact, find that there was bias at the FBI and that--but--but he said that he wasn't able to prove that the bias affected the employees work product because as in questions that I asked him--he said, I--I found that there was cl

early bias, but in order to prove whether that affected the work output of those who were bias I had to ask them whether it impacted it and they of course said no. And I didn't have other evidence to prove otherwise. This gets back to a conversation you had earlier about whether the FBI's business or whether his business was to prove a negative or whether it was

to find some actionable conduct. My--my reason in going through this with you is that I want to get at what we can do--well, first of all, whether you agree that there is a problem of bias in the FBI in some parts or on some individuals at the FBI and whether you are undertaking activities to address that?

BARR:

Well, you know I--I you mean political bias?

CRAPO:

Yes. Whether there--whether there is political bias that is resulting in biased conduct by FBI agents?

BARR:

I haven't seen that since I've been there. I think Chris Wray the new director has changed out the people who were there before and brought in--not brought in from outside but promoted and developed a new leadership team that I think is doing a--a great job and I think he is focused on--on ensuring that the bureau isn't biased and that any of the problems from before are addressed.

CRAPO:

Do you believe it is inappropriate conduct for an FBI employee to leak politically sensitive information to the public for purposes of impacting political--

BARR:

--Yes--

CRAPO:

--discussion?

BARR:

Yes. And--and I think some leaks--some leaks are--are maybe for political purposes. I think probably more leaks are because people handling a case don't like what their su--superiors or supervisors are doing and they leak it in order to control people up the chain.

CRAPO:

And, I understand you have some investigations into that type of conduct under way?

BARR:

Yes.

CRAPO:

Just to note, a couple of quick questions. When did the DOJ and the FBI, if you know--when did the DOJ and the FBI know that the Democratic party paid for Christopher Steele's dossier which then served as the foundation for the Carter Page FISA application?

BARR:

I don't know the answer to that.

CRAPO:

Are you investigating to determine that?

BARR:

Yes.

CRAPO:

Did the Department of Justice the FBI and other federal agencies engage in investigative activities before an official investigation was launched in July 2016?

BARR:

I don't know the answer to that, but that's one of the areas--

CRAPO:

You are already investigating that. Okay. Thank you very much, attorney general.

LEE:

Senator Cruz?

CRUZ:

Thank you, Mr. Chairman. General Barr, thank you for your testimony. And let me start by just saying thank you. You have an extraordinarily successful legal career. You didn't have to take this job. And you stepped forward and answered the call yet again knowing full well that you would be subject to the kind of slanderous treatment, the Kavanaugh treatment, that we have seen of senators impugning your integrity. And I for one am grateful that you answered that call and are leading the Department of Justice both with integrity and fidelity of the law, that is what the nation rightly expects of our attorney general. And I believe you are performing that very. I think this hearing today has been quite revealing to anyone watching.

To although, perhaps, not for the reason some of the democratic senators intended. One thing that's revealing in the discussion questions that came up, a word that occurred almost none at all is the word Russia. For two and a half years we heard democratic senators going on and on and on about Russia collusion. We heard journalists going on and on and on about Russia collusion, alleging, among other things, some using extreme rhetoric calling the president a traitor. We heard very little of that in this hearing today. Instead the principle attack the Democratic senators have marshalled upon you concerns this March 27 letter from Robert Mueller. And it's an attack that I want people to understand just how revealing it is. If this is their whole argument they ain't got nothing.

So, their argument is as follows, and let me see if I understand it correctly. You initially when you received the Mueller report released to Congress and the public a four-page summary of the conclusions. Then on March 27 Mr. Mueller asked you to release an additional 19 pages, the introduction and summary that he had drafted. And, indeed, in the letter what he says is, quote, "I am requesting that you provide these materials to Congress and authorize their public release at this time." And the reason he says that it's--is that it--is that to fully capture the context, nature and substance of the office's work and conclusion.

So, you did not release those 19 pages at that time. Instead, a couple of weeks later, you released 448 pages, the entire report, which includes those 19 pages. Do I have that timeline correct?

BARR:
That's right.

CRUZ:
So, their entire argument is General Barr, you suppressed the 19 pages that are entirely public that we have that we can read that they know every word of it. And their complaint is it was delayed a few weeks. And that was because of your decision not to release the report piecemeal but rather than release those 19 pages along with the entire 448 pages produced by the special counsel.

BARR:
Yes.

CRUZ:
If that is their argument I have to say that is an exceptionally weak argument.

BARR:
(LAUGHTER).

CRUZ:

Because if you're hiding something I'll tell you right now, General Barr, you're doing a very lousy job of hiding it because the thing that they're suggesting you hid you released to Congress and the American people. And so if anyone wants to know what's in those 19 pages that are being so breathlessly, oh, Bob Mueller said release the 19 pages. You did. You did it a couple weeks later. But, we can read every word of the 19 pages along with the full report.

In your judgement was the Mueller report thorough?

BARR:

Yes.

CRUZ:

Did they expend enormous time, energy and resources investigating and producing that report?

BARR:

Yes.

CRUZ:

And the Mueller report concluded flat out on the question of Russian collusion, the evidence did not support criminal charges?

BARR:

That's right.

CRUZ:

And, indeed, the Mueller report, if I have these stats right, was compiled by 19 lawyers who were on the team, approximately 40 FBI agents, intelligence analysts, forensic accountants and professional staff. The special counsel issued more than 2,800 subpoenas, nearly 500 search warrants, more than 230 orders for communication records, almost 50 orders authorizing the use of pen register, 13 requests to foreign government for evidence and interviewed approximately 500 witnesses. Is that correct?

BARR:
That's right.

CRUZ:
So, we have investigated over and over and over again and the substance of the accusations that have been leveled at the president for two and a half years have magically disappeared. Instead the complaint is the 19 pages that we can all read, that is entirely public, could have been released a few weeks earlier. Oh, the collateral.

Let me shift to a different topic, a topic that has been addressed already quite a bit. I believe the Department of Justice under the Obama Administration was profoundly politicized and was weaponized to go after political opponents in the press. If that is the case, would you agree that politicizing the Department of Justice and weaponizing it to go after your political opponents is an abuse of power?

BARR:
I think it's an abuse of power regardless of who does it.

CRUZ:
Of course, yeah. To the best of your knowledge when did surveillance of the Trump campaign begin?

BARR:

The position today appears to be it began in July. But, I do not know the answer to the question.

CRUZ:

It is an unusual thing is it not for the Department of Justice to be investigating a candidate for president particularly a candidate from the opposing party of the--of the party in power?

BARR:

Yes.

CRUZ:

Do we know if the Obama administration investigated any other candidates running for president?

BARR:

I don't know.

CRUZ:

Do we know if they wiretapped any others?

BARR:

Well, I guess they were investigating Hillary Clinton for the email, the email fraud.

CRUZ:

Do we know if there were wiretaps?

BARR:

I don't know.

CRUZ:

Do we know if there were efforts to send investigators in wearing a wire?

BARR:

I don't know.

CRUZ:

So, General Barr, I would urge you have had remarkable transparency. You promised this committee you would with regard to the Mueller report. You promised this committee and the American people you would release the Mueller report publically. You have released the report. Anyone can read it. It's right here. I appreciate that transparency. I would ask you to bring the same transparency to this line of questioning about whether--whether and the extent to which the previous administration politicized the Department of Justice, targeted their political rivals and used law enforcement and intelligence assets to surveil them improperly.

GRAHAM:

Thank you. So, that's the end of the first round. We have votes I think at three. I think there are four votes. But, what I'd like to do is just can you go for a few more minutes here? You're okay? You're all right?

BARR:

Yes.

GRAHAM:

Okay, good. Senator Leahy, you're next. Will do three minute second rounds.

LEAHY:

Senator Feinstein noted that you felt the FBI (INAUDIBLE) duty if it did not investigate after learning from Australia. Not the Trump administration, but Australia. The Trump campaign knew Russia's (INAUDIBLE) on democratic emails before the victims do. And they were told the Russians could assist in a campaign with--with the stolen emails. The FBI was right to look into it. That resulted, of course, in 37 indictments.

But, let me ask you, Mr. Barr, in your March 24 letter, you claim that the lack of evidence of an underlying crime bears on whether the president had the requisite intent to commit obstruction of justice or there numerous reasons why someone may interfere with investigations. Most critically, an interference may prevent the discovery of an underlying crime. So, interfering, you might not know if there's a crime. But, the special counsel did uncover evidence of underlying crimes here, including one that directly implicated the president.

And didn't we learn due to special counsel's investigation that Donald Trump is known as individual one in the Southern District of New York, directing hush payments as part of a criminal scheme to violate campaign finance laws? That matter was discovered by special counsel referred to the Southern District of New York; is that correct?


BARR:
Yes.


LEAHY:
Thank you. And we have--the Mueller report references a dozen ongoing investigations stemming from the special counsel's investigation. Will you commit that you will not interfere with those investigations?


BARR:
Sorry. Can you--


LEAHY:

--Do you commit that you will not interfere with the dozen ongoing investigations?

BARR:
I--I will supervise those investigations as attorney general.

LEAHY:
Will you let them reach natural conclusions without interference from the White House? Let me put it that way then.

BARR:
Yes.

LEAHY:
Thank you.

BARR:
Did you--yeah. As I said when I was up for confirmation, part of my responsibility is to make sure there is no political interference in cases.

LEAHY:
Well, and you testified a number of things and that's why I'm--I'm double checking. You--the appropriations committee asked you whether Mr. Mueller expressed any expectation or interests in leaving the obstruction decision to Congress and you testified he didn't say that to you. Ac--actually, you said that he did--didn't say that to me.

BARR:
Right.

LEAHY:

But, then, he has numerous references in his report to Congress playing a role in deciding whether the president committed obstruction of justice. So, I know you testified many times, but that--

BARR:

--Well, I--I--

LEAHY:

--Definitely was not correct.

BARR:

That's not correct. I--I think it is correct. I mean, I don't--he has not said that he conducted the investigation in order to turn it over to Congress. That would be very inappropriate. That's not what the Justice Department does.

LEAHY:

Well, he included numerous references report to Congress playing a role in it. Volume two, page eight, inclusion of Congress being a part of the obstruction (INAUDIBLE) president's corrupt exercise of the power of office in accordance with our constitutional system of justice.

BARR:

Yeah. I don't think Bob--Bob Mueller was suggesting that--that the next step here was for him to turn this stuff over for--to Congress to act upon. That's not why we conduct grand jury investigations.

LEAHY:

And President Trump--I am correct in my earlier statement--never allowed anybody to interview him directly under oath. Is that correct?

BARR:

I think that's correct.

LEAHY:

Even though he said he was ready to testify. Thank you.

BARR:

Well--

GRAHAM:

--Senator Durbin--

BARR:

--could I--

GRAHAM:

--Sure.

BARR:

A point--a point you raised about the absence of a underlying crime--one point I was trying to make earlier is the absence of an underlying crime doesn't necessarily mean that there-- that there would be other motives for obstruction, although it gets a little bit harder to prove and more speculative as to what those motives might be. But, the point I was trying to make earlier is that in this situation of the president, who has constitutional authority to supervise proceedings, if in fact a proceeding was not well-founded, if it was a groundless proceeding, if it was based on false allegations, the president does not have to sit there, constitutionally, and allow it to run its course. The president could terminate that proceeding and it would not be a corrupt intent because he was being falsely accused and he would be worried about the impact on his administration. That's important because most of the obstruction claims

that are being made here or--or episodes do involve the exercise of the president's constitutional authority. And we now know that he was being falsely accused.

LEAHY:

I don't--I don't agree with that, but that's okay. Thank you.

DURBIN:

General Mueller, I have two questions, if you don't mind. The Mueller--pardon me. General Barr

(LAUGHTER)

I have two questions. The Mueller report re--describes the reasons why the FBI opened a counterintelligence investigation in July 2016 into Russian election coun--interference. There have been many references to why they would do such a thing. By that date, the Democratic National Committee server had been hacked and Russians has been deemed responsible. Some of the stolen emails had been released by WikiLeaks. The foreign government, the Australian government, had told our FBI the Trump foreign policy aid, George Papadopoulos, said he'd been contacted by a person on Russia's behalf offering to assist the Trump campaign by releasing information damaging to Hillary Clinton. That was all in the Mueller report.

Do you believe that it was an appropriate predicate for opening a counterintelligence investigation to determine whether Russia had targeted people in the Trump campaign to offer hacked information that might impact a presidential election?

BARR:

I'd have to see exactly what the report was from Downer--the Australian Downer and exactly what he quoted Papadopoulos as saying. But, from what you just read, I'm not sure what the correlation was between the Russians having dirt and jumping to the conclusion that that suggested foreknowledge of the hacking.

DURBIN:

According to Mr. Mueller in his report, this involvement of Trump Foreign Policy Aid George Papadopoulos had something to do with their conclusion. I'd like to ask you a separate issue.

It's been reported that on April 16th, you received a waiver to participate in the investigation and litigation of the so-called 1MDB matter. This is an investigation into a Malaysian company from alleged money laundering. According to news reports, as part of this investigation, U.S. Attorney's Office for the Eastern District of New York is investigating whether a Malaysian national illegally donated to the Trump Inaugural Committee, with money taken from 1MDB. You sought a waiver to participate in this matter, even though your former law firm, Kirkland and Ellis, represents an entity involved in the investigation. Namely, Goldman Sachs. How many waivers have you received to allow you to participate in matters or investigations involving Trump businesses, the Trump campaign, or the Trump Inaugural Committee?

BARR:

None.

DURBIN:

You did seek a waiver in this case?

BARR:

I--actually, the impetus, as I recall, and people should jump me if I'm wrong, but didn't-- didn't come from me. I was asked to seek a waiver in this case.

DURBIN:

Do you--do you see the problem if the issue is whether or not a money laundering operation in Malaysia is sending money to the Trump Inaugural Committee that as attorney general of

the United States you may not want to in--involve yourself in this?

BARR:

I--well, no, I don't. I don't because I was not involved with inaugural committee.

DURBIN:

Why would you seek a waiver then to participate in this?

BARR:

The waiver was--I guess the conflict was not because of any relationship I had to the inaugural committee, which I didn't.

DURBIN:

No, it's to Goldman Sachs, your former client, Kirkland and Ellis.

BARR:

No. It's--it's--it's Kirkland and Ellis, the law firm.

DURBIN:

Right. And their client, Goldman Sachs. I just don't understand why you would touch that hot stove.

BARR:

Well, that's a good--

DURBIN:

--You sought the waiver. That's why I'm asking the question.

BARR:

The attorney--the criminal division ac--actually asked me to get a waiver because of the importance of this investigation overall. I was requested by the criminal division. I didn't seek it. I--the impetus did not come from me.

DURBIN:

And who would that be that made that recommendation to you?

BARR:

I am told it was the criminal division.

DURBIN:

Mr. Benczkowski?

BARR:

Right. Yeah, it would--he was the head of the criminal division. But, before--apparently, they discussed it with a career ethics official and they made the recommendation.

DURBIN:

Thank you.

GRAHAM:

Senator Whitehouse?

WHITEHOUSE:

Mr. Barr, a couple of timing questions. You said that on March 5, Mr. Mueller came to you and said that he was going to not make a decision on obstruction, leave that to you.

BARR:



He didn't--he didn't say he was leaving it to me.

WHITEHOUSE:
But, he was not gonna make an obstruction--

BARR:
--Right.

WHITEHOUSE:
On March 24 you sent out the letter describing your decision. Somewhere between March 5 and March 24 you made that decision. When was that?

BARR:
We started talking about it on March 5 and there had already been a lot of discussions prior to March 5 involving the deputy, the principal associate deputy in the Office of Legal Counsel that had dealings with the Special Counsel's Office. So, they had knowledge of--of a number of the episodes and some of the thinking of the Special Counsel's Office. So, right after March 5 we started discussing what the implications of this were and how we would--

WHITEHOUSE:
--And you made the decision when?

BARR:
Probably on Sunday the 24th.

WHITEHOUSE:
That was the day the letter came out.

BARR:

Yes. We made the decision--

WHITEHOUSE:
--You didn't make the decision until the letter came out?

BARR:
No, no.

WHITEHOUSE:
You must have told somebody how to write the letter. When did you actually decide that there was no obstruction?

BARR:
The 24th.

WHITEHOUSE:
Okay. When did you get the first draft of the Mueller Report?

BARR:
The first--it wasn't a draft. We got the final.

WHITEHOUSE:
The first version of it that you saw?

BARR:
Well, the only version of it I saw.

WHITEHOUSE:
Okay, the only version--when you first--

BARR:

--The 22nd.


WHITEHOUSE:

The 22nd. And you told Senator Harris that you made your decision on the obstruction charge, you and Rosenstein, based on the Mueller Report. Do I correctly infer that you made that decision then between the 22nd and the 24th?


BARR:

Well, we had--had a lot of discussions about it before the 22nd, but that the final decision was made on the 24th.


WHITEHOUSE:

And you didn't receive--


BARR:

--We had more--we had more than two and a half days.


WHITEHOUSE:

--The Mueller Report until the 22nd?


BARR:

We had more than two and a half days to consider this. OLC had already done a lot of--a lot of thinking about some of these issues even before the 20--we got the report and even before March 5. They had been in regular contact--the department had been in regular contact with Mueller's people and understood, you know--


WHITEHOUSE:

--But they were--the OLC was looking into the Mueller investigation while it was going on and with it of the evidence that they were gathering on obstruction?

BARR:
--The--

WHITEHOUSE:
--Before you saw the report?

BARR:
My understanding--no, I wasn't there, okay? but, my understanding is that the deputy and the, what we call the PAD (INAUDIBLE), the principle associate deputy, were in regular contact with the Mueller's team and were getting briefings on evidence and some of their thinking and some of the issues.

WHITEHOUSE:
Did they know enough to know--

BARR:
--OLC was brought into some of those discussions.

WHITEHOUSE:
Did they know enough to know it might be--need to be redacted before they saw the 3/22 report?

BARR:
No. the problem we had is we could not identify the 6 (e) material when--when the report came over. We needed the help of Bob Mueller's team to do that.

WHITEHOUSE:

And, lastly, can you assure me that nothing related to obstruction or the Mueller Report was discussed at your Office of Legal Counsel, brown bag lunch on June 27th?

BARR:

Nothing that what?

WHITEHOUSE:

Nothing about the obstruction issue and nothing about the Mueller report itself was discussed when you had a brown bag lunch on June 27th with OLC?

BARR:

Yeah, did--we didn't discuss anything having to do with the Mueller report or Mueller's eventual position on it.

WHITEHOUSE:

(INAUDIBLE) discussed your obstruction memo?

BARR:

I'd forgot if it was then, but I think I've previously said that I mentioned that I had a memo and was sending it to--

WHITEHOUSE:

--You have not yet said that it was mentioned at this OLC brown bag lunch.

BARR:

I--I don't--I don't think--well, it was not at the brown bag lunch, no.

WHITEHOUSE:

My time is up.


GRAHAM:

Okay, we are--the vote has started. We're gonna split the time between Senator Klobuchar and Senator Blumenthal will try to go--they won't hold the vote open too long, but let's start with Senator Klobuchar and see if we can do this.


KLOBUCHAR:

Thank you. Mr. Attorney General, on April 27th President Trump stated Mueller, I assume, for $35 million he checked my taxes and he checked my financials. Is that accurate? Did the special counsel review the president's taxes and the Trump Organization's financial statements?


BARR:

I don't know.


KLOBUCHAR:

Can you find out if I ask later in a written question?


BARR:

I--yes, or you can ask Bob Mueller when he comes here.


KLOBUCHAR:

Okay. Well, I'll do that too. But, I think I'll also ask you. And then, obviously, we would want to see them as underlying information. During my earlier questions we went through a number of actions by the president that the special counsel looked into. My point is that we should be looking into the totality of the evidence and the pattern that the report develops.

On page 13 of volume two, the special counsel instructs that we do something similar. The report says, and this is a quote, "circumstantial evidence that illuminates intent may include a pattern of potentially obstructive acts." On this point, the report cites three U.S. cases. U.S. v. Frankenhauser --or Frank Houser, U.S. v. Arnold and U.S. v. Centola. Do you agree that obstruction law allows for intent to be informed by a pattern of potentially obstructive acts?

BARR:

Well, intent eventually has to be established by proof beyond a reasonable doubt. Obviously, some inferences can be drawn from circumstantial evidence that can contribute to an overall determination of proof beyond a reasonable doubt. But, that's one of the problems with this whole approach that's suggested at the--the special counsel's report, which is it is trying to determine the subjective intent of a facially lawful act and it permits a lot of selectivity on the part of the prosecutors and--and it's been shot down in a number of other context. So, one of the reasons that we are very skeptical of this approach is that in--

KLOBUCHAR:

--You mean you and Director Mueller or--

BARR:

--structural cases--

KLOBUCHAR:

--you, the Justice Department?

BARR:

The Justice Department. Is that in this kind of situation we have a facially innocent act and a--you know, but it's authorized by the constitution.

KLOBUCHAR:

Okay, I just--

BARR:

--It's hard to--it's hard to establish beyond a reasonable doubt that it's corrupt.

KLOBUCHAR:

Okay, I just want to get in just a few more questions like Senator Whitehouse did. At your confirmation hearing you testified that in the absence of a violation of a statute the president would be accountable politically for abusing the pardon power. How do you reconcile your suggestion that political accountability is available when the administration is refusing the comply with subpoenas and asserting executive privilege to stand in the way of that very accountability?

How do you reconcile your suggestion that political accountability is available when the administration is refusing to comply with subpoenas and asserting executive privilege to stand in the way of that very accountability?

BARR:

As to a pardon?

KLOBUCHAR:

No, this was about in your confirmation hearing you said in the absence of a violation of a statute, the president would be accountable politically for abusing the pardon power if he did. Basically--

BARR:

--But you are--but your question really is abusing any power, not just the pardon power? Is that--is that what you're saying? Well, the president--



KLOBUCHAR:

--I mean, it's hard to evaluate that--

BARR:

--presidents have been held accountable before and it--and as have other officeholders.

KLOBUCHAR:

Okay. Last question. Are the president's actions detailed in this report consistent with his oath of office and the requirement in the Constitution that he take care that the laws be faithfully executed?

BARR:

Is what consistent with that?

KLOBUCHAR:

I said are the president's actions detailed in the report consistent with his oath of office and the requirement in the Constitution that he take care that the laws be faithfully executed?

BARR:

Well, the evidence in the report is conflicting and--and there's different evidence and they don't--they don't come to a determination as to how their coming down on it.

KLOBUCHAR:

And so you made that decision?

BARR:

Yes. And as a--as you know, if it's--we--

GRAHAM:

--All right, we've got--


KLOBUCHAR:

--Okay--


GRAHAM:

--Two minutes left. Senator Blumenthal.


BLUMENTHAL:

Thank you, Mr. Chairman. Attorney General Barr, I wonder if you could tell us about the conversation between yourself and Bob Mueller shortly after your summary was issued. He called you?


BARR:

No, I called him.


BLUMENTHAL:

What prompted you to call him?


BARR:

The letter.


BLUMENTHAL:

Your letter or his letter?


BARR:

His letter. His letter.

BLUMENTHAL:

His letter. So you called him?


BARR:

Yeah.


BLUMENTHAL:

And how long did the conversation last?


BARR:

I don't know, maybe 10, 15 minutes. There were multiple witnesses in the room. It was on the speakerphone.


BLUMENTHAL:

Who was in the room?


BARR:

Among others, the deputy attorney general was in the room.


BLUMENTHAL:

Anyone else?


BARR:

Several other people who been working on the project.


BLUMENTHAL:

Members of your staff?

BARR:

Yes. And--and the deputy's staff.


BLUMENTHAL:

And as best you can recall, in the language that was used, who said what to whom?


BARR:

I said Bob, what's with the letter, you know? Why don't you just pick up the phone and call me if there's an issue? And he said that they were concerned about the way the media was playing this and felt that it was important to get out the summaries, which they felt would put their work and proper context and avoid some of the confusion that was emerging. And I asked him if he felt that my letter was misleading or inaccurate and he said no, that the press--he felt that the press coverage was and it was--and that a completer--a more complete picture of his thoughts and the context and so forth would--would deal with that.

And I--I suggested that I would rather just get the whole report out then just putting out stuff seriatim and piecemeal. And--but I said I would think about it some more. And the next day I put out a letter that made it clear that no one should read the March 24 letter as a summary of the overall report and that a full account of Bob's Mueller's thinking was going to be in the report and everyone could--would have access to that.


BLUMENTHAL:

But there's nothing in Robert Mueller's letter to you about the press. His complaint to you is about your characterization of the report, correct?


BARR:

Well, the letter speaks for itself.


BLUMENTHAL:

It does. And in fact, in response to your question, why not just pick up the phone, this letter was an extraordinary act. A career prosecutor rebuking the attorney general of the United States, memorializing it in writing, right question mark I know of no other instance of that happening. Do you?

BARR:

I don't consider Bob at this stage a career prosecutor. He's had a career as a prosecutor--

BLUMENTHAL:

--Well he's a very eminent prosecutor.

BARR:

He was the head of the FBI for 12 years.

BLUMENTHAL:

He's a career--

BARR:

--He's had a--he's had a--

BLUMENTHAL:

Law enforcement professional.

BARR:

Right.

BLUMENTHAL:

I know of no other instance of--

BARR:

--But he was also political appointee and he was a political appointee with me at the Department of Justice. I don't--I--you know, the letters a bit snitty and I think it was probably written by one of his staff people.

BLUMENTHAL:

Did you make a memorandum of your conversation?

BARR:

Huh?

BLUMENTHAL:

Did you make a memorandum or did anyone else?

BARR:

No, I did make a memorandum. What?

BLUMENTHAL:

Did anyone, either you or anyone on your staff memorialize your conversation with Robert Mueller?

BARR:

Yes.

BLUMENTHAL:

Who did that?

BARR:

There were notes taken of--of the call.

BLUMENTHAL:

May we have those notes?

BARR:

No.

BLUMENTHAL:

Why not?

BARR:

Why should you have them?

GRAHAM:

I'll tell you, we've got to end this, but I'm going to write a letter to Mr. Mueller and I'm going to ask him is there anything you said about that conversation he disagrees with. And if there is, he can come and tell us.

BARR:

Right.

GRAHAM:

So the hearing is now over and--

BLUMENTHAL:

--If--if I may just--

GRAHAM:

--Senator Blumenthal, I promise you that if there's any--Mr. Mueller will have a chance to make sure that the conversation relayed by Attorney General Barr is accurate, and I'm going to give him a chance to correct anything you said that he finds misleading or inaccurate and that will be it. Five seconds.

LEE:

Attorney General Barr, I just want to thank you for your service to our country and I especially today want to thank you for your civility and your composure. I missed what has been a needlessly and unfairly hostile environment. Your professionalism has been remarkable and I'm grateful. Thank you.

BARR:

Thank you.

GRAHAM:

From my point of view, it's pretty interesting and it got off in a ditch every now and then, but generally speaking, the committee did pretty good and this is what democracy is all about. Thank you for being our attorney general.

BARR:

Thank you, Mr. Chairman.

List of Panel Members and Witnesses

PANEL MEMBERS:

SEN. LINDSEY GRAHAM (R-S.C.), CHAIRMAN

SEN. CHARLES E. GRASSLEY (R-IOWA)

SEN. JOHN CORNYN (R-TEXAS)

SEN. MIKE LEE (R-UTAH)

SEN. TED CRUZ (R-TEXAS)

SEN. BEN SASSE (R-NEB.)

SEN. JOSH HAWLEY (R-MO.)

SEN. THOM TILLIS (R-N.C.)

SEN. JONI ERNST (R-IOWA)

SEN. MICHAEL D. CRAPO (R-IDAHO)

SEN. JOHN KENNEDY (R-LA.)

SEN. MARSHA BLACKBURN (R-TENN.)

SEN. DIANNE FEINSTEIN (D-CALIF.), RANKING MEMBER

SEN. PATRICK J. LEAHY (D-VT.)

SEN. RICHARD J. DURBIN (D-ILL.)

SEN. SHELDON WHITEHOUSE (D-R.I.)

SEN. AMY KLOBUCHAR (D-MINN.)

SEN. CHRIS COONS (D-DEL.)

SEN. RICHARD BLUMENTHAL (D-CONN.)

SEN. MAZIE K. HIRONO (D-HAWAII)

SEN. CORY BOOKER (D-N.J.)

SEN. KAMALA HARRIS (D-CALIF.)

WITNESSES:

ATTORNEY GENERAL WILLIAM P. BARR

**Testimony & Transcripts**

[Complete written testimony for this event](#) May 1, 2019

**About Senate Judiciary**

[Staff](#)

[Hearing](#)

[Transcripts](#)

[Testimony](#)

[Committee Reports](#)

[Associated Bills](#)

[Schedules](#)

[Markup](#)

[Amendments](#)

© 2019 · CQ · Roll Call, Inc · All Rights Reserved.

1625 Eye Street, Suite 200 · Washington, D.C. 20006-4681 · 202-650-6500

About CQ   Help   Privacy Policy   Masthead   Terms & Conditions