1                    BEFORE THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF COLUMBIA

3    UNITED STATES OF AMERICA,        .
                                      .  Case Number 18-CR-32
4              Plaintiff,             .
                                      .
5         vs.                         .
                                      .  Washington, D.C.
6    CONCORD MANAGEMENT AND           .  May 28, 2019
     CONSULTING LLC,                  .  11:01 a.m.
7                                     .
               Defendant.             .
8    - - - - - - - - - - - - - - - -

9                  SEALED TRANSCRIPT OF MOTIONS HEARING
                  BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                    UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:               JONATHAN I. KRAVIS, AUSA
                                       DEBORAH A. CURTIS, AUSA
13                                     KATHRYN RAKOCZY, AUSA
                                       U.S. Attorney's Office
14                                     555 Fourth Street Northwest
                                       Washington, D.C. 20530
15
                                       HEATHER ALPINO, AUSA
16                                     U.S. Department of Justice
                                       National Security Division
17                                     950 Pennsylvania Avenue Northwest
                                       Washington, D.C. 20530
18

19   For the Defendant Concord
     Management and Consulting LLC:    ERIC A. DUBELIER, ESQ.
20                                     Reed Smith LLP
                                       1301 K Street Northwest
21                                     Suite 1000, East Tower
                                       Washington, D.C. 20005
22
                                       KATHERINE J. SEIKALY, ESQ.
23                                     Reed Smith LLP
                                       7900 Tysons One Place
24                                     Suite 500
                                       McLean, Virginia 22102
25

1     Official Court Reporter:          SARA A. WICK, RPR, CRR
                                        333 Constitution Avenue Northwest
2                                       U.S. Courthouse, Room 4704-B
                                        Washington, D.C. 20001
3                                       202-354-3284


4
      Proceedings recorded by stenotype shorthand.
5     Transcript produced by computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2       (Call to order of the court.)

3           THE COURTROOM DEPUTY:  This is Criminal Case Year

4  2018-032, United States of America versus Concord Management and

5  Consulting LLC, defendant number 2.  This is a sealed motions

6  hearing.

7       Counsel, please come forward and introduce yourselves for

8  the record.

9           MR. KRAVIS:  Good morning, Your Honor.  Jonathan

10  Kravis for the United States.  With me today are Deborah Curtis

11  and Kathryn Rakoczy from the U.S. Attorney's Office and Heather

12  Alpino from the National Security Division.

13           THE COURT:  Good morning, all.

14           MR. DUBELIER:  Good morning, Your Honor.  Eric

15  Dubelier and Katherine Seikaly for Defendant Concord.

16           THE COURT:  Good morning, Mr. Dubelier and

17  Ms. Seikaly.

18       So I scheduled today's sealed hearing to consider Concord's

19  motion for a show cause order based on the government's alleged

20  violation of Local Criminal Rule 57.7.  In its motion, Concord

21  argues that the government violated Rule 57.7 by releasing

22  information in the Mueller report that extends beyond the

23  allegations in the indictment.  Concord further argues that the

24  government improperly opined on the guilt of Concord and its

25  co-defendants.

1       Concord's principal complaints are, first, that the report

2   states that the activity charged in the indictment was sponsored

3   by the Russian government and, second, the report states that

4   this allegation and others in the report were established by the

5   Special Counsel's investigation.  The report goes on to explain

6   that the term "established" means that the Special Counsel

7   found, quote, substantial credible evidence that enabled the

8   Office of the Special Counsel to reach a conclusion with

9   confidence.

10       Although the indictment alleges that Concord held

11   government contracts, Concord is correct that the indictment

12   does not allege that the Russian government sponsored the

13   activities charged in the indictment.  And of course, a return

14   of an indictment signals only that a grand jury has found that

15   the allegations in the indictment are supported by probable

16   cause, and it is improper for the government to express a

17   personal view about the guilt of any defendant.

18       For these reasons, I set this hearing to hear from the

19   government about the decisionmaking process that was used to

20   make redactions to the report.

21       The record before me suggests that the government redacted

22   portions of the report to protect the interests of Roger Stone,

23   another defendant in this courthouse, but it did not do so with

24   respect to Concord.  The government's brief suggests that the

25   existence of a court order in the Stone case which limited

1    counsel for the parties from making public statements, the

2    government suggests that that could explain the difference in

3    treatment here, but I am not at all sure that that is a

4    distinction that matters.  Local Rule 57.7 applies in all cases,

5    with or without a court order.

6         So Mr. Kravis, I will hear first from you.  Am I correct

7    that the government did redact portions of the report relating

8    to Defendant Stone?

9              MR. KRAVIS:  Yes, Your Honor, as it did with respect

10   to Defendant Concord Management.

11             THE COURT:  But in order to protect Stone's interests?

12             MR. KRAVIS:  Well, it wasn't quite that.  On

13   February 21st, 2019, the Court in United States v. Roger Stone

14   entered an order prohibiting Defendant Stone from making any

15   public statements about the Special Counsel's investigation or

16   the case or any of the participants in the investigation or the

17   case.  That order appeared as a minute entry on the docket

18   following a show cause hearing.

19        While that order applied only to Defendant Stone, the

20   Justice Department interpreted the order as also applying to the

21   United States as a matter of fairness.  And that order --

22             THE COURT:  Sorry to interrupt, Mr. Kravis.  But the

23   order that you just referred to, the minute order, it did not --

24   I am familiar with the order that Judge Jackson entered on

25   February 15th.  You are saying that there was another order in

1   the case?

2           MR. KRAVIS:  Yes, Your Honor.

3           THE COURT:  And what did that provide again?

4           MR. KRAVIS:  The order appeared after a show cause

5   hearing that was held based on a particularly incendiary post to

6   Mr. Stone's Instagram account.  That order, which appears on the

7   docket as a minute order from February 21st, 2018, states, "The

8   conditions of defendant's pretrial release are hereby modified

9   to include the condition that, and the February 15, 2019, media

10  communications order is hereby modified to provide that the

11  defendant is prohibited from making statements to the media or

12  in public settings about the Special Counsel's investigation or

13  this case or any of the participants in the investigation or the

14  case.  The prohibition includes but is not limited to statements

15  made about the case through the following means."  And then it

16  lists a bunch of means.

17      "Furthermore, the defendant may not comment publicly about

18  the case indirectly by having statements made publicly on his

19  behalf by surrogates, family members, spokespersons,

20  representatives, or volunteers."

21      That order -- and Judge Jackson, when she entered the

22  order, made it clear that that order was broader than Local Rule

23  57.7.

24          THE COURT:  But it applied to the defendant; correct?

25          MR. KRAVIS:  Correct.  The Justice Department

1    interpreted that order as also restricting the statements of the

2    United States as a matter of simple fairness.  If Roger Stone

3    was not allowed to make any public statements at all about the

4    case, the Justice Department determined it simply would not be

5    fair for the Department to be making public comments that

6    Mr. Stone could be imprisoned for responding to.

7            THE COURT:  But even though a subsequent order by

8    Judge Jackson indicated that counsel for the parties must

9    refrain from making statements to the media or in public

10   settings that pose a substantial likelihood of material

11   prejudice to this case, despite that order, the government

12   interpreted the earlier order as applying to it as well?

13           MR. KRAVIS:  Not the earlier order.  It's a later

14   order.

15           THE COURT:  A later order?  So you interpreted that

16   more stringent order as applying to the government, as well as

17   the defendant?

18           MR. KRAVIS:  Yes.  The government did not believe it

19   would be appropriate or fair to interpret Judge Jackson's ruling

20   as imposing a greater restriction on the defendant than on the

21   United States.

22           THE COURT:  But hadn't he taken significant steps to

23   publicize the case in ways that she thought were prejudicial?

24           MR. KRAVIS:  Absolutely, absolutely.

25           THE COURT:  So of course, it would be fair to have

1     tighter restraints.

2          MR. KRAVIS:  Well, we didn't agree with that

3     assessment, in part because what Judge Jackson said when she

4     entered the order was the problem here is that -- one of the

5     problems here is that every time Mr. Stone makes a public

6     statement about the case, the media reports on the allegations

7     set forth in the indictment and so on and so forth and that

8     Mr. Stone's repeated public statements about the case were

9     creating a kind of echo chamber effect in the media that the

10    judge was concerned would affect the ability to conduct a fair

11    trial.

12         In addition, the Department was concerned that if the

13    Department interpreted Judge Jackson's order in the Stone case

14    as applying only to Mr. Stone and not to the Department, it

15    would leave the playing field such that the Department could

16    make public statements about the case, and if Mr. Stone

17    attempted to respond to them in any way, he could be imprisoned

18    for those responses.

19         The government believed that that was just not a reasonable

20    interpretation of what Judge Jackson intended when she imposed

21    the subsequent order on February 21st.  That order, which went

22    broader than Local Rule 57.7, was one of the reasons why the

23    Justice Department took a different approach to the redactions

24    in the section of the Mueller report related to Mr. Stone than

25    it did --

1          THE COURT:  Okay.  So it had nothing to do with this

2     order I just read, February 15th order?

3          MR. KRAVIS:  It was the February 21st order that

4     guided the Justice Department's determinations about the

5     propriety of the distinctions.

6          Another distinction that the Justice Department considered

7     was at the time the report was released, a trial date had been

8     set in the Stone case.  The Department took the view that when a

9     case has a pending trial date, any public statements about the

10    case are more likely to interfere with a fair trial or otherwise

11    prejudice the due administration of justice.

12         Because a trial date had been set in the Stone matter at

13    the time the redactions were made and the report was released,

14    the redactions of the sections of the report related to the

15    Stone case were treated somewhat differently from the redactions

16    that were made in the section of the report related to

17    United States v. Internet Research Agency.

18         THE COURT:  So although I have been saying for some

19    time I want to set a trial date, you are saying the fact that I

20    hadn't set a trial date --

21         MR. KRAVIS:  Well, it's not just the fact that the

22    Court hadn't set a trial date.  A trial date is not only set in

23    that case; it is set for November of this year.  So the fact

24    that there was a trial date pending on the calendar for this

25    year led the Department to conclude that there was a greater

likelihood that public statements about the Stone case would

interfere with that fair trial or otherwise prejudice the due

administration of justice.

However --

THE COURT:  Haven't I made clear that I hope to try

this case early in the new year?  Is a matter of a couple months

really a difference that matters?

MR. KRAVIS:  First of all, the statements that the

Court is referring to regarding the timing of the trial date, I

believe, were made after the redactions and the public release

of the report.  I could be wrong about that, because I'm not

certain of the dates of the hearings.

But in any event, it is not a question of the government's

interpretation of the Court's intentions.  It's the fact that at

the time the redaction decisions were being made by the Office

of the Deputy Attorney General, there was an order in place that

was more restrictive than the local rule, and there was a trial

date on the calendar for that year.  And that led the Office of

the Deputy Attorney General to treat the redactions in the Stone

section of the report somewhat differently from the redactions

in the section of the report on U.S. v. Internet Research

Agency.

But in handling the U.S. v. IRA section redactions, the

Office of the Deputy Attorney General did consult with other

components within the Department, including the Special

1  Counsel's Office, the National Security Division, the

2  intelligence community, and experts within the Department on

3  professional responsibility obligations, in an effort to ensure

4  that the redactions in that section of the report were made

5  consistent with the government's obligations, including its

6  obligations under Rule 57.7.

7        In evaluating those redactions --

8            THE COURT:  But was the rule flagged internally?  Were

9  there discussions?

10            MR. KRAVIS:  Yes, yes, yes.

11            THE COURT:  And there wasn't concern expressed about

12  the "established" language, which I don't think appears in the

13  Stone section of the report?

14            MR. KRAVIS:  The "established" language does not

15  appear in the Internet Research Agency section of the report.

16  The portion of the report that the defendant quoted from appears

17  on page 2 in the general introduction and describes the general

18  methodology employed by the Special Counsel's Office in making

19  charging decisions.

20        To the extent that the report notes that Roger Stone was

21  charged with a crime, that general introductory language would

22  apply equally to the public statement about that case.  There is

23  no --

24            THE COURT:  But the term "established," wasn't it used

25  with respect to the IRA and Concord section?

1        MR. KRAVIS:  I had thought that the provision of the

2   report that the defendant was citing was on page 2 in the

3   general introduction.

4        THE COURT:  But isn't that a defining term that

5   applies to the whole report and, to the extent it was used

6   elsewhere, that's the meaning of the term?

7        MR. KRAVIS:  It was a general term that was used in

8   the section of the report describing its methodology.  The

9   section describing the methodology employed by the Special

10  Counsel's Office really does not differ in any material way from

11  the requirements in the Justice Manual about the level of

12  confidence that the government must have in its evidence to

13  return an indictment in the case.

14     The notion that Concord is substantially prejudiced or that

15  it is likely to interfere with a fair trial because the

16  introductory section to the Special Counsel's report largely

17  restates the requirements of the justice manual for returning an

18  indictment is just --

19       THE COURT:  But to be fair, it is more than that.  A

20  prosecutor can't say on the courthouse steps or elsewhere

21  that "I have great confidence," "I return this with confidence,"

22  state a personal view.

23       MR. KRAVIS:  The report does not state a personal view

24  with respect to the Internet Research Agency or Concord

25  Management and Consulting LLC.  There is no portion of the

report where the Special Counsel's Office says the evidence against Concord or any other charged defendant is strong or that the Special Counsel personally believes the evidence to be strong or personally has confidence.

The return of the indictment by the Special Counsel's Office, I think, is materially identical in terms of the statements about the confidence of the level of evidence to the statements about evidence in the report.

And again, I would note that to the extent the Court's concern is the difference of treatment between Stone and Concord, there is really no difference here.

THE COURT:  I am troubled by this "established" language.  And I appreciate the point that, are folks who are reading this report really focused on the definitions section. But my understanding is that the word "established" is used in the section that relates to IRA and Concord.  What troubles me about the definition is it does state that "there is substantial credible evidence that enabled the Office of the Special Counsel to reach a conclusion with confidence."

That's not what prosecutors do.  That's not what the Deputy Attorney General did in this case when he announced the charges against Concord and the IRA and others.

MR. KRAVIS:  Looking at Concord's motion, I see they cite to page 35 which says, "The investigation established that Russia interfered in the 2016 presidential election through the

active measures social media campaign."  That section of the report does not also -- does not say anything further.

Concord then points to another portion of the report that is not specifically related to Concord that states, "When substantial credible evidence enabled the Office to reach a conclusion with confidence," the report states that "the investigation established that certain actions or events occurred."

Again, with respect to the standard set forth in the local rule about interfering with the due administration of justice or the right to a fair trial, the Office of the Deputy Attorney General reached the conclusion that that language did not trigger the local rule because it was -- because it did not add anything to the public comments about the case beyond the return of the indictment itself.

THE COURT:  But it did.  It did.  It stated that they reached the conclusion with confidence.  That's beyond the indictment.

MR. KRAVIS:  Again, these are two words in a 448-page report that do not appear in the section on the Internet Research Agency or Concord.  The Office of the Deputy Attorney General's conclusions with respect to the redactions were that the material that was -- the information that was publicly released in the report concerning the Internet Research Agency case was consistent with Local Rule 57.7(b).

1          I would also note that that section of the report does --

2     it does have redactions in it, and those redactions were made by

3     the Office of the Deputy Attorney General, in part to -- in an

4     effort to ensure that the information that appeared in the

5     public section of the report largely tracked the allegations

6     that are set forth in the indictment in the case.

7               THE COURT:  Was it redacted not to prejudice Concord

8     or just to protect national security interests?

9               MR. KRAVIS:  For both of those reasons.

10              THE COURT:  For both reasons, okay.

11              MR. KRAVIS:  Yes, Your Honor.

12              THE COURT:  Because I understood from the litigation

13    before, I think, Judge Walton that the exemptions that were

14    cited did not include the one to protect Concord's interests or

15    the IRA's.

16              MR. KRAVIS:  The particular provisions of the Freedom

17    of Information Act that were invoked in another matter aside,

18    part of the reason for the redactions that appeared in the

19    section of the report on United States v. Internet Research

20    Agency reflected an effort to --

21              THE COURT:  Protect Concord's interests, as well as

22    national security interests?

23              MR. KRAVIS:  I wouldn't say protect Concord's

24    interests, but to comply with Local Rule 57.7, yes.

25              THE COURT:  Well, to ensure that the dissemination

1    would not interfere with a fair trial or otherwise prejudice the

2    due administration of justice?

3              MR. KRAVIS:  Yes.

4              THE COURT:  You are representing to me that there were

5    two reasons for the redactions:  One, national security or

6    privacy or whatever the exemptions that were asserted in the

7    Walton case were, as well as to not interfere with a fair trial

8    or otherwise prejudice the due administration of justice?

9              MR. KRAVIS:  Yes, that's correct.  Now, there are

10   multiple redactions in that section of the report.  So I'm not

11   saying I can go redaction by redaction and identify the specific

12   basis for each redaction.  But what I can say is that when the

13   Office of the Deputy Attorney General made its determination

14   about the redaction decisions in this section of the report, one

15   of the reasons that some of the material was redacted was to

16   comply with Local Rule 57.7.

17        I would also note that these decisions made by the Office

18   of the Deputy Attorney General, which were made in consultation

19   with other components within the Justice Department, including

20   the D.C. U.S. Attorney's Office, were made in the context of an

21   intense public and congressional interest in the release of as

22   much of the report as possible.

23        Because of that intense interest and that intense pressure,

24   there was a significant law enforcement interest in releasing as

25   much of the report as possible, consistent with the Department's

1    other obligations, including the obligations to comply with the

2    local rule.

3        It was in that context that the Office of the Deputy

4    Attorney General made the redaction decisions, and those

5    redaction decisions were made for the categories of information

6    that are set forth in the Attorney General's April 2019 letter

7    to Congress.  And one of the categories of redactions that's

8    described in the Attorney General's April letter to Congress is

9    information that, if released, could harm ongoing law

10   enforcement matters, including charged cases where court rules

11   and orders bar public disclosure by the parties of case

12   information.  That was one of the categories, and that category

13   was applied both to the Concord case and to the Stone case.

14       I understand from reading Concord's motion that Concord may

15   have disagreements about how that standard was applied to

16   particular sentences in the report.

17           THE COURT:  Well, you didn't give me a lot in your

18   brief -- you didn't make these points in your brief, which would

19   be helpful.  You basically said it tracked the indictment.  And

20   while I agree large parts of it did track the indictment, these

21   two areas are the ones that concern me most.

22           MR. KRAVIS:  Right.  And I apologize for not including

23   more detail in the government's opposition.  The government was,

24   I was endeavoring to file a public reply.  Some of the

25   information that I am talking about now about the specific

procedures used by the Office of the Deputy Attorney General to make its redaction decisions is not information that has made its way onto the public record.  So I am providing the information now in the context of the sealed hearing.

But I do want to emphasize that the Office of the Deputy Attorney General, in making its redaction decisions, did consider the application of local rules, including Local Rule 57.7, both in the context of this case and in the context of the Stone case, and it made those decisions against the backdrop of a significant law enforcement interest in providing as much information to the public about the Special Counsel's investigation as was possible.

I understand that Concord has some disagreements about how those standards apply to specific sentences within the report, and what I can say about that is that the Department, the Office of the Deputy Attorney General considered each line of the report in making its redaction decisions in consultation with other components of the Department.

THE COURT:  And Mr. Kravis, if you can address also the specific tie to the Russian government, which is the overarching comment that the Attorney General made tying both this case and then the case involving the hacking and the release of e-mails, the GRU case, to the Russian government.

MR. KRAVIS:  The report doesn't say that.  The report does not say that the Russian government participated in the

1    activity that is charged in United States v. Internet Research

2    Agency.  And in fact --

3         THE COURT:  But doesn't Attorney General Barr's

4    comments make the point at the outset that there were two

5    schemes and the Russian government was behind both schemes, one

6    involved this trolling, conspiracy, and the other involved the

7    computer hacking?

8         MR. KRAVIS:  In the Attorney General's March 2019

9    letter to Congress setting forth the principal conclusions of

10   the Special Counsel investigation, the Attorney General's

11   comments, the Attorney General's summary of those conclusions to

12   Congress distinguished between the activities of the Internet

13   Research Agency and the activities that are described in the

14   Netyshko case or the GRU hack-and-dump case.

15        The Attorney General's letter to Congress made the

16   distinction between the two, that, one, it was handled -- one

17   was alleged to have been handled by a Russian organization, the

18   other by the Russian government.  That was the Attorney

19   General's definitive statement of the principal conclusions of

20   the Mueller report with respect to these matters.

21        To the extent that the Attorney General in public

22   testimony, which as the Court may recall went on for nearly a

23   full day, may have made -- used loose language that would

24   suggest otherwise, I would say that the Attorney General's kind

25   of definitive statement of the principal conclusions of the

1   Special Counsel's investigation are set forth in the March

2   letter to Congress, and the report itself does not state

3   anywhere that the Russian government was behind the Internet

4   Research Agency activity.

5       To the extent that Concord argues in its motion that a

6   reader of the public version of the report could draw an

7   inference from different sentences of the report in different

8   places, I would say, again, the fact that there may be ambiguous

9   language in a few sentences out of the hundreds and hundreds of

10  pages in the report and the thousands and thousands of pages of

11  testimony at this point is just not reasonably likely to

12  interfere with a fair trial in this matter.  I think, at best,

13  these are cherry-picked statements from what is at this point a

14  large public record of statements about this activity.

15          THE COURT:  All right.  So it is the government's

16  position that tying Concord and its co-defendants to the Russian

17  government is not prejudicial?

18          MR. KRAVIS:  Again, if the report actually said that,

19  I think this would be a different -- I think this would be a

20  different situation.  The report does not say that, and the

21  Attorney General 's March 2019 letter to Congress setting forth

22  the principal conclusions of the Special Counsel's investigation

23  also does not say that.

24      My point is that in thousands of pages of congressional

25  testimony, to the extent the Attorney General may have used

1  loose language on one or two occasions that could be interpreted

2  to suggest that the Russian government was involved in the

3  activity that's described in the Internet Research Agency

4  indictment, those few isolated instances of ambiguous language

5  in the context of thousands of pages of testimony and hundreds

6  of pages of report and the March 2019 letter are -- those in

7  themselves are not sufficient to prejudice Concord's right to a

8  fair trial under Local Rule 57.7.

9          THE COURT:  Okay.  So I am just citing to page 12 of

10  the Attorney General's testimony where he did testify, "The

11  Special Counsel found that the Russians engaged -- engaged in

12  two distinct schemes.  First, the Internet Research Agency, a

13  Russian entity with close ties to the Russian government,

14  conducted a disinformation social media operation to sow discord

15  among Americans."

16      That was, to be fair, in response, I believe, to a question

17  relating to 6(e) as opposed to his introductory statement.

18          MR. KRAVIS:  So it doesn't say Russian government.  It

19  says in the first sentence "the Russians."

20          THE COURT:  But then it says "close ties to the

21  Russian government."  "First, the Internet Research Agency, a

22  Russian entity with close ties to the Russian government."

23          MR. KRAVIS:  Right.  So that is not the same thing as

24  saying that the Russian government was behind the activities of

25  the -- is behind the activities charged in the indictment.  It

1   is an allegation that the Internet Research Agency had ties to

2   the Russian government.

3           THE COURT:  And is that something that the government

4   plans to introduce at trial in this case?

5           MR. KRAVIS:  I'm not certain of the answer to that

6   question at this point.

7           THE COURT:  All right.  Am I correct, Mr. Kravis, that

8   the AG, rather than Special Counsel Mueller, had the last word

9   on the redactions?

10          MR. KRAVIS:  The Attorney General authorized the

11  public release of the report with the redaction categories

12  identified in the Attorney General's April 2019 letter to

13  Congress.  Those redaction -- those redaction decisions were

14  made by staff within the Office of the Deputy Attorney General

15  in consultation with other sections of the Justice Department,

16  including the Special Counsel's Office, the National Security

17  Division, the intelligence community, and experts within the

18  Department on Rules of Professional Responsibility and the U.S.

19  Attorney's Offices involved in the cases, including the D.C.

20  U.S. Attorney's Office.

21          THE COURT:  Mr. Kravis, moving forward, my goal is to

22  minimize any ongoing risk to Concord, any prejudicial effect the

23  report or any statements the Attorney General has made might

24  have on Concord.

25      In doing so, what is the government's view as to whether I

should enter an order akin to what Judge Jackson did in the Stone case?

MR. KRAVIS:  Is the Court -- which order is the Court referencing?

THE COURT:  Well, I wasn't aware of the one that you brought up today.  So I will ask you with respect to both.  I was initially asking about an order that would incorporate basically Rule 57.7 into a court order.  To the extent that the government was drawing a distinction between a court order stating the rule and the local rule, which I don't think is a difference that matters --

MR. KRAVIS:  And to be clear, that's not what I'm saying.  I'm not saying that the Justice Department treated Stone differently from Concord because there was an order embodying the local rule.  I'm saying that on February 21, the Stone Court entered a more restrictive order, and the --

THE COURT:  No, I understand, and I wasn't aware of that until this morning.

But to what extent should the Court enter or entertain a similar order to prevent any ongoing prejudice to Concord?

MR. KRAVIS:  With respect to the February 15th order, the government does not oppose the entry of an order like that in the Concord case.

With respect to the February 21st order, I don't think there is a -- I'm not sure that there is a factual basis for the

1    Court to enter such an order at this point.  The government

2    will, of course, defer to the Court on that matter.

3         I would note that the -- the public release of the Special

4    Counsel's report, obviously, is a one-time event that is not

5    going to be repeated.  However, as the Court is no doubt aware,

6    Congress has requested more information from the Special Counsel

7    himself about the investigation.

8         And so what the government would propose to do, whatever

9    order the Court enters or even if it enters no order, is to

10   apprise the Court of those developments, as the government

11   sought to do in its supplemental filing in this case last week,

12   so that the Court can be aware of the steps that the Department

13   is taking to comply with its obligations, while being as

14   forthcoming as possible about the principal conclusions of the

15   Special Counsel's investigation and so that the Court can

16   provide guidance if that is necessary.

17            THE COURT:  All right.  Are there any additional steps

18   that you think the Court could take other than entering an order

19   to minimize the prejudice moving forward?

20            MR. KRAVIS:  I do not believe, the government does not

21   believe that any further steps are necessary in this case.

22            THE COURT:  All right.  Thank you, Mr. Kravis.

23            MR. KRAVIS:  Thank you, Your Honor.

24            THE COURT:  Mr. Dubelier, at the outset, let me ask

25   you, to what extent -- in assessing prejudice to Concord, to

1    what extent should I consider the fact that you filed the motion

2    to show cause on the public record and not under seal?

3                MR. DUBELIER:  Your Honor, I don't think it matters at

4    all.  The damage was done.  The damage is done by the report.

5                THE COURT:  Well, I don't know.  I hadn't focused on

6    the definition of "established," for one.  I hadn't made that

7    link.

8                MR. DUBELIER:  But the media did.  We set forth in our

9    pleading the media reports.  That's exactly what was seized

10   upon.  We didn't cherry-pick in terms of the arguments we made.

11   The media seized upon the statement in the report that this was

12   a Russian government-run operation.  And the notion that

13   Mr. Kravis gets up her and says that's not in the report is

14   simply not true.  At page 14 of the report where it begins

15   talking about the IRA case, and I am quoting, it talks

16   about Mr. Prighozin and IRA in the introductory language.  And

17   then it says these operations constituted, quote unquote, active

18   measures, which refer to operations conducted by Russian

19   security services and in influencing the course of international

20   relations.

21        That's what the report says.  So the notion that Mr. Kravis

22   is going to get up here and say that that's not in the report,

23   it is in the report.  And that's what the media seized upon in

24   reporting what they said, in terms of the media reports that we

25   quoted to you.  And Your Honor, I could have given you a

1    thousand of them.  We had to stop.  If it's necessary for me to

2    do it, I will go back and collect every one of them.  That's

3    what the focus in the media reports was.

4         And so the damage is done here.  The fact that we filed

5    this motion on the public record, candidly, I think this hearing

6    should be on the public record, because the damage is already

7    done.

8              THE COURT:  Mr. Dubelier, look, I am trying to

9    minimize any prejudice to your client.  So I think it is

10   appropriate to handle this under seal, and I think it would have

11   been appropriate for you to file your motion under seal.

12        We are where we are, and I do need to decide whether I need

13   to take steps pursuant to your motion.  But I also need to

14   decide moving forward how we are going to minimize the risk of

15   any further prejudice to your client.  And one way to do that is

16   not to have open hearings on this.  You want headlines about

17   this.  That is not something I want.

18             MR. DUBELIER:  Oh, no, Your Honor.  I want the truth

19   to be in the public record.  This has nothing to do with getting

20   headlines about anything.  It's the truth in the public record.

21        They wanted headlines.  This notion that there was a law

22   enforcement interest in releasing as much information as

23   possible, that's nonsensical.  It was a political interest.  It

24   has nothing to do with law enforcement.  It has nothing to do

25   with law enforcement interest.  It was purely political.  It was

a political decision made that they needed to release this
report publicly, as they did.

    And let me note, Your Honor, as well, this is not the first
time it's happened.  It's probably the fifth time it's happened
that Mr. Kravis stands up here and makes arguments that aren't
contained in the pleadings.  He gets up and he says stuff that
isn't in any record of anything he's filed with the Court
leading up to the hearing, leaving it impossible for us to
prepare for hearings like this if he can continue to change the
game.  He just gets up here and says stuff that isn't contained
in any pleading.

    And I will give you an example of how he apparently has
done that today.  So now we hear for the first time ever that
the Department of Justice, the Deputy Attorney General, and the
Special Counsel considered 57.7 in making the redactions with
respect to Concord.

    First of all, there is no evidence that they did.  There's
no evidence that they did.  Mr. Kravis just got up and said it.

    THE COURT:  He is an officer of the Court.  I am going
to take him at his word.

    MR. DUBELIER:  Where is the contemporaneous record
that that's what was done?  Where is a document which indicates
that that is, in fact, what they did, that the reviewers who
were doing the redactions were instructed that this is how you
are supposed to behave with respect to 57.7?

1      Taken in the context, Your Honor, of the Attorney General

2 of the United States saying he overwrote the regulations in

3 terms of making decisions in this case as to what was going to

4 be public and not public, he stated that.

5      THE COURT:  I appreciate the Attorney General's desire

6 to be as forthcoming as possible with respect to Congress and

7 the American people, but he does need to do so consistent with

8 the rules, like, as he acknowledged, 6(e) and the local rules

9 and orders of this court.  So I am not going to fault them for

10 trying to be forward-leaning with Congress and the public.  I

11 wish they could have been a little more careful here.

12      But go ahead.

13      MR. DUBELIER:  Your Honor, there are two other things

14 we heard today that we haven't heard before, and it is not

15 contained in any pleading before the Court.  That is, that the

16 order in the Stone case was one of the reasons why there was a

17 distinction in the redactions between the Concord section of the

18 report and the Stone section of the report.  The report itself,

19 the FOIA version of the report itself absolutely defies that

20 statement, absolutely.

21      THE COURT:  The what?

22      MR. DUBELIER:  The FOIA version of the report, the one

23 that actually has the --

24      THE COURT:  In Judge Walton's case?

25      MR. DUBELIER:  Yes.  There is not a single redaction

1    in the Concord section of the report with respect to protecting

2    Concord's rights to a fair trial.  There are over 100 redactions

3    in approximately 15 pages of the report that relate to Stone

4    that are the FOIA provision protecting Stone's right to a fair

5    trial.

6         Now, Mr. Kravis gets up here and says, well, one of the

7    reasons why the redactions in the Concord section were made were

8    to protect Concord's right to a fair trial.  Well, then that

9    makes the document filed in the FOIA litigation invalid.  Does

10   Judge Walton know that?  Does Judge Walton know there were other

11   reasons for the redactions in the Concord section of the report

12   that the Department of Justice did not advise the plaintiff in

13   that case or the Court in that case?

14        Now they're going to get up and say, oh, no, no, we made

15   redactions to protect Concord's rights to a fair trial.  There's

16   not a single redaction consistent with that FOIA section in that

17   version of the report.  It's simply not true.  And to get up and

18   say it, I mean, I can understand if we had -- let's say there

19   were 20 or 30 redactions in our section that went to protecting

20   our right to a fair trial and then all the other ones were other

21   stuff.  There's not a single one.  How do you get up and say we

22   made redactions to protect Concord's right to a fair trial when,

23   in 25 pages of text, there is not a single redaction under that

24   section of FOIA.

25        So is there a concession now that that FOIA version of the

1  report is inaccurate, that it is incomplete, that there were

2  additional reasons for redactions that they didn't advise Judge

3  Walton of or advise the plaintiffs of in that case?  It's simply

4  not true.  And again, we are hearing it for the first time

5  today, and Mr. Kravis is just saying it.  There is no

6  contemporaneous evidence before the Court that that is, in fact,

7  a fact.

8      And then this notion that we made a different decision

9  because there was a trial date in Stone and there's not a trial

10 date in this case, there is no exception in the local rule for

11 whether or not a trial date is set.  It's simply ludicrous to

12 say, okay, we decided since there was no trial date we could put

13 more information out in the public about Concord than we would

14 about Stone.  Where is the contemporaneous evidence of that?

15 Where is a document instructing the reviewer who did these

16 redactions, you can put more stuff in the Concord portion of

17 this than you can in the Stone portion of this because there is

18 no trial date yet set in Concord?

19     And I would suggest, Your Honor, that if Mr. Kravis is

20 saying that is a criteria they used, that criteria is unlawful.

21 It is absolutely inconsistent with the rule.  There is nothing

22 in the rule that creates an exception that if you do it early

23 enough before a trial date is set, the damage won't be done.

24     Look, we could have a trial in two years from now.  The

25 headline is going to be, this was a Russian government-run

1    operation.  It doesn't matter that they said it two years

2    earlier.  That's what the headline is going to be, and that's

3    what the headline was in every single major news organization

4    that reported this, this was a Russian government-run operation.

5            THE COURT:  Did that headline not appear -- I'm just

6    asking.  Did that headline appear before these statements?

7            MR. DUBELIER:  Not to my knowledge, Your Honor.  They

8    quoted what the report said.  They quoted what the report said,

9    that this was a Russian government-run operation.

10       In fact, as the Court knows, that's not alleged in the

11   indictment, primarily because there is no evidence to support

12   that it was.  There is none.

13       And again, the reporting, because of the way they did this

14   release, again connects Mr. Prighozin with President Putin.

15   That's in the report.

16           THE COURT:  Well, that was in the press before.

17           MR. DUBELIER:  No, Your Honor, that was in the press

18   in 2018.  It was in the press before the report, but the sole

19   basis upon which the Special Counsel makes that statement in a

20   report that they issued publicly is a newspaper article in the

21   New York Times.  There is no other citation to authority.

22       So they issue a public report saying that they find, for

23   all intents and purposes, Concord is guilty and this was a

24   Russian government-run operation, and then they drop a footnote,

25   and the connection between Mr. Prighozin and the President of

1    Russia is a newspaper article from The New York Times.

2         It would be inadmissible in any court of law.  And I find

3    it very interesting, when you ask Mr. Kravis are they going to

4    introduce evidence with respect to that, he doesn't know.  He

5    doesn't know yet?  How is that possible that he doesn't know?

6    And the evidence can't be the newspaper article.  There is no

7    other evidence.  There's none.  It's just a newspaper article

8    that could never be admitted into evidence.

9         THE COURT:  Mr. Dubelier, I don't know that we can

10   assume there is no other evidence.  There may not be other

11   evidence they want to put in the public record, but I don't

12   think you can say here -- we don't know -- that there is no

13   other evidence.

14        MR. DUBELIER:  Wait a minute, Your Honor.  There was

15   no, with respect to the Mueller report, argument that we were

16   keeping stuff out of the report itself because we didn't want it

17   in the public record.  It's in the report, and then it is

18   blacked out.

19        I will suggest to Your Honor, get an unredacted copy of the

20   report and look at it.  And if you find evidence, alleged

21   evidence in there of the connection between Mr. Prighozin and

22   President Putin other than that newspaper article, you can take

23   it and bang me over the head with it.  It's not in there.  It's

24   not in there.

25        THE COURT:  Even if it's not in the report, could they

1    not still have it?

2          MR. DUBELIER:  We don't have it.  We are supposed to

3    have all of the evidence in the case.  We don't have it.  It's

4    not in the sensitive discovery.

5          It's nonsensical.  The man owned a restaurant in

6    Saint Petersburg, and Putin, before he was president, ate in the

7    restaurant.  That's the evidence.  That's what The New York

8    Times reports.  That's the evidence.  That's what makes

9    Mr. Prighozin Putin's chef.  That's the evidence.  That evidence

10   is not admissible in court.

11         Your Honor, I just ask you to consider this:  Where would

12   we be if I called a press conference and I said, you know, we've

13   got all the discovery in the case now, and I can tell you, this

14   stuff isn't even admissible?

15         THE COURT:  And I'm sure we will have a good fight

16   over that.

17         MR. DUBELIER:  Oh, no, I'm not going to have a press

18   conference.  I'm just saying what if.

19         THE COURT:  Let me cite to you, the motion to dismiss

20   had a footnote in this case stating that Prighozin and both

21   Concord entities charged in the indictment were at that time

22   under sanctions by the U.S. Department of Treasury for their

23   involvement in the Russian government's activities in Ukraine.

24         Correct?  Was that not in --

25         MR. DUBELIER:  I'm sorry.  What were you reading from,

1   Your Honor?

2          THE COURT:  This is from a footnote in the motion to

3   dismiss, I guess the opposition in this case.  I can't recall.

4     But I am just making the point that the government has

5   previously in this case drawn connections between Prighozin and

6   the Russian government and the activities in the Ukraine and

7   cited this press release related to Treasury sanctions.  So that

8   is out there from the beginning of this case.

9          MR. DUBELIER:  Well, that is far from an allegation

10  that the Russian security services directed the activity in this

11  case.

12         THE COURT:  No, this is to rebut your point that

13  Prighozin is just a chef at the restaurant where Putin shows up

14  or whatever you --

15         MR. DUBELIER:  No, he's not a chef.  He doesn't even

16  know how to cook.

17         THE COURT:  Well, my point is, there have been ties

18  alleged at least in this case between Prighozin and the Russian

19  government.

20         MR. DUBELIER:  In the press.

21         THE COURT:  No, in a filing in this case, in a

22  footnote.

23         MR. DUBELIER:  Your Honor, I don't know what filing

24  you are referring to.  I don't know whether this is something we

25  filed, the government filed.  I don't know.

1          THE COURT:  Anyway, okay.

2          MR. DUBELIER:  Your Honor, look, I think the issue

3   here is that the government has not met its burden to rebut the

4   allegation that we made that there was a violation of Rule 57.7.

5   They just haven't.  And they are supplying argument to the Court

6   now that is not contained in the papers that they filed.

7          And I think they are conflating two things here.  One is

8   whether or not there is a violation of the local rule.  Our

9   position is, and we have briefed it, and I am not going to

10  reargue, there is a violation of the local rule.

11         So the question now for us procedurally, I think, is, if

12  the Court agrees there is a violation of the local rule, the

13  Court ought to hold that and hold so publicly, and then the

14  issue becomes the remedy.  And we haven't argued the remedy yet.

15  And I think we ought to have the opportunity to brief the

16  remedy.  There is a whole range of potential remedies for a

17  violation of this rule.

18         THE COURT:  But Mr. Dubelier, courts that have done

19  that, they have not done that in front of a trial, and for good

20  reason.  They don't want to exacerbate any prejudice that

21  already exists.  Right?  The Eastern District of Michigan case,

22  you are familiar with that case in which the Attorney General

23  made comments linking the defendants in that case to terrorism

24  activities that were tied to the 9/11 attacks.  I don't remember

25  the exact statements that Attorney General Ashcroft made.

1    But in that case the Court was concerned, and the Court

2    admonished the government along the way and warned the

3    government not to have any further releases of that type and

4    then ultimately dealt with the motion for show cause order

5    subsequently after trial in that matter, so as not to prejudice

6    the defendant in that case.

7    And why isn't that a process I should consider here?

8    MR. DUBELIER:  We will waive that prejudice.

9    THE COURT:  Well, I have to look at the due

10   administration of justice and panelling a jury that's impartial.

11   And so I have an independent obligation to ensure that the panel

12   that we see here in the new year is not tainted as much as

13   possible.  And I understand your frustration, and this is

14   certainly going to make voir dire harder in terms of the

15   questioning of the panel and the questionnaire and all of those

16   things.

17   But why should I not -- to the extent I am going to order a

18   show cause, put out an order to show cause to the Attorney

19   General, why would I not defer that until after trial?  What can

20   be gained by doing this in front of trial except to further

21   prejudice the jurors?

22   MR. DUBELIER:  Your Honor, I don't understand how it

23   prejudices Concord's right to a fair trial if the public knows

24   that the Court believes that they violated Rule 57.7.  I don't

25   understand how that accrues to some prejudice of ours.  The

1    damage is done.  The matter is in the public record.  It is

2    going to be repeated over and over and over again, and you can't

3    take the report and put it away.  And there is going to be

4    continued reporting on it, and there is, and there is subsequent

5    reporting from when we filed our motion.

6        I don't understand that.  What you're doing, it seems to

7    me, the only consequence of doing it that way is you're

8    protecting them from a public statement that they violated the

9    local rule, and I don't know why the Court would do that.  They

10   violated the local rule.  There is no question that they did.

11   And there ought to be an order that says they did that.  And

12   then we ought to brief the remedy, and the remedy can be

13   dismissal of the indictment at one extreme.

14        THE COURT:  That's an extreme remedy, extreme case

15   when prejudice is presumed, extreme.  I need to see whether

16   there is actual prejudice in this case.

17        MR. DUBELIER:  I understand that.  Again, what we

18   moved for was criminal contempt.  This is punitive.  It has

19   nothing to do with civil contempt, oh, don't do it again.  How

20   does it help us to just tell them don't do it again?  Then there

21   is no punishment for what they did.  If they violated the rule,

22   they should be punished.

23        THE COURT:  How does their punishment help Concord

24   have a right to a fair trial?

25        MR. DUBELIER:  It doesn't have to.  It doesn't have to

1    help us have a right to a fair trial.

2              THE COURT:  No, I understand.  But it is something

3    that I can consider in the future.  Why must I consider that

4    now?

5              MR. DUBELIER:  Because now is when they committed the

6    violation.  To say we are going to deal with this in a year from

7    now when nobody cares about any of this anymore --

8              THE COURT:  But that's exactly the point,

9    Mr. Dubelier.

10             MR. DUBELIER:  But that's not punishment.  They have

11   to be punished for what they did.

12             THE COURT:  But you don't want to -- assuming I agree

13   with you, you don't want to inflict punishment to further

14   prejudice the fair administration of justice going forward.  The

15   Fourth Circuit case, Eastern District of Virginia case, that

16   attorney was out on the courthouse steps talking about a witness

17   after he had been warned not to do it and after a copy of 57.7

18   had been given to him.  And the Court in that case waited until

19   after trial to deal with that attorney in order to not further

20   prejudice the defendant in that case.

21             MR. DUBELIER:  Your Honor, we will have to disagree

22   that you sanctioning them in some way now would cause additional

23   prejudice to us.  I just don't understand it.  I don't

24   understand the argument, and I don't agree with it, with all due

25   respect.  And I am telling you, to the extent any such argument

exists, we will waive it.

It is our position that they broke the rule now.  They ought to be punished now.  And so the issue for the Court is, they broke the rule.  What is the proper punishment?  We are happy to brief what the proper punishment is, and then a determination can be made as to what it is.  But the notion that they broke the rule and there is no public finding of that for six months or a year does not accrue to the benefit of Concord.  They broke the rule now.

THE COURT:  All right.  Mr. Kravis?

MR. KRAVIS:  Your Honor, I just want to briefly correct the record on a couple of points here.

With respect to my own statements today, the issue of the Roger Stone case and the analogy between the Stone case and the Concord case was raised for the first time in the defendant's reply in support of their motion.  If it had been raised in the original motion, we would have addressed it in our opposition.  Because it was raised for the first time in the reply, I addressed it today at the hearing.

With respect to the other arguments that I have made here, I have endeavored to be as forthcoming as possible with the Court about the Justice Department's internal deliberations about the redactions in response to the minute order that the Court entered.  Those aren't matters that I would typically put in a public filing.

1        THE COURT:  No, I understand.  But can you shed light

2   on why those exemptions weren't claimed in the FOIA litigation?

3        MR. KRAVIS:  So here's my understanding:  The

4   redactions that were made in the report at the time they were

5   made were color-coded to reflect the basis for the redaction in

6   accordance with the four categories set forth by the Attorney

7   General.  Some of the redactions were supported by more than

8   one -- fell within more than one of the categories.  But because

9   of the way color-coding works, there could only be one color

10  attached to the box that was used for the redaction.

11       I don't know, because I wasn't involved in drafting the

12  FOIA response, but I believe that what may have happened here is

13  that the color of the box drove the FOIA response.  And I do

14  know that for many, maybe all of the redactions in the section

15  of the report related to the Internet Research Agency case,

16  there were ongoing law enforcement and national security

17  interests that were being protected by the redactions in

18  addition to the effort to comply with Local Rule 57.7.

19       My supposition about what may have happened with respect to

20  the FOIA request is that the response may have been drafted

21  based on the color of the boxes that was used to make the

22  redactions.  And so the person drafting the FOIA response may

23  have relied on one of the exemptions or one of the categories

24  when, in fact, more than one category applies.  I don't know

25  that because I didn't work on the FOIA response.

1          But in any event --

2          THE COURT:  Do you know whether multiple exemptions

3    were claimed with respect to any of the redactions in the

4    Mueller report?  In other words, whether they asserted --

5          MR. KRAVIS:  I don't know.  I was not involved in

6    drafting the FOIA response.  I don't know.  But I will tell the

7    Court that I have consulted with the staff in the Office of the

8    Deputy Attorney General, the office that made the final

9    decisions, the final calls on all of the redactions, about the

10   process by which redactions were made and redaction decisions

11   were made, both in connection with the Internet Research Agency

12   section of the report and the Stone section of the report.

13         And I can advise the Court that in both Concord and in

14   Stone, the Office of the Deputy Attorney General considered the

15   application of Local Rule 57.7, and at least some of the

16   redactions in the Internet Research Agency section were made for

17   that reason, among others.  Again, there may have been multiple

18   reasons for the redactions that appeared in those sections.  But

19   in at least some of the redactions in the Internet Research

20   Agency section were made in part with Local Rule 57.7 in mind

21   and with the category that the Attorney General identified in

22   his April 2019 letter to Congress.

23         With respect to the statement that Mr. Dubelier cited that

24   appears on page 17 of the report, I don't think that he was

25   fully quoting -- I'm sorry.  Page 14 of the report.  I don't

think that he was fully quoting that page of the report

correctly.  The sentence that refers -- that uses the

phrase "active measures," I believe, says that that phrase is

typically used to describe operations conducted at Russian

security services.  The report does not say on that page or

anywhere else that the Russian government was involved in the

activities that are described in the U.S. v. Internet Research

Agency indictment.

When the defense argues that the public version of the

report alleged that the Russian government was involved in this,

they are making inferences from what I think is, at best,

ambiguous language in a few stray sentences of the report.

And with respect to the Attorney General's comments on the

matter, in his March 2019 letter setting forth the principal

conclusions of the Mueller report, the Attorney General

distinguished between the activities of the Internet Research

Agency, describing it as activities of a Russian organization,

and the activities in the Netyshko indictment, describing those

as the activities of the Russian government.

The bottom line of all of this is that I believe that the

few ambiguous sentences that Concord has identified in the

public record, the rather large public record in this matter,

are just not enough to establish a reasonable likelihood that

those public statements will interfere with a right to a fair

trial under the facts and circumstances of the case.

1        THE COURT:  Okay.  Mr. Kravis, I have received your

2   supplemental filing about the further disclosure to the

3   intelligence committees of portions of the report that to date

4   have been redacted.

5        Can you -- I understand that the intelligence committees

6   have a secure space where they are looking at that material, as

7   they frequently deal with national security information, and

8   that it will be handled appropriately.

9        But can you assure me that the government is also

10   explaining to members of Congress that there are two pending

11   cases in this courthouse --

12        MR. KRAVIS:  Yes.

13        THE COURT:  -- and that disclosures can adversely

14   affect and prejudice the defendants in these cases?

15        MR. KRAVIS:  Yes, Your Honor, I can represent to the

16   Court that those admonishments have been given, and I will ask

17   the people in the Office of the Deputy Attorney General and the

18   Office of Legislative Affairs and recommend to them that they

19   repeat those admonitions in light of the matters that we have

20   discussed today.

21        THE COURT:  All right.  Thank you, Mr. Kravis.

22   Mr. Dubelier?

23        MR. DUBELIER:  May I reply briefly?

24        THE COURT:  Yes.

25        MR. DUBELIER:  You ordered that the government produce

somebody here today who had knowledge of how the redactions were made.  Mr. Kravis just got up and gave you an explanation based on supposition.  That was what he said, "I don't know, but I suppose," and then he came up with this thing about color-coding of the FOIA version of the report.

Your Honor, if you look at the FOIA version of the report, each redaction contains multiple FOIA sections for the reason for the redaction.  It doesn't contain one.  It doesn't default based upon some color-coding system to one.  It contains all of them.  In fact, some of the redactions contain as many as three or four different sections of FOIA with respect to Concord alone.

The notion that he is going to get up here and now suppose that a color-coding system created a result where there were, in fact, redactions under (b)(7)(B) in the Concord section of the report and they just didn't get picked up when the actual FOIA version of the report was generated, that is ludicrous.  And I would suggest to you, Your Honor, that you order production to you of the color-coded FOIA version of this thing and see whether or not what Mr. Kravis just said is true.

Because for his -- in his defense, thank goodness he used the word "I suppose," because if he had said it as a fact, you are going to find out it is not a fact.  It is simply unbelievable, and it is not true.  There are no redactions in the Concord section of this report pursuant to (b)(7)(B)

1   protecting Concord's right to a fair trial.  There are none.

2           THE COURT:  Okay.  Mr. Dubelier, I forgot to ask you,

3   what is your position with respect to whether I enter an order

4   along the lines of Judge Jackson's orders in the Stone case?

5           MR. DUBELIER:  Your Honor, I don't think you needed

6   one before, and I don't think you need one now.  First of all --

7           THE COURT:  You don't oppose it?

8           MR. DUBELIER:  Well, we are not talking to the media.

9   So I don't think there should be any order.

10          THE COURT:  So you do oppose an order?

11          MR. DUBELIER:  Your Honor, I want to be clear.  They

12  violated Rule 57 --

13          THE COURT:  No, I understand.  I want you to address

14  that.  Go ahead and make your point.  But I want you to address,

15  moving forward, is it not prudent for me to enter an order along

16  the lines of Judge Jackson's order?

17          MR. DUBELIER:  Your Honor, it seems to me that if you

18  want to issue an order telling them that they have to abide by a

19  rule that they already have to abide by, I don't have any

20  objection to that.

21          THE COURT:  But Judge Jackson went further than that,

22  and she relied on 57.7(c).  And I'm wondering, why should I not

23  do the same here to protect the rights of the accused to a fair

24  trial and impartial jury?

25          MR. DUBELIER:  Well, with respect to an order that you

1   want to issue that prohibits them from doing what they already

2   did, I don't have any objection to that.

3          THE COURT:  But you do object to me prospectively

4   entering an order that would apply to both sides?

5          MR. DUBELIER:  We haven't done anything wrong, and we

6   don't intend to.

7          THE COURT:  So the answer is yes?

8          MR. DUBELIER:  The answer is yes.

9          THE COURT:  All right.  I am going to take a 15-minute

10  break, and I will be back.

11         MR. DUBELIER:  Thank you, Your Honor.

12      (Recess taken from 12:02 p.m. to 12:21 p.m.)

13         THE COURTROOM DEPUTY:  We are now back on the record.

14         THE COURT:  Yes, Mr. Kravis?

15         MR. KRAVIS:  May I be heard on one point, Your Honor?

16         THE COURT:  Yes.

17         MR. KRAVIS:  During the recess, I made a phone call to

18  follow up on the FOIA response, because as I mentioned in my

19  earlier comments, I wasn't involved in preparing the response.

20     What I was advised is, with respect to the FOIA response,

21  the Department believed that the strongest basis for the

22  government's position in the FOIA litigation on the Internet

23  Research Agency redactions was the redaction for national

24  security interests that the government invoked in its FOIA

25  response in that section.

1    In the Stone case, the government also -- with respect to

2    the redactions from the section of the report on the Stone case,

3    again for purposes of the FOIA litigation, the government also

4    chose to rely on the (b)(7)(B) exemption, specifically because

5    there was this more restrictive order.  And so for those

6    redactions, the government believed that that exemption was the

7    proper one to invoke because of the more restrictive order.

8    But setting aside the FOIA response, when the Office of the

9    Deputy Attorney General was making redaction decisions about the

10   Internet Research Agency section of the report, the Office of

11   the Deputy Attorney General did consider the application of

12   Local Rule 57.7, as well as the category of ongoing law

13   enforcement and national security interests.

14   I just wanted to clarify that point for the record.

15                THE COURT:  Thank you, Mr. Kravis.

16                MR. KRAVIS:  Thank you.

17                THE COURT:  So I am not going to rule now.  I am going

18   to order some supplemental briefing on this issue.

19   First, I want to direct the parties to abide moving forward

20   by Local Criminal Rule 57.7(b), and I want to make clear that

21   any willful failure to do so will result in the initiation of

22   contempt proceedings.

23   I am also going to direct the government to refrain from

24   making or authorizing any future public statement that links the

25   alleged conspiracy in the indictment to the Russian government

1    or its agencies.

2        And to the extent the government makes or authorizes any

3    public statement about the allegations in the indictment, any

4    such statement must make clear that, one, the government is

5    summarizing the allegations in the indictment which remain

6    unproven and, two, the government does not express an opinion on

7    the defendant's guilt or innocence or the strength of the

8    evidence in this case.

9        I am also going to order the parties to file supplemental

10   briefs that address these questions:  First, can I and should I

11   defer consideration of Concord's motion for an order to show

12   cause until after trial in order to ensure a fair and impartial

13   trial?

14       Second, if I were to find that the government has violated

15   Local Criminal Rule 57.7(b), do I have discretion to decline to

16   initiate contempt proceedings and to, instead, address the

17   violation through other means, such as through a Rule 57.7(c)

18   order or through specific questioning during voir dire or

19   through other disciplinary measures exercised pursuant to the

20   Court's inherent disciplinary authority?

21       And finally, if I do decide to enter an order regulating

22   the parties' public statements about this case pursuant to Local

23   Criminal Rule 57.7(c) -- and by this, I mean either party --

24   what terms should that order contain?  And specifically, how, if

25   at all, should the order address the Mueller report, which has

1    already been disseminated publicly in its current form and which

2    may in the future be released with additional redactions removed

3    based on further negotiations between the Department of Justice

4    and Congress and/or the resolution of other pending court cases?

5         So I will direct both parties to file their supplemental

6    memoranda on or before June 5th, and the parties shall file any

7    response to one another's memoranda on or before June 12th.

8         Understood?

9              MR. KRAVIS:  Yes, Your Honor.

10             MR. DUBELIER:  Yes, Your Honor.

11             THE COURT:  All right.  Thank you very much.  Yes?

12             MR. KRAVIS:  Your Honor, as a housekeeping matter, the

13   court reporter has once again reminded me to orally move for the

14   parties to be permitted access to the transcript of this

15   proceeding.

16             THE COURT:  Thank you.  I will grant that motion so

17   that the parties can have access to the sealed transcript in

18   this matter.  Thank you, Mr. Kravis.

19        (Proceedings adjourned at 12:25 p.m.)

1        CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Sara A. Wick, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     /s/ Sara A. Wick                May 31, 2019

10    SIGNATURE OF COURT REPORTER         DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25