**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA

v.

CONCORD MANAGEMENT &
CONSULTING LLC,

      *Defendant.*

No. 18-cr-32-2 (DLF)

---

<u>**MEMORANDUM OPINION & ORDER**</u>

Before the Court is defendant Concord Management and Consulting LLC's motion for an order to show cause why Special Counsel Robert S. Mueller, III and Attorney General William P. Barr should not be held in criminal contempt for violating this Court's local rules governing extrajudicial statements by prosecutors in criminal cases. *See* Local Crim. R. 57.7. For the reasons that follow, the Court will deny the motion. Although the Court agrees that the government violated Rule 57.7, it disagrees that contempt proceedings are an appropriate response to that violation. Instead, the Court has entered an order limiting public statements about this case moving forward and cautions the government that any future violations of that order will trigger a range of potential sanctions.

## I.    BACKGROUND

On February 16, 2018, the grand jury returned an indictment charging Concord and others with conspiring to defraud the United States by impairing the lawful functions of the Federal Election Commission, the Department of Justice, and the Department of State. Indictment ¶ 9, Dkt. 1. The indictment alleges, among other things, that the defendants and their

conspirators conducted an "information warfare" campaign on social media and at political

rallies to sow discord among U.S. voters in advance of the 2016 presidential election.  *Id.* ¶ 10.

As required by regulation, the Special Counsel submitted to the Attorney General on

March 22, 2019, a report titled Report on the Investigation Into Russian Interference in the 2016

Presidential Election.[1]  The Report summarized the results of the Special Counsel's two-year

investigation into potential links between the Trump Campaign and efforts by the Russian

government to influence the 2016 presidential election.  Two days later, the Attorney General

released a summary of the 448-page Report's "principal conclusions."[2]  And several weeks later,

the Department of Justice released a redacted version of the full Report.  At that time, the

Attorney General offered a few brief remarks about the Report at a press conference,[3] and he

later appeared before Congress to answer extensive questions about the Special Counsel's

investigation.[4]

During a hearing before the Senate Appropriations Committee, the Attorney General

testified that the regulations governing the Special Counsel's investigation "did not contemplate

---

[1] *See* Report on the Investigation Into Russian Interference in the 2016 Presidential Election 1 (as released on Apr. 18, 2019), https://www.justice.gov/storage/report.pdf (citing 28 C.F.R. § 600.8(c)) [hereinafter Special Counsel Report].

[2] *See* Letter from Att'y Gen. William P. Barr to U.S. Senate, Comm. on the Judiciary and U.S. H.R., Comm. on the Judiciary 2 (Mar. 24, 2019), www.documentcloud.org/documents/5779700-AG-March-24-2019-Letter-to-House-and-Senate.html.

[3] *See* Press Conference, Att'y Gen. William P. Barr Delivers Remarks on the Release of the Report on the Investigation into Russian Interference in the 2016 Presidential Election (Apr. 18, 2019), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-release-report-investigation-russian [hereinafter Press Conference Tr.].

[4] *See* Hr'g on Justice Dep't Investigation of Russian Interference in 2016 Presidential Election Before the Senate Judiciary Comm., 116th Cong. (May 1, 2019), Dkt. 131-1 [hereinafter Senate Judiciary Tr.].

and specifically [were] meant to avoid . . . public reports," but that he nevertheless retained the "discretion . . . to make the [Special Counsel's] report public."[5]   The Attorney General later testified before the Senate Judiciary Committee that he had "exercise[d] whatever discretion [he] had to make as much of the report available to the public and to congressional leaders as [he] could, consistent with the law."  Senate Judiciary Tr. at 10.  He explained that certain redactions were deemed necessary to protect national security interests, privacy interests, grand jury materials, and ongoing criminal matters.  *Id.* at 11; *see also* Senate Appropriations Tr. at 11. Those "redactions were all carried out by DOJ lawyers with special counsel lawyers in consultation with [the] intelligence community."  Senate Judiciary Tr. at 12.  Although the Attorney General had the final say over which redactions to include in the public Report, *see* May 28, 2019 Hr'g Tr. at 22, Dkt. 144, he did not overrule the Special Counsel's Office on any proposed redactions, Senate Judiciary Tr. at 21–22.

On April 25, 2019, Concord filed the instant motion in which it argues that the Attorney General and Special Counsel violated Local Rule 57.7 by releasing information to the public that was not contained in the indictment.  Concord's main contention is that the Special Counsel's Report, as released to the public, and the Attorney General's related public statements improperly suggested a link between the defendants and the Russian government and expressed an opinion about the defendants' guilt and the evidence against them.

The Court held a hearing on Concord's motion on May 28, 2019.  Following the practice of other courts, *see United States v. Koubriti*, 305 F. Supp. 2d 723, 730 (E.D. Mich. 2003), the Court conducted the hearing under seal to avoid causing any further prejudice to Concord and

---

[5] *See* Hr'g on Justice Dep't Fiscal 2020 Budget Request Before the Senate Appropriations Subcomm. on Commerce, Justice and Science, 116th Cong. 10 (Apr. 10, 2019), Dkt. 129-2 [hereinafter Senate Appropriations Tr.].

the administration of justice.  The Court also sought to ensure that the national security, privacy, and other interests that the government sought to protect through its redactions would not be revealed through an open hearing.

At the conclusion of the hearing, the Court ordered the parties "to abide moving forward by Local Criminal Rule 57.7(b)" and ordered the government "to refrain from making or authorizing any public statement that links the alleged conspiracy in the indictment to the Russian government or its agencies."  May 28, 2019 Hr'g Tr. at 47–48.  The Court further ordered that "any public statement about the allegations in the indictment . . . must make clear that, one, the government is summarizing the allegations in the indictment which remain unproven, and, two, the government does not express an opinion on the defendant's guilt or innocence or the strength of the evidence in this case."  *Id.* at 48.[6]  The Court also ordered supplemental briefing on (1) whether the Court should defer consideration of Concord's motion until after trial, (2) whether the Court can and should exercise its discretion not to initiate criminal contempt proceedings even if it finds a violation of Rule 57.7, and (3) what terms the Court should include in any order regulating the parties' public statements about this case moving forward.  *See id.* at 48–49.  The parties have now fully briefed these issues.

As an initial matter, the Court will exercise its discretion to resolve Concord's motion now, rather than hold it in abeyance until after trial, because no trial date has been set in this case and Concord has agreed to waive any prejudice that might result from resolving the issue publicly before trial.  *See id.* at 36, 38–39; Concord's Supp. Br. at 6–9, 14, Dkt. 140.  The issue

---

[6] The Court memorialized these terms in a written order issued the following day.  *See* May 29, 2019 Order, Dkt. 137.

now before the Court is whether a Rule 57.7 violation occurred—and if so, what action, if any, the Court should take to address the violation.

## II.    ANALYSIS

### A.    Rule 57.7

Rule 57.7 imposes a general duty on lawyers in criminal cases "not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication . . . if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice."  Local Crim. R. 57.7(b)(1).  The rule prohibits lawyers associated with the prosecution or defense from publishing, between the time of the indictment and the commencement of trial, "[a]ny opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case."  *Id.* 57.7(b)(3)(vi).  At the same time, the rule provides that these prohibitions "shall not be construed to preclude [lawyers], in the proper discharge of official or professional obligations, . . . from disclosing the nature, substance, or text of the charge, including a brief description of the offense charged," or "from quoting or referring without comment to public records of the court in the case."  *Id.*  57.7(b).

On its face, Rule 57.7 prohibits lawyers in criminal cases from expressing an extrajudicial opinion about a case without regard to prejudice.  The rule begins with a general prohibition on prejudicial statements and includes, in a separate paragraph, six specific prohibitions, including one that applies to extrajudicial "opinions."  *Id.* 57.7(b)(1), (b)(3)(i)–(vi).  However, other circuits have construed identically structured rules to imply a general prejudice standard across each per se category of prohibited statements to avoid First Amendment concerns.  *See United States v. Cutler*, 58 F.3d 825, 835–36 (2d Cir. 1995); *Hirschkop v. Snead*,

594 F.2d 356, 367–68 (4th Cir. 1979) (per curiam).  These decisions suggest that statements falling within one of the specific categories in 57.7(b)(3) are *presumptively* prejudicial, but a lawyer can rebut that presumption by showing the opinion was not actually prejudicial under the circumstances.  *See Cutler*, 58 F.3d at 836.  The Court need not decide whether this interpretation is correct because, for the reasons stated below, the statements at issue are prejudicial.

Concord points to a number of discrepancies between the allegations of the indictment and statements in the Special Counsel Report and the Attorney General's remarks.  In the Court's view, two categories of statements create a risk of prejudice to the defendants: (1) those linking the defendants in this case to the Russian government and its efforts to interfere with the 2016 presidential election, and (2) those providing an opinion or conclusion about the defendants' guilt or the evidence against them.  The Court will address each in turn, though the two are intertwined and must ultimately be considered together.

The Special Counsel Report describes efforts by the Russian government to interfere with the 2016 presidential election.  *See* Special Counsel Report 36–65; *see also* Indictment, *United States v. Netyksho*, No. 18-cr-215 (D.D.C. July 13, 2018), Dkt. 1 (indictment against multiple Russian intelligence officers based on the alleged hacking and leaking of private documents belonging to Democratic officials).  But the indictment, which alleges that private Russian entities and individuals conducted an "information warfare" campaign designed to sow discord among U.S. voters, Indictment ¶ 10, does not link the defendants to the Russian government.  Save for a single allegation that Concord and Concord Catering had several "government contracts" (with no further elaboration), *id.* ¶ 11, the indictment alleges only private conduct by private actors.

The Report, however, identifies the social media efforts alleged in the indictment as one of "two principal interference operations in the 2016 U.S. presidential election" carried out by the Russians.  Special Counsel Report at 9; *see also id.* at 14 (similar).  The Report also refers to the defendants' "social media operations" as "active measures"—a term of art "that typically refers to operations *conducted by Russian security services* aimed at influencing the course of international affairs."  *Id.* at 14 (emphasis added); *see also id.* at i, iv, 14, 35, 174.  Elsewhere, the Report states that "[defendant Yevgeniy Viktorovich] Prigozhin is widely reported to have ties to Russian President Vladimir Putin."  *Id.* at 4.  And more significantly, the concluding paragraph of the section of the Report related to Concord states that the Special Counsel's "investigation established that *Russia* interfered in the 2016 presidential election through the 'active measures' social media campaign carried out by" Concord's co-defendant, the Internet Research Agency (IRA).  *Id.* at 35 (emphasis added).  By attributing IRA's conduct to "Russia"—as opposed to Russian individuals or entities—the Report suggests that the activities alleged in the indictment were undertaken on behalf of, if not at the direction of, the Russian government.

Similarly, the Attorney General drew a link between the Russian government and this case during a press conference in which he stated that "[t]he Special Counsel's report outlines two main efforts *by the Russian government* to influence the 2016 election."  Press Conference Tr. (emphasis added).  The "[f]irst" involved "efforts by the Internet Research Agency, a Russian company *with close ties to the Russian government*, to sow social discord among American voters through disinformation and social media operations."  *Id.*  The "[s]econd" involved "efforts by Russian military officials associated with the GRU," a Russian intelligence agency, to hack and leak private documents and emails from the Democratic Party and the Clinton

Campaign.  *Id.*  The Attorney General further stated the Report's "bottom line": "After nearly two years of investigation, thousands of subpoenas, and hundreds of warrants and witness interviews, the Special Counsel confirmed that the *Russian government sponsored efforts* to illegally interfere with the 2016 presidential election but did not find that the Trump campaign or other Americans colluded in *those schemes.*"  *Id.* (emphases added).  In context, it is clear that one of these "efforts" or "schemes" attributed to the Russian government was the information warfare campaign alleged in the indictment.  *Id.*  Thus, the Attorney General "confirmed" what the indictment does not allege—that Concord's and its co-defendants' activities were "sponsored" by the "Russian government" and part of a two-pronged attack on our nation's democratic institutions.  *Id.*  This bottom-line conclusion was highlighted in multiple press articles following the Report's release.  *See* Concord's Mot. at 4–7, Dkt. 129 (collecting articles).

Although some of the government's statements considered individually could be viewed as ambiguous, viewed together, they were "reasonabl[y] likel[y]" to cause prejudice, Local Crim. R. 57.7(b), because they drew a clear connection between the defendants and a foreign government accused of interfering with the 2016 presidential election.  And the fact that some media outlets might have reported as much before the release of the Report does not eliminate the prejudice to Concord.  Regardless of media coverage before the Report, it is significant and prejudicial that the government itself drew a link between these defendants and the Russian government.  *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1074 (1991) ("Because lawyers have special access to information through discovery and client communications, their extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative.").

The government's statements were also prejudicial for another reason: they provided an opinion about the defendants' guilt and the strength of the evidence.  The Report explains that it used the term "established" whenever "*substantial, credible evidence* enabled the Office to reach *a conclusion with confidence*."  Special Counsel Report at 2 (emphases added).  It then states in its conclusion that the Special Counsel's "investigation *established* that Russia interfered in the 2016 presidential election through the 'active measures' social media campaign carried out by the IRA."  *Id.* at 35 (emphasis added).  In context, this statement characterizes the evidence against the defendants as "substantial" and "credible," and it provides the Special Counsel's Office's "conclusion" about what actually occurred.  The Attorney General similarly stated at his press conference that "[a]fter nearly two years of investigation, thousands of subpoenas, and hundreds of warrants and witness interviews, the Special Counsel *confirmed* that the Russian government sponsored efforts to illegally interfere with the 2016 presidential election."  *Id.* (emphasis added).   These statements fall within Rule 57.7(b)(3)(vi)'s per se prohibition on extrajudicial opinions and are prejudicial under the circumstances.

The government argues that the above statements are not prejudicial because the trial in this case will not occur for several months.  While it is true that courts consider the timing of a statement in determining whether it will cause prejudice to the defense, *see Gentile*, 501 U.S. at 1044 (plurality opinion), given the intense public interest in the Special Counsel Report and its conclusions, this factor cannot be decisive, *see Koubriti*, 305 F. Supp. 2d at 745 (observing that "a statement made even in the early stages of a criminal proceeding can still be quite prejudicial").  The Court remains confident that any prejudice can and will be cured through the passage of time, voir dire, and jury instructions.  But the question under Rule 57.7 is not whether prejudice is inevitable or in fact occurs—it is whether the government's statements were

"reasonabl[y] likel[y]" to cause prejudice *at the time they were made*.  Local Crim. R. 57.7(b);

*see Koubriti*, 305 F. Supp. 2d at 745 (concluding that a statement "[wa]s reasonably likely to

prejudice [an] individual's subsequent criminal trial" at the time it was made even though the

statement appeared to have been "forgotten by the time of trial" and "extensive *voir dire*

revealed no actual prejudice" to the defense); *Gentile*, 501 U.S. at 1047 (plurality opinion)

(noting that a potential violation of a rule restricting extrajudicial statements "must be judged at

the time a statement is made").  Under the circumstances, the Court finds that standard satisfied.

In short, the Court concludes that the government violated Rule 57.7 by making or

authorizing the release of public statements that linked the defendants' alleged activities to the

Russian government and provided an opinion about the defendants' guilt and the evidence

against them.[7]  The Court will therefore proceed to consider the appropriate response to that

violation, beginning with the possibility of contempt.

## B.      Contempt

The general contempt statute, 18 U.S.C. § 401, gives a court the "power to punish" three

categories of "contempt of its authority."  The third category, relevant here, consists of

"[d]isobedience or resistance to [a court's] lawful writ, process, order, rule, decree, or

command."  *Id.* § 401(3).

"[W]hether a contempt is civil or criminal turns on the character and purpose of the

sanction involved."  *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 827 (1994)

(internal quotation marks omitted).  "If the sanction is punitive and vindicates the authority of the

---

[7] Concord also argues that the Special Counsel and the Attorney General violated D.C. ethics rules and Department of Justice regulations that contain prohibitions similar to those found in Rule 57.7.  *See* Concord's Mot. at 9–11.  But because the contempt power concerns only violations of a court's own rules and orders, *see* 18 U.S.C. § 401(3), there is no need to address potential violations of these other authorities.

court, it is criminal, but if it is remedial and for the benefit of the complainant, it is civil." *United States v. Two Gen. Elec. Aircraft Engines*, 317 F. Supp. 3d 516, 521 (D.D.C. 2018).  Because Concord seeks to punish the government's violation, rather than obtain a remedy or secure the government's compliance moving forward, *see* Concord's Mot. at 11–12, it seeks the initiation of criminal contempt proceedings, and the Court will analyze its request accordingly.

"Criminal contempt is a crime in the ordinary sense[.]" *Bloom v. Illinois,* 391 U.S. 194, 201 (1968).  As a result, the initiation of criminal contempt proceedings is a serious step that should not be taken lightly.  *See Koubriti*, 305 F. Supp. 2d at 756–57.  Under Federal Rule of Criminal Procedure 42(a), the court must provide the defendant with formal notice that "state[s] the time and place of the trial," "allow[s] the defendant a reasonable time to prepare a defense," and "state[s] the essential facts constituting the charged criminal contempt."  Fed. R. Crim. P. 42(a)(1)(A)–(C).  In addition, the court must appoint an attorney to prosecute the contempt.  *Id.* 42(a)(2).  Ordinarily, courts refer contempt charges to the Department of Justice for prosecution, but where, as here, the entire Department would be conflicted, the court must enlist a private attorney, *Koubriti*, 305 F. Supp. 2d at 756 n.20.  At the contempt proceedings themselves, a host of constitutional rights attach.  As in any criminal case, the defendant enjoys the right to a jury trial (if the charge is sufficiently "serious"), the privilege against self-incrimination, the right to proof beyond a reasonable doubt, the right to assistance of counsel, the right to present a defense, and double jeopardy protection.  *See Bagwell*, 512 U.S. at 826–27 (collecting cases).

Given the procedural and constitutional significance of criminal contempt proceedings, they should be initiated only as a last resort.  "While a court has the authority to initiate a prosecution for criminal contempt, its exercise of that authority must be restrained by the principle that only the least possible power adequate to the end proposed should be used in

contempt cases." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793–801 (1987) (alteration adopted and internal quotation marks omitted); *see also In re Brown*, 454 F.2d 999, 1006 (D.C. Cir. 1971) (highlighting a "long standing congressional will to restrict the federal courts to the least possible criminal contempt power adequate to the end proposed" (alteration adopted and internal quotation marks omitted)).

The decision to initiate criminal contempt proceedings is left to "the sole discretion of the court" because criminal contempt is designed to vindicate the court's own authority, rather than to compensate private parties. *Brandt v. Gooding*, 636 F.3d 124, 135 (4th Cir. 2011); *see also Blalock v. United States*, 844 F.2d 1546, 1561 (11th Cir. 1988) (Tjoflat, J., concurring) ("The bringing of a criminal contempt proceeding is a matter committed to the sole discretion of the district court or the prosecutor[.]"). Courts "must and should have the broadest possible discretion to determine whether the conduct at issue is such that a finding of criminal contempt is necessary to vindicate its authority." *United States v. Lynch*, 952 F. Supp. 167, 172 (S.D.N.Y. 1997). In exercising that discretion, courts "must keep in mind that the judicial contempt power is 'shielded from democratic controls' and hence should be exercised with restraint and discretion." *In re Smothers*, 322 F.3d 438, 442 (6th Cir. 2003) (quoting *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980)). Before reaching for the criminal contempt power, "courts should be aware of the options available to them" and keep in mind that, "in situations where a criminal contempt order may be too strong, courts still have other means to maintain the dignity of the court and respect for all parties present." *Id.* at 443.

Though Concord has asked the Court to initiate criminal contempt proceedings, if the Court were to do so, those proceedings would be "separate and independent" from this case, and their purpose would be solely "to vindicate the authority of the court." *Brandt*, 636 F.3d at 135

(internal quotation marks omitted).  Accordingly, Concord itself "ha[s] no legitimate interest in such . . . proceeding[s]," and cannot claim to be prejudiced should the Court decide not to pursue them.  *Id.*; *see also Ramos Colon v. U.S. Atty. for Dist. of Puerto Rico*, 576 F.2d 1, 5 (1st Cir. 1978) ("A party to the original litigation has no standing to prosecute an action for criminal contempt or to take an appeal from the court's rejection of his allegations."); *Kienle v. Jewel Tea Co.*, 222 F.2d  98, 100 (7th Cir. 1955) ("Whether [a contempt] proceeding should be instituted is a matter concerning [the] defendant and the public, in which [the complainant's] interest is no greater than that of every member of the general public.").

Applying these principles, a number of factors persuade the Court to exercise its discretion not to initiate criminal contempt proceedings at this time.  *See Islamic Inv. Co. of the Gulf (Bah.) Ltd. v. Harper*, 545 F.3d 21, 25 (1st Cir. 2008) (explaining that "the trial court retains a certain negative discretion to eschew the imposition of contempt sanctions . . . in the interests of justice" "even if all of [the] conditions [for contempt] are satisfied").

*First*, the government violated a standing court rule, rather than a specific court order addressed to the parties.  To be sure, some courts have initiated contempt proceedings based on violations of generally applicable local court rules, including those governing extrajudicial statements.  *See, e.g.*, *In re Morrissey*, 168 F.3d 134, 137 (4th Cir. 1999).  But the D.C. Circuit has expressed doubt about whether standing rules can serve as the basis for criminal contempt proceedings under 18 U.S.C. § 401(3).  *See In re Brown*, 454 F.2d at 1006.  Without deciding the issue, the *Brown* court noted that "every other directive" mentioned in 18 U.S.C. § 401(3)—a "writ, process, order, . . . decree, or command"—is "specifically addressed to a particular person or group" and has traditionally "been enforceable through the contempt power."  *Id.* (internal quotation marks omitted).  Consequently, "it may be that the 'rule' to which [§ 401(3)] refers is

the rule in the process sense—the rule to show cause, the rule nisi, and the like—rather than a general, standing rule of court, which usually draws its sanctions from other sources." *Id.*

The Ninth Circuit has picked up where the D.C. Circuit left off and converted *Brown*'s dicta into a holding. *See United States v. Kimsey*, 668 F.3d 691, 699 (9th Cir. 2012) ("conclud[ing] that the D.C. Circuit's suggestion is correct"). In deciding that § 401's companion provision, § 402, "does not permit convictions for criminal contempt for violations of standing rules of court," *id.* at 698, the *Kimsey* court examined contemporary legal usage of the term "rule," applied the *noscitur a sociis* canon, and observed that interpreting "rule" to include generally applicable court rules would lead to absurd results by converting violations of minor procedural and pleading requirements into federal crimes. *See id.* at 700–03.[8]

Further, even if § 401 authorizes a court to hold a party in criminal contempt for violating standing court rules, it certainly does not require it to do so. In deciding whether to take that step in this case, the Court is mindful that wielding the contempt power to punish violations of generally applicable orders would, at the very least, push the outer limits of the Court's contempt power. *See Brown*, 454 F.2d at 1006 n.33 (warning that "[u]se of the criminal contempt power to vindicate violations of court rules of practice arguably would expand that power beyond congressional contemplation and in given cases would produce monstrous results"). And in terms of culpability, a violation of a standing court rule does not involve the same affront to the Court's authority as would a violation of a specific court order directing a party to take or refrain from a particular action. In the Court's view, this factor counsels strongly against the initiation of contempt proceedings as a matter of discretion.

---

[8] Other circuits have reached a contrary conclusion, though not with the same degree of analysis. *See, e.g.*, *United States v. Herrera*, 252 F.3d 1356 (5th Cir. 2001) (per curiam).

*Second*, the government's statements, all of which relate to the Special Counsel Report, amount to a single violation.  Though a single, particularly egregious violation might justify the immediate invocation of a court's contempt power in certain circumstances, criminal contempt is generally reserved for "repeated and flagrant abuses" that demonstrate a willful disregard for the court's authority.  *Koubriti*, 305 F. Supp. 2d at 748 (collecting cases upholding contempt findings based on repeated violations).  In this case, nothing about the government's conduct to date suggests a flagrant disregard for the Court's authority.

To the contrary, the government has demonstrated that moving forward it will comply with Rule 57.7 and any further order of the Court.  On May 29, 2019, following the Court's hearing, the Special Counsel held a press conference to announce the conclusion of his investigation and his resignation as Special Counsel.[9]  In delivering his remarks, the Special Counsel carefully distinguished between the efforts by "Russian intelligence officers who were part of the Russian military" and the efforts detailed "in a separate indictment" by "a *private* Russian entity engaged in a social media operation where Russian *citizens* posed as Americans in order to interfere in the election."  Special Counsel Statement Tr. (emphases added).  He also repeatedly referred to the activities described in the Report as "allegations" and made clear that his Office was "not commenting on the guilt or innocence of any specific defendant."  *Id.*  The Special Counsel added that the defendants were "presumed innocent unless and until proven guilty in court."  *Id.*  These actions demonstrate that the government understands and intends to

---

[9] *See* Special Counsel Robert S. Mueller III Makes Statement on Investigation Into Russian Interference in the 2016 Presidential Election (May 29, 2019), https://www.justice.gov/opa/speech/special-counsel-robert-s-mueller-iii-makes-statement-investigation-russian-interference [hereinafter Special Counsel Statement Tr.].

abide by the Court's May 28, 2018 Order, and they serve as a strong indication that contempt proceedings would be both unnecessary and excessive under the circumstances.

*Third*, the record before the Court strongly suggests that the government did not act with the willfulness required for criminal contempt. "[A]lthough § 401(3) does not explicitly mention *mens rea*, wrongful intent is necessary," and "[t]he disregard of authority must be willful." *In re Holloway*, 995 F.2d 1080, 1082 (D.C. Cir. 1993). "Knowledge that one's act is wrongful and a purpose to nevertheless do the act are" therefore "prerequisites to criminal contempt." *In re Brown*, 454 F.2d at 1007. Willfulness may "be inferred if a lawyer's conduct discloses a reckless disregard for his professional duty," *Sykes v. United States*, 444 F. 2d 928, 930 (D.C. Cir. 1971) (per curiam), but a "[g]ood faith pursuit of a plausible though mistaken alternative is antithetical" to the intent required, *In re Brown*, 454 F.2d at 1007.

The government represents that the Attorney General and his team were aware of their obligations under Rule 57.7(b) and consulted with internal ethics experts to determine which redactions Rule 57.7(b) required. *See* May 28, 2019 Hr'g Tr. at 10–11. Moreover, it is evident that in deciding which redactions to approve, the Attorney General balanced "two roles of equal importance, one as the Nation's chief prosecutor, and one as the head of an Executive department with responsibilities to keep the public informed on policy matters." *Koubriti*, 305 F. Supp. 2d at 760.

The Court appreciates the "difficult and challenging task" the Attorney General faced in "harmonizing these dual roles" under tight time pressures. *Id*. But the Attorney General's discretion to balance these competing interests ends where the language of the local rule begins. And for the reasons stated above, the government violated Rule 57.7. Even so, its "[g]ood faith pursuit of a plausible though mistaken alternative" is incompatible with the willfulness required

for criminal contempt, *In re Brown*, 454 F.2d at 1007, and the Attorney General's careful (but incorrect) assessment of his competing obligations does not suggest a reckless disregard for his responsibilities to the Court, *see Koubriti*, 305 F. Supp. 2d at 755 ("[T]o the extent that the Attorney General's transgressions . . . were attributable to an improper balancing of his public policy and prosecutorial roles, there is ample reason for the Court to proceed with caution, and to ensure that any punitive or disciplinary measures do not unduly encroach upon the Attorney General's legitimate political functions.").

Concord disagrees with this assessment of the government's intent and offers two arguments—one substantive and one procedural. Substantively, Concord argues that willfulness has been established based on the appearance of unequal treatment between Concord and another defendant, Roger Stone. Both defendants were indicted in the course of the Special Counsel's investigation, and both are discussed in his Report. *See* Special Counsel Report at 14–35, 51–62. Concord acknowledges that both defendants were the subject of redactions made to prevent "harm to an ongoing matter." *See id*. But Concord argues that the redactions for Stone were made in part to prevent harm to the defense, while the redactions for Concord were made only to prevent harm to the prosecution. As proof, Concord points to the FOIA Exemptions the government has invoked to defend those redactions in a separate litigation. *See* Brinkmann Decl. Ex. D., *Electronic Privacy Information Center v. DOJ* (*EPIC*), No. 19-cv-810 (D.D.C. June 3, 2019), Dkt. 54-4 (copy of Report with additional FOIA markings). For Stone, the government invoked (among other things) FOIA Exemption 7(B), which applies to materials that "would deprive a person of a right to a fair trial or an impartial adjudication." 5 U.S.C. § 552(b)(7)(B). For Concord, however, the government did not invoke Exemption 7(B). This difference,

Concord argues, strongly suggests that the government consciously chose to fulfill its Rule 57.7

obligations with respect to Stone, while ignoring those same obligations with respect to Concord.

The government counters with a credible explanation for the difference in treatment

between Concord and Stone.  The government asserts that it made redactions in both cases to

prevent prejudice and comply with Rule 57.7.  *See* Hr'g Tr. at 15; Brinkmann Decl. ¶¶ 44, 46,

50, *EPIC*, No. 19-cv-810, Dkt. 54-3.  But it chose not to invoke Exemption 7(B) for the Concord

redactions because Exemption 7(B) only applies to information that "would deprive" a party of a

fair trial.  *See* Gov't's Response to Concord's Supp. Br. at 6–8, Dkt. 143 (quoting 5 U.S.C.

§ 552(b)(7)(B)).  For Exemption 7(B) to apply, "a trial or adjudication" must be "pending or

truly imminent," and it must be "more probable than not that disclosure of the material sought

would seriously interfere with the fairness of those proceedings."  *Wash. Post Co. v. DOJ*, 863

F.2d 96, 101–02 (D.C. Cir. 1988).

In this case, no trial date has been set, and the Court has not previously entered an order

limiting public statements in response to concerns about pretrial publicity.  For these reasons, the

government relied on Exemption 7(A), which is broader than Exemption 7(B) and applies to

materials that "could reasonably be expected to interfere with enforcement proceedings."  5

U.S.C. § 552(b)(7)(A).  In *Stone*, however, a trial date has been set, and the court has already

taken "steps to assure public statements by the parties do not adversely affect the trial."

Brinkmann Decl. ¶ 53; *see also id.* ¶ 56 (relying in part on "the extraordinary media attention

surrounding [Stone's] case" and "the court's multiple orders further restricting public

statements").  These distinctions, coupled with the difference in standards between Exemption

7(A) and Exemption 7(B), explain the difference in treatment between Concord and Stone.

Without deciding whether the government's choice of exemptions was correct—under FOIA or

as a matter of litigation strategy—it has explained the basis for its decision, and that explanation

is entitled to a presumption of good faith, absent clear evidence to the contrary.  *See People for*

*the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection*

*Serv.*, 918 F.3d 151, 157 (D.C. Cir. 2019).

Procedurally, Concord objects to the Court deciding the question of willfulness on the

current record and argues that the Court should hear testimony and review an unredacted version

of the Special Counsel Report to test the government's explanations for its conduct.  The Court

disagrees.

Government officials are presumed to act in good faith when exercising their authority,

and the Court considers their statements as officers of the Court relevant in determining whether

a more complete record would be worth the considerable burden of collateral contempt

proceedings.  *See Koubriti*, 305 F. Supp. 2d at 756 (relying in part on the Attorney General's

statements as an officer of the court to conclude that the "record in support of criminal contempt

charges . . . [fell] well short of warranting the engagement of th[e] complex machinery" of

criminal contempt proceedings); *see also Holloway v. Arkansas,* 435 U.S. 475, 486 (1978)

("[A]ttorneys are officers of the court, and when they address the judge solemnly upon a matter

before the court, their declarations are virtually made under oath." (internal quotations omitted)).

Moreover, the government does not rely solely on representations by counsel; it also points to a

sworn declaration submitted in the FOIA matter that explains the Department of Justice's

decision-making process.  *See* Brinkmann Decl., *EPIC*, No. 19-cv-810.  This evidence—

combined with the government's representations, the Attorney General's congressional

testimony, and the public record—is more than adequate to establish that the "complex

machinery" of criminal contempt proceedings is unwarranted under the circumstances.  *Koubriti*, 305 F. Supp. 2d at 756.

*Fourth*, the Court has adequate alternative means, short of contempt, to address any affront to its authority or prejudice to Concord.  *See In re Smothers*, 322 F.3d at 442–43 (explaining that courts should favor a system of "progressive discipline" that begins with a warning and then escalates to more serious sanctions).  The Court also is confident that any risk of prejudice to Concord caused by the government's statements can be fully and adequately addressed through careful voir dire questioning and jury instructions.  *See Gentile*, 501 U.S. at 1055 (plurality opinion) ("*Voir dire* can play an important role in reminding jurors to set aside out-of-court information and to decide the case upon the evidence presented at trial").  In light of these readily available and less drastic measures, the Court sees no need to invoke its criminal contempt authority.

For all these reasons, the Court declines to initiate criminal contempt proceedings in response to the government's Rule 57.7 violation.

## C.    The Court's Inherent Disciplinary Authority

The Court next considers the possibility of imposing a lesser sanction under its inherent disciplinary authority.  The Court's disciplinary "power is distinct from [its] contempt power." *Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 591 (7th Cir. 2008).  But it, too, must be exercised "with restraint and discretion."  *Shepherd v. ABC*, 62 F.3d 1469, 1478 (D.C. Cir. 1995).  In general, courts imposing disciplinary sanctions "must use the least restrictive sanction necessary to deter the inappropriate behavior."  *In re First City Bancorporation of Tex. Inc.*, 282 F.3d 864, 867 (5th Cir. 2002) (per curiam).  And before imposing a disciplinary sanction, a court must find "clear and convincing evidence" that a party

"committed sanctionable misconduct that is tantamount to bad faith." *Ali v. Tolbert*, 636 F.3d 622, 627 (D.C. Cir. 2011).

For many of the reasons already discussed—in particular, the lack of any evidence of bad faith—the Court will refrain from imposing any punitive sanction at this time and, consistent with other courts, will instead adopt a policy of "progressive discipline." *In re Smothers*, 322 F.3d at 442. The Court cautions the government that any future violations of Rule 57.7 or the Court's May 29, 2019 Order will trigger a range of potential sanctions. *See* ABA Standards for Imposing Lawyer Sanctions § 6.2 (listing the sanctions of "admonition," "reprimand," "suspension," and "disbarment" as potential responses to an attorney's violation of a court order, depending on the severity of the violation (capitalization omitted)).

### D.      Order Regulating the Parties' Statements Moving Forward

Rule 57.7(c) provides that "[i]n a widely publicized or sensational criminal case, the Court, on motion of either party or on its own motion, may issue a special order governing such matters as extrajudicial statements by parties[.]" Local Crim. R. 57.7(c). The Court previously suggested that a Rule 57.7(c) order might be warranted under the circumstances and ordered the parties to brief the potential terms of such an order. May 28, 2019 Hr'g Tr. at 22–23, 45, 48–49. In response, the parties appear to agree that the Court's May 29, 2019 Order effectively serves as a Rule 57.7(c) order and that the terms of that order are adequate and appropriate. *See* Concord's Supp. Br. at 11 (stating that the May 29, 2019 Order "is, for all intents and purposes, an order entered pursuant to Rule 57.7(c)" and that "its terms are appropriate"); Gov't's Supp. Br. at 14, Dkt. 139 (indicating that the "government does not oppose an order in this case further restricting extrajudicial statements" and proposing terms similar to those already contained in the Court's May 29, 2019 Order). Accordingly, that order will remain in effect through trial.

### E.     Unsealing this Opinion and Related Materials

The Court initially chose to resolve this matter under seal to protect Concord's interests

and enable a candid discussion of the redactions to the Special Counsel Report.  However,

Concord now objects to that decision and requests that the Court unseal the May 28, 2019

hearing transcript, the Court's May 29, 2019 Order, the parties' supplemental briefs, and

presumably this decision as well.  Concord's Supp. Br. at 11–15.  The government has requested

an opportunity to brief the issue before the Court decides whether to unseal these portions of the

record.  Gov't Response to Concord's Supp. Br. at 9.

Before acting on Concord's request, the Court will give the government an opportunity to

file an objection and propose any redactions if the materials are to be released.  If the

government objects to releasing the materials, in whole or in part, it should address in its

opposition the public's right to access those materials and any First Amendment concerns that

might arise from maintaining them under seal.

### CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Concord's motion for an order to show cause why Special Counsel

Robert S. Mueller, III and Attorney General William P. Barr should not be held in contempt is

**DENIED**;

**ORDERED** that the Court's May 29, 2019 Order shall remain in effect through trial;

**ORDERED** that, on or before July 5, 2019, the government shall file under seal any

opposition to Concord's request to unseal (1) the May 28, 2019 hearing transcript, Dkt. 144; (2)

the Court's May 29, 2019 Order, Dkt. 137; (3) the parties' supplemental briefs, Dkts. 139, 140,

142, 143; and (4) this Memorandum Opinion and Order.  Concord shall file any response to the

government's opposition on or before July 11, 2019.  Both parties shall include in their

respective filings any proposed redactions to these materials in the event they are released.


DABNEY L. FRIEDRICH
United States District Judge

July 1, 2019