**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC | |
| Defendant. | |

**DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S MOTION FOR
A SUPPLEMENTAL BILL OF PARTICULARS**

Pursuant to Federal Rule of Criminal Procedure 7(f), Defendant Concord Management and Consulting LLC ("Concord" or "Defendant"), through counsel, respectfully moves for a supplemental Bill of Particulars. In support of its Motion, Concord states as follows:

## I.    INTRODUCTION

In sum and substance the Indictment contains generally described allegations against Concord that it funded and oversaw the operations of co-defendant Internet Research Agency, LLC ("IRA"). *See* Indictment ¶¶ 3, 11, 12, ECF No. 1. The Indictment identifies only one individual associated with Concord, co-defendant Yevgeniy Prigozhin. *Id.* ¶ 12. The Bill of Particulars provided by the government names one unindicted co-conspirator named "SP," who may have worked for Concord. *See* Gov't's Bill of Particulars (Redacted) ¶ 1, ECF No. 176 (the "BOP").[1]

---

[1] The Bill of Particulars also names five unindicted co-conspirators who do not appear to be real people, but rather names associated with email addresses; as well as one "unindicted co-conspirator" who is actually an *indicted* defendant.

In this one of a kind, never before brought case, the Court ordered the government to provide a bill of particulars to identify: (1) the statutory and regulatory requirements that the defendants allegedly conspired to impair; (2) each category of expenditures the government intends to establish required disclosure to the Federal Election Commission ("FEC"); and (3) each category of activities that the government intends to establish triggered a duty to register under the Foreign Agents Registration Act ("FARA"). *See* Mem. Op. & Order at 12, May 24, 2019, ECF No. 136 ("May 24 Opinion"). The Court denied Concord's request that the government identify any conspirators who were required to report expenditures to the FEC or register as a foreign agent with DOJ, reframing the request as seeking identification of which entities or individuals allegedly violated FECA and FARA. *See id*. at 13.[2] The Court equated that request to one seeking the identity of which conspirator committed each act alleged in the Indictment, which the Court denied based on its conclusion that "[t]he detailed allegations in the indictment, combined with the list of co-conspirators the government plans to introduce at trial and the additional relief the Court orders [in its Memorandum Opinion and Order], provide Concord with more than enough information to conduct its own investigation of the charges against it." *Id.* at 8.

For the reasons set forth below, the government's Bill of Particulars is deficient because it does not identify which defendant(s) failed to make the allegedly required filings with the FEC and DOJ. This is not the normal case involving a defendant who engaged in proscribed conduct where the government can argue that a bill of particulars is not necessary because each defendant knows what he or she did, such that defense counsel could determine whether that conduct was illegal. In contrast, here the Court has determined that the Indictment alleged violations of FECA

---

[2] This portion of the Court's Opinion cites in error to section II.B, which should have been III.B, wherein the Court denied Concord's request that the government identify which defendant committed each act alleged in the Indictment.

and FARA's disclosure requirements, which are alleged ***failures to act***.  *See id*. at 11 (noting that

"the Court held that while the government was not necessarily *required* to allege FECA and FARA

violations to establish a defraud-clause conspiracy, the indictment *did* allege such violations as

one of several forms of deceptive conduct aimed at the United States") (emphasis in original); *id*.

("it will be difficult to tie the deceptive acts alleged in this case to FEC's and DOJ's administration

of FECA's and FARA's disclosure requirements if those requirements did not actually apply to

the conspirators").  The Bill of Particulars confirms that these alleged violations involve a failure

to report or register.  *See* BOP ¶ 2 (identifying FECA reporting requirement and FARA registration

requirement); ¶ 3 (identifying FECA "registration requirement"); ¶ 4 (identifying FARA

"reporting requirement").[3]  As discussed below, there is no possibility from the Indictment, the

cited statutes or regulations, or the Bill of Particulars that Concord can determine who allegedly

failed to act.

       Given the fact that the alleged failures to act are an essential element of the conspiracy

charge, the government must prove who specifically failed to act.  In these circumstances it is not

possible for Concord to adequately prepare for trial without knowing that information, and

withholding that information from Concord until trial will result in prejudicial surprise.  *See United*

*States v. U.S. Gypsum Co.*, 37 F. Supp. 398, 402 (D.D.C. 1941) ("The proper office of a bill of

particulars in criminal cases is to furnish to the defendant further information respecting the charge

stated in the indictment when necessary to the preparation of his defense, and to avoid prejudicial

---

[3] In the Bill of Particulars, the government refers to a "registration requirement" in FECA, BOP ¶ 3, and to "FARA's reporting requirement."  BOP ¶ 4.  FECA does not use the term "register" and the statutory section cited by the government is titled "Reporting Requirements."  52 U.S.C. § 30104.  Similarly, FARA does not use the term "report" and the statutory section cited by the government is titled "Registration statement."  22 U.S.C. § 612.  Despite the confusing language used by the government in the BOP, Concord will refer to FECA's reporting requirement and to FARA's registration requirement.

surprise at the trial.").  Moreover, depending upon who the government identifies as having failed to act, the Indictment may fail as a matter of law, or may form the basis of a pre-trial motion *in limine* limiting the government's ability to present certain theories of liability to the jury.   *See United States v. Schiff*, 602 F.3d 152, 159, 161 (3d Cir. 2010).

### A.    The Court's Previous Findings and the Government's Changed Theory of Liability

The Special Counsel initially advised the Court that the Indictment ***did not*** allege that any defendant was required to file a report with the FEC or to register with the Department of Justice ("DOJ") under FARA.  *See* Gov't's Resp. Def's Mot. *In Camera* Review of Grand Jury Materials 3, ECF No. 20 ("The Indictment does not allege any violation, or even cite to specific statutory provisions, of FECA, FARA, or the substantive offense of visa fraud.").  *See also* June 15, 2018 Hr'g Tr. 8:5-7 ("the elements of [FECA and FARA] are not an ingredient in this case); 8:14-19 (stating that a § 371 defraud clause conspiracy is "a different crime because it's not saying that they necessarily were required to file with the FEC or that they were required to register with the Department of Justice"); 12:1-2 (explaining that the allegations involving fraud on the State Department are not different from the allegations of fraud on the FEC or DOJ because "it's not a question of whether the defendant was violating the substantive offense").  Instead the Special Counsel argued that it was enough to prove its case if use of deceptive acts by the Defendants impeded the regulatory functions of the FEC or DOJ.  *See id.* at 9:11-13.  The Special Counsel repeated this position in its Opposition to Defendant's Motion to Dismiss.  Opp'n Def.'s Mot. Dismiss 11, ECF No. 56 (arguing that "the government will not have to ultimately prove that any particular defendant's conduct violated, for example, FECA or FARA.  Rather, the government will only have to prove that the defendants knowingly and intentionally engaged in deceptive acts

that interfered with the regulatory functions of the FEC or DOJ in a way that precluded those entities from ascertaining *whether* those substantive statues were violated.") (emphasis in original).

Later however, in response to questioning by the Court, the Special Counsel conceded that "when the only deceptive acts the government has alleged are a failure to disclose or a failure to report, well, then, you are going to have to show a duty to disclose or a duty to report." Oct. 15, 2018 Hr'g Tr. 47:23-48:2. The Special Counsel, then assisted by the United States Attorney for the District of Columbia and the United States Department of Justice, reframed this new theory by claiming that the indictment ***did allege*** that defendants had a legal duty to register and file reports with the FEC and DOJ. *See* Gov't's Suppl. Br. Opp'n Def.'s Mot. Dismiss 3-4, ECF No. 69. Throughout this back and forth, the Special Counsel never identified which defendant(s) allegedly failed to file and/or register.

The Court was correctly skeptical of these positions from the outset. *See* June 15, 2018 Hr'g Tr. 8:20-9:1. In fact, in denying the Motion to Dismiss the Court stated, ". . . it is difficult to see how the defendant's deception would impair agencies' ability to 'administer' disclosure requirements if those requirements did not apply to the defendants' conduct." Mem. Op. at 15, Nov. 15, 2018, ECF No. 74 ("Nov. 15 Opinion"). And in ordering the government to provide a bill of particulars the Court again stated, "it will be difficult for the government to establish that the defendants intended to use deceptive tactics to conceal their Russian identities and affiliations from the United States if the defendants had no duty to disclose that information to the United States in the first place." May 24 Opinion at 12.

Importantly, the Court has interpreted the Indictment as alleging a failure to report as opposed to making prohibited expenditures. *See* Nov. 15 Opinion at 5 ("Although [paragraph 25] also mentions FECA's ban on foreign expenditures, it focuses on FEC's administration of FECA's

'reporting requirements' . . ."); *id.* (paragraph 9 of the indictment—"the heart of the conspiracy charge"—"alleges that the defendants conspired to impair the functions of the FEC, DOJ, and DOS '*in administering federal requirements for disclosure* of foreign involvement in certain domestic activities") (emphasis in original); *id.* 6 ("In sum, the text and structure of the indictment reveal that the government functions targeted by the conspiracy are alleged solely to be the 'administration' of 'federal requirements for disclosure'") (alterations omitted).[4]  Moreover, the Court has determined that "a failure to disclose information can only be deceptive—and thus serve as the basis for a § 371 violation—if there is a legal duty to disclose the information in the first place." *Id.* 10.  And the Court has emphasized that because the Indictment alleges a conspiracy to impair the FEC and DOJ's functions of "administering federal requirements for disclosure," "the government may ultimately have to prove that the defendants agreed to a course of conduct that, if carried out, would require disclosure to the FEC or DOJ."  *See* May 24 Opinion at 11 (citing Nov. 15 Opinion at 15-16).

### B.  The Bill of Particulars

With respect to the FEC, the government now maintains that funds spent for independent expenditures for internet advertisements and to promote political rallies in the United States, (1) triggered a requirement that unidentified conspirators submit reports under 52 U.S.C. § 30104(c); and (2) violated the foreign national expenditure ban in 52 U.S.C. § 30121.  *See* BOP ¶ 2.  With respect to the FARA, the government now maintains that the travel by certain conspirators to the United States and the use of the internet triggered a requirement that unidentified conspirators register under FARA.  *Id.*  The Bill of Particulars is not consistent with what the Special Counsel

---

[4] The Court noted that if alleged independent expenditures violated FECA then those expenditures could be relevant to establishing "defendants' motive for failing to submit reports as required." Nov. 15 Opinion at 12 n.4.

told the Court with respect to Concord's Motion to Dismiss the Indictment, and as such appears to be "a game of musical chairs with their pursuit of changing legal theories . . . ." *Schiff*, 602 F.3d at 161.[5]

The Bill of Particulars severely limited the scope of the alleged unlawful conduct from what originally was alleged in the Indictment by the Special Counsel.   The government now concedes that only independent expenditures—which by their definition and through case law are those that expressly advocate the election or defeat of a specific candidate—could have triggered reporting to the FEC.   BOP ¶ 3.[6]   The government leaves unsaid specifically which conspirator was required to file a report with the FEC and what that report was supposed to contain.   And as to FARA, the government concedes that the only conduct that would have required FARA registration was certain conspirators' travel to the United States and unspecified social media activity.   *Id.* ¶ 4.   Again the government leaves unsaid which conspirator failed to register under FARA and, crucially for FARA purposes, on behalf of what foreign principal such defendant was allegedly acting.   Depending on who the government now claims was required to register under FARA and file under FECA, the Indictment may fail as a matter of law.   For that reason, the Court should compel the government to supplement the Bill of Particulars and identify the conspirators

---

[5] Given the fact that the Special Counsel's prosecutors who indicted the case have withdrawn and new prosecutors from the United States Attorney's Office and the Department of Justice have appeared, there is a serious question whether these new prosecutors have changed the theory of liability from what was presented to the Grand Jury.

[6] In the allegations relating to actual conduct by the Defendants, the Indictment refers only to "expenditures," not independent expenditures.   *See, e.g.,* Indictment ¶ 6 ("Defendants made various expenditures to carry out those activities"); ¶ 7 ("including by making expenditures in connection with the 2106 U.S. presidential election without proper regulatory disclosure"); ¶ 48 ("Defendants and their co-conspirators did not report their expenditures to the Federal Election Commission").   The only reference in the Indictment to "independent expenditures" are in those paragraphs that describe the regulatory scheme.   *See id.* ¶ 25.

the government intends to establish were required to report information to the FEC and register as a foreign agent under FARA, and on behalf of which foreign person or entity they acted.

## II.     LAW & ARGUMENT

### A.     A Supplemental Bill of Particulars is Required for This Alleged Crime of Omission

Crimes of omission are unique because they punish based upon the *absence* of conduct, rather than the *presence* of affirmative criminal activity.  *See, e.g., Lambert v. California*, 355 U.S. 225, 228 (1957) (reversing conviction for violation of registration law, noting that "conduct that is wholly passive—mere failure to register" . . .  "is unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed").  As such, defendants who violate such laws may be completely "unaware of any wrongdoing" and may properly claim that they had no knowledge of a violation.  *Id.* (recognizing an exception to the rule that ignorance of the law is not an excuse for criminal conduct where the violation consists of "wholly passive" conduct by a person who is "unaware of any wrongdoing").  A lack of notice regarding potential criminal penalties for doing nothing implicates fundamental due process rights. *Lambert*, 355 U.S. at 228.  Put another way, crimes of omission often leave defendants in the dark about the nature of their alleged criminal conduct and deprive them of due process rights.

As this Court recognized and the government confirmed in its Bill of Particulars, the Indictment alleges, and the government intends to prove at trial, failures to act under FECA's reporting and FARA's registration requirements as part of the "deceptive conduct" underlying the § 371 defraud-clause conspiracy.  *See* May 24 Opinion at 11; BOP ¶¶ 2-4.  These alleged violations are prime examples of the "wholly passive conduct" addressed in *Lambert*, involving only omissions, not affirmative conduct.  As such, the special due process considerations recognized in *Lambert* and subsequent cases—notice and a recognition that the defendant may be ignorant of the

law—underscore why a supplemental Bill of Particulars identifying precisely who is alleged to have been subject to these duties and failed to act is needed.  Specifically, where, as here, *the co-conspirators themselves* may be "unaware of any wrongdoing," *Lambert*, 355 U.S. at 228, simply identifying the disclosure requirements and categories of expenditures or activities that allegedly triggered them does not provide Concord with sufficient information to conduct its own investigation of the charges against it and to prepare a defense.  *See* May 24 Opinion at 8.

This request is not seeking a preview of the government's evidence, as the Court warned against.  *Id.*  Rather, Concord is seeking clarification of the Indictment and the Bill of Particulars so it can understand the charges against it and prepare a defense.  *Id.* 3 (citing *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987) and *United States v. Lorenzana-Cordon*, 130 F. Supp. 3d 172, 174 (D.D.C. 2015)).

### B.  It is Not Possible for Concord to Determine Who Was Required to File Any Report with the FEC

#### 1.  The Arguably Independent Expenditures

The relevant statute states that it is unlawful for foreign nationals to make "an expenditure, independent expenditure, or disbursement for an electioneering communication."  52 U.S.C. § 30121(a)(1)(C).[7]  However, this Court has limited the application of this statute only to

---

[7] The FEC has interpreted "electioneering communication" to only modify "disbursement."  67 Fed. Reg. 69928, 69944 (Nov. 19, 2002); *see also* 11 C.F.R. § 110.20 (2019).  This interpretation is critical because if "electioneering communication" modifies "expenditure" and "independent expenditure," then only broadcast, cable or satellite communications within sixty days of a presidential election would be covered.  *See* 11 C.F.R. § 100.29 (defining electioneering communication).  The FEC is wrong for two reasons.  First, in 11 C.F.R. § 110.20 (e) and (f), the FEC has broadened the scope of the statute by creating two prohibitions with respect to disbursements instead of the one contained in the statute.  Second, while the rule of the last antecedent would normally support the FEC's interpretation, the rule is not absolute and can be overcome by other indicia of meaning.  *See Lockhart v. United States*, 136 S.Ct. 958, 962 (2016).  Here, the FEC's own website defines "disbursement" as a "broader term that covers both expenditures and other kinds of payments (those not made to influence a federal election)." https://www.fec.gov/help-candidates-and-committees/making-disbursements/  Since by definition

expenditures or independent expenditures that expressly advocate the election or defeat of a specific candidate. *See Bluman v. F.E.C.*, 800 F. Supp. 2d 281, 284 (D.D.C. 2011). Expenditures or independent expenditures by foreign nationals for issue advocacy are not prohibited. *See id*; FEC's Motion to Dismiss or Affirm 21, 23, *Bluman v. FEC,* No. 11-275 (Nov. 14, 2011), *available at* https://www.justice.gov/sites/default/files/osg/briefs/2011/01/01/2011-0275.resp.pdf.[8]

A person who makes an independent expenditure is only required to file reports with the FEC listing contributors if the aggregate amount of the value of the independent expenditures is in excess of $250 in a calendar year. *See* 52 U.S.C. § 30104(c)(1). As recently as 2018, the FEC maintained and argued in this Court that § 30104(c)(1) was "ambiguous," "could be read in multiple ways," and "caused confusion" about whether it required disclosure of donors where the donation was not expressly linked to the independent expenditure. *See Citizens for Responsibility & Ethics in Washington v. FEC*, 316 F. Supp. 3d 349, 395, 396, 403 (D.D.C. 2018) (holding that FEC regulation interpreting the statute was invalid because it improperly required an express link between the independent expenditure and the donation for reporting purposes).[9]

To qualify as an "independent expenditure" for either reporting purposes or the foreign national prohibition it must expressly advocate the election or defeat of a clearly identified candidate. *See* 52 U.S.C. § 30101(17). "Clearly identified" means that the candidate's name or

---

an "electioneering communication" contains the name of a specifically identified candidate for federal office, 11 C.F.R. § 100.29(a), a "disbursement for an electioneering communication" results in a modifier that contracts the noun, rendering the phrase meaningless.

[8] Foreign nationals are also permitted to provide volunteer services to a campaign. *See* Ex. A, FEC, Advisory Op. 2014-20 (Mar. 19, 2015).

[9] The instructions in the FEC regulations are even more confusing, containing seemingly conflicting instructions for various levels of expenditures. *See* 11 C.F.R. § 109.10, How do political committees and other persons report independent expenditures?

photograph appears or the identity is apparent by unambiguous reference. *See id* § 30101(18). "Expressly advocating" means that certain key words such as "vote for," "re-elect," "vote against," appear, and/or when taken as a whole, the words could only be interpreted by a reasonable person as containing advocacy for or against a clearly identified candidate. *See* 11 C.F.R. § 100.22 (2019). The Supreme Court has recognized that the distinction between campaign advocacy and issue advocacy "may often dissolve in practical application." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 456-457 (2007).

Here, from what can be determined from the discovery produced by the government, the aggregate amount spent on social media advertisements that even arguably meet the definition of independent expenditures was $2,930.[10]   Specifically, the discovery provided by the government contains 104 paid advertisements on Facebook and Instagram that mention or depict a clearly identified candidate through the date of the 2016 presidential election.[11]   Only thirteen of these

---

[10] Each advertisement was paid for by an individual purchaser in Russian rubles. *See* Ex. B, Testimony of Colin Stretch, General Counsel, Facebook at 5, *Hr'g Before the United States Senate Committee on the Judiciary Subcommittee on Crime and Terrorism*, 115th Cong. (Oct. 31, 2017). Facebook and Instagram utilized technology that made them aware that the payments were coming from accounts located in Russia. *Id.*   As such, if these independent expenditures were contrary to law, Facebook and Instagram are equally liable. *See* 11 C.F.R. § 110.20(h)(2) (prohibiting any person from knowingly providing substantial assistance in the making of a prohibited independent expenditure).   For purposes of this motion, undersigned counsel has converted the amount paid in rubles to U.S. dollars according to the exchange rate in effect as of the start date of the ad.

[11] The date of the election is the last day any of the alleged advertisements could constitute an independent expenditure that expressly advocates the election or defeat of a clearly identified candidate. FEC regulations define when an individual becomes a candidate for federal office based on the amount of contributions the individual has received or expenditures made on his or her behalf, which must be "aggregated on an election cycle basis" and "[t]he election cycle shall end on the date on which the general election for the office or seat the individual seeks is held."   11 C.F.R. § 100.3.

advertisements are specifically alleged in the Indictment.  *See* Indictment ¶ 50.[12]  Based on the information provided by the government in discovery, the total amount allegedly spent for these thirteen advertisements was the ruble equivalent of $454.55.

The analysis required by FEC to determine whether an advertisement expressly advocates the election or defeat of a clearly identified federal candidate under FECA is highly fact specific. *See, e.g.,* Ex. C, FEC, Advisory Op. 2012-27 (Aug. 24, 2012).  To qualify as express advocacy the advertisement   must   contain   Federal   electoral   references.   *See*   Ex. D, FEC, Advisory Op. 2012-11 (May 8, 2012) (concluding that Facebook advertisement relating to gun control that referenced President Obama by name with no Federal electoral references was not express advocacy under 11 C.F.R. § 100.22).  For example, the FEC determined that advertisements mentioning a candidate's name and criticizing that candidate were not express advocacy where they did not explicitly encourage or discourage a person to vote for that candidate. *See* Ex. C, Advisory Op. 2012-27 at 2-4 ("Nydia Velazquez. Ethically challenged" and "Don't Trust Harry Reid" are not express advocacy).

The FEC had the opportunity to make determinations whether the advertisements allegedly posted by IRA constituted express advocacy, and apparently declined to do so.  In particular, Common Cause filed a complaint with the FEC in September 2017 alleging that prohibited political advertisements were posted to Facebook by accounts operating out of Russia and constituted violations of FECA.[13]  *See* Ex. E, Common Cause Complaint.  The FEC has taken no

---

[12] The Indictment also refers to certain advertisements used to promote political rallies, some of which relate to a clearly identified candidate.  Indictment ¶¶ 51-56, 60, 63, 66, 71, 75, 85.  As explained further below, those advertisements are included in this analysis.

[13] 52 U.S.C. § 30109(a)(2) (2018) provides that "[i]f the Commission, upon receiving a complaint . . . or on the basis of information ascertained in the normal course of carrying out its supervisory responsibilities, determines, by an affirmative vote of 4 of its members, that it has reason to believe that a person has committed, or is about to commit, a violation of this Act . . ., the Commission

action on this complaint.  *See* FEC Matters Under Review Database ("MUR") (last checked on Aug. 19, 2019).  So while it is clear that the Special Counsel, the Department of Justice, and the Grand Jury have no authority to determine whether any particular advertisement constitutes express advocacy, it remains entirely unclear who will make that determination in this case. Concord's Sixth Amendment right to a jury trial gives it the right to demand that a jury find it guilty of all elements of the crime with which it is charged.  *See United States v. Gaudin*, 515 U.S. 506, 511 (1995).  There has been no discovery provided to date regarding the FEC's position on any of the advertisements alleged in the Indictment or otherwise identified in the discovery.[14]

Moreover, putting aside whether any of the foreign defendants were even aware of the FEC statute and regulations, and the government has provided no discovery that they were, not even the FEC is capable of determining whether some advertisements constitute express advocacy.  *See,*

_____

*shall* . . . notify the person of the alleged violation. . . . The Commission *shall* make an investigation of such alleged violation . . . ."  *Id.*

[14] Some backers of new election security legislation have already concluded that advertisements alleged to have been made by defendant Internet Research Agency were in compliance with FECA. Michigan Congresswoman Elissa Slotkin, the author of the PAID AD bill, recently told constituents "[i]f you haven't seen it, you should see some of the fake, Russian-produced social media ads that were targeted at Michigan. They are groups pretending to be Muslim-American groups, saying terrible things to ramp up hatred and discord. There are groups pretending to be African-American groups, sowing absolute racial war and discrimination, they are horrible. They have ads that show Hillary Clinton along with the devil, and Donald Trump along with Jesus[.] And I want to be honestly clear about this: that is totally legal in our current political environment." *See* Rep. Elissa Slotkin, Live Facebook feed from town hall at Sexton High School, Lansing, Mich., Facebook.com (June 6, 2019), www.facebook.com/RepElissaSlotkin/videos/vb.2202052983148029/301447767398161.  In an op-ed endorsing the PAID AD bill, the Editorial Board of *The Washington Post* wrote last month that "Russia's Internet Research Agency purchased more than 3,500 [advertisements] on Facebook ahead of the 2016 election, the platform says — and, according to researchers, most were legal." *See* Editorial Board, *Americans deserve to know who pays for political ads. But is that enough?*, The Washington Post (Jul. 2, 2019), www.washingtonpost.com/opinions/is-disclosure-enough-to-keep-foreign-interference-out-of-political-ads/2019/07/02/863a533e-9852-11e9-8d0a-5edd7e2025b1_story.html.

*e.g.,* Ex. C, FEC, Advisory Op. 2012-27 at 4-5 (the FEC could not determine whether certain advertisements were express advocacy: an advertisement naming Nancy Pelosi and President Obama and attacking "ObamaCare;" an advertisement mentioning Nancy Pelosi and her alleged failure to support express delivery of overseas military ballots). *See also* Ex. D, FEC, Advisory Op. 2012-11 at 7-8 (the FEC could not determine whether certain advertisements were express advocacy: an advertisement naming President Obama and attacking his position on environmental policy and gun rights). *See also Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 52 (1st Cir. 2001) (recognizing that "[t]he division between pure 'issue discussion' and 'express advocacy' of a candidate's election or defeat is a conceptual distinction that has played an important, and at times confounding, role in a certain set of modern Supreme Court election law precedents").[15]

Despite the nuanced analysis the FEC routinely engages in to determine whether an advertisement constitutes express advocacy, it is clear that many of the advertisements listed in ¶ 50 of the Indictment are not express advocacy and as such are not independent expenditures. For example, the advertisements alleged to have been posted on April 19, 2016, June 7, 2016, July 20, 2016, and August 10, 2016 are not express advocacy because they contain no reference to an election or voting. According to the discovery produced to date, the arguably express advocacy advertisements alleged in ¶ 50 cost as follows: April 6, 2016 ($27.83); April 7, 2016 ($44.02);

---

[15] Congress has declined to take action on a bill explicitly prohibiting foreign nationals from paying for internet advertising. *See* Ex. F, PAID AD Act, H.R. 2135, 116th Cong. (2019). The FEC has similarly declined to issue a final rule regarding required disclaimers for internet advertising. *See* Ex. G, https://www.fec.gov/updates/nprm-internet-communication-disclaimers-definition-public-communication-2018/. *See* also Ex. H, Mem. from FEC Chair Ellen L. Weintraub to Commission Secretary (June 13, 2019).

May 10, 2016 ($10.57); May 19, 2016 ($2.47); May 24, 2017 ($213.01); June 30, 2016 ($23.40); August 4, 2016 ($7.58); October 14, 2016 ($7.93); and October 19, 2016 ($0.00).[16]

Further, the FEC has declined to take action even on direct contributions by foreign persons to a presidential campaign in the 2016 election cycle where the amounts in question were *de minimis*. *See, e.g.,* Ex. I, FEC First General Counsel's Report, MUR 7205, at 7. According to the discovery in this case, only seven advertisements cost in excess of U.S. dollar equivalent $100, and those advertisements accounted for U.S. dollar equivalent $1,585; that is, over half of the entire amount of the arguably independent expenditures for advertisements. None of these seven advertisements contain any of the magic words regarding voting required by the FEC. The allegation in the Indictment at ¶ 35 claiming that IRA spent thousands of dollars each month to purchase advertisements is at best misleading and at worse demonstrably false because the discovery indicates that the many of the advertisements took place after the 2016 presidential election or did not involve any clearly identifiable candidate.[17]

The Indictment further alleges that the defendants purchased advertisements on Facebook and Instagram to promote rallies in the United States. Indictment ¶¶ 51-56, 60, 63, 66, 71, 75, 85. According to the government, this conduct also required reporting to the FEC. BOP ¶ 3. The 104 candidate-specific advertisements referred to above include a total of 25 advertisements to promote rallies, costing approximately $1,677.30, more than half of the $2,930 spent on candidate-specific advertisements.

---

[16] Notably, for most of these advertisements it is not the text cited in ¶ 50 of the indictment that could arguably constitute express advocacy, but some other portion of the advertisement, again raising a question about legal instructions provided to the Grand Jury.

[17] The Court relied on this allegation in denying Defendant's Motion to Dismiss the Indictment. *See* Nov. 15 Opinion at 13.

Finally, with respect to rally-related payments that could arguably constitute independent expenditures, the Indictment alleges that the defendants paid U.S. persons to participate in or perform certain tasks at rallies held in the U.S.  *See* Indictment ¶¶ 54-56, 62, 64, 72, 73, 77, 82, 84.[18]  The amount of money allegedly spent for political rallies where it can be determined from the discovery that some payment was actually made is approximately $1,833.00.

2.    It is Not Possible for Concord to Determine Who Was Required to File Any Report with the FEC

The BOP now requires Concord to determine on its own who was required to file a FEC Form 5.[19]  It cannot be Concord because the Indictment does not allege that Concord paid directly for any of the advertisements or rallies, but instead funded IRA.  As such, it could only be IRA or the individuals allegedly working at IRA who allegedly purchased the advertisements and spent money on rallies.  It is clear that any such filing would not have required the filer to include any information about Concord because at most Concord would be considered under FECA to be a donor to IRA, and there is no allegation that the alleged payments from Concord to IRA were for specific independent expenditures.  *See Citizens*, 316 F. Supp. 3d at 394 (FEC maintained as late as 2018 that filers were not required to identify specific donors unless the donation was earmarked for a specific independent expenditure).

Further, as a matter of law, failure to file a Form 5 would constitute a violation of FECA only if IRA or an individual allegedly employed by IRA knew that a Form 5 was required and

---

[18] The Bill of Particulars references only "payments to promote political rallies in the United States."  BOP ¶ 3.  It is unclear whether the government considers these payments to individuals to participate in or perform certain tasks in connection with the rallies to be for "promotion" of the rallies, but for the sake of argument Concord is including information about these payments.

[19] *See* Ex. J, FEC Form 5 and Instructions, and note that the form contains no field for the filer to indicate she or he lives in a foreign country.

willfully failed to file it.  *See* 52 U.S.C. § 30109(d).  This means that the responsible conspirator would have had to know that of the millions of rubles equating to hundreds of thousands of dollars of Concord's money allegedly spent by IRA, at worst approximately $2,900 were spent for advertisements and $1,800 were spent for rallies that the FEC could possibly conclude were independent expenditures for express advocacy.  Without knowing precisely who the government intends to establish was required to report to the FEC, it is impossible for Concord to conduct its own investigation of the conspiracy charge against it.  *See* May 24, 2019 at 8.

3.    No Defendant Was Obligated To Self-Incriminate

To the extent the government can establish that any individual actually had a duty to report to the FEC, Concord is entitled to the identity now— before trial—in order to determine whether there is a defense available under the Fifth Amendment.  "Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one."  *California v. Byers*, 402 U.S. 424, 427 (1971).  The Supreme Court has established certain criteria for determining when the threat of self-incrimination from a disclosure statute is so offensive to the mandate of the Fifth Amendment as to render the statute unconstitutional.  In *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 86 (1965), the Supreme Court held unconstitutional a statute which required Communist Party members to register, thereby subjecting themselves to prosecution for being members of the Communist Party. This holding was based on the fact that registration would involve an admission of a crucial element of a crime.  Later Supreme Court cases used this standard in striking down various disclosure statutes.  *See Leary v. United States*, 395 U.S. 6 (1969) (statute requiring registration of persons who deal in marijuana); *Marchetti v. United States*, 390 U.S. 39 (1968) and *Grosso v. United States*, 390 U.S. 62 (1968) (statutes requiring registration by gamblers); *Haynes v. United*

*States*, 390 U.S. 85 (1968) (statute requiring registration of certain firearms).  *See also Communist Party v. United States*, 331 F.2d 807 (D.C. Cir. 1963) (holding that criminal punishment may not be imposed for failure of organization's officers to make a required disclosure on the organization's behalf).  In sum, where disclosures are required of a select group that is inherently suspect of engaging in criminal activity, and those disclosures would necessarily provide the basis for a criminal prosecution, then any such required disclosure is unconstitutional.  *See United States v. Dichne*, 612 F.2d 632, 640 (2d Cir. 1980).

This principle applies here.  If a foreign national reported independent expenditures advocating for or against a candidate such disclosure would be an admission to, and form all of the elements of, a crime under FECA.  *See* 52 U.S.C. § 30121(a)(1)(C).  Much like the cases above, the reporting requirement advocated by the government here is, in essence, a compelled disclosure that violates the Fifth Amendment protections, *see Albertson*, 382 U.S. at 86, and should be found to be unconstitutional.  *Dichne*, 612 F.2d at 640.

If it is IRA that the government alleges was required to file a Form 5,[20] it may attempt to argue that a legal entity does not have a Fifth Amendment privilege against self-incrimination. Any such argument would be wrong.  In this specific context courts have held that "Fifth Amendment concerns  . . . 'buttress[]'" the proposition that there is no duty to disclose uncharged criminal conduct.  *See United States v. Crop Growers Corp.*, 954 F. Supp. 335, 345-348 (D.D.C. 1997) (citing *United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986)); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (recognizing the "[F]ifth [A]mendment concerns . . . present in *Matthews*"); *cf. Whiteside & Co. v. S.E.C.*, 883 F.2d 7, 10 (5th Cir. 1989) (implicitly recognizing principle that corporate petitioner had rights against self-incrimination when rejecting

---

[20] For the reasons set forth above, it is clear that Concord did not have any reporting requirement.

argument that SEC capital deficiency reporting requirement violated those rights).  The D.C. Circuit in *Crop Growers* dismissed a 18 U.S.C. §§ 1001 charge and two other charges against a corporate defendant where the defendant had no duty to disclose uncharged criminal conduct related to alleged violations of FECA by making illegal campaign contributions.  *Id.* at 344-48.  In reaching that conclusion, the court relied on the Second Circuit's decision in *Matthews*, which involved an appeal of a conviction for violation of securities laws in which the defendant failed to disclose on a proxy statement that he had engaged in conspiracy.  *Matthews*, 787 F.2d at 44. Similarly, in *Communist Party of U.S. v. United States*, 384 F.2d 957, 959 (D.C. Cir. 1967), the D.C. Circuit reversed convictions against a legal entity—the Communist Party—for failing to register under the Subversive Activities Control Act because convictions were "hopelessly at odds with the protections afforded by the Fifth Amendment."

**B.**     **It is Not Possible for Concord to Determine Who Was Required to Register Under FARA or the Identity of the Foreign Principal**

With respect to FARA registration, the government first claims that travel to the United States by certain conspirators triggered a FARA reporting requirement pursuant to 22 U.S.C. §§ 612(a), 611(c)(1)(ii) and 611(g), (h), (p).  BOP ¶ 4.  The government fails to indicate who was supposed to register or the name of the foreign principal to be disclosed, and the citations in the Bill of Particulars offer no guidance.  Section 612(a) simply requires the "agent" of a "foreign principal" to register under FARA.  Section 611(c)(1)(ii) defines "agent" as a person who "acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for a foreign principal."  Section 611(g) defines a "public-relations counsel" as a person "who engages directly or indirectly in informing, advising, or in any way representing a principal in any public relations matter pertaining to political or public interests, policies, or relations of such principal."  Section 611(h) defines a "publicity agent" as a person

who engages directly or indirectly in the publication or dissemination of oral, visual, graphic, written, or pictorial information or matter of any kind, including publication by means of advertising, books, periodicals, newspapers, lectures, broadcasts, motion pictures, or otherwise." Section 611(p) defines a "political consultant" as a person "who engages in informing or advising any other person with reference to the domestic or foreign policies of the United States or the political or public interest, policies, or relations of a foreign country or of a foreign political party."

The sub-provisions of FARA now relied upon by the government were not identified in the Indictment, nor were they cited by the government in its Opposition to the Motion to Dismiss. *See* ECF 56 at 6-7 (citing 22 U.S.C. § 611(b), (c), and (o) for the definition of foreign principal). Nor were any of these sub-provisions relied upon by the Court in denying the Motion to Dismiss. *See* Nov. 15 Opinion at 12-13. These omissions are unsurprising, as there is exactly one reported case in the history of FARA dealing with any of the definitions cited by the government. In *RM Broad. v. United States Dep't of Justice*, 379 F. Supp. 3d 1256 (S.D. Fla. 2019), the court held that a U.S. broadcasting company who contracted to broadcast transmissions from a Russian government-owned news agency was a "publicity agent" and required to register under FARA.[21]

Concord is left to deduce who was required to register under FARA and who are the agents and principals because, as noted above, the Bill of Particulars fails to provide that information. The agent cannot be Concord because the Indictment does not allege that Concord actually engaged in any of the travel to the United States or social media postings, but only controlled funding, recommended personnel, and oversaw activities of IRA. *See* Indictment ¶¶ 3, 11, 12.

---

[21] Further, until the Special Counsel started flinging FARA indictments around, for 50 years, from 1966 to 2015, the Department of Justice brought only seven criminal FARA cases. *See* Ex. K, Office of the Inspector General, U.S. Department of Justice Audit Report Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act at 8 (September 2016).

Further, if Concord was the agent required to register, the identity of the principal remains an utter mystery because, as the Court has noted and the government has agreed, the Indictment contains no allegation that the conspirators were acting as agents of the Russian government.  *See* Mem. Op. & Order 6, July 1, 2019, ECF No. 148; Gov't's Suppl. Brief Regarding Def.'s Mot. to Show Cause 4, June 5, 2019, ECF No. 139.

Nor can Concord be the principal for the individuals who traveled to the United States or the individuals who posted content on the internet because the Indictment contains no allegation that Concord had an agency relationship with any of those individuals.  So if Concord is neither the agent nor the principal, that leaves only the possibility that the individual conspirators were acting as foreign agents of IRA and were required to register as such.  But that does not create FARA liability for IRA or Concord; the only possible theory of liability would be as to the individuals who worked for IRA and their failure to register as agents of IRA under FARA.  *See* 22 U.S.C. § 612(a) (2018) (requiring agents of foreign principals to file registration statement) and 22 U.S.C. § 618 (2018) (setting for the punishment for willful violations of FARA).

Because there is no case law regarding whether or not the conduct of the individuals working for IRA were required to file under FARA, once again in this case we are dealing with a legal issue of first impression.  That is, while the government alleges that there was a duty to register, we only have the government's word for it.  Worse yet, we have no independent government agency making this determination, instead we have the Department of Justice both making the determination and prosecuting the case.

So we are left with relying on the plain language of the statute.  The government claims that the three individuals working for IRA who apparently traveled to the United States were public relations counsel, publicity agents, and/or political consultants.  BOP ¶ 4 (citing 22 U.S.C. §§

611(g), (h), and (p)).  Of course, there is no such allegation in the Indictment.  Moreover, even if these individuals did what the government claims, they did nothing falling within the definitions contained in the statute.   Further, if their conduct did require registration, which it did not, any foreign person working for a foreign country or foreign company who traveled to the United States and reported back on what they did, saw, or observed would be required to register under FARA. There is no precedent to apply FARA in this way.

Similarly, with respect to the alleged internet activity to allegedly influence public opinion on political matters, the government suggests without any legal support that unidentified "conspirators" were required to register under FARA.  BOP ¶ 4.  This despite the fact that the Indictment contains no allegations that any individual was within the United States when they engaged in the alleged conduct that, according to the government, triggered the registration requirement under FARA.  The government has not presented, nor is the undersigned aware of, any authority that supports the notion that a foreign national who resides in and engages in conduct from a foreign country is subject to the FARA registration requirements.  To the contrary, the plain language of the statute and the legislative history suggest otherwise.  FARA defines "agent of a foreign principal" as "any person who . . . (i) engages *within the United States* in political activities . . . (ii) acts *within the United States* as a public relations counsel . . . (iii) *within the United States* solicits . . . contributions, loans, money, or other things of value . . . or (iv) *within the United States* represents the interests of such foreign principal before any agency or official of the Government of the United States."  22 U.S.C. § 611(c)(1)(i), (ii), (iii) and (iv).  Similarly, 22 U.S.C. § 614, which restricts the dissemination of propaganda materials, expressly applies to "person[s] *within the United States*."  (The government failed to disclose this provision in its citation to § 614(a). BOP ¶ 2.)  Had Congress intended for these definitions and restrictions to apply to conduct

occurring abroad, it certainly would have omitted the phrase "within the United States." FARA also provides that "[a]ny alien who shall be convicted of a violation . . . shall be subject to removal pursuant to chapter 4 of title II of the Immigration and Nationality Act." 22 U.S.C. § 618(c) (2018). An alien, of course, cannot be removed from the United States unless he or she is already present within its borders.

The legislative history of FARA also demonstrates an intent that the statute apply only to conduct occurring within the United States. During a floor debate leading up to the original passage of the law in 1938, Representative Celler stated that the purpose of the bill was "to require all persons *who are in the United States* for political propaganda purposes . . . to register with the State Department and to supply information about their political propaganda activities, their employers, and the terms of their contracts." Ex. L, House Agreement to Conference Report, June 2, 1938, pp. 8021-22 Debate: 75th Congress, 2nd Session [Vol. 82]: Document No. 15. Representative Celler added that the law "will publicize the nature of subversive or other similar activities of such foreign propagandists, so that the American people may know those *who are engaged in this country* by foreign agencies to spread doctrines alien to our democratic form of government . . . ." *Id.* Finally, Representative Celler noted that the bill would not require a "foreign corporation engaged in honorable trade relations with this country" to register, but that "whenever representatives *are sent here* to spread by word of mouth, or by the written word, the ideology, the principle, and the practices of other forms of government and the things for which they stand, then registry must be made." *Id.* Clearly, Congress intended for the registration requirements of FARA to apply only where the foreign agent is operating within the borders of the United States.

There has been no allegation or evidence produced in discovery to suggest that the conduct identified in the second bullet of ¶ 4 of the BOP was carried out by any individual located within

the United States.  As such, it remains a mystery who the government contends, and intends to establish at trial, was required to register under FARA and for what purpose.  The government should be required to provide this information before trial so as to avoid prejudicial surprise and allow Concord to understand the charges against it.

## III.    CONCLUSION

Concord, a foreign corporation with no past or current presence in the United States, should not be required to engage in a guessing game in preparing for trial.  The government has clearly shifted its theory of liability post-indictment.  If the Court does not require the government to identify which defendant(s) were required to register under FARA (and on behalf of whom) or file under FECA it will be impossible for Concord to prepare for trial; and moreover, the Court will not know until sometime during trial whether or not the Indictment should be dismissed as a matter of law.

Dated:   August 19, 2019

Respectfully submitted,

CONCORD MANAGEMENT AND
CONSULTING LLC

By Counsel

 /s/ *Eric A. Dubelier*
Eric A. Dubelier (D.C. Bar No. 419412)
Katherine Seikaly (D.C. Bar No. 498641)
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
202-414-9200 (phone)
202-414-9299 (fax)
edubelier@reedsmith.com
kseikaly@reedsmith.com