# Exhibit K



Office of the Inspector General
U.S. Department of Justice

# Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act

# AUDIT OF THE NATIONAL SECURITY DIVISION'S ENFORCEMENT AND ADMINISTRATION OF THE FOREIGN AGENTS REGISTRATION ACT

## EXECUTIVE SUMMARY

The Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C § 611 *et seq.*, as amended, is a disclosure statute that requires persons acting as agents of foreign principals in a political or quasi-political capacity to make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts, and disbursements in support of those activities.  According to the Department of Justice (Department), this disclosure facilitates evaluation by the government and the American people of the statements and activities of such persons in light of their function as foreign agents.  The FARA Registration Unit (FARA Unit) of the Counterintelligence and Export Control Section (CES) within the Department's National Security Division (NSD) is responsible for the administration and enforcement of the Act.  A willful failure to register as an agent of a foreign principal may result in criminal prosecution and a sentence of a fine and up to 5 years in prison.  There also is a civil enforcement provision that permits the Department to seek to enjoin a party from acting as an agent of a foreign principal in violation of FARA.

This review was initiated in response to a requirement by the U.S. House of Representatives Committee on Appropriations that the OIG review the Department's enforcement of FARA.  Based on this direction, our audit objectives were to review and evaluate the monitoring and enforcement actions taken by the Department to ensure appropriate registration, and to identify areas for the Department to consider seeking legislative or administrative improvements.

During our audit, we found that the number of active FARA registrations peaked in the 1980s, with a high of 916 active registrations in 1987, and began to fall sharply in the mid-1990s.  The Department has not performed an analysis on the decline, but NSD officials speculated that the imposition of FARA registration fees in 1993 and the passage of the Lobbying Disclosure Act (LDA), which carved out a significant exemption to FARA in 1995, were likely factors.  In addition to the declining trend in registrations, we also found that there historically have been very few FARA prosecutions.  Between 1966 and 2015 the Department only brought seven criminal FARA cases – one resulted in a conviction at trial for conspiracy to violate FARA and other statutes, two pleaded guilty to violating FARA, two others pleaded guilty to non-FARA charges, and the remaining two cases were dismissed. We were also told by NSD that the Department has not sought civil injunctive relief under FARA since 1991.

In discussions with several Federal Bureau of Investigation (FBI) counterintelligence agents and Assistant United States Attorneys (AUSA), as well as NSD officials, we found differing understandings between field agents and prosecutors and NSD officials about the intent of FARA as well as what constitutes a

"FARA case."  The primary difference stemmed from the belief of investigators that investigations conducted pursuant to a separate criminal provision, 18 U.S.C. § 951 (Section 951), were FARA cases.  However, NSD officials stated that unlike FARA and the LDA, Section 951 can be aimed at political or non-political activities of agents under the control of foreign governments.  Although registration under FARA can serve as the required notification to the Attorney General under Section 951, the criminal activity targeted is different.  According to NSD officials, who must approve both FARA and Section 951 cases, a true FARA case can only be brought pursuant to 22 U.S.C. § 611, *et seq.*, and these officials stated that NSD currently is engaged in ongoing outreach activities that will help better educate investigators about FARA.  We believe these differing understandings are indicative of the lack of a comprehensive Department enforcement strategy on FARA, which the Department should develop and integrate with its overall national security efforts.

Further, the majority of those agents interviewed believed that NSD's review of what they believed to be FARA cases was generally slow and that NSD is reluctant to approve these charges.  Some investigators believed that NSD has a clear preference toward pursuing registration for alleged FARA violators rather than seeking prosecution, which in their opinion, leaves an important counterintelligence tool underutilized.  NSD officials told us that they believed that even though criminal penalties are available under FARA, the primary goal of FARA is in fact to ensure appropriate registration and public disclosure.  These NSD officials also disputed that there is any reluctance on their part to approve either true FARA or Section 951 cases, and stated that they approve charges when the evidence presented leads them to judge that a provable willful violation exists.

Timely submission of required documentation is essential for full and complete public disclosure.  However, we found in our testing that 62 percent of initial registrations were untimely, and that 50 percent of registrants filed at least one supplemental statement late.  We also found that NSD needs to improve its controls and oversight of FARA registrations, particularly involving its inspections of registered foreign agents and enforcing the complete and timely submission of required documentation.  Agents of foreign principals are required to maintain records of activities on behalf of their principal for the duration of the agreement and 3 years thereafter.  These records are subject to inspection by the NSD's FARA Unit.  If an inspection identifies deficiencies in an agent's disclosures, the FARA Unit advises the registrant of the deficiencies and actions required for resolution.  We noted, however, that several inspection recommendations issued by the FARA unit still remained unresolved and believe that NSD can further improve its monitoring efforts by developing a policy to ensure appropriate resolution of recommendations identified in its inspection reports.  NSD stressed to us that because the FARA Unit has limited staff and considerable responsibilities follow-up can be difficult.  We understand this challenge but believe improvements can still be made.

With regard to potential legislative improvements, NSD officials stated that a major difficulty is a lack of authority to compel the production of information from persons who may be agents.  As a result, NSD is currently pursuing civil investigative demand (CID) authority from Congress in order to enhance its ability

to assess the need for potential agents to register.  While we concur that CID could be a useful tool for NSD, there are important competing considerations at stake, and we believe that any expansion of such authority must also include appropriate controls and oversight to ensure it is used appropriately.  Another difficulty NSD cited relates to the breadth and scope of existing exemptions to the FARA registration requirement and determining whether activities performed by certain groups, such as think tanks, non-governmental organizations, university and college campus groups, foreign media entities, and grassroots organizations that may receive funding and direction from foreign governments fall within or outside those exemptions.  According to the FARA Unit, these types of organizations generally claim that they act independently of foreign control or are not serving a foreign interest and are not required to register.

NSD officials also told us that the enactment of the LDA in 1995 may have contributed to the recent decline in FARA registrations.  The LDA focuses on those engaged in lobbying activities on behalf of domestic and foreign interests and those agents of foreign principals who engage in lobbying activities and who register under the LDA, and, as a result, are exempt from registration under FARA.  However, NSD believes that because FARA disclosure requirements are more rigorous than those of the LDA, those lobbying on behalf of foreign commercial interests should not be exempt from FARA registration.  We believe that the development of an enforcement strategy for FARA cases should include an assessment of the LDA exemption and its impact to determine if legislative changes should be sought.

In this report we make 14 recommendations to help improve NSD's enforcement and administration of FARA.  We found that several of these recommendations were similar to those made over the years in reports by the Government Accountability Office, and its predecessor the General Accounting Office, and by public interest organizations, and that these recommendations should be seriously considered if the purposes of FARA are to be fully realized.

# AUDIT OF THE NATIONAL SECURITY DIVISION'S ENFORCEMENT AND ADMINISTRATION OF THE FOREIGN AGENTS REGISTRATION ACT

## TABLE OF CONTENTS

INTRODUCTION .................................................................................. 1

    History of FARA ......................................................................... 2

    NSD's Administration and Enforcement of FARA ....................... 3

    FARA Registration Trends ......................................................... 5

    OIG Audit Approach .................................................................. 6

    Prior Reports ............................................................................. 7

FINDINGS AND RECOMMENDATIONS ............................................... 8

    Efforts to Enforce FARA ............................................................ 8

    Administration and Monitoring of FARA Registrations .............. 13

    Other Possible Legislative Improvements that the Department Might Seek  17

    Conclusion ............................................................................... 21

    Recommendations ................................................................... 21

STATEMENT ON INTERNAL CONTROLS ........................................... 23

STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS ........................ 24

APPENDIX 1:  OBJECTIVES, SCOPE, AND METHODOLOGY ................................ 25

APPENDIX 2:  PRIOR REPORTS INVOLVING FARA ............................................ 27

APPENDIX 3:  NATIONAL SECURITY DIVISION'S RESPONSE TO
              THE DRAFT REPORT ................................................... 29

APPENDIX 4:  OFFICE OF THE INSPECTOR GENERAL ANALYSIS AND SUMMARY
              OF ACTIONS NECESSARY TO CLOSE THE REPORT ....................... 37

# AUDIT OF THE NATIONAL SECURITY DIVISION'S ENFORCEMENT AND ADMINISTRATION OF THE FOREIGN AGENTS REGISTRATION ACT

## INTRODUCTION

The Foreign Agents Registration Act (FARA) of 1938, as amended, requires persons acting as agents of foreign principals in a political or quasi-political capacity to make periodic public disclosure of their relationship with the foreign principal, as well as their activities, receipts and disbursements in support of those activities.[1] According to the Department of Justice (Department or DOJ), such disclosure enables the American people to evaluate the statements and activities of such persons in light of their function as foreign agents.

Individuals or entities may act as agents or employees of foreign governments or interests on a variety of matters, including for instance lobbying a member or committee within Congress.  FARA requires an agent, upon entering into an agreement with a foreign principal, to submit an initial registration to the Department.  This registration must describe the agent registering, the foreign principal, the nature of work to be performed, and include a copy of the agreement between the agent and the associated foreign principal.  These registrations must be filed within 10 days of an agreement to become an agent of a foreign principal, and the foreign agent must pay a filing fee of $305.[2]

Every 6 months after the initial filing, the agent is required to submit a supplemental statement to the FARA Unit describing activities performed during that period and the amounts paid for that work.  Each supplemental statement also requires the agent to pay an additional $305 fee for each foreign principal represented during the period.

The agent also is required to submit to the FARA Unit any informational materials produced on behalf of the principal and transmitted to two or more persons within 48 hours of transmittal.  These informational materials must contain a conspicuous statement that the materials were distributed by an agent on behalf of a foreign principal, and that further information is on file with DOJ.

As discussed in detail below, there are multiple exemptions to FARA registration requirements, including persons whose activities are of a purely commercial nature or solely of a religious, scholastic, academic, scientific or fine arts nature, as well as attorneys engaged in legal representation of foreign principals so long as they do not try to influence policy at the behest of their client. In addition, any agent who is engaged in lobbying activities and is registered under

---

[1]  22 U.S.C. § 611, *et seq.*

[2]  Specific requirements for the registration and its submission are contained in a regulation promulgated by the Department, 28 C.F.R. § 5.1, *et seq.*

the Lobbying Disclosure Act (LDA) is exempt from registration under FARA if the representation is on behalf of a foreign commercial interest rather than a foreign government or foreign political party.[3]  As we discuss later in the report, there are different requirements for registrants under the LDA that may impact the Department's efforts under FARA.  LDA is administered by Congress rather than the Department.  FARA Unit staff told us they review LDA filings, typically once a month, looking for potential FARA registrants.  The unit looks for direction, control, and tasking from a foreign government.  When a potential FARA obligation is found, the unit sends the potential registrant a letter of inquiry.

## History of FARA

FARA was enacted in 1938 in response to recommendations of a special congressional committee investigating anti-American activities in the United States. The committee studied the rise of propaganda activity by European fascist and communist governments to determine whether the United States needed a new means to protect its citizens from political propaganda from foreign sources.  A significant finding of the committee's study was that the Nazi German government had established an extensive underground propaganda apparatus using American firms and citizens.

From its passage in 1938 until amendments made in 1966, FARA primarily focused on propagandists.  The 1966 amendments, which still form the core of the current Act, shifted its focus to protecting the integrity of the government's decision-making process and to the identity of the sources of political propaganda. The 1966 amendments also narrowed the reach of FARA so that the government has to prove that a foreign agent is acting at the order, request, or under the direction and control of a foreign principal.  The amendments led DOJ to allow persons who believe they may be subject to FARA requirements, or their attorneys, to request an advisory opinion from the Department regarding their obligation to register.[4]  According to FARA Unit staff, the 1966 amendments reduced the incidence of criminal FARA prosecutions in favor of increased civil and administrative resolution of FARA violations.

The next significant legislative change affecting FARA resulted from the 1995 passage of the LDA. Under the LDA, any agent who is engaged in lobbying activities and is registered under the LDA is exempt from FARA registration if the representation is on behalf of a foreign commercial interest rather than a foreign government or foreign political party.  The term "political propaganda" was also removed from FARA and replaced with the term "informational materials," which is not defined.  According to FARA Unit staff, Congress believed the term "propaganda" to be an unnecessary remnant of the original law and believed the

---

[3]  2 U.S.C § 613(h).

[4]  28 C.F.R. § 5.2

change to "informational materials" reflected the shift in focus to the public disclosure of agents engaged in the U.S. political process.

## NSD's Administration and Enforcement of FARA

The National Security Division's (NSD) Counterintelligence and Export Control Section (CES), and its FARA Registration Unit are primarily responsible for the enforcement and administration of FARA.  CES and the FARA Unit have been part of NSD since the Division's creation in 2006.  Prior to 2006, CES and the FARA Unit were part of the Department's Criminal Division.  The NSD maintains a publicly available page on the Department's website at www.fara.gov, which contains information on the statute and filing requirements and contact information for the FARA Unit.  The fara.gov webpage also contains an e-filing capability for registrations, a document search page that allows for public access to initial and supplemental registration statements and their Exhibits, and the semiannual reports from the Department to Congress that are required by the Act and list registered agents of foreign interests and their activities.  FARA cases are primarily investigated by Federal Bureau of Investigation (FBI) counterintelligence agents and prosecuted by United States Attorney's Offices (USAO) after receiving NSD approval as required by Section 9-90.710 of the United States Attorneys' Manual. A willful violation of FARA, including false statements or omission of material facts, carries a penalty of a fine or imprisonment for up to 5 years, or both.

During our audit the FARA Unit was comprised of one Unit Chief, who is also an attorney; two staff attorneys; one Supervisory Program Manager; one Intelligence Research Specialist; one Program Specialist; and two Case Management Specialists.[5]  NSD staff emphasized that this is a limited staff, which is responsible for a considerable range of activities.  The unit is responsible for processing and monitoring new and existing FARA registrations on an ongoing basis.  This includes receiving, reviewing and processing documentation and payments, and addressing late or inaccurate submissions.  The unit also performs periodic formal inspections to assess the adequacy of registrant reporting and disclosure, and conducts open source searches to identify individuals that may be obligated to register.  It also provides, upon request, advisory opinions to individuals who are unsure whether FARA registration is required of them and maintains foreign agent submissions in electronic and hard copy form for public consumption.  The unit has received 14 requests for advisory opinions since the beginning of 2013.  We inquired whether advisory opinions were made publicly available as an informational resource.  Unit staff responded that advisory opinions are not made public, adding that each request is unique, opinions rely on the information provided by the requestor, and that advisory requests involve proposed activity.  However we note that the Office of the Inspector General (OIG) posts investigative findings on its public website, and that the DOJ Criminal Division posts

---

[5]  One of these two staff attorneys joined the FARA Unit during our audit.  At the conclusion of our audit we were informed that the FARA Unit was back to one staff attorney, however the unit planned to hire a replacement.

Foreign Corrupt Practices Act opinions as well, both in anonymized form.[6]  We believe the FARA advisory opinions may be a worthwhile informational resource, and recommend NSD consider whether there is value in making them publicly available.  The FARA Unit also assists CES, FBI and USAOs with FARA-related investigations as needed.

The FARA Unit Chief reports to the Section Chief of CES.  As noted above, the U.S. Attorneys' Manual requires NSD approval before a USAO can charge a FARA violation.  CES reviews and approves or declines FARA charges in consultation with the FARA Unit.

---

[6]  See https://oig.justice.gov/reports/inv-findings.htm and https://www.justice.gov/criminal-fraud/opinion-procedure-releases.

**FARA Registration Trends**

We compiled data on foreign agent registrations under FARA from 1966 to the present.  The following charts show the number of annual active and new registered agents and foreign principals as of the end of each calendar year.

**Figure 1**

**Active Registrants and Foreign Principals per Year**



Source:  www.fara.gov

**Figure 2**

**New Registrant and Foreign Principals per Year**



Source:  www.fara.gov

As reflected in Figures 1 and 2 above, the number of active registrations for foreign agents under FARA peaked at 916 in 1987.  However, in the mid-1990s active FARA registrations began falling sharply after the imposition of fees in 1993 and the passage of the LDA in 1995, leaving a total of 360 as of the end of 2014. Consequently, the number of active foreign principals also fell sharply in the mid-1990s from a high of 2079 in 1991, and was at 561 as of the end of 2014.  New registrations have followed a similar trend, peaking at 157 in 1986 to a total of 66 new registrations in 2014.  Since the abrupt decline in the mid-1990s, registrations have continued to trend down, albeit at a more gradual pace.

While no formal analysis on the decline has been performed by the Department, FARA Unit staff speculated that the imposition of FARA registration fees in 1993 and the passage of the LDA in 1995 were likely factors.  While the OIG does not dispute that these factors played some role in declining number of FARA registrations, we could not definitively correlate specific causation for the declining trend.[7]

## OIG Audit Approach

The Department of Justice Office of the Inspector General (OIG) initiated this audit at the request of the U.S. House of Representatives Committee on Appropriations, which required the OIG to review the Department's enforcement of FARA.  The Committee requirement specifically directed the OIG to review the Department's enforcement of FARA, specifying:

> The report should take into account FARA filing trends and foreign government tactics to engage in public advocacy in the United States while avoiding FARA registration.  The report shall recommend administrative or legislative options for the improvement of FARA enforcement.[8]

Based on this request, the objectives of our audit were to review and evaluate the monitoring and enforcement actions taken by the Department to ensure appropriate registration, and to identify areas for the Department to consider seeking legislative or administrative improvements.

We also inquired about tactics to avoid FARA registration and learned from the Assistant United States Attorneys (AUSA) and FBI case agents with whom we spoke that the impetus for FARA avoidance often appears to come not from the foreign principal, but from the agent, who is conscious of the need to preserve credibility by concealing the support of the foreign principal.  FBI staff told us the foreign principal typically is indifferent to FARA requirements.  The FARA Unit disagreed with the FBI staff assessment and told us that in its experience foreign principals are not indifferent to FARA requirements.

To accomplish our objectives, we interviewed staff from the National Security Division, including its Counterintelligence and Export Control Section and its FARA Unit.  We also interviewed AUSAs and FBI counterintelligence agents from district and field offices involved with FARA investigations.  We also spoke with staff from the FBI's Counterintelligence Division and National Security Law Branch, and with staff from the Department of Justice's Office of Legislative Affairs.  Lastly, we

---

[7] Direct staff knowledge of the FARA Unit's history extends back to 1984. The Unit Chief has been with the FARA Unit since that time.

[8] House Report 113-448- Commerce, Justice, Science, and Related Agencies Appropriations Bill, 2015.

reviewed FARA registered agent documentation and FARA Unit records and communications.

The results of our audit are detailed in the Findings and Recommendations section of this report.  Appendix 1 contains more information about our objectives, scope, and methodology, and Appendix 2 provides information on prior reports conducted by both government and private organizations that have reviewed the Department's administration and enforcement of FARA.

**Prior Reports**

Our research identified three prior reports prepared by the General Accounting Office (now known as the Government Accountability Office) that dealt with the administration and enforcement of the Foreign Agents Registration Act.[9] Although these reports date back to 1974, 1980, and 1990, they identified some of the same issues identified in this report, including timeliness and the use of available enforcement tools.  We believe that these recommendations should be seriously considered if the purposes of FARA are to be fully realized.  Additional details on these reports, as well as more recent reports produced by public interest organizations, can be found in Appendix 2.

---

[9] There also was a 2008 GAO report that referenced certain FARA authorities as discussed below.

# FINDINGS AND RECOMMENDATIONS

We found that field level agents and prosecutors expressed frustration as they attempted to develop FARA investigations due to the perception that NSD, which must concur before charges can proceed, is reluctant to approve FARA charges.  NSD officials denied that they are reluctant to approve FARA charges and told us that in the few instances where FARA charges were proposed but not pursued it was due to insufficient evidence of willful conduct necessary to bring a FARA case.  Nevertheless, NSD officials acknowledged that communication about why cases might not be approved can be improved.  NSD officials also acknowledged that even though criminal penalties are available under FARA, it primarily views FARA as disclosure statute, and this could also be communicated better to field agents and prosecutors.  We believe this is indicative of the lack of a comprehensive FARA enforcement strategy, which the Department should develop and integrate with its overall national security efforts.  In addition, we found that FARA registrants often submitted required documentation late, and were not always responsive to FARA Unit requests and recommendations to update information and correct deficiencies.  We also learned about several proposals developed by NSD for legislative improvements to FARA that could improve its enforcement efforts if enacted.

## Efforts to Enforce FARA

During our audit we found that historically there have been hardly any FARA prosecutions.  Over the past 50 years, between 1966 and 2015, the Department reported to us that it brought, in total, only seven criminal FARA cases – one resulted in a conviction at trial for conspiracy to violate FARA and other statutes, two pleaded guilty to violating FARA, two others pleaded guilty to non-FARA charges, and the remaining two cases were dismissed.[10]  Another was approved for prosecution by NSD in November 2015.[11]  We also found that the NSD does not track the number of FARA cases declined for prosecution, or the reasons for such declinations.  Therefore, the OIG cannot determine quantitatively whether foreign governments employ any specific tactics to avoid FARA registration.  We did, however, review the cases that have been filed alleging FARA violations and spoke to the FARA Unit Chief about this topic.  The FARA Unit Chief noted that foreign government lobbying in the United States is not itself inappropriate or unlawful, and that foreign agents who are not otherwise exempt must register under FARA.  While

---

[10]  According to the Department, the two dismissed FARA cases resulted from a statute of limitations issue, and the resignation of the principal prosecutor handling the case, respectively.

[11]  In addition to criminal penalties, FARA allows the Department to seek civil injunctive relief when it identifies a foreign agent it believes to be in violation of the statute.  The last civil enforcement action by NSD occurred in 1991.  As explained in further detail in this report, NSD has been reluctant to pursue civil injunctive relief since that time.

foreign governments may be creative in their attempt to influence U.S. policy and sway public opinion, if it is done in a way that does not create a statutory agency relationship on the part of the agent acting within the United States at the direction or control of the foreign government, then there is no agent of a foreign principal with an obligation under FARA.

*FARA Criminal Investigations and Prosecutions*

We learned that the focus of the FARA Registration Unit's enforcement efforts is encouraging voluntary compliance, rather than pursuing criminal or civil charges. Conversely, we found that FBI and USAO staff members with whom we spoke are actively pursuing FARA criminal charges.  FBI staff told us they believe this to be an effective tool carrying sufficient penalties to deter foreign principals from exerting undisclosed influence, or to compel the development of cooperating sources. Although NSD officials disagreed with the assessment offered by these FBI staff members, we believe this disagreement reflects the lack of a comprehensive Department enforcement strategy, and a lack of mutual understanding and clarity in enforcement goals as discussed in greater detail below.

This was confirmed when we spoke about the process for pursuing FARA prosecutions with NSD officials, as well as FBI counterintelligence agents and AUSAs with experience investigating FARA cases.  During these discussions we found differing understandings between field agents and prosecutors and NSD officials about the intent of FARA as well as what constitutes a prosecutable FARA case.  Most notably, when we discussed FARA with FBI personnel, we found that they considered a "FARA case" to be a case investigated pursuant to either the FARA, 22 U.S.C. § 611, *et seq.*, *or* 18 U.S.C. § 951 (Section 951), which is the federal statute that provides criminal penalties for certain agents of foreign governments who act in the United States without first notifying the Attorney General.[12]  Unlike Section 951, FARA requires agents of foreign principals engaged in legal political or quasi-political activities such as lobbying, government and public relations, tourism promotion, and foreign economic development activities in the United States to register and make detailed disclosures of their activities in the United States conducted on behalf of their foreign principals.[13]

By contrast, Section 951 was described to us by the NSD as "espionage lite" because a Section 951 case generally involves espionage-like or clandestine behavior or an otherwise provable connection to an intelligence service, or information gathering or procurement-type activity on behalf of a foreign

---

[12]  According to NSD, notification under Section 951 may be made by registration under FARA in circumstances where the activity requiring notice is disclosed on the FARA registration form.

[13]  Political activities are defined by the statute as "any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party."

government.  Although FARA registration can serve as the required notification to the Attorney General under Section 951, NSD officials told us FARA and Section 951 involve different sets of elements and different types of issues.  According to NSD officials, only 22 U.S.C. 611 *et seq.* constitutes a FARA case.  Nevertheless, NSD officials acknowledged the differing views on what constitutes a FARA charge and are currently engaged in an ongoing effort to better educate field investigators and prosecutors on the difference.  However, in reviewing the training developed by NSD we noted that it did not appear to include specifics on how FARA cases would gain approval to proceed from NSD or what is included in case reviews to give agents and prosecutors an understanding of the length of time needed for such reviews.  We therefore recommend that NSD update its current training for investigators and prosecutors to include information about the time it takes and the process used by NSD to approve or deny these cases for prosecution.

We asked the FBI for data about FARA cases presented and not prosecuted, but we were told by the FBI that their case coding commingles both FARA and Section 951 cases.  Therefore, we were unable to isolate cases presented under FARA alone.  We believe segregating these two types of cases in the FBI's classification codes may help advance NSD's efforts to clarify the distinction for case agents, and we recommend NSD discuss the feasibility of this with the FBI.

In addition, the majority of FBI field personnel we interviewed believed that NSD's review of FARA cases was generally slow and that NSD is reluctant to approve FARA charges, although these individuals generally speculated as to why NSD might be reluctant.  We found that the NSD does not track the timeliness of its handling of FARA referrals, with the general view that the matters will take as long as they take.  One person from the FBI with whom we spoke told us that, as a result, what could be an extraordinarily effective tool has instead become a point of contention and frustration, and found not just a lack of support from NSD, but "negative support."  Some FBI personnel we spoke with told us that CES generally appeared to lack confidence in FARA because it was too seldom used or too difficult to prosecute.  Most personnel from the FBI however told us that they came away from their interactions frustrated with CES because they were not given any explanation from CES as to why what they believed to be solid evidence of a FARA violation was declined for prosecution.[14]  Some of these agents noted that NSD has a clear preference toward pursuing registration for alleged FARA violators rather than seeking prosecution, in keeping with its voluntary compliance approach.  FBI and USAO staff we spoke with told us that they have been asked, repeatedly in some instances, to solicit voluntary registration from targets of investigations despite the fact that it is evident to the investigators that the target has no intention of complying. NSD officials denied this and stated that the FARA Unit is unaware of any instance in which it requested the FBI or any USAO to ask the target of an ongoing criminal investigation to register.

---

[14]  *Cf.* USAM 9-27.270(A), providing that attorneys from the government should ensure that the reasons for declinations are communicated to the investigative agency and documented in the file.

Further, FBI personnel with whom we spoke believed that FARA carries a penalty sufficient enough to serve as a deterrent to both the agent and his foreign principal or to induce the target of an investigation to become a cooperating source. These agents felt that the Department's reluctance to bring charges in FARA cases resulted in missed opportunities to deter agents of foreign principals from criminal or other misconduct or to obtain valuable cooperation. Some staff with whom we spoke expressed concern about case agent morale and discouragement toward pursuing future FARA investigations as a result of this reluctance.

We also heard frustration expressed from FBI and AUSAs with respect to the parameters of CES' approval authority. For example, in one instance, we were told that CES cited jury appeal as a factor in declining a FARA prosecution. The AUSAs and FBI staff we spoke to about this expressed doubt whether it was appropriate for CES to overrule local prosecutors, who were in a much better position to assess the jury appeal of a case in their local jurisdiction, on this basis. NSD disagreed with this view, and told us that in any circumstance where NSD has approval authority, it must reach a conclusion by assessing prosecution risk as per the U.S. Attorney's Manual to obtain and sustain a conviction. Among the matrix of factors it considers are how a case is presented, and the risk of jury nullification.

We also noted that some of the AUSAs and FBI personnel with whom we spoke recognized the value of CES' role in the process and, in particular, stated CES can provide sound judgment, experience, and expertise when evaluating FARA investigations. Some also praised the new leadership at CES for its willingness to be more candid and communicative with the FBI and the USAOs.

CES officials acknowledged to us that even though criminal penalties are available under FARA, the primary goal of FARA is in fact to ensure appropriate registration and public disclosure. These NSD officials also disputed that there is any reluctance on their part to approve FARA criminal charges (or Section 951 charges), and stated that criminal charges are approved when the evidence presented leads them to judge that a provable criminal violation has occurred. NSD also stated that criminal FARA cases are difficult to prove because prosecutors under FARA must demonstrate both willfulness on the part of the accused to avoid registration or to make a false statement or omission in their filings, and that the agent was directed and controlled by a foreign principal. Though we do not dispute these difficulties, we found that there was not a coordinated strategy on FARA enforcement at the Department and, in particular, there was no strategy addressing how FARA fits into the Department's overall national security efforts. We therefore recommend that the Department develop a comprehensive strategy for the enforcement and administration of FARA that includes the agencies that perform FARA investigations and prosecutions and integrates with the Department's overall national security efforts. We also recommend that the NSD ensure that it informs investigators and prosecutors in a timely fashion of the reasons for which FARA cases are not approved.

In addition, because NSD does not track the number of cases it receives for enforcement consideration, we recommend that it maintain information on the

number of cases submitted for review, the amount of time such review takes, and the final determination made on the case.  We believe this will enable the Department to assess and improve its handling of FARA cases.  In particular, trends could be determined regarding what case information has been used to move forward with prosecutions, or whether NSD is making determinations on a timely basis.

*Civil Enforcement of FARA*

In addition to criminal penalties, FARA allows the Department to seek civil injunctive relief when it identifies a foreign agent it believes to be in violation of the statute.  In order to seek injunctive relief, the Attorney General may petition the appropriate U.S. District Court for an order temporarily or permanently disallowing the alleged foreign agent from acting as an agent of a foreign principal.  This type of remedy could be sought in instances where an alleged agent failed to register or was delinquent in filing their supplemental statements.  It could also be used in instances where a registered foreign agent fails to address recommendations stemming from an inspection by the FARA Unit.

When we inquired about the Department's use of injunctive relief, we were told that it has not made use of the remedy since 1991, for several reasons.  First, according to FARA Unit staff, in order to pursue a petition seeking to enforce registration, the Department must have specific evidence of foreign direction and control to be successful.  According to these staff members, it is rare that such evidence exists.  In addition, we were told that, as a matter of practice, before the unit would seek injunctive relief that will require registration or remedying delinquent filings, it would have to have sought voluntary registration and received a direct refusal.  According to the FARA Unit, they do not typically encounter such scenarios.

FARA Unit staff also told us that the unit sought authority to impose civil fines for delinquencies twice in the 1990s, without success.  However, current staff added that they would be reluctant to seek civil fines at present because it would be counterproductive in that it could serve as a deterrent to disclosure to seek fines for lateness against a registrant who is otherwise in compliance with FARA, and it would add administrative costs to the unit's work.

Nevertheless, based on the widespread delinquencies we found, we believe that there may be circumstances in which an injunctive remedy or other penalty is merited.  For instance, as discussed later in this report, when we reviewed FARA Unit inspection reports from 2008 to 2014, we found instances where the unit issued recommendations to the registrant requesting submission of late supplemental statements; however, the requested supplemental statements do not appear in the FARA database, and appear to remain delinquent despite the inspection and notification of the deficiencies.  Although we are not questioning that NSD needs to have the ability to use its discretion when deciding whether to pursue criminal penalties or an injunctive remedy against an alleged violator of FARA, we

believe NSD should ensure that it appropriately utilizes all of the enforcement tools available to it.

**Administration and Monitoring of FARA Registrations**

The FARA Unit is responsible for the monitoring of new and existing FARA registrations on an ongoing basis.  This includes receiving, reviewing and processing documentation and payments, and addressing late or inaccurate submissions.  As of the end of calendar year 2014, the FARA Unit was responsible for a foreign agent registrant pool of 360 agents representing 561 foreign principals.  We tested documentation dating back to 2013 from a judgmentally selected risk-based sample of 78 FARA registrants, representing approximately 22 percent of the total, to evaluate the effectiveness of the FARA Unit's monitoring efforts.  Generally, we found that the required documents were complete.  However, we also found that documents were routinely submitted late, and in some instances registrants had ceased submitting required documentation entirely.  These findings are further detailed in the sections below.

*Identifying Potential Registrants*

The FARA Unit attempts to identify and make contact with individuals or entities that may have an obligation to register under FARA.  Identification is made primarily through review of a range of publications, web sites, and LDA filings for indications of a connection between a potential agent and a foreign principal.  Potential registrants may also be identified through review of existing registrant information, or through referral from other government offices or agencies, or from the public.

When a potential obligation to register is found, the unit issues a letter of inquiry to the potential registrant advising of FARA requirements, and requests additional information relevant to registration status.  The FARA Unit has found that most of the recipients of such letters responded within what it has considered to be a reasonable amount of time and either register or offer what the unit finds to be sufficient explanation that FARA requirements do not apply to them.  If there is no response to the letter, a seemingly false response, or another reason to believe a significant FARA offense has been committed, FARA personnel will refer the matter to the FBI.

The FARA Unit stated it has issued approximately 130 letters of inquiry over the past ten years.  Thirty-eight of the recipients were found to have an obligation to register under FARA, and subsequently did so.  The remaining recipients were found to either have no obligation to register, or the FARA Unit is continuing to seek additional information to make a determination.

*New Registrations*

Thirteen of the 78 agent files from 2013 to 2015 that we reviewed had registrations that were initiated after January 1, 2013.  We considered these to be

"new" registrations for testing purposes, and they were filed as such.  However, we found that only 3 of these 13 registrations, or 23 percent, were submitted within 10 days of the underlying contract's execution as required by FARA.  Eight of the 13 registrations, or 62 percent, were submitted late; with the lateness ranging from 7 to 343 days.  The remaining two agent files involved verbal agreements with no contract execution date provided to the FARA Unit.[15]  Without the contract execution dates, which NSD does not require, we could not assess the timeliness of these two registrations.[16]

Timely submission of initial registration documentation is essential for full and complete public disclosure of foreign agents engaged in the U.S. political process on behalf of foreign principals.  However, we understand that it is difficult for NSD to ensure the timely registration of a foreign agent when it has no easy independent way to know of the foreign agent's obligation to register.

*Supplemental Statements*

Every 6 months after their initial registration, a foreign registered agent must submit a supplemental statement describing activities performed and sums transacted during that period.  We found that 34 of 78 (44 percent) foreign agents we reviewed submitted supplemental statements in a timely manner - however half, 39 of 78, did not.[17]  Of these 39, 8 (10 percent of the total) had not submitted *any* supplemental statements since January 1, 2013.  FARA Unit staff believed that the registered agents who ceased filing supplemental documentation likely concluded their work for the foreign principal, but either neglected to formally inform the FARA Unit of the termination or were unaware of their obligation to do so, although 28 C.F.R. 5.205 includes a requirement to notify the FARA Unit of such termination.  However, the possibility remains that these registrants may still be active.

In addition to the 8 agents who had not filed at all since January 2013, we found that 4 other agents in our sample had filed previously during that period, but were more than 6 months delinquent as of the end of 2014.  In total, 12 of the 78 (15 percent) of active agents we reviewed had ceased filing altogether or were over six months delinquent.  For these delinquent agents, we found that the FARA Unit sent delinquency notices periodically, but the notices did not appear to be sent

---

[15]  FARA Unit personnel told us that they typically do not seek to impose any penalties such as late fees in such instances because they would rather see a complete submission sent in late than an incomplete one sent in on time.

[16]  During discussions with the FARA Unit about enhancements to its electronic filing system, we suggested adding a field requiring registrants to enter a date for verbal agreements, in order that adherence to the ten day requirement for such agreements may be assessed going forward.  FARA Unit staff agreed to consider this.

[17]  Five of the foreign agents we reviewed had terminated their contracts as of January 1, 2013, and were not required to submit supplemental statements during our testing period.  These five contained anomalies – duplicate registrations, terminated registration with active short forms, etc., – that caused us to include them in the sample.

consistently or on a regular schedule.  FARA Unit staff told us they are working on a standardized system for batching and sending delinquency notices at regular intervals.  This effort was still in development at the time of our audit and we recommend that the FARA Unit ensure the system is completed and implemented.

In addition to ensuring consistency when sending delinquency notices, we recommend that NSD develop a policy and procedures that ensure that registration files are timely closed and that it fully investigates when agents cease meeting their supplemental filing obligations for an extended period of time.  We believe that enhancing the sources of information available to the Unit as discussed above will facilitate such efforts.

*Registration of New Contracts*

Registered agents under contract with a particular foreign principal may periodically enter into additional contracts with different foreign principals.  In the 78 foreign agent files we reviewed, we found a total of 86 'new business' contracts.  We found that 34 of the 86 new contracts were registered timely, but 49 of the 86 (57 percent) were not.[18]  Further, we found that the late contract registrations were submitted an average of 57 days past the ten day requirement specified in FARA, ranging from 4 to 251 days late, even though these agents would have been familiar with the requirements and process from prior registrations.  We recommend that the FARA Unit should consider expanding the sources of information beyond those it currently uses to locate potential or delinquent foreign agents, currently limited to open source internet and LexisNexis searches.

*Filing of Informational Materials*

FARA does not limit the lobbying activity or the nature of the materials distributed by agents of foreign principals, but it does require that such agents file with the Department any informational materials produced on behalf of their principal, and transmitted to two or more persons, to the FARA Unit within 48 hours of the beginning of transmittal.  These informational materials must contain a conspicuous statement that the materials are distributed by an agent on behalf of a foreign principal, and that further information is on file at the Department of Justice.

We tested informational materials submitted by the 78 agents of foreign principals we reviewed to determine if the documentation was submitted within the 48 hour requirement and included the required disclosure statement.  We identified a total of 1,278 pieces of informational material, 780 pieces of which were submitted by one agent, and 498 of which were submitted by the other 77 agents.  It appears that many of the one agent's submissions were late because they were batched and mailed monthly without apparent regard to the date and time of

---

[18]  We could not determine the timeliness of three of the contracts because they were verbal agreements and no date of execution was provided to the FARA Unit.

transmission to the recipients, although each contained the requisite disclosure statement. As for the 498 pieces of information submitted by the other 77 agents, we found that only 457 included a date and time of transmittal to the recipients. The remaining 41 did not, which made determining timeliness for them impossible. Of the 457 pieces of informational materials with an identifiable transmittal date and time, we found that 179 (39 percent) were submitted timely within 48 hours of transmittal, but 278 (61 percent) were not.  We also found that almost half or 234 of the 498 items of information materials (47 percent) did not include the required disclosure statement.  We believe that these compliance rates are unacceptable, and that the FARA Unit and the Department need to either take steps to improve them to achieve the purposes of the Act or, if the Unit considers the standard unreasonable, pursue appropriate modifications.  We discuss potential modifications to informational materials requirements below.

*FARA Inspections of Existing Registrants*

Registered foreign agents are required by FARA and its implementing regulation to maintain accounts and records of their activities on behalf of their principals and make the records available for inspection by NSD for the duration of the agreement and for 3 years thereafter.  The FARA Unit conducts these formal inspections of FARA registrants and told us that it selects files to review based on multiple factors, such as deficiencies identified during the initial review, delinquent filings, suspected undisclosed activities, and information drawn from news or law enforcement sources.  An inspection involves review of all the registrant's activity files, correspondence, accounting records, invoices, and receipts related to the agent's representation of the foreign principal.  If the FARA Unit finds deficiencies in an agent's disclosures, it will summarize its findings and advise the registrant of the deficiencies and provide recommendations for correcting them.

We inquired about the number of inspections conducted since 2000 and found that the FARA Unit conducted a total of eight inspections from 2000 through 2007.  From 2008 through 2014, the Unit completed 87 inspections, and the current target is to perform 14 inspections per year.  We believe the higher rate of inspections performed since 2008 is a positive development and, having reviewed recent inspection reports and the worthwhile recommendations they have produced, we encourage the FARA Unit to continue to maximize its inspection efforts.

However, we noted during our review of the 87 inspections conducted since 2008 that insufficient follow-up was performed on several recommendations made by the FARA Unit, and that the deficiencies identified and communicated to registrants in these recommendations remained unresolved as of the time of our audit work.  Specifically, we found 11 inspection reports (12.6 percent) which recommended submission of documentation such as amendments or delinquent supplemental statements; however we found the requested documentation was not posted to the FARA web site as of January 2016.  We found an additional two inspection reports for which requested documentation was not submitted until well over a year after the inspection date.  NSD stressed to us that because the FARA

Unit has limited staff and considerable responsibilities follow-up on inspection reports can be difficult.  We understand this challenge but believe improvements can still be made.  We recommend that NSD further improve its overall monitoring efforts by developing a policy and practices that ensure appropriate and timely follow-up and resolution of findings identified in its inspection reports.

**Other Possible Legislative Improvements that the Department Might Seek**

Throughout this audit we discussed with NSD and FBI officials whether there were any legislative improvements that the Department might seek to FARA that would help in its efforts to administer and enforce the law.  The FBI did not have any suggestions but the NSD officials indicated that in recent years they have pursued some key legislative changes to FARA, but these efforts have largely been unsuccessful.

One area that was identified as a possible subject for such amendments is the statutory exemptions to FARA's registration requirement.  There are a number of statutory exemptions to FARA registration requirements, which were summarized on the NSD website as of January 2016 as follows:

- Diplomats and officials of foreign governments, and their staffs, if properly recognized by the U.S. State Department.

- Persons whose activities are of a purely commercial nature or solely of a religious, scholastic, academic, scientific or fine arts nature.

- Certain soliciting or collecting of funds to be used for medical aid, or for food and clothing to relieve human suffering.

- Lawyers engaged in legal representation of foreign principals in the courts or similar type proceedings, so long as the attorney does not try to influence policy at the behest of their client.

- Any agent who is engaged in lobbying activities and is registered under the Lobbying Disclosure Act if the representation is on behalf of a foreign commercial interest rather than a foreign government or foreign political party.

NSD officials indicated to us that broadly worded exemptions make criminal or civil enforcement difficult, though they did not propose any specific changes to these categories.  We believe that this is an area that the Department should examine to determine if additional refinement of these categories is warranted.

*The Lobbying Disclosure Act and FARA*

FARA Unit staff believed that the passage of the Lobbying Disclosure Act (LDA) in 1995 contributed to the steep decline in FARA registrations in the years that followed.  We were told that because the LDA allowed agents representing foreign commercial interests to register as lobbyists under LDA, rather than as

foreign agents under FARA, FARA is now largely limited to those who represent foreign governmental and political party interests.

In the FARA Unit's judgment, registration and disclosure requirements under the LDA are less stringent and result in less transparency than FARA, specifically with respect to funds transacted and activities performed.  In addition, unlike FARA, lobbyists with income or expenses below certain thresholds are not required to register under LDA.  If a lobbyist representing a foreign commercial interest does not meet LDA thresholds, that lobbyist may have no obligation to register under either statute, because the activity serves a commercial rather than foreign governmental or political interest.  Moreover, the LDA is administered by the Congress and, according to the FARA Unit, the LDA staffs who reside in the U.S. Senate and U.S. House of Representatives do not perform inspections of registrants, as the FARA Unit does for FARA registrants.  FARA Unit staff also expressed concern that because of the LDA amendments to FARA, foreign governmental and commercial interests, which are not always as distinct from one another as in the United States, could use LDA as a loophole to avoid FARA registration and disclosure, even though they are acting under the direction and control of a foreign government.

NSD officials believe that Congress should act and once again require those who lobby for foreign commercial interests to register under FARA.  We agree with the concern that foreign governmental and commercial interests overseas may not always be distinct and we recommend that NSD perform a formal assessment of the LDA exemption, along with the other current FARA exemptions and determine whether a formal effort to seek legislative change is warranted.

*Civil Investigative Demand Authority*

As discussed above, one of the tasks for the FARA Unit is to locate foreign agents who may have an obligation under FARA but either knowingly or unknowingly fail to register.  The FARA Unit told us that, when it successfully identifies a potential agent, it can sometimes be difficult to obtain the necessary information the FARA Unit needs to determine whether registration is required. Civil investigative demand authority (CID) allows the Department to compel the production of records, or response to written interrogatories or oral testimony concerning such records.  The Department submitted legislative proposals seeking CID authority for the FARA Unit in 1991, and again in 1999.  A GAO report in 2008 also recommended CID authority for the FARA Unit.[19]  However, the Department's attempts to obtain this authority in 1991 and 1999 were unsuccessful.  Neither NSD officials nor the Department's Office of Legislative Affairs could offer an opinion as to why these efforts were unsuccessful; however, FARA Unit staff did provide some insight as to how this authority could help it better determine when FARA violations are occurring, specifically identifying think tanks, non-governmental and grass roots

---

[19]  U.S. Government Accountability Office, *Post-Government Employment Restrictions and Foreign Agent Registration,* GAO-08-855 (July 30, 2008).

organizations, organizations operating on college or university campuses, and foreign media outlets operating in the United States as potential registrants as to which it can be difficult to obtain information for a variety of reasons.  Such organizations may receive funding from foreign governments and subsequently take public political positions that are favorable to those governments.  According to the FARA Unit, these types of organizations generally claim that they act independently of foreign control or are not serving a predominantly foreign interest and are not required to register.

The FARA Unit has identified the above as its primary enforcement challenge, and believes CID is vital in determining whether FARA violations are occurring.  We do not dispute that CID authority would provide FARA Unit staff with a very useful additional tool in its efforts to administer and enforce FARA.  However, we believe CID authority is a powerful authority that can be subject to overreach and abuse if left unchecked, and which cannot be allowed to be used to overcome legitimate and important legal protections and interests.  Therefore, we believe that any such expansion of CID authority would have to include rigorous controls and oversight to ensure that it is being used appropriately.

*Process for Filing Informational Materials*

As discussed earlier in this report, FARA requires registrants who transmit informational materials on behalf of their foreign principal to appropriately mark that material and file it with the Department of Justice within 48 hours of the beginning of transmittal.  The FARA Unit told us that the term "informational materials," which replaced the term "propaganda" in 1995, is not formally defined in the Act or its implementing regulation.  As a result, the FARA Unit has developed its own working definition of what constitutes informational materials in order to fairly advise registrants of the requirements.  However, without a statutory definition of the term "informational materials," the FARA Unit cannot be certain it is satisfying Congressional intent for FARA.

Additionally, the FARA Unit believes that advances in information technology have made the 48-hour rule outdated.  Registered foreign agents now send out informational materials via Twitter and other social media on a near-continuous basis.  Trying to enforce the requirement for them to submit all of these materials in hard copy within 48 hours of dissemination creates a constant and unrealistic burden on registrants to submit materials, and on FARA personnel to police their submissions.  Allocating resources to enforcing the 48 hour rule also would consume a disproportionate amount of time on the part of FARA unit, often to the detriment of other crucial aspects of their work.  FARA Unit staff also told us that informational materials mailed via the U.S. Postal Service in hard copy must pass through screening prior to delivery.  This often results in submissions being delayed for weeks or longer before arriving at the FARA Unit's office.  The FARA Unit believes that the statute should be amended to allow registrants to compile informational materials and submit them semi-annually with each supplemental statement.

Lastly, the FARA Unit believes that the labeling requirement needs to be updated to address the internet and social media as means of conveying informational materials.  Twitter, for instance, allows a limited number of characters per message, and the FARA Unit told us that registrants find it impractical to include the disclaimer within these types of messages.

We believe the Department should continue to consider whether to seek legislative changes to address these and other issues as identified in this report consistent with the requirements of FARA and other laws.

*Resources*

FARA Unit staff told us that budget and staffing have improved since moving from the Criminal Division to NSD in 2006, and that these additional resources have allowed the unit to develop new technologies.  The FARA Unit staff spends a significant amount of the time on the collection and processing of FARA filing fees.  FARA fees were first imposed on FARA registrants in 1993.  As noted above, the FARA Unit believed that this imposition of fees contributed, at least in part, to the substantial decline in registrations that began in the mid-1990s.  In addition, we learned that a proposal to increase FARA fees in 2010 was declined by NSD due to concerns that it would deter registrations.  Fee collections have also been declining along with registrations since their imposition, and in 2014 totaled only $283,441 according to FARA Congressional reporting.  Because of limited staffing, other priorities, and the possibility that fees may serve as a deterrent to registration, we believe it is possible that the overall cost of the time spent collecting and processing fees may not be justifiable.  We therefore recommend that NSD conduct a formal cost-benefit analysis to determine whether the current FARA fee structure is appropriate or whether it should seek modifications in the future.

*Tools and Technologies*

Since joining NSD in 2006, there have been significant improvements to the tools and technologies used to ensure foreign agents comply with FARA.  In 2007, the FARA Unit established a searchable online database of disclosure documents.  In 2011, an e-file application was established that allowed registrants to register and file documentation online.  We were told that the application is currently being updated to implement other improvements that will standardize and eliminate redundant entry of information, improve search capability, and ensure completeness of submissions.  It will provide a more user-friendly, interactive guided interview process for entering forms, and the improved application will mask from public view personally identifiable information required on certain forms.  Previously, registrants had to formally request removal of this information from the publically available forms.

We believe the e-file application improvements are a positive development.  As discussed above, we also believe the application presents opportunities to allow the FARA Unit to better manage and improve the timeliness of registrant submissions, and that it should be developed with this in mind in addition to the

other opportunities it presents.  We therefore recommend that NSD include improvement of timeliness as an objective in the development of the e-file system, to include requiring execution dates for all contracts.

**Conclusion**

We found that FARA registrants are frequently late in submitting required documentation and are often unresponsive to FARA Unit requests to update their information.  Because timely and complete disclosure of foreign agent political and quasi-political activities are central to the act, we believe the FARA Unit should be more proactive and assess whether additional tools may be available to assist it in its efforts to identify and monitor these foreign agents.  With regard to proposed criminal FARA charges, investigators and prosecutors believe that a greater effort should be made by NSD officials to improve communication, transparency, and responsiveness regarding approval decisions.  We believe that there may well be room for the Department to make use of the civil injunctive provision in FARA in appropriate cases.  To help address this we believe that the Department should develop a comprehensive enforcement strategy for FARA that fits within its overall national security effort.  There also are a number of areas where the Department should consider whether to seek administrative or legislative changes to enhance its efforts to enforce FARA and achieve the purposes for which it was enacted into law.

**Recommendations**

We recommend that the National Security Division:

1. Consider the value of making FARA advisory opinions publicly available as an informational resource.

2. Update its current training for investigators and prosecutors to include information about the time it takes and the process used by NSD to approve or deny these types of cases for prosecution.

3. Explore with the FBI the feasibility of distinct classification codes for FARA and Section 951 in its record keeping system.

4. Develop a comprehensive strategy for the enforcement and administration of FARA that includes the agencies that perform FARA investigations and prosecutions and that is integrated with the Department's overall national security efforts.

5. Ensure that it timely informs investigators and prosecutors regarding the reasons for decisions not to approve FARA prosecutions.

6. Establish a comprehensive system for tracking the FARA cases received for review, including whether cases are approved for further criminal or civil action, and the timeline for approval or denial.

7.  Complete its effort to standardize a system for batching and sending registration delinquency notices at regular intervals, and develop policy and procedures that ensure appropriate follow up on them.

8.  Develop a policy and tracking system that ensures that registration files are timely closed and that when agents cease meeting their supplemental filing obligations for an extended period of time an appropriate investigation is conducted.

9.  Consider expanding the sources of information beyond those currently used by the FARA Unit to help identify potential or delinquent foreign agents, currently limited to open source internet and LexisNexis searches.

10. Either take steps to improve the compliance rates for the filing of informational materials to achieve the purposes of the Act or, if the Unit considers the current 48-hour standard unreasonable, pursue appropriate modifications.

11. Ensure appropriate and timely follow-up and resolution of findings identified in its inspection reports.

12. Perform a formal assessment of the LDA exemption, along with the other current FARA exemptions and determine whether a formal effort to seek legislative change on any of these exemptions is warranted.

13. Conduct a formal cost-benefit analysis to determine whether the current FARA fee structure is appropriate.

14. Include improvement of timeliness as an objective in the development of the e-file system, to include requiring execution dates for all contracts.

## STATEMENT ON INTERNAL CONTROLS

As required by the Government Auditing Standards, we tested, as appropriate, internal controls significant within the context of our audit objectives.  A deficiency in an internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to timely prevent or detect:  (1) impairments to the effectiveness and efficiency of operations, (2) misstatements in financial or performance information, or (3) violations of laws and regulations.  Our evaluation of internal controls was not made for the purpose of providing assurance on the Department's internal control structure as a whole.  The Department and the individual components discussed in this report are responsible for the establishment and maintenance of internal controls.

Through our audit testing, we did not identify any deficiencies in the National Security Division's internal controls that are significant within the context of the audit objectives and based upon the audit work performed that we believe would affect the National Security Division's ability to effectively and efficiently operate, to correctly state financial and performance information, and to ensure compliance with laws and regulations.

Because we are not expressing an opinion on the Department's internal control structure as a whole, this statement is intended solely for the information and use of the Department and the individual components discussed in this report. This restriction is not intended to limit the distribution of this report, which is a matter of public record.

## STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS

As required by the *Government Auditing Standards* we tested, as appropriate given our audit scope and objectives, selected statistics, procedures, and practices to obtain reasonable assurance that NSD complied with federal laws and regulations for which noncompliance, in our judgment, could have a material effect on the results of our audit.  NSD is responsible for ensuring compliance with applicable federal laws and regulations.  In planning our audit, we identified the following laws and regulations that were significant within the context of the audit objectives:

- 22 U.S.C. § 611, *et seq.* (Foreign Agents Registration Act)
- 18 U.S.C. § 951
- 2 U.S.C. § 1601, *et seq.* (the Lobbying Disclosure Act of 1995)
- 28 C.F.R. § 5.1, *et seq.*

Nothing came to our attention that caused us to believe that the Department or its components discussed in this report were not in compliance with the aforementioned laws and regulations.

# OBJECTIVES, SCOPE, AND METHODOLOGY

## Objectives

The U.S. House of Representative Committee on Appropriations requested that the OIG review the Department of Justice's enforcement of the Foreign Agents Registration Act.[20]  The Committee requested that the report should take into account FARA filing trends and foreign government tactics to engage in the public advocacy of the United States while avoiding FARA registration, and that the report should recommend administrative or legislative options for the improvement of FARA enforcement.

The objectives of our audit were to review and evaluate the monitoring and enforcement actions taken by the Department to ensure appropriate registration, and to identify areas for the Department to consider seeking legislative or administrative improvements.

## Scope and Methodology

We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

To accomplish our objectives, we interviewed staff from National Security Division, including the Counterintelligence and Export Control Section and its FARA Unit.  We also interviewed Assistant U.S. Attorneys and FBI counterintelligence agents from all of the district and field offices involved with each FARA investigation we learned of.  We spoke with staff from the FBI's Counterintelligence Division and National Security Law Branch and with staff from the Department's Office of Legislative Affairs.  We also reviewed FARA registered foreign agent documentation, as well as FARA Unit records and communications.

We attempted to meet with the Clerk of the House and Secretary of the Senate staffs to obtain their views on the Lobbying Disclosure Act issue identified in this report and to learn about any best practices for registrant management and oversight.  They instead offered to review and try to answer specific questions in writing, but given time constraints we were not able to pursue that option further.

---

[20]  U.S. House Committee Report Committee Report 113-448.

*FBI and USAO Interviews*

Because CES does not maintain a record of FARA charges brought to it for review, we began by interviewing AUSAs and FBI agents involved in those FARA charges we learned of through our discussions with CES staff or our review of CES documents. We also interviewed staff at FBI Counterintelligence Division headquarters in Washington, D.C. During these discussions, we learned about additional FARA charges, involving both FARA, 22 U.S.C. 611 *et seq.*, and a related statute, 18 U.S.C. § 951 (Section 951). Section 951 provides criminal penalties for certain agents of foreign governments who act in the United States without first notifying the Attorney General. Registration under FARA can serve as the requisite notification. We learned that the FARA Unit is called upon by CES to advise on Section 951 cases. Given this, we considered the information we received about Section 951 cases during our interviews.

*FARA Document Review*

To review FARA Unit monitoring of existing registrants, we selected a judgmental, risk based sample of 22 percent of the total registered agents as of May 2015. Factors in selecting our sample included payment amounts, weighted toward the more active registrants; and anomalies such as duplicate registrations and apparent discrepancies between long and short form registrations. We did not intend this sample to be projected to the universe of registered agents.

After we selected the sample, we reviewed documentation submitted by selected agents during calendar years 2013, 2014, and 2015. We reviewed all documents submitted including initial registration and accompanying exhibits, supplemental statements, amendments, and informational materials. We elected not to include short form registrations, which include information about the registrant's individual employees engaged in activities in furtherance of the foreign principal's interests, in our testing because these forms included personally identifiable information.

# PRIOR REPORTS INVOLVING FARA

Our research and interviews with FARA Unit personnel has identified four reports prepared by the General Accounting Office (now known as the Government Accountability Office), one report from the Project on Government Oversight (POGO), and one report from the Sunlight Foundation all which dealt with the execution and administration of the Foreign Agents Registration Act (FARA). Although some of these reports are over 10 years in age, they have identified some of the same issues discussed in this report.  These issues include timeliness and adequacy of information submitted on behalf of registrants, not making full use of its authority to enforce the act and related regulations, efforts to have civil investigative demand authority (CID) passed denied, and the lack of tools required and necessary to enforce the statue properly.

In 1974, the General Accounting Office, now known as the Government Accountability Office, issued a report titled, *Effectiveness of the Foreign Agents Registration Act of 1938, As Amended, and Its Administration by the Department of Justice*.  At the time of the report, the General Accounting Office reported that many agents' statements to the Department of Justice were not filed on a timely basis or lacked sufficient detail to adequately describe the registered agents' activities on behalf of their foreign principals.  The report also stated that the Department of Justice was not making full use of its authority to enforce the act and related regulations.

In 1980, the General Accounting Office, now known as the Government Accountability Office, issued a follow-up report to their 1974 report titled, *Improvements Needed in the Administration of Foreign Agents Registration.* The General Accounting Office reported that despite the Department of Justice's efforts to improve the administration of the act, people were acting as foreign agents without registering, registered agents were not fully disclosing their activities, and officials in the executive branch were often unaware of the act's requirements. Thus, the act's goal of providing the public with sufficient information on foreign agents and their activities was not completely fulfilled.

In 1990, the General Accounting Office, now known as the Government Accountability Office, issued an update to its 1980 report titled, *Foreign Agent Registration: Justice Needs to Improve Program Administration.*  The report was issued to provide the United States Senate an update of the prior 1980 report.  The purpose of the report was to apprise on whether the recommendations made in the 1980 report have been implemented and if foreign agents are complying with the law by registering with the Department of Justice, by fully disclosing their activities, and by filing required reports on time.  The report noted deficiencies; including lateness and inadequately disclosing forms from foreign principals. The General Accounting Office explained that both foreign agents and the Department of Justice officials who review the agents' registration forms lack specific written guidance on what should be reported.

In 2008, the Government Accountability Office issued a report titled, *Post-Government Employment Restrictions and Foreign Agent Registration*. The Government Accountability Office reported that in order for the Department of Justice to enhance their ability to ensure that the American people know the identity of persons trying to influence the United States government policy on behalf of foreign entities, Congress may wish to consider granting the Department of Justice civil investigative demand authority (CID).  This recommendation was essentially closed and not implemented as Congress did not take any action in response to this matter.

In 2014, the Sunlight Foundation, issued a report titled, *Sunlight Foundation Recommendations to the Department of Justice Regarding the Foreign Agents Registration Act.*  The Sunlight Foundation reported that the current method of recording the disseminated material submitted by foreign agents is outdated and is not fully transparent.  Sunlight explained that an implementation of a new, modernized FARA collection and disclosure system that collects and releases detailed structured data would promote greater transparency.

Finally in 2014, the Project on Government Oversight (POGO), issued a report titled, *Loopholes, Filing Failures, and Lax Enforcement:  How the Foreign Agents Registration Act Falls Short.*  POGO reported that countless documents in the FARA database do not conform to the requirements of the FARA statue. Furthermore, POGO reports, that it is next to impossible to determine if the 573 U.S. firms, corporations, and individuals registered with FARA, between their scope of 2009 and 2012, filed every document they disseminated. POGO concluded that the Department of Justice must use the enforcement power it has to ensure that registrants, and those who do not register, comply with all aspects of the law. Merely relying on "voluntary compliance" allows for rampant rule breaking in the timely filing and labeling of informational materials.

**APPENDIX 3**

# NATIONAL SECURITY DIVISION'S RESPONSE TO DRAFT REPORT



**U.S. Department of Justice**

National Security Division

---

*National Security Division*                    *Washington, D.C. 20530*

August 12, 2016

Jason R. Malmstrom
Assistant Inspector General for Audit
Office of the Inspector General

RE:   OIG's Draft Audit Report –The National Security Division's Enforcement and
        Administration of the Foreign Agents Registration Act

Dear Mr. Malmstrom:

    The National Security Division (NSD) appreciates the opportunity to review and provide comments to the Office of Inspector General's Draft Audit Report (Report) concerning NSD's Enforcement and Administration of the Foreign Agents Registration Act (FARA or the Act), which you provided to NSD on July 22, 2016.  NSD provides below general comments on the Report, followed by specific comments on the 14 recommendations contained in the Report.

**General Comments**

    The enforcement and administration of FARA is an important responsibility of NSD, and NSD appreciates the time and effort taken by the Office of the Inspector General (OIG) to conduct this audit.  In addition to providing overall perspective in assessing the administration and enforcement of FARA, the audit was helpful in reviewing some trends in registrations, the timeliness and sufficiency of FARA registration filings, and some areas for administrative or legislative improvements to achieve FARA's primary goal:  greater transparency of foreign influence in the United States.  NSD was pleased to have the opportunity to inform OIG of the complexities of FARA and the challenges NSD faces in applying FARA's criminal and civil enforcement provisions.  The audit prompted a productive dialogue about the criminal enforcement of FARA and the key role administrative authorities play in promoting visibility into the identities, activities, and information provided by persons acting as agents of foreign principals.  NSD anticipates that the audit will lead to improved efforts to help others better understand FARA's role, as well as increase the Act's effectiveness.

    As noted in the report, the OIG interviewed AUSAs and FBI personnel who complimented NSD's Counterintelligence and Export Control Section's (CES) evaluation of FARA cases and specifically noted the sound judgment, experience, and expertise of CES in handling FARA investigations.  The AUSAs and FBI personnel also praised the new leadership

at CES for its candid assessment of cases and communication with the FBI and U.S. Attorney's Offices.[1]

Although OIG's report reflects some criticism of aspects of NSD's review of FARA cases, NSD notes at the outset, as OIG acknowledged in the Report, that personnel interviewed in preparation of the Report frequently confused FARA (22 U.S.C. § 611 *et seq*) with 18 U.S.C. § 951 ("Section 951"), a criminal statute entitled "Agents of foreign governments."  Although the two statutes have similar terms, they address different types of conduct.  The typical conduct to which Section 951 applies consists of espionage-like behavior, information gathering, and procurement of technology, on behalf of foreign governments or officials.  FARA, on the other hand, is designed to provide transparency regarding efforts by foreign principals (a term defined more broadly than foreign governments or officials) to influence the U.S. government or public through public speech, political activities, and lobbying.  Accordingly, Section 951 is codified in Title 18 of the U.S. Code (designated for "Crimes and Criminal Procedure"), while FARA is codified in Title 22 (designated for "Foreign Relations").  Section 951 is aimed exclusively at criminally punishing individuals who violate its terms, and lacks a formal administrative registration regime.  FARA, in contrast, is predominantly a disclosure statute, under which there is an administrative registration regime, and while the Act authorizes criminal penalties for willful violations, the primary means of achieving FARA's main purpose of transparency is through voluntary disclosure in compliance with the Act.  The mistaken conflation of the two statutes can lead to undue weight being given to criminal prosecution as the measure of FARA enforcement and insufficient recognition of the significance of administrative enforcement efforts relating to the FARA registration regime.  It is therefore essential to understand the distinctions between FARA and Section 951 for purposes of this audit, the scope of which is expressly limited to the enforcement and administration of FARA.[2]

The administrative enforcement efforts undertaken by FARA Unit staff focus on identifying foreign agents with an obligation to register and achieving compliance with the Act's provisions.  Actions undertaken by FARA Unit staff in furtherance of these goals include: combing public source information for prospective registrants; reviewing registration materials submitted by existing registrants and inspecting registrants' books and records for information pertaining to registration obligations for other entities and individuals; analyzing referrals or information provided by other government agencies or offices; and reviewing information obtained from the public.  Based on that work, FARA Unit staff draft and issue letters to

---

[1] To NSD's knowledge, during its audit, OIG did not contact or interview any existing FARA registrants or firms that represent FARA registrants, although NSD provided contact information for those groups.  Existing FARA registrants and firms who represent FARA registrants are significant stakeholders who have extensive knowledge of and experience with the administration and enforcement of FARA.  NSD understands that OIG did seek to interview officials at the U.S. House of Representatives and U.S. Senate who are responsible for the administration of the Lobbying Disclosure Act ("LDA"), a statute which has certain overlaps with FARA, although those officials declined to be interviewed.  NSD believes those officials also may possess useful insights into FARA's administration and enforcement.

[2] NSD further notes that in the Report, the OIG states that they "were told by FBI that their case coding commingles both FARA and Section 951 cases" and therefore the OIG was "unable to isolate cases presented under FARA alone."  For this reason, among others, NSD believes that many of the references in the Report to *FARA* cases or investigations were actually references to cases or investigations relating to *Section 951*.

individuals or entities they identify who may have an obligation to register.  In those letters, they outline the information potentially giving rise to an obligation to register and seek information to make a determination regarding that obligation.  They analyze the responses to those letters and continue to research public information to assess whether a registration obligation does in fact exist.  The letters they send frequently result in the filing of registrations by the individuals or entities, thus achieving FARA's transparency purpose.  Once a registration is on file, FARA Unit staff carefully reviews registration filings for deficiencies, seeks amendments to correct those deficiencies, and conducts inspections (and follow-up inspections) to ensure continued compliance.  FARA Unit staff also provides advisory opinions regarding the application and requirements of the Act.

In addition to activities devoted to administrative enforcement of the Act, FARA Unit personnel produce and process a significant volume of registration forms and associated filing fees; provide support, guidance, and assistance to registrants, potential registrants, their attorneys, and other government agencies concerning FARA issues; produce a semi-annual report to Congress; maintain a public office reading room; process a high volume of database searches for the FBI, Department of Homeland Security, Senate Foreign Relations Committee, and other government agencies; handle frequent media inquiries; and assist numerous members of the public with registration and search guidance through in-person meetings, e-mail exchanges, and telephone inquiries.  They perform all of these duties while maintaining and enhancing the FARA e-File system and database, and while providing extensive customer service to users of the system.

As noted above and in the Report, FARA contains a criminal penalty provision, and NSD approves criminal prosecution as an enforcement mechanism if there is sufficient admissible evidence of a willful violation of FARA, and the standards applicable to all federal criminal prosecutions set forth in the U.S. Attorney's Manual are otherwise satisfied.  The high burden of proving willfulness, difficulties in proving "direction and control" by a foreign principal, and exemptions available under the statute make criminal prosecution for FARA violations challenging.  These challenges are compounded by the government's current inability to compel the production of records from potential and current registrants, a situation NSD is working to remedy by proposing legislation for consideration by the Department of Justice (Department).  Despite these challenges, the Department has brought four FARA criminal cases since 2007, all of which resulted in convictions (one conviction at trial for conspiracy to violate FARA and other statutes; two guilty pleas for violating FARA; and one guilty plea to related non-FARA charges).

The OIG Report, however, also cites a view that the limited number of FARA criminal prosecutions is indicative of a counterintelligence tool that is underutilized.  To demonstrate this, the Report refers to a belief by some FBI staff that the prospect of FARA charges might assist in obtaining cooperation from FARA violators, presumably in counterintelligence investigations.  This, again, is most likely indicative of a mistaken conflation of Section 951 with FARA.  It might be possible to use Section 951 in this manner; however, given the considerable challenges cited above in developing viable, appropriate prosecutions for FARA-related activity, such a use of FARA to obtain cooperation is unlikely at best.  By promoting disclosures that unmask foreign political influence and foreign direction of political activities, FARA is an effective

counterintelligence tool.   In the alternative, a reluctance to register and disclose under FARA can, in fact, deter a foreign principal from engaging in political activities in the United States in the first place.

The Report devotes significant emphasis to the timeliness of filings by registrants.   NSD notes that well over half of the filings categorized as late were filed within 30 days after the filing deadline.   In addition, in a number of filings considered late in the Report, the FARA Unit provided an extension to the registrant, which mitigated the lateness.   Under FARA's current statutory and regulatory authorities, there is no penalty for lateness.   Although the Department previously has proposed legislation imposing fines for late filing under FARA, NSD's recent assessment is that imposing fines for late filing could act as a disincentive to registration and result in less transparency.   Many parties who register late do so because they are unaware of the existence of FARA.   Penalizing someone who, when informed about the Act, complies with the statute, could serve as a deterrent to registration.   NSD believes that encouraging disclosure is preferable to fines in furthering the national security mission of FARA.

### OIG Recommendations

1. **OIG Recommendation** – Consider the value of making FARA advisory opinions publicly available as an information resource.

   **NSD Response – Agree.**  Prior to this audit, NSD determined it was appropriate to release, in response to specific FOIA requests, redacted versions of advisory opinions issued to persons who subsequently registered based on the decision in the advisory opinion.  By March 31, 2017, NSD will review its policy and practices regarding FARA advisory opinions and determine how to expand public accessibility of these opinions.

2. **OIG Recommendation** – Update its current training for investigators and prosecutors to include information about the time it takes and the process used by NSD to approve or deny these types of cases for prosecution.

   **NSD Response – Agree.**  NSD will continue to update and provide training for investigators and prosecutors regarding FARA, to include information about the time it takes and the process used by NSD to approve or deny FARA cases for prosecution. NSD already commenced efforts to enhance prosecutors' understanding of FARA with multiple presentations to prosecutors and law enforcement partners around the country in 2016.  These presentations delineated the differences between FARA and Section 951, and highlighted the types of cases suitable for prosecution under each statute.  NSD will continue to deliver such training to prosecutors and agents.  In addition, CES has initiated preparation of a monograph on FARA and Section 951 for broad dissemination to prosecutors and agents.  NSD anticipates completion of the monograph by September 30, 2017.

3. **OIG Recommendation** – Explore with the FBI the feasibility of distinct classification codes for FARA and Section 951 in its record keeping system.

   **NSD Response – Agree.**   Although the FBI already has distinct codes, as indicated in the Report, FBI personnel often commingle the coding, causing confusion.  It is imperative that agents are aware of the correct code to use for FARA investigations, and NSD will meet with the FBI prior to September 30, 2016 to explore resolution of this issue.

4. **OIG Recommendation** – Develop a comprehensive strategy for the enforcement and administration of FARA that includes the agencies that perform FARA investigations and prosecutions and that is integrated with the Department's overall national security efforts.

   **NSD Response – Agree.**  NSD agrees with the importance of having a comprehensive strategy regarding FARA that is integrated within the Department's overall national security efforts.  In fact, in March 2015, NSD conducted its own written internal assessment of the existing strategy for enforcement and administration of FARA, identifying key current issues and strategies for addressing them, and then took active steps to implement those new strategies.  The Department has an "all tools" approach to addressing national security threats, and NSD currently includes FARA as one of those tools.  Efforts to enforce compliance with FARA include research, identification of potential agents, inquiry, investigation, and prosecution if willful conduct is found.  FARA fits into the Department's overall national security efforts by promoting detection of, discouraging, and neutralizing undisclosed foreign messaging and forcing disclosure of foreign efforts to influence United States domestic and foreign policy, as well as public opinion.  As noted above, CES has initiated preparation of a monograph on FARA and Section 951 for broad dissemination to prosecutors and agents that it anticipates will be completed by September 2017.  This will clarify for agencies the use of FARA and Section 951, and NSD also will include discussion of its comprehensive strategy in its ongoing training for investigators and prosecutors.  NSD's comprehensive strategy will include updates to its FARA-related training materials to provide helpful information regarding NSD's evaluation of potential criminal cases under FARA.  These updates will be included in all FARA-related training presentations going forward.

5. **OIG Recommendation** – Ensure that it timely informs investigators and prosecutors regarding the reasons for decisions not to approve FARA prosecutions.

   **NSD Response – Agree**.  As noted in the OIG Report, CES has taken steps to ensure that it timely informs investigators and prosecutors in individual cases regarding the reasons for not approving FARA charges and will continue these efforts in all FARA investigations and prosecutions.  In addition, as discussed in the response to OIG Recommendation 2 and 4, NSD is updating its FARA-related training materials to provide helpful information regarding NSD's evaluation of potential criminal cases under FARA.  These updates will be included in all FARA-related training presentations going forward.

6. **OIG Recommendation** – Establish a comprehensive system for tracking the FARA cases received for review, including whether cases are approved for further criminal or civil action, and the timeline for approval or denial.

   **NSD Response – Agree**.  NSD will improve tracking of FARA matters through:  (1) the efforts set forth in Recommendation 3 above regarding working with the FBI to ensure FARA matters are coded correctly; and (2) improvements to NSD's case tracking system to ensure ready identification of those FARA matters.  Moreover, NSD will ensure the case tracking system captures actions that are taken and approved, and, consistent with Recommendations 2 and 5, also captures dates the matter was received, as well as dates of actions and approvals.  As noted above, NSD will meet with FBI on the coding issue prior to September 30, 2016.  Improvements to the case tracking system to ensure identification of FARA matters will take place on an ongoing basis as NSD's new case management system is developed and implemented during 2016 and 2017.

7. **OIG Recommendation** – Complete its effort to standardize a system for batching and sending registration delinquency notices at regular intervals, and develop policy and procedures that ensure appropriate follow up on them.

   **NSD Response – Agree**.  NSD is committed to completing its current effort to standardize a system for batching and sending registration delinquency notices at regular intervals, and to develop policy and procedures that ensure appropriate follow-up.  During the past year, the FARA Unit has standardized a system for batching and sending registration delinquency notices at regular intervals.  It is currently in the process of expanding on this system to ensure appropriate tracking of responses, and estimates that the enhancement will be completed by September 30, 2017.  When the system is complete, NSD will ensure that FARA Unit personnel will be able to adequately and efficiently track compliance and that they take appropriate measures to address delinquency.

8. **OIG Recommendation** – Develop a policy and tracking system that ensures that registration files are timely closed and that when agents cease meeting their supplemental filing obligations for an extended period of time an appropriate investigation is conducted.

   **NSD Response – Agree**.  NSD will develop a policy and tracking system that ensures that registration files are timely closed and that appropriate action is taken when supplemental filing obligations are not met for an extended period of time.  NSD's current efforts to update its system for batching and sending registration delinquency notices at regular intervals will help to identify candidates for termination.  These upgrades will help to determine which registrants are no longer active and enable the FARA Unit to take appropriate action to terminate the registrations.  NSD anticipates this policy will be developed by March 31, 2017.

9. **OIG Recommendation** – Consider expanding the sources of information beyond those currently used by the FARA Unit to help identify potential or delinquent foreign agents, currently limited to open source internet and LexisNexis searches.

    **NSD Response – Agree**. NSD agrees that expansion of sources of information would assist in identifying potential or delinquent foreign agents. NSD has already engaged in outreach to other government agencies that might have access to additional information that would assist the FARA Unit's efforts. NSD will continue to pursue that outreach on an ongoing basis and also will work to identify other sources of information that would be useful to the Unit in fulfilling its mission.

10. **OIG Recommendation** – Either take steps to improve the compliance rates for the filing of informational materials to achieve the purposes of the Act or, if the Unit considers the current 48-hour standard unreasonable, pursue appropriate modifications.

    **NSD Response – Agree**. NSD considered this issue and determined that the 48-hour rule is out of date and unreasonable. To that end, NSD drafted appropriate modifications to address this issue that are being reviewed within the Department.

11. **OIG Recommendation** – Ensure appropriate and timely follow-up and resolution of findings identified in its inspection reports.

    **NSD Response – Agree**. Many of the inspections conducted by the FARA Unit are conducted to correct deficiencies in registrations, and to bring into compliance untimely registrations. NSD notes that OIG viewed most (87.4 percent) inspection follow-up as timely. To ensure appropriate and timely follow-up and resolution of inspections, the FARA Unit's efforts with respect to Recommendation 7 and 8 above will provide benefits here as well. In addition, the FARA Unit will standardize its electronic calendaring of inspections and timelines for completion of recommendations after inspections. NSD expects enhancements to its inspection practices to be completed by September 30, 2017.

12. **OIG Recommendation** – Perform a formal assessment of the LDA exemption, along with the other current FARA exemptions and determine whether a formal effort to seek legislative change on any of these exemptions is warranted.

    **NSD Response – Agree**. NSD endorses, and will undertake, a formal assessment of the LDA and other current FARA exemptions. As noted in the Report, the FARA Unit has attributed a decrease in the number of registrants and foreign principals to the enactment of the LDA exemption and has also noted that the reporting requirements of LDA are not as robust as those under FARA. Prior to the OIG Report, NSD embarked on efforts to study the LDA and other FARA exemptions. Those efforts will continue, and NSD will determine the need and viability of legislative changes by June 30, 2017.

13. **OIG Recommendation** – Conduct a formal cost-benefit analysis to determine whether the current fee structure is appropriate.

**NSD Response – Agree**.  NSD will conduct a formal cost-benefit analysis to determine whether the current fee structure is appropriate by September 30, 2017.  Included in this analysis will be an assessment of whether the processing of fees takes valuable time and resources of the FARA Unit that could be better utilized on enforcement.

14. **OIG Recommendation** – Include improvement of timeliness as an objective in the development of the eFile system, to include requiring execution dates for all contracts.

**NSD Response – Agree.**  The FARA Unit has discussed this issue with the FARA eFile system development team and has received positive feedback that it is feasible to add a field to the eFile system to collect the date of the registrant's agreement with the foreign principal.  This feature will be included in the roll out of the FARA eFile system, which is anticipated by September 30, 2017.

**Conclusion**

NSD appreciates the time and effort of the OIG in conducting its audit.  The enforcement and administration of FARA is an important responsibility, and NSD welcomes the opportunity to improve efforts to help others better understand FARA's administration and enforcement, as well as increase the Act's effectiveness.

Sincerely,

G. Bradley Weinsheimer
Acting Chief of Staff
National Security Division

# OFFICE OF THE INSPECTOR GENERAL ANALYSIS AND SUMMARY OF ACTIONS NECESSARY TO CLOSE THE REPORT

The Office of the Inspector General (OIG) provided a draft of this audit report to the National Security Division (NSD).  NSD's response is incorporated in Appendix 3 of this final report.  The following provides the OIG analysis of the response and summary of actions necessary to close the report.

**Analysis of NSD Response**

In its response, NSD agreed with each of our recommendations and discussed the actions it will implement in response.  NSD also provided general comments on the report.  In its general comments, NSD reemphasized what NSD officials told us during the audit - although 22 U.S.C. § 611, *et seq.* (FARA) and 18 U.S.C. § 951 (Section 951) have similar terms, they address different types of conduct.  NSD also reemphasized that it generally disagrees with investigators who believe that FARA can serve as an effective tool to compel the development of cooperating sources.  We acknowledge both of NSD's points in the report and continue to believe that these differing understandings among key personnel are the result of insufficient training on FARA for field investigators and the lack of a comprehensive FARA enforcement strategy within the Department.  As we state in the report, we believe our recommendations, once implemented, have the potential to greatly improve the Department's overall FARA enforcement efforts by helping to ensure that field personnel and NSD officials are in agreement on their approach to these important statutes.

NSD also noted in a footnote to its general comments that the OIG did not interview any FARA registrants.  NSD is correct.  The OIG determined that although FARA registrants might be in a position to offer an opinion about their interactions with NSD, interviewing these individuals would not significantly advance our objective to evaluate the monitoring and enforcement actions taken by the Department to ensure appropriate registration and to identify areas where the Department might make administrative or seek legislative improvements to its FARA enforcement efforts.  In performing our audit, we ensured that we performed appropriate analysis and conducted numerous interviews, including discussions with individuals external to NSD and the Department of Justice, who provided us with an appropriate and sufficient understanding of FARA administration and enforcement.

Lastly, in its general comments, NSD addressed our findings with respect to late submissions by FARA registrants.  NSD stated that for a number of filings we considered to be late in the report, the FARA Unit had provided an extension to the registrant, which mitigated the lateness.  In our review and analysis of registrant documentation during our audit, we included all extensions that we found within registrant files in calculating the timeliness of submitted documentation and, as a result, believe that our calculations accurately reflect the timeliness of submissions.

**Summary of Actions Necessary to Close the Report**

1. **Consider the value of making FARA advisory opinions publicly available as an informational resource.**

   <u>Resolved.</u>  NSD agreed with our recommendation.  In its response, NSD stated that by March 31, 2017, it would review its policy and practices regarding FARA advisory opinions and determine how to expand public accessibility.

   This recommendation can be closed when we receive evidence that this review was conducted and of the actions taken as a result of the review.

2. **Update its current training for investigators and prosecutors to include information about the time it takes and the process used by NSD to approve or deny these types of cases for prosecution.**

   <u>Resolved.</u>  NSD agreed with our recommendation.  In its response, NSD stated it would continue to update its FARA training for investigators and prosecutors, to include information about the time it takes and the process used by NSD to approve or deny FARA cases.

   This recommendation can be closed when we receive evidence that the relevant training was updated and provided to prosecutors and agents.

3. **Explore with the FBI the feasibility of distinct classification codes for FARA and Section 951 in its record keeping system.**

   <u>Resolved.</u>  NSD agreed with our recommendation.  In its response NSD noted that, to its understanding, the FBI already has distinct classification codes for these statutes.  However, NSD also acknowledged possible confusion and commingling of those codes.  We note that we asked FBI officials about its classification codes for FARA cases both during our audit and subsequent to the issuance of our draft report to NSD, and were told by the FBI that both statutes are recorded under a single FARA code.  NSD stated it intends to meet with FBI prior to September 30, 2016, to explore resolution of this issue.

   This recommendation can be closed when we receive evidence that NSD explored with the FBI the feasibility of distinct classification codes in its record keeping system.

4. **Develop a comprehensive strategy for the enforcement and administration of FARA that includes the agencies that perform FARA investigations and prosecutions and that is integrated with the Department's overall national security efforts.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated that it has conducted an internal assessment of FARA enforcement and administration and has begun implementing strategies resulting from that assessment.  NSD's response stated that FARA fits into the Department's overall national security efforts by promoting the detection of, discouraging, and neutralizing undisclosed foreign messaging, and forcing disclosure of foreign efforts to influence United States foreign and domestic policy and public opinion.  NSD's comprehensive strategy will include updates to FARA training materials to provide helpful information regarding NSD's evaluation of FARA criminal charges.

This recommendation can be closed when we receive evidence of a completed comprehensive strategy that includes the agencies that perform FARA investigations and prosecutions and is integrated with the Department's overall national security efforts.

5. **Ensure that it timely informs investigators and prosecutors regarding the reasons for decisions not to approve FARA prosecutions.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it has taken steps to ensure that it timely informs investigators and prosecutors in individual cases regarding the reasons for FARA decisions. NSD added that it intends to update training materials to provide helpful information regarding evaluation of FARA charges.

This recommendation can be closed when we receive evidence of the steps described and of the updated training materials.

6. **Establish a comprehensive system for tracking the FARA cases received for review, including whether cases are approved for further criminal or civil action, and the timeline for approval or denial.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it intends to address this recommendation by addressing classification coding with FBI as described in recommendation 3 above, and by improvements to NSD's case tracking system to ensure ready identification of FARA matters, to include dates of receipt, action, and approval of FARA matters.  Case tracking improvements are anticipated to take place during 2016 and 2017.

This recommendation can be closed when we receive evidence of the classification code resolution with FBI, and of a case tracking system that includes information about approval for further criminal or civil action, and the timeline for approval or denial.

7. **Complete its effort to standardize a system for batching and sending registration delinquency notices at regular intervals, and develop policy and procedures that ensure appropriate follow up on them.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated that in the past year it has standardized a system for batching and sending registration delinquency notices at regular intervals.  NSD also noted that it is currently in the process of expanding the system, which is anticipated to be complete by September 30, 2017.  Additionally, NSD stated that it is committed to developing policy and procedures that ensure appropriate follow-up.  NSD stated that upon completion of the delinquency notice system, it will ensure FARA Unit staff adequately and efficiently track compliance and take appropriate measures to address delinquency.

This recommendation can be closed when we receive evidence of the completion and implementation of the delinquency notice system, and policy and procedures to ensure appropriate follow-up.

8.     **Develop a policy and tracking system that ensures that registration files are timely closed and that when agents cease meeting their supplemental filing obligations for an extended period of time an appropriate investigation is conducted.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it intends to address this recommendation through the development of the delinquency notice system described in recommendation 7 above, which will help identify candidates for termination, and through the development of policy to ensure registration files are timely closed and appropriate actions are taken when obligations are not met for an extended period of time.  NSD anticipates this policy will be developed by March 31, 2017.

This recommendation can be closed when we receive evidence of the completion and implementation of the delinquency notice system, a policy is implemented to ensure registration files are timely closed, and appropriate actions are taken when obligations are not met for an extended period of time.

9.     **Consider expanding the sources of information beyond those currently used by the FARA Unit to help identify potential or delinquent foreign agents, currently limited to open source internet and LexisNexis searches.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it has already engaged in outreach to other government agencies that might have such sources of information.  NSD stated it will continue to pursue that outreach on an ongoing basis, and additionally will work to identify additional sources of information.

This recommendation can be closed when we receive evidence of such outreach and identification.

10.  **Either take steps to improve the compliance rates for the filing of informational materials to achieve the purposes of the Act or, if the Unit considers the current 48-hour standard unreasonable, pursue appropriate modifications.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it has determined the 48-hour standard is out of date and unreasonable.  NSD has drafted appropriate modifications to address the issue which are under review within the Department of Justice.

This recommendation can be closed when we receive evidence of the modifications or steps taken to improve the compliance rates for the filing of informational materials.

11.  **Ensure appropriate and timely follow-up and resolution of findings identified in its inspection reports.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated that, in addition to its actions with respect to recommendations 7 and 8 above, the FARA Unit will standardize its electronic calendaring of inspections and timelines for completion, anticipated to be complete by September 30, 2017.

This recommendation can be closed when we receive evidence of appropriate and timely follow-up and resolution of findings identified in inspection reports.

12.  **Perform a formal assessment of the LDA exemption, along with the other current FARA exemptions and determine whether a formal effort to seek legislative change on any of these exemptions is warranted.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated that it has already embarked on a study of Lobbying Disclosure Act and other exemptions, that these efforts will continue, and that NSD will make determinations with respect to need and viability of legislative changes by June 30, 2017.

This recommendation can be closed when we receive evidence of the completed LDA assessment and the results of any additional exemption assessments performed by NSD.

13.  **Conduct a formal cost-benefit analysis to determine whether the current FARA fee structure is appropriate.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it will conduct a formal cost benefit analysis of the fee structure by September 30, 2017.

This recommendation can be closed when we receive evidence of that analysis and NSD's resulting decision about the current fee structure.

**14.   Include improvement of timeliness as an objective in the development of the e-file system, to include requiring execution dates for all contracts.**

Resolved.  NSD agreed with our recommendation.  In its response, NSD stated it has determined it is feasible to add a field to collect execution dates for all contracts; however, NSD's response was silent on the overarching issue of incorporating timeliness as an objective in the development of the e-file system, beyond the specific contract date issue.  We continue to believe that e-file presents opportunities to better manage and ultimately improve registrant timeliness, and recommend that e-file develop with timeliness as a consideration.

This recommendation can be closed when we receive documentation demonstrating that NSD has included the improvement of timeliness as an objective in the development of the e-file system, including the requirement of execution dates for all contracts.

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations. Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig