```
 1                  BEFORE THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF COLUMBIA

 3    UNITED STATES OF AMERICA,        .
                                       .   Case Number 18-CR-32
 4              Plaintiff,             .
                                       .
 5         vs.                         .
                                       .   Washington, D.C.
 6    CONCORD MANAGEMENT AND           .   March 7, 2019
      CONSULTING LLC,                  .   10:10 a.m.
 7                                     .
                Defendant.             .
 8    - - - - - - - - - - - - - - - - -

 9                  PUBLIC TRANSCRIPT OF MOTION HEARING
          (SEALED PORTIONS REDACTED PER 08/09/2019 MINUTE ORDER)
10              BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                     UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12
      For the Government:              JEANNIE S. RHEE, AUSA
13                                     LAWRENCE RUSH ATKINSON, AUSA
                                       U.S. Department of Justice
14                                     Special Counsel's Office
                                       950 Pennsylvania Avenue NW
15                                     Washington, D.C. 20530

16                                     JONATHAN I. KRAVIS, AUSA
                                       U.S. Attorney's Office
17                                     555 Fourth Street NW
                                       Washington, D.C. 20530
18
      For the Defendant Concord
19    Management and Consulting LLC:   ERIC A. DUBELIER, ESQ.
                                       Reed Smith LLP
20                                     1301 K Street NW
                                       Suite 1000, East Tower
21                                     Washington, D.C. 20005

22                                     KATHERINE J. SEIKALY, ESQ.
                                       Reed Smith LLP
23                                     7900 Tysons One Place, Suite 500
                                       McLean, Virginia 22102
24

25
```

```
Official Court Reporter:        SARA A. WICK, RPR, CRR
                                U.S. Courthouse, Room 4704-B
                                333 Constitution Avenue N.W.
                                Washington, D.C. 20001
                                202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.
```

```
1                    P R O C E E D I N G S

2          (Call to order of the court.)

3          THE COURTROOM DEPUTY:  Criminal Action 18-32, United

4    States of America versus Concord Management and Consulting LLC.

5          Counsel, please come forward and identify yourselves for

6    the record.  Thank you.

7          MR. KRAVIS:  Good morning, Your Honor.  Jonathan

8    Kravis on behalf of the United States.

9          THE COURT:  Good morning, Mr. Kravis.

10         MR. KRAVIS:  With me at counsel table are Jeannie Rhee

11   and Rush Atkinson, also on behalf of the United States.

12         THE COURT:  Good morning.

13         MR. DUBELIER:  Good morning, Your Honor.  Eric

14   Dubelier and Katherine Seikaly for Concord Management and

15   Consulting.

16         THE COURT:  Good morning, Mr. Dubelier and

17   Ms. Seikaly.

18         All right.  We are here for argument on Concord's motion

19   for approval to disclose sensitive discovery materials to

20   Concord's officers and employees for purpose of preparing for

21   trial.

22         Earlier this week, Concord filed a motion for bill of

23   particulars.  The government has not yet had an opportunity to

24   respond to that motion, and the briefing will not be complete

25   for some time.  At the conclusion of this hearing, I will talk
```

1    about setting a date for argument on that motion.

2         In June of 2018, when I entered the protective order in

3    this case, I found at that time that the government had

4    demonstrated good cause for restricting discovery based on

5    important national security, law enforcement, and privacy

6    concerns.  But I made clear then that I would revisit the scope

7    of the protective order once the parties had litigated pretrial

8    motions and a trial date had been set.

9         I have now ruled on almost all of Concord's pretrial

10   motions.  With the input of the parties, I would like to set a

11   trial date once I've ruled on Concord's remaining motions.

12        Since the protective order was entered, Concord has made

13   several requests to disclose discovery to individuals outside

14   the Concord defense team, including to its officers and

15   employees.  Concord has also requested to take sensitive

16   discovery documents to Russia.

17        I did not address these specific requests while Concord was

18   litigating pretrial motions that challenged the authority of the

19   Special Counsel to bring this case and the legal sufficiency of

20   the indictment.  But now that I've ruled in the government's

21   favor on these pretrial motions, I did invite Concord to argue

22   the instant motion in open court, because it is no secret that

23   Concord seeks to share discovery with Concord officers and

24   employees.

25        I have read the parties' briefs.  I have a number of

1    questions for both sides, some of which will need to be handled

2    in a sealed proceeding.  Both parties have filed information

3    under seal, and the government has submitted information ex

4    parte.  If at any point either side believes that our discussion

5    is touching on sealed or sensitive matters, please speak up.  My

6    goal here is to address as much as we can in open court, but

7    there are matters that we will need to address in a sealed

8    proceeding following this hearing.

9         Before I hear from Mr. Dubelier, I would first like to get

10    an update from the government about discovery and the status of

11    it.  Mr. Kravis, will you be speaking for the government?

12              MR. KRAVIS:  Yes, Your Honor.

13              THE COURT:  All right.  Can you summarize for me the

14    discovery that's been provided to date?  I understand from

15    defense counsel that there's roughly 4 million documents, I

16    believe, in total that have been provided to defense counsel.

17         Is that correct?

18              MR. KRAVIS:  I believe that number is approximately

19    correct, Your Honor, yes.

20              THE COURT:  And of that number, as I understand it,

21    the government has designated roughly 3.2 million of those

22    4 million documents as sensitive; is that correct?

23              MR. KRAVIS:  That is correct.  What I would say about

24    that is, the government has designated those documents as

25    sensitive because the government believes that there are

1  national security and law enforcement interests at stake in the

2  entirety of those accounts, or those accounts viewed as a whole.

3      The government's position is not that every single document

4  within those accounts is -- necessarily has to be limited to

5  defense counsel's eyes only.  But the government has designated

6  the entirety of those accounts as sensitive because the

7  government believes that the disclosure of an entire account

8  and, in addition, multiple entire accounts viewed side by side

9  would implicate important law enforcement and national security

10 interests.  And that's why the government entered into that

11 designation.

12      I say that only because I do not want to give the Court the

13 misimpression that the government believes that every single

14 document or piece of paper that has been produced under the

15 label of "sensitive discovery" necessarily has to be limited to

16 defense counsel's eyes only.  That's not our position.

17         THE COURT:  I understand.  But the current protective

18 order places tight restriction on roughly 3.2 million documents,

19 and that is that foreign nationals cannot access them.  They

20 cannot be transported outside the U.S.  They must be stored at

21 Reed Smith, and Reed Smith attorneys or employees must supervise

22 the review of these materials, absent a court order.

23         MR. KRAVIS:  Absent further order of the Court, yes,

24 Your Honor.

25         THE COURT:  In contrast, with respect to the

1   nonsensitive discovery materials, which are roughly 800,000, no

2   limitations have been placed on those, except that they may be

3   used only to defend this case; correct?

4          MR. KRAVIS:  That is correct.

5          THE COURT:  All right.  In your opposition, you

6   indicate that an investigation reveals that some of the

7   nonsensitive discovery materials were altered and disseminated

8   on the Internet as a part of a disinformation campaign aimed at

9   discrediting ongoing investigations.

10   Concord disputes this allegation in its reply, most of

11   which Concord has filed under seal, which I will address in the

12   sealed proceeding following this hearing.

13          Previously, I think Ms. Rhee had indicated at some point

14   that the government had also provided Concord's defense team

15   with roughly 4- or 500 key documents; is that correct?

16          MR. KRAVIS:  That is correct.  We have produced a key

17   documents collection that comes from the sensitive discovery,

18   and then we have also produced a key documents collection that

19   reflects key documents in the nonsensitive discovery.

20          THE COURT:  All right.  And roughly in total, how many

21   documents are we talking about?

22          MR. KRAVIS:  I believe that there -- actually, may I

23   have just a moment?  I want to confirm to make sure I've got

24   this right.

25          THE COURT:  Sure.

1        (Government counsel conferred.)

2            MR. KRAVIS:  The hot documents are roughly 500

3    documents total, and then in addition, we've also provided

4    translations for some of those documents.

5            THE COURT:  Okay.  So the 500 are split into sensitive

6    and nonsensitive?

7            MR. KRAVIS:  That's correct.

8            THE COURT:  Does the government anticipate adding

9    documents that are a part of the currently designated sensitive

10   materials to those key documents between now and trial?

11           MR. KRAVIS:  Among the sensitive discovery that has

12   been produced to the defense, the government believes that the

13   key documents designation that we've provided is up-to-date.

14       It is, of course, always possible that in preparing the

15   matter for trial and going back through those materials again,

16   we may see additional things that were not included the first

17   time.  But as of this point, that is up-to-date.

18           THE COURT:  Okay.  I do want to warn you, the time is

19   not now, but the time sufficiently in advance of trial, I will

20   make clear that if the government seeks to add documents out of

21   the sensitive discovery materials that are not already

22   designated as key documents, the government is going to have to

23   have a really good reason at that point.

24       And we're not there yet.  But I'm thinking months before

25   trial, I'm going to be really reluctant to allow the government

1    to take documents out of the sensitive discovery documents that

2    have not been identified as key documents and put them into the

3    key documents that the government intends to use at trial.

4              MR. KRAVIS:  Right.  So the key documents collection,

5    as it was provided to the defense, was intended to assist the

6    defense in identifying the documents that the government

7    believed were most material to the allegations in the

8    indictment.

9         The government had not intended that the key documents

10   collection would comprise every exhibit that the government

11   would introduce at trial.  We would, of course, be prepared to

12   provide the defense with an exhibit list in whatever pretrial

13   schedule the Court sets.

14             THE COURT:  All right.  Does the government anticipate

15   producing additional discovery in this case?

16             MR. KRAVIS:  Yes, there is a small amount of

17   additional discovery.

18             THE COURT:  And when do you intend to produce that?

19             MR. KRAVIS:  Some of that additional discovery we had

20   intended to produce once a trial date and trial schedule were

21   set, because there is a small amount of discovery that carries

22   witness security implications to it.

23        There is another small amount of discovery that we expect

24   that we may need to file a motion with the Court on.

25             THE COURT:  All right.  Does the government anticipate

1   filing a superseding indictment in this case?

2           MR. KRAVIS:  No, Your Honor.

3           THE COURT:  All right.  Because when I do set a trial

4   date, and I hope to do that in the not-too-distant future, I

5   want to set a firm one.  So I'm going to be pressing on the

6   government very hard at that time to make sure that it has

7   provided the discovery to the defense.

8           MR. KRAVIS:  Yes, Your Honor.

9           THE COURT:  All right.  Mr. Kravis, in June when I

10  determined that the government had shown good cause, at least at

11  that time good cause to justify the entry of a broad protective

12  order to protect the disclosure of sensitive documents because

13  they implicated national security, law enforcement, privacy

14  concerns, at that time I found good cause.  And the government

15  has supplemented that good cause determination with the more

16  recent filing, which adds additional bases.  But at that time

17  when I did that, I made clear that I viewed this as a very broad

18  protective order that would potentially change over time as we

19  got closer to trial.

20      So now here we are very close to finishing pretrial

21  motions, and I'm wondering, has the government made any effort

22  to go back and look at this large volume of documents and try to

23  separate those out that don't raise national security or law

24  enforcement concerns?  Because I would expect over time that the

25  number, the volume of those documents would diminish

1    dramatically over time as your investigation proceeds.

2          MR. KRAVIS:  And this goes back to what I was trying

3    to articulate a moment ago.  The government's law enforcement

4    and national security interests here relate principally to the

5    view of the accounts that were searched as a whole.  And the

6    reason for that is because when an individual looks at the

7    entirety of a search warrant return, the individual is then able

8    to see what the government was able to collect and was not able

9    to collect, where the gaps in the coverage were.

10          And once an individual can put several of those entirety of

11    search warrant productions together, they can then start to

12    recreate the investigative steps that were taken.  They can see

13    how the accounts were linked together, how the search of one

14    account led to another account, what the government collected,

15    and what the government did not collect.

16          And that information, particularly in the hands of a

17    foreign adversary, can be used to avoid detection in the future,

18    all of which is a very long-winded way of saying it's really not

19    feasible for the government to narrow the amount of sensitive

20    discovery, because the government's interest in the sensitive

21    discovery is with respect to the accounts as a whole.

22          And as we've articulated, I think, to the Court and also to

23    defense counsel, within that sensitive discovery, there will

24    likely be numerous documents, the content of which is not itself

25    particularly sensitive and the content of which the government

would not have an objection to Concord showing its officers and
employees.  And that was why we had advocated for the protective
order the Court entered that would allow Concord to seek on --
not even necessarily a document by document, but a group of
documents by group of documents basis permission to disclose the
sensitive discovery.

Our concern principally within the sensitive discovery is
with the disclosure of the search warrant returns on particular
accounts, the entirety of the return as a whole, and what that
information can reveal about investigative methods.

THE COURT:  All right.  Correct me if I'm wrong, but
isn't the vast majority of these documents, are they not
documents that were produced or in the possession of the
defendant?

MR. KRAVIS:  Yes.

THE COURT:  And fall under Rule 16; right?

MR. KRAVIS:  Yes, many of them are, which again is why
the content -- for many of them, not every one -- but for many
of them, the content is not -- the content of the documents
themselves is not the government's principal good cause
interest.

The government's principal good cause interest is in the
information, the information about investigative techniques and
collection techniques that can be gathered from viewing the
returns as a whole and viewing the entirety of the returns side

1    by side.  And that information, the information that can be

2    gleaned from viewing sort of the entirety of the sensitive

3    discovery or the entirety of particular returns, is not

4    information that Concord needs to show its officers and

5    employees in order to prepare for trial.

6         The content for most of the documents, the content is not

7    itself sensitive.  So that was why we had contemplated that

8    Concord would identify categories of documents or batches of

9    documents within the sensitive discovery that it intended to

10   show to particular officers and employees of Concord, and

11   depending upon the details of those requests, the government

12   would not necessarily anticipate objecting to those.

13             THE COURT:  Okay.  Well, the problem is, under

14   Rule 16, the burden of showing good cause is on the government,

15   right --

16             MR. KRAVIS:  Right.

17             THE COURT:  -- to keep documents and records from the

18   defendant?

19             MR. KRAVIS:  Well, I guess I would say two things

20   about that.  The first is, I do believe the government has made

21   the showing of good cause.  But we would submit that we have not

22   kept these records from the defendant.

23             THE COURT:  Well, you've given it to the counsel, but

24   in terms of anyone at Concord, any officer, any employee having

25   access to date, none have had that.

1          MR. KRAVIS:  We don't know.  I mean, we're not --

2          THE COURT:  What do you mean you don't know?

3      These have been restricted according to my protective

4  order, and they've been kept at Reed Smith, and the attorneys

5  have had access.

6      Are you aware of a breach with respect to sensitive --

7          MR. KRAVIS:  No, no.  I'm sorry.  That's not what I

8  meant to imply.  It was just that, to the extent there have been

9  proceedings that have involved firewall counsel, we, the

10  investigative team, are not privy to those.

11          THE COURT:  I will tell you, at this point the

12  documents have not been released to officers or employees.

13          MR. KRAVIS:  Understood.

14          THE COURT:  And in part, we are where we are because

15  Mr. Dubelier was making arguments about taking documents to

16  Prigozhin and to Russia that I thought could be handled in open

17  court to some degree.  We might get in there and be right back

18  where we started.

19      But it seemed to me that once I was done, you know, with

20  pretrial motions, which I'm almost done with, that it made sense

21  to revisit the scope of the protective order, which was

22  admittedly very broad when I entered it --

23          MR. KRAVIS:  Right.

24          THE COURT:  -- and explore with you, the government,

25  whether the protective order can be narrowed, explore with you

whether you can make a more particularized showing.

Because I do think under Rule 16, it is the government's burden to make a showing.  And at the outset, and again more recently, you've certainly shown good cause that there are national security and other interests at play here.  But based on the case law, my job is to balance those weighty government interests against the defendant's interest in presenting a full and fair defense at trial, and it's very difficult for me to do that in the abstract.

And I understand the government's position is that the onus should be on defense counsel to bring the documents to the Court, and then you are going to be very forthcoming and say yes, those can go, these can't go.  But I don't know under Rule 16 that the onus is on the defendant to come forward, because right now he doesn't have officers or employees helping him look at those sensitive documents to determine what might be helpful to them.

MR. KRAVIS:  Well, I mean, I guess what I would say about that is that this is not -- this is not a situation where -- as it was, for example, in the *Johnson* case that the defense cites, where we have provided discovery to the defense and said, There are some materials in here that we actually care about and some materials that we don't, we've designated it all sensitive, you figure out what's important and come back to us when you've done it.

1    We've articulated a slightly different interest, which is

2    an interest in the protection of disclosure of the accounts, the

3    accounts as a whole. ████████████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████ We have made

6    a first effort at identifying some of those documents in the hot

7    document collections.

8        For those documents --

9        THE COURT:  Wait.  I missed you there.  So if all of

10   these are records, documents of the defendant and you're saying

11   that ████████████████████████████████ what -- I thought

12   that they all did.

13       MR. KRAVIS:  I don't think it would be correct to say

14   that they are records -- I don't think it would be correct to

15   say that they are records of the defendant.  I'm sorry.  I'm

16   trying to be as forthcoming as possible with the Court about

17   this, but we are now talking about the content of the sensitive

18   discovery.

19       THE COURT:  No, I understand.  Some of this we can

20   continue under seal, if necessary.

21       But it's hard for me in the abstract, without any better

22   understanding of what these documents are, to weigh competing

23   interests.  And I understand that's the government's proposal,

24   to set up firewall counsel and have that process handle it.  But

25   again, I don't know that the burden is on the defendant to come

1    forward.  It seems like the burden is on the government to come

2    forward and say these need to be protected and here's why.

3    Maybe not document by document, because they are so voluminous,

4    and maybe there are documents that are similar in nature such

5    that you could make a showing with respect to a category of

6    documents that would give me more confidence in what they are.

7    But I don't know how I do an individualized determination with

8    respect to the 3.2 million documents.

9         MR. KRAVIS:  Again, I don't think it's a question of

10   individualized determination of the documents or particular

11   documents within the accounts being designated as sensitive.

12   The government's principal interest here is in the disclosure of

13   the accounts as a whole, the entirety of the return.  When you

14   see an entire search warrant return, you are then able to see

15   what the government did collect and didn't collect, which you're

16   not able to see if you say here are 300 or 3,000 e-mails that we

17   found within the whole.  And --

18        THE COURT:  What about not disclosing the return and

19   some subset of those documents?  Why doesn't that achieve the

20   same goal?

21        MR. KRAVIS:  I think that is always what we had

22   envisioned, that some subset of the information -- that some

23   subset of the information would be -- that Concord would be

24   providing some subset of this information to its individual

25   officers and employees to review without showing them the

1    entirety of the return and, as Concord has requested, without

2    showing them the entirety of all the returns --

3          THE COURT:  Why isn't it the government's burden to

4    pull out some subset of documents, the return and some other

5    documents, such that they're not getting the full panoply of the

6    return and then providing that to defense counsel to share with

7    Concord?

8          MR. KRAVIS:  Well, to an extent, we can do that.  So

9    we can say, for example, here are the documents in the accounts

10   identified as sensitive discovery that we have found that appear

11   to contain evidence relevant to the charges in the indictment or

12   that appear to contain evidence relevant to the activities of

13   Concord and so on and so forth.  But we are a little bit limited

14   in that effort, because we don't know exactly what Concord's

15   defenses may be and exactly what their interests in the material

16   may be.

17        And so they may have --

18          THE COURT:  Again, the default is not that the

19   defendant has to come forward.  It's that the government has to

20   provide it absent good cause.

21        Why can't you make a cut that would still preserve the

22   government's interests here, which is not to provide every

23   single document of the return such that the other side can do

24   the kinds of analysis that you're concerned about that would

25   affect national security?

1          Is there not some smaller chunk that the government could

2     peel off of each return and not provide the actual return itself

3     and achieve that goal?

4          MR. KRAVIS:  Yes.  And the collection of the key

5     documents was a first effort to do that.  We can certainly kind

6     of, for lack of a better way to put it, broaden the scope of the

7     identification --

8          THE COURT:  Well, I'm looking at 500 documents versus

9     3.2 million, and it's heavily on the government's side here in

10    terms of protecting government interests.

11         And I am not suggesting by my questioning that I'm prepared

12    to let any document that affects national security go to someone

13    who shouldn't have it for national security reasons or go to a

14    country that shouldn't have it.  I'm not making that

15    determination here.

16         All I'm saying is, based on what the government has shown

17    so far, I don't feel as though the government's made the

18    particularized showing that the case law requires such that I

19    have to put the onus on Mr. Dubelier to come forward and explain

20    why withholding that smaller set of documents is going to impair

21    his ability to defend his client.

22         And I can't do that in the abstract.  You're saying I can

23    do it in the sealed proceeding with firewall counsel.  But

24    again, that's only if Mr. Dubelier comes forward with documents.

25    And it seems to me that a defendant -- its employees and

1    officers should have some access to this to help him determine

2    what might be critical to the defense.

3            MR. KRAVIS:  Well, I guess I would say a couple things

4    about that.  The first thing is that that request has never been

5    brought to -- has never been brought to our attention or has

6    never been brought to my attention of, Look, here are the

7    returns, you've designated all of these as sensitive, we want to

8    find the e-mails or the communications that relate to Concord's

9    business, can you help us figure out which ones those are so

10   that we can provide some of them without revealing the entirety

11   of the accounts.

12       That's not the relief that Concord has requested in this

13   motion, for example.

14           THE COURT:  To be fair, it is a broad motion, but this

15   is one I invited in open court, because I felt like we were

16   getting into arguments that could be aired publicly about how

17   you wanted to deal with documents.  And to be fair, he has also

18   objected, I think, across the board to what he perceives as an

19   overcategorization of materials as sensitive materials.  So he,

20   in effect, has challenged the protective order and the breadth

21   of the protective order.

22       And so I think it does swing back to you and to me to

23   ensure that the protective order is as narrow and as permissible

24   as possible for the defendant to receive documents under

25   Rule 16.

So I think he has challenged the categorization across the board.  He says that much of this is not sensitive.

MR. KRAVIS:  So if the issue is identifying within the -- within the sensitive discovery accounts particular sets of documents that may be relevant to the case so that Concord could show that subset of documents to its officers and employees without revealing the entirety of the accounts or without revealing the entirety of all the accounts, we are certainly willing to work with the Court and work with defense counsel to do that.

But our understanding at the beginning had been that defense counsel really didn't want to do it that way.  Our understanding, at least, was that their view was that the identification of those relevant documents would tend to reveal defense strategy, and so they wouldn't -- that would not be something they would want to do with us, which is why the firewall counsel position was created.

We're willing to work with the Court, to work with defense counsel, to work with our own selves to identify materials within the sensitive discovery that -- where disclosure may be warranted.  How that disclosure happens, of course, is then a further question, but --

THE COURT:  I understand.  And I will hear from Mr. Dubelier eventually on that point.  But if I understand your position, the government may well not object to large swaths of

these 3.2 million sensitive documents being declared not

sensitive, as long as some portion is held back as sensitive.

          MR. KRAVIS:  Sorry.  Can I have just one moment?

          THE COURT:  Absolutely.

    (Government counsel conferred.)

          MR. KRAVIS:  I guess what I would say there is that I

didn't mean to suggest what the government is proposing is that

large swaths of the documents be designated "nonsensitive."  The

protective order still -- contains restrictions on how those

sensitive documents are handled and disseminated, and the

government believes that those restrictions continue to be

appropriate.

    What I was trying to say was, we would have no problem

working to identify documents within the sensitive discovery

that we believe may be appropriate for Concord to show

particular officers and employees under the right set of

circumstances.  I'm not --

          THE COURT:  Let's talk about what is the right set of

circumstances.  Is that in the offices of Reed Smith here in the

United States, I assume?

          MR. KRAVIS:  That was the proposal -- that was the

proposal in the first instance, and we do believe that that

restriction is appropriate.

          THE COURT:  To your knowledge, does Concord have

officers or employees who could travel here and not be arrested?

1        MR. KRAVIS:  I don't know the answer to that question.

2        THE COURT:  All right.  Let's assume for a moment --

3        MR. KRAVIS:  Well, I'm sorry.  That's not quite right.

4   In one of Concord's earlier filings, they had said that the

5   officers that they were talking about were Mr. Prigozhin and

6   another person who was -- who worked in their legal department.

7   To my knowledge -- in an earlier filing, they had said those

8   were the officers that we're talking about in terms of showing

9   them the sensitive discovery.  To my knowledge, the person in

10  the legal department who was not identified by name, I don't

11  believe that that is an indicted defendant.

12       THE COURT:  All right.  So you do believe that there

13  are officers or employees who could get a visa here in a timely

14  fashion and view the documents at Reed Smith and not risk being

15  arrested?

16       MR. KRAVIS:  My understanding from Concord's prior

17  filings on this matter is that there are officers of Concord who

18  are not indicted defendants in this case.

19       The issue of the timeliness of the visas was one that had

20  not been brought, at least, to my attention until Concord filed

21  its reply.  I am aware there are programs out there that allow

22  for expedited consideration of visas in certain circumstances --

23       THE COURT:  Would the government -- the trial team

24  assist with that to ensure that there would be an expedited

25  visa?

1          MR. KRAVIS:  We would certainly work to make the

2     appropriate inquiries.  I'm not familiar enough with that

3     program to say exactly what we would and would not be able to

4     accomplish.  We're certainly willing upon request to try to

5     assist in that process.  Of course, if it doesn't work, we would

6     try something else.

7          But the issue of, well, this isn't going to work because

8     they can't get visas, was one that wasn't brought to our

9     attention until Concord's reply.

10          THE COURT:  With respect to some set of documents --

11     let's assume for a moment that the defense can show that they

12     need Prigozhin to see some set of documents in order for the

13     company to defend itself.  Now, that would be an argument that I

14     would hear from defense counsel, but let's assume for a moment

15     that they convince me that that's the case.

16          He's under indictment, so presumably would be arrested when

17     he sets down here in the United States.  And is it the

18     government's position that that is the price the corporation has

19     to pay in order to get discovery in this case, that the company

20     has to subject the officer to arrest?

21          MR. KRAVIS:  Well, I'm not sure I would phrase it

22     as "the price they pay."  I would say two things about this.

23          The first is, to the extent that Concord has officers or

24     employees who have personal preferences or personal interests

25     about coming to the United States or not coming to the United

States, we don't believe that that is a factor the Court

considers in balancing the interests here.  The interests are

the government's good cause showing versus Concord's ability to

present a defense, not the personal preferences or interests of

its individual officers.

THE COURT:  But can a company make an officer or

employee come to the United States and be subject to arrest in

order to get discovery it needs to defend itself?

MR. KRAVIS:  Can the company force the officer to do

that?  I don't know.  I mean, I would expect the answer is

probably no.

But what I would say is that I think that that is a

situation -- it is analogous to a situation where a company

under indictment has a key officer who pleads the Fifth and

chooses not to cooperate with the corporation's investigation.

The individual officers who make up a corporation may have

personal interests and personal preferences that are not

squarely aligned with the litigation interests of the

corporation itself.

But that is not -- that issue does not warrant the Court's

intervention and does not warrant relaxing what are otherwise

reasonable restrictions on the dissemination of the discovery

based on the government's showing of good cause.

But the other thing I would say about this is that the

protective order always allowed Concord to request permission to

provide sensitive discovery to officers and employees in Russia.
So the government's initial view is that just saying, well, the
officer or employee doesn't want to come to the United States
for their own personal reasons, our view is that that's not
sufficient -- that is not a sufficient showing to relax the
restrictions on sensitive discovery in the protective order.
But in the last instance, that would be a determination that
would be made by the Court.

The government does believe that it would be appropriate
for Concord to provide the Court and the government, either the
investigative team or the firewall counsel, with a little bit
more information about exactly what the proposal is, how the
documents would be safeguarded, where they would be taken, who
they would be shown to, whether they would be left in Russia or
brought back to the United States.  We believe that all of those
restrictions are still appropriate for the sensitive discovery.

But I think it is also true that we would be able to work
with the Court, work with defense counsel to identify categories
of documents within the sensitive discovery that could be shown
to officers and employees of Concord under the restrictions and
limitations that are set forth in the protective order.

THE COURT:  Is it the government's position that
Prigozhin, under no circumstances, no matter what document it
is, would ever get that document in the U.S. or in Russia?
Let's say he did come here.

1          MR. KRAVIS:  No, that's not our position.

2          THE COURT:  It's not?

3          MR. KRAVIS:  No, no.  Our position is that we believe

4    the restrictions on the viewing and the dissemination of the

5    sensitive discovery are appropriate based on the government's

6    good cause showing.  We can help to identify documents,

7    categories of documents within the sensitive discovery that

8    could be shown to officers and employees of Concord in the

9    Washington offices of Reed Smith under the terms that are set

10   forth in the protective order, because the protective order

11   includes other restrictions as well.  It involves signing the

12   memorandum of understanding.  It involves where the documents

13   are stored.  It involves who accompanies the person viewing the

14   sensitive discovery.

15       We continue to believe that those restrictions are

16   appropriate, but we do believe that we can help to identify

17   categories of documents where viewing by Concord officers and

18   employees would be appropriate under those circumstances.

19       Should the Court decide that it is appropriate for some

20   subset of the sensitive documents to travel to Russia, Concord

21   has the opportunity to make that motion with the Court and to

22   make that showing, and the protective order as it is currently

23   written allows for all of that.

24          THE COURT:  Assume for a moment there's a Concord

25   officer or employee who comes to the United States to view

documents in the office of Reed Smith.

In your view, does that employee get -- this is not one who is under indictment.  Does that employee get access to all the 3.2 million sensitive discovery documents?

MR. KRAVIS:  No, I don't think that is what the -- I don't think that is what the protective order -- I don't think that is what the protective order contemplates.

THE COURT:  Obviously, you can, through firewall counsel, argue that limitations should be placed.

MR. KRAVIS:  Right.

THE COURT:  But I'm trying to understand how this might play out.  If there is an officer or employee who comes here and goes to the offices of Reed Smith, is it -- how much is going to be withheld?

MR. KRAVIS:  I think, again, the government's interests with respect to the sensitive material was in -- for the most part is in the viewing of the accounts -- in the viewing of the accounts as a whole and the information that could be gleaned from looking at the entirety of a search warrant return, from looking at the entirety of the sensitive discovery.

There are particular documents or particular categories of documents that are appropriate for -- that are particularly appropriate for an officer or employee of Concord to view in the Washington, D.C., offices of Reed Smith.  The protective order

1    allows for the review of those appropriate documents in that

2    fashion.

3              THE COURT:  I guess I'm trying to get a sense as to

4    what rough percentage of documents you think a Concord employee

5    or officer could look at in the offices of Reed Smith.

6         We're looking at 3.2 million.  Is it your hot docs?

7              MR. KRAVIS:  No.  It would be a broader category of

8    documents.  For the most part, it could include anything that is

9    relevant to the allegations in the indictment, as long as it's

10   not revealing the entirety of the accounts.

11        The number of actual relevant documents that would fit the

12   interest that has been articulated by Concord in showing its

13   officers and employees their documents to try to gather

14   information from them about what they understood a particular

15   document to mean or what they understood a particular

16   communication to convey, that would be a much smaller

17   subcategory of the sensitive documents.

18        I think for the most part, the government would not --

19   again, depending on the officer or employee we are talking

20   about, the government would not have -- likely not have

21   objection to almost all of those relevant documents being made

22   available to be viewed by that officer or employee in the Reed

23   Smith Washington, D.C., offices.

24        There may be a few instances where the government would ask

25   that headers be removed or metadata not be viewed, because that

might tend to reveal methods of collection.  But I think that's

a relatively small subset of the documents that we are talking

about.

     I think that there are -- this is a very long-winded way of

saying, I think that there are not very many documents, if any,

in the sensitive discovery where the government would say this

just cannot be viewed by a Concord officer or employee, even

under the circumstances --

          THE COURT:  You think that that officer or employee

could access the vast majority of sensitive documents, with some

modifications?

          MR. KRAVIS:  Yes, yes, yes, under the terms that I've

described in protecting the interests that I've tried to

articulate.

          THE COURT:  And that officer or employee would have an

unlimited amount of time to look at these documents and then go

back to Russia?

          MR. KRAVIS:  Yes.

          THE COURT:  Beyond the jurisdiction of this court?

          MR. KRAVIS:  Yes.

          THE COURT:  And share whatever he or she gleaned from

those documents in Russia?

          MR. KRAVIS:  Yes, yes.

          THE COURT:  All right.  In that case, how different

would it be to have some sort of video conference system from

1    the office of Reed Smith to that same individual in Russia?

2        MR. KRAVIS:  I just think the ability to secure those

3    kinds of communications into Russia is very, very limited.  And

4    so the assurances that the Court could have and that the

5    government could have that the information is being shown only

6    to the person who is on the other side of the communication,

7    when we are talking about Russia, it's just very, very low.

8        And part of what the protective order contemplated was that

9    the Court and the government could be assured that the

10   particular officers and employees of Concord who were designated

11   to view sensitive discovery pursuant to orders of the Court,

12   that they were the only people that were actually looking at the

13   discovery.  The protective order contemplated that we could be

14   assured of that because there were requirements about defense

15   counsel providing the access and monitoring the access.

16       There were provisions that were put in place to make sure

17   that there isn't also someone else who is looking at the

18   material who is not authorized by the Court to see it and the

19   government was not told about.  And those restrictions just fall

20   away when we start talking about electronic transmission of

21   information into Russia.

22       THE COURT:  All right.  I do want to talk about the

23   proposal Concord has made, but we're going to have to do that

24   under seal.

25       MR. KRAVIS:  Can I add one -- I want to add one caveat

1    to what I was talking about with respect to the sensitive

2    discovery.

3         The sensitive discovery also includes the process itself,

4    like the affidavits in support of the warrants, the warrants

5    themselves for 2703(d) orders, the applications and the orders.

6    The government views those materials as falling into a different

7    category.  Those are materials where we would object to any

8    officer or employee of Concord seeing those.

9         In those materials, the interests that I talked about and

10   identifying methods of collection, what's gathered, what's not

11   gathered, investigative steps, it's very, very high.  And the

12   need for any particular fact witness to see an affidavit is

13   very, very low.  To the extent that Concord has an interest in

14   mounting legal challenges to a particular legal process, they

15   can do that without showing the affidavit itself to an officer

16   or employee of Concord.

17        I'm adding that just as a caveat to what I was saying

18   before about the government's interests with respect to the

19   content of the sensitive discovery.

20             THE COURT:  All right.  And in terms of documents that

21   the government intends to introduce in its case-in-chief, I know

22   you would abide by whatever order the Court enters, but what do

23   you envision?

24        Obviously, we don't want to be in a situation where we have

25   a trial date and we have hundreds of potential jurors ready to

1    serve and get in a situation where there's a surprise.  At some
2    point, the documents that you intend to introduce in your
3    case-in-chief will become public and will be flying around the
4    world.
5              MR. KRAVIS:  Yes.
6              THE COURT:  And that can't happen during trial.  Do
7    you agree, or do you think that --
8              MR. KRAVIS:  I'm sorry?
9              THE COURT:  How much advance notice does the
10   government believe would be appropriate in a case like this to
11   provide exhibits in advance of trial?  How far in advance of
12   trial would the government be willing to provide its exhibits?
13             MR. KRAVIS:  I mean, depending on how quickly the
14   Court were to set the trial date, we could provide trial
15   exhibits several months in advance of the trial date itself.
16             THE COURT:  And again, recognizing that once you do,
17   those documents are out there.
18             MR. KRAVIS:  Yeah, we recognize that.  There may be a
19   very limited category of documents where we believe that some
20   redactions are appropriate to protect the interests that I've
21   talked about.
22        But for the vast majority of the discovery that we are
23   talking about, the law enforcement interests are in the sort of
24   view you get of the return as a whole, when you look at the
25   entirety of the return or you look at the affidavit or you stack

1    the returns next to each other.  And that interest is not

2    necessarily implicated by the viewing of any particular document

3    as a trial exhibit in open court.

4         THE COURT:  Okay.  So the vast -- the national

5    security interests hinge on the scope of the discovery that's

6    provided, as opposed to --

7         MR. KRAVIS:  That is true for most of the sensitive

8    discovery.  Again, I want to add the caveat that I mentioned

9    earlier about the process itself, like the affidavits, the

10   applications, the orders, the warrants, there may be a small

11   number of documents ████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████

16       But for most of the documents, most of the sensitive

17   discovery, the law enforcement and national security interests

18   at stake go to the information that can be gathered when the

19   account is viewed in its entirety and when the entirety of the

20   account is stacked up next to the entirety of another account

21   and so on and so forth.

22         THE COURT:  All right.  Thank you.  Anything else you

23   want to add?

24         MR. KRAVIS:  There was one other thing I wanted to add

25   with respect to the Court's questions about officers and

1    employees of Concord coming to the United States and then

2    returning to Russia.

3         It would be our understanding, of course, that officers and

4    employees of Concord who are viewing the sensitive discovery are

5    signing the memorandum of understanding.  They are subjecting

6    themselves to the Court's jurisdiction.

7              THE COURT:  Not while they're in Russia.

8              MR. KRAVIS:  Well, while they're in the United States,

9    and that they're signing the memorandum of understanding.

10             THE COURT:  Understood.

11             MR. KRAVIS:  Thank you, Your Honor.

12             THE COURT:  Mr. Dubelier?

13             MR. DUBELIER:  Wow, I don't know where to start,

14   because we're in a different place we were based on the

15   pleadings.

16        So for the first time, I think, we learned a half hour ago

17   that not all 3.2 million documents in the sensitive discovery

18   are sensitive, and instead, it's this conceptual thing, that if

19   you look at them in their entirety, that could be sensitive, but

20   if you look at them individually, then they're not necessarily

21   sensitive.

22        That is completely different from what was represented to

23   us for the past eight months by the government, and I really

24   think under these circumstances, Mr. Kravis needs to go back and

25   do his homework on what was represented by the government when

we first started litigating this case.

I will also tell Your Honor, and Your Honor knows, we tried to test the protective order by taking a crummy 80 documents and giving them to firewall counsel six months ago and saying, We wanted to share those 80 documents with our client.  And firewall counsel said, No, you can't share any of these with any Russian person.

That's why we're here today, because we hit a wall on that. I don't want to get in trouble here about talking about the sealed discussions we had about all that.  But we hit a wall and recognized this is going --

THE COURT:  But to be fair, at the outset, I said issues of documents going to Russia, issues of documents going to Prigozhin we're going to handle post-pretrial motions, because, Mr. Dubelier, you challenged the authority of the Special Counsel to bring this case.

MR. DUBELIER:  Yep.

THE COURT:  You challenged the indictment.  Had you prevailed on either motion, there would be no trial.

MR. DUBELIER:  Uh-huh.

THE COURT:  So I don't know that it's fair to say that firewall counsel's position was one that would last throughout this endeavor.  At the pretrial stage, I sent a pretty clear message that I'm not entertaining -- to you in the closed proceeding, I'm not entertaining documents going to Russia or

documents going to Prigozhin while these motions are pending.

So I don't know what communications you've had with him, but it certainly wasn't my expectation in those proceedings to approve documents going to Russia or to Prigozhin, but I did intend to potentially approve of documents being released at the offices of Reed Smith.

And I thought I made that clear at the outset, and I know there's confusion. But just to be fair, I think that may well be where he was coming from as well.

So we are at a different stage here. We're almost in pretrial prep. There is no trial date. You have not been prejudiced. So moving forward, yes, I hear you.

MR. DUBELIER: Your Honor, I also get what you're saying, with a caveat, though. The caveat is, we have been done with the pretrial motions for some time. And you ordered the parties to brief, and we briefed, and nowhere in those briefs, nowhere did Mr. Kravis or anybody else in the government say, Wait a minute, not all of the 3.2 million documents are sensitive, if they're looked at in their entirety they might be sensitive, but we're not saying that none of those 3.2 million documents can be shared with the defense. We learned that for the first time 20 minutes ago.

So that's not the briefing that we had. They in no way raised that issue within the briefing. They maintained their position in their briefing that the 3.2 million documents could

1    not be shared with a Russian person outside the United States.

2    And now they're saying something different.

3        And I think the key here is what you said to them.  The

4    burden is not on us.  There is no burden on us.  There is no

5    case law that puts any burden on us.  And you can rely on Judge

6    Bates's opinion in the *Johnson* case, but you don't have to rely

7    on that alone.  We've cited other cases to the Court.  There is

8    no burden on us to do anything.

9        And this notion now where they seem to be hedging that,

10   okay, we identified 500 or so key documents, we're happy to go

11   back and identify additional relevant documents.  This has

12   nothing to do with their determinations of relevance.  This

13   sensitive discovery is chock-full of exculpatory information.

14   They can't make those decisions.  We get to determine, in

15   talking to our client, what documents within that document set

16   we want to use.

17       And this comes down to, they have to come to you and say

18   these are the documents that are truly sensitive and cannot be

19   shared and these are the ones that aren't.  And if they

20   overdesignate -- it sounds like they concede they overdesignated

21   in the beginning of the case.  Well, now they have to go back

22   and redesignate, and we have to know, of the 3.2 million

23   documents, which ones can we share with our client, and let them

24   tell us which ones we can share.

25       This notion that we have to pick out the ones we want to

share and then go case by case to firewall counsel and say we want to share this and this is the person we want to share it with, there is not a case ever in the history of the United States that put a requirement on a corporate defendant ever. They've not cited a single case to this effect. There is no case where even a judge could decide who of a corporate defendant was allowed to see discovery materials.

And so for the first time, it seems, the burden should be on them. It was all along, but now the burden is on them. They have to come and tell us, of the 3.2 million, what we can share and what we can't share. Now, when they then create the category of what we can't share, then we have to come argue about that, because we're not going to agree, of course.

I'm not suggesting to the Court that I'm going to take some irrational crazy position here. And that is, there are search warrant affidavits in the sensitive discovery. I may or may not agree with them that it might not be necessary to share that with the client. I'm not sure. That's a subset of the 3.2 million documents. There's a subset. There's search warrant affidavits in there.

If in the beginning they had come to us and said, We don't want you to share the search warrant affidavits but you can share everything else, we never would have been in this position, and we wouldn't have wasted eight months of our inability to communicate with our client about the evidence.

1    Because remember, Your Honor, the protective order doesn't

2    simply say you can't share the documents.  It says you can't

3    even talk about them.  I've been prohibited for eight months

4    from having a conversation with the client about any of these

5    sensitive documents.  And the sensitive documents are the core

6    of the case.

7        Let me also say, so the Court is not under any

8    misimpression, because I think Mr. Kravis -- I don't think he

9    purposely misspoke, but what he said is not accurate.

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13           ████████████████████████████████████████

14   ████████████████████████████████████████████

15           ████████████████████████████████████████████████

16   ██████████████████████████████████████████████████

17   ██████

18           MR. KRAVIS:  I'm sorry, Your Honor.  I apologize for

19   interrupting.  I think that conversation is best had --

20           THE COURT:  All right.

21           MR. DUBELIER:  Let me put that issue aside, and we can

22   circle back to it when you usher the folks out.

23       Your Honor, I want to go briefly to the issue of people

24   coming here.  Look, we said it in our pleading, and we will say

25   it again, it's a nonstarter.  I really believe it's a

1    nonstarter.  I would like us more to focus on the proposal we

2    presented to the Court under seal on that issue, because we

3    think it's the equivalent of the people coming here, that is, in

4    terms of the ability to protect the documents.

5        I understand the government's issue about the electronic

6    access to the documents.  And regardless of what our vendor

7    does, it's never going to be foolproof, and I would never

8    represent to the Court that it would be foolproof.  So there are

9    practical problems with that.

10       But we do believe the proposal we presented to the Court

11   under seal, as a practical matter, moots out that issue.

12            THE COURT:  We will discuss that in a minute.

13            MR. DUBELIER:  Okay.  Your Honor, the only other thing

14   I want to touch on briefly is setting a trial date.  We do want

15   a trial date, but I think we're far away from being done with

16   all the pretrial motions.

17            THE COURT:  Tell me what I have coming.

18            MR. DUBELIER:  Motions to suppress evidence, which we

19   can't fully assess until we have the ability to talk to our

20   client about the documents.  We've got, I think, *Daubert*

21   motions.  And that is, within the sensitive discovery, there are

22   documents which, at least from our reading of them, contain

23   expert opinion-type information that would require a person with

24   expertise to testify about it.  It largely goes to the methods

25   used by the people that were subpoenaed to collect stuff.  I

1    don't want to go into too much detail on that, but there are

2    reports in there that are, for all intents and purposes, expert

3    reports that would require someone with expertise to testify

4    about.

5         We asked the government eight months ago to identify who

6    the experts were, and to date, they haven't done it.  I don't

7    know whether their position is going to be they're not going to

8    have expert testimony, that they've given us the reports but

9    they're not going to try to admit the reports, but we will have

10   that.

11        And I think finally, Your Honor, there is very complicated,

12   very complicated evidentiary issues that if they're not resolved

13   pretrial, we could take a four-week trial and make it a

14   four-year trial.  And that is, just by way of example, let's say

15   theoretically -- because I'm talking theoretically.  I don't

16   want to talk about actual evidence.  But let's say

17   ███████████████████████████████████████████████████████

18   ███████████████████████████████████████████

19        THE COURT:  Let's hold up.  I think the government is

20   getting uncomfortable, even with your hypothetical.

21        MR. DUBELIER:  Let me try and dumb it down in a way --

22   let's say they subpoenaed an account, and they say it belonged

23   to somebody.  And we can figure that out by -- the indictment is

24   public.  You presume, then, for every paragraph in the

25   indictment, they have some evidence to support what they allege.

1   So just assume for purposes of argument, on a paragraph of the

2   indictment when they say there was an Internet account that did

3   X, Y, Z, that they have evidence to support that.

4        Well, the question becomes, whose account is that, and

5   whose records exist in that account?  And so the government's

6   position, based on the discovery they've given us, is that those

7   records would be business records of the provider.  For

8   instance, Google, they're business records of Google.  And there

9   are certificates in the discovery that say these are business

10  records of Google.

11       There's no case law that is getting those documents in

12  evidence as business records of Google.  They're not.  Those

13  documents belong to the person who had the account.  They're not

14  business records of Google.  They don't come in under a business

15  record exception by virtue of the fact that they were in

16  Google's possession.

17       But all of the case law on this, Your Honor, is in the last

18  two or three years, certainly litigated well after I left the

19  government.  But we've looked at that law, and it's unsettled,

20  and it gets very, very document-specific.  And if those issues

21  are not litigated pretrial, once we know what the government's

22  evidence list is going to be, we're going to get bogged down in

23  a lot of, you know, dead time, I think, in terms of --

24            THE COURT:  All right.  I'm not going to rush to set a

25  trial date before we're ready, because when we set one I want it

to be a firm date.  But we can talk about briefing once we get

through this discovery round.

MR. DUBELIER:  So Your Honor, I don't think I have

anything else that I can say publicly.

THE COURT:  All right.  I understand that I have to

take a brief break.

Mr. Kravis, would you like to respond to anything he had to

say publicly?

MR. KRAVIS:  Yes, Your Honor, very briefly.

The government is not saying, as Mr. Dubelier just

suggested, that the vast majority of the sensitive discovery is

not actually sensitive.  That is not the government's position.

We are not saying that those documents should be -- that there

are any documents in the sensitive discovery that should be

exempted from the restrictions imposed by the protective order.

What we are saying is that there are categories of

documents within the sensitive discovery that can be viewed by

officers and employees of Concord pursuant to the restrictions

in the protective order.

Those are not the same thing.  And I think that Concord's

filings and their arguments continue to falsely conflate those

two things.  Saying that Concord's officers -- that particular

officers and employees of Concord can view particular categories

of documents within the sensitive discovery is not the same

thing as saying that those documents are nonsensitive.  And the

1   reason for that is because the way in which the government

2   acquired those documents is highly sensitive, and that is the

3   basis or part of the basis for the government's good cause

4   showing.

5        So I just want to clarify, the government is not conceding

6   that a whole bunch of -- that the discovery was overdesignated

7   as sensitive.  The government is not conceding that a whole

8   bunch of the sensitive documents are actually not sensitive.

9        What we are saying is that there are -- there is material

10  within the sensitive discovery -- just about all of it, in

11  fact -- that can be viewed by Concord officers and employees

12  under the restrictions on the viewing of sensitive information

13  in the protective order.

14       I just want to make that clarification.  Thank you.

15            THE COURT:  Thank you.  We will take a brief recess in

16  order to clear the courtroom and do whatever else the clerk

17  needs to do.  Five-minute recess.

18       (Recess taken from 11:10 a.m. to 11:22 a.m.)

19            THE COURT:  All right.  We are now in a sealed

20  hearing, and I would like to address two issues.

21       First, with regard to Concord's proposal, I would like to

22  hear the government's response to Concord's proposal that was

23  filed under seal.

24            MR. KRAVIS:  Yes, Your Honor.  Before I do that, I

25  would like to ask for one other thing.  Now that we are under a

sealed proceeding, the government would like to have the

opportunity to move to seal portions of the transcript of the

hearing that we just held.

   Defense counsel, during his argument, made some references

to where documents in the sensitive discovery came from and

where they did not come from, and we would like --

        THE COURT:  What specifically?  I'm not recalling.

        MR. KRAVIS:  ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

        THE COURT:  There was an open press room.  So it may

be out there already.

        MR. KRAVIS:  We would still like the opportunity.

        THE COURT:  Of course.

        MR. KRAVIS:  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ We

believe that the restrictions that are in place in the

protective order on the sensitive discovery currently are

appropriate, and we think that the -- those restrictions were

and are supported by good cause.

   And the events that have transpired with respect to the

nonsensitive discovery since the protective order was entered

highlight the risks of discovery in this case going beyond the

1    jurisdiction of this Court to investigate.

2              THE COURT:  I want to get to that in a moment.  That's

3    a second reason I sealed this hearing.  I do want to talk about

4    that.

5        But obviously, if these documents were to be shared outside

6    the offices of Reed Smith in any form, there would be additional

7    restrictions.  It would not be -- these documents would not be

8    released as the nonsensitive documents were released, simply

9    with a directive that they're to be used only to prepare the

10   defense.

11       So I agree, there would have to be more restrictions on

12   these documents.  The trouble I have with the government's

13   position is, if you agree that officers and employees -- we

14   don't know who, but some officers and employees could come here

15   and view these sensitive materials at the offices of Reed Smith.

16   And in all likelihood, you would be able to, it sounds like -- I

17   don't know if the right word is, effectively, "reclassify" some

18   of those sensitive documents at the time, to hold back some

19   percentage that would prevent them from seeing the whole scope

20   of documents such that they would be able to determine, you

21   know, the national security interests that you are worried about

22   protecting.

23       The trouble I have with the government's position is, an

24   individual comes here, views the documents, and then still goes

25   back to Russia.  Correct?

1          MR. KRAVIS:  Yes.  And that is always -- that is

2     always a risk.

3          THE COURT:  So is there a way we can come up -- can

4     the government propose an alternative, if the government doesn't

5     like the defendant's, an alternative that would be as close to

6     that as possible, that would ensure that the national security

7     risks are protected and to the same degree they would be if

8     someone saw this material at Reed Smith and then went back to

9     Russia?  We've got a problem in that case, too.

10         MR. KRAVIS:  Well, the government believes that -- the

11    government believes that the documents themselves residing

12    within the jurisdiction of the Court is the most important

13    restriction on the viewing and dissemination of sensitive

14    discovery in the protective order, as illustrated by those

15    events.

16         So if the question is, are there other places within the

17    United States where the documents can be housed that make things

18    easier for defense counsel, of course, we're certainly willing

19    to engage with them -- to engage with them on that question.

20         But if the question is, the sensitive discovery materials

21    going outside of the United States, the government does not

22    believe that that's -- the government does not believe that

23    that's appropriate or warranted.

24         And the issue is not -- the issue is not just the Court's

25    jurisdiction to enforce the protective order, although there is

certainly that.  It is just that, with respect to the country we are talking about, the ability to safeguard the integrity of those documents just goes way, way, way down when they leave the United States.

THE COURT:  Understood.  Is there a way to ensure safe passage for someone from Concord to come here and not be arrested?

I also have a problem with tying the release of the discovery to an arrest and prosecution.  Obviously, for the individual defendants, that makes sense, but we have officers who are wearing two hats, and one is the criminal defendant hat, and the other is the officer of the corporation hat.  And I have the defendant, the officer of the corporation before me.

Is there a way, if the government doesn't want to send documents to Russia, which I can appreciate, is there a way to have safe passage so someone can come here and review them in the offices of Reed Smith or some government location?

MR. KRAVIS:  I mean, I think at this point, I would have to say that we just don't have enough information to be able to evaluate that kind of request.

THE COURT:  Well, Let's say it's Prigozhin.  I'm guessing that's where he's going.

MR. KRAVIS:  If the Court orders us to look into it, we will look into it.  I think the chances of Mr. Prigozhin being granted safe passage into the United States to view the

discovery while avoiding the jurisdiction of the Court for purposes of the indictment are low.

THE COURT:  Okay.  I would like the government to think about potential alternatives.  My concern is, while you have made a good cause showing that there are national security concerns, at this point, I don't have enough information about the national security concerns to balance that against the defendant's right to present a full defense.

And you've told me that it's not all of the individual documents individually; it's all of the individual documents together that make it a problem for the government.

MR. KRAVIS:  It's the methods that the government used to collect the documents that we are talking about.

THE COURT:  Understood.

MR. KRAVIS:  █████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████

1          And the problem is that that information can then be used

2     to avoid detection the next time.  So in the hands of the wrong

3     person, that presents grave national security and law

4     enforcement risks for the United States.

5               THE COURT:  All right.  I do understand.  But

6     something short of 3.2 million documents can be released, I

7     think, based on what you've told me.

8               MR. KRAVIS:  Well, the government's view is, this

9     should not be a question of releasing the documents.  The

10    government's view is that what should happen here is that

11    individual officers and employees of Concord should be

12    permitted, under the procedures and the restrictions in place in

13    the protective order, to view some of these documents.  It's not

14    a question of releasing the documents.  The protective order

15    always contemplated that officers and employees of Concord would

16    be able to look at portions of the sensitive discovery.

17              THE COURT:  If they're willing to come here and risk

18    arrest?

19              MR. KRAVIS:  But that's a different question.  That's

20    not a question of the government's interest in how many

21    documents someone gets to see.  That's a question of whether the

22    restrictions in the protective order, which the government

23    believes are supported by good cause and the government believes

24    are reasonable, should be modified to accommodate the personal

25    preferences of Concord's individual officers and employees, to

1    the extent that those individual preferences may be at odds with

2    the interests of the corporation.

3        Now, the protective order allows Concord to seek that

4    relief.  In our view, the answer to that question is no, the

5    reasonable restrictions in place on the sensitive discovery

6    should not be modified to accommodate the personal preferences

7    of Concord's officers and employees.  But the protective order

8    as written contemplates Concord's ability to seek that relief.

9    That is certainly not the relief that they have sought with this

10   motion.

11       THE COURT:  And you can't tell me, of a Concord

12   officer or employee, who could come here and view this

13   information without being subject to arrest?

14       MR. KRAVIS:  None of them has been identified to us.

15   In the filings that Concord has made, they have referenced

16   Mr. Prigozhin.  They have referenced an unnamed head of a legal

17   department.

18       THE COURT:  Aren't there public filings that have to

19   be filed in Russia with respect to legitimate corporations, and

20   has the government looked at those, and who are those

21   individuals, and can any of them come here safely?

22       MR. KRAVIS:  I believe the question to that is yes.

23   I'm just consulting now one of the government's earlier filings

24   with respect to the protective order.  If I may have the Court's

25   indulgence for just a moment, please.

1          THE COURT:  Sure.

2      (Pause.)

3          MR. KRAVIS:  I'm sorry.  I apologize for the delay,

4  Your Honor.

5      The government had referenced this in one of its earlier

6  filings.  Some of Concord's filings in Russia regarding its

7  management structure had at one time identified a person who was

8  not Mr. Prigozhin as an officer of Concord.

9          THE COURT:  You don't have to do this now, but I would

10  like the government to consider that.  I'm guessing that

11  Mr. Dubelier will not say that's sufficient, because he wants

12  Prigozhin to have access to the documents.  But I do think that

13  if there is a Concord officer who can be assured safe passage

14  here, that that does -- is a factor that I should consider.

15      I do think the government's manner and place restrictions

16  are reasonable in this case.  The problem is, I don't think it's

17  fair to say that Concord, the defendant, can only get access to

18  them if one of their officers or employees are arrested.  That's

19  the tension here.

20          MR. KRAVIS:  My understanding from the earlier

21  findings is that that is not the position we are in.  I don't

22  think defense counsel has ever suggested that every officer and

23  employee of Concord is under indictment in this case and,

24  therefore, could not come to the United States without being

25  arrested pursuant to this indictment.  I don't think that's ever

1   been their representation.

2          THE COURT:  Well, he said just a few minutes ago that

3   he doesn't think it will happen because they're concerned that

4   they will be arrested.  So maybe the government could do

5   something to assure them that that would not be the case.

6          MR. KRAVIS:  Of course.  As always, I'm happy to look

7   into it.  I'm not sure what "concerned about being arrested" is

8   a reference to.  Like on a probable cause -- I'm not sure.

9          THE COURT:  He's mentioned material witness and other

10  things beyond a criminal case.

11         MR. KRAVIS:  We are talking now about individuals who

12  have not actually been indicted in this case.  We would, of

13  course, be happy to look into that question.  Our intention is

14  not, as defense counsel suggested, to obtain hostages through

15  the discovery process.  Our intention is to try to maintain

16  reasonable restrictions on the viewing of the sensitive

17  discovery.

18         THE COURT:  And my preference, too, would be to have

19  this evidence reviewed at the offices of Reed Smith.  That

20  certainly is, I think, reasonable if there is someone who can

21  adequately defend the company and come here and not be arrested.

22         MR. KRAVIS:  Right, right.

23         THE COURT:  And it's the government's -- the

24  government has to make a particularized showing with respect to

25  the documents that it's holding back.  So I do think the burden

1   is on the government here to come up with a proposal.  If -- I

2   hear you, you don't like the defense proposal, but I think we

3   are in a situation where something has got to give.  I don't

4   think that we can keep the documents restricted to Reed Smith

5   on-site unless we have someone from Concord who can come here

6   and look at them.

7          MR. KRAVIS:  Right.  And I'm not trying to be cagey in

8   my responses.  Part of the difficulty here is, it's a little

9   hard for me to have this question in the abstract.  Until we

10  know the identity of the particular individual that we are

11  talking about, it would not be responsible for me to start

12  making representations about their status and their -- you know,

13  what would happen to them in the United States.

14         But we are certainly willing to engage on that process.  To

15  the extent that the defense is willing to identify for us the

16  particular individuals we are talking about, we can try to

17  figure that out.

18         THE COURT: ██████████████████████████████████

19  ██████████████████████████████████████████

20  ██████████████████████████████████████████

21          ██████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████

25  ████████████████████████████████████████████



         And this incident, I think, further reinforces the
reasonableness of the restrictions that are currently in place
for the viewing and dissemination of the sensitive discovery.
Again, the point is not that Concord's officers and employees
can't look at this sensitive discovery.  That is not the point.
The point is that the protective order puts into place
restrictions on how that viewing can occur.  And this incident
shows why those restrictions are necessary and why they're
reasonable.
         THE COURT:  Right.  And you're saying those

restrictions would be that the Concord officer or employee has
to come to the offices of Reed Smith and review them in the
presence of counsel.  Presumably, they can't take documents with
them or take notes without violating the protective order.  And
yet, they would go back to Russia with all of the knowledge in
their head of what they've seen and be able to share that, and
they would be beyond the jurisdiction of this Court.

          Correct?

          MR. KRAVIS:  Well, for practical purposes, once they
go back to Russia -- I mean, they would be required to sign the
memorandum of understanding.

          THE COURT:  They could sign something, right.

          MR. KRAVIS:  They would sign a memorandum of -- which
we don't have any -- ███████████████████████

          THE COURT:  That could be imposed on something going
outside the U.S., too, but --

          MR. KRAVIS:  The ability of an individual to misuse or
misappropriate the sensitive discovery under the restrictions in
place in the protective order is much lower than it would be if
the sensitive discovery was permitted to travel to Russia,
because the risk that we are talking about here, the risk that
someone might come over, look at the material, see something
significant, take it back with them, and then be beyond the
jurisdiction of the Court to do anything about it, that risk
becomes a certainty as soon as those -- once those documents

1    travel to Russia.

2         In addition, for the purposes of the sensitivity that we

3    have been talking about, the sources and methods of collection,

4    it's just much more -- it's much more difficult for a person who

5    is viewing a slice of the sensitive discovery, not transporting

6    it with them but just coming over and looking at it, to obtain

7    and retain and orally transmit that information once they travel

8    back to Russia.  It's just different when you actually have

9    the -- when you actually have the stuff in front of you.

10        And the risk --

11             THE COURT:  Could a restriction be placed -- whether

12   it's Russia or some other place, could a restriction be placed

13   on the documents such that they're just viewed?

14             MR. KRAVIS:  For the reasons that -- we talked about

15   this a little bit in some of our filings, sealed filings, also

16   the classified ex parte filing.  The ability to enforce those

17   kinds of restrictions in the country we are talking about is

18   just very, very low.

19             THE COURT:  And are there other countries that we

20   could feel more confident about?

21             MR. KRAVIS:  I don't know the answer to that question.

22             THE COURT:  All right.  Anything -- well, let me ask,

23   with respect to the breach, the alleged breach, is it the

24   government's position that I should at this point attempt to

25   impose additional restrictions on the nonsensitive discovery, or

1   is it already out there, and it's too late?

2          MR. KRAVIS:  We are not asking for that remedy at this

3   time.  To the extent that it's out there, it's out there.

4        To be clear, we have not necessarily alleged that this was

5   a breach, but the government -- to answer the Court's question,

6   the government is not asking for further restrictions on the

7   nonsensitive discovery at this time.

8          THE COURT:  I thought you were alleging just now that

9   it was a breach.  You said it's hard to fathom that someone

10  could put this number on another document without having

11  received the document.

12         MR. KRAVIS:  I think that this shows that information

13  about the nonsensitive discovery was obtained and misused.  When

14  I say "misused," I mean not used consistent with the terms of

15  the protective order.  I am just saying, we are not making

16  allegations about how exactly that information was obtained.

17         THE COURT:  All right.  And you're not alleging that

18  defense counsel is at fault here?

19         MR. KRAVIS:  No, no.

20         THE COURT:  I understand.  But you do think that the

21  documents that appeared on the website were documents that came

22  from the nonsensitive discovery?  You believe that, but --

23         MR. KRAVIS:  I don't want to say that.  The file

24  folder names and the file structure that appeared on the

25  sync.com webpage is uniquely similar to file folder names and

structures that appear in the nonsensitive discovery as it

was -- as it was provided.  I think that shows an unauthorized

access.  We don't know whether that was -- whether that

unauthorized access was obtained through a breach or through

something else.

THE COURT:  What is the "something else"?

MR. KRAVIS:  Well, that someone was able to obtain

access to the nonsensitive discovery in a manner that did not

involve, for example, hacking into someone else's computers.  I

think there is a little bit more information -- we have

submitted a little bit more information about this elsewhere.

But to return to the Court's original question, the reason

I was sort of hedging on the question about the files is that,

as defense counsel has pointed out, the files themselves that

actually appeared on the sync.com webpage, the ones that match

files in the nonsensitive discovery, many, if not all, of them

are also available elsewhere on the Internet.

And so the government is not able to say this particular

file definitely came from our discovery disks, as opposed to

this particular file may have come from somewhere else on the

Internet.  What did come from the discovery disks were these

file folder names and the structure in which those file folders

were organized.  And that shows that the person or people who

did this had access to information about the nonsensitive

discovery.

```
1            THE COURT:  Okay.  Thank you.

2            MR. KRAVIS:  Thank you, Your Honor.

3            THE COURT:  Mr. Dubelier?

4            MR. DUBELIER:  Your Honor, can we start with the

5   second half first, on the alleged breach?

6            THE COURT:  Sure.

7            MR. DUBELIER:  ████████████████████████████████

8   ███████████████████████████████████████████████████████

9   ██████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ██████████████████████████████████████████████████████

12  ████████████████████████████████████████████

13       ███████████████████████████████████████████████

14  █████████████████████████████████████████████████████████

15  █████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████

18  █████████████████████

19       ██████████████████████████████████████████████

20  ██████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████

24  ████████████████████████

25       ███████████████████████████████████████
```







The problem is -- I tried
to set this out in the pleading to be rational about this,
because I'm trying not to be irrational.  I don't want this to
be perceived as this is just some end game where we really don't
want the documents.  We do want access to them.  We want the

1   client to have access to them.  One person from Concord can't

2   come here and look at 3.2 million documents.  If we do it that

3   way, this trial will occur in 2025.  That's not practical.

4        So what we wanted to do, if the documents were lodged --

5        THE COURT:  Mr. Dubelier, that's the case in every

6   criminal case with a large number of documents.  It takes time,

7   and counsel helps the client focus on critical documents, which

8   you could do.

9        MR. DUBELIER:  We do, and obviously, we are doing.

10  We're looking at them.  We're not wasting time.

11       THE COURT:  I don't think this would take years for

12  someone to go through.  We have this in U.S. courts with

13  3 million documents.

14       So you would focus your client on certain areas, and they

15  would help you, and you would not look at every single document.

16  You would say some of this is worthless, and they wouldn't have

17  to look at it.

18       MR. DUBELIER:  It seems to me it leaves us with two

19  choices, Your Honor.  And that is, it can be done here, and the

20  prerequisite would be, either one or more people would not only

21  have to get a visa, but would have to have guaranteed safe

22  passage, and that is, no detention as a material witness, no

23  arrest.  They would have to be able to come here, spend the

24  amount of time they need to come here, and return to Russia.

25  ████████████████████████████████████████████████



MR. DUBELIER:  Okay.  With those particular people, is
the Court suggesting that I give the trial team the names, and
then the trial team says, well, yes or no, depending upon who
that person is?

THE COURT:  You want assurances.  You're asking for
assurances up front.

MR. DUBELIER:  That's right.

THE COURT:  The only way that's going to happen is
that they can vet this.  You run the risk of them landing at
Dulles and being arrested.  So it's in your interest, it's in
their interest to share this information.

I would be open to -- if there's some issue of revealing
defense strategy, is this a firewall matter, I don't know.  But

1    this seems like there is a workable solution here, that you can

2    bring these people into the United States, into your offices to

3    review this evidence, and this makes the whole process much

4    easier for you, for them, for everyone, and your client can

5    better defend itself.

6         So I think this is a terrific solution, and I think you all

7    need to spend some time talking about whether this is feasible,

8    and I'm willing to approve it.

9         I do think that the burden can't be shifted to you, but

10   you've come forth with a proposal that they have unease about.

11   And I can understand why. ████████████████████████████████

12   ██████████████████████████████████████████████

13   ██████████████████████████████████████████████████████

14   ████████████████████

15         ████████████████████████████████████████████████████

16   ████████████████████████████

17         THE COURT:  Anyway, they're willing to have your

18   officers and employees come here.  So let's make sure that you

19   can get them here, and let's see if they'll agree to allow them

20   to come here.

21         We've just saved ourselves months of litigation.

22         MR. DUBELIER:  So, your Honor, there's a collateral

23   issue here that I think is very critical.  I don't want to move

24   on without touching upon that.  That is, as I mentioned in our

25   earlier argument, the protective order not only prohibits

sharing the actual documents, but it prohibits me talking to
anyone at the client about the documents. I have to be able to
talk to Mr. Prigozhin about the evidence. I have to. Whether
or not I can show him a particular document or whether or not at
some point there's a smaller subset of documents that I would
come to you and say, Can I show him these particular documents,
I have to be able to talk to him.

THE COURT: I don't envision this being the end of the
firewall process. I do think that you're going to continue to
press on Prigozhin. But we're going to be looking at a much
narrower set of documents, I hope, at that point, and I will
have to consider and weigh those interests.

But I don't want to do it, as I must now, with respect to
3.2 million documents, some of which are national security, some
of which are personal information, some of which are law
enforcement. I need more information to do that. Once we've
whittled these documents down, the government will be able to
tell me better, This is why we don't want this document
discussed with him. And we will have to litigate that before
firewall counsel.

All right?

MR. DUBELIER: So, Your Honor, as I understand it,
then -- I want to make sure I understand the process that's
going forward. I'm not suggesting -- I'm not trying to put a
ruling in your mouth, but I think where we are going is that the

1    Court agrees that at this point it's the burden on the

2    government to identify which documents that they agree can be

3    shown to employees and officers of Concord if they are shown

4    here.

5                THE COURT:  Well, no, that's not what I'm saying.  So

6    I'm saying, I hope you all get together and work out an

7    agreement where two or three Concord officers or employees can

8    come here and look at the documents.

9                MR. DUBELIER:  Look at all of the documents?

10               THE COURT:  Look at all of the documents, you know,

11   pursuant to the protective order.

12           And then once that's happened, I think at that point -- the

13   company's had access to the documents.  And at that point, you

14   need to say, That's not good enough, I need my client to see

15   documents A, B, C, and D.  And so the burden is on you at that

16   point.

17               MR. DUBELIER:  I get it, but I think the one caveat

18   there, Your Honor, is, the government has already told you

19   they're not going to agree for anybody at Concord to see all the

20   sensitive documents.  They've already said that.  So which ones

21   are they going to get to see?

22               THE COURT:  That's another area where I think you all

23   can maybe work this out.  You've heard their argument, and it is

24   compelling to me, that if they see every single document they

25   can piece this together and that maybe they need to withhold 5,

1    10 percent.  I don't know what that magic percentage is.  But

2    you two can have a discussion up front about what that 5 or

3    10 percent is.  And you tell them, you know -- I don't know if

4    you all can work it out, but I hope you can work it out, that

5    you're able to see the documents you want to see in that batch

6    and they're able to protect enough that it doesn't reveal the

7    sources and methods.

8         And maybe I have to get involved at some point if you're

9    having an argument over that, but I hope not.  I hope things

10   like you say you need to show them the search warrant

11   affidavits, those are specific issues I will have to rule on.

12   But with respect to just the mass of documents and which 5 or

13   10 percent or whatever it is they think they need to do -- and

14   I'm not trying to pin them down to 5 or 10 percent -- I think

15   they have a legitimate national security interest in not giving

16   access to everything --

17             MR. DUBELIER:  Okay.

18             THE COURT:  -- to anyone.  All right?

19        But I think you ought to be able to have conversations with

20   them about what can be withheld and, you think, not prejudice

21   your client.  And then if you decide, Oh, gee, one of those

22   documents, I was wrong, I really need, then we will have that

23   fight with firewall counsel.  And I will have to weigh whether

24   that's the key document that's going to enable them to

25   understand the sources and methods or not and you get it.

1          MR. DUBELIER:  I understand.

2          THE COURT:  I think that there's a lot that you all

3     can do together at this point that will significantly reduce the

4     amount of litigation we have before firewall counsel.

5        Do you agree?

6          MR. DUBELIER:  I do agree, Your Honor, and we're going

7     to give it a shot.

8        I will tell the Court again, just so the Court understands

9     where we are coming from on this, we have been churning away at

10    the sensitive discovery for a long period of time.  We're maybe

11    a third of the way through it.  And I've got, it looks like, a

12    sweatshop up there.  I'm afraid to go in the room where all

13    those people are.

14          THE COURT:  I'm not going to set a trial date until

15    you're ready.

16          MR. DUBELIER:  I understand; I understand.

17          THE COURT:  I appreciate you have been on hold for the

18    last eight months.  I did that, Mr. Dubelier, to get discovery

19    going, realizing that this case might not even exist at this

20    point.  Now it does, and we're in pretrial mode, and we're doing

21    this as quickly as we can.  There are sensitive national

22    security issues at stake, and the government is legitimately

23    trying to protect those.

24          MR. DUBELIER:  Understood, Your Honor.  We will give

25    it our best shot, and if it doesn't work, we will come back.

1          THE COURT:  All right.  So in terms of where we go

2     from here and your motions you anticipate filing, are you at a

3     stage where you can do that, or this is going to be after you

4     spend time going through discovery?

5          MR. DUBELIER:  I think it would be premature to do any

6     of that now.  Particularly with the motions to suppress, there

7     has to be discussions with the client on that.  We may wind up

8     there might not be a basis.  We might not have standing.  I just

9     don't know the answer to that yet.  So we have to resolve the

10    standing issues, I think, on the motions to suppress.

11         THE COURT:  All right.

12         MR. DUBELIER:  I'll start a discussion with Mr. Kravis

13    about what we believe to be these expert reports I referred to,

14    to see whether we can make any progress on that and see whether

15    the government may agree with me.  They may disagree.  We will

16    figure out if we can work that out.

17         THE COURT:  All right.

18         MR. DUBELIER:  Ultimately, on the evidentiary stuff,

19    again, I think it's premature until we have the opportunity to

20    discuss with the client the particular documents and then have

21    an understanding of, is there a basis to challenge -- is the

22    government going to be able to get this in evidence or not and

23    what are going to be our objections to that particular document,

24    document by document.

25         THE COURT:  All right.  In terms of a motion hearing

1    on the motion for bill of particulars?

2         MR. DUBELIER:  Your Honor, our view is that I think

3    both sides are pretty thorough in briefing these things.

4         THE COURT:  You don't need the argument?

5         MR. DUBELIER:  We wouldn't ask for oral argument.  If,

6    when the Court gets the briefing and the reply and if you want

7    it --

8         THE COURT:  If either side wants argument on it, I

9    will entertain that, and you all should propose three dates to

10   the courtroom deputy, and I will pick one.

11        MR. DUBELIER:  Okay.

12        THE COURT:  If there's not a need for a hearing, then

13   I will rule on the papers.  If I think I need a hearing, despite

14   what you think, I will let you know.

15        MR. DUBELIER:  Great.  Our instinct right now is we

16   will not be asking for a hearing, but I will discuss that with

17   the government.

18        Thank you.

19        THE COURT:  Mr. Kravis, it does seem to me like there

20   might be a solution here.  Am I sending you all off on an

21   exercise in futility, ██████████████████████████████████████

22   ██████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ██████████████████████████████████

25        There's at least a possibility, that you all ought to see

1   if that can be done.

2          MR. KRAVIS:  Yes.

3          THE COURT:  Because I share your concerns about

4   documents going to Russia, ████████████████████.  But I

5   have to balance competing interests.  I would much prefer to

6   have these folks come here, and if there's a way that you all

7   can accomplish that, that would be my preference as well.

8          So I just want to know whether you think you have enough

9   direction at this point to try to make some progress here.  And

10  if you all reach a impasse, then, obviously, I'm here, and we

11  can have a status conference to discuss whatever has arisen.

12         But does this make sense?

13         MR. KRAVIS:  Yes.  So I have kind of two thoughts

14  about it.

15         First, with respect to the identification of the particular

16  officers, employees who would come here, if defense counsel is

17  willing to share that information with the investigative team,

18  we can look into the issue to make sure there are no legal

19  issues that we are not aware of that would pose a problem for

20  that person coming to the United States.

21         If these are names that defense counsel is not willing to

22  share with the investigative team, for example, because they

23  could be fact witnesses and it might reveal defense strategy at

24  this stage, we could make arrangements for them to make that

25  inquiry through firewall counsel in the first instance and see

1    where that gets us.

2          With respect to the documents themselves, we will go back

3    and look at the sensitive discovery and see if, beyond the

4    collection of documents that we have already provided as the key

5    documents, we can identify within the accounts a larger subset

6    of documents that are relevant to -- that are relevant to

7    Concord.

8          Particularly when those documents are not -- and I don't

9    think it ever is, the entire contents of an account,

10   particularly when they are across multiple accounts and are not

11   organized by which account they were obtained from, the

12   government's concerns about that, about Concord officers and

13   employees viewing them in the United States offices of Reed

14   Smith, goes way down.

15         We would set aside, at least for the moment, the warrants,

16   the affidavits, the 2703(d) applications and orders, for the

17   reasons that we have already discussed.

18         Once we have made progress on that, we can engage with

19   defense counsel and tell them where we are on it and see if that

20   facilitates review of those materials under the terms of the

21   protective order by the officers and employees of Concord.

22         I just want to emphasize again, we're not talking about

23   designating documents as nonsensitive.  We are talking about

24   working to identify materials for review under the terms in the

25   protective order regarding sensitive discovery.  We will do

```
1    that.  We will do it.
2              THE COURT:  Okay.  And I would encourage the
3    government to be as forward-leaning as you can in releasing
4    documents, because if you aren't, the likelihood is that we're
5    going to be litigating this in front of firewall counsel.  And I
6    know we can't avoid that, but the more you all can discuss up
7    front about what he thinks is important or, you know, how much
8    you can give without revealing the sources and methods, you
9    know, I would encourage you to do it, because it's just going to
10   create more work on the back end with firewall counsel if you
11   don't.
12             MR. KRAVIS:  Understood.
13             THE COURT:  All right.  So that seems like a plan.
14             MR. KRAVIS:  Yes.
15             THE COURT:  How much time would you suggest we take to
16   have you report back?
17             MR. KRAVIS:  Can I just have a moment?
18             THE COURT:  Sure.
19        (Government counsel conferred.)
20             MR. DUBELIER:  Your Honor, can I ask a question?
21             THE COURT:  Sure.
22             MR. DUBELIER:  Is it the Court's intention to rule on
23   the motion or hold it in abeyance?
24             THE COURT:  I prefer to hold it in abeyance.
25             MR. DUBELIER:  I'm 100 percent in agreement with you.
```

1     Otherwise, we are going to get media stuff that's crazy.

2          Thank you.

3               THE COURT:  I'd prefer to hold this in abeyance until

4     you all come back to me and say we've worked out something or

5     you need me to referee.

6               MR. KRAVIS:  I think in a period of about 60 days, we

7     should be able to make progress on this and have a better sense

8     of what is working and what is not working.

9               THE COURT:  All right.  That's reasonable.  All right.

10         In that event, I think Concord filed its motion for bill of

11    particulars on the 4th.  Does the government intend to respond

12    on the 18th, or do you need more time?

13              MR. KRAVIS:  No, the 18th is fine.

14              THE COURT:  And Concord will reply on the 25th?

15              MR. DUBELIER:  Yes, Your Honor.

16              THE COURT:  Mr. Dubelier, are you okay holding off

17    with the firewall process while these conversations are going

18    on?

19              MR. DUBELIER:  We talked about that yesterday.  I am,

20    for this reason, and that is, I think both sides found ourselves

21    talking in the abstract, unable to figure out really what we

22    needed to do with the protective order until we determined what

23    the Court was going to do.  And now it's more, rather than the

24    Court doing something, the burden is back on us to figure out

25    whether we can do something.

1            THE COURT:  And when it gets back before me, assuming

2     you all reach an agreement and we are back in the firewall

3     counsel world, I need clear directions on the mechanics of this,

4     how it's going to work.  Because the protective order is not

5     clear on that, and there was confusion at the beginning on your

6     part, Mr. Dubelier, and firewall counsel's part and the clerk's

7     office.

8         How do you all want to communicate with them?  Do we need

9     to not be putting out orders on ECF?  We're open to your

10    suggestions here.  You all know better about what we're

11    protecting.  So I really want clear directions and instructions

12    for the court and for you all.

13            MR. DUBELIER:  Sure.  The only thing, Your Honor, I

14    can't concede without talking to the client again is on the

15    notion of Concord people coming here and providing those names.

16    There's going to be sensitivity on that.

17        So the question is, are they going to press me to do that

18    through firewall counsel as opposed to the trial team?  And

19    so --

20            THE COURT:  Is who going to press you?

21            MR. DUBELIER:  The client, the client.

22            THE COURT:  Wants you to share it with trial counsel?

23            MR. DUBELIER:  No, not want me to share it with

24    counsel.

25            THE COURT:  Well, he said if that's a problem, that

1    they're willing to go through firewall counsel.

2            MR. DUBELIER:  But that's the only thing that I can

3    envision going through firewall counsel in the foreseeable

4    future --

5            THE COURT:  In the interim?

6            MR. DUBELIER:  Yeah.

7            THE COURT:  I see.

8            MR. DUBELIER:  No document requests or anything like

9    that.

10           THE COURT:  All right.  Thank you.

11           MR. DUBELIER:  Just simply giving the names.

12           THE COURT:  All right.  If you all two days from now

13   realize you're at an impasse here on something I didn't resolve

14   here, let's come back in, have a sealed hearing, and talk

15   through any hiccups that you have.  Otherwise, I will hear from

16   you within 60 days.

17       And how do you propose doing that?  Through a joint status

18   report, or do you want to come back and let me know?

19           MR. DUBELIER:  Your Honor, I think it probably makes

20   sense to put a date on the calendar in 60 or so days and just

21   have us come back for a status hearing.  I think we all find it

22   easier to talk these things through rather than try and brief

23   it.

24           THE COURT:  I can certainly do that.  Do you all want

25   to look at your schedules and let me know or set a date?  I'm

1    fairly open in May.

2              MR. KRAVIS:  We're available at the Court's

3    convenience the month of May.

4              MR. DUBELIER:  Your Honor, May 10th?

5              THE COURT:  Does 11:00 work?

6              MR. DUBELIER:  Sure.

7              THE COURT:  All right.  We will see you on May 10th.

8    Thank you.

9         (Proceedings adjourned at 12:09 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


          I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.




/s/ Sara A. Wick                    August 26, 2019

SIGNATURE OF COURT REPORTER         DATE