```
 1                BEFORE THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF COLUMBIA

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 18-CR-32
 4            Plaintiff,              .
                                      .
 5       vs.                          .
                                      .  Washington, D.C.
 6   CONCORD MANAGEMENT AND           .  April 10, 2019
     CONSULTING LLC,                  .  10:04 a.m.
 7                                    .
              Defendant.              .
 8   - - - - - - - - - - - - - - - -

 9              PUBLIC TRANSCRIPT OF STATUS CONFERENCE
                    (SEALED PORTIONS REDACTED)
10            BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                     UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Government:            JEANNIE S. RHEE, AUSA
13                                  LAWRENCE RUSH ATKINSON, AUSA
                                    U.S. Department of Justice
14                                  Special Counsel's Office
                                    950 Pennsylvania Avenue NW
15                                  Washington, D.C. 20530

16                                  JONATHAN I. KRAVIS, AUSA
                                    DEBORAH A. CURTIS, AUSA
17                                  U.S. Attorney's Office
                                    555 Fourth Street NW
18                                  Washington, D.C. 20530

19                                  HEATHER ALPINO, AUSA
                                    U.S. Department of Justice
20                                  National Security Division
                                    950 Pennsylvania Avenue NW
21                                  Washington, D.C. 20530

22
                          -- continued --
23

24

25
```

```
1    APPEARANCES(CONTINUED):

2    For the Defendant Concord
     Management and Consulting LLC:   ERIC A. DUBELIER, ESQ.
3                                     Reed Smith LLP
                                      1301 K Street NW
4                                     Suite 1000, East Tower
                                      Washington, D.C. 20005
5
                                      KATHERINE J. SEIKALY, ESQ.
6                                     Reed Smith LLP
                                      7900 Tysons One Place, Suite 500
7                                     McLean, Virginia 22102

8

9

10   Official Court Reporter:        SARA A. WICK, RPR, CRR
                                     U.S. Courthouse, Room 4704-B
11                                   333 Constitution Avenue N.W.
                                     Washington, D.C. 20001
12                                   202-354-3284

13   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2          (Call to order of the court.)
3              THE COURTROOM DEPUTY:  Criminal Action 18-32, United
4    States of America versus Concord Management and Consulting LLC.
5          Counsel, please identify yourselves for the record.
6              MR. KRAVIS:  Good morning, Your Honor.  Jonathan
7    Kravis on behalf of the United States.  I am joined at counsel
8    table this morning by Deborah Curtis, Heather Alpino, Jeannie
9    Rhee, and Rush Atkinson.
10             THE COURT:  Good morning, Mr. Kravis and everyone
11   else.  Do we also have firewall counsel in here?
12             MR. KRAVIS:  No, firewall counsel is not present for
13   this hearing today.
14             THE COURT:  Okay.  I probably should have suggested
15   that, but it's all right.
16             MR. KRAVIS:  I'm sorry.  In reviewing the transcript
17   from the last hearing, I thought I heard defense counsel to say
18   that he did not anticipate in the near term any more requests of
19   firewall counsel.  And so I just didn't think to have --
20             THE COURT:  I think part of the problems we get
21   ourselves in is if -- he doesn't necessarily hear everything
22   that occurs in here and you in there.  So I am trying to
23   eliminate confusion that way.  But of course, he can review the
24   transcript.
25             MR. KRAVIS:  Yes, we will make sure he gets the
```

1    transcript.

2              THE COURT:  All right.

3              MR. DUBELIER:  Good morning, Your Honor.  Eric

4    Dubelier and Katherine Seikaly for Concord.

5              THE COURT:  Good morning, Mr. Dubelier and

6    Ms. Seikaly.

7        All right.  So we are here for a continuation of the

8    March 7th sealed hearing addressing Concord's motion for

9    approval to disclose sensitive discovery materials to Concord's

10   officers and employees.

11       Since the hearing, the parties have been unable to reach an

12   agreement on an arrangement that would provide approved Concord

13   employees with access to a substantial portion of the discovery

14   materials that have been designated as sensitive in this case.

15       I have reviewed the parties' recent sealed filings.  They

16   do reflect wide disagreement about what I tasked the parties to

17   do.  Before I get into substance of these disputes, I want to

18   take just a few minutes to review how we got here.

19       So the discovery that the government provided at the

20   beginning of the case consists of roughly 4 million documents.

21   The government has classified 3.2 million of these documents as

22   sensitive in nature.  Though not classified, the government

23   represented at the outset that the sensitive discovery materials

24   included information about ongoing investigations, investigative

25   techniques, cooperating witnesses, and personal identifying

1    information.

2         At the start of this case, we needed at a minimum a way to

3    get discovery going, including sensitive discovery.  We needed

4    to get it to Concord's counsel so that he and his team could

5    begin to review discovery and file motions on Concord's behalf.

6         To get discovery off the ground, I ordered the government

7    to provide nonsensitive discovery to the defense without

8    restriction, except I ordered that the nonsensitive discovery

9    materials could only be used to prepare Concord's defense.  I

10   also imposed tight restrictions on sensitive discovery.

11        The protective order I approved that remains in effect to

12   this day provides that sensitive discovery can only be viewed

13   here in the United States at the offices of Reed Smith under the

14   supervision of Reed Smith employees, and beyond the Reed Smith

15   defense team, sensitive discovery can only be reviewed by

16   preapproved individuals who are vetted by firewall counsel.

17        When I entered the protective order last June, I made clear

18   then that I contemplated reviewing the terms of the protective

19   order once I resolved Concord's pretrial motions and set a trial

20   date.  We are almost there now.

21        I had anticipated that by this time the government would

22   have loosened its restrictions on sensitive discovery so that

23   the number of sensitive discovery materials would be

24   significantly smaller and the number of nonsensitive discovery

25   materials would be significantly higher.  That to date has not

happened.

Last fall, while I was considering motions to dismiss filed by Concord, I told Mr. Dubelier I would not consider requests to share sensitive discovery with Prigozhin until I resolved his pending dispositive motions.  I also stated that I was unwilling to allow sensitive discovery to go to Russia before I resolved those motions.

Also in the sealed proceedings, firewall counsel objected to any attempt by Concord to take sensitive discovery to Russia. Firewall counsel took the position that the issue of whether sensitive discovery could go to Russia should be litigated with the trial team here in open court.  So here we are.

During our March 7th sealed hearing, the government clarified its position with respect to sensitive discovery.  It stated that the vast majority of the 3.5 million documents that are currently designated as sensitive are sensitive not because of their contents but because, when viewed in their entirety, they could permit a sophisticated party to reverse engineer the sources and methods that were used to obtain them.

Specifically, the government articulated its interest as extending to search returns in their entirety, but the government largely conceded that it would not object to a significant subset of the sensitive discovery being viewed by Concord officers and employees, provided they did so in the U.S. offices of Reed Smith and subject to the terms of the protective

order.



During the March 7th hearing, in an attempt to strike a fair balance between the government's legitimate national security interests and Concord's need to review discovery to prepare its defense, I proposed another alternative.  Instead of allowing the sensitive discovery to go to Russia under the terms that Mr. Dubelier proposed, I proposed that preapproved Concord employees come here to the United States to view a sanitized subset of sensitive discovery at the offices of Reed Smith.

I asked the government whether it would be willing and able to assist Concord employees in obtaining visas and ensuring safe

1  passage here to the United States for them to view the

2  discovery.

3      I also asked the government whether they could work

4  together with Mr. Dubelier and his team to identify a small

5  subset of documents that could be removed from the sensitive

6  discovery materials to ensure that the viewers of discovery

7  would not be able to reverse engineer the sources and methods

8  that were used to obtain the documents.  The government

9  expressed an ability and a willingness to do both.

10      Since then, the parties' attempts to identify an agreed-

11  upon subset of sensitive discovery that excludes search warrant

12  affidavits and other documents that directly implicate sources

13  and methods have not been successful.

14      As I see it, there appear to be four main areas of dispute.

15  Two of these I continue to think the parties should be able to

16  resolve with some clarification of my position.

17      The first issue that I continue to think can be resolved by

18  the parties is identifying an appropriate subset of otherwise

19  sensitive discovery that excludes search warrant affidavits and

20  enough of the full warrant returns to avoid the government's

21  reverse engineering concern.

22      The second issue that I also think can be solved by the

23  parties is how that subset of sensitive discovery will be stored

24  and viewed in the offices of Reed Smith.

25      The more difficult issues and the ones we did not

explicitly address at the last hearing are the following:
First, assuming that the parties are able to come up with a
subset of sensitive discovery that is safe for viewing by
Concord employees here in the United States, can those Concord
employees discuss the contents of what they review with other
Concord officers and employees after they return to Russia?

And relatedly, can Concord's attorneys at Reed Smith begin
to discuss the contents of that subset of discovery with Russian
lawyers and representatives of Concord over the phone or in
person now, as long as the documents themselves are not copied
and remain stored offline in the U.S. offices of Reed Smith?

And the second issue that I think we should discuss now is,
are there some documents that are so important to the defense
that at some point the documents themselves will have to be
transmitted to Prigozhin and others in Russia?

I want to start with the more straightforward issues first.
And let me express my views on these two issues more clearly.
First, let me address how I envision the parties coming up with
a subset of sensitive discovery that is safe for Concord
employees to view here in the United States.

I understand why, after the hearing, the government
proposed creating a sanitized subset of sensitive discovery by
running various searches with terms that would be relevant to
the defense.  That seems like a logical way to ensure that the
sensitive discovery documents that Concord's counsel believes

are relevant to its defense are not inadvertently excluded from

the subset of sensitive discovery that Concord employees are

allowed to view at Reed Smith.

But to be clear, my impression at the March 7th hearing was

that the government could more or less randomly select enough

documents to remove the reverse engineering concern and then

allow the defense team to review those removed documents to see

whether the government had inadvertently withheld documents that

the defense team deemed relevant to Concord's defense.

I also envisioned that if the defense did not want to

disclose to the trial team specific documents that it considered

relevant to its defense, that conversation about which documents

should be removed from the set and put into the larger set of

documents that Concord employees could review could occur before

firewall counsel.

Now, Mr. Kravis, if I could hear from you first on this

first issue.  Is this approach that I have outlined feasible, in

your view?

I do appreciate that there's no magic number of documents,

and maybe the documents omitted can't be completely random.  But

I do think it is the government's burden at this point to

provide a subset to the defense that's safe for viewing.

MR. KRAVIS:  Yes, Your Honor, and we have agreed to do

that.

THE COURT:  And once the government has done so, I

think that the burden can then shift to defense counsel to

identify any documents that have been omitted that defense

counsel wants to disclose, and if necessary, the defense can

make these points to firewall counsel.

Is that a process that can still work?

MR. KRAVIS:  Yes, Your Honor.  And I think that is

where we sort of ended up in our conversations with defense

counsel on this particular point.

As the Court mentioned, we sort of started with the

proposal of search terms to identify relevant materials.  Based

on defense counsel's objections to that approach, we proposed

the alternative that the Court described, that we would identify

a small subset within each of the accounts of nonrelevant

material.  We would identify those documents to defense counsel.

Defense counsel, if they saw anything in there that seemed

relevant, could either tell the trial team or tell firewall

counsel they wanted it back in.

We would -- among the nonrelevant material that we propose

to remove would be some documents that tend to identify the

account itself, like a --

THE COURT:  ███████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

1  ████████████████████████████████████████

2  ██████████████████████████████████████████

3  ████████████████████

4           THE COURT:  All right.

5           MR. KRAVIS:  And we have told defense counsel that we

6  are prepared to do this that way.

7           THE COURT:  Okay.  That is great to hear.  And with

8  respect to the second issue, and that is, how the subset of

9  sensitive documents is reviewed, is there not a way -- and I am

10  going to hear from Mr. Dubelier as well on this issue.  But is

11  there a way technologically for you and Mr. Dubelier to work it

12  out so that the Concord employees can view only the approved

13  subset of sensitive discovery but that Reed Smith can still

14  apply its work product to the viewing platform so that it

15  doesn't have to retag all these documents in the new data set?

16           MR. KRAVIS:  So we've given ground on that point as

17  well.  Our initial proposal was to provide defense counsel with

18  a stand-alone hard drive or reviewing platform that would

19  contain only the subset of materials to be reviewed by the

20  Concord employees.  Defense counsel objected on the ground that

21  it would create a technological nightmare with respect to the

22  work product that they had already generated.  I'm assuming

23  they're talking about like document tags and relativity or

24  something like that.

25           THE COURT:  I assume.  I don't know.

1    MR. KRAVIS:  So we agreed that the materials, the

2 subset of sensitive discovery that we were just talking about

3 could be reviewed on -- through defense counsel's vendor, which,

4 as I understand it, would address the concerns that they have

5 raised.

6    Now, if we are going to do it that way, the government will

7 have some specific requests about -- or proposals about what

8 exactly the Concord employees who come to the United States are

9 and are not able to see within the reviewing platform.  And

10 ███████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████

14    We've also offered for Mr. Dubelier to have that

15 conversation with firewall counsel if he believes that that

16 conversation would tend to reveal anything about defense

17 strategy.

18    But with that understanding, we are prepared to allow

19 defense counsel to do this the way they suggested.

20    THE COURT:  Okay.  So this is more just a technology

21 problem rather than a legal problem?

22    MR. KRAVIS:  As I see it now.  I mean, our -- what we

23 would be asking is if defense counsel wants to have the Concord

24 employees view these materials on their own -- on a platform

25 created by their vendor, that the government be allowed to have

a conversation with defense counsel and the vendor about what

exactly the Concord employees are able to see when they are

using that reviewing platform. ███████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████

        I'm confident that that is an issue that we would be able

to sort of work through.  And again, if that tends to reveal

defense strategy, it can be done through firewall counsel.

            THE COURT:  Okay.

            MR. KRAVIS:  That's the only concession we are asking

for here.  Otherwise, it can be done through their platform.

            THE COURT:  Okay.  Thank you, Mr. Kravis.

            MR. KRAVIS:  Thank you, Your Honor.

            THE COURT:  Mr. Dubelier, do you agree that the two

sides can work through these two issues?

            MR. DUBELIER:  I don't, Your Honor, unfortunately.

With all due respect to the Court, on the first issue,

Mr. Kravis repeats over and over again -- he did it in our

e-mails, and he did it with the Court last time we were here --

applying some relevancy standard, and I don't even understand

what that means.

            THE COURT:  No, no, no, hold up.  I don't think that

he's talking about now applying a relevance standard in terms of

searching for relevant terms through these documents.  I think
what he is saying is there are certain documents that have to be
pulled out that reveal sources and methods, how these documents
were obtained.  Those are going to come out.  And I think he is
still saying some small subset will need to be removed to ensure
that the sources and methods can't be reverse engineered.

And if he pulls those out in some random way -- and I don't
know what percentage of documents that is, but I'm expecting a
very small percentage here.  He pulls them out.  He shows them
to you, and if you look at them and you have a problem with
anything that's in there at all, you don't have to go back to
him.  You go to firewall counsel, and you say look, there's some
stuff in here we want, they need to run some more documents so
that we get the number, the percentage, whatever it is.

I don't understand technologically, but the government can
explain this in written product so it is on the record clearly.

But the point is, you are going to have a chance to argue
about what's in that group with firewall counsel, and they are
not a part of that at all.

MR. DUBELIER:  I understand, Your Honor.  But again,
Mr. Kravis, when we were last here, repeated over and over again
the word "relevancy," "relevance standard," and he did it again
today.  So I think we need a better understanding of what that
means.  When he says, we are going to exclude things that are
not relevant, relevant to what or not relevant to what?  What is

1  that standard?

2          THE COURT:  All right.  I will talk to him again, but

3  what I envision is basically a random pull of documents in

4  addition to the ones that they are really concerned that would

5  enable someone to see how the documents were obtained.

6          MR. DUBELIER:  Okay.

7          THE COURT:  That is how I view that.

8          MR. DUBELIER:  All right.

9          THE COURT:  If we are still talking past each other, I

10 need to continue to talk with him.  But assuming we're not, why

11 is the proposal I envision not workable for you?

12         MR. DUBELIER:  That part of the proposal, I think, is

13 a workable starting point to get to a database that Concord can

14 ultimately review.  I would agree with that.

15         THE COURT:  All right.  So if you get a stack of

16 documents that are going to be pulled out and it is provided to

17 you by trial counsel and you review them and you have a problem

18 with anything being pulled out that is in that stack, you can go

19 to firewall counsel and express that.

20         MR. DUBELIER:  Correct.

21         THE COURT:  And they can go back and do another run,

22 replace the documents, because I do think that -- the government

23 probably, Mr. Dubelier, needs a little bit of a buffer in this

24 set of documents.  Because at some future point, if you come

25 back in firewall counsel world and you say, oh, you know, I made

1    a mistake, there's something in there we really want, you are

2    going to be hard-pressed to convince me to give it up unless

3    there is enough of a buffer in there for there to be changes to

4    that.

5          What I would much prefer to have happen is that the two of

6    you be on the same page on the front end that this stuff is all,

7    even in your mind, irrelevant, and we are not ever going to have

8    to litigate it again, and the government has protected any

9    reverse engineering interests it has at that stage, and you've

10   protected any interests your clients have.  So that discovery is

11   essentially gone for all time for Concord.  That's where I would

12   like to be.  I don't want to keep hashing that out with firewall

13   counsel, and that's why I would like you all to work together

14   now to agree on whatever that set of documents is.

15         So I will hear -- let me get to issue 2 with you on the

16   mechanics.

17              MR. DUBELIER:  Your Honor, for the reasons that we

18   have set forth in our pleading, no one from Concord is coming

19   here.

20              THE COURT:  Wait.  What do you mean "no one from

21   Concord is coming here"?

22              MR. DUBELIER:  Well, I think I've said in our pleading

23   that we filed that no one from Concord is going to come here.

24              THE COURT:  Why?

25              MR. DUBELIER:  I can't make people come here from

1   Concord.

2          THE COURT:  They can choose not to avail themselves of

3   discovery, but there can be reasonable place and manner

4   restrictions on where they review discovery, and I am telling

5   you right now it is here in the United States at your offices.

6          MR. DUBELIER:  Okay.  So Your Honor, what I would say

7   to that is that is an unprecedented decision that has never been

8   entered by any court in the United States ever over a foreign

9   corporation and their right to see discovery.

10       So if that is the end point, we are at an impasse.

11         THE COURT:  Explain to me, Mr. Dubelier, how your

12  proposal ████████████████████████████████████████████████

13  ██████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████████████████

18  █████████████████████

19         MR. DUBELIER:  Your Honor, that proposal is off the

20  table as far as I am concerned, that proposal we made.  Once

21  Mr. Kravis got up here and said the vast majority of the content

22  of the documents that are in the sensitive discovery -- which I

23  have the advantage of, we have seen, the Court has not seen --

24  are not sensitive.  The data is not sensitive.

25         THE COURT:  Let's talk one issue at a time.  I will

1   talk to Mr. Kravis, but I think we have an agreement that even

2   you are going to be okay with now.  All right?  So let's take

3   that issue off the table.

4        Let's talk about the employees and where they are going to

5   review this data.  Why does it have to be in Russia?  Can you

6   explain that to me?

7            MR. DUBELIER:  Your Honor, if I was representing an

8   American company and the discovery was here and I had an

9   American defendant, would I have random people from that client

10  go review discovery?  For what purpose?

11           THE COURT:  What do you mean "random people"?  These

12  are people that ███████████████████████████████████████████

13  █████████████████████████████████████████████████████

14  ██████████████████████████████████████████

15           MR. DUBELIER:  Your Honor, we are talking about people

16  that work for a catering company.  Remember, this whole proposal

17  required originally, and the Court stated it again today, these

18  people have to be vetted and approved.  I don't even understand

19  what that means.

20           THE COURT:  By firewall counsel.

21           MR. DUBELIER:  All right.  But what does that mean?

22  What is firewall counsel going to do to vet and approve someone

23  who works at a catering company to look at what they consider to

24  be sensitive discovery?  What is that?

25           THE COURT:  Well, first off, one, it is to ensure that

1    they are going to come here and not get arrested, which you

2    want; it is to ensure that they can get a visa.  It's that, at a

3    minimum.

4         MR. DUBELIER:  Your Honor, all I can tell you is, if

5    the only option to review discovery is that someone from Concord

6    has to come here, we are at an impasse.  That is not going to

7    happen.

8         THE COURT:  Mr. Dubelier, here is the problem.  Your

9    client voluntarily came into U.S. courts, didn't have to do it,

10   wasn't arrested, voluntarily appeared, and made the company

11   subject to the rules and regulations of U.S. courts.

12        MR. DUBELIER:  No one is contesting that.

13        THE COURT:  All right.  There's certainly restrictions

14   on discovery in cases in America all over the country all of the

15   time.  There are.

16        MR. DUBELIER:  We have been unable to find a single

17   case where any court said to a foreign company you have to come

18   here to the United States to view discovery.  There is no such

19   case.  If there was such a case, I'm sure the government would

20   have had it before the Court long before now.  There is no such

21   case.

22        THE COURT:  Mr. Dubelier, this case is unprecedented

23   on so many different fronts, that is true.  However, there are

24   restrictions placed on discovery all the time.  You know that

25   there are criminal defendants, individual defendants who have to

1    sit in the jail cell and review discovery there.  There are all

2    kinds of restrictions that are made all the time.

3         MR. DUBELIER:  Your Honor, there is no restriction

4    that bears any resemblance to the restriction you would be

5    imposing if you say the 3.2 million documents that they have

6    characterized unilaterally as sensitive can only be reviewed in

7    the United States at my office.  There's no case that says that.

8         THE COURT:  No, no.  Look, at this point we are

9    talking -- say that again.

10        MR. DUBELIER:  There is no case, no case that says

11   that they have -- they can unilaterally designate 3.2 million

12   documents as sensitive and then the Court says you can only

13   review those documents in the lawyer's office in the United

14   States.  There is no case that says that.  There is no case that

15   comes close to saying that.

16        And we distinguished all the cases that the government

17   cited when we argued over this substantively.  I am not talking

18   about the status hearing pleadings we just filed, but the

19   motions that originally gave rise to this issue.  There simply

20   is no such case.

21        THE COURT:  Okay.

22        MR. DUBELIER:  Your Honor, I will, with all due

23   respect, remind the Court that the day you decided to go after

24   me, that morning right after New Year's, about what you didn't

25   like that I put in a pleading, you told me, Mr. Dubelier, you

will win your motion if the law is on your side.  That's what
you said.  The law is on our side.  They have no case law to
support the relief, and there is no case law to support such an
order by the Court.

Now, I understand you have the power, Your Honor.  You can
say, okay, there's a lot of things unique about this case, it's
different, and I am going to impose an order that has never been
imposed before in any case ever in the United States.  You can
do that.

But that can't make me do something else other than what I
think I have to do which is in the best interest of the client,
nor can it make me tell people who work for a catering company
in Russia, oh, everything will be fine, just submit your visa
application, come on over, and you know what, in a year from now
or two years from now when you are no longer working for Concord
and you want to get a visa to come to the United States, it
won't be a problem, you will get your visa to come here on a
holiday.  I can't give those assurances to anybody, nor would I
even begin to.

THE COURT:  All right.  To be clear, so that I
understand your current position, your current position is that
at this point you wouldn't even agree to have these employees go
look at this information ███████████████████████?

MR. DUBELIER:  I would not.

THE COURT:  And why have you changed your position on

1   that?

2        MR. DUBELIER:  Because I was under the impression

3   until the last hearing, I learned for the first time because it

4   wasn't in any of the pleadings filed, when Mr. Kravis stood up

5   and said the vast majority of the substance of what's in these

6   documents is not sensitive.  That's the first time the

7   government ever said that.  They never said it in any pleading.

8   It was the first time we ever heard that.  And in my view, that

9   changes everything in terms of what is going on here.

10      I will tell you, Your Honor, in our view, this is a charade

11   in terms of what they are doing about this sources and methods

12   thing.  And I will tell you why.  We have access to the

13   materials, and we can see them.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1    And the notion that the general public doesn't know that and

2    that the general public doesn't have access to knowledge that if

3    ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████

5    ████

6         This whole thing, in our view, with all due respect to the

7    Court, is a scam.  And we know it because we can actually see

8    the documents.  Now, the Catch-22 I am in is I can't say to the

9    Court, Judge, why don't you look at the documents as we have,

10   and you will see it's a scam.  I can't do that.  I can't impose

11   that burden on the Court.  How are you going to do that?

12        But our view is this notion of the protection of --

13             THE COURT:  Well, I can try to do it, or I can appoint

14   a special master.

15             MR. DUBELIER:  I am confident, I am confident that if

16   either the Court were to do it or a special master were to do

17   it, you will come to the same conclusion that I have come to and

18   that I have just proffered to the Court.

19        And again, this notion of -- you've already found, you told

20   them three times at the last hearing, you, the government, have

21   failed to make a particularized showing that is necessary to

22   keep these documents under the control that they are currently

23   under.  That's what you told them.

24        Well, that's true, and also, that's what the law says.  It

25   is their burden to do that.  And they haven't come any further

in terms of doing that today than they had when we were here a month ago.  They still haven't done it.

So basically what we have here is a document set for which there has not been a particularized showing of why those documents need to be secured in the way they're secured, and we still cannot even discuss them with our client, let alone take them there to show them to our client.

Let me give you another example, Your Honor, so you get a little bit of substance.

THE COURT:  We are going to talk about the discussing with your client in a minute.  So I haven't decided that issue.

MR. DUBELIER:  I understand, but I think this would be helpful to know.

Let's just take, for example, the government has produced in discovery -- we can talk about this because this is all under seal. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

THE COURT:  Mr. Dubelier, hold up a moment.  I'm not saying that this is the end game.

1          MR. DUBELIER:  Okay.  I understand that.

2          THE COURT:  What I am trying to do is take the 3.5

3    million that, to date, have been declared sensitive -- and I

4    agree with you, the government just explained, last hearing, how

5    they viewed the sensitivity of these documents as a whole as

6    opposed to each individual document.

7          MR. DUBELIER:  Okay.

8          THE COURT:  All right?  But you haven't been

9    prejudiced at this point.  We still have no trial date.  You've

10   had nine months to be looking at this yourself.  You made a lot

11   of progress with what you have had, and you have had everything.

12   All right?

13         MR. DUBELIER:  We haven't had everything, because

14   they've said there's additional discovery to come.

15         THE COURT:  Understood.  But I am hoping and expecting

16   that that is a pretty small amount of discovery and that they

17   have a very good reason for you not having that yet.

18         MR. DUBELIER:  Okay.

19         THE COURT:  But I will engage with them about that.

20         MR. DUBELIER:  All right.

21         THE COURT:  So I am trying to get the 3.5 million

22   sensitive discovery documents down to a much smaller number that

23   is truly sensitive, by document, by documents.

24         MR. DUBELIER:  Your Honor, I agree with you.  What I

25   am suggesting, though, is the way to do that is not have Concord

people come here and look at 3.2 million documents.  The

solution is for them to make their particularized showing, pull

out what has to be pulled out, and the remainder of it is no

longer sensitive.

THE COURT:  No, I don't agree.  I agree there can be

an intermediate set of documents for which controls greater than

the nonsensitive discovery are imposed.

MR. DUBELIER:  Well, I think that they would have to

make a particularized showing to you.

THE COURT:  I agree; I agree.

MR. DUBELIER:  Again, Your Honor, you are saying that

in the abstract, because you haven't looked at the documents.  I

don't know, once you see the documents or a special master sees

the documents, you are going to agree with that.  I don't think

you are.  They are either sensitive, or they are not.

And remember, we are already engaging in terms that don't

mean anything.  There's no such thing as sensitive documents

within the United States classification system of documents.  A

document is classified or it is not.  We have made this up for

purposes of this litigation.  It doesn't exist anywhere.  It is

not defined anywhere.

The only place it is defined is in the remarkable

protective order in this case, which I am not criticizing the

Court about.  I understand why you did it initially.  But we are

nine months down the road here now, and we haven't made the

1    progress, in my view, that we need to make on what is the next

2    step, and that is, how do I get this stuff to the client so I

3    can sit down and start talking to the client.

4        Look, Mr. Kravis can deny it, but three times you asked him

5    in the last hearing, if a Concord person comes here and looks at

6    the documents, then they can go back to Russia and talk to the

7    people in Russia about the documents, right, and he said yes.

8        THE COURT:  At some point he got back up and he said,

9    to be clear, we are talking about operating under the terms of

10   the existing protective order.

11       And to be fair, Mr. Dubelier, your proposal did not

12   envision those Concord employees ███████████████████ and going

13   to talk to other Concord officers and employees.  It didn't.

14   Just to you.

15       And so that is where my mind-set was.  I was trying to take

16   your proposal, which I have discomfort with because I have

17   greater comfort with these documents remaining in the United

18   States, particularly with what happened with the nonsensitive

19   discovery.  I am not pointing fingers here, but the fact remains

20   that someway, somehow that nonsensitive discovery is out there

21   in ways beyond helping Concord prepare its defense.  I am not

22   suggesting it is your fault at all, but it is out there.  All

23   right?  I have concerns with documents going to Russia.

24       MR. DUBELIER:  Again, Your Honor, when you say it's

25   out there, I think the Court will agree, there are copies of

1     things that are out there, not necessarily coming from the

2     nonsensitive discovery.  That's all.  And we are still trying to

3     get to the bottom of it.

4              THE COURT:  All right.  Fair enough.  But I do have

5     concerns --

6              MR. DUBELIER:  I am open to -- that was ████████████

7     ████████████████████████████.  Maybe there has to be some additional

8     restriction, and that is, maybe the previously marked sensitive

9     discovery, which is really not sensitive, ████████████████████████

10    █████████████████████████████████████████████████████████████████

11    █████████████████████████████████████████████████████████████████████

12    █████████████████████████████████████████████████████████████████

13    ████████████████████████████████████████.

14       Your Honor, all I am saying is that I am convinced now,

15    based on the chronology of this whole thing, that having people

16    come here, even if I could make them and I can't, is a waste of

17    our time.  It is a waste of our time because they --

18              THE COURT:  You don't think it would be helpful to you

19    in the same way having them look at this stuff ████████████████████

20    ██████████████████████████████?  What is different about them

21    reviewing it there versus here?

22              MR. DUBELIER:  Here is why right now I don't think it

23    would be helpful.  Those individuals cannot do anything more

24    than we can do with those documents.

25              THE COURT:  Well, then why did you ever make that

1    proposal?

2         MR. DUBELIER:  Because they were making it impossible

3    for us to even structure any type of situation.

4         THE COURT:  But you clearly thought there was value to

5    that, or you wouldn't have made it at all.

6         MR. DUBELIER:  It was the only thing that appeared to

7    be on the table.

8         THE COURT:  Again, if there is no value to it, you

9    wouldn't have wasted your time.  You would just keep doing what

10   you're doing.

11        MR. DUBELIER:  What I am saying now, Your Honor, what

12   I understand the government to be saying now, that the vast

13   majority of the substance of the documents in the sensitive

14   discovery are not actually sensitive.  What I am saying now is,

15   I don't see the value in that process that I previously saw in

16   the process.

17        THE COURT:  All right.  Fine.

18        MR. DUBELIER:  I also do not see any legitimacy for

19   the restriction based on that proffering of what the data is.

20        THE COURT:  Well, you all are going to have to brief

21   whether or not that means they go to Russia, because I am

22   telling you right now I have concerns about documents going to

23   Russia.  I do.  And I think there are other ways to address the

24   issue than just sending the documents to Russia.

25        MR. DUBELIER:  Well, the other way to do it is

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

They are saying that doesn't work; they're not going to agree to

that.

THE COURT:  You can also discuss the documents.  You

can also travel with a smaller set.

MR. DUBELIER:  Your Honor, remember the complexity

here that I face -- and I'm not crying.  I'm not trying to be a

baby about this.  But I have a client -- I don't make these

decisions unilaterally.  I have a client I have to discuss this

with, and I can't even discuss the issue to discuss the issue.

THE COURT:  You cleared the first proposal with your

client.

MR. DUBELIER:  I did.

THE COURT:  You said you did.

MR. DUBELIER:  I did, but I had to do it in the

abstract, because I can't explain to the client exactly what

they are going to be seeing or what is in any of this stuff.

THE COURT:  I find it interesting that your client is

okay with that proposal ████████████████████ but isn't okay

with people coming here who are cleared who aren't going to be

arrested.  I don't understand that.

MR. DUBELIER:  Your Honor, what I am saying is,

circumstances changed based on the representations that the

government made at the last hearing.  That's what I am saying.
And you can take me at my word for that or not.  I am just
telling you, that's what happened.  The circumstances changed,
and I had subsequent discussions which led us to the position
that we have now.

    And I don't think that's unreasonable.  You may disagree
with me, but there's certainly nothing mysterious about how I
got there.  I'm telling you.

            THE COURT:  Just to be clear, there is no point in us
having further discussions about whether this set can be
whittled down to a much --

            MR. DUBELIER:  I think there is.  We are going to have
to do that, in any event.

            THE COURT:  I know, it is to whittle down.  But in
terms of anything happening on your computers here at Reed
Smith, that is off the table?

            MR. DUBELIER:  Correct.  I think the whittling down at
some point has got to occur, because they have a burden that
they have --

            THE COURT:  I agree.  I didn't mean to suggest that I
don't still need to do that.  We need to do that to determine
whether or not you can discuss them with your client.

            MR. DUBELIER:  Right.  And so then the question
becomes, once it is whittled, where are they looked at.  And
maybe, Your Honor, maybe -- again, I don't want to place an

unreasonable burden on the Court.  I know what I am asking for,
and it's a lot.  Maybe once it's whittled, then the Court needs
to actually dip into this stuff and say, you know, I have this
abstract concern about this stuff going to Russia, but wait a
minute, now that I'm looking at this, they have pulled out the
search warrant affidavits, they've pulled out all the subpoenas,
all this is Internet stuff that was publicly available anyway,
so what if it goes to Russia, there is no danger here in it
going to Russia.  You may very well reach that decision.  That's
where I am.  That's what I think the correct answer is.

    But again, you don't have the access yet to the documents
to be able to reach that same decision.  Maybe the whittling
process gets us to a set of documents that is more reasonable
for the Court or someone the Court designates to approach it in
that same way.

    THE COURT:  All right.  Let me hear from Mr. Kravis.

    Mr. Kravis, if you could first address the issue that
Mr. Dubelier initially raised with respect to the relevance term
that you keep using.

    MR. KRAVIS:  Yes, Your Honor.

    THE COURT:  Again, to be clear, my view is that the
government ought to be able to pull out the really truly
sensitive documents that would include the documents you just
mentioned that show specifics about e-mails and their sources.
I forget the exact words you used.  But you would pull that



1    stuff out.

2            MR. KRAVIS:  Right.

3            THE COURT:  You would pull out ▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6        Would you do more than that, and if so, why?

7            MR. KRAVIS:  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮

13       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮

18      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮









1 ███████████████████████████████████████

2 ████████████████████████████████████

3 ██████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████

6           THE COURT:  I know that's what the government wants,

7 but let me tell you how I view this moving forward.  I view this

8 as requiring a modification of the current protective order.  I

9 don't think the current protective order gets us all the way to

10 trial.  I just don't.

11      So what I am envisioning is there's some, perhaps,

12 intermediate set.  It sounds like Mr. Dubelier is not even going

13 to concede that, but that there is some set of documents that is

14 quite large.  It's the set of documents that you have sanitized

15 out of sensitive discovery that has much lower restrictions on

16 it.

17      I don't know at this point how much of that, if any, I will

18 let go to Russia, but I think at some point before firewall

19 counsel Mr. Dubelier might convince me that certain documents

20 need to go to Russia.

21           MR. KRAVIS:  So the reason the government can't agree

22 to that proposal is because even though the documents we are

23 talking about may be not relevant to the allegations in the

24 indictment, they tend to identify accounts, and they tend to

25 identify methods that were used to collect material.

```
 1            THE COURT:  But I thought you sanitize it so that

 2   that's --

 3            MR. KRAVIS:  Now I'm not sure what the Court means

 4   by "sanitize."

 5            THE COURT:  When you pull enough out of what is now

 6   sensitive discovery so that it can't be reverse engineered, when

 7   you pull that 5 percent out, you are saying there is still

 8   information in those documents that would enable people to

 9   recreate how you got those documents?  Is that what you are

10   saying?

11      I thought that there was -- when I say "sanitize," I mean

12   you take out enough from what is currently designated as

13   sensitive materials, you take out enough such that no one can

14   look at those documents and determine how you got the materials.

15      Is that not right?

16            MR. KRAVIS:  I guess I would clarify by saying it

17   makes it more difficult to identify.

18            THE COURT:  So to be clear, I am not suggesting that,

19   if the protective order is modified -- to create an intermediate

20   batch of discovery, so not nonsensitive, not fully sensitive,

21   I'm not suggesting now that at some point I would let all of

22   that go.  It sounds like that's what he wants, but I don't know

23   that that's what I would agree to do.

24      But pieces of that I may well let go to Russia, if he

25   convinces me that it is essential for his defense.  And I don't
```

1    know that he is going to convince me that all of that is

2    essential.

3         Do you understand what I am saying?

4         MR. KRAVIS:  I understand what the Court is saying.

5    The government's position has been and continues to be that this

6    material should not be going to Russia.

7         THE COURT:  No, I understand.  We are getting a little

8    bit ahead of ourselves.  But when the government concedes that

9    by taking 5 percent out of what is currently the sensitive

10   discovery and taking out the other items you mentioned, when the

11   government concedes then that it doesn't have a problem with

12   Concord employees coming to Reed Smith to view them because at

13   that point they can't reverse engineer it -- just wait a second.

14        MR. KRAVIS:  Sorry.

15        THE COURT:  Once you concede that, I don't understand

16   why then those employees or, to be more efficient, Mr. Dubelier

17   himself can't also be talking about the content of those

18   documents with folks in Russia?

19        MR. KRAVIS:  Because our ability to control the

20   dissemination of that information in Russia is zero.

21        THE COURT:  No, not the documents, but the content.

22        MR. KRAVIS:  It is the same thing.  We are talking

23   about the dissemination of the content of that information, the

24   dissemination of information about which accounts we are talking

25   about, the dissemination of information about what's in those

accounts sufficient to identify the account holders and

sufficient to identify the accounts that we are talking about,

information that could then be used to figure out the methods of

collection that were used.

To be clear, when the Concord officers and employees come

to the United States to look at the sensitive discovery, there

is still that risk to the government's operational sources and

methods.  Our position is that we are willing to take that risk

because we believe that Concord has the right to defend itself

in the case, and so we are willing to take that risk and to take

on that burden.

But that doesn't mean that we are agreeing to let just

anybody look at that material or just anybody have access to

that material.  And once the material, whether we are talking

about the documents themselves or information about the

documents, goes to Russia, it is impossible to control who has

that material and how that material is used.

THE COURT:  But once the employees come here and look

at it, it is impossible for you to control what happens to that

knowledge that is in their head, too, when they go back to

Russia.

MR. KRAVIS:  Right.  And what we have said is that,

again, that is -- we understand that that is a risk, and that is

a risk that the government is willing to take on, that the

Concord officers and employees who come to the United States and

1   view the subset of sensitive discovery we are talking about may

2   go back to Russia, and they may act in a manner that is not

3   consistent with the terms of the protective order and that the

4   Court may not be able to enforce the protective order against

5   them because they are beyond the Court's jurisdiction.  We

6   recognize that as a risk, and we are willing to take it on.

7        But when the material goes to Russia, now it's not just a

8   risk that that will happen.  It is a practical certainty that

9   that material will be disseminated to people who are not

10  supposed to receive it.  It will be used --

11       THE COURT:  Let's separate.  Not even documents.

12  You're saying even conversations about these documents, once I

13  permit that, the government has a problem with?

14       MR. KRAVIS:  At this point, yes, that is the

15  government's position.

16       THE COURT:  Again, I'm weighing weighty national

17  security interests against the defendant's right to defend

18  itself.  All right?  And as it gets closer to trial, that

19  becomes -- the defendant's right to defend itself becomes

20  greater relative -- maybe not relative to national security, but

21  you have got to make a greater showing than you have made now.

22       MR. KRAVIS:  Look, I understand, the government

23  understands that when we are down to talking about exhibit lists

24  and we are talking about exhibits that will be used at trial,

25  that we may be in a different posture with respect to the

1  protective order.

2      But just to try to make a point that I have been trying to

3  articulate a little bit more concrete, ████████████████████



███████████████████████████

    ███████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

    Again, when Concord officers and employees come to the United States, they may be able to glean some of that information by viewing a subset of the relevant discovery.  We understand that that is a risk that we are taking on.  But that doesn't mean that we are taking the position that anyone in Russia can look at any of this stuff.  It's not -- those are not the same thing.

    And our view is that the appropriate next step here -- again, I understand that there may be further discussions on this down the road, but that the appropriate next step is for Concord officers and employees to abide by the restrictions in the protective order and come to the United States to view the sensitive discovery.

    Concord had argued in its filing on this that it needed to talk to people who worked at the company in order to be able to understand what their e-mails meant, what the documents meant.  They said there were issues of Russian translation.  They said

that there were business documents that they needed to talk to Concord employees about.  We thought that that was the next step that we were taking here.

I understand that there may be a point further down the road where the Court wants to revisit -- where the Court wants to revisit that issue.  But at this point we believe it is not appropriate for these materials or information about these materials to be going to Russia, and that if Concord officers and employees need to view them, they should come here, and we will take the steps that we discussed at the last hearing to make sure that nobody gets arrested at the airport.

THE COURT:  Okay.  I agree with the government that having Concord employees come here to look at the documents in the offices of Reed Smith is an appropriate next step, but it would not get us all the way to trial.

MR. KRAVIS:  Understood.

THE COURT:  And I am really interested in moving this case now.  I am telling both sides that.  These intractable issues we need to be resolving now on what is the path forward. And what I am telling you is that the current terms of the protective order do not get me to trial.  It just doesn't.  And if you think it does, we are going to have to go back and have you brief this and explain to me why -- once the government concedes that employees can come here and look at it, why counsel can't even talk to anyone else back there.

1        You have to concede that employees who are going to come

2   here might be pretty low-level employees, even if he were

3   willing to stick with the initial plan, and that that's not

4   necessarily enough for a defendant, a corporate defendant to

5   defend itself.

6        And I understand that the government has weighty national

7   security interests.  I understand that.  But you are now in a

8   criminal courtroom.  You are not in the intelligence world.  You

9   have to give some.  All the time, we have to give -- when the

10  government brings cases involving CIs, those get burned.  Things

11  get burned when you bring a criminal case.

12        MR. KRAVIS:  And as I was trying to say a moment ago,

13  the government believes at this stage it has already made

14  significant concessions.  Again, we understand there is an

15  operational risk here to Concord officers and employees viewing

16  this sensitive discovery.  And so when the Court says we have to

17  give, we believe that we have given that.

18        When the Court reviews the correspondence between counsel

19  about the manner in which that sensitive discovery is viewed in

20  the United States, I think the Court will see that the

21  government gave on every point.  Every time the defense raised

22  an objection to our proposal, we gave on it.

23        I understand that there may be further discussions down the

24  road about the dissemination of this material, but at this

25  moment we believe that the appropriate -- the appropriate next

1    step is the one the Court outlined at the last hearing and is

2    not -- does not involve the dissemination of documents or

3    information about documents in the sensitive discovery in

4    Russia.

5                THE COURT:  All right.  Even if we were in a place

6    where today we could get agreement on the next step, which we're

7    not, based on what Mr. Dubelier has said, even if we were in

8    that position, I am telling you right now, I don't think the

9    government has made a showing at this point that employees can

10   come here and review the stuff but they can't talk about it when

11   they go back or defense counsel can't talk about it when they go

12   back.

13       Now, we can argue about when those conversations should

14   occur, but I feel very uncomfortable saying -- I guess one

15   extreme position would be -- and maybe this should be briefed,

16   that Concord can defend itself with U.S. counsel alone having

17   access to the full discovery.  Maybe that's what needs to be

18   briefed here, if that's the government's position.

19               MR. KRAVIS:  To be clear, that has never been our

20   position.

21               THE COURT:  Okay.  So it is not that; it is that plus.

22               MR. KRAVIS:  Yes.

23               THE COURT:  And the plus that the government has

24   conceded on most recently is having employees come here to

25   review the stuff.

 1          MR. KRAVIS:  Yes.

 2          THE COURT:  And that's a significant concession, I

 3     will agree, to have Mr. Dubelier have the assistance of

 4     employees, and that, in my view, would be progress.  I think it

 5     would be progress, in his view, a month ago or whenever we last

 6     were here.

 7          Again, I'm just telling the government that at this point I

 8     don't see how that gets us to trial, even that alone.

 9          MR. KRAVIS:  I would respond with a point that I made

10     at the last hearing, which is that the interest that the defense

11     has articulated in Concord officers and employees not coming to

12     the United States, as far as I can tell, has simply been that

13     there are people under indictment who don't want to come here

14     and face the Court's jurisdiction.  The government's view has

15     been and continues to be that that is just not a legitimate

16     reason to modify what are otherwise reasonable restrictions in a

17     protective order.

18          I mean, the idea that it -- it doesn't have to be low-level

19     Concord employees who come to the United States.  Anybody from

20     Concord can come to the United States, as far as we know.

21     Obviously, we want to make sure that there is not some other

22     issue with them coming, and they can do that through firewall

23     counsel.

24          But if the defense's position is this information needs to

25     go to Russia because the people in Russia do not want to face

1     the jurisdiction of the Court, the government's view is that

2     that is not a legitimate reason to modify what are otherwise

3     reasonable restrictions in the protective order.

4          THE COURT:  Okay.  Well, I guess what I need to be

5     explicit about is, my understanding of the basis for the

6     original protective order didn't conform with what you told me

7     last month.  I understood that the protective order was

8     protecting a much greater percentage of truly sensitive

9     documents.  All right?

10         So if the government wants to move forward with the current

11    protective order, I am going to need a lot more justification on

12    why that protective order still holds now.

13         And I am not saying that I'm not sensitive to the points

14    you are making in terms of reverse engineering this.  I am.  But

15    Mr. Dubelier has challenged the whole categorization of

16    everything.  And I think, on the one hand, we have 3.5 million

17    documents, and it sounds like we have a really small subset of

18    truly sensitive documents.

19         MR. KRAVIS:  ███████████████████████████████████

20    ███████████████████████████████████████████████████████████

21    ███████████████████████████████████████████████████████████

22    ███████████████████████████████████████████████

23    ███████████████████████████████████████████████████████

24    ███████████████████████████████████████████████████████

25    ███████████████████████████████████████████████████████



          THE COURT:  Right.  And yet, the government is willing

to give and concede in order to facilitate the defense letting

some employees come here and see the documents; right?

          MR. KRAVIS:  Well, now I feel like I am stuck between

a rock and a hard place with the Court, because the Court says

something has got to give, and then I say we gave, and then the

Court says, well, you gave, so why can't you give more.

          THE COURT:  I understand.  But at some point the

government's got to make a greater showing.  Even if you hadn't

given, I would have been drilling down on the 3.5 million.  All

right?

1    So I appreciate that you are trying to be reasonable here

2    and come up with a solution that helps the defense defend itself

3    in court.  I appreciate the government's position.  It is just,

4    I don't think that will get us all the way to trial.

5    And I guess your point is, well, they're not even willing

6    to take this step, they're not willing to avail themselves of

7    this opportunity, and therefore, that's the end of the game.

8    MR. KRAVIS:  I mean, I will confess that I agreed with

9    the way the Court articulated this path at the end of the last

10   hearing.  What I heard the Court say to Mr. Dubelier at the end

11   of the last hearing was, I think the Court said, I expect you to

12   keep pressing on this issue of information going to

13   Mr. Prigozhin, but my view right now is that we should try to

14   narrow down the stuff that we are talking about, and the best

15   way to move forward there is for officers and employees of

16   Concord to come to the United States to work with Concord's

17   counsel to try to figure out what they need to know about the

18   documents within the sensitive discovery and then move forward

19   from there.

20   I think that that -- the Court's articulation of that

21   process was an eminently reasonable one, and that is the

22   position the government believes that the Court should adhere to

23   at this stage.

24   I understand the Court's point that there will come a time

25   further down the road when we will have to discuss this again,

but --

            THE COURT:  But I don't know how much further down the
road.  Look, this case has been charged for over a year.  He has
had access to discovery for nine months.  If we loosen
restrictions now -- I view this case as -- I am not going to
push it to trial in the fall, but I am looking early next year.
So the time has come for us to work through all of these
difficult issues and get this case moving.

      So we are in pretrial mode now, and so we do need to talk
about what the next step is beyond the employees, whether he
wants to avail himself of that or not, and maybe that's a factor
that I consider in a negative way against Concord, that they
won't avail themselves of that.

      But what I am telling you is, even if you had reached
agreement today on the employees coming to the offices of Reed
Smith, I would be pressing the government on why there can't be
discussions about documents with restrictions.  I'm not saying
discussions without any restrictions about the content of the
discovery, but that there would be -- as I envision it, there's
the nonsensitive that's just out there flying around Russia now.
I'm not doing any more of that.

            MR. KRAVIS:  Right.

            THE COURT:  Then there's the sensitive that I view as
potentially overclassified.  I hear your point on reverse
engineering, but I think that there are ways that the government

could selectively pull out some personal accounts.  Like I think
you could get that smaller, and you've suggested you can, at
least for employees who are going to come here.  I think it
could get smaller.

     And then I think with that still very large category of
documents, the documents you were talking about having the
employees review, I think there should be restrictions, but I
don't know that the restrictions should include no conversations
between counsel and people back in Russia about the content of
that.

     That's where I was.  If you all were going to reach
agreement today on this interim process, I was also going to
telegraph -- I wasn't going to rule, because I think the
government needs to brief this.  It hasn't been argued.  I'm
just telegraphing for you how I view this moving forward.

     And even if we had an agreement today, I view two things:
One, that the Concord employees who would come here and Reed
Smith counsel should have restrictions on that set of documents
the employees are reviewing, but that they would be able to talk
about the content of those documents at some point with people
in Russia, and two, with respect to not just the government's
exhibits but also documents that are within this, for lack of a
better word -- I know the government doesn't like this, but this
intermediate tier I see, that some of those documents might go
to Russia.  Some of the purely sensitive might go to Russia at

1    some point.

2         But the way it works is under Rule 16, the government bears

3    the burden to show good cause, and once the government's done

4    that, then the defense, with firewall counsel, is going to have

5    to argue this is really essential, and it's really essential

6    that these people in Russia get it.  And when it comes time for

7    that, you know, if they want to say Prigozhin, they are going to

8    have to convince me that he and only he can get this

9    information.

10         MR. KRAVIS:  I completely and wholeheartedly agree

11   with that articulation of the path forward here.

12         THE COURT:  But it sounds like you are holding back,

13   though, because you want to do this more incrementally than I

14   want to do right now, and I don't want to do it super

15   incrementally, because I feel like we are going to be going to

16   trial in 2021 if we keep on this path.  All right?

17         MR. KRAVIS:  I mean, I guess what I would say about

18   that is the Court wanting to have that discussion about the

19   conversation -- conversations about the content of the sensitive

20   discovery with individuals in Russia is we just haven't -- we

21   also haven't gotten any explanation of what exactly it is we are

22   talking about here.  Like are we talking about the discussion of

23   particular documents?  Are we talking about discussion of things

24   more generally?  Are we talking about conversations over the

25   phone?  Who are we talking about the conversations with?

1        And I understand that some of that the defense may want to

2    litigate through firewall counsel if they believe it reveals

3    defense strategy.  But it is difficult for the government to

4    respond to a request like we want to talk about stuff with

5    people in Russia.

6        THE COURT:  I guess, Mr. Kravis, what I am saying now

7    is, at the time to get discovery moving, I approved this very

8    broad protective order, and I did so without really getting into

9    the mess of the documents itself.  And if the government's

10   position is this is the protective order that we think needs to

11   stay in place until trial, it is your burden to convince me that

12   that remains the case.  I don't think I did the job I need to

13   do, if that's the protective order that is going to get us to

14   trial.  And the burden is on you at this point.

15       So the protective order will remain in place until we brief

16   this.  I guess some of this might need to be ex parte.  I don't

17   know.  But if this is the protective order you really think is

18   the only, the government's view, way to get to trial, I am going

19   to need to understand more why restrictions can't be loosened on

20   some subset of those documents.

21       MR. KRAVIS:  Again, I'm not sure that the Court is

22   fairly characterizing the government's position.  Our view is

23   that -- the protective order right now says that the sensitive

24   discovery is for defense counsel's eyes only.  We have said that

25   we believe it would be appropriate for Concord officers and

1    employees to come to the United States to view the sensitive --

2    so the government's position is not that the current protective

3    order should stay in place all the way through --

4           THE COURT:  Fair enough.  The current protective order

5    plus the concession you made, if your view is that this is it

6    from now until trial, I need to do more work on understanding

7    what this sensitive discovery includes.  And I know you've tried

8    to articulate it here, and you have done a pretty good job.  But

9    I think for the record, I need more briefing on this.  All

10   right?

11       And some of that, I appreciate, may need to be -- certainly

12   all of this is under seal, but maybe there are elements of that

13   that need to be ex parte.  I don't know.

14          MR. KRAVIS:  Which reminds me, the court reporter

15   asked if I could orally move to have -- tell me if I get this

16   wrong.  Orally move to have her notes unsealed for the limited

17   purpose of providing to the parties so that we can propose

18   redactions for the Court so we don't have to file a motion.

19          THE COURT:  Just to be clear, this is a motion for you

20   to release -- the court reporter to release a transcript to the

21   parties?

22          MR. KRAVIS:  Yes, for limited unsealing to the parties

23   only so that we can propose the necessary redactions to the

24   Court.  The court reporter has advised that she cannot give even

25   me the transcript without an order of the Court.  So we would

1    just ask for that limited unsealing.

2         THE COURT:  That's fine.  I grant that.

3         MR. KRAVIS:  So that I am clear with respect to the

4    path forward here, are we now -- we are not doing the thing

5    about the Concord employees coming here anymore?  Are we not

6    continuing to have those conversations?

7         THE COURT:  I think that -- as a practical matter, it

8    sounds like it is not worth anyone's time right now.  But I do

9    think that the government's -- I can't force them to come.  I

10   can say that they didn't avail themselves --

11        MR. KRAVIS:  But the Court could say this is the

12   relief that you are getting --

13        THE COURT:  For now.

14        MR. KRAVIS:  -- and if you choose not to avail

15   yourself of it, then that's fine, but we are moving on to the

16   next thing.

17        THE COURT:  Yes.

18        MR. KRAVIS:  The reason I ask is, as the Court can

19   tell, we spilled a fair amount of toner hammering out these

20   positions, and now it sounds like we are not doing it.

21        THE COURT:  When I say we are not doing it, I mean it

22   sounds like he is not availing himself of it.  And I do think

23   that that's a significant concession by the government to try to

24   accommodate the defendant's interests here.  So I don't think

25   it's a wasted exercise that you did here.  It's definitely

something for me to consider in balancing these issues.  So it
was not all for naught.

     But my bigger point is that was not going to be enough even
for me based on what you've shown me so far.  All right?  So if
the government's position now is the existing protective order
with the modification to allow Concord employees to come here
and review a small subset, as we have been discussing --

          MR. KRAVIS:  Right.

          THE COURT:  -- if the government's position is that is
adequate to get us to trial, I need more.  I don't know that I
feel like you've made that showing.

          MR. KRAVIS:  Very well.

          THE COURT:  Does that make sense?

          MR. KRAVIS:  It does.  I just want to make sure the
Court -- because the Court has used the phrase several
times "until trial."  The government had always envisioned that
at the time the Court selected a trial date, the Court would
enter a scheduling order that would require things like
deadlines for expert notice and the submission of exhibit lists
and so on and so forth.  The government was always prepared to
address, you know, what happens to the contents of the
government and defense trial exhibits since they are going to be
handled in open courtroom and so on and so forth.

     So I just wanted to make sure that our position is clear in
that respect.

1          THE COURT:  Right.  No, I understand.  So Mr. Kravis,

2     in terms of moving forward, I think what might be the most

3     helpful way to proceed now is for the government to propose

4     changes it thinks would be appropriate to the existing

5     protective order.  All right?

6          MR. KRAVIS:  Very well.  Yes.

7          THE COURT:  And provide its basis for that and make a

8     good showing with respect -- good cause showing with respect to

9     that.  All right?

10          MR. KRAVIS:  Understood.  Yes.

11          THE COURT:  And then the defense can respond.  Do you

12     agree with that?

13          MR. KRAVIS:  I understand that instruction, yes.

14     Thank you.

15          THE COURT:  Mr. Dubelier?

16          MR. DUBELIER:  Your Honor, briefly, I think we pointed

17     this out in one of our pleadings, but the irony here is if we

18     were dealing with classified information as opposed to sensitive

19     information, it seems to me we would have more rights than we

20     have been afforded up until now.

21          For example, if the government came and made a sources and

22     methods argument to the Court with respect to classified

23     information, it would require testimony under oath from somebody

24     from the intelligence community to come in and convince the

25     Court not only is this classified, but it can't be disclosed, it

 1    would harm national security.

 2         I want to be very clear here.  I believe Mr. Kravis

 3    believes the argument he is making.  I believe he believes it.

 4    I just disagree with him.  And where I think we may be here,

 5    Your Honor, is we may be beyond argument.  And that is, you and

 6    I have the disadvantage of we listen to this argument in the

 7    abstract, and he says over and over again sources and methods.

 8    ███████████████████████████████████████████████

 9    ██████████████████████████████████████████████████

10    █████████████████████████

11    ██████████████████████████████████████████████████████████

12    ████████████████████████████████████████████████

13    ██████████████████████████████████████████████████

14    █████████████████████████████████████████████████

15    ████████████████████████████████████████████████

16    ███████████████████████████████████████████████

17    ██████████████████████████████████████████████████████████

18    █████████████████████████████████

19    ███████████████████████████████████████████

20    ████████████████████████████████████████████████

21    ██████████████████████████████████

22    █████████████████████████████████████████

23    ████████████████████████████████████████████

24    ██████████████████████████████████████████████████████████

25    ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

3        This is unprecedented as far as I understand, and I have

4   actually litigated SIPA matters as a government lawyer.  I have

5   never heard an argument like this ever, and I think it's

6   unprecedented.  Let's get somebody from the FBI or the

7   intelligence community to come in, file a report with the Court,

8   be subject to cross-examination by both me and the Court, and

9   let's get to -- what I'm saying, Your Honor, I think this is

10  important.  This may move the Court's thinking on whether, in

11  fact, this 3.5 million documents needs to be protected in the

12  manner that they are currently protected and would give the

13  Court the opportunity to at least see some window into what's in

14  there as opposed to the other alternative of going through all

15  the stuff yourself, which is not manageable.  I wouldn't ask the

16  Court to do that.  It's not manageable.

17           THE COURT:  And I don't have the expertise to --

18           MR. DUBELIER:  Also, we would be litigating the case

19  in 2025 as opposed to 2021.

20       So what I would urge the Court to consider is whether or

21  not we need a report, a written report from the government.  If

22  they want -- I mean, I don't think it would be classified,

23  because we are not talking about underlying classified

24  information, but I suppose they could come argue to the Court

25  that the report has to be classified.  That will create a whole

separate set of problems because we won't be able to
cross-examine on it, then, unless we get security clearances.

But I think their burden now is to put evidence before the
Court, not just argument.  That's how important this issue is.

Thank you, Your Honor.

THE COURT:  All right.  Mr. Kravis, do you want to
respond to Mr. Dubelier's last points about whether the
appropriate way to proceed is an evidentiary hearing?

MR. KRAVIS:  We do not believe the appropriate way to
proceed is through an evidentiary hearing.  The Court has asked
the government to make a further showing, and we will certainly
do that.  As the Court is aware, the Federal Rules of Criminal
Procedure allow the government to proceed ex parte on that
matter.

The Court, after reviewing the government's submissions,
can always decide that it wants an adversarial presentation of
those matters.  But in the first instance, we don't believe an
evidentiary hearing is appropriate.

THE COURT:  All right.  I will defer for some time to
decide that issue.  But to be clear, I would hope that the
government attempts to file something that -- as much as it can
that Mr. Dubelier can respond to.  I don't want this entire
thing ex parte.  I would assume that there are elements of this
that you can do under seal but giving him the opportunity to
respond to.  And to the extent there's facts that back it up,

1    obviously, that needs to be ex parte.  But your arguments and

2    the logic of your opinion needs to be fleshed out so that he can

3    see it.

4              MR. KRAVIS:  We have made every effort to do that in

5    prior filings and will continue to do that.

6              THE COURT:  All right.  So Mr. Kravis, how much time

7    would you need to do this?

8              MR. KRAVIS:  Can I have a moment?

9              THE COURT:  Sure.

10             MR. KRAVIS:  Thank you.

11         (Government counsel conferred.)

12             THE COURT:  Mr. Dubelier, while he is doing that, let

13   me just confirm and be clear for the record.

14         It is your position that you are declining on behalf of

15   your client to avail yourself of the documents that the

16   government would work with you to make available at the offices

17   of Reed Smith; is that correct?

18             MR. DUBELIER:  Yes, Your Honor.  Again, I think it is

19   important to be clear about this.  I don't want to take this the

20   wrong way, but I got the impression that the Court was

21   suggesting that I changed my view of that, and I really didn't.

22   We went back and looked at the transcript of the last hearing.

23   What I said at the last hearing was that "we've said it in our

24   pleadings and I will say it again on the record, Concord

25   employees coming here is a nonstarter."  That's what I said.

1     The Court then asked for us to engage in a negotiation with

2     the government to see whether or not that was a possibility.  We

3     engaged in a negotiation with them.  I had further discussions

4     with the client.  That's where we are now.

5          THE COURT:  I understand you didn't have client

6     approval at the time that you tentatively agreed to work with

7     the government to try to do this.  I understand that.

8          I just want to be clear that your position is the client

9     declines to send employees of Concord who are approved --

10         MR. DUBELIER:  I don't think that's a fair way to

11    characterize it, Your Honor.

12         THE COURT:  All right.  Tell me exactly what you are

13    saying.

14         MR. DUBELIER:  I think the way to characterize it is,

15    we don't believe that that's the way to go forward at this time.

16         THE COURT:  And if I determine otherwise, do you

17    decline the opportunity?

18         MR. DUBELIER:  I can't answer that question because I

19    would have to go back to the client and say okay, this is the

20    only option.  And I haven't done that, because we're not in that

21    position.

22         THE COURT:  You might have those conversations,

23    because it is possible that that is where I end up, that that's

24    the next stage and I want an answer to that question.  All

25    right?

1          MR. DUBELIER:  Okay.  I'm not sure I understand what

2     the Court is directing me to do.

3          THE COURT:  If I determine after the briefing that I

4     do agree with the government here and the next step is to see

5     whether your client wants to come here to view the evidence, I

6     would like for you to be having those conversations now in the

7     event I reach that determination.

8       Do you understand?

9          MR. DUBELIER:  I do understand that, but that

10    conversation would require me also explaining to the client

11    whether or not this is an interim step or whether it's the end

12    game.  And that is, I need to be able to tell the client in that

13    conversation, look, this is all we're ever going to get, this is

14    it, or --

15         THE COURT:  I'm trying to move things along.  So I am

16    suggesting that you have those conversations with him.  It could

17    go either way.  I may not agree with them, and I may be more in

18    your camp.  But for the next time we are here, I would like to

19    know -- if I've resolved this, I would like for you to have

20    answers to those questions.  I understand it may be different

21    depending on what my position is, if this is the end game or it

22    is this plus something else.  I understand.

23         MR. DUBELIER:  I understand.

24         THE COURT:  There is no point in you delaying having

25    those conversations.

1          MR. DUBELIER:  Okay.  I get it.  Thank you.

2          THE COURT:  All right.  Mr. Kravis?

3          MR. KRAVIS:  Your Honor, we would ask for 60 days to

4    make our submission to the Court.  As the Court is aware from

5    our prior filings, there are other agencies and other

6    prosecutor's offices that we have to consult with in preparing

7    this material, and we believe we can get it done in that time

8    frame.

9          THE COURT:  All right.  So you are suggesting -- we

10   are at April 10th.  You are suggesting first week in June?

11         MR. KRAVIS:  Yes, Your Honor.

12         THE COURT:  Again, Mr. Kravis, I do want to move

13   things along.  I know this is a big job, and I want you to be

14   thorough here, because I need a lot more than is in the record

15   now to stick with the government's plan here.  All right?

16         MR. KRAVIS:  I understand, Your Honor.

17         THE COURT:  So I want you to do a fulsome job, and I

18   want to give you the time you need to do that.  But you really

19   need eight weeks to do that?

20         MR. KRAVIS:  Yes, we do, Your Honor.

21         THE COURT:  All right.  Can you file that by June 5th?

22   Is that adequate time?

23         MR. KRAVIS:  Yes, Your Honor.

24         THE COURT:  Mr. Dubelier?

25         MR. DUBELIER:  Your Honor, ironically, it kind of

1   depends what we get access to.  If it all winds up being mostly

2   ex parte, we don't need a lot of time.

3          THE COURT:  Do you want to wait?

4          MR. DUBELIER:  Maybe out of an abundance of caution,

5   give us 30 days, and if we can do it faster, we certainly will.

6      And then we are also wondering whether we can cancel the

7   May 10th hearing, which I don't think we any longer need.

8          THE COURT:  I don't know that it makes sense to have

9   that.  Do you agree, Mr. Kravis?

10         MR. KRAVIS:  Yes, Your Honor.

11         THE COURT:  All right.  So the government will file by

12  June 5th.  Mr. Dubelier, do you want to file by July 3rd?

13         MR. DUBELIER:  Sure.

14         THE COURT:  Okay.  Is there anything else we can

15  handle?

16         MR. KRAVIS:  Your Honor, one final housekeeping

17  matter.  I just wanted to advise the Court that Ms. Rhee will be

18  withdrawing her appearance in the case.

19         THE COURT:  Okay.  Thank you.

20      Anything else, Mr. Dubelier?

21         MR. DUBELIER:  No, Your Honor.  Thank you.

22         THE COURT:  All right.  Once I have the filings, I

23  will be in touch with timing on a hearing, if necessary, and how

24  to move forward.

25      One other matter, the bill of particulars is now ripe.  I

do expect to issue a ruling on that in the next couple of weeks.

Is it still the view of both parties that a hearing is not

necessary on that?

          MR. DUBELIER:  We don't believe it's necessary unless

the Court has any questions.

          THE COURT:  Mr. Kravis?

          MR. KRAVIS:  I agree with that.

          THE COURT:  I don't think I do, but if I do reach out,

that will be why, for a hearing on that.  All right?  Thank you.

     (Proceedings concluded at 11:32 a.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.




/s/ Sara A. Wick                    August 26, 2019

SIGNATURE OF COURT REPORTER         DATE