```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2    _____

 3    United States of America,    )  Criminal Action
                                   )  No. 18-cr-032-DLF
 4                    Plaintiff,   )  Public Transcript
                                   )  (Sealed Portions
 5    vs.                          )  Redacted)
                                   )
 6    Concord Management and       )  Motion Hearing
      Consulting, LLC,             )
 7                                 )  Washington, D.C.
                      Defendant.   )  July 17, 2019
 8                                 )  Time:  12:30 p.m.

 9    _____

10      Public Transcript (Sealed Portions Redacted) of Motion
                              Hearing
11                          Held Before
                 The Honorable Dabney L. Friedrich
12                  United States District Judge
      _____

13                     A P P E A R A N C E S

14    For the Plaintiff:      Jonathan I. Kravis
                              Kathryn L. Rakoczy
15                            U.S. ATTORNEY'S OFFICE FOR THE
                              DISTRICT OF COLUMBIA
16                            555 Fourth Street, Northwest
                              Washington, D.C. 20530
17
                              Heather Alpino
18                            U.S. DEPARTMENT OF JUSTICE
                              National Security Division
19                            950 Pennsylvania Avenue, Northwest
                              Washington, D.C. 20530
20
      For the Defendant:      Eric A. Dubelier
21                            REED SMITH, LLP
                              1301 K Street, Northwest
22                            Suite 1000, East Tower
                              Washington, D.C. 20005
23
                              Katherine J. Seikaly
24                            REED SMITH, LLP
                              7900 Tysons One Place, Suite 500
25                            McLean, Virginia 22102
```

```
 1   Also Present:          Jason McCullough
     (Firewall Counsel)     U.S. DEPARTMENT OF JUSTICE
 2                          950 Pennsylvania Avenue, Northwest
                            Washington, D.C. 20530
 3   _____

 4   Court Reporter:        Nancy J. Meyer
                            Official Court Reporter
 5                          Registered Merit Reporter
                            Certified Realtime Reporter
 6                          United States Courthouse, Room 6509
                            333 Constitution Avenue, Northwest
 7                          Washington, D.C. 20001
                            (202) 354-3118
 8   _____
```

9                    P R O C E E D I N G S

10          THE COURTROOM DEPUTY:  This is Criminal Case

11   2018-032, United States of America vs. Concord Management and

12   Consulting, LLC, Defendant No. 2.  This is a sealed motion

13   hearing.

14          Counsel, please come forward and introduce yourselves

15   for the record, beginning with the government.

16          MR. KRAVIS:  Good afternoon, Your Honor.  Jonathan

17   Kravis for the United States.

18          THE COURT:  Good afternoon.

19          MR. KRAVIS:  With me at counsel table are Heather

20   Alpino and Kathryn Rakoczy.  Also for the United States present

21   in the courtroom is Jason McCullough, who has been designated

22   as firewall counsel in this matter.

23          THE COURT:  Thank you, Mr. Kravis.

24          MR. DUBELIER:  Eric Dubelier and Katherine Seikaly

25   for Defendant Concord.  Good afternoon, Your Honor.

1          THE COURT:  Good afternoon.

2          All right.  We are here on Concord's motion to permit

3    disclosure of discovery pursuant to a protective order and the

4    government's motion regarding the protective order.  These most

5    recent motions are the culmination of a series of attempts to

6    craft a protective order that balances the government's

7    legitimate national security interests with the defendant's

8    right to discovery under Federal Rule of Criminal Procedure 16.

9          At the very beginning of this case the government

10   turned over sensitive discovery to defense counsel, but it

11   argued that no sensitive discovery could be transported to

12   Russia absent Court approval.  The government has since relaxed

13   its position at the urging of the Court.  The government's

14   latest proposal divides the sensitive discovery into two

15   categories.  The government has proposed a protective order

16   that draws a distinction between intermediate-sensitive

17   discovery and U.S.-sensitive discovery.

18          Under the new proposed protective order,

19   intermediate-sensitive discovery would be housed offline but in

20   Russia at Concord's IT vendor.  U.S.-sensitive discovery, on

21   the other hand, would continue to be housed offline in the

22   offices of Reed Smith here in the United States, and only those

23   who have Court approval would be permitted to view the

24   discovery here in the United States.  The government's latest

25   proposal continues to permit Concord to seek approval through

1    firewall counsel to share sensitive discovery with individuals

2    who are not already cleared to see sensitive discovery at the

3    offices of Reed Smith here in the United States.  It would also

4    permit Concord to seek approval to take sensitive documents to

5    Russia -- or Concord's attorneys, rather.

6         Like earlier hearings related to this matter, I

7    scheduled this hearing as a sealed matter to protect against

8    inadvertent disclosures of sensitive discovery or grand jury

9    matters.  But following this hearing, I'd like the parties to

10   review the transcript of this proceeding and jointly propose

11   redactions for my consideration so that a transcript that does

12   not include any reference to sensitive materials can be

13   accessible to the public on the docket.  I'd also like the

14   parties to address in a joint filing whether earlier hearings

15   that have been held under seal or briefs that have been filed

16   under seal can be redacted to address any concerns about

17   sensitive discovery or grand jury materials.

18        The D.C. Circuit has explained that although there is

19   a strong presumption in favor of public access, that

20   presumption may be overcome based on a weighing of the six

21   *Hubbard* factors, and it is well established that court

22   proceedings and records may be sealed, among other reasons, to

23   protect against risk to national security interests, to protect

24   ongoing investigations, and to minimize the danger of unfair

25   trial by adverse publicity.  I have considered the *Hubbard*

1  factors with respect to previous proceedings.  And for those

2  proceedings relating to the protective order and sensitive

3  discovery and for matters occurring before the grand jury, I

4  have determined that it was appropriate to conduct these

5  proceedings under seal, at least as an initial matter.  But I

6  am -- I remain concerned about inadvertent disclosures, and

7  we've run into issues in the past when parties have tried to

8  discuss issues relating to sensitive discovery in an open

9  courtroom.  So, historically, I proceeded with caution and held

10  these hearings under seal.

11       But as I made clear, I want to be as open as possible

12  in this case with hearings and with court filings.  So with

13  respect to the briefing on protective order motions, both

14  parties have moved to seal their filings, and in its

15  December 20, 2018, filing, Concord agreed that the protection

16  for sensitive discovery should be discussed under seal.  In its

17  recent opposition to the government's motion, however, Concord

18  has objected to the continued sealing of at least the most

19  recent round of briefing.  In light of Concord's objection and

20  in a continued effort to ensure that the public has as much

21  access as possible to the record, taking into account the

22  concerns I've expressed with regard to sensitive discovery and

23  grand jury matters, I'd like the parties to review the recent

24  filings and transcripts, as I said, and submit a joint filing

25  that either proposes redactions or justifies in more detail the

1    continued sealing of the documents in full.  If the parties

2    disagree, they can articulate the respective positions in the

3    joint filing by providing the grounds for the redactions or

4    request to keep the entire matter under seal and addressing the

5    Hubbard factors.

6         Moving forward, I suggest if the parties can address

7    any concerns relating to sensitive discovery, grand jury

8    materials, or other sensitive materials through redacted

9    filings as opposed to a request to seal the entire documents,

10   they should do so.  And any future filings that request the

11   sealing in full or in part should include a full justification

12   for the need to seal or redact the document and the right to

13   the public's access.

14        With respect to ex parte filings, Concord has

15   repeatedly challenged the Court's willingness to consider the

16   government's ex parte filings relating to the protective order.

17   While it is true that ex parte proceedings are disfavored,

18   Federal Rule of Criminal Procedure 16(d)(1) expressly provides

19   that the Court may permit a party to show good cause by a

20   written statement that the Court will inspect ex parte.  And as

21   I stated previously, I have found the government's ex parte

22   filings justified to protect the national security of the

23   United States and ongoing law enforcement investigations.

24   These filings have included the factual bases for the

25   government's claim that access to sensitive discovery should be

1    restricted.  I also note that the most recent ex parte filing

2    that the government submitted in connection with the current

3    motion is no exception.  It, too, is appropriate for the same

4    reasons.

5           There are a few housekeeping matters that relate to

6    the docket that I'd like to cover with the parties, but I'd

7    like to do that at the end of the hearing, after argument on

8    the motions.

9           So turning to the briefing on the proposed protective

10   order, at the last hearing I did ask the government for an

11   additional showing because I felt at this stage of the

12   proceedings after the resolution of Concord's pretrial motions,

13   the government needed to establish with greater particularity

14   its good cause basis for withholding all of the documents that

15   the government initially designated as sensitive discovery.  As

16   I explained, I expected the government to provide a more

17   extensive and detailed explanation on a category-by-category

18   basis that would justify the terms of the original protective

19   order.  I did not expect the government to make this showing on

20   a document-by-document basis, but I did expect the government

21   to further articulate its bases for the restrictions set forth

22   in the original protective order and to consider whether it

23   could loosen the restrictions of the original protective order

24   without jeopardizing the national security or law enforcement

25   interests in the United States.

1          In connection with its recent motion, the government

2     has supplied an ex parte filing which articulates its reasoning

3     with additional detail and provides examples that highlight its

4     national security concerns.  The government has also proposed a

5     modified protective order which loosens the restrictions on a

6     substantial number of sensitive documents by permitting them to

7     travel to Russia subject to certain conditions.

8          Based on my review of the briefing and the

9     government's proposed protective order, I do have a number of

10    questions for each side.  I want to make sure I fully

11    understand each side's position before I rule on this motion.

12    So, Mr. Kravis, I'll start first with you.  And before I ask

13    you any questions, I want to make clear, I do expect you to be

14    as forthcoming as you can in answering my questions, but to the

15    extent that I do ask you questions that you can't answer fully

16    without revealing classified information, I need you to let me

17    know that and I will follow up with you in an additional

18    ex parte hearing because I do have some questions that I'm not

19    sure whether you can answer.

20          MR. KRAVIS:  Yes, Your Honor.

21          THE COURT:  All right.  And let me start by saying

22    with respect to your current proposal, as I understand it, it's

23    the government's position that it is concerned about the

24    national security risk associated with the disclosure of any

25    single-sensitive, U.S.-sensitive document; that it has national

security concerns with respect to each and every one of those

documents but that level of concern about the risk increases as

the number of sensitive documents go to Russia; is that a fair

expression of the government's position?

        MR. KRAVIS:  I would say that the -- the government's

position is maybe best articulated a little bit different for

the different categories of materials that we have identified

as remaining U.S.-sensitive discovery.  For the -- what I think

is the largest category and the category that implicates the

most significant interests, ███████████████████████████







            THE COURT:  All right.  Well, walk me through how you
envision firewall counsel process working.
            MR. KRAVIS:  So the way --
            THE COURT:  So as I see it, the defense would
identify a stack of documents it's interested in --
            MR. KRAVIS:  Yes.  Yes.

1          THE COURT:  -- with no explanation as to why.

2          MR. KRAVIS:  Yes.

3          THE COURT:  Just we want these --

4          MR. KRAVIS:  Yes.

5          THE COURT:  -- 10,000 documents.

6          MR. KRAVIS:  Yes.  So here's the way we envision this

7     process.  First of all, for the email accounts which we believe

8     contain the vast majority of our trial exhibits, the vast

9     majority of the relevant material for this case, that stuff is

10    now off the table.  We proposed --

11         THE COURT:  Right.  But iCloud is completely locked

12    down?

13         MR. KRAVIS:  Yes.  Yes.  So the way we envision it is

14    the defense comes to the -- comes to the Court and they do it

15    through firewall counsel, if they have a reason for doing so, a

16    reason being it'll implicate defense strategy if the trial team

17    sees which documents ███████████████████████████████.

18         THE COURT:  Okay.  Well, on that point, I know you

19    proposed a provision --

20         MR. KRAVIS:  Yes.

21         THE COURT:  -- in the latest protective order --

22         MR. KRAVIS:  Yes.

23         THE COURT:  -- that I assume you proposed in part to

24    address the concerns I raised about --

25         MR. KRAVIS:  Yes.

1          THE COURT:  -- you know, expanding the paralegals and

2     translators and attorneys that don't reveal defense strategy.

3          MR. KRAVIS:  Right.

4          THE COURT:  Is that the concern you were trying to

5     address there?  Was there something more?

6          MR. KRAVIS:  No, that was it.  I -- I -- my

7     recollection was that in an earlier hearing the Court had

8     flagged the concern that perhaps there were things being

9     litigated through firewall counsel that did not have to be

10     litigated through firewall counsel.  So the way that the

11     government proposed to address that in the proposed revised

12     protective order is to require defense counsel to file a motion

13     with the Court.  They could do it ex parte.

14          THE COURT:  Yeah.  I think that's -- I appreciate the

15     government's attempt to satisfy my concern there, but I think

16     that that's unduly burdensome, but -- but I just want to make

17     sure that was the interest you were trying to address.

18          MR. KRAVIS:  It is.  It's not central to our

19     proposal.  It was just in order to address that.

20          THE COURT:  All right.  So let's scratch that.  So

21     they come with their large stack of documents.

22          MR. KRAVIS:  They come with a stack of documents.

23          THE COURT:  No showing whosoever, just --

24          MR. KRAVIS:  Right.  Right.

25          THE COURT:  -- we want to take these to Russia.

1          MR. KRAVIS:  Yes.

2          THE COURT:  And firewall counsel then does what?

3          MR. KRAVIS:  What we would expect is the defense

4   would come to the Court and to firewall counsel and say:  Here

5   are the -- we found these hundred, 500,000 documents within

6   ██████████████████████.  These are documents we would like to

7   either discuss by phone with individuals in Russia or we would

8   like to take them to Russia or transmit them to Russia or

9   whatever, and here's how we propose to do it.

10         ████████████████████████████████████████████

11  █████████████████████████████████████████████████████████████

12  █████████████████████████████████████████████████████████████

13  ████████████  We wouldn't tell the client, at least in the first

14  instance, where this particular document came from or what

15  format it came in.  We'll tell the client this is a document

16  that's been produced in discovery.  We would like to discuss

17  its content with you.

18         At that point, the Court, with the assistance of

19  firewall counsel, would evaluate whether the defense proposal

20  is a reasonable accommodation to the interests that the

21  government has articulated, and if the Court believes the

22  answer is yes, the Court grants the -- the Court grants the

23  defense request.

24         THE COURT:  Okay.  So firewall counsel at that point,

25  absent any showing as to the -- the -- how essential these

1   documents are to the defense --

2              MR. KRAVIS:  Right.

3              THE COURT:  -- no showing of that nature by the

4   defense --

5              MR. KRAVIS:  No, that's right.

6              THE COURT:  -- firewall counsel is given the

7   documents, understands how they're going to be used, where

8   they're going to be used, you know, Russia, by phone, whatever

9   the case is.

10             MR. KRAVIS:  Yes.

11             THE COURT:  And then firewall counsel's job is to

12  make a particularized showing with respect to those documents

13  if he is going to object --

14             MR. KRAVIS:  Correct.

15             THE COURT:  -- to any?

16             MR. KRAVIS:  Correct.  So firewall counsel could come

17  to the Court and say:  Look, the proposal that the defense has

18  articulated unduly infringes on the government's law

19  enforcement and national security interests because ███████

20  ████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ██████████████████████████████████████████

23  ████████████████████████████████████████████

24  ███████████████████████████████████████████████████

25  ████████████████████████████████████████████

1    this is just like -- this is so kind of critical that we don't

2    think that they should be allowed to show the -- that they

3    should be allowed to show the client at all.

4         Understanding that if it's going to be that position,

5    if it's going to be you can't talk about this document or show

6    this document to the client, that firewall counsel is going to

7    have to make a strong particularized justification for that

8    document or set of documents, and then in the final instance,

9    the Court will make the determination about how those documents

10   are going to be handled going forward.

11        THE COURT:  Okay.  As you've made clear in your

12   recent round of briefing, the first order objection will be

13   made by firewall counsel across the board; right?

14        MR. KRAVIS:  Well --

15        THE COURT:  We object.  Like, we've done all we can

16   do and we're objecting.

17        MR. KRAVIS:  I mean, I think that what my

18   expectation -- firewall counsel, obviously, is their own

19   entity.  My expectation is that the -- the United States's

20   position with respect to that may be that the position that we

21   have continued to articulate in our filings, which is we

22   believe that in this process Concord ought to have to make some

23   kind of showing to the government as -- I'm sorry -- showing to

24   the Court as to why it is unduly burdensome to have people come

25   and look at the documents here, but we make this proposal

1    recognizing that the Court may not agree with that argument,

2    and if the Court doesn't agree with that argument --

3            THE COURT:  All right.  But that's preserved in your

4    briefing.  What I don't want, if we get there, if I approve

5    something like you're proposing --

6            MR. KRAVIS:  Yes.

7            THE COURT:  -- and I don't know yet whether I will,

8    but if I do, what I don't want is every stack of documents that

9    comes is the objection we object.  You know, that's a standing

10   objection that's on the record.  Like, what I need to know are

11   the specific particularized issues with respect to this set of

12   documents, not we've done all we can do and we're not doing any

13   more.

14           MR. KRAVIS:  I understand.  I understand.  And -- and

15   firewall counsel obviously is in the courtroom.  Here's the --

16   the message.  We'll make -- we'll make sure it's clear that to

17   the extent that the government is going to object -- talking in

18   the sphere of the ████████████, to the extent the government

19   through firewall counsel is going to object to the defense

20   showing a document or a set of documents ██████████████

21   ████████ to individuals in Russia, the -- the Court's

22   expectation is that the government, while preserving its

23   objection, will make a particularized showing as to why the

24   defense proposal will harm the government's law enforcement and

25   national security interests beyond just we don't think any of

1    this stuff should go to Russia.  That more particularized

2    showing will be required from the Court before the Court denies

3    such a request from the defense.  That is our understanding.

4         THE COURT:  Okay.  So firewall makes that

5    particularized showing.  If I think it's legitimate, then it

6    swings back to Concord's attorneys to explain why this is so

7    critical to their defense?

8         MR. KRAVIS:  Yes.

9         THE COURT:  All right.  And tell me -- I mean,

10   potentially we could be in a CIPA-like world in that scenario,

11   could we not, or no?  Is there -- there's nothing that's

12   classified, but it's the same kind of, like, national security

13   interests.  So do the -- the proceedings that apply in CIPA

14   apply here?  What -- what -- what is that process?  What is

15   this?  Is this all ex parte with firewall counsel?  I'm asking.

16   I don't know the answer to these questions.

17        MR. KRAVIS:  As a general matter, this -- these would

18   be the -- as a general matter, the process that we are

19   describing would be a -- would be litigation between defense

20   counsel and firewall counsel.  It would obviously be sealed so

21   that -- to ensure the investigative team didn't have access to

22   it, but I don't believe that we would be -- as a general

23   matter, I don't believe we would be talking about classified

24   proceedings.

25   ████████████████████████████████████████████████████

1  ████████

2                    ████████████████████████████████████

3  ████████████

4              THE COURT:  All right.  All right.  Let me ask you

5  some specific questions.  Do you want to add something?

6              MR. KRAVIS:  I'm sorry.  May I just have a moment?

7              THE COURT:  Sure.

8              (REPORTER'S NOTE:  A sotto voce conference was held

9  between government counsel.)

10             MR. KRAVIS:  My colleague offered an important

11  clarification, which is that without -- without discussing this

12  in the abstract, without having in front of us a specific

13  defense proposal, of course, it is possible that in responding

14  to a defense request, firewall counsel might request permission

15  from the Court to make a classified ex parte filing

16  articulating some particular law enforcement or national

17  security interests that firewall counsel believed was

18  implicated by the defense request.

19             As the government has done in its -- in the

20  litigation over the -- in the recent litigation over the

21  protective order, the government's belief at this point is that

22  that would not need to take place through a CIPA process.  It

23  could be done the way we have done the litigation over the

24  protective order; that is, defense counsel makes a request to

25  the Court, firewall counsel receives the request and then files

1    a motion asking for the Court's permission to make a classified

2    ex parte filing as part of the government's response, and the

3    Court either grants that permission or denies it.

4              THE COURT:  So you're saying some portion of that

5    could be ex parte with firewall counsel?  That's how you

6    envision it?

7              MR. KRAVIS:  I envision that firewall counsel could

8    ask the Court for permission to do some of that ex parte for

9    the same reasons that the government -- the trial team has

10   asked for permission to proceed or make showings ex parte in

11   the litigation over the protective order, and, of course, it

12   would be within the Court's discretion to decide whether to

13   grant or deny firewall counsel the permission to make such a

14   filing.

15             THE COURT:  Okay.  But firewall counsel -- again, not

16   to beat a dead horse, but firewall counsel will be looking at

17   the stack of documents?

18             MR. KRAVIS:  As a particularized matter, not just

19   generally.

20             THE COURT:  Not general.  This doesn't --

21             MR. KRAVIS:  Yes.

22             THE COURT:  Like this is -- these documents in

23   particular, here's why there's a problem.

24             MR. KRAVIS:  And our -- again, speaking as a general

25   matter, not having a particular proposal in front of us, our

1    expectation, given the interests and the nature of the

2    documents we are talking about, is that more often than not

3    firewall counsel would likely be saying:  Here is a -- an

4    amendment we propose to the way in which defense counsel

5    presents or discusses the content of these documents with the

6    client rather than saying we just don't think they can show

7    them the document at all.

8            I can't say that across the board, but as a general

9    matter, given the interest that we have articulated, that is

10   our expectation of what firewall counsel would be doing here.

11           THE COURT:  Okay.  And, again, we're talking in the

12   abstract.  So it's difficult to flush all of this out, but

13   based on what you're saying, I'm envisioning that there could

14   be a document where it has, like, something across the top,

15   perhaps, like that -- that would be revealing or --

16           MR. KRAVIS:  Or --

17           THE COURT:  Give me some examples.

18   ███████████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████████

20   █████████████████████████████████████████████████

21   ███████████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████████

23   ███████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮

5        Defense counsel may, I suppose, come back to the

6 Court and say:  We need -- we need to talk with the client

7 about more.  We need to tell them more about where the document

8 came from.  And at that point firewall counsel would articulate

9 the government's position, and the Court would make a

10 determination.  But that's sort of what I have in mind when

11 I -- when I say -- when I describe generally the nature of what

12 we expect firewall counsel's positions would be on these

13 issues.

14        THE COURT:  Okay.  And it sounds like at least with

15 respect to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮

17        MR. KRAVIS:  Right.

18        THE COURT:  That a big reason behind the government's

19 decision on this is just a logistical one and how to --

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



THE COURT:  All right.  Paragraph 25 of your proposed

order provides that, alternatively, the defense may create its

own set of intermediate-sensitive materials from the discovery

that has already been produced in this case for review by

authorized persons.  As far as I can tell, you don't discuss

this in your brief.  What -- what does this paragraph mean?

MR. KRAVIS:  So this was intended to address a

concern that defense counsel articulated to the government at

the time that we were talking about Concord's officers and

employees coming to the United States to look at the discovery.

Our initial proposal had been that we, the

government, would provide a set of the discovery for them to

review, and defense counsel had told us:  That's no good

because -- it's no good for us because we have work product

embedded in the materials that you have already given us.  I

1     think what they mean is that they have, like, tags and

2     discovery or -- and relativity or Eclipse or something like

3     that.  So they've already reviewed and tagged and identified

4     certain documents, and if we give them a brand-new set, it's

5     going to be difficult for them to map their work product onto

6     the new set.

7          So this provision in a protective order was intended

8     to acknowledge that defense interest by saying for the

9     material -- the intermediate-sensitive discovery that's

10    reviewed in Russia, if you want, we can create a set and give

11    it to you, but we expect, from our prior conversations, you're

12    not going to want to do that.  So it's okay with us if you

13    create the set through your vendor, provided the Court and

14    firewall counsel gets some information about how that's

15    happening.

16         THE COURT:  About what the categories are and the

17    categories match the ones that you've proposed?

18         MR. KRAVIS:  Yes.  So that they can describe again --

19    they don't have to do it, not with us, but firewall counsel.

20    They can do it in a way the Court and firewall counsel are

21    satisfied that the vendor is protecting the -- the interests

22    that we have articulated, and we would -- what we would expect

23    to do is if the Court grants the -- the motion for the proposed

24    protective order or something like it within a short period of

25    time, send a letter to defense counsel formally -- formally

1    dividing up the sensitive discovery between intermediate

2    sensitive and U.S. sensitive so they know exactly which

3    categories of documents can be viewed in Russia and which must

4    remain in the United States.

5              THE COURT:  But you don't think that whatever

6    platform they were viewing this on creates the same problems in

7    terms of how you read ██████████████ and other things that

8    you're worried about?

9              MR. KRAVIS:  Well, our position is that the vendor

10   has to create it in such a way that ████████████████ aren't

11   just being viewed by the people in Russia who are looking at

12   it.

13             THE COURT:  Okay.  So this is for all the other

14   stuff?

15             MR. KRAVIS:  Yes.  The email -- I think we're talking

16   principally now about the email accounts.

17             I take Concord's point in their opposition about the

18   subpoena returns.  I think we can -- in that -- that is one

19   area where we can sort of slice the bologna a little thinner by

20   identifying particular subpoena returns that we would like to

21   designated U.S. sensitive and allowing the remainder to be

22   intermediate sensitive, but principally --

23             THE COURT:  Sorry.  These are the 2703(d) orders?  Is

24   that -- is that what we're talking about?

25             MR. KRAVIS:  Subpoena returns, I think -- I think,

1    largely.

2              THE COURT:  All right.  Okay.

3              MR. KRAVIS:  Concord made the point in its opposition

4    that the subpoena returns include information about financial

5    accounts and email accounts that the government will allege are

6    attributed or connected to the defendant and so they should be

7    allowed to show the defendant those returns.  We acknowledge

8    that point, and so I think we can sort of -- we can -- we can

9    take a cut at the -- designating the subpoena returns.

10             THE COURT:  What would you be withholding?

11             MR. KRAVIS:  There are some subpoena returns that go

12   beyond just describing, like, account information that, again,

13   reveal sensitive --

14             THE COURT:  Stuff that you can't talk about?  I need

15   to understand where this is -- what I'm looking for is basis

16   for categories; right?  So if the -- if you're saying the

17   subpoena returns you agree are overly broad, what's different

18   about what you would hold back versus what's going?

19             MR. KRAVIS:  There are -- I think the best I could do

20   in this setting is to say there ███████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ███████████████████████████████████████████████████████████████

25   ███████████████████████████████████████████████████████████

1 ████████████████████████████████████████████

2 ███████████████████████████

3          We can make a more particularized showing for the

4 Court.  In the first instance, we'd ask to do that on an

5 ex parte basis, if necessary.

6          THE COURT:  Okay.  Mr. Kravis, your motion states

7 that the U.S.-sensitive discovery consists largely of

8 ████████████████████████████████████████████

9 ███████████████████████████████████████████████

10 ███████████████████████████████████████████████

11 ██████████████

12          MR. KRAVIS:  Yes.

13          THE COURT:  So when you say the U.S.-sensitive

14 discovery consists largely of ██████████████████████████

15 ███████████████████████████████████████████████

16 ██████████████████████████████

17          MR. KRAVIS:  Yes.  Yes.

18          THE COURT:  Is there anything more than that?

19          MR. KRAVIS:  No.  No.

20          THE COURT:  So his formulation, there's six different

21 categories here.

22          MR. KRAVIS:  Yes.

23          THE COURT:  And that's the sum total of what you've

24 held back?

25          MR. KRAVIS:  Yes.

1          THE COURT:  Everything falls in one of those six

2    categories?

3          MR. KRAVIS:  Yes.

4          THE COURT:  All right.

5          MR. KRAVIS:  I mean, just -- that -- everything falls

6    into those six categories under the proposal that we have

7    provided to the Court.

8          THE COURT:  Okay.

9          MR. KRAVIS:  Yes.

10         THE COURT:  And you're qualifying this because

11   there's still this small piece of discovery that even defense

12   counsel doesn't have, is -- why are you qualifying things now?

13         MR. KRAVIS:  There is a very small amount of

14   discovery that we have not yet provided to defense counsel.

15   The reason I was qualifying was just because the Court had said

16   what we have held back.  I just want to be sure that --

17         THE COURT:  Okay.  Yeah.  I don't mean to use that

18   term because right now the -- I know we're on a proposal, but

19   what you propose keeping here in the U.S. is U.S. sensitive?

20         MR. KRAVIS:  Yes.  Correct.

21         THE COURT:  That's what I mean.

22         MR. KRAVIS:  Correct.  Correct.

23         THE COURT:  All right.  And with respect to the small

24   set --

25         MR. KRAVIS:  Yes.

1          THE COURT:  And we're talking about total discovery,

2     four million documents; right?

3          MR. KRAVIS:  Yes.

4          THE COURT:  Small relative to four million can be

5     pretty large.  Can you give me some sense of what you're

6     talking about in terms of holding back a small set.

7          MR. KRAVIS:  I believe at this point there is one

8     search warrant return and some *Jencks* and *Giglio* material that

9     has been withheld that has not yet been provided to the -- that

10    has not yet been provided to defense.

11         THE COURT:  You want a moment?

12         MR. KRAVIS:  Okay.  From our investigation, there is

13    a search warrant return and there is a *Jencks* and *Giglio*

14    material -- not a large amount of material -- that has not yet

15    been provided to the defense.

16    ████████████████████████████████████████

17    ████████████████████████████████████████████

18    ██████████████████████████████████████████████████

19    ██████████████████████████████████████████████████

20    █████████████████████████████████████

21    ███████████████████████████████████████████████

22    ████████████████████████████████████████

23    ████████████████████████████████████████████

24    ██████████████

25    ████████████████████████████████████████████





1   ████████████████████████████████████████████

2         ██████████████████████████

3         ████████████████████████████████

4         MR. KRAVIS:  Okay.  Just checking with the table.

5         THE COURT:  I can appreciate your nervousness.

6         All right.  With respect to -- with respect -- I had

7   a question.  All right.  I hope it'll come to me.  I've lost

8   it.

9         Paragraph 22 of your proposed protective order states

10  that authorized persons may view the intermediate discovery in

11  a locked room of Concord's vendor in Russia.  Paragraph 2

12  further states that authorized persons include Concord officers

13  and employees designated by defense counsel.  Am I correct that

14  under your proposal Court approval would not be necessary for

15  any Concord officer, employee, including Prigozhin, to view the

16  intermediate discovery at Concord's vendor's office?

17        MR. KRAVIS:  Correct.

18        THE COURT:  Okay.

19        MR. KRAVIS:  I mean, our expectation is that -- that

20  the individuals who view the intermediate-sensitive discovery

21  in Russia will be signing a memorandum of understanding and

22  there will be someone --

23        THE COURT:  From Reed Smith who is there?

24        MR. KRAVIS:  Oh, a vendor, an agent of Reed Smith.

25  It could be an employee of the vendor, a --

1          THE COURT:  Can it be a Russian employee of Reed

2     Smith?  A translator?  A paralegal in Russia?  Anyone?

3          MR. KRAVIS:  There is someone who is answerable to

4     this Court who is keeping track of who is looking at that

5     discovery, but there -- we -- not -- not a restriction on -- on

6     who can look at it.  And that they are -- they have been

7     advised of the terms of the proposed protective order and that

8     they are representing to the Court that the people who are

9     viewing the intermediate-sensitive discovery in Russia are

10    viewing it for the purpose of preparing the defense as required

11    by the protective order.

12         THE COURT:  And this is a restriction that was not

13    imposed on the initial nonsensitive discovery that I allowed to

14    go to Russia in part because of the -- what appear to be abuses

15    associated with the misuse of --

16         MR. KRAVIS:  Yes.

17         THE COURT:  -- the nonsensitive discovery?

18         MR. KRAVIS:  Yes.

19         THE COURT:  All right.  Backing up on -- on what

20    you've provided.  To the extent you have any exculpatory

21    evidence, have you turned that over?

22         MR. KRAVIS:  Yes, with the -- I want to add the

23    caveat, there is *Jencks* and *Giglio* material we will provide to

24    the defense.  Just making sure -- thinking of the definition as

25    broadly as possible, there is *Jencks* and *Giglio* material that

1     has not yet been provided to the defense that will be provided

2     to the defense well in time for them to use any of that

3     material at trial.

4               THE COURT:  When I set a pretrial order.

5               MR. KRAVIS:  Yes.

6               THE COURT:  Okay.  What about the discussions with

7     Concord officers and employees?  Those need to occur, putting

8     aside the firewall process.

9               MR. KRAVIS:  Right.

10              THE COURT:  With respect to the

11    intermediate-sensitive discovery that's going to go to the

12    vendor in Russia, anyone can come in as long as they sign this

13    MOU to that office to view the discovery?  Anyone, including

14    Prigozhin himself?

15              MR. KRAVIS:  Yes.

16              THE COURT:  And discussions can be had about any of

17    that discovery that's sitting in that office, but it has to

18    occur in that office; is that the government's position?

19              MR. KRAVIS:  Yes.  Now, we understand that defense

20    counsel may want to propose -- they may have some proposal -- I

21    don't know exactly what their -- what their workday looks like,

22    but they may say:  Look, we would like to have an arrangement

23    where we, the United States Reed Smith attorneys, can talk with

24    folks in Russia about the intermediate-sensitive material.  And

25    we would work with defense counsel to figure out some way to do

 1   that.  That respects everyone's interests.  I couldn't sort of

 2   envision how that would -- what exactly they would want from

 3   that and --

 4             THE COURT:  Well, I'm guessing they want to pick up

 5   the phone here in D.C. and call and talk to people in Russia,

 6   including Prigozhin and others, about what's in all the

 7   discovery, but I know that's different, but talking about the

 8   intermediate discovery, it is your position that needs to occur

 9   in Russia at the vendor's --

10             MR. KRAVIS:  We're open to working with defense

11   counsel on that.

12             THE COURT:  But I've got to set a protective order.

13   So that's something that -- I -- I appreciate you're trying

14   to --

15             MR. KRAVIS:  We understand --

16             THE COURT:  -- work out an arrangement.

17             MR. KRAVIS:  We understand that interest, and I

18   believe we can work with defense counsel to craft a proposal

19   that allows for that.

20             THE COURT:  Okay.  Because as I read the protective

21   order, paragraph 16 appears to limit the discussion of

22   U.S.-sensitive discovery, but paragraph 23 does not appear to

23   limit the discussion of intermediate-sensitive discovery, is

24   that correct, and is that intentional?  Is this just an issue

25   that the government left open because it anticipates trying to

1    work out something with defense counsel?

2         MR. KRAVIS:  I mean, we did anticipate trying to work

3    something out with defense counsel.  Was the paragraph that the

4    Court cited 23?

5         THE COURT:  Yes.  Paragraph 23 does not appear to

6    limit discussion of intermediate-sensitive discovery.

7         MR. KRAVIS:  I see.  We had not intended to -- we had

8    not intended for paragraph --

9         THE COURT:  23 to be open?

10        MR. KRAVIS:  Right.

11        THE COURT:  But that said, your brief suggests that

12   it needs to occur -- right now it needs to occur, if I adopted

13   this, at the vendor's office.  And what you're saying here is

14   the government can appreciate that that might be unduly

15   burdensome and --

16        MR. KRAVIS:  Yes.

17        THE COURT:  -- open to other suggestions --

18        MR. KRAVIS:  Yes.

19        THE COURT:  -- that defense counsel could propose?

20        All right.  So let's talk about the sensitive

21   discovery that the government proposes should remain here in

22   the U.S., the U.S.-sensitive discovery.  I know we've gone

23   through this before.  There's four million documents total.

24   Under the initial original protective order there's 3.2 that

25   were deemed sensitive.  Now the government's taken a chunk of

```
1     that and said this is intermediate sensitive.

2              And so what number are we now talking about roughly?

3     I'm -- just some -- it's hard for me to tell with you all

4     spatting in the briefs what we're talking about.

5              MR. KRAVIS:  Right.

6              THE COURT:  Is it the majority of --

7              MR. KRAVIS:  No.

8              THE COURT:  -- what the government deems relevant?

9     Is it the majority of sensitive discovery?  Like, what -- what

10    are we talking about?  Give me a ballpark number.

11             MR. KRAVIS:  I mean, so if we're -- with the caveat

12    that -- it's a little bit difficult to put numbers on the --

13    start with this caveat.  It's a little difficult to put numbers
```



What I can -- what I can say is the -- we tried to look at it by just the sheer size, like the sheer volume, and it comes out to somewhere around 50 percent of the sensitive discovery in terms of size.  That number is misleadingly large because the

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2          In terms of our assessment of what the -- the

3 relevant materials are -- and I know that defense counsel may

4 have a different -- may have a different view, but our

5 assessment is the vast majority of the relevant documents in

6 the case are in the email accounts and are -- consist of

7 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8 ▓▓▓▓▓▓▓

9          So as we represented in the motion regarding the

10 protective order, we believe that there are a relatively -- a

11 relatively small number of relevant documents -- by which I

12 mean documents discussing -- discussing the conduct at issue in

13 the indictment in the -- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14          THE COURT:  But his point is that's not really a

15 determination once it's Rule 16; that I should be making

16 Rule 16, Rule 16 and they get it, but, I -- I mean, you're

17 trying to balance the equities here.

18          MR. KRAVIS:  Correct.  And this sort of -- I --

19 before I move on, my colleague corrects me.  In terms of

20 datawise, just looking at the sheer size of it, about

21 25 percent of the discovery -- again, just in terms of, like,

22 the size of the files would remain U.S. -- would remain U.S.

23 sensitive.

24          THE COURT:  Of 25 percent of sensitive discovery?

25          MR. KRAVIS:  Twenty-five percent of the total

```
 1    discovery.

 2              THE COURT:  Total discovery?

 3              MR. KRAVIS:  Yes, produced in the case.

 4              And just to respond to the last point that the Court

 5    made -- and I think this is one area where we disagree with the

 6    defense's characterization of the issue before the Court.  Our

 7    view is that this is not -- the -- the issue here is not what

 8    discovery Concord gets and doesn't get.  They've gotten the

 9    discovery.  The issue is --

10              THE COURT:  Make them come here.

11              MR. KRAVIS:  The issue is where and when that

12    discovery can be viewed and discussed, and rule -- the reason I

13    mention this is the Court invoked Rule 16, but Rule 16, of

14    course, allows the Court to enter a protective order that

15    limits where and when certain discovery can be viewed based on

16    a -- based on a showing of good cause.

17              THE COURT:  Right, but it has to be narrowly drawn.

18              MR. KRAVIS:  Yes.

19              THE COURT:  And you're making me a little nervous

20    with the ███████████, but what you're saying is it's

21    technologically infeasible to --

22              MR. KRAVIS:  Both --

23              THE COURT:  -- break it down.

24              MR. KRAVIS:  Both technologically and as a matter of

25    protecting the -- the interest that the government has
```

1   articulated.

2            THE COURT:  And explain that again.  Because you tell

3   me it's not any one document.  It's as a whole, and I say,

4   okay, take out 95 percent, let it go.  Then you say, can't

5   really do that easily; right?  Help me understand that

6   position.

7            MR. KRAVIS:  Can I do that on an ex parte basis?

8            THE COURT:  Yes.  I'm just wondering maybe we

9   should --

10           MR. DUBELIER:  We can leave.

11           THE COURT:  Yeah, no.  I -- I don't know.  I'm going

12  to have other questions to ask you, and I don't want to try to

13  do this all at the bench.  But I appreciate you need to give

14  more explanation, and I do -- I do need, Mr. Kravis, more

15  explanation.  I appreciate you're trying to be forthcoming

16  here.  I just -- I just want to make sure that I'm -- to the

17  extent I go along with the government's proposal that it is as

18  narrowly crafted as we can do reasonably and protect the

19  national security interests of the country.  So --

20           MR. KRAVIS:  I understand.

21           THE COURT:  -- that's my concern.

22           All right.  This is probably going to be a similar

23  problem here.  Concord points out that you've already

24  designated some ███████████████ that's nonsensitive discovery

25  data in this case.  And, again, can you explain without getting

1    into sensitive --

2              MR. KRAVIS:  Yeah.  So --

3              THE COURT:  -- classified information why you've

4    delineated certain accounts as appropriate for the intermediate

5    bucket and others stay here?











13          THE COURT:  Okay.  But, again, your baseline point is

14    you've provided it and they still can come here and see it, if

15    they so choose.

16          MR. KRAVIS:  And they can ask the Court for --

17    through firewall counsel for permission to show documents --

18    categories of documents from that material to individuals in

19    Russia, to discuss it with individuals in Russia.  That

20    opportunity also remains available.

21          THE COURT:  Okay.  So is there any of the newly

22    created -- the proposal you have for this new sensitive --

23    U.S.-sensitive category, do any of those materials include

24    materials that are already available in the public in another

25    way that you --

48

```
1            MR. KRAVIS:  I don't -- I don't believe so.  Not to

2    my knowledge.
```



1　　[REDACTED]

2　　[REDACTED]

3　　[REDACTED]

4　　　　　　THE COURT:  So if the defense decides this is -- this

5　　is good but not good enough and we actually do want some of our

6　　officers and employees to come here and look at this in our

7　　offices here at Reed Smith, you've suggested that there are

8　　folks who aren't charged in the indictment who could do that?

9　　　　　　MR. KRAVIS:  Yes.  Now, in that -- if we were -- if

10　　we were at that stage, I think we would obviously need to

11　　[REDACTED]

12　　[REDACTED]

13　　[REDACTED]

14　　　　　　THE COURT:  Well, that would be -- firewall counsel

15　　would be doing that; correct?

16　　　　　　MR. KRAVIS:  Correct.  Correct.  Yes.

17　　　　　　THE COURT:  But, you know, I'm operating under the

18　　assumption that there's still all this discovery sitting at the

19　　offices of Reed Smith that Concord officers and employees can

20　　come to the U.S. and see --

21　　　　　　MR. KRAVIS:  Yes.

22　　　　　　THE COURT:  -- if they get approval.

23　　　　　　MR. KRAVIS:  Yes.

24　　　　　　THE COURT:  And you've suggested to me previously

25　　that there are folks who wouldn't be arrested when they touch

1    down, and I'm not going to ask you to guarantee self -- safe

2    passage now for any of them, but my impression is the

3    government hasn't charged all of Concord --

4              MR. KRAVIS:  Correct.

5              THE COURT:  -- as a criminal defendant, nor would it

6    intend to treat every Concord employee like that; right?

7              MR. KRAVIS:  Correct.  Yes.

8              THE COURT:  But you, the trial team, would not know

9    this.  This would be through firewall counsel, and firewall

10   counsel would be objecting if there's a need to, but --

11             MR. KRAVIS:  Yes.

12             THE COURT:  -- I guess my question is it remains the

13   government's position that there are those folks who could come

14   here and firewall counsel not object to?

15             MR. KRAVIS:  Yes.

16             THE COURT:  We don't know who -- I'm not asking you

17   exactly who they are, but that's your --

18             MR. KRAVIS:  Yes.

19             THE COURT:  -- impression?

20             MR. KRAVIS:  Yes.

21             THE COURT:  That this isn't a null set?

22             MR. KRAVIS:  Yes.

23             THE COURT:  All right.  Back to the -- the question

24   about ████████████████.  And you agree to classify some of

25   the -- so this is separate than the grand jury returns.  We're

1    talking about two separate things, the grand jury returns and

2    ██████████████████.

3             MR. KRAVIS:  We had -- we had sort of lumped them

4    into one category, I think, in our response, and I think we

5    would propose to treat them the same way, which is I recognize

6    Concord's point in its opposition that there may be -- that

7    there may be material in there, in the subpoena returns.

8    Perhaps -- I'm not as sure about ████████████████████████

9    ████████████████████████, but at least in the subpoena

10   returns, that they would want to discuss with their client --

11   that they would want to discuss with their client.  And so when

12   we had been crafting this proposal, we just had not viewed the

13   subpoena returns as the kind of material that they were

14   proposing.

15            THE COURT:  That they care about.

16            MR. KRAVIS:  Right, but I understand their point.

17            THE COURT:  And that might be something that they

18   lump -- could that be something they lump into their own

19   created intermediate discovery?  I mean, it would involve a

20   conversation.

21            MR. KRAVIS:  I think we -- we can, in the first

22   instance, try to accommodate that request by making -- making

23   finer designations for the grand jury, the subpoenas

24   themselves, and the -- the returns on the subpoenas so that a

25   chunk of that material off the top we could designate as

1    intermediate sensitive.

2          The remaining -- there are other materials that we

3    were discussing previously within the grand jury subpoenas and

4    returns ███████████████████████████ that we would propose to

5    designate as U.S. sensitive, and then those would be treated in

6    the same manner as the other categories.  That is, Concord

7    could come to the Court and say:  We would like to show this

8    material to our clients or discuss it with our clients in

9    Russia, and then firewall counsel would provide the Court with

10   guidance on the government's position.

11         THE COURT:  So why can't there be a smaller category

12   of these returns, ████████████████, for example?  You

13   think there can be?

14         MR. KRAVIS:  I'm not sure I follow the --

15         THE COURT:  If there are some that are just

16   associated with that case that are really -- I mean, this is

17   the issue -- in your eyes, not really relevant to what's

18   charged here and they're going to say different, but I'm just

19   wondering if that -- if that category is as narrow as it can

20   be.  You're suggesting now --

21   ██████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ██████████████████████████████████████████████

24   ██████████████

25         For the material gathered in our investigation, what

1    I'm suggesting is we acknowledge defense counsel's point that

2    the category of grand jury subpoenas, subpoena returns, ███████

3    ████████████████████████ for our investigation could --

4    could be narrowed, and we would -- we're ready to do that.

5              THE COURT:  Okay.  And do you think that ██████████

6    document category can be narrowed any further than you've done?





19          THE COURT:  Okay.  Mr. Kravis, you said in your brief

20   an intention to propose additional modifications to any

21   protective order that I may enter once your exhibit list is

22   ordered to be disclosed.  Tell me what you envision at that

23   stage.  Do you envision your exhibits at some point going all

24   into the intermediate discovery, or do you view them as

25   virtually all of them are in there already?

1          MR. KRAVIS:  We believe that virtually all of them

2    are in there already.  We do believe there are a small number

3    of documents that the government may put on an exhibit list,

4    seek to introduce in its case in chief that would remain in the

5    U.S.-sensitive discovery bucket under our proposal.

6          If we intended to use any of those materials in our

7    case in chief at trial to put on an exhibit list, at that time

8    we would submit a proposal to the Court, obviously through --

9    with defense counsel's non-ex parte proceeding, that set forth

10   our position for what we wanted to do with those materials.

11         It is possible for some of them we might say that we

12   would propose to simply take that exhibit and designate as

13   intermediate sensitive or it might be possible to do something

14   more than that.  I mean, we would -- we would come up with a

15   proposal for how we would seek to do it, understanding that the

16   Court would have to make a ruling in the final instance on

17   whether our proposal was acceptable and sufficient for us to be

18   allowed to use the exhibit at trial.

19         THE COURT:  All right.  And just to recap on the

20   discussion restrictions.  Walk me through your position with

21   respect to sensitive and nonsensitive -- intermediate

22   sensitive.  Intermediate sensitive, you say that there may be

23   room for negotiation with the defense there, not holding them

24   to discussions in the room with the vendor in Russia.

25         MR. KRAVIS:  I mean, we -- we would ask for some

1    restriction on where the material is housed, where the material

2    is viewed, and where the material is discussed.  And the reason

3    we would ask for those restrictions is our understanding is

4    that these are Concord officers and employees who would be

5    going into the -- the area, the vendor's office, to view the

6    intermediate-sensitive discovery for the purpose of assisting

7    Concord in preparing its defense for trial.

8            Given that while those individuals may not be before

9    the Court, Concord is before the Court.  We think it's not too

10   much to ask that Concord's own officers and employees agree

11   that they will limit their conversations about that material to

12   some designated space.  We -- I -- I acknowledge that defense

13   counsel likely will get up here and say:  Look, I don't want to

14   have to fly to Russia every time I need to talk to a Concord

15   employee about something in the intermediate-sensitive

16   discovery.  And I think the best I can say right at this moment

17   is that we are -- we stand ready to sort of talk with defense

18   counsel.

19           THE COURT:  And this is the firewall problem, right,

20   or are you saying right now on the front end you think there

21   might be some way to craft a protective order that would take

22   into account this concern?

23           MR. KRAVIS:  I'm saying on the front end; right.  I

24   mean, this is something that -- this is something that we, the

25   government, internally would need to discuss and we would want

 1    to discuss with defense counsel, but I think we stand ready to

 2    try to work something out on the front end so that they don't

 3    have to go through firewall counsel every time they want to

 4    have a conversation about the intermediate-sensitive discovery

 5    without traveling to Russia.  We're willing to work on it.

 6              THE COURT:  All right.  Anything else?  Any other

 7    points you'd like to make?

 8              MR. KRAVIS:  If I can just have a moment.

 9              THE COURT:  Oh, if I cut you off on the sensitive

10    discovery, it remains in firewall counsel world to discuss

11    that?

12              MR. KRAVIS:  Yes.  Yes.

13              (REPORTER'S NOTE:  A sotto voce conference was held

14    between government counsel.)

15              MR. KRAVIS:  Just two things before I sit down.  The

16    first is my colleagues advise me that I said a moment ago that

17    there is █████████████████████████████████████████

18    ████████████████████████████████████████████████████████████

19    ████████████████████████████████████████████████████████████

20    ████████████████████████████████████████████████████████████

21    ██████████████████████████████████████████████████████████████

22    ████████████████████████████████████████████████████████████

23    ███████████████████████████

24         ██████████████████████████████████████████████████

25    ████████████████████████████████████████████████

1   ▬▬▬▬▬▬▬

2       ▬▬▬▬▬▬▬▬

3   ▬▬▬▬▬▬▬▬▬▬▬▬

4       ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

5   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

6   ▬▬▬▬▬▬▬▬▬

7              THE COURT:  Okay.

8              MR. KRAVIS:  The last thing before I sit down is the

9   court reporter graciously reminded me at the start of the

10  hearing that I am supposed to move to unseal the transcript to

11  the parties only for the limited --

12             THE COURT:  So that they can propose redactions.

13  And, yes, I do grant that motion, and I -- I grant the motion

14  retroactively for all these other transcripts that I'm going to

15  ask you all to review.  I guess you have them already.  Do you

16  have the prior ones?

17             MR. KRAVIS:  Yes.  Yes.

18             THE COURT:  But to the extent there's any question

19  for the court reporter -- and it will not be this court

20  reporter -- but I'll make sure she's aware.

21             MR. KRAVIS:  Thank you, Your Honor.

22             THE COURT:  All right.  Mr. Dubelier.

23             MR. DUBELIER:  Yes, Your Honor.

24             THE COURT:  So I appreciate that you continue to

25  object to a blanket protective order.  You continue to object

1    to the scope of the sensitive discovery.  You continue to

2    object to discussion restrictions.

3            Recognizing all those things, it seems to me the

4    government's come a long way here in terms of proposing

5    something that's very much like what you proposed with respect

6    to the ████████████████.  So putting aside those bigger

7    concerns that I know you haven't waived and you're not

8    conceding, but tell me what your view is of this intermediate

9    discovery category.

10           MR. DUBELIER:  Your Honor, the difficulty we have --

11   and I think we expressed in our pleading -- was we still

12   believe the cut is arbitrary and don't understand it.

13           THE COURT:  Well, I'm -- and you heard us talk, and

14   I'm going to have to drill down more on this, but ████████ is

15   a problem.

16           MR. DUBELIER:  Yeah.  And, Your Honor, I did -- I did

17   hear it, and as far as I'm concerned from listening to it from

18   the outside while you two were going back and forth, the

19   argument changed as it was in process.  And that is what's

20   happened several times in this case is that the government

21   makes an ex parte presentation to you, which puts you in a

22   difficult position, and then you come out and try and

23   articulate to them in a nonsensitive way what they said to you.

24   And every time that's happened -- it's happened three or four

25   times -- they tell you, no, you have it wrong.

1      So what happened today is the Court came out and said

2    it was the Court's impression that now what they wanted to

3    maintain as sensitive, the substance of that information was

4    sensitive.  So that's what the Court gleaned from the ex parte

5    presentation.

6       THE COURT:  No, that -- that wasn't -- that's not the

7    question I intended to ask.  That may be how it came off.

8       MR. DUBELIER:  Okay.

9       THE COURT:  But -- but the question I was trying to

10    ask is it's not the substance of any one document.  It's that

11    when you reveal a document, a single document, regardless of

12    the substance, if there's a chance that they can reverse

13    engineer and figure out how they got it.  It's not what's on

14    the page.  It's that this was only in so-and-so's account.

15    That's the question I was trying to ask.

16       MR. DUBELIER:  The advantage we have, Your Honor,

17    though, again -- and I recognize the impossible situation the

18    Court is in.  We have access to the materials.  So we're not

19    talking about something in the abstract.  Our side can actually

20    see what they're talking about.  We cannot look at these

21    materials and see the distinction that the government is

22    making.

23       THE COURT:  I know.  And I appreciate the difficult

24    position you're in because I can't share classified information

25    with you, nor can they, but that's -- that's -- I'm balancing

1    two very legitimate interests here.  I will assure you,

2    Mr. Dubelier, is there -- they have made a very particularized

3    showing as to categories, not -- I've got follow-up questions

4    with respect to these six categories that I have to drill down

5    with them in an ex parte proceeding.  And I think I'm allowed

6    to do that under Rule 16, and I intend to do so.

7           But I am trying to make sure that any protective

8    order I enter is as narrow as possible, because I should not

9    unduly burden you, and under Rule 16, you have the right to

10   these documents.  I do think the default position is one that I

11   was very receptive to last time, you'll recall.  Like, if your

12   people are going to see this, it's going to be here in your

13   offices at Reed Smith, and I was trying to get you all to work

14   together to identify some people to come here.  So, you know,

15   there's that; that still remains an option.

16          I know you said I don't know whether my client will

17   want that and all that and I'm not going to commit here, but

18   let's not forget, that remains an option, and there's still a

19   sliver that you don't have -- maybe a pretty significant

20   sliver -- you might not view it as a sliver, but the government

21   is going to have to justify, you know, not disclosing stuff to

22   you well in advance of trial.  But, for the most part, it

23   sounds like if they come here, they can get a lot of this

24   stuff.

25          MR. DUBELIER:  Your Honor, that's not -- that's not a

1    practical solution for the reasons I've already explained to

2    the Court and as we've said in our pleadings on this.  First of

3    all, they need a visa.  The visa process is a year to get a

4    visa.

5              THE COURT:  Well, I don't -- I -- I will be shocked

6    if you say one of your employees wants to come here that the

7    government is going to tell me, sorry, we can't get them here

8    before trial.  I will be shocked and disappointed.

9              MR. DUBELIER:  Okay.  Let me go to the second issue

10   then, Your Honor, and obviously just an employee of Concord

11   doesn't help me in any way in preparing for a defense in this

12   case.  I need to be talking to the people that they allege

13   violated the law.

14             THE COURT:  Yeah.

15             MR. DUBELIER:  How -- the government is never going

16   to agree that those people can come here freely and look at

17   discovery.

18             THE COURT:  Of course they're not.  Of course they're

19   not, but that's when we're in firewall counsel world.

20             MR. DUBELIER:  But firewall counsel can't help with

21   that.  Firewall counsel would have to give an employee of

22   Concord that they believe was responsible for violating the law

23   safe passage to come in the United States.

24             THE COURT:  No.  No, no, no.  No.  At that point

25   you're saying these need to go.  These -- we need -- like I

1    need to take this to Russia.  I need to have a telephone

2    conversation.  And those fights are going to continue to occur,

3    but I'm trying to, again, balance two weighty interests, and I

4    think the government has come a really long way.  Frankly, I

5    was surprised that they proposed sending all of this to Russia,

6    but they have, and we are where we are, but there's this other

7    mechanism that you can explore.  And you may not like it, in

8    which case you can -- you can say that's not good enough.  You

9    can go to firewall counsel and say Prigozhin needs to see this.

10          MR. DUBELIER:  Well, Your Honor, as -- as we said in

11   our pleading, we're not going to deny taking the information

12   they say we can take.  I'm not going to refuse to take it.

13          THE COURT:  Nor am I going to refuse.

14          MR. DUBELIER:  Yeah.

15          THE COURT:  But -- but I'm just saying that we

16   can't -- that's not your only option here.  And you can say the

17   other, you know, option to have them view things here in the

18   U.S. is really no option at all because these people are

19   worthless.  Well, you know, make that case, before me before

20   firewall counsel and explain the structure of the company.

21   Explain why this person needs to see it.

22          At some point you've got to make some showing and not

23   just sit here and say give it all to me and give it all to me

24   in Russia and, you know, we're here and we're entitled to all

25   of it.  You've got it all at your offices.  You've got it.  But

 1    for the rest to sit back and say we have to get it -- bring it

 2    to us --

 3                MR. DUBELIER:  Well, Your Honor, what I'm saying is

 4    consistent with what the law is.  They haven't --

 5                THE COURT:  I don't -- I don't know.

 6                MR. DUBELIER:  They haven't produced a single case

 7    that says a foreign corporation can't view the discovery

 8    materials in the country in which they're incorporated.

 9                THE COURT:  This is a case of first impression.  That

10    is true.  They have produced cases where individual defendants

11    only got to see stuff in the jailhouse cell.  That's an option

12    here.  Come here and see it in the jailhouse cell.

13                MR. DUBELIER:  Your Honor, those cases are completely

14    distinguishable for what we're talking about here.

15                THE COURT:  They're all distinguishable.  This is a

16    case of first impression.  They're distinguishable, but the

17    principles apply more broadly --

18                MR. DUBELIER:  Your Honor --

19                THE COURT:  -- and blanket protective orders are

20    permissible.

21                MR. DUBELIER:  Okay.  It sounds like now I'm in an

22    argument with you that I don't need to be in, because --

23    because with respect to the email accounts that they say can

24    go, the only objection we've lodged to that is we can't be

25    restricted to sitting in a room at a vendor and that's the only

1    place we can talk about evidence.

2             THE COURT:  Okay.

3             MR. DUBELIER:  We have conceded that it can only be

4    reviewed in that room that the vendor has.  Nobody can carry it

5    out.

6             THE COURT:  And it sounds like if you two will

7    engage, the government is offering perspectively -- not in

8    firewall counsel world -- but perspectively to see if we can

9    put in language in the protective order that satisfies this

10   concern.

11            MR. DUBELIER:  Well, Your Honor, I'm happy to do

12   that.  The reply brief didn't say that.  That was set for the

13   first time today.

14            THE COURT:  I know.  I know, but we are where we are.

15   But, you know, the other thing, there's some -- you know, in

16   some cases there's information that the defendant, him or

17   herself, never gets.  It's classified, but there's that too.

18            MR. DUBELIER:  Well, let's go into a secret

19   proceeding.  If there's classified information that we're

20   entitled to, we're entitled to be in a CIPA proceeding, and

21   it's got to be in -- in accordance with the procedures and the

22   Classified Information Procedures Act.  We're not doing that.

23            THE COURT:  All right.

24            MR. DUBELIER:  If that's what they want to do, let's

25   go.

```
 1              THE COURT:  But the jailhouse review of information
 2    is not restricted to classified information.
 3              MR. DUBELIER:  Your Honor, that jailhouse review case
 4    involves potential witnesses being killed.  We're talking about
 5    drug traffickers.
 6              THE COURT:  We're talking about significant national
 7    security issues at stake.
 8              MR. DUBELIER:  I can't respond to it because I don't
 9    know what they have.
10              THE COURT:  And you can't, but I'm just -- I'm just
11    telling you from my perspective we are.
12              MR. DUBELIER:  Well, I don't know what they are.  So
13    it's not possible for me to agree or disagree with you because
14    I'm not -- I haven't been made privy to that information.
15              THE COURT:  All right.  Okay.  Let's talk about some
16    of the particular objections, like the grand jury subpoenas,
17    ███████████████████.  What -- what is your position on those?
18    If I were to adopt something similar to the government's
19    protective order, what should it say with regard to those
20    materials?
21              MR. DUBELIER:  Your Honor, we -- we briefed that, and
22    our position is there's material in there that we think we need
23    to share with our client.  We're willing to concede for the
24    time being that the search warrant affidavits -- we don't
25    believe at this time we need to show those search warrant
```

 1     affidavits to our client.  We may at some point in time in the

 2     future because I'm still not sure whether or not there's going

 3     to be standing here for motions to suppress any of this stuff.

 4          There's complexities there that we haven't discussed

 5     with the client in the abstract so we can determine then is

 6     there something here that we need to share with them so we can

 7     determine whether there's a legal basis for a motion to

 8     suppress on any of the search warrant materials.

 9          THE COURT:  Say that again.

10          MR. DUBELIER:  There's standing issues with respect

11     to motions to suppress on some of the search warrants, and we

12     have to figure that out.  It's complicated, and there may come

13     a time where I have to come to you -- we're willing to say for

14     now, as we said in our pleading, no need to show that stuff to

15     the client right now.  But there may be a time in the future

16     where I come to you and say on this search warrant, we're

17     preparing a motion to suppress the evidence and I need to talk

18     to the person whose search warrant this account was executed on

19     about this search warrant.

20          THE COURT:  Okay.

21          MR. DUBELIER:  But we don't have to do that now.  As

22     I said in our pleading, we can wait on that.

23          THE COURT:  All right.  You -- you've objected to the

24     government's proposed language that puts a -- like a threshold,

25     you know, requirement on you to say this is appropriate for

1    firewall counsel, and I'm pushing back on that.  I think it's

2    too burdensome.  I agree with you, but do you agree with me

3    that adding paralegals, translators, new attorneys, that that's

4    not something that needs to be litigated in firewall counsel

5    world or they don't need to be informed in firewall counsel

6    world of that?  Trial team can know about that.  There's no

7    defense strategy that's revealed by you saying I want to add

8    these translators, these paralegals, these attorneys to the

9    authorized group.

10             MR. DUBELIER:  I don't think the trial team needs to

11   know anything about that.  That's a firewall counsel issue, it

12   seems to me.

13             THE COURT:  But help me understand that.  I'm not --

14   I'm not convinced of that.  Help me understand why the --

15   why -- what defense strategy is revealed through that.

16             MR. DUBELIER:  Your Honor --

17             THE COURT:  These are not witnesses.

18             MR. DUBELIER:  Your Honor, it's because the

19   restrictions are content driven, not person driven.

20             THE COURT:  No, not the documents.  Not that you're

21   going to show this stack of documents to this person.  That's

22   not what I'm talking about.  I'm talking about this list of

23   names are people who are going to get access to something.

24   We're not saying what.

25             MR. DUBELIER:  Right.  Those people have to sign a

1     memorandum of understanding pursuant to the protective order,

2     and we retain that and it's available to the Court for review.

3     We shouldn't have to go to firewall counsel or the trial team

4     and say these are the people who have signed MOUs.  That's

5     not -- there's no reason for them to know that because the

6     restriction is not content driven -- I mean, the restriction is

7     content driven.  It's not person driven.  Why do they need to

8     know the names of everybody on my team who's reviewing

9     discovery materials?  That -- that will be unprecedented.

10    They're not entitled to that.

11              THE COURT:  I thought you had no objection to this.

12              MR. DUBELIER:  No, we never said we didn't have an

13    objection.

14              THE COURT:  I thought you said at one time, sure, I

15    don't -- like translators, paralegals.  Did I dream that?

16              MR. DUBELIER:  Well, Your Honor, there's like a stack

17    of stuff this thick on this issue.  If you look at the

18    transcripts and all the pleadings, I can't tell you for certain

19    I didn't say that somewhere, but I don't think I did.

20              THE COURT:  I thought -- I thought you did.  I

21    thought this was a nonissue.

22              MR. DUBELIER:  I -- I don't think I said that,

23    Your Honor, because I don't know why I would have.  And I don't

24    understand why the government has an interest in having that

25    information.  It's our affirmative obligation to make sure they

1  sign the MOU and retain that MOU, and if there's some

2  violation, I would expect the way it would work is the Court

3  would say give me all the MOUs and then you would make a

4  decision as to whether or not you were going to share with the

5  government.

6          THE COURT:  All right.  Any other points you want to

7  make?

8          MR. DUBELIER:  No, Your Honor.

9          THE COURT:  Okay.  Mr. Kravis, can you address this

10 issue with respect to the potential challenge to the search

11 warrant.  Is there a way to get to the bottom of this --

12         MR. KRAVIS:  I mean --

13         THE COURT:  -- before we go through, like, weeks and

14 months of firewall world to --

15         I want motions filed.  I'm going to tell both parties

16 that I'm going to be issuing an opinion and -- and setting a

17 tight schedule here.  So I want legal motions, motions in

18 limine, jury instructions, proposals for jury questionnaire all

19 to start rolling as soon as I've ruled on this.  And this makes

20 me nervous that there's some piece that they can't determine.

21 Do you have any insights you can share with me on how we can

22 get through this impasse?

23         MR. KRAVIS:  I do not.  I mean, I'm -- I am -- I'm

24 sorry to report that I really think that this is one that's

25 just going to have to get litigated on a warrant-by-warrant

```
1   basis.  It may give -- I mean, it may give the Court some

2   comfort -- ████████████████████████████████████████████

3   ████████████████████████████████████████████████

4   ██████████████████████████████████████████████████

5   ████████████████████████████████████████████████

6   ██████████████████████████████████████████████████

7   ████████████████

8                THE COURT:  Do you think --

9            MR. KRAVIS:  So -- but I do think that the -- the

10  affidavits and the applications for the (d) orders do implicate

11  significant law enforcement and national security interests.

12               THE COURT:  Well, I can appreciate that, but is there

13  a way to answer his question, the factual question, that helps

14  him on standing without revealing all of that, putting it in

15  another form, or is this --

16               MR. KRAVIS:  This is -- the thing I don't understand

17  about the standing issue is they're getting the email accounts

18  going to Russia, so -- with the exception of the small number

19  of other email accounts that we've discussed elsewhere.  So at

20  least in the first instance, they're going to have something on

21  the order of, like, a hundred email accounts with the contents

22  of the emails and the basic subscriber information.  I'm not

23  sure why they can't --

24               THE COURT:  Does that cover -- do those -- that batch

25  of email accounts that they have, is that sufficient to
```

1    challenge every warrant?

2            MR. KRAVIS:  Well, it's -- I mean, at least it's

3    sufficient for them to figure out the standing issue because --

4            THE COURT:  For every warrant?  Or are there some

5    that are only --

6            MR. KRAVIS:  No, not the -- not ▮▮▮▮▮▮▮▮▮▮▮▮▮

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13            ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24            THE COURT:  And can the government -- I mean, if

25   the -- can we get to the merit?  Can the government concede

1    standing on this stuff?

2              MR. KRAVIS:  No.  No.  I mean, no.  No.  There's --

3    we're talking about a lot of email accounts here, and I

4    don't --

5              THE COURT:  Are there some that you could --

6              MR. KRAVIS:  I'm sure there are, yes.  Yes, I'm sure

7    there are, but -- but, I mean, you have to bear in mind the

8    defendant before the Court right now is not any of the

9    individual defendants who are charged in the indictment.  It is

10   a company.  If the -- if the defense wants to come to us and

11   say:  We would like to file a motion to suppress on these email

12   accounts, we would --

13             THE COURT:  And they're not company accounts?

14             MR. KRAVIS:  No.  We want you to tell us your

15   position on our -- on whether you think we have standing to

16   challenge.  We'll happily do that.  I can't today concede

17   standing for every account.

18             THE COURT:  I'm not asking you to concede.  Can you

19   just answer that question?

20             MR. KRAVIS:  Yes.

21             THE COURT:  Can you convince him, is there enough to

22   satisfy him, that you're -- the answer is truthful?

23             MR. KRAVIS:  I think so.  I mean, we will -- of

24   course we will certainly answer the question.  If they -- they

25   come to us and say:  We want to file a motion to suppress

1    before we file the -- on these X number of accounts, here are

2    the accounts we're talking about, can you give us your position

3    on -- before we start litigating through firewall counsel, can

4    you give us your position on standing.  Of course we will do

5    that, and, of course, we will try to, you know, narrow the

6    issues that have to be resolved through firewall counsel.

7            My point is just that for purposes of determining

8    standing, I'm not sure -- at least for the email accounts --

9    I'm not sure what they need beyond what we've already given

10   them.

11           THE COURT:  Okay.  Well, I'm going to -- I know it's

12   difficult for you all to sit down and consult and meet and

13   confer, but I'm going to order you to do that and report back

14   to me on where you get with this.  It seems like some, if not

15   all, of these motions could be filed now rather than later.

16           MR. KRAVIS:  Yes.

17           THE COURT:  And that's what I'm expecting.  If

18   there's -- is it -- the problem, Mr. Dubelier suggested, is or

19   not, and can you work with him to explore?

20           MR. KRAVIS:  Yes.

21           THE COURT:  And if I need to make some determinations

22   to get to the bottom of this, I want to do it because I want to

23   decide these motions and I want to move on.

24           MR. KRAVIS:  Another thing I'll just sort of put out

25   on the table is that without having all of the affidavits in

1    front of me, I believe that the -- the -- the law enforcement

2    and national security interests are not really implicated by

3    the -- the -- by the facts that would establish standing.  Like

4    standing, we're just talking about who the person is and what

5    their relationship is to -- is to Concord.  And I believe it's

6    going to be Concord's burden to establish that they have

7    standing to bring -- Fourth Amendment standing now -- to bring

8    a motion to suppress for an account that belongs to -- belongs

9    to an individual.

10           I'm not really -- I'm having trouble -- I will -- we

11   will meet and confer on the issue.  I'm just having trouble

12   envisioning what it is in the affidavits that they need to talk

13   about with their client in order to get to standing for any

14   particular email.

15           THE COURT:  Okay.  All right.  Well, I'm -- I'm going

16   to direct you all in the next week to sit down and talk by

17   phone and see if we can't resolve some of this.  And to the

18   extent that there's an issue you need to tee up for me, I want

19   to know.  And if it's getting in firewall counsel world and

20   resolving it, that's what I'm going to do.  I'm not going to

21   put this off until the eve of trial.

22           MR. KRAVIS:  Understood.

23           THE COURT:  We're going to figure this out, and if I

24   have to rule, we're going to do that.  All right.

25           MR. KRAVIS:  Can I, while I'm up here, add one

1    scheduling point?  I wanted to advise the Court that I have

2    another case set for trial in this courthouse on November 5th.

3    I understand the Court wants the case to move forward

4    expeditiously to trial.  The government will, of course,

5    accommodate.  We'll meet any deadlines the Court sets.

6              THE COURT:  Do you have co-counsel?  How can you

7    possibly do both of these at once?  I'm not going to set a

8    trial in November, but I'm thinking, as I said before, early in

9    the new year.  And who's going to be dealing with all the

10   motions in limine and the pretrial stuff that we're immersed in

11   when you're trying this other case?

12             MR. KRAVIS:  I do have co-counsel in the case.  Of

13   course, the government will meet any deadlines the Court

14   imposes, and we'll make whatever staffing adjustments are

15   necessary.  I just want to advise the Court of my own schedule.

16             THE COURT:  So you may not always be here?

17             MR. KRAVIS:  Correct.

18             MR. DUBELIER:  Your Honor, may I raise one additional

19   issue?

20             THE COURT:  Yes.

21             MR. DUBELIER:  It seems to me with regard to the

22   ████████████████████████████ there should no longer be a

23   restriction about us talking to our client about that stuff.

24   Whether we can show it to them, I understand the government

25   taking an issue with that, but the argument they're making now

1    at the core is that the substance is not sensitive.  It is if

2    someone can see the entirety of that production and the way

3    it's produced, then they could reconstruct what the government

4    can get from ███████████████████████████████████.

5           I can't describe that to somebody.  I would never be

6    able to describe that in a way that would interfere with their

7    law enforcement or national security concerns.  It would seem

8    to me that if I've got ███████████████████████ of

9    somebody who works for Concord or works for IRA or -- or in the

10   past worked for IRA, I would be able to tell the client and be

11   able to discuss it.

12          THE COURT:  But I guess at some point there's a

13   tipping point where if you talk about enough content about it,

14   at some point it's clear.

15          MR. DUBELIER:  Well, Your Honor, I can assure you in

16   these accounts, there's microscopic amounts of stuff that we'll

17   need to discuss with the client.  What you're basically doing

18   is --

19          THE COURT:  Well, then let's -- let's --

20          MR. DUBELIER:  What you're doing --

21          THE COURT:  This is helpful.

22          MR. DUBELIER:  I mean, they just reach in with a

23   giant hand and they pull someone's entire account.

24          THE COURT:  Okay.  Well, that's encouraging to me.

25   Again, I'm going to ask you all to sit down on this, because it

1    sounds like if that's the case they may even before I decide

2    this protective order say, fine, this is can be -- you can talk

3    about this chunk with firewall.

4         MR. DUBELIER:  Okay.

5         THE COURT:  All right?

6         MR. DUBELIER:  Yes.

7         THE COURT:  I mean, I -- I hear you, Mr. Dubelier.  I

8    want this to be as narrow as it possibly can.  I think that

9    there's legitimate, competing, significant national security

10   interests that are driving the government's proposal here, and

11   I think if there's a way to loosen some of this lockdown on the

12   ███████████, they're open and receptive and they will be.

13   I've gotten every inclination that's the case.  It's just a

14   difficult problem.  It's --

15        MR. DUBELIER:  I understand, Your Honor.

16        THE COURT:  We can't say it all goes and you can talk

17   unlimited about ███████████, and I hear you saying I'm not

18   going to do that.  But where I am right now, I'm inclined to

19   say the solution is a lockdown and you come to firewall

20   counsel.  And I fully expect him to say yes, yes, yes, yes, and

21   yes.  And if we -- if that's not what happens, then we're going

22   to have a problem, but I think based on what they're saying, I

23   think that's what's going to happen.

24        MR. DUBELIER:  Well, Your Honor, I guess -- that

25   probably leads me to one final point that the government made

1    in their -- their pleading and I took offense to, actually took

2    personal offense to, and that is some suggestion that what

3    we're doing here as lawyers has some other intent than

4    defending our client.  And I can assure you, Your Honor, that

5    I've never received any instruction from this client other than

6    defend the case.  And everything we've done has been in the

7    best interest of defending the client.  There is no secret

8    agenda here that I'm aware of of the Russians wanting to get

9    access to this information for some purpose other than

10   defending the case.  And if -- if there's any representation

11   like that in the ex parte information --

12            THE COURT:  No, there's nothing of that nature in the

13   ex parte.

14            MR. DUBELIER:  Okay.

15            THE COURT:  The ex parte is all the facts about the

16   national security stuff.  There's not -- there's no argument.

17   There's no -- that's not what these filings are.  These are --

18            MR. DUBELIER:  Fair enough.

19            THE COURT:  -- classified paper kind of filings.

20   These are not --

21            MR. DUBELIER:  I understand.

22            THE COURT:  -- like here's why you should reject his

23   argument.  None of that.

24            MR. DUBELIER:  Okay.

25            THE COURT:  Not happening.

1          All right.  Anything else, Mr. Dubelier?

2          MR. DUBELIER:  No, Your Honor.  Thank you.

3          THE COURT:  Okay.  So, Mr. Kravis, we need to talk,

4    not now, but I'll have my courtroom deputy contact you about a

5    time at which -- sooner rather than later -- we can schedule an

6    ex parte proceeding for me to dot these I's and cross these T's

7    so I understand fully the government's position.  And your

8    colleague is --

9          MS. ALPINO:  And I just want to make sure we consult

10   with the security officers.

11         MR. KRAVIS:  Let me --

12         THE COURT REPORTER:  Can you identify yourself?

13         MS. ALPINO:  Sure.  Heather Alpino.  I want to make

14   sure that we have time to be able to consult with the security

15   officers to make sure we --

16         THE COURT:  Of course.  Yes.  Yes.  Of course.  Yes.

17   Yes.  I understand this can't happen this afternoon or

18   tomorrow, what -- but in -- as soon as we can do so, I would

19   like to have a follow-up ex parte hearing to talk about the

20   issues you weren't able to answer here.

21         MR. KRAVIS:  Yes.  And in light of the last colloquy,

22   I just want to confirm all of the restrictions in the current

23   protective order will remain in place until the Court rules

24   on --

25         THE COURT:  That is correct.

1        MR. KRAVIS:  -- the pending motions?

2        THE COURT:  That is correct.

3        MR. KRAVIS:  Thank you.

4        THE COURT:  All right.  So there are two things that

5   I just mentioned.  One is the issue with the search warrants

6   and the standing that you all are going to talk to each other

7   about and see in the next -- what did I say -- week or ten days

8   whether you all can put forth a proposal, and if there's

9   something I need to address, let me know that; all right?

10        Secondly, you're going to talk about this -- these

11   limitations on discussions with counsel.  Mr. Kravis, you

12   suggested that perhaps there is something more that can be done

13   there.  You appreciate his concerns with all the intermediate

14   discovery being locked down in the vendor room.  To the extent

15   you're able to work out an agreement, you know, in the next

16   week, let me know.  I intend to rule on this in the next two

17   weeks.  All right.  So you have some time, but not a lot of

18   time.  And if you reach an impasse and conversations are going

19   nowhere, leave it and I'll rule based on what I have.  This is

20   not -- I'm not going to hold up ruling on this waiting for you

21   all to work something out.  I hope you can, but if you can't,

22   then I'll be prepared to rule without it.

23        So, first, as to the sealed matters I referenced

24   earlier, I'm directing the parties to review -- and I want to

25   be particular about the docket numbers.  And, again, to the

1    extent you think I've missed anything here that's in the same

2    category but we made a mistake and didn't list the number, I'm

3    interested in hearing from you about whether we can unseal at

4    least portions of -- of these docket numbers.  So the docket

5    numbers would be 79, 92, 96, 98, 105, 113, 116, 120, 128, 141,

6    145, and 152.

7              And I'll direct you to submit a joint filing on or

8    before August 2nd that proposes redactions or, as I said

9    before, justifies the continued sealing of the documents in

10   full.  And, again, if the parties disagree, they can articulate

11   their respective positions and provide grounds for each

12   proposed redaction addressing the public's right to access and

13   I will rule.

14             Mr. Kravis, is there something else?

15             MR. KRAVIS:  For purposes of complying with that

16   order, I would orally move that the -- the full docket be

17   unsealed for the limited purpose of allowing us to --

18             THE COURT:  To do this?

19             MR. KRAVIS:  Yes, just because my colleague reminds

20   me, we may not be able to see on the public document all of the

21   numbers that the Court --

22             THE COURT:  Oh, really?

23             MR. DUBELIER:  We can't either.

24             MR. KRAVIS:  I believe there -- there is a -- like a

25   sealed version of the docket that would have the -- the clerk's

1    office can provide that has all of the numbers and all of the

2    descriptions.

3            THE COURT:  Okay.  All right.  I don't know

4    logistically how to do this, but you get the sense what I'm

5    trying to do.  And I will talk to the clerk's office, and we'll

6    figure this out.  And if we need to be in touch with you

7    through the courtroom deputy, we'll do so.

8            MR. KRAVIS:  Thank you.

9            THE COURT:  But thank you for bringing that to my

10   attention.  And on that front, I -- it just occurred to me when

11   they have these sealed proceedings relating to sensitive

12   discovery and grand jury and other matters, Mr. Dubelier, are

13   you -- you are not talking to your client about the contents of

14   the sealed matters?

15           MR. DUBELIER:  What -- what we do with the transcript

16   is Ms. Seikaly vets it for any information that would disclose

17   sensitive discovery, and we redact that out before we share it.

18           THE COURT:  For example, you know, you made the

19   comment about ██████████████████.  You made the comment about ██

20   ████████; that we went into sealed proceeding for that reason.

21   I would assume you're not talking to your client about either

22   of those things.

23           MR. DUBELIER:  No, not at all, and that would be the

24   kind of thing that Ms. Seikaly would redact out before we send

25   it to --

1          THE COURT:  All right.  The protective order,

2     Mr. Kravis, doesn't address this issue, and this is something

3     to the extent the government has concerns about the way the

4     process is operating now, we need to address them.

5          MR. DUBELIER:  Well, Your Honor, we've erred on the

6     said of caution with this.  So, really, we're --

7          THE COURT:  I'm just flagging this because my -- my

8     impression was what was happening in here was not being shared,

9     not because there's any order that says that, but certainly

10    anything that comes close to the grand jury and all the

11    sensitive stuff, I trust that you've been, as you say, very

12    liberal in your interpretation of that.

13         MR. DUBELIER:  We have been, Your Honor.  And with

14    respect to the docket, as I understand it, Your Honor, I've

15    actually -- when I've had cases before where there's sealed

16    stuff, there's a docket number for it and it says sealed item.

17    That's not occurring in this case.

18         THE COURT:  That's not happening?

19         MR. DUBELIER:  No.  There's missing numbers.  That's

20    how you can tell stuff is sealed.  So technically we could

21    figure it out by looking for the missing numbers, but that's --

22         THE COURT:  All right.  Well, this docket has had a

23    lot of different hands touch it.  There's been a lot of

24    turnover.  And so we will work on that.  This is -- I assumed

25    that you all were able to see there's a sealed filing and, you

 1    know, you -- you would know that there's something that's been

 2    filed but maybe it's ex parte and you can't access it.

 3             MR. DUBELIER:  I assumed that until last week when I

 4    asked Ms. Seikaly to give me a copy of the docket.  I said,

 5    "Where is all the sealed stuff?"  And she said, "Those are the

 6    missing numbers."  The numbers just aren't on there at all.  So

 7    you can see gaps in numbers, and you can kind of reverse

 8    engineer it and figure out there must be something sealed.

 9             THE COURT:  Well, you shouldn't have to do that.

10    There ought to be a way we can fix this.

11             MR. DUBELIER:  Well, not only shouldn't we have to do

12    it, but it should be in the public record unless it's a sealed

13    item.

14             THE COURT:  Yes, yes.  I assumed they all were.  So

15    they're not?

16             MR. DUBELIER:  They're not.

17             THE COURT:  They're like numbers --

18             MR. DUBELIER:  It's a missing number.  So you -- you

19    have Item 7, Item 9.  Well, Item 8 must have been something

20    sealed.

21             THE COURT:  Okay.  Now, I know with respect to --

22    there was one recent opinion or some order I issued in

23    connection with the motion for an order to show cause on

24    contempt where the number needed to be out of order, and I

25    can't remember now.  I'm not going to be able to explain why,

 1    but you're not talking about that?

 2              MR. DUBELIER:  No.

 3              THE COURT:  You're talking about literally a number

 4    is not on the docket?

 5              MR. DUBELIER:  Correct.

 6              THE COURT:  All right.  Thank you for letting me

 7    know.  I was unaware of that.

 8              Does the government have anything you want to add on

 9    that point?

10              MR. KRAVIS:  Well, not really on that point.

11              But, generally, the first is I just wanted to make

12    sure that the -- the Court is aware that Mr. McCullough, who is

13    serving as firewall counsel in this case, is also beginning

14    trial on August 12th.  I'm confident -- he has a supervisor

15    working with him on this matter.  I'm confident we'll be able

16    to staff the firewall counsel side of the case.

17              THE COURT:  How long is this trial?

18              MR. McCULLOUGH:  I anticipate it will be

19    approximately two weeks.

20              THE COURT:  Okay.  All right.

21              MR. KRAVIS:  The second thing is I would just like to

22    inquire through the Court, again, based on this colloquy if our

23    sealed pleadings are being shared with the --

24              THE COURT:  Yeah, this is an issue.  I -- I --

25              MR. KRAVIS:  So the protective order does not -- does

 1    not specifically reference filings or transcripts, but it does

 2    say the content -- the information about the content of the

 3    sensitive discovery.

 4              THE COURT:  Right.

 5              MR. DUBELIER:  That's what we redacted.

 6              THE COURT:  That's what he's saying he's doing, but,

 7    you know, this -- preparing for this hearing, this thought just

 8    came to my mind, and I -- it made me nervous.  But I assume

 9    that you were kind of operating like I was, that when we were

10    under seal, these are sealed proceedings, but I don't think the

11    protective order says that except the content of sensitive

12    discovery, and I think we've discussed content; right?

13              MR. KRAVIS:  Right.  Okay.

14              THE COURT:  We may have something more.  This is yet

15    another reason why all of these proceedings shouldn't be locked

16    down under seal.  They should be redacted.

17              MR. KRAVIS:  Understood.

18              THE COURT:  And it should be a process between the

19    two sides.  So that --

20              MR. KRAVIS:  Understood.

21              THE COURT:  -- you know, Mr. Dubelier's operating in

22    good faith -- I'm not suggesting he's not, but to the extent

23    there's human error and something slips, like this should be an

24    adversary process with redactions.  And this is sensitive

25    areas, and I'm trying to minimize risk to national security.

1          MR. KRAVIS:  Very well.

2          THE COURT:  So perspectively moving forward, I don't

3    want things filed under seal unless you can justify with

4    particularity why the whole document needs to be under seal,

5    and I want things where possible filed with redactions and you

6    give me the basis for the redactions and then we don't have

7    this problem.

8          MR. KRAVIS:  Very well.

9          THE COURT:  And same with the transcripts.

10         MR. KRAVIS:  Yes, Your Honor.

11         THE COURT:  Okay.  So we'll look in on our side.

12   We'll look into the problems with the docket.

13         All right.  One other matter.  I also permitted both

14   parties to file under seal certain briefing on the motion for

15   bill of particulars.  These documents are Docket No. 114 and

16   123.  With respect to the bill of particular materials,

17   Mr. Dubelier, do you object to the government's motion for

18   leave to file its bill of particulars under seal?  This is

19   Docket No. 146.

20         MR. DUBELIER:  Your Honor, we do, because the bill of

21   particulars does not contain any reference to or any substance

22   of sensitive discovery.

23         THE COURT:  Okay.  So, Mr. Kravis, I --

24         MR. DUBELIER:  Your Honor, if I could add -- and I'm

25   sorry to interrupt.  I'm not even sure why they filed it, to be

```
 1    candid with you.

 2              THE COURT:  You're not even sure what?

 3              MR. DUBELIER:  Why they filed the bill of particulars

 4    in the record.  They gave us the bill of particulars.  That

 5    would satisfy what their obligation was to do.  There was no --

 6              THE COURT:  Well, I want the bill of particulars.

 7              MR. DUBELIER:  I guess then --

 8              THE COURT:  Why wouldn't it be part of the record?

 9              MR. DUBELIER:  I don't know.

10              THE COURT:  It should be part of the record.

11              MR. DUBELIER:  Well, I would say that that has not

12    been the practice that I've seen --

13              THE COURT:  Really?

14              MR. DUBELIER:  -- in the past.

15              THE COURT:  I mean, I view it as like an extension of

16    the indictment.

17              MR. DUBELIER:  Could be.  Could be.  But to be fair,

18    there's nothing in it that's sensitive.

19              THE COURT:  Well, presumably what they're concerned

20    about is the list of -- of unindicted co-conspirators being

21    public, and I'll hear from Mr. Kravis on that, but the rest of

22    it, Mr. Kravis, sealing the whole bill of particulars, I don't

23    see a basis to do, and tell me your basis for the unindicted

24    co-conspirators.  What's the issue there?

25              MR. KRAVIS:  It's -- it's the Justice Department's
```

1    standard practice not to name unindicted co-conspirators by

2    name.  If these people were identified in a public indictment,

3    they would be recognized as Person A.

4          THE COURT:  Is that because of their privacy

5    interests or law enforcement interests?

6          MR. KRAVIS:  No, it's -- it's a privacy interest.

7    It's just not the Justice Department's practice to --

8    generally, to sort of accuse people of committing crimes

9    without charging them in court and giving them the opportunity

10   to respond.  I don't think -- I think it would be -- I think it

11   would be a violation of our ethical obligation under the

12   department practice to publicly file a document that named

13   unindicted co-conspirators.

14         THE COURT:  People who haven't been indicted?

15         MR. KRAVIS:  Who haven't been charged.  Now, we'll --

16   if the Court --

17         THE COURT:  You can -- I mean, putting that issue

18   aside, the rest of it is not seal worthy at all.

19         MR. KRAVIS:  No, that's fine.  We can redact.

20         THE COURT:  Okay.  But Mr. Dubelier has the list

21   unredacted; right?

22         MR. KRAVIS:  Yes.

23         THE COURT:  He has the list.  And this is another

24   area.  Your assumption is he's talking to his client about that

25   list.

```
1                    MR. KRAVIS:  Right.

2                    THE COURT:  Okay.

3                    MR. KRAVIS:  I mean, that -- I --

4                    THE COURT:  You're not putting restrictions on

5      locking this down from the client.  You're locking down from

6      the public.

7                    MR. KRAVIS:  Yes.  Yes.  Yes.

8                    THE COURT:  All right.  Mr. Dubelier, I mean, I think

9      that the bill of particulars -- maybe this isn't the practice,

10     but it -- I don't know.  I mean, is there a reason you think

11     why they shouldn't be on the public docket?

12                   MR. DUBELIER:  No.  It seems to me they file it on

13     the public docket, that's fine.  I understand Mr. Kravis's

14     position regarding the unindicted people.  I don't represent

15     them.  So I'm not going to get in here and argue that interest.

16                   THE COURT:  Yeah.  But you have it and you've shared

17     it with your client?

18                   MR. DUBELIER:  Yes, we have.

19                   THE COURT:  Okay.  All right.  Well, I -- I -- at

20     least at this juncture, maybe at some point this whole record,

21     this whole trial, everything is unsealed at some point, but at

22     this point, I don't know what the public interest is in the

23     names of the uncharged folks, who the government chose not to

24     charge.  That's my -- I mean, do you have any objection to

25     those remaining --
```

 1                MR. DUBELIER:  None at all.

 2                THE COURT:  -- under seal?

 3                MR. DUBELIER:  Not at all.  I had forgotten,

 4     candidly, that that was in there.

 5                THE COURT:  Okay.  All right.  So, Mr. Kravis, that's

 6     another one I would instruct you to file redacted.  All right?

 7                MR. KRAVIS:  Yes, Your Honor.

 8                THE COURT:  And with the basis for the portion that's

 9     redacted.  And if the press wants to challenge it, they

10     challenge it; all right?  I'll just have to deal.  Seems to me

11     a legitimate basis not to have their names flying around the

12     web if they're not charged, but I'll have to weigh that if

13     there's a motion.

14                All right.  Mr. Dubelier, you may have a seat.

15                MR. DUBELIER:  Thank you.

16                THE COURT:  Speedy trial issues.  So I've had pending

17     motions, I think, for most of the pendency of this case.  I

18     know I declared the case complex on May 23, 2018, and I found

19     the ends of justice justified excluding time for a period in

20     which the motions were not pending back then, but that was a

21     set time period back in May.

22                Since that time, I've asked the courtroom deputy to

23     calculate the time, if any, in which we haven't had motions

24     pending.  Do either side happen to know that number?  I don't

25     know it as I sit here now.

1          MR. KRAVIS:  I do not know it off the top of my head.

2     We had intended once the Court had resolved the motions to file

3     to get the defense's position and then file a speedy trial

4     issue.

5          THE COURT:  Okay.  Well, I just want to do it now,

6     because, Mr. Dubelier, you know, soon I'll rule on this motion

7     and there may be no motions pending.  It seems to me because of

8     the complexity of the case, as I've said before, the voluminous

9     discovery in the case, the novel issues of fact and law that

10    additional time would be appropriately excluded under the

11    Speedy Trial Act, and do you agree, and what's your issue on

12    the speedy trial clock?

13         MR. DUBELIER:  Your Honor, just to be completely

14    transparent so no one has to stress over this, we're going to

15    renew our motion to dismiss based on the bill of particulars

16    that was provided.  So -- and I expect we can do that as early

17    as next week.  And so then that's going to set up a cycle of --

18         THE COURT:  What's your argument?  What's -- I ruled

19    that they sufficiently alleged in the indictment.  I -- like,

20    that alone was enough.  I granted more than I think I needed to

21    do, but I exercised my discretion to do so through a bill of

22    particulars to help you do your case.  It's not that I think

23    that there's not a legal basis for the charges in the

24    indictment.

25         MR. DUBELIER:  Your Honor, this is complex and I'm

1   not prepared to argue it now, but I will tell you the bill of

2   particulars narrows the allegations significantly.

3          THE COURT:  It is -- they -- what they responded to,

4   I'm just going to tell you to don't waste your client's money

5   here, Mr. Dubelier.  The way -- you can file it, but the way

6   they answered it is consistent with the way I ruled.

7          MR. DUBELIER:  I'm not sure I'm taking issue with

8   that.  You ordered them to produce certain information and they

9   produced it.

10          THE COURT:  Right.  Right.  And so what's --

11          MR. DUBELIER:  And producing that information narrows

12   the allegations in the indictment.  If the Court would like, I

13   can give you an example or you can just wait for the pleading,

14   but let me give the Court an example.

15          THE COURT:  I'll wait for the pleading, but,

16   Mr. Dubelier, we've -- we've been through pretrial motions.

17   Why are you waiting to file -- why didn't you do it as soon as

18   you got the bill of particulars?

19          MR. DUBELIER:  I just got the bill of particulars a

20   week ago.

21          THE COURT:  Only a week ago.  Okay.

22          MS. SEIKALY:  Maybe two weeks.

23          MR. DUBELIER:  Maybe two weeks we've been doing

24   research on it.

25          THE COURT:  If you haven't sensed, I'm setting

1   deadlines on pretrial motions; all right?

2          MR. DUBELIER:  Your Honor, I understand that, but,

3   again, since the Court is challenging me, let me just give you

4   an example.  The bill of particulars now limits -- for

5   instance, with respect to the FEC, they have to be expenditures

6   that are characterized by the FEC as independent expenditures,

7   which means they advocate for the election of somebody or you

8   not to elect somebody.  They have to have magic words in them

9   according to the regulations to make those ads.  These are ads

10  that are purchased.

11         So the entirety of the ads that were purchased by IRA

12  before the election that even arguably contain the magic words

13  that would make them independent expenditures, which would make

14  them required to be reported to the FEC, $2800 was spent.

15         THE COURT:  That's -- that a trial -- I mean, this

16  is --

17         MR. DUBELIER:  Oh, no, no.  It's a matter of law.

18  No, no, no.

19         THE COURT:  It doesn't --

20         MR. DUBELIER:  It's a matter of law.  Your Honor,

21  it's a matter of law, because it becomes a matter of law when

22  you look at those whether or not as a matter of law the

23  government could ever prove that those expenditures required a

24  filing with the FEC.  That's a matter of law.  It's purely

25  legal.

```
1              THE COURT:  But as alleged --
2              MR. DUBELIER:  It's -- Your Honor, but it becomes a
3     purely legal issue.  The -- look, what they alleged is this
4     massive "we're going to interfere with the election"; right?
5     That's what -- you've got to read through the whole thing and
6     it says, okay, IRA is trying to interfere in the election.  And
7     we've all agreed that interfering in the election is not
8     against the law.
9              What the Court determined was that if we -- if the
10    defendants -- one or more of the defendants -- had an
11    affirmative obligation to report something and didn't, then
12    potentially it could fall within a 371 defraud conspiracy.  We
13    will show you that none of the defendants had a legal
14    obligation to either file a report with the FEC or file any
15    registration with FARA, as a matter of law.  Taking their
16    allegations as true, as a matter of, law there was no such
17    obligation.
18             THE COURT:  All right.  File your motion, but, you
19    know, I'm -- we had deadlines for pretrial motions.  I get this
20    is a new one based on new information, the bill of particulars,
21    but the search warrants, this motion, they need to be filed;
22    all right?  We're not going to trickle this out into 2022; all
23    right?
24             MR. DUBELIER:  Well, Your Honor, there was never an
25    expectation we're going to trickle anything to 2022, and it was
```

1    my impression from, I guess, our earlier hearings that you were

2    talking about spring of 2021.

3              THE COURT:  No.  I'm talking about January, first

4    week in February at the latest.  So both parties need to be

5    thinking that's what I'm -- you know, may be little bit later,

6    but not -- not like -- I'm certainly not late spring of 2021 --

7    2020.  Where are we?

8              MR. DUBELIER:  We're in 2019.

9              THE COURT:  It seems like it's been years.

10             MR. DUBELIER:  Yes, it does.  It has been over a

11   year.

12             THE COURT:  All right.  Well, file your motion.

13             Mr. Kravis, you want to respond to any of that?

14             MR. KRAVIS:  We'll wait and respond in writing.  I

15   would make the point, as we made in the bill of particulars,

16   that the Federal Election Campaign Act, in addition to imposing

17   registration requirements for independent expenditures,

18   prohibits foreign nationals from making expenditures

19   altogether, so...

20             THE COURT:  That alone gets you there.

21             Okay.  So, again, Mr. Dubelier, your position on the

22   speedy trial clock is that it's appropriate, should I rule and

23   there's no motion pending, to continue to exclude time based on

24   the complexity of the case, the volume of discovery, the

25   complicated factual and legal issues --

```
 1                    MR. DUBELIER:  Yes.

 2                    THE COURT:  -- still at play?

 3                    MR. DUBELIER:  Yes.

 4                    THE COURT:  You do not object?

 5                    MR. DUBELIER:  Do not.

 6                    THE COURT:  Your client does not object to excluding

 7        time under the Speedy Trial Act?

 8                    MR. DUBELIER:  I can't say, Your Honor, that recently

 9        I've ever discussed that issue with the client.  I'll do that,

10        though, to make sure.

11                    THE COURT:  You'll need to do that.

12                    MR. DUBELIER:  Okay.

13                    THE COURT:  All right.  So, again, the -- we just

14        need to start looking towards trial.  I want -- I want to be

15        reasonable here, but I also -- this case has been pending, you

16        know, over -- well over a year, and I think it's time to get it

17        tried.  So I know the government has competing obligations, and

18        I'm sure Reed Smith does as well, but I'm looking once I rule

19        for you all to -- I'll put out an order and direct you all to

20        set a proposed schedule for proceedings with moving forward

21        with respect to all of the many things that need to happen

22        between now and trial.

23                    All right.  Anything else?

24                    MR. KRAVIS:  Nothing from the government.  Thank you,

25        Your Honor.
```

1                    MR. DUBELIER:  Nothing, Your Honor.

2                    THE COURT:  All right.  Thank you.

3                    (The proceedings were concluded.)

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Merit Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 26th day of August, 2019.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Professional Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest, Room 6509
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25