# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       v.<br><br>CONCORD MANAGEMENT AND<br>CONSULTING LLC,<br><br>    Defendant. | CRIMINAL NUMBER:<br><br>1:18-cr-00032-2-DLF |

## DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S
## RENEWED MOTION TO DISMISS COUNT ONE OF THE INDICTMENT

Pursuant to Rule 12(b)(1) and 12(b)(3) of the Federal Rules of Criminal Procedure, Defendant Concord Management and Consulting LLC ("Concord"), by and through undersigned counsel, respectfully moves to dismiss Count One of the Indictment, ECF 1.  As set forth more fully in the accompanying memorandum of points and authorities, Count One should be dismissed as to Concord for the following reasons:

1. The government's prosecution of Concord, and related conduct associated with the prosecution, violates the Due Process Clause's prohibition on arbitrary government conduct.

2. The Indictment fails to allege the requisite *mens rea* to support the 18 U.S.C. § 371 conspiracy to defraud charge against Concord.

A proposed order is filed with this Motion.

Dated: October 7, 2019

Respectfully submitted,

CONCORD MANAGEMENT
AND CONSULTING LLC

By:  /s/ Eric A. Dubelier
     Eric A. Dubelier (D.C. Bar No. 419412)
     Katherine J. Seikaly (D.C. Bar No. 498641)
     REED SMITH LLP
     1301 K Street, N.W.
     Suite 1000 – East Tower
     Washington, D.C. 20005-3373
     202.414.9200 (phone)
     202.414.9299 (fax)
     edubelier@reedsmith.com
     kseikaly@reedsmith.com

     James C. Martin[*]
     Colin E. Wrabley[*]
     REED SMITH LLP
     225 Fifth Avenue
     Pittsburgh, PA 15222-2716
     412.288.3131 (phone)
     412.288.3063 (fax)
     jcmartin@reedsmith.com
     cwrabley@reedsmith.com
     [*]*Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S RENEWED MOTION TO DISMISS COUNT ONE OF THE INDICTMENT**

# TABLE OF CONTENTS

**PAGE**

I.      PRELIMINARY STATEMENT .................................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND......................................................... 3

        A.      The Threat Of Arbitrary And Discriminatory Prosecution Is Inherent In
                Any Case Involving A Special Counsel.................................................................. 3

        B.      The Record Reveals That Concord Is Being Subjected To An Arbitrary
                And Discriminatory Prosecution That Violates Due Process Commands.............. 4

                1.      The United States Attorney And DOJ Declined To Investigate
                        Alleged Conduct That Is The Subject Of This Indictment And That
                        Had Been In The Public Domain For Years. ............................................... 4

                2.      This Unprecedented Defraud Conspiracy Prosecution Was
                        Arbitrary At Inception, Contravening DOJ Policy, Practice, And
                        Precedent............................................................................................... 6

                3.      The Government's Arbitrary Tactics Became Manifest When The
                        Special Counsel, And Later The Attorney General, Publicly
                        Declared Concord's Guilt Before Any Trial........................................... 11

                4.      The Government's Arbitrary Conduct Continued With Its
                        Invention And Re-Invention Of The Conspiracy Charge Against
                        Concord................................................................................................ 14

III.    LEGAL STANDARDS ........................................................................................... 19

IV.     SUMMARY OF ARGUMENT ................................................................................. 20

V.      ARGUMENT ....................................................................................................... 22

        A.      The Indictment Should Be Dismissed Because The Government's
                Arbitrary Prosecution Of Concord Violates The Due Process Clause. ................ 22

                1.      The Due Process Clause, Animated By Bedrock Systemic
                        Principles, Prohibits Arbitrary Government Prosecutions....................... 22

                2.      The Record Conclusively Shows That The Government's
                        Prosecution Of Concord Violates The Due Process Clause. ................... 26

        B.      The Indictment Should Be Dismissed Because It Fails To Allege The
                Requisite *Mens Rea* To Support The § 371 Defraud Conspiracy Charge
                Against Concord. ........................................................................................... 31

                1.      Recent Supreme Court Precedent, Reinforced By D.C. Circuit
                        Precedent, Calls For A Reexamination Of The *Mens Rea* The
                        Government Must Prove In This Case. .................................................. 32

                2.      Due Process Principles Requiring Fair Notice And Neutral
                        Prosecution, Coupled With The Rule Of Lenity, Establish The
                        Need For A Willfulness Requirement..................................................... 40

3.      The Absence Of The Requisite Willfulness Allegations In The
        Indictment Compels Dismissal. ................................................................. 45

VI.    CONCLUSION ............................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albino v. United States*,
  78 F. Supp. 3d 148 (D.D.C. 2015) ........................................................................30

*Berger v. United States*,
  295 U.S. 78 (1935) ..........................................................................3, 12, 23, 24

*Bismullah v. Gates*,
  501 F.3d 178 (D.C. Cir. 2007), *vacated on other grounds*, 554 U.S. 913
  (2008) ..................................................................................................................30

*Bluman v. FEC*,
  800 F. Supp. 2d 281 (D.D.C. 2011) ....................................................................42

*Bordenkircher v. Hayes*,
  434 U.S. 357 (1978) ............................................................................................25

*Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*,
  367 U.S. 886 (1961) ............................................................................................31

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009) ......................................................................................22, 31

*Champion Lumber Co. v. Fisher*,
  227 U.S. 445 (1913) ............................................................................................22

*Cheek v. United States*,
  498 U.S. 192 (1991) ......................................................................................34, 39

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ............................................................................................30

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ............................................................................................42

*Cone v. Bell*,
  556 U.S. 449 (2009) ............................................................................................23

*Daniels v. Williams*,
  474 U.S. 327 (1986) ............................................................................................22

*Authorities upon which we chiefly rely are marked with asterisks.

*Dennis v. United States*,
    384 U.S. 855 (1966).................................................................................26, 35

*Duncan v. Louisiana*,
    391 U.S. 145 (1968)......................................................................................26

*Gaither v. United States*,
    413 F.2d 1061 (D.C. Cir. 1969).....................................................................17

*Gannett Co. v. DePasquale*,
    443 U.S. 368 (1979)......................................................................................23

*Giaccio v. Pennsylvania*,
    382 U.S. 399 (1966)......................................................................................24

*Gonzales v. Carhart*,
    550 U.S. 124 (2007)......................................................................................44

*In re Sealed Case*,
    838 F.2d 476 (D.C. Cir. 1988), *rev'd sub nom. on other grounds by Morrison*
    *v. Olson*, 487 U.S. 654 (1988) ......................................................................4

*Jackson v. Conway*,
    763 F.3d 115 (2d Cir. 2014)..........................................................................23

*Johnson v. United States*,
    135 S. Ct. 2551 (2015)..................................................................................23

*Kincaid v. Gov't of Dist. of Columbia*,
    854 F.3d 721 (D.C. Cir. 2017).......................................................................43

*Lambert v. California*,
    355 U.S. 225 (1957)......................................................................................42

*Liparota v. United States*,
    471 U.S. 419 (1985)..........................................................................37, 38, 41

*Marinello v. United States*,
    138 S. Ct. 1101 (2018)......................................................................11, 23, 33

*Marshall v. Jerrico, Inc.*,
    446 U.S. 238 (1980)......................................................................................24

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004)......................................................................................30

*Nat. Res. Def. Council, Inc. v. SEC*,
    606 F.2d 1031 (D.C. Cir. 1979).....................................................................30

*Posters 'N' Things, Ltd. v. United States*,
    511 U.S. 513 (1994) .................................................................................. 40

*Ratzlaf v. United States*,
    510 U.S. 135 (1994) ............................................................................. 34, 39

\*  *Rehaif v. United States*,
    139 S. Ct. 2191 (2019) ....................................................................... *passim*

*Rivera v. Minnich*,
    483 U.S. 574 (1987) .................................................................................. 22

*Russell v. United States*,
    369 U.S. 749 (1962) ................................................................... 15, 19, 20, 45

*Sanabria v. United States*,
    437 U.S. 54 (1978) .................................................................................... 28

*Sandvig v. Sessions*,
    315 F. Supp. 3d 1 (D.D.C. 2018) ............................................................... 8

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ..................................................................23, 24, 41

*Smith v. Goguen*,
    415 U.S. 566 (1974) .................................................................................. 23

*Staples v. United States*,
    511 U.S. 6000 (1994) ............................................................................... 39

*Steenholdt v. FAA*,
    314 F.3d 633 (D.C. Cir. 2003) ................................................................... 9

*Stirone v. United States*,
    361 U.S. 212 (1960) .................................................................................. 14

*Strickler v. Greene*,
    527 U.S. 263 (1999) .................................................................................. 23

*Tanner v. United States*,
    483 U.S. 107 (1987) .................................................................................. 36

*Tumey v. Ohio*,
    273 U.S. 510 (1927) .................................................................................. 22

*United States v. Armstrong*,
    517 U.S. 456 (1996) .................................................................................. 30

*United States v. Batchelder*,
   442 U.S. 114 (1979)..................................................................................24, 43, 44

*United States v. Bridges*,
   346 U.S. 209 (1953).........................................................................................26

\* *United States v. Burden*,
   934 F.3d 675 (D.C. Cir. 2019) ................................................................. *passim*

*United States v. Burwell*,
   690 F.3d 500 (D.C. Cir. 2012) ........................................................................39

*United States v. Cano-Flores*,
   796 F.3d 83 (D.C. Cir. 2015) .................................................................40, 41, 43

*United States v. Childress*,
   58 F.3d 693 (D.C. Cir. 1995) ..........................................................................36

*United States v. Class*,
   930 F.3d 460 (D.C. Cir. 2019) ........................................................................43

*United States v. Conlon*,
   628 F.2d 150 (D.C. Cir. 1980) ...................................................................40, 45

*United States v. Craig*,
   No. 1:19-cr-00125-ABJ, 2019 WL 3604630 (D.D.C. Aug. 8, 2019) ...............42, 43

*United States v. Crop Growers Corp.*,
   954 F. Supp. 335 (D.D.C. 1997) ......................................................................43

*United States v. Feola*,
   420 U.S. 671 (1975).........................................................................................44

*United States v. Hillie*,
   227 F. Supp. 3d 57 (D.D.C. 2017) .....................................................14, 17, 20, 29

*United States v. Hitt*,
   249 F.3d 1010 (D.C. Cir. 2001) ....................................................14, 28, 45

*United States v. Kingrea*,
   573 F.3d 186 (4th Cir. 2009) ..........................................................................45

*United States v. Lanier*,
   520 U.S. 259 (1997).........................................................................................41

*United States v. Lemire*,
   720 F.2d 1327 (D.C. Cir. 1983) ......................................................................36

*United States v. Park*,
  297 F. Supp. 3d 170 (D.D.C. 2018) .................................................................19

*United States v. Rafiekian*,
  No. 1:18-cr-00457-AJT, 2019 WL 4647254 (E.D. Va. Sept. 24, 2019) .................................37

*United States v. Rosenblatt*,
  554 F.2d 36 (2d Cir. 1977) .........................................................................26

*United States v. Safavian*,
  528 F.3d 957 (D.C. Cir. 2008) .....................................................................43

*United States v. Sherman*,
  150 F.3d 306 (3d Cir. 1998) .......................................................................44

*United States v. Sunia*,
  643 F. Supp. 2d 51 (D.D.C. 2009) ..................................................................20

*United States v. Tuohey*,
  867 F.2d 534 (9th Cir. 1989) .......................................................................8

*United States v. X-Citement Video, Inc.*,
  513 U.S. 64 (1994) ................................................................................40

*Wayte v. United States*,
  470 U.S. 598 (1985) ...........................................................................24, 25

*Wilkinson v. Austin*,
  545 U.S. 209 (2005) ............................................................................30–31

*Williams v. Pennsylvania*,
  136 S. Ct. 1899 (2016) ............................................................................22

*Wolff v. McDonnell*,
  418 U.S. 539 (1974) ..............................................................................22

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
  481 U.S. 787 (1987) ..............................................................................24

## Constitutional Provisions & Statutes

18 U.S.C. § 371 ...........................................................................*passim*

18 U.S.C. § 922(g) ................................................................................32

18 U.S.C. § 924(a)(2) .............................................................................32

22 U.S.C. § 612(d) ................................................................................42

22 U.S.C. § 618(a)(2)..................................................................................................42

52 U.S.C. § 30109(d).................................................................................................42

U.S. Const. amend. V............................................................................................ *passim*

**Rules**

Fed. R. Crim. Proc. 12(b)(1)......................................................................................19

Fed. R. Crim. Proc. 12(b)(3)(B)................................................................................19

Fed. R. Crim. Proc. 12(b)(3)(B)(v)...........................................................................19

**Regulations**

28 C.F.R. § 600.1(a)....................................................................................................6

28 C.F.R. § 600.7(a)....................................................................................................9

**Other Authorities**

1 W. LaFave & A. Scott, *Substantive Criminal Law* § 5.1(a) (1986)..........................33

Br. for *Amici Curiae* Edward H. Levi, Griffin B. Bell, and William French Smith,
    *Morrison v. Olson*, 1988 WL 1031601 (1988) (No. 87-1279) ..................................4

Covington, Election and Political Law, *A Review of Pending FARA Reform Bills* 1
    (Mar. 15, 2018), available at https://www.cov.com/-
    /media/files/corporate/publications/2018/03/a_review_of_pending_fara_refor
    m_bills.pdf.................................................................................................................42

Provision for Special Prosecutor: Hearing on H.R. 14,476, H.R. 11,357, H.R.
    11,999, H.R. 8281, H.R. 8039, H.R. 15,634, and Title I of S. 495 Before the
    Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 94th
    Cong., 2d Sess. 35 (1976) ...........................................................................................4

U.S. Dep't of Justice, *Criminal Resource Manual* § 923 (updated Apr. 2018),
    available at https://www.justice.gov/jm/criminal-resource-manual-923-18-usc-
    371-conspiracy-defraud-us ..............................................................................7–8, 9, 27

U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* at 163 (Dec. 2017
    8th Ed.), available at https://www.justice.gov/criminal/file/1029066/download ......8, 9, 27, 34

U.S. Dep't of Justice, *Justice Manual* § 1-1.100 (updated Apr. 2018), available at
    https://www.justice.gov/jm/jm-1-1000-introduction ..................................................7

## I.      PRELIMINARY STATEMENT

It cannot comport with due process for a Special Counsel to bring a case by manipulatively pleading around United States Attorney for the District of Columbia ("USAO DC") and Department of Justice ("DOJ") policy, practice, and precedent in pursuit of a conviction against a foreign corporation with no presence in the United States, for alleged conduct that no person or entity, foreign or domestic, has ever been charged with before, and who would have no notice that the Special Counsel would deem its acts to be unlawful.  And it is precisely because a case pursued and charged in that fashion defies settled due process principles requiring fair notice and prosecutorial neutrality that this prosecution of Defendant Concord Management and Consulting, LLC ("Concord") should be dismissed.

There is no dispute that Concord had no knowledge whatsoever of the Federal Election Commission ("FEC") and its rules and regulations, or the DOJ Foreign Agents Registration Act Unit and its rules and regulations.  Indeed, the current prosecutors have conceded there is no evidence of any such knowledge.  Because the Special Counsel knew this, his office imagined a liability theory never used before—that because Russian nationals allegedly funded by Concord pretended to be Americans on the internet, that game of pretend proves that the Defendants intended to defraud the government.  This sleight-of-hand was accomplished, in turn, simply by changing three words in a § 371 template indictment from conspiracy to "commit crimes against" the United States to one word—conspiracy to "defraud" the United States.  In doing so, the Special Counsel trashed decades of policy, practice, and precedent and deprived Concord of the fair and just application of the law that would have prevailed had the USAO DC not been excluded from the grand jury process for reasons that still remain unknown today.

And after the doers of this dirty trick returned to their private law practices, the USAO DC and DOJ retroactively endorsed this gross anomaly from their own policy, practice, and

precedent for the purpose of avoiding political suicide.  But both they and the Special Counsel failed to predict intervening Supreme Court authority that establishes the jig is up.

From inception, Concord has maintained that this prosecution transgressed settled regulatory and constitutional limits.  The prosecution was not initiated by the USAO DC but instead by a Special Counsel unburdened by established charging constraints and appointed with the singular goal of indicting Russians who purportedly played make-believe on the internet during the 2016 U.S. presidential election cycle.  For its part, Concord was on the periphery of this unprecedented charge, accused of funding the internet activity.  Nevertheless, the Special Counsel and the Attorney General felt free to publicly declare Concord's guilt before a single piece of evidence had been introduced, or a single witness had been sworn.

Federal prosecutors ordinarily are entitled to a presumption of regularity, and even when zealous advocacy is involved, there typically is no issue of constitutional dimension.  But those leveling principles normally are considered and applied in cases involving federal line prosecutors, who are bound by regulations and policies designed to ensure neutrality and deter arbitrary treatment.  No such constraints are evident or at work in this case, where the Special Counsel operated with unchecked autonomy in pursuit of a single-minded mission to accuse Russia and Russian nationals.  Since at least January 1, 2010, it was the established practice— and publicly declared policy—of the USAO DC to allege willfulness as an element in § 371 defraud conspiracy indictments.  In this case, had prior practice and settled policy been followed, Concord never could have been charged at all.  Instead, through the artifice of a Special Counsel appointment, Concord has been deprived of the safeguards afforded every other defendant, and singled out for arbitrary and discriminatory treatment because of its Russian nationality.  The basic principles of fairness the Framers embedded in the Due Process Clause thus require that

Count One of this indictment (the "Indictment") as to Concord be dismissed.[1]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Threat Of Arbitrary And Discriminatory Prosecution Is Inherent In Any Case Involving A Special Counsel.

Prosecutors must adhere to principles of neutrality and fairness, consistent with the expectations of our criminal justice system.  The Supreme Court gave life to those expectations more than 80 years ago in *Berger v. United States*, 295 U.S. 78 (1935).  There, the Court explained that the prosecutor is the "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."  *Id.* at 88.  Thus, while prosecutors may "prosecute with earnestness and vigor" and "strike hard blows," they are "not at liberty to strike foul ones.  It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Id.*

Where prosecutors are displaced by a special counsel, however, these expectations of neutrality and fairness are threatened by virtue of the mandate underlying the appointment itself.  Indeed, as the D.C. Circuit observed, the threat arises precisely because a special counsel is appointed for the purpose of pursuing specified targets for indictment and prosecution:

> A person occupying this statutory office has, it seems to us, unique incentives to seek an indictment.  Our concern is based on the self-evident proposition that the whole *raison d'etre* of the independent counsel is not to administer the criminal law across a wide population, but rather to focus on one individual or group of individuals targeted at the inception of the office.  In effect, an entire self-sufficient government agency is created from scratch to investigate and perhaps prosecute a single individual.  The need to justify even the expense of an office

---

[1] Concord is named only in Count One of the Indictment.  For convenience, this motion refers to the Indictment generally.

dedicated solely to one goal must generate a reluctance to decide against indictment or to conclude the investigation absent near certainty that no indictment is possible or that no further leads remain. And inevitably, the success of the office itself, in the public's eyes, at least, must turn to some extent upon whether indictment and conviction are obtained.

*In re Sealed Case*, 838 F.2d 476, 509–10 (D.C. Cir. 1988), *rev'd sub nom. on other grounds by*

*Morrison v. Olson*, 487 U.S. 654 (1988).

While expressed by the D.C. Circuit in 1988, these concerns were not new. Nor are they any less relevant today. A decade prior to *Sealed Case* and *Morrison*, Attorney General Edward Levi warned that an independent special counsel is "subject to formidable public—and perhaps self-imposed—pressure to indict in the one case he was appointed to pursue." Provision for Special Prosecutor: Hearing on H.R. 14,476, H.R. 11,357, H.R. 11,999, H.R. 8281, H.R. 8039, H.R. 15,634, and Title I of S. 495 Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 94th Cong., 2d Sess. 35 (1976) (statement of Hon. Edward H. Levi, Attorney General). A decade later, joined by Attorneys General Bell and Smith, Attorney General Levi expressed these same concerns in an amicus brief to the U.S. Supreme Court, identifying "the occupational hazards of the dedicated prosecutor; the danger of too narrow a focus, of the loss of perspective, of preoccupation with the pursuit of one alleged suspect to the exclusion of other interests." Br. for *Amici Curiae* Edward H. Levi, Griffin B. Bell, and William French Smith, *Morrison v. Olson*, 1988 WL 1031601, at *11 (1988) (No. 87-1279). These trenchant observations have played out in practice in this case.

**B.     The Record Reveals That Concord Is Being Subjected To An Arbitrary And Discriminatory Prosecution That Violates Due Process Commands.**

**1.     The United States Attorney And DOJ Declined To Investigate Alleged Conduct That Is The Subject Of This Indictment And That Had Been In The Public Domain For Years.**

There can be no dispute that the factual framework of allegations forming the basis of the

Indictment here was in the American public domain since, at the latest, June 2, 2015, when *The New York Times Magazine* published "The Agency" by Adrian Chen. The basic elements of the Indictment are there in specifics regarding the name of Internet Research Agency ("IRA"), its address at 55 Savushkina Street in Saint Petersburg, its alleged connection to Concord and co-Defendant Mr. Prigozhin, and its alleged interference in U.S. political debate.  **Ex. 1**.[2]  *The New Yorker* published an article a year later discussing reports that Mr. Prigozhin was using the IRA to support then candidate Mr. Trump.  **Ex. 2**.[3]  Both of these articles, and numerous others dating back to 2014,[4] occurred well in advance of the 2016 election, and the DOJ and USAO DC could have conducted a criminal investigation based on these allegations if they believed a crime was being committed.  This public information also was available to the FEC, DOJ FARA Unit, and

---

[2]    *See* Adrian Chen, *The Agency*, The New York Times Magazine (June 2, 2015), https://www.nytimes.com/2015/06/07/magazine/the-agency.html.

[3]    *See* Adrian Chen, *The Real Paranoia-Inducing Purpose of Russian Hacks*, The New Yorker (July 27, 2016), https://www.newyorker.com/news/news-desk/the-real-paranoia-inducing-purpose-of-russian-hacks.

[4]    *See*, *e.g.*, **Ex. 3**, Max Seddon, *Documents Show How Russia's Troll Army Hit America*, Buzzfeed News (June 2, 2014), https://www.buzzfeednews.com/article/maxseddon/documents-show-how-russias-troll-army-hit-america (identifying IRA in connection with a campaign to mold American public opinion);  **Ex. 4**, Max Seddon, *New Leaked Documents Show Russian Trolls Targeting Obama, Harry Potter Fans*, Buzzfeed News (June 3, 2014), https://www.buzzfeednews.com/article/maxseddon/new-leaked-documents-show-russian-trolls-targeting-obama-har (same); **Ex. 5**, *From Obama to 'troll farms': how social media is changing politics*, Financial Times (Jan. 20, 2016), https://www.ft.com/content/0db52286-a25b-11e5-8d70-42b68cfae6e4 (describing the presence of "troll farms" all over the world); **Ex. 6**, *The Baltic Elves Taking on Pro-Russian Trolls*, The Daily Beast (Mar. 20, 2016), https://www.thedailybeast.com/the-baltic-elves-taking-on-pro-russian-trolls (describing anti-IRA "disinformation warriors" working out of the Baltic countries); **Ex. 7**, *Hillary Clinton's Super PAC, Taking a Page from Vladimir Putin, Spends $1 Million on Online Trolls*, Paste Magazine (Apr. 22, 2016), https://www.pastemagazine.com/articles/2016/04/hillary-clintons-super-pac-taking-a-page-from-vlad.html (noting that supporters of Hillary Clinton's presidential campaign had started a pro-Hillary troll farm inspired by IRA); **Ex. 8**, *It looks like Russia hired internet trolls to pose as pro-Trump Americans,* Business Insider (July 27, 2016), https://www.businessinsider.com/russia-internet-trolls-and-donald-trump-2016-7 (linking alleged IRA social media activity to Soviet-era "*dezinformatsiya*").

Department of State ("DOS"), who also did nothing.  Then in January 2017, the Office of the Director of National Intelligence issued its "Intelligence Community Assessment" in which the Federal Bureau of Investigation, National Security Agency, and Central Intelligence Agency jointly stated their official assessment that IRA had interfered in the 2016 election on behalf of Donald Trump and against Hillary Clinton.[5]  But no criminal investigation ensued then either.

Only after the Special Counsel was appointed on May 17, 2017, to specifically determine whether President Trump's campaign coordinated with Russia to get him elected, is there any evidence that a criminal investigation had begun. ███████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████  So because of the allegations against the Trump campaign that proved to be false, the Defendants in this case became collateral damage to justify the Special Counsel's appointment despite there never having been any basis to exclude the USAO DC or DOJ career prosecutors from investigating and making charging decisions about this particular case.

> **2.      This Unprecedented Defraud Conspiracy Prosecution Was Arbitrary At Inception, Contravening DOJ Policy, Practice, And Precedent.**

At inception, the displacement of the USAO DC and DOJ's line prosecutors was itself a contrivance.  The Special Counsel's appointment was made under regulations (the "Special Counsel Regulations" or "Regulations") that require the presence of a conflict of interest or other extraordinary circumstances to remove prosecutorial responsibility from the U.S. Attorney or line prosecutors at DOJ.  *See* 28 C.F.R. § 600.1(a).  As to Concord, however, no conflict or

---

[5]     *See* **Ex. 9**, *Assessing Russian Activities and Intentions in Recent US Elections*, ICA 2017-01D, Office of the Director of National Intelligence (Jan. 6, 2017), available at https://www.dni.gov/files/documents/ICA_2017_01.pdf.

extraordinary justifications for a special counsel have ever existed or even been offered.  In fact, since 2018, attorneys from the USAO DC and DOJ, all previously deemed to be conflicted but who, in adhering to DOJ's stated policies and longstanding practices, could not have charged this case in the first place, began entering appearances and taking active roles in this case.  Then, in March and April 2019, attorneys with the Special Counsel's Office began to withdraw from the case, and by May 2019, the Special Counsel's Office had dropped completely from any filings, leaving only USAO DC and DOJ attorneys. The Special Counsel's precipitous withdrawal and replacement by DOJ lawyers reinforces that the Special Counsel appointment as to Concord was pretextual from the start and used to initiate the arbitrary prosecution that followed.

Once enabled, the Special Counsel brought an unprecedented "*Klein*" conspiracy charge under 18 U.S.C. § 371's defraud clause against Concord based on allegations lacking a *mens rea* component as to any specified government functions created by any specifically identified federal statutes.  Count One does *not* allege that any of the Defendants, including Concord, violated any specific statute other than § 371, or knew that the statutes or regulations that govern elections, foreign agents, and visa applications even existed.  In fact, there is no allegation that Concord had a duty to file or register with respect to FECA or FARA, or committed any other act specifically prohibited by U.S. election statutes applicable to foreign nationals.

Had the USAO DC or a DOJ line prosecutor been involved here, Concord could not have been named as a defendant.  Rather, following established charging guidelines, they would have been required to adhere to DOJ's own *Criminal Resource Manual*, one part of the broader "*Justice Manual*."   The *Justice Manual* "contains publicly available [DOJ] policies and procedures."  U.S. Dep't of Justice, *Justice Manual* § 1-1.100 (updated Apr. 2018), available at https://www.justice.gov/jm/jm-1-1000-introduction.  In Section 923, entitled "18 U.S.C. § 371—

Conspiracy To Defraud The United States," the *Criminal Resource Manual* outlines the law of defraud conspiracies under § 371.  In pertinent part, § 923 states that the "defraud part of section 371 criminalizes any **willful** impairment of a legitimate function of government, whether or not the improper acts or objective are criminal under another statute."  *Criminal Resource Manual* § 923 (quoting *United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989)) (emphasis added), available at https://www.justice.gov/jm/criminal-resource-manual-923-18-usc-371-conspiracy-defraud-us.

The *Criminal Resource Manual* is, of course, intended to put the brakes on arbitrary prosecutorial conduct that could result in charges against individuals for conduct they had no idea was unlawful.  Indeed, when expedient to do so, the government does not hesitate to claim it is bound to follow such internal guidelines.  *See*, *e.g.*, *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 20 (D.D.C. 2018) (rejecting government's argument that, based on a 2014 charging-policy memorandum from the Attorney General to U.S. Attorneys the government claimed provided "binding guidance" to prosecutors regarding when to prosecute under a criminal statute, the government would not prosecute plaintiffs who were mounting pre-enforcement challenge to that statute).  Thus, adhering to the *Criminal Resource Manual*, the USAO DC and any DOJ line prosecutor would have demanded a showing of willfulness to impair a government function before considering an indictment against Concord.  But the Special Counsel's intent not to be limited by these safeguards became apparent when Concord called the question.

The arbitrary abandonment of the *Criminal Resource Manual* was made in tandem with the equally arbitrary rejection of the Special Counsel Regulations that were in place.[6]  Those

---

[6]    The Special Counsel similarly dispensed with DOJ's election-law charging policies, embodied in the *Federal Prosecution of Election Offenses* (the "*Charging Policies*").  ECF 74 at
                                                                                        (continued)

Regulations, too, provided unequivocally that the Special Counsel must follow DOJ's policies and practices. *See* 28 C.F.R. § 600.7(a) ("A Special Counsel shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice."); *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) (government actors must "follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions"). Although the Special Counsel later declared, when expedient to do so, that the Regulations were "binding" on him, ECF 47 at 1, that did not apply to this prosecution itself. On the contrary, he singled out Concord for the unprecedented § 371 defraud conspiracy charge, disregarding the *mens rea* allegations required under DOJ's *Charging Policies* and its *Criminal Resource Manual*.[7]

But the Special Counsel's charge did not just violate formal DOJ policies and practices— it violated the USAO DC's longstanding and traditional practice in prosecuting actual § 371 defraud conspiracy cases.[8] Since January 1, 2010, in all but four § 371 defraud conspiracy indictments, the USAO DC has consistently adhered to the *Criminal Resource Manual* in alleging § 371 defraud-clause conspiracies, as opposed to a conspiracy to violate another federal

---

22–23. This Court previously indicated it was unmoved by this departure—or by DOJ's post hoc revisions to the policies in direct response to this case—in addressing the proper level of *mens rea*. *Id.* But that does not change the fact that the Special Counsel's departure from these policies was arbitrary, too.

[7] Concord acknowledges the Court's prior finding, in concluding that the Special Counsel's appointment did not violate the Special Counsel Regulations, that the Regulations do not "create judicially enforceable rights." ECF 55 at 38–39. But that certainly does not mean the Special Counsel's decision to flout the *Criminal Resource Manual*—which, in turn, constitutes a violation of the Special Counsel Regulations by the Special Counsel, an issue this Court did not previously decide—is not relevant to whether the government has conducted this prosecution in an impermissibly arbitrary manner.

[8] As previously argued, time and again, federal prosecutors have followed through on DOJ's *Charging Policies* and *Criminal Resource Manual* and alleged "willfulness" in § 371 defraud conspiracy cases predicated on FECA or the FEC's electoral regulatory functions. ECF 46 at 24–25 n.10.

statute. In eleven of those cases, the charging document alleged with respect to the § 371 defraud count that the defendant(s) had acted willfully. *See* **Ex. 10**, *United States v. Abn Amro Bank, N.V.*, No. 10-cr-00124-CKK, Ind. Count One, ¶ 2; **Ex. 11**, *United States v. Khaki*, No. 1:12-cr-00061-RWR, Ind. Count One, ¶ 2; **Ex. 12**, *United States v. Shih*, No. 11-cr-00119-JEB, Ind. Count One, ¶ 10; **Ex. 13**, *United States v. Hassanshahi*, No. 13-cr-274-RC, Ind. Count One, ¶ 1; **Ex. 14**, *United States v. Yindeear-Rom*, No. 14-cr-00069-RMC, Ind. Count One, ¶ 9; **Ex. 15**, *United States v. Credit Agricole Corporate and Investment Bank*, No. 15-cr-00137-CKK, Ind. Count One, ¶ 27; **Ex. 16**, *United States v. Pereira Da Fonseca*, No. 16-cr-00089-EGS, Ind. Count One, ¶ 16; **Ex. 17**, *United States v. Ali Khan*, No. 16-cr-00096-RBW, Ind. Count One, ¶ 4; **Ex. 18**, *United States v. Claiborne*, No. 17-cr-00069-RDM, Ind. Count One, ¶ 29; **Ex. 19**, *United States v. Tajideen*, No. 17-cr-00046-RBW, Ind. Count One, ¶ 17; **Ex. 20**, *United States v. Unicredit Bank AG*, No. 19-cr-00128-BAH, Ind. Count One, ¶ 1.[9]

Of the remaining four, none involving FECA or FARA, one was a tax case, **Ex. 21**, *United States v. Cooper*, No. 15-cr-00152-RMC, where lawyers from DOJ's Tax Division appeared, Dkt. No. 16; one was a treasury sanctions case, **Ex. 22**, *United States v. Shandong Sheenrun Electronics Co. Ltd.*, No. 14-cr-00089-JEB, where the absence of willfulness was inconsistent with every other § 371 defraud-clause trade sanctions case filed by the USAO DC, *compare* **Ex. 10**, *ABN Amro Bank NV*; **Ex. 11**, *Khaki*; **Ex. 12**, *Shih*; **Ex. 13**, *Hassanshahi*; **Ex. 16**, *Pereira Da Fonseca*, and **Ex. 20**, *Unicredit*, *supra*; one was a multi-count immigration scheme that included a § 1001 count requiring willfulness, **Ex. 23**, *United States v. Sestak*, No. 13-cr-00168-JDB; and the final case was *United States v. Khan*, No. 11-cr-00276-EGS, a multi-count

---

[9] A search of federal court dockets using Bloomberg Law by undersigned counsel identified just fifteen such cases.

money laundering charge where the conspiracy count was dismissed, **Ex. 24**, Ind. ¶ 33; *see also id.* Minute Entry indicating Count 1 dismissed on government's motion (July 11, 2013); *id.* Dkt. No. 197, July 11, 2013 Hr'g Tr. at 59:1–5 (government moving to dismiss count one).

In sum, had the USAO DC not been pretextually excluded from the charging decision as to Concord, it would have either declined to charge, or included willfulness as an element (if there was evidence to support it, which there is not), consistent with established policy, practice, and precedent.  But the decision was left for the Special Counsel, who had been appointed for the specific purpose of investigating and indicting Russians for interfering with a presidential campaign.  And he proceeded to dispense with USAO DC and DOJ policy, practice, and precedent and forged ahead with the first-of-its-kind § 371 defraud conspiracy charge against Concord.  The Special Counsel took a statute that does not provide fair warning to "the world in language that the common world will understand," and has never before been used in this manner, to nullify the obligation of the government to prove beyond a reasonable doubt that Defendants were aware that the government would view their conduct as illegal.  *Marinello v. United States*, 138 S. Ct. 1101, 1103 (2018) (citation and internal quotation marks omitted).

### 3. The Government's Arbitrary Tactics Became Manifest When The Special Counsel, And Later The Attorney General, Publicly Declared Concord's Guilt Before Any Trial.

The Special Counsel's arbitrary and discriminatory treatment of Concord manifested itself in a particularly stark fashion when the Special Counsel and the Attorney General— contrary to ethical rules and basic principles of prosecutorial neutrality—made public statements asserting Concord's purported guilt for the crime alleged against it.

The version of the Mueller Report released publicly on April 18, 2019, together with Attorney General Barr's public statements about the Report, departed from all of these strict rules—and, indeed, from the settled role the prosecutor must play in our constitutional order.

*See Berger*, 295 U.S. at 88 (explaining that prosecutor's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done").  The Report repeatedly states that the Defendants are guilty of the conduct with which they have been charged in this pending case, and also conveys that Concord acted on behalf of the Russian government itself in a scheme involving Russian military intelligence.  ECF 148 at 6–9.  Specifically, "[b]y attributing IRA's conduct to 'Russia'—as opposed to Russian individuals or entities—the Report suggests that the activities alleged in the [I]ndictment were undertaken on behalf of, if not at the direction of, the Russian government."  *Id.* at 7.  For his part, "the Attorney General drew a link between the Russian government and this case[,]" ultimately "'confirm[ing]' what the [I]ndictment does not allege—that Concord's and its co-defendants' activities were 'sponsored' by the 'Russian government' and part of a two-pronged attack on our nation's democratic institutions."  *Id.* at 7–8.  Altogether, the Court found the government's various statements prejudiced Concord "because they drew a clear connection between [Concord] and a foreign government accused of interfering with the 2016 presidential election" and because "they provided an opinion about [Concord's] guilt and the strength of the evidence."  *Id.* at 8–9.

While the Court is determined to have a trial early in 2020, the government insists on a political persecution in addition to a criminal prosecution, thus further depriving Concord of due process under the law.  That is, despite the Court's holding, similar conduct continues as recently as one week ago through other high-ranking U.S. government officials.  On September 30, 2019, the Treasury Department issued new sanctions against Concord's general director, Mr. Prigozhin.[10]  In its press release announcing the action, the Treasury Department asserted that

---

[10]  *See* **Ex. 25**, *Foreign Interference in a U.S. Election Designations; Cyber-Related Designations; Ukraine-/Russia-Related Designations; North Korea Designations Update*, U.S.

(continued)

Concord's co-Defendant, IRA, attempted to influence the 2018 midterm elections and that it was "calling out" Mr. Prigozhin for assisting and supporting these efforts.[11]   U.S. Secretary of Treasury Mnuchin went on to say that "Treasury is targeting the private planes, yacht, and associated front companies of Yevgeniy Prigozhin, the Russian financier behind the Internet Research Agency and its attempts to subvert American democratic processes" and that the Department's actions were intended to "safeguard[] our democratic processes from adversaries— primarily Russia, Iran, and China—that may be seeking to influence the upcoming 2020 elections."[12]   The same day, U.S. Secretary of State Pompeo issued his own press release making similar assertions.[13]   Just last Friday, in a piece published on Polygraph.info, a news website operated by the United States Agency for Global Media ("USAGM"), a federal agency,[14] the author concluded—based on the aforementioned press releases and the allegations in the Indictment here (and other Special-Counsel indictments)—that any assertion "that investigations

---

Dep't of Treasury (Sept. 30, 2019),   available at https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20190930.aspx?src=ilaw.

[11]   *See* **Ex. 26**, Press Release, *Treasury Targets Assets of Russian Financier who Attempted to Influence 2018 U.S. Elections*, U.S. Dep't of Treasury (Sept. 30, 2019), available at https://home.treasury.gov/news/press-releases/sm787.

[12]   *Id.*

[13]   *See* **Ex. 27**, Press Statement from Michael R. Pompeo, U.S. Sec'y of State, *U.S. Targets Russian Actors Involved in Efforts to Influence U.S. Elections* (Sept. 30, 2019), available at https://www.state.gov/u-s-targets-russian-actors-involved-in-efforts-to-influence-u-s-elections/.

[14]   *See* **Ex. 28**, *About*, Polygraph.info, https://www.polygraph.info/p/5981.html (last visited Oct. 7, 2019) ("Polygraph.info is a fact-checking website produced by Voice of America (VOA) and Radio Free Europe/Radio Liberty."); **Ex. 29**, *Missions and Values*, VOA Public Relations, https://www.insidevoa.com/p/5831.html (last visited Oct. 7, 2019) ("VOA is part of the U.S. Agency for Global Media (USAGM), the government agency that oversees all non-military, U.S. international broadcasting. It is funded by the U.S. Congress."); **Ex. 30**, *Who we are*, U.S. Agency for Global Media, https://www.usagm.gov/who-we-are/ (last visited Oct. 7, 2019) (noting USAGM is a "federal agency" whose "mandate comes from multiple pieces of legislation")

into election meddling failed to find evidence of Russian interference in U.S. elections" was "false."[15]   And these public pronouncements followed public statements by the United States Attorney for the Eastern District of Virginia regarding potential foreign interference in the 2020 presidential election, reportedly asserting that "they're going to do the same thing."[16]

### 4.   The Government's Arbitrary Conduct Continued With Its Invention And Re-Invention Of The Conspiracy Charge Against Concord.

Abandonment of prosecutorial safeguards and resort to arbitrary tactics likewise have been evident in the government's continued redefinition and reformulation of the Indictment's charge.   Indictments are intended to ensure both the Sixth Amendment's guarantee that "'the defendant [be informed] of the nature of the accusation against him'" and "the Fifth Amendment's protections against abusive criminal charging practices; specifically, its guarantees that a criminal defendant can only be prosecuted for offenses that a grand jury has actually passed upon, and that a defendant who is convicted of a crime so charged cannot be prosecuted again for that same offense." *United States v. Hillie*, 227 F. Supp. 3d 57, 69–70 (D.D.C. 2017) (first quoting *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001); then citing *Stirone v. United States*, 361 U.S. 212, 218 (1960)). "[C]areful drafting in the 'language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury[,]' and that '[t]he precise manner in which an indictment is drawn cannot be ignored . . . .'" *Id.* (citations omitted).   And,

---

[15]   *See* **Ex. 31**, William Echols, *New Sanctions Against 'Putin's Chef' Prompt Latest Russian Election Meddling Denial*, Polygraph.info (Oct. 4, 2019), available at https://www.polygraph.info/a/sanctions-putins-chef-election-fact-check/30197184.html.

[16]   *See* **Ex. 32**, Rachel Weiner, *U.S. attorney warns of possible Russian interference in 2020 elections*, The Washington Post (Sept. 26, 2019), https://www.washingtonpost.com/local/legal-issues/us-attorney-warns-of-possible-russian-interference-in-2020-elections/2019/09/26/53f09c82-e085-11e9-8dc8-498eabc129a0_story.html.

importantly, the "settled rule in the federal courts [is] that an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form." *Russell v. United States*, 369 U.S. 749, 770 (1962) (citations omitted).

In this case, the government has treated these fundamental constitutional safeguards as optional from the start, even as the Court has tried to hold the government to its constitutionally mandated duties.  The Indictment alleges a vague conspiracy to interfere with generically stated "functions" of the U.S. government, leaving out key details such as what laws created those functions and which conspirators, if any, could have violated—or did violate—the purported legal duties alluded to.  *Supra* at 7.  Omitted, too, is any allegation that Concord or the Defendants acted willfully—to that point a staple of § 371 defraud conspiracy indictments in this District.  *Supra* at 7, 9–10.

When pressed by Concord's July 2018 motion, the government insisted that the Indictment did not allege that any Defendant was required to make any disclosures under FECA or to register with DOJ under FARA, and instead maintained that it only needed to show some amorphous interference with undefined "regulatory functions" of the FEC or DOJ.  ECF 56 at 11.  When later asked by the Court at the hearing on Concord's motion, the government shifted, admitting that "when the only deceptive acts the government has alleged are a failure to disclose or a failure to report, well, then, you are going to have to show a duty to disclose or a duty to report."  Oct. 15, 2018 Hr'g Tr. 47:24-48:2.  And after the hearing, the government shifted yet again, claiming that in fact the Indictment—which, of course, had not itself changed (nor could it)—***did*** allege that Concord and the Defendants had a legal duty to disclose and register under FECA and FARA, despite the fact that those statutes make it clear that any failure to act on any such duty would only be actionable if the Defendants had a willful mental state and the

- 15 -

Indictment does not allege who had any such duty.  ECF 69 at 3–4.

Given these machinations, Concord asked that the government provide a bill of particulars identifying the specific statutes and regulations referred to in the Indictment and any conspirators who were required by FECA to make the disclosures or required by FARA to register.  ECF 104.  Concord also sought clarification as to whether it or its agents specifically were alleged to have violated the two statutes.  *Id.*  The Court granted Concord's motion in part.  ECF 136.  Noting that the "indictment *did* allege" violations of FECA and FARA (despite the fact that willfulness was not alleged), the Court reiterated its earlier finding "that the Government may ultimately have to prove these violations at trial to show that the deceptive acts directed at private parties were *also* intended to impair the FEC's and DOJ's functions 'in administering federal requirements for disclosure.'"  *Id.* at 11 (citation omitted).  The Court further reiterated that "it would be difficult to tie the deceptive acts alleged in this case to FEC's and DOJ's administration of FECA's and FARA's disclosure requirements if those requirements did not actually apply to the conspirators."  *Id.*  "In other words," the Court reasoned, "it will be difficult for the government to establish that the defendants intended to use deceptive tactics to conceal their Russian identities and affiliations from the United States if the defendants had no duty to disclose that information to the United States in the first place."  *Id.* at 12.  "For that reason," the Court concluded, "the specific laws—and underlying conduct—that triggered such a duty are critical for Concord to know well in advance of trial so it can prepare its defense."  *Id.*

Notably, however, the Court found, "the indictment does not cite the specific statutory and regulatory disclosure requirements that the defendants violated" or "clearly identify which expenditures and activities violated which disclosure requirements."  *Id.*  And just as critically, the duty identified by the Court is not specifically alleged in the Indictment.  The Court therefore

- 16 -

ordered the government to provide information to Concord regarding the statutory and regulatory disclosure requirements "whose administration the defendants allegedly conspired to impair," along with the specific conduct that allegedly violated those requirements. *Id.* [17]

In response, the government filed a bill of particulars setting forth the specific sections of FECA and FARA that it claimed the Defendants had failed to comply with, ECF 176, even though none of these provisions appear in the Indictment itself, and it remains a mystery whether any of this was explained to the grand jury. But a bill of particulars can neither "'cure' an indictment that fails to provide Defendant with present notice of the charges against him or that potentially thwarts the role of the grand jury in bringing those charges in the first place," nor amend or revise the indictment itself. *Hillie*, 227 F. Supp. 3d at 81 (citation omitted); *see also Gaither v. United States*, 413 F.2d 1061, 1067 (D.C. Cir. 1969) ("The bill of particulars … does not preserve [a defendant's constitutional] right to be tried on a charge found by a grand jury.").

Because Concord could still not determine which specific Defendants had the duties the government (but not the Indictment) alleged, it sought a supplemental bill of particulars. ECF 181. At the hearing on that motion, the government's arbitrary approach to this prosecution revealed itself yet again. In a colloquy at the start of the hearing, the Court stated that it had previously "interpreted the indictment to allege a conspiracy that targeted only the administration of federal disclosure requirements and not some other set of functions, such as the enforcement of the ban on expenditures by foreign nationals." Sept. 16, 2019 Hr'g Tr. 4:13–17. But the Court questioned the government's opposition to the motion for a supplemental bill of particulars, where the government asserted that the Indictment "also alleges that the conspirators

---

[17]    Later, the Court concluded that the Indictment is "difficult to follow in terms of what the objectives are." Sept. 16, 2019 Hr'g Tr. 6:15–16 and 15:17–18.

interfered with the FEC's function of enforcing the statutory prohibition on certain expenditures by foreign nationals." ECF 194 at 18 n.3.

The government then asked the Court to clarify or reconsider its previous order.  In that motion, the government said that it intends to prove that the co-conspirators did not comply with the duties now required by the Court for conviction because, as foreigners, they allegedly made expenditures, not charged in the Indictment (because it would require proof of willfulness), that were potentially separately prohibited under FECA (which amounted to the Russian ruble equivalent of just over $2,900).  ECF 201 at 2; ECF 181 at 11 & n.10; ECF 206 at 7.  The Court denied this motion, reaffirming that the Indictment did not allege that the Defendants conspired to interfere with the FEC's function of enforcing a foreign expenditure ban, ECF 209 at 3, which is not a "ban" at all, but rather a highly complex set of rules that prohibits some expenditures, and permits others.  ECF 181 at 9–16.

The Court also said that it had "previously held as a matter of law the government 'will not have to prove that any defendant had a legal duty to file reports with the FEC or to register with the DOJ.'"  ECF 209 at 3 n.1 (quoting ECF 74 at 15).  But that is *not* what the Court said previously.  The Court previously stated that while the government might "[i]n theory [be] correct" that it would not have to prove that any defendant had a legal duty to file with the FEC or register with DOJ, "it is difficult to see how the defendants' deception would impair agencies' ability to 'administer' disclosure requirements if those requirements did not apply to the defendants' conduct."  ECF 74 at 15.  And in a letter to undersigned counsel on October 4, 2019, the government now claims for the first time that it will argue at trial that the co-conspirators caused certain U.S. persons to unwittingly act as their agents in violation of FARA.  **Ex. 33**, Ltr. from U.S. Attorney to E. Dubelier (Oct. 4, 2019).  Even putting aside that neither FARA itself

nor any case precedent supports this brand-new theory, this mind-boggling whirlpool created by the Special Counsel and perpetuated by the government leaves Concord wondering why the government did not simply assert its position in its opposition to the supplemental bill of particulars instead of arguing that even if such a duty existed, the government did not have to tell Concord prior to trial which duties applied to which co-conspirators.  ECF 194 at 14–19.

Thus, the Court has determined the Indictment charges only interference with functions related to the "administ[ration] [of] federal requirements for disclosure," ECF 74 at 6; the government claims that it does not have to tell Concord in advance of trial who specifically had these disclosure duties, nor does it have to prove that any Defendant had such a duty; and the Court agrees in theory, but it, too, is unable to determine how the government can prove its case without proving that any duties of disclosure attached to the Defendants.  So the government continues to move the target around, impermissibly left "free to roam at large—to shift its theory of criminality so as to take advantage of each passing vicissitude . . . ."  *Russell*, 369 U.S. at 768.

## III.   LEGAL STANDARDS

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. Proc. 12(b)(1).  This includes "a defect in the indictment or information" such as "failure to state an offense."  *Id.* 12(b)(3)(B), (B)(v). Challenges to the lawfulness of this prosecution on constitutional and other grounds can be asserted in a Rule 12(b) motion.  *See United States v. Park*, 297 F. Supp. 3d 170, 174 (D.D.C. 2018).  Concord challenges the prosecution at this juncture on two independent and dispositive grounds:  (1) the prosecution is unlawful under the Due Process Clause; and (2) the Indictment, given the controlling burden of proof, fails to state an offense and is incurably defective.

A "'valid indictment must: (1) allege the essential facts constituting the offense[,] (2) allege each element of the offense, so that fair notice is provided[,] and (3) be sufficiently

distinctive that a verdict will bar a second prosecution for the same offense.'"  *United States v. Sunia*, 643 F. Supp. 2d 51, 77 (D.D.C. 2009) (alterations in original) (citations and emphasis omitted).  "[T]he first requirement … has its origins in the Grand Jury Clause," while the "second and third requirements … derive from the notice requirement of the Sixth Amendment and the Double Jeopardy clause of the Fifth Amendment, respectively[.]"  *Id.* at 77–78 (citation omitted).  As this Court explained in *Hillie*:

> [C]areful drafting in the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury[,] and [] [t]he precise manner in which an indictment is drawn cannot be ignored, because an important function of the indictment is to ensure that, in case any other proceedings are taken against [the defendant] for a similar offen[s]e, ... the record [will] sho[w] with accuracy to what extent he may plead a former acquittal or conviction[.]

*Hillie*, 227 F. Supp. 3d at 70 (citations and internal quotation marks omitted).

Thus, "'[t]o allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant' of the 'protection which the guaranty of the intervention of a grand jury was designed to secure[,] [f]or a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.'"  *Sunia*, 643 F. Supp. 2d at 77 (quoting *Russell*, 369 U.S. at 770).

## IV.    SUMMARY OF ARGUMENT

The Indictment against Concord should be dismissed for two reasons.  First, the Due Process Clause forbids the kind of arbitrary prosecution the government has conducted against Concord.  From its inception, this prosecution has been an act of manipulation and, through the artifice of a special counsel appointment, broken sharply from established USAO DC and DOJ policy, practice, and precedent.  The United States Attorney for the District of Columbia and line prosecutors reporting through normal channels at DOJ were at first excluded, but then, without

explanation, magically appeared to prosecute a case they never could have indicted in the first place.  And, of course, they cannot now retroactively apply USAO DC and DOJ policy for fear of being publicly accused of failing to punish the Russians.  The charge itself is unprecedented and the Special Counsel and the government abandoned all pretenses of neutrality by publicly declaring Concord's purported guilt, and changing, repeatedly, their view of the Indictment and what Concord was charged with doing.  Simply put, the Constitution will not tolerate an arbitrary prosecution like this one and this Court should call a halt to it in these circumstances.

Second, the Indictment should be dismissed because it fails to allege that Concord had knowledge of the specific statutes and regulations related to elections and influencing public opinion it allegedly conspired to interfere with, but which the government only recently identified—or, at a minimum, that Concord knew its status as a foreign-national corporation imposed disclosure and registration duties on it under U.S. law that, if not performed, would subject Concord to criminal prosecution.  The government has no evidence that Concord knew about the existence of these statutes and regulations at the time of the alleged conspiracy in question.  In fact, the Indictment contains no such allegation of the knowledge the Court has determined will be required for conviction.  At the same time, the Supreme Court's recent decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), requires a fresh look and compels close scrutiny of the government's *mens rea* allegations—or lack thereof—which raise a constitutionally intolerable risk that Concord may be convicted for purely innocent conduct.  The Indictment does not allege and the government cannot prove the elevated form of *mens rea* that the controlling law mandates in this particular defraud conspiracy case.  Dismissal is the appropriate remedy for this deficiency as well.

V.    **ARGUMENT**

   A.    **The Indictment Should Be Dismissed Because The Government's Arbitrary Prosecution Of Concord Violates The Due Process Clause.**

      1.    **The Due Process Clause, Animated By Bedrock Systemic Principles, Prohibits Arbitrary Government Prosecutions.**

The "Due Process Clause, like its forebear in the Magna Carta, was 'intended to secure the individual from the arbitrary exercise of the powers of government[.]'" *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (citations and internal quotation marks omitted).  The very "touchstone of due process is protection of the individual against arbitrary action of government[.]" *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (citation omitted).  Simply put, "arbitrary power resides nowhere in our system of government[.]" *Champion Lumber Co. v. Fisher*, 227 U.S. 445, 448–49 (1913) (citation and internal quotation marks omitted).  Given its fundamental purpose, the Due Process Clause applies in a variety of contexts, as needed, to check the arbitrary exercise of government power.

Criminal prosecutions certainly are no exception given the "especially severe consequences" that can result from them.  *See Rivera v. Minnich*, 483 U.S. 574, 581 (1987).  Thus, "[i]t is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (citation omitted); *see also Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016) (reversing judgment affirming death-penalty sentence under Due Process Clause where lower-court justice had, in his prior capacity as district attorney, authorized the death penalty in that very case); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) ("[I]t certainly … deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him").

The Due Process Clause likewise extends its protections against arbitrary treatment by

the government beyond the courtroom to the conduct of the prosecution itself.   Indeed, the Supreme Court has left no doubt just how deeply destructive of our constitutional order arbitrary prosecutorial conduct can be.   *See Marinello*, 138 S. Ct. at 1109 ("[I]nsofar as the public fears arbitrary prosecution, it risks undermining necessary confidence in the criminal justice system").   The prosecutor plays a "special role … in the search for truth in criminal trials."   *Strickler v. Greene*, 527 U.S. 263, 281 (1999).   Therefore, our system of justice requires prosecutors to see "that justice shall be done."   *Berger*, 295 U.S. at 88.[18]   And in all events, the prosecutor's role "requires him to be sensitive to the due process rights of a defendant to a fair trial."   *Gannett Co. v. DePasquale*, 443 U.S. 368, 384 n.12 (1979).

Preventing arbitrary prosecutorial conduct similarly animates the Due Process Clause's command that Congress speak clearly and unambiguously in its enacted statutes.   Due process "requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'"   *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974) (citations omitted).   The Supreme Court reiterated this critical safeguard in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), stressing that due process "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges."   *Id.* at 1212 (citation omitted).

In fact, due process operates in a "quite sweeping" manner, invalidating laws that "'authorize[] or *even encourage*[] arbitrary and discriminatory enforcement.'"   *Johnson v. United States*, 135 S. Ct. 2551, 2566 (2015) (emphasis added) (citation omitted).   Arbitrary prosecutorial conduct is at the heart of this due process safeguard because, as Justice Gorsuch

---

[18]   This duty under *Berger* to seek justice has since been "incorporated … into the Court's Fourteenth Amendment prosecutorial misconduct jurisprudence."   *Jackson v. Conway*, 763 F.3d 115, 145 (2d Cir. 2014) (citing cases); *see also Cone v. Bell*, 556 U.S. 449, 451 (2009).

pointedly explained in his concurrence in *Dimaya*, "vague laws invite the exercise of arbitrary power … by leaving the people in the dark about what the law demands[,]" which in turn "allow[s] prosecutors and courts to make it up." 138 S. Ct. at 1223–24 (Gorsuch, J., concurring in part and concurring in the judgment); *see also Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03 (1966) ("arbitrary enforcement" of law leaves government "free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case") (citations omitted).

To preserve and implement these constitutional imperatives, the Supreme Court has stressed that "the state [must] wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters. We have always been sensitive to the possibility that important actors in the criminal justice system may be influenced by factors that threaten to compromise the performance of their duty." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987) (plurality op.); *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249–250 (1980) (rejecting the notion "that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors" and stressing that where "irrelevant or impermissible factors [are injected] into the prosecutorial decision[, that may] raise serious constitutional questions") (citations omitted).

The Court also has assured that "'[s]electivity in the enforcement of criminal laws is … subject to constitutional constraints.'" *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). Thus, the Constitution forbids basing "the decision to prosecute … 'upon an … arbitrary classification,' … including the exercise of protected statutory and constitutional rights." *Id.* (citations omitted). The Constitution likewise prohibits unfair tactics during a prosecution that demonstrate arbitrary and discriminatory treatment of a criminal defendant, *see*, *e.g.*, *Berger*, 295 U.S. at 85, 89 (reversing

conviction because the government's evidence was weak and "[t]he prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury"), including when those tactics raise the specter that the government is retaliating against the defendant for exercising its constitutional right to defend itself when other similarly situated defendants have not done so. *See Wayte*, 470 U.S. at 608 (recognizing prohibition against prosecutorial decisions made in retaliation for the exercise of constitutional rights); *cf. Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (noting due process violation can arise where government's conduct raises "the danger that the State might be retaliating against the accused for lawfully attacking his conviction") (citation omitted).

While the due process precedents discussed above implicate a variety of fact patterns, their reasoning reflects a singular message:  the Due Process Clause is intended to ensure fair, neutral, and non-discriminatory government action.  The working concepts derived from these precedents also are readily distilled.  At its core, the Due Process Clause is intended to check and prevent arbitrary government conduct—of whatever kind, by any actor, in every branch, prosecutors and Executive-Branch officials included.  It guarantees, at a minimum, fairness and impartiality from courts and prosecutors.  Due process thus forbids prosecutions undertaken for arbitrary reasons, conducted by anything less than totally disinterested prosecutors who seek solely to do justice, not simply obtain convictions.  Due process likewise insists that prosecutors protect the accused's constitutional rights and refrain from misconduct—in any form—that might prejudice the accused or taint the fairness of the proceeding.  And finally, in any context— criminal prosecutions included—due process is flexible, adapted to carry out the core constitutional objective of preventing arbitrary government conduct.  These safeguards, flexibly implemented, plainly bar a prosecution shown to be deliberately devoid of neutrality,

deliberately undertaken outside of established regulations and rules intended to cabin prosecutorial discretion, and deliberately intended to hinder a fair and unbiased result. So it is in this case.

> **2.     The Record Conclusively Shows That The Government's Prosecution Of Concord Violates The Due Process Clause.**

When constitutional limits are transgressed, "it is necessary to draw a line[.]" *Duncan v. Louisiana*, 391 U.S. 145, 160 (1968). And wherever the line separating zealous from arbitrary prosecutions is precisely, the record now shows the government has transgressed it here.

*First*, the arbitrary nature of this prosecution was evident at the outset when it was conducted not by the USAO DC or a line DOJ prosecutor, but by a Special Counsel who justified his appointment on the basis of a pretextual "conflict of interest" that later disappeared without explanation.

*Second*, the government, in an effort to skirt the heightened *mens rea* requirements of the underlying FECA and FARA provisions it only recently disclosed—but that it cannot meet— framed the indictment in defraud-clause language for the purpose of cloaking an actual charge of conspiracy to violate FARA and FECA, and, as such, the Court should view the indictment as a conspiracy to violate FARA and FECA. *See United States v. Bridges*, 346 U.S. 209, 223–24 (1953) (rejecting government's attempt to use defraud clause as a "cloak" to avoid adverse consequences of charging under the offense clause); *see also United States v. Rosenblatt*, 554 F.2d 36, 41 (2d Cir. 1977) (rejecting government's contention that it was free to elect between the clauses "in cases where they overlap, in such a way as to produce the most favorable result" for the government); *see also Dennis v. United States*, 384 U.S. 855, 863 (1966) (accepting government's charge under defraud clause instead of offense clause, but only because the defraud allegation there "properly reflect[ed] the essence of the alleged offense" and, unlike the

charge here, did "not involve an attempt by prosecutorial sleight of hand to overcome" a limitation on the government were it to make an offense-clause charge). This, too, exposes the arbitrariness of this prosecution of Concord.

*Third*, the arbitrary treatment became manifest when the Special Counsel jettisoned DOJ's *Charging Policies* and *Criminal Resource Manual* to create a crime to fit the facts. That arbitrary departure from the *Charging Policies* and *Manual* was especially significant given that, as detailed above, the USAO DC had a well-established practice of charging willfulness in § 371 defraud-clause indictments, and would not have charged the § 371 conspiracy here—omitting "willful" as a prerequisite to the offense. The significance of this cannot be overstated. Had policy and practice been followed, as in almost every other § 371 defraud conspiracy case in this District, and every other FARA or FECA case nationally, there is no question that the Indictment either would not have been brought because there is no evidence of willfulness, or would have alleged willfulness as an element that the government would have to prove beyond a reasonable doubt (but which it cannot prove because there is no such evidence). Certainly Concord, like any other defendant, was entitled to have the grand jury make these determinations.

*Fourth*, the Special Counsel and the Attorney General broke with norms again when they made high-profile public statements asserting Concord's guilt in violation of this Court's rules, DOJ policy, and rules of professional conduct. Those statements fully exposed the arbitrary nature of the prosecution—the government having declared that Concord was guilty as charged without the need for a trial. And while the Court did not penalize the earlier violations because the government said it would not do it again, it did do it again, and now Concord will face a trial in the next presidential election year, with the Secretaries of State and Treasury having said publicly that the allegations in the Indictment are true, and the U.S. Attorney for the Eastern

District of Virginia saying publicly that the Russians (*i.e.*, Concord) are continuing to interfere.

*Fifth*, the government, from the inception of this case, treated the charges against Concord as a moving target without regard for the limitations that ordinarily bind prosecutorial conduct in relation to an indictment, leaving Concord at a loss to determine what it must defend against.  As recently as October 4, 2019, the government changed its FARA theory again, now stating for the first time that the Defendants caused uncharged U.S. persons to act as their foreign agents by duping them into believing that the Defendants were Americans.  **Ex. 33**.  This theory is contrary to the statute and the plain language of the Indictment, and is an unlawful, after-the-fact creation by the government to newly interpret what the Special Counsel did.  And it deprives Concord of fair notice of the actual charge against it and threatens its core Fifth Amendment right not to have "to answer a charge not contained in the indictment" itself, *Hitt*, 249 F.3d at 1016 (citation and internal quotation marks omitted), and severely impairs Concord's Fifth Amendment double-jeopardy right by beclouding exactly what Concord will (or won't) be tried for.  *See Sanabria v. United States*, 437 U.S. 54, 65–66 (1978) ("The precise manner in which an indictment is drawn cannot be ignored, because an important function of the indictment is to ensure that, 'in case any other proceedings are taken against [the defendant] for a similar offence, . . . the record [will] sho[w] with accuracy to what extent he may plead a former acquittal or conviction.'") (citation omitted).  The government's obfuscation thus accentuates the arbitrariness of this prosecution, further endangering the constitutional safeguards at the heart of our criminal justice system.

The double-jeopardy danger is especially virulent here because, as things currently stand, although the government has not charged Concord (or its co-Defendants) with making expenditures in violation of FECA, the government may ultimately be permitted to offer

evidence of such alleged expenditures to prove Concord's motive to avoid its purported disclosure duties.  ECF 209 at 3 & n.1.  The jury then might convict Concord based on *that* uncharged unlawful-expenditure evidence—and no one could later say with any degree of certainty that it didn't.  Yet, the government would be left free to charge Concord later with FECA violations based on the same evidence, comfortable in its belief that no jeopardy attached to the first conviction because of the Court's ruling that the government never charged that unlawful expenditures were made in the first place.  Moreover, as noted, this case continues to morph into a § 371 conspiracy to "commit an offense" against the government—a charge the Indictment does not contain and that government has explicitly disavowed.  ECF 56 at 9.  This creates a palpable risk that the jury may find Concord guilty for a crime with which it has not been charged, based on evidence—purported FECA and FARA violations—that goes directly to proving that uncharged crime.  And, as noted, only three days ago, the government injected a brand-new theory likewise nowhere to be found within the four corners of the Indictment—that Defendants induced more than two dozen individuals and organizations to act as agents of a foreign principal, which in turn gave rise to duties to register under FARA.  **Ex. 33**.  At a bare minimum, all of this makes it far from "clear that a future prosecution for conduct arising out of the charges here would be barred."  *Hillie*, 227 F. Supp. 3d at 79 (citation omitted) (dismissing indictment based in part on Double Jeopardy Clause).  And given the arbitrariness that has marked the government's prosecution of this case to this point, it takes little imagination to foresee that duplicative-prosecution train coming down the tracks.

Taken individually, one might be tempted to conclude there is nothing of constitutional dimension in this conduct.  But taken together, the government's conduct in prosecuting this case has crossed the line from fairness and neutrality, instead employing whatever tactics are needed

to make good on the preconceived notion and politically expedient option that some Russian, namely Concord, must be guilty of something.   As each prosecutorial policy, practice, and precedent has been circumvented, and each constitutional safeguard ignored, the arbitrary and discriminatory nature of this prosecution has been fully revealed.

In response, the government may say there is no case exactly on point that has granted the relief Concord seeks.  But the Court already has agreed that there has never been a case like this before.  *See* Oct. 15, 2018 Hr'g Tr. at 22:6–7.  And as the Supreme Court has made clear, "a prosecutor's discretion is 'subject to constitutional constraints[,]'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted), and the "'presumption of regularity'" (*id.*) (citation omitted) to which prosecutors ordinarily are entitled serves only as a rebuttable "general working principle" that demands a "meaningful evidentiary showing[,]" *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174–75 (2004)—it alone cannot "shield" an arbitrary prosecution "from a thorough, probing, in-depth review."  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).  Nor does it prevent courts from "look[ing] behind the presumption to the actual facts."  *Bismullah v. Gates*, 501 F.3d 178, 186 (D.C. Cir. 2007), *vacated on other grounds*, 554 U.S. 913 (2008); *see, e.g.*, *Albino v. United States*, 78 F. Supp. 3d 148, 165 (D.D.C. 2015) (rejecting application of presumption where "nothing about the [government conduct at issue] was regular").  Thus, the presumption can be rebutted where the government "has demonstrated undue bias towards particular private interests" or "has departed from its consistent and longstanding precedents or policies[.]"  *Nat. Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1050 n.23 (D.C. Cir. 1979) (citations omitted).

Moreover, the Due Process Clause, above all, calls for close scrutiny of government conduct "when the particular situation demands[.]"  *Wilkinson v. Austin*, 545 U.S. 209, 224

(2005) (citation omitted).   Indeed, the "very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961) (citations omitted). Here, the prosecution is once-in-forever, and it is fraught, by its very nature, with a bent towards arbitrary treatment.   The absence of a case exactly on-point is simply a function of the never-before-brought prosecution the government has mounted, but is nevertheless illustrative of the very arbitrary targeting that prosecutors are constitutionally bound to avoid.   Such "extreme cases often test the bounds of established legal principles," but they are also "more likely to cross constitutional limits, [thus] requiring [judicial] intervention"—especially "when[,]" as here, "due process is violated." *Caperton*, 556 U.S. at 887 (citations omitted).   The Indictment of Concord should therefore be dismissed.

### B.   The Indictment Should Be Dismissed Because It Fails To Allege The Requisite *Mens Rea* To Support The § 371 Defraud Conspiracy Charge Against Concord.

The requisite level of *mens rea* the government must establish has been a central issue in this case from inception.   Concord previously argued that the government must show Concord knew about the specific statutes and regulations—left unidentified in the Indictment itself—that it allegedly conspired with others to impair.   At that time, the Court thought otherwise and ruled accordingly.   But key aspects of the Court's reasoning for rejecting Concord's *mens rea* argument are subject to reexamination in light of (i) the Supreme Court's recent decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), and (ii) how the government now views its case.

The absence of a heightened level of *mens rea* regarding FECA and FARA, and how Concord's (and the other Defendants') status triggers legal disclosure and registration duties under those statutes, is especially dangerous in light of the government's continued shifting of its own interpretation of the Indictment and the "lawful governmental functions" that purportedly

were the target of the conspiracy alleged.   Now, in light of *Rehaif* and consistent with

fundamental due process principles, it is apparent that the government must show—but has not

even alleged—that, at a minimum, Concord knew that its status as a foreign-national corporation

imposed disclosure and registration duties on it under U.S. law that it was obligated, on pain of

criminal sanction, to carry out; and, arguably, that Concord knew about the specific statutes and

regulations invoked when it acted.   The Indictment should be dismissed for this reason as well.

>    1.    **Recent Supreme Court Precedent, Reinforced By D.C. Circuit Precedent, Calls For A Reexamination Of The *Mens Rea* The Government Must Prove In This Case.**

In *Rehaif*, the defendant was charged with violating 18 U.S.C. § 922(g), which bars aliens

who are unlawfully present in the United States from possessing firearms.   The penalty provision

for § 922(g) is contained in § 924(a)(2), which requires the government to prove that the

defendant acted "knowingly."   In *Rehaif*, the Supreme Court held that the "knowingly"

requirement applied to both the firearm-possession and the unlawful-presence elements of the

statute.   139 S. Ct. at 2194.   The Court stressed the longstanding and critical role scienter plays in

"helping to 'separate those who understand the wrongful nature of their act from those who do

not.'"   *Id.* at 2196 (citation omitted).   That role was especially called for in *Rehaif* because,

"[a]ssuming compliance with ordinary licensing requirements, the possession of a gun can be

entirely innocent."   *Id.* at 2197 (citation omitted).   Thus, it was the "***defendant's status***, and not

his conduct alone, that makes the difference.   Without knowledge of that status, the defendant

may well lack the intent needed to make his behavior wrongful."   *Id.* (emphasis added).

The *Rehaif* Court proceeded to reject the government's contention that based on the

maxim "ignorance of the law is no excuse," the government was not required to prove the

defendant knew he was unlawfully present in the U.S.   That maxim, the Court explained,

"normally applies where a defendant has the requisite mental state in respect to the elements of

the crime but claims to be 'unaware of the existence of a statute proscribing his conduct.'" *Id.* at 2198 (quoting 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 5.1(a), p. 575 (1986)).  But it "does not normally apply where a defendant 'has a mistaken impression concerning the legal effect of some collateral matter and that mistake results in his misunderstanding the full significance of his conduct,' thereby negating an element of the offense." *Id.* (quoting 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 5.1(a) p. 575 (1986)).  The latter was the case in *Rehaif* because the "defendant's status as an alien 'illegally or unlawfully in the United States' … is what the commentators refer to as a 'collateral' question of law." *Id.*  That is, a "defendant who does not know that he is an alien 'illegally or unlawfully in the United States' does not have the guilty state of mind that the statute's language and purposes require." *Id.*

The D.C. Circuit's recent decision in *United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019), reinforces the central point of *Rehaif*—that *mens rea* must be tied closely to each element of the statute to ensure that innocent conduct is not ensnared.  The D.C. Circuit rejected a jury instruction that required the government to prove only generally that the defendant "acted with knowledge that his conduct was unlawful." *Burden*, 934 F.3d at 692.  More was required on the facts before the court, however, because there was "evidence of willfully unlawful conduct apart from the charged offenses, creating a risk that the jury may consider any and all evidence of the defendant's guilty mind—whatever its object—as supporting willful commission of the charged offense." *Id.*  "The requirement that the *mens rea* relate to the charged *actus reus* is the baseline for any criminal mental standard." *Id.* at 692–93 (citation omitted); *see also Marinello*, 136 S. Ct. at 1106 (reasoning that verbs such as "obstruct" or "impede"—like the same or similar verbs used in the judicially created § 371 *Klein* conspiracy, and contained in the Indictment here (*e.g.*, ¶¶ 2, 7, 9, 28)—require a "***particular***" object; that is, the defendant must obstruct or impede "a

*particular* person or thing") (emphasis added).

The reasoning and holding in *Rehaif*, together with the D.C. Circuit's decision in *Burden*, necessitate a fresh look at the *mens rea* the government must prove to meet its § 371 defraud conspiracy burden of proof as to Concord.   That look, in turn, reveals the need for the government to show, at a minimum, that Concord knew that because of its status as a foreign corporation, its alleged funding of IRA created a duty for one or more of the alleged co-conspirators to register with the DOJ and to file reports with the FEC, and that the failure to do so was unlawful.   *Rehaif* and *Burden* in fact demand even more in this particular case—proof that Concord had actual knowledge of the provisions of FECA and FARA themselves.

When the Court first considered the requisite *mens rea* in this case in November 2018, the Court rejected Concord's *mens rea* argument despite the fact that:  (1) the D.C. Circuit had not (and still has not) ruled on this issue with respect to § 371 defraud conspiracy charges; (2) the Third Circuit has applied a willfulness standard to § 371 defraud-clause cases; (3) another judge of this Court required the government to prove willfulness in a § 371 conspiracy to interfere with the FEC case; and (4) DOJ's *Charging Policies* provide that willfulness is required in cases like this one.   The Court specifically rejected Concord's reliance on *Cheek v. United States*, 498 U.S. 192 (1991) and *Ratzlaf v. United States*, 510 U.S. 135 (1994), where the Supreme Court held that the government was required to prove that the defendant knew his allegedly criminal conduct was unlawful.   The Court reasoned that each of those cases involved statutes that included a textual "willfulness" requirement and, importantly in the Court's view, neither was "meant to 'dishonor the venerable principle that ignorance of the law generally is no defense to a criminal charge.'"   ECF 74 at 17 (citations omitted).

The Court also rejected the relevance of the fact that the underlying statutes with which

Concord allegedly interfered—FECA and FARA—themselves required proof of willfulness. The Court acknowledged that the Indictment alleged violations of these statutes as "deceptive conduct" aimed at the United States, and that the government ultimately might have to prove such violations at trial in order to establish the requisite nexus between any such deception by Defendants and interference with the disclosure and registration statutes at the core of the government's case. ECF 74 at 15–16. But in the Court's view, "the government has not charged Concord with violating FECA or FARA" and there was little-to-no "'danger of convicting individuals engaged in apparently innocent activity'" because the government still had to prove deceitful conduct, *id.* at 18 (citation omitted), thus suggesting that § 371 defraud conspiracies are inherently immune to any concerns about criminalizing innocent conduct.

Ultimately, the Court determined that the gap between Concord's and the government's view of the required *mens rea* in this case was narrower than it appeared. The government, the Court stated, "agrees that to form the intent to impair or obstruct a government function, one must first be aware of that function." *Id.* at 24. However, the Court went on to find, mere "general knowledge that U.S. agencies are tasked with collecting the kinds of information the defendants agreed to withhold and conceal would suffice[,]" *id.* at 25—Concord went "too far in asserting that the Special Counsel must *also* show that Concord knew with specificity 'how the relevant laws described those functions.'" *Id.*

But when coupled with the "evolution" of the government's ever-shifting theories as related to the Indictment, Concord submits the Supreme Court's decision in *Rehaif* calls the Court's previous *mens rea* analysis into question. *Rehaif* (and *Burden*) demand rigorous scrutiny of criminal charges and strict application of *mens rea* requirements where, as alleged, there is a

serious risk of ensnaring innocent conduct.[19]   That risk is already great in the mine run of

conspiracy cases, and greater still in § 371 defraud conspiracy cases.   *See Dennis*, 384 U.S. at

860 ("[I]ndictments under the broad language of the general conspiracy statute must be

scrutinized carefully as to each of the charged defendants because of the possibility, inherent in a

criminal conspiracy charge, that its wide net may ensnare the innocent as well as the culpable.")

(citations omitted).[20]   It is especially high where, as here, the government's case rests on the

Defendants' status and purported failures to act—in this case, failures to disclose or register—

under arcane and obscure statutes and regulations that impose duties based on Defendants'

status, but that themselves require proof of willfulness before criminal sanction can be attached

for violations of their requirements.   There is no statute in the federal criminal code that

proscribes "interference" with an election or prohibits a foreign national from pretending to be an

American on the internet.   And the risk of criminalizing lawful conduct is even greater still

where, as here, the government has taken statutes and regulations that are ambiguous and, with

no specificity at all, dumped that entire statutory and regulatory morass into the Indictment.   This

creates a significant risk that Concord could be convicted simply because foreign nationals

---

[19]   That § 371 does not explicitly contain a scienter requirement like the "knowingly" standard
in the statute in *Rehaif* is of no moment.   The law is settled that conspiracy statutes such as § 371
require proof of "specific intent."   *See, e.g.*, *United States v. Childress*, 58 F.3d 693, 707 (D.C.
Cir. 1995).   And "specific intent" means to act willfully.   *See United States v. Lemire*, 720 F.2d
1327, 1341 (D.C. Cir. 1983).   Further, the presumption in favor of finding a scienter requirement
in a criminal statute applies "even when Congress does not specify any scienter in the statutory
text."   *Rehaif*, 139 S. Ct. at 2195 (citation omitted).

[20]   This is all the more true given the discipline § 371's defraud clause demands to ensure it
extends only to conspiracies aimed *at the United States government*.   As the Supreme Court
confirmed decades ago, the "conspiracies criminalized by § 371 are defined not only by the
nature of the injury intended by the conspiracy, and the method used to effectuate the conspiracy
but also—and most importantly—by the *target* of the conspiracy."   *Tanner v. United States*, 483
U.S. 107, 130 (1987).   Without proof that one knew it was interfering with federal statutes, the
risk of criminalizing conduct beyond the reach of § 371's defraud clause is especially high.

associated with IRA played make-believe on the internet.

In this particular case, to eliminate the risk of convicting based on innocent conduct that *Rehaif* and *Burden* decry, the government must be required to prove, and the Court must satisfy itself that the grand jury found, that Concord knew either it or specific co-conspirators had legal disclosure and registration duties under U.S. law because of Concord's status as a foreign-national corporation. A close look at *Rehaif* shows why the Court must adopt this view. There, it was the defendant's knowing status (lawfully or unlawfully present)—and not knowing conduct alone (firearm possession)—that made the difference under the criminal statute there.

Here, it is knowing interference with a "lawful governmental function"—and not knowing deception alone—that makes the difference under § 371. And just as lack of knowledge of one's legal status in *Rehaif* threatened to subject otherwise innocent conduct—possession of a firearm—to criminal punishment, lack of knowledge of whether particular "lawful governmental functions" were being obstructed by the Defendants' alleged conspiracy here threatens to subject otherwise innocent conduct—failures to disclose or register not necessarily required by law—to criminal punishment. *See also Liparota v. United States*, 471 U.S. 419, 425 n.9 (1985) (requiring knowledge that defendant knew his use of food stamps violated the law where the statute at issue required proof that stamps were used in a "manner not authorized by the statute or regulations") (reaffirmed and discussed approvingly by *Rehaif*, 139 S. Ct. at 2198); *cf. United States v. Rafiekian*, No. 1:18-cr-457-AJT-1, 2019 WL 4647254, at *18 (E.D. Va. Sept. 24, 2019) (conditionally granting new trial on § 371 conspiracy conviction where jury was required to be (but was not) instructed that "the Government must prove not only that the [underlying conduct] the defendant was engaged in was illegal [under the offense-defining statute] but also that the defendant knew it was illegal[,]" an instruction necessary to prevent

"'criminaliz[ing] a broad range of apparently innocent conduct'") (quoting *Liparota*, 471 U.S. at 426).[21]   For this reason alone, *Rehaif* requires a revisiting of the level of *mens rea* the government must show here.

The D.C. Circuit's decision in *Burden* reinforces this central teaching of *Rehaif*—that *mens rea* must be tied closely to each element of the relevant criminal statute to ensure that innocent conduct is not ensnared.   *Burden* mandates that the government charge (and prove) Concord's *mens rea* both as to its alleged deceitful acts, as well as the vague "lawful government functions" with which those acts interfered.   And it forbids allowing a showing of the former *mens rea* as to dishonest means to make up for the absence of *mens rea* on interfering with known lawful government functions.   That is, the government cannot prevail simply by proving that Concord knew the specific conduct of foreign nationals that the Indictment alleges was prohibited by some law.   Instead, the Indictment must allege and the government must prove that Concord knew that its foreign status created specific duties, and that by not complying with those alleged duties, the actions of Concord and the Defendants were unlawful because they interfered with the government's lawful functions relating to those duties.

Beyond this, *Rehaif*'s clarification of the "ignorance of the law is no defense" principle undercuts the Court's reliance on that maxim in its prior dismissal ruling.   *Rehaif* makes clear that the maxim plays no role in this case because the relevant "ignorance of the law" here— ignorance of both the specific statutes and regulations with which the government claims Concord conspired to interfere, *and* of the legal duties that flow from Concord's status— "'concern[s] the legal effect of some collateral matter" which would "result[] in [a]

---

[21]   There is a clear parallel between the relevant statutory language in *Liparota*—"use[d] … in a[ ] manner not authorized by statute or regulations"—and the relevant, judicially engrafted portion of § 371's defraud clause—"interference with a lawful governmental function."

misunderstanding [of] the full significance of" the conduct alleged, and "thereby negat[e] an element of the [§ 371] offense":  interference with a lawful governmental function.  *Rehaif*, 139 S. Ct. at 2198 (citation and internal quotation marks omitted).  For this reason, too, *Rehaif* calls for a careful reexamination of the Court's prior *mens rea* analysis.

Finally, *Rehaif* confirms the continued potency of the presumption that *mens rea* is a required element under all federal statutes—whether or not their text provides for it.  This aspect of *Rehaif* is significant not only because § 371 does not textually provide for *mens rea*, but also because it refutes the Court's reliance on the absence of such *mens rea* text from § 371 in rejecting a willfulness requirement and attempting to distinguish *Cheek* and *Ratzlaf*.  ECF 74 at 17.  The absence of "willfully" or any other *mens rea* term from § 371's text, *Rehaif* makes clear, is of no moment.  *Supra* at 36 n.19; *see also United States v. Burwell*, 690 F.3d 500, 549 (D.C. Cir. 2012) (en banc) (Kavanaugh, J., dissenting, joined by Tatel, J.) ("If the presumption of mens rea were overcome by statutory silence, it would not be much of a presumption.  But the presumption of mens rea is quite potent.  Indeed, the Supreme Court has stated that statutes containing no express mens rea requirement still *unambiguously* contain a mens rea requirement. You read that correctly.") (citing *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994)).

The need for the scrutiny that *Rehaif* and *Burden* require is brought into especially sharp relief in light of the government's "clarification" of the charge against Concord.  According to the government's bill of particulars, Concord conspired to interfere with certain specific statutory and regulatory disclosure and registration requirements set forth by FECA and FARA.  Those statutes require a showing of willfulness in order to establish a violation of their requirements; they are chock full of ambiguities and exceptions; and it may very well be that the FECA and FARA provisions belatedly enumerated by the government, construed consistent with the rule of

lenity, were not in fact even violated here.  Plus, just a few weeks ago, the government filed a motion in this Court suggesting that the specific statutes and regulations identified in its bill of particulars will have little, if any, relevance to its case at trial, and resurrecting its vague but expansive allegations of "interference."  All of this post-Indictment maneuvering "casts doubt on the sufficiency of the indictment" itself.  *United States v. Conlon*, 628 F.2d 150, 156 (D.C. Cir. 1980).  And, as is now apparent, the risk of ensnaring innocent conduct in this case is great, and requires the heightened *mens rea* showing set forth above.

>    **2.**    **Due Process Principles Requiring Fair Notice And Neutral Prosecution, Coupled With The Rule Of Lenity, Establish The Need For A Willfulness Requirement.**

Due process principles and the rule of lenity reinforce what *Rehaif* and *Burden* demand on the particular facts of this case and require, at a minimum, a heightened *mens rea* to avoid the constitutional problems engendered by the government's charge.  *See United States v. Cano-Flores*, 796 F.3d 83, 94 (D.C. Cir. 2015) ("constitutional avoidance" canon requires rejection of interpretation that "raises 'serious constitutional problems'" where another reading is permissible based on statue's text) (citation omitted); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (reading statute to require *mens rea* to avoid constitutional problem of criminalizing innocent conduct); *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 526 (1994) ("'[A] *scienter* requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice ... that [the] conduct is proscribed.'") (second alteration in original) (citation omitted).

*First*, allowing Concord to be convicted for interfering with supposed "lawful governmental functions" created by ambiguous statutes and regulations that neither Concord nor

its alleged co-conspirators knew about,[22] and which were first identified by the prosecution more than 18 months after the Indictment was filed, triggers serious fair-notice and rule-of-lenity concerns. Due process "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes" and "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Dimaya*, 138 S. Ct. at 1212 (citations omitted).

Courts enforce these principles through the "rule of lenity," which directs that criminal statutes be applied "only to conduct clearly covered[,]" *United States v. Lanier*, 520 U.S. 259, 266 (1997) (citations omitted), and "'requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them[,]'" *Cano-Flores*, 796 F.3d at 93–94 (citation omitted). The rule "ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota*, 471 U.S. at 427 (citation omitted). And it goes hand in hand with the need for a *mens rea* requirement. *Id.* at 427 ("[R]equiring *mens rea* is in keeping with our longstanding recognition of the principle that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'") (citations omitted).

There was no way Concord could have known—at the time it allegedly acted—that "lawful governmental functions" encompassed the specific FECA and FARA statutes and regulations not revealed by the government until ***August 2019***. FECA and FARA are widely considered to be among the most inscrutable provisions in the ever-burgeoning federal criminal code. "Campaign finance regulations now impose 'unique and complex rules' on" regulated

---

[22]   This is not a question of fact to be resolved at trial because the government has not produced any discovery to prove such knowledge, and has conceded that no such evidence exists. ECF 206 at 6.

parties. *Citizens United v. FEC*, 558 U.S. 310, 334 (2010). "FARA is a complex and broadly worded criminal statute. . . . The breadth of the statute, its criminal penalties, the absence of interpretive guidance, and the growing attention paid to the 1930s era law by federal prosecutors combine to create dangerous and difficult-to-manage risks for multinational companies, lobbying firms, and public relations firms." Covington, Election and Political Law, *A Review of Pending FARA Reform Bills* 1 (Mar. 15, 2018); *see also United States v. Craig*, No. 1:19-cr-00125-ABJ, 2019 WL 3604630, at *29 (D.D.C. Aug. 8, 2019) (dismissing FARA criminal count under rule of lenity due to ambiguity in provisions). Thus, just as "[t]here are many aliens in this country who no doubt are unaware of the statutory ban on foreign *expenditures*," *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 292 (D.D.C. 2011) (Kavanaugh, J.), there are even more "aliens" who no doubt are unaware of the complex and technical requirements of campaign-finance laws, FECA, and FARA. It stands to reason, then, that FECA and FARA themselves criminalize only "willful" violations of their obscure requirements. ECF 74 at 18; *see also* 52 U.S.C. § 30109(d) (FECA); 22 U.S.C. § 612(d) (FARA); 22 U.S.C. § 618(a)(2) (FARA).

The fair-notice problems endemic to FECA and FARA-based prosecutions are particularly acute in a case like this one, where the government's Indictment is trained on a foreign national's status and supposed crimes of omission—failures to disclose and register. Those who violate laws that require disclosure of information or registration may be completely "unaware of any wrongdoing." *Lambert v. California*, 355 U.S. 225, 228 (1957). Indeed, in *Lambert*, the Court recognized an exception to the "ignorance of the law is no excuse" maxim where the conduct was "passive" and consisted of a failure to register. *Id.* at 228. And courts repeatedly invoke due process considerations in rejecting failure-to-disclose theories of criminal culpability where ambiguity or lack of notice precludes knowledge of the source of the purported

disclosure duty.  *See*, *e.g.*, *United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008) (reversing § 1001 false-statement conviction for failing to disclose where supposed disclosure requirements were not sufficiently specific to meet due process notice standard); *United States v. Crop Growers Corp.*, 954 F. Supp. 335 (D.D.C. 1997) (dismissing § 1001 and other charges for failure to allege a disclosure duty with sufficient clarity to address due process concerns).

But more than that—even if Concord had known of the specific but obscure statutes and regulations the government has disclosed, it reasonably could read them far differently than the government now suggests.  *See* ECF 181 at 9–24 (detailing the multiple instances of ambiguity in the FECA and FARA provisions identified by the government in its bill of particulars).  And that reading, as the rule of lenity dictates, must prevail.  *See Cano-Flores*, 793 F.3d at 94; *see also*, *e.g.*, *Craig*, 2019 WL 3604630, at *29 (dismissing charge for violating FARA §§ 612 and 618(a)(2) under the rule of lenity).  Indeed, in the end, without the elevated *mens rea* Concord advocates, § 371's defraud clause—as the government seeks to apply it to Concord here based on the obscure FECA and FARA disclosure and registration provisions—"is so difficult for the average person to understand that the Constitution *forbids* [Concord's] conviction without such proof" of that *mens rea*.  *United States v. Class*, 930 F.3d 460, 470 (D.C. Cir. 2019).

**Second**, without a requirement that Concord knew about the specific statutes and regulations with which it is alleged to have interfered, the threat of tactical and discriminatory enforcement of § 371 by the government far exceeds what the Constitution can tolerate.  *See Kincaid v. Gov't of Dist. of Columbia*, 854 F.3d 721, 729 n.2 (D.C. Cir. 2017) (Kavanaugh, J.) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.") (quoting *Batchelder*, 442 U.S. at 125).  This threat is realized in this very case given the substantial evidence that Concord—whose alleged connection to IRA was publicly

- 43 -

known before the Special Counsel was even appointed—already has been prosecuted and otherwise treated arbitrarily by the government since the inception of this proceeding. *Supra* at 26–31. "[W]hen an act violates more than one criminal statute, the Government may prosecute under either[,]" but only "so long as it does not discriminate against any class of defendants." *Batchelder*, 442 U.S. at 123–24 (citations omitted). Thus, "a prosecutor's charging decision cannot be 'motivated solely by a desire to [achieve] a tactical advantage by impairing the ability of a defendant to mount an effective defense'"—in such a case, "'a due process violation might be shown.'" *United States v. Sherman*, 150 F.3d 306, 313 (3d Cir. 1998) (citation omitted).

As evident in the facts of this case, the risk of discriminatory enforcement inheres in § 371 because offense-clause conspiracies require "at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola*, 420 U.S. 671, 686 (1975) (citations omitted). This only incentivizes prosecutors to try to cleverly package conspiracies to violate substantive statutes that require a heightened *mens rea* to support criminal punishment— like the FECA and FARA provisions here—as § 371 defraud conspiracies to "interfere" with the "functions" created by those same statutes. As noted, that is exactly what has happened here. The Indictment walks, talks, and looks like a § 371 offense-clause conspiracy—not a defraud-clause one—and that presents serious issues all on its own. *Supra* at 26. For present purposes, the risk that the government will discriminatorily choose to charge under one prong of § 371 instead of the other in order to circumvent a *mens rea* proof problem—on full display here— reinforces the need for a heightened level of *mens rea*, which can serve to prevent such an abuse by "limit[ing] prosecutorial discretion." *Gonzales v. Carhart*, 550 U.S. 124, 150 (2007).

Given the extensive record revealing the arbitrary nature of this prosecution, the due process principles that must be brought to bear, and how the government now suggests it can

prove its case, the government must be strictly held to the requirement of showing that Concord knew about the specific laws identified in the bill of particulars.

### 3. The Absence Of The Requisite Willfulness Allegations In The Indictment Compels Dismissal.

The grand jury did not charge Concord with acting willfully or with having knowledge either of the statutes giving rise to the "lawful functions" at issue or, more generally, that Concord's status imposed various disclosure and registration duties on it under U.S. law. But if, as shown, this is the type and heightened level of *mens rea* the government must prove in this first-of-its-kind conspiracy case, only the grand jury can cure that deficiency.

Criminal prosecutions are constitutionally "limited to the unique allegations of the indictments returned by the grand jury." *Hitt*, 249 F.3d at 1016 (citations omitted). The government therefore "cannot cure a defective indictment" later by clarifying the charges in "a bill of particulars" or at "oral argument." *Conlon*, 628 F.2d at 156. Nor can jury instructions at trial belatedly fill holes left in an indictment like the gaping *mens-rea* one here. *See*, *e.g.*, *United States v. Kingrea*, 573 F.3d 186, 194 (4th Cir. 2009) (holding that "subsequent jury instructions could not cure [indictment's] fatal" failure to allege a required element of conspiracy charge) (citation omitted). Thus, if the Court agrees that the government must prove the type and level of *mens rea* Concord advocates in this motion, the only course is to dismiss the Indictment and allow the government—if it chooses—to go back to the grand jury and try again. *See Russell*, 369 U.S. at 771–72 (reversing where indictment omitted an essential fact).

## VI.   CONCLUSION

The prosecution of Concord is unconstitutional and Count One is incurably defective and should therefore be dismissed.

- 45 -

Dated: October 7, 2019

Respectfully submitted,

CONCORD MANAGEMENT
AND CONSULTING LLC

By: /s/ Eric A. Dubelier
     Eric A. Dubelier (D.C. Bar No. 419412)
     Katherine J. Seikaly (D.C. Bar No. 498641)
     REED SMITH LLP
     1301 K Street, N.W.
     Suite 1000 – East Tower
     Washington, D.C. 20005-3373
     202.414.9200 (phone)
     202.414.9299 (fax)
     edubelier@reedsmith.com
     kseikaly@reedsmith.com

     James C. Martin[*]
     Colin E. Wrabley[*]
     REED SMITH LLP
     225 Fifth Avenue
     Pittsburgh, PA 15222-2716
     412.288.3131 (phone)
     412.288.3063 (fax)
     jcmartin@reedsmith.com
     cwrabley@reedsmith.com

     [*]*Admitted Pro Hac Vice*