**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. No. 18-CR-32-2 (DLF)** |
| **CONCORD MANAGEMENT AND CONSULTING LLC,** | |
| **Defendant.** | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO STRIKE SURPLUSAGE PURSUANT TO RULE 7(d)

The United States of America, by and through undersigned counsel, respectfully opposes defendant Concord Management and Consulting LLC's motion to strike surplusage from the Indictment. Doc. 208. Motions to strike surplusage are disfavored, and Concord bears the burden of establishing that the challenged language is clearly irrelevant, inflammatory, and prejudicial. Concord has not made these extraordinary showings. And even then, the district court has discretion to deny the motion.

The Indictment in this case alleges a conspiracy to defraud the United States in violation of 18 U.S.C. § 371. In short, the Indictment alleges that beginning in 2014, and through the date of the Indictment, February 16, 2018, the conspirators engaged in what they called "information warfare" to spread distrust about the U.S. political system and to influence the outcome of the 2016 presidential election. To carry out their interference activities without detection of their Russian affiliation, the Indictment charges that the defendants conspired to obstruct the lawful functions of the Federal Election Commission, the Department of Justice, and the Department of State, which monitor and police foreign influence activities. The Indictment further alleges that the conspirators used a host of deceptive means to impede these entities' functions, including by making false

statements on visa applications, using false online personas, and failing to disclose and register their activities.

Concord asks the Court to strike several of the core allegations that establish acts in furtherance of the conspiracy, the motive for the conspiracy, and general knowledge that government agencies regulate in this area.  These include references to the conspirators' aim to sow discord beyond the 2016 presidential election, their aim to assist one candidate in that election, their focus on certain social and political issues, and their physical activities in the United States. These allegations explain why the conspirators sought to interfere in the function of three government agencies and form some of the very conduct that deceived these government agencies or that required disclosure.   These allegations are directly relevant to the case and certainly not so clearly irrelevant as to constitute surplusage.  In any event, Concord has also not shown that these allegations are so clearly inflammatory and prejudicial as to warrant being excised by the Court. To the contrary, even if any of these allegations were irrelevant (which they are not), they merely describe the context for the conspiracy to defraud the United States, including the conspirators' motives, goals, and means of operating.

Concord's motion fails to come to terms with the demanding standards for striking language from an indictment that was presented by the government and returned by a grand jury. In portions of its motion, Concord entirely fails to argue that the challenged allegations are irrelevant to this case—a prerequisite to striking them as "surplusage."  And while Concord is quick to label allegations as "prejudicial," much of those claims are pure *ipse dixit* and do not engage with the particularly high standard for prejudice that applies here.  Concord's motion is, at bottom, merely at attempt to sterilize what is already a fairly anodyne indictment.  Concord thus asks the Court to strike both allegations about the conspirators' goals outside of the 2016

presidential election and allegations about their specific goals in the 2016 election.  Concord also

asks to strike some allegations because they constitute "other crimes" while asking to strike others

that constitute "legal conduct."   A motion to strike surplusage is not a vehicle to rewrite an

indictment, change its focus, delete relevant context, or water down the charged scheme.  Concord

has not met and cannot meet the exacting standards applicable here, and the motion to strike should

therefore be denied.

## BACKGROUND

On February 16, 2018, a grand jury returned an eight-count Indictment against thirteen

individuals and three corporate defendants based in Russia.  The Indictment alleges that the

defendants engaged in a multi-year effort, from 2014 through February 2018, to interfere in the

U.S. political system, sow discord, and influence the outcome of the 2016 presidential election.

Doc. 1 ¶ 2.  To accomplish that objective, the Indictment alleges that the defendants conspired to

defraud three government agencies that combat such efforts and that monitor and make public

foreign attempts to exert influence in the United States.  *Id.* ¶ 9.  Based on this conduct, Count One

charges Concord and the other defendants with conspiracy to defraud the United States in violation

of 18 U.S.C. § 371.

On October 1, 2019, Defendant moved to strike six portions of the Indictment as

"surplusage."  Defendant contends that these sections of the Indictment contain inflammatory

language that is not related to the allegations at issue in this case.

## ARGUMENT

Motions to strike language from an indictment are "highly disfavored."  *United States v.*

*Apodaca*, 275 F. Supp. 3d 123, 157 (D.D.C. 2017).  A defendant moving to strike language from

an indictment must show that "it is clear" that the challenged allegations "are not relevant to the

charge and are inflammatory and prejudicial." *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998). This standard is "strictly construed against striking surplusage." *Id.* And motions to strike are, in any event, addressed to the discretion of the Court. *Id.*; *see Apdoaca*, 275 F. Supp. 3d at 157 ("[T]he striking of surplusage from an indictment, although permissible, is by no means mandatory."). Concord has not come close to making the demanding showings necessary to strike any language from the Indictment. To the contrary, the challenged sections of the Indictment use plain, concise, and definite language to set forth essential facts constituting the offense charged and to allege the motive and means by which the defendants committed the charged offense. If there is any doubt, questions about relevance and prejudice should be addressed after the Court has resolved the relevant legal questions, and the parties have put on their respective cases. And the Court should address any remaining concerns about prejudice as courts ordinarily do, through careful application of the rules of evidence and instructions to the jury.

### A.  References Beyond the 2016 Presidential Election

Concord first moves to strike references to political and electoral processes that are broader than the 2016 U.S. Presidential Election. Doc. 208, at 3-4. That language, however, is directly relevant and therefore should not be stricken. The Indictment alleges that the defendants sought to interfere with U.S. political and electoral processes, that this effort eventually focused on the 2016 presidential election, and that it continued through the date of the Indictment, in February 2018. *E.g.,* Doc. 1 ¶¶ 2-4, 6, 9-10, 28, 42-47, 58. To accomplish that objective, the Indictment alleges, the defendants conspired to use deceitful means to interfere in the lawful government functions of the three agencies that combat such activity. *E.g.,* Doc. 1 ¶¶ 7, 28. Even as a general matter, "the background necessary for a jury to understand the full scope of defendant's activities, and to place defendant's conduct in the appropriate context" is relevant. *United States v. Watt*,

911 F. Supp. 538, 554 (D.D.C. 1995).   Such background is "particularly useful" in cases that involve obstructing a government investigative function because it helps a jury to understand the defendant's acts, motive, and intent.   *Id.* (discussing false statements, perjury, and obstruction of justice); *see also United States v. Poindexter*, 725 F. Supp. 13, 37 (D.D.C. 1989).   Here, the challenged language is more than just background and context.   It describes the conspirators' objective and the reason that they sought to defraud the United States.   It is therefore directly relevant to the charge of conspiring to defraud the United States and should not be stricken.

Concord's arguments about relevance (Doc. 208, at 4) are question begging.   Concord asserts that "[t]he allegations contained in the Indictment are limited to the 2016 presidential election and the government has made no effort to allege facts to suggest the alleged conspiracy was aimed more broadly."   *Id.*   In fact, the allegations are not so limited.   The Indictment plainly alleges a broader goal, and to alter the Indictment as Concord requests would misrepresent the Grand Jury's allegations.   A defendant cannot decide for itself the scope, object, and purpose of the conspiracy that has been alleged.   In addition to efforts to interfere in the 2016 U.S. presidential election, the Indictment alleges, among other things, deceptive conduct in furtherance of the conspiracy to defraud the United States that substantially precedes and follows the 2016 election. *E.g.,* Doc. 1 ¶¶ 3, 10, 29, 58; *see also* Doc. 1 ¶ 42-47.   Referring to a sealed colloquy, Concord inaccurately claims that "the government conceded that allegations against Concord are not broad enough to encompass subsequent conduct."   Doc. 208, at 4.   The Government's clear point in the referenced exchange was that the charged conspiracy in this case ended on the date of the

Indictment, and conduct subsequent to the Indictment—not the 2016 election—is not charged in this case.  *See* 7/16/19 Tr. 31-32, 53.

Concord's reliance on *United States v. Quinn*, 401 F. Supp. 2d 80 (D.D.C. 2005), and *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998), only underscores the point.  In *Quinn*, a U.S.-based company and several employees and affiliates were charged with conspiring to export goods to Iran in violation of a trade embargo.  401 F. Supp. 2d at 83-84.  The court struck "two brief references in the indictment to Iran's support for international terrorism and the threat it poses to the United States," because "the policies underlying the trade embargo against Iran [we]re irrelevant to the charges."  *Id.* at 98.  *Hsia* similarly made clear that allegations relevant to the case cannot be stricken as surplusage and accordingly denied the defendant's motion to strike a number of assertedly "inflammatory words" but struck certain individual words or phrases that did not themselves convey substance or meaning.  24 F. Supp. 2d at 26-27.  In contrast to *Quinn* and *Hsia*, Concord is asking the Court to edit the Indictment to alter the conspirators' overarching goal and their motive for conspiring to deceive U.S. agencies to defeat their lawful functions.  In contrast to deleting the underlying policy of a regulatory provision or inflammatory words that convey no relevant meaning, Concord would fundamentally "alter the substance of the indictment."  *Id.*  The Court should reject this unsupported request.

In any event, Concord has also failed to show that references beyond the 2016 presidential election are so clearly inflammatory and prejudicial as to warrant being struck.  In an Indictment that, as even Concord agrees, alleges a concerted effort to interfere in a presidential election and

systematic deception aimed at interfering with the government agencies that combat such efforts, it is fanciful that differences in the precise goal or purpose are themselves particularly prejudicial.

### B. References to "Other Crimes"

Concord next moves to strike references to the use of stolen identities and false personas, as well as destruction of evidence. Doc. 208, at 4-6. These acts, however, are very much relevant. The use of stolen identities and false personas is how the conspirators conducted their influence campaign and is one means by which they sought to deceive the government agencies tasked with combatting such foreign influence. *See, e.g.*, Doc. 1 ¶¶ 40, 48; *see United States v. Hastie*, No. 14-cr-291, 2015 WL 13309605, at *3 (S.D. Ala. Mar. 17, 2015) (alleged submission of false state financial disclosures not surplusage in a *Klein* conspiracy "to achieve personal gain through tax evasion"); *see also Hsia*, 24 F. Supp. 2d at 26 ("If the alleged conspiratorial agreement included an agreement to engage in acts of concealment and cover-up such as those described in the indictment, those acts could be overt acts in furtherance of the conspiracy or a part of the manner and means of the conspiracy, and reference to them should not be stricken."). The use of false personas was an important part of the surreptitious influence campaign that the conspirators sought to conceal from the government agencies charged with monitoring foreign influence in the American political system. As for the destruction of evidence, that was one means by which the conspirators sought to impair government investigations, and it also demonstrates the conspirators' awareness that the U.S. government regulates and acts in this area. Doc. 1 ¶ 58; *see, e.g., United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986) ("Spoliation evidence . . . is admissible to show consciousness of guilt.") (collecting cases); *cf. Al-Adahi v. Obama*, 613 F.3d 1102, 1107

(D.C. Cir. 2010) (noting the "well-settled principle that false exculpatory statements are evidence—often strong evidence—of guilt").

Concord does not seriously argue that these allegations are irrelevant.  Concord declares that these are allegations of "other crimes."   But even if the relevant allegations all properly alleged other offenses, that does not mean that the allegations are not also relevant to the charged conspiracy.  Indeed, it is black letter law that conduct "intertwined with the commission of charged crimes," *United States v. Machado-Erazo*, 901 F.3d 326, 333-334 (D.C. Cir. 2018), such as acts that are "part of the charged offense" or are otherwise "performed contemporaneously with the charged crime" that "facilitate the commission of the charged crime," are "intrinsic" to the charged crime and admissible. *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (quoting *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000)); *see, e.g.*, *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992) (false statements to government agents intertwined with transporting undocumented immigrants).

In any event, Concord's assertion of prejudice is also mistaken.  Even assuming that the relevant allegations would constitute other offenses, Concord does not explain why that meets the stringent test of "clear[ly]" being "inflammatory and prejudicial." *See Rezaq*, 134 F.3d at 1134. That is particularly so here, where the conduct is not violent, the relevant paragraphs of the Indictment does not allege that the conduct is itself criminal, and this conduct was not carried out by Concord but rather by its co-conspirators.  Even if this conduct were not relevant to the conspiracy (which it is), the allegations would at most suggest that Concord did business with other companies that, in turn, had employees who engaged in unscrupulous conduct.  That is not itself "inflammatory" or so prejudicial as to warrant rewriting an Indictment.  The assertion that language in an Indictment might "confus[e] the jury" (Doc. 208, at 5) is nowhere close to meeting

that governing standard for striking language as surplusage and is properly addressed through jury instructions.

### C.  References to Specific 2016 Presidential Candidates and Political Groups

Having argued that the Court should strike references that are "broader than the 2016 presidential election" (Doc. 208, at 3), Concord also argues (*id.* at 6-7) that the Court should strike references to Concord's goals and means in interfering with the 2016 presidential election. Specifically, Concord urges that the Court should strike from the Indictment references to specific candidates in that election, political parties, "politically-charged regions" and "contentious political issues" including immigration, race, and religion.

Concord again does not engage with the first part of the controlling legal question: whether the alleged conduct is relevant to the charged conspiracy.  These references describe Concord's twin goals in the 2016 election—favoring one candidate and sowing discord.  They also describe the means by which Concord acted: targeting particular geographic regions and divisive social and political issues.  *E.g.,* Doc. 1 ¶¶ 4, 34.  This also relates to the specific effort to impair U.S. agencies.  By focusing on hot-button issues and acting as a force multiplier for existing social and political tensions, the conspirators could more reasonably expect to have a concrete impact, so long as they were not outed by law enforcement and regulatory entities.  And by engaging, in particular, with groups that are closely aligned with identity politics or specific geographic areas, it was critical that the conspirators' Russian identity, which would have been publicized by the U.S. government, remain concealed.  Additionally, as Concord well knows from the bill of particulars, Doc. 146-2, at 2-3, the focus on specific social groups and issues is particularly relevant to the Department of Justice's enforcement of the Foreign Agents Registration Act.  *See, e.g.,* 22 U.S.C. §§ 611(c)(1)(i), (o) (covered "political activities"  include attempt to influence "any section

of the public" about U.S. "domestic or foreign policies"); *see also Oakar*, 111 F.3d at 157 (reportable activity not surplusage in conspiracy to defraud FEC).

In any event, references to political candidates, geographic regions, and particular policy issues are not clearly inflammatory and prejudicial.  To be sure, individual jurors may have views—positive or negative—about the candidates, regions, groups, or issues that the defendants are alleged to have advocated for or against or to have used as a means of impacting the U.S. political system.  But the reality of any case that relates to an election is that it may touch on such matters.  Regardless of what is excised from the Indictment, the Court will manage any risk of unfair prejudice through a careful voir dire and jury instructions.  Mere descriptions of the conspirators' actual conduct is not something that must be removed from the Indictment to mitigate such a risk, and Concord provides no sufficient basis upon which the Court should do so

### D.  References to "Intelligence-Gathering" and Government Contracts

Concord next contends (Doc. 208, at 8-9) that the Court should strike references in the Indictment to gathering "intelligence" (Doc. 1 ¶¶ 5, 15, 17, 19, 29-31) and further seeks to strike from the description of two of the charged corporations that they are "related Russian entities with various Russian government contracts" (Doc. 1 ¶ 11).  Concord urges that this improperly "draws connections between [it] and the Russian government."  Doc. 208, at 8.

The Indictment's use of the word "intelligence" when describing defendants' effort to collect and gather intelligence does not improperly tie Concord to the Russian government.  It describes an organized and systemized campaign to collect information for later tactical use (which conspirators called "information warfare," Doc. 1 ¶ 10c).  And it further describes covert means of collecting that information, including the use of false identities, "drop phones" and "evacuation scenarios."  Doc. 1 ¶¶ 30a, 31.  The word "intelligence" accurately captures that sort of information

gathering.  And it is regularly used to describe non-governmental activity of that sort.[1]  It is therefore both relevant and not inflammatory under even Concord's asserted view that any tie to the Russian government would be impermissible surplusage.

As for the fact that two of the defendants are "related Russian entities with various Russian government contracts," (Doc. 1 ¶ 11), this is relevant for several reasons.  Initially, it is relevant identifier information and also explains the relationship between those two entities.  The fact that they have government contracts also supports the allegation that the conspirators' overarching goal was to interfere in the U.S. political process and 2016 presidential election:  Individuals and entities that are financially dependent on a government have far more significant geopolitical interests. *See Watt*, 911 F. Supp. at 554 (background and context bear on motive and intent).  While "the indictment does not allege that the Russian government sponsored the activities charged in the indictment" (Doc. 208, at 8), the defendants' own motive for acting is a separate matter and is clearly relevant.  Again, even Concord's chosen cases underscore the relevance here.  *See United States v. Weinberger*, No. 92-cr-235, 1992 WL 294877, at *7 (D.D.C. Sept. 29, 1992) (cited at Doc. 208, at 8) (reserving the question whether to strike references that suggest a conspiracy, even though none was charged, because it could "place the defendant's actions in context" and "establish the defendant's state of mind, intent and motives"); *compare United States v. Groos*, 616 F. Supp. 2d 777, 789-790 (N.D. Ill. 2008) (cited at Doc. 208, at 8) (striking background concerning the statutes that were charged); *Quinn*, 401 F. Supp. 2d at 98 (cited at Doc. 208, at 8) (striking "policies underlying the trade embargo" that had been violated).

In any event, any passing suggestion of a relationship to the Russian government is not

---

[1] *See, e.g.*, Daniel Rugger, "Corporate Intelligence is No Spy Game," *Forbes* (May 24, 2014), https://www.forbes.com/sites/riskmap/2014/05/29/corporate-intelligence-is-no-spy-game/

"clear[ly] . . . inflammatory and prejudicial." *Rezaq*, 134 F.3d at 1134.   Contrary to Concord's

assertion, it does not automatically tie the conspiracy alleged in this case to other conduct carried

out by the Russian government itself.   And any possibility that jurors make that connection

themselves, *see* Doc. 208, at 8, is better addressed through instructions to the jury than through a

judicial rewriting of the charging document returned by the Grand Jury.   Indeed, Concord's

assertion that jurors might draw such a connection based on news stories and "the public's general

knowledge" underscores that the challenged Indictment allegations are not themselves

inflammatory or prejudicial and that Concord's complaint will, in all events, be addressed through

appropriate jury instructions.   *Cf. Apodaca*, 275 F. Supp. 3d at 158 (use of aliases may be

prejudicial but not "unfairly so," especially where witnesses know defendants by their aliases).

### E.  References to "Issue Advocacy"

Concord next argues (Doc. 208, at 9-10) that the Court should strike allegations about

"issue advocacy," which Concord contends is not "potentially prohibited . . . by foreign nationals."

Concord, however, does not seriously argue that these allegations are irrelevant.   Nor could

Concord do so.   Initially, "many acts that are by themselves perfectly legal may constitute overt

acts manifesting participation in an illegal conspiracy." *United States v. Tarantino*, 846 F.2d 1384,

1404 (D.C. Cir. 1988).   And "[c]ourts in this Circuit have consistently held that 'the government

is not precluded from including information in the indictment used to place the defendant's actions

in context and to establish the defendant's state of mind, intent and motives.'" *United States v.

Salahmand*, No. 08-cr-192, 2009WL10680698, at *2 (D.D.C. May 12, 2009) (quoting *United

States v. Trie*, 21 F.Supp.2d 7, 19 (D.D.C. 1998)); *see also United States v. Kanchanalak*, 41 F.

Supp. 2d 1, 10 (D.D.C. 1999) (in conspiracy to defraud the United States by interfering in FEC

functions, while reporting provisions did not apply to "soft money," that was relevant insofar as it

"may establish a pattern of conduct by defendants and help support the allegations with respect to hard money").  The Indictment charges a conspiracy to defraud the United States, in which the conspirators sought to interfere in the functions of agencies that police foreign participation in the U.S. political system, in order to surreptitiously carry out their political influence campaign.  What Concord labels "issue advocacy" is part of that very influence campaign.  Indeed, Paragraph 34, which is the first of two examples cited by Concord is contained within a sub-section of the "Manner and Means" section of Count One that alleges how "[d]efendants and their co-conspirators, through fraud and deceit, created hundreds of social media accounts and used them to develop certain fictitious U.S. personas into 'leader[s] of public opinion' in the United States," Doc. 1 ¶32, so that these personas would have greater ability to exert influence to interfere with U.S. political and electoral processes.  Thus, as with the express advocacy for particular political candidates, discussed in Section C, *supra*, this alleged "issues advocacy" conduct is also directly relevant to the object of their conspiracy.

Moreover, as Concord well knows from the bill of particulars, this activity directly relates to registration under FARA.  *See, e.g.*, 22 U.S.C. §§ 611(c)(1)(i), (ii), (iii) & (g), (h), (o).  And at least some of what Concord appears to have labeled "issue advocacy" are, in fact, "independent expenditures" subject to disclosure under FECA.  *See* 52 U.S.C. § 301014(c); 11 C.F.R. § 109.10; *see also* 52 U.S.C. § 30101(17) (defining "independent expenditure"); 11 C.F.R. § 100.22 (regulation interpreting "independent expenditure").[2]  Again, Concord is not charged with a

---

[2]  Contrary to Concord's suggestion, while advertisements declaring "JOIN our #HillaryClintonForPrison2016," "Trump is our only hope for a better future!" "Ohio Wants Hillary 4 Prison," and "We cannot trust Hillary to take care of our veterans!" do not contain magic words "referenc[ing] to an election or voting,"  (Doc. 208, at 10), they "could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s)."  11 C.F.R. § 100.22 (defining express advocacy).

substantive violation of FARA or FECA.  But engaging in activity that would have to be reported without doing so is deceptive conduct.  And, in any event, engaging in activity that would or even may have to reported, or that would or potentially would violate the foreign electioneering ban, helps to establish that one purpose of the other agree-to deceptive conduct was to impair the function of the DOJ and FEC, which would themselves monitor and evaluate such activity and decide whether it must be reported.  It is therefore plainly relevant.  *See Oakar*, 111 F.3d at 157 (alleged activities that triggered reporting are relevant to conspiracy to deceive FEC).[3]

In any event, Concord has also failed to establish that allegations about "issue advocacy" are clearly inflammatory and prejudicial.  Concord's argument reduces to the claim that there is a "risk of prejudice" by mentioning in the Indictment both "legal and illegal conduct."  Doc. 208, at 10.  Even Concord's alleged harm does not come close to the high bar required for striking language as impermissible surplusage.  *See Rezeq*, 134 F.3d at 1134 (it must be "clear" that the language is "inflammatory and prejudicial" and the standard is "strictly construed against striking surplusage").  And Concord's asserted "risk of prejudice" is itself overblown to say the least.  In stark contrast to Concord's one example, the Indictment here does not place "legal means in a list entitled 'illegal means.'"  *United States v. Hubbard*, 474 F. Supp. 64, 83 (D.D.C. 1979).  And in a case where, as Concord concedes, the jury will be presented with evidence of expressly advocating for and against candidates for President of the United States, forming issue-related Facebook groups (Doc. 1 ¶ 34), or buying advertisements that positively or negatively paint the same candidates (Doc. 1 ¶ 34), the challenged language raises little, if any, risk of prejudice.

---

[3] Additionally, the government disagrees with Concord's contention that at least what it calls "issue advocacy" is not plainly "an appeal to vote for or against a specific candidate."  *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011) (quoting *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469-470 (2007)); *see supra* n.2.

### F. "Trial Demonstrative Exhibits"

Finally, Concord moves to strike a list of political advertisements contained in Paragraph 50 of the Indictment, declaring that it "essentially contains a trial demonstrative exhibit." Doc. 208 at 10-11.   As the Court can see for itself, this "exhibit" is just a table with the dates and relevant language of political advertisements purchased by the conspirators.   That table is merely an organized and readable way of listing examples of alleged express advocacy by conspirators.   For the reasons already discussed, those allegations are centrally relevant and neither inflammatory nor prejudicial.   If Concord means to challenge these allegations themselves, Concord has wholly failed to explain why they "circumvent the rules of evidence" or are "redundant," (Doc. 208, at 10-11) and in any event why that would render them impermissible surplusage.   Indeed, one of Concord's citations rejected the very argument that Concord appears to be advancing here.   *See United States v. Smallwood*, No. 09-cr-249, 2011 WL 2784434, at *9-*10 (N.D. Tex. July 15, 2011) (explaining that "there is no *prohibition* against pleading 'evidentiary allegations,'" "[t]he indictment is not evidence, and the government will be required to establish the admissibility of evidence at trial, despite what the indictment alleges").   It is unclear what, if any, format Concord thinks would have been sufficient.   But Concord has not cited any case, and the government is aware of none, where a chart—as compared to a list, as compared to bullet points, as compared to prose in a paragraph—rendered allegations irrelevant and prejudicial.

## CONCLUSION

For the foregoing reasons, Concord's motion to strike surplusage should be denied.

Respectfully submitted,


JOHN C. DEMERS                                    JESSIE K. LIU
Assistant Attorney General for National Security   United States Attorney


By: /s/                                           By: /s/
Heather N. Alpino                                 Jonathan Kravis
U.S. Department of Justice                        Luke M. Jones
National Security Division                        Kathryn Rakoczy
950 Pennsylvania Ave. NW                          555 Fourth Street NW
Washington, D.C. 20530                            Washington, D.C. 20530
Telephone: (202) 514-2000                         Telephone: (202) 252-6886