<div align="center">

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC, | |
| Defendant. | |

<div align="center">

**DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S**
**MOTION TO DISMISS COUNT ONE OF THE SUPERSEDING INDICTMENT**

</div>

Pursuant to Rule 12(b)(1) and 12(b)(3) of the Federal Rules of Criminal Procedure, Defendant Concord Management and Consulting LLC ("Concord"), by and through undersigned counsel, respectfully moves to dismiss Count One of the Superseding Indictment, ECF 247. As set forth more fully in the accompanying memorandum of points and authorities, Count One should be dismissed as to Concord for the following reasons:

1. The government's prosecution of Concord, and related conduct associated with the prosecution, violates the Due Process Clause's prohibition on arbitrary government conduct.

2. The Superseding Indictment fails to allege the requisite *mens rea* to support the 18 U.S.C. § 371 conspiracy to defraud charge against Concord.

3. The Superseding Indictment's allegation that Concord "caused unwitting persons to produce, purchase, and post advertisements on U.S. social media and other online sites expressly advocating for the election of then-candidate Trump or expressly opposing Clinton" (¶ 48) fails as a matter of law to support the § 371 conspiracy to defraud charge.

A proposed order is filed with this Motion.

Dated: November 26, 2019                    Respectfully submitted,

                                            CONCORD MANAGEMENT
                                            AND CONSULTING LLC

                                            By Counsel

                                            /s/ *Eric A. Dubelier*
                                            Eric A. Dubelier (D.C. Bar No. 419412)
                                            Katherine J. Seikaly (D.C. Bar No. 498641)
                                            REED SMITH LLP
                                            1301 K Street, N.W.
                                            Suite 1000 – East Tower
                                            Washington, D.C. 20005-3373
                                            202.414.9200 (phone)
                                            202.414.9299 (fax)
                                            edubelier@reedsmith.com
                                            kseikaly@reedsmith.com

                                            James C. Martin[*]
                                            Colin E. Wrabley[*]
                                            REED SMITH LLP
                                            225 Fifth Avenue
                                            Pittsburgh, PA 15222-2716
                                            412.288.3131 (phone)
                                            412.288.3063 (fax)
                                            jcmartin@reedsmith.com
                                            cwrabley@reedsmith.com
                                            [*]*Admitted Pro Hac Vice*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
CONCORD MANAGEMENT AND CONSULTING LLC'S MOTION TO DISMISS
COUNT ONE OF THE SUPERSEDING INDICTMENT**

## TABLE OF CONTENTS

**PAGE**

I.      PRELIMINARY STATEMENT ............................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ......................................... 3

    A.    The Threat Of Arbitrary And Discriminatory Prosecution Is Inherent In Any Case Involving A Special Counsel ................................................. 4

    B.    Concord Has Been Subjected To An Arbitrary And Discriminatory Prosecution That Violates Due Process Commands ................................ 5

        1.    The Arbitrariness Begins:  The USAO DC And DOJ Do Not Investigate Alleged Conduct That Becomes The Subject Of This Indictment. ......................................................................................... 5

        2.    The Arbitrariness Continues:  The Special Counsel Charges An Unprecedented Defraud Conspiracy, Contravening DOJ Policy, Practice, And Precedent. .......................................................... 7

        3.    The Arbitrariness Continues:  The Special Counsel, And Later The Attorney General, Publicly Declare Concord's Guilt Before Any Trial. .............................................................................................. 11

        4.    The Arbitrariness Continues:  The Government Invents And Re-Invents The Conspiracy Charge, Adding A FARA Theory Lacking Any Basis In The Original Indictment. ................................... 14

        5.    The Arbitrariness Becomes Insidious:  On Pretext, The Government Obtains A Superseding Indictment That Materially Prejudices Concord. .................................................................. 21

III.    LEGAL STANDARDS AND SUMMARY OF ARGUMENT ....................... 24

IV.     ARGUMENT .................................................................................................... 25

    A.    The Superseding Indictment Should Be Dismissed Because This Prosecution Violates Due Process. ..................................................... 25

        1.    The Due Process Clause, Animated By Bedrock Systemic Principles, Prohibits Arbitrary Government Prosecutions. ....................... 25

        2.    The Government's Prosecution Of Concord Violates The Due Process Clause. ....................................................................... 29

        3.    The Superseding Indictment Reinforces And Compounds The Due Process Violation Here. ............................................................ 33

    B.    The Superseding Indictment Should Be Dismissed Because It Fails To Allege The Requisite *Mens Rea*. .......................................................... 34

        1.    Recent Supreme Court Precedent, Reinforced By Recent D.C. Circuit Precedent, Requires A Heightened *Mens Rea* For This § 371 Defraud Conspiracy. ........................................................ 35

2.     Settled Due Process Principles Requiring Fair Notice And Neutral Prosecution, When Coupled With The Rule Of Lenity, Underscore The Need For A Heightened *Mens Rea* Requirement. ............................ 39

3.     The Superseding Indictment's Deliberate Omission Of The Requisite *Mens Rea* Allegations Compels Dismissal. .............................. 42

C.    The Superseding Indictment's Unprecedented Theory That Concord Caused "Unwitting" Americans To Violate FARA Fails As A Matter Of Law. ........................................................................................................ 43

V.    CONCLUSION............................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Az. Free Enter. Club's Freedom Club PAC v. Bennett,*
    564 U.S. 721 (2011)................................................................................................44

*Berger v. United States,*
    295 U.S. 78 (1935)........................................................................................ *passim*

*Bluman v. Fed. Election Comm'n,*
    800 F. Supp. 2d 281 (D.D.C. 2011)......................................................................40

*Bordenkircher v. Hayes,*
    434 U.S. 357 (1978)...............................................................................................28

*Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy,*
    367 U.S. 886 (1961)...............................................................................................32

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009).........................................................................................26, 32

*Champion Lumber Co. v. Fisher,*
    227 U.S. 445 (1913)...............................................................................................26

*Costello v. United States,*
    350 U.S. 359 (1956)...............................................................................................11

*Daniels v. Williams,*
    474 U.S. 327 (1986)...............................................................................................25

*Dennis v. United States,*
    384 U.S. 855 (1966).........................................................................................29, 37

*Duncan v. Louisiana,*
    391 U.S. 145 (1968)...............................................................................................29

*Gannett Co. v. DePasquale,*
    443 U.S. 368 (1979)...............................................................................................26

*Giaccio v. Pennsylvania,*
    382 U.S. 399 (1966)...............................................................................................27

*In re Sealed Case,*
    223 F.3d 775 (D.C. Cir. 2000)...............................................................................44

*In re Sealed Case*,
   838 F.2d 476 (D.C. Cir. 1988), *rev'd sub nom. on other grounds by Morrison
   v. Olson*, 487 U.S. 654 (1988) ..................................................................................4

*Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*,
   138 S. Ct. 2448 (2018) ..........................................................................................44

*Johnson v. United States*,
   135 S. Ct. 2551 (2015) ..........................................................................................27

*Kincaid v. Gov't of Dist. of Columbia*,
   854 F.3d 721 (D.C. Cir. 2017) ..............................................................................41

*Lambert v. California*,
   355 U.S. 225 (1957) ..............................................................................................40

*Liparota v. United States*,
   471 U.S. 419 (1985) ..............................................................................................38

*Marinello v. United States*,
   138 S. Ct. 1101 (2018) ..........................................................................................26

*Marshall v. Jerrico, Inc.*,
   446 U.S. 238 (1980) ..............................................................................................27

*New York v. United States*,
   505 U.S. 144 (1992) ........................................................................................31, 32

*Rehaif v. United States*,
   139 S. Ct. 2191 (2019) .................................................................................. *passim*

*Rivera v. Minnich*,
   483 U.S. 574 (1987) ..............................................................................................26

*Russell v. United States*,
   369 U.S. 749 (1962) ........................................................................................15, 43

*Sanabria v. United States*,
   437 U.S. 54 (1978) ................................................................................................31

*Sessions v. Dimaya*,
   138 S. Ct. 1204 (2018) ....................................................................................27, 39

*Smith v. Goguen*,
   415 U.S. 566 (1974) ..............................................................................................27

*Steenholdt v. FAA*,
   314 F.3d 633 (D.C. Cir. 2003) ................................................................................9

*Stirone v. United States,*
    361 U.S. 212 (1960)............................................................................................15

*Strickler v. Greene,*
    527 U.S. 263 (1999)............................................................................................27

*United States v. Batchelder,*
    442 U.S. 114 (1979)......................................................................................28, 41

*United States v. Bridges,*
    346 U.S. 209 (1953)......................................................................................29, 44

*United States v. Burden,*
    934 F.3d 675 (D.C. Cir. 2019)......................................................................36, 37

*United States v. Cano-Flores,*
    796 F.3d 83 (D.C. Cir. 2015)........................................................................39, 40

*United States v. Class,*
    930 F.3d 460 (D.C. Cir. 2019)............................................................................41

*United States v. Concord Mgmt. & Consulting LLC,*
    347 F. Supp. 3d 38 (D.D.C. 2018)......................................................................45

*United States v. Conlon,*
    628 F.2d 150 (D.C. Cir. 1980)............................................................................42

*United States v. Craig,*
    No. 19-cr-0215 (ABJ), 2019 WL 3604630 (D.D.C. Aug. 8, 2019)......................40

*United States v. Feola,*
    420 U.S. 671 (1975)............................................................................................41

*United States v. Hillie,*
    227 F. Supp. 3d 57 (D.D.C. 2017)......................................................................14

*United States v. Hitt,*
    249 F.3d 1010 (D.C. Cir. 2001)...........................................................14–15, 31, 42

*United States v. Kingrea,*
    573 F.3d 186 (4th Cir. 2009)..............................................................................42

*United States v. Lanier,*
    520 U.S. 259 (1997)............................................................................................39

*United States v. Marks*,
   No. 11-80072-CR, 2013 WL 4502319 (S.D. Fla. Mar. 5, 2013), *report and recommendation adopted*, No. 11-80072-CR, 2013 WL 4502309 (S.D. Fla. Aug. 23, 2013) ...................................................................................................................33

*United States v. Park*,
   297 F. Supp. 3d 170 (D.D.C. 2018) ....................................................................................24

*United States v. Prentiss*,
   206 F.3d 960 (10th Cir. 2000), *on reh'g en banc*, 256 F.3d 971 (10th Cir. 2001) ...................................................................................................................................42

*United States v. Rafiekian*,
   No. 1:18-cr-457-AJT-1, 2019 WL 4647254 (E.D. Va. Sept. 24, 2019) ...............................38

*United States v. Rosenblatt*,
   554 F.2d 36 (2d Cir. 1977) ....................................................................................................29

*United States v. Sherman*,
   150 F.3d 306 (3d Cir. 1998) ...................................................................................................41

*United States v. Tuohey*,
   867 F.2d 534 (9th Cir. 1987) ....................................................................................................8

*United States v. X-Citement Video, Inc.*,
   513 U.S. 64 (1994) .................................................................................................................39

*Wayte v. United States*,
   470 U.S. 598 (1985) ...............................................................................................................28

*Wilkinson v. Austin*,
   545 U.S. 209 (2005) ...............................................................................................................32

*Williams v. Pennsylvania*,
   136 S. Ct. 1899 (2016) ...........................................................................................................26

*Wolff v. McDonnell*,
   418 U.S. 539 (1974) ...........................................................................................................25–26

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
   481 U.S. 787 (1987) ...............................................................................................................27

## Statutes

18 U.S.C. § 371 ................................................................................................................... *passim*

18 U.S.C. § 922(g) ........................................................................................................................35

18 U.S.C. § 924(a)(2) ...................................................................................................................36

22 U.S.C. § 612(d) .................................................................................................40

22 U.S.C. § 618(a)(2) ............................................................................................40

52 U.S.C. § 30109(d) .............................................................................................40

U.S. Const. amend. I .........................................................................................43, 44

U.S. Const. amend. V .....................................................................................*passim*

U.S. Const. amend. VI ............................................................................................14

**Regulations**

28 C.F.R. § 600.1(a) .................................................................................................7

28 C.F.R. § 600.7(a) .................................................................................................9

**Rules**

Fed. R. Crim. Proc. 12(b)(1) .................................................................................24

Fed. R. Crim. Proc. 12(b)(3)(B) ...........................................................................24

Fed. R. Crim. Proc. 12(b)(3)(B)(v) .......................................................................24

**Other Authorities**

1 W. LaFave & A. Scott, *Substantive Criminal Law* § 5.1(a) (1986).....................35, 36

Answer Br. of the United States, *United States v. Woodard*,
    No. 19-5009 (10th Cir. Oct. 10, 2019), 2019 WL 5107398 ....................................31

Br. for *Amici Curiae* Edward H. Levi, Griffin B. Bell, and William French Smith,
    *Morrison v. Olson*, 1988 WL 1031601 (1988) (No. 87-1279) ..................................5

Provision for Special Prosecutor: Hearing on H.R. 14,476, H.R. 11,357, H.R.
    11,999, H.R. 8281, H.R. 8039, H.R. 15,634, and Title I of S. 495 Before the
    Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 94th
    Cong., 2d Sess. 35 (1976) ......................................................................................5

U.S. Dep't of Justice, *Criminal Resource Manual* § 923 (updated Apr. 2018),
    available at https://www.justice.gov/jm/criminal-resource-manual-923-18-usc-
    371-conspiracy-defraud-us ...........................................................................8, 9, 30

U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* at 163 (Dec. 2017
    8th Ed.), available at https://www.justice.gov/criminal/file/1029066/download ..........9, 30, 33

U.S. Dep't of Justice, *Justice Manual* § 1-1.100 (updated Apr. 2018), available at
    https://www.justice.gov/jm/jm-1-1000-introduction .................................................................8

## I.       PRELIMINARY STATEMENT

After twice declaring that it had no intention of superseding the indictment, the government sat mum while Defendant Concord Management and Consulting, LLC ("Concord") fully briefed a renewed motion to dismiss and a motion for disclosure of the grand jury instructions.  Then, as soon as the government had those pleadings in hand, it secretly went to the Court to say it was going to supersede the indictment to add a single new theory of liability relating to the restrictions on certain campaign expenditures by foreign nationals.  Then, as fast as it said this, the government proceeded to do something else, adding, without any warning to the Court or Concord, an unprecedented theory of liability under the Foreign Agents Registration Act ("FARA") involving alleged unwitting Americans acting as foreign agents—all in an attempt to moot Concord's attack on the original indictment and the legal instructions provided to the first grand jury.[1]  But there is no mootness.  The government's manipulation is just the latest and starkest illustration of why this unprecedented prosecution violates due process.

At inception, the Special Counsel's Office ("SCO") brought this case through an act of arbitrary manipulation, deliberately pleading around United States Attorney for the District of Columbia ("USAO DC") and Department of Justice ("DOJ") policy, practice, and precedent to pursue a conviction against a foreign corporation that had no presence in the United States and involving alleged conduct that no person or entity, foreign or domestic, had ever been charged with or knew would be deemed unlawful.  This arbitrary manipulation, borne of a desire to blame private Russian companies and individuals for the defeat of Hillary Clinton in 2016, continued throughout this prosecution, with public declarations of guilt before trial, the constant

---

[1]     The government used a new grand jury to supersede the original indictment.  **Ex. 1**, Nov. 11, 2019 Email from Assistant U.S. Attorney to E. Dubelier.

re-invention of unprecedented liability theories, and, finally, a pretextual superseding indictment, all of which establishes that any further prosecution of this case is an affront to the Constitution.

Here, there is no dispute that at the time of its allegedly unlawful conduct, Concord had no knowledge whatsoever of the Federal Election Commission ("FEC") or its rules and regulations, the DOJ FARA Unit or its rules and regulations, or the State Department's rules and regulations regarding travel visas. Because the Special Counsel knew as much, his office substituted in for government's line prosecutors and invented a liability theory for this case only—that is, because Russian nationals allegedly funded by Concord pretended to be Americans on the internet, that game of make-believe during a presidential election proves that the Defendants intended to defraud the government. This sleight-of-hand was accomplished by changing three words in a template § 371 indictment from conspiracy to "commit crimes against" the United States to one—"defraud." With that edit, the Special Counsel trashed decades of policy, practice, and precedent and deprived Concord of the fair and just application of the law that would have prevailed had the USAO DC not been excluded from the grand jury process—for reasons that are still unknown today.

Worse still, the individuals who concocted this sleight-of-hand have now returned to their private law practices—mission accomplished. And to double down on the unfairness and avoid political suicide, the USAO DC and DOJ retroactively have endorsed this gross departure from their own policy, practice, and precedent by pretextually adding new allegations to a superseding indictment ("Superseding Indictment," ECF 247) that still omits any assertion of *mens rea* that would require the jury to find that Concord was aware that what is was allegedly doing was a violation of law, and which now charges—for the first time—that Concord caused "unwitting" Americans to violate FARA.

Concord consistently has maintained that this prosecution transgresses settled regulatory and constitutional limits. Now, the jig is up. The Special Counsel operated for well over a year in a manner that demonstrated a lack of neutrality and fairness. The USAO DC and the DOJ, in avoiding a political third-rail, now have embraced, contrary to their own settled practice, this same arbitrariness, as revealed by the content of the Superseding Indictment and the conduct leading up to it. And the Special Counsel, USAO DC and DOJ failed to account for recent Supreme Court authority requiring a heightened level of *mens rea* that the government has consciously chosen to omit. This prosecution is, in a word, illegitimate; one where the truth-seeking function has been irretrievably compromised, and where prosecutors, terrified of being accused of sympathy with Russians, are marching lock-step with the never-before utilized theories of liability first served up by the SCO. In these circumstances, the basic principles of fairness and neutrality the Framers embedded in the Due Process Clause require that Count One of the Superseding Indictment as to Concord be dismissed.[2]

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The government's prosecution of Concord has been marked by arbitrariness from inception, as Concord's briefing has established. The government's response has been marked, in turn, by conduct that has deepened the arbitrariness both in scope and degree. The recently returned Superseding Indictment, an apparent attempt to wipe the slate clean, underscores why this prosecution lacks any legitimacy. Simply put, the Superseding Indictment does not allow the government to pretend that its arbitrary conduct never occurred.

---

[2]   As with the original indictment—which has not been dismissed—Concord is named only in Count One of the Superseding Indictment. For convenience, this motion refers to the Superseding Indictment generally.

## A.     The Threat Of Arbitrary And Discriminatory Prosecution Is Inherent In Any Case Involving A Special Counsel.

To meet the expectations of our criminal justice system, prosecutors must adhere to principles of neutrality and fairness.  The Supreme Court gave voice to that expectation more than 80 years ago in *Berger v. United States*, 295 U.S. 78 (1935).  There, the Court explained that the prosecutor is the "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."  *Id.* at 88.  Thus, while prosecutors may "prosecute with earnestness and vigor" and "strike hard blows," they are "not at liberty to strike foul ones.  It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Id.*

Where prosecutors are displaced by a special counsel, however, these principles of neutrality and fairness are threatened by the mandate embedded in such an appointment.  Indeed, as the D.C. Circuit observed, the threat arises precisely because a special counsel is appointed for the purpose of pursuing specified targets for indictment and prosecution:

> A person occupying this statutory office has, it seems to us, unique incentives to seek an indictment.  Our concern is based on the self-evident proposition that the whole *raison d'etre* of the independent counsel is not to administer the criminal law across a wide population, but rather to focus on one individual or group of individuals targeted at the inception of the office.  In effect, an entire self-sufficient government agency is created from scratch to investigate and perhaps prosecute a single individual.  The need to justify even the expense of an office dedicated solely to one goal must generate a reluctance to decide against indictment or to conclude the investigation absent near certainty that no indictment is possible or that no further leads remain.  And inevitably, the success of the office itself, in the public's eyes, at least, must turn to some extent upon whether indictment and conviction are obtained.

*In re Sealed Case*, 838 F.2d 476, 509–10 (D.C. Cir. 1988), *rev'd sub nom. on other grounds by Morrison v. Olson*, 487 U.S. 654 (1988).

A decade prior to *Sealed Case*, Attorney General Edward Levi warned that an independent special counsel is "subject to formidable public—and perhaps self-imposed—pressure to indict in the one case he was appointed to pursue."  Provision for Special Prosecutor: Hearing on H.R. 14,476, H.R. 11,357, H.R. 11,999, H.R. 8281, H.R. 8039, H.R. 15,634, and Title I of S. 495 Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 94th Cong., 2d Sess. 35 (1976) (statement of Hon. Edward H. Levi, Attorney General).  And a decade later, joined by Attorneys General Bell and Smith, Attorney General Levi expressed these same concerns to the U.S. Supreme Court, identifying "the occupational hazards of the dedicated prosecutor; the danger of too narrow a focus, of the loss of perspective, of preoccupation with the pursuit of one alleged suspect to the exclusion of other interests."  Br. for *Amici Curiae* Edward H. Levi, Griffin B. Bell, and William French Smith, *Morrison v. Olson*, 1988 WL 1031601, at *11 (1988) (No. 87-1279).  These trenchant observations have played out in practice in this case.

**B.**     **Concord Has Been Subjected To An Arbitrary And Discriminatory Prosecution That Violates Due Process Commands.**

**1.**     **The Arbitrariness Begins:   The USAO DC And DOJ Do Not Investigate Alleged Conduct That Becomes The Subject Of This Indictment.**

The factual framework underlying the Original and Superseding Indictments has been in the American public domain since, at the latest, June 2, 2015, when *The New York Times Magazine* published "The Agency" by Adrian Chen. They are there in specifics regarding the name of Internet Research Agency ("IRA"), its address at 55 Savushkina Street in Saint Petersburg, its alleged connection to Concord and co-Defendant Mr. Prigozhin, and its alleged interference in U.S. political debate.  **Ex. 2**.[3]  *The New Yorker* published an article a year later

---

[3]     *See* Adrian Chen, *The Agency*, The New York Times Magazine (June 2, 2015), https://www.nytimes.com/2015/06/07/magazine/the-agency.html.

discussing reports that Mr. Prigozhin was using IRA to support then candidate Mr. Trump.  **Ex. 3**.[4]  Both of these articles, and numerous others dating back to 2014,[5] occurred well in advance of the 2016 election, and DOJ and USAO DC could have conducted a criminal investigation based on these allegations if they believed a crime was being committed.  This widely publicized information also was available to the FEC, DOJ FARA Unit, and Department of State ("DOS"), which also did nothing to enforce their domains, but which now the prosecution claims were breached.  Then, in January 2017, the Office of the Director of National Intelligence issued its "Intelligence Community Assessment" in which the Federal Bureau of Investigation, National Security Agency, and Central Intelligence Agency jointly stated that IRA had interfered in the

---

[4]   *See* Adrian Chen, *The Real Paranoia-Inducing Purpose of Russian Hacks*, The New Yorker (July 27, 2016), https://www.newyorker.com/news/news-desk/the-real-paranoia-inducing-purpose-of-russian-hacks.

[5]   *See*, *e.g.*, **Ex. 4**, Max Seddon, *Documents Show How Russia's Troll Army Hit America*, Buzzfeed News (June 2, 2014), https://www.buzzfeednews.com/article/maxseddon/documents-show-how-russias-troll-army-hit-america (identifying IRA in connection with a campaign to mold American public opinion); **Ex. 5**, Max Seddon, *New Leaked Documents Show Russian Trolls Targeting Obama, Harry Potter Fans*, Buzzfeed News (June 3, 2014), https://www.buzzfeednews.com/article/maxseddon/new-leaked-documents-show-russian-trolls-targeting-obama-har (same); **Ex. 6**, *From Obama to 'troll farms': how social media is changing politics*, Financial Times (Jan. 20, 2016), https://www.ft.com/content/0db52286-a25b-11e5-8d70-42b68cfae6e4 (describing the presence of "troll farms" all over the world); **Ex. 7**, *The Baltic Elves Taking on Pro-Russian Trolls*, The Daily Beast (Mar. 20, 2016), https://www.thedailybeast.com/the-baltic-elves-taking-on-pro-russian-trolls (describing anti-IRA "disinformation warriors" working out of the Baltic countries); **Ex. 8**, *Hillary Clinton's Super PAC, Taking a Page from Vladimir Putin, Spends $1 Million on Online Trolls*, Paste Magazine (Apr. 22, 2016), https://www.pastemagazine.com/articles/2016/04/hillary-clintons-super-pac-taking-a-page-from-vlad.html (noting that supporters of Hillary Clinton's presidential campaign had started a pro-Hillary troll farm inspired by IRA); **Ex. 9**, *It looks like Russia hired internet trolls to pose as pro-Trump Americans,* Business Insider (July 27, 2016), https://www.businessinsider.com/russia-internet-trolls-and-donald-trump-2016-7 (linking alleged IRA social media activity to Soviet-era "*dezinformatsiya*").

2016 election on behalf of Donald Trump and against Hillary Clinton.[6]  But there is no evidence

that any criminal investigation ensued then either.

Instead, a Special Counsel was appointed in May 2017 specifically to determine whether

President Trump's campaign coordinated with Russia to get him elected and, according to the

discovery produced to date, ███████████████████████████████████

███ ██████████████████████████████████████████████████████████████

█████████████  However, since the allegations against the Trump campaign proved to be

false, Concord became collateral damage to justify the Special Counsel's appointment.

> **2.     The Arbitrariness Continues:  The Special Counsel Charges An Unprecedented Defraud Conspiracy, Contravening DOJ Policy, Practice, And Precedent.**

At inception, the displacement of the USAO DC and DOJ's line prosecutors was itself a

contrivance.  The Special Counsel's appointment was made under regulations (the "Special

Counsel Regulations" or "Regulations") that require the presence of a conflict of interest or other

extraordinary circumstances to remove prosecutorial responsibility from the U.S. Attorney or

line prosecutors at DOJ.  *See* 28 C.F.R. § 600.1(a).  As to Concord, however, no conflict or

extraordinary justifications for a special counsel have ever existed or been offered.[7]

Nevertheless, once enabled, the Special Counsel brought a unique and unprecedented

"*Klein*" conspiracy charge under 18 U.S.C. § 371's defraud clause against Concord based on

---

[6]     *See* **Ex. 10**, *Assessing Russian Activities and Intentions in Recent US Elections*, ICA 2017-01D, Office of the Director of National Intelligence (Jan. 6, 2017), available at https://www.dni.gov/files/documents/ICA_2017_01.pdf.

[7]     In fact, the Special Counsel's appointment as to Concord has been shown to be pretextual. Since 2018, attorneys from the USAO DC and DOJ, all previously deemed to be conflicted but who, in adhering to DOJ's stated policies and longstanding practices, could not have charged this case in the first place, began entering appearances and taking active roles.  Then, in March and April 2019, attorneys with the SCO began to withdraw, until by May 2019, they were dropped completely.

allegations lacking a *mens rea* component as to any specified government functions created by any specifically identified federal statutes.  *See* Original Indictment ("Orig. Ind."), ECF 1.  Count One of the Original Indictment did *not* allege that any of the Defendants, including Concord, violated any specific statute other than § 371, or knew that the statutes or regulations that govern elections, foreign agents, and visa applications even existed.  Nor was there any allegation that Concord specifically had a duty to file or register with respect to FECA or FARA, or committed any other act specifically prohibited by U.S. election statutes applicable to foreign nationals. (There isn't any such allegation in the Superseding Indictment either.)

By comparison, had this prosecution initially been led by a USAO DC or DOJ line prosecutor, under established policy, practice, and precedent, Concord could not have been charged.  The line prosecutors instead would have adhered to DOJ's own *Criminal Resource Manual*, one part of the broader "*Justice Manual*."  The *Justice Manual* "contains publicly available [DOJ] policies and procedures."  U.S. Dep't of Justice, *Justice Manual* § 1-1.100 (updated Apr. 2018), available at https://www.justice.gov/jm/jm-1-1000-introduction.  In Section 923, entitled "18 U.S.C. § 371—Conspiracy To Defraud The United States," the *Criminal Resource Manual* outlines the law of defraud conspiracies under § 371.  In pertinent part, § 923 states that the "defraud part of section 371 criminalizes any **willful** impairment of a legitimate function of government, whether or not the improper acts or objective are criminal under another statute."  *Criminal Resource Manual* § 923 (quoting *United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989)) (emphasis added), available at https://www.justice.gov/jm/criminal-resource-manual-923-18-usc-371-conspiracy-defraud-us.

The *Criminal Resource Manual* is, of course, intended to check arbitrary prosecutorial conduct that could result in charges against individuals for conduct they had no idea was

unlawful.  But here, the deliberate abandonment of the *Criminal Resource Manual* was made in tandem with the equally deliberate refusal to obey the supposedly "binding" Special Counsel Regulations that were already in place.[8]  Those Regulations, too, unequivocally provided that the Special Counsel must follow DOJ's policies and practices.  *See* 28 C.F.R. § 600.7(a) ("A Special Counsel shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice."); *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) (government actors must "follow their own rules").

But the Special Counsel's charge did not just contravene formal DOJ policies and practices—it took a further step and violated the USAO DC's own longstanding and traditional practice in prosecuting § 371 defraud conspiracy cases.[9]  Since January 1, 2010, in all but four § 371 defraud conspiracy indictments, the USAO DC has consistently adhered to the *Criminal Resource Manual* in alleging § 371 defraud-clause conspiracies, as opposed to a conspiracy to violate another federal statute.  In eleven of those cases, the charging document alleged with respect to the § 371 defraud count that the defendant(s) had acted willfully.  *See* **Ex. 11**, *United States v. Abn Amro Bank, N.V.*, No. 10-cr-00124-CKK, Ind. Count One, ¶ 2; **Ex. 12**, *United*

---

[8]     The Special Counsel similarly dispensed with DOJ's election-law charging policies, embodied in the *Federal Prosecution of Election Offenses* (the "*Charging Policies*").  ECF 74 at 22–23.  This Court previously indicated it was unmoved by this departure—or by DOJ's post hoc revisions to the policies in direct response to this case—in addressing the proper level of *mens rea*.  *Id.*  But that does not change the fact that the Special Counsel's departure from these policies was arbitrary, too.

[9]     As previously argued, time and again, federal prosecutors have followed through on DOJ's *Charging Policies* and *Criminal Resource Manual* and alleged "willfulness" in § 371 defraud conspiracy cases predicated on FECA or the FEC's electoral regulatory functions.  ECF 46 at 24–25 n.10.  Concord acknowledges the Court's prior finding that the Regulations do not "create judicially enforceable rights."  ECF 55 at 38–39.  But that certainly does not mean the Special Counsel's decision to flout the *Criminal Resource Manual*—which, in turn, constitutes a violation of the Special Counsel Regulations—is not relevant to whether the government has conducted this prosecution in an impermissibly arbitrary manner.

*States v. Khaki*, No. 1:12-cr-00061-RWR, Ind. Count One, ¶ 2; **Ex. 13**, *United States v. Shih*, No. 11-cr-00119-JEB, Ind. Count One, ¶ 10; **Ex. 14**, *United States v. Hassanshahi*, No. 13-cr-274-RC, Ind. Count One, ¶ 1; **Ex. 15**, *United States v. Yindeear-Rom*, No. 14-cr-00069-RMC, Ind. Count One, ¶ 9; **Ex. 16**, *United States v. Credit Agricole Corporate and Investment Bank*, No. 15-cr-00137-CKK, Ind. Count One, ¶ 27; **Ex. 17**, *United States v. Pereira Da Fonseca*, No. 16-cr-00089-EGS, Ind. Count One, ¶ 16; **Ex. 18**, *United States v. Ali Khan*, No. 16-cr-00096-RBW, Ind. Count One, ¶ 4; **Ex. 19**, *United States v. Claiborne*, No. 17-cr-00069-RDM, Ind. Count One, ¶ 29; **Ex. 20**, *United States v. Tajideen*, No. 17-cr-00046-RBW, Ind. Count One, ¶ 17; **Ex. 21**, *United States v. Unicredit Bank AG*, No. 19-cr-00128-BAH, Ind. Count One, ¶ 1.[10]

Of the remaining four, none involving FECA or FARA, one was a tax case, **Ex. 22**, *United States v. Cooper*, No. 15-cr-00152-RMC, where lawyers from DOJ's Tax Division appeared, Dkt. No. 16; one was a treasury sanctions case, **Ex. 23**, *United States v. Shandong Sheenrun Electronics Co. Ltd.*, No. 14-cr-00089-JEB, where the absence of willfulness was inconsistent with every other § 371 defraud-clause trade sanctions case filed by the USAO DC, *compare* **Ex. 11**, *ABN Amro Bank NV*; **Ex. 12**, *Khaki*; **Ex. 13**, *Shih*; **Ex. 14**, *Hassanshahi*; **Ex. 17**, *Pereira Da Fonseca*, and **Ex. 21**, *Unicredit*, *supra*; one was a multi-count immigration scheme that included a § 1001 count requiring willfulness, **Ex. 24**, *United States v. Sestak*, No. 13-cr-00168-JDB; and the final case was *United States v. Khan*, No. 11-cr-00276-EGS, a multi-count money laundering charge where the conspiracy count was dismissed, **Ex. 25**, Ind. ¶ 33; *see also id.* Minute Entry indicating Count 1 dismissed on government's motion (July 11, 2013); *id.* Dkt. No. 197, July 11, 2013 Hr'g Tr. at 59:1–5 (government moving to dismiss count one).

---

[10]   A search of federal court dockets using Bloomberg Law by undersigned counsel identified just fifteen such cases.

In fact, even the recently indicted former mayor of Baltimore gets the benefit of the government having to prove willfulness for the charge of a § 371 conspiracy to defraud the government.  **Ex. 26**, *United States v. Pugh*, No. 19-cr-0541, Ind. Count Nine, ¶ 13 (D. Md.). From any perspective, therefore, the charging decision here reveals arbitrariness and discrimination.  The burden of proof should be the same for any defendant, including a foreign national with no presence in the United States, and there is no principled reason for allowing the government to willy-nilly manipulate the requisite burden of proof when it suits its purpose to do so.  Yet that is exactly what happened here.  The initial charging decision was left for a special counsel appointed for the specific purpose of investigating and indicting Russians for interfering with a presidential campaign and the burden of proof set forth in established USAO DC and DOJ policy, practice, and precedent arbitrarily went by the board.[11]

> **3.**    **The Arbitrariness Continues:  The Special Counsel, And Later The Attorney General, Publicly Declare Concord's Guilt Before Any Trial.**

The arbitrary nature of the government's assault on Concord revealed itself in a particularly stark fashion when the Special Counsel and the Attorney General—contrary to

---

[11]    Recent evidence further reinforces that arbitrariness and discrimination is at work where foreign nationals are concerned.  In a "60 Minutes" segment entitled "The Russian hack," aired on November 24, 2019, Assistant Attorney General John Demers explained that the Special Counsel pursued the indictment of the so-called Russian hackers (*United States v. Netyksho*, No. 1:18-cr-00215-ABJ (D.D.C.)) in part to "educate the public" about what transpired during the 2016 U.S. presidential election.  *See 60 Minutes: The Russian Hack, Tania's Story, Mind Reading (Season 52, Episode 9)* (CBS television broadcast Nov. 24, 2019), available at https://tinyurl.com/w3hu7xt.  There is no basis in DOJ's *Charging Policies* evoking such a purpose for indicting.  Needless to say, "educating the public" is not what the Framers had in mind when they constitutionally entrusted grand juries with the "sole" and solemn duty of deciding whether to charge others with serious crimes.  *See Costello v. United States*, 350 U.S. 359, 362 (1956).  Manipulating that solemn constitutional function to "educate the public" is incongruous with the "high place" the grand jury holds "as an instrument of justice[,]" *Costello*, 350 U.S. at 362, not to mention the fundamental role of the prosecutor itself to do justice, *Berger*, 295 U.S. at 88.

ethical rules and basic principles of prosecutorial neutrality—made public statements asserting Concord's purported guilt for the crime alleged against it.

The version of the Mueller Report released publicly on April 18, 2019, together with Attorney General Barr's public statements about the Report, departed from all of these strict rules—and, indeed, from the settled role the prosecutor must play in our constitutional order. *See Berger*, 295 U.S. at 88 (explaining that prosecutor's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done"). The Report repeatedly states that the Defendants are guilty of the conduct with which they have been charged in this pending case, and also conveys that Concord acted on behalf of the Russian government itself in a scheme involving Russian military intelligence. ECF 148 at 6–9. Specifically, "[b]y attributing IRA's conduct to 'Russia'—as opposed to Russian individuals or entities—the Report suggests that the activities alleged in the [Original] [I]ndictment were undertaken on behalf of, if not at the direction of, the Russian government." *Id.* at 7. For his part, "the Attorney General drew a link between the Russian government and this case[,]" ultimately "'confirm[ing]' what the [Original] [I]ndictment does not allege—that Concord's and its co-defendants' activities were 'sponsored' by the 'Russian government' and part of a two-pronged attack on our nation's democratic institutions." *Id.* at 7–8. Altogether, the Court found the government's various statements prejudiced Concord "because they drew a clear connection between [Concord] and a foreign government accused of interfering with the 2016 presidential election" and because "they provided an opinion about [Concord's] guilt and the strength of the evidence." *Id.* at 8–9.

While the Court is determined to have a trial early in 2020, the government insists on a political persecution in addition to a criminal prosecution, thus further depriving Concord of due process under the law. That is, despite the Court's holding, similar conduct continued as recently

September 30, 2019, when the Treasury Department issued new sanctions against Concord's general director, Mr. Prigozhin.[12]   In its press release announcing the action, the Treasury Department asserted that Concord's co-Defendant, IRA, attempted to influence the 2018 midterm elections and that it was "calling out" Mr. Prigozhin for assisting and supporting these efforts.[13]   U.S. Secretary of Treasury Mnuchin went on to say that "Treasury is targeting the private planes, yacht, and associated front companies of Yevgeniy Prigozhin, the Russian financier behind the Internet Research Agency and its attempts to subvert American democratic processes" and that the Department's actions were intended to "safeguard[] our democratic processes from adversaries—primarily Russia, Iran, and China—that may be seeking to influence the upcoming 2020 elections."[14]   The same day, U.S. Secretary of State Pompeo issued his own press release making similar assertions.[15]   Then on October 4, in a piece published on Polygraph.info, a news website operated by the United States Agency for Global Media ("USAGM"), a federal agency,[16] the author concluded—based on the aforementioned press

---

[12]   *See* **Ex. 27**, *Foreign Interference in a U.S. Election Designations; Cyber-Related Designations; Ukraine-/Russia-Related Designations; North Korea Designations Update*, U.S. Dep't of Treasury (Sept. 30, 2019),   available at   https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20190930.aspx?src=ilaw.

[13]   *See* **Ex. 28**, Press Release, *Treasury Targets Assets of Russian Financier who Attempted to Influence 2018 U.S. Elections*, U.S. Dep't of Treasury (Sept. 30, 2019), available at https://home.treasury.gov/news/press-releases/sm787.

[14]   *Id.*

[15]   *See* **Ex. 29**, Press Statement from Michael R. Pompeo, U.S. Sec'y of State, *U.S. Targets Russian Actors Involved in Efforts to Influence U.S. Elections* (Sept. 30, 2019), available at https://www.state.gov/u-s-targets-russian-actors-involved-in-efforts-to-influence-u-s-elections/.

[16]   *See* **Ex. 30**, *About*, Polygraph.info, https://www.polygraph.info/p/5981.html (last visited Oct. 7, 2019) ("Polygraph.info is a fact-checking website produced by Voice of America (VOA) and Radio Free Europe/Radio Liberty."); **Ex. 31**, *Missions and Values*, VOA Public Relations, https://www.insidevoa.com/p/5831.html (last visited Oct. 7, 2019) ("VOA is part of the U.S. Agency for Global Media (USAGM), the government agency that oversees all non-military, U.S. international broadcasting. It is funded by the U.S. Congress."); **Ex. 32**, *Who we are*, U.S.
(continued)

releases and the allegations in the Indictment here (and other Special-Counsel indictments)—that any assertion "that investigations into election meddling failed to find evidence of Russian interference in U.S. elections" was "false."[17]  And these public pronouncements followed equally public pronouncements by the United States Attorney for the Eastern District of Virginia regarding potential foreign interference in the 2020 presidential election, reportedly asserting that "they're going to do the same thing."[18]

<div style="text-align:center">

**4.      The Arbitrariness Continues:   The Government Invents And Re-Invents The Conspiracy Charge, Adding A FARA Theory Lacking Any Basis In The Original Indictment.**

</div>

The jettisoning of prosecutorial safeguards and resort to arbitrary tactics likewise have been just as evident, if not more so, in the government's continued redefinition and reformulation of the charge in the Original Indictment.   Indictments are intended to ensure both the Sixth Amendment's guarantee that "'the defendant [be informed] of the nature of the accusation against him'" and "the Fifth Amendment's protections against abusive criminal charging practices;  specifically, its guarantees that a criminal defendant can only be prosecuted for offenses that a grand jury has actually passed upon, and that a defendant who is convicted of a crime so charged cannot be prosecuted again for that same offense."  *United States v. Hillie*, 227 F. Supp. 3d 57, 69–70 (D.D.C. 2017) (first quoting *United States v. Hitt*, 249 F.3d 1010, 1016

---

Agency for Global Media, https://www.usagm.gov/who-we-are/ (last visited Oct. 7, 2019) (noting USAGM is a "federal agency" whose "mandate comes from multiple pieces of legislation")

[17]   *See* **Ex. 33**, William Echols, *New Sanctions Against 'Putin's Chef' Prompt Latest Russian Election Meddling Denial*, Polygraph.info (Oct. 4, 2019), available at https://www.polygraph.info/a/sanctions-putins-chef-election-fact-check/30197184.html.

[18]   *See* **Ex. 34**, Rachel Weiner, *U.S. attorney warns of possible Russian interference in 2020 elections*, The Washington Post (Sept. 26, 2019), https://www.washingtonpost.com/local/legal-issues/us-attorney-warns-of-possible-russian-interference-in-2020-elections/2019/09/26/53f09c82-e085-11e9-8dc8-498eabc129a0_story.html.

(D.C. Cir. 2001); then citing *Stirone v. United States*, 361 U.S. 212, 218 (1960)).  Thus, the "settled rule in the federal courts [is] that an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form."  *Russell v. United States*, 369 U.S. 749, 770 (1962) (citations omitted).

In this case, from the start, the government has treated these fundamental constitutional safeguards as optional.  The Original Indictment alleged only a vague conspiracy to interfere with generically stated "functions" of the U.S. government, leaving out key details such as what laws created those functions and which conspirators, if any, could have violated—or did violate—the purported legal duties alluded to.  *Supra* at 7–8.  Omitted, too, was any allegation that Concord or the Defendants acted willfully—to that point a staple of § 371 defraud conspiracy indictments in this District.  *Id.*  When pressed by Concord's July 2018 motion to dismiss, the government insisted that the Original Indictment did not allege that any Defendant was required to make any disclosures under FECA or to register with DOJ under FARA, and instead maintained that it only needed to show some amorphous interference with undefined "regulatory functions" of the FEC or DOJ.  ECF 56 at 11.  When later asked by the Court at the hearing on Concord's motion, the government shifted, admitting that "when the only deceptive acts the government has alleged are a failure to disclose or a failure to report, well, then, you are going to have to show a duty to disclose or a duty to report."  Oct. 15, 2018 Hr'g Tr. 47:24–48:2.  And after the hearing, the government shifted yet again, claiming that in fact the Original Indictment—which, of course, had not itself changed (nor could it)—***did*** allege that Concord and the Defendants had a legal duty to disclose and register under FECA and FARA, despite the fact that those statutes make it clear that any failure to act on any such duty would only be actionable if the Defendants had a willful mental state and the Original Indictment does not allege who had

any such duty.  ECF 69 at 3–4.

Given these machinations, Concord asked that the government provide a bill of particulars identifying the specific statutes and regulations referred to in the Original Indictment and any conspirators who were required by FECA to make the disclosures or required by FARA to register.  ECF 104.  Concord also sought clarification as to whether it or its agents specifically were alleged to have violated the two statutes.  *Id.*  The Court granted Concord's motion in part. ECF 136.  Noting that "the [Original I]ndictment *did* allege" violations of FECA and FARA (despite the fact that willfulness was not alleged), the Court reiterated its earlier finding "that the Government may ultimately have to prove these violations at trial to show that the deceptive acts directed at private parties were *also* intended to impair the FEC's and DOJ's functions 'in administering federal requirements for disclosure.'"  *Id.* at 11 (citation omitted).  The Court further reiterated that "it would be difficult to tie the deceptive acts alleged in this case to FEC's and DOJ's administration of FECA's and FARA's disclosure requirements if those requirements did not actually apply to the conspirators."  *Id.*  "In other words," the Court reasoned, "it will be difficult for the government to establish that the defendants intended to use deceptive tactics to conceal their Russian identities and affiliations from the United States if the defendants had no duty to disclose that information to the United States in the first place."  *Id.* at 12.  "For that reason," the Court concluded, "the specific laws—and underlying conduct—that triggered such a duty are critical for Concord to know well in advance of trial so it can prepare its defense."  *Id.*

Notably, however, the Court found that "the [Original I]ndictment does not cite the specific statutory and regulatory disclosure requirements that the defendants violated" nor does it "clearly identify which expenditures and activities violated which disclosure requirements."  *Id.* And just as critically, the duty the Court identified was not specifically alleged in the Original

Indictment.   The Court therefore ordered the government to provide information to Concord regarding the statutory and regulatory disclosure requirements "whose administration the defendants allegedly conspired to impair," along with the specific conduct that allegedly violated those requirements.  *Id.*[19]

In response, the government filed a bill of particulars setting forth several sections of FECA and FARA that it claimed the Defendants had failed to comply with, *see* ECF 176, even though none of these provisions appeared in the Original Indictment, and it remains a mystery whether any of this was explained to the grand jury.  Because Concord still could not determine which specific Defendants had the duties the government (but not the Original Indictment) alleged, it sought a supplemental bill of particulars.  *See* ECF 181.  At the hearing on that motion, the government's cavalier approach to the charges in this prosecution revealed itself yet again.  In a colloquy at the start of the hearing, the Court stated that it had previously "interpreted the indictment to allege a conspiracy that targeted only the administration of federal disclosure requirements and not some other set of functions, such as the enforcement of the ban on expenditures by foreign nationals."  Sept. 16, 2019 Hr'g Tr. 4:13–17.  But the Court questioned the government's opposition to the motion for a supplemental bill of particulars, where the government asserted that the Original Indictment "also alleges that the conspirators interfered with the FEC's function of enforcing the statutory prohibition on certain expenditures by foreign nationals."  ECF 194 at 18 n.3.

The government then asked the Court to clarify or reconsider its previous order.  ECF 201.  In that motion, the government said that it intended to prove that the co-conspirators did

---

[19]   Later, the Court concluded that the Original Indictment is "difficult to follow in terms of what the objectives are."  Sept. 16, 2019 Hr'g Tr. 6:15–16 and 15:17–18.

not comply with the duties now required by the Court for conviction because, as foreigners, they allegedly made expenditures, not charged in the Original Indictment, that were potentially separately prohibited under FECA (which amounted to the Russian ruble equivalent of just over $2,900). ECF 201 at 2; ECF 181 at 11 & n.10; ECF 206 at 7. This Court denied the motion, reaffirming that the Original Indictment did not allege that the Defendants conspired to interfere with the FEC's function of enforcing a foreign expenditure ban, ECF 209 at 3, which is not a "ban" at all, but rather a highly complex set of rules that prohibits some expenditures, and permits others. ECF 181 at 9–16.

Unchastened, the government continued its arbitrary conduct, leaving Concord to guess at what the government had up its sleeve. Late on Friday, October 4, 2019, in response to the Court's oral order during the September 16 status hearing on the motion for a supplemental bill of particulars, and three days before Concord's renewed motion to dismiss was due, the government advised undersigned counsel in a letter that it intends to "argue at trial" that the defendants conspired to cause certain named U.S. persons and organizations to unwittingly act as agents of an unidentified foreign principal and "therefore either the individuals or organizations or the conspirators (or both) would have had a legal duty to register under [FARA.]" **Ex. 35**, Oct. 4, 2019 Letter from United States Attorney to E. Dubelier.

While this charge came across as just a routine development, through the course of 19 months of pre-trial litigation, numerous hearings, and hundreds of pages of briefing related to Concord's motions to dismiss and for bills of particulars, to that point the government had never once notified Concord or the Court of its intent to use this new theory. Nor did the government ever argue that the Original Indictment actually charged such a theory. And its October 4 letter did not disclose specifically who, if anyone, had any legal duty to register under FARA, or who,

specifically, is the foreign "principal" in this instance.   In point of fact, the government's revelation of its brand-new, never-before-used FARA theory underscored just how arbitrary this prosecution had become.

Consider the sequence.   In its late-August 2019 supplemental bill of particulars motion, Concord noted that with respect to FARA, an agent of a foreign principal would be subject to FARA only for conduct within the United States.   ECF 181 at 22–24.   Concord further noted the absence of any case law suggesting that a foreign person using the internet *outside* of the United States would be subject to FARA.   *Id.*   In its September 3 opposition, the government argued that the indictment alleged "that the *conspirators* were required . . . to register under . . . FARA . . . ." ECF 194 at 13 (emphasis added).   Following the Court's September 16 oral order, the government sought to delay the time to comply with that order and supplement its bill of particulars, resulting in the 18-day gap between the order and the October 4 letter.   *See* ECF 205. In the meantime, during that 18-day period, on October 1, Concord filed a motion to strike as prejudicial allegations relating to lawful conduct with respect to racial issues in the United States.   ECF 208 at 9–10.   Then, just three days later, the government proffered its brand-new FARA theory that includes the argument that certain U.S. persons, who are predominantly African-American, were duped by the Defendants into failing to register under FARA.   *See* **Ex. 35**.   That theory, however, had no grounding in the Original Indictment.   Count One of that Indictment referenced FARA in paragraphs 1, 7, 26, 48 and 51.   But none of these references supports a theory of culpability that the co-conspirators caused unwitting U.S. persons or organizations to engage in conduct that gave rise to a duty for someone to register under FARA.

Then, consider the context surrounding the government's October 4 disclosure.   Prior to that disclosure, not a single filing or document in the case reflected the government's newly

- 19 -

contrived FARA theory.  The government's opposition to Concord's July 2018 motion to dismiss argued that the Original Indictment discussed in detail the charged conduct.  ECF 56 at 6–8.  In particular, the government stated that the Original Indictment specified the Defendants' deceitful practices, such as that "defendants did not register as foreign agents with the United States Department of Justice."  *Id*. at 7 n.4 (citing Orig. Ind. ¶ 48).  Similarly, in opposing Concord's motion for a bill of particulars, the government argued that the Original Indictment clearly described the charges, specifically referenced the above language in its opposition to the motion to dismiss, and stated that the opposition "describes in detail the government's theory of Concord's criminal liability, including an explanation of the relevant statutory provisions of [FARA.]"  ECF 111 at 3.  And more recently, in opposing Concord's motion for a supplemental bill of particulars, the government claimed the Original Indictment "alleges that the ***conspirators*** were required to . . . register under FARA . . . ."  ECF 194 at 13 (emphasis added).  But nowhere in these various submissions did the government argue—or even hint—that the theory of causing unwitting U.S. persons or organizations to fail to register under FARA is alleged in the Original Indictment.  Quite the opposite.

For its part, the Court didn't perceive the new theory either.  When directing the government to provide a bill of particulars with respect to the FARA allegations, the Court determined that the Original Indictment alleged that "***foreign nationals***" were required to disclose certain information about themselves to U.S. agencies.  ECF 136 at 1–2 (emphasis added).  The Court further concluded that had Concord (and the other Russian defendants) complied with FARA, "***they***" would have had to disclose their Russian identities and affiliations to U.S. regulators.  *Id*. (emphasis added).  Similarly, the Court stated that the "***defendants and their co-conspirators***" impaired government functions by failing to register under FARA.  *Id*. at

- 20 -

2 (emphasis added); *see also id.* at 12 (ordering the government to identify with respect to FARA the disclosure provisions "*the defendants or their co-conspirators*" allegedly violated) (emphasis added).

> ### 5.     The Arbitrariness Becomes Insidious:  On Pretext, The Government Obtains A Superseding Indictment That Materially Prejudices Concord.

In its renewed motion to dismiss and motion for the grand jury instructions, Concord fully exposed how and why the government's new FARA theory lacked grounding in the Original Indictment.  ECF 210, 217.  Concord also demonstrated the settled custom and practice in the USAO DC, consistent with DOJ policy, of alleging willfulness when charging § 371 defraud conspiracies and how the Original Indictment here broke sharply from that settled practice.  ECF 210 at 9–11.  Yet in its October 21 and October 30, 2019 oppositions to Concord's two motions (ECF 219, 224), the government barely acknowledged Concord's challenges to its new FARA theory, and it didn't dispute that the theory represented an unconstitutional constructive amendment of the Original Indictment.  Nor did the government dispute that the Original Indictment was a sharp break from the USAO DC's own custom and practice in charging § 371 defraud conspiracies.[20]  Now we know why:  the government seemingly had planned to include the new FARA allegation in its then-forthcoming Superseding Indictment and (presumably) believed that by having the USAO DC sign off on the *Superseding* Indictment, that somehow might refute Concord's argument that the USAO DC would not have

---

[20]    The government made a feeble effort to try to show that it doesn't always charge willfulness in § 371 defraud conspiracy indictments by pointing to a Southern District of New York indictment filed *after* Concord's renewed motion to dismiss.  ECF 219 at 12.  But as noted above, just a few weeks ago, the government *did* charge willfulness in a § 371 defraud conspiracy indictment in the District of Maryland—in a case against a U.S. citizen, who is far more likely than a Russian company to know the lawful function purportedly obstructed.  **Ex. 26**.

brought the *Original* Indictment.   But one does not follow the other, and the USAO DC's apparent made-for-litigation use of the Superseding Indictment—to try to rebut what the history of its § 371 charging practice clearly shows—exposes just how arbitrary this prosecution is.

As for including the new FARA theory in its Superseding Indictment, that reinforces the arbitrariness point and then some.   To begin with, the government never told Concord or the Court what it was up to.   On the contrary, the government twice assured the Court that it would ***not*** even seek a superseding indictment in this case.   Mar. 7, 2019 Hr'g Tr. at 9:25–10:2; Sept. 16, 2019 Hr'g Tr. at 15:12–16.   After going back on its assurance and revealing its intent to do just that, ECF 244, the government then engaged in more misdirection, advising the Court that the Superseding Indictment would be sought solely for the purpose of adding the allegation the Court found the Original Indictment lacked—that the alleged § 371 conspiracy included an agreement to interfere with the FEC's enforcement of the restrictions on certain election-related expenditures by foreign nationals.   ECF 245 at 1–2.   In this regard, the government stated unequivocally that "[i]n light of the Court's decision" denying the government's motion to clarify or reconsider:

> [T]he government intends to ask the Grand Jury to issue a superseding indictment that alleges a conspiracy to interfere with more than one lawful function of the [FEC]; that is, that the defendants not only conspired to interfere with the enforcement of the disclosure requirements set forth in the [FECA], but that they also conspired to interfere with the related FEC function of enforcing the statutory ban on certain expenditures by foreign nationals.

*Id.*   That's it.   No mention of FARA or the new FARA theory.   Not even a hint.

The government stayed true to form at ensuing hearings and communications with Concord.   In a sealed *ex parte* hearing on October 29, it was abundantly clear that the Court believed—understandably—that the government sought a superseding indictment strictly to add the foreign-national expenditure ban allegation that the Court said the Original Indictment

lacked.  *See generally* Oct. 29 Hr'g Tr.  The government played along, never mentioning FARA or the new theory the government added in the Superseding Indictment despite the Court's expressed understanding of the limited scope of any such new Indictment.  *Id.*  And when the government finally revealed to Concord the next day (October 30) its intent to seek a superseding indictment—two days *after* Concord's filing of its reply brief in support of its renewed motion to dismiss (ECF 221)—it said exactly the same thing.  **Ex. 36**, Oct. 30, 2019 Letter from United States Attorney to E. Dubelier.  Again, no mention of FARA or the new FARA theory.

When the Superseding Indictment was revealed on November 8, 2019, however, the new FARA theory was stage center, with specific allegations never made before.  *See* Superseding Indictment ("Super. Ind.") ¶ 48, ECF 247 (alleging that "Defendants and their co-conspirators . . . caused unwitting persons to produce, purchase, and post advertisements on U.S. social media and other online sites expressly advocating for the election of then-candidate Trump or expressly opposing Clinton" and that "Defendants and their co-conspirators did not report these expenditures to the Federal Election Commission, or register as foreign agents with the U.S. Department of Justice, nor did any of the unwitting persons they caused to engage in such activities"); *id.* ¶ 51 (alleging that "Defendants and their co-conspirators . . . caused unwitting persons to organize and coordinate political rallies in the United States" and that those "unwitting persons" "did not register as foreign agents with the U.S. Department of Justice").  These were not the only new allegations, however.  In addition to the new allegation everyone expected—that Defendants conspired to interfere with "the enforcement of the statutory prohibition on certain election-related expenditures by foreign nationals" (Super. Ind. ¶ 7)—the Superseding Indictment also refers to unspecified "influence-related conduct" that supposedly

must be disclosed to the Attorney General.  *Id.* ¶ 1.[21]

## III.   LEGAL STANDARDS AND SUMMARY OF ARGUMENT

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. Proc. 12(b)(1).  This includes "a defect in the indictment or information" such as "failure to state an offense."  *Id.* 12(b)(3)(B), (B)(v). Challenges to the lawfulness of this prosecution on constitutional and other grounds can be asserted in a Rule 12(b) motion.  *See United States v. Park*, 297 F. Supp. 3d 170, 174 (D.D.C. 2018).  Concord challenges the prosecution at this juncture on two independent and dispositive grounds:  (1) the prosecution is unlawful under the Due Process Clause; and (2) the Indictment, given the controlling burden of proof, fails to state an offense and is incurably defective.

First, the Due Process Clause forbids the kind of arbitrary prosecution the government has conducted against Concord.   From its inception, this prosecution has been an act of manipulation and, through the artifice of a special counsel appointment, has broken sharply from established USAO DC and DOJ policy, practice, and precedent.   The charge itself is unprecedented and the Special Counsel and the government abandoned all pretenses of neutrality by publicly declaring Concord's purported guilt, and changing, repeatedly, their view of the Original Indictment and what Concord was charged with doing.  To make matters worse, the government then pursued the Superseding Indictment in an equally mischievous way—only adding to the arbitrariness of its treatment of Concord—and that Indictment cannot now alter the consistent historical practice of the USAO DC in charging willfulness in § 371 defraud

---

[21]   Based on the Superseding Indictment, the Court denied without prejudice Concord's October 7, 2019 renewed motion to dismiss the Original Indictment, and directed it to file any motion to dismiss the Superseding Indictment by November 26, 2019.  *See* Nov. 12, 2019 Minute Order denying without prejudice renewed motion to dismiss (ECF 210) and motion for disclosure of grand jury instructions (ECF 217).

conspiracies.  The Constitution will not tolerate an arbitrary prosecution like this one and this Court should call a halt in these circumstances.

Second, the Superseding Indictment should be dismissed because it fails to allege that Concord had knowledge of the specific statutes and regulations related to elections and influencing public opinion that it allegedly conspired to interfere with, but which the government only recently identified—or, at a minimum, that Concord knew its status as a foreign-national corporation imposed disclosure and registration duties on it under U.S. law that, if not performed, would subject Concord to criminal prosecution.  The government has no evidence that Concord knew about the existence of these statutes and regulations at the time of the alleged conspiracy in question.  At the same time, the Supreme Court's recent decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), requires a fresh look and compels close scrutiny of the government's *mens rea* allegations—or lack thereof—which raise a constitutionally intolerable risk that Concord may be convicted for purely innocent conduct.  The Superseding Indictment does not allege and the government cannot prove the elevated form of *mens rea* that the controlling law mandates in this particular defraud conspiracy case.  Dismissal is the appropriate remedy for this deficiency as well.

## IV.    ARGUMENT

### A.    The Superseding Indictment Should Be Dismissed Because This Prosecution Violates Due Process.

#### 1.    The Due Process Clause, Animated By Bedrock Systemic Principles, Prohibits Arbitrary Government Prosecutions.

The "Due Process Clause, like its forebear in the Magna Carta, was 'intended to secure the individual from the arbitrary exercise of the powers of government[.]'"  *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (citations and internal quotation marks omitted).  The very "touchstone of due process is protection of the individual against arbitrary action of government[.]"  *Wolff v.*

*McDonnell*, 418 U.S. 539, 558 (1974) (citation omitted).  Simply put, "arbitrary power resides nowhere in our system of government[.]"  *Champion Lumber Co. v. Fisher*, 227 U.S. 445, 448– 49 (1913) (citation and internal quotation marks omitted).  Given its fundamental purpose, the Due Process Clause applies in a variety of contexts, as needed, to check the arbitrary exercise of government power.

Criminal prosecutions certainly are no exception given the "especially severe consequences" that can result from them.  *See Rivera v. Minnich*, 483 U.S. 574, 581 (1987). Thus, "[i]t is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (citation omitted); *see also Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016) (reversing judgment affirming death-penalty sentence under Due Process Clause where lower-court justice had, in his prior capacity as district attorney, authorized the death penalty in that very case).  The Due Process Clause likewise extends its protections against arbitrary government treatment beyond the courtroom to the conduct of the prosecution itself.  Indeed, the Supreme Court has left no doubt just how deeply destructive of our constitutional order arbitrary prosecutorial conduct can be.  *See Marinello v. United States*, 138 S. Ct. 1101, 1109 (2018) ("[I]nsofar as the public fears arbitrary prosecution, it risks undermining necessary confidence in the criminal justice system").  The prosecutor plays a "special role . . . in the search for truth in criminal trials."  *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  Prosecutors must see "that justice shall be done[,]" *Berger*, 295 U.S. at 88, and they must "be sensitive to the due process rights of a defendant to a fair trial."  *Gannett Co. v. DePasquale*, 443 U.S. 368, 384 n.12 (1979).

Preventing arbitrary prosecutorial conduct similarly animates the Due Process Clause's command that Congress speak clearly and unambiguously in its enacted statutes.  Due process

"requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'" *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974) (citations omitted).  The Supreme Court reiterated this critical safeguard in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), stressing that due process "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Id.* at 1212 (citation omitted).

By design, due process operates in a "quite sweeping" manner, invalidating laws that "'authorize[] or even encourage[] arbitrary and discriminatory enforcement.'" *Johnson v. United States*, 135 S. Ct. 2551, 2566 (2015) (citation omitted).  Arbitrary prosecutorial conduct is at the heart of this due process safeguard because, as Justice Gorsuch pointedly explained in his concurrence in *Dimaya*, "vague laws invite the exercise of arbitrary power . . . by leaving the people in the dark about what the law demands[,]" which in turn "allow[s] prosecutors and courts to make it up."  138 S. Ct. at 1223–24 (Gorsuch, J., concurring in part and concurring in the judgment); *see also Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03 (1966) ("arbitrary enforcement" of law leaves government "free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case") (citations omitted).

To preserve and implement these constitutional imperatives, the Supreme Court has stressed that "the state [must] wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters.  We have always been sensitive to the possibility that important actors in the criminal justice system may be influenced by factors that threaten to compromise the performance of their duty." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987) (plurality op.); *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249–250 (1980) (rejecting the notion "that the Due Process Clause imposes no

limits on the partisanship of administrative prosecutors" and stressing that where "irrelevant or impermissible factors [are injected] into the prosecutorial decision[, that may] raise serious constitutional questions") (citations omitted).

Our highest court also has assured that "'[s]electivity in the enforcement of criminal laws is . . . subject to constitutional constraints.'" *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). Thus, the Constitution forbids basing "the decision to prosecute . . . 'upon an . . . arbitrary classification,' . . . including the exercise of protected statutory and constitutional rights." *Id.* (citations omitted). The Constitution likewise prohibits unfair tactics during a prosecution that demonstrate arbitrary and discriminatory treatment of a criminal defendant, *see, e.g.*, *Berger*, 295 U.S. at 85, 89 (reversing conviction because the government's evidence was weak and "[t]he prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury"), including when those tactics raise the specter that the government is retaliating against the defendant for exercising its constitutional right to defend itself when other similarly situated defendants have not done so. *See Wayte*, 470 U.S. at 608 (recognizing prohibition against prosecutorial decisions made in retaliation for the exercise of constitutional rights); *cf. Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (noting due process violation can arise where government's conduct raises "the danger that the State might be retaliating against the accused for lawfully attacking his conviction") (citation omitted).

While the Supreme Court precedents discussed above implicate a variety of fact patterns, their reasoning reflects a singular message: the Due Process Clause is intended to ensure fair, neutral, and non-discriminatory government action. At its core, the Due Process Clause is intended to check and prevent arbitrary government conduct—of whatever kind, by any actor, in

every branch, prosecutors and Executive-Branch officials included.

>    **2.    The Government's Prosecution Of Concord Violates The Due Process Clause.**

When constitutional limits are transgressed, "it is necessary to draw a line[.]" *Duncan v. Louisiana*, 391 U.S. 145, 160 (1968). And wherever the line separating zealous from arbitrary prosecutions is precisely, the record now shows the government has transgressed it here.

*First*, the arbitrary nature of this prosecution was evident at the outset when it was conducted not by the USAO DC or a line DOJ prosecutor, but by a Special Counsel who justified his appointment on the basis of a pretextual "conflict of interest" that later disappeared without explanation.

*Second*, the arbitrariness continued with the government's efforts to skirt the heightened *mens rea* requirements of the FECA and FARA provisions it relies on by cloaking the Original Indictment, and now the Superseding Indictment, in defraud-clause language. That sleight-of-hand, first accomplished by the Special Counsel, is deliberately intended to avoid a burden the government knows it cannot meet, leaving Concord as the victim of its manipulation. *See United States v. Bridges*, 346 U.S. 209, 223–24 (1953) (rejecting government's attempt to use defraud clause as a "cloak" to avoid adverse consequences of charging under the offense clause); *see also United States v. Rosenblatt*, 554 F.2d 36, 41 (2d Cir. 1977) (rejecting government's contention that it was free to elect between the clauses "in cases where they overlap, in such a way as to produce the most favorable result" for the government); *see also Dennis v. United States*, 384 U.S. 855, 863 (1966) (accepting government's charge under defraud clause instead of offense clause, but only because the defraud allegation there "properly reflect[ed] the essence of the alleged offense" and, unlike the charge here, did "not involve an attempt by prosecutorial sleight of hand to overcome" a limitation on the government were it to make an offense-clause charge).

*Third*, the arbitrary treatment further manifested itself when the Special Counsel jettisoned DOJ's *Charging Policies* and *Criminal Resource Manual* to create a crime to fit the facts. That arbitrary departure from the *Charging Policies* and *Manual* was especially significant given that, as detailed above, the USAO DC had a well-established practice of charging willfulness in § 371 defraud-clause indictments, and would not have charged the § 371 conspiracy here—omitting "willful" as a prerequisite to the offense—had it been in charge and followed its own past practice and DOJ policy. The significance of this cannot be overstated. Had policy and practice been followed, as in almost every other § 371 defraud conspiracy case in this District, and every other FARA or FECA case nationally, there is no question that neither the Original nor the Superseding Indictment would have been brought because there is no evidence of willfulness—or, if brought, each would have alleged willfulness as an element that the government would have to prove beyond a reasonable doubt. And, as discussed below, the fact that the USAO DC signed the Superseding Indictment does not—and cannot—hide the profound departure from the USAO DC's settled practice of charging willfulness in cases like this one.

*Fourth*, the Special Counsel and the Attorney General broke with norms again when they made high-profile public statements asserting Concord's guilt in violation of this Court's rules, DOJ policy, and rules of professional conduct. Those statements further exposed the arbitrary nature of the prosecution—the government having declared that Concord was guilty as charged without the need for a trial. And while the Court did not penalize the earlier violations because the government said it would not do it again, it did do it again, and now Concord will face a trial in the next presidential election year, with the Secretaries of State and Treasury having said publicly that the allegations in the Original Indictment are true, and the U.S. Attorney for the Eastern District of Virginia saying publicly that the Russians (*i.e.*, Concord) are continuing to

interfere.

*Fifth*, the government, from the inception of this case, treated the charges against Concord as a moving target without regard for the limitations that ordinarily bind prosecutorial conduct in relation to an indictment, leaving Concord at a loss to determine what it must defend against.  The Original Indictment became a springboard for ever-evolving FECA and FARA theories which materially altered what the government claimed it would prove and would have to prove.  The latest piece of manipulation is the Superseding Indictment, which, as shown below, makes a mockery of the principles of fair notice that lie at the heart of Concord's Fifth Amendment right not to have "to answer a charge not contained in the indictment" itself, *Hitt*, 249 F.3d at 1016 (citation and internal quotation marks omitted), and severely impairs Concord's Fifth Amendment double-jeopardy right by beclouding exactly what Concord will (or won't) be tried for.  *See Sanabria v. United States*, 437 U.S. 54, 65–66 (1978) ("The precise manner in which an indictment is drawn cannot be ignored, because an important function of the indictment is to ensure that, 'in case any other proceedings are taken against [the defendant] for a similar offence, . . . the record [will] sho[w] with accuracy to what extent he may plead a former acquittal or conviction.'") (citation omitted).

In response, the government may say (as it previously did) that there is no controlling case exactly on point that has granted the relief Concord seeks.  But the Court already has agreed that there has never been a case like this before, *see* Oct. 15, 2018 Hr'g Tr. at 22:6–7, and the government elsewhere has acknowledged that "'[s]ilence by th[e Supreme] Court on a subject is not authority for anything.'"  Answer Br. of the United States at *30-31, *United States v. Woodard*, No. 19-5009 (10th Cir. Oct. 10, 2019), 2019 WL 5107398 (quoting *New York v. United States*, 505 U.S. 144, 203 (1992) (White, J., concurring in part and dissenting in part));

*see also New York*, 505 U.S. at 203  (reasoning that "it should go without saying that the *absence* of any on-point precedent from this Court has no bearing on the question" of what the Constitution means in a given case).

The government also has argued that any deception utilized by the Defendants is itself evidence of an agreement to defraud the United States.  But there has never been any case charging a conspiracy to defraud the United States constructed on this kind of meager proof, where multiple reasonable explanations exist for the alleged deceptive acts which the government refuses to consider.

Moreover, the most basic rationale supporting Concord's motion is not open to debate. The Due Process Clause calls for close scrutiny of government conduct "when the particular situation demands[.]"  *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (citation omitted).  Indeed, the "very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."  *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961) (citations omitted).  Here, the prosecution is once-in-forever, and it is fraught, by its very nature, with a bent towards arbitrary treatment.

The absence of a case exactly on-point is simply a function of the never-before-brought prosecution the government has mounted, but is nevertheless illustrative of the very arbitrary targeting that prosecutors are constitutionally obligated to avoid.  Such "extreme cases often test the bounds of established legal principles," but they are also "more likely to cross constitutional limits, [thus] requiring [judicial] intervention"—especially "when[,]" as here, "due process is violated."  *Caperton*, 556 U.S. at 887 (citations omitted).  The Superseding Indictment therefore should be dismissed.

### 3. The Superseding Indictment Reinforces And Compounds The Due Process Violation Here.

Prosecutors ordinarily have wide discretion to seek superseding indictments. But they may not pursue them for an improper purpose or with an "improper motive." *See*, *e.g.*, *United States v. Marks*, No. 11-80072-CR, 2013 WL 4502319, at *3–4 (S.D. Fla. Mar. 5, 2013), *report and recommendation adopted*, No. 11-80072-CR, 2013 WL 4502309 (S.D. Fla. Aug. 23, 2013). That, however, appears to be—at least in large part—what drove the government to seek the Superseding Indictment here. Far from curing the due process violation caused by the conduct of this prosecution, the Superseding Indictment reinforces and exemplifies its illegitimacy.

To begin with, the Superseding Indictment embodies an apparent deception. The government said it would seek that Indictment to add specific allegations relating to the ban on certain election-related expenditures by foreign nationals. *Supra* at 21–24. But the government's filing added its newly-conceived "unwitting Americans" FARA theory and other new allegations, none of which were previewed or identified. *Id.*

In addition, the Superseding Indictment amounts to nothing more than a convenient litigating position aimed, *post hoc*, at Concord's unrebutted showing of the USAO DC's consistent practice of alleging willfulness in § 371 defraud conspiracies. This after-the-fact adjustment is not unlike the government's midstream rewriting of the *Charging Policies* during this case to change the burden of proof for election-related § 371 defraud conspiracies. Both underscore that the government will do whatever it takes to obtain a conviction, even if it means changing the rules as to Concord along the way.

Lastly, the Superseding Indictment further confirms that the government's previous attempts to insert its new "unwitting Americans" FARA theory by letter and brief were unconstitutional efforts to constructively amend the Original Indictment, which conspicuously

lacked the new-FARA-theory allegations contained in the Superseding Indictment.  Yet when that unlawful gambit was exposed, the government made another after-the-fact pivot and included the theory in the Superseding Indictment; a theory that has never before been used and which is contrary to the plain language of FARA.  *Infra* at 43–45.

Concord recognizes that superseding indictments can be used to bring additional charges when the record permits it.  But the routine utilization of such indictments has no relevance to what has occurred here or the argument Concord is advancing.  Concord has established that there is nothing ordinary about this prosecution—up to and including the filing of the Superseding Indictment.  The path leading to that filing was deceptive, and deliberately so, continuing the arbitrary treatment that has marked this prosecution since its inception.  The content of the Superseding Indictment is a further manifestation of that arbitrary treatment, particularly in the novel FARA theory it embodies.  Indeed, the Superseding Indictment is "Exhibit A" underscoring the lack of fairness or neutrality in this prosecution and it reveals, starkly, the prosecution's illegitimacy.  This case should be dismissed for this reason, just as due process demands.

**B.     The Superseding Indictment Should Be Dismissed Because It Fails To Allege The Requisite *Mens Rea*.**

Concord previously argued that the government must show Concord knew about the specific statutes and regulations—left unidentified in the Original Indictment—that it allegedly conspired with others to impair.  At that time, the Court thought otherwise and ruled accordingly.  But key aspects of the Court's reasoning for rejecting Concord's *mens rea* argument are subject to reexamination in light of (i) the Supreme Court's recent decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), and (ii) how the government now views its case.

The reasoning and holding in *Rehaif* necessitates a fresh look at the *mens rea* the

government must prove to meet its § 371 defraud conspiracy burden of proof as to Concord. That look, in turn, reveals the need for the government to show, at a minimum, that Concord knew that because of its status as a foreign corporation, its alleged funding of IRA created a duty for one or more of the alleged co-conspirators to register with the DOJ and to file reports with the FEC, and that the failure to do so was unlawful.

**1.      Recent Supreme Court Precedent, Reinforced By Recent D.C. Circuit Precedent, Requires A Heightened *Mens Rea* For This § 371 Defraud Conspiracy.**

In *Rehaif*, the defendant was charged with violating 18 U.S.C. § 922(g), which bars aliens who are unlawfully present in the United States from possessing firearms.  The penalty provision for § 922(g) is contained in § 924(a)(2), which requires the government to prove that the defendant acted "knowingly."   In *Rehaif*, the Supreme Court held that the "knowingly" requirement applied to both the firearm-possession and the unlawful-presence elements of the statute.  139 S. Ct. at 2194.  The Court stressed the longstanding and critical role scienter plays in "helping to 'separate those who understand the wrongful nature of their act from those who do not.'"   *Id.* at 2196 (citation omitted).   That role was especially called for in *Rehaif* because, "[a]ssuming compliance with ordinary licensing requirements, the possession of a gun can be entirely innocent."  *Id.* at 2197 (citation omitted).

The *Rehaif* Court proceeded to reject the government's contention that based on the maxim "ignorance of the law is no excuse," the government was not required to prove the defendant knew he was unlawfully present in the U.S.  That maxim, the Court explained, "normally applies where a defendant has the requisite mental state in respect to the elements of the crime but claims to be 'unaware of the existence of a statute proscribing his conduct.'"   *Id.* at 2198 (quoting 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 5.1(a), p. 575 (1986)).  But it "does not normally apply where a defendant 'has a mistaken impression concerning the legal

effect of some collateral matter and that mistake results in his misunderstanding the full significance of his conduct,' thereby negating an element of the offense." *Id.* (quoting 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 5.1(a) p. 575 (1986)).  The latter was the case in *Rehaif* because the "defendant's status as an alien 'illegally or unlawfully in the United States' . . . is what the commentators refer to as a 'collateral' question of law.'"  *Id.*  That is, a "defendant who does not know that he is an alien 'illegally or unlawfully in the United States' does not have the guilty state of mind that the statute's language and purposes require."  *Id.*

The D.C. Circuit's recent decision in *United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019), reinforces *Rehaif*'s central point—that *mens rea* must be tied closely to each element of the statute to ensure that innocent conduct is not ensnared.  The D.C. Circuit rejected a jury instruction that required the government to prove only generally that the defendant "acted with knowledge that his conduct was unlawful."  *Burden*, 934 F.3d at 692.  More was required on the facts before the court, however, because there was "evidence of willfully unlawful conduct apart from the charged offenses, creating a risk that the jury may consider any and all evidence of the defendant's guilty mind—whatever its object—as supporting willful commission of the charged offense."  *Id.*  "The requirement that the *mens rea* relate to the charged *actus reus* is the baseline for any criminal mental standard."  *Id.* at 692–93 (citation omitted).

*Rehaif* and *Burden*, read together, demand rigorous scrutiny of criminal charges and strict adherent to specific and heightened *mens rea* requirements where, as alleged, there is a serious risk of ensnaring innocent conduct.[22]  That risk is already great in the mine run of conspiracy

---

[22]   That § 371 does not explicitly contain a scienter requirement like the "knowingly" standard in the statute in *Rehaif* is of no moment.  As *Rehaif* itself makes clear, the presumption in favor of finding a scienter requirement in a criminal statute applies "even when Congress does not specify any scienter in the statutory text."  *Rehaif*, 139 S. Ct. at 2195 (citation omitted).

cases, and greater still in § 371 defraud conspiracy cases.  *See Dennis*, 384 U.S. at 860.  It is especially high where, as here, the government's case rests on the Defendants' status and purported failures to act—in this case, failures to disclose or register—under arcane and obscure statutes and regulations that impose duties based on Defendants' status, but that themselves require proof of willfulness before criminal sanction can be attached for violations of their requirements.  There is no statute in the federal criminal code that proscribes "interference" with an election or prohibits a foreign national from pretending to be an American on the internet.  And the risk of criminalizing lawful conduct is even greater still where, as here, the government has taken statutes and regulations that are ambiguous and just dumped them into the Superseding Indictment.  This creates a significant risk that Concord could be convicted simply because foreign nationals associated with IRA played make-believe on the internet.

*Rehaif*'s clarification of the "ignorance of the law is no defense" principle provides further reason for renewed reflection on the requisite burden of proof.  *Rehaif* makes clear that the maxim plays no role in this case because the relevant "ignorance of the law" here—ignorance of both the specific statutes and regulations with which the government claims Concord conspired to interfere, *and* of the legal duties that flow from Concord's status—"'concern[s] the legal effect of some collateral matter" which would "result[] in [a] misunderstanding [of] the full significance of" the conduct alleged, and "thereby negat[e] an element of the [§ 371] offense": interference with a lawful governmental function.  *Rehaif*, 139 S. Ct. at 2198 (citation and internal quotation marks omitted).

To eliminate the risk of convicting simply innocent conduct that *Rehaif* and *Burden* condemn, the government must be required to prove, and the Court must satisfy itself that the grand jury found, that Concord knew either it or specific co-conspirators had legal disclosure and

registration duties under U.S. law because of Concord's status as a foreign-national corporation. Here, it is knowing interference with a "lawful governmental function"—and not knowing deception alone—that makes the difference under § 371.  Just as lack of knowledge of one's legal status in *Rehaif* threatened to subject otherwise innocent conduct—possession of a firearm—to criminal punishment, lack of knowledge of whether particular "lawful governmental functions" were being obstructed by the Defendants' alleged conspiracy threatens to subject otherwise innocent conduct—failures to disclose or register not necessarily required by law—to criminal punishment.  *See also Liparota v. United States*, 471 U.S. 419, 425 n.9 (1985) (requiring knowledge that defendant knew his use of food stamps violated the law where the statute at issue required proof that stamps were used in a "manner not authorized by the statute or regulations") (reaffirmed and discussed approvingly by *Rehaif*, 139 S. Ct. at 2198); *cf. United States v. Rafiekian*, No. 1:18-cr-457-AJT-1, 2019 WL 4647254, at *18 (E.D. Va. Sept. 24, 2019) (conditionally granting new trial on § 371 conspiracy conviction where jury was required to be (but was not) instructed that "the Government must prove not only that the [underlying conduct] the defendant was engaged in was illegal [under the offense-defining statute] but also that the defendant knew it was illegal[,]" an instruction necessary to prevent "'criminaliz[ing] a broad range of apparently innocent conduct'") (quoting *Liparota*, 471 U.S. at 426).[23]

---

[23]   There is a clear parallel between the relevant statutory language in *Liparota*—"use[d] . . . in a[ ] manner not authorized by statute or regulations"—and the relevant, judicially engrafted portion of § 371's defraud clause—"interference with a lawful governmental function."

**2.      Settled Due Process Principles Requiring Fair Notice And Neutral Prosecution, When Coupled With The Rule Of Lenity, Underscore The Need For A Heightened *Mens Rea* Requirement.**

Due process principles and the rule of lenity reinforce what *Rehaif* and *Burden* demand on the particular facts of this case and require, at a minimum, a heightened *mens rea* to avoid the constitutional problems engendered by the government's charge.   *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (reading statute to require *mens rea* to avoid constitutional problem of criminalizing innocent conduct).

*First*, allowing Concord to be convicted for interfering with supposed "lawful governmental functions" created by ambiguous statutes and regulations that neither Concord nor its alleged co-conspirators knew about,[24] and which were first identified by the prosecution more than 18 months after the Original Indictment was filed, triggers serious fair-notice and rule-of-lenity concerns.  Due process "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes" and "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Dimaya*, 138 S. Ct. at 1212 (citations omitted).  Courts enforce these principles through the "rule of lenity," which directs that criminal statutes be applied "only to conduct clearly covered[,]" *United States v. Lanier*, 520 U.S. 259, 266 (1997) (citations omitted), and "'requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them[,]'" *United States v. Cano-Flores*, 796 F.3d 83, 93–94 (D.C. Cir. 2015) (citation omitted).

There was no way Concord could have known—at the time it allegedly acted—that "lawful governmental functions" encompassed the specific FECA and FARA statutes and

---

[24]   This is not a question of fact to be resolved at trial because the government has not produced any discovery to prove such knowledge, and has conceded that no such evidence exists.  ECF 206 at 6.

regulations not revealed by the government until *August 2019*.  FECA and FARA already are widely considered to be among the most inscrutable provisions in the ever-burgeoning federal criminal code.  That is particularly so for foreign nationals, many of whom "no doubt are unaware of the statutory ban on foreign *expenditures*," *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 292 (D.D.C. 2011) (Kavanaugh, J.), and surely of the complex and technical requirements of FECA, and FARA as well.  It stands to reason, then, that FECA and FARA themselves criminalize only "willful" violations of their obscure requirements.  ECF 74 at 18; *see also* 52 U.S.C. § 30109(d) (FECA); 22 U.S.C. § 612(d) (FARA); 22 U.S.C. § 618(a)(2) (FARA).

The fair-notice problems endemic to FECA and FARA-based prosecutions are particularly acute in a case like this one, where the government's Superseding Indictment is trained on a foreign national's status and supposed crimes of omission—failures to disclose and register.  Those who violate laws that require disclosure of information or registration may be completely "unaware of any wrongdoing."  *Lambert v. California*, 355 U.S. 225, 228 (1957). Indeed, in *Lambert*, the Court recognized an exception to the "ignorance of the law is no excuse" maxim where the conduct was "passive" and consisted of a failure to register.  *Id.* at 228.

Here, even if Concord had known of the specific but obscure statutes and regulations the government recently disclosed and refers to in the Superseding Indictment, it reasonably could read them far differently than the government now suggests.  *See* ECF 181 at 9–24 (detailing the multiple instances of ambiguity in the FECA and FARA provisions identified by the government in its bill of particulars).  And that reading, as the rule of lenity dictates, must prevail.  *See Cano-Flores*, 793 F.3d at 94; *see also*, *e.g.*, *United States v. Craig*, No. 1:19-cr-00125-ABJ, 2019 WL 3604630, at *29 (D.D.C. Aug. 8, 2019) (dismissing charge for violating FARA §§ 612 and

618(a)(2) under the rule of lenity).   Indeed, in the end, without the elevated *mens rea* Concord advocates, § 371's defraud clause—as the government seeks to apply it to Concord here based on the obscure FECA and FARA disclosure and registration provisions—"is so difficult for the average person to understand that the Constitution *forbids* [Concord's] conviction without such proof" of that *mens rea*.  *United States v. Class*, 930 F.3d 460, 470 (D.C. Cir. 2019).

**Second**, without a requirement that Concord knew about the specific statutes and regulations with which it is alleged to have interfered, the threat of tactical and discriminatory enforcement of § 371 by the government far exceeds what the Constitution can tolerate.  *See Kincaid v. Gov't of Dist. of Columbia*, 854 F.3d 721, 729 n.2 (D.C. Cir. 2017) (Kavanaugh, J.) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.") (quoting *Batchelder*, 442 U.S. at 125)).   This threat is realized in this very case given the substantial evidence that Concord—whose alleged connection to IRA was publicly known before the Special Counsel was even appointed—already has been prosecuted and otherwise treated arbitrarily by the government since the inception of this proceeding.   A "prosecutor's charging decision cannot be 'motivated solely by a desire to [achieve] a tactical advantage by impairing the ability of a defendant to mount an effective defense'"—in such a case, "'a due process violation might be shown.'"  *United States v. Sherman*, 150 F.3d 306, 313 (3d Cir. 1998) (citation omitted).

As evident in the facts of this case, the risk of discriminatory enforcement inheres in § 371 because offense-clause conspiracies require "at least the degree of criminal intent necessary for the substantive offense itself."  *United States v. Feola*, 420 U.S. 671, 686 (1975) (citations omitted).   This only incentivizes prosecutors to try to cleverly package conspiracies to violate substantive statutes that require a heightened *mens rea* to support criminal punishment—

like the FECA and FARA provisions here—as § 371 defraud conspiracies to "interfere" with the "functions" created by those same statutes.  As noted, that is exactly what has happened here. The Superseding Indictment, like the Original one, walks, talks, and looks like a § 371 offense-clause conspiracy—not a defraud-clause one—and that presents serious issues all on its own. *Supra* at 29.  Given the extensive record revealing the arbitrary nature of this prosecution, the due process principles that must be brought to bear, and how the government now suggests it can prove its case, the government must be strictly held to the requirement of showing that Concord knew about the specific laws identified in the Superseding Indictment.

### 3.    The Superseding Indictment's Deliberate Omission Of The Requisite *Mens Rea* Allegations Compels Dismissal.

The grand jury did not charge Concord with having knowledge either of the statutes giving rise to the "lawful functions" at issue or, more generally, that Concord's status imposed various disclosure and registration duties on it under U.S. law.  But if, as shown, this is the type and heightened level of *mens rea* the government must prove in this first-of-its-kind conspiracy case, only the grand jury can cure that deficiency.

Criminal prosecutions are constitutionally "limited to the unique allegations of the indictments returned by the grand jury."  *Hitt*, 249 F.3d at 1016 (citations omitted).  The government therefore "cannot cure a defective indictment" later by clarifying the charges in "a bill of particulars" or at "oral argument."  *United States v. Conlon*, 628 F.2d 150, 156 (D.C. Cir. 1980).  Nor can jury instructions at trial belatedly fill holes left in an indictment like the gaping *mens-rea* one here.  *See, e.g.*, *United States v. Kingrea*, 573 F.3d 186, 194 (4th Cir. 2009) (holding that "subsequent jury instructions could not cure [indictment's] fatal" failure to allege a required element of conspiracy charge) (citation omitted); *United States v. Prentiss*, 206 F.3d 960, 965 (10th Cir. 2000), *on reh'g en banc*, 256 F.3d 971 (10th Cir. 2001) (failure to include

essential element of conspiracy in indictment is a "fundamental defect [that] cannot be cured by the absence of prejudice to the defendant or a jury instruction" (citation omitted)).  Thus, if the Court agrees that the government must prove the type and level of *mens rea* Concord advocates in this motion, the only course is to dismiss the Superseding Indictment and allow the government—if it chooses—to go back to the grand jury and try again:  for the third time.  *See Russell*, 369 U.S. at 771–72 (reversing where indictment omitted an essential fact).

### C.     The Superseding Indictment's Unprecedented Theory That Concord Caused "Unwitting" Americans To Violate FARA Fails As A Matter Of Law.

The Court should find, as a matter of law, that the government's new "unwitting Americans" FARA theory cannot support the § 371 defraud conspiracy charge against Concord because "causing" Americans to post and purchase political advertisements is not unlawful— indeed, it treads dangerously close to the First Amendment's core protections—and, at best, the theory makes out a § 371 offense-clause conspiracy, not a defraud-clause one.

The Superseding Indictment alleges that Defendants and their co-conspirators:

> caused unwitting persons to produce, purchase, and post advertisements on U.S. social media and other online sites expressly advocating for the election of then-candidate Trump or expressly opposing Clinton.  Defendants and their co-conspirators did not report these expenditures to the Federal Election Commission, or register as foreign agents with the U.S. Department of Justice, nor did any of the unwitting persons they caused to engage in such activities.

Super. Ind. ¶ 48; *see also id.* ¶ 51 ("Defendants and their co-conspirators . . . caused unwitting persons to organize and coordinate political rallies in the United States" and those "Defendants and their co-conspirators did not register as foreign agents with the [DOJ], nor did any of the unwitting persons they caused to engage in the activities described in this paragraph.").

These allegations get the government nowhere in its apparent quest to transform § 371's defraud clause into an all-purpose prosecutorial weapon of choice.  In fact, as noted above, the allegations don't even make out a defraud-clause conspiracy—they state an offense-clause one:

conspiring to violate FARA.  "[C]loak[ing]" its true claim in defraud-clause garb does not, and should not, get the government anywhere.  *See Bridges*, 346 U.S. at 223–24.

However conceived, the government's new FARA theory fails as a matter of law.  FARA does not prohibit producing, purchasing, or posting political advertisements advocating expressly for or against particular candidates, or "causing" someone else to do so.  Nor does FARA even prohibit causing a U.S. citizen to violate FARA's registration requirements—something the Superseding Indictment does not actually allege—and we are not aware of a single case or other authority that has ever held or suggested it does.  This is especially true where, as here, there is no evidence Concord even knew about FARA and its registration requirements.  And to boot, no U.S. person would have any idea anyhow that his or her mere political interactions with a foreign person would impose a legal duty to register—and the government alleges no facts to suggest they would.

In addition, any attempt to base criminal liability on encouraging U.S. citizens to produce, purchase, or post such political advertisements in the course of a U.S. presidential election steers directly into the heart of the First Amendment's core protections for political speech.  *See Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (noting that "political" speech "'occupies the highest rung of the hierarchy of First Amendment values'" (citation omitted)); *Az. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 749-50 (2011) (same).  Thus, the government's new FARA theory does not make out any unlawful conduct, and it therefore cannot support the § 371 defraud conspiracy charge against Concord.  *See*, *e.g.*, *In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000) (explaining that "there can be no finding of conspiracy" to commit an offense or defraud under § 371 based on election-law violations where the underlying wrongful "transaction described by the

government does not violate FECA").[25]

## V.     CONCLUSION

The prosecution of Concord is unconstitutional and Count One of the Superseding Indictment is incurably defective and should therefore be dismissed.

Dated: November 26, 2019

<div style="margin-left: 40%;">

Respectfully submitted,

CONCORD MANAGEMENT
AND CONSULTING LLC

By: /s/ Eric A. Dubelier
    Eric A. Dubelier (D.C. Bar No. 419412)
    Katherine J. Seikaly (D.C. Bar No. 498641)
    REED SMITH LLP
    1301 K Street, N.W.
    Suite 1000 – East Tower
    Washington, D.C. 20005-3373
    202.414.9200 (phone)
    202.414.9299 (fax)
    edubelier@reedsmith.com
    kseikaly@reedsmith.com

    James C. Martin[*]
    Colin E. Wrabley[*]
    REED SMITH LLP
    225 Fifth Avenue
    Pittsburgh, PA 15222-2716
    412.288.3131 (phone)
    412.288.3063 (fax)
    jcmartin@reedsmith.com
    cwrabley@reedsmith.com

    [*] *Admitted Pro Hac Vice*

</div>

---

[25]   The Court's November 2018 motion-to-dismiss ruling acknowledged this holding in *Sealed Case* but found it did not support dismissal of the entire Original Indictment because the government also alleged various forms of deception.  *See United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38, 48–49 (D.D.C. 2018).   But the relief sought here is narrower—that the new FARA theory allegations should be dismissed or stricken.