**Exhibit 16** to Memorandum of Points and Authorities in Support of Defendant Concord Management and Consulting LLC's Motion to Dismiss Count One of the Superseding Indictment, 18-cr-00032-2-DLF

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. _____ |
| | : | |
| v. | : | VIOLATION: 18 U.S.C. § 371 |
| | : | (Conspiracy to Defraud the United |
| CRÉDIT AGRICOLE CORPORATE | : | States and to Violate IEEPA and |
| AND INVESTMENT BANK, | : | TWEA) |
| | : | |
| Defendant. | : | FORFEITURE: 21 U.S.C. § 853(p); 18 |
| | | U.S.C. § 981(a)(1)(C); and 28 U .S.C. |
| | | § 2461(c) |

**INFORMATION**

The United States charges that:

General Allegations

1.      At all times relevant to this Information, Defendant, Crédit Agricole Corporate and Investment Bank ("CACIB"), was a financial institution registered and organized under the laws of France.

2.      Crédit Agricole S.A. ("CASA") is currently the largest retail banking group in France and one of the largest retail banking groups in Europe. As of December 31, 2014, CASA had €1.59 trillion of consolidated assets. CASA is headquartered in Montrouge, France. CASA has a number of subsidiaries and affiliates, including, among others, CACIB and Crédit Lyonnais ("CL"). CL was ultimately rebranded "LCL" and continues to operate an extensive retail banking network in France. The CASA group has a presence in over 60 countries, with 11,300 branches worldwide. CASA is listed on the Paris Stock Exchange (Euronext Paris). CASA acquired CL in and around 2003.

3.      CACIB is the result of a 2004 transfer of the corporate and investment banking operations of CL to another CASA subsidiary, Crédit Agricole Indosuez ("CAI"). CACIB

1

initially operated under the name "Calyon."  In 2010, it began operating under its current name, CACIB.  Hereinafter, regardless of whether the entity was operating under the name "Calyon" or "CACIB," the entity is identified as CACIB.

4. Crédit Lyonnais (Suisse) SA ("CLS") was a subsidiary of CL that CL operated in Switzerland prior to CASA's acquisition of CL.

5. Crédit Agricole Indosuez (Suisse) SA ("CAIS") was a subsidiary of CAI that CAI operated in Switzerland prior to CASA's acquisition of CL.

6. Crédit Agricole (Suisse) SA ("CAS") was formed in March 2005.  CACIB combined the operations of CLS and CAIS to form CAS.

7. Since at least 1997, and at all times relevant to this Information, CAI, and subsequently CACIB had a license issued by the state of New York to operate as a foreign bank branch in New York, New York.  Prior to the 2004 merger, CL had a license issued by the state of New York to operate as a foreign bank branch in New York, New York.

8. At all times relevant to this Information, CACIB, CLS, CAS, and CAIS conducted U.S. Dollar ("USD") clearing at CL's New York Branch, CACIB's New York branch, and the New York offices of unaffiliated U.S. financial institutions.  All of the New York branches and offices used for USD clearing were located in Manhattan, New York.

9. At all times relevant to this Information, CACIB and CASA were subject to oversight and regulation by the Board of Governors of the Federal Reserve, including the Federal Reserve Bank of New York ("FRBNY"), and CACIB was also subject to oversight and regulation by the New York State Department of Financial Services ("DFS").  Prior to the CACIB merger, CL was subject to oversight and regulation by the Board of Governors of the Federal Reserve, including FRBNY, and DFS.

The International Emergency Economic Powers Act

10. The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, among other things, administers and enforces economic and trade sanctions against certain foreign countries and entities associated with those countries, including institutions located in or controlled by Sudan and Iran ("Sanctioned Entities"). At all relevant times, OFAC was empowered to authorize transactions with Sanctioned Entities by granting licenses for transactions. In addition, OFAC administers and enforces economic and trade sanctions against Specially Designated Nationals ("SDNs").[1]

11. Over the years, the United States has employed sanctions and embargos with regard to Sanctioned Entities and SDNs. Those restrictions arose, in part, in response to repeated support by many of these Sanctioned Entities and SDNs for international terror against the United States.

12. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat.

13. It is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under IEEPA.

---

[1] OFAC publishes a Specially Designated National ("SDN") List, which includes individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and weapons of mass destruction proliferators designated under programs that are not country-specific.

*The Sudanese Sanctions*

14. On November 3, 1997, President Clinton issued Executive Order No. 13067, which imposed a trade embargo against Sudan and blocked all property and interests in property of the Government of Sudan. Effective July 1, 1998, OFAC issued the Sudanese Sanctions Regulations ("SSR"), 31 C.F.R. Part 538, to implement Executive Order No. 13067. On October 13, 2006, President George W. Bush issued Executive Order No. 13412 (collectively with Executive Order No. 13067, the "Sudanese Executive Orders"), which continued the comprehensive blocking of the Government of Sudan imposed by Executive Order No. 13067, but exempted the then-regional Government of South Sudan from the definition of the Government of Sudan. The Sudanese Executive Orders prohibit virtually all trade and investment activities between the United States and Sudan, including, but not limited to, broad prohibitions on: (i) the importation into the United States of goods or services from Sudan; (ii) the exportation or re-exportation of any goods, technology, or services from the United States or by a U.S. person to Sudan; and (iii) trade- and service-related transactions with Sudan by U.S. persons, including financing, facilitating, or guaranteeing such transactions. The Sudanese Executive Orders further prohibited "[a]ny transaction by any U.S. person or within the U.S. that evades or avoids, or has the purposes of evading or avoiding, or attempts to violate, any of the prohibitions set forth in [the SSR]." With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudanese sanctions generally prohibited the export of services to Sudan from the United States.

*The Burmese Sanctions*

15. In May 1997, President Clinton, pursuant to IEEPA, issued Executive Order No. 13047, finding that "the actions and policies of the Government of Burma constitute an unusual and extraordinary threat to the national security and foreign policy of the United States" and

4

"declare[d] a national emergency to deal with that threat." The Executive Order prohibited new investment in Burma by U.S. persons. The Executive Order also prohibited "any approval or other facilitation by a United States person, wherever located, of a transaction by a foreign person where the transaction would constitute new investment in Burma" and "any transaction by a United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions" set forth in the OFAC regulations.

16.     In July 2003, President Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta, and issued Executive Order No. 13310, which blocked all property and interest in property of other individuals and entities meeting the criteria set forth in that order. President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked. Executive Order No. 13310 also prohibited the importation into the U.S. of articles that are a product of Burma and the exportation or re-exportation to Burma of financial services from the U.S., or by U.S. persons, wherever located. The "exportation or re-exportation of financial services to Burma" is defined to include the transfer of funds, directly or indirectly, from the U.S.

*The Iranian Sanctions*

17.     On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat."

18.     President Clinton followed this with Executive Order No. 12959, issued on May 6, 1995, which imposed comprehensive trade and financial sanctions on Iran. These

5

sanctions prohibit, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the United States or by U.S. persons, wherever located.  This includes persons in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transshipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran.  On August 19, 1997, President Clinton issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders").  The Executive Orders authorized the U.S. Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITRs"),[2] 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

19.     With the exception of certain exempt transactions, the ITRs prohibit, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts.  One such exception would be transactions for which a validated export license had been obtained from OFAC, which was located in the District of Columbia.  The ITRs also prohibit transactions that evade or avoid, have the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs.  The ITRs were in effect at all times relevant to the conduct described below.

20.     While the ITRs promulgated for Iran prohibited USD transactions, they contained a specific exemption for USD transactions that did not directly credit or debit a U.S. financial institution.  This exemption is commonly known as the "U-turn exemption."

---

[2]     Effective October 22, 2012, the Department of the Treasury renamed and reissued the ITRs as the Iranian Transactions and Sanctions Regulations.

21.     The U-turn exemption permitted banks to process Iranian USD transactions that began and ended with a non-U.S. financial institution, but were cleared through a U.S. correspondent bank.  In relevant part, the ITRs provided that U.S. banks were "authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer . . . is by order of a foreign bank which is not an Iranian entity from its own account in a domestic bank . . . to an account held by a domestic bank . . . for a [second] foreign bank which is not an Iranian entity." 31 C.F.R. §560.516(a)(1).  That is, a USD transaction to or for the benefit of Iran could be routed through the United States as long as a non-U.S. offshore bank originated the transaction and the transaction terminated with a non-U.S. offshore bank.  These U-turn transactions were only permissible where no U.S. person or entity had direct contact with the Iranian bank or customer and were otherwise permissible (e.g., the transactions were not on behalf of an SDN).

22.     Effective November 10, 2008, OFAC revoked the U-turn exemption for Iranian transactions.  As of that date, U.S. depository institutions were no longer authorized to process Iranian U-turn payments.

<u>The Trading with the Enemy Act & Cuban Asset Control Regulations</u>

23.     Beginning with Executive Orders issued in 1960 and 1962, which found that the actions of the Government of Cuba threatened the U.S. national and hemispheric security, the United States has maintained an economic embargo against Cuba through the enactment of various laws and regulations.  Pursuant to the Trading with the Enemy Act ("TWEA"), 12 U.S.C. Section 95a et seq., OFAC has promulgated a series of rules and regulations that prohibit virtually all financial and commercial dealings with Cuba, Cuban businesses, and Cuban assets.

24.     Unless authorized by OFAC, the Cuban Assets Control Regulations ("CACRs") prohibit persons subject to the jurisdiction of the United States from engaging in financial transactions involving or benefiting Cuba or Cuban nationals, including all "transfers of credit and all payments" and "transactions in foreign exchange." 31 C.F.R. § 515.201(a). Furthermore, unless authorized by OFAC, persons subject to the jurisdiction of the United States are prohibited from engaging in transactions involving property in which Cuba or Cuban nationals have any direct or indirect interest, including all "dealings in . . . any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States" and all "transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States." 31 C.F.R. § 515.201(b). The CACRs also prohibit any "transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" set forth in the OFAC regulations. 31 C.F.R. § 515.201(c).

COUNT ONE

(CONSPIRACY TO DEFRAUD THE UNITED STATES AND
TO VIOLATE THE INTERNATIONAL EMERGENCY ECONOMIC
POWERS ACT AND THE TRADING WITH THE ENEMY ACT)

25.     The allegations contained in paragraphs 1 through 24 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

26.     From in or around August 2003 through in or around September 2008, CACIB through CAS, and its predecessor entities CAIS and CLS, processed USD transactions for a number of Sanctioned Entities and SDNs. At no time did CACIB, CAS, CAIS, CLS, or their co-conspirators apply for, receive, or possess a license or authorization from OFAC for any of the unlawful transactions set forth below.

The Conspiracy and Its Objects

27.     From in or around August 2003 through in or around September 2008, the exact dates being unknown to the United States, in the District of Columbia and elsewhere, Defendant

**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**

and others, both known and unknown to the United States, unlawfully, willfully and knowingly combined, conspired, confederated and agreed with one another and with others to commit offenses against the United States, that is, to defraud the United States and to engage in financial transactions with Sanctioned Entities and SDNs in violation of IEEPA and TWEA, and the executive orders and regulations issued thereunder.

Goals of the Conspiracy

28.     The goal of the conspiracy was for CACIB and others, both known and unknown to the United States, to profit financially by engaging in a conspiracy and a scheme to defraud the United States and to violate IEEPA and TWEA, and the executive orders and regulations issued thereunder.

29.     A further goal of the conspiracy was for CACIB and others both known and unknown to the United States, to violate executive orders and regulations prohibiting the exportation, directly and indirectly, of services from the United States to Sanctioned Entities and SDNs.

Manner and Means of the Conspiracy

30.     Among the manner and means by which CACIB and its co-conspirators carried out the conspiracy were the following:

   a.     CACIB, through CAS and its predecessor entities, intentionally used a non-transparent method of payment messages, known as cover payments, to conceal the involvement of Sanctioned Entities and SDNs in USD transactions processed through CL's New York

Branch, CACIB's New York branch, and the branches and offices of other financial institutions in the United States.

      b.      CACIB, through CAS and its predecessor entities, eliminated payment data that would have revealed the involvement of Sanctioned Entities with the specific intent to evade U.S. sanctions.

      c.      CACIB, through CAS's predecessor entity CLS, structured payments to mask the involvement of sanctioned entities, including using two payment messages—one that was sent through the United States and one that was not sent through the United States—for no purpose other than to conceal the involvement of Sanctioned Entities and SDNs in USD transactions processed through CL's New York Branch and the New York branches and offices of other unaffiliated U.S. financial institutions in the United States.

Overt Acts

      31.      In furtherance of the conspiracy and to achieve the objects and purposes thereof, CACIB, CAS and its predecessor entities, and co-conspirators, both known and unknown to the United States, committed and caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

      a.      On or about September 9, 2004, CLS sent $1 million on behalf of one of its sanctioned Sudanese clients for the benefit of a sanctioned Sudanese bank. CLS sent two MT 202s—the de facto standard payment message used for bank-to-bank credit transfers—in furtherance of the single $1 million payment. One MT 202 was sent to the clearing bank in the United States and the other MT 202 was sent only to the ultimate beneficiary's bank, which was located in Lebanon. The MT 202 sent to Lebanon revealed both the Sudanese originator and the Sudanese beneficiary. But the MT 202 sent to the United States listed the Lebanese bank that

received the funds as the ultimate beneficiary and made no mention of Sudanese entities being involved in the transaction.

  b. On or about March 29, 2006, CAS sent two MT 202 payment messages to the United States involving the same Sudanese entity that both failed to identify the Sudanese background of the Sudanese entity so that the transactions would not be stopped and rejected in the United States.

  c. On or about October 10, 2006, a member of CAS's compliance department approved a USD transaction where a Sudanese bank was the ultimate beneficiary but advised the CAS employee who was handling the transaction that the payment message could not identify the ultimate beneficiary.

  d. On or about July 20, 2007, a member of CAS's compliance department who reviewed a proposed USD letter of credit involving a Sudanese entity stated that any reference to Sudan should be deleted if the letter of credit was going to be settled in USD.

  e. On or about August 24, 2007, a member of CAS's compliance department approved a transaction involving the purchase of $187,433 of Sudanese goods in which the port of loading was located in Sudan, noting that the transaction was acceptable because the letter of credit associated with the transaction did not reference Sudan.

(Title 18, United States Code, Section 371)

FORFEITURE ALLEGATION

  32. Upon conviction of the offense alleged in Count One, CACIB shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The United States will seek entry of a forfeiture money judgment of at least $312,000,000.

33. If any of the property described above as being subject to forfeiture, as a result of any act or omission of CACIB:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty;

CACIB shall forfeit to the United States any other property of CACIB, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28 United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p))

_____      _____
DATE      CHANNING D. PHILLIPS
    UNITED STATES ATTORNEY
    FOR THE DISTRICT OF COLUMBIA
    Matt Graves, D.C. Bar No. 481052
    Maia Miller, VA Bar No. 73221
    Assistant United States Attorneys
    555 Fourth Street, N.W.
    Washington, D.C. 20530
    (202) 252-7762 (Graves)
    (202) 252-6737 (Miller)
    matthew.graves@usdoj.gov
    maia.miller@usdoj.gov