**Exhibit 17** to Memorandum of Points and Authorities in Support of Defendant Concord Management and Consulting LLC's Motion to Dismiss Count One of the Superseding Indictment, 18-cr-00032-2-DLF

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on January 8, 2016

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.: |
| | : | |
| v. | : | MAGISTRATE NO.: 16-0326-M |
| | : | |
| JOAO MANUEL PEREIRA DA FONSECA, | : | VIOLATIONS: |
| | : | |
| Defendant. | : | 18 U.S.C. § 371 |
| | : | (Conspiracy) |
| | : | |
| | : | 50 U.S.C. § 1705 |
| | : | (International Emergency Economic |
| | : | Powers Act) |
| | : | |
| | : | 31 C.F.R. Part 560 |
| | : | (Iranian Transactions and Sanctions |
| | : | Regulations) |
| | : | |
| | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting) |
| | : | |
| | : | 18 U.S.C. § 981(a)(1)(C) |
| | : | 28 U.S.C. § 2461 |
| | : | 21 U.S.C. § 853(p) |
| | : | (Criminal Forfeiture) |

INDICTMENT

The Grand Jury charges that:

GENERAL ALLEGATIONS

At all times material to this Indictment:

1. Defendant **JOAO MANUEL PEREIRA DA FONSECA** ("**FONSECA**") is a citizen of Portugal. Defendant **FONSECA** is an electrical-mechanical engineer who owns a company called Tratoscope Research and Development Technologies in Portugal.

2. Defendant **FONSECA** also worked with another Portuguese company, identified herein as the "Portuguese Company." The owner of the Portuguese Company is identified herein as "Coconspirator A."

3. The Portuguese Company also worked with an Iranian company, identified herein as the "Iranian Company." One of the employees of the Iranian Company is identified herein as "Coconspirator B."

4. The Iranian Company and the Portuguese Company also worked with a Turkish company, identified herein as the "Turkish Company." The owner of the Turkish Company is identified herein as "Coconspirator C."

5. A company located in New Hampshire, identified herein as the "New Hampshire Company," manufactures equipment, that is, an ultra-precision diamond turning lathe that helps produce precision lenses that could have both military and non-military uses ("precision lens equipment").

6. A company located in North Dakota, identified herein as the "North Dakota Company," manufactures a two axis positioning and rate table system that is used to test high precision inertial guidance systems that could have both military and non-military uses ("inertial guidance system test table").

### The International Emergency Economic Powers Act And the Executive Orders Issued Thereunder

7. Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701-1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701 (a). Pursuant to that authority, the President may declare a national emergency

through Executive Orders that have the full force and effect of law. Among other things, IEEPA empowers the President to issue regulations governing exports from the United States.

8. On March 15, 1995, the President issued Executive Order 12,957, which declared that the actions and policies of the Government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency under IEEPA to deal with that threat. 60 Fed. Reg. 14,615 (Mar. 17, 1995). In two subsequent Executive Orders in 1995 and 1997, the President clarified his original declaration of a national emergency. *See* Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 9, 1995). Since 1997, the President has continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders. The most recent continuation of this national emergency was executed on March 9, 2016. 81 Fed. Reg. 12,791 (Mar. 10, 2016). In his 2016 Notice, President Barack Obama referenced the July 2015 Joint Comprehensive Plan of Action ("JCPOA"), stating that, "[d]espite the historic deal to ensure the exclusively peaceful nature of Iran's nuclear program, certain actions and policies of the Government of Iran continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. For this reason, the national emergency declared on March 15, 1995, must continue in effect beyond March 15, 2016." *Id.* at 12,793. To implement the national emergency with respect to Iran, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued the Iranian Transactions and Sanctions Regulations ("ITSR") (31 C.F.R. Part 560).

9. Also pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13,222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in

light of the expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001. 66 Fed. Reg. 44,025 (Aug. 22, 2001). While in effect, the EAA regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the Department of Commerce's Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contained restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. See 15 C.F.R. § 730.02. In Executive Order 13, 222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13,222 from the time period covered by that Executive Order through the present. See, e.g., 80 Fed. Reg. 48,233 (Aug. 11, 2015).

### Export Controls and Sanctions Regulations

10. Under both the ITSR and EAR, the export or reexport of any U.S. good, software, or technology (collectively, "items") from the United States to Iran without the requisite OFAC or BIS license was prohibited. 31 C.F.R. §§ 560.203-.205; 15 C.F.R. § 746.7.[1] Both regulations similarly prohibited conspiring, attempting, aiding, abetting, or facilitating in any way the unlicensed export of U.S. goods or technology to Iran, or engaging in a transaction to evade the provisions of the regulations. 31 C.F.R. § 560.203; 15 C.F.R. § 764.2.

11. Even with the JCPOA in place, U.S. persons, including U.S. companies, continued to be broadly prohibited from engaging in transactions or dealings with Iran and the

---

[1] Section 746.7(a)(2) of the EAR notes, however, that "[t]o avoid duplication, exporters or reexporters are not required to seek separate authorization from BIS for an export or reexport subject both to the EAR and to [the ITSR]. Therefore, if OFAC authorizes an export or reexport, such authorization is considered authorization for purposes of the EAR as well."

4

Government of Iran unless such activities were exempt from regulation or authorized by OFAC. In addition, non-U.S. persons continued to be prohibited from knowingly engaging in conduct that seeks to evade U.S. restrictions on transactions or dealings with Iran or that causes the export of goods or services from the United States to Iran.

12. Specifically, absent permission from OFAC in the form of a license, the ITSR prohibited, among other things:

    a. The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, trans-shipment, or reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);

    b. The reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States, if: (a) such reexportation is undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran, and (b) the exportation of such goods, technology, or services, was subject to export license application requirements under any United States regulations (31 C.F.R. § 560.205); and

    c. Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITSR (31 C.F.R. § 560.203).

13. Through the EAR and independent of the ITSR, BIS reviews and controls the export from the United States to foreign countries of certain U.S. items. 15 C.F.R. §§ 734.2-.3. In particular, BIS has placed restrictions on the export and reexport of items that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use. A BIS license may be required not only to export items from the United States, but also to lawfully reexport such items from one country to a new country. *See* 15 C.F.R. § 734.2(b)(4).

14. The most sensitive items subject to EAR controls were identified on the Commerce Control List, or "CCL," set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1. Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which had export control requirements depending on destination, end use, and end user. Items categorized under ECCNs required a license for export based on a specific "reason for control. The "reason for control," in turn, determined the countries to which export of an item required a license.

15. Under the EAR, the precision lens equipment is categorized under ECCN 2B001, and it is controlled for National Security ("NS") and Anti-Terrorism ("AT") reasons for export to Iran. In addition, the inertial guidance system test table is categorized under ECCN 2B120, and it is controlled for Missile Technology ("MT") and AT reasons for export to Iran.

## THE CONSPIRACY

### COUNT ONE

16. Beginning in or around October 2014, and continuing through in or around April 2016, defendant **JOAO MANUEL PEREIRA DA FONSECA** did willfully combine, conspire, and agree with others known and unknown to the Grand Jury, to: (a) commit offenses against the United States, that is, to export and cause the exportation of goods, technology and services from the United States to Iran, in violation of the prohibitions imposed upon Iran by the United States Government, without having first obtained the required license from the Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, in violation of Title 50, United States Code, Section 1705 ("IEEPA"), and the Iranian Transactions and Sanctions Regulations ("ITSR"), Title 31, Code of Federal Regulations, Parts 560.203, 560.204 and 560.205; and (b) defraud the United States Government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods, technology, and services by a person, other than a United States person, to Iran and other countries without having first obtained the required license from OFAC, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

17. The conduct alleged in this Indictment occurred within the District of Columbia and elsewhere, and therefore within the venue of the United States District Court for the District of Columbia pursuant to Title 18, United States Code, Section 3237(a).

### Objects of the Conspiracy

18. The objects of the conspiracy were:

    a. to make money and profits;

    b. to export goods, technology and services from the United States to persons

and entities in Iran;

      c.    to evade the prohibitions and licensing requirements of IEEPA and the ITSR; and

      d.    to conceal the prohibited transactions from detection by the United States government so as to avoid penalties.

### Manner and Means of the Conspiracy

19.    The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

      a.    The Iranian Company, through Coconspirator B, requested that the Portuguese Company, through Coconspirator A, and sometimes with the assistance of the Turkish Company, through Coconspirator C, order equipment from companies in the United States on behalf of the Iranian Company and Coconspirator B.

      b.    The Portuguese Company and Coconspirator A purchased equipment requested by the Iranian Company and Coconspirator B from companies in the United States, knowing that the equipment would be delivered to Iran.

      c.    Defendant **FONSECA** acquired technical information and knowledge from companies in the United States that was needed to use the equipment and for delivery to the Iranian Company.

      d.    The coconspirators did not obtain a license from the federal government to export from the United States to Iran the goods, technology and services purchased from companies in the United States.

### Overt Acts

20. In furtherance of the above-described conspiracy, and in order to carry out the objects thereof, defendant **JOAO MANUEL PEREIRA DA FONSECA** and others known and unknown to the Grand Jury committed or caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

    a. On or about October 14, 2014, Coconspirator A sent an email to Coconspirator C with questions about the capabilities of the precision lens equipment manufactured by the New Hampshire Company.

    b. On or about March 15, 2015, Coconspirator C sent an email to Coconspirator A requesting a 50% down payment of approximately $104,000 USD to pay for additional items related to an earlier order to purchase the precision lens equipment manufactured by the New Hampshire Company.

    c. On or about March 31, 2015, Coconspirator A sent a confirmation letter to the New Hampshire Company confirming that the Portuguese Company had received a quotation on March 13, 2015 to purchase precision lens equipment from the New Hampshire Company for the amount of $411,300 USD. On or about May 6, 2015, Coconspirator A provided the New Hampshire Company with a letter falsely certifying that the precision lens equipment would be installed at the Portuguese Company's warehouse in Portugal; that the precision lens equipment would not be sold, transferred or exported outside of Portugal except to the United States or certain other countries not including Iran; and that the precision lens equipment would not be used in any sensitive nuclear activities.

    d. Between on or about October 17, 2015 through on or about October 31, 2015, defendant **FONSECA** visited the New Hampshire Company's headquarters in Swanzey,

9

New Hampshire and received training on how to install and use the precision lens equipment the Portuguese Company was purchasing on behalf of the Iranian Company.

  e. On or about October 27, 2015, Coconspirator A sent Coconspirator B an email indicating that the Portuguese Company was billing the Iranian Company €43,347 Euros to pay for the training defendant **FONSECA** was receiving at the New Hampshire Company's headquarters.

  f. On or about May 23, 2015, Coconspirator B sent an email to Coconspirator A requesting that Coconspirator A obtain an inertial guidance system test table from the North Dakota Company.

  g. On or about June 5, 2015, Coconspirator A emailed a quotation to Coconspirator B indicating that Coconspirator A would sell the North Dakota Company's inertial guidance system test table to Coconspirator B for the amount of $515,141 USD. On or about October 21, 2015, the North Dakota Company obtained a license from the United States Department of Commerce permitting it to sell the inertial guidance system test table to the Portuguese Company for the total price of $341,175 USD.

  h. On or about March 26, 2016, defendant **FONSECA** entered the United States at the Minneapolis-St. Paul International Airport and falsely stated to a federal agent that he had not been to Iran within the past five years, while knowing that he had visited Iran in or about June 2014, in order to install a machine that helps make precision lenses that the Portuguese Company had purchased from a German company, on behalf of the Iranian Company.

  i. On or about March 28, 2016, defendant **FONSECA** went to the North Dakota Company's plant in Grand Rapids, North Dakota in order to test, inspect and receive

10

training on how to use the inertial guidance system test table that the Portuguese Company was purchasing for the Iranian Company.

          j.        On or about March 28, 2016, defendant **FONSECA** signed an end-user statement that falsely certified to the North Dakota Company that the equipment would be used at the Portuguese Company's facility in Portugal; that it would not be used for any nuclear application; and it would not be diverted, exported or resold for any end use or to any end user that is prohibited by United States law, including to Iran.

> (**Conspiracy to Unlawfully Export U.S. Goods and Technology to Iran and to Defraud the United States**, in violation of Title 18, United States Code, Section 371; Title 50, United States Code, Section 1705; and Title 31, Code of Federal Regulations, Part 560)

## COUNT TWO

The Grand Jury re-alleges Paragraphs 1 through 17 and 20 of Count One of this Indictment as if fully set forth herein.

Beginning in or around October 2014, and continuing through in or around April 2016, within the District of Columbia and elsewhere, defendant **JOAO MANUEL PEREIRA DA FONSECA**, and others known and unknown to the Grand Jury, did knowingly and willfully attempt to export goods, technology and services, to wit, the New Hampshire Company's precision lens equipment and the information and knowledge of how to use it, and the North Dakota Company's inertial guidance system test table and the information and knowledge of how to use it, without having first obtained the required licenses or authorizations from the Office of Foreign Assets Control, located in the District of Columbia.

> (**Attempted Unlawful Export**, in violation of Title 50, United States Code, Section 1705; and Title 31, Code of Federal Regulations, Parts 560.203, 560.204 and 560.205; and Title 18, United States Code, Section 2)

## FORFEITURE ALLEGATION

1. Upon conviction of the offenses alleged in Counts One and Two, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to this offense.

2. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p))

A TRUE BILL

*Channing D. Phillips* (PM)　　　　　　　FOREPERSON
Attorney of the United States in
and for the District of Columbia

12