**Exhibit 19** to Memorandum of Points and Authorities in Support of Defendant Concord Management and Consulting LLC's Motion to Dismiss Count One of the Superseding Indictment, 18-cr-00032-2-DLF

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on November 3, 2016**

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. |
| | 17MJ173 |
| v. | |
| | **VIOLATIONS:** |
| CANDACE MARIE CLAIBORNE | |
| | 18 U.S.C. § 371 |
| | (Conspiracy to Defraud the United States) |
| | 18 U.S.C. § 1512(c) (Obstructing an Official Proceeding) |
| | 18 U.S.C. § 1001 (False Statements) |
| | 18 U.S.C. § 1343 (Wire Fraud) |
| | 18 U.S.C. § 981(a)(1) 21 U.S.C. § 2461(c) 28 U.S.C. § 2461(c) (Criminal Forfeiture) |

## <u>INDICTMENT</u>

The Grand Jury charges that:

### <u>COUNT ONE</u>
### (Conspiracy to Defraud the United States)

At all times relevant to the Indictment:

INTRODUCTION

Lawful Functions of the Department of State

1.      Every employee in the federal government is subject to investigation to determine whether that person's employment is "clearly consistent with the interests of the national security." See Executive Orders 10450 and 13467. More specifically, employees with access to classified information are the subject of "periodic reinvestigations." See Executive Order 12968. As part of this assessment, trained background investigators evaluate an employee's close and continuing contacts with foreign nationals to, among other things, assess whether the employee is free from "conflicting allegiances and potential for coercion." See Executive Order 12968. For those with access to TOP SECRET information, federal regulations require reinvestigations every five years. See 5 C.F.R. 1400.201(a)(2) and 5 C.F.R. 732.203. As part of this process, investigators try to identify whether an employee "may be subjected to coercion, influence, or pressure which may cause him to act contrary to the best interests of the national security." See Executive Order 10450. To make this determination, investigators rely in part on the SF-86 Questionnaire for National Security Positions, which, among other things, asks applicants to identify all foreign nationals with whom they have or have recently had "close and/or continuing contact" and are "bound by affection, influence, common interests, and/or obligation."

2.      The Secretary of State is authorized by United States Code Title 22, Section 4802 to develop and implement (in consultation with the heads of other Federal agencies having personnel or missions abroad where appropriate and within the scope of the resources made available) policies and programs to provide for the security of United States Government operations of a diplomatic nature and foreign government operations of a diplomatic nature in the United States. Such policies

2

and programs include the conduct of investigations relating to suitability for employment, employee security, and other investigations, as authorized by law.

3.      The Secretary of State fulfills these obligations in part through the promulgation and enforcement of policies and directives issued in the Foreign Affairs Manual ("FAM"). Authority for the issuance of employee requirements through the FAM derives from United States Code Title 5, Section 301, which authorizes the heads of agencies to prescribe regulations regarding the conduct of employees; Presidential Executive Orders 10450 and 13467, which require the investigation of civilian officers and employees of the United States to ensure their initial and continued employment is clearly consistent with the national security of the United States; and other statutes, orders, and regulations.

4.      Pursuant to Title 12, Sections 262, 271, and 274 of the FAM, Department of State employees must report unofficial contact with a person whom the employee knows or suspects is a member of a foreign intelligence agency. The term "contact" means all manners of personal or impersonal communication and includes, but is not limited to, written, telephonic, electronic mail, text messaging, and wire. The FAM requires employees to report such contacts immediately. The employee must also report a concern that he or she may be the target of actual or attempted exploitation by a foreign entity. Employees are warned that failure to report information required by this policy may result in the initiation of an appropriate investigation, immediate suspension of the employee's security clearance (which is a mandatory condition of employment for Department of State Foreign Service employees), and/or disciplinary action.

5.      Other regulations prohibit executive branch employees from accepting gifts. Pursuant to Title 5, Section 2635.202 of the Code of Federal Regulations and to Title 11, Section 613.1 of the FAM, Department of State employees shall not directly or indirectly solicit or accept

3

a gift that is either (1) from a prohibited source, or (2) given because of the employee's position. A "gift" includes any gratuity, favor, discount, entertainment, hospitality, loan, forbearance, or other item having monetary value, including services, meals, travel, and tickets to, or free attendance at, events. A "prohibited source" generally includes any person or entity seeking official action by the Department; doing business or seeking to do business with the Department; conducting activities regulated by the Department; or having interests that may be substantially affected by the performance or nonperformance of the employee's official duties.

6.   Under 5 U.S.C. § 7342, federal civil service employees are prohibited from receiving gifts above a "minimal value," as prescribed by regulations provided by the Administrator of General Services, from a "foreign government," a term that includes any "agent or representative" thereof. In 2011, "minimal value" was set at $350. Currently, "minimal value" is set at $390. During the intervening period, "minimal value" was set between $350 and $390. This statutory prohibition is further expounded upon in Title 2, Sections 961 and 962 of the FAM.

<u>The People's Republic of China's Intelligence Services</u>

7.   The People's Republic of China's intelligence services ("PRCIS") encompassed both the civilian and military components of Chinese intelligence programs. Civilian intelligence collection was handled by the Ministry of State Security ("MSS"). The MSS could be described as an institution similar to the Federal Bureau of Investigation ("FBI") and the Central Intelligence Agency ("CIA") combined under one intelligence directorate responsible for counter-intelligence, foreign intelligence, and political security. The MSS consisted of a central ministry, provincial state security departments, and municipal state security bureaus, such as the Beijing State Security Bureau ("BSSB") and the Shanghai State Security Bureau ("SSSB").

8.     Among other things, the MSS and its regional bureaus were concerned with identifying and influencing the foreign policy of other countries, including the United States. The MSS and its bureaus sought to obtain information on political, economic, and security policies that might affect China, foreign intelligence operations directed at China, and biographical profiles of foreign politicians and intelligence officers.

9.     Additionally, the MSS and its bureaus were tasked with conducting clandestine and overt human source operations, of which the United States was a principal target. These operations used trained intelligence case officers, as well as non-professional collectors called "cut-outs" or "co-optees." A cut-out or co-optee was a person trusted by both the source and the intelligence officer who helped to provide a layer of insulation between an intelligence officer and a source, and thereby increased operational security.  Cut-outs or co-optees could operate under a variety of covers, posing as diplomats, journalists, academics, or business people both at home and abroad. These individuals were tasked with spotting, assessing, targeting, collecting, and handling sources or assets with access to classified, open-source, proprietary, or sensitive information that the government of the PRC could utilize for economic, political, or military decision-making or advantage.  Sources or assets were people who agreed to help a foreign intelligence service by providing information to that service in response to taskings from foreign intelligence officers or agents.

10.     PRCIS source operations tended to originate inside China, where the PRCIS preferred to meet with its sources or assets. To facilitate continued meetings inside China, the PRCIS would arrange and/or pay for travel and expenses.  The PRCIS was known to pay their sources not only in cash, but also through other means, including business considerations or other types of assistance within China.

<u>The Defendant and Co-Conspirators</u>

11.     Defendant Candace Claiborne ("Claiborne") was an Office Management Specialist ("OMS") with the Department of State. She was a United States citizen, who resided and worked in Washington, D.C. Claiborne earned a bachelor's degree in criminal justice and law enforcement from the University of the District of Columbia. She joined the Department of State in 1999, and served in a variety of places, including Washington, D.C., Baghdad, Iraq, Beijing and Shanghai, China, and Khartoum, Sudan. According to Department of State records, Claiborne had language proficiency in Arabic, Mandarin Chinese, and Spanish. From May 2016 until March 2017, she worked at the Department of State headquarters building in Washington, D.C. in the Office of Caucasus Affairs and Regional Conflicts. Claiborne has four adult children. Claiborne held a TOP SECRET security clearance at all relevant times since 1999.

12.     Co-Conspirator A was a close family member of Claiborne. He was a United States citizen, who lived in Los Angeles, California. He previously lived with or near Claiborne in Washington, D.C. and in China. Co-Conspirator A graduated from Salisbury University in Maryland with a major in fine arts. Co-Conspirator A lived in China from 2000 through 2005, and then again from approximately January 2012 through August 2013. During the latter stay, Co-Conspirator A studied fashion design at the Raffles Design Institute at Donghua University in Shanghai.

13.     Co-Conspirator B was a Shanghai-based importer/exporter who ran a spa and restaurant in Shanghai. He was a citizen of the People's Republic of China ("PRC") who knew and regularly communicated with Claiborne and Co-Conspirator A since at least 2007.

14.     Co-Conspirator C was a PRC citizen and an agent of the PRCIS. Co-Conspirator C worked closely with Co-Conspirator B and had frequent communications with both Claiborne and

Co-Conspirator A since 2012. Co-Conspirator B worked closely with Co-Conspirator C. Co-Conspirators B and C, both of whom were agents of the PRCIS, specifically the SSSB, provided Claiborne and Co-Conspirator A with numerous gifts at all relevant times since 2011.

<u>Overview of Claiborne's Positions at the Department of State</u>

15.     Claiborne joined the Department of State in 1999. Claiborne signed an Oath of Office that read, "I will support and defend the Constitution of the United States against all enemies foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God."

16.     As required for her employment, Claiborne obtained a TOP SECRET security clearance in 1999. Claiborne retained that clearance at all relevant times since then.

17.     Claiborne's first duty post with the Department of State was the United States Embassy in Beijing, China. Before departing for China, Claiborne completed foreign language training in Mandarin Chinese at the Department of State's Foreign Service Institute ("FSI") in Arlington, Virginia. Claiborne began working in Beijing in or around March 2000.

18.     There, she was an OMS for the Economic Minister Counselor and for the Security Engineering Center at the embassy. As an OMS, Claiborne was required, as a condition of employment, to obtain and maintain a TOP SECRET clearance. Her duties included providing office management and administrative support to senior U.S. diplomats and to various embassy sections, to include among other things, managing meeting calendars for senior staff, preparing agendas and support materials for meetings, helping ensure that classified information was properly secured, and editing and revising documents and reports prepared by diplomatic personnel. Claiborne's Beijing tour of duty concluded in or around June 2003.

19.     Claiborne's next Department of State posting was also in China, this time at the United States Consulate General in Shanghai. There, Claiborne served as the OMS to the Executive Assistant to the Consul General from approximately August 2003 through July 2005. Throughout Claiborne's tours of duty in both Beijing and Shanghai, Co-Conspirator A lived with her in China.

20.     After China, Claiborne worked as an OMS to the Deputy Chief of Mission in Buenos Aires, Argentina, from approximately 2005 through the summer of 2007, before returning to the United States to enroll in Arabic courses at the Department of State's FSI. Claiborne's next posting was in Baghdad, Iraq, where she worked as an OMS for the Political Affairs Section from approximately June 2008 through July 2009.

21.     After Iraq, Claiborne returned to Beijing, China, where she worked at the United States Embassy as the OMS for the Minister Counselor for Public Affairs. Claiborne's third tour in China lasted from approximately November 2009 through November 2012. Starting in approximately January 2012, Co-Conspirator A lived with Claiborne in Beijing. Co-Conspirator A moved to Shanghai in approximately July 2012, staying there until August 2013.

22.     From approximately November 2012 through June 2013, Claiborne rotated between stints at the Department of State headquarters in Washington, D.C., and roving OMS assignments in Libya and Morocco. Claiborne then began work at the United States Embassy in Khartoum, Sudan, where she worked as an OMS to the Deputy Chief of Mission. Claiborne remained in Sudan from approximately July 2013 through August 2015.

23.     From approximately August 2015 through February 2016, Claiborne took Spanish classes at FSI. During that time, Claiborne lived in temporary, Department of State-funded housing. She moved out of that housing, and back into her permanent residence in Washington, D.C., on or about February 27, 2016. She has lived in Washington, D.C. since then.

8

24.     Starting in approximately May 2016, and continuing to the date of her arrest, Claiborne worked as an OMS in the Office of Caucasus Affairs and Regional Conflicts at the Department of State headquarters in Washington, D.C. Claiborne was responsible for providing a full range of administrative support to the Office Director, Deputy Director, and six action officers, as well as to the Organization for Security and Cooperation in Europe Minsk Group Co-Chair (ambassadorial rank).

25.     Claiborne, a Department of State employee with a TOP SECRET clearance, received periodic counterintelligence trainings and briefings, including multiple times during her tenure in China. These briefings and trainings detailed Claiborne's obligations to, among other things, complete a Foreign Contact Report after any unofficial contact with a person that she "knows or suspects is a member of a foreign intelligence agency."

26.     Due to her TOP SECRET clearance, at all relevant times, Claiborne was required to report any unofficial contact with a person that she "knows or suspects is a member of a foreign intelligence agency."

27.     In order to maintain her TOP SECRET clearance, every five years, Claiborne was required to pass a background investigation that included questions regarding her foreign contacts, including contacts with representatives of foreign governments and with foreign nationals with whom Claiborne had "close and/or continuing contact" and with whom she was bound by "affection, influence, common interests, and/or obligation."

VENUE

28.     The conduct alleged in this Count began outside of the jurisdiction of any particular State or district and later occurred within the District of Columbia, where Claiborne was arrested

and last resided, and elsewhere, and therefore within the venue of the United States District Court

for the District of Columbia pursuant to Title 18, United States Code, Sections 3237(a) and 3238.

THE CONSPIRACY

29.     Beginning as early as in or around 2007, the exact date being unknown to the Grand

Jury, and continuing through on or about March 28, 2017, Claiborne did willfully combine,

conspire, and agree with others known and unknown to the Grand Jury to defraud the United States

Government by interfering with and obstructing a lawful government function, that is, the

enforcement of policies, programs, and statutes providing for the security of United States

Government operations of a diplomatic nature and otherwise establishing the security

responsibilities of the Secretary of State, by using deceit, craft, trickery, and dishonest means to

hide from the United States Government her contacts with and gifts received from her foreign

national co-conspirators, in violation of Title 18, United States Code, Section 371; Title 5, United

States Code, Section 7342; Title 12, Sections 262, 271, and 274 of the FAM;  Title 5, Section

2635.202 of the Code of Federal Regulations; Title 11, Section 613.1 of the FAM; Title 2, Sections

961 and 962 of the FAM; Executive Orders 10450, 12968, and 13467; and Title 5, Sections 732.203

and 1400.201(a)(2) of the Code of Federal Regulations.

OBJECTS OF THE CONSPIRACY

30.     The objects of the conspiracy were:

A.     For Claiborne to maintain close and continuing contact with Co-Conspirators B and

C without the knowledge of the United States Government in order to defraud the United States

Government;

B.     For Claiborne and Co-Conspirator A to receive gifts and monies from Co-

Conspirators B and C without the knowledge of the United States Government in order to defraud

10

the United States Government;

C.     To conceal from the U.S. Government the gifts and monies received by Claiborne and Co-Conspirator A from Co-Conspirators B and C in order to defraud the United States Government;

D.     For Claiborne to maintain her TOP SECRET clearance, as required for her continued Foreign Service employment, by concealing her contacts and Co-Conspirator A's contacts with Co-Conspirators B and C, in order to defraud the United States Government; and

E.     For Claiborne to continue to receive salary and benefits from the Department of State despite her unreported contacts with, and gifts received from, Co-Conspirators B and C, which would jeopardize her employment if reported, in order to defraud the United States Government.

## OVERT ACTS

31.     In furtherance of said conspiracy, and to effect the illegal objects thereof, Claiborne and her co-conspirators committed or caused to be committed the following overt acts, among others, in the District of Columbia and elsewhere:

### 2007-2010

32.     Beginning in or around 2007 and continuing throughout 2008, Claiborne, Co-Conspirator A, and Co-Conspirator B communicated about possible employment opportunities for Co-Conspirator A in China.

33.     In or around July 2010, Claiborne traveled to Shanghai, where she stayed at the JW Marriott. Claiborne and Co-Conspirator B took a photograph together during that visit.

### 2011

34.     On or about April 11, 2011, Claiborne received $2,480 by wire into her USAA account. The wire originated from Delta Shipping Co. Ltd./Bank of China Hong Kong, and the

memo line read, "For [Co-Conspirator B] Shanghai."

35.     Claiborne failed to report to the Department of State the gift she received on or about April 11, 2011, despite a reminder notice issued to all Beijing Department of State personnel the previous month reminding employees of their obligation to report gifts over $350 from foreign governments.

36.     On or about May 10, 2011, a month after providing this reportable gift, Co-Conspirator B tasked Claiborne by email with questions regarding the Chinese currency exchange rate and the United States Government's response to the U.S.-Sino Strategic Economic Dialogue. Co-Conspirator B inquired about the "internal evaluation of the fruits and consensus . . . made by the US government" from the U.S. – Sino Strategic Economic Dialogue, and also wanted information about what types of pressures the United States government planned to place on the Chinese government if certain expectations were unmet. Finally, he inquired about the "internal attitudes taken by the high-level American officials."

37.     Claiborne failed to report to the Department of State the tasking she received from Co-Conspirator B on or about May 11, 2011.

38.     On or about May 19, 2011, after Claiborne answered Co-Conspirator B's tasking with responsive, but publicly available information, Co-Conspirator B clarified, "What they are looking for is what they cannot find on Internet."

39.     On or about May 19, 2011, Co-Conspirator B, consistent with his PRCIS affiliation, emphasized caution in the mode of communication. He warned Claiborne, "If you find something next time don't send them by email bcs [sic] others also can catch it with Internet." Co-Conspirator B offered to personally pick up any information Claiborne passed.

40.     On or about July 9, 2011, Claiborne had lunch with Co-Conspirator B.

41.     Beginning on or about July 11, 2011, Co-Conspirator B emailed Co-Conspirator A about potential job opportunities for Co-Conspirator A.

42.     On or about July 13, 2011, Claiborne received a $580 wire into her U.S. bank account from Delta Shipping Co Ltd./Bank of China. Again, the memo read, "For [Co-Conspirator B] Shanghai."

43.     Claiborne failed to report to the Department of State the gift she received from Co-Conspirator B on or about July 13, 2011.

44.     On or about August 24, 2011, Claiborne requested that Co-Conspirator B send her more slippers because her feet were often cold.

45.     On or about August 31, 2011, Claiborne invited Co-Conspirator A to join her in China, suggesting that he could work in Co-Conspirator B's salon in Shanghai.

46.     On or about November 8, 2011, Co-Conspirator B emailed Co-Conspirator A, noting that Claiborne would return to the Department of State on November 18.

**2012**

47.     In or around January 2012, Claiborne met Co-Conspirator C and began to have close and continuing contact with him. On or about January 13, 2012, Co-Conspirator C emailed Claiborne, saying, "There is some feedback about our last talk, which I think is positive . . . besides, I prepare new year gifts for you." Co-Conspirator C suggested they meet in Beijing, and asked Claiborne to tell Co-Conspirator A hello. Claiborne wrote back, "I'll see you soon."

48.     On or about February 2, 2012, Co-Conspirator B informed Co-Conspirator A that he had lined up a job for him teaching English in Shanghai if Claiborne approved.

49.     On or about February 7, 2012, Co-Conspirator A wrote Co-Conspirator B, lamenting that he could not pay his U.S. school loans because it was "impossible" for him "to keep a job."

50.     On or about February 9, 2012, Co-Conspirator B advised Co-Conspirator A not to worry because he was "working on [Co-Conspirator A's] project." Co-Conspirator B said, "Give me some time to find a way."

51.     On or about February 13, 2012, Claiborne sent Co-Conspirator A an email spelling out the various degree offerings at Raffles Design Institute in Shanghai, China and included information about the cost. Combined with a 1500 RMB registration fee, total tuition cost for the program was 301,500 RMB, or approximately $47,500.   Co-Conspirator A informed Co-Conspirator B that the cost of the program did "not sound possible" for him, and further indicated that Claiborne might not agree to Co-Conspirator A accepting help from Co-Conspirator B.

52.     That same day, on or about February 13, 2012, Co-Conspirator B responded to Co-Conspirator A, "I know [Claiborne] very well. . . I will try my best to convince [Claiborne] for your move to Shanghai. We are checking with the fashion school and the school for you to teach the English in the evening."

53.     On or about February 27, 2012, Co-Conspirator B emailed Co-Conspirator A to confirm information about the fashion design program including costs and housing. Co-Conspirator B stated that Co-Conspirator A would also "hv to rent a apartment outside school" and register with the police to obtain a permit to live in Shanghai. Co-Conspirator B then asked Co-Conspirator A when Claiborne was leaving Beijing to go to Australia, writing, "I will try to meet her again when I will be in Beijing next month."

54.     On or about April 16, 2012, Co-Conspirator A emailed Co-Conspirator B, asking if he could stay at Co-Conspirator B's home on May 3. Co-Conspirator A said he lost his job, which was "bad timing" because he had two friends visiting between May 12 and 23. Co-Conspirator A continued, "I don't want to ask so much of you and [Co-Conspirator C] but I want to take them at

least one day to see Shanghai, if anything Pudong. If its possible you or [Co-Conspirator C] can spend time with us for the day. Any ways its always nice to see you two. If there is also anything you need me to do then please feel free to ask." Co-Conspirator A acknowledged he was having financial difficulties because of the lost job. On or about May 17, 2012, Co-Conspirator B emailed Co-Conspirator C roundtrip flight reservations between Beijing and Shanghai for Co-Conspirator A and his friends. The total value of the flights was 4290 RMB, or approximately $678.

55.     From on or about May 24, 2012 through on or about June 7, 2012, Co-Conspirator A continued to email Claiborne, Co-Conspirator B, and Co-Conspirator C about the costs associated with attending fashion school in Shanghai, including tuition and housing.

56.     On or about June 13, 2012, Co-Conspirator A prepared to transition from Beijing to Shanghai the following month to begin a three-year program of studies in fashion design at Raffles Design School, Donghua University, to be paid for by Co-Conspirators B and C.

57.     On or about June 20, 2012, Co-Conspirator C emailed Co-Conspirator A, copying Claiborne and Co-Conspirator B, writing, "Hey, [Co-Conspirator A]! Nice to get your call. And I have good news for you too. I find an apartment suitable for you. It is a one bedroom, one living room flat, bigger than the one you saw that day. It is newly renovated, fully equipped. Pls check out the attached pics. And it is 10 mins walk from the school. I am going to sign the contract tmr. As long as the contract is signed, I will proceed with the residence permit. Maybe you will need to come down to SH, maybe I will fly to BJ to get your passport. We will see what is the best. As I told you this afternoon, I have got all the document from the school. I will hand them to you when we meet."

58.     On or about June 29, 2012, Co-Conspirator A told Co-Conspirators B and C, "I'm excited to move to Shanghai. . . Thank you so much [Co-Conspirator B] and [Co-Conspirator C] for your help!"

59.     On or about July 10, 2012, Claiborne informed Co-Conspirator A that she was meeting Co-Conspirator B the next day.

60.     On or about July 13, 2012, Co-Conspirator C emailed Co-Conspirator A, letting him know that "should you need anything, please let me or [Co-Conspirator B] know." Co-Conspirator A wrote back, elaborating on the expenses he anticipated occurring to satisfy his course requirements.

61.     On or about July 24, 2012, having communicated the previous two days about getting together that week, Co-Conspirator A wrote to Co-Conspirator C, "Thank you for the money," indicating he had just purchased a phone with it.

62.     On or about August 21, 2012, Co-Conspirator A emailed Co-Conspirator B, Co-Conspirator C, and Claiborne to thank them for a "wonderful birthday around Shanghai." As Co-Conspirator A explained to his sister, he went on his birthday to "some fancy hotel terrace to relax the night away overlooking the famous river and financial district of Shanghai." Co-Conspirator B sent Co-Conspirator A and Claiborne photos of the three of them together at the birthday celebration.

63.     On or about September 10, 2012, Co-Conspirator A told Co-Conspirators B and C that he would be opening a bank account that week. He also noted his lack of funds and referenced Claiborne, who was "always stressing" about sending Co-Conspirator A money. Co-Conspirator A acknowledged that "[i]nternational trips are out because they are costly."

64.    On or about September 15, 2012, Claiborne reminded Co-Conspirator A to inform Co-Conspirator B that Co-Conspirator A would be traveling soon.

65.    On or about October 29, 2012, and again on November 1, 2012, Co-Conspirator A emailed Co-Conspirator B requesting a sewing machine. Co-Conspirator A sent a web link to Co-Conspirator B for the machine.

66.    On or about November 26, 2012, Claiborne completed an Exit Interview Form supplied by the U.S. Embassy Regional Security Office in Beijing, China. Under the heading Foreign National Contacts, Claiborne listed "None." Under the heading Any Other Unusual Incidents or Anomalies to Report, Claiborne observed seeing an "Asian man standing at the south gate every day at 12:00 – 1:00 lunchtime." Claiborne mentioned nothing about her close and continuing contacts with Co-Conspirators B and C, including the May 2011 tasking by Co-Conspirator B or the various gifts and benefits that Co-Conspirators B and C had provided to Claiborne and Co-Conspirator A.

67.    On or about December 9, 2012, Claiborne forwarded Co-Conspirator B an email from Co-Conspirator A with a web link for a shaver. Claiborne wrote, "Can u get this for [Co-Conspirator A] along with the proper transformer?" Co-Conspirator B responded, "I hv order similar shaver for [Co-Conspirator A] on [a Chinese online shopping site]. No need transformer." Claiborne replied, thanking Co-Conspirator B. She then added Co-Conspirator C to the email chain, asking if Co-Conspirator B or Co-Conspirator C knew the serial number to the Apple iPhone that Co-Conspirator C purchased for Claiborne in China. Claiborne failed to report this gift to the Department of State.

68. On or about December 11, 2012, Co-Conspirator B wrote Claiborne that Co-Conspirator A had "open[ed] the bank account already. We are going to pay for his third semester cost this weekend."

69. On or about December 27, 2012, Co-Conspirator A emailed Co-Conspirator B, saying, "I saw [Co-Conspirator C] today at Starbucks so we had a good talk. . . [Co-Conspirator C] says you will have someone deposit money into the account."

**2013**

70. On or about January 22, 2013, Claiborne asked Co-Conspirator B whether there was a password for the Microsoft Office program on her "apple notebook," indicating that Co-Conspirators B and C had purchased an Apple laptop computer for Claiborne. Co-Conspirator B responded that to use Microsoft Office, Claiborne, who was no longer in China, would have to order the program over the Internet and pay for it. Claiborne failed to report the laptop computer to the Department of State.

71. On or about February 17, 2013, Claiborne told Co-Conspirator B that Co-Conspirator A was short on cash, and requested that Co-Conspirator B help him. Co-Conspirator B seemed perplexed, responding that he had just transferred "3,000" to Co-Conspirator A on February 1. It is unclear whether the 3,000 was in U.S. dollars (USD) or RMB. If the latter, it would have converted to approximately $484.65.

72. On or about February 18, 2013, Claiborne and Co-Conspirator B discussed a job opening in Hong Kong, apparently at the Department of State. Claiborne stated 17 other people had already bid for the posting. Claiborne then informed Co-Conspirator B that Co-Conspirator A "would like to go to Thailand during the 2 week break. What do you think?"

73.     On or about February 25, 2013, Claiborne sent an email to Co-Conspirator B asking for financial assistance for Co-Conspirator A to travel home, writing, "He [Co-Conspirator A] needs to get away for his 2 week break but he doesn't want to ask for help. . . I think it would be good if he could go home for that time . . . it will do him good. Is there some way you can make that happen? . . . Can we schedule a time to talk on skype?"

74.     On or about February 25, 2013, regarding finances for Co-Conspirator A's education, Co-Conspirator B responded to Claiborne, "We apply the scholarship for three years. It is really a big job for us." Co-Conspirator B emphasized the need for Co-Conspirator A to focus on his studies and not worry about employment yet.

75.     On or about February 27, 2013, Claiborne emailed Co-Conspirator A, "So [Co-Conspirator B] said he was getting u a ticket . . . did u have a discussion?"

76.     On or about February 28, 2013, Co-Conspirator C wrote to Claiborne, requesting guidance and providing assurance. He said he had just spoken with Co-Conspirator A, who was preparing a trip to Thailand. However, Co-Conspirator C knew that Claiborne wanted Co-Conspirator A to spend his break in the United States. Co-Conspirator C asked Claiborne which option she preferred, stating he would "only follow YOUR decision . . . [s]o I am asking you to confirm where he should spend his two-week break." Regarding travel arrangements, Co-Conspirator C assured Claiborne that "Me and [Co-Conspirator B] will see what we can do." Co-Conspirator C went on to say, referring to Co-Conspirator B and himself and recalling a similar conversation he recently had with Claiborne in Shanghai, that "our duty is to make sure [Co-Conspirator A] is focused on his study, not anything else, and other than tuition and rental, we can provide some pocket money for his basic needs." Regarding upcoming costs, Co-Conspirator C

wrote, "we have to prepare well for his last year's study, which is overseas and much more costly. So please don't worry, you have our word."

77.     On or about February 28, 2013, Claiborne replied to Co-Conspirator C, approving Co-Conspirator A's trip to Thailand. She also informed Co-Conspirator C that she would be doing a temporary duty assignment in Morocco, and that she had applied for a job at the Consulate General in Hong Kong. Claiborne provided Co-Conspirator C with the name of the new Consulate General for Hong Kong, who, according to Claiborne, would be starting in late summer.

78.     On or about March 14, 2013, Co-Conspirator B informed Claiborne, "WE HV TRANSFER 4K TO [Co-Conspirator A] FOR HIS HOLIDAY+ROUND TRIP TICKETS TO BANKOK.[sic]" Co-Conspirator B made clear that he and Co-Conspirator C knew Co-Conspirator A's Industrial and Commercial Bank of China (ICBC) account information, including the account number.

79.     On or about March 18, 2013, Claiborne told Co-Conspirators B and C that she did not get the job in Hong Kong. She also requested large calligraphy hangers, adding, "I am willing to pay for them."

80.     Between on or about April 6, 2013 through on or about May 26, 2013, Co-Conspirator A, Co-Conspirator B, and Co-Conspirator C exchanged multiple emails reflecting payments from Co-Conspirator B and Co-Conspirator C to Co-Conspirator A.

81.     On or about June 10, 2013, Claiborne admonished Co-Conspirator A regarding his behavior, reminding him that "you are in China . . . and you are there on someone else's dime . . . and because of someone else's sacrifices . . . so think twice . . . about your actions." Claiborne made clear that "[Co-Conspirator B/ Co-Conspirator C] are responsible for you while you are in the country."

82.     On or about June 16, 2013, Co-Conspirator A emailed Claiborne that he had "ran out of the moneh.[sic]" Regarding Co-Conspirator A's need to obtain his Delta Airlines flight confirmation number from Co-Conspirator B, Claiborne inquired, "Did u ask [Co-Conspirator C]?", making clear that she knew that Co-Conspirators B and C purchased Co-Conspirator A's roundtrip plane ticket to Washington, D.C. Co-Conspirator A traveled roundtrip from China to the United States, returning to China on or about July 7, 2013.

83.     On or about August 6, 2013, Co-Conspirator A emailed Co-Conspirators B and C. He worried that China would prohibit him from ever returning to the country because he had allegedly committed a serious crime in China. Co-Conspirator A apologized, writing, "I can not imagine what you all are going through because youve [sic] already done so much to help and try to stabilize my life." Co-Conspirator B responded, telling Co-Conspirator A that he had "already bought the tickets" for Co-Conspirator A to fly home to the United States on August 10.

84.     On or about August 7, 2013, Claiborne forwarded to Co-Conspirator A an email that appears to have been sent from Co-Conspirator C to Claiborne. The email indicated that Co-Conspirator A had committed a possible "felony" offense, and that "we made some efforts and the police agrees [sic] that they won't come after [Co-Conspirator A] but there is no way to keep the student visa. As you may know, the given deadline of leaving the country is next Monday. [Co-Conspirator B] will arrange a flight for him to go back to the States."

85.     On or about August 7, 2013, Claiborne asked Co-Conspirator B whether the payments he made to the school in China could be transferred to an affiliated school in another country. Co-Conspirator B promised to look into it.

86.     On or about August 10, 2013, Co-Conspirator A departed China for the United States. Claiborne was aware that Co-Conspirator B paid for the travel.

87.     On or about August 21, 2013, Claiborne and Co-Conspirator A conversed about Co-Conspirator A's communications with Co-Conspirators B and C. Claiborne suggested that Co-Conspirator A talk with Co-Conspirator B via Skype.

88.     On or about September 10, 2013, Co-Conspirator A wrote to Co-Conspirators B and C requesting a reference letter to help him secure a position in Korea teaching English. Co-Conspirator C contacted Claiborne, promising, "[S]urely we will help."

89.     On or about November 11, 2013, Co-Conspirator C emailed Claiborne, offering, "Anything we can do from here, please let me know." Co-Conspirator C then inquired about Claiborne's job, asking "Is the work hard there, is it still very tense? Anything interesting, please share with us." Co-Conspirator C then reminded Claiborne that "it's been a year since you left and many things have happened. We miss you very much." Co-Conspirator C asked, "Do you have a plan for a vacation? If possible, we would like to meet you."

90.     On or about November 11, 2013, Claiborne responded to Co-Conspirator C, "If my travel allowance is enough, I will come to China."

91.     On or about December 2, 2013, Co-Conspirator C contacted Claiborne again, saying, "Anything we can do from our side, let me know." Co-Conspirator C assured Claiborne that, "As you know, we do want to meet here in China and we will arrange everything."

## 2014

92.     In or around January 2014, Co-Conspirator C sent New Year's greetings to Claiborne, reminding her that "Anything we can do here, please let us know."

93.     On or about February 22, 2014, Co-Conspirator C informed Claiborne that Co-Conspirator A was "financially tight, so we wired 5000 Yuan [approximately $826] to him to offer a little help. Of course, if he needs cash in the coming months, we will be happy to give a hand."

He then told Claiborne that "me and [Co-Conspirator B] are planning a business tour in Africa in a couple of months, visiting some interesting places and exploring business opportunities there. We will certainly stop in East Africa, Sudan or Kenya, most likely. If possible we would like to visit you there. And if you have time, you can join us for a vacation."

94.     On or about March 17, 2014, Claiborne emailed Co-Conspirator A, "Read your Skype message ASAP then delete the history."

95.     On or about June 2, 2014, Co-Conspirator B emailed Co-Conspirator A, shortly after Co-Conspirator A had left China to return to the United States, and copying Co-Conspirator C, saying, "Hi I knew you will back to home end of may. That's why [Co-Conspirator C] want to give you some money for back home."

96.     On or about August 17, 2014, Claiborne emailed Co-Conspirators B and C. She extended her "sincere thanks for always being there for [Co-Conspirator A] and for extending welcoming hospitality to us during our stay in China." She observed that "We really had some good times and good food." Regarding work, Claiborne said she was "trying to get a posting in Taiwan or India next year." As for Claiborne's finances, "One thing is for sure I need to go back abroad to pay off all this debt I have accrued here in Wash (smile)." Claiborne signed the email as "Kangdai," her Chinese name.

97.     On or about October 26, 2014, having recently returned to Khartoum, Sudan, Claiborne submitted via electronic wire her completed SF-86 questionnaire for her national security clearance background check. The SF-86 instructions page warned Claiborne that "All questions on this form must be answered completely and truthfully in order that the Government may make the determinations described below on a complete record. Penalties for inaccurate or false statements are discussed below." In the section entitled "Penalties for Inaccurate or False Statement," the

instructions advised, "The U.S. Criminal Code (title 18, section 1001) provides that knowingly falsifying or concealing a material fact is a felony which may result in fines and/or up to (5) years imprisonment." The instructions further stated, "This form will be used by the United States (U.S.) government in conducting background investigations, reinvestigations, and continuous evaluations of persons under consideration for, or retention of, national security positions."

98.     On or about October 26, 2014, Claiborne answered "No" in response to Section 19 of the SF-86, entitled "Foreign Contacts," which asked, "Do you have, or have you had, close and/or continuing contact with a foreign national within the last seven (7) years with whom you, or your spouse, or cohabitant are bound by affection, influence, common interests, and/or obligation?"

99.     On or about October 26, 2014, Claiborne answered "No" in response to Section 20B of the SF-86, entitled "Foreign Business, Professional Activities, and Foreign Government Contacts," which asked, in relevant part under the subheading "Foreign Government Contact," whether during the past seven years Claiborne or anyone in her immediate family "had any contact with a foreign government, its establishment (such as embassy, consulate, agency, military service, intelligence or security service, etc.) or its representatives, whether inside or outside the U.S.?" Immediate family was defined to include Claiborne's children.

100.    On or about October, 26, 2014, before submitting the SF-86, Claiborne certified as follows: "My statements on this form, and on any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith. I have carefully read the foregoing instructions to complete this form. I understand that a knowing and willful false statement on this form can be punished by fine or imprisonment or both (18 U.S.C. 1001). I understand that intentionally withholding, misrepresenting, or falsifying information may have a negative effect on

24

my security clearance, employment prospects, or job status, up to and including denial or revocation of my security clearance, or my removal and debarment from Federal service."

101.   On or about October 26, 2014, under the section of the SF-86 entitled "Statement of understanding," Claiborne affirmatively answered that "I have read the instructions and I understand that if I withhold, misrepresent, or falsify information on this form, I am subject to the penalties for inaccurate or false statement[s] (per U.S. Criminal Code, Title 18, section 1001)."

102.   On or about November 3, 2014, Co-Conspirator B emailed Claiborne about Co-Conspirator A, stating that "we can do nothing for him if he is not in china. We believe that we should not give him up." Claiborne replied, "Personally, I don't want him to go back to China." She also inquired about Co-Conspirator C, asking, "Is he still working with you? Will he take over your business some day?"

<u>2015</u>

103.   On a date unknown to the Grand Jury but before on or about July 10, 2015, Claiborne wrote a journal entry which read "[Co-Conspirator B]: Business plan, Generate 20k in 1 year." Claiborne also wrote, "Clean up yahoo email contacts." Claiborne used a Yahoo email address as one means to communicate with Co-Conspirators B and C.

104.   On or about July 14, 2015, Claiborne informed Co-Conspirator B that she would be in Beijing for a quick visit that week, and that she would try to call him.

105.   On or about July 19, 2015, while she was in China, having been brought into secondary screening on or about July 16, 2015, by Customs and Border Patrol ("CBP") agents on her way out of the United States, where her bags were inspected, Claiborne emailed Co-Conspirator A, requesting, "Please communicate with me thru yahoo, viper, what's app, we chat, apple."

106.    On or about September 1, 2015, Claiborne, having recently returned from China, where she met with Co-Conspirators B and C, emailed Co-Conspirator B her USAA bank account information, saying, "I thought I would go ahead and send you this . . . if that's ok. I'll call u tomorrow."

107.    On or about September 5, 2015, Claiborne wrote, "Hi [Co-Conspirator B], hope all is well. Just wanted to know if you will be able to help me out." The subject line of the email was "Home repairs." Co-Conspirator B responded, "Hi Candace, we are on holiday these days. Can you inform me clearly the 5k to which account?"

108.    On or about September 6, 2015, Claiborne wrote back to Co-Conspirator B, provided her USAA account information, and said, "I'm sorry to disturb you while on vacation I didn't know. You can send it to my checking acct which is below. Are you in Europe? Enjoy yourself. I can wait until you return. I start school for Spanish training this week."

109.    On or about September 8, 2015, Claiborne responded to an email from the Department of State about scheduling an appointment for her background investigation interview. The email, from a contract Special Investigator with the Bureau of Diplomatic Security, noted that Claiborne "didn't list any foreign contacts or foreign travel" in her SF-86. The investigator requested that "if there is anyone or any trip that you have forgotten please use the attached templates to provide that information." Claiborne attached supplemental foreign contact and foreign travel information, saying, "I started this process so long ago. Sorry I don't remember these achievements. I have filled them out to the best of my knowledge. I am not sure of what your definition of foreign contacts are."

110.    On or about September 8, 2015, for her supplemental foreign contacts, Claiborne listed an education professor in China, a retired martial arts teacher in China, and an executive

assistant to the ambassador at the Barbados Embassy in China. She failed to list Co-Conspirators B and C.

111.   On or about September 8, 2015, Claiborne contacted the education professor in China whom she had listed in her supplemental list of foreign contacts. She wrote, "Hi I am doing my security clearance... someone may contact you by email. i said that I have met you since 2000.. we are colleagues/friends... we contact one another by email occasionally...thats all... you showed me around beijing during my first stay... nothing more...and that's the truth!"

112.   On or about September 9, 2015, Claiborne contacted a relative, a retired FBI agent. Claiborne talked about how, unlike last time she went through her background check, this time the investigator was a contractor. Claiborne asked whether the background investigators have prior security/agent/police experience. Regarding foreign contacts, Claiborne said, "I know all kinds of people . . . what the hell." Her relative explained that the investigators were interested in regular and continuing foreign contacts.

113.   On or about September 9, 2015, Claiborne called Co-Conspirator A and asked him how to delete her WeChat account. WeChat is a Chinese-based communications app that Claiborne used to communicate with "them, those China experts," including Co-Conspirator B.

114.   On or about September 9, 2015, Claiborne emailed Co-Conspirator B to instruct him not to send any money while her background investigation was ongoing, writing, "Very busy this week I have language orientation and my security clearance interview so I'm putting everything on hold until that's cleared."

115.   On or about September 10, 2015, during a "point-by-point review" of her security forms with the background investigator, Claiborne, despite being warned at the start of the interview

that "18 USC 1001 makes it a crime to knowingly falsify or conceal material facts related to this investigation," made materially false statements and omissions, including the following:

A.      Claiborne claimed that Co-Conspirator A's only trip out of the country was a pleasure trip to Africa. Claiborne failed to mention anything about Co-Conspirator A's extensive travels and stays in China, including his year living in Shanghai housing provided by Co-Conspirators B and C.

B.      Claiborne denied accepting financial support from any person or entity outside of her employment.

C.      Claiborne claimed she had no "close ties of affection or obligation" to a citizen or resident of a foreign country, other than those she had listed (which did not include Co-Conspirators B and C).

D.      Despite making no mention of Co-Conspirators B and C, Claiborne denied failing to report any contacts with foreign nationals. Claiborne specifically averred that she maintained no contact with any foreign nationals, including through any social media, including Snapchat, Skype, or Facebook.

E.      Claiborne denied that any foreign contact had ever asked for "special favors" or had any influence over her. Claiborne stated that no foreign contact had ever asked probing questions about her work, asked her to participate in a clandestine meeting, or introduced her to members of a foreign intelligence agency or government.

F.      Claiborne asserted that she had no "unauthorized association with a suspected or known collaborator or employee of a foreign intelligence service ["FIS"] and Claiborne [had] no knowledge or suspicions of ever having been a target of interest of a FIS."

28

G.      Claiborne denied accepting any "educational, medical, or other benefits . . . from a foreign country."

H.      Claiborne said that she had not "deliberately omitted, concealed, or falsified relevant and material facts from any personnel security questionnaire, personal history statement, or similar form used to conduct investigations . . . [or] determine security clearance eligibility or trustworthiness."

I.      Claiborne asserted she had not "deliberately provided false or misleading information concerning relevant and material matters to [any representative] in connection with a personnel security or trustworthiness determination."

116.    On or about September 11, 2015, Claiborne asked the background investigator by email, "When will I be informed about the completion of my clearance?"

117.    On or about September 11, 2015, Claiborne called Co-Conspirator A, who was living in Claiborne's house in Washington, D.C., to tell him about her security clearance interview. She complained about how many questions she was asked, including about whether people like Co-Conspirator A had "traveled abroad." Claiborne told Co-Conspirator A that she said he had only gone to Africa. While she did not think Co-Conspirator A would be contacted, she made sure he knew that she "didn't say anything about . . . um . . . ya know," referring to China. Claiborne said she would tell him more when she saw him. Claiborne also acknowledged that if she was not fully forthcoming, she could lose her job.

118.    On or about September 13, 2015, Co-Conspirator B emailed Claiborne, asking, "Did everything clear now?" Claiborne immediately responded, "Clear all messages please. Everything below . . ."

119.   On or about September 13, 2015, after Claiborne called Geotelecom customer service to learn how to dial a cell phone number in China using her calling card, Claiborne made a phone call to Co-Conspirator B using her calling card.  Co-Conspirator B asked whether everything was alright. Claiborne responded, "Yes. I want to say yes, so. I didn't want to email because now . . . it, it take a while for the whole process to be finish." Claiborne elaborated, "They ask, oh so many questions. You have no idea." Co-Conspirator B responded, "So, so, so I can't transfer the 5k to your that . . . to the account?" Claiborne replied, "No, no, no, no, no. No, no, no, no, no." Claiborne said, "I will tell you a little later. You know when it's all, when it's all finished." Co-Conspirator B responded, "Okay, okay, no problem. . . I will wait." Claiborne explained, "cause they, they check into it, everything, your taxes, your, oh, everything, your foreign travel, your foreign contact." She then said, "M-hmm, trouble, very big trouble." Co-Conspirator B clarified, "So, it's not yet finished, right?" Claiborne confirmed that was right.  Claiborne continued, "Every five years, we have to do this, even though. But, now, they change, they want to know about your foreign travel. Where did you go? Who did you meet?" Co-Conspirator B noted, "A lot of questions." Claiborne agreed, observing, "This is too excessive. Really, even your children. . . Now, they ask what your children did when they went overseas." Co-Conspirator B said, "Now, I understand. . . No problem. Uh... when it's over, you let me know. Then, I can do. Okay?" Claiborne affirmed, "Good." Claiborne closed the conversation, saying, "So, I just cleaned, cleaned up all my emails and stuff. You know, delete, delete, delete." Co-Conspirator B responded, "Good, understand."

## 2016

120.   On or about April 1, 2016, having learned on February 23, 2016, that her background check was completed successfully, Claiborne received a reminder from birthdayalarm.com about

Co-Conspirator B's 50th birthday on April 4. Claiborne forwarded the reminder to Co-Conspirator A, saying, "Send a card to [Co-Conspirator B]." Co-Conspirator A responded, "Who is [Co-Conspirator B]?" Claiborne replied, "[Co-Conspirator B] from Shanghai."

121.    On or about June 7, 2016, after Co-Conspirator A boarded a plane bound for China, he spoke by phone with Claiborne. Co-Conspirator A told Claiborne he would set up WeChat once he arrived. Claiborne instructed Co-Conspirator A, "If you happen to talk to [Co-Conspirator B] or any of them, just say… [Claiborne] is working in D.C. I'm sure they'll ask – they're spies."

122.    On or about July 12, 2016, Co-Conspirator B emailed Claiborne, "Hi Candace, long time no see! How is life in DC? Found [Co-Conspirator A] is back in Shanghai? What do you want me to do for him?" Claiborne responded, thanking Co-Conspirator B for the offer, but saying, "I don't need you to do anything for [Co-Conspirator A]."

123.    On or about July 12, 2016, Claiborne asked Co-Conspirator A whether he had seen Co-Conspirators B or C. Co-Conspirator A answered that he had not.

124.    During Co-Conspirator A's reentry to the United States from China, in response to questioning by a CBP agent, Co-Conspirator A said that he had been to China many times, but denied having ever lived anywhere other than Beijing. Co-Conspirator B omitted that he had lived in Shanghai for a year at the expense of Co-Conspirators B and C.

125.    On or about July 28, 2016, Claiborne obtained a new iPhone at an Apple store, complaining that her old phone had been out of her sight for a couple of hours at the airport.

126.    On or about August 23, 2016, during the course of a voluntary interview in Washington, D.C. at the FBI's Washington Field Office with an FBI Special Agent and a Joint Terrorism Task Force Officer, Claiborne, having been warned that "it's a crime to lie to federal agents," made materially false statements and omissions, including the following:

A.      Regarding her most recent trip to China (in the summer of 2015), Claiborne claimed that she did not meet with any foreign government officials. By contrast, in October 2015, Co-Conspirator A emailed Co-Conspirator B, who was a PRCIS agent, saying, "[Claiborne] said she met with you on her last trip to Shanghai." And later, in a March 28, 2017 voluntary interview with the FBI, Claiborne admitted to meeting with Co-Conspirators B and C during her summer 2015 trip to China.

B.      When asked whether she maintained contact with any Chinese foreign nationals, Claiborne omitted any mention of Co-Conspirators B and C.

C.      When asked directly whether she "ever had contact with representatives of any foreign entity or intelligence agency while either overseas or here in the U.S.," Claiborne responded, "No," adding, "those are the same things we have to report in our clearance."

D.      Claiborne falsely denied that any of her children maintains contacts with any Chinese government officials. She omitted any reference to Co-Conspirator A's connections with Co-Conspirators B and C, who were both PRCIS agents. When asked if Co-Conspirator A still travels, Claiborne responded, "Well, he's in California now. He was in DC last year, and he's in California. I don't know what he's doing exactly. He's trying to go back to school." Claiborne failed to mention that she knew Co-Conspirator A had just returned from China the previous month.

E.      Claiborne acknowledged that Co-Conspirator A had attended fashion school in China, but misrepresented how his education was funded. When asked directly, "Who paid for that?" Claiborne responded, "I think he paid for it. . . I think he had like some kind of scholarship." Claiborne said nothing about Co-Conspirators B and C providing the tuition payments, housing costs, and living expenses for Co-Conspirator A.

F.      Claiborne falsely stated that no one had ever offered to provide travel benefits for her other than the U.S. government.

G.      Claiborne additionally falsely denied having ever been offered any "gifts, benefits, money" by a foreign national. Claiborne volunteered, "That's the kind of stuff we have to report."

127.    On or about August 23, 2016, about three hours after her interview at the FBI's Washington Field Office had concluded, Claiborne left her desk at the Department of State to call Co-Conspirator A from her cell phone. She asked him if he had received a scholarship when attending the fashion school in China. Co-Conspirator A responded, "Not that I know of." Claiborne falsely insisted otherwise, saying, "You did! You did! Uh-huh, yeah, yeah."

128.    On or about August 23, 2016, about seven minutes after her cell-phone call to Co-Conspirator A, Claiborne called Co-Conspirator A again, this time not from her cell phone or from her desk phone, but from a phone booth located three floors below Claiborne's office in the Department of State. Claiborne told Co-Conspirator A that CBP had previously stopped her, searched her bags, and asked questions. Claiborne then explained how earlier that day, the FBI had asked questions about where she had been and why. Claiborne relayed to Co-Conspirator A that she told the FBI she had not taken money or gifts, and that Co-Conspirator A had been on scholarship while at the art school. Claiborne explained to Co-Conspirator A that during a national security clearance investigation, a lot of questions get asked about your family because of the clearance you hold and the access you have to certain documents. As a result, Co-Conspirator A needed to be careful with what he said and did, because his actions could lead back to Claiborne. Co-Conspirator A told Claiborne, apparently for the first time, that he too was stopped by CBP after his most recent trip to China. CBP searched his belongings outside his presence and required him to unlock his phone, just as they had done with Claiborne. This information prompted Claiborne to

express concern and speculate that CBP's actions had something to do with their visits to China, and that they should "stay away from that for now." Claiborne asked Co-Conspirator A when he studied in China, to which Co-Conspirator A answered 2012 to 2013. Claiborne reiterated her point from the earlier call that Co-Conspirator A was "on scholarship, and they paid for your housing," expressing that she did not want any trouble. After the call, Claiborne returned to her desk.

129.    On or about the evening of August 23, 2016, Claiborne called Co-Conspirator A again. The call once more was focused on the CBP searches in light of the FBI interview earlier that day. Claiborne asked Co-Conspirator A more specific questions about his recent stop by CBP, including about the questions CBP asked and about the search of his electronics. Claiborne expressed to Co-Conspirator A that "you don't really know what to think, you know, who to trust." Claiborne warned Co-Conspirator A that a person's words could be used against that person at some point. Claiborne was uncomfortable with CBP going through her iPhone, so she got a new phone. Claiborne advised Co-Conspirator A to clean his "stuff up," and to be mindful of his words and actions.

130.    On or about that same evening of August 23, 2016, Claiborne emailed Co-Conspirator A, writing, "I'm sorry u were harassed at airport. U should have told me. When are you coming home for a visit? Be mindful and clean up your computer, Facebook etc. People will hunt for anything."

131.    The next day, on or about August 24, 2016, Claiborne sent Co-Conspirator A an e-card message using the service Birthday Alarm. The message's subject was "Happy Birthday," even though Co-Conspirator A's birthday occurred five days before, and Claiborne had conveyed birthday greetings by phone to Co-Conspirator A on his actual birthday. The message, however, had little to do with Co-Conspirator A's birthday. To the contrary, it read, "I hope you enjoyed your

day. May Allah bless you with health and happiness. Btw delete all email messages and contact information in your email and phone pertaining to [Co-Conspirator B] and [Co-Conspirator C] – I don't want any trouble going forward ok – please do this immediately! Messages, nos, anything having to do with that fashion school your apartment anything – even from wechat, fb, skype, etc u got me?"

132.    That same day, on or about August 24, 2016, Claiborne asked a T-Mobile representative whether it was possible to batch delete numbers from an iPhone 6s.

## 2017

133.    On or about January 26, 2017, Claiborne met with an FBI undercover employee ("UCE") whom Claiborne believed was an agent of the PRC government associated with Co-Conspirators B and C. The UCE was standing outside Claiborne's home in Washington, D.C. when Claiborne returned from work. It was cold and dark outside. Nevertheless, Claiborne admitted the stranger into her home after he described himself as "[Co-Conspirator C] and [Co-Conspirator B]'s colleague."   Over the next 1.5 hours, Claiborne and the UCE engaged in a wide-ranging conversation. The UCE, explaining that he worked for the MSS and that Co-Conspirators B and C were with the SSSB, stated that the MSS considered Claiborne to be one of its "highest regarded" friends.  The UCE went further, thanking Claiborne, on behalf of the MSS, for her past assistance. Claiborne did not deny this assistance, but did refuse to continue providing assistance or receiving benefits, including cash proffered on the spot by the agent. As Claiborne articulated, "Things are not the way they used to be." Rather, she now had "to do security stuff all the time." In particular, she had been asked "just way too many questions" about "travels" and "foreign contacts." Moreover, Claiborne complained that during national security clearance investigations, "they ask us about this kinda stuff . . . like your relationship with foreign governments."

134.    In accordance with the request of the UCE, Claiborne failed to report to the Department of State her conversation with the UCE, in violation of Department of State requirements.

135.    Claiborne at no time reported to the Department of State the close and continuing contacts that she had with Co-Conspirators B and C or the gifts, monies, and other benefits that she and Co-Conspirator A received from Co-Conspirators B and C.

(**Conspiracy to Defraud the United States**, in violation of Title 18, United States Code, Section 371; Title 5, United States Code, Section 7342; Title 12, Sections 262, 271, and 274 of the Foreign Affairs Manual; Title 11, Section 613.1 of the Foreign Affairs Manual; Title 2, Sections 961 and 962 of the Foreign Affairs Manual; Title 5, Section 2635.202 of the Code of Federal Regulations; Executive Orders 10450, 12968, and 13467; and Title 5, Sections 732.203 and 1400.201(a)(2) of the Code of Federal Regulations).

## COUNT TWO
### (Obstructing an Official Proceeding – 18 U.S.C. § 1512 (c))

136.    Beginning as early as on or about October 26, 2014, and continuing through on or about February 23, 2016, Claiborne corruptly obstructed, influenced, and impeded, and attempted to corruptly obstruct, influence, and impede, an official proceeding, that is, a background investigation conducted by or on behalf of the Department of State, located in the District of Columbia.

(**Obstructing an Official Proceeding** in violation of 18 U.S.C. § 1512 (c))

## COUNT THREE
### (False Statements – 18 U.S.C. § 1001(a)(3))

137.    On or about October 26, 2014, beginning outside of the jurisdiction of any particular State or district and within the venue of the United States District Court for the District of Columbia pursuant to Title 18, United States Code, Section 3238, in a matter within the jurisdiction of the executive branch of the United States, namely the Department of State, Claiborne knowingly and

willfully made and used a false writing and document, that is, an SF-86 form submitted to the Department of State, as set forth in paragraphs 1, 97, 98, 99, 100, and 101 of Count One, which are herein re-alleged and incorporated by reference, knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, to wit, the statements set forth in paragraphs 98, 99, and 100, of Count One, which are herein re-alleged and incorporated by reference.

(**False Statements**, in violation of Title 18, United States Code, Section 1001(a)(3))

## COUNT FOUR
### (False Statements– 18 U.S.C. § 1001(a)(2))

138.   On or about August 23, 2016, in the District of Columbia, in a matter within the jurisdiction of the executive branch of the United States, namely the Federal Bureau of Investigation, Claiborne made materially false, fictitious and fraudulent statements and representations, to wit, the statements set forth in paragraphs 126 A through 126 G of Count One, which are herein re-alleged and incorporated by reference.

(**False Statements**, in violation of Title 18, United States Code, Section 1001(a)(2))

## COUNT FIVE
### (Wire Fraud – 18 U.S.C. § 1343)
### The Scheme and Artifice to Defraud

139.   Beginning in or around as early as 2007, the exact date being unknown to the Grand Jury, and continuing through on or about March 28, 2017, Claiborne devised and intended to devise an unlawful scheme and artifice to defraud the U.S. Department of State and to obtain property by means of materially false and fraudulent pretenses, representations, and promises.

### Object, Manner, and Means

140.   The allegations contained in paragraphs 1 through 27, and 31 through 135 of Count

One of this Indictment are hereby re-alleged and incorporated by reference herein as setting forth the materially false and fraudulent pretenses, representations, and promises which were further part of the scheme and artifice to defraud. As Claiborne knew, if Department of State security personnel or background investigators knew that she was in continual contact with Co-Conspirators B and C, and was further receiving gifts and monies from those Co-Conspirators, whom she knew or believed to be intelligence agents of, or acting on behalf of a foreign government, then Claiborne's eligibility for a TOP SECRET security clearance would have been suspended or revoked. Claiborne also knew that maintaining her TOP SECRET security clearance was a condition of her employment.

141.    It was part of the scheme and artifice that, based on the aforesaid materially false fraudulent and misleading pretenses, representations, and promises, Claiborne obtained monies, in the form of salary payments, funds, and property from the United States Department of State and the United States government for her own benefit.

### The Purpose of the Scheme and Artifice

142.    The purpose of the scheme and artifice was for Claiborne to fraudulently maintain a TOP SECRET security clearance, which was a necessary condition for her Foreign Service employment at the Department of State, and to fraudulently obtain monies and property from the Department of State and the United States government for her own use and benefit and to further the scheme by various means including false material pretenses, representations, and promises.

### Execution of the scheme and artifice

143.    On or about October 26, 2014, Claiborne did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce the writings, signs, and signals set forth here; that is a transmission of an SF-86 electronic questionnaire for national security positions from a computer in Khartoum, Sudan to the United States Department of State,

passing through various United States judicial districts.

(**Wire Fraud,** in violation of Title 18, United States Code, Section 1343)

## FORFEITURE ALLEGATIONS

144.    Upon conviction of the offense alleged in Count Five, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to this offense.

a.    The Grand Jury finds by probable cause that the following specific property is subject to forfeiture upon conviction of an offense alleged in Count Five:

(1) real property located at 2108 2nd Street N.W., Washington, D.C., with all appurtenances, improvements, and attachments thereon; and

(2) USAA Federal Savings Bank account ending 2496, held in defendant's name.

145.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred, sold to, or deposited with a third party;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture,** in violation of Title 18, United States Code, Sections 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p)).

A TRUE BILL

*Chamnly D. Phillips /KK*                FOREPERSON

Attorney of the United States in
and for the District of Columbia