**Exhibit 25** to Memorandum of Points and Authorities in Support of Defendant Concord Management and Consulting LLC's Motion to Dismiss Count One of the Superseding Indictment, 18-cr-00032-2-DLF

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 16, 2011**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.** |
| | : | |
| | : | **Grand Jury Original** |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| | : | |
| **KERRY F. KHAN,** | : | **18 U.S.C. § 371** |
| **LEE A. KHAN,** | : | **(Conspiracy)** |
| **MICHAEL A. ALEXANDER, and** | : | |
| **HAROLD F. BABB,** | : | **18 U.S.C. § 201** |
| | : | **(Bribery)** |
| | : | |
| **Defendants.** | : | **41 U.S.C. § 8702 (Unlawful Kickbacks)** |
| | : | |
| | : | **18 U.S.C. § 1956(h) (Conspiracy to** |
| | : | **Launder Monetary Instruments)** |
| | : | |
| | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting and** |
| | : | **Causing an Act to be Done)** |
| | : | |
| | : | **18 U.S.C. §§ 981 and 982, and 28** |
| _____ : | | **U.S.C. § 2461 (Criminal Forfeiture)** |

## I N D I C T M E N T

The Grand Jury charges that:

At all times material to this Indictment:

### Introduction

1.      The defendants, KERRY F. KHAN, LEE A. KHAN, MICHAEL A.

ALEXANDER, HAROLD F. BABB, and others, both known and unknown to the Grand Jury,

engaged in a conspiracy to commit offenses against the United States and agencies thereof, and

engaged in other substantive offenses as set forth herein, through the promised payment,

solicitation, and laundering of bribe and kickback payments in excess of $20,000,000 and the

planned steering of a $780,000,000 government contract to a favored government contractor.

### The United States Small Business Administration

2.      The United States Small Business Administration ("SBA") was an agency of the

Executive Branch of the Government of the United States.

3.      The SBA was authorized by law to develop a program and promulgate regulations

to assist socially and economically disadvantaged small businesses.  The SBA's Section 8(a)

program, the "Business Development Program," provided business development assistance to

socially and economically disadvantaged small businesses, including help in obtaining federal

contracts.

4.      In 1971, Congress passed the Alaska Native Claims Settlement Act ("ANCSA"),

which created thirteen regional Alaska Native Corporations ("ANCs") and approximately 200

local village ANCs to stimulate Alaska's economy and settle land disputes between the United

States Government and Alaskan natives.  In 1986, Congress authorized regional and village

ANCs to be included in the SBA 8(a) program.  ANCs were granted unique procurement

advantages beyond those available to other 8(a) participants, including the following exemptions:

- ANCs were eligible to receive sole source 8(a) contracts regardless of dollar size, with no upper limit, while all other 8(a) firms could not receive sole source contracts in excess of $3 million for services and $5 million for manufacturing.

- The ANCSA automatically conferred "economically disadvantaged" status upon ANCs, while other 8(a) firms had to be managed by economically and minority disadvantaged owners.

**Relevant Entities and Individuals**

5.      The United States Army Corps of Engineers ("USACE") was a branch of the

United States Army made up of approximately 34,000 civilian and military personnel.  The

Headquarters for the USACE was located at 441 G Street, N.W., in the District of Columbia.

The USACE's stated mission was to "provide vital public engineering services in peace and war

to strengthen our Nation's security, energize the economy, and reduce risks from disasters."  The

Directorate of Contingency Operations ("DCO") was a branch of the USACE.  The USACE

administered the Technology for Infrastructure, Geospatial, and Environmental Requirements

("TIGER") Contract.  The USACE was a "contracting agency," as defined in Title 41, United

States Code, Section 8701(1).  The TIGER Contract was a "prime contract," as defined in Title

41, United States Code, Section 8701(4).

6.      Defendant KERRY F. KHAN ("KHAN") was employed as a Program Manager

with the USACE's DCO at Headquarters in Washington, D.C.  KHAN was a public official.  As

part of his official duties, KHAN had authority, among other things, to place orders for products

and services for the USACE through the TIGER Contract as well as other federal government

contracts and to certify that the work on the orders had been completed.  KHAN resided in

Alexandria, Virginia.

7.      Defendant LEE A. KHAN ("LEE KHAN") was the son of KERRY F. KHAN.

LEE KHAN resided in Fairfax, Virginia.

8.      Defendant MICHAEL A. ALEXANDER ("ALEXANDER") was employed as a

Program Director with the USACE's DCO at Headquarters in Washington, D.C.  ALEXANDER

was a public official.  As part of his official duties, ALEXANDER had authority, among other

things, to obtain funding for USACE projects, including funding for orders placed through the TIGER Contract and other federal government contracts.  As part of his official duties, ALEXANDER produced and actively managed a budget within USACE of $54,000,000.  ALEXANDER resided in Woodbridge, Virginia.

9.      Eyak Technology LLC ("EyakTek") was an ANC with an office in Dulles, Virginia.  EyakTek was the "prime contractor," as defined in Title 41, United States Code, Section 8701(5), for the TIGER Contract.

10.     Defendant HAROLD F. BABB ("BABB") was employed as the Director of Contracts at EyakTek.  BABB resided in Sterling, Virginia.  As an employee of EyakTek, BABB was a "prime contractor employee," as defined in Title 41, United States Code, Section 8701(6).

11.     Company A was a provider of information assurance and security services to federal agencies and commercial companies.  Company A maintained its corporate headquarters in Chantilly, Virginia.  In September 2007, Company A was certified by the SBA as an 8(a) small disadvantaged business.  Company A had "subcontracts" and was a "subcontractor," as defined in Title 41, United States Code, Sections 8701(7) and 8701(8)(A), respectively, with EyakTek under the TIGER Contract.

12.     Co-Conspirator 1 (hereinafter, "CC-1") was the Chief Technology Officer of Company A.  CC-1 was a "subcontractor employee," as defined in Title 41, United States Code, Section 8701(9).

13.     Khan Family Member A was a close family member of KHAN and LEE KHAN.  Since in or about February 2011, Khan Family Member A resided in the Alexandria Detention Facility in Alexandria, Virginia.

14.     AcePoint Consulting LLC ("AcePoint") was a Virginia limited liability company formed on or about October 16, 2009.  KHAN and LEE KHAN controlled AcePoint Consulting.

15.     Adrasteak Insurance Corporation was a registered corporate entity in Anguilla. KHAN controlled Adrasteak Insurance Corporation.

16.     Adrastea, LLC ("Adrastea") was a Virginia limited liability company formed on or about January 8, 2010.  KHAN controlled Adrastea.  LEE KHAN was listed as a member of Adrastea in the company's corporate filings with the Virginia State Corporation Commission.

17.     Ananke, LLC ("Ananke") was a Virginia limited liability company formed on or about November 14, 2007.  KHAN controlled Ananke.  LEE KHAN was listed as the manager of Ananke in the company's corporate filings with the Virginia State Corporation Commission.  A website for Ananke identified BABB as a "managing partner" of Ananke.

18.     Ananke Consulting Services L.P. ("Ananke Consulting Services") was a limited partnership formed on or about June 6, 2011.  KHAN was the general partner of Ananke Consulting Servies.  KHAN controlled Ananke Consulting Services.

19.     Ananke Consulting Services Alpha L.P. ("Ananke Consulting Services Alpha") was a limited partnership formed on or about June 6, 2011.  Ananke Consulting Services was the general partner of Ananke Consulting Services Alpha.  KHAN controlled Ananke Consulting Services Alpha.

20.     Ananke Consulting Services Beta L.P. ("Ananke Consulting Services Beta") was a limited partnership formed on or about June 6, 2011.  Ananke Consulting Services was the general partner of Ananke Consulting Services Beta.  KHAN controlled Ananke Consulting Services Beta.

21.     Ananke Consulting Services Gamma L.P. ("Ananke Consulting Services Gamma") was a limited partnership formed on or about June 6, 2011.  Ananke Consulting Services was the general partner of Ananke Consulting Services Gamma.  KHAN controlled Ananke Consulting Services Gamma.

22.     AssureIT LLC ("AssureIT") was a Virginia limited liability company formed on or about October 19, 2009.  CC-1 controlled AssureIT.

23.     Company D was a Virginia corporation formed on or about November 20, 2007.  A married couple, hereinafter referred to as "Couple D," controlled Company D.  Couple D resided in and operated Company D out of Virginia Beach, Virginia.  Couple D were associates of BABB.

24.     Executive Drive LLC ("Executive Drive") was a Virginia limited liability company formed on or about March 2, 2007. CC-1 controlled Executive Drive.

25.     KanuHub, LLC ("KanuHub") was a Virginia limited liability corporation formed on or about February 28, 2011.  KHAN controlled KanuHub.

**The IDIQ Contracts**

26.     The TIGER Contract was a vehicle used by authorized federal government agencies and departments to purchase products and services.  The TIGER Contract was an audited and awarded Indefinite Delivery/Indefinite Quantity ("IDIQ") contract.  As a result, such authorized agencies and departments were not required to obtain three separate bids or to compare the TIGER Contract to another contract before submitting an invoice for products and services through the TIGER Contract.  The current TIGER Contract is a five-year contract

running from October 1, 2009 through September 30, 2014.  Over that term, the total award of

orders placed against the TIGER Contract is authorized to exceed $1,000,000,000.

27.     As the prime contractor for the TIGER Contract, EyakTek subcontracted many of

the USACE's orders to other businesses, including Company A.  After a subcontractor performed

work on an order by providing the products and/or services to the USACE, the subcontractor sent

a quote to EyakTek describing the amount due to the subcontractor.  EyakTek generally marked

up this amount in order to build in a profit margin for EyakTek, and then sent an invoice to the

USACE for payment.  After EyakTek received payment from the USACE and subtracted

EyakTek's profit margin, EyakTek generally paid the remainder to the subcontractor.

28.     The Contingency Operations Readiness Engineering & Support (the "CORES")

Contract was a planned IDIQ contract.  The CORES Contract, which if approved and issued

would be administered by the USACE, would offer authorized departments and agencies an

alternative to the TIGER Contract and be a potential replacement for the TIGER Contract.  As

planned, the CORES Contract would be a five-year contract with an award potential for all

contracts placed against the contract of up to $780,000,000.

29.     Contracting Officer A was an employee of the USACE.  As part of his official

duties, Contracting Officer A had responsibility, among other things, to prepare the CORES

Contract for solicitation to potential bidders.

30.     As part of his official duties, KHAN had responsibility to prepare the CORES

Contract for solicitation to potential bidders and to approve the solicitation prior to its issuance to

potential bidders.

7

31.     As part of his official duties, ALEXANDER had responsibility to obtain funding for USACE projects placed through the CORES Contract.

**COUNT ONE**
**(Conspiracy)**

32.     Paragraphs 1 through 31 of this Indictment are realleged and incorporated by reference as if set out in full.

33.     From in or about July 2007 through the present, in the District of Columbia and elsewhere, the defendants,

**KERRY F. KHAN,**

**LEE A. KHAN,**

**MICHAEL A. ALEXANDER, and**

**HAROLD F. BABB,**

did knowingly combine, conspire, and agree with each other and with persons known and unknown to defraud the United States, that is, to obtain money, property, and other things of value of the United States and agencies thereof through false, fraudulent, and misleading representations, and to commit the following offenses against the United States, in violation of 18 U.S.C. § 371:

a.     **Bribery of a Public Official**: That is, to directly and indirectly, corruptly give, offer, and promise things of value to a public official, and to promise a public official to give things of value to other persons and entities, with intent to influence an official act, with intent to influence a public official to commit, collude in, and allow fraud on the United States,

and with intent to induce a public official to do and omit to do an act in violation of the lawful

duty of such official, in violation of 18 U.S.C. § 201(b)(1) (bribery of a public official);

        b.     **Receipt of a Bribe by a Public Official**: That is, to directly and

indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept things of

value personally and for others, in return for being influenced in the performance of an official

act, in return for being influenced to commit, collude in, and allow fraud on the United States,

and in return for being induced to do and omit to do an act in violation of the official duty of such

official, in violation of 18 U.S.C. § 201(b)(2) (receipt of a bribe by a public official);

        c.     **Scheme to Defraud Relating to the TIGER Contract**: That is, to

knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to

defraud, and to obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises, knowing they were false and fraudulent when made, for the

purpose of executing such scheme and artifice and attempting so to do, and transmitting and

causing to be transmitted by means of wire communication in interstate commerce, writings,

signs, and signals for the purpose of executing such scheme and artifice, that is, knowingly

causing to be sent, delivered, and moved by interstate wire false information concerning

payments for orders placed through EyakTek under the TIGER Contract and direct awards placed

through Company A, in violation of Title 18, United States Code, Section 1343; and

        d.     **Scheme to Defraud Relating to the CORES Contract**: That is, to

knowingly and with intent to defraud devise and intend to devise a scheme and artifice to

defraud, and to obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises, knowing they were false and fraudulent when made, for the

purpose of executing such scheme and artifice and attempting so to do, and transmitting and

causing to be transmitted by means of wire communication in interstate commerce, writings,

signs, and signals for the purpose of executing such scheme and artifice, that is, knowingly

causing to be sent, delivered, and moved by interstate wire information to the USACE in an

attempt to steer the CORES Contract to Company A, in violation of Title 18, United States Code,

Section 1343.

## Goal of the Conspiracy

34.     A goal of the conspiracy was for the defendants, KHAN, LEE KHAN,

ALEXANDER, and BABB to unlawfully enrich themselves and others by directing federal

government contracts and orders to businesses in return for things of value.

## Manner and Means of the Conspiracy

35.     In order to achieve a goal of the conspiracy, the defendants KHAN, LEE KHAN,

ALEXANDER, BABB, and others used the following manner and means, among others:

a.     KHAN and ALEXANDER used their official positions as USACE

employees, and BABB used his position at EyakTek, to direct USACE orders through the TIGER

Contract to Company A.  ALEXANDER obtained federal funding for the orders.  With KHAN's

knowledge and direction, CC-1 submitted fraudulently inflated quotes to EyakTek for the work

performed on the orders.  The fraudulently inflated amounts were referred to as "overhead."  The

"overhead" referred to fictitious and overpriced information assurance and security equipment

and services on the quotes submitted by Company A.  EyakTek took the fraudulently inflated

quotes and created invoices that it submitted to the USACE.  Company A provided to the

USACE the information assurance and security equipment and services legitimately included on

the orders, but also billed for the inflated and fictitious equipment and services included on the orders.  KHAN caused the USACE to approve and remit payment to EyakTek for the fraudulently inflated invoices.  After subtracting its profit margin, EyakTek paid the remainder to Company A.  This remainder included payment for the overhead.  As directed by KHAN, ALEXANDER, and BABB, CC-1 caused Company A to pay a portion of the "overhead" directly and indirectly for the benefit of KHAN, LEE KHAN, ALEXANDER, and BABB.

        b.        KHAN and ALEXANDER also caused the USACE to award USACE contracts directly to Company A.  ALEXANDER obtained federal funding for the contracts.  With KHAN's knowledge and direction, CC-1 submitted fraudulently inflated invoices to the USACE.  Company A provided to the USACE the information assurance and security equipment and services legitimately included on the orders, but also billed for the inflated and fictitious equipment and services included on the orders.  KHAN caused the USACE to approve and remit payment to Company A for the fraudulently inflated invoices.  As directed by KHAN and ALEXANDER, CC-1 caused Company A to pay a portion of the "overhead" directly and indirectly for the benefit of KHAN, LEE KHAN, and ALEXANDER.

        c.        Using the manner and means described above, from 2007 to the present, as directed by KHAN, ALEXANDER, and BABB, CC-1 caused invoices to be submitted to the USACE, directly and through EyakTek, for total costs of over $45,000,000.  As directed by KHAN, ALEXANDER, and BABB, CC-1 caused Company A to fraudulently inflate its quotes and invoices by approximately $20,000,000.  CC-1 promised and paid the inflated amounts directly and indirectly to KHAN, LEE KHAN, ALEXANDER, and BABB.

d.      Using the manner and means described above, from 2007 to the present, CC-1 promised and made payments directly and indirectly to KHAN in excess of $18,000,000, including, among others, the following: (i) payments to KHAN personally and to accounts controlled by KHAN in excess of $5,000,000; (ii) payments to a home improvement contractor to renovate multiple properties for the benefit of KHAN; (iii) payments to multiple retailers to furnish and improve properties for the benefit of KHAN, including flat screen televisions, computer equipment, and furniture; (iv) payments to LEE KHAN and Khan Family Member A for employment with Company A; (v) payments for the benefit of LEE KHAN, Khan Family Member A, and another close family member of KHAN in excess of $800,000; (vi) payments to car dealerships to lease and purchase Acura TL-S, BMW M3, BMW 335i, BMW X6, and Infiniti G35 automobiles for the benefit of KHAN, LEE KHAN, Khan Family Member A, and another close family member of KHAN; (vii) payments to criminal defense attorneys and a criminal defense investigator for the benefit of Khan Family Member A; (vii) payments to improve property in Berkeley Springs, West Virginia intended for the benefit of KHAN; (ix) payments to and for the benefit of KHAN's associates in Virginia, Florida, and the Philippines; and (x) miscellaneous payments for the benefit of KHAN, including two Rolex watches, high-end liquor, clothing expenses at Nieman-Marcus, first-class airline tickets, and luxury international hotel accommodations.  As directed by KHAN, LEE KHAN conducted financial transactions in order to conceal from law enforcement and tax authorities the proceeds of the conspiracy and to use proceeds of the conspiracy unlawfully to obtain real property, vehicles, and luxury personal goods for the personal benefit of KHAN and LEE KHAN.

e.      Using the manner and means described above, from 2007 to the present,

CC-1 promised and made payments directly and indirectly to ALEXANDER in excess of

$1,000,000, including, among others, the following:  (i) payments to ALEXANDER personally

and through a third-party conduit; (ii) payments to a close family member of ALEXANDER for

employment with Company A; (iii) payment to retailers of approximately $21,000 to purchase a

Cartier watch and $6,405 to purchase a Chanel watch intended for a close family member of

ALEXANDER; (iv) payments of approximately $1,000,000 to purchase property and an Audi A4

automobile for ALEXANDER's associate in South Korea; (v) the promise of future employment

for ALEXANDER at Company A; and (vi) miscellaneous payments for the benefit of

ALEXANDER, including first-class airline tickets for ALEXANDER, a close family member of

ALEXANDER, and ALEXANDER's associate in South Korea.

f.      Using the manner and means described above, from 2007 to the present,

CC-1 promised and made payments directly and indirectly to BABB in excess of $700,000,

including, among others, the following:  (i) payments to BABB personally; (ii) payments for

first-class airline tickets for the benefit of BABB; and (iii) the promise of future employment at

Company A for BABB.

g.      KHAN, ALEXANDER, BABB, CC-1, and other employees of Company

A devised a scheme to steer the award of the CORES Contract to Company A, with the intent to

use the CORES Contract as a vehicle to enable Company A to funnel monies and other things of

value directly and indirectly to KHAN, ALEXANDER, BABB, and others.  CC-1 promised

things of value to KHAN, ALEXANDER, BABB, and others to steer the award of the CORES

Contract to Company A.  As part of the scheme, KHAN, BABB, CC-1, and employees of

13

Company A worked on a statement of objectives/statement of work for the CORES Contract, with the intent to tailor the statement to the qualifications of Company A and thereby reduce competition.  It was intended that the USACE would disseminate the statement to potential bidders.  As a result, certain USACE officials and the potential bidders would not know that Company A had been involved in drafting the statement.  Also as part of the scheme, KHAN, ALEXANDER, and BABB planned to install certain employees of the USACE to serve on the selection board to insure the award of the CORES Contract to Company A.

### Overt Acts

36.     Within the District of Columbia and elsewhere, in furtherance of the above-described conspiracy and in order to carry out the objects thereof, defendants KHAN, LEE KHAN, ALEXANDER, BABB, and others committed the following overt acts, among others:

a.     On or about July 25, 2008, EyakTek wired $147,544 to an account in the name of Ananke.

b.     On or about August 12, 2008, Company D wired $1,200,000 to an account in the name of Ananke.

c.     On or about September 5, 2008, Executive Drive wired $220,000 to an account in the name of Ananke.

d.     On or about October 8, 2008, Company D wired $2,441,310.04 to an account in the name of Ananke.

e.     On or about December 18, 2008, CC-1 wired $29,463 to a third-party conduit for the intended benefit of ALEXANDER.

   f.  On or about December 18, 2008, the third-party conduit issued a check for

$29,463 payable to ALEXANDER.

   g.  On or about December 24, 2008, CC-1 wired $31,000 to a third-party

conduit for the intended benefit of ALEXANDER.

   h.  On or about December 24, 2008, the third-party conduit issued a check for

$30,357 payable to ALEXANDER.

   i.  On or about December 23, 2008, Company A wired $1,000,000 to a third-

party conduit for the intended benefit of ALEXANDER.

   j.  On or about March 24, 2009, CC-1 paid $100,000 to LEE KHAN via a

cashier's check and a personal check.

   k.  On or about March 27, 2009, CC-1 paid $100,000 to LEE KHAN via a

cashier's check.

   l.  On or about April 29, 2009, Company A wired $230,000 to an account in

the name of Ananke.

   m.  On or about December 3, 2009, AssureIT paid $500,000 to AcePoint

Consulting via a cashier's check.

   n.  On or about December 9, 2009, AssureIT issued a check for $498,762

payable to Ananke.

   o.  On or about December 9, 2009, Company A issued a cashier's check for

$3,332,351.65 payable to Adrasteak.

   p.  On or about December 9, 2009, AssureIT issued a check for $130,000

payable to BABB.

       q.      On or about January 26, 2010, AssureIT wired $15,000 to an account in the name of Khan Family Member A.

       r.      On or about February 8, 2010, following the arrest of Khan Family Member A, Adrasteak Insurance Corporation issued a check for $3,342,815.97 payable to Company A.

       s.      On or about February 21, 2010, Company A issued a check for $3,342,815.97 payable to Ananke.

       t.      On or about February 25, 2010, AssureIT issued a check for $71,460.20 payable to BABB.

       u.      On or about August 2, 2010, Company A issued a check for $602,893.26 payable to Adrasteak Insurance Corporation.

       v.      On or about September 14, 2010, AssureIT issued a check for $487,206.13 payable to Adrasteak Insurance Corporation.

       w.      On or about March 3, 2011, BABB sent an e-mail to CC-1 regarding the TIGER Contract and the CORES Contract.  In this e-mail, BABB wrote, among other things:  "I was expecting a little more in way of support from you, it is the second quarter of the year and many invoices have been processed and paid. . . .You know all I got for a billion dollar contract for Eyak was a hand shake and [the Chief Financial Officer of EyakTek's] thanks.  Not going to repeat that mistake."

       x.      On or about March 4, 2011, at the direction of ALEXANDER, CC-1 paid ALEXANDER $7,500 cash in McLean, Virginia.

   y.  On or about March 10, 2011, at the direction of ALEXANDER, CC-1 paid ALEXANDER $7,500 cash in Washington, D.C.

   z.  On or about March 16, 2011, KHAN, CC-1, and other employees of Company A met to discuss drafting the statement of objectives/statement of work for the CORES Contract.  The discussion included different ways that Company A could draft the statement to provide Company A with an unfair advantage over other potential bidders.

   aa.  On or about March 25, 2011, BABB met with CC-1 in Sterling, Virginia. During the meeting, BABB asked CC-1 for $300,000 in return for BABB's assistance steering the CORES Contract to Company A and in return for BABB's continued assistance in processing Company A's quotes related to the TIGER Contract.  BABB stated, among other things, concerning his efforts to steer the CORES Contract to Company A: "I can't guarantee it, but it's going to be damn sure.  The biggest problem there is getting, is getting everybody line up.  That was the whole thing and stuff.  Uh, getting Kerry [KHAN] lined up to say the right things. [Contracting Officer A] lined up.  I was going to put some money in [Contracting Officer A's] pocket to kind of give him a little bit of incentive up front. . . . Our biggest thing is being able to stack the board.  We can put Kerry on that board to select. . . . That's what I'm trying to do.  I'm trying to stack it in our favor."

   bb.  On or about March 29, 2011, at the direction of BABB, CC-1 paid BABB $5,000 cash in Sterling, Virginia.

   cc.  On or about April 1, 2011, at the direction of ALEXANDER, CC-1 paid ALEXANDER $20,000 cash in McLean, Virginia.

dd.     On or about April 4, 2011, BABB sent an e-mail to CC-1 regarding the

CORES Contract.  In this e-mail, BABB wrote, among other things: "Kerry [KHAN] or someone

we can trust will have to be on the selection board."  BABB also described ideas to limit

competition in the bidding process.  At the end of the e-mail, BABB wrote:  "Delete this as soon

as you read it."

ee.     On or about April 29, 2011, at the direction of ALEXANDER, CC-1 paid

ALEXANDER $20,000 cash in Washington, D.C.

ff.     On or about May 10, 2011, BABB met with CC-1 in Sterling, Virginia.

During the meeting, at the direction of BABB, CC-1 paid BABB $15,000 cash.  During the

meeting, BABB stated, among other things, concerning the CORES Contract: "Kerry [KHAN] is

going to be one, he is going to be President of the board, that's what, pretty much and, uh, that's

what [Contracting Officer A] wanted to do. [Contracting Officer A] is going to be a member and

then he's going to find two other people.  OK?  But here's the idea is that [Contracting Officer

A] said if the numbers come in he can always look at the numbers and change them a little bit if

need be.  So he says, he needs to have the competition, but he needs the numbers where they

need to be.  And he said he'll tell me where that number has to be. . . . So we're stacked pretty

good at both ways."

gg.     On or about May 11, 2011, CC-1 met with KHAN at a condominium

controlled by KHAN in Falls Church, Virginia.  During the meeting, KHAN discussed, among

other things, a payment of $6,000,000 that CC-1 had promised to pay to KHAN in exchange for

KHAN having used his official position to approve fraudulently inflated contracts and orders

awarded to Company A.  To document the $6,000,000 payment owed to KHAN by CC-1, KHAN

presented CC-1 with three separate promissory notes for $2,000,000 each between Company A and the following entities:  Ananke Consulting Services Alpha; Ananke Consulting Services Beta; and Ananke Consulting Services Gamma.  As directed by KHAN, CC-1 executed the promissory notes on behalf of Company A.

   hh. On or about May 17, 2011, BABB sent an e-mail to CC-1 regarding the CORES Contract.  In this e-mail, BABB wrote, among other things: "Kerry [KHAN] will be neeeded [sic] to sit on the selection board[.] [Contracting Officer A] said Kerry could be the head of the board."  BABB also wrote that "[w]hen the RFP [Request for Proposal] is released I need to provide feedback as to what the bid amount should be and make sure all the bases are covered."

   ii. On or about May 18, 2011, KHAN, ALEXANDER, and CC-1 met at a hotel in Washington, D.C. to discuss, among other things, direct awards to Company A and the CORES Contract.  In discussing the upcoming direct awards to Company A, KHAN and ALEXANDER agreed to fraudulently inflate the awards by $900,000 and to pay the inflated amount as follows: $300,000 to KHAN; $300,000 to ALEXANDER; and $300,000 reserved for contingencies.

   jj. On or about May 20, 2011, ALEXANDER provided a fictitious invoice to CC-1 via e-mail for purposes of hiding the true reason for an intended $32,000 wire payment from CC-1 to ALEXANDER's associate.

   kk. On or about May 23, 2011, at the direction of ALEXANDER, CC-1 wired $32,000 to a person in South Korea that is believed to be ALEXANDER's associate.

ll.     On or about May 25, 2011, KHAN, BABB, and CC-1 met at a hotel in Washington, D.C. to discuss, among other things, the CORES Contract.

mm.     On or about May 27, 2011, at the direction of ALEXANDER, in Washington, D.C., CC-1 paid ALEXANDER $20,000 cash and handed to ALEXANDER a watch that CC-1 had purchased for $6,405.  The watch was intended for one of ALEXANDER's close family members.

nn.     On or about June 30, 2011, at the direction of ALEXANDER, CC-1 paid ALEXANDER $20,000 cash in Washington, D.C.

oo.     On or about July 8, 2011, KHAN, ALEXANDER, and CC-1 met at a hotel in Washington, D.C. to discuss, among other things, the upcoming direct awards for Company A and the CORES Contract.  In discussing the upcoming direct awards to Company A, KHAN and ALEXANDER agreed to fraudulently inflate the awards by $658,000 and to pay the inflated amount as follows: $300,000 to ALEXANDER and the rest to KHAN.

pp.     On or about July 8, 2011, in a meeting in Washington, D.C., ALEXANDER asked CC-1 to re-hire a close family member of ALEXANDER's to work at Company A.

qq.     On or about July 8, 2011, KHAN, BABB, and CC-1 met at a hotel in Washington, D.C. to discuss, among other things, the TIGER Contract and the CORES Contract.

rr.     On or about July 12, 2011, BABB sent an e-mail to CC-1 regarding the TIGER Contract and the CORES Contract.  In this e-mail, BABB stated, among other things: "In October I meet [sic] with [CC-1] to talk about an IDIQ for [Company A] during this year.  At that time we talked about the $400K for the efforts being done keeping the orders on track and

getting the contract lined up for [Company A]. . . . [Contracting Officer A] stated we need to have a trusted person to head up the board of selection.  I recommended Kerry [KHAN] and [Contracting Officer A] agreed."  BABB wrote concerning his efforts to steer contracts to Company A: "I have met twice with Kerry [KHAN] and [CC-1] to talk about the award of an IDIQ to [Company A] also we have talked about 2 direct awards to act as a bridge until the IDIQ can be awarded.  We also talked about a schedule for the award.  My action item was to ask [Contracting Officer A] for a early release of the RFP."  BABB wrote the following regarding the compensation he expected from CC-1 for these efforts: "Going forward I was looking at $350K for the direct awards and keep everything on track and provide for transition to the new contract.  Eyak will most likely not pay me the bonus at the end of the year as well as commission owed to me."

    ss.  On or about July 26, 2011, at approximately 4:08 p.m., BABB received a call from Contracting Officer A regarding the CORES Contract.  Contracting Officer A informed BABB that the CORES Contract would be awarded through a SBA set-aside program.  Contracting Officer A explained to BABB that there would not be a public solicitation, but rather the SBA would identify qualified companies based on certain criteria and the USACE would identify other qualified companies based on past performance.  Babb asked Contracting Officer A if Contracting Officer A needed someone to help Contracting Officer A with anything.  Contracting Officer A stated, "I don't know how I'm going to do this.  I won't be able to [sighs], I won't be able to deal with you, I [Unintelligible] on this, you know, publicly."  BABB said, "Right, right, exactly."  Contracting Officer A stated that he would coordinate with KHAN in order to "cover my ass."

tt.     On or about July 26, 2011, at approximately 4:32 p.m., KHAN called BABB after BABB had texted KHAN to call BABB.  Babb related to KHAN the conversation BABB had with Contracting Officer A.  BABB explained that Contracting Officer A could avoid a public solicitation for the CORES Contract by working through the SBA.  BABB stated that Contracting Officer A would put in the acquisition plan some so-called "delinears," *i.e.*, various factors that favored Company A, "we want to put in there."  KHAN asked if "they" would show up as one of the companies.  BABB explained that Contracting Officer A could list some specific companies based on past performance.  BABB stated that he expected to meet with Contracting Officer A to give him some "delinears."  BABB stated that he could work with Contracting Officer A, "but, you know, I can't officially be out in front of it."  KHAN stated that there needed to be two to three months between the RFP and the award of the CORES Contract "to show that we actually did work on this thing."  KHAN concluded it was a "sweet plan."

uu.     On or about July 26, 2011, at approximately 5:48 p.m., BABB sent an e-mail to KHAN and CC-1 regarding the CORES Contract.  In this e-mail, BABB wrote, among other things:  "With a SBA 8A award you by pass some of the FAR [Federal Acquisition Regulation] rules for advertising the RFP and qualifications to bid the RFP. . . . [Contracting Officer A] need[s] from you a list of qualifiers you want from the 8a companies bidding. . . . I will need a list of criteria from Kerry [KHAN] to give to [Contracting Officer A].  Kerry, [Contracting Officer A] said he did not know where you were going with the questions you sent him so he did not answer them directly. [Contracting Officer A] does not like using email and feels direct communication with him by cell or through me is the best avenue.  With some work we can see an RFP by mid September."

vv.    On or about July 27, 2011, at the direction of BABB, CC-1 paid BABB $5,000 cash in Washington, D.C.

ww.    On or about July 29, 2011, at the direction of ALEXANDER, CC-1 paid ALEXANDER $15,000 cash in Washington, D.C.

xx.    In or about August 2011, BABB gave Contracting Officer A the "delinears" that CC-1 provided to BABB at BABB's request for the CORES Contract.

yy.    On or about August 22, 2011, at the direction of ALEXANDER, CC-1 paid ALEXANDER $20,000 cash in Washington, D.C.

zz.    On or about August 29, 2011, KHAN and LEE KHAN had a telephone conversation in which KHAN and LEE KHAN agreed to pay approximately $400,000 to Khan Family Member A so that Khan Family Member A would not alert law enforcement authorities to the payments from CC-1 to KHAN.

**(Conspiracy to Commit Bribery and Wire Fraud, and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Section 371 and Section 2)**

## COUNT TWO
### (Bribery)

37.    Paragraphs 1 through 31, 35, and 36 of this Indictment are realleged and incorporated by reference as if set out in full.

38.    From in or about July 2007, through in or about September 2011, in a continuing course of conduct, in the District of Columbia and elsewhere, defendants KERRY F. KHAN and MICHAEL A. ALEXANDER, being public officials, directly and indirectly, corruptly demanded, sought, received, accepted, and agreed to receive and accept things of value

personally and for other persons and entities, in return for: (A) being influenced in the

performance of an official act; (B) being influenced to commit and aid in committing, and to

collude in, and allow, fraud, and make opportunity for the commission of fraud, on the United

States; and (C) being induced to do and omit to do an act in violation of the official duty of such

official and person, to wit, KHAN and ALEXANDER corruptly demanded, sought, received,

accepted, and agreed to receive and accept things of value personally and for other persons and

entities from CC-1, Company A, and others in return for funding and approving orders for

Company A and others and providing preferential treatment for Company A and others with

contracts awarded through the USACE.

> **(Receipt of a Bribe by a Public Official, in Violation of Title 18, United States Code, Section 201(b)(2)(A), (B), and (C))**

### COUNT THREE
**(Unlawful Kickbacks)**

39.     Paragraphs 1 through 31, 35, and 36 of this Indictment are realleged and

incorporated by reference as if set out in full.

40.     From in or about July 2007, through in or about September 2011, in a continuing

course of conduct, in the District of Columbia and elsewhere, defendant HAROLD F. BABB

solicited, accepted, and attempted to accept a kickback, that is, money, fees, commissions,

credits, gifts, gratuities, things of value, and compensation provided, directly and indirectly, to

BABB, as a prime contractor employee, for the purpose of improperly obtaining and rewarding

favorable treatment in connection with a subcontract relating to a prime contract, to wit, BABB

solicited, accepted, and attempted to accept a kickback from CC-1 and Company A for the

purpose of improperly obtaining and rewarding favorable treatment in connection with Company

A's performance of subcontracts and as a subcontractor for the TIGER Contract.

**(Unlawful Kickbacks, in Violation of Title 41, United States Code, Section 8702(2))**

**COUNT FOUR**
**(Money Laundering Conspiracy)**

41.     Paragraphs 1 through 31, 35, and 36 of this Indictment are realleged and

incorporated by reference as if set out in full.

42.     From in or about July 2007 through the present, in the District of Columbia and

elsewhere, the defendants,

**KERRY F. KHAN,**

**LEE A. KHAN,**

**MICHAEL A. ALEXANDER, and**

**HAROLD F. BABB,**

did knowingly combine, conspire, and agree with each other and with persons known and

unknown to the United States to commit the following offenses against the United States, in

violation of 18 U.S.C. § 1956(h):

a.     to knowingly conduct and attempt to conduct financial transactions

affecting interstate commerce and foreign commerce, which transactions involved the proceeds

of specified unlawful activities, that is, bribery and conspiracy to commit bribery and wire fraud,

knowing that the transactions were designed in whole and in part to conceal and disguise the

nature, location, source, ownership, and control of the proceeds of these specified unlawful

activities, and that while conducting and attempting to conduct such financial transactions, knew

that the property involved in the financial transactions represented the proceeds of some form of

unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

    b.  to knowingly engage and attempt to engage, in monetary transactions by,

through, and to a financial institution, affecting interstate and foreign commerce, in criminally

derived property of a value greater than $10,000, such property having been derived from

specified unlawful activity, that is, bribery and conspiracy to commit bribery and wire fraud, in

violation of 18 U.S.C. § 1957.

Goal of the Conspiracy

   43.  It was a goal of the conspiracy for the defendants KHAN, LEE KHAN,

ALEXANDER, and BABB to unlawfully conduct and cause to be conducted financial

transactions in order to conceal from law enforcement and tax authorities the proceeds of their

bribery and fraud scheme and to unlawfully use proceeds of the bribery and fraud scheme to

obtain real property, vehicles, and luxury personal goods for their own personal benefit.

Manner and Means of the Conspiracy

   44.  In order to achieve a goal of the conspiracy, defendants KHAN, LEE KHAN,

ALEXANDER, BABB, and others used the following manner and means, among others:

Summary of the Manner and Means of the Conspiracy

   45.  KHAN, LEE KHAN, ALEXANDER, and BABB collectively received millions of

dollars from Couple D and CC-1 in return for the efforts of KHAN, ALEXANDER, and BABB

to ensure the past and future awards of government contracts and subcontracts to Company A.

Specifically, CC-1 promised and made payments directly and indirectly to KHAN and members

of his family, including LEE KHAN, in excess of $18,000,000.  CC-1 promised and made

26

payments directly and indirectly to ALEXANDER and BABB in excess of $1,000,000 and

$700,000, respectively.  Couple D, acting through Company D, also paid over $3,600,000 to

KHAN and over $150,000 to BABB.

46.     In an attempt to surreptitiously receive and hide the receipt of proceeds of the

scheme, KHAN, LEE KHAN, ALEXANDER, BABB, and other co-conspirators established and

used multiple corporate entities, including shell companies that had no legitimate business

purpose, as well as multiple bank and financial accounts, including accounts held in the names of

corporate entities.  These bank accounts then received proceeds of the scheme, from cash

deposits by KHAN, LEE KHAN, and ALEXANDER; from transfers and checks from accounts

controlled by CC-1, Company A, and Couple D; and from transfers from other accounts that had

received proceeds of the scheme.  KHAN, LEE KHAN, ALEXANDER, BABB, and other co-

conspirators often moved the proceeds of the scheme through various other bank accounts, which

often were held in corporate entities' names, for the purpose of further impeding the tracing of

the proceeds by law enforcement and tax authorities.  Between on or about January 1, 2007, and

the present, approximately twenty-seven financial accounts held in KHAN's name or the name of

a corporate entity he controlled have listed KHAN as a signatory on the account.

47.     KHAN, BABB, LEE KHAN, and other co-conspirators also purchased or paid off

the mortgage for at least a portion of at least sixteen pieces of real property, including several

houses and condominiums, using proceeds of the scheme.  These real property transactions

occurred in several fashions: (a) with certified or cashier's checks for the purchase price or part

of the purchase price that was funded by amounts in a bank account held in the name of one of

the corporate entities or one of the co-conspirators; (b) with a check for the purchase price or part

of the purchase price that was drawn on a bank account held in the name of one of the corporate entities or one of the co-conspirators; and (c) with a wire transfer from a bank account held in the name of one of the corporate entities or one of the co-conspirators to a mortgage lender to pay off the mortgage on the property.

48.     KHAN, LEE KHAN, BABB, and other co-conspirators owned several automobiles that were purchased with the proceeds of the bribery scheme.  At one point during the conspiracy, KHAN and members of his immediate family owned in full ten automobiles. Most of the automobiles purchased by KHAN, LEE KHAN, and BABB with proceeds of the scheme were luxury automobiles.

49.     KHAN opened in his own name an investment account with a brokerage firm that he funded with several hundred thousand dollars of proceeds of the scheme.

50.     With instruction and supervision from his father, LEE KHAN managed the portfolio of real property and automobiles that he and KHAN had purchased with proceeds of the scheme, including purchasing real property, selling real property after its value had appreciated, managing the lease of certain items of real property to tenants, and selling automobiles.

<u>Specific Examples of the Manner and Means of the Conspiracy</u>

51.     The below-described transactions are specific examples of the manner and means that the conspirators used to launder the proceeds of the scheme and are not intended to encompass all the transactions and acts conducted by the conspirators in furtherance of the conspiracy.

**Laundering of Payments to KHAN and BABB Through Company D**

52.     In furtherance of the conspiracy, KHAN and BABB used a corporate entity,

Company D, to launder proceeds of the scheme.  Couple D controlled Company D and were the

sole signatories on bank accounts opened in Company D's name.

53.     On or about July 25, 2008, the USACE paid $3,665,000 to EyakTek in connection

with the award of an order by the USACE to EyakTek.  KHAN approved this payment.  That

same day, EyakTek wrote a check for $1,448,965.45 made payable to Company D, which was

deposited into a bank account held in Company D's name at BB&T bank.  The highest ending

monthly balance for this account prior to this date was less than $8,000.  On or about August 12,

2008, $1,200,000 was wire transferred from this same account to an account held in Ananke's

name at SunTrust Bank for which KHAN was the sole signatory (hereinafter referred to as

"Ananke Account 1").  On or about August 18, 2008, KHAN purchased two cashier's checks

from Ananke Account 1 that totaled $679,284.44, which he used to pay down a credit line and a

mortgage on his residence in Alexandria, Virginia.  This property was titled in the names of

KHAN and a close family member of KHAN.

54.     Similarly, on or about September 15, 2008, the USACE paid $5,764,262.13 to

EyakTek in connection with the award of an order by the USACE to EyakTek.  On or about

September 16, 2008, KHAN sent an email to BABB in which KHAN stated that the work done

by Company A and Company D had been completed, and that BABB could consider the contract

completed.  On or about September 19, 2008, EyakTek wrote a check for $3,198,369.92 made

payable to Company D, which was deposited into a bank account held in Company D's name at

BB&T bank.  On or about September 30, 2008, $3,198,369.92 was transferred from this account

29

to a separate account held in Company D's name at BB&T bank that had been opened in August 2008.  On or about October 8, 2008, $2,441,310.04 was wire transferred from this second account to Ananke Account 1, and on or about October 9, 2008, $158,500 was wire transferred from this second account to a real estate settlement attorney as a down payment for the purchase of real property titled in the name of BABB in Virginia Beach, Virginia.  On or about October 14, 2008, KHAN purchased a cashier's check for $306,866.02 from Ananke Account 1, which he used to pay down the mortgage on his residence in Alexandria, Virginia.

### Use of Adrastea, LLC to Launder Payments to KHAN and LEE KHAN

55.     In furtherance of the conspiracy, KHAN and LEE KHAN used a shell company, Adrastea, to launder proceeds of the scheme.  On or about February 22, 2010, a check for $3,342,815.97 drawn on a bank account held by Company A was deposited into Ananke Account 1.  On or about March 1, 2010, two transfers in the amounts of $493,947.16 and $538,383.89, respectively, were made from Ananke Account 1 to a separate account held in the name of Ananke at SunTrust Bank for which KHAN was the sole signatory.  On or about this same day, March 1, 2010, a check for $227,326.78 drawn on this second Ananke account at SunTrust Bank was deposited into a bank account at BB&T bank held under the name of Adrastea (hereinafter referred to as the "Adrastea Account").  At the time of this deposit, KHAN and LEE KHAN were the only signatories for the Adrastea Account.

56.     Also on or about March 1, 2010, a check for $1,271,383.28 drawn on Ananke Account 1 was deposited into a bank account at Citibank held in the name of Ananke that listed KHAN as the sole signatory.  On or about March 24, 2010, an official check in the amount of

$462,000 purchased with funds from this Ananke account at Citibank was deposited into the

Adrastea Account.

57.     On or about April 21, 2010, an official check for $310,000 purchased with funds

from the Adrastea Account was used to purchase real property located at 15690 Avocet Loop,

Woodbridge, Virginia, which was titled in the name of Adrastea.  On or about August 31, 2010,

an official check for $500,000 purchased with funds from the Adrastea Account was used to

purchase real property located at 13104 Peach Leaf Place, Fairfax, Virginia, which was the

residence of LEE KHAN and was titled in the name of Adrastea.

58.     In furtherance of the conspiracy, on or about July 11, 2011, KHAN and LEE

KHAN discussed how LEE KHAN's management of the portfolio of real property owned by

KHAN and his family members was evidence of LEE KHAN's business skills.

**Use of Adrasteak Insurance Corporation to Launder Payments to KHAN**

59.     In furtherance of the conspiracy, KHAN laundered proceeds of the scheme

through a shell company, Adrasteak Insurance Corporation.  For example, on or about August 2,

2010, a check for $602,893.26 was deposited into an account held at SunTrust Bank under the

name Adrasteak Insurance Corp (hereinafter referred to as the "Adrasteak Insurance Account").

The check was drawn on an account held by Company A at a separate bank.  KHAN was the sole

signatory on the Adrasteak Insurance Account.

60.     On or about September 14, 2010, a check for $487,206.13 was deposited into the

Adrasteak Insurance Account.  The check was drawn on an account held by AssureIT at SunTrust

Bank.

31

61.     On or about March 1, 2011, KHAN transferred $250,000 from the Adrasteak
Insurance Account to a separate account he controlled at SunTrust Bank, and on or about April
14, 2011, KHAN transferred $250,100 from this separate account back to the Adrasteak
Insurance Account.

62.     On or about August 15, 2011, KHAN ordered a wire transfer of $267,426.79 from
the Adrasteak Insurance Account to a title insurance agency in Cape Coral, Florida for the
purchase of real property located at 1135 Lorraine Court, Cape Coral, Florida.  Previously, on or
about August 11, 2011, KHAN had told an agent of MBH Settlement Group that he wished to
title the real property in Florida under the name of Adrastea, but that he could not do so because
there was another, unrelated corporate entity in Florida with a similar name.  KHAN told the
agent that he therefore wished to title the property in the name of a corporate entity called
"KanuHub."  KHAN owned real property in West Virginia through a shell company registered in
Virginia called KanuHub, LLC.  On or about August 12, 2011, title for the real property at 1135
Lorraine Court, Cape Coral, Florida was transferred to KanuHub, LLC

**Laundering of Payments to BABB**

63.     In furtherance of the conspiracy, BABB conducted or caused to be conducted
financial transactions involving multiple bank accounts to launder proceeds of the scheme.  On
or about December 9, 2009, a check for $130,000 drawn on a bank account held by AssureIT was
deposited into an account held under the names of BABB and another individual at BB&T bank.
On or about January 27, 2010, $250,000 was transferred from this account to an account held
under just BABB's name at BB&T bank.  Two additional checks drawn on the same AssureIT
bank account were deposited into the account held by BABB and another individual on or about

February 24, 2010, and April 8, 2010.  These checks were in amounts of $71,460.20 and $8,500,

respectively.  On or about June 1, 2010, $100,000 was transferred from the account held by

BABB and the other individual to the account held just by BABB.  On or about February 9, 2011,

a check for $9,475.62 drawn on the AssureIT account was deposited directly into the account

held just by BABB.

### Laundering of Cash Payments to ALEXANDER

64.     In furtherance of the conspiracy, between March and July 2011, at

ALEXANDER's direction, CC-1 made several payments in cash and luxury personal goods to

ALEXANDER that had a total value of over $148,000, and ALEXANDER subsequently

laundered these payments through financial institutions.  One of these payments occurred on or

about the afternoon of Friday, March 4, 2011, when, at ALEXANDER's direction, CC-1 paid

ALEXANDER $7,500 in cash in McLean, Virginia.  On the next business day, Monday, March

7, 2011, ALEXANDER deposited $1,500 in cash into an account he held at CommonWealth One

Federal Credit Union (hereinafter referred to as the "COFCU Account") at the CommonWealth

One Federal Credit Union branch located in the USACE Headquarters at 441 G Street N.W.,

Washington, D.C. (hereinafter referred to as the "GAO branch").

65.     Another of these payments occurred on or about April 1, 2011, when, at

ALEXANDER's direction, CC-1 paid ALEXANDER $20,000 in cash in McLean, Virginia.

That same day, ALEXANDER deposited $5,500 in cash into the COFCU Account at a

CommonWealth One Federal Credit Union branch in Virginia.  He then made cash deposits on

April 4, 2011, and April 6, 2011, of $1,200 and $2,500, respectively, into the COFCU Account at

the GAO branch. ALEXANDER also deposited $5,000 in cash on April 14, 2011, into a bank

account he held at BB&T, at a BB&T branch in Virginia.

66.     Another of the payments from CC-1 to ALEXANDER occurred on or about April

29, 2011, when, at ALEXANDER's direction, CC-1 paid ALEXANDER $20,000 in cash in

Washington, D.C.  That same day, ALEXANDER made a cash deposit of $5,800 into the

COFCU Account at a CommonWealth One Federal Credit Union branch in Virginia.

67.     A final example of the payments from CC-1 to ALEXANDER occurred on or

about Friday, May 27, 2011, when, at ALEXANDER's direction, CC-1 paid ALEXANDER

$20,000 in cash and gave ALEXANDER a watch worth approximately $6,405 in Washington,

D.C.  ALEXANDER then made a deposit of $2,000 in cash into his account at BB&T on the

next business day, Tuesday, May 31, 2011, at a BB&T branch in Virginia, and deposited $2,000

and $3,000 in cash on June 2, 2011, and June 8, 2011, respectively, into the COFCU Account at

a CommonWealth One Federal Credit Union branch in Virginia.

**Laundering of Payments to ALEXANDER via Payments to His Associate**

68.     In furtherance of the conspiracy, at KHAN's and ALEXANDER's direction, CC-1

made several payments for the benefit of ALEXANDER's associate in South Korea.  In or about

the summer of 2009, CC-1 met with KHAN and ALEXANDER in Virginia.  ALEXANDER

stated during the meeting that ALEXANDER wanted to buy a coffee shop for his associate in

South Korea, and that he estimated that it would cost approximately $1 million.  KHAN directed

CC-1 to purchase a coffee shop for ALEXANDER's associate.

69.     At KHAN's direction, Company A submitted a proposal for several USACE

subcontracts through EyakTek that involved providing secure video connections to USACE

military districts.  The USACE awarded three separate contracts to Company A totaling

approximately $16 million, which included an amount of "overhead."

70.     CC-1 used the "overhead" from the contracts to pay approximately $1 million for

a coffee shop for the benefit of ALEXANDER's associate.  Company A paid for the coffee shop

by transferring funds to a diversified company in South Korea.  The diversified company

purchased the coffee shop and signed the title over to ALEXANDER's associate.  The coffee

shop, called Seven Monkeys, is located in a wealthy area in Seoul, South Korea.

71.     Additionally, on or about May 23, 2011, at ALEXANDER's direction and with

KHAN's knowledge, CC-1 wire transferred $32,000 to ALEXANDER's associate in South

Korea.  As requested by CC-1, ALEXANDER prepared and submitted to CC-1 a false invoice

from his associate's coffee shop in South Korea to AssureIT for $32,000.  The invoice was from

Seven Monkeys Coffee Shop in South Korea, addressed to AssureIT, at 1200 J Street, N.W.,

Washington, D.C., for $32,000, referencing "Catering services provided for multiple

conferences/meetings from 3/2011 through 5/2011."  The address given for AssureIT on the

invoice did not exist, and Seven Monkeys did not provide the services described in the invoice.

### Laundering of Scheme Proceeds Through the Purchase of Automobiles

72.     In furtherance of the conspiracy, the conspirators laundered proceeds of the

scheme by using such proceeds to purchase luxury vehicles.  For example, in or about November

2008, a cashier's check for $66,113.50 was purchased from a bank account at BB&T held in the

corporate name of Company D.  The money used to fund this cashier's check was proceeds of the

scheme, and BABB used the check to purchase a 2007 Porsche 911 from a used car dealership in

Virginia.   BABB registered this vehicle in the corporate name of a company associated with Company D.

73.      Similarly, on or about April 11, 2011, KHAN wrote a check to himself in the amount of $63,640 from an account at Wachovia held in the name of Ananke for which KHAN was the sole signatory and that was funded with proceeds of the scheme.   KHAN used the check to pay for his purchase of a 2011 Porsche Cayenne from an auto dealership in Virginia.   Less than one week later, on or about April 15, 2011, a check for $55,109.93 was drawn on an account at SunTrust Bank held in KHAN's name that was funded with proceeds of the scheme.   KHAN used this check to pay a separate auto dealership in Virginia for a 2011 Audi Q5.

### Laundering of Payments to Khan Family Member A

74.      In furtherance of the conspiracy, KHAN and LEE KHAN laundered proceeds of the scheme by transferring scheme proceeds through various bank accounts to an account held in the name of Khan Family Member A so that Khan Family Member A would not alert law enforcement authorities to the existence of the scheme.   On or about August 22, 2011, Khan Family Member A sent a letter to CC-1, with a copy to LEE KHAN, from the Alexandria Detention Center in Alexandria, Virginia, where Khan Family Member A was incarcerated after having been convicted of a federal felony drug trafficking crime.   In the letter, Khan Family Member A wrote to CC-1, "I got a copy of the 40,000 dollar payment you put on my BMW, while Kerry was still on the federal payroll, along with other documents, tell Kerry, he has until September 2nd to deposit the entire cost of my house and 4 cars into my TD bank account, or I will enter a agreement with the federal government."

75.    On or about August 26, 2011, KHAN transferred $201,000 from a bank account held at Ananke Account 1 to an account held at BB&T under the name Khan Family Estate Trust (hereinafter referred to as the "Khan Family Trust Account").  On or about August 29, 2011, LEE KHAN transferred $200,000 from a bank account he controlled at Bank of America held under the name of AcePoint to another bank account at Bank of America held under LEE KHAN's name.  Also on or about August 29, 2011, LEE KHAN transferred $200,000 from the account at Bank of America held under his name to the Khan Family Trust Account.

76.    On or about August 29, 2011, KHAN and LEE KHAN had a telephone conversation in which LEE KHAN expressed concern that the large transfers between bank accounts that he and KHAN recently had made would be suspected by bank authorities of being money laundering transactions.  LEE KHAN told KHAN that LEE KHAN believed that bank and law enforcement authorities would be less suspicious about the large payment to Khan Family Member A if the money arrived in Khan Family Member A's bank account from "the trust account," as opposed to from an account held in the name of a shell company.

77.    On or about August 31, 2011, LEE KHAN told KHAN that BB&T would not allow LEE KHAN to withdraw money "out of the trust," and that KHAN would have to do it instead.  KHAN told LEE KHAN that he would do it the following day.  LEE KHAN told KHAN that Khan Family Member A had instructed them to write a check for $17,000 to another close family member of KHAN and LEE KHAN, and to deposit the rest of the money into Khan Family Member A's bank account.

78.    On or about September 1, 2011, a cashier's check for $383,000 was drawn on the Khan Family Trust Account and made payable to Khan Family Member A.  This cashier's check

37

was deposited on or about the same day, September 1, 2011, into an account held at TDBank by

Khan Family Member A.

**(Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h))**

**FORFEITURE ALLEGATION**

79.     The violations alleged in Count One, Count Two, and Count Four of this

Indictment are re-alleged as though set forth fully herein and incorporated by reference herein for

the purpose of alleging forfeiture to the United States of America, pursuant to Title 18, United

States Code, Sections 981(a)(1)(C) and 982(a)(1), and Title 28, United States Code, Section

2461(c).

80.     As a result of the offense alleged in Count One of this Indictment, defendants

**KERRY F. KHAN**, **LEE A. KHAN, MICHAEL A. ALEXANDER**, and **HAROLD F.**

**BABB**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property constituting,

or derived from, any proceeds obtained, directly or indirectly, as a result of the violation alleged

in Count One of this Indictment.

81.     As a result of the offense alleged in Count Two of this Indictment, defendants

**KERRY F. KHAN** and **MICHAEL A. ALEXANDER** shall forfeit to the United States,

pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code,

Section 2461(c), any and all property constituting, or derived from, any proceeds obtained,

directly or indirectly, as a result of the violation alleged in Count Two of this Indictment.

82.     As a result of the offense alleged in Count Four of this Indictment, defendants

**KERRY F. KHAN**, **LEE A. KHAN, MICHAEL A. ALEXANDER**, and **HAROLD F.**

**BABB**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section

982(a)(1), any and all property involved in the offense alleged in Count Four of this Indictment,

and any property traceable to such property.

83.     The property subject to forfeiture to the United States as a result of the offenses

alleged in Count One, Count Two, and Count Four of this Indictment includes, but is not limited

to, the following:

(a)     Money Judgment:

Judgment in favor of the United States of America for a sum of
money equal to the value of any property constituting, or derived
from, any proceeds obtained, directly or indirectly, as a result of
the violation alleged in Count One of this Indictment, in violation
of Title 18, United States Code, Section 371, and the violation
alleged in Count Two of this Indictment, in violation of Title 18,
United States Code, Sections 2 and  201(b)(2)(A), (B), and (C);
and any property, and any property traceable to such property,
involved in the violation alleged in Count Four of the Indictment,
in violation of Title 18, United States Code, Section 1956(h).

(b)     Real Property:

(i) The real property and appurtenances known and described as 5501 Seminary
Road, Apartment 2405S, Falls Church, VA 22041;

(ii) The real property and appurtenances known and described as 13104 Peach
Leaf Place, Fairfax, VA 22030;

(iii) The real property and appurtenances known and described as 3713 S. George
Mason Drive, Apartment 705W, Falls Church, VA 22041;

(iv) The real property and appurtenances known and described as 3705 S. George
Mason Drive, Apartment 417-S, Falls Church, VA 22041;

(v) The real property and appurtenances known and described as 10367 Valley Road (U.S. Rt 522), Berkeley Springs, WV 25411;

(vi) The real property and appurtenances known and described as 6526 Dearborn Drive, Falls Church, VA 22042;

(vii) The real property and appurtenances known and described as 6522 Dearborn Drive, Falls Church, VA 22042;

(viii) The real property and appurtenances known and described as 930 N. Chambliss Street, Alexandria, VA 22312;

(ix) The real property and appurtenances known and described as 15690 Avocet Loop, Woodbridge, VA 22191;

(x) The real property and appurtenances known and described as 521 26th Street, Virginia Beach, VA 23451;

(xi) The real property and appurtenances known and described as 912 S. Oriole Street, Virginia Beach, VA 23451;

(xii) The real property and appurtenances known and described as 4787 S. Park Court, Woodbridge, VA 22193;

(xiii) The real property and appurtenances known and described as 15191 Valley Stream Dr., Woodbridge, VA 22191;

(xiv) The real property and appurtenances known and described as 20551 Birchfield Place, Sterling, VA 20165;

(xv) The real property and appurtenances known and described as 1135 Lorraine Court, Cape Coral, FL 33904; and

(xvi) The real property and appurtenances known and described as 1600 Renate Drive, # T-2, Woodbridge, VA 22192.

84.    By virtue of the commission of the felony offense charged in Count One of this

Indictment, any and all interest that defendants **KERRY F. KHAN**, **LEE A. KHAN,**

**MICHAEL A. ALEXANDER**, and **HAROLD F. BABB**, have in any property constituting, or

derived from, any proceeds obtained, directly or indirectly, as a result of such offense, is vested

in the United States and hereby forfeited to the United States pursuant to Title 18, United States

Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

85.     By virtue of the commission of the felony offense charged in Count Two of this

Indictment, any and all interest that defendants **KERRY F. KHAN** and **MICHAEL A.**

**ALEXANDER** have in any property constituting, or derived from, any proceeds obtained,

directly or indirectly, as a result of such offense, is vested in the United States and hereby

forfeited to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and

Title 28, United States Code, Section 2461(c).

86.     By virtue of the commission of the felony offense charged in Count Four of this

Indictment, any and all interest that defendants **KERRY F. KHAN**, **LEE A. KHAN,**

**MICHAEL A. ALEXANDER**, and **HAROLD F. BABB**, have in any property involved in such

offense, and any property traceable to such property, is vested in the United States and hereby

forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(1).

**Substitute Asset Provision**

87.     If any of the above-described forfeitable property, as a result of any act or

omission of any the defendants:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third person;

        c.     has been placed beyond the jurisdiction of the Court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be subdivided

             without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and

Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said

defendant up to the value of said forfeitable property described above.

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(C)
and 982(a)(1), and Title 28, United States Code, Section 2461(c))**

A TRUE BILL



FOREPERSON.


_____/s/_____
ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA