# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC | |
| Defendant. | |

**DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S OPPOSITION TO THE GOVERNMENT'S MOTION FOR AN EARLY RETURN TRIAL SUBPOENA**

Pursuant to Federal Rule of Criminal Procedure 17(c), Defendant Concord Management and Consulting LLC ("Concord" or "Defendant"), through counsel, submits this opposition to the Government's Motion for an Early Return Trial Subpoena ("Motion" or "Mot."). In support, Concord states as follows:

### I. INTRODUCTION

Despite a year-long investigation, hundreds of subpoenas and search warrants, and more than four million documents collected, the government now wants one more thing, this time from Concord: Could it provide from business records located outside of the United States all documents related to the allegations in the Superseding Indictment that the government must prove at trial? And it does so in a diminutive four-page Motion that cites no legal authority supporting its proposition, and ignores the significant legal and factual obstacles to its request. Regardless of whether this request is a joke, a plea for help, or the government's latest effort to manipulate these proceedings to extract the greatest tactical advantage, is of no moment, because the subpoena request should be denied.

1

## II. BACKGROUND

Both the Original and the Superseding Indictments charge Concord with conspiring to defraud the United States by interfering with the lawful governmental functions of the Department of Justice, the Federal Election Commission, and the State Department. Despite the breadth of the charges against all defendants generally, the allegations against Concord are far more limited. Specifically, the Superseding Indictment devotes only a few sentences (unchanged substantively from the Original Indictment) to Concord's role in the alleged conspiracy, *i.e.*, that it "controlled funding, recommended personnel, and oversaw ORGANIZATION activities through reporting and interaction with ORGANIZATION management," Sup. Ind. ¶ 11, which according to the government included in person meetings between Mr. Prigozhin and two co-defendants, *Id*. ¶¶ 13, 14. This what the government must prove at trial against Concord, because it represents the only link between Concord and the larger alleged conspiracy.

The government filed the Original Indictment ten months after the appointment of the Special Counsel in May 2017, and continued to investigate after the Indictment. The investigation involved hundreds of different legal process to various entities which resulted in the collection of over four million documents turned over in discovery to Concord many of which are subject to the Court's stringent Protective Order that precluded them for over a year from being shared with Concord employees or officials, co-defendants, or alleged co-conspirators or even removed from defense counsel's offices.

Despite the staggering size of this collection, and with less than a month before the government's exhibit list is due, the government filed the instant motion seeking for the first time documents directly from Concord. ECF No. 267. Under the auspices of Federal Rule of Criminal Procedure 17(c), the government seeks a court-issued early-return trial subpoena to Concord, directing it to produce, among other things, "records reflecting any payments from Concord

2

Management and Consulting LLC to any of the following entities, either directly or via an intermediary or subsidiary organization: Internet Research Agency LLC, Neva News LLC, Commercial News Agency LLC, Internet Research LLC, Federal News Agency LLC, MediSintez LLC, Glavset LLC, MixInfo LLC, Azimuth LLC, Novinfo LLC, Nation News LLC, Economy Today LLC." ECF 267-1. Five of these entities are neither named defendants nor unindicted co-conspirators identified in the government's bill of particulars nor even mentioned in the Indictment. Also requested are similar records related to payments by Concord Management and Consulting LLC to the same entities, "for goods and services." *Id.* Finally, the proposed subpoena also seeks documents reflecting any meetings between individuals from Internet Research Agency and Concord Management and Consulting LLC; all communications between individuals affiliated with Internet Research Agency and Concord Management and Consulting LLC; and all communications between individuals affiliated with Concord Management and Consulting LLC and any of the named co-defendants, as well as corporate records and computer infrastructure information. *Id.*

Put another way, the government's request sounds a lot like it is seeking both documents it needs to prove that Concord "controlled funding, recommended personnel, and . . . report[ed] and interact[ed] with" its alleged co-conspirators, *see* Sup. Ind. ¶ 11, and copies of documents it has but for which there is no way for the government to authenticate and admit into evidence. Mot. 2-3. The government should have addressed these problems pre-indictment, not shortly before trial. And for the Court to permit this subpoena (even though the government proposes no way to actually serve it), that would for all intents and purposes allow the government to continue to conduct its investigation without limitation post-indictment.

## II. LAW & ARGUMENT

Rule 17(c)(1) states that "[a] subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." Fed. R. Crim. P. 17(c)(1).[1] Rule 17 is not designed as a discovery tool but instead is intended to be used to prevent delays during trial when documents are produced in response to a subpoena *duces tecum* and are offered in evidence. *See United States v. Ferguson*, 37 F.R.D. 6, 7 (D.D.C. 1965). Unlike Rule 16, which permits limited discovery in criminal cases, the purpose of Rule 17(c) "was not to grant additional discovery, but merely to facilitate and expedite trials, in order that a trial may not be delayed while counsel are examining voluminous documents produced in response to a subpoena." *United States v. Carter*, 15 F.R.D. 367, 369 (D.D.C. 1954). To otherwise construe Rule 17 as a discovery rule "would render Rule 16 nugatory and meaningless and would defeat its limitations." *Id.* To prevent an overbroad use for discovery purposes, Rule 17 requires the Court to review the subpoena, which is "no mere technicality" but a "vital protection against misuse or improvident use of [such subpoenas]." *Ferguson*, 37 F.R.D. at 8. In order to obtain a subpoena under Rule 17(c), the Supreme Court has recognized that the party seeking production "must clear three hurdles: (1) relevancy; (2) admissibility; and (3) specificity." *United States v. Nixon*, 418 U.S. 683, 700 (1974).

### A. The Government's Proposed Subpoena Violates Rule 17

The government's requested subpoena improperly seeks information that is discovery material and represents nothing more than a fishing expedition in an effort to obtain documents (if such documents actually exist) that the government assumes will support the allegations in the Superseding Indictment. In the alternative the government is seeking admissibility through the

---

[1] The government conspicuously omits the phrase "the witness" in its recitation of the Rule. Mot. 1.

4

back door by hoping to obtain directly from Concord copies of documents it already has and establish admissibility as admissions of a party opponent and co-conspirator statements in furtherance of the alleged conspiracy. Mot. 2. But as discussed below, such material is not properly the subject of an early-return trial subpoena under Rule 17, and the government cites no authority suggesting otherwise. Moreover, even if the request were adequately specific—which it is not—it would fail the relevance and admissibility requirements because the sheer volume of documents sought would make it impossible to determine whether any particular one meets the requirements of the Federal Rules of Evidence. This is anathema to the purpose of Rule 17, which is to expedite—not delay—trial.

### 1. The Request is Insufficiently Specific

As noted, this Court has recognized strict limits on what Rule 17 allows, particularly as it relates to the specificity requirement. *See United States v. Libby*, 432 F. Supp. 2d 26, 31-32 (D.D.C. 2006). Among those limits is the requirement that "courts will not approve a subpoena for documents based upon requests for disclosure from broad categories of documents." *Id.* at 31. "Specificity, by definition, requires . . . [a] link that explains what the government expected to find and why it expected to find it" through the evidence sought in a subpoena. *United States v. Vo*, 78 F. Supp. 3d 171, 181 (D.D.C. 2015). Put another way, it is inappropriate for a Rule 17 subpoena to be "used as a fishing expedition to see what may turn up." *Libby*, 432 F. Supp. 2d at 32 (internal quotation marks omitted).

This Court has rejected overly broad requests on specificity grounds before. *See United States v. North*, 708 F. Supp. 402 (D.D.C. 1989). In *North*, the Court denied a government subpoena request under Rule 17(c) for the defendant's notebooks used between February 1, 1983 and November 25, 1986 on the ground that the government could not "identify any material entry or practice that assures the Court that the standards of relevance, materiality and necessity . . . will

5

be satisfied." *Id.* at 403, 404. Moreover, the Court added that the "wording of the proposed subpoena is unduly broad, as it could sweep within its ambit notebooks *never* used at work, and its time span as initially framed is too broad." *Id.* at 404 (emphasis in original).

The government's request here is similarly lacking. Indeed, like in *North*, it seeks documents, which even if they exist are located outside the United States and would not be in the English language, from a time period spanning multiple years, related to "any payments," "any meetings," and "all communications" between individuals associated with Concord and 12 different entities and 13 individuals. ECF No. 267-1. This is not a "tailored . . . request" as the government asserts. *Id.* To the contrary, it is a wholesale effort to discover the proverbial needle in a haystack, and sweeps within its ambit documents that likely have *nothing* to do with the conspiracy charge alleged in the Superseding Indictment. *See North*, 708 F. Supp. at 404. As such, the government's request should be rejected as insufficiently specific.

### 2. The Requested Documents are Inadmissible

The government's request fails the relevancy and admissibility prongs of the *Nixon* test for largely the same reason that it is insufficiently specific—it sweeps too broadly for the Court to determine whether any particular piece of evidence will be relevant or admissible at trial. Indeed, the request does not even specify what it is seeking; rather, it merely identifies "records," "documents," and "communications." ECF No. 267-1. From this, it is impossible to tell if the requested return will involve evidence that would be either relevant or admissible under the Rules of Evidence. *See Libby*, 432 F. Supp. 2d at 31 (noting that the relevancy and admissibility prongs of the *Nixon* test are governed by the Rules of Evidence). As to relevancy, the government further complicates matters in requests 4 and 5 by seeking records reflecting payments to Neva News LLC, Commercial News Agency LLC, Federal News Agency LLC, Nation News LLC, and Economy Today LLC, none of which are defendants or unindicted co-conspirators. As such, it

6

will be impossible for the Court to determine how, much less whether, such evidence is relevant to the charged conspiracy.

Put another way, in order to make a determination about relevancy or admissibility, the Court would first need to assume that there was, in fact, a conspiracy, and that Concord participated in the alleged conspiracy in exactly the way that the government sets forth in the Superseding Indictment. This alone is improper and a ground for rejecting the government's request.

Moreover, by failing to give the Court a basis on which to make fundamental determinations about relevance and admissibility, the government's request also undermines a central tenet of Rule 17, which is "to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials." *Nixon*, 418 U.S. at 698-99. Here, assuming only for purposes of argument that the requested documents exist and could be produced pursuant to the proposed subpoena, the sheer scope of the request—covering over four years, "any individual affiliated with" Concord or co-defendant Internet Research Agency, bank records for twelve different entities—guarantees a massive effort to search for and identify any responsive documents. In that circumstance, regardless of whether the government's request is for an early-return trial subpoena or a subpoena for production at trial, the inevitable result will be delay. The volume of material will ensure arguments (and many motions *in limine*) over relevancy and admissibility. In sum, given the impossibility of making a timely relevancy and admissibility determination regarding the huge swath of requested evidence, the government's proposed subpoena fails these prongs as well.

### B. The Government's Motion Ignores the Complexities of Its Proposed Request

In addition to the technical failures of the government's requested subpoena under the applicable legal standard, a significant shortcoming in the government's Motion is its complete failure to address the substantial complexities raised by its request—of which there are several.

*First*, compliance with the subpoena—if issued—would subject both Concord and its counsel to potential legal peril in Russia, and thus any subpoena issued by this Court pursuant to the government's request would be subject to a motion to quash under established law. Rule 17(c)(2) provides that a party served with a trial subpoena may move to quash or modify the subpoena if compliance would be "unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). Recent decisions from the D.C. Circuit and this Court have recognized that a subpoena to a foreign entity that would require the entity to violate foreign law can, under circumstances like those here, meet the definition of "unreasonable or oppressive." *See In re Grand Jury Subpoena*, 912 F.3d 623, 633-34 (D.C. Cir. 2019) (considering argument by a foreign corporation invoking Federal Rule of Criminal Procedure 17(c)(2) that a grand jury subpoena was "unreasonable or oppressive" and should be quashed because it would require the corporation to violate its country's domestic law); *see also In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987) (reversing contempt order entered against foreign bank for failing to comply with a grand jury subpoena where compliance would have constituted a criminal offense in a different country on the specific facts of that case, noting the court's "considerable discomfort to think that a court of law should order a violation of law, particularly on the territory of the sovereign whose law is in question[,]" that "[m]ost important to our decision is the fact that [the contempt] sanctions represent an attempt by an American court to compel a foreign person to violate the laws of a different foreign sovereign on that sovereign's own territory" and a "decision whether to enter a contempt order in cases like this one raises grave

difficulties for courts"); *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 and 50 U.S.C. § 1705*, 381 F. Supp. 3d 37, 49 (D.D.C. 2019) ("A subpoena might be unreasonable or oppressive if compliance would violate foreign law.").

Here, if the Court were to issue the government's requested subpoena, Concord would be able to demonstrate that the request would cause Concord to violate Russian law on Russian soil—a result that is improper under controlling law. *See In re Sealed Case*, 825 F.2d at 498 (party challenging subpoena on basis that it would require the party to violate foreign law bears burden of making such a showing) (per curiam). Specifically, if Concord, individuals acting on its behalf, undersigned counsel, or its Russian counsel were to produce the information requested in the government's proposed subpoena to the government pursuant only to a U.S. subpoena,[2] they would likely be subject to legal jeopardy in Russia under criminal and other laws.

For example, production of information in response to the government's requested item 3—"Documents sufficient to identify any Internet Protocol address used by Concord Management and Consulting LLC from January 1, 2014 to February 1, 2018"—would for Russian citizens arguably satisfy the elements of the crime "State Treason," Article 275 of the Russian Criminal Code, which provides a term of imprisonment of up to 20 years for a single count of "rendering financial, logistical, consultancy or other assistance to a foreign government or an international or foreign organization or representatives thereof in activities directed against the security of the Russian Federation." *Id.* at Ugolovnyi Kodeks Rossiiskoi Federatsii [Criminal Code] [UK RF]

---

[2] The legal way provided under Russian law for a foreign government to obtain evidence located in Russia for a criminal proceeding abroad is pursuant to an international request for legal assistance. *See* Code of Criminal Procedure of the Russian Federation, Article 457, "Execution in the Russian Federation of a Request for Legal Assistance," as amended Nov. 4, 2019 (available at http://www.consultant.ru/document/cons_doc_LAW_34481/978fcc8d14628b074b83f3083ca9b09568d20d3a/).

9

art. 275 (Russia), *available at* www.consultant.ru/document/cons_doc_LAW_10699/2ca391674eeaa02069722fa3f13cbb41cce0a95d/). The broad treason statute could easily be applied to any or all of the other items sought to be included in the subpoena as being voluntary cooperation (from the perspective of Russian law), *see* n.2, *supra*, with the United States government in a matter that the United States government has on multiple occasions cited as grounds for imposing sanctions on Russian citizens and their property. *See, e.g.,* Press Release, Department of the Treasury, Treasury Sanctions Russian Cyber Actors for Interference with 2016 U.S. Elections and Malicious Cyber-Attacks (Mar. 15, 2018), https://home.treasury.gov/news/press-releases/sm0312 (announcing designation of Russian entities and individuals for conduct alleged in the Indictment); Press Release, Department of the Treasury, Treasury Targets Assets of Russian Financier who Attempted to Influence 2018 U.S. Elections," https://home.treasury.gov/news/press-releases/sm787 (announcing additional designations for alleged election interference).[3]

Providing information on Russian computer networks would also facially violate Article 274 of the Russian Criminal Code, "Violation of the Rules of Operation of Systems of Storage,

---

[3] Moreover, the Russian State Duma, the lower house of Russian Parliament, is currently considering bill number 710099-7, that would prohibit any Russian person from providing information to a foreign government or organization that leads to the imposition of sanctions. *See* Draft Law No. 710099-7, submitted by State Duma Deputy M.V. Yemelyanov, May 15, 2019 (*available at* http://asozd2c.duma.gov.ru/addwork/scans.nsf/ID/8B8067E9744291E8432583FB004BD50C/$FILE/710099-7_15052019_710099-7.PDF). A person convicted may face imprisonment for a term up to 5 years, a fine up to 5 million rubles and deprivation of the right to occupy certain positions or engage in certain activities for up to 10 years, for each count. The fact that the legislative purpose of this bill is to further criminalize provision of information in this precise situation is made clear in the first sentence of the explanatory note by the bill's sponsors: "In connection with the sanctions pressure from foreign governments, any information about companies relating to persons who have already been sanctioned allows OFAC to include these companies in the sanctions list." *Id.*

Processing or Transmission of Computer Information and Information-Telecommunications Networks." *Id.* at Ugolovnyi Kodeks Rossiiskoi Federatsii [Criminal Code] [UK RF] art. 274 (Russia), *available at* www.consultant.ru/document/cons_doc_LAW_10699/b5a4306016ca24a588367791e004fe4b14b0b6c9/ (amended Nov. 4, 2019). That law provides that any violation of the rules of access or operation of computer networks that leads to a major loss, blocking, modification or copying of computer information is punishable by a fine of up to 500,000 rubles or disgorgement of income or correctional labor of up to one year, or probation, forced labor or imprisonment of up to two years. *Id*. A violation of this statute that created a threat of "grave consequences" is punishable by up to 5 years' imprisonment. *Id*. There is a particularized risk that information provided by Concord could or would be used for surveillance purposes which might be lawful from a U.S. perspective, but would from a Russian perspective constitute a foreign incursion into Russian computer infrastructure.[4]

The materials requested in items 6, 7, 8 and 9 also include documents that, if they exist, would constitute and/or contain personal data that, if Concord had such data, Concord would be generally forbidden by law from producing to the U.S. government or any third-party without each individual's consent under Article 7 of Russian Federal Law 152-FZ, "On Personal Data," paragraph 1 of Article 3 of which defines the term "personal data" broadly as "any information relating to an individual who is directly or indirectly identified or identifiable[.]" *Id*. at "On

---

[4] There is also a particularized risk of such information being used for out-and-out cyberattacks, similar to those carried out by the U.S. military during the 2018 midterm elections. *See* Ellen Nakashima, *U.S. Cyber Command Operation Disrupted Internet Access of Russian Troll Factory on Day of 2018 Midterms*, Wash. Post (Feb. 27, 2019), at www.washingtonpost.com/world/national-security/us-cyber-command-operation-disrupted-internet-access-of-russian-troll-factory-on-day-of-2018-midterms/2019/02/26/1827fc9e-36d6-11e9-af5b-b51b7ff322e9_story.html

Personal Data," No. No. 152-FZ Art. 3, 7, Jul. 27, 2006, *available at* www.consultant.ru/document/cons_doc_LAW_61801/. Each violation of this prohibition entails administrative liability in the form of a fine of up to 40,000 rubles under Article 13.13 of the Russian Code of Administrative Offenses, "Unlawful Activity Relating to Protection of Information." *Id*. at Kodeks Rossiiskoi Federatsii RF OB Administrativnykh Pravonarusheniiakh [Code of Administrative Violations] art. 13.13 (Russia) (as amended Dec. 2, 2019). Giving the U.S. government information on the correspondence and meetings of Russian citizens without their consent also satisfies the elements of the crime of "Invasion of Privacy," Article 137 of the Russian Criminal Code, which provides penalties of a fine up to 200,000 rubles or disgorgement of income, or forced labor of up to two years combined with a restriction on allowed occupation for up to three years, community service of up to 360 hours, detention for up to four months or up to two years' imprisonment. *Id*. at Ugolovnyi Kodeks Rossiiskoi Federatsii [Criminal Code] [UK RF] art. 237 (Russia), *available at* http://www.consultant.ru/document/cons_doc_LAW_10699/4234a27af714cc608ea71b7bae9400f3613c8f60/ (amended Nov. 4, 2019).

Russian law also has concepts of criminal conspiracy, criminal accomplices, separate criminal liability for preparation for crime, criminal enterprise and the like that could be applied to undersigned counsel and/or local counsel for participating in any production of documents to the U.S. government that violates Russian law. *Id.* at Ugolovnyi Kodeks Rossiiskoi Federatsii [Criminal Code] [UK RF] art. 35 (Russia), *available at* www.consultant.ru/document/cons_doc_LAW_10699/c7778082963ad8bd72f941e737f99a57cebf81ac/) ("Commission of a Crime by a Group, a Group by Conspiracy, an Organized Group or Criminal Enterprise (Criminal Organization)" as amended Nov. 4, 2019).

Given these constraints, Concord is prepared to challenge any subpoena issued pursuant to the government's request on this basis, which would result in further delay—because of the government's belated request—and is ultimately unnecessary because, by the government's own admission, it already possesses information on the requested topics. Mot. 3.

***Second***, the government cites no legal authority—and Concord is aware of none—supporting its request for a Rule 17 subpoena to a foreign corporation defendant with no presence in the United States, such that any responsive documents would be located only in a foreign country. The only authority on which the government relies is a single citation to a thirty year old case from the Northern District of Illinois, *United States v. McCollom*, 651 F. Supp. 1217 (N.D. Ill. 1987), which is easily distinguishable. Mot. 3. Specifically, *McCollom* involved a trial subpoena directed to an individual U.S. citizen defendant—not a foreign corporation. More importantly, however, the government in *McCollom* was willing to seek use immunity related to the production of the documents identified in the subpoena under 18 U.S.C. §§ 6002 and 6003. *Id*. at 1219-20. Needless to say, the government has made no such offer to Concord here, rendering any comparison to *McCollom* completely irrelevant.

Moreover, as it relates to Rule 17(c), the government's request in *McCollom* was far more targeted than what is requested here. Specifically, the government sought the defendant's "check registers" and "accounts," which are types of documents that the court recognized "have common, ordinary meanings," and are thus easily identifiable. *Id.* at 1224. Here, by contrast, the government's general request for "records," "documents," and "communications" identifies merely broad categories of documents—exactly the type of overly broad categories that courts have rejected under Rule 17. *North*, 708 F. Supp. at 404.

***Third***, the government's request ignores the significant issues associated with serving process on a foreign-entity in Russia when that entity has no business presence in the United States. To that end, undersigned counsel has no authority to accept a subpoena on Concord's behalf, nor does counsel have any authority or ability to access or collect the documents at issue. Accordingly, even if the requested subpoena were proper under Rule 17—which it unquestionably is not—it should still be denied based on the government's complete failure to consider whether the law actually permits it to serve a subpoena and compel the production of documents from a foreign corporation with no presence in the United States, and has only appeared before this Court through counsel to defend itself.

Rule 17(e) governs service of a subpoena in a foreign country and provides that "[i]f the witness is in a foreign country, 28 U.S.C. § 1783 governs the subpoena's service." Fed. R. Crim. P. 17(e)(2). Section 1783, on its face, applies to "a national or resident of the United States who is in a foreign country." 28 U.S.C. § 1783(a). But courts have interpreted § 1783 "to limit the court's personal jurisdiction to subpoena a foreign corporation to the kind of circumstances described in *International Shoe Company v. Washington*, 326 U.S. 310 (1945)." *See In re Arawak Trust Co. (Cayman), Ltd.*, 489 F. Supp. 162, 165 (E.D.N.Y. 1980) (finding that the foreign corporation was not subject to U.S. subpoena "merely because it transfer[ed] funds and maintain[ed] a bank account [in the United States]"). The D.C. Circuit has applied a similar test. *See e.g.*, *In Re Sealed Case*, 832 F.2d 1268, 1272 (D.C. Cir. 1987) (finding that a subpoena for records of a foreign company is enforceable only if the company does sufficient business or otherwise has sufficient contacts within the United States to enable the court to exercise personal jurisdiction over it). Here, there is no dispute that Concord has no contacts with the United States,

as would be required to satisfy the personal jurisdiction analogy and thus allow for the Court to issue a subpoena.

Other courts interpreting Rule 17 have similarly recognized that they have no power to compel aliens living outside the United States to respond to a subpoena. *Gillars v. United States*, 182 F. 2d 962, 978 (D.C. Cir. 1950) ("Aliens who are inhabitants of a foreign country cannot be compelled to respond to a subpoena. They owe no allegiance to the United States.") (quoting *United States v. Best*, 76 F. Supp. 138, 139 (D. Mass. 1948)); *see also United States v. Theresius Filippi*, 918 F. 2d 244, 246 n. 2 (1st Cir. 1990) ("The United States has no subpoena power over a foreign national in a foreign country."); *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984) (holding that Swiss nationals in Switzerland are "not amendable to service of United States process . . ."); *United States v. Haim*, 218 F. Supp. 922, 926 (S.D.N.Y 1963) ("the court has no power to compel the attendance of aliens when such are, at the time of the request, inhabitants of a foreign country"). This authority highlights the yawning gap in the government's logic, which seems to gloss over any potential problems with serving or obtaining a return of a subpoena from a foreign corporation—like Concord—that has no presence in the United States.

Further, the government's request fails to comply with the Department of Justice's own policies, which similarly recognize that a court cannot issue a subpoena for documents located in a foreign country to a foreign corporate entity that has no connection to the United States. "[F]oreign governments strongly object to such subpoenas, contending that they constitute an improper exercise of United States jurisdiction." Dep't of Justice Manual, *Subpoenas*, https://www.justice.gov/jm/criminal-resource-manual-279-subpoenas (last visited December 5, 2019).

Given these limits on what the rules allow, this Court has quashed Rule 17 subpoenas issued by the government where its conduct "overstepped" the principles outlined in the rule. *See Vo*, 78 F. Supp. 3d at 174. In *Vo*, this Court acknowledged the fundamental truth that "[t]he government's power when prosecuting criminal cases is not infinite. Nor does it extend to any power not specifically forbidden by law." *Id.* at 173. In the case, the Court criticized the government's defense of its actions (improperly issuing a Rule 17 subpoena without court permission) as one that "was reminiscent of a grade schooler seeking to avoid detention: Our actions are authorized because nothing specifically prohibits them." *Id.* at 174. The court found there was no legal basis to support such argument and therefore concluded that the subpoenas were improper. *Id.*

The same result is appropriate here. The government cites no legal authority giving it permission to subpoena documents from a foreign-corporation criminal defendant with no presence in the United States. Nor does it explain how it might be able to accomplish service of such a subpoena. Despite these significant hurdles, the government went ahead and filed its Motion anyway—and simply turned a blind eye to any possible procedural concerns. But as this Court has recognized, the absence of a prohibition is not the same as affirmative permission to do something, and the facts here make clear that there is no mechanism for serving Concord. The Court should reject the government's request.

*Fourth*, the government's request threatens to completely derail the Court's pretrial scheduling order. Because of its late-filed subpoena request, the government now concedes that, if the Court grants its motion, the government is able to serve the subpoena, and the documents are produced, the government will not be able to include any of the requested documents on its trial exhibit list, which is currently due on January 6, 2020. In light of this fact, the government

16

simply informs the Court (without seeking permission to amend the scheduling order) that it "will supplement its exhibit list with any documents from the subpoena production that the government intends to use at trial on or before January 27, 2020." Mot. 1 n.1. Apart from disrespecting the Court's orders, this unilateral scheduling change has significant follow-on effects, because the government conveniently omits the fact that Concord's motions *in limine* related to the government's exhibit list are currently due on February 7—less than two weeks after the government's new self-imposed deadline. As a result, the government has simply decided that if its Motion is granted, Concord will suffer prejudice from an even more compressed briefing schedule in order to raise any challenge to the government's supplemental exhibit list.

This is yet another example of the government seeking to gain a tactical advantage by dictating to the Court how it wants things to be done. It is unacceptable and must be put to an end.

### III. CONCLUSION

That the government would try to subpoena documents from Concord mere weeks before its exhibit list is due is telling. The government either lacks confidence in its ability to prove its case at trial, or it never had admissible evidence to do so to begin with. Either way, Rule 17 is not meant to be a backstop against an incomplete investigation, and it is certainly not intended to remedy an insufficient indictment. Accordingly, the government's motion should be denied.

Dated: December 9, 2019                                    Respectfully submitted,

                                                           CONCORD MANAGEMENT AND
                                                           CONSULTING LLC

                                                           By Counsel

/s/ *Eric A. Dubelier*
Eric A. Dubelier (D.C. Bar No. 419412)
Katherine Seikaly (D.C. Bar No. 498641)
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
202-414-9200 (phone)
202-414-9299 (fax)
edubelier@reedsmith.com
kseikaly@reedsmith.com