# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC, | |
| Defendant. | |

## REPLY IN SUPPORT OF DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S MOTION TO DISMISS COUNT ONE OF THE SUPERSEDING INDICTMENT

## TABLE OF CONTENTS

**PAGE**

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   ARGUMENT ................................................................................................... 3

    A.   The Grounds For Dismissal Are Effectively Unrebutted And This Action
         Should Be Dismissed. ............................................................................... 3

         1.   The Government's Prosecution Violates Due Process. ............................ 3

         2.   The Government's Response On Arbitrariness Misses The Point............. 7

         3.   *Rehaif* Compels A Heightened *Mens Rea* Requirement. ......................... 14

    B.   The Government's New FARA Theory Is Fatally Flawed. ................................ 21

    C.   The Superseding Indictment Provides Further Evidence Of Arbitrariness. ......... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bluman v. FEC,*
  800 F. Supp. 2d 281 (D.D.C. 2011) ...............................................................1, 15

*Burns v. Wilson,*
  346 U.S. 137 (1953) ...........................................................................................6

*Cafeteria & Rest. Workers Union, Local 473, AFLCIO v. McElroy,*
  367 U.S. 886 (1961) ...........................................................................................6

*Dennis v. United States,*
  384 U.S. 855 (1966) .........................................................................................11

*Henson v. Santander Consumer USA Inc.,*
  137 S. Ct. 1718 (2017) .....................................................................................22

*Kingsley Int'l Pictures Corp. v. Regents of the Univ. of N.Y.,*
  360 U.S. 684 (1959) ...........................................................................................6

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) .................................................................................6, 10

*Lambert v. California,*
  355 U.S. 225 (1957) .........................................................................................17

*New York v. United States,*
  505 U.S. 144 (1992) ...........................................................................................5

*Rehaif v. United States,*
  139 S. Ct. 2191 (2019) ............................................................................. *passim*

*RJR Nabisco, Inc. v. European Cmty.,*
  136 S. Ct. 2090 (2016) .....................................................................................23

*United States v. Burden,*
  934 F.3d 675 (D.C. Cir. 2019) ...............................................................2, 14, 21

*United States v. Caldwell,*
  989 F.2d 1056 (9th Cir. 1993), *overruled on other grounds by Neder v. United States,* 527 U.S. 1 (1999) .........................................................................20

*United States v. Craig,*
  401 F. Supp. 3d 49 (D.D.C. 2019) ...................................................................17

*United States v. Concord Mgmt. & Consulting LLC*,
    347 F. Supp. 3d 38 (D.D.C. 2018) ......................................................................14

*United States v. Flores-Perez*,
    646 F.3d 667 (9th Cir. 2011) ............................................................................23

*United States v. Lopez*,
    514 U.S. 549 (1995)............................................................................................6

*United States v. Rafiekian*,
    No. 1:18-cr-457-AJT-1, 2019 WL 4647254 (E.D. Va. Sept. 24, 2019) ..................16

## Constitutional Provisions & Statutes

U.S. Const. amend. V............................................................................. *passim*

18 U.S.C. § 371 ...................................................................................... *passim*

22 U.S.C. § 611(c) ...............................................................................22, 23

22 U.S.C. § 611(c)(1)...................................................................................22

## Other Authorities

Answer Br. of the United States, *United States v. Woodard*, No. 19-5009 (10th
    Cir. Oct. 10, 2019), 2019 WL 5107398 ....................................................5

## I.      PRELIMINARY STATEMENT

Notwithstanding the government's cries of protest in its opposition brief, the critical

foundational facts establishing the arbitrariness of this prosecution remain:

(1)     There has never been in recorded U.S. history the indictment of a foreign company with no presence in the United States for a conspiracy to defraud the United States by posting content on the internet;

(2)     There has never been a criminal case where the prosecutors drafted and published a report while the case was pending trial concluding that the defendants were guilty;

(3)     There is no reported criminal case where the prosecutors purposely charged a one-count § 371 defraud conspiracy in order to circumvent the heightened *mens rea* required by the statutes the conspiracy allegedly aimed to impede—the Foreign Agents Registration Act ("FARA") and the Federal Election Campaign Act ("FECA")—because there is no evidence showing that the defendant knew about those statutes or the government agencies that administer them; and

(4)     Had the United States Attorney's Office for the District of Columbia ("USAO DC") originally presented this case to the grand jury free from global political hysteria, based on past practice, the indictment would have charged that heightened level of *mens rea* or, in the absence of any proof of such mental state, would not have brought the indictment in the first place.

These are proven facts, undisputed by the government, and apparently specially reserved

for Concord, a Russian company with no presence in the United States.  To be clear, the

government does not deny that it (1) lacks evidence of willfulness or (2) carefully manipulated

the charging language to plead around willfulness because it lacked such evidence.  All of this

despite the additional uncontested fact that then Judge, now Justice, Kavanaugh explicitly

warned the government that in seeking criminal penalties for any foreign national defendant's

expenditures relating to elections, it would have to prove the defendant had knowledge of the law

prohibiting those expenditures.  *See Bluman v. FEC*, 800 F. Supp. 2d 281, 292 (D.D.C. 2011).

Justice Kavanaugh did not qualify this warning by adding a § 371 defraud conspiracy

exception—and there would be no reason to.  It is apparent that there is no fairness or neutrality

in this prosecution and its arbitrariness has gone beyond what the Due Process Clause will tolerate.

The government does not dispute that the Due Process Clause, of necessity, applies to prosecutorial conduct.  But it claims an immunity for this prosecution based on a singularly remarkable, but just as singularly indefensible, proposition:   free of any constitutional constraints, the government can proceed with a prosecution that (i) violates applicable regulations, policies, and practices, (ii) goes beyond the four corners of the indictment, (iii) rests on a vague and constantly changing charge whose end and aim is unknown, and (iv) needs no heightened criminal mental state despite the fact that it is predicated on a complex and obscure statutory scheme whose elements are unknown to foreign nationals.  But the government does not cite a case that says a prosecution shown to be arbitrary because it contravenes established regulations and charging practices, improperly manipulates the burden of proof and ethical rules, and abandons, at every turn, principles of neutrality and fairness, is somehow immune from a due process attack.  Nor could it.  Case law instead makes clear that the protections of due process are afforded when arbitrary government conduct reveals itself, just as it has in this case.

Beyond that, in light of the Supreme Court's recent decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), it is equally apparent that the government must now show a heightened level of *mens rea* in order to prove its defraud conspiracy charge.  Here, too, the government claims an immunity, but its response is equally indefensible.  Its recitation of *Rehaif* and *United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019)—as far as it goes—is disingenuously incomplete.  These two decisions stress the need to ensure, case-by-case, that innocent conduct is not criminally punished and confirm that lack of knowledge can defeat a criminal charge where, as in this case, it negates a specific element of the offense.  *Rehaif* and *Burden* thus demand that

the *mens rea* burden of proof must be elevated where, as here, a § 371 defraud conspiracy predicated on acts of omission relating to obscure statutes and regulations purportedly governing foreign actors creates a substantial risk that unknowing or innocent conduct will be punished. The government had its chance to fix its infirm *mens rea* allegations when it sought the Superseding Indictment—but it passed on the opportunity.  This Court should not rescue it now.

The government likewise has nothing convincing to say when it comes to the Superseding Indictment or its new FARA theory.  Without disputing the arbitrariness reflected in how that Indictment came about, the government claims that it only amounts to a "clarification" of the charges originally alleged.  The record, simply put, will not sustain that benign characterization.  The run-up to the filing of the Superseding Indictment put the government's lack of neutrality on full display and its ultimate allegations—which are far more than a mere clarification—add another chapter to the arbitrariness of this prosecution.  As for its new FARA allegations, they clearly go beyond the Original Indictment and advance a theory that not only has never been alleged, but that continues to change as well, given that the government has just advised Concord that its new FARA allegations actually relate in part to *non*-U.S. citizens engaged in conduct *outside the U.S.*  Such allegations are plainly flawed as a matter of law.

In sum, the record, the case law, and the Constitution support dismissal of this arbitrary and unfounded prosecution.

## II.    ARGUMENT

### A.    The Grounds For Dismissal Are Effectively Unrebutted And This Action Should Be Dismissed.

#### 1.    The Government's Prosecution Violates Due Process.

Concord's motion painstakingly explains how and why Concord has been subjected to an arbitrary prosecution lacking in fairness or neutrality.  ECF 256 at 29–32.  The government does

not dispute the foundational evidence supporting Concord's showing.  Indeed, it notably does not dispute the arbitrary departure from the USAO DC's custom and practice of charging willfulness in § 371 defraud conspiracy cases (ECF 256 at 9–11), a practice very recently followed in the USAO DC's § 371 indictment of the former mayor of Baltimore.  *Id.* at 11 (citing Exhibit 26). There is no need to speculate why.  The government knows that there is a complete absence of any evidence that any of the alleged co-conspirators had ever heard of the government departments and agency in question, let alone knew about the registration and filing duties the government claims were neglected.  From inception, this case has been about blaming a surprise election outcome on Russians.[1]

In any event, the government's principal responsive contention is, as it was before, that the Court already has heard and rejected Concord's due process argument.  ECF 266 ("Gov't Opp.") at 7–8.  That is wrong.  Concord's due process argument is both new and properly raised for the first time.  It is the cumulative conduct in this prosecution—a record the government made entirely on its own—when measured against settled due process constraints, which compels dismissal.  None of this Court's prior rulings, individually or collectively, addresses the *due process* arguments Concord mounts now.

When it finally deigns to consider the due process argument Concord actually makes, the government has nothing of substance to say.  As the government would have it, this Court need not be concerned because Concord does not have a case directly on point that knits the evidence

---

[1]    Add to this the USAO DC's November 2019 indictment of multiple U.S. residents under § 371, which, rather than charging a § 371 defraud conspiracy and omitting allegations of a heightened *mens rea*—as it has done here vis-à-vis Concord—charges a § 371 offense-clause conspiracy and includes allegations of a heightened *mens rea*, willfulness.  **Ex. 1**, *United States v. Khawaja*, No. 19-374, Ind. Count One, ¶ 23 & Count Thirteen, ¶ 53 (D.D.C.).  Again, the use of § 371's defraud clause sans a heightened scienter showing appears to be uniquely and selectively reserved for Russians.

showing arbitrariness to a violation of due process.  Well, of course it doesn't because it is proven that the government has never acted like this before.  Everyone agrees that this prosecution is unique and has no parallel to any other defraud conspiracy ever initiated.  But that is precisely where the government's argument breaks down.  Due process principles always operate and apply on particular fact patterns—with each fact pattern measured by the demands for fairness, neutrality, non-arbitrariness, and non-discrimination that must govern in any prosecution.  If the government's legal paradigm took hold, no new constitutional due process precedent—addressing novel fact patterns—could ever occur for the lack of a previous identical case.  That is not, and cannot be, the law and the government knows it.  ECF 256 at 31 ("Silence by th[e Supreme] Court on a subject is not authority for anything.") (first citing Answer Br. of the United States at *30–31, *United States v. Woodard*, No. 19-5009 (10th Cir. Oct. 10, 2019), 2019 WL 5107398; then quoting *New York v. United States*, 505 U.S. 144, 203 (1992) (White, J., concurring in part and dissenting in part)).

Apart from that, the constitutional analysis called for here is straightforward and not rebutted by the government in any respect.  The prosecutor is a state actor and thus its conduct falls squarely within the ambit of the Due Process Clause.  And due process, by its very nature, is an "as applied" concept, flexible and adaptable to deal with all manner of arbitrary government conduct that rises to constitutional dimension.  The Constitution, for its part, applies to criminal proceedings, demanding fairness and neutrality and a freedom from arbitrary prosecution.[2]  The

---

[2]    The government cannot and does not claim that:  (i) the Due Process Clause plays no role in checking prosecutorial excess or the arbitrary targeting of defendants for criminal sanction; (ii) that courts have no duty to enforce the Clause against such prosecutorial overreach; or (iii) that prosecutors are not bound by the Clause's foundational prohibition against arbitrary treatment.  Nor can it.  The Due Process Clause stands as an essential bulwark against any of the countless forms arbitrary government conduct can take.

government does not deny any of this, nor could it.   The fact that Concord has no directly applicable precedent involving prosecutorial conduct accordingly carries no weight now in the analysis.   Courts are "often called upon to resolve questions of constitutional law not susceptible to the mechanical application of bright and clear lines[,]" *United States v. Lopez*, 514 U.S. 549, 579 (1995) (Kennedy, J., concurring), especially when they involve the reach of the Due Process Clause, *see*, *e.g.*, *Cafeteria & Rest. Workers Union, Local 473, AFLCIO v. McElroy*, 367 U.S. 886, 895 (1961) (reasoning that the Due Process Clause, by its "very nature[,] . . . negates any concept of inflexible procedures universally applicable to every imaginable situation").   And they must, for "'[a]bdication of [this judicial] responsibility is not part of the constitutional design.'"   *Kisor v. Wilkie*, 139 S. Ct. 2400, 2440 (2019) (Gorsuch, J., concurring in the judgment) (citation omitted).

To that end, many of the cases Concord cites arose on unique facts, just as this one does. The resolution of those cases turned, as it does here, on the need to protect individuals from injustice, and it necessitated the "instance-by-instance, case-by-case application of th[e Due Process] [C]lause" that "inheres in the very nature of the judicial enforcement of [that] Clause." *Kingsley Int'l Pictures Corp. v. Regents of the Univ. of N.Y.*, 360 U.S. 684, 696 (1959) (Frankfurter, J., concurring in the judgment) (further reasoning that the Court "cannot escape such [case-by-case analyses] of that clause in all the varieties of situations that come before" it). That is the basic guarantee the Clause imparts.   ECF 256 at 25–29 (discussing cases); *see also Burns v. Wilson*, 346 U.S. 137, 142–43 (1953) (plurality op.) (explaining that "the constitutional guarantee of due process is meaningful enough, and sufficiently adaptable, to protect [individuals] from the crude injustices of a trial so conducted that it becomes bent on fixing guilt by dispensing with rudimentary fairness rather than finding truth through adherence to those

basic guarantees which have long been recognized and honored by the . . . courts . . . .").  In this case, settled due process principles establish that the government has crossed the line separating lawful from arbitrary protections.

### 2.    The Government's Response On Arbitrariness Misses The Point.

As it did before, the government tries to moot its constitutional violation by examining each fact revealing arbitrariness and asserting that it does not rise to the level of a due process violation.  But this isolation and minimization effort misses the point in every particular.

*First*, the government's minimization strategy studiously ignores what the cumulative evidentiary record indisputably shows.  This conduct in question, when collectively considered, goes beyond mere violations of court rules (in the case of the Mueller Report and the Attorney General's congressional testimony) or legal doctrines (in the case of the decision to deviate from the settled custom and practice of the USAO DC and "cloak" an offense-clause conspiracy in a defraud-clause one), and substantiates a pattern of flagrant arbitrariness in the way the government has carried out this prosecution.  It is that conduct, in cumulation, that leaves due process in its wake.

*Second*, as noted above, the government offers no explanation for the fact that, in the decade leading up to the Indictments here, the USAO DC consistently charged willfulness in § 371 defraud conspiracy indictments.  So why did the government repeatedly include willfulness in those indictments, until this case came along?  Why, the very same week it filed the Superseding Indictment here against Russians that omitted allegations of a heightened *mens rea*, did the government file a § 371 defraud conspiracy indictment in the District of Maryland against an American citizen including those very allegations?  And why did the government fail to follow in this case its own election-crime and § 371 charging guidelines and practices?  The answer is that an arbitrary departure was needed so the government could find a crime to fit what

it thinks it can prove.  That is not, however, a rationale that passes due process muster.

The USAO DC tries to justify its arbitrary abandonment of its consistent practice with a rhetorical flourish, claiming that:

> Even if the government has not been fully consistent in its position about the defraud clause, it does not follow that the Due Process Clause forever compels the government to take what it believes to be an incorrect position, and to do so in contravention of extensive case law holding that willfulness is not required.

Gov't Opp. at 13–14.  The government later doubles down, adding to this line of argument a contention that wasn't in its previous opposition—claiming that *if* what "Concord means to argue" is that the government's choice to allege willfulness in some defraud-clause conspiracy indictments but not the Indictments here is a "due process violation[,] . . . this Court has already rejected that argument."  Gov't Opp. at 18 (citing ECF 74, Memo. Op.).  These *non sequiturs* do not do the government any good at all.

The due process violation here emanates from the government's cumulative conduct and its decision to abandon its customary proof requirements with an aim towards obtaining a conviction at any cost for the conspiracy alleged in this case.  Those proof requirements are reinforced in guidelines and practice manuals intended to keep the exercise of prosecutorial discretion within constitutional bounds and they have particular meaning where the government departs from those policies to charge a never-before-prosecuted defraud conspiracy against a Russian entity under an obscure statutory scheme.  In this light, and at a minimum, the Court is bound to consider whether this about-face by the government is evidence of precisely the sort of arbitrary prosecutorial conduct due process forbids.  As for this Court's supposedly having decided the issue, it plainly has not addressed the government's abandonment of its charging practices as part of the arbitrary prosecution argument made here.  And if, as Concord has shown, this prosecution has crossed the due process line, whatever might be within constitutional

limits in another case is irrelevant.

The government's further effort to describe its departure as its "frequent litigating position" indicating that a heightened *mens rea* is not required, *see* Gov't Opp. at 13, confirms Concord's arbitrariness point by showing the depths to which the government is willing to go. Concord's evidentiary showing establishes the USAO DC's consistent practice of charging willfulness in cases like this one, right up to the present. Concord has been singled out; it is as simple as that. Nor is it sufficient for the government to rely on an indictment handed down in the Southern District of New York, *see id.* at 13, two days **after** Concord filed its renewed motion to dismiss (ECF 210)—which, contrary to the USAO DC's longstanding practice, but like the Indictment here, also happens to omit any mention of willfulness. The New York indictment is quite convenient for the government in this case, much like the after-the-fact reinterpretation of DOJ charging policies the Special Counsel ginned up in August 2018. And now the government can argue in the New York case that this case against Concord provides the necessary precedent for the omission of *mens rea* allegations in the indictment there. But why would the court consider this New York indictment as proof of anything when **the U.S. Attorney in this district** has a pattern and practice to the contrary?

**Third**, the government's minimization efforts veer further off course when it addresses the pretextual nature of the Special Counsel's appointment as to Concord. The government recycles its prior contention that the Regulations do not "create judicially enforceable rights." Gov't Opp. at 10 (citation and internal quotation marks omitted). That's right, they don't. But that doesn't mean unjustified deviations from the Regulations cannot be proof of arbitrary government conduct for constitutional due process purposes. The Executive Branch cannot immunize itself from the constitutional scrutiny of an Article III court based on arbitrary

violations of regulations simply by planting a clause in the regulations saying that they do not create judicially enforceable rights. Courts, not the Executive Branch, are the judges of whether the Executive Branch's arbitrary conduct violates due process, as decades (and more) of settled precedent make clear. ECF 256 at 25–29 (discussing cases). Indeed, "[t]he founders afforded" the federal courts the "extraordinary powers" of judicial review "'free from potential domination by other branches of government'" specifically "so that an independent judiciary could better guard the people from the *arbitrary* use of governmental power." *Kisor*, 139 S. Ct. at 2438 (Gorsuch, J., concurring in the judgment) (emphasis added) (citations omitted).

*Fourth*, when it gets to Concord's identifying the government's decision to manufacture a defraud-clause conspiracy out of an offense-clause conspiracy under the governing statutes, the government invokes cases that say the prosecution has latitude to choose its charge when conduct violates more than one law. Gov't Opp. at 12. While it is true the government has discretion to choose its charge when multiple laws might support it, that discretion is not unchecked, as the cases Concord cites make clear. ECF 256 at 29 (citing cases). But here the government lacked evidence of any knowledge whatsoever of the statutory or regulatory schemes, making it impossible to charge any substantive offense, or a § 371 conspiracy to violate any substantive offense. In fact, the government never denies this. So to cure this insurmountable problem, the government charged Concord not with violating another statute, but by tweaking the language of the same § 371 statute with the intent to negate the *mens rea* obstacle. These are the facts that the Court must deal with, not generic distinguishable cases cited by the government for the proposition that the government can choose what statute to use. Again, here the government worded a charge purposely to circumvent a lack of proof. The government cites to no case that says this is permissible. Nor can it. Similarly, the government

also does not even try to show—again because it can't—that its defraud-clause charge "properly reflect[ed] the essence of the alleged offense" and "d[id] not involve an attempt by prosecutorial sleight of hand to overcome" the willfulness burden it would have faced had it charged under § 371's offense clause.  *Dennis v. United States*, 384 U.S. 855, 863 (1966).

As for the government's claim that the Court previously rejected this argument, that turns a blind eye to what the Court said and when it said it.  In its November 2018 ruling denying Concord's earlier motion to dismiss, the Court simply stated that courts had rejected arguments in § 371 defraud-clause cases for borrowing the *mens rea* from substantive statutes allegedly interfered with, and found that just because the government alleges a violation of such statutes, that does not alone foreclose its use of § 371's defraud clause.  ECF 74 at 8–9, 18–19.  But the Court didn't reject the argument Concord makes now because Concord didn't make it then.  *See id. generally*.  In fact, Concord never even argued that the *mens rea* required in criminal FECA and FARA cases should be borrowed and used in § 371 cases predicated on those statutes simply because the statutes were invoked.  *See generally* ECF 46.  Rather, Concord argued that a heightened *mens rea* was required in this defraud-clause case because it was based on complex and technical statutes that foreign nationals especially were unlikely to know about and targeted political speech in the heat of a presidential election.  *Id.* at 17–26.  Notably, Concord anticipated the very rebuttal the government offers now and made clear that such a "rejoinder is misdirected" given the arguments Concord actually had made.  *Id.* at 25.  And the developing record since the Court's November 2018 ruling—and the Superseding Indictment itself—make one thing abundantly clear:  this is really an offense-clause charge.

*Fifth*, the government minimizes its unprecedented public declarations of Concord's guilt by noting that the Court found them not "flagrant" and it consulted ethics experts to avoid any

rule violations.  Gov't Opp. at 14.  So what?  The statements still reflect the arbitrary treatment of Concord, and manifestly so.  Who else did the Special Counsel and the Attorney General publicly declare guilty—other than Concord and some other Russians?  By marked contrast, the government devotes substantial attention to the prejudicial public statements made by other government actors that Concord identified (ECF 256 at 12–14)—including the Secretaries of Treasury and State.  Gov't Opp. at 14–15.  As for the government's facile response that these statements did not violate the Court's order because they were not made "by lawyers representing the government in this case[,]" *id.* at 14, the May 29 order by its terms applies broadly and without exception to the "government."  ECF 137 at 1.  And, whether those statements violated the Court's order or its rules or, in the government's words, "could reasonably be expected to impact the trial in this case[,]" Gov't Opp. at 15, the evidence of arbitrariness remains—a concerted effort by the Executive Branch to "convict" Concord in the court of public opinion before a single witness is heard at trial.

*Sixth*, when turning to the ever-changing details of the charges leveled against Concord, exposed by Concord as a series of arbitrary tactical moves driven by a desire to convict at all costs, the government goes so far as to say it "has consistently articulated a single theory of criminal liability" and that it's Concord that has changed its position.  Gov't Opp. at 15.  Come on.  As Concord's detailed recitation of the dizzying history of the government's theories and interpretations in this case makes clear, the government's assertion that it has stuck to a "single theory" is not even close to credible.  ECF 256 at 14–24.  And Concord's showing, unlike the government's, cites specifically to the actual words written and spoken by the prosecutors.  *Id.*

Notwithstanding this record, the government also has the gall to characterize Concord's arbitrariness showing as nothing more than "complaints" about giving Concord "a more detailed

preview of the government's factual and legal theories . . . ."  Gov't Opp. at 16.  But this ignores entirely the way this came about—a tortuous process driven by Concord's motions for bills of particulars met by government evasion and sleight of hand.  What is more, the government just recently prompted yet a third motion for a bill of particulars from Concord with a series of letters and ambiguous emails—only to "correct" itself after the fact.  **Ex. 2**, Nov. 26, 2019 Email; **Ex. 3**, Dec. 5, 2019 Email; **Ex. 4**, Dec. 10, 2019 Email.  Far from doing Concord a favor, the government simply continues its cavalier prosecutorial tactics aimed only at hindering Concord's ability to mount a defense.

Here, the arbitrariness lives on in the way the government continues to act out its convict-at-all costs predilections.  In a brief filed November 27, 2019, the government, in yet another attempt to obstruct Concord's reasonable discovery requests, asserted that in § 371 defraud conspiracy cases, "a party can obstruct lawful government functions, including the enforcement and administration of statutes and regulations, even if, at the end of the day, the responsible agencies conclude that the statutes or regulations they enforce do not apply to the party's conduct or if, for whatever reason, the agencies decline to take any enforcement action."  ECF 262 at 11.  But in its November 2018 motion-to-dismiss ruling, the Court stated that it found it "difficult to see how the defendants' deception would impair agencies' ability to 'administer' disclosure requirements if those requirements did not apply to the defendants' conduct."  ECF 74 at 15.  And, the Court concluded, "because this indictment"—like the Superseding Indictment— "alleges a conspiracy to impair [the FEC's and DOJ's] functions of 'administering federal requirements for disclosure,' the government may ultimately have to prove that the defendants agreed to a course of conduct that, if carried out, would require disclosure to the FEC or DOJ." *Id.* at 15–16 (citing Original Indictment ¶ 9, ECF 1); *see also* Superseding Indictment ¶ 9, ECF

247.   The government never mentioned these findings in its November 27 filing, further revealing that principles of fairness and neutrality have long been abandoned where prosecuting Concord is concerned.  Rather, the arbitrary treatment will continue and the offense against due process remains.

### 3.   *Rehaif* Compels A Heightened *Mens Rea* Requirement.

Concord also argued in its renewed motion to dismiss (ECF 210) that, based on *Rehaif v. United States*, 139 S. Ct. 2191 (2019) and *United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019), the Court should revisit its preliminary *mens rea* ruling.  ECF 256 at Part IV.B.[3]  Concord contends that those cases, and the principles they espouse, require the government in this case to allege and prove that Concord knew its status as a foreign-national corporation imposed specific disclosure and registration duties on Concord that it was obligated, on pain of criminal sanction, to carry out; and, further, that Concord knew about the specific FECA and FARA statutes and regulations invoked when it acted.  *Id.*  The government does not take this argument seriously either.  But avoidance does not dispel what the controlling law now compels.

*Rehaif*, as Concord explained, calls for rigorous scrutiny of criminal charges and strict application of *mens rea* requirements where, as alleged, there is a serious risk of ensnaring innocent conduct.  ECF 256 at 35–38.  Because that risk in this case is high, the *mens rea* burden on the government must be proportionately high.  And *Burden*, for its part, reinforces this aspect of *Rehaif* and what it requires in this case.  *Id.   Rehaif* also provides important clarity on the

---

[3]   The Court previously found that the *mens rea* issue would be later addressed in litigation over the jury instructions.  *See United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38, 57 (D.D.C. 2018) ("Concord will have further opportunities—with jury instructions and in trial and post-trial motions, if any—to ensure that the government proves enough knowledge to support a specific intent to thwart at least one of the three government functions alleged in the indictment.").

ignorance of the law defense and its continued vitality where, as here, knowledge of a law or legal requirement goes to a very element of the criminal offense. *Id.* at 37–38.

The government simply relies on the argument that these cases do not apply because § 371 itself does not spell out the mental state required for a fact pattern like the one the government has charged and advanced here.   Gov't Opp. at 19–20.   But the need for a heightened *mens rea* showing is a fundamental principle of criminal law, necessary to ensure that only blameworthy conduct is criminalized.   ECF 256 at 36–38.   On its own, the basic statement of a § 371 defraud conspiracy such as the one the government repeatedly incants—that "Concord knowingly conspired to impair lawful government functions through deceptive means" (Gov't Opp. at 22)—does not conceivably provide fair warning to Concord of what is or was illegal in this case.   Moreover, the word "knowingly" does not appear in § 371 either; and the government would not dare argue that such an absence means that the statute creates strict criminal liability.

In certain kinds of defraud-conspiracy cases, where the illegality of the underlying conduct is apparent and a reasonable person would know that, a heightened *mens rea* requirement may be unnecessary.   But here, it was far from reasonably clear at the time Concord allegedly acted that what it was allegedly doing—conspiring to interfere with the government functions, under obscure and arcane statutes, of obtaining disclosures and registrations relating to elections—was criminal.   In these circumstances, due process demands that defendants have fair warning of what the law prohibits.   *See* ECF 256 at 39–42.   Requiring knowledge of the specific prohibitions as part of the charge and the burden of proof bridges this due process gap.   With respect to the alleged FEC-related offenses, Justice Kavanaugh has already said so in *Bluman*.   If that burden is met, then it becomes reasonably clear that the defendant did know.

The lack of fair notice of the alleged crimes the government has charged and intends to

prove is even more pronounced now given how the government recently described its new FARA theory.   Prompted by Concord's December 2 motion for another supplemental bill of particulars aimed at the new FARA allegations in paragraph 48 of the Superseding Indictment, *see* ECF 264, the government informed undersigned counsel that it "do[es] ***not*** intend to present evidence that the defendants and co-conspirators caused 'unwitting persons' ***in the United States*** 'to produce, purchase, and post advertisements'" and that Paragraph 48 of the Superseding Indictment "does ***not*** describe the conduct . . . as ***occurring in the United States*** . . . ."   **Ex. 3**, Dec. 5, 2019 Email (emphasis added).   Thus, the government intends to prove Concord committed a defraud conspiracy by showing that "unwitting" non-U.S. persons acting outside the United States nonetheless are "agents" subject to FARA's registration requirements, which apply solely to those who act "within the United States."   *Infra* at 22–23.   But the government has already conceded it has no evidence of Concord's (or any other defendant's) awareness of FARA.   ECF 196 at 2 (citing Ex. A at ECF 197-1).   And even if it had that evidence, that is not evidence that Concord or the "unwitting" non-U.S. persons noted in paragraph 48 knew or could have known that their alleged conduct outside the United States could be swept up by FARA and then leveraged into a § 371 defraud conspiracy.

For all these reasons then, all defraud conspiracies cannot be viewed as fungible, and no case says they should be.   Remarkably, the government doesn't deny that it is seeking a conviction without proving Concord was aware of the relevant duties.   Instead, it admits it.   But where the "lawful" government function lies, as in this case, in obscure and arcane statutory provisions, and acts of non-disclosure or omission related to those provisions are involved, an awareness of the statutes should be required as a matter of due process.   That is because where non-disclosures and omissions are concerned and the defendant does not know its failure to act is

unlawful, there is no way to avoid the adverse consequences. These are the central lessons of *Lambert v. California*, 355 U.S. 225 (1957) (discussed at ECF 256 at 40)—another case the government's opposition noticeably omits.[4]

As *Burden* would say, *mens rea* needs to be "calibrated" to the statutes that are involved. 938 F.3d at 690. What is required depends on the particular circumstances of the case and conspiracy alleged, and sometimes a requirement must be added that one knows its act violates the law. *Rehaif* is to the same end. Heightened scienter requirements are imposed to ensure that a defendant understands the wrongful nature of its alleged act. A "mature system of law" reads this requirement in as necessary in the case at hand. *Rehaif*, 139 S. Ct. at 2196 (citation and internal quotation marks omitted).

These are the principles that drove the Supreme Court in *Rehaif*—as Concord's motion lays out in detail. ECF 256 at 35–38. But one would not know any of this from reading just the government's opposition. It provides a technically accurate, but substantially incomplete, description of *Rehaif*, *see* Gov't Opp. at 18–19, ignoring outright the Court's overarching focus there on the *mens rea* function of sparing innocent conduct from the reach of a criminal statute and its discussion of the limits on the maxim that ignorance of the law is no excuse—and further ignoring how all of this impacts this Court's prior *mens rea* analysis in this case. It is those particular aspects of *Rehaif*, though, that make it so critically important to the *mens rea* issue here, and why its reasoning should compel reconsideration of the government's burden of proof on that question is in this case.

---

[4]     The government ignores most of the other authorities Concord cites in its discussion of *mens rea*, including relevant, recently decided § 371 defraud conspiracy and criminal FARA cases in this Court and the Eastern District of Virginia. ECF 256 at 38 (citing *United States v. Rafiekian*, No. 1:18-cr-457-AJT-1, 2019 WL 4647254 (E.D. Va. Sept. 24, 2019)); *id.* at 40–41 (citing *United States v. Craig*, 401 F. Supp. 3d 49 (D.D.C. 2019)).

Instead of grappling with these critical aspects of *Rehaif*, the government resorts once again to misdirection and mischaracterization.  It claims, for example, that "Concord would apparently extract from [*Rehaif*] a newly established rule that courts must read willfulness requirements into statutes where none exist."  Gov't Opp. at 19.  As *Rehaif* itself makes clear, however, there's nothing "newly established" about reading a *mens rea* requirement into a criminal statute that does not provide for one.  *Rehaif*, 139 S. Ct. at 2195.  Nor, obviously, is Concord claiming some broad and universal rule "that courts must read willfulness requirements into statutes where none exist."  As noted, Concord's argument is far narrower and case-specific—that a heightened *mens rea* showing is required in this particular § 371 defraud conspiracy case based specifically on the way the Superseding Indictment is structured and what the prosecution has alleged.

The government also attempts to confine *Rehaif* to instances where the criminal statute at issue requires proof of one's "status."  Gov't Opp. at 19–20.  That is not even close to a credible reading of *Rehaif*.  The Supreme Court' held that *mens rea* must be shown as to each element of a criminal statute—whether it's one's status, any other element, or, as here, whether one (i) has knowingly engaged in deception that one (ii) knows interferes with a lawful government function.  And § 371 contains no *mens rea* element at all, so if we follow the government's argument to its logical conclusion, then § 371 would be a strict-liability criminal statute, which no court has ever found.

The government is well wide of the mark, too, when it says *Rehaif* "distinguished" the very arguments it claims Concord is making:  "that *Rehaif* required some combination of a willful intent when entering the conspiracy and knowledge of FECA and FARA" and that Concord "cannot be held liable because it was unaware of the law regulating its conduct."  Gov't

Opp. at 19–20.  The government says that these arguments are blocked by *Rehaif* because *Rehaif* says there is no defense "where a defendant has the requisite mental state in respect to the elements of the crime *but claims to be 'unaware of the existence of the statute proscribing his conduct.'*"  *Id.* at 19 (quoting *Rehaif*, 139 S. Ct. at 2198).  In other words, according to *Rehaif*, mere ignorance of the "statute proscribing [one's] conduct" and under which he is criminally charged is not a defense.

This is all just more government misdirection.  As indicated, this reference from *Rehaif* was addressing the typically unsuccessful argument that, even when one has the requisite *mens rea* as to each element of a statutory offense, one cannot be culpable unless he or she actually knows about the statute that creates the offense—*i.e.*, that one has to know about the law he or she has allegedly violated.  That is the classic case for applying the maxim that ignorance of the law is no excuse.  But Concord is not arguing that the government must prove Concord knew about § 371 and its defraud conspiracy clause—the "statute proscribing [its alleged] conduct" here.  Rather, Concord's argument is right in line with *Rehaif* and the recognized ignorance of the law defense—that the government must show knowledge as to the "lawful government function" **element** of the § 371 defraud conspiracy offense, and that knowledge has to include knowledge of the laws that give rise to the "functions" allegedly interfered with.  That is what *Rehaif* demands.  Where a defendant lacks knowledge that goes directly to a statutory element on which the government bears the burden of proof, the law forbids him from being criminally punished.  And again, the government desperately tries to rebut a reasonable interpretation of *Rehaif* because there is not one iota of evidence that Concord or any other alleged co-conspirator was aware that their status as a foreign national created arguable duties under U.S. law to three agencies within the U.S. government.

The government is not done, though.  It proceeds to claim that "Concord would appear to seek a per se requirement that it must have known details of the statutory provisions administered by the government to have conspired to obstruct the government functions at all." Gov't Opp. at 20.  "Per se" is just silly because Concord argues nothing of the sort.  What it does argue—as it has previously—is that in ***this case***, as the government has charged it (and reinvented it), Concord, a foreign corporation with no presence in the United States, must have known of the duties that the statutory provisions arguably created and the exercise of which it allegedly interfered.  And these foreign-national co-conspirators must have known of these duties despite the government never previously charging even one single similarly-situated defendant with the same crime.  *Rehaif*, among other binding precedents, supports precisely this type of knowledge here, focused as it is on the particulars of the underlying statutory scheme giving rise to the "functions" supposedly obstructed and the allegations at issue, and the need for a heightened *mens rea* where, as here, that is necessary to ensure that innocent conduct is not punished.  *See generally* ECF 256 at Part IV.B.

In its final rhetorical flourish, the government even goes so far as to say that § 371 "prohibits conspiring to impair the government through deceptive means, rather than any particular conduct or violation of any particular legal framework."  Gov't Opp. at 20.  To follow the government's reasoning, it can convict Concord on an entirely theoretical basis with no actual interference at all.  As noted above, however, that is wrong and the Court has said so— mere impairment of "the government," without any reference to "any particular conduct or violation of any particular legal framework," is not enough and rightly would never pass constitutional muster, much less a fair statutory construction tied to controlling § 371 precedent. *See*, *e.g.*, *United States v. Caldwell*, 989 F.2d 1056, 1060 (9th Cir. 1993) (noting that § 371's

defraud clause does **not** "make it a federal crime to do *anything*, even that which is otherwise permitted, with the goal of making the government's job more difficult"), *overruled on other grounds by Neder v. United States*, 527 U.S. 1, 8–9 (1999).  And it is beside the point because the case the government has brought here against Concord—predicated on the "particular legal framework[s]" created by FECA and FARA (Gov't Opp. at 20)—would indeed require such a showing before Concord could be convicted of a crime.  The government cites no case that says otherwise.[5]

The government closes by cramming Concord's due process and fair notice arguments into a few generic sentences in the final paragraph of its *mens rea* argument, claiming that any due process concerns are assuaged by the fact that the government has charged a § 371 defraud—not offense—conspiracy, and assuring that Concord's due process rights will be fully protected at trial.  Gov't Opp. at 22.  This hardly does justice to these serious concerns here, jeopardized in the extreme by the government's arbitrary prosecutorial and associated tactics against Concord over the past 21-plus months—with no signs of abating.

### B.    The Government's New FARA Theory Is Fatally Flawed.

In an effort to defend its new FARA theory—that the conspirators allegedly caused unwitting persons to engage in specific political activities and buy and post political advertisements, who then themselves failed to report or disclose those activities and advertisement expenditures—the government repeats its assurances that it has not charged

---

[5]    When *Burden* is considered, moreover, there is still more evasion.  The government focuses on the fact that in *Burden*, the jury was given a willfulness instruction, as the criminal statute at issue required.  Gov't Opp. at 18.  But Concord does not dispute any of that and it is not relevant to the arguments Concord actually makes.  *Burden* matters for the same reason *Rehaif* matters— it reinforces the critical need to ensure a guilty mind is shown as to each statutory element and that innocent conduct is not caught up in a criminal dragnet.  ECF 256 at 36–37.

Concord with violating FARA, and then claims that "[c]onduct need not violate FARA to shed light on the object of the conspiracy or to constitute deception of and interference with the federal government's lawful functions, including the Department of Justice's administration of FARA." Gov't Opp. at 23. Whatever "shed[ding] light on the object of the conspiracy" means, that function alone cannot sustain the new allegations. Nor, for the reasons discussed above and previously noted by the Court, can such alleged conduct constitute "interference" with DOJ's "administration of FARA" if it does "not violate FARA" itself. *Supra* at 13; ECF 74 at 15.

The government's efforts to defend its new theory also must be read in light of its latest pronouncements on the allegations in paragraph 48 of the Superseding Indictment. It is important to start with the fact that the government has never charged either a substantive FARA violation or a § 371 defraud FARA violation based on this theory of liability. As the government explains it, its new FARA allegations make out a "failure to register" in "contravention of a legal duty imposed by FARA" because the underlying "influence activities" by the "unwitting persons" trigger FARA's registration requirements, which "apply to those who engage in such activities 'directly or through any other person.'" Gov't Opp. at 23 (quoting 22 U.S.C. § 611(c)(1)). But as now understood in light of the government's aforementioned December 5 email (**Ex. 3**)— which expressly limits the unwitting persons in paragraph 48 to *non*-U.S. citizens engaged in conduct *outside* the United States—the government's new FARA allegations are even more plainly, and fatally, defective. FARA only requires "agents" of "foreign principals" to register with DOJ, and "agents" encompass only those who act "within the United States." *See* 22 U.S.C. § 611(c). That unambiguous text says what it means and means what it says—an "agent" subject to FARA's registration requirements is ***not*** someone who engages in conduct ***outside*** the United States. *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017)

(courts "presume . . . 'that [the] legislature says ... what it means and means ... what it says.'")
(citation omitted).  Nor, by extension, can one be a FARA "agent" by acting "through any other
person" *outside* the United States.  *See* 22 U.S.C. § 611(c).  And no case says otherwise.

Indeed, given its express confinement to conduct "within the United States," FARA most
assuredly cannot be construed to overcome the interpretive presumption against
extraterritoriality, which provides that "[a]bsent clearly expressed congressional intent to the
contrary, federal laws will be construed to have only domestic application."  *RJR Nabisco, Inc. v.*
*European Cmty.*, 136 S. Ct. 2090, 2100 (2016) (citation omitted).  That presumption requires
courts to ask "not whether [they] think 'Congress would have wanted' a statute to apply to
foreign conduct 'if it had thought of the situation before the court,' but [rather] whether Congress
has affirmatively and unmistakably instructed that the statute will do so."  *Id.* (citation omitted).
For these reasons, all the government's talk of "broader legal principles that apply when acting
through intermediaries" and FARA's applicability to one who engages in "influence activities"
"through any other person" (Gov't Opp. at 23–24) are entirely inapposite—no one can be a
FARA "agent" based on conduct that occurred outside the United States.

### C.    The Superseding Indictment Provides Further Evidence Of Arbitrariness.

When it comes to the Superseding Indictment, the government (wisely) abstains from
claiming that it erases all vestiges of its arbitrary conduct in this proceeding and cures the
resulting constitutional violation.  A "superseding indictment does not [even] nullify an original
indictment," *United States v. Flores-Perez*, 646 F.3d 667, 671 (9th Cir. 2011), much less cleanse
the government's arbitrary conduct in a criminal proceeding from the record or magically
eliminate its taint on the fairness of the proceeding.  Indeed, the government all but concedes the
duplicity at work in the run-up to the Superseding Indictment, including its willful concealment
of the new FARA allegations—even from the Court—and its surprise insertion of those after-

- 23 -

the-fact allegations.  Gov't Opp. at 17.  This Indictment thus further cements that Concord is the victim of an arbitrary prosecution.

Worse still, the government has the nerve to say that its new FARA allegations are just a "clarification" of allegations advanced in the Original Indictment that actually "provide further notice and clarity of the government's theory[.]"  Gov't Opp. at 17.  This description is convenient but dead wrong.  The new allegations are hardly a "clarification" of previously made allegations, and they certainly are no aid to Concord as it is forced to continue playing "Guess the government's theory," a game with apparently no rules.  The government tries to carefully parse the two Indictments to show that the gist of the Superseding Indictment's FARA allegations relating to "unwitting" individuals is fundamentally the same as similar allegations in the Original Indictment.  Gov't Opp. at 3.  But inexplicably, the government fails to even mention paragraph 48 of the Superseding Indictment in that page-3 recitation (the government sneaks it on at the end of the brief on page 22), the paragraph which, as Concord explicitly pointed out, is the heart of the government's new theory.  ECF 256 at 23 (quoting Superseding Indictment ¶ 48, ECF 247).  The reason is apparent—the allegations in that paragraph about "caus[ing] unwitting persons to produce, purchase, and post advertisements" who then themselves failed to report their expenditures or register with DOJ are, undeniably, new.

In response to Concord's calling out of the Superseding Indictment—with factual support—as "nothing more than a convenient litigating position aimed, *post hoc*, at Concord's unrebutted showing of the USAO DC's consistent practice of alleging willfulness in § 371 defraud conspiracies[,]" the government finds this "inexplicable."  Gov't Opp. at 17 (citing ECF 256 at 33).  But explicable it is.  Confronted with its undisputed historical practice of charging willfulness in § 371 defraud conspiracies, and having not itself brought the Original Indictment

lacking such heightened *mens rea* allegations (the Special Counsel did), the USAO DC saw the Superseding Indictment as a chance to put its own stamp on this case and show that it doesn't always charge willfulness.  With deafening silence, the government does not deny any of this.

Finally, with respect to Concord's charge that the Superseding Indictment confirms that the government's attempt to inject its new FARA theory through letters and briefs was effectively an unconstitutional constructive amendment of the Original Indictment, ECF 256 at 33, the government demurs on the basis that its FARA theory actually was in the Original Indictment.  Gov't Opp. at 18.  The government further contends that even if Concord were right, that would provide "no basis to dismiss the Superseding Indictment, which clearly and expressly describes this theory."  *Id.*  The government's first point strains credulity to the breaking point, as Concord's briefing shows.  The second point misses the mark—the government's prior unconstitutional act in trying to constructively amend the Original Indictment is still more proof, and powerful proof at that, of the arbitrariness that has marked this prosecution from Day One.

The Court should grant Concord's motion to dismiss.

Dated: December 10, 2019

Respectfully submitted,

CONCORD MANAGEMENT
AND CONSULTING LLC

By: */s/ Eric A. Dubelier*
    Eric A. Dubelier (D.C. Bar No. 419412)
    Katherine J. Seikaly (D.C. Bar No. 498641)
    REED SMITH LLP
    1301 K Street, N.W.
    Suite 1000 – East Tower
    Washington, D.C. 20005-3373
    202.414.9200 (phone)
    202.414.9299 (fax)
    edubelier@reedsmith.com
    kseikaly@reedsmith.com

James C. Martin[*]
Colin E. Wrabley[*]
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222-2716
412.288.3131 (phone)
412.288.3063 (fax)
jcmartin@reedsmith.com
cwrabley@reedsmith.com

[*] *Admitted Pro Hac Vice*

**Exhibit 1** to Reply in Support of Defendant Concord Management and Consulting LLC's Motion to Dismiss Count One of the Superseding Indictment, 18-cr-00032-2-DLF

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on May 7, 2019

SEALED

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. |
| | : | |
| v. | : | **INDICTMENT** |
| | : | |
| AHMAD "ANDY" KHAWAJA, | : | **Counts 1 and 13: 18 U.S.C. § 371** |
| GEORGE NADER, | : | **(Conspiracy)** |
| ROY BOULOS, | : | |
| RUDY DEKERMENJIAN, | : | **Counts 2, 15-20, 25, 27, 30, 33, 36, 38, 41,** |
| MOHAMMAD "MOE" DIAB, | : | **and 44: 52 U.S.C. §§ 30122 and 30109** |
| RANI EL-SAADI, | : | **(Contributions in the Name of Another)** |
| STEVAN HILL, and | : | |
| THAYNE WHIPPLE, | : | **Counts 3, 5, 7, 9, 11, 21, 23, 28, 31, 34, 39,** |
| | : | **42, 45, and 47: 18 U.S.C. §§ 1001(a)(2) and** |
| Defendants. | : | **2** |
| | : | **(False Statements)** |
| | : | |
| | : | **Counts 4, 6, 8, 10, 12, 22, 24, 29, 32, 35, 40,** |
| | : | **43, 46, and 48: 18 U.S.C. §§ 1519 and 2** |
| | : | **(Destruction, alteration, or falsification of** |
| | : | **records)** |
| | : | |
| | : | **Counts 14, 26, and 37: 52 U.S.C. §§ 30116** |
| | : | **and 30109** |
| | : | **(Excessive Contributions)** |
| | : | |
| | : | **Counts 49-53: 18 U.S.C. § 1503** |
| | : | **(Obstruction)** |

U.S. District and Bankruptcy Courts
for the District of Columbia
A TRUE COPY
ANGELA D. CAESAR, Clerk

By _Zeenah Purmill_
Deputy Clerk

Case 1:19-cr-374
Assigned to: Judge Randolph D. Moss
Date Assigned: 11/07/2019
Description: Indictment (B)

1

## INDICTMENT

The Grand Jury charges that:

      1.    At all times relevant to this indictment:

### Introduction

      2.    Defendant Ahmad "Andy" KHAWAJA was a resident of Los Angeles, California, and the Chief Executive Officer of an online payment processing company headquartered in West Hollywood, California ("Company A").

      3.    Defendant George NADER was the owner of a business entity in Foreign Country A ("Company B"), and a self-described advisor to certain foreign governments in the Middle East, including Foreign Country A.

      4.    Defendant Roy BOULOS was a resident of Las Vegas, Nevada, and the owner of a liquor, wine, and cigar store in the Las Vegas-area.

      5.    Defendant Rudy DEKERMENJIAN was a resident of Glendale, California, an attorney in the Los Angeles-area, and an attorney for Company A.

      6.    Defendant Mohammad "Moe" DIAB was a resident of Glendale, California, the cousin of KHAWAJA, and the Chief Operating Officer of Company A.

      7.    Defendant Rani EL-SAADI was the owner of travel services provider located in Los Angeles, California.

      8.    Defendant Stevan HILL was a resident of Santa Monica, California, and an associate of KHAWAJA, who became a Managing Director at Company A in or about 2017.

      9.    Defendant Thayne WHIPPLE was a resident of Ojai, California, and was an outside contractor for Company A.

10.     Candidate 1 was a candidate for the Office of the President of the United States in the 2016 election.  In addition to his/her official campaign committee, Candidate 1 had two joint fundraising committees ("Political Committee 1" and "Political Committee 2") supporting his/her candidacy in 2016.  Both committees were registered with the Federal Election Commission and subject to specified contribution limits, limiting the allowable contributions by individuals in the 2016 election cycle.  Individual 1 was Candidate 1's spouse.

11.     Candidate 2 was a candidate for the Office of the President of the United States in the 2016 election.

12.     Elected Official 1 was an elected, federal official.

13.     Elected Official 2 was an elected, federal official.

14.     Political Committee 3 was a political committee formed to raise money for a national political party's national convention in 2016.  It was registered with the Federal Election Commission.

15.     Political Committee 4 was a super-political action committee or "super PAC" registered with the Federal Election Commission.

16.     Political Committee 5 was the governing body for a national political party.  It was registered with the Federal Election Commission as a national political party committee and subject to specified contribution limits, limiting the allowable contributions by individuals in 2016.

17.     Political Committee 6 was the governing body for a national political party.  It was registered with the Federal Election Commission as a national political party committee and subject to specified contribution limits, limiting the allowable contributions by individuals in 2017.

3

18.     Political Committee 7 was national political party committee registered with the Federal Election Commission and subject to specified contribution limits, limiting the allowable contributions by individuals in 2018.

19.     Political Committee 8 was a joint fundraising committee registered with the Federal Election Commission.

20.     The Federal Election Campaign Act of 1971, as amended, Title 52, United States Code, Sections 30101, *et seq.* ("Election Act"), limited financial influence in the election of candidates for federal office, including the office of the President of the United States, and provided for public disclosure of the financing of federal election campaigns, as follows:

   a.   The Election Act limited the amount and source of money that may be contributed to a federal candidate or that candidate's authorized campaign committee and political committees established and maintained by a national political party.

   b.   The Election Act expressly states that contributions made through an intermediary are treated as contributions from the original payor.

21.     The Federal Election Commission ("FEC") was an agency and department of the United States with jurisdiction to enforce the limits and prohibitions of the Election Act, and to compile and publicly report accurate information about the source and amounts of contributions. The Election Act required committees to file campaign finance reports accurately disclosing activity related to contributions, expenditures, debts, and loans of the committee.

**COUNT ONE**
**18 U.S.C. § 371**
**(Conspiracy to Make Conduit Contributions, Cause False Statements, and Cause False Entries in Records)**

22.     Paragraphs 1 through 21 are realleged and incorporated herein by reference.

23.     From in or about March 2016 through in or about January 2017, in the District of
Columbia and elsewhere, the defendants,

**AHMAD "ANDY" KHAWAJA, and**
**GEORGE NADER,**

knowingly conspired and agreed together and with each other, and with other persons both
known and unknown to the Grand Jury, to commit offenses against the United States, that is:

    a.  willfully making contributions in the name of another person and permitting
        one's name to be used to effect such contributions, and causing another to
        accept contributions made by one person in the name of another person, which
        contributions aggregated $25,000 and more in calendar year 2016, in violation
        of 52 U.S.C. §§ 30109(d)(1)(A)(i) and 30122, and 18 U.S.C. § 2;

    b.  willfully causing the submission of material false, fictitious, and fraudulent
        statements and representations in a matter within the jurisdiction of the
        executive branch of the government of the United States, in violation of 18
        U.S.C. §§ 1001(a)(2) and 2; and

    c.  with the intent to impede, obstruct, and influence, and in relation to and
        contemplation of, the investigation and proper administration of matters
        within the jurisdiction of departments and agencies of the United States,
        knowingly causing the concealment, covering up, falsifying, and making of
        false entries in records, documents, and tangible objects, in violation of 18
        U.S.C. §§ 1519 and 2.

## PURPOSES OF THE CONSPIRACY

24.     It was a purpose of the conspiracy to facilitate unlawful campaign contributions
from NADER, through KHAWAJA, to political committees, including Political Committee 1,

Political Committee 2, Political Committee 3, and Political Committee 4, in order for

KHAWAJA and NADER to gain access to and influence with Candidate 1 and others during and

following the 2016 U.S. Presidential election.

25.     It was a purpose of the conspiracy for NADER and KHAWAJA to use their

access to Candidate 1 to gain favor with, and potential financial support from, the government of

Foreign Country A.

26.     It was a purpose of the conspiracy to cause Political Committee 1, Political

Committee 2, Political Committee 3, and Political Committee 4 to unwittingly file false

campaign finance reports concealing these unlawful campaign contributions from the FEC and

the public by falsely stating that the contributions were made by KHAWAJA and Company A

when in reality they were funded by NADER.

27.     It was a purpose of the conspiracy to conceal the co-conspirators' unlawful

activity.

## MANNER AND MEANS

28.     The manner and means of the conspiracy included, but were not limited to, the

following:

a.  The conspirators caused more than $3.5 million in contributions to Political

Committee 1, Political Committee 2, Political Committee 3, and Political

Committee 4, all funded with monies funneled by NADER to KHAWAJA for

contribution;

b.  The conspirators made the millions of dollars in contributions to access—and,

at times, to host—political events in an effort to gain influence with high-level

political figures, including Candidate 1;

6

c.  The conspirators concealed their scheme by surreptitiously communicating about the funneling of monies from NADER to KHAWAJA, as well as their attendance at and hosting of political events, through the use of an encrypted messaging system and coded language;

d.  The conspirators created a false licensing agreement and invoice to disguise approximately $4.9 million in payments from NADER to KHAWAJA as a legitimate commercial transaction; and

e.  The conspirators caused Political Committee 1, Political Committee 2, Political Committee 3, and Political Committee 4 to submit reports to the FEC unwittingly stating falsely that the contributions were made by KHAWAJA and Company A.

## OVERT ACTS

29.  In furtherance of the conspiracy, and to accomplish its purpose, the defendants,

**AHMAD "ANDY" KHAWAJA, and**
**GEORGE NADER,**

and others known and unknown to the Grand Jury, committed, and caused to be committed, in the District of Columbia, and elsewhere, the following overt acts:

**Initial Communications About NADER Sending Money for Contribution**

a.  On or about April 16, 2016, KHAWAJA, DEKERMENJIAN, and NADER attended an event in support of Candidate 1. In March and April 2016, KHAWAJA had contributed at least $275,000 to Political Committee 2, and he brought NADER as his guest to the event. Following the event, on or about April 17, NADER reported to an official from Foreign Country A's

government via WhatsApp message that he had a "Wonderful meeting with the Big Lady . . . Can't wait to tell you all about it."

b. On or about May 6, NADER attended an event at KHAWAJA's home with an official from Candidate 1's campaign and another high-profile elected official. On or about May 7, NADER reported to an official from Foreign Country A's government via WhatsApp message that he, "Had a magnificent sessions with Big Lady's key people. . . . You will be most amazed by my progress on that side!"

c. On or about May 15, KHAWAJA sent NADER a WhatsApp message about arranging a private event with Candidate 1, stating: "The birthday party has been set up. 3 party have been arranged for my sister and it's going to be huge for her. She is very excited and happy. All arranged buddy :) as you will see I'm a man of my word." In these messages, "sister" is a reference to Candidate 1.

d. On or about May 22, NADER sent KHAWAJA a WhatsApp message about money he was planning to send to KHAWAJA for contribution in support of Candidate 1, stating: "I am following up with my people on making sure the goodies arrive later this week in time for the Party! That is for sure and I shall definitely be with you early next month in preparation and celebration !" On or about May 31, NADER wrote, "Package was authorized and sent! Expected sometimes this week ! Are we still on for first party on June 6?" KHAWAJA responded, "Yes we are on for the 6th."

e. On or about June 2, KHAWAJA met with an official from Candidate 1's campaign and, in an effort to ingratiate himself with the campaign, promised to contribute $1 million.

f. In early June 2016, KHAWAJA and NADER continued to communicate via WhatsApp about the status of the money NADER promised to send. On or about June 2, KHAWAJA wrote, "Hi George the package still did not arrive." NADER responded, "Not to worry my Dear. Consider it done." On or about June 3, KHAWAJA wrote, "George my people tell me the delivery still did not arrive .. Was suppose to arrive yesterday.." NADER responded: "I know! I repeat don't worry about it! It is done! Just had to come on certain truck and delivery that is taken couple extra days for delicacy and since it is very fragile! So consider it done and it will be there in next couple of days or so! It has to be handled very very carefully! I explain when I see you in person soon!"

g. On or about June 2, NADER reported to an official from Foreign Country A's government via WhatsApp message that he was "leaving very early morning to catch up with big Lady over the weekend. . . . Can I come over for 10 minutes . . . to get your blessings and instruction before I leave please?"

h. On or about June 6, KHAWAJA attended an event in support of Candidate 1. On or about June 7, KHAWAJA wrote a check for $250,000 to Political Committee 2, falsely representing that it was a contribution from him and his wife, when it was, in fact, made with the expectation that it would reimbursed in full by monies to be funneled to him by NADER. This caused Political

9

Committee 2 to unwittingly file a false report with the FEC stating that the contribution was from KHAWAJA and his wife, when it was not.

i.  On or about June 7, NADER reported to an official from Foreign Country A's government via WhatsApp message that he, "Had a terrific meeting with my Big Sister H  You will be most delighted!"

j.  On or about June 10, KHAWAJA again informed NADER via WhatsApp message that the "package" had not arrived.

### KHAWAJA Seeks Funds for Private Event, and the Conspirators Create a Fake Commercial Transaction to Disguise the Transfer

k.  KHAWAJA arranged to host a private fundraiser at his home on June 26, for Candidate 1 featuring Individual 1.  In order to host the event, KHAWAJA was required to contribute or raise $1 million for Political Committee 1 and Political Committee 2.

l.  On or about June 11, KHAWAJA told NADER in a WhatsApp message about the June 26 event, and stated that there would be an event on June 28 with Candidate 1.

m.  On or about June 13, KHAWAJA complained in a WhatsApp message to NADER, "no package arrived today either."  NADER responded, "I told them about the upcoming deadline and events and they assure me that it will be over there in coming days! . . . . It will be over there in time for the 26th event!  That is all!"  KHAWAJA responded, "Just make sure you guys don't look bad buddy .. I did not part and more.  It's all up in your hands now."  NADER responded: "Good!  I am sure you can take care of it till the package arrive!  No way I can press them anymore!  You have to understand that will

10

backfire if I push anymore!  It will be there!  I have seeing the approval of the first package!  I am not worry about it at all I hope you deliver as promised!"

n.  On or about June 14, KHAWAJA and NADER discussed via WhatsApp a false invoice to disguise the payments from NADER as a legitimate commercial transaction.  NADER wrote: "Hi Andy  As per our conversation and agreement for consultation and services provided by your company kindly send me the bill to my email address (Rudy has it) so we can take care of it ASAP!  Specify in bill method and full details of payment please.  As already mentioned half of 10 to be paid upon receipt and second half by 15 August!"  On or about June 15, DEKERMENJIAN sent NADER an email attaching an invoice from Company A for €10 million for a supposed license of Company A's software by one of NADER's companies.  On or about June 15, KHAWAJA confirmed, "Invoice was sent last night from Rudy."

o.  On or about June 16, KHAWAJA wrote in a WhatsApp message, "Rudy resent you the updates address on the invoice.  All good now.  Please send the package ASAP.  I'm on my way back to la now.  Everything is planned and confirmed.  This is going to be very large and private events.  Will maximize it as much as possible."

p.  On or about June 22, KHAWAJA wrote, "Hi George, 4 days left for the Sunday event and Still nothing arrived yesterday or today??"  NADER responded, in part, "The issue has been taken care of and is in order!  Nothing more can be done about it!  I have also discussed the company issue and will

11

send you a note on the matter as per HH instruction!"  On or about June 24,

KHAWAJA continued to complain that the "package" had not arrived.

q.  On or about June 24, NADER reported to an official from Foreign Country

A's government via WhatsApp message that he was "traveling on Sat

morning to catch up with our Big Sister and her husband: I am seeing him on

Sunday and her in Tuesday Sir!  Would love to see you tomorrow at your

convenience . . . for your guidance, instruction and blessing!"

r.  On or about June 26, KHAWAJA hosted a fundraiser at his home for

Candidate 1, which featured Individual 1.  KHAWAJA, NADER,

DEKERMENJIAN, and other guests invited by KHAWAJA attended.

s.  On or about June 27, NADER reported to an official from Foreign Country

A's government via WhatsApp message, "Meeting with [Individual 1] was

superb!"  On or about June 29, NADER reported to an official from Foreign

Country A's government via WhatsApp message, "Meeting with Big Lady

went extremely well."

t.  KHAWAJA contributed almost $1 million in connection with the June 26

event, including $400,800 to Political Committee 1 and $407,000 to Political

Committee 2.  At the time, this represented the maximum contributions that

could be made under KHAWAJA and his wife's names to Political

Committee 1 and Political Committee 2.

u.  As part of the contributions in connection with the June 26 event, on or about

June 28, KHAWAJA wrote a $157,000 check to Political Committee 2,

falsely representing that it was a contribution from his wife, when it was, in

12

fact, made with the expectation that it would reimbursed in full by monies to be funneled to him by NADER. This caused Political Committee 2 to unwittingly file a false report with the FEC stating that the contribution was from KHAWAJA's wife, when it was not.

v. Also as part of the contributions in connection with the June 26 event, on or about July 1, KHAWAJA wrote a $400,800 check to Political Committee 1, falsely representing that it was a contribution from him and his wife, when it was, in fact, made with the expectation that it would reimbursed in full by monies to be funneled to him by NADER. This caused Political Committee 1 to unwittingly file a false report with the FEC stating that the contribution was from KHAWAJA and his wife, when it was not.

**KHAWAJA Seeks Reimbursement and NADER Seeks Additional Private Events**

w. In early July 2016, KHAWAJA and NADER continued to communicate via WhatsApp about the status of the money from NADER. On or about July 1, KHAWAJA complained that the "delivery" had not arrived; NADER responded, "I shall pursue it vigorously!" On or about July 3 and 4, KHAWAJA again complained that there had been no "delivery." On or about July 6, NADER asked: "Do you have anybody here you can trust so I can either hand him over or pass on the partial Baklava gift that is at least good and enough for the upcoming dinner with our Sister? Since it will be easier and fresh and he can pass it on to you! . . . . otherwise I will have to transfer it directly from me to your address you gave me! What you recommend?

Friends prefer that comes from me directly to you !"  KHAWAJA responded, "Send me the gift to me by mail.  I have no one I can trust over there."

x.  On or about July 7, 11, and 12, KHAWAJA again complained via WhatsApp messages that no "delivery" had arrived.  NADER asked, "When exactly is the private event at the house with only 3 people please?"  KHAWAJA responded, "July 29," and NADER stated:  "Very well:  I will make sure you get a nice tray of Baklava before that date."

y.  Between July 13 and 15, NADER and DEKERMENJIAN engaged in further communications about the false invoice between Company A and Company B.  The final invoice provided for half of the invoice to be paid within 48 hours and half by August 15, 2016.  The invoice falsely purports to be for a one-year license for Company A's software to Company B.  No transfer of software ever occurred.

z.  On or about July 14, 2016, KHAWAJA caused Company A to write a $550,000 check to Political Committee 3 to purchase box seats to a political party's national convention.  This check falsely represented that it was a contribution from Company A, when it was, in fact, made with the expectation that it would reimbursed in full by monies to be funneled to KHAWAJA by NADER.  This caused the Political Committee 3 to unwittingly file a false report with the FEC stating that the contribution was from Company A, when it was not.

aa. According to a WhatsApp message between NADER and one of his associates, NADER considered attending the political party's national

14

convention. NADER wrote, "I have a dilemma: invited to attend the []
convention next week with Andy as a VIP guest where I meet all the major
principles! On 29/30 July invited to a very small dinner with the Lady: just 5
people altogether![Foreign Country A Official] cautious and not terribly
excited about the big event. He thinks I am better of with the smaller private
one but the convention you are too exposed!" NADER did not attend the
event.

bb. On or about July 14, NADER stated in a WhatsApp message to KHAWAJA:
"Fresh hand made Baklava on the way designed especially for that private
event at your house later this month! First tray on the way! . . . You have got
to lose some weight for the upcoming tray of Baklava next week. Once you
taste it and you like the choices more on the way soon." On or about July 18,
KHAWAJA confirmed, "Small baklava arrived. 2.7 pieces arrive this
morning." On or about July 18, Company A received a €2.5 million wire
transfer from Company B.

cc. On or about July 19, NADER sent an official from Foreign Country A's
government via WhatsApp message photos of himself with Individual 1 in
KHAWAJA's home. On or about July 27, NADER reported to an official
from Foreign Country A's government via WhatsApp message that he was
"catching up with key figures in both camps and have been developing a
steady, consistent and constructive relationship with both camps!"

dd. On or about July 31, KHAWAJA sent NADER a WhatsApp message stating,
"That's why we need birthday gift, If [Candidate 2] gets elected its over for

the Arabs." NADER responded, "Let us hope we put a good one in next couple of weeks and to follow up fast and immediate with a new tray of Cookies!" KHAWAJA responded, "Agree….. I did a lot from me already."

ee. KHAWAJA continued to pursue a private event with Candidate 1. On or about August 2, KHAWAJA wrote in a WhatsApp message, "All set.. It's going to be the 23rd at 11am my house 3 people only you me and my wife and Juju :) will be up to 2 hours breakfast. . . . and then at 1pm we go for lunch with her at [] the actor .. It's at his house up the from my me. It will be larger crowd :) so private breakfast then a lunch with others." Approximately one hour later, however, KHAWAJA wrote, "Was too hard to get it set up. Too small of birthday gift and the time is worth 5 times more they say .." NADER wrote on the same date: "As a show of appreciation, respect and total confidence in You body, and for having set up the private event with Only you, wife, Juju and me Only, I will press the bakery to prepare me another tray of Baklawa to arrive in time for that event! I will do my best to get something in time! Don't know how big since the second tray was prepared immediately after the Birthday party but I trust my Friend that I can arrange a bit more Baklawa, especially so that I know Juju loves it." KHAWAJA responded, "Please do and it will make us all look good if you know what I mean."

ff. On or about August 4, NADER sent KHAWAJA a WhatsApp message stating he had met with "HH," "And as soon as we get back to [a foreign city]

prepare something with bakery for the upcoming event . . . With pleasure and
stressed important and unique role you are playing."

gg. In further messages, KHAWAJA encouraged NADER to ensure the
"baklawa" arrived before the 22nd.  On or about August 21, NADER wrote,
"A package of Baklava was prepared today as promised and sent DHL  It
should arrive in time for the event with your Sister, Wife and Juju."
KHAWAJA responded, "Ok buddy please make sure u in la no later then
3pm. I will pick u up at 4pm. We go to meet sister at event at 5pm :)"

hh. On or about August 22, KHAWAJA, co-hosted an event in support of
Candidate 1; DEKERMENJIAN and NADER attended.  On or about August
22, NADER reported to an official from Foreign Country A's government via
WhatsApp message, "I am on my way to catch up with Big Sister and Family
in NY Sir."

ii. On or about August 23, KHAWAJA and NADER attended another event in
support of Candidate 1.  On or about August 23, NADER reported to an
official from Foreign Country A's government via WhatsApp message, "I just
had dinner with my Big Sister and had a very very productive discussion with
her."

jj. On or about August 24, Company A received a €1,941,939.92 wire transfer
from Company B.

kk. On or about August 27, NADER sent a WhatsApp message to KHAWAJA
stating, "I have conveyed to HH your commitment and promise to hold the

upcoming two events in coming weeks." NADER went on to mention events in "LF" and "NY."

**KHAWAJA Arranges Another Private Event in Las Vegas**

ll.   KHAWAJA arranged to host a private fundraiser for Candidate 1 in Las Vegas, Nevada in September 2016.  In order to host the event, KHAWAJA was required to contribute or raise $500,000 for Political Committee 1 and Political Committee 2.  Due to his prior contributions and the contribution limits, KHAWAJA could not contribute the full amount in his name or his wife's name.  Instead, he was able to contribute $130,000 under his name and his wife's name.  To evade contribution limits, KHAWAJA gave an additional $1 million to seven associates for them to make contributions to Political Committee 2 in their names, thereby concealing from the committee, the public, and the FEC the true source of the contributions.  This caused Political Committee 2 to unwittingly file a false report with the FEC stating that the contributions were from KHAWAJA's seven associates when they were not.

mm.   On or about September 8, NADER wrote in a WhatsApp message, "Don't give up any Baklava in my name till I come over and discuss it in person! You handle it for now in your resilient and creative manner !"  KHAWAJA confirmed, "Don't worry  Will not."

nn. On or about September 9, KHAWAJA wrote a $130,000 check to Political Committee 2, falsely representing that it was a contribution from him and his wife, when it was, in fact, made with monies funneled to him by NADER. This caused Political Committee 2 to unwittingly file a false report with the

18

FEC stating that the contribution was from KHAWAJA and his wife, when it
was not.

oo. On or about September 12, KHAWAJA sent NADER a WhatsApp message
stating that he was on the telephone with the campaign and the Las Vegas
meeting was postponed.  KHAWAJA recorded part of his telephone call with
the campaign and sent it to NADER.  NADER forwarded the recording to an
official from Foreign Country A's government via WhatsApp.

pp. On or about September 27, KHAWAJA wrote a check for $1 million to
Political Committee 4.  The memorandum line of the check contained
Candidate 1's name.  This check falsely represented that it was a contribution
from KHAWAJA, when it was, in fact, made with monies funneled to him by
NADER.  This caused Political Committee 4 to unwittingly file a false report
with the FEC stating that the contribution was from KHAWAJA, when it was
not.

qq. On or about October 12, KHAWAJA hosted an event for Candidate 1 in Las
Vegas, Nevada, which was rescheduled from its original September 14 date.
Prior to the event, representatives of Candidate 1 requested that NADER not
attend, as he had not contributed anything.  KHAWAJA demanded that
NADER be permitted to attend as his guest.  KHAWAJA, NADER,
DEKERMENJIAN, and others invited by KHAWAJA attended this event.

rr. Following the event, on or about October 13, NADER reported to an official
from Foreign Country A's government via WhatsApp message, "Had a simply

19

Terrific Magnificent brainstorming and discussion with the Big Lady This evening!"

ss. On or about October 16, NADER wrote in a WhatsApp message to KHAWAJA, "I am leaving early morning back to join HH  Have already told him about the Wonderful Event with Our Sister and he was thrilled and want to know all about it in person."

tt. On or about November 2, KHAWAJA wired $100,000 to Political Committee 4, falsely representing that it was a contribution from KHAWAJA, when it was, in fact, made with monies funneled to him by NADER.  This caused Political Committee 4 to unwittingly file a false report with the FEC stating that the contribution was from KHAWAJA, when it was not.

uu. Following the 2016 election, KHAWAJA caused Company A to contribute $1 million to the U.S. President-Elect's inaugural committee.  In connection with his contribution, KHAWAJA obtained tickets to the 2017 U.S. Presidential inauguration in January 2017.  He attended the inauguration with NADER and DEKERMENJIAN as his guests.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

30.    Paragraphs 1 through 29 are realleged and incorporated herein by reference.

31.    From in or about June 2016 through in or about November 2016, in the District of Columbia and elsewhere, the defendants,

**AHMAD "ANDY" KHAWAJA, and
GEORGE NADER,**

20

willfully made contributions in the name of another person, and willfully permitted

KHAWAJA's name to be used to effect such contributions, to Political Committee 2, Political

Committee 4, and Political Committee 5, and willfully caused the same entities to unwittingly

accept contributions made by one person in the name of another person, which aggregated

$25,000 and more in calendar year 2016.

All in violation of Title 52, United States Code, Sections 30122 and

30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

### COUNT THREE
**18 U.S.C. §§ 1001(a)(2) and 2**
**(False Statements and Aiding and Abetting)**

32.    Paragraphs 1 through 29 are realleged and incorporated herein by reference.

33.    On or about July 8, 2016, and September 9, 2016, in the District of Columbia and

elsewhere, the defendant,

**GEORGE NADER,**

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent

statement and representation in a matter within the jurisdiction of the executive branch of the

government of the United States, to wit, causing Political Committee 2 to unwittingly, falsely

record in a report to the Federal Election Commission dated October 15, 2016, that KHAWAJA

and his wife contributed $287,000 when the contributions actually came from someone other

than KHAWAJA and his wife.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

### COUNT FOUR
**18 U.S.C. §§ 1519 and 2**
**(Causing False Records and Aiding and Abetting)**

34.    Paragraphs 1 through 29 are realleged and incorporated herein by reference.

35.     On or about July 8, 2016, and September 9, 2016, in the District of Columbia and elsewhere, the defendant,

**GEORGE NADER,**

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry in a record, document, and tangible object, to wit, causing Political Committee 2 to unwittingly, falsely record in a report to the Federal Election Commission dated October 15, 2016, that KHAWAJA and his wife contributed $287,000 when the contributions actually came from someone other than KHAWAJA and his wife, which falsification the defendant well knew and contemplated was related to the proper administration of Political Committee 2's required disclosures under the Election Act by the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT FIVE
### 18 U.S.C. §§ 1001(a)(2) and 2
### (False Statements and Aiding and Abetting)

36.     Paragraphs 1 through 29 are realleged and incorporated herein by reference.

37.     On or about July 8, 2016, in the District of Columbia and elsewhere, the defendants,

**AHMAD "ANDY" KHAWAJA, and
GEORGE NADER,**

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, causing Political Committee 1 to unwittingly, falsely record in a report to the Federal Election Commission dated October 15, 2016, that KHAWAJA

and his wife contributed $400,800 when the contributions actually came from someone other than KHAWAJA and his wife.

        All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

**COUNT SIX**
**18 U.S.C. §§ 1519 and 2**
**(Causing False Records and Aiding and Abetting)**

    38.    Paragraphs 1 through 29 are realleged and incorporated herein by reference.

    39.    On or about July 8, 2016, in the District of Columbia and elsewhere, the defendants,

**AHMAD "ANDY" KHAWAJA, and**
**GEORGE NADER,**

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry in a record, document, and tangible object, to wit, causing Political Committee 1 to unwittingly, falsely record in a report to the Federal Election Commission dated October 15, 2016, that KHAWAJA and his wife contributed $400,800 when the contributions actually came from someone other than KHAWAJA and his wife, which falsification the defendants well knew and contemplated was related to the proper administration of Political Committee 1's required disclosures under the Election Act by the Federal Election Commission.

        All in violation of Title 18, United States Code, Sections 1519 and 2.

**COUNT SEVEN**
**18 U.S.C. §§ 1001(a)(2) and 2**
**(False Statements and Aiding and Abetting)**

    40.    Paragraphs 1 through 29 are realleged and incorporated herein by reference.

23

41.     On or about July 18, 2016, in the District of Columbia and elsewhere, the

defendants,

**AHMAD "ANDY" KHAWAJA, and**
**GEORGE NADER,**

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent

statement and representation in a matter within the jurisdiction of the executive branch of the

government of the United States, to wit, causing Political Committee 3 to unwittingly, falsely

record in a report to the Federal Election Commission dated September 26, 2016, that Company

A contributed $550,000 when the contribution actually came from someone other than Company

A.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

### COUNT EIGHT
**18 U.S.C. §§ 1519 and 2**
**(Causing False Records and Aiding and Abetting)**

42.     Paragraphs 1 through 29 are realleged and incorporated herein by reference.

43.     On or about July 18, 2016, in the District of Columbia and elsewhere, the

defendants,

**AHMAD "ANDY" KHAWAJA, and**
**GEORGE NADER,**

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the

investigation and proper administration of matters within the jurisdiction of departments and

agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in a record, document, and tangible object, to wit, causing Political Committee 3 to unwittingly,

falsely record in a report to the Federal Election Commission dated September 26, 2016, that

Company A contributed $550,000 when the contribution actually came from someone other than

Company A, which falsification the defendants well knew and contemplated was related to the proper administration of Political Committee 3's required disclosures under the Election Act by the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT NINE
### 18 U.S.C. §§ 1001(a)(2) and 2
### (False Statements and Aiding and Abetting)

44.     Paragraphs 1 through 29 are realleged and incorporated herein by reference.

45.     On or about September 30, 2016, in the District of Columbia and elsewhere, the defendants,

**AHMAD "ANDY" KHAWAJA, and
GEORGE NADER,**

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, causing Political Committee 4 to unwittingly, falsely record in a report to the Federal Election Commission dated October 20, 2016, that KHAWAJA contributed $1,000,000 when the contribution actually came from someone other than KHAWAJA.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT TEN
### 18 U.S.C. §§ 1519 and 2
### (Causing False Records and Aiding and Abetting)

46.     Paragraphs 1 through 29 are realleged and incorporated herein by reference.

47.     On or about September 30, 2016, in the District of Columbia and elsewhere, the defendants,

**AHMAD "ANDY" KHAWAJA, and**

**GEORGE NADER,**

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the

investigation and proper administration of matters within the jurisdiction of departments and

agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in a record, document, and tangible object, to wit, causing Political Committee 4 to unwittingly,

falsely record in a report to the Federal Election Commission dated October 20, 2016, that

KHAWAJA contributed $1,000,000 when the contribution actually came from someone other

than KHAWAJA, which falsification the defendants well knew and contemplated was related to

the proper administration of Political Committee 4's required disclosures under the Election Act

by the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

### COUNT ELEVEN
### 18 U.S.C. §§ 1001(a)(2) and 2
### (False Statements and Aiding and Abetting)

48.     Paragraphs 1 through 29 are realleged and incorporated herein by reference.

49.     On or about November 2, 2016, in the District of Columbia and elsewhere, the

defendants,

**AHMAD "ANDY" KHAWAJA, and**
**GEORGE NADER,**

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent

statement and representation in a matter within the jurisdiction of the executive branch of the

government of the United States, to wit, causing Political Committee 4 to unwittingly, falsely

record in a report to the Federal Election Commission dated December 8, 2016, that KHAWAJA

contributed $100,000 when the contribution actually came from someone other than

KHAWAJA.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT TWELVE
### 18 U.S.C. §§ 1519 and 2
#### (Causing False Records and Aiding and Abetting)

50.    Paragraphs 1 through 29 are realleged and incorporated herein by reference.

51.    On or about November 2, 2016, in the District of Columbia and elsewhere, the

defendants,

### AHMAD "ANDY" KHAWAJA, and
### GEORGE NADER,

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the

investigation and proper administration of matters within the jurisdiction of departments and

agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in a record, document, and tangible object, to wit, causing Political Committee 4 to unwittingly,

falsely record in a report to the Federal Election Commission dated December 8, 2016, that

KHAWAJA contributed $100,000 when the contribution actually came from someone other than

KHAWAJA, which falsification the defendants well knew and contemplated was related to the

proper administration of Political Committee 4's required disclosures under the Election Act by

the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT THIRTEEN
### 18 U.S.C. § 371
#### (Conspiracy to Make Conduit Contributions, Make Excessive Contributions, Cause False Statements, and Cause False Entries in Records)

52.    Paragraphs 1 through 29 are realleged and incorporated herein by reference.

53.    From in or about March 2016 through in or about June 2018, in the District of

Columbia and elsewhere, the defendants,

27

AHMAD "ANDY" KHAWAJA,
ROY BOULOS,
RUDY DEKERMENJIAN,
MOHAMMAD "MOE" DIAB,
RANI EL-SAADI,
STEVAN HILL, and
THAYNE WHIPPLE,

knowingly conspired and agreed together and with each other, and with other persons both known and unknown to the Grand Jury, to commit offenses against the United States, that is:

    a.  willfully making contributions in the name of another person and permitting one's name to be used to effect such contributions, and causing another to accept contributions made by one person in the name of another person, which contributions aggregated $25,000 and more in calendar years 2016, 2017, and 2018, in violation of 52 U.S.C. §§ 30109(d)(1)(A)(i) and 30122, and 18 U.S.C. § 2;

    b.  willfully causing a political committee to accept contributions in excess of the limits of the Election Act, which aggregated $25,000 and more in calendar years 2016, 2017, and 2018, in violation of 52 U.S.C. §§ 30109(d)(1)(A)(i) and 30116(f), and 18 U.S.C. § 2;

    c.  willfully causing the submission of material false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the government of the United States, in violation of 18 U.S.C. §§ 1001(a)(2) and 2; and

    d.  with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and agencies of the United States,

knowingly causing the concealment, covering up, falsifying, and making of false entries in records, documents, and tangible objects, in violation of 18 U.S.C. §§ 1519 and 2.

## PURPOSES OF THE CONSPIRACY

54.    It was a purpose of the conspiracy to facilitate unlawful campaign contributions from KHAWAJA through the other conspirators to various political committees in order for KHAWAJA and others to gain access to and host events featuring prominent politicians, in an effort to gain influence with those politicians and others.

55.    It was a purpose of the conspiracy to cause Political Committee 2, Political Committee 6, Political Committee 7, and Political Committee 8 to unwittingly file false campaign finance reports concealing these unlawful campaign contributions from the FEC and the public by falsely stating that the contributions were made by various co-conspirators other than KHAWAJA when in reality they were funded by KHAWAJA.

56.    It was a purpose of the conspiracy to conceal the co-conspirators' unlawful activity.

## MANNER AND MEANS

57.    The manner and means of the conspiracy included, but were not limited to, the following:

    a.    KHAWAJA funneled more than $1.8 million to the conspirators to contribute to political committees under their names as he directed;

    b.    The conspirators caused the monies funneled to them by KHAWAJA to be contributed to various political committees under their own names;

    c.  The conspirators caused the political committees to unwittingly submit reports to the FEC falsely stating that the contributions were made by the other conspirators when they were actually made by KHAWAJA; and

    d.  The conspirators attempted to further conceal the contributions by falsely claiming that the payments from KHAWAJA were legitimate, when in actuality, the payments were to illegally fund KHAWAJA's political contributions in the names of the other conspirators.

## OVERT ACTS

58.    In furtherance of the conspiracy, and to accomplish its purpose, the defendants,

**AHMAD "ANDY" KHAWAJA,**
**ROY BOULOS,**
**RUDY DEKERMENJIAN,**
**MOHAMMAD "MOE" DIAB,**
**RANI EL-SAADI,**
**STEVAN HILL, and**
**THAYNE WHIPPLE,**

and others known and unknown to the Grand Jury, committed, and caused to be committed, in the District of Columbia, and elsewhere, the following overt acts:

## KHAWAJA Gives His Co-Conspirators Money to Contribute to His Private Fundraiser

    a.  KHAWAJA arranged to host a private fundraiser for Candidate 1 in Las Vegas, Nevada in September 2016. In order to host the event, KHAWAJA was required to contribute or raise $500,000 for Political Committee 1 and Political Committee 2. Due to his prior contributions and the contribution limits, KHAWAJA was not able to contribute the full amount in his name or his wife's name. As a result, KHAWAJA provided the other co-conspirators

with money to contribute to Political Committee 1 and Political Committee 2 in their names to meet the fundraising requirement for the event.

b.  On or about August 1, 2016, KHAWAJA wrote a $196,000 check to DIAB. On or about August 2, 2016, DIAB wrote a $100,000 check to Political Committee 2 in connection with the event to be hosted by KHAWAJA. The check falsely represented that it was a contribution from DIAB, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law. This caused Political Committee 2 to unwittingly file a false report with the FEC stating that the contribution was from DIAB, when it was not.

c.  On or about August 6, 2016, KHAWAJA wrote a $30,000 check to HILL, and on or about August 18, 2016, KHAWAJA wrote a $75,000 check to HILL. On or about August 28, 2016, HILL wrote a $100,000 check to Political Committee 2 in connection with the event to be hosted by KHAWAJA. The check falsely represented that it was a contribution from HILL, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law. This caused Political Committee 2 to unwittingly file a false report with the FEC stating that the contribution was from HILL, when it was not.

d.  On or about August 15, 2016, KHAWAJA caused Company A to send a $100,000 check, signed by DIAB, to Co-Conspirator A. On or about August

31

18, 2016, Co-Conspirator A wrote a $133,000 check to Political Committee 2 in connection with the event to be hosted by KHAWAJA and another political event attended by Co-Conspirator A and KHAWAJA. The check falsely represented that it was a contribution from Co-Conspirator A, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law. This caused Political Committee 2 to unwittingly file a false report with the FEC stating that the contribution was from Co-Conspirator A, when it was not. On or about August 23, 2016, KHAWAJA wrote a $10,000 check to Co-Conspirator A.

e. On or about August 17, 2016, KHAWAJA wrote a $44,000 check to WHIPPLE. On or about September 8, 2016, DIAB wrote a $50,000 check to WHIPPLE at KHAWAJA's direction. On or about September 8, 2016, WHIPPLE wrote a $100,000 check to Political Committee 2 in connection with the event to be hosted by KHAWAJA. The check falsely represented that it was a contribution from WHIPPLE, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law. This caused Political Committee 2 to unwittingly file a false report with the FEC stating that the contribution was from WHIPPLE, when it was not.

f. On or about August 25, 2016, KHAWAJA caused Company A to wire transfer $294,965 to BOULOS. On or about September 8, 2016, BOULOS

wrote a $300,000 check for contribution to Political Committee 2 in connection with the event to be hosted by KHAWAJA. The check falsely represented that it was a contribution from BOULOS, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law. This caused Political Committee 2 to unwittingly file a false report with the FEC stating that the contribution was from BOULOS, when it was not.

g. On or about September 9, 2016, KHAWAJA caused Company A to wire transfer $148,965 to EL-SAADI's company. On or about the same date, EL-SAADI transferred $150,000 from his company's account to his personal account, and wrote a check for $150,000 to Political Committee 2 in connection with the event to be hosted by KHAWAJA. The check falsely represented that it was a contribution from El-SAADI, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law. This caused Political Committee 2 to unwittingly file a false report with the FEC stating that the contribution was from EL-SAADI, when it was not.

h. On or about September 9, 2016, KHAWAJA wrote a $185,000 check to DIAB. On or about the same date, DIAB wrote a $100,000 check to Political Committee 2 in connection with the event to be hosted by KHAWAJA. The check falsely represented that it was a contribution from DIAB, when it was,

in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law. This caused Political Committee 2 to unwittingly file a false report with the FEC stating that the contribution was from DIAB, when it was not.

i. On or about September 9, 2016, KHAWAJA wrote a $130,000 check to Political Committee 2 in connection with the event he was hosting. The memorandum line of the check stated, "Vegas."

j. On or about October 2, 2016, KHAWAJA wrote a $165,000 check to DIAB. On or about October 7, 2016, DIAB wrote a $50,000 check to DEKERMENJIAN at KHAWAJA's direction (and had previously written a $50,000 check to WHIPPLE at KHAWAJA's direction). On or about October 13, 2016, DEKERMENJIAN wrote a $50,000 check for contribution to Political Committee 2 in connection with the event to be hosted by KHAWAJA. The check falsely represented that it was a contribution from DEKERMENJIAN, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law. This caused Political Committee 2 to unwittingly file a false report with the FEC stating that the contribution was from DEKERMENJIAN, when it was not.

k. On or about October 12, 2016, KHAWAJA hosted an event for Candidate 1 in Las Vegas, Nevada, which was rescheduled from its original September 14 date. BOULOS, DEKERMENJIAN, DIAB, El-SAADI, HILL, NADER, and

WHIPPLE attended the event along with KHAWAJA.  Co-Conspirator A did
not attend the event.

### KHAWAJA Gives HILL, WHIPPLE, DIAB, and BOULOS Money to Contribute

l.  In or about March 2017, KHAWAJA caused the contribution of $250,000 to
Political Committee 6 on behalf of himself and his wife.

m.  On or about June 16, 2017, HILL wrote a $50,000 check to Political
Committee 6, which posted on June 21, 2017.  The check falsely represented
that it was a contribution from HILL, when it was, in fact, made with monies
funneled to him by KHAWAJA for the purpose of making the contribution
and to avoid and exceed the personal contribution limits set by federal law.
This caused Political Committee 6 to unwittingly file a false report with the
FEC stating that the contribution was from HILL, when it was not.  On or
about June 19, 2017, KHAWAJA wrote a $60,000 check to HILL.

n.  On or about September 14, 2017, WHIPPLE wrote a $100,000 check to
Political Committee 6.  The check falsely represented that it was a
contribution from WHIPPLE and his wife, when it was, in fact, made with
monies to be funneled to him by KHAWAJA for the purpose of making the
contribution and to avoid and exceed the personal contribution limits set by
federal law.  This caused Political Committee 6 to unwittingly file a false
report with the FEC stating that the contribution was from WHIPPLE and his
wife, when it was not.  On or about October 13, 2017, KHAWAJA caused a
company he controlled to write a $100,000 check to WHIPPLE.

o. On or about November 29, 2017, KHAWAJA caused a company he controlled to write a $214,000 check to a company controlled by DIAB.  On or about the same date, DIAB wrote a $100,000 check to Political Committee 6.  The check falsely represented that it was a contribution from DIAB, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law.  This caused Political Committee 6 to unwittingly file a false report with the FEC stating that the contribution was from DIAB, when it was not.

p. On or about March 5, 2018, KHAWAJA caused Company A to wire transfer $275,000 to BOULOS.  On or about the same date, BOULOS wrote a $250,000 check to Political Committee 6.  The check falsely represented that it was a contribution from BOULOS, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution. This caused Political Committee 6 to unwittingly file a false report with the FEC stating that the contribution was from BOULOS, when it was not.

**KHAWAJA Gives HILL and DEKERMENJIAN Money to Contribute for His Private Fundraising Dinner**

q. On or about January 19, 2018, KHAWAJA wrote a $50,000 check to HILL. On or about January 28, 2018, HILL wrote a $50,000 check to Political Committee 7 in connection with an event hosted by KHAWAJA at his home for Elected Official 1 on or about March 11, 2018.  The check falsely represented that it was a contribution from HILL, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the

36

contribution and to avoid and exceed the personal contribution limits set by federal law.  This caused Political Committee 7 to unwittingly file a false report with the FEC stating that the contribution was from HILL, when it was not.

r.  On or about January 19, 2018, KHAWAJA wrote a $45,000 check to DEKERMEJIAN.  On or about January 30, 2018, DEKERMENJIAN wrote a $50,000 check to Political Committee 7 in connection with an event hosted by KHAWAJA at his home for Elected Official 1 on or about March 11, 2018. The check falsely represented that it was a contribution from DEKERMENJIAN, when it was, in fact, made with monies funneled to him by KHAWAJA for the purpose of making the contribution and to avoid and exceed the personal contribution limits set by federal law.  This caused Political Committee 7 to unwittingly file a false report with the FEC stating that the contribution was from DEKERMENJIAN, when it was not.

s.  On or about March 10, 2018, KHAWAJA wrote a $237,000 check to Political Committee 7 in connection with an event hosted by KHAWAJA at his home for Elected Official 1 on or about March 11, 2018.

## KHAWAJA Gives DIAB Money to Contribute for Another Political Event

t.  On or about June 20, 2018, KHAWAJA caused a company he controlled to write a $225,000 check to a company controlled by DIAB.  On or about June 25, 2018, DIAB wrote a $225,000 check to Political Committee 8 in connection with an event featuring Elected Official 2 on or about June 18, 2018.  The check falsely represented that it was a contribution from DIAB,

when it was, in fact, made with monies funneled to him by KHAWAJA for

the purpose of making the contribution. This caused Political Committee 8 to

unwittingly file a false report with the FEC stating that the contribution was

from DIAB, when it was not. As a result of the contribution, KHAWAJA was

invited to the aforementioned event. Although he did not attend the event

itself, he did attend a private meeting with Elected Official 2 on the very same

date.

All in violation of Title 18, United States Code, Section 371.

### COUNT FOURTEEN
**52 U.S.C. §§ 30116(f) and 30109(d)(1)(A)(i); 18 U.S.C. § 2**
**(Causing Excessive Contributions and Aiding and Abetting)**

59.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

60.     From in or about August 2016 through in or about November 2016, in the District

of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

willfully caused Political Committee 2 and Political Committee 5 to unwittingly accept

contributions in excess of the limits of the Election Act, which aggregated $25,000 and more in

calendar year 2016.

All in violation of Title 52, United States Code, Sections 30116(f) and

30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

38

## COUNT FIFTEEN
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

61.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

62.     From in or about August 2016 through in or about November 2016, in the District of Columbia and elsewhere, the defendant,

### ROY BOULOS,

willfully permitted his name to be used to effect contributions of another to Political Committee 2 and Political Committee 5, and willfully caused the same entities to unwittingly accept contributions made by one person in the name of another person, which aggregated $25,000 and more in calendar year 2016.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT SIXTEEN
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

63.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

64.     From in or about August 2016 through in or about November 2016, in the District of Columbia and elsewhere, the defendant,

### RUDY DEKERMENJIAN,

willfully permitted his name to be used to effect contributions of another to Political Committee 2 and Political Committee 5, and willfully caused the same entities to unwittingly accept

contributions made by one person in the name of another person, which aggregated $25,000 and more in calendar year 2016.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT SEVENTEEN
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

65.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

66.     From in or about August 2016 through in or about November 2016, in the District of Columbia and elsewhere, the defendant,

## MOHAMMAD "MOE" DIAB,

willfully permitted his name to be used to effect contributions of another to Political Committee 2 and Political Committee 5, and willfully caused the same entities to unwittingly accept contributions made by one person in the name of another person, which aggregated $25,000 and more in calendar year 2016.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT EIGHTEEN
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

67.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

68.     From in or about August 2016 through in or about November 2016, in the District of Columbia and elsewhere, the defendant,

**RANI EL-SAADI,**

willfully permitted his name to be used to effect contributions of another to Political Committee 2 and Political Committee 5, and willfully caused the same entities to unwittingly accept contributions made by one person in the name of another person, which aggregated $25,000 and more in calendar year 2016.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT NINETEEN
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

69.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

70.    From in or about August 2016 through in or about November 2016, in the District of Columbia and elsewhere, the defendant,

**STEVAN HILL,**

willfully permitted his name to be used to effect contributions of another to Political Committee 2 and Political Committee 5, and willfully caused the same entities to unwittingly accept contributions made by one person in the name of another person, which aggregated $25,000 and more in calendar year 2016.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT TWENTY
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

71.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

72.     From in or about August 2016 through in or about November 2016, in the District of Columbia and elsewhere, the defendant,

### THAYNE WHIPPLE,

willfully permitted his name to be used to effect contributions of another to Political Committee 2 and Political Committee 5, and willfully caused the same entities to unwittingly accept contributions made by one person in the name of another person, which aggregated $25,000 and more in calendar year 2016.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT TWENTY-ONE
### 18 U.S.C. §§ 1001(a)(2) and 2
### (False Statements and Aiding and Abetting)

73.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

74.     On or about July 8, 2016, August 2, 2016, August 23, 2016, and September 9, 2016, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, causing Political Committee 2 to unwittingly, falsely

record in a report to the Federal Election Commission dated October 15, 2016, that KHAWAJA,

his wife, DIAB, EL-SAADI, Co-Conspirator A, HILL, and WHIPPLE contributed $970,000

when the contributions actually came from someone other than the reported contributors.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT TWENTY-TWO
### 18 U.S.C. §§ 1519 and 2
### (Causing False Records and Aiding and Abetting)

75.      Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

76.      On or about July 8, 2016, August 2, 2016, August 23, 2016, and September 9,

2016, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the

investigation and proper administration of matters within the jurisdiction of departments and

agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in a record, document, and tangible object, to wit, causing Political Committee 2 to unwittingly,

falsely record in a report to the Federal Election Commission dated October 15, 2016, that

KHAWAJA, his wife, DIAB, EL-SAADI, Co-Conspirator A, HILL, and WHIPPLE contributed

$970,000 when the contributions actually came from someone other than the reported

contributors, which falsification the defendant well knew and contemplated was related to the

proper administration of Political Committee 2's required disclosures under the Election Act by

the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

43

## COUNT TWENTY-THREE
### 18 U.S.C. §§ 1001(a)(2) and 2
#### (False Statements and Aiding and Abetting)

77.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

78.    On or about October 5, 2016, and October 13, 2016, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, causing Political Committee 2 to unwittingly, falsely record in a report to the Federal Election Commission dated October 27, 2016, that BOULOS and DEKERMENJIAN contributed $350,000 when the contributions actually came from someone other than BOULOS and DEKERMENJIAN.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT TWENTY-FOUR
### 18 U.S.C. §§ 1519 and 2
#### (Causing False Records and Aiding and Abetting)

79.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

80.    On or about October 5, 2016, and October 13, 2016, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and

44

agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in a record, document, and tangible object, to wit, causing Political Committee 2 to unwittingly,

falsely record in a report to the Federal Election Commission dated October 27, 2016, that

BOULOS and DEKERMENJIAN contributed $350,000 when the contributions actually came

from someone other than BOULOS and DEKERMENJIAN, which falsification the defendant

well knew and contemplated was related to the proper administration of Political Committee 2's

required disclosures under the Election Act by the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT TWENTY-FIVE
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

81.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

82.     From in or about June 2017 through in or about November 2017, in the District of

Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

willfully made contributions in the name of another person to Political Committee 6, and

willfully caused the same entity to unwittingly accept contributions made by one person in the

name of another person, which aggregated $25,000 and more in calendar year 2017.

All in violation of Title 52, United States Code, Sections 30122 and

30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT TWENTY-SIX
### 52 U.S.C. §§ 30116(f) and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Causing Excessive Contributions and Aiding and Abetting)

83.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

84.     From in or about June 2017 through in or about November 2017, in the District of

Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

willfully caused Political Committee 6 to unwittingly accept contributions in excess of the limits

of the Election Act, which aggregated $25,000 and more in calendar year 2017.

All in violation of Title 52, United States Code, Sections 30116(f) and

30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT TWENTY-SEVEN
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

85.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

86.     In or about June 2017, in the District of Columbia and elsewhere, the defendant,

### STEVAN HILL,

willfully permitted his name to be used to effect contributions of another to Political Committee

6, and willfully caused the same entity to unwittingly accept contributions made by one person in

the name of another person, which aggregated $25,000 and more in calendar year 2017.

All in violation of Title 52, United States Code, Sections 30122 and

30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT TWENTY-EIGHT
### 18 U.S.C. §§ 1001(a)(2) and 2
### (False Statements and Aiding and Abetting)

87.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

88.     On or about June 21, 2017, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, causing Political Committee 6 to unwittingly, falsely record in a report to the Federal Election Commission dated July 20, 2017, that HILL contributed $50,000 when the contribution actually came from someone other than HILL.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT TWENTY-NINE
### 18 U.S.C. §§ 1519 and 2
### (Causing False Records and Aiding and Abetting)

89.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

90.     On or about June 21, 2017, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

47

in a record, document, and tangible object, to wit, causing Political Committee 6 to unwittingly,

falsely record in a report to the Federal Election Commission dated July 20, 2017, that HILL

contributed $50,000 when the contribution actually came from someone other than HILL, which

falsification the defendant well knew and contemplated was related to the proper administration

of Political Committee 6's required disclosures under the Election Act by the Federal Election

Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT THIRTY
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

91.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

92.    In or about September 2017, in the District of Columbia and elsewhere, the

defendant,

**THAYNE WHIPPLE,**

willfully permitted his name to be used to effect contributions of another to Political Committee

6, and willfully caused the same entity to unwittingly accept contributions made by one person in

the name of another person, which aggregated $25,000 and more in calendar year 2017.

All in violation of Title 52, United States Code, Sections 30122 and

30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT THIRTY-ONE
### 18 U.S.C. §§ 1001(a)(2) and 2
### (False Statements and Aiding and Abetting)

93.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

94.     On or about September 18, 2017, in the District of Columbia and elsewhere, the

defendant,

**AHMAD "ANDY" KHAWAJA,**

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent

statement and representation in a matter within the jurisdiction of the executive branch of the

government of the United States, to wit, causing Political Committee 6 to unwittingly, falsely

record in a report to the Federal Election Commission dated October 20, 2017, that WHIPPLE

and his wife contributed $100,000 when the contributions actually came from someone other

than WHIPPLE and his wife.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

### COUNT THIRTY-TWO
**18 U.S.C. §§ 1519 and 2**
**(Causing False Records and Aiding and Abetting)**

95.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

96.     On or about September 18, 2017, in the District of Columbia and elsewhere, the

defendant,

**AHMAD "ANDY" KHAWAJA,**

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the

investigation and proper administration of matters within the jurisdiction of departments and

agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in a record, document, and tangible object, to wit, causing Political Committee 6 to unwittingly,

falsely record in a report to the Federal Election Commission dated October 20, 2017, that

WHIPPLE and his wife contributed $100,000 when the contributions actually came from

49

someone other than WHIPPLE and his wife, which falsification the defendant well knew and contemplated was related to the proper administration of Political Committee 6's required disclosures under the Election Act by the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT THIRTY-THREE
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

97.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

98.     In or about November 2017, in the District of Columbia and elsewhere, the defendant,

### MOHAMMAD "MOE" DIAB,

willfully permitted his name to be used to effect contributions of another to Political Committee 6, and willfully caused the same entity to unwittingly accept contributions made by one person in the name of another person, which aggregated $25,000 and more in calendar year 2017.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT THIRTY-FOUR
### 18 U.S.C. §§ 1001(a)(2) and 2
### (False Statements and Aiding and Abetting)

99.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

100.    On or about November 30, 2017, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

50

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, causing Political Committee 6 to unwittingly, falsely record in a report to the Federal Election Commission dated December 20, 2017, that DIAB contributed $100,000 when the contribution actually came from someone other than DIAB.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT THIRTY-FIVE
### 18 U.S.C. §§ 1519 and 2
### (Causing False Records and Aiding and Abetting)

101.   Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

102.   On or about November 30, 2017, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry in a record, document, and tangible object, to wit, causing Political Committee 6 to unwittingly, falsely record in a report to the Federal Election Commission dated December 20, 2017, that DIAB contributed $100,000 when the contribution actually came from someone other than DIAB, which falsification the defendant well knew and contemplated was related to the proper administration of Political Committee 6's required disclosures under the Election Act by the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT THIRTY-SIX
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

103.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

104.    From in or about January 2018 through in or about March 2018, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

willfully made contributions in the name of another person to Political Committee 6 and Political Committee 7, and willfully caused the same entities to unwittingly accept contributions made by one person in the name of another person, which aggregated $25,000 and more in calendar year 2018.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT THIRTY-SEVEN
### 52 U.S.C. §§ 30116(f) and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Causing Excessive Contributions and Aiding and Abetting)

105.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

106.    From in or about January 2018 through in or about March 2018, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

willfully caused Political Committee 7 to unwittingly accept contributions in excess of the limits of the Election Act, which aggregated $25,000 and more in calendar year 2018.

All in violation of Title 52, United States Code, Sections 30116(f) and

30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

### COUNT THIRTY-EIGHT
52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
(Making Conduit Contributions and Aiding and Abetting)

107.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

108.    In or about March 2018, in the District of Columbia and elsewhere, the defendant,

**ROY BOULOS,**

willfully permitted his name to be used to effect contributions of another to Political Committee

6, and willfully caused the same entity to unwittingly accept contributions made by one person in

the name of another person, which aggregated $25,000 and more in calendar year 2018.

All in violation of Title 52, United States Code, Sections 30122 and

30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

### COUNT THIRTY-NINE
18 U.S.C. §§ 1001(a)(2) and 2
(False Statements and Aiding and Abetting)

109.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

110.    On or about March 15, 2018, in the District of Columbia and elsewhere, the

defendant,

**AHMAD "ANDY" KHAWAJA,**

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent

statement and representation in a matter within the jurisdiction of the executive branch of the

government of the United States, to wit, causing Political Committee 6 to unwittingly, falsely

record in a report to the Federal Election Commission dated April 20, 2018, that BOULOS

contributed $250,000 when the contribution actually came from someone other than BOULOS.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT FORTY
### 18 U.S.C. §§ 1519 and 2
### (Causing False Records and Aiding and Abetting)

111.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

112.    On or about March 15, 2018, in the District of Columbia and elsewhere, the

defendant,

### AHMAD "ANDY" KHAWAJA,

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the

investigation and proper administration of matters within the jurisdiction of departments and

agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in a record, document, and tangible object, to wit, causing Political Committee 6 to unwittingly,

falsely record in a report to the Federal Election Commission dated April 20, 2018, that

BOULOS contributed $250,000 when the contribution actually came from someone other than

BOULOS, which falsification the defendant well knew and contemplated was related to the

proper administration of Political Committee 6's required disclosures under the Election Act by

the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT FORTY-ONE
## 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

113.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

114.    From in or about January 2018 through in or about March 2018, in the District of Columbia and elsewhere, the defendant,

## STEVAN HILL,

willfully permitted his name to be used to effect contributions of another to Political Committee 7, and willfully caused the same entity to unwittingly accept contributions made by one person in the name of another person, which aggregated $25,000 and more in calendar year 2018.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT FORTY-TWO
## 18 U.S.C. §§ 1001(a)(2) and 2
### (False Statements and Aiding and Abetting)

115.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

116.    On or about March 14, 2018, in the District of Columbia and elsewhere, the defendant,

## AHMAD "ANDY" KHAWAJA,

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, causing Political Committee 7 to unwittingly, falsely

record in a report to the Federal Election Commission dated April 20, 2018, that HILL

contributed $50,000 when the contribution actually came from someone other than HILL.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT FORTY-THREE
### 18 U.S.C. §§ 1519 and 2
### (Causing False Records and Aiding and Abetting)

117.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

118.    On or about March 14, 2018, in the District of Columbia and elsewhere, the

defendant,

### AHMAD "ANDY" KHAWAJA,

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the

investigation and proper administration of matters within the jurisdiction of departments and

agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in a record, document, and tangible object, to wit, causing Political Committee 7 to unwittingly,

falsely record in a report to the Federal Election Commission dated April 20, 2018, that HILL

contributed $50,000 when the contribution actually came from someone other than HILL, which

falsification the defendant well knew and contemplated was related to the proper administration

of Political Committee 7's required disclosures under the Election Act by the Federal Election

Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT FORTY-FOUR
### 52 U.S.C. §§ 30122 and 30109(d)(1)(A)(i); 18 U.S.C. § 2
### (Making Conduit Contributions and Aiding and Abetting)

119.   Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

120.   From in or about January 2018 through in or about March 2018, in the District of Columbia and elsewhere, the defendant,

### RUDY DEKERMENJIAN,

willfully permitted his name to be used to effect contributions of another to Political Committee 7, and willfully caused the same entity to unwittingly accept contributions made by one person in the name of another person, which aggregated $25,000 and more in calendar year 2018.

All in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i), and Title 18, United States Code, Section 2.

## COUNT FORTY-FIVE
### 18 U.S.C. §§ 1001(a)(2) and 2
### (False Statements and Aiding and Abetting)

121.   Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

122.   On or about March 14, 2018, in the District of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, causing Political Committee 7 to unwittingly, falsely record in a report to the Federal Election Commission dated April 20, 2018, that

DEKERMENJIAN contributed $50,000 when the contribution actually came from someone

other than DEKERMENJIAN.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

**COUNT FORTY-SIX**
**18 U.S.C. §§ 1519 and 2**
**(Causing False Records and Aiding and Abetting)**

123.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

124.    On or about March 14, 2018, in the District of Columbia and elsewhere, the

defendant,

**AHMAD "ANDY" KHAWAJA,**

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the

investigation and proper administration of matters within the jurisdiction of departments and

agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in a record, document, and tangible object, to wit, causing Political Committee 7 to unwittingly,

falsely record in a report to the Federal Election Commission dated April 20, 2018, that

DEKERMENJIAN contributed $50,000 when the contribution actually came from someone

other than DEKERMENJIAN, which falsification the defendant well knew and contemplated

was related to the proper administration of Political Committee 7's required disclosures under

the Election Act by the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT FORTY-SEVEN
### 18 U.S.C. §§ 1001(a)(2) and 2
### (False Statements and Aiding and Abetting)

125.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

126.    On or about June 26, 2018, in the District of Columbia and elsewhere, the defendant,

## AHMAD "ANDY" KHAWAJA,

knowingly and willfully, caused the submission of a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, causing Political Committee 8 to unwittingly, falsely record in a report to the Federal Election Commission dated July 13, 2018, that DIAB contributed $225,000 when the contribution actually came from someone other than DIAB.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT FORTY-EIGHT
### 18 U.S.C. §§ 1519 and 2
### (Causing False Records and Aiding and Abetting)

127.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

128.    On or about June 26, 2018, in the District of Columbia and elsewhere, the defendant,

## AHMAD "ANDY" KHAWAJA,

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in a record, document, and tangible object, to wit, causing Political Committee 8 to unwittingly, falsely record in a report to the Federal Election Commission dated July 13, 2018, that DIAB contributed $225,000 when the contribution actually came from someone other than DIAB, which falsification the defendant well knew and contemplated was related to the proper administration of Political Committee 8's required disclosures under the Election Act by the Federal Election Commission.

All in violation of Title 18, United States Code, Sections 1519 and 2.

**COUNT FORTY-NINE**
**18 U.S.C. § 1503**
**(Obstruction)**

129.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

130.    On or about March 18, 2019, in the District of Columbia and elsewhere, the defendant,

**ROY BOULOS,**

corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and impede, the due administration of justice, to wit, a federal grand jury investigation pending in the District of Columbia.  With knowledge that his statements would be transmitted to the grand jury in the District of Columbia, BOULOS falsely told FBI Agents that he requested money from KHAWAJA so that he could make a contribution to Political Committee 2; and that KHAWAJA never asked or directed him to make the contribution.

All in violation of Title 18, United States Code, Section 1503.

**COUNT FIFTY**
**18 U.S.C. § 1503**
**(Obstruction)**

131.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

132.     On or about March 20, 2019, in the District of Columbia and elsewhere, the defendant,

**MOHAMMAD "MOE" DIAB,**

corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and impede, the due administration of justice, to wit, a federal grand jury investigation pending in the District of Columbia.  With knowledge that his statements would be transmitted to the grand jury in the District of Columbia, DIAB falsely told FBI Agents that KHAWAJA did not give him money in order to make political contributions; that DIAB's political contributions were all made with his own money; and that all of the checks DIAB received from KHAWAJA in 2016 were for DIAB's salary and bonuses from work at Company A, not reimbursement for political contributions.

All in violation of Title 18, United States Code, Section 1503.

**COUNT FIFTY-ONE**
**18 U.S.C. § 1503**
**(Obstruction)**

133.     Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein by reference.

134.     On or about March 20, 2019, in the District of Columbia and elsewhere, the defendant,

**STEVAN HILL,**

61

corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and

impede, the due administration of justice, to wit, a federal grand jury investigation pending in the

District of Columbia.  With knowledge that his statements would be transmitted to the grand jury

in the District of Columbia, HILL falsely told FBI Agents that nobody gave him the money he

contributed to the Political Committee 2 in 2016; that the money he received from KHAWAJA

in 2016 had nothing to do with the $100,000 HILL contributed to Political Committee 2; and that

any checks he received from KHAWAJA were investments in HILL's business, bonuses, or

reimbursement for invoices HILL had to pay in connection with a joint venture he had with

KHAWAJA.

All in violation of Title 18, United States Code, Section 1503.

### COUNT FIFTY-TWO
**18 U.S.C. § 1503**
**(Obstruction)**

135.    Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

136.    On or about March 22, 2019, in the District of Columbia and elsewhere, the

defendant,

**THAYNE WHIPPLE,**

corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and

impede, the due administration of justice, to wit, a federal grand jury investigation pending in the

District of Columbia.  With knowledge that his statements would be transmitted to the grand jury

in the District of Columbia, WHIPPLE falsely told FBI Agents that WHIPPLE's political

contributions were made with his own money; that any checks he received from KHAWAJA in

2016 were in connection with work WHIPPLE performed for Company A; and that WHIPPLE

was not reimbursed for the political contribution he made to Political Committee 2.

All in violation of Title 18, United States Code, Section 1503.

### COUNT FIFTY-THREE
### 18 U.S.C. § 1503
### (Obstruction)

137.   Paragraphs 1 through 29 and 52 through 58 are realleged and incorporated herein

by reference.

138.   Between on or about June 26, 2019, and on or about July 18, 2019, in the District

of Columbia and elsewhere, the defendant,

### AHMAD "ANDY" KHAWAJA,

corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and

impede, the due administration of justice, to wit, a federal grand jury investigation pending in the

District of Columbia.  With knowledge that Individual 2 was testifying before the federal grand

jury in the District of Columbia regarding matters contained in this Indictment, KHAWAJA

provided Individual 2 with a false factual narrative, including that Company A had a user

guide—that predated the "NextGen User Guide"—for its legacy software; that the NextGen User

Guide was constantly being revised; that the NextGen User Guide was a blueprint to Company

A's software, which would enable a developer to steal Company A's software; and that NADER

had stolen Company A's software.  When KHAWAJA provided these false facts to Individual 2,

KHAWAJA knew then and there that the statements were false.  KHAWAJA also directed

Individual 2 to be careful what he said.

All in violation of Title 18, United States Code, Section 1503.


A TRUE BILL.

Dated: _____

_____
GRAND JURY FOREPERSON


COREY R. AMUNDSON
Chief, Public Integrity Section

By:     _____
John D. Keller
Deputy Chief
James C. Mann
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice

**Exhibit 2** to Reply in Support of Defendant Concord Management and Consulting LLC's Motion to Dismiss Count One of the Superseding Indictment, 18-cr-00032-2-DLF

| | |
|---|---|
| **From:** | Jones, Luke (USADC) <Luke.Jones@usdoj.gov> |
| **Sent:** | Tuesday, November 26, 2019 11:41 AM |
| **To:** | Seikaly, Kate J; Dubelier, Eric A. |
| **Cc:** | Alpino, Heather (NSD); Kravis, Jonathan (USADC); Rakoczy, Kathryn (USADC); Atkinson, Lawrence (CRM); Dickey, Ryan (CRM) |
| **Subject:** | RE: 18-CR-032 Superseding Indictment |

Hi Kate,

Thanks for your email.  We've identified the "unwitting persons."  We don't believe we're obligated at this stage to spell out who did what with respect to each allegation in the indictment.

Thanks,

Luke

**From:** Seikaly, Kate J <KSeikaly@ReedSmith.com>
**Sent:** Friday, November 22, 2019 3:01 PM
**To:** Jones, Luke (USADC) <LJones2@usa.doj.gov>; Dubelier, Eric A. <EDubelier@ReedSmith.com>
**Cc:** Alpino, Heather (NSD) <halpino@jmd.usdoj.gov>; Kravis, Jonathan (USADC) <JKravis1@usa.doj.gov>; Rakoczy, Kathryn (USADC) <KRakoczy2@usa.doj.gov>; Atkinson, Lawrence (CRM) <Lawrence.Atkinson@crm.usdoj.gov>; Dickey, Ryan (CRM) <Ryan.Dickey@CRM.USDOJ.GOV>
**Subject:** RE: 18-CR-032 Superseding Indictment

Luke,

I am very familiar with government's October 4, 2019 letter supplementing the bill of particulars and listing the individuals and entities you intend to argue were "unwitting persons."  However, we have searched the discovery for any evidence that any of those individuals or entities "produce[d], purchase[d], and post[ed] advertisements on U.S. social media and other online sites expressly advocating for the election of then-candidate Trump or expressly opposing Clinton," as alleged in Paragraph 48 of the Superseding Indictment, but have found nothing.  That is why I asked the question last week.

Are you willing to identify for us which individuals listed in the October 4 letter you believe produced, purchased, and posted advertisements expressly advocating for the election of Trump or expressly opposing Clinton?

Thanks,
Kate

**From:** Jones, Luke (USADC) <Luke.Jones@usdoj.gov>
**Sent:** Friday, November 22, 2019 1:38 PM
**To:** Seikaly, Kate J <KSeikaly@ReedSmith.com>; Dubelier, Eric A. <EDubelier@ReedSmith.com>
**Cc:** Alpino, Heather (NSD) <Heather.Alpino@usdoj.gov>; Kravis, Jonathan (USADC) <Jonathan.Kravis3@usdoj.gov>; Rakoczy, Kathryn (USADC) <Kathryn.Rakoczy@usdoj.gov>; Atkinson, Lawrence (CRM) <Lawrence.Atkinson2@usdoj.gov>; Dickey, Ryan (CRM) <Ryan.Dickey@usdoj.gov>
**Subject:** RE: 18-CR-032 Superseding Indictment

EXTERNAL E-MAIL

Hi Kate,

On the first question, we would refer you to the government's October 4, 2019, letter (copy attached), which supplemented the government's initial bill of particulars.  That list contains the identities of "unwitting" persons referenced in paragraph 48 of the Superseding Indictment.

On the second question, we would refer you to the list of defendants (in the Indictment) and the list of unindicted co-conspirators that we identified in our initial bill of particulars (copy attached).  Those are the names of persons or entities that might be considered foreign principals in the context of the allegations relating to unwitting persons.

Let me know if you have any questions.

Have a good weekend,

Luke

**From:** Seikaly, Kate J <KSeikaly@ReedSmith.com>
**Sent:** Thursday, November 14, 2019 1:58 PM
**To:** Jones, Luke (USADC) <LJones2@usa.doj.gov>; Dubelier, Eric A. <EDubelier@ReedSmith.com>
**Cc:** Alpino, Heather (NSD) <halpino@jmd.usdoj.gov>; Kravis, Jonathan (USADC) <JKravis1@usa.doj.gov>; Rakoczy, Kathryn (USADC) <KRakoczy2@usa.doj.gov>; Atkinson, Lawrence (CRM) <Lawrence.Atkinson@crm.usdoj.gov>; Dickey, Ryan (CRM) <Ryan.Dickey@CRM.USDOJ.GOV>
**Subject:** RE: 18-CR-032 Superseding Indictment

Luke,

Will you please identify for us the unwitting persons referenced in paragraph 48 of the Superseding Indictment?

Also, will you please identify for us who is the foreign principal for the allegations relating to unwitting agents?

Thanks,
Kate

**From:** Jones, Luke (USADC) <Luke.Jones@usdoj.gov>
**Sent:** Friday, November 8, 2019 5:56 PM
**To:** friedrich_chambers@dcd.uscourts.gov; Courtney Lesley <Courtney_Lesley@dcd.uscourts.gov>; Dubelier, Eric A. <EDubelier@ReedSmith.com>; Seikaly, Kate J <KSeikaly@ReedSmith.com>
**Cc:** Alpino, Heather (NSD) <Heather.Alpino@usdoj.gov>; Kravis, Jonathan (USADC) <Jonathan.Kravis3@usdoj.gov>; Rakoczy, Kathryn (USADC) <Kathryn.Rakoczy@usdoj.gov>; Atkinson, Lawrence (CRM) <Lawrence.Atkinson2@usdoj.gov>; Dickey, Ryan (CRM) <Ryan.Dickey@usdoj.gov>
**Subject:** 18-CR-032 Superseding Indictment

## EXTERNAL E-MAIL

Chambers and counsel,

This afternoon the grand jury returned the attached, unsealed superseding indictment in *U.S. v. Internet Research Agency et al.*  It has been filed with the clerk's office.  We are sending this copy by email because the clerk's office indicated that it may not be on the docket until Tuesday.

Best regards,

Luke Jones

*Luke Jones*
*Assistant U.S. Attorney*
*District of Columbia*
*202-252-7066 (office)*

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Disclaimer Version RS.US.201.407.01

**Exhibit 3** to Reply in Support of Defendant Concord Management and Consulting LLC's Motion to Dismiss Count One of the Superseding Indictment, 18-cr-00032-2-DLF

| From: | Jones, Luke (USADC) <Luke.Jones@usdoj.gov> |
|---|---|
| Sent: | Thursday, December 5, 2019 5:41 PM |
| To: | Seikaly, Kate J; Dubelier, Eric A. |
| Cc: | Kravis, Jonathan (USADC); Rakoczy, Kathryn (USADC); Alpino, Heather (NSD) |
| Subject: | Follow-up to phone call re Bill of Particulars |

Hi Kate / Eric,

Following up to memorialize what I conveyed on our phone call with Kate a few minutes ago regarding the bill of particulars.  As we discussed, you had asked us by email on Nov. 14 to identify the "unwitting persons" referenced in paragraph 48 of the superseding indictment, which states that "From at least April 2016 through November 2016, Defendants and their co-conspirators . . . caused unwitting persons to produce, purchase, and post advertisements on U.S. social media and other online sites expressly advocating for the election of then-candidate Trump or expressly opposing Clinton.  Defendants and their coconspirators did not report these expenditures to the [FEC], or register as foreign agents with the U.S. Department of Justice, nor did any of the unwitting persons they caused to engage in such activities."  In my Nov. 22 email, I had referred you to the list of persons in our October 4 letter, which provided a list of individuals and organizations and stated that the government intends to argue at trial that the defendants conspired to cause some or all of those individuals "to act as agents of a foreign principal while concealing from those individuals or organizations the fact that they were acting as agents of a foreign principal and therefore either the individuals or organizations or the conspirators (or both) would have had a legal duty to register under the Foreign Agents Registration Act."  I said that the Oct. 4 list contained the identities of the "unwitting" persons in paragraph 48.  I realize now that we had read your request as relating to "unwitting persons" in the United States who may have had an obligation to register under FARA.  In your response, you helpfully clarified that you were asking about the "produce, purchase, and post advertisements" language.  Notwithstanding that clarification, we responded simply by stating that we had given you the list of individuals and did not believe we were obligated to do more.  That email was also based on my initial misunderstanding.  Although we did not believe (and still don't believe) we were obligated to provide the type of information you were requesting (which we view as information regarding the government's intended proof at trial), I simply didn't appreciate at the time your distinction between "unwitting persons" related to the "produce, purchase, and post" language in paragraph 48 and the "unwitting persons" identified in the October 4 letter (which are also the subject of paragraph 51 of the superseding indictment).  Your Nov. 22 email was clear, and it was my error that I failed to process it.  I also realize that, in conferring with colleagues, I likely misstated your follow-up request, which would have compounded the problem and prevented us from providing you a correct answer despite my personal misunderstanding.  Having reviewed your motion, I recognize that my error led to a substantial amount of work on your end.  I sincerely apologize for that.

As to your request, and as I said on the phone, we can tell you right now that, based on our understanding of the current state of the evidence, we do not intend to present evidence that the defendants and co-conspirators caused "unwitting persons" *in the United States* "to produce, purchase, and post advertisements . . . ."  The language in paragraph 48 does not describe the conduct (posting ads, etc.) as occurring in the United States—in contrast to the language in paragraph 51 (rallies, etc.), which describes conduct in the United States.  Accordingly, the language in paragraph 48 is broader and, while it would cover conduct (e.g., posting ads) by unwitting persons in the United States, it would also cover conduct by an innocent person in Russia whom the defendants and co-conspirators caused to act (e.g., by posting ads).  The language was meant to clarify that, even if the person who actually purchased or posted an ad was not a

defendant or co-conspirator, the ad would be relevant if a defendant or co-conspirator had *caused* the person to purchase or post the ad.

In any event, I hope that our answer now—that is, we do not intend to present evidence that the defendants and co-conspirators caused "unwitting persons" in the United States to produce, purchase, and post advertisements, etc.—is sufficient to satisfy your request and address the issues raised in your motion.  Please let us know.

Best regards,

Luke




*Luke Jones*
*Assistant U.S. Attorney*
*District of Columbia*
*202-252-7066 (office)*

**Exhibit 4** to Reply in Support of Defendant Concord Management and Consulting LLC's Motion to Dismiss Count One of the Superseding Indictment, 18-cr-00032-2-DLF

| From: | Jones, Luke (USADC) <Luke.Jones@usdoj.gov> |
|-------|---------------------------------------------|
| Sent: | Tuesday, December 10, 2019 8:41 AM |
| To: | Seikaly, Kate J; Dubelier, Eric A. |
| Cc: | Kravis, Jonathan (USADC); Rakoczy, Kathryn (USADC); Alpino, Heather (NSD) |
| Subject: | Follow-up re Bill of Particulars |

Hi Kate and Eric,

Following up on our discussion with Kate on Friday, we write to address your follow-up questions regarding the allegations in paragraph 48 of the Superseding Indictment—in particular the references to "unwitting persons." As we explained, we do not intend to present evidence that the defendants or co-conspirators caused unwitting *Americans* "to produce, purchase and post advertisements . . . ." We realize the use of "unwitting persons" in paragraph 48 led to some confusion on that point and hope we have resolved that by now.

As we also explained, the government believes that the evidence at trial will show that some of the Facebook accounts that were used to produce, purchase, or post the advertisements described in paragraph 48 can be linked back to members of the conspiracy identified in the indictment and the bill of particulars. In some instances, the Facebook accounts that were used to produce, purchase, or post an advertisement can be linked back to the Internet Research Agency, but not to a particular person that the government can identify by name or can demonstrate was a member of the conspiracy. Paragraph 48 alleges that both sets of advertisements—those that can be connected to a particular member of the conspiracy and those that can only be connected to the IRA generally—were part of the conspiracy to defraud the United States by interfering with the lawful government functions of the FEC and the DOJ FARA Unit.

You asked if we could confirm the following:

1. You are not taking the position that any of the unwitting persons referred to in paragraph 48 would have been required to register with DOJ or file reports with the FEC had they known whatever facts you assert were concealed from them to cause them to be "unwitting."
2. The Indictment, Bill of Particulars, and your October 4 letter identifies any person who you contend was required to register with DOJ or file reports with the FEC based on the advertisements expressly advocating for Trump or expressly opposing Clinton that were purchased, produced, or posted by unwitting persons as alleged in paragraph 48.

On your first point, we do not believe we can confirm that statement as written. We do not intend paragraph 48 to serve as a categorical statement about whether certain persons had (or would have had) an obligation to register/file. But we are open to discussing this further. As noted above, we do not intend to present evidence that conspirators caused unwitting Americans to produce, purchase, or post ads. And, as noted below, we've identified the persons about whom we do intend to present evidence. If you have further questions on this point, please let us know.

On your second point, we can confirm that the indictment and bill of particulars identifies all of individuals whom we've identified by name and whom we contend were required to register/file. Consistent with the above, we do not intend to present evidence that *Americans* identified in the October 4 letter were involved in producing, purchasing, or posting advertisements. And, as noted above, there may be other persons we cannot identify by name who had registration/filing obligations based on the advertisements.

Please let us know if this satisfies your request for information and/or if you have further questions.

1

Best,

Luke

*Luke Jones*
*Assistant U.S. Attorney*
*District of Columbia*
*202-252-7066 (office)*