**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC | |
| Defendant. | |

**DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S MOTION TO QUASH UNSERVED EARLY RETURN TRIAL SUBPOENA AND OPPOSITION TO THE GOVERNMENT'S RENEWED MOTION FOR EARLY RETURN TRIAL SUBPOENA**

Pursuant to Federal Rule of Criminal Procedure 17(c), Defendant Concord Management and Consulting LLC ("Concord" or "Defendant"), through counsel, submits this Motion to Quash the Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena.[1]  In support, Concord states as follows:

## I.    INTRODUCTION

Let's be clear about what is really going on here.  After more than two years of investigation and prosecution, the government has collected millions of documents it cannot authenticate for

---

[1]  The government has not served Concord or undersigned counsel with a trial subpoena for the three categories of documents the Court approved on December 12, 2019.  Nevertheless, consistent with the Court's instruction at the December 12, 2019 hearing and December 18, 2019 Minute Order, Concord is using this motion to challenge the forthcoming subpoena relating to those three categories, as well as to oppose the government's Renewed Motion for Early Return Trial Subpoena, ECF 284-1 (the "Renewed Motion").

The government has not yet filed a publicly-available version of its Renewed Motion, despite the Court's December 26, 2019 Minute Order granting the government's request to file its unredacted Renewed Motion under seal and ordering the government to file a redacted version on the public docket."

purposes of admissibility at trial.  So at this late date, using an overbroad and nonspecific "trial subpoena," it seeks those same or similar documents directly from Concord in the hopes of finding something admissible.  So yet again we have the government improperly attempting to do something it has never done before and which no court has ever authorized.  This latest attempt to manipulate established rules and recognized legal principles to achieve an unlawful and, indeed, unconstitutional end has no place in this proceeding.  It should be rejected.

The government has the burden under Rule 17(c) to demonstrate that its trial subpoena complies with the Rule's express terms and controlling law.  Yet in its Renewed Motion, the government noticeably avoids the Rule's language (and its limitations) and likewise cites no case (nor is Concord aware of one) holding that the requirements for Rule 17(c) are met by service of a trial subpoena on defense counsel for a foreign corporate criminal defendant:  (1) who has no presence in the United States other than through a voluntary appearance through counsel to defend itself; (2) when the alleged documents are not located in the United States; and (3) when defense counsel has not been authorized to accept service.  The government provides no legal authority to address these undisputed facts.  On the contrary, the government's effort to compel production of documents located overseas by service on counsel conflicts with Rule 17 and with basic protections that must be afforded to a criminal defendant in Concord's position.  The government's proposed subpoena also seeks publicly available documents that Concord should not be forced to supply, requires violation of Russian law that neither defense counsel nor Concord should be forced to carry out, and fails to meet legally-required specificity requirements.  Nor has the government credibly explained how this unlawful, over-broad, and constitutionally infirm subpoena will materially aid its trial preparation.  For each of these reasons, Concord's motion to quash should be granted.

## II.      BACKGROUND

The government initially sought the issuance of an early return trial subpoena on December

3, 2019, identifying nine broad categories of documents.   ECF 267.   The Court entered an

expedited briefing schedule, Dec. 13, 2019 Minute Order, and Concord opposed the request as a

matter of law and because of its breadth, ECF 273.   With respect to categories four through nine

in that subpoena, the Court agreed with Concord, noting that these categories were "far too broad,"

Dec. 12, 2019 Hr'g Tr. at 49:9, but directed the government to attempt to "significantly narrow[]

categories four through nine," Dec. 12, 2019 Order at 4, ECF 279.   The Court provided no reason

for permitting the government another do-over.   *See, e.g.,* Gov't Mot. to Clarify or, In Alt.

Reconsider, ECF 201 (seeking clarification or reconsideration of Court's November 15, 2018

memorandum opinion); Superseding Indictment, ECF 247.   The Court granted the government's

request as it related to categories 1 through 3, which sought the following:   (1) all corporate

registration documents for Concord Management and Consulting LLC; (2) documents sufficient

to identify the corporate officers of Concord Management and Consulting LLC from January 1,

2014 to February 1, 2018; and (3) documents sufficient to identify any IP address used by Concord

Management and Consulting LLC from January 1, 2014 to February 1, 2018.   For these categories,

the Court then authorized Concord to move to quash the government's proposed subpoena.   ECF

279 at 4.

On December 20, 2019, the government filed its Renewed Motion, which for all intents

and purposes is nothing more than a motion for reconsideration of the Court's partial denial of its

original motion.   It includes the same categories one through three that the Court previously

approved, and adds, not subtracts, three new requests:

> (4) For the time period from January 1, 2014 to February 1, 2018, records reflecting any
> payments from Concord Management and Consulting LLC to fund the activities of the
> Internet Research Agency, made directly or through another organization.

(5) For the time period from January 1, 2014 to February 1, 2018, all communications between any individual affiliated with Concord Management and Consulting LLC or Concord Catering and any of the following individuals concerning the activities of the Internet Research Agency: Mikhail Bystrov, Mikhail Burchik, Aleksandra Krylova, Anna Bogacheva, Sergey Polozov, Maria Bovda, Robert Bovda, Dzheykhun Aslanov, Vadim Podkopaev, Gleb Vasilchenko, Irina Kaverzina, Vladimir Venkov, and Elena Khusyaynova.

(6) Calendar entries for Yevgeniy Prigozhin for the time period from January 1, 2014 to February 1, 2018 reflecting any meeting(s) with Mikhail Burchik, "Burchik M.," "Misha Lakhta," or any of the following individuals: Mikhail Bystrov, Aleksandra Krylova, Anna Bogacheva, Sergey Polozov, Maria Bovda, Robert Bovda, Dzheykhun Aslanov, Vadim Podkopaev, Gleb Vasilchenko, Irina Kaverzina, Vladimir Venkov, and Elena Khusyaynova.

As defense counsel previously informed the Court, they are not authorized to accept service of the subpoena, and the government has not attempted service on undersigned counsel.  ECF 273 at 14; Dec. 12, 2019 Hr'g Tr. at 50:12.

## II.     LAW & ARGUMENT

### A.     Concord's Counsel Cannot Lawfully Be Served With a Trial Subpoena Directing Concord To Appear And Produce Documents In This Court

The government's effort to force Concord to appear and provide documents in this Court by serving a trial subpoena on its counsel exceeds this Court's subpoena power.  As a judge of this Court has noted, "[t]he government's power when prosecuting criminal cases is not infinite.  Nor does it extend to any power not specifically forbidden by law."  *United States v. Vo*, 78 F. Supp. 3d 171, 173 (D.D.C. 2015) (criticizing the government's defense of an improper Rule 17 subpoena that boiled down to a claim that:  "Our actions are authorized because nothing specifically prohibits them").  So it should be with service of this trial subpoena in this case.

***First***, a subpoena *duces tecum* under Rule 17 is directed at a ***witness***, not to that witness's counsel.  *See* Fed. R. Crim. P. 17(c)(1); (d) (directing the server to "deliver a copy of the subpoena ***to the witness*** . . .") (emphasis added).  Nothing in the rule suggests that service on a witness's attorney is sufficient under Rule 17 to require the witness's compliance with the subpoena.  Indeed,

courts have recognized that service of a trial subpoena on a foreign corporation's lawyer is not sufficient to satisfy the service component of Rule 17.  *See United States v. Brennerman*, No. 17-155, 2017 WL 4513563, at *1 (S.D.N.Y. Sept. 1, 2017) (Kaplan, J.).

In *Brennerman*, the foreign company from whom the defendant sought documents through a trial subpoena in a criminal case had voluntarily availed itself of the jurisdiction of the court by filing a separate civil action that had been removed to federal court.  The court in the criminal case held that the corporation's counsel, Mr. Hessler, "[was] not the witness whose attendance, and the production of whose documents, the subpoena [sought] to compel", and that "[s]ervice on a party's lawyer is not sufficient."  *Id.* (collecting cases); *see also* Fed. R. Civ. P. 45, cmt. (in the analogous civil subpoena rule, comment noting that "[s]ervice of the subpoena on a witness's attorney is not permissible . . . and this is so of individual as well as corporate subpoenas. . . . [T]he effort must be made to serve the party"); *United States v. Target Ship Mgmt. PTE, Ltd.*, No. 11-368, 2012 WL 1415001, at *1 (S.D. Ala. Apr. 24, 2012) (declining to find proper government's service on defendant's counsel of trial subpoena issued to defendant's custodian of records, an individual employee of the foreign corporation and a citizen and resident of a foreign country, noting that "the government has not cited to this Court any precedent suggesting that the defendant foreign corporation can be required to produce its custodian of records in court under a trial subpoena served on its attorney, as opposed to a trial subpoena properly served on the custodian of records").

Consistent with the Rule's directive, therefore, attorneys defending criminal cases who are not authorized to accept subpoenas on behalf of their clients can refuse to do so in appropriate circumstances.  *See United States v. Lynch*, 678 F. App'x 441, 443 (8th Cir. 2017) (acknowledging that a witness's attorney "refused to accept service of a subpoena on behalf of her client"); *see also* Mot. Aid Service Process, *United States v. Lynch*, No. 15-164-SRB (W.D. Mo.), ECF 31 (motion

in aid of service of process recognizing that witness's counsel refused to accept service); Order, *United States v. Lynch*, No. 15-164 (W.D. Mo.), ECF 44 (granting motion by requiring pretrial services officer to compel the witness's attendance, but not requiring attorney to accept service); Letter to Court, *United States v. Weisberg*, No. 08-347 (E.D.N.Y.), ECF 88 (indicating that counsel for foreign corporations refused to accept service of a subpoena). That lack of authorization in this case is dispositive; nothing in Rule 17 provides to the contrary.

In its Renewed Motion, the government does not address the issue of service at all. Nor did it note this clearly contrary law in its reply in support of its original motion. Instead it relied on a 50-year-old case that is clearly distinguishable. Gov't Reply in Sup. of Mot. for Early Return Trial Sub. at 15, ECF 278; Dec. 12, 2019 Hr'g Tr. at 55:7-56:7. As the government would have it, *Kelberine v. Societe Internationale, Etc.*, 363 F.2d 989 (D.C. Cir. 1966), stands for the proposition that a foreign criminal defendant corporation may be properly served with a subpoena through its attorney—even though the case has never been cited for such a proposition. ECF 279 at 3. But as usual, the government fails to give the Court the entire story.

*Kelberine* is a civil case, in which the foreign corporation voluntarily filed suit in the district court seeking damages and thus willingly came into court for the purpose of obtaining a benefit. 363 F.2d at 993. Further, the case involved the service of a summons to appear, not a subpoena to produce documents that, if they exist at all, would be located in a foreign country. *Id.* And the foreign corporation in *Kelberine* had established a presence in the United States by "appoint[ing] and maintain[ing] an attorney in fact, who was ***authorized to accept service of all notices and process on its behalf for such proceedings*** . . . ." *Id.* (emphasis added). Thus, in that civil case, service was proper because it was upon the corporation's designated agent in the United States, who was expressly empowered to accept process in the context of that litigation. *Id.* And there is

more.  The D.C. Circuit expressly limited its holding, noting that "[w]e intend this ruling to be no broader than the case.  We hold that, if a foreign corporation comes into the District of Columbia *for the purpose of filing and prosecuting in the District Court a suit concerning certain property*, it cannot, by restricting the authority of its resident agent, immunize itself against suit in that same court involving that same property."  *Id.* at 993-94 (emphasis added).  The government's briefing omits this critical limiting language.

In its ruling on the initial Motion for Early Return Trial Subpoena, ECF 279, without deciding the issue, this Court found a rough analogy to what it called *Kelberine*'s animating principle: a foreign defendant having sought our criminal justice system's benefits should be held to the system's obligations including acceptance of service of a court-issued subpoena.  *Id.* at 4.  Nevertheless, this Court described the issue as a close one, *id.*, and Concord submits that, on reflection, *Kelberine* is not analogous and certainly not controlling.  This case is different and materially so.

This case involves a subpoena to a witness, not service of a complaint and summons.  Service of process on a party to a lawsuit is subject to a different set of rules and procedures, and is not so restrictive as Rule 17's directive that service be made directly on the witness—not its counsel.  *See* 9A Wright & Miller, *Federal Practice and Procedure* § 2454 (recognizing that "Rule 4 [of the civil rules] does not require the personal service of a summons and complaint" as opposed to Rule 45, which requires personal service of a subpoena, and under which "service on a person's lawyer will not suffice").  Moreover, this case involves a criminal defendant that has appeared only for the purpose of defending itself against criminal charges that the United States government widely publicized and then used as a basis to impose extrajudicial economic sanctions against the defendants.  By simply defending itself from criminal charges, Concord is in no sense using the

court system as a 'sword,' as the foreign corporation did in *Kelberine*.  And, unlike the foreign corporation in *Kelberine*, Concord has never established a presence in the United States or authorized its counsel to accept service of the subpoena for any reason.[2]  In short, *Kelberine*'s animating principal is inapplicable to the criminal defendant in this case.

    ***Second***, as it relates to foreign entities, Rule 17(e)(2) directs that 28 U.S.C. § 1783 governs service of a trial subpoena in a foreign country.  Fed. R. Crim. P. 17(e)(2) (recognizing that "[i]f the witness is in a foreign country, 28 U.S.C. § 1783 governs the subpoena's service").  But § 1783, which permits a court to order the issuance of a subpoena requiring the appearance as a witness or the production of specified documents or other thing by him, by its express terms, is limited to "a national or resident of the United States who is in a foreign country."  28 U.S.C. § 1783(a).  Thus, § 1783—and by extension, Rule 17—does not provide a mechanism for a trial subpoena to be served on a foreign entity like Concord.  Courts agree.  *See United States v. Gordon*, 634 F.2d 639, 646 (1st Cir. 1980) ("A person who at the time of the Rule 17 application is not a citizen or resident of the United States and is not within the United States does not come within that limited category" of proposed witnesses whom the court has the power to summon under Rule 17); *In re Grand Jury Subpoena*, 646 F.3d 159, 165 (4th Cir. 2011) (acknowledging that "Company 1 correctly points out that because it is neither a United States national nor a resident, Rule 17(e)(2) prevents the government from serving a grand-jury subpoena on Company 1 in a foreign country") (citing *United States v. Moussaoui*, 382 F.3d 453, 462–63 (4th Cir. 2004) (noting the "well established

---

[2] Nor did undersigned counsel accept service of the Indictment or Superseding Indictment.  *See* ECF 7-4 (Apr. 30, 2018 email from undersigned counsel to government returning summons issued to Concord for failure to comply with Fed. R. Crim. P. 4); Nov. 15, 2019 Hr'g Tr. at 2:21-3:2 (at arraignment for Superseding Indictment, Court asking undersigned counsel whether Concord has received a copy of the Superseding Indictment and authorized entry of a plea).

and undisputed principle that the process power of the district court does not extend to foreign nationals abroad")).

During the December 12 hearing and in its Order, the Court noted that Concord's appearance through counsel supported the service of the subpoena because Concord "agreed to comply with the Federal Rules of Criminal Procedure, this Court's rules, and this Court's orders." ECF 279 at 3; Dec. 12, 2019 Hr'g Tr. at 51:2-4.  The Court cited no case authority for its ruling. But, as just noted, Rule 17 and the statute it cross-references do not authorize or compel acceptance of service by counsel in these circumstances.  Nor should the government be permitted to accomplish indirectly what the law directly forbids.  *See Vo*, 78 F. Supp. 3d at 174 (rejecting government's argument that its actions were permitted just because nothing specifically prohibited them).  This is particularly true where the prohibition in question (limits on the service of trial subpoenas) acts as an important restraint on the exercise of governmental power.  *See id.* at 173.

*Third*, this Court has no jurisdiction to compel Concord—a foreign corporation with no presence in the United States—to personally appear in this forum to respond to a subpoena and subject itself to this Court's adjudicatory power.  As noted above, however, by its purpose and effect, that is exactly what answering a subpoena *duces tecum* would compel.  The proposed subpoena obligates the person or entity to whom the subpoena is directed to appear in court and provide the requested materials, if they exist.  But, as the Court is well aware, this outcome is as untenable as the government's proposed resolution for showing sensitive discovery to Concord employees in the United States.  Apr. 20, 2019 Hr'g Tr. at 58:9 (when discussing government proposal that Concord personnel's review of sensitive discovery be limited to the United States, Court stating: "I can't force them to come").  Accordingly, the proposed subpoena, by its terms,

provides this Court with power it does not have and service of it on Concord's counsel should be rejected for this reason as well.

*Fourth*, the Sixth Amendment guarantees to all criminal defendants effective representation by competent legal counsel.  Counsel, in turn, is obligated to undertake that representation consistent with the Rules of Prof'l Conduct, which require zealous advocacy for the client and for counsel to act in the client's best interests.  *See* ABA Model Code of Prof'l Responsibility, Rule 1.3, Cmt. ("A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.").  Each of these obligations is, however, undermined by requiring defense counsel to accept service of the government's proposed subpoena in this case—directly threatening Concord's Sixth Amendment right to effective representation by counsel.

Specifically, requiring acceptance of service raises a potential conflict of interest between counsel's obligation to follow the Court's orders and the obligation to zealously advocate for Concord's best interests.  Rule 1.7 of the ABA Model Rules of Professional Conduct explicitly provides that a lawyer may not represent a client if such representation involves a concurrent conflict of interest, including where "there is a significant risk that the representation of one . . . client[] will be materially limited by the lawyer's responsibilities . . . by a personal interest of the lawyer." ABA Model Rule of Professional Conduct 1.7.  In this instance, that personal interest is counsel's obligation to comply with the orders of this Court, which would be in direct conflict with Concord's interests in not responding to an unlawfully issued subpoena.  In these circumstances, defense counsel should not, consistent with the Sixth Amendment, be forced to act against Concord's interest in this instance.  *See United States v. Klubock*, 832 F.2d 649, 654 (1st Cir. 1987) (where a grand jury subpoena would potentially require an attorney to be a witness against his

client and violate the Rules of Professional Conduct, "counsel will possibly be required to resign as attorney for his client.  Not only the right to counsel of choice under the Sixth Amendment but also due process is thus implicated, because the attorney/prosecutor is potentially given control over who shall be his attorney/adversary"); *United States v. Romano*, 736 F.2d 1432, 1438 (11th Cir. 1984) (finding that a court order that violated the Sixth Amendment by precluding defendant from conferring with counsel was prejudicial and warranted reversal of the defendant's conviction).

As a variation on this same principle, Concord's defense counsel has no authority to go to Russia, make an unauthorized search for responsive documents in the files of a Russian corporation, and bring those documents to a United States courtroom for use in a prosecution against its client.  To compel it to do so by virtue of service of a subpoena not only would violate defense counsel's ethical obligations, but the attorney-client privilege as well.  To demonstrate compliance with the subpoena, counsel inevitably would be forced to reveal confidential communications relevant to the search.   The Sixth Amendment should intercede in these circumstances as well.  *See United States v. Bergeson*, 425 F.3d 1221, 1225-26 (9th Cir. 2005) (affirming district court's decision to quash Rule 17 subpoena where the government would have compelled an attorney to offer testimony that would have irreparably damaged the attorney-client relationship).

*Fifth*, Concord cannot reasonably have anticipated that by having defense counsel appear in response to an indictment in a U.S. district court, it would find itself forced to search for and, if they exist at all, provide overseas documents that have no connection to the U.S. to facilitate the government's case against it.  Concord has no presence in the United States.  It has no employees here.  It has never conducted any business in the United States.  It has never taken any steps to

obtain affirmative relief provided by the U.S. legal system.  While the government claims that the provision of the documents sought in response to the subpoena is the price for having appeared to defend its interests, *see* ECF 278 at 14-15, nothing in the governing rules, statutes, or even case law establishes that would be the case.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted).  On this record, however, Concord had no reason to expect that Rule 17 could or would be utilized to convert a post-indictment appearance by its defense counsel into a discovery fishing expedition authorizing the government to seek documents located overseas that, if they exist at all, are outside the Court's jurisdiction.  Rule 17, by its terms, provides no notice supporting the government's expectations, nor does any other statute, regulation, rule, or case.  Nor, given governing ethics principles, is there any reason that Concord could have expected that its own counsel would be compelled to act against its interests and be the conduit, under Rule 17, for such a court-ordered disclosure.  Rule 17 cannot be redrafted to do so consistent with "'ordinary notions of fair play and the settled rules of law.'"  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citations omitted); *see also Fox Television Stations*, 567 U.S. at 253 ("This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment.") (citation omitted).  By requiring fair notice, due process thus "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes" and "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges."  *Dimaya*, 138 S. Ct. at 1212 (citations omitted).  That standard cannot be met with respect to the service of this subpoena on Concord's counsel in this case.

**B.     The Trial Subpoena Is Legally Unenforceable In All Its Particulars**

There is no lawful basis for serving this trial subpoena on Concord's defense counsel and it should be quashed for that reason alone.  But this motion also should be granted because the subpoena fails in all its relevant particulars to comply with what Rule 17 otherwise requires.

Rule 17(c)(1) states that "[a] subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates."  Fed. R. Crim. P. 17(c)(1).  By its terms, it is intended to be used to prevent delays during trial when documents are produced in response to a subpoena *duces tecum* and are offered in evidence.  *See United States v. Ferguson*, 37 F.R.D. 6, 7 (D.D.C. 1965).  Moreover, Rule 17(c)(2) provides that "on motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17(c)(2).  To quash a subpoena under Rule 17(c)(2), courts have looked to three factors:  (1) relevancy; (2) admissibility; and (3) specificity.  *United States v. Libby*, 432 F. Supp. 2d 26, 31-32 (D.D.C. 2006) (citing *United States v. Nixon*, 418 U.S. 683, 700 (1974)).  Here, when this factorial analysis is undertaken and the government's requests are analyzed, Concord's Motion to Quash should be granted.

**1.     Requests One And Two Seek Publicly Available Information**

As the Supreme Court recognized in *Nixon*, the government (as the party seeking the subpoena) bears the burden of demonstrating that the documents sought "are not otherwise procurable reasonably in advance of trial by exercise of due diligence."  *See Nixon*, 418 U.S. at 699; *see also United States v. Rajaratnam*, 09-1184, 2011 WL 335170, at *4 (S.D.N.Y. Feb. 2, 2011) (noting that the "otherwise procurable" element from *Nixon* "suggests an inquiry into what else the government could presently do to obtain the requested documents").  For this subpoena, categories one and two seek: (1) all corporate registration documents for Concord Management and Consulting LLC and (2) documents sufficient to identify the corporate officers of Concord

Management and Consulting LLC from January 1, 2014 to February 1, 2018.  These documents are available to the government; accordingly, Concord should not be forced to provide them.

Here, the corporate registration documents and documents identifying corporate officers are available either online or in person from a repository maintained by the Russian tax authorities known as the Russian Unified State Register of Legal Entities (YeGRYuL) (available at https://egrul.nalog.ru/index.html?t=1577827043837).  *See* Administrativny Reglament Predostavleniya Federal'noi Nalogovoi Sluzhboi Gosudarstvennoi Uslugi po Predostavleniyu Svedeniy i Dokumentov, Soderzhashchikhsya v Yedinom Gosudarstvennom Reyestre Yuridicheskikh Lits i Yedinom Gosudarstvennom Reyestre Individual'nykh Predprinimatelei [Regulations on Provision by the Federal Tax Service of Documents and Information from YeGRYuL], *available at* https://www.nalog.ru/html/sites/www.new.nalog.ru/docs/minfin/pril_minfin5n_150115.docx, (English translation attached as Exhibit 1).  In fact, the government has previously accessed the corporate records maintained in this repository and submitted the retrieved records to the Court, specifically noting that it has "reviewed publicly available documents related to Concord Management and Consulting LLC," including documents indicating the general director of Concord on particular dates before and after the date of the Indictment.  *See* Declaration of FBI Special Agent Aleksander Kobzanets, ECF 40-1 (describing and attaching documents retrieved from the website of the Federal Tax Service of Russia available at www.nalog.ru).  *See also* ECF 278 at 3 (referring to "Russian Federation tax record" gathered during the investigation).  So the government's assertion that it cannot otherwise obtain this information is simply false.  ECF 278 at 11.

Similarly, the prosecution previously has engaged U.S. personnel in Russia to assist it with legal process in Russia, and could do so again in order to retrieve in person the requested data from YeGRYul.  *See* ECF 124, 125, and 126 (summonses for certain defendants attempted to be served in Russia and executed by Eric J. Reese, Assistant Legal Attaché).  Because the information the government seeks in these two categories is readily available to the government pretrial through public sources, the early return trial subpoena should be quashed as to those two categories.

**2.      Compliance With Requests Three, Four, Five, And Six Asks Concord or Its Employees To Violate Russian Law**

Courts have recognized that compliance with a subpoena may be "unreasonable or oppressive if compliance would violate foreign law."  *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 and 50 U.S.C. § 1705*, 381 F. Supp. 3d 37, 49 (D.D.C. 2019) (citing *In re Grand Jury Subpoena*, 912 F.3d 623, 633 (D.C. Cir. 2019)).  This Court should not compel a response to requests three through six on the basis that doing so would violate Russian law.

Concord, as the "party who [is relying] on foreign law . . . assumes the burden of showing that such law prevents compliance with the [subpoena]."  *In re Grand Jury Subpoena*, 912 F.3d at 633 (citations and internal quotation marks omitted).  "In order to meet that burden, the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law."  *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993).  "Given the world's many and diverse legal systems, and the range of circumstances in which a foreign government's views may be presented, no single formula or rule will fit all cases in which a foreign government describes its own law.  Relevant considerations include the statement's clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign

government's past positions." *Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865, 1873-74 (2018).  To this end, courts have "great latitude in the sources [they] may consider in determining foreign law . . . irrespective of whether they are admissible under the Federal Rules of Evidence." *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 541 n.1 (N.D. Ill. 2004) (addressing foreign law question under Fed. R. Civ. P. 44.1).

When these sources are analyzed here, Concord and its counsel should not be compelled to respond to categories three through six.  Given the conflict with Russian law, recognized principles of comity also weigh against enforcing the subpoena as to these categories.

### a.    Compliance with requests three, four, five, and six would require Concord to violate the Russian treason statute

The Russian treason statute, Article 275 of the Criminal Code, provides as follows:

> State treason, that is espionage, disclosure of information constituting a state secret entrusted to a person or made known to them through service, work, study or in other cases stipulated by the legislation of the Russian Federation to a foreign state, international or foreign organization or their representatives, *or financial, material, technical, consulting or any other assistance rendered to a foreign state*, international or foreign organization, or their representatives in hostile activities aimed against the security of the Russian Federation, shall be punishable by incarceration for a term of from twelve to twenty years with or without a fine in the amount of up to five hundred thousand rubles or in the amount of the wage/salary, or other income of the convicted person for a period of up to three years and with restriction of liberty for a term of up to two years.

> Note: A person who has committed crimes stipulated in this Article, or by Articles 276 or 278 of this Code, shall be relieved from criminal liability if they have facilitated the prevention of further damage to the interests of the Russian Federation by informing the government authorities voluntarily and in due time, or in any other way, if their actions contain no other corpus delicti.

*See Ugolovnyi Kodeks Rossiiskoi Federatsii* [Criminal Code] art. 275 (Russia), *available at* http://ips.pravo.gov.ru:8080/document/232/ (English translation attached as Exhibit 2) (emphasis added).  This provision is intentionally broad.  Contrary to the government's insinuation, ECF 278 at 7, there is no requirement, either in the text of the treason statute or in enforcement practice, that

a person either be affiliated with the Russian government in any way, or have official access to any national security information, in order to be subject to prosecution under Article 275.  Under this provision, an allegation that a person rendered "consult[ation] or any other assistance to . . . a foreign state . . . aimed against the security of [Russia]," is sufficient to suggest a charge of treason. *Id.*; *see also* Rossiyanin prigovoryon k 15 godam kolonii strogogo rezhima za gosizmenu [Russian sentenced to 15 years in maximum security prison for treason], Interfax (Nov. 28, 2015), available at https://www.interfax.ru/russia/482094 (English translation attached as Exhibit 3) (describing treason charge).  As investigative journalist Howard Amos reported in 2015, "[a]mid Russia's deepening international isolation over Ukraine and now Syria, officials routinely characterize association with foreign organizations as a possible threat to national security."  *See* Howard Amos, *Russia's 'War' Mentality Boosts Treason Case Count*, The Moscow Times (Oct. 14, 2015), *available at* https://www.themoscowtimes.com/2015/10/14/russias-war-mentality-boosts-treason-case-count-a50271.

This broad interpretation of treason likewise has been demonstrated by recent Article 275 prosecutions.  According to Russian defense lawyer Ivan Pavlov, "[y]ou won't find a more ambiguous or fuzzy phrasing" than the Russian treason statute, under which "[t]reason could be understood to include simply helping another government."  *See* Vera Chelishcheva, *The Career Boost*, Meduza (Feb. 10, 2016), *available at* https://meduza.io/en/feature/2016/02/10/the-career-boost.  Pavlov defended Svetlana Davydova, a Russian housewife and mother of seven who was charged in January 2015 with treason under Article 275 after she called the Ukrainian embassy in Moscow to tell them that she thought that soldiers from a radio regiment based near her home in rural Russia had been deployed to Eastern Ukraine based on a conversation she overheard on a bus.  *See* Alec Luhn, *Russian woman faces 20 years in prison on treason charges*, The Guardian

(Feb. 3, 2015), available at https://www.theguardian.com/world/2015/feb/03/petition-putin-free-russian-svetlana-davydova-treason.  Davydova's prosecution had echoes of an earlier case where Pavlov defended a different Russian housewife charged with treason for informing foreigners of information learned on a bus: Oksana Sevestidi was arrested, charged under Article 275, convicted and sentenced to 7 years' imprisonment for snapping two photographs of a Russian military train she saw in 2008 through the window of a bus traveling near the Russia-Georgia border and sending them by text message to a friend in Georgia.  *See Treason Convict Was Pressured To Seek Pardon From Putin, Lawyer Says*, Radio Free Europe/Radio Liberty (Mar. 15, 2017), *available at* https://www.rferl.org/a/russia-sevastidi-pardon-pressured-putin/28370700.html.    Sevastidi, in turn, was only one of at least three civilian women who have been convicted of treason and imprisoned for sending text messages to friends in Georgia about the movement of Russian military hardware near the Russia-Georgia border in 2008.  *See Two Women Pardoned By Putin Want Treason Convictions Overturned*, Radio Free Europe/Radio Liberty (Aug. 8, 2017) https://www.rferl.org/a/russia-pardoned-women-want-treason-convictions-overturned/28665113.html.

Similarly, this past summer, Kaliningrad residents Antonina Zimina and her husband Konstantin Antonets were arrested on suspicion of treason under Article 275.  According to Zimina's father, this was because at the couple's 2015 wedding a childhood friend of Zimina's had become intoxicated and started bragging to a group of Latvian guests that he works for Russia's Federal Security Service (FSB); this friend then appeared in Zimina's wedding pictures. *See "On podpil khoroshenko i pered latyshami vypendrivalsya." Otets obvinyayemoy v gosizmene rasskazal kak ona "raskryla sotrudnika FSB" po versii sledstviya [*"He had a bit too much to drink and was showing off before the Latvians." Father of woman accused of state treason tells how she*

"*revealed     an     FSB     agent*"], Meduza (Jul. 12, 2019), *available     at* https://meduza.io/news/2019/07/12/on-podpil-horoshenko-i-pered-latyshami-vypendrivalsya-otets-obvinyaemoy-v-gosizmene-rasskazal-kak-ona-raskryla-sotrudnika-fsb-po-versii-sledstviya (English translation attached as Exhibit 4).  To that end, in 2016, retired aircraft controller Pyotr Parpulov was sentenced to 12 years in prison under Article 275 for sharing what he claimed was publicly available information during a 2010 trip to Georgia.  *See Former Sochi Air Traffic Controller Gets 12 years For Treason*, The Moscow Times (Jan. 22, 2016), *available at* https://www.themoscowtimes.com/2016/01/22/former-sochi-air-traffic-controller-gets-12-years-for-treason-a51557.  Finally, there is the case of physicist Valentin Danilov, who spent 10 years in prison for having consulted a Chinese company about satellite technology even though Danilov produced documents in court showing that the information was in the public domain.  *See* Claire Bigg, *Russian Scientist Danilov Walks Free After Decade In Jail For Espionage*, Radio Free Europe/Radio Liberty (Nov. 23, 2012), available at https://www.rferl.org/a/russian-scientist-danilov-walk-free-after-decade-in-jail-for-espionage-spying/24779230.html.

With this backdrop, factual context here becomes critical.  While the Indictment contains no allegation that Concord was acting at the direction of the Russian government, the Special Counsel and DOJ both made such an allegation in connection with the release of the Mueller Report.  *See* July 1, 2019 Mem. Op. & Order at 7-8, ECF 148.  As such, the Russian government could easily take the position that producing any Russian documents, if they exist, would assist the United States in a matter where the U.S. government has publicly accused the Russian government of misconduct.

In addition, the risk that the Russian government could find compliance with the subpoena to be an act "directed against the security of the Russian Federation" as required by the Treason

Statute potentially increased just recently.  Senate Bill 482, the Defending American Security from Kremlin Aggression Act of 2019 ("DASKA"), passed out of committee on December 19, 2019, expands the Countering America's Adversaries Through Sanctions Act to introduce a number of new provisions for new sanctions against Russia, including ones specifically aimed at Russia's financial sector.  Specifically, under the DASKA, if specific members of the executive branch make a finding that Russia is interfering in elections anywhere in the world—not just the United States—sanctions can be imposed prohibiting the investment in any Russian national debt.  *See* DASKA, S.B. 482, 116th Cong. § 238(a) (2019).  If the bill passes and the United States government uses documents produced by Concord to impose sanctions aimed at Russia's financial sector, the Russian government could easily interpret this act as having been directed against the security of the Russian Federation.[3]

Finally, Russian law enforcement may perceive compliance with the subpoena as damaging to Russian security by effectively forcing Concord and its personnel to assist the Department of Justice in subverting Russia's inherent sovereign interest—explicitly enshrined in

---

[3] Additionally, public reporting indicates that the U.S. government has previously engaged in cyberattacks on codefendant IRA, and is developing tactics to attack other Russian targets in the future if U.S. military leaders make a determination regarding "election interference."  *See* Ellen Nakashima, *U.S. Cyber Command Operation Disrupted Internet Access of Russian Troll Factory on Day of 2018 Midterms*, Wash. Post (Feb. 27, 2019), available at www.washingtonpost.com/world/national-security/us-cyber-command-operation-disrupted-internet-access-of-russian-troll-factory-on-day-of-2018-midterms/2019/02/26/1827fc9e-36d6-11e9-af5b-b51b7ff322e9_story.html; Ellen Nakashima, *U.S. Cybercom Contemplates Information Warfare to Counter Russian Election Interference*, The Washington Post (Dec. 25, 2019), available at https://www.washingtonpost.com/national-security/us-cybercom-contemplates-information-warfare-to-counter-russian-interference-in-the-2020-election/2019/12/25/21bb246e-20e8-11ea-bed5-880264cc91a9_story.html.  Operations "targeting key leaders in the security services and the military and potentially some oligarchs . . . would be accompanied by a limited cyber-operation that demonstrates the Americans' access to a particular system or account[.]"  *Id.*

Russia's laws and treaties—by manipulating the rules to allow an extra-jurisdictional fishing expedition into Russian territory without reliance upon the proper channels.

In particular, Russia and the United States have entered into a treaty that clearly provides for the Department of Justice to liaise with the Office of the Prosecutor General of the Russian Federation (styled as "Office of the Procurator General of the Russian Federation" in the English text of the treaty) when the U.S. requires assistance on criminal law matters.  *See* Treaty Between the United States of America and the Russian Federation on Mutual Legal Assistance in Criminal Matters, art. 3, June 17, 1999, S. Treaty Doc. No. 106–22, available at https://www.state.gov/13046 (the "U.S.-Russia MLAT").  By its terms, the U.S.-Russia MLAT provides that, upon request, the two nations will provide "comprehensive mutual legal assistance in criminal matters."  U.S.–Russia MLAT, art. 1, ¶ 1.  Such legal assistance includes "providing documents, records, and other items."  *Id.* art. 2(2).  The treaty specifies that the receiving party "shall promptly execute the request," *id.* art. 7, ¶ 1, and that "[t]he competent authorities of the Requested Party shall have the authority to issue subpoenas, search warrants, or other orders necessary for the execution of requests," *id.* art. 7, ¶ 3.  The Dep't of Justice similarly recognizes an obligation to comply with an MLAT, where applicable.  *See* Department of Justice, Justice Manual Criminal Resource Manual § 276.  The U.S.-Russia MLAT has been used in criminal cases to obtain evidence from a defendant in Russia.  *See United States v. Wathne*, No. 05-594, 2008 WL 4344112, at *1-2 (N.D. Cal. Sept. 22, 2008).

The documents that have been produced in discovery appear to have been obtained from U.S. companies under U.S. law.  But now, the government seeks to obtain documents in Russia from Russian persons under U.S. law, notwithstanding the existence of the procedures for the government to do precisely that through the MLAT process.  The government has given no

indication that it tried to comply with the requirements of the U.S.-Russia MLAT prior to seeking the proposed subpoena. And, as noted above, the government has no basis for seeking to subpoena a foreign corporation with no presence in the United States. Given that, the present subpoena is nothing more than an end-run around the procedures negotiated between Russia and the United States, and is an affront to Russian sovereignty in this case.[4]

As this analysis demonstrates, the threshold for finding treasonous conduct in Russia is low, and the conduct at issue here—providing documents in response to a trial subpoena issued by the United States government—could easily fall within the scope of "any other assistance rendered to a foreign state" outlined in the treason provision.

The government previously has argued that Concord has not "address[ed] the full section" 275 of the Russian treason statute, because "a Google translation of the cited treason provision states that persons 'shall be exempted from criminal liability' if they 'voluntarily and promptly

---

[4] Multiple Russian statutes make clear that foreign courts, prosecutors and law enforcement bodies have authority in Russia only to the extent provided under international treaties. *See, e.g.*, Federal'ny Konstitutsionny Zakon O Sudebnoi Sisteme Rossiiskoi Federatsii [Judicial System Law] art. 6 para. 3 (Russia) ("[t]he binding nature of orders of the courts of foreign states, international courts and tribunals shall be determined pursuant to international treaties of the Russian                                     Federation"),                                     available                            at http://www.consultant.ru/cons/cgi/online.cgi?req=doc&base=LAW&n=322913, (English translation attached as Exhibit 5); Ugolovny-Protsessual'ny Kodeks Rossiiskoi Federatsii [Criminal     Procedure     Code]     art.     457     para.     1     (Russia),     available     at http://ips.pravo.gov.ru:8080/document/219/ ("[t]he court, the public prosecutor or the investigator shall execute inquiries on the performance of procedural actions handed over to them in the prescribed manner, which have been received from the relevant competent bodies and officers of foreign states in accordance with international treaties of the Russian Federation and international agreements, or on the basis of the principle of reciprocity") (English translation attached as Exhibit 6); Ugolovny-Protsessual'ny Kodeks Rossiiskoi Federatsii [Criminal Procedure Code] art. 457 para. 2 (Russia), available at http://ips.pravo.gov.ru:8080/document/219/ ("procedural norms of the legislation of the foreign state may also be applied in accordance with the international treaties of the Russian Federation, with the international agreements or on the basis of the principle of reciprocity, unless this contradicts the legislation and the international obligations of the Russian Federation") (English translation attached as Exhibit 6).

communicate[] to the authorities or otherwise contribute[] to the prevention of further damage'
and their 'actions do not contain another composition crime.'"  ECF 278 at 8.  The government
apparently has misconstrued this provision as an affirmative defense or legal excuse. That is
incorrect.

As Konstantin Rodionov, a scholar at the Institute of State and Law at Tyumen State
University, wrote in 2016, the provision is designed to be an incentive for a traitor, still under
cover, to turn himself in:  "This statutory incentive is supposed to show a person who has
committed the relevant crimes a path to a release from criminal liability provided that he fulfills
the conditions specified in the law.  The note to Article 275 of [the Russian Criminal Code] relates
to a completed crime, i.e., when a voluntary renunciation of the crime is no longer possible."
Konstantin Alekseyevich Rodionov, *Osvobozhdeniye ot ugolovnoi otvetsvennosti za prestupleniya
protiv vneshnei bezopasnosti gosudarstva* [*Release from criminal liability for crimes against the
external security of the state*], 28 Molodoi Uchyony [Young Scientist] 671 (Dec. 2016), available
at https://moluch.ru/archive/132/pdf/807/ (English translation attached as Exhibit 7).  Rodionov
also notes that "voluntarily" in the text cited by the government requires that "the authorities are
aware neither of the completed crime nor of the person that committed it[.]"  *Id.*  In this case, by
contrast, the crime would be committed in the open, in the context of public judicial proceedings.
Thus, were Concord to inform the Russian government that it intends to supply information to the
U.S. government, it would not serve the purpose of the statutory incentive (*i.e.*, to convince a
Russian person who has committed treason who is also unknown to the Russian government to
turn himself in of his own volition).

### b. Compliance with request three would violate the statute prohibiting unlawful access to computer information

Article 272 of the Russian Criminal Code prohibits "[i]llegal access to legally protected computer information, if such action has entailed the destruction, blocking, modification or copying of computer information."  *See* Ugolovnyi Kodeks Rossiiskoi Federatsii [Criminal Code] art. 272 (Russia), *available at* http://ips.pravo.gov.ru:8080/document/232/ (English translation attached as Exhibit 2).  There is at least one Russian case where a defendant was convicted under Article 272 for using IP addresses, such as the ones the government wants Concord to supply, to spoof access to user accounts.  *See Russian Federation v. [Redacted]*, Lenin District Court of the City of Makhachkala ([dated redacted]), available at http://www.gcourts.ru/case/8709035 (English translation attached as Exhibit 8).  Thus, if Concord supplies the government with IP addresses, personal data, or other information (if such data exists) that is then used to access a computer "system or account," it is possible that the U.S. Cyber Command, under the auspices of "deterring election interference," will use such information to potentially launch a cyberattack against Russian targets.  *See* Nakashima, *supra* note 3.

Given this, if forced to comply with the subpoena, Concord or its personnel could be charged under Article 272 via paragraph 5 of Article 33 ("Types of Criminal Accomplices") of the Russian Criminal Code for being "[a] person who has assisted in the commission of a crime by advice, instructions, by providing information, means and tools, or removal of obstacles[.]"  *See* Ugolovnyi Kodeks Rossiiskoi Federatsii [Criminal Code] art. 272 (Russia), *available at* http://ips.pravo.gov.ru:8080/document/232/ (English translation attached as Exhibit 2).

### c. Compliance with request four would violate the prohibition against receipt of commercial secrets

Article 183 of the Russian Criminal Code, "Illegal Receipt and Disclosure of Information Classified as a Commercial, Tax or Banking Secret," provides, in part:

> Illegal disclosure or use of information classified as a commercial, tax or banking secret, without the consent of the owner thereof by a person to whom it is entrusted or became known in the course of service or work shall be punishable with a fine in the amount of up to one million rubles or in the amount of a wage/salary or any other income of the convicted person for a period of up to two years with deprivation of the right to occupy certain offices or be engaged in certain activities for a term of up to three years, or by corrective labor for a term of up to two years, or by compulsory labor for a term of up to three years, or by incarceration for the same term.

Ugolovnyi Kodeks Rossiiskoi Federatsii [Criminal Code] art. 183, para. 2 (Russia), *available at* http://ips.pravo.gov.ru:8080/document/232/ (English translation attached as Exhibit 2).   In this situation, the documents requested in category four—assuming that they exist and that Concord has possession of them—appear likely to have been obtained from third parties.  The inclusion in request four of payments made "through another organization" indicates that the government is requesting documents not only reflecting transactions from Concord to a third party, but also transactions to which Concord itself is not a party.

There is at least one recent Russian criminal prosecution leading to conviction where the defendants were accused of disclosing invoices and contracts.  Specifically, in late February 2019, two Russian individuals named N.V. Chernitsov and V.N. Ivanov were convicted by the Dzerzhinsky District Court of the City of Novosibirsk under Article 183, para. 2 of the Russian Criminal Code for disclosing, among other documents, commercial invoices.  *See Russian Federation vs. Chernitsov and Ivanov*, Dzerzhinsky District Court of the City of Novosibirsk, Sentence in case No. 1-62/2019 (Feb. 26, 2019), *available at*: https://dzerzhinsky--nsk.sudrf.ru/modules.php?name=sud_delo&srv_num=1&name_op=doc&number=109770042&delo_id=1540006&new=0&text_number=1 (English translation attached as Exhibit 9).  Chernitsov and Ivanov were, respectively, the independent contractor and local supervisor of the Novosibirsk branch of a Russian wireless communications company.  They were found guilty of having carried

out a scheme to sell company information, including customer contracts and invoices. The court in that case found that:

> In accordance with Article 3 of Federal Law No. 98-FZ, "On Commercial Secrets" of July 29, 2004, information constituting a commercial secret is information of any nature (industrial, technical, economic, organizational and other), including as the result of intellectual activity in the field of science and technology, as well as information about the means of carrying out professional activity, which has an actual or potential commercial value by virtue of its being unknown to third parties, and to which third parties lack free, lawful access, and in relation to which the owner of such information has imposed a regime of commercial secrecy.
>
> In accordance with Article 4 of Federal Law No. 98-FZ, "On Commercial Secrets" of July 29, 2004, the right to define information as information constituting a commercial secret, and to determine the list and content of such information, belongs to the owner of such information subject to the provisions of this Federal Law.

*Id.*; *see also* Federal'ny Zakon O Kommercheskoi Tainye [Commercial Secrets Law] (Russia), No. 98-FZ (Jul. 29, 2004; amended as of Apr. 18, 2018), available at http://ips.pravo.gov.ru:8080/document/603/ (English translation attached as Exhibit 10).

Concord does not have the permission of any third party to disclose any information regarding any transaction in which Concord was a payor or payee, much less any transaction between two third parties in which Concord was neither payor nor payee. Nor has the government requested that Concord seek any such third-party consent. The government is requesting that Concord produce documents that, if they exist, belong to third parties and are protected under Russian law from disclosure by criminal penalties if such third parties have decided to protect them. Accordingly, disclosure of such documents pursuant to a U.S. subpoena could constitute a crime.

### d. Compliance with requests five and six would violate Russia's personal data law

Under Russia's Personal Data Law, Federal Law No. 152-FZ of July 27, 2006, "operators and the other persons which have access to personal data shall abstain from disclosing to third

persons and from disseminating the personal data without the consent of the personal data subject, except as otherwise envisaged by a federal law." *See* Federal'ny Zakon o Personal'nykh Dannykh [Federal Personal Data Law] art. 7 (Russia), available at http://ips.pravo.gov.ru:8080/document/285/ (the "Personal Data Law") (English translation attached as Exhibit 7).  The term "personal data" is defined in the Personal Data Law broadly as "any information relating to an individual who is directly or indirectly identified or identifiable (personal data subject)."  *Id.* at art. 3(1).

Legal scholars, court practice, and administrative regulations have further developed the definition of "personal data" to include the names and e-mail addresses of Russian citizens, as well as other information that can be found in e-mails. *See* Alexander Savelyev, *Russia's new personal data localization regulations: A step forward or a self-imposed sanction?*, 32 Computer Law & Security Review 128 (2016) ("the described approach is rather close to the definition of personal data contained in the UK Data Protection Act of 1998.  In accordance with section 1(1) of this act, 'personal data' means data which relate to a living individual who can be identified – (a) from those data or (b) from those data and other information which is in the possession of, or is likely to come into the possession of, the data controller") (attached as Exhibit 12);  *Scartel LLC v. the Directorate of the Federal Service for Supervision of Communications, Information Technology, and Mass Media for the Central Federal District*, Case No. A40-32030/16 of the Ninth Commercial Court of Appeal, Resolution No. 09AP-30590/2016 (Aug. 2, 2016), available at http://www.consultant.ru/cons/cgi/online.cgi?req=doc&base=MARB&n=1066376 (defining "full name, passport details (series, number, issuing authority), registration address, contact telephone, [and] e-mail" as "personal data" and finding an unlawful transfer of employees' personal data outside of Russia by a company using Microsoft's 365 cloud service and Yammer corporate social

network) (English translation attached as Exhibit 13); Ministry of Communications and Mass Media of the Russian Federation, *On Clarification of Provisions of the Federal Legislation*, Letter No. P11-15054-OG (Jul. 7, 2017), available at http://www.consultant.ru/document/cons_doc_LAW_220762/ ("a subscriber's number or e-mail address may be recognized as personal data in the cases when such information relates to an individual directly or indirectly identified or identifiable") (English translation attached as Exhibit 14); Government of the Russian Federation, *Resolution on Determination of the Scope of Information to be Placed in the Unified Informational Personal Data System Ensuring Processing, Including Collection and Storage, of Biometric Personal Data, Their Checking and Transfer of Information About a Level of Their Compliance With the Submitted Biometric Personal Data of a Citizen of the Russian Federation, Including a Type of Biometric Personal Data, As Well As on Amendments to Certain Regulations of the Government of the Russian Federation*, No. 772 (Jun. 30, 2018), as amended Sep. 13, 2019, available at http://pravo.gov.ru/proxy/ips/?docbody=&prevDoc=102166684&backlink=1&&nd=102474390 (defining "contact details of an individual (number of mobile wireless communication subscriber device, e-mail address)" as information included in the "unified informational personal data system") (English translation attached as Exhibit 15).

In particular, employers are specifically forbidden from disclosing this type of personal data of Russian employees to third parties without the employees' express consent. *See* Ministry for Econ. Dev. of the Russian Federation, Letter No. OG-D28-12951 (Oct. 2, 2015), available at http://kad.arbitr.ru/Document/Pdf/130b0900-87ca-4371-aee8-f3dcf72d6ddf/09f66cf4-b2d0-4b60-bdcd-cb0adbd31ead/A40-32030-2016_20160802_Postanovlenie_apelljacionnoj_instancii.pdf ("[a]ccording to clause 1 of part 1 of

Article 6 and Article 7 of [the Personal Data Law], as a general rule, an employer is prohibited to disclose to any third parties personal data of employees without their consent.  At the same time, a duty to prove an employee's consent to transfer of his/her personal data is imposed on the employer.") (English translation attached as Exhibit 16); *McDonald's LLC v. Zamoskvoretskiy Interdistrict Prosecutor of Moscow*, Case No. 33a-3957, Moscow City Court Appellate Ruling (Jun. 4, 2018), available at http://www.consultant.ru/cons/cgi/online.cgi?req=doc&base=SOCN&n=1167688 (Moscow prosecutors cited as a violation by a McDonald's franchisee in Russia a finding that "[t]here is no consent of dismissed employees to cross-border transfer of their personal data to Ireland and the United Kingdom and no cross-border transfer of data is specified in the agreement with Moscow-McDonald's CJSC") (English translation attached as Exhibit 17); *Scartel LLC v. the Directorate of the Federal Service for Supervision of Communications, Information Technology, and Mass Media for the Central Federal District*, Case No. A40-32030/16 of the Ninth Commercial Court of Appeal, Resolution No. 09AP-30590/2016 (Aug. 2, 2016), available at http://kad.arbitr.ru/Document/Pdf/130b0900-87ca-4371-aee8-f3dcf72d6ddf/09f66cf4-b2d0-4b60-bdcd-cb0adbd31ead/A40-32030-2016_20160802_Postanovlenie_apelljacionnoj_instancii.pdf (holding that an agreement between corporate entities is insufficient to serve as consent to transfer of employee personal information, and that the violator "Scartel LLC should prepare and use a standard written form of a consent to employee's personal data processing providing for only one purpose of personal data processing in case of transfer of the employees' personal data to third parties") (English translation attached as Exhibit 13).

Given that names and contact information, including e-mail addresses, constitute "personal data" under Russian law and that employers are forbidden from transferring employees' personal data to third parties without the employees' express consent, it would be a violation punishable under Russian law to transfer "all communications between any individual affiliated with Concord Management Consulting LLC" and any other person.  *See* Kodeks Rossiiskoi Federatsii ob Administrativnykh Pravonarusheniyakh [Code of Administrative Offenses] art. 13.11 (Russia) (Dec. 30, 2001; amended as of Nov. 4, 2019), *available at* http://ips.pravo.gov.ru:8080/document/231/ (English translation attached as Exhibit 18).

The government nevertheless argues that it is "implausible" that under Russian law "giving . . . corporate emails or records of meetings to a court is illegal."  ECF 278 at 9.  But the government has no idea what it is talking about.  In support, the government cites "one secondary source" that "states that 'no protection is granted against disclosure to the ***responsible authorities*** in the course of ***an official investigation***[.]'" *Id.* (emphasis added).  But the government fails to mention that the same "secondary source" defines (unsurprisingly) the term "responsible authorities" as *Russian*—not U.S.—authorities:

> The competent authority for a preliminary investigation of a given crime shall be identified in accordance with article 151 of the Code of Criminal Procedure of the Russian Federation (hereinafter—the "RF CPC").  The powers to investigate crimes are primarily vested in the Investigative Committee of the Russian Federation and the Ministry of Interior of the Russian Federation, although certain types of crimes can be investigated by other, more specialized agencies such as, inter alia, the Federal Security Service of the Russian Federation. . . . The authorities responsible for prosecution and preliminary investigation (hereinafter—the 'Responsible authorities') are competent to act on a federal, as well as on a regional, level; in the latter case, they normally act through their regional subdivisions.

Vasily Torkanovskiy, *Russian Federation: Business Crime 2018*, Mondaq (Oct. 30, 2017), available at http://mondaq.com/russianfederation/x/641110/Crime/Business+Crime+2018.  Thus, contrary to the government's arguments, there is no 'investigatory exception' to the Personal Data

Law that would apply in this case.  As such, any disclosure of personal data by Concord in response to the government's requests five and six would constitute a violation of this law as well.

### e. Principles of comity establish that this Court should not enforce the subpoena as to requests three through six

Given the threatened violations of Russian law, principles of comity weigh heavily against any exercise of the Court's authority to actually enforce the subpoena.  *See generally In re Grand Jury Investigation*, 381 F. Supp. 3d 37.  The comity analysis follows on from the determination (discussed above and below) that there exists a "true conflict" between foreign and domestic law, and involves a determination of whether the Court should abstain from exercising its subpoena authority.  *Id.* at 62 (citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798-99 (1993)).

In making the comity determination, courts in this Circuit consider several factors:  "'the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States; or compliance with the request would undermine important interests of the state where the information is located.'"  *Id.* at 65-66 (quoting *Restatement (Third) of Foreign Relations Law*, § 442(c)(1)).  This Court has since recognized two additional factors:  "'hardship of the party facing conflicting legal obligations and whether that party has demonstrated good faith in addressing its discovery obligations.'"  *Id.* at 66 (quoting *Linde v. Arab Bank, PLC*, 706 F.3d 92, 110 (2d Cir. 2013)).  In *Societe Nationale Industrielle Aerospatiale v. U.S. District Court for Southern District of Iowa*, the U.S. Supreme Court cautioned that "in supervising pretrial proceedings . . . American courts should . . . take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its

operations, and for any sovereign interest expressed by a foreign state." 482 U.S. 522, 544 n.28 (1987).  Here, each one of the comity factors weigh in favor of deferring to Russian law and quashing the subpoena.

*Importance to the investigation of the requested information*.  To be clear, there is no investigation at this stage of proceedings.  The government investigated Concord for a year, using the full gamut of investigatory techniques and resources available to it.  In doing so, it obtained more than 4 million documents and ultimately used what it learned to obtain an indictment, then a superseding indictment, against Concord and 15 of its alleged co-conspirators.  Trial is only three months away, and the government now appears to be backpedaling, asking for documents that it hopes will substantiate its allegations against Concord.  While on its face such a request may seem to be important to the government's case, that importance is belied by the government's own representations.  For example, the government concedes in its Renewed Motion that it likely has many of the same documents, or ones similar to those it is requesting.  *See infra* at 34-36.  Beyond that, the government's information request appears to be less a matter of importance than one of desperation to authenticate documents it already has.[5]  But the government cites no case authority for such a rationale and that is an insufficient justification to threaten a violation of Russian criminal law in any event.

---

[5] The government all but concedes this unprecedented motive in its original four-page Motion for Early Return Trial Subpoena.  There, the government asserts that "[t]he requested documents concern the corporate structure of Concord, payments from Concord to co-defendant Internet Research Agency and subsidiary organizations, and communications between Concord employees and Internet Research employees[,]" eliding the fact that the Indictment and Superseding Indictment were based on evidence purporting to show just that.  ECF 267 at 2.  And then the real purpose of the request:  "Moreover, the documents would be admissible at trial, as they would constitute admissions of a party opponent and co-conspirator statements in furtherance of the conspiracy."  *Id*.  The only difference between the evidence the government has and the evidence the government seeks is that what it has would be inadmissible at trial.

*Specificity of the request.*  As discussed in more detail below, the government's requests are insufficiently specific to meet the *Nixon* requirements, and as such, this factor weighs against enforcing the trial subpoena.

*Origin of the information.*   There is no dispute that the material requested in the government's trial subpoena, to the extent it exists at all, originated in (and remains) in Russia.  As this court has put it in regard to this factor in a similar situation, this weighs in favor of refusing to enforce the subpoena, and "[n]o further discussion is needed."  *In re Grand Jury Investigation*, 381 F. Supp. 3d at 68.

*Alternative means of obtaining the information.*   "[E]nforcing a subpoena that compels conduct in violation of foreign law may be ill-advised if investigators have alternative means to obtain the same information."  *Id.* at 69 (citing *In re Sealed Case*, 825 F.2d 494, 499 (D.C. Cir. 1987)).  To that end, the MLAT between the United States and Russia, discussed *supra* pp. 20-21, provides such an alternative means, and should be used in this situation, along with the publicly-available resources that relate to categories one and two, discussed *supra* pp.13-14.

*Balancing of the national interests.*  Russia has a strong national interest in not having its corporate citizens compelled to turn over documents, particularly where the subpoena power legally cannot reach Russian corporations with no presence in the United States.  Russia's national interest is further implicated because compulsion to comply with the subpoena would require Concord to violate Russian law (as described above), and where turning over the requested information could expose Russia and its citizens to harmful economic sanctions and military cyberattacks.  These considerations weigh strongly in favor of Concord.

By contrast, the government has argued that "'[t]he United States has a strong national interest in the effective enforcement of its criminal laws.'"  ECF 278 at 10 (quoting *United States*

*v. Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985)).  And while the government goes to great lengths to dramatize the allegations in this case, *id.* at 11 ("This is all the more so in a case that does not just concern any alleged violation of U.S. criminal law, but rather a systematic effort to interfere in a presidential election . . ."), it ignores that serving and enforcing this subpoena goes well beyond what both the criminal law and the Constitution permit.  Thus, contrary to the government's assertion, the subpoena does not advance the United States' interest; instead, it improperly seeks to end-run important checks on governmental power.  *Vo*, 78 F. Supp. 3d at 173.  Given that, the balancing of the national interests weighs in favor Concord.

*Hardship on Concord*.  The subpoena imposes hardship on at least two fronts, both of which prohibit enforcing the subpoena.  First, as noted, compliance with the subpoena will lead to liability for Concord or its personnel under Russian law.  Second, compliance will also adversely affect the lawyer-client relationship between counsel and Concord.  As noted, counsel may be forced to withdraw if placed in the untenable position of asking Concord to comply with an unlawful subpoena.  Given these difficulties, this factor also weighs in Concord's favor.

*Concord's good faith*.  This factor has less relevance in the criminal context where the defendant has few discovery obligations.  *See* Fed. R. Crim. P. 16(b) (outlining limited scope of information subject to disclosure by a criminal defendant).  Nevertheless, despite the Court's highly restrictive protective order and tight controls on discovery, Concord has complied with its discovery obligations in this case.

In sum, when taken together, the relevant comity factors weigh against enforcing the subpoena.  This Court should quash the subpoena for categories three through six for this reason as well.

3.      **Requests Four, Five, And Six Still Fail To Meet** *Nixon's* **Specificity Requirements**

The government claims to have "significantly narrow[ed]" its renewed subpoena request as it relates to the new categories 4 through 6, but it has not.  Renewed Mot. at 2.  In fact, two of the three new requests have been broadened, and all of the requests reflect little more than an impermissible "fishing expedition" under *Nixon*, and should be quashed.  As for all three revised categories, moreover, there are incurable problems that compel the granting of Concord's motion.

a.      **Requests four, five, and six are not necessary for the government's trial preparation**

The government has not complied with the overarching principle of Rule 17—that is, demonstrating why it "cannot properly prepare for trial without such production and inspection in advance of trial and [why] the failure to obtain such inspection may tend unreasonably to delay the trial." *Nixon*, 418 U.S. at 699-700.  Indeed, the government's Renewed Motion discusses at length the "evidence gathered in the course of the investigation" that largely overlaps with what the government is requesting.  *See* Renewed Mot. 3-4 (with respect to documents concerning financial transactions, the government has already obtained "█████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████"); *id.* at 4 (with respect to communications, the government has already obtained, *inter alia*, "████████████████████ ████████████████████████████," yet seeks "other such communications"); *id.* at 4-5 (with respect to calendar entries, the government has already obtained "█████████████ ███████████████████████" yet it is seeking calendar entries of "other similar meetings").  Moreover, the government does not explain why it cannot adequately prepare for trial based on the more than 4 million documents it has already obtained during its investigation.  The mere fact that the government wants more or "other" documents is not enough to overcome its

burden—nor does it explain how these unidentified "other" documents would further its trial preparation.[6]  *See Nixon*, 418 U.S. at 700 (recognizing that party seeking subpoena bears the burden of making the required showing).  The substantial authentication problems that the government is facing should have been resolved prior to indictment, not through the improper issuance of an unlawful and overbroad trial subpoena.[7]

Put another way, the government used its vast investigative powers to obtain over 4 million documents as part of its year-long investigation; it admits that it already has some (possibly all) of the documents it believes exist in connection with categories 4 through 6; claims that it "expects that the trial subpoena will yield a limited number of documents that the government would designate as additions to its exhibit list"; and it does not explain why more of the same would help it prepare for trial, leaving as the only possible explanation the need to solve its authentication problem.  But that hypothetical authentication cannot cure the threshold problem.  The subpoena for these categories is, by its terms, an overbroad, non-specific discovery demand that does not comport with Rule 17's limited purpose or case law limiting the Rule's reach.  Even in their new form, the government's requests are just the sort of fishing expedition that controlling law condemns.  *See United States v. North*, 708 F. Supp. 402, 404 (D.D.C. 1989) (rejecting subpoena language that was so broad that it swept irrelevant material up within its scope); *Libby*, 432 F.

---

[6] Ironically, when Concord has made requests to disclose discovery materials pursuant to the Protective Order through firewall counsel, firewall counsel has rejected those requests on the basis that showing similar documents to those individuals is sufficient, and the Court agreed.  If other similar documents are sufficient for Concord to prepare its defense, why aren't they good enough for the government to prepare for trial?

[7] A purported need for authentication does not obviate the arguments and limitations governing trial subpoenas served under Rule 17.  *United States v. Wilmington Tr. Corp.*, 321 F.R.D. 100, 102 (D. Del. 2017).

Supp. 2d at 32 (finding that it is inappropriate to use a Rule 17 subpoena "as a fishing expedition to see what may turn up") (internal quotation marks omitted).

### b.      Request four is not specific

The government's first "narrowed" request now seeks "[f]or the time period from January 1, 2014 to February 1, 2018, records reflecting any payments from Concord Management and Consulting LLC to fund the activities of the Internet Research Agency, made directly or through another organization."  This request remains insufficiently specific, and in some respects, has actually been broadened.  The original request sought documents reflecting payments from Concord to twelve identified entities, either directly or via an intermediary or a subsidiary organization.  Now the revised request seeks records reflecting any payment from Concord regardless of the entity that received the payment.  This is not a narrowing, it is a broadening.

Nor does the government's addition that the purpose of the payment be "to fund the activities of the Internet Research Agency" narrow this request at all.  Any payment to an entity, its affiliates, its customers, its creditors, or subsidiaries can be said to fund that entity's activities—because such payments can be used for any purpose the receiving entity sees fit to use them for.  In fact, the government seems to move from the specific to the general by removing the limitation that the payment be made to particular legal entities—including named defendant "Internet Research Agency LLC"—from its original requests, and replacing it with the undefined term "the Internet Research Agency" in its revised requests.  And recall that even under the government's allegations, the conduct that was allegedly aimed at the United States was only a part of Internet Research Agency LLC's operations.  *See* Superseding Indictment ¶¶ 10(c), 11(c).  In this way, seeking any payment "to fund the activities of the Internet Research Agency" is overbroad.  Thus, while the government's attempted "narrowing" sounds nice, it has no real effect on what is being

37

requested.  It still falls short of the specificity requirement and fails to comply with the Court's order.

The government continues to rely upon *United States v. McCollom*, 651 F. Supp. 1217 (N.D. Ill. 1987),[8] for the proposition that a subpoena is appropriate where it requests "any and all original checks, check registers, or withdrawal slips, or other information reflecting withdrawals of funds or the drawing on funds from accounts." *Id.* at 1224; Renewed Mot. at 5.  Needless to say, "records reflecting any payments," including those made "directly or through another organization" is a far cry from the specificity of "original checks," "check registers," and "withdrawal slips"—particularly where the subpoena in *McCollom* was issued concurrently with a government request for use immunity, and where the court ordered the government to narrow the subpoena by "identif[ying] particular accounts at particular institutions." *Id.* at 1219-20, 1223. Further, in *McCollum*, the government's immunity request contained a provision that the act of production could not be used to authenticate the documents; here, the government provides no such guarantee.  Nor is the government's request as specific as the records requested in *United States v. Gel Spice Co.*, 601 F. Supp. 1214, 1220 (E.D.N.Y. 1985)—another case the government cites—which involved a request for records regarding the shipment and importation of certain foods where the government "tailored its request to records concerning ten discrete shipments of goods, thereby specifying its request with reasonable particularity." *Id.* at 1225.  Here, the government has done nothing to tailor its request for records reflecting payments to limit it with any reasonable specificity.  Further, in *Gel Spice*, the court noted that the requested documents

---

[8] The government simply copied and pasted the legal authority (including parentheticals) that it cited in support of its original Rule 17(c) motion into its renewed motion. *Compare* ECF 278 at 5, *with* Renewed Mot. at 5.  It is telling that the government would rely on the same boilerplate statements for both its original, overly broad request, and its supposed "narrowed" subpoena request.

were not available from another source because the court had no jurisdiction over the foreign companies that might possess copies of the requested documents. *Id.*

Finally, the government's attempt to explain what it hopes to gain from this request further confirms that it is improperly seeking a litigation advantage. The government contends that through its investigation, it "obtained emails between an accountant for [IRA] and employees of Concord attaching budgets that appear to show payments from Concord funding the activities of [IRA]" and that this requested category of documents "is likely to contain records showing the financial transactions reflected in these budget spreadsheets." Renewed Mot. 3-4. But the government does not point to one document that actually reflects a payment from Concord funding the activities of IRA. Instead it equivocates that the records it seeks are "likely" to show the financial transactions that the government has accused Concord of making. Superseding Indictment ¶ 11c. Contrary to the government's argument, therefore, this request is purely a fishing expedition to see what may turn up.

### c.     Request five remains over-broad

The government's "narrowed" fifth request still seeks "all communications between any individual affiliated with Concord Management and Consulting LLC or Concord Catering [and thirteen individuals] concerning the activities of the Internet Research Agency." Once again, the government has expanded rather than narrowed its request.

In particular, the government has now added Concord Catering to its request, when that entity was not included in the original request. Yet even the government acknowledges that Concord Catering is a separate legal entity, having named it as a separate defendant in the Indictment and Superseding Indictment, and seeking to serve it separately with the Indictment. *See* Superseding Indictment (naming Concord Catering as a separate legal entity); ECF 117 (return of summons for Concord Catering). So now the government is asking for the Court's approval to

seek from one legal entity the communications between "any individual affiliated with" a separate legal entity and third party individuals.  And the proposed subpoena categories offer no explanation as to what is meant by the overbroad and undefined phrase "any individual affiliated with" these legal entities.  As written, this could include consultants, vendors, customers, and contracting third parties.

Similarly, the government's addition of the phrase "concerning the activities of the Internet Research Agency," does nothing to actually narrow its prior request, given that all of the individuals specifically identified in the request are, by the government's own admission, "individuals associated with the Internet Research Agency."  Renewed Mot. at 4.  As such, it stands to reason that individuals associated with a particular business, when communicating with individuals associated with another business, would, in fact be communicating about the activities of that business.  As worded, the revised request still falls short of the specificity requirement because it fails to "reasonably specify the information contained or believed to be contained in the documents sought."  *Libby*, 432 F. Supp. 2d at 39 (internal quotation marks omitted).

The government claims that (1) it has "recovered some communications between [IRA] and employees of Concord", and (2) such communications "concern[ed] matters related to the work of the Agency."  Renewed Mot. at 4.  But it nowhere suggests that these communications concerned the sole allegation against Concord in the Superseding Indictment—that it "controlled funding, recommended personnel, and oversaw [IRA's] activities through reporting and interactions with [IRA] management."  Superseding Indictment ¶ 11.  Instead, these vague platitudes are insufficiently specific to identify what the government hopes will be in the requested

communications,[9] confirming that the request is merely a fishing expedition. *Libby*, 432 F. Supp. 2d at 31-32 (noting that "if the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes to that something useful will turn up, this is a sure sign that the subpoena is being misused") (*quoting United States. v. Noriega*, 764 F. Supp. 1480, 1493 (S.D. Fla. 1991)).

Lastly, the government misrepresents the cases it cites to suggest that its request is sufficiently specific. In all of those cases, the subpoena request provided sufficient detail to narrow the request—from identifying specific allegations that served as the basis for the request, to identifying a limited number of specific individuals subject to the request and confining the requests to narrow time periods. All of these factors made the requests in those cases appropriate, while the government's request here fails to include any such specificity.

First, the government cites to *United States v. Nosal*, 291 F.R.D. 403, 409 (N.D. Cal. 2013), asserting that in that case the court upheld in part a trial subpoena issued by a defendant to a third party requesting "any and all . . . documents" related to particular allegations in the underlying indictment. Renewed Mot. 6. The government neglects to mention that the *Nosal* court did not apply the specificity requirement traditionally applied to Rule 17(c) trial subpoenas, but instead "relax[ed] the specificity factor," and considered only whether the requests are material to the defense and not overly oppressive. 291 F.R.D. at 407-409 (noting that "requiring the defendant to specify precisely the documents he wants without knowing what they are borders on rendering Rule 17 a nullity") (quoting *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 320 (S.D.N.Y.

---

[9] Indeed, the platitudes used by the government don't even meet the standard it set for itself during the December 12 hearing, where counsel for the government readily acknowledged that "the Court can narrow the subpoena or order the government to narrow the subpoena to focus more closely on particular subjects, particular individuals, particular time periods, particular methods of communication." 12/12/19 Tr. at 47:17-21.

2011).  For this reason, the *Nosal* court's approval of certain trial subpoena requests for "any and all . . . documents" is unhelpful to the government here, in which it concedes that the specificity requirement applies.  Renewed Mot. at 2.  *Nosal* is further distinguishable because each of the requests seeking "any and all . . . documents" was explicitly connected to specifically identified paragraphs and detailed allegations in the indictment.  *See id.* at 410-11.  None of the requests approved in *Nosal* sought "all communications between any individual affiliated with" a particular company, as the government attempts to pursue here.  And, in fact, the *Nosal* court—again, applying a relaxed standard that did not include a specificity requirement—quashed a request that was so broad that it would have required the responding party to examine "all of its communications with anyone who ever worked for it."  *Id.* at 411.  This is precisely what the government is seeking in its proposed request.

Second, the government cites to *Rajaratnam*, 2011 WL 335170, at *2, asserting that the court granted the government's application for a trial subpoena to a corporation requesting "'any and all e-mails sent or receiv[ed] by' the defendant regarding certain subjects."  Renewed Mot. at 5.  The government fails to advise the Court that the trial subpoena requests for communications in *Rajaratnam* were limited to a particular type of communication (e-mails) sent or received by exactly three individuals, during periods ranging from one month to six months.  *See* 2011 WL 335170, at *2.  Further, the requests were limited to e-mails related to certain specifically-identified companies in the context of an insider trading case.  As such, the request was nothing remotely similar to the government's proposed request for "all communications between any individual affiliated with" two separate legal entities over the course of a four year period with thirteen employees of a third company generally related to "the activities of" that third company.

Third, the government cites to *Libby*, 432 F. Supp. 2d at 35-36, stating that it upheld a "trial subpoena requesting 'all documents' referencing certain individuals or discussing certain topics." Renewed Mot. at 5.  The government fails to note that the *Libby* court determined that while these requests sought "all documents," each one "provided a narrow subcategory of documents being sought, which cover a discrete topic and typically limit the pertinent time frame."  *Libby*, 432 F. Supp. 2d at 38.  No such limitations can be found in the government's request here, where it merely seeks "all communications" related to the "activities" of a large organization.  And to the extent the Court in *Libby* further acknowledged that the subpoenaed entity "had no difficulty locating and producing to the Court documents that it deems responsive to these requests," that factor, too is absent here.  Concord has no way of determining what constitutes an "activity" of the Internet Research Agency for purposes of responding to the proposed subpoena.

Put simply, the government's cases are inapposite and only serve to demonstrate just how broad and inappropriate its request is.

### d.       Request six is unspecific and unsupported

The government's sixth request seeks calendar entries for Mr. Prigozhin related to potential meetings with thirteen individuals over a more than four year period.  Notably, this request puts defense counsel in the ultimate 'heads I win, tails you lose' situation.  That is, the government supports this request by referring to documents contained in the U.S. sensitive discovery materials that defense counsel has been prohibited from even mentioning, much less disclosing or substantively discussing, with Concord.  Renewed Mot. 4-5; ECF 278 at 4.  So DOJ argues to the Court that it has a particular type of document and that because of the existence of that particular type of document it needs other copies of that same type of document, but defense counsel is forbidden to discuss that type of document with the defendant without violating the Court's Protective Order.

Beyond that conundrum, the government's own explanation of what information it hopes to gain from this request is dubious at best.  That is, the government represents to the Court that it "████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████" and so request 6 "is likely to yield ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████." Renewed Mot. 5.  These vague and unspecified references, which undersigned counsel is prohibited from discussing with Concord, do not furnish the specificity needed to authorize the government to rummage through four years of documents related to at least twelve additional individuals.  Otherwise, the specificity argument has no meaning.[10]

### e.     Requests five and six cannot be complied with in any event

As a final matter, requests five and six remain impossible for Concord to comply with because of the Protective Order the government demanded and the Court approved.  The reasons for this are straightforward.  The government's requests include statements about what evidence the government has already obtained ("████████████████████████████████████ ████████████████████████████████████████]" and ███████████████████ ████████"). That information, in turn, provides context for the types of information the government is seeking in the subpoena return.  But because those descriptors are so vague, counsel cannot describe them without potentially violating the Protective Order by discussing the content of discovery the government has unilaterally designated as U.S. sensitive.  In that situation, counsel

---

[10] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

cannot discuss these two categories of the government's evidence without describing to the client

what the government says it has, and the Protective Order prohibits the entire exercise.  Put simply,

the government's own Protective Order has made its subpoena request so burdensome as to render

the request invalid.

### III.   CONCLUSION

The government has failed to meet the high standards for serving and properly structuring

an early return trial subpoena under Rule 17.  As such, its subpoena should be quashed.

Dated:   January 3, 2020

Respectfully submitted,

CONCORD MANAGEMENT AND
CONSULTING LLC

By Counsel

 /s/ *Eric A. Dubelier*
Eric A. Dubelier (D.C. Bar No. 419412)
Katherine Seikaly (D.C. Bar No. 498641)
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
202-414-9200 (phone)
202-414-9299 (fax)
edubelier@reedsmith.com
kseikaly@reedsmith.com

**Exhibit 1** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

TRANSLATION FROM RUSSIAN

Appendix
to Order of the Ministry of Finance of the Russian Federation

No. 5n dated January 15, 2015

# ADMINISTRATIVE REGULATION FOR RENDERING BY THE FEDERAL TAX SERVICE OF PUBLIC SERVICE FOR PROVISION OF INFORMATION AND DOCUMENTS CONTAINED IN THE UNIFIED STATE REGISTER OF LEGAL ENTITIES (YeGRYuL) AND UNIFIED STATE REGISTER OF INDIVIDUAL ENTREPRENEURS (YeGRIP)

I. General Provisions

Subject of this Administrative Regulation

1. The Administrative Regulation for Rendering by the Federal Tax Service of Public Service for Provision of Information and Documents Contained in the Unified State Register of Legal Entities (YeGRYuL) and Unified State Register of Individual Entrepreneurs (YeGRIP) (hereinafter referred to as the "public service") sets the periods and sequence of administrative procedures (actions) carried out by the territorial tax authorities (hereinafter referred to as the "tax authorities"), the organization subordinate to the Federal Tax Service and authorized to provide the public service (hereinafter referred to as the "authorized organization"), and their officials, and also determines the procedure for interaction between tax authorities, their structural subdivisions and officials, structural subdivisions and officials of the authorized organization as well as the procedure for interaction between the tax authority and the authorized organization with other public authorities, legal entities and individuals while rendering the public service.

Applicants

2. Applicants may be individuals (including individual entrepreneurs) and legal entities (except for public authorities (their territorial bodies), bodies of state extra-budgetary funds (their territorial bodies), local authorities, courts).

3. The provisions set forth by this Administrative Regulation in respect of the applicant shall apply to his/her/its representative when the applicant applies to the tax authority or authorized organization with a request for rendering the public service through a representative, taking into account the considerations provided for by this Administrative Regulation.

Requirements for Procedure for Informing on Rendering the Public Service

4. Location of the Federal Tax Service: 23 Neglinnaya Street, Moscow, Russian Federation.
Postal address of the Federal Tax Service: 23 Neglinnaya Street, Moscow, 127381, Russian Federation.

5. Call center of the Federal Tax Service:
+7 (495) 913-00-09.

6. Official web site of the Federal Tax Service on the Internet (hereinafter the "official web site"): www.nalog.ru.

7. Locations of the tax authorities, their postal addresses, telephone numbers of call centers, faxes and other contact information shall be available on the official web site of the Federal Tax Service at the "Find the IFTS Address" service, on the official web sites of the Federal Tax Service Departments

Original Text Available at
https://www.nalog.ru/html/sites/www.new.nalog.ru/docs/minfin/pril_minfin5n_150115.docx

2

for constituent entities of the Russian Federation, hereinafter the Federal Tax Service Departments (www.rXX.nalog.ru, where XX is the code of a constituent entity of the Russian Federation).

Information about the authorized organization, its location and telephone numbers shall be available on the official web site of the Federal Tax Service.

8. Working hours of tax authorities and authorized organization rendering the public service

| | |
|---|---|
| Monday to Thursday: | 9:00 am to 6:00 pm; |
| Friday: | 9:00 am to 4:45 pm; |
| Saturday, Sunday: | days off. |

By resolution of the head (deputy head) of the tax authority, working hours of the tax authority may be changed.

9. Information on rendering the public service shall be made available directly on the premises of the tax authorities or authorized organization using information stands, on the official web sites of the Federal Tax Service and the Federal Tax Service Departments, in the federal state information system "Unified Portal of Public and Municipal Services (Functions)" (hereinafter the "Unified Portal of Public and Municipal Services (Functions)"), multifunctional centers for public and municipal services (hereinafter the "multifunctional center"), shall be provided by telephone at the numbers of call centers of tax authorities, including through automated telephone information system (if any), a hotline number, a toll-free telephone number of a help desk (if any), using computers with legal reference systems and software products developed by the Federal Tax Service as well as directly by tax officials responsible for rendering the public service.

10. The following information shall be posted on the official web site of the Federal Tax Service:

1) Full and abbreviated names of the Federal Tax Service, Federal Tax Service Department and the relevant inspectorates of the Federal Tax Service for districts, urban districts, cities not divided into districts, interdistrict inspectorates of the Federal Tax Service rendering the public service, their postal addresses, working hours;

2) Address of the official web site of the Federal Tax Service;

3) Telephone numbers of call centers, faxes of the Federal Tax Service, the Federal Tax Service Department and inspectorates referred to in subparagraph 1 of this paragraph;

4) Hotline number, a toll-free telephone number of a help desk (if any).

11. The following information shall be posted on information stands of inspectorates referred to in subparagraph 1 of paragraph 10 of this Administrative Regulation:

1) Full and abbreviated name of the inspectorate, its postal address, taxpayer identification number (hereinafter the "INN"), tax registration reason code (hereinafter the "KPP"), addresses of local units (if any);

2) Name of the higher-level tax authority, its postal address, INN, KPP;

3) Official web sites of the Federal Tax Service, relevant Federal Tax Service Department;

4) Telephone numbers of call centers, hotline, automated telephone information system (if any), fax numbers of the inspectorate and higher-level tax authority, toll-free telephone number of a help desk (if any);

5) Working hours of the inspectorate, its structural subdivisions and local units (if any), the Federal Tax Service Department for the relevant constituent entity of the Russian Federation, Federal Tax Service;

6) Working hours of the call center of the inspectorate and the relevant Federal Tax Service Department, the Federal Tax Service;

7) Visiting hours of the officials responsible for rendering the public service;

8) On locations (on operating rooms, on offices) of rendering the public service;

9) List of grounds for suspension or denial of the public service;

10) Amount of a fee for rendering the public service;

11) Recommended sample request form for rendering the public service in case of provision of information and documents contained in the Unified State Register of Legal Entities (YeGRYuL) and (or) Unified State Register of Individual Entrepreneurs (YeGRIP) through the Internet (according to the form in Appendix No. 1 to this Administrative Regulation).

12. In addition to information specified in paragraphs 10 and 11 hereof, the following information shall be posted on the official web sites of the Federal Tax Service Departments, information stands of inspectorates referred to in subparagraph 1 of paragraph 10 of this Administrative Regulation, at locations of rendering the public service, Unified Portal of Public and Municipal Services (Functions):

1) List of documents required for rendering the public service, requirements for execution of these documents;

2) Time period for rendering the public service;

3) Results of rendering the public service, procedure for provision of a document resulting from rendering the public service;

4) Requirements for procedure for informing on rendering the public service;

5) Procedure for appealing decisions, actions (omissions) of tax authorities, their officials;

6) Extracts from this Administrative Regulation, other regulatory legal acts governing the public service rendering procedure.

Full text of this Administrative Regulation shall be posted on the official web site of the Federal Tax Service;

7) Flowchart of rendering the public service.

13. When answering telephone calls of the applicants, tax officials shall:

1) Provide information on the name of the tax authority which has received the corresponding application;

2) Introduce himself/herself by giving his/her surname, first name and patronymic (if any), position;

3) Provide information on rendering the public service within the scope of his/her competence in accordance with this Administrative Regulation.

14. Applicants who submitted the documents necessary for rendering the public service directly to the tax authorities or the authorized organization shall be informed by the specialists about the time period for rendering the public service and the procedure for issuing (sending) documents.

## II. Standard for Rendering the Public Service

### Name of the Public Service

15. Public Service for Provision of Information and Documents Contained in the Unified State Registry of Legal Entities (hereinafter the "YeGRYuL") and Unified State Registry of Individual Entrepreneurs (hereinafter the "YeGRIP").

### Name of the Federal Executive Authority Rendering the Public Service

16. The public service shall be rendered by the tax authorities or by the authorized organization.

The Federal Treasury shall also take part in the rendering of the public service and have at its disposal the document required to render the public service, as provided for by paragraph 28 of this Administrative Regulation.

When rendering the public service, the tax authorities or the authorized organization shall not have the right to require that the applicant takes actions, including obtaining of approvals, required to receive the public service and related to applying to any other public authorities, local authorities and

organizations, except for receiving services and documents and information provided as a result of rendering such services included in the lists specified in Part 1 of Article 9 of the Federal Law dated July 27, 2010 No. 210-FZ On Organization of Rendering of Public and Municipal Services (Collection of Legislative Acts of the Russian Federation, 2010, No. 31, Article 4179; 2011, No. 27, Article 3880; No. 29, Article 4291; 2014, No. 26, Article 3366).

Description of the Result of Rendering the Public Service

17. Results of rendering the public service are:

1) In case of rendering the public service for provision of information and documents on a particular legal entity/individual entrepreneur contained in the YeGRYuL/YeGRIP:

Extract from the YeGRYuL/YeGRIP in the form of Appendices No. 2 and No. 3 to this Administrative Regulation;

Copy of a document (documents) contained in the YeGRYuL/YeGRIP;

Statement of conformity or non-conformity of the information on the personal data of an individual contained in the request for rendering of the public service to the information contained in the YeGRYuL/YeGRIP in the form of Appendices No. 4 and No. 5 to this Administrative Regulation;

Extract from the YeGRIP about the place of residence of an individual entrepreneur in the form of Appendix No. 6 to this Administrative Regulation;

Statement that the requested information is not contained in the YeGRYuL/YeGRIP;

2) Information on the persons who received information from the YeGRIP on the place of residence of an individual entrepreneur in the form of Appendix No. 7 to this Administrative Regulation;

3) In case of rendering the public service for provision of information contained in the YeGRYuL/YeGRIP in electronic form (hereinafter the "information from the YeGRYuL/YeGRIP in electronic form"):

Notice on provision of the information from the YeGRYuL/YeGRIP using Internet-based technologies that contains attributes of access to the information from the YeGRYuL/YeGRIP (in case the information from the YeGRYuL/YeGRIP in electronic form is provided using telecommunications channels (hereinafter the "Internet-based technologies"));

Electronic extract about a particular legal entity or individual entrepreneur (in case the information from the YeGRYuL/YeGRIP in electronic form is provided using the Internet service posted on the website of the Federal Tax Service (hereinafter the "Internet service"));

4) Notice that it is impossible to render the public service specifying a ground provided for by paragraphs 31 and 33 of this Administrative Regulation.

Time Period for Rendering the Public Service, Time Period for Issuing (Sending) Documents Resulting from Rendering the Public Service

18. Time period for rendering the public service:

1) For provision of information and documents contained in the YeGRYuL/YeGRIP, shall not exceed five days from the date the tax authority receives a request for rendering the public service. On an urgent basis, information and documents contained in the YeGRYuL/YeGRIP shall be provided no later than the business day following the date the tax authority receives a request for rendering the public service;

2) For provision of information from the YeGRYuL/YeGRIP in electronic form, shall not exceed five days from the date the authorized organization receives a request for rendering the public service.

List of Regulatory Legal Acts Governing the Relations Arising out of Rendering the Public Service

19. The public service shall be rendered in accordance with the following regulatory legal acts:

Federal Law dated August 8, 2001 No. 129-FZ On State Registration of Legal Entities and Individual Entrepreneurs (Collection of Legislative Acts of the Russian Federation, 2001, No. 33, Article 3431; 2003, No. 26, Article 2565; No. 50, Article 4855; No. 52, Article 5037; 2004, No. 45, Article 4377; 2005, No. 27, Article 2722; 2007, No. 7, Article 834; No. 30, Article 3754; No. 49, Article 6079; 2008, No. 18, Article 1942; No. 30, Article 3616; No. 44, Article 4981; 2009, No. 1, Article 19, Article 20, Article 23; No. 29, Article 3642; No. 52, Article 6428; 2010, No. 21, Article 2526; No. 31, Article 4196; No. 49, Article 6409; No. 52, Article 7002; 2011, No. 27, Article 3880; No. 30, Article 4576; No. 49, Article 7061; 2012, No. 14, Article 1553; No. 31, Article 4322; No. 53, Article 7607; 2013, No. 26, Article 3207; No. 30, Article 4084; No. 44, Article 5633; No. 51, Article 6699; 2014, No. 14, Article 1551; No. 19, Article 2312; No. 30, Article 4217, Article 4242; Rossiyskaya Gazeta, December 31, 2014, No. 299; January 12, 2015, No. 1) (hereinafter "Federal Law dated August 8, 2001 No. 129-FZ");

Federal Law dated July 27, 2006 No. 149-FZ On Information, Information Technologies and Information Protection (Collection of Legislative Acts of the Russian Federation, 2006, No. 31, Article 3448; 2010, No. 31, Article 4196; 2011, No. 15, Article 2038; No. 30, Article 4600; 2012, No. 31, Article 4328; 2013, No. 14, Article 1658; No. 23, Article 2870; No. 27, Article 3479; No. 52, Article 6961, Article 6963; 2014, No. 19, Article 2302; No. 30, Article 4223, Article 4243);

Federal Law dated July 27, 2006 No. 152-FZ On Personal Data (Collection of Legislative Acts of the Russian Federation, 2006, No. 31, Article 3451; 2009, No. 48, Article 5716; No. 52, Article 6439; 2010, No. 27, Article 3407; No. 31, Article 4173, Article 4196; No. 49, Article 6409; No. 52, Article 6974; 2011, No. 23, Article 3263; No. 31, Article 4701; 2013, No. 14, Article 1651; No. 30, Article 4038; No. 51, Article 6683; 2014, No. 23, Article 2927; No. 30, Article 4217);

Federal Law dated July 27, 2010 No. 210-FZ On Organization of Rendering of Public and Municipal Services (Collection of Legislative Acts of the Russian Federation, 2010, No. 31, Article 4179; 2011, No. 15, Article 2038; No. 27, Article 3873, Article 3880; No. 29, Article 4291; No. 30, Article 4587; No. 49, Article 7061; 2012, No. 31, Article 4322; 2013, No. 14, Article 1651; No. 27, Article 3477, Article 3480; No. 30, Article 4084; No. 51, Article 6679; No. 52, Article 6952, Article 6961, Article 7009; 2014, No. 26, Article 3366; No. 30, Article 4264; Rossiyskaya Gazeta, January 12, 2015, No. 1) (hereinafter "Federal Law dated July 27, 2010 No. 210-FZ");

Federal Law dated April 6, 2011 No. 63-FZ On Electronic Signatures (Collection of Legislative Acts of the Russian Federation, 2011, No. 15, Article 2036, No. 27, Article 3880; 2012, No. 29, Article 3988; 2013, No. 14, Article 1668; No. 27, Article 3463, Article 3477; 2014, No. 26, Article 3390);

Resolution of the Government of the Russian Federation dated May 17, 2002 No. 319 On the Authorized Federal Executive Authority Performing State Registration of Legal Entities, Peasant (Farm) Enterprises, Individuals as Individual Entrepreneurs (Collection of Legislative Acts of the Russian Federation, 2002, No. 20, Article 1872; No. 33, Article 3222; 2003, No. 18, Article 1715; No. 38, Article 3667);

Resolution of the Government of the Russian Federation dated September 30, 2004 No. 506 On Approval of the Regulation on the Federal Tax Service (Collection of Legislative Acts of the Russian Federation, 2004, No. 40, Article 3961; 2005, No. 8, Article 654; No. 12, Article 1042; No. 23, Article 2270; No. 42, Article 4277; No. 48, Article 5042; 2006, No. 23, Article 2510; No. 24, Article 2602; No. 33, Article 3638; No. 52, Article 5587; 2007, No. 15, Article 1800; No. 24, Article 2920; 2008, No. 9, Article 853; No. 29, Article 3527; No. 46, Article 5337; 2009, No. 6, Article 738; No. 9, Article 1119; No. 30, Article 3805; 2010, No. 11, Article 1224; No. 26, Article 3350; No. 50, Article 6725; 2011, No. 12, Article 1639; No. 14, Article 1935; 2012, No. 1, Article 192; No. 24, Article 3188; No. 53, Article 7951; 2013, No. 12, Article 1342; No. 41, Article 5189; No. 45, Article 5822; 2014, No. 26, Article 3561; No. 27, Article 3775; No. 28, Article 4058; No. 45, Article 6229; No. 51, Article 7456);

Resolution of the Government of the Russian Federation dated May 16, 2011 No. 373 (Collection of Legislative Acts of the Russian Federation, 2011, No. 22, Article 3169, No. 35, Article 5092; 2012, No. 28, Article 3908, No. 36, Article 4903, No. 50, Article 7070, No. 52, Article 7507; 2014, No. 5, Article 506);

Resolution of the Government of the Russian Federation dated May 19, 2014 No. 462 On Amount of Fee for Provision of Information and Documents Contained in the Unified State Register of Legal Entities and Unified State Register of Individual Entrepreneurs and Invalidation of Certain Acts of the Government of the Russian Federation (Collection of Legislative Acts of the Russian Federation, 2014, No. 21, Article 2714) (hereinafter "Resolution of the Government of the Russian Federation dated May 19, 2014 No. 462").

Exhaustive List of Documents, Required in Accordance with Regulatory Legal Acts for Rendering the Public Service, to Be Submitted by the Applicant, Ways of their Receipt by the Applicant, Including in Electronic Form, Procedure for their Submission

20. The public service for provision of information and documents contained in the YeGRYuL/YeGRYuL and documents on a particular legal entity (individual entrepreneur) shall be rendered at the applicant's request for rendering the public service prepared in any form, specifying the following information:

1) On the legal entity/individual entrepreneur whereon the information and documents are requested (copies of documents):

Full or abbreviated name of the legal entity or surname, first name and patronymic (if any) of the individual entrepreneur;

Primary state registration number (OGRN) of the legal entity or primary state registration number (OGRNIP) of the individual entrepreneur;

Taxpayer identification number (INN);

2) On the applicant:

Information provided for by subparagraph 1 of this paragraph;

Contact telephone number, postal address or e-mail address;

Information on the identity document (series, number, date of issue and name of the issuing authority), in case of a request for information on the place of residence of an individual entrepreneur or on conformity of information on an individual specified in the request with the information contained in the YeGRYuL/YeGRIP;

3) On the way of obtaining the document resulting from rendering the public service that is convenient for the applicant (by the applicant or his/her/its representative, by post, in electronic form at the official website of the Federal Tax Service or the Unified Portal of Public and Municipal Services (Functions)), subject to the specific features provided for by this Administrative Regulation.

If the request submitted directly or in electronic form does not contain information on the way of obtaining the document resulting from rendering the public service, such document shall be sent to the applicant by post.

If the applicant's request is submitted through a representative, the powers of the representative shall be supported by documents in accordance with the legislation of the Russian Federation.

21. A request for rendering the public service shall be submitted:

In the form of a physical document by sending it by post, submitting directly to the tax authority or the authorized organization or through the multifunctional center;

In electronic form using the Internet-based technologies, including the Unified Portal of Public and Municipal Services (Functions) (provided that there is a technical capability).

22. A request for rendering the public service in the form of a physical document shall be submitted (sent):

1) When providing information from the YeGRYuL, to any tax authority authorized to provide information from the YeGRYuL or to the multifunctional center;

2) When providing information from the YeGRIP, to any tax authority authorized to provide information from the YeGRIP or to the multifunctional center;

3) When providing a copy of document(s) contained in the YeGRYuL, to the tax authority at the location of the legal entity that is authorized to provide copies of documents contained in the YeGRYuL or to the multifunctional center;

4) When providing a copy of document(s) contained in the YeGRIP, to the tax authority at the place of residence of the individual entrepreneur that is authorized to provide copies of documents contained in the YeGRIP or to the multifunctional center.

23. A request for rendering the public service for comparing information on the personal data of a particular individual set forth in the request with the information contained in the YeGRYuL/YeGRIP shall be submitted in the form of a physical document directly by the individual requesting such information to any tax authority authorized to provide information from the YeGRYuL/YeGRIP. Together with the request, the said individual shall submit a document proving his/her identity in accordance with the legislation of the Russian Federation.

24. A request for rendering the public service for providing information on the place of residence of a particular individual entrepreneur contained in the YeGRIP shall be submitted in the form of a physical document directly by the individual requesting such information to any tax authority authorized to provide information from the YeGRIP. Together with the request, the said individual shall submit a document proving his/her identity in accordance with the legislation of the Russian Federation.

25. A request for rendering the public service for providing an individual entrepreneur with information on individuals who received information on his/her place of residence shall be submitted in the form of a physical document to the tax authority at the place of residence of the individual entrepreneur that is authorized to provide such information. Together with the request, the said individual entrepreneur shall submit a document proving his/her identity in accordance with the legislation of the Russian Federation.

26. A request for rendering the public service for providing information from the YeGRYuL/YeGRIP in electronic form using the Internet-based technologies shall be submitted directly in the form of a physical document or sent by post to the authorized organization in order to obtain information on legal entities/individual entrepreneurs registered in the Russian Federation.

If there is a technical capability, the request specified in this paragraph may be sent to the authorized organization in electronic form.

27. A request for rendering the public service for providing an extract on a particular legal entity or individual entrepreneur in electronic form shall be sent through the Internet service using an electronic signature verification key certificate (hereinafter the "ESVKC").

Exhaustive List of Documents Required in Accordance with Regulatory Legal Acts for Rendering the Public Service that are at the Disposal of Public Authorities and Other Bodies Involved in Rendering the Public Service and that the Applicant is Entitled to Submit as well as Ways of their Receipt by Applicants, Including in Electronic Form, and the Procedure for their Submission

28. If in accordance with Federal Law dated August 8, 2001 No. 129-FZ, the public service for provision of information and documents contained in the YeGRYuL/YeGRIP is rendered for a fee which amount is established by Resolution of the Government of the Russian Federation dated May 19, 2014 No. 462, the applicant is entitled to submit to the tax authority or the authorized organization on his/her own initiative a document confirming payment together with the request for rendering the public service.

29. The applicant's failure to submit the document specified in paragraph 28 of this Administrative Regulation shall not constitute the ground for refusal to render the public service.

Reference that It Is Prohibited to Request the Applicant to Submit the Documents and Information or to Take the Actions Provided for by Paragraphs 1 and 2 of Part 1 of Article 7 of Federal Law dated July 27, 2010 No. 210-FZ On Organization of Rendering of Public and Municipal Services.

30. The tax authority or the authorized organization may not require that the applicant:

1) Submits any documents and information or takes any actions, which submission or taking is not provided for by the regulatory legal acts governing the relations arising out of rendering the public service;

2) Submits any documents and information that in accordance with regulatory legal acts of the Russian Federation, regulatory legal acts of constituent entities of the Russian Federation and municipal legal acts are at the disposal of the public authorities rendering the public service, other public authorities, local authorities and organizations involved in rendering the public service, except for the documents specified in Part 6 of Article 7 of Federal Law dated July 27, 2010 No. 210-FZ.

Exhaustive List of Grounds for Denial to Accept Documents Required for Rendering the Public Service

31. The grounds for denial to accept the request required for rendering the public service shall be:

1) For an individual not being an individual entrepreneur, the absence in the request submitted in hard copy of the individual's signature, his/her surname, first name and patronymic (if any); postal address or e-mail address (if the result of rendering the public service shall be sent by post or e-mail, accordingly);

2) For an organization (an individual entrepreneur), the absence in the request of:

a) Name of the organization (surname, first name and patronymic (if any) of the individual entrepreneur);

b) OGRN (OGRNIP) and INN of the applicant;

c) Postal address or e-mail address (if the result of rendering the public service shall be sent by post or e-mail, accordingly);

d) Signature and surname and initials of the individual who signed the request submitted in hard copy;

3) Submitting of an illegible request;

4) Non-conformity of the data of the holder of the electronic signature verification key certificate with the applicant's data specified in the request submitted in electronic form;

5) Applicant's lack of authority to obtain an extract in electronic form (about himself/herself) using the Internet service;

6) Applicant's not having, or inaccuracy of, ESVKC (in case of sending a request for rendering the public service using the Internet service).

Exhaustive List of Grounds for Suspension or Denial of the Public Service

32. There are no grounds to suspend rendering the public service.

33. The public service shall not be provided in case:

1) Applicant fails to submit the documents required for rendering the public service provided for by paragraphs 23–25 of this Administrative Regulation;

2) There is information on non-receipt of the fee charged for rendering the public service (if in accordance with Federal Law dated August 8, 2001 No. 129-FZ, the public service for provision of

information and documents contained in the YeGRYuL/YeGRIP shall be rendered for a fee which amount is established by Resolution of the Government of the Russian Federation dated May 19, 2014 No. 462).

List of Services that are Necessary and Compulsory for Rendering the Public Service, Including Information on Document(s) Issued by Organizations Involved in Rendering the Public Service

34. While rendering the public service, no other services necessary and compulsory for rendering the public service are rendered and no other organizations are involved in rendering the public service.

Procedure, Amount and Grounds for Charging State Duties or other Fees Charged for Rendering the Public Service

35. In accordance with paragraph 1 of Article 7 of Federal Law dated August 8, 2001 No. 129-FZ, the public service for provision of information and documents contained in the YeGRYuL/YeGRIP shall be rendered for a fee, unless otherwise provided for by federal laws.

36. No state duty shall be charged for rendering the public service related to the provision of information and documents from the YeGRYuL/YeGRIP.

37. A fee shall be charged for rendering the public service related to provision of information and documents from the YeGRYuL/YeGRIP; the amount of such fee is established by Resolution of the Government of the Russian Federation dated May 19, 2014 No. 462.

38. Amount of a fee for rendering the public service is:

In case of providing information on a particular legal entity or individual entrepreneur (except for providing information to a legal entity or an individual entrepreneur on themselves), RUB 200;

In case of providing information on a particular legal entity or individual entrepreneur no later than the business day following the day the request is received by the registering authority (hereinafter the "urgent provision"), RUB 400;

In case of providing the statement provided for by paragraph 6 of Article 6 of Federal Law dated August 8, 2001 No. 129-FZ, RUB 200 (in case of the urgent provision of the statement, RUB 400);

In case of providing a document on a particular legal entity or individual entrepreneur (except for provision of documents in accordance with paragraph 2 of Article 7 of the Federal Law dated August 8, 2001 No. 129-FZ), RUB 200 (in case of urgent provision of the document, RUB 400).

39. The amount of fee for rendering the public service for provision of information contained in the YeGRYuL/YeGRIP in electronic form shall be:

In case of one-time provision of information (except for provision of information on a particular legal entity or individual entrepreneur) in electronic form, RUB 50,000 (in case of one-time provision of updated information, RUB 5,000);

In case of providing information (except for provision of information on a particular legal entity or individual entrepreneur) in electronic form as annual subscription services per workplace, RUB 150,000.

Maximum Waiting Period in a Queue when Submitting a Request for Rendering the Public Service and Obtaining the Result of Rendering the Public Service

40. In case the applicant directly contacts the tax authority or the authorized organization to submit a request for rendering the public service or to obtain the result of rendering the public service directly, the waiting period in a queue shall be no more than 15 minutes.

Time Period and Procedure for Registering an Applicant's Request for Rendering the Public Service, Including in Electronic Form

41. The time period for registering a request for rendering the public service, including in electronic form, shall not exceed one business day from the date it is received by the tax authority or the authorized organization.

42. A request for rendering the public service, including in electronic form, shall be registered by assigning a reference number specifying the date it is received by the tax authority or the authorized organization.

Requirements for Premises where the Public Service is Rendered, Place of Waiting and Reception of Applicants, Placement and Appearance of Visual, Text and Multimedia Information on the Procedure for Rendering the Public Service

43. Information on the working hours of the tax authority or the authorized organization shall be prominently placed at the entrance to the building of the tax authority or the authorized organization.

44. As a rule, applicants shall be received by the tax authorities or the authorized organization in specially equipped premises (service areas or offices).

The premises for receiving the applicants shall be located on the lower floors of buildings of the tax authorities, with a separate entrance, where practical.

Entrance to the premises where the public service is rendered and movement therein shall not offer difficulties for persons with disabilities.

45. While waiting for the reception, the applicants shall be in rooms equipped with chairs, armchair sections or benches, tables (desks) enabling execution of documents.

46. The premises for reception of applicants shall be equipped with an information stand and a telephone for enquiries.

Information stands shall be in a visible place (including in case of a large number of visitors).

Information shall be placed in a readable fashion.

47. Officials of the tax authorities or the authorized organization in charge of receiving applicants for rendering the public service are required to carry badges and/or have plates at their workplaces specifying their surnames, first names, patronymics (if any) and positions held.

48. No additional requirements are set for placement and appearance of the premises and of the visual, text and multimedia information.

Parameters of Accessibility and Quality of the Public Service, Including Number of Interactions between the Applicant and Officials when Rendering the Public Service and their Duration, Possibility to Receive the Public Service in a Multifunctional Center Rendering Public and Municipal Services, Possibility to Obtain Information on the Progress of Rendering the Public Service, including with the Use of Information and Communication Technologies

49. The parameters of accessibility and quality of the public service shall be:

1) Possibility of receiving the public service in a timely manner and in accordance with this Administrative Regulation, including through the multifunctional center;

2) Possibility of obtaining full, relevant and reliable information on the procedure for rendering the public service, including in electronic form;

3) Possibility of out-of-court consideration of applicants' complaints about decisions, actions (inaction) of officials in charge of rendering the public service;

4) Number of interactions between the applicant and the officials when rendering the public service and their duration.

While obtaining the public service, the applicant shall interact with the officials twice, i.e. when submitting a request to the tax authority (authorized organization) and when the result of rendering the

public service is directly obtained by the applicant. When rendering the public service, one interaction between the applicant and the official shall not be more than 15 minutes.

50. The public service shall be received in the multifunctional centers in accordance with this Administrative Regulation on the basis of cooperation agreements entered into by the tax authority and the authorized multifunctional center.

51. The applicants shall be provided with the opportunity to obtain information on the progress of rendering the public service at the official websites of the Federal Tax Service and the Federal Tax Service Departments, the Unified Portal of Public and Municipal Services (Functions).

52. The applicants shall be provided with the opportunity to assess the availability and the quality of the public service at the official website of the Federal Tax Service www.nalog.ru in the Polling (Anketirovanie) service.

Other Requirements, Including Those Taking into Account Specific Features of Rendering the Public Service in Multifunctional Centers Rendering Public and Municipal Services and of Rendering the Public Service in Electronic Form

53. Any other requirements, including those taking into account specific features of rendering the public service in multifunctional centers and of rendering the public service in electronic form shall not be set.

III. Composition, Sequence and Time Periods of Administrative Procedures (Actions), Requirements for their Performance, including Specific Features of Administrative Procedures (Actions) in Electronic Form

54. Rendering of the public service includes the following administrative procedures:
Receiving and registering an applicant's request;
Generating and sending an interdepartmental request for provision of the document required for rendering the public service and provided for by paragraph 28 of this Administrative Regulation to the federal executive body that performs law enforcement duties to ensure the implementation of the federal budget and cash services for implementation of budgets of the budget system of the Russian Federation in accordance with the legislation of the Russian Federation;
Preparing and executing documents resulting from rendering the public service;
Issuing (sending) documents resulting from rendering the public service.

55. The sequence of administrative procedures for rendering the public service is shown in the flowchart in Appendix No. 8 to this Administrative Regulation.

Receiving and Registering an Applicant's Request

56. The basis for initiating the administrative procedure for receiving and registering an applicant's request shall be receipt:
By the tax authority of a request (sent by post, submitted directly or through the multifunctional center) for rendering the public service for provision of information contained in the YeGRYuL/YeGRIP in the form of an extract from the YeGRYuL/YeGRIP; copies of a document (documents) contained in the YeGRYuL/YeGRIP; on the conformity of information on the personal data of a particular individual set forth in the request for rendering the public service with the information contained in the YeGRYuL/YeGRIP; on the provision of information on the place of residence of an individual entrepreneur; on providing an individual entrepreneur with information on persons who received information on his/her place of residence in accordance with Federal Law dated August 8, 2001 No. 129-FZ;

By the authorized organization of a request (submitted directly, sent by post or electronically) for provision of information from the YeGRYuL/YeGRIP using the Internet-based technologies or a request for provision of information on a particular legal entity or individual entrepreneur (on themselves) sent using the Internet service in the form of an electronic document.

57. When the applicant submits a request in writing (hereinafter the "written request") directly to the tax authority or to the authorized organization, the specialist in charge of receiving and registering documents shall check the existence of grounds for denial to accept the request specified in paragraph 31 of this Administrative Regulation.

58. When submitting a request for provision of information on the place of residence of an individual entrepreneur or a request for conformity of information on the personal data of a particular individual set forth in a request for rendering the public service with the information contained in the YeGRYuL/YeGRIP or a request for providing an individual entrepreneur with information on persons who received information on his/her place of residence in accordance with Federal Law dated August 8, 2001 No. 129-FZ, the specialist in charge of receiving and registering the documents shall check the document identifying, in accordance with the legislation of the Russian Federation, the individual who submitted the request for rendering the public service.

59. If there is at least one of the grounds specified in paragraph 31 or sub-paragraph 1 of paragraph 33 of this Administrative Regulation, the specialist in charge of receiving and registering documents shall return the written request to the applicant.

At the instance of the applicant, the specialist in charge of receiving and registering documents shall make a note of the denial to accept on the request for rendering the public service, specifying the grounds, his/her surname, initials, position and the date of denial to accept the request.

60. If there are no grounds specified in paragraph 31 or sub-paragraph 1 of paragraph 33 of this Administrative Regulation, the specialist in charge of receiving and registering documents shall accept the written request, at the instance of the applicant, make a note of its acceptance on the second copy of the request and specify his/her surname, initials, position and the date of receipt of the request.

A written request of the applicant, including that sent by post, shall be received and registered by the specialist in charge of receiving and registering documents within the time limits and in the manner prescribed by paragraphs 41–42 of the Administrative Regulation.

61. If a request is received in electronic form by the authorized organization, the format and logical control of the request shall be carried out automatically, and the existence of grounds for denial to accept the request specified in paragraph 31 of this Administrative Regulation shall be checked.

If there are no grounds for denial to accept the request specified in paragraph 31 of this Administrative Regulation, the request shall be automatically recorded by the software of the authorized organization.

If there are any grounds for denial to accept the request specified in paragraph 31 of this Administrative Regulation, a notice of impossibility to render the service and of the reason therefor shall be sent to the applicant using the Internet service no later than the day following the day of receipt of the request.

62. The administrative procedure shall result in registration of the request.

63. After completing the administrative actions provided for by paragraphs 56–60 of this Administrative Regulation, the specialist responsible for receipt and registration of documents shall transfer the submitted request to the specialist responsible for generation and submission of an interdepartmental request for documents required for rendering the public service to public and any other authorities involved in rendering of the public service.

Generating and Sending an Interdepartmental Request for Provision of the Document Required for Rendering the Public Service and Provided for by Paragraph 28 of This Administrative Regulation to the Federal Executive Body that Performs Law Enforcement Duties to Ensure the Implementation of

the Federal Budget and Cash Services for Implementation of Budgets of the Budget System of the Russian Federation in Accordance with the Legislation of the Russian Federation

64. The ground for initiation of the administrative procedure for generation and sending of an interdepartmental request for a document required for rendering the public service, as provided for by paragraph 28 of this Administrative Regulation, to the Federal Treasury shall be non-submission by the applicant of a document required for rendering the public service as provided for by paragraph 28 of this Administrative Regulation.

65. An interdepartmental request shall be generated in accordance with the requirements of Article 7.2 of Federal Law No. 210-FZ dated July 27, 2010 and sent as an electronic document signed with an enhanced encrypted and certified electronic signature, through the channels of the interdepartmental electronic interaction system (hereinafter referred to as the "interdepartmental electronic interaction system").

66. After sending an interdepartmental request, the request for rendering the public service submitted to the tax authority or the authorized organization shall be transferred to the specialist responsible for preparation and execution of documents resulting from rendering the public service.

67. If, for rendering the public service, no submission of the document provided for by paragraph 28 of this Administrative Regulation is required or if the document required for rendering the public service as provided for by paragraph 28 of this Administrative Regulation is submitted by the applicant on his/her/its own initiative, the request submitted to the tax authority or the authorized organization shall be transferred to the specialist responsible for preparation and execution of documents resulting from rendering the public service, without generating and sending an interdepartmental request.

68. The maximum period for performing administrative actions provided for by paragraphs 64–67 of this Administrative Regulation shall not exceed one business day from the date of registration of the request for rendering the public service.

Preparing and Executing Documents Resulting from Rendering the Public Service

69. The ground to initiate an administrative procedure for preparation and execution of documents resulting from rendering the public service shall be receipt by a structural subdivision of the tax authority or the authorized organization responsible for provision of the information (documents) contained in YeGRYuL/YeGRIP of a request for rendering the public service.

Provision of Information on a Particular Legal Entity/Individual Entrepreneur Contained in the YeGRYuL/YeGRIP

70. The specialist responsible for provision of the information from YeGRYuL/YeGRIP on a particular legal entity/individual entrepreneur shall prepare an extract from YeGRYuL/YeGRIP. The said extract shall include the information contained in YeGRYuL/YeGRIP, except for the information, to which an access is limited in accordance with paragraph 1 of Article 6 of Federal Law No. 129-FZ dated August 8, 2001 (number, date of issue and name of the authority that has issued the individual's identity document).

71. Extracts from YeGRYuL/YeGRIP shall be executed taking into account the following.

Based on one request for rendering the public service, the following documents shall be provided:

One copy of the extract from YeGRYuL/YeGRIP provided for by the second paragraph of subparagraph 1 of paragraph 17 of this Administrative Regulation if such extract, in accordance with the legislation of the Russian Federation, is provided free of charge;

Number of copies of the extract from YeGRYuL/YeGRIP specified in the second paragraph of subparagraph 1 of paragraph 17 of this Administrative Regulation as specified in the request for

information, taking into account the fee amount for provision of information, if such extract, in accordance with the legislation of the Russian Federation, is provided for a fee.

72. The extract shall be printed on A4 sheets in Times New Roman font (font size 12).

The following printing types shall be allowed:

One-sided printing, portrait orientation, one page on one side of a sheet (page parameters: scale — 100% of the natural size, margins: left — 2 cm, top, right and bottom — 1 cm);

Two-sided printing, portrait orientation, side bind, one page on one side of a sheet (page parameters: scale — 90% of the natural size, margins: left and right — 2 cm, top and bottom — 1 cm);

One-sided printing, portrait orientation, two pages on one side of a sheet (page parameters: scale — 100% of the natural size, margins: top — 2 cm, left, right and bottom — 1 cm);

Two-sided printing, portrait orientation, side bind, two pages on one side of a sheet (page parameters: scale — 100% of the natural size, margins: top and bottom — 2 cm, left and right — 1 cm).

73. The first page of the extract shall mandatorily bear the date of its generation and the number of the extract according to the register of extracts from YeGRYuL/YeGRIP.

Each page of the extract shall bear two lines in the page footer: in the first line — "Extract from YeGRYuL/YeGRIP" on the left, OGRN (OGRNIP) XXXXXXXXXXXXX (XXXXXXXXXXXXXXX) at the center, the page number on the right as: page Y of No., where Y is the relevant page number, No. is the number of pages in the extract; in the second line — DD.MM.YYYY HH:NN on the left, where DD is the day, MM is the month, YYYY is the year, HH is the hour, and NN is the minutes.

74. An extract of more than one sheet shall be "bound" so that not to impede its reading and making it possible to ensure inalterability of the document being prepared and its integrity as a whole.

It shall be bound through binding the extract sheets in two places located in the middle of the left edge (in case of one page on one side of a sheet) or in the middle of the upper edge (in case of two pages on one side of a sheet) of the extract sheets at approximately 6 to 8 cm distance from each other.

Two binding types shall be allowed:

By a string using a punch;

By metal staples using a stapler.

When binding the extract, a paper sticker, which is to be bound together with the extract, shall be applied to the front page of the extract. In this case, the ends of the string tied with a knot or the ends of metal staples shall be located on the back page of the last sheet of the extract. The loose edge of the paper sticker shall be folded covering the "binding" on the front page of the extract and glued to the back page of the last sheet of the extract covering the ends of the metal staples or the string knot (the ends of the string shall remain loose).

The paper sticker on the back page of the last sheet of the extract, in any case of binding of the extract, shall bear the following text: "Numbered, bound, and sealed on (specifying the number of sheets in words and in figures in brackets) sheets", which may go beyond the sticker.

The sticker shall be affixed with a signature of the official, who has signed the extract, sealed with the official seal of the tax authority. In this case, the official's signature and the seal of the tax authority shall be applied partially on the sticker and partially on the sheet, where it is attached.

75. If there is no requested information in YeGRYuL/YeGRIP or it is impossible to determine a particular legal entity or a particular individual entrepreneur due to the lack of information in the request for rendering the public service as provided for by subparagraph 1 of paragraph 20 of this Administrative Regulation, the specialist responsible for provision of the information from YeGRYuL/YeGRIP shall prepare a certificate on the absence of the requested information in YeGRYuL/YeGRIP.

76. If there is information on non-receipt of the fee charged for rendering the public service (if in accordance with Federal Law dated August 8, 2001 No. 129-FZ, the public service for provision of information contained in the YeGRYuL/YeGRIP shall be rendered for a fee which amount is

established by Resolution of the Government of the Russian Federation dated May 19, 2014 No. 462), the specialist responsible for provision of the information from YeGRYuL/YeGRIP shall prepare a notice that it is impossible to render the public service specifying a ground.

A document confirming payment (if submitted) shall be attached to the notice of the impossibility to render the public service.

77. An extract from YeGRYuL/YeGRIP or a certificate on the absence of the requested information in YeGRYuL/YeGRIP, or a notice of the impossibility to render the public service, all signed by an authorized official, shall be transferred to the specialist responsible for issue (sending) of the documents resulting from rendering the public service.

Submission of a Copy of a Document (Documents) Contained in the YeGRYuL/YeGRIP

78. The specialist responsible for provision of copies of the documents contained in YeGRYuL/YeGRIP shall prepare a copy of the requested document.

A copy of the document contained in YeGRYuL or YeGRIP shall be provided to a party concerned in the number of counterparts specified in the request, taking into account the fee amount for provision of a copy of the document.

79. A copy of a document contained in the YeGRYuL/YeGRIP shall be made taking into account the following.

A copy of each requested document contained in YeGRYuL/YeGRIP shall be made separately.

When making a copy of the document, it shall be allowed to place two pages of the document on one sheet — one on each side of the sheet.

The first page of the copy of the document shall bear the following text in a blank space in the upper left corner: "True copy".

The last page of the copy of a constituent document shall bear the following text: "The copy is made from the constituent document of a legal entity: OGRN (specifying OGRN), submitted upon making an entry in YeGRYuL dated (specifying the date) under state registration number (specifying OGRN or state registration number of the entry, for making which in YeGRYuL the constituent document of the legal entity, from which this copy is made, is submitted)".

The last page of the copy of amendments to the constituent document shall bear the following text: "The copy is made from the amendments to the constituent document of a legal entity: OGRN (specifying OGRN), submitted upon making an entry in YeGRYuL dated (specifying the date) under state registration number (specifying state registration number of the entry on amendments to the constituent document of the legal entity, for making which in YeGRYuL the amendments to the constituent document, from which this copy is made, are submitted)".

A copy of more than one sheet shall be bound subject to the requirements provided for by paragraph 74 of this Administrative Regulation.

80. If there is no requested document in YeGRYuL/YeGRIP or it is impossible to determine a particular legal entity or a particular individual entrepreneur, for which a copy of the document is requested, the specialist responsible for provision of copies of the documents contained in YeGRYuL/YeGRIP shall prepare a certificate on the absence of the requested information in YeGRYuL/YeGRIP.

81. If there is information on non-receipt of the fee charged for rendering the public service (if in accordance with Federal Law dated August 8, 2001 No. 129-FZ, the public service for provision of documents contained in the YeGRYuL/YeGRIP shall be rendered for a fee which amount is established by Resolution of the Government of the Russian Federation dated May 19, 2014 No. 462), specialist responsible for provision of copies of the documents contained in YeGRYuL/YeGRIP shall prepare a notice that it is impossible to render the public service specifying a ground.

A document confirming payment (if submitted) shall be attached to the notice of the impossibility to render the public service.

82. A copy of the document contained in YeGRYuL/YeGRIP, or a certificate on the absence of the requested information, or a notice of the impossibility to render the public service, all certified by an authorized official, shall be transferred to the specialist responsible for issue (sending) of the documents resulting from rendering the public service.

Provision of a Certificate of Correspondence or Non-Correspondence of Information on Personal Data of a Particular Individual Set Forth in the Request for Rendering the Public Service with the Information Contained in YeGRYuL/YeGRIP

83. The specialist responsible for provision of the information from YeGRYuL/YeGRIP shall compare the information contained in YeGRYuL/YeGRIP on the personal data of a particular individual with the information contained in the request for rendering the public service and prepare a certificate of correspondence or non-correspondence of the information set forth in the request for rendering the public service with the information contained in YeGRYuL/YeGRIP.

84. If there is information on non-receipt of the fee charged for rendering the public service (if in accordance with Federal Law dated August 8, 2001 No. 129-FZ, the public service for provision of information contained in the YeGRYuL/YeGRIP shall be rendered for a fee which amount is established by Resolution of the Government of the Russian Federation dated May 19, 2014 No. 462), the specialist responsible for provision of the information from YeGRYuL/YeGRIP shall prepare a notice that it is impossible to render the public service specifying a ground.

A document confirming payment (if submitted) shall be attached to the notice of the impossibility to render the public service.

85. A certificate of correspondence or non-correspondence of personal data of a particular individual set forth in the request for rendering the public service with the information contained in YeGRYuL/YeGRIP or a notice of the impossibility to render the public service, both signed by an authorized official, shall be transferred to the specialist responsible for issue (sending) of the documents resulting from rendering the public service.

Provision of Information on a Place of Residence of an Individual Entrepreneur

86. The specialist responsible for provision of the information from YeGRIP shall prepare an extract from YeGRIP on the place of residence of an individual entrepreneur.

87. If there is information on non-receipt of the fee charged for rendering the public service (if in accordance with Federal Law dated August 8, 2001 No. 129-FZ, the public service for provision of information contained in the YeGRYuL/YeGRIP shall be rendered for a fee which amount is established by Resolution of the Government of the Russian Federation dated May 19, 2014 No. 462), the specialist responsible for provision of the information from YeGRYuL/YeGRIP shall prepare a notice that it is impossible to render the public service specifying a ground.

A document confirming payment (if submitted) shall be attached to the notice of the impossibility to render the public service.

88. An extract from YeGRIP on the place of residence of an individual entrepreneur or a notice of the impossibility to render the public service, both signed by an authorized official, shall be transferred to the specialist responsible for issue (sending) of the documents resulting from rendering the public service.

Provision to an Individual Entrepreneur of Information on Persons Who Have Obtained, in Accordance with Federal Law No. 129-FZ dated August 8, 2001, Information on His/Her Place of Residence

89. The specialist responsible for provision of the information from YeGRIP shall prepare the information on the persons who have obtained, in accordance with Federal Law No. 129-FZ dated August 8, 2001, the information on the place of residence of an individual entrepreneur.

90. If there is no requested information, the specialist responsible for provision of the information from YeGRIP shall prepare a certificate on the absence of the requested information.

91. The information on the persons who have obtained, in accordance with Federal Law No. 129-FZ dated August 8, 2001, the information on the place of residence of an individual entrepreneur or a certificate on the absence of the requested information, both signed by an authorized official, shall be transferred to the specialist responsible for issue (sending) of the documents resulting from rendering the public service.

Provision of Information from YeGRYuL/YeGRIP in Electronic Form

92. The information from YeGRYuL/YeGRIP in electronic form shall be provided:

Using the Internet-based technologies — by establishing an access to the section of the official web site of the Federal Tax Service, which contains the information from YeGRYuL/YeGRIP;

Using the Internet-based service — in the form of an extract on a legal entity or an individual entrepreneur (on himself/herself).

Provision of Information from YeGRYuL/YeGRIP Using Internet-Based Technologies

93. The specialist responsible for provision of the information from YeGRYuL/YeGRIP using the Internet-based technologies shall:

Determine for the applicant the attributes of an access to the information from YeGRYuL/YeGRIP using the Internet-based technologies that make it possible to clearly identify him/her/it;

Prepare a notice on provision of the information from the YeGRYuL/YeGRIP using Internet-based technologies that contains attributes of access to the information from the YeGRYuL/YeGRIP using the Internet-based technologies.

94. If there is information on non-receipt of the fee charged for rendering the public service (if in accordance with Federal Law dated August 8, 2001 No. 129-FZ, the public service for provision of information contained in the YeGRYuL/YeGRIP shall be rendered for a fee which amount is established by Resolution of the Government of the Russian Federation dated May 19, 2014 No. 462), the specialist responsible for provision of the information from YeGRYuL/YeGRIP using the Internet-based technologies shall prepare a notice that it is impossible to render the public service specifying a ground.

A document confirming payment (if submitted) shall be attached to the notice of the impossibility to render the public service.

95. A notice of provision of the information from YeGRYuL/YeGRIP using the Internet-based technologies or a notice of the impossibility to render the public service specifying the reason, both signed by an authorized official, shall be transferred to the specialist responsible for issue (sending) of the documents resulting from rendering the public service.

96. The duration of the access attributes shall be one year from the beginning date of provision of the information from YeGRYuL/YeGRIP using the Internet-based technologies.

The beginning date for provision of the information shall be the date of the user's first logging in the system but no later than a month after the sending date of a notice of provision of the information from YeGRYuL/YeGRIP using the Internet-based technologies as specified in paragraph 93 of this Administrative Regulation.

Upon expiration of the duration of the said access attributes, provision of the information from YeGRYuL/YeGRIP using the Internet-based technologies shall be extended based on a newly submitted request provided for by paragraph 26 of this Administrative Regulation.

97. Provision of the information from YeGRYuL/YeGRIP using the Internet-based technologies may be performed as:

One-time provision of the information (updated information);

Subscriber maintenance of one work station.

98. One-time provision of the information shall be performed by establishing for the applicant an access to the information (updated information) contained in YeGRYuL/YeGRIP, starting from the beginning date of generation of the relevant register (July 1, 2002 for YeGRYuL; January 1, 2004 for YeGRIP) to the date of provision of an access to the information (updated information) inclusive.

The updated information shall be provided based on the relevant request if the applicant has valid attributes of an access to the information from YeGRYuL/YeGRIP.

In case of provision of the information (updated information), the applicant shall be procured with a possibility to access the section of the official web site of the Federal Tax Service containing the information from YeGRYuL/YeGRIP, which status is recorded as at the provision date of the access attributes, for an unlimited number of times within the duration of the access attributes.

99. In case of subscriber maintenance of one work station, the applicant shall be provided with a possibility to access the section of the official web site of the Federal Tax Service containing the daily updated information from YeGRYuL/YeGRIP in full, starting from the beginning date of generation of the relevant register (July 1, 2002 for YeGRYuL; January 1, 2004 for YeGRIP) to the date of visit of the said section, for an unlimited number of times within the duration of the access attributes.

100. In case of provision of the information from YeGRYuL/YeGRIP using the Internet-based technologies, the user shall be provided with a possibility to search for the information in the amount of information from YeGRYuL/YeGRIP provided in accordance with paragraphs 98 and 99 of this Administrative Regulation.

101. In case of subscriber maintenance of one work station, in addition to the possibility to obtain the information from YeGRYuL/YeGRIP specified in paragraphs 99 and 100 of this Administrative Regulation, the applicant shall be provided with a possibility to obtain the information from YeGRYuL/YeGRIP for use in his/her/its information systems (hereinafter referred to as the "integration of the information from YeGRYuL/YeGRIP").

In case of integration of the information from YeGRYuL/YeGRIP, the applicant shall be provided with:

Information from YeGRYuL/YeGRIP in full, starting from the beginning date of generation of the relevant register (July 1, 2002 for YeGRYuL; January 1, 2004 for YeGRIP) to January 1 of the current year (hereinafter referred to as the "complete information for integration");

Amendments to the information from YeGRYuL/YeGRIP (hereinafter referred to as "amendments to the information for integration"), starting from January 1 of the current year daily as at a particular date.

The complete information for integration (amendments to the information for integration) shall be provided as archive files generated by a standard archiving program. Each archive file shall contain no more than 100 XML files, each of which contains the information on no more than 20 thousand legal entities/individual entrepreneurs.

The description of the name and structure of the files mentioned in this paragraph shall be posted on the official web site of the Federal Tax Service in the "Access to YeGRYuL/YeGRIP" service.

102. The obtained information from YeGRYuL/YeGRIP for integration shall be processed by the applicant's software applications.

Provision of Information from YeGRYuL/YeGRIP Using the Internet-Based Service

103. Provision of the information from YeGRYuL/YeGRIP using the Internet-based service shall be in the form of an extract on a legal entity/individual entrepreneur being the applicant (on himself/herself) as an electronic document.

104. The Internet-based service shall be accessed if an individual entrepreneur or a person entitled to act on behalf of a legal entity without a power of attorney has a valid electronic signature verification key certificate (ESVKC) (CryptoPro certificate) issued by the certification centers accredited by the Ministry of Communications and Mass Media of the Russian Federation.

105. Upon receipt of the request generated using the Internet-based service hosted on the web site of the Federal Tax Service, the software applications of the Federal Tax Service shall automatically verify the authenticity of the applicant's ESVKC and the applicant's authority in accordance with the information on a legal entity and an individual entrepreneur contained in YeGRYuL/YeGRIP.

106. If, during verification specified in paragraph 105 of this Administrative Regulation, any grounds provided for by paragraph 31 of this Administrative Regulation are found, a notice of the impossibility to render the public service specifying the reason shall be generated.

107. If, during the verification specified in paragraph 105 of this Administrative Regulation, no grounds provided for by paragraph 31 of this Administrative Regulation are found, an extract in electronic form with an electronic signature shall be generated.

108. An extract in electronic form using the Internet-based service shall be provided by providing the applicant with a link to download the extract mentioned in paragraph 107 of this Administrative Regulation.

The extract shall be provided to the applicant directly when clicking on the specified link.

109. An extract using the Internet-based service shall be provided no later than the day following the registration date of the request in the Internet-based service.

An extract in electronic form shall be available to the applicant for use during five business days upon providing the link. After expiration of the said period, an access to the generated extract at the download link provided shall be terminated.

Before expiration of the said period, the applicant may repeatedly download the generated extract using the link provided.

Issuing (Sending) Documents Resulting from Rendering the Public Service

110. The ground to initiate an administrative procedure for issue (sending) of documents resulting from rendering the public service shall be receipt of the said documents by the specialist responsible for their issue (sending).

111. In case the applicant directly contacts the tax authority or the authorized organization to obtain the documents resulting from rendering the public service, the specialist responsible for issue of the said documents shall issue the documents provided for by paragraph 17 of this Administrative Regulation.

The maximum period for performing an administrative action provided for by this paragraph shall not exceed 10 minutes.

112. The documents resulting from rendering the public service, the method of which receipt is not specified, shall be transferred to the tax authority's structural subdivision sending mail to send them to the applicant by mail.

If a request for rendering the public service is submitted by the applicant to the tax authority through a multifunctional center, the documents resulting from rendering the public service shall be sent to the multifunctional center.

If the Request for provision of the information contained in the Unified State Register of Legal Entities and/or the Unified State Register of Individual Entrepreneurs using the Internet submitted to

the authorized organization specifies the "via e-mail" receipt method, the documents resulting from rendering the public service shall be sent to the applicant at the e-mail address specified in the named request (an archive file containing a scanned image of the specified notice and attributes of an access to the information from YeGRYuL/YeGRIP using the Internet-based technologies shall be attached).

113. Upon receipt by the authorized organization of a request for rendering the public service using the Internet-based service, the documents resulting from rendering the public service shall be provided to the applicant in the said Internet-based service as an electronic document.

114. No maximum period for performing administrative actions provided for by this subsection of the Administrative Regulation, except for the administrative action to be performed in accordance with paragraph 111 of this Administrative Regulation, shall be set forth, but it shall be limited by the requirements for the period set forth for rendering the public service.

IV. Forms of Control over Compliance with This Administrative Regulation

Procedure for Exercising Routine Control over Compliance with and Performance of Provisions of This Administrative Regulation and Any Other Regulatory Legal Acts Setting Forth Requirements for Rendering Public Service and for Taking Decisions by Responsible Officials

115. The routine control over compliance with and performance of the provisions of this Administrative Regulation and any other regulatory legal acts setting forth the requirements for rendering the public service and for taking decisions by the responsible officials (hereinafter referred to as the "routine control") shall be exercised by the officials of the tax authority or the authorized organization responsible for works in rendering the public service through a check.

The frequency of routine controls shall be set forth by the head of the tax authority or the authorized organization.

116. The list of officials exercising routine control shall be set forth by the internal administrative documents (orders, directives) of the tax authority or the authorized organization.

Procedure for and Frequency of Scheduled and Unscheduled Checks of Completeness and Quality of Rendering Public Service, including Procedure for and Forms of Control over Completeness and Quality of Rendering Public Service

117. The control over completeness and quality of rendering the public service shall be exercised by the Federal Tax Service in the form of scheduled and unscheduled checks of the tax authorities or the authorized organization responsible for rendering the public service.

The checks shall be conducted in order to find and remove infringements of the applicants' rights and legitimate interests, consider complaints from applicants against decisions or actions (omissions) of the officials of the tax authorities or the authorized organization responsible for rendering the public service, take decisions on, and prepare responses to, such complaints.

118. Scheduled checks shall be conducted based on semi-annual or annual action plans of the Federal Tax Service or the Federal Tax Service Departments.

119. Unscheduled checks shall be conducted based on orders or directives of the Federal Tax Service or the Federal Tax Service Departments.

120. When conducting checks, all issues related to rendering the public service (integrated checks) or any individual issues related to rendering the public service (subject checks) may be considered.

Responsibility of Officials of Tax Authorities or Authorized Organization for Decisions and Actions (Omissions) Taken (Performed) by Them during Rendering Public Service

121. Based on the results of the checks conducted, if any unlawful decisions, actions (omissions) of the officials of the tax authorities or the authorized organization responsible for rendering the public service or actual infringements of the applicants' rights and legitimate interests are found, the guilty officials shall be held responsible in accordance with the legislation of the Russian Federation.

122. Personal responsibility of the officials of the tax authorities or the authorized organization shall be envisaged in their job descriptions in accordance with the legislation of the Russian Federation.

Requirements for Procedure for and Forms of Control over Rendering Public Service, including by Citizens, Their Associations and Organizations

123. Control over rendering the public service, including by the citizens, their associations and organizations, shall be ensured through transparency of the activities of the tax authorities or the authorized organization in rendering the public service, receipt by the citizens, their associations and organizations of complete and reliable information on the procedure for rendering the public service, a possibility to appeal against the decisions or actions (omissions) of the tax authorities or the authorized organization responsible for rendering the public service and their officials under a prejudicial (extrajudicial) procedure.

V. Prejudicial (Extrajudicial) Procedure for Appealing against Decisions and Actions (Omissions) of Tax Authority Rendering Public Service and Its Officials

Information for Applicant on His/Her/Its Right to File Complaint against Decision and/or Action (Omission) of Tax Authority, Authorized Organization, and/or Its Officials in Rendering Public Service

124. The decisions and/or actions (omissions) of the tax authorities and/or their officials in rendering the public service may be appealed against, the relevant complaints shall be considered, and the decision thereon shall be taken according to the procedure set forth by Chapter 2.1 of Federal Law dated July 27, 2010 No. 210-FZ.

Basis of a Complaint

125. The basis of the complaint may be decisions and actions (omissions) of the tax authorities and their officials (specialists) taken (performed) by them in rendering the public service in accordance with this Administrative Regulation (hereinafter referred to as the "complaint"), which, in the applicant's opinion, infringe his/her/its rights and legitimate interests.

The applicant may file a complaint, in particular, in the following cases:

1) Delay in registration of the request for rendering the public service submitted to the tax authority or the authorized organization;

2) Delay in rendering the public service;

3) Request from the applicant for the documents not provided for by the regulatory legal acts of the Russian Federation for rendering the public service;

4) Refusal to accept the documents provided for by the regulatory legal acts of the Russian Federation for rendering the public service, from the applicant;

5) Refusal to render the public service, unless the grounds for refusal are provided for by the federal laws and any other regulatory legal acts of the Russian Federation adopted in accordance therewith;

6) Request for payment, not provided for by the regulatory legal acts of the Russian Federation in rendering the public service, to be made by the applicant;

7) Refusal of the tax authority rendering the public service or its officials to correct typos or errors made in the documents issued as a result of rendering the public service or delay in the period set for such corrections.

### Public Authorities and Officials Authorized for Complaint Consideration, to Whom Complaint May Be Sent

126. A complaint about the actions (omissions) of a specialist of the tax authority shall be filed to the tax authority rendering the public service.

A complaint about the decisions taken by an official of the tax authority rendering the public service and his/her actions (omissions) shall be filed to a higher tax authority.

### Complaint Filing and Consideration Procedure

127. The ground to initiate prejudicial (extrajudicial) appeal procedure shall be receipt by the tax authority specified in paragraph 126 of this Administrative Regulation of the complaint in writing in hard copy or in electronic form from the applicant.

The complaint may be sent by mail, using the official web sites of the Federal Tax Service, the Federal Tax Service Departments, the Unified Portal of Public and Municipal Services (Functions), or may be accepted through personal appointment of the applicant.

The complaint shall specify:

1) Name of the tax authority rendering the public service, name, patronymic (if any), and surname of the official, whose decisions and actions (omissions) are appealed against;

2) Name, patronymic (if any), and surname, information on the place of residence of the applicant being an individual or name, information on the location of the applicant being a legal entity, number(s) of contact telephone, e-mail address(es) (if any) and postal address, to which response shall be sent to the applicant;

3) Information on the appealed decisions and actions (omissions) of the tax authority rendering the public service or its official;

4) Arguments, on which basis the applicant disagrees with the decision and action (omission) of the tax authority rendering the public service or its official. The applicant may provide the documents (if any) confirming the applicant's arguments or their copies.

### Time Limits for Complaint Consideration

128. The complaint received by the authority specified in paragraph 126 of this Administrative Regulation shall be considered by the official empowered to consider complaints within fifteen business days from the date of its registration or, in case of appeal against the refusal of the tax authority or the authorized organization rendering the public service (or its official) to accept the documents from the applicant or to correct typos and errors or in case of appeal against the delay of the period set for such corrections, within five business days from the date of its registration.

### List of Reasons for Suspension of the Complaint Consideration

129. There are no reasons for suspension of the complaint consideration.

### Complaint Consideration Result

130. Based on the complaint consideration results, the authority specified in paragraph 126 of this Administrative Regulation shall take one of the following decisions:

1) To uphold the complaint, including in the form of reversal of the decision taken, correction of the typos and errors made by the tax authority or the authorized organization rendering the public service in the documents issued as a result of rendering the public service, refund of funds to the applicant, which are not to be charged as provided for by the regulatory legal acts of the Russian Federation, or in any other forms;

2) To dismiss the complaint.

Procedure for Informing Applicant of Complaint Consideration Results

131. Based on the complaint consideration results, the tax authority specified in paragraph 126 of this Administrative Regulation shall, no later than the day following the date of the decision specified in paragraph 130 of this Administrative Regulation, send to the applicant a reasoned response in writing and, at the applicant's option, in electronic form on the complaint consideration results.

Procedure for Appeal against Decision on Complaint

132. The decision on the complaint may be appealed against through a court.

Applicant's Right to Obtain Information and Documents Required for Complaint Grounding and Consideration

133. When considering the complaint, the applicant may file a request for the information and documents required for the complaint grounding and consideration, including in electronic form.

Methods for Informing Applicants of Complaint Filing and Consideration Procedure

134. The applicants shall be informed of the complaint filing and consideration procedure in accordance with paragraph 12 of this Administrative Regulation.

24

Appendix No. 1

to the Administrative Regulation for Rendering by the Federal Tax Service of Public Service for Provision of Information and Documents Contained in the Unified State Register of Legal Entities and the Unified State Register of Individual Entrepreneurs (Approved by Order of the Ministry of Finance of the Russian Federation dated January 15, 2015 No. 5n

REQUEST

for Provision of Information Contained in the Unified State Registry of Legal Entities (YeGRYuL) and (or) Unified State Registry of Individual Entrepreneurs (YeGRIP) through the Internet

name of a legal entity/name, patronymic, and surname of an individual

OGRN[1] _____     INN/KPP[1] _____

Identity document[2] _____

(document type)

series _____   number _____

issued by and on _____

requests to provide the information contained in (*tick appropriate box with V*):

☐ - Unified State Register of Legal Entities;

☐ - Unified State Register of Individual Entrepreneurs

as (*tick appropriate box with V*):

☐ - One-time provision of the information in full;

☐ - One-time provision of the updated information. Specify the date of the previously sent Request for provision of the information in full _____ ;

☐ - Annual subscriber maintenance of one work station.

The payment is made by payment document dated _____ No. _____

_____ No. _____

Please send the response:

☐ - By mail (registered mail)

☐ - Via e-mail without using the information protection tools

---

[1]To be filled in if the person receiving the information is a legal entity.
[2]To be filled in if the person receiving the information is an individual.

25

☐ - Via e-mail using archiving with a password
Passwo
rd: _____ (Latin letters and figures only)

☐ - Via e-mail using the certified information encryption tools

at _____

contact telephone: _____
area code, telephone number

_____     _____     _____
title of the person who has signed          name, patronymic, and surname of the          signature
the application                                    person who has signed the application
                                                            L.S.
_____
filling-in date

26

Appendix No. 2
to the Administrative Regulation for Rendering
by the Federal Tax Service of Public Service for
Provision of Information and Documents
Contained in the Unified State Register of Legal
Entities and the Unified State Register of
Individual Entrepreneurs (Approved by Order of
the Ministry of Finance of the Russian
Federation dated January 15, 2015 No. 5n

EXTRACT
from the Unified State Register of Legal Entities

_____                    No. _____

\_
   Date of the extract generation

This extract contains information about the following legal entity

_____

—
                                 full name of the legal entity

OGRN   | | | | | | | | | | | | |  ,

included    in    the    Unified    State    Register    of    Legal    Entities    as    at
_____  _____ 20\_\_\_\_\_:
  day       month in words            year

| No. | Item name | Item value |
|-----|-----------|------------|
|     |           |            |
|     |           |            |
|     |           |            |

The                 extract                 is                 generated                 by
_____
full name of the tax authority / organization subordinate to the Federal Tax
Service and authorized to provide information from the YeGRYuL

Position       of       the       responsible       official       _____
_____
                signature       surname and initials

27

L.S.

Extract from the Unified State Register of Legal Entities (YeGRYuL)      OGRN
XXXXXXXXXXXXX        page Y of N
DD.MM.YYYY HH:NN

28

Appendix No. 3
to the Administrative Regulation for Rendering
by the Federal Tax Service of Public Service for
Provision of Information and Documents
Contained in the Unified State Register of Legal
Entities and the Unified State Register of
Individual Entrepreneurs (Approved by Order of
the Ministry of Finance of the Russian
Federation dated January 15, 2015 No. 5n

EXTRACT
from the Unified State Register of Individual Entrepreneurs

_____ No. _____
   Date of the extract generation

    This extract contains information about individual entrepreneur/peasant (farm) enterprise, the head of which is *(specify as appropriate)*

_____
—
                     surname, first name and patronymic (if any)

              OGRNIP     | | | | | | | | | | | | | | | ,

included in the Unified State Register of Individual Entrepreneurs as at
_____ _____ 20\_\_\_\_\_
day       month in words       year

| No. | Item name | Item value |
|-----|-----------|------------|
|     |           |            |
|     |           |            |
|     |           |            |
|     |           |            |

The              extract           is             generated           by
_____
                full name of the tax authority / organization subordinate to the Federal Tax
                Service and authorized to provide information from the YeGRIP

Position       of       the       responsible       official       _____
_____
                signature                 surname and initials

L.S.

29

Extract from the Unified State Register of Individual Entrepreneurs (YeGRIP)    OGRNIP
XXXXXXXXXXXXXXX    page Y of N
DD.MM.YYYY HH:NN

30

Appendix No. 4
to the Administrative Regulation for Rendering
by the Federal Tax Service of Public Service for
Provision of Information and Documents
Contained in the Unified State Register of Legal
Entities and the Unified State Register of
Individual Entrepreneurs (Approved by Order of
the Ministry of Finance of the Russian
Federation dated January 15, 2015 No. 5n

LETTERHEAD
of the Taxation Authority

_____

__

**(postal code, address, telephone)**

N

_____   _____

To ref. No.   _____

CERTIFICATE
of Correspondence (Non-Correspondence) of the Information, Set Forth in the Request, on Personal
Data of an Individual with the Information Contained in the Unified State Register of Legal Entities

_____

No. _____

date

This is to inform that the information contained in the Unified State Register of Legal Entities
on personal data of

_____

__

surname, first name and patronymic (if any)

corresponds/does not correspond to the information stated in the request
*(specify as appropriate)*

_____

__

surname, first name and patronymic (if any) of the applicant

This              certificate              is              prepared              by

_____

full name of the tax authority

Position         of         the         responsible         official

_____

signature                    surname and initials

32

Appendix No. 5
to the Administrative Regulation for Rendering by the Federal Tax Service of Public Service for Provision of Information and Documents Contained in the Unified State Register of Legal Entities and the Unified State Register of Individual Entrepreneurs (Approved by Order of the Ministry of Finance of the Russian Federation dated January 15, 2015 No. 5n

LETTERHEAD
of the Taxation Authority

_____

**(postal code, address, telephone)**

_____ N _____

To ref. No.    _____

CERTIFICATE
of Correspondence (Non-Correspondence) of the Information, Set Forth in the Request, on Personal Data of an Individual with the Information Contained in the Unified State Register of Individual Entrepreneurs

_____
No. _____
date

This is to inform that the information contained in the Unified State Register of Individual Entrepreneurs on personal data of

_____

surname, first name and patronymic (if any)

OGRNIP  [ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ] ,

<u>corresponds/does not correspond</u> to the information stated in the request
*(specify as appropriate)*

_____

surname, first name and patronymic (if any) of the applicant

This           certificate           is           prepared           by
_____
full name of the tax authority

| Position | of | the | responsible | official |
|---|---|---|---|---|
| | | signature | | surname and initials |

34

Appendix No. 6
to the Administrative Regulation for Rendering by the Federal Tax Service of Public Service for Provision of Information and Documents Contained in the Unified State Register of Legal Entities and the Unified State Register of Individual Entrepreneurs (Approved by Order of the Ministry of Finance of the Russian Federation dated January 15, 2015 No. 5n

EXTRACT

from the Unified State Register of Individual Entrepreneurs on the Place of Residence of an Individual Entrepreneur (Head of a Peasant (Farm) Enterprise)

_____                           No. _____
Date of the extract generation

     This extract contains information about individual entrepreneur/peasant (farm) enterprise, the head of which is *(specify as appropriate)*

_____
__

surname, first name and patronymic (if any)

OGRNIP     ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐ ,

included in the Unified State Register of Individual Entrepreneurs:

| No. | Item name | Item value |
|-----|-----------|-----------|
|  | Postal code |  |
|  | Constituent entity of the Russian Federation |  |
|  | District |  |
|  | City |  |
|  | Settlement |  |
|  | Street (avenue, lane, etc.) |  |
|  | House (estate) No. |  |
|  | Building (block) |  |
|  | Apartment No. |  |

The      extract      is      generated      by
_____
full name of the tax authority

| Position | of | the | responsible | official | _____ |
|----------|----|----|----|----|----|
| _____ | | | signature | surname and initials | |

L.S.

Appendix No. 7
to the Administrative Regulation for Rendering by the Federal Tax Service of Public Service for Provision of Information and Documents Contained in the Unified State Register of Legal Entities and the Unified State Register of Individual Entrepreneurs (Approved by Order of the Ministry of Finance of the Russian Federation dated January 15, 2015 No. 5n

LETTERHEAD
of the Taxation Authority

_____

__
**(postal code, address, telephone)**
N
_____ . _____

To ref. No.        _____

INFORMATION
on the Persons Who Have Obtained the Information from the Unified State Register of Individual Entrepreneurs on the Place of Residence of an Individual Entrepreneur (Head of a Peasant (Farm) Enterprise)

_____                        No.
_____
date

This is to inform that the information contained in the Unified State Register of Individual Entrepreneurs on the place of residence of an individual entrepreneur/head of a peasant (farm) enterprise (*specify as appropriate*)

_____
__
surname, first name and patronymic (if any)

OGRNIP    | | | | | | | | | | | | | | | ,

was provided to the following persons:

| No. | Name, patronymic (if any), and surname of the person who has obtained the information | Information provision date |
|-----|-----|-----|
|  |  |  |
|  |  |  |
|  |  |  |

Information is provided by _____
full name of the tax authority

Position          of          the          responsible          official
_____
signature                            surname and initials

Appendix No. 8
to the Administrative Regulation for Rendering
by the Federal Tax Service of Public Service for
Provision of Information and Documents
Contained in the Unified State Register of Legal
Entities and the Unified State Register of
Individual Entrepreneurs (Approved by Order of
the Ministry of Finance of the Russian
Federation dated January 15, 2015 No. 5n

**Flowchart**
**of Sequence of the Administrative Procedures in Rendering by the Federal Tax Service of**
**Public Service for Provision of Information and Documents Contained in the Unified State**
**Register of Legal Entities and the Unified State Register of Individual Entrepreneurs**



39

**Exhibit 2** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

TRANSLATION FROM RUSSIAN

CRIMINAL CODE OF THE RUSSIAN FEDERATION

**Article 33. Types of Accomplices of a Crime**

1. Organizer, instigator and accessary shall be deemed accomplices in addition to the perpetrator.

2. A person who has actually committed a crime or who directly participated in its commission together with other persons (co-perpetrators), as well as a person who has committed a crime by using other persons who are not subject to criminal liability by reason of age, incapacity or other circumstances provided for by this Code, shall be deemed to be a perpetrator.

3. A person who has organized the commission of a crime or has directed its commission, as well as a person who has created an organized group or a criminal community (criminal organization) or has guided them, shall be deemed an organizer.

4. A person who has abetted another person in committing a crime by persuasion, bribery, threat or by any other method shall be deemed an instigator.

5. A person who has assisted in the commission of a crime by advice, instructions, by providing information, means and tools, or removal of obstacles to it, as well as a person who has promised beforehand to conceal the criminal, means and tools of commission of the crime, traces of the crime, or objects obtained criminally, as well as a person who has promised beforehand to acquire or sell such objects, shall be deemed to be an accessary.

**Article 34. Liability of Accomplices in a Crime**

1. The liability of accomplices in a crime shall be determined by the nature and degree of the actual participation of each of them in the commission of the crime.

2. Co-perpetrators shall be liable under an article of the Special Part of this Code for a crime committed by them jointly, without reference to Article 33 of this Code.

3. The criminal liability of an organizer, instigator or accessary shall ensue under the Article that provides for punishment for the crime committed, with reference to Article 33 of this Code, except for cases when they simultaneously were co-perpetrators of the crime.

4. A person who is not a participant in a crime specially indicated in the respective article of the Special Part of this Code and who has taken part in the commission of the crime, stipulated by this article, shall bear criminal liability for the such crime as its organizer, instigator or accessary.

5. If the perpetrator of a crime fails to carry out this crime due to circumstances beyond their control, then the other co-perpetrators shall bear criminal liability for preparation for the crime or attempted crime. A person who has not managed to abet other persons to commit a crime due to circumstances beyond their control shall also bear criminal liability for preparation for the crime.

**Article 35. Commission of a Crime by a Group of Persons, by a Group of Persons by Previous Concert, and by an Organized Group of a Criminal Community (Criminal Organization)**

1. A crime shall be deemed committed by a group of persons if two or more perpetrators have jointly participated in its commission without previous concert.

2. A crime shall be deemed committed by a group of persons by previous concert if the persons took part in it after they reached an agreement on the joint commission of a crime.

3. A crime shall be deemed committed by an organized group if it was committed by a sustainable group of persons who in advance united for the commission of one or more crimes.

4. A crime shall be deemed committed by a criminal community (criminal organization), if it has been perpetrated by a structured organized group or by an association of organized groups under a consolidated guidance, whose members have united for the purpose of jointly committing one or several grave and especially grave crimes aimed at deriving direct or indirect financial or other material benefits.

5. A person who has created an organized group or a criminal community (criminal organization) or has managed them shall be subject to criminal liability for their organization in cases provided for by Articles 205$^4$, 208, 209, 210 and 282$^1$ of this Code, as well as for all the crimes committed by the organized group or the criminal community (criminal organization), if they have been suited to their intent. Other participants in the organized group or criminal community (criminal organization) shall bear criminal liability for their participation in cases provided for by Articles 205$^4$, 208, 209, 210 and 282$^1$ of this Code, and also for the crimes in the preparation and commission of which they have taken part.

6. Creation of an organized group in cases which are not provided for by articles of the Special Part of this Code shall involve criminal liability for preparation for those crimes for which it was set up.

7. The commission of a crime by a group of persons, a group of persons by previous concert, by an organized group, or a criminal community (criminal organization) shall entail strict punishment on the ground and within the limits provided for by this Code.


**Article 137. Invasion of Personal Privacy**

1. Unlawful collection or distribution of information about the private life of a person which constitutes their personal or family secret, without their consent, or distribution of such information in a public speech, in a publicly performed work, or in the mass media,

shall be punishable with a fine in the amount of up to two hundred thousand rubles, or in the amount of a wage/salary or other income of the convicted person for a period of up to eighteen months, or by obligatory labor for a term of up to three hundred sixty hours, or by corrective labor for a term of up to one year, or by compulsory labor for a term of up to two years accompanied by deprivation of the right to hold certain offices or be engaged in certain activities for a term of up to three years or without such, or by an arrest for a term of up to four months, or by incarceration for a term of up to two years accompanied by deprivation of the right to hold certain offices or be engaged in certain activities for a term of up to three years.

2. The same actions committed by a person through the use of their official position,

shall be punishable with a fine in the amount of from one hundred thousand to three hundred thousand rubles, or in the amount of the wage/salary or any other income of the convicted person for a period of from one to two years, or by deprivation of the right to hold certain offices or to be engaged in certain activities for a term of from two to five years, or by compulsory labor for a term of up to four years accompanied by deprivation of the right to hold certain offices or to be engaged in certain activities for a term of up to five years or without such, or by arrest for a term of up to six months, or by incarceration for a term of up to four years accompanied by deprivation of the right to hold certain offices or to be engaged in certain activities for a term up to five years.

3. Unlawful distribution in a public speech, a publicly performed work, in the mass media or in the information and telecommunication networks of information indicating the identity of a minor victim in a criminal case under the age of sixteen, or information containing a description of his physical or mental suffering in connection with such crime, resulting in harm to the health of the minor, or mental disorder of the minor, or other severe consequences

shall be punishable with a fine in the amount of from one hundred fifty thousand to three hundred fifty thousand rubles, or in the amount of the wage/salary or any other income of the

convicted person for a period from eighteen months to three years, or by deprivation of the right to hold certain offices or to be engaged in certain activities for a term from three to five years, or by compulsory labor for a term of up to five years accompanied by deprivation of the right to hold certain offices or to be engaged in certain activities for a term of up to six years or without such, or by arrest for a term of up to six months, or by incarceration for a term of up to five years accompanied by deprivation of the right to hold certain offices or to be engaged in certain activities for a term up to six years.

**Article 183. Illegal Receipt and Disclosure of Information Classified as a Commercial, Tax or Banking Secret**

1. Gathering of information classified as a commercial, tax or banking secret, by means of stealing documents, bribery and threats as well as in other illegal ways

shall be punishable with a fine in the amount of up to five hundred thousand rubles or in the amount of salary or any other income of the convicted person for a period of up to six months, or by corrective labor for a term of up to one year, or by compulsory labor for a term of up to two years, or by incarceration for the same term.

2. Illegal disclosure or use of information classified as a commercial, tax or banking secret, without the consent of the owner thereof by a person to whom it is entrusted or became known in the course of service or work

shall be punishable with a fine in the amount of up to one million rubles or in the amount of a wage/salary or any other income of the convicted person for a period of up to two years with deprivation of the right to occupy certain offices or be engaged in certain activities for a term of up to three years, or by corrective labor for a term of up to two years, or by compulsory labor for a term of up to three years, or by incarceration for the same term.

3. The same actions that have caused major damage or which have been committed because of vested interest

shall be punishable with a fine in an amount of up to one million five hundred thousand rubles or in the amount of a wage/salary or any other income of the convicted person for a period of up to three years with deprivation of the right to occupy certain offices or be engaged in certain activities for a term of up to three years, or with compulsory labor for a term of up to five years, or with incarceration for the same term.

4. The actions specified in Parts 2 or 3 of this Article which have entailed severe consequences

shall be punishable by compulsory labor for a term of up to five years or by incarceration for a term of up to seven years.

**Article 272. Illegal Access to Computer Information**

1. Illegal access to legally protected computer information, if such action has entailed the destruction, blocking, modification or copying of computer information,

shall be punishable with a fine in the amount of up to two hundred thousand rubles, or in the amount of a wage/salary or any other income of the convicted person for a period of up to eighteen months, or with corrective labor for a term of up to one year, or with restriction of liberty for a term of up to two years, or with compulsory labor for a term of up to two years, or with incarceration for the same term.

2. The same action that has caused major damage or has been committed because of vested interest

shall be punishable with a fine in the amount of from one hundred thousand to three hundred thousand rubles, or in the amount of a wage/salary or any other income of the

convicted person for a period from one year to two years, or with corrective labor for a term from one year to two years, or with restriction of liberty for a term of up to four years, or with compulsory labor for a term of up to four years, or with incarceration for the same term

3. The actions provided for by Parts One or Two of this Article which are committed by a group of persons by previous concert or by an organized group, or by a person through their official position

shall be punishable with a fine in the amount of up to five hundred thousand rubles, or in the amount of a wage/salary or any other income of the convicted person for a period of up to three years with deprivation of the right to hold certain offices or to be engaged in certain activities for a term of up to three years, or with restriction of liberty for a term of up to four years, or with compulsory labor for a term of up to five years, or with incarceration for the same term.

4. The actions provided for by Parts One, Two or Three of this Article, if they have entailed severe consequences or created a threat of their occurrence

shall be punishable by incarceration for a term of up to seven years.

Notes. 1. Computer information shall mean information (messages, data) presented in the form of electric signals, regardless of the facilities used for their storage, processing and transmittance.

2. Major damage in the Articles of this Chapter shall be deemed one whose amount exceeds one million rubles.


**Article 274. Violation of Rules for Operation of Facilities for Computer Information Storage, Processing and Transmittance and of Information and Telecommunication Networks**

1. Violation of the rules for operation of facilities for computer information storage, processing and transmittance or of information and telecommunication systems and of terminal equipment, as well as of the rules for access to information and telecommunication networks, that entails the destruction, blocking, modification or copying of computer information accompanied by causing major damage

shall be punishable with a fine in the amount of up to five hundred thousand rubles or in the amount of a wage/salary or other income of the convicted person for a period of up to eighteen months, or by corrective labor for a term of from six months to one year, or by restriction of liberty for a term of up to two years, or by compulsory labor for a term of up to two years, or by incarceration for the same term.

2. The action provided for by Part One of this Article, if it entails severe consequences or a threat of their occurrence

shall be punishable by compulsory labor for a term of up to five years, or by incarceration for the same term.


**Article 275. State Treason**

State treason, that is espionage, disclosure of information constituting a state secret entrusted to a person or made known to them through service, work, study or in other cases stipulated by the legislation of the Russian Federation to a foreign state, international or foreign organization or their representatives, or financial, material, technical, consulting or any other assistance rendered to a foreign state, international or foreign organization, or their representatives in hostile activities aimed against the security of the Russian Federation, shall be punishable by incarceration for a term of from twelve to twenty years with or without a fine in the amount of up to five hundred thousand rubles or in the amount of the wage/salary, or

other income of the convicted person for a period of up to three years and with restriction of liberty for a term of up to two years.

Note: A person who has committed crimes stipulated in this Article, or by Articles 276 or 278 of this Code, shall be relieved from criminal liability if they have facilitated the prevention of further damage to the interests of the Russian Federation by informing the government authorities voluntarily and in due time, or in any other way, if their actions contain no other corpus delicti.

**Exhibit 3** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

**TRANSLATION FROM RUSSIAN**

**A Russian sentenced to 15 years in a maximum security penal colony for state treason**
Update 02:19 am →
Supreme Court will check legality of sentence of Russian citizen in state treason case

Moscow. November 28. INTERFAX.RU – Moscow city court sentenced Russian citizen Valery Selyanin, charged with state treason, to 15 years in a penal colony a source familiar with the situation informed Interfax.

"Selyanin is convicted of state treason; he will serve his sentence in a maximum security penal colony," the agency's interlocutor says.

According to information at his disposal, the "top secret" verdict was announced back in the summer of 2015.

The source says that along with the Russian citizen, two people from the Middle East were convicted of instigating state treason. There is information that they are from Iran.

"Hashemi Dolabi Hamid and Ghased Nedjad Benhaz were convicted under Part 4 Article 33, Article 275 of the Russian Criminal Code and sentenced to 13 years in a maximum security [colony] and 12 years in a general security [colony], respectively," the source said.

Head of the press service of the Moscow city court Ulyana Solopova confirmed to Interfax that this verdict had been announced. At the same time, the press service of the Supreme Court of the Russian Federation informed Interfax that this verdict was appealed, and that the appeal case was filed with the instance on November 25.

Information about the existence of this case came out in March of 2015. At that time, the Moscow city court denied a complaint of the suspect's defense regarding the extension of his arrest to 20 months. Two other suspects in the criminal case according to the materials published at the time, are foreign citizens who "speak a rare Eastern language the translation of which is made difficult, since there are few specialists."

Valery Selyanin, born in Soumy Region in Ukraine, who holds a degree in engineering, was accused of giving consultations or other assistance to foreigners, aimed against the security of the Russian Federation. Selyanin does not admit his guilt. "The investigation from the outset had a complete picture of my innocence. I have not been accused of anything; all the expert examinations confirmed my full innocence. There is no need for me to hide," he said in court on March 24.

According to the known case materials, it was initiated on August 29, 2013 in respect to Selyanin and unknown persons, and on December 3, he was provided the final indictment.

Valery Selyanin

**Exhibit 4** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

TRANSLATION FROM RUSSIAN

**"He had a bit too much to drink and was showing off before the Latvians." Father of woman accused of state treason tells how she "revealed an FSB agent"**

6:53 pm, July 12, 2019
Source: Novy Kaliningrad
Reliable source

Father of Kaliningrad resident Antonina Zimina who was arrested for state treason in 2018 gave an interview to Novy Kaliningrad on the possible reasons for her criminal prosecution.

According to Konstantin Zimin, after her arrest, the daughter told him that she "disclosed an FSB agent to the Latvians" by transferring his image "through a computer."

In Zimin's opinion, they're talking about an old friend of his daughter who was a guest at her wedding in 2015. "He had a bit too much to drink then and was showing off before the Latvians that he was an FSB agent," the man says.

"According to the investigation, roughly speaking, the Latvians asked her whether it's true that her friend from the wedding is an FSB agent, and she answered 'yes,'" the Novy Kaliningrad quotes him. Zimin says that in his daughter's opinion, this FSB agent reported her himself.

- Antonina Zimina after the arrest said that the only evidence in her case file are some photos from her wedding. Zimina's defense says that it wasn't a secret for anyone that one of the guests works at the FSB.

- In the summer of 2019, Antonina Zimina's husband Konstantin Antonets was arrested in a state treason case. No details about his case are available at this point.

Original Text Available at https://meduza.io/news/2019/07/12/on-podpil-horoshenko-i-pered-latyshami-vypendrivalsya-otets-obvinyaemoy-v-gosizmene-rasskazal-kak-ona-raskryla-sotrudnika-fsb-po-versii-sledstviya

**Exhibit 5** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

TRANSLATION FROM RUSSIAN

**Federal Constitutional Law "On the judicial system of the Russian Federation" No.1-FKZ**

dated December 31, 1996 (as amended on October 30, 2018)
[excerpt]

### Article 6. Binding Nature of Court Resolutions

1. Resolutions of federal courts, magistrate judges and courts of constituent entities of the Russian Federation, which entered into force, as well as their legitimate orders, requirements, instructions, summons and other appeals shall be binding on any and all public authorities, local authorities, public associations, officials and other individuals and legal entities and shall be strictly complied with throughout the entire territory of the Russian Federation.

2. Non-compliance with a court resolution as well as any other contempt of a court entail liability stipulated by the federal law.

3. The binding nature of orders of the courts of foreign states, international courts and tribunals shall be determined pursuant to international treaties of the Russian Federation.

**Exhibit 6** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

CRIMINAL PROCEDURAL CODE OF THE RUSSIAN FEDERATION

**Article 457. Execution of an Inquiry on Legal Assistance in the Russian Federation**

1. The court, the public prosecutor or the investigator shall execute inquiries on the performance of procedural actions handed over to them in the prescribed manner, which have been received from the relevant competent bodies and officers of foreign states in accordance with the international treaties of the Russian Federation and the international agreements, or on the basis of the principle of reciprocity. The principle of reciprocity shall be confirmed by a written statement of the foreign state on rendering legal assistance to the Russian Federation in the performance of certain procedural actions, received by the Supreme Court of the Russian Federation, by the Investigative Committee of the Russian Federation, by the Ministry of Foreign Affairs of the Russian Federation, by the Ministry of Justice of the Russian Federation, by the Ministry of Internal Affairs of the Russian Federation, by the Federal Security Service of the Russian Federation or by the Office of the Prosecutor General of the Russian Federation. (as amended by Federal Laws No.86-FZ dd. 06/30/2003, No.58-FZ dd. 06/29/2004, No.404-FZ dd. 12/28/2010, No.329-FZ dd. 07/03/2016)

2. In execution of the inquiry the norms of this Code shall apply, but the procedural norms of the legislation of the foreign state may also be applied in accordance with the international treaties of the Russian Federation, with the international agreements or on the basis of the principle of reciprocity, unless this contradicts the legislation and the international obligations of the Russian Federation.

3. In execution of the inquiry the representatives of the foreign state may be present, if such is stipulated by the international treaties of the Russian Federation or by a written obligation on interaction based on the principle of reciprocity.

4. If the inquiry cannot be executed, the received documents shall be returned specifying the reasons which prevented it from being executed, through the body that received it or via diplomatic channels, to the competent body of the foreign state from which the inquiry was directed. The inquiry shall be returned without execution if it contradicts the legislation of the Russian Federation, or if its execution may inflict damage upon its sovereignty or security.

**Article 459. Execution of Inquiries on Criminal Prosecution or on Instituting a Criminal Case on the Territory of the Russian Federation**

1. An inquiry from the competent body of a foreign state on carrying out criminal prosecution with respect to a citizen of the Russian Federation who has committed a crime on the territory of the foreign state and has returned to the Russian Federation, shall be considered by the Office of the Prosecutor General of the Russian Federation. A preliminary inquisition and judicial proceedings shall be conducted in such cases in accordance with the procedure established by this Code.

2. If a crime is committed on the territory of a foreign state by a person who is a citizen of Russia and who has returned to the Russian Federation before criminal prosecution was instituted against them at the place of the crime, a criminal case may be instituted and investigated based on the materials supplied by the corresponding competent body of the foreign state to the Office of the Prosecutor General of the Russian Federation in accordance with this Code subject to there being grounds stipulated by Article 12 of the Criminal Code of the Russian Federation.

**Article 462. Execution of an Inquiry on Extradition of a Person from the Territory of the Russian Federation**

1. The Russian Federation, in accordance with an international treaty of the Russian Federation or on the basis of the principle of reciprocity, may extradite to a foreign state a foreign citizen or a stateless person from the territory of the Russian Federation, for criminal prosecution or for executing the sentence for acts criminally punishable pursuant to the criminal law of the Russian Federation and the laws of the foreign state which sent an inquiry for the extradition of the person.

2. The extradition of a person on the basis of the principle of reciprocity shall mean that in accordance with the assurances of the foreign state that has forwarded an inquiry for the extradition, it may be expected that in a similar situation extradition would be effected on an inquiry of the Russian Federation.

3. A person may be extradited in the following cases:

1) if criminal law provides punishment for these acts in the form of incarceration for a term of over one year, or a more severe punishment, when the person is extradited for criminal prosecution;

2) if the person with respect to whom an inquiry for extradition is directed is sentenced to incarceration for a term of no less than six months or to a harsher punishment;

3) if the foreign state which forwarded the inquiry can guarantee that the person with respect to whom an inquiry for extradition is directed will be prosecuted only for the crime indicated in the inquiry, and that after completing the judicial proceedings and serving the sentence they will be able to leave the territory of the given state without obstruction, and will not be sent away, handed over or extradited to a third state without the consent of the Russian Federation.

4. The decision on extradition of a foreign citizen or of stateless person from the territory of the Russian Federation accused of committing a crime or convicted by the court of a foreign state shall be adopted by the Prosecutor General of the Russian Federation or by his Deputy.

5. The Prosecutor General of the Russian Federation or his deputy shall notify of an adopted decision in writing the person in respect to whom it is adopted, and shall explain his right to appeal this decision in court in compliance with Article 463 of this Code.

6. A decision on extradition shall take legal effect 10 days after the person in respect of whom it is adopted is notified. In the event the decision is appealed, the extradition shall not be effected until the court decision takes legal effect.

7. If inquiries for extradition of the same person are received from several foreign states, the decision on which of these inquiries shall be satisfied shall be taken by the Prosecutor General of the Russian Federation or by his Deputy. The Prosecutor General of the Russian Federation or his Deputy shall inform about the adopted decision the person with respect to whom it is adopted, in writing within 24 hours.

**Article 473[1]. Recognition and enforcement of a verdict, foreign court order with regard to confiscation of proceeds of crime on the territory of the Russian Federation**

1. The verdict, foreign court order with regard to confiscation of the proceeds of crime on the territory of the Russian Federation shall be recognized and enforced in the Russian Federation if such is stipulated by an international treaty of the Russian Federation. In the absence of a relevant international treaty, the issue of recognition of the verdict, foreign court order can be resolved on the basis of the principle of reciprocity, confirmed by a written obligation of the foreign state and received by the Ministry of Justice of the Russian Federation in accordance with Part 1 Article 457 of this Code.

2. The basis of enforcement of the verdict, foreign court order with regard to confiscation of the proceeds of crime on the territory of the Russian Federation shall be a court order of the

Russian Federation on the recognition and enforcement of the verdict, foreign court order, issued in accordance with an international treaty of the Russian Federation or on the basis of the principle of reciprocity upon consideration of request sent in the prescribed manner to the competent authority of the foreign state and the relevant verdict, foreign court order.

3. For the purposes of this Chapter, proceeds of a crime shall mean property specified in Article 104[1] of the Criminal Code of the Russian Federation.

**Article 473[2]. Content of the request for recognition and enforcement of a verdict, foreign court order with regard to confiscation of proceeds of a crime on the territory of the Russian Federation**

1. Request of the competent authority of the foreign state for recognition and enforcement of the verdict, foreign court order with regard to confiscation of proceeds of a crime on the territory of the Russian Federation shall contain:

1) the name of the competent authority of the foreign state which sent the request;

2) the name of the criminal case and information on the foreign court which delivered the verdict or the order;

3) information on the property located on the territory of the Russian Federation and is subject to confiscation as proceeds of a crime, as well as information on the owner, holder of the property, including date and place of birth, citizenship, occupation, place of residence or location, and for legal entities – name and location;

4) request of the competent authority of the foreign state on recognition of the verdict, foreign court order with regard to confiscation of the proceeds of a crime and enforcement of the decision with regard to confiscation of the proceeds of a crime in accordance with such verdict or the order.

2. The request of the competent authority of the foreign state can specify other information, including phone numbers, fax numbers, email addresses, if they are necessary for the proper and timely consideration of the case.

3. The request of the competent authority of the foreign state shall be accompanied by documents provided for by an international treaty of the Russian Federation, and if such is not stipulated by an international treaty of the Russian Federation, the following documents shall be attached:

1) copy of the verdict, foreign court order certified by the foreign court, which provides for the confiscation of the proceeds of crime on the territory of the Russian Federation;

2) document confirming that the verdict, foreign court order entered into legal force;

3) document on execution of the verdict, foreign court order if they had been previously executed on the territory of the respective foreign state;

4) document confirming that the property subject to confiscation is located on the territory of the Russian Federation;

5) document from which it follows that the person against whom the judgment on confiscation of proceeds of a crime on the territory of the Russian Federation was made in their absence, did not participate in the proceedings, despite the fact that they were timely and duly notified of the place, date and time of the hearing of the case;

6) certified translation of the documents referred to in paragraphs 1-5 of this Part into the Russian language.

**Article 473[3]. Court considering the request on recognition and enforcement of the verdict, foreign court order with regard to confiscation of proceeds of a crime on the territory of the Russian Federation**

The request of the competent authority of the foreign state on recognition and enforcement of the verdict, foreign court order with regard to confiscation of proceeds of a crime on the

territory of the Russian Federation, addressed in the prescribed manner, shall be sent by the Ministry of Justice of the Russian Federation for the consideration to the republic court, regional court, court of the city with federal status, court of the autonomous region or court of the autonomous district at the place of residence or location in the Russian Federation of the person in respect of whose property, by the verdict, foreign court order, the decision on confiscation was made, and in the event such person has no place of residence or location in Russian Federation or their location is unknown – at the location in the Russian Federation of their property subject to confiscation.

### Article 473[4]. Procedure for considering a request for recognition and enforcement of a verdict, foreign court order with regard to confiscation of proceeds of a crime on the territory of the Russian Federation

1. A request of a competent authority of a foreign state for recognition and enforcement of a verdict, foreign court order with regard to confiscation of proceeds of a crime on the territory of the Russian Federation shall be considered by a single judge in open court with a notice about the place, date and time of request consideration to the person in respect of whose property, by the verdict, foreign court order, the decision on confiscation was made, other interested parties who own, possess, use or have disposition over the property subject to confiscation, and/or their representatives, the competent authority of the foreign state and the prosecutor.

2. Persons referred to in paragraph 1 of this Article, living or staying on the territory of the Russian Federation, shall be notified of the place, date and time of the hearing no later than 30 days prior to the day of the hearing. Notice to persons living or staying outside the Russian Federation and the competent authority of the foreign state shall be sent in the prescribed manner, according to Part 3 of Article 453 of this Code, no later than 6 months prior to the day of hearing.

3. The person in respect of whose property, by the verdict, foreign court order, the decision on confiscation was made, who is held in custody and has declared their desire to participate in the consideration of the request from the competent authority of the foreign state, shall be given by the court the right to participate in the hearing directly or via video conference, as well as the right to inform the court of their position with the help of their representative on their behalf or in writing.

4. Other interested parties who own, possess, use or have disposition over the property subject to confiscation and/or their representatives may also participate in the hearing.

5. The failure to appear in the court of persons timely notified of the place, date and time of the hearing, except persons whose participation in the hearing is recognized by the court as compulsory, shall not preclude the consideration of the request of from the competent authority of the foreign state.

6. The consideration of a request from the competent authority of a foreign country shall start with the hearing of explanations of the person, in respect of whose property, by the verdict, foreign court order, the decision on confiscation was made, the representative of the competent authority of the foreign state, interested parties, if they participate in the hearing, as well as conclusions of the prosecutor. Upon the consideration of the request, the court shall decide on recognition and enforcement of the verdict, foreign court order with regard to confiscation of the proceeds of crime on the territory of the Russian Federation, on denial to do so or recognition and partial enforcement of the verdict, foreign court order.

7. If the court has any doubts in connection with the incompleteness or absence of required information, the judge may request in the prescribed manner the competent authority of the foreign state submitting the said request, as well as other persons participating in the consideration of the request, for additional clarifications, additional information and materials.

**Article 473⁵. Grounds for refusing recognition and enforcement of a verdict, foreign court order with regard to confiscation of proceeds of a crime on the territory of the Russian Federation**

Recognition and enforcement of the verdict, foreign court order with regard to confiscation of proceeds of a crime on the territory of the Russian Federation shall not be allowed if:

1) execution of the verdict, foreign court order with regard to confiscation of the property contradicts to the Constitution of the Russian Federation, generally recognized principles and norms of international law, international treaties of the Russian Federation, the legislation of the Russian Federation;

2) execution of the verdict, foreign court order with regard to confiscation of the property may cause damage to the sovereignty or security or other essential interests of the Russian Federation;

3) the verdict, foreign court order, providing for the confiscation of the property, did not enter into legal force;

4) property subject to confiscation is located on the territory that is not under the jurisdiction of the Russian Federation;

5) the act in respect of which the verdict, foreign court order provides for the confiscation of the property was committed on the territory of the Russian Federation and/or the act is not recognized by the legislation of the Russian Federation as a crime;

6) the legislation of the Russian Federation does not provide for confiscation of property for an act similar to the act in respect of which the verdict, foreign court order decided on confiscation;

7) with regard to the person referred to in the request of the competent authority of the foreign state, a court of the Russian Federation has ruled a legally effective verdict in respect of the same act, criminal proceedings were terminated, as well as if there is an uncancelled decision on the termination of a preliminary investigation on termination of the criminal case or refusal of initiation of a criminal case;

8) the verdict, foreign court order providing for the confiscation of the property, cannot be enforced due to lapse of the statute of limitations period or other grounds stipulated by the Constitution of the Russian Federation, international treaties of the Russian Federation, the legislation of the Russian Federation;

9) the request of the competent authority of the foreign state and the accompanying verdict, foreign court order providing for confiscation of property contain no evidence that the property subject to the confiscation is the proceeds of the crime or is the income was obtained from criminal activities or was used to commit the crime;

10) in the Russian Federation, there is criminal prosecution for the same act of the person regarding whose property the request on confiscation is sent by the competent authority of the foreign state;

11) the property the confiscation of which was requested by the competent authority of the foreign state was charged by the verdict or decision of a court of the Russian Federation in criminal, civil or administrative proceedings;

12) the property specified in the verdict, foreign court order is not subject to confiscation in accordance with the legislation of the Russian Federation.

**Article 473⁶. Court decision upon the consideration of the request from a competent authority of a foreign state on recognition and enforcement of a verdict, foreign court order with regard to confiscation of proceeds of a crime on the territory of the Russian Federation**

1. If when considering the request from a competent authority of a foreign state on recognition and enforcement of a verdict, foreign court order with regard to confiscation of proceeds of a crime on the territory of the Russian Federation, the court concludes on the presence of grounds under Article 473[5] of this Code for the refusal of recognition and enforcement of the verdict, foreign court order with regard to confiscation of proceeds of a crime on the territory of the Russian Federation, it shall rule on the refusal of recognition of the verdict, foreign court order and their enforcement.

2. In all other cases, the court shall decide on recognition of the verdict, foreign court order with regard to confiscation of proceeds of a crime and their enforcement fully or partially, with the relevant order, which shall specify:

1) name of the foreign court, place and date of the verdict, foreign court order;

2) information on the last place of residence, place of work and occupation in the Russian Federation of the person convicted by the foreign court;

3) description of the crime for which the convicted person was found guilty, and the criminal law of the foreign state under which they were convicted and the decision on confiscation of the property was made;

4) article of the Criminal Code of the Russian Federation providing liability for the crime committed by the convicted person and the application of confiscation of the property;

5) information on the property located on the territory of the Russian Federation and subject to confiscation;

6) appeal procedure established by Chapters 45[1], 47[1] and 48[1] of this Code.

3. If the confiscation of a specific item included in the property subject to confiscation at the time of the court's decision on recognition of the verdict, foreign court order with regard to confiscation of the proceeds of crime and their enforcement fully or partially, is impossible due to its use, sale or other reason, the court in accordance with Article 104[2] of the Criminal Code of the Russian Federation shall determine the amount subject to confiscation that equals the value of this item, or shall determine other property the value of which corresponds to the value of the item subject to confiscation or comparable to its cost.

4. Copies of the order within 3 days from the date of the verdict shall be sent by the court to the competent authority of the foreign state, the person in respect of whose property the decision on confiscation was made by the verdict, foreign court order, the prosecutor, as well as other interested parties who own, possess, use or have disposition over the property subject to confiscation.

### Article 473[7]. Issue of the writ of execution and its enforcement

1. On the basis of the effective court decision on recognition and enforcement of the verdict, foreign court order with regard to who own, possess, use or have disposition over the property subject to confiscation of the proceeds of crime on the territory of the Russian Federation, the court shall issue a writ which shall contain the operative part of the verdict, foreign court order, as well as the operative part of the court decision on recognition of the verdict, foreign court order and their enforcement fully or partially.

2. The writ with copies of the verdict, foreign court order and the copy of the court decision on recognition and enforcement of the verdict, foreign court order shall be sent to a bailiff for execution in accordance with the legislation of the Russian Federation on enforcement proceedings.

**Exhibit 7** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

### Exemption from Criminal Responsibility for Crimes against External Security of Country

Konstantin Alekseevich Rodionov, master's degree student
Institute of State and Law of the State University of Tyumen

Exemption from criminal responsibility is leaving criminal responsibility without its implementation, i. e. artificial interruption of a criminal matter. Exemption from criminal responsibility is the government's refusal to express censure to the persons who have committed a crime. It is expressed in termination of criminal cases before a conviction. Exemption from criminal responsibility is regulated by chapter 11 of the General Part of the Criminal Code of Russia. This chapter provides for, in particular, such grounds for exemption as effective regret (Article 75 of the Criminal Code of Russia), settlement with the injured person (Article 76 of the Criminal Code of Russia), transfer of monetary compensation to the federal budget (Article 76.1 of the Criminal Code of Russia), imposition of a court fine (Article 76.2 of the Criminal Code of Russia), expiry of a period of limitation (Article 78 of the Criminal Code of Russia).

A ground for such exemption is the pointlessness of prosecution of the person who, after committing a crime, has largely ceased to pose a danger to the public or, due to the special circumstances that have caused this crime, poses a minor danger.

Since such crimes as state treason and espionage are classified as the most serious crimes, the grounds for exemption from punishment provided for by part 1 of Article 75, Articles 76, 76.1, 76.2, and 90 of the Criminal Code of Russia do not apply to them. Also, there are no known issues of amnesty acts which would exempt the persons who have committed such crimes from criminal responsibility.

At the same time, in accordance with part 2 of Article 75 of the Criminal Code of Russia, a person who has committed a crime of a different category (serious or the most serious one) is exempted from criminal responsibility in the cases specifically provided for by the relevant articles of the Special Part of the Criminal Code of Russia.

The special kinds of exemption from criminal responsibility provided for by the law are generally aimed at motivating the persons who have committed crimes to terminate the criminal activities or to take active actions aimed at prevention, removal, or neutralization of the adverse social consequences of the crimes committed, and in many cases they are associated with additional conditions for exemption. [1. P. 78]

A specific incentive provision providing for a specific ground for exemption from criminal responsibility is contained in a note to Article 275 of the Criminal Code of Russia. [2. P. 148] It determines that the person who has committed the crimes provided for by Articles 275, 276, and 278 of the Criminal Code of Russia is exempted from criminal responsibility provided that, through a voluntary and timely report to the authorities or otherwise, he or she has contributed to prevention of further damage to the interests of the Russian Federation and that his or her actions do not contain other elements of a crime.

This statutory incentive is supposed to show a person who has committed the relevant crimes a path to a release from criminal liability provided that he fulfills the conditions specified in the law.

The note to Article 275 of the Russian Criminal Code relates to a completed crime, i.e., when a voluntary renunciation of the crime is no longer possible.. This note also involves prevention of further damage to the interests of the Russian Federation, so it is necessary to be

aware that the damage has already been caused. As a condition for exemption from criminal responsibility, a combination of the following two circumstances is required:

1) Voluntary basis of the guilty person's acts;

2) Timeliness of such acts.

The legislator does not associate a voluntary report of the crime committed to the authorities with either the motives of the person's behavior or the circumstances that have preceded this behavior and influenced a decision made by the individual. Such report may be made to any state or municipal authority.

The voluntary basis of the report contemplates:

— No coercion on the individual from anyone else;

— The authorities are aware neither of the completed crime nor of the person that committed it;

— Real opportunity of a subject of the crime to continue his or her criminal activities. [2. P. 78]

A recommendation to acknowledge reports to the authorities as voluntary if the individual "…has become aware of the investigative or operative actions… or the report has been made after consulting with any official, closed one, attorney, etc." appears to be one-way. [4. P. 148] There is objectification of the conclusions on the voluntary basis of a report. For the criminal's knowledge that a criminal case is brought against him or her or counterintelligence is working on them, may result not in voluntary but in forced refusal as the conclusion of the subject of the crime that it is impossible to continue the criminal act under the current conditions. [5. P. 152] This recommendation provides grounds to present forced refusals as voluntary and to terminate the crime, which generally consists of a series of espionage acts, with impunity.

Within the meaning of the note to Article 275 of the Criminal Code of Russia, it is not expected that a voluntary report of the crime committed will necessarily have such attributes of effective regret known to the law as compensation of damage or contribution to the crime solution. These actions may take place, but their absence does not preclude any other circumstances required to apply the note under analysis.

Timeliness of the report implies that it has been made in due time, which is sufficient to enable the competent authorities to take measures to prevent the damage to the interests of Russia. Based on the text of the law, timeliness of the report does not depend on a stage in the commission of a crime, so it may appear both at the stage of attempt and after completion of the crime.

In the language and within the meaning of the law, timeliness of voluntary reports by persons means that this has contributed to prevent further damage to the Russian state. The emphasis is on "further prevention", but not on the damage already caused by the spy who has committed illegal actions.

However, may an attribute of timeliness be at all applied to the crimes aimed against the external security of the country? Any act of espionage or disclosure of the information containing a state secret causes significant damage to the country. After the first criminal act, the purpose of the crime may be considered as achieved and, therefore, the decision to suppress by the subject of anti-state activities may not be fully acknowledged as voluntary. This standpoint forms a basis for the position, pursuant to which the report made at the beginning of the criminal activities, i. e. when the interests of the Russian Federation and its external security have not suffered significant damage, is considered as timely. If voluntary surrender happens after long-time cooperation between the subject and foreign intelligence services,

when Russia has already suffered significant damage, then clause "i" of part 1 of Article 61 of the Criminal Code (i. e. a circumstance mitigating punishment), but not the note to Article 275 of the Criminal Code of Russia, becomes effective.

However, the legislator considers such reasoning as unacceptable to such elements of the crime, since it expressly indicates that a person will be exempted from criminal responsibility if he or she contributes to prevent further damage to the interests of the Russian Federation. Therefore, regardless of whether the purpose of the crime is achieved by one or several acts of espionage or state treason, the note on exemption from criminal responsibility should apply when the person who has committed it voluntarily declares his or her activities.

In this regard, the note to Article 275 of the Criminal Code of Russia compares favorably with the note to Article 64 of the Criminal Code of the Russian Soviet Federative Socialist Republic of 1960, which provided for that the recruited persons could be exempted from criminal responsibility if they have not performed any actions and have voluntarily declared their acts of state treason. [5. P. 23]

Pursuant to another standpoint, exemption from criminal responsibility due to a voluntary report of the crime committed should be allowed if the seriousness of the further damage to the country prevented by the voluntary report is greater than the damage already caused". [7. P. 22] Here the well-known attributes of the extreme necessity concept are already being introduced. At the same time, there is still the same issue: the said conditions are not reflected in the very text of the law and, therefore, the interpretation of the law is largely determined by the doctrinal position. However, the issue may be solved comprehensively only in a legal way: this is an amendment to the content of the law itself. When there is no contradiction between is and ought, then the law will effectively protect the interests of the country, the individual, and the society.

"Other" contribution to prevent damage to the interests and to Russia as an alternative basis for exemption from responsibility for state treason generally happens after reporting the crime committed. Such contribution may be expressed either in exposure of accomplices or disclosure of communication channels with foreign intelligence services or conversion of their agents, etc.

So, the issue, when the report of treason or espionage should be considered as voluntary and timely, is interpreted differently in the criminal doctrine, and therefore it needs a clear-cut solution by legislative action.

List of References:

1. Antonov, A. G. (2009). Spetsialnye osnovaniya osvobozhdeniya ot ugolovnoy otvetstvennosti za gosudarstvennuyu izmenu, shpionazh, nasilstvennyy zakhvat ili uderzhanie vlasti [Special Grounds for Exemption from Criminal Responsibility for State Treason, Espionage, Seizure or Retention of Power]. *Ugolovnoe pravo*, 3, p. 9.

2. Antonov, A. G. (2011). Gosudarstvennaya izmena i shpionazh: voprosy osvobozhdeniya ot ugolovnoy otvetstvennosti [State Treason and Espionage: Issues of Exemption from Criminal Responsibility]. *Vestnik instituta. Nauchno-prakticheskiy zhurnal Vologodskogo instituta prava i ekonomiki FSIN. Prestuplenie. Nakazanie. Ispravlenie*, 4 (16), p. 78.

3. Leontyevskiy, V. A. (2003). K voprosu i konstruirovanii primechaniy k statyam Osobennoy chasti UK RF, soderzhashchikh normy ob osvobozhdenii ot ugolovnoy

otvetstvennosti [Regarding the Issue and Formation of Notes to Articles of the Special Part of the Criminal Code of Russia Containing Provisions on Exemption from Criminal Responsibility]. *Vestnik Volgogradskogo gosudarstvennogo universiteta*, series 5: Jurisprudence, 6, p. 148.

4. Dyakov, S., Samoylenko, P. (1984). Izmeneniya i dopolneniya Zakona Ob ugolovnoy otvetstvennosti za gosudarstvennye prestupleniya ot 25 dekabrya 1958 g. [Amendments to the Law On Criminal Responsibility for Crimes against State Dated December 25, 1958]. *Sotsialisticheskaya zakonnost*, 11, p. 23.

5. Dyakov, S. V. (2012). *Prestupleniya protiv osnov konstitutsionnogo stroya i bezopasnosti gosudarstva: ugolovno-pravovoe i kriminologicheskoe issledovanie* [Crimes against Foundations of the Constitutional System and Security of the Country: Criminal, Legal, and Criminological Research]. Saint Petersburg: Press Legal Centre, 152 p.

6. Potapova, D. (2013). K voprosu o novovvedeniyakh v sostave gosudarstvennoy izmeny [Regarding the Novelties in the Elements of State Treason]. *Aktualnye problemy pravotvorchestva i pravoprimenitelnoy deyatelnosti v Rossiyskoy Federatsii*, Irkutsk, p. 148.

7. Emelyanov, V. (2002). Terroristicheskiy akt i akt terrorizma: ponyatie, sootnoshenie i razgranichenie [Terrorist Act and Act of Terrorism: Definition, Correspondence, and Differentiation]. *Zakonnost.*, 7, p. 22.

**Exhibit 8** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

**Case No. not determined**

Criminal case No. _ (date)

SENTENCE

IN THE NAME OF THE RUSSIAN FEDERATION

MM.DD.YYYY Makhachkala

Sh. Ya. Abdurakhmanov, Judge of the Leninskiy District Court of Makhachkala,

with participation of Public Prosecutor, Senior Prosecutor Assistant of Leninskiy District of Makhachkala — Full Name 16,

accused person — Full Name 1,

defense attorney — Full Name 13, who presented certificate No. _ issued by the Main Directorate of the Ministry of Justice of Russia for the Republic of Dagestan on MM.DD.YYYY and warrant of attorney No. _ dated MM.DD.YYYY,

injured persons Full Name 6 and Full Name 8,

in the presence of Secretary Full Name 5,

having considered in the open court session the files of the criminal case with regard to:

Full Name 1, born on MM.DD.YYYY at <address>, Republic of Dagestan, residing at <address>, <address>-1 Village, <address>, Russian citizen, having a higher educational institution degree, not married, temporarily unemployed, bound to military service, and not previously convicted,

being accused of the crimes provided for by part 2 of Article 183 and part 1 of Article 272 of the Criminal Code of Russia,

**found:**

Having expertise in computer equipment, software, and network technologies, Full Name 1 committed crimes under the following circumstances during the period from July 2010 to September 2010, when being on probation at <address> as a technical support specialist, whose duties included answering subscribers' calls and consulting in resolution of operating failures of clients. Deliberately, being motivated by greed, in order to illegally access a computerized information protected by law, collect and disclose the information constituting a trade secret, using his official position, having sufficient knowledge in using computer equipment, he illegally copied the information protected by law — access details/usernames and passwords of <address>'s users — to his Kingston-2GB memory stick. Subsequently, he copied all information on the users to his Asus laptop, thereby violating the trade secret of <address>.

Thus, the actions of Full Name 1 are classified under part 2 of Article 183 of the Criminal Code of Russia as illegal collection of the information constituting a trade secret without a consent of the information's owner by the person who became aware of such information in a professional capacity.

During the period from MM.DD.YYYY to MM.DD.YYYY, having expertise in computer equipment and software obtained during the training at <address>, having at his disposal Asus laptop and access to the Internet installed in the apartment at his place of residence at <address> by the Internet service provider, which, based on the agreement, was <address>, he illegally connected to the Internet and used the computerized information owned by <address> under other users' accounts; thereby, he blocked the authorized users from the access to the Internet for the said period and deprived them of the opportunity to use the Internet. By his illegal actions, he caused users: Full Name 15 /password and username <data seized>/ damage in the amount of 400 Russian rubles; Full Name 7 /password and username <data seized>/ damage in the amount of 500 Russian rubles; Full Name 14 /password and username <data seized>/ damage in the amount of 300 Russian rubles; and Full Name 8 /password and username <data seized>/ damage in the amount of 400 Russian rubles.

Thus, the actions of Full Name 1 are classified under part 1 of Article 272 of the Criminal Code of Russia as unauthorized access to the computerized information protected by law resulting in the information blocking and the disruption of the computer network

Accused person Full Name 1 interviewed in the court session did not plead guilty to the crime provided for by part 2 of Article 183 of the Criminal Code of Russia, having explained that he did not know that the information he had downloaded from the Internet to his memory stick being the database of all clients of <address> was a trade secret and he had not signed any documents for trade secret non-disclosure either. He pleaded guilty to the crime provided for by part 1 of Article 272 of the Criminal Code of Russia and testified that, from July to September XXXX, he worked as a technical support specialist at <address>, and the said company was engaged in providing the Internet connection. Working at the said company, he downloaded the database of all clients of <address> from the Internet to his memory stick. Then he uploaded the information from his memory stick to his Asus laptop. Approximately in June 2011, he began to use the usernames and passwords of the client database of <address>. Currently, he is regretful of committing the wrongful acts.

Despite the fact that Full Name 1 does not plead guilty in the criminal conduct, his guilt in the crimes provided for by part 2 of Article 183 and part 1 of Article 272 of the Criminal Code of Russia is established by the evidence obtained both at the preliminary investigation and in court.

For example, Full Name 6 interviewed as an injured person testified that, since 2004 to the present day, he had been working as a Director of <address>. The company is incorporated to perform works in providing access to the Internet in accordance with the current legislation. <address> is operated so as to make automated settlements with clients for the services provided to them, depending on the usage time. For this purpose, there is information in the Internet service provider's network on assigning a "unique name" and "password" to a user, which is a trade secret and is communicated only to the user upon entry into an agreement with him/her, in order to grant him/her a possibility to access the Internet. When third parties deal with such information, there is a computer malfunction, which results in registering of the distorted information on the user, time and duration of his/her session in the records and

statistical data of the network, and funds are debited. In addition, when using other person's name and password, a third party blocks the Internet access for an authorized user for the said period, thereby depriving him/her of the opportunity to use the Internet. The information on the users of services of <address> is a trade secret. On MM.DD.YYYY, one of the subscribers of <address>, Full Name 7, filed a complaint to this firm that the Internet could not be accessed. Pursuant to the request, he checked the connection status of <data seized> username, which was given to Full Name 7 for connecting to the Internet access server. Pursuant to the billing system's reports, it turned out that, under that account, from MM.DD.YYYY, the subscriber having computer's IP address: No. _ accessed the Internet, although subscriber Full Name 7 was assigned IP address No. _ in the database, using which he attempted to access the Internet. IP address No. _ was not given to anyone. The law breaker, i. e. Full Name 1, installed it by himself. By checking the table of correspondence of IP addresses to MAC addresses on their equipment, the physical (mac) address of the computer having used IP address No. _ was found. It was found out that the computer connected to the 15th port of the switch installed on the house at <address> accessed the network under the given mac-address. It was also found that, on MM.DD.YYYY, the subscriber having mac-address No. _ replaced his computer's IP address with No. _ again and, using then that IP address, connected to the Internet through the accounts of other users, after which they turned to K Department of the Ministry of Internal Affairs for the Republic of Dagestan requesting to take measures against the person who illegally connected to their network. As it was later found, Full Name 1, former employee of <address>, who was on probation at the company from July to September 2010 as a technical support specialist, connected to the network. He was dismissed as he did not pass the probationary period. The subscriber database is a trade secret of <address>; by his illegal actions, Full Name 1 caused a malfunction of the equipment, since the equipment of <address> is designed for a certain number of users and does not take into account the unauthorized number of users. The increased load of equipment results in overloads or errors in data transmission and, as a consequence, unreasonable delays in operation. The information is also blocked, i. e. an authorized user cannot use the Internet-based services.

Full Name 8 interviewed as an injured person testified that, in May 2010, he entered into an agreement with <address>, which is the Internet service provider, to provide him with the Internet access services for the funds deposited on his personal account. He accessed the Internet using his <data seized> username and password. Since approximately the end of June to the beginning of July 2011, he had issues when accessing the Internet. During the said period, 400 Russian rubles were debited from his personal account. However, he did not use the Internet-based services during the said period. He does not know who could use his password and username. He has no claims against the accused person and he requested the court not to impose Full Name 1 a sentence related to imprisonment.

The testimonies of injured persons Full Name 7, Full Name 14, and Full Name 15, which were given at the preliminary investigation, were announced in the court session upon the consent of the parties; these testimonies are similar to the testimony of injured person Full Name 8

Full Name 9 interviewed as a witness, during the court session, testified that, since XXXX, he had been working as a Senior Field Agent of K Department of the Bureau for Special Technical Measures of the Ministry of Internal Affairs for the Republic of Dagestan. On MM.DD.YYYY, Director of <address> Full Name 6 filed a written statement with K Department of the Bureau for Special Technical Measures of the Ministry of Internal Affairs

for the Republic of Dagestan that, using the account details of their subscribers, an unidentified person unlawfully connected to the Internet, for which his company was the Internet service provider. During the investigative operations, the employees of K Department of the Bureau for Special Technical Measures of the Ministry of Internal Affairs for the Republic of Dagestan obtained the information that citizen Full Name 1 residing at <address>, during the period from MM.DD.YYYY to MM.DD.YYYY, when at home, had an unauthorized access to the computerized information — he connected to the Internet, using usernames and passwords of the subscribers of <address>'s network. In this regard, in order to verify the information on the crime, based on the resolution of I. M. Mamaev, Deputy Chairman of the Supreme Court of the Republic of Dagestan, dated MM.DD.YYYY, the dwelling belonging to Full Name 1 and located at <address> was inspected; during the inspection at Full Name 1's, in the presence of attesting witnesses, the following computer equipment was found and seized: Asus laptop, Kingston-2GB removable data storage device, and 35 CDs. During the forensic processing, it was found that the memory of the seized Asus laptop contained the client database of <address>, which constituted a trade secret.

It follows from the statement filed by Director of <address> Full Name 6 that, using the account details of other subscribers, an unidentified person unlawfully connected to the network of <address> to access the Internet.

It follows from the statement filed by Full Name 7 addressed to the Director of <address> that, on MM.DD.YYYY, he lost an access to the Internet, although the balance of his personal account was positive. When attempting to connect to the server of <address> using his username and password, there was always error No _. He was unable to use the Internet-based services for five days.

It appears from the report of Full Name 11, Senior Field Agent of K Department of the Bureau for Special Technical Measures of the Ministry of Internal Affairs for the Republic of Dagestan, Police Major, that, during the operative activities, on MM.DD.YYYY, actual unauthorized access to the computerized information and illegal receipt of the information constituting a trade secret of <address> by citizen Full Name 1 residing at <address> were detected

REPORT of check of the connection status of <data seized> username / photo table/, from which it follows that an unidentified person using the computer connected to the 15th port of the switch installed on the house at <address> connected to the Internet using the account details of other persons.

Report of the premises inspection dated MM.DD.YYYY and the seizure report, from which it follows that, during the inspection of <address>, where accused person Full Name 1 resided, the Asus laptop connected to the Internet, Kingston- 2GB memory stick, and 35 CDs were found and seized.

Statement of inspection No. _ dated MM.DD.YYYY, from which it follows that the Microsoft Windows operating system was installed on the Asus laptop. There was a database of <data seized>, which contained a list of the services agreements entered into for connecting to the network of Internet service provider <address>

Resolution on disclosure of the results of the investigative operations dated MM.DD.YYYY

Expert's opinion under No. _ dated MM.DD.YYYY, from which it follows that the Microsoft Windows operating system was installed on the Asus laptop; Mac-address of the laptop's network card was 00-22-15-70-A7-5E.

Thus, the cumulative evidence collected on the case, fully and thoroughly checked at the court session, fully proves the guilt of Full Name 1 in the crimes provided for by part 2 of Article 183 and part 1 of Article 272 of the Criminal Code of Russia and his actions are correctly classified.

When imposing a sentence, the court takes into account the nature and degree of a danger of a crime to the public, a personality of the guilty person, including the circumstances mitigating or aggravating the sentence, and an effect of the imposed sentenced on reformation of the convicted person.

No circumstances aggravating the sentence of the guilty person were found on the case.

The court takes into account that Full Name 1 partially pleaded guilty, acknowledged his criminal conduct, got a positive letter of recommendation at the place he worked, and was not previously convicted; his first crime is minor, and injured person Full Name 8 has no claims against him.

In view of the above facts, the personality of Full Name 1 and the nature and degree of the danger of the crime to the public, the **Court concludes** that it is necessary to impose on the guilty person a sentence not related to social isolation, applying Article 46 of the Criminal Code of Russia.

Based on the foregoing and being guided by Articles 303–304 and 307–308 of the Criminal Procedure Code of Russia, the court

**sentenced**:

To convict Full Name 1 of the crimes provided for by part 2 of Article 183 and part 1 of Article 272 of the Criminal Code of Russia and impose a sentence:

- Under part 2 of Article 183 of the Criminal Code of Russia in the form of a fine in the amount of five thousand (5,000) Russian rubles;

- Under part 1 of Article 272 of the Criminal Code of Russia in the form of a fine in the amount of five thousand (5,000) Russian rubles.

To determine a fine in the amount of ten thousand (10,000) Russian rubles by adding, by virtue of Article 69 of the Criminal Code of Russia, the sentences;

To discontinue the preventive measure being recognizance not to leave and to be of good behavior upon entry of the sentence into force.

To return the physical evidence being Asus laptop, Kingston-2GB removable data storage device (memory stick), 35 CDs, black computer mouse and Asus adapter, power supply with a cord, all being stored in the files of the criminal case, to their owner Full Name 1.

The sentence may be appealed to the Supreme Court of the Republic of Dagestan under the cassation procedure within 10 days from its announcement date, subject to the requirements of Article 317 of the Criminal Procedure Code of Russia. If a cassation appeal is filed, the convicted person may petition for his involvement in consideration of the criminal case by the court of cassation.

Presiding Judge: Sh. Ya. Abdurakhmanov

[Original document](#)

**Exhibit 9** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

Decision on the criminal case

Case No. 1-62/2019
Submitted to the court on
January 24, 2019
SENTENCE IN THE NAME OF THE RUSSIAN FEDERATION
Novosibirsk
February 26, 2019

Dzerzhinskiy District Court of Novosibirsk consisting of:
Presiding Judge V. A. Shchukina
in the presence of L. V. Kolykhanova, Secretary,
with participation of:

State Accuser being Chief Assistant Prosecutor of Dzerzhinskiy District of Novosibirsk E. V. Balmaeva,

Defense Counsel I. A. Shuvalova, which provided a certificate and warrant of attorney from Partner bar association No. 420 (in defense of N. V. Chernitsov),

Defense Counsel M. N. Kungurtseva, which provided a certificate and warrant of attorney from the bar association of Leninskiy District No. 463 (in defense of V. N. Ivanov),

Accused persons being N. V. Chernitsov, V. N. Ivanov,

Representatives of the injured person XXX PJSC being Full Name1, Full Name13 (under the power of attorney),

having considered in the open court session the files of the criminal case with regard to:

N. V. CHERNITSOV, ...

being accused of the crime provided for by part 3 of Article 183 of the Criminal Code of Russia

V. N. IVANOV, ...

being accused of the crime provided for by part 3 of Article 183 of the Criminal Code of Russia, the court

FOUND:

Accused persons N. V. Chernitsov and V. N. Ivanov collected the information constituting the commercial secret in other illegal way out of mercenary interest.

The crime was committed in Dzerzhinsk District of Novosibirsk in the following circumstances:

XXX Public Joint-Stock Company (hereinafter "XXX PJSC") was registered on DD.MM.YYYY by the State Registration Chamber at the Ministry of Justice of the Russian Federation, main activity of XXX PJSC is the activity in communications based on wireless technologies. XXX PJSC has the Branch in Novosibirsk Region located at ..., another Branch of XXX PJSC in Novosibirsk Region is located at ... subject to real estate rental agreement (non-residential premises) No. ...–...) dated DD.MM.YYYY and concluded between XXX PJSC and "..." LLC.

In accordance with Article 3 of the Federal Law No. 98-FZ "On Commercial Secrets" of July 29, 2004, information constituting a commercial secret is information of any nature (industrial, technical, economic, organizational and other), including as the result of intellectual activity in the field of science and technology, as well as information about the means of carrying out professional activity, which has an actual or potential commercial value by virtue of its being unknown to third parties, and to which third parties lack free, lawful access, and in

**TRANSLATION FROM RUSSIAN**

relation to which the owner of such information has imposed a regime of commercial secrecy.

In accordance with Article 4 of Federal Law No. 98-FZ, "On Commercial Secrets" of July 29, 2004, the right to define information as information constituting a commercial secret, and to determine the list and content of such information, belongs to the owner of such information subject to the provisions of this Federal Law..

In accordance with Annex 5 to the policy "Regulation on information safety procedures (confidentiality) of XXX OJSC", approved by order of the President of XXX PJSC No. ...P dated DD.MM.YYYY, information containing the commercial secret includes, among others:

- Subscriber contracts;

- Bills to subscribers, clients, dealers;

- Input and output data (in electronic form) of the billing system.

01.04.2018  the Branch of XXX PJSC in Novosibirsk Region being the "customer" and N. V. Chernitsov being the "contractor" concluded paid services agreement No. .../DP for the period from April 01, 2018 to March 31, 2019. Pursuant to the obligation to keep confidential the commercial secret and other confidential information dated April 01, 2018 being Annex No. ... to the services agreement, N. V. Chernitsov obliges (during the period of civil law relations with XXX PJSC and within three years after its termination):

- Not to disclose to any third parties the information constituting the commercial secret of XXX PJSC and any other confidential information which became known to him during performance of his contractual duties;

- Not to transfer to any third parties and not to disclose in public the information constituting XXX PJSC's commercial secret;

- In case of an attempt by any unauthorized persons to obtain from him any protected information, report this immediately to the Personnel and Facilities Security Department of the Corporate Security and Procedures Unit of the Corporate Center (Regional Security Service) of XXX PJSC;

- To keep in confidence any official secret of ministries and agencies, which became known to him due to civil law relations, as well as any commercial secret of any counterparties, with whom XXX PJSC has business (partner) relationships;

- Not to use information of confidential nature of XXX PJSC to run a business and gain personal benefit;

- Immediately report to the Security Department of the Corporate Center (Personnel and Facilities Security Department of the Corporate Security and Procedures Unit of the Corporate Center (Regional Security Service)) in case of loss or lack of any media containing the Employer's commercial secret and any other confidential information, authorizations, passes, keys (of restricted access rooms, depositories, vaults (steel cabinets)), personal seals and other facts which may result in disclosure or leakage of the protected information.

12.07.2018  Agreement No. .../DP dated DD.MM.YYYY between the Branch of XXX PJSC in Novosibirsk Region and N. V. Chernitsov was terminated.

During the period from February 11, 2016 to March 19, 2018, V. N. Ivanov worked at the branch of XXX PJSC in Novosibirsk Region as a supervisor. Upon entering employment, V. N. Ivanov signed an obligation (agreement) to keep confidential the commercial secret and other confidential information, in which the latter obliged (during the period of civil law relations with the employer and within three years after their termination):

- Not to disclose the information constituting the commercial secret of the employer and any other confidential information which became known to him during performance of his labor duties;

- Not to transfer to any third parties and not to disclose in public the information constituting the employer's commercial secret;

- Not to use information of confidential nature of MTC PJSC to run a business and gain personal benefit.

07.05.2018  SSS LLC providing services for outsourcing of merchandising for clients of FFF LLC, including XXX PJSC, under services agreement No. .../GR dated DD.MM.YYYY

**TRANSLATION FROM RUSSIAN**

and concluded between FFF LLC and SSS LLC, and FFF LLC providing services to XXX PJSC under framework agreement No. ... concluded on DD.MM.YYYY between FFF LLC (since DD.MM.YYYY FFF LLC is referred to as FFF LLC) and XXX PJSC, referred in the agreement as the "employer", represented by director Full Name5, acting under the Articles of Association, and V. N. Ivanov, referred to as the "employee", labor agreement No. ... is concluded, pursuant to clause 1.1 of which the employer employs the employee to the Department for Sales of Fixed Business Services on Retail Market as a direct sales professional since May 07, 2018.

According to subclause 2.20, the employee shall not disclose the commercial secret and other confidential information in accordance with the "Obligation to keep confidential the commercial secret and other confidential information", which is to be signed by the employee when concluding the labor agreement and which constitute its integral part.

According to the obligation to keep confidential the commercial secret and other confidential information dated May 07, 2018, V. N. Ivanov confirms that he is familiarized with the Regulation on Information Safety Procedures (Confidentiality) of XXX OJSC and, inter alia, obliges (during the period of civil law relations with XXX PJSC and within three years after its expiration):

- Not to disclose to any third parties the information constituting the commercial secret of XXX PJSC and any other confidential information, which became known to him during performance of his contractual duties, without XXX PJSC's authorization;

-. Not to transfer to any third parties and not to disclose in public the information constituting XXX PJSC's commercial secret;

- Not to use information of confidential nature of XXX PJSC to run a business and gain personal benefit.

During the period from April 01, 2018 to July 12, 2018, N. V. Chernitsov received a proposal from a person, which was not identified during the preliminary investigation and which knew a place and nature of employment of N. V. Chernitsov at XXX PJSC, to provide him/her for monetary reward with the information about subscribers of XXX PJSC, including information about subscriber contracts, bills being issued to subscribers, which, in accordance with Annex 5 to the policy "Regulation on information safety procedures (confidentiality) of XXX OJSC", approved by order of the President of XXX PJSC No. ...P dated DD.MM.YYYY, is referred to the information containing the commercial secret, due to which N. V. Chernitsov developed, because of mercenary interest, a criminal intent to collect the information constituting the commercial secret of XXX PJSC in other illegal way, while implementing which he proposed his acquaintance, V. N. Ivanov, to commit this crime together, to which proposal the latter agreed

During the period from July 10, 2018 to July 18, 2018, in the circumstances, not identified during the investigation, V. N. Ivanov, while implementing his criminal intent aimed at collection of the information constituting the commercial secret of XXX PJSC in other illegal way, out of mercenary interest, found an unidentified person being ready to purchase from him the information about subscribers of XXX PJSC, including about subscriber contracts and bills being issued to subscribers of Novokuznetsk, about which he informed N. V. Chernitsov during this period.

Thus, during the period from July 10, 2018 to July 18, 2018 N. V. Chernitsov and V. N. Ivanov being aware that the information about subscriber contracts and bills being issued to subscribers of XXX PJSC constituted the commercial secret and having obliged to keep it confidential, entered into previous concert to collect the information constituting the commercial secret in other illegal way to further transfer it for monetary reward to an unidentified person, that means out of mercenary interest, namely to illegally collect the information about subscriber contracts and bills being issued to subscribers of XXX PJSC which constituted the commercial secret at XXX PJSC, having outlined roles in the prospective crime.

18.07.2018 at about 5:15 p. m., implementing the common criminal intention aimed at illegal collection of the information on subscriber contracts and bills issued to subscribers of XXX PJSC in Berdsk, Barnaul, Novokuznetsk, which constitutes the commercial secret at

XXX PJSC, N. V. Chernitsov and V. N. Ivanov together arrived at the office of the Branch of XXX PJSC for Novosibirsk Region located at ..., Dzerzhinskiy District of Novosibirsk, where, using the passes they had, they went to room ...".

After that, in order to exclude any suspicion of Full Name14 and Full Name15, employees of Branch of XXX PJSC in Novosibirsk Region being in the room, with regard to the purpose of their staying in the room, V. N. Ivanov, acting pursuant to his role in the crime, called the customers of XXX PJSC to offer them additional services of the company.

N. V. Chernitsov, acting pursuant to his role in the crime, without having any username and password assigned to him (as well as to V. N. Ivanov) and required to log in to the corporate computer network (domain of XXX PJSC) and ... information system, contacted Full Name2, who was working at the Branch of XXX PJSC in Novosibirsk Region, requesting to provide him with a username and a password required to log in to the corporate network (domain of XXX PJSC) without informing him of his criminal intentions and of his dismissal from XXX PJSC on July 12, 2018.

Full Name2, not realizing that by his actions he procures a crime and being mistaken about the true intentions of N. V. Chernitsov, provided the latter with the username and password assigned to him and required to log in to the corporate computer network (domain of XXX PJSC) through the WhatsApp application from the subscriber number used by him to the subscriber number used by N. V. Chernitsov.

After that, from 5:15 p. m. to 5:49 p. m., still staying in room ... at the specified address, through the WhatsApp application from the subscriber number used by him to the subscriber number used by N. V. Chernitsov, V. N. Ivanov sent the latter a list of streets located in Novokuznetsk, for the subscribers of which it was not required to collect information, accordingly, for the remaining addresses of Novokuznetsk it was required to collect the information constituting the commercial secret of XXX PJSC, whereafter N. V. Chernitsov logged in to the corporate network (domain of XXX PJSC), through the corporate computer installed at the work place, using the username and password provided to him by Full Name2, and then logged in, using the username and password belonging to Full Name12, group head of the Branch of XXX PJSC in Novosibirsk Region, and automatically saved by Full Name2, using the means of the Google Chrome browser, to ... information system, through which he requested the information on the subscribers of XXX PJSC in Novosibirsk, Berdsk, Barnaul, and Novokuznetsk, in the scope specified by V. N. Ivanov, including the information on subscriber contracts and bills issued to subscribers of XXX PJSC, which constituted a commercial secret of XXX PJSC. The information contained in ... information system on the subscribers of XXX PJSC in Novosibirsk, Berdsk, Barnaul, and Novokuznetsk, including the information on subscriber contracts and bills issued to subscribers of XXX PJSC, was sent by N. V. Chernitsov to his e-mail ...; however, the files containing the specified information were not delivered due to the large volume of information, whereof N. V. Chernitsov informed V. N Ivanov, who informed N. V. Chernitsov that it was necessary to split the file into several files, whereafter N. V. Chernitsov split the file containing, among other things, the information on subscriber contracts and bills issued to the subscribers of XXX PJSC with regard to 506,185 subscribers, which constituted a commercial secret of XXX PJSC, into two files bearing similar name "Archive WinRAR.rar", which were sent by him to his e-mail ....

Then, V. N. Ivanov checked e-mail ... for receipt of the above information, found two files bearing similar name "WinRAR.rar Archive" received on it and containing the information on the subscribers of XXX PJSC in Novosibirsk, Berdsk, Barnaul, and Novokuznetsk, including the information on subscriber contracts and bills issued to the subscribers of XXX PJSC, with regard to 506,185 subscribers, which constituted a commercial secret of XXX PJSC, whereof he informed N. V. Chernitsov.

Thus, on July 18, 2018, N. V. Chernitsov and V. N. Ivanov collected the information constituting the commercial secret of XXX PJSC in other illegal way, out of their mercenary interest, by a group of persons by previous concert.

<REDACTED SECTION>

Original Text Available at https://dzerzhinsky--nsk.sudrf.ru/modules.php?name=sud_delo&srv_num=1&name_op=doc&number=109770042&delo_id=1540006&new=0&text_number=1

Guilt of the said persons in commitment of the crime is confirmed both by confessionary statements by accused person V. N. Ivanov that on July 18, 2018, upon preliminary coordination with N. V. Chernitsov, being at the office of XXX PJSC at ..., using the user account of Full Name2 and the user account of Full Name12, they entered the corporate network of the company, from which they downloaded the information about personal data of subscribers in order to further sale the obtained information to interested persons, by explanations given by N. V. Chernitsov to the extent the court recognizes them as true, namely that on July 18, 2018 he was at the office of XXX PJSC at ..., together with V. N. Ivanov, where he, having received a login and password of the user account of Full Name2, entered the corporate network, from which he started to download the information, further sending it to his e-mail, and by testimony of the representative of injured person Full Name1, witnesses Full Name23, Full Name24 that the security system of XXX PJSC identified transfer on July 18, 2018 of a large volume of personal data from the corporate e-mail of the company to the external e-mail address, due to which checking of the obtained information began and it was found that using the e-mail address of employee Full Name2, an archive, containing personal data of subscribers of XXX PJSC, was sent to an external media; testimony of witness Full Name6 that having been informed about occurred information leakage he found that on July 18, 2018 Full Name2 was absent at the office in the afternoon but provided his credentials for entering the user account to former employee N. V. Chernitsov, which was also stated by Full Name2 examined at the court, having explained that upon request of P. V. Chernitsov, with whom he was on friendly terms, he provided the login and password to enter the user account, besides he previously saved the credentials provided by his manager Full Name12 to enter ... software application, to which he had not his own access; testimony by witness Full Name12 that previously Full Name2 worked under his direction at the team and subsequently he provided to Full Name2 credentials to enter ... software application but he was not informed that the latter performed autosaving of data, furthermore, he specified that on July 18, 2018 he saw N. V. Chernitsov and N. V. Ivanov at the office and N. V. Chernitsov requested him to provide a user account, which request he declined; testimony by witnesses Full Name14 and Full Name15 that on July 18, 2018 they were at the office of ... at ..., which was also visited by V. N. Ivanov and N. V. Chernitsov, who sat down at the computer installed at the office; testimony by witness Full Name18 that on July 21, 2018, being at work at XXX PJSC, during one of the breaks she met N. V. Chernitsov, who informed that he downloaded the client base and sold it, about which she further informed Full Name20, when it became known that someone downloaded client base of XXX, explanations by Full Name20 that in July 2018 Chernitsov and Ivanov requested her for a user account to enter the corporate system, which request she declined, and when she became aware about occurred information leakage one of the employees being Full Name18 informed her that Chernitsov told that he downloaded the client base and sold it; testimony by witnesses Full Name19, Full Name21, Full Name22, Full Name16 that they were in the commission for internal investigation of information leakage, during which it was found that on July 18, 2018 V. N. Ivanov, working under the outsourcing agreement, and N. V. Chernitsov, dismissed from XXX PJSC but having not returned his pass, were at the office of ... at ..., where they, using the user account of Full Name2, where credentials of Full Name12 to enter ... software application were saved, entered the corporate network, where they downloaded information about subscribers from ... software application, containing personal data of subscribers, which constitute the commercial secret, after which they sent the information to the external e-mail address using the corporate e-mail; testimony by witnesses Full Name25 and Full Name17 that in their official capacity they performed law enforcement intelligence operations with regard to leakage of the information constituting the commercial secret of XXX PJSC, during which N. V. Chernitsov and V. N. Ivanov were found, who, being present at the office of XXX PJSC, using the credentials provided by Full Name2, entered the corporate network, from which they downloaded data and then sent them to the external media; testimony by witness Full Name3 to the extent the court recognizes her testimony as corresponding to other evidence, namely that she received a proposal about purchase of personal data of subscribers of XXX PJSC from V. N. Ivanov and she received letters with files from the sender with name ...@....ru to her e-mail address; testimony by

**TRANSLATION FROM RUSSIAN**

witness Full Name4 that, while working at TTT PJSC, he more than once received from N. V. Chernitsov, who worked at XXX PJSC, proposals to purchase a base with telephone numbers; which the court finds logical, true, mutually supportive and consistent with written evidence on the case, given in the descriptive and analytical part of the sentence, in particular: statement by representative of XXX PJSC Full Name1 that sending of personal data of clients to the external media was found; report on discovery of indicia of crime; resolution on provision of results of law enforcement intelligence operations; protocols of inspection of premises during which computers as well as user accounts of employees were examined at the office of XXX PJSC with the involvement of a specialist, during which it was recorded that letters were sent from the corporate e-mail registered to employee Full Name2 and such letters contained files which, in their turn, contained archived files being a result of generation of reports from ... software application which were downloaded using the credentials of employee Full Name12, which were sent to the external media being ...@....ru, and, according to viewed records from video surveillance cameras installed at the office of the company at ..., Full Name12 and Full Name2 were absent at the office of the company, V. N. Ivanov and N. V. Chernitsov were at the room where the computer, from which the corporate network was entered, is installed, and the latter, on July 18, 2018, had not already had any labor relations with XXX PJSC, which, in its turn, is confirmed by the agreement dated DD.MM.YYYY for termination of Agreement No. .../DP dated DD.MM.YYYY; protocol of voluntary surrender by N. V. Chernitsov of a laptop and the protocol of its inspection, during which downloads of files from e-mail addresses ...@....ru on July 18, 2018 and July 19, 2018, containing personal data of clients, were recorded in the browser's log; protocol of inspection of N. V. Chernitsov's mobile phone, which contains correspondence with the subscriber number of V. N. Ivanov, containing messages about downloading of information about subscribers of XXX, as well as e-mail addresses ...@....ru; protocols of inspection of telephone connections, provided by mobile network operators, according to which connections between subscriber numbers being used by V. N. Ivanov and N. V. Chernitsov and subscriber numbers being used by Full Name2 and Full Name3 were recorded

The court finds the above testimonies of the injured person's representatives and prosecution witnesses as mutually supportive and reliable, since the court did not find any grounds for these persons to defame accused persons N. V. Chernitsov and V. N. Ivanov, and the accused persons themselves did not indicate such facts.

The initial arguments of accused person N. V. Chernitsov on his non-involvement in this crime, given by him at the preliminary investigation and in court, were checked in the court session and were not confirmed; they were not confirmed either by accused person N. V. Chernitsov himself, therefore the court assesses them as unreliable, given pursuant to the chosen position in defense on the case, since it follows from the testimonies of the prosecution witnesses, who are employees of XXX PJSC, in particular, Full Name12 and Full Name20, that in July 2018 N. V. Chernitsov requested account information to log in to the corporate network, which was denied, since such data was not given to the agents; in addition, Chernitsov terminated his employment at XXX PJSC; furthermore, as the company's employees explained, the corporate network of XXX PJSC has a number of protection levels, the network is accessed by entering the username and password assigned to a particular employee, and access to the corporate network programs is restricted, even if there is an account, according to the position held in the company.

The court finds accused person N. V. Chernitsov's references at the preliminary investigation to the fact that he had not read the regulation on keeping information confidential, did not know that the personal data on subscribers was a commercial secret as meritless, since a copy of annex ... to the services agreement being an obligation to keep confidential the commercial secret and other confidential information (volume 1, case file sheets 90–91), which N. V. Chernitsov had personally read as evidenced by his signature, is available in the files of the criminal case; in addition, the interviewed representatives of the injured person and prosecution witnesses that worked previously and currently work at XXX PJSC pointed out that when entering into an agreement, both employment and civil law agreements for provision of services, the employees mandatorily signed an obligation to keep confidential the commercial secret, which includes personal information of the subscribers being the clients of

XXX PJSC, and these provisions were communicated by the immediate supervisor of employee, thus, all employees of XXX PJSC were aware that the information on the subscribers constitutes a commercial secret and assumed the obligations to keep it confidential not only during fulfilment of their duties, but also after termination of the employment relations for 3 years.

Thus, the court has found that, on July 18, 2018, accused persons N. V. Chernitsov, who terminated the contractual relations for provision of the services to XXX PJSC since July 12, 2018, and V. N. Ivanov, who was the employee of SSS and who provided the services to XXX PJSC under an outsourcing agreement, both aware that the information on subscriber contracts and bills issued by XXX PJSC to the subscribers constitute a commercial secret, staying in the office of XXX PJSC at ... office ..., acting as a group of persons by previous concert, in their illegal way, using the account data of Full Name2 and Full Name12, without informing them of their criminal intentions, logged in to the corporate network of XXX PJSC using ... program, generated reports containing the subscribers' personal data, whereafter sent the generated files to e-mail ... @ .... ru used by N. V. Chernitsov, for further sale of information to interested parties, i. e. they illegally collected the information constituting the commercial secret.

The fact that there was previous concert between the accused persons is evidenced by the testimony of accused person V. N. Ivanov, who pointed out that, as offered by N. V. Chernitsov, he agreed to download the client database of PJSC XXXX for further sale, and by the cumulative evidence examined by the court, which indicates that N. V. Chernitsov and V. N. Ivanov acted jointly, in concert, each playing an assigned role in the crime.

The classifying attribute "out of mercenary interest" was confirmed in the court session, based on the explanations of accused person V. N. Ivanov that, as offered by N. V. Chernitsov, they decided to download the client database of PJSC XXX for further sale of the information on the subscribers' personal data, as well as of the witnesses that, according to N. V. Chernitsov, they became aware that he had sold the client database of XXX PJSC; therefore, the information constituting the commercial secret of XXX PJSC was collected by N. V. Chernitsov and V. N. Ivanov out of mercenary interest and was aimed at obtaining financial gains.

The court classifies the actions of accused persons N. V. Chernitsov and V. N. Ivanov under part 3 of Article 183 of the Criminal Code of Russia as collection of the information constituting the commercial secret in other illegal way out of mercenary interest.

Proceeding to imposition of a sentence, the court takes into account the nature and degree of a danger of the committed crime to the public, which is moderately serious, the data on a personality of each accused person, the circumstances mitigating or aggravating the sentence, an effect of the imposed sentence on reformation of the convicted persons, and the living conditions of their families.

The court takes into account the data on a personality of N. V. Chernitsov, who was not previously convicted (volume 3, case file sheet 2); ... is characterized satisfactorily as a competent employee (volume 2, case file sheet 86); is not under dispensary observation at State Budget-Funded Healthcare Institution of Novosibirsk Region Novosibirsk Regional Clinical Narcological Dispensary (volume 3, case file sheet 3); is not under observation of a psychiatrist at State Budget-Funded Healthcare Institution of Novosibirsk Region State Novosibirsk Regional Psychiatric Clinical Hospital … (volume 3, case file sheet 5); is characterized positively by the head          at the previous place of residence (volume 3, case file sheet 8)

The court takes into account the plea of guilty and active assistance in the investigation of the crime by giving confessionary explanations about the crime committed with his involvement as the circumstances mitigating the punishment of N. V. Chernitsov.

The court takes into account the data on a personality of V. N. Ivanov, who was not previously convicted (volume 3, case file sheets 55, 69); ... is characterized by his manager as proved himself as an employee with low responsibility (volume 2, case file sheet 87); is not under dispensary observation at State Budget-Funded Healthcare Institution of Novosibirsk Region Novosibirsk Regional Clinical Narcological Dispensary (volume 3, case file sheet 56); is not under observation of a psychiatrist at State Budget-Funded Healthcare Institution of

Novosibirsk Region State Novosibirsk Regional Psychiatric Clinical Hospital ... (volume 3, case file sheet 58); is not under dispensary observation at State Budget-Funded Healthcare Institution Territorial Psychiatric Clinical Hospital (volume 3, case file sheet 70); is not under dispensary observation at State Budget-Funded Healthcare Institution Territorial Narcological Dispensary (...) (volume 3, case file sheet 71)

The court acknowledges the plea of guilty, regret of the committed crime, having a child of tender years born in ..., active assistance in the investigation of the crime by submitting the information on the circumstances of the crime to the investigative authorities from the inspection and by giving faithful and complete testimony that contributed to the investigation of the crime as the circumstances mitigating the punishment of V. N. Ivanov.

The court takes into consideration that accused persons N. V. Chernitsov and V. N. Ivanov were not previously convicted, but does not acknowledge this circumstance as mitigating for each of the accused persons, taking into account the seriousness of the crime and the absence of a matter of chance.

In accordance with clause "c" of part 1 of Article 63 of the Criminal Code of Russia, the court acknowledges commission of the crime by a group of persons by previous concert as the circumstance aggravating the punishment for each of the accused persons.

Taking into account the facts of the case, nature and degree of a danger of the committed crime to the public, the information on a personality of each of the accused persons, circumstances mitigating and aggravating the punishment, in order to restore social justice and prevent new crimes, the court considers that it is necessary to impose on N. V. Chernitsov and V. N. Ivanov a sentence in the form of deprivation of liberty, which is reasonable, fair and sufficient to reform them and achieve the punishment purpose. The court does not see a ground for imposing on N. V. Chernitsov and V. N. Ivanov any other, milder types of punishment. However, taking into account the combination of circumstances mitigating the punishment, information on a personality of each of the accused persons who have a permanent place of residence, stable social ties, absence of previous prosecution, the court believes that reformation of each of them is possible without social isolation and that a punishment applying the requirements of Article 73 of the Criminal Code of Russia may be imposed on each accused person.

Taking into account the aggravating circumstance, the court concludes that there are no grounds for changing the crime category to a less serious one in accordance with part 6 of Article 15 of the Criminal Code of Russia with regard to N. V. Chernitsov and V. N. Ivanov.

When imposing a sentence on the accused persons, the court takes into account the requirements of Articles 6, 43, 60, 61, and 63 of the Criminal Code of Russia.

No stated claims on the case were asserted.

During the preliminary investigation, N. V. Chernitsov was defended by defense attorneys I. A. Shuvalova and D. V. Plakhova, while V. N. Ivanov was defended by defense attorney M. N. Kungurtseva, and the court costs amounted to 7,488 Russian roubles and 3,816 Russian rubles, respectively. Taking into account the financial situation of the accused persons, information on a personality of each of them, and the fact that they are able-bodied persons and in the court session agreed to pay the court costs, there are no grounds for exemption of N. V. Chernitsov and V. N. Ivanov from paying the same, for which reason, in accordance with Article 132 of the Criminal Procedure Code of Russia, the said amounts shall be charged from the accused persons.

The issue of the fate of physical evidence shall be resolved in accordance with the requirements of Article 81 of the Criminal Procedure Code of Russia.

Based on the foregoing and being guided by Articles 307–309 of the Criminal Procedure Code of Russia, the court

SENTENCED:

To find N. V. CHERNITSOV guilty of the crime provided for by part 3 of Article 183 of the Criminal Code of Russia and, based on the sanction of this Article, sentence him to imprisonment for one (1) year six (6) months.

Original Text Available at https://dzerzhinsky--nsk.sudrf.ru/modules.php?name=sud_delo&srv_num=1&name_op=doc&number=109770042&delo_id=1540006&new=0&text_number=1

In accordance with Article 73 of the Criminal Code of Russia, the sentence imposed on N. V. Chernitsov shall be considered as conditional with a test period of one (1) year six (6) months.

To impose on convict N. V. Chernitsov the following duties:

-To appear at a designated state authority monitoring the behavior of the probationer at the place of his residence for registration once a month;

-Not to change the place of residence without a notice to the said authority.

To find V. N. IVANOV guilty of the crime provided for by part 3 of Article 183 of the Criminal Code of Russia and, based on the sanction of this Article, sentence him to imprisonment for one (1) year three (3) months.

In accordance with Article 73 of the Criminal Code of Russia, the sentence imposed on V. N. Ivanov shall be considered as conditional with a test period of one (1) year three (3) months.

To impose on convict V. N. Ivanov the following duties:

-To appear at a designated state authority monitoring the behavior of the probationer at the place of his residence for registration once a month;

-Not to change the place of residence without a notice to the said authority.

To discontinue the preventive measure being recognizance not to leave and to be of good behavior with regard to N. V. Chernitsov and V. N. Ivanov upon entry of the sentence into legal force.

To charge for the federal budget the court costs associated with involvement of defense attorneys in the preliminary investigation: from N. V. Chernitsov in the amount of seven thousand four hundred eighty-eight (7,488) Russian rubles, from V. N. Ivanov in the amount of three thousand eight hundred sixteen (3,816) Russian rubles.

Upon entry of the sentence into legal force, the following physical evidence on the case:

-CD-R containing the information from e-mail ... @ .... ru on sending files on DD.MM.YYYY and inability to deliver them (volume 1, case file sheet 51); CD-R containing the information on sending the message dated DD.MM.YYYY from Full Name23 to Full Name1 and on sending the messages dated DD.MM.YYYY (volume 1, case file sheet 71); DVD-R disc containing the records from the surveillance cameras dated DD.MM.YYYY at the office of XXX PJSC (volume 1, case file sheet 123); CD-R containing the records of electronic copies of letters and file attachments (volume 1, case file sheet 130); information on the connections of subscriber number ... (volume 2, case file sheet 138); CD-R containing the details of connections by subscriber numbers ..., ..., ... (volume 2, case file sheet 146); information in the form of printed images from the telephone screen of N. V. Chernitsov showing the messages with subscriber number ... (volume 3, case file sheet 37); DVD-R containing the information on cash flow on account ... in the name of N. V. Chernitsov (volume 3, case file sheet 115) should be still stored in the files of the criminal case;

- Mobile telephone ... IMEI ... was returned to N. V. Chernitsov during the preliminary investigation (volume 3, case file sheet 40);

- external magnetic hard drive ... s/n ... containing the information copied from the laptop used by N. V. Chernitsov, stored in the files of the criminal case in the physical evidence storage room of the Dzerzhinskiy District Court of Novosibirsk (entry ... in book 55) should be returned to the Directorate of the Federal Security Service for Novosibirsk Region (...).

The sentence may be appealed to the Novosibirsk Regional Court within 10 days from its announcement date.

If an appeal or appellate submission is filed, the convicts may, within 10 days from delivery of its copy, petition for their involvement in consideration of the case by the court of appeal.

Presiding Judge:                              V. A. Shchukina

Original Text Available at https://dzerzhinsky--nsk.sudrf.ru/modules.php?name=sud_delo&srv_num=1&name_op=doc&number=109770042&delo_id=1540006&new=0&text_number=1

**Exhibit 10** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

**Federal Law No.98-FZ "On commercial secret" dated July 29, 2004**
(edition of April 18, 2018)
[excerpts]

### Article 3. General definitions used in this Federal Law

For the purpose of this Federal Law, the following definitions are used:

1) a trade secret shall mean a regime for confidentiality of information allowing its holder in existing or possible circumstances to increase revenues, to avoid unjustified expenses, to maintain [its] position on the market of goods, works, services or to receive commercial benefits;

2) information constituting a commercial secret is information of any nature (industrial, technical, economic, organizational and other), including as the result of intellectual activity in the field of science and technology, as well as information about the means of carrying out professional activity, which has an actual or potential commercial value by virtue of its being unknown to third parties, and to which third parties lack free, lawful access, and in relation to which the owner of such information has imposed a regime of commercial secrecy;

3) Repealed on January 1, 2008. - Federal Law No.231-FZ dated 12.18.2006;

4) a holder of information constituting a trade secret shall mean an entity which legally possesses information constituting a trade secret, has restricted access to such information and has implemented a trade secret regime in respect to it;

5) access to information constituting a trade secret shall mean familiarization of certain entities with information constituting a trade secret with its holder's consent or on any other legal basis, provided that such information shall be kept confidential;

6) transmission of information constituting a trade secret shall mean transmission of information constituting a trade secret and recorded on tangible media by its holder to a contracting agent on the basis of a contract in the scope and on the terms and conditions provided for by the contract, including the condition that the contracting agent shall take measures to protect its confidentiality prescribed by the contract;

7) a contracting agent shall mean a party to a civil law contract to which the holder of information constituting a trade secret transmitted such information;

8) provision of information constituting a trade secret shall mean transfer of information constituting a trade secret and recorded on a tangible medium by its holder to government authorities, other state authorities, local government authorities for purposes of performing their functions;

9) disclosure of information constituting a trade secret shall mean an act or omission, as a result of which information constituting a trade secret in any form whatsoever (oral, written, other form, including via technical means) becomes known to third parties without the consent of the holder of such information or in violation of a labor or civil law contract.

**Article 4. Right to classify information as information constituting a trade secret, and methods for obtaining such information**

1. The right to classify information as information constituting a commercial secret, and to determine the list and content of such information, belongs to the owner of such information subject to the provisions of this Federal Law.

2. Repealed on January 1, 2008. – Federal Law No.231-FZ dated 12.18.2006.

3. Information constituting a trade secret received from its holder on the basis of an agreement or other legal basis shall be deemed obtained legally.

4. Information constituting a trade secret held by another person shall be deemed obtained illegally if it was received with intentional overcoming of the measures taken by the holder of the information constituting a trade secret to protect its confidentiality, as well as if the person receiving this information knew or had reasonable grounds to believe that such information constitutes a trade secret held by another person and that the person transmitting such information could not transmit such information legally.

**Exhibit 11** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

July 27, 2006                                                                      No. 152-FZ

---

**RUSSIAN FEDERATION**

**FEDERAL LAW**

**ON PERSONAL DATA**

Passed by
the State Duma
on July 8, 2006

Approved by
the Federation Council
on July 14, 2006

List of Amending Documents
(as amended by Federal Laws dated November 25, 2009 No. 266-FZ,
dated December 27, 2009 No. 363-FZ, dated June 28, 2010 No. 123-FZ, dated July 27, 2010
No. 204-FZ,
dated July 27, 2010 No. 227-FZ, dated November 29, 2010 No. 313-FZ dated December 23,
2010 No. 359-FZ,
dated June 04, 2011 No. 123-FZ, dated July 25, 2011 No. 261-FZ, dated April 05, 2013 No.
43-FZ,
dated July 23, 2013 No. 205-FZ, dated December 21, 2013 No. 363-FZ, dated June 04, 2014
No. 142-FZ,
dated July 21, 2014 No. 216-FZ, dated July 21, 2014 No. 242-FZ, dated July 03, 2016 No.
231-FZ,
dated February 22, 2017 No. 16-FZ, dated July 01, 2017 No. 148-FZ, dated July 29, 2017 No.
223-FZ,
dated December 31, 2017 No. 498-FZ)

## Chapter 1. GENERAL PROVISIONS

### Article 1. Scope of This Federal Law

1. This Federal Law regulates the relationships relating to the processing of personal data
by federal governmental bodies, governmental bodies of subjects of the Russian Federation
and other governmental bodies (hereinafter referred to as the "governmental bodies"), local
self-government bodies and other municipal bodies (hereinafter referred to as the "municipal
bodies"), legal entities and natural persons by means of automation facilities, for instance in
information-telecommunication networks, or without such facilities, if the processing of
personal data without the use of such facilities corresponds to the character of the actions
(operations) as involving the personal data by means of automation facilities, i.e. allows to
search — according to a set algorithm — for the personal data recorded on a material medium

and available in card files or other systematized corpuses of personal data and/or access to such personal data.
(part 1 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

2. The scope of this Federal Law shall not apply to the relations arising:

1) In case of personal data being processed by individuals exclusively for personal and family needs unless that is in violation of the rights of the subjects of personal data;

2) In the organization of safe-keeping, building-up, record-keeping and use of personal data containing Russian Federation's Archives fund documents and other archives documents as envisaged under the legislation on archives in the Russian Federation;

3) Abrogated. - Federal Law dated July 25, 2011 No. 261-FZ;

4) In case of processing of personal data categorized, as appropriate, as the data constituting a state secret;

5) Abrogated. - Federal Law dated July 29, 2017 No. 223-FZ.

3. The information on the activities of courts in the Russian Federation containing personal data shall be provided, distributed, transferred, and obtained, and the information systems and information and telecommunications networks in order to create conditions to access the said information shall be maintained and used in accordance with Federal Law No. 262-FZ dated December 22, 2008 On Provision of Information on the Activities of Courts in the Russian Federation.
(part 3 is introduced by Federal Law dated July 29, 2017 No. 223-FZ)

### Article 2. Aim of This Federal Law

The aim of this Federal Law is to provide for the protection of the rights and liberties of a person and citizen in the processing of his or her personal data, including protection of the rights to the inviolability of private life, personal and family secrets.

### Article 3. Basic Notions Used in This Federal Law

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

The following basic notions are used for the purposes of this Federal Law:

1) "Personal data" meaning any information relating to an individual who is directly or indirectly identified or identifiable (personal data subject);

2) "Operator" meaning a governmental body, a municipal body, a legal entity or a natural person that on its/his/her own or jointly with other persons organizes and/or realizes the processing of personal data, and also defines the purposes of personal data procession, the composition of the personal data which are subject to processing and the actions (operations) involving personal data;

3) "Processing of personal data" meaning any action (operation) or a set of actions (operations) realized by means of automation facilities or without such facilities as involving personal data, including the gathering, recording, systematizing, accumulating, storing,

updating (renewing and altering), retrieving, using, transmitting (disseminating, providing and accessing), depersonalizing, blocking, deleting and destroying personal data;

4) "Automated personal data processing" meaning the processing of personal data by means of computers;

5) "Dissemination of personal data" meaning actions aimed at disclosing personal data to an unlimited group of persons;

6) "Provision of personal data" meaning actions aimed at disclosing personal data to a certain person or a certain group of persons;

7) "Blocking personal data" meaning the temporary termination of personal data processing (except for cases when processing is needed for adjusting personal data);

8) "Destruction of personal data" meaning actions resulting in the impossibility of restoring the content of personal data in an informational personal data system and/or in the destruction of personal data material media;

9) "Depersonalization of personal data" meaning actions resulting in the impossibility of identifying — without the use of additional information — the belonging of personal data to a specific personal data subject;

10) "Informational personal data system" meaning the combination of the personal data contained in databases and the information technologies and hardware allowing to process them;

11) "Transborder flow of personal data" meaning the dispatch of personal data to the territory of a foreign state to a governmental body of a foreign state, to a foreign natural person or a foreign legal entity.

**Article 4. Legislation of the Russian Federation Relating to Personal Data**

1. The legislation of the Russian Federation in relation to personal data is based on the Constitution of the Russian Federation and international agreements of the Russian Federation and consists of this Federal Law and other federal laws determining instances and the specificity of processing personal data.

2. On the basis of and pursuant to federal laws, governmental bodies, the Bank of Russia and local self-government bodies within the scope of their powers may adopt regulatory legal acts, regulatory acts and legal acts (hereinafter referred to as "regulatory legal acts") on specific issues relating to the processing of personal data. Such acts shall not contain provisions limiting the rights of personal data subjects, establishing restrictions — other than those envisaged by federal laws — on the activities of operators or vesting in operators the duties not envisaged by federal laws, and they are subject to official publication.
(part 2 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

3. The specificity of processing of personal data effected without the use of automation facilities may be prescribed by the federal laws and other statutory legal acts of the Russian Federation with due regard for the provisions of this Federal Law.

4. Unless an international agreement of the Russian Federation establishes rules other

than those specified under this Federal Law, the rules of the international agreement shall prevail.

## Chapter 2. PRINCIPLES OF AND CONDITIONS FOR PROCESSING PERSONAL DATA

### Article 5. Principles of Processing Personal Data

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1. Personal data shall be processed lawfully and fairly.

2. Personal data shall be processed within the scope of specified, preset and lawful purposes. It is hereby prohibited to process personal data if such processing is incompatible with the purposes of personal data gathering.

3. It is hereby prohibited to pool up databases containing the personal data whose processing is done for purposes which are mutually incompatible.

4. Processing shall involve only the personal data which meet the intended purposes of the processing thereof.

5. The contents and scope of processed personal data shall correspond to the declared purposes of processing. Processed personal data shall not be excessive in respect of the declared purposes of processing thereof.

6. When personal data are being processed, it is necessary to ensure the correctness of the personal data, the sufficiency thereof, and where necessary also relevancy in respect of the purposes of personal data processing. The operator shall take the necessary measures or make sure they are taken to delete or update incomplete or inaccurate data.

7. Personal data shall be stored in a form allowing to identify the subject of the personal data for a term not exceeding the one which is required by the purposes of personal data processing, unless a storage term is established for the personal data by a federal law or a contract to which the personal data subject is a beneficiary or surety. Processed personal data shall be destroyed or depersonalized when the purposes of processing are attained or if the need for attaining such purposes is lost, except as otherwise established by a federal law.

### Article 6. Conditions for Processing Personal Data

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1. Personal data shall be processed so that the principles and the rules envisaged by this Federal Law be observed. The processing of personal data is admissible in the following cases:

1) Personal data are processed on the consent of the subject of the personal data to his/her personal data's being processed;

2) Personal data are to be processed for the purpose of attaining the objectives envisaged by an international agreement of the Russian Federation or a law, for the realization and execution of the functions, powers and duties vested in the operator by the legislation of the Russian Federation;

3) Personal data are processed due to involvement of a person in constitutional, civil, administrative, criminal proceedings, or proceedings of commercial courts;
(Item 3 as amended by Federal Law dated July 29, 2017 No. 223-FZ)

3.1) Personal data are to be processed for the purpose of performing a court's judgement, a decision of another body or official which have to be performed according to the legislation of the Russian Federation on execution proceedings (hereinafter referred to as "the performance of a court's judgement");
(Item 3.1 is introduced by Federal Law dated July 29, 2017 No. 223-FZ)

4) Personal data are to be processed for the purpose of execution of the powers of federal executive governmental bodies, the bodies of state non-budget funds, the executive governmental bodies of subjects of the Russian Federation and local self-government bodies and the functions of the organizations taking part in the provision of state and municipal services respectively which are envisaged in Federal Law No. 210-FZ of July 27, 2010 on Organizing the Provision of State and Municipal Services, including the registration of a personal data subject on the integrated portal for state and municipal services and/or the regional portals for state and municipal services;
(as amended by Federal Law dated April 05, 2013 No. 43-FZ)

5) Personal data are to be processed for the purpose of executing the contract to which the personal data subject is either a beneficiary or surety and also of concluding a contract on the initiative of the personal data subject or a contract under which the personal data subject is going to be a beneficiary or surety;
(as amended by Federal Laws dated December 21, 2013 No. 363-FZ, dated July 03, 2016 No. 231-FZ)

6) Personal data are to be processed for the purpose of protecting the life, health or other vital interests of the personal data subject, when the consent of the personal data subject cannot be obtained;

7) Personal data are to be processed for the purpose of exercising the rights and lawful interests of the operator or third persons, including as provided for by the Federal Law On Protection of Rights and Lawful Interests of Individuals When Performing Activities in Repayment of Past-Due Debts and on Amendments to the Federal Law On Microlending Activities and Microlenders, or for the purpose of attaining goals of public importance, unless in this case the rights and freedoms of the personal data subject are infringed upon;
(as amended by Federal Law dated July 03, 2016 No. 231-FZ)

8) Personal data are to be processed for the purpose of pursuing the professional activities of a journalist and/or the lawful activities of a mass medium or scientific, literary or another creative activity, unless the rights and lawful interests of the personal data subject are infringed upon;

9) Personal data are processed for statistical or other research purposes, except for the purposes specified in Article 15 of this Federal Law, on the condition of compulsory depersonalization of the personal data;

10) Processing is done in respect of personal data to which access is provided by the personal data subject or on the request thereof to an unlimited group of persons (hereinafter referred to as the "personal data made available to the general public by the personal data subject");

11) Processing is done in respect of personal data which are subject to publication or compulsory disclosure in accordance with a federal law.

1.1. Personal data of persons subject to state guard and their family members are processed taking into account the specificity provided for by Federal Law No. 57-FZ dated May 27, 1996 On State Guard.
(part 1.1 is introduced by Federal Law dated July 01, 2017 No. 148-FZ)

2. The details of processing of special categories of personal data and also biometric personal data are established by Articles 10 and 11 of this Federal Law, respectively.

3. On the consent of the personal data subject, the operator is entitled to entrust another person with the processing of personal data, except as otherwise envisaged by a federal law, under a contract concluded with that person, including a state or municipal contract or by means of a relevant act adopted by a governmental or municipal body (hereinafter referred to as "the operator's assignment"). The person processing personal data on the operator's assignment shall observe the principles and rules governing the processing of personal data which are envisaged by this Federal Law. The operator's assignment shall define a list of the actions (operations) which are going to be committed (performed) in respect of the personal data by the person processing personal data, and the purposes of the processing as well as that person's duty to observe the non-disclosure status of personal data and it shall ensure the security of personal data when they are being processed and also specify requirements for protection of processed personal data according to Article 19 of this Federal Law.

4. The person processing personal data on the operator's assignment is not obligated to seek the consent of the personal data subject to his/her personal data's being processed.

5. If the operator entrusts another person with the processing of personal data, the operator shall be liable to the personal data subject for the actions of said person. The person processing personal data on the operator's assignment shall be liable to the operator.

### Article 7. Non-Disclosure Status of Personal Data

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

The operators and the other persons which have access to personal data shall abstain from disclosing to third persons and from disseminating the personal data without the consent of the personal data subject, except as otherwise envisaged by a federal law.

### Article 8. Generally Accessible Sources of Personal Data

1. For informational support purposes, generally accessible sources of personal data (including reference books, address books) may be created. Generally accessible sources of personal data may, with the written consent thereto of the subject of personal data, may comprise his or her family name, first name, patronymic, year and place of birth, address, subscriber's number, data on the profession and other personal data communicated by the personal data subject.
(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

2. The data on the subject of personal data shall be excluded at any time from generally accessible sources of personal data at the request of the subject of personal data or by decision

of the court or other duly authorized state bodies.
(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

### Article 9. Consent of a Personal Data Subject to His/Her Personal Data's Being Processed

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1. A personal data subject shall take a decision on provision of his/her personal data and shall give his/her consent to their processing without duress, by his/her own will and in his/her own interest. The consent to the processing of personal data shall be specified, well-informed and in full awareness. The consent to the processing of personal data may be given by the personal data subject or a representative thereof in any form that allows to acknowledge that is has been obtained, except as otherwise established by a federal law. If the consent to the processing of personal data is obtained from a representative of the personal data subject, the powers of that representative to give consent on behalf of the personal data subject shall be verified by the operator.

2. The consent to the processing of personal data may be revoked by the personal data subject. If the consent to the processing of personal data is revoked by the personal data subject, the operator is entitled to keep processing the personal data without the consent of the personal data subject if there are the grounds described in Items 2–11 of Part 1 of Article 6, Part 2 of Article 10 and Part 2 of Article 11 of this Federal Law.

3. The duty to provide evidence of the existence of the consent of the personal data subject to his/her personal data's being processed or evidence of the existence of the grounds described in Items 2–11 of Part 1 of Article 6, Part 2 of Article 10 and Part 2 of Article 11 of this Federal Law is vested in the operator.

4. In the cases envisaged by a federal law, personal data shall be processed only subject to the written consent of the personal data subject. The following shall qualify as a written consent on a paper medium of a personal data subject containing the autograph signature of the personal data subject: consent filed as an electronic document signed in accordance with a federal law by means of an electronic signature. The written consent of the personal data subject to his/her personal data's being processed shall, in particular, include the following:

1) Surname, first name, patronymic and address of the personal data subject, the number of his/her main personal identification document, date of issue of the said document and information on the body that has issued it;

2) Surname, first name, patronymic and address of the representative of the personal data subject, number of his/her main personal identity document, date of issue of the said document and information on the body that has issued it, details of the power of attorney or the other document confirming the powers of that representative (if the consent is received from a representative of the personal data subject);

3) Name or surname, first name, patronymic and address of the operator which seeks the consent of the personal data subject;

4) Goal of personal data processing;

5) List of the pieces of personal data to the processing of which the consent of the personal

data subject is given;

6) Name or surname, first name, patronymic and address of the person that processes the personal data on the operator's assignment, if such person is going to be entrusted with the processing;

7) List of the actions involving the personal data to the commission of which the consent is given and a general description of the personal data processing techniques used by the operator;

8) Effective term of the consent of the personal data subject and also the manner in which it may be revoked, except as otherwise established by a federal law;

9) Signature of the personal data subject.

5. The procedure for getting the consent of the personal data subject in the form of an electronic document to his/her personal data's being processed for the purposes of providing state and municipal services and also the services deemed necessary and compulsory for the purposes of providing state and municipal services shall be established by the Government of the Russian Federation.

6. If the personal data subject lacks capacity, consent to his/her personal data's being processed shall be given by a legal representative of the personal data subject.

7. In the event of death of the personal data subject, a consent to his/her personal data's being processed shall be given by the heirs of the personal data subject, unless such consent had been given by the personal data subject in his/her life.

8. Personal data may be received by the operator from a person other than the personal data subject, if the operator is provided with evidence of the existence of the grounds mentioned in Items 2–11 of Part 1 of Article 6, Part 2 of Article 10 and Part 2 of Article 11 of this Federal Law.

### Article 10. Special Categories of Personal Data

1. The processing of special categories of personal data concerning racial and/or national background, political outlook, religious or philosophical convictions, state of health, intimate life shall not be allowed, except for the instances specified under Part 2 of this Article.

2. The processing of special categories of personal data specified under Part 1 of this Article shall be allowed in instances when:

1) Subject of personal data gives his or her written consent to the processing of his or her personal data;

2) Personal data have been made available to the general public by the personal data subject;
(Item 2 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

2.1) Processing of personal data is necessary in connection with the realization of the international treaties of the Russian Federation on readmission;
(Item 2.1 is introduced by Federal Law dated November 25, 2009 No. 266-FZ)

2.2) Personal data shall be processed in accordance with Federal Law No. 8-FZ dated January 25, 2002 on the All-Russia Census of the Population;
(Item 2.2 is introduced by Federal Law dated July 27, 2010 No. 204-FZ)

2.3) Personal data are processed in accordance with the legislation on state welfare, the labor legislation and the pension legislation of the Russian Federation;
(Item 2.3 is introduced by Federal Law dated July 25, 2011 No. 261-FZ, as amended by Federal Law dated July 21, 2014 No. 216-FZ)

3) Personal data are to be processed for the purpose of protecting the life, health or other vital interests of the personal data subject or the life, health or other vital interests of other persons, and no consent can be obtained from the personal data subject;
(Item 3 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

4) Personal data processing is effected for medical-disease-prevention purposes, for purposes of establishing a medical diagnosis, providing medical and medical-social services, provided always that the personal data processing is conducted by a person who is professionally engaged in medical activity and is obligated under the legislation of the Russian Federation to keep medical secrecy;

5) Processing of personal data of members (participants) of a public association or religious organization is conducted by the appropriate public association or religious organization operating in accordance with the legislation of the Russian Federation, for achieving legitimate goals envisaged in their constituent documents, provided that the personal data shall not be disseminated without the consent thereto in writing of the subjects of personal data;

6) Personal data are to be processed for the purpose of establishing or exercising the rights of the personal data subject or third persons as well as in connection with the exercise of justice;
(Item 6 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

7) Personal data are processed in accordance with the legislation of the Russian Federation on defense, security, countering terrorism, transport safety, countering corruption, operative search operations, execution proceedings and the criminal execution legislation of the Russian Federation;
(Item 7 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

7.1) Personal data obtained in the cases established by the legislation of the Russian Federation shall be processed by the bodies of the procurator's office in connection with the exercise of procuracy supervision by them;
(Item 7.1 is introduced by Federal Law dated July 23, 2013 No. 205-FZ)

8) Personal data are processed in accordance with the legislation on compulsory types of insurance or the insurance legislation;
(Item 8 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

9) Personal data are processed in the cases envisaged by the legislation of the Russian Federation by governmental bodies, municipal bodies or organizations for the purposes of placing children left without parental care into citizens' families for foster care;
(Item 9 is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

10) Personal data shall be processed in compliance with the legislation of the Russian

Federation on Russian Federation citizenship.
(Item 10 is introduced by Federal Law dated June 04, 2014 No. 142-FZ)

3. The processing of personal data on previous conviction may be effected by the state bodies or municipal bodies within the limit of their respective powers vested in them under the legislation of the Russian Federation and also by other persons in instances and according to the procedure to be prescribed by the federal laws.

4. The processing of special categories of personal data effected in the instances specified under Parts 2 and 3 of this Article shall be immediately terminated, provided the reasons for which the processing was undertaken have been removed, except as otherwise established by a federal law.
(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

### Article 11. Biometric Personal Data

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1. The information which characterizes the physiological and biological features of a single individual whereby he/she can be identified (biometric personal data) and is used by an operator to identify a personal data subject may be processed only if there is a written consent of the personal data subject, except for the cases envisaged by Part 2 of this Article.

2. Biometric personal data may be processed without the consent of the personal data subject in connection with the implementation of international agreements of the Russian Federation on readmission, in connection with the exercise of justice and the performance of court's judgements, in connection with mandatory state fingerprinting and also in the cases envisaged by the legislation of the Russian Federation on defense, security, countering terrorism, transport safety, countering corruption, operative search operations, the state service, the criminal execution legislation of the Russian Federation and the legislation of the Russian Federation on the procedure for exit from the Russian Federation and entry in the Russian Federation, on Russian Federation citizenship.
(as amended by Federal Laws dated June 04, 2014 No. 142-FZ, dated December 31, 2017 No. 498-FZ)

### Article 12. Transborder Personal Data Flow

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1. The transborder flow of personal data to the territories of the foreign states being a party to the Convention of the Council of Europe for the Protection of Individuals with Regard to Automatic Processing of Personal Data and also of the other foreign states that ensure adequate protection in respect of the rights of personal data subjects shall take place in accordance with this Federal Law and it may be prohibited or restricted for the purposes of protecting the foundation of the constitutional system of the Russian Federation, the morals, health, rights and lawful interests of citizens and safeguarding national defense and state security.

2. The authorized body for protection of the rights of the subjects of personal data shall endorse a list of the foreign states which are not a party to the Convention of the Council of Europe for the Protection of Individuals with Regard to Automatic Processing of Personal Data

and ensure adequate protection of the rights of personal data subjects. A state not being a party to the Convention of the Council of Europe for the Protection of Individuals with regard to Automatic Processing of Personal Data may be included in the list of the foreign states which ensure an adequate protection of the rights of personal data subjects if the norms of law and applicable personal data security measures effective in said state comply with the provisions of said Convention.

3. Before the beginning of the transborder personal data flow, the operator shall make sure that the foreign state to whose territory the personal data are sent provides adequate protection for the rights of personal data subjects.

4. The transborder flow of personal data to the territories of the foreign states which do not provide adequate protection for the rights of personal data subjects may take place in:

1) Case when there is a written consent of a personal data subject to the transborder flow of his/her personal data;

2) Cases envisaged by international agreements of the Russian Federation;

3) Cases envisaged by federal laws if it is required for the purposes of protecting the foundation of the constitutional system of the Russian Federation, national defense and state security, and also ensuring the safe, steady and secure operation of the transport complex, safeguarding the interests of person, society and state in the transport complex from illegal interference;

4) Event of implementation of a contract to which a personal data subject is a party;

5) Event of protection of the life, health, other vital interests of a personal data subject or other persons, if no written consent can be obtained from the personal data subject.

### Article 13. Specificity of Personal Data Processing within State or Municipal Informational Personal Data Systems

1. The state and municipal bodies shall set up within the limits of their authority state or municipal informational personal data systems established in accordance with federal laws.

2. Federal laws may establish the specificity of record-keeping of personal data within state and municipal informational personal data systems, including the use of various methods of designating the belonging of personal data contained in the appropriate state or municipal personal data informational system to a specific subject of personal data.

3. The rights and freedoms of person and citizen may not be restricted for reasons associated with the use of various methods of personal data processing or designation of the belonging of personal data contained in the state or municipal personal data informational systems to a specific subject of personal data. It is not permitted to use methods of designation of belonging of personal data contained in the state or municipal personal data informational systems to a specific subject of personal data that may hurt the feelings of citizens or be derogatory to human dignity.

4. For purposes of ensuring the realization of the rights of the subjects of personal data in connection with the processing of their personal data within state or municipal personal data informational systems, there may be created a state register of the population whose legal status

and procedure for work with which shall be such as prescribed under the federal law.

## Chapter 3. RIGHTS OF THE SUBJECT OF PERSONAL DATA

### Article 14. Right of a Personal Data Subject of Access to His/Her Personal Data

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1. A personal data subject is entitled to receive the information specified in Part 7 of this Article, except for the cases envisaged by Part 8 of this Article. The personal data subject is entitled to demand from an operator that his/her personal data be adjusted, blocked or destroyed if the personal data are incomplete, outdated, incorrect, illegally received or are not necessary for the declared purpose of processing, and also to take the measures envisaged by a law for protecting his/her rights.

2. The information mentioned in Part 7 of this Article shall be provided by the operator to the personal data subject in an accessible form and they shall not comprise personal data concerning other personal data subjects, except for cases when there exist legal grounds for disclosing such personal data.

3. The information specified in Part 7 of this Article shall be provided by the operator to the personal data subject or a representative thereof when an inquiry is received from the personal data subject or a representative thereof. The inquiry shall contain the number of the main personal identity document of the personal data subject or of his/her representative, the date of issue of the said document and information on the body that has issued it, information confirming the participation of the personal data subject in relations with the operator (the number of a contract, the date of conclusion of the contract, a conventional word designation and/or other details) or information otherwise confirming the fact that the personal data are processed by the operator, the signature of the personal data subject or of his/her representative. The inquiry may be sent as an electronic document and signed by means of an electronic signature in accordance with the legislation of the Russian Federation.

4. If the information available in Part 7 of this Article and also the processed personal data have been provided to the personal data subject to get acquainted with them on his/her request, the personal data subject is entitled to apply again to the operator or to send a repeated inquiry to it for the purpose of getting the information mentioned in Part 7 of this Article and get acquainted with such personal data at least 30 days after the initial application or the dispatch of the initial inquiry, unless a shorter term is established by a federal law, a normative legal act adopted pursuant thereto or a contract to which the personal data subject is a beneficiary or surety.

5. The personal data subject is entitled to apply again to the operator or to send a repeated inquiry to it for the purpose of getting the information specified in Part 7 of this Article and also for the purpose of getting acquainted with the processed personal data before the expiry of the term specified in Part 4 of this Article, unless such information and/or processed personal data have been provided to him/her to get acquainted with them in full according to the results of the initial application. The repeated inquiry shall contain a reason for sending a repeated inquiry together with the details specified in Part 3 of this Article.

6. The operator is entitled to refuse to perform the personal data subject's repeated inquiry that does not comply with the conditions set out in Parts 4 and 5 of this Article. Such refusal

shall be substantiated. The burden of providing proof of the existence of a good reason for the refusal to perform the repeated inquiry shall be borne by the operator.

7. The personal data subject is entitled to obtain information concerning the processing of his/her personal data, in particular including the following:

1) Confirmation of the fact that the personal data are processed by the operator;

2) Legal grounds and purposes of processing of the personal data;

3) Objectives of processing of the personal data and methods of processing used by the operator;

4) Name and location of the operator, information on the persons (except for the operator's employees) who have access to the personal data or to whom the personal data may be disclosed under a contract with the operator or under a federal law;

5) Processed personal data relating to the relevant personal data subject, the source from which they are obtained, unless another procedure is envisaged by a federal law for the provision of such data;

6) Term for completion of personal data processing, including the term of data storage;

7) Procedure for the personal data subject to exercise the rights envisaged by this Federal Law;

8) Information on the completed or proposed transborder data flow;

9) Name or surname, first name, patronymic and address of the person processing the personal data on the operator's assignment, if such person has been or is going to be entrusted with the processing;

10) Other information envisaged by this Federal Law or other federal laws.

8. The personal data subject's right of access to his/her personal data may be restricted in accordance with federal laws, for instance if:

1) Processing of the personal data, including the personal data obtained as the result of active search operations, counter-intelligence and intelligence activities, takes place for the purposes of national defense, state security and law enforcement;

2) Personal data are processed by the bodies which have detained the personal data subject on suspicions of having committed a crime or which have presented criminal-case charges to the personal data subject or have imposed a measure of restraint on the personal data subject before presenting charges, except for the cases envisaged by the criminal procedural legislation of the Russian Federation when the suspect or accused is allowed to get acquainted with such personal data;

3) Personal data are processed in accordance with the legislation on countering the legalization of incomes received through crime (money laundering) and the financing of terrorism;

4) Personal data subject's access to his/her personal data infringes the rights and lawful

interests of third persons;

5) Personal data are processed in the cases envisaged by the legislation of the Russian Federation on transport safety for the purposes of ensuring the steady and safe operation of the transport complex, safeguarding the interests of the individual, society and state in the area of the transport complex from illegal interference.

**Article 15. Rights of the Subjects of Personal Data in Case of Their Personal Data Being Processed for the Purposes of Promotion of Goods, Work, Services in the Market and Also for Purposes of Political Propaganda**

1. The personal data processing for purposes of promoting goods, work, services in the market by implementing direct contacts with potential consumers with the help of communications facilities and also for the purposes of political campaigning shall be allowed only on the condition of the prior consent thereto of the subject of personal data. The said personal data processing shall be regarded as being carried out without the prior consent thereto of the subject of personal data, unless the operator has proved that such consent was obtained.

2. The operator shall be obligated to immediately terminate at the request of the subject of personal data the processing of his or her personal data as envisaged under Part 1 of this Article.

**Article 16. Rights of the Subjects of Personal Data in Decision-making Exclusively on the Basis of the Automated Processing of Their Personal Data**

1. It is prohibited to take decisions generating legal consequences in relation to the subject of personal data or in any other way affecting his or her rights and legitimate interests exclusively on the basis of the automated processing of personal data, except for the cases envisaged under Part 2 of this Article.

2. The decision generating legal consequences in relation to the subject of personal data or otherwise affecting his or her rights and legitimate interests may be taken exclusively on the basis of the automated processing of his or her personal data only with the availability of the written consent of the subject of personal data or in the cases stipulated under federal laws also establishing measures towards ensuring the rights and legitimate interests of the subject of personal data.

3. The operator shall be obligated to explain to the subject of personal data the procedure for taking decision exclusively on the basis of the automated processing of his or her personal data and possible legal consequences of that decision, to provide him or her with the possibility to put up an objection against that decision and also to explain the procedure for protection by the subject of personal data of his or her rights and legitimate interests.

4. The operator shall be obligated to consider the objection specified in Part 3 of this Article within thirty days from the receipt thereof and notify the subject of personal data of the results of considering that objection.
(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

**Article 17. Right to Appeal Actions or Inaction of the Operator**

1. If the subject of personal data considers that the operator is effecting the processing of

his or her personal data in violation of the requirements of this Federal Law or is otherwise infringing upon his or her rights and liberties, the subject of personal data shall have the right to appeal the actions or inaction of the operator before the authorized body for protection of the rights of the subjects of personal data or by judicial procedure.

2. The subject of personal data shall be entitled to protection of his or her rights and legitimate interests, including to reimbursement of damages and/or to compensation of moral damage by judicial procedure.

## Chapter 4. DUTIES OF THE OPERATOR

### Article 18. Duties of the Operator when Personal Data Are Gathered

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1. While gathering personal data, the operator shall provide the personal data subject on his/her request with the information envisaged by Part 7 of Article 14 of this Federal Law.

2. If the provision of personal data is compulsory under a federal law, the operator shall explain to the personal data subject the legal consequences of his/her refusal to provide his/her personal data.

3. Except in the cases envisaged by Part 4 of this Article, if personal data have been received from a person other than the personal data subject, then prior to starting the processing of such personal data the operator shall provide the following information to the personal data subject:

1) Name or surname, first name, patronymic and address of the operator or his/her/its representative;

2) Purpose of processing of the personal data and the legal ground for it;

3) Potential users of the personal data;

4) Rights of the personal data subject established by this Federal Law;

5) Source from which the personal data are received.

4. The operator is relieved from the duty to provide the personal data subject with the information envisaged by Part 3 of this Article if:

1) Personal data subject has been notified of his/her personal data's being processed by the relevant operator;

2) Personal data have been received by the operator under a federal law or in connection with the performance of a contract to which the personal data subject is either a beneficiary or a surety;

3) Personal data have been made available to the general public by the personal data subject or have been received from a source open to the general public;

4) Personal data are processed by the operator for statistical or other research purposes, for the purpose of pursuing the professional activities of a journalist or scientific, literary or

other creative activity, unless in this case the rights and lawful interests of the personal data subject are infringed upon;

5) Provision of the information envisaged by Part 3 of this Article to the personal data subject infringes on the rights and lawful interests of third persons.

5. When gathering personal data, including using the Internet information and telecommunications network, the operator shall ensure recording, systematizing, accumulating, storing, updating (renewing and altering), retrieving personal data of citizens of the Russian Federation using the databases located in the Russian Federation, except as specified in Items 2, 3, 4, 8 of Part 1 of Article 6 of this Federal Law.
(part 5 is introduced by Federal Law dated July 21, 2014 No. 242-FZ)

### Article 18.1. Measures for Ensuring the Operator's Executing the Duties Envisaged by This Federal Law

(is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

1. The operator shall take the measures which are necessary and sufficient for ensuring the execution of the duties envisaged by this Federal Law and the regulatory legal acts adopted pursuant thereto. The operator shall define on its own the composition of, and a list of, the measures which are necessary and sufficient for the execution of the duties stipulated by this Federal Law and the regulatory legal acts adopted pursuant thereto, except as otherwise envisaged by this Federal Law or other federal laws. Such measures may, in particular, include the following:

1) Appointment of a person as responsible for organizing the processing of personal data by the operator being a legal entity;

2) Promulgation of documents by the operator being a legal entity, defining the operator's policies in respect of personal data processing, local acts on issues of personal data processing and also local acts establishing procedures aimed at preventing and detecting breaches of the legislation of the Russian Federation and the elimination of the consequences of such breaches;

3) Application of legal, organizational and technical measures for ensuring the security of personal data in accordance with Article 19 of this Federal Law;

4) Exercising of internal control and/or audit of the compliance of personal data processing with this Federal Law and the regulatory legal acts adopted pursuant to it, with the requirements for personal data protection, the operator's policies in respect of personal data processing, local acts of the operator;

5) Assessment of the harm that can be caused to a personal data subject when this Federal Law is violated, the correlation of said harm and the measures taken by the operator for ensuring the execution of the duties envisaged by this Federal Law;

6) Acquaintance of the operator's employees who directly process personal data with the provisions of the legislation of the Russian Federation on personal data, in particular, with the requirements for the protection of personal data, the documents defining the operator's policies in respect of personal data processing, local acts on issues of personal data processing and/or the training of said employees.

2. The operator shall promulgate or otherwise provide unrestricted access to the document determining the operator's policies in respect of personal data processing and to information on implemented requirements for personal data protection. An operator gathering personal data by means of information-telecommunication networks shall use the relevant information-telecommunication network to publish a document defining the operator's policies in respect of personal data processing and information on implemented requirements for the protection of personal data and also provide an opportunity for having access to the said document by means of the facilities of the relevant information-telecommunication network.

3. The Government of the Russian Federation shall establish a list of measures aimed at ensuring the execution of the duties envisaged by this Federal Law and the regulatory legal acts adopted pursuant thereto by the operators being governmental or municipal bodies.

4. In reply to an inquiry of the authorized body for protection of the rights of the subjects of personal data, the operator shall provide the documents and the local acts specified in Part 1 of this Article and/or otherwise confirm that the measures mentioned in Part 1 of this Article have been taken.

### Article 19. Measures for Ensuring the Security of Personal Data When They Are Being Processed

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1. While processing personal data, the operator shall take the necessary legal, organizational and technical measures or make sure they are taken for the purpose of protecting the personal data from illegal or accidental access thereto, destruction, modification, blocking, copying, provision and dissemination of the personal data as well as other illegal actions in respect of the personal data.

2. The security of personal data shall be, in particular, achieved by means of:

1) Detecting threats to the security of the personal data when they are being processed in informational personal data systems;

2) Taking the organizational and technical measures for ensuring the security of the personal data when they are being processed in informational personal data systems which are required to meet the personal data protection requirements whose observance maintains the personal data protection levels established by the Government of the Russian Federation;

3) Using the information protection facilities which have passed a conformity assessment procedure according to the established procedure;

4) Assessing the effectiveness of the measures taken to ensure the security of the personal data before the commissioning of an informational personal data system;

5) Keeping record of machine personal data media;

6) Detecting the cases of unauthorized access to the personal data and taking measures;

7) Restoring the personal data that have been modified or destroyed as the result of unauthorized access thereto;

8) Establishing rules for getting access to the personal data processed in the informational personal data system and also making sure all the actions involving the personal data in the informational personal data systems get registered and recorded;

9) Control over measures taken to ensure the security of the personal data and the level of protection of informational personal data systems.

3. The following shall be established by the Government of the Russian Federation with due regard to the possible harm to a personal data subject, the scope and content of processed personal data, the type of activity whereby personal data are processed and the significance of threats to personal data security:

1) Levels of protection of personal data when they are being processed in informational personal data systems depending on the threats to the security of the data;

2) Requirements applicable to the protection of personal data when they are processed in informational personal data systems whose implementation ensures the established levels of personal data protection;

3) Requirements applicable to biometric personal data material media and the technologies used to store such data outside informational personal data systems.

4. The composition and contents of the organizational and technical measures ensuring the security of personal data in the course of their processing in informational personal data systems required to meet the requirements established by the Government of the Russian Federation in accordance with Part 3 of this Article as applicable to personal data protection for each of the protection levels shall be established by the federal executive governmental body empowered in the area of security and the federal executive governmental body empowered in the area of countering technical intelligence and of the technical protection of information, within the scope of their powers.

5. The federal executive governmental bodies carrying out the function of state policy elaboration and normative legal regulation in the established area of activity, the governmental bodies of the subjects of the Russian Federation, the Bank of Russia, the bodies of state non-budget funds and other governmental bodies within the scope of their powers shall adopt regulatory legal acts defining the threats to personal data security which are significant when personal data are being processed in the informational personal data systems used to pursue relevant types of activity, with account being taken of the content of personal data and the character and methods of processing thereof.

6. Apart from the threats to personal data security defined in the regulatory legal acts adopted in accordance with Part 5 of this Article, associations, unions and other entities uniting operators are entitled to issue their decisions to define additional threats to personal data security which are significant when personal data are being processed in the informational personal data systems used to pursue specific types of activity by the members of such associations, unions and other entities uniting operators, with account being taken of the content of personal data and the character and methods of processing thereof.

7. Approval shall be sought for the draft regulatory legal acts mentioned in Part 5 of this Article from the federal executive governmental body empowered in the area of security and the federal executive governmental body empowered in the area of countering technical intelligence and the technical protection of information. Approval shall be sought for the draft

decisions specified in Part 6 of this Article from the federal executive governmental body empowered in the area of security and the federal executive governmental body empowered in the area of countering technical intelligence and the technical protection of information, according to the procedure established by the Government of the Russian Federation. A decision of the federal executive governmental body empowered in the area of security and the federal executive governmental body empowered in the area of countering technical intelligence and the technical protection of information on refusal to approve the draft decisions specified in Part 6 of this Article shall be substantiated.

8. Control and supervision over the implementation of the organizational and technical measures for ensuring personal data security established in accordance with this Article shall be exercised in the course of personal data processing in state informational personal data systems by the federal executive governmental body empowered in the area of security and the federal executive governmental body empowered in the area of countering technical intelligence and the technical protection of information, within the scope of their powers and without the right of getting acquainted with the personal data processed in informational personal data systems.

9. By a decision of the Government of the Russian Federation with due regard to the significance and contents of processed personal data, the federal executive governmental body empowered in the area of security and the federal executive governmental body empowered in the area of countering technical intelligence and the technical protection of information may be given the powers of control over the observance of the organizational and technical measures ensuring personal data security which are established in accordance with this Article, when they are being processed in the informational personal data systems which are used to pursue specific types of activity and are other than state informational personal data systems, without the right of getting acquainted with the personal data processed in informational personal data systems.

10. Personal data may be used and stored outside informational personal data systems only on such material data media and by means of such data storage technology that ensure the protection of the data from illegal or accidental access thereto or the destruction, modification, blocking, copying, provision or dissemination thereof.

11. For the purposes of this Article the "threat to personal data security" means a set of conditions and factors posing a danger of unauthorized, including accidental, access to personal data that can result in the destruction, modification, blocking, copying, provision or dissemination of the personal data as well as other illegal actions in the course of their processing in an informational personal data system. The "level of protection of personal data" means a complex indicator characterizing the requirements whose observance ensures the neutralizing of specific personal data security threats when data are being processed in informational personal data systems.

**Article 20. Duties of the Operator when a Personal Data Subject Applies to It or when an Inquiry Is Received from a Personal Data Subject or a Representative Thereof and Also from an Authorized Body for Protection of the Rights of the Subjects of Personal Data**

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1. Information shall be provided by the operator according to the procedure envisaged by

Article 14 of this Federal Law to a personal data subject or a representative thereof about the availability of personal data relating to the relevant personal data subject as well as an opportunity for getting acquainted with these personal data if the personal data subject or a representative thereof applies for it or within thirty days after an inquiry is received from the personal data subject or a representative thereof.

2. In the event of refusal to provide information on the availability of personal data concerning the relevant personal data subject or personal data to the personal data subject or a representative thereof if they have applied or when an inquiry is received from the personal data subject or a representative thereof, the operator shall be given a substantiated reply in writing including reference to the provision of Part 8 of Article 14 of this Federal Law or another federal law deemed a ground for such refusal, within thirty days after the application of the personal data subject or the representative thereof or after the date of receiving the inquiry from the personal data subject or the representative thereof.

3. The operator shall provide free of charge an opportunity to the personal data subject or a representative thereof to get acquainted with the personal data concerning that personal data subject. Within seven working days after the provision of information by the personal data subject or a representative thereof confirming that the personal data are incomplete, incorrect or out of date, the operator shall make the necessary amendments thereto. Within seven working days after the provision of information by the personal data subject or a representative thereof confirming that such personal data have been illegally received or are not necessary for the declared purpose of processing, the operator shall destroy such personal data. The operator shall notify the personal data subject or a representative thereof of the amendments made and the measures taken and shall take reasonable measures for notifying the third persons to which that subject's personal data have been provided.

4. The operator shall provide the authorized body for protection of the rights of the subjects of personal data, in reply to that body's inquiry, with the necessary information within thirty days after receiving such inquiry.

### Article 21. Operator's Duty to Eliminate Breaches of the Legislation That Occurred when Personal Data Were Being Processed and to Update, Block and Destroy Personal Data

(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1. If it is discovered that personal data have been wrongfully processed when the personal data subject or a representative thereof applied or on an inquiry of the personal data subject or a representative thereof or of the authorized body for protection of the rights of the subjects of personal data, the operator shall block the wrongfully processed personal data relating to that personal data subject or make sure they get blocked (if the personal data are processed by another person acting on the operator's assignment) from the time of such application or of the receipt of said inquiry for the period of verification. If incorrect personal data have been discovered when the personal data subject or a representative thereof applied or on their inquiry or on an inquiry of the authorized body for protection of the rights of the subjects of personal data, the operator shall block the personal data relating to that personal data subject or make sure they get blocked (if the personal data are processed by another person acting on the operator's assignment) from the time of such application or of the receipt of said inquiry for the period of verification, unless the blocking of the personal data infringes on the rights and lawful interest of the personal data subject or third persons.

2. If the incorrectness of the personal data has been confirmed, then on the basis of the information provided by the personal data subject or a representative thereof or the authorized body for protection of the rights of the subjects of personal data or the other necessary documents the operator shall adjust the personal data or arrange for the adjustment thereof (if the personal data are processed by another person acting on the operator's assignment) within seven working days after the provision of such data and shall cancel the blockage of the personal data.

3. If it is discovered that the operator or a person acting on the operator's assignment has wrongfully processed personal data then the operator shall within three working days after the discovery stop the wrongful processing of the personal data or make sure the wrongful processing of the personal data is stopped by another person acting on the operator's assignment. If the legality of processing of personal data cannot be ensured, the operator shall destroy such personal data or make sure they get destroyed within ten working days after the discovery of wrongful personal data processing. The operator shall notify the personal data subject or a representative thereof about the elimination of the committed wrongdoing or the destruction of the personal data, and, in the event an application of the personal data subject or a representative thereof or an inquiry of the authorized body for protection of the rights of the subjects of personal data have been sent by the authorized body for protection of the rights of the subjects of personal data, also that body.

4. Once the purpose of processing of personal data has been achieved, the operator shall stop processing the personal data or make sure it is stopped (if the personal data are processed by another person acting on the operator's assignment) and destroy the personal data or make sure they get destroyed (if the personal data are processed by another person acting on the operator's assignment) within thirty days after the date of achievement of the purpose of personal data processing, except as otherwise envisaged by a contract to which the personal data subject is a beneficiary or surety, another agreement between the operator and the personal data subject or if the operator is not entitled to process the personal data without the consent of the personal data subject on the grounds envisaged by this Federal Law or other federal laws.

5. If a personal data subject has revoked his/her consent to his/her personal data's being processed, the operator shall stop processing them or make sure it is stopped (if the personal data are processed by another person acting on the operator's assignment), and if the storage of the personal data is no longer needed for the purposes of personal data processing, destroy the personal data or make sure they get destroyed (if the personal data are processed by another person acting on the operator's assignment) within thirty days after the receipt of said revocation, except as otherwise envisaged by a contract to which the personal data subject is a beneficiary or surety, another agreement between the operator and the personal data subject or if the operator is not entitled to process the personal data without the consent of the personal data subject on the grounds envisaged by this Federal Law or other federal laws.

6. If the personal data cannot be destroyed within the term specified in Parts 3–5 of this Article, the operator shall block such personal data or make sure they get blocked (if the personal data are processed by another person acting on the operator's assignment) and make sure the personal data are destroyed within six months, except if another term is established by federal laws.

### Article 22. Notification of Personal Data Processing

1. The operator shall, prior to commencing the processing of personal data, notify the

authorized body for protection of the rights of the subjects of personal data of its intention to carry out the processing of personal data, except for instances envisaged under Part 2 of this Article.

2. The operator shall have the right to effect, without notifying the authorized body for protection of the rights of the subjects of personal data, processing of personal data:

1) That are processed in accordance with the labor legislation;
(Item 1 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

2) That were obtained by the operator in connection with making a contract, the party to which is the subject of personal data, unless the personal data are disseminated and furnished to third persons without the consent thereto of the subject of personal data and provided those are used by the operator exclusively to execute the said contract and to conclude contracts with the subject of personal data;

3) That pertain to the members (participants) of a public association or religious organization and are processed by a relevant public association or religious organization operating in accordance with the legislation of the Russian Federation, for achieving the legitimate goals specified under their respective constituent documents, provided that the personal data are not disseminated or disclosed to third persons without the written consent thereto of the subjects of personal data;
(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

4) Made available to the general public by the personal data subject;
(Item 4 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

5) That include only surnames, first names and patronymics of the subjects of personal data;

6) That are essential for purposes of one-time passage of the subject of personal data into the territory of location of the operator or for other similar purposes;

7) That are included in the personal data informational systems, enjoying in accordance with the federal laws the status of state automated informational systems and also in the governmental informational systems of personal data created with the objective of protecting the security of the state and public order;
(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

8) That are processed without the use of automation facilities as is envisaged under the federal laws or other statutory legal acts of the Russian Federation prescribing requirements for ensuring the security of personal data in processing of the same and for observance of the rights of the subjects of personal data;

9) That are processed in the cases envisaged by the legislation of the Russian Federation on transport safety, for the purposes of ensuring the steady and safe operation of the transport complex, protecting the interests of the individual, society and state in the area of the transport complex from illegal interference.
(Item 9 is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

3. The notice envisaged by part 1 of this Article shall be sent as a paper document or an electronic document and signed by an empowered person. The notice shall comprise the

following information:
(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

1) Name (surname, first name, patronymic), address of the operator;

2) Goal of personal data processing;

3) Categories of personal data;

4) Categories of the subjects whose personal data are processed;

5) Legal grounds for personal data processing;

6) List of actions involving personal data, general description of the methods of personal data processing used by the operator;

7) Description of the measures envisaged by Articles 18.1 and 19 of this Federal Law, including information on the availability of encoding (cryptographic) facilities and a description of such facilities;
(Item 7 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

7.1) Surname, first name and patronymic of the natural person or the name of the legal entity responsible for the organization of personal data processing and their contact phone numbers, postal and e-mail addresses;
(Item 7.1 is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

8) Date of beginning the processing of personal data;

9) Period or condition for termination of personal data processing;

10) Information on the existence or lack of transborder flow of personal data in the course of their processing;
(Item 10 is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

10.1) Information on the location of a database of the information containing personal data of citizens of the Russian Federation;
(Item 10.1 is introduced by Federal Law dated July 21, 2014 No. 242-FZ)

11) Information on personal data security arrangements according to the requirements for the protection of personal data established by the Government of the Russian Federation.
(Item 11 is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

4. The authorized body for protection of the rights of the subjects of personal data shall, within thirty days from receipt of notification of personal data processing, enter the data specified under Part 3 of this Article and also data on the date of forwarding said notification into the register of operators. The data found in the register of operators, except for the data on the means of ensuring the security of personal data in their processing, shall be open to the general public.

5. The operator may not be required to bear the costs involved in considering the notification of personal data processing by the authorized body for protection of the rights of the subjects of personal data and also in connection with the entering of data into the register of operators.

6. In case of the submission of incomplete or inaccurate data as stipulated under Part 3 of this Article, the authorized body for protection of the rights of the subjects of personal data shall have the right to demand that the operator specify the data submitted prior to entering them into the register of operators.

7. If the information mentioned in Part 3 of this Article is modified, and also if personal data processing is terminated, the operator shall notify accordingly the authorized body for protection of the rights of the subjects of personal data within ten working days after the date of such modification or the date of termination of personal data processing.
(part 7 as amended by Federal Law dated July 25, 2011 No. 261-FZ)

### Article 22.1. Persons Responsible for Organizing Personal Data Processing in Organizations

(is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

1. An operator being a legal entity shall appoint a person as responsible for organizing the processing of personal data.

2. The person responsible for organizing the processing of personal data shall get directions directly from the executive body of the organization being the operator and shall report to that body.

3. The operator shall provide the person responsible for organizing the processing of personal data with the information mentioned in Part 3 of Article 22 of this Federal Law.

4. Among other things, the person responsible for organizing the processing of personal data shall:

1) Exercise internal control over the operator's and its employees' observance of the legislation of the Russian Federation on personal data, including the requirements for personal data protection;

2) Inform the operator's employees of the provisions of the legislation of the Russian Federation on personal data and local acts on issues of personal data processing and requirements for personal data protection;

3) Organize the acceptance and processing of applications and inquiries of personal data subjects or their representatives and/or exercise control over the acceptance and processing of such applications and inquiries.

### Chapter 5. STATE CONTROL AND SUPERVISION OVER THE PROCESSING OF PERSONAL DATA. LIABILITY FOR VIOLATION OF THE REQUIREMENTS OF THIS FEDERAL LAW
(as amended by Federal Law dated February 22, 2017 No. 16-FZ)

### Article 23. Authorized Body for Protection of the Rights of the Subjects of Personal Data

1. Authorized body for protection of the rights of the subjects of personal data shall be the federal executive governmental body carrying out the functions of control and supervision

over compliance of personal data processing with the legal requirements of the Russian Federation in relation to personal data.
(part 1 as amended by Federal Law dated February 22, 2017 No. 16-FZ)

1.1. The authorized body for protection of the rights of the subjects of personal data shall ensure, organize, and exercise state control and supervision over compliance of personal data processing with the requirements of this Federal Law and the regulatory legal acts adopted pursuant thereto (state control and supervision over personal data processing). The procedure for organizing and conducting inspections of legal entities and individual entrepreneurs being operators by the authorized body for protection of the rights of the subjects of personal data and the procedure for organizing and exercising state control and supervision over personal data processing by any other persons being operators shall be established by the Government of the Russian Federation.
(part 1.1 is introduced by Federal Law dated February 22, 2017 No. 16-FZ)

2. The authorized body for protection of the rights of the subjects of personal data shall deal with applications of the subject of personal data regarding the conformity of the content of personal data and methods of their processing with the goals of processing of the same and take relevant decisions.

3. The authorized body for protection of the rights of the subjects of personal data shall be entitled:

1) To request that individuals or legal entities furnish the information necessary for the realization of its powers and to receive that information free of charge;

2) To carry out verification of data contained in the notification of personal data processing or engage in order to carry out such verification the services of other governmental bodies within their respective powers;

3) To demand that the operator update, block or destroy inaccurate or illegally obtained personal data;

3.1) To restrict an access to the information being processed in violation of the legislation of the Russian Federation in relation to personal data according to the procedure established by the legislation of the Russian Federation;
(Item 3.1 is introduced by Federal Law dated July 21, 2014 No. 242-FZ)

4) To take according the procedure established under the legislation of the Russian Federation measures to suspend or terminate the processing of personal data effected in violation of the requirements of this Federal Law;

5) To apply to the court with the statements of claim to protect the rights of the subjects of personal data, including for the protection of the rights of an unlimited group of persons, and represent the interests of the subjects of personal data in court;
(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

5.1) To send to the federal executive governmental body empowered in the area of security and the federal executive governmental body empowered in the area of countering technical intelligence and of the technical protection of information, as applicable to the field of their activities, the information specified in Item 7 of Part 3 of Article 22 of this Federal Law;

(Item 5.1 is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

6) To file applications to the body effecting the licensing of activity of the operator for considering the issue of taking measures to suspend or annul a respective license according to the procedure established by the legislation of the Russian Federation, when the prerequisite of the license to conduct that activity is the ban to transfer personal data to third persons without the written consent thereto of the subject of personal data;

7) To send to the bodies of prosecution and other law enforcement bodies materials to take decisions on starting legal proceedings on the basis of elements of crime associated with the violation of rights of the subjects of personal data, in accordance with the relevant jurisdiction;

8) To make to the Government of the Russian Federation proposals on improving the statutory legal regulation of protection of rights of the subjects of personal data;

9) To bring to administrative liability persons guilty of violating this Federal Law.

4. The personal data that became known to the authorized body for protection of the rights of the subjects of personal data as it conducts its activity shall be subject to confidentiality of personal data.

5. The authorized body for protection of the rights of the subjects of personal data shall be obligated to:

1) Organize in accordance with the requirements of this Federal Law and other federal laws protection of the rights of the subjects of personal data;

2) Consider the complaints and applications of citizens or legal entities on issues associated with the processing of personal data and also to take within its respective powers decisions proceeding from the results of considering said complaints and applications;

3) Keep the register of operators;

4) Implement measures aimed at improving the protection of the rights of the subjects of personal data;

5) Take, according to the procedure established under the legislation of the Russian Federation upon the recommendation of the federal executive body authorized in the field of ensuring the security or the federal executive body authorized in the field of countering technical intelligence services and technical protection of information, measures to suspend or terminate the processing of personal data;
(as amended by Federal Law dated July 01, 2017 No. 148-FZ)

6) Inform the governmental bodies and also the subjects of personal data in response to their applications or inquiries of the state of affairs in the sphere of protection of rights of the subjects of personal data;

7) Perform other obligations as may be envisaged under the legislation of the Russian Federation.

5.1. The authorized body for protection of the rights of the subjects of personal data shall co-operate with bodies empowered to protect the rights of personal data subjects in foreign

states, in particular, carry out the international exchange of information on the protection of the rights of personal data subjects and endorse a list of the foreign states that provide adequate protection of the rights of personal data subjects.
(part 5.1 is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

6. Decisions of the authorized body for protection of the rights of the subjects of personal data may be appealed by judicial procedure.

7. The authorized body for protection of the rights of the subjects of personal data shall, on an annual basis, send a report on its activity to the President of the Russian Federation, the Government of the Russian Federation and the Federal Assembly of the Russian Federation. Said report shall be published in mass media outlets.

8. The financing of the authorized body for protection of the rights of the subjects of personal data shall be effected for account of the federal budget funds.

9. A consultative board, procedure for the formation and activity of which shall be determined by the authorized body for protection of the rights of the subjects of personal data, shall be set up on a voluntarily basis under the authorized body for protection of the rights of the subjects of personal data.

### Article 24. Liability for Violation of the Requirements of This Federal Law

1. Persons guilty of violation of the requirements of this Federal Law shall bear the liabilities envisaged by the legislation of the Russian Federation.
(as amended by Federal Law dated July 25, 2011 No. 261-FZ)

2. Moral harm sustained by a personal data subject as the result of an infringement on his/her rights, a breach of the personal data processing rules established by this Federal Law and also requirements for personal data protection established in accordance with this Federal Law is subject to compensation in accordance with the legislation of the Russian Federation. Compensation for moral harm shall be provided irrespectively of compensation for property harm and the damages sustained by the personal data subject.
(part 2 is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

### Chapter 6. FINAL PROVISIONS

### Article 25. Final Provisions

1. This Federal Law shall take effect upon the expiration of one hundred and eighty days from its official publication.

2. Following the effective day of this Federal Law, the processing of personal data that were incorporated within the personal data informational systems prior to its effective day shall be carried out in accordance with this Federal Law.

2.1. The operators that had been processing personal data before July 1, 2011 shall provide the authorized body for protection of the rights of the subjects of personal data with the information specified in Items 5, 7.1, 10 and 11 of Part 3 of Article 22 of this Federal Law by January 1, 2013.
(part 2.1 is introduced by Federal Law dated July 25, 2011 No. 261-FZ)

3. Abrogated. - Federal Law dated July 25, 2011 No. 261-FZ.

4. The operators that have been carrying out the processing of personal data prior to the effective day of this Federal Law and continue effecting that processing following its effective day shall be obligated to send to the authorized body for protection of the rights of the subjects of personal data, except for the instances specified under Part 2 of Article 22 of this Federal Law, a notification provided under Part 3 of Article 22 of this Federal Law, not later than January 1, 2008.

5. The relationships that have to do with personal data processing carried out by state bodies, legal entities and natural persons when state and municipal services are being provided, state and municipal functions are performed in the subject of the Russian Federation that is the federally-significant City of Moscow are regulated by this Federal Law, except as otherwise envisaged by the Federal Law on the Details of Regulation of Specific Legal Relationships in Connection with the Joining of Territories to the Subject of the Russian Federation That Is the Federally-Significant City of Moscow and on Amending Certain Legislative Acts of the Russian Federation.

(part 5 is introduced by Federal Law dated April 05, 2013 No. 43-FZ)

President
of the Russian Federation
V. PUTIN

The Kremlin, Moscow

July 27, 2006

No. 152-FZ

**Exhibit 12** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

COMPUTER LAW & SECURITY REVIEW 32 (2016) 128–145



Available online at www.sciencedirect.com

ScienceDirect

www.compseconline.com/publications/prodclaw.htm

Computer Law
&
Security Review

# Russia's new personal data localization regulations: A step forward or a self-imposed sanction?



## Alexander Savelyev *

*Legal Department, IBM East ern Europe/Asia Ltd., Moscow, Russia*

*Keywords:*
Personal data
Data localization
Cloud computing
Big data
Transborder data flows
Digital sovereignty

### ABSTRACT

The paper represents one of the first comprehensive analyses of Russian personal data localization regulations, which became effective at September 1, 2015. This work describes in detail the main components of the data localization mechanism: triggers of its application, scope, exemptions and enforcement. It also takes into account the official and non-official interpretations of the law by Russian regulators, some of which were developed with the participation of the author. Special consideration is given to the jurisdictional aspects of the Russian data protection legislation and the criteria of its application to foreign data controllers. The author also reveals the rationale behind the adoption of data localization provisions and analyzes their possible impact on foreign companies operating in Russia and implementation of innovative IT-technologies (Cloud computing, Big Data and Internet of Things). The paper concludes that most of the potential benefits of data localization provisions, i.e. in the area of public law, law enforcement activities and taxation. Nevertheless, data localization provisions may still have medium-term positive impact on privacy, since they force all stakeholders to revisit the basic concepts of existing personal data legislation (the notion of personal data, data controller, processing, etc.), thus serving as a driver for re-shaping existing outdated data privacy regulations and crafting something more suitable for the modern IT-environment.

© 2016 Alexander Savelyev. Published by Elsevier Ltd. All rights reserved.

## 1. Introduction

The Russian legislation in the sphere of information technologies is changing rapidly these days. Lots of newly adopted legal rules are reshaping the IT-market in Russia: software import substitution regulations in public procurement[1], special provisions governing blogger's activities, imposition of data retention obligations on Internet communication services, to name a few. But one of the most controversial and widely discussed is the recent "reinforcement" of Russian IT-law that relates to data localization provisions.

* IBM East ern Europe/Asia Ltd., Presnenskaya nab., 10, Moscow 123317, Russia.
  E-mail address: garantus@rambler.ru.

[1] Federal Law No. 188-FZ of 19 June 2015, which established preferential treatment of "domestic" software during public procurement procedures. The criteria of domestic software are: 1) exclusive right to such software should belong to a Russian person, specified in a law (e.g. to Russian Federation or its region, Russian citizen, non-commercial entity controlled by the above persons, commercial entity, established by the above persons, etc.); 2) such software should be freely available for distribution on the territory of the Russian Federation, including Crimea; 3) licence fees to foreign persons should not exceed 30% of proceeds from sales of such software.

http://dx.doi.org/10.1016/j.clsr.2015.12.003

0267-3649/© 2016 Alexander Savelyev. Published by Elsevier Ltd. All rights reserved.

Until recently, Russian legislation did not contain any special provisions governing data location: information could be stored and processed everywhere, subject to limitations associated with some traditional special regimes (e.g. information constituting state secret or conditions of transborder data flow to countries not providing adequate protection of personal data).

The first signs of data localization provisions appeared in the banking sphere. In accordance with amendments to Federal Law "On Banks and Banking Activities", adopted in 2013, financial institutions acting under a license from Central Bank of Russia were obliged to reflect all their financial transactions in electronic databases, allowing to store such data for a period not less than five years. Subsequent regulations of the Central Bank of Russia established that backup copies of such databases should be located in Russia[2]. However, location of primary databases with such data was not regulated: for the purposes of control and oversight activities, it is more than enough to have local backup databases not complicated by jurisdictional matters.

The second wave of data localization provisions happened in 2014. As a legislative response to the terrorist acts committed in Russian city Volgograd in the end of 2013, the so-called anti-terrorist "package" of laws was introduced, which apart from strengthening criminal liability for terrorist and related activities, introduced additional limitations on anonymous electronic money payments, obligations to identify users of Internet services in public access points and, what is more important, amendments to the main Russian statute regulating information technologies: Federal Law No. 149-FZ "On Information, Information Technologies and Protection of Information" (hereinafter – "Law on Information")[3].

These amendments may be divided into two parts: one relating to bloggers and another one to all other persons, which «organize dissemination of information in Internet». The first part, which was most widely discussed in blogosphere, pursues the goal of equalizing the legal status of popular bloggers (with more than 3000 views per day) with Mass Media and imposing obligations similar to those, which Mass Media has viz specifically, to be responsible for the accuracy of information published, to register with Russian supervisory authority in IT-sphere ("Roskomnadzor"[4]), to reveal true identity and provide contact details for sending communications relevant in law. Something similar was adopted in China as early as 2005, when all bloggers with independent web sites were required to register with the Government[5].

The second part directly relates to data localization requirements. A new legal status has been introduced, named as "*Organizer of dissemination of information in Internet*" (hereinafter – "Organizer"), which is defined as:

*any person, facilitating functioning of information systems and/ or computer programs, which may be used and/or are used for receipt, transfer, delivery and/or processing electronic messages of the users in Internet. (Article 10.1 of the Law on Information)*

Once it is established that a certain Internet-service falls within the definition of "Organizer", such person has to fulfil a number of obligations: to notify Roskomnadzor; to store user's traffic and other specified data for six months in Russia; and to cooperate with Russian law enforcement agencies (mostly Federal Security Service) by granting them access to the stored data upon request. Failure to comply with such obligations may lead to fines and blocking access to the web site of such Organizer.

As it may be seen, the definition of "Organizer" is formulated rather vaguely, allowing the inclusion in its scope of almost anyone associated with Internet service, even vendors of server hardware and software. Some further guidance is provided in subordinate regulations: Decree on Data Retention and Storage[6]. It contains a narrow approach, specifying that special data retention obligations associated with the status of Organizer apply only to providers of "communication Internet-services" understood as an:

*information system and/or computer program that is used or may be used for receipt, transfer and/or processing of electronic messages between Internet users, including for sending messages to the general public.*

According to this definition, Organizer is understood to be a person providing the services that allow Internet users to communicate *with each other*. Such an approach narrows the practical application of the legal regime of "Organizer" to such ISPs as social networks, providers of public e-mail, providers of collaboration/storage cloud services, providers of forums and other discussion groups. This narrow approach is used in the day-to-day practice of the Russian supervisory authority ("Roskomnadzor") as well.

As of July 1, 2014, there were around 60 Organizers registered with Roskomnadzor, which represent major Russian Internet platforms, providing users with communication facilities, among which are: public e-mail services of Mail.ru, Yandex and Rambler; social networks VKontakte and Odnoklassniki; free hosting/web-site configurator service uCoz.ru; cloud storage service YandexDisk; some of the biggest news aggregators with user discussion functionality. There are no foreign Internet businesses, since none have a physical presence in Russia yet. However, Roskomnadzor is conducting extensive discussions with foreign communication Internet-service providers with the intent to facilitate their compliance with the law. Whether many foreign companies will comply with this law yet remains to be seen. For now, it is possible to conclude that addressees of the second wave of data localization are *Internet communication services operating in Russia*.

The list of the data subject to local storage requirements is provided in the Decree on Data Retention and Storage. It

---

[2] Section 3.6 of Regulation of Central Bank of Russia No. 397-II of 21 February 2013.
[3] In practice, these amendments are usually designated/referred to by the number of the amending law (Federal Law No. 97-FZ).
[4] The Federal Service for Supervision of Communication, Information Technologies, and Mass Media. URL: http://eng.rkn.gov.ru
[5] China orders bloggers to register with government // The Guardian, 7 June 2005 http://www.theguardian.com/media/2005/jun/07/chinathemedia.digitalmedia.

[6] Decree of the Government of the Russian Federation No. 759 of 31.07.2014.

includes several types of data: i) data about user; ii) data about electronic communications occurred and iii) information about electronic payment transactions. Actual content of the communications is exempted from data storage requirements.

Taking into account that, from a legal perspective, most of the information which has to be stored by Organizers falls within the definition of "personal data", this relates to individuals, which can be directly or indirectly identified by means of it[7]. So, it is possible to argue that Federal Law No. 97-FZ has established a *regime of partial local storage of personal data*, thus preparing the ground for subsequently adopting Federal Law No. 242-FZ on full local storage and processing of personal data of Russian citizens. (This will be reviewed later in this paper.)

However, it needs to be mentioned that Federal Law No. 97-FZ does not require that the data are stored exclusively on the territory of Russia. In other words, it does not prevent data from leaving Russia by prohibiting its processing abroad. The law only requires that the copy of it is stored locally. That seems to be logical taking into account the main purpose of this law: facilitating investigatory activities without jurisdictional complications. For such purpose, it is enough to facilitate availability of relevant data to local authorities: exclusive storage of data in Russia seems to be an excessive measure.

Generally, Federal Law No. 97-FZ can be perceived as a legislative response to the convergence of Internet services and traditional telecommunication providers[8]. Historically, telecommunication operators were subject to multiple regulations, facilitating investigatory activities (e.g. as one of the conditions of their telecom license was that they have to implement special wiretapping infrastructure ("SORM") and provide relevant information upon request to authorized law enforcement agencies). However, in the modern era, where communications in the Internet environment become more and more common, limitation of those obligations to traditional fixed/mobile operators is no longer adequate. There are more and more voices in favour of the position that services of similar value and purpose need to have similar treatment, at least in critical matters. Of course, data retention obligations could be introduced without the localization requirements, but in such cases, Russian law enforcement authorities would lack enforcement teeth when such data are stored abroad. In such cases, special mutual legal assistance treaties should be followed, which provide lengthy procedures and discretion to the other party. So, absent other efficient enforcement mechanisms, localization of such data becomes an essential element of national sovereignty. But its limitation to traffic data and one type of actors (communication Internet-services) is not enough to make it efficient. Something more universal is needed; thus, the third wave of data localization has been introduced.

Such third wave is represented by the Federal Law No. 242-FZ, which supplemented Federal Law No. 152-FZ "On Personal Data" with a new controversial obligation. Data controllers, while collecting personal data of Russian citizens online, are obliged to store and process such data in databases located within the territory of the Russian Federation.

The Draft of Federal Law No. 242-FZ was prepared and adopted very quickly: it was submitted to the State Duma (lower house of Russian parliament) at June 24, 2014. On July 4, 2014, it was approved by State Duma, and on July 9, it was approved by the Federal Council (upper chamber of Russian parliament). On July 21, 2014, the President signed it. Explanatory materials accompanying the draft contain little information regarding the motives or justification of the proposed regulation. It simply states that the law is aimed at enhancement of the existing procedures of processing personal data and is "in line with the case law of European Court of Human Rights", referring to the decision of European Court of Justice of May 13, 2014[9]. Evident confusion of European Court of Justice with European Court of Human Rights illustrates the haste that accompanied the preparation of the draft and formal approach to its justifications. What can be said with absolute confidence, however, is that it will be adopted regardless of the presence or absence of persuasive arguments in its favour.

Regardless of all the circumstances surrounding the process of drafting and adoption of the Federal Law No. 242-FZ, the result is evident: Russia has introduced unprecedented regulation in the sphere of personal data protection.

## 2.     Overview of Russian personal data localization law and its existing interpretations

The well-known truism that "the devil is in the detail" perfectly applies to the matters of practical implementation of data localization provisions and their alignment with the rest of the corpus of data protection laws. It is one thing to proclaim data localization provisions and quite another to make them work. Not surprisingly, initial feedback on the data localization concept was very sceptical because of the difficulties of its alignment with the possibility of transborder data transfer and jurisdictional issues, associated with potentially exorbitant scope of application of this law. Many other questions were raised, driven by the novelty of the data localization concept and interpretation of the "letter of law", which most experts consider to be poorly drafted. However, in the year between the adoption of the law and its effective date (September 1, 2015), as a result of hot discussions between regulators and business community, interpretations were developed, which make the data localization regulations even if not perfect, but at least feasible.

---

[7] In accordance with the position of ECJ, retention of data constitutes the processing of personal data within the meaning of that article and, therefore, necessarily has to satisfy the data protection requirements. See: ECJ, Case C-293/12, Digital Rights Ireland and in Case C-594/12 Kärntner Landesregierung and Others. 8.04.2014.

[8] For more details, see Digital Convergence Policy and Regulatory Issues. Working Party on Communications Infrastructure and Services Policy. DSTI/ICCP/CISP(2015)2, 2 June 2015.

[9] C-131/12 Google Spain SL, Google Inc. v Agencia Española de Protección de Datos, Mario Costeja González (ECJ 13 May 2014). In this controversial decision, ECJ found that Google was a data controller and could be obliged to remove links to webpages published by a third party in order to protect an individual's so-called "right to be forgotten".

This section will be dedicated to the analysis of the details of application of data localization requirements within the scope of Russian personal data legislation, which is mostly based on Council of Europe Convention № 108 for the Protection of Individuals with regard to Automatic Processing of Personal Data 1981 to which the Russian Federation is a party to.

According to the newly introduced section 18(5) of the Russian Law on Personal Data, "data controllers when collecting personal data of Russian citizens online or offline, are obliged to record, systematize, accumulate, store, update, change and retrieve such data in databases located within the territory of the Russian Federation, except as indicated in subsections 2,3, 4,8 of Section 6(1) of the present law"[10].

In order to understand the mechanism of application of data localization provisions, it is necessary to split it into the following components and provide their interpretation:

(1) *the "triggers" of its application*: i) "collection" of ii) "personal data" of iii) "Russian citizen", performed or arranged by the iv) data controller, which is subject to the jurisdiction of Russian Law on Personal Data;
(2) *the scope of obligation imposed*: types of processing, which have to be localized; correlation with transborder transfer provisions;
(3) *statutory exemptions*;
(4) *enforcement and liability*.

Let's consider these elements in more details.

## 2.1.    The "triggers" of data localization provisions

One of the first question, asked by most companies and their associations, is when exactly do data localization requirements apply and which business-processes of the company fall within these requirements. The answer on this question depends on multiple factors.

### 2.1.1.    Information at hand should qualify as "personal data"
Russian Law on Personal Data contains rather broad definition of personal data, according to which it is "any information, relating to directly or indirectly identified or identifiable individual (data subject)". As a result, much (if not all) data contains information that can be construed as personal data. Besides, in reality, there is no technical or legal way to separate personal data from non-personal mechanical information. Any transaction on the Internet made while logged in to an account may amount to personal data, and even the most harmless pieces of company data may contain information about the employee. Since such a broad approach to personal data makes enforcement of the law almost unmanageable, in its day-to-day practice, Roskomnadzor follows narrower approach to the definition of personal data. According to it, information is considered personal, if it meets two criteria: 1) it identifies *specific* individual, and 2) such precise identification is possible either from the data at hand itself or from this data and other in-

formation in the possession of the data controller[11]. Moreover, information constituting identifiers, assigned to a specific person by a state (passport number, social security number, taxpayer number, etc.), is assumed to be personal data in all cases, although may is difficult to identify a person based only on such number, without access to a database with information matching this number to the particular person. Thus, all information related to the individual, which allows to identification of her/him, is potentially within the scope of localization requirements, unless there is only one element of personal data at hand, for example, first and last name or e-mail address, or phone number, etc. But any combination of two or more such elements or the presence of the state-assigned identifiers brings all the data within the scope of localization obligations. Unfortunately, not all the information may be clearly qualified as personal or non-personal by using such an approach. The status of user-generated content, dynamic IP-addresses, nicknames in online games, and other types of information that potentially may be linked with a particular individual is in grey area [12].

### 2.1.2.    Personal data should be "collected"
It means that such data should be received as a result of purposeful and direct interaction of operator (or its agent) with the data subject. Personal data received from third parties (e.g. from the employer of the data subject) is not subject to localization by its recipient, since it is assumed that such employer should have already localized it. As also clarified by Roskomnadzor and Russian Ministry of Communications, accidental receipt of personal data (e.g. in e-mail from data subject) does not amount to "collection". Similarly, a provider of IaaS cloud services does not perform collection with regard to personal data, put by its client in the cloud; therefore, such "data in the cloud" is not subject to localization by the cloud provider; however, the client of the cloud provider, being a data controller, may still be subject to data localization

---

[10] This section was introduced by the Federal Law No. 242-FZ, which is most common designation of the data localization provisions.

[11] This narrow approach is not formalized somehow, though. However, some traces of it can be found in the text of non-official commentary, prepared by the group of authors from Roskomnadzor. See: Commentary on the Federal Law No. 152-FZ "On Personal Data" [in Russian] /ed. by the deputy head of Roskomnadzor A.A. Priezzheva. "Russian gazette", Moscow, Vol. 11, 2015. P. 15–17. As it may be seen, described approach is rather close to the definition of personal data contained in the UK Data Protection Act of 1998. In accordance with section 1(1) of this act, "personal data" mean data which relate to a living individual who can be identified – (a) from those data or (b)from those data and other information which is in the possession of, or is likely to come into the possession of, the data controller.

[12] European authorities experience similar difficulties in assessing the status of such information. For example, on October 28, 2014, the German Federal Court of Justice referred the question of whether a dynamic IP address constitutes personal data under the EU Data Protection Directive 95/46/EC to the European Court of Justice. The approaches of national courts to the status of dynamic IP addresses diverge. The Irish High Court decided that IP addresses do not amount to personal data under the terms of the Irish implementation of the Data Protection Directive (EMI & Ors v Eircom Ltd [2010] IEHC 108). The French Constitutional Court, when deciding the question on constitutionality of Hadopi law, held that IP addresses constitute personal data (Décision No. 2009-580 DC du 10 juin 2009).

requirements[13]. Linkage of data localization requirements to some kind of purposeful and clearly defined action of a data controller is aimed to provide a degree of predictability to the overall mechanism and avoid its potentially overreaching scope of application.

### 2.1.3.   *Collected personal data should be linked with Russian citizen*

The practical application of this requirement is rather complicated and tricky. It is generally quite unusual to limit the scope of application of personal data laws by the nationality principle. European data protection legislation, which treats protection of personal data as a fundamental human right, is nationality-neutral. As Working Party 29 clarified:

> . . .*Nor would it be acceptable to reduce the scope of protection to persons residing in the EU, since the fundamental right to protection of personal data is enjoyed regardless of nationality or residence*[14].

Attempts of some European countries to introduce a narrower, country-specific approach were not successful. According to Kuner, Greece once tried to follow a nationality-based approach in application of its data protection legislation, by requiring data controllers operating outside Greece, who processed data of Greek residents to appoint a representative in Greece, who would be liable for such processing. These provisions were later changed following the objections by the European Commission[15].

But even apart from the fundamental rights considerations, it is very difficult to link the application of data protection legislation to the nationality of the data subject. Most data operators, especially those collecting and processing personal data via the Internet, do not have information relating to the nationality of data subjects. Such information is irrelevant for the provision of most Internet services. But even if some kind of additional field in the registration form is introduced, reflecting the nationality of the user, there is no guarantee that the information provided is correct, unless a burdensome procedure of verification of user passports is introduced which is not feasible in most cases. Roskomnadzor understood the magnitude of the problem and decided to entrust its solution to data controllers themselves.

According to the interpretations provided, it is up to data controllers to define how they will identify the citizenship of the data subject. However, in case of doubt, it is possible to lo-

calize all the personal data collected on the territory of Russia and remain compliant[16]. So, Roskomnadzor basically substituted a nationality criterion with the residence one as more convenient both in practical application and enforcement. It is also more coherent with the general Russian approach granting "national treatment" to foreign persons[17]. Besides, this approach also means that data localization requirements do not apply to personal data of Russian citizens collected outside Russia (e.g. from Russian citizens who are living outside Russia). What leads to a more adequate jurisdictional reach of the Russian data protection law will be discussed in more detail later. Generally, as Russian experience shows, it is not feasible to structure personal data localization requirements based on citizenship criteria, although it may have some populist advantages for politicians lobbying for such laws.

### 2.1.4.   *Collection of personal data of Russian citizen is performed or arranged by a data controller*

In accordance with Russian Law on Personal Data, the data controller ("operator" in terminology of Russian law) is the natural or legal person, state or municipal authority, processing personal data solely or jointly with other persons and determining the purposes of such processing, scope of personal data and means of processing. So, data processors, acting in the interest of data controller and in accordance with existing agreements, are not subject to data localization obligations themselves. The data controller is liable for their activities. Therefore, if a transnational company, acting as a data controller, has a global IT-outsourcing agreement with a foreign company, and is a provider of these services, as a part of its obligations, then collects and processes personal data of Russian clients of transnational company, such company is liable for non-compliance with Russian law on Data Protection, not the service-provider.

Data localization obligations apply to all data operators without industry-based exemptions. Although initially there were discussions to limit localization requirements only to Internet-businesses as the source of most risks, associated with misuse of personal data in the digital economy, such an approach was considered unsatisfactory as discriminating and difficult in application.

Finally, it is necessary to emphasize that not any person formally falling within the definition of "data controller" is subject to data localization requirements of Russian law, but only the person falling under the jurisdiction of Russian laws. Jurisdictional aspects of Russian Law on Data Protection will be considered later on in detail.

## 2.2.   **The scope of data localization obligations**

Once it is established that data localization provisions are triggered, the data operator has to ensure that such types of processing as "recording, systematization, accumulation, storage, updating, changing and retrieving" of such data are performed in databases located within the territory of the Russian Federation. Such types of processing as usage,

---

[13] While supporting the result of the clarifications, I think that it would be more appropriate to say that IaaS cloud service provider is not a data controller, rather than just saying that it does not perform "collection" as one of the methods of processing. But anyway, any approach recognizing the specifics of cloud services is a big step to recognizing the sui generis status of IaaS cloud providers, advocated by Christopher Millard and others. See: Cloud Computing Law / ed. by Christopher Millard. Oxford University Press. 2013. P. 193–220.

[14] Article 29 Data Protection Working Party. Opinion 8/2010 On Applicable Law. 16 December 2010. P. 24.

[15] *Christopher Kuner*, Data Protection Law and International Jurisdiction on the Internet (Part 1) // International Journal of Law and Information Technology. Vol. 18 No. 2, 2010. P. 189.

[16] § 5 of Letter of Roskomnadzor No. 08AII-3572 of 19 January 2015.

[17] Article 2(1) of Civil Code of the Russian Federation.

COMPUTER LAW & SECURITY REVIEW 32 (2016) 128–145

dissemination, depersonalization, blocking, erasure, destruction are not on the list of types of processing, which are subject to localization. Therefore, they can be performed elsewhere. Provision of remote access to local database is not prohibited either.

The data controller is also obliged to notify Roskomnadzor about the location of its primary databases, unless such controller falls within one of the notification exceptions, as indicated in Section 22 of Russian Law on Personal Data (e.g. it processes only personal data of its employees or clients under the contract without further transfer of such personal data to third parties; processes personal data necessary for facilitating one-time access to the controller's premises, etc.). The presence of such notification obligation is essential for performance of compliance audits by Roskomadzor.

But one of the most critical questions relating to the scope of data localization obligations is whether transborder transfer of personal data of Russian citizens is allowed, and if yes, how to align it with data localization requirements.

From the very beginning, it was not clear how the wording of the law may co-exist with the remaining opportunity to transfer personal data abroad. If storage of personal data should be arranged on Russian territory, then transborder transfer is not possible since, from technical point of view, the transferred data will inevitably be stored at least for some period of time on a server located somewhere abroad. Besides, transborder transfer is usually accompanied with such types of processing on the side of recipient as "systematization and retrieval"; otherwise, it will be impossible to work with the received data.

The question was further complicated by the statements of the Russian officials, according to which data localization regulations are intended to prevent misuse of personal data of Russian citizens by foreign data controllers and to protect Russian citizens from the surveillance of foreign states[18]. Assuming that it is so, the right to transfer personal data abroad, especially in countries not providing adequate protection, seems to be at odds with the stated purposes. How can personal data localization requirements protect from all those risks, if after all personal data can be still transferred and processed abroad, without any control by the Russian authorities?

However, the Russian data protection authority (Roskomnadzor) managed to find a solution enabling co-existence of data localization and transborder transfer of personal data. The essence of the solution is to divide all the databases that may contain personal data into two groups: *primary databases* and *secondary databases*. The database where the personal data should be *initially* recorded into, as well as stored and updated at a later stage, must be located in Russia (the "primary database"). After that, information from such "primary databases" can be transferred to databases located outside of Russia ("secondary databases"), subject to provisions of the Law on Personal Data related to transborder transfer.

In other words, a master copy of personal data of Russian citizens, collected in Russia, should be located in Russia, as well

as subsequent updates and additions to that personal data. Technical solutions where the primary database is located abroad, and only a Russian copy ("replica" or "mirror") of such foreign database is created, are not in line with the law. What it means for companies and what are the potential reasons for such an approach from the perspective of Russian government will be discussed in subsequent sections of the paper.

Provisions on transborder transfer of personal data in Russian Law on Personal Data are generally similar to those in Directive 95/46/EC. The conditions of transfer of personal data to a foreign jurisdiction depend on the level of protection of personal data, which such jurisdiction has. If it can be considered as "safe harbour" jurisdiction, providing "adequate" protection (countries, which are the parties to the Council of Europe Convention 108, and those states, which are considered as providing an adequate level of data protection by the decision of Roskomnadzor[19]), transfer of personal data to such "safe harbour" states does not require additional consent in a written form and is generally permitted, subject to the general provisions of Russian Law on Data Protection (e.g. the presence of specific and informed consent for processing personal data).

Transfer of personal data to the country, which does not provide for an adequate protection of data subjects' rights, may take place with the prior written consent of the data subject or in limited cases without such specific consent, for instance, in the context of the performance of an agreement with the data subject.

### 2.3. Statutory exceptions

Section 18 (5) of the Russian Law on Personal Data containing data localization obligations includes four exceptions. All of them are structured by means of reference to some grounds of processing of personal data without consent of a data subject, listed in Section 6, specifically, to its subsections 2, 3, 4 and 8:

(1) processing is required for meeting the goals of international agreement or statute, or for the purposes of compliance with obligation imposed on data controller by the Russian legislation (subsection 2);
(2) processing of personal data is performed for the purposes of law enforcement (subsection 3);
(3) processing of personal data is performed by government agencies authorized in a course of provisions of public services (subsection 4);

---

[18] Savelyev A. Data localization laws and their potential impact on E-commerce in Russia [in Russian] // Zakon. Vol. 9, 2014. P. 51–68.

[19] In accordance with the Order of Roskomnadzor No. 274 of 15 March 2013 (as amended by the Order No. 152 of 29 October 2014), among such countries are: Australia, Israel, Canada, Morocco, Malaysia, Mexico, Mongolia, New Zealand, Angola, Benin, Cape Verde, South Korea, Peru, Senegal, Tunisia, Chile. Accordingly, such countries as USA, China, Japan and other are not considered as providing "adequate" level of protection of personal data. The criteria which Roskomnadzor uses for assessment are not formalized, but from personal sources the author knows, that there are three of them: 1) the presence of legislation, based on the same principles as reflected in CE Convention No.108; 2) the presence of special government agency, responsible for supervision in this sphere, which cooperates with Roskomnadzor, and 3) the presence of liability for breach of personal data legislation.

(4) processing is performed by Mass Media or journalists in the course of performance of their professional activities, or in the course of scientific or other creative activities, if rights and legitimate interests of data subject are not harmed (subsection 8).

The list of exemptions from the requirement of local personal data storage is a closed one and is covering situations, relating to the public sphere. There are no exemptions specifically addressing the private sphere, e.g. the list does not include such vital e-commerce exceptions as processing personal data for the purposes of performance of a contract to which the data subject is party. Nor does such a list contain an exception for personal data that were made publicly available by the data subject himself, an exception relevant for social networks and blogging platforms. Finally, the situations where processing is performed based on legitimate interests of the data controller are also not covered by the exemptions to local storage obligations. Therefore, most of the operations of Internet businesses are not exempted from the data localization requirements.

The most valuable exemption on the list relates to situations where processing is required for meeting the goals of international agreement or statute, or for the purposes of compliance with obligations imposed on data controllers by the Russian legislation (subsection 2). The most evident example is processing by financial institutions of personal data of their clients, in accordance with the provisions of Federal Law No. 115-FZ of 7 August of 2001 "On combating money laundering and terrorist financing activities". Another example relates to the sphere of civil aviation, which is governed by the Russian Air Code and a number of international conventions to which the Russian Federation is a party to[20]. According to the clarifications of the Ministry of Communications of Russia, since air carriers have to process personal data of the passengers for the purposes of performance of their obligations and ensuring security of flights and passengers, such processing can be performed abroad. This exception is also applicable to the agents of air carriers, e.g. to reservation systems. However, if air carriers and their agents are involved in other types of activities, having a complementary nature (e.g. such as provision of hotel booking services), they are subject to the data localization requirements on a general basis. However, since this exception applies mostly to those of a public nature rather than private relations, it does not apply to processing driven by the existing contractual relations in its core, e.g. to situations where a seller processes personal data of a consumer as a part of its statutory warranties or where an employer processes personal data as a part of existing labour obligations.

As the analysis of the scope of exemptions from data localization requirements shows, application of this mechanism is not dependent somehow on the will of the data subject, in contrast to, e.g., the Malaysian Personal Data Protection Act of 2010, which established localization requirements but still permits transfer of personal data abroad if the data subject has given their consent for transfer abroad[21]. Even if he is fully aware about the potential risks of processing his personal data abroad and is ready to accept them, it is not possible, since data localization provisions are mandatory and override all the possible private agreements between data subject and data controller. It may look like excessive paternalism and intrusion in the private sphere of an individual, but in the era of universal use of privacy, policies suggested a "take-it-or-leave-it" basis; this other approach would effectively negate data localization obligations, since it would be very easy to bypass them by updating privacy policies with relevant provisions. In reality, there is no feasible alternative to the mandatory nature of data localization requirements (subject to a narrow list of public policy driven exemptions), if government wants to ensure that they work in practice *and there are no economic or other incentives that could ensure compliance with them on voluntary basis.*

### 2.4.   Enforcement and liability

Enforcement authority is vested with Roskomnadzor, whose powers were substantially expanded by Federal Law No. 242-FZ. Roskomnadzor performs its supervisory activities in several forms, including the old ones, such as audits of data controllers, and a new one: systematic monitoring of the Internet. Audits can be either documentary, where only documents relating personal data processing are requested and analyzed, or onsite, where apart from documents, IT-infrastructure can be checked as well as other aspects of personal data processing. Audits can also be scheduled, when the audited company is included on the special list available on the Roskomnadzor's website and valid for the relevant year[22], or unscheduled, when an audit is initiated with 24-hour prior notice of the data controller (usually based upon a data subject's complaint)[23]. In the latter case, relevant violations can be revealed by the Roskomnadzor's official himself, without prior interactions with a data controller. Among the possible grounds for performance of audits is information about possible violations, which is circulating in Mass Media, and complaints of data subjects. Roskomandzor also received a right to engage experts for performance of onsite audits, since analysis of IT-infrastructure and information flows require deep expertise, which ordinary officials usually lack. If any non-compliance is found, Roskomnadzor is obliged to issue a prescription to fix it with an indication of specific measures which need to be taken. Thus, the degree of certainty is increased since the data controller will be able to work out an action plan to

---

[20]   e.g. Convention on International Civil Aviation 1944 (Chicago Convention), Convention for the Unification of certain rules relating to international carriage by air 1929 (Warsaw Convention) and others.

[21]   Article 129 (3)(a) of Personal Data Protection Act 2010, No. 709. URL: http://www.kkmm.gov.my/pdf/Personal%20Data%20Protection%20Act%202010.pdf.

[22]   The most likely candidates for inclusion on the list of scheduled audits are those companies, which fell "on the radar" of Roskomanzor as a result of submission of notification to it on performance of personal data processing operations, which do not fall within the list of exemptions indicated in Section 22 of Russian Law on Personal Data.

[23]   Draft of Regulations on the procedure of State control and supervision for the compliance with personal data protection requirements of the legislation of the Russian Federation approved by the Decree of the Government of the Russian Federation. It is expected to be adopted in the beginning of 2016.

COMPUTER LAW & SECURITY REVIEW 32 (2016) 128–145

implement them, without guessing what exactly was the reason for dissatisfaction of the DPA. Roskomnadzor is also entitled to issue a binding order to suspend or terminate processing.

Failure to comply with data localization obligations may lead to a number of consequences. One of them is an administrative fine, which may be imposed on legal entities for violation of the general rules of collection, storage, use or distribution of personal data that amounts to RUB 10,000[24] (approx. $175). Of course, such fines can hardly be regarded as an efficient deterrent of unwanted behaviour, especially comparing to the costs of localization of personal data processing processes. Currently, the amount of fine and wording of specific types of violation of data protection legislation is under reconsideration in the Russian parliament and may be increased. No criminal liability is established for violation of data localization provisions and personal data legislation provisions in general.

However, the main risk of non-compliance with new data localization provisions is represented by the new provisions on blocking access to web sites. Federal Law No. 242-FZ also empowered Roskomnadzor to block access to web sites, containing information which is being processed in breach of Russian data protection legislation. Network addresses (IP addresses and/or domain names) of such Internet services are included in a special Register maintained by Roskomnadzor, while the data controller is included in a special black-list of companies, violating data protection legislation.

This provision is, perhaps the strongest incentive for companies, valuing their reputation, to comply with the new law. As Uta Kohl aptly puts it, "The fact is that being perceived as a law-breaker is not good for business"[25]. As Kuner further explains, "soft" penalties such as adverse publicity are an important incentive to comply with data protection law, since damage to a company's reputation can ultimately cause it more harm in the marketplace than can a fine[26]. So, associated reputational risks of being blacklisted and "tagged" as a violator of data protection legislation with subsequent negative publicity force many foreign companies, especially public ones, to consider compliance with new data localization provisions seriously.

Taking into account that most of the Internet companies are out of the jurisdictional reach of the Russian government authorities, blocking access to their web sites by means of local intermediaries seems to be the most effective way of enforcing exterritorial application of the law. As Goldsmith and Wu note: "With few exceptions governments can use their coercive powers only within their borders and control offshore Internet communications only by controlling local intermediaries, local assets, and local persons"[27].

## 2.5.    *Jurisdictional scope of Russian law on data protection*

Whether or not Russian Law on Personal Data and particularly its new data localization requirements apply to foreign data operators, if that is so, then on which conditions? These questions were among the top ones for almost a year between the adoption of Federal Law No. 242-FZ and its effective date during discussions within the business community. Ironically, prior to Federal Law No. 242-FZ, jurisdictional aspects of personal data legislation were not of much concern for international market players and regulators. The former perceived Russian personal data legislation to be something on the periphery, not worthy of serious attention, especially in light of the amounts of fines for its violation. The latter was trying to enforce its provisions at least with regard to domestic data controllers; there were no resources, desire or directions from the above to apply it to companies acting outside Russia. Data localization provisions changed the attitude of the business community to personal data legislation in general and provoked massive interest and desire to ensure compliance with it.

But from the very beginning, lots of criticisms were directed at the data localization provisions on the ground that these are overreaching and make the entire world non-compliant with it. It was argued that small hotels say, somewhere in Austria, processing personal data of Russian tourists or Oxford university processing personal data of Russian students will hardly involve servers in Russia for those purposes. These arguments were further heated by the concerns expressed in blogosphere, that Roskomnadzor would start massive blocking of access to foreign web sites because of their non-compliance with data localization provisions. It is evident that the key question here is not whether data localization requirements are applicable as such from the jurisdictional perspective, but what is the territorial scope of the application of Russian Law on Personal Data, including those data localization obligations. The answer to this question will define whether such 'absurd-looking' situations fall within the ambit of the law, or not.

Russian Law on Data Protection does not contain any specific provisions governing its territorial scope and potential application to foreign persons. Its section 1, dedicated to the scope of the law, the provision just says that it governs automatic and non-automatic personal data processing, performed by federal, regional and municipal authorities, natural or legal entities and lists some activities, exempted from the scope (processing for personal use such as processing of information constituting a state secret, or processing of information subject to regulations on archives). Foreign persons are not specifically mentioned in the text, unlike what is done, e.g., in the Singapore Data Protection Act of 2012[28]. However, since personal data legislation contains both public law provisions (e.g., relating to the authority of DPA and enforcement

---

[24] Article 13.11 of the Code of Administrative Offences of the Russian Federation.

[25] Uta Kohl, *Jurisdiction and the Internet: Regulatory Competence over Online Activity*. Cambridge University Press. 2007. P. 208.

[26] Christopher Kuner, *The "Internal Morality" of European Data Protection Law,* (November 24, 2008), P. 9 *available at* http://ssrn.com/abstract=1443797.

[27] Jack Goldsmith & Tim Wu, *Who Controls the Internet?* Oxford University Press, 2008. P. 159.

[28] The definition of «organization», provided in this law includes «any individual, company, association or body of persons, corporate or unincorporated, whether or not — (a) formed or recognized under the law of Singapore; or (b) resident, or having an office or a place of business, in Singapore» (Section 2(1)).

procedures) and civil law ones (e.g., relating to consent requirements, agreements between data controllers and processors, etc.)[29], it is possible to refer to the provisions of the Russian Civil Code, according to which foreign persons enjoy national treatment, unless otherwise is provided in the law (Article 2(1)). So, even in the absence of explicit reference to foreign companies in the Russian Law on Personal Data, there are no reasons to limit it only to national data controllers. This is exactly what the Russian Ministry of Communications did in one of its early responses on private requests for clarifications. It maintained a position that since Russian law applies only on the territory of the Russian Federation, it does not apply to foreign companies and nationals, and applies only to Russian individuals, companies and public authorities, including those, which process personal data abroad.

However, not everyone shared that approach, as it creates a basis for law evasion and shifts the burden of compliance mostly on Russian-based data controllers, since they are cut off from access to cheap hosting services and have to incur extra costs for reconfiguring their infrastructure, what inevitably will be reflected in their competitive position.

Thus, there was a need for balanced criteria which, on the one hand, would provide a sufficient degree of certainty and predictability, allowing market players to foresee the possibility of application of personal data legislation, while, on the other, would provide a necessary degree of application flexibility, thus minimizing the temptations for law evasion. Such criteria should take into account the specifics of Internet architecture: it is a global network based on protocols without regard to national borders, where information is routed across the network based on automatic decisions driven by efficiency.

To develop such criteria, a special working group within the Advisory Board of Roskomnadzor was created. The group consisted of the representatives from the leading Russian universities, legal consulting companies, business community, and was headed by the author[30]. The results of this work were reflected in a report[31] and official interpretations of Federal Law 242-FZ, provided by the Ministry of Communications of Russia[32], the summary of which is provided below.

The working group based on the performed analysis of various approaches to definition of the territorial scope of data protection legislation (accessibility, country of origin, equipment-based, targeting) came to the following conclusions.

While having some value in criminal jurisdiction by allowing policing of serious crimes committed via Internet from abroad, accessibility of web sites on the territory of a particular country is quite unsatisfactory as a factor for defining the jurisdictional reach of data protection legislation, since it leads to exorbitant jurisdiction. Associated enforceability problems leading to mass-scale non-compliance, undermining the law's and regulator's credibility, are also evident.

It was also concluded that a country of origin approach, as initially proposed by the Ministry of Communications, and which assumes that a data controller has to comply with data protection legislation of the country of its establishment (incorporation), works well only when data protection legislation of countries for which it is applied is highly harmonized and there is an established effective cooperation between their data protection authorities. Otherwise, the country of origin approach may lead to "forum shopping" and choosing the most favourable jurisdiction for data controller. Since personal data localization requirements are unique for Russia and do not have analogies in other countries[33], and compliance with them is associated with certain costs, the country of origin approach for Russia would mean a massive exodus of data controllers from Russia to foreign countries. So, the effect of the data localization law could be the exact opposite to what was intended, just because of the outdated approach to handling of jurisdictional matters concerning the Internet.

The equipment-based approach similar to the one provided for in Article 4 (1)(c) of Directive 95/46/EC, establishing the application of data protection laws of the country where data controller uses equipment for the purposes of processing personal data, was also considered unsatisfactory. Although, at least at the first glance, such an approach may seem to be a good compromise between traditional territory-based jurisdictional criteria and new technological realities, it was considered to be too complex in application. It took into account that as European practice shows, it is difficult to provide a clear definition of "equipment" (e.g. whether user's equipment with cookies installed may amount to "equipment" used by data controller). It is also difficult to trace the exact location of equipment used in cloud environment. Besides, an equipment-based approach may lead to undesired and unexpected results of application of the country's personal data law to processing which has no real connection with such country (e.g. EU law may be applicable in situations, where a Singaporean

---

[29] For details see: Christopher Kuner, *Data Protection Law and International Jurisdiction on the Internet (Part 1)* // 18 Int'l J.L. & Info. Tech. 2010. P. 181–183.

[30] The following members of the working group, who provided valuable contributions need to be especially mentioned: Vadim Plekhanov (Ph.D., associate professor of the faculty of law of Moscow State University), Elena Voinikanis (Ph.D., associate professor of the faculty of philosophy of Moscow State University, GR executive of Rostelecom company), Vadim Perevalov (associate of Baker & McKenzie, Moscow), Ludmila Terentieva (Ph.D, associate professor of Moscow State Law Academy), Vladislav Arkhipov (Ph.D., associate professor of the faculty of law of Saint-Petersburg State University, counsel at Dentons, Saint-Petersburg).

[31] Currently, this report is for Roskomnadzor internal use only. However, there are plans to publish it on the official web-site of the Roskomnadzor.

[32] The text of interpretations (in Russian) is available on official website of the Ministry of Communications of Russian Federation via the link: http://www.minsvyaz.ru/ru/personaldata/.

[33] Data localization requirements are presented in legislation of some other countries, e.g. in Australia, India, Malaysia, Vietnam (see generally: A. Chander, U. P. Le, Breaking the Web: Data Localization vs. the Global Internet, Working Paper 2014-1, California International Law Center, 12.03.2014. P. 28–30. http://ssrn.com/abstract = 2407858). However, neither of them are as general and comprehensive as in Russia and backed up with specific enforcement mechanism, such as DPA's audits with the possibility of outside experts involvement and website blocking provisions.

company processes personal data of Singaporean residents, using cloud services of a provider with the data centre located in the Netherlands)[34]. In Russian realities, the equipment-based approach to jurisdiction of personal data legislation also creates a basis for evasion of such laws, by moving processing activities offshore.

As a result, the working group came to the conclusion that a targeting approach for definition of the scope of jurisdiction is the most appropriate one with regard to the objectives set. When a data controller purposefully directs its activities on the territory of the Russian Federation and extracts benefits from such activities, such benefits should be accompanied with corresponding obligations of compliance with the laws of the Russian Federation. Therefore, a fine-tuned targeting approach may provide a degree of certainty and predictability, allowing market players to foresee the possibility of the application of Russian personal data legislation to their activities, while on the other hand providing a substantial degree of flexibility, allowing it to address new trends in the IT-sphere while minimizing the temptations for the legal evasion. Besides, the targeting approach is presented already in the Russian law. Initially, it has been reflected in the Russian Civil Code, which establishes special rules applicable to the choice of law in consumer contracts, pretty similar to those expressed in Section 6 (1) of Rome I Regulation[35]. Recently, targeting approach found its expression in the sphere of information law. The new law the "right to be forgotten", which will be described in more detail later, is applicable to search engines, which direct their ads on consumers located in the Russian Federation[36]. So the "targeting approach" is not something alien to the Russian legal system, and it was not very difficult for the Ministry of Communications of the Russian Federation to put it as a main jurisdictional criterion for the personal data protection legislation.

However, the most challenging objective is to define factors which may serve as evidence of targeting of online activities on the territory of the Russian Federation. After extensive discussions and analysis of foreign experience, the following list of factors has been prepared.

---

[34] Article 29 Data Protection Working Party. Opinion 8/2010 On Applicable Law. 16 December 2010. P. 29.

[35] Article 1212 of the Russian Civil Code states: «The choice of law applicable to a contract concluded with an individual, using, acquiring or ordering, or having an intent to use, acquire or order tangible good (works, services) for personal, family, home and other needs, not associated with performance of commercial activity, cannot deprive such individual (consumer) of protection of his rights, provided by the laws of the country of the habitual residence of such consumer, if the counterparty of the consumer (the entrepreneur) pursues his commercial activities in such country or by any means **directs such activities** to that country or to several countries including that country, and the contract falls within the scope of such activities».

[36] Federal Law No. 264-FZ of 13 July 2015, 'On amendments to the Federal Law No. 149-FZ "On Information, Information Technologies and Protection of Information" and Articles 29 and 402 of the Code Civil Procedure of the Russian Federation'. The law becomes effective January 1, 2016.

### 2.5.1. Primary factors

*2.5.1.1. Usage of geographic domain name, associated with Russian Federation or its regions (.ru, .su, .рф, .moscow, etc.).* This approach is already being used by Russian Federal Antimonopoly Service (FAS) for definition of the scope of application of Russian law on advertising[37]. It seems to be justified, since registration and factual use of such geographic domain names can be interpreted as a will of the company to perform its activities "having Russia in mind", due to a strong linkage of such domain names with the territory of Russian Federation. However, if such domain name is registered for protective purposes only (e.g. for prevention of its takeover by a competitors or cybersquatters), and is not accompanied with its factual use, it should not be generally regarded as a "targeted" activity within the Russian Federation.

*2.5.1.2. Usage of Russian language.* The presence of a localized Russian version of web sites can be regarded as a strong indicator of a targeting of Russian users, regardless which domain name is used (i.e. this criteria is applicable also to web sites registered under functional domain names such as .com, .org, etc.). However, such a presumption can be valid only if translation has been purposefully performed by the owner of a web site himself or by other person, acting under a contract with the owner. Use of automated translation functionality, allowing translation into multiple languages chosen by the user, cannot be a basis for a conclusion that a web site targets the Russian Federation: rather it is possible to argue that it targets an *international audience in general*, without its nationality differentiation. Moreover, if automated translation functionality is implemented by the user himself (e.g. by using special web-browser plugins), subjecting web-site owner to Russian data protection laws (absent other factors, evidencing about the targeting of its activities on Russian Federation) would mean that a legal duty of a person depends not only on the circumstances beyond control of such person, but also on the circumstances, which such person is not reasonably aware of. Such an approach is incompatible with the principles of legal certainty.

Taking into account that the Russian language is widely used in countries other than Russia, and can even be recognized as the official language in some of them (e.g., in Belarus, Kazakhstan, Kirgizstan, Tajikistan), there is a need for secondary, fine-tuning factors. Therefore, in addition to the presence of localized Russian version of a web site, there should be at least one of the following secondary factors in place:

### 2.5.2. Secondary factors

(1) Pricing in rubles;
(2) Availability of Russian phone numbers or Russian toll-free numbers (8–800. . .);
(3) Russia-oriented marketing activities of the web site owner, including usage of keyword advertising or banners in Russian language with a link to a relevant web site;

---

[37] Letter of FAS No. AK/24981 of 3 August 2012 "On advertising of alcoholic drinks on Internet and print media".

(4) Possibility of conclusion of the contract with a Russian resident and possibility of delivery of goods/digital content in Russia;

(5) Place of services provision. If the service is provided outside Russia (e.g. hotel or education services), it is possible to argue that the customer himself "came" in a foreign jurisdiction by choosing a foreign service provider; thus, there is no reason for the conclusion that the service provider purposefully "came" into Russia, making it a part of its business strategy, unless targeting activities of relevant web-sites follow from other factors evaluated;

(6) Presence of a branch or other local establishment of the company, operating a web site, provided that the activities of such local establishment are directly linked with the activities performed via the web site.

The above list of factors was reflected in official clarifications of the Ministry of Communications of Russia. It is expected that it should provide more certainty both for the business community and for regulators, than just reference to a targeting approach, leaving to define its application for each case on an *ad hoc* basis. How it will be applied in particular cases yet remains to be seen.

## 3. The reasons behind the adoption of personal data localization requirements in Russia

One of the key questions lying on the surface, while analyzing new personal data localization obligations, concerns the purposes of their adoption. What were the goals the legislator tried to achieve and have they been achieved? Depending on the answers, some predictions about future enforcement can be made, as well locating the key for interpretation of its uncertain provisions.

### 3.1. Protection of data subjects

According to the commentaries made by Russian officials, the main purpose of the law is to provide extra protection for Russian citizens both from misuse of their personal data by foreign companies and surveillance of foreign governments[38]. While sounding pompous, such an explanation may seem plausible only for those who disinclined to dig into details. After a closer look, it does not stand up to criticism.

The first problem with such an interpretation is that it rests on an untested assumption that data localization somehow facilitates extra protection of the rights of data subjects. On the one hand, it is possible to argue that data localization facilitates better enforcement and protection of data subjects. Some basis for this kind of argument can be found in ECJ case law. In one of the cases, ECJ stated,

. . .that directive[39] *does not require the data in question to be retained within the European Union, with the result that it cannot be held that the control, explicitly required by Article 8(3) of the Charter, by an independent authority of compliance with the requirements of protection and security, as referred to in the two previous paragraphs, is fully ensured.* (Emphasis added – A.S.)

"Such a control, carried out on the basis of EU law, is an essential component of the protection of individuals with regard to the processing of personal data. . ."[40] It should be noted, however, that this passage from the ECJ decision seems peripheral; thus, it is not clear how much emphasis should be put on this paragraph and whether it is really central to the judgment.

But even if it is true, and data localization indeed facilitates better enforcement, it does not solve the problem of unconscionable practices during personal data processing itself. Nothing prevents transnational companies misusing their rights to process client's personal data from pursuing their questionable activities even if data is localized: it is still under the control of such companies which, as data controllers, define the purposes, means and other elements of the processing mechanism. Especially, it is true if data localization does not prevent transborder transfer of personal data, as is the case with Russian regulation. Even being fully compliant with Russian data localization requirements, data controllers may perform their "dark deeds" with the data after it is transferred into a foreign database of its choice.

It is also doubtful that data localization may prevent or at least make it harder to perform foreign surveillance over Russian citizens. According to one source, it was recognized that data localization is ineffective against foreign surveillance[41]. US NSA and its counterparts in other countries already concentrate much of its surveillance efforts abroad. Moreover, the use of malware eliminates the need to have operations on the ground of the countries where the data are located. Besides, due to data localization, foreign intelligence agencies may concentrate on spying citizens of a particular country more easily, since information gathered together in one place offers a tempting "honeypot"[42]. The only realistic way to remove the risk of foreign surveillance in the Internet is not to connect anything to it. Thus, data localization requirements are hardly a remedy against US surveillance. However, whether it minimizes the risks in this sphere or not is still subject to a deeper research. It is argued that a more appropriate solution to the privacy/security issues would be to encourage the creation and use of de-centralized and end-to-end encrypted services that

---

[38] See: Interview with the head of Roskomnadzor, Alexander Zharov [in Russian]. 12 November 2014. URL: http://82.rkn.gov.ru/news/news70654.htm.

[39] Directive 2006/24/EC of the European Parliament and of the Council of 15 March 2006 on the retention of data generated or processed in connection with the provision of publicly available electronic communications services or of public communications networks and amending Directive 2002/58/EC // OJ L 105/54, 13 April 2006.

[40] ECJ Joined Cases C-293/12 and C-594/12.

[41] A. Chander, U. P. Le, Op. Cit.P. 28–30.

[42] Idem

do not store data in one place[43]. If it is true, then the technical solution, such as sharding[44] used in Cloud Computing, would be less costly and more effective than a legal solution such as data localization regulations.

The second problem with the explanation at hand lies with the role of the data subject's will in defining the legal destiny of its personal data. As was noted earlier, Russian personal data localization provisions have a mandatory nature and cannot be changed by the decision of the data subject, e.g. expressed in their consent. Although such an approach has valid reasons, it is still questionable from a human rights perspective. Assuming that blocking the access to web sites non-compliant with data localization requirements is the main mechanism of protection of Russian citizens, it looks like data localization regulations are "protecting" the privacy of Russian citizens at the cost of minimizing their freedom of choice. Basically, a person is stripped of the ability to control its personal data and define how it should be used (at least assuming that in the age of pre-formulated privacy policies, something still depends on the will of the data subject). At the same time, Russian government officials did not ask citizens whether they approved of such acting in their "best interests". No association representing the rights of the data subjects and no research or survey of Russian citizens' opinions has been conducted. It is possible to argue that mandatory data localization requirements violate constitutional rights of Russian citizens to privacy[45] (the right to control the flow of personal information) and the right to freedom of information[46] (the right to take decisions regarding the dissemination of certain information)[47]. However, the perspectives of recognizing data localization provisions as unconstitutional, on the basis of the above arguments, are rather murky in the present political environment.

For the sake of objectivity, it is necessary to mention that apart from the data localization requirement, some other provisions from the Federal Law No. 242-FZ may enhance the protection of the data subjects. When the data subject is entitled to ask the court to block the web site from processing his personal data in violation of personal data legislation, it both creates extra incentives for compliance for those companies which have something to lose, and creates more or less an efficient remedy against those companies which have nothing to lose.

And such blocking may be justified with reference to international law. In accordance with Article 3 of the International Covenant on Civil and Political Rights, each State Party to it undertakes:

(a) *To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;*
(b) *To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;*
(c) *To ensure that the competent authorities shall enforce such remedies when granted* (Emphasizes added – A.S.).

Thus, implementation of web site blocking provisions as a remedy against violation of privacy rights ensured by data protection legislation may be viewed as an "effective" remedy[48]. In this case, Federal Law No. 242-FZ indeed has some extra protection mechanisms for data subjects. It is another matter that web site blocking provisions are not inevitably linked with data localization requirements, and the privacy enhancing nature of the latter remains questionable.

### 3.2.    Retaliation for US/EU sanctions

This opinion was very popular when the Federal Law No 242-FZ was just adopted and there was confusion in the market[49]. The main arguments in favour of this opinion relate to the timing of the adoption of the law, which corresponded to the period of escalation of the Ukrainian crisis and associated tensions between Russia, the USA and its allies. Besides frequent mentioning by Roskomnadzor officials of Facebook, Twitter and other big transnational Internet services in the context of the potential application of this law, mention was also made to the "offshore" orientation of the law. As ECIPE argues, data localization requirements are effectively disruptive bans on data processing and hence the foreign provision of that service into the domestic territory[50].

After almost a year of discussions about the implementation of the law, which were conducted by Roskomnadzor with the business community, including representatives from US-based companies, this explanation cannot be treated now as the dominating one. However, it is impossible to deny completely the effect which the Federal Law No. 242-FZ law produced on foreign IT-companies operating in Russia: they started to express more willingness to engage in the dialogue with the Russian regulator and to ensure compliance with Russian legislation.

---

[43] Rohin Dharmakumar, India's Internet Privacy Woes, Forbes India (Aug. 23, 2013). URL: http://forbesindia.com/article/checkin/indias-internet-privacywoes/35971/1#ixzz2r0zriZTF.
[44] Sharding is a process of dispersing of a data set in fragments among the servers or other storage equipment, to be reunited and delivered to a user logging in with the correct credentials.
[45] Article 23 of the Constitution of the Russian Federation.
[46] Article 29 (4) of the Constitution of the Russian Federation.
[47] Such an opinion was expressed by Anton Ivanov, the former Chief Justice of the Supreme Commercial Court of Russian Federation (merged with Supreme Court of Russian Federation in 2014). See: Anton Ivanov. *Cross-Border Personal Data Storage by the Russian Law* [In Russian] // Zakon, 2015. No. 1. P. 141–143.

[48] However, the author should acknowledge, that the question of correlation between web site blocking provisions and international law deserves much deeper research.
[49] The author of this paper also shared this opinion to a certain extent. See: Savelyev A. Data localization laws and their potential impact on E-commerce in Russia [in Russian] // Zakon. Vol. 9, 2014. P. 67.
[50] The Costs of Data Localisation: Friendly Fire on Economic Recovery // Occasional Paper. European Centre for International Political Economy (ECIPE). 2014. № 3. URL: http:// ecipe.org/publications/dataloc.

### 3.3.   A measure to support of local data-centre market

Introducing mandatory comprehensive data localization regulations increases the demand for local hosting and data centre services, at least from those companies which are willing to comply with such regulations. Not surprisingly, some Russian companies link new opportunities with data localization regulations, and one of these is the Russian telecommunications behemoth, Rostelecom[51], which is a frequent participant in various government-held meetings on implementation of Federal Law No. 242-FZ. Apart from Rostelecom, many local data centres have already announced their readiness to accommodate foreign companies. Other local IT-companies may also benefit from these regulations, e.g., providing integration and software development services.

However, it is very unlikely that Federal Law No. 242-FZ had economic objectives, at least as primary ones. No analysis of the potential economic impact of data localization provisions on the IT-market and Russian economy in general was performed. Besides, strong opposition and critics of the law, which accompanied its discussions for almost a year since its introduction, could have changed the position of the Russian government given, it seemed, that the lobbying efforts of some companies were the sole drivers of the law at that time. But the reluctance of the Russian parliament and other government agencies to change something in the law evidences the fact that something bigger than purely economic interests was at stake here.

### 3.4.   Implementation of the new "digital sovereignty" agenda of the Russian government

Data localization regulations can be regarded as a part of the new approach of the Russian government to regulation of the IT-sphere and Internet in particular. This new approach can be designated as "digital sovereignty", although this phrase is not stated in Russian legislation and other official acts, but is still frequently used in speeches of officials and Mass Media. In general terms, digital sovereignty, being a derivative from state sovereignty[52], can be defined as a right of a national government to exercise control over information processes within the country without external interference. Implementation of a "digital sovereignty" agenda may be considered as a natural and predictable reaction of national government to the situation of the political, social and economic instability surrounding it. Revolutions in Egypt and other Arabic countries (Arab spring), where according to the prevailing opinion

social networking played a prominent role;[53] US National Security Agency's global surveillance program, revealed by Edward Snowden in 2013; several terrorist acts, committed in Russia in December 2013; the Ukrainian crisis and heightened USA-Russia political tensions; international sanctions imposed on Russian government officials and Russian companies, examples of unilateral refusal without notice to perform its obligations demonstrated by Visa and MasterCard, were only a fraction of the political events which can be regarded as a threat to a stability of the Russian government. Taking into account the role of the Internet in the modern society, it would be too imprudent from the national government's perspective to stay away from it. After all, "information is the foundation of all governing"[54]. As one Russian official in informal conversation argued: "If you don't control the Internet, someone else controls it".

Data localizations requirements can facilitate strengthening the control of the Russian government over Internet activities in the following ways.

#### 3.4.1.   Prevention of mass-scale loss of personal data if Russian segment of Internet becomes isolated

Due to the current geopolitical situation, this has moved from the hypothetical to the actual. Lots of possible scenarios were discussed within the Russian government including the most extreme reaction such as cutting Russia off from the global Internet. In this case, if most of the data resides on foreign servers, such cut off would mean that the Russian segment of the Internet becomes almost useless, since it would be stripped of valuable data, most of which constitutes personal data. To some extent, this risk is indeed mitigated by the concepts of "primary" and "secondary" databases, which form the element of Russian data localization mechanisms. If personal data should be first recorded and further updated in the primary database located in Russia, it will be still available even if the Russian segment of the Internet becomes isolated, thus making it more independent and operational. If data localization provisions only required making a copy of personal data in Russia, thus allowing primary databases to be located outside Russia, access to personal data could be still be cut off, since "mirrors" of primary databases technically depend on the replication processes and may not function without having access to the primary database.

#### 3.4.2.   Additional opportunities for Russian law enforcement agencies

The presence of relevant information on the territory of the Russian Federation triggers the territorial basis for jurisdiction, thus giving additional powers to police and other law enforcement agencies. Relevant data can be requested more easily and without following burdensome provisions of mutual legal assistance treaties, which are unlikely to work effectively during intense political environments.

---

[51]  According to various sources, Rostelecom plans to invest more than 40 billion rubles in new data centres. http://www.interfax.ru/russia/416473.

[52]  State sovereignty is defined as «supreme, absolute, and uncontrollable power by which an independent state is governed and from which all specific political powers are derived; the intentional independence of a state, combined with the right and power of regulating its internal affairs without foreign interference». West's Encyclopedia of American Law, edition 2. 2008. The Gale Group, Inc. http://legal-dictionary.thefreedictionary.com/State+sovereignty.

[53]  Catherine O'Donnell. New Study Quantifies Use of Socia Media in Arab Spring // University of Washington. 12 September 2011. http://www.washington.edu/news/2011/09/12/new-study-quantifies-use-of-social-media-in-arab-spring/.

[54]  Governance and Information Technology, eds. Victor Mayer-Schönberger and David Lazer, Cambridge, MA: MIT Press, 2007, P. 1.

### 3.4.3.  Additional instrument of control over distribution of unwanted content

Since lots of user-generated content distributed on web sites can be qualified as personal data, relevant takedown and web site blocking mechanisms may apply. Thus, personal data legislation, accompanied with the blocking "functionality", may be used to put pressure on foreign Internet resources distributing undesired content. Recently introduced into Russian law, the "right to be forgotten", inspired by ECJ decision of *Google v. Spain*[55], further expands this opportunity. This new Russian law requires search engines distributing ads targeted at Russian audience to remove links to content distributed "in violation of the law", or deemed "untrustworthy", or that is "no longer relevant due to subsequent events or actions"[56]. Since there are no exceptions relating to the public persons, there are reasons to believe that such law may be used for limitation of access to information compromising public officials and perform some kind of censorship in favour of government policy.

As it can be seen, the benefits of data localization provisions for national security purposes are rather evident, at least from a theoretical perspective. National security reasons may explain the speed of the adoption of the law and massive ignorance of the industry feedback on it: arguments appealing to national security are immune from almost all the possible criticisms in the time of crises[57]. Appeals to national security matters were frequently used by Russian officials in comments relating to Federal Law No. 242-FZ[58]. Data protection legislation thus plays a role of a "shelter" for reaching important national security goals, just like protection of minors or control over distribution of child pornography is often used as a reason for control over online content. Personal data regulations are more and more becoming "dual use" in nature and pursue two different purposes. One purpose is the official one: the need to protect the interests of data subjects. Another hidden purpose is implementation of an existing political

agenda for increasing control over the Internet. And Russia is not a new player in the field of using personal data legislation for such purposes. According to Kuner, national regulation of data protection (transborder personal data flow in particular) frequently may be one of the ways to protect national interests and national sovereignty. Although examples provided by him relate to the 1970–80s period of the last century, these seem hardly outdated even today[59].

Summing up the above, it is possible to draw the conclusion that adoption of personal data localization provisions in Russia is mostly driven by national security concerns, covered in "protection-of-data-subjects" wrap. All other reasons, even if indeed they were considered by the ideologists of the law, are only of a supplementary nature. Understanding of the reasons behind the law helps to understand its possible interpretation. National security driven laws usually have a broad nature, enabling maximum discretion during its enforcement. It explains the long-lasting reluctance of the Russian Ministry of Communications and Roskomnadzor to provide any written official interpretations of the law. It also indicates the risk that the law may lead to selective enforcement, depending on the political needs.

## 4.      Potential impact on the market and technologies

After all the buzz personal data localization regulations created on the Russian market, they will hardly remain only on paper. However, compliance with them has economic as well as technological consequences, which are substantially intertwined. This section will provide a brief analysis of the potential impact of data localization on the Russian market in general and the IT-market in particular.

### 4.1.    Extra costs for companies

Compliance with data localization requirements requires time and money. The first steps for a company typically include identification of all the existing databases and analysis of the information contained in them. Then for those databases, which process information qualifying as personal data, it is necessary to understand how the information flows: where and from whom it is received (whether it is "collected" in the meaning of the law) and where it goes thereafter. If the relevant database is used mostly by the local entity, it is possible to ensure its localization without substantial difficulties. Complications appear when there is a need to localize centralized databases of large multinational companies, since it requires reconfiguration and restructuring of its IT-infrastructure. Typical solutions for global databases (e.g. HR databases) are to create a customized local application with the database and integrate them within the global ("Core") database. When personal data, collected in Russia, is entered and saved in a local database, it will be automatically transferred into the Core database. Such a solution requires changes in the core

---

[55] Google Spain SL v. Agencia Espahola de Proteccion de Datos, Case C- 131/12, 13 May 2014.

[56] Federal Law No. 264-FZ of 13 July 2015, 'On amendments to the Federal Law No. 149-FZ "On Information, Information Technologies and Protection of Information" and Articles 29 and 402 of the Code Civil Procedure of the Russian Federation'. The law becomes effective January 1, 2016.

[57] The history of the adoption of US PATRIOT act after terrorist acts of 9/11 is a vivid example of it. Another one is the history of adoption of EU Data retention directive. Several EU Member States adopted regulations, which imposed obligations on service providers with regard to data retention putting the aim of combating terrorism and serious crimes upfront as a result of the terrorist attacks of 11 September 2001 in New York (United States), 11 March 2004 in Madrid (Spain) and 7 July 2005 in London (United Kingdom). See generally: Peter J Milford. *The Data Retention Directive too fast, too furious a response? Implementing and Transposing European Directive 2006/24/EC.* LLM Dissertation. Southampton Business School. http://www.petermilford.com/downloads/Data_Retention_PMilford.pdf.

[58] See e.g.: Interview with the head of State Duma's committee on information policy Leonid Levin, where he explicitly stated that Russian will resist the attempts to destabilize Russian Internet from the outside. He also pointed out that data localization is meant to increase stability of Russian Internet by implementing "backup" infrastructure. Tass.ru, 6 October 2014. URL: http://tass.ru/politika/1489008.

[59] Christopher Kuner, *Transborder Data Flows and Data Privacy Law.* Oxford University Press. 2013. P. 30 ff.

application of the user interface and bi-directional synchronization between them. Writing the new code followed by integration and testing may require months of work and millions of dollars, depending on the complexity of the Core database.

Of course, such expenses do not bother Roskomnadzor or the Russian Ministry of Communications, since they are perceived to be a "cost of doing business" in Russia. Such an approach is generally typical for all government authorities responsible for supervision. A similar approach can be seen among European regulators as well[60]. It is possible to expect that extra costs incurred by foreign companies, which decide to comply with the data localization provisions, can be shifted on to consumers, thus increasing the price of goods and services for them. The same may be true for Russian companies which will have less flexibility for optimization of its costs. Since average prices for hosting of comparable quality in Russia are higher than, say, in Germany, such a limitation may lead to extra costs imposed on foreign companies, which have to choose less efficient local suppliers to handle their personal data processing operations.

### 4.2.    Losses for the Russian economy

It is also necessary to mention that ECIPE[61] has conducted research into the impact of data localization provisions on the Russian economy with a name which already reflects the biased nature of the research[62]. The overall conclusion of the research is rather pessimistic. According to the executive summary, "the losses are equivalent to –0.27% of gross domestic product (GDP), equivalent to a loss of 286 billion roubles (USD 5.7 billion). Applied with 2015 IMF forecasts, the Russian economy would contract by –4.1% this year. Investments in the Russian economy would drop by –1.41% or 213 billion roubles, with considerable effects on employment".

The main problem with this research is that no detailed methodology of calculation was provided, which could enable independent verification of the results. ECIPE only stated that

*The analysis uses a computable general equilibrium model (CGE) based on the GTAP8 database, which is a well-acknowledged methodology that is frequently used for trade and economic impact analyses by academia and policymakers worldwide. Based on these computations, we calculate the impact of data privacy and data localisation requirements on key variables – real GDP, sectorial output, domestic income, exports, and investment[63].*

But the GTAP8 database does not have data older than 2009, what is more than six years old already[64]. Besides, no official Russian statistics were used (Federal State Statistics Service or Russian Ministry of Economic Development), only data from the International Monetary Fund (IMF) and World Bank, which may lack objectivity in the present political situation. It is also not clear how "any possible positive effects, e.g. from Russian data processing firms replacing foreign ones", as claimed by ECIPE, have been taken into account: nowhere else in the document are these "positive effects" disclosed. At the same time, it would be very interesting to see such an analysis, taking into account that the idea of localization of Internet services is rather popular in some European countries under the mottos of development of the local IT-market. For example, in Germany, the leading Telco provider, Deutsche Telekom, launched "E-mail made in Germany", a service that seeks to store and route data exclusively through German servers[65]. France also has plans for building "Made in France" a set of Internet services, such as cloud computing, big data and Internet of things as a part of national innovation plan, which also implies efforts to keep data processing in France[66]. So, there is nothing principally extraordinary in the possible protectionism of local IT-companies by Russian government by adoption of data localization provisions. Whether such protectionist measures will indeed help to strengthen local market players remains to be seen, but one thing is clear: the outcome will strongly depend on the results of the import substitution policy, initiated by the Russian government in parallel. Otherwise, localization of data centres might lead to an increase in the import of US/EU hardware and software, a result which is at odds with digital sovereignty objectives.

It is not surprising that the overall reaction towards the ECIPE research has been very sceptical, both from the government authorities' perspective as well as the blogosphere. Nevertheless, the Administration of the President of Russia expressed interest in conducting a thorough research on the economic impact of personal data localization[67]. It is expected to gather relevant data by the end of 2015 year for subsequent analysis. If such research is done, it could provide a unique source of information for decision-makers in other jurisdictions considering the option of adoption of similar legislation.

### 4.3.    Possible discrimination of Russian users

Some technical solutions, e.g., collaboration solutions, provided in Software-as-a-service mode, such as instant messaging, videoconferencing, etc., have architecture which cannot be

---

[60] «Situations where the same database can be subject to different applicable laws do increasingly happen in practice. This is often the case in the field of human resources where subsidiaries /establishments in different countries centralize employee data in a single database. While this traditionally happens for reasons of economies of scale, it should not have an impact on the responsibilities of each establishment under local law. This is the case not only from a data protection perspective, but also in the context of labour law and public order provisions». Article 29 Data Protection Working Party. Opinion 8/2010 On Applicable Law. 16 December 2010. P. 15.

[61] The European Centre for International Political Economy (ECIPE) is an independent and non-profit policy research think tank dedicated to trade policy and other international economic policy issues of importance to Europe. http://www.ecipe.org/about-us/.

[62] Data Localisation in Russia: A Self-imposed Sanction by Matthias Bauer, Hosuk Lee-Makiyama, Erik van der Marel, June 2015. URL: http://www.ecipe.org/publications/data-localisation-russia-self-imposed-sanction/.

[63] Idem

[64] https://www.gtap.agecon.purdue.edu/databases/v8/.

[65] Deutsche Telekom, WEB.DE and GMX launch "E-mail made in Germany" initiative. 9 August 2013. URL: https://www.telekom.com/media/company/192834.

[66] A. Chander, U. P. Le, Op. Cit. P. 12.

[67] Results of the Meeting at the Administration of the President of the Russian Federation of 16 July 2015 (not publicly available).

"federated", meaning that the Russian data are stored in Russia, Spanish data are stored in Spain, US data are stored in US, etc. The most evident solution for such situations is to restrict provision of relevant services to Russian users, although this results in a revenue decrease for the company while limiting consumer choice among potential providers.

### 4.4. Impact on implementation of innovative technologies

For Cloud computing services, new data localization regulations may have a substantial transformative effect. Local data storage requirements are in a state of confrontation with the architecture of cloud computing. Computing resources (compute capability, storage, networking, etc.) are used *where it is more efficient* and cheapest from a taxation perspective, hardware, labour and electricity costs. Such optimization opportunities become substantially limited when a cloud provider has to use data centres mostly in one country. So, whether the resulting architecture of the cloud will meet the definition of cloud computing[68], relating to scalability is a question to be resolved. Absent such a feature of the Cloud as scalability, then Cloud computing may lose one of its critical benefits: the benefits of scale allowing lower costs for providers while giving the realistic illusion of infinite resources availability for users.

Data localization requirements also have limiting possibilities for offering cloud services having a layered structure. Besides, some value-added cloud services, mostly SaaS, are built on top of other cloud services: IaaS and/or PaaS[69]. Data localization regulations diminish opportunities of SaaS providers to build upon globally-established platforms since their use will automatically imply the possibility of processing data in foreign data centres. Without specialized interfaces and configurations, it would be difficult to ensure collection and updating of personal data of Russian citizens in line with local legislation.

Data localization requirements also have an impact on usage of innovative technologies, associated with Big Data, e.g.

e-Health platforms, where IBM Watson is one of the examples[70]. Such platforms frequently perform deep analytics of personal health data of various patients from different clinics all over the world for identification of the most preferable method of treatment of a disease for a particular patient or for R&D activities. Existing personal data protection legislation already provides substantial obstacles for effective implementation of such technologies (e.g., necessity of specific consent for "secondary" processing of such data, which is usually not obtained when such data is initially collected for treatment purposes; prohibition on processing of personal data sets, collected for incompatible purposes; restrictions on transborder transfer of personal data). Some countries even place specific restriction on the transfer of health data outside the borders; e.g. in 2012, Australia passed the Personally Controlled Electronic Health Records Act, which prohibits, with certain exceptions, the transfer of health records outside of Australia[71]. Not surprisingly, the Organization for Economic Co-operation and Development (OECD) recently initiated work on preparation of the Council Recommendation on Privacy-Protective Uses of Personal Health Data[72]. Of course, data localization requirements, requiring processing of such data via a primary local database, introduce further complications for the effective use of such technology. They increase costs and complexities for collection and maintenance of data and, in the worst scenario, may reduce the size of data sets available for processing, eroding the informational value that can be gained by cross-jurisdictional studies[73].

Finally, data localization provisions may impede development of the Internet of Things ("IoT") technologies. The term IoT signifies that almost every device and object could over time be connected to the Internet's network of networks. Some of the other terms used to describe this process are the Internet of Everything, Industrial Internet and Machine-to-Machine communication. The IoT likely has profound implications for all aspects and sectors of the economy, in industrial and commercial processes, consumer and home services, energy, transport systems, health care, infotainment and public services. Of course, not all the data collected by devices and objects amount to personal data, but much of this data can be attributed to a specific individual (e.g. data collected by RFID sensors of a car, data collected from smart watch or devices like Google Glass). Since collected data usually resides on a provider's (vendor's) servers located anywhere across the world, segmentation of data storage and processing is not a feasible alternative for

---

[68] While various definitions are proposed, yet the most widely cited is that of the US National Institute of Standards and Technology (NIST). In accordance with it, "cloud computing is a model for enabling convenient, on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or service provider interaction". This definition includes five characteristics. First, it is an on-demand service, where users can obtain computing capabilities in the amount "as needed automatically". Second, the cloud service can be accessed via broadband network and standard protocols, which support heterogeneous clients and user equipment. Third, resource pooling allowing "to serve multiple consumers using a multi-tenant model, with different physical and virtual resources dynamically assigned and reassigned according to consumer demand". Fourth, rapid elasticity meaning that "capabilities can be rapidly and elastically provisioned" in order to meet demand lows and peaks as required by the users. Fifth, the use of the service is automatically measured in an abstract unit, for example storage, processing or bandwidth, based on which the utilized service is billable. See: The NIST Definition of Cloud Computing. Special publication 800-145. September 2011. http://csrc.nist.gov/publications/nistpubs/800-145/SP800-145.pdf.

[69] For details see: Cloud Computing Law / ed. By Christopher Millard. Oxford University Press. 2013. P. 32–34.

[70] IBM Watson brings together clinical, research and social data from a diverse range of health sources, creating a secure, cloud-based data sharing hub, powered by advanced cognitive and analytic technologies. It is expected that IBM Watson will dramatically improve the ability of doctors, researchers and insurers to surface new insights from the all personal health data being created daily. URL: http://www.ibm.com/smarterplanet/us/en/ibmwatson/health/.

[71] See: § 77 of Personally Controlled Electronic Health Records Act, 2012. URL: http://www.comlaw.gov.au/Details/C2012A00063/Html/Text#_Toc327957207.

[72] Council Recommendation on Privacy-Protective Uses of Personal Health Data: Draft Discussion Paper. Working Party on Security and Privacy in the Digital Economy of the Committee on Digital Economy Policy. DSTI/ICCP/REG(2015)6, June 2015.

[73] A. Chander, U. P. Le, Op. Cit. P. 42.

many of the services, due to associated costs. It is much easier to limit functionality of IoT-type of products for a certain territory or even exclude such products from the distribution in the relevant country.

Taking into account that Big Data, Cloud Computing, and Internet of Things present interrelated technologies, e.g., IoT can be regarded as a source of data for subsequent processing and analysis by means of Big Data technologies performed on the basis of Cloud computing capabilities; this could lead to a negative impact with each component negatively influencing the other ones. Therefore, data localization provisions are not friendly to all those technologies; however, they can get along provided that enough investment has been made. Whether transnational companies will be willing to make those investments or will largely ignore the new data localization requirements will depend on the level of enforcement and the value of Russian data (which depends on the value of the Russian market) for such companies and associated costs.

### 4.5.   *New taxation opportunities*

New data localization provisions bring foreign companies, at least those willing to comply with the legislation of countries of their operations, in this case on Russian soil. The presence of the servers, processing personal data of Russian citizens, most of which will have the status of "clients", can be regarded as an establishment, thus enabling more efficient taxation of their virtual activities. According to the current OECD Model Tax Convention, a permanent establishment is defined as "fixed place of business through which the business of an enterprise is wholly or partly carried on.[74]" The commentaries concede that a server hosting an application and making it accessible is a piece of equipment that has a physical location and, as such, can constitute a "fixed place of business"[75]. In the context of the digital economy, a company that provides a service in a country by using data collected through regular and systematic monitoring of users in that country could be deemed to have a virtual permanent establishment there. Although there is no position of Russian tax authorities on this matter yet, for sure, these ideas will become very attractive for Russian fiscal authorities and Ministry of Finance at some point in the future.

Besides, data localization provisions create a basis for implementation of new taxes, specifically oriented on Internet activities. As an example of potential tax, it is possible to mention initiatives expressed in France to introduce a special tax depending on the data collected and its geographical origin[76]. Without data localization provisions, such kinds of taxes would be difficult to administer.

It is possible to outline even more consequences of implementation of data localization provisions, and it is clear that subsequent years will reveal unexpected developments. But one thing is clear: the data localization concept is too complicated to be perceived only through the lens of privacy protection. The reality is always a little more complicated than people think. Therefore, it is submitted that positions that draw data localization in a solely negative light[77] are superficial and fail to see possible positive outcomes in areas not related to privacy.

## 5.   Conclusion

The trend towards sovereignty of the Internet is present not only in Russia: many other countries, including those in Europe, are trying to increase control over information processes in their national segments of the Internet. Russia has adopted an unprecedented personal data localization mechanism, which does not have analogues in foreign countries and which has attracted a great deal of attention from foreign companies operating in the Russian market. The Russian mechanism of data localization is unique since it is applicable to all the personal data, not only to some types of it. Moreover,; it is aligned with other provisions of personal data legislation, including those which regulate transborder transfer of personal data. It is also accompanied with web site blocking provisions, providing incentives for compliance for companies valuing their reputation.

While it is difficult to argue that data localization provisions substantially enhance security and protection of data subjects *per se*, it is necessary to admit their potential value in the sphere of public law. Thus, personal data legislation may be used as a conduit for reaching national security and fiscal objectives. Local storage and processing of personal data of users, collected in Russia, create a good basis for taxation, either for existing types of taxing or for newly crafted ones.

While the real effect of data localization provisions in the public law sphere remains to be seen, the costs of their implementation are rather tangible already. Many companies have started to adapt their infrastructure to the new requirements at what may cost millions of dollars, depending on the size of the company and complexity of the information flows within its databases. Access to innovative information technologies, such as Cloud computing, Big Data and Internet of Things, and their usage can become more complicated due to associated extra costs for collection and maintenance of data in Russia. At the same time, restrictions on the usage of "classical" models of relevant technologies may lead to their mutation into something new, more resilient to data localization requirements, and such technologies may be of interest to other countries, willing to adopt similar regulations.

The estimated losses for the Russian economy in general, as predicted by ECIPE, do not look persuasive, since the relevant research lacks reliable and verifiable data. Hopefully, there will be other researches in this area, which can provide more detailed conclusions based on more substantive analysis.

---

[74]  Article 5 of OECD Model Convention with Respect to Taxes on Income and on Capital 2014. URL: http://www.oecd.org/ctp/treaties/2014-model-tax-convention-articles.pdf.

[75]  Report to the Minister for the Economy and Finance, the Minister for Industrial Recovery, the Minister Delegate for the Budget and the Minister Delegate for Small and Medium-Sized Enterprises, Innovation and the Digital Economy Task Force on Taxation of the Digital Economy. P. 113. URL: http://www.hldataprotection.com/files/2013/06/Taxation_Digital_Economy.pdf.

[76]  Report to the Minister for the Economy and Finance, the Minister for Industrial Recovery, P. 121 ff.

---

[77]  The examples of such approach can be seen in works of ECIPE and paper of A. Chander and U. P. Le.

In conclusion, it is necessary to mention two principle matters. At first, such regulations invited many foreign companies into a dialogue with the Russian government, which were reluctant to conduct such dialogues until now. Second, data localization provisions have attracted substantial attention to the problems of privacy in general and personal data legislation concepts from all the stakeholders: government officials, business and users. In a world where the enormous increase in the collection and use of data, new and unanticipated uses became a norm, while increased complexity and the pervasive nature of the Internet of things and Big Data present new challenges to the traditional principles, such attention is very much welcome. Maybe, as an initially unexpected outcome, these new data localization regulations, even if proven ineffective in the future, will serve as a driver for re-shaping existing outdated data privacy regulations and crafting something more suitable for the modern IT-environment.

Therefore, Russian data localization laws are neither a step forward, nor a self-imposed sanction: it is a bold step in an unknown direction which, if proven successful, may serve as a model for many other countries not satisfied by the existing models of Internet governance.

*The author is Ph.D. and senior legal researcher of the Center on Information Law, the National Research University "Higher School of Economics"; **Member of the Advisory Board for Federal Service for Supervision of Communications, Information Technology and Mass Media;** legal attorney of IBM Russia/CIS*; author of books on IP and contract law (including "The Law of Electronic Commerce in Russia and Abroad", "Licensing of software in Russia. Legislation and case law", "Freedom of contract and its limits" (in co-authorship with Prof. A. Karapetov, Ph.D.) and Commentary to the Federal Law of Russian Federation No. 149-FZ "On information, information technologies and protection of information") and articles on various IP and contract law matters.*

*e-mail address:* garantus@rambler.ru.

*The views expressed are the personal views of the author and are not intended to reflect either the opinion of IBM or any other organization on relevant matters. This paper is an output of a research project implemented as part of the Basic Research Program for year 2015 at the National Research University "Higher School of Economics".*

**Exhibit 13** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

### NINTH COMMERCIAL COURT OF APPEAL

**RESOLUTION**
**dated August 2, 2016 No. 09AP-30590/2016**

Case No. A40-32030/16

The operative part of the resolution was announced on July 25, 2016.

The resolution was fully executed on August 2, 2016.

The Ninth Commercial Court of Appeal consisting of:

Presiding Judge M. V. Kocheshkova,

Judges S. M. Mukhin and P. V. Rumyantsev, the minutes being kept by Court Session Secretary P. V. Ryasina, having considered in the open court session the appeal of Scartel LLC against the decision of the Commercial Court of Moscow dated April 26, 2016 on case No. A40-32030/2016 (145-275) rendered by Judge D. G. Vigdorchik upon the statement of claim filed by Scartel LLC against the Directorate of the Federal Service for Supervision of Communications, Information Technology, and Mass Media for the Central Federal District for invalidation and cancellation of the directive, with the participation of:

on behalf of the claimant: M. A. Yusupova under the power of attorney dated December 21, 2015;

on behalf of the interested party: D. G. Ovramenko under the power of attorney dated October 20, 2016, D. A. Polyakov under the power of attorney dated December 30, 2015, and V. A. Solomonenko under the power of attorney dated December 30, 2015;

has found:

Scartel Limited Liability Company (hereinafter referred to as "Scartel LLC", the "Company", or the "Claimant") has filed a statement of claim with the Commercial Court of Moscow against the Directorate of the Federal Service for Supervision of Communications, Information Technology, and Mass Media for the Central Federal District (hereinafter referred to as "Roskomnadzor" or the "Interested Party") for invalidation and cancellation of directive No. P-77/07/1148-nd dated November 24, 2015.

By the decision of the Commercial Court of Moscow dated April 26, 2016, the claims of Scartel LLC have been dismissed.

Scartel LLC has filed an appeal, in which it requests to reverse the court decision. In the Claimant's opinion, when rendering the decision being appealed against, the court of first instance has incorrectly applied the provisions of substantive law and the court's conclusions do not correspond to the facts of the case.

In the court session, the Company's representative has supported the arguments of the appeal and petitioned to reverse the decision of the court of first instance.

In the court session, the Interested Party's representative has disagreed with the arguments of the appeal for the grounds given in the statement of defence to the appeal and petitioned to uphold the decision of the court of first instance.

Having considered the case according to the procedure under Articles 266 and 268 of the Commercial Procedure Code of the Russian Federation, having examined the files of the case, and having heard the representatives of the parties to the case, the court of appeal finds no grounds to satisfy the appeal and to reverse or change the decision of the commercial court taken in accordance with the current legislation of the Russian Federation.

Pursuant to part 1 of Article 198 of the Commercial Procedure Code of Russia, individuals, entities, and any other persons may file a statement of claim with a commercial

court for invalidation of non-regulatory legal acts, decisions, and actions (omissions) of state authorities if they believe that the challenged non-regulatory legal act, decision, or action (omission) does not correspond to the law or any other regulatory legal act and infringes their rights and legitimate interests in their entrepreneurial and other economic activities, illegally imposes any duties on them, or creates any other obstacles to carry out entrepreneurial and other economic activities.

In accordance with part 4 of Article 200 of the Commercial Procedure Code of Russia, when considering cases on challenging non-regulatory legal acts, decisions, and actions (omissions) of state authorities, local authorities, other authorities, and officials, the commercial court shall, in the course of court session, check the challenged act or certain provisions thereof, challenged decisions and actions (omissions), shall find whether they comply with the law or any other regulatory legal act, whether the authority or person, which/who has adopted the challenged act or decision or performed the challenged actions (omissions), has the relevant powers, and shall find whether the challenged act, decision, or action (omission) infringes the claimant's rights and legitimate interests in entrepreneurial and other economic activities.

Thus, the range of facts to be found during consideration of cases on challenging non-regulatory acts, actions (omissions) of state authorities includes a check whether the challenged act complies with the law or other regulatory legal act, a check whether the challenged act or action (omission) actually infringes the claimant's rights and legitimate interests, and meeting the deadline for filing a statement of claim with a court.

Having examined the files of the case, the court of appeal concludes that, when adopting the challenged decision, the court of first instance has legally and reasonably proceeded from the evidence available in the case, the disputed relations have been adequately evaluated from a legal perspective, and the provisions of substantive law have been applied correctly.

At the same time, pursuant to part 5 of Article 200 of the Commercial Procedure Code of Russia subject to part 1 of Article 65 of the Commercial Procedure Code of Russia, the duty to prove compliance of the challenged non-regulatory legal act with the law or any other regulatory legal act, legality of adoption of the challenged decision or performance of the challenged actions (omissions), possessing by an authority or person of the appropriate powers to adopt the challenged act or decision or to perform the challenged actions (omissions) as well as the facts serving as a ground to adopt the challenged act or decision or to perform the challenged actions (omissions) shall be imposed on the authority or person that has adopted the act or decision or performed the action (omission).

By virtue of the said provisions and Article 13 of the Civil Code of Russia, the range of facts to be found during consideration of cases on challenging non-regulatory acts, actions (omissions) of state authorities includes a check whether the challenged act or action (omission) complies with the law or other regulatory legal act, whether the challenged act or action (omission) actually infringes the claimant's rights and legitimate interests, and meeting the deadline for turning to a court with a statement of claim.

When adopting the challenged decision, the court of first instance, in spite of the arguments of the appeal, has fully and comprehensively examined the facts relevant to correct consideration of the case, applied and interpreted the provisions of substantive law to be applied, and, on their basis, made a reasoned conclusion that there have been no required conditions to satisfy the stated claims.

The board of appeal supports this conclusion of the court of first instance, based on the following.

The court of first instance has found that, during the period from October 02, 2015 to November 24, 2015, based on Order No. 1148-nd dated September 09, 2015, the employees of Roskomnadzor conducted a scheduled field audit of Scartel LLC.

During the audit, the Directorate has found that Scartel LLC and Iron Mountain CIS LLC have entered into Agreement No. 11-1005 dated July 01, 2011, the subject matter of which is provision of services with regard to document storage, archiving, and destruction. No telecommunication networks are used as part of performance of this agreement.

In accordance with clause 1 of Annex No. 1 to the agreement, Iron Mountain CIS LLC will provide the client with the services for storage of documents in archive cases and of data storage media as well as with any other services specified in the Price List. The Price List specifies, in particular, the following services: storage of documents; dismantling of registrar folders, packing of documents into an archive folder, drawing up of a list of documents; Archive Case search, file search, document search, standard delivery, electronic delivery (fax, e-mail), - copying of the stored documents from files binding copies; printing of documents from the electronic archive and binding; certified destruction; sealing of an archive case; destruction of unnecessary data; scanning (for subsequent placement of electronic document copies in the archive); storage of electronic document copies and other files of the customer in the archive; provision of an access to the archive of electronic document copies; data media storage (search in the storage facility, return to the storage facility); archive processing of documents (comprehensive examination of the condition and availability of documents of the entity's fund, expert examination of scientific and practical effect viewing and selecting documents from files per sheet, generation of files, documenting of files, etc.); binding, filing of documents, document systematization, packing into archive cases, provision of processed documents and materials to the customer's courier.

Thus, during provision of the services under the agreement, Iron Mountain CIS LLC may obtain an access to the personal data of subscribers of Scartel LLC.

Upon the end of the audit, the administrative authority has drawn up Audit Report No. A-77/11/1148-nd dated November 24, 2015 and issued Directive No. P-77/07/1148-nd dated November 24, 2015 to rectify the violation detected.

In accordance with the Directive, the Company is directed to rectify the following violations:

1) Through the Applicant's Form for the Sales and Service Specialist vacancy posted and available at http:www.yota.ru/corporate/jobs/-/vacancy/4412/#questionary on the Internet, Scartel LLC collects personal data without a consent, which violates the requirements of part 1 of Article 6 of Federal Law dated July 27, 2006 No. 152-FZ On Personal Data.

In order to rectify the detected violation, Scartel LLC should stop processing personal data on the website without a consent and implement the functions to obtain prior consent of an applicant by making the appropriate mark in the consent field before the applicant's form is sent to Scartel LLC.

2) Scartel LLC has not ensured destruction of personal data of applicants for the vacancies contained in the CV in the e-mails of the employees of Scartel LLC within the period not exceeding thirty days from the date of decision to employ or refuse to employ, which violates the requirements of part 4 of Article 21 of Federal Law dated July 27, 2006 No. 152-FZ On Personal Data.

In order to rectify the detected violation, Scartel LLC should ensure destruction of personal data of applicants for vacancies contained in the CV in the e-mails of the employees of Scartel LLC within the period not exceeding thirty days from the date of decision to employ or refuse to employ.

3) Scartel LLC receives applicants' CVs to the e-mails of its employees and discloses the personal data contained therein to third parties without a consent of the applicants, which violates the requirements of Article 7 of Federal Law dated July 27, 2006 No. 152-FZ On Personal Data.

In order to rectify the detected violation, Scartel LLC should stop disclosing the personal

data of the applicants to third parties without their consent.

4) When transferring the employees' personal data to third parties, Scartel LLC uses a standard written form of a consent to employee's personal data processing providing for several purposes of personal data processing, which violates the requirements of clause 4 of part 4 of Article 9 of Federal Law dated July 27, 2006 No. 152-FZ On Personal Data.

In order to rectify the detected violation, Scartel LLC should prepare and use a standard written form of a consent to employee's personal data processing providing for only one purpose of personal data processing in case of transfer of the employees' personal data to third parties.

5) When transferring the employees' personal data to third parties, Scartel LLC uses a standard written form of a consent to employee's personal data processing not providing for indication of a name of the legal person processing personal data as assigned by Scartel LLC as part of employees' personal data processing within personnel record keeping and accounting, which violates the requirements of clause 6 of part 4 of Article 9 of Federal Law dated July 27, 2006 No. 152-FZ On Personal Data.

In order to rectify the detected violation, Scartel LLC should prepare and use a standard written form of a consent to employee's personal data processing providing for indication of a name of the legal person processing personal data as assigned by Scartel LLC.

6) Scartel LLC includes the employees' personal data in publicly available Yammer without employees' written consent, which violates the requirements of part 1 of Article 8 of Federal Law dated July 27, 2006 No. 152-FZ On Personal Data.

In order to rectify the detected violation, Scartel LLC should prepare and use a standard form of a written consent of a personal data subject to inclusion of his/her personal data in Yammer.

7) An operator performs cross-border transfer of the employees' personal data to the USA without employees' written consent to cross-border transfer of their personal data, which violates the provisions of clause 1 of part 4 of Article 12 of Federal Law dated July 27, 2006 No. 152-FZ On Personal Data.

In order to rectify the detected violation, Scartel LLC should prepare and use a standard form of a written consent of a personal data subject to cross-border transfer of his/her personal data to the USA.

8) Scartel LLC assigns Iron Mountain CIS LLC to store subscribers' personal data without their consent, which violates the requirements of part 3 of Article 6 of Federal Law dated July 27, 2006 No. 152-FZ On Personal Data.

In order to rectify the detected violation, Scartel LLC should ensure obtainment of consents from subscribers to assignment to Iron Mountain CIS LLC of their personal data's storage.

9) Scartel LLC discloses the clients' personal data contained in the Applications for Transfer of a Subscriber Number to Iron Mountain CIS LLC without their consent, which violates the requirements of Article 7 of Federal Law dated July 27, 2006 No. 152-FZ On Personal Data.

In order to rectify the detected violation, Scartel LLC should stop disclosing the clients' personal data, contained in the Applications for Transfer of a Subscriber Number, to Iron Mountain CIS LLC without the clients' consent.

Having disagreed with the said Directive, the Claimant has filed a statement of claim with a commercial court.

When dismissing the statement of claim of Scartel LLC, the court of first instance has reasonably proceeded from the following.

In accordance with the Regulation on the Federal Service for Supervision of Communications, Information Technology, and Mass Media approved by Decree of the

Russian Government dated March 16, 2009 No. 228, the Federal Service for Supervision of Communications, Information Technology, and Mass Media (Roskomnadzor) is a federal executive authority performing control and supervision functions in mass information, including electronic and mass communications, information technologies and communications, functions in control and supervision over compliance of personal data processing with the legal requirements of the Russian Federation on personal data, and functions in arrangement for activities of a radio frequency service.

The Federal Service for Supervision of Communications, Information Technology, and Mass Media is an authorized federal executive authority for protection of personal data subjects' rights.

In accordance with clause 6.1 of the Administrative Regulation on Performance by the Federal Service for Supervision of Communications, Information Technology, and Mass Media of a Public Function in Exercising State Control (Supervision) over Compliance of Personal Data Processing with the Legal Requirements of the Russian Federation on Personal Data approved by Order of the Ministry of Communications and Mass Media of Russia dated November 14, 2011 No. 312, when conducting audits, the officers of the Service or its territorial body may issue within the limits of their competence binding directives to rectify the detected violations with regard to personal data.

The violations detected during the audit are governed by Federal Law dated July 27, 2006 No. 152-FZ On Personal Data (hereinafter referred to as "Law No. 152-FZ" or the "Law on Personal Data"). This Federal Law governs the relations associated with personal data processing by federal state authorities, state authorities of constituent entities of the Russian Federation and other state authorities (hereinafter referred to as the "state authorities"), local authorities and other municipal authorities (hereinafter referred to as the "municipal authorities"), legal entities and individuals by means of automation facilities, including in information-telecommunication networks, or without such facilities, if personal data processing without using such facilities corresponds to the nature of the actions (operations) as involving personal data by means of automation facilities, i. e. allows to search — according to a set algorithm — for the personal data recorded on a material data storage media and contained in card files or other systematized corpuses of personal data and/or access to such personal data.

By virtue of Article 6 of Law No. 152-FZ, personal data shall be processed complying with the principles and rules provided for by this Federal Law.

Upon a consent of the personal data subject, the operator may assign personal data processing to another person, except as otherwise provided for by a federal law, under an agreement to be entered into with such person, including a state or municipal contract or by adopting the relevant act by a state or municipal authority (hereinafter referred to as the "operator's assignment"). The person processing personal data under the operator's assignment shall comply with the principles and rules governing the personal data processing as provided for by this Federal Law. The operator's assignment shall determine a list of actions (operations) with regard to personal data which are to be performed by the person processing personal data, and the purposes of the processing as well as that person's duty to observe the confidentiality of personal data and ensure the security of personal data when they are being processed and shall also specify the requirements for protection of personal data being processed in accordance with Article 19 of this Federal Law.

By virtue of Article 7 of Law No. 152-FZ, the operators and other persons granted an access to personal data shall not disclose or distribute personal data to any third parties without a consent of a personal data subject, unless otherwise is provided for by the federal law.

In accordance with the provisions of Article 9 of Law No. 152-FZ, a personal data subject shall take a decision on provision of his/her personal data and shall give his/her consent to their

processing without duress, by his/her own will, and in his/her own interest. The consent to personal data processing shall be specific, well-informed, and deliberate.

In the cases provided for by the federal law, personal data shall be processed only subject to a written consent of a personal data subject. The written consent of a personal data subject to his/her personal data processing shall, in particular, include a purpose of personal data processing (clause 4 of part 4 of Article 9 of the Law).

By virtue of clause 1 of part 4 of Article 12 of Law No. 152-FZ, a cross-border transfer of personal data to the territories of the foreign countries that do not provide adequate protection for the rights of personal data subjects may take place if there is a written consent of a personal data subject to cross-border transfer of his/her personal data.

By virtue of part 4 of Article 21 of Law No. 152-FZ, once the purpose of personal data processing has been achieved, the operator shall stop processing the personal data or make sure it is stopped (if the personal data is processed by another person acting on the operator's assignment) and destroy the personal data or make sure it is destroyed (if the personal data is processed by another person acting on the operator's assignment) within thirty days after the date of achievement of the purpose of personal data processing, except as otherwise provided by an agreement, under which the personal data subject is a party, beneficiary or surety, another agreement between the operator and the personal data subject or, if the operator is not entitled to process the personal data without the consent of the personal data subject, on the grounds provided for by this Federal Law or other federal laws.

As it follows from the files of the case, having examined audit report dated November 24, 2015 No. A-77/11/1148-nd and directive to rectify the detected violation dated November 24, 2015 No. P-77/07/1148-nd, Scartel LLC has sent letter dated December 09, 2015 No. 09122015/1 to the Directorate under ref. No. 35554/77 dated December 17, 2015, where it has reported that a number of violations specified in the directive being appealed against (under numbers 1 to 3, 7) are acknowledged by the Company; the Company has stated that the violations will be resolved on or before May 24, 2016.

In the statement of claim filed with the court, the Company points out that the violations specified by clauses 1 to 3, 7 of the Directive being appealed against have been actually rectified.

At the same time, the court of first instance has correctly pointed out that rectifying the detected violations after their detection may not be a ground for reversal of the judicial act being appealed against.

As to the Claimant's argument on clause 4 of the Directive that there are no grounds for obtaining several consents to personal data processing, the court takes into account the following.

In accordance with part 4 of Article 9 of Law No. 152-FZ, in the cases provided for by a federal law, personal data shall be processed only subject to a written consent of the personal data subject. A consent as an electronic document signed in accordance with a federal law by means of an electronic signature shall be equivalent to a consent on paper containing the autograph signature of the personal data subject. The written consent of a personal data subject to his/her personal data processing shall include, in particular: name, patronymic, surname, address of the personal data subject, number of the main identity document, information on the date of issue of the said document and the issuing authority; name, patronymic, surname, address of the representative of the personal data subject, number of the main identity document, information on the date of issue of the said document and the issuing authority, details of a power of attorney or any other document confirming the authority of this representative (upon receipt of a consent from the representative of the personal data subject); name or name, patronymic, surname and address of the operator receiving the consent of the personal data subject; purpose of personal data processing; a list of personal data, for which

processing the consent of the personal data subject is provided; name or name, patronymic, surname and address of the person processing the personal data as assigned by the operator, if processing is assigned to such person; a list of actions with regard to personal data, for which the consent is provided; general description of the methods used by the operator for personal data processing; period, during which the consent of the personal data subject is valid, and the method of its revocation, unless otherwise is provided by the federal law; signature of the personal data subject.

It follows from the files of the case that, in its activities, the Company uses the written consent of the Company's employee: "Consent to the Employee's Personal Data Processing".

By virtue of the provisions of Article 88 of the Labour Code of Russia, when transferring the employee's personal data, an employer shall comply with the following requirements: not disclose the employee's personal data to a third party without the employee's written consent, except as it is necessary to prevent a threat to the employee's health and life and except for the other cases provided for in this Code or other federal laws; not disclose the employee's personal data for commercial purposes without his/her written consent;

Thus, if the purposes of personal data processing go beyond the scope of the Labour Code of Russia, it is necessary to obtain an individual written consent of the employee for each transfer of the employees' personal data to third parties.

The court of first instance has taken into account that, during provision of the services under agreement No. 11-005 dated July 01, 2011, Iron Mountain CIS LLC may obtain an access to the personal data of subscribers of Scartel LLC. The information on the subscriber transferred to Iron Mountain CIS LLC for storage, archiving, processing, and destruction is irrelevant to the subject matter of the communications services agreement.

The information obtained by Iron Mountain CIS LLC from the communications service provider makes it possible to directly (or indirectly) identify the user as a certain individual (the "personal data subject").

Thus, when transferring the information on subscribers to Iron Mountain CIS LLC, the communications service provider being Scartel LLC should obtain consents from its subscribers in writing.

During the unscheduled field audit, no subscribers' written consents to transfer of the information on them and to other processing of their personal data by Iron Mountain CIS LLC have been presented by Scartel LLC to the Directorate.

Due to the foregoing, the court concludes that the claimant's arguments (the Company's Arguments) that clause 5 of the Directive is not grounded because the Standard Form prepared by the company complies with the requirements of the current legislation shall be also rejected.

The court takes into account that transfer of the employees' personal data is a special case provided for by Article 88 of the Labour Code of Russia, where personal data is processed only upon a consent of the personal data subject in writing. In accordance with clause 6 of part 4 of Article 9 of Law No. 152-FZ, the written consent of the personal data subject to his/her personal data processing shall, in particular, include name or name, patronymic, surname and address of the person processing the personal data as assigned by the operator if processing is assigned to such person.

Thus, the arguments of Scartel LLC that the Company has prepared a certain list of contracting parties that may be assigned with personal data processing is ungrounded and does not comply with the requirements of Article 9 of the Law on Personal Data.

The arguments that clause 6 of the Directive is ungrounded because there are no violations of the provisions of part 1 of Article 8 of Law No. 152-FZ in the company's activities have been lawfully rejected by the court of first instance due to the following grounds.

By virtue of part 1 of Article 8 of Law No. 152-FZ, publicly available sources of personal data (including reference books, address books) may be created for informational support

purposes. Publicly available sources of personal data may, upon a written consent thereto of the personal data subject, comprise his or her family name, first name, patronymic, year and place of birth, address, subscriber's number, data on the profession and other personal data communicated by the personal data subject.

During the audit, Scartel LLC has provided the information on arranging by the company for processing the employees' personal data for informational support through use of a publicly available source of the employees' personal data — Yammer.

In accordance with the Company's explanations, it performs cross-border transfer of personal data of its employees to the Netherlands as part of use of Microsoft's Office 365 cloud service, including the Yammer corporate social network.

Thus, it is the Company that arranged for use of Yammer corporate social network for its employees, thereby arranging for the employees' personal data processing in Yammer, which is confirmed by receipt by the Company of the written consents from its employees.

The publicly available source of personal data — Yammer — is created (deployed in the cloud service) by the Company for informational support. For this reason, by virtue of part 1 of Article 8 of the Law, the Company should receive a written consent of a personal data subject to inclusion of his/her personal data in Yammer.

At the same time, the Company's reference to the fact that there is a written consent is unlawful, since this consent does not comply with the requirements of part 4 of Article 9 of the Law on Personal Data as is indicated above.

As to the violations set out in clause 8 of the Directive, the court of first instance has found the following.

The claimant has pointed out that Scartel LLC has transferred the personal data to Iron Mountain CIS LLC in accordance with Federal Law dated October 22, 2004 No. 125-FZ On Archive Keeping of the Russian Federation, for which reason the Law on Personal Data does not apply to the said relations.

In accordance with part 2 of Article 1 of the Law on Personal Data, the said law shall not cover the relations arising when arranging for storage, building-up, record keeping, and use of the documents of the Archives Fund of the Russian Federation containing personal data and other archive documents in accordance with the legislation on archive keeping in the Russian Federation.

At the same time, the relations that have developed between Scartel LLC and Iron Mountain CIS LLC are not governed by the legislation on arranging for storage, building-up, record keeping, and use of the documents of the Archives Fund of the Russian Federation and other archive documents, since the documents (including subscription agreements), for which the file is not archived, are transferred for storage.

Iron Mountain CIS LLC provides services with regard to storage of all documents, not only those that were performed (expired, terminated, etc.). Scartel LLC transfers to Iron Mountain CIS LLC communications services agreements (and other documents) not after their expiration, but after entry into them and during their performance.

Before archiving the performed document and transferring it for archive storage, the relations in transfer of this document shall be subject to the legislation on protection of the rights of personal data subjects if it contains the information subject to protection in accordance with the requirements of the legislation on personal data and the legislation on communications in terms of observance of secrecy of communication and the procedure for provision of information on subscribers to third parties.

Thus, all documents, including subscription agreements, before archiving the relevant file (before expiration of the agreement) shall be transferred, in particular, in accordance with the requirements of the legislation on personal data and the legislation on communications.

The said facts are confirmed by the terms and conditions of Agreement No. 11-1005 dated

July 01, 2011 and entered into by and between Scartel LLC and Iron Mountain CIS LLC, in accordance with which the subject matter of the Agreement is the services with regard to document storage, archiving, and destruction.

Within this agreement, Scartel LLC transfers the documents relating to the entity's activities, including communications services agreements entered into with the subscribers being individuals.

In accordance with Article 53 of Federal Law dated July 07, 2003 No. 126-FZ On Communications (the "Law on Communications"), the information on subscribers and communications services being provided to them, which has become known to communications service providers by virtue of performance of the communications services agreement, shall be restricted information and shall be subject to protection in accordance with the legislation of the Russian Federation. In this case, the said relations are governed by the Law On Personal Data.

The Claimant's arguments that there are no violations of the provisions of Article 7 of Law No. 152-FZ as set out in clause 9 of the Directive have been rejected by the court of first instance due to the following grounds.

The Claimant points out that the Company and Iron Mountain CIS LLC also have a confidentiality agreement in effect, in accordance with which the latter has assumed an obligation to keep all data received from the Claimant confidential.

However, the said agreement may not be a ground for the company's exemption from the provisions and rules set forth by Law No. 152-FZ.

So, when entering into the Agreement (Rules for Provision of Communications Services of the Communications Service Provider), the Communications Service Provider provides for a possibility to transfer a subscriber number.

During the audit of the Company, the administrative authority has obtained a copy of the Application for Transfer of a Subscriber Number dated October 14, 2015 and signed by the client. Following the results of analysis of the submitted Application for Transfer of a Subscriber Number, the administrative authority has found the following.

Through the application, the Communications Service Provider collects the following personal data: full name, passport details (series, number, issuing authority), registration address, contact telephone, e-mail.

By signing the application, the client provides to the Communications Service Provider his/her consent to processing of his/her personal data specified in the application, including its transfer to third parties and processing by third parties, when transferring the subscriber number.

The Communications Service Provider transfers the signed application to Iron Mountain CIS LLC for storage under agreement dated July 01, 2011 No. 11-1005.

Transfer of personal data for storage is provided for by clause 4.7 of the Regulation on Personal Data Processing and Protection (Annex No. 1 to Order No. 17-Sc-P09-02/15 dated September 02, 2015), pursuant to which storage of personal data being processed without the use of automated facilities is assigned to third parties under the agreements and the Flowchart of Collection and Subsequent Transfer of Personal Data of the Company's Subscribers as submitted by the Communications Service Provider during the audit.

The personal data collected by Scartel LLC through the Application for Transfer of a Subscriber Number relates, in accordance with part 1 of Article 53 of the Law on Communications, to the information on a subscriber, for which reason the communications service provider may assign its processing to a third party without the subscriber's consent only to enter into and/or perform the communications services agreement, to which the subscriber being an individual is a party.

At the same time, data storage and archiving assignment is not a case specified in part 1

of Article 53 of the Law on Communications providing for transfer of the subscriber's data to third parties to enter into and/or perform the communications services agreement.

In this regard, by virtue of the provisions of part 1 of Article 53 of the Law on Communications, the communications service provider shall provide evidence of obtaining the consent of a subscriber being an individual to provision of the information on him/her to third parties.

Following the results of analysis of clauses 2 and 2.5. of the Application for Transfer of a Subscriber Number, the administrative authority has found the following.

So, for example, it follows from clause 2.2.: "I do hereby provide my consent to processing of my personal data specified in this Application by the communications service provider being Scartel LLC, including its transfer to and processing by third parties, when transferring my subscriber number.

Thus, it has been found that Scartel LLC has no subscriber's consent to process his/her personal data using such processing method as storage at Iron Mountain CIS LLC.

Therefore, in the absence of the subscriber's consent, Scartel LLC has assigned storage of his/her personal data to another person (Iron Mountain CIS LLC), thereby it has disclosed the personal data of its subscribers when transferring it for storage, which provides for scanning and formation of an electronic archive at Iron Mountain CIS LLC (agreement No. 11-1005).

In accordance with part 2 of Article 5 of Law No. 152-FZ, personal data shall be processed within the scope of specific pre-set and lawful purposes. No personal data processing incompatible with the purposes of personal data collection shall be allowed.

Thus, the court of first instance has lawfully supported the conclusions of the administrative authority that there have been violations of the requirements of part 3 of Article 6 of Law No. 152-FZ in the Company's actions in terms of assignment of storage of the clients' personal data to another person without their consent and of the requirements of Article 7 of the Law in terms of disclosure of the clients' personal data to third parties without their consent.

There have been no violations committed by the Interested Party when commissioning and conducting the audit. Federal Law dated December 26, 2008 No. 294-FZ On Protection of Rights of Legal Entities and Individual Entrepreneurs When Exercising State Control (Supervision) and Municipal Control setting forth the procedure for arranging for and conducting audits shall not apply when exercising control and supervision over personal data processing.

Taking into account the facts set out, the court of first instance has come to the correct conclusion that Directive No. P-77/07/1148-nd dated November 24, 2015, which is being challenged by the Claimant, is legal and grounded.

The court of appeal has considered all arguments of the appeal, but they do not refute the court's conclusions that form a basis of the decision and may not be a ground for reversing the decision and satisfying the appeal.

The facts of the case have been fully and correctly found by the court of first instance and have been adequately evaluated from a legal perspective.

There have been no violations of the provisions of procedural law committed by the court of first instance, which have resulted in adoption of an incorrect decision. There are no grounds to reverse the court decision.

Being guided by Articles 266, 268, 269, and 271 of the Commercial Procedure Code of the Russian Federation, the court

has resolved:

To uphold the decision of the Commercial Court of Moscow dated April 26, 2016 on case No. A40-32030/2016 and to dismiss the appeal.

Original Text Available at
http://www.consultant.ru/cons/cgi/online.cgi?req=doc&base=MARB&n=1066376

The resolution shall come into legal force from the date of its adoption and may be appealed to the Commercial Court of Moscow Circuit within two months from the date of its execution in full.

Presiding Judge
M. V. KOCHESHKOVA

Judges
S. M. MUKHIN
P. V. RUMYANTSEV

---

**Exhibit 14** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

**TRANSLATION FROM RUSSIAN**

## MINISTRY OF COMMUNICATIONS AND MASS MEDIA
## OF THE RUSSIAN FEDERATION

### LETTER
### dated July 7, 2017 No. П11-15054-ОГ

### ON CLARIFICATION OF PROVISIONS OF THE FEDERAL LEGISLATION

The Ministry of Communications and Mass Media of the Russian Federation (hereinafter the "Ministry of Communications of Russia") considered within its competence a request to clarify provisions of Federal Law on Personal Data No. 152-FZ dated July 27, 2006 (hereinafter the "Law on Personal Data") and Federal Law on Communications No. 126-FZ dated July 07, 2003 (hereinafter the "Law on Communications") in the context of adopted Federal Law No. 290-FZ dated July 03, 2016 on amendments to Federal Law on Application of Cash Register Equipment when Making Cash Settlements and (or) Settlements Using Payment Cards and to Certain Legislative Acts of the Russian Federation and hereby informs as follows.

Pursuant to clause 1 of Article 3 of the Federal Law On Personal Data, personal data shall mean "any information related to an individual directly or indirectly identified or identifiable (a personal data subject)".

Thus, a subscriber's number or e-mail address may be recognized as personal data in the cases when such information relates to an individual directly or indirectly identified or identifiable. For example, a subscriber's number owned by a legal entity may not be treated as personal data.

According to clause 3 of Article 3 of the Law on Personal Data, "processing of personal data means any action (operation) or a set of actions (operations) realized by means of automation facilities or without such facilities as involving personal data, including collecting, recording, systematizing, accumulating, storing, updating (renewing and altering), retrieving, using, transmitting (disseminating, providing and accessing), depersonalizing, blocking, deleting and destroying personal data".

Clause 1 of part 1 of Article 6 of the Law on Personal Data stipulates that personal data shall be processed upon a consent of a personal data subject to processing of his/her personal data. At the same time, clauses 2 to 11 of part 1 of Article 6 of the Law on Personal Data provides for the cases when it is allowed to process personal data without a consent of a personal data subject to their processing.

Such cases include, in particular, processing of personal data which is "necessary for the purpose of attaining the objectives envisaged by an international treaty of the Russian Federation or a law, for realization and execution of the functions, powers and duties vested in the operator by the legislation of the Russian Federation" (clause 2 of part 1 of Article 6 of the Law on Personal Data).

Subject to definitions of concepts "controlled-issue form", "cash register receipt", "user", "settlements" set forth by Article 1.1 of Federal Law on Application of Cash Register Equipment when Making Cash Settlements and (or) Settlements Using Payment Cards No. 54-FZ dated May 22, 2003 (hereinafter the "Law on CRE"), a user's duty, stipulated by part 2 of Article 1.2 of the Law on CRE, when making settlements in case of submission by a buyer (client) to the user before the moment of settlement making of a subscriber's number or e-mail

address to send a cash register receipt or a controlled-issue form in electronic form to a buyer (client) to a subscriber's number or e-mail address submitted by him/her (if it is technically feasible to transfer information to a buyer (client) in electronic form to his/her e-mail) means performance of functions, powers and duties, imposed by the legislation of the Russian Federation on a personal data controller (a "user" for the purposes of the Law on CRE), in accordance with clause 2 of part 1 of Article 6 of the Law on Personal Data.

Pursuant to clause 1 of Article 53 of Law on Communications "information about subscribers and communication services provided to them which became known to communication providers by virtue of performance of communication services agreement shall be restricted information and shall be protected according to the legislation of the Russian Federation.

Information about a subscriber includes surname, name, patronymic or alias name of a subscriber being an individual, name (trade name) of a subscriber being a legal entity, surname, name, patronymic of a director and employees of such legal entity as well as an address of this subscriber or address of installation of end equipment, subscriber's numbers and other data allowing identification of a subscriber or his/her/its end equipment, information from databases of systems of settlements for provided communication services, including about connections, traffic and payments of a subscriber.

Information about subscribers being individuals may be provided to any third parties only subject to a consent of such subscribers, excluding the cases stipulated by this Federal Law and other federal laws.

A duty to prove obtaining of a consent from a subscriber, being an individual, to provision of information about him/her to third parties is imposed on the communications provider.

In accordance with part 3 of Article 6 of Federal Law on Personal Data No. 152-FZ dated July 27, 2006, a communications provider may entrust third parties with processing of personal data of its subscriber being an individual.

If the communications provider assigns processing of personal data of a subscriber being an individual to a third party for the purposes of conclusion and (or) performance of communication services agreement, a party to which a subscriber being an individual is, and (or) for the purposes of exercising rights and legitimate interests of the communications provider or subscriber being a citizen, a consent from a subscriber being an individual to such assignment, including to transfer of his/her personal data to such third party, and processing of personal data by such third party in accordance with the communications provider's assignment is not required".

At the same time, we inform you that in accordance with part 1 of Article 24 of the Law on Personal Data any persons being guilty of a violation of requirements of the Law on Personal Data shall be held liable as prescribed by the legislation of the Russian Federation, including liability stipulated by Article 13.11 of the Administrative Offences Code of the Russian Federation.

Please note that according to the right of Ministry of Communications of Russia "to provide to state authorities, local authorities, legal entities and individuals clarifications on the issues referred to the scope of jurisdiction of the Ministry" established by clause 6.6 of the Regulation on Ministry of Communications and Mass Media of the Russian Federation, which is approved by decree of the Government of the Russian Federation No. 418 dated June 02,

2008, this letter does not contain any legal provisions or general rules detailing regulatory prescriptions and is not a regulation. This letter provides information and explanations on issues of application of the legislation of the Russian Federation on personal data.

Director of the High Technologies Development Department of the Ministry of
Communications and Mass Media of Russia
S. D. MIGRANOV

---

**Exhibit 15** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

TRANSLATION FROM RUSSIAN

### GOVERNMENT OF THE RUSSIAN FEDERATION

### RESOLUTION
**dated June 30, 2018 No. 772**

**ON DETERMINATION OF THE SCOPE OF INFORMATION TO BE PLACED IN THE UNIFIED INFORMATIONAL PERSONAL DATA SYSTEM ENSURING PROCESSING, INCLUDING COLLECTION AND STORAGE, OF BIOMETRIC PERSONAL DATA, THEIR CHECKING AND TRANSFER OF INFORMATION ABOUT A LEVEL OF THEIR COMPLIANCE WITH THE SUBMITTED BIOMETRIC PERSONAL DATA OF A CITIZEN OF THE RUSSIAN FEDERATION, INCLUDING A TYPE OF BIOMETRIC PERSONAL DATA AS WELL AS ON AMENDMENTS TO CERTAIN REGULATIONS OF THE GOVERNMENT OF THE RUSSIAN FEDERATION**

List of Amending Documents

(as amended by Resolution of the Government of the Russian Federation No. 1197 dated September 13, 2019)

Pursuant to part 8 of Article 14.1 of the Federal Law on Information, Information Technologies and Information Protection, the Government of the Russian Federation resolves:

To approve the attached:

Scope of information to be placed in the unified informational personal data system ensuring processing, including collection and storage, of biometric personal data, their checking and transfer of information about a level of their compliance with the submitted biometric personal data of a citizen of the Russian Federation, including a type of biometric personal data;

Amendments to be introduced to the acts of the Government of the Russian Federation.

Chairman of the Government of the Russian Federation
D. MEDVEDEV

Approved
by Resolution of the Government of the Russian Federation
dated June 30, 2018 No. 772

**SCOPE OF INFORMATION TO BE PLACED IN THE UNIFIED INFORMATIONAL PERSONAL DATA SYSTEM ENSURING PROCESSING, INCLUDING COLLECTION AND STORAGE, OF BIOMETRIC PERSONAL DATA, THEIR CHECKING AND TRANSFER OF INFORMATION ABOUT A LEVEL OF THEIR COMPLIANCE WITH THE SUBMITTED BIOMETRIC PERSONAL DATA OF A CITIZEN OF THE RUSSIAN FEDERATION, INCLUDING A TYPE OF BIOMETRIC PERSONAL DATA**

List of Amending Documents

(as amended by Resolution of the Government of the Russian Federation No. 1197 dated September 13, 2019)

Original Text Available at
http://pravo.gov.ru/proxy/ips/?docbody=&prevDoc=102166684&backlink=1&&nd=102474390

The unified informational personal data system ensuring processing, including collection and storage, of biometric personal data, their checking and transfer of information about a level of their compliance with the submitted biometric personal data of a citizen of the Russian Federation (hereinafter the "unified informational personal data system") shall contain the following information:

a) Biometric personal data of an individual being a citizen of the Russian Federation, of the following types:

Data of an image of an individual's face obtained using photo and video devices;

Data of a voice of an individual obtained using sound-recording devices;

b) Identifier of information in the relevant register of legal entities or register of bodies and entities of the federal state information system "Unified System of Identification and Authentication in the Infrastructure Ensuring Informational and Technological Interaction between Information Systems Used to Provide State and Municipal Services in Electronic Form" (hereinafter the "unified system of identification and authentication") about state body, bank, other entity in the cases stipulated by the federal law, which placed biometric personal data of a citizen of the Russian Federation in electronic form in the unified biometric system (hereinafter the "authorized entities") — primary state registration number of an entry on establishment of the legal entity;

c) Identifier of information about an authorized employee of an authorized entity in the register of bodies and entities of the unified system of identification and authentication, who placed biometric personal data of a citizen of the Russian Federation in electronic form to the unified biometric system — insurance number of the individual ledger account of an insured person in the personifIed record-keeping system of the Pension Fund of the Russian Federation;

d) Identifier of information about an individual in the register of individuals of the unified system of identification and authentication, biometric personal data of which are placed in the unified biometric system — identifier of an account in the unified system of identification and authentication;

e) Contact details of an individual (number of mobile wireless communication subscriber device, e-mail address).

(clause "e" was introduced by Resolution of the Government of the Government of the Russian Federation No. 1197 dated September 13, 2019)

Approved
by the Resolution of the Government
of the Russian Federation
dated June 30, 2018 No. 772

**Exhibit 16** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

**Question:** On Submitting by a Customer of a Request to Procurement Participants to Provide Personal Data.

**Answer:**

**MINISTRY FOR ECONOMIC DEVELOPMENT OF THE RUSSIAN FEDERATION**

**LETTER**
**dated October 2, 2015 No. ОГ-Д28-12951**

The Contract System Development Department of the Ministry for Economic Development of the Russian Federation has considered an application concerning clarification of the provisions of Federal Law No. 223-FZ dated July 18, 2011 On Procurements of Goods, Works, or Services by Certain Types of Legal Entities (hereinafter "Law No. 223-FZ) and informs as follows.

According to part 1 of Article 2 of Law No. 223-FZ, when procure goods, works, services customers shall be guided by the Constitution of the Russian Federation, Civil Code of the Russian Federation, Law No. 223-FZ, other federal laws and other regulations of the Russian Federation as well as the regulations regulating procurement rules (hereinafter the "procurement regulation") adopted in accordance therewith and approved subject to provisions of part 3 of Article 2 of Law No. 223-Federal Law.

Pursuant to part 2 of Article 2 of Law No. 223-FZ, the procurement regulation is a document which regulates procurement activities of the customer and which shall specify requirements for procurement, including a procedure for preparation and holding procurement procedures (including procurement methods) and conditions for their application, procedure for conclusion and performance of agreements as well as other provisions related to procurement.

In order to ensure an equal access of interested parties to customer's procurement, it is appropriate to set forth in the procurement documents (in accordance with the procurement regulation) an exhaustive list of requirements for procurement participants as well as for documents and information to be provided within a bid.

According to clause 1 of Article 3 of Federal Law On Personal Data No. 152-FZ dated July 27, 2006 (hereinafter referred to as "Law No. 152-FZ"), personal data shall include any information related to an individual directly or indirectly identified or identifiable.

As the aforementioned rule does not detail exactly what kind of information about an employee relates to his/her personal data, it follows from the definition above that personal data, apart from individual ones (surname, name, patronymic, date and place of birth, address, marital status), may be also deemed information about education, profession, position held, length of employment.

According to clause 6 of Article 3 of Law No. 152-FZ, provision of personal data means actions aimed at disclosing personal data to a certain person or a certain group of persons. The rules for transfer of personal data of an employee are regulated by Article 88 of the Labor Code of the Russian Federation.

If follows from provisions of the said regulations that the legislation does not prohibit

transfer of personal data of individuals (in particular, employees), only restrictions are set.

According to clause 1 of part 1 of Article 6 and Article 7 of Law No. 152-FZ, as a general rule, an employer is prohibited to disclose to any third parties personal data of employees without their consent. At the same time, a duty to prove an employee's consent to transfer of his/her personal data is imposed on the employer.

Thus, in order to determine compliance of procurement participants with the requirements for performance of works, provision of services, supply of goods, the customer may request necessary personal data of a procurement participant, if such requirements are established in the procurement regulation and procurement documents, taking into account restrictions established in Article 88 of the Labor Code of the Russian Federation.

We note in addition that Article 13.11 of the Administrative Offences Code of the Russian Federation provides for liability for violation of the statutory procedure for collection, storage, use or distribution of information about citizens (personal data).

At the same time, the Contract System Development Department of the Ministry for Economic Development of Russia points out that clarifications from a state authority have legal effect only if such authority is vested (according to the legislation of the Russian Federation) with special competence to issue clarifications on application of regulations' provisions. The Ministry of Digital Development, Communications and Mass Media of Russia is a federal executive authority which is not competent according to the existing regulations of the Russian Federation, including the Regulation on the Ministry approved by Resolution of the Government of the Russian Federation No. 437 dated June 5, 2008, to clarify the legislation of the Russian Federation.

Director of the Contract System Development Department
M. V. CHEMERISOV

October 02, 2015

**Exhibit 17** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

# MOSCOW CITY COURT

## APPELLATE RULING
### dated June 4, 2018 on case No. 33a-3957

Judge: N. V. Rubtsova

Judicial Chamber on Administrative Cases of the Moscow City Court consisting of Presiding Judge V. V. Stavich,

Judges R. B. Mikhailova and V. V. Lukyanchenko,

In the presence of Secretary P.

Having considered in the open court session, based on the report by judge R. B. Mikhailova, the administrative case under the appeal filed by lawyer O. I. Ulymov, representative of administrative claimant McDonalds LLC, against the decision of the Zamoskvoretskiy District Court of Moscow dated December 06, 2017 and resolving:

To dismiss the claims filed by McDonald's LLC against the Zamoskvoretskiy Interdistrict Prosecutor of Moscow for invalidation and cancellation of the petition,

has found:

McDonald's LLC has filed an administrative statement of claim with a court, where it has requested to invalidate petition of the Zamoskvoretskiy Interdistrict Prosecutor of Moscow No. 07-04-2016 dated August 04, 2016 pointing out that it had not violated the requirements of the legislation on personal data protection.

The court has taken the above decision, which reversal as illegal according to the arguments of the appeal is requested by lawyer O. I. Ulymov, representative of the administrative claimant, asserting that the court's conclusions do not correspond to the facts of the case and that the court has violated the provisions of procedural law.

Having examined the files of the case, having discussed the arguments of the appeal, having heard the explanations of the representatives of administrative claimant M. and lawyer O. I. Ulymov, who have supported the arguments of the appeal, the representative of administrative defendant B., who has considered the court decision to be legal and grounded, and having checked the decision, the judicial chamber comes to the conclusion that there are no grounds provided for by Article 310 of the Administrative Procedure Code of Russia to reverse or change the court resolution on appeal.

Thus, within the meaning of part 1 of Article 218, part 2 of Article 227 of the Administrative Procedure Code of Russia, the required condition to satisfy an administrative claim being considered under Article 22 of the Administrative Procedure Code of Russia shall be a set of facts evidencing non-compliance of the challenged decision or actions (omissions) of the administrative defendant with the requirements of the current legislation and infringement, in this regard, of the rights of the administrative claimant (at the same time, the latter is imposed by the procedural law with a duty to prove the facts evidencing an infringement of its rights) and evidencing meeting the deadline for turning to a court to protect the infringed right, the administrative defendant shall prove that his/her/its decision or actions

(omissions) comply with the law (parts 9 and 11 of Article 226, Article 62 of the Administrative Procedure Code of Russia).

When considering the administrative case, the court has found that, during the period from May 04 to June 01, 2016, the Directorate of the Federal Service for Supervision of Communications, Information Technology, and Mass Media (Roskomnadzor) for the Central Federal District conducted an audit of compliance by McDonald's LLC with the requirements of the legislation on personal data protection.

On June 01, 2016, the Directorate of Roskomnadzor for the Central Federal District issued directive No. P-77/07/285-nd/1/105 to McDonald's LLC to rectify the violations of the legislation with regard to personal data processing and transfer:

- Violation of part 7 of Article 22 of Federal Law dated July 27, 2006 No. 152-FZ On Personal Data (hereinafter referred to as the "Law") in terms of submission to the authorized body of a notice of personal data processing, which contains incomplete and/or inaccurate information.

- Violation of part 1 of Article 6 of the Law in terms of personal data processing in the cases not provided for by the Law;

- Violation of part 3 of Article 6 of the Law in terms of assignment of personal data processing to another person without a consent of a personal data subject;

- Violation of clause 7 of Decree of the Government of the Russian Federation dated September 15, 2008 No. 687 On Approval of the Regulation on Specific Features of Personal Data Processing without the Use of Automated Facilities, in terms of non-correspondence of the standard forms of documents, the nature of information in which implies or allows inclusion of personal data therein, to the requirements of the legislation of the Russian Federation;

- Violation of part 4 of Article 21 of the Law in terms of non-compliance with the requirements set forth for personal data processing once the processing purposes are achieved;

- Violation of part 1 of Article 18.1 of the Law in terms of failure to take measures that are necessary and sufficient to perform the duties provided for by the Law and the regulatory legal acts adopted in accordance therewith;

- Violation of clause 1 of part 4 of Article 12 of the Law in terms of cross-border transfer of personal data to a foreign country without a consent of a personal data subject in writing;

- Violation of part 4 of Article 9 of the Law in terms of non-correspondence of the content of the personal data subject's written consent to personal data processing to the requirements of the legislation of the Russian Federation.

These violations were to be rectified by September 14, 2016.

A case on administrative offence under Article 13.11 of the Administrative Offences Code of Russia (violation of the statutory procedure for collection, storage, use, or distribution of the information on individuals (personal data)) has been initiated against the Company.

On August 24, 2016, the magistrate judge of court circuit No. 399 of Zamoskvorechye District of Moscow, acting as a magistrate judge of court circuit No. 398 of Zamoskvorechye District of Moscow, rendered a resolution, by which the proceedings on administrative offence

case against the administrative claimant have been discontinued because there was no set of elements of an administrative offence.

By the decision of the Zamoskvoretskiy District Court of Moscow dated January 26, 2017, the resolution of the magistrate judge has been upheld.

By the final and binding decision of the Simonovskiy District Court of Moscow dated April 20, 2017, directive dated June 1, 2016 No. P-77/07 of the Directorate of Roskomnadzor for the Central Federal District has been invalidated and cancelled.

Along with this, it has been found that, upon a request of the Directorate of Roskomnadzor for the Central Federal District, during the period from July 20 to August 04, 2016, an audit of compliance by McDonald's LLC with the requirements of the legislation on personal data protection was conducted by the Zamoskvoretskiy Interdistrict Prosecutor's Office of Moscow as well.

On August 04, 2016, the Zamoskvoretskiy Interdistrict Prosecutor's Office of Moscow filed Petition to Rectify Violations of the Legislation on Personal Data No. 07-04-2016 (hereinafter referred to as the "Petition") against McDonald's LLC.

The grounds for such petition were as follows:

1. As to the data entered in the Notice: the following personal data categories are not specified: citizenship, which does not comply with clause 3 of part 3 of Article 22 of the Federal Law On Personal Data (hereinafter also referred to as the "Law"); the operator has not specified the e-mail address of the individual responsible for arranging for personal data processing and the postal address is not specified as well, which does not comply with clause 7.1 of part 3 of Article 22 of the Law; the operator has not specified a complete list of countries, in particular, Ireland, to which cross-border transfer of personal data is performed; the operator has not specified the information on the location of the database of mcdbirthdays.ru website;

2. There is no consent of dismissed employees to cross-border transfer of their personal data to Ireland and the United Kingdom and no cross-border transfer of data is specified in the agreement with Moscow-McDonald's CJSC;

3. Questionnaires that applicants can fill out directly in a restaurant to fill a vacancy do not comply with clause 7 of the Regulation on Specific Features of Personal Data Processing without Using Automated Facilities approved by Decree of the Russian Government dated September 15, 2008 No. 687 in terms of the lack of information on the processing purpose, deadlines for personal data processing, a list of actions that will be performed during its processing, and general description of the methods used by the Operator for personal data processing;

4. In the personal record of the employee of the restaurant controlled by McDonald's LLC, a CV and consent to applicant's personal data processing have been found and, during the audit activities, when analysing the minor employee's personal record, the CV for McDonald's printed from the website has been found, which is a violation of part 4 of Article 21 of the Law;

5. Violation of the requirements of Article 18.1 and clause 1 of part 1 of Article 6 of the Law expressed in the fact that McDonald's LLC has no internal local acts governing personal data processing, when including employees and dismissed employees in the employees pool,

and no individual written consents of the applicants who have decided to join the employees pool;

6. In the restaurant employee's personal record (dated May 15, 2016), unified form T-2 of the restaurant contains a handwritten phone number of the employee's parent; however, there is no consent of the employee's close relative to his/her personal data processing, which is a violation of the requirements of clause 1 of part 1 of Article 6 of the Law;

7. During the visual analysis of Oracle HR Information System of Personal Data, it has been found that Moscow-McDonald's CJSC processes personal data of the dismissed employees after achieving the purpose of processing of personal data of the employees dismissed more than 5 years before the audit, which is a violation committed by McDonald's LLC of part 4 of Article 21 of the Law;

8. Cross-border transfer of the employees' personal data to a foreign country that does not provide adequate protection for the rights of personal data subjects (USA), based on the employee's consent in writing not compliant with the requirements of the Law, which is a violation of the requirements of part 4 of Article 9 and clause 1 of part 4 of Article 12 of the Law (case file sheets 30–35).

The Company shall report within one month the results of the petition consideration and the measures taken to the prosecutor's office.

In response to the Petition to Rectify Violations of the Federal Legislation, the Company has provided a reply dated August 29, 2016 with objections, with which the administrative defendant has agreed; no other measures of the prosecutor's response have been taken by the Zamoskvoretskiy Interdistrict Prosecutor's Office of Moscow with regard to McDonald's LLC in connection with the challenged petition, the prosecutor's office has not filed a claim to compel the Company to rectify the violations of the legislation on personal data; no administrative offence case under Article 17.7 of the Administrative Offences Code of Russia against the administrative claimant has been initiated.

When resolving the dispute, having evaluated the evidence gathered on the case in its entirety under the rules of Article 84 of the Administrative Procedure Code of Russia and having analysed the arguments of the administrative claim in relation to the requirements of the legislation governing the legal relations under consideration, the court has concluded to dismiss the stated claims and, while doing so, proceeded from the fact that, when filing the Petition, the administrative defendant has acted within the powers and competencies granted to him/her by the Federal Law On Prosecutor's Office of the Russian Federation without infringing the rights and legitimate interests of the administrative claimant; the prosecutor's office is satisfied with the objections submitted by the Company and dated August 29, 2016 and considers them as a duty imposed on the claimant to consider the petition and report the measures taken within a month.

The judicial chamber finds the court's conclusions lawful and does not see any ground to disagree with them, believing that they correspond to the facts of the case and the law governing the legal relations under consideration and are supported by evidence.

So, by virtue of part 1 of Article 129 of the Constitution of the Russian Federation, the powers, arrangement and procedure for the activities of the prosecutor's office of the Russian Federation are determined by a federal law.

In accordance with Federal Law dated January 17, 1992 No. 2202-1 On Prosecutor's Office of the Russian Federation, a prosecutor shall supervise observance of the human and civil rights and freedoms; the subject of supervision pursuant to Article 26 of the said Law shall be observance of the human and civil rights and freedoms by the management bodies and managers of profit and non-profit entities; by virtue of Article 22 of the same Law, the prosecutor's powers shall include filing a petition to rectify violations of the law.

Pursuant to the Federal Law On Prosecutor's Office of the Russian Federation, the prosecutor's claims arising from his/her powers listed in Article 22 of this Law shall be unconditionally satisfied within the set period (clause 1 of Article 6); a petition to rectify violations of the law shall be filed by the prosecutor or his/her deputy if the actual violation of the law by the authorities and officials specified in clause 1 of Article 21 of this Federal Law (clause 3 of Article 22) has been found; the petition to rectify violations of the law shall be filed by the prosecutor or his/her deputy to the authority or official that is authorized to rectify the violations and shall be subject to immediate consideration; specific measures shall be taken to rectify the violations of the law, their causes and conditions conductive to them, within a month from the rendering date of the petition; the results of the measures taken shall be reported to the prosecutor in writing (clause 1 of Article 24).

Within the meaning of the above interrelated provisions of the law and taking into account that, when supervising obeyance of laws, prosecution authorities do not substitute any other state authorities (clause 2 of Article 21), the prosecutor's petition itself is not absolute and does not have an effect of enforcement, it is aimed to compel the authorities and officials specified in clause 1 of Article 21 of the said Law to rectify the committed violations of the law, primarily, on a voluntary basis. The claim to unconditionally fulfil the prosecutor's petition shall be implemented through special procedures — by rendering by the prosecutor of a resolution to initiate administrative offence proceedings or by turning to a court.

Therefore, the provisions of Article 24 of the Federal Law On Prosecutor's Office of the Russian Federation, which grant the prosecutor (his/her deputy) with the right to file a petition, which is subject to immediate consideration, to rectify violations of the law to the authority or official that is authorized to rectify the violations, given that the interested parties are provided with a possibility to appeal against the prosecutor's decisions, by themselves cannot be considered as infringing the rights and freedoms.

By their nature, administrative proceedings are also aimed not at the actual invalidation of any decisions or actions (omissions) of the state authority, judicial defence is exactly aimed at redressing the infringed right of the administrative claimant (Articles 3 and 4 of the Administrative Procedure Code of Russia, Article 46 of the Constitution of the Russian Federation).

Challenging the petition, the administrative claimant has asserted that there have been no violations of the requirements of the Federal Law on Personal Data in its actions, referred to the judicial acts enforced against McDonald's LLC, however, it has not challenged that, in connection with the petition, no other prosecutor's response measures have been taken to the Company, including up to the present moment. At the same time, the judicial acts themselves do not evidence that the petition is illegal; within the limits of the powers granted, the prosecutor independently determines whether it is necessary to take any prosecutor's response measures.

Based on the foregoing, the judicial chamber finds the court decision (being appealed

against) to dismiss the stated claims as legal and grounded, considers that it has been adopted in accordance with Article 227 of the Administrative Procedure Code of Russia; the legally relevant facts on the case are determined correctly based on the requirements of part 9 of Article 226 of the Administrative Procedure Code of Russia; the burden of proving is legally distributed between the parties (Article 62, part 11 of Article 226 of the Administrative Procedure Code of Russia); the evidence gathered on the case is sufficient to adopt a correct decision; the evidence is evaluated according to the rules of Article 84 of the Administrative Procedure Code of Russia; all facts of the case are thoroughly examined and proven; the conclusions of the court of first instance set out in the court decision correspond to the facts of the administrative case, are based on the correct application of the provisions of substantive law governing the legal relations under consideration, and made without violating the provisions of procedural law; the arguments of the parties and the evidence presented by them are adequately evaluated in the decision from a legal perspective to the effect that the challenged petition does not infringe the rights and legitimate interests of the administrative claimant.

The arguments of the appeal duplicate the administrative claimant's position in the court of first instance, have been the subject matter of consideration by the court, are adequately evaluated, and the court of appeal has no grounds to disagree with such evaluation, they are aimed at challenging the groundedness of the court's conclusions on the findings or interpreting the provisions of law differently, and are not the grounds provided for by Article 310 of the Administrative Procedure Code of Russia for reversal of the judicial act enforced on the case.

The arguments of the appeal do not contain any facts that would not be checked and taken into account by the court of first instance, when considering the case, would have a legal effect for rendering a judicial act on its merits, would affect the groundedness and legality of the court decision or refute the court conclusions, so they cannot be a ground to reverse the decision.

Despite the statements in the appeal, the court has correctly determined the facts relevant to the administrative case, while the administrative claimant's arguments to the contrary are based on the incorrect interpretation of the provisions of the current legislation.

When considering the case, the court has correctly applied the provisions of substantive law; there have been no violations of such kind committed by the court; the court conclusions correspond to the facts of the case.

There have been no violations of the provisions of procedural law committed by the court that result in reversal of the decision, either, and the reference to it in the appeal is groundless.

There are no grounds on the case as provided for by Article 310 of the Administrative Procedure Code of Russia for reversal or change of the court decision on appeal.

Based on the foregoing and being guided by Articles 309 to 311, 177 of the Administrative Procedure Code of Russia, the judicial chamber

has ruled:

To uphold the decision of the Zamoskvoretskiy District Court of Moscow dated December 06, 2017 and dismiss the appeal of lawyer O. I. Ulymov, representative of the administrative claimant being McDonald's LLC.

**Exhibit 18** to Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, 18-cr-00032-2-DLF

**Code of Administrative Offenses of the Russian Federation**
No.195-FZ dated December 30, 2001
(edition of December 16, 2019)
[excerpts]

**Article 13.11. Violation of Legislation of the Russian Federation regarding Personal Data**

1. Processing of personal data in cases not provided for by the legislation of the Russian Federation regarding personal data, or processing of personal data incompatible with the purposes of collecting personal data, except for cases provided for in Part 2 of this Article, if these actions do not contain a criminal offense,

shall entail a warning or imposition of an administrative fine on individuals in the amount from one thousand to three thousand rubles, on officials in the amount from five thousand to ten thousand rubles, and on legal entities in the amount from thirty thousand to fifty thousand rubles.

2. Processing of personal data without written consent of the personal data subject to the processing of their personal data in cases where such consent must be obtained in accordance with the legislation of the Russian Federation regarding personal data, if these actions do not contain a criminal offense, or processing of personal data in violation of the requirements for the composition of information established by the legislation of the Russian Federation regarding personal data included in the written consent of the subject of personal data for the processing of their personal data,

shall entail imposition of an administrative fine on individuals in the amount from three thousand to five thousand rubles, on officials in the amount from ten thousand to twenty thousand rubles, and on legal entities in the amount from fifteen thousand to seventy five thousand rubles.

3. Failure by an operator to comply with the obligation provided for by the legislation of the Russian Federation regarding personal data to publish or otherwise provide unrestricted access to a document determining the operator's policy regarding the processing of personal data, or information about the requirements for the protection of personal data that are being implemented

shall entail a warning or imposition of an administrative fine on individuals in the amount from seven hundred to one thousand five hundred rubles, on officials in the amount from three thousand to six thousand rubles, on individual entrepreneurs in the amount from five thousand to ten thousand rubles, and on legal entities in the amount from fifteen thousand to thirty thousand rubles.

4. Failure by an operator to comply with the obligation provided for by legislation of the Russian Federation regarding personal data to provide the subject of personal data with information regarding the processing of their personal data,

shall entail a warning or imposition of an administrative fine on individuals in the amount from one thousand to two thousand rubles, on officials in the amount from four thousand to six thousand rubles, on individual entrepreneurs in the amount from ten thousand to fifteen thousand rubles, and on legal entities in the amount from twenty thousand to forty thousand rubles.

5. Failure by the operator to meet the timeframes established by the legislation of the Russian Federation regarding personal data, the requirements of the subject of personal data or their representative, or the authorized body for the protection of the rights of subjects of personal data regarding the clarification of personal data, their blocking or destruction if

personal data is incomplete, outdated, inaccurate, illegally obtained or not necessary for the stated purpose of processing, -

shall entail a warning or imposition of an administrative fine on individuals in the amount from one thousand to two thousands rubles, on officials in the amount from four thousand to ten thousand rubles, on individual entrepreneurs in the amount from ten thousand to twenty thousand rubles, and on legal entities in the amount from twenty five thousand to forty five thousand rubles.

6. Failure by the operator when processing personal data without using automation means to comply with the conditions that ensure, in accordance with the legislation of the Russian Federation regarding personal data, the safety of personal data when storing tangible personal data carriers and excluding unauthorized access to them, if this entailed unauthorized or accidental access to personal data, its destruction, modification, blocking, copying, provision, distribution or other illegal actions with respect to personal data, if there is no element of a criminal offense

shall entail imposition of an administrative fine on individuals in the amount from seven hundred to two thousand rubles, on officials in the amount from four thousand to ten thousand rubles, on individual entrepreneurs in the amount from ten thousand to twenty thousand rubles, and on legal entities in the amount from twenty five thousand to fifty thousand rubles.

7. Failure by an operator being a state or municipal body to fulfill an obligation provided for by the legislation of the Russian Federation regarding personal data to anonymize personal data or to comply with established requirements or methods for anonymizing personal data

shall entail a warning or the imposition of an administrative fine on officials in the amount from three thousand to six thousand rubles.

### Article 13.12. Violating the Rules on Protecting Information

1. Violation of the terms and conditions stipulated by a license for exercising information protection activities (except for information constituting a state secret)

shall entail the imposition of an administrative fine on individuals in the amount from one thousand to one thousand five hundred rubles, on officials in the amount from one thousand five hundred to two thousand five hundred rubles, and on legal entities in the amount from fifteen thousand to twenty thousand rubles.

2. Using uncertified information systems, databases and data banks, as well as uncertified means of information protection, where they are subject to obligatory certification (except for means of protection of information constituting a state secret)

shall entail imposition of an administrative fine on individuals in the amount from one thousand five hundred to two thousand five hundred rubles with or without confiscation of uncertified means of information protection; on officials in the amount from two thousand five hundred to three thousand rubles; and on legal entities in the amount from twenty thousand to twenty five thousand rubles with or without confiscation of uncertified means of information protection.

3. Violation of the terms and conditions stipulated by a license for conducting works related to the use and protection of information constituting a state secret, or to production of means intended for protecting information constituting a state secret, or to taking measures and/or rendering services concerning protection of information constituting a state secret

shall entail imposition of an administrative fine on officials in the amount from two thousand to three thousand rubles; and on legal entities in the amount from twenty thousand to twenty five thousand rubles.

4. Using uncertified means intended for protection of information constituting a state secret

shall entail imposition of an administrative fine on officials in the amount from three thousand to four thousand rubles, and on legal entities in the amount from twenty thousand to

thirty thousand rubles with or without confiscation of the uncertified means intended for protection of information constituting state secret.

5. A gross violation of the terms provided for by a license for exercising information protection activities (except for information constituting state secret)

shall entail imposition of an administrative fine on the persons exercising business activities without forming a legal entity in the amount from two thousand to three thousand rubles or the administrative suspension of their activities for a term of up to ninety days; on officials in the amount from two thousand to three thousand rubles and on legal entities in the amount from twenty thousand to twenty five thousand rubles or administrative suspension of the activities for a term of up to ninety days.

6. Violation of requirements for protection of information (except for information constituting state secret) established by federal laws and other regulatory legal acts of the Russian Federation adopted in accordance therewith, except for cases provided for by Parts 1, 2 and 5 of this Article,

shall entail imposition of an administrative fine on individuals in the amount from five hundred to one thousand rubles, on officials in the amount from one thousand to two thousand rubles, and on legal entities in the amount from ten thousand to fifteen thousand rubles.

7. Violation of requirements for protection of information constituting a state secret established by federal laws and other regulatory legal acts of the Russian Federation adopted in accordance therewith, except for cases provided for in Parts 3 and 4 of this Article, if such actions/omission do not contain a criminal offense,

shall entail imposition of an administrative fine on individuals in the amount from one thousand to two thousand rubles, on officials in the amount from three thousand to four thousand rubles, and on legal entities in the amount from fifteen thousand to twenty thousand rubles.

Note. The concept of a gross violation shall be defined by the Government of the Russian Federation in respect of each specific type of licensed activity.

### Article 13.13. Unlawful Activities in Information Protection

1. Engagement in activities in information protection (except information constituting a state secret) without duly obtaining special permission/license, where such permission/license is obligatory under federal law

shall entail imposition of an administrative fine on individuals in the amount from five hundred to one thousand rubles with or without confiscation of the means of information protection; on officials in the amount from two thousand to three thousand rubles with or without confiscation of the means of information protection; and on legal entities in the amount from ten thousand to twenty thousand rubles with or without confiscation of the means of information protection.

2. Engagement in activities related to use and protection of information constituting a state secret, or to production of means intended for protection of information constituting a state secret, or to taking measures and/or rendering services in order to protect state secrets, without a license

shall entail imposition of an administrative fine on officials in the amount from four thousand to five thousand rubles, and on legal entities in the amount from thirty thousand to forty thousand rubles with or without confiscation of the means of protecting information constituting a state secret produced in the absence of a license.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC | |
| Defendant. | |

### PROPOSED ORDER

Upon consideration of Concord Management and Consulting LLC's Motion to Quash Unserved Early Return Trial Subpoena and Opposition to the Government's Renewed Motion for Early Return Trial Subpoena, and any opposition or reply thereto, it is hereby

**ORDERED** that the motion is **GRANTED**, and

The government's proposed early return trial subpoena is hereby quashed and the government's Renewed Motion for Early Return Trial Subpoena is denied with prejudice.

_____              _____
Date                                                                    DABNEY L. FRIEDRICH
                                                                            United States District Judge