**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. No. 18-CR-32-2 (DLF)** |
| **CONCORD MANAGEMENT AND CONSULTING LLC,** | |
| **Defendant.** | |

## GOVERNMENT'S DISCUSSION OF DIFFERENCES BETWEEN THE PARTIES' PROPOSED JURY INSTRUCTIONS

The United States of America, by and through undersigned counsel, respectfully submits this response to Concord's brief concerning proposed jury instructions (Doc. 280).

### A.    Notetaking by Jurors

The parties agree that whether to allow jurors to take notes is subject to the Court's discretion.  Doc. 280, at 1; Doc. 281, at 2; *see 1 Criminal Jury Instructions for DC Instruction 1.105*.  In the government's experience, permitting jurors to take notes is the common, if not standard, practice in this District.  This is an increasingly standard practice throughout the country.[1] And it is an increasingly standard recommendation by experts and committees studying the jury system.  *See, e.g.,* American Bar Ass'n, Standards for Criminal Justice, Standard 15-3.5

---

[1] *See, e.g.*, *United States v. Robinson*, No. 15-cr-20652, 2019 WL 1778866, at *1 (E.D. Mich. Apr. 23, 2019); *United States v. Ganesh*, No. 16-cr-211, 2017 U.S. Dist. LEXIS 224392 (N.D. Cal. Oct. 20, 2017); *see generally* 5 Business and Commercial Litigation in Federal Courts § 46:2 (4th ed. Nov. 2019) ("The practice of allowing jurors to take notes during trial has broad support."); Hon. Antoinette Plogstedt, E-Jurors: A View From The Bench, 61 Clev. St. L. Rev. 597, 614-615 (2013) ("[I] n the 21st century, most courts now allow jurors to take notes."); Nancy S. Marder, Jury Reform: The Impossible Dream?, 5 Tenn. J. L. & Pol'y 149, 162 n.51 (2009) ("The trend is toward allowing jurors to take notes, but not all courts have adopted this practice.") (citation omitted); Tom M. Dees, Juries: On the Verge of Extinction? A Discussion of Jury Reform, 54 SMU L. Rev. 1755, 1773 (2001) ("[T]he growing consensus is in favor of allowing jury note-taking.").

(Dec. 2018); American Bar Ass'n, Principles Relating to Juries and Jury Trials, Principle 13 (2016 revision); Council for Court Excellence, District of Columbia Jury Project, Juries for the Year 2000 and Beyond: Proposals to Improve the Jury System in Washington, D.C. (1998).  For at least some jurors, notetaking helps them pay attention, serves as a useful memory aid, and is a helpful resource when later trying to locate exhibits in a voluminous trial record.  The complex and document-heavy nature of this case only underscores the merits of permitting jurors to take notes. *See, e.g., United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir. 1986); Federal Judicial Center, Manual for Complex Litigation 3d, § 22.421 (4th ed. May 2019).

Concord cites three examples of courts prohibiting jurors from taking notes.  Doc. 280, at 2.  The government does not dispute that some courts have, and still do, prohibit jurors from taking notes.  But the fact that Concord cites only three examples, two of which are over 25 years old, illustrates that this is an increasingly uncommon practice.  In fact, one of Concord's cases noted that back in 1993, there was "ongoing argument" about whether jurors should be allowed to take notes and merely held that in light of the unresolved debate, the district court "did not abuse its broad discretion" by ordering jurors not to do so.  *United States v. Baker*, 10 F.3d 1374, 1403 (9th Cir. 1993).  And in another of Concord's three cases, the district court allowed jurors to take notes while reviewing exhibits but not while witnesses were testifying.  *United States v. Darden*, 70 F.3d 1507, 1536 (8th Cir. 1995).

Concord asserts (Doc. 280, at 2-3), with little support, that taking notes could detract from jurors' ability to focus on testimony or evidence or could result in certain jurors—here those who take detailed notes—having additional sway during deliberations.  Arguments like these have long formed one side of the debate on notetaking, but significant literature suggests that "[n]one of these concerns have been borne out in research." *E.g.*, 2 Jurywork Systematic Techniques § 16:21 (Nov.

2019 update).  While the empirical evidence is not entirely one sided, study after study suggests that notetaking aids attention and memory and has little, if any, of these effects.[2]  Additionally, many of these concerns can be addressed with "appropriate instructions."  Wayne R. LaFave, et al., Criminal Procedure § 24.9(b) & n.21 (4th ed. Dec. 2019 update); *see, e.g., United States v. Maclean*, 578 F.2d 64, 66 (3d Cir. 1978) ("We are confident that the dangers of note-taking can be substantially avoided by proper instruction to the jury.").  Thus, as noted, courts and expert committees—including the American Bar Association and a panel of judges in Washington, D.C.—increasingly recommend that jurors be allowed to take notes.  The government respectfully suggests that this Court follow that practice.

### B.       Corporate Defendant Appearing Through Counsel

Although Concord has identified no example of a court having done so, if the trial proceeds with Concord appearing only through counsel and without any other representative in court, the government does not oppose instructing the jury that it should not draw any adverse inference from that fact.  Doc. 280, at 4; Doc. 281, at 2-3.  As the government has explained, however, Concord's requested instruction includes language that is unnecessary and risks misstating the law.  Doc. 281, at 2-3.  Concord's brief does not explain why the disputed sentence is necessary or what it communicates to the jury that the rest of Concord's novel instruction does not.

---

[2] *See, e.g.,* Mark W. Bennett, Reinvigorating and Enhancing Jury Trials Through an Overdue Juror Bill of Rights, 48 Ariz. St. L.J. 481, 510-511 & nn. 122-125 (2016); Matthew A. Reiber & Jill D. Weinberg, The Complexity of Complexity: An Empirical Study of Juror Competence in Civil Cases, 78 U. Cin. L. Rev. 929, 965-966 & n.73 (2010); B. Michael Dann and Valerie P. Hans, Recent Evaluative Research on Jury Trial Innovations, 41 Court Rev. 12, 13-14 (2004); Douglas Smith, Structural and Functional Aspects of the Jury: Comparative Analysis and Proposals for Reform, 48 Ala. L. Rev. 441, 572-577 (1997); Steven Penrod & Larry Heuer, Tweaking Commonsense, 3 Psychol. Pub. Pol'y & L. 259, 268 (1997); Leonard B. Sand & Steven Alan Reiss, Report on Seven Experiments Conducted by District Court Judges in the Second Circuit, 60 N.Y.U. L. Rev. 423, 446-452 (1985).

### C.      Corporate Responsibility

The parties agree that there should be an instruction about corporate responsibility and agree on most of the substance of that instruction.  Doc. 280, at 5-8; Doc. 281, at 3-4.  The only issue is whether to instruct the jury that a corporation is liable for its agent's acts when, in addition to being done to benefit the corporation (Doc. 248-1, at 7), the acts either "concern a matter that the corporation generally entrusted to the agent" (government's formulation) or "relate directly to the performance of the agent's general duties" (Concord's formulation).

Concord declares that the government's (and Seventh Circuit's) formulation is "contrary to the well-settled law on corporate responsibility" and "risks imposing liability on a corporation for conduct by its employees that falls outside the scope of their employment duties."  Doc. 280, at 5.  While Concord agrees with the government that the Restatement of Agency provides an appropriate guidepost, *id.* at 5-6, Concord relies on a long-superseded version of the restatement, dating from 1958.  As the government argued (Doc. 281, at 4), the Restatement (Third) of Agency (2005) asks whether the employee was "performing work assigned by the employer" or engaged in "an independent course of conduct not intended by the employee to serve any purpose of the employer." *Id.* § 7.07.  This more closely resembles the government's proposed instruction, which links the agent's act to the matters assigned to him without the potentially-confusing term "relate directly."

Even the Second Restatement, cited by Concord, asks whether the conduct was "of the kind" the agent "is employed to perform"—a standard that still more closely mirrors the government's proposed language, which asks whether the conduct "concern[ed] a matter that the corporation generally entrusted to the agent," than Concord's requirement that the act must "relate directly" to the agent's duties.  In fact, the very next section of the Second Restatement went on to

4

clarify that the conduct must "be of *the same general nature* as that authorized, or *incidental to* the conduct authorized."  *Id.* § 229(1) (emphasis added).  Conduct could be of the same general nature or incidental to that authorized but not "relate directly" to the employee's duties.   As the government has explained, the term "relate directly" may incorrectly suggest that the act itself had to have been authorized by corporate officers or a broader corporate body and may incorrectly suggest excluding circumstances where the employee had apparent, even if not actual, authority to take the act.  *See* Doc. 281, at 4 (citing cases); *see also, e.g.*, *United States v. Oceanic Illsabe Ltd.,* 889 F.3d 178, 192 (4th Cir. 2018) (similar formulation to that proposed by the government); *United States v. Hilton Hotels Corporation*, 467 F.2d 1000, 1004 (9th Cir. 1972) (corporation can be criminally liable "without proof that the conduct was within the agent's actual authority").

Concord's argument by example (Doc. 280, at 6) is fanciful.  By characterizing the Internet Research Agency ("IRA") employees' duties at the highest possible level of generality ("use of computers and other internet-connected devices"), Concord suggests that virtually any use of electronics could result in corporate liability for the IRA.  Beyond the fact that the IRA is not the defendant in this trial, Concord ignores that the act must also have been to benefit the corporation. *See* Doc. 248-1 (part 3 of the proposed instruction).  More to the point, Concord's instruction would raise the same concerns, insofar as "the jury could potentially find any acts that [relate directly to] computers and internet connected devices to fall within the scope of those individual's employment." *See* Doc. 280, at 6 (Concord's argument with Concord's legal standard substituted in).  If a corporate employee undertakes an act that concerns a matter entrusted to him by the corporation and he does so to benefit the corporation, then the corporation can be held liable. Taking aim at a straw man cannot overcome the analytical problems with Concord's proposed instruction.

### D.       Suppression or Fabrication of Evidence

The government suggested that, if supported by the evidence admitted at trial, the Court should give the jury a standard instruction that if the jury finds there was intentional suppression of evidence, the jury may consider that fact in determining guilt.  Doc. 248-1, at 10.   The Superseding Indictment alleges that conspirators "deleted and destroyed data, including emails, social media accounts, and other evidence of their activities" and alleges two concrete examples: (1) The ongoing deletion of operational email accounts in response to public reporting, and (2) a particular set of "covering tracks" that occurred in 2017.  Doc. 247 ¶ 58.   As the government has explained (Doc. 281, at 5), if the evidence admitted at trial does not support a finding that these activities occurred, then no such instruction would be warranted.   But at this point in the proceedings, the government intends to introduce evidence, which it believes is admissible, of evidence suppression.  *See* Doc. 281, at 5 (citing Fed. R. Evid. 801(d)(2)(D); Fed. R. Evid. 801(d)(2)(E); and Fed. R. Evid. 804(b)(3)).

Concord ignores the allegation of ongoing destruction of operational email accounts.  And with respect to an e-mailed admission by a conspirator that "the FBI busted [their] activity (no joke)" and she was busy "covering tracks" (Doc. 247 ¶ 58d), Concord argues only that this individual sometimes sent false or misleading emails.  That observation alone does not defeat the government's request for the proposed jury instruction.  The government intends to file a motion *in limine* regarding the admission of this email.  If the Court grants the government's motion and admits the email, then this jury instruction will be appropriate to advise the jury on one issue concerning how it may consider the email.  In any event, contrary to Concord's assertion (Doc. 280, at 9-10), the fact that a conspirator may have sometimes lied does not render all admissions by her "irrelevant."  Concord additionally declares (*id.* at 9) that because the government collected

that conspirator's email describing efforts to conceal and destroy evidence, it "proves the opposite." But the fact that the government recovered one personal email admitting to destruction of evidence does not show that no such destruction ever occurred. Criminals sometimes destroy some but not all evidence, attempt to destroy evidence but fail, or destroy evidence in their possession but not backups to which they lack access. If the evidence at trial points in different directions about whether the conspirators destroyed evidence, then the jury may weigh that evidence and rely on it when considering the charge at issue.

### E.    Unanimity and Verdict Form

**1.** As a threshold matter, no special unanimity instruction is warranted. A jury's verdict must be unanimous, but "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict," such as the "means of commission," so long as the jurors "agree upon the bottom line." *Schad v. Arizona*, 501 U.S. 624, 631-632 (1991) (plurality op.); *see also United States v. Hurt*, 527 F.3d 1347, 1352-1353 (D.C. Cir. 2008). In a conspiracy, "the agreement itself is the crime," and the government "need not show that the conspirators agreed on the details of their criminal scheme" but rather the "essential nature of the plan," *i.e.*, "what kind of agreement or understanding existed" and the "type of conduct" agreed to. *United States v. Treadwell*, 760 F.2d 327, 336-337 (D.C. Cir. 1985). As the government has explained, the essential nature of the charged plan was to engage in "information warfare" to spread distrust about the U.S. political system and to influence the outcome of the 2016 presidential election and "to obstruct through fraud and deceit the lawful functions of the United States government in monitoring, regulating, and enforcing laws concerning foreign influence on and involvement in U.S. elections and the U.S. political system." Doc. 247 ¶ 7; *accord id.* ¶ 28 (object of the conspiracy).

The jury need not be unanimous as to exactly what facet of those government functions the conspirators had in mind. *See Treadwell*, 760 F.2d at 335-337 (upholding jury instruction that described as one "object" a conspiracy "[t]o defraud the United States and its agencies of their lawful right to conduct their business and affairs, particularly HUD's housing programs for low and moderate income tenants and IRS' administration and enforcement of the tax laws of the United States"). That is particularly apparent here, where the conspiracy entailed interrelated and overlapping deceptive conduct aimed at impairing a cluster of interrelated and overlapping government functions. The conspirators need not have known, for example, whether American law distinguishes between different overlapping methods of foreign influence and, if so, where those lines fall (such as efforts to influence public opinion on political candidates versus policy issues); whether the American government addresses such categories differently (for example, with a categorical ban versus a disclosure regime); whether the same or different agencies police these areas; and, if so, exactly what agency regulated what and where the lines fell. *See* Doc. 74, at 24-25 (this Court's memorandum opinion explaining that the government need not show specific knowledge about the government's administration of disclosure requirements but "general knowledge that U.S. agencies are tasked with collecting" certain kinds of information suffices). The jury therefore need not be unanimous on exactly what facet of these interrelated government functions the conspirators targeted. *See Treadwell*, 760 F.2d at 335-337; *see also United States v. Tham*, 960 F.2d 1391, 1400 (9th Cir. 1992) (explaining in the context of a sentencing decision that a defendant "was charged with conspiring to defraud the United States by three *means*" where the conspiracy entailed overlapping deceitful conduct aimed at impeding an FBI's investigation and corrupting related judicial proceedings) (emphasis added); *cf. Schad*, 501 U.S. at 631-632 (jury need not be unanimous on the "means of commission"). This charge no more requires a special

unanimity instruction than a conspiracy to deprive the government of several parcels of money or property.

Relying on a line of cases that pre-dates *Schad*, Concord contends that a special unanimity instruction is necessary to address a risk of "different jurors concluding the defendant committed different acts."  Doc. 280, at 11-13.  In that line of cases, the D.C. Circuit had suggested (albeit sometimes in dicta) that "when an indictment charges several distinct conceptual grouping of activities in an individual count, as opposed to a single conceptual grouping of related facts, the jury must agree unanimously as to which of these distinct groupings the defendant is guilty." *United States v. North*, 910 F.2d 843, 876 (D.C. Cir. 1990), *opinion withdrawn*, 920 F.2d 940, 950-951 (D.C. Cir.  1990) (cited at Doc. 280, at 12).[3]

As the D.C. Circuit has recognized, the analysis set forth in the cases cited by Concord has been superseded by *Schad*.  *See Hurt*, 527 F.3d at 1352-1353 (noting that "[f]ive Justices agreed in *Schad* that jurors need not reach unanimity as to the means of committing a crime, and where the Court has gone, we have followed," and citing post-*Schad* cases holding that special unanimity instructions were not necessary); *see also, e.g., United States v. Gonzalez*, 786 F.3d 714, 718-719 (9th Cir. 2015) (holding that in light of *Schad*, jurors need not be unanimous on what overt act was committed in furtherance of a conspiracy, and noting agreement with the Second, Fifth, and Seventh Circuits).  *Schad* explained that by requiring unanimity as to what "conceptual grouping" of acts was proven, some lower courts had mistakenly imposed a requirement that juries agree not

---

[3] *See also United States v. Sayan*, 968 F.2d 55, 65 (D.C. Cir. 1992) (cited at Doc. 280, at 11) (rejecting ineffective assistance claim where defense counsel failed to request special unanimity instruction under *North*); *United States v. Hubbard*, 889 F.2d 277, 279 (D.C. Cir. 1989) (cited at Doc. 280, at 12) (rejecting argument on plain error); *United States v. Mangieri*, 694 F.2d 1270, 1281 (D.C. Cir. 1982) (cited at Doc. 280, at 11-12) (rejecting argument on plain error).

just on the elements of the crime but also on predicate facts. *See* 501 U.S. at 634-635 (plurality op.); *id.* at 648-652 (op. of Scalia, J.).[4]

Since *Schad*, the D.C. Circuit has adopted a different approach from the one set forth in the pre-*Schad* cases cited by Concord, asking instead whether a conviction under the statute at issue without a special unanimity instruction violates the Due Process Clause. *See Hurt*, 527 F.3d at 1353. Concord does not attempt to show it can meet that standard, and with good reason. Section 371 does not "creat[e] a mishmash" of crimes, *id.*, but rather criminalizes one crime—a conspiracy to defraud the United States. The particular governmental functions that the conspirators hoped to impede and the particular means for interfering with those functions are methods of committing the crime, not different crimes, and therefore the Due Process Clause does not demand a special unanimity instruction under *Schad* and its progeny.

In any event, even under pre-*Schad* cases, no special unanimity instruction would be warranted. Initially, there is little risk of "different jurors concluding the defendant committed different acts" (Doc. 280, at 11-13), because the crime charged here is a conspiracy, and the "act" is therefore "the agreement itself." *Treadwell*, 760 F.2d at 336. To be sure, the jury must be unanimous as to what the defendant agreed to. But that is only the "essential nature of the plan" and not the further "details" of the "scheme." *Id.* at 336-337. More to the point, even under that line of cases, the jury had to agree on a "conceptual grouping" of acts supporting the charge, but not on the specific act they believe the defendant committed. *North*, 910 F.2d at 876. As discussed, the charged conspiracy does not include several, unrelated objects, but instead concerns

---

[4] In so doing, *Schad* overruled several of the cases relied on by Concord here. *See* 501 U.S. at 634-635 (citing, *inter alia United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977) (relied by Concord at Doc. 280, at 12-13), and *United States v. Beros*, 833 F.2d 455 (3d Cir. 1987) (relied on by Concord at Doc. 280, at 12)); *see also Mangieri*, 694 F.2d at 1280-1281 (describing the pre-*Schad* division).

a unified effort to use interrelated and overlapping acts to impair the government's interrelated and overlapping functions of policing foreign influence.  Therefore, by analogy to the prior "conceptual grouping" test, no special unanimity instruction would be warranted.  *Cf. Sayan*, 968 F.2d at 65 ("a count charging a series of similar acts in furtherance of a fraudulent scheme falls into a single conceptual grouping that does not require a special unanimity instruction").[5]

**2.**  If a special unanimity instruction were warranted, the government does not believe that a further interrogatory or special verdict form is appropriate.  As Concord concedes, "special interrogatories in a criminal case are generally disfavored."  Doc. 280, at 13; *see Black v. United States*, 561 U.S. 465, 472 & n.11 (2010).  Juries "are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), including instructions on unanimity.  Concord provides no convincing reason to overcome those presumptions.

Concord broadly states (Doc. 280, at 13-14) that special verdict forms can be useful in "complex" cases or where there are a "multiplicity of objects."  Concord fails to acknowledge the

---

[5] In addition to relying on this series of dated cases, Concord notes that during the argument on one of its earliest motions to dismiss, the government suggested that the jury would have to be unanimous "as to the lawful government function that's interfered with."  Doc. 280, at 11(quoting 10/15/18 Tr. 29).  That hearing did not concern the question now at issue.  In response to a question from the Court about the nature of Count One, government counsel correctly declined to describe the charged crime as "a single conspiracy with three different objects" but instead described it as "a defraud clause conspiracy" where there were "three different lawful government functions that were alleged to have been interfered with."  10/15/18 Tr. 28.  As it does in this filing, the government observed that the alleged conspiracy did not concern disparate acts "directed to individual lawful government functions" but rather "a larger conspiracy to defraud that included defrauding several different federal government agencies at the same time."  *Id.* at 29.  In the midst of that colloquy, counsel for the government stated, "I believe that they would, that the jury would have to be unanimous as to the lawful government function that's interfered with."  *Id.*  In so far as a conspiracy does not require that any function was "interfered with," that answer was imprecise.  But as reflected by counsel's prefatory statement that he "believe[d]" the jury would have to be unanimous, the government had not yet focused on the question of specific unanimity fifteen months ago, and government counsel was answering that question on his feet.  With the benefit of research and further consideration, the government does not believe that special unanimity is required.

countervailing risk that special verdicts "may in fact be more productive of confusion than of clarity." *United States v. Stonefish*, 402 F.3d 691, 697 (6th Cir. 2005). And Concord's examples of the complexity that could warrant a special verdict form only underscore that a special verdict is unnecessary here. For example, in *United States v. Ogando*, 968 F.2d 146 (2d Cir. 1992) (cited at Doc. 280, at 13-14), two different defendants were charged with multiple drug and firearm crimes, including "operating a continuing criminal enterprise ('CCE'), in violation of 21 U.S.C. § 848(a)," which has multiple elements that themselves include a nested series of drug offenses. *Id.* at 146-148. The six-week trial included testimony by 25 government witnesses and 150 government exhibits, including "a leger . . . chronicling two months of daily narcotics activities in the [drug] organization." *Id.* at 147, 149. When the parties could not agree on an appropriate form of special verdict, the district court declined to require one, and the Second Circuit held that the district court did not abuse its discretion. *Id.* at 149; *see also, e.g., United States v. Recognition Equip., Inc.*, 711 F. Supp. 1, 4, 6 (D.D.C. 1989) (cited at Doc. 280, at 14) (stating in dictum when denying a motion to dismiss a multi-object, multi-defendant conspiracy that involved a "kickback arrangement" to fund "illegal actions" on one defendant's behalf, a "scheme to replace the Postmaster General," "theft of property," "mail and wire frauds," and "four conspiratorial objects alleging corruption of Postal Service operations," that a "special verdict form" would be warranted).

**3.** Concord also does not defend its extraordinary special verdict form. As the government has explained (Doc. 281, at 9-11), Concord's proposed interrogatories use language that departs from the accepted jury instructions for a conspiracy to defraud the United States, require long written answers and factual descriptions, *but see Ogando*, 968 F.2d at 149 (cited by Concord at Doc. 280, at 13-14) (endorsing "multiple-choice formats"), and mistakenly suggest elements that

are not required for the charged crime.  Concord simply declares (Doc. 280, at 13 n.3) that because the government did not propose its own special verdict form, the government has "waive[d]" any objections to Concord's proposed form and "the Court should adopt Concord's proposed form." The government did not propose a special verdict form because it does not believe such a form is necessary.  It is also anomalous to craft a special verdict form before the Court has determined whether a special unanimity instruction is necessary, if so whether a special verdict form is also necessary, and how it will instruct the jury on the elements of the crime.  The Court should not choose to use a verdict form that is confusing and replete with legal errors based on such a theory of "waiver."  Should the Court conclude that a special verdict form is warranted, the government requests the opportunity to provide the Court with an alternative form that is less confusing and that accurately states the elements on which the jury must be unanimous.

### F.        Proof of State of Mind

The government has requested a standard instruction stating that intent and knowledge cannot ordinarily be proved directly and that a jury can infer intent and knowledge from speech, acts, omissions, and other facts and circumstances.  Doc. 248-1, at 16.  Concord does not dispute that proposition, *i.e.*, that intent may be inferred from acts, omissions, and the totality of the circumstances.  In fact, the case that Concord primarily relies on makes that very point.  *United States v. Philip Morris*, 566 F.3d 1095, 1118 (D.C. Cir. 2009).  Concord instead asserts (Doc. 280, at 15) that such an instruction could "open the door" to the jury imposing liability based on "collective intent," whereby it aggregates the knowledge and intentions of many people.  The government does not see how this proposed, standard instruction about proving state of mind suggests imposing liability under a theory of collective intent.  Concord cites no case, and the

government is aware of none, where a court held on that basis that it is improper to give this standard instruction about proving state of mind.

To the extent that Concord believes that some further instruction is necessary for evaluating an entity's intention in joining a conspiracy, Concord was free to propose such an instruction but has not done so.  In fact, while Concord's stated objection concerns the imposition of liability on corporate defendants, its own proposed instruction on corporate liability does not address the issue at all.  This may be because the standard corporate liability instructions proposed by both parties tie together the act and scienter by making clear that a single agent must have "intentionally join[ed] in the agreement."  Doc. 248-1, at 7, 8.   Concord's concern about "collective intent" is not a basis to vary from the standard instruction on corporate criminal liability or not to give a standard instruction of proof of state of mind.

### G.      Good Faith

Concord appears to argue that defendants are always entitled to "good faith" instructions, regardless of the scienter for the charged crime, the defense's actual theory of the case, or the evidence adduced at trial.  *See* Doc. 280, at 17-18.  As discussed (Doc. 281, at 12), Concord also would also use a good faith instruction that could not apply to this case: by instructing the jury that there was "no crime" if "Concord believed in good faith that it was acting properly," (Doc. 248-1, at 17), Concord effectively inserts the very willfulness element into Count One that the Court has repeatedly rejected.

If Concord's theory of the case is that Concord acted in good faith *in such a way that negates an element of the crime*, and that theory has a *foundation in the evidence* at trial, *then* Concord can request such an instruction.  *See United States v. Hurt*, 527 F.3d 1347, 1350-1352 (D.C. Cir. 2008) (explaining that the charged crime required a certain scienter, that a particular

14

formulation of good faith means the defendant "lacks the necessary *mens rea*" for the charged crime, and that a court should issue such an instruction "if there is sufficient evidence from which a reasonable jury could find for the defendant on his theory") (quotation marks omitted). Concord's citations only underscore that basic point. *See, e.g., United States v. Bowser*, 318 F. Supp. 3d 154, 175-176 (D.D.C. 2018) (cited twice by Concord) (giving defense theory of the case instruction in a false statements case that if the defendant made the charged statements with a "good faith belief in [their] accuracy," then "it is not a crime'").

Contrary to Concord's assertion (Doc. 280, at 17), it is not the government's burden to establish "the absence" of any kind of good faith. Rather, the government bears the burden to prove that Concord acted with the mens rea required for this conspiracy charge. *See Hurt*, 527 F.3d at 1350-1351 (cited by Concord) (reviewing the specific intent requirements for theft of government properly under 18 U.S.C. § 641 and explaining why a particular conception of good faith—"a good faith but mistaken belief that the stolen property belong[ed] to him"—would negate that element of the crime); *see also, e.g.*, *United States v. Bowling*, 619 F.3d 1175, 1183 (10th Cir. 2010) ("join[ing] the majority of courts that hold a separate good faith instruction is no longer necessary where a district court properly instructs the jury on the element of intent"); *United States v. Given,* 164 F.3d 389, 394-395 (7th Cir. 1999) (a defendant "is entitled to have the jury consider any theory of defense supported by the law if it has some foundation in the evidence" but "is not entitled to a specific good faith instruction, however, so long as, considering the instructions as a whole, the jury was adequately instructed upon his theory of defense").

Concord appears to argue the Court should nonetheless give a good faith instruction (and presumably Concord's requested instruction), to avoid any risk of error. *See* Doc. 280, at 18. Concord primarily relies on *United States v. Casperson*, 773 F.2d 216 (8th Cir. 1985), which held

that although the court correctly instructed the jury on the required scienter for an elaborate mail and wire fraud scheme, the court erred by declining to give good faith and theory-of-the-defense instructions requested by the defendants. *Id.* at 222-224. But the court there made clear that the defendants were entitled only to instructions that would negate the required intent and where "the evidence supports the proffered instruction." *Id.* at 223. Because "the entire defense in th[e] case was that the alleged false statements and representations were made with a genuine belief that they were true," the court concluded that such an instruction was appropriate. *Id.* And in light of the complexity of the charged scheme, specificity of that defense, length of trial, and large number of defendants, the court found that the error was not harmless. *Id.* at 223-224. As the Tenth Circuit subsequently noted, the Eighth Circuit's decision in *Casper* is an unusual outlier that departs from the practice of every other circuit and from subsequent cases in the Eighth Circuit itself. *See United States v. Chavis*, 461 F.3d 1201, 1209 n.1 (10th Cir. 2006). Although "[t]he Eighth Circuit has not expressly overruled its statement that a good-faith instruction is required," it "has implicitly done so by holding that the requirement is satisfied by a proper specific-intent instruction." *Id.*; *see also, e.g.*, *United States v. Howard*, 245 F. Supp. 2d 24, 38-39 (D.D.C. 2003) (rejecting good faith instruction where the instruction on "intention or purpose to deceive or cheat" had "accurately recited the level of intent the government had to prove to establish the mail and wire fraud charges" and citing *Casper* as an outlier).

In any event, the government is not categorically opposed to any good faith instruction. As discussed, if Concord's theory of the defense is that it had some good faith belief or intention that, in fact, negates the required scienter, and the evidence at trial can support that theory, then the government does not oppose an appropriate instruction about that defense theory. *See Hurt*, 527 F.3d at 1350-1352. But Concord's proposed good faith instruction does not negate the required

intent for this crime but instead appears to be a back-door means of requiring willfulness.  And it is also premature to know what Concord's theory of the case is and whether the evidence at trial can fairly support it.

> **H.    Conspiracy to Defraud the United States**

As the government has explained, Concord's and the government's proposed instructions on conspiracy to defraud the United States differ structurally and substantively.  Doc. 281, at 13-17.

**1.**  The government's instruction far more closely adheres to the standard instruction in this jurisdiction on conspiracy and to the standard definition of a conspiracy to defraud the United States used in pattern jury instructions.  *See* Doc. 248-1, at 26-28; Doc. 281, at 13.  The government proposed two concrete additions to address concerns raised by Concord and the Court and to do so as clearly, plainly, and accurately as possible.  First, given Concord's repeated observation that it is not charged with conspiring to deceive the electorate and given the interrelated nature of the deception at issue, the government proposed what should be an uncontroversial instruction: that impeding lawful government functions must be an objective of the conspiracy but need to be the sole or major objective.  Doc. 248-1, at 29; *see United States v. Gricco*, 277 F.3d 339, 348 (3d Cir. 2003) (Alito, J.).  Second, given that a failure to disclose information is generally deceptive only if there was a duty to disclose and given Concord's repeated efforts categorically to require a duty to disclose, the government proposed additional language to explain the sorts of deception at issue in this case and when and how a legal duty to disclose is necessary.  *See* Doc. 248-1, at 29-30; *see also* Doc. 281, at 13-14.

Concord's proposed instructions, by contrast, vastly depart from standard instructions for conspiracies or conspiracies to defraud the United States.  *See* Doc. 248-1, at 18-25.  In particular,

Concord would wrongly impose the willfulness requirement rejected by this Court, Doc. 281, at 14; would incorrectly require a duty to disclose information even if the failure to disclose formed no part of the proven conspiracy, *id.* at 15; and would insert ambiguous prolix about "specific intent," having "specifically agreed," and "fraudulent" conduct that is not typically used in instructions for conspiracies to defraud the United States and risks confusing the jury, *id.* at 14-17.

**2.**  Concord appears to agree with the substance of the additions suggested by the government.  Concord, however, would reinvent the wheel by departing from standard model instructions, by adding several elements to the charged crime, by cherry picking language from instructions in individual cases—some of which do not concern conspiracies to defraud the United States—and by inserting significant verbiage that is potentially confusing.  The government respectfully suggests that the Court adhere to standard instructions where possible and address case-specific legal issues—such as the alleged multiple purposes of the conspiracy and the role of a duty to disclose—in as simple and straightforward a manner as possible.  Beyond issues of structure and clarity, however, Concord asks for a number of substantive modifications to the model instructions, some of which would add elements to the charged crime and would likely confuse the jury.  The government respectfully opposes those additions.

a.  First, Concord urges (Doc. 280, at 20-21) that the Court should instruct the jury that the conspiracy ended on November 8, 2016—Election Day.  This is the same issue that Concord raised in its prior motion to strike material from the Indictment as surplusage (Doc. 208, at 3-4).  The Superseding Indictment alleges that the defendants sought to interfere with U.S. political and electoral processes, that this effort eventually focused on the 2016 presidential election, and that it then continued into 2018.  *E.g.,* Doc. 247 ¶¶ 2-6, 9-10, 28, 42-47, 58.  Contrary to Concord's claim, the Superseding Indictment does not allege that the conspirators solely sought to impede

government functions in connection with the 2016 election.  It even specifically alleges conduct well after the election.  Doc. 247 ¶ 58.  In all events, it is premature to alter the period of the charged conspiracy.  If the evidence at trial does not support the allegation that the conspiracy continued after 2016, then the Court can revisit the issue at that time.[6]

b.  Second, Concord asks (Doc. 280, at 21) that the jury instructions should name the three agencies that monitor and police foreign influence and that, the government has alleged, conduct the lawful functions that were an object of the conspiracy.  The government's proposed instruction instead lists the lawful government functions at issue (a list that will need to be expanded given the Superseding Indictment).  Doc. 248-1, at 29.  The government does not object, however, to naming the three agencies that conduct these functions.

c.  Third, Concord again contends (Doc. 280, at 22 n.5; *see id.* at 26) that a conspiracy to defraud the United States should be limited to a conspiracy to obtain or deprive the government of money or property.  Although the government disagrees with Concord's assertion about the better reading of the term "defraud" in this statute, that is beside the point.  Arguments about jury instructions are not the proper place to re-argue the validity of the charged crime.  And, in all events, as this Court has already held, it is black-letter law that a "conspiracy to defraud the United States" is "not confined to fraud as that term has been defined in the common law" but also "reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government."  *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *see also, e.g., McNally v. United States*, 483 U.S. 350, 359 & n.8  (1987); *Tanner v. United States*, 483 U.S. 107, 129-130 (1987); *Dennis v. United States*, 384 U.S. 855, 861 (1966); *Glasser v.*

---

[6] Concord correctly notes that the Superseding Indictment alleges that the conspiracy continued until January 2018.  Doc. 247 ¶¶ 2, 9.  The government agrees that is the appropriate end date to include in the jury instructions.

*United States*, 315 U.S. 60 (1942); *Haas v. Henkel*, 216 U.S. 462, 479-480 (1910); *United States v. Davis*, 863 F.3d 894 , 898-899 (2017); *United States v. Dean*, 55 F.3d 640, 647 (1995); *United States v. Treadwell*, 760 F.2d 327, 3365-337 (D.C. Cir. 1985).

     d.  Fourth, Concord again urges (Doc. 280, at 22; *see id.* at 22-31) that the defendants must "have known about the specific statutes creating the 'functions' with which the conspirators allegedly conspired to interfere, acted intentionally to violate those statutes, and that their conduct was unlawful under those statutes."  The Court has repeatedly (and correctly) rejected that argument.  To constitute a conspiracy to defraud the United States, one objective of the conspiracy must have been to obtain money or property or to impede lawful government functions.  But the conspirators need not have known specifics about those functions, such as the "specific statutes" (*id.*) authorizing them. *See* Doc. 74, at 24-25 (this Court's memorandum opinion explaining that the government need not show specific knowledge about the government's administration of disclosure requirements but "general knowledge that U.S. agencies are tasked with collecting" certain kinds of information suffices).  And the government does not have to show a violation of those statutes.  *See id.* at 8-9 (this Court's holding that "conspiracies to defraud the government by interfering with its agencies' lawful functions are illegal because § 371 makes them illegal, not because they happen to overlap with substantive prohibitions found in other statutes") (collecting cases).  Section 371 prohibits conspiring to defraud the United States.   Much as a defendant need not know details of the money or property it hopes to obtain through fraud, it need not know granular details of the functions it sought to impede.  If a defendant conspires to seeks to impair the government's lawful functions through deceptive means, that is a crime.  And defendants who lack detailed knowledge of regulatory apparatuses but nonetheless try to impair the government through deception are guilty of that crime.  Concord again rehashes (Doc. 281, at 26-31) its list of

arguments about notice and prosecutorial overreach.  In so doing, Concord appears to acknowledge that Section 371 does not itself require detailed knowledge of the governing statutes, but Concord nonetheless asks the Court to add such a requirement.

e.  Fifth, Concord argues (Doc. 281, at 31-32) that to be guilty of a conspiracy to defraud the United States, there must have been a duty to disclose information to the government.  The government does not dispute that for the mere failure to disclose information to constitute deception, there must be a duty to disclose.   Thus, the government has requested an instruction clarifying that very point.  *See* Doc. 248-1, at 29-30 (requesting an instruction to that effect).  But that is not an element of a conspiracy to defraud the United States, which requires only an agreement to impede through deception.

To be sure, a duty to disclose would provide a basis for inferring that the government was a target and the intent to impede the government's lawful functions in this area.  *See* Doc. 74, at 15 (this Court's observation).  But as discussed (Doc. 281, at 10-11), a jury can base the inference that the conspirators targeted the government on other facts, such as the conspirators' disguising IP addresses that the public would never see, the conspirators' likely violation of the ban on foreign electioneering and influence activities, and the risk that investigation in this area might impede the influence operation.  A duty to disclose is also not legally necessary for conspiring to impede the lawful government functions alleged here.   Initially, the crime charged is conspiracy, not "interference."  The Superseding Indictment also alleges with clarity government functions that do not directly concern disclosure.   And with respect to the administration of disclosure requirements, those functions include investigating and determining whether someone should disclose.  Thus, it is for the FEC and DOJ to obtain and review relevant information, to evaluate whether and how the potentially-applicable laws apply, and to exercise their discretion in deciding

how they wish to proceed.   Using deceitful means to conceal information interferes with and obstructs those functions.   A party can obstruct lawful government functions of administering disclosure requirements even if, at the end of the day, the responsible agencies may have concluded that the statutes they enforce do not apply or may have declined to take enforcement action.   These are all issues of proof, however, to be resolved by the jury.   They are not elements of count one on which the jury must be instructed.

f.   Sixth, Concord criticizes the government (Doc. 280, at 32) for not proposing a detailed instruction on the potentially applicable sections of FARA and FECA.   As the government explained (Doc. 248-1, at 30), because of the complexity of these statutory schemes and the fact that the parties have not yet even exchanged exhibit lists, it is premature to address exactly which provisions the jury should be instructed on.   *See generally, e.g.,* 22 U.S.C. 22 U.S.C. §§ 611(a), (b), (c)(1)(i)-(iii), (g), (h), (o), (p), 612(a) (potentially applicable FARA provisions and definitions).   In light of the multitude of potentially-applicable provisions and the absence of model instructions, the government would propose simply to describe the general disclosure requirements and then mirror the statutory and regulatory text.   *Cf., e.g.*, *United States v. Park*, No. 05-cr-59, Transcript p. 1696-1699 (July 12, 2006) (jury instructions on FARA).   Although subject to change based on the defense theory and exhibits, the government has submitted with this filing an attachment that describes the likely relevant FECA and FARA disclosure requirements and reproduces the potentially-applicable definitions.   The government submits that a jury instruction should be crafted from these definitions once the exhibits and testimony admitted at trial makes clear which statutory provisions are implicated by the evidence.

g.   Seventh, Concord again contends (Doc. 280, at 33) that the jury should be required to find willfulness (and instructed on that in yet a further part of the instructions), and further proposes

language about "knowing[] participat[ion] in an unlawful plan."  This Court has repeatedly rejected Concord's efforts to insert a willfulness requirement.  And the proposed reference to knowing participation in an unlawful plan may wrongly suggest that the defendants must have known their plan was illegal—the definition of willfulness.  Concord's reliance on *United States v. Bostick*, 791 F.3d 127, 144 (D.C. Cir. 2015), underscores the problem.  Like much of Concord's requested instructions, Concord's proposed paragraph on intent when joining a conspiracy departs from the model instructions used in this jurisdiction and, to the government's knowledge, in other courts.  *Bostick* did not suggest or approve of the language Concord requests.  To the contrary, the only point at issue on the page cited by Concord is whether the jury instruction correctly required the government to "prove each individual defendant's involvement" in the multi-defendant drug conspiracy charged there.  *Id.*; *see id.* at 135-137 (describing the 90-count, multi-defendant case).  The D.C. Circuit found that the instruction did so, insofar as it "emphasized that to convict a particular defendant of Count One, the jury must find that the individual defendant knowingly participated in the conspiracy with the specific intent to further its objectives."  *Id.* at 144.

To the extent that Concord is merely relying on the instruction quoted in *Bostick*, Concord is departing (albeit slightly) from that instruction, and that instruction was crafted in a case that required willfulness.  *See* J.A. 6719, *Bostick, supra*.  More to the point, the government respectfully suggests that the Court use the model instructions from this jurisdiction rather than a particular instruction given in 2001 in a multi-defendant, multi-count drug conspiracy.  In fact, the model instruction proposed by the government addresses Concord's stated concern—"whether Concord had the requisite intent to join the conspiracy" (Doc. 280, at 33)—by making clear that a defendant must have "intentionally joined in the agreement," "underst[oo]d[] the unlawful nature of the plan and voluntarily and intentionally join[ed] in it with the intent to advance or further [its] unlawful

object." Doc. 248-1, at 26-27; *see 1 Criminal Jury Instructions for DC Instruction 7.102.* Other than potentially inviting the jury to think in terms of willfulness, it is unclear what Concord's language would achieve or why the Court should depart from the model language.

Respectfully submitted,

JOHN C. DEMERS
Assistant Attorney General for National Security

By: /s/
Heather N. Alpino
U.S. Department of Justice
National Security Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Telephone: (202) 514-2000

JESSIE K. LIU
United States Attorney

By: /s/
Luke Jones
Kathryn Rakoczy
Jonathan Kravis
555 Fourth Street NW
Washington, D.C. 20530
Telephone: (202) 252-6886

**Duty to Disclose**

If you conclude that a duty to disclose is relevant to your decision about whether Concord conspired to defraud the United States, there are two duties to disclose that are at issue in this case.

1. First, the Federal Election Campaign Act requires anyone who makes "independent expenditures" of more than $250 in a calendar year must file reports with the Federal Election Commission containing information about the expenditure, including who made it and its purpose. An "independent expenditure" is any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office, that expressly advocates the election or defeat of a clearly identified candidate.

Expressly advocating means either

(a) phrases such as "vote for the President," "re-elect your Congressman," "support the Democratic nominee," "cast your ballot for the Republican challenger for U.S. Senate in Georgia," "Smith for Congress," "Bill McKay in '94," "vote Pro-Life" or "vote Pro-Choice" accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice, "vote against Old Hickory," "defeat" accompanied by a picture of one or more candidate(s), "reject the incumbent," or communications of campaign slogan(s) or individual word(s), which in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s), such as posters, bumper stickers, advertisements, etc. which say "Nixon's the One," "Carter '76," "Reagan/Bush" or "Mondale!"; or

(b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing

advocacy of the election or defeat of one or more clearly identified candidate(s) because - (a) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and (b) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

2.    Second, the Foreign Agents Registration Act (FARA) promotes transparency with respect to foreign influence within the United States by ensuring that the United States government and the public know the source of certain information from foreign agents intended to influence American public opinion, policy, and laws, thereby facilitating informed evaluation of that information.   FARA fosters transparency by requiring that persons who engage in specified activities within the United States on behalf of a foreign principal, either directly or through any other person, register with and disclose those activities to the Department of Justice.   It is an important tool to identify foreign influence in the United States and address threats to national security.

Under FARA, anyone who acts as an agent of a foreign principal must register with the Department of Justice and disclose who they work for and what they're doing.   A foreign principal includes an entity organized under foreign law or based in another country, and a person or entity located outside of the United States who is not a U.S. citizen who lives in the United States or U.S.-based entity.   An "agent of a foreign principal" is anyone who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a

foreign principal, and who directly or through any other person engages in certain acts in the United States for or in the interests of the foreign principal.

As relevant here, three categories of acts can render someone an agent under FARA:

(i) "Political activities."  The term "political activities" means any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party;

(ii) Various public-relations conduct and political consulting.  This includes acting as a public relations counsel; engaging directly or indirectly in the publication or dissemination of oral, visual, graphic, written, or pictorial information or matter of any kind, including publication by means of advertising, books, periodicals, newspapers, lectures, broadcasts, motion pictures, or otherwise; and informing or advising any other person with reference to the domestic or foreign policies of the United States or the political or public interest, policies, or relations of a foreign country or of a foreign political party.

(iii) soliciting, collecting, disbursing, or dispensing contributions, loans, money, or other things of value

52 U.S.C. § 30104(c) (FECA); 11 C.F.R. § 109.10 (FEC regulation); *see* 52 U.S.C. § 30101(17) (defining "independent expenditure"); 11 C.F.R. § 100.22 (regulation interpreting "independent expenditure").  22 U.S.C. §§ 611(a), (b), (c)(1)(i)-(iii), (g), (h), (o), (p), 612(a) (FARA).