**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. No. 18-CR-32-2 (DLF)** |
| **CONCORD MANAGEMENT AND CONSULTING LLC,** | |
| **Defendant.** | |

## GOVERNMENT'S OPPOSITION TO MOTION TO QUASH AND REPLY IN SUPPORT OF OPPOSITION TO MOTION FOR EARLY RETURN TRIAL SUBPOENA

The United States of America, by and through undersigned counsel, respectfully submits this response to defendant Concord Management and Consulting's motion to quash and opposition to the government's motion for an early return trial subpoena (Doc. 288). Concord argues that the requests are not sufficiently specific, that because it is a foreign corporation it cannot be issued a subpoena in connection with this case, and that the subpoena should be quashed because compliance risks violating Russian law. Concord's contentions lack merit.

The central thesis of Concord's arguments about specificity is that a trial subpoena is valid only if seeking a small set of records and described with exquisite precision. These arguments misunderstand the governing standard, which does not concern the number of documents sought but instead whether the requesting party has a good-faith basis to believe that those relevant and admissible records exist and describes the information contained therein in appropriately specific terms. The argument that this Court cannot direct Concord to produce the requested records is equally unsound. Concord appeared in this Court, agreed to be bound by orders of the Court, has been actively litigating this case, has received substantial discovery, and has been doing all of that solely through counsel. The Court accordingly has jurisdiction to issue orders to Concord in the

case, and any required service is accomplished by service on Concord's counsel in the case. Finally, Concord has failed to carry its burden to show that compliance with the subpoena would violate Russian law, and its asserted foreign-law conflict would, in any event, not render the subpoena unreasonable or oppressive.

## I.  The Subpoena Seeks Relevant, Admissible, And Specific Evidence That Should Be Produced In Advance Of Trial

The government is seeking six specific sets of records for use in trial.  The Court granted the government's motion to direct Concord to produce categories one, two, and three.  Doc. 279, at 1.  The government has substantially narrowed the additional requests and now seeks Concord's records of payments funding the Internet Research Agency ("IRA") (category four); communications within the relevant time frame between Concord and a list of individuals concerning the IRA's activities (category five); and calendar entries for one Concord officer—Yevgeniy Prigozhin—during the relevant period that show meetings with a list of individuals (category six).   These sorts of documents—known sets of corporate records of payments, communications, and meetings—are commonly the subject of Rule 17 trial subpoenas issued by both the government and defendants.[1]   Concord asks the Court to reconsider its decision with respect to categories one and two but provides no sound reason to do so.  Concord's arguments about categories four through six largely reduce to unsupported innuendo that those categories could encompass a large number of records.  But Concord makes no proffer to substantiate such a claim.  Nor does Concord engage with the controlling standard for specificity, which does not concern the number of documents sought but instead whether the requesting party has a good-faith

---

[1] While the government more often subpoenas these sorts of records from corporations for trials of individuals, that fact does not bear on Rule 17's requirements.  And because Concord is a corporation, it has no Fifth Amendment right against active production.  *Braswell v. United States*, 487 U.S. 99, 102 (1988).

basis to believe that those relevant and admissible records exist and the requesting party describes them in appropriately specific terms.

A.      **Concord Provides No Basis For The Court To Reconsider Its Prior Decision About Categories One And Two**

Concord contends (Doc. 288, at 13-15) that the Court should not order the production of categories one and two because that information is publicly available and therefore not the proper subject of a subpoena under *United States v. Nixon*, 418 U.S. 683 (1974).  Concord does not acknowledge, however, that the parties already briefed whether these categories satisfy *Nixon* and that the Court granted the government's motion as to those categories.  Doc. 279, at 1.  While the Federal Rules of Criminal Procedure do not explicitly provide for motions for reconsideration of interlocutory orders, courts apply the Civil Rules, granting reconsideration if "justice requires." *See, e.g.*, *United States v. Lieu*, No. 17-cr-50, 2018 WL 5045335, at *2 (D.D.C. Oct. 17, 2018); *United States v. Slough*, 61 F. Supp. 3d 103, 107 (D.D.C. 2014).  This generally depends on whether the Court "'patently misunderstood a party," made a decision "outside the adversarial issues presented," or "where a controlling or significant change in the law or fact" has occurred. *Lieu*, 2018 WL 5045335, at *3; *see also United States v. Hemingway*, 930 F. Supp. 2d 11, 12-13 (D.D.C. 2013).  Concord provides no sound reason for the Court to reconsider its prior decisions on categories one and two.  Concord had the opportunity to make the argument it makes here.  The Court understood Concord's arguments and based its decisions on careful consideration of the parties' submissions and applicable law and fact.

Concord's argument also lacks merit.  Concord declares that this information is publicly available and cites a few documents obtained by the government from the website of Russian tax authorities, just one of which concerns Concord.  No good reason exists to conclude that the few documents obtained from this website are the *only* such records or contain all of the information

requested.  The online document regarding Concord Management and Consulting LLC lists just two of Concord's corporate officers and reflects information as of a specific date and not for the entire time period requested by the subpoena.  The fact that the government obtained this single document regarding Concord does not show that the government can reasonably procure all documents falling in categories one and two through publicly-available information.

To the extent that Concord also suggests that the government should seek other documents from Russian authorities that are not online (Doc. 288, at 15), that is fanciful. ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

Concord's argument also ignores the fact that obtaining the documents from Concord confirms their authenticity.  Concord has repeatedly suggested, including in this very motion, that it will contest the authenticity of records already obtained by the government. Contrary to Concord's unsupported assertion (Doc. 288, at 36), resolving authenticity challenges is a proper function of a trial subpoena.  *See, e.g., United States v. Wilmington Trust Corp.*, 321 F.R.D. 100, 102 (D. Del. 2017) (noting that a "need to authenticate documents may" be a proper purpose for a trial subpoena, but quashing the subpoena on other grounds); *see also In re Custodian of Records of Variety Distributing, Inc.*, 927 F.2d 244 (6th Cir. 1991) (upholding contempt finding based on refusal of corporate records custodian to comply with trial subpoena to produce and authenticate

records).  Concord cannot have it both ways, arguing that the documents already obtained by the government provide the sought-after information and also that those documents are not authentic.

### B.   Concord's Challenges To Categories Four, Five, And Six Lack Merit

Concord also contends (Doc. 288, at 35-44) that the government's narrowed requests— categories four through six—are not sufficiently specific.  These arguments rest on unsupported factual assertions and fail to come to grips with the governing legal standard, which does not require "exquisite specificity," but only that the requesting party "reasonably specify the information contained or believed to be contained in the documents sought."  *United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006).  The government has a strong basis to believe that the requested records exist and has narrowed its requests to the precise contours of those records that would also be relevant and admissible.  Because the records are kept by a Russian company, the government is unable to describe with precision, or in English, the exact form they take.  But the government has now described those records with reasonable specificity.  Concord cites no example of a court quashing a comparable request.

**1.**  Concord first argues (Doc. 288, at 35-37) that categories four through six are not specific because the government has not shown whether that it "cannot properly prepare for trial without such production and inspection in advance of trial and [why] the failure to obtain such inspection may tend unreasonably to delay the trial."  *Id.* at 35 (quoting *Nixon*, 418 U.S. at 699-700).  It is unclear why necessity for trial preparation could bear on the required specificity.  *See id.* at 36-37 (pivoting between this argument and *ipse dixit* claims that these categories are "overbroad" and "non-specific").  Courts have correctly recognized that arguments tying this language from *Nixon* to the validity of a subpoena read the language "out of context."  *E.g.*, *United States v. Scala*, 432 F. Supp. 2d 395, 402 (S.D.N.Y. 2006).  The "full statement" in *Nixon* makes clear that this

language concerns "the timing of production, not to the enforceability of the subpoena *vel non*." *Id.*; *see Nixon*, 418 U.S. at 699-700 (discussing "production prior to trial").

Moreover, even if that language in *Nixon* were somehow tied to specificity (or any other requirement for a valid subpoena), it still asks only "whether the government would be prepared '*properly*' absent enforcement of the subpoena." *Scala*, 432 F. Supp. 2d at 402 (quoting *Nixon*) (emphasis added). Concord's assertion boils down to a claim that the government can adequately prepare for trial with the documents it has. Doc. 288, at 35. But "[t]here is a powerful public interest in the trial jury having all relevant evidence," and courts have therefore rejected the "good enough" standard that Concord attempts to draw from *Nixon*. *Scala*, 432 F. Supp. 2d at 402; *see also, e.g.*, *United States v. Rajaratnam*, No 09-cr-1184, 2011 WL 335170, at *5 (S.D.N.Y. Feb. 2, 2011) (rejecting the argument that motion for trial subpoena should be denied because "the government *could* proceed to trial" without the evidence requested by the subpoena).[2]

**2.** Concord next challenges (Doc. 288, at 37-39) the specificity of category four, which seeks Concord's records of its payments funding the IRA. As the government explained in its motion, documents gathered during the investigation—██████████████████████████ ███████████████████████—provide a strong basis to believe that Concord made payments to fund the IRA's activities and that Concord keeps records of those payments. The government has also described those records in as specific a manner as it believes possible. Courts regularly uphold trial subpoenas framed in the terms of documents related to particular categories of financial transactions. *E.g.*, *Rajaratnam*, 2011 WL 335170, at *2 (trial subpoena seeking data

---

[2] To the extent Concord suggests (*see* Doc. 288, at 36) that the government should have obtained the documents "prior to indictment," that ignores the reality that only now has Concord subjected itself to the jurisdiction of this Court and, in any event, has no bearing on the validity of a trial subpoena. *See*, *e.g.*, *Rajaratnam*, 2011 WL 335170, at *3-*4.

regarding trades in the securities of identified issuers); *United States v. McCollom*, 651 F. Supp. 1217, 1219-25 (N.D. Ill. 1987) (trial subpoena seeking documents related to particular accounts). And here, the government faces the additional burden of specifically describing payment records that are not maintained in English or subject to American accounting practices.[3]

Concord seemingly suggests that this set of records may be large or that some may concern activities that are irrelevant. *See* Doc. 288, at 37 (arguing that "any payment to an entity . . . can be said to fund that entity's activities"). But Concord provides no proffer about how many such records exist or why this subpoena is merely "fishing" in some vast ocean of otherwise irrelevant payment records. Given the limited nature of the IRA's activities and the nature of the conspiracy charged here, it is highly likely that any payment from Concord funding the IRA's activities is pertinent. And, as discussed, the government is seeking records of the very payments that it believes are reflected in the budget documents and emails already obtained. Concord does not suggest how the government can more specifically describe that request.

Concord's only concrete argument (Doc. 288, at 38) is that category four cannot be sufficiently specific because it uses the word "records" instead of identifying specific record types, such as "checks," "check registers," and "withdrawal slips" like the subpoena at issue in *McCollom*. The government used the term "records" because the government has no way of knowing the terms—in Russian or English—that Concord would use to describe the records it keeps for its financial transactions (*e.g.*, ledger, bank statements, spreadsheet, QuickBooks file).

---

[3] Concord attempts to distinguish *McCollom* on the ground that the defendant in that case received act of production immunity, whereas "here, the government provides no such guarantee." Doc. 288, at 38. But the defendant in *McCollom* received immunity because otherwise he could have resisted the subpoena by asserting a Fifth Amendment privilege. As a corporation, Concord has no such privilege. *Braswell*, 487 U.S. at 102. Concord does not attempt to explain how the government's decision to confer production immunity on McCollom had any bearing on the specificity of the trial subpoena in that case.

Concord's argument reduces to the proposition that a party cannot subpoena relevant and admissible records if it cannot identify the form of record with absolute precision—here the word that Concord (a Russian company) uses to describe records memorializing financial transactions. That argument is without merit.   The question is whether the government has "reasonably specif[ied] *the information* contained or believed to be contained in the documents sought." *Libby*, 432 F. Supp. at 31 (emphasis added).   The description of the subject matter of the financial transactions renders the request sufficiently specific.[4]

**3.**   Concord next contends (Doc. 288, at 39-43), that category five, which seeks communications within the relevant time frame between Concord and a list of individuals concerning the IRA's activities, is "over-broad."   Because this request is limited to particular individuals and a particular subject that is relevant to the case, this request is sufficiently specific. The subpoena upheld in *Rajaratnam* included a very similar request.   *See* 2011 WL 335170, at *2 (upholding a request for "any and all emails sent or received by" a particular individual during a particular time period regarding a particular subject).   Concord attempts to distinguish *Rajaratnam* because that request covered fewer custodians over a shorter period of time.   Doc. 288, at 42.   But that argument misapprehends the nature of the specificity inquiry, which does not depend on the sheer number of records requested, but rather whether "there is a 'sufficient likelihood,' demonstrated through rational inferences, that the documents being sought contain relevant and admissible evidence."   *United States v. Binh Tango Vo*, 78 F. Supp. 3d 171, 178 (D.D.C. 2015);

---

[4] Concord notably does not proffer that the subpoena's use of the term "records" renders the subpoena unduly burdensome because Concord has too many "documents" regarding this specific category of transactions.   *Compare, e.g.*, *United States v. Jungen*, No. 13-cr-121, 2014 WL 4924654, at *4 (E.D. Wis. Sept. 30, 2014) (holding that similar request that related to "specific entities" and "topics" discussed in "communications" was not sufficiently specific based on subpoenaed party's representation that it would "result in the production of thousands of pages of documents").

*see also, e.g., United States v. Tyson Foods, Inc.*, 2002 WL 32058964, at *1 (E.D. Tenn. May 22, 2002) (denying motion to quash trial subpoena issued to corporate defendant requesting "plant production cost summary reports" for "sixteen" plants over a five-year period).

Concord tips its hand by attacking (Doc. 288, at 40) the added specification that limits the requested communications between Concord and named individuals to only those concerning the IRA's activities. Concord posits that the listed individuals are all associated with the IRA, and therefore "it stands to reason" that all of Concord's communications with them are about the IRA's activities. This is a classic *non sequitur*. The listed individuals could have other business with Concord or could communicate with Concord employees about social matters—this request was narrowed to exclude such non-relevant categories. But if all of the requested communications were about the IRA's activities, that would only underscore that the request is sufficiently specific, *i.e.,* that it appropriately identifies the set of records sought by the government that are likely relevant and admissible at trial. The specificity requirement does not mean that the government must first identify a set and then request a subset of it. Rather, the specificity requirement is intended to insure that the trial subpoena is not a fishing expedition. This request is not a fishing expedition—the government has proffered a strong basis to believe that the requested communications exist and has narrowed the request to cover only those communications that would be relevant to the allegations in this case.

It is also of no matter that the subpoena uses the phrase "individuals affiliated with" Concord rather than simply "Concord" or "Concord employees, officers, and contractors." *Cf.* Doc. 288, at 42. Concord is a corporate defendant that can act through various individuals, and this formulation is therefore appropriate. That set is also limited in scope: the evidence ███████ ████████████████████████████████████████████████████ The requested

records are also significantly limited by naming the particular individuals at the IRA who were parties to the communications and the subject matter of those communications.  In any event, if the Court were to conclude that the use of this phrase renders the subpoena overbroad, the proper remedy would be for the Court to "modify" the subpoena, Fed. R. Crim. P. 17(c)(2), simply to say "Concord" or "employees, officers, and contractors" of Concord.[5]

4.  Concord's final contention (Doc. 288, at 43-44) is that category six, which seeks calendar entries for Prigozhin during the relevant time period that show meetings with a list of individuals, is "unspecific and unsupported."  Those assertions get matters exactly backwards.  ███

███████████████████████████████████████████████████████████████

███████████████████████████████████  The government has then specified only those calendar entries that reflect meetings with certain people.  In the pre-digital world, a trial subpoena might simply request a corporate officer's calendar.  But thanks to use of digital records, the government can be far more precise.  Concord's argument rests on the conclusory assertion that ███████████████████████ "do not furnish the specificity needed to authorize the government to rummage through four years of documents related to at least twelve additional individuals."  Doc. 288, at 44.  ██████████████ provide a "'sufficient likelihood,' demonstrated through rational inferences, that" this request will yield "relevant and admissible evidence," namely the original copies of these and other similar calendar entries.  The government is not

---

[5] Concord additionally complains (Doc. 288, at 39-40) that this request includes communications with Concord Catering in addition to Concord Management and Consulting.  The government included that language only because documents gathered in the course of the investigation show that ███████████████████████████████████████████████████ ████████.  In any event, the subpoena reaches only communications in the possession of Concord Management and Consulting.  The government did not intend, as Concord appears to suggest (*see id.* at 39-40), that Concord must search files beyond its control for responsive documents.

asking to "rummage through" documents related to "twelve additional individuals." Rather, the government is requesting the Court to authorize a trial subpoena requiring Concord to produce the relevant evidence. [6]

## II.   This Court Can Issue An Order In This Case To A Party Who Has Chosen To Appear In The Case

The authority to issue a trial subpoena to Concord is straightforward. Concord voluntarily appeared in this Court through counsel, agreed to be bound by orders of the Court, has been actively litigating the case, has received substantial discovery, and has been doing all of that solely through counsel, *see* Fed. R. Crim P. 43(b)(1). Concord nonetheless contends (Doc. 287, at 4-12) that because it is a foreign corporation organized abroad and conducting business abroad, it cannot be issued a subpoena to produce documents in connection with this case. That position is misguided. As a party properly before the Court, Concord is subject to orders of the Court. And any required service in this case is satisfied by serving Concord's counsel in this case. Parties may not pick and choose what obligations they wish to be subject to. And the fact that Concord is an entity organized under foreign law does that alter that basic principle. In fact, after Concord initially disputed whether it had been properly served with a summons in this case, the Court confirmed that defense counsel was authorized "to enter a voluntary appearance in this matter and to subject [Concord] to the jurisdiction of this Court." 5/9/19 Tr. 4-5. The Court clarified that Concord understood "that by doing so, it must also comply with the Federal Rules of Criminal

---

[6] Defense counsel's contention (Doc. 288, at 43, 44-45) that the protective order prohibits it from discussing this request with Concord is specious. Concord is correct that ████████████ ███████████████████████. But that does not mean that counsel cannot discuss the "type of document" identified in request six—calendar entries—without violating the protective order. In any event, subsequent to the filing of the defense motion to quash, the government advised defense counsel that the government will agree ███████████████████████████████████

Procedure, the rules of this Court, and with the orders of this Court," and defense counsel agreed. *Id.* at 5.  Yet Concord (through that same counsel) now suggests that the Court has no authority to issue certain orders to Concord. First, Concord contends that because it is a foreign corporation, the Court lacks jurisdiction to require Concord to produce records located abroad.  Second, Concord contends that it is legally impossible to serve such a subpoena because Concord's officers and employees are located abroad.  Each of these arguments lacks merit.

### A.    The Court Has Personal Jurisdiction Over Concord In This Case

**1.**  Concord's principal contention is that as an entity located abroad, Concord cannot be subject to the jurisdiction of an American court.  *See* Doc. 287, at 9-10 (arguing that "this Court has no jurisdiction to compel Concord—a foreign corporation with no presence in the United States—to personally appear in this forum to respond to a subpoena and subject itself to this Court's adjudicatory power"); *id.* at 11-12 (asserting "due process" violation because Concord never "anticipated" that it would have to produce records for this trial and lacked "notice" when it chose to appear); *see also id.* at 4-9.  It is black-letter law, however, that "a district court has personal jurisdiction over any party who appears before it."  *United States v. Lussier*, 929 F.2d 25, 27 (1st Cir. 1991); *see*, *e.g.*, *United States v. McLaughlin*, __ F.3d__, No. 19-308, 2019 WL 7285847, at *2 (2d Cir. Dec. 30, 2019); *United States v. Marks*, 530 F.3d 799, 810 (9th Cir. 2008). If Concord wanted to contest jurisdiction, it had to assert a defect in instituting the prosecution under Rule 12.  *United States v. Marquez*, 594 F.3d 855, 858 (11th Cir. 2010). Concord filed no such motion, for the obvious reason that Concord appeared voluntarily and chose to participate in this case, demanding discovery and filing motions to dismiss.  Having engaged in that activity, Concord cannot now claim that it is beyond the Court's jurisdiction.

As Concord previously conceded, by appearing in this case, Concord is "subject . . . to the

jurisdiction of this Court" and must "comply with the Federal Rules of Criminal Procedure, the rules of this Court, and with the orders of this Court." 5/9/19 Tr. 4-5. Concord cites no authority, and the government is aware of none, for the proposition that when a party appears and participates in a case, courts must nonetheless reconsider personal jurisdiction on an order by order basis. To the contrary, a court's authority to issue orders to parties—including orders that require production of evidence or information—is part and parcel of a court's power to hear the case. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004) (explaining that a "tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence" whereas "[i]n contrast, nonparticipants . . . may be outside [that] tribunal's jurisdictional reach"); *see also* 9 *Moore's Federal Practice* § 45.22[1] (3d ed.) (Moore) ("a district court must have personal jurisdiction over a *nonparty* in order to compel it to comply with a subpoena") (emphasis added). This principle applies equally to a trial subpoena, which is a court order commanding a person to testify or to produce documents or objects for use in a trial, *see* Fed. R. Crim. P. 17(a), (c)(1),[7] and to an order by the court "direct[ing] the witness to produce the designated items in court before trial," Fed. R. Crim. P. 17(c)(1).

**2.** Because Concord has subjected itself to the jurisdiction of the Court, the Court has jurisdiction to enforce any order, including a trial subpoena, against Concord, and no further analysis is required. But even were there any basis for examining personal jurisdiction over a party like Concord that voluntarily appeared and litigated (which there is not), this Court would still

---

[7] *See, e.g.*, *United States v. Grooms*, 6 Fed. App'x 377, 381 (7th Cir. 2001) (unpub.) ("A subpoena is a court order—not merely a demand of a party to litigation"); *Waste Conversion, Inc. v. Rollins Envtl. Servs.*, 893 F.2d 605, 613 (3d Cir. 1990) (Scirica, J., dissenting) ("I doubt there is any lawyer in the United States who does not know that a subpoena is a court order and remains such until vacated or discharged by the court"); *see also* Wright & Miller, *Federal Practice and Procedure* § 2451 (3d ed.) ("A 'subpoena' is a mandate lawfully issued in the name of the court, usually by the clerk thereof, but under current practice, by attorneys.").

have jurisdiction to order Concord to produce documents in this case for at least two overlapping reasons.

First, personal jurisdiction can be waived, and a court may therefore establish personal jurisdiction based on consent. *In re Sealed Case*, 932 F.3d 915, 922 (D.C. Cir. 2019); *see Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703-704 (1982) (describing various examples of parties consenting); *see also* Restatement (Fourth) of the Foreign Relations Law of the United States § 423(1) (2018) (Restatement Fourth) ("A court in the United States may exercise in personam jurisdiction over a defendant only if the defendant has been properly served *or has waived service*.") (emphasis added).  Waiver can be "implied," based on, among other things, a party's decision to appear and litigate.  *See Insurance Corp.*, 456 U.S. at 704; *see*, e.*g., Kelberine v. Societe Internationale*, 363 F.2d 989, 993 (D.C. Cir. 1966) (explaining that "the institution and prosecution of a civil action" in this district "voluntarily subjected" that corporation "to the jurisdiction of the court" for a related matter).  Concord did exactly that.

Second, courts may exercise personal jurisdiction so long as there are "sufficient 'minimum contacts' to satisfy 'traditional notions of fair play and substantial justice.'"  *Sealed Case*, 932 F.3d at 922 (quoting *Int'l Shoe Co. v.* Washington, 326 U.S. 310, 316 (1945)).  Personal jurisdiction is more expansive in criminal cases than in civil cases.  *See id.*; *see, e.g., United States v. Ali*, 718 F.3d 929, 942 (D.C. Cir. 2013) (personal jurisdiction to prosecute foreigner for conduct abroad so long as there is "a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair").  But Concord has, in any event, "purposefully directed its relevant activities at the forum."  *Sealed Case*, 932 F.3d at 924.  By appearing and participating in this case, challenging the charges, demanding and obtaining extensive discovery in preparation for trial, and moving forward to trial, Concord has directed its

case-related activities at this very Court and may therefore be fairly subject to the authority of this Court with respect to case Concord has been participating in. *Cf. First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998) (personal jurisdiction for subpoena served on non-party with loose connection to case).

**3.** Concord's argument appears to proceeds from the premise that Concord is a non-party being haled into court. Thus, Concord relies heavily on cases about asserting personal jurisdiction over non-party, foreign corporations. But the Court need not decide whether it has jurisdiction to "compel Concord . . . to personally appear in this forum" (Doc. 288, at 9), because Concord has already appeared in this forum, when it entered an appearance in this case. And contrary to Concord's suggestion (*id.*), the requested document subpoena would not require the personal attendance of a corporate officer who is not a party to this case. It is of no matter that Concord does not conduct business in the United States and keeps any responsive records in another country. *Cf. id.* at 9, 11-12. "If a court has jurisdiction over a foreign corporation, a subpoena duces tecum may be issued requiring the corporation to produce records that are within its possession, even if the records themselves are beyond the geographical boundary of the United States." 25 Moore § 617.06; *see, e.g., Sealed Case*, 932 F.3d at 924.

Concord's arguments on this score raise the question whether Concord believes that the Court has authority with respect to other orders issued in this case, such as the protective order governing the extensive discovery being given to the defense, some of which is now in Russia. Concord's general discovery obligations, *see* Fed. R. Crim. P. 16(b), or any order to submit trial exhibits may require Concord to produce documents located abroad. If Concord were convicted, it would presumably have to provide information and records located abroad about its finances to assist the Court in determining the sentence. And if Concord were ordered to pay a fine, it would

likely have to use assets located abroad.  As these examples illustrate, by appearing in this Court and subjecting itself to the jurisdiction of this Court, Concord must comply with the obligations related to this case, even if Concord is not based in the United States and doing so involves activities outside of the United States.

## B.     Concord's Counsel Can Be Served With The Trial Subpoena

Concord also argues (Doc. 288, at 4-9) that even if the Court has the authority to order production of documents, serving that order is a legal impossibility because no one in the United States—including Concord's counsel and lone representative in court in this case—can be served. This argument is misguided and ignores the fact that Concord is a party to this case represented by and appearing through counsel.

### 1.   Concord's counsel is an appropriate representative of concord in this case

As a threshold matter, it is unclear whether any formal service is necessary.  This Court regularly issues orders to Concord by posting them on the docket without any formal means of service.  Not only is a subpoena a court order, but here the government is asking the Court to "direct" Concord "to produce the designated items in court before trial." Fed. R. Crim. P. 17(c)(1). The Court would do so by issuing an order, much as it issues other orders communicated to Concord's counsel.  For non-parties, "service" is generally used to "obtain jurisdiction." *See Green v. Chicago, B. & Q. R. Co.*, 205 U.S. 530, 531 (1907); *I.A.M. Nat'l Pension Fund, Ben. Plan A v. Wakefield Industries, Inc., Div. of Capehart Corp.*, 699 F.2d 1254, 1260 (D.C. Cir. 1983).  Because this Court already has jurisdiction over Concord, however, service is not required to perform that function.  *Cf., e.g., Shi v. New Mighty United States Trust*, 918 F.3d 944, 951 (D.C. Cir. 2019) (explaining that "courts can reach foreign *non-party* witnesses" through specified means) (emphasis added).

Assuming that the government's request requires formal service, that requirement is satisfied by service through Concord's attorneys, who are representing Concord in this case.  This is so for at least two reasons.  First, Federal Rule of Criminal Procedure 49 provides that "[u]nless the court orders otherwise, when these rules or a court order requires or permits service on a party represented by an attorney, service must be made on the attorney instead of the party."  Fed. R. Crim. P. 49(a)(2).  Although a trial subpoena may be directed to a party witness or non-party witness, Concord does not dispute that Rule 17 "permits service on a party."  *Id.*  Service therefore not only can but "must be made on [Concord's] attorney."  *Id.*; *see Hardin v. Belmont Textile Mach. Co.*, No. 05-cv-492, 2007 WL 2300795, at *3 (W.D.N.C. Aug. 7, 2007) (applying companion civil rules); *First City, Tex.-Hous., N.A. v. Rafidain Bank*, 197 F.R.D. 250, 254 (S.D.N.Y. 2000) (same), *aff'd*, 281 F.3d 48, 55 (2d Cir. 2002); *cf. Lehman v. Kornblau*, 206 F.R.D. 345, 346-347 (E.D.N.Y. 2001) (rejecting argument that subpoena could be served on non-party witness through his attorney "because th[at] rule expressly applies only to parties").  This should come as no surprise.  Courts communicate orders to parties through their attorneys in litigation, and parties serve filings on each other in the same manner.  *See, e.g.*, D.C. L.Cr.R. 49(b), (d) (providing for service on attorneys by electronic means).  Those filings, however, ultimately impose legal obligations on the parties, not the attorneys who receive them.  *See, e.g. Link v. Wabash R. Co.*, 370 U.S. 626, 633-636 (1962) (explaining that a party "voluntarily chose this attorney as his representative in the action" and is therefore bound by a deadline communicated to the attorney).[8]

---

[8] In other contexts, the law recognizes procedural differences between party witnesses and non-party witness.  For example, while a non-party witness can appeal the denial of motion to quash a subpoena once the court issues a civil contempt order, a party witness must instead wait for final judgment or be held in criminal contempt.  *See Fox v. Capital Co.,* 299 U.S. 105, 107

Second, even setting aside the specific rules governing service on a party, under the particular facts of this case, Concord's attorney is a proper recipient of service for Concord. A corporation is an artificial entity, and any form of service must therefore accomplished by serving an appropriate representative. "A corporation may be served through an officer or agent explicitly *or implicitly authorized to accept service* of process." *In re Grand Jury Subpoenas Issued to Thirteen Corporations*, 775 F.2d 43, 46 (2d Cir. 1985) (emphasis added). Under the right circumstances, an attorney for a corporation may be deemed an appropriate agent for service of a subpoena. *See id.* Defense counsel's role in this litigation more than suffices. Concord chose to appear solely through counsel, never sending a corporate representative to attend hearings. Counsel entered a plea on behalf of Concord and accepted discovery on behalf of Concord. At the very first hearing in this case, counsel confirmed that he was fully representing Concord in this matter. Under these circumstances, defense counsel is Concord's sole representative for purposes of these proceedings and therefore is implicitly authorized to accept service of process.

As this Court correctly decided in its initial ruling (Doc. 279, at 2-4), the D.C. Circuit's decision in *Kelberine*, 363 F.2d 989, supports this conclusion. In *Kelberine*, a foreign corporation filed suit in American court and actively litigated the case, represented solely by its attorneys who accepted service of filings in that matter. *Id.* at 991, 993. Individuals who were not parties to that case filed a new action against the parties to the case, including the foreign corporation, seeking the property at issue in that case as damages for a tort. *Id.* at 992. The D.C. Circuit held that the plaintiffs in the new action could initiate suit by serving a complaint on the attorney representing the foreign corporation in the related case. *Id.* at 993. Although that attorney's "expressed

---

(1936); *see also United States v. Johnson*, 801 F.2d 597, 599 (2d Cir. 1986) (applying this rule to criminal defendants).

authority was limited," it "covered the law suit respecting the [relevant] property," including the power to accept service in that matter. *Id.* Even assuming that the attorney lacked "express authority" to accept service of a complaint initiating a new case, the court held "under the total circumstances of the case the agent of the corporation present in the District for the purpose of conducting the litigation in the courts here was subject to process in this suit." *Id.* By "com[ing] into the District of Columbia for the purpose of filing and prosecuting in the District Court a suit concerning certain property," the court held that the foreign corporation could not "by restricting the authority" of its attorney, "immunize itself against suit in that same court involving that same property." *Id.* at 993-994.

Concord misunderstands the significance of *Kelberine*. Concord appears to suggest (Doc. 288, at 6) that *Kelberine* turned on the particular terms of that corporation's designation of its attorney, declaring that the attorney was "was expressly empowered to accept process in the context of that litigation." But to be clear, the D.C. Circuit explained that while "[i]t could quite properly be held that process in this case fell within the agent's express authority," the court's decision did "not rest upon that power of attorney." 363 F.2d at 993. Rather, the court found that by choosing to send an attorney into a court in this district to litigate a related matter, the corporation had implicitly rendered that attorney as its representative on such matters and could not simultaneously "prosecut[e] in the District Court a suit concerning certain property" and also "immunize itself against suit in that same court involving that same property." *Id.* at 993-994.

Concord correctly notes (Doc. 288, at 6-8), that the facts of *Kelberine* are not identical to the facts here. As this Court correctly explained, however, "*Kelberine*'s animating principle" is that "when a foreign corporation avails itself of our court system, it cannot lightly immunize itself from process by restricting its agent's authority only to its benefit." Doc. 279, at 4. "A foreign

defendant that voluntarily reaps our criminal justice system's benefits—including its procedural protections, rights to discovery, and constitutional safeguards—also assumes its burdens, which include the obligations to comply with court orders and to accept service of court-issued subpoenas." *Id.* If anything, the factual differences between *Kelberine* and this case only strengthen the arguments for serving Concord through its attorney. *Kelberine* concerned the initiation of an entirely new, albeit related, action for which the foreign corporation had not yet hired counsel. Here, the government is serving a trial subpoena in this case through the very attorneys representing Concord in the case. Even ignoring the Federal Rules of Criminal Procedure and Local Rules provide for service on a party through its attorney, the facts here are far stronger than they were in *Kelberine* for treating the foreign corporation (here Concord) as having implicitly authorized service on its attorney.

Like Concord's arguments about personal jurisdiction, its service arguments ignore that Concord is a party to the case represented by counsel. Indeed, as an organizational defendant, Concord has chosen to appear *solely* through counsel. *See* Fed. R. Crim. P. 43(b). Those critical facts distinguish the cases on which Concord relies, which concern efforts to summon non-party witnesses and thus stand only for the proposition (not applicable here) that non-party witnesses generally must be served themselves, rather than through others. Thus, *United States v. Lynch*, 678 F. App'x 441, 443 (8th Cir. 2017) (unpub.) (per curiam) (discussed at Doc. 288, at 5-6), merely observed in its recitation of facts that a non-party witness's attorney "refused to accept service of a subpoena on her client's behalf." *Id.* at 443. The court did not address whether that was proper. (In fact, the non-party witness was under indictment in a separate case, and the district court ordered pretrial services to require her to testify. *Id.*) And *United States v. Target Ship Mgmt. PTE, Ltd.*, No. 11-cr-368, 2012 WL 1415001, at *1 (S.D. Ala. Apr. 24, 2012) (cited at Doc. 288,

at 5), concerned an effort to subpoena an individual, non-party witness.  The government delivered a subpoena to a corporate party's counsel to require testimony by a particular corporate employee. *Id.* at *1.  There was no basis to believe that the corporation's attorney could "accept a trial subpoena directed at an individual employee."  *Id.*  The court stressed that the corporation's attorney "must accept legal papers regarding the alleged violations on behalf of the [corporation]" but not "on behalf of individual employees."  *Id.*

## 2.  Rule 17 does not require service by the government on one of Concord's officers in Russia

Contrary to Concord's suggestion (Doc. 288, at 4-5, 7-9), Federal Rule of Criminal Procedure 17 does not alter the analysis.  Rule 17 does not displace the complimentary rule that any required service on a represented party should be made on its attorney.  Fed. R. Crim. P. 49(a)(2).  Rule 17 also does not address when a party may consent or be deemed to consent to service on its attorney, who constitutes a proper representative of a corporation for service in a particular case, or the principle that "when a foreign corporation avails itself of our court system, it cannot lightly immunize itself from process by restricting its agent's authority only to its benefit," Doc. 279, at 4; *see Kelberine*, 363 F.2d at 993-994.

As Concord notes (Doc. 288, at 4), Rule 17 describes a subpoenaed person as a "witness."  Concord does not dispute, however, that that a trial subpoena may issue to a non-party or party witness.  *See, e.g., United States v. Johnson*, 801 F.2d 597, 599 (2d Cir. 1986).  The word "witness" simply describes a person who testifies or produces evidence for a trial.  *See Merriam-Webster Online* ("one that gives evidence") (def. 2); *Oxford English Dictionary* ("One who gives evidence in relation to matters of fact under inquiry") (def. 4); *see, e.g., It's a 10, Inc. v. PH Beauty Labs, Inc.*, 718 F. Supp. 2d 332, 336 (S.D. N.Y. 2010) ("The convenience of non-party witnesses is accorded more weight than that of party witnesses.").  The fact that Rule 17 uses the word

"witness" to describe the recipient of a trial subpoena does not alter the rule that a party like Concord may be served through its counsel in the matter that gives rise to the subpoena.

Concord suggests (Doc. 288, at 4-5, 7-8) that Rule 17 categorically requires in-person delivery to a witness himself.  Even were that correct (which it is not), the "witness" at issue here is an artificial entity.  It is therefore impossible to deliver a subpoena to the "witness" itself; it must be delivered to an appropriate representative of the witness.  *See* Wright & Miller § 2454; Moore § 45.21.  For the reasons discussed above, the attorneys representing Concord in this matter are an appropriate representative of Concord to receive a subpoena for this matter.  *See, e.g.*, *Kelberine*, 363 F.2d at 993-994.  The Court need go no further to resolve this motion.[9]

Concord is mistaken, moreover, when it suggests that a subpoena must always be handed to a witness—including a party witness—in person and by only certain intermediaries (such as a process sever) but not the witness's lawyer.  Nothing in the text of Rule 17 expressly requires that method of service, particularly on a party to the case where service is addressed by Rule 49(a)(2), or on a corporate party where service would have to be made on some human representative.  Concord's reading also ignores the contrast to Rule 4's provision for service of a summons "to the defendant personally." Fed. R. Crim. P. 4(c)(3)(B)(ii). Concord's interpretation is also inconsistent with the governing principle that the criminal rules "are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay."  Fed. R. Crim. P. 2.  Indeed, it

---

[9] In civil cases, courts have noted that for service on an "artificial entity, the concept of 'personal' service is somewhat obscured, because the entity is not a 'person' on whom service can be directly made" and thus have imported Federal Rule of Civil Procedure 4, which governs service of a summons. *GMA Accessories, Inc. v. Eminent, Inc.*, No. 07-cv-3219, 2007 WL 4456009, at *1 (S.D.N.Y. Dec. 11, 2007) (quoting Moore § 45.21).  Following that principle here would also permit service on Concord's attorney.  *See In re Pangang Grp. Co.*, 901 F.3d 1046 (9th Cir. 2018) (Criminal Rule 4 permits service of summons on foreign defendant's attorney).

would lead to results that the drafters could not possibly have intended—allowing foreign organizational defendants to litigate and receive discovery while nonetheless evading any court-authorized subpoena.  This would facilitate gamesmanship and uniquely shield foreign corporate defendants as compared to foreign human defendants and any American defendant.

Concord relies heavily (Doc. 288, at 5-6) on *United States v. Brennerman*, No. 17-cr-155, 2017 WL 4513563, at *1 (S.D.N.Y. Sept. 1, 2017) (unpub.).  That case, however, concerned a non-party witness.  *Id.*  The criminal defendant attempted to serve a non-party witness through a lawyer representing that witness in a related "civil case," and the court concluded that the subpoena had to be "served personally."  *Id.*  In this case, by contrast, Concord (unlike the witness in *Brennerman*) appeared voluntarily through counsel as a party to this case.  In other words, the subpoena is being served in the very case where Concord appeared and is represented by counsel.[10]

Concord is on no firmer ground when it notes (Doc. 8, at 8-9) that when Rule 17 addresses the "Place of Service," the rule distinguishes between service "In the United States" and service

---

[10] Concord seemingly suggests (*see* Doc. 288, at 5, 7) that some courts have required subpoenas to be served in person and directly on party witnesses.  But Concord does not justify that rule or acknowledge the disagreement among courts on that set of issues.  As noted, a number of courts have held that party witnesses may be served through the attorneys representing them.  *See* p.17, *supra*.  In fact, even with respect to non-party witnesses, the emerging trend in interpreting Rule 17 and its civil counterpart is that service is proper where the subpoena is delivered to the witness by intermediaries.  *See, e.g.*, *Ott v. City of Milwaukee*, 682 F.3d 552, 557 (7th Cir. 2012) (analyzing the text); *SEC v. Pence*, 322 F.R.D. 450, 453-455 (S.D.N.Y. 2017) (noting the "more recent line of cases").  And those cases that have suggested there must be "personal service" on party-witnesses have not, to the government's knowledge, addressed the import of Rule 49's provision for service on represented parties, or the scenario of a corporate party appearing solely through counsel.  They are mostly civil cases, concern individual (rather than corporate) parties, and generally rely on non-party cases without acknowledging the additional issues that arise.  Many also trace back to an unreasoned decision in *Harrison v. Prather*, 404 F.2d 267, 273 (5th Cir. 1968) (per curiam), about service on an individual.  The court of appeals affirmed a district court opinion "for the reasons" provided by the district court.  404 F.2d at 268.  The district court, in turn, merely quoted the then-applicable rule and stated without explanation that the subpoena "was not served in conformity with the rule."  *Id.* at 273 (appendix).

"In a Foreign Country."  Fed. R. Crim. P. 17(e).  The government is not attempting to serve a subpoena in Russia.  Any required service will occur where the Court has jurisdiction over Concord—in the United States.  Concord has chosen to appear in an American court in this District through its chosen attorney.  Under both Federal Rule of Criminal Procedure 49 and principles governing service on corporations, the government may therefore serve Concord by serving its attorney in this case in the United States.  The cases cited by Concord again ignore these basic points.  *See United States v. Gordon*, 634 F.2d 639, 645-646 (1st Cir. 1980) (denying defendant's motion to subpoena the President and "over 200 other persons," including 28 people in other countries, and explaining that the court had no "power to summon" witnesses "who were not within the United States, and were not citizens or residents of the United States"); *see also In re Grand Jury Subpoena*, 646 F.3d 159, 165 (4th Cir. 2011) (similar); *United States v. Moussaoui*, 382 F.3d 453, 462–63 (4th Cir. 2004) (similar).

### 3.  Concord's Sixth Amendment argument demonstrates its misunderstanding

Concord additionally asserts (Doc. 288, at 10-11), that transmitting a trial subpoena to its counsel in this case would "threaten[] [its] Sixth Amendment right to effective representation by counsel."  This argument only underscores Concord's misunderstanding of its counsel's role as its representative in this case, as well as Concord's misguided effort to selectively enjoy the benefits of the American criminal process without subjecting itself to the concomitant burdens.

The Sixth Amendment guarantees a criminal defendant "the Assistance of Counsel for his defense."  U.S. Const. Amend. VI.  This right serves "to assure fairness in the adversary criminal process," *Wheat v. United States*, 486 U.S. 153, 158 (1988), and includes a "correlative right to representation that is free from conflicts of interest."  *Wood v. Georgia*, 450 U.S. 261, 271 (1981).  A serious conflict of interest can give rise to what is essentially "a type of ineffective assistance of

counsel claim," where an attorney's interest potentially diverges from the client's, thereby calling into question whether the attorney represented the client's interests in the case. *United States v. Thomas*, 114 F.3d 228, 252 (D.C. Cir. 1997); *see also Holloway v. Arkansas*, 435 U.S. 475, 481-483 (1978); *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 199-200 (D.C. Cir. 2013).

No conflict exists here. Concord's argument is not that its attorney may be beholden to another client or has an adverse personal obligation. Concord's argument is simply that it would be better off if certain orders were never served at all. Attorneys representing clients in criminal cases regularly receive orders that a client may not wish to be bound by. If Concord were convicted and sentenced, Concord's attorney would receive the judgment. That does not create an unconstitutional conflict of interest. Rather, it honors Concord's right to be represented by counsel and Concord's choice to appear solely through counsel rather than through another representative, *see* Fed. R. Crim. P. 43(b)(1).[11]

## III. Concord's Asserted Conflict with Russian Law Does Not Render the Subpoena Unreasonable or Oppressive

Concord additionally contends (Doc. 288, at 15-34) that the Court should quash the subpoena with respect to requests three through six because it would force Concord to violate Russian law on treason, cyber security, commercial secrets, and personal data. Concord has failed to meet its burden to show that compliance with the subpoena would require Concord to violate Russian law. Quashing the subpoena would, in any event, be unjustified given the weighty

---

[11] Equally unavailing is Concord's contention that defense counsel "has no authority to go to Russia, make an unauthorized search for responsive documents in the files of a Russian corporation, and bring those documents to a United States courtroom for use in a prosecution against its client." Doc. 287, at 11. The subpoena is not directed to counsel; it is directed to *Concord*. How Concord chooses to comply with it is up to Concord. And like any other defendant or represented party served with a document subpoena, Concord can locate the necessary documents without "reveal[ing] confidential communications relevant to the search." *Id.*

interests here and the speculative and minimal harms from compliance.

### A.   Concord Has Not Carried Its Burden Of Showing That Compliance Would Place It In Violation Of Russian Law

As "the party who 'relies on foreign law," Concord "assumes the burden of showing that such law prevents compliance." *In re Grand Jury Subpoena*, 912 F.3d 623, 633 (D.C. Cir. 2019) (quoting *In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987) (per curiam)).   Concord has not come close to meeting that burden.   As discussed below and in the accompanying expert declaration of Professor Paul Stephan,[12] Concord's arguments are undeveloped and rest on strained interpretations of the applicable text and entirely-inapt examples.   While not strictly necessary, Concord has also provided no declaration from a recognized expert on Russian law, even though that is "[g]enerally, . . . the basic method by which foreign law is proved." *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 103 (D.D.C. 2014) (quoting *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984)); *see* Wright & Miller § 2444 (expert views are "the basic mode of proving foreign law"); *see, e.g.*, *United States v. Mitchell*, 985 F.2d 1275, 1280 (4th Cir. 1993) (noting "the frequent need for expert assistance in understanding and applying [foreign legal] materials").

*1. Treason*

Concord contends (Doc. 288, at 16-23), that producing the required IP addresses, records of Concord's payments to fund the IRA, and calendar entries (categories four, five, and six), could violate the Russian treason statute.   That law prohibits disclosure of "state secret[s]" and "any other assistance rendered to a foreign state . . . in activities aimed against the security of the Russian

---

[12] *See* Fed. R. Crim. P. 26.1 ("Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence.").   A number of American (and foreign) courts have credited and favorably cited Professor Stephan's views on Russian law.  *See* Stephan Decl. Ex. 1, at 22-23; *see, e.g.*, *Norex Petroleum v. Access Indus.*, 304 F. Supp. 2d 570, 577-578 (S.D.N.Y. 2004); *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 700-704 (S.D.N.Y. 2003).

Federation."   Art. 275.   As a threshold matter, Concord does not actually claim that producing these records would, in fact, violate the Russian treason law.   Instead, citing press accounts of treason prosecutions, Concord declares that the statute is "broad," Doc. 288, at 16-17, and then suggests that the Russian government could possibly view compliance as treason.   *See, e.g., id.* at 19 (asserting that Russia "could easily take the position" that Concord committed treason); *id.* at 20 (Russia "may perceive compliance with the subpoena" as treasonous); *id.* at 22 (conduct "could easily fall within the scope" of that law).   That is insufficient.   Concord bears "the burden of showing that [Russian] law prevents compliance." *In re Grand Jury Subpoena*, 912 F.3d at 633. Concord must show a "true conflict." *Sealed Case*, 932 F.3d at 931.   Concord's assertions that compliance "could" violate Russian law or that the Russian government "could" or "may" take that position does not attempt to meet that controlling legal standard.[13]

In any event, the Russian treason statute does not prohibit Concord's compliance with the requested trial subpoena.   As Concord admits, the subpoena does not seek any "state secret." Concord therefore must establish that complying with the subpoena would constitute "financial,

---

[13] Concord has not and cannot contend that the subpoena would be unreasonable and oppressive if compliance did not require violating Russian law but Russian officials might retaliate against Concord for complying.   As the Stephan Declaration explains, "[w]hile prosecutorial abuse can exist and first-instance courts may not always provide a sufficient check, the Russian court system as a whole strives to uphold the law," and "[t]he possibility that compliance with foreign law might irritate the political leadership does not mean that prosecution and conviction are a likely consequence."   Stephan Decl. ¶ 23.   More to the point, the threat of extra-legal retaliation is not a basis to invalidate a subpoena.   *See In re Grand Jury Proceedings*, 943 F.2d 132, 135 (1st Cir. 1991); *In re Grand Jury Proceedings*, 914 F.2d 1372, 1375 (9th Cir. 1990); *In re Grand Jury Proceedings*, 713 F.2d 616, 617 n.1 (11th Cir. 1983) (per curiam); *United States v. Field*, 532 F.2d 404, 408 (5th Cir. 1976).   "Absent a clash of foreign and domestic law, American courts may press forward free from worry that their rulings will threaten the international legal ties that advance the rule of law within and among nations." *Sealed Case*, 932 F.3d at 931 (quotation marks omitted); *see In re Grand Jury Subpoena*, 912 F.3d at 633 (requiring a "showing that [foreign] law prevents compliance"); Restatement (Fourth) of the Foreign Relations Law of the United States § 442, rptr n. 2 (2018) ("The question of foreign-state compulsion arises only when a person cannot comply with both federal and foreign law.").

material, technical, consulting or any other assistance rendered to a foreign state . . . in activities aimed against the security of the Russian Federation." Art. 275.[14]

The most apparent problem with Concord's position is that this criminal trial is not an "activit[y] aimed against the security of the Russian Federation." Art. 275. This is a prosecution of a private company that has repeatedly declared it is not part of the Russian government and has sought to distance its activities from that of the Russian government. The government does not intend to argue at trial that the conduct at issue was undertaken at the command of the Russian government. And even if the prosecution suggested that the Russian state played a role, that would neither concern "*the security* of the Russian Federation" nor be "aimed" against it. Art. 275 (emphasis added). As Professor Stephan's declaration explains, Article 275 does not apply to "assistance rendered to foreign activities to which the government of the Russian Federation might be opposed." Stephan Decl. ¶ 17; *see also id.* ¶ 15 n.10 (discussing the explanatory notes to the 2012 amendments and explaining that while the defendant's motive need not be hostile, it must "assist foreign activity with a hostile purpose"). The "activity in question has to pose a threat to the nation's security, not merely to what its government views as its range of interests." *Id.* ¶ 17; *see id.* ¶ 21 (explaining that Article 275 "gives 'security' a limited definition, and does not confuse it with general policy interests of the Russian political leadership"); *see also id.* ¶¶ 17-19 (explaining the history and development of that rule).[15]

---

[14] As Professor Stephan's declaration notes, the 2012 amendment deleted the word "hostile," which appears in Concord's translation, but did so only to clarify that the defendant need not have a hostile motive while nonetheless preserving the meaning that the activity must have a hostile purpose in being "aimed against the security of the Russian Federation." Stephan Decl. ¶ 15 n.10.

[15] Concord's prior acknowledgement (Doc. 237, at 10 n.3) that Russia is considering a bill barring the provision of information "that leads to the imposition of sanctions" underscores that under existing law, activities that may be bad for Russia or loosely relate to national-security concerns are not "aimed against the security of the Russian Federation." Art. 275.

Concord also fails to show that complying with a trial subpoena would constitute providing "assistance." *See* Stephan Decl. ¶ 20 (questioning whether, in light of the law's stated policies and history, "complying with a lawful order of a foreign court with jurisdiction over the person concerned would count as assistance"). Complying with a court order is not typically considered providing "assistance" to the court or the other parties to the case. To be sure, "providing financial, material, technical, consulting or any other assistance" is textually broad. But when reading a list, it is natural to read expansive terms in light of the other items, so as to avoid giving them "unintended breadth." *Gustafson v. Alloyd Co.*, 513 U. S. 561, 575, (1995); *see* Stephan Decl. ¶ 20 ("As a general rule of interpretation in Russian law, the concrete terms are understood as modifying 'any other' so as to limit the possible applications of those words," and "[h]ence indirect acts based on existing legal obligations would not be considered 'other assistance' within the meaning of Article 275"); *see also, e.g., Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality op.) (reading "tangible object" in light of accompanying terms).

Concord provides no argument based on the text of this statute, an expert declaration, or scholarly commentary. And Concord's exemplary prosecutions do not come close to meeting its burden. To the contrary, Concord relies on critical media accounts that broadly characterize Russian practice, *e.g.,* Doc. 288, at 17, provide no information about the charged conduct, *e.g.,* Doc. 288, at 17 & Ex. 3, or describe prosecutions for vastly distinguishable conduct, *e.g.*, "The Career Boot" (cited at Doc. 288, at 17) (prosecution for "divulging classified information"); "Russian woman faces 20 years in prison" (cited at Doc. 288, at 18-18) (calling Ukrainian embassy to report deployment of Russian special forces); Doc. 288, at 18 (communications about Russian military movements). *See* Stephan Decl. ¶ 22 (explaining that Concord's cases appear to involve "revealing information regarding Russian military or clandestine activity" and therefore concern

"the state-secrets prong of the treason definition, not the providing-assistance prong").

Concord posits (Doc. 288, at 19) that because American officials have suggested that the activities charged in this case may have been tied to the Russian government's efforts to interfere in the 2016 election, "the Russian government could easily take the position" that responding to the subpoena "would assist the United States in a matter where the U.S. government has publicly accused the Russian government of misconduct."  But "publicly accusing Russia of misconduct" is distinct from any activity "aimed against the security of the Russian Federation."  Art. 275.  And the subpoena here concerns a criminal trial where the government agrees it will not introduce evidence of a Russian government role in the charged crime.

Concord's also argues that the U.S. government could theoretically use the evidence submitted in response to this subpoena as a basis for sanctioning Russians or mounting cyber attacks.  *See* Doc. 288, at 19-21 & n.3.  This argument fails at every turn.  The sanctions framework that Concord cites is not law; it is a proposed bill authorizing sanctions of Russia's "finance sector" if Russia interferes in non-U.S. elections.  *Id.* at 19.  Concord's attorney does not proffer that any responsive records will show interference in other country's elections or bear on cyber warfare.  And in any event, Concord does not explain why its compliance with a trial subpoena would constitute "assistance" to such activities or why sanctions of the financial sector, for example, would be a "hostile activit[y] aimed against the security of the Russian Federation."  As Professor Stephan explains, "actions that might increase the exposure of the Russian Federation or its officials to foreign trade, travel, or financial sanctions could not be considered as implicating 'the security of the Russian Federation' within the meaning of Article 275, unless those measures would pose an existential threat to Russia."  Stephan Decl. ¶ 24.

Concord also mistakenly suggests (Doc. 288, at 20-22) that because Russia and the United

States have a mutual legal assistance treaty, complying with this subpoena may somehow damage Russian security.  The mutual legal assistance treaty is not exclusive and does not bar either country from seeking information through other means.  *See, e.g. In re Grand Jury Subpoena*, 646 F.3d 159, 165 (4th Cir. 2011) (interpreting similarly worded MLAT); *see also* Stephan Decl. ¶¶ 40 n.14, 50. Working outside of a mutual legal assistance treaty also does not constitute harm to Russian national security.  Article 275 does not "equate[] Russian sovereignty with Russian security."  Stephan Decl. ¶ 25 (noting that the Russian Duma "rejected" such a version); *see id.* ¶¶ 17-19 (detailing the distinction between "the security of the Russian Federation" and other "sovereign interests").  Nor could Concord's producing its own business records in response to a subpoena be a "hostile activit[y] aimed against" Russian state security.  As discussed, it is fanciful to believe that the Russian government would have complied with an MLAT request for this case.  But if anything, the fact that the Russian government sometimes obtains and provide records for U.S. criminal cases only underscores the implausibility of Concord's argument that providing its own business records would be treason.

Finally, Concord has also not met its burden to show why, even if compliance otherwise constituted treason, Concord could not avoid liability by immediately reporting it to the Russian government.  Article 275 contains a defense if the otherwise offending party "voluntarily and promptly communicate[s] to the authorities or otherwise contributed to the prevention of further damage to the interests of the Russian Federation and if his actions do not contain other composition crime."  Art. 275.  Complying with the subpoena would not contain any other "composition crime." Concord cites (Doc. 288, at 23) a student writing, which posits that this exception applies only to "completed crimes, *i.e.,* when a voluntary renunciation of the crime is no longer possible" and when the government is not yet aware of the crime.  Doc. 288 Ex. 7, at 2.

Even assuming that this interpretation were correct, Concord could notify the Russian government after it has provided the information, thus helping Russia to address whatever theoretical harm could come to the Russian state.  *See* Stephan Decl. ¶ 25.  While the motion for a trial subpoena was filed on a public docket, it is unclear whether the Russian government is aware of the subpoena, and Concord's compliance (which Concord has suggested may not occur) would not necessarily be public.  *Cf.* Restatement Fourth § 442 cmt. e (a person may rely on conflicting foreign law if he "makes serious efforts to secure a release from or waiver of a foreign prohibition").  Although less straightforward than the other problems with Concord's argument, this is a further reason to find that Concord has not met its burden.

2. *Cyber Security*

Concord next contends (Doc. 288, at 24) that providing the IP addresses it used from 2014-2018 would violate a Russian cyber-security law.  That law bars "[i]llegal access to legally protected computer information, if such action has entailed the destruction, blocking, modification or copying of computer information."  Art. 272.  Concord again does not actually argue that compliance would violate Russian law.  Concord does not contend that sharing its own historic IP addresses involves "illegal access" to anything, "protected computer information," or "destruction, blocking, modification, or copying of computer information."  *Id.*

Concord's only argument is that *if* the U.S. government later used the IP addresses to mount a cyber attack, the U.S. government could be violating Article 272, and in that circumstance Concord could be viewed as an "accomplice."  Doc. 288, at 24.  It is unclear whether any hypothetical U.S. cyberattack would violate Article 272.[16]  But more to the point, Concord does

---

[16] Concord bases that assertion on "one Russian case," where a defendant was convicted "for using IP addresses."  Doc. 288, at 24.  In that case, however, the charged defendant "illegally copied" certain "user names and password" and then "illegally connected to the Internet" and used

not justify its apparent assertion that providing any information which could theoretically later be used to commit a crime—even with no intent to facilitate such a crime—would render someone an accessory under Russian law.  Rather, as Professor Stephan explains (Decl. ¶¶ 30-32), accessory liability requires a sufficient mens rea, and even negligence (which would not be the case when complying with a court order) is not enough.  The accessory must have engaged in the criminal conduct "purposively."  *See* Art. 24.

Concord's interpretation implausibly suggests that providing almost any computer information—such as posting computer models online to solicit technical support—is a violation of Article 272.  The applicable mens rea requirement prevents such an absurd result.  And here, Concord would be acting with a plainly non-culpable purpose: complying with a court order.  As Professor Stephan explains, "Russian law does not regard the provision of information under compulsion of law as constituting purposive assistance to any and all uses to which that information is put."  Stephan Decl. ¶ 32.  "A person who complies with a subpoena would be regarded as having the purpose of not obstructing a particular criminal prosecution," and "Russian law would regard the possibility that the U.S. government might exploit the information provided to commit a crime on Russian territory as a contingency over which the person providing the information would have no control."  *Id.*  With "no purpose to facilitate" any future violation of Article 272, Concord would not have broken any law.  *Id.*

Additionally, separate and aside from the required scienter, Professor Stephan explains that a generally applicable defense would apply for "a person 'acting in execution of an order or instruction binding on him'" unless "known to be illegal."  Stephan Decl. ¶¶ 33-34 (quoting Article

---

that stolen information to "block[] the authorized users from the access to the Internet," causing quantifiable financial damage .  Doc. 288 Ex. 8, at 3.

42(1) and comparing this to a "general duress defense").  Concord does not address that provision of Russian law at all.  By its terms, it is not limited to orders from Russian courts or officials.  To be sure, the order must be "binding."  Foreign courts therefore could not willy nilly order violations of Russian law, because Russians are not typically subject to the jurisdiction of foreign courts.  *See generally* Restatement Fourth § 483 & cmt. e (absence of personal jurisdiction is a common basis not to recognize a foreign court order).  And the order cannot be the sort of act "known to be illegal."  *See* Stephan Decl. ¶ 34 (discussing the content of that exception).  But where a Russian company subjects itself to the jurisdiction of a foreign court, complying with an order of that court to produce what are essentially ordinary business records would typically be a defense to criminal liability in Russia.  Concord's failure even to address potential defenses to liability further shows its failure to meet its burden.

### 3. Commercial Secrets

Concord next argues (Doc. 288, at 24-26) that producing its records of payments from Concord to fund IRA activities (subpoena category four) would violate a Russian law on transmission of commercial secrets.  That law prohibits "[i]llegal disclosure or use of information classified as a commercial, tax or banking secret, without the consent of the owner thereof." Art. 183.  As an initial matter, it is difficult to see how a payment record could disclose "a commercial . . . secret."  Concord makes no attempt to show that it would, and that itself is a basis to reject the argument.  The statute defines a commercial secret as, among other things, having "commercial value" that is derived from its "confidentiality."  Stephan Decl. ¶ 37 (describing Federal Law No. 98-FZ of July 29, 2004, on Commercial Secrecy, Article 3(1), Exhibit 10 to Concord's Motion).  Concord does not explain why records of its own financial transactions would have "commercial value" at all, let alone "commercial value" derived from "confidentiality."

Concord also fails to explain how Concord is not the "owner" of the information being sought—records in Concord's possession or control of Concord's payments funding the IRA. Art. 183; *see also* Stephan Decl. ¶ 38 (Article 183 applies "only to the gathering of another person's information" and "would not apply to any information belonging to Defendant, even if that information were to qualify as Defendant's commercial secret").   Concord makes a passing assertion (Doc. 288, at 25) that because the subpoena covers payments made by Concord "directly or through another organization," the records were "likely" "obtained from third parties."   That argument could only apply to whatever records concern payments made through another organization, and Concord makes no proffer about the nature of the records it has in mind.  More to the point, Concord also makes no argument about why Concord is not the "owner" of whatever information Concord's records of Concord's payments made through another entity would show.

This provision also applies only to "*[i]llegal* disclosure" of commercial secrets.  Art. 183 (emphasis added); *see* Stephan Decl. ¶ 39.  But as Professor Stephan explains, "Russian law would not regard compliance with a valid subpoena issued by another country to a person over whom that country has jurisdiction as illegal in the absence of Russian legislation outlawing such compliance."  *Id.*; *see id.* ¶¶ 40-41.  Relatedly, the same general defense for complying with binding court orders would apply here.  *See id.* ¶¶ 42-43.

Rather than rely on the statutory text, legislative history, or expert views, Concord describes (Doc. 288, at 25-26) one example of a prosecution under this statute.  That example confirms that Concord's compliance would not violate the Russian commercial secrets law.  The case made clear that a "commercial secret" is "information about the means of carrying out professional activity, which has an actual or potential commercial value by virtue of it being unknown to third parties and in relation to which the owner of such information has imposed a

regime of commercial secrecy."  Doc. 288 Ex. 9, at 2-3.  As noted, Concord does not seriously argue, let alone meet its burden to show, that the requested records contain such information.  In fact, Concord does not even aver that its work with the IRA was "commercial" at all.  The cited case also concerns two contractors who performed work for a company and agreed to keep confidential the covered commercial secrets.  *Id.* at 3-4.  Here, by contrast, Concord does not demonstrate that its own payments describe information owned by someone else or that they were subject to rules of secrecy.  And Concord's example involves expropriation for personal gain.  Here, by contrast, it would involve compliance with a court order issued by a court in which Concord voluntarily appeared, filed motions, and accepted significant discovery.

### 4. Personal Data

Finally, Concord asserts (Doc. 288, at 26-31) that providing communications in its possession between Concord employees and certain individuals (subpoena category five) and calendar entries in its possession reflecting meeting between Yevgeniy Prigozhin and certain individuals (category six) would violate a Russian personal data law.  That law concerns "the processing of personal data." 152-FZ, Art. 1.  It is not a criminal statute; rather, it is an administrative provision backed by a fine of $16 to $55.  Stephan Decl. ¶ 45.  It generally describes rules of accuracy and privacy for such data processing, *id.* Art. 5, including a non-disclosure provision cited by Concord, 152-FZ Art 7.

The personal data law contains clear exemptions for conduct undertaken in connection to a "constitutional, civil, administrative, criminal proceedings, or proceedings of commercial courts," or if "processed for the purpose of exercising the rights and lawful interests of the operator or third persons."  *Id.* Arts. 6(1)(3), 6(1)(7).  Both exceptions would apply here, where Concord would be responding to a judicial order issued as part of a criminal proceeding, and where Concord

would be doing so to comply with its own legal obligations.  *See* Stephan Decl. ¶¶ 47-50 (reaching this conclusion based on, *inter alia*, the statutory text and "the overall focus of the Personal Data Law on exploitation of personal data for commercial gain").  Concord does not address these exceptions.  In its initial reply to Concord's surprising assertion of a conflict with the provision, the government located an article stating that no privacy protection "is granted against disclosure to the responsible authorities in the course of an official investigation"[17]  Concord claims (Doc. 288, at 30) that this article referred only to Russian authorities.  But Concord then quotes a different section of the article explaining what is a "competent authority" that can prosecute business crimes in Russia.  As Professor Stephan agrees (Decl. ¶ 47 n.16), Concord is simply mixing up answers to different questions raised in the article.  Concord may now claim (in what will now be its third filing on this issue), that the exception is limited to Russian proceedings or legal obligations imposed by Russian law.  But the exemptions are not written in such narrow terms. This is in stark contrast other provisions that specifically reference laws or governmental bodies "of the Russian Federation."  *See* Art. 6.  *Cf. First Nat'l City Bank of NY v. IRS*, 271 F.2d 616, 619-620 (2d Cir. 1959) (interpreting provision in the Panamanian Constitution permitting documents to be seized only by "a competent authority" to include seizure by U.S. authorities pursuant to U.S. law).

Concord also does not meet its burden to show that producing its own corporate communications or calendars would impermissibly disclose other people's "personal data." The subpoena here concerns communications and calendar entries by Concord employees on Concord's corporate systems for what appear to be activities undertaken on behalf of Concord.  A corporation is an artificial entity and cannot create records for itself.  By definition, any corporate record will have been created by an individual; an email will have been sent by an individual; and

---

[17] http://www.mondaq.com/russianfederation/x/641110/Crime/Business+Crime+2018

any calendar will reflect an event attended by an individual.  It would be surprising if a corporation cannot permissibly share its own records because they bear a human being's name or suggest what employee was involved in the company's activities.  If the statute applies so broadly, moreover, and if Concord actually believes it would be enforced, then Concord's employment agreements or IT policies would likely include some form of waiver.  *Cf.*  Nicolas F. Palmieri III, *Who Should Regulate Data*?, 11 Hastings Sci. & Tech. L.J. 37, 41-43 (2020) (noting the pervasiveness of broad consents to address such risks).  Concord does not address these issues and makes no proffer about any policies or understandings governing these files.  In any event, if Concord's emails and calendar entries would reveal personal data simply because they bear individuals' names, Concord could seek to redact solely the names.  (If so, the government could expand its request for calendar entries to apply to meetings that include other Concord officers.)

*   *   *

In sum, as a party seeking to quash a subpoena based on an asserted conflict with foreign law, Concord bears a heavy burden.  Concord must do more than raise questions; Concord must "show[] that such law prevents compliance."  *In re Grand Jury Subpoena*, 912 F.3d at 633. Concord cannot meet and has not come close to meeting that burden.

**B.     Even If Concord Had Shown A Foreign Law Conflict, The Requested Subpoena Would Not Be Unreasonable Or Oppressive**

Even if Concord were able to show that the subpoena would subject Concord to conflicting legal obligations (and it is not), the subpoena still would not be unreasonable or oppressive.  The operation of foreign law "do[es] not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute."  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*, 482 U.S. 522, 544 n.29 (1987); *see In re Sealed Case*, 932 F.3d at 931-939.  "[A]lthough courts recognize comity as an

important objective, there is little doubt that '[a] United States Court has the power to order any party within its jurisdiction to testify or produce documents regardless of a foreign sovereign's views to the contrary.'" *In re Sealed Case*, 832 F.2d 1268, 1283 (D.C. Cir. 1987) (citation omitted); *see also* Restatement Fourth § 442 cmt. e ("When courts in the United States have jurisdiction to adjudicate, adjudication should take place on the basis of the best information available"); Note, *The Aerospatiale Dilemma: Why U.S. Courts Ignore Blocking Statutes and What Foreign States Can Do About It*, 106 Cal. L. Rev. 231, 245 (2018) (surveying post-*Societe Nationale* federal authorities and finding "[c]ourts compelled foreign parties to produce discovery in violation of foreign law in thirty-seven of . . . forty-two contemplated orders").

If confronted with such a conflict, courts must engage in a comity balancing that considers a "constellation of factors" including the importance of the requested records, the degree of specificity, where the information originated, the availability of alternative means to obtain the same records, the extent to which noncompliance would undermine important interests of the United States and of the country where the information is located, hardship on the subpoenaed party, and whether that party has acted in good faith. *Sealed Case*, 932 F.3d at 931-932; *see Société Nationale*, 482 U.S. at 544 n.28; Restatement (Third) of Foreign Relations Law of the United States § 442(1)(c) (1987) (Restatement Third). These factors weigh strongly in favor of requiring compliance notwithstanding the asserted foreign-law conflict.

**1.** Most significantly, the United States has an overwhelming interest in obtaining evidence that bears on this case. This kind of multi-factor balancing arises in a range of contexts, including private civil litigation. *See, e.g., Societe Nationale*, 482 U.S. at 525. The importance of abiding by an American subpoena is at its weightiest here. "The United States has a strong national interest in the effective enforcement of its criminal laws." *United States v. Davis*, 767 F.2d 1025, 1035

(2d Cir. 1985); *see United States v. Vetco, Inc.*, 691 F.2d 1281, 1288 & n.9 (9th Cir. 1981) (in conducting comity analysis, "[i]t is important to distinguish between action brought by the government . . . and private suits"); *see also Davis*, 767 F.2d at 1035 (because "the subpoena . . . arose in the course of a criminal suit brought by the United States government" court "accord[ed] some deference" to the government's decision that the "benefits of disclosure" outweigh any diplomatic friction); *cf. Pasquantino v. United States*, 544 U.S. 349, 369 (2005) (discounting risk of "international friction" where the federal government initiated the case); *United States v. Sinovel Wind Group*, 794 F.3d 787, 792 (7th Cir. 2015) (similar). This is all the more so in a criminal trial and one where the charged conduct is a systematic effort to interfere in a presidential election and a conspiracy to impair through deception the government agencies charged with monitoring, regulating, and enforcing laws concerning foreign influence. The interests of the United States are threefold: the general interest in enforcing the nation's criminal laws that most often carries the day in a comity balancing; the further interest of the American judicial system in conducting trials with all admissible evidence; and the importance of the United States "defend[ing] itself against obstruction, or fraud," *United States v. Bowman*, 260 U.S. 94, 98 (1922) (discounting presumption against extraterritoriality).

The subpoena is also specific, and the requested records are important to the proceedings before this Court. In contrast to what is the more common scenario in criminal cases where a grand jury subpoena would cause a conflict with foreign law, *see, e.g., Sealed Case*, 932 F.3d at 919, the subpoena here must comply with Rule 17's requirements of relevancy, admissibility, and specificity. *See United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299-301 (1992) (contrasting the standards for grand jury and trial subpoenas). In fact, because the government is asking the Court to direct Concord "to produce the designated items in court before trial," Fed. R. Crim. P.

17(c)(1), and because Concord moved to quash, this issue will only arise if the Court independently finds that Rule 17's requirements are satisfied. *Cf. Cheney v. United States Dist. Court*, 542 U.S. 367, 387 (2004) (explaining that for a Rule 17 subpoena to overcome executive privilege, the specificity required by *Nixon* and confirmed by a court "serves as an important safeguard"). The government believes that the requested evidence is important in this case. As discussed above, the government has reason to believe that the requested records exist and are in Concord's control and that the government cannot obtain the same information elsewhere. And as also discussed above, the requested subpoena is tailored to those categories of documents. Concord thus gets thing exactly backwards when it suggests (Doc. 288, at 32), that because this case has already been indicted, the subpoenaed documents could not be of much importance. Brushing away Concord's rhetoric, its argument appears to be that once a case has been indicted, records cannot be very important. *See id.* But some important records cannot be obtained prior to indictment. And in the context of a trial subpoena, the requested records are calculated to a particular and focused use.

Concord wrongly suggests (*id.* at 33; *see id.* at 21-22) that the need for the subpoenaed records can be addressed through public records and through a request to the Russian government in accordance with the mutual legal assistance treaty. This is not a "'substantially equivalent'" method to secure the relevant information. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992) (quoting *Vetco*, 691 F.2d at 1290). The possibility of an MLAT request does mean that conflicting legal obligations render the subpoena unreasonable or oppressive but rather is just one of many factors to consider. *See, e.g.*, *Societe Nationale*, 482 U.S. at 541-546; *Sealed Case*, 932 F.3d at 936-939; *Sealed Case*, 832 F.2d at 1283-1284. Among other things, "evidence-sharing arrangements set up by international agreements, although often valuable, can also prove 'unduly time consuming and expensive, as well as less certain' than court-

enforced subpoenas 'to produce needed evidence.'" *Sealed Case*, 932 F.3d at 938 (quoting *Société Nationale*, 482 U.S. at 542); *see also, e.g., In re Grand Jury Proceedings (Bank of Nova Scotia)*, 691 F.2d 1384, 1390 (11th Cir. 1982) ("Applying for judicial assistance [from the Supreme Court of Bahamas], however, is not a substantially equivalent means for obtaining production because of the cost in time and money and the uncertain likelihood of success in obtaining the order."); *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 793 (S.D.N.Y. 2012) ("'the mere fact [of] an alternative method for obtaining the documents is not proof that it is necessarily effective, or efficient, for doing so in this case'" (citation omitted)).  As discussed above, the government has good reason to conclude here that an MLAT request to Russian government for records would likely result in "inadequate production of documents," *Sealed Case*, 932 F.3d at 934.

**2.**  The countervailing considerations are not significant.  Although national security, computer network integrity, commercial secrets, and privacy are weighty interests, the harm to those interests from disclosing particular the records requested here is non-existent or minimal. For these statutes to apply at all (which they do not) would require imparting on them an expansive reading that would effectively render them blocking statutes applicable to any disclosure of information, even in compliance with a U.S. subpoena, that might embarrass Russia, be useful in any later conduct adverse to Russia, describe any corporate practice, or include the names of any individuals.  As discussed, that is not the correct meaning of the Russian statutes cited by Concord. But if it were, these would be the types of "general" foreign-state interests that courts should not weigh heavily. Restatement Third § 442, cmt. c; *see also Societe Nationale*, 482 U.S. at 544 n.29 (foreign state's "blocking" statute "is relevant" to "comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds

of material."); *United States v. First Nat'l City Bank,* 396 F.2d 897, 903 (2d Cir. 1968) ("mere existence of a bank secrecy doctrine" does not automatically mean that its violation would undermine "an important public policy of [the enacting country]").

The many exceptions to the statutes at issue further undermine any claim of harm to important interests.  As discussed, the statutes at issue contain exceptions—several of them quite broad.  Even if, for example, compliance with an American subpoena does not satisfy an exception for binding orders or criminal proceedings, the many ways that Concord could legally give the requested records to other courts and third parties undermines any claim that doing so here would seriously injure the security or privacy interests at issue.  *See, e.g., Davis,* 767 F.2d at 1035 (applicable exceptions undermined competing foreign interest); *In re: Grand Jury Proceedings Bank of Nova Scotia*, 740 F.2d 817, 826 (11th Cir. 1984) (noting that a bank secrecy law was not a "blanket guarantee of privacy" and had "many exceptions"); *Vetco*, 691 F.2d 1289 (discounting secrecy interest that applies only to certain persons and permits them to consent); *United States v. Field*, 532 F.2d 404, 408 (5th Cir. 1976) (reasoning that if the requested information is "obtainable" by the home country, then it is "difficult to understand how . . . rights of privacy would be significantly infringed simply because the investigating body is a foreign tribunal").  Concord's only attempt to suggest a specific Russian interest here is its assertion (Doc. 288, at 33) that complying with the subpoena "could expose Russia and its citizens to harmful economic sanctions and military cyberattacks."  As discussed, that contention is speculative and fanciful.[18]

Concord has also provided little reason to believe that it would, in fact, be prosecuted.  At

---

[18] Additionally, if as Concord suggests, the Russian government would plausibly obtain the requested records from Concord and produce them to the American government, then the issue would not be about national security, cyber security, or privacy, but instead just a dispute about the appropriate means of production.

most, Concord's "violation" would appear to be a tangential application of the statutes, unlike any example cited by Concord, and compelled by a U.S. court order. Any claimed hardship warrants little if any weight where there is no example of someone being prosecuted under similar circumstances. *See Linde v. Arab Bank, PLC*, 706 F.3d 92, 114 (2d Cir. 2013); *Vetco, Inc.*, 691 F.2d at 1289; *see also* Restatement Fourth § 442, cmt. b (foreign-state-compulsion defense "requires," *inter alia*, that "risk of punishment must not be purely hypothetical"). In fact, governments are particularly unlikely to prosecute their citizens for disclosing business records to foreign governments and when ordered by foreign courts. *See, e.g., Linde*, 706 F.3d at 114. Concord's suggestion that the Russian State has an interest in Concord, a hypothetical cyber-attack on Concord, and sanctions related to Concord's activities further call into question whether Russia would prosecute Concord. *Cf. Societe Nationale*, 482 U.S. at 528 n.10, 544 n.29 (corporation owned by government "stand[s] in most advantageous position" in decision whether to prosecute); *Societe Internationale v. Rogers*, 357 U.S. 197, 205 (1958) (Swiss banking company was "in a most advantageous position to plead with its own sovereign for relaxation of penal laws" relating to bank secrecy). With respect to the personal data law, moreover, the prohibition is not even classified as "criminal," and any violation would result in only a small fine—the equivalent of $16 to $55. Stephan Decl. ¶ 45; *see* Restatement Fourth § 442, rptr n. 3 ("To excuse compliance with U.S. law, the likely foreign sanctions must be severe.").[19]

       Finally, Concord has shown little good faith. It chose to appear in this case, has obtained

---

[19] Concord additionally declares (Doc. 288, at 34) that complying with the subpoena would be a "hardship" because it would "adversely affect the lawyer-client relationship between counsel and Concord" and may require defense counsel to withdraw. As discussed, Concord's Sixth Amendment is entirely meritless; this contention could be made by any party who believes that complying with a court order is not in its interests. But as also relevant here, Concord does not explain why this asserted hardship bears on the potential for a conflicting foreign legal obligation to render the subpoena invalid.

substantial discovery, and continues to seek additional information about how the United States detected its activities and detects and responds to related activities more generally. But when facing a trial subpoena, Concord has shown no sign of trying to comply. It claimed that notwithstanding its prior representations, this Court lacks jurisdiction. And it made blanket, speculative assertions about what it views as possible conflicts with Russian law rather than providing any proffer about the responsive records or seeking ways to produce them that might mitigate any risk. *See* Restatement Fourth § 442 rptr n. 4 (courts "have attached great significance to the efforts of the person facing conflicting legal demands to cooperate with authorities"). Foreign entities should not lightly be permitted to come to American courts while shielding themselves from the same obligations that would apply to American defendants. *Cf. Bank of Nova Scotia*, 740 F.2d at 828 (explaining that where a bank "voluntarily elected" to do business abroad, it "accepted the incidental risk of occasional inconsistent governmental actions" and "cannot expect to avail itself of the benefits of doing business here without accepting the concomitant obligations"). That is what Concord is doing. Concord's claim to "good faith" (Doc. 288, at 34) should therefore also ring hollow.

## CONCLUSION

For the foregoing reasons, Concord's motion to quash should be denied, and the Court

should direct Concord to produce the designated items in court before trial.


Respectfully submitted,


JOHN C. DEMERS                                    JESSIE K. LIU
Assistant Attorney General for National Security  United States Attorney

By: /s/                                           By: /s/
Heather N. Alpino                                 Luke Jones
U.S. Department of Justice                        Peter Lallas
National Security Division                        Jonathan Kravis
950 Pennsylvania Ave. NW                          555 Fourth Street NW
Washington, D.C. 20530                            Washington, D.C. 20530
Telephone: (202) 514-2000                         Telephone: (202) 252-6886

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**CONCORD MANAGEMENT AND CONSULTING LLC,**<br><br>**Defendant.** | **Crim. No. 18-CR-32-2 (DLF)** |

## DECLARATION OF PROFESSOR PAUL B. STEPHAN AS AN EXPERT WITNESS WITH RESPECT TO ISSUES OF RUSSIAN LAW RELEVANT TO DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S MOTION QUASH UNSERVED EARLY RETURN TRIAL SUBPOENA AND THE GOVERNMENT'S RENEWED MOTION FOR EARLY RETURN TRIAL SUBPOENA

## I.    *Introduction*

1.    My name is Paul B. Stephan. The United States has asked me to provide an expert opinion on Russian law as it pertains to the motion ("Defendant's Motion) by Defendant Concord Management and Consulting LLC ("Defendant") to quash the early return subpoena ("subpoena") and the government's renewed motion for that subpoena.

2.    To summarize my conclusions in this report, it is my opinion that:

    a.    Russian law does not create significant legal jeopardy for Defendant were it to comply with the early return subpoena.

    b.    In particular, compliance with the subpoena would not put Defendant in violation of Articles 183, 272, or 275 of the Russian Criminal Code or Russian Federal Law No. 152-FZ of July 27, 2006, as amended ("Personal Data Law").

## II.   *Qualifications and Expertise*

3.      I am the John C. Jeffries, Jr., Distinguished Professor of Law at the University of Virginia.
I also am a member of the bars of the Supreme Court of the United States, the United States
Court of Appeals for the District of Columbia Circuit, the United States Tax Court, the
District of Columbia, and the Commonwealth of Virginia. From 1993 through 1998 I
served as a consultant to the U.S. Department of the Treasury with respect to its program
to assist tax reform in the former Soviet Republics, with a particular focus on the Russian
Federation. From August 2006 until December 2007, I served as Counselor on
International Law in the Office of the Legal Adviser, U.S. Department of State, on leave
from my university. From 2012 until 2018, I served as coordinating reporter for the
American Law Institute's Restatement (Fourth) of the Foreign Relations Law of the United
States. I obtained my B.A. and M.A. degrees from Yale University in 1973 and 1974,
respectively, and my J.D. degree from the University of Virginia in 1977. The full details
of my academic career, my experience as a consultant and adviser on matters of Russian
law, and my research and publications are provided in my resume, attached to this report
as Exhibit 1.

4.      From the start of my academic career I have concentrated on Soviet and Russian law,
politics, and economics, in addition to tax law, international law, and the organization and
regulation of international business transactions. I have taught a course related to Soviet or
Russian law in virtually every one of the 41 years I have worked as a law professor. I read
Russian and have substantial facility with Russian legal terminology; my scholarship has
been published in Russian as well as English. The English version of most of the Russian
legal sources that I attach to this Declaration (exhibits 2-3, 5-7, 9-11) are my own

translations; I also correct one mistake in the translated document identified as Exhibit 2 to Defendant's Motion and clarify the translation of the document identified as Exhibit 11 to Defendant's Motion.

5.    After the dissolution of the Soviet Union, I took part in the law reform process in the former republics of the Soviet Union, with the bulk of my activities involving the Russian Federation. In 1992-1993, legal specialists working on behalf of the Russian government solicited my advice concerning the framing of the Russian Federation's new Constitution, which was ratified at the end of 1993. During this period, I also advised members of the State and Law Administration of the Office of the President of the Russian Federation concerning organization of the judicial system and the conditions for promoting judicial independence. I played a central role in establishing the presence of the American Bar Association's Central and East European Law Initiative in Russia.

6.    From 1993 to 1998, I was employed by a number of government and international bodies in connection with law reform projects in this region, including the International Monetary Fund, the World Bank, the Organization for Economic Cooperation and Development, the U.S. Department of the Treasury, and the U.S. Federal Bureau of Investigation. I also organized or directed programs to train Russian lawyers and judges, which were funded by the U.S. Agency for International Development. The details of this work are provided in my resume.

7.    For the last twenty-plus years, I have appeared as an expert on Russian law in numerous cases in U.S. and foreign courts as well as various international arbitrations. These bodies have cited my opinions in multiple cases, not only in those where I participated as an expert. In all, seven U.S. federal courts, three state courts, four English courts, and one Canadian

court have published opinions citing my submitted expert opinions on Russian law as reliable authority.[1] A full list of my experience as an expert witness and of citations of my expert opinions by courts and arbitration tribunals appears in my resume.

### III.   *Basic Principles of Russian Law*

8.   All Russian law rests ultimately on the 1993 Constitution, as amended. Pursuant to that Constitution, only the Russian legislature (the Federal Assembly, a bicameral body comprising the State Duma and the Council of the Federation) has the authority to adopt legislation. In accordance with the civil law tradition, Russia legislation may take the form of Code, the purpose of which is to occupy a particular field of law in a comprehensive, coherent, and systematic manner. In the case of criminal law, the 1996 Criminal Code of the Russian Federation, as amended (Criminal Code), sets out the exclusive basis for criminal liability under the Russian legal system.

9.   Russian law, consistent with other legal systems that fall within the civil law family, for the most part does not regard judicial decisions in particular cases as a source of law. An exception exists for rulings of the Constitutional Court of the Russian Federation, whose decisions are binding on other courts not only as to outcome but as to reasoning.[2] In addition, the Plenum of the Supreme Court of the Russian Federation on occasion provides guiding explanations that address and resolve general interpretive issues regarding the application of Russian law.[3] These guiding explanations, which do not arise out of any

---

[1]   One of these matters involved a federal criminal prosecution, specifically addressing the scope of the "lawful under the written laws and regulations" defense to a prosecution under the Foreign Corrupt Practices Act. United States v. Kozeny, 582 F. Supp. 2d 535 (S.D.N.Y. 2008), 664 F. Supp. 2d 369 (S.D.N.Y. 2009). The court there accepted my characterization of Azeri criminal law, which was based on Russian law, but ruled that, so characterized, the defense provided by that law did not render a corrupt payment to a government official "lawful."

[2]   Resolution No. 19-P of the Constitutional Court of the Russian Federation of June 16, 1998, point 4, Exhibit 3 to this Declaration.

[3]   Federal Constitutional Law on the Judicial System Article 19(4), Exhibit 5 to this Declaration. Exhibit 5 to Defendant's Motion contains a different article from this legislation.

particular case but rather represent the Court's response to the general pattern of practice of the lower courts, are regarded as binding on the lower courts. As best I have been able to determine, neither the Constitutional Court nor the Supreme Court has issued any resolutions or guiding explanation that bear directly on the questions of Russian law presented by Defendant's Motion.[4] In the absence of such authority, actors in the Russian

---

Under Russian Law, a federal constitutional law must satisfy more stringent voting requirements than normal legislation and has the effect of amending those provisions of the Constitution not included in Chapters 1 (Fundamentals of the Constitutional System), 2 (Rights and Freedoms of the Person and Citizen), and 9 (Constitutional Amendments and Review of the Constitution). Russian Constitution Articles 108, 135, 136, Exhibit 2 to this Declaration.

[4]   The Constitutional Court did address questions with respect to Article 64 of the R.S.F.S.R. Criminal Code, the predecessor to Article 275 of the 1996 Criminal Code. Resolution 17-P of the Constitutional Court of the Russian Federation of December 20, 1995 "In the case of the constitutionality of a number of provisions of Article 64 of the Criminal Code of the Russian Federation in connection with the complaint of citizen V.A. Smirnov"), 37 Statutes and Decisions, No. 2, Mar.-Apr. 2001, Exhibit 4 to this motion. The principal issue in that case was the constitutionality of the provision, subsequently eliminated in the 1996 Code, that classified as treason a refusal to return from a foreign country to the U.S.S.R. The Court in passing observed that the criminalization as treason of rendering assistance to hostile actions of foreign states aimed against the security of the Russian Federation did comply with the Constitution. In a separate opinion, Judge Vitruk expressed reservations about the constitutionality of the "rendering assistance" language in then-Article 64:

And, finally, the complaint of V. A. Smirnov challenges the constitutionality of such a form of treason against the Motherland as rendering assistance to a foreign state in the conduct of hostile activity against the Russian Federation, in view of the lack of clarity of the given elements of the crime. One must agree that such a formulation does not exhibit the necessary level of social danger of rendering assistance to a foreign state in the conduct of hostile activity against the Russian Federation that would make it possible with a sufficient degree of objectivity, clarity, and explicitness to view such deeds as treason against the Motherland. However, this shortcoming (albeit a serious one!), as well as other shortcomings of the formulation of the elements of crimes, especially as concerns their subjective side (guilt, reasons, purposes), must be corrected by the legislator itself.

Id. at  45. In another separate opinion, Judge Kononov also criticized the definition of treasonable assistance in the former Article 64:

Thus, the element of point "a" of Article 64 of the Criminal Code of the RSFSR under consideration gives all grounds for its contradictory and arbitrary interpretation by the applier of the law, including the possibility of conviction for purely political reasons.

This contradicts generally accepted principles and norms of international law, which in accordance with part 4 of Article 15 of the Constitution of the Russian Federation constitute a component part of the legal system and the requirements made of a criminal law, which must clearly and explicitly define the elements of a crime (point 5.18 of the document of the Copenhagen meeting of the Conference on the Human Dimension of the Conference on Security and Cooperation in Europe) and the requirements of fair and impartial justice (the first part of Article 14 of the International Covenant on Civil and Political Rights of 1966).

Id. at 52. Although the 1996 Criminal Code addressed these concerns, the staff of the Duma cited these separate opinions as providing some of the motivation for the amendments to the "assisting" prong to Article 275 in 2012. See this Declaration at ¶ 16 n. 10.

legal system typically look to interpretations of statutes issued by the relevant government authorities as well as scholarly commentary as guides to the proper application of legislation.

10. Both the Russian Constitution and the Criminal Code adopt the principle of legality, that is the requirement that a person can be subjected to criminal sanctions only on the basis of enacted and published legislation.[5] The Constitution and the Criminal Procedure Code also provide that all doubts about a person's guilt under the criminal law must be resolved in favor of the accused.[6] As a result, Russian authorities may not extend criminal liability beyond activity that is clearly proscribed by the Criminal Code.

11. Russian law recognizes a field of administrative law that addresses delegation of regulatory authority to various branches of the executive branch. In Russia, the executive branch comprises the President and the Government, the latter of which is subordinate to the President and is governed by a Council of Ministers headed by a Prime Minister. The Federal Assembly has not adopted an administrative code, but in 2001 it enacted a Code of Administrative Offenses that covers non-criminal sanctions for violations of regulatory norms.[7]

12. The Russian Constitution establishes a legal hierarchy within the Russian legal system. In particular, Article 15(4) of the Constitution states that the provisions of treaties of the Russian Federation have direct effect within the legal system and, in the event of any

---

[5]   Russian Constitution Article 49(1), Exhibit 2 to this Declaration; Russian Criminal Code Article 3, Exhibit 6 to this Declaration.
[6]   Russian Constitution Article 49(3), Exhibit 2 to this Declaration; Russian Criminal Procedure Code Article 14(3), Exhibit 7 to this Declaration.
[7]   Exhibit 18 to Defendant's Motion contains an excerpt from this Code.

contradiction between those provisions and Russian legislation, those of the treaty must prevail.[8]

13.     The Russian legal system, like all human institutions, is not immune from political interference or private corruption. Instances where political authorities have perverted the legal system in support of what are considered to be matters of high national policy are not unknown, but they also are not common. Corruption of prosecutors and judges by private interests also occurs, but this phenomenon is not so pervasive, and judicial integrity so lacking, as to render the legal system as a whole irrelevant.

## IV.     *Relevance of Russian Criminal Code to Compliance with the Early Return Subpoena*

14.     None of the provisions of the Criminal Code cited in Defendant's Motion appears to be relevant to actions Defendant would have to undertake to comply with the early return subpoena. I discuss each in turn.

## A.     Article 275

15.     Defendant's Motion asserts that compliance with the subpoena would result in a violation of Article 275 of the Criminal Code. To assess this claim, one must look primarily at the statutory language. It describes two categories of offense, transmission of state secrets and the rendering of assistance to a foreign power in actions that threaten Russian national security. It is my understanding that Defendant does not claim that any of the information covered by the subpoena qualifies as state secrets, that is secret information belonging to

---

[8]    It provides:

> The universally recognized principles and norms of international law and the international treaties of the Russian Federation shall be a component part of its legal system. If an international treaty of the Russian Federation establishes rules other than those provided for by law, the rules of the international treaty shall be applied.

Exhibit 2 to this Declaration.

the Russian state. It is my further understanding that the subpoena covers only information with respect to private persons, which would not qualify as state secrets. Accordingly, the first portion of Article 275 dealing with transmittal of state secrets is irrelevant to Defendant's Motion

16. Rather, the relevant portion of Article 275 is that addressing assistance to foreign powers. This part of the statute criminalizes "financial, material, technical, consulting or any other assistance rendered to a foreign state, . . . in activities aimed against the security of the Russian Federation." This language was introduced in 2012: The previous version of the statute applied to "any other assistance rendered to a foreign State, a foreign organization, or their representatives in hostile activities to the detriment of the external security of the Russian Federation, committed by a citizen of the Russian Federation."[9] The amendment gave greater definition to the term "assistance" and removed the modifier "hostile" from the term "activities" and the modifier "external" from the term "security."[10] The Duma rejected language in the original version of the proposed amendment that would have expanded the concept of actions against state security to include activities directed "against sovereignty, constitutional order, territorial and state integrity."[11]

---

[9]   Criminal Code of the Russian Federation No. 63-FZ of June 13, 1996, with amendments through March 1, 2012, Exhibit 9 to this Declaration.

[10]   Federal Law No. 190-FZ of November 12, 2012, "On introducing changes into the Criminal Code of the Russian Federation and in Article 151 of the Criminal Procedure Code of the Russian Federation, Exhibit 8 to this Declaration. The translation of Article 275 in Exhibit 2 to Defendant's Motion retains the modifier "hostile," which the 2012 amendment struck. The explanatory memorandum prepared by Duma staff accompanying the bill stated that the striking of "hostile" responded to uncertainty among prosecutors as to whether they had to establish that the provision of assistance was motivated by hostility to Russian security in cases where the foreign activity assisted was objectively hostile to Russian security. Explanatory Note to the draft federal law on amending to the Criminal Code of the Russian Federation and article 151 of the Criminal Procedure Code of the Russian Federation, Exhibit 10 to this Declaration. As amended, Article 275 still requires that the assisted foreign action be "aimed against the security of the Russian Federation." As a result, conduct to be treasonable would have to assist foreign activity that has a hostile purpose, whether or not the assisting person shared that motivation. I discuss the role of purpose in Russian criminal law below at ¶¶ 30-32.

[11]   Ekaterina Vinokurova, A Law of Particular Application, Which the Opposition Considers Repressive, @gazetaru, Oct. 23, 2012, https://www.gazeta.ru/politics/2012/10/23_a_4821625.shtml, Exhibit 11 to this Declaration.

17.   It is clear from this legislative history that the Russian legislature, while expanding somewhat the category of national security threats posed by foreign powers the provision of assistance to which by a Russian citizen would constitute treason, did not intend to treat as treasonable any assistance rendered to foreign activities to which the government of the Russian Federation might be opposed. Rather, the foreign activity in question has to pose a threat to the nation's security, not merely to what its government views as its range of interests.

18.   This definition of treason in Article 275 must be contrasted with its counterpart under Soviet law, namely Article 64 of the R.S.F.S.R. Criminal Code. That provision regarded as a serious criminal offense any conduct that could be viewed as against the interests of the Soviet system, including its economic and ideological basis. The broad scope of Soviet criminal law allowed the authorities to treat any opposition to Soviet policy as a grave offense. In the words of one member of the Constitutional Court of the Russian Federation, describing this provision (which had remained in force in the Russian Federation until 1996):

> Article 64 of the Criminal Code of the RSFSR, over the course of many years, with the rare exception of instances of genuine espionage, was a factual instrument of political repression and of the battle against dissent and political opponents, a method of brutal suppression of the generally accepted rights and freedoms of the person and the citizen, and [a method] of protection of the Soviet socialist state, the name of which, incidentally, is preserved both in the name of the Code and in the text of the article itself.

Separation Opinion of Judge Kononov in Resolution 17-P of the Constitutional Court of the Russian Federation of December 20, 1995, reprinted and translated in 37 Statutes and Decisions, No. 2 (Mar.- Apr. 2001) at 34, 47, Exhibit 4 to this Declaration.

19.     The present Criminal Code was drafted as a means of preventing the abuse of concepts

such as treason by distinguishing political embarrassment of political authorities from

conduct that threatened the essential security interests of the state. In the words of a

prominent Russian legal scholar and criminal law expert writing shortly after adoption of

the 1996 Code:

> The Criminal Code of the RSFSR, as well as of other Soviet republics,
> proceeded from the principle of protection of state interests first, public
> interests next, and only afterward the interests of the individual . . . . For the
> first time in the history of Russian criminal legislation, the following
> principles of criminal law are recognized: legality (article 3), equality of all
> citizens before the law (article 4), culpability (article 5), justice (article 6),
> and humanism (article 7).

Anatolyi V. Naumov, *The New Russian Criminal Code as a Reflection of Ongoing*

*Reforms*, 8 Criminal Law Forum 191 (1997), Exhibit 12 to this Declaration. The new Code,

in short, represented the culmination of a movement since the mid-1980s to shift the

priority of criminal law away from state protection and toward safeguarding individuals

from harm.

20.     In light of these policies as expressed in the Criminal Code, there are several reasons why

compliance with the subpoena would not put Defendant in any significant risk of

prosecution under Article 275. First, it is far from clear that complying with a lawful order

of a foreign court with jurisdiction over the person concerned would count as assistance.

Using the principle of legality as a means of limiting a criminal statute to its plain meaning,

one normally would not consider complying with legal obligations as a form of assistance,

any more than not destroying evidence is a form of assistance. Notably, as amended Article

275 refers to "financial, material, technical, consulting or any other assistance." As a

general rule of interpretation in Russian law, the concrete terms are understood as

modifying "any other" so as to limit the possible applications of those words. Hence indirect acts based on existing legal obligations would not be considered "other assistance" within the meaning of Article 275.

21. Second, even if complying with an investigation into criminal activity were considered a kind of assistance, it is my opinion that Russian law does not regard the prosecution of private persons not accused of acting at the direction of or on behalf of the Russian government as an activity aimed at the national security of the Russian Federation. Even after its amendment, Article 275 is limited to conduct facilitating foreign actions "aimed against the security of the Russian Federation," not conduct opposed to a current policy of the country's political leadership. This provision gives "security" a limited definition, and does not confuse it with general policy interests of the Russian political leadership.

22. Defendant's Motion refers to six cases where Russian nationals were charged with treason for revealing information regarding Russian military or clandestine activity. Defendant's Motion pp. 17-19. As best one can tell from the facts given, all these cases involved the state-secrets prong of the treason definition, not the providing-assistance prong. As indicated above in ¶ 15 of this motion, I am aware of no argument under Russian law that would permit the classification of the information sought by the subpoena as a state secret.

23. Defendant might be arguing that Russian prosecutors are so unconstrained by law that they can prosecute someone for treason even when the objective facts do not satisfy the statutory definition of the crime. If so, I reject this assertion. While prosecutorial abuse can exist and first-instance courts may not always provide a sufficient check, the Russian court system as a whole strives to uphold the law. The possibility that compliance with foreign law might

irritate the political leadership does not mean that prosecution and conviction are a likely consequence.

24. Defendant's Motion also suggests that compliance with the subpoena might fuel efforts in the United States to impose economic sanctions on Russian officials and businesses. Defendant's Motion pp. 19-20. But actions that might increase the exposure of the Russian Federation or its officials to foreign trade, travel, or financial sanctions could not be considered as implicating "the security of the Russian Federation" within the meaning of Article 275, unless those measures would pose an existential threat to Russia. The Duma, in adopting its 2012 amendments, made clear that such inflation of the concept of "Russian security" is inadmissible. The Motion does not identify any existential threats from the United States on the horizon, and I find the prospect of the United States wielding any implausible.

25. Finally, Defendant's Motion argues that "manipulating the rules to allow an extra-judicial fishing expedition into Russian territory" would be regarded by Russian authorities as "subverting Russia's inherent sovereign interest" and thus an attack on Russian security. Defendant's Motion pp. 20-22. But, putting aside the issue of whether the subpoena constitutes "an extra-judicial fishing expedition into Russian territory," the Russian Duma in 2012 rejected an attempt to rewrite Article 275 that would have equated Russian sovereignty with Russian security. Russian law on this point is clear.

26. I further note that a portion of Article 275 provides an exclusion from criminal liability for persons who desist in activity otherwise deemed treasonable and disclose what they had done to the government voluntarily and in a way that will avoid further harm. How this exclusion would apply to compliance with the subpoena is unclear. The assertion in

Defendant's Motion that "the crime would be committed in the open, in the context of public judicial proceedings," Defendant's Motion at p. 23, is not necessarily correct. For example, if the judicial order to enforce the subpoena were made under seal, it would be possible for Defendant to comply and then inform the government, bringing its conduct within the terms of the exclusion.

27. In conclusion, it is my opinion that compliance with the subpoena would not compel Defendant to violate Article 275 of the Criminal Code.

**B.    Article 272**

28. Article 272 of the Criminal Code criminalizes unauthorized intrusions into computer databases. In particular, it criminalizes "illegal access to legally protected computer information, if such action entails the destruction, blocking, modification or copying of computer information."

29. As I understand Defendant's Motion at p. 24, there is no assertion that compliance with the subpoena would require Defendant to engage in conduct proscribed under Article 272. Rather, the concern is that information provided pursuant to the subpoena might be exploited by third parties, in particular agencies of the U.S. government, to engage in activity that would violate Article 272, such as by copying legally protected computer information. The Motion expresses the concern that such exploitation then would expose Defendant to the risk of being prosecuted as an accessory before the fact, as defined by Article 33(5) of the Criminal Code, to a violation of Article 272.

30. This argument overlooks an important feature of Russian criminal law: An essential requirement of criminal responsibility is satisfaction of the mental element or *mens rea* in

accordance with the principle of culpability.[12] The Criminal Code lays out the requisite

mental element for a crime to exist:

> Article 24. Forms of Guilt
> 1. Guilt for a crime shall be recognized if a person commits a deed
> purposively or negligently.
> 2. A deed committed only negligently shall be recognized as a crime only
> in cases where this is specially provided by an article of the Special Part of
> this Code.

Exhibit 6 to this Declaration.

31.     As this provision makes clear, Russian law permits the imposition of criminal liability only

if a person has engaged in proscribed conduct purposively, unless the provision defining

the particular crime expressly permits liability for negligent behavior. Article 272 of the

Criminal Code does not impose liability for negligent behavior. As a result, pursuant to

Article 24(2), it applies only to purposeful conduct.

32.     Russian law does not regard the provision of information under compulsion of law as

constituting purposive assistance to any and all uses to which that information may be put.

A person who complies with a subpoena would be regarded as having the purpose of not

obstructing a particular criminal prosecution. Russian law would regard the possibility that

the U.S. government might exploit the information provided to commit a crime on Russian

territory as a contingency over which the person providing the information would have no

control. Lacking any knowledge of the U.S. government's determination to violate Article

272, and having no purpose to facilitate such a violation, Defendant, were it to comply with

---

[12]   Article 5 of the Criminal Code provides:

> 1. A person shall be subject to criminal liability only for those socially dangerous actions (inactions)
> and socially dangerous consequences in respect of which his guilt has been established.
> 2. Objective imputation, that is criminal liability for innocent injury, shall not be allowed.

Russian scholars understand this provision as prohibiting strict liability for the infliction of harm. Naumov, *supra*, at
203.

the subpoena, would not satisfy the mental element necessary for commission of a crime under Articles 33(5) and 272.

33. Moreover, Russian law provides a complete defense to criminal liability for a person "acting in execution of an order or instruction binding on him." Article 42(1) of the Russian Criminal Code, Exhibit 6 to this Declaration. This provision applies to all binding orders or instruction, whether the authority was domestic or foreign. Article 42(2) restores criminal liability in instances where a person commits an intentional offense in execution of an order or instruction known to be illegal. Id. Taken as a whole, Article 42 represents a special instance of the general duress defense, and therefore applies to all activity undertaken in compliance with lawful authority except where the "known to be illegal" exception applies.

34. In my view, a valid subpoena issued with respect to a person properly within the jurisdiction of the issuing authority would constitute a binding order or instruction within the meaning of Article 42(1) of the Criminal Code. Nor would such an order be "known to be illegal" within the meaning of Article 42(2), as long as it did not require sharing of state secrets in violation of Article 275 or similarly specific legislation. The risk that compliance with an order might, through no fault of the person complying with the order, facilitate a later illegal act by a third party would not make compliance illegal. As indicated above, no Russian legislation makes it illegal per se to cooperate with a foreign criminal investigation.

35. As a result, compliance with the subpoena would not put Defendant at risk of violation of Article 272, either directly or as an accessory.

C. **Article 183**

36. Article 183 of the criminal code prohibits the illegal receipt or disclosure of commercial, tax, or banking secrets. The focus of this provision is on expropriation of other persons' information for personal benefit. It applies not to all transfers of third-party information, but only to "illegal" disclosures.

37. As an initial matter, it is not clear that a record reflecting payments from Defendant to the persons designated in the subpoena would qualify as a commercial, tax, or banking secret. I understand Defendant's Motion as not asserting that any information covered by the subpoena would qualify as a tax or banking secret. It also is doubtful that the information sought has commercial value, as defined by Russian legislation. To qualify as a commercial secret under Russian law, confidentiality must enable its possessor to derive a commercial benefit.[13] Russian law would not regard avoidance of criminal liability through the hiding of information as itself a commercial benefit. The information sought here would qualify as a commercial secret only if its owner derived some economic benefit from its secrecy other than the avoidance of liability for wrongful conduct.

38. I further understand Article 183 as applicable only to the gathering of another person's information. Accordingly, it would not apply to any information belonging to Defendant, even if that information were to qualify as Defendant's commercial secret.

39. In any event, Article 183 limits criminal liability to the gathering of trade secrets by "illegal" means. In my opinion, Russian law would not regard compliance with a valid subpoena issued by another country to a person over whom that country has jurisdiction as

---

[13] Federal Law No. 98-FZ of July 29, 2004, on Commercial Secrecy, Article 3(1), Exhibit 10 to Defendant's Motion.

illegal in the absence of Russian legislation outlawing such compliance. No such provision

exists in the Criminal Code.

40. One may not infer from the express provisions in Russian law that authorize compliance

with the treaties of the Russian Federation an implicit prohibition of any forms of

cooperation not required by such treaties.[14] Article 457 of the Criminal Procedure Code,

Exhibit 6 to Defendant's Motion, expressly authorizes Russian authorities to extend

cooperation on the basis of the principle of comity. More to the point, it does not forbid

private persons who are Russian nationals from cooperating in other ways. As I discuss

below, Article 6(1)(3) of the Personal Data Law contains an express exemption from its

strictures with respect to compliance with a valid order in the context of legal proceedings,

without limitation to Russian legal proceedings.

41. It is therefore my conclusion that the transmission of any information within the

Defendant's possession in compliance with a valid subpoena issued by an appropriate U.S.

authority would not be regarded as "illegal" within the meaning of Article 183, even if the

information transmitted might be regarded as a commercial secret belonging to a third

party.

42. Moreover, as noted above in ¶¶ 33-34, Russian law excuses from criminal liability an

person "acting in execution of an order or instruction binding on him." Article 42(1) of the

Russian Criminal Code, Exhibit 2 to this Declaration. This provision applies to all binding

---

[14]   Provisions recognizing the primacy of international treaties of the Russian Federation, such as Article 457 of the Criminal Procedure Code, are widespread in Russian legislation. They reflect and repeat the constitutional rule found in Article 15(4) of the Constitution, Exhibit 2 to this Declaration. Because the constitutional rule applies regardless of any language in the legislation, references to international treaties in this legislation are in some sense unnecessary, but serve as useful reminders of the applicable law. The reference to international comity in Article 457, by contrast, is not redundant and has a broader scope than the specific obligation in Article 21 of the U.S.-Russia Mutual Legal Assistance Treaty to grant legal assistance in accordance with "national laws and practice." Exhibit 13 this Declaration.

orders or instruction, whether the authority was domestic or foreign. Article 183 by its terms proscribes only "illegal" transmission of trade secrets, while Article 42 permits compliance with foreign orders not known to be illegal. There is no Russian law that would make illegal an order to share information (state secrets aside) within the possession of the person subject to the order. Hence Article 42 confirms the interpretation of Article 189 as not applying to transmissions made in compliance with a binding order by a foreign authority with jurisdiction over the person making the transmission.

43.     In my view, a valid subpoena issued with respect to a person properly within the jurisdiction of the issuing authority would constitute a binding order or instruction within the meaning of Article 42(1) of the Criminal Code. Nor would such an order be "known to be illegal" within the meaning of Article 42(2). As noted above, no Russian legislation makes cooperation with a foreign criminal investigation per se illegal.

44.     As a result, compliance with the subpoena would not put Defendant at risk of violation of Article 183.

**V.**     ***Relevance of the Personal Data Law to Compliance with the Early Return Subpoena***

45.     The Federal Assembly adopted the Personal Data Law in 1996 and amended it several times since. This law regulates data collection, storage, processing, and transmittal. It is not a criminal statute and provides no sanctions for violations of its provisions. Rather, Article 13.11 of the Code on Administrative Offenses, Exhibit 18 to Defendant's Motion, imposes a fine of one thousand to three thousand rubles ($16 to $55 at current exchange rates) on non-governmental persons who violate rules regarding the storage, processing, and transmission of personal data, include those rules found in the Personal Data Law.

46.  Article 3(1) of the Personal Data Law defines as "personal data" any information relating

to a "which directly or indirectly identifies or makes identifiable a physical person

(personal data subject)."[15] Accordingly, the Law does not apply to any information covered

by the subpoena with respect to legal entities. Information with respect to any individual,

however, would come within the Law, absent any exclusion provided by the law. Such an

exclusion, however, does exist.

47.  Article 6(1)(3) of the Personal Data Law excludes from its regulatory scope any

transmission of personal data, whether through electronic means or otherwise, that occurs

"in connection with a person's participation in constitutional, civil, administrative, or

criminal court proceedings." This provision treats activity that complies with a judicial

order as excluded from the regulation of personal data. It does not by its terms limit this

exclusion from liability to compliance with orders made only by Russian courts. Thus acts

taken to comply with a subpoena issued by a foreign court as part of a criminal case are

not covered by the Personal Data Law.[16] This exclusion is consistent with the overall focus

of the Personal Data Law on exploitation of personal data for commercial gain.[17]

---

[15]  The translation of the Personal Data Law provided in Exhibit 11 to Defendant's Motion uses the term "individual," which is not incorrect but also not as precise as the actual term used in the statute (физическому лицу), literally physical person. In Russian law, a physical person is a flesh-and-blood person, as distinguished from a legal entity (legal person).

[16]  Defendant's Motion reads an article by a Russian practitioner as limiting Article 6(1)(3) of the Personal Data Law to investigations by Russian authorities. Defendant's Motion at 30. I do not understand the source cited as making this claim. At the beginning of the article, the author addresses the question of what Russian authorities are competent to prosecute business crimes. Vasily Torkanovskiy, Russian Federation: Business Crime 2018, Mondaq, Oct. 30, 2017, http://www.mondaq.com/russianfederation/x/641110/Crime/Business+Crime+2018. He provides the obvious answer that only persons identified by Russian law can prosecute a case in Russia. Later in the article he addresses the grounds under Russian law for resisting seizure of documents by Russian authorities. At that point he indicates that the Personal Data Law does not protect such documents. At no point in his article, however, does the author address, much less provide an opinion on, the application of the Personal Data Law with respect to foreign criminal investigations carried out under the authority of foreign law.

[17]  The Russian Ministry of Communications and Mass Media has issued a clarifying instruction regarding the interpretation of the Personal Data Law. Exhibit 14 to Defendant's Motion. It confirms that any activity coming within clauses 2 to 11 of Article 6(1) of that Law do not require the consent of the owner of the personal data involved. It is noteworthy that the instruction does not limit the application of clause 3 to compliance with the orders of Russian authorities only.

48.     As indicated above, Russian law limits the binding force of foreign official acts within its own legal system to instances prescribed by treaties or legislation. At the same time, Russian law does not proscribe compliance by Russian persons with foreign judicial orders, absent a specific provision of Russian law prohibiting such compliance. There is no provision of Russian law requiring Russian persons generally not to cooperate with foreign legal authorities.

49.     In addition, Article 6(1)(7) of the Personal Data Law creates another exclusion for a copying of personal data "for the purpose of exercising the rights and lawful interests of the operator." Here Defendant, as holder of the data, has a clear lawful interest in complying with a binding order of a legal authority that has jurisdiction over the Defendant.

50.     In any event, were a Russian court to restrict Article 6(1)(3)'s exclusion to acts taken to comply with only Russian judicial proceedings, and Article 6(1)(7)'s exclusion to lawful interests created only by Russian law, glosses that are not supported by the language of the statute or the spirit of the Mutual Legal Assistance Treaty into which the Russian Federation has entered with the United States, Exhibit 13 to this Declaration, the consequences for Defendant would be inconsiderable. The sanction applicable to a private entity such as Defendant for failure to comply with the provisions of the Personal Data Law potentially implicated by the early return subpoena would be at most a very modest fine.

51.     Accordingly, the Personal Data Law does not create a significant impediment to Defendant's compliance with the subpoena.

## VI.     *Other Enactments of Russian Law*

52.     To my knowledge, the Russian Federation has not adopted a general blocking law prohibiting persons subject to its jurisdiction from cooperating with a criminal investigation carried out by another state. It would regard as a violation of its law any acts by a foreign state carried out on Russian territory to seize persons or property. I am unaware, however, of any Russian law that would bar a Russian subject not acting as an official of the Russian state or otherwise representing the Russian state from transmitting information otherwise within that subject's lawful possession and control to foreign law enforcement authorities.

## VII.    *Russian Legal Policy*

53.     The Russian legal system does not regard the obstruction of foreign criminal investigations as a valid policy goal. To the contrary, the Russian Federation is a party to multiple mutual legal assistance treaties. In particular, the United States since 1999 has maintained and complied with a Mutual Legal Assistance Treaty with the Russian Federation. This treaty creates a specific procedure for collection of evidence, among other matters, by one party at the request of the other. As noted above in ¶ 40 n. 13, its Article 21 more generally provides for cooperation in legal matters beyond the specific commitments found in the treaty's other provisions.

54.     As discussed in ¶ 40 above, Russian law, in keeping with the U.S. approach to such treaties, does not regard compliance with a treaty as the exclusive means of international cooperation with respect to law enforcement and legal assistance. In particular, Russian law does not regard such cooperation as inherently illegal unless required by a treaty to which the Russian Federation is a party or Russian legislation. In addition, the Russian Federation belongs to international organizations, such the Financial Action Task Force,

that promote international investigative and prosecutorial cooperation with respect to white-collar crime. In my opinion, Russian law would not regard enforcement of the subpoena as posing a threat to Russian sovereignty or any fundamental state policy.

**VII.** *Conclusion*

55.    It is my conclusion that compliance with the early return subpoena will not require Defendant to violate Russian criminal law.

56.    It is also my opinion that compliance with the early return subpoena will not require Defendant to violate any Russian statute that imposes substantial administrative (noncriminal) sanctions for its violation.

57.    Accordingly, it is my conclusion that compliance with the early return subpoena would not put Defendant in any significant legal jeopardy with respect to the Russian Federation.

58.    It is also my conclusion that enforcement of the subpoena would not interfere with any significant Russian policy interest.

Paul B. Stephan

1/16/20

January 16, 2020

Exhibit List

1.   Stephan Resume
2.   Articles 15, 49, 108, 135, and 136 of Russian Constitution
3.   Resolution 19-P of the Constitutional Court of the Russian Federation of June 16, 1998
4.   Resolution 17-P of the Constitutional Court of the Russian Federation of December 20, 1995
5.   Federal Constitution Law on the Judicial System Article 19
6.   Articles 3, 5, 24, and 275 of the Criminal Code
7.   Article 14 of the Criminal Procedure Code
8.   Federal Law No. 190-FZ of November 12, 2012, "On introducing changes into the Criminal Code of the Russian Federation and in Article 151 of the Criminal Procedure Code of the Russian Federation
9.   Criminal Code of the Russian Federation No. 63-FZ of June 13, 1996, with amendments through March 1, 2012
10.  Explanatory Note to the draft federal law on amending to the Criminal Code of the Russian Federation and article 151 of the Criminal Procedure Code of the Russian Federation
11.  Ekaterina Vinokurova, A Law of Particular Application, @gazeta.ru, Oct. 23, 2012
12.  Anatolyi V. Naumov, *The New Russian Criminal Code as a Reflection of Ongoing Reforms*, 8 <u>Criminal Law Forum</u> 191 (1997)
13.  Treaty Between the United States of America and the Russian Federation on Mutual Legal Assistance in Criminal Matters

**Resume**

Paul Brooke Stephan

University of Virginia                                 1807 Rugby Place
School of Law                                         Charlottesville VA 22903
580 Massie Rd.                                        E-mail: pbs@virginia.edu
Charlottesville VA 22903-1738                         Mobile: 434-981-2442
(434) 924-7098; FAX: (434) 924-7536

Born 1950; married to Dr. Pamela Clark; children Paul, George, and Adriana

## *Specialties*

post-Soviet law; international business transactions; contract law; international law; federal taxation; U.S. constitutional law

## *Employment*

| | |
|---|---|
| John C. Jeffries, Jr., Distinguished Professor, University of Virginia School of Law | 2009- |
| Lecturer for Special Course, Public International Law, Hague Academy of International Law (invited) | 2022 |
| John V. Ray Research Professor of Law, University of Virginia School of Law | 2016-19 |
| Scholar in Residence, Wilmer Cutler Pickering Hale and Dorr (London) | 2014, 2019 |
| Visiting Professor, Duke Law School | 2014 |
| Coordinating Reporter, Restatement (Fourth) of the Foreign Relations Law of the United States, American Law Institute | 2012-18 |
| David H. Ibbeken '71 Research Professor, University of Virginia School of Law | 2012-15 |
| Visiting Professor, Peking University School of Transnational Law | 2011, 2013, 2015, 2019 |
| Justin D'Atri Visiting Professor of Law, Business, and Society, Columbia Law School | 2010 |
| Visiting International Professor, Sydney University | 2010, 2011, 2013, 2015, 2017 |
| Visiting International Professor, Radzyner School of Law, Interdisciplinary Center Herzliya | 2008-09 2011-12 |
| Elizabeth D. and Richard A. Merrill Professor, University of Virginia School of Law | 2008-11 |

| | |
|---|---|
| Counselor on International Law, Office of the Legal Adviser, U.S. Department of State | 2006-07 |
| Visiting Professor, Université Paris 2 – Panthéon-Assas, Faculté de Droit | 2004, 2015 |
| Visiting Professor, Institut d'Études politiques de Paris and Université Paris 1 – Panthéon-Sorbonne, Faculté de Droit | 2004 |
| Parsons Visiting Professor, Sydney University, Faculty of Law | 2004 |
| Lewis F. Powell, Jr., Professor, University of Virginia School of Law | 2003-2009 |
| Visiting Professor, Melbourne University, Faculty of Law | 2002, 2004, 2006, 2015, 2017, 2019 |
| Visiting Professor, Université de Lausanne, Faculté de Droit | 2001 |
| E. James Kelly, Jr – Class of 1965 Research Professor | 2000-03 |
| Guest Professor, Universität Wien, Rechtswissenschaftliche Fakultät | 1998 |
| Barron F. Black Research Professor, University of Virginia School of Law | 1996-99 |
| Hunton & Williams Research Professor, University of Virginia School of Law | 1992-95, 2004-07 |
| Percy Brown, Jr., Professor, University of Virginia School of Law | 1991-2003 |
| Professor, University of Virginia School of Law | 1985-91 |
| Associate Professor, University of Virginia School of Law | 1983-85 |
| Assistant Professor, University of Virginia School of Law | 1979-83 |
| Law Clerk, Hon. Lewis F. Powell, Jr., Supreme Court of the United States | 1978-79 |
| Law Clerk, Hon. Levin H. Campbell, United States Court of Appeals for the First Circuit | 1977-78 |

### *Education*

| | |
|---|---|
| University of Virginia School of Law | J.D., 1977 |
| Executive Editor, VIRGINIA LAW REVIEW | |
| Order of the Coif | |
| Yale University (Russian Studies) | M.A., 1974 |
| Yale University (cum laude; history major) | B.A., 1973 |

### *Summer Employment*

| | |
|---|---|
| Associate, Sullivan & Cromwell, New York, N.Y. | 1977 |
| Associate, Covington & Burling, Washington, D.C. | 1976 |
| Intern, Soviet Internal Branch, Office of Current Intelligence, Central Intelligence Agency | 1974, 1975 |
| Intern, Economic Analysis Branch, Environmental Protection Agency | 1973 |

*Courses Taught*

*First-year courses:* property; contracts; constitutional law

*Comparative and foreign law:* comparative law; Russian law; Soviet legal system; research seminar in Soviet law; tutorial in Soviet law; Soviet-Capitalist business transactions; American contracts law; international business transactions; transactions; emerging markets; foreign investment in the former Soviet Union; introduction to the common law; terrorism, human rights and the rule of law: a comparative approach; Russian in the international order; Soviet and Russian approaches to international law

*Taxation:* federal income taxation; corporate taxation; estate and gift taxation; international taxation; taxation of innovative financial transactions; tax policy; U.S. taxation of business transactions

*International law:* international law; international trade law; international trade and investment; international financial crimes; international law and the scholarly process; international law in the U.S. Supreme Court; colloquium on international economic law; international economic law

*U.S. public law:* international civil litigation; U.S. Supreme Court decisions; legal aspects of foreign intelligence

### Award

Roger and Madeleine Traynor Faculty Achievement Award, University of Virginia School of Law, 2018

### Publications: In Print

### Books

RESTATEMENT (FOURTH) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES (2018) (co-ordinating reporter with Sarah Cleveland; co-reporter of Chapters 4 and 8 with William S. Dodge and Anthea Roberts)

DOING BUSINESS IN EMERGING MARKETS – A TRANSACTIONAL COURSE (Foundation Press: New York, 2d ed. 2015) (with Richard N. Dean and James W. Skelton, Jr.), (Foundation Press: New York, 2010) (with Richard N. Dean)

INTERNATIONAL TRADE AND INVESTMENT (LexisNexis: Newark, 2011)

INTERNATIONAL BUSINESS AND ECONOMICS – LAW AND POLICY (LexisNexis: Newark, 4th ed., 2010) (with Julie A. Roin), (LexisNexis: Charlottesville, 1993, 2d ed. 1996, 3d ed. 2004) (with Julie A. Roin and Don Wallace, Jr.)

THE LIMITS OF LEVIATHAN – CONTRACT THEORY AND THE ENFORCEMENT OF INTERNATIONAL LAW (Cambridge University Press: Cambridge, 2006) (with Robert E. Scott)

THE LAW AND ECONOMICS OF THE EUROPEAN UNION (LexisNexis: Charlottesville, 2003) (with Ben W.F. Depoorter and Francesco Parisi)

### *Book Chapters*

*International Law as a Wedge Between Legal Systems*, in THE COMMON LAW AND THE CIVIL LAW TODAY – CONVERGENCE AND DIVERGENCE 1 (Vernon Press: Wilmington, Del., Marko Novakovic, editor 2019)

*Constitutionalism and Internationalism: U.S. Participation in International Institutions*, in OXFORD HANDBOOK OF COMPARATIVE FOREIGN RELATIONS LAW 375 (Oxford University Press: New York, Curtis A. Bradley, editor 2019)

*Conceptualizing Comparative International Law* and *Comparative International Law, Foreign Relations Law and Fragmentation: Can the Center Hold?* in COMPARATIVE INTERNATIONAL LAW 3, 53 (Oxford University Press: Oxford, Anthea Roberts, Paul B. Stephan, Pierre-Hugues Verdier & Mila Versteeg eds., 2018)

*The Law and Economics of International Law Enforcement*, in OXFORD HANDBOOK OF LAW AND ECONOMICS, VOL. 3: PUBLIC LAW AND LEGAL INSTITUTIONS (Oxford University Press: Oxford, Francesco Parisi, ed., 2017)

*Treaty Enforcement*, in ECONOMIC ANALYSIS OF INTERNATIONAL LAW 181 (Edgar Elgar: Cheltenham, Eugene Kontorovich & Francesco Parisi eds. 2016)

*The Political Economy of* Jus Cogens and *The Political Economy of Judicial Production of International Law*, in THE POLITICAL ECONOMY OF INTERNATIONAL LAW: A EUROPEAN PERSPECTIVE 75 and 202 (Edgar Elgar: Cheltenham, Alberta Fabbricotti ed., 2016)

*Guerras Fiscais nos Estados Unidos (Fiscal Wars in the United States)*, in COLEÇÃO FEDERALISMO E TRIBUTAÇÃO – VOLUME 2: ESTADOS FEDERAL E GUERRA FISCAL NO DIREITO COMPARADO (COLLECTION ON FEDERALISM AND TAXATION – FEDERAL STATES AND FISCAL WARS IN DIRECT COMPARISON) 161 (Arraes Editores: Belo Horizonte, Misabel Abreu Machado Derzi, Onofre Batista Júnior & André Mendes Moreira eds., 2015)

*Introduction* and *Unjust Legal Systems and the Enforcement of Foreign Judgments*, in RECOGNITION AND ENFORCEMENT OF JUDICIAL JUDGMENTS 1, 84 (Martinus Nijhoff Publishers: Boston, Paul B. Stephan ed. 2014)

*Human Rights and Wealth*, in ESSAYS IN INTERNATIONAL ECONOMIC LAW, DEVELOPMENT AND ARBITRATION IN HONOR OF DON WALLACE, JR. 207 (JurisNet LLC: Huntington, NY, Ian A. Laird, Borzu Sabahi, Jose Antonio Rivas & Nicholas J. Birch eds. 2014)

*International Law and Competition Policy*, in COMPETITION AND THE ROLE OF THE STATE 121 (Stanford University Press: Stanford, D. Daniel Sokol, Ioannis Lianos and Thomas Cheng eds. 2014))

*Sovereign Immunity and the International Court of Justice: The State System Triumphant*, in FOREIGN AFFAIRS LITIGATION IN UNITED STATES COURTS 67 (Martinus Nijhoff Publishers: Boston, John N. Moore ed. 2013)

*The Impact of the Cold War on Soviet and US Law: Reconsidering the Legacy*, in THE LEGAL DIMENSION IN COLD WAR INTERACTIONS: SOME NOTES FROM THE FIELD 141 (Martinus Nijhoff Publishers: Leiden, Tatiana Borisova and William B. Simons, eds. 2012)

*International law as a source of law*, in PRODUCTION OF LEGAL RULES – ENCYCLOPEDIA OF LAW AND ECONOMICS, SECOND EDITION 255 (Edward Elgar: Cheltenham, Francesco Parisi, ed., 2011)

*Treaties in the Supreme Court, 1946-2000*, and Empagran *– Empire Building or Judicial Modesty?* in INTERNATIONAL LAW IN THE U.S. SUPREME COURT: CONTINUITY AND CHANGE 317, 553 (Cambridge University Press: New York, David L. Sloss, Michael D. Ramsey & William S. Dodge eds. 2011)

*The Problem with Cooperation* in COOPERATION, COMITY AND COMPETITION POLICY 217 (Oxford University Press: New York, Andrew T. Guzman, ed. 2011)

*Tax Law and International Investment* in INTERNATIONAL INVESTMENT LAW AND COMPARATIVE PUBLIC LAW 599 (Oxford University Press: New York, Stephan W. Schill ed. 2010)

*Taxes, Economics of* in 3 ENCYCLOPEDIA OF LAW AND SOCIETY – AMERICAN AND GLOBAL PERSPECTIVES 1463 (SAGE Publications: Thousand Oaks, David S. Clark ed. 2007)

*Introduction* in ECONOMICS OF EUROPEAN UNION LAW xi (Edgar Elgar: Cheltenham, Paul B. Stephan ed. 2007)

*The United States* in PARTY AUTONOMY: CONSTITUTIONAL AND INTERNATIONAL LAW LIMITS IN COMPARATIVE PERSPECTIVE 313 (Juris Publishing, Inc.: Huntington, George A. Berman ed. 2005)

*Energy Development and Distribution – What Can the Law Do?* in INTERNATIONAL ENERGY POLICY, THE ARCTIC AND THE LAW OF THE SEA 201 (Martinus Nijhoff Publishers: Leiden, Myron H. Nordquist, John Norton Moore & Alexander S. Skaridov eds. 2005)

*Against International Cooperation*, in COMPETITION LAWS IN CONFLICT: ANTITRUST JURISDICTION IN THE GLOBAL ECONOMY 66 (The AEI Press: Washington, D.C., Richard A. Epstein & Michael S. Greve eds. 2004)

*Regulatory Cooperation and Competition – The Search for Virtue* in TRANSATLANTIC REGULATORY COOPERATION – LEGAL PROBLEMS AND POLITICAL PROSPECTS 167 (Oxford University Press: Oxford, George A. Bermann, Matthias Herdegen & Peter L. Lindseth eds. 2000)

*Inheritance and Gift Taxation* in IV ENCYCLOPEDIA OF LAW AND ECONOMICS 239 (Edward Elgar: Cheltenham, Boudewijn Bouckaert & Gerrit De Geest eds. 2000)

*Toward a Positive Theory of Privatization: Lessons from Soviet-type Economies* in ECONOMIC DIMENSIONS IN INTERNATIONAL LAW 324 (Cambridge University Press: Cambridge, Jagdeep S. Bhandari & Alan O. Sykes eds. 1997)

*Foreword* and *Westernization of the European East?* in LEGAL REFORM IN POST-COMMUNIST EUROPE: THE VIEW FROM WITHIN 1, 473 (Martinus Nijhoff Publishers: Dordrecht, Stanislaw Frankowski & Paul B. Stephan eds.1994) (with Stanislaw Frankowski)

*Introduction* and *Prevention and Control of International Terrorism*, in INTERNATIONAL LAW AND INTERNATIONAL SECURITY – A U.S.-SOVIET DIALOGUE ON THE MILITARY AND POLITICAL DIMENSIONS (M.E. Sharpe, Inc.: Armonk, Boris M. Klimenko & Paul B. Stephan eds. 1991) (published in the Soviet Union as Международное право и международная безопасность – Диалог советских и американских экспертов (International Relations: Moscow, 1991))

*Introduction*, *Property Law and Economic Rights under Perestroyka: A Sovietologist's Perspective*, and *Revisiting the Incorporation Debate: The Role of Domestic Political Structure*, in THE MOSCOW CONFERENCE ON LAW AND BILATERAL ECONOMIC RELATIONS 147 (American Bar Association: Chicago, James R. Silkenat & Paul B. Stephan eds. 1991) (published in the Soviet Union as Тезицы выступлений советских и американских докладов – Московская конференция право и экономическое сотрудничество (Union of Jurists: Moscow, 1991))

*Comrades' Courts and Labor Discipline Since Brezhnev*, in LAW AND ECONOMY IN THE U.S.S.R. 221 (Martinus Nijhoff Publishers: Dordrecht, Olimpiad S. Ioffe & Mark W. Janis eds. 1986)

***Articles***

*One Voice in Foreign Relations and Federal Common Law*, 60 VA. J. INT'L L. 1 (2019)

*What Should We Ask Reputation to Do?* 113 AM. J. INT'L L. UNBOUND 223 (2019)

*The Future of International Human Rights Law – Lessons from Russia*, 81 LAW & CONTEMP. PROBS. 167 (Winter 2018), reprinted as Будущее международного права в области защиты прав человека – уроки России, Теоретическя и прикладная Юриспруденция [Theoretical and Applied Jurisprudence] (No. 2, 2019)

*Inferences of Judicial Lawmaking Power and the Law of Nations*, 106 GEORGETOWN L.J. 1793 (2018)

*Competing Sovereignty and Laws' Domains*, 45 PEPPERDINE LAW REV. 239 (2018)

*Blocher, Gulati and Coase: Making or Buying Sovereignty?* 66 DUKE L.J. ONLINE 51 (2017)

*Agora: Reflections on* RJR Nabisco v. European Community *– Private Litigation as a Foreign Relations Problem*, 110 AM. J. INT'L L. UNBOUND 40 (2016)

*Comparative International Law: Framing the Field*, 109 AM. J. INT'L L. 467 (2015) (with Anthea Roberts, Pierre-Hugues Verdier & Mila Versteeg)

*Standards, Networks, and the Political Economy of International Lawmaking: A Response to Stavros Gadinis*, 109 AM. J. INT'L L. UNBOUND 34 (2015)

United States v. Bond *and Information-Forcing Defaults: The Work that Presumptions Do*, 90 NOTRE DAME L. REV. 1465 (2015)

*International Investment Law and Municipal Law: Substitutes or Complements?* 9 CAPITAL M'KTS L.J. 354 (2014)

*Courts on Courts: Contracting for Engagement and Indifference in International Judicial Encounters*, 100 VA. L. REV. 17 (2014)

*Human Rights Litigation in the United States after* Kiobel, 1 PEKING U. TRANSNAT'L L. REV. 338 (2013)

*The Political Economy of Extraterritoriality*, 1 POLITICS AND GOVERNANCE 92 (2013)

*Taxation and Expropriation – The Destruction of the Yukos Oil Empire*, 35 Houston J. Int'l L. 1 (2013)

*Regulatory Competition and Anticorruption Law*, 53 Va. J. Int'l L.53 (2012)

*Rethinking the International Rule of Law: The Homogeneity Fallacy and International Law's Threats to Itself,* 3 Jerusalem Rev. Leg. Stud. 19 (Vol. 4, 2012)

*The Limits of Change: International Human Rights and the Obama Administration*, 35 Fordham Int'l L.J. 488 (2012)

*Privatizing International Law*, 97 Va. L. Rev. 1573 (2011)

*The Political Economy of* Jus Cogens, 44 Vand. J. Transnat'l L. 1073 (2011)

*International Humanitarian Law in the Context of Terrorism and the U.S. Courts*, 2009 Russian YB. Int'l L. 201 (2010)

*Disaggregating Customary International Law*, 21 Duke J. Comp. & Int'l L. 191 (2010)

*Symmetry and Selectivity: What Happens in International Law When the World Changes,* 10 Chi. J. Int'l L. 91 (2009)

*Open Doors*, 13 Lewis & Clark L. Rev. 11 (2009)

*What Story Got Wrong – Federalism, Localist Opportunism and International Law*, 73 Mo. L. Rev.1041 (2008)

*The Institutionalist Implications of an Odious Debt Doctrine*, 70 Law & Contemp. Probs. 213 (Summer 2007)

*Private Remedies for Treaty Violations after* Sanchez-Llamas, 11 Lewis & Clark L. Rev. 65 (2007)

*U.S. Judges and International Courts*, Proceedings of the 100th ASIL Annual Meeting 238 (2006)

*Process Values, International Law, and Justice*, 23 Social Philosophy and Policy 131 (2006), *republished in* Justice and Global Politics131 (Ellen Frankel Paul, Fred D. Miller, Jr., & Jeffrey Paul eds., Cambridge University Press: Cambridge, 2006)

*The Politics of the Geneva Convention: Anxiety as the Beginning of Insight*, 46 Va. J. Int'l L. 1 (2005) (with Samuel Estreicher)

*Global Governance, Antitrust, and the Limits of International Cooperation*, 38 Cornell Int'l L.J. 173 (2005), *reprinted in* Economics of European Union Law 419 (Edgar Elgar: Cheltenham, Paul B. Stephan ed. 2007)

*An Empirical Assessment of the Impact of Formal Versus Informal Dispute Resolution on Poverty: A Governance-Based Approach*, 25 Int'l Rev. L. & Econ. 89 (2005) (with Edgardo Buscaglia)

*Self-Enforcing International Agreements and the Limits of Coercion*, 2004 Wisc. L. Rev. 551 (with Robert E. Scott)

*US Constitutionalism and International Law: What the Multilateralist Move Leaves Out*, 2 J. Int'l Crim. Just. 11 (2004)

*Courts, the Constitution, and Customary International Law – The Intellectual Origins of the Restatement (Third) of the Foreign Relations Law of the United States*, 44 Va. J. Int'l L. 33 (2003)

*Foreword – Taking International Law Seriously*, 44 Va. J. Int'l L. 1 (2003) (with Samuel Estreicher)

*A Becoming Modesty – U.S. Litigation in the Mirror of International Law*, 52 DePaul L. Rev. 627 (2002)

*Courts, Tribunals and Legal Unification – The Agency Problem*, 3 Chi. J. Int'l L. 333 (2002)

*Institutions and Élites: Property, Contract, the State, and Rights in Information in the Global Economy*, 10 Cardozo J. Int'l & Comp. L. 305 (2002)

*Redistributive Litigation – Judicial Innovation, Private Expectations and the Shadow of International Law*, 88 Va. L. Rev. 789 (2002)

*The Political Economy of Conflicts of Laws*, 90 Georgetown L.J. 957 (2002)

*International Governance and American Democracy*, 1 Chi. J. Int'l L. 237 (2000)

*Choice of Law and Its Consequences: Constitutions for International Transactions*, 26 Brooklyn J. Int'l L. 211 (2000)

*Richardson v. McKnight and the Scope of Immunity after Privatization*, 8 Sup. Ct. Econ. Rev. 103 (2000) (with Clayton P. Gillette)

*The Cold War and Soviet Law*, 93 Am. Soc'y Int'l L. Proc. 43 (2000)

*Sheriff or Prisoner? The United States and the World Trade Organization*, 1 CHI. J. INT'L L. 49 (2000)

*Rationality and Corruption in the Post-Socialist World*, 14 CONN. J. INT'L L. 533 (1999)

*The Futility of Unification and Harmonization in International Commercial Law*, 39 VA. J. INT'L L. 743 (1999)

*The New International Law – Legitimacy, Accountability, Authority, and Freedom in the New Global Order*, 70 U. COLO. L. REV. 1555 (1999)

*Constitutional Limitations on Privatization*, 46 AM. J. COMP. L. 481 (Supp. 1998) (with Clayton P. Gillette)

*Creative Destruction – Idiosyncratic Claims of International Law and the Helms-Burton Legislation*, 27 STETSON L. REV. 1341 (1998)

*Toward a Positive Theory of Privatization – Lessons from Soviet-Type Economies*, 16 INT'L REV. L. & ECON. 173 (1996)

*Accountability and International Lawmaking: Rules, Rents and Legitimacy*, 17 NW. J. INT'L L. & BUS. 681 (1996-97)

*The Fall – Understanding the Collapse of Soviet Communism*, 29 SUFFOLK U. L. REV. 17 (1995)

*Barbarians Inside the Gate: Public Choice Theory and International Economic Law*, 10 AM. U. J. INT'L L. & POL'Y 745 (1995)

*Modern Techniques for Financial Transactions and Their Effects on Currency*, 42 AM. J. COMP. L. 203 (Supp. 1994), *reprinted in* MODERN TECHNIQUES FOR FINANCIAL TRANSACTIONS AND THEIR EFFECTS ON CURRENCY (Aspen Publishers: New York, Michael Stathopoulos ed. 1995)

*Further Thoughts on the Rule of Law and a New World Order*, 26 JOHN MARSHALL L. REV. 739 (1993)

*Privatization After Perestroyka: The Impact of State Structure*, 14 WHITTIER L. REV. 403 (1993)

*Labor Law in Russia – The Hopes and Fears of Post-Soviet Workers*, 32 VA. J. INT'L L. 789 (1992)

*Further Reflections on the Implementation of Comparative Advantage Principles in Trade Law*, 2 J. LEG. ECON. 111 (1992)

*Soviet Law and Foreign Investment:* Perestroyka*'s Gordian Knot*, 25 INT'L LAW. 741 (1991)

*Revisiting the Incorporation Debate: The Role of Domestic Political Structure*, 31 VA. J. INT'L L. 417 (1991)

Perestroyka *and Property: The Law of Ownership in the Post-Socialist Soviet Union*, 39 AM. J. COMP. L. 1101 (1991)

*International Law in the Supreme Court*, 1990 SUP. CT. REV. 133

*The Restructuring of Soviet Commercial Law and Its Impact on International Business Transactions*, 24 GEO. WASH. J. INT'L L. & ECON. 89 (1990)

*Soviet Economic Law: The Paradox of Perestroyka*, Carl Beck Papers in Russian and East European Studies, No. 805, June 1990

*Disaggregation and Subchapter C: Rethinking Corporate Tax Reform*, 76 VA. L. REV. 655 (1990)

*Перестройка и советология* [Perestroyka and Sovietology] in США – ЭКОНМИКА ПОЛИТИКА ИДЕОЛОГИЯ [USA – ECONOMICS, POLITICS, AND IDEOLOGY], No. 3, p. 30 (1989)

*Courts with Income Tax Jurisdiction – An International Comparison*, 8 VA. TAX REV. 233 (1988), *reprinted as Una Comparacion Internacional de Tribunales de Impuestos*, REVISTA DE TRIBUNA FISCAL DE LA FEDERACION, NO. 11, p. 73 (1988)

*Constitutional Limits on the Struggle Against International Terrorism: Revisiting the Rights of Overseas Aliens*, 19 CONN. L. REV. 831 (1987)

*A Comment on Transfer Tax Reform*, 72 VA. L. REV. 1471 (1986), *reprinted in* FEDERAL WEALTH TRANSFER TAX ANTHOLOGY (Anderson Publishing Co.: Cincinnati, 1998, Paul L. Caron, Grayson M.P. McCouch, and Karen C. Burke eds.)

*Nontaxpayer Litigation of Income Tax Disputes*, 3 YALE L. & POL'Y REV. 73 (1985)

*Federal Income Taxation and Human Capital*, 70 VA. L. REV. 1357 (1984), *reprinted in* FEDERAL INCOME TAX ANTHOLOGY (Anderson Publishing Co.: Cincinnati, 1997, Paul L. Caron, Karen C. Burke, and Grayson M.P. McCouch eds.)

Bob Jones University v. United States: *Public Policy in Search of Tax Policy*, 1983 SUP. CT. REV. 33

*The First Amendment and Content Discrimination*, 68 VA. L. REV. 203 (1982)

*Constitutional Limits on International Rendition of Criminal Suspects*, 20 VA. J. INT'L L. 777 (1980)

*Defenses, Presumptions, and Burden of Proof in the Criminal Law*, 88 YALE L.J. 1325 (1979) (with John C. Jeffries, Jr.)

*The Central Intelligence Agency: Present Authority and Proposed Legislative Change*, 62 VA. L. REV. 332 (1976)

### Books Edited

COMPARATIVE INTERNATIONAL LAW (Oxford University Press: Oxford, 2018) (co-editor with Anthea Roberts, Pierre-Hugues Verdier & Mila Versteeg)

RECOGNITION AND ENFORCEMENT OF JUDICIAL JUDGMENTS (Martinus Nijhoff Publishers: Boston, 2014)

ECONOMICS OF EUROPEAN UNION LAW (Edgar Elgar: Cheltenham, 2007)

PROCEEDINGS OF THE 94TH ASIL ANNUAL MEETING (American Society of International Law: Washington, D.C., 2000)

LEGAL REFORM IN POST-COMMUNIST EUROPE: THE VIEW FROM WITHIN (Martinus Nijhoff Publishers: Dordrecht, 1994) (with Stanislaw Frankowski)

INTERNATIONAL LAW AND INTERNATIONAL SECURITY – A U.S.-SOVIET DIALOGUE ON THE MILITARY AND POLITICAL DIMENSIONS (M.E. Sharpe, Inc.: Armonk, 1991) (co-editor-in-chief with Boris M. Klimenko) (joint study with the USSR Diplomatic Academy; published in the Soviet Union as Международное право и международная безопасность – Диалог советских и американских экспертов (International Relations: Moscow, 1991))

THE MOSCOW CONFERENCE ON LAW AND ECONOMIC COOPERATION (American Bar Association: Chicago, 1991) (with James R. Silkenat) (published in the Soviet Union as Тезицы выступлений советских и американских докладов – Московская конференция право и экономическое сотрудничество (Union of Jurists: Moscow, 1991))

### Book Reviews

*Book Review (Peter H. Solomon, Jr. & Todd S. Fogelsong, Courts and Transition in Russia: The Challenge of Judicial Reform*, 117 POL. SCI. Q. 165 (2002)

*Has Globalization Gone Too Far?* 18 NW. J. INT'L L. & BUS. 246 (1997)

*Book Review (Gordon B. Smith, Reforming the Russian Legal System)*, 56 RUSSIAN REV. 492 (1997)

*Book Review (Robert Rand, Comrade Lawyer)*, 51 RUSSIAN REV. 452 (1992)

*Book Review (P.I. Stuchka, Selected Writings; George Ginsburgs, The Soviet Union and Legal Cooperation),* 49 RUSSIAN REV. 373 (1990)

*Glasnost' and the Soviet System of Justice (Book Review – Ger P. van den Berg, The Soviet System of Justice: Figures and Policy)*, 21 LAW & SOC'Y REV. 837 (1988)

*Book Review (George M. Armstrong, The Soviet Law of Property)*, 34 AM. J. COMP. L. 813 (1986)

*Book Review (John N. Hazard et al., The Soviet Legal System: Law in the 1980s)*, 12 SOVIET UNION/UNION SOVIÉTIQUE 351 (1985)

*Book Review (Frank M. Coffin, The Ways of a Judge)*, 67 VA. L. REV. 1447 (1981)

### *In Press*

*Introduction – The Role of the Restatements in U.S. Foreign Relations* and *The Waning of the Federal Common Law of Foreign Relations* in THE RESTATEMENT AND BEYOND – THE PAST, PRESENT, AND FUTURE OF U.S. FOREIGN RELATIONS LAW (Oxford University Press: New York, Sarah A. Cleveland & Paul B. Stephan, eds. 2020)

*The Legitimacy of International Law*, for PALGRAVE HANDBOOK OF INTERNATIONAL POLITICAL THEORY (Palgrave MacMillan: New York, Howard Williams, David Boucher, Peter Sutch & David A. Reidy, eds., forthcoming 2021)

*Big Data and the Future Law of Armed Conflict in Cyberspace*, for THE LAW OF ARMED CONFLICT IN 2040 (Oxford University Press: New York, Matthew C. Waxman, ed. 2020)

### *Work in Progress*

Wonderful Dreams and Sordid Deals – Cosmopolitanism, Nationalism, and the Struggle for International Law (book project)

Corporate Accountability for Human Rights Violations – A New Template (co-authored with Pierre-Hugues Verdier)

Enforcement Mechanisms and International Obligations (co-authored with Rachel Brewster)

Applying Municipal Law in International Disputes, for Recueil des Cours, Hague Academy of International Law

*Miscellany*

Foreign Relations and the City, Cities, Geopolitics, and the International Legal Order – Report and Thought Pieces (Perry World House 2019)

Stephan column: U.S. must not privatize anti-terrorism, Richmond Times-Dispatch, Sept. 14, 2016

*Statement of Paul B. Stephan, Professor of Law, University of Virginia Law School*, JUSTICE AGAINST SPONSORS OF TERRORISM ACT, HEARING BEFORE THE SUBCOMMITTEE ON THE CONSTITUTION AND CIVIL JUSTICE OF THE COMMITTEE ON THE JUDICIARY, HOUSE OF REPRESENTATIVES, 114TH CONG., 2D SESS. 60 (2016)

*Perspectives on the Restatement (Fourth) Project*, 109 AM. SOC'Y INT'L L. PROC. 209 (2015)

Abbott v. Abbott: A New Take on Treaty Interpretation by the Supreme Court, ASIL Insights (Aug. 4, 2010)

Morrison v. National Australia Bank, Ltd.: The Supreme Court Rejects Extraterritoriality, ASIL Insights (Aug. 2, 2010)

Introductory Note to U.S. Supreme Court: Morrison v. National Australia Bank Ltd., 49 INT'L LEGAL MATERIALS 1217 (2010)

Коррупция – не только российская проблемма [*Corruption – Not Only a Russian Problem*], Независимая Газета [INDEPENDENT GAZETTE], Oct. 21, 2008, p. 3

*Does the CISG Fill a Much-Needed Gap?* 101 AM. SOC'Y INT'L L. PROC. 414 (2007)

*Don't Feed the Bear*, THE AMERICAN INTEREST, p. 90 (March/April 2007) (with Hugh Ragsdale)

*The Skeptic Speaks: I am Not a Blind, Pig-Stupid Opponent of Unification*, 96 AM. SOC'Y INT'L L. PROC. 336 (2002)

FEDERAL ESTATE AND GIFT TAXATION (Emanuel Law Outlines: Larchmont, 2001)

*Introduction*, 94 AM. SOC'Y INT'L L. PROC. *xi* (2000)

*International Law and Economics – Remarks*, 90 AM. SOC'Y INT'L L. PROC. 115 (1997)

*Statement of Paul B. Stephan III, Professor, University of Virginia School of Law, Charlottesville, Virginia*, ADMINISTRATION'S PROPOSAL RELATING TO THE TAX TREATMENT OF AMERICANS WHO RENOUNCE CITIZENSHIP, HEARING BEFORE THE SUBCOMMITTEE ON OVERSIGHT OF THE COMMITTEE ON WAYS AND MEANS, HOUSE OF REPRESENTATIVES, 104TH CONG., 2D SESS. 92 (1995)

*Change in the Soviet Union: Political Dynamics in the Gorbachev Era* in SOVIET AND POST-SOVIET RUSSIA IN A WORLD IN CHANGE 3 (University Press of America: Lanham, Allen C. Lynch & Kenneth W. Thompson eds. 1994)

The Political Economy of Federalism: The United States Experience and Soviet Problems (for Moscow conference on federalism, December 1991) (published in U.S.S.R. as Политическая экономия федерализма – опыт США и советские проблемы (Gorbachev Foundation: Moscow, 1991)

*A U.S. Perspective on the Legal Environment for Foreign Investment in Russia*, in PRACTICING LAW INSTITUTE, LEGAL AND PRACTICAL ASPECTS OF DOING BUSINESS IN THE SOVIET REPUBLICS (Practicing Law Institute: New York, 1992)

Из почты международных отделов – Советы юриста [Postings from Abroad – A Lawyer's Advice], Правда [PRAVDA], Jan. 16, 1991, p. 7

FEDERAL INCOME TAXATION (Emanuel Law Outlines: Larchmont, 1990, 2nd ed. 1994, 3rd ed. 1997, 4th ed. 2001)

*History, Background and Outstanding Problems of the Twenty-Fifth Amendment* in PAPERS ON PRESIDENTIAL DISABILITY AND THE TWENTY-FIFTH AMENDMENT (University Press of America: Lanham, 1988) (for Commission on Presidential Disability and the Twenty-fifth Amendment)

SIGNIFICANT SUPREME COURT DECISIONS, 1980 TERM (The AEI Press: Washington, D.C., 1985)

*The Breach of Trust behind* The Brethren, VA. L. WKLY., Feb. 22, 1980, at 1, 4

*Foreword: The First Amendment and National Security* in THE FIRST AMENDMENT AND NATIONAL SECURITY (Darby Print Co.: Atlanta, 1984) (for Center for Law and National Security, University of Virginia School of Law)

### Blog Posts

Jurisdiction to Adjudicate under Customary International Law (with William S. Dodge and Anthea Roberts), Opinio Juris, September 11, 2018

After ATS Litigation: A FCPA for Human Rights? (with Pierre Verdier), Lawfare, May 7, 2018

On Is International Law International? – Where Next?, Opinio Juris, February 8, 2018

Testimony in Opposition to the Justice Against Sponsors of Terrorism Act, Lawfare, July 14, 2016

More Mischief than Guidance: What Zivotofsky Says About the Supreme Court, Lawfare, June 9, 2015

Reputation and Responsibility: Moving the Goalposts, EJIL: *Talk!*, March 26, 2015

Taxing Eggs: Paul Stephan, The Faculty Lounge, February 26, 2014

Book Symposium The Electronic Silk Road: Comment by Paul Stephan, Opinio Juris, October 22, 2013

Regulatory Competition and Anticorruption Law, CLS Blue Sky Blog, February 21, 2013

Paul Stephan on ICJ Decision in Jurisdictional Immunities of the State (Germany v. Italy), Opinio Juris, February 5, 2012

Paul Stephan on Erin O'Hara & Larry Ribstein, The Law Market, The Conglomerate, March 18, 2009

Professor Paul Stephan on Sanchez Llamas/Bustillo, Opinio Juris, June 29, 2006

### *Lecturing and Consulting Activities*

*international and U.S. governmental organizations*

General Secretariat of Organization of Black Sea Economic Cooperation – advisor on various legal issues (2005-06)

Coalition Provisional Authority of Iraq – site visit to Baghdad to assess rule of law efforts and goals of Iraqi stakeholders (2003)

International Bank for Reconstruction and Development (World Bank) – advisor on drafting of Turkmenistan Tax Code (2000)

Organization for Economic Cooperation and Development – organized workshops for Central and East European governments on tax dispute resolution (1996-97); presentation to quarterly meeting of Competition Committee of Directorate for Financial, Fiscal and Enterprise Affairs (2004)

International Monetary Fund – adviser on implementation of Kazakh tax code and on drafting of Azerbaijan tax code (1998-2000)

U.S. Court of Appeals for the Fourth Circuit – speaker at 2001 Judicial Conference

U.S. Department of Treasury – adviser on technical assistance to Central and East European and former Soviet states (1992-98)

U.S. Securities and Exchange Commission – lecturer in International Securities Regulation symposium (1998)

U.S. Tax Court – speaker at Judicial Conference (2001); organized seminar for Russian judges (1997); reporter for international conference on courts with tax jurisdiction (1988)

Federal Bureau of Investigation – lecturer in programs for combatting international organized and white collar crime involving former Soviet Union (1994-97)

Central Intelligence Agency – lecturer on Soviet politics and international law issues (1990)

National Judicial College – organized and taught in training program for Soviet judges (1990)

Treasury Executive Institute, U.S. Department of Treasury – lecturer on Soviet management problems (1989)

Office of Technology Assessment, U.S. Congress – consultant on problems of First Amendment and information controls (1988)

Federal Executives Institute – lecturer at seminars on legal aspects of foreign intelligence and post-Soviet politics (1983, 1988)

Supreme Court of Virginia – lecturer at semiannual district judges conferences and annual judicial conferences (1980-90)

Delaware Supreme Court – lecturer on recent Supreme Court decisions (1981)

*foreign governments and educational institutions*

Xiamen University – lecture on U.S. foreign relations law (2019)

Peking University School of Transnational Law – workshop on U.S. foreign relations law (2019)

City University of Hong Kong – workshop on U.S. foreign relations law (2019)

Xi'an Jiaotong University – Innovation Harbour Lecture on U.S. foreign relations law (2019)

Sapienza Università di Roma – presentation on international law and self-defense doctrine (2018)

Melbourne Law School – presentation on U.S. approaches to international law (2017)

Australian Attorney-General's Department for International Law, Department of Foreign Affairs and Trade, the Centre for International and Public Law and the Australian National University School of Regulation and Global Governance (RegNet) – presentation on international law at a crossroads in the United States (2017)

Saarland University Europa-Institut – presentation on foreign relations law and international law (2015)

Oxford University Public International Law Discussion Group – presentation on foreign relations law and international law (2015)

Melbourne Law School – presentation on U.S. Restatement of Foreign Relations Law (2015)

Xi'an Jiaotong University School of Law – presentation on developments in sovereign immunity law (2013)

Peking University School of Transnational Law – presentation on human rights litigation in U.S. (2013)

Sydney University – presentation on Yukos disputes (2013)

Melbourne University – presentation on international courts (2013)

Hebrew University – panelist for program on International Law Year in Review (2012)

Xiamen University School of Law – presentation on foreign sovereign immunity (2011)

Hebrew University – panelist for program on National Courts and the International Rule of Law (2009)

Interdisciplinary Center Herzliya – panelist for program on Law in a Time of Crisis (2009)

Max Planck Institute of Comparative Public Law and International Law – panelist for U.S. State Department-German Ministry of Foreign Affairs Conference on Legal Aspects of Global War on Terror (2006)

Centre Americain, Institut d'Études politiques de Paris – lecturer on U.S. approaches to international law (2004)

Australian National University – lecturer on U.S. approaches to international law (2004)

Lauterpacht Research Centre for International Law, Cambridge University – lecturer on political economy of international lawmaking (2001)

Diplomatic Academy, Austrian Ministry of Foreign Affairs – lecturer on legal aspects of the post-Communist transition (1998)

Soviet-American Center for the Development of Constitutional Democracy – planning committee (1992-93)

Supreme Court of the Republic of Georgia – co-chair of international working group developing model commercial and business laws (1992-93)

Fund for Education, Ministry of Foreign Affairs of the Republic of Georgia – foreign member of advisory board (1991-92)

Ministry of Foreign Affairs of the Georgian Republic – lecturer on international law and domestic elections (1991)

Diplomatic Academy, Soviet Ministry of Foreign Affairs – lecturer on international law and super-power relations (1990)

Tbilisi State University, Faculty of International Relations – lecturer on international law of trade and economics (1990)

Moscow State University, Faculty of Social Sciences – lecturer on the United States and Perestroyka (1990)

*International academic conferences and exchanges*

U.S. Military Academy West Point – presented paper at conference on the law of armed conflict in 2040 (2019)

American Society of International Law – panel on litigation under the Helms-Burton Act

Perry World House, University of Pennsylvania, Workshop on Cities, Geopolitics, and the International Legal Order – presented paper (2019)

Center for Transnational Legal Studies, London – panelist on comparative foreign relations law (2019)

William & Mary Law School International Law Workshop – presented paper (2018)

Academic Exchange, Israel – participant, chaired session at High Court (2017)

Colloquium on the United States Constitution and the Law of Nations, Georgetown Law School – presented paper (2017)

Duke-Pretoria University Conference on Comparative Foreign Relations Law, University or Pretoria – presented paper (2017)

South Slavic Branch of International Law Association – paper presented at conference on common law and civil law (2017)

Duke-Geneva University Conference on Comparative Foreign Relations Law – presented paper (2016)

American Society of International Law Annual Meeting – panelist (2015)

American Branch of International Law Association International Law Weekend – panelist and moderator (2014)

British Branch of International Law Association annual meeting – speaker and panelist (2014)

Sapienza Università di Roma Conference on Political Economy of International Law – paper presenter (2014)

American Society of International Law Annual Meeting – panelist (2014)

International Economic Law Interest Group of American Society of International Law Biannual Meeting – panelist and paper presenter (2012)

American Branch of International Law Association International Law Weekend – panelist (2013)

American Branch of International Law Association International Law Weekend – panelist (2012)

American Political Science Association Annual Meeting – panelist (2011)

Russian Society of International Law Annual Meeting – panelist (2010)

American Society of International Law Annual Meeting – planning committee, moderator (2009)

Sixth World Public Forum Dialogue of Civilizations – speaker (2008)

Russian Society of International Law Annual Meeting and Martens Lectures – featured speaker, panel moderator (2008)

American Society of International Law Annual Meeting – panelist (2007)

European Law and Economics Association Annual Meeting – delivered paper, panelist (2006)

Kennan Institute for Advanced Russian Studies – speaker at symposium on Russian Democracy (2006)

American Society of International Law Annual Meeting – panelist (2006)

American Association for the Advancement of Slavic Studies Annual Meeting – panelist (2005)

Federalist Society – speaker at faculty conference (2006), national meeting (2011)

Kennan Center for Advanced Russian Studies Conference on Commercial Law Reform in Russia and Eurasia – panel moderator (2005)

Bowling Green State University Conference on Justice and Global Politics – delivered paper (2004)

Kennedy School of Government, Harvard University, conference on regulatory competition and complementarity – commentator (2004)

St. Petersburg Conference on International Energy Policy, the Arctic and the Law of the Sea – panelist (2004)

American Constitution Society – speaker at annual meeting (2004)

American Enterprise Institute – speaker at conference on sovereignty and antitrust federalism (2004)

American Society of International Law Annual Meeting – panelist (2004)

American Society of Law and Economics Annual Meeting – delivered paper (2003)

American Enterprise Institute Conference on Antitrust Policy: Competition and Cooperation – delivered paper (2003)

Clifford Symposium on Civil Litigation – delivered paper (2002)

American Society of International Law Annual Meeting – delivered paper (2002)

European Law and Economics Association Annual Meeting – delivered paper (2001)

Latin American Law and Economics Association Annual Meeting – delivered paper (2000)

American Society of International Law Annual Meeting – co-chair of program committee, panelist and panel moderator (2000)

Yale Law School Conference on the Rule of Law in the Russian Federation – delivered paper (1999)

American Society of International Law Annual Meeting – delivered paper (1997)

Sanford Institute of Public Policy, Duke University – lecture on tax dispute resolution in Russia (1996)

International Academy of Comparative Law World Congress – U.S. delegate, delivered paper (1994)

International Law Institute – lecturer on privatization and tax reform for Kazakh and Mongolian legal officials and law reform for Russian legal academics (1993)

National Democratic Institute for International Relations – election observer for Georgian elections (1992)

American Association of Law Schools – lecturer at conference for property law teachers (1992)

International Center Moscow Conference on Federalism – planning committee and delivered lead paper (1991)

Duke University Conference on Law Reform in the Soviet Union – delivered paper (1991)

American Bar Association Moscow Conference on Law and Economic Cooperation – vice chair of executive committee; member of faculty (1990)

Association of State Attorney Generals – organized and lectured in program for Soviet procurators (1990)

International Conference on Courts with Tax Jurisdiction – reporter for conference and author of lead discussion paper (1987)

Commission on Presidential Disability and the Twenty-Fifth Amendment – counsel to the Commission (1986-88)

Soviet Jewry Legal Advocacy Center – lecturer on Soviet criminal law and human rights violations (1981)

Virginia Hospital Buyers Association – lecturer on contract law at annual seminars (1981)

*legal practice*

Counsel of Record, brief of *Amicus Curiae*, National Foreign Trade Council, Sakwe Balintulo et al. v. Daimler AG et al., No. 09-2778-CV, United States Court of Appeals for the Second Circuit

Counsel of Record, brief of *Amicus Curiae* The Hon. Alejo Vidal-Quadras, MEP (Spain), Vice President, European Parliament, The Hon. Struan Stevenson, MEP (Scotland), *et al.*, People's Mojahedin Organization of Iran, v. United States Department of State, No. 09-1059, United States Court of Appeals for the District of Columbia Circuit

Counsel of Record, brief of *Amicus Curiae* Professors of International Law, Federal Jurisdiction and the Foreign Relations Law of the United States, Sanchez-Llamas v. Oregon, No. 04-10566 and Bustillo v. Johnson, No. 05-51, Supreme Court of the United States

Co-Author, brief of Amicus Curiae Professors Paul B. Stephan and David P. Stewart, Scalin v. Société Nationale des Chemins de Fer Français, No. 18-1887, United States Court of Appeals for the Seventh Circuit

Co-Author, brief of Amicus Curiae Professors William S. Dodge and Paul B. Stephan, Animal Science Products, Inc. v. Hebei Welcome, No. 16-1220, Supreme Court of the United States, in support of petition for writ of certiorari

Author, brief of *Amicus Curiae* Professors of International Law, Federal Jurisdiction and the Foreign Relations Law of the United States, Medellín v. Dretke, No. AP 75,207, Texas Court of Criminal Appeals

Counsel of Record, brief of *Amicus Curiae* Professors of International Law, Federal Jurisdiction and the Foreign Relations Law of the United States, Medellín v. Dretke, No. 04-5928, Supreme Court of the United States

Counsel of Record, brief of *Amicus Curiae* Professors of International Law, Federal Jurisdiction and the Foreign Relations Law of the United States, Sosa v. Alvarez-Machain, No. 03-339, Supreme Court of the United States

Counsel for petitioner, Hausmaninger v. Commissioner, U.S. Tax Court

Baker & McKenzie – adviser on civil and criminal matters relating to foreign corrupt payments

WilmerHale – co-counsel on international arbitration matter and expert on Russian and international law in U.S. litigation

Coudert Brothers – adviser on Russian law in civil and criminal matters

Wilmer, Cutler & Pickering – adviser

Institute of Chartered Financial Analysts – tax counsel

*Work as expert witness*

U.S. Department of Justice – expert on Russian law in U.S. prosecution

Williams & Connolly – expert on Russian law in U.S. litigation

Rosenfeld & Kaplan – expert on Russian law in U.S. litigation

Whiteford Taylor Preston – expert on Virginia contract law in arbitral proceeding

De Brauw Blackstone Westbroek N.V. – expert on Russian law in Dutch litigation

Shearman & Sterling – expert on Russian law in U.S., Belgian and French litigation

Horten – expert on Russian law in Danish criminal matter

Three Crowns – expert on Russian law in international arbitration

Kelly Hart – expert on Russian law in U.S. litigation

Gibson Dunn & Crutcher – expert on Russian law in international investment arbitration and Canadian litigation

Olswang LLP – expert on Russian law in English litigation
Holman Fenwick Willan LLP – expert on Russian law in foreign litigation
PCB Litigation LLP – expert on Russian law in English litigation
Bilzen Sumberg – expert on Russian law in international commercial arbitration
Loyens & Loeff N.V. – expert on Russian law in Dutch litigation
Infante, Zumpano, Hudson & Miloch – expert on Russian law in U.S. litigation
Rothgerber Johnson & Lyons – expert on Russian law in U.S. litigation
Bryan Cave – expert on Russian law in English litigation
Moncrief Oil International, Inc. – expert on Russian law in German litigation
Lovells – expert on Russian law in U.S. litigation
Compagnie Noga d'Importation et d'Exportation S.A. – expert on Russian law in English litigation
Fulbright & Jaworski – expert on Russian law in international commercial arbitration
Schindler Cohen & Hochman LLP – expert on Russian law in U.S. litigation
DLA Piper Rudnick Gray Cary – expert on Russian law in U.S. litigation
Akin Gump Strauss Hauer & Feld – expert on Russian law in U.S. litigation
Covington & Burling – expert on Russian law in international investment arbitrations
Morvillo, Abramowitz, Grand, Iason & Silberberg – expert on Russian law in U.S. litigation
Piper Rudnick – expert on Russian law in U.S. litigation
White & Case – expert on Russian law in U.S. litigation
Perkins Coie – expert on Russian law in U.S. litigation
Winston & Strawn – expert on Russian law and Azeri law in U.S. criminal proceeding and Russian law in U.S. litigation
Sullivan & Cromwell – expert on Russian law in U.S. litigation
Munger Tolles & Olson – expert on international business practices in Marshall Islands litigation
Latham & Watkins – expert on Russian law in U.S. litigation
Williams & Connolly – expert on international financial transactions in U.S. litigation
Hogan & Hartson – expert on Russian law in U.S. litigation
Steptoe & Johnson – expert on Russian law in English litigation
Richards Butler – expert on international-letter-of-credit law in English litigation
Jenner & Block – expert on Russian law in U.S. litigation
Films By Jove, Inc. – expert on Russian law in U.S. litigation

*judicial citations of expert opinions*

The Russian Federation v. Luxtona Limited, 2019 ONSC 4503 (Ontario Superior Court of Justice) (qualifications as an expert witness on questions of Russian law)
Unique Goals International, Ltd. v. Finskiy, No. 655692/2017, 2018 WL 5634326 (N.Y. Sup. Ct. 2018) (issue of applicable Russian statute of limitations)
Liebovitch v. Islamic State of Iran, 297 F. Supp. 2d 816 (E.D. Ill. 2018) (issue of limits on national jurisdiction imposed by international law)
Luxtona Limited v. Russian Federation, PCA Case No. 2014-09, Interim Award on Jurisdiction, Mar. 22, 2017 (issue of Russian law of domestic application of international law)

Archangel Diamond Corporation Liquidating Trust v. OAO Lukoil, 75 F. Supp. 3d 1343 (D. Col. 2014) (issue of adequacy of Russian courts for purposes of forum non conveniens)

Hulley Enterprises Limited (Cyprus) v. Russian Federation, PCA Case No. AA 226, Final Award, Jul. 18, 2014 (issue of Russian tax law)

JSC VTB Bank v. Skurikhin, [2014] E.W.H.C. 271 (Comm.) (issue of availability of legal defense to action on a debt in Russian courts)

Yukos Capital Sarl v. OJSC Rosneft Oil Co., [2012] E.W.C.A. Civ. 855 (issue of adequacy of Russian courts for purposes of recognizing a Russia court judgment)

Quasar de Valores SICA V S.A. v. Russian Federation, Arbitration Institute of the Stockholm Chamber of Commerce, Award, Jul. 20, 2012 (issue of Russian tax law)

Creditanstalt Investment Bank AG v. Holme Roberts & Owen, 01-CV-1677 (Denver Dist. Ct. 2011) (issue of contractual liability under Russian Civil Code)

Pacific International Sports Clubs Ltd. v. Soccer Marketing International Ltd., [2009] E.W.H.C. 1839 (Ch.) (issue of adequacy of Russian courts for purposes of forum non conveniens)

Cherney v. Deripaska, [2008] E.W.H.C. 1530 (Comm.) (issue of adequacy of Russian courts for purposes of *forum non conveniens*), *on appeal*, [2009] All Eng. Rep. D 02 (C.A.)

United States v. Kozeny, 582 F. Supp. 2d 535 (S.D.N.Y. 2008), 664 F. Supp. 2d 369 (S.D.N.Y. 2009) (issue of legality of bribe payment under Azeri law)

Whale Telecom Ltd. v. Qualcomm Inc., __ Misc. 3d __ (N.Y. Sup. Ct. 2006) (issue of Russian statute of limitations), *aff'd*, 41 A.D.3d 348, 839 N.Y.S.2d 726 (N.Y. App. Div. 2007)

Norex Petroleum Ltd. v. Access Industries Inc., 304 F. Supp. 2d 570 (S.D.N.Y. 2004) (issue of adequacy of Russian courts for purposes of *forum non conveniens*)

JSC Foreign Economic Ass'n Technostroyexport v. International Development and Trade Services, Inc., 295 F. Supp. 2d 366 (S.D.N.Y. 2003) (issue of Russian statute of limitations)

Base Metal Trading, S.A. v. Russian Aluminum, 253 F. Supp. 2d 681 (S.D.N.Y. 2003) (issue of adequacy of Russian courts for purposes of *forum non conveniens*)

Films By Jove, Inc. v. Berov, 154 F. Supp. 2d 432 (E.D.N.Y. 2001), 250 F. Supp. 2d 156 (E.D.N.Y. 2003) (issues of ownership of copyright under Soviet law and effect of conversion of state enterprise into lease enterprise)

Pavlov v. Bank of New York Co., 135 F. Supp. 2d 426 (S.D.N.Y. 2001) (issue of adequacy of Russian courts for purposes of *forum non conveniens*)

*summer teaching*

Martens Summer School on International Law, University of Tartu Pärnu College – guest professor, 2019

Westfälische Wilhelms-Universität, Münster – guest professor, 2000, 2005

University of San Diego International and Comparative Law Institute, Paris – visiting professor, 1998, 1999, 2008, 2014

Russian Law Institute, Emory University, Moscow – instructor, 1994

Cardozo Law School Summer Institute at Moscow State Institute for International Relations – visiting professor and educational director, 1991

Virginia Law School LL.M. in the Judicial Process – instructor, 1981, 1985, 1987, 1989, 1997, 2000

***Professional Membership and Affiliations***

Member, Bar of the Supreme Court of United States, U.S. Court of Appeals for the District of Columbia Circuit, U.S. Tax Court, Virginia and District of Columbia

American Law Institute (life member)

American Society of International Law (member of Executive Council, 2012-15; member of organizing committee, 2000 Annual Meeting)

International Law in Domestic Courts Interest Group, American Society of International Law (co-chair 2008-10)

International Economic Law Interest Group, American Society of International Law (member of Advisory Board)

American Branch, International Law Association

Editorial Board, Review of Law and Economics

Co-Editor, European Law Abstracts, Legal Scholarship Network

Advisory Board, Comparative Law Abstracts, Legal Scholarship Network

Contributing Editor, Preview of United States Supreme Court Cases, Public Education Division, American Bar Association

Omicron Delta Kappa

American Bar Association Section on International Law and Practice – Chair, Special Committee on Soviet law projects; member, council (1991-94); member of advisory committee for Soviet lawyer internship projects; chair of committee on legal education

American Bar Association Central and East European Law Initiative – Chair, Commonwealth Planning Group, and participant in assessment trips and workshops in Moscow and Kiev; member of advisory board (1992-95)

Forum for U.S.-Soviet Dialogue – chair (1986-89), board of directors (1983-91), conference participant (1982-1991)

**Exhibit 2 – Excerpts from the Constitution of the Russian Federation**

Article 15

1. The Constitution of the Russian Federation shall have supreme juridical force, direct effect, and apply on the whole territory of the Russian Federation. Laws and other legal acts adopted in the Russian Federation may not contradict the Constitution of the Russian Federation.

2. The bodies of state authority, the bodies of local self-government, officials, private citizens and their associations shall be obliged to observe the Constitution of the Russian Federation and laws.

3. Laws must be officially published. Unpublished laws may not be applied. Any normative legal acts concerning the rights, freedoms and duties of the person and citizen may not be applied, if they are not officially published for general information.

4. The universally recognized principles and norms of international law and the international treaties of the Russian Federation shall be a component part of its legal system. If an international treaty of the Russian Federation establishes rules other than those provided for by law, the rules of the international treaty shall be applied.

Article 49

1. Every person accused of committing a crime shall be considered innocent, if his guilt is not proved as provided for by the federal legal order and brought into legal force by a court sentence.

2. The accused shall not be obliged to prove his innocence.

3. Unresolved doubts about the guilt of a person shall be interpreted in favor of the accused.

Article 108

1. Federal constitutional laws shall be adopted on the issues envisaged by the Constitution of the Russian Federation.

2. A federal constitutional law shall be considered to be adopted, if it is approved by not less than three fourths of the total number of the members of the Council of the Federation and not less than two thirds of the total number of the deputies of the State Duma. The adopted federal constitutional law shall be signed by the President of the Russian Federation in fourteen days and made public.

Article 135

1. Provisions of Chapters 1, 2 and 9 of the Constitution of the Russian Federation may not be revised by the Federal Assembly.

2. If a proposal on the review of the provisions of Chapters 1, 2 and 9 of the Constitution of the Russian Federation is supported by three fifths of the total number of the members of the Council

of the Federation and the deputies of the State Duma, then according to federal constitutional law a Constitutional Assembly shall be convened.

3. The Constitutional Assembly shall either confirm the invariability of the Constitution of the Russian Federation or draft a new Constitution of the Russian Federation, which shall be adopted by the Constitutional Assembly by two thirds of the total number of its members or submitted to a referendum. In case of a referendum the Constitution of the Russian Federation shall be considered adopted, if over half of the voters who came to the polls supported it and under the condition that over half of the electorate participated in the referendum.

Article 136

Amendments to the provisions of Chapters 3-8 of the Constitution of the Russian Federation shall be adopted according to the rules fixed for adoption of federal constitutional laws and come into force after they are approved by the bodies of legislative power of not less than two thirds of the subjects of the Russian Federation.

[National emblem of the Russian Federation]

In the name
of the Russian Federation

**RESOLUTION**

**OF THE CONSTITUTIONAL COURT OF THE RUSSIAN FEDERATION**

providing interpretation of certain provisions of  Articles 125, 126, and 127 of the Constitution of the Russian Federation

The city of Moscow                                                                                   June 16, 1998

The Constitutional Court of the Russian Federation […]

[…]

has established as follows:

[…]

3. Articles 125, 126, and 127 of the Constitution of the Russian Federation consistently elaborate on the logic of its Article 118, whereby the judiciary power shall be exercised through constitutional, civil, administrative, and criminal proceedings. This is precisely because, under Article 125, the constitutional proceedings shall be administered by the Constitutional Court of the Russian Federation, that Articles 126 and 127 establish that the jurisdiction of other courts shall include legal proceedings in civil, criminal, and administrative cases and in resolving economic disputes.

The list of powers of the courts of general jurisdiction and arbitrazh courts is not exhaustive since Articles 126 and 127 also allow these courts to examine other categories of cases not mentioned in these constitutional rules, which is related to the ability to introduce (on the basis of Article 128 of the Constitution of the Russian Federation) new judicial procedures that have not been enshrined in the Constitution of the Russian Federation currently in effect. However, in no event does it imply that the courts of general jurisdiction or arbitrazh courts may proceed with constitutionality review of the normative acts listed in Article 125 of the Constitution of the Russian Federation, since the Article in question expressly assigns this function to the Constitutional Court of the Russian Federation.

4. The jurisdiction to review constitutionality of the aforesaid normative acts is conferred on the Constitutional Court of the Russian Federation alone and shall be exercised by the Constitutional Court in a special judicial procedure: the constitutional proceedings. This is due to the fact that the decisions of the Constitutional Court of the Russian Federation that result in the cessation of the legal force of unconstitutional normative acts shall have the same scope of application in time and space and the same scope of personal jurisdiction as the decisions of the rule-making body and, therefore, the same general meaning (which is not resident in the acts of the courts of general jurisdiction and arbitrazh courts that deal, by virtue of their nature, with application of law) as the relevant normative acts.

At the same time, as it renders a decision on a case, the Constitutional Court of the Russian Federation shall also weigh up the meaning attached to the normative act under consideration by the existing judicial practice. In this way, it expresses its attitude both to the position of the legislator or any other rule-making body and to the interpretation of such position by the entity applying the law, while providing its interpretation of the provisions of the Constitution of the Russian Federation

whereby, within the meaning of Article 125 (parts 5 and 6), only the Constitutional Court of the Russian Federation shall render official decisions of a universally binding nature. Hence, the decisions of the Court shall be final, may not be revised by any other bodies or overridden by re-enacting a rejected unconstitutional act, and shall compel all entities applying the law, including other courts, to act in compliance with the legal positions of the Constitutional Court of the Russian Federation.

No decision of a court of general jurisdiction or an arbitrazh court shall have the legal force of this kind. Such decisions shall not be binding on other courts in any other cases, since courts shall construe applicable rules independently, while following the Constitution of the Russian Federation and federal laws (Article 120, part 1 of the Constitution of the Russian Federation). Any decision of a court of general jurisdiction or an arbitrazh court may be challenged in such procedural form as may be established by a federal law. In addition, no official publication of such decisions is required, which, by virtue of Article 15 (part 3) of the Constitution of the Russian Federation, whereby only officially published acts shall be applicable, also makes it unnecessary for other entities applying laws to comply with such decisions in the process of resolution of other cases. Publishing certain judicial decisions or any part thereof does not serve as a sufficient guarantee for purposes of implementation of the constitutional rule in question.

In view of the foregoing, according to the Constitution of the Russian Federation, no decision of a court of general jurisdiction or an arbitrazh court shall be regarded as an adequate way of depriving the normative acts referred to in its Article 125 (paragraphs (a) and (b) of part 2 and part 4) of their legal force due to their unconstitutionality.

5. The fact that the courts of general jurisdiction and arbitrazh courts have no jurisdiction to hold the said normative acts inconsistent with the Constitution of the Russian Federation and hence inoperative, also arises directly from part 2 of Article 125 of the Constitution of the Russian Federation which describes the Supreme Court of the Russian Federation and the High Arbitrazh Court of the Russian Federation as entitled to file requests with the Constitutional Court of the Russian Federation seeking to review constitutionality (regardless of a specific case, i.e., as a matter of an abstract consistency review) of the normative acts listed in paragraphs (a) and (b) of part 2 of the Article in question. In addition, under part 4 of Article 125, the Constitutional Court of the Russian Federation shall, following a court's request, review the constitutionality of a law either applied or applicable in a specific court case.

Thus, the Constitution establishes that conclusions made by other courts as to unconstitutionality of a law cannot as such serve as a ground for the law to be officially declared inconsistent with the Constitution of the Russian Federation and to cease to be in force. In terms of interactions between courts of various jurisdiction and delimitation of their competence to identify unconstitutional laws, the exclusion of the latter from the statutes currently in effect constitutes a cumulative result of the exercise, on the one hand, of the duty of the courts of general jurisdiction to raise the question of constitutionality of a law before the Constitutional Court of the Russian Federation and, on the other, of the duty of the latter to resolve this matter conclusively.

Requests filed by other courts with the Constitutional Court of the Russian Federation, as provided for by Article 125 (part 4) of the Constitution of the Russian Federation, to review constitutionality of a law applied or applicable in a specific case (if the court finds the law inconsistent with the Constitution of the Russian Federation) cannot be regarded only as the right of such court, as the court must file its request to make sure that the act inconsistent with the Constitution of the Russian Federation ceases to be in force (part 6 of Article 125) in a constitutionally established manner, so as to rule out its further application. This duty of the courts arises from the constitutional power, bestowed on them as independent judicial bodies, to ensure judicial protection of human rights and freedoms, including equality before the law and courts (Articles 18, 19, and 46), while abiding by the Constitution of the Russian Federation and federal laws (Article 120).

Non-application, in a specific case, of a law found unconstitutional by a court without recourse to the Constitutional Court of the Russian Federation in this connection would also be inconsistent with the constitutional provisions whereby laws shall operate uniformly throughout the entire territory of the Russian Federation (Articles 4, 15, and 76) and, at the same time, would cast doubt on the supremacy of the Constitution of the Russian Federation, as such supremacy could not

be realized if various courts were allowed to construe constitutional norms in a conflicting manner. It is for this reason that recourse to the Constitutional Court of the Russian Federation is also mandatory in instances where, in a specific case, a court finds unconstitutional a law that has been enacted prior to the entry into force of the Constitution of the Russian Federation and that must not be applied under paragraph 2 of its Final and Transitional Provisions.

The duty of the courts to apply to the Constitutional Court of the Russian Federation for official confirmation of unconstitutionality of a law, if they find such law unconstitutional, does not restrict any direct application of the Constitution of the Russian Federation by them to the extent that such application seeks to ensure the implementation of the constitutional norms, primarily when they are not concretized through legal provisions. If a court believes that the law that must be applied in a specific case is inconsistent with the Constitution of the Russian Federation and, as such, hinders its implementation, then, in order to secure the direct effect of the Constitution of the Russian Federation, in all instances, including the instances where the matter has been resolved by the court on the basis of a specific constitutional norm, such law must be deprived of its legal force in accordance with the constitutional proceedings envisaged by Article 125 of the Constitution of the Russian Federation.

The striking out of an unconstitutional law from the system of normative acts cannot be achieved either by resolving a matter in accordance with civil, administrative, or criminal proceedings or by way of clarification of judicial practice which is to be given, according to Articles 126 and 127 of the Constitution of the Russian Federation, by the Plenums of the Supreme Court of the Russian Federation and the High Arbitrazh Court of the Russian Federation. The latter are not entitled to determine any procedure for ensuring direct application of the Constitution of the Russian Federation in deciding specific cases other than those provided for by the Constitution or by a federal constitutional law.

[…]

In view of the foregoing and pursuant to Articles 72, 74, and 75 of the Federal Constitutional Law "On the Constitutional Court of the Russian Federation," the Constitutional Court of the Russian Federation has resolved as follows:

1. The power provided for by Article 125 of the Constitution of the Russian Federation to resolve matters related to the consistency with the Constitution of the Russian Federation of federal laws, normative acts of the President of the Russian Federation, the Federation Council, the State Duma, the Government of the Russian Federation, the constitutions of the republics, the charters, and the laws and other normative acts of the constituent entities of the Russian Federation enacted with respect to matters falling under the jurisdiction of the State bodies of the Russian Federation and the joint jurisdiction of the State bodies of the Russian Federation and the State bodies of the constituent entities of the Russian Federation, shall fall within the jurisdiction of the Constitutional Court of the Russian Federation only. Within the meaning of Articles 125, 126, and 127 of the Constitution of the Russian Federation, no courts of general jurisdiction or arbitrazh courts may declare the acts referred to in Article 125 (paragraphs (a) and (b) of part 2 and part 4) of the Constitution as inconsistent with the Constitution of the Russian Federation and hence deprived of legal force.

2. A court of general jurisdiction or an arbitrazh court, having found that a federal law or a law of a constituent entity of the Russian Federation is inconsistent with the Constitution of the Russian Federation, shall not be entitled to apply such law to a specific case and shall file a request with the Constitutional Court of the Russian Federation seeking to review the constitutionality of such law. The duty to file such request with the Constitutional Court of the Russian Federation, within the meaning of parts 2 and 4 of Article 125 of the Constitution of the Russian Federation, in conjunction with Articles 2, 15, 18, 19, 47, 118, and 120 of the Constitution, shall exist regardless of whether or not the case has been resolved by a court, which declined to apply a law it believed unconstitutional, on the basis of the provisions of the Constitution of the Russian Federation that operate directly.

[…]

No. 19-P

*Statutes and Decisions*, vol. 37, no. 2, March–April 2001, pp. 34–53.
© 2002 M.E. Sharpe, Inc. All rights reserved.
ISSN 1061–0014/2002 $9.50 + 0.00.

**(48)**

# IN THE CASE CONCERNING VERIFICATION OF THE CONSTITUTIONALITY OF A NUMBER OF PROVISIONS OF POINT "A" OF ARTICLE 64 OF THE CRIMINAL CODE OF THE RSFSR IN CONNECTION WITH THE COMPLAINT OF CITIZEN V. A. SMIRNOV

Decree No. 17–P of the Constitutional Court
of the Russian Federation, 20 December 1995;
*Sobranie zakonodatel'stva Rossiiskoi Federatsii*,
1995, No. 1, Item 54;
translated by Bruce Collins

The Constitutional Court of the Russian Federation, in the composition of Presiding [Judge] B. S. Ebzeev and Judges M. V. Baglai, N. V. Vitruk, G. A. Gadzhiev, A. L. Kononov, Iu. D. Rudkin, N. V. Seleznev, O. I. Tiunov, and V. G. Iaroslavtsev,

with the participation of advocate I. L. Petrukhin, representative of the party that made recourse with a complaint to the Constitutional Court of the Russian Federation,

being guided by Article 125 (part 4) of the Constitution of the Russian Federation, point 3 of part one and parts two and three of Article 3, point 3 of part two of Article 22, and Articles 36, 74, 96, 97, and 99 of the Federal Constitutional Law "On the Constitutional Court of the Russian Federation,"

has considered in open session the case concerning the verification of the constitutionality of a number of provisions of point "a" of Article 64 of the Criminal Code of the RSFSR.

The justification for consideration of the case was the complaint of citizen V. A. Smirnov concerning the violation of his constitutional rights

and freedoms by point "a" of Article 6 of the Criminal Code of the RSFSR, which was applied in his case.

The [legal] basis for consideration of the case was the revealed uncertainty in the question of whether the challenged provisions of point "a" of Article 64 of the Criminal Code of the RSFSR, which establishes criminal liability for treason against the Motherland in the form[s] of provision of state or military secrets to a foreign state, flight abroad, or refusal to return from abroad, and rendering assistance to a foreign state in the conduct of hostile activity, are in accord with the Constitution of the Russian Federation.

Having heard the report of Reporting-Judge N. V. Seleznev, the explanations of the representative of the party that made recourse with the complaint, and the presentations of experts and a specialist, as well as of a representative of the General Procuracy of the Russian Federation who was invited the session, and having studied the materials in hand, the Constitution of the Russian Federation

*has established*:

1. The court collegium for criminal cases of the Moscow City Court on 26 October 1982 recognized citizen V. A. Smirnov as guilty of committing a crime envisioned by point "a" of Article 64 of the Criminal Code of the RSFSR ("treason against the Motherland").

The cassational and subsequent appeals of V. A. Smirnov concerning the illegality and lack of substantiation of the judgment were left unsatisfied. On 19 June 1991, the Presidium of the Supreme Court of the RSFSR, having considered the case on the basis of a protest of the first deputy procurator-general of the RSFSR, left the judgment in force, thereby confirming the conclusion concerning V. A. Smirnov's guilt in committing treason against the Motherland, as expressed in a refusal to return from abroad, provision of state secrets to foreign states, and rendering assistance to them in the conduct of hostile activity.

In his appeal to the Constitutional Court of the Russian Federation, the petitioner asserts that the indicated provisions of point "a" of Article 64 of the Criminal Code of the RSFSR contradict a number of norms of the Constitution of the Russian Federation concerning the rights and freedoms of citizens and are not in accord with generally accepted principles and norms of international law; and that as a result of their application in the concrete criminal case, his rights and freedoms were violated, the consequences of which persist to the present time.

2. The Constitution of the Russian Federation embodies the sovereign statehood of Russia and the integrity and inviolability of its territory as one of the foundations of the constitutional order (Preamble and parts 1 and 3 of Article 4). Within the bounds of their authority, bodies of state power carry out measures envisioned by the Constitution of the Russian Federation and federal laws for the protection of the sovereignty of the Russian Federation, its independence and state integrity, and provision for the defense of the country and the security of the state (Articles 71, 80, 82, 83, 87, 114, and others of the Constitution of the Russian Federation).

The citizen and the state in the Russian Federation are connected by mutual rights, responsibility, and obligations. In guaranteeing the rights and freedoms of the person and the citizen and providing for their protection, the state simultaneously has the right to establish in federal law restrictions of rights and freedoms for the purposes of provision for the defense of the country and the security of the state (part 3 of Article 55 of the Constitution of the Russian Federation), including the right to envision criminal liability for intentionally committed deeds that are to the detriment of the basic values of the constitutional order. However, the lawful exercise by the citizen of his constitutional rights and freedoms cannot be viewed as inflicting damage on the sovereignty of the Russian Federation, the defense of the country, and the security of the state; [nor can it] entail for him adverse legal consequences, specifically in the form of criminal liability for treason (treason against the Motherland).

3. The appeal of citizen V. A. Smirnov contains a demand to recognize as unconstitutional the provision of point "a" of Article 64 of the Criminal Code of the RSFSR, in accordance with which flight abroad or refusal to return from abroad are qualified as one of the forms of treason against the Motherland—that is, as a deed intentionally committed by a citizen to the detriment of [state] sovereignty, territorial inviolability, or state security and defense capability. In the opinion of the petitioner, this provision contradicts Article 27 (part 2) of the Constitution of the Russian Federation.

In accordance with Article 27 (part 2) of the Constitution of the Russian Federation, each person can freely travel beyond the bounds of the Russian Federation; and a citizen of the Russian Federation has the right to return to the Russian Federation without hindrance.

The elaboration of the powers that make up the content of this right and the procedure and conditions of its realization are determined by

the Law of the USSR "On the Procedure for Exit from the Union of Soviet Socialist Republics and Entry into the Union of Soviet Socialist Republics of Citizens of the USSR," the effect of which, in accordance with Decree No. 4183–I of the Supreme Soviet of the Russian Federation of 22 December 1992 "On the Entry into Force on the Territory of the Russian Federation of the Law of the USSR 'On the Procedure for Exit from the USSR and Entry into the USSR of Citizens of the USSR,' " was extended to the territory of the Russian Federation as of 1 January 1993. That law envisions restrictions on the right of exit connected with provision for security and other interests protected by the state, but these restrictions are of a temporary character and do not deprive a citizen of the right itself to freely exit from the country and to return to it without hindrance.

This provision conforms to the enactments contained in point 2 of Article 12 of the International Covenant on Civil and Political Rights and other international acts concerning the right of each person to leave any country, including his own, and concerning his lack of any obligation to return to that country.

Restrictions of the right to freely travel beyond the bounds of the Russian Federation, as well as of any other constitutional right, are admissible for the purposes strictly defined by Article 55 (part 3) of the Constitution of the Russian Federation. These restrictions cannot be interpreted broadly and must not lead to the impairment of other civil and political and other rights guaranteed to citizens by the Constitution and laws of the Russian Federation nor entail criminal liability for flight abroad and refusal to return from abroad, which are qualified in accordance with point "a" of Article 64 of the Criminal Code of the RSFSR as treason against the Motherland. The deed envisioned by the challenged norm, on the strength of the Constitution of the Russian Federation and international treaties with the participation of the Russian Federation, cannot be viewed as a crime infringing on the defense, sovereignty, territorial inviolability, state security, or defense capability, or by itself serve as grounds for criminal liability for treason against the Motherland.

4. The petitioner likewise challenges the constitutionality of another form of treason against the Motherland—provision of state or military secrets to a foreign state—in connection with the circumstance that the blanket disposition of this norm includes lists of information constituting state secrets (*taina*) that are [themselves] secret (*sekretnyi*) and therefore not accessible to citizens. This provision, in his opinion, is not in

accord with the constitutional requirements concerning the conditions and bounds of regulation of the rights, obligations, and responsibility of citizens, in particular the requirement that any normative legal acts affecting the rights, freedoms, and obligations of the person and the citizen cannot be applied if they are not published officially for public information (part 3 of Article 15 of the Constitution of the Russian Federation).

The freedom of thought and speech and the right of each person to freely seek, obtain, transfer, produce, and disseminate information guaranteed in Article 29 of the Constitution of the Russian Federation may be exercised in any legal manner. These rights and freedoms of the person and the citizen can be restricted by federal law only to the extent necessary, in particular for purposes of provision for the defense of the country and the security of the state.

Consequently, the state has the right to categorize as state secrets various kinds of information in the sphere of military, economic, and other types of activity, the dissemination of which can cause damage to the defense of the country and the security of the state. In connection with this, Article 29 (part 4) of the Constitution of the Russian Federation envisions that the list of information constituting state secrets is to be determined by federal law. The state likewise has the right to determine the means and methods of the protection of state secrets, including the right to establish criminal liability for their disclosure and provision to a foreign state.

However, on the strength of the indicated constitutional norm, criminal liability for the provision of a state secret to a foreign state is lawful only on the condition that the list of information constituting state secrets is contained in a federal law officially published for general information. A decision applying the law, including the judgment of a court, cannot be based on an unpublished normative legal act, which follows from Article 15 (part 3) of the Constitution of the Russian Federation.

Realization of the requirement of Article 29 (part 4) of the Constitution of the Russian Federation is provided for by the Law of the Russian Federation of 21 July 1993 "On State Secrets," which defines the concept of a state secret and indicates information categorized as state secrets.

Consequently, the establishment of criminal liability for the provision of a state or military secret to a foreign state does not contradict the Constitution of the Russian Federation, Articles 15 (part 3), 29 (part 4), and 55 (part 3).

5. The complaint of V. A. Smirnov likewise raises the question of recognition as not in accord with the Constitution of the Russian Federation of such a form of treason against the Motherland as rendering assistance to a foreign state in the conduct of hostile activity against the Russian Federation, in view of the lack of clarity of the elements of the given composition of the crime.

The establishment of criminal liability for treason against the Motherland in the form of rendering assistance to a foreign state in the conduct of hostile activity against the Russian Federation, intentionally committed by a citizen to the detriment of the sovereignty, territorial inviolability, or state security and defense capability [of the Russian Federation] does not contradict the Constitution of the Russian Federation, Articles 4 (parts 1 and 3), 55 (part 3), and 59 (part 1).

Definition of the degree of formalization of the elements of any crime as a component part of the norm-creating process is within the exclusive competence of the legislator. On the other hand, the necessary explanations concerning questions of the application of the norms of criminal legislation arising in court practice, in accordance with Article 126 of the Constitution of the Russian Federation, are to be given by the Supreme Court of the Russian Federation.

Proceeding from that set forth [above] and being guided by part one of Article 71 and Articles 72, 75, and 100 of the Federal Constitutional Law "On the Constitutional Court of the Russian Federation," the Constitutional Court of the Russian Federation

*has decreed*:

1. The provision of point "a" of Article 64 of the Criminal Code of the RSFSR qualifying flight abroad or refusal to return from abroad as a form of treason against the Motherland shall be recognized as not in accord with the Constitution of the Russian Federation, Articles 27 (part 2) and 55 (part 3).

In accordance with the first and third parts of Article 79 of the Federal Constitutional Law "On the Constitutional Court of the Russian Federation," the indicated provision of point "a" of Article 64 of the Criminal Code of the RSFSR shall lose force as of the moment of pronouncement of this Decree.

2. The provision of point "a" of Article 64 of the Criminal Code of the RSFSR qualifying the provision of state or military secrets to a foreign state as a form of treason against the Motherland shall be recognized as in accord with the Constitution of the Russian Federation.

3. The provision of point "a" of Article 64 of the Criminal Code of the RSFSR qualifying provision of assistance to a foreign state in the conduct of hostile activity against the Russian Federation as a form of treason against the Motherland shall be recognized as in accord with the Constitution of the Russian Federation.

4. In accordance with the second part of Article 100 of the Federal Constitutional Law "On the Constitutional Court of the Russian Federation," the criminal case in relation to V. A. Smirnov in the part [concerning] application of the provision of point "a" of Article 64 of the Criminal Code of the RSFSR that is recognized by the present Decree as unconstitutional shall be subject to review by the Supreme Court of the Russian Federation through the established procedure, if there are no other obstacles to this.

5. In accordance with the first and second parts of Article 79 of the Federal Constitutional Law "On the Constitutional Court of the Russian Federation," the present Decree is final, is not subject to appeal, shall enter into force immediately after its pronouncement, and has direct effect.

6. In accordance with Article 78 of the Federal Constitutional Law "On the Constitutional Court of the Russian Federation," the present Decree shall be subject to publication in *Sobranie zakonodatel'stva Rossiisskoi Federatsii, Rossiiskaia gazeta,* and other official publications of bodies of state power of the Russian Federation. The Decree must also be published in *Vestnik Konstitutsionnogo Suda Rossiiskoi Federatsii.*

# SEPARATE OPINION OF
# JUDGE N. V. VITRUK OF THE
# CONSTITUTIONAL COURT
# OF THE RUSSIAN FEDERATION

Verification of the constitutionality of a number of provisions of point "a" of Article 64 of the Criminal Code of the RSFSR on the basis of the complaint of citizen V. A. Smirnov can be carried out on the basis of a preliminary resolution of the general theoretical question of the volume of the content and the permissible bounds of realization of the constitutional rights of citizens and the possibility for their restriction. The con-

stitutional rights of the citizen are not unbounded: Their content and bounds of exercise are dependent on the relationship with other constitutional rights and freedoms of the citizen and his constitutional obligations. Moreover, the rights and freedoms of the person and the citizen, in accordance with part 3 of Article 55 of the Constitution of the Russian Federation, can be restricted by federal law to the extent necessary for purposes of the protection of the foundations of the constitutional order, morality and health, the rights and lawful interests of other persons, and provision for the defense of the country and the security of the state.

For purposes of the rational combination and harmony of the interests of society, the state, and the individual, the legislator, together with the determination of the content of a constitutional right, establishes the procedure for its realization. The purpose of a procedural order for the realization of a right consists in providing for (guaranteeing) the use of the concrete benefits and values on which the content of the right is based. The procedural order for the realization of a right can also take the form of a certain means of its restriction for a specific category of citizens. Restriction of the rights and freedoms of the citizen can be carried out by means of the exclusion of one or other possibility (power) from the content of a right (freedom), as well as by way of the establishment of a special procedure for its realization. Let us trace this in the example of the constitutional right established by Article 27 (part 2) of the Constitution of the Russian Federation: "Each person can freely travel beyond the bounds of the Russian Federation." The present constitutional norm conforms to the requirements of international-legal documents (part 2 of Article 13 of the Universal Declaration of Human Rights, point 2 of Article 12 of the International Covenant on Civil and Political Rights, and others). Realization of the given constitutional right can be dependent on fulfillment by the citizen of his legal obligations. For example, a citizen serving a measure of criminal punishment in the form of deprivation of freedom cannot freely leave the bounds of the Russian Federation.

In accordance with the provisions of part 3 of Article 55 of the Constitution of the Russian Federation, the constitutional right of each person to freely travel beyond the bounds of the Russian Federation can be restricted by competent bodies for a specific category of citizens by way of the establishment of a special procedure for travel abroad that presupposes the receipt of permission to exit and the possibility of refusal

of exit, given the presence of grounds established in law or permission to exit on the condition of fulfillment by the citizen of certain obligations, for example the obligation to return to the Motherland within an established time period.

A certain restriction of the right of each person to freely travel beyond the bounds of the country is likewise contained in the establishment by other states of their own conditions and rules of entry into their country (the receipt, for example, of a visa).

The complaint of citizen V. A. Smirnov challenges the constitutionality of the provision of point "a" of Article 64 of the Criminal Code of the RSFSR, in accordance with which flight abroad and refusal to return to the Motherland from abroad intentionally committed by a citizen to the detriment of the sovereignty, territorial inviolability, or state security and defense capability of the country are viewed as an autonomous form of treason against the Motherland, in view of the fact that, in the opinion of the petitioner, this provision contradicts Article 27 (part 2) of the Constitution of the Russian Federation, the content of which was cited above.

Flight abroad can be deemed only an illegal means by which a citizen leaves the territory of his country, that is, a crossing of the border in violation of the rules of travel abroad, while a refusal to return to the Motherland from abroad in a criminal-legal sense can only exist in instances of the effect of the obligation of a citizen—for example, one who possesses a state secret—to return to the Motherland within an established time period, which can be determined, for example, by the time period of a business trip abroad. Violation of the established rules of travel and return to the Motherland in instances of the presence of such an obligation to the state can be qualified by the legislator as an administrative- or criminal-law violation, depending on the degree of their social danger. Such a qualification is carried out by the legislator at the constitutional or legislative level.

The question of the criminalization of flight abroad and refusal to return to the Motherland is not a subject of constitutional regulation, much less [the question of its suitability] in the capacity of an autonomous form of treason against the Motherland. An affirmative answer to the given question was given by the legislator at the legislative level in the content of point "a" of Article 64 of the Criminal Code of the RSFSR. However, the judicial practice of the application of point "a" of Article 64 of the Criminal Code of the RSFSR has shown that the indicated

actions—flight abroad and refusal to return to the Motherland—as an autonomous form of treason against the Motherland cannot exist de facto. The indicated actions organically enter into the composition of other forms of treason against the Motherland (the provision to a foreign state of a state or military secret, the rendering of assistance to a foreign state in the conduct of hostile activity against the Russian Federation) on their objective side.* This same position has also been taken by criminal law theory in recent years. Courts of general jurisdiction that have considered the given category of criminal cases have incriminated citizens for flight abroad and refusal to return to the Motherland as treason against the Motherland together with other forms of treason against the Motherland. In this instance, the courts of general jurisdiction have guided themselves more by ideological-political precepts than by the principles and logic of rights and law and acted as a tool of persecution of citizens for political convictions. The Constitution of the Russian Federation, which envisions the right of each person to freely travel beyond the bounds of the Russian Federation, does not deny but rather presupposes the effect of Article 55 (part 3), which establishes that the rights and freedoms of the person and the citizen can be restricted by federal law. The establishment of restrictions of the constitutional right of each person to freely travel beyond the bounds of the Russian Federation is permissible if they conform to the requirements of part 3 of Article 55 of the Constitution of the Russian Federation. On the strength of this, likewise permissible is the establishment of special legal obligations of citizens in the realization of the constitutional right to freely leave the country, as well as a legal obligation to return to the Motherland for a special category of persons possessing, for example, state secrets. The definition of concrete types of violations as violation of obligations in the exercise of the constitutional right to freely leave the country, including the criminalization and decriminalization of the composition of [specific] crimes, is not a subject of constitutional regulation, but constitutes the exclusive competence of the legislator and is resolved by it at the legislative level. This provision applies in equal measure to qualification of the provision to a foreign state of a state secret or military secret or the rendering to a foreign state of assistance in the conduct of hostile activity against the Russian Federation as autonomous elements of crimes or as autonomous forms of treason against the Motherland.

---

*i.e., as an objective element of action of the violator—Ed.

Proceeding from criminal law theory and judicial practice, it is possible to recognize that the content of point "a" of Article 64 of the Criminal Code of the RSFSR relating to flight abroad or refusal to return to the Motherland from abroad as an autonomous form of treason against the Motherland is imperfect and perhaps even erroneous from the position of legislative regulation of the given type of relations between the state and the individual, for the given instance lacks the necessary clarity and explicitness in the resolution of the question of the extent of social danger of the indicated unlawful actions on the part of a special category of persons. However, this question is not a subject of constitutional regulation.

From the standpoint of constitutional provisions, the legislator has the right to establish restrictions in the content and realization of the constitutional right to freely travel beyond the bounds of the Russian Federation, as well as to establish a special procedure for the exercise of the given right, which presupposes, among other things, the obligation of return to the Motherland from abroad for a special category of persons. Transcending the bounds of the constitutional right to freely leave the country and violating the procedure for the realization of the indicated right, including the obligation to return to the Motherland from abroad, can be recognized by the legislator as an administrative delict or a criminal offense, depending on the extent of social danger of the indicated law violations. This is in full accord with the provisions of the Constitution of the Russian Federation in effect.

The complaint of citizen V. A. Smirnov challenges the constitutionality of the provision of point "a" of Article 64 of the Criminal Code of the RSFSR concerning the provision to a foreign state of a state or military secret, which makes it possible, in the opinion of the author of the complaint, on the strength of the existence of normative-legal acts concerning information constituting state secrets that are not published for general information, to subject [a person] to criminal liability for treason against the Motherland without [their] fault.

Part 4 of Article 29 of the Constitution of the Russian Federation establishes that the list of information constituting state secrets is to be determined by federal law, which, on the strength of the fact that it affects the rights, freedoms, and obligations of the person and the citizen, must be published officially for general information (part 3 of Article 15 of the Constitution of the Russian Federation). However, this requirement cannot be turned into an absolute. It is known that acts below the

level of a law which elaborate the provisions of the federal law on state secrets in terms of their type, subject (carrier), and so forth are published in practice. They envision organizational and other measures directed at the provision for and protection of state secrets. In the opinion of the petitioner, all these acts must be officially published for general information and only in that instance is a citizen who provided a state secret to a foreign state subject to criminal liability on the basis of point "a" of Article 64 of the Criminal Code of the RSFSR. One cannot agree with this argument; since the given acts are acts of special effect, they must be known only to those persons for whom they are intended, since they concern state secrets.

The question of the citation in court judgments of normative acts regulating questions of state secrets is a question of sufficiency for legal qualification of criminally punishable deeds, and it must be resolved in each concrete instance proceeding from the established circumstances of the case, not *a priori*.

At the same time, one can agree with the author of the complaint that to the shortcomings of the formulation of the provision to a foreign state of state or military secrets as a form of treason against the Motherland one must ascribe insufficient clarity and explicitness in the determination of the subjective side (fault, reasons, purposes). Shortcomings of this kind can and must be eliminated by the legislator itself.

And, finally, the complaint of V. A. Smirnov challenges the constitutionality of such a form of treason against the Motherland as rendering assistance to a foreign state in the conduct of hostile activity against the Russian Federation, in view of the lack of clarity of the given elements of the crime. One must agree that such a formulation does not exhibit the necessary level of social danger of rendering assistance to a foreign state in the conduct of hostile activity against the Russian Federation that would make it possible with a sufficient degree of objectivity, clarity, and explicitness to view such deeds as treason against the Motherland. However, this shortcoming (albeit a serious one!), as well as other shortcomings of the formulation of the elements of crimes, especially as concerns their subjective side (guilt, reasons, purposes), must be corrected by the legislator itself.

A certain influence on the formation of practice in the application of the challenged provisions of point "a" of Article 64 of the Criminal Code of the RSFSR can be exerted by superior court instances during their summaries of judicial practice concerning the given category of criminal cases.

The complaint of citizen V. A. Smirnov challenges the establishment of a number of elements of the objective and subjective side of the [crime of] provision to a foreign state of a state secret (for example, whether the characterization by V. A. Smirnov of researcher-colleagues and officials that was provided to a representative of a foreign state is a state secret). This is part of the establishment of the factual circumstances of the criminal case of V. A. Smirnov. It is possible to assume that judicial errors were made in the criminal case of V. A. Smirnov, but they cannot be a subject of consideration by the Constitutional Court.

On the basis of that set forth [above], I come to the conclusion that all the questions raised in the appeal of V. A. Smirnov and resolved in point "a" of Article 64 of the Criminal Code of the RSFSR did not receive resolution in the Constitution of the Russian Federation, and also that, in terms of their content, character, and meaning, they are not attributable to constitutional [questions]. On the strength of the indicated reasons and on the basis of the requirements of Article 68 of the Federal Constitutional Law "On the Constitutional Court of the Russian Federation," the case concerning verification of the constitutionality of the challenged provisions of point "a" of Article 64 of the Criminal Code of the RSFSR in connection with the appeal of V. A. Smirnov is not under the jurisdiction of the Constitutional Court of the Russian Federation and proceedings in the case are subject to dismissal.

## SEPARATE OPINION OF JUDGE A. L. KONONOV OF THE CONSTITUTIONAL COURT OF THE RUSSIAN FEDERATION

1. In accordance with Article 74 of the Federal Constitutional Law "On the Constitutional Court of the Russian Federation," the Constitutional Court, in adopting a decision on a case, assesses both the literal meaning of the act under consideration and the meaning imparted to it by an official or other interpretation or by the practice of application of the law that has arisen, as well as proceeding from its place in the system of legal acts. And the practice of application of Article 64 of the Criminal Code of the RSFSR is too serious and glaring to be completely ignored in the Court's decision.

Article 64 of the Criminal Code of the RSFSR, over the course of many years, with the rare exception of instances of genuine espionage, was a factual instrument of political repression and of the battle against dissent and political opponents, a method of brutal suppression of the generally accepted rights and freedoms of the person and the citizen, and [a method] of protection of the Soviet socialist state, the name of which, incidentally, is preserved both in the name of the Code and in the text of the article itself.

In the historical-legal respect, this article inherits all the attributes of Article 58 of the previous Criminal Code, notorious in the years of the Stalinist terror, on counterrevolutionary crimes. The extremely ideologized nature of this type of crime is graphically perceived from the highly typical definition of it in the "Course in Soviet Criminal Law": "Treason against the Motherland is treason against the political and social environment to which a person belongs. It constitutes an infringement on the unity of the citizen with that environment, an unnatural break with it, and a profoundly negative social fact. It is treason against the people building a communist society and direct assistance to imperialist reaction, the instigators of war, and the most evil foes of progressive mankind" (Leningrad State University, 1973).

The name itself of the crime—"treason against the Motherland"— does not have an explicit legal content but is more of a moral-political assessment. It is characteristic that instead of the legal concept of "travel abroad," the negative assessment "flight" is used. The concepts of "damage to the sovereignty, territorial inviolability, or state security and defense capability of the USSR" are absolutely indeterminate and permit any interpretation whatsoever. The deed identified as "rendering assistance to a foreign state in the conduct of hostile activity" does not lend itself to formalized analysis and elaboration.

It appears that the lack of clarity of both the terminology and the legal content of a whole number of elements of crimes included in Article 64 of the Criminal Code of the RSFSR was intentionally permitted by the legislator precisely for purposes of the possibility of their broad interpretation and freedom of discretion of bodies that apply the law, which contradicts general principles of law and the principles of criminal law in particular.

The refusal to petitioner V. A. Smirnov in 1991 and 1995 of a reconsideration of his case through supervisory proceedings, as well as a number of analogous problems of the rehabilitation of victims of political

repression, show that the applier of the law takes these same positions up to the present time. The political practice of recent years, with elements of the revival of great-power patriotism and totalitarian legal consciousness, attests to the danger of the use of the provisions, not disqualified to this day, of Article 64 of the Criminal Code of the RSFSR in combating political opponents—"defectors," "traitors," "enemies of the people," and so forth—for purposes of restriction of the political and other constitutional rights of citizens. All this speaks to the high degree of relevancy of the question under consideration.

2. The decision of the Constitutional Court correctly indicates that "flight abroad or refusal to return from abroad" as a norm of point "a" of Article 64 of the Criminal Code of the RSFSR contradicts the provisions of part 2 of Article 27 and part 3 of Article 55 of the Constitution of the Russian Federation, as well as that such actions by their character cannot be an infringement on the sovereignty, territorial inviolability, state security, and defense capability of the state.

However, the decision does not sufficiently thoroughly substantiate the impossibility of qualification of such deeds as treason against the Motherland.

A literal interpretation of the elements of the crime under consideration leads to the conclusion that the fact itself of the crossing over by a citizen of the USSR to the territory of a foreign state, it being not even material whether by legal or unlawful means, already constitutes treason. It is characteristic that criminal law doctrine and practice have never been able to work out a common, noncontradictory approach to the subjective side of the given acts, inasmuch as its formulation itself presupposes objective imputation and a political assessment of the subject's purposes and reasons as defection to the camp of the class opponent, as disagreement and disloyalty and, consequently, as treason in relation to the existing order, policy, and so forth. Such an assessment of this type of action arose back in the first years of Soviet rule and was legally embodied, for example, in the decree of the Presidium of the Central Executive Committee of the USSR of 21 November 1929, "On the Declaration of Officials/Citizens of the USSR Abroad Who Defected to the Camp of Enemies of the Working Class and the Peasantry and Who Refuse to Return to the USSR as Outside the Law."

On the other hand, in practice this led to a recognition of such political reasons as criminal regardless of the actions, which is seen in the case of petitioner V. A. Smirnov. Thus, the proof of his treasonous anti-

Soviet motivations was "his regular listening to subversive Western radio stations, negative attitude toward Soviet reality, discontent with the order existing in the USSR and with the international policy conducted by the Soviet state, solidarity with persons who engaged in anti-Soviet activity, and request to the Norwegian authorities that he be granted political asylum."

Consequently, the elements of point "a" of Article 64 of the Criminal Code of the RSFSR under consideration, both in terms of their content and with due regard for their interpretation and application in practice, contradict the provisions embodied in the Constitution of the Russian Federation concerning the presumption of innocence and liability for the commission of a crime [only with] fault (Article 49) and, contrary to the sense of the provisions of Article 55 of the Constitution of the Russian Federation, obstruct the exercise of the basic political rights and freedoms of the person and the citizen: the freedom of travel and choice of place of sojourn, the freedom to leave the country and to return to it without hindrance (Article 27), and the freedom of thought and of expression of one's opinions and convictions (Article 29, parts 1, 3), and contradict the principle of the inadmissibility of persecution for political convictions (part 2 of Article 63) and the right to seek asylum from persecution in other countries (point 1 of Article 14 of the Universal Declaration of Human Rights and part 4 of Article 15 and Article 63 of the Constitution of the Russian Federation).

3. The Constitutional Court recognized without any stipulations the provision of point "a" of Article 64 of the Criminal Code of the RSFSR concerning the provision of a state or military secret as in accord with the Constitution of the Russian Federation, citing the fact that the Law of the Russian Federation of 21 July 1993 "On State Secrets" realizes the requirement of part 4 of Article 29 of the Constitution; in doing so, however, the substantive aspects of the petitioner's argumentation are left without attention.

In the court session it was confirmed that, as before, a whole number of lists of information constituting state secrets exists at the present time. These lists are not confirmed by federal law, have a departmental character, and in connection with their secrecy are not published.

The formulation of Article 64 of the Criminal Code of the RSFSR, as well as the existing practice of its application, permit criminal liability for the provision of information contained in any of these lists. Moreover, as seen from the text, criminal liability arises as well for the provi-

sion of military information not related in terms of content to state secrets. At the same time, the fact itself of whether one or other item of information is categorized as a state or military secret is so unclear that, as a rule, special expert testimony is appointed in each concrete instance.

The case of petitioner V. A. Smirnov provides a characteristic example. The latter was convicted of having disclosed [to foreign officials] exporters of output prohibited for import into the Soviet Union by Western countries. This information was known to Smirnov from open sources. He had not been warned and had not given any signed statement concerning their nondisclosure, and he had not been given access to secret documents. Information of this type is not identified as secret in either the open list of information constituting state secrets that existed earlier or in the Law of the Russian Federation "On State Secrets" that is now in effect. However, the investigation and the court, in imputing to Smirnov treason in the form of providing state secrets, cited the secret and unpublished List of Key Information Constituting State Secrets confirmed by a Decree of the Council of Ministers of the USSR of 3 December 1980, about which Smirnov could not have known. The possibility of objective imputation [of criminal intent] under these circumstances is obvious.

Such an interpretation of the elements of point "a" of Article 64 of the Criminal Code of the RSFSR under consideration is utterly impermissible from the viewpoint of the following constitutional norms:

—part 3 of Article 15, in accordance with which any normative legal acts affecting the rights, freedoms, and obligations of the person and the citizen cannot be applied if they were not published officially for public information;

—part 3 of Article 55, in accordance with which the rights and freedoms of the person and the citizen can be restricted by federal law;

—part 4 of Article 29, in accordance with which the right to information can be restricted by a list defined by federal law of information constituting state secrets.

An analysis of the indicated provisions of the Constitution of the Russian Federation leads to the obvious conclusion that no other lists of information constituting state secrets except those officially published in federal law can serve as grounds for restriction of the right to freely seek, obtain, transfer, produce, and disseminate information by any le-

gal methods (and independently of state borders, as stated in part 2 of Article 19 of the International Covenant on Civil and Political Rights of 1966), let alone be grounds for criminal liability for treason.

In addition, treason in the form of providing state or military secrets is set out in the text of Article 64 of the Criminal Code of the RSFSR as an autonomous composition [of the crime] that is supposedly different from the preceding form—espionage. However, theoretically and practically it appears absolutely impossible to differentiate these two compositions and to draw any substantive distinctions between them. Both the one and the other formally constitute the intentional transfer (provision) of a state secret to a foreign state. Given the absence of attributes of treason or espionage, such a deed, as is well known, is qualified according to Article 75 of the Criminal Code of the RSFSR as disclosure of a state secret.

Thus, the presence in Article 64 of the Criminal Code of the RSFSR of an autonomous form of treason expressed in the provision of a state or military secret that does not constitute espionage or the disclosure of a state secret does not have a logical and legal substantiation and in practice leads either to objective imputation [of criminal intent], as in the case of Smirnov, or to an artificial doubling of guilt and punishment, which contradicts the provisions of Articles 4 and 50 (part 1) of the Constitution of the Russian Federation. The absence of clearly expressed legal distinctions among the indicated compositions of the crimes leads to obvious arbitrariness on the part of the applier of the law and, consequently, violates the constitutional principle of the equality of all before the law and the court (part 1 of Article 19).

4. Rendering assistance to a foreign state in the conduct of hostile activity against the USSR is one of the most indeterminate elements of point "a" of Article 64 of the Criminal Code of the RSFSR.

Theoretically, all that is not encompassed by the other elements of this article fall under this formulation, although in practice it is used as a kind of generalized form of treason that is without fail inherent in all the other elements, artificially doubling and complicating the qualification of the deed.

The location and sense of the formulation of the given composition attest to the fact that the list of forms of treason is not closed and the applier of the law can attribute to this as well certain other deeds that it subsequently deems necessary to qualify as treason.

Criminal law doctrine and practice long ago indicated the defective

nature of the given composition and the absence of concretely defined, criminally censurable forms of manifestation of so-called assistance in hostile activity; however, the legislator has yet to manage to do this on the strength of the fundamental impossibility, in my opinion, of giving an adequate formulation of this element as any special form of treason.

All of the examples known from practice either indicate different forms of involvement and coparticipation in espionage (recruitment of agents, the gathering of espionage information, and so on); subversion; terrorist acts or other crimes requiring a different qualification; or concern instances in which the concept of hostile activity has been given a purely political meaning in such characteristic terms as "subversive propaganda," "ideological subversion," "anti-Soviet actions," and so on. It was very easy to qualify such "activity" as treason "causing damage to the interests of the USSR" or "undermining" or "weakening the Soviet state."

The Smirnov case is one of the examples of this kind. He was convicted, in particular, for the fact that he communicated to representatives of Norway routine characterizations of his colleagues that, in the opinion of the investigation and the court, "could be used by foreign intelligence services for the conduct of ideological subversion, the inclining of Soviet citizens to commit treason against the Motherland, and the organization of other hostile actions" directed at undermining and weakening the Soviet state.

Thus, the element of point "a" of Article 64 of the Criminal Code of the RSFSR under consideration gives all grounds for its contradictory and arbitrary interpretation by the applier of the law, including the possibility of conviction for purely political reasons.

This contradicts generally accepted principles and norms of international law, which in accordance with part 4 of Article 15 of the Constitution of the Russian Federation constitute a component part of the legal system and the requirements made of a criminal law, which must clearly and explicitly define the elements of a crime (point 5.18 of the document of the Copenhagen meeting of the Conference on the Human Dimension of the Conference on Security and Cooperation in Europe) and the requirements of fair and impartial justice (the first part of Article 14 of the International Covenant on Civil and Political Rights of 1966).

The Constitutional Court in its decision indirectly recognized the defective nature of the norm of the Criminal Code of the RSFSR under consideration; however, despite the previously formulated position, it did not find this norm to be not in accord with the Constitution. In the

decree of 25 April 1995 concerning the complaint of citizen L. N. Sitalova, the Constitutional Court unambiguously stated: "The possibility of the arbitrary application of the law is a violation of the equality of all persons before the law and the court declared by the Constitution of the Russian Federation (Article 19, part 1)."*

It appears that an analogous conclusion is all the more substantiated in the given instance.

---

*See the Decree of the Constitutional Court of the Russian Federation of 25 April 1995, "In the Case Concerning Verification of the Constitutionality of Parts One and Two of Article 54 of the Housing Code of the RSFSR in Connection with the Appeal of L. N. Sitalova," in *Statutes and Decisions,* vol. 31, no. 4 (July–August 1995), p. 83.

**Exhibit 5 – Excerpt from Federal Constitutional Law No. 1-FKZ of Dec. 31, 1996, on the Judicial System of the Russian Federation**

Article 19. Supreme Court of the Russian Federation

1. The Supreme Court of the Russian Federation is the highest judicial body in civil cases, economic disputes, criminal, administrative and other cases within the jurisdiction of courts established in accordance with this Federal Constitutional Law.

2. Using the procedural forms stipulated in federal law, the Supreme Court of the Russian Federation exercises judicial supervision over the activities of courts established in accordance with this Federal Constitutional Law by considering civil cases, economic disputes, criminal, administrative and other cases within the jurisdiction of the aforementioned courts as a court of supervision and also, within the scope of its competence, as a court of appeal and a court of cassation.

3. The Supreme Court of the Russian Federation considers cases within its jurisdiction as a court of first instance and also based on new or newly discovered facts.

4. In order to ensure the uniform application of legislation of the Russian Federation, the Supreme Court of the Russian Federation gives the courts clarifications on issues of judicial practice.

**Exhibit 6 – Excerpt from the Russian Criminal Code**

Article 3. The Principle of Legality

1. The criminality of a deed, and also its punishability and other criminal-legal consequences shall be determined only by the present Code.

2. Application of the criminal law by analogy shall not be allowed.

Article 5. The Principle of Guilt

1. A person shall be subject to criminal liability only for those socially dangerous actions (inactions) and socially dangerous consequences in respect of which his guilt has been established.

2. Objective imputation, that is criminal liability for innocent injury, shall not be allowed.

Article 24. Forms of Guilt

1. Guilt for a crime shall be recognized if a person commits a deed purposively or negligently.

2. A deed committed only negligently shall be recognized as a crime only in cases where this is specially provided by an article of the Special Part of this Code.

Article 42. Execution of Order or Instruction

1. Infliction of harm to legally-protected interests shall not be qualified as an act of crime if it was caused by a person acting in execution of an order or instruction binding on him. Criminal liability for infliction of such harm shall be borne by a person who gave an illegal order or instruction.

2. A person who committed intentional offence in execution of an order or instruction known to be illegal, shall be liable under usual terms. Failure to execute an order or instruction known to be illegal shall preclude criminal liability.

Article 275. State Treason

    State treason, that is, espionage committed by a citizen of the Russian Federation, disclosure to a foreign state, international or foreign organization or their representatives of information constituting a state secret entrusted to a person or made known to him by service, work, study or in other cases stipulated by the legislation of the Russian Federation, or the provision of financial, material, technical, consulting or other assistance to a foreign state, international or foreign organization, or their representatives in activities aimed against the security of the Russian Federation, shall be punished by deprivation of liberty for a term of from twelve to twenty years, with a fine in the amount of up to five hundred thousand rubles or in the amount of the wage or other income of the convicted person for a period of up to three years, or without it, and with restriction of liberty for a term of up to two years.

Note. A person who has committed the crimes provided for in this article, as well as articles 276 and 278 of this Code, shall be relieved from criminal liability if he voluntarily and promptly communicated to the authorities or otherwise contributed to the prevention of further damage to the interests of the Russian Federation and if his actions do not contain other composition crime.

**Exhibit 6 – Excerpt from the Russian Criminal Procedure Code**

Article 14. Presumption of Innocence

1. The accused shall be regarded as not guilty until his guilt of committing a crime is proved as provided for by the present Code and brought into legal force by a court sentence.

2. A suspect or an accused is not obliged to prove his innocence. The burden of proving the charge and of refuting the arguments made in defense of the suspect or of the accused shall lie with the party of the prosecution.

3. All doubts concerning the guilt of the accused that cannot be eliminated in accordance with the procedure established by the present Code shall be interpreted in favor of the accused.

4. The verdict of guilty cannot be based on suppositions.

 

Strasbourg, 14 August 2013

**CDL-REF(2013)036**

**Opinion no. 717 / 2013**

Engl. only

<u>**EUROPEAN COMMISSION FOR DEMOCRACY THROUGH LAW**</u>

**(VENICE COMMISSION)**

# FEDERAL LAW

## ON MAKING AMENDMENTS
## TO THE CRIMINAL CODE OF THE RUSSIAN FEDERATION AND
## ARTICLE 151 OF THE CODE OF CRIMINAL PROCEDURE

## OF THE RUSSIAN FEDERATION

## adopted on 23 October 2012*

*\* unofficial translation - Source : the International Centre for Not-for-Profit Law (ICNL)*

**FEDERAL LAW**

**On Making Amendments to the Criminal Code of the Russian Federation and Article 151 of the Code of Criminal Procedure of the Russian Federation[1]**

**Article 1**
To amend the Criminal Code of the Russian Federation (the Code of Laws of the Russian Federation, 1996, # 25, Art. 2954; 1998, # 26, Art. 3012; 1999, # 28, Art. 3489; 2002, # 30, Art. 3029; 2003, # 50, Art. 4848; 2004, # 30, Art. 3091; 2006, # 31, Art. 3452; 2007, # 31, Art. 4008; 2008, # 52, Art. 6232; 299, # 1, Art.29; # 52, Art. 6453; 2010, # 31, Art. 4164; 2011 # 19, Art. 2714; # 30 Art. 4598; #50, Art. 7362; 2012, # 10, Art. 1166) as follows:

1) to add the number "283$^{1}$" after the number "282$^{2}$" in clause "a" of the first part of Article 104$^1$;

2) to word the first paragraph of Article 275 as follows:
"High treason, that is committed by a citizen of the Russian Federation acts of espionage, disclosure to a foreign state, an international or foreign organization, or their representatives of information constituting a state secret that has been  entrusted or has become known to that person through service, work, study or in other cases determined by the legislation of the Russian Federation, or any financial, material and technical, consultative or other assistance to a foreign state, an international or foreign organization, or their representatives in activities against the security of the Russian Federation, -";

3) to word the first paragraph of Article 276 as follows:
"Transfer, collection, theft, or keeping for the purpose of transfer to a foreign state, an international or foreign organization, or their representatives of information constituting a state secret, and also transfer or collection under the order of a foreign intelligence service or a person acting in its interest of other information for its use against security of the Russian Federation, i.e. espionage, if these acts have been committed by a foreign national or a stateless person,-";

4) to substitute the words ", work, study or in other cases determined by the legislation of the Russian Federation" for the words "or work" in the first paragraph of the first part of Article 283, and the words "crimes provided for by Article 275 and 276 of this Code" for the words "high treason";

5) to add Article 283$^1$ as follows:
"**Article 283$^1$:  Illegal Obtaining of Information Constituting a State Secret**
1. Obtaining of information constituting a state secret through abduction, deception, blackmail, coercion, threatened violence or through other illegal way (in absence of the *corpus delicti* stipulated by Articles 275 and 276 of this Code) - shall be punishable by a fine in the amount of 200,000 to 500,000 rubles or in the amount of the wages or salary or any other income of the convicted person for a period from one to three years, or by deprivation of liberty for a term up to four years.

2. The same act if :
a) committed by a group of persons;

---
[1] Adopted by the State Duma in the second and the third reading simultaneously on October 23, 2012

b) committed with the use of violence;
c) caused grave consequences;
d) committed with the use of specialized and other technical equipment for surreptitious obtaining of information;
e) connected with the dissemination of information constituting a state secret, or with the transfer of the carrier of information outside the borders of the Russian Federation, -
shall be punishable by deprivation of liberty for a term of three to eight years."

**Article 2[2]**
<…>

**Article 3**
This Federal Law shall come into force from the day of its official publication.

President of the Russian Federation.

---

[2] This Article amends the similar articles of the Criminal Procedure Code

**Exhibit 9 – Article 275 of the Criminal Code before 2012 Amendment**

Article 275. Treason

Treason, that is espionage, disclosure of state secrets, or any other assistance rendered to a foreign State, a foreign organization, or their representatives in hostile activities to the detriment of the external security of the Russian Federation, committed by a citizen of the Russian Federation,

Shall be punishable by deprivation of liberty for a term of 12 to 20 years with or without a fine in an amount of up to 500 thousand rubles or in the amount of the wage or salary, or other income of the convicted person for a period of up to three years and with restriction of liberty for a term of up to two years.

Note: A person who has committed crimes stipulated in this Article, or by Articles 276 and 278 of this Code, shall be relieved from criminal liability if he has facilitated the prevention of further damage to the interests of the Russian Federation by informing the governmental authorities of his own free will and in due time, or in any other way, if his actions contain no other corpus delicti.

**EXPLANATORY NOTE**

**to the draft federal law on amending
to the Criminal Code of the Russian Federation
and article 151 of the Criminal Procedure Code of the
Russian Federation**

This draft federal law is prepared on the basis of an analysis of the federal security service's analysis of the detection, suppression and investigation of crimes, for which the responsibility is provided by Articles 275, 276 and 283 of the Criminal Code of the Russian Federation (the Russian Criminal Code), and is aimed at perfecting criminal legislation to protect state secrets from criminal encroachments and improve the effectiveness of ensuring the security of the Russian Federation The Federation.

The analysis of article 275 of the Criminal Code of Russia and the practice of its application shows that espionage and the issuance of state secrets have come to be considered not as a form of treason, but as a form of assistance to a foreign recipient, which has led to an ambiguous interpretation of the subject of proof, in particular, in the cases of espionage in relation to Articles 275 and 276 of the Criminal Code of Russia. This circumstance necessitated the introduction of appropriate editorial changes in the disposition of Article 275 of the Criminal Code of Russia.

It should be noted that such a form of treason as "assisting a foreign addressee in carrying out hostile activities at the expense of the external security of the Russian Federation" needs to be adjusted. The uncertainty of the signs of this form of high treason, giving grounds for its contradictory and arbitrary interpretation by the law enforcer, was indicated by the judges of the Constitutional Court of the Russian Federation (see the separate opinions of Vitruk N.V. and Kononov A.L. in Resolution 17-P of the Constitutional Court of the Russian Federation of December 20, 1995 "In the case of the constitutionality of a number of provisions of article 64 of the Criminal Code of the Russian Federation in connection with the complaint of citizen V.A. Smirnov").

This form of treason in the current editorial office is extremely difficult to prove, as references to the lack of evidence of the presence of "hostile" activities in the actions of the person are used by the defense as the main argument for the release of defendants and defendants from criminal responsibility and punishment.

The active use of foreign special services in the course of intelligence and other activities aimed at damaging the security of the Russian Federation, the capabilities of international and non-governmental organizations dictates the need to include international organizations and their representatives in Article 275 of the Criminal Code of Russia as recipients of assistance in carrying out activities at the expense of the security of the Russian Federation. The current version of article 275 of the Russian Criminal Code does not allow the term "foreign organization" to be included as a recipient of assistance in carrying out activities aimed at harming the security of the Russian Federation, an organization whose membership and jurisdiction is not limited to the territory of one state, but has a wide supranational international character. In this case, we are talking not only about organizations created by two or more states, but also organizations founded by individuals to carry out activities in the territories of several states.

As full subjects of international legal relations, when receiving information that constitutes state secrets in relation to the Russian Federation, individual international organizations may act

both in their own interests and in the interests of special services of certain foreign countries. However, the methods for obtaining such information may be different. For example, in accordance with the Law of the Russian Federation On State Secrets, information constituting a state secret is transferred to international organizations on the basis of a decision of the Government of the Russian Federation.

At the same time, several international organizations have repeatedly made attempts to obtain information constituting a state secret by illegal means. In this regard, the proposed changes are aimed at establishing the legal basis for prosecuting persons who have issued information constituting a state secret to an international organization in violation of the procedure established by law.

Amendments to the disposition of Article 275 of the Criminal Code of Russia in order to specify the objective and subjective parties to the corpus delicti in relation to the three traditional forms of high treason, as well as the subject of such a high treason, as the issuance of state secrets, will allow, on the one hand, to exclude the very possibility of arbitrariness and abuse on the part of law enforcement authorities in case of prosecution under this article and, on the other hand, to fully realize the purpose of criminal proceedings, which consists in protecting the victims from criminal encroachments, and protecting the person from unlawful and unjustified accusation, conviction, restrictions on his rights and freedoms.

.
In connection with the fact that the concept of espionage as a form of treason is revealed through the disposition of Article 276 of the Criminal Code of Russia, the amendment of Article 275 of the Criminal Code of Russia entails the need to make amendments to Article 276 of the Criminal Code of Russia aimed at forming a uniform approach to determining the objective side of espionage, first of all from the point of view of the subject of proof.

As the law enforcement practice of the federal security services shows, there are cases when a foreign citizen, by virtue of the duties assigned to him, becomes the owner of information constituting a state secret on legal grounds. Moreover, an analysis of Article 283 of the Criminal Code of Russia, which provides for liability for the disclosure of state secrets, shows that only a citizen of the Russian Federation can be the subject of this act. Thus, the disclosure by a foreign citizen admitted to information constituting a state secret of this information is currently not considered to be a criminal offense. This circumstance indicates the need for the proposed changes to the disposition of the first part of Article 283 of the Criminal Code of Russia.

One of the serious problems that the federal security services had to deal with was the dissemination of state secrets along the so-called "chain". In this regard, the issue of establishing liability of persons who, while not being special entities specified in article 283 of the Criminal Code of Russia, criminally seized information constituting a state secret, has become an acute issue. The results of the analysis of the materials of criminal cases in the production of the investigative units of the federal security service showed that the information constituting a state secret is not protected from deliberate actions of persons to whom it was not trusted and did not become known from the service or work, attempting their illegal receipt and use in the absence of signs of treason and espionage in their actions. Moreover, such people, often associated with criminal structures, are primarily interested in information in the field of operational-search activity (about the methods of work of law enforcement agencies, about persons providing assistance on a confidential basis, etc.). An increased interest is also shown in information constituting a state secret in the field of geology, geodesy, cartography, topography, and economic activity (mainly from representatives of commercial organizations) in order to generate additional income when using it.

Exhibit 10

The introduction of a norm in the Criminal Code of Russia that establishes liability for the illegal receipt of information constituting a state secret by a person to whom she was not entrusted or did not become known in the service or work, in the absence of signs of treason or espionage, will ensure systematic protection of various types of information of limited access (for example, commercial, banking and state secrets) and will help to increase the effectiveness of protecting state secrets from socially dangerous encroachments with by persons who are not their legal holders.

In this regard, it is worth noting the experience of foreign countries, such as Kazakhstan, Great Britain and others, whose legislation provides for responsibility for the commission of similar acts.

The proposed addition to the Code of Criminal Procedure of the Russian Federation is due to the need to determine the jurisdiction of a crime, the responsibility for the commission of which is proposed to be established in article 283.1 of the Criminal Code of Russia. It is proposed that this act be attributed to the direct jurisdiction of investigators of the federal security service.

Exhibit 10

Ekaterina Vinokurova, A Law of Particular Application, @gazeta.ru, Oct. 23, 2012 – Exhibit 11

The State Duma adopted in the second and third reading amendments to the articles of the Criminal Code, which tighten the responsibility for the disclosure of state secrets and expand the interpretation of the concept of "high treason." The discussion did not take the deputies ten minutes. Human rights activists and lawyers are confident that this law will become another repressive tool in the hands of the authorities.

Amendments to the criminal law, expanding the interpretation of the concepts of "high treason," "espionage," "illegal obtaining of state secrets," were adopted by the State Duma immediately in the second and third final reading. United Russia, the Liberal Democratic Party and the Communist Party voted for the bill, and Fair Russia decided to abstain.

The discussion of the bill on state treason with minor amendments took no more than 5 minutes.

According to the decision of the State Duma Committee on Civil, Criminal, Arbitration and Procedural Legislation, the article proposed by the Government that changes criminal penalties for providing "financial, material, material, technical, consulting or other assistance to a foreign state, international or foreign, will remain in the article of the Criminal Code 'High Treason' organizations or their representatives in activities against the security of the Russian Federation."

The deputies, however, removed the phrase from the bill that activity against the security of the state may be considered an activity directed "including against its constitutional order, sovereignty, territorial and state integrity."

Earlier, treason was considered "the issuance of state secrets or other assistance to a foreign state, foreign organization or their representatives in conducting hostile activities to the detriment of the external security of the Russian Federation."

Deputies consider that amendments of the committee exclude abuses when applying the article.

"The application of the law is always associated with specific actions. Any law, especially in the field of criminal law, is applied upon the commission of illegal actions. And no other principles will apply to this law,"said Irina Yarovaya, chairman of the Duma's security committee, to Gazeta.ru. Her colleague Tatyana Moskalkova, a deputy from Just Russia, believes that the main danger of abuse of the article was precisely the wording "activities directed, including against sovereignty, constitutional order, territorial and state integrity" as a definition of "activities directed against the security of the Russian Federation" contained in the original text of the bill. "This definition would make it possible to attract almost anyone under the article" High Treason," for example, for publications or rallies against the government and the president," says Moskalkova. In her opinion, the final version of the bill eliminates this possibility. Moskalkova also noted that, according to statistics, cases under articles "high treason," "espionage" or "disclosure of state secrets" of a unit, these articles are used quite rarely.

Human rights activists and lawyers believe that the new version of the article, even with the exception of a few unclear provisions, will serve the authorities precisely for a targeted fight against political opponents.

The head of the human rights organization For Human Rights, Lev Ponomarev, considers the adopted amendments to be the sword of Damocles, which are now suspended above the heads of the opposition. "The law was originally written in such a way that even after editing it, the authorities have the opportunity to use this article to prosecute political opponents," says Ponomarev. "By 'security,' unlike 'external security,' as in the previous edition of the article, anything can be meant: food, domestic, legal security . . . There are a lot of terms that can be coined and summed up for any action related to the communication of political opponents of power with foreigners or foreign organizations, up to the presentation of reports on human rights in international forums."

The adoption of this law is a continuation of the tendency to tighten the screws against the political opposition, said the former head of the presidential human rights council, human rights activist and public figure Ella Pamfilova. "The problems in our country are usually not in laws, but in how they are applied. The law can lie to itself calmly until everyone forgets about it, and at the right moment be used precisely as the state needs it. It is difficult now to say how often these amendments will be applied, but if the government needs it, they will work as the authorities need. It is clear that the adoption of this law is a continuation of the current frantically prohibitive legislative trend. It is hoped that, having reached its peak, it will decline, "says Pamfilova.

The lawyer Konstantin Rivkin, in a conversation with Gazeta.Ru, also uses the definition of "sword of Damocles" regarding the adopted amendments, but believes that he is listed not only over the opposition, but over all citizens.

"It is clear that the addition of disposition of Art. 275 of the Criminal Code (high treason) is aimed at expanding its practical application, and, worst of all, it depends largely on the discretion of a specific law enforcer, for example, the investigator of the FSB system, whose jurisdiction includes this category of criminal cases," says Rivkin. Criminalization in the form of "providing financial, material, technical, consulting or other assistance to a foreign state, international or foreign organization or their representatives in activities against the security of the Russian Federation" raises a sword of Damocles almost over every citizen who communicates with a foreigner official need, or even with a harmless meeting of a domestic nature."

Rivkin explains that the previous version of this article of the Criminal Code "rested" on the normatively developed concept of state secrets with a corresponding limited list of relevant information.

"The freshly baked short story leaves a significant field for free interpretation by the security services of assistance directed against the security of the Russian Federation. Given the indications here of consulting and other assistance, those who wish to be 'right in the presence of big rights' include lecturing at a foreign university, participating in international scientific seminars, conducting disputes, publishing critical articles, etc. And if we note that now the criminal law

speaks simply about security, and not, as before, about external security, then the flaw of such legislation is even more revealing," the lawyer said.

The Criminal Code should contain as few vague language as possible, as they automatically give rise to abuse, and the concept of "security" is just that, the head of the Agora human rights association Pavel Chikov told Gazeta.ru: "The criminal code requires an exhaustive list of that which is considered an offense, all concepts should be extremely specific, and ideally, the article should contain an exhaustive list of what is a threat to the security of the country, not allowing any interpretation. The wording 'security threat' is evaluative in nature and can mean anything: it is up to the person who initiates the criminal case to decide what it is."

The government proposed amendments to the criminal article "High Treason" back in 2008, but then the bill did not reach consideration, and, according to Gazeta.Ru sources in the lower house of parliament, one of the most ardent opponents of this law was MP Gennady Gudkov, in September 2012, prematurely deprived of his mandate in the pretrial order. A week after he was expelled from the Duma, government amendments were suddenly remembered. Now they are to be considered by the Federation Council, after which the new law will be signed by the president.

Vol. 8 No. 2 (1997)                                                                191

# The New Russian Criminal Code as a Reflection of Ongoing Reforms[*]

*Anatolyi V. Naumov*[**]

The new Criminal Code of Russia took effect on January 1, 1997. Its predecessor, the Criminal Code of the Russian Soviet Federated Socialist Republic, was enacted in 1960, and despite many revisions had become hopelessly obsolete. The 1960 Criminal Code proceeded from the class principle of Soviet criminal law, the supremacy of socialist (communist) ideology, and the adherence of all penal law rules to a centralized, planned economy and command–administrative system. Contemporary Russian society, however, is in a new era, requiring criminal legislation that conforms to current social, political, and economic conditions.

Before we begin to describe the new code, it is necessary, at least briefly, to describe the former one, and to identify the reasons behind the enactment of the new code.

---

[*]      This article was translated from Russian by Oxsana Gribakova, Class of 1997, Rutgers University School of Law.

[**]      Professor of Law and Head of the Department of Criminal Law and Criminology, Institute of State and Law of the Russian Academy of Science; Doctor of Legal Science 1975. The author participated in drafting several legislative instruments, including the 1991 Fundamental Principles of Criminal Legislation of the USSR and the Union Republics, the new Criminal Code of the Russian Federation, and the Model Penal Code for members of the Commonwealth of Independent States.

## THE LEGISLATIVE FRAMEWORK OF THE SOVIET ERA

The Russian Criminal Code of 1960, along with the previously enacted Fundamental Principles of Criminal Legislation of the USSR and the Union Republics of 1958 *(Osnovy Ugolovnogo Zakonodatel'stva Souiza SSR i Souiznykh Respublic),*[1] was adopted during the so-called Khrushchev thaw and constituted a significant step (at that time) toward both the democratization of state criminal policy and legislation and the renunciation of the dark Stalinist legacy. These trends were reflected initially in the abolition of the principle of analogy in the application of criminal law[2] and in the adoption of the principle of *nullum crimen sine lege.*

Both the Russian Code of 1960 and the criminal codes of other Soviet Republics enacted from 1959 to 1961 conformed precisely to the basic principles embodied in the Fundamental Principles of Criminal Legislation of the USSR and the Union Republics, and thus inevitably mirrored all the weaknesses and strengths of the Fundamental Principles. On the one hand, the code to a certain extent reflected ongoing democratic transformations in society; on the other, both the code and the Fundamental Principles continued to adhere to the class principle of Soviet criminal law and its apparent opposition to bourgeois criminal law, and proceeded from the ideology of Marxism–Leninism, a centralized, planned economy, and the principle of supremacy of the Communist party. Failure to comply with international human rights standards constituted one of the most serious deficiencies of the 1960 code. Thus, certain provisions of the code significantly circumscribed the freedom of Soviet citizens; for example, article 70 ("anti-Soviet agitation and propaganda"), article 142 ("violation of the law on separation of church

---

[1]     *Editors' note:* In effect, the "Fundamental Principles" served as the general part of the Criminal Code.

[2]     Prior to 1958, the doctrine of analogy was codified in RSFSR Criminal Code, 1926, art. 16: "If any socially dangerous act is not directly provided for by the present Code, the basis and limits of responsibility for it shall be determined by application of those articles of the Code which provide for crimes most similar to it in nature." *Translated in* Harold Berman & James W. Spindler, *Soviet Criminal Law and Procedure* 22 (2d ed. 1972).

and state and of church and schools"); article 198 (violation of passport rules); article 209 (prohibition of vagrancy, begging, and any other parasitic way of life); and article 153 (prohibition of any private entrepreneurial activity and activity as commercial middleman). The code was incompatible not only with the Universal Declaration of Human Rights of 1948 but also with the International Covenant on Civil and Political Rights and subsequent international instruments on human rights.

As is well known, the year 1985 witnessed the start of numerous democratic changes and renewal of the socialist state in the Soviet Union. The body of criminal law was not immune to these changes. One of the first achievements of *perestroika* in Soviet criminal law was the repeal of prohibitions on "anti-Soviet agitation" and "anti-Soviet propaganda." The previous Soviet legislation defined "anti-Soviet propaganda" and "anti-Soviet agitation" as deliberate public dissemination, or possession for the purpose of dissemination, of published or written materials or information in other forms with the intention of undermining, discrediting, or weakening the political and economic system of the USSR. The number of people charged with violations of these provisions was enormous. Most of the people confined in overcrowded labor camps during the Stalinist regime were convicted of anti-Soviet agitation or propaganda. In fact, charges of this type of crime were not infrequent even in the 1960s, 1970s, and early 1980s.

Criminal liability for anti-Soviet agitation and propaganda significantly circumscribed the right of citizens to read and to think independently. For many years, proof of anti-Soviet intention was presumed in practice. For example, admission of possessing anti-Soviet literature conclusively demonstrated anti-Soviet purpose. But how and by whom was literature evaluated as counterrevolutionary (anti-Soviet)? During the Stalinist repression, the answer was incredibly simple: if, for instance, yesterday, the author of a certain piece of literature was determined to be "an enemy of the people," then tomorrow everything written by that author would be labeled anti-Soviet, and consequently, the finding of any book by that author in someone's possession would "legally" convert the reader of that book into a perpetrator of a crime against the Soviet state. The recent history of the fight against the most dangerous crimes against the state during the 1960s and 1970s (and even the early 1980s) demonstrated that no essential changes were taking

place: the only changes that occurred were in the names of authors but not in the approach to finding literature anti-Soviet.

During the period of *perestroika* and democratic revival of society, it was evident that the old version of article 70 of the Criminal Code had to be repealed because it was in direct contradiction to *glasnost,* the development of democracy, and the idea of the rule of law. The article was in fact repealed in 1989. Almost simultaneously, the article on criminal liability for dissemination of knowingly false fabrications that defame the Soviet state and social system was removed from the Criminal Code. This obviously antidemocratic definition of a crime had been formulated in 1966 for the purpose of punishing dissidents and appeared to be a type of fallback crime with respect to anti-Soviet agitation and propaganda that could be used when proof thereof was not sufficient.

One of the declared goals of *perestroika,* building a new state based on the rule of law, has been related to the coherent embodiment of the principle of separation of powers (legislative, judicial, and executive) in practice. Due to a long and sad tradition, empowering the judiciary in the Soviet Union was quite difficult. It is well known that the judicial branch in the Soviet Union had a subordinate place in the partocratic (government by the party) structure of the command–administrative system. One of the first steps toward the goal of strengthening the judiciary was the enactment of a federal statute in November 1989 "On Liability for Disrespect of the Court." This statute created criminal liability for interfering with court decisions and for threatening or insulting a judge or people's assessor (later these norms became part of the Criminal Code of the RSFSR).

On July 2, 1991, the Parliament of the Soviet Union adopted one of its last legislative acts, the new Fundamental Principles of Criminal Legislation of the USSR and Union Republics, designed to replace the Fundamental Principles of 1958. Because of the subsequent collapse of the USSR, the new Fundamental Principles never took effect. Unfortunately, the enactment of this statute did not generate much interest in the context of the disintegration of the Soviet state, which was followed by intense and sometimes bloody conflicts on interethnic grounds and by a series of infamous events in August of the same year (in particular, the antidemocratic coup d'état of 1991). Nonetheless, the 1991 Fundamental Principles merit attention for several reasons. First, they reduced the number of capital offenses. Second, they introduced

a number of criminal law norms intended to reinforce individualized criminal liability and punishment, as well as to make them more fair. For example, an article on classification of crimes assigned all crimes to one of four categories depending on the character and dangerousness of the offense. The penal consequences for individuals who committed a crime depended on its category. Third, the Fundamental Principles included a provision on the diminished responsibility of mentally deranged but legally sane individuals.   Fourth, the Fundamental Principles expanded the range of exculpating circumstances that eliminated the criminality of an act, such as taking a justifiable professional or economic risk or following orders. Finally, the Fundamental Principles took into account the phenomenon of organized crime and increased the range of punishments that do not rely on a deprivation of freedom.   It is worth noting that a few years later, many of these innovations, because of their progressive and democratic character, were reflected in the new Russian Criminal Code.

Further changes to the Russian Criminal Code of 1960 were taking place in the context of the postsocialist development of the criminal law.  Officially, the beginning of this stage of development of Russian criminal legislation is associated with the enactment of the new Constitution of the Russian Federation in December 1993.  However, the first steps in this direction had already been taken in the Criminal Code of the RSFSR at the end of 1991. After the well-known events of August 1991, the collapse of the Soviet Union, and Russia's attainment of genuine statehood, it became possible to include in Russian criminal legislation certain changes demonstrating rejection of the old ideology and acceptance of a new one:  the precedence of humanitarian values over class values, a refusal to adhere to the "socialist choice,"[3] a decisive turn toward the recognition of legal safeguards for rights and liberties as a fundamental idea of criminal legislation, and the conformity of criminal prohibitions to the transition to a market economy.  This shift was reflected in the repeal of criminal law norms violating human rights and freedoms and of the prohibitions contained in articles 142, 198,

---

[3]      *Editors' note:*  this terms comprises the hegemonic position of the state party and central economic planning.

209, and 227 of the Criminal Code of 1960.[4]

Relying on provisions of the Declaration of Rights and Freedoms of the Individual and Citizen of the Russian Federation of 1991 and furthering the development of the humanist foundation of criminal law, the Russian Federation, on December 5, 1991, abolished the death penalty for violation of currency laws, grand theft of state and/or public property, and bribery under aggravated circumstances. In addition, a statute of May 27, 1993, repealed the death penalty for all women and for men over sixty-five. On April 21, 1992, article 38 of the Constitution of the Russian Federation established that the death penalty may be applied only as an exceptional form of punishment for grave crimes against individuals (this principle was later endorsed by the Constitution of the Russian Federation of 1993), although some provisions of the Criminal Code failed to conform to this constitutional provision.

Norms of Soviet criminal legislation had always strictly protected a centralized, planned economy. Subsequently, concrete steps toward a Russian market economy resulted in the repeal of criminalization of the following: private enterprise and commercial middleman activity; production of poor quality, nonstandard, and/or incomplete products; and additions to or other distortions of accounts concerning fulfillment of an economic plan. At the beginning de facto, and later de jure, speculation was decriminalized.[5] At the same time, certain criminal law norms intended to protect economic relations during the transitional period were enacted. Criminal liability was imposed for failure to report income; hiding of profits or other income subject to taxation (tax evasion); violations of antitrust law; failure to cooperate with or follow directions of tax inspectors in order to hide profits or evade taxes; unlawful entrepreneurial activity; unlawful business undertaking in trade; and similar acts. Another important development in this respect was the elimination in 1994 of chapter 2 of the Criminal Code, which dealt with crimes against socialist property, along with the formulation of a uniform

---

[4]     *Editors' note:* articles 142, 198, and 209 are discussed *supra* pp. 192–93. Article 227 generally restricted religious activities.

[5]     RSFSR Criminal Code, 1960, art. 154, defined speculation as "buying up and reselling of goods or any other articles for the purpose of making a profit." *Translated in* Berman & Spindler, *supra* note 1, at 22.

system of provisions concerning responsibility for crimes against property in general, clarification of the notion of criminally punishable smuggling, and formulation of norms establishing liability for other crimes relating to customs.

In spite of all these amendments, the 1960 Criminal Code had become hopelessly obsolete, and its practical implementation increasingly difficult. Reality urgently demanded the enactment of a new criminal code, responsive to the new conditions and demands of life in Russia.

## THE NEW CRIMINAL CODE

Work on a new Criminal Code began in 1991, during the last month of existence of the Soviet Union. For this purpose, two working groups were formed—one at the Ministry of Justice of the Russian Federation; the other at the Supreme Soviet of the RSFSR. The Justice Ministry's first draft was ready in December 1991 and was published for public discussion.[6] Later, this draft was substantially modified, taking into account comments from legal scholars and practitioners. The Justice Ministry draft was also reviewed by specialists at Harvard Law School.[7] In September 1992, the President of Russia sent the draft to the Supreme Soviet of the RSFSR. At the time, relations between the President and the Supreme Soviet of the Russian Federation were strained. For this and other reasons, the Supreme Soviet did not review the Justice Ministry draft, and indeed was naturally inclined to support the text on which its own drafting group was working. The Justice Ministry draft was further revised by the State Legal Department of the

---

[6]      *Za Chto i Kak Budut Sudit' v Rossii . . . Novyi Ugolovnyi Kodeks (Proekt) [For What and How One Is to Judge in Russia . . . New Criminal Code (Draft)]* (pts. 1–3), 2 Zakon 85 (1992); 3 Zakon 90 (1992); 4 Zakon 93 (1992). *Zakon* is a magazine supplement to *Izvestiia.*

[7]      The draft was published twice in revised editions. Yuridicheskii Vestnik, 1992, No. 20; *Prestuplenie i Nakazanie: Kommentarii k Proektu UK Rossii [Crime and Punishment: Comments to the Draft of the Criminal Code of Russia]* (N.F. Kuznezhova & A.V. Naumov eds., 1993).

Russian Federation and the Ministry of Justice and, on behalf of the President, submitted for consideration to the state Duma (lower house of Parliament) at the end of 1994. At the same time, a group of delegates introduced another draft Criminal Code based on the Justice Ministry draft of 1991–1992. Recognizing that the basic concepts in the Justice Ministry and Supreme Soviet drafts coincided, the legislators came to a reasonable and compromise decision to create a single, coordinated draft Criminal Code on the basis of these two texts. The new draft was prepared very quickly, and during 1995 the state Duma enacted it in three readings and then forwarded it to the Council of the Federation (upper house of Parliament). The latter rejected this draft but the state Duma overrode the veto and forwarded the text to the President. The President, however, refused to sign this version into law on the ground of some significant, in his opinion, deficiencies. After a relatively brief period of revision, on May 24, 1996, the state Duma approved the revised draft of the Criminal Code, and on June 5, 1996, the Council of the Federation did the same. Finally, on June 13, 1996, the President of the Russian Federation signed the federal law "Concerning the Introduction into Operation of the Criminal Code of the Russian Federation" *(O Vvedenii v Deistvie Ugolovnogo Kodeksa Rosiiskoi Federatsii)*.

### The Structure of the Code

The new code has retained the traditional division between a general part and a special part, but at the same time its structure differs from that of the previous code. Thus, both the general part and the special part of the code now are divided not simply into chapters, as before, but instead into sections, which are then subdivided into chapters.

This change reflects the increase in the number of norms in the general and special parts, which can be explained in turn by a more complex elaboration of many problems of criminal protection in the modern world, entailing the emergence of new criminal law doctrines in the general part and the formulation of many new specific crime definitions in the special part. In all, the code comprises 12 sections, 34 chapters, and 360 articles.

The section and chapter headings are set out below:

## GENERAL PART

*SECTION I.*   *Criminal Legislation*
          Chapter 1.       Objectives and Principles of the Criminal Code of
                           the Russian Federation
          Chapter 2.       The Operation of Criminal Legislation in Time
                           and Space

*SECTION II.*   *Crime*
          Chapter 3.       The Concept of Crime and Categories of Crime
          Chapter 4.       Persons Subject to Criminal Responsibility
          Chapter 5.       Culpability
          Chapter 6.       Inchoate Crime
          Chapter 7.       Complicity in Crime
          Chapter 8.       The Circumstances Excluding Criminality of an
                           Act

*SECTION III.*   *Punishment*
          Chapter 9.       Definition and Purposes of Punishment. Categories
                           of Punishment
          Chapter 10.      Assignment of Punishment

*SECTION IV.*   *Release from Criminal Responsibility and Punishment*
          Chapter 11.      Release from Criminal Responsibility
          Chapter 12.      Release from Punishment
          Chapter 13.      Amnesty, Executive Clemency, Criminal Record

*SECTION V.*   *Criminal Responsibility of Minors*
          Chapter 14.      Specifics of Criminal Responsibility and Punish-
                           ment of Minors

*SECTION VI.*   *Compulsory Measures of a Medical Nature*
          Chapter 15.      Compulsory Measures of a Medical Nature

## SPECIAL PART

*SECTION VII.*   *Crimes against the Person*
          Chapter 16.      Crimes against Human Life and Health
          Chapter 17.      Crimes against Freedom, Honor, and Dignity of
                           the Person

Chapter 18.     Crimes against Sexual Inviolability and Freedom of the Person

Chapter 19.     Crimes against Constitutional Rights and Freedoms of the Person and Citizen

Chapter 20.     Crimes against the Family and Minors

*SECTION VIII.  Crimes in the Sphere of the Economy*

Chapter 21.     Crimes against Property

Chapter 22.     Economic Crimes

Chapter 23.     Crimes against the Interests of Commercial and Other Organizations

*SECTION IX.    Crimes against Public Security and Public Order*

Chapter 24.     Crimes against Public Security

Chapter 25.     Crimes against Human Health and Public Morality

Chapter 26.     Environmental Crimes

Chapter 27.     Crimes against Traffic Safety and Maintenance of Means of Transportation

Chapter 28.     Computer-Related Crimes

*SECTION X.     Crimes against State Authority*

Chapter 29.     Crimes against the Fundamentals of the Constitutional Order and State Security

Chapter 30.     Crimes against the State, Interests of the Civil Service, and Interests of Local Self-governing Bodies

Chapter 31.     Crimes against the Administration of Justice

Chapter 32.     Crimes against the System of Administration

*SECTION XI.    Military Crimes*

Chapter 33.     Military Crimes

*SECTION XII.   Crimes against the Peace and Security of Mankind*

Chapter 34.     Crimes against the Peace and Security of Mankind

## Characteristics of the Legislatively Formulated Objectives and Principles

The code begins by stating that "the criminal legislation of the Russian Federation consists of this Code. New laws defining criminal responsi-

bility are subject to inclusion in this Code" (article 1). What is the significance of this provision? In many Western countries, criminal codes are not the exclusive source of criminal law. In addition, various pieces of legislation outside the codes (sometimes very extensive) also contain criminal law norms establishing responsibility, for example, for economic, environmental, and transportation crimes. Such an approach was proposed during the preparatory work on the new Russian Criminal Code because it makes it easier for lawmakers to change criminal legislation without disturbing the structure of the code. However, it seems that in this instance, the preservation of national traditions with respect to the exhaustive incorporation of criminal law norms within the framework of the Criminal Code was very important. It should facilitate the practical application of criminal legislation, especially in the provinces, where legal information is not easily accessible, and thereby should contribute to a fuller implementation of the rule of law.

Article 1 of the Criminal Code also provides that "the [C]ode is based on the Constitution of the Russian Federation and universally recognized principles and norms of international law."

Article 2 formulates the objectives of the Criminal Code as follows: protection of the rights and freedoms of the individual and the citizen, property, the social order and public safety, the environment, and the constitutional order of the Russian Federation against criminal acts; securing of the peace and security of mankind; and prevention of crime.

Actually, such objectives of the criminal law are wholly tradition-al and, in principle, are the same for any Judeo-Christian or Muslim society or state since they originate from biblical commandments, such as "thou shall not kill" and "thou shall not steal." Historically, criminal law emerged to defend society from criminal acts. Protection is the main function of criminal law, which in essence is not dependent on the political and economic order of the state. As far as the formulation of objectives is concerned, as strange as it may seem, even the criminal codes of the Soviet socialist republics were largely similar to the criminal codes of the American states. In one way, however, they were funda-mentally different; namely, in the way they determined priorities of criminal protection. The Criminal Code of the RSFSR, as well as of other Soviet republics, proceeded from the principle of protection of state interests first, public interests next, and only afterward the interests of the individual; in contrast, in the criminal codes of developed democratic

countries, these priorities are generally reversed.

The new code refused to adhere to the old, indigenous tradition and established a new hierarchy of values protected by criminal law—the person, the public, the state.[8] Admittedly, this shift did not come about easily. During discussions of the drafts, it was persistently reiterated that such an allocation of priorities "is not good for Russia," that the interests of the state and the public should take precedence, and that only the effective criminal law protection of these interests will ensure the safety of the person.

For the first time in the history of Russian criminal legislation, the following principles of criminal law are recognized: legality (article 3), equality of all citizens before the law (article 4), culpability (article 5), justice (article 6), and humanism (article 7).

The principle of *legality* means that the criminality of an act, as well as prescription of penalties and other penal consequences of conviction, shall be determined only by the present code. The principle absolutely prohibits application of criminal sanctions by analogy.[9] Russian jurists have terrifying recollections related to the doctrine of analogy. If, for example, a person inadvertently dropped the bust of a leader, and the bust broke, even the Stalinist Criminal Code did not stipulate punishment for such an act. In spite of this "gap," in accordance with the doctrine of analogy, a criminal proceeding could be instituted against the unlucky klutz, and he could be convicted of attempted assassination. Unfortunately, this example is not a flight of imagination. The doctrine of analogy was formally renounced by the Fundamental Principles of Criminal Legislation of the USSR and the Union Republics of 1958. However, since this doctrine was occasionally invoked by the courts, a legislatively explicit renunciation was required in the new code. Of course, the notion of the social dangerousness of an act is not immutable. Both the development of social relationships,

---

[8]     In Soviet law, the special part began with the most serious offenses, "treason" and other crimes against the state; then followed crimes against socialist property and, finally, provisions on responsibility for homicide. In the new Criminal Code, criminal law protection of persons' and citizens' rights and freedoms has top priority; the interests of the society and state are secondary.

[9]     See *supra* note 2.

and the progress of science and technology, may alter the criteria for finding acts socially dangerous and punishable.   Something that is socially dangerous today may lose this character; vice versa, new criminal prohibitions may be needed for acts not previously deemed socially dangerous.  Law enforcement agencies may still find acts socially danger-ous that fall outside the legislative purview and thus are not criminally punishable.  But such a "filling in the gaps" should remain exclusively in the legislative domain.  A court, a prosecutor, an investigator, or an agency of inquiry has no right to assign criminal significance to an act falling outside the sphere of criminal legislation.  The new Criminal Code expressly says so.

The principle of *equality* of citizens means that persons who have committed crimes should be treated equally before the law and be subject to the same criminal responsibility, regardless of gender, race, nationality, language, origin, economic or official status, place of residence, religion, beliefs, membership in social associations, and other circumstances.

The principle of *culpability* means that a person is subject to criminal responsibility only for socially dangerous acts (or omissions to act) and the ensuing socially dangerous consequences with respect to which his personal culpability is established.  Only an actor who has committed a forbidden act intentionally or negligently may be found guilty of crime.   Strict liability—criminal responsibility for the nonculpable infliction of harm—is not permitted.  Hence, no act in spite of its dangerous consequences may be considered a crime if it was committed innocently, that is to say, without culpability.  This principle reflects the elementary requirement of a fair social and legal evaluation of human behavior in general and of criminal behavior in particular, because convictions based on an act as to which the social danger was unforeseen, or could not have been foreseen, would not have any preventive or educational significance.  The new Criminal Code not only legally reinforces the principle of culpability but also develops it significantly compared to the previous criminal legislation.  In the new Criminal Code, an act committed negligently is deemed a crime only if it is provided for in a particular article of the special part of the code (criminal codes of many European countries, including the Federal Republic of Germany, contain an analogous rule).  Therefore, unless an article in the special part specifically provides otherwise, it shall be presumed that criminal intent is required.

The principle of *justice* is defined in article 6 of the new Criminal Code. First, this principle means that punishment, as well as other penal consequences, applied to a person who commits a crime must be just; that is, must correspond to the character and degree of social dangerousness of the crime, attendant circumstances, and the personality of the accused. Second, no one shall be criminally responsible twice for the same crime (the latter reflects a constitutional principle). In fact, the principle of justice includes individualized responsibility and punishment. Thus, statutory penalties have a relatively definite (when they provide for a specific kind of punishment within certain limits) or an alternative character (when they provide for two or more kinds of punishment alternatively). Sometimes, statutory penalties combine those characteristics (for example, a negligent act causing death is punishable by deprivation of freedom, explained below, for up to three years or imprisonment for the same term). Even broader boundaries for the individualization of responsibility are established in the norms on sentencing and relief from criminal responsibility and punishment (articles 61–68), allowing a court in certain circumstances significantly to mitigate punishment or relieve the perpetrator of criminal responsibility and punishment.

The principle of *humanism* has also been redefined. First of all, the principle is addressed not to criminals but to all citizens: "The criminal legislation of the Russian Federation ensures the security of the individual." The traditional understanding of this principle is that "punishment and other means of criminal law applied to persons who have committed crimes may not be applied so as to cause any physical suffering and humiliation of the individual." Therefore, this principle prohibits punishments that torment, or humiliate, or are cruel. Under this principle, the state attempts through conviction and punishment to correct the person who has committed a crime, bring him back to a socially useful life, and positively influence other people. Unfortunately, in Russian society at present, the view that cruelty and *retribution* are the best means of eradicating crime is widespread.

### New Provisions on Crime and Punishment in the General Part

Central to criminal law is the concept of crime. The new Criminal Code has retained the formal and substantive character of the legislative

definition of crime.  The definition includes a formal (normative) element, the prohibition of an act by criminal legislation, and a substantive indicium, social dangerousness.  The latter indicium lies in a criminally prohibited act's capability to cause significant social harm to interests protected by criminal law.  Social danger, as was mentioned before, is a substantive indicium, an innate characteristic of a criminal act that reveals the act's social essence.  This is an objective characteristic of a crime, one that does not depend on a legislator's will.  In criminal legislation in Western countries, the substantive indicium of a crime (an indication of its social dangerousness) is absent, as a rule.  Thus, for example, the Criminal Code of the Federal Republic of Germany defined a crime as "an unlawful act which is to be punished by deprivation of freedom for a minimum of one year."  In this regard, some Russian legal commentators suggested eliminating the substantive definition of crime and returning to its purely formal definition:  crime merely as unlawful criminal act.[10]

The draft of the new Criminal Code of the Russian Federation proposed by a group from the State Legal Department of the President of Russia and the Ministry of Justice of the Russian Federation also tried to eliminate the substantive indicium of crime.  Thus, article 14 of that draft offered the following definition:  "A crime is deemed an act (an action or omission) forbidden by criminal legislation and causing harm or danger of harm to the person, society and state."  Clearly, this formulation suffers from significant methodological flaws.  The wording blurs the line between a crime and any other violation of the law since the harmfulness of an act is inherent in any breach of law.  And crime as a species of violation of law is differentiated from other offenses by enhanced harmfulness, that is, by causing significant harm to protected interests (in other words, by being socially dangerous).

The legislature correctly refused to accept this proposal.  The problem is not so much that Western criminal law rejects the indicium

---

[10]     *Sud Prisyazhnix: Vozvrashenie v Rossiu—Programma Meropriyatii po Etapnomy Vvedeniu Suda Prisyazhnich i Drugich Printsipial'no Novix Polozhenii Protsesual'nogo i Sudoustroistvennogo Zakonodatel'stva [Trial by Jury: Return to Russia—The Program on Measures of Gradual Introduction of Trial by Jury and Other Major New Provisions on Legislation Concerning the Judiciary and Judicial Procedure]*, Sovetskaia Ustitsiia, 1993, No. 3, at 2.

of the social dangerousness of a criminal act but that Western legislative traditions are different. Thus, the legislative definition of crime in the German Criminal Code existed at the beginning of the last century, during the heyday of the "classical school" of criminal law, at the time when criminal law theory had not yet formulated the notion of social dangerousness. The theory of social dangerousness emerged and was developed not in the framework of Soviet criminal law but in the theoretical writings of those representing a sociological school of criminal law. It is a separate issue that this theory actually took root in Soviet legislation.

It should be acknowledged that, although Russian criminal legislation of the last and the beginning of the present century (the Code of Criminal and Corrective Punishment of 1845, including the 1885 edition, and the Criminal Code of 1903) set out a formal definition of crime, the most eminent Russian criminal law scholar N.S. Tagantsev came close to a substantive definition of crime in his acclaimed course on criminal law. In his famous textbook, Tagantsev maintained that

> an act is considered criminally punishable when it infringes upon a legal norm in its "real being" and upon prohibitions by law of the place of the act's perpetration under the fear of punishment; or, emphasizing more the extent of infringement: an act en-croaching on such interest which is protected by a legal norm that in a particular country, at a given time, is recognized as so significant that the state, in light of the insufficiency of other means of protection, threatens the perpetrator with punish-ment.[11]

Social dangerousness is the objective and intrinsic characteristic of a crime. And an attempt to renounce this characteristic or this attribute is tantamount to "throwing out the baby with the bath water." Without this characteristic, the definition of crime would be defective. It would fail to make clear why certain acts are prohibited under the threat of criminal punishment.

---

[11]    N.S. Tagantsev, *Russkoe Ugolovnoe Pravo: Lektsii — Chast' Obshchaya [Russian Criminal Law: Lectures — The General Part]* 46 (St. Petersburg n.d.).

The new Criminal Code of the Russian Federation, recognizing social dangerousness as an indicium of crime, specifically stipulates in article 14(2) that "an act or an omission to act shall not be a crime, although it formally contains the indicia of any act provided for by the present Code, if due to its insignificance it does not represent a social danger, that is, it has not caused or threatened to cause harm to the person, society, or the state" (a modified formulation of the previous Criminal Code of the RSFSR).

Article 15, which introduces a formal categorization of crimes, represents an important innovation. Legislative classification of crimes is necessary so that assignment of a particular criminal act to the appropriate category entails specific legal consequences. Henceforth, the categorization of crimes is taken into account not only when a legislature establishes the punishment and a court determines the sentence but also when resolving many other penal law issues, such as defining dangerous and extremely dangerous recidivism; determining liability for criminal preparation or criminal association, or punishment for multiple crimes; and providing relief from criminal responsibility and punishment.

The Criminal Code of the Russian Federation of 1996, for the first time in the history of Russian criminal law, includes a special provision regarding the criminal responsibility of mentally deranged but legally sane offenders. In accordance with this provision (article 22), a sane individual who while committing a crime could not have fully realized the actual character and social dangerousness of his actions (or omissions), or could not have fully controlled his actions due to a mental disorder, is subject to criminal liability. However, such mental disorder is taken into account by the court when sentencing and may serve as a basis for imposition of compulsory medical measures.

It should be noted that research by lawyers and psychiatrists has demonstrated that among those who committed crimes and were recognized as sane, a large percentage were suffering from mental deficiencies (chronic alcoholism, organic afflictions of the brain, and so on). The fact that these circumstances were to be taken into account when determining punishment was recognized early in Soviet and Russian criminal law theory. Provisions mandating mitigation of punishment for persons who commit crimes in a state of mental disorder, not excluding sanity, also exist in the criminal legislation of a number of foreign countries. For example, in the Criminal Code of the

Federal Republic of Germany this type of impairment was called diminished capacity.

At the same time, the legal and the medical literature also supports the opposite view, denying the necessity of taking limited (diminished) responsibility into account in sentencing. Objections along this line rest, in general, on the following arguments: the difficulty of identifying concrete criteria to determine diminished capacity; the possibility of errors and abuses in making such a determination; and the possible reduction of punishment for dangerous criminals. However, modern researchers, relying on the latest scientific recommendations by forensic psychiatrists, justifiably conclude that these difficulties are exaggerated. The exaggeration reflects a faulty understanding of diminished capacity as an intermediate condition between sanity and insanity; in contrast, the inquiry should focus on diminished sanity as a type of sanity and recognize that its medical and legal criteria are fully identifiable. Persons of diminished capacity suffer psychological handicaps but at the same time retain an ability, although weakened, to be aware of their actions (or inactions) and to control their behavior. The medical criteria for this type of sanity are familiar from so-called borderline conditions, which at present have been well researched in both general and special psychiatry.[12]

As stated earlier, the new Criminal Code attempts to limit responsibility for crimes committed through negligence. The code has done so by establishing a rule according to which an act committed negligently is considered a crime only when it is specifically provided for in an appropriate article of the special part (article 24).

The new Criminal Code also has formulated a norm for nonculpable infliction of harm, the content of which was borrowed from criminal law theory and criminal practice. In accordance with article 28 of the Criminal Code, an act is deemed to have been committed without culpability if the actor did not and, due to circumstances, could not have recognized the social dangerousness of his actions (or inactions) or did not and, due to circumstances, could not have foreseen the possible occurrence of socially dangerous consequences.

---

[12]        See *Ugolovnyi Zakon: Opyt Teoreticheskogo Modelirovaniaya [Criminal Law: The Experience of Theoretical Simulation]* 78–79 (Moscow 1987).

Moreover, an act is also deemed to have been committed without culpability when the actor foresaw the possibility of harmful consequences but could not have prevented them due to the disparity between his psychological and physiological abilities and the demands of extreme psychological overload.   This rule originates from the principle of subjective imputability, according to which a person performing an act under extreme conditions and psychological pressure may be convicted only if the person's abilities could have met the objective demands of the situation and the person foresaw the socially dangerous character and consequences of his action (or inaction), or if the person did not foresee the consequences he could have foreseen and prevented them by virtue of his own abilities.   This rule is not applicable to situations where socially dangerous consequences resulted from the person's own culpability; for example, in the case of concealing psycho-physiological impairments that would prevent the actor from carrying out a certain type of activity; fraudulently gaining employment requiring special knowledge, skills, or training; or voluntarily becoming intoxicated through the ingestion of alcohol, narcotics, psychotropics, and other controlled substances.

This type of accident as a nonculpable infliction of harm quite often is related to extreme stress on the actor, most often in the operation of sophisticated machinery or equipment.   Examples include pilots operating aircraft or drivers operating heavy trucks without adequate rest, and air traffic controllers or railroad engineers working under continual, intense pressure.   In many such cases, although the person who allowed the occurrence of socially dangerous consequences had foreseen the possibility of their occurrence, he could not have prevented them given the stressful circumstances in which he was working.

Another essential characteristic of the new Criminal Code is the specific targeting of organized crime.   Article 35 sets out the legal definition and the special features and limits of responsibility for commission of a crime by a group of persons, by a group of persons having a prior agreement, by an organized group, or by a criminal association (criminal organization).   For example, a person who creates or supervises a criminal association (criminal organization) is subject to criminal responsibility for its organization and supervision, and also for all the crimes committed by the association if the crimes were within the

person's intent. Commission of crime by a criminal association entails more severe punishment. Article 210, which deals with responsibility for organizing a criminal association, is in the special part of the Criminal Code. This provision makes the following acts subject to severe punishment: the creation of a criminal association for the purpose of perpetuating grave or especially grave crimes; the supervision of such association or any of its structural subgroups; and the creation of a group of organizers, leaders, or any other representatives of organized groups for the purpose of devising plans and conditions for the commission of grave and especially grave crimes. Participation in such associations or unions is also a punishable offense (moreover, if a person takes advantage of his official position in committing such a crime, the sentence is imprisonment for ten to twenty years with or without confiscation of property). In addition, the commission of a crime while a member of a group, a group by prior agreement, an organized group, or a criminal association is deemed to be an aggravating circumstance as provided for in the general part of the code.

At the same time, the new Criminal Code has significantly expanded the range of exculpating conditions. The previous code provided only for the two most traditional of such conditions — necessary defense and extreme necessity. The new code adds four more such conditions: causing harm while arresting a person who has committed a crime (article 38), physical and psychological duress (article 40), justified risk (article 41), and execution of an order or duty (article 42).

Under article 38, the infliction of harm on a suspect during his arrest, during his transfer to the authorities, and in order to prevent his committing further crimes does not constitute a crime, unless there were other reasonable means to bring the suspect under control and greater force than necessary.

The means to effect an arrest shall be deemed excessive if they were clearly disproportionate to the nature and dangerousness of the alleged crime and if the harm inflicted on the suspect was excessive and unjustified under the circumstances. The more dangerous the alleged crime and the more resistance offered by the suspect, the more harm may be inflicted on the criminal during arrest. In the case of a grave crime, if the suspect does not put up any resistance during arrest, harming the suspect is not permitted. Harm would include both unnecessary deprivation of liberty and physical injury. With regard to

effecting an arrest, criminal responsibility is available, however, only if the harm inflicted was intentional. In addition, the special part of the Criminal Code provides for criminal responsibility in the case of a person who commits a homicide under mitigating circumstances, such as when one exceeds the means needed to detain a person suspected of committing a crime. Moreover, in accordance with the general part of the Criminal Code, the commission of a crime while detaining a criminal is deemed mitigated, even though the conditions for legally inflicting harm are violated.

According to the new Criminal Code, where physical duress is present, infliction of harm to an interest protected by law is not a crime if the duress rendered the actor unable to control his actions. Given that not every socially dangerous act can support criminal responsibility, but only those which are voluntary, it follows that if coercion (physical or psychological) excludes volition, then it also precludes criminal responsibility. The defense of extreme necessity applies where, in the face of psychological or physical duress, the actor retained the ability to control his own actions but nonetheless harmed interests protected by law.

In order for physical coercion to preclude criminal responsibility, an act that would otherwise be criminal must be committed against the will of the person acting under duress. For example, a person who damages another person's property is not criminally responsible if he was intentionally shoved in order to cause damage. However, if the physical coercion did not exclude the possibility of the person's acting under his own will, then the person is not relieved of criminal responsibility, although duress is considered as a mitigating factor at the time of sentencing. Psychological duress also has some significance in criminal law under the new code. This type of duress means a threat to inflict harm, including physical harm, in order to force another person to commit a socially dangerous act. Psychological coercion (duress) usually does not exclude the possibility of a volitional act, and thus, as a general rule, it does not exclude criminal responsibility. Psychological duress precludes criminal responsibility only when the requirements of the defense of extreme necessity are met: that is, the danger could not have been avoided by other means, and the harm done was less than the harm meant to be averted. As with physical coercion, psychological coercion that does not overcome the actor's volition may be a mitigating factor at the time of sentencing.

The Criminal Code of 1996 introduces a new exculpatory doctrine into Russian criminal law; namely, exclusion of responsibility on the ground of justified risk. This innovation reflects the fact that in the modern context of advancing technology, the need to take certain risks of physical harm to life or significant damage to property occurs more often than ever before (for instance, during the adoption of new industrial technology or the development of new medical treatments).

Justified risk can arise in any area of professional work. The most common examples are scientific risk (for example, the researchers who invented the polio vaccine tested it on their own children); industrial and economic risk (for instance, making a decision to dismantle a chimney not by ordinary means, which would be very expensive, but by detonation, where the risk lies in deciding on the explosive charge sufficient to do the job but not likely to affect nearby structures); and commercial risk (for example, making banking, investment, and other speculative financial decisions).

The new Criminal Code deems risk legally justified when the following conditions are met:

First, the risk must be taken for the realization of socially useful goals (saving lives or improving people's health, ameliorating significant financial burdens, and so on).

Second, the goal accomplished by the risk taking could not have been achieved otherwise. This requirement brings to mind the case of extreme necessity, although in the case of extreme necessity the threat inevitably will entail socially harmful consequences if not averted, whereas in the case of risk such consequences are only a possibility. Another difference is that the harm resulting from justified risk may be greater than the averted harm.

Third, the person who takes the risk must observe all necessary precautions to avert possible harm to interests protected by law.

Risk should not be deemed justified if the actor knowingly created a threat to the lives of many people, a threat of environmental catastrophe, or a threat of social disaster. The unavailability of a defense of justified risk in the case of potential environmental catastrophes reflects the sharp deterioration of the environment in many regions of Russia, manifesting itself in violations of environmental safety regulations that result in significant harm to the health of the population, damage to different ecological zones, and ultimately enormous economic losses.

Thus, risks that may result in fires, landslides, epidemics, or other social or health crises, even if undertaken to achieve a socially beneficial goal, should not be deemed justified.

The 1996 Criminal Code of the Russian Federation, for the first time in Russian criminal law, excludes criminality and punishment in the case of actions taken in compliance with official orders or directives. Criminal law principles relating to harm caused in the execution of orders were codified in the Charter of the Nuremberg Tribunal at the end of World War II. International law does not recognize following orders as a defense, although this claim may be considered as a mitigating factor in sentencing. Many European countries have codified this approach in their domestic legislation.

Under article 42 of the Criminal Code, an act committed pursuant to an order or directive carries no criminal responsibility if the order or directive is deemed obligatory when given in a prescribed manner and in a particular form and if the order or directive was legal in content, as well as in form. Commission of an intentional crime during the execution of an order or directive known to be unlawful does not relieve either the perpetrator or the person giving the order or directive from criminal responsibility.

An order or instruction is known to be unlawful if the perpetrator knew of its obvious and clear criminality. For example, in accordance with the Russian Federation statute "On Militia" (1991), a member of the militia has the right to use special means (truncheon, tear gas, water hose, etc.) in certain situations. Such use, in particular, is authorized in cases of disobedience; for example, in connection with breaking up an unauthorized demonstration or mass meeting. However, use of firearms will be knowingly unlawful (and criminal) in the absence of an attack on a police officer endangering his life or health or an attempt to seize the officer's weapon. Responsibility for the execution of such an order or directive will be imposed on both the superior who gave the order and the subordinate who carried it out. At the same time, in accordance with the norms of the general part of the Criminal Code, commission of a crime pursuant to an order or directive that does not meet the requirements of lawfulness of content and form may be deemed a circumstance that mitigates the punishment of the subordinate.

The new Criminal Code (like the previous one) includes an exhaustive enumeration of types of punishment. Courts may not impose

any punishment that is not expressly enumerated.

The Criminal Code provides for punishments that vary in severity and character. The range of punishments allows the courts to take into account the gravity of the crime and the dangerousness of the perpetrator and to assign a sentence that serves the purposes of rehabilitating the convicted person as well as achieving social justice and preventing new crimes.

The new Criminal Code has abandoned the principle embodied in the former code of structuring the system of punishments from more severe to less severe. That is, the old principle steered the courts toward more severe punishment. The new principle (from less to more severe punishment) favors the imposition of a more just sentence. Only where a less severe punishment is inappropriate will the court order a more severe punishment (considering the actual circumstances of the case and the individual's particular characteristics).

The list of punishments in the Criminal Code of 1996 (other than those that existed previously, such as fines, correctional labor tasks, and deprivation of freedom) introduces a number of new kinds of punishment that are explained below: mandatory labor, restriction on military service, restriction of freedom, "arrest," and life imprisonment (formerly, life imprisonment was available only as a substitute for capital punishment by way of executive clemency). These new kinds of punishment are designed, whenever possible, to limit the use of sentences involving deprivation of liberty.

Mandatory labor (article 49) requires the offender to perform unremunerated, socially useful services in his free time; the type of service is determined by agencies of local government. Such services are assigned for a period of 60–240 hours and are to be performed for a period not to exceed four hours a day. Examples include cleaning streets and public squares.

Restriction on military service in some ways resembles a form of punishment known as "correctional labor tasks," which is not applicable to military personnel. Introduction of this new type of punishment is designed to allow military personnel who have not committed serious crimes to continue their military service (especially where the offender is a highly qualified specialist in one or another area of military science). The goals of rehabilitating military offenders and preventing commission of new crimes are achieved through imposing certain deprivations and

limitations on the rights of the convicted person, who serves his sentence while performing his military duties. Thus, the court can order withholding up to 20 percent of the offender's monetary allowance; moreover, the period of time during which the sentence is in effect cannot be credited toward seniority and no promotions may be granted while this punishment remains in effect.

Restriction of freedom consists of keeping a person who was at least eighteen years old at the time of sentencing in a special institution. While the offender is not isolated from society in the sense that a prisoner is, he remains under supervision. The Penal–Correctional Code of the Russian Federation provides for different types of restrictive measures and the order of their implementation. Restriction of freedom may be imposed where this punishment is the principal statutory penalty for a specific offense, as a penalty of lesser severity than the one provided for a particular crime, and as a substitute for mandatory or correctional labor. Restriction of freedom may also be ordered in lieu of completing the unserved portion of a more severe sentence.

"Arrest" is defined as keeping the convicted person in strict isolation from society and is assigned for a period of 1–6 months. Arrest is appropriate for a first-time offender who has committed a crime that is not very serious and who should not necessarily be deprived of freedom for a long period. Arrest may not be ordered for persons who were under the age of sixteen at the time of sentencing, pregnant women, or women who have children under the age of eight. The conditions and regimen of serving the sentence are determined by the Penal–Correctional Code. Arrest as a form of punishment differs from deprivation of freedom not only in its length but also in the conditions of imprisonment. The former is served in strict isolation; in other words, harsh conditions. Arrest is in effect a warning to the criminal about what criminal punishment is like and a reminder that stiffer punishment is available.

As noted above, life imprisonment was not a form of punishment that courts could impose under the former code. Under the new code, life imprisonment is designated as an alternative to the death penalty only for extremely serious crimes involving homicide or attempted homicide. This sentence may be assigned in cases where the court determines that imposition of the death penalty is inappropriate.

The new Russian Criminal Code has retained the death penalty

but sharply reduced the scope of its application, conforming the criminal law to the Russian Constitution, according to which the death penalty, "until it is abolished, may be imposed by federal law as an exceptional measure for extremely serious crimes against life, provided that the accused shall have a right to have his case heard by a court with the participation of a jury." In the special part of the Criminal Code, the death penalty is available for the following five crimes: homicide with aggravating circumstances; assassination or assassination attempt on a state or public figure, a person carrying out justice or conducting a preliminary investigation, or an employee of a law enforcement agency; and genocide.

As in the past, the death penalty is not applicable to women, to persons who commit crimes under the age of eighteen, or to men over the age of sixty-five. Through executive clemency, the death penalty can be replaced by life imprisonment without the possibility of parole or by deprivation of freedom for a period of twenty-five years. The regimen of execution is controlled by penal–correctional legislation.

Chapter 10 of the new code includes a number of new rules on sentencing, including circumstances that go to mitigating or aggravating punishment. Special attention is given to positive behavior on the part of an offender after the commission of a crime. Thus, if the court finds mitigating circumstances—such as surrendering, actively cooperating in the investigation of the crime, exposing accomplices, giving assistance in the search for property acquired as the result of the crime, rendering medical or other assistance to victims, voluntarily providing compensation for property damage and moral harm, performing other acts intended to compensate for the harm caused to victims—then, in the absence of aggravating circumstances, the punishment may not exceed three-quarters of the maximum punishment provided for in the appropriate article of the special part of the code (article 62).

Reductions in punishment are available also pursuant to a jury recommendation of leniency (not to exceed two-thirds of the statutory maximum) or of special leniency (a sentence lower than the statutory minimum or assignment of a lesser type of punishment than the one provided for in the appropriate article of the Criminal Code); and in the case of a conviction for preparation for a crime (not to exceed half the statutory maximum provided in the Criminal Code) or for attempted crime (not to exceed three-quarters of the maximum).

Conversely, article 68 introduces mandatory minimum sentences that courts must impose in cases of recidivism, dangerous recidivism, and especially dangerous recidivism. The new code also significantly increases punishment where an offender is convicted of multiple crimes. Formerly, the principle of absorbing a lesser sentence into a more serious one was applied when an offender was simultaneously convicted of two or more crimes. Even if the court specified separate sentences for each crime, the total sentence imposed could not exceed the maximum sentence provided for the most serious crime among those of which the accused was convicted. According to the new Criminal Code, the principle of absorption is retained only in the case of less severe crimes. In all other cases, the final punishment by way of deprivation of freedom may be cumulated up to twenty-five years. Where a convicted person, after the first conviction but before completing the first sentence, commits a new crime, the total punishment may not exceed thirty years (by combining the sentence for the new crime and the term of the previous sentence not yet served).

In addition, the new Criminal Code has consolidated some features of "conditional sentencing" and "stay of execution" known to the previous code. For example, a court that sentences conditionally may impose certain obligations on the convict, the nonfulfillment of which establishes a basis for revocation of the conditional sentence or extension of the probationary period.

The general part of the new code also includes significant innovations relating to release from criminal responsibility and punishment. The new code envisages two new grounds for release from criminal responsibility: active repentance (article 75) and reconciliation with the victim (article 76). Both apply only to first-time offenders who have committed minor crimes. In addition, active repentance by way of a voluntary confession, assistance in the investigation of a crime, compensation for losses, and other forms of relieving damages where more serious crimes have taken place may result in release from criminal liability in cases provided for in the special part of the Criminal Code (for example, a person who committed treason may be released from criminal responsibility if she voluntarily and in a timely manner took steps to prevent further damage to national interests, provided the act of treason does not also fall within the definition of another criminal offense).

For the first time, the Criminal Code of the Russian Federation includes norms concerning amnesty and executive clemency.

The new Criminal Code also contains separate sections on juvenile criminal liability and punishment (section V), and on the judicial imposition of compulsory measures of a medical nature (section VI) for individuals who committed criminal acts while insane; became mentally ill after committing a crime (making sentencing or execution of punishment impossible); committed a crime while mentally ill but legally sane; or committed a crime and later was found to be in need of treatment for alcoholism or drug dependence.

### Innovations in the Special Part

A novel feature of the special part of the Criminal Code is the introduction of norms on punishment for economic crimes (chapter 22), crimes by corporate executives in violation of their official duties (chapter 23), environmental crimes (chapter 26), crimes related to computer information (chapter 28), and crimes against the peace and security of mankind (chapter 34). Strengthening the protection of the rights and freedoms of individuals is noticeable not only in norms relating to responsibility for crimes against constitutional rights and freedoms (chapter 19) but also in norms relating to responsibility for certain other crimes.

#### STRENGTHENING CRIMINAL LAW PROTECTION OF THE RIGHTS AND FREEDOMS OF THE INDIVIDUAL

As noted above, the Russian Federation inherited a burdensome legacy from Soviet "developed" socialism relating to the rights and freedoms of citizens. The Soviet state not only deprived its citizens of many inalienable human rights but also imposed criminal responsibility for violations of prohibitions on the exercise of such rights. Many such senseless criminal law provisions were excluded from the Russian Criminal Code only after the infamous events of August 1991. The potential for expanding human rights protection through the mechanism of criminal law was enormous, and a substantial step in this direction has been made in the new Criminal Code.

Consider the following significant developments. For the first time in the history of Russian criminal legislation, criminal responsibility

is provided for the coercive taking of human organs and tissues for trans-
plantation (article 120). Because of recent medical advances in the field
of transplantation, human tissues and organs have become objects of
criminal business. Establishing criminal responsibility and severe penalties
for coercion (physical or psychological) to relinquish human organs and
tissues for transplantation inevitably will help to safeguard the most
important rights of the individual—life and health. Indeed, increased
criminal responsibility is provided for such acts if they are committed
upon an individual who is financially or otherwise dependent on the
offender.

*Perestroika* and *glasnost* of the Gorbachev era had revealed the real
shame of Soviet psychiatry, which used "diagnosis" of mental illness as
a method to suppress political dissidents. In the years of "classic
stagnation" (1960s–1980s), there was a close link between extrajudicial
repression and psychiatry. People bothersome to the authorities were
deprived of their freedom without any investigation or adjudication, by
confinement in psychiatric hospitals (as in the case of General P.
Grigorenko, a famous human rights defender). By 1988, the Criminal
Code of the RSFSR introduced criminal responsibility for knowingly
placing a mentally sound individual in a psychiatric institution (article
126). The new Criminal Code has significantly increased the protection
of citizens in this regard. First, according to the previous Criminal
Code, criminal responsibility and punishment were available only if a
person known to be mentally sound were placed in a psychiatric hospital.
However, it is commonly accepted that not every person who is mentally
ill should receive compulsory treatment. Therefore, the new Criminal
Code formulates this crime as "unlawful commitment of a person to a
psychiatric institution" (article 129(1)). Second, the Criminal Code
includes an aggravated form of this crime: "the same acts if committed
by a person using his or her official position or if causing death or
serious harm to the health of an individual or having other harmful
consequences" (article 129(1)). Third, the criminal sanctions for these
crimes have been significantly increased.

Substantial strengthening of the criminal protection of the rights
and freedoms of citizens is associated with the formulation of a number
of new criminal law provisions on responsibility for violations of
constitutional rights and freedoms. The article relating to the right of

privacy is particularly noteworthy. It is now illegal to gather or disseminate information on a person's private life that is a personal or family secret without consent, or to disseminate such information through public channels if such acts are done to gain advantage or profit and cause harm to the rights and legally protected interests of the victim (article 138(1)). If such acts are committed by a person using her official position, the code contemplates increased criminal responsibility (article 138(2)). These provisions implement a tenet of the Russian Constitution, as well as of the Universal Declaration of Human Rights, that no person may be subjected to arbitrary interference with his private or family life and that each person has a right to be legally protected from such interference.

Article 140 of the Criminal Code makes the unlawful refusal by an official to furnish to an individual documents and materials directly affecting the citizen's rights and freedoms criminally punishable; providing incomplete or knowingly false information that causes harm to the rights and lawful interests of a citizen also comes within the scope of article 140.

Both Stalin's 1936 and Brezhnev's 1977 Constitution "guaranteed" the Soviet people not only freedom of speech but also freedom of association. In fact, "freedom" to march or assemble was restricted to official party activities such as traditional demonstrations on May 1 and November 7. Gorbachev's *perestroika* lead to a "normative regulation" providing for organizing and carrying out mass meetings and related gatherings. Unfortunately, effective penal law protection of these freedoms (which were announced in the new Constitution) did not exist in Russian criminal law until now. Although the Criminal Code in 1995 established criminal responsibility for violations of Russian Federation legislation on association, meetings, demonstrations, marches, and picketing, it did so only contingent upon the previous imposition of an administrative penalty. Taking into account the importance of legal protection for this sort of political freedom, the new Criminal Code has removed that limitation. Under article 149, criminal responsibility arises if the right to assemble is violated by a government official either through coercion or through the threat of coercion.

The previous Criminal Code mandated criminal responsibility for violation of privacy of correspondence, telephone communications, and

telegraph messages. The new Criminal Code expands this responsibility to include punishment for interference with other means of communication between citizens (article 138). Additionally, article 138(2) increases responsibility for such acts when committed by a person using his official position. Article 138(3) establishes criminal responsibility for the unlawful manufacturing, distribution, or wholesale acquisition, with purpose to distribute, of special technology designed for covert gathering of information.

More thorough regulation in the new code of responsibility for other crimes against the constitutional rights and freedoms of the individual is also noteworthy. Thus, article 136 provides for punishment for violating the equal rights of citizens based on gender, race, nationality, language, origin, economic or official status, place of residence, religion, beliefs, or association, provided the violation harms the rights and legal interests of citizens. Articles 141 and 142 elaborate on conditions of responsibility for violation of the right to vote. The former article establishes responsibility for impeding the exercise of the right to vote or impeding the work of electoral commissions; the latter article, for falsification of electoral or referendum documents or incorrect tallying of ballots. The new Criminal Code, in contrast to the previous, increases criminal law protection of women's right to work. The previous Criminal Code established responsibility for refusal to employ, or for discharge of, a pregnant woman or a breastfeeding mother, whereas the analogous article in the new Criminal Code extends such protection to women with children under three years of age.

The new Criminal Code also includes an aggravated form of responsibility for violation of the inviolability of a person's residence. In contrast with the previous Criminal Code, article 140 of the new code provides for such aggravated forms of the crime as unlawful entry into a house, using coercion or threat of coercion, against the will of the inhabitant, and as well as commission of the crime by a person using her official status.

Progress has also been made toward strengthening protection of freedom of conscience and religion. In the previous Criminal Code, criminal responsibility arose only if such violations were attended by violence, threat of violence, or damage to property. The new code eliminates this limitation; thus, criminal responsibility now applies to any unlawful interference with religious activities or practices (article 148).

ECONOMIC CRIMES

As noted earlier, the code introduces two new types of economic offense: crimes in the sphere of economic activity and crimes committed by corporate officers against the interests of commercial or other organizations.

The first group includes interference with lawful entrepreneurial activity; registration of unlawful real estate agreements; illegal entrepreneurial activity; illegal banking activity; fraudulent entrepreneurship; laundering of money or any other assets acquired illegally; illegal acquisition or distribution of property knowingly obtained by illegal means; illegal procurement of credit; willful evasion of the repayment of creditor indebtedness; monopolization and unfair competition; use of coercion in negotiating an agreement; unlawful use of trademarks or the state hallmark; violation of manufacturing rules; knowingly false advertisement; illegal acquisition and dissemination of information constituting commercial and banking secrets; bribery of participants and organizers of professional sports and commercial events; securities issuance violations; manufacture and distribution of fraudulent credit or debit cards and other negotiable instruments; illegal export of technology, scientific information, and services used in the production of weapons of mass destruction and other military equipment; failure to return art, historical, or archeological property of the Russian Federation and foreign countries; unlawful trade in precious metals, gems, or pearls; violations of rules for handing over precious metals or precious stones to the state; flight of foreign currency; evasion of custom payments; illegal bankruptcy activities; deliberate or false bankruptcy; income tax evasion; corporate tax evasion; and consumer fraud.

With few exceptions (such as smuggling and consumer fraud, traditionally called "economic" crimes in Soviet criminal law), the majority of crimes are new, and creation of responsibility for them has been dictated by the difficult process of building a market economy. The same process caused the creation in chapter 23 in the Criminal Code of a set of crimes against corporate interests committed by corporate officers. This chapter comprises norms on responsibility for abuse of authority (responsibility for private notaries and auditors is covered by a separate article), abuse of power by employees of private security and private investigative agencies, commercial bribery, and so

forth.  Given that the formation of penal law norms relating to a market economy is a new matter for the Russian legislature, the legal experiences of countries with developed market economies (in particular, drawing on the Model Penal Code of the American Law Institute) have been used in preparing the code.

The new code successfully combines two approaches to the legal protection of interests in the economic sphere.  On the one hand, it protects honest entrepreneurial activity and all citizens from dishonest activity, which is in essence a type of fraud.  This includes illegal banking activity that causes widespread harm; pseudo-entrepreneurial activity, which means the creation of a commercial organization without the intention of conducting any legitimate entrepreneurial or banking activity but rather for the purpose of obtaining credit, tax breaks, and other benefits; laundering of money or other property illegally obtained; unlawful procurement of credit; willful avoidance of debt repayment; deliberate and false bankruptcy; knowingly false advertisement; and securities exchange fraud.  The previous Criminal Code covered none of these activities.  On the other hand, the new Criminal Code does not leave unpunished other kinds of abuse and official misconduct inside commercial and other nonstate institutions or organizations (including those that are not municipal or local government organizations).  These are types of "official" crimes that recently appeared to be beyond the reach of criminal law, such as abuse of one's official position (this includes private notaries and auditors), abuse of power by employees of private security or investigative agencies, and commercial bribery.

### ENVIRONMENTAL CRIMES

Severe deterioration of ecological conditions in many regions of Russia and existing international agreements on protection of the environment were factors in including a separate chapter on criminal responsibility for environmental crimes in the new Criminal Code.  In this regard, the code creates a number of offenses that were not previously criminalized although they represent common violations of environmental safety regulations.  As noted earlier, such violations cause great harm to human health, the environment, and ultimately the economy. Newly criminalized types of conduct include violations of environmental regulations in manufacturing (article 246), violations of environmental regula-

Criminal Law Forum              Vol. 8 No. 2

tions on handling environmentally dangerous substances (article 247), deterioration of land (article 254), and destruction of critical habitats of endangered species listed in the Endangered Species Book of the Russian Federation (article 259).

The chapter on environmental crimes includes seventeen criminally punishable acts. Environmental crimes may be divided into two categories: general, those that infringe on nature in general; and specific, those that infringe on particular aspects of the natural environment. The code contains three criminal law norms on responsibility for general environmental crimes (articles 246–248). Specific environmental crimes target pollution of water (article 250); pollution of the atmosphere (article 251); pollution of the marine environment and contravention of legislation relating to the continental shelf and the exclusive offshore economic zone of the Russian Federation (articles 252–253); damage to soil and violation of rules for the protection and use of natural resources (article 254–255); and harm to flora and fauna, as well as violations of law pertaining to specially protected territories (articles 249, 256–262).

The majority of these offenses are defined as acts resulting in tangible harm; in other words, certain harmful consequences provided for in the criminal law are necessary for criminal responsibility to attach to a particular act. Cases of merely threatening environmental interests usually fall within the area of administrative law; in such cases, administrative remedies serve as a means of preventing and punishing the commission of environmental crimes.

A provision criminalizing violations of environmental safety regulations in manufacturing (including the designing and building of structures) opens the chapter on environmental crimes (article 246). This article was absent in the previous Criminal Code. Its inclusion in the new code is a response (although belated) to the tragic consequences of the accident at the Chernobyl nuclear plant, the destruction of Aral Lake, and the criminal activity on the part of the former Ministry of Water Economy of the Soviet Union that resulted in the destruction of a vast area of fertile agricultural land.

## CRIMES AGAINST THE PEACE AND SECURITY OF MANKIND

For the first time in Russia's history, the Criminal Code separately provides for crimes against the peace and security of mankind. The

development of this jurisprudence in international law is beyond the scope of this essay. Briefly, the modern genesis of this movement can be traced to the prosecutions of the major German and Japanese war criminals following the second world war. After the Nuremberg and Tokyo trials, work on elaborating a normative and jurisdictional basis for prosecuting the most serious violations of fundamental humanitarian principles has continued within the framework of the United Nations.[13] Both a Draft Code of Crimes[14] and a Draft Statute for an International Criminal Court[15] are currently before the international community.

Informed by the Draft Code[16] and various international humanitarian treaties, Russia' new Criminal Code defines as crimes against the peace and security of mankind the following acts: the planning, preparation, launching, or conducting of a war of aggression; public incitement to begin a war of aggression; manufacturing and dissemination of weapons of mass destruction; use of prohibited means or methods of conducting warfare; genocide; ecocide; use of mercenaries; and attacks on persons or institutions under international protection.

## THE NEW CRIMINAL CODE AND PERSPECTIVES ON FIGHTING CRIMINALITY

Naturally, Russian society hopes that the adoption and enforcement of the new Criminal Code will lead to a decrease in criminal activity,

---

[13]     *Editors' note:* Benjamin Ferencz, *An International Criminal Court* (1980); M. Cherif Bassiouni, *A Draft International Criminal Code and Draft Statute for an International Criminal Tribunal* (1987).

[14]     Draft Code of Crimes against the Peace and Security of Mankind, *Report of the International Law Commission on Its Forty-eighth Session,* U.N. GAOR, 51st Sess., Supp. No. 10, at 9, U.N. Doc. A/51/10 (1996).

[15]     Draft Statute for an International Criminal Court, *Report of the International Law Commission on Its Forty-sixth Session,* U.N. GAOR, 49th Sess., Supp. No. 10, at 43, U.N. Doc. A/49/10 (1994).

[16]     *Editors' note:* That is, the 1991 text. Draft Code of Crimes against the Peace and Security of Mankind, *Report of the International Law Commission on Its Forty-third Session,* U.N. GAOR, 46th Sess., Supp. No. 10, at 238, U.N. Doc. A/46/10 (1991).

especially crimes of violence. Unfortunately, this hope appears to be ill founded. Without denying that criminal legislation has an effect on criminality, it is also undeniable that criminal activity is a complicated social phenomenon, and the link between law and crime is not straight-forward or mechanistic. The level of criminal activity is determined not so much by the quality of criminal laws but rather by socioeconomic, political, moral, and other factors. Ignoring such factors was common to the various Soviet power structures before the collapse of the USSR. The Congress of Peoples' Deputies, the President of the USSR, and the Supreme Soviet all announced the most "categorical and uncompromising" fight against crime. Unfortunately, these intentions were soundly defeated. The proposed battle was to be waged generally by means of improvements in criminal legislation and different types of organizational, propagandistic methods (for example, the creation of anticrime committees and task forces).

The new Russian authorities more or less learned a lesson from the defeat. It is now recognized that a comprehensive government approach, with primary emphasis on economic, financial, and technological strategies (for example, funds for strengthening and developing law enforcement agencies),[17] must be the basis for combating crime. However, even now, certain old, traditional approaches that fail to correspond to modern understanding of the crime problem continue to have some influence. This influence is especially apparent in a widespread view of the relationship between solving the crime problem and achieving economic reforms. According to this view, the first goal is to reduce (ideally, stop) criminal activity; only then will it be possible to implement economic reforms. Obviously, the interplay between crime and economics is much more complex. On the one hand, the present level

---

[17]     The first such effort by the Russian Federation was a program for strengthening the fight against crime for 1994–1995, which was decreed by the President of the Russian Federation on May 24, 1994. This program was based on a theoretical model of a comprehensive anticrime program developed by Prof. S.V. Borodin, a senior researcher at the Institute of State and Law of the Russian Academy of Science. S.V. Borodin, *Bor'ba s Prestupnost'iu: Teoreticheskaya model kompleksnoi programmi [Struggle against Crime: Theoretical Model of a Comprehensive Program]* (Moscow, "Nauka" 1990). In 1996, the government of the Russian Federation decreed the second federal program for strengthening the fight against crime for 1996–1997. Rossiiskaya Gazeta, July 24, 1996.

of crime, to a certain extent, is the product of negative social, political, and economic conditions that have persisted in Russian society (most noticeably, the sharp decline in the standard of living for the majority of the population). On the other hand, it is idle to think that successful implementation of economic and other reforms will automatically result in the decline of criminality, as the experience of both economically successful and unsuccessful countries demonstrates.

Analysis of crime worldwide (according to data compiled by the United Nations) and in particular study of its tendencies in industrially developed, democratic countries with a market economy show that crime has experienced both an absolute and a relative increase. In the last quarter of this century, when the United Nations began monitoring crime around the world, criminal activity has on average increased two to three times. During the same period, criminality in developed countries has increased four to five times, and the crime rate exceeded 8,000 for every 100,000 people. From 1960 to 1990, the average annual increase in criminality, for example, in the United States was 6.75 percent; in France, 5.55 percent; in Great Britain, 5.4 percent; and in the Federal Republic of Germany, 3.9 percent.[18] Democratic Russia will not escape this tendency, at least according to statistics for the period 1976–1995.

*Recorded Crime in the Russian Federation, 1976–1995.*

| Year | Total | Change from preceding year (%) | Change relative to 1976 (%) |
|------|-------|-------------------------------|-----------------------------|
| 1976 | 834,998 | — | — |
| 1977 | 824,243 | -1.3 | -1.3 |
| 1978 | 889,599 | +7.9 | +6.5 |
| 1979 | 970,514 | +9.1 | +16.2 |

---

[18]      V.V. Luneev, *Tendentsii Prestupnosti: Mirovye, Regional'nye, Rosiiskie [Trends of Criminality: World, Regional, Russian]*, 5 Gosudarstvo i Pravo 7 (1993).

| 1980 | 1,028,284 | +6.0 | +23.1 |
|------|-----------|------|-------|
| 1981 | 1,087,908 | +5.8 | +30.3 |
| 1982 | 1,128,558 | +3.7 | +35.2 |
| 1983 | 1,398,239 | +23.9 | +67.5 |
| 1984 | 1,402,294 | +0.3 | +68.0 |
| 1985 | 1,416,935 | +1.0 | +69.7 |
| 1986 | 1,338,424 | -5.5 | 60.3 |
| 1987 | 1,185,914 | -11.4 | +42.0 |
| 1988 | 1,220,361 | +2.9 | +46.2 |
| 1989 | 1,619,181 | +32.7 | +93.9 |
| 1990 | 1,839,451 | +13.6 | +120.3 |
| 1991 | 2,167,964 | +17.9 | +159.6 |
| 1992 | 2,760,652 | +27.3 | +230.6 |
| 1993 | 2,799,614 | +1.4 | +235.3[19] |
| 1994 | 2,632,708 | -6.0 | |
| 1995 | 2,755,700 | +4.7[20] | |

In light of these data, it is necessary to devise realistic crime prevention strategies that will slow down its growth, keep criminal activity at a more or less socially optimal level, and achieve some degree of control over crime by the state and society. More ambitious goals

[19]        SOURCE:  *Prestupnost' i Pravonarusheniia [Criminality and Law Violations]*, in *Statisticheskii Sbornik [Statistical Collection]* 17 (Moscow 1994).

[20]        SOURCE:  *Kratkii Analys Sostoyaniya Prestupnosti v Rossiiskoi Federatsii (dannye MVDRF) [Succinct Analysis of the Condition of Criminality in the Russian Federation (data of the Ministry of Internal Affairs)]*, 5 Rossiiskaya Ustitsiia 58 (1996).

presently appear utopian.[21]  While Soviet penal law policy traditionally attributed the existence of criminality to capitalist society and concocted from this supposed relationship a myth of total eradication of crime only after the rise of communism, at the present time, during the difficult and complex process of reforming the Russian economy and society, this ideological fiction is gradually disappearing.

Among the reasons for setting "moderate" goals in the area of crime prevention is the fact that social control over criminality in a democratic, as compared to a totalitarian, society is more difficult to implement. In this context, the history of crime prevention presents, at first glance, a surprising paradox. Statistics demonstrate that in a democratic society, the level of criminality is much higher than under a totalitarian regime. Fascism and Stalinism, in fact, were able to exert considerable influence on criminality. It appears that the higher level of criminality is, in a way, part of the price paid for democracy. However, the real level of individual freedom in a society cannot be measured only by crime statistics. Although the number of crimes against the person (for example, homicide) was relatively low in both fascist and Stalinist society, the limitation of human rights not linked to the commission of formally criminal acts—freedom of speech, assembly, political association, movement, residence, and so forth—occurred on a scale never seen before. Concentration camps existed not so much for the imprisonment of real criminals as for the imprisonment of imagined ones (and not always those who opposed the regime).

The challenge of crime control in a democratic society arises in part because in such a society this kind of control has a twofold goal: to secure the rule of law and to prevent crime but within the framework of the rule of law, which guarantees individual rights and freedoms. In an emerging democracy experiencing rising criminality and social instability, it is especially difficult for law enforcement agencies (for example, the police) to reconcile these goals, and it is understandable that law enforcement agents may be sorely tempted to sacrifice fundamental rights

---

[21]      Symposium, *Kontrol' nad Prestupnost'i v Democraticheskom Obshestve (Materialy "Kruglogo" Stola) [Control of Criminality in a Democratic Society (Materials of the "Round" Table)]*, 10 Gosudarstvo i Pravo 54 (1993).

in the name of public safety.[22] History shows that in this situation people are deprived of both safety and freedom.   Nonetheless, the goal of democratization should not be used to justify inaction by law enforcement agencies in the daily fight against crime.

---

[22]      *Editors' note:* A recent report by Amnesty International documents that such "sacrifices" are liberally made.   Amnesty International, *Torture in Russia: "This Man-Made Hell"* (1997).

| 106TH CONGRESS 2d Session | SENATE | TREATY DOC. 106–22 |
| --- | --- | --- |

## TREATY WITH RUSSIA ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

———

# MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE RUSSIAN FEDERATION ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS, SIGNED AT WASHINGTON ON JUNE 17, 1999, AND A RELATED EXCHANGE OF NOTES



FEBRUARY 10, 2000.—Treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

———

U.S. GOVERNMENT PRINTING OFFICE

79–118                    WASHINGTON : 2000

# LETTER OF TRANSMITTAL

––––––––––

THE WHITE HOUSE, *February 10, 2000.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty Between the United States of America and the Russian Federation on Mutual Legal Assistance in Criminal Matters, signed at Moscow on June 17, 1999. I transmit also, for the information of the Senate, a related exchange of notes and the report of the Department of State with respect to the Treaty.

The Treaty is one of the series of modern mutual legal assistance treaties being negotiated by the United States in order to counter criminal activities more effectively. The Treaty should be an effective tool to assist in the prosecution of a wide variety of crimes, including terrorism, money laundering, organized crime and drug-trafficking offenses. The Treaty is self-executing.

The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the Treaty includes obtaining the testimony or statements of persons; providing documents, records and other items; serving documents; locating or identifying persons and items; executing requests for searches and seizures; transferring persons in custody for testimony or other purposes; locating and immobilizing assets for purposes of forfeiture, restitution, or collection of fines; and any other form of legal assistance not prohibited by the laws of the Requested Party.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

WILLIAM J. CLINTON.

# LETTER OF SUBMITTAL

---

DEPARTMENT OF STATE,
*Washington, December 30, 1999.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty Between the United States of America and the Russian Federation on Mutual Legal Assistance in Criminal Matters (the "Treaty"), signed at Moscow on June 17, 1999. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification. Accompanying the Treaty is a related exchange of notes that I recommend be transmitted for the information of the Senate.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with a number of countries. This Treaty contains many provisions similar to those in the other treaties and all of the essential provisions sought by the United States. It will enhance our ability to investigate and prosecute a variety of crimes, including terrorism, money laundering, organized crime and drug-trafficking offenses of particular interest to the U.S. law enforcement community with respect to the Russian Federation.

The Treaty is designed to be self-executing and will not require new legislation.

Article 1 states that the Parties shall provide to each other, in accordance with the Treaty, comprehensive mutual legal assistance in criminal matters. Article 1(2) defines legal assistance in criminal matters for purposes of the Treaty as assistance provided by the Parties in connection with: prevention, suppression, and investigation of crimes; criminal prosecutions; and other proceedings related to such criminal matters. Article 1(3) provides for legal assistance where the conduct that is the subject of the request constitutes a crime under the laws of both Parties. The Requested Party may, in its discretion, also provide legal assistance where the conduct that is the subject of the request would not constitute a crime under the laws of the Requested Party. Article 1(4) states explicitly that the Treaty is intended to apply solely between the Parties; it does not give rights to any other persons to obtain or exclude any evidence, or to impede the execution of a request. Article 1(5) defines the term "person" to include both individuals and legal entities in Article 1(4), Article 2(4), Article 5(3) subparagraphs 1–5, Article 10(1), Article 14), and Article 15(2).

Article 2 sets forth a non-exclusive list of the major types of assistance to be provided under the Treaty, including obtaining testimony and statements; providing documents, records, and other

(V)

items; serving documents; locating and identifying persons and items; executing requests for searches and seizures; transferring persons in custody for testimony or other purposes under the Treaty; locating and immobilizing assets for purposes of forfeiture, restitution, or collection of fines; and providing any other legal assistance not prohibited by the laws of the Requested Party.

Article 3 provides for the establishment of Central Authorities and defines Central Authorities for purposes of the Treaty. Each Party must implement the provisions of the Treaty, including the making and receiving of requests, through its Central Authority. For the United States, the Central Authority is the Attorney General or persons designated by the Attorney General. For the Russian Federation, the Central Authority is the Office of the Procurator General of the Russian Federation or persons designated by the Procurator General. Article 3(3) provides that the Central Authorities will communicate directly with one another for the purposes of the Treaty, and may agree upon such practical measures as may be necessary to facilitate the implementation of the Treaty.

Article 4 deals with the denial of legal assistance. Article 4(1) sets forth the circumstance under which a Requested Party's Central Authority may deny assistance under the Treaty. A request may be denied if: (i) it relates to a crime under military law that is not a crime under general criminal law, (ii) its execution would prejudice the security or other essential interests of the Requested Party, or (iii) it does not conform to the requirements of the Treaty. In an exchange of diplomatic notes dated June 17, 1999, September 22, 1999, and October 20, 1999, the Parties restated the understanding of the negotiating delegations that the "security or other essential interests" provision in Article 4(1) provides an adequate basis upon which to deny assistance requests in cases the United States would consider political offenses. Under Article 4(2), the Requested Party may not decline execution of a request on the grounds of bank secrecy.

Before denying assistance, the Central Authority of the Requested Party is required under Article 4(3) to consult with its counterpart in the Requesting Party to consider whether legal assistance can be given subject to such conditions as the Central Authority of the Requested Party deems necessary. If the Requesting Party accepts assistance subject to such conditions, it is required to comply with the conditions. If the Central Authority of the Requested Party denies assistance, it is required under Article 4(4) to inform the Central Authority of the Requesting Party of the reasons for the denial.

Article 5 prescribes the form and content of written requests under the Treaty, specifying in detail the information required in each request. The article permits requests to be made in other forms in urgent situations but requires written confirmation within ten days unless the Central Authority of the Requested Party agrees otherwise.

Article 6 provides that, except as otherwise agreed by the Central Authority of the Parties, requests for legal assistance and documents attached to them must be accompanied by a translation into the language of the Requested Party.

VII

Article 7 addresses the execution of requests. Article 7(1) requires the Central Authority of the Requested Party to execute a request promptly or to transmit it to the authority having jurisdiction to do so. It obligates the competent authorities of the Requested Party to do everything in their power to execute a request in a timely manner. Article 7(2) requests the Central Authority of the Requested Party to represent the interests of the Requesting Party in executing the requests.

Under Article 7(3), requests are to be executed in accordance with the laws of the Requested Party except if the Treaty provides otherwise. It provides that the competent authorities of the Requesting Party will have the authority to issue subpoenas, search warrants, or other orders necessary for the execution of requests. Except if prohibited by its laws, the Requested Party must follow procedures specified in the request. Under Article 7(4), if the Central Authority of the Requested Party considers that execution of a request will interfere with a criminal investigation, criminal prosecution, or proceeding related to a criminal matter ongoing in that State, it may postpone execution or impose conditions on execution after consultation with the Central Authority of the Requesting Party. If the Requesting Party accepts legal assistance subject to such conditions, it must comply with them.

Article 7(5) further requires the Requested Party, if so requested, to use its best efforts to keep confidential a request and its contents, and to inform the Requesting Party's Central Authority if the request cannot be executed without breaching such confidentiality. This provides the Requesting Party an opportunity to decide whether to pursue the request or to withdraw it in order to maintain confidentiality.

Article 7(6) requires the Requested Party's Central Authority to respond to inquiries by the Requesting Party's Central Authority regarding the status of the execution of a request. Article 7(7) states that, upon request of the Central Authority of the Requesting Party, the Central Authority of the Requested Party must furnish information in advance about the date and place of the execution of a request. During the execution of a request, the Requested Party must permit the presence of such persons as are specified therein.

Article 7(8) requires the Central Authority of the Requested Party to inform promptly the Central Authority of the Requesting Party of the outcome of the execution of the request. If the request is not executed, or if execution is delayed or postponed, the Central Authority of the Requested Party must inform the Central Authority of the Requesting Party of the reasons for non-execution, delay, or postponement.

Article 8 apportions between the two Parties costs incurred in executing a request. It provides that the Requested Party pay all costs, except for the following items to be paid by the Requesting Party: fees of experts, costs of translation, interpretation, and transcription, and the allowances expense related to travel of persons pursuant to Articles 11 and 12. If it becomes apparent that the execution of the request requires expenses of an extraordinary nature, the Central Authorities of the Parties must consult to determine

VIII

the terms and conditions under which legal assistance can be provided.

Article 9 requires the Requesting Party to comply with any request by the Central Authority of the Requested Party not to use the results of the execution of a request obtained under the Treaty for purposes other than those described in the request without its prior consent. Nothing in the Article prevents the use or disclosure of the results of an executed request to the extent that there is an obligation to do so under the Constitution of the Requesting Party in a chemical prosecution. The Central Authority of the Requesting Party is obliged to notify the Central Authority of the Requested Party in advance of any such possible or proposed use or disclosure. Once the results of an executed request have been used for the purpose for which they were provided, and in the course of such use have been made public in the Requesting Party in accordance with the Treaty, no further limitations on use apply.

Article 10 addresses the procedures for obtaining testimony and evidence in the Requested Party. Article 10(1) provides that a person requested to testify and produce documents, records, or items in the Requested Party be summoned, if necessary by subpoena or order, to appear and testify and produce such documents, records, or items, in accordance with the requirements of the law of the Requested Party. Article 10(2) further states that, in accordance with procedures used in the Requested Party, persons present at the execution of a request must be permitted to pose questions directly or to formulate questions to be posed to the person being questioned, and to make a verbatim transcript of the proceeding using, if necessary, technical means. In the event that a person whose testimony or evidence is being taken asserts a claim of immunity, incapacity or privilege under the laws of the Requesting Party, Article 10(3) provides that the evidence will still be taken and the claim made known to the Requesting Party for resolution by its authorities.

Article 11 addresses the procedures for obtaining testimony in the Requesting Party. Article 11(1) provides a mechanism for the Requesting Party to invite the voluntary appearance in its territory of a person located in the Requested Party. As part of its invitation, the Requesting Party must indicate the extent to which the expenses and allowances will be paid. The Central Authority of the Requested Party is required to inform promptly the Central Authority of the Requesting Party of the response of the person. A person who agrees to appear may ask that the Requesting Party advance money to cover these expenses. This advance may be provided through the Embassy or a consulate of the Requesting Party. Article 11(2) provides that a person appearing in the Requesting Party pursuant to this Article will not be subject to service of process, or be detained or subjected to any restriction of personal liberty by reason of any acts or convictions that preceded the person's departure from the Requested Party. If this guarantee cannot be provided for any reason, the Central Authority of the Requesting Party is obligated to indicate this in the request to inform the invited person and to allow that person to decide whether to appear taking these circumstances into account.

IX

Under Article 11(3), any safe conduct provided for by this Article ceases seven days after the Central Authority of the Requesting Party has notified the Central Authority of the Requested Party that the person's presence is no longer required, or if the person has left the Requesting Party and has voluntarily returned to it. The Central Authority of the Requesting Party may, in its discretion, extend this safe conduct period up to fifteen days if it determines that there is good cause to do so.

Article 12 provides that a person who is in the custody of either Party and whose presence in the other Party is sought for purposes of legal assistance under the Treaty will be transferred to that Party for that purpose if the person consents and the Central Authorities of both Parties agree. Under this article, for example, a witness incarcerated in the Requested Party could be transferred to the Requesting Party to have his deposition taken in the presence of the defendant or a defendant in the Requesting Party could be transferred to attend a witness deposition in the Requested Party.

Article 12(2) further establishes both the express authority and the obligation of the receiving Party to maintain the person transferred in custody unless otherwise authorized by the sending Party. The return of the person transferred is to occur as soon as circumstances permit or as otherwise agreed by both Central Authorities, and the sending Party is not required to initiate extradition proceedings for return of the person transferred. The person transferred receives credit for service of the sentence imposed in the sending Party for time served in the custody of the receiving Party. Where the sentence imposed expires, or where the sending Party advises the receiving Party that the transferred person is no longer required to be held in custody, the person is to be treated as a person invited pursuant to Article 11 or returned to the sending Party.

Article 13 requires that, upon request, the Requested Party Provide the Requesting Party with copies of publicly available records, including documents or information of any nature and in any form that are in the possession of an executive, legislative, or judicial authority in the Requested Party. The Requested Party may further provide copies of records, including documents or information of any nature and in any form that are in the possession of an executive, legislative, or judicial authority in that Party, but that are not publicly available, but only to the same extent and under the same conditions as these records would be available to the competent authorities of that Party. The Requested Party has the discretion to deny the latter type of request entirely or in part.

Article 14 requires the Requested Party to use its best efforts to ascertain the location or identity of persons or information about items in the Requested Party specified in a request.

Article 15 obligates the Requested Party to use its best efforts to effect service of documents pursuant to a request. A request for the service of a document requiring a person to appear in the Requesting Party must be transmitted a reasonable time before the scheduled appearance. Proof of service is to be provided in the manner specified in the request.

Article 16 provides the conditions through which items can be located, seized and transferred. Article 16(1) obligates the Requested

x

Party to execute requests for search, seizure, and transfer of any item to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party. Article 16(2) provides that, if requested, every official of the Requested Party who has custody of a seized item certify the identity of the item, the continuity of its custody, and the integrity of its condition. Article 16(3) further provides that the Requested Party may require that the Requesting Party agree to the terms and conditions deemed necessary to protect third-party interests in items to be transferred.

Article 17 addresses the transfer of documents, records, and other items. When a request for legal assistance concerns the transfer of documents or records, Article 17(1) requires the Requested Party to transfer true copies of them, unless the Requesting Party expressly requests the originals, in which case the Requested Party must make every effort to comply with the request. Article 17(2) further provides that, insofar as not prohibited by its laws, the Requested Party is obligated to transfer documents, records, or other items in such a manner or accompanied by such certification as may be requested by the Requesting Party in order to make them admissible according to the law of the Requesting Party. For this purpose, the Central Authorities of the Parties will exchange information pursuant to Article 3(3) with respect to the requirements for admissibility in their respective legal systems. Documents, records, and other items transferred as requested under this paragraph require no further certification to make them admissible. Article 17(3) states that the Central Authority of the Requested Party may require the Central Authority of the Requesting Party to return, as soon as possible, any documents, records, or other items furnished to it in execution of a request under the Treaty.

Article 18 obligates the Parties, in accordance with their laws, to assist each other in locating, immobilizing, and seizing proceeds, including earnings from, or that are the result of, criminal activities, as well as instrumentalities of crime, for purposes of forfeiture, restitution to victims of crime, and collection of fines imposed pursuant to judicial decisions in criminal matters. Article 18(2) provides that if the Central Authority of one Party becomes aware that proceeds and instrumentalities of crime that may be subject to forfeiture are located in the territory of the other Party, it may so inform the Central Authority of the other Party so that the other Party may take appropriate measures under Article 18(3). The Central Authority receiving the information is obligated to notify the Central Authority providing the information of the action taken.

Under Article 18(3), the Party that has immobilized, seized, or forfeited the proceeds and instrumentalities of crime is required to dispose of them in accordance with its laws. That Party shall transfer all or part of such forfeited assets, or the proceeds of their sale, to the other Party, including for the purpose of forefeiture and restitution, insofar as permitted by its laws and to the extent it deems it appropriate and within the time frame and under the conditions it deems acceptable.

XI

Article 19 provides that the Central Authorities will consult, at times mutually agreed, to promote the most effective use of the Treaty.

Article 20 states that the Treaty applies to any requests presented after its entry into force even if the relevant acts or omissions occurred before that date.

Article 21 provides that the provisions of the Treaty will not prevent either of the Parties from cooperating and granting legal assistance in accordance with the provisions of other applicable international treaties and agreements, national laws, and practices.

Article 22 provides that the Treaty is subject to ratification and will enter into force upon the exchange of instruments of ratification, which is to take place as soon as possible. Article 22(2) provides further that, upon entry into force of the Treaty, the Agreement between the Government of the United States of America and the Government of the Russian Federation on Cooperation in Criminal Matters, signed on June 30, 1995, will no longer be in force. Article 22(3) states that either Party may terminate the Treaty by written notice to the other Party through the diplomatic channel, and that such termination will take effect six months following the date of receipt of notification.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate as soon as possible.

Respectfully submitted.

STROBE TALBOT.

**TREATY BETWEEN**
**THE UNITED STATES OF AMERICA**
**AND**
**THE RUSSIAN FEDERATION**
**ON**
**MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS**

(1)

2

The United States of America and the Russian Federation (hereinafter referred to as "the Parties"),

Striving to broaden and deepen American-Russian cooperation to prevent and fight against crime, and

Reaffirming their determination to enhance legal assistance in criminal matters,

Have agreed as follows:

3

-2-

## ARTICLE 1

### GENERAL PROVISIONS

1.     The Parties shall provide to each other, in accordance with this Treaty, comprehensive mutual legal assistance in criminal matters.

2.     For the purposes of this Treaty, legal assistance in criminal matters shall mean any assistance provided by the Parties in connection with:  prevention, suppression, and investigation of crimes; criminal prosecutions; and other proceedings related to such criminal matters.

3.     Legal assistance shall be provided in accordance with the provisions of this Treaty where the conduct that is the subject of the request constitutes a crime under the laws of both Parties.  The Requested Party may, in its discretion, also provide legal assistance where the conduct that is the subject of the request would not constitute a crime under the laws of the Requested Party.

4.     This Treaty is intended solely for cooperation and legal assistance between the Parties.  The provisions of this Treaty shall not give rise to a right on the part of any other persons to obtain evidence, to have evidence excluded, or to impede the execution of a request.

5.     For purposes of this Treaty, the term "person" shall mean both individuals and legal entities in the following articles: Article 1(4), Article 2(4), Article 5(3) subparagraphs 1-5, Article 10(1), Article 14, and Article 15(2).

## ARTICLE 2

### SCOPE OF LEGAL ASSISTANCE

Legal assistance under this Treaty shall include:

    (1)     obtaining testimony and statements;

    (2)     providing documents, records, and other items;

    (3)     serving documents;

    (4)     locating and identifying persons and items;

    (5)     executing requests for searches and seizures;

    (6)     transferring persons in custody for testimony or other purposes under this Treaty;

    (7)     locating and immobilizing assets for purposes of forfeiture, restitution, or collection of fines; and

    (8)     providing any other legal assistance not prohibited by the laws of the Requested Party.

4

-3-

## ARTICLE 3

### CENTRAL AUTHORITIES AND PROCEDURES
### FOR COMMUNICATIONS

1.    Each Party shall implement the provisions of this Treaty, including the making and receiving of requests, through its Central Authority.

2.    For the United States of America, the Central Authority shall be the Attorney General or persons designated by the Attorney General.  For the Russian Federation, the Central Authority shall be the Office of the Procurator General of the Russian Federation or persons designated by the Procurator General.

3.    The Central Authorities shall communicate directly with one another for the purposes of this Treaty and may agree upon such practical measures as may be necessary to facilitate the implementation of this Treaty.

## ARTICLE 4

### DENIAL OF LEGAL ASSISTANCE

1.    The Central Authority of the Requested Party may deny legal assistance if:

   (1)    the request relates to a crime under military law that is not a crime under general criminal law;

   (2)    the execution of the request would prejudice the security or other essential interests of the Requested Party; or

   (3)    the request does not conform to the requirements of this Treaty.

2.    The Requested Party shall not decline execution of a request on the ground of bank secrecy.

3.    Before denying legal assistance pursuant to paragraph 1 of this Article, the Central Authority of the Requested Party shall consult with the Central Authority of the Requesting Party to consider whether legal assistance can be given subject to such conditions as it deems necessary.  If the Requesting Party accepts legal assistance subject to these conditions, it shall comply with the conditions.

4.    If the Central Authority of the Requested Party denies legal assistance, it shall inform the Central Authority of the Requesting Party of the reasons for the denial.

5

-4-

**ARTICLE 5**

**FORM AND CONTENTS OF REQUESTS**
**FOR LEGAL ASSISTANCE**

1.     A request for legal assistance shall be in writing, but in urgent situations the Central Authority of the Requested Party may accept a request in another form.  If the request is not in writing, the request shall be confirmed in writing within ten days of its receipt by the Requested Party unless the Central Authority of the Requested Party agrees otherwise.

2.     The request shall include:

     (1)     the identity of the authority on whose behalf the request is made;

     (2)     a description of the facts and circumstances of the case;

     (3)     the text of the law under which the conduct constitutes a crime;

     (4)     a description of the legal assistance sought; and

     (5)     a statement of the purpose for which the legal assistance is sought.

3.     To the extent necessary and possible, a request shall also include:

     (1)     information on the identity and suspected location of a person to be located;

     (2)     information on the identity and location of a person to be served, that person's relationship to the proceeding, and the manner in which service is to be made;

     (3)     information on the identity and location of a person from whom evidence is sought;

     (4)     a list of questions to be asked of a person identified in the request;

     (5)     a precise description of the place or person to be searched and of the item to be seized;

     (6)     a description of procedures for the execution of the request;

     (7)     information as to the allowances and expenses to which a person asked to appear in the territory of the Requesting Party will be entitled; and

     (8)     any other information that may be brought to the attention of the Central Authority of the Requested Party to facilitate the execution of the request.

4.     The request shall be prepared and signed in accordance with the regulations of the Requesting Party.

6

-5-

## ARTICLE 6

### LANGUAGE

Except as otherwise agreed by the Central Authorities of the Parties, requests for legal assistance and documents attached thereto shall be accompanied by a translation into the language of the Requested Party.

## ARTICLE 7

### EXECUTION OF REQUESTS

1.    The Central Authority of the Requested Party shall promptly execute the request or shall transmit it to the authority having jurisdiction to do so.  The competent authorities of the Requested Party shall do everything in their power to execute the request in a timely manner.

2.    The Central Authority of the Requested Party shall represent the interests of the Requesting Party in executing the request.

3.    Requests shall be executed in accordance with the laws of the Requested Party except if this Treaty provides otherwise.  The competent authorities of the Requested Party shall have the authority to issue subpoenas, search warrants, or other orders necessary for the execution of requests.  Except if prohibited by its laws, the Requested Party shall follow procedures specified in the request.

4.    If the Central Authority of the Requested Party considers that execution of a request will interfere with a criminal investigation, criminal prosecution, or proceeding related to a criminal matter ongoing in that State, it may postpone execution, or make execution subject to conditions determined to be necessary after consultations with the Central Authority of the Requesting Party.  If the Requesting Party accepts the legal assistance subject to these conditions, it shall comply with the conditions.

5.    The Requested Party shall use its best efforts to keep confidential a request and its contents if so requested by the Central Authority of the Requesting Party.  If execution of the request would require a breach of this confidentiality, the Central Authority of the Requested Party shall so inform the Central Authority of the Requesting Party, which shall then determine whether the request should be executed under such circumstances.

6.    The Central Authority of the Requested Party shall respond to inquiries by the Central Authority of the Requesting Party concerning progress toward execution of the request.

7.    Upon request of the Central Authority of the Requesting Party, the Central Authority of the Requested Party shall furnish information in advance about the date and place of the execution of a request.  During the execution of a request, the Requested Party shall permit the presence of such persons as are specified therein.

8.    The Central Authority of the Requested Party shall promptly inform the Central Authority of the Requesting Party of the outcome of the execution of the request.  If the request is not executed, or if execution is delayed or postponed, the Central Authority of

7

-6-

the Requested Party shall inform the Central Authority of the Requesting Party of the reasons for non-execution, delay, or postponement.

## ARTICLE 8

### COSTS

1.    The Requested Party shall pay all costs relating to the execution of the request, except that the Requesting Party shall pay for the fees of experts, the costs of translation, interpretation, and transcription, and the allowances and expenses related to travel of persons pursuant to Articles 11 and 12 of this Treaty.

2.    If it becomes apparent that the execution of the request requires expenses of an extraordinary nature, the Central Authorities of the Parties shall consult to determine the terms and conditions under which the requested legal assistance can be provided.

## ARTICLE 9

### LIMITATIONS ON USE
### OF THE RESULTS OF EXECUTED REQUESTS

1.    The Central Authority of the Requested Party may require that the Requesting Party not use the results of the execution of a request obtained under this Treaty for purposes other than those described in the request without the prior consent of the Central Authority of the Requested Party.  In such cases, the Requesting Party shall comply with such limitations on use of the results of the executed request.

2.    Nothing in this Article shall preclude the use or disclosure of the results of an executed request to the extent that there is an obligation to do so under the Constitution of the Requesting Party in a criminal prosecution.  The Central Authority of the Requesting Party shall notify the Central Authority of the Requested Party in advance of any such possible or proposed use or disclosure.

3.    The results of an executed request that have been used for the purpose for which they were provided and, in the course of such use, have been made public in the Requesting Party in accordance with this Treaty may thereafter be used for any purpose.

## ARTICLE 10

### OBTAINING TESTIMONY AND EVIDENCE IN
### THE REQUESTED PARTY

1.    A person requested to testify and produce documents, records, or items in the Requested Party shall be summoned, if necessary by subpoena or order, to appear and testify and produce such documents, records, or items, in accordance with the requirements of the law of the Requested Party.

2.    In accordance with procedures used in the Requested Party, persons present at the execution of a request shall be permitted to pose questions directly or to formulate

8

-7-

questions that shall be posed to the person being questioned, and to make a verbatim transcript of the proceeding using, if necessary, technical means.

3.     If the person referred to in paragraph 1 of this Article asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting Party, the evidence shall nonetheless be taken and the claim made known to the Requesting Party for resolution by the authorities of the Requesting Party.

## ARTICLE 11

### OBTAINING TESTIMONY IN
### THE REQUESTING PARTY

1.     When the Requesting Party requests the appearance of a person in its territory, the Requested Party shall invite the person to appear before the appropriate authority in the Requesting Party.  The Requesting Party shall indicate the extent to which the expenses and allowances will be paid.  The Central Authority of the Requested Party shall promptly inform the Central Authority of the Requesting Party of the response of the person.  A person who agrees to appear may ask that the Requesting Party advance money to cover these expenses.  This advance may be provided through the Embassy or a consulate of the Requesting Party.

2.     A person appearing in the Requesting Party pursuant to this Article shall not be subject to service of process, or be detained or subjected to any restriction of personal liberty, by reason of any acts or convictions that preceded the person's departure from the Requested Party.  If such guarantee cannot be provided for any reason, the Central Authority of the Requesting Party shall indicate this in the request in order to inform the invited person and to allow that person to decide whether to appear taking these circumstances into account.

3.     The safe conduct provided for by this Article shall cease seven days after the Central Authority of the Requesting Party has notified the Central Authority of the Requested Party that the person's presence is no longer required, or if the person has left the Requesting Party and voluntarily returned to it.  The Central Authority of the Requesting Party may, in its discretion, extend this period up to fifteen days if it determines that there is good cause to do so.

## ARTICLE 12

### TRANSFER OF PERSONS
### IN CUSTODY

1.     A person in the custody of either Party whose presence in the other Party is sought for purposes of legal assistance under this Treaty shall be transferred from the sending Party to the receiving Party for that purpose if the person consents and if the Central Authorities of both Parties agree.

9

-8-

2. For the purposes of this Article:

(1) the receiving Party shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the sending Party;

(2) the receiving Party shall return the person transferred to the custody of the sending Party as soon as circumstances permit or as otherwise agreed by both Central Authorities;

(3) the receiving Party shall not require the sending Party to initiate extradition proceedings for the return of the person transferred;

(4) the person transferred shall receive credit for service of the sentence imposed in the sending Party for time served in the custody of the receiving Party; and

(5) where the sentence imposed expires, or where the sending Party advises the receiving Party that the transferred person is no longer required to be held in custody, that person shall be treated as a person invited pursuant to Article 11 or returned to the sending Party.

## ARTICLE 13

### PRODUCTION OF OFFICIAL RECORDS

1. Upon request, the Requested Party shall provide the Requesting Party with copies of publicly available records, including documents or information of any nature and in any form in the possession of an executive, legislative, or judicial authority in the Requested Party.

2. The Requested Party may provide copies of any records, including documents or information of any nature and in any form that are in the possession of an executive, legislative, or judicial authority in that Party, but that are not publicly available, but only to the same extent and under the same conditions as such records would be available to the competent authorities of that Party. The Requested Party may in its discretion deny a request pursuant to this paragraph entirely or in part.

## ARTICLE 14

### LOCATION OR IDENTIFICATION OF
### PERSONS AND ITEMS

If the Requesting Party seeks the location or identity of persons or information about items in the Requested Party, the Requested Party shall use its best efforts to execute the request.

10

-9-

## ARTICLE 15

### SERVICE OF DOCUMENTS

1.     The Requested Party shall use its best efforts to effect service of documents pursuant to a request.

2.     The Requesting Party shall transmit any request for the service of a document requiring the appearance of a person before a competent authority in the Requesting Party a reasonable time before the scheduled appearance.

3.     The Requested Party shall return to the Requesting Party a proof of service in the manner specified in the request.

## ARTICLE 16

### SEARCH AND SEIZURE

1.     The Requested Party shall execute a request for the search, seizure, and transfer of any item to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party.

2.     If requested, every official of the Requested Party who has had custody of a seized item shall certify the identity of the item, the continuity of its custody, and the integrity of its condition.

3.     The Requested Party may require that the Requesting Party agree to the terms and conditions deemed necessary to protect third party interests in the item to be transferred.

## ARTICLE 17

### TRANSFER OF DOCUMENTS, RECORDS, AND OTHER ITEMS

1.     When a request for legal assistance concerns the transfer of documents or records, the Requested Party shall transfer true copies thereof, unless the Requesting Party expressly requests the originals, in which case the Requested Party shall make every effort to comply with the request.

2.     Insofar as not prohibited by its laws, the Requested Party shall transfer documents, records, or other items in such manner or accompanied by such certification as may be requested by the Requesting Party in order to make them admissible according to the law of the Requesting Party.   For this purpose, the Central Authorities of the Parties shall exchange information pursuant to Article 3(3) with respect to the requirements for admissibility in their respective legal systems.  Documents, records, and other items transferred as requested under this paragraph shall require no further certification to make them admissible.

11

-10-

3.    The Central Authority of the Requested Party may require that the Central Authority of the Requesting Party return, as soon as possible, any documents, records, or other items furnished to it in execution of a request under this Treaty.


### ARTICLE 18

### PROCEEDS AND INSTRUMENTALITIES
### OF CRIME

1.    The Parties, in accordance with their laws, shall assist each other in locating, immobilizing, and seizing proceeds, including earnings from, or that are the result of, criminal activities, as well as instrumentalities of crime, for the purpose of:  forfeiture; restitution to victims of crime; and collection of fines imposed pursuant to judicial decisions in criminal matters.

2.    If the Central Authority of one Party becomes aware that proceeds and instrumentalities of crime that may be subject to forfeiture are located in the territory of the other Party, it may so inform the Central Authority of the other Party so that the other Party may take appropriate measures under paragraph 3 of this Article.  The Central Authority receiving the information shall notify the Central Authority providing the information of the action taken.

3.    The Party that has immobilized, seized, or forfeited the proceeds and instrumentalities of crime shall dispose of them in accordance with its laws.  That Party shall transfer all or part of such assets, or the proceeds of their sale, to the other Party, including for the purpose of forfeiture and restitution (which includes returning them to the rightful owner) insofar as permitted by its laws and to the extent it deems it appropriate and within the time frame and under the conditions it deems acceptable.


### ARTICLE 19

### CONSULTATION

The Central Authorities shall consult, at times mutually agreed to by them, to promote the most effective use of this Treaty.


### ARTICLE 20

### SCOPE OF APPLICATION

This Treaty shall apply to any requests presented after its entry into force even if the relevant acts or omissions occurred before that date.

12

-11-

### ARTICLE 21

### OTHER LEGAL BASES FOR COOPERATION

The provisions in this Treaty shall not prevent either of the Parties from cooperating and from granting legal assistance in accordance with the provisions of other applicable international treaties and agreements, national laws, and practices.

### ARTICLE 22

### ENTRY INTO FORCE AND TERMINATION

1.    This Treaty shall be subject to ratification, and shall enter into force upon the exchange of the instruments of ratification, which shall take place as soon as possible.

2.    Upon entry into force of this Treaty, the Agreement between the Government of the United States of America and the Government of the Russian Federation on Cooperation in Criminal Matters, signed on June 30, 1995, shall no longer be in force.

3.    Either Party may terminate this Treaty by means of written notice to the other Party through the diplomatic channel.  Termination shall take effect six months following the date of receipt of such notification.

DONE at *Moscow* , this *17th* day of *June* , 1999, in duplicate, in the English and Russian languages, both texts being equally authentic.

FOR THE  UNITED STATES OF AMERICA:     FOR THE RUSSIAN FEDERATION:

13

EMBASSY OF THE
UNITED STATES OF AMERICA

LES/063                                    Moscow, June 17, 1999

Excellency:

I have the honor to refer to the treaty between the United States of America and the Russian Federation on Mutual Legal Assistance in Criminal Matters (the "Treaty",) signed on this date.

In connection with the treaty, my government notes that during its negotiation the United States delegation agreed to delete from Article 4(1) its proposal for the inclusion of an express reference to a "political offense" exception among the bases for denial of assistance under the treaty. In so doing, the United States took into account the view of the Russian delegation that the term "political offense" is not used in Russian law and that Article 4(1) (2) of the treaty provided an adequate basis upon which to deny assistance requests in cases the United States would consider "political offenses." Article 4(1) (2) permits each party to deny assistance if the execution of the request would prejudice the "security or other essential interests" of the requested party. I hereby confirm that it is the view of the United States that Article 4(1) (2) is sufficient to meet the

His Excellency
        Igor Ivanov,
              Minister of Foreign Affairs,
                    The Russian Federation.

14

- 2 -

concerns of the United States in this area, and the United States will implement the treaty accordingly.

Accept, Excellency, the renewed assurances of my highest consideration.

15

**DEPARTMENT OF STATE**
OFFICE OF LANGUAGE SERVICES
(Translation Division)

LS No.      0992972
            JS/
            Russian

His Excellency
J. Collins
Ambassador Extraordinary and Plenipotentiary
of the United States of America
n the Russian Federation

Moscow

No. 3729/dsa

Moscow, September 22, 1999

Your Excellency:

I have the honor to confirm receipt of your note no. LES/063 of June 17, 1999, concerning the Treaty between the United States of America and the Russian Federation on Mutual Legal Assistance in Criminal Matters signed on June 17, 1999, which [note] reads as follows:

[The Russian translation of the aforesaid note corresponds in all substantive respects to the text of the English original, with the following exception:

English: ...is sufficient to meet the concerns of the United States in this area...
Russian [translated]: ...is sufficient grounds for concern in this area...]

I have the honor to report that the Russian side shares the understanding in regard to Article 4(1)(2) set forth in the above-mentioned note.

Please accept, Your Excellency, the assurances of my highest consideration.

[s] A. Avdeyev

/Stamp of the RF Ministry of Foreign Affairs/

16

**DEPARTMENT OF STATE**
OFFICE OF LANGUAGE SERVICES
(Translation Division)

LS No.   1000193
JS/
Russian

MINISTRY OF FOREIGN AFFAIRS
OF THE RUSSIAN FEDERATION

No. 4289/dsa

The Ministry of Foreign Affairs of the Russian Federation presents its compliments to the Embassy of the United States of America and, referring to its note no. 3729 of September 22, 1999, concerning paragraph 1(2) of Article 4 of the Treaty between the Russian Federation and the United States of America on Cooperation in Criminal Law Matters, has the honor to request that the final sentence in the first paragraph on the second page of the aforesaid note read as follows: "I hereby confirm that, from the viewpoint of the United States, paragraph 1(2) of Article 4 is sufficient to meet the concern in this area, and that the United States will apply this Treaty accordingly."

The Ministry avails itself of this opportunity to renew to the Embassy the assurances of its high consideration.

Moscow
October 20, 1999
/Stamp of the MFA of the Russian Federation/

To the Embassy of the United States of America
Moscow