Case 1:18-cr-00032-DLF   Document 306-14   Filed 01/17/20   Page 1 of 40

# The New Russian Criminal Code
# as a Reflection of Ongoing Reforms[*]

*Anatolyi V. Naumov*[**]

The new Criminal Code of Russia took effect on January 1, 1997. Its predecessor, the Criminal Code of the Russian Soviet Federated Socialist Republic, was enacted in 1960, and despite many revisions had become hopelessly obsolete. The 1960 Criminal Code proceeded from the class principle of Soviet criminal law, the supremacy of socialist (communist) ideology, and the adherence of all penal law rules to a centralized, planned economy and command–administrative system. Contemporary Russian society, however, is in a new era, requiring criminal legislation that conforms to current social, political, and economic conditions.

Before we begin to describe the new code, it is necessary, at least briefly, to describe the former one, and to identify the reasons behind the enactment of the new code.

[*]      This article was translated from Russian by Oxsana Gribakova, Class of 1997, Rutgers University School of Law.

[**]      Professor of Law and Head of the Department of Criminal Law and Criminology, Institute of State and Law of the Russian Academy of Science; Doctor of Legal Science 1975. The author participated in drafting several legislative instruments, including the 1991 Fundamental Principles of Criminal Legislation of the USSR and the Union Republics, the new Criminal Code of the Russian Federation, and the Model Penal Code for members of the Commonwealth of Independent States.

## THE LEGISLATIVE FRAMEWORK OF THE SOVIET ERA

The Russian Criminal Code of 1960, along with the previously enacted Fundamental Principles of Criminal Legislation of the USSR and the Union Republics of 1958 *(Osnovy Ugolovnogo Zakonodatel'stva Souiza SSR i Souiznykh Respublic),*[1] was adopted during the so-called Khrushchev thaw and constituted a significant step (at that time) toward both the democratization of state criminal policy and legislation and the renunciation of the dark Stalinist legacy. These trends were reflected initially in the abolition of the principle of analogy in the application of criminal law[2] and in the adoption of the principle of *nullum crimen sine lege.*

Both the Russian Code of 1960 and the criminal codes of other Soviet Republics enacted from 1959 to 1961 conformed precisely to the basic principles embodied in the Fundamental Principles of Criminal Legislation of the USSR and the Union Republics, and thus inevitably mirrored all the weaknesses and strengths of the Fundamental Principles. On the one hand, the code to a certain extent reflected ongoing democratic transformations in society; on the other, both the code and the Fundamental Principles continued to adhere to the class principle of Soviet criminal law and its apparent opposition to bourgeois criminal law, and proceeded from the ideology of Marxism–Leninism, a centralized, planned economy, and the principle of supremacy of the Communist party. Failure to comply with international human rights standards constituted one of the most serious deficiencies of the 1960 code. Thus, certain provisions of the code significantly circumscribed the freedom of Soviet citizens; for example, article 70 ("anti-Soviet agitation and propaganda"), article 142 ("violation of the law on separation of church

---

[1]     *Editors' note:* In effect, the "Fundamental Principles" served as the general part of the Criminal Code.

[2]     Prior to 1958, the doctrine of analogy was codified in RSFSR Criminal Code, 1926, art. 16: "If any socially dangerous act is not directly provided for by the present Code, the basis and limits of responsibility for it shall be determined by application of those articles of the Code which provide for crimes most similar to it in nature." *Translated in* Harold Berman & James W. Spindler, *Soviet Criminal Law and Procedure* 22 (2d ed. 1972).

and state and of church and schools"); article 198 (violation of passport rules); article 209 (prohibition of vagrancy, begging, and any other parasitic way of life); and article 153 (prohibition of any private entrepreneurial activity and activity as commercial middleman). The code was incompatible not only with the Universal Declaration of Human Rights of 1948 but also with the International Covenant on Civil and Political Rights and subsequent international instruments on human rights.

As is well known, the year 1985 witnessed the start of numerous democratic changes and renewal of the socialist state in the Soviet Union. The body of criminal law was not immune to these changes. One of the first achievements of *perestroika* in Soviet criminal law was the repeal of prohibitions on "anti-Soviet agitation" and "anti-Soviet propaganda." The previous Soviet legislation defined "anti-Soviet propaganda" and "anti-Soviet agitation" as deliberate public dissemination, or possession for the purpose of dissemination, of published or written materials or information in other forms with the intention of undermining, discrediting, or weakening the political and economic system of the USSR. The number of people charged with violations of these provisions was enormous. Most of the people confined in overcrowded labor camps during the Stalinist regime were convicted of anti-Soviet agitation or propaganda. In fact, charges of this type of crime were not infrequent even in the 1960s, 1970s, and early 1980s.

Criminal liability for anti-Soviet agitation and propaganda significantly circumscribed the right of citizens to read and to think independently. For many years, proof of anti-Soviet intention was presumed in practice. For example, admission of possessing anti-Soviet literature conclusively demonstrated anti-Soviet purpose. But how and by whom was literature evaluated as counterrevolutionary (anti-Soviet)? During the Stalinist repression, the answer was incredibly simple: if, for instance, yesterday, the author of a certain piece of literature was determined to be "an enemy of the people," then tomorrow everything written by that author would be labeled anti-Soviet, and consequently, the finding of any book by that author in someone's possession would "legally" convert the reader of that book into a perpetrator of a crime against the Soviet state. The recent history of the fight against the most dangerous crimes against the state during the 1960s and 1970s (and even the early 1980s) demonstrated that no essential changes were taking

place:  the only changes that occurred were in the names of authors but not in the approach to finding literature anti-Soviet.

During the period of *perestroika* and democratic revival of society, it was evident that the old version of article 70 of the Criminal Code had to be repealed because it was in direct contradiction to *glasnost*, the development of democracy, and the idea of the rule of law.  The article was in fact repealed in 1989.  Almost simultaneously, the article on criminal liability for dissemination of knowingly false fabrications that defame the Soviet state and social system was removed from the Criminal Code.  This obviously antidemocratic definition of a crime had been formulated in 1966 for the purpose of punishing dissidents and appeared to be a type of  fallback crime with respect to anti-Soviet agitation and propaganda that could be used when proof thereof was not sufficient.

One of the declared goals of *perestroika*, building a new state based on the rule of law, has been related to the coherent embodiment of the principle of separation of powers (legislative, judicial, and executive) in practice.  Due to a long and sad tradition, empowering the judiciary in the Soviet Union was quite difficult.  It is well known that the judicial branch in the Soviet Union had a subordinate place in the partocratic (government by the party) structure of the command–administrative system.  One of the first steps toward the goal of strengthening the judiciary was the enactment of a federal statute in November 1989 "On Liability for Disrespect of the Court."  This statute created criminal liability for interfering with court decisions and for threatening or insulting a judge or people's assessor (later these norms became part of the Criminal Code of the RSFSR).

On July 2, 1991, the Parliament of the Soviet Union adopted one of its last legislative acts, the new Fundamental Principles of Criminal Legislation of the USSR and Union Republics, designed to replace the Fundamental Principles of 1958.  Because of the subsequent collapse of the USSR, the new Fundamental Principles never took effect. Unfortunately, the enactment of this statute did not generate much interest in the context of the disintegration of the Soviet state, which was followed by intense and sometimes bloody conflicts on interethnic grounds and by a series of infamous events in August of the same year (in particular, the antidemocratic coup d'état of 1991).  Nonetheless, the 1991 Fundamental Principles merit attention for several reasons.  First, they reduced the number of capital offenses.  Second, they introduced

a number of criminal law norms intended to reinforce individualized criminal liability and punishment, as well as to make them more fair. For example, an article on classification of crimes assigned all crimes to one of four categories depending on the character and dangerousness of the offense. The penal consequences for individuals who committed a crime depended on its category. Third, the Fundamental Principles included a provision on the diminished responsibility of mentally deranged but legally sane individuals. Fourth, the Fundamental Principles expanded the range of exculpating circumstances that eliminated the criminality of an act, such as taking a justifiable professional or economic risk or following orders. Finally, the Fundamental Principles took into account the phenomenon of organized crime and increased the range of punishments that do not rely on a deprivation of freedom. It is worth noting that a few years later, many of these innovations, because of their progressive and democratic character, were reflected in the new Russian Criminal Code.

Further changes to the Russian Criminal Code of 1960 were taking place in the context of the postsocialist development of the criminal law. Officially, the beginning of this stage of development of Russian criminal legislation is associated with the enactment of the new Constitution of the Russian Federation in December 1993. However, the first steps in this direction had already been taken in the Criminal Code of the RSFSR at the end of 1991. After the well-known events of August 1991, the collapse of the Soviet Union, and Russia's attainment of genuine statehood, it became possible to include in Russian criminal legislation certain changes demonstrating rejection of the old ideology and acceptance of a new one: the precedence of humanitarian values over class values, a refusal to adhere to the "socialist choice,"[3] a decisive turn toward the recognition of legal safeguards for rights and liberties as a fundamental idea of criminal legislation, and the conformity of criminal prohibitions to the transition to a market economy. This shift was reflected in the repeal of criminal law norms violating human rights and freedoms and of the prohibitions contained in articles 142, 198,

---

[3]     *Editors' note:* this terms comprises the hegemonic position of the state party and central economic planning.

209, and 227 of the Criminal Code of 1960.[4]

Relying on provisions of the Declaration of Rights and Freedoms of the Individual and Citizen of the Russian Federation of 1991 and furthering the development of the humanist foundation of criminal law, the Russian Federation, on December 5, 1991, abolished the death penalty for violation of currency laws, grand theft of state and/or public property, and bribery under aggravated circumstances. In addition, a statute of May 27, 1993, repealed the death penalty for all women and for men over sixty-five. On April 21, 1992, article 38 of the Constitution of the Russian Federation established that the death penalty may be applied only as an exceptional form of punishment for grave crimes against individuals (this principle was later endorsed by the Constitution of the Russian Federation of 1993), although some provisions of the Criminal Code failed to conform to this constitutional provision.

Norms of Soviet criminal legislation had always strictly protected a centralized, planned economy. Subsequently, concrete steps toward a Russian market economy resulted in the repeal of criminalization of the following: private enterprise and commercial middleman activity; production of poor quality, nonstandard, and/or incomplete products; and additions to or other distortions of accounts concerning fulfillment of an economic plan. At the beginning de facto, and later de jure, speculation was decriminalized.[5] At the same time, certain criminal law norms intended to protect economic relations during the transitional period were enacted. Criminal liability was imposed for failure to report income; hiding of profits or other income subject to taxation (tax evasion); violations of antitrust law; failure to cooperate with or follow directions of tax inspectors in order to hide profits or evade taxes; unlawful entrepreneurial activity; unlawful business undertaking in trade; and similar acts. Another important development in this respect was the elimination in 1994 of chapter 2 of the Criminal Code, which dealt with crimes against socialist property, along with the formulation of a uniform

---

[4]    *Editors' note:* articles 142, 198, and 209 are discussed *supra* pp. 192–93. Article 227 generally restricted religious activities.

[5]    RSFSR Criminal Code, 1960, art. 154, defined speculation as "buying up and reselling of goods or any other articles for the purpose of making a profit." *Translated in* Berman & Spindler, *supra* note 1, at 22.

system of provisions concerning responsibility for crimes against property in general, clarification of the notion of criminally punishable smuggling, and formulation of norms establishing liability for other crimes relating to customs.

In spite of all these amendments, the 1960 Criminal Code had become hopelessly obsolete, and its practical implementation increasingly difficult. Reality urgently demanded the enactment of a new criminal code, responsive to the new conditions and demands of life in Russia.

## THE NEW CRIMINAL CODE

Work on a new Criminal Code began in 1991, during the last month of existence of the Soviet Union. For this purpose, two working groups were formed—one at the Ministry of Justice of the Russian Federation; the other at the Supreme Soviet of the RSFSR. The Justice Ministry's first draft was ready in December 1991 and was published for public discussion.[6] Later, this draft was substantially modified, taking into account comments from legal scholars and practitioners. The Justice Ministry draft was also reviewed by specialists at Harvard Law School.[7] In September 1992, the President of Russia sent the draft to the Supreme Soviet of the RSFSR. At the time, relations between the President and the Supreme Soviet of the Russian Federation were strained. For this and other reasons, the Supreme Soviet did not review the Justice Ministry draft, and indeed was naturally inclined to support the text on which its own drafting group was working. The Justice Ministry draft was further revised by the State Legal Department of the

---

[6]     *Za Chto i Kak Budut Sudit' v Rossii . . . Novyi Ugolovnyi Kodeks (Proekt) [For What and How One Is to Judge in Russia . . . New Criminal Code (Draft)]* (pts. 1–3), 2 Zakon 85 (1992); 3 Zakon 90 (1992); 4 Zakon 93 (1992). *Zakon* is a magazine supplement to *Izvestiia.*

[7]     The draft was published twice in revised editions. Yuridicheskii Vestnik, 1992, No. 20; *Prestuplenie i Nakazanie: Kommentarii k Proektu UK Rossii [Crime and Punishment: Comments to the Draft of the Criminal Code of Russia]* (N.F. Kuznezhova & A.V. Naumov eds., 1993).

Russian Federation and the Ministry of Justice and, on behalf of the President, submitted for consideration to the state Duma (lower house of Parliament) at the end of 1994. At the same time, a group of delegates introduced another draft Criminal Code based on the Justice Ministry draft of 1991–1992. Recognizing that the basic concepts in the Justice Ministry and Supreme Soviet drafts coincided, the legislators came to a reasonable and compromise decision to create a single, coordinated draft Criminal Code on the basis of these two texts. The new draft was prepared very quickly, and during 1995 the state Duma enacted it in three readings and then forwarded it to the Council of the Federation (upper house of Parliament). The latter rejected this draft but the state Duma overrode the veto and forwarded the text to the President. The President, however, refused to sign this version into law on the ground of some significant, in his opinion, deficiencies. After a relatively brief period of revision, on May 24, 1996, the state Duma approved the revised draft of the Criminal Code, and on June 5, 1996, the Council of the Federation did the same. Finally, on June 13, 1996, the President of the Russian Federation signed the federal law "Concerning the Introduction into Operation of the Criminal Code of the Russian Federation" *(O Vvedenii v Deistvie Ugolovnogo Kodeksa Rosiiskoi Federatsii).*

### The Structure of the Code

The new code has retained the traditional division between a general part and a special part, but at the same time its structure differs from that of the previous code. Thus, both the general part and the special part of the code now are divided not simply into chapters, as before, but instead into sections, which are then subdivided into chapters.

This change reflects the increase in the number of norms in the general and special parts, which can be explained in turn by a more complex elaboration of many problems of criminal protection in the modern world, entailing the emergence of new criminal law doctrines in the general part and the formulation of many new specific crime definitions in the special part. In all, the code comprises 12 sections, 34 chapters, and 360 articles.

The section and chapter headings are set out below:

## GENERAL PART

*SECTION I.     Criminal Legislation*
    Chapter 1.      Objectives and Principles of the Criminal Code of the Russian Federation
    Chapter 2.      The Operation of Criminal Legislation in Time and Space

*SECTION II.     Crime*
    Chapter 3.      The Concept of Crime and Categories of Crime
    Chapter 4.      Persons Subject to Criminal Responsibility
    Chapter 5.      Culpability
    Chapter 6.      Inchoate Crime
    Chapter 7.      Complicity in Crime
    Chapter 8.      The Circumstances Excluding Criminality of an Act

*SECTION III.     Punishment*
    Chapter 9.      Definition and Purposes of Punishment. Categories of Punishment
    Chapter 10.     Assignment of Punishment

*SECTION IV.     Release from Criminal Responsibility and Punishment*
    Chapter 11.     Release from Criminal Responsibility
    Chapter 12.     Release from Punishment
    Chapter 13.     Amnesty, Executive Clemency, Criminal Record

*SECTION V.     Criminal Responsibility of Minors*
    Chapter 14.     Specifics of Criminal Responsibility and Punishment of Minors

*SECTION VI.     Compulsory Measures of a Medical Nature*
    Chapter 15.     Compulsory Measures of a Medical Nature

## SPECIAL PART

*SECTION VII.     Crimes against the Person*
    Chapter 16.     Crimes against Human Life and Health
    Chapter 17.     Crimes against Freedom, Honor, and Dignity of the Person

Chapter 18.    Crimes against Sexual Inviolability and Freedom of the Person
Chapter 19.    Crimes against Constitutional Rights and Freedoms of the Person and Citizen
Chapter 20.    Crimes against the Family and Minors

SECTION VIII.  Crimes in the Sphere of the Economy
Chapter 21.    Crimes against Property
Chapter 22.    Economic Crimes
Chapter 23.    Crimes against the Interests of Commercial and Other Organizations

SECTION IX.    Crimes against Public Security and Public Order
Chapter 24.    Crimes against Public Security
Chapter 25.    Crimes against Human Health and Public Morality
Chapter 26.    Environmental Crimes
Chapter 27.    Crimes against Traffic Safety and Maintenance of Means of Transportation
Chapter 28.    Computer-Related Crimes

SECTION X.     Crimes against State Authority
Chapter 29.    Crimes against the Fundamentals of the Constitutional Order and State Security
Chapter 30.    Crimes against the State, Interests of the Civil Service, and Interests of Local Self-governing Bodies
Chapter 31.    Crimes against the Administration of Justice
Chapter 32.    Crimes against the System of Administration

SECTION XI.    Military Crimes
Chapter 33.    Military Crimes

SECTION XII.   Crimes against the Peace and Security of Mankind
Chapter 34.    Crimes against the Peace and Security of Mankind

## Characteristics of the Legislatively Formulated Objectives and Principles

The code begins by stating that "the criminal legislation of the Russian Federation consists of this Code.  New laws defining criminal responsi-

bility are subject to inclusion in this Code" (article 1). What is the significance of this provision? In many Western countries, criminal codes are not the exclusive source of criminal law. In addition, various pieces of legislation outside the codes (sometimes very extensive) also contain criminal law norms establishing responsibility, for example, for economic, environmental, and transportation crimes. Such an approach was proposed during the preparatory work on the new Russian Criminal Code because it makes it easier for lawmakers to change criminal legislation without disturbing the structure of the code. However, it seems that in this instance, the preservation of national traditions with respect to the exhaustive incorporation of criminal law norms within the framework of the Criminal Code was very important. It should facilitate the practical application of criminal legislation, especially in the provinces, where legal information is not easily accessible, and thereby should contribute to a fuller implementation of the rule of law.

Article 1 of the Criminal Code also provides that "the [C]ode is based on the Constitution of the Russian Federation and universally recognized principles and norms of international law."

Article 2 formulates the objectives of the Criminal Code as follows: protection of the rights and freedoms of the individual and the citizen, property, the social order and public safety, the environment, and the constitutional order of the Russian Federation against criminal acts; securing of the peace and security of mankind; and prevention of crime.

Actually, such objectives of the criminal law are wholly traditional and, in principle, are the same for any Judeo-Christian or Muslim society or state since they originate from biblical commandments, such as "thou shall not kill" and "thou shall not steal." Historically, criminal law emerged to defend society from criminal acts. Protection is the main function of criminal law, which in essence is not dependent on the political and economic order of the state. As far as the formulation of objectives is concerned, as strange as it may seem, even the criminal codes of the Soviet socialist republics were largely similar to the criminal codes of the American states. In one way, however, they were fundamentally different; namely, in the way they determined priorities of criminal protection. The Criminal Code of the RSFSR, as well as of other Soviet republics, proceeded from the principle of protection of state interests first, public interests next, and only afterward the interests of the individual; in contrast, in the criminal codes of developed democratic

countries, these priorities are generally reversed.

The new code refused to adhere to the old, indigenous tradition and established a new hierarchy of values protected by criminal law—the person, the public, the state.[8]  Admittedly, this shift did not come about easily.  During discussions of the drafts, it was persistently reiterated that such an allocation of priorities "is not good for Russia," that the interests of the state and the public should take precedence, and that only the effective criminal law protection of these interests will ensure the safety of the person.

For the first time in the history of Russian criminal legislation, the following principles of criminal law are recognized:  legality (article 3), equality of all citizens before the law (article 4), culpability (article 5), justice (article 6), and humanism (article 7).

The principle of *legality* means that the criminality of an act, as well as prescription of penalties and other penal consequences of conviction, shall be determined only by the present code.  The principle absolutely prohibits application of criminal sanctions by analogy.[9]  Russian jurists have terrifying recollections related to the doctrine of analogy.  If, for example, a person inadvertently dropped the bust of a leader, and the bust broke, even the Stalinist Criminal Code did not stipulate punishment for such an act.  In spite of this "gap," in accordance with the doctrine of analogy, a criminal proceeding could be instituted against the unlucky klutz, and he could be convicted of attempted assassination.  Unfortunately, this example is not a flight of imagination.  The doctrine of analogy was formally renounced by the Fundamental Principles of Criminal Legislation of the USSR and the Union Republics of 1958.  However, since this doctrine was occasionally invoked by the courts, a legislatively explicit renunciation was required in the new code.  Of course, the notion of the social dangerousness of an act is not immutable.  Both the development of social relationships,

---

[8]      In Soviet law, the special part began with the most serious offenses, "treason" and other crimes against the state; then followed crimes against socialist property and, finally, provisions on responsibility for homicide.  In the new Criminal Code, criminal law protection of persons' and citizens' rights and freedoms has top priority; the interests of the society and state are secondary.

[9]      See *supra* note 2.

and the progress of science and technology, may alter the criteria for finding acts socially dangerous and punishable. Something that is socially dangerous today may lose this character; vice versa, new criminal prohibitions may be needed for acts not previously deemed socially dangerous. Law enforcement agencies may still find acts socially dangerous that fall outside the legislative purview and thus are not criminally punishable. But such a "filling in the gaps" should remain exclusively in the legislative domain. A court, a prosecutor, an investigator, or an agency of inquiry has no right to assign criminal significance to an act falling outside the sphere of criminal legislation. The new Criminal Code expressly says so.

The principle of *equality* of citizens means that persons who have committed crimes should be treated equally before the law and be subject to the same criminal responsibility, regardless of gender, race, nationality, language, origin, economic or official status, place of residence, religion, beliefs, membership in social associations, and other circumstances.

The principle of *culpability* means that a person is subject to criminal responsibility only for socially dangerous acts (or omissions to act) and the ensuing socially dangerous consequences with respect to which his personal culpability is established. Only an actor who has committed a forbidden act intentionally or negligently may be found guilty of crime. Strict liability—criminal responsibility for the nonculpable infliction of harm—is not permitted. Hence, no act in spite of its dangerous consequences may be considered a crime if it was committed innocently, that is to say, without culpability. This principle reflects the elementary requirement of a fair social and legal evaluation of human behavior in general and of criminal behavior in particular, because convictions based on an act as to which the social danger was unforeseen, or could not have been foreseen, would not have any preventive or educational significance. The new Criminal Code not only legally reinforces the principle of culpability but also develops it significantly compared to the previous criminal legislation. In the new Criminal Code, an act committed negligently is deemed a crime only if it is provided for in a particular article of the special part of the code (criminal codes of many European countries, including the Federal Republic of Germany, contain an analogous rule). Therefore, unless an article in the special part specifically provides otherwise, it shall be presumed that criminal intent is required.

The principle of *justice* is defined in article 6 of the new Criminal Code. First, this principle means that punishment, as well as other penal consequences, applied to a person who commits a crime must be just; that is, must correspond to the character and degree of social dangerousness of the crime, attendant circumstances, and the personality of the accused. Second, no one shall be criminally responsible twice for the same crime (the latter reflects a constitutional principle). In fact, the principle of justice includes individualized responsibility and punishment. Thus, statutory penalties have a relatively definite (when they provide for a specific kind of punishment within certain limits) or an alternative character (when they provide for two or more kinds of punishment alternatively). Sometimes, statutory penalties combine those characteristics (for example, a negligent act causing death is punishable by deprivation of freedom, explained below, for up to three years or imprisonment for the same term). Even broader boundaries for the individualization of responsibility are established in the norms on sentencing and relief from criminal responsibility and punishment (articles 61–68), allowing a court in certain circumstances significantly to mitigate punishment or relieve the perpetrator of criminal responsibility and punishment.

The principle of *humanism* has also been redefined. First of all, the principle is addressed not to criminals but to all citizens: "The criminal legislation of the Russian Federation ensures the security of the individual." The traditional understanding of this principle is that "punishment and other means of criminal law applied to persons who have committed crimes may not be applied so as to cause any physical suffering and humiliation of the individual." Therefore, this principle prohibits punishments that torment, or humiliate, or are cruel. Under this principle, the state attempts through conviction and punishment to correct the person who has committed a crime, bring him back to a socially useful life, and positively influence other people. Unfortunately, in Russian society at present, the view that cruelty and *retribution* are the best means of eradicating crime is widespread.

### New Provisions on Crime and Punishment in the General Part

Central to criminal law is the concept of crime. The new Criminal Code has retained the formal and substantive character of the legislative

definition of crime.  The definition includes a formal (normative) element, the prohibition of an act by criminal legislation, and a substantive indicium, social dangerousness.  The latter indicium lies in a criminally prohibited act's capability to cause significant social harm to interests protected by criminal law.  Social danger, as was mentioned before, is a substantive indicium, an innate characteristic of a criminal act that reveals the act's social essence.  This is an objective characteristic of a crime, one that does not depend on a legislator's will.  In criminal legislation in Western countries, the substantive indicium of a crime (an indication of its social dangerousness) is absent, as a rule.  Thus, for example, the Criminal Code of the Federal Republic of Germany defined a crime as "an unlawful act which is to be punished by deprivation of freedom for a minimum of one year."  In this regard, some Russian legal commentators suggested eliminating the substantive definition of crime and returning to its purely formal definition:  crime merely as unlawful criminal act.[10]

The draft of the new Criminal Code of the Russian Federation proposed by a group from the State Legal Department of the President of Russia and the Ministry of Justice of the Russian Federation also tried to eliminate the substantive indicium of crime.  Thus, article 14 of that draft offered the following definition:  "A crime is deemed an act (an action or omission) forbidden by criminal legislation and causing harm or danger of harm to the person, society and state."  Clearly, this formulation suffers from significant methodological flaws.  The wording blurs the line between a crime and any other violation of the law since the harmfulness of an act is inherent in any breach of law.  And crime as a species of violation of law is differentiated from other offenses by enhanced harmfulness, that is, by causing significant harm to protected interests (in other words, by being socially dangerous).

The legislature correctly refused to accept this proposal.  The problem is not so much that Western criminal law rejects the indicium

---

[10]      *Sud Prisyazhnix: Vozvrashenie v Rossiu—Programma Meropriyatii po Etapnomy Vvedeniu Suda Prisyazhnich i Drugich Printsipial'no Novix Polozhenii Protsesual'nogo i Sudoustroistvennogo Zakonodatel'stva [Trial by Jury: Return to Russia—The Program on Measures of Gradual Introduction of Trial by Jury and Other Major New Provisions on Legislation Concerning the Judiciary and Judicial Procedure]*, Sovetskaia Ustitsiia, 1993, No. 3, at 2.

of the social dangerousness of a criminal act but that Western legislative traditions are different. Thus, the legislative definition of crime in the German Criminal Code existed at the beginning of the last century, during the heyday of the "classical school" of criminal law, at the time when criminal law theory had not yet formulated the notion of social dangerousness. The theory of social dangerousness emerged and was developed not in the framework of Soviet criminal law but in the theoretical writings of those representing a sociological school of criminal law. It is a separate issue that this theory actually took root in Soviet legislation.

It should be acknowledged that, although Russian criminal legislation of the last and the beginning of the present century (the Code of Criminal and Corrective Punishment of 1845, including the 1885 edition, and the Criminal Code of 1903) set out a formal definition of crime, the most eminent Russian criminal law scholar N.S. Tagantsev came close to a substantive definition of crime in his acclaimed course on criminal law. In his famous textbook, Tagantsev maintained that

> an act is considered criminally punishable when it infringes upon a legal norm in its "real being" and upon prohibitions by law of the place of the act's perpetration under the fear of punishment; or, emphasizing more the extent of infringement: an act encroaching on such interest which is protected by a legal norm that in a particular country, at a given time, is recognized as so significant that the state, in light of the insufficiency of other means of protection, threatens the perpetrator with punishment.[11]

Social dangerousness is the objective and intrinsic characteristic of a crime. And an attempt to renounce this characteristic or this attribute is tantamount to "throwing out the baby with the bath water." Without this characteristic, the definition of crime would be defective. It would fail to make clear why certain acts are prohibited under the threat of criminal punishment.

---

[11]     N.S. Tagantsev, *Russkoe Ugolovnoe Pravo: Lektsii — Chast' Obshchaya [Russian Criminal Law: Lectures — The General Part]* 46 (St. Petersburg n.d.).

The new Criminal Code of the Russian Federation, recognizing social dangerousness as an indicium of crime, specifically stipulates in article 14(2) that "an act or an omission to act shall not be a crime, although it formally contains the indicia of any act provided for by the present Code, if due to its insignificance it does not represent a social danger, that is, it has not caused or threatened to cause harm to the person, society, or the state" (a modified formulation of the previous Criminal Code of the RSFSR).

Article 15, which introduces a formal categorization of crimes, represents an important innovation. Legislative classification of crimes is necessary so that assignment of a particular criminal act to the appropriate category entails specific legal consequences. Henceforth, the categorization of crimes is taken into account not only when a legislature establishes the punishment and a court determines the sentence but also when resolving many other penal law issues, such as defining dangerous and extremely dangerous recidivism; determining liability for criminal preparation or criminal association, or punishment for multiple crimes; and providing relief from criminal responsibility and punishment.

The Criminal Code of the Russian Federation of 1996, for the first time in the history of Russian criminal law, includes a special provision regarding the criminal responsibility of mentally deranged but legally sane offenders. In accordance with this provision (article 22), a sane individual who while committing a crime could not have fully realized the actual character and social dangerousness of his actions (or omissions), or could not have fully controlled his actions due to a mental disorder, is subject to criminal liability. However, such mental disorder is taken into account by the court when sentencing and may serve as a basis for imposition of compulsory medical measures.

It should be noted that research by lawyers and psychiatrists has demonstrated that among those who committed crimes and were recognized as sane, a large percentage were suffering from mental deficiencies (chronic alcoholism, organic afflictions of the brain, and so on). The fact that these circumstances were to be taken into account when determining punishment was recognized early in Soviet and Russian criminal law theory. Provisions mandating mitigation of punishment for persons who commit crimes in a state of mental disorder, not excluding sanity, also exist in the criminal legislation of a number of foreign countries. For example, in the Criminal Code of the

Federal Republic of Germany this type of impairment was called diminished capacity.

At the same time, the legal and the medical literature also supports the opposite view, denying the necessity of taking limited (diminished) responsibility into account in sentencing. Objections along this line rest, in general, on the following arguments: the difficulty of identifying concrete criteria to determine diminished capacity; the possibility of errors and abuses in making such a determination; and the possible reduction of punishment for dangerous criminals. However, modern researchers, relying on the latest scientific recommendations by forensic psychiatrists, justifiably conclude that these difficulties are exaggerated. The exaggeration reflects a faulty understanding of diminished capacity as an intermediate condition between sanity and insanity; in contrast, the inquiry should focus on diminished sanity as a type of sanity and recognize that its medical and legal criteria are fully identifiable. Persons of diminished capacity suffer psychological handicaps but at the same time retain an ability, although weakened, to be aware of their actions (or inactions) and to control their behavior. The medical criteria for this type of sanity are familiar from so-called borderline conditions, which at present have been well researched in both general and special psychiatry.[12]

As stated earlier, the new Criminal Code attempts to limit responsibility for crimes committed through negligence. The code has done so by establishing a rule according to which an act committed negligently is considered a crime only when it is specifically provided for in an appropriate article of the special part (article 24).

The new Criminal Code also has formulated a norm for nonculpable infliction of harm, the content of which was borrowed from criminal law theory and criminal practice. In accordance with article 28 of the Criminal Code, an act is deemed to have been committed without culpability if the actor did not and, due to circumstances, could not have recognized the social dangerousness of his actions (or inactions) or did not and, due to circumstances, could not have foreseen the possible occurrence of socially dangerous consequences.

---

[12]    See *Ugolovnyi Zakon: Opyt Teoreticheskogo Modelirovaniaya [Criminal Law: The Experience of Theoretical Simulation]* 78–79 (Moscow 1987).

Moreover, an act is also deemed to have been committed without culpability when the actor foresaw the possibility of harmful consequences but could not have prevented them due to the disparity between his psychological and physiological abilities and the demands of extreme psychological overload. This rule originates from the principle of subjective imputability, according to which a person performing an act under extreme conditions and psychological pressure may be convicted only if the person's abilities could have met the objective demands of the situation and the person foresaw the socially dangerous character and consequences of his action (or inaction), or if the person did not foresee the consequences he could have foreseen and prevented them by virtue of his own abilities. This rule is not applicable to situations where socially dangerous consequences resulted from the person's own culpability; for example, in the case of concealing psycho-physiological impairments that would prevent the actor from carrying out a certain type of activity; fraudulently gaining employment requiring special knowledge, skills, or training; or voluntarily becoming intoxicated through the ingestion of alcohol, narcotics, psychotropics, and other controlled substances.

This type of accident as a nonculpable infliction of harm quite often is related to extreme stress on the actor, most often in the operation of sophisticated machinery or equipment. Examples include pilots operating aircraft or drivers operating heavy trucks without adequate rest, and air traffic controllers or railroad engineers working under continual, intense pressure. In many such cases, although the person who allowed the occurrence of socially dangerous consequences had foreseen the possibility of their occurrence, he could not have prevented them given the stressful circumstances in which he was working.

Another essential characteristic of the new Criminal Code is the specific targeting of organized crime. Article 35 sets out the legal definition and the special features and limits of responsibility for commission of a crime by a group of persons, by a group of persons having a prior agreement, by an organized group, or by a criminal association (criminal organization). For example, a person who creates or supervises a criminal association (criminal organization) is subject to criminal responsibility for its organization and supervision, and also for all the crimes committed by the association if the crimes were within the

person's intent. Commission of crime by a criminal association entails more severe punishment. Article 210, which deals with responsibility for organizing a criminal association, is in the special part of the Criminal Code. This provision makes the following acts subject to severe punishment: the creation of a criminal association for the purpose of perpetuating grave or especially grave crimes; the supervision of such association or any of its structural subgroups; and the creation of a group of organizers, leaders, or any other representatives of organized groups for the purpose of devising plans and conditions for the commission of grave and especially grave crimes. Participation in such associations or unions is also a punishable offense (moreover, if a person takes advantage of his official position in committing such a crime, the sentence is imprisonment for ten to twenty years with or without confiscation of property). In addition, the commission of a crime while a member of a group, a group by prior agreement, an organized group, or a criminal association is deemed to be an aggravating circumstance as provided for in the general part of the code.

At the same time, the new Criminal Code has significantly expanded the range of exculpating conditions. The previous code provided only for the two most traditional of such conditions — necessary defense and extreme necessity. The new code adds four more such conditions: causing harm while arresting a person who has committed a crime (article 38), physical and psychological duress (article 40), justified risk (article 41), and execution of an order or duty (article 42).

Under article 38, the infliction of harm on a suspect during his arrest, during his transfer to the authorities, and in order to prevent his committing further crimes does not constitute a crime, unless there were other reasonable means to bring the suspect under control and greater force than necessary.

The means to effect an arrest shall be deemed excessive if they were clearly disproportionate to the nature and dangerousness of the alleged crime and if the harm inflicted on the suspect was excessive and unjustified under the circumstances. The more dangerous the alleged crime and the more resistance offered by the suspect, the more harm may be inflicted on the criminal during arrest. In the case of a grave crime, if the suspect does not put up any resistance during arrest, harming the suspect is not permitted. Harm would include both unnecessary deprivation of liberty and physical injury. With regard to

effecting an arrest, criminal responsibility is available, however, only if the harm inflicted was intentional. In addition, the special part of the Criminal Code provides for criminal responsibility in the case of a person who commits a homicide under mitigating circumstances, such as when one exceeds the means needed to detain a person suspected of committing a crime. Moreover, in accordance with the general part of the Criminal Code, the commission of a crime while detaining a criminal is deemed mitigated, even though the conditions for legally inflicting harm are violated.

According to the new Criminal Code, where physical duress is present, infliction of harm to an interest protected by law is not a crime if the duress rendered the actor unable to control his actions. Given that not every socially dangerous act can support criminal responsibility, but only those which are voluntary, it follows that if coercion (physical or psychological) excludes volition, then it also precludes criminal responsibility. The defense of extreme necessity applies where, in the face of psychological or physical duress, the actor retained the ability to control his own actions but nonetheless harmed interests protected by law.

In order for physical coercion to preclude criminal responsibility, an act that would otherwise be criminal must be committed against the will of the person acting under duress. For example, a person who damages another person's property is not criminally responsible if he was intentionally shoved in order to cause damage. However, if the physical coercion did not exclude the possibility of the person's acting under his own will, then the person is not relieved of criminal responsibility, although duress is considered as a mitigating factor at the time of sentencing. Psychological duress also has some significance in criminal law under the new code. This type of duress means a threat to inflict harm, including physical harm, in order to force another person to commit a socially dangerous act. Psychological coercion (duress) usually does not exclude the possibility of a volitional act, and thus, as a general rule, it does not exclude criminal responsibility. Psychological duress precludes criminal responsibility only when the requirements of the defense of extreme necessity are met: that is, the danger could not have been avoided by other means, and the harm done was less than the harm meant to be averted. As with physical coercion, psychological coercion that does not overcome the actor's volition may be a mitigating factor at the time of sentencing.

The Criminal Code of 1996 introduces a new exculpatory doctrine into Russian criminal law; namely, exclusion of responsibility on the ground of justified risk. This innovation reflects the fact that in the modern context of advancing technology, the need to take certain risks of physical harm to life or significant damage to property occurs more often than ever before (for instance, during the adoption of new industrial technology or the development of new medical treatments).

Justified risk can arise in any area of professional work. The most common examples are scientific risk (for example, the researchers who invented the polio vaccine tested it on their own children); industrial and economic risk (for instance, making a decision to dismantle a chimney not by ordinary means, which would be very expensive, but by detonation, where the risk lies in deciding on the explosive charge sufficient to do the job but not likely to affect nearby structures); and commercial risk (for example, making banking, investment, and other speculative financial decisions).

The new Criminal Code deems risk legally justified when the following conditions are met:

First, the risk must be taken for the realization of socially useful goals (saving lives or improving people's health, ameliorating significant financial burdens, and so on).

Second, the goal accomplished by the risk taking could not have been achieved otherwise. This requirement brings to mind the case of extreme necessity, although in the case of extreme necessity the threat inevitably will entail socially harmful consequences if not averted, whereas in the case of risk such consequences are only a possibility. Another difference is that the harm resulting from justified risk may be greater than the averted harm.

Third, the person who takes the risk must observe all necessary precautions to avert possible harm to interests protected by law.

Risk should not be deemed justified if the actor knowingly created a threat to the lives of many people, a threat of environmental catastrophe, or a threat of social disaster. The unavailability of a defense of justified risk in the case of potential environmental catastrophes reflects the sharp deterioration of the environment in many regions of Russia, manifesting itself in violations of environmental safety regulations that result in significant harm to the health of the population, damage to different ecological zones, and ultimately enormous economic losses.

Thus, risks that may result in fires, landslides, epidemics, or other social or health crises, even if undertaken to achieve a socially beneficial goal, should not be deemed justified.

The 1996 Criminal Code of the Russian Federation, for the first time in Russian criminal law, excludes criminality and punishment in the case of actions taken in compliance with official orders or directives. Criminal law principles relating to harm caused in the execution of orders were codified in the Charter of the Nuremberg Tribunal at the end of World War II. International law does not recognize following orders as a defense, although this claim may be considered as a mitigating factor in sentencing. Many European countries have codified this approach in their domestic legislation.

Under article 42 of the Criminal Code, an act committed pursuant to an order or directive carries no criminal responsibility if the order or directive is deemed obligatory when given in a prescribed manner and in a particular form and if the order or directive was legal in content, as well as in form. Commission of an intentional crime during the execution of an order or directive known to be unlawful does not relieve either the perpetrator or the person giving the order or directive from criminal responsibility.

An order or instruction is known to be unlawful if the perpetrator knew of its obvious and clear criminality. For example, in accordance with the Russian Federation statute "On Militia" (1991), a member of the militia has the right to use special means (truncheon, tear gas, water hose, etc.) in certain situations. Such use, in particular, is authorized in cases of disobedience; for example, in connection with breaking up an unauthorized demonstration or mass meeting. However, use of firearms will be knowingly unlawful (and criminal) in the absence of an attack on a police officer endangering his life or health or an attempt to seize the officer's weapon. Responsibility for the execution of such an order or directive will be imposed on both the superior who gave the order and the subordinate who carried it out. At the same time, in accordance with the norms of the general part of the Criminal Code, commission of a crime pursuant to an order or directive that does not meet the requirements of lawfulness of content and form may be deemed a circumstance that mitigates the punishment of the subordinate.

The new Criminal Code (like the previous one) includes an exhaustive enumeration of types of punishment. Courts may not impose

any punishment that is not expressly enumerated.

The Criminal Code provides for punishments that vary in severity and character.  The range of punishments allows the courts to take into account the gravity of the crime and the dangerousness of the perpetrator and to assign a sentence that serves the purposes of rehabilitating the convicted person as well as achieving social justice and preventing new crimes.

The new Criminal Code has abandoned the principle embodied in the former code of structuring the system of punishments from more severe to less severe.  That is, the old principle steered the courts toward more severe punishment.  The new principle (from less to more severe punishment) favors the imposition of a more just sentence.  Only where a less severe punishment is inappropriate will the court order a more severe punishment (considering the actual circumstances of the case and the individual's particular characteristics).

The list of punishments in the Criminal Code of 1996 (other than those that existed previously, such as fines, correctional labor tasks, and deprivation of freedom) introduces a number of new kinds of punishment that are explained below:  mandatory labor, restriction on military service, restriction of freedom, "arrest," and life imprisonment (formerly, life imprisonment was available only as a substitute for capital punishment by way of executive clemency).   These new kinds of punishment are designed, whenever possible, to limit the use of sentences involving deprivation of liberty.

Mandatory labor (article 49) requires the offender to perform unremunerated, socially useful services in his free time; the type of service is determined by agencies of local government.  Such services are assigned for a period of 60–240 hours and are to be performed for a period not to exceed four hours a day.  Examples include cleaning streets and public squares.

Restriction on military service in some ways resembles a form of punishment known as "correctional labor tasks," which is not applicable to military personnel.  Introduction of this new type of punishment is designed to allow military personnel who have not committed serious crimes to continue their military service (especially where the offender is a highly qualified specialist in one or another area of military science).  The goals of rehabilitating military offenders and preventing commission of new crimes are achieved through imposing certain deprivations and

limitations on the rights of the convicted person, who serves his sentence while performing his military duties. Thus, the court can order withholding up to 20 percent of the offender's monetary allowance; moreover, the period of time during which the sentence is in effect cannot be credited toward seniority and no promotions may be granted while this punishment remains in effect.

Restriction of freedom consists of keeping a person who was at least eighteen years old at the time of sentencing in a special institution. While the offender is not isolated from society in the sense that a prisoner is, he remains under supervision. The Penal–Correctional Code of the Russian Federation provides for different types of restrictive measures and the order of their implementation. Restriction of freedom may be imposed where this punishment is the principal statutory penalty for a specific offense, as a penalty of lesser severity than the one provided for a particular crime, and as a substitute for mandatory or correctional labor. Restriction of freedom may also be ordered in lieu of completing the unserved portion of a more severe sentence.

"Arrest" is defined as keeping the convicted person in strict isolation from society and is assigned for a period of 1–6 months. Arrest is appropriate for a first-time offender who has committed a crime that is not very serious and who should not necessarily be deprived of freedom for a long period. Arrest may not be ordered for persons who were under the age of sixteen at the time of sentencing, pregnant women, or women who have children under the age of eight. The conditions and regimen of serving the sentence are determined by the Penal–Correctional Code. Arrest as a form of punishment differs from deprivation of freedom not only in its length but also in the conditions of imprisonment. The former is served in strict isolation; in other words, harsh conditions. Arrest is in effect a warning to the criminal about what criminal punishment is like and a reminder that stiffer punishment is available.

As noted above, life imprisonment was not a form of punishment that courts could impose under the former code. Under the new code, life imprisonment is designated as an alternative to the death penalty only for extremely serious crimes involving homicide or attempted homicide. This sentence may be assigned in cases where the court determines that imposition of the death penalty is inappropriate.

The new Russian Criminal Code has retained the death penalty

but sharply reduced the scope of its application, conforming the criminal law to the Russian Constitution, according to which the death penalty, "until it is abolished, may be imposed by federal law as an exceptional measure for extremely serious crimes against life, provided that the accused shall have a right to have his case heard by a court with the participation of a jury." In the special part of the Criminal Code, the death penalty is available for the following five crimes: homicide with aggravating circumstances; assassination or assassination attempt on a state or public figure, a person carrying out justice or conducting a preliminary investigation, or an employee of a law enforcement agency; and genocide.

As in the past, the death penalty is not applicable to women, to persons who commit crimes under the age of eighteen, or to men over the age of sixty-five. Through executive clemency, the death penalty can be replaced by life imprisonment without the possibility of parole or by deprivation of freedom for a period of twenty-five years. The regimen of execution is controlled by penal–correctional legislation.

Chapter 10 of the new code includes a number of new rules on sentencing, including circumstances that go to mitigating or aggravating punishment. Special attention is given to positive behavior on the part of an offender after the commission of a crime. Thus, if the court finds mitigating circumstances — such as surrendering, actively cooperating in the investigation of the crime, exposing accomplices, giving assistance in the search for property acquired as the result of the crime, rendering medical or other assistance to victims, voluntarily providing compensation for property damage and moral harm, performing other acts intended to compensate for the harm caused to victims — then, in the absence of aggravating circumstances, the punishment may not exceed three-quarters of the maximum punishment provided for in the appropriate article of the special part of the code (article 62).

Reductions in punishment are available also pursuant to a jury recommendation of leniency (not to exceed two-thirds of the statutory maximum) or of special leniency (a sentence lower than the statutory minimum or assignment of a lesser type of punishment than the one provided for in the appropriate article of the Criminal Code); and in the case of a conviction for preparation for a crime (not to exceed half the statutory maximum provided in the Criminal Code) or for attempted crime (not to exceed three-quarters of the maximum).

Conversely, article 68 introduces mandatory minimum sentences that courts must impose in cases of recidivism, dangerous recidivism, and especially dangerous recidivism. The new code also significantly increases punishment where an offender is convicted of multiple crimes. Formerly, the principle of absorbing a lesser sentence into a more serious one was applied when an offender was simultaneously convicted of two or more crimes. Even if the court specified separate sentences for each crime, the total sentence imposed could not exceed the maximum sentence provided for the most serious crime among those of which the accused was convicted. According to the new Criminal Code, the principle of absorption is retained only in the case of less severe crimes. In all other cases, the final punishment by way of deprivation of freedom may be cumulated up to twenty-five years. Where a convicted person, after the first conviction but before completing the first sentence, commits a new crime, the total punishment may not exceed thirty years (by combining the sentence for the new crime and the term of the previous sentence not yet served).

In addition, the new Criminal Code has consolidated some features of "conditional sentencing" and "stay of execution" known to the previous code. For example, a court that sentences conditionally may impose certain obligations on the convict, the nonfulfillment of which establishes a basis for revocation of the conditional sentence or extension of the probationary period.

The general part of the new code also includes significant innovations relating to release from criminal responsibility and punishment. The new code envisages two new grounds for release from criminal responsibility: active repentance (article 75) and reconciliation with the victim (article 76). Both apply only to first-time offenders who have committed minor crimes. In addition, active repentance by way of a voluntary confession, assistance in the investigation of a crime, compensation for losses, and other forms of relieving damages where more serious crimes have taken place may result in release from criminal liability in cases provided for in the special part of the Criminal Code (for example, a person who committed treason may be released from criminal responsibility if she voluntarily and in a timely manner took steps to prevent further damage to national interests, provided the act of treason does not also fall within the definition of another criminal offense).

For the first time, the Criminal Code of the Russian Federation includes norms concerning amnesty and executive clemency.

The new Criminal Code also contains separate sections on juvenile criminal liability and punishment (section V), and on the judicial imposition of compulsory measures of a medical nature (section VI) for individuals who committed criminal acts while insane; became mentally ill after committing a crime (making sentencing or execution of punishment impossible); committed a crime while mentally ill but legally sane; or committed a crime and later was found to be in need of treatment for alcoholism or drug dependence.

### Innovations in the Special Part

A novel feature of the special part of the Criminal Code is the introduction of norms on punishment for economic crimes (chapter 22), crimes by corporate executives in violation of their official duties (chapter 23), environmental crimes (chapter 26), crimes related to computer information (chapter 28), and crimes against the peace and security of mankind (chapter 34). Strengthening the protection of the rights and freedoms of individuals is noticeable not only in norms relating to responsibility for crimes against constitutional rights and freedoms (chapter 19) but also in norms relating to responsibility for certain other crimes.

#### STRENGTHENING CRIMINAL LAW PROTECTION OF THE RIGHTS AND FREEDOMS OF THE INDIVIDUAL

As noted above, the Russian Federation inherited a burdensome legacy from Soviet "developed" socialism relating to the rights and freedoms of citizens. The Soviet state not only deprived its citizens of many inalienable human rights but also imposed criminal responsibility for violations of prohibitions on the exercise of such rights. Many such senseless criminal law provisions were excluded from the Russian Criminal Code only after the infamous events of August 1991. The potential for expanding human rights protection through the mechanism of criminal law was enormous, and a substantial step in this direction has been made in the new Criminal Code.

Consider the following significant developments. For the first time in the history of Russian criminal legislation, criminal responsibility

is provided for the coercive taking of human organs and tissues for transplantation (article 120). Because of recent medical advances in the field of transplantation, human tissues and organs have become objects of criminal business. Establishing criminal responsibility and severe penalties for coercion (physical or psychological) to relinquish human organs and tissues for transplantation inevitably will help to safeguard the most important rights of the individual—life and health. Indeed, increased criminal responsibility is provided for such acts if they are committed upon an individual who is financially or otherwise dependent on the offender.

*Perestroika* and *glasnost* of the Gorbachev era had revealed the real shame of Soviet psychiatry, which used "diagnosis" of mental illness as a method to suppress political dissidents. In the years of "classic stagnation" (1960s–1980s), there was a close link between extrajudicial repression and psychiatry. People bothersome to the authorities were deprived of their freedom without any investigation or adjudication, by confinement in psychiatric hospitals (as in the case of General P. Grigorenko, a famous human rights defender). By 1988, the Criminal Code of the RSFSR introduced criminal responsibility for knowingly placing a mentally sound individual in a psychiatric institution (article 126). The new Criminal Code has significantly increased the protection of citizens in this regard. First, according to the previous Criminal Code, criminal responsibility and punishment were available only if a person known to be mentally sound were placed in a psychiatric hospital. However, it is commonly accepted that not every person who is mentally ill should receive compulsory treatment. Therefore, the new Criminal Code formulates this crime as "unlawful commitment of a person to a psychiatric institution" (article 129(1)). Second, the Criminal Code includes an aggravated form of this crime: "the same acts if committed by a person using his or her official position or if causing death or serious harm to the health of an individual or having other harmful consequences" (article 129(1)). Third, the criminal sanctions for these crimes have been significantly increased.

Substantial strengthening of the criminal protection of the rights and freedoms of citizens is associated with the formulation of a number of new criminal law provisions on responsibility for violations of constitutional rights and freedoms. The article relating to the right of

privacy is particularly noteworthy. It is now illegal to gather or disseminate information on a person's private life that is a personal or family secret without consent, or to disseminate such information through public channels if such acts are done to gain advantage or profit and cause harm to the rights and legally protected interests of the victim (article 138(1)). If such acts are committed by a person using her official position, the code contemplates increased criminal responsibility (article 138(2)). These provisions implement a tenet of the Russian Constitution, as well as of the Universal Declaration of Human Rights, that no person may be subjected to arbitrary interference with his private or family life and that each person has a right to be legally protected from such interference.

Article 140 of the Criminal Code makes the unlawful refusal by an official to furnish to an individual documents and materials directly affecting the citizen's rights and freedoms criminally punishable; providing incomplete or knowingly false information that causes harm to the rights and lawful interests of a citizen also comes within the scope of article 140.

Both Stalin's 1936 and Brezhnev's 1977 Constitution "guaranteed" the Soviet people not only freedom of speech but also freedom of association. In fact, "freedom" to march or assemble was restricted to official party activities such as traditional demonstrations on May 1 and November 7. Gorbachev's *perestroika* lead to a "normative regulation" providing for organizing and carrying out mass meetings and related gatherings. Unfortunately, effective penal law protection of these freedoms (which were announced in the new Constitution) did not exist in Russian criminal law until now. Although the Criminal Code in 1995 established criminal responsibility for violations of Russian Federation legislation on association, meetings, demonstrations, marches, and picketing, it did so only contingent upon the previous imposition of an administrative penalty. Taking into account the importance of legal protection for this sort of political freedom, the new Criminal Code has removed that limitation. Under article 149, criminal responsibility arises if the right to assemble is violated by a government official either through coercion or through the threat of coercion.

The previous Criminal Code mandated criminal responsibility for violation of privacy of correspondence, telephone communications, and

telegraph messages.  The new Criminal Code expands this responsibility to include punishment for interference with other means of communication between citizens (article 138).  Additionally, article 138(2) increases responsibility for such acts when committed by a person using his official position.   Article 138(3) establishes criminal responsibility for the unlawful manufacturing, distribution, or wholesale acquisition, with purpose to distribute, of special technology designed for covert gathering of information.

The new Criminal Code also includes an aggravated form of responsibility for violation of the inviolability of a person's residence.  In contrast with the previous Criminal Code, article 140 of the new code provides for such aggravated forms of the crime as unlawful entry into a house, using coercion or threat of coercion, against the will of the inhabitant, and as well as commission of the crime by a person using her official status.

More thorough regulation in the new code of responsibility for other crimes against the constitutional rights and freedoms of the individual is also noteworthy.  Thus, article 136 provides for punishment for violating the equal rights of citizens based on gender, race, nationality, language, origin, economic or official status, place of residence, religion, beliefs, or association, provided the violation harms the rights and legal interests of citizens.  Articles 141 and 142 elaborate on conditions of responsibility for violation of the right to vote.  The former article establishes responsibility for impeding the exercise of the right to vote or impeding the work of electoral commissions; the latter article, for falsification of electoral or referendum documents or incorrect tallying of ballots.  The new Criminal Code, in contrast to the previous, increases criminal law protection of women's right to work.   The previous Criminal Code established responsibility for refusal to employ, or for discharge of, a pregnant woman or a breastfeeding mother, whereas the analogous article in the new Criminal Code extends such protection to women with children under three years of age.

Progress has also been made toward strengthening protection of freedom of conscience and religion.  In the previous Criminal Code, criminal responsibility arose only if such violations were attended by violence, threat of violence, or damage to property.  The new code eliminates this limitation; thus, criminal responsibility now applies to any unlawful interference with religious activities or practices (article 148).

ECONOMIC CRIMES

As noted earlier, the code introduces two new types of economic offense: crimes in the sphere of economic activity and crimes committed by corporate officers against the interests of commercial or other organizations.

The first group includes interference with lawful entrepreneurial activity; registration of unlawful real estate agreements; illegal entrepreneurial activity; illegal banking activity; fraudulent entrepreneurship; laundering of money or any other assets acquired illegally; illegal acquisition or distribution of property knowingly obtained by illegal means; illegal procurement of credit; willful evasion of the repayment of creditor indebtedness; monopolization and unfair competition; use of coercion in negotiating an agreement; unlawful use of trademarks or the state hallmark; violation of manufacturing rules; knowingly false advertisement; illegal acquisition and dissemination of information constituting commercial and banking secrets; bribery of participants and organizers of professional sports and commercial events; securities issuance violations; manufacture and distribution of fraudulent credit or debit cards and other negotiable instruments; illegal export of technology, scientific information, and services used in the production of weapons of mass destruction and other military equipment; failure to return art, historical, or archeological property of the Russian Federation and foreign countries; unlawful trade in precious metals, gems, or pearls; violations of rules for handing over precious metals or precious stones to the state; flight of foreign currency; evasion of custom payments; illegal bankruptcy activities; deliberate or false bankruptcy; income tax evasion; corporate tax evasion; and consumer fraud.

With few exceptions (such as smuggling and consumer fraud, traditionally called "economic" crimes in Soviet criminal law), the majority of crimes are new, and creation of responsibility for them has been dictated by the difficult process of building a market economy. The same process caused the creation in chapter 23 in the Criminal Code of a set of crimes against corporate interests committed by corporate officers. This chapter comprises norms on responsibility for abuse of authority (responsibility for private notaries and auditors is covered by a separate article), abuse of power by employees of private security and private investigative agencies, commercial bribery, and so

forth. Given that the formation of penal law norms relating to a market economy is a new matter for the Russian legislature, the legal experiences of countries with developed market economies (in particular, drawing on the Model Penal Code of the American Law Institute) have been used in preparing the code.

The new code successfully combines two approaches to the legal protection of interests in the economic sphere. On the one hand, it protects honest entrepreneurial activity and all citizens from dishonest activity, which is in essence a type of fraud. This includes illegal banking activity that causes widespread harm; pseudo-entrepreneurial activity, which means the creation of a commercial organization without the intention of conducting any legitimate entrepreneurial or banking activity but rather for the purpose of obtaining credit, tax breaks, and other benefits; laundering of money or other property illegally obtained; unlawful procurement of credit; willful avoidance of debt repayment; deliberate and false bankruptcy; knowingly false advertisement; and securities exchange fraud. The previous Criminal Code covered none of these activities. On the other hand, the new Criminal Code does not leave unpunished other kinds of abuse and official misconduct inside commercial and other nonstate institutions or organizations (including those that are not municipal or local government organizations). These are types of "official" crimes that recently appeared to be beyond the reach of criminal law, such as abuse of one's official position (this includes private notaries and auditors), abuse of power by employees of private security or investigative agencies, and commercial bribery.

## ENVIRONMENTAL CRIMES

Severe deterioration of ecological conditions in many regions of Russia and existing international agreements on protection of the environment were factors in including a separate chapter on criminal responsibility for environmental crimes in the new Criminal Code. In this regard, the code creates a number of offenses that were not previously criminalized although they represent common violations of environmental safety regulations. As noted earlier, such violations cause great harm to human health, the environment, and ultimately the economy. Newly criminalized types of conduct include violations of environmental regulations in manufacturing (article 246), violations of environmental regula-

tions on handling environmentally dangerous substances (article 247), deterioration of land (article 254), and destruction of critical habitats of endangered species listed in the Endangered Species Book of the Russian Federation (article 259).

The chapter on environmental crimes includes seventeen criminally punishable acts. Environmental crimes may be divided into two categories: general, those that infringe on nature in general; and specific, those that infringe on particular aspects of the natural environment. The code contains three criminal law norms on responsibility for general environmental crimes (articles 246–248). Specific environmental crimes target pollution of water (article 250); pollution of the atmosphere (article 251); pollution of the marine environment and contravention of legislation relating to the continental shelf and the exclusive offshore economic zone of the Russian Federation (articles 252–253); damage to soil and violation of rules for the protection and use of natural resources (article 254–255); and harm to flora and fauna, as well as violations of law pertaining to specially protected territories (articles 249, 256–262).

The majority of these offenses are defined as acts resulting in tangible harm; in other words, certain harmful consequences provided for in the criminal law are necessary for criminal responsibility to attach to a particular act. Cases of merely threatening environmental interests usually fall within the area of administrative law; in such cases, administrative remedies serve as a means of preventing and punishing the commission of environmental crimes.

A provision criminalizing violations of environmental safety regulations in manufacturing (including the designing and building of structures) opens the chapter on environmental crimes (article 246). This article was absent in the previous Criminal Code. Its inclusion in the new code is a response (although belated) to the tragic consequences of the accident at the Chernobyl nuclear plant, the destruction of Aral Lake, and the criminal activity on the part of the former Ministry of Water Economy of the Soviet Union that resulted in the destruction of a vast area of fertile agricultural land.

CRIMES AGAINST THE PEACE AND SECURITY OF MANKIND

For the first time in Russia's history, the Criminal Code separately provides for crimes against the peace and security of mankind. The

development of this jurisprudence in international law is beyond the scope of this essay. Briefly, the modern genesis of this movement can be traced to the prosecutions of the major German and Japanese war criminals following the second world war. After the Nuremberg and Tokyo trials, work on elaborating a normative and jurisdictional basis for prosecuting the most serious violations of fundamental humanitarian principles has continued within the framework of the United Nations.[13] Both a Draft Code of Crimes[14] and a Draft Statute for an International Criminal Court[15] are currently before the international community.

Informed by the Draft Code[16] and various international humanitarian treaties, Russia' new Criminal Code defines as crimes against the peace and security of mankind the following acts: the planning, preparation, launching, or conducting of a war of aggression; public incitement to begin a war of aggression; manufacturing and dissemination of weapons of mass destruction; use of prohibited means or methods of conducting warfare; genocide; ecocide; use of mercenaries; and attacks on persons or institutions under international protection.

## THE NEW CRIMINAL CODE AND PERSPECTIVES ON FIGHTING CRIMINALITY

Naturally, Russian society hopes that the adoption and enforcement of the new Criminal Code will lead to a decrease in criminal activity,

---

[13]     Editors' note: Benjamin Ferencz, An International Criminal Court (1980); M. Cherif Bassiouni, A Draft International Criminal Code and Draft Statute for an International Criminal Tribunal (1987).

[14]     Draft Code of Crimes against the Peace and Security of Mankind, Report of the International Law Commission on Its Forty-eighth Session, U.N. GAOR, 51st Sess., Supp. No. 10, at 9, U.N. Doc. A/51/10 (1996).

[15]     Draft Statute for an International Criminal Court, Report of the International Law Commission on Its Forty-sixth Session, U.N. GAOR, 49th Sess., Supp. No. 10, at 43, U.N. Doc. A/49/10 (1994).

[16]     Editors' note: That is, the 1991 text. Draft Code of Crimes against the Peace and Security of Mankind, Report of the International Law Commission on Its Forty-third Session, U.N. GAOR, 46th Sess., Supp. No. 10, at 238, U.N. Doc. A/46/10 (1991).

especially crimes of violence. Unfortunately, this hope appears to be ill founded. Without denying that criminal legislation has an effect on criminality, it is also undeniable that criminal activity is a complicated social phenomenon, and the link between law and crime is not straightforward or mechanistic. The level of criminal activity is determined not so much by the quality of criminal laws but rather by socioeconomic, political, moral, and other factors. Ignoring such factors was common to the various Soviet power structures before the collapse of the USSR. The Congress of Peoples' Deputies, the President of the USSR, and the Supreme Soviet all announced the most "categorical and uncompromising" fight against crime. Unfortunately, these intentions were soundly defeated. The proposed battle was to be waged generally by means of improvements in criminal legislation and different types of organizational, propagandistic methods (for example, the creation of anticrime committees and task forces).

The new Russian authorities more or less learned a lesson from the defeat. It is now recognized that a comprehensive government approach, with primary emphasis on economic, financial, and technological strategies (for example, funds for strengthening and developing law enforcement agencies),[17] must be the basis for combating crime. However, even now, certain old, traditional approaches that fail to correspond to modern understanding of the crime problem continue to have some influence. This influence is especially apparent in a widespread view of the relationship between solving the crime problem and achieving economic reforms. According to this view, the first goal is to reduce (ideally, stop) criminal activity; only then will it be possible to implement economic reforms. Obviously, the interplay between crime and economics is much more complex. On the one hand, the present level

---

[17]     The first such effort by the Russian Federation was a program for strengthening the fight against crime for 1994–1995, which was decreed by the President of the Russian Federation on May 24, 1994. This program was based on a theoretical model of a comprehensive anticrime program developed by Prof. S.V. Borodin, a senior researcher at the Institute of State and Law of the Russian Academy of Science. S.V. Borodin, *Bor'ba s Prestupnost'iu: Teoreticheskaya model komplexsnoi programmi [Struggle against Crime: Theoretical Model of a Comprehensive Program]* (Moscow, "Nauka" 1990). In 1996, the government of the Russian Federation decreed the second federal program for strengthening the fight against crime for 1996–1997. Rossiiskaya Gazeta, July 24, 1996.

Case 1:18-cr-00032-DLF   Document 306-14   Filed 01/17/20   Page 37 of 40

of crime, to a certain extent, is the product of negative social, political, and economic conditions that have persisted in Russian society (most noticeably, the sharp decline in the standard of living for the majority of the population).  On the other hand, it is idle to think that successful implementation of economic and other reforms will automatically result in the decline of criminality, as the experience of both economically successful and unsuccessful countries demonstrates.

Analysis of crime worldwide (according to data compiled by the United Nations) and in particular study of its tendencies in industrially developed, democratic countries with a market economy show that crime has experienced both an absolute and a relative increase.  In the last quarter of this century, when the United Nations began monitoring crime around the world, criminal activity has on average increased two to three times.  During the same period, criminality in developed countries has increased four to five times, and the crime rate exceeded 8,000 for every 100,000 people.  From 1960 to 1990, the average annual increase in criminality, for example, in the United States was 6.75 percent; in France, 5.55 percent; in Great Britain, 5.4 percent; and in the Federal Republic of Germany, 3.9 percent.[18]  Democratic Russia will not escape this tendency, at least according to statistics for the period 1976–1995.

*Recorded Crime in the Russian Federation, 1976–1995.*

| Year | Total | Change from preceding year (%) | Change relative to 1976 (%) |
|---|---|---|---|
| 1976 | 834,998 | — | — |
| 1977 | 824,243 | -1.3 | -1.3 |
| 1978 | 889,599 | +7.9 | +6.5 |
| 1979 | 970,514 | +9.1 | +16.2 |

[18]      V.V. Luneev, *Tendentsii Prestupnosti: Mirovye, Regional'nye, Rosiiskie [Trends of Criminality: World, Regional, Russian]*, 5 Gosudarstvo i Pravo 7 (1993).

| 1980 | 1,028,284 | +6.0 | +23.1 |
|------|-----------|------|-------|
| 1981 | 1,087,908 | +5.8 | +30.3 |
| 1982 | 1,128,558 | +3.7 | +35.2 |
| 1983 | 1,398,239 | +23.9 | +67.5 |
| 1984 | 1,402,294 | +0.3 | +68.0 |
| 1985 | 1,416,935 | +1.0 | +69.7 |
| 1986 | 1,338,424 | -5.5 | 60.3 |
| 1987 | 1,185,914 | -11.4 | +42.0 |
| 1988 | 1,220,361 | +2.9 | +46.2 |
| 1989 | 1,619,181 | +32.7 | +93.9 |
| 1990 | 1,839,451 | +13.6 | +120.3 |
| 1991 | 2,167,964 | +17.9 | +159.6 |
| 1992 | 2,760,652 | +27.3 | +230.6 |
| 1993 | 2,799,614 | +1.4 | +235.3[19] |
| 1994 | 2,632,708 | -6.0 | |
| 1995 | 2,755,700 | +4.7[20] | |

In light of these data, it is necessary to devise realistic crime prevention strategies that will slow down its growth, keep criminal activity at a more or less socially optimal level, and achieve some degree of control over crime by the state and society. More ambitious goals

[19]        SOURCE:  *Prestupnost' i Pravonarusheniia [Criminality and Law Violations]*, in *Statisticheskii Sbornik [Statistical Collection]* 17 (Moscow 1994).

[20]        SOURCE:  *Kratkii Analys Sostoyaniya Prestupnosti v Rossiiskoi Federatsii (dannye MVDRF) [Succinct Analysis of the Condition of Criminality in the Russian Federation (data of the Ministry of Internal Affairs)]*, 5 Rossiiskaya Ustitsiia 58 (1996).

presently appear utopian.[21]  While Soviet penal law policy traditionally attributed the existence of criminality to capitalist society and concocted from this supposed relationship a myth of total eradication of crime only after the rise of communism, at the present time, during the difficult and complex process of reforming the Russian economy and society, this ideological fiction is gradually disappearing.

Among the reasons for setting "moderate" goals in the area of crime prevention is the fact that social control over criminality in a democratic, as compared to a totalitarian, society is more difficult to implement.  In this context, the history of crime prevention presents, at first glance, a surprising paradox.  Statistics demonstrate that in a democratic society, the level of criminality is much higher than under a totalitarian regime.  Fascism and Stalinism, in fact, were able to exert considerable influence on criminality.  It appears that the higher level of criminality is, in a way, part of the price paid for democracy.  However, the real level of individual freedom in a society cannot be measured only by crime statistics.  Although the number of crimes against the person (for example, homicide) was relatively low in both fascist and Stalinist society, the limitation of human rights not linked to the commission of formally criminal acts—freedom of speech, assembly, political association, movement, residence, and so forth—occurred on a scale never seen before.  Concentration camps existed not so much for the imprisonment of real criminals as for the imprisonment of imagined ones (and not always those who opposed the regime).

The challenge of crime control in a democratic society arises in part because in such a society this kind of control has a twofold goal: to secure the rule of law and to prevent crime but within the framework of the rule of law, which guarantees individual rights and freedoms.  In an emerging democracy experiencing rising criminality and social instability, it is especially difficult for law enforcement agencies (for example, the police) to reconcile these goals, and it is understandable that law enforcement agents may be sorely tempted to sacrifice fundamental rights

---

[21]     Symposium, *Kontrol' nad Prestupnost'i v Demokraticheskom Obshestve (Materialy "Kruglogo" Stola) [Control of Criminality in a Democratic Society (Materials of the "Round" Table)]*, 10 Gosudarstvo i Pravo 54 (1993).

in the name of public safety.[22] History shows that in this situation people are deprived of both safety and freedom.   Nonetheless, the goal of democratization should not be used to justify inaction by law enforcement agencies in the daily fight against crime.

---

[22]     *Editors' note:* A recent report by Amnesty International documents that such "sacrifices" are liberally made.  Amnesty International, *Torture in Russia:  "This Man-Made Hell"* (1997).