**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **CONCORD MANAGEMENT AND CONSULTING LLC,** | **Criminal No. 18-CR-32-2** |
| **Defendant.** | |

**GOVERNMENT'S OPPOSITION TO**
**CONCORD'S MOTION IN LIMINE TO EXCLUDE EVIDENCE**

The United States of America, by and through undersigned counsel, respectfully submits this opposition to defendant Concord Management and Consulting LLC's motion to exclude seven broad categories of evidence (Doc. 300).

The Superseding Indictment in this case alleges a conspiracy to defraud the United States in violation of 18 U.S.C. § 371.  In short, the Superseding Indictment alleges the conspirators engaged in what they called "information warfare" to spread distrust about the U.S. political system and to influence the outcome of the 2016 presidential election, and that to carry out their interference activities without detection of their Russian affiliation, the defendants conspired to obstruct the lawful functions of the Federal Election Commission, the Department of Justice, and the Department of State, which monitor and police foreign influence activities.  The Superseding Indictment further alleges that the conspirators used a host of deceptive means to impede these entities' functions, including by making false statements on visa applications, using false online personas, using virtual and proxy servers in the United States to mask their location, and failing to disclose and register their activities.

Concord asks to exclude evidence and argument of (A) The Russian government's involvement in the conspiracy and ties to conspirators; (B) nicknames used by co-conspirators for Yevgeniy Prigozhin, such as "Putin's Chef"; (C) sanctions imposed on the defendants; (D) defendants' election interference in other countries; (E) online postings that did not expressly advocate the election or defeat of an identified candidate; (F) defendants' violation of the ban on election expenditures by foreign nationals; and (G) conduct by the conspirators after January 2018. The government does not intend to introduce evidence in its case in chief that the Russian government sponsored the charged activity, of U.S. sanctions against the named defendants, or of the defendants' conduct after January 2018.  Although the government does not agree with several of Concord's arguments, it is unnecessary to address these issues.  Concord is mistaken, however, in seeking to exclude other categories of evidence, which include evidence of core acts in furtherance of the conspiracy, the motive for the conspiracy, and the role and identity of conspirators, including Concord officers.  These categories of evidence are relevant, and Concord has not come close to meeting its burden to show that such evidence is unfairly prejudicial and that such prejudice outweighs its substantial probative value.

## DISCUSSION

"The general rule is that relevant evidence is admissible."  *United States v. Foster*, 986 F.2d 541, 545 (D.C. Cir. 1993); *see* Fed. R. Evid. 402; *Huddleston v. United States*, 485 U.S. 681, 687 (1988).  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401; *see Foster*, 986 F.2d at 545; *see also Old Chief v. United States*, 519 U.S. 172, 178-179 (1997) (evidence is relevant if it is "a step on one evidentiary route" to establishing an element

of an offense).  Relevance is therefore "determined in the context of the facts and arguments in a particular case."  *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008).

Relevant evidence "may" be excluded "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Particularly pertinent here is that Rule 403 does not apply to "powerful, or even 'prejudicial' evidence" but instead "focuses on the 'danger of *unfair* prejudice.'" *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998) (Court's emphasis).  It does not "generally require the government to sanitize its case" or "to tell its story in a monotone." *Id.*  Nor does it "provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury." *Id.*  Rule 403 also gives the court discretion to exclude evidence only if that danger "'*substantially* outweigh[s]' the evidence's probative value." *Gartmon*, 146 F.3d at 1021 (Court's emphases and alteration).  This standard is "somewhat exacting," *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 555 (D.C. Cir. 1993), and a decision to exclude relevant evidence under Rule 403 is "an extraordinary remedy to be used sparingly." *United States v. Libby*, 467 F. Supp. 2d 1, 20 (D.D.C. 2006).

### A.  The Russian Government's Role In The Conspiracy And Ties To Conspirators

Concord first contends (Doc. 300, at 5-9) that the Court should exclude certain evidence regarding the Russian government's role in the conspiracy.  The government does not intend to introduce evidence in its case in chief that the Russian government sponsored the conspiracy alleged in the Superseding Indictment.  It is therefore unnecessary for the Court to make any ruling on these issues in advance of trial.[1]

---

[1] If at trial the defense were to put the Russian government's connection to the events at issue, it may become necessary for the government to respond with evidence or argument on that

In places, however, Concord appears to be asking for more.  Concord's argument primarily concerns evidence of "a connection between the Russian government and the alleged conspiracy." Doc. 300, at 6; *see, e.g., id.* at 5 ("involvement of the Russian government in the alleged conspiracy").   But parts of Concord's argument also make broad reference to any evidence that the conspirators are "connected to the Russian government," *id.* (capitalization omitted), or "associated with the Russian government," *id.* at 9, or "linking Concord to the Russian government," *id.* at 6.  The government intends to introduce limited evidence that—depending on what Concord means by these terms—may be in dispute.  Specifically, the government intends to introduce limited evidence to prove the identities of the conspirators and connections between them that could incidentally refer to entities of the Russian government.  For example, records or testimony regarding Concord's corporate registration with a Russian government agency would be relevant and not unduly prejudicial.[2]

This limited category of evidence is relevant.  Concord's registration documents with the Russian government show the connection between Concord and Prigozhin.  Concord makes no argument about why such evidence is irrelevant.  *See* Doc. 300, at 5-6.  Instead, Concord argues

---

topic.  For example, if the defense were to argue that the Russian government, and not Concord, sponsored the election interference activity charged in the Superseding Indictment, at that point the government might be entitled to introduce evidence connecting Concord to the Russian government in order to rebut the defense's assertion.  The issues at that point would be different, and that possibility therefore does not warrant a ruling on hypothetical evidentiary questions.  *See, e.g.*, *United States v. Loza*, 764 F. Supp. 2d 55, 58 (D.D.C. 2011) ("As a general rule, inadmissible extrinsic evidence can become admissible on redirect examination as rebuttal evidence, when defense counsel has opened the door to such evidence.") (internal quotation marks and alterations omitted).

[2] The government does not presently intend to introduce exhibits or elicit on direct examination any evidence of substantive connections between the defendants and the Russian government.  But the government does not yet have Concord's exhibit list and cannot predict with certainty what other incidental references to the Russian government may arise, particularly on cross examination or redirect.

only that "the Indictment does not allege any involvement of the Russian government in the alleged conspiracy" and that the government has already stated that "it does not intend to introduce evidence or argue to the jury that the Russian government was behind the charged conspiracy." *Id.* at 5.  Concord then asserts that there is no "probative value" to evidence either "showing that the Russian government was behind the alleged conspiracy" or "linking Concord to the Russian government." *Id.* at 6.

Concord broadly argues (Doc. 300, at 6-9) that any such evidence should be excluded under Federal Rule of Evidence 403 because it suggests "guilt by association."  Merely recognizing certain connections between the conspirators and Russia, however—in particular that Concord is registered as a legal entity—is not the kind of "association" that is likely to suggest "guilt by association."  It also does not take the further series of steps of arguing that the Russian government is guilty of something and that the jury should also impute that guilt to Concord.  Concord's argument reduces to the erroneous view that relevant evidence which involves people who are unpopular or have themselves engaged in crimes must be excluded.  Any risk of unfair prejudice, moreover, should be addressed through a limiting instruction issued by the Court.  *See* Adv. Comm. Note to Rule 403.

Concord's repeated attack (Doc. 300, at 6-9) on the Attorney General's and Special Counsel's statements regarding Russian interference in the 2016 presidential election does not alter that analysis.  As the Court knows, the government respectfully reads those statements in a different manner than Concord does.  But, as relevant here, Rule 403 is not a tort system, and those statements have no bearing on either the relevance of these limited categories of evidence or whether any risk of unfair prejudice outweighs their probative value.  Moreover, any suggestion that the Russian government broadly interfered in the 2016 election or that the influence campaign

at issue here was part of that effort is hardly a novel contention.  The Court will select a jury that can set aside any information it has that may bear on this case.  The Court will further instruct that jury to consider only the evidence introduced at trial. And if there is any risk that any reference to the Russian government would unfairly prejudice Concord, then the Court can give a further limiting instruction.  But the fact that the government made public statements that can be viewed as suggesting a Russian government role in this conspiracy does not alter that straightforward calculus.

### B.  Yevgeniy Prigozhin's Nicknames

Concord also argues (Doc. 300, at 10-12) that the government should not be able to introduce evidence of nicknames commonly used for Yevgeniy Prigozhin, whom the Superseding Indictment alleges was the controlling officer of Concord.  Those nicknames include "Putin's Chef" or "Putin's Cook."  In a footnote, Concord notes that the Russian word "chef" translates to "boss" or "chief."

The government intends to introduce limited evidence regarding Prigozhin's various nicknames for the purpose of connecting Prigozhin to the activities of the Internet Research Agency (IRA).  With respect to the moniker "Putin's Chef" or "Putin's Cook," the government intends to introduce ████████████████████████████████████████████████████ ████████████████████████████████████████████████████  When taken together with evidence that one of Prigozhin's nicknames is "Putin's Chef," the images are probative of the allegation that Prigozhin led and oversaw the IRA, which was commonly called a "troll farm," including the conspirators whose activities concerned sowing political discord, people commonly called "trolls."   Similarly, with respect to the title "boss" or "chief," the government intends to introduce evidence showing that IRA employees used one of their false identities and false social

media accounts to persuade an unwitting individual to hold up a sign outside the White House that read, "Happy 55th Birthday Dear Boss" around the date of Prigozhin's 55th birthday.   The Government does not intend to introduce any evidence that Vladimir Putin directed the actions of the conspirators or evidence connecting Prigozhin to Putin other than Prigozhin's nickname.   The government also does not intend to use the term Oligarch in its case-in-chief.

Both sets of evidence are highly probative of Prigozhin's (the head of the Concord) activity, knowledge, and intentions and thus bears on Concord's role in the conspiracy.   Contrary to Concord's assertion (Doc. 300, at 11), these nicknames are not "solely used by the media," but were also used by members of the conspiracy and by an unwitting American whom the conspirators caused to act in the United States.   And the purpose of admitting this evidence is not to distinguish Yevgeniy Prigozhin from "any other individuals named Prigozhin," *id.*, but rather to identify some of his connections to the IRA and its activities.

Concord fails to show that these limited categories of evidence are unduly prejudicial. Concord's sole argument is its assertion that these nicknames would unfairly link Prigozhin to the Russian government.  Doc. 300, at 11.   As noted, Federal Rule of Evidence 403 concerns only "the 'danger of *unfair* prejudice,' and gives the court discretion to exclude evidence only if that danger '*substantially* outweighs' the evidence's probative value."   *Gartmon*, 146 F.3d at 1021 (quoting Fed. R. Evid. 403) (Court's emphasis).  Evidence about Prigozhin's nicknames, however, would not be "offered for an unfair purpose," on an "ancillary issue," or "to inflame the jury."   *Id.* Rather, the government intends to offer it as evidence of Prigozhin's "knowing involvement in, and direction of, the scheme" and his "controlling role."   *Id.* at 1020-1021.  In contrast to evidence admitted for similar purposes in other cases, Prigozhin's association with Putin is hardly "outrageous."   *See id.* at 1021 (upholding admission of evidence in a trial for fraud and money

laundering of the defendant ordering a coconspirator to undress and holding a gun against her genitals).  And the government does not intend to argue that Putin directed the conspiracy.  Given the limited way in which the government's evidence might touch on the Russian government, the "natural use" of the evidence "would be for its appropriate use." *Id.*  Any risk of prejudice can also be addressed with a limiting instruction rather than by excluding important evidence altogether.  *See* Adv. Comm. Note to Rule 403.  Any risk of prejudice could also be addressed through a defense stipulation or redaction of the government's evidence that removes the word "Putin."  In all events, any risk of unfair prejudice does not "substantially outweigh[]" its significant "probative value.  Fed. R. Evid. 403.

## C.  Sanctions Against The Defendants

Concord next contends (Doc. 303, at 12-14) that the government should not be permitted to introduce evidence of the sanctions imposed by Department of Treasury on Prigozhin, Concord, and other co-conspirators in December 2016 and January 2017.  As the government has previously represented, it does not intend to introduce such evidence in its case-in-chief.  The Court therefore need not address these issues.

## D.  The Conspirators' Activities In Other Countries

Concord further argues (Doc. 300, at 14-15) that the Court should exclude evidence of the conspirators' election interference in other countries, because the only possible purpose for this evidence would be to demonstrate propensity.  The government intends to introduce limited evidence that may suggest the conspirators' activities in other countries, but not to establish that fact or to suggest any kind of propensity.  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

    This evidence is relevant, but not for the impermissible propensity purpose suggested by Concord.  Rather, this evidence is admissible to show Prigozhin's knowledge of the activities of the IRA. ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ The government will argue at trial that this knowledge is attributable to Concord given Prigozhin's high-level role at the company.  This knowledge of the IRA's activities is relevant to establish that Concord knowingly participated in the conspiracy when it funded the activities of the IRA.

    This evidence is not offered to establish any separate set of bad acts or for the impermissible purpose of establishing propensity. ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

Concord additionally makes a passing reference to Federal Rule of Evidence of 403 and declares that evidence of activities in other countries is "unfair and prejudicial." *See* Doc. 300, at 14-15. As explained, the evidence that the government intends to introduce is limited to Prigozhin's attendance at these meetings and the subjects discussed. It is therefore highly probative of Concord's role in the conspiracy. The government does not intend to introduce additional evidence of the conspirators' "election interference," *id.* at 15, ████████████████ ████████ Concord is mistaken when it suggests (*id.*) that any evidence whatsoever referring to other countries is "prejudicial" or will "serve only to confuse the jury." Such evidence does not even directly concern the United States, and the jury will hear evidence of Concord's actual election interference directed at the United States—the very activity that Concord sought to hide from the U.S. government, formed the motive for the conspiracy to defraud the United States, and constituted acts in furtherance of the conspiracy. As Concord notes, the Superseding Indictment charges a conspiracy to defraud the United States and not to influence individual Americans. The Court will instruct Concord on the elements of that crime. But Rule 403 does not mean that courts should withhold this highly probative evidence relevant to the charged crime.

### E.  Social Media Posts In Furtherance Of The Conspiracy

Concord next contends (Doc. 300, at 15-17) that the Court should exclude evidence of "lawful activity to support the conspiracy charged." Concord's motion does not make clear exactly what acts and events it seeks to exclude. Concord appears to take aim at certain online social media postings and paid advertisements that it avers are "lawful issue advocacy" and not "express

advocacy." *Id.* at 15 (citing Superseding Indictment, Doc. 247 ¶¶ 34, 50).  Although the parties have already briefed these very issues, Concord does not acknowledge any of the government's responses and relies on the same unsupported assertions as it has before.  *See* Doc. 208, at 9-10 (Concord's motion to strike Indictment allegations); Doc. 215, at 12-14 (government's response); Doc. 220, at 8-9 (Concord's reply).  Specifically, Concord again argues that anything which isn't "express advocacy" is not covered by the Federal Election Campaign Act (FECA), and that the defendants' activity is not covered by the Foreign Agents Registration Act (FARA) because the conspirators were located in Russia.  Doc. 300, at 15-16.  Concord deems evidence of such activities "irrelevant," argues the "the only basis" for presenting such evidence would be to establish bad character and propensity, and further argues that such evidence is unduly prejudicial and confusing.  *Id.* at 16-17.  This argument fails at every turn.  An act does not have to be independently illegal to constitute an act in furtherance of a conspiracy or to shed light on the nature of the conspirators' agreement, their motive, and their intent.  Concord's perfunctory argument fails to show that the activity at issue is not subject to FECA and FARA.  And Concord does not meet its burden to show that the probative value of this evidence is substantially outweighed by any risk of juror confusion or unfair prejudice.

     **1.**  The government intends to introduce several categories of evidence that Concord may have intended to address in its motion.  This evidence will include the use of Facebook and Twitter accounts controlled by the conspirators.  Some of the Facebook accounts were for individual users, whom the conspirators gave American-sounding names (like "Matt Skiber" and "Helen Christopherson").  Other Facebook accounts were for group pages, which also had American-sounding names and themes (like "Being Patriotic," and "Secured Borders," and "LGBT United").

The Twitter accounts were also given American-sounding names and themes (such as "March for Trump" and "TENGOP").

The conspirators used these accounts for several purposes related to the conspiracy. First, they used several of the Facebook accounts to purchase advertisements. As discussed below, many of the advertisements were covered by FECA and FARA. But all related to the conspirators' overarching goal of sowing discord in the American political system and favoring one candidate over another. Second, the conspirators used both the Facebook accounts and the Twitter accounts to request that persons in the United States engage in conduct that implicates FARA, including organizing and speaking at political rallies. Third, the conspirators used the Facbeook accounts to post politically and socially incendiary messages.

**2.** As an initial matter, conduct that is not independently illegal can nonetheless be highly relevant to a conspiracy charge. "[M]any acts that are by themselves perfectly legal may constitute overt acts manifesting participation in an illegal conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1404 (D.C. Cir. 1988). The Superseding Indictment charges a conspiracy to defraud the United States, in which the conspirators sought to interfere in the functions of agencies that police foreign participation in the U.S. political system, in order to surreptitiously carry out their political influence campaign. What Concord labels "issue advocacy" is part of that very influence campaign. In fact, as the Superseding Indictment alleges, the creation of social media identities and groups and the messaging that the conspirators pushed out through those identities served to create large followings, so that these personas would have greater ability to exert influence, to interfere with U.S. political and electoral processes, and to bolster the fictitious identities that were necessary to their scheme. The government also contends that the conspirators' use of false personas in their influence activities, whether or not covered by FECA or FARA, served to deceive

not only average Facebook and Twitter users but also the relevant government agencies. Thus, even if some social media activity was otherwise lawful conduct, it is still admissible as overt action in furtherance of the conspiracy. *See, e.g.*, *United States v. Palivos*, 486 F.3d 250, 258 (7th Cir. 2007) (an "overt act proved may itself be a lawful act"); *United States v. Hurley*, 957 F.2d 1, 4 (1st Cir. 1992) (otherwise "lawful activity may furnish the basis for a conviction under § 371"); *United States v. Monroe*, 552 F.2d 860, 864 (9th Cir. 1977) (an "overt act need not be unlawful").

Even those influence activities that may not be themselves be covered by FECA or FARA shed light on the nature of the agreement, the conspirators' intent, and the conspirators' motive for a number of interrelated reasons. As noted, the government will argue that these acts were themselves deception aimed, in part, at the responsible government agencies. The conspirators' range of social media activity—even if not all covered by FECA or FARA—also illustrates their overarching goal to sow discord and to influence the 2016 elections and their broad, long term strategy. It is therefore probative of the conspirators' motive and intent to impede the government agencies that police foreign influence. *See, e.g.*, *United States v. Kanchanalak*, 41 F. Supp. 2d 1, 10 (D.D.C. 1999) (in conspiracy to defraud the United States by interfering in FEC functions, while reporting provisions did not apply to "soft money," such activity "may establish a pattern of conduct by defendants and help support the allegations with respect to hard money"). For example, the conspirators' development of false personas and issue-based followings could only succeed as long as they kept hidden their true Russian identities. An FEC report, FARA registration document, or investigation by either agency that identified Russians as the source of the conspirators' independent expenditures likely would have drawn media attention to and thereby exposed the false personas. Similarly, by focusing on certain hot-button issues and acting as a force multiplier for existing social and political tensions, the conspirators could more reasonably

expect to have a concrete impact, so long as they were not outed by law enforcement and regulators.  The overall volume of activity is also highly probative: The fact that the conspirators' activity was not limited to a few stray ads but instead included large numbers of posts, ads, and rallies is probative of the highly organized nature of the undertaking and provides a further reason to believe that the conspirators targeted not only individual Americans but also the government agencies that police this area.

Additionally, the concealment of conduct that is not itself addressed by FECA or FARA was a necessary step in the conspiracy to impede the government's lawful functions in this area. The administration of FECA and FARA includes investigating possible violations and determining whether someone should file a disclosure or is engaging in otherwise unlawful activity.  Even legal activity may tip off these regulators to related, illegal activity.  And for activity that is not plainly legal or illegal, regulators may engage in their own careful determination about whether the potentially-relevant statutes apply.  A party can obstruct lawful government functions of administering disclosure requirements even if, at the end of the day, the responsible agencies may have concluded that the statutes they enforce do not apply.  And a foreigner who broadly recognizes that the government polices foreign influence but who does not know the exact contours of that regulation may plausibly seek to impede the government's policing without regard to where the exact lines fall.

For all of these reasons, the conspirators influence activities are highly relevant to the charged crime, even if some of these activities are not independently covered by FECA and FARA. Concord again fails to engage with these arguments.

**3.**  Concord also fails to justify the linchpin of its argument—that other than certain paid advertisements, the conspirators' influence activities are not covered by FECA or FARA.  Again,

Concord is not charged with a substantive violation of FARA or FECA.  But engaging in activity that would have to be reported without doing so is deceptive conduct.  (And, in any event, engaging in activity that would or even may have to be reported, or that would or potentially would violate the foreign electioneering ban, helps to establish that one purpose of the other agreed-to deceptive conduct was to impair the function of the DOJ and FEC, which would themselves monitor and evaluate such activity and decide whether it must be reported.)

a.  With respect to FECA, although the Superseding Indictment lists certain advertisements and the government has provided all such advertisements in discovery, Concord does not address what advertisements it has in mind.  Concord has previously made these kinds of broad assertions, albeit with some further detail, *e.g.,* Doc. 208, at 9-10, and the government has argued that much of what Concord appears to view as "issue advocacy" could reasonably be found by the jury to be "independent expenditures" that trigger FECA's disclosure requirement and addressed particular ads, *see* Doc. 215, at 13-14 & n.2 (addressing particular ads); *see also* 52 U.S.C. § 30101(17) (defining "independent expenditure"); 11 C.F.R. § 100.22 (regulation interpreting "independent expenditure").  (These would also be prohibited by FECA's foreign source ban, which the government has now clearly alleged as a lawful government function at issue.)

Concord's generalized motion in limine is improper.  A determination of whether certain ads meet FECA's definitions is an application of law to fact normally undertaken by the jury.  Even if only independently illegal acts could bear on the conspiracy (which is not the case), Concord has failed to identify whatever ads it believes are so clearly "lawful issue advocacy," that the jury should not be able to make these determinations for itself.  To the extent that Concord is seeking a broad ruling to be applied on an ad-by-ad basis, Concord's approach would greatly delay the trial by requiring repeated mini-trials about each ad.

b.  With respect to FARA, Concord's sole argument is a half-sentence contention that "FARA only applies to conduct occurring within the United States."  Doc. 300, at 16 (citing 22 U.S.C. § 611(c)).  The sorts of broad influence activities at issue here are the kinds of influence activities covered by FARA.  *See* 22 U.S.C. § 611(c)(1)(i)-(iii), (g), (h), (o), (p).  Other than quoting one part of one definition, Concord does not engage with the defined categories of triggering conduct, or engage with the statutory provisions that govern acting indirectly or the required degree of foreign control.

It is unclear whether Concord's argument concerns the conspirators' acting through unwitting Americans who were located in the United States.  The government intends to introduce such evidence at trial, largely in the form of social media direct messages from accounts controlled by the conspirators to persons in the United States encouraging those persons to participate in activity implicating FARA. As the government has previously argued in response to the same contention in Concord's motion to dismiss (Doc. 266, at 23-24), Concord does not engage with the language in FARA that requires registration by any individual acting as the agent of a foreign principal in the United States "through any other person," 22 U.S.C. § 611(c)(1), or with the legal principles that apply when acting through intermediaries.  *See, e.g.,* 18 U.S.C. § 2(b) (criminal liability when causing innocent intermediary to act); *Hyde & Schneider v. United States*, 225 U.S. 347, 362-363 (1912) (discussing common law rule of "constructive presence" for all coperpetrators where acts occur); Caleb Nelson, State and Federal Models of the Interaction Between Statutes and Unwritten Law, 80 U. Chi. L. Rev. 657, 702 n.182 (2013) (same).

In any event, while the conspirators were not themselves in the United States, FARA applies if they "act[ed] within the United States."  22 U.S.C. § 611(c)(1).  They plainly did so, both on their own and "through" many "other person[s]," 22 U.S.C. § 611(c)(1).  For example,

when the conspirators bought advertisements in the United States, rented virtual private servers in the United States, and paid for other services in the United States, they "disburs[ed] or dispens[ed]" money "for or in the interests of [a] foreign principal," in the United States.   22 U.S.C. § 611(c)(1)(iii).   As for social media groups and related activities, the conspirators targeted and sent their content into the United States; they directed and controlled further messaging in the United States, such as posting content on Facebook pages on servers in the United States, moving content between servers in the United States, causing Facebook to send messages to others in the United States, and asking others to pass along those messages; and they did so from physical platforms in the United States, such as the virtual private servers that they established to conceal the ultimate origin of their activities.   On these facts, although the conspirators were not themselves in the United States, they acted within the United States.   *See* 22 U.S.C. § 611(c)(1)(i) ("directly or through any other person . . . engages within the United States in political activities for or in the interests of such foreign principal;"); *id.* § 611(c)(1)(ii) ("directly or through any other person . . . acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal").

As is true of FECA, Concord's generalized motion in limine is improper.   The application of law (here FARA) to fact is something that should normally be undertaken by the jury. Concord's half-sentence observation that the defendants were not physically in the United States does not speak to whether the conspirators or others acting at their direction were, in fact, engaging in covered activities in the United States.   If the government had to show a FARA violation, it would be the jury's role to make that determination.

**4.**   Finally, Concord's assertions of prejudice and jury confusion (Doc. 300, at 16-17) provide no basis to exclude this relevant evidence.   For the reasons discussed, evidence of the

conspirators' influence activities is highly probative.  Not only is most of this conduct covered by

FECA and FARA and the failure to disclose it therefore constituted deception, but this conduct

demonstrates the nature of the conspirators' plan, shows their motive to defraud the United States,

and provides a strong basis to infer that part of the agreement was to deceive the United States

government.  Although the conspiracy is not simple, *cf.* Doc. 303, at 17, the jury will have to

carefully consider the nature of the crime charged—that it is a conspiracy and that the charged

object is impeding lawful government function through deceptive means—regardless of exactly

what ads or social media posts are admitted at trial.  This is not the first case where a defendant is

charged with engaging in one act (or conspiring to engage in a course of conduct) for the purposes

of facilitating another set of acts that are not themselves charged.  Courts regularly manage any

risk of confusion or prejudice by providing an overview to the jury of the case, by offering limiting

instructions where appropriate, and by instructing the jury on the elements of the crime.

Concord is on no firmer ground when it notes (Doc. 300, at 17) that much of the

conspirators' influence campaign concerned "contentious political issues" such as race and

immigration, particular political parties, and certain "regions" of the country.  These issues were

not injected into the case by the government's choice of exhibits, but by the conspirators

themselves, who deliberately chose such topics to further their stated goal of sowing political

discord in the United States.[3]  The conspirators' engagement with hotly debated issues, political

---

[3] For example, an internal IRA memo entitled "Waging Information War Against the United States," states that the objective of the "Information Warfare Against the United States Planning Agency" is to "shape public opinion and to advance relevant topics."  Another document circulated by the conspirators proposed using social media "to portray Obama as one of America's problems, the personification of the main problem of the country."  This document recommended emphasizing "the difficulties of life in the United States," including "societal ills" like "street crime, firearm abuse, medical insurance, etc.."  Another document circulated among the conspirators described "general strategy according to the main topics," and included the following suggestions:  (1) "to convince Americans that the government institutions are failing, that corruption is spreading among the civilian population due to economic pressures and the reform

parties, and geographic regions does not render evidence of their activities "unfairly prejudicial," Fed. R. Evid. 403.  To be sure, individual jurors may have views—positive or negative—about the policy issues, political parties, regions, and groups that the defendants are alleged to have advocated for or against or to have used as a means of impacting the U.S. political system.  But the reality of any case that relates to an election is that it may touch on such matters.  Even if such activity may arouse emotions, it formed a critical part of the charged scheme.  As discussed, Rule 403 does not apply to "powerful, or even 'prejudicial' evidence" but instead "focuses on the 'danger of *unfair* prejudice.'"  *Gartmon*, 146 F.3d at 1021.  The fact that the conspirators chose to engage in an influence campaign that focused on high-salience issues, racial groups, and geographic regions, should not then "shield" Concord from the relevant evidence, simple because that evidence describes views that some may disagree with or view as distasteful.  *See id.* at 1020- 1021.  For Concord now to argue that those posts should be excluded because they concern inflammatory topics is specious—it was the conspirators themselves who chose inflammatory topics and did so for a calculated reason.

Even if this evidence posed any risk of "*unfair* prejudice" (which it does not), that risk does not substantially outweigh the probative value.  As the government has argued, this evidence is highly probative.  By focusing on hot-button issues and acting as a force multiplier for existing social and political tensions, the conspirators could more reasonably expect to have a concrete

---

becoming a law," (2) "to support the Second Amendment indicating that the law enforcement is incapable of ensure adequate safety of the U.S. citizens," (3) "to emphasize that the expectations of the US citizens do not match the reality" with respect to "social programs," (4) "the government's policy toward black population caused a new wave of racism," (5) advancement of "LGBTQ" rights in America "lead to a moral decline of the society," (6) "foment a distrust of the church as a moral authority," (7) emphasize "a fear of the illegal immigrants," (8) "to sow distrust toward the candidates" in the 2016 presidential election "and the political system as a whole," (9) "the Americans are a nation of violence and aggression,"  and (10) "to show the 'dark' side of American democracy.

impact, so long as they were not outed by law enforcement and regulatory entities.  And because the conspirators' plan involved engaging, in particular, with groups that are closely aligned with identity politics or specific geographic areas, it was critical that the conspirators' Russian identity, which would have been publicized by the U.S. government, remain concealed.  Additionally, as Concord well knows, the focus on specific social groups and issues is particularly relevant to the Department of Justice's enforcement of FARA.  *See, e.g.,* 22 U.S.C. §§ 611(c)(1)(i), (o) (covered "political activities"  include attempt to influence "any section of the public" about U.S. "domestic or foreign policies").  The jury will be instructed on the elements of the offense and on how to consider particular pieces of evidence.  *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (Juries "are presumed to follow their instructions").  Any risk that a juror takes issue with a view espoused by the conspirators as part of their scheme is not a basis to exclude the relevant conduct.

### F.  Evidence Related To The Ban On Election Expenditures By Foreign Nationals

Concord next argues (Doc. 300, at 18) that the Court should exclude evidence that concerns the conspirators ban on foreign electioneering.  Concord's argument is perplexing.  Concord asserts (without explanation) that the only ads that it believes to meet the definition of prohibited expenditures cost a total of $2,930.  *Id.*  Concord then notes that the Superseding Indictment does not charge a violation of FARA's ban on foreign expenditures and asserts (again without explanation) that the government could not prove such a charge.  *Id.*  From these unsupported premises, Concord declares (still without explanation), that evidence of the conspirators' violating the foreign source ban would confuse the jury or pose an undue risk of prejudice.  *Id.*

Concord's argument makes no sense.  The Superseding Indictment alleges that one of the lawful government functions the conspirators sought to impede was enforcement of the foreign source ban.  Further, the fact that the conspirators were violating that ban—or even just the risk

that they were—is a strong basis for the jury to infer that the conspirators sought to impede the very agency that polices such foreign electioneering conduct.  In fact, this Court has observed that defendants' purchase of social media advertising "may have violated FECA's ban on foreign independent expenditures [and] could be relevant to establishing defendants' motive for failing to submit reports as required." Doc. 74 at 12 n. 4.  Concord has long argued that the government must prove that the conspirators violated FECA, and even argues in this very motion that the Court should exclude evidence of the conspirators' "legal" conduct.  Yet Concord now also argues that the Court should exclude evidence of illegal conduct.

As for Concord's unexplained assertion about the total value of the prohibited expenditures, the government cannot engage with that assertion without Concord stating what ads it believes were covered and not covered and why.  Concord cites its motion for a bill a particulars, but that motion provided little additional explanation other than stating that it reached that number based on "104" advertisements.  Doc. 181, at 11.  Concord has previously asserted that some of the ads at issue were not "independent expenditures" (Doc. 208, at 10), and the government responded to that assertion.  Doc. 215, at 13 & n.2; *see also* 52 U.S.C. § 30101(17) (defining "independent expenditure"); 11 C.F.R. § 100.22 (regulation interpreting "independent expenditure").  More to the point, Concord also does not state why its unexplained total value of $2,930 has any bearing on its argument.  The foreign source ban contains no monetary threshold. *See* 52 U.S.C. § 30121; *see also Bluman v. FEC*, 800 F. Supp. 2d 281, 284-285 (D.D.C. 2011) (cited by Concord) (activity included "print[ing] flyers supporting President Obama's reelection and [] distribut[ing] them in Central Park").  The amount may bear on the steps that the relevant government agencies can take to stop it.  But even $2,930 of illegal expenditures is a crime.  *See* 52 U.S.C. § 30109(d)(1)(A) (willful violation involving aggregate of $2,000-$25,000 is a

misdemeanor, and $25,000 or more is a felony).  As the Court has previously noted, "FECA's enforcement provisions include civil penalties" as well.  Doc. 74, at 14.  The FEC can also seek injunctive relief, 52 U.S.C. § 30109(a)(6).  And as particularly relevant to Concord's broader scheme, the FEC's activities can reveal the foreign origin of ads that purport to have been purchased by Americans.

In all events, evidence that conspirators violated FECA's foreign source ban poses little risk of jury confusion or unfair prejudice.  Like the other categories of evidence that Concord seeks to exclude, this evidence is highly probative of the conspirators' motive and the nature of their agreement.  Any risk of jurors misunderstanding exactly what crime is charged in this case will be addressed by appropriate ands careful jury instructions.

### G.  Conduct By The Conspirators After January 2018

Finally, Concord seeks (Doc. 300, at 18-20) to exclude evidence of the conspirators' conduct after January 2018.  The Government does not intend to introduce evidence in its case-in-chief related to conduct by Concord or its co-conspirators that occurred after that date, and the Court therefore need not consider that issue.

### CONCLUSION

For the foregoing reasons, this Court should not exclude many of the categories of evidence which are the subject of the defendant's Motion.  Particularly at a stage of the proceedings at which the government knows little about the defense case (and does not yet have the defense exhibit list), the Court should resist Concord's requests for an order precluding wide swaths of evidence.  Instead, if the Court is inclined to grant any portion of Concord's motion, the government respectfully requests that the order apply only to its case-in-chief and leave open the possibility of the government presenting otherwise-precluded evidence in rebuttal.

Respectfully submitted,

JOHN C. DEMERS                                    JESSIE K. LIU
Assistant Attorney General for National Security  United States Attorney


By: /s/                                            By: /s/
Heather N. Alpino                                  Luke Jones
U.S. Department of Justice                         Peter Lallas
National Security Division                         Jonathan Kravis
950 Pennsylvania Ave. NW                           555 Fourth Street NW
Washington, D.C. 20530                             Washington, D.C. 20530
Telephone: (202) 514-2000                          Telephone: (202) 252-6886