```
 1                  BEFORE THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF COLUMBIA

 3    UNITED STATES OF AMERICA,        .
                                       .   Case Number 18-CR-32
 4              Plaintiff,             .
                                       .
 5         vs.                         .
                                       .   Washington, D.C.
 6    CONCORD MANAGEMENT AND           .   January 24, 2020
      CONSULTING LLC,                  .   11:05 a.m.
 7                                     .
                Defendant.             .
 8    - - - - - - - - - - - - - - - -

 9                    TRANSCRIPT OF MOTIONS HEARING
               BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                   UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12    For the Government:            JONATHAN I. KRAVIS, AUSA
                                     LUKE JONES, AUSA
13                                   PETER LALLAS, AUSA
                                     ADAM JED, AUSA
14                                   U.S. Attorney's Office
                                     555 Fourth Street Northwest
15                                   Washington, D.C. 20530

16                                   HEATHER ALPINO, AUSA
                                     U.S. Department of Justice
17                                   National Security Division
                                     950 Pennsylvania Avenue Northwest
18                                   Washington, D.C. 20530

19    For Defendant Concord
      Management and Consulting LLC: ERIC A. DUBELIER, ESQ.
20                                   Reed Smith LLP
                                     1301 K Street Northwest
21                                   Suite 1000, East Tower
                                     Washington, D.C. 20005
22
                                     KATHERINE J. SEIKALY, ESQ.
23                                   Reed Smith LLP
                                     7900 Tysons One Place
24                                   Suite 500
                                     McLean, Virginia 22102
25
```

```
1    Official Court Reporter:        SARA A. WICK, RPR, CRR
                                     333 Constitution Avenue Northwest
2                                    U.S. Courthouse, Room 4704-B
                                     Washington, D.C. 20001
3                                    202-354-3284

4
     Proceedings recorded by stenotype shorthand.
5    Transcript produced by computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          THE COURTROOM DEPUTY:  Your Honor, we are in Criminal
 3    Action 18-032, United States of America versus Concord
 4    Management and Consulting LLC.
 5          If I can have counsel please approach the podium and state
 6    your name for the record.
 7          MR. JONES:  Good morning, Your Honor.  Luke Jones for
 8    the United States.  With me from the U.S. Attorney's Office are
 9    Jonathan Kravis, Peter Lallas, Adam Jed, who recently entered an
10    appearance, and from the National Security Division, Heather
11    Alpino.
12          THE COURT:  Good morning.
13          MR. DUBELIER:  Good morning, Your Honor.  Eric
14    Dubelier and Katherine Seikaly for Concord Management and
15    Consulting.
16          THE COURT:  Good morning.
17          Before we get into the pending motions related to the Rule
18    17(c) trial subpoena and a discussion of the proposed jury
19    instructions, I want to address the parties' joint motion for an
20    order setting procedures for jury selection and voir dire.
21          First of all, the questionnaire that the parties have
22    submitted jointly, I will adopt.  And I want to ask the parties
23    again, based on -- what is your best estimate right now of the
24    length of trial?  Is it still two weeks for the government?
25          MR. JONES:  Yes, Your Honor.
```

1          THE COURT:  The outer limit?

2          MR. JONES:  Yes, and that's our outer limit estimate.

3          THE COURT:  Mr. Dubelier, to the extent you know?  I'm

4   just trying to get a sense because I'm trying to determine

5   whether the jury office should send out a prescreening

6   questionnaire based on the length of the trial.  I think if it's

7   two to three weeks, perhaps not, but what I don't want to do is

8   get a bunch of people to come in here to fill out these

9   questionnaires who have a problem with serving for a long period

10  of time.  So I'm trying to get a sense --

11         MR. DUBELIER:  This is a real tough one for me, Your

12  Honor.  The last time I had the government say four weeks, it

13  was four months.  So I mean, I will be doing, I think, lots of

14  cross-examining in their case-in-chief.  And so when they say

15  two weeks, I don't know whether they've factored that in.

16      My gut feeling on this is at the outside probably a month,

17  but probably less.  I can't imagine it goes longer than that.

18         THE COURT:  I'm going to check with the jury office on

19  this prescreening questionnaire.  But my understanding is if

20  they are going to send out such a questionnaire, that it needs

21  to go out next week.

22      So does either party have an objection to that, if they

23  determine, given the length of trial, that that's prudent to do?

24         MR. DUBELIER:  Not at all, Your Honor.  No objection.

25         THE COURT:  All right.  So I will have a conversation

1    with them and let you know next time, but it's possible such a

2    prescreening questionnaire could go out early next week.  So it

3    will be a truncated version, kind of a standard form that goes

4    out in these sorts of lengthy trials.  All right?  No objection,

5    though?

6              MR. DUBELIER:  None.

7              THE COURT:  All right.  Okay.

8         In terms of setting a date for the prospective jurors to

9    come in to fill out the joint written questionnaire, I want to

10   make sure there's time for you all to review it and make motions

11   for strikes for cause and me a chance to consider your strikes.

12        I'm wondering whether it makes sense to have the

13   prospective jurors come in to fill out the written

14   questionnaires on March 10th, and then thereafter, I give the

15   parties a week to file their strikes for cause under seal.

16             MR. DUBELIER:  No objection to that, Your Honor.

17             MR. JONES:  No objection, Your Honor.

18             THE COURT:  Does that make sense?  All right.

19        I know that the parties have proposed that the court make

20   the copies of all these questionnaires, but my understanding is

21   that in other cases the government has done so.

22             MR. JONES:  We will do that, Your Honor.

23             THE COURT:  So I will grant your -- what is it?  Your

24   joint motion for an order setting procedures for jury selection

25   and voir dire, with that one amendment, that the government

1    rather than the court will make the copies.

2         All right.  So I had excluded time under the Speedy Trial

3    Act up until the last hearing, which I apologize.  That hearing

4    was canceled because there was a death in the court family, and

5    there was not a court reporter available for the hearing that we

6    had set.  We have motions pending.  So it's not a problem.  But

7    I do want to address speedy trial.

8         I know at different points both sides have said they're

9    excluding time up to and including trial.  Does that remain the

10   case, Mr. Dubelier?  You have no objection?

11             MR. DUBELIER:  Yes, it does, Your Honor.  No

12   objection.

13             THE COURT:  And the government?

14             MR. JONES:  No objection.

15             THE COURT:  For all the reasons I previously stated on

16   the record, I do exclude time from today until April 6th, 2020.

17   I do find it is in the interest of justice and that it outweighs

18   the best interests of the public and the defendant in a speedy

19   trial to exclude time from today until that date.

20        On jury instructions, I am going to reserve ruling on some

21   of these issues, including the conspiracy and the unanimity

22   issues, until after the parties have supplemented the additional

23   materials they want me to consider on FECA and FARA.

24        And as I understand it, both parties wanted more time on

25   that for the exhibits, but the defense exhibits are due, what,

1  February 3rd?  Is that right?

2         MR. DUBELIER:  February 10th.

3         THE COURT:  How soon can we get -- I would like the

4  parties to submit the list of instructions, standard

5  instructions on which they agree, as well as any additional

6  material, FECA, FARA, otherwise, you want me to consider by a

7  date certain.

8      I was going to propose February 7th.  But if there's some

9  reason why that has to wait until the defense turns over its

10 exhibits, I will hear it.  But is there a reason you can't do

11 that by February 7th?

12        MR. DUBELIER:  No, Your Honor.  The only thing I would

13 ask, we are a little confused by the FECA/FARA thing.

14        THE COURT:  Am I misunderstanding that both sides

15 think that I should give some instructions on FECA and FARA, and

16 do you want to propose that?

17        MR. DUBELIER:  We already have.

18        THE COURT:  You have?

19        MR. DUBELIER:  It's in our draft instructions.

20        THE COURT:  I thought that you wanted specific

21 provisions of FECA and FARA?  Am I confusing what the government

22 wants?

23        MR. JONES:  I think, Your Honor, the government

24 doesn't believe there should be FECA/FARA instructions nested

25 within the conspiracy instruction.

1          THE COURT:  But I thought that you all were going to

2   supplement.

3          MR. JONES:  We did indicate, and in our most recent

4   filing filed an attachment identifying specific FARA and FECA

5   functions that we suspected may be the most relevant.

6          THE COURT:  I must have missed that.  I will take

7   another look at that.  I thought you all were proposing -- there

8   was some language in the briefs about after exhibits are

9   provided.  Was that just the possibility of additional

10  instructions being necessary, depending on what the exhibits

11  are?

12         MR. JONES:  I think that's true, and I think as the

13  government lays out in its argument, the particular provisions

14  that might be relevant based on the evidence at trial may shift,

15  depending on the exhibits and, frankly, maybe on the evidence

16  that comes out at trial.  And so --

17         THE COURT:  All right.  I will take a look at -- I

18  didn't pick up on that submission.  So I will take a look at

19  that.

20      And I'm wondering, can you do the joint submission on the

21  list of standard instructions you agreed to by February 7th?

22         MR. JONES:  Yes.  I think we essentially did file that

23  the first go-around.  In our initial jury instruction filing,

24  there was a -- which indicated the instructions that we agreed

25  on.  We can --

1          THE COURT:  No, you don't need to refile it if I've

2      got it.

3          So we will work on putting together a packet.  And I'm not

4      going to address the conspiracy and unanimity here today, but I

5      am going to tell you my rulings with respect to some of them.

6      So you can have a seat.

7          So with respect to notetaking, I will exercise my

8      discretion to allow the jurors to take notes.

9          The corporate defendant instruction, I will adopt Concord's

10     proposal to supplement the government's proposed instruction

11     with a sentence:  "A corporate defendant may appear in court

12     through its counsel who is present."

13         On corporate responsibility, I will also adopt Concord's

14     proposal and use the "related directly" language that has

15     support in jury instructions from the D.C., Second, Third,

16     Sixth, and Eighth Circuits over the Seventh Circuit's

17     instruction.

18         With regard to the government's request for a jury

19     instruction on suppression of evidence, I will postpone ruling

20     on this instruction until after the government's case.  If

21     ultimately I give the instruction, I think Concord's proposal to

22     reference certain defendants is a reasonable one.

23         Concord's request for a jury instruction on good faith, I

24     will also postpone this ruling on the instruction until after

25     Concord presents its defense.  I don't think such an instruction

1    is required for all specific intent crimes, and I am not

2    inclined to give one absent some evidence of that presented by

3    Concord.

4         With regard to the state of mind instruction, I am inclined

5    to give the standard instruction on state of mind.  But

6    Mr. Dubelier, I did want to talk to you about this collective

7    intent issue you are worried about.

8         And specifically, what part of your proposed instruction

9    addresses that?  Is it really -- as I see it, it's the first two

10   sentences.

11             MR. DUBELIER:  Your Honor, if you could give me a

12   minute to dig it out.

13             THE COURT:  Sure.

14             MR. DUBELIER:  What was the question, Your Honor?

15             THE COURT:  You've raised this issue of collective

16   intent and your concern with the government's state of mind

17   instruction.  I'm wondering whether, in looking at the language

18   you've proposed, what portion of your proposal really gets to

19   that?  Is it the first couple of sentences, and specifically, is

20   it the second, "Because a corporation only acts and wills by

21   virtue of its employees, corporate intent depends on the

22   wrongful intent of specific employees"?  Is that the critical

23   sentence?

24             MR. DUBELIER:  The second sentence, yes, Your Honor.

25             THE COURT:  The second sentence?

1          MR. DUBELIER:  Yes.

2          THE COURT:  Does the government have any objection to

3    that second sentence or even sentences 1 and 2?

4          MR. JONES:  Just a second, Your Honor.

5          THE COURT:  All right.

6          MR. JONES:  Sorry, Your Honor.  Are we referring to

7    the second in --

8          THE COURT:  The second in Concord's.  "Corporations

9    may be held liable for specific intent offenses based on the

10   knowledge and intent of their employees.  Because a corporation

11   only acts" -- What do you mean by "and wills"?  How about,

12   "Because a corporation only acts through its employees,

13   corporate intent depends on the wrongful intent of specific

14   employees"?

15       I'm going to modify this slightly.  Here's what I will do:

16   I will incorporate this into instructions that we will prepare a

17   packet and then give them to you all and you can give responses

18   if you're not prepared today.

19          MR. JONES:  That makes sense, Your Honor.  I think

20   we're generally okay with that second sentence.  We do take

21   issue with the "specific intent" references and the third and

22   fourth sentence of that proposed instruction.

23          THE COURT:  Yeah, I wasn't inclined to give the third

24   and fourth, and I think I will tweak this language.  But I will

25   prepare a packet of instructions, and then you all can comment

1    on those.  All right?

2            MR. JONES:  Thank you.

3            THE COURT:  Okay.  Before I get into the trial

4    subpoena issue, the upcoming hearings we have scheduled, we have

5    one for February 11th and one for February 20th.  On

6    February 11th, I will address the motions in limine that are

7    unrelated to exhibits.  And just looking at the calendar, I'm

8    inclined to move back the February 20th hearing a week.  I'm

9    reluctant -- not knowing at this point how many motions in

10   limine based on exhibits are going to be filed, I'm reluctant to

11   leave all of those for the March 9th pretrial conference.

12       So what I would like you all to do after this hearing is

13   take a moment and talk to Mr. Hopkins about whether there's a

14   date that's mutually convenient for the two of you February 26th

15   through 28th.

16       And what I would like to do is, we've got the motions in

17   limine based on exhibits due to be filed on February 7th, and I

18   would like to move up the opposition deadline from February 21st

19   to February 17th and the reply deadlines from February 28th to

20   21 and try to address some of those, and I will let you know

21   ahead of time which ones, at that hearing, which will be

22   February 26th through 28th.

23       Does that work for the parties?

24           MR. DUBELIER:  It does, Your Honor.  And we are

25   available the 26th through the 28th, if the government wants to

1    pick a time now that works for the Court.

2              THE COURT:  All right.  I'm fairly open.

3              MR. JONES:  It sounds like any of those dates would be

4    fine.  Perhaps the 27th.

5              THE COURT:  So why don't we say --

6              MR. JONES:  The morning of the 27th may actually not

7    be good.  Either the 26th --

8              THE COURT:  All right.  Any preference, Mr. Dubelier,

9    the 26th or the 28th?

10             MR. DUBELIER:  None at all, Your Honor.

11             THE COURT:  Let's do March -- sorry, February 26th,

12   10:00 a.m.

13             THE COURTROOM DEPUTY:  Should I set this as a status

14   conference, Your Honor, or a motions hearing?

15             THE COURT:  This is a motions hearing on the motions

16   in limine.

17        To help you all be prepared, I will put out a minute order

18   in advance indicating which motions in limine.

19        All right.  I think that's all the housekeeping.  So having

20   reviewed the briefs, I am prepared to rule on the trial subpoena

21   issue.

22        Before the Court are the government's motion for early

23   return trial subpoena and Concord's motion to quash.  My ruling

24   follows several rounds of briefing and one hearing covering

25   these issues.  The parties have raised a large number of issues

in their briefs.  I won't address each one here, but I have considered all of them in reaching my decision.  I will address the most significant issues here.

First, I will start with the threshold question of whether the Court has the power to issue a trial subpoena to Concord.  I conclude that it does.

Concord urges that the Court's authority to issue a subpoena to Concord does not depend on whether the Court has personal jurisdiction over Concord or whether Concord agreed to follow rules or court orders.  Instead, Concord says that the Court must find its authority in the particulars of the rules and statutes governing such subpoenas.  Here, Federal Rule of Criminal Procedure 17.

The Court understands Concord's argument to proceed as follows:  Rule 17(e)(2), which covers service in a foreign country, provides that if the witness is in a foreign country, 28 U.S.C. 1783 governs the subpoena service; Section 1783 provides for service upon a national or resident of the United States who is in a foreign country for the production of a specified document or other thing by him; because Section 1783 is silent about foreign corporations that are not nationals or residents of the United States, such corporations are not subject to a Rule 17 subpoena, regardless of the place and manner of service.

This argument is misplaced.  In fact, the Second Circuit

persuasively rejected this argument that a Court must derive its authority to issue subpoenas to foreign corporations from Rule 17.  See *In re Marc Rich & Company*, A.G. 707 F.2d 663 at 668, Second Circuit 1983.

As the Second Circuit recognized -- this is a quote -- the judicial authority to issue subpoenas has had congressional approval from the start.  From almost the birth of our nation, Congress has recognized that the right to resort to means competent to compel the production of written as well as oral testimony seems essential to the very existence and constitution of a court of common law.

This court has likewise recognized this, quote, well-established principle that courts have the power to exercise authority on people and entities over whom they have personal jurisdiction, including compelling those individuals or entities to retrieve documents from abroad.  *In re Search of Information*, Case Number 16-MJ-767.  It's a D.D.C. July 31st, 2017, case.

And the D.C. Circuit similarly has explained that there is little doubt that a United States court has the power to order any party within its jurisdiction to testify or produce documents, regardless of a foreign sovereign's views to the contrary.  *In re Sealed Case*, 832 F.2d 1268 at 1283.  This is true regardless of where the records are, because federal courts have long required the production of documents held abroad.  *In re Sealed Case*, 932 F.3d at 924.

Based on these principles, the Second Circuit concluded correctly that arguments like Concord's put the cart before the horse.  A federal court's jurisdiction is not determined by its power to issue a subpoena.  Its power to issue a subpoena is determined by its jurisdiction.  *In re Marc Rich*, 707 F.2d at 66.

The Court rejects the suggestion that Rule 17(e)(2)'s silence on foreign corporations, rather than failing to grant the Court that power, eliminates that power.  Just as Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions, it does not remove long-standing essential court powers by implication through a vague reference in a subsection of Rule 17 to a subsection of another statute.  It does not, one might say, hide elephants in mouseholes.  *Whitman v. American Trucking Association,* 531 U.S. 457 at 468.

That is especially so given that Rule 17(e)(2) seems more concerned with the manner and place of service than the substantive reach of the Court's power to subpoena.

As other courts have concluded, it is not reasonable to impute to Congress a purpose in enacting Rule 17(e)(2) to immunize from process nonresident foreign corporations conducting substantial and continuing activities here.  *In re Arawak*, 489 F.Supp. 162 at 165, E.D.N.Y. 1980.

The better reading of Rule 17(e)(2) is that it merely

provides a means to make service on nationals or residents of this country who are physically outside it.  Again, *Arawak* at 165.

And even if Concord were correct that Rule 17(e)(2) prevents this Court from issuing a subpoena to foreign corporations with no presence in the United States, Concord ignores 17(e)(1), which allows for service within the United States of witnesses found there.  As other courts have held in interpreting 17(e)(1), under familiar principles of personal jurisdiction, a foreign corporation may be found in the United States even though its headquarters and place of incorporation may be elsewhere.  *U.S. v. Quigg*, 80-41-1, 1981 Westlaw 1884 at 4, District of Vermont 1981.  See also *Arawak*, 489 F.Supp. at 165.

Based on that rationale, those courts concluded that if a foreign corporation is in the United States under personal jurisdiction principles, then the Court may issue a subpoena, and the corporation may be served under Rule 17(e)(1).

The cases Concord cites to the contrary are inapposite.  One concerns foreign individuals, which, unlike foreign corporations, Section 1783 does discuss.  See *U.S. v. Gordon,* 634 F.2d 639 at 646.  And others concern only whether 17(e)(2) permits serving a subpoena to a foreign company in a foreign country, not whether it permits issuing such a subpoena, but serving it in the United States.  See, for example, *In re Jury*

*Subpoena*, 646 F.3d at 165.

In sum, if a court has personal jurisdiction over a foreign corporation, then the court has the power to issue a trial subpoena to that corporation.

I conclude that the Court has personal jurisdiction over Concord.

For starters, a party may consent to a court's personal jurisdiction. *In re Sealed Case*, 932 F.3d at 922. Concord did just that. Defense counsel represented that Concord had consented to this court's jurisdiction and had agreed to comply with the Federal Rules of Criminal Procedure, this court's rules, and this court's orders. Nor has Concord ever suggested that this court lacks personal jurisdiction over it. Its argument on this motion is simply that personal jurisdiction is irrelevant.

In addition, as the First, Second, Eighth, Ninth, and Eleventh Circuits recognize, in criminal cases, a district court has personal jurisdiction over any party who appears before it, regardless of how this appearance was obtained. *U.S. v. Lussier*, 929 F.2d at 27, *U.S. v. Rendon*, 354 F.3d at 1326. A federal district court has personal jurisdiction to try any defendant brought before it on a federal indictment charging a violation of federal law. *U.S. v. Stuart*, 689 F.2d at 762.

It is well-established that irregularities in the manner in which a defendant is brought into custody does not deprive the

court of personal jurisdiction over the defendant in a criminal case.  *U.S. v. Warren*, 610 F.2d at 684.  In this circuit -- and that is the Ninth Circuit -- a court has exclusive personal jurisdiction over any party who appears before it, regardless of how that appearance was effected.  *U.S. v. McLaughlin*, 2019 Westlaw 7285847 at 2.  When a district court has subject matter jurisdiction over the criminal offenses charged, it has personal jurisdiction over the individuals charged in the indictment and present before the Court to answer those charges.

And even under the minimum contacts standard, the Court would still conclude that it has personal jurisdiction over Concord.  In the civil context, the essential constitutional touchtone for establishing personal jurisdiction is whether the defendant purposely established minimum contacts in the foreign state such that he should reasonably anticipate being haled into court there.  *Burger King Corporation,* 471 U.S. 462 at 474.

A defendant cannot avoid jurisdiction merely because it did not physically enter the forum.  *Mwani v. Bin Laden,* 417 F.3d at 12.  Instead, so long as an actor's efforts are purposely directed toward residence of another forum, the Supreme Court has consistently rejected the notion that an absence of physical contact can defeat personal jurisdiction there.

Based on the grand jury's allegations, which are rooted in the evidence presented to it, there's probable cause to believe that Concord carried out activities directed at and felt in this

forum.  These activities are such that Concord could reasonably anticipate being haled into court in the United States, not to mention Concord is not being haled into court.  The subpoena requests documents, not the presence of Concord's representatives, and Concord chose to appear here voluntarily.  Thus, the Court has personal jurisdiction over Concord and the power to issue a trial subpoena to Concord.

The Court concludes next that the government may serve a trial subpoena on Concord's defense counsel.  As a threshold matter, the Court agrees with the government that the need for serving a court order on Concord is not apparent.  The need for service on nonparties is obvious because they are not before the Court, and service facilitates obtaining jurisdiction over the nonparty.  But as explained, Concord is already a party to this case.  And so the Court already has jurisdiction to issue orders to Concord.

But in any event, service on Concord's defense counsel in the United States is proper.  This outcome proceeds from a straightforward application of Federal Rule of Criminal Procedure 49.  It categorically provides that unless the Court orders otherwise, when these rules or a court order requires or permits service on a party represented by an attorney, service must be made on the attorney instead of the party.

This rule makes complete sense.  In litigation, parties routinely serve notice on attorneys rather than on parties.  And

this rule also ensures that parties cannot game the court system by appearing in litigation only through counsel, which Congress indeed authorized, while evading service when it suits them. Here, Rule 17 plainly permits service on witnesses, and no one, including Concord, disputes that a represented party can be a witness, as Rule 17 uses that term.  See, for example, *U.S. versus Johnson*, 801 F.2d at 599.

Rule 17 plainly permits service on a party represented by an attorney, and in such cases, Rule 49 is unequivocal.  When the rules permit service on a party represented by an attorney, as Rule 17 clearly does, service must be made on the attorney. Concord, the witness in Rule 17 parlance, is a party represented by an attorney.  So under Rule 49, the government must serve Concord's defense counsel.

In the alternative, the Court also concludes that based on the actions of Concord's defense attorney in this case, service on Concord's counsel is proper.  As the Court previously recognized, when a foreign corporation that comes into the District of Columbia for a certain purpose, it cannot, by restricting the authority of its resident agent, immunize suit in that same court involving the same.  *Kelberine*, 363 F.2d at 993 through 94.

Concord contests *Kelberine*'s significance based on its expressly limited holding and its distinguishing characteristics.  And the Court recognized those differences in

its earlier order on the government's first motion for an early return of trial subpoena.  But the Court maintains that *Kelberine*'s animating bitter with the sweet principle properly guides this case.

Nor is *Kelberine* the first or only case to rest on such a rationale.  As the D.C. Circuit said decades after *Kelberine*, most courts, including this one, are reluctant to embrace doctrines that would allow those who break American laws to escape sanction by setting up base abroad.  *Commodity Futures Trading Commission v. Nahas*, 738 F.2d at 492, note 11.

In a similar way, this Court declines to embrace a doctrine that would allow a foreign corporate defendant to evade court orders at its discretion simply by appearing through counsel and then authorizing their counsel to accept only certain court orders.

Concord has authorized its defense counsel to appear on its behalf, to waive service, to waive personal jurisdiction, to enter a plea, to accept discovery, to file motions, and to litigate every aspect of this case, except, apparently, this one.  The Court concludes that at least under these circumstances and absent any evidence to the contrary, Concord's defense counsel was implicitly authorized to accept service of the subpoena.

Finally, Concord is incorrect that accepting service on Concord's behalf threatens Concord's Sixth Amendment right to

effective representation.  First, the subpoena is not directed at defense counsel and would not require defense counsel to assist Concord in searching for responsive documents, as Concord suggests.  And second, Concord's interests in not receiving a trial subpoena with which its defense counsel's obligation to accept service of such a subpoena might conflict does not create an unconstitutional conflict of interest.  A party always has an interest in evading adverse orders, and unconstitutional conflict of interest does not arise merely because defense counsel accepts service for such an order.

For all these reasons, the Court concludes that the government may serve the subpoena on Concord's defense counsel in the United States.

Concord also raises several arguments challenging the government's subpoena in substance.  The Court will address each in turn.

First, the Court rejects Concord's argument that requests 1 and 2 seek publicly available information and should be quashed. Concord cites some examples of similar documents from the Web site of a Russian tax authority, but this does not mean that these are the only such records available.  The Court is persuaded that there is a sufficient likelihood of corporate registration documents and documents identifying corporate officers of Concord existing in nonpublic sources.  And the Court rejects Concord's contention that the government should

seek documents from Russian authorities that are not online.
The government has established that such efforts would be
futile.

Second, Concord has failed to carry its burden to show that
compliance with requests 3, 4, 5, and 6 would violate foreign
law.  Concord, as a party relying on foreign law, assumes the
burden of showing that such law prevents compliance.  *In re*
*Grand Jury Subpoena*, 912 F.3d at 633.

In general, Concord's arguments about Russian law stand on
conjecture, hypotheticals, and overly broad interpretations of
Russian law.  And unlike the government, which does not bear the
burden of establishing a conflict, Concord's motion does not
include a declaration from an expert on Russian law, which is
typically the basic method by which foreign law is proved.
*Doe v. ExxonMobil*, 69 F.Supp.3d at 103.

In short, Concord has failed to establish a true conflict
between subpoena compliance and Russian law.  Moreover, even if
Concord had succeeded, the Court would conclude that comity
favors granting certain of the subpoena requests.

First, Concord raises a Russian treason law that prohibits
disclosure of state secrets and providing any other assistance
rendered to a foreign state and activities aimed against the
security of the Russian Federation.

But Concord never claims that complying with the
government's subpoena requests actually would violate this law.

1   Concord characterizes the statute as broad and repeatedly

2   predicts that Russia could or may seek compliance with the

3   subpoena as treason.  But this conjecture falls short of

4   establishing a true conflict between Russian law.

5       The Court agrees with the government that despite Concord's

6   suggestions, the treason statute does not prohibit Concord's

7   compliance with the subpoena request.  Concord does not contend

8   that the subpoena request seeks a state secret, and this trial

9   is not an activity aimed against the security of the Russian

10  Federation.  It is, instead, a prosecution of a private company

11  that is purportedly not part of the Russian government.

12      In addition, even if the prosecution were to suggest some

13  connection between Concord and the Russian government, it is

14  also unclear how this trial could be aimed at the security of

15  the Russian Federation.  As the government's expert explains, to

16  violate the treason statute, the activity must pose a threat to

17  the nation's security, not merely to what its government views

18  as its range of interest.  Stephan declaration, paragraph 17.

19      Moreover, even if this trial were aimed at Russia's

20  security, Concord fails to show why complying with the trial

21  subpoena would constitute assistance.  It provides no textual

22  argument, expert declaration, or scholarly commentary to support

23  this argument.

24      The Court also rejects Concord's argument that the

25  government could use the evidence collected from the subpoena as

a foundation to sanction Russia or launch cyber attacks.  For

starters, Concord cites a sanctions bill that is not yet law.

Nor does Concord establish that the sanctions on Russia's

financial sector would be actions aimed against the security of

the Russian Federation or that complying with subpoenas in this

context would be considered assisting the United States

government in the unrelated context of financial sector

sanctions or cyber warfare.  In addition, Concord does not

identify any potentially responsive record that would serve as a

basis for sanctions or cyber attacks.

And the Court disagrees with Concord that complying with

the subpoena would somehow damage Russian security by

frustrating the relationship surrounding the two countries'

mutual legal assistance treaty.  The government has shown that

the Russian treason statute does not equate Russian sovereignty

with Russian security.  Stephan declaration, paragraph 25.

In addition, Concord's suggestion that the Russian

government might have complied with an MLAT request for

Concord's records in this case only strengthens the government's

view that providing those records does not amount to treason.

For all of these reasons, Concord has not established a

true conflict between the Russian treason law and complying with

the subpoena.

Next, Concord argues that providing certain IP addresses

could violate a Russian cyber security law that bars illegal

access to legally protected computer information if such action
has entailed the destruction-blocking modification or copying of
computer information.  Article 272.

Concord does not actually contend complying with the
subpoena would alone violate this law.  Instead, Concord argues
only that if the United States government later used the IP
addresses in a cyber attack that violates this law, Concord
could be charged as an accomplice to that attack.

This does not establish a true conflict between subpoena
compliance and Russian law.  Moreover, Concord would likely lack
sufficient mens rea to be charged.  Complying with a court order
would not meet the statutory requirement that the accessory
engage in criminal conduct purposely.  Article 24.  Concord has
not established a true conflict under Russia's cyber security
law.

Concord also contends that request 4, which requests
payment records from Concord to fund IRA activities, would
violate a Russian law in transmitting commercial secrets.  It
bars illegal disclosure or use of information classified as a
commercial tax or banking secret without the consent of the
owner thereof.  Article 183.  But Concord does not explain how a
payment record would disclose commercial secrets.  As the
government explains, the statute defines a commercial secret as,
among other things, having commercial value that is derived from
its confidentiality.

Concord does not explain why its payment records have any
commercial value at all or why, even if they do, they derive
that value from their confidentiality.  In addition, Concord
fails to establish that it is not the owner of the payment
records.  The law bars disclosure of commercial secrets only
absent the owner's consent.

Concord claims that the government seeks documents that, if
they exist, belong to third parties and are protected under
Russian law from disclosure absent the third party's consent,
which Concord purportedly lacks.  But request 4 seeks Concord's
records of payments from Concord.  Concord does not explain why,
despite third-party involvement in these transactions, Concord
does not own the records that the government seeks.

And finally, the law applies only to illegal disclosure or
use of information.  Concord does not explain why complying with
an otherwise valid subpoena would amount to illegal disclosure.
Concord has not established that compliance with request 4
conflicts with the Russian commercial secrets law.

Last, Concord asserts conflicts between requests 5 and 6
and a Russian personal data law.  That law, which is not a
criminal statute but only an administrative provision that
imposes a small fine, concerns the processing of personal data
and includes a nondisclosure provision.

Concord suggests that disclosing communications or calendar
entries that name its employees and others could violate this

law.  But this law contains exemptions for conduct undertaken pursuant to constitutional, civil, administrative, criminal proceedings or proceedings of commercial courts and for data processed for the purpose of exercising the rights and lawful interests of the operator or third persons.

Concord argues that these exceptions apply to Russian proceedings or when exercising rights under Russian law, but the Court agrees with the government that these provisions are not written so narrowly and that, at the very least, Concord has not persuaded the Court that a true conflict exists.

As I've explained, Concord has not established a true conflict between subpoena compliance and Russian law, but even if it had, comity would still favor granting the subpoena.

The second question, assuming a true conflict exists, is, quote, whether the factual circumstances of the case at hand counsel against applying American law.  *In re Sealed Case*, 932 F.3d at 931.

Courts apply a constellation of factors to answer this question.  Those factors include the importance to the litigation of the documents requested, the degree of specificity of the request, whether the information originated in the United States, the extent to which noncompliance with the request would undermine important interests of the United States or compliance with the request would undermine important interests of the state where the information is located, whether alternative

means of securing the information exists, whether compliance would impose hardship on the party targeted by the subpoena, and whether that party has acted in good faith.

Nearly all factors favor the government.  First and of particular weight, the Court agrees that the government has a substantial interest in obtaining evidence in this case and that noncompliance with the subpoena request would undermine those important interests.  The United States has a strong national interest in effective enforcements of its criminal laws, here an alleged conspiracy to impair with deception the government agencies tasked to moderate, regulate, and enforce laws that shield our elections from improper influence.  *U.S. v. Davis,* 767 F.2d at 1035.

The government identifies three interests which the Court credits:  The interest in enforcing laws in the United States, the interest of the United States judicial system in conducting trials with all admissible evidence, and the United States's interest in defending itself against obstruction or fraud.  All of these interests weigh heavily against quashing the subpoena.

Second, these documents are important to the litigation. The government has suggested that this may be its only means of securing admissible versions of certain documents.  And as explained, by meeting Rule 17 requirements, these requests will concern only admissible and relevant documents, thus further ensuring that the subpoenas concern only documents that are

important to the litigation.  This factor weighs against

quashing.

Third and relatedly, there does not appear to be an

alternative means of securing this information, particularly

internal corporate documents of Concord.  This factor, too,

weighs against quashing.

Fourth, it appears unlikely that compliance would impose

undue hardship on Concord.  As explained, it is unlikely that

compliance will subject Concord to liability under Russian law,

and the Court disagrees that compliance would threaten the

relationship between counsel and Concord.  The subpoena does not

mention defense counsel and, other than transmitting the

subpoena, requires no further involvement from defense counsel

in complying with the subpoena.

In addition, Concord suggests that, perhaps, no documents

exist that are responsive to the subpoena, and the government

believes, based on evidence it already possesses and its

understanding of Concord and its relationship to the other

entities mentioned in the subpoena, that the number of

responsive documents may be limited.  This factor, too, weighs

against quashing.

Fifth, as for Concord's good faith, the Court agrees with

Concord that this factor has less relevance in criminal cases

because a defendant has few discovery obligations.  On the other

hand, the government suggests that Concord's efforts to resist

the subpoena show a lack of good faith.  The Court will consider this factor to be neutral.

Sixth, there is no dispute that the material requested originated in Russia.  This factor weighs against favor of quashing.

Seventh, request 3 is sufficiently specific.  Unlike in the grand jury context, the subpoena here must comply with Rule 17's requirements of relevancy, admissibility, and specificity.  The circumscribed nature of request 3, which is unlike grand jury subpoenas or civil discovery requests, weighs against quashing the subpoena.

As for requests 4, 5, and 6, the Court will shortly conclude that those requests are overly broad for Rule 17 purposes, and thus, this factor favors quashing as to those requests.

Last, Concord argues that compliance would hurt Russian interests because it would require Concord to violate Russian law and because, according to Concord, this Court's subpoena power cannot reach Concord.  But as I've already explained, this Court disagrees on both counts.  As such, this factor is at best neutral.

On balance, the comity factors would favor against quashing request 3.  Thus, even if a true conflict existed, the Court would still grant the government's subpoena request.

That said, the Court does agree with Concord that aspects

of requests 4, 5, and 6 fail to meet *Nixon*'s specificity requirement.  As this Court has explained, the specificity requirement can be satisfied if there's a sufficient likelihood demonstrated through rational inferences that the documents being sought contain relevant and admissible evidence.  But the government must provide a link that explains what the government expects to find and why it expects to find it.  *U.S. v. Binh Tang Vo*, 78 F.Supp.3d at 181.  Based on the record before me, it has failed to do so.

Request 4 seeks records reflecting any payments from Concord to fund the IRA during the alleged conspiracy.  The government has apparently obtained budgets between an accountant for the IRA and Concord employees that appear to show payments from Concord that fund the agency's activities.  But the government has not demonstrated that these budgets relate to the allegations in the indictment, nor has the government explained why these budgets, even if they do relate to the allegations in the indictment, justify its request for records pertaining to all payments between Concord and the IRA.  It is possible that some or many of the payments the government seeks do not pertain to allegations contained in the indictment and would, thus, likely be inadmissible or irrelevant.

So based on what the government has shown the Court so far, request 4 remains overly broad.

Request 5, likewise, seeks all communications between any

1    individual affiliated with Concord and a list of individuals

2    concerning the IRA.  The government supports this request with

3    communications between an IRA accountant and unnamed employees

4    of Concord, as well as by communications between likely

5    secretaries of Prigozhin and IRA employees.

6        Again, this evidence fails to support the government's

7    broad requests.  The government failed to establish through

8    evidence or rational inferences that these communications

9    entitle it to its request for all communications concerning the

10   IRA between anyone affiliated with Concord and the list of 13

11   individuals, nor has the government explained why request 5 is

12   unlikely to encompass -- why it is unlikely to encompass

13   irrelevant, inadmissible information.

14       And request 6, which seeks certain calendar entries for

15   Prigozhin that reflect any meetings between him and a list of

16   specific individuals is, likewise, not adequately supported and,

17   thus, overly broad.  The government finds support in photographs

18   it obtained showing Prigozhin's calendar and meeting schedule

19   between him and the alleged executive director of the IRA during

20   the alleged conspiracy, but this alone does not justify the

21   government's request for any meeting between Prigozhin and the

22   other individuals listed in request 6.

23       The government fails to establish that the documents it

24   seeks will likely contain admissible relevant information rather

25   than information about meetings that had nothing to do with the

1    allegations in the indictment.

2        The government has options.  It can further narrow its

3    request, or it can provide additional justifications through

4    more detailed evidence or a more thorough account of the

5    rational inferences it is relying on for its current request, or

6    it can do both.  But based on the requests before me and the

7    government's motion, I must deny requests 4, 5, and 6 without

8    prejudice.

9        In sum, the Court denies Concord's motion to quash except

10   as to requests 4, 5, and 6.  The Court grants the government's

11   motion for an early return trial subpoena as modified -- as

12   stated here.  The government may serve the trial subpoena on

13   Concord's defense counsel in the United States.

14       I will issue a minute order consistent with this ruling.

15   If the government seeks to file another motion, it must do so by

16   next Wednesday.

17       All right.  Any other matters I neglected to cover?

18            MR. DUBELIER:  Not from the defense, Your Honor.

19            MR. JONES:  Nothing from the government, Your Honor.

20            THE COURT:  Okay.  All right.  I will take a brief

21   break and then have the ex parte meeting on the CIPA motion.

22       (Proceedings adjourned at 11:51 a.m.)

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     /s/ Sara A. Wick              January 28, 2020

10    SIGNATURE OF COURT REPORTER        DATE