**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

CONCORD MANAGEMENT AND
CONSULTING LLC

      Defendant.

CRIMINAL NUMBER:

1:18-cr-00032-2-DLF

**DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S OPPOSITION
TO THE GOVERNMENT'S MOTION IN LIMINE TO ADMIT DOCUMENTS**[1]

---

[1] Undersigned counsel is assuming that its Unopposed Motion for Leave to File Excess Pages, ECF 342, will be granted.  If that Motion is denied, undersigned counsel requests leave of court to re-file an abbreviated version of this pleading complying with the page limitations in the local rules.

## <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT .................................................................. 1

II.    LEGAL STANDARDS ........................................................................... 4

    A.    Authentication............................................................................ 4

    B.    Hearsay ..................................................................................... 9

    C.    Relevance and Prejudice ........................................................... 13

III.   ARGUMENT ...................................................................................... 14

    A.    Social Media Accounts ............................................................. 14

    B.    Other Business Records ............................................................ 24

    C.    Internal IRA Documents And Communications.................................... 30

    D.    Communications Between IRA and Concord....................................... 35

    E.    Documents Purporting to Link IRA and Prigozhin ............................. 40

    F.    Other Statements by Co-conspirators .................................................. 46

        1.    Exhibit 347— ▮▮▮▮▮ email ....................................................... 46

        2.    Exhibit 303— ▮▮▮▮▮ emails ...................................................... 48

    G.    The Government's Motion Does Not Address Certain Exhibits and
        Concord Raises Additional Objections.................................................. 49

IV.   CONCLUSION................................................................................... 55

Defendant Concord Management and Consulting LLC ("Concord" or "Defendant"), through counsel, submits this Opposition to the Government's Motion in Limine to Admit Documents.  In support, Concord states as follows:

## I.      PRELIMINARY STATEMENT

The government's motion in limine discloses its plan for admitting hundreds of thousands of pages of prejudicial hearsay evidence—virtually all of it having no connection to Concord whatsoever.  According to the government, this evidence is admissible because Concord is presumed to be part of a conspiracy to defraud the Department of Justice FARA Unit ("DOJ"), the Federal Election Commission ("FEC"), and the Department of State ("DOS").  According to the government, it obtained and is currently seeking additional business records certifications that like magic will make the massive contents of email and social media accounts admissible without as much as a peep from a human witness.  But the contents of these accounts are not business records of any of the providers and at most any such certifications may be used only with respect to certain limited technical data about each account.

The government chooses to ignore the law in an effort to make things simple.  In the government's view, if it has seized the contents of a private social media or email account of a person it believes is linked to ███████████████████████████, then the entire content of those accounts are automatically admissible based on the business record certifications noted above, and in the alternative are also admissible either as co-conspirator statements, or will not be offered for the truth of the matter asserted.  The government has not identified a single case where massive amounts of email and social media data was so facilely admitted.

Controlling law directs that before hearsay evidence can be admitted against Concord, it must independently be shown, by a preponderance of the evidence, that Concord knowingly agreed with the co-conspirators to pursue the common objectives alleged in the Superseding Indictment.

Unless and until the government comes forward with that evidence, the proffered co-conspirator statements have no meaning, no relevance, and no legal effect in this proceeding. The independent proof the government must produce now cannot be met with speculation, conjecture, assumption or attorney argument, nor can the government simply rely on the allegations in the indictment.

The government pays little mind to these controlling legal principles as it seeks permission to introduce hundreds of thousands of pages of evidence most of which *has nothing to do with Concord at all*. Indeed, none of the government's proffered evidence—no matter how generously construed in the government's favor—suggests that Concord knowingly intended to join the common objectives the government alleges here. Rather, it consists largely of inadmissible hearsay statements made by and to alleged employees of IRA who are alleged to have hatched and carried out the alleged defraud conspiracy—without a solitary reference to Concord. In that regard, the government begins its motion seeking permission to introduce purported records from the alleged IRA co-conspirators' social media accounts which, according to the government, evidence "the instruments by which the crime" of a defraud conspiracy against the U.S. government "was committed" here. Mot. 10-11. The government also seeks to introduce numerous statements purportedly made to and by the alleged IRA co-conspirators. As noted, however, none of this evidence mentions or references Concord, much less is shown (or even alleged) to have been made to or by Concord or its agents or employees. Nor does the government attempt to show, with independent evidence, that there was in fact a conspiracy to defraud the government and that Concord knowingly joined an agreement to pursue the conspiracy's alleged objectives— prerequisites to admitting co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E).

The government insists that "evidence gathered during the course of the investigation shows that Concord knowingly participated in this conspiracy" purportedly carried out by the IRA

conspirators, Mot. 3, but it grossly oversells this.  One category of this purported evidence is alleged emails between ████████████████████████████████████ ████████████████████████.  But the government fails to lay the requisite foundation to show that these individuals were in fact Concord employees, or even real people.  And even if they were, the emails, which are hearsay, do not show that Concord knowingly participated in this conspiracy to interfere with the U.S. government's lawful functions relating to foreign involvement in U.S. elections.  Another category of evidence supposedly tying Concord to the IRA conspirators is "documents connecting Concord's controlling officer Yevgeniy Prigozhin to the IRA."  Mot. 1.  That, too, however, falls short of imputing the requisite knowledge because the government has no independent evidence to substantiate its claim that Prigozhin "controlled" Concord during the time period of the conspiracy, including the 2016 presidential election, or that he knowingly joined a conspiracy to interfere in the 2016 presidential election.

In the end, the most one can say about the government's evidence is that if there was a defraud conspiracy here like the one the government has charged, Concord not only had nothing to do with it and did not join it—it didn't even know such a conspiracy existed.  And just because the government has hearsay documents supposedly indicating Concord funding of certain IRA activity, that does not mean that Concord itself knew that these alleged funds were being used to defraud the United States as opposed to supporting a legitimate public forum to discuss global social issues and political candidates.

But there is another and equally compelling reason for denying the government's motion outright.  The government's purpose in dispensing with the needed preliminary proof reveals the prejudice that will follow if its tactical gambit succeeds.  The government wants to use this evidence to persuade the jury that Concord is part of an unlawful conspiracy even though the

government cannot link Concord to that conspiracy with the evidence it needs.  In this instance, Federal Rule of Evidence 403 forecloses the introduction of this hearsay evidence because its relevance is less than marginal and the potential for prejudice to Concord is so great.  The government's motion should be denied and the evidence should be excluded.

Beyond these, the ground rules that govern admissibility also compel denial of the government's motion.  Here, the government stitches together various hearsay exclusions and exceptions to try to achieve its ends, but they do not provide a basis to admit the evidence in this case as to Concord.  Nor does the government's motion survive the foundational authentication problems the government so readily glosses over.  On this point, the government falls well short of meeting its burden under Federal Rule of Evidence 901(a) of "produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is" because it doesn't give this Court any basis to test the government's claims.  It simply asks the Court to take its authentication assertions on faith based on a handful of supposed exemplars, and seeks to shift the burden to Concord to prove a negative—that nothing in those hundreds of thousands of pages of documents authenticates the government's evidence.  But, once again, that is plainly contrary to what the law requires.  And, in any event, when the government's authentication theories are subjected to even minimal scrutiny, it is abundantly clear that the Court should take none of what the government has to say on faith.  The government should be held to the standard the law imposes and its evidence tested for authenticity and admissibility in this criminal proceeding just as it would be in any other.

## II.    LEGAL STANDARDS

### A.    Authentication

The government's first hurdle is to prove that the evidence is what the government "claims it is"—that it is authenticated.  *See* Fed. R. Evid. 901(a).  The proponent of evidence ordinarily

must "produce evidence to support a finding" that the evidence is authentic, *United States v. Haight*, 892 F.3d 1271, 1277 (D.C. Cir. 2018)—*i.e.* evidence "extrinsic to the document or item itself," *United States v. Blanchard*, 867 F.3d 1, 5 (1st Cir. 2017). Where the proponent fails to meet its authentication burden, the evidence must be excluded, as "[a]uthentication and identification are specialized aspects of relevancy that are necessary conditions precedent to admissibility." *United States v. Blackwell*, 694 F.2d 1325, 1330 (D.C. Cir. 1982).

Some documents "'are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted.'" *United States v. Farrad*, 895 F.3d 859, 876 (6th Cir. 2018) (quoting Fed. R. Evid. 902). Specifically, Rule 902(11) permits authentication of certified domestic records of regularly-conducted business activity by a written declaration of the records' custodian or other qualified person. A Rule 902(11) certification is a declaration "that complies with a federal statute or a rule prescribed by the Supreme Court." Fed. R. Evid. 902(11). This exception to the ordinarily required procedure of authenticating evidence at trial through the direct testimony of a foundation witness is narrow. "Rule 902(11) was intended as a means of authenticating *only* that evidence which is being offered under the business records exception to the hearsay rule." *United States v. Safavian*, 435 F. Supp. 2d 36, 39 (D.D.C. 2006) (emphasis in original); *United States v. Browne*, 834 F.3d 403, 409 (3d Cir. 2016) (same).

But self-authentication is not the end of the story—particularly as it relates to internet-based evidence. As this Court recently warned, "determining the accuracy of information posted to social media is far from straightforward and hence [is] of questionable reliability." *United States v. James*, No. 17-184, 2019 WL 2516413, at *3 (D.D.C. June 18, 2019). "Facebook records, for example, are 'no more sufficient to confirm the accuracy or reliability of' information posted to the website 'than a postal receipt would be to attest to the accuracy or reliability of the contents of

the enclosed mailed letter.'" *Id.* at *6-7 (quoting *Browne*, 834 F.3d at 411).   In *Browne*, the district court admitted Facebook chat logs as self-authenticating business records to support the defendant's conviction on child pornography and other sex offenses.   The Third Circuit rejected that finding because "Facebook chat logs are [not] the kinds of documents that are properly understood as records of a regularly conducted activity under Rule 803(6)."   834 F.3d at 405, 409. Ultimately, the court found that the government had offered enough evidence extrinsic to the Facebook logs themselves to support a finding that they were indeed what the government claimed them to be—messages actually sent by the defendant soliciting child pornography.   *Id.* at 406.   But that was because the government there—unlike here—presented a trove of such extrinsic evidence, including:   (i) detailed testimony from multiple minors who had received the defendant's messages, all of which was consistent with the message logs; (ii) the fact that two of the minors actually met in person with the defendant after a meet-up was orchestrated via Facebook messenger, which was "powerful evidence not only establishing the accuracy of the chat logs but also linking them to" the defendant; (iii) the defendant's own confessions that he owned one of the Facebook accounts at issue, had the password to the account, exchanged messages with the minors, owned the phone that contained images of the minors that were solicited via the Facebook messages; and (iv) that certain biographical information about the defendant which was mentioned in the online messages was in fact consistent with him in real life.   *See id.* at 413-14.

The reliability concerns inherent in social media content stem from how easily it can be manipulated:

> To create a profile, a person must go to www.facebook.com, enter his or her full name, birth date, and e-mail address, and register a password.   Facebook then sends a confirmation link to the registered e-mail, which the person must click on to complete registration.   . . .   Thus, concern over authentication arises because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password, and, consequently, [t]he

potential for fabricating or tampering with electronically stored information on a social networking sight is high, and poses challenges to authenticating printouts from the website.

*Smith v. State*, 136 So. 3d 424, 432 (Mo. 2014); *see James*, 2019 WL 2516413 at *3 (quoting *Browne*, 834 F.3d at 412) (recognizing "the great ease with which a social media account may be falsified or a legitimate account may be accessed by an imposter.").[2]

Emails, too, present unique authentication problems.  In *Jimena v. UBS AG Bank, Inc.*, 07-367, 2011 WL 2551413 (E.D. Cal. June 24, 2011), the plaintiff sued UBS after he was defrauded of a fee he was told he needed to send to receive a $19 million payment.  *Id.* at *1.  The instructions were sent to him from two email accounts, standish@yahoo.com and customerservices@privateclientsubs.cjb.net, purporting to be from UBS CFO Clive Standish.  *Id.*  The court found the emails were not self-authenticating, given the lack of trustworthiness associated with "generic addresses that can be personalized by anyone."  *Id.* at *3.  The emails also could not be authenticated through the use of extrinsic evidence under Rule

---

[2] Other cases similarly delineate the substantial authentication burden on the government.  *See United States v. Lewisbey*, 843 F.3d 653 (7th Cir. 2016) (Facebook posts were authenticated as belonging to the defendant where the account listed defendant's nickname, date of birth, and place of residence; the e-mail associated with the account was the same as the e-mail on his phone; the account included more than 100 photos of him which also matched photos found on his phone, and the Facebook app on his phone was linked to the same account); *United States v. Encarnacion-Lafontaine*, 639 F. App'x 710, 713 (2d Cir. 2016) (online messages were supported as being penned by defendant, as "(1) the Facebook accounts used to send the messages were accessed from IP addresses connected to computers near [his] apartment; (2) patterns of access to the accounts show that they were controlled by the same person; (3) . . . the accounts were used to send messages to other individuals connected to [the defendant]; (4) [the defendant] had a motive to make the threats [espoused in the messages], and (5) a limited number of people, including [the defendant], had information that was contained in the messages"); *United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (the government met its burden of authenticating the defendant's alleged Facebook messages where a witness testified that she saw the defendant using Facebook and recognized his online profile and style of communication in the disputed messages); *Safavian*, 435 F. Supp. 2d 36 (emails, while not self-authenticating, were sufficiently authenticated by extrinsic evidence, including the sender's email address, signature, the name of the sender in the email, and by comparing the emails to already authenticated emails).

902.  The plaintiff testified as the recipient of the emails, but that did "not provide any foundation that Plaintiff knows or had any prior communication with" the alleged sender.  *Id.* at *4.  Nor were there any "identifying characteristics that provide any foundation for linking the e-mails to" the alleged sender.  *Id.*; *see also United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012) (authentication via Rule 901(b)(1) is "impossible" where the email's composition has not been witnessed, as "only the author of the e-mail message or anyone who saw the author compose and transmit the message will truly 'know' the message's authorship"); *United States v. Shah*, 125 F. Supp. 3d 570, 577 (E.D.N.C. 2015) (rejecting authentication of Gmail account content under Rule 902(11), and indicating that, for purposes of Rule 901 generally, "[e]ven where the email address or username employed by the sender is an eponym, . . . the sender's identity is not immediately discernable.  In neither case can the recipient rely on the use of an email address or username to conclude that a third party has not made surreptitious use of an otherwise familiar account.  Instead, the recipient must use additional information gleaned from context, for example, the knowledge that the communication was prompted by the recipient, or content, the identifying or unique characteristics inherent in the message, to identify the sender").

Likewise, in *Safavian*, the emails in question had many distinctive indicators linking them to the alleged senders.  In *Safavian*, "most of the e-mail addresses themselves contain[ed] the name of the person connected to the address."  *Id.* at 40.  These identifying names were also "[f]requently" in the emails' bodies, signatures, and "To:" and "From:" indicators.  *Id.*  Moreover, the government in *Safavian* pointed to and explained how the content within the emails supported their veracity.  *See id.* (describing the government's presentation of "various identifiable matters" in the emails, including "Mr. Safavian's work at the General Services Administration ("GSA"), Mr. Abramoff's work as a lobbyist, Mr. Abramoff's restaurant, Signatures, and various other

personal and professional matters"). The court in *Safavian* required independent testimony based on personal knowledge confirming the information in the emails.

### B.        Hearsay

A second hurdle to admissibility is whether the government's proffered evidence is inadmissible hearsay under Rule 802. A statement is inadmissible hearsay if it "is an out-of-court statement offered in evidence to prove the truth of the matter asserted." *United States v. Alexander*, 331 F.3d 116, 122 n.3. (D.C. Cir. 2003) (citing Fed. R. Evid. 801(c)). Rule 801 excludes from the category of inadmissible hearsay several forms of statements that otherwise meet the hearsay definition. Fed. R. Evid. 801. Otherwise inadmissible hearsay under Rule 802 may be admitted if "it falls under one of the applicable exceptions" in Rule 803. *United States v. Abdul Karim Khanu*, 664 F. Supp. 2d 35, 42 (D.D.C. 2009). The government generally invokes a slew of these hearsay exclusions and exceptions in its motion, on which it bears the burden of admissibility. *See Corrigan v. Glover*, 254 F. Supp. 3d 184, 191 (D.D.C. 2017):

**Opposing party statements; statements by employees or agents of an opposing party; and co-conspirator statements in furtherance of the conspiracy**:  Rule 801(d)(2) generally excludes from the definition of hearsay statements made by an opposing party against that party. While this exclusion also can extend to statements made by an opposing party's agent or employee, only statements made within the scope of the employment relationship and while the relationship existed fall within the exclusion. Fed. R. Evid. 801(d)(2)(D); *United States v. Dynamic Visions, Inc.*, 220 F. Supp. 3d 16, 24 (D.D.C. 2016).

Rule 801(d)(2)(E) authorizes the admission of an out-of-court statement "made by the party's coconspirator during and in furtherance of the conspiracy." The statement must have been "made by" the co-conspirator—statements merely made *to* a co-conspirator, without more, are not admissible under this Rule. In order for "[s]tatements by an alleged co-conspirator [to] be received

in evidence against the defendants on trial[,]" there must be "substantial evidence, independent of those statements, that (1) a conspiracy existed, (2) the co-conspirator and the defendant against whom the statement is offered, were members of the conspiracy, and (3) the statements were made in furtherance of the conspiracy." *United States v. Gantt*, 617 F.2d 831, 844 (D.C. Cir. 1980); *see also United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006). The proponent must point to proof that the defendant "'had the specific intent to further [a] common unlawful objective.'" *United States v. Beckham*, 968 F.2d 47, 51 (D.C. Cir. 1992) (quoting *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988) (per curiam)).[3] Thus, for example, the D.C. Circuit has

---

[3] Despite the *Beckham* court's reference to a "common ***unlawful*** objective" (emphasis added), the D.C. Circuit later held that the government need not make a showing that the defendant knowingly agreed to an *unlawful* conspiracy to meet its burden under the co-conspirator exception—the exception applies even upon a showing of an agreement to engage in a ***lawful*** venture. *See Gewin*, 471 F.3d at 201-02. That counter-textual and ahistorical reading of Rule 801(d)(2)(E) is wrong. *See generally* Ben Trachtenberg, *Coconspirators, "Coventurers," and the Exceptions Swallowing the Hearsay Rule*, 61 Hastings L.J. 581, 626 (2010) (arguing that the Rule is satisfied only where the proponent can prove that the defendant specifically intended to further the conspiracy's unlawful objective). But even accepting *Gewin* on its own terms, it does not help the government. For one thing, *Gewin* still requires a showing, with independent evidence, that the defendant knowingly agreed to pursue a common plan or objective, a showing the government makes no effort to make here. For another, unlike in *Gewin*—where the defendant did not dispute the district court's finding of a plainly unlawful "common enterprise of stock promotion" that amounted to a "pump and dump" scheme—Concord explicitly contests any such evidence here of a knowing agreement to pursue a common enterprise of sowing discord or interfering in U.S. elections. Moreover, while *Gewin* involved a straightforward "pump and dump" stock scheme implicating fewer than ten people, this case involves an alleged conspiracy of amorphous nature and scope, and an uncertain number of participants, to engage in innocent conduct—social media activity— and which remains subject to heated dispute. In these circumstances, at a minimum, a more robust showing about the nature of the common goal should be required before admitting purported co-conspirator statements. Holding otherwise would permit the government to introduce guilt-by-association evidence on a flimsy factual record where—as here—the alleged conspiracy is complex and involves many facets. Ultimately, and in any event, to the extent *Gewin*'s holding that a conspiracy to pursue an unlawful objective is not required is relevant to the Court's resolution of the co-conspirator statement exception's applicability here, Concord—while acknowledging *Gewin*'s presently binding effect—hereby preserves an argument that the government must show Concord specifically intended to achieve a common unlawful objective in order to trigger the co-conspirator exception.

rejected the admissibility of co-conspirator statements where there was "scant basis for inferring . . . a criminal enterprise or . . . any sort of prior agreement" between the defendant and the co-conspirators. *Beckham*, 968 F.2d at 51; *see also Dyer v. McCormick & Schmick's Seafood Rests., Inc.*, 264 F. Supp. 3d 208, 240–41 (D.D.C. 2017) (excluding statements in civil case where proponent failed to offer proof that conspiracy existed).

If the Court makes the requisite finding of a knowing conspiracy, it still must determine that the statements at issue were made during and in furtherance of the conspiracy before they may be admitted. *Id.* The "conspiratorial objective being furthered by the declarant's statement must in fact be the objective of a conspiracy between the defendant and the declarant." *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002). "'[M]ere narratives of past successes and failures' or 'a conspirator's casual comments to people outside or inside the conspiracy'" do not qualify. *United States v. Miller*, 738 F.3d 361, 374 (D.C. Cir. 2013) (quoting *Tarantino*, 846 F.2d at 1412); *see also United States v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986) (rejecting under Rule 801(d)(2)(E) statement that was "merely a causal aside to the discussion").

**Statements against interest**:  Rule 804(b)(3) permits hearsay statements made against interest where "(1) [ ] the witness is unavailable, (2) [ ] the government has made reasonable efforts to obtain the presence of the witness for trial, and (3) [ ] at the time it was made the statement was 'so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.'" *United States v. Hsia*, 87 F. Supp. 2d 10, 13-14 (D.D.C 2000) (quoting materially similar former language of Fed. R. Evid. 804(b)(3)). The proponent bears the burden of showing that such a statement against interest "is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal

case as one that tends to expose the declarant to criminal liability."  Fed. R. Evid. 804(b)(3)(B).

**Business records**:  For a statement to be exempted from the general prohibition on hearsay under Rule 803(6)'s "business records" exception, the record of regularly conducted activity must strictly meet five requirements:

(A)   the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B)   the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C)   making the record was a regular practice of that activity;

(D)   all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E)   the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Failure to satisfy any one of these requirements precludes a finding of admissibility. Moreover, Rule 803(6) affords the district court "'broad discretion in determining whether documents otherwise admissible as business records are sufficiently trustworthy,'" and the court may, "[p]ursuant to this discretion, . . . decline, on a sparse record, to treat [an exhibit] as a trustworthy business record."  *New York v. Microsoft Corp.*, No. 98-1233, 2002 WL 649951, at *2 (D.D.C. Apr. 12, 2002) (quoting Fed. R. Evid. 803(6)) (finding email untrustworthy even though it "may have been 'kept in the course' of RealNetworks regularly conducted business activity," where the proponent did not "establish[] that it was the 'regular practice' of RealNetworks employees to write and maintain such emails"); *see also United States v. Adefehinti*, 510 F.3d 319, 328 (D.C. Cir. 2007) (acknowledging that Rule 803(6) contains an explicit limitation as it relates to untrustworthy documents).

**Residual exception**:  Under Rule 807, a hearsay statement which fails to meet any of the other exceptions enumerated in the Federal Rules can still be admitted under limited

circumstances.  But only where (1) it is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  Fed. R. Evid. 807(a).

The residual exception is "extremely narrow and require[s] testimony to be 'very important and very reliable.'"  *United States v. Washington*, 106 F.3d 983, 1001 (D.C. Cir. 1997) (per curiam) (quoting *United States v. Kim,* 595 F.2d 755, 766 (D.C. Cir. 1979)).  It is to be "applied sparingly" in only "truly exceptional cases."  *United States v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017); *see Alexander*, 198 F.R.D. at 320 (finding an exceptional case where the hearsay's reliability was supported by "documents that the Court ha[d] reviewed *in camera*, the ability to cross-examine [the declarant] as to his memory of the conversation with the White House Counsel's Office, and [other] contextual guarantees of trustworthiness").

## C.   Relevance and Prejudice

Properly authenticated evidence that passes all hearsay hurdles is only admissible if it is "relevant to some matter at issue in the trial."  *Blackwell*, 694 F.2d at 1332.  Evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence.  *See* Fed. R. Evid. 401.  The government therefore must "logically connect[] the document with the issues of the case."  Weissenberger's Fed. Evid., 1 Fed. Evid. § 901.5 (2019).  "Foundational testimony must establish a connection between the physical evidence offered at trial and the relevant transaction, incident, person, or place.  In other words, the witness must identify the item in a way that ties it to an element in the case."  *Id.* § 901.6.

Relevant evidence may be excludable under Fed. R. Evid. 403 because "its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence." Fed. R. Evid. 403.  The prejudice prong "focuses on 'unfair prejudice,' or prejudice that is 'compelling or unique' or has an 'undue tendency to suggest decision on an improper basis.'" *United States v. Thorne*, No. 18-389, 2020 WL 122985, at *6 (D.D.C. Jan. 10, 2020).   To conduct this balancing test, a district court must "take account of the ***full evidentiary context of the case*** as the court understands when the ruling must be made." *Id.* (citing *Old Chief v. United States*, 519 U.S. 172, 182 (1997) (emphasis added)).   To that end, in the conspiracy context, courts have found that although evidence regarding co-conspirators is relevant, such evidence should be excluded as unduly prejudicial under Rule 403.   *See United States v. Hernandez*, 780 F.2d 113, 118 (D.C. Cir. 1986) (finding abuse of discretion where evidence admitted that "would naturally lead a jury to assume that [defendant] had the motive of his associates: a slightly refined version of guilt by association"); *United States v. Varoudakis*, 233 F.3d 113, 124 (1st Cir. 2000) (vacating ruling admitting evidence of co-conspirator testimony under Rule 403 because the probative value of establishing a relationship between the co-conspirators "was substantially outweighed by the danger of unfair prejudice at the time the district court admitted it"); *In re Processed Egg Prods. Antitrust Litig.*, No. 08-2002, 2019 WL 5656101, at *20 (E.D. Pa. Oct. 31, 2019) (noting court may exclude co-conspirator statements under Rule 403 "if it determines the statements' arguable probative value is being substantially outweighed by prejudice . . .").

## III.   ARGUMENT

### A.   Social Media Accounts

The first category of evidence the government addresses is the voluminous contents of various social media accounts that purportedly are owned by or linked to the alleged IRA

conspirators, none of which meet the requirements for admissibility.[4]   The evidence cannot be authenticated, because even if it was an appropriate business record—which it is not— confirmation that something is a Facebook or Twitter account does nothing to authenticate its **contents**, nor does it prove that a particular individual created that content.  Relatedly, the contents of the social media accounts are hearsay, and the government has not met its burden of demonstrating that those contents of the social media accounts were, in fact, a co-conspirator statements.  Finally, the contents are irrelevant and threatens to prejudice Concord by tarring it with guilt by association, rather than a substantive link between the IRA conspirators' conduct and Concord's knowing participation in such conduct.

*Authenticity*.  The government maintains that subscriber information, IP address records, and machine cookie data relating to the various social media accounts at issue can be authenticated as business records.  Mot. 5-6.  But the government fails to meet its burden for self-authentication, acknowledging that it does not yet have 902(11) certifications for Facebook, *id*. at 4 n.3, and failing to identify a witness who will testify as to authenticity.  As to Twitter, the government represents that it has provided 902(11) certifications from Twitter to the defense.  *Id*.  Concord has been unable to locate any such document in the discovery materials.

From there, with sleight of hand and no supporting authority, the government makes the leap that the **contents** of the associated accounts—messages, posts, and the like—themselves are authentic.  *Id*. 5-6.  But the government has no way to prove whether real people were involved in

---

[4] The motion does not identify which exhibits fall within each of the six categories addressed. Concord has attempted to identify each exhibit it believes relates to each category.  A copy of the government's exhibit list is attached here as Ex. A.  Concord believes the exhibits that fall within the first category are Exs. 21, 55, 56, 59, 68, 69, 76, 77, 82, 83, 89, 107-110, 125, 126, 127, 132, 133, 144-146, 163-165, 167-177.

posting content, as opposed to "bots,"[5] and even if real people were involved, that their names are correct and that nobody else posted any of the content.  As the law in this rapidly developing area makes clear, the government's leap is unsupported.

*IP addresses, subscriber information, and cookie data are not self-authenticating.*  The first link in the government's authentication argument is that IP addresses,[6] subscriber information, and cookie data are self-authenticating business records under Rules 803(6) and 902(11).  But the cases the government cites are easily distinguishable and undercut its argument.  First, neither *United States v. Hunter*, 862 F.3d 725 (8th Cir. 2017), nor *United States v. Cameron*, 699 F.3d 621 (1st Cir. 2012), involved self-authentication of an IP address under Rule 902(11), as the government suggests.  In fact, *Cameron* did not directly concern authentication, but rather involved a question of whether the evidence in question was "testimonial" for purposes of the Confrontation Clause, and the court merely assumed, without further analysis, that the evidence was a business record so that it could proceed to the question at issue—*i.e.* whether the evidence was testimonial. 699 F.3d at 640-41.  In both cases, witnesses testified and provided context for the evidence.  *See Hunter*, 862 F.3d at 728 (IRS investigator testified about IRS database that includes online tax return filings and testified about spreadsheet from that database that includes IP addresses); *Cameron*, 699 F.3d at 641 (outlining testimony from Yahoo! and Google witnesses).  Second, *United States v. Taylor*, No. 16-1377, 2017 WL 11458484 (D. Ariz. Nov. 2, 2017), involved subscriber data from Verizon in the context of allegations of being a felon in possession of a

---

[5] *See, e.g.,* Russia's Use of Social Media, S. Rep. No. 116-XX, at 51-52 (2019) (describing IRA's alleged use of automated bots, including those that posted election-related content during the 2016 election).

[6] The IP addresses do not link an account to a specific location or fixed address.  For example, for the Russian IP addresses the government indicates that they were somewhere within the city of St. Petersburg, Russia.

firearm and a straw purchaser of firearms—not crimes based on internet conduct. *Id.* at *1; s*ee also* Superseding Indictment, *United States v. Taylor*, No. 16-1377, ECF 66 (D. Ariz. June 6, 2017).  This distinction is critical because the records at issue in *Taylor* provided nothing more than the defendant's address and phone numbers, Ex.75, *United States v. Taylor*, No. 16-1377, ECF 277-1 (D. Ariz. Nov. 1, 2017), but more importantly, that case did not involve the unique authentication and reliability issues inherent in internet-based crimes.  *See* Fed. R. Evid. 803(6)(E).

     *Social media content cannot be authenticated through business records.*  Having failed to demonstrate that the data underlying the social media accounts themselves is authentic, the government goes even farther afield as it relates to the contents of those accounts in the search warrant returns, including the direct messages, public posts, and tweets.  But even assuming the government authenticated the accounts themselves as connected or belonging to IRA conspirators, that plainly does not establish that the specific contents of those accounts are in fact what the government claims them to be—that is, messages, posts, tweets, and the like ***made or created by the alleged IRA conspirators*** and directed to the purported "unwitting Americans" who helped effectuate the charged § 371 defraud conspiracy.

     As discussed above, the government ignores the consensus of authorities which have found that various forms of comparable electronically stored information are not business records within the meaning of Rule 803(6).  *See Browne*, 834 F.3d 403, 411 (3d Cir. 2016) ("[T]he Facebook records are not business records under Rule 803(6) and thus cannot be authenticated by way of Rule 902(11).  In fact, the Government's position [arguing otherwise] would mean that all electronic information whose storage or transmission could be verified by a third-party service provider would be exempt from the hearsay rules—a novel proposition indeed, and one we are unwilling to espouse."); *see Farrad*, 895 F.3d at 879 and n.14 (noting that *Browne* has been widely

accepted, as "[t]he only circuit that is potentially in conflict [with *Browne*] is the Fourth Circuit, but even that is not clearly the case").

It should come as no surprise then, given the lack of reliability and untrustworthiness in social media evidence such as that the government seeks to introduce, that the case law forecloses the government's facile effort at authentication of content here.  Unlike *Browne*, *Lewisbey*, and the other cases cited above, the government has offered no social media accounts bearing the name of any alleged conspirator and no pictures appearing to be a conspirator adorning such page.[7]  Nor has the government pointed to a single witness who can testify that she saw a conspirator sign up for the various social media accounts or send an email, or who can describe patterns of consistency across the various digital communications to indicate they come from the same source.

The government's skeletal case for authentication closely resembles the archetype for a deficient showing as outlined in *United States v. Vayner*, 769 F.3d 125 (2d Cir. 2014).  There, the Second Circuit vacated a conviction because the district court erroneously admitted a printout of a social media page on VK.com, the Russian equivalent to Facebook.  *Id.* at 127.  Like in *Browne*, the court ruled that the social media content did not qualify as a self-authenticating business record. *Id.* at 129 n.4.  But unlike *Browne*, the court in *Vayner* found that the government failed to authenticate the evidence because it "presented insufficient evidence that the" social media content was in fact the defendant's "profile page, as opposed to a profile page on the Internet that Zhyltsou did not create or control." *Id.* at 127.  The "*only* evidence [in *Vayner*] suggesting that the defendant was the owner of [the] social media account opened in his name was the fact that the account

---

[7] The government has indicated to Concord that it intends to introduce at trial Fed. R. Evid. 1006 summaries of IP address records, apparently to create the link between the social media accounts and IRA that is not addressed in the motion.  *See* Ex. B, Jan. 6, 2020 letter.  Despite repeated requests from undersigned counsel, the government has identified the 40 social media accounts for it intends to summarize but has not provided the summaries or indicated when it will do so.

included his photograph and basic biographical information about him that was known to many others." *Encarnacion-Lafontaine*, 639 F. App'x at 713 (summarizing *Vayner*).

Here, the government has not offered even that. Nor can it point to any evidence of verification by any of the social media accounts identified that would support a finding that the content on those pages was actually created by any of the co-conspirators. Facebook has no such requirement,[8] and thus, has no way of linking a page to the identity of its actual creator. In the thousands of pages of social media content, there is not a single direct reference to Concord or any Concord employee, and none of which have been sufficiently linked to Concord.[9] *Browne* and *Vayner* remind that simply authenticating a social media page as "a web page that existed on the Internet," *Vayner*, 769 F.3d at 131, does not make the online profile or contents of that page relevant to actually incriminate a defendant. *See id.* at 132 ("The VK profile page was helpful to the government's case only if it belonged to Zhyltsou"). Other extrinsic evidence must be presented to connect the actual content in the electronically stored information—whether that content is Facebook messages as in *Browne*, or the various details listed on a social media profile page as in *Vayner*, or any other form of digital content—to the defendant. A failure to present that extrinsic evidence precluded admissibility in *Vayner* and it precludes admissibility here.

Nor do the cases the government cites help it overcome this overwhelming weight of contrary authority. In *United States v. Farrad*, 895 F.3d 859 (6th Cir. 2018), the Sixth Circuit

---

[8] Facebook does not require a person to verify their identity before creating an account. *See Smith v. State*, 136 So. 3d 424, 432 (Mo. 2014); *see also Browne*, 834 F.3d at 410 (Facebook does not "verify or rely on the substantive contents of the communications in the course of its business.").

[9] The government vaguely assures that certain anonymous email addresses are "linked to" each other, *see* Mot. 9 n.7, and that certain Facebook accounts "were also used by the conspirators"— without elaboration or evidentiary support. *Id.* n.8. In so doing, the government effectively places the burden on Concord to prove that these unspecified and unsubstantiated links are flawed. This, of course, is contrary to law, which places the burden squarely and solely on the proponent of the evidence—here, the government.

found that, while pictures uploaded to Facebook were not self-authenticating business records, adequate circumstantial evidence was offered for their admission under regular authentication under Rule 901, including that the images were of the actual defendant, that the person in the pictures had the same tattoos as the defendant, and that the images showed his distinctive apartment. *Id.* at 878. Further separating the facts of *Farrad* from this case, was the fact that the crux of the charge in *Farrad* was showing that the defendant unlawfully possessed a firearm. Thus, to convict the defendant on the charge, the government did not necessarily have to prove ownership or use of the social media account by the actual defendant.[10] Here, by contrast, if the government cannot prove that a co-conspirator was behind the digital content, then it has no case.

Similarly, in *United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014), the facts presented to connect the social media content to the actual defendant distinguishes it from this case. There, evidence was offered to show that the defendants "posted their personal biographical information, as well as quotations and listings of their interests" on the Facebook pages at issue, adequately supporting the proponent's claim that the pages were in fact the defendants'. *Id.* at 133. Here, by contrast, the government has no biographical references or identifying information on any of the social media records which would indicate ownership or control.[11]

---

[10] Notably, however, there was significant evidence presented that the defendant did indeed own the account, as it was registered to his name, with an email that also included his name, and in the city he was from. *Id.* at 867.

[11] The government attempts to connect "several" of the accounts to IRA through what the government asserts is "direct evidence," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mot. 9 (referring to Gov. Exs. 1 and 3, respectively). The obvious implication—that some of the accounts the government seeks to introduce at trial appear on ▮▮▮▮▮▮▮—is accurate. The following accounts that appear on the government's exhibit list ***do not*** appear on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Moreover, what the government conveniently leaves out of its briefing is that the court in *Hassan* heavily emphasized the need to draw a logical and supported linkage, through a sufficient presentation of extrinsic evidence, between the digital content and the defendant as the alleged author of such content (which in that case involved directly linking Facebook pages and accounts to the defendants' specific mailing and email addresses via IP address data). *See id.* at 132-33 ("That the Facebook pages and YouTube videos were self-authenticating business records was not, however, the end of the trial court's inquiry. The [trial] court also [properly] required the government, pursuant to Rule 901, to prove that the Facebook pages were directly linked to Hassan and Yaghi."). Thus, the government's reliance on *Hassan* is to its own detriment, as the government has ignored the second half of its burden by providing nothing more than a convoluted chain of inferences between the social media content and any co-conspirator.

Finally, *United States v. Recio*, 884 F.3d 230 (4th Cir. 2018)—another felon in possession case—is even less applicable than *Farrad*. There, the prosecution presented direct evidence of the crime totally unrelated from the challenged social media evidence. Namely, "the Government's case rested primarily on the testimony of the two police officers on the scene" who knew the defendant had outstanding warrants, then gave chase, and ultimately recovered a loaded handgun which the defendant discarded as he fled. *Id.* at 238, 33. The supporting social media evidence— a rap lyric posted to the defendant's Facebook account and which described carrying a gun—was secondary at best. In fact, "even if the district court erred in admitting the Facebook post, the error was harmless" given the strength of the other evidence, in particular, the corroborated testimony of multiple officers. *Id.* at 239. Here, by contrast, the government has offered no direct testimony nor any other direct proof that the accounts were actually controlled by the alleged co-conspirators. Rather, its case rests on inherently suspect and insufficiently authenticated social media content.

The government glosses over one critical element of the content of these social media accounts that it seeks to introduce—direct messages—consistently lumping them together with other content such as public posts and tweets and arguing that the content of these direct messages are authenticated by the proposed business record data (for which the government has not provided a business record certification).  Mot. 6-10.  But the government does not address the most obvious failure of authentication as it relates to these messages—that it cannot establish who was actually on either end of the messages and whether the alleged "unwitting American" person was a real person with a real name.  The Twitter direct messages, which appear in Ex. 168, do not identify any of the participants in the messages by name, only by "id" number.  The government has not included in its exhibit or even in discovery any information linking these id numbers to any actual person.  And, as noted in the February 12, 2020 hearing, the government does not intend to call as witnesses at trial any of the people it claims corresponded with the co-conspirators through these messages such that there would be any extrinsic evidence of authenticity.  *See* Feb. 12, 2020 Hr'g Tr. 60:9-61:1; Ex. C, Feb. 3, 2020 letter transmitting government's witness list.  *Cf. Browne*, 834 F.3d at 406-07 (noting extrinsic evidence presented at trial to authenticate social media messages, including detailed testimony of minors who received defendant's messages).  And as to Facebook, the government's exhibits offer only a name of a person on the messages.  *See* Exs. 89, 144, 146, 164, 165, 167.  But again, there is no extrinsic evidence as to who actually received these messages, and whether that was an actual American person, as the government alleges and must prove.

*Hearsay*.  But even if the government's social media evidence were authenticated, it would nonetheless be inadmissible hearsay precluded under Rule 802.  The government contends that the social media "posts and direct messages were plainly made in furtherance of the conspiracy" and thus admissible under Rule 801(d)(2)(E).  Mot. 11.  The government makes no effort here—or

anywhere else in its motion—to meet its threshold burden:  to point to substantial evidence, independent of the conspirator statements themselves, that the charged § 371 defraud conspiracy existed and that Concord (and the declarants) knowingly agreed to join it.  Without that showing, none of the social media evidence can be admitted under this Rule.

Beyond all this, the government fails to provide the Court with the contents of a single statement in furtherance of the conspiracy.  This begs the question of how the Court is to consider whether the statements in question are more than "mere narratives of past successes and failures;" "casual comments to people outside or inside the conspiracy;" *Miller*, 738 F.3d at 374; or "casual aside[s];" *Urbanik*, 801 F.2d at 698.  For this same reason, the government's "truth of the matter asserted" argument also must fail.  How can the Court determine whether undisclosed statements are being admitted for their truth (or not) without seeing the actual statements?  The Court is not required to merely take the government's word for it and Concord does not have the burden of showing that the government's evidence is inadmissible.

***Relevance and prejudice***.  Consistent with its approach throughout its motion, the government assumes the relevance of the social media account evidence to its § 371 conspiracy charge against Concord, but this assumption is misguided.  In fact, the name "Concord" does not appear once in the entire section of the government's motion discussing the social media accounts. This absence is telling, because ultimately the government fails to demonstrate how the social media evidence is relevant ***to Concord***, as opposed to IRA.  And make no mistake, this difference is critical, because, as noted above, Rule 403 mandates a context-dependent analysis of what evidence presents a danger of "unfair prejudice" or threatens to "confus[e] the issues."  Fed. R. Evid. 403; *see also Thorne*, 2020 WL 122985, at *6 (recognizing that a district court must "take account of the ***full evidentiary context of the case***" when ruling on admissibility issues under Rule

403) (emphasis added) (internal quotation marks omitted).

Here, the prejudice to Concord in the form of guilt by association is obvious. The government makes no effort to tie the alleged acts of IRA employees as reflected in the social media evidence to Concord—or, more importantly, to Concord's knowledge of those acts, or the conspiracy as a whole. Put another way, the nonexistent evidentiary connection between Concord and IRA as it relates to social media evidence creates the likelihood that Concord will be convicted for a conspiracy in which it took no part and of which it had no knowledge. But that is not all. Indeed, the evidence further threatens to confuse the issues for the jury because it has to do with conduct Concord isn't even charged with—that is, the alleged "information warfare" and election interference—and that has no bearing on whether Concord had the necessary specific intent to defraud the U.S. government. By introducing such evidence at the trial against Concord only, the government creates the likelihood that the jurors will convict Concord on the basis of conduct engaged in by individuals associated with IRA, and with no bearing on Concord's specific intent as alleged in the Superseding Indictment. In sum, any probative value associated with proving actions or a conspiracy involving IRA, without proof that Concord knew of that conspiracy or those actions, is invalid under the rules of evidence.

### B.    Other Business Records

The government separately seeks to admit an array of "other business records"—of advertisement purchases, payments, subscriber information, etc.—on the grounds that they are self-authenticating business records under Rule 902(11). In doing so, the government fails to provide an accurate description of the records at issue, provides only the most bare-bones analysis and cites virtually no case law in support of its position. Instead, it relies on a myriad of unsupported assumptions and makes a series of logical leaps that no reasonable person could make.

*Authentication*.  As with the social media account information above, the government

simply assumes that Rule 902(11) is a panacea, and that so long as that certification is provided, all authentication issues are resolved—full stop. This assumes too much. The Facebook ad records, ███ payment records, ████████████████████, ███ IP address data, ███ subscriber information, ████████████████, and WHOIS IP address records the government identifies in its motion all suffer from the same fundamental authentication issues as the general social media data discussed above. Specifically, the existence of such data (and even the verification of it) does not effectively tie the contents of any of that data to a particular person— much less a specific co-conspirator or Concord. And once again, the government recognizes this problem, because much of its argument is based on the use of the conspirators' alleged use of "personas." *See* Mot. 12. Thus, to authenticate these records, the government is required to show that the information reflected therein belongs to, was authored by, or can otherwise be linked to Concord in a meaningful way. *Browne*, 834 F.3d at 410 ("To authenticate the [Facebook] messages, the Government was therefore required to introduce enough evidence such that the jury could reasonably find, by a preponderance of the evidence, that [Defendant] and the victims authored the Facebook messages at issue.").

Specific authenticity problems, to the extent that they can be ascertained based on the government's bare-bones showing, are listed below.

*Facebook ad records*.[12] The government seeks to admit purchase records for Facebook ads that advocated for the election or defeat of particular candidates posted to eleven different Facebook pages. Mot. 12. The government admits that it has not obtained a business record certification it is hoping will self-authenticate these records. *Id*. at 4 n.3. On top of that, the

---

[12] Exs. 7, 22-52; 57-58; 60-67; 70-71; 78-81; 84-87; 90-105; 111-124; 128-131; 134-142; and 147-162.

government fails to address the relevance of these records.  The ad purchase records are relevant only if the government can overcome the admissibility and authentication issues discussed above.

More significantly, the government glosses over the only way it has to connect the ad records to a purchaser, innocuously stating that "Facebook has also produced a spreadsheet linking each ad to a particular Facebook user."  Mot. 12.  The government fails to explain that nothing in the ad exhibits or Facebook account content indicates who purchased a particular ad.  Instead, the government needs Exhibit 7, a spreadsheet consisting of 3,394 lines of data in three columns: Ad ID, Ad Account ID, and User ID, for an unidentified subset of Facebook ads.  The government does not explain to the Court or Concord what any of these data points represent, but it is clear that the spreadsheet does not identify the name of any ad purchaser.  Rather, it a series of numbers, which must be cross-referenced to other data to accomplish what the government seeks to do— establish that a particular person purchased a particular ad.  And apparently the government wants to do this without a witness from Facebook, as no Facebook representative appears on the government's witness list.

This is additionally problematic because the spreadsheet runs afoul of the Confrontation Clause, which bars the admission of "testimonial statements of witnesses absent from trial."  *See Crawford v. Washington*, 541 U.S. 36, 59 (2004).  "To rank as testimonial, a statement must have a primary purpose of establishing or proving past events potentially relevant to later criminal prosecution."  *Bullcoming v. New Mexico*, 564 U.S. 647, 659 n.6 (2011) (internal quotation marks and alterations omitted).  Where business records have been "prepared specifically for use at [a defendant's criminal] trial," they are inadmissible unless their authors could be cross-examined. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).  In *Cameron*, the First Circuit concluded that business records prepared by Yahoo! that were used to report suspected child

pornography to a tip-line database were testimonial statements barred by the Confrontation Clause because the government sought to introduce this evidence to establish a link between the IP address contained in the reports and the defendant. 699 F.3d at 642. That is precisely what the government seeks to do here—link particular Facebook ads to the specific purchaser. And because "the primary utility" of the Facebook spreadsheet is to identify purchasers of particular ads, "not in providing Internet-based services to [its] customers," the evidence is testimonial and the government must present a witness from Facebook to testify and be cross-examined about the creation of this exhibit. *Id*. at 246. If the government is unable to present such a witness, Ex. 7 should be excluded.

██████ *payment records (Exs. 18 and 19)*. Again, the government attempts to introduce ████████████████████████████████████████████████████████████████████████ for which it has offered no explanation regarding their preparation, or what the data contained in them represent without proffering a witness, raising Confrontation Clause concerns. Not only has the government failed to identify a trial witness but it does not even have the business record certification that it hopes to use to authenticate these records. Mot. 3 n. 4.

████████████████████████████ *(Exs. 5, 6, 8-10, 14, 72-75, 221, 222, 280, 281, 297)*. In order to link certain of the social media accounts on the government's exhibit list to IRA, the government wants to introduce ██████████████████, Mot. 12-13, and to introduce that evidence based on a business record certification without any witness. But the government offers no case law or other support for admitting this data as a business record. And before any of this evidence can be deemed admissible, the government must be able to demonstrate the relevance and admissibility of the social media evidence described above.

██████ *IP address data (Exs. 20, 223, 344)*. ██████ IP address data suffers from the same

problems as the social media accounts. Namely, the government blurs the line between IP address data and users of the service. Additionally, Ex. 344, a spreadsheet listing dates and certain email addresses raises the same Confrontation Clause issues mentioned above.

█ *subscriber information*. In its motion, the government points to a single example of this type of record, arguing that "records produced by ████ show that ████████████ ████████████████████████████████████████████." Mot. 13. But no such record is included on the government's exhibit list, and as best Concord can determine, neither does any other record constituting ████ subscriber information.

████████████████ (*Ex. 342*). As with the Facebook, ████, and ████ spreadsheets, the government seeks to admit ████████████████ the significance of which is unclear on its face without a witness to testify about what it represents or the manner in which it was prepared, presenting the Court with another Confrontation Clause issue. And despite the government's representation that it has provided Concord with business record certifications from ████, undersigned counsel has been able to locate any such certifications in the discovery materials and objects to the admission of these records under 902(11).

*WHOIS IP address records*. The government argues that records obtained from a company called WHOIS show that ████████████████████ ████████████ Mot. 14. However, there is no document on the government's exhibit list that indicates it came from a company called WHOIS and undersigned counsel has been unable to locate any documents in the discovery materials from any such company.[13] Concord objects to

---

[13] The government's exhibit list describes Exhibit 318 as ████████████████████ ████████████████ However, the face of Exhibit 318 indicates it came from a website called "centralops.net" and not that it was produced to the government by WHOIS.

the admission of any document that was not produced in discovery and does not appear on the government's exhibit list.  Furthermore, the government acknowledges that it has not yet obtained or provided to Concord a business record certification for the WHOIS records it apparently seeks to admit for the truth of the matter asserted without a witness.

*Hearsay.*  As a general matter, the government does not address hearsay at all, except the rote repetition of the statement that the records "are self-authenticating and admissible as business records."  Mot. 12-13 (the one exception is the WHOIS data, discussed below).  But the government doesn't give specifics about which records it has certifications for, and which it doesn't.  And despite its assurances, the government offers no explanation or details about the method or circumstances of the preparation of this data.  Given the lack of such information, neither the Court nor Concord is able to determine whether those processes are sufficiently reliable or trustworthy to warrant admissibility.  *See* Fed. R. Evid. 803(6)(E).  The government should not be permitted to place the burden on the Court and Concord to determine whether its bare-bones legal assertions are sufficient to warrant admitting evidence.  *See Perkins v. Silver Mountain Sports Club & Spa, LLC*, 557 F.3d 1141, 1148 (10th Cir. 2009) (recognizing that "lawyer argument is not admissible evidence," and that "[a]t the very least, the court must be given enough information to determine admissibility of the evidence . . .").

The only reference to hearsay the government makes is citing to *EarthLink, Inc. v. Ahdoot*, No. 03-2559, 2005 WL 8154298, at *8 (N.D. Ga. Feb. 1, 2005), for the proposition that WHOIS records fall within the Rule 803(17) hearsay exception for "directories . . . that are generally relied on by the public or by persons in particular occupations."  Fed. R. Evid. 803(17).  However, *EarthLink* was a civil case, and the court's observation in that case that WHOIS records are admissible under Rule 803(17) was made in the context of a motion to strike an affidavit submitted

in response to a motion to dismiss for lack of personal jurisdiction—it had nothing to do with admissibility at trial. *EarthLink*, 2005 WL 8154298, at *7-8. In fact, the court declined to conduct a robust authentication analysis, finding that "[a]t this stage in the litigation where the court considers only jurisdictional matters," the testimony of plaintiff's counsel that "he went to the WHOIS directory. . . and the printouts reflect what he viewed" was sufficient. *Id.* at *8. This flimsy legal precedent undercuts the government's argument and weighs against admissibility of the WHOIS records—particularly here, where critical aspects of the government's case rest upon the admissibility of this evidence.

*Relevance and prejudice*. The government does not make a specific argument about relevance, but all of the same considerations discussed above with respect to the admissibility of the social media content applies here with equal—if not more—force. Put simply, the government makes no effort to tie the acts of the IRA employees as reflected in the "other business records" to Concord—or, more importantly, to Concord's knowledge of the acts reflected in those records, or the conspiracy as a whole. This is fatal to their admissibility.

## C.    Internal IRA Documents And Communications[14]

The next category of evidence the government seeks to introduce bears no relation to Concord, because the documents are purported internal IRA documents. ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[14] Exs. 1, 2, 4, 11, 247-254, 256, 258, 262, 278, 345, 351-358. As set forth in more detail in section III.G, although the government's exhibit list contains a subheading called "IRA Internal Communications," the government does not proffer sufficient facts—either in its motion or proposed exhibits—to suggest that all of the exhibits under that subheading actually constitute internal IRA communications. Likewise, there are documents under other subheadings that the government believes are internal IRA communications, that Concord assumes belong in this category.

████████████████████████████   Mot. 14.  But apart from the authentication and hearsay problems discussed below, there is nothing in these documents that links the IRA conduct to Concord's knowing participation in the conspiracy.  This makes the documents particularly irrelevant and prejudicial.

*Authentication*.   The IRA communications cannot be authenticated because the government relies on the same *ipse dixit* to connect the alleged IRA co-conspirators to the contents of the email accounts at issue—and in doing so, improperly attempts to shift the burden to Concord to prove that the users it claims created the emails in question did not, in fact, do so.  This turns the government's burden on its head, and warrants exclusion.

By way of example the government contends that ████████████████████████, Mot. 14 (emphasis added), but bases that assurance on ████████████████████████████████████████████████████████ Mot. 16.  But the government's own description undercuts its position.  Taking the government at its word, the fact that ████████████████████████, as opposed to exclusively, means that without some other evidence to authenticate each of the emails from that account, the government cannot establish that the email is what the government claims it to be— an email to or from ████.   Similarly, the government contends that ████████████ ████████████████████████████████████████████████ ████████████████████████████████ Mot. 15, 16.  As with ████, the government makes no representation about why the contents of the emails from this account (which the government seeks to introduce into evidence) originated with ████.   The   same   is   true   of   the   email   accounts   ████████████

████████████████████, which the government similarly asserts contain ██████████

████████████████████████████████. Mot. 16.  The government has no evidence to

establish that these accounts were used exclusively by these individuals, and offers no testimony

of the authors of any of the emails or other documents in these accounts.

The emails the Government attempts to authenticate mirror those at issue in *Jimena*, 2011

WL 2551413, because all of the emails at issue were created through "publicly available e-mail

providers, available to and sendable by anyone," and thus are not self-authenticating.  *Id.* at *6.

Anyone could have made these accounts.  *See id.* at *1 ("[A]ny individual can sign up for a

Yahoo.com email account bearing the name [FIRST NAME]_[LAST NAME]@yahoo.com

without providing any evidence that he or she is the person whose name is used in the email

address, and . . . that the person whose name is used has consented to the use of the name.").

Nor does the fact that ████████████████████████████████████████████

████████████ provide an adequate foundation for linking them to Concord, because signatures,

headers, and other identifying features are not enough to overcome the "skepticism of the common

law" absent other additional facts.  *Id.* at *6.  Here "there are no unique circumstances that link the

printed e-mails to" the alleged senders.  *Id.* at *5.  The mere fact that "American-sounding names"

are included in various proffered records does not establish their authenticity.  *See id.* at *6

(requiring evidence independent of the emails demonstrating that the person purportedly sending

them had knowledge of the subject matter); *see also Safavian*, 435 F. Supp. 2d at 40 (requiring

testimony based on personal knowledge to sufficiently explain how the content within the emails

supported their veracity).  Put simply, the emails at the heart of the Government's case, by in large,

"were unsolicited, contain only publicly available, self-serving information, and do not contain

any substantive or unique information that supports authenticity;" accordingly, this Court has

simply not given "a sufficient foundation nor evidentiary reliability to justify [their] admission." *Jimena*, 2011 WL 2551413 at *7.

The tenuous connection between IRA employees and the contents of these email accounts is further evidenced by the cases the government cites—both of which involved far more robust sets of circumstantial facts establishing authenticity. In *United States v. Fluker*, the court considered the authenticity of emails allegedly sent by an individual named Haywood Borders. 698 F.3d at 999-1000. In support, the court pointed out that the author of the emails was identified as "Hayward Borders," who was a board member of the company in question (and who used an email address referencing the company's name), that the emails were sent to an email address that only a board member would have access to, and that the emails contained information that only a board member would have access to. *Id.* Similarly, in *United States v. Siddiqui*, 235 F.3d 1318 (11th Cir. 2000), the court addressed the authenticity of emails allegedly sent and received by the defendant. *Id.* at 1321-23. In that case, the court affirmed the authenticity determination based on several factors, including the fact that: (1) the emails used the defendant's nickname, "Mo;" (2) the email recipients testified that they spoke on the phone with the defendant shortly after receiving the emails and during those conversations he reiterated the requests made in the emails; and (3) in a separate email from the same email address the defendant revealed a fact uniquely within his knowledge that was later confirmed by witness testimony. *Id.*

Here, by contrast, the government rests its authentication argument largely on ██████████ ███████████████████████████████████████████. This is not sufficient to tie particular individuals to the contents of these email accounts and, in turn, those individuals to particular emails sent by or actions taken within those accounts.

***Hearsay.*** Although the Court need not reach the government's hearsay arguments because

of the authenticity problems with the internal IRA documents, these arguments fail. First, the government argues that the IRA internal documents are co-conspirator statements made in furtherance of the conspiracy. Mot. 17. But the government skips several key steps in rushing to this conclusion by ignoring the need to establish (1) that a conspiracy existed; (2) that both Concord and IRA were members of that conspiracy; and (3) that Concord had the specific intent to further the conspirators' common that objective. *Gewin*, 471 F.3d at 201; *Beckham*, 968 F.2d at 51. Without such foundational showings, co-conspirator statements are not admissible. As Concord has demonstrated at length here, the government has failed to meet its burden. Moreover, most of the emails addressed in this section were not shown to be sent by the alleged co-conspirators—and their purported *receipt* by alleged conspirators does not satisfy the Rule.

Second, the government alternatively relies on the "the state of mind exception," Mot. 17, which permits admission of "[a]n out-of-court statement that is offered to show its effect on the hearer's state of mind." *United States v. Thompson*, 279 F.3d 1043, 1047 (D.C. Cir. 2002). This exception to the hearsay ban is limited by relevance requirements—it "allows the admission of extrajudicial statements to show the state of mind of the declarant at that time *if that is at issue in the case*." *United States v. Brown*, 490 F.2d 758, 762 (D.C. Cir. 1973) (emphasis added); *see United States v. Sesay*, 313 F.3d 591, 599-600 (D.C. Cir. 2002) (cautioning against accepting "state of mind" statements which are "not relevant to a fact of consequence in the trial.").

This is exactly the situation here. The government wants to admit statements by alleged IRA co-conspirators that purportedly disclose their state of mind. But this is irrelevant to the fundamental question at trial: whether Concord possessed the requisite intent to engage in a defraud-clause conspiracy where it is accused only of funding and overseeing IRA's activities, not participating in them. This has nothing to do with whether IRA employees "coordinated their

efforts" or "chose their topics for particular reasons." Mot. 17.  Thus, it does not matter what was in the minds of the IRA employees, and these statements are hearsay as it relates to the "issue in the case." *Brown*, 490 F.2d at 762.

*Relevance and prejudice*.   Much like the social media evidence, the "Internal IRA Documents and Communications" category fails to draw any connection between IRA conduct and Concord's knowing participation in the alleged conspiracy—indeed, by definition, these relate solely to IRA.  However, as argued above, all of the documents in the government's motion present an acute risk of unfair prejudice and confusion of issues by suggesting that Concord is connected to the IRA conduct discussed in the IRA's own internal documents, without actually establishing such a connection.  They should be excluded on that basis alone.

### D.    Communications Between IRA and Concord[15]

Buried in the middle of the government's motion is its very first attempt to draw a link between IRA and Concord, by way of ████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████ Mot. 17.  As an initial matter, this is inconsistent with the Superseding Indictment, which alleges ████████████████████████████████████████.  But regardless, the substance of the purported connection is insufficient to meet any of the admissibility tests.

*Authenticity*.  The government's authenticity argument is based—like in its trial subpoena motion—on ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[15] Exs. 228, 230-242, 276, 277.

███████████████████.  The only evidence of this are the hearsay statements themselves. As to

████████████████████████████████████████████████████████

██████████████████████████████.  *Id.* 18.[16]  But by contrast, the government offers no

support for its speculation that ███████████████████████.  *Id.*  The government offers

no legal authority for its leap of faith: ███████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████  Mot. 18.  It is not.

Instead, the government asks the Court to simply accept its say-so that ███████████████

████████████████████████████████████████████████████████

██████████████████████████████.  *See* Fed. R. Evid. 901(a).

And perhaps most critically as it relates to the alleged conspiracy, ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████.  *Compare* Exs. 232,

242, 277 (███████████████████████), *with* Exs. 230, 234, 236, 237, and 276

(███████████████████████████████).

 Furthermore, the government's characterization that ███████████████████████

██████████████████████████.  Mot. 18.  ███████████████████

████████████████████████████████████████████████████████

---

[16] As noted above, and elsewhere in the record, the government has not produced in discovery any
documents or information to support its assertion that ███████████████████████
            *See supra* 28-29;
Ex. 318 (███████████████████████████); ECF 330-1 at 14 n.5.



████████████████████████  Gov't Ex. 237.  █████████████████████████████████

████████  Gov't Ex. 238.  This is not a minor dispute about semantics; the government's entire

argument for the authentication of ██████████████████████████████████████████

██████████████████████████████████████████████████████████████████.

*Hearsay*.  The government offers attorney assertion—and little else—in support of its

argument that this hearsay is admissible.  Mot. 20.  None of it meets the government's burden.

*First*, the government asserts, without elaboration or supporting case law, that ██

██████████████████████████████████  are admissible as co-conspirator statements in

furtherance of the conspiracy.  That's it.  No mention of the other prerequisites needed under Rule

801(d)(2)(E), particularly the foundational requirement that Concord knowingly agreed to the

charged plan to "sow discord" and conceal foreign identities from U.S. authorities.

*Second*, the government argues that the emails ██████████████████████████████

████████████  are admissible as statements by Concord's agents and employees.  Mot. 20.

Presumably (although it doesn't say so), the government is referring to the exemption under Rule

801(d)(2)(D) for statements made by a party's agent or employee "on a matter within the scope of

that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D).  This unsupported statement

fails to meet the government's burden of proving "the existence of the relationship of servant or

agent to principal . . . by evidence independent of the out-of-court statement of the servant or

agent."  *United States v. AT&T*, No. 74-1698, 1981 WL 2047, at *2 (D.D.C. Apr. 9, 1981).  Here,

the only evidence of an employment relationship ██████████████████████████████████

████████  is speculation layered on top of the hearsay statements themselves, which is

impermissible.  Nor does the government cite to any case where (at best) the alleged employee is

███████████████████████████████████████████████████████████████████████;[17] and

██████████████████████████████████████████████████████████████████. But even if

the government could cite such a case, it still fails to meet the remainder of its burden by

demonstrating either "that the statement[s] [were] made during the course of the relationship," and

"that [they] relate[] to a matter within the scope of the [relationship]." *See Pappas v. Middle Earth*

*Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992).

*Third*, the government argues that the emails are business records, but fails to offer any

support for that proposition beyond the bare assertion that ████████████████████████

████████████████████████████████████ Mot. 20; *see Tom Sawyer Prods.,*

*Inc. v. Progressive Partners Achieving Sols., Inc.*, 550 F. Supp. 2d 23, 29 (D.D.C. 2008) ("A

lawyer's argument does not substitute for admissible evidence.").  Specifically, the government

has not pointed to a certification that avoids the hearsay problem; nor has it identified a witness

who can certify that the emails comply with Rule 902(11).

*Fourth*, the government's final argument relies on the last-ditch-effort "residual exception"

to the hearsay rule.  *See* Fed. R. Evid. 807.  But as noted above, the residual exception is to be

"applied sparingly" in only "truly exceptional cases."  *First City Fin.*, 890 F.2d at 1225; *Slatten*,

865 F.3d at 807.  This is no such circumstance.  The government argues that the residual exception

should apply here because "there is little reason to doubt the accuracy of the statements."  Mot.

20.  But like much else in its Motion, the government overstates its case.  Indeed, it baldly claims—

without any elaboration—that ████████████████████████████████████

████████████████████████████████████████████████████████████

---

[17] To the extent that the government relies on WHOIS information to make this connection, as
discussed above, that evidence is also inadmissible.

███████████████████████   Mot. 20.  But once again, the government provides only narrative,

without any basis by which this Court should conclude that █████████████████████████

████████████████████████████████████████████████████████████████████████████

███████.  These bare-bones arguments are not enough to cross the line.  *Perkins*, 557 F.3d at

1147-48.  Moreover, the case the government cites in support, *United States v. Ramsey*, 785 F.2d

184 (7th Cir. 1986) (which did not even involve the residual exception), found that the trial court

erred in admitting "[o]ccasional desk calendars, in which entries may or may not appear at the

whim of the writer" under the business records exception.  *Id.* at 192.  Here, ████████████████

████████████████████████████████████████████████████████████   do not amount

to business records.  The government points to ████████████████████████   as a basis

for trustworthiness—but offers no substantiation for this assertion.  Mot. 20.  And here again, the

government's case law is to the contrary.  In *Singletary v. Reilly*, 452 F.3d 868 (D.C. Cir. 2006)

(also not a residual exception case), the court rejected a parole board's finding that hearsay

statements about a criminal confession were reliable.  *Id.* at 874.  The detail provided here, if any,

is unremarkable and unrelated to Concord.  It should not be admitted pursuant to Rule 807.

 ***Relevance and prejudice***.   The government's relevance argument boils down to an

assertion that ████████████████████████████████████████████████████████████

Mot. 18.   But the government offers nothing indicating that ████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████.  Ex. 245.  Nor does it explain why such innocuous evidence

demonstrates that Concord knowingly joined the interference conspiracy alleged in the

Superseding Indictment.  This does not a conspiracy make.  *See, e.g., United States v. Gaskins*,

690 F.3d 569, 569 (D.C. Cir. 2012) (reversing conviction where evidence failed to connect defendant to the conspiracy). Indeed, the emails the government suggests are most damning may never have gone to Concord because █████████████████████████████████████████████████ ███████████████████████████████████████. Given the tenuous connection between the government's proffered evidence and the alleged conspiracy, the fact that ██████ █████████████████████████████ without more, is overly prejudicial because the jury may erroneously view that otherwise innocent behavior as an overt act in furtherance of the conspiracy. Rule 403 prohibits exactly such a result.

### E.    Documents Purporting to Link IRA and Prigozhin

The government devotes five pages of its Motion to documents purportedly linking Prigozhin to IRA (but not, conspicuously, to Concord). Reading those five pages, moreover, the reader is left with one overarching question: "Where's Concord?" Indeed, █████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ Mot. 22 (emphasis added). Based on what? The government declines to say. This begs the question of how this evidence is relevant to Concord's knowing participation in the alleged conspiracy.

What the government will say, though, is that Prigozhin was involved with IRA, and that Prigozhin "control[ed]" Concord. Mot. 1. In support, it points to ████████████████████ ████████████████████████████████████████████████████████, but no document on the government's exhibit list supports this assertion. The government also asserts that ████████████████████████████████████████████████████████████████ ████████████, but again no such document appears on the exhibit list or even in the discovery materials. *Supra* 28-29. And, in any event, these unsupported assertions shed no light on Prigozhin and Concord's supposed relationship. Notably, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████  So the government has literally no admissible

evidence to demonstrate that Prigozhin "controlled" Concord during the time period of the alleged

conspiracy and for this reason the evidence that the government hopes to admit that connects

Prigozhin to IRA does not move the ball in demonstrating that Concord knowingly joined a

conspiracy to defraud the United States.   And even in its specifics, the discrete evidence the

government does point to is almost comically thin, and requires mental gymnastics to even follow

the through-line.   This effort purporting to connect Prigozhin (and by extension Concord) to IRA

fails to meet the applicable admissibility standards.

████████████  *(Exs.    310-314;  319-340).*  █████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████  ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

And the equivocation does not end there.

[18]

---

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████

*Social media messages (Ex. 89).*  The social media messages discussed on pages 23-24 of the government's Motion fail for the same reasons discussed above for excluding the contents of the social media accounts, and in particular direct messages without any corroborating testimony.

██████████████████████████████████████████████████

████████████████████████████████████████████  Mot. 24.

These messages do no such thing.  To say otherwise would be to suggest that there is a connection between President Trump and the accounts used by IRA in furtherance of the conspiracy.

█████████████████  *(Ex. 317).*[19]  ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████  Mot. 24.  ███████████████████

---

[19] The government's exhibit list inaccurately describes this exhibit as ████████████████████ █████████████████████████████████████████



██████████████████████████████████████████████████████

████████████████████████

**F.      Other Statements by Co-conspirators**

The final category of evidence the government addresses consists of two emails. ████

██████████████████████████████████████████████████████

████████████      Like the rest of the evidence at issue, these emails fall into the same traps identified

throughout this response.

**1.      Exhibit 347—**████████████████

████████████████████████████████████      But as Concord has argued

multiple times, the email is inadmissible.

*Authenticity*.  ██████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

*Hearsay*.  ██████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

*Relevance and prejudice.* ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████ █████████

███████████████████████████████████████████████

██████████████████████████████████████

---

[20] The government also argues that ████████████████████
████████████████████████████████████████████████
████████████████████████████

### 2.      **Exhibit 303—** ████████ **emails**

The government also seeks to admit ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Ex. D.[21]

***Authenticity***.  The government does not make a specific argument for authentication of the

████████████ email, but instead asserts, paradoxically, that ████████████████████████

████████████████████████████████████████████ Mot. 28-29.  So

what?  There is nothing provided that authenticates the contents of the email at issue—including

the name of the account from which they were sent.  This alone is sufficient to exclude them.

***Hearsay***.  █████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  ████████████

---

[21] The government's translation Ex. 303 is incomplete and does not include this critical instruction. Undersigned counsel raised this issue in a letter to the government on January 31, 2020 but has received no response. As such, Concord is attaching its own translation to this opposition.



In sum, Ex. 303 does nothing more than ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. What little—if any—relevance these statements have is vastly outweighed by the unfair prejudice of distracting from the real issue, *i.e.* whether Concord had the requisite intent to knowingly join the alleged conspiracy. *See* Fed. R. Evid. 403. It should be excluded.

### G.   The Government's Motion Does Not Address Certain Exhibits and Concord Raises Additional Objections

The government acknowledges that its motion does not address every document on its exhibit list. Mot. 1. As best Concord can determine, the motion fails to address the following exhibits by failing to proffer any explanation as to authentication or admissibility or explaining

---

[22] To the extent that the government backstops its hearsay argument with the residual exception, it offers no basis for the Court to conclude that the requisite "exceptional circumstances" exist, and this argument should be rejected. *Slatten*, 865 F.3d at 807.

how it intends to use the exhibits at trial and whether a hearsay exception applies. Consistent with the Court's instruction at the February 12, 2020 hearing, Concord objects to the authenticity and admissibility of the government's proposed exhibits for the reasons that follow.

**Ex. 3:** █████████████████████

██████████████████████████████████

**Ex. 16:** ████████████████████████

- The motion fails to to connect the email's sender to any named defendant or unindicted co-conspirator, such that it would constitute a co-conspirator statement.

**Ex. 53:** ██████████████████████

██████████████

- The motion fails to connect the email's sender with any named defendant or unindicted co-conspirator.

**Exs. 178-205:** ██████████████████

██

- The motion fails to connect the emails' sender with any named defendant or unindicted co-conspirator.

**Ex. 207:** ██████████████

- The government's description of Ex. 207 is incomplete and does not offer any assurance regarding authenticity or admissibility. Nor does the government attempt to meet the requirements of Fed. R. Evid. 902(3) regarding Foreign Public Documents.

**Ex. 208:** ███████████████████

- The motion fails to identify who it believes to be the sender or recipients of the email or to connect the email accounts with any named defendant or unindicted co-conspirator.[24]

**Ex. 209:** ██████████████████

███████████

- The government does not identify who it believes the senders of the emails to be and whether that person is believed to be a named defendant or unindicted co-conspirator.

---

[23] The descriptions following each exhibit number are as they appear in the government's Exhibit List. Concord does not adopt the government's characterizations of these exhibits and only includes the descriptions for ease of reference.

[24] ████████████████████████████████

██████████████████████████████████.

**Ex. 211: "Unified State Register of Legal Entities Entry for Concord Management and Consulting"**
- The government does not attempt to meet the requirements of Fed. R. Evid. 902(3) regarding Foreign Public Documents.

**Ex. 212:** ███████████████████████████████

- The government does not identify who it believes the sender or recipients of the email are or who they work for. As such, it is impossible to determine whether the government believes the email to constitute a co-conspirator statement or an internal IRA document and communication. To the extent the government asserts any of these individuals are Concord employees, the motion does not address internal Concord communications and ████████ ███████████████████████████████ Mot. 17-21

**Ex. 213: "Unified State Register of Legal Entities entry for Glavset"** and **Ex. 214: "Unified State Register of Legal Entities entry for Azimut"**
- The government does not attempt to meet the requirements of Fed. R. Evid. 902(3) regarding Foreign Public Documents.

**Ex. 215: "Corporate registration document for Concord Catering"**
- The government does not attempt to meet the requirements of Fed. R. Evid. 902(3) regarding Foreign Public Documents.
- Concord also objects to the admissibility of Ex. 215 because it is evidence of facts that took place after January 2018. The document indicates that an entity known as Concord Catering was registered on February 27, 2018. The government has previously represented to the Court that it would not offer evidence of conduct after January 2018. ECF 340.

**Ex. 216:** ███████████████████████████████

- The government does not identify who it believes to be the sender of the email or who that individual works for and so it is impossible to determine whether the government believes the email to constitute a co-conspirator statement.
- Furthermore, the government's description of Ex. 216 in its Exhibit List is inaccurate and misleading. ███████████████████████████████

**Ex. 217:** ███████████████████████████████ and **Ex. 218:** ███████████████████████████████

- The government does not identify who it believes to be the senders or recipients of the emails. The government's motion suggests that the government believes the documents to be internal Concord communications. However, the government does not address internal Concord communications in its motion.
- Furthermore, ███████████████████████████████ ████████, and so cannot constitute co-conspirator statements.

**Ex. 219:** ███████████████████████████████████████████████████
███████████████ and **Ex. 220:** ████████████████████████████████████
████████████████████████

- The government does not identify who it believes to be the senders or recipients of the emails. As such, it is impossible to determine whether the documents fall into the categories of documents addressed in the motion.

**Ex. 224:** █████████████████████████████████████████████

- While the government's exhibit list includes this exhibit under the heading "IRA/Concord Communications," the motion does not explain whether or why it believes the recipient to be a Concord employee.  In any event, ████████████████████████████████████████████████
████████████████████████████████████████████████████████████ Mot. 17-21.

**Ex. 225:** ████████████████████████████████████████████████████
████████████████████████████████████████

- The government does not identify who it believes the senders of the emails to be and whether those individuals are believed to be a named defendant or unindicted co-conspirator such that the emails would constitute co-conspirator statements.  While the government's exhibit list includes this exhibit under the heading "IRA/Concord Communications," the motion does not explain whether or why it believes the senders to be Concord employees.  In any event, ███████
████████████████████████████████. Mot. 17-21.

**Ex. 229:** ███████████████████████████████████████████████████████
████████████████ and **Ex. 244:** ████████████████████████████████████
████████████████████████████

- The government's exhibit list includes these exhibits under the heading "IRA/Concord Communications," but the government does not explain whether or why it believes the recipient to be a Concord employee. █████████████████████████████████████
████████████████████████████████████████ Mot. 17-21.

**Ex. 245:** ██████████████████████████████████████████████████████

- The government does not identify who it believes the sender of the email to be and whether that person is believed to be a member of the conspiracy such that the email would constitute a co-conspirator statement.  While the government's exhibit list includes this exhibit under the heading "IRA/Concord Communications," the motion does not explain whether or why it believes the sender to be a Concord employee.   In any event, ███████████████████
█████████████████████████████████████████████. Mot. 17-21.

**Ex. 246:** ████████████████████████████████████████████████████

- The government does not identify who it believes the sender of the email to be and whether it believes that person to be a member of the conspiracy such that the email would constitute a co-conspirator statement.  While the government's exhibit list includes this exhibit under the heading "IRA Internal Communications," the motion does not explain whether or why it believes the sender to be an IRA employee.

**Ex. 255:** █████████████████████████████████████
- The government does not identify who it believes the sender of the email to be and whether that person is believed to be a member of the conspiracy such that the email would constitute a co-conspirator statement. While the government's exhibit list includes this exhibit under the heading "IRA Internal Communications," the motion does not explain whether or why it believes the sender or recipient to be an IRA employee.[25]

**Ex. 257:** ████████████████████████████████████████████████
████████████████████████
- The government does not identify who it believes the senders or recipients of the emails to be and fails to connect any of them to a named defendant or unindicted co-conspirator. While the government's exhibit list includes the exhibits under the heading "IRA Internal Communications," the government fails to explain whether or why it believes the sender or recipients to be IRA employees.

**Ex. 260:** ████████████████████████████████████████████
- The government does not identify who it believes the sender or recipient of the email to be, and fails to connect them to a named defendant or unindicted co-conspirator. While the government's exhibit list includes this exhibit under the heading "IRA Internal Communications," the motion does not explain whether or why it believes the sender or recipient to be IRA employees.

**Ex. 261:** ██████████████████████████████████████████
- The motion does not connect the sender or the recipient to a named defendant or unindicted co-conspirator. While the government's exhibit list includes this exhibit under the heading "IRA Internal Communications," the government does not explain whether or why it believes the sender or recipient to be IRA employees.

**Ex. 262:** █████████████████████████████████
- The document marked as Exhibit 262 is not a document that exists in the government's discovery materials. Rather, it appears that the government modified a document for the purpose of essentially creating a demonstrative. However, the government should be required to admit the entire document as produced, and once a proper foundation has been laid, it may seek to admit the demonstrative as an exhibit at trial. Specifically, as best undersigned counsel can determine, ███████████████████████████████████████████████████████
████████████████████████████████████████ Concord objects to the admission of Exhibit 262 on this basis.

**Ex. 263:** ███████████████████████████████████████████

---

[25] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

53

███████████████████████████████████████

- The government does not explain who authored the documents, to whom they were sent (if anyone), where the documents were located, or how they are connected to any named defendant or unindicted co-conspirator.  While the government's exhibit list includes these exhibits under the heading "IRA Internal Communications," the government does not explain whether or why it believes the unidentified authors of the documents to be IRA employees and offers no explanation as to why the documents constitute internal IRA documents.

**Ex. 273:** ████████████████████████████████████

- The motion fails to connect the senders or the recipients to a named defendant or unindicted co-conspirator and it is impossible to determine whether the government believes the emails constitute an internal IRA communications.

**Ex. 275:** ████████████████████████████

- The government does not explain who authored the document, to whom it was sent (if anyone), where the document was located, or how it is connected to any named defendant or unindicted co-conspirator.

**Exs. 279, 282-296, 298-302, 304-306:** ████████████████

- ████████████████       Twenty-four of these exhibits do not fall within one of the six categories of documents addressed in the government's motion.  As to each of these twenty-four documents, the government does not provide any explanation of what the document is, who they believe authored it or received it, or how the government intends to use it at trial and whether a hearsay exception is applicable.  Some of these documents are mentioned within the motion in a manner that suggests the government will use them to authenticate other exhibits on the exhibit list.

███████████████████████████████████████████████

    However, because the government does not explain who it believes to be the sender(s) or recipient(s) of these emails, it is impossible to determine whether they fall within the category of internal IRA communications.

**Ex. 307:** ███████████████████

- ██████████████████████████████████████████
███████████████████████████

**Ex. 318:** ████████████████████████████
██████████████████████████████████████

- The motion states that "[r]ecords obtained from the government by a company called WHOIS [sic] show that ███████████████████████████████████████ and that the WHOIS records are admissible as business records.  Mot. 14.  However, as noted above, Ex. 318 does not indicate it is from a company called WHOIS, but suggests it came

from a website called "centralops.net." Further, neither the document nor the underlying information contained in Ex. 318 was produced in discovery and Concord objects to its admission on that basis as well.

**Ex. 343:** <span style="background:black">                 </span>

- The government fails to connect the sender or the recipient to a named defendant or unindicted co-conspirator and it is impossible to determine whether the government believes the emails constitute an internal IRA communication.

**Ex. 346:** <span style="background:black">                 </span>

- For the reason explained above with respect to Ex. 255, the government fails to connect the sender to a named defendant or unindicted co-conspirator such that the document would constitute a co-conspirator statement or an internal IRA communication.

**Exs. 348-350:** <span style="background:black">                 </span>

- <span style="background:black">                 </span> The government does not address these documents in its Motion and the government's witness list does not include a representative from CBP or DHS.

**Ex. 355:** <span style="background:black">                 </span>

- The government does not identify who it believes to be the recipient of the email other than in the exhibit list to state that it is an email <span style="background:black">      </span> But the government offers no explanation as to why it believes this email address belongs to <span style="background:black">   </span>, making it impossible to determine whether the email is an internal IRA document and communication.

**Exs. 359-373:** <span style="background:black">                 </span>

- <span style="background:black">                 </span> However, the government does not mention these documents in its Motion or explain whether it will attempt to admit them using a business record certification or a witness from <span style="background:black">  </span>.
- Additionally, Exs. 365 and 373 relate to <span style="background:black">                 </span> The government offers no explanation as to the relevance of this document and none is apparent from the face of the documents. As such, Concord objects to these exhibits on the basis of relevance.
- On January 17, 2020, counsel for the government proposed a stipulation as to admissibility of exhibits 348 through 373, referring to them as <span style="background:black">         </span> Undersigned counsel responded on January 31, 2020 that Concord would be willing to stipulate to <span style="background:black">      </span>, as long as that stipulation contains a statement that the records are not complete, that is, that <span style="background:black">                 </span>. The government has not responded to this proposal.

## IV.   CONCLUSION

For the reasons set forth above, the government's Motion in Limine should be denied.

Dated:   February 17, 2020

Respectfully submitted,

CONCORD MANAGEMENT AND
CONSULTING LLC

By Counsel

/s/ *Eric A. Dubelier*

Eric A. Dubelier (D.C. Bar No. 419412)
Katherine Seikaly (D.C. Bar No. 498641)
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
202-414-9200 (phone)
202-414-9299 (fax)
edubelier@reedsmith.com
kseikaly@reedsmith.com