1              BEFORE THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3     UNITED STATES OF AMERICA,        .
                                       .  Case Number 18-CR-32
4              Plaintiff,              .
                                       .
5          vs.                         .
                                       .  Washington, D.C.
6     CONCORD MANAGEMENT AND           .  February 11, 2020
      CONSULTING LLC,                  .  10:02 a.m.
7                                      .
               Defendant.             .
8     - - - - - - - - - - - - - - - - -

9              PUBLIC TRANSCRIPT OF STATUS CONFERENCE
              BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                 UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12    For the Government:             JONATHAN KRAVIS, AUSA
                                      LUKE JONES, AUSA
13                                    PETER LALLAS, AUSA
                                      ADAM JED, AUSA
14                                    U.S. Attorney's Office
                                      555 Fourth Street Northwest
15                                    Washington, D.C. 20530

16                                    HEATHER ALPINO, AUSA
                                      U.S. Department of Justice
17                                    National Security Division
                                      950 Pennsylvania Avenue Northwest
18                                    Washington, D.C. 20530

19
      For Defendant Concord
20    Management and Consulting LLC:  ERIC A. DUBELIER, ESQ.
                                      Reed Smith LLP
21                                    1301 K Street Northwest
                                      Suite 1000, East Tower
22                                    Washington, D.C. 20005

23                                    KATHERINE J. SEIKALY, ESQ.
                                      Reed Smith LLP
24                                    7900 Tysons One Place
                                      Suite 500
25                                    McLean, Virginia 22102

```
1    Official Court Reporter:        SARA A. WICK, RPR, CRR
                                     333 Constitution Avenue Northwest
2                                    U.S. Courthouse, Room 4704-B
                                     Washington, D.C. 20001
3                                    202-354-3284


4
     Proceedings recorded by stenotype shorthand.
5    Transcript produced by computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2          THE COURTROOM DEPUTY:  Your Honor, we are in Criminal

3   Action 18-32, United States of America versus Concord Management

4   and Consulting LLC.

5          Can I have counsel please approach the podium and state

6   your name for the record.

7          MR. JONES:  Good morning, Your Honor.  Luke Jones for

8   the United States.

9          THE COURT:  Good morning.

10          MR. JONES:  Joined by Jonathan Kravis, Peter Lallas,

11   Adam Jed from the U.S. Attorney's Office, and Heather Alpino

12   from the National Security Division.

13          THE COURT:  Good morning.

14          MR. DUBELIER:  Good morning, Your Honor.  Eric

15   Dubelier and Katherine Seikaly for Concord.

16          THE COURT:  Good morning.

17          Before we get into the jury instructions and the motions in

18   limine, I just wanted to go over the order that I put out after

19   the last hearing relating to the jury questionnaire.

20          So the jury office needed until April 1 to get the jurors

21   in here.  So that's when they will fill out the questionnaire.

22   I am going to ask the parties to get together and figure out who

23   is going to do the 125 copies.  Maybe Concord can do that since

24   the government is doing the copies of the filled-out

25   questionnaires.  So we will need 125 questionnaires available

1      for the jurors to fill out.

2              MR. DUBELIER:  Sure.  We can do it, Your Honor.

3              THE COURT:  Terrific.

4      So we will be in the ceremonial courtroom, because I think

5      there will be roughly 125 potential jurors in the courtroom.  So

6      I will briefly instruct the jurors, introduce them to you.  Then

7      we will leave, and Mr. Hopkins will be in there while they fill

8      out the questionnaire.  He will alert you after the

9      questionnaire is completed.  The government can then come pick

10     up the questionnaires, copy them, and get copies to the Court

11     and to the defense.

12         And I am giving you all until Friday afternoon to propose

13     strikes for cause under seal.  And I just want the names of the

14     jurors you think should be excused and the questions that form

15     the basis for the motion to strike.

16         Any questions about that?

17         In terms of when the individual voir dire will start, I had

18     hoped it would start on April 6th.  The problem is the jury

19     office may need to know by Friday, April 3rd, who to call back.

20     So it's possible -- we will address this that last week when we

21     are in court whether they will come back for the individualized

22     voir dire on the 6th, the Monday, or the Tuesday.  We will see

23     how quickly we can move.  But we may need to start that on the

24     7th rather than the 6th.

25         Is that all clear?

1          MR. JONES:  Yes, Your Honor.

2          MR. DUBELIER:  Yes, Your Honor.

3          THE COURT:  On the jury instructions, in addition to

4   the parties' briefs, I've reviewed the materials from the

5   out-of-circuit cases which the government provided in response

6   to my order requesting jury instructions and related materials

7   for Section 371 defraud clause conspiracies involving multiple

8   agencies prosecuted since *U.S. v. Treadwell*.  I've reviewed

9   those.

10      Who is arguing for the government?  Mr. Jones?

11          MR. JONES:  Yes, Your Honor.

12          THE COURT:  Mr. Jones, let me ask you this:  Is the

13   issue of the lawful government function, is that one of fact or

14   law?

15          MR. JONES:  We view it as at most a mixed question of

16   law and fact but primarily a question of fact.  The government

17   will have to establish through testimony what those functions

18   are.  The indictment, and as Your Honor reflected in your

19   November 2018 opinion, describes those functions as alleged.

20   Those are something that the government will -- intends to prove

21   up, and then it will be for the jury to determine whether

22   there's been sufficient evidence of the defendant's intent to

23   interfere.

24          THE COURT:  So the jury has to decide not only that

25   there was sufficient evidence of an intent to interfere with a

1  function, but also that the alleged function is actually a

2  function of the FEC, DOJ, and the State Department?

3          MR. JONES:  Correct, Your Honor.  That's the

4  government's position.

5          THE COURT:  All right.  If that's the case, then

6  hypothetically -- I don't know that any such opinion exists, but

7  if there were an opinion, for example, out of the FEC or out of

8  DOJ's FARA unit which says one or both our functions is not to

9  regulate issue advocacy, for example, say the FARA unit issued

10  an opinion that says the FARA regulations don't cover issue

11  advocacy, why would that not be a document that the defense

12  should have in convincing the jury that this is not a function

13  of either agency?

14          MR. JONES:  Well, I think that such a document, if it

15  was publicly available, then it would be relevant to that

16  assessment.

17          THE COURT:  But why does it have to be publicly

18  available?  If you're having to convince the jury that the

19  function of the FARA unit is to do -- to police this kind of

20  political activity and the FARA unit itself doesn't view that as

21  a function, why is that not a relevant piece of information in

22  determining whether there is such a function that's covered by

23  that agency?

24          MR. JONES:  Well, I think the government would have to

25  establish the function through testimony that would be tested by

1    cross-examination, would have to be credible.  To the extent it

2    is an interrelated question of what the agency does and what is

3    established through statute or regulation, we certainly concede

4    that the Court would have a role in ensuring that any

5    description of the function wasn't contrary to statutory or

6    regulatory law.

7         I think speculation as to whether the witness would be

8    testifying untruthfully about what the function of the agency is

9    is simply that.  It's speculation.  I'm not sure there would be

10   any other obligation.

11        THE COURT:  You are saying because there's no such

12   public opinion?  I don't understand.  If the issue that the jury

13   has to determine is this is a function of the agency to do X and

14   if there's an opinion that says X is not our function, why is

15   that not something the defense should have?

16        And there may not be such an opinion, but he asked for

17   them, and I was viewing this more as a question of law as

18   opposed to a fact that the jury would be deciding.

19        MR. JONES:  Right.  I think it would depend on how

20   official this document or opinion was.  For example, if someone

21   in the FEC had a view that it's not really our place to

22   interfere with or to monitor --

23        THE COURT:  I mean an official opinion of the FARA

24   unit expressing these are our functions and duties, A, B, C, D,

25   and that is not one of them.

1          MR. JONES:  Oh, I think those wouldn't be -- I think

2    that couldn't supersede the functions of the agency that's

3    established through the statutes and regulations.  That is what

4    makes it a lawful function, the fact that it's established by

5    law, and I think that's where we would submit the sort of basis

6    of the lawful function is ultimately rooted, is in those

7    statutes and regulations.

8          THE COURT:  But you're also saying the jury has to

9    find it.

10         MR. JONES:  Well, we have to demonstrate to the jury

11    that the U.S. government, through these agencies, has these

12    functions, and we have to connect the defendant's intent to

13    interfere through deception with those functions.

14       And so I think the object of the conspiracy is wrapped up

15    with those regulations and statutes, but it is as a factual

16    matter that certain functions are relevant.  The functions of in

17    this case the Department of Education aren't implicated.  It's

18    the specific functions of these agencies that the testimony

19    will -- we submit will convince.

20         THE COURT:  My question is, if there's an opinion, not

21    an e-mail but there's an opinion, the agency's determined that

22    it's not a function, for example, of the FARA unit to regulate

23    political activities of the nature charged in this indictment

24    and you have to prove that it is a function, then why wouldn't

25    that be something the defense should have and be able to

1    cross-examine your witness about?

2             MR. JONES:  Well, I think the key issue in your

3    question there, as far as I see it, is whether the agencies

4    regulate the particular conduct alleged or charged in this

5    indictment.

6        I think our position with respect to the allegations is

7    that there is an overarching function that these agencies are

8    serving with respect to investigating and monitoring foreign

9    influence through disclosure provisions but also foreign source

10   ban and other regulations.

11       The idea is, this function exists at a broader level than,

12   I think, what a particular opinion would address.  And it's not

13   that the FEC, you know, enforces certain conduct.  It's that the

14   FEC investigates and monitors in this -- sort of in this space,

15   so to speak.

16            THE COURT:  So anything remotely close to a function

17   that the FEC or the FARA unit covers is under the umbrella just

18   automatically?

19            MR. JONES:  No.  I think as laid out in paragraph 9 of

20   the indictment, the alleged functions are monitoring,

21   regulating, and enforcing laws concerning foreign influence on

22   and involvement in U.S. elections and the U.S. political system,

23   and it goes on to detail that these functions include the

24   enforcement of a statutory prohibition on expenditures,

25   requirements for filing reports, enforcement of a ban on

1    unregistered agents acting, a requirement for agents to

2    register, and a requirement with respect to the State

3    Department.

4         THE COURT:  But just hypothetically, if there were an

5    official opinion out of the FARA unit that says a foreign entity

6    acting in the way that's alleged here in the indictment is not

7    something that -- it's not our function to police that, that

8    would be relevant?  I'm sure that there's not such an opinion,

9    but if there were, it would be.

10        MR. JONES:  I think it would depend on exactly what it

11   said.  If the FARA unit were to say that they're not involved in

12   investigating or regulating involvement, foreign influence in

13   the U.S. political system through the enforcement of regulations

14   but more generally through collecting information,

15   investigating, and making itself aware of activities that might

16   fall within that umbrella of regulation, then yes, that would

17   certainly be -- that would seem to contradict the allegations in

18   the indictment.

19        THE COURT:  All right.  So if I were to agree with you

20   that the jury need not be unanimous as to the particular

21   functions, the five particular functions that are alleged

22   explicitly in the indictment, then why should the jury

23   instructions mention them at all?

24        MR. JONES:  Well, I don't know that the jury

25   instructions necessarily need to.  Looking at the submissions we

made from the out-of-circuit cases, you have standard Red Book

instructions and, I think, are much -- hue more closely to the

D.C. Red Book instruction.

Our effort at identifying those functions, frankly, is an

effort to provide the jury with that information.  But in terms

of unanimity with respect to functions or agencies, we don't see

that as an issue that's even a close call here under the

unanimity jurisprudence and, frankly, these other cases that

we've submitted to the Court.

THE COURT:  Okay.  I assume the government would have

no objection if I were to include in the jury instructions

paragraph 9 of the indictment, which describes the agreement as

one to defraud the United States by impairing, obstructing, and

defeating the lawful functions of the FEC, the DOJ, and the

Department of State in monitoring, regulating, and enforcing

laws concerning foreign influence on and involvement in U.S.

elections in the U.S. political system in order to capture the

essential nature of the agreement?  You would have no objection

in the same way that the D.C. Circuit commended the District

Court for doing in *Treadwell*?  That paragraph has always seemed

to me to capture the essential nature of the agreement.

MR. JONES:  Right.  I think we definitely agree with

that.

THE COURT:  And you would have no objection to me

including that in the instructions?

 1           MR. JONES:  No.

 2           THE COURT:  All right.  Help me understand what the

 3    government thinks its burden is with respect to knowledge here.

 4    If the government, I understand, does not -- I've already held

 5    willfulness is not required under 371.  But I take it that the

 6    government does not think that it must prove that the

 7    co-conspirators had knowledge of the five specific functions

 8    that are alleged in the indictment, or does it?

 9           MR. JONES:  No, absolutely not, Your Honor.

10           THE COURT:  So what is the argument you will make to

11    the jury in terms of knowledge here?  What level of generality

12    should you, in your view, be able to argue knowledge?

13           MR. JONES:  I think our argument is, I think, best

14    articulated in the standards -- would track the standards set

15    out by Your Honor in the November 2018 opinion regarding the

16    sufficiency of the indictment.

17       The mens rea under 371, as I've discussed many times,

18    involves an intent to deceive -- an intent to interfere with

19    lawful functions through deception.  That has to be aimed at the

20    U.S. government certainly in some respect.

21           THE COURT:  And aimed at lawful functions, not just

22    some kind of broad policing U.S. elections?

23           MR. JONES:  No, there needs to be -- right.  There

24    needs to be, as Your Honor noted, an intent directed at the

25    United States government's regulation in this area.  That

doesn't mean that the conspirators need to know the particular regulations or regulators who operate in this space, but they need to have a sufficient awareness that the government is interested in this activity and has this type of role and, more importantly, that the conspirators purposefully intended to frustrate that role through deception and concealment.

THE COURT:  But what is this type of activity?  Is it bans on foreign money in elections?  Is it disclosure requirements associated?  What is the --

MR. JONES:  It's not merely those regulations and statutes that have requirements for disclosure or prohibit certain activity, but it also encompasses those agencies' efforts to monitor, to gather information, and to generally police that activity, which is sort of the basis and the purpose of their function, of their mission, of why they exist.

We have to establish that the conspirators were not merely trying to sow discord or interfere with an election or sway the vote, so to speak, but that they had an awareness that the U.S. government regulated in this area and was interested in preventing foreign influence through violations of disclosure obligations or prohibited expenditures and that they, in order to achieve their broader goal of sowing discord or interfering, took steps -- or, rather, agreed to take steps to obstruct those functions, to ensure the success of their overarching goal, just as Your Honor laid out in your opinion in November.

1          THE COURT:  All right.  So in addition to the five

2     specific functions that you've alleged in the superseding

3     indictment, there are additional functions that you will argue

4     were in play here, like some sort of -- can you articulate what

5     it is exactly, an investigative function of the three agencies?

6          MR. JONES:  Well, I think paragraph 9 speaks to that.

7          THE COURT:  Usually, you have a -- often, you will

8     have an agreement to impair the functions of the FEC, the DOJ,

9     the Department of State, and you have general knowledge of a

10    defendant knowing that -- like the tax case, there's an IRS, and

11    they care about tax stuff.

12         Here, you have -- are you going to have evidence -- I think

13    you've said that you won't have evidence that there's an

14    awareness of the specific agencies or FARA or FECA, that you're

15    not going to be presenting that kind of evidence, that often in

16    these sorts of cases you do have evidence that an individual

17    knows the IRS wants tax forms and that sort of thing.

18         MR. JONES:  Right.

19         THE COURT:  So here, presumably, you have evidence

20    that the Department of State wanted truthful visa forms.

21         MR. JONES:  Yes; right.  We will have evidence that

22    these agencies conduct these functions as described generally in

23    paragraph 9 and with respect to specific ways in which they

24    execute those functions.

25         With respect to typical cases, yes, it's very common that a

1    defendant is familiar with the IRS or, you know, other

2    particular regulatory agencies.  As Your Honor no doubt saw in

3    the submissions regarding other cases, often, a conspiracy to

4    defraud isn't -- doesn't stand alone.  Often, there's other

5    statutes that, by the nature of the facts and the elements of

6    the other offenses, require or result in evidence that the

7    defendant knew about, I know what the IRS is.  But that

8    doesn't -- that's not an element of the offense charged in this

9    case.

10            THE COURT:  Understood.  But that is an argument that

11   the government can make in those cases about knowledge, and

12   here, the knowledge of the FEC roles, functions and the DOJ's.

13   Articulate for me one more time what that is, what Concord and

14   the co-conspirators needed to know about that set of functions,

15   not the State Department, but that set of functions, to the

16   extent they're going to rely on them.  Maybe they convict based

17   on State alone.

18       But if the government is going to argue you can convict

19   based on these other functions, what is that high-level

20   knowledge?  Articulate for me what you think the jury needs to

21   find with respect to the co-conspirators' knowledge of those

22   functions.

23            MR. JONES:  The jury needs to find not that its aware

24   of the FARA unit or the FEC, but that the U.S. government has

25   functions -- has as a function, as is laid out in paragraph 9,

1    monitoring, regulating, and enforcing laws concerning foreign

2    influence.

3              THE COURT:  Foreign influence on elections and on

4    political activity?

5              MR. JONES:  Right; correct.  And that's what we have

6    to establish.

7         And the sort of protection against a jury convicting based

8    on lawful conduct are the elements of 371 which require evidence

9    of an intent to deceive, an intent to frustrate these functions

10   through deception.  And our argument to the jury will be, based

11   on the evidence before it, the jury can conclude that the

12   defendant had sufficient mens rea with respect to its intent to

13   interfere with the functions as laid out in paragraph 9.  And

14   the deception is sort of the protection there against what might

15   otherwise be a vague or insufficient statute.

16             THE COURT:  Okay.  In the jury instructions the

17   government has proposed, the government agrees that it has to

18   show that the co-conspirators knowingly entered an agreement.

19             MR. JONES:  Right.  Standard Red Book conspiracy law.

20             THE COURT:  Right.  With the specific intent to

21   defraud the United States of its lawful functions.

22             MR. JONES:  Right.  We object to the use of the

23   word "specific" simply because --

24             THE COURT:  And tell me why.

25             MR. JONES:  We don't think it's a helpful word for the

1    jury.

2           THE COURT:  So it's just "with the intent"?

3           MR. JONES:  Right, "with the intent to defraud."

4           THE COURT:  And is your concern that "specific intent"

5    means something more than just "intent"?

6           MR. JONES:  The jury may think that this means

7    something other than what is required, which is simply intent to

8    defraud.  And as we argued, I think, in our brief, the risk

9    there is, perhaps, some confusion as to whether there was some

10   willfulness requirement or some specific knowledge with respect

11   to, you know, regulations that isn't required as a part of the

12   offense.

13       I mean, specific intent, attorneys use that term in terms

14   of talking about the law, but for a jury, it doesn't, in our

15   view, have any substantive meaning other than, perhaps, like to

16   confuse.

17           THE COURT:  So your position is because the intent is

18   tied to intent to defraud, that that's sufficient, and the jury

19   is not going to get confused and say, Oh, you knowingly and

20   intentionally enter an agreement?  That's not enough.  You agree

21   it's got to be knowingly enter an agreement with the intent to

22   defraud, and that takes care of any concern that the jury is

23   going to not require sufficient mens rea as to the functions?

24           MR. JONES:  Yes.

25           THE COURT:  All right.  Thank you.

1    Mr. Dubelier?  Let me ask you first, what is your position

2    with respect to the function issue, whether it's an issue of

3    fact or law or a mixed question of fact and law?

4         MR. DUBELIER:  I think it's a mixed question of fact

5    or law, Your Honor.  I think that's the way we've argued it in

6    our previous pleadings.

7    This gets into a highly, I think, complex and novel area in

8    that they say they're going to call fact witnesses.  You will

9    remember we argued over whether or not these were going to be

10   expert or fact witnesses.  They just told you basically they're

11   going to call fact witnesses from FEC and DOJ to testify to the

12   jury about the law, and I don't think --

13        THE COURT:  I will get clarification.  I didn't hear

14   him to say that.

15        MR. DUBELIER:  Well, he said they're going to explain

16   to the jury what the responsibilities of the specific agencies

17   are.  That's describing what the law is and describing what, if

18   any, obligations the defendants had with respect to filing and

19   reporting with those agencies.  That's expert testimony.  It's

20   not only expert testimony.  It crosses into expert legal

21   testimony, which in a criminal trial is absolutely prohibited.

22   They just can't elicit testimony like this.

23   This is where I think there's significant burden on the

24   Court in terms of the jury instructions to charge the jury as to

25   what the law is, not have a lay witness get up here and testify

1    as a matter of testimony under oath to explain to the jury what

2    the law is.  I don't know how they do that.

3              THE COURT:  So what would you want --

4              MR. DUBELIER:  Your Honor, if I could make one point.

5    I don't even think they can get close without conceding that

6    they have to give us a report in advance of what that witness is

7    going to say.  There's no possibility that they can get through

8    that being lay testimony.  It's just not.

9              THE COURT:  But what do you think is appropriate?  For

10   me to instruct the jury this is what the statute provides and

11   this is what -- this statute tasks this agency to do these

12   things as outlined in the statute?

13             MR. DUBELIER:  Yes.  First of all, paragraph 9, we

14   absolutely object to putting that in a jury instruction because

15   that's argumentative.  It's not a statement of the law.

16             THE COURT:  But it is describing, is it not, the

17   essence of the conspiracy?

18             MR. DUBELIER:  It's describing this wishy-washy

19   nonsense that they want to get a conviction on.

20        Look, there is no question -- it's very troubling when the

21   prosecutor gets up here and argues specific intent is a

22   troubling concept for them.  Of course it is because it goes to

23   the heart of what the defense is in the case.

24        First of all, three of the four cases they gave you on

25   Friday afternoon, there's a specific intent instruction in

1    there.  You have already found that they have to prove specific

2    intent.  It's in your order ECF 74 at page 24.  So --

3         THE COURT:  Agreed.  But does the specific intent mean

4    they entered the agreement with the intent to defraud?  Does the

5    term "specific" add anything that's not confusing to the intent

6    to defraud?

7         MR. DUBELIER:  It's an accurate statement of the law.

8    The jury has to be charged on specific intent.

9         THE COURT:  So all those other instructions they gave

10   me include specific intent to defraud?

11        MR. DUBELIER:  Well, again, the notion here that the

12   prosecutor's arguing that specific intent is going to confuse

13   the jury, that's really a novel argument, given the fact that

14   the cases they give you to establish what they think the jury

15   instructions should be in each of -- three of those four cases,

16   there's a specific intent instruction that explains what it is.

17   And it's specific intent to defraud in this case the FEC, DOJ,

18   and Department of State.

19        THE COURT:  So I will take a look at that.  But those

20   four, you think, include an instruction different or in addition

21   to what the government's proposing?

22        MR. DUBELIER:  It's an additional specific intent

23   instruction that is appropriate to give under these

24   circumstances.  We've embedded it in the conspiracy instruction

25   because there seems to be a bias in this district, when you look

1    at the jury instructions, that there was a finding a number of

2    years ago that this notion of intent ought to be embedded in the

3    substantive instruction as opposed to having a separate

4    instruction.  In three of the four cases they gave you on

5    Friday, there's a separate specific intent instruction.  We

6    basically took that specific intent language and embedded it

7    into our proposed conspiracy instruction.

8           THE COURT:  All right.  So back to the issue of the

9    existence of a lawful government function, Concord's position is

10   I should instruct the jury this is what the law says?

11          MR. DUBELIER:  That's what the law says.

12          THE COURT:  And the witness shouldn't be able to

13   elaborate at all on what they do as a practical matter in their

14   job?

15          MR. DUBELIER:  It would depend exactly what the

16   witness is going to say, and that's why they should be obligated

17   to give us notice of that.  I can't resolve this in the abstract

18   because I don't know what the witness is going to say.  I can

19   only go based on what Mr. Jones said in that there's no question

20   that they intend the witness to testify about what the law says

21   and what the regulations say.

22          THE COURT:  But you agree it's appropriate for the

23   witness to get up and say, This is my role, this is what I do

24   day to day, this is what I do when I get a complaint that

25   alleges X, these are the steps I take?

1        Your objection is to them giving a legal opinion on how

2    they interpret the statute?

3        MR. DUBELIER:  Yes, and certainly in the absence of

4    not giving us notice of what that opinion is going to be and a

5    chance to object to it prior to trial.

6        And again, I think one of the problems that we're having

7    here in my colloquy back and forth with you as well as Mr. Jones

8    is we're talking in the abstract, because we don't know exactly

9    what they intend the witness to say.  We know generally now

10   based on what Mr. Jones said that the witness is going to get up

11   and testify about what the law and the regulations say and how

12   that's handled at that particular agency.

13       And I would note to the Court that as far as we can figure

14   out from the names they've identified, these are not

15   senior-level people.  We're talking about low-level people.

16       THE COURT:  Which makes me think that it's kind of

17   ministerial, this is what we do, this is our job, this is how we

18   handle complaints, this is -- it's not a legal opinion by the

19   general counsel.

20       MR. DUBELIER:  I don't understand why we need to be

21   dealing with that at this stage in the case in the abstract.

22   What is the penalty to the United States to just come forward

23   and say this is what the testimony is going to be, just as they

24   would do with any other expert witness, and then let's argue it

25   out when we know what exactly they intend to do.

1          THE COURT:  Okay.  What they have said today is that

2     they -- I'm sure they're going to elicit testimony that we

3     investigate complaints relating to foreign money; right?  Is

4     that objectionable, in your view?

5          MR. DUBELIER:  Yeah, it's objectionable, because it's

6     not a correct statement of the law.  They don't investigate

7     issue -- money being spent by foreigners on issue ads.  They

8     don't, because it's not prohibited.

9          THE COURT:  But if they get a complaint that says this

10    foreigner is doing these things -- I don't know what the

11    specific facts are, but it appears that they're advocating for

12    or against a real candidate, express advocacy.  They're going to

13    roll up their sleeves, and they're going to dig in, and they're

14    going to look into that.

15         MR. DUBELIER:  Maybe.  You give a lot of credit to the

16    Federal Election Commission.  They have to have an agreement of

17    a certain number of commissioners to even open up and conduct an

18    investigation.  And they're polarized at this point.  They can't

19    agree on anything.  They don't even have enough members to go

20    forward with anything.

21         Again, I know we're looking at the 2016 time period, but in

22    the 2016 time period, the Federal Election Commission was

23    incapable, incapable of determining what was prohibited specific

24    expenditures advocating for or against the election of a

25    specific person.  We have actual rulings that they have made

1    where they say, We can't decide whether or not this is actually

2    advocating for the election of a specific candidate or against

3    the election of a specific candidate.

4           THE COURT:  Regardless of what sort of testimony they

5    seek to elicit, Concord is not calling an expert; right?  You

6    have not given notice of an expert.

7           MR. DUBELIER:  Well, we didn't because the fundamental

8    problem is you're not going to let me put a legal expert in, and

9    I view it as it would be legal testimony.  It would be somebody

10    to come in and say -- after their person testifies, if you let

11    them, what they say the law and the regulations say.  If we were

12    to disagree with that, then we would have to have someone come

13    in and say, Well, that's not what the law and regulations say.

14       But then you've opened up in this trial the ability of lay

15    people to give legal testimony that's going to go to the jury.

16    And that's prohibited.  That's prohibited in any case, let alone

17    a criminal case.

18           THE COURT:  Okay.  How do you distinguish *Treadwell*?

19           MR. DUBELIER:  In what respect?

20           THE COURT:  How I instruct, the unanimity respect.

21           MR. DUBELIER:  Oh, unanimity is very important here.

22    And the reason is, if you go back and look at the cases they

23    gave you on Friday --

24           THE COURT:  And *Treadwell*?

25           MR. DUBELIER:  We worked collaboratively on this.  We

1    were trying to help the government search --

2              THE COURT:  And by the way, that directive to them was

3    because I thought they had the ability.  It wasn't that I did

4    not want your cases, too, to the extent you came up with others.

5              MR. DUBELIER:  Oh, no, we tried to help.  It's very

6    difficult with the specific search parameters to try to go into

7    the PACER system and find this stuff.  It is very, very

8    difficult.  You have to use Westlaw and back your way into

9    PACER, and it's not ideal.  So I don't think either side

10   believes that we've gotten you every single case.

11        On the unanimity issue, if you look at the other cases, the

12   exact same conduct triggered the violation with respect to each

13   of the government agencies.  And that is, it's one conduct that

14   triggers what the government -- what those particular multiple

15   government agencies were overseeing.  And in those

16   circumstances, I can understand you arguing away from a specific

17   unanimity instruction.

18        Here, though, for example, what they claim with respect to,

19   let's say, FARA, this unwitting Americans thing, the conduct

20   with respect to those unwitting Americans has absolutely nothing

21   to do with the jurisdiction of the Federal Election Commission

22   and what they would look at.  The conduct of buying an ad from

23   overseas here and it turns out it's an ad that would have

24   required notification to the FEC has absolutely nothing to do

25   with the Department of Justice FARA unit, nothing to do with it

1    at all.

2         So the risk here without a specific unanimity instruction

3    and the unanimity verdict form is you could very well have six

4    jurors say, You know what, I think they should have told the FEC

5    about those ads, those $2,400 worth of ads, which is what it

6    comes to.  I've already told the Court that.  That's what I

7    think, so I'm voting guilty.  And you have six other jurors

8    saying, Wait a minute, that's ridiculous with that ad thing, the

9    FEC doesn't even properly oversee that, I'm not convinced that

10   they had to do anything with that, but I think the unwitting

11   American thing where they got some woman to dress up like

12   Hillary Clinton and go to some type of protest, I think they did

13   that, and I think that's against the law.  You could very well

14   have then six one way, six the other, and a guilty verdict.

15        THE COURT:  But doesn't the indictment allege this

16   election activity and political activity was all intertwined,

17   they're doing both at the same time, and isn't that essentially

18   the same conduct?

19        MR. DUBELIER:  No, it's not, it's not, because they've

20   chosen these very specific and narrow government -- areas of

21   government responsibility.  They chose that.  It's not defraud

22   the United States.  It's defraud the United States by

23   interfering specifically with the FEC, the Department of

24   Justice, and the Department of State.

25        THE COURT:  But in the same way *Treadwell* was dealing

1    with a project and it impaired the IRS and it impaired HUD, I

2    mean, it was --

3            MR. DUBELIER:  Again, all the same conduct

4    triggering -- again, if you look at *Treadwell* and look at the

5    cases they gave you on Friday, it's one set of conduct

6    triggering each of those government agencies.  Here, that's not

7    the case.

8            THE COURT:  But I know you may have a defense to this,

9    but they allege Project Lakhta, it was to muck with the U.S.

10   system politically, electoral system.

11           MR. DUBELIER:  Well, to me, latke is potato pancakes,

12   because that's the way I was brought up.

13           THE COURT:  They are alleging it's something else

14   here; right?  This is their housing project, Project Lakhta.

15           MR. DUBELIER:  Your Honor, I hear you, but again, it

16   would require the Court -- to do this the way they want to do it

17   without unanimity, it would require the Court to say it's okay

18   for the scenario I just went through of six people saying it's

19   the FEC and six people saying no, it's the DOJ, and six plus six

20   equals 12.

21           THE COURT:  I know.  Similarly, in the *Treadwell* case,

22   six could have said it was IRS, and six could have said it was

23   HUD.

24           MR. DUBELIER:  Again, different conduct triggering

25   each of the responsibilities here.  You don't have that present

there.  You have one set of conduct that triggers what each of those government agencies oversaw.  This is different.

Again, 99 percent of the conduct in this case is not illegal anyway.  It's just not.  So we have to focus in on that very, very narrow sliver.  They're going to put everything in there.  They want everything to go before the jury, even the lawful conduct, because, again, it feeds into this notion that if you argue all this stuff the jury is going to find them guilty of something.

But again, it would be unlawful for the jury in this case to split 6-6 and add those two 6s together and have a 12.  So why even set up that possibility?  What is the problem, what is the fundamental problem as a matter of justice that the jury be asked to answer this question?  They're ignorant?  They're not going to be able to figure that out?  That's not the case.  Why not ask them the question and have them give the answer.

THE COURT:  Because it's a conspiracy to impair the lawful functions of the United States, not three specific agencies, as it's charged.

MR. DUBELIER:  That's where we fundamentally disagree.  It's defraud the United States by interfering with these three government agencies.  If they had said we violated something with respect to the Department of Education, if they put that proof in at the trial, would you let them do that?  No.

THE COURT:  If it's tied into Project Lakhta, like

1   Education required a certain kind of -- I don't know.  I can't

2   see how it would come in.

3              MR. DUBELIER:  Or even the IRS.  You wouldn't let them

4   get that in.  It's not alleged in the indictment.

5              THE COURT:  Definitely not, but -- you disagree that

6   Project Lakhta was a thing, and they've alleged in the

7   indictment it was this project.

8              MR. DUBELIER:  I want to be clear.  I'm not

9   disagreeing it's a thing.  I'm just holding to the fact that if

10  they allege it, they have to prove it.  I'm not going to concede

11  it.

12             THE COURT:  No, I know.

13             MR. DUBELIER:  They allege that was the name for

14  everything that occurred.  They think that was the name for

15  everything that occurred.  So even if they prove that that was a

16  name used by the IRA --

17             THE COURT:  No, not just a name.  Put Lakhta aside.

18  But the conspirators had a project here that we are going to

19  muck with the political system in America.

20             MR. DUBELIER:  Not against the law; not against the

21  law.  If that's all they had charged, that's not against the

22  law.  You would have to dismiss the indictment.  They had to

23  charge the SEC, the DOJ, and the DOS to make it a crime.

24  Without that, there's no crime.

25             THE COURT:  No, understood, but it was to muck with

1    the political system, and a part of that is this election

2    interference, but it was all the same conspiracy.

3           MR. DUBELIER:  Right.  So is it okay for the jury,

4    then, to convict if they've -- let's say 12 jurors find, No, I'm

5    not buying this FEC thing, these regulations are all mushy, the

6    FEC doesn't even know what they're doing, I'm not buying that,

7    and you know what, I'm not buying the DOJ thing, because as a

8    matter of fact, no one in the history of FARA has ever been

9    prosecuted, there's no opinion from the FARA unit ever saying

10   that any of this type of conduct was against the law, it's

11   simply unprecedented, I'm not convicting on that, and you know

12   what, the State Department thing, Concord didn't have anything

13   to do with that, but I'm going to convict them anyway because

14   they posted social media with respect to Black Lives Matter and

15   they engaged with African American people here in the United

16   States, and they tried to stir them up with respect to Black

17   Lives Matter, so I'm going to convict them.

18          THE COURT:  If they follow my instructions, they have

19   to find it was intended to impair one of those three agencies.

20          MR. DUBELIER:  Well, I agree with you.  But if it's

21   intended to impair one of those three agencies, we have to be

22   able to explain to the jury what specifically was in violation

23   with respect to each one of those agencies, and why, if you're

24   going to do that and go that far anyway, wouldn't you ask the

25   jury simply for unanimity?  Did 12 of you agree on the FEC?  Did

1    12 of you agree on DOJ?  Did 12 of you agree on DOS?  I don't

2    know why you wouldn't.  I don't get it.

3         THE COURT:  But you can make that same argument with

4    all the other jury instructions they've given me in all those

5    other cases.

6         MR. DUBELIER:  Again, I don't think you can when you

7    have different conduct in our case with respect to what triggers

8    the obligation with respect to each one of those agencies.  It's

9    different conduct.

10         THE COURT:  But you and I are arguing about -- the

11   indictment charges one project.  One set of conduct included a

12   lot of different things in it.

13         MR. DUBELIER:  Your Honor, I don't think we're going

14   to get agreement on this.  I think you're wrong, with all due

15   respect.

16         THE COURT:  You don't think the indictment charges

17   that there was this project?

18         MR. DUBELIER:  No.  What the indictment charges is 99

19   percent of stuff that isn't even illegal and then trying to

20   thread a needle on how do we make this illegal after the fact.

21   That's what the indictment charges.  And I think under those

22   circumstances, we are entitled to have the jury be unanimous.

23      And look, I'm not sure whether the government is saying

24   they don't have to be unanimous or they just don't want a

25   unanimity instruction and a unanimity verdict form.  If they're

1   actually going to get up here and say the jury, for example,

2   with respect to the FEC, to convict, the jury wouldn't have to

3   have 12 people agree on that?  That would be absolutely shocking

4   to me if they make that argument.  And if they don't make the

5   argument, then there's no reason not to poll the jury in the

6   verdict form about their unanimity to confirm that it's there.

7           THE COURT:  But am I missing something, or in all of

8   those cases, *Treadwell* included, you could have split verdicts?

9           MR. DUBELIER:  You technically could have.  I think in

10  each one of them, you have to look at the case and say what was

11  the risk and how great was the risk.

12          THE COURT:  And the risk here is you think that this

13  conspiracy is just too big?  The *Shadd* case talks about you have

14  murder and two ways to commit it.  And the essential nature of

15  this conspiracy is too spread out for there to be one

16  conspiracy?

17          MR. DUBELIER:  No, I don't think that's it, Your

18  Honor.  I think it's, again, the majority of the conduct charged

19  in the indictment is not illegal, and then you have these little

20  slivers of stuff that they after the fact go in and say is

21  illegal.

22      I'm glad you mentioned the *Shadd* case.  I do know a little

23  bit about that.  I was a state prosecutor prosecuting

24  first-degree murder cases.  *Shadd* does not support their

25  argument here.  What you have with *Shadd* is you have one person

1    killed one person, and there's two ways that that could be

2    charged:  Felony murder or intent ahead of time to kill.  And

3    almost every state first-degree murder statute reads that way.

4    And of course, this is important because if it's first-degree

5    murder, it ultimately incorporates in most states, in most

6    southern states anyway, a potential death penalty.

7        So what you have here -- arguing our case is equivalent to

8    *Shadd* would be saying okay, you have one person that killed

9    three people, and it really doesn't matter when the jury goes

10   back to deliberate, they can find someone guilty if eight of

11   them found you killed person A, four of them found you killed

12   person B, and three of them found you killed person C.  As long

13   as it adds up to 12, that that would be okay.

14       There's no way that would ever be acceptable, would ever

15   pass muster, and *Shadd* simply doesn't stand for that.  They are

16   trying to mix apples and oranges when they inject *Shadd* as

17   priority.

18           THE COURT:  It addresses a due process issue which

19   I've already ruled on.

20       But *Treadwell*, the object of the conspiracy in *Treadwell*

21   was to unjustly and illegally enrich the defendants and their

22   businesses.  Pretty broad, you would agree?

23           MR. DUBELIER:  Well, again, I don't know the -- I

24   haven't read *Treadwell* for a while.  I don't know specifically

25   what they were accused of doing, the actual conduct.

1           THE COURT:  This related to housing stuff.  And what

2    saved it, it seemed, on appeal was that the trial court had read

3    a paragraph of the indictment, a couple paragraphs of the

4    indictment, and the court determined that together it provided

5    the essential nature of the conspiracy, which was sufficient to

6    convict.  And the jury had to only find that the overarching

7    object was committed in that case.  The jury didn't have to find

8    that there was intent -- 12 jurors didn't have to find that

9    there was intent to defraud HUD or 12 jurors find there was

10   intent to defraud the IRS.  It was an agreement on the essential

11   nature of the object of the conspiracy.  And it's very broad, I

12   agree, but it is this circuit's authority.

13        And likewise here, we've got an overarching object as

14   alleged in the conspiracy that appears to me to be -- it's

15   large, but one thing.

16           MR. DUBELIER:  Your Honor, I think where we disagree

17   is, *Treadwell* was not an unusual case when you look at it on its

18   fact.  It's a basic fraud case, and it had the collateral effect

19   of interfering with the IRS.

20        You've already agreed with me that we've never had a case

21   like this one, like this specific case before, and I don't think

22   you can take *Treadwell* and apply *Treadwell* and say it's on all

23   fours, it matches up here.  I think you have to look at --

24   again, I would encourage the Court again to look carefully at

25   the cases they gave us on Friday night.  If you look at those

cases, first of all, in three of four, willful is charged.  I
know you've already ruled on that and you're not going to go
back and revisit it, but willful is charged.  And that's no
small coincidence.  We've already shown you that if you go back
10 years here in the District of Columbia, in the vast majority
of cases where defraud was charged, willfulness was required.
It was written in there, and it was required in the jury
instruction.

There is no question that specific intent is required.
There's none.  You've already found it.  And the case law, we've
cited *U.S. v. Dale*, *U.S. v. Ali*, *U.S. v. Ehrlichman* from this
district, *U.S. v. Childress*.  In each one of those cases,
there's no question specific intent is required for a 371
defraud conspiracy.

So if you put those -- so then the question becomes, Your
Honor, specific intent to do what?  And where I think you and I
are separating is, you seem to think it's specific intent to
generally defraud the United States, where I'm saying no, no,
it's specific intent to defraud the FEC, the DOJ, and the DOS.
And that seems to be the difference between us.  It's a pretty
narrow difference, but it's important for determining exactly
what you're going to tell the jury and what the verdict form is
going to look like.

And again, if you agree with me that if six people decide
FEC and six people decide DOJ, they can add those together to 12

1    and find us guilty, then I think as a matter of law, this case

2    is going to get reversed if there's a conviction.  Why not ask

3    and foreclose the issue forevermore?  Why not just ask the jury?

4        What's wrong with -- let me turn it around that way.

5    What's the downside of asking the jury that question?  We would

6    know, then, forevermore going forward what the answer is.

7            THE COURT:  It's just not charged as a three-object

8    conspiracy.

9            MR. DUBELIER:  Well, again, Your Honor, it's charged

10    as something that is not illegal, interfering with a United

11    States election.  That's how it's charged.  That's not illegal.

12    So you have to go down to the agency level to get to the

13    illegality.  They cannot convict us of interfering in an

14    election.  They can't.

15            THE COURT:  *Treadwell*'s object was to unjustly and

16    illegally enrich themselves.

17            MR. DUBELIER:  So it's a typical fraud case.  There's

18    nothing unusual about that.  They're stealing money.

19            THE COURT:  So in the four cases that you all have

20    given me, none of those had a specific unanimity instruction;

21    right?  You say they had the specific intent, but they didn't

22    require the jury to agree on --

23            MR. DUBELIER:  I have to confess, Your Honor, I have

24    to go back and look at that, because I didn't look for that.  I

25    didn't look specifically for that in the jury instructions.

1    What I was looking for is --

2             THE COURT:  I don't think any of them did.  The

3    verdict form was just unanimously find that they entered this

4    agreement with the intent to impair the United States, not

5    breaking it down by agency.

6             MR. DUBELIER:  Your Honor, I would have to go back and

7    look at it.  But again, I distinguish those cases from what we

8    have here, and I'm not going to belabor it because I've already

9    said it.

10            THE COURT:  All right.  I asked for these cases

11   because *Treadwell* seemed very broad to me, and I wanted to make

12   sure that the law to date is consistent with that.

13        All right.  With respect to the government's burden of

14   proof, I know you disagree, recognizing that I've ruled the

15   government is not required to prove willfulness.

16            MR. DUBELIER:  Your Honor, in all fairness to us, they

17   attacked us on this in the pleadings.  We conceded that you had

18   already ruled on it.  I just put it in there to preserve it for

19   an appellate review.

20            THE COURT:  I understand.  I'm interested in what you

21   think is proper argument of knowledge here.

22            MR. DUBELIER:  They can't prove knowledge.  Forget

23   about argument.

24            THE COURT:  What do you think they need to prove?

25            MR. DUBELIER:  The question should be, what is the

```
1   proper evidence to prove knowledge, not what the argument is.
2   What they argue means nothing.  They have to have evidence to
3   prove it.
4           THE COURT:  What do you think the proper evidence of
5   knowledge is?
6      I've already ruled they don't have to have evidence that
7   they knew the specific laws.  So I know you think I'm wrong
8   there.  But putting that aside, consistent with my earlier
9   rulings, what do you think the evidence is they would need to
10  prove their case?
11          MR. DUBELIER:  I don't think you can convict without
12  evidence that there was an objective of the conspiracy to
13  defraud the Federal Election Commission, the Department of
14  State, and the Department of Justice.  You have to have that.
15          THE COURT:  So they have to know the names of the
16  agencies?
17          MR. DUBELIER:  Well, again, this is where we get into
18  this wishy-washy stuff that takes us back two years.  I remember
19  Mr. Dreeben standing right here on the first or second day in
20  court and us talking about that.
21          THE COURT:  I do, too.
22          MR. DUBELIER:  And I wanted my head to explode.  I
23  thought my head was going to explode listening to him, with all
24  due respect to Mr. Dreeben.  He's a smart guy.  But it was this
25  wishy-washy, Well, maybe they need to know the name of the
```

agency, but maybe not, and they clearly have to know something, but maybe not everything.  That's really consistent with the argument they've made all along here, continuing through to what Mr. Jones argued this morning.  You even got frustrated.  You said, No, no, tell me specifically what it is, what is the evidence.

I know what they're going to argue.  The question is, what is the evidence?  And the reason I frame it as what is the evidence, it's not in any of the evidence they've given us.

THE COURT:  But again, you think they need to have knowledge of, is it, the name of the agencies, or you concede it's not the name, it's the specific functions of those agencies?

MR. DUBELIER:  I think they have to have knowledge of the agencies, their existence and what the name is.  If you say no, to me, the alternative is they have to at least know there is an agency and what that agency is responsible for doing.

THE COURT:  Or what about there is a part of the U.S. government?

MR. DUBELIER:  I don't think that works.

THE COURT:  Really?

MR. DUBELIER:  No, no, because then it gets into this whole what did we do that was illegal.  And what we're alleged to have done as illegal is such a narrow, narrow sliver of what the indictment talks about and what their evidence is going to

be.  If you look at their exhibit list, it's all this Black
Lives Matter stuff.  There's nothing in there that's illegal,
nothing.

And that's what they're going to put in front of the jury
to muck it up so the jury then goes back and says, You know
what, they must be guilty of something, and we don't have to --
we don't really have to have consensus or agreement of what they
did, all we need is 12 people in here to say we don't like this,
they're guilty of something, and then they convict us.  That's
what they want to happen.

THE COURT:  All right.  So you think it's name of
agency and the fact that it's an agency?  It's not some portion
of the U.S. government?  They actually need to know it's an
agency?

MR. DUBELIER:  We're not dealing with agencies.  The
DOJ FARA unit is not an agency.  It's an office of a department.

THE COURT:  But a department or agency, they need to
know that there's a thing called one of those two things, and
you think that they need to know that there are these statutes
called FECA and FARA?

MR. DUBELIER:  No, I don't think the case law gets us
there on that.  I mean, it just doesn't.  But they have to know
what they were doing -- they have to have an object that is
illegal, and they have to know that.  And if they don't have
that illegal object, they can't defraud those agencies.

1          And again, this is where -- I will say it again.  99

2     percent of the indictment and 99 percent of their proof is going

3     to be about stuff that's legal, not illegal.

4          THE COURT:  And the functions that are alleged, the

5     five specific functions alleged in the indictment, do you think

6     that the government's articulated a broader investigative

7     monitoring function?

8          MR. DUBELIER:  No.  They have to not only know those,

9     but they have to show -- we have to know we had a duty.  We have

10    to know we had a duty.  It goes back to the issue you raised

11    when you originally talked about this with Dreeben and then in

12    one of the subsequent hearings.  And again, I'm not holding you

13    to what you said from the bench.  That may have been a ruling;

14    it may have been just you thinking out loud.  And that's okay.

15    There's nothing wrong with that.

16         THE COURT:  Inarticulate statements.

17         MR. DUBELIER:  We agree there has to be a duty.

18         THE COURT:  I've already held that they don't have to

19    have a duty.  As a practical matter, they may have to show there

20    was a legal duty, and a legal duty if they're going to show that

21    that was an act of deception.  But I've said they don't have to

22    have a duty.  I've ruled that.

23         MR. DUBELIER:  Well, without a duty, there's no crime,

24    you're going to see when the evidence comes out in the case.  If

25    there's no duty, there's no crime.

1          THE COURT:  But I've ruled in a 371 that it doesn't

2     require proof of the duty.

3          MR. DUBELIER:  Oh, okay.

4          THE COURT:  They have to have intent to defraud.

5          MR. DUBELIER:  Specific intent to defraud.  It makes a

6     big difference.

7          THE COURT:  All right.  I guess that's it.

8          MR. DUBELIER:  Okay.  Thank you, Your Honor.

9          THE COURT:  Thank you.

10         Mr. Jones, let me follow up with you on a couple of points.

11     I haven't focused on the specific intent instruction and whether

12     these cases that you gave me actually have a separate

13     instruction.  Have you focused on that?

14         MR. JONES:  I hadn't, but I think the key point here

15     is, what is specific about the intent?  It's specifically an

16     intent to defraud.  So you say intent to defraud, and that's the

17     specificity.

18         I think our main point here is that using the

19     word "specific" doesn't help the jury.  As a legal matter and

20     sort of analyzing statutes, crimes, it might be helpful to

21     lawyers, but it's used differently in different contexts.  In

22     jury instructions, your goal is to give this to the jury in a

23     digestible format.  Introducing that word "specific" there,

24     although courts may do it in certain circumstances doesn't mean

25     that it's helpful and doesn't mean that it should be included

here, especially when there's sufficient specificity as to what
the intent of the defendant must be.

THE COURT:  All right.  I'm going to look at this
issue more carefully, but I hear what you're saying on the
wording.  I mean, we all agree that you have to show an
intent -- more than entering the agreement, you have to show an
intent to defraud.

MR. JONES:  Right.  You must understand the agreement,
and the agreement is to defraud.  So yes, that -- an intent to
just join an agreement and then without knowledge of what that
agreement is about, obviously, that's not really joining an
agreement.

THE COURT:  All right.  So back to this troubling area
of the FEC and DOJ witnesses, you are calling folks from both
entities?

MR. JONES:  Yes, we intend to call witnesses who will
testify as to the functions of their agencies, what do they do.
Those functions don't start at the beginning of the statute and
end at the end of the statute.  They have jobs in which they
investigate, collect information, and start digging into areas
that they suspect may be, you know, in violation of regulations.

THE COURT:  Are they going to come close to giving
legal opinions?

MR. JONES:  No.  We're not going to be asking them to
render any legal opinions, to interpret any statutes, to say on

these specific facts this would constitute a violation of this

statute.

THE COURT:  You will not ask them that?

MR. JONES:  No.  We're not asking them to render legal

opinions.  To the extent issues regarding whether conduct is

deceptive because it constituted a failure to comply with the

regulation, that would be an area in which the Court, we submit,

would be the source of the law for the jury, the guidance as to

whether or not that -- the jury should consider certain conduct

as, you know, a violation of a statute and, therefore, evidence

of an intent to deceive.

But that's a subsidiary factual matter with respect to the

evidence that we seek to produce for deception.  As to the sort

of lawful government function, that's not something where we're

looking for the -- we expect a witness to testify as to legal

opinions.

THE COURT:  He's suggested that, I'm guessing, what

the FARA unit witness is going to say, we cover this, we cover

this political activity, and he says that's just flat wrong,

it's not illegal, they don't cover it.

So how are we going to avoid getting into a debate about

the law?

MR. JONES:  Well, we're not seeking to elicit legal

opinions.  I think Your Honor can police the testimony as it

progresses, depending on the cross-examination.  And if the

witness is getting into an impermissible area, just as any other

fact witness might get into an impermissible area, the Court can

intervene, and the parties can address the issue with respect to

those specific facts.

I mean, arguing it in the abstract here, I think, is a bit

difficult, but we can say with confidence that we are not

seeking to elicit expert testimony or testimony as to what the

law is.

THE COURT:  Okay.  Anything else, Mr. Dubelier?

MR. DUBELIER:  Yes, Your Honor, just two quick points.

First, with this notion that the word "specific" in a

specific intent crime case is unhelpful, I would challenge the

government and the Court to come up with a case that says that

ever.

THE COURT:  I'm going to take a careful look at that.

MR. DUBELIER:  And then secondly, again, I'm not being

critical of Mr. Jones, but I just feel like the more we talk

about what these DOJ, FEC, DOS witnesses are going testify to,

it sounds like more of the same.  As sure as I'm sitting here or

standing here in the middle of trial, this is going to come out

as an argument that we all wish we should have resolved before

trial.  And it could easily be resolved by simply saying to

them, tell them what the witness is going to say.  And then to

the extent that we have to weave through issues of is it legal

testimony, is it not legal testimony, do we need a legal expert

 1    to rebut it, it could all be resolved pretrial.

 2        And there's no penalty to them.  That's what I don't

 3    understand.  They fight everything.  I don't understand why they

 4    fight stuff that shouldn't even matter.

 5            THE COURT:  They've given you a lot of their case very

 6    early.

 7            MR. DUBELIER:  Well, I would disagree with that.  They

 8    dumped 5 million pages of garbage on us very early, and it took

 9    us years to get through it.

10            THE COURT:  You have their exhibits and witnesses

11    three months before trial.

12            MR. DUBELIER:  We do; we do; we do.

13        I have nothing else, Your Honor.  Thank you.

14            THE COURT:  Wait, Mr. Dubelier.  One more question.

15            MR. DUBELIER:  Yes.

16            THE COURT:  Articulate with specificity how you think

17    this is going to be a real problem when the FARA witness is on

18    the stand.

19            MR. DUBELIER:  Well, I have to do it in the abstract

20    because I don't know what the person is going to say.

21            THE COURT:  He's going to talk about what he does.

22            MR. DUBELIER:  He can't just talk about what he does.

23    He has to talk about the statute and the regulations that they

24    oversee.  Otherwise, what's the point of his testimony?

25            THE COURT:  Let's say he's reading the statute

1    verbatim.

2           MR. DUBELIER:  So he gets up and he says, Okay, this

3    is what the Foreign Agents Registration Act says, and to your

4    point, he reads the statute verbatim.  And then, Okay, well,

5    what kind of conduct is prohibited by the statute?

6        What is he going to say?  Is he going to say what we did?

7           THE COURT:  I don't think they're going to ask him

8    that question.

9           MR. DUBELIER:  Well, then, what are they going to ask

10   him?  It's a one-question witness.  Why is he even coming?  We

11   could just put the statute and the regulations in, and you could

12   charge the jury as to what it says.  They're calling these

13   witnesses for a purpose, and the purpose is to lead the jury to

14   believe that we are actually -- we acted contrary to what that

15   specific office oversees.

16          THE COURT:  I think that they're going to call them to

17   say, What do you do in your job?  This is what I do, I get a

18   complaint, I look at this, I look at that.  They say they're not

19   going to ask the legal question.

20          MR. DUBELIER:  Again, there's a way of asking the

21   legal question without asking a legal question.  Again, we're

22   arguing this in the abstract.

23       I guess what I'm troubled with, Your Honor, is, why should

24   I have to stand up here and say what I object to about what

25   they're going to say when they're refusing to say what they're

1    going to say?  I just don't understand the downside here.  Just

2    do it.  Why not just tell us now.

3             THE COURT:  Question, question, question?

4             MR. DUBELIER:  No, I don't expect them to do that, but

5    this is what we're going to elicit from this witness, here it

6    goes, we're going to talk about A, B, C, D, E, and F.

7             THE COURT:  I need to go back and look, but haven't

8    they done that in one of their earlier briefs?

9             MR. DUBELIER:  No.

10            THE COURT:  They have not?

11            MR. DUBELIER:  No.  That's why we allege this is

12   expert testimony.

13            THE COURT:  I will take another look at that as well.

14   My recollection is they did give some specificity there, but I

15   will look.

16            MR. DUBELIER:  Okay.  Thank you.

17            THE COURT:  All right.  I will not require the jury to

18   unanimously agree on a particular government function that

19   Concord allegedly obstructed.  The government has charged

20   Concord with a single crime here:  Conspiracy to defraud the

21   United States pursuant to 18 U.S.C. Section 371.  Paragraph 9 of

22   the indictment alleges one conspiracy to defraud the United

23   States by impairing, obstructing, and defeating the lawful

24   functions of the Federal Election Commission, U.S. Department of

25   Justice, and the U.S. Department of State in monitoring,

regulating, and enforcing laws concerning foreign influence on and involvement in U.S. elections and the U.S. political system.

Relatedly, paragraph 7 of the indictment alleges a conspiracy to obstruct through fraud and deceit the lawful functions of the United States government in monitoring, regulating, and enforcing laws concerning foreign influence on and involvement in U.S. elections and the U.S. political system.

Neither the enumeration of three government agencies nor the enumeration of five specific government functions in the indictment subdivides a single conspiracy that the government has charged into a multiple object conspiracy.

Given the nature of 371 defraud clause conspiracy charge, the government need only prove three elements:  First, the existence of an unlawful agreement to defraud the United States; second, Concord's knowing and intentional participation in that agreement; and third, an overt act in furtherance of that agreement.

This ruling is consistent with the D.C. Circuit's decision in *United States v. Treadwell*, 760 F.2d 327.  In that case the indictment charged a conspiracy to defraud the United States and its agencies of their lawful right to conduct their business in a fair, particularly HUD's housing programs for low- and moderate-income tenants and IRS's administration and enforcement of the tax laws of the United States, free from deceit, fraud, misrepresentation, and theft.

1    The District Court did not give a special unanimity

2    instruction in *Treadwell*, and the defendant complained that the

3    Court's instruction requiring unanimity only as to the broad

4    object articulated in the indictment allowed each juror to

5    convict the defendant for any one of several purported frauds

6    and misdeeds described in the means and methods and overt acts

7    paragraphs of the conspiracy count.

8    But the D.C. Circuit disagreed, holding that because the

9    District Court had read to the jury the key paragraphs of the

10   indictment which describe the alleged agreement, the

11   instructions were clearly sufficient to inform the jury of the

12   essential nature of the conspiratorial agreement that the

13   government was required to prove beyond a reasonable doubt.

14   The Court will follow *Treadwell* in declining to give a

15   special unanimity instruction here.  It will also follow

16   *Treadwell*'s requirement that the government prove the essential

17   nature of the plan by reading to the jury the key statements in

18   paragraph 9 of the indictment that describe that agreement,

19   namely to defraud the United States by impairing, obstructing,

20   and defeating the lawful instructions of the FEC, the DOJ, and

21   the Department of State in monitoring, regulating, and enforcing

22   laws concerning foreign influence on and involvement in U.S.

23   elections and the U.S. political system.

24   The jury must unanimously agree that Concord knowingly and

25   intentionally joined this particular agreement, but it need not

1    agree on any particular subsidiary goal that the conspirators

2    may have sought to attain.

3        This ruling is also consistent with the four sets of jury

4    instructions provided to the Court, all of which involve

5    multi-object conspiracy charges brought under 18 U.S.C. 371.

6    Sorry, multiagency conspiracies.  These alleged conspiracies

7    consisted of, one, a conspiracy to impair Department of State's

8    lawful functions with respect to the review process for

9    immigrant visas and DHS's lawful functions with respect to the

10   awarding of immigration benefits.  That's the *Khan* case,

11   K-h-a-n; two, a conspiracy to impair the lawful functions of the

12   VA, the GSA, the Army, and the Navy in implementing a veteran-

13   owned small business program.  That's the *Gorski* case,

14   G-o-r-s-k-i; three, a conspiracy to impair the lawful functions

15   of the EPA and the Department of Defense to limit environmental

16   contamination, enforce environmental protection standards, and

17   dispose of military waste.  That's the *Overholt* case; and four,

18   a conspiracy to impair the lawful functions of the ATF and the

19   NFA branch in regulating machine guns, the *Rodman* case.

20       All four of the alleged conspiracies sought to impair

21   multiple lawful government functions performed by multiple

22   federal government agencies.  Yet, none of the jury instructions

23   required the special unanimity that Concord seeks here.

24       For all these reasons, the Court declines to require

25   unanimity beyond the three elements required to prove the single

1    unified conspiracy that the government has alleged.

2         As for the remaining issues relating to the conspiracy

3    instruction, I'm inclined to follow much of the government's

4    proposal, which is drawn primarily from standard pattern jury

5    instructions.

6         For its part, Concord has proposed language that includes

7    legal principles that I've already rejected at earlier points in

8    this case.  For example, Concord would require the government to

9    prove that the co-conspirators had an affirmative duty to

10   disclose information to the FEC, DOJ, or DOS, but as I've

11   previously held, this duty to disclose is not an element of the

12   crime charged.  As the government's proposed instruction

13   correctly states, the government is only required to prove the

14   existence of an affirmative duty if it argues that the

15   conspiracy aimed to defraud the United States by the specific

16   means of failing to provide information to the government that

17   it was legally required to provide.

18        Concord also would require the government to prove

19   Concord's knowledge of the specific statutes creating functions

20   with which conspirators allegedly conspired to interfere, but

21   Mr. Dubelier, I think, has made clear that that's not, in fact,

22   the case.  But if he did, this, too, is not an element of the

23   crime, as I've explained.

24        And because the charged conspiracy is not limited to the

25   2016 presidential election but extends into January 2018, the

1    instruction may state as much.

2        I am going to look at Concord's argument regarding specific

3    intent.

4        I will also accept Concord's point that the agreement must

5    not only aim to obstruct or interfere with one of the United

6    States government's lawful functions; it must aim to do so by

7    deceit, craft, trickery, or dishonest means.

8        And consistent with the concluding paragraph of Concord's

9    proposal, I will add the following sentence to the government's

10   proposed instructions:  Attempting to influence the outcome of

11   U.S. election without more is not a crime.

12       The instruction also should clarify that 18 U.S.C. Section

13   371 does not make it a crime to defraud the people of the United

14   States but only the United States government.

15       So shortly, I will provide the parties with a packet of

16   jury instructions that include the proposed instructions the

17   parties have already agreed upon and the rulings I have made

18   today.  I will look at the specific intent issue, and I will

19   give the parties an opportunity to submit any objections to that

20   packet.

21       All right.  Moving on to motions in limine, who will be

22   arguing for the government?

23           MR. JONES:  I will argue the government's motion.  My

24   colleague, Mr. Jed, is going to argue the defendant's motion.

25           THE COURT:  Okay.  All right.  I have these broken

down by issues.  But the issue of whether the government may
introduce evidence of sanctions, this is the defense motion, I
guess, and the government's -- whether the government can
introduce evidence of the Russian government's role, this is
Mr. Kravis, or is that you?

MR. JONES:  It was going to be Mr. Jed.  Why don't I
address it until I need to tap out, if that's okay with the
Court.

THE COURT:  That's fine.

So with respect to whether the government may introduce
evidence of sanctions against Concord and post-January 2018
conduct, as I understand it, the government has indicated it
does not plan to introduce any evidence regarding the sanctions
or the defendant's conduct after January 2018.  Is that true?

MR. JONES:  That is correct, Your Honor.  We have no
intent to introduce that evidence in our case-in-chief.

THE COURT:  So based on the record before me now, I
will exclude any such evidence.

Second, whether the government may introduce evidence of
the Russian government's role in the conspiracy, the government
stated on more than one occasion that it does not intend to
introduce any evidence that Russia was involved in the
conspiracy.  You've mentioned these corporate registration
documents and other incidental matters like that.

Aside from that, I just want to confirm your intention is

1   not to introduce any other evidence.  Earlier on, you mentioned

2   the fact that because Concord did contracts with the Russian

3   government, it has a motive to do what it did here.  Have you

4   abandoned that argument?  That strategy is not one that you're

5   going to pursue at trial?

6           MR. JONES:  We don't intend to introduce evidence

7   linking the conspiracy --

8           THE COURT:  The government contracts Concord had with

9   Russia to suggest it has a motive to --

10          MR. JONES:  No, we don't have any intention to

11  introduce that evidence.  And with all of these, obviously,

12  concessions, depending on the defense's opening,

13  cross-examination case --

14          THE COURT:  Right.  Clearly, if the defense at any

15  point opens the door to any evidence relating to Russia or to

16  Putin -- and I will get to that in a moment.  If there's any

17  argument that the government wants to make that that door's been

18  opened, obviously, the government needs to do so outside the

19  presence of the jury.

20          MR. JONES:  Of course.

21          THE COURT:  This conspiracy does not allege any

22  involvement by the Russian government.  Therefore, at this

23  point, based on the record before me, evidence that Russia was

24  involved in the conspiracy doesn't seem relevant to the charged

25  conspiracy.  It risks confusing the jury, and it would be

1    prejudicial to Concord.

2         What about the issue -- are you prepared to address the

3    Putin chef argument?

4              MR. JONES:  Certainly.

5              THE COURT:  All right.  On that, you've explained, I

6    think, quite well why "chef" and "boss" are relevant here.  What

7    I don't get is why you need "Putin" in front of that.

8              MR. JONES:  I don't think we do need that.  To the

9    extent it's necessary to redact that, we wouldn't oppose that.

10             THE COURT:  I don't see why that's relevant.  I think

11   it's potentially highly prejudicial.  And again, to the extent

12   the door is opened in some way to any of this, I am open to the

13   government raising the issue outside the presence of the jury.

14   But based on this record now, I think that that evidence needs

15   to be redacted to just refer to "chef" or "boss."

16             MR. JONES:  Understood.

17             THE COURT:  Okay.  With regard to the evidence of

18   election interference in other countries -- and on this point,

19   if you or Mr. Dubelier in talking about this need to address any

20   portion of your briefs that are under seal, let me know, and we

21   will at the end take this up.  I can seal the courtroom.  I

22   think there are portions of this content --

23             MR. JONES:  The portions that we redacted, the only

24   interests that we're seeking to protect there is Concord's

25   interests.

1          THE COURT:  Right.  And I want to protect that as

2     well.  So I'm going to try to talk about this without getting

3     into that.  But if it becomes difficult to do so, then we can

4     seal the courtroom.

5          But the indictment does read, "Project Lakhta had multiple

6     components, some involving domestic audiences with the Russian

7     Federation and others targeting foreign audiences in various

8     countries, including the United States."

9          Help me understand the government's position here.  Is its

10     position that this is inextricably intertwined with the charged

11     conspiracy, or is it that this is 404(b) evidence of knowledge

12     and intent?

13          MR. JONES:  We're not seeking to introduce any of this

14     as 404(b) evidence.  The only, frankly, piece of evidence that

15     we submit is close to the line is with respect to the

16     anticipated testimony of a meeting between a witness and

17     Prigozhin.

18          THE COURT:  And as to that?

19          MR. JONES:  The purpose of that evidence, to the

20     extent it is evidence of election interference intentions

21     somewhere else, first, we don't think it necessarily is, because

22     there's not -- we don't anticipate testimony describing actual

23     interference somewhere else.  But more importantly, the purpose

24     of that testimony is purely to establish Prigozhin's knowledge

25     of the IRA's activities and his oversight of that.

1        THE COURT:  Isn't that classic 404(b), to show

2    knowledge and intent?

3        MR. JONES:  No, because it's not knowledge and intent

4    that -- it's context for the conversation between Prigozhin and

5    the person.  It's not --

6        THE COURT:  But why is that relevant?  Why is that

7    relevant if you're not --

8        MR. JONES:  Well, we think it's relevant because it's

9    a part of the facts surrounding the meeting and the reason for

10   the meeting.  I think moreover, we don't see that particular

11   reference as especially prejudicial.

12       THE COURT:  Well, it's a conspiracy to defraud the

13   United States, not any other country.

14       MR. JONES:  Right.  And accordingly, that's why, I

15   think, we don't see it as terribly prejudicial that there's

16   reference to another country.

17       THE COURT:  That there's evidence that they were doing

18   this in other countries?

19       MR. JONES:  An intent to -- I don't think there's

20   evidence that they were intending to defraud another country's

21   lawful government functions.

22       THE COURT:  I want to continue this under seal at the

23   end.  For now, I'm good with you.

24     Mr. Dubelier?  So I guess from your perspective, no need to

25   argue the first three here that I agree with you on with regard

1    to the Russian government and Putin and sanctions; right?  We're

2    all in agreement there.

3        If you want to add anything on the last issue and you can

4    do so in a way that doesn't get into sealed matters --

5            MR. DUBELIER:  Yeah, I don't think we can.  I wouldn't

6    be comfortable with that.

7            THE COURT:  Very well.  Then let me move on to your

8    arguments that the government should not be permitted to

9    introduce evidence of lawful activity that's alleged in the

10   indictment.  And this activity is issue advocacy and

11   advertisements that don't expressly advocate for or against a

12   candidate.

13       Why is this not relevant to show the object of impeding the

14   FARA unit?

15           MR. DUBELIER:  I don't know how it would be relevant

16   to that.  I mean, just because -- if Concord -- let's say that

17   IRA, not Concord, IRA had a set of activity that the government

18   is going to prove that they engaged in and 99 percent of that

19   activity is not unlawful and wouldn't trigger any reporting or

20   registration requirements with respect to the U.S. government.

21       How does that activity become relevant to whether or not

22   they had the specific intent to defraud the government.

23           THE COURT:  But I think that the government -- they

24   will correct me if I'm wrong, but I think the government's

25   theory of the case is that that was political activity that

violated FARA.

MR. DUBELIER:  Oh, I don't think so, but again, this gets into we don't know the answer to that, because you haven't required them to tell us who was supposed to register for what conduct.  We have no idea.  I won't know that until the trial happens.  I have no idea still to this day -- I've been a lawyer for almost 40 years.  I can't figure out who was supposed to register.

And this whole unwitting Americans things, that's the biggest farce of all time.  Let me tell you a little bit about that.  They gave us the list of the unwitting Americans, and we said, Okay, can you give us contact information for them. There's like 40 people on the list.  They came back with contact information for two.  And none of those people are on the witness list, none of them.  They're not even going to call them.

THE COURT:  All right.

MR. DUBELIER:  We don't even know if they're real people.  In certain circumstances, these are just names of individuals that show up in some social media account or on an e-mail account.  We don't even know if these are real people, and they're going to argue to the jury that we caused these unwitting, possibly fake people to theoretically not register as an agent of a foreign government.  It's preposterous.

THE COURT:  They're not calling any of them?

1          MR. DUBELIER:  None.

2          THE COURT:  And these are the people that you believe

3     they're arguing were required to register?

4          MR. DUBELIER:  Well, again --

5          THE COURT:  Had they known they were operating at

6     Concord's --

7          MR. DUBELIER:  That's the only thing that I can come

8     up with.  But these are the people -- again, we specifically --

9     you made them tell us, in the universe of things, you have to

10    tell them every single person who may have been obligated to do

11    something, whether they were the foreign principal or whether

12    they had to register as a foreign agent.  And they gave us that

13    list.

14       We did the logical thing, give us the contact information.

15    Oh, the FBI has only been able to find three of them, one of

16    them is dead, here's a phone number for another one, and, I

17    think, here is an address for the other one.  And none of those

18    names are on the exhibit list.

19       This is an after-the-fact nonsensical manipulation of what

20    was charged in this original indictment.  And the fact that they

21    went back and got a superseding indictment, having never talked

22    to any of these people about this, it's crazy.

23         THE COURT:  All right.  Putting that aside, isn't the

24    evidence also relevant -- the evidence relating to issue

25    advocacy done by false persons, isn't that relevant to prove

1    that Concord and its co-conspirators used deceptive means?

2         MR. DUBELIER:  There's nothing illegal about issue

3    advocacy by false persons.  There just isn't.  Any foreign

4    national could go on the Internet tomorrow -- or at least he

5    could four years ago.  I don't know if he or she could do it

6    now, but probably, and maybe we will test this and then have the

7    Facebook witness come in.  We will have a fake person put an ad

8    up saying reelect Donald Trump, and I will guarantee you,

9    Facebook will take the money and post the ad, guaranteed.

10        So that general activity is not unlawful.

11             THE COURT:  Is not evidence of deception, though?

12             MR. DUBELIER:  No.  You know what it's evidence of?

13   It's evidence of what they want.  It's evidence of deception of

14   a U.S. person, which is not against the law.  That's what they

15   want to prove.  That's how they're going to get the jury all

16   worked up.  U.S. people were inflamed by this.  What does Black

17   Lives Matter have to do with this case as charged?  Nothing.

18   Nothing.

19        If a foreign person goes on the Internet and pretends

20   they're somebody different -- which now I understand maybe 90

21   percent on the internet at any given moment are pretending

22   they're different from who they actually are.  But a foreign

23   person goes on the Internet, puts up a Facebook page for Black

24   Lives Matter, and then engages with U.S. people who may or may

25   not be using their correct name, in this case maybe not because

1    the government can't even find these people, and says you know

2    what, you ought to go have a protest in the town you're in about

3    a Black Lives Matter issue.

4         That's not illegal.  It's not illegal.  And it's not -- and

5    all it does is it mucks it up for the jury.  The jury then sees

6    oh, they're manipulating Americans who might be African American

7    in connection with Black Lives Matter, and that's evil, that's

8    wrong.  That's what they want, because that's how they're

9    going -- the only way they're going to get a conviction here.

10   They can't get it straight on the facts and the law.  That's how

11   they're going to try and get it.

12        THE COURT:  Am I correct that some of the accounts

13   that were used to do the unlawful express advocacy were also

14   used -- like advocating for or against a candidate was also used

15   for this lawful, you say --

16        MR. DUBELIER:  Let me say probably, Your Honor, but I

17   would have to go back again and look.  Again, there are only a

18   couple handfuls of these ads that come across as would have

19   required reporting to the FEC.  It's literally a handful.  We

20   added it up, $2,500, giving them every benefit of the doubt.

21        THE COURT:  Okay.  What about the FEC's restrictions/

22   prohibitions on certain expenditures by foreign nationals?  That

23   seems directly relevant to the charges in the indictment.  They

24   have to show the intent to impair the FEC.

25        MR. DUBELIER:  That wasn't originally charged, and

1    they charged it after the fact.

2              THE COURT:  But now they have.

3              MR. DUBELIER:  Well, Your Honor, we've argued

4    everything we were going to argue in the papers.  I don't have

5    anything to add.  I really don't.

6              THE COURT:  All right.  Mr. Jones?

7              MR. JONES:  I'm going to defer to my colleague,

8    Mr. Jed.

9              MR. JED:  Apologies for the tag team.

10             THE COURT:  Mr. Jed, in terms of the FEC's

11   restrictions on certain expenditures by foreign nationals,

12   clearly relevant.  So we don't need to address that.

13             MR. JED:  Yes, Your Honor.

14             THE COURT:  With respect to the other what the defense

15   says is lawful activity, explain to me why I should allow that

16   in.

17             MR. JED:  Absolutely.  So I think maybe the colloquy

18   that you just had with Mr. Dubelier got into kind of a subpoint

19   of a subpoint of a subpoint.  So if I could just back up a

20   little bit, and I'm happy to sort of work my way back into the

21   point Mr. Dubelier was making.

22        Just as an initial matter, regardless of -- we think we can

23   show that much of this implicated the FEC.  We think that we can

24   show that virtually all of this implicated FARA.  But just

25   setting that to the side for just a moment, we think in some

sense this is something like *Kanchanalak* where you had

conspiracy to defraud the United States that concerned the FEC.

The Court held that the jury could consider evidence with

respect to both hard money and soft money, even though actually

only one of those was regulated by FECA there.  There are a

number of reasons for that.  We think a lot of the same reasons

apply here.

So first, much as the Court in *Kanchanalak* pointed out, the

undertaking of a particular set of activity, even if that set of

activity is not covered by a specific statute, nonetheless sheds

light on the overarching plan, the goal, what it is they were

trying to accomplish.  So even to the extent that not all of

this activity implicated FECA or FARA, it does show that they

were nonetheless trying to influence the American political

system, influence the outcome of the election, and just to be

clear, not because that's a crime but because we're saying that

was their overarching goal and that's the reason then that they

in turn had to impair the agencies of the United States that

police unlawful -- that police foreign interference in the

American political system.

Second, I think we've said that actually some of this

deceptive conduct, although presumably also aimed at American

people, was aimed at the American government as well.  If you

use a fake-sounding American name, if you develop a kind of

elaborate identity of an American individual, that doesn't just

1    deceive the citizen who is looking at perhaps a Facebook account

2    or looking at an ad.  It also potentially deceives the FEC

3    employee, the FBI agent, the DOJ analyst who is looking at that

4    same information.

5         And finally, Your Honor, I would say we made a number of

6    points about why it is that the kind of scope and magnitude of

7    this sheds light on their motivations.  Again, the overall

8    allegation in this case is that their goal, their primary

9    purpose was to interfere in the election and to deceive the

10   electorate, but that in order to do so, they had to impede the

11   U.S. agencies that police this area.

12        And so if you look at the volume of what they were doing,

13   the organized nature of what they were doing, the fact that they

14   were praying on particular issues that, for example, might be

15   regional specific, all of that made it absolutely necessary that

16   they conceal their Russian identity.

17        And so for that reason, just setting aside whether FECA or

18   FARA applies, we think all of it is relevant.

19        Then just moving into why it is that FECA and FARA applies,

20   I will get into the weeds, but just kind of two preliminary

21   observations.  One is, there's a little bit of a game of shadow

22   boxing going on here, because unfortunately the sole argument

23   that we've gotten from Mr. Dubelier on this are basically kind

24   of half-sentence assertions in his brief.  I'm happy to kind of

25   speculate as to what he's getting at, and I think we got a bit

of a new argument at the podium just now, and I'm happy to
address that, but it is a little bit hard for us to unpack and
start responding to arguments that he hasn't actually made yet.

The other point I would just make up front is, ultimately,
to the extent that any determination needs to be made whether
FECA and FARA were violated, typically these are determinations
that are made by the jury.  Again, this is an evidentiary
motion.  This is a motion in limine.  We are just deciding
whether these things are relevant.  So kind of everything I am
discussing about FECA and FARA, whether Your Honor ultimately
agrees with it or not, I think, gets us well into the realm of
it's certainly relevant and a jury should be able to consider
it.

And so as for the ads and whether those ads would have
either violated the FECA foreign source ban or whether they
would have triggered the FECA reporting requirements, we agree
with Mr. Dubelier at the kind of highest level of generality
that it does need to be express advocacy.

Now, Mr. Dubelier has made various assertions that some of
it, very little of it, maybe none of it were express advocacy.
It's actually particularly hard for us to engage with that
because he's never really said what ad was what.  As we pointed
out in our filing here, we dug back through some of
Mr. Dubelier's prior filings.  In one of them, there were a
couple of ads that he alleged were not express advocacy.  In a

1    footnote of that prior filing, we pointed out why they were.  We

2    cited the relevant FEC regulation.  Again, we just haven't

3    gotten a response from him on that.

4         So all that I can say is, if this is just a dispute on the

5    exact number, I think on some level everyone agrees that at

6    least some of this was express advocacy, and it's hard for me to

7    stand up here and engage on exactly what the number is unless I

8    actually know how Mr. Dubelier is going about calculating his

9    number.

10              THE COURT:  You have a significant amount that is

11   clearly express advocacy?

12              MR. JED:  That's correct.

13        And by the way, just to respond to a question that Your

14   Honor asked to my friend, the very Facebook accounts that were

15   buy and paid ads that were clearly express advocacy, I think

16   even under Mr. Dubelier's probably narrowest like magic word

17   standard of express advocacy, were also engaging in some of the

18   other activity that we are talking about, which is just kind of

19   a further reason that any even nonexpress advocacy activity --

20              THE COURT:  So same account?

21              MR. JED:  Correct.

22        As for the FARA activity, as we pointed out in our filing,

23   it seems as if the sole argument that Mr. Dubelier has made is

24   this kind of half-sentence assertion that the Russians were

25   physically located in Russia, therefore they could not have

violated FARA.

So as we point out, there are two kind of particularly important provisions of FARA here.  One is that you're acting as an agent under FARA, both based on your own actions and actions through other people.  Two, the question is not, if you just look at the plain text of the statute, where the individual is physically located.  The question is where they are acting.  So ultimately, the question is, did these individuals act -- and it's not any kind of action.  They're delineated categories of action.  Did they engage in those delineated categories of action, either themselves or through other people, in the United States.

And I think we've outlined why all or almost all or much of this would certainly foot the bill.  So just as an initial matter, we pointed out that they were spending money in the United States.  They were making electronic transfers to Facebook.  They were buying virtual private servers that were located in the United States.  That's a triggering set of conduct.  That conduct is happening in the United States.  Therefore, FARA is implicated.

We talked about some of the general social media activity, and there are kind of a litany of facts that I will point in the same direction here.  The messages were being beamed into the United States for the purpose of influencing the United States.  They were moving around within the United States.  Essentially,

messages were being posted on Facebook servers and being caused to move to other Facebook servers.  Other individuals in the United States were in turn being encouraged to repost and to move these things around.

And by the way, all of this was being done actually from a physical platform located in the United States.  As we pointed out, a lot of the activity that was undertaken, rather than just being basically beamed in directly from St. Petersburg, was actually essentially kind of stopping and pausing on a virtual private server in the United States for the purposes of concealing where it was coming from so that if anyone -- probably not something the general electorate could do, something more likely the government could do, but so that if anyone tried to trace back what IP address is this coming from, you would actually see an American-located IP address.  So again, all of that activity is happening in the United States.

The very last kind of category of reasons this is happening in the United States is that there were unwitting Americans involved.  This is a point we've now made in, I think, about three or four different filings to the Court.  This just a moment ago was the very first time I've heard any response to it, and I'm still struggling to understand exactly what Mr. Dubelier's response is.

I mean, insofar as even just looking at the FARA text specifically, FARA says it's acting yourself or through someone

else.  If you're acting through someone physically located in the United States, particularly an unwitting person, then you are acting in the United States.

We have also pointed out just --

THE COURT:  So the co-conspirators themselves were required to register?

MR. JED:  So I think certainly the individuals in Russia, correct, and through unwitting people would be required to register.  It's a little difficult to wrap your head around the question of whether the unwitting individuals would also have to register.  Obviously, if you're unwitting, you couldn't be expected to register.

If Mr. Dubelier wanted to sort of make a detailed legal argument about that, we might be in a position to respond.  If nothing else, I think yes, once you're acting through the individuals in the United States, those people outside of the United States who are acting in the United States would have to register.

I mean, by the way, FARA is not unique.  We point out, this is just kind of general principles of co-perpetration laws. When you have a group of people who undertake something together, normally all of them are deemed to be acting when any of them have been acting.  And in fact, traditionally what has basically now been codified in 18 U.S.C. 2(b) is just a common law principle which says if you act through someone's innocent

```
1    hands, essentially you are acting where their hands are.  This
2    used to be very important because of limited territorial
3    principles.  Now it doesn't come up as much.  But I think FARA's
4    concept that you are acting through someone else is not unique,
5    and just the plain text of the statute shows why it is FARA is
6    triggered, even if some of these folks were physically located
7    in Russia.
8              THE COURT:  By causing another?
9              MR. JED:  That's correct.
10             THE COURT:  Anything else?
11             MR. JED:  I think that's it.  I would be happy to
12   address the 403 prejudice arguments if the Court is interested.
13   I believe Mr. Dubelier, when he was just standing here, kind of
14   suggested, relevance aside, that he thought some of this was
15   prejudicial.  I'm happy to engage with that.
16             THE COURT:  You mean on the lawful conduct?
17             MR. JED:  Yes, that's correct.
18             THE COURT:  No, that's not necessary.
19             MR. JED:  Thank you, Your Honor.
20             THE COURT:  Mr. Dubelier, do you want to respond to
21   that at all?
22             MR. DUBELIER:  No, Your Honor.
23             THE COURT:  All right.  So in addition to allowing the
24   government to introduce evidence relating to the FEC's
25   restrictions on certain expenditures by foreign nationals, I
```

1    also will allow the government to introduce evidence of lawful

2    activity that is alleged in the indictment.

3        Mr. Dubelier, if I can engage with you a little bit on the

4    government's motion to exclude argument, I guess, anticipating

5    what you may or may not do but what they think you might do.

6        You have made clear you are not going to argue that Concord

7    should be acquitted because of selective prosecution.  But from

8    your brief, it does appear that you want to be free to argue

9    that no person or entity has ever been prosecuted on this theory

10   of liability before, that the government has not previously

11   interpreted or applied the statute or regulations at issue as it

12   does here in this case, and that the government has not

13   previously provided any guidance consistent with the application

14   of the statute and regulations at issue here.

15       Is that fair?

16           MR. DUBELIER:  Yes, Your Honor.  And to be clear, we

17   would only argue that if evidence was elicited at trial to

18   support that.  I'm not talking about just coming here and making

19   something up, making an argument up.  There would have to be

20   evidence at trial that supports the argument.

21           THE COURT:  So in opening statement, you're not going

22   to --

23           MR. DUBELIER:  Oh, no, I would say it in my opening

24   statement, because I know where the evidence is coming from.

25           THE COURT:  In terms of what you could say in your

opening statement, I'm not going to let you say no person's ever

been prosecuted under this theory.  All right?  There have been

371 conspiracies.  These facts, yes, these facts are unique.

But I've said, this is not a made-up crime, and whether or not

the government has ever charged 371 conspiracy in this precise

manner does not negate Concord's intent here to defraud the

United States.

So that argument is inappropriate.  I'm not going to allow

you to do it.

The tougher issue is the extent to which I allow you to

introduce evidence that the government, the FEC, the DOJ, has

not previously issued guidance on or applied statutes or regs in

the manner that they have done here.  All right?

So can you help me -- can you give me some sense of what

you want to say?  Is it just that, this has never happened

before?  There are no prosecutions under these statutes with

these facts?  There are no legal opinions that are posted on the

Web sites?  What is it?

MR. DUBELIER:  That's essentially where we want to go

with that, Your Honor.  I think it will be elicited through

cross-examination of the government's witnesses who work at

those agencies.

THE COURT:  And you think you should be able to do

that regardless of whether you have a witness who testifies, you

know, I tried to determine whether this was legal, and I looked

1    on the Web sites, and there's nothing on there that suggested it

2    was illegal?  You think even without that, you should be able to

3    get into that?

4         MR. DUBELIER:  I think that would be expert legal

5    testimony, and I don't think you would let me do that.

6         THE COURT:  No, I mean if an individual here who is

7    engaged allegedly in the scheme comes in and says, I didn't have

8    any intent to defraud the DOJ or SEC, and in fact, I wanted to

9    make sure, and I looked at the Web site, and there's nothing

10   there, I did my best to figure out whether this was lawful

11   conduct, and I didn't have that intent because --

12        MR. DUBELIER:  I think where the government seems to

13   take their argument on this is if we can't prove that we

14   actually went and looked, then we shouldn't be able to elicit

15   evidence in that respect.  I just don't think that's the case.

16        Again, this all goes back to what we spent a lot of time

17   talking about already this morning and our position that they

18   have to prove specific intent to defraud.

19        Had there been prosecutions or actions by the FEC and DOJ

20   on this fact situation and those had been publicized, I think

21   that would be an argument that we knew, because anybody who

22   looked on the Internet would know, and that's simply not the

23   case here.

24        And Your Honor, I don't want to belabor it because we've

25   argued it in the papers.  I really don't have anything to add

1    other than what we put in the papers.

2        I will say this, if I could put in a placeholder.  This one

3    might be premature.

4            THE COURT:  Yeah, I think I am going to have to

5    reserve some of this.  I want to hear from the government on it.

6    But I am concerned about getting into the nitty-gritty

7    enforcement of FECA and FARA and confusing the jury with that.

8    They don't have to prove a willful violation of those acts, as

9    I've held.

10          MR. DUBELIER:  What you just said terrifies me.  We

11    have to get into the nitty-gritty of this statute and

12    regulations.  We have to, or they're not going to be able to

13    tell the jury what was illegal.

14          THE COURT:  But the defendants, the co-conspirators

15    did not have to know the specific laws, I've already held;

16    right?

17          MR. DUBELIER:  But they had to know -- they had to

18    have an intent that they were going to break a law.

19          THE COURT:  I agree -- no, intent that they were going

20    to impair a function.

21          MR. DUBELIER:  Which is against the law, against 371.

22          THE COURT:  It doesn't -- intent to impair a function

23    is not the same as intent to commit a crime.

24          MR. DUBELIER:  The reason why this is tortured and why

25    *Treadwell* doesn't apply or any of the other cases you're talking

1    about apply, in every single one of those cases, there's a 371

2    to defraud, and almost in every one of them, there's also a 371

3    to violate a specific statute, and then there's multiple --

4         THE COURT:  Not always.

5         MR. DUBELIER:  We can't find any single-count

6    indictment cases, conspiracy to defraud.  There's always this

7    other stuff.  I was a federal prosecutor for a long time.  You

8    load it up.  You purposely put all that stuff in here.

9         Here, the uniqueness is, they purposely didn't put it in

10   here because they can't prove it.  They can't prove a

11   substantive violation.

12        THE COURT:  The whole indictment has substantive

13   charges in it, but Concord is not charged with those.

14        MR. DUBELIER:  I've always viewed it as with respect

15   to us at least, it's a one-count indictment.

16        THE COURT:  It's a multiple-count indictment, but your

17   client is accused of just being a part of the conspiracy, being

18   behind it with the funding.

19        MR. DUBELIER:  Right.

20        THE COURT:  All right.  From the government, who is

21   arguing this?

22        MR. JONES:  Briefly, Your Honor.

23        Mr. Dubelier said there needs to be an intent to break the

24   law.  That's willfulness.  That's not --

25        THE COURT:  There does need to be an intent to defraud

1    the government, and that's the government's burden, to show some

2    degree of knowledge of what the function is.

3         MR. JONES:  Right.  And if the defense has a witness

4    on its behalf that can come in and testify to its intent,

5    certainly that would be relevant evidence.  But absent that --

6         THE COURT:  Why is the fact that -- you say FARA never

7    published its opinions until 2018.

8         MR. JONES:  Arguing that the government hasn't met its

9    burden with respect to intent is one thing.  Coming in and

10   arguing through opening statement or cross-examination

11   questions, getting into far-afield issues of what these agencies

12   have done or haven't done or what the department has charged or

13   hasn't charged, I mean, that, first of all, is not -- is far

14   afield from the defendant's actual intent, which is what the

15   burden of proof is for the government.

16       In addition, we're going to end up with a trial within a

17   trial, and the government is going to have to put on another

18   case as to each of these -- to rebut these questions and

19   arguments, which is precisely what 403 is meant to prevent.

20       So for those reasons, we think it would be improper.

21       THE COURT:  But you have to show an intent to impair a

22   function.

23       MR. JONES:  Right.

24       THE COURT:  So the knowledge of the function is

25   clearly relevant.  And whether the government has issued

1    opinions, public opinions on these issues, is that not relevant?

2           MR. JONES:  I think as a general matter, I'm not sure

3    the defendant's opposition indicates with real specificity how

4    it intends to introduce or elicit this evidence or testimony.

5    And so arguing it again in the abstract may be premature.

6           THE COURT:  It is premature, but this is -- we're

7    trying to anticipate.

8       By the way, Mr. Dubelier, have you provided any evidence or

9    witness lists to the government?

10          MR. DUBELIER:  Yes, we did.

11          THE COURT:  You did?

12          MR. DUBELIER:  You ordered me to, yes.

13          THE COURT:  And that doesn't shed light on any of

14   this?

15          MR. JONES:  They provided it last night.  I haven't

16   had a chance to look at it.

17          THE COURT:  I agree it's premature.  I really want to

18   try hard -- there's some complicated issues in this case.  I

19   want to try hard not to be in a situation where we are in the

20   middle of trial and we have to address a complicated legal

21   argument on this.  So I really expect the parties to flag these

22   issues ahead of time.

23      Mr. Dubelier, you've not filed a motion to exclude any of

24   the government's exhibits or witnesses, aside from presumably

25   you're going to oppose their motion to admit all of these

1    exhibits.

2         But would that opposition raise additional grounds?  Do you

3    have any other objections to any other evidence that they seek

4    to admit?

5              MR. DUBELIER:  I think we agreed with Mr. Kravis some

6    time ago that we didn't want cross-motions flying.  So we're

7    just going to do our opposition to their motion in limine.

8              THE COURT:  I just want to make sure that that

9    opposition raises not only your opposition to their argument on

10   why it's admissible, but any additional objections you have, and

11   I want to make sure that you haven't failed to file a motion to

12   exclude other evidence that they aren't seeking to admit here.

13        There is a motion before me wanting to admit their whole

14   case.  Does that cover all of their exhibits?  If not, have you

15   neglected to object to some of the other exhibits that are not

16   covered by the motion to admit?

17        I want to make sure that we're covered, that you don't have

18   any additional objections.  I'm fine with how you're doing the

19   briefing.  It's what I encouraged you to do, and I appreciate

20   it.  I just want to make sure there's not a gap here between

21   what they're seeking to admit and what you're objecting to.

22             MR. DUBELIER:  I understand, Your Honor.

23             THE COURT:  The government's deadline to file any

24   motions in limine relating to the defendant's exhibits and

25   witnesses is due February 17th.  All right.

1    So I think we've covered everything except for continued

2    argument on the motion that raises sealed issues.

3    My law clerk has just pointed out, I thought -- we did

4    exclude time until trial under the Speedy Trial Act, until

5    April 6th.  It's noted incorrectly on the docket.  So we do need

6    to clarify.  I did exclude time until April 6th, and I did find

7    that the ends of justice served by excluding the time outweigh

8    the best interests of the public and the defendant in a speedy

9    trial.

10    So you all agree that I have done that; right?

11    MR. DUBELIER:  Yes, Your Honor.

12    MR. JONES:  Yes, Your Honor.

13    THE COURT:  I think that's it, unless there's

14    something else.

15    MR. DUBELIER:  Your Honor, I had three issues.  Two, I

16    think, would be better raised in a closed court.  The other one

17    is just ministerial, but I keep forgetting to raise it with the

18    Court, if the Court can help us get office space for the trial.

19    THE COURT:  I will look into that.  I'm sure there is

20    a way to do that.

21    MR. DUBELIER:  Just one room that we can fit all the

22    boxes in.  Thank you very much.

23    THE COURT:  Thank you.

24    MR. JONES:  I did want to note, February 17th is

25    President's Day.  To the extent that affects the Court's

1    calendar --

2              THE COURT:  You're not working that day?  I am.

3              MR. JONES:  Yes, I imagine we will be working that

4    day, but --

5              THE COURT:  I'm fine with you filing the 18th and

6    giving Concord an additional day on its end for the opposition,

7    I think.  Are we jammed up on the March 2nd hearing?  Let me

8    look.

9              MR. JONES:  We can take a day off the reply deadline,

10   if that would keep things on track.

11             THE COURT:  Let me just look at the deadlines here.

12     So the motion in limine was due the 17th, the opposition

13   the 24th.  You're already short on the reply.  So the government

14   is saying it wants to file on the 18th?

15             MR. JONES:  Yes, Your Honor.

16             THE COURT:  You can file on the 17th if you want.

17             MR. JONES:  I understand, Your Honor, but we are

18   requesting to file on the 18th.

19             THE COURT:  All right.  File on the 18th, Concord

20   opposition by the 25th, and the reply by the 28th, as previously

21   scheduled?  Does that work, Mr. Jones?

22             MR. JONES:  That's fine with the government, Your

23   Honor.

24             THE COURT:  What's today?  The 11th?  All right.  So

25   we have a hearing scheduled for March 2nd and March 9th.  If it

 1   appears, based on the briefs, the opening brief and the

 2   opposition, that these are complicated issues, then I am going

 3   to give you more time, and we will bump that until the 9th.  I

 4   would prefer not to.

 5        Okay.  Anything else?

 6             MR. DUBELIER:  No, Your Honor.

 7             THE COURT:  So we are going to seal the courtroom for

 8   continuation of argument.

 9        (Public proceedings concluded at 11:50 a.m.)

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

12

13                  CERTIFICATE OF OFFICIAL COURT REPORTER

14

15        I, Sara A. Wick, certify that the foregoing is a

16   correct transcript from the record of proceedings in the

17   above-entitled matter.

18

19

20   /s/ Sara A. Wick                  February 13, 2020

21   SIGNATURE OF COURT REPORTER       DATE

22

23

24

25