**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal No. 18-CR-32-2** |
| **CONCORD MANAGEMENT** **AND CONSULTING LLC,** | |
| **Defendant.** | |

**GOVERNMENT'S REPLY IN SUPPORT OF**
**MOTION IN LIMINE TO ADMIT DOCUMENTS**

The government moved *in limine* to admit certain categories of documentary evidence with the goals of simplifying and shortening the trial in this matter, alerting defense counsel and the Court to the bases upon which the government seeks to admit its evidence, and generally avoiding any unfair surprise or unnecessary delay.[1]  For each category of information, the government explained the reasons why the evidence met the minimal standards for authenticity and relevance. As is common, the relevance and admissibility of certain evidence depends on whether the government can make a sufficient showing as to underlying facts, and, in several instances, the government's motion includes a proffer as to how the government expects to make such a showing. In addition, the government's motion addressed anticipated hearsay objections by the defendant, Concord Management and Consulting LLC ("Concord"), and identified the reasons why certain

---

[1]    The categories of exhibits identified in the government's motion include:  (1) the contents of social media accounts used by the conspirators to further the conspiracy, including both business records from the accounts and content created by the conspirators; (2) business records of various companies; (3) emails between members of the Internet Research Agency ("IRA") furthering the conspiracy; (4) communications between IRA members and agents of defendant Concord Management and Consulting; (5) documents connecting Concord's controlling officer Yevgeniy Prigozhin to the IRA; and (6) other statements by members of the conspiracy.

evidence was either *not* hearsay or was nonetheless admissible under the Federal Rules of Evidence ("Fed. R. Evid.").

Although *in limine* rulings are not explicitly recognized in the Federal Rules of Evidence, "the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 (1984). Furthermore, "a trial judge's discretion extends not only to [a] substantive evidentiary ruling, but also to the threshold question of whether a motion *in limine* presents an evidentiary issue that is appropriate for ruling in advance of trial." *United States v. Holland*, 41 F. Supp. 3d 82, 89 (D.D.C. 2014) (internal quotation marks and citation omitted). For the reasons presented by the government in its opening brief, the Court should grant the motion. If the Court is not inclined to do so, however, the Court should defer ruling until trial, at which time the Court's decisions "can be better informed by the context, foundation, and relevance of the contested evidence within the framework of the trial as a whole." *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 175 (D.D.C. 2015).

Concord's opposition makes clear that it objects to the authenticity and relevance of nearly all (if not all) of the government's proposed exhibits, and Concord raises additional objections based on hearsay. For the reasons stated below, these objections are without merit. Concord also challenges the government's evidence as unfairly prejudicial, citing Fed. R. Evid. 403, which permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, [etc.]." On this point, the government understands Concord's filing as, in effect, a motion to exclude evidence; however, Concord fails to justify the "extraordinary remedy" of excluding the government's proposed evidence under Fed. R. Evid. 403. *See United States v. Libby*, 467 F. Supp. 2d 1, 20 (D.D.C. 2006).

## RELEVANT LEGAL AUTHORITY

"In evaluating the admissibility of proffered evidence on a pretrial motion *in limine* the court must assess whether the evidence is relevant and, if so, whether it is admissible, pursuant to Federal Rules of Evidence 401 and 402." *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 175 (D.D.C. 2015).  Fed. R. Evid. 401 states that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Thus, relevance is "determined in the context of the facts and arguments in a particular case." *Sprint/United Mgmt. Co. v. Mendelsoh*, 552 U.S. 379, 387 (2008).  Fed. R. Evid. 402 states that relevant evidence is admissible, unless otherwise provided by law or other rules, and that irrelevant evidence is not admissible.

"Authentication is an aspect of relevancy." *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006).  To authenticate evidence, the proponent must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  However, this threshold is "not high," and the proponent's burden is "slight." *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016).  Importantly, in deciding whether evidence is admissible, the Court is not bound by evidence rules, except those on privilege.  Fed. R. Evid. 104(a). Furthermore, under Fed. R. Evid. 104(b):  "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.  The court may admit the proposed evidence on the condition that the proof be introduced later." Evidence can by authenticated through, among other ways, "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Fed. R. Evid. 901(b)(4).

# ARGUMENT

As a general matter, Concord's opposition overstates the government's burden regarding the admissibility of the categories of evidence identified in the motion *in limine*. For example, Concord appears to suggest (Opp. at 1-4) that the government must prove its entire case—that is, establish there was a conspiracy to defraud the United States and prove Concord joined that conspiracy—before any of the government's evidence may be admitted. But motions *in limine* to admit or exclude evidence typically depend on a proffer by the movant, particularly when evidentiary issues are raised in advance of trial, as is the case here. Similarly, Concord broadly suggests (at 2) that the admissibility of exhibits depends on the government establishing a direct connection between proffered exhibits and Concord, as opposed to a connection between the exhibits and "any fact of consequence in determining the action," which would certainly include facts not directly tied to Concord. Fed. R. Evid. 401. In addition, Concord suggests (at 5-9) that the government must attribute each social media post, message, or other communication to a particular person—in other words, putting an identified individual behind the keyboard—even though, in many instances, attribution of evidence to the conspiracy, if not a particular conspirator, is sufficient to establish authenticity and relevance in this case. But that significantly overstates the relatively low quantum of proof required by the law to establish authenticity.

With respect to exhibits whose admission may turn on a requirement for the government to make a certain showing—as to authenticity, relevance, an exception to the hearsay rule, or otherwise—the government has proffered that showing in significant detail in its motion. There is no requirement that the government present its entire case-in-chief before exhibits are admitted, even if conditionally, and before the trial actually begins. At trial, of course, the government

intends to present its evidence in greater detail, and the Court will then be in a position, if it is not already, to resolve any remaining disputes over authenticity, relevance, and admissibility.

## I.      Social Media Accounts

In its motion, the government described the content of search warrant returns from Facebook and Twitter accounts that were used by the conspirators to further their common goals of interference in the U.S. political system and 2016 election and defrauding the United States as alleged in the Superseding Indictment.  Mot. at 5-7.  For the reasons stated therein, the entirety of these accounts are admissible as business records and are not barred by rules against hearsay because they are not offered for their truth and, in any event, constitute statements by co-conspirators in furtherance of the conspiracy.  In response, Concord claims that government has not yet established the authenticity of the records associated with these accounts and that  these documents are hearsay and irrelevant as to Concord.  These arguments are unavailing.

Concord relies heavily on *United States v. Vayner*, 769 F.3d 125 (2d Cir. 2014), a case in which the Second Circuit disagreed with the district court's admission of a page from the Russian social media platform VK.com that the government argued belonged to the defendant.  But there are at least two key points of differentiation here: (1) the context or purpose for which the government seeks to introduce the records, and (2) the government's quantum of evidence.

In *Vayner*, a forged birth certificate was sent from an email account with a particular moniker, and the government introduced the VK printout to show that the defendant used that moniker.  The VK printout contained information about the moniker and the defendant, but "no evidence in the record suggested that [the defendant] even had a VK profile page, much less that the page in question was that page."  *See Vayner*, 769 F.3d at 132-33.  The Court of Appeals did not explain what kind of evidence would have been sufficient to authenticate the VK printout, but

the court did emphasize the low bar for authentication and cited to the "distinctive characteristics" example from Fed. R. Evid. 901(b)(4). *See id.* at 132.

Here, the government seeks to introduce the social media records to demonstrate a coordinated effort by the IRA to influence the American political system while concealing the IRA members' foreign identities. The government is not necessarily intending to identify all of the specific individuals that controlled these accounts; the government is only seeking to show that the accounts were used and/or controlled by a group of individuals acting in concert under the direction of the IRA and, through other evidence, Concord. *See United States v. Turner*, 836 F.3d 849, 858 (7th Cir. 2016) (holding that consulting agreement "was properly authenticated under Rule 901(b)(4), despite uncertainty regarding the identity of the declarant, based on its content detailing the distinctive payment structure and the circumstances surrounding its receipt").

Concord would have this Court apply an impossibly high—not to mention tortured— standard that the government must offer "social media accounts bearing the name of any alleged conspirator" and that "their names are correct and that nobody else posted any of the content." Opp. at 18. That might have been the purpose in *Vayner*, but that is not the purpose here. Though additional evidence establishing "true-name" accounts might bolster the government's showing as to authentication, it is not at all necessary to meet the government's "slight" authentication burden, nor is it necessary to establish relevance.

With respect to the quantum of evidence, unlike the government in *Vayner*, here the government has "more 'than the page itself' to support authentication." *See United States v. Quintana*, 763 F. App'x 422, 427 (6th Cir. 2019) (quoting *Vayner*, 769 F.3d at 132). In addition to the content of the accounts, the government's evidence of authenticity here includes: (1) IP address records reflecting that social media accounts were accessed by the same IP addresses as

were used by the conspirators to access their personal email accounts; (2) the fact that the social media accounts were accessed via virtual private servers maintained by ███████ and leased by customer accounts created by ██████████████ ; (3) ████████████ reflecting that many of the social media accounts were accessed by the same computers; (4) ████████ ████████████████████████████ ; (5) ████████████████ ; (6) ████████████████ ████ ; and (7) ████████████████████████ ████████████████████████████ . This evidence, taken together, shows that those controlling these accounts were acting in concert, as part of the IRA, to influence the American political system while concealing their foreign identities.

As described in the government's motion (at 10-11), the social media posts and direct messages are not impermissible hearsay because they are not offered for the truth of the matter asserted and they constitute statements of co-conspirators in furtherance of the conspiracy. The social media posts will be offered to show how the conspirators spread propaganda using social media accounts and sought to influence American political debate while concealing that the operators of these accounts were Russian nationals operating from Russia. They will not be offered to prove that, for instance, a particular presidential candidate was preferable due to his or her positions on gun control, immigration, or racial justice issues. These messages are also admissible as statements of co-conspirators in furtherance of the conspiracy. Indeed, they were some of the primary instruments by which the conspirators sought to achieve their common objectives.

In its opposition (at 22-24), Concord contends as it does elsewhere that the government has not yet proven the ties between the individual conspirators who authored these posts, the IRA, and Concord. But that misunderstands the purpose of the government's motion, which was not to lay

out the details of every single co-conspirator statement and exactly how the individual who made it participated in the conspiracy but, rather, to lay out in considerable detail the factual and legal bases on which the government will seek admission of certain broad categories of documents. The government will prove at trial that the social media posts and messages were made by co-conspirators and done so in furtherance of the conspiracy. The government believes that the factual proffers in its motion are sufficient for the Court to admit the subject exhibits, even if conditionally, but, if this Court disagrees, the government requests that the Court defer final rulings on admissibility until trial.

## II.    Other Business Records

In its motion, the government also seeks the admission of Facebook ad records, █████ ████████, ██████████████████, ████████████, subscriber information, ████████ server data, and WHOIS IP address records. Concord raises authentication, hearsay, and relevance objections to this evidence. These arguments are addressed in turn below.

Concord argues in its opposition (at 25) that "to authenticate these records, the government is required to show that the information reflected therein belongs to, was authored by, or can otherwise be linked to Concord in a meaningful way." However, the government need not show specific links between each piece of evidence and Concord. Rather, the government must link the evidence to the conspiracy, of which Concord is alleged to have been a member. The above-described records, for the reasons explained in the government's motion, are each connected to the conspiracy. Moreover, for each set of the above-described records—with the exception of the WHOIS records, as explained in more detail below—the government has produced or will produce

to the defense a certification attesting that the documents are authentic business records of various companies.[2]  *See* Fed. R. Evid. 902(11) (business records with certificate are self-authenticating).

    *Facebook ad records.*  The government's motion seeks the admission of: (1) records for each advertisement showing how the ad was purchased (typically through the ███████████ ███), where the ad was displayed, and the ad's content; and (2) a spreadsheet linking each ad to a particular Facebook account.  Concord opposes the admission of these records, *inter alia*, because the data "must be cross-referenced to other data to . . . establish that a particular person purchased a particular ad" and because the spreadsheet, if admitted without testimony from a representative from Facebook, would violate the Confrontation Clause.  The government is awaiting a business records certification from Facebook that the government expects, with respect to the proposed Facebook exhibits including the spreadsheet, will attest to the various requirements in Fed. R. Evid. 803(6), including the requirements that the records were kept in the course of a regularly conducted activity of a business and that making the records was a regular practice of that activity.  The government may issue a trial subpoena for the testimony of a witness from Facebook, in the event that the government ultimately cannot obtain a certification or the certification is insufficient.

    Moreover, none of the Facebook ad records, including the ad-to-account spreadsheet, are testimonial within the meaning of Confrontation Clause.  On this point, the defense cites *United States v. Cameron*, 699 F.3d 621 (1st Cir. 2012).  The Facebook spreadsheet here differs from the

---

[2] The government may properly obtain business records certifications shortly before trial. *See, e.g.*, *United States v. Hassan*, 742.F.3d 104, 133 n.25 (4th Cir. 2014) ("The appellants' contention that the Facebook and Google certifications are insufficient because they were made for litigation purposes several years after the postings occurred is entirely unpersuasive. It would make no sense to require a records custodian to contemporaneously execute an affidavit attesting to the accuracy of a business record each time one is created or maintained, when there is no pending litigation or need for such a certification.").

"CP Reports" at issue in *Cameron*, which the First Circuit found to be testimonial hearsay,. Here, the primary purpose of the spreadsheet is to provide missing information—namely, which advertisements are associated with which advertising and user accounts—that were inherent (but omitted) in the already-existing business records.  The identifiers are, accordingly, listed under *neutral* headings: "Ad ID," "Ad Account ID," and "User ID."  The CP reports in *Cameron*, on the other hand, reflected the *analysis* of Yahoo!'s legal department and bore the conclusory headings "Suspect Screen Name," "Suspect Email Address," "Suspect URL," and "Suspect IP Address." 699 F.3d at 644 (recognizing that Yahoo! had created the CP Reports after its own employees had already concluded that a crime had been committed).  The *Cameron* court itself recognized that information reflecting associations of already-existing data, as is the case here, are more akin to non-testimonial business records.  *See* 699 F.3d at 648 n.12 ("[T]he association between a picture and an account is clearly a business record of Yahoo!; without keeping track of these associations, Yahoo! could not figure out which photos on its servers belonged to which users.").



In the event that the government cannot obtain a certification or if the certification is insufficient, the government will issue a trial subpoena for the testimony of a witness from ████.  Moreover, these records are also admissible through Fed. R. Evid. 901(b)(4) based on "Distinctive Characteristics and the Like," specifically, "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Here, ██████████, taken together with the Facebook ads themselves and the records associated with those ads, show that ████████ ████ are what the government claims they are.  *See* Fed. R. Evid. 901(a).

███████████████████████████████████████████████ *and* ██████ *subscriber*

*information.* ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ are self-authenticating under Fed. R. Evid. 902(11).[3]  Courts

routinely find account subscriber information to be self-authenticating under Fed. R. Evid.

902(11).  *See, e.g.*, *United States v. Hunter*, 862 F.3d 725, 728 (8th Cir. 2017) (IP address

evidence); *United States v. Taylor*, 2017 WL 11458484, at *1 (D. Az. Nov. 2, 2017) (telephone

subscriber records); *United States v. Jones*, 2016 WL 10704381, at *2-*3 (E.D. La. Feb. 17, 2016)

(Google subscriber information); *United States v. Baptiste*, 2012 WL 12873769, at *5 (D.S.C. Oct.

19, 2012) (profile and login times produced by Yahoo!).  Moreover, *Cameron* stands for the

proposition—advanced by the government here—that basic subscriber information, IP address

logs, and other similar information collected automatically by providers such as ██████████,

Facebook, ███████████████████ to further their business purposes are not excluded by the rule

against hearsay, pursuant to Fed. R. Evid. 803(6); though not at issue in *Cameron*, the records

would thus be self-authenticating, pursuant to Fed. R. Evid. 902(11).  *See* 699 F.3d at 641 ("[W]e

agree with the government that the Account Management Tools and the Login tracker were

business records of Yahoo!, and the Google Hello Connection Logs were business records of

Google").

---

[3]      Concord notes in its opposition (at 28) that subscriber information for the account
█████████████████████████ was not included on the government's exhibit list.  This
information was produced to Concord in discovery and has now been formally identified for
defense counsel as Government's Exhibit 374.

Moreover, ████████████████████████████████████████

████████████████████████████████████████████████

███████████████ thus providing additional "evidence sufficient to support a finding that the

item is what the [government] claims it is." *See* Fed. R. Evid. 901(a).  To the extent that Concord

wishes to refute any information contained within the subscriber information (for example, the

name with which an account was registered), Concord is free to make arguments to the jury about

the weight of this evidence.  *See, e.g.*, *United States v. Vayner*, 769 F.3d 125, 131 (2d Cir. 2014)

("[A]fter the proponent of the evidence has adduced sufficient evidence to support a finding that

the proffered evidence is what it is claimed to be, the opposing party 'remains free to challenge

the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of

its meaning, but these and similar other challenges go to the *weight* of the evidence—not to its

*admissibility*.'" (emphasis in original) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d

Cir.2004))).  This does not, however, alter the fact that this evidence is self-authenticating.

███████████████.  Through Fed. R. Evid. 1006 summaries, the government seeks

to admit at trial ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████.  These records

are self-authenticating and are admissible as business records of Green Floid under Fed. R. Evid.

902(11) for the same reasons as ███████████████████████████

████, and the ██████ subscriber information.

With respect to hearsay, Concord generally argues (at 29) that it is unable to determine

whether the method or circumstances of the preparation of the data that is the subject of the Rule

803(6) certifications is sufficiently reliable or trustworthy to warrant admissibility.  The

government has already produced or will produce certifications attesting to the various requirements in Rule 803(6).  To the extent that Concord wishes to raise objections to particular certifications, it has failed to do so thus far.

With respect to the WHOIS records showing ████████████████████████ ██████, the WHOIS database is available through several websites, including through centralops.net, the website through which Government's Exhibit 318 was obtained.  As explained in the government's motion, the WHOIS records are admissible under Federal Rule of Evidence 803(17) as a "director[y]" that is "generally relied on by the public."  *See* Fed. R. Evid. 803(17); *EarthLink, Inc. v. Ahdoot*, 2005 WL 8154298, at *8 (N.D. Ga. Feb. 1, 2005) (explaining that WHOIS is a "public database" and admitting WHOIS record in civil litigation under Rule 803(17)); *cf. United States v. Woods*, 321 F.3d 361, 365 (3d Cir. 2003) (holding that information in a database maintained by the National Insurance Crime Bureau was admissible under Rule 803(17)); *United States v. Cassiere*, 4 F.3d 1006, 1018-19 (1st Cir. 1993) (holding that compilation of real estate sales information was admissible under Rule 803(17)).  Records admitted through Rule 803(17) do not require a business records certification.[4]  Moreover, some courts have also taken judicial notice of WHOIS records.  *See, e.g.*, *Anderson Boneless Beef, Inc. v. Value Meat, Inc.*, 2017 WL 7806359, at *3 (C.D. Cal., Feb. 17, 2017); *United States v. Bode*, 2013 WL 4501303, at *3 n.6 (D. Md. Aug. 21, 2013); *Liberty Media Holdings, LLC v. Vinigay.com*, 2011 WL 7430062, at *5 n.10 (D. Ariz., Dec. 28, 2011).

With respect to relevance and prejudice, Concord argues (at 30) that "all of the same considerations . . . with respect to the admissibility of the social media content" apply to the above-

---

[4]     The government's motion incorrectly stated that it was in the process of obtaining a business records certification from WHOIS.  For the reasons stated herein, records from WHOIS are admissible without such a certification.

described business record information.  For the reasons explained above, the Court should reject these arguments.

**III.    Internal IRA Documents and Communications**

As described in the government's motion (at 14-16), the government intends to offer email communications ███████████████████████████████████████████████ ███████████████████████████████, and the logistics of their coordinated efforts to sow discord in the U.S. political system by waging "information warfare" through social media and other platforms.  These documents are both authentic and admissible.

Concord's familiar refrain of challenging the authenticity of these records because the government has not yet proven the conspiracy alleged in the Superseding Indictment fails here for the reasons it does elsewhere.  Namely, the government's motion sought to bring to the Court's attention the legal bases on which it intends to offer various categories of evidence and to provide some, but not anywhere close to all, of the factual support for the authenticity and admissibility of these records.  To the extent that the Court finds the government's current factual proffer insufficient, the government requests that the Court defer ruling on its motion until trial.  Returning to the instant objection by Concord, as the government stated in its motion (at 16), the government will authenticate these emails by tying the subject email accounts to members of the conspiracy.

Concord's assertion that the documents should be excluded because they relate explicitly only to the IRA and not to Concord misapprehends the nature of the conspiracy charge against the defendant.  Namely, just because the participants in these email communications may have been on the IRA's payroll and not Concord's does not mean that they were not conspiring with Concord.  Indeed, the government intends to show that the individuals who sent these emails were conspirators and that these communications were in furtherance of the conspiracy.  Some of the

examples laid out in the government's motion (at 14-15) elucidate the strength of the government's evidence that these emails were in furtherance of the conspiracy between Concord, the IRA, and others.

Concord's further objection to this category of proffered evidence appears to be that the emails are hearsay, but that is not correct because they are not being offered for the truth of the matters asserted but, rather, to show the state of mind of the conspirators.  They are also admissible as co-conspirator statements in furtherance of the conspiracy.  Indeed, many of these emails discuss ███████████████████████████████████████████████████████████ ████████████████████████  Among other things, these communications reveal that the conspirators brought real rigor to their work.  This was not a group of loosely affiliated individuals but, rather, a highly coordinated and well-financed operation that systematically reviewed and edited social media posts to ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████

## IV.      Communications Between the IRA and Concord

The government intends to introduce a number of emails between IRA accountant Elena Khusyaynova and Concord employees that relate to Concord's payments to fund the IRA's activities.   As discussed in the government's motion, the government will establish that Khusyaynova was an accountant for the IRA and the people with whom she corresponded were Concord employees.  We will do so through a variety of means, including ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

These email communications are relevant and admissible for the reasons set forth in the government's motion.  The emails, budgets, and other financial transactions reflected therein show, among other things, the role Concord played in funding the IRA's election interference activities.  They are admissible as business records, statements in furtherance of the conspiracy, and under the residual hearsay exception.

Concord contends that the quantum of evidence proffered by the government is insufficient to establish that, among other things, Khusyaynova was an IRA accountant, ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ Doc. at 35-39.  These arguments are appropriate for the jury consider as it contemplates what weight, if any, to give this evidence, but the arguments do not negate the conclusion that there is sufficient evidence to establish authenticity and admissibility.

At least at this stage of the proceedings, the evidence proffered in the government's motion is sufficient to establish authenticity and admissibility.  As noted, *supra*, the intent of the government's motion was not to lay out every single factual basis for the evidence it intends to offer at trial but, rather, to lay out the broad categories of evidence the government will offer and the legal and factual bases for the exhibits' authenticity and admissibility.  The evidence described in the government's motion is sufficient to admit the documents therein but, if the Court concludes otherwise, the government requests that the Court admit the exhibits conditionally or, at a minimum, defer ruling until the government makes a further showing.

## V.      Documents Linking the IRA and Prigozhin

The government's motion describes and seeks to admit documents linking Yevgeniy Prigozhin to the IRA, which the evidence will establish is a co-conspirator and the entity directly

responsible for the conspiracy's interference activities.  As noted elsewhere, the government intends to present evidence that Concord funded the IRA's activities, supporting the conclusion that Concord was a member of the alleged conspiracy.  The evidence at trial will also show that Prigozhin controlled Concord—in part, as the government's motion lays out, through ██████ ██████ Accordingly, evidence connecting Prigozhin's actions, knowledge, and intent to the actions, knowledge, and intent of the IRA is highly relevant to the question of Concord's membership in the alleged conspiracy.  The government's motion explains this relevance and establishes the authenticity and admissibility of the records that the government seeks to admit. As explained below, Concord's counter-arguments largely go to the weight of the evidence proffered by the government, and not its admissibility.  Accordingly, the Court should grant the government's motion with respect to this category of evidence.

With respect to the proffered ███████████████, Concord claims that the government relies on "unsupported assumptions" to establish their authenticity.  As the government's motion explained, however, ██████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ███████████—are sufficient to support a finding that the contents are what the government claims they are, that is, records attributable to █████, Prigozhin, and, ultimately, Concord, as the government's motion describes.

To authenticate such evidence for purposes of admissibility, "[o]nly a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." *United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012).   Concord suggests (at 41) that the burden is higher, characterizing the government as claiming: ████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████   As an initial matter, the government's motion provides additional evidence supporting a finding of authenticity. But more importantly, a proponent "is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *Achey v. BMO Harris Bank, N.A.*, 64 F. Supp. 3d 1170, 1175 (N.D. Ill. 2014).   In addition, as noted in the government's motion, ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████.

Concord's remaining arguments are similarly unavailing.   Regarding ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████, Concord's arguments all go to weight and not admissibility.   And each of these pieces of evidence, along with other evidence, supports the government's argument that Prigozhin was directly connected to the IRA, in addition to his connection through Concord's funding of that entity.

Lastly, the context surrounding ████████████████████████████████████████ ██████ are sufficient to authenticate the exhibits and to demonstrate their relevance to the case. ████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Concord will of course be free to argue that the jury should discount this evidence or conclude, in the jury's judgment, that the exhibits are not "authentic."  But that is not a reason for this Court prevent the jury from making that determination by excluding the evidence itself.

## VI.   Other Exhibits

The government's motion describes two emails and the bases for their authenticity and admissibility.  The first ████████████████████████████████████

████████████████████████████████████████████████████

Mot. at 26.  Concord's primary objection to the admissibility of this email appears to be that ██

████████████████████████████████████████████████████

████████████████████████████ Opp. at 46.  The defendant is mistaken.  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

The  second ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



[5]

Finally, the government will not endeavor to make an exhibit-by-exhibit analysis of the scores of other exhibits to which Concord now objects. *See* Opp. at 50-55. Most if not all of these documents are captured within the broad categories of exhibits the government described in its motion. The government therefore suggests that Concord's objections to these documents be taken up after the Court has provided guidance, if not rulings, regarding the government's proposed bases for the authentication, relevance, and admissibility of the categories of evidence identified in the instant motion.

## CONCLUSION

For all the foregoing reasons, as well as those stated in the government's motion, the government has cleared the relatively low hurdles of establishing the authenticity and admissibility of the categories of documents described in its motion. The government therefore respectfully

---

[5]    The residual exception would be appropriate based on all of the evidence proffered above connecting these emails to the conspiracy, the fact that the communications took place abroad, the fact that these witnesses are unavailable, and the fact that there is little reason to doubt the accuracy of the statements. *See United States v. Slatten*, 865 F.3d 767, 806-811 (D.C. Cir. 2017).

requests that the Court grant its motion and admit those documents now, even if it does so conditionally.

Respectfully submitted,

JOHN C. DEMERS
Assistant Attorney General for National Security

By: */s/ Heather Alpino*
Heather N. Alpino
U.S. Department of Justice
National Security Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Telephone: (202) 514-2000

TIMOTHY J. SHEA
United States Attorney
D.C. Bar No. 437437

By: */s/ Luke Jones*
Luke Jones, VA Bar 75053
Peter Lallas
Adam Jed
555 Fourth Street NW
Washington, D.C. 20530
Telephone: (202) 252-7066