**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

CONCORD MANAGEMENT AND
CONSULTING LLC,

     Defendant.

CRIMINAL NUMBER
1:18-cr-00032-2-DLF

## NOTICE OF FILING DECLARATION OF YEVGENIY PRIGOZHIN

Pursuant to the Court's March 2, 2020 Order, ECF 368, Defendant Concord Management and Consulting LLC ("Concord"), through counsel, provides notice that it is filing a scanned copy of a Russian-language declaration of Yevgeniy Prigozhin, along with an English translation, including Russian-language and English translations of exhibits 1 through 3 referenced therein.

Further, undersigned counsel certifies that it has conveyed a translated copy of the Court's March 2, 2020 Order to Concord.

Dated: March 4, 2020

Respectfully submitted,

CONCORD MANAGEMENT AND
CONSULTING LLC

By:  */s/ Eric A. Dubelier*
    Eric A. Dubelier (D.C. Bar No. 419412)
    Katherine J. Seikaly (D.C. Bar No. 498641)
    REED SMITH LLP
    1301 K Street, N.W.
    Suite 1000 - East Tower
    Washington, DC  20005-3373
    202.414.9200 (phone)
    202.414.9299 (fax)
    edubelier@reedsmith.com
    kseikaly@reedsmith.com



78 А Б 8242182

## В ОКРУЖНОЙ СУД США
## ПО ОКРУГУ КОЛУМБИЯ

СОЕДИНЕННЫЕ ШТАТЫ АМЕРИКИ

против

УГОЛОВНОЕ ДЕЛО НОМЕР:
1:18-cr-00032-2-DLF

ООО «КОНКОРД МЕНЕДЖМЕНТ И
КОНСАЛТИНГ»

Ответчик.

### ЗАЯВЛЕНИЕ ЕВГЕНИЯ ВИКТОРОВИЧА ПРИГОЖИНА

Я, Евгений Викторович Пригожин, 01 июня 1961 года рождения, место рождения: гор. Ленинград, гражданство: Российская Федерация, пол: мужской, паспорт серии 40 07 № 136936 выдан 28 о/м Центрального района Санкт-Петербурга 29 января 2007 года, зарегистрированный по адресу: Санкт-Петербург, ул. Пушкинская, д. 4, кв. 35 заявляю следующее:

1.      Я являюсь гражданином Российской Федерации и был в Соединенных Штатах Америки 1 раз, ориентировочно в период с 1992 по 1993 год.

2.      В настоящее время я являюсь Генеральным директором ООО «Конкорд Менеджмент и Консалтинг», ИНН 7825100880 ОГРН 1037843002515 (далее «Конкорд») и занимаю эту должность с 1 марта 2018 года. В период с 1 января 2014 года до 1 февраля 2018 года я не был ни Генеральным директором компании «Конкорд», ни ее должностным лицом или сотрудником. В настоящее время я также являюсь единственным участником «Конкорд» и приобрел долю в «Конкорд» 28 февраля 2017 года. В период с 1 января 2014 года до 28 февраля 2017 года я не был участником «Конкорд».

3.      Мне разъяснено юридическим консультантом «Конкорд», что дача ложных показаний в рамках судебного разбирательства является преступлением в США, и я подтверждаю, что насколько мне известно, заявления, содержащиеся в настоящем документе, являются правдивыми.

4.      Я осведомлен о практике документооборота в «Конкорд», поскольку, будучи Генеральным директором, я лично несу ответственность за текущую деятельность «Конкорд», включая практику документооборота общества. Я также осведомлен о всех действиях «Конкорд» с целью выполнить требования судебного запроса и решения окружного суда США по округу Колумбия от 2 марта 2020 года, поскольку лично участвовал в обсуждении по этим двум вопросам.

5.      По состоянию на 04 марта 2020 года в «Конкорд» работает 40 сотрудников, в основном занимающиеся кейтеринговой деятельностью, за исключением ряда сотрудников, занятых административно-управленческими функциями, таких как: Главный бухгалтер, Юрист, Секретарь, Аудитор и одно должностное лицо – Генеральный директор. Компания значительно сократила штат сотрудников за последние несколько лет в связи с изменениями на рынке, санкциями Министерства финансов США и продажей

части ключевых активов. В «Конкорд» отсутствует сотрудник с должностью «хранитель документов», а лицом, в чьи должностные обязанности входит хранение бумажной документации или электронных документов «Конкорд» является Генеральный директор. В «Конкорд» отсутствует Отдел или сотрудник, специализирующийся на информационных технологиях (далее «ИТ-отдел/специалист»); вместо этого привлекаются сторонние поставщики ИТ-услуг по мере необходимости.

6.      В соответствии с законодательством РФ «Конкорд» является обществом с ограниченной ответственностью, и ни российское законодательство, ни российские регуляторные органы, ни какие-либо бывшие или нынешние кредиторы «Конкорд» не устанавливают и не устанавливали когда-либо какие-либо правила в отношении сроков хранения корреспонденции «Конкорд» (будь то в электронной или иной форме), записей об операциях и платежах, расписания или аналогичных документов. Практики документооборота «Конкорд» должны пониматься в контексте российских, а не американских, практик и фактический порядок документооборота «Конкорд» осуществляется с учетом того, что «Конкорд» стал жертвой нескольких кибератак и имеет основания полагать возможность новых кибератак со стороны правительства США и третьих лиц.

7.      С 17 апреля 2014 года в «Конкорд» установлен порядок хранения электронных почтовых сообщений и записей сроком не более трех месяцев, и этот порядок заключается в автоматическом уничтожении электронных писем как на уровне почтового сервера, так и на уровне рабочих станций. Копия приказа, установившего настоящий порядок хранения электронной корреспонденции прилагается в Приложении 1, вместе с переводом на английский язык. Согласно распространенной практике многих российских компаний, «Конкорд» как правило не хранит электронные копии документов о своей хозяйственной деятельности, в связи с чем договоры, корреспонденция (за исключением электронных писем, которые уничтожаются), корпоративные и аналогичные документы хранятся в бумажных папках локально в офисе «Конкорд». Что касается документов о платежах, то «Конкорд» использует программное обеспечение 1С (известную также под английским названием «1S»), популярное российское готовое программное решение учета деятельности компании, в отношении платежей, а также бухгалтерской и налоговой отчетности. Компания «Конкорд» не имеет доступ к мобильным телефонам своих сотрудников и не ведет учет звонков, сообщений с мобильных телефонов своих сотрудников или иного их использования. «Конкорд» не использует какую-либо электронную резервную систему, в том числе облачные системы, и не имеет сторонних дубликатов бумажных документов.

8.      Компания «Конкорд» считает, что документы, предоставленные в ответ на категории 1 (один) и 2 (два) судебного запроса от 24 января 2020 года, полностью соответствуют тем документам, которыми могло бы располагать любое российское общество с ограниченной ответственностью. Для ответа на категорию 3 (три) судебного запроса от 24 января 2020 года, я ознакомился с договорами «Конкорд» с поставщиками интернет-услуг, с которыми у «Конкорд» были договорные отношения в период с 1 января 2014 года по 1 февраля 2018 года. Эти договоры не содержат указания конкретного IP-адреса, предоставленного компании «Конкорд» в тот период, и никаких иных записей не хранилось, ввиду того, что наличие конкретного IP-адреса никогда не имело значения для коммерческой деятельности «Конкорд». С учетом изложенного для установления IP-адресов, которые могли бы использоваться «Конкорд» мне пришлось бы отправить запросы компаниям, поставлявшим нам интернет-услуги в соответствующий период, как указано в абзаце 10 ниже. Учитывая практики документооборота, описанные в абзаце 7 выше, произвести поиск по некоторым категориям запрашиваемых документов не



78 А Б 8242185

представлялось возможным ввиду их отсутствия. В том, что касается категории 1 (один) судебного запроса от 10 февраля 2020 года, компания «Конкорд» никогда не вела записи моего расписания в течение периода до моего назначения Генеральным директором, а я стал Генеральным директором после 1 февраля 2018 года, в связи с чем в документах «Конкорд» не удалось произвести какой-либо поиск. У «Конкорд» отсутствовал и отсутствует доступ к телефону предыдущего Генерального директора, с которого, по заявлениям стороны обвинения, были получены фотографии расписаний и других документов, таким образом, «Конкорд» не может подтвердить источник таких фотографий. В отношении категории 2 (два) судебного запроса от 10 февраля 2020 года, я поручил Главному бухгалтеру «Конкорд» произвести поиск как бумажных, так и электронных записей о каких-либо платежах в пользу ООО «Агентство интернет-исследований», ООО «Медиасинтез», ООО «Главсеть», ООО «Миксинфо», ООО «Азимут» и ООО «Новинфо» за период с 1 января 2014 по 1 февраля 2018 года, а также платежах в пользу третьих лиц, в которых упоминаются такие компании. Каких-либо записей обнаружено не было. Я также поручил Главному бухгалтеру «Конкорд» произвести дополнительный поиск в системе 1С путем ввода различных вариантов написания, учитывающих опечатки. Дополнительный поиск не дал результатов. В том, что касается категории 3 (три) первого судебного запроса от 10 февраля 2020 года, я подтверждаю, что в соответствии с внутренней политикой «Конкорд», упомянутой выше в абзаце 7, на почтовых серверах «Конкорд» и иных электронных устройствах нет электронных писем за период с 1 января 2014 года по 1 февраля 2018 года, в связи с чем произвести поиск данных электронной переписки не представлялось возможным.

9.  Я ознакомился с переводом на русский язык судебных запросов от 24 января 2020 года и от 10 февраля 2020 года и могу утверждать, что компания «Конкорд» выполнила оба запроса полностью, предоставив все документы, находившиеся у нее на хранении, под ее контролем или в ее собственности, которые соответствуют категориям судебных запросов.

10.  Никто из должностных лиц или сотрудников компании «Конкорд» не владеет информацией, запрашиваемой в категории 3(три) судебного запроса от 24 января 2020 года. Для выполнения требований категории три судебного запроса от 24 января 2020 года, я нашел в документах «Конкорд» договоры «Конкорд» с АО «Северн-Телеком» и ООО «Юнител», двумя поставщиками интернет-услуг, с которыми у «Конкорд» были договорные отношения в период с 1 января 2014 года по 1 февраля 2018 года. В связи с тем, что в данных договорах не указаны адреса интернет-протоколов («IP»), которые компания «Конкорд» использовала в тот период, 7 января 2020 г. я направил письма от имени «Конкорд» в адрес АО «Северн-Телеком» и ООО «Юнител» с копиями этих договоров и запросами на предоставление информации о том, какие IP-адреса были предоставлены «Конкорд» или использовались ею в тот период. Копии этих писем и их переводы на английский язык, а также договоры приложены в Приложениях 2 и 3. АО «Северн-Телеком» ответило в письменной форме, что запрашиваемая информация не может быть предоставлена. Копия письма АО «Северн-Телеком» и его перевод на английский язык приложены в Приложении 2. ООО «Юнител» ответило, что информация в отношении IP-адресов не может быть предоставлена. Копия письма ООО «Юнител» и его перевод на английский язык приложены в Приложении 3. Соответственно у

ООО «Типография «Офросоюза-2 СПб», г. Санкт-Петербург, 2019 г. Уровень «В».

«Конкорд» нет никаких документов, которые можно было бы предоставить в ответ на категорию 3 (три) судебного запроса от 24 января 2020 года.

11.    Компания «Конкорд» не предоставила документы в ответ на категорию 1 (один) судебного запроса от 10 февраля 2020 года, так как у «Конкорд» нет каких-либо соответствующих документов. Как указано выше, в период с 1 января 2014 года по 1 февраля 2018 года. я не был ни генеральным директором, ни должностным лицом, ни сотрудником «Конкорд». Я стал участником 28 февраля 2017 года. Соответственно в распоряжении «Конкорд» не было никаких записей из расписания или распорядка дня, составленных мною или для меня. У «Конкорд» нет никаких документов, которые можно было бы предоставить в ответ на категорию 1 (один) судебного запроса от 10 февраля 2020 года.

12.    Компания «Конкорд» не предоставила документы в ответ на категорию 2 (два) судебного запроса от 10 февраля 2020 года, так как компания «Конкорд» не совершала ни прямых, ни косвенных платежей в пользу Агентства интернет-исследований в период, обозначенный в судебном запросе.

13.    Компания «Конкорд» не предоставила документы в ответ на категорию 3 (три) судебного запроса от 10 февраля 2020 года, как указано выше, так как компания «Конкорд» хранит все свои электронные письма не более 3 (трех) месяцев в соответствии с внутренней письменной политикой компании. Следовательно, для «Конкорд» не представляется возможным предоставить переписку по электронной почте за период с 1 января 2014 года по 1 февраля 2018 года.

14.    В отношении того, активно ли участвует «Конкорд» в данном деле – вопрос, который подняли прокуроры во время слушания 2 марта 2020 года – я могу заверить суд, что «Конкорд» проделала огромный путь, чтобы участвовать в данном деле и всячески намерена участвовать в судебном разбирательстве через своих адвокатов в соответствии с законодательством США.


Дата: 4 марта 2020 г.                          Подпись: _____

                                              Евгений Викторович Пригожин


*Пригожин Евгений Викторович* _____

**Российская Федерация**

**Санкт-Петербург**

**Четвёртого марта две тысячи двадцатого года**

Я, Лакман Диана Анатольевна, временно исполняющая обязанности нотариуса нотариального округа Санкт - Петербург Акуленко Анатолия Ивановича, свидетельствую подлинность подписи Пригожина Евгения Викторовича.

Подпись сделана в моем присутствии.

Личность подписавшего документ установлена.

Зарегистрировано в реестре: № 78/6-н/18-2020-3-488

Взыскано государственной пошлины (по тарифу):            100 руб. 00 коп.

Уплачено за оказание услуг правового и технического характера: 800 руб. 00 коп.

                                                        Д.А.Лакман

Итого в настоящем документе _две_ лист _а_

Нотариус _а_

[TRANSLATION FROM RUSSIAN]

78 A B 8242182

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| | CRIMINAL NUMBER |
| v. | 1:18-cr-00032-2-DLF |
| CONCORD MANAGEMENT AND CONSULTING LLC, | |
| Defendant. | |

## DECLARATION OF YEVGENIY VIKTOROVICH PRIGOZHIN

I, Yevgeniy Viktorovich Prigozhin, date of birth June 1, 1961, place of birth: Leningrad, citizenship: Russian Federation, sex: male, passport series 40 07 № 136936 issued by the 28th Police Precinct of the Central District of St. Petersburg on January 29, 2007, registered at the address: 4 Pushkinskaya Ulitsa, Apt. 35, St. Petersburg, state the following:

1.　　I am a citizen of the Russian Federation and have visited the United States of America one time, in approximately the period of 1992 to 1993.

2.　　At present, I am the General Director of Concord Management and Consulting LLC, Individual Taxpayer Number 7825100880, Main State Registration Number 1037843002515 ("Concord"), and have held this position since March 1, 2018. During the period from January 1, 2014 to February 1, 2018, I was neither Concord's General Director, nor its officer nor its employee. I am also currently the sole shareholder of Concord and acquired this stake in Concord on February 28, 2017. During the period from January 1, 2014 to February 28, 2017, I was not a shareholder of Concord.

3.      Concord's counsel has explained to me that giving false testimony in a court proceeding is a crime in the United States, and I affirm that the statements contained herein are truthful to the best of my knowledge.

4.      I am familiar with Concord's recordkeeping practices because, as General Director, I am responsible for the ongoing operation of Concord's business, including the company's recordkeeping practices.  I am also familiar with all of Concord's efforts to comply with the trial subpoena and Order of the U.S. District Court for the District of Columbia dated March 2, 2020 because I have been personally involved in discussions on these two issues.

5.      As of March 4, 2020, Concord has 40 employees, who primarily work in the catering business, with the exception of a number of employees engaged in administrative and managerial functions such as Chief Accountant, Lawyer, Secretary, Auditor, and one officer – the General Director. The company has significantly reduced its number of employees in the past several years due to market changes, U.S. Treasury sanctions, and divestment of core assets. Concord does not have an employee with the title "custodian of records," and the person whose responsibilities include maintaining Concord's paper records and electronic documents is the General Director.  Concord does not have an Information Technology ("IT") department or employee, and instead engages outside vendors for IT services on an as-needed basis.

6.      Pursuant to the laws of the Russian Federation, Concord is a limited liability company and neither Russian law, nor Russian regulators nor any of Concord's lenders, past or present, imposes or has ever imposed any rules on Concord regarding how long records must be maintained of correspondence (electronic or otherwise), records of transactions and payments, calendars and the like.  Concord's recordkeeping practices must be understood in the context of Russian, not American, practices, and Concord's actual recordkeeping is effected with due account

of the fact that Concord has been the victim of several cyberattacks and has reason to expect future

cyberattacks from the United States government and third parties.

7.      Since April 17, 2014, Concord has had an established policy for maintaining

electronic mail messages and records for no more than three months, and this policy is enforced

by automated destruction of electronic messages at both the mail server and workstation levels.  A

copy of the order establishing this policy for maintaining electronic correspondence is attached as

Exhibit 1 along with a translation into English.   As is common practice for many Russian

organizations, Concord does not as a rule keep electronic copies of business documents; therefore,

contracts, correspondence (other than electronic mail which is destroyed), corporate documents

and the like are kept in paper folders on-premises at Concord's office. As for records of payments,

Concord uses 1C (also known as 1S in English), a popular Russian off-the-shelf business software

solution, for payments as well as accounting and tax compliance. Concord does not have access to

its employees' mobile phones or keep records of its employees' mobile phone calls, text messages

or other usage. Concord does not use electronic back-up systems, including cloud systems, and

does not have an off-site duplicate of paper records.

8.      Concord believes that the records supplied in response to categories one (1) and

two (2) of the January 24, 2020 subpoena are the full and complete records that any Russian limited

liability company would possess.  In order to respond to category three (3) of the January 24, 2020

subpoena, I reviewed the contracts between Concord and internet service providers with which it

contracted between January 1, 2014 and February 1, 2018.  These contracts do not specify a

particular IP address provided to Concord during that period, and no other records have been kept,

because having a particular IP address has never been relevant to Concord's business.  Given the

above, in order to establish the IP addresses which Concord could have used, I had to make

inquiries with the companies that were our internet service providers during the relevant period as described in paragraph 10 below.  Given Concord's recordkeeping practices as described in paragraph 7 above, it was not possible to perform searches for some categories of requested documents due to the absence of such.  With respect to category one in the February 10, 2020 trial subpoena, Concord never had any calendar entries for me during the period before I became General Director, and I became General Director after February 1, 2018, so no searches were able to be performed in Concord's documents. Concord did not and does not have access to the previous General Director's telephone from which the prosecution claims to have obtained photographs of calendars and other documents, so Concord is unable to confirm the origin of such photographs. With respect to category two (2) in the February 10, 2020 trial subpoena, I tasked Concord's Chief Accountant with conducting search both paper and electronic records for any payments to Internet Research Agency LLC, Mediasintez LLC, Glavset LLC, Mixinfo LLC, Azimut LLC and Novinfo LCC for the period from January 1, 2014 to February 1, 2018, as well as payments made to third parties that mention such companies. No records were found.  I further tasked Concord's Chief Accountant with conducting additional searches in the 1C system by entering some spelling variations that would account for typographical errors. Nothing further resulted from the additional searches.  With respect to category three (3) in the February 10, 2020 trial subpoena, I confirm that in accordance with Concord's internal policy referenced above in paragraph 7, there are no electronic messages on Concord's mail servers or other electronic devices for the period from January 1, 2014 through February 1, 2018, so no searches of electronic correspondence were able to be performed.

9.      I have reviewed Russian translations of the trial subpoenas dated January 24, 2020 and February 10, 2020, and I can state that Concord has fully complied with both subpoenas,

having provided all records in its possession, custody, or control that are responsive to the categories in the subpoenas.

10.     No officer or employee of Concord possesses the information requested in category three (3) of the trial subpoena dated January 24, 2020.  In order to comply with category three in the trial subpoena dated January 24, 2020, in Concord's records I found contracts between Concord and Severen-Telecom JSC and Unitel LLC, the two internet service providers with which Concord contracted between January 1, 2014 and February 1, 2018. Because these contracts do not identify the internet protocol ("IP") addresses used by Concord during that period, on January 7, 2020 I sent letters on behalf of Concord to Severen-Telecom JSC and Unitel LLC transmitting copies of these contracts and requesting that the companies advise as to which IP addresses were provided to or used by Concord during that period.  Copies of these letters and English translations, as well as the attached contracts, are attached as Exhibits 2 and 3.  Severen-Telecom JSC responded in writing that the requested information cannot be provided.  A copy of Severen-Telecom JSC's letter and an English translation are attached as Exhibit 2.  Unitel LLC responded that information regarding IP addresses cannot be provided.  A copy of Unitel LLC's letter and an English translation of is attached as Exhibit 3.  Accordingly, Concord does not have any documents that could be provided in response to category three (3) of the January 24, 2020 subpoena.

11.     Concord has produced no documents in response to subpoena category one of the trial subpoena dated February 10, 2020 because Concord does not possess any responsive documents.   As stated above, during the period January 1, 2014 through February 1, 2018, I was neither Concord's general director, nor an officer nor an employee of Concord. I became a shareholder on February 28, 2017.  Accordingly, Concord would never have been in possession of any daily schedules or calendars that I may have created or may have been created for me.  Concord

does not have any documents to provide in response to category one (1) of the February 10, 2020 subpoena.

12.     Concord has produced no documents in response to subpoena category two (2) of the trial subpoena dated February 10, 2020 because Concord made no direct or indirect payments to the Internet Research Agency during the period covered by the subpoena.

13.     Concord has produced no documents in response to subpoena category three (3) of the trial subpoena dated February 10, 2020 because, as noted above, none of Concord's electronic mail is kept longer than three (3) months, in accordance with written company policy.  As a result, it is not possible for Concord to produce electronic mail correspondence from the period of January 1, 2014 through February 1, 2018.

14.     As to whether Concord is actively participating in this case, a question raised by the prosecutors at the March 2, 2020 hearing, I can assure the Court that Concord has gone to great lengths to participate in this case and has every intention of participating in the trial, appearing through our counsel as U.S. law provides.

Dated: March 4, 2020                    Signed: _____[signature]_____
                                                            Yevgeniy Viktorovich Prigozhin

[handwritten] Yevgeniy Viktorovich Prigozhin [signature]

**Russian Federation**

**Saint Petersburg**

**March Fourth, Two Thousand Twenty**

I, Diana Anatolievna Lakman, temporarily performing the duties of Anatoly Ivanovich Akulenko, notary of the Saint Petersburg Notary District, certify the authenticity of the signature of Yevgeniy Viktorovich Prigozhin.
The signature was made in my presence.
The signatory's identity was verified.

Registered in the register: № 78/6-I/78-2020-3-488
State duty collected (according to the schedule): 100 rubles, 00 kopecks
Payment of legal and technical services: 800 rubles, 00 kopecks

                                                      D.A. Lakman [signature, seal]
                                In this document *two* sheets / Acting notary [signature]

**Exhibit 1** to Declaration of Yevgeniy Prigozhin

*United States v. Concord Management and Consulting LLC*, Case No. 18-cr-00032-2-DLF

[TRANSLATION FROM RUSSIAN]

## *Concord Management and Consulting Limited Liability Company*

Liteiny Prospekt, bldg. 41, ste. 11N, St. Petersburg 191004
INN 7825100800, KPP 784101001, OGRN 1037843002515

Order No. 1
On the rules for storage of electronic messages

St. Petersburg                                              April 17, 2014

Due to the increasing number of hacker attacks in Russia aimed at gaining unlawful access to electronic mail databases, and in order to minimize the risks of unauthorized access of third parties to confidential information regarding Concord Management and Consulting LLC,

I ORDER:

1.     To carry out the irrecoverable deletion (irreversible deletion) of all electronic correspondence from the mail server of Concord Management and Consulting LLC, as well as all personal computers, when more than three (3) months has elapsed from the date of sending/receipt.

2.     To establish an electronic correspondence storage regime on the company's mail server, as well as on all personal computers and other devices, so that each electronic message is kept for not more than three (3) months from the date of sending/receipt, upon which it will be automatically and irrecoverably deleted.

3.     To familiarize all employees and contract employees of Concord Management and Consulting LLC with this order.

4.     To enforce compliance with this order within a period of no more than one (1) week from the date of issuance. I hereby make myself responsible for fulfillment of this order.

General Director of Concord Management and Consulting LLC
[signature]      /Samuil Fridmanovich Zharkoi

[seal: St. Petersburg * Limited Liability Company *
Concord Management & Consulting * "Concord
Management & Consulting" Co.]

# *Общество с ограниченной ответственностью*

# *«Конкорд Менеджмент и Консалтинг»*

191104, Санкт-Петербург, Литейный пр., д. 41, пом. 11Н
ИНН 7825100880, КПП 784101001, ОГРН 1037843002515

=================================================================

Приказ № 1
О правилах хранения электронных сообщений

г. Санкт-Петербург                                              «17» апреля 2014 г.

В связи с участившимися на территории РФ хакерскими атаками, направленными на получение незаконного доступа к хранилищам электронных писем, и в целях минимизации рисков несанкционированного доступа третьих лиц к конфиденциальной информации в отношении ООО «Конкорд Менеджмент и Консалтинг»

ПРИКАЗЫВАЮ:

1.  Осуществить удаление без возможности восстановления (безвозвратное удаление) всей электронной переписки с почтового сервера ООО «Конкорд Менеджмент и Консалтинг», а также со всех персональных компьютеров с даты отправки/получения которых прошло более 3 (трех) месяцев.

2.  Установить режим хранения электронной переписки на почтовом сервере компании, а также на всех персональных компьютерах и прочих устройствах будут храниться не более 3 (трех) месяцев с даты отправки/получения соответствующего электронного сообщения, после чего будут автоматически удаляться без возможности восстановления.

3.  Ознакомить всех сотрудников ООО «Конкорд Менеджмент и Консалтинг», как штатных, так и внештатных с настоящим приказом.

4.  Обеспечить исполнение настоящего приказа в срок не более 1 (одной) недели с момента его принятия. Обязанность по исполнению настоящего приказа возлагаю на себя.

Генеральный директор ООО «Конкорд Менеджмент и Консалтинг»

_____  /Жаркой Самуил Фридманович

**Exhibit 2** to Declaration of Yevgeniy Prigozhin

*United States v. Concord Management and Consulting LLC*, Case No. 18-cr-00032-2-DLF

**<u>Translated from Russian</u>**

[on letterhead of Severen-Telecom JSC]

Ref. No.68
dated 01.20.2020

Attn: Ye.V. Prigozhin
General Director of
Concord Management & Consulting LLC

Dear Yevgeniy Viktorovich!

In response to your query No.1 dated 01.07.2020, we hereby inform that contract No.1704-13 dated 11.01.2013 was indeed entered into by and was in effect between Concord Management & Consulting LLC and Severen-Telecom JSC from January 01, 2014 to February 01, 2018.

During the above period, network nodes were being upgraded, accompanied by technical breakdowns; therefore the information for the said period was not saved and cannot be provided.

Sincerely,
Business Development Director                    [signature]              A.V. Skakun
[seal: St. Petersburg * Severen-Telecom Joint-Stock Company]

<u>**Translated from Russian**</u>

[on letterhead of Concord Management & Consulting LLC]

Ref. No.1 dated 01.07.2020

Attn: General Director
Severen-Telecom CJSC
A.V. Kovtanyuk

Dear Andrey Vladimirovich!

Concord Management & Consulting Limited Liability Company (hereinafter the "Company")
and Severen-Telecom CJSC entered into contract No.1704-13 dated 11.01.2013 being
effective during the period from January 01, 2014 to February 01, 2018.

Due to the ongoing proceedings in a US court in case No.1:18-CR-00032-DLF the Company
needs to provide to the US Department of Justice information that will identify IP addresses
the Company was using during the period from January 01, 2014 to February01, 2018.

Since the Company does not have such information, please advise as to which IP addresses
were provided to the Company (used by the Company) during the period from
January 01, 2014 to February 01, 2018 pursuant to contract No. 1704-13 dated 11.01.2013.

Attachment:
1. Copy of contract No.1704-13 dated 11.01.2013

Sincerely,

General Director
Concord Management & Consulting LLC   [signature]
Ye.V. Prigozhin

[seal: St. Petersburg * Limited Liability Company
* Concord Management & Consulting * "Concord
Management & Consulting" Co.]



АО «Северен-Телеком»
ИНН 7816181675 КПП 780601001
Юридический адрес, почтовый адрес,
а также отдел обслуживания абонентов:
195112, г. Санкт-Петербург,
ул. Республиканская, д. 28, лит. А, пом. 12Н



Исх. № ___68___

от ___20.01.20___

Генеральному директору

ООО «Конкорд менеджмент и консалтинг»

Е.В. Пригожину

Уважаемый Евгений Викторович!

В соответствии с Вашим запросом № 1 от 07.01.2020 сообщаем, что действительно между ООО «Конкорд менеджмент и консалтинг» и   ЗАО «Северен-Телеком» в период с 01 января 2014 года по 01 февраля 2018 был заключен и действовал договор № 1704-13 от 1.11.2013.

Поскольку в указанный период происходила модернизация узлового оборудования и сопровождалось техническими сбоями, информация за указанный период не сохранилась и предоставлена быть не может.

С уважением,

Коммерческий директор                                                        Скакун А.В.

Банковские реквизиты
© ОПЕРБАНКА ВТБ (ПАО) в САНКТ-ПЕТЕРБУРГЕ
р/с 407 028 107 800 0 000 5746
к/с 301 018 102 000 000002 704, БИК 044030704
Адрес: 195221, Санкт-Петербург,
Светлановский пр., д. 17А
www.severen.ru



**Concord Management & Consulting**
Общество с ограниченной
ответственностью
«КОНКОРД МЕНЕДЖМЕНТ И
КОНСАЛТИНГ»

---------------------------------------------------------------------------
191028, г. Санкт-Петербург, ул. Моховая, д. 37, лит. Б, офис №1, 2
ИНН/КПП 7825100880/784101001

Исх № 1 от 7.01.2020

Генеральному директору
ЗАО «Северен-Телеком»
А.В. Ковтанюк

Уважаемый Андрей Владимирович!

Между Обществом с ограниченной ответственностью «Конкорд менеджмент и
консалтинг» (далее – «Общество») и ЗАО «Северен-Телеком» был заключен и в период с
01 января 2014 года по 01 февраля 2018 действовал договор №1704-13 от 1.11.2013.

В связи с имеющимся в производстве суда США делом 1:18-CR-00032-DLF Обществу
необходимо представить Министерству юстиции США сведения, которые позволяют
идентифицировать адреса межсетевых протоколов IP, использовавшихся Обществом в
период с 01 января 2014 по 01 февраля 2018.

Поскольку у Общества отсутствует данная информация прошу Вас сообщить какие адреса
межсетевых протоколов IP, которые предоставлялись Обществу (использовались
Обществом) в период с 01 января 2014 по 01 февраля 2018 в соответствии договором
№1704-13 от 1.11.2013.

Приложение:
   1. Копия договора №1704-13 от 1.11.2013

С уважением,

Генеральный директор
ООО «Конкорд менеджмент и консалтинг»
Е.В.Пригожин

\~ 454943.

TA  01.10.13

# ДОГОВОР № 1704-13

## ОБ ОКАЗАНИИ УСЛУГ СВЯЗИ

## МЕЖДУ

### ЗАО «Северен-Телеком»

## И

### ООО "Конкорд Менеджмент и Консалтинг"

Настоящий Договор содержит конфиденциальную информацию, которая не может быть опубликована или раскрыта каким-либо другим образом без письменного согласия Сторон, подписавших этот Договор.

### САНКТ-ПЕТЕРБУРГ
2013

ДОГОВОР № 1704-13.
ОБ ОКАЗАНИИ УСЛУГ СВЯЗИ

"01" ноября 2013г.                                              г. Санкт - Петербург

ЗАО «Северен-Телеком» в лице Генерального директора Лагира С.В., действующего на основании Устава, именуемое в дальнейшем «Оператор», с одной стороны, и ООО "Конкорд Менеджмент и Консалтинг", именуемое в дальнейшем «Клиент», в лице Генерального директора Жаркого С. Ф., действующего на основании Устава, с другой стороны, именуемые каждое в отдельности «Сторона», а совместно «Стороны»,

принимая во внимание, что Оператор оказывает услуги связи (далее - «Услуги») на основании лицензий, выданных Федеральной службой по надзору в сфере связи, информационных технологий и массовых коммуникаций, №№ 102745, 102747,102748, 102749, 102753, 102741, 102740, 102746, 103925, 102751, 102752 заключили настоящий договор о нижеследующем:

## Статья 1. ПРЕДМЕТ ДОГОВОРА.
1.1. Оператор обязуется оказывать Услуги связи, особые условия оказания которых приведены в Приложениях к Договору, а Клиент обязуется принимать и оплачивать Услуги на согласованных в Договоре и соответствующих Приложениях к нему условиях.

## Статья 2. ОБЩИЕ ПОЛОЖЕНИЯ.
2.1. Клиент может начать пользоваться Услугами Оператора после подписания настоящего Договора и (или) соответствующего Приложения, оплаты стоимости подключения и в соответствии со сроками установки, указанными в соответствующем Приложении к настоящему Договору. При возникновении необходимости выполнения дополнительной работы или, если дополнительная работа выполняется по письменной просьбе Клиента, соответственно, могут быть согласованы и изменены сроки установки и скорректирована сумма, подлежащая оплате.
2.2. Завершение любых работ по настоящему Договору оформляется двусторонним Актом выполненных работ, который подписывается уполномоченными представителями обеих сторон. В день установки Клиент обязан обеспечить присутствие уполномоченного представителя для подписания от имени Клиента Акта выполненных работ, нарядов, Акта приема-передачи оборудования. В случае отказа и/или отсутствия уполномоченного представителя Клиента при проведении работ по установке, акт (наряд) направляется Клиенту с курьером или по почте. В случае, если Акт не будет подписан Клиентом в течение 3 (трех) рабочих дней после его получения, и если по нему в указанный срок не будут представлены обоснованные письменные замечания, Оператор имеет право приостановить оказание услуги до момента получения соответствующего документа, а работы будут считаться выполненными Оператором в полном объеме и в соответствии с настоящим Договором.
2.3. В случае необходимости подключения Клиента через внутрипроизводственные кабельные сети, не принадлежащие Оператору, условия настоящего Договора (обязанности сторон, оплата, сроки, ответственность Оператора и др.) распространяются только до точки соединения с такими сетями (Приложение №1). Урегулирование взаимоотношений с владельцами таких сетей по выделению абонентских линий, их обслуживанию, оплате и т.д. является обязанностью Клиента. Приемка работ по установке осуществляется непосредственно на внутрипроизводственной сети.
2.4. В случае необходимости подключения Клиента через оборудование, которое не обслуживается Оператором, условия настоящего Договора (обязанности сторон, оплата, сроки, ответственность Оператора и др.) распространяются только до точки соединения с таким оборудованием. Урегулирование взаимоотношений с владельцами такого оборудования по подключению абонентских линий, их обслуживанию, оплате и т.д. является обязанностью Клиента.
2.5. В случае необходимости подключения Клиента через оборудование, которое обслуживается Оператором, Оператор обязуется подключить и запрограммировать данное оборудование. Подключение и программирование в этом случае входит в установочную плату. Исходные данные, необходимые для программирования оборудования, Клиент обязан предоставить Оператору в письменном виде не позднее, чем за 5 (пять) рабочих дней до даты начала предоставления услуг.
2.6. Оператор не гарантирует возможность установки охранной сигнализации на своих линиях.
2.7. Оператор имеет право на увеличение срока проведения работ, связанных с прокладкой кабеля в следующих случаях:
- наличие документов или устных предписаний контролирующих организаций (органов), временно запрещающих выполнение работ по данному Договору.
- возникновение внеплановых ситуаций, в том числе: необходимость выполнения работ по устранению провалов телефонной канализации, строительства телефонной канализации, восстановлению целостности проложенной линии связи поврежденной из-за действий третьей стороны.

## Статья 3. ОБЯЗАННОСТИ СТОРОН

### 3.1. Обязанности Оператора

3.1.1. Установить и передать Клиенту в пользование оконечное Оборудование Оператора, находящееся в течение всего срока действия Договора в собственности Оператора (далее – «Оборудование»), и/или организовать, если это предусмотрено Приложением, линию доступа к Услугам, выполнив для этого необходимые работы, провести проверку качественных показателей доступа к Услугам и сдать работоспособные услуги Клиенту по Акту выполненных работ.

3.1.2. Оказывать в течение срока действия Договора, заказанные Услуги, соответствующие по качеству стандартам и техническим нормам, установленным уполномоченными государственными органами, условиям Договора, и условиям лицензий, 24 часа в сутки ежедневно, за исключением перерывов для проведения необходимых профилактических и ремонтных работ, которые будут планироваться на время, когда это может причинить наименьшие неудобства Клиенту и о которых Оператор обязан уведомить Клиента за 48 часов до их начала, с указанием периода времени на такое обслуживание.

3.1.3. Обеспечивать своевременное проведение ремонтных работ в соответствии с ИНСТРУКЦИЕЙ О ПОРЯДКЕ УСТРАНЕНИЯ ПОВРЕЖДЕНИЙ И УЧЕТА ЗАЯВЛЕНИЙ, ПОСТУПАЮЩИХ В БЮРО РЕМОНТА (ЦБР) НА МЕСТНЫХ ТЕЛЕФОННЫХ СЕТЯХ, утвержденной Министерством связи Российской Федерации 01.04.1994.

3.1.4. Обеспечивать соблюдение тайны связи Клиента согласно нормам действующего Законодательства РФ.

3.1.5. Обеспечивать перенос предоставляемых Услуг (при изменении местоположения) при наличии технической возможности по новому адресу Клиента. Условия переноса Услуг определяются Дополнительным Соглашением.

3.1.6. Обеспечивать соблюдение сроков и порядка устранения неисправностей в сети связи Оператора, препятствующих пользованию услугами телефонной связи.

### 3.2. Обязанности Клиента

3.2.1. Своевременно оплачивать оказанные Клиенту Услуги в порядке и размере, определенных настоящим Договором.

3.2.2. Предоставлять Оператору следующую информацию: фамилия, имя, отчество, место жительства и реквизиты основного документа, удостоверяющего личность, представленные при личном предъявлении абонентом указанного документа, - для абонента-гражданина; наименование (фирменное наименование) юридического лица, его место нахождения, а также список лиц, использующих оконечное оборудование юридического лица, заверенный уполномоченным представителем юридического лица, в котором указаны их фамилии, имена, отчества, места жительства и реквизиты основного документа, удостоверяющего личность, - для абонента - юридического лица - согласно Правилам взаимодействия операторов связи с уполномоченными государственными органами, осуществляющими оперативно-розыскную деятельность, утвержденных Постановлением Правительства РФ от 27 августа 2005 года № 538.

3.2.3. Оказывать Оператору необходимое содействие в выполнении предусмотренных Приложением и/или Дополнительным Соглашением работ по установке Оборудования Оператора, включая:

   а) подготовку и обслуживание помещений и площадей согласно спецификациям Оператора, если таковые согласованы с Клиентом в Приложениях. При отсутствии у Оператора права прохода до помещений и площадей Клиента, обязанность по предоставлению данного права лежит на Клиенте;

   б) обеспечение в рабочее время доступа сотрудников и подрядчиков Оператора в помещения и на площади Клиента.

   в) назначение представителей Клиента, которые будут ответственны за оказание содействия Оператору в скорейшем монтаже, испытании и сдаче-приемке работоспособных Услуг и относящегося к ним Оборудования Оператора.

3.2.4. Оборудование Оператора может использоваться Оператором для оказания Услуг третьим лицам и как транзитный узел, вследствие чего Клиент не вправе препятствовать Оператору производить необходимые для этого работы, не влияющие на оказание Услуг Клиенту.

3.2.5. Соблюдать технические и иные нормы и условия эксплуатации Оборудования Оператора, переданного Клиенту, в течение всего срока действия Договора и немедленно возвратить его (либо его стоимость) Оператору, в строгом соответствии с Актом приема-передачи Оборудования, после прекращения действия Договора. Возврат Оборудования Оператора также оформляется Актом приема-передачи Оборудования.

3.2.6. При пользовании Услугами использовать абонентские аппараты (терминалы), имеющие сертификаты соответствия для применения на сетях связи Российской Федерации, не допускать злоупотреблений Услугами, включая, но не ограничиваясь содержанием сообщений, передаваемых с использованием предоставляемых Услуг, соблюдением установленных отраслевых норм по допустимой нагрузке на станционные и распределительные сооружения Оператора и сети связи общего пользования.

3.2.7. За один месяц письменно уведомить Оператора о своем выбытии, о продаже обслуживаемого по Договору помещения, об изменении реквизитов Клиента, адреса для высылки счета, об установке сигнализации на линии Оператора и др.

3.2.8. Не оказывать услуги связи (пейджинг, доступ в Интернет и прочие), требующие обязательного лицензирования, используя телекоммуникационные услуги, предоставляемые Оператором по настоящему Договору.

3.2.9. Не передавать свои права и обязанности по Настоящему Договору другим физическим и (или) юридическим лицам без письменного согласования с Оператором.

3.2.10. Обратиться за переоформлением Договора в случае сдачи обслуживаемого помещения в аренду, реорганизации предприятия Клиента и в других вышеуказанных случаях.

3.2.11. Не допускать самовольной установки (перестановки) оборудования Оператора, переданного Клиенту по Акту приема-передачи Оборудования.

3.2.12. Не допускать несанкционированного подключения к линии на территории Клиента и пользования линией Клиента из-за его недосмотра. В указанных случаях счета Оператора подлежат оплате Клиентом.

3.2.13. Стороны в своей деятельности имеют право использовать товарные знаки другой Стороны только с ее письменного согласия. Сторона признает права другой Стороны на все товарные знаки и знаки обслуживания этой Стороны.

3.2.14. В случае предоставления услуг, связанных с необходимостью прокладки кабеля связи:

- до начала работ по договору направить Оператору разрешение на производство работ и согласованный с владельцем здания и территории план прокладки кабеля от линейно-кабельного ввода в здание или на территорию по адресу обслуживания до помещения с размещаемым там оборудованием, и при необходимости подготовить трассу прокладки кабеля от линейно-кабельного ввода в здание до помещения с оборудованием;

- нести полную ответственность за сохранность кабеля, проложенного в здании по адресу обслуживания. В случае повреждения кабеля в указанном здании Клиент оплачивает Оператору расходы на ремонтно-восстановительные работы. Клиент несет ответственность за сохранность кабеля на началах риска. Обстоятельства непреодолимой силы освобождают Клиента от ответственности.

## Статья 4. ПОРЯДОК ИНФОРМАЦИОННОГО ВЗАИМОДЕЙСТВИЯ СТОРОН.

4.1.    Стороны обязуются письменно уведомлять друг друга об изменении своих адресов. Любые уведомления или иные сообщения, подлежащие передаче от одной Стороны другой Стороне должны передаваться в письменной форме (с использованием почтовой или/и факсимильной связи) по следующим адресам:

| Если получатель Оператор: | Если получатель ООО "Конкорд Менеджмент и Консалтинг": |
|---|---|
| Российская Федерация,<br>Фактический адрес:<br>197342, С.-Петербург, Кантемировская ул., д.4, 7-ой этаж. | Российская Федерация,<br>Фактический адрес:<br>199034, гор. Санкт-Петербург, Лейтенанта Шмидта наб., д.7 |
| Вниманию:<br>Генерального директора<br>Лагира С.В.<br>Факс: 8127407071<br>E-mail: info@severen.net | Вниманию:<br>Генерального директора<br>Жаркого С. Ф.<br>Факс: ---<br>E-mail: u.vinogradov@office-vp.spb.ru |

4.2. В процессе исполнения Договора, эксплуатационное взаимодействие между Оператором и Клиентом определяется следующей последовательностью документально оформленных действий:

-факты нарушения договорного качества обслуживания, а также устранения обнаруженных нарушений фиксируются в журнале Оперативного дежурного на основании обмена телефонограммами, (факсимильными сообщениями) по телефону: 8127407072, или электронной почте: info@severen.net, с отметкой времени и даты поступления заявки о нарушении и его устранения.

-сроки устранения повреждений соответствуют ИНСТРУКЦИИ О ПОРЯДКЕ УСТРАНЕНИЯ ПОВРЕЖДЕНИЙ И УЧЕТА ЗАЯВЛЕНИЙ, ПОСТУПАЮЩИХ В БЮРО РЕМОНТА (ЦБР) НА МЕСТНЫХ ТЕЛЕФОННЫХ СЕТЯХ, утвержденной Министерством связи Российской Федерации 01.04.1994.

## Статья 5. ЦЕНЫ И УСЛОВИЯ ОПЛАТЫ.

5.1. Клиент осуществляет платежи за предоставленные Услуги по тарифам, указанным в Договоре. Эти тарифы могут изменяться Оператором в одностороннем порядке с обязательным направлением письменного (с использованием почтовой или факсимильной связи) уведомления Клиенту не менее чем за 20 (двадцать) календарных дней до изменения. Указанные тарифы и цены включают НДС (в размере 18%) и не включают другие действующие налоги в соответствии с действующим налоговым законодательством Российской Федерации. Эти налоги оплачиваются Клиентом.

5.2. Первоначальный платеж: Клиент обязан оплатить общую стоимость подключения в размере, указанном в Приложении на расчетный счет Оператора. В случае если Клиент не оплачивает выставленный ему Оператором счет в течение 10 дней, с даты выставления счета, соответственно переносится срок установки. В случае неоплаты указанного счета в течение 30 (тридцати) дней с момента его выставления, Договор автоматически расторгается.

5.3. В случае, если по требованию Клиента при инсталляции Услуг Оператор выполняет иные работы, не предусмотренные Приложениями, Клиент обязуется подписать соответствующий Акт выполненных работ в течение 3 (трех) календарных дней с даты его получения и оплатить работы по тарифам согласно Акту выполненных работ на условиях настоящего Договора. При письменном немотивированном отказе Клиента от подписания Акта выполненных работ или пропуске срока его подписания такой Акт выполненных работ считается подписанным Клиентом, а Оператор вправе включить сумму таких работ в счет на оплату Услуг в расчетном месяце.

5.3.1. В случае необходимости выполнения Оператором работ по устранению повреждения Оборудования наступившего по вине Клиента, а также установкой дополнительного Оборудования по требованию Клиента оплата производится в соответствии с тарифами, указанными в прейскуранте, размещенном на официальном сайте Оператора.

**5.4. Форма расчетов и порядок оплаты Услуг.**

5.4.1. Клиент обязуется оплачивать абонентскую плату и/или другие гарантированные платежи в соответствии с Договором ежемесячно авансом, начиная с момента подписания акта выполненных работ, если иное не оговорено Сторонами. Данные платежи включаются в счет за предоставленные услуги связи. В случае если стоимость оказанных Услуг превышает сумму аванса, оплата в пределах разницы включается в авансовый платеж за следующий период.

5.4.2. Оператор выставляет Клиенту счет на оплату Услуг содержащий:
- информацию о расчетном периоде;
- информацию об Услугах, оказанных в отчетном периоде;
- общую сумму на оплату;
- дату выставления счета;
- срок оплаты;
- иные сведения в соответствии с действующим Законодательством РФ.

5.4.3. Счета на оплату Услуг выставляются в рублях РФ. Тарификация Услуг осуществляется в рублях РФ.

5.4.4. Счета доводятся до сведения Клиента до 13 числа текущего месяца. В случае неполучения счета Клиентом, он может получить счет в офисе Оператора до 15 числа. Если до 15 числа текущего месяца, счет Клиентом не получен, то датой получения счета считается 15 число.

5.4.5. Счет считается полученным:
- в случае получения счета с курьером Оператора - с даты, указанной в расписке о получении;
- в случае получения счета в офисе Оператора - с даты, указанной в расписке о получении;
- в случае получения факсимильной копии счета - с даты, указанной в подтверждении о прохождении факса.
- в случае не получения Клиентом счета до 15 числа – 15 число.

5.4.6. Клиент обязуется произвести оплату счёта в срок не более 10 календарных дней с даты, когда счет считается полученным, но не позднее 25-го числа соответствующего месяца. Счет доставляется Клиенту по адресу, указанному ниже в Договоре. В случае уклонения Клиента от получения счета и/или несвоевременного уведомления об изменении адреса, по которому доставляются счета, Клиент несет ответственность, предусмотренную п.7.2.1 настоящего Договора.

5.4.7. При оплате счетов на оплату Клиент обязан указывать номер оплачиваемого счета с тем, чтобы Оператор мог идентифицировать получаемые платежи.  В случае получения платежа от Клиента без указания номера оплачиваемого счета, Оператор засчитывает платеж в счет погашения имеющейся задолженности, а в случае отсутствия задолженности – в счет предварительной оплаты за Услуги.

5.4.8. В случае нарушения Клиентом сроков оплаты оказанных Услуг, Оператор имеет право приостановить оказание Услуг до устранения нарушения. При этом, Оператор оставляет за собой право взимать с Клиента абонентскую плату/гарантированные платежи за весь период времени, в течение которого Услуга была приостановлена.

5.4.9. В случае необходимости переоформления договора, по инициативе Клиента, Клиент обязуется оплатить Оператору денежную сумму в размере, указанном в прейскуранте на дополнительные услуги, размещенном на официальном сайте Оператора.

5.4.10. В случае утраты Договора или документов относящихся к договору, таких как счета, счет-фактуры, дополнительные соглашения и др., по вине Клиента, восстановление вышеуказанных документов подлежит оплате согласно прейскуранту на дополнительные услуги, размещенном на официальном сайте Оператора.

5.4.11. В случае оказания Услуг в течение периода меньшего, чем отчетный, когда это не было вызвано виновными действиями Клиента, фиксированные ежемесячные платежи за Услуги пересчитываются пропорционально фактическому времени оказания Услуг, за исключением случая, предусмотренного пунктом 5.4.8 Договора.

---

## Статья 6.  ПРИОСТАНОВЛЕНИЕ ОКАЗАНИЯ УСЛУГ СВЯЗИ.

6.1.     В случаях если Клиент
а) нарушил технические и иные нормы и условия эксплуатации Оборудования Оператора, если таковые доведены до сведения Клиента в форме приложения к Договору, или

б) использует абонентские аппараты (терминалы), не имеющие сертификатов соответствия для применения на сетях связи Российской Федерации, или

в) нарушил условия оплаты Услуг, или

г) превышает допустимую нагрузку на аналоговые линии, или цифровой тракт, оговоренную в п. 7.2.2.

д) не обеспечил и/или препятствовал в рабочее время доступу сотрудников и подрядчиков Оператора в помещения и на площади Клиента,

Оператор вправе немедленно приостановить оказание Клиенту Услуг до устранения Клиентом вышеуказанных нарушений или до наступления оснований для расторжения Договора.

## Статья 7. ОТВЕТСТВЕННОСТЬ СТОРОН.

**7.1.    Ответственность Оператора.**

7.1.1.    Если в отчетном периоде имелись перерывы в оказании Услуг продолжительностью более одного часа, которые не являлись следствием виновных действий или бездействия Клиента и не являлись перерывами для проведения необходимых профилактических и ремонтных работ, проводимыми Оператором с предварительным уведомлением Клиента, Оператор уменьшит сумму счета на оплату ежемесячной фиксированной платы на 1/720 от суммы ежемесячной фиксированной платы за Услуги за каждый полный час перерыва Услуг. Течение срока перерыва начинается с момента, когда Оператор получил от Клиента письменную заявку (с использованием почтовой или факсимильной связи) на предмет устранения повреждения, и окончанием перерыва считается момент, когда оказание Услуг возобновлено.

7.1.2.    Перерасчет абонентской платы, предусмотренный соответствующими пунктами является единственным видом ответственности Оператора.

**7.2.    Ответственность Клиента и иные последствия нарушения клиентом договора.**

7.2.1.    В случае если Клиент не исполнил обязанность по оплате счета в течение установленного пунктом 5.4.6 Договора срока, Оператор имеет право в любой день до погашения Клиентом задолженности немедленно приостановить оказание Услуг.

7.2.2.    Нагрузка на аналоговую линию, создаваемая Клиентом при взаимодействии с телефонной сетью общего пользования, не должна превышать 0.15 Эрл на линию или, в случае предоставления цифровых трактов –0.7 Эрл. на канал в цифровом тракте. В случае превышения Клиентом нагрузки Оператор имеет право потребовать от Клиента ее снижения путем уменьшения объема переговоров или приобретения дополнительных линий, в противном случае Оператор имеет право приостановить обслуживание с предварительным уведомлением об этом Клиента не менее чем за 10 календарных дней до предполагаемой приостановки обслуживания.

7.2.3.    В случае повреждения или неправомерного удержания по вине Клиента Оборудования Оператора, переданного в пользование Клиенту, последний обязан возместить реальный ущерб, обусловленный подобным повреждением или неправомерным удержанием. За использование неисправного, не сертифицированного или несогласованного с Оператором (в случае необходимости такого согласования) оконечного устройства, вызывающего повреждение сооружений связи, Клиент возмещает Оператору нанесенный реальный ущерб.

7.2.4.    При отказе Клиента от любой из Услуг до окончания Минимального срока ее предоставления, расходы Оператора, связанные с отказом, будут определяться как денежная сумма, равная сумме ежемесячных абонентских выплат и/или иных выплат, предусмотренных настоящим договором, от момента отказа до окончания минимального срока предоставления Услуг.

**7.3.    Ограничение ответственности.**

7.3.1.    Ответственность Сторон за нарушение любых обязанностей по данному Договору ограничивается реальным ущербом. Ни одна из Сторон не будет нести ответственности перед другой Стороной за упущенную выгоду.

7.3.2.    Стороны не принимают к рассмотрению претензии третьих лиц, связанные с исполнением настоящего Договора.

**7.4.    Основания освобождения от ответственности**

7.4.1    Сторона не несет ответственности перед другой Стороной, если докажет, что неисполнение или ненадлежащее исполнение обязательств произошло не по ее вине, за исключением случаев, предусмотренных пунктами 3.2.14, 7.1.1 Договора.

7.4.2.    Стороны не несут ответственности за неисполнение или ненадлежащее исполнение своих обязательств по Договору, если задержки или неисполнение произошли вследствие обстоятельств непреодолимой силы; в число таких обстоятельств входят: войны, военные действия, мятежи, саботаж, забастовки, пожары, взрывы, наводнения или иные стихийные бедствия, издание нормативных актов запретительного характера государственными органами Российской Федерации либо субъектов Федерации, или органами местного самоуправления и пр.

7.4.3.    Немедленно после получения информации о наступлении любых обстоятельств, задерживающих исполнение или иным образом препятствующих исполнению настоящего Договора, Стороны письменно уведомляют об этом друг друга, если только такие события не препятствуют такому уведомлению. В случае если такие события препятствуют уведомлению, Сторона, затронутая указанными обстоятельствами,

уведомляет другую Сторону о таких обстоятельствах немедленно после получения возможности совершить такое уведомление.

7.4.4. Если обстоятельство непреодолимой силы вызывает существенное нарушение или неисполнение обязательств по настоящему Договору, длящееся более 90 (девяносто) дней, каждая Сторона имеет право прекратить действие настоящего Договора после подачи другой Стороне предварительного - за 30 (тридцать) дней - письменного уведомления о своем намерении прекратить действие Договора.

## Статья 8. ПРЕДОСТАВЛЕНИЕ УСЛУГ ИНТЕРНЕТ.

8.1. Сеть Интернет (далее - «Интернет») представляет собой глобальное объединение принадлежащих множеству различных людей и организаций компьютерных сетей и информационных ресурсов, для которых не установлено единого, общеобязательного свода правил (законов) пользования Интернет. Но существуют общепринятые нормы работы в Интернет, с которыми Вы можете ознакомиться по адресу http://www.ofisp.org/documents/ofisp-008.html .Данные нормы направлены на то, чтобы деятельность каждого пользователя Интернет не мешала работе других пользователей.

8.2. Услуга предоставляется «как есть» («as is») и в том виде, в котором она доступна на момент предоставления.

8.2.1. Информация или советы, даваемые Оператором, не могут рассматриваться как гарантии, поскольку являются консультациями, но не техническим способом обеспечения предоставления Услуги.

8.2.2. Ни при каких обстоятельствах Оператор не будет нести ответственности за прямой или косвенный ущерб, причиненный Клиенту в результате использования или невозможности использования Услуги, или доступа в Интернет или ее части; или понесенный в силу зависимости от информации, услуг или товаров, поставляемых Услугой или посредством Услуги.

8.3. Клиент, который не удовлетворен Услугой, условиями, правилами, качеством, ее содержанием или практикой предоставления Услуги, имеет исключительное право Клиента - прекратить пользование Услугой.

8.4. При предоставлении Услуги доступа в Интернет Клиенту запрещается:

8.4.1. Ограничивать доступ других пользователей или препятствовать другим пользователям использовать Интернет.

8.4.2. Производить самовольное (несанкционированное) проникновение в любые технологические компоненты (узлы), программы, базы данных и иные составляющие элементы Интернета, имея в виду установленную в РФ уголовную ответственность за такие деяния (гл. 21 УК РФ «Преступления против собственности» ст. 159 «Мошенничество»; гл. 28 УК РФ «Преступления в сфере компьютерной информации» ст. 272 «Неправомерный доступ к компьютерной информации», ст. 273 «Создание, использование и распространение вредоносных программ для ЭВМ», ст. 274 «Нарушение правил эксплуатации ЭВМ, системы ЭВМ или их сети»).

8.4.3. Посылать или делать доступной по сети Интернет любую информацию, распространение которой, так или иначе, противоречит действующему Законодательству РФ и/или международному законодательству.

8.4.4. Передавать любую информацию или программное обеспечение, которое заведомо содержит в себе вирусы или другие вредные компоненты.

8.4.5. Оператор не в праве преднамеренно просматривать, изменять или разглашать любые частные сообщения электронной почты (за исключением случаев, предусмотренных действующим Законодательством). Оператор не обязан следить за содержанием информации, распространяемой посредством Услуги. Однако Клиент принимает условие, что Оператор имеет право периодически отслеживать проходящую через Услугу информацию и раскрывать любые сведения, если это необходимо в соответствии с законом, требованиями уполномоченных государственных учреждений.

8.5. В выделяемой подсети IP-адресов 3 адреса не могут быть использованы Клиентом. Первичное назначение и дальнейшее изменение адресного пространства происходит единым блоком, при этом блок может иметь размер от 4-х до 256-ти адресов с градацией по степеням числа "2". При выделении Клиенту подсети, содержащей более 4 IP адресов, Клиент должен предоставить обоснование выделения адресов, а также отчитываться за использование выделенных адресов в соответствии с документом ripe-220 (http://www.ripe.net/ripe/docs/ripe-220.html). При первичном назначении и изменении количества IP-адресов они выделяются в количестве из приведенного списка:1, 5, 13, 29, 61, 125, 253. При изменении количества адресов не гарантируется сохранение имеющихся адресов.

## Статья 9. СРОК ДЕЙСТВИЯ ДОГОВОРА.

9.1. Договор заключен на неопределенный срок.

9.2. Минимальный срок (далее – «Минимальный срок»), в течение которого могут предоставляться услуги Оператором по Настоящему Договору составляет 12 (двенадцать) месяцев с даты установки (переоформления, переключения), указанной в Акте выполненных работ, если иное не оговорено Сторонами.

9.3.    Оператор вправе отказать Клиенту в предоставлении Услуг, а также дополнительных Услуг при наличии одного из следующих обстоятельств:

*   предоставление Услуги может создать угрозу безопасности и обороноспособности государства, здоровью и безопасности людей;
*   предоставление Услуги невозможно ввиду каких-либо физических, топографических или иных естественных препятствий;
*   Клиент без веских оснований не соглашается на условия предоставления Услуги, своевременно не производит платежи за предоставленные ранее Услуги;
*   Клиент использует или намерен использовать аппаратуру связи для каких-либо незаконных целей, или же получает Услуги незаконным способом, эксплуатирует предоставленное Оборудование с нарушением правил технической эксплуатации, или использует несертифицированное оборудование.

Отказ в каждом конкретном случае должен быть обоснован.

9.4.    Если по истечении минимального срока Оператор продолжает оказывать определенный вид услуги, а Клиент продолжает ею пользоваться, договор в части предоставления указанной услуги считается пролонгированным на тот же срок без дополнительного соглашения сторон. Договор не пролонгируется, если одна из сторон письменно уведомит другую сторону об отказе от предоставления (пользования) услугой за 30 (тридцать) календарных дней до окончания минимального срока.

## Статья 10. ИЗМЕНЕНИЕ И РАСТОРЖЕНИЕ ДОГОВОРА.

10.1.    Все изменения Договора производятся по согласованию Сторон в письменной форме и подписываются обеими Сторонами, если иной порядок не предусмотрен иными положениями Договора.
10.2.    Оператор имеет право расторгнуть Договор в соответствии со ст.44 Закона «О связи». При этом Клиент не освобождается от обязанности погашения задолженности перед Оператором.
10.3.    Клиент вправе в любое время отказаться от какой-либо Услуги, либо от исполнения Договора в целом, при условии письменного уведомления об этом Оператора не менее чем за 30 календарных дней и оплаты понесенных Оператором расходов, связанных с таким отказом.
10.4    Клиент вправе расторгнуть Договор и истребовать у Оператора неиспользованную до даты расторжения сумму предварительной оплаты, если таковая производилась Клиентом в случаях, если:
10.4.1.    Оператор неоднократно нарушил объявленные стандарты качества Услуг, что повлекло за собой стойкую невозможность для Клиента использовать заказанные Услуги; или
10.4.2.    Оператор повысил тарифы на Услуги свыше 10% в квартал.

## Статья 11. ПОРЯДОК РАЗРЕШЕНИЯ СПОРОВ.

11.1.    В случае возникновения споров и разногласий по настоящему договору, они подлежат урегулированию в претензионном порядке. Претензия направляется стороне заказным письмом с уведомлением. Срок ответа на претензию – 10 календарных дней с момента получения адресатом.
11.2.    Если споры не могут быть разрешены путем переговоров, спорные вопросы передаются на рассмотрение Арбитражного суда города Санкт-Петербурга и Ленинградской области в порядке, установленном действующим законодательством Российской Федерации.
11.3.    Настоящий Договор составлен и будет выполняться Сторонами в соответствии с действующим законодательством Российской Федерации.

## Статья 12. ЗАКЛЮЧИТЕЛЬНЫЕ ПОЛОЖЕНИЯ.

12.1    Договор, включая все Приложения и дополнения к нему, которые являются неотъемлемой частью данного Договора, составляет один единый Договор между Оператором и Клиентом, который заменяет все другие предварительные соглашения, договоренности и другие отношения, письменные      или      устные, между Сторонами, имеющие отношение к предмету данного Договора. Все изменения данного Договора производятся в письменной форме и подписываются обеими Сторонами.
12.2    Стороны договорились, что при подписании документов, имеющих непосредственное отношение к настоящему Договору, а именно ежемесячные счета и акты оказанных услуг, могут использовать факсимильное воспроизведение подписи, в соответствии со статьей 160 Гражданского Кодекса РФ. При этом факсимильная подпись будет иметь такую же силу, как и подлинная подпись уполномоченного лица.
12.3. Стороны вправе при подписании документов, имеющих непосредственное отношение к настоящему Договору, а именно ежемесячные счета, счета-фактуры и акты об оказанных услугах, использовать электронную цифровую подпись согласно действующему законодательству РФ.

**Статья 13.  РЕКВИЗИТЫ СТОРОН.**
ЗАО «Северен-Телеком»
ИНН 7816181675 КПП 781601001
Юридический адрес:
192007, г. Санкт-Петербург, ул. Воронежская, д.92, лит. Б, пом.1-Н
Почтовый адрес, а также отдел обслуживания абонентов:
197342, г. Санкт-Петербург, Кантемировская ул., д. 4 этаж 7
Тел/факс. 8127407070/8127407071.
Банковские реквизиты:
Филиал ОПЕРУ ОАО БАНК ВТБ в Санкт-Петербурге
р/с 407 028 107 800 000 05 746, к/с 301 0181 020 000 000 0704,  БИК 044030704
ОКПО-56187996, ОКАТО-40296561000, ОГРН 1037835033598


Клиент:
ООО "Конкорд Менеджмент и Консалтинг"
ИНН/КПП 7825100880/ 784101001
Юридический адрес:
191104, гор. Санкт-Петербург, Литейный просп., д.41, пом. 11-Н
Фактический адрес:
199034, гор. Санкт-Петербург, Лейтенанта Шмидта наб., д.7
Телефон/факс:  8123202128/8123202128
Банковские реквизиты:
р/с 40702810255200183118, Операционное управление Северо-Западного  банка ОАО "Сбербанк России"
к/с 30101810500000000653,  БИК 044030653

| От имени   ЗАО «Северен- Телеком»: | От имени ООО "Конкорд Менеджмент и Консалтинг": |
|---|---|
| Лагир С.В.<br>Генеральный директор | Жаркой С. Ф.<br>Генеральный директор |

# **Exhibit 3** to Declaration of Yevgeniy Prigozhin

*United States v. Concord Management and Consulting LLC*, Case No. 18-cr-00032-2-DLF

**Translated from Russian**

[on letterhead of Unitel LLC]

Ref. No.306 dated 01.20.2020

Attn: Ye.V. Prigozhin
General Director
Concord Management & Consulting LLC

Dear Yevgeniy Viktorovich!

In response to your query Ref. No.3 dated 01.07.2020, we hereby confirm that contract No.846-17 was indeed in effect between Concord Management & Consulting LLC and Unitel LLC from January 01, 2014 to February 01, 2018.
We inform you that due to partial loss of archive documents for the period in question, the information regarding IP addresses cannot be provided.

Sincerely,

Business Development Director
Unitel LLC                                    [signature]              A.N. Temeev
                              [seal: St. Petersburg * Unitel Limited Liability Company]

**Translated from Russian**

[on letterhead of Concord Management & Consulting LLC]

Ref. No.3 dated 01.07.2020

Attn: Director of Unitel LLC
A.N. Temeev

Dear Andrey Nikolayevich!

Concord Management & Consulting Limited Liability Company (hereinafter the "Company") and Unitel LLC entered into contract No.846-17 dated 04.28.2017 being effective during the period from January 01, 2014 to February 01, 2018.

Due to ongoing proceedings in a US court in case No.1:18-CR-00032-DLF the Company needs to provide to the US Department of Justice information that will identify IP addresses the Company was using during the period from January 01, 2014 to February 01, 2018.

Since the Company does not have such information, please advise as to which IP addresses were provided to the Company (used by the Company) during the period from January 01, 2014 to February 01, 2018 pursuant to contract No.846-17 dated 04.28.2017.

Attachment:
1. Copy of contract No.846-17 dated 04.28.2017

Sincerely,

General Director
Concord Management & Consulting LLC  [signature]
Ye.V. Prigozhin

[seal: St. Petersburg * Limited Liability Company
* Concord Management & Consulting * "Concord
Management & Consulting" Co.]



197342, Санкт-Петербург, Кантемировская, 4, офис 510
+7 (812) 244-244-4, info@unitelecom.net, www.унител.рф

Исх. № 306 от 20.01.2020г.

Генеральному директору
ООО «Конкорд Менеджмент и консалтинг»
Е.В. Пригожину

Уважаемый Евгений Викторович!

В соответствии с Вашим запросом исх. №3 от 07.01.2020 г. подтверждаем, что действительно между ООО «Конкорд Менеджмент и консалтинг» и ООО «Унител» в период с 01 января 2014 года по 01 февраля 2018 действовал договор № 846-17.

Сообщаем Вам, что в связи с частичной утерей архивов документов за запрашиваемый период, информацию об адресах межсетевых протоколов IP предоставить возможности нет.

С уважением,

Коммерческий директор
ООО «Унител»



Темеев А.Н.

ООО «Унител»: ИНН 7814534043 / КПП 781401001 / ОГРН 1127847222007, р/сч 40702810500000023928
в АО Банк «ПСКБ», БИК 044030852, к/сч 30101810000000000852



**Concord Management & Consulting**
Общество с ограниченной
ответственностью
**«КОНКОРД МЕНЕДЖМЕНТ И
КОНСАЛТИНГ»**

---------------------------------------------------------------------------
**191028, г. Санкт-Петербург, ул. Моховая, д. 37, лит. Б, офис №1, 2
ИНН/КПП 7825100880/784101001**

Исх № 3 от 7.01.2020

Директору ООО «Унител»
А.Н. Темееву

Уважаемый Андрей Николаевич!

Между Обществом с ограниченной ответственностью «Конкорд менеджмент и консалтинг» (далее – «Общество») и ООО «Унител» был заключен и в период с 01 января 2014 года по 01 февраля 2018 действовал договор № 846-17 от 28 .04.2017.

В связи с имеющимся в производстве суда США делом 1:18-CR-00032-DLF. Обществу необходимо представить Министерству юстиции США сведения, которые позволяют идентифицировать адреса межсетевых протоколов IP, использовавшихся Обществом в период с 01 января 2014 по 01 февраля 2018.

Поскольку у Общества отсутствует данная информация прошу Вас сообщить какие адреса межсетевых протоколов IP, которые предоставлялись Обществу (использовались Обществом) в период с 01 января 2014 по 01 февраля 2018 в соответствии договором № 846-17 от 28 .04.2017

Приложение:
1. Копия договора № 846-17 от 28 .04.2017

С уважением,

Генеральный директор
ООО «Конкорд менеджмент и консалтинг»
Е.В.Пригожин

# ДОГОВОР № 846-17

## НА ПРЕДОСТАВЛЕНИЕ УСЛУГ СВЯЗИ МЕЖДУ

## ООО «Унител» и

## ООО «Конкорд Менеджмент и Консалтинг»



г. Санкт-Петербург

**ДОГОВОР № 846-17**
**НА ПРЕДОСТАВЛЕНИЕ УСЛУГ СВЯЗИ**

**28.04.2017 г.**                                                      **г. Санкт-Петербург**

ООО «Унител», в лице Коммерческого Директора Темеева Андрея Николаевича, действующего на основании Доверенности № 1 от 01.01.2017 г., именуемое в дальнейшем **Оператор** (лицензии №№ 117605, 117606, 117607, 117608, 117609 от 13 ноября 2012 г., выдана Федеральной службой по надзору в сфере связи), с одной стороны, и ООО «Конкорд Менеджмент и Консалтинг», в лице Генерального директора Саутиной Анастасии Витальевны, действующего на основании Устава, именуемый в дальнейшем **Клиент** с другой стороны, вместе именуемые Стороны, заключили настоящий Договор, именуемый в дальнейшем Договор, о нижеследующем:

1. ### ТЕРМИНЫ И ОПРЕДЕЛЕНИЯ

1.1. «Договор» - настоящий Договор с Описанием Услуг и Приложениями, а также все дополнения и изменения, оформленные надлежащим образом.

1.2. «Клиент» - пользователь Услугами, с которым заключен Договор.

1.3. «Описание услуг» - документ, содержащий описание, условия и порядок предоставления каждой Услуги (нескольких Услуг), а также процедуру взаимодействия Сторон в рамках предоставления Услуги (нескольких Услуг), технические показатели Услуг связи и другую необходимую информацию. Описание Услуг размещается **Оператором** связи на соответствующем сайте и по усмотрению **Оператора** связи может передаваться Клиенту в момент подписания Договора.

1.4. «Абонентская линия» - линия связи, соединяющая Пользовательское (оконечное) оборудование с Узлом связи Сети **Оператора** связи, находящаяся в собственности **Оператора** связи.

1.5. «Узел связи» - оборудование, средства связи, выполняющие функции систем коммутации и маршрутизации.

1.6. «Оборудование» - технические средства и программное обеспечение, которые могут быть установлены в Помещениях в целях предоставления Услуг по Договору. Адрес установки, вид (тип) и/или стоимость Оборудования, а также Сторона, которая его предоставляет для оказания Услуг связи, указываются в Акте сдачи-приемки Услуг по предоставлению доступа.

1.7. «Пользовательское (оконечное) оборудование» – оборудование, необходимое Клиенту для подключения к Узлу связи с помощью Абонентской линии, находящееся в собственности Клиента. Вид (тип) Пользовательского (оконечного) оборудования указывается в Приложении.

1.8. «Помещение» – помещение, находящееся вне зоны ответственности **Оператора** связи, где может быть установлено Оборудование для предоставления Услуг по Договору, принадлежащее Клиенту на каком-либо вещном праве.

1.9. «Прерывание предоставления Услуги связи» – означает перерыв в предоставлении Услуги связи, зарегистрированный технической службой **Оператора** связи.

1.10. «Услуга» - все Услуги, предоставляемые в рамках Договора и включают в себя телематические услуги.

1.11. «Услуга связи» – деятельность по приему, обработке, хранению, передаче, доставке сообщений электросвязи.

1.12. «Услуга по предоставлению доступа» - совокупность действий **Оператора** связи, направленных на обеспечение возможности оказания Клиенту Услуг связи и включающих формирование Абонентской линии и присоединение с ее помощью Пользовательского (оконечного) оборудования Клиента к Узлу связи, оформление Договора, регистрацию Клиента. В зависимости от вида предоставляемой Услуги связи Услуги по предоставлению доступа могут включать в себя осуществление **Оператором** связи иных действий, предусмотренных выбранных Клиентом Тарифом предоставления доступа.

1.13. «Дополнительная услуга» - услуга, технологически связанная с Услугами связи и направленная на повышение их потребительской ценности, предоставляемая **Оператором** связи при наличии технической возможности.

1.14. «Сеть связи» - все распределительные сети, принадлежащие **Оператором** связи на любом вещном праве и предназначенные для оказания Услуг связи.

1.15. «Расчетный период» - текущий календарный месяц с 00 часов 00 минут первого числа до 24 часов 00 минут последнего дня того же календарного месяца, в котором оказываются Услуги по настоящему Договору.

1.16. «Тарифы на Услуги» (Тарифы **Оператора** связи) – условия оплаты Услуг **Оператора** связи, которые включают в себя: тарифы предоставления доступа, тарифные планы, тарифы на дополнительные услуги.

1.17. «Тарифы предоставления доступа» - условия предоставления доступа Клиенту к Сети и оплаты Услуги по предоставлению доступа.

1.18. «Тарифные планы» - условия пользования и оплаты Услуг связи.

1.19. «Тарифы на дополнительные услуги» – условия предоставления и оплаты Дополнительных услуг, оказываемых **Оператором** связи Клиенту.

Свидетельство полного и безоговорочного акцепта (принятия) условий данного Договора и его приложений является подписание данного Договора.

2. ### ПРЕДМЕТ ДОГОВОРА

2.1. **Оператор** предоставляет, а Клиент оплачивает Услуги и иные технологически неразрывно связанные с ними услуги, описанные в настоящем Договоре и соответствующих Приложениях к нему. Приложения являются неотъемлемыми частями настоящего Договора.

2.2. Приложения, подписанные Сторонами, определяют дополнительные условия, такие как: цены, сроки установки Оборудования и предоставления Услуг, спецификация Оборудования и состав Услуг.

Во исполнение условий настоящего Договора в случае необходимости, **Оператор** установит свое телекоммуникационное оборудование.

### 3.    ПРАВА И ОБЯЗАТЕЛЬСТВА СТОРОН

3.1.  **Обязательства Оператора:**

3.1.1. **Оператор** предоставляет Клиенту Услуги, перечисленные в Приложении к Договору, а также последующих Дополнительных Соглашениях. Во время действия настоящего Договора Клиент имеет право давать новые заказы на Услуги, оформляемые Дополнительными Соглашениями, которые после соответствующего подтверждения **Оператора** будут считаться составной частью настоящего Договора.

3.1.2. Планируемый срок начала предоставления Услуг будет указан в Приложении к настоящему Договору.

3.1.3. **Оператор** при предоставлении Клиенту Услуг связи, обеспечивает соответствие качественных показателей стандартам и техническим нормам, установленным уполномоченными государственными органами РФ.

3.1.4. В случае возникновения неисправностей не по вине Клиента в линейно-кабельных сооружениях или оборудовании **Оператора**, **Оператор** обязуется обеспечивать устранение таких неисправностей. Устранение неисправностей линейно-кабельных сооружений и ремонтно-восстановительные или монтажные работы волоконно-оптических линий связи и Оборудования производятся в срок установленный руководящими документами отрасли, если иное не установлено настоящим Договором и Приложениями к нему.

3.2.  **Оператор вправе:**

3.2.1. В случае, если в ходе работ по предоставлению доступа к Услугам, возникнет необходимость проведения дополнительных работ, в том числе ремонта или строительства телефонной канализации, вызванная не прохождением кабеля или в соответствии с техническими условиями телефонных узлов или другой уполномоченной организации, стоимость выполнения работ по настоящему Договору могут быть изменены по согласованию Сторон, что должно быть отражено в Дополнительном Соглашении к настоящему Договору.

3.2.2. **Оператор** вправе увеличить срок проведения работ, связанных с прокладкой кабеля в следующих случаях:
- наличие документов или устных предписаний контролирующих организаций (органов), временно запрещающих выполнение работ по данному Договору.
- возникновение внеплановых ситуаций, в том числе: необходимость выполнения работ по устранению провалов телефонной канализации, строительства телефонной канализации, восстановлению целостности проложенной линии связи поврежденной из-за действий третьей стороны.

3.2.3. Прерывать полностью или частично предоставление Услуг, связанное с заменой оборудования, программного обеспечения или с проведением других работ в целях поддержания работоспособности и развития сети **Оператора** с уведомлением Клиента не менее чем за 24 (Двадцать четыре) часа.

3.2.4. В случае нарушения Клиентом требований, связанных с оказанием Услуг связи, установленных Законодательством Российской Федерации и настоящим Договором, в том числе нарушения сроков и порядка оплаты оказанных Клиенту Услуг, нарушение технических и иных норм и условий эксплуатации Оборудования **Оператора**, включая использование Клиентом несертифицированного Оборудования, а также необеспечение права доступа сотрудников **Оператора** в случае возникновения плановых профилактических работ и устранения аварийных ситуаций, **Оператор** имеет право приостановить оказание Услуг до устранения нарушения. Возобновление предоставления Услуг осуществляется после полного устранения нарушений. Возобновление оказания приостановленных Услуг производится **Операторогм** в течение следующего рабочего дня с момента получения заявления от Клиента либо когда **Оператору** стало известно об устранении Клиентом нарушения. В случае если допущенные нарушения не будут устранены Клиентом в течение 6 (шести) месяцев с даты его уведомления о намерении **Оператора** приостановить оказание Услуг, **Оператор** вправе использовать выделенные в соответствии с Договором телекоммуникационные ресурсы для оказания Услуг третьему лицу.

3.2.5. **Оператор** не гарантирует установку охранной сигнализации на своих линиях.

3.2.6. Оборудование **Оператора** может быть использовано **Оператором** для оказания Услуг третьим лицам и как транзитный узел, вследствие чего Клиент не вправе препятствовать **Оператору** производить необходимые для этого работы, не влияющие на оказание Услуг Клиенту

3.2.7. **Оператор** вправе отказать Клиенту в предоставлении Услуг, а также дополнительных Услуг при наличии одного из следующих обстоятельств:
- предоставление Услуги может создать угрозу безопасности и обороноспособности государства, здоровью и безопасности людей;
- предоставление Услуги невозможно ввиду каких-либо физических, топографических или иных естественных препятствий;
- Клиент без веских оснований не соглашается на условия предоставления Услуги, своевременно не производит платежи за предоставленные ранее Услуги;

- Клиент использует или намерен использовать аппаратуру связи для каких-либо незаконных целей, или же получает Услуги незаконным способом, эксплуатирует предоставленное Оборудование с нарушением правил технической эксплуатации, или использует несертифицированное оборудование.

Отказ в каждом конкретном случае должен быть обоснован.

3.3. **Клиент обязуется:**

3.3.1. Обеспечить круглосуточный доступ персонала Оператора в Помещения Клиента для проведения работ по предоставлению Клиенту доступа к Услугам Оператора. Клиент за свой счет обеспечивает все изменения и приготовления Помещения, необходимые для предоставления Услуг;

3.3.2. При необходимости предоставить помещение под размещение оборудования связи Оператора и обеспечивать сохранность установленного оборудования.

3.3.3. Завершение любых работ по настоящему Договору оформляется двусторонним Актом выполненных работ, подписанным уполномоченными представителями обеих сторон. В день установки Клиент обязан обеспечить присутствие уполномоченного представителя для подписания от имени Клиента Акта выполненных работ, нарядов, Акта приема-передачи оборудования. В случае отказа и/или отсутствия уполномоченного представителя Клиента при проведении работ по установке, акт (наряд) направляется Клиенту с курьером или по почте. В случае, если Акт не будет подписан Клиентом в течение 3 (трех) рабочих дней после его получения, и по нему в течение 3 (трех) дней не будут представлены обоснованные письменные замечания, работы будут считаться выполненными Оператором в полном объеме и в соответствии с настоящим Договором.

3.3.4. Осуществлять оплату Услуг своевременно и в полном объеме в соответствии с условиями настоящего Договора;

3.3.5. Не передавать и не продавать предоставляемые в соответствии с настоящим Договором Услуги, требующие обязательного лицензирования, используя при этом телекоммуникационные услуги, предоставляемые Оператором по настоящему Договору.

3.3.6. При подписании настоящего Договора предоставить Оператору следующие документы

- копию свидетельства о государственной регистрации Клиента в качестве юридического лица;
- копию документа, подтверждающего право владения или пользования Помещением, в котором устанавливается оборудование связи;
- копию документа, подтверждающего полномочия лица, подписывающего Договор со стороны Клиента.

3.3.6.1.    Клиент обязан предоставить Оператору список лиц, использующих пользовательское (оконечное) оборудование Оператора (их фамилию, имя, отчество, место жительства, реквизиты основного документа, удостоверяющего личность) в течение 5(пяти) рабочих дней, заверенный Клиентом. Данный список должен быть заверен уполномоченным представителем юридического лица или индивидуального предпринимателя и обновляться Клиентом не реже одного раза в квартал (согласно Постановлений Правительства РФ от 31.07.2014 N 758, от 03.02.2016 N 57)

3.3.7. Клиент обязуется использовать исключительно такое пользовательское (оконечное) оборудование, на которое имеется документ о подтверждении соответствия этих средств связи установленным требованиям. Клиент обязуется содержать в исправном состоянии абонентскую линию и оборудование, находящиеся в Помещении Клиента, соблюдать правила эксплуатации оборудования.

3.3.8. Ежемесячно Клиент принимает на себя обязательство подписывать Акты об оказанных услугах в случае отсутствия обоснованных претензий к их качеству в течение 3 (трех) рабочих дней с момента получения Клиентом экземпляров Акта, подписанных Оператором. В случае не подписания Акта, Клиент в течение 3 (трех) рабочих дней с момента получения экземпляров Акта должен предоставить Оператору письменное обоснование отказа от подписания Акта. В случае непредставления такого письменного обоснования, Услуги считаются оказанными надлежащим образом и в полном объеме, а Акт подписанным с обеих сторон.

3.3.9. Извещать Оператора обо всех изменениях в схеме организации связи Клиента, составе и размещении оборудования, подключаемого к сети Оператора. Оператор вправе осуществлять проверку соответствия организации схемы связи и оборудования Клиента.

3.3.10. Самостоятельно получить письменное разрешение от Арендодателя/Собственника на ввод кабеля в здание и/или в Помещение Клиента, а также на использование в своих интересах существующих линейно-кабельных сооружений Арендодателя/Собственника.

3.3.11. Не нарушать прав собственности Оператора на Оборудование Оператора, установленное Оператором в Помещениях Клиента и исключительных прав Оператора на программное обеспечение в рамках оказания Услуг.

3.3.12. Письменно уведомить Оператора о не согласии получать услуги по новым тарифам или условиям (п.п. 4.2 и 4.8 Договора), до их введения.

3.3.13. Письменно уведомить Оператора не менее чем за 30 (тридцать) календарных дней, о прекращении своего права владения и/или пользования Помещением, а также в течение 5 (пяти) календарных дней об изменении наименования, места нахождения, банковских реквизитов и т.п.

3.3.14. Обязанность по предоставлению оконечного оборудования, подлежащего подключению к абонентской линии, возлагается на Клиента, если иное не установлено Сторонами в Дополнительном соглашении к настоящему Договору.

3.3.15. Услуги по настоящему Договору предоставляются по адресу, указанному в Приложении к Договору. Клиент принимает на себя расходы по любому перемещению Услуг, предоставляемых по настоящему Договору в случае изменения адреса Клиента. Такое перемещение предоставляется при наличии технической возможности у **Оператора**.

3.4. **Клиент вправе:**

3.4.1. Получать Услуги **Оператора**, а также пользоваться дополнительными услугами, предоставляемыми **Оператором**.

3.4.2. Потребовать возврата средств, уплаченных за пользование Услугами, за период отсутствия возможности воспользоваться Услугами, возникшей по вине **Оператора**.

3.4.3. Сообщать о нарушении работы Услуг связи в службу технической поддержки в соответствии с реквизитами, указанными в пункте 10.1 настоящего Договора.

3.4.4. Клиент в своей деятельности имеет право использовать товарные знаки **Оператора** только с его письменного согласия. Клиент признает права **Оператора** на все товарные знаки и знаки обслуживания **Оператора** в связи с предоставлением Услуг.

4. **ЦЕНЫ И УСЛОВИЯ ОПЛАТЫ**

4.1. Платежи осуществляются Клиентом за предоставленные Услуги по ценам, указанным в Приложениях к настоящему Договору и последующих Дополнительных Соглашениях.

4.2. Цены на услуги могут быть изменены **Оператором** в одностороннем порядке с направлением уведомления Клиенту не менее чем за 10 (десять) календарных дней до вступления изменений в силу.

4.3. Счет на оплату единовременных (инсталляционных) платежей за доступ к Услугам выставляется Клиенту **Оператором** в течение 45 (сорока пяти) дней с даты подписания настоящего Договора и Приложений к нему.

4.4. **Оператор** посредством электронной почты, с последующим предоставлением оригиналов, до 15 числа текущего месяца выставляет Клиенту счет на оплату:
   4.4.1 ежемесячных фиксированных (абонентских) платежей за отчетный период;
   4.4.2 услуг, оказанных в расчетном периоде;
   4.4.3 в последующий счет включается задолженность согласно данным оборудования, используемого для учета объема оказанных Услуг (при превышении лимита услуг, включенных в абонентские платежи).

4.5. В случае неполучения счета Клиентом, он может получить счет в офисе Оператора до 15 числа. Если до 15 числа текущего месяца, счет Клиентом не получен, то датой получения счета считается 15 число. Счет считается полученным:
   - в случае получения счета с курьером Оператора - с даты, указанной в расписке о получении;
   - в случае получения счета в офисе Оператора - с даты, указанной в расписке о получении;
   - в случае получения факсимильной копии счета - с даты, указанной в подтверждении о прохождении факса.
   - в случае не получения Клиентом счета до 15 числа – 15 число.

4.5.1. Счета на оплату Услуг выставляются в рублях РФ. Тарификация Услуг осуществляется в рублях РФ.

4.6. Оплата счетов выставленных **Оператором** в соответствии с условиями настоящего Договора производится Клиентом ежемесячно авансом по реквизитам, указанным в счетах **Оператора** в течение 10 (десяти) календарных дней с даты выставления счета (далее – «Срок платежа»), но не позднее 25 числа соответствующего месяца.

4.7. При осуществлении платежа Клиент указывает номер настоящего Договора с тем, чтобы **Оператор** мог идентифицировать получаемые платежи. **Оператор** вправе засчитать поступивший от/за Клиента платеж в счет погашения любой ранее возникшей задолженности Клиента. Клиент самостоятельно несет ответственность за правильность производимых им платежей.

4.8. Датой оплаты счета считается дата списания денежных средств с расчетного счета Клиента.

4.9. В случае нарушения Клиентом сроков оплаты оказанных Услуг, **Оператор** имеет право приостановить оказание Услуг до устранения нарушения. При этом, **Оператор** оставляет за собой право взимать с Клиента абонентскую плату/гарантированные платежи за весь период времени, в течение которого Услуга была приостановлена.

4.10. **Оператор** вправе в одностороннем порядке изменять условия настоящего Договора, в том числе если это обусловлено принятием новых нормативных актов, которые прямо или косвенно затрагивают деятельность по оказанию Услуг, а также изменением уровня инфляции. Указанные изменения вносятся посредством направления уведомления Клиенту не менее чем за 10 (десять) календарных дней до даты вступления изменений в силу.

4.11. Клиент вправе отказаться от принятия изменений, направив об этом письменное уведомление **Оператору** до вступления предполагаемых изменений в силу. Изменения считаются вступившими в силу, а настоящий Договор соответственно измененным или расторгнутым, с даты, указанной в уведомлении **Оператора**, как дата вступления изменений в силу, что не освобождает Клиента от оплаты **Оператору** любой имеющейся задолженности по Договору.

4.12. Счета, счета-фактуры и акты оказанных услуг направляются Клиенту по адресу, указанному в настоящем Договоре.

4.13. В случае утраты Договора или документов, относящихся к договору, таких как счета, счет-фактуры, дополнительные соглашения и др., по вине Клиента, восстановление вышеуказанных документов подлежит оплате согласно прейскуранту на дополнительные услуги, размещенном на официальном сайте Оператора.

## 5.   СРОК ДЕЙСТВИЯ ДОГОВОРА

5.1.   Договор вступает в силу с даты подписания Сторонами и заключен на неопределенный срок.

## 6.   ОТВЕТСТВЕННОСТЬ СТОРОН

6.1.   Ответственность Стороны перед другой Стороной за неисполнение обязательств по Договору ограничивается видами и размерами, предусмотренными законодательством Российской Федерации, условиями Договора, а также Правилами оказания Услуг связи. Помимо указанной ответственности Сторона не отвечает за убытки, причиненные другой Стороне.

6.2.   Оператор не несет ответственности за сбои программного обеспечения и оборудования, если они не являются собственностью Оператора и/или не находятся на обслуживании Оператора. Все ответственные лица, указанные в Договоре или письменном уведомлении должны быть доступны по контактным телефонам или электронной почте в течение рабочего времени : 9:00 – 18:00.

6.3.   В случае недоступности ответственных лиц, Оператор не несет ответственности за неполучение ими информационных сообщений. Клиент принимает на себя обязательства письменно сообщить Оператору по факсу: 8122442443 и/или по электронной почте: info@unitelecom.net, о замене ответственных лиц и/или изменении контактных данных.

6.4.   Оператор не предоставляет никаких других гарантий, выраженных или подразумеваемых, в том числе гарантий по использованию Услуг в конкретных целях, за исключением гарантий, прямо указанных в Договоре.

6.5.   Перерасчет абонентской платы является единственным видом Ответственности Оператора.

6.6.   Ни одна из Сторон ни при каких обстоятельствах не несет никакой ответственности перед другой Стороной за остановку производства, утраченный бизнес, потерю данных, упущенную выгоду или любые другие косвенные потери или их последствия, в том числе возникшие в результате перерывов в предоставлении Услуг, вне зависимости от того, могла или нет Сторона предвидеть возможность таких потерь в конкретной ситуации.

6.7.   Клиент несет всю ответственность за использование Услуг, предоставляемых Оператором, и обеспечивает за свой счет защиту Оператора от любых претензий и исков третьих лиц, связанных с использованием Услуг Клиентом.

6.8.   В случае повреждения (хищения, порчи) или неправомерного удержания по вине Клиента Оборудования Оператора, переданного в пользование Клиенту, последний обязуется возместить реальный ущерб, обусловленный подобными действиями.

6.9.   За использование неисправного, не сертифицированного или несогласованного с Оператором (в случае необходимости такого согласования) оконечного устройства, вызывающего повреждение сооружений связи, Клиент возмещает Оператору нанесенный реальный ущерб, подтвержденный Оператором в установленном законом порядке

6.10.   Если в отчетном периоде имелись перерывы в оказании Услуг продолжительностью более одного часа, которые не являлись следствием виновных действий или бездействия Клиента и не являлись перерывами для проведения необходимых профилактических и ремонтных работ, проводимыми Оператором с предварительным уведомлением Клиента, Оператор уменьшит сумму счета на оплату ежемесячной фиксированной платы на 1/720 от суммы ежемесячной фиксированной платы за Услуги за каждый полный час прерывания Услуг. Течение срока перерыва начинается с момента, когда Оператор получил от Клиента письменную заявку (с использованием почтовой или факсимильной связи) на предмет устранения повреждения, и окончанием перерыва считается момент, когда оказание Услуг возобновлено.

## 7.   ОБСТОЯТЕЛЬСТВА НЕПРЕОДОЛИМОЙ СИЛЫ

7.1.   Стороны не несут ответственности за задержки в исполнении или неисполнение обязательств по настоящему Договору, если задержки или неисполнение произошли вследствие обстоятельств непреодолимой силы. В число таких обстоятельств входят: войны, военные действия, мятежи, саботаж, забастовки, пожары, взрывы, наводнения или иные стихийные бедствия, издание нормативных актов запретительного характера государственными органами Российской Федерации либо субъектов Федерации, или органами местного самоуправления.

7.2.   Немедленно после получения информации о наступлении любых обстоятельств, задерживающих исполнение или иным образом препятствующих исполнению настоящего Договора, Стороны письменно уведомляют об этом друг друга.

7.3. Стороны не несут ответственности за любой ущерб, включая убытки, а также расходы, связанные с претензиями или требованиями третьих лиц, которые могут возникнуть в результате обстоятельств непреодолимой силы.

7.4. Если обстоятельство непреодолимой силы вызывает существенное нарушение или неисполнение обязательств по настоящему Договору, длящееся более 180 (ста восьмидесяти) календарных дней, каждая Сторона имеет право прекратить действие настоящего Договора после подачи другой Стороне предварительного, за 30 (тридцать) календарных дней письменного уведомления о своем намерении прекратить действие Договора.

## 8. АРБИТРАЖ

8.1. В случае возникновения между Оператором и Клиентом любых споров или разногласий, связанных с настоящим Договором или выполнением либо невыполнением любой Стороной обязательств по Договору, Стороны приложат все усилия для их дружественного разрешения путем переговоров. Претензионный порядок рассмотрения споров обязателен.

8.2. Если споры не будут разрешены путем переговоров, спорные вопросы передаются в Арбитражный суд г. Санкт-Петербурга и Ленинградской области в порядке, установленном действующим законодательством РФ.

8.3. До обращения в суд по вопросам, связанным с отказом в оказании Услуг, несвоевременным или ненадлежащим исполнением обязательств, вытекающих из Договора и/или Приложений к Договору, Клиент предъявляет Оператору претензию в течение 6 (шести) месяцев со дня оказания Услуг, отказа в их оказании или со дня выставления счета за оказанные Услуги. К претензии прилагаются копия Договора и иные документы, которые необходимы для рассмотрения претензии по существу и в которых должны быть указаны сведения о неисполнении или ненадлежащем исполнении обязательств по Договору, а в случае предъявления претензии о возмещении ущерба - о факте и размере причиненного ущерба. Претензия должна быть рассмотрена в течение 30 (тридцати) календарных дней с даты ее регистрации. О результатах рассмотрения претензии должно быть сообщено Клиенту в письменной форме.

8.4. До обращения в суд по вопросам, связанным с неоплатой Услуг и возмещением ущерба Оператор предъявит Клиенту обоснованную претензию, которая должна быть рассмотрена Клиентом в течение 10 (десяти) календарных дней со дня ее получения.

## 9. ПОРЯДОК ИЗМЕНЕНИЯ И РАСТОРЖЕНИЯ ДОГОВОРА

9.1. Все изменения Договора производятся по согласованию Сторон в письменной форме и подписываются обеими Сторонами, если иной порядок не предусмотрен иными положениями Договора.

9.2. Стороны вправе расторгнуть настоящий Договор в целом или вчасти, письменно уведомив об этом другую Сторону не позднее, чем за 30 (тридцать) календарных дней до даты расторжения , если иное не установлено иными положениями настоящего Договора и Приложениями к нему.

9.3. По расторжению настоящего Договора, отказа Клиента от Услуг Оператор прекратит предоставление Услуг Клиенту и Клиент прекратит использование Услуг. После такого расторжения настоящего Договора, Оператор вправе вернуть свое Оборудование и другую собственность, если таковые передавались Клиенту.

9.4. В случае одностороннего расторжения договора со стороны Клиента, Оператор вправе потребовать возмещения фактически (понесенных затрат) доказанного ущерба, согласно действующему законодательству РФ.

## 10. УВЕДОМЛЕНИЯ

10.1. Стороны обязуются информировать друг друга в письменном виде об изменении своих адресов и иных данных и реквизитов, указанных в настоящем Договоре. Любые уведомления или иные сообщения, подлежащие передаче от одной Стороны другой Стороне должны передаваться в письменной форме по следующим адресам:

| Если получатель Оператор: | Если получатель Клиент: |
|---|---|
| Российская Федерация, Фактический адрес: 197342, г. Санкт-Петербург, Кантемировская ул., д. 4, 5 этаж | Российская Федерация, Фактический адрес: 191011, г. Санкт-Петербург, наб. реки Фонтанки, д. 13, лит. А, пом. 2-Н №4 |
| Коммерческий директор: Темеев А.Н. | Генеральный директор: Саутина А.В. |
| Факс: 8122442443 | Тел.: 8126770585 |
| E-mail: info@unitelecom.net | E-mail: |

## 11. КОНФИДЕНЦИАЛЬНАЯ ИНФОРМАЦИЯ.

11.1. Стороны пришли к соглашению, что в рамках Настоящего Договора конфиденциальной признается конкретная информация, касающаяся предмета Договора, хода его исполнения и полученных результатов.

11.2. Каждая из Сторон обязана обеспечить защиту конфиденциальной информации, ставшей доступной ей в рамках Договора, обеспечить невозможность от несанкционированного использования, распространения и/или публикации.

11.3. Любой ущерб, вызванный нарушением условий конфиденциальности, определяется и возмещается в соответствии с действующим законодательством Российской Федерации.

11.4. Оператор может передавать полученную конфиденциальную информацию полученную им в ходе исполнения настоящего Договора третьим лицам только по письменному согласованию с Клиентом при условии, что третьи лица используют полученную конфиденциальную информацию только в рамках оказываемых услуг, проводимых на договорной основе между Заказчиком и Исполнителем, при этом Исполнитель гарантирует соблюдение третьими лицами условий конфиденциальности Договора

## 12. РЕКВИЗИТЫ СТОРОН

**ООО «Унител»**
ИНН 7814534043 КПП 781401001
Юридический адрес:
197342, г. Санкт-Петербург, Кантемировская ул., д.4, лит. А, пом.11Н
Почтовый адрес, а также отдел обслуживания абонентов:
197342, г. Санкт-Петербург, Кантемировская ул., д. 4, 5 этаж
Тел/факс. 8122442444/8122442445.
Банковские реквизиты:
Расчетный счет № 40702810500000023928
В АО «ПСКБ», БИК 044030852
К/с 30101810000000000852
ОГРН 1127847222007

**Клиент:**
**ООО «Конкорд Менеджмент и Консалтинг»**
ИНН 7825100880 КПП 784101001
Юридический адрес:
191011, г. Санкт-Петербург, наб. реки Фонтанки, д. 13, лит. А, пом. 2-Н №4
Почтовый адрес:
191011, г. Санкт-Петербург, наб. реки Фонтанки, д. 13, лит. А, пом. 2-Н №4
Тел/факс: 8126770585
Банковские реквизиты:
Расчетный счет № 40702810255200183118
В Северо-Западный банк ПАО Сбербанк г. Санкт-Петербург БИК 044030653
К/с 30101810500000000653



| От имени   ООО «Унител»: | От имени ООО «Конкорд Менеджмент и Консалтинг»: |
|---|---|
| «29» мая 2017 г. | 2017 г. |
| Темеев А.Н. | Саутина А.В. |
| Коммерческий директор | Генеральный директор |